**EXHIBIT 61**

# INTENTIONALLY

# OMITTED

**EXHIBIT 62**

# INTENTIONALLY

# OMITTED

**Appx. 00897**

# EXHIBIT 63

Appx. 00898

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements**
**With Report of Independent Auditors**
**December 31, 2008**

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
**Contents**
**December 31, 2008**

|  | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Audited Consolidated Financial Statements** | |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Income | 3 |
| Consolidated Statement of Partners' Capital | 4 |
| Consolidated Statement of Cash Flows | 5–6 |
| Notes to Consolidated Financial Statements | 7–51 |
| **Supplemental Information** | |
| Unconsolidated Balance Sheet (unaudited) | 52 |
| Income Statement (Unaudited) | 53 |

HIGHLY CONFIDENTIAL

**Report of Independent Auditors**

To the General and Limited Partners of
Highland Capital Management, L.P

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements
of income, of changes in partners' capital and of cash flows (hereinafter referred to as the "financial
statements") present fairly, in all material respects, the consolidated financial position of Highland
Capital Management, L.P. (the "Partnership") and its subsidiaries at December 31, 2008, and the
consolidated results of their operations and their consolidated cash flows for the year then ended in
conformity with accounting principles generally accepted in the United States of America.  These
financial statements are the responsibility of the Partnership's management.  Our responsibility is to
express an opinion on these financial statements based on our audits.  We conducted our audits of
these statements in accordance with auditing standards generally accepted in the United States of
America.  Those standards require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement.  An audit includes examining,
on a test basis, evidence supporting the amounts and disclosures in the financial statements,
assessing the accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation.  We believe that our audit provides a
reasonable basis for our opinion.

Our audit was conducted for the purpose of forming an opinion on the consolidated financial
statements taken as a whole.  The supplemental unconsolidated balance sheet and unconsolidated
statement of income are presented for purposes of additional information, and are not a required part
of the consolidated financial statements.  Such information has been subjected to the auditing
procedures applied in the audits of the consolidated financial statements and, in our opinion, is fairly
stated in all material respects in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

July 21, 2009

HIGHLY CONFIDENTIAL

D-CNL000003
**Appx. 00901**

## Highland Capital Management, L.P.
**Consolidated Balance Sheet**
**December 31, 2008**

*(in thousands of dollars)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash and cash equivalents | $ | 53,230 |
| Restricted cash | | 358,877 |
| Investments, at fair value (cost $5,457,411) | | 2,338,759 |
| Unrealized gains on derivative contracts, at fair value (proceeds $3,887) | | 8,974 |
| Equity method investees | | 4,977 |
| Management and incentive fees receivable | | 20,120 |
| Due from brokers | | 145,311 |
| Other assets | | 86,708 |
| Deferred incentive fees receivable | | 25,997 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets, net | | 25,474 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,578 | | 131,555 |
| Total assets | $ | 3,223,982 |
| **Liabilities and Partners' Capital** | | |
| Liabilities | | |
| Accounts payable | $ | 18,498 |
| Securities sold, not yet purchased, at fair value (proceeds $60,094) | | 71,831 |
| Unrealized losses on derivative contracts at fair value (proceeds $3,319) | | 261,815 |
| Obligations to return capital | | 161,882 |
| Due to brokers | | 464,252 |
| Due to brokers for securities purchased not yet settled | | 181,938 |
| Accrued and other liabilities | | 191,880 |
| Secured borrowing | | 127,868 |
| Debt and notes payable | | 397,822 |
| Long-term incentive plan | | 6,945 |
| Total liabilities | | 1,884,731 |
| Minority interest | | 1,338,461 |
| Commitments (Note 13) | | |
| Partners' capital | | 790 |
| Total liabilities, minority interest and partners' capital | $ | 3,223,982 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000004

**Appx. 00902**

**Highland Capital Management, L.P.**
**Consolidated Statement of Income**
**Year Ended December 31, 2008**

*(in thousands of dollars)*

| | | |
|---|---:|---:|
| **Revenue** | | |
| Management fees | $ | 204,917 |
| Incentive fees/allocations | | 870 |
| Interest and investment income | | 424,322 |
| Other income | | 46,144 |
| Total revenue | | 676,253 |
| **Expenses** | | |
| Compensation and benefits | | 4,029 |
| Professional fees | | 40,475 |
| Investment and research consulting | | 2,384 |
| Amortization and depreciation | | 12,026 |
| Interest expense | | 144,244 |
| Net depreciation on deferred incentive fees | | 150,281 |
| Other expenses | | 87,150 |
| Total expenses | | 440,589 |
| Net income before investment transactions | | 235,664 |
| **Realized and unrealized loss from investment transactions** | | |
| Net realized loss | | (2,110,841) |
| Net change in unrealized loss | | (3,070,895) |
| Total realized and unrealized loss from investment transactions | | (5,181,736) |
| **Realized and unrealized loss from equity method investees** | | |
| Net realized loss from equity method investees | | (128,462) |
| Net unrealized loss from equity method investees | | (1,778) |
| Total realized and unrealized loss from equity method investees | | (130,240) |
| Net loss before minority interest in net income of consolidated entities | | (5,076,312) |
| Minority interest in net loss of consolidated entities | | 4,469,051 |
| Net loss | $ | (607,261) |

The accompanying notes are an integral part of these consolidated financial statements.

3

## Highland Capital Management, L.P.
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2008**

| *(in thousands of dollars)* | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| **Partners' capital at December 31, 2007** | $ | 6,466 | $ | 666,958 | $ | 673,424 |
| Net loss | | (5,416) | | (601,845) | | (607,261) |
| Partner distributions | | (533) | | (59,232) | | (59,765) |
| Other comprehensive income (loss) | | (50) | | (5,558) | | (5,608) |
| **Partners' capital at December 31, 2008** | $ | 467 | $ | 323 | $ | 790 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2008**

*(in thousands of dollars)*

**Cash flows from operating activities**

| | |
|---|---:|
| Net loss | $ (607,261) |
| Adjustment to reconcile net loss to cash and cash equivalents provided by operating activities | |
| Cash provided by operating activities: | |
| Net realized loss on investments and derivative contracts | 2,110,841 |
| Net unrealized loss on investments and derivative contracts | 3,070,895 |
| Amortization of equity distributions on CLOs | 54,586 |
| Net realized loss from equity method investees | 128,462 |
| Net unrealized loss from equity method investees | 1,778 |
| Minority interest in net loss of consolidated entities | (4,469,051) |
| Depreciation and amortization | 12,026 |
| Changes in assets and liabilities | |
| Management and incentive fees receivable | 210 |
| Deferred incentive fees | 150,281 |
| Investment management contracts | 5,662 |
| Other assets | 118,535 |
| Due from brokers | 1,970,423 |
| Accounts payable | 11,521 |
| Accrued and other liabilities | (100,327) |
| Due to brokers for unsettled trades | (59,527) |
| Long-term incentive plan | (38,111) |
| Obligations to return collateral | 161,882 |
| Net cash provided by operating activities | 2,522,825 |

**Cash flows from investing activities**

| | |
|---|---:|
| Restricted cash | 921,167 |
| Purchase of fixed assets and leasehold improvements, net | 5,498 |
| Purchases of investments | (8,624,670) |
| Proceeds from dispositions of investments | 11,044,838 |
| Purchases of investments to cover securities sold, not yet purchased | (12,920,295) |
| Proceeds from securities sold, not yet purchased | 10,748,348 |
| Net cash provided by financing activities | 1,174,886 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000007

**Appx. 00905**

**Highland Capital Management, L.P.**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2008**

*(in thousands of dollars)*

| | | |
|---|---|---:|
| **Cash flows from financing activities** | | |
| Payments on long-term debt | | (63,574) |
| Proceeds from revolving debt and promissory notes | | 115,649 |
| Proceeds from affiliate loans | | 48,448 |
| Net payments on secured borrowings | | (3,306,382) |
| Change in due to brokers | | (944,702) |
| Capital contributions from minority interest investors of consolidated entities | | 907,113 |
| Capital withdrawals from minority interest investors of consolidated entities | | (783,503) |
| Partner distributions | | (52,265) |
| Net cash used in financing activities | | (4,079,216) |
| Net decrease in cash and cash equivalents | | (381,506) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 434,736 |
| End of year | $ | 53,230 |
| **Supplemental disclosure of cash flow information** | | |
| Interest paid during the year | $ | 65,035 |
| Non-cash distributions to partners | | 7,500 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000008

**Appx. 00906**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**1.    Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment advisor under the Investment Advisors Act of 1940 that manages collateralized loan obligations ("CLOs"), registered investment companies ("RICs"), hedge funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc.  (the "General Partner").  The Partnership is 100% owned by senior management of the Partnership.

As of December 31, 2008, the Partnership provided investment advisory services in accordance with management agreements for thirty CLOs, sixteen RICs, one warehouse transaction, five separate accounts, one master limited partnership, and twelve hedge fund structures, with total assets under management of approximately $28.5 billion.

**2.    Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in the preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP") and are stated in United States dollars.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment of 50% or more and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership consolidates all VIEs for which it is considered to be the primary beneficiary, pursuant to Financial Accounting Standards Board ("FASB") Interpretation No. 46 (revised December 2003), *Consolidation of Variable Interest Entities — an interpretation of ARB No. 51, as revised* ("FIN 46R").  FIN 46R clarifies the consolidation guidance for entities in which the equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance activities without additional subordinated financial support from other parties.  These entities are defined as VIEs.  In general, FIN 46R requires an enterprise to consolidate a VIE when the enterprise holds a variable interest in the VIE and is deemed to be the primary beneficiary of the VIE.  An enterprise is the primary beneficiary if it absorbs a majority of the VIEs expected losses, receives a majority of the VIEs expected residual returns, or both.

The Partnership consolidates non-VIEs in which it as the general partner has control over significant operating, financial and investing decisions of the entity, pursuant to the Emerging Issues Task Force ("EITF") 04-5, *Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights*.

7

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

*Consolidation of Non-Variable Interest Entities*

Under EITF 04-5, the Partnership consolidates the following non-VIEs (collectively referred to as the "Consolidated Investment Funds"). The Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations. :

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005;

- Highland Credit Opportunities CDO, L.P. ("Credit Opportunities Master"), a Delaware limited partnership that commenced operations on December 29, 2005;

- Highland Select Equity Fund, L.P. ("Select Equity Fund"), a Delaware limited partnership that commenced operations on January 1, 2002;

- Highland Equity Focus Fund, L.P. ("Equity Focus Fund"), a Delaware limited partnership that commenced operations on September 1, 2002;

- Highland Real Estate Fund 2002-A, L.P. ("Real Estate Fund"), a Delaware limited partnership that commenced operation on April 1, 2002;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Prospect Management Advisors, L.P. ("PMA"), a Delaware limited partnership that commenced operations on November 22, 2004 (not an investment fund);

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore") a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore") a Delaware limited partnership that commenced operations on September 2, 2008; and

- Highland Restoration Capital Partners Master, L.P. ("Restoration Master") a Delaware limited partnership that began commenced on September 2, 2008.

8

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

*Consolidation of Variable Interest Entities*
Under FIN 46R the Partnership consolidated the following VIEs as it is the primary beneficiary:

- Highland Financial Corporation ("HFC"), a company incorporated on February 28, 2006 under the laws of the state of Delaware;

- Highland Financial Real Estate Corporation ("HFREC"), a company incorporated on March 15, 2006 under the laws of the state of Maryland; and

- HCM Trident (Delaware) Corporation ("HCM Trident"), a company incorporated on July 3, 2007 under the laws of the state of Delaware.

*Consolidation of Majority Owned Entities*
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Management Europe, Ltd. ("Highland Europe"), a company organized in the United Kingdom and purchased by the Partnership on April 6, 2005;

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 87.5% interest in HySky Communications, LLC, a Delaware limited liability company that commenced operations on December 22, 2006; and

- 84.5% interest in HE Capital, LLC, a Delaware limited liability company that commenced operations on March 22, 2007.

All significant interpartnership and intercompany accounts and transactions have been eliminated in consolidation of all of the aforementioned consolidated entities. All the Consolidated Investment Funds are, for US GAAP purposes, investment companies under the AICPA Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds pursuant to EITF No. 85-12 *Retention of Specialized Accounting for Investments in Consolidation*.

The Partnership and its majority owned entities have a 29.3% interest in an affiliate, Highland Financial Partners, L.P. ("HFP"), which is considered a VIE. The Partnership and its consolidated entities have a 48.11% interest in HFP. The Partnership is not the primary beneficiary, and the financial results for HFP have not been consolidated, but have been accounted for using the equity method of accounting whereby it records its share of the underlying income or loss of HFP.

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

9

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Fair Value Measurement**

Effective January 1, 2008, the Partnership and its consolidated entities adopted the provisions of Statement of Financial Accounting Standards ("SFAS") No. 157, *Fair Value Measurements*, for the financial assets and liabilities recorded at fair value on the Consolidated Statement of Assets, Liabilities and Partners' Capital.

SFAS No. 157 defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Investment Funds have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on models in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure the fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Investment Funds use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being re-classified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates.

Whenever possible, the Partnership and its Consolidated Investment Funds use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Investment Funds develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

10

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

As of December 31, 2008, the Partnership and its consolidated entities investments consisted of floating rate syndicated bank loans, high yield corporate bonds, CLO securities, private placements, private placement real estate debt and equity, life settlement contracts and common and preferred equity securities. In addition, the consolidated entities are parties to various credit default swaps. The majority of these financial instruments are not listed on national securities exchanges, and management is required to use significant judgment to estimate their values.

The fair value of the loans, corporate bonds and CLO securities are generally based on quotes received from brokers or independent pricing services. Due to the recent disruption in the credit markets, an increasing number of these quotes are derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades. The policy of the Partnership and its consolidated subsidiaries is to classify loans and bonds that are prices in this manner as Level 3 assets because the markets in which they trade are not active and the inputs used by the brokers and pricing services are not readily observable. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

The consolidated entities private placement real estate investments include equity interests in limited liability companies and debt issued by entities that invest in commercial real estate. The fair value of these investments is based on internal models developed by the Partnership. The significant inputs to the models include cash flow projections for the underlying properties and appraisals performed by independent valuation firms. Since these inputs are no readily observable, the investments are classified as Level 3 assets.

Common and preferred equity securities traded on national exchanges are valued at their closing prices as of December 31, 2008. These securities are classified as Level 1 assets. The consolidated entities also hold certain equity securities for which no active market exists. The value of these securities, which are classified as Level 3 assets, is based on a combination of broker quotes and internal valuation models.

Life settlement contracts are valued using mortality tables and interest rate assumptions that are deemed appropriate for the demographic characteristics of the parties insured under the policies. Since these inputs are not readily observable, they are classified as Level 3 assets.

The fair value of credit default swaps is based on quotes received from an independent pricing service. The inputs used to derive the quotes are not readily observable and are therefore classified as Level 3.

Refer to Note 5 for the disclosures required by SFAS No. 157.

**Management and Incentive Fee/Allocation Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2008, the Partnership and its consolidated entities recognized management and incentive fees and incentive allocations of approximately $204.9 million, and $0.9 million, respectively. The Partnership recognized approximately $150.3 million of depreciation on incentive fees previously deferred under Sec. 409(A) of the Internal Revenue Code. This has been presented in *Net depreciation on deferred incentive fees* in the consolidated statement of income.

11

D-CNL000013

Appx. 00911

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Dividends, Interest and Expense Recognition**
Dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. Operating expenses, including interest on securities sold short, not yet purchased are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes, which have been recognized in accordance with SFAS No. 109, *Accounting for Income Taxes*.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. The stated objectives of SFAS No. 109 are to recognize (a) the amount of taxes payable or refundable for the current year and (b) deferred tax liabilities and assets for the future tax consequences of events that have been recognized in financial statements or filed tax returns. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. The following subsidiaries are subject to these provisions: Highland Europe, HFC and HFREC. Deferred tax assets of approximately $0.2 million are presented in *Other assets* in the consolidated balance sheet. Federal, state and city taxes for the Partnership and its consolidated corporate subsidiaries of approximately $20,000 are presented in *Other expense* in the consolidated statement of income.

The Consolidated Investments Funds are not subject to federal income taxes and therefore no provision has been made in the accompanying consolidated financial statements.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Foreign cash of $1.8 million is included in the cash and cash equivalents on the consolidated balance sheet.

**Restricted Cash**
The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

**Total Return Swaps**
A total return swap agreement is a two-party contract under which an agreement is made to exchange returns from predetermined investments or instruments. The gross returns to be exchanged or "swapped" between the parties are calculated based on a "notional amount," which is valued monthly according to the valuation policy mentioned above to determine each party's obligation under the contract.

HIGHLY CONFIDENTIAL

D-CNL000014

**Appx. 00912**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

Risks could arise from entering into swap agreements from the potential inability of counterparties to meet the terms of their contracts, and from the potential inability to enter into a closing contract. The Partnership's Consolidated Investment Funds recognize all cash flows received (paid) or receivable (payable) from swap transactions on a net basis as realized or unrealized gains or losses in the consolidated statement of income. The Partnership and the Consolidated Investment Funds are charged a finance cost by counterparties with respect to each agreement. The finance cost is reported as part of the realized or unrealized gains or losses.

**Credit Default Swaps**
As discussed in Note 7, under a credit default swap agreement two parties agree to transfer the credit exposure of an asset between one another. The seller of the swap guarantees the credit worthiness of a specific instrument by agreeing to pay the buying party a specific amount (generally par value) in the event that the instrument defaults.

At December 31, 2008, the Partnership's Consolidated Investment Funds were party to multiple credit default swaps in which it acts as the guaranteeing party. In the event that any of the underlying instruments default prior to the expiration of the agreements, the Consolidated Investment Funds are obligated to pay the swap counterparty the par value of the specific instrument. The Consolidated Investment Funds collect a fee based on the size of the underlying positions which are treated as realized gains once received. The difference between the current market value of the swaps and the original price of the swap is reported as an unrealized gain or loss.

At December 31, 2008, the Partnership's Consolidated Investment Funds were party to several credit default swaps in which it was the guaranteed party. In the event that any of the instruments underlying the various swap agreements default before the swap agreement expires, the Partnership and the Consolidated Investment Funds will be made whole by the swap counterparty. The Partnership and the Consolidated Investment Funds treat the fees paid as a realized loss once paid. The difference between the current market value of the swaps and the original price of the swap is reported as an unrealized gain or loss.

**Securities Sold, Not Yet Purchased**
The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand. Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash or securities. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender.

**Securities Loaned**
The Partnership's Consolidated Investment Funds may lend securities to their financing counterparties for margin. The lending entity receives the interest associated with the securities loaned. The loans are secured by the fair value of the securities. Gains or losses in the fair value of the securities loaned that occur during the term of the loan will be for the account of the lender. The lender has the right under the lending agreement to recover the securities from the prime brokers on demand. The lender pays a fee to the broker for the cash collateral received. This is accounted for as interest expense. A credit risk exists to the lender under this type of transaction to the extent that the counterparty defaults on its obligation to return the securities loaned.

HIGHLY CONFIDENTIAL

D-CNL000015

**Appx. 00913**

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

**Options**
The Partnership's Consolidated Investment Funds purchase and sell call and put options on equity securities and equity indices as part of its overall portfolio management strategies. Purchased call or put options may be used to obtain economic exposure equivalent to a long or short position, respectively, or to hedge existing or anticipates portfolio positions. Certain options contracts are index options, under which amounts due or payable upon exercise are settled entirely in cash based on the difference between the value of the index at maturity and its contract (or strike) value. The potential risk of loss for purchased options is limited to the premium paid.

The premium paid for the purchase of an option is included in the consolidated balance sheet as an investment and subsequently marked-to-market to reflect the current value of the option. If an option expires on the stipulated expiration date, the Consolidated Investment Funds realize a loss equal to the cost of the option. If the Consolidated Investment Funds enter into a closing sale transaction, the Consolidated Investment Funds realize a gain or loss, depending on whether the proceeds from the closing sale transaction are greater or less than the cost of the option. If the Consolidated Investment Funds exercise a call option, the cost of the securities acquired upon exercise is increased by the premium paid to buy the call. If the Consolidated Investment Funds exercise a put option, it realizes a gain or loss from the sale of the underlying security and the proceeds from such sale are decreased by the premium originally paid.

**Margin Transactions**
In order to obtain more investable cash, the Partnership and its subsidiaries may use various forms of leverage including purchasing securities on margin. Such leverage may allow the Partnership and its subsidiaries to increase net assets at a greater rate during increasing markets, but also may lead to a more rapid decrease in net assets in a declining market. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2008. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. Withdrawals payable may be treated as capital for purposes of allocations of gains/losses pursuant to the partnerships' governing documents. At December 31, 2008, the Partnership and its consolidated entities had withdrawals payable of $16,825. Refer to Note 16.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates.

HIGHLY CONFIDENTIAL

D-CNL000016

**Appx. 00914**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Foreign Currency Transactions**

The Partnership's subsidiary Highland Europe uses British Pounds as its functional currency and enters into transactions in multiple foreign currencies. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2008. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the consolidated statement of income.

The Consolidated Investment Funds do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the Net realized and unrealized gains or loss from investments.

**Financial Instruments**

The Partnership and its consolidated entities determine fair value of financial instruments as required by SFAS No. 107, *Disclosures About Fair Values of Financial Instruments*. The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

**Derivative Financial Instruments**

During 2008, the Partnership was a party to a total return swap agreement. In addition, the Partnership engaged in purchases and sales (including "short sales") of exchange traded commodities and the short sale of subprime backed collateralized mortgage obligations through a purchase of a credit default swap. The Partnership has not designated any derivative transactions as accounting hedges, and, consequently, has not applied hedge accounting treatment under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended and interpreted.

As discussed in more detail in Note 6, all realized gains or losses related to the Partnership's total return swap, credit default swap and commodity purchases and sales are recorded in *Net realized loss on investment transactions*. The cash flows associated with derivative transactions are classified as investing in the consolidated statement of cash flows.

As of December 31, 2008, the Partnership was not a party to a derivative transaction.

**Life Settlement Contracts**

Two of the Partnership's Consolidated Investment Funds invest in life settlement contracts (the "Policies") and account for them using the fair value method in accordance with FASB Staff Position FTB85-4-1, *Accounting for Life Settlement Contracts by Third-Party Investors*. The Policies are reflected as a component of "Investments, at fair value" in the Consolidated Statement of Assets, Liabilities and Partners' capital. Realized and unrealized gains (losses) on the Policies are reflected in the Consolidated Statement of Income. Cash flows used to purchase the Policies are reflected as a component of "Purchases of Investments" in the Consolidated Statement of Cash Flows.

The Consolidated Investment Funds were invested in 138 Policies at December 31, 2008 with a total face value of approximately $1,216 million.

**Partners' Capital**

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

15

D-CNL000017
**Appx. 00915**

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

**Goodwill and Other Intangible Assets**
The Partnership purchased Highland Europe on April 6, 2005. Goodwill represents the amount paid in excess of the fair value of the assets of Highland Europe at the date of acquisition. No goodwill impairments existed as of December 31, 2008.

The Partnership has obtained the rights to the management contracts of certain RICs it manages by acquiring the underlying contracts from the predecessor investment manager. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets,* the Partnership performs an impairment test on the purchased investment contracts on an annual basis. Any depreciation in the value of the purchased investment management contracts are accounted for in the year when it occurs. The carrying values of the purchased investment contracts are not adjusted for appreciation. During 2008, two RICs were reorganized into a fund managed by the Partnership. As more fully described in Note 15, the carrying value of these purchased management contracts were written off at that time. For the remaining contracts, there was no impairment.

The goodwill and purchased investment management contracts are indefinite-lived assets and are not amortized.

During 2007, the underlying companies consolidated by HFREC purchased rental property (the "Project"). The Projects' purchase prices were allocated to the fair value of tangible and intangible assets and liabilities acquired with the purchases. Lease intangibles represent the measurement of certain intangibles associated with operating leases.

The lease intangible components are the estimated values of 1) leasing commissions (prepaid origination costs), 2) in-place leases, and 3) tenant/customer relationships. Leasing commissions and in-place leases represent the value associated with "cost avoidance" of acquiring in-place leases and are computed as the estimated loss of revenue, net of costs incurred for the period required to lease the "assumed vacant" property to the occupancy level when purchased. These amounts are amortized using the straight-line method over the remaining term of the lease of 2.5 years and are included in depreciation and amortization. Tenant relationships represent the present value of the anticipated renewals of in-place leases, adjusted for the probability of the renewals. The value of tenant relationships is amortized using the straight-line method over the average renewal term of the lease of 7 years and is included in depreciation and amortization. Refer to Note 15.

**Recently Issued Accounting Standards & Interpretations**
In September 2008, the Financial Accounting Standards Board ("FASB") issued FSP FAS 133-1 and FIN 45-4, *Disclosures about Credit Derivatives and Certain Guarantees: An Amendment of FASB Statement No. 133 and FASB Interpretation No. 45; and Clarification of the Effective Date of FASB Statement No. 161.* FSP FAS 133-1 and FIN 45-4 requires enhanced disclosures about credit derivatives and guarantees and amends FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* to exclude derivatives instruments accounted for at fair value under SFAS 133. The Consolidated Investment Funds adopted FSP FAS 133-1 and FIN 45-4 as of December 31, 2008. Since FSP FAS 133-1 and FIN 45-4 only requires additional disclosures concerning credit derivatives and guarantees, it did not have any effect on the Consolidated Investment Fund's financial position, results of operations or cash flows. Refer to Note 7 for the disclosures required by FSP FAS 133-1 and FIN 45-4.

HIGHLY CONFIDENTIAL

D-CNL000018

**Appx. 00916**

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

In December 2008, the FASB issued FIN 48-3, Effective Date of FASB Interpretation No. 48 for Certain Nonpublic Enterprises ("FSP 48-3"), which deferred the effective date of FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109 ("FIN 48"). Under FSP 48-3, in the absence of early adoption, FIN 48 will become effective for the Partnership and its Consolidated Investment Funds at December 31, 2009. Management has elected to take advantage of the deferral and will continue to accrue for liabilities relating to uncertain tax positions only when such liabilities are probably and estimable. Based on its continued analysis, management has determined that adoption of FIN 48 will not have a material impact to the financial statements. However, management's conclusions regarding FIN 48 may be subject to review and adjustment at a later date based on ongoing analyses of tax laws, regulation and interpretations thereof and other factors.

FIN 48 requires management to determine whether a tax position is more likely than not to be sustained upon examination by the applicable taxing authority, including resolution of any related appeals or litigation processes, based on the technical merits of the position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement which could result in recording a tax liability that would reduce partners' capital. FIN 48 must be applied to all existing tax positions upon initial adoption and the cumulative effect, if any, is to be reported as an adjustment to the beginning balance of partners' capital upon adoption.

In February 2007, the FASB released SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115*, or SFAS 159. This statement permits entities to choose to measure many financial instruments and certain other items at fair value. SFAS 159 may be adopted and the fair value option may be elected in the first quarter of 2008. The Partnership has elected to adopt this statement and evaluates securities on an instrument by instrument basis.

In December 2007, the FASB issued SFAS No. 160, *Accounting for Non-controlling Interests*, or SFAS 160. SFAS 160 clarifies the classification of minority interests in the consolidated balance sheet and statement of income. This Statement is effective for fiscal years beginning on or after December 15, 2008. Under SFAS 160, the ownership of consolidated subsidiaries by other consolidated subsidiaries will be presented separately in the equity section of the consolidated balance sheet. Also, upon the deconsolidation of any subsidiary, the retained equity investment will be measured at fair value. The Partnership has not yet determined the impact, if any, that the implementation of SFAS No. 157 would have on our consolidated results of operations or financial condition.

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141 (revised 2007), *Business Combinations* ("SFAS 141(R)"). SFAS 141(R) requires assets acquired, liabilities assumed, contractual contingencies and contingent consideration to be measured at their fair values at the acquisition date. In addition, SFAS 141(R) requires subsequent adjustments to any acquisition-related tax reserves to be recognized in net income rather than as an adjustment to the purchase price. SFAS 141(R) is effective for business combinations completed in periods beginning on or after December 15, 2008. The Partnership has not yet determined the impact, if any, that the implementation of SFAS No. 157 would have on our consolidated results of operations or financial condition.

17

D-CNL000019
**Appx. 00917**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

In October 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position 157-3, *Determining the Fair Value of a Financial Asset in a Market That Is Not Active,* ("FSP 157-3") which clarifies the application of SFAS No. 157, *Fair Value Measurements,* ("SFAS 157") in an inactive market and provides an illustrative example to demonstrate how the fair value of a financial asset is determined when the market for that financial asset is not active. The guidance provided by FSP 157-3 is consistent with the Partnership and its consolidated entities' approach to valuing financial assets for which there are no active markets.

3.     **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2008:

*(in thousands of dollars)*

| | | |
|---|---:|---:|
| Buildings | $ | 100,536 |
| Land | | 25,168 |
| Leasehold improvements | | 4,907 |
| Computer and equipment | | 3,917 |
| Furniture and fixtures | | 2,911 |
| Computer software | | 2,423 |
| Tenant improvements | | 2,285 |
| Site improvements | | 986 |
| Accumulated depreciation | | (11,578) |
| | $ | 131,555 |

The Partnership and its consolidated entities are depreciating fixed assets as follows:

| | Period |
|---|---:|
| Buildings | 29 - 40 years |
| Leasehold improvements | Lease term |
| Computer and equipment | 5 years |
| Furniture and fixtures | 7 years |
| Computer software | 3 years |
| Site improvements | 10 years |
| Tenant improvements | Shorter of lease term or estimated life of tenant improvement |

Depreciation expense in 2008 totaled approximately $6.1 million for the Partnership and its subsidiaries.

The Partnership and its consolidated entities had approximately $5.5 million of capital expenditures in 2008.

18

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

4. **Investments**

Detailed below is a summary of the Partnership and its subsidiaries' investments at December 31, 2008:

| *(in thousands)* | Amortized Cost/Cost | | Value | |
|---|---|---|---|---|
| Investments in floating rate syndicated bank loans | $ | 489,400 | $ | 206,847 |
| Investments in fixed rate syndicated bank loans | | 88,749 | | 62,918 |
| Investments in fixed income securities | | 1,432,684 | | 435,497 |
| Investments in floating income investments | | 315,363 | | 84,335 |
| Investments in equity securities | | 1,583,804 | | 770,028 |
| Investments in life settlement contracts | | 247,668 | | 200,386 |
| Investments in CLOs (mezz tranches) | | 254,453 | | 84,214 |
| Investments in CLOs (residual CLO equity tranches) | | 470,421 | | 70,700 |
| Investments in closed-end mutual funds | | 26,253 | | 9,244 |
| Investments in private placement real estate | | 439,095 | | 282,428 |
| Investments in limited partnerships | | 121,433 | | 130,077 |
| Investments in warrants | | 6,088 | | 2,085 |
| Total investments | $ | 5,475,411 | $ | 2,338,759 |
| Total return swaps | $ | - | $ | (96,228) |
| Credit default swaps | | (7,206) | | (156,613) |
| Net unrealized gain/loss on swaps | $ | (7,206) | $ | (252,841) |

| | Proceeds | | Value | |
|---|---|---|---|---|
| Securities sold short, not yet purchased | $ | 60,094 | $ | 71,831 |

**Affiliated Investments**
***Investments in Residual CLO Equity and Mezzanine Tranches***
Investments in affiliated residual CLO equity tranches primarily represent tranches of CLOs for which the Partnership and Highland Europe provide investment advisory services. The CDO Master Fund receives quarterly distributions based on the excess interest after paying the stated interest distributions to the senior and mezzanine note holders, and paying the investment manager, trustee and other related fees. A portion of these distributions are amortized against the cost basis of the investment based of the actual cash distributions received during the year versus the total expected remaining cash distributions to the residual CLO equity tranche. The remainder of the distribution is recorded as interest income.

Investments in residual equity and mezzanine tranches of CLOs are not actively traded. The estimated fair value of the CLOs is derived from broker quotes and valuation models. The estimated fair value of these investments as presented in the consolidated balance sheet does not necessarily represent the amount that could be obtained from the sale of these investments. Changes in the credit quality or the performance of the underlying collateral, the availability and price of assets available for reinvestment, interest rates and/or the interest rate curve, or other market conditions could have a material impact on the estimated fair value of the investments.

19

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

*Investment in Highland Special Situations Fund*
The Partnership invests in Highland Special Situations Fund ("HSSF"), a diversified, closed end RIC for which the Partnership provides investment advisory services. As of December 31, 2008, the market value of the Partnership's investment in HSSF was approximately $2.1 million. During the year ended December 31, 2008, the Partnership accrued approximately $0.3 million in dividends from HSSF.

*Investment in Highland Equity Opportunities Fund*
The Partnership invests in Highland Equity Opportunities Fund ("HEOF"), a diversified, open end RIC for which the Partnership provides investment advisory services. As of December 31, 2008, the market value of the Partnership's investment in HEOF was approximately $0.2 million. During the year ended December 31, 2008, the Partnership received approximately $152 in dividends from HEOF, which the Partnership reinvested in the fund.

*Investment in Highland Distressed Opportunities, Inc.*
The Partnership invests in Highland Distressed Opportunities, Inc. ("HCD"), a non-diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2008, the market value of the Partnership's investment in HCD was approximately $2.1 million. During the year ended December 31, 2008, the Partnership received approximately $0.1 million in dividends from HCD, which the Partnership reinvested in the fund.

*Investment in Highland High Income Fund*
The Partnership invests in Highland High Income Fund. ("HHIF"), a non-diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2008, the market value of the Partnership's investment in HHIF was approximately $0.2 million. During the year ended December 31, 2008, the Partnership received approximately $0.3 million in dividends from HHIF, which the Partnership reinvested in the fund.

*Investment in Highland Income Fund*
The Partnership invests in Highland Income Fund ("HIF"), a non-diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2008, the market value of the Partnership's investment in HIF was approximately $0.3 million. During the year ended December 31, 2008, the Partnership received approximately $0.3 million in dividends from HIF, which the Partnership reinvested in the fund.

*Prepaid Forward Contract*
On July 28, 2006, Highland Multi-Strategy Onshore Master Subfund I, LLC and Barclays Bank PLC ("Barclays") entered into a prepaid forward contract. The Partnership and affiliates redeemed approximately $312.7 million of a reference portfolio, which was comprised of the following basket of funds advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund and Select Equity Fund. Barclays simultaneously contributed approximately $312.7 million as a hedge to its obligation under the prepaid forward contract.

Barclays was prepaid approximately $156.3 million, or one-half of the reference portfolio value at initiation of the transaction. A notional amount, (the initial reference portfolio value less the amount prepaid), accretes interest to Barclays at monthly LIBOR plus 0.90% per annum. As of December 31, 2008, the notional amount was approximately $184.3 million.

A collateral account in the amount of approximately $53.2 million was established to further secure the transaction. Due to extreme market volatility, all of the underlying holdings in the collateral account were sold during 2008.

HIGHLY CONFIDENTIAL

D-CNL000022

**Appx. 00920**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

The term of the prepaid forward contract is three years and allows for net settlement upon termination.  At contract expiration, Barclays will remit in cash the greater of the difference between the reference portfolio value and the notional amount, as valued on the scheduled termination date, or zero.  As of December 31, 2008, the contract did not have a positive net fair value.

Detailed below is a summary of the transaction as of December 31, 2008:

*(in thousands of dollars)*

| Reference Portfolio | | Value |
|---|---|---|
| Real Estate Fund | $ | 46,265 |
| Highland Crusader Fund, L.P. | | 30,483 |
| Select Equity Fund | | 15,337 |
| Equity Focus Fund | | 8,451 |
| Highland Credit Opportunities CDO, L.P. | | 295 |
| Highland CDO Opportunity Fund, Ltd. | | - |
| Highland Credit Strategies Fund, L.P. | | - |
| Reference portfolio total | | 100,831 |
| Notional amount | | (184,272) |
| Fair value of prepaid forward contract | $ | (83,441) |

On October 7, 2008, Barclays submitted a notice of early termination for the prepaid forward contract.  Refer to Note 17 for further discussion.

***Accreting Strike Option***
On February 28, 2007, Highland Multi-Strategy Onshore Master Subfund II, LLC entered into an Accreting Strike Option ("ASO") with Barclays.  The ASO's value is based on the following basket of funds ("the reference portfolio") advised by the Partnership:  Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund, Select Equity Fund and Credit Opportunities Domestic Feeder.  The value of the reference portfolio at inception was approximately $250.2 million

Barclays was paid a $71.4 million premium on the option.  The strike price, (the initial reference portfolio value less the premium paid), accretes interest to Barclays at monthly LIBOR plus 1.4% per annum.  As of December 31, 2008, the strike price was approximately $176.4 million.

The term of the accreting strike option is five years and allows for net settlement upon termination.  At contract expiration, Barclays will remit in cash the greater of the difference between the reference portfolio value and the strike price, as valued on the scheduled termination date, or zero.  As of December 31, 2008, the ASO did not have a positive net fair value.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

Detailed below is a summary of the transaction as of December 31, 2008:

*(in thousands of dollars)*

| Reference Portfolio | | Value |
|---|---|---|
| Select Equity Fund | $ | 93,228 |
| Real Estate Fund | | 20,687 |
| Highland Crusader Fund, L.P. | | 11,040 |
| Equity Focus Fund | | 5,749 |
| Highland Credit Opportunities CDO, L.P. | | 365 |
| Highland CDO Opportunity Fund, Ltd. | | - |
| Highland Credit Strategies Fund, L.P. | | - |
| Reference portfolio total | | 131,069 |
| Notional amount | | (176,400) |
| Fair value of prepaid forward contract | $ | (45,331) |

On October 13, 2008, Barclays served notice of early termination for the accreting strike option. Refer to Note 17 for further discussion.

***Investment in Highland Financial Partners, L.P. ("HFP")***
The Partnership invests in HFP, a holding company organized to provide investors with the earnings of its leveraged credit subsidiaries. As of December 31, 2008, the Partnership's equity investment in HFP had no value and was permanently impaired. The Partnership recognized a $74.7 million realized loss in Net realized loss from equity method investees.

On October 20, 2008, the Partnership received an HFP senior secured note in the amount of $22.3 million from CDO Master Fund. The note was transferred to the Partnership to satisfy a prior obligation. The note accrues interest at a rate of 10% per annum, payable quarterly. As of December 31, 2008, the fair value of the note was approximately $7.4 million.

***Investment in Highland Capital Special Allocation, LLC***
The Partnership is the sole owner of HCSA, which was organized to receive management incentive allocations from HFP. During 2008, HCSA did not receive an incentive allocation. As of December 31, 2008, the Partnership's investment in HCSA had no value and was permanently impaired. The Partnership recognized a $53.8 million realized loss in Net realized loss from equity method investees.

**5.** **Fair Value of Financial Instruments**

As discussed in Note 2, the Partnership and its consolidated entities categorize investments recorded at fair value in accordance with the hierarchy established by SFAS No. 157.

HIGHLY CONFIDENTIAL

D-CNL000024
**Appx. 00922**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2008:

| *(in thousands of dollars)* | Level 1 | Level 2 | Level 3 | Total Fair Value at December 31, 2008 |
|---|---|---|---|---|
| Investments | $ 221,571 | $ 43,837 | $ 2,073,351 | $ 2,338,759 |
| Derivatives | - | - | (252,841) | (252,841) |
| Securities sold, not yet purchased | 71,831 | - | - | 71,831 |

The following table provides a roll forward of the financial instruments classified within Level 3 for the year ended December 31, 2008. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.

**Fair Value Measurements Using Significant Unobservable Inputs**

| *(in thousands of dollars)* | Investments | Derivatives |
|---|---|---|
| Estimated fair values as of January 1, 2008 | $ 5,740,260 | $ 78,060 |
| Purchases, sales and maturities, net | (788,142) | 51,512 |
| Net transfers in/(out) of Level 3 | 10,959 | - |
| Net realized (losses)/gains | (1,014,179) | (181,345) |
| Net unrealized losses | (1,875,546) | (201,068) |
| Estimated fair values as of December 31, 2008 | $ 2,073,352 | $ (252,841) |

6.   **Derivative Transactions**

In June 2008, the Partnership terminated a total return swap ("TRS") and began the process of selling the underlying assets in the TRS. The Partnership recognized a $7.8 million loss on the sale of the underlying assets in the TRS. The loss and net settlement interest are recorded in Net realized loss on investment transactions in the Consolidated Statement of Income. As of December 31, 2008, all of the assets in the TRS had been sold; however, there were certain assets that remained unsettled. As of December 31, 2008, approximately $2.5 million in collateral posted was owed to the Partnership for these unsettled trades. This amount is recorded in Due from broker.

During the first quarter of 2008, the Partnership held short positions in exchange traded commodities and realized a loss of $16.7 million from these transactions. This activity is recorded in Net realized loss on investment transactions.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

During the first quarter of 2008, the Partnership participated in a credit-default swap ("CDS") through one of the Partnership's Consolidated Investment Funds. The underlying assets in the CDS were subprime mortgage backed securities. In this transaction, the Partnership was a purchaser of protection against the lack of future cash flows from these securities. The Partnership realized a gain of $74.5 million from the sale of the CDS, which is recorded in Net realized loss on investment transactions. The Partnership's premium recognized for the transaction in 2008 was $0.9 million. The premiums are recorded in Net realized loss on investment transactions.

**7.    Total Return Swaps**

Detailed below is an analysis of the total return swap balances of the Consolidated Investment Funds at December 31, 2008:

| *(in thousands of dollars)* | | Value |
|---|---|---:|
| Collateral included in "Restricted cash" | $ | 196,409 |
| Notional value of underlying investments | $ | 231,586 |
| Fair value of underlying investments | | 101,588 |
| Unrealized depreciation of underlying investments included in "Unrealized losses on derivatives contracts" | $ | (117,046) |

**8.    Credit Default Swaps**

The Consolidated Investment Funds enter into credit default swaps to simulate long and short bond positions that are either unavailable or considered to be less attractively priced in the bond market. The Consolidated Investment Funds use these swaps to reduce risk where they have exposure to the issuer, or to take an active long or short position with respect to the likelihood of an event of default.

The buyer of a credit default swap is generally obligated to pay the seller a periodic stream of payments over the term of the contract in return for a contingent payment upon the occurrence of a credit event with respect to an underlying reference obligation. A credit event for corporate reference obligations includes bankruptcy, failure to pay, obligation acceleration, repudiation/moratorium or restructuring. If a credit event occurs, the seller must pay the contingent payment to the buyer, which is typically the par value (full notional value) of the reference obligation, though the actual payment may be mitigated by terms of the International Swaps and Derivative Agreement ("ISDA"), allowing for netting arrangements and collateral. In addition, the payment may be reduced by anticipated recovery rates, segregated collateral and netting arrangements that may incorporate multiple transactions with a given counterparty.

The seller of credit default swaps receives a fixed rate of income throughout the term of the contract, which typically is between one month and five years, provided that no credit event occurs. If a credit event occurs, the seller may be required to pay the buyer the full notional value of the reference obligation.

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

As of December 31, 2008, the Consolidated Investment Funds were the buyers of credit default swaps ("receiving protection") on a total notional amount of $72.5 million and the sellers of credit default swaps ("providing protection") on a total notional amount of $387.1 million. The notional amount of the swaps is not recorded in the financial statements; however it approximates the maximum potential amount of future payments that the Consolidated Investment Funds could be required to make if they are the seller of protection and a credit event were to occur.

Those credit default swaps for which the Partnership provided protection at December 31, 2008 are summarized in the tables below. The reference obligations for all of these swaps are single issuers.

| *(in thousands of dollars)* | Underlying Referenced Asset | | |
|---|---|---|---|
| | Corporate Debt | Collateralized Loan Obligation Securities | Total |
| Fair value of credit default swaps | $ (109,184) | $ (48,875) | $ (158,059) |
| Maximum potential amount of future payme | 328,110 | 59,000 | 387,110 |
| Collateral posted with counterparties by the consolidated investment funds | 152,787 | 18,563 | 171,350 |

| *(in thousands of dollars)* | Maximum Potential Amount of Future Payments by Contract Term | | | |
|---|---|---|---|---|
| Current Credit Rating* on Underlying Bond | 1-5 Years | 5-10 Years | Greater than 10 Years | Total |
| BBB | $ (213,110) | $ - | $ (20,000) | $ (233,110) |
| BB | (40,000) | - | (24,000) | (64,000) |
| BB- | (10,000) | (15,000) | (5,000) | (30,000) |
| B+ | (10,000) | - | - | (10,000) |
| B- | (20,000) | - | - | (20,000) |
| CCC+ | (15,000) | - | - | (15,000) |
| CCC- | (15,000) | - | - | (15,000) |
| | $ (323,110) | $ (15,000) | $ (49,000) | $ (387,110) |

The fair value of the credit default swaps for which the Consolidated Investment Funds purchased protection at December 31, 2008 was approximately $5.5 million.

25

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

9. **Debt and Notes Payable**

Consolidated debt and notes payable as of December 31, 2008 consists of:

| (in thousands of dollars) | December 31, 2008 |
|---|---:|
| Partnership revolving credit facility | $ 150,000 |
| Credit Opportunities Master note payable | 116,590 |
| HFREC notes payable | 98,482 |
| Real Estate Fund revolving credit facility | 20,000 |
| HCM Trident | 11,875 |
| Partnership promissory note | 875 |
| | $ 397,822 |

**Revolving Credit Facilities**

On January 26, 2007, the Partnership entered into a syndicated credit agreement with Bank of America as syndication agent and The Bank of Nova Scotia as administrative agent in the amount of $60 million (the "Credit Agreement"). The Credit Agreement provides for revolving loans which are scheduled to mature on June 30, 2009, or March 26, 2010 if certain derivative transactions are extended by the Partnership.

Interest is payable on the last day of each loan, or if the loan is greater than three months, then interest is payable in three month increments. The applicable spread for LIBOR loans under the Credit Agreement is LIBOR plus 1.75% per annum. For base rate loans, the spread is 0.50% per annum over the prevailing prime rate.

Under the terms of the Credit Agreement, the availability of credit was subject to financial covenants requiring the Partnership to maintain a minimum amount of fee earning assets under management, a minimum tangible net worth, and a maximum leverage ratio.

On March 20, 2007, the Credit Agreement was amended and restated, increasing the availability under the facility to $150 million and increasing the lender group to include five other banks. On November 2, 2007, the Credit Agreement was amended a second time to allow the Partnership to maintain certain insurance policies through an affiliate.

On December 19, 2008, the Partnership was notified by the Bank of Nova Scotia of an event of default under the terms of the Credit Agreement. The default was related to a failure to maintain a minimum tangible net worth. As a result, on December 24, 2008, the spread over LIBOR for LIBOR loans not maturing before December 31, 2008 increased to 3.75% per annum. On December 30, 2008, all LIBOR loans not maturing before December 31, 2008 were converted to base rate loans, with the applicable spread being 2.5% per annum. All other outstanding LIBOR borrowings with maturations prior to December 31, 2008 were financed at the applicable base rate. The note was subsequently refinanced in July 2009, see note 18.

The fair value of the facility as of December 31, 2008 was approximately $126.3 million.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

In 2005, the CDO Master Fund entered into a credit agreement in the amount of $150 million (the "CDO Credit Agreement") with Citibank, N.A. and Citigroup Financial Products Inc. The CDO Credit Agreement was restated on the original maturity date of August 27, 2008. The restated agreement stated that equity cash flows earned on the assets in the facility would be pledged against the debt principal until paydown with no further drawdowns available. Interest is charged at Federal Funds open rate plus 1.50%. As of December 31, 2008, the facility had been paid back in full.

In February 2006, the Real Estate Fund entered into a credit agreement in the amount of $31 million (the "REF Credit Agreement") with Wachovia Bank. Interest is charged at LIBOR plus 2%. Interest is payable on the first day of each quarter. On September 29, 2008, the REF credit agreement was amended and restated, decreasing the availability under the facility to $25 million. Interest is charged at LIBOR plus 2.25%. As of December 31, 2008, $20 million was outstanding under the REF Credit Agreement and approximately $116.5 million of investments were pledged as collateral. The Partnership considers the book value of the line of credit at December 31, 2008 to approximate its fair value. As of December 31, 2008, Real Estate Fund was in payment default for its failure to make a required $5 million principal reduction payment. Real Estate Fund has subsequently received a forbearance agreement. See Note 16.

**Term Loan**
On July 6, 2007, HCM Trident entered into a term loan facility agreement (the "Facility Agreement") with Nomura International PLC in the amount of $26.25 million. The Facility Agreement is scheduled to mature on the July 6, 2008, unless extended. The Facility Agreement interest is charged at LIBOR plus 0.75% and is payable quarterly on July 6, October 6, January 6, and April 6.

On July 14, 2008, the Facility Agreement was amended to reduce the availability to $25 million. The Facility Agreement rate of interest was increased to 2.25% in excess of LIBOR. Interest is payable quarterly on July 6, October 6, January 6, and April 6.

On November 2, 2008, the Facility Agreement was amended to allow for periodic payments of principal and interest. The amortization schedule of the facility is as follows:

| *(in thousands of dollars)* | Repayment Amount |
|---|---|
| **Payment Date** | |
| October 28, 2008 | $ 1,000 |
| November 3, 2008 | 5,000 |
| December 15, 2008 | 4,000 |
| February 16, 2009 | 3,000 |
| March 16, 2009 | 2,000 |
| April 15, 2009 | 2,000 |
| May 15, 2009 | 2,000 |
| June 15, 2009 | 2,800 |
| | $ 21,800 |

As of December 31, 2008, the estimated fair market value of the facility was approximately equal to the carrying value.

27

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Promissory Notes**

On January 4, 2006, the Partnership received a promissory note (the "Promissory Note") from Compass Bank in the amount of $2 million. The Partnership must make monthly payments of principal and accumulated interest on the fifth day of each month. The Promissory Note will mature on February 1, 2011. On February 8, 2007, the Partnership and Compass Bank modified the Promissory Note, which reduced the interest rate from 2.0% to 1.7% in excess of LIBOR. The outstanding balance of the Promissory Note as of December 31, 2008 was $0.9 million. As of December 31, 2008, the estimated fair market value of the note was approximately equal to the carrying value.

**Credit Opportunities Master Note Payable**

On December 19, 2008, Highland Credit Opportunities CDO Financing, LLC ("CDO Financing"), a wholly owned subsidiary of Credit Opportunities Master, issued $122.4 million par value of senior secured convertible notes and received cash proceeds of $115.6 million and investment securities with an estimated fair value of $0.9 million. The notes are governed by a Note Purchase Agreement (the "Purchase Agreement") and guaranteed by Credit Opportunities Master and Highland Credit Opportunities, Ltd. (the "CDO"). At the note holders' option, the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master between January 1, 2010 and December 31, 2012. Subject to certain conditions, the Purchase Agreement also allows for CDO Financing to issue up to $106.7 million par value of additional notes to the existing note holders in exchange for proceeds of $101.4 million.

The proceeds from the notes were used primarily to fund an additional equity investment in the CDO. This investment was required under the terms of a forbearance agreement that Credit Opportunities Master executed with the Majority Controlling Class of the CDO's note holders.

The notes have a stated maturity date of December 31, 2012 and accrue interest on a quarterly basis at a rate of 25% per annum. In addition, the Purchase Agreement requires payment of a 2.5% fee on the unfunded portion of the note commitment.

Credit Opportunities Master may elect to prepay up to 50% of the outstanding principal balance from July 1, 2010 through December 31, 2010. After that period, Credit Opportunities Master may prepay all or a portion of the outstanding principal, provided that each partial payment made to the note holders is in an aggregate principal amount of at least $0.5 million.

The Agreement requires Credit Opportunities Master to pay the following fees, as a percentage of the principal balance, in the event of a prepayment:

| Prepayment Period | Fees |
|---|---|
| July 1, 2010 - December 31, 2010 | 15.0% |
| July 1, 2011 - December 31, 2011 | 10.0% |
| July 1, 2012 - December 31, 2012 | 6.0% |

28

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

The Purchase Agreement grants the note holders a lien on certain assets held by Credit Opportunities Master and the CDO. In addition, it requires Credit Opportunities Master and the CDO to comply with various financial covenants. Failure to meet these covenants may result in an event of default and give the note holders the right to accelerate repayment of the debt or initiate a liquidation of certain assets. Credit Opportunities Master was not in technical compliance with a liquidity calculation specified in the debt covenants as of December 31, 2008. However, the calculation was in compliance with covenants as of January 31, 2009.

As of December 31, 2008, the estimated fair market value of the notes was approximately equal to the par value.

**HFREC Notes Payable**
*HE Sugar Land Project, LLC "HE Sugar Land" Note Payable*
On August 27, 2007, HE Sugar Land assumed a mortgage loan from KeyBank Real Estate Capital secured by the underlying property in HE Sugar Land. The note had an original principal balance of $46 million and a balance of $43.4 million on the date of assumption. HE Sugar Land paid an assumption fee of $0.2 million and deposited $5.3 million into a reserve fund in connection with the assumption of the note. The note accrues interest at a fixed rate of 7.72% per annum. The note matures with all principal and accrued interest due on July 11, 2011. The monthly payment for principal and interest is $0.3 million and is due on the eleventh of each month. As of December 31, 2008, the estimated fair market value of the note was approximately equal to the carrying value.

**HE 1001 West Loop Project, LLC "1001 West Loop" Note Payable**
On December 13, 2007, 1001 West Loop entered into a $19.5 million loan with affiliates of the Partnership, which is secured by the underlying property in 1001 West Loop (the "Term Loan"). The Term Loan matures with all principal and accrued interest due on December 13, 2012. The Term Loan bears interest at a rate of 3.5% plus 90-day LIBOR, set on the 13th day of every third month (5.5% on December 31, 2008). Interest payments are due on the first day of the third month after the date of the Term Loan agreement, and on the first day of every third month thereafter.

In addition, 1001 West Loop entered into a $6.5 million loan with affiliates of the Partnership on December 13, 2007, which is secured by a pledge of 1001 West Loop's ownership interests in its subsidiaries and the Manager's Subordination of Property Management Agreement (the "Mezz Loan"). The Mezz Loan matures with all principal and accrued interest due on December 31, 2012. The Mezz Loan bears interest at a fixed rate of 12%. Interest payments are due on the first day of the third month after the date of the Mezz Loan agreement, and on the first day of every third month thereafter.

As of December 31, 2008, the estimated fair market values of the notes were approximately equal to their carrying values.

**HE 2425 West Loop Project, LLC "2425 West Loop" Note Payable**
On December 13, 2007, 2425 West Loop entered into a $22.9 million loan with affiliates of the Partnership, which is secured by the underlying property in 1001 West Loop (the "Term Loan"). The Term Loan matures with all principal and accrued interest due on December 13, 2012. The Term Loan bears interest at a rate of 3.5% plus 90-day LIBOR, set on the 13th day of every third month (5.5% on December 31, 2008). Interest payments are due on the first day of the third month after the date of the Term Loan agreement, and on the first day of every third month thereafter.

29

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

In addition, 2425 West Loop entered into a $7.6 million loan with affiliates of the Partnership on December 4, 2007, which is secured by a pledge of 1001 West Loop's ownership interests in its subsidiaries and the Manager's Subordination of Property Management Agreement (the "Mezz Loan"). The Mezz Loan matures with all principal and accrued interest due on December 31, 2012. The Mezz Loan bears interest at a fixed rate of 12%. Interest payments are due on the first day of the third month after the date of the Mezz Loan agreement, and on the first day of every third month thereafter.

As of December 31, 2008, the estimated fair market values of the notes were approximately equal to their carrying values.

***HCREA Nolen Drive, L.P. ("Nolen Drive") Note Payable***
On September 18, 2006, Nolen Drive entered into a $7.1 million note payable with Artesia Mortgage Capital Corporation, which is secured by the underlying property in Nolen Drive (the "Term Loan"). The Term Loan matures with all principal and accrued interest due on October 11, 2011. The Term Loan bears interest at a rate of 6.52% per annum. Payments are due on the 11th of every month. As of December 31, 2008, the estimated fair market value of the note was approximately equal to the carrying value.

10.     **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its consolidated entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The consolidated entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the consolidated entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the consolidated balance sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Master Partnership due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Investment Fund's exposure to market risk is affected by a number of factors, including the size, composition and diversification of its investments and swap agreements; interest rates; and market volatility. The Partnership and its Consolidated Investment Funds use various forms of leverage, including notes, which increase the effect of any investment value changes on partners' capital.

**Credit Risk**
Credit risk is the potential loss the Partnership and its consolidated entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the consolidated entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the consolidated entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Investment Fund's limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Investment Funds nor their manager expect such a market to develop.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Business Risk**
The Partnership provides advisory services to the consolidated investment funds. The Consolidated Investment Funds could be materially affected by the actions and liquidity of the Partnership.

**High Yield Bonds and Loans**
The Partnership and its Consolidated Investment Funds may invest in high-yield bonds that have been assigned a lower rating categories or are not rated by various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed. In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further reduce their liquidity. The Consolidated Investment Funds also invest in senior secured syndicated bank loans and enter into direct contractual relationships with the corporate borrowers. As such, the Partnership and its Consolidated Investment Funds are exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower.

The current economic recession has severely disrupted the market for most high-yield bonds and loans and may continue to have an adverse effect on the value of such instruments. It is also probable that the economic downturn could adversely affect the ability of the issuers of such securities to repay principal and interest thereon and increase the incidence of default for such securities.

**CLO Equity Investments**
The Partnership and its Consolidated Investment Funds may invest in CLO equity that are not rated by various credit rating agencies and are generally considered to be speculative with respect to the issuer's ability to repay principal and interest. The yields and prices of these non-rated CLO equity tranches are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed. In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further limit their liquidity. Given a backdrop of deteriorating general economic conditions, the Partnership and its consolidated investment funds are exposed to the potential non-payment of principal and interest from their CLO equity investments. As of December 31, 2008, 25 of the 30 CLOs managed by the Partnership paid interest to the equity holders on their last payment date.

**Distressed Investments**
A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Investment Funds invest have been issued by distressed companies in an unstable financial condition. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions.

HIGHLY CONFIDENTIAL

D-CNL000033

Appx. 00931

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Credit Default Swaps**

Credit default swaps involve greater risks than if the Partnership or its Consolidated Investment Funds had shorted the reference obligations directly. In addition to the market risk discussed above, credit default swaps are subject to liquidity risk and credit risk. If a credit event occurs, the value of the reference obligation received by the Partnership or its Consolidated Investment Funds, couple with the periodic payments previously received, may be less than the full notional amount it pays to the buyer, resulting in loss of value.

**Limited Diversification**

The Investment Manager attempts to diversify the Consolidated Investment Funds' investments. However, the Consolidated Investment Funds' portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Investment Funds. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Investment Funds to losses that are disproportionate to market movements as a whole.

**Custody Risk**

The clearing operations for the Partnership and its Consolidated Investment Funds are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Investment Funds' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Investment Funds may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Investment Funds' might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**

The Consolidated Investment Funds may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Investment Funds' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Investment Funds. If the value of the Consolidated Investment Funds' securities fall below the margin level required by a counterparty, additional margin deposits are required. If the Consolidated Investment Funds are unable to satisfy a margin call, the counterparty could liquidate the position in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Investment Funds to incur significant losses.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Investment Funds' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Investment Funds. In addition, because the use of leverage allows the Consolidated Investment Funds to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Investment Funds may lose in the event of adverse price movements is high in relation to the amount of their investment.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

In the event of a sudden drop in the value of the Consolidated Investment Funds' assets, the Consolidated Investment Funds may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements.  As a result, the Consolidated Investment Funds may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets.  The banks and dealers that provide financing to the Consolidated Investment Funds have the ability to apply discretionary margin, haircut, financing and collateral valuation policies.  Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar.  The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2008, the Partnership and Consolidated Investment Funds' investments and derivative contracts were predominantly concentrated in the United States and the Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that the Consolidated Investment Funds' are able to realize on the sale of its investments will directly affect the amounts that the investors in the Feeder Funds are able to redeem in connection with the wind down process.  These amounts may differ materially from the partners' capital balances as of December 31, 2008.

**Litigation Risk**
The Partnership and its Consolidated Investment Funds are periodically subject to legal actions arising from the ordinary course of business.  In addition, certain of the Consolidated Investment Funds' Feeder Fund investors have filed lawsuits after receiving notification of the decision to wind-down certain Consolidated Investment Funds' investment portfolios (Note 16).  Refer to Note 17 for a discussion of the open litigation.

11.     **Related Party Transactions**

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages.  A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds.  As of December 31, 2008, approximately $18.8 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other current assets* in the accompanying consolidated balance sheet.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Long Term Incentive Plan and Intercompany Loan Payable to Highland Capital Management Services, Inc. ("HCMSI")**

Effective January 1, 2001, all of the Partnership's employees were transferred to HCMSI, which provides personnel management and consulting services to the Partnership. The Partnership and HCMSI entered into a management agreement whereby the Partnership compensated HCMSI for its employee expenses plus a consulting services fee. As of January 1, 2005, there were no further transactions with HCMSI as all employees were transferred to the Partnership.

Effective January 1, 2001, HCMSI approved a long-term incentive plan ("the LTIP") for select employees who are eligible to receive Long-Term Incentive Units ("the Units") under the LTIP. The number of Units authorized under the LTIP is 30,000,000 and a majority of the Units granted vest 40% during the grant year and 30% for each of the two years thereafter, expiring 10 years after such grant date, unless different terms are agreed upon between the Plan Administrator and the employee. The fair value of the Units are based upon the fair value of the Partnership, as determined in good faith, by James Dondero, the Plan Administrator and the sole shareholder of the general partner and a limited partner of the Partnership. The LTIP was transferred to the Partnership from HCMSI on January 1, 2005.

The Units are exercisable at the discretion of the Plan Administrator, or upon a triggering event defined as the earlier of the following events:

- Change in control

- Initial public offering

- Participant's voluntary or involuntary termination due to death, disability, retirement, or hardship

- Participant's voluntary or involuntary termination other than due to death, disability, retirement, hardship, or cause is exercisable to the extent the Participant is entitled to only 80% of the vested shares.

A total of 3,425,074 Units are outstanding as of December 31, 2008 under the LTIP. During the year ended December 31, 2008, a total of 350,366 Units were exercised. These exercised Units reverted back to the LTIP. During the year ended December 31, 2008, the liability under the LTIP decreased by approximately $38.1 million, which is included in Compensation and benefits in the consolidated statement of income.

The total balance payable to HCMSI was approximately $3.8 million as of December 31, 2008, which is related to the LTIP accrual.

Effective December 31, 2004, all of the employees at HCMSI were transferred to the Partnership, and the management agreement between the Partnership and HCMSI was terminated as to the provision of future services. However, all of the outstanding and unfunded obligations of the Partnership to HCMSI as of December 31, 2004, as well as any additional obligations that may arise in relation to these amounts, will continue to be due and payable to HCMSI until satisfied in accordance with the provisions of the agreements in place.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Accounts Held with Related Party**

During the year the Partnership and its subsidiaries maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2008, balances in the accounts were approximately $15.8 million. Approximately $0.1 million of interest was earned on this account for the year ended December 31, 2008.

**Controlling Positions**

Various members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. Any director's fees received by the Partnership for these services as directors are paid to and retained by the Partnership. As of December 31, 2008, the Partnership and its subsidiaries held the following investments in these companies:

HIGHLY CONFIDENTIAL

D-CNL000037

**Appx. 00935**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

*(in thousands of dollars)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| American Banknote Corporation | Common Equity | $ 15,161 |
| Complete Genomics | Common Equity | 16,000 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 17,857 |
| Highland Financial Corporation | Common Equity | 2,871 |
| Legacy Pharmaceuticals | Common Equity | 385 |
| Marcal paper Mills, LLC | Common Equity | 55 |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 5,533 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 767 |
| Safety-Kleen Inc. | Common Equity | 183,720 |
| Trussway Industries, Inc. | Common Equity | 11,519 |
| Blackwell BMC, LLC | Common Equity | 17,225 |
| Epocal, Inc. | Preferred Equity | 76,403 |
| Solstice Neurosciences, Inc. | Preferred Equity | 10,700 |
| Terrestar Corporation | Preferred Equity | 60,250 |
| Highland Distressed Opportunities Fund | Closed-End Mutual Fund | 2,140 |
| Highland Credit Strategies Fund | Closed-End Mutual Fund | 3,607 |
| Highland Special Situations Fund | Mutual Fund | 2,094 |
| Highland Long/Short Equity Fund | Mutual Fund | 193 |
| Highland High Income Fund | Mutual Fund | 177 |
| Highland Income Fund | Mutual Fund | 330 |
| Highland Healthcare Fund | Mutual Fund | 2,295 |
| Broadstripe Holdings, LLC | Loan Revolver | 1,986 |
| Home Interiors & Gifts, Inc. | Loan Revolver | 5,024 |
| Legacy Pharmaceuticals | Loan Revolver | (871) |
| Home Interiors & Gifts, Inc. | Initial Term Loan | 18,988 |
| Consolidated Restaurant Companies, Inc. | Term Loan | 9,366 |
| Blackwell BMC, LLC | Term Loan | 2,376 |
| Decision One Corporation | Term Loan | 1,000 |
| Legacy Pharmaceuticals | Term Loan | 13,121 |
| Broadstripe Holdings, LLC | Term Loan - First Lien | 7,806 |
| Cornerstone Healthcare Group Holding, Inc. | Loan - Second Lien | 24,014 |
| Broadstripe Holdings, LLC | Term Loan - Second Lien | 8,918 |
| Decision One Corporation | Term Loan B | 1,601 |
| Highland Financial Partners, L.P. | Long-Term Debt | 15,661 |
| Home Interiors & Gifts, Inc. | Swap | (9,878) |

During the year ended December 31, 2008, the Partnership earned approximately $0.3 million of income from those entities where members of management serve as members of the Board of Directors. The amount is included in Other income in the consolidated statement of income.

HIGHLY CONFIDENTIAL

D-CNL000038

**Appx. 00936**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Real Estate Partnerships**

The Partnership and its principals serve as the general partner of the general partner of various partnership investments in the Real Estate Fund and Highland Financial Real Estate Corporation. Such investments are listed below:

*(in thousands of dollars)*

| Limited Partnership | Value |
|---|---:|
| HE Sugar Land Project, LLC | $ 13,719 |
| HCREA Prosper Crossing West, L.P. | 13,632 |
| HCREA Canyon Falls | 10,175 |
| HCREA Prosper Crossing East, L.P. | 8,983 |
| HCREA Canyon Falls Town Center, L.P. | 8,511 |
| HCREA Kings Wood | 6,672 |
| HCREA Indian Creek, L.P. | 5,467 |
| HCREA Terrell Land, L.P. | 5,124 |
| HE 2425 West Loop Project, LLC | 4,415 |
| HE 1001 West Loop Project, LLC | 3,922 |
| HCREA Wilcox 190, L.P. | 3,629 |
| HCREA Celina Springs, L.P. | 3,504 |
| HE Mezz KR, LLC | 3,133 |
| HCREA The Tribute, L.P. | 2,986 |
| HCREA Nolen Drive, L.P. | 2,193 |
| HCREA Wylie Partners I, L.P. | 1,764 |
| HCREA Princeton 380, L.P. | 1,411 |
| HCREA Highland Village, L.P. | 1,202 |
| HCREA Lockhill, Retail, L.P. | 1,049 |
| HCREA Pilot Point Land, L.P. | 1,030 |
| HCREA Grey Walls, L.P. | 880 |
| Highland Capital Terrell Investment Partners, L.P. | 565 |
| HCREA Embarcadero, L.P. | 278 |
| HCREA Hutchins Truck Service, L.P. | 110 |
| HCREA Trimarchi of North Dallas, L.P. | - |
| HCREA Court Glen, L.P. | - |
| HCREA Breckenridge, L.P. | - |

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank, SSB, an affiliate of the Partnership, was the agent bank. Interest earned on the loans during the year was approximately $27.8 million. At December 31, 2008, these subsidiaries were invested in NexBank, SSB agented loans with commitments and market values totaling approximately $462.1 million and $175 million, respectively.

HIGHLY CONFIDENTIAL

D-CNL000039

**Appx. 00937**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Notes to Affiliates**

On July 31, 2006, the Partnership issued a promissory note in the amount of $400,000 to an employee of an affiliate. The note accrued interest at the mid-term applicable federal rate as promulgated by the Internal Revenue Service. The note is payable in one lump sum on the earlier of July 31, 2010 or an event of acceleration. In July 2008, the remaining balance of the promissory note was forgiven.

On August 1, 2008, the Partnership issued a promissory note in the amount of $500,000 to an employee of a subsidiary. The note accrues interest at a rate of LIBOR plus 1.75%, compounded quarterly. The note is payable in one lump sum on the earlier of August 1, 2011 or an event of acceleration. As of December 31, 2008, the principal amount on the promissory note was $500,000 with interest accrued of approximately $15,000.

On May 21, 2007, the Partnership issued two loans to employees of a subsidiary aggregating $2.0 million, each with a principal balance of $1.0 million. The note accrues interest at a rate of LIBOR plus 1.75%, compounded quarterly. The principal balance plus all accrued interest is due on the earlier of May 1, 2010 or an event of acceleration. During 2008, 30% of the outstanding principal of each loan was forgiven. As of December 31, 2008, each loan principal was $0.7 million, with interest accrued of approximately $65,000.

On August 20, 2008, the Partnership issued a promissory note in the amount of $330,000 to an employee of the Partnership. The note accrues interest at a rate of LIBOR plus 1.75%. The note is payable in one lump sum on the earlier of August 20, 2015 or an event of acceleration. As of December 31, 2008, the principal amount on the promissory note was $330,000 with interest accrued of approximately $5,000.

On August 1, 2008, the Partnership issued a promissory note in the amount of $500,000 to an employee of a subsidiary. The note accrues interest at a rate of LIBOR plus 1.75%, compounded quarterly. The note is payable in one lump sum on the earlier of August 1, 2011 or an event of acceleration. As of December 31, 2008, the principal amount on the promissory note was $500,000 with interest accrued of approximately $9,000.

On October 15, 2008, the Partnership issued a promissory note in the amount of $500,000 to an employee of a subsidiary. The note accrues interest at a rate of LIBOR plus 1.75%, compounded quarterly. The note is payable in one lump sum on the earlier of October 15, 2011 or an event of acceleration. As of December 31, 2008, the principal amount on the promissory note was $500,000 with interest accrued of approximately $4,000.

On December 19, 2007, the Partnership issued a promissory note in the amount of $30 million to a subsidiary of HFP. The note accrues interest quarterly on the principal balance on the last business day of each quarter ending March 31, June 30, September 30, and December 31 at a rate equal to the Fed Funds Rate as published by the Federal Reserve Bank of New York on the Business Day next succeeding each quarter end. The note is payable in $5 million quarterly installments commencing June 30, 2008 and is due and payable in full on June 30, 2009, subject however to acceleration. All payments are first applied to interest and then to principal. In July 2008, the Partnership received six million common units of HFP through a conversion of the promissory note at a conversion price of $5 per common unit.

38

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

On September 12, 2008, the Partnership issued a promissory note in the amount of $13.9 million to a subsidiary of HFP. The note accrues interest monthly on the principal balance on the last business day of each month at a rate equal to the Fed Funds Rate as published by the Federal Reserve Bank of New York on the Business Day next succeeding each month end. As of December 31, 2008, the principal amount on the promissory note was $0.9 million.

**Investments in Affiliates**
The Partnership and its subsidiaries are the investment/collateral manager for approximately $69.2 million of the CDO Master Fund's investments, consisting of United States and European Floating Rate CLO Mezzanine Tranches, Residual CLO Equity Tranches, common stock, Investment Funds, total return swaps, credit default swaps, long-term debt and claims. During the year, CDO Master Fund earned interest income of $74.9 million and net realized/unrealized losses on investment transactions of $386 million from related party investments.

In 2006, the Partnership was granted 124,468 restricted HFP units and 809,263 non-qualified HFP unit options. The options were granted with a strike price of $15.00 and $16.50 per unit. Both the restricted units and options vest in thirds on the anniversary of the grant date. In 2008, 41,489 and 273,087 of restricted units and options vested, respectively. Of the options that vested, 114,476 were exercised at a strike price of $15.

On June 25, 2008, HCSA received an in kind distribution of 3,049,732 units of HFP in lieu of their incentive allocation balance. The conversion of HCSA's incentive allocation balance to HFP units implied a conversion price of $5 per unit.

On September 26, 2008, HFP issued $316 million of senior secured notes to the Consolidated Investment Funds in exchange for an interest in certain assets which included collateralized loan obligation securities. Due to a lack of a transfer of control caused by certain restrictive covenants associated with the exchange, these assets continue to be recognized on the Consolidated Statement of Assets, Liabilities and Partners' Capital of the Consolidated Investment Funds. Upon full payment of the outstanding principal of the senior secured notes, the restrictive covenants of the assets will be satisfied and HFP will have unencumbered interests in the assets. The Consolidated Investment Funds have recorded a liability to account for the future release of the assets, which is classified on their balance sheets as Obligation to return collateral. The Consolidated Investments Funds elected to apply the fair value option prescribed by SFAS No. 159 when they first recognized the liability, which resulted in the liability being carried at the same value as the assets in aggregate. Accordingly, the change in the fair value of the liability between September 26 and December 31, 2008 has been recognized as an unrealized gain. As discussed in Note 18, the senior secured notes were terminated subsequent to December 31, 2008.

**Charitable Contributions**
One of the Partnership's limited partners serves on the board of directors of Grace Ministries, a not-for-profit organization. During the year, the Partnership made a charitable contribution of $0.1 million to Grace Ministries. This amount is presented in Other operating expenses.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

**Services Performed by an Affiliate**
In March 2007, Highland Capital of New York, L.P., a New York limited partnership ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2008, total marketing fee expense charged to the Partnership by Highland New York was approximately $4.8 million and as of December 31, 2008, amounts owed to Highland New York for services rendered was approximately $2.4 million.

**Participation Agreement**
The Partnership and its Consolidated Investment Funds purchased protection under credit default swaps referencing residential mortgage-backed collateralized debt obligations during the year. The Partnership and some of its Consolidated Investment Funds along with an affiliated entity under common control (collectively, the "Participants") entered into related participation agreements (collectively, the "Agreements") at the time the positions were established. During the year, the Participants traded credit default swaps with a notional value of approximately $294.8 million that were governed under the Agreements with the Participants. As of December 31, 2008, all Agreements between the Participants were closed.

**Letter of Credit**
In April 2007, the Partnership entered into a $4 million standby letter of credit ("LC") on behalf of one of its Consolidated Investment Funds with the Bank of Nova Scotia. Interest is charged at 1.95%. As of December 24, 2008, the rate of interest had increased to 3.95%. As of December 31, 2008, there were no amounts drawn against the LC. Any interest paid by the Partnership on behalf of the Consolidated Investment Fund is reimbursed through an investment in the fund. For the year ended December 31, 2008, $0.1 million of interest had been paid by the Partnership on the funds behalf.

**Notes from Affiliates**
On April 15, 2008, the Partnership entered into a $24.6 million promissory note with an employee of the Partnership. The note accrues interest at a rate of 6% per annum, compounded annually and is payable upon demand. As of December 31, 2008, the principal amount on the promissory note was $3.5 million with interest accrued of approximately $12,000.

On April 15, 2008, the Partnership entered into an $8.2 million promissory note with an employee of the Partnership. The note accrues interest at a rate of 6% per annum, compounded annually and is payable upon demand. As of December 31, 2008, the principal amount on the promissory note was $4 million with interest accrued of approximately $17,000.

On October 3, 2008, the Partnership entered into a $2 million promissory note with Governance RE, Ltd ("Gov Re"). The note accrues interest at a rate of LIBOR plus 1.75%, compounded annually and is payable on demand. As of December 31, 2008, the principal amount on the promissory note was $2 million with interest accrued of approximately $28,000.

**Loans to Affiliates**
During 2008 the Partnership entered into short-term, non-interest bearing loans to its Consolidated Investment Funds and affiliates. The total amount of borrowings made to the Consolidated Investment Funds and affiliates in 2008 was approximately $127.7 million. As of December 31, 2008, all amounts borrowed had been repaid to the Partnership.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Intercompany Balance**
During 2008, the Partnership and an affiliate engaged in a series of short-term, non-interest bearing transactions. The affiliate's primary function is to provide personnel management and consulting services to the Partnership. As of December 31, 2008, the Partnership's intercompany liability to the affiliate was $20.7 million.

12. **Rentals Under Operating Leases**

The following is a schedule of future rental payments on noncancelable tenant operating leases for properties consolidated by HFREC at December 31, 2008. The schedule does not include any amounts due from tenants upon the exercise of renewal options under certain leases. The underlying companies consolidated by HFREC also received reimbursements from tenants for certain common area maintenance ("CAM") expenses, which may include CAM costs, insurance and real estate taxes. Reimbursements for insurance and real estate taxes are not included in the following schedule.

*(in thousands of dollars)*

| Years Ending December 31, | | |
|---|---|---|
| 2009 | $ | 15,224 |
| 2010 | | 7,841 |
| 2011 | | 4,666 |
| 2012 | | 3,703 |
| 2013 | | 2,827 |

13. **Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's consolidated balance sheet, consolidated statement of income, or its liquidity.

**Warehouse Guarantee**
On July 6, 2007, the Partnership was a party to a warehouse agreement as a first loss guarantor. HCM Trident entered into the warehouse agreement and is entitled to the positive net carry or is required to pay the negative net carry. The Partnership guaranteed the payment of the negative net carry owed by HCM Trident. This guarantee was capped at 25% of the initial purchase price of the warehouse assets of $25.7 million, or approximately $6.4 million plus accrued interest. The Partnership fronted $3.8 million to HCM Trident as a deposit for the first loss guarantee.

On July 14, 2008, the warehouse agreement was amended to reflect the Partnership guaranteeing 100% of the negative net carry. The Partnership posted an additional $1.5 million, for a total guarantee deposit on hand of $3.1 million, net of any prior loss amounts.

41

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

On November 2, 2008, the warehouse agreement was amended to reflect the Partnership guaranteeing any credit facility amortization payments of principal and interest on HCM Trident's behalf. As of December 31, 2008, the remaining balance on the facility with accrued interest was approximately $12.3 million.

**Operating Leases**

Future minimum lease payments under operating lease commitments of the Partnership and its consolidated entities with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands of dollars)*

| Years Ending December 31, | | |
|---|---|---|
| 2009 | $ | 2,354 |
| 2010 | | 2,230 |
| 2011 | | 2,022 |
| Thereafter | | - |
| | $ | 6,606 |

Total rental expense of the Partnership and its consolidated entities for operating leases was approximately $4.9 million for the year ended December 31, 2008.

**Loan Commitments**

Loan and other participation interests purchased by the Consolidated Investment Funds such as bank debt and trade claims may include accompanying letters of credit, revolving credit arrangements or other financing commitments obligating the Consolidated Investment Funds to advance additional amounts on demand. At December 31, 2008, the Consolidated Investment Funds had outstanding loan commitments of approximately $70.8 million. The total amount of outstanding commitments does not necessarily reflect the actual future cash requirements, as commitments may expire unused.

14. **Postretirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

HIGHLY CONFIDENTIAL

D-CNL000044

Appx. 00942

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. Therefore, no new participants shall enter the plan after 2008 and no new benefits shall accrue under the plan after 2008. The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2008 are reconciled in the tables below.

*(in thousands of dollars)*

| Change in projected benefit obligation | | 2008 |
|---|---|---|
| Benefit obligation at commencement of plan | $ | 4,486 |
| Service cost | | 2,608 |
| Interest cost | | 254 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | (3,008) |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (797) |
| Benefit obligation at end of year | $ | 3,543 |

| Change in plan assets | | 2008 |
|---|---|---|
| Fair value of plan assets at commencement of the plan | $ | 2,588 |
| Actual return on plan assets | | (2,783) |
| Acquisition/(divestiture) | | - |
| Employer contribution | | 2,138 |
| Plan participants' contributions | | - |
| Benefits paid | | (797) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 1,146 |

| Reconciliation of Funded Status | | 2008 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 3,543 |
| Projected benefit obligation at end of year | | 3,543 |
| Fair value of assets at end of year | | 1,146 |
| Funded status at end of year | $ | (2,397) |

The Partnership expects to contribute $2.6 million to the plan during 2009.

**Assumptions**
Weighted-average assumptions used to determine benefit obligations at December 31, 2008:

| | |
|---|---|
| Discount rate | 6.30% |
| Rate of compensation increase | N/A |

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2008:

| | |
|---|---|
| Discount rate | 6.50% |
| Expected long-term return on plan assets | 6.50% |
| Rate of compensation increase | N/A |

**15.    Goodwill, Other Intangible Assets and Purchased Investment Management Contracts**

Below is a summary of the Partnership's goodwill and other intangible assets as of December 31, 2008:

| *(in thousands of dollars)* | | Carrying Value |
|---|---|---|
| Lease intangibles, net | $ | 14,425 |
| Highland Floating Rate Fund | | 12,672 |
| Highland Floating Rate Advantage Fund | | 11,328 |
| Goodwill for Highland Europe | | 8,020 |
| Licenses | | 2,021 |
| Patents | | 1,008 |
| | $ | 49,474 |

On April 9, 2004, the Partnership purchased the management agreements Highland Floating Rate Fund (the "Floating Rate Fund") and Highland Floating Rate Advantage Fund (the "Advantage Fund"). The combined purchase price for the above agreements was $24.0 million. The purchase price was allocated among the Purchased Funds pro-rata based on the approximate combined total managed assets of the funds as of the date of purchase. As a result, $12.7 million of the purchase price was allocated to the Floating Rate Fund and $11.3 million was allocated to the Advantage Fund.

On January 21, 2000, the Partnership purchased the investment advisory agreement for Prospect Street High Income Shares, Inc. ("PHY"), a diversified, closed-end RIC. The purchase price was approximately $11.9 million.

On July 31, 2001, the Partnership purchased the investment advisory agreement for Prospect Street Income Shares, Inc. ("CNN"), a diversified, closed-end RIC. The purchase price was approximately $2.2 million.

On July 21, 2008, PHY and CNN were reorganized into Highland Credit Strategies Fund. The reorganization was based on the respective Funds' relative net asset values as of 4:00 p.m. on Friday July 18, 2008. As PHY and CNN ceased to exist after the reorganization, the prior capitalized costs of $5.7 million for the purchased investment advisory agreements were recognized into income.

For the remaining purchased investment advisory agreements, the Partnership performed an impairment test under SFAS No. 142. The Partnership's management analyzed market multiples on retail asset managers within the industry as of December 31, 2008 to determine fair value of these assets. The Partnership has determined no impairment charge is necessary for the current year.

44

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

On December 17, 2007, HySky, LLC ("HySky") purchased all of the assets and liabilities of Equitas, LLC for approximately $3.8 million. Through this purchase, HySky obtained two patents with a purchase price value of $1.1 million and an FCC license with a value of $2.2 million. As of December 31, 2008, $0.3 million in amortization has been recognized on these assets.

During 2007, the companies consolidated by HFREC capitalized $20.6 million of lease intangibles related to their property acquisitions. As of December 31, 2008, lease intangibles are as follows:

Lease intangibles consist of the following at December 31, 2008:

*(in thousands of dollars)*

| | | |
|---|---:|---:|
| Leasing commissions | $ | 1,634 |
| Value of in-place leases | | 8,495 |
| Tenant relationships | | 10,426 |
| Total lease intangibles | | 20,555 |
| Less: Accumulated amortization | | (6,130) |
| Lease intangibles, net | $ | 14,425 |

The amortization expense of lease intangibles is as follows for the five years ending December 31:

*(in thousands of dollars)*

| | | |
|---|---:|---:|
| 2009 | $ | 4,070 |
| 2010 | | 2,535 |
| 2011 | | 1,123 |
| 2012 | | 1,121 |
| 2013 | | 1,118 |

45

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

16. **Consolidated Investment Fund Wind-Downs**

Throughout 2008, Credit Strategies Master and Crusader Master were negatively affected by deteriorating conditions in the overall economy and credit markets. These conditions became more severe during the third and fourth quarters of 2008 and generated significant losses on various derivative transactions and repurchase agreements to which Credit Strategies Master and Crusader Master were a party. In addition, certain assets that Credit Strategies Master and Crusader Master purchased on margin through prime brokerage agreements experienced a significant decline in value. In certain cases, Credit Strategies Master and Crusader Master were unable to post the collateral required to secure these losses, and the counterparties provided notice of their intent to terminate the agreements. As a result, access to the credit that Credit Strategies Master and Crusader Master used to manage their investing and financing activities became highly constrained, and in some cases unavailable. In light of these circumstances, the General Partners (the general partner of Highland Credit Strategies Fund, L.P. and the general partner of Highland Crusader Fund, L.P.) and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. concluded, in consultation with the Investment Manager, that it would be in the best interests of their investors to wind down the investment portfolios of Credit Strategies Master and Crusader Master. On October 15, 2008, the Investment Manager notified investors that it would begin the wind-down process immediately. The Investment Manager also restricted subscriptions and the payment of withdrawals to the Feeder Funds effective immediately.

In connection with the wind down, the limited partner interests of the Feeder Funds were compulsorily withdrawn/redeemed as set forth in the terms of the governing documents. A formal plan of liquidation has not been finalized by management, and there are no assurances that investors will realize the remaining equity balance over the course of the wind down of Credit Strategies Master and Crusader Master. The General Partner has suspended payment of distributions, and any outstanding balances with respect to withdrawal and/or redemption requests that were made prior to October 15, 2008, will be made on a pro-rata basis with the amounts owed to investors that have been compulsorily withdrawn/redeemed, unless a plan of distribution dictates otherwise. The equity of the investors for Credit Strategies Master that were compulsorily redeemed was zero. The equity of the investors for Crusader Master that were compulsorily redeemed was $423.6 million. Future distributions will only be made as the value of Credit Strategies and Crusader Masters' investments are realized and all obligations due to counterparties and service providers of Credit Strategies and Crusader Master and their representative Feeder Funds have been satisfied.

As of December 31, 2008, the estimated value of the net assets available for distribution from Crusader Master and Credit Strategies Master to their Feeder Funds was approximately $1,092 million and $163.5 million, respectively. The actual amounts distributed upon completion of the wind down process are inherently uncertain and may differ materially from the partners' capital as of December 31, 2008. The Investment Manager estimates that the wind-down of Credit Strategies Master and Crusader Master could take up to four years to complete. Capital will be distributed as it becomes available in accordance with a plan of distribution, once implemented.

A summary of the significant events that were considered by the General Partners and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. in the decision to wind-down the investment portfolios of Credit Strategies Master and Crusader Master are provided below.

46

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2008**

**Credit Strategies Master Wind-Down**
***Total Return Swap***
Since its inception, Credit Strategies Master was invested in a total return swap program that allowed it to gain exposure to bank loans and high yield corporate bonds. During September 2008, the leveraged loan market began to deteriorate, and Credit Strategies Master was required to post cash collateral based on the declining value of the loans held in the swap portfolio. As of September 30, 2008, Credit Strategies Master had met multiple collateral calls.

The fall in leveraged loan prices accelerated dramatically during the first week of October, which resulted in approximately $43.1 million of additional collateral calls. Credit Strategies Master did not have sufficient sources of liquidity to post all of the required collateral and could not sell assets at prices that reflected their long-term value. Therefore, the counterparty delivered notice of its intent to terminate the swap agreement effective October 15, 2008. The counterparty then offered to (1) sell the remaining assets in the swap portfolio, which would have required Credit Strategies Master to compensate the counterparty for any realized losses in excess of the $473.3 million of collateral that it had previously posted; or (2) allow Credit Strategies Master to forfeit any rights to the collateral in exchange for terminating all current and future exposures under the swap agreement. Credit Strategies Master elected to forfeit its rights to the collateral and executed a release and waiver with the counterparty. The release and waiver became effective on October 16, 2008.

***Repurchase Agreement***
Credit Strategies Master entered into a repurchase agreement with a counterparty, which allowed it to gain exposure to high yield corporate bonds and structured credit securities on a leveraged basis. In October 2008, the counterparty contended that Credit Strategies Master failed to meet margin calls that were required due to a decline in the fair value of the assets. The counterparty delivered a formal notice of default and their intent to exercise the rights and remedies available to it.

The repurchase agreement stipulated that the termination values for the underlying assets would be established through bids received from the market or recognized pricing sources. The counterparty contends that it offered the assets for sale through bids-wanted-in-competition. After netting the proceeds received from the sales, the counterparty requested payment from Credit Strategies Master of $14.3 million. Credit Strategies Master has disputed the liability, and the counterparty filed a lawsuit seeking recovery of the balance (Note 17).

***Credit Default Swaps***
Credit Strategies Master entered into various credit default swap transactions with a major financial institution for both hedging and speculative purposes. In October 2008, the counterparty provided a notice of termination due to a decline in the value of swaps. Credit Strategies Master disputed the notice on the basis that an event of default had not occurred; however, the counterparty proceeded to terminate the outstanding swap transactions, which resulted in realized losses of approximately $6.0 million. Credit Strategies Master has a net outstanding claim payable to the counterparty of $2.6 million.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

*Prime Brokerage Agreement*

During the first two quarters of 2008, Credit Strategies Master actively purchased equity securities, treasury bonds, investment grade corporate bonds and other liquid assets on margin through a prime brokerage agreement with a major financial institution.  The value of the investments declined during the third quarter, and in October 2008, the counterparty issued a notice of default based on a decline the net asset value of the account during the twelve month period ended September 30, 2008.  As a result, Credit Strategies Master was required to liquidate the remaining investments in the account and by the end of the year had realized an aggregate net loss of approximately $68.2 million on the margin transactions.

**Crusader Master Wind-Down**
*Lehman Exposure*
Crusader Master provided protection under a credit default swap agreement that referenced debt issued by Lehman Brothers Holding, Inc. ("Lehman").  Following Lehman's bankruptcy filing on September 15, 2008, Crusader Master was required to post $39.1 million of cash to satisfy a margin call from the counterparty. In aggregate, Crusader Master realized net losses $54.6 million of losses under the agreement.

*Repurchase Agreement*
Crusader Master entered into a repurchase agreement with a counterparty, which allowed it to gain exposure to high yield corporate bonds and structured credit securities on a leveraged basis.  In October 2008, the counterparty contended that Crusader Master failed to meet margin calls that were required due to a decline in the fair value of the assets. The counterparty delivered a formal notice of default and its intent to exercise the rights and remedies available to them.

The repurchase agreement stipulated that the termination values for the underlying assets would be established through bids received from the market or recognized pricing sources. The counterparty contends that it offered the assets for sale through bids-wanted-in-competition. After netting the proceeds received from the sales and certain balances to Crusader Master, the counterparty requested payment from Crusader Master of approximately $50.0 million. Crusader Master has disputed the amount of the liability, and the counterparty filed a lawsuit seeking recovery of the balance.

*Prime Brokerage Agreement*
During the first two quarters of 2008, Crusader Master actively purchased equity securities, treasury bonds, investment grade corporate bonds and other liquid assets on margin through a prime brokerage agreement with a major financial institution.  The value of the investments declined during the third quarter, and in September 2008, the counterparty issued a notice of default based on Crusader Master's alleged failure to meet a margin call.  Crusader Master was ultimately required to transfer or liquidate the remaining investments held in the account and by the end of the year had realized an aggregate net loss of approximately $21.6 million on the margin transactions.

HIGHLY CONFIDENTIAL

D-CNL000050

Appx. 00948

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

**17.    Legal Proceedings**

In April 2007, CDO Master Fund entered into a risk sharing agreement structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Financial Partners, L.P. ("HFP"), which is an affiliated entity. The warehouse was financed by a reputable financial institution and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, the counterparty agreed to extend it for one year on March 15, 2008. As a condition of the extension, CDO Master Fund posted $10.2 million of cash as collateral. In addition, HFC posted certain securities on behalf of CDO Master Fund and HFP. During October and November 2008, the counterparty requested additional collateral calls from CDO Master Fund and HFP totaling $20 million. Due to liquidity constraints, CDO Master Fund was unable to meet the November call, and the counterparty elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by the counterparty and sold on the open market through bids-wanted-in-competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, the counterparty notified CDO Master Fund that its pro-rate share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount.

On February 24, 2009, the counterparty filed a lawsuit against CDO Master Fund and HFP in the New York State Supreme Court of Manhattan alleging that it had suffered no less than $745 million in aggregate losses due to the depreciation in value of the warehouse collateral. The Partnership was also named as a party to the lawsuit. The Partnership does not believe it has any liability in this case and has filed a motion to have its name removed from the lawsuit.

Certain consolidated investment funds (collectively, the "Plaintiffs") filed a claim against Deutsche Bank AG and Deutsche Bank Securities, Inc. (collectively, "Deutsche Bank") in Dallas County District Court alleging fraudulent inducement, fraud and breach of contract in connection with three repurchase agreements to which the Plaintiffs and Deutsche Bank were a party. Deutsche Bank subsequently filed a lawsuit against the Plaintiffs in the United Kingdom on November 7, 2008 alleging breach of contract and fraud. The court in the United Kingdom has granted Deutsche Bank an injunction, which compels the Plaintiffs to stay the action in Dallas County Court until the action in the United Kingdom is resolved. The Plaintiffs have filed a motion to appeal the injunction and are waiting for the court to rule. Based on the demand for payment that Deutsche Bank sent prior to the onset of the litigation, the consolidated investment funds have accrued liabilities of $64.3 million in the accompanying consolidated financial statements.

**18.    Subsequent Events**

In January 2009, the Partnership, certain consolidated investment funds and other affiliated entities were named as parties to a lawsuit claiming breach of fiduciary duties for their alleged failure to comply with obligations owed under a credit agreement. The plaintiff is seeking an unspecified amount of actual damages as well as exemplary damages and attorney's fees. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
Notes to Consolidated Financial Statements
December 31, 2008

On February 4, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent and that it was in the best interest of the fund to liquidate the fund's remaining assets. The proceeds from the asset liquidations will be distributed to the remaining financing counterparties and other senior and trade creditors as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

On March 20, 2009, the Partnership and its Consolidated Investment Funds agreed to terminate the senior secured notes that were issued by HFP. As a result, the Consolidated Investment Funds have been relieved of their obligation to transfer the underlying assets to HFP. As of January 1, 2009, the fair value of the assets securitizing the note was $233.6 million.

In April 2009, a partner withdrew from the Partnership. The departing partner's Partnership interest is to be purchased by the Partnership or the remaining partners.

In April 2009, HYMF, Inc. filed a lawsuit in the New York State Court against the Partnership and certain consolidated investment funds (collectively "the Defendants"). The lawsuit alleges that the Defendants breached their contractual and fiduciary duties by failing to return HYMF's original investment in the consolidated investment funds. The Defendants believe they acted in accordance with the provisions of their partnership agreements and intend to vigorously defend against the lawsuit. At this time, discovery has not yet been initiated, and management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

In April 2009, the Partnership and certain consolidated investment funds (collectively "the Plaintiffs") filed a lawsuit in Texas District Court against HYMF, Inc. The lawsuit states that HYMF, Inc. failed to properly terminate the prepaid forward contract and accreting strike option. The Plaintiffs believe they acted in accordance with the provisions of the prepaid forward and accreting strike option contracts. At this time management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount of range of potential loss with any reasonable degree of certainty.

In April 2009, Real Estate Fund received a forbearance agreement with respect to the REF credit agreement. The lender allowed for the forbearance of any prior obligations until October 15, 2009 where at such time, the facility is due in full.

During the first quarter of 2009, certain investors in Highland Credit Strategies Fund, Ltd. filed lawsuits in response to the decision to wind-down Credit Strategies Master's investment portfolio (Note 16). Each of these investors is seeking to recover the outstanding balances due under the redemption requests that they submitted prior to the announcement of the wind-down. They have also made various claims, including breach of fiduciary duties, committed negligence, tortuous interference with the payment of redemption amounts, and/or committed fraud. Both the Partnership and Highland Credit Strategies Fund, Ltd. have been named as parties to the lawsuits. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2008**

In July 2009, the Partnership amended and restated its Credit Agreement (the "2009 Credit Agreement"). All amounts borrowed under the 2009 Credit Agreement are due on July 21, 2011. For base rate loans, interest is charged at a rate of 4% plus the highest of (i) the prime rate, (ii) 2% plus the Federal Funds Rate, and (iii) 2% plus LIBOR. For LIBOR loans, interest is charged at a rate of 5% plus LIBOR. For base rate loans, interest is payable on the last business day of each calendar month, as well as the maturity date. For LIBOR loans, interest is payable on the last day of each calendar month, as well as the maturity date.

In July 2009, certain investors in Highland Credit Strategies Fund, L.P. and Highland Credit Strategies Fund, Ltd. filed a lawsuit seeking damages for alleged recission, fraud, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, various violations of Massachusetts general law, and aiding and abetting fiduciary duty. The Partnership, Highland Credit Strategies Fund, L.P., Highland Credit Strategies Fund, Ltd., employees of the Partnership, J.P. Morgan Investor Services Co., and J.P. Morgan Hedge Fund Services (Bermuda), Ltd. have been named as parties to the lawsuit. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree or certainty.

HIGHLY CONFIDENTIAL

D-CNL000053

**Appx. 00951**

**Supplemental Information
Highland Capital Management, L.P.
Unconsolidated Balance Sheet and Income
Statement (Unaudited)
December 31, 2008**

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Supplemental Unconsolidated Balance Sheet (unaudited)**
**December 31, 2008**

*(in thousands of dollars)*

**Assets**
Current assets

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 10,725 |
| Restricted cash | | 1,400 |
| Investments, at fair value (cost $141,819) | | 75,821 |
| Equity method investees | | 36,149 |
| Management and incentive fees receivable | | 19,715 |
| Due from brokers | | 8,189 |
| Other current assets | | 29,076 |
| Deferred incentive fees receivable | | 25,997 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets, net | | 388 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $6,399 | | 9,511 |
| Total assets | $ | 240,971 |

**Liabilities and Partners' Capital**
Liabilities

| | | |
|---|---|---|
| Accounts payable | $ | 12,992 |
| Accrued and other liabilities | | 69,369 |
| Debt and notes payable | | 150,875 |
| Long-term incentive plan | | 6,945 |
| Total liabilities | | 240,181 |
| Partners' capital | | 790 |
| Total liabilities and partners' capital | $ | 240,971 |

Should be read in conjunction with audited financial statements.

52

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Unconsolidated Statement of Income (unaudited)**
**Year Ended December 31, 2008**

*(in thousands of dollars)*

| | | |
|---|---:|---:|
| **Revenue** | | |
| Management fees | $ | 201,660 |
| Incentive fees/allocations | | 870 |
| Interest and investment income | | 4,009 |
| Other income | | 11,278 |
| Total revenue | | 217,817 |
| **Operating expenses** | | |
| Compensation and benefits | | (1,970) |
| Professional fees | | 24,717 |
| Investment and research consulting | | 2,281 |
| Amortization and depreciation | | 2,191 |
| Interest expense | | 9,568 |
| Net depreciation on deferred incentive fees | | 150,281 |
| Other operating expenses | | 32,614 |
| Total expenses | | 219,682 |
| Income/(loss) before investment and derivative activities | | (1,865) |
| **Realized and unrealized gain/(loss) from investments and derivative transactions:** | | |
| Net realized gain/(loss) on sale of investment transactions | | 20,156 |
| Net change in unrealized gain/(loss) on investments | | (490,052) |
| Total realized and unrealized gain/(loss) from investments and derivative transactions | | (469,896) |
| **Realized and unrealized earnings from equity method investees:** | | |
| Net realized earnings from equity method investees | | (128,462) |
| Net unrealized earnings from equity method investees | | (7,038) |
| Total realized and unrealized earnings from equity method investees | | (135,500) |
| Net income | $ | (607,261) |

Should be read in conjunction with audited financial statements.

53

D-CNL000056

**Appx. 00954**

# EXHIBIT 64

Appx. 00955

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements**
**And Supplemental Information**
**With Report of Independent Auditors**
**Year Ended December 31, 2009**

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### Contents
### December 31, 2009

Page

**Report of Independent Auditors**............................................................................................................ 1

**Audited Consolidated Financial Statements**

Consolidated Balance Sheet...................................................................................................................... 2

Consolidated Statement of Income ........................................................................................................... 3

Consolidated Statement of Changes in Partners' Capital.......................................................................... 4

Consolidated Statement of Cash Flows .................................................................................................... 5

Notes to Consolidated Financial Statements ............................................................................................ 7

Supplemental Information ........................................................................................................................ 43

HIGHLY CONFIDENTIAL

**Report of Independent Auditors**

To the General and Limited Partners of
Highland Capital Management, L.P:

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of income, of changes in partners' capital and of cash flows (hereinafter referred to as the "financial statements") present fairly, in all material respects, the consolidated financial position of Highland Capital Management, L.P. (the "Partnership") and its subsidiaries at December 31, 2009, and the consolidated results of their operations, the changes in their partners' capital, and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The supplemental unconsolidated balance sheet and statement of income are presented for purposes of additional information, and are not a required part of the consolidated financial statements. Such information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole.

May 21, 2010

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
## Consolidated Balance Sheet
### December 31, 2009

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 50,246 |
| Restricted cash | | 248,044 |
| Investments, at fair value (cost $3,953,077) | | 2,013,858 |
| Restricted investments, at fair value (cost $5,245) | | 5,508 |
| Unrealized gains on derivative contracts | | 1,045 |
| Management and incentive fees receivable | | 16,783 |
| Due from brokers | | 8,784 |
| Other assets | | 45,712 |
| Deferred incentive fees receivable | | 28,891 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets, net | | 8,020 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $9,536 | | 14,891 |
| **Total assets** | $ | 2,465,782 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,451 |
| Securities sold, not yet purchased (proceeds $15,093) | | 21,406 |
| Unrealized losses on derivative contracts (proceeds $2,563) | | 103,650 |
| Withdrawals payable | | 54,631 |
| Interest payable | | 3,737 |
| Due to brokers | | 394,359 |
| Due to brokers for securities purchased not yet settled | | 115,890 |
| Accrued and other liabilities | | 57,221 |
| Secured borrowing | | 61,842 |
| Debt and notes payable | | 279,509 |
| Long-term incentive plan | | 2,858 |
| Total liabilities | | 1,099,554 |
| Non-controlling interest | | 1,358,360 |
| Commitments (Note 10) | | |
| Partners' capital | | 7,868 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000261

Appx. 00959

**Highland Capital Management, L.P.**
**Consolidated Statement of Income**
**Year Ended December 31, 2009**

*(in thousands)*

| | | |
|---|---|---:|
| Revenue: | | |
| Management fees | $ | 91,920 |
| Incentive fees/allocations | | 1,550 |
| Interest and investment income | | 168,134 |
| Other income | | 17,610 |
| Total revenue | | 279,214 |
| | | |
| Expenses: | | |
| Compensation and benefits | | 52,163 |
| Professional fees | | 36,942 |
| Investment and research consulting | | 838 |
| Amortization and depreciation | | 5,064 |
| Interest expense | | 52,607 |
| Other expenses | | 31,134 |
| Total expenses | | 178,748 |
| | | |
| Income before investment and derivative activities | | 100,466 |
| | | |
| Realized and unrealized gain/(loss) from investment transactions: | | |
| Net realized loss on sale of investment transactions | | (1,001,610) |
| Net change in unrealized gain on investment transactions | | 1,214,188 |
| Total realized gain from investment transactions | | 212,578 |
| | | |
| Unrealized earnings from equity method investees: | | |
| Net unrealized earnings from equity method investees | | 2,377 |
| Total unrealized earnings from equity method investees | | 2,377 |
| | | |
| Net income | | 315,421 |
| | | |
| Net income attributable to the non-controlling interest | | (315,498) |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (77) |

The accompanying notes are an integral part of these consolidated financial statements.

3

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2009**

| *(in thousands)* | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2008 | $ | 467 | $ | 323 | $ | 790 |
| Net loss | | – | | (78) | | (78) |
| Partner contributions | | 68 | | 12,509 | | 12,577 |
| Partner distributions | | (29) | | (5,392) | | (5,421) |
| Partners' capital, December 31, 2009 | $ | 506 | $ | 7,362 | $ | 7,868 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

D-CNL000263

**Appx. 00961**

**Highland Capital Management, L.P.**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2009**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 315,420 |
| Adjustment to reconcile net income to cash and cash equivalents | | |
| provided by operating activities: | | |
| Cash provided by operating activities: | | |
| Net realized loss on investments and derivative contracts | | 1,001,610 |
| Net unrealized loss on investments and derivative contracts | | (1,214,188) |
| Net unrealized gain from equity method investees | | (2,377) |
| Depreciation and amortization | | 2,728 |
| Changes in assets and liabilities: | | |
| Restricted cash | | 103,696 |
| Management and incentive fee receivable | | 4,677 |
| Deferred incentive fees | | (2,894) |
| Other assets | | 27,507 |
| Due from brokers | | 31,439 |
| Accounts payable | | (9,318) |
| Accrued and other liabilties | | (154,724) |
| Due to brokers for unsettled trades | | 145,957 |
| Interest payable | | 3,737 |
| Withdrawals payable | | 54,631 |
| Long-term incentive plan | | (4,087) |
| Obligations to retun collateral | | (161,882) |
| Net cash provided by operating activities | | 141,932 |
| | | |
| **Cash flows from investing activities:** | | |
| Purchase of fixed assets and leasehold improvements, net | | 16,431 |
| Purchases of investments | | (397,439) |
| Proceeds from dispositions of investments | | 392,040 |
| Net cash provided by investing activities | | 11,032 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000264

**Appx. 00962**

**Highland Capital Management, L.P.**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2009**

*(in thousands)*

| | |
|---|---:|
| **Cash flows from financing activities:** | |
| Payments on long-term debt | (8,381) |
| Net payments on secured borrowings | (66,026) |
| Due to brokers | (73,451) |
| Capital contributions from minority interest investors of consolidated entities | 62,342 |
| Capital withdrawals by minority interest investors of consolidated entities | (72,300) |
| Partner distributions | (1,421) |
| Net cash used in financing activities | (146,660) |
| | |
| Net decrease in cash and cash equivalents | (4,728) |
| | |
| **Cash and cash equivalents** | |
| Beginning of year | 43,942 |
| End of year | $ 39,214 |
| | |
| **Supplemental disclosure of cash flow informaton:** | |
| Interest paid during the year | $ 42,124 |
| Non-cash distributions to partners | 4,000 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000265

**Appx. 00963**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

1. **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment advisor under the Investment Advisors Act of 1940 that manages collateralized loan obligations ("CLOs"), registered investment companies ("RICs"), hedge funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is 100% owned by senior management of the Partnership.

As of December 31, 2009, the Partnership provided investment advisory services in accordance with management agreements for twenty-nine CLOs, nine RICs, four separate accounts, one master limited partnership, and twelve hedge fund structures, with total fee-earning assets under management of approximately $24.5 billion.

2. **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment of 50% or more and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether, if by design, an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

**Consolidation of Non-Variable Interest Entities**

The Partnership consolidates the following non-VIE's (collectively referred to as the "Consolidated Investment Funds"). The Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations:

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005;

- Highland Credit Opportunities CDO, L.P. ("Credit Opportunities Master"), a Delaware limited partnership that commenced operations on December 29, 2005;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore") a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore") a Delaware limited partnership that commenced operations on September 2, 2008; and

- Highland Restoration Capital Partners Master, L.P. ("Restoration Master") a Delaware limited partnership that began commenced on September 2, 2008.

**Consolidation of Variable Interest Entities**

The Partnership consolidated the following VIE's as it is the primary beneficiary:

- Highland Financial Corporation ("HFC"), a company incorporated on February 28, 2006 under the laws of the state of Delaware;

- Highland Financial Real Estate Corporation ("HFREC"), a company incorporated on March 15, 2006 under the laws of the state of Maryland; and

- HCM Trident (Delaware) Corporation ("HCM Trident"), a company incorporated on July 3, 2007 under the laws of the state of Delaware.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Management Europe, Ltd. ("Highland Europe"), a company organized in the United Kingdom and purchased by the Partnership on April 6, 2005;

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Employee Retention Assets, LLC, a Delaware limited liability company that commenced operations on October 26, 2009;

- 86.5% interest in HySky Communications, LLC, a Delaware limited liability company that commenced operations on December 22, 2006; and

- 84.5% interest in HE Capital, LLC, a Delaware limited liability company that commenced operations on March 22, 2007.

**Deconsolidation of Hedge Funds**

The following funds have been deconsolidated for 2009 as the limited partners have been granted substantive participating rights:

- Highland Select Equity Fund, L.P., a Delaware limited partnership that commenced operations on January 1, 2002;
- Highland Equity Focus Fund, L.P., a Delaware limited partnership that commenced operations on September 1, 2002; and
- Highland Capital Real Estate Fund, L.P., a Delaware limited partnership that commenced operation on April 1, 2002.

All significant interpartnership and intercompany accounts and transactions have been eliminated in consolidation of all of the aforementioned consolidated entities. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the AICPA Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

**Investment Transactions**

Investment transactions are recorded on a trade date basis. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

**Fair Value Measurement**

Fair value represents the price that would be received upon the sale of an asset or paid upon the transfer of a liability in an orderly transaction between market participants at the measurement date (exit price). Assets and liabilities measured at fair value are classified into one of the following categories:

- Level 1 – Valuation based on quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Investment Funds have the ability to access as of

9

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on models in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure the fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Investment Funds use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being re-classified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates.

Whenever possible, the Partnership and its Consolidated Investment Funds use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Investment Funds develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

As of December 31, 2009, the Partnership and its consolidated entities investments consisted of floating rate syndicated bank loans, high yield corporate bonds, CLO securities, private placements, private placement real estate debt and equity, life settlement contracts and common and preferred equity securities. In addition, the consolidated entities are parties to various credit default swaps. The majority of these financial instruments are not listed on national securities exchanges, and management is required to use significant judgment to estimate their values.

The fair value of the loans, corporate bonds and CLO securities are generally based on quotes received from brokers or independent pricing services. Due to the recent disruption in the credit markets, an increasing number of these quotes are derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades. The policy of the Partnership and its consolidated subsidiaries is to classify loans and bonds that are prices in this manner as Level 3 assets because the markets in which they trade are not active and the inputs used by the brokers and pricing services are not readily observable. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

10

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

The consolidated entities private placement real estate investments include equity interests in limited liability companies and debt issued by entities that invest in commercial real estate. The fair value of these investments is based on internal models developed by the Partnership. The significant inputs to the models include cash flow projections for the underlying properties and appraisals performed by independent valuation firms. Since these inputs are no readily observable, the investments are classified as Level 3 assets.

Common and preferred equity securities traded on national exchanges are valued at their closing prices as of December 31, 2009. These securities are classified as Level 1 assets. The consolidated entities also hold certain equity securities for which no active market exists. The value of these securities, which are classified as Level 3 assets, is based on a combination of broker quotes and internal valuation models.

Life settlement contracts are valued using mortality tables and interest rate assumptions that are deemed appropriate for the demographic characteristics of the parties insured under the policies. Since these inputs are not readily observable, they are classified as Level 3 assets.

The fair value of credit default swaps is based on quotes received from an independent pricing service. The inputs used to derive the quotes are not readily observable and are therefore classified as Level 3.

Refer to Note 5 for the required fair value disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2009, the Partnership and its consolidated entities recognized management and incentive fees of approximately $92 million, and $1.6 million, respectively. The Partnership recognized approximately $2.9 million of appreciation on incentive fees previously deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the consolidated statement of income.

**Dividends, Interest and Expense Recognition**
Dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. Operating expenses, including interest on securities sold short, not yet purchased are recorded on the accrual basis, if any incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. The following subsidiaries are subject to these provisions: Highland Europe, HFC and HFREC.

HIGHLY CONFIDENTIAL

D-CNL000270

**Appx. 00968**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

The Consolidated Investments Funds are not subject to federal income taxes and therefore no provision has been made in the accompanying consolidated financial statements.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Foreign cash of $4.1 million is included in the cash and cash equivalents on the consolidated balance sheet.

**Restricted Cash**
The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

**Total Return Swaps**
A total return swap agreement is a two-party contract under which an agreement is made to exchange returns from predetermined investments or instruments. The gross returns to be exchanged or "swapped" between the parties are calculated based on a "notional amount," which is valued monthly according to the valuation policy mentioned above to determine each party's obligation under the contract.

Risks could arise from entering into swap agreements from the potential inability of counterparties to meet the terms of their contracts, and from the potential inability to enter into a closing contract. The Partnership's Consolidated Investment Funds recognize all cash flows received (paid) or receivable (payable) from swap transactions on a net basis as realized or unrealized gains or losses in the consolidated statement of income. The Partnership and the Consolidated Investment Funds are charged a finance cost by counterparties with respect to each agreement. The finance cost is reported as part of the realized or unrealized gains or losses.

**Credit Default Swaps**
As discussed in Note 6, under a credit default swap agreement two parties agree to transfer the credit exposure of an asset between one another. The seller of the swap guarantees the credit worthiness of a specific instrument by agreeing to pay the buying party a specific amount (generally par value) in the event that the instrument defaults.

At December 31, 2009, the Partnership's Consolidated Investment Funds were party to credit default swaps in which it acts as the guaranteeing party. In the event that any of the underlying instruments default prior to the expiration of the agreements, the Consolidated Investment Funds are obligated to pay the swap counterparty the par value of the specific instrument. The Consolidated Investment Funds collect a fee based on the size of the underlying positions which are treated as realized gains once received. The difference between the current market value of the swaps and the original price of the swap is reported as an unrealized gain or loss.

**Securities Sold, Not Yet Purchased**
The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand. Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash or securities. The amount of the required deposit, which earns interest, is

12

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender.

**Securities Loaned**

The Partnership's Consolidated Investment Funds may lend securities to their financing counterparties for margin. The lending entity receives the interest associated with the securities loaned. The loans are secured by the fair value of the securities. Gains or losses in the fair value of the securities loaned that occur during the term of the loan will be for the account of the lender. The lender has the right under the lending agreement to recover the securities from the prime brokers on demand. The lender pays a fee to the broker for the cash collateral received. This is accounted for as interest expense. A credit risk exists to the lender under this type of transaction to the extent that the counterparty defaults on its obligation to return the securities loaned.

**Options**

The Partnership's Consolidated Investment Funds purchase and sell call and put options on equity securities and equity indices as part of its overall portfolio management strategies. Purchased call or put options may be used to obtain economic exposure equivalent to a long or short position, respectively, or to hedge existing or anticipates portfolio positions. Certain options contracts are index options, under which amounts due or payable upon exercise are settled entirely in cash based on the difference between the value of the index at maturity and its contract (or strike) value. The potential risk of loss for purchased options is limited to the premium paid.

The premium paid for the purchase of an option is included in the consolidated balance sheet as an investment and subsequently marked-to-market to reflect the current value of the option. If an option expires on the stipulated expiration date, the Consolidated Investment Funds realize a loss equal to the cost of the option. If the Consolidated Investment Funds enter into a closing sale transaction, the Consolidated Investment Funds realize a gain or loss, depending on whether the proceeds from the closing sale transaction are greater or less than the cost of the option. If the Consolidated Investment Funds exercise a call option, the cost of the securities acquired upon exercise is increased by the premium paid to buy the call. If the Consolidated Investment Funds exercise a put option, it realizes a gain or loss from the sale of the underlying security and the proceeds from such sale are decreased by the premium originally paid.

**Margin Transactions**

In order to obtain more investable cash, the Partnership and its subsidiaries may use various forms of leverage including purchasing securities on margin. Such leverage may allow the Partnership and its subsidiaries to increase net assets at a greater rate during increasing markets, but also may lead to a more rapid decrease in net assets in a declining market. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**

Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2009. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. Withdrawals payable may be treated as capital for purposes of allocations of gains/losses pursuant to the partnerships' governing documents. At December 31, 2009, the Consolidated Investment Funds had withdrawals payable of $36.2 million.

**Use of Estimates**

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2009**

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates.

**Foreign Currency Transactions**
The Partnership's subsidiary Highland Europe uses British Pounds as its functional currency and enters into transactions in multiple foreign currencies.  All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2009.  Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period.  Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the consolidated statement of income.

The Consolidated Investment Funds do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held.  Such fluctuations are included within the *Net realized and unrealized gains or loss from investments*.

**Financial Instruments**
The Partnership and its consolidated entities determine fair value of financial instruments as required by U.S. GAAP.  The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

**Life Settlement Contracts**
One of the Partnership's Consolidated Investment Funds invests in life settlement contracts (the "Policies").  The Policies are reflected as a component of "Investments, at fair value" in the Consolidated Statement of Assets, Liabilities and Partners' capital.  Realized and unrealized gains/ (losses) on the Policies are reflected in the Consolidated Statement of Income.  Cash flows used to purchase the Policies are reflected as a component of "Purchases of Investments" in the Consolidated Statement of Cash Flows.

The Consolidated Investment Funds were invested in 119 policies at December 31, 2009 with a total face value of approximately $1 billion.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

**Goodwill and Other Intangible Assets**
The Partnership purchased Highland Europe on April 6, 2005.  Goodwill represents the amount paid in excess of the fair value of the assets of Highland Europe at the date of acquisition.  No goodwill impairments existed as of December 31, 2009.

The Partnership has obtained the rights to the management contracts of certain RICs it manages by acquiring the underlying contracts from the predecessor investment manager.  The Partnership performs an impairment test on the purchased investment contracts on an annual basis.  Any depreciation in the value of the purchased investment management contracts are accounted for in the year when it occurs.  The carrying values of the purchased investment contracts are not adjusted for appreciation.  The goodwill and purchased investment management contracts are indefinite-lived assets and are not amortized.

**Recently Issued Accounting Standards & Interpretations**

14

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

In September 2009, the FASB issued ASU 2009-06, *Income Taxes (Topic 740)—Implementation Guidance on Accounting for Uncertainty in Income Taxes and Disclosure Amendments for Nonpublic Entities* (formerly proposed as FASB Staff Position No. 48-d, *Application Guidance for Pass-Through Entities and Tax-Exempt Not-for-profit Entities and Disclosure Modifications for Nonpublic Entities)*, which amended Accounting Standards Codification Subtopic 740-10, *Income Taxes – Overall*. ASU 2009-06 clarifies that an entity's assertion that it is a pass-through entity is a tax position should be assessed in accordance with Subtopic 740-10. Additionally, the ASU provides implementation guidance on the attribution of income taxes to entities and owners. The revised guidance is effective for periods ending after September 15, 2009. The adoption of ASU 2009-06 did not have a material impact on the Partnership's financial position or results of operations at the date of adoption.

In June 2009, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles, a replacement of FASB Statement No. 162* (subsequently codified into FASB ASC Topic 105) which established the FASB Accounting Standards Codification ("ASC" or the "Codification") as the single source of authoritative accounting principles for U.S. GAAP issued by the FASB. The Codification supersedes all existing non-SEC accounting and reporting standards and subsequent to adoption, the FASB will issue new standards in the form of ASUs, and no longer as SFASs, FASB Staff Positions or Emerging Issues Task Force Abstracts. The Codification is effective for reporting periods ending on or after September 15, 2009. The adoption of the Codification did not have any impact on the Partnership's financial position or results of operations at the date of adoption.

In April 2009, the FASB issued guidance on determining fair value when the volume and level of activity for an asset or liability has significantly decreased and identifying transactions that are not orderly (originally issued as FASB Staff Position SFAS 157-4, *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly,* and subsequently codified within FASB ASC Topic 820). The guidance provides additional guidance to expand on the factors that should be considered in estimating fair value when there has been a significant decrease in market activity for an asset or liability. The guidance is effective for interim and annual periods ending after June 15, 2009. The adoption did not have any impact on the Partnership's financial position or results of operations at the date of adoption.

In December 2007, the FASB issued guidance on noncontrolling interests in consolidated financial statements (originally issued as SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51,* and subsequently codified within FASB ASC Topic 810). The guidance requires a company to clearly identify and present ownership interests in subsidiaries held by parties other than the company within the equity section of the consolidated financial statements. Additionally, Topic 810 requires: (i) the amount of consolidated net income (loss) attributable to the controlling and the noncontrolling interests to be clearly identified and presented on the face of the consolidated statements of operations; (ii) acquisitions of noncontrolling interest to be accounted for as equity transactions with no step-up to fair value; (iii) when a subsidiary is deconsolidated, any retained noncontrolling interest and the gain or loss upon deconsolidation to be measured at fair value; and (iv) losses to be allocated to noncontrolling interest regardless of whether cumulative losses have exceeded the noncontrolling interest in the subsidiary's capital. The guidance is effective for reporting periods beginning on or after December 15, 2008. The adoption of the revised guidance did not have any impact on the Partnership's financial position or results of operations at the date of adoption.

In June 2009, the FASB issued amended guidance on accounting for transfers of financial assets (originally issued as SFAS No. 166, *Accounting for Transfers of Financial Assets, an amendment of FASB Statement No. 140,* and subsequently reissued as ASU 2009-16, *Accounting for Transfers of*

15

D-CNL000274
**Appx. 00972**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

*Financial Assets*). The amendments were issued to improve the information that a reporting entity provides in its financial statements about a transfer of financial assets, the effects of a transfer on its financial statements, and a transferor's continuing involvement, if any, in transferred financial assets. The amendments eliminate the concept of qualifying special purpose entities from U.S. GAAP. These entities will now be evaluated for consolidation in accordance with the applicable consolidation criteria. The amendments are effective for reporting periods beginning on or after November 15, 2009. The adoption of ASU 2009-16 is not expected to have any impact on the Company's financial position or results of operations.

In June 2009, the FASB issued amended guidance on accounting for variable interest entities (originally issued as SFAS No. 167, *Amendments to FASB Interpretation No. 46(R)*, and subsequently reissued as ASU 2009-17, *Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities*). The amendments were issued to address the effects of the removal of the concept of qualifying special purpose entities from U.S. GAAP and to address concerns regarding the consolidation of variable interest entities. ASU 2009-17 will require a qualitative approach rather than a quantitative approach when determining the primary beneficiary of a variable interest entity and will also change the criteria by which an enterprise determines whether it is the primary beneficiary of an entity. In addition, the amended interpretation will no longer consider removal rights when determining whether an entity is a variable interest entity and whether to consolidate a variable interest entity as the primary beneficiary unless those rights are held by a single party. ASU 2009-17 is effective for reporting periods beginning on or after November 15, 2009. The adoption of ASU 2009-17 is not expected to have any impact on the Partnership's financial position or results of operations, as substantially all of the entities in which it holds variable interests will qualify for the scope deferral included in ASU 2010-10, *Amendments to Statement 167 for Certain Investment Funds.*

In February 2010, the FASB issued ASU 2010-10, *Amendments to Statement 167 for Certain Investment Funds.* ASU 2010-10 defers the effective date of ASU 2009-17 for certain investment entities to allow the FASB to work with the International Accounting Standards Board ("IASB") in developing consistent consolidation guidance. The deferral will apply to a reporting entity's (i.e. investment manager's) interest in an entity (i) that has the attributes of an investment company or (ii) for which it is industry practice to apply measurement principles for financial reporting purposes that are consistent with those followed by investment companies. The deferral in ASU 2010-10 would not apply in situations in which a reporting entity has the explicit or implicit obligation to fund actual losses of an entity that could potentially be significant to the entity. ASU 2010-10 is effective for annual reporting periods beginning on or after November 15, 2009, and for interim periods within that first annual reporting period. The adoption of ASU 2010-10 is not expected to have any impact on the Company's financial position or results of operations, as adoption of the deferral results in the Company continuing to apply consolidation and disclosure requirements in effect during prior periods.

In September 2009, the FASB issued Accounting Standards Update ("ASU") 2009-12, *Fair Value Measurements and Disclosures (Topic 820)—Investments in Certain Entities That Calculate Net Asset Value Per Share (or Its Equivalent)* which amended Accounting Standards Codification Subtopic 820-10, *Fair Value Measurements and Disclosures—Overall.* The amended guidance offers investors a practical expedient for measuring the fair value of investments in certain entities that calculate net asset value per share (NAV). The ASU is effective for the first reporting period (including interim periods) ending after December 15, 2009. The Partnership has not yet determined the impact, if any, that the implementation of ASU 2009-12 would have on our consolidated results of operations or financial condition.

**3.     Fixed Assets and Leasehold Improvements**

HIGHLY CONFIDENTIAL

D-CNL000275

**Appx. 00973**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2009:

*(in thousands)*

| | | |
|---|---:|---:|
| Buildings | $ | 10,119 |
| Leasehold improvements | | 4,060 |
| Computer and equipment | | 3,448 |
| Furniture and fixtures | | 3,185 |
| Computer software | | 2,287 |
| Land | | 1,328 |
| Accumulated depreciation | | (9,536) |
| | $ | 14,891 |

The Partnership and its consolidated entities are depreciating fixed assets as follows:

| | **Period** |
|---|---|
| Buildings | 29 - 40 years |
| Leasehold improvements | Lease term |
| Computer and equipment | 5 years |
| Furniture and fixtures | 7 years |
| Computer software | 3 years |

Depreciation expense in 2009 totaled approximately $4.8 million for the Partnership and its subsidiaries.

The Partnership and its consolidated entities had approximately $16.4 million of capital expenditures in 2009.

4. **Investments**

Detailed below is a summary of the Partnership and its subsidiaries' investments at December 31, 2009:

17

HIGHLY CONFIDENTIAL

D-CNL000276

**Appx. 00974**

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---:|---:|---:|---:|
| Investments in floating rate syndicated bank loans | $ | 937,360 | $ | 365,304 |
| Investments in fixed rate syndicated bank loans | | 6,695 | | 7,822 |
| Investments in fixed income securites | | 948,995 | | 528,096 |
| Investments in equity securities | | 1,277,263 | | 761,508 |
| Investments in life settlement contracts | | 242,472 | | 144,952 |
| Investments in CLOs (mezz tranches) | | 83,369 | | 37,254 |
| Investments in CLOs (residual CLO equity tranches) | | 150,381 | | 11,084 |
| Investments in closed-end mutual funds | | 13,238 | | 12,558 |
| Investments in private placement real estate | | 132,373 | | 22,372 |
| Investments in limited partnerships | | 160,133 | | 119,180 |
| Investments in warrants | | 6,076 | | 9,236 |
| Total investments | $ | 3,958,355 | $ | 2,019,366 |
| Net unrealized gain/loss on credit default swaps | $ | (2,563) | $ | (102,605) |

| | Proceeds | | Fair Value | |
|---|---:|---:|---:|---:|
| Securities sold, not yet purchased | $ | 15,093 | $ | 21,406 |

**Affiliated Investments**
***Investments in Residual CLO Equity and Mezzanine Tranches***
Investments in affiliated residual CLO equity tranches primarily represent tranches of CLOs for which the Partnership and Highland Europe provide investment advisory services. The Consolidated Investment Funds receive quarterly distributions based on the excess interest after paying the stated interest distributions to the senior and mezzanine note holders, and paying the investment manager, trustee and other related fees. A portion of these distributions are amortized against the cost basis of the investment based of the actual cash distributions received during the year versus the total expected remaining cash distributions to the residual CLO equity tranche. The remainder of the distribution is recorded as interest income.

18

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

Investments in residual equity and mezzanine tranches of CLOs are not actively traded. The estimated fair value of the CLOs is derived from broker quotes and valuation models. The estimated fair value of these investments as presented in the consolidated balance sheet does not necessarily represent the amount that could be obtained from the sale of these investments. Changes in the credit quality or the performance of the underlying collateral, the availability and price of assets available for reinvestment, interest rates and/or the interest rate curve, or other market conditions could have a material impact on the estimated fair value of the investments.

*Investment in Highland Special Situations Fund*
The Partnership invests in Highland Special Situations Fund ("HSSF"), a diversified, closed end RIC for which the Partnership provides investment advisory services. As of December 31, 2009, the market value of the Partnership's investment in HSSF was approximately $3 million. During the year ended December 31, 2009, the Partnership accrued approximately $0.2 million in dividends from HSSF.

*Investment in Highland Long/Short Equity Fund*
The Partnership invests in Highland Long/Short Equity Fund ("HEOF"), a diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2009, the market value of the Partnership's investment in HEOF was approximately $0.2 million.

*Investment in Highland Healthcare Fund*
The Partnership invests in Highland Healthcare Fund ("HHF"), a non-diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2009, the market value of the Partnership's investment in HHF was approximately $3.6 million.

*Investment in Highland Credit Strategies Fund*
The Partnership invests in Highland Credit Strategies Fund ("HCF"), a diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2009, the market value of the Partnership's investment in HCF was approximately $4 million. During the year ended December 31, 2009, the Partnership received approximately $0.1 million in dividends from HCF.

*Prepaid Forward Contract*
On July 28, 2006, Highland Multi-Strategy Onshore Master Subfund I, LLC ("Subfund") and Barclays Bank PLC ("Barclays") entered into a prepaid forward contract. The Partnership and affiliates redeemed approximately $312.7 million of a reference portfolio, which was comprised of the following basket of funds advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund and Select Equity Fund. Barclays simultaneously contributed approximately $312.7 million as a hedge to its obligation under the prepaid forward contract.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

Barclays was prepaid approximately $156.3 million, or one-half of the reference portfolio value at initiation of the transaction. A notional amount, (the initial reference portfolio value less the amount prepaid), accretes interest to Barclays at monthly LIBOR plus 0.90% per annum.

A collateral account in the amount of approximately $53.2 million was established to further secure the transaction. Due to extreme market volatility, all of the underlying holdings in the collateral account were sold during 2008.

The term of the prepaid forward contract was three years and allowed for net settlement upon termination. The contract expired on July 31, 2009 whereby Barclays was to remit in cash the greater of the difference between the reference portfolio value and the notional amount, as valued on the scheduled termination date, or zero. Upon expiration, Barclays was not obligated to make a cash payment to the Subfund.

On October 7, 2008, Barclays submitted a notice of early termination for the prepaid forward contract. Refer to Note 17 for further discussion.

***Accreting Strike Option***
On February 28, 2007, Highland Multi-Strategy Onshore Master Subfund II, LLC entered into an Accreting Strike Option ("ASO") with Barclays. The ASO's value is based on the following basket of funds ("the reference portfolio") advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund, Select Equity Fund and Credit Opportunities Domestic Feeder. The value of the reference portfolio at inception was approximately $250.2 million

Barclays was paid a $71.4 million premium on the option. The strike price, (the initial reference portfolio value less the premium paid), accretes interest to Barclays at monthly LIBOR plus 1.4% per annum. As of December 31, 2009, the strike price was approximately $179.6 million.

The term of the accreting strike option is five years and allows for net settlement upon termination. At contract expiration, Barclays will remit in cash the greater of the difference between the reference portfolio value and the strike price, as valued on the scheduled termination date, or zero. As of December 31, 2009, the ASO did not have a positive net fair value.

Detailed below is a summary of the transaction as of December 31, 2009:

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

*(in thousands)*

| Reference Portfolio | | Fair Value |
|---|---|---|
| Select Equity Fund | $ | 110,491 |
| Crusader Domestic Feeder | | 12,156 |
| Equity Focus Fund | | 6,974 |
| Credit Opportunities Domestic Feeder | | 3,238 |
| Real Estate Fund | | - |
| Highland CDO Opportunity Fund, Ltd. | | - |
| Credit Strategies Domestic Feeder | | - |
| Reference portfolio total | | 132,859 |
| Notional amount | | (179,563) |
| Fair value of accreting strike option | | (46,704) |

On October 13, 2008, Barclays served notice of early termination for the accreting strike option. Refer to Note 16 for further discussion.

***Investment in Highland Employee Retention Assets LLC ("HERA")***
During 2009, the Partnership established HERA, an employee deferred compensation vehicle. On October 26, 2009, approximately $12.1 million of assets were transferred to HERA. As of December 31, 2009, the Partnership's equity investment in HERA was approximately $11 million.

**5.    Fair Value of Financial Instruments**

As discussed in Note 2, the Partnership and its consolidated entities categorize investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Investment Fund's investments and derivatives at December 31, 2009 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2009:

HIGHLY CONFIDENTIAL

D-CNL000280

**Appx. 00978**

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

*(in thousands)*

| | Level 1 | Level 2 | Level 3 | Estimated Fair Value at 12/31/09 |
|---|---|---|---|---|
| Loans | $          - | $   16,048 | $   357,077 | $   373,125 |
| Bonds & Asset Backed Securities | - | 148,511 | 402,020 | 550,531 |
| Collateralized loan obligations | - | - | 16,001 | 16,001 |
| Rights & Warrants | 3,275 | - | 4,995 | 8,270 |
| Private placement real estate | - | - | 12,180 | 12,180 |
| Limited partnership interest | 11,552 | - | 129,372 | 140,924 |
| Common equity securities | 133,123 | - | 245,612 | 378,735 |
| Mutual Funds | 9,605 | - | 2,952 | 12,557 |
| Privately held equity | - | - | 246,090 | 246,090 |
| Life Settlement Contracts | - | - | 144,952 | 144,952 |
| Preferred stock | - | - | 136,000 | 136,000 |
| Common stock sold short | (21,406) | - | - | (21,406) |
| Credit Default Swaps | - | - | (102,605) | (102,605) |
| **Total** | $ 136,149 | $ 164,559 | $ 1,594,646 | $ 1,895,354 |

The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2009:

*(in thousands)*

| | Estimated Fair Value as of December 31, 2008 | Purchases, Sales and Maturities, Net Level 3 | Net Transfers In/(Out) of Level 3 | Net Realized Losses | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2009 |
|---|---|---|---|---|---|---|
| Loans | $   337,962 | $   32,004 | $   22,878 | $   (49,165) | $   13,398 | $   357,077 |
| Bonds & Asset Backed Securities | 469,197 | (122,399) | (6,469) | (241,960) | 303,651 | 402,020 |
| Collateralized loan obligations | 123,730 | (57,985) | - | (385,826) | 336,082 | 16,001 |
| Rights & Warrants | 192 | (871) | (140) | (5) | 5,819 | 4,995 |
| Private placement real estate | 68,721 | (12,461) | 14,100 | (9,337) | (48,843) | 12,180 |
| Limited partnership interest | 137,544 | (13,274) | 120 | 6,002 | (1,020) | 129,372 |
| Common equity securities | 304,595 | (10,149) | - | (14,434) | (34,400) | 245,612 |
| Mutual Funds | 2,094 | - | - | - | 858 | 2,952 |
| Privately held equity | 109,543 | (45,119) | - | (34,963) | 216,629 | 246,090 |
| Life Settlement Contracts | 199,178 | (6,123) | - | (7,595) | (40,508) | 144,952 |
| Preferred stock | 175,778 | 3,085 | - | - | (42,863) | 136,000 |
| | $ 1,928,534 | $ (233,292) | $ 30,489 | $ (737,283) | $ 708,803 | $ 1,697,251 |

The following table provides a roll forward of the derivative contracts classified within Level 3 for the year ended December 31, 2009:

22

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

*(in thousands)*

| | | |
|---|---|---:|
| **Estimated Fair Value as of December 31, 2008** | $ | (194,761) |
| Settlement of open contracts, net | | 123,096 |
| Net transfers in/(out) of Level 3 | | - |
| Net realized losses | | (126,158) |
| Net change in unrealized gain | | 95,218 |
| **Estimated Fair Value as of December 31, 2009** | $ | (102,605) |

6. **Derivative Financial Instruments**

Effective January 1, 2009, the Consolidated Investment Funds adopted the amended authoritative guidance on disclosures about derivative instruments. The new requirement amends and expands the disclosure requirement related to derivative instruments, to provide users of the financial instruments with an enhanced understanding of the use of derivative instruments by the Consolidated Investment Funds and how these derivatives affect the financial condition, financial performance, and cash flows of the Consolidated Investment Funds. This guidance requires qualitative disclosures about the objectives and strategies for using derivative instruments, quantitative disclosures about their fair value of, and gains and losses on, derivative instruments, as well as disclosures about credit-risk-related contingent features in derivative agreements.

Credit Default Swaps

The Consolidated Investment Funds enter into credit default swaps to simulate long and short bond positions that are either unavailable or considered to be less attractively priced in the bond market. The Consolidated Investment Funds use these swaps to manage risk where they have exposure to the issuer, or to take an active long or short position with respect to the likelihood of an event of default.

The buyer of a credit default swap is generally obligated to pay the seller a periodic stream of payments over the term of the contract in return for a contingent payment upon the occurrence of a credit event with respect to an underlying reference obligation. A credit event for corporate reference obligations includes bankruptcy, failure to pay, obligation acceleration, repudiation/moratorium or restructuring. If a credit event occurs, the seller must pay the contingent payment to the buyer, which is typically the par value (full notional value) of the reference obligation, though the actual payment may be mitigated by terms of the International Swaps and Derivative Agreement ("ISDA"), allowing for netting arrangements and collateral. In addition, the payment may be reduced by anticipated recovery rates, segregated collateral and netting arrangements that may incorporate multiple transactions with a given counterparty.

The seller of credit default swaps receives a fixed rate of income throughout the term of the contract, which typically is between one month and five years, provided that no credit event occurs. If a credit event occurs, the seller may be required to pay the buyer the full notional value of the reference obligation.

As of December 31, 2009, the Consolidated Investment Funds sellers of credit default swaps ("providing protection") on a total notional amount of $248.6 million. The notional amount of the swaps is not recorded in the financial statements; however it approximates the maximum potential amount of future payments that the Consolidated Investment Funds could be required to make if they are the seller of protection and a credit event were to occur. The fair value of the swaps as of December 31, 2009 was approximately ($102.6 million), and the Consolidated Investment Funds have posted approximately $144.4 million of cash collateral with the counterparty to secure these unrealized losses.

23

D-CNL000282

Appx. 00980

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

The Consolidated Investment Funds reduced their overall exposure to credit default swaps by closing several positions, which generated approximately $78.7 million of net realized losses that are recorded in the Consolidated Statement of Operations as a component of net realized losses from investment transactions. The Consolidated Investment Fund's average exposure to credit default swap contracts for which it provided protection during the year ended December 31, 2009 was approximately $247 million.

The following table provides a summary of the Consolidated Investment Fund's maximum exposure by maturity credit rating under the swaps for which it sold protection. All of the contracts mature within the next five years.

*(in thousands)*

Current issuer credit rating*

| | | |
|---|---|---:|
| BBB | $ | 29,500 |
| B+ | | 7,500 |
| B | | 7,500 |
| B- | | 20,250 |
| CC | | 135,410 |
| | $ | 200,160 |

\* The credit rating on the underlying bond provides an indicator of the risk that the Consolidated Investment Funds will have to perform under the swap arrangement. Lower credit ratings with a shorter contract term indicate a higher likelihood of performance by the Consolidated Investment Funds.

<u>Total Return Swaps</u>
A total return swap is a two-party contract under which the parties agree to exchange returns from a predetermined portfolio of investments. The gross returns to be exchanged or swapped between the parties are calculated based on a notional amount, which is valued monthly to determine each party's obligation under the contract. All of the Consolidated Investment Fund's total return swap programs were terminated in 2009. As of December 31, 2009, approximately $45.2 million was owed to various counterparties, on a net basis. Approximately $54.1 million of cash and securities have been posted to secure the balance payable. During the year, the Consolidated Investment Funds realized $96.4 million in realized losses related to the contracts closed out during the year.

**7.    Debt and Notes Payable**

Consolidated debt and notes payable as of December 31, 2009 consists of:

| *(in thousands)* | | December 31, 2009 |
|---|---|---:|
| Partnership revolving credit facility | $ | 143,435 |
| Credit Opportunities Master note payable | | 128,603 |
| HCREA Nolen Drive note payable | | 7,005 |
| Partnership promissory note | | 466 |
| | $ | 279,509 |

24

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

**Revolving Credit Facility**

On July 21, 2009, the Partnership amended and restated its credit agreement with Bank of America as syndication agent and The Bank of Nova Scotia as administrative agent in the amount of $147.3 million (the "Credit Agreement"). The Credit Agreement provides for loans which are scheduled to mature on July 21, 2011.

Interest is payable on the last day of each month. The applicable spread for LIBOR loans under the Credit Agreement is LIBOR plus 5% per annum. For base rate loans, the spread is 4% per annum over the prevailing prime rate.

Under the terms of the Credit Agreement, the availability of credit was subject to financial covenants requiring the Partnership to maintain a minimum amount of fee earning assets under management, a minimum amount of management fees earned, a minimum collateral ratio and a maximum on compensation paid.

On September 15, 2009, the Credit Agreement was amended and restated to clarify some documentation items. On February 22, 2010, the Credit Agreement was amended a second time to clarify some of the reporting requirements.

The fair value of the facility as of December 31, 2009 was approximately $127 million.

**Promissory Note**

On January 4, 2006, the Partnership received a promissory note (the "Promissory Note") from Compass Bank in the amount of $2 million. The Partnership must make monthly payments of principal and accumulated interest on the fifth day of each month. The Promissory Note will mature on February 1, 2011. On February 8, 2007, the Partnership and Compass Bank modified the Promissory Note, which reduced the interest rate from 2.0% to 1.7% in excess of LIBOR. The outstanding balance of the Promissory Note as of December 31, 2009 was $0.5 million. As of December 31, 2009, the estimated fair market value of the note was approximately equal to the carrying value.

**Credit Opportunities Master Note Payable**

On December 19, 2008, Highland Credit Opportunities CDO Financing, LLC ("CDO Financing"), a wholly-owned subsidiary of Credit Opportunities Master, executed a Note Purchase Agreement (the "Purchase Agreement") with certain investors that provided for the issuance of up to $218 million of senior secured convertible notes guaranteed by Credit Opportunities Master. Pursuant to the terms of the Purchase Agreement and concurrent with the execution of the Purchase Agreement, CDO Financing issued $116.6 million of senior secured convertible notes for $115.6 million of cash and securities with a fair value of $0.9 million. The proceeds from the notes were used primarily to fund an additional equity investment in Highland Credit Opportunities, Ltd. (the "CDO"). This investment was required under the terms of a forbearance agreement that the Credit Opportunities Master executed with the Majority Controlling Class of the CDO's note holders.

The notes have a stated maturity date of December 31, 2012 and accrue interest on a quarterly basis at a rate of 25% per year. The terms of the Purchase Agreement allow for up to 75% of the accrued interest due at any payment date to be capitalized as additional principal owed to the holders of the notes. For the year ended December 31, 2009, approximately $12 million of interest payable was capitalized and issued to the note holders.

Subject to certain conditions, the Purchase Agreement allows for CDO Financing to issue up to $101.4 million of additional notes to the existing note holders. The Purchase Agreement requires payment of a fee of 2.5% per annum on the unfunded portion of the note commitment. For the year ended December 31, 2009, approximately $2.6 million of unfunded commitment fees is recorded in

25

D-CNL000284

**Appx. 00982**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

interest expense in the Credit Opportunities Master's consolidated statement of operations. As of December 31, 2009, a liability of approximately $2.7 million is included in interest payable in Credit Opportunities Master's consolidated statement of assets, liabilities, and partners' capital.

Under the terms of the Purchase Agreement, the Credit Opportunities Master may not make any prepayments until July 1, 2010. From July 1, 2010 through December 31, 2010, the Credit Opportunities Master may elect to prepay 50% of the outstanding principal balance. After that period, Credit Opportunities Master may prepay all or a portion of the outstanding principal, provided that each partial payment made to the note holders is in an aggregate principal amount of at least $0.5 million.

The Purchase Agreement stipulates a premium due to the note holders upon full or partial payment of the outstanding principal of the notes. The premium due is determined by the date the principal is repaid and is calculated as a percentage of that principal balance, with a minimum of 5% due on the stated maturity date of the notes. The following table presents the premium rates by payment period:

| Prepayment Period | Fees |
|---|---|
| July 1, 2010 - Dec. 31, 2010 | 15.0% |
| July 1, 2011 - Dec. 31, 2011 | 10.0% |
| July 1, 2012 - Dec. 31, 2012 | 6.0% |
| Dec. 31 2012 | 5.0% |

Credit Opportunities Master is accruing the minimum premium due, 5% of the outstanding balance, over the contractual life of the notes using the effective-yield method. For the year ended December 31, 2009, approximately $0.9 million of this premium due is recorded as a component of interest expense in Credit Opportunities Master's consolidated statement of operations. As of December 31, 2009 a liability of approximately $0.9 million for the total premium recognized over the life of the notes is included in interest payable in Credit Opportunities Master's consolidated statement of assets, liabilities, and partners' capital.

At the note holders' option, up to 50% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master between January 1, 2010 and June 30, 2010. From July 1, 2010 through December 31, 2012, up to 100% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master.

The Purchase Agreement grants the note holders a lien on certain assets held by Credit Opportunities Master. In addition, it requires Credit Opportunities Master and the CDO to comply with various financial covenants. Failure to meet these covenants may result in an event of default and give the note holders the right to accelerate repayment of the debt or initiate a liquidation of certain assets. Credit Opportunities Master was in compliance with the covenants as of December 31, 2009 and for the year then ended. As of December 31, 2009, the estimated fair value of the notes was approximately $167.4 million, which is based on value of the risk-adjusted yield from the expected future cash flows of the notes relative to comparable investments. Actual values may vary significantly from the estimates, particularly since the terms of the Company's debt are complex, and the market for the instruments is illiquid.

**HCREA Nolen Drive Note Payable**
On September 18, 2006, Nolen Drive entered into a $7 million note payable with Artesia Mortgage Capital Corporation, which is secured by the underlying property in Nolen Drive (the "Term Loan"). The Term Loan matures with all principal and accrued interest due on October 11, 2011. The Term

HIGHLY CONFIDENTIAL

D-CNL000285

**Appx. 00983**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

Loan bears interest at a rate of 6.52% per annum.  Payments are due on the 11th of every month.  As of December 31, 2009, the estimated fair market value of the note was approximately $7.2 million.

8.  **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its consolidated entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans.  The consolidated entities may also invest in derivative instruments, including total return and credit default swaps.  Investments in these derivative instruments throughout the year subject the consolidated entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Statement of Assets, Liabilities and Partners' Capital.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Master Partnership due to a change in the market value of its investments or the value of the investments underlying swap agreements.  The Partnership and its Consolidated Investment Fund's exposure to market risk is affected by a number of factors, including the size, composition and diversification of its investments and swap agreements; interest rates; and market volatility.  The Partnership and its Consolidated Investment Funds use various forms of leverage, including notes, which increase the effect of any investment value changes on net assets.

**Credit Risk**
Credit risk is the potential loss the Partnership and its consolidated entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract.  Because the consolidated entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties.  To limit the credit risk associated with such transactions, the consolidated entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Investment Fund's limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law.  There is no public market for the interests, and neither the Consolidated Investment Funds nor their manager expect such a market to develop.

**Business Risk**
The Partnership provides advisory services to the consolidated investment funds.  The Consolidated Investment Funds could be materially affected by the actions and liquidity of the Partnership.

**High Yield Bonds and Loans**
The Partnership and its Consolidated Investment Funds may invest in high-yield bonds that have been assigned a lower rating category or are not rated by various credit rating agencies.  Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest.  They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions.  Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.  In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further reduce their liquidity.  The Consolidated Investment Funds also invest in senior secured syndicated bank loans and enter into direct contractual relationships with the corporate borrowers.  As such, the Partnership and its

27

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

Consolidated Investment Funds are exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower.

The current economic recession has severely disrupted the market for most high-yield bonds and loans and may continue to have an adverse effect on the value of such instruments. It is also probable that the economic downturn could adversely affect the ability of the issuers of such securities to repay principal and interest thereon and increase the incidence of default for such securities.

**CLO Equity Investments**
The Partnership and its Consolidated Investment Funds may invest in CLO equity that are not rated by various credit rating agencies and are generally considered to be speculative with respect to the issuer's ability to repay principal and interest. The yields and prices of these non-rated CLO equity tranches are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed. In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further limit their liquidity. Given a backdrop of deteriorating general economic conditions, the Partnership and its consolidated investment funds are exposed to the potential non-payment of principal and interest from their CLO equity investments. As of December 31, 2009, 2 of the 29 CLO's managed by the Partnership paid interest to the equity holders on their last payment date.

**Distressed Investments**
A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Investment Funds invest have been issued by distressed companies in an unstable financial condition. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions.

**Credit Default Swaps**
Credit default swaps involve greater risks than if the Partnership or its Consolidated Investment Funds had shorted the reference obligations directly. In addition to the market risk discussed above, credit default swaps are subject to liquidity risk and credit risk. If a credit event occurs, the value of the reference obligation received by the Partnership or its Consolidated Investment Funds, couple with the periodic payments previously received, may be less than the full notional amount it pays to the buyer, resulting in loss of value.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Investment Funds' investments. However, the Consolidated Investment Funds' portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Investment Funds. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Investment Funds to losses that are disproportionate to market movements as a whole.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Investment Funds are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Investment Funds' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Investment Funds may lose all or a portion of the assets held by these banks or

HIGHLY CONFIDENTIAL

D-CNL000287

**Appx. 00985**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Investment Funds' might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**
The Consolidated Investment Funds may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Investment Funds' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Investment Funds. If the value of the Consolidated Investment Funds' securities fall below the margin level required by a counterparty, additional margin deposits are required. If the Consolidated Investment Funds are unable to satisfy a margin call, the counterparty could liquidate the position in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Investment Funds to incur significant losses.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Investment Funds' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Investment Funds. In addition, because the use of leverage allows the Consolidated Investment Funds to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Investment Funds may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Investment Funds' assets, the Consolidated Investment Funds may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Investment Funds may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Investment Funds have the ability to apply discretionary margin, haircut, financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2009, the Consolidated Investment Funds' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that the Consolidated Investment Funds' are able to realize on the sale of its investments will directly affect the amounts that the investors in the Feeder Funds are able to redeem in connection with the wind down process. These amounts may differ materially from the partners' capital balances as of December 31, 2009.

**Litigation Risk**

29

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
### December 31, 2009

The Partnership and its Consolidated Investment Funds are periodically subject to legal actions arising from the ordinary course of business. In addition, certain of the Consolidated Investment Funds' Feeder Fund investors have filed lawsuits after receiving notification of the decision to wind-down certain Consolidated Investment Funds' investment portfolios. Refer to Note 16 for a discussion of the open litigation.

9.   **Related Party Transactions**

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2009, approximately $9.3 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other current assets* in the accompanying consolidated balance sheet.

**Long Term Incentive Plan and Intercompany Loan Payable to Highland Capital Management Services, Inc. ("HCMSI")**
Effective January 1, 2001, all of the Partnership's employees were transferred to HCMSI, which provides personnel management and consulting services to the Partnership. The Partnership and HCMSI entered into a management agreement whereby the Partnership compensated HCMSI for its employee expenses plus a consulting services fee. As of January 1, 2005, there were no further transactions with HCMSI as all employees were transferred to the Partnership.

Effective January 1, 2001, HCMSI approved a long-term incentive plan ("the LTIP") for select employees who are eligible to receive Long-Term Incentive Units ("the Units") under the LTIP. The number of Units authorized under the LTIP is 30,000,000 and a majority of the Units granted vest 40% during the grant year and 30% for each of the two years thereafter, expiring 10 years after such grant date, unless different terms are agreed upon between the Plan Administrator and the employee. The fair value of the Units are based upon the fair value of the Partnership, as determined in good faith, by James Dondero, the Plan Administrator and the sole shareholder of the general partner and a limited partner of the Partnership. The LTIP was transferred to the Partnership from HCMSI on January 1, 2005.

The Units are exercisable at the discretion of the Plan Administrator, or upon a triggering event defined as the earlier of the following events:

- Change in control

- Initial public offering

- Participant's voluntary or involuntary termination due to death, disability, retirement, or hardship

- Participant's voluntary or involuntary termination other than due to death, disability, retirement, hardship, or cause is exercisable to the extent the Participant is entitled to only 80% of the vested shares.

A total of 2,479,281 Units are outstanding as of December 31, 2009 under the LTIP. During the year ended December 31, 2009, the liability under the LTIP decreased by approximately $4.1 million, which is included in *Compensation and benefits* in the consolidated statement of income.

HIGHLY CONFIDENTIAL

D-CNL000289

**Appx. 00987**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

The total balance payable to HCMSI was approximately $2.6 million as of December 31, 2009, which is related to the LTIP accrual.

Effective December 31, 2004, all of the employees at HCMSI were transferred to the Partnership, and the management agreement between the Partnership and HCMSI was terminated as to the provision of future services. However, all of the outstanding and unfunded obligations of the Partnership to HCMSI as of December 31, 2004, as well as any additional obligations that may arise in relation to these amounts, will continue to be due and payable to HCMSI until satisfied in accordance with the provisions of the agreements in place.

**Accounts Held with Related Party**
During the year the Partnership and its subsidiaries maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2009, balances in the accounts were approximately $52.2 million.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

**Controlling Positions**

Various members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. Any director's fees received by the Partnership for these services as directors are paid to and retained by the Partnership. As of December 31, 2009, the Partnership and its subsidiaries held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| American Banknote Corporation | Common Equity | $ 25,564 |
| Biosyntech | Bond | 2,963 |
| Biosyntech | Options | 1,529 |
| Biosyntech | Common Equity | 434 |
| Blackwell BMC, LLC | Term Loan | 3,201 |
| Broadstripe Holdings, LLC | Loan Revolver | 2,363 |
| Broadstripe Holdings, LLC | Term Loan - First Lien | 8,857 |
| Broadstripe Holdings, LLC | Term Loan - Second Lien | 4,265 |
| Complete Genomics | Preferred Equity | 8,497 |
| Consolidated Restaurant Companies, Inc. | Term Loan | 20,263 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 48,205 |
| Cornerstone Healthcare Group Holding, Inc. | Term Loan | 17,031 |
| Cornerstone Healthcare Group Holding, Inc. | Loan - Second Lien | 4,537 |
| Decision One Corporation | Term Loan | 981 |
| Decision One Corporation | Term Loan B | 1,578 |
| Epocal, Inc. | Preferred Equity | 68,613 |
| Ginn-LA Resorts Holdings, LLC | Term Loan | 1,027 |
| Highland Special Situations Fund | Mutual Fund | 2,952 |
| Highland Long/Short Equity Fund | Mutual Fund | 225 |
| Highland Healthcare Fund | Mutual Fund | 3,571 |
| Highland Credit Strategies Fund | Closed-End Mutual Fund | 4,012 |
| Home Interiors & Gifts, Inc. | Proof of Claims | 210 |
| Marcal Paper Mills, LLC | Common Equity | 8 |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 134 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 480 |
| Safety-Kleen Inc. | Common Equity | 115,471 |
| Solstice Neurosciences, Inc. | Preferred Equity | 14,686 |
| Terrestar | Preferred Equity | 1,772 |
| Trussway Industries, Inc. | Common Equity | 15,993 |

During the year ended December 31, 2009, the Partnership earned approximately $0.2 million of income from those entities where members of management serve as members of the Board of Directors. The amount is included in *Other income* in the consolidated statement of income.

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank, SSB, an affiliate of the Partnership, was the agent bank. Interest earned on the loans during the year was approximately $16.3 million. At December 31, 2009, these subsidiaries

32

D-CNL000291
**Appx. 00989**

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

were invested in NexBank, SSB agented loans with commitments and market values totaling approximately $323.6 million and $85.1 million, respectively.

**Affiliated Transactions**

On August 20, 2008, the Partnership issued a promissory note in the amount of $330,000 to an employee of the Partnership. The note accrues interest at a rate of LIBOR plus 1.75%. The note is payable in one lump sum on the earlier of August 20, 2015 or an event of acceleration. The note has specific forgiveness provisions of principal and interest prior to maturity if certain milestone dates are obtained. As of December 31, 2009, the principal amount on the promissory note was $259,286 with interest accrued of approximately $2,000.

On August 1, 2008, the Partnership issued a promissory note in the amount of $500,000 to an employee of a subsidiary. The note accrues interest at a rate of LIBOR plus 1.75%, compounded quarterly. The note is payable in one lump sum on the earlier of August 1, 2011 or an event of acceleration. As of December 31, 2009, the principal amount on the promissory note was $500,000 with interest accrued of approximately $20,000.

On October 20, 2008, the Partnership received a Highland Financial Partners, L.P. ("HFP") senior secured note in the amount of $22.3 million from CDO Master Fund. The note was transferred to the Partnership to satisfy a prior obligation. The Partnership received assets from HFP of approximately $7.4 million on March, 26, 2009 for satisfaction of the note.

On September 26, 2008, HFP issued $316 million of senior secured notes to the Consolidated Investment Funds in exchange for an interest in certain assets which included collateralized loan obligation securities. Due to a lack of a transfer of control caused by certain restrictive covenants associated with the exchange, these assets continue to be recognized on the Consolidated Statement of Assets, Liabilities and Partners' Capital of the Consolidated Investment Funds. Upon full payment of the outstanding principal of the senior secured notes, the restrictive covenants of the assets will be satisfied and HFP will have unencumbered interests in the assets. The Consolidated Investment Funds have recorded a liability to account for the future release of the assets, which is classified on their balance sheets as *Obligation to return collateral*. The Consolidated Investments Funds elected to apply the fair value option prescribed by current accounting guidance when they first recognized the liability, which resulted in the liability being carried at the same value as the assets in aggregate. Accordingly, the change in the fair value of the liability was recognized in the Consolidated Statement of Operations as an unrealized gain.

On March 20, 2009, the Partnership and its Consolidated Investment Funds agreed to terminate the senior secured notes that were issued by HFP. As a result, the Consolidated Investment Funds have been relieved of their obligation to transfer the underlying assets to HFP.

In accordance with the terms of a Master Indenture Agreement (the "Indenture") dated November 2, 2006, the Credit Opportunities Master acquired 250,000 Preferred Shares of Highland Credit Opportunities CDO, Ltd (the "CDO"). The Indenture requires Credit Opportunities Master to hold, directly or indirectly, more than 99% of the CDO's outstanding Preferred Shares at all times. As of December 31, 2009, the Credit Opportunities Master held 350,000 Preferred Shares and was the sole beneficial preferred shareholder.

The CDO invests primarily in floating rate syndicated bank loans, fixed income securities, and equity investments. These investments were purchased with funds the CDO received from the issuance of rated floating rate notes and Credit Opportunities Master's purchase of the Preferred Shares. Credit Opportunities Master is the sole beneficiary of all residual income from the CDO's portfolio. Although the Preferred Shares do not have a voting interest in the CDO, they carry certain rights. Specifically, they are entitled to receive quarterly preferential dividends, without requiring any declaration by the Directors, from the date they were issued until they are redeemed.

HIGHLY CONFIDENTIAL

D-CNL000292

**Appx. 00990**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

The Investment Manager serves as the Collateral Manager for the CDO but does not receive any fees for its services to the CDO.

During the fourth quarter of 2008, the CDO failed to meet certain over-collateralization tests set forth in the First Supplement to the Indenture dated November 2, 2006. This breach would have given the CDO's Majority of Controlling Debt Class the option to accelerate repayment of the CDO's outstanding debt or initiate a liquidation of its assets. To protect the value of its investment in the CDO, Credit Opportunities Master entered into a forbearance agreement whereby the Majority Controlling Class of the CDO's note holders waived the breach and agreed not to exercise the rights discussed above. The Majority Controlling Class also agreed to waive any future events of default resulting from the CDO's failure to meet the overcollateralization tests through December 31, 2011. In return, the CDO agreed not make any preferred dividend payments to Credit Opportunities Master until the over-collateralization tests exceed certain thresholds.

Credit Opportunities Master paid certain expenses related to the forbearance agreement, which have been recorded as an increase to the cost basis of its investment in the CDO's Preferred Shares. Credit Opportunities Master has also committed to pay certain expenses in 2010 and 2011.

The Consolidated Investment Funds periodically enter into transactions to buy or sell securities with affiliated entities. During the year ended December 31, 2009, the Consolidated Investment Funds purchased approximately $10.8 million of securities from affiliated entities and sold approximately $37.1 million of securities to affiliated entities, which generated net losses of approximately $8.7 million.

**Services Performed by an Affiliate**
In March 2007, Highland Capital of New York, L.P., a New York limited partnership ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2009, total marketing fee expense charged to the Partnership by Highland New York was approximately $3.4 million and as of December 31, 2009, amounts owed to Highland New York for services rendered was approximately $1.2 million.

**Intercompany and Affiliate Balances**
During 2008, the Partnership and affiliates engaged in a series of short-term, non-interest bearing transactions. As part of the satisfaction of the outstanding affiliated balances, approximately $14.4 million of assets were transferred to the affiliates during 2009. Additionally, $12.6 million of the remaining balance was converted to equity in the Partnership during 2009.

10. **Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the

34

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
### December 31, 2009

final outcome will not have a materially adverse effect on the Partnership's consolidated balance sheet, consolidated statement of income, or its liquidity. See Note 16.

**Warehouse Guarantee**

On July 6, 2007, the Partnership was a party to a warehouse agreement as a first loss guarantor. HCM Trident entered into the warehouse agreement and is entitled to the positive net carry or is required to pay the negative net carry. The Partnership guaranteed the payment of the negative net carry owed by HCM Trident. This guarantee was capped at 25% of the initial purchase price of the warehouse assets of $25.7 million, or approximately $6.4 million plus accrued interest. The Partnership paid $3.8 million to HCM Trident as a deposit for the first loss guarantee.

On July 14, 2008, the warehouse agreement was amended to reflect the Partnership guaranteeing 100% of the negative net carry. The Partnership posted an additional $1.5 million, for a total guarantee deposit on hand of $3.1 million, net of any prior loss amounts.

On November 2, 2008, the warehouse agreement was amended to reflect the Partnership guaranteeing any credit facility amortization payments of principal and interest on HCM Trident's behalf. On June 15, 2009, the warehouse agreement was paid in full and the asset in the warehouse was transferred to the Partnership.

**Operating Leases**

Future minimum lease payments under operating lease commitments of the Partnership and its consolidated entities with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | | |
|---|---|---|
| 2010 | $ | 2,071 |
| 2011 | | 1,804 |
| Thereafter | | - |
| | $ | 3,875 |

Total rental expense of the Partnership and its consolidated entities for operating leases was approximately $4.4 million for the year ended December 31, 2009.

**Loan Commitments**

Loan and other participation interests purchased by the Consolidated Investment Funds such as bank debt and trade claims may include accompanying letters of credit, revolving credit arrangements or other financing commitments obligating the Consolidated Investment Funds to advance additional amounts on demand. At December 31, 2009, the Consolidated Investment Funds had outstanding loan commitments of approximately $30.5 million. The total amount of outstanding commitments does not necessarily reflect the actual future cash requirements, as commitments may expire unused.

## 11. Postretirement Benefits

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. Therefore, no new participants shall enter the plan after 2008 and

HIGHLY CONFIDENTIAL

D-CNL000294
Appx. 00992

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

no new benefits shall accrue under the plan after 2008. The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2009 are reconciled in the tables below.

*(in thousands)*

| Change in projected benefit obligation | | 2009 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 3,543 |
| Service cost | | - |
| Interest cost | | 199 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 630 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (956) |
| Benefit obligation at end of year | $ | 3,416 |

| Change in plan assets | | 2009 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 1,146 |
| Actual return on plan assets | | 457 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | 2,966 |
| Plan participants' contributions | | - |
| Benefits paid | | (956) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,613 |

| Reconciliation of Funded Status | | 2009 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 3,416 |
| Projected benefit obligation at end of year | | 3,416 |
| Fair value of assets at end of year | | 3,613 |
| Funded status at end of year | $ | 197 |

The Partnership does not expect to contribute to the plan during 2010.

HIGHLY CONFIDENTIAL

D-CNL000295

Appx. 00993

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2009:

| | |
|---|---|
| Discount rate | 6.10% |
| Rate of compensation increase | N/A |

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2009:

| | |
|---|---|
| Discount rate | 6.30% |
| Expected long-term return on plan assets | 6.30% |
| Rate of compensation increase | N/A |

As of December 31, 2009, approximately $0.6 million of the plan assets were categorized as Level 3.

**12.  Goodwill and Other Intangible Assets**

Below is a summary of the Partnership's goodwill and other intangible assets as of December 31, 2009:

| (in thousands) | Carrying Value |
|---|---|
| Highland Floating Rate Fund | $ 12,672 |
| Highland Floating Rate Advantage Fund | 11,328 |
| Goodwill for Highland Europe | 8,020 |
| | $ 32,020 |

On April 9, 2004, the Partnership purchased the management agreements Highland Floating Rate Fund (the "Floating Rate Fund") and Highland Floating Rate Advantage Fund (the "Advantage Fund").  The combined purchase price for the above agreements was $24.0 million.  The purchase price was allocated among the Purchased Funds pro-rata based on the approximate combined total managed assets of the funds as of the date of purchase.  As a result, $12.7 million of the purchase price was allocated to the Floating Rate Fund and $11.3 million was allocated to the Advantage Fund.

The Partnership performs an impairment test as required by U.S. GAAP on a yearly basis.  The Partnership's management analyzes market multiples on retail asset managers within the industry as of December 31, 2009 to determine fair value of these assets.  The Partnership has determined that no impairment charge is necessary for the current year.

**13.  Lehman Claim**

On October 3, 2008, Lehman Brothers Special Financing Inc. (U.A.) ("LBSF"), an entity underlying the Consolidated Investment Fund's North American OTC derivative relationship with Lehman Brothers, filed for Chapter 11 bankruptcy.

The Consolidated Investment Fund's legal right with respect to these assets and the probability of their return is currently unclear.  The unwinding of LBSF is described as large and exceptionally complex and may take years to complete. The Consolidated Investment Fund's expected losses of approximately $4.7 million relating to LBSI's bankruptcy are recorded as a component of the net

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

change in unrealized depreciation on investments and swap contracts on the Consolidated Statement of Operations. The current value assigned to the Consolidated Investment Fund's claim on LBSF of $13 million has been determined by the Investment Manager in good faith based on the information currently available and does not necessarily represent the amount that may ultimately be realized. This value is included in the investments balance on the Consolidate Statement of Assets, Liabilities and Partners' Capital.

**14.    Reverse Repurchase Agreements**

Crusader Master and Credit Strategies Master are parties to collateralized financing transactions consisting of securities sold under agreements to repurchase. As of December 31, 2009, Crusader Master and Credit Strategies Master held high yield corporate bonds and equities with a fair value of $77.2 million under reverse repurchase agreements. The gross amount payable to the counterparty (including accrued interest) was approximately $44.4 million and is recorded as a component of due to brokers in the Consolidated Statement of Assets, Liabilities and Partners' Capital.

**15.    Income Taxes**

The Partnership

For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2009, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2005 forward (with limited exceptions).

The Partnership adopted the authoritative guidance on accounting for and disclosure of uncertainty in tax positions on January 1, 2009, which required the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2009.

Crusader Master

Crusader Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Crusader Master. Crusader Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Crusader Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Crusader Master's net taxable income.

Since Crusader Master trades investments for its own account, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The General Partner intends to conduct Crusader Master's business in

38

D-CNL000297
**Appx. 00995**

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2009**

such a way that it does not constitute a U.S. trade or business or create a taxable presence in any of the jurisdictions in which the Investment Manager has offices, including the United Kingdom.

Dividends as well as certain interest and other income received by Crusader Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles.  Interest, dividend and other income realized by Crusader Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Crusader Master adopted the authoritative guidance on accounting for and disclosure of uncertainty in tax positions on January 1, 2009, which required management to determine whether a tax position of Crusader Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As a result of adopting this guidance, management has established a reserve of approximately $9.8 million for uncertain tax positions, which includes approximately $0.5 million of interest and $2.3 million of penalties. Of this amount, approximately $1.3 million related to the current year and was recorded as a tax expense in Statement of Operations.  The remaining $8.5 million related to prior years and was recorded as an adjustment to the beginning partners' capital available for distribution as of January 1, 2009.  Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2009.

Crusader Master files tax returns as prescribed the tax laws of the jurisdictions in which it operates. In the normal course of business, Crusader Master is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2009, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2006 forward.

A wholly owned corporation of Crusader Master has incurred capital losses on the sale of investments that exceed the amount of capital gains it has earned.  Management has concluded that the subsidiary is not likely to generate additional gains in future periods and has established a valuation allowance to reserve for the entire amount of the deferred tax asset associated with the unused capital losses.

<u>Credit Opportunities Master</u>
The Credit Opportunities Master adopted the authoritative guidance on accounting for and disclosure of uncertainty in tax positions on January 1, 2009, which required management to determine whether a tax position of Credit Opportunities Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As a result of adopting this guidance, management has increased their tax liability by approximately $1.6 million to account for uncertain tax positions, which includes approximately $0.4 million of interest and penalties. This amount relates to prior years and was recorded as an adjustment to beginning partners' capital as of January 1, 2009. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2009.

Credit Opportunities Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Opportunities Master is subject to

HIGHLY CONFIDENTIAL

D-CNL000298

**Appx. 00996**

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2009

examination by federal and foreign jurisdictions, where applicable. As of December 31, 2009, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2006 forward (with limited exceptions).

Credit Opportunities Master invests in equity securities. To the extent these securities pay dividends, the Credit Opportunities Master is required to withhold 30% of the gross dividends allocable to the Feeder Fund and remit the amounts to the Internal Revenue Service. As of December 31, 2009, a withholding tax liability of $2.2 million is included in other liabilities in the Consolidated Statement of Assets, Liabilities, and Partners' Capital of the Master Partnership.

<u>Credit Strategies Master</u>
Credit Strategies Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Credit Strategies Master. Credit Strategies Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Credit Strategies Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Credit Strategies Master's net taxable income.

The Credit Strategies Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Strategies Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2009, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2006 forward (with limited exceptions).

Credit Strategies Master adopted the authoritative guidance on accounting for and disclosure of uncertainty in tax positions on January 1, 2009, which required the General Partner to determine whether a tax position of Credit Strategies Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2009.

Dividends as well as certain interest and other income received by Credit Strategies Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Strategies Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The remaining entities consolidated by the Partnership did not accrue for uncertain tax positions as required by U.S. GAAP.

**16. Legal Proceedings**
In April 2007, CDO Master Fund entered into a risk sharing agreement structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Special Opportunities Holding Company. The warehouse was financed by a reputable financial institution and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, the counterparty agreed to extend it

40

D-CNL000299
Appx. 00997

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

for one year on March 15, 2008. As a condition of the extension, CDO Master Fund posted $10.2 million of cash as collateral. In addition, HFC posted certain securities on behalf of CDO Master Fund and HFP. During October and November 2008, the counterparty requested additional collateral calls from CDO Master Fund and HFP totaling $20 million. Due to liquidity constraints, CDO Master Fund was unable to meet the November call, and the counterparty elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by the counterparty and sold on the open market through bids-wanted-in-competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, the counterparty notified CDO Master Fund that its pro-rata share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount. On February 24, 2009, the counterparty (the "Plaintiffs") filed a lawsuit against CDO Master Fund. HFP and the Partnership in the New York State Supreme Court of Manhattan alleging that they suffered losses in excess of $745 million due to the depreciation in value of the warehouse collateral. The Plaintiffs are seeking leave to amend their complaint to add additional claims and defendants, including other hedge funds managed by the Partnership. On February 19, 2010 a New York Appeals Court sided with the Partnership and dismissed UBS' claims against the Partnership.

Certain consolidated investment funds (collectively, the "Plaintiffs") filed a claim against Deutsche Bank AG and Deutsche Bank Securities, Inc. (collectively, "Deutsche Bank") in Dallas County District Court alleging fraudulent inducement, fraud and breach of contract in connection with three repurchase agreements to which the Plaintiffs and Deutsche Bank were a party. Deutsche Bank subsequently filed a lawsuit against the Plaintiffs in the United Kingdom on November 7, 2008 alleging breach of contract and fraud. During 2009, the Plaintiffs settled all of the outstanding litigation with Deutsche Bank and recorded a gain of approximately $33.1 million on the settlement, which is included as a component of realized gains on investment transactions in the Consolidated Statement of Operations.

In April 2009, HYMF, Inc. filed a lawsuit in the New York State Court against the Partnership and certain consolidated investment funds (collectively "the Defendants"). The lawsuit alleges that the Defendants breached their contractual and fiduciary duties by failing to return HYMF's original investment in the consolidated investment funds. The Defendants intend to vigorously defend against the lawsuit. At this time, management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

In January 2009, Crusader Master, the Partnership and other affiliated entities were named as parties to a lawsuit claiming breach of fiduciary duties for their alleged failure to comply with obligations owed under a credit agreement. Crusader Master reached a settlement with the plaintiff in October 2009. Under the terms of the settlement agreement, the investments that Crusader Master held in a term loan and revolving credit facility issued by the plaintiff were transferred to a third party in exchange for other assets and cash of equivalent value.

On July 15, 2008, Crusader Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida. The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. Based on the ruling, Crusader Master recorded a reserve of approximately $34 million as of December 31, 2009, which represents its ratable share of the judgment. However, the Defendants believe they acted in good faith pursuant to the terms of the relevant agreements and have filed the appeal and final adjudication of the appeal is pending. The reserve is included as a

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2009**

component of accrued expenses on the Consolidated Statement of Assets and Liabilities and a component of net realized losses from investment transactions on the Consolidated Statement of Operations.

During the first quarter of 2009, certain investors in Highland Credit Strategies Fund, Ltd. filed lawsuits in response to the decision to wind-down Credit Strategies Master's investment portfolio. Each of these investors is seeking to recover the outstanding balances due under the redemption requests that they submitted prior to the announcement of the wind-down. They have also made various claims, including breach of fiduciary duties, committed negligence, tortuous interference with the payment of redemption amounts, and/or committed fraud. Both the Partnership and Highland Credit Strategies Fund, Ltd. have been named as parties to the lawsuits. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

17. **Fund Wind Down**
On February 4, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent and that it was in the best interest of the fund to liquidate the fund's remaining assets. The proceeds from the asset liquidations will be distributed to the remaining financing counterparties and other senior and trade creditors as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

18. **Subsequent Events**
In May 2009, the Financial Accounting Standards Board issued guidance regarding subsequent events, which detailed general standards for the accounting and disclosure of events that occur after the balance sheet date but before the financial statements are issued or available to be issued. This guidance did not have an impact on the Partnership or its consolidated entities' results of operations or financial position. In preparing the financial statements, management evaluated subsequent events though May 21, 2010, which is the date these financial statements were available to be issued.

Pursuant to the terms of the Purchase Agreement discussed in Note 7, approximately $36.2 million of withdrawals previously recorded by Credit Opportunities Master were paid to investors in the Master Partnership and the Feeder Fund.

CDO Financing received a waiver from the holders of the senior secured convertible notes allowing it to prepay principal, premium and accrued interest on the notes. Approximately $45 million of principal, $6.8 million of premium and $8.1 million of interest were paid to the note holders.

Highland Europe reduced its share premium account by £800,000 and remitted the funds to its parent company. Share premium was reduced as it was determined that the entity was overcapitalized.

The Partnership funded $7 million of capital calls to Restoration Onshore and Restoration Master, collectively.

HIGHLY CONFIDENTIAL

**Supplemental Information
Highland Capital Management, L.P.
Unconsolidated Balance Sheet and Income
Statement (Unaudited)
December 31, 2009**

HIGHLY CONFIDENTIAL

D-CNL000302

**Appx. 01000**

## Highland Capital Management, L.P
### Supplemental Unconsolidated Balance Sheet (unaudited)
### December 31, 2009

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 90 |
| Restricted cash | | 3,501 |
| Investments at fair value (cost $103,533) | | 65,154 |
| Equity method investees | | 25,655 |
| Management and incentive fees receivable | | 15,292 |
| Due from brokers | | 1,116 |
| Other current assets | | 19,547 |
| Deferred incentive fees receivable | | 28,891 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets, net | | 388 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $8,444 | | 6,597 |
| | $ | 190,231 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 2,852 |
| Accrued and other liabilities | | 32,752 |
| Debt and notes payable | | 143,901 |
| Long-term incentive plan | | 2,858 |
| Total liabilities | | 182,363 |
| Partners' capital | | 7,868 |
| **Total liabilities and partners' capital** | $ | 190,231 |

The above information was derived from the audited December 31, 2009 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

44

D-CNL000303

Appx. 01001

# Highland Capital Management, L.P
## Supplemental Unconsolidated Balance Sheet (unaudited)
### December 31, 2009

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 83,437 |
| Incentive fees/allocations | | 1,550 |
| Interest and investment income | | 1,483 |
| Other income | | 7,463 |
| Total revenue | | 93,933 |
| | | |
| **Operating expenses:** | | |
| Compensation and benefits | | 47,440 |
| Professional fees | | 4,192 |
| Investment and research consulting | | 810 |
| Amortization and depreciation | | 2,093 |
| Interest expense | | 9,023 |
| Other operating expenses | | 13,032 |
| Total operating expenses | | 76,590 |
| | | |
| Income/(loss) before investment activities | | 17,343 |
| | | |
| **Realized and unrealized gain/(loss) from investment transactions:** | | |
| Net realized loss on sale of investment transactions | | (73,174) |
| Net change in unrealized gain/(loss) on investments | | 50,966 |
| Total realized and unrealized loss from investment transactions | | (22,208) |
| | | |
| **Realized and unrealized earnings from equity method investee:** | | |
| Net unrealized earnings from equity method investees | | 4,788 |
| Total realized and unrealized earnings from equity method investees | | 4,788 |
| | | |
| **Net income** | $ | (77) |

The above information was derived from the audited December 31, 2009 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

HIGHLY CONFIDENTIAL

# EXHIBIT 65

Appx. 01003

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2010**

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2010**

**Page(s)**

**Report of Independent Auditors** ........................................................................................................... 1

**Audited Consolidated Financial Statements**

Balance Sheet ............................................................................................................................................. 2

Statement of Income ................................................................................................................................... 3

Statement of Changes in Partners' Capital ............................................................................................... 4

Statement of Cash Flows ........................................................................................................................... 5

Notes to Financial Statements ............................................................................................................... 6–42

Supplemental Information……………………………………………………………………………...43-45



## Report of Independent Auditors

To the General and Limited Partners of
 Highland Capital Management, L.P.:

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of income, of changes in partners' capital and of cash flows (hereinafter referred to as the "financial statements") present fairly, in all material respects, the. consolidated financial position of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership") at December 31, 2010, and the results of their operations, the changes in their partners' capital, and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The supplemental unconsolidated balance sheet and statement of income are presented for purposes of additional information, and are not a required part of the basic consolidated financial statements. Such information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 20, 2011

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201*
*T: (214) 999-1400, F: (214) 754-7991, www.pwc.com/us*

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Balance Sheet**
**December 31, 2010**

*(in thousands)*

**Assets**

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 96,115 |
| Restricted cash | | 29,101 |
| Investments at fair value (cost $3,622,415) | | 2,350,386 |
| Unrealized gains on derivative contracts | | 953 |
| Management and incentive fees receivable | | 17,611 |
| Due from brokers | | 33,100 |
| Other assets | | 37,805 |
| Deferred incentive fees receivable | | 35,883 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets | | 8,020 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,057 | | 11,267 |
| **Total assets** | $ | 2,644,241 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---|
| Accounts payable | $ | 2,198 |
| Securities sold, not yet purchased (proceeds $14,366) | | 21,406 |
| Withdrawals payable | | 15,736 |
| Interest payable | | 7,061 |
| Due to brokers | | 420,846 |
| Due to brokers for securities purchased not yet settled | | 67,548 |
| Accrued and other liabilities | | 84,084 |
| Secured borrowing | | 3,803 |
| Debt and notes payable | | 190,139 |
| Long-term incentive plan | | 1,081 |
| Total liabilities | | 813,902 |
| Non-controlling interest | | 1,798,232 |
| Commitments (Note 11) | | |
| **Partners' capital** | | 32,107 |
| **Total liabilities and partners' capital** | $ | 2,644,241 |

The accompanying notes are an integral part of these consolidated financial statements.

2

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2010**

*(in thousands)*

| | | |
|---|---|---:|
| Revenue: | | |
| Management fees | $ | 85,927 |
| Incentive fees/allocations | | 8,066 |
| Interest and investment income | | 140,136 |
| Other income | | 16,233 |
| Total revenue | | 250,362 |
| | | |
| Expenses: | | |
| Compensation and benefits | | 60,717 |
| Professional fees | | 26,406 |
| Investment and research consulting | | 785 |
| Amortization and depreciation | | 2,086 |
| Interest expense | | 48,056 |
| Tax expense | | 6,907 |
| Other expenses | | 22,359 |
| Total expenses | | 167,316 |
| | | |
| Income before investment and derivative activities and extinguishment of debt | | 83,046 |
| | | |
| Realized and unrealized gain/(loss) from investment and derivative transactions: | | |
| Net realized loss on investment and derivative transactions | | (416,398) |
| Net change in unrealized gain on investment and derivative transactions | | 780,716 |
| Total realized and unrealized gain from investment and derivative transactions | | 364,318 |
| | | |
| Net realized gain on extinguishment of debt | | 10,000 |
| | | |
| Net income | | 457,364 |
| | | |
| Net income attributable to the non-controlling interest | | (431,023) |
| | | |
| Net income attributable to Highland Capital Management, L.P. | $ | 26,341 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000309

**Appx. 01008**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2010**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| **Partners' capital, December 31, 2009** | $ 506 | $ 7,362 | $ 7,868 |
| Net gain attributable to Highland Capital  Management, L.P. | - | 26,341 | 26,341 |
| Partner contributions | - |  | - |
| Partner distributions | (11) | (2,091) | (2,102) |
| **Partners' capital, December 31, 2010** | $ 495 | $ 31,612 | $ 32,107 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2010**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 457,364 |
| Adjustment to reconcile net income to cash and cash equivalents provided by operating activities: | | |
| Net realized loss on investments and derivative transactions | | 416,398 |
| Net realized gain on extinguishment of debt | | (10,000) |
| Net change in unrealized gain on investments and derivative transactions | | (780,716) |
| Amortization and depreciation | | 2,086 |
| **Changes in assets and liabilities:** | | |
| Restricted cash | | 218,942 |
| Management and incentive fee receivable | | (828) |
| Deferred incentive fees | | (6,992) |
| Other assets | | 7,908 |
| Due from brokers | | (24,316) |
| Accounts payable | | (2,253) |
| Accrued and other liabilities | | 3,176 |
| Due to brokers for unsettled trades | | (48,342) |
| Interest payable | | 3,324 |
| Withdrawals payable | | (20,495) |
| Long-term incentive plan | | (1,777) |
| Due to Affiliate | | 23,685 |
| Net cash provided by operating activities | | 237,164 |
| | | |
| **Cash flows from investing activities:** | | |
| Proceeds from fixed assets and leasehold improvements, net | | 1,539 |
| Purchases of investments | | (404,384) |
| Proceeds from dispositions of investments | | 331,663 |
| Net cash required by investing activities | | (71,182) |
| **Cash flows from financing activities:** | | |
| Payments on long-term debt | | (47,684) |
| Payments on revolving debt and promissory notes | | (45,000) |
| Proceeds from affiliate loans | | 13,314 |
| Net payments on secured borrowings | | (58,039) |
| Due to brokers | | 27,552 |
| Capital contributions from minority interest investors of consolidated entities | | 119,745 |
| Capital withdrawals by minority interest investors of consolidated entities | | (127,900) |
| Partner distributions | | (2,101) |
| Net cash required by financing activities | | (120,113) |
| Net increase in cash and cash equivalents | | 45,869 |
| | | |
| **Cash and cash equivalents** | | |
| Beginning of year | | 50,246 |
| End of year | $ | 96,115 |
| | | |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | 53,704 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000311

**Appx. 01010**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**1.    Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment advisor under the Investment Advisors Act of 1940 that manages collateralized loan obligations ("CLOs"), registered investment companies ("RICs"), hedge funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is 100% owned by senior management of the Partnership.

As of December 31, 2010, the Partnership provided investment advisory services for twenty-seven CLOs, seven RICs, two separate accounts, one master limited partnership, and twelve hedge fund structures, with total fee-earning assets under management of approximately $21.7 billion.

**2.    Liquidity Considerations**

As further discussed in Note 8, the Partnership has a Revolving Credit Facility (the "Credit Agreement") scheduled to mature on July 21, 2011, including forbearance from the exercising of remedies for events of default from July 21, 2011 to November 18, 2011.  Management is currently in negotiations to extend or refinance the Credit Agreement with the lenders. Management is also considering alternative sources of financing to repay in the event that an extension of the existing Credit Agreement cannot be obtained although to date, such alternative sources have not been secured. The Credit Agreement is collateralized by assets of the Partnerships with an estimated fair value of approximately $100 million at December 31, 2010.  Although there can be no assurance that these assets could be sold at that value, management has the ability to sell these and certain other assets should it become necessary in order to pay off the remaining balance of the Credit Agreement in the event an extension cannot be obtained.  There can be no assurance that management will be successful in their attempts to extend the Credit Agreement, to identify alternative sources of financing or to sell assets for proceeds sufficient to repay the balance of the Credit Agreement.

**3.    Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

**Consolidation of Non-Variable Interest Entities**
The Partnership consolidates the following non-VIE's (collectively referred to as the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005;

- Highland Credit Opportunities CDO, L.P. ("Credit Opportunities Master"), a Delaware limited partnership that commenced operations on December 29, 2005;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore") a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore") a Delaware limited partnership that commenced operations on September 2, 2008; and

- Highland Restoration Capital Partners Master, L.P. ("Restoration Master") a Delaware limited partnership that began commenced on September 2, 2008.

7

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Management Europe, Ltd. ("Highland Europe"), a company organized in the United Kingdom and purchased by the Partnership on April 6, 2005;

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008; and

- 100% interest in Highland Employee Retention Assets, LLC, a Delaware limited liability company that commenced operations on October 26, 2009.

- 100% interest in Highland Special Situations Fund, a Delaware statutory trust that is registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, as a non-diversified, closed-end management investment company, and commenced operations on May 18, 2005.

All significant interpartnership and intercompany accounts and transactions have been eliminated in consolidation of all of the aforementioned consolidated entities. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2010, the Partnership and its consolidated entities recognized management and incentive fees of approximately $85.9 million, and $8.1 million, respectively. The Partnership recognized approximately $7.0 million of appreciation on incentive fees earned prior to 2008, previously

8

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the Consolidated Statement of Income.

**Derivative Contracts**
Credit Default Swaps are marked-to-market based upon values from third party vendors or broker quotations and the change in value is recorded as unrealized appreciation/depreciation. Swap contracts with cumulative unrealized gains as of a reporting date are recorded as assets on the Consolidated Balance Sheet, while swap contracts with cumulative unrealized losses as of the reporting date are recorded as liabilities. Upfront payments made/received by the Consolidated Funds are amortized or accreted for financial reporting purposes, with the unamortized or unaccreted portion included in the Consolidated Balance Sheet. A termination payment by the counterparty or the Consolidated Funds is recorded as a realized gain or loss, as well as the net periodic payments received or paid by the Consolidated Fund.

**Dividends, Interest and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. Of the entities consolidated, only Highland Europe is subject to these provisions.

The Consolidated Investments Funds are not subject to federal income taxes and therefore no provision has been made in the accompanying consolidated financial statements.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Foreign cash of $2.8 million is included in the cash and cash equivalents on the consolidated balance sheet, a portion of which exceeds Federal deposit insurance limits.

9

D-CNL000315

**Appx. 01014**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Restricted Cash**

The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash.

**Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

**Debt Securities**

The Consolidated Funds invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Consolidated Funds first seek to obtain reliable market quotes from other parties dealing in the specific asset. Absent both a reliable market quote and third-party pricing service date, the Consolidated Funds may use various models to establish an estimated exit price. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Due to/from Brokers**

Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Investment Manager's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Private Equity Investments**

The Consolidated Funds hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Consolidated Funds will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

10

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Asset Backed Securities**
The Consolidated Funds invest in a variety of asset backed securities. Asset backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Funds generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Funds evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Funds may apply other techniques based on a specific asset's characteristics.

**Total Return Swaps**
A total return swap agreement is a two-party contract under which an agreement is made to exchange returns from predetermined investments or instruments. The gross returns to be exchanged or "swapped" between the parties are calculated based on a "notional amount," which is valued monthly according to the valuation policy mentioned above to determine each party's obligation under the contract.

Risks could arise from entering into swap agreements from the potential inability of counterparties to meet the terms of their contracts, and from the potential inability to enter into a closing contract. The Partnership's Consolidated Investment Funds recognize all cash flows received (paid) or receivable (payable) from swap transactions on a net basis as realized or unrealized gains or losses on investment transactions in the consolidated statement of income. The Partnership and the Consolidated Investment Funds are charged a finance cost by counterparties with respect to each agreement. The finance cost is reported as part of the realized or unrealized gains or losses.

**Credit Default Swaps**
As discussed in Note 7, under a credit default swap agreement two parties agree to transfer the credit exposure of an asset between one another. The seller of the swap guarantees the credit worthiness of a specific instrument by agreeing to pay the buying party a specific amount (generally par value) in the event that the instrument defaults.

At December 31, 2010, the Partnership's Consolidated Investment Funds were party to credit default swaps in which they act as the guaranteeing party. In the event that any of the underlying instruments default prior to the expiration of the agreements, the Consolidated Investment Funds are obligated to pay the swap counterparty the par value of the specific instrument. The Consolidated Investment Funds collect a fee based on the size of the underlying positions which are treated as realized gains once received. The difference between the current market value of the swaps and the original price of the swap is reported as an unrealized gain or loss.

**Securities Sold, Not Yet Purchased**
The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand. Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash or securities. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender.

11

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Securities Loaned**

The Partnership's Consolidated Investment Funds may lend securities to their financing counterparties for margin. The lending entity receives the interest associated with the securities loaned. The loans are secured by the fair value of the securities. Gains or losses in the fair value of the securities loaned that occur during the term of the loan will be for the account of the lender. The lender has the right under the lending agreement to recover the securities from the prime brokers on demand. The lender pays a fee to the broker for the cash collateral received. This is accounted for as interest expense. A credit risk exists to the lender under this type of transaction to the extent that the counterparty defaults on its obligation to return the securities loaned.

**Revolving Credit Agreements**

The funded portion of revolving credit agreements is recorded at fair value on the Consolidated Balance Sheet as a component of investments, net of the fair value of unfunded commitments for which the Consolidated Funds may be liable in the future (Note 11).

**Margin Transactions**

In order to obtain more investable cash, the Partnership and its subsidiaries may use various forms of leverage including purchasing securities on margin. Such leverage may allow the Partnership and its subsidiaries to increase net assets at a greater rate during increasing markets, but also may lead to a more rapid decrease in net assets in a declining market. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**

Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2010. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. Withdrawals payable may be treated as capital for purposes of allocations of gains/losses pursuant to the partnerships' governing documents. At December 31, 2010, the Consolidated Investment Funds had withdrawals payable of $15.7 million.

**Foreign Currency Transactions**

The Partnership's subsidiary Highland Europe uses British Pounds as its functional currency and enters into transactions in multiple foreign currencies. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2010. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the consolidated statement of income.

The Consolidated Investment Funds do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments*.

12

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Financial Instruments**
The Partnership and its consolidated entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

**Life Settlement Contracts**
One of the Partnership's Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. The contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of "Purchase of investments" and "Proceeds from the disposition of investments" on the Consolidated Statement of Cash Flows.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

**Goodwill and Other Intangible Assets**
The Partnership purchased Highland Europe on April 6, 2005. Goodwill represents the amount paid in excess of the fair value of the assets of Highland Europe at the date of acquisition. No goodwill impairments existed as of December 31, 2010.

The Partnership has obtained the rights to the management contracts of certain RICs by acquiring the underlying contracts from the predecessor investment manager. The Partnership performs an impairment test on the purchased investment contracts on an annual basis. Any depreciation in the value of the purchased investment management contracts are accounted for in the year when it occurs. The carrying values of the purchased investment contracts are not adjusted for appreciation. The goodwill and purchased investment management contracts are indefinite-lived assets and are not amortized.

**Recently Issued Accounting Standards and Interpretations**
In June 2009, the FASB issued amended guidance on accounting for transfers of financial assets (originally issued as SFAS No. 166, *Accounting for Transfers of Financial Assets, an amendment of FASB Statement No. 140,* and subsequently reissued as ASU 2009-16, *Accounting for Transfers of Financial Assets*). The amendments were issued to improve the information that a reporting entity provides in its financial statements about a transfer of financial assets, the effects of a transfer on its financial statements, and a transferor's continuing involvement, if any, in transferred financial assets. The amendments eliminate the concept of qualifying special purpose entities from U.S. GAAP. These entities will now be evaluated for consolidation in accordance with the applicable consolidation criteria. The amendments are effective for reporting periods beginning on or after November 15, 2009. The adoption of ASU 2009-16 did not have a material impact on the Company's financial position or results of operations.

In June 2009, the FASB issued amended guidance on accounting for variable interest entities (originally issued as SFAS No. 167, *Amendments to FASB Interpretation No. 46(R),* and subsequently reissued as ASU 2009-17, *Improvements to Financial Reporting by Enterprises*

13

D-CNL000319
**Appx. 01018**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

*Involved with Variable Interest Entities*). The amendments were issued to address the effects of the removal of the concept of qualifying special purpose entities from U.S. GAAP and to address concerns regarding the consolidation of variable interest entities. ASU 2009-17 will require a qualitative approach rather than a quantitative approach when determining the primary beneficiary of a variable interest entity and will also change the criteria by which an enterprise determines whether it is the primary beneficiary of an entity. In addition, the amended interpretation will no longer consider removal rights when determining whether an entity is a variable interest entity and whether to consolidate a variable interest entity as the primary beneficiary unless those rights are held by a single party. ASU 2009-17 is effective for reporting periods beginning on or after November 15, 2009. The adoption of ASU 2009-17 did not have a material impact on the Partnership's financial position or results of operations, as substantially all of the entities in which it holds variable interests will qualify for the scope deferral included in ASU 2010-10, *Amendments to Statement 167 for Certain Investment Funds.*

In February 2010, the FASB issued ASU 2010-10, *Amendments to Statement 167 for Certain Investment Funds*. ASU 2010-10 defers the effective date of ASU 2009-17 for certain investment entities to allow the FASB to work with the International Accounting Standards Board ("IASB") in developing consistent consolidation guidance. The deferral will apply to a reporting entity's (i.e. investment manager's) interest in an entity (i) that has the attributes of an investment company or (ii) for which it is industry practice to apply measurement principles for financial reporting purposes that are consistent with those followed by investment companies. The deferral in ASU 2010-10 would not apply in situations in which a reporting entity has the explicit or implicit obligation to fund actual losses of an entity that could potentially be significant to the entity. ASU 2010-10 is effective for annual reporting periods beginning on or after November 15, 2009, and for interim periods within that first annual reporting period. The adoption of ASU 2010-10 did not have a material impact on the Company's financial position or results of operations, as adoption of the deferral results in the Company continuing to apply consolidation and disclosure requirements in effect during prior periods.

In January 2010, the FASB issued guidance on improving disclosures about fair value measurements. The guidance requires additional disclosure on transfers in and out of Levels I and II fair value measurements in the fair value hierarchy and the reasons for such transfers. In addition, for fair value measurements using significant unobservable inputs (Level III), the reconciliation of beginning and ending balances shall be presented on a gross basis, with separate disclosure of gross purchases, sales, issuances and settlements and transfers in and transfers out of Level III. The new guidance also requires enhanced disclosures on the fair value hierarchy to disaggregate disclosures by each class of assets and liabilities. In addition, an entity is required to provide further disclosures on valuation techniques and inputs used to measure fair value for fair value measurements that fall in either Level II or Level III. The guidance is effective for interim and annual periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level III fair value measurements, which are effective for fiscal years beginning after December 15, 2010. Adoption did not have a material impact on the Partnership's financial statements.

In December 2010, the FASB issued enhanced guidance on when to perform step two of the goodwill impairment test for reporting units with zero or negative carrying amounts. The updated guidance modifies existing requirements under step one of the goodwill impairment test for reporting units with zero or negative carrying amounts and requires step two to be performed if it is more likely than not that a goodwill impairment exists. The guidance is effective for interim and annual reporting periods beginning after December 15, 2010. As the Partnership and Consolidated

14

D-CNL000320
**Appx. 01019**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

entities do not currently have zero or negative carrying values, adoption will not have a material impact on the Partnership's financial statements.

4.     **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2010:

*(in thousands)*

| | | |
|---|---|---:|
| Buildings | $ | 8,250 |
| Land | | 1,084 |
| Leasehold improvements | | 4,064 |
| Computer and equipment | | 3,488 |
| Furniture and fixtures | | 3,141 |
| Computer software | | 2,297 |
| Accumulated depreciation | | (11,057) |
| | $ | 11,267 |

The Partnership and its consolidated entities are depreciating fixed assets as follows:

| | **Period** |
|---|---:|
| Buildings | 29 - 40 years |
| Leasehold improvements | Lease term |
| Computer and equipment | 5 years |
| Furniture and fixtures | 7 years |
| Computer software | 3 years |

Depreciation expense in 2010 totaled approximately $2.1 million for the Partnership and its subsidiaries.

15

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

5.  **Investments**

Detailed below is a summary of the Partnership's investments at December 31, 2010:

| *(in thousands)* | Amortized Cost/Cost | | Value | |
|---|---|---|---|---|
| Floating rate syndicated bank loans | $ | 680,415 | $ | 222,695 |
| Fixed rate syndicated bank loans | | 11,320 | | 15,644 |
| Fixed income securites | | 907,237 | | 708,957 |
| Equity securities | | 1,373,233 | | 1,037,090 |
| Life settlement contracts | | 270,802 | | 165,223 |
| CLOs (mezz tranches) | | 51,730 | | 25,846 |
| CLOs (residual CLO equity tranches) | | 31,077 | | 5,436 |
| Closed-end mutual funds | | 11,799 | | 14,580 |
| Private placement real estate | | 116,190 | | 524 |
| Limited partnerships | | 162,515 | | 150,775 |
| Warrants | | 6,097 | | 3,616 |
| Total investments | $ | 3,622,415 | $ | 2,350,386 |
| Credit default swaps | $ | - | $ | 953 |
| Net unrealized gain/loss on swaps | $ | - | $ | 953 |
| | Proceeds | | Value | |
| Securities sold, not yet purchased | $ | 14,366 | $ | 21,406 |

**Affiliated Investments**
***Investments in Residual CLO Equity and Mezzanine Tranches***
Investments in affiliated residual CLO equity tranches primarily represent tranches of CLOs for which the Partnership and Highland Europe provide investment advisory services. The Consolidated Investment Funds receive quarterly distributions based on the excess interest after paying the stated interest distributions to the senior and mezzanine note holders, and paying the investment manager, trustee and other related fees. A portion of these distributions are amortized against the cost basis of the investment based on the actual cash distributions received during the year versus the total expected remaining cash distributions to the residual CLO equity tranche. The remainder of the distribution is recorded as interest income.

Investments in residual equity and mezzanine tranches of CLOs are not actively traded. The estimated fair value of the CLOs is derived from broker quotes and valuation models. The estimated fair value of these investments as presented in the consolidated balance sheet does not necessarily represent the amount that could be obtained from the sale of these investments. Changes in the credit quality or the performance of the underlying collateral, the availability and price of assets available for reinvestment, interest rates and/or the interest rate curve, or other market conditions could have a material impact on the estimated fair value of the investments.

16

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

---

***Investment in Highland Long/Short Equity Fund***
The Partnership invests in Highland Long/Short Equity Fund ("HEOF"), a diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2010, the market value of the Partnership's investment in HEOF was approximately $0.2 million.

***Investment in Highland Healthcare Fund***
The Partnership invests in Highland Healthcare Fund ("HHF"), a non-diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2010, the market value of the Partnership's investment in HHF was approximately $7.4 million.

***Investment in Highland Credit Strategies Fund***
The Partnership invests in Highland Credit Strategies Fund ("HCF"), a diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2010, the market value of the Partnership's investment in HCF was approximately $4.8 million. During the year ended December 31, 2010, the Partnership received approximately $0.4 million in dividends from HCF.

***Investment in Highland Diversified Credit Fund***
The Partnership invests in Highland Diversified Credit Fund ("DCF"), a hedge fund for which the Partnership provides investment advisory services. As of December 31, 2010, the market value of the Partnership's investment in DCF was approximately $2.0 million. During the year ended December 31, 2010, the Partnership did not receive any dividends from DCF.

***Prepaid Forward Contract***
On July 28, 2006, Highland Multi-Strategy Onshore Master Subfund I, LLC ("Subfund") and Barclays Bank PLC ("Barclays") entered into a prepaid forward contract. The Partnership and affiliates redeemed approximately $312.7 million of a reference portfolio, which was comprised of the following basket of funds advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund and Select Equity Fund. Barclays simultaneously contributed approximately $312.7 million as a hedge to its obligation under the prepaid forward contract.

Barclays was prepaid approximately $156.3 million, or one-half of the reference portfolio value at initiation of the transaction. A notional amount, (the initial reference portfolio value less the amount prepaid), accretes interest to Barclays at monthly LIBOR plus 0.90% per annum.

A collateral account in the amount of approximately $53.2 million was established to further secure the transaction. Due to extreme market volatility, all of the underlying holdings in the collateral account were sold during 2008.

The term of the prepaid forward contract was three years and allowed for net settlement upon termination. The contract expired on July 31, 2009 whereby Barclays was to remit in cash the greater of the difference between the reference portfolio value and the notional amount, as valued on the scheduled termination date, or zero. Upon expiration, Barclays was not obligated to make a cash payment to the Subfund.

On October 7, 2008, Barclays submitted a notice of early termination for the prepaid forward contract.

17

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

*Accreting Strike Option*
On February 28, 2007, Highland Multi-Strategy Onshore Master Subfund II, LLC entered into an Accreting Strike Option ("ASO") with Barclays. The ASO's value is based on the following basket of funds ("the reference portfolio") advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund, Select Equity Fund and Credit Opportunities Domestic Feeder. The value of the reference portfolio at inception was approximately $250.2 million.

Barclays was paid a $71.4 million premium on the option. The strike price, (the initial reference portfolio value less the premium paid), accretes interest to Barclays at monthly LIBOR plus 1.4% per annum. As of December 31, 2010, the strike price was approximately $182.6 million.

The term of the accreting strike option is five years and allows for net settlement upon termination. At contract expiration, Barclays will remit in cash the greater of the difference between the reference portfolio value and the strike price, as valued on the scheduled termination date, or zero. As of December 31, 2010, the ASO did not have a positive net fair value. As such, no amount was recorded in the Partnership's financial statements.

Detailed below is a summary of the transaction as of December 31, 2010:

*(in thousands)*

| Reference Portfolio | | Value |
|---|---|---|
| Select Equity Fund | $ | 113,506 |
| Crusader Domestic Feeder | | 15,138 |
| Equity Focus Fund | | 5,978 |
| Credit Opportunities Domestic Feeder | | 4,828 |
| Real Estate Fund | | - |
| Highland CDO Opportunity Fund, Ltd. | | - |
| Credit Strategies Domestic Feeder | | - |
| Reference Portfolio Total | $ | 139,450 |
| Notional Amount | $ | (182,631) |
| Deficit of Reference Portfolio Total to Notional Amount | $ | (43,181) |

On October 13, 2008, Barclays served notice of early termination for the accreting strike option.

*Investment in Highland Employee Retention Assets LLC ("HERA")*
During 2009, the Partnership established HERA, an employee deferred compensation vehicle. On October 26, 2009, approximately $12.1 million of assets were transferred to HERA. As of December 31, 2010, the Partnership's equity investment in HERA was approximately $3.5 million.

18

D-CNL000324
Appx. 01023

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

6.    **Fair Value of Financial Instruments**

**Fair Value Measurement**
In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Consolidated Investment Funds disclose the fair value of their investments in a hierarchy that prioritizes the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to valuation based upon unobservable inputs that are significant to the valuation (level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

- Level 1 – Valuation based on quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Investment Funds have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure the fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Investment Funds use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments. During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being re-classified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates.

Whenever possible, the Partnership and its Consolidated Investment Funds use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Investment Funds develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

19

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

As of December 31, 2010, the Partnership and its consolidated entities' investments consisted of floating rate syndicated bank loans, high yield corporate bonds, CLO securities, private placements, private placement real estate debt and equity, life settlement contracts and common and preferred equity securities. In addition, the consolidated entities are parties to various credit default swaps. The majority of these financial instruments are not listed on national securities exchanges, and management is required to use significant judgment to estimate their values.

The fair value of the loans, corporate bonds and CLO securities are generally based on quotes received from brokers or independent pricing services. The policy of the Partnership and its consolidated subsidiaries is to classify loans and bonds that are prices in this manner as Level 3 assets because the markets in which they trade are not active and the inputs used by the brokers and pricing services are not readily observable. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

The consolidated entities' private placement real estate investments include equity interests in limited liability companies and debt issued by entities that invest in commercial real estate. The fair value of these investments is based on internal models developed by the Partnership. The significant inputs to the models include cash flow projections for the underlying properties and appraisals performed by independent valuation firms. Since these inputs are not readily observable, the investments are classified as Level 3 assets.

Common and preferred equity securities traded on national exchanges are valued at their closing prices as of December 31, 2010. These securities are classified as Level 1 assets. The consolidated entities also hold certain equity securities for which no active market exists. The value of these securities, which are classified as Level 3 assets, is based on a combination of broker quotes and internal valuation models.

Life settlement contracts are valued using mortality tables and interest rate assumptions that are deemed appropriate for the demographic characteristics of the parties insured in the underlying policies. Since these inputs are not readily observable, they are classified as Level 3 assets.

The Consolidated Funds engage in "short sales" as part of its investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand. Pending the return of such securities, the Consolidated Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash or securities. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Funds are required to return to the lender.

The fair value of credit default swaps is based on quotes received from an independent pricing service. The inputs used to derive the quotes are not readily observable and are therefore classified as Level 3 liabilities.

20

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2010

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. All of the Consolidated Investment Fund's investments and derivatives at December 31, 2010 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2010:

*(in thousands)*

| | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/10 |
|---|---|---|---|---|
| Loans | $ - | $ 11,885 | $ 226,453 | $ 238,338 |
| Bonds & Asset Backed Securities | - | 409,448 | 313,814 | 723,262 |
| Collateralized loan obligations | - | - | 16,977 | 16,977 |
| Rights & Warrants | 573 | 1,799 | 1,244 | 3,616 |
| Private placement real estate | - | - | 524 | 524 |
| Limited partnership interest | - | - | 150,775 | 150,775 |
| Common equity securities | 211,944 | 73,774 | 316,209 | 601,927 |
| Mutual Funds | 14,580 | - | - | 14,580 |
| Privately held equity | - | - | 296,339 | 296,339 |
| Life Settlement Contracts | - | - | 165,223 | 165,223 |
| Preferred stock | - | - | 138,824 | 138,824 |
| Common stock sold short | (21,406) | - | - | (21,406) |
| **Total** | $205,691 | $496,906 | $ 1,626,382 | $ 2,328,979 |

The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2010:

*(in thousands)*

| | Estimated Fair Value as of December 31, 2009 | Purchases, Sales and Maturities, Net | Net Transfers In/(Out) | Net Realized Losses | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2010 |
|---|---|---|---|---|---|---|
| Loans | $ 360,828 | $ (130,417) | $ (6,216) | $(116,820) | $ 119,078 | $ 226,453 |
| Bonds & Asset Backed Securities | 414,356 | (21,867) | (148,769) | (80,500) | 150,594 | 313,814 |
| Collateralized loan obligations | 8,142 | 1,075 | - | 28 | 7,732 | 16,977 |
| Rights & Warrants | 5,003 | (3,083) | (2,574) | - | (4,122) | 1,244 |
| Private placement real estate | 12,180 | (5,330) | - | (5,856) | (470) | 524 |
| Limited partnership interest | 129,393 | 2,150 | - | - | 19,232 | 150,775 |
| Common equity securities | 249,553 | 38,842 | 1,097 | (48,880) | 75,597 | 316,209 |
| Privately held equity | 246,090 | (52,811) | 85 | (754) | 103,729 | 296,339 |
| Life Settlement Contracts | 144,952 | 28,323 | - | - | (8,052) | 165,223 |
| Preferred stock | 141,103 | (14,526) | - | (18,808) | 31,055 | 138,824 |
| | $1,711,600 | $ (157,644) | $(156,377) | $(265,570) | $ 494,373 | $1,626,382 |

HIGHLY CONFIDENTIAL

D-CNL000327
**Appx. 01026**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to a decline or an increase in market activity (e.g. frequency of trades), which resulted in a lack of or increase in available market inputs to determine price. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2010.

The following table provides a summary of the derivative contracts recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2010:

*(in thousands)*

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Derivative contracts, asset | $ - | $ - | $ 953 | $ 953 |
| Derivative contracts, liability | - | - | - | - |
| **Derivative contracts, net** | **$ -** | **$ -** | **$ 953** | **$ 953** |

The following table provides a roll forward of the derivative contracts classified within Level 3 for the year ended December 31, 2010:

*(in thousands)*

| | |
|---|---|
| **Estimated Fair Value as of December 31, 2009** | $ (102,605) |
| Settlement of open contracts, net | 126,383 |
| Net transfers in/(out) of Level 3 | - |
| Net realized losses | (123,821) |
| Net change in unrealized gain | 100,996 |
| **Estimated Fair Value as of December 31, 2010** | $ 953 |

7.   **Derivative Financial Instruments**

**Credit Default Swaps**

Credit default swap ("CDS") contracts are financial instruments that involve the payment of a fixed rate premium for protection against the loss in value of an underlying debt instrument, referenced entity or index, or the occurrence of a defined credit event. Under the terms of the swap, one party acts as a "guarantor" (the Seller), receiving the periodic stream of payments (from the Buyer) over the term of the contract and agreeing to the remedies that are specified within the credit default agreement. A credit event for corporate reference obligations includes bankruptcy, failure to pay, obligation acceleration, repudiation/moratorium or restructuring. If a credit event occurs, the seller must pay the contingent payment to the buyer, which is typically the par value (full notional amount) of the reference obligation, though the actual payment may be mitigated by terms of the International Swaps and Derivative Agreement ("ISDA"), allowing for netting arrangements and collateral. In addition, the payment may be reduced by anticipated recovery rates, segregated collateral and netting arrangements that may incorporate multiple transactions with a given counterparty.

22

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

The following table summarizes the CDS contracts the Consolidated Investment Funds held as of December 31, 2010:

*(in thousands)*

| Industry | Purchased / Sold | Maturity Date | Fixed Rate of Payment | Notional Amount / Exposure Purchased | Unamortized Upfront Payment | Market Value |
|---|---|---|---|---|---|---|
| Beverage, Food and Tobacco | Sold | 9/20/2012 | 4.65% | $ 7,500 | $ - | $ 402 |
| Electronics | Sold | 9/20/2012 | 2.65% | 7,500 | - | 171 |
| Diversified/Conglomerate Service | Sold | 9/20/2012 | 3.55% | 3,750 | - | 117 |
| Broadcasting and Entertainment | Sold | 9/20/2012 | 3.00% | 6,000 | - | 92 |
| Buildings and Real Estate | Sold | 9/20/2012 | 4.05% | 3,750 | - | 63 |
| Electronics | Sold | 9/20/2012 | 3.20% | 7,500 | - | 62 |
| Media/Telecom | Sold | 9/20/2012 | 3.00% | 3,000 | - | 46 |
| **Total** | | | | $ 39,000 | $ - | $ 953 |

The following table provides a summary of the Consolidated Investment Fund's maximum exposure by maturity credit rating under the swaps for which it sold protection. All of the contracts mature within the next five years.

*(in thousands)*

Current issuer credit rating*

| | |
|---|---|
| BB- | $ 7,500 |
| B | 12,750 |
| B- | 18,750 |
| | $ 39,000 |

\* The credit rating on the underlying bond provides an indicator of the risk that the Consolidated Investment Funds will have to perform under the swap arrangement. Lower credit ratings with a shorter contract term indicate a higher likelihood of performance by the Consolidated Investment Funds.

**Total Return Swaps**

A total return swap is a two-party contract under which the parties agree to exchange returns from a predetermined portfolio of investments. The gross returns to be exchanged or swapped between the parties are calculated based on a notional amount, which is valued monthly to determine each party's obligation under the contract. The investments held in the swap portfolio consist primarily of corporate bank debt.

During the year ended December 31, 2010, the Consolidated Investment Funds' were invested in a total return swap program with a major international financial institution. The Consolidated Investment Funds realized approximately $2.2 million of net gains, which are included as a component of net realized loss from investments and derivative contracts in the Consolidated Statement of Income, and were netted against collateral previously posted with the counterparty upon termination of the program.

23

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

8. **Debt and Notes Payable**

Consolidated debt and notes payable as of December 31, 2010 consists of:

| (in thousands) | | December 31, 2010 |
|---|---|---:|
| Partnership revolving credit facility | $ | 86,296 |
| Credit Opportunities Master note payable | | 83,603 |
| Highland Capital Management Europe note payable | | 13,314 |
| Nolen Drive note payable | | 6,926 |
| | $ | 190,139 |

**Revolving Credit Facility**

On July 21, 2009, the Partnership amended and restated the Credit Agreement with Bank of America as syndication agent and The Bank of Nova Scotia as administrative agent in the amount of $147.3 million. The Credit Agreement provides for loans which are scheduled to mature on July 21, 2011.

Interest is payable on the last day of each month. The applicable spread for LIBOR loans under the Credit Agreement is LIBOR plus 5% per annum. For base rate loans, the spread is 4% per annum over the prevailing prime rate.

Under the terms of the Credit Agreement, the availability of credit was subject to financial covenants requiring the Partnership to maintain a minimum amount of fee earning assets under management, a minimum amount of management fees earned, a minimum collateral ratio and a maximum on compensation paid.

On September 15, 2009 and February 22, 2010, the Credit Agreement was amended and restated to clarify some documentation items and reporting requirements.

On December 28, 2010, a waiver to the Credit Agreement was executed which allowed the Partnership to reduce its debt from $141.3 million to $86.3 million as of December 31, 2010. The waiver called for a cash payment of $45.0 million on or before December 30, 2010 which would result in the retirement of $55.0 million in face value of debt. The waiver allowed for the sources of the cash payment to be from cash on hand, sale of collateral or additional subordinated indebtedness. This cash payment resulted in a gain on the extinguishment of the debt of $10.0 million which is recorded in the Net Realized Gain on Extinguishment of Debt line item on the Consolidated Statement of Income. In addition to the cash payment made on December 30, 2010, the waiver also called for a cash payment of $12.8 million on or before March 31, 2011 which would result in the retirement of an additional $15.6 million in face value of debt. The sources of cash available for the March 31, 2011 payment was to consist of cash on hand, sale of collateral or additional subordinated indebtedness.

On March 31, 2011, the Partnership amended the Revolving Credit Agreement a third to extend a number of provisions from the December 28, 2010 waiver, including forbearance from the exercising of remedies for events of default from July 21, 2011 to November 18, 2011. As referred to above, cash of $12.8 million was paid, retiring $15.6 million in face value. In order to help fund a portion of the March 31, 2011 repayment, the Partnership obtained loans from its co-founders

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

totaling $6.7 million. The loans accrue interest at a rate of LIBOR plus five percent and mature on December 31, 2015 with all interest and principal due upon maturity.

The balance as of the date of this report is $66.7 million.

The fair value of the facility as of December 31, 2010 was approximately $83.6 million.

**Credit Opportunities Master Note Payable**
On December 19, 2008, Highland Credit Opportunities CDO Financing, LLC ("CDO Financing"), a wholly-owned subsidiary of Credit Opportunities Master, executed a Note Purchase Agreement (the "Purchase Agreement") with certain investors that provided for the issuance of up to $218 million of senior secured convertible notes guaranteed by Credit Opportunities Master. Pursuant to the terms of the Purchase Agreement and concurrent with the execution of the Purchase Agreement, CDO Financing issued $116.6 million of senior secured convertible notes for $115.6 million of cash and securities with a fair value of $0.9 million. The proceeds from the notes were used primarily to fund an additional equity investment in Highland Credit Opportunities, Ltd. (the "CDO"). This investment was required under the terms of a forbearance agreement that the Credit Opportunities Master executed with the Majority Controlling Class of the CDO's note holders.

The notes have a stated maturity date of December 31, 2012 and accrue interest on a quarterly basis at a rate of 25% per year. The terms of the Purchase Agreement allow for up to 75% of the accrued interest due at any payment date to be capitalized as additional principal owed to the holders of the notes. For the year ended December 31, 2010, no interest payable was capitalized and $45.0 million of senior secured convertible notes were repaid. As of December 31, 2010, there are $83.6 million of senior secured convertible notes outstanding.

Subject to certain conditions, the Purchase Agreement allows for CDO Financing to issue up to $101.4 million of additional notes to the existing note holders. The Purchase Agreement requires payment of a fee of 2.5% per annum on the unfunded portion of the note commitment. For the year ended December 31, 2010, approximately $2.6 million of unfunded commitment fees is recorded in interest expense in the Consolidated Statement of Income. As of December 31, 2010, a liability of approximately $5.3 million is included in interest payable in the Consolidated Balance Sheet. The fees will be paid on the stated maturity date, or on the full repayment of the notes.

Under the terms of the Purchase Agreement, the Credit Opportunities Master was not able to make any prepayments until July 1, 2010. From July 1, 2010 through December 31, 2010, the Credit Opportunities Master could elect to prepay 50% of the outstanding principal balance. After that period, Credit Opportunities Master may prepay all or a portion of the outstanding principal, provided that each partial payment made to the note holders is in an aggregate principal amount of at least $0.5 million.

25

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

The Purchase Agreement stipulates a premium due to the note holders upon full or partial payment of the outstanding principal of the notes. The premium due is determined by the date the principal is repaid and is calculated as a percentage of that principal balance, with a minimum of 5% due on the stated maturity date of the notes. The following table presents the premium rates by payment period:

| Prepayment Period | Fees |
|---|---|
| July 1, 2010 - Dec. 31, 2010 | 15.0% |
| July 1, 2011 - Dec. 31, 2011 | 10.0% |
| July 1, 2012 - Dec. 31, 2012 | 6.0% |
| Dec. 31 2012 | 5.0% |

Credit Opportunities Master is accruing the minimum premium due, 5% of the outstanding balance, over the contractual life of the notes using the effective-yield method. For the year ended December 31, 2010, approximately $0.8 million of this premium due is recorded as a component of interest expense in Credit Opportunities Master's consolidated statement of operations. As of December 31, 2010 a liability of approximately $1.7 million for the total premium recognized over the life of the notes is included in interest payable in the Consolidated Balance Sheet. Premium of $6.8 million was paid upon the prepayment during the year and is recorded in interest expenses in the Consolidated Statement of Income.

At the note holders' option, up to 50% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master between January 1, 2010 and June 30, 2010. From July 1, 2010 through December 31, 2012, up to 100% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master. As of December 31, 2010, no unpaid principal or accrued interest on the notes was converted into limited partnership interests in the Feeder Fund or Credit Opportunities Master.

The Purchase Agreement grants the note holders a lien on certain assets held by Credit Opportunities Master. In addition, it requires Credit Opportunities Master and the CDO to comply with various financial covenants. Failure to meet these covenants may result in an event of default and give the note holders the right to accelerate repayment of the debt or initiate a liquidation of certain assets. Credit Opportunities Master was in compliance with the covenants as of December 31, 2010 and for the year then ended.

As of December 31, 2010, the estimated fair value of the notes was approximately $115.2 million, which is based on value of the risk-adjusted yield from the expected future cash flows of the notes relative to comparable investments. Actual values may vary significantly from the estimates, particularly since the terms of the Company's debt are complex, and the market for the instruments is illiquid.

**Highland Capital Management Europe, Ltd. Credit Facility**

On December 29, 2010, Highland Europe entered into a $13.3 million non-recourse credit facility with Natixis Financial Products, LLC. The facility is secured by the management fees of Highland Europe. Payments are made on the 15th day of February, May, August and November until the facility is fully paid down. The facility matures on December 31, 2015. The facility bears interest at a rate of 4.00% per annum. The rate shall be reduced to 3.50% per annum once the principal balance is reduced below $10.8 million. The rate shall again be reduced to 3.00% per annum once

26

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2010

the principal balance is reduced below $6.2 million. As of December 31, 2010, the estimated fair market value of the facility was approximately $13.3 million.

**HCREA Nolen Drive Note Payable**
On September 18, 2006, Nolen Drive entered into a $7.0 million note payable with Artesia Mortgage Capital Corporation, which is secured by the underlying property in Nolen Drive (the "Term Loan"). The Term Loan matures with all principal and accrued interest due on October 11, 2011. The Term Loan bears interest at a rate of 6.52% per annum. Payments are due on the 11th of every month. As of December 31, 2010, the estimated fair market value of the note was approximately $7.1 million.

9. **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its consolidated entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The consolidated entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the consolidated entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Investment Funds due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Investment Fund's exposure to market risk is affected by a number of factors, including the size, composition and diversification of its investments and swap agreements; interest rates; and market volatility. The Partnership and its Consolidated Investment Funds use various forms of leverage, including notes, which increase the effect of any investment value changes on net assets.

**Credit Risk**
Credit risk is the potential loss the Partnership and its consolidated entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the consolidated entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the consolidated entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Investment Fund's limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Investment Funds nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the consolidated investment funds. The Consolidated Investment Funds could be materially affected by the liquidity, credit and other events of the Partnership.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Investment Funds' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Investment Funds' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Investment Funds' purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Investment Funds have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Investment Funds may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**CLO Equity Investments**

The Partnership and its Consolidated Investment Funds may invest in CLO equity that are not rated by various credit rating agencies and are generally considered to be speculative with respect to the issuer's ability to repay principal and interest. The yields and prices of these non-rated CLO equity tranches are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed. In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further limit their liquidity. The Partnership and its consolidated investment funds are exposed to the potential non-payment of principal and interest from their CLO equity investments. As of December 31, 2010, 1 of the 29 CLO's managed by the Partnership paid interest to the equity holders on their last payment date.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Investment Funds invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Credit Default Swaps**
Credit default swaps involve greater risks than if the Partnership or its Consolidated Investment Funds had shorted the reference obligations directly. In addition to the market risk discussed above, credit default swaps are subject to liquidity risk and credit risk. If a credit event occurs, the value of the reference obligation received by the Partnership or its Consolidated Investment Funds, couple with the periodic payments previously received, may be less than the full notional amount it pays to the buyer, resulting in loss of value.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Investment Funds' investments. However, the Consolidated Investment Funds' portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Investment Funds. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Investment Funds to losses that are disproportionate to market movements as a whole.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Investment Funds are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Investment Funds' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Investment Funds may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Investment Funds' might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**
The Consolidated Investment Funds may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Investment Funds' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Investment Funds. If the value of the Consolidated Investment Funds' securities fall below the margin level required by a counterparty, additional margin deposits are required. If the Consolidated Investment Funds are unable to satisfy a margin call, the counterparty could liquidate the position in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Investment Funds to incur significant losses. In addition, to the extent the Consolidated Investment Funds has posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Investment Funds' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Investment Funds. In addition, because the use of leverage allows the Consolidated Investment Funds to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Investment Funds may lose in the event of adverse price movements is high in relation to the amount of their investment.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

In the event of a sudden drop in the value of the Consolidated Investment Funds' assets, the Consolidated Investment Funds may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Investment Funds may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Investment Funds have the ability to apply discretionary margin, haircut, financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2010, the Consolidated Investment Funds' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that the Consolidated Investment Funds' are able to realize on the sale of its investments will directly affect the amounts that the investors in the Feeder Funds are able to redeem in connection with the wind down process. These amounts may differ materially from the partners' capital balances as of December 31, 2010.

**Litigation Risk**
The Partnership and its Consolidated Investment Funds are periodically subject to legal actions arising from the ordinary course of business. In addition, certain of the Consolidated Investment Funds' Feeder Fund investors have filed lawsuits after receiving notification of the decision to wind-down certain Consolidated Investment Funds' investment portfolios. Refer to Note 17 for a discussion of the open litigation.

10. **Related Party Transactions**

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2010, approximately $8.1 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in Other Assets in the accompanying Consolidated Balance Sheet.

**Long Term Incentive Plan and Intercompany Loan Payable to Highland Capital Management Services, Inc. ("HCMSI")**
Effective January 1, 2001, all of the Partnership's employees were transferred to HCMSI, which provides personnel management and consulting services to the Partnership. The Partnership and

30

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

HCMSI entered into a management agreement whereby the Partnership compensated HCMSI for its employee expenses plus a consulting services fee. As of January 1, 2005, there were no further transactions with HCMSI as all employees were transferred to the Partnership.

Effective January 1, 2001, HCMSI approved a long-term incentive plan ("the LTIP") for select employees who are eligible to receive Long-Term Incentive Units ("the Units") under the LTIP. The number of Units authorized under the LTIP is 30,000,000 and a majority of the Units granted vest 40% during the grant year and 30% for each of the two years thereafter, expiring 10 years after such grant date, unless different terms are agreed upon between the Plan Administrator and the employee. The fair value of the Units are based upon the fair value of the Partnership, as determined in good faith, by James Dondero, the Plan Administrator and the sole shareholder of the general partner and a limited partner of the Partnership. The LTIP was transferred to the Partnership from HCMSI on January 1, 2005.

The Units are exercisable at the discretion of the Plan Administrator, or upon a triggering event defined as the earlier of the following events:

- Change in control

- Initial public offering

- Participant's voluntary or involuntary termination due to death, disability, retirement, or hardship

- Participant's voluntary or involuntary termination other than due to death, disability, retirement, hardship, or cause is exercisable to the extent the Participant is entitled to only 80% of the vested shares.

A total of 1,104,353 Units are outstanding as of December 31, 2010 under the LTIP. During the year ended December 31, 2010, the liability under the LTIP decreased by approximately $1.8 million, which is included in *Compensation and benefits* in the Consolidated Statement of Income.

The total balance payable to HCMSI was approximately $0.9 million as of December 31, 2010, which is related to the LTIP accrual.

Effective December 31, 2004, all of the employees at HCMSI were transferred to the Partnership, and the management agreement between the Partnership and HCMSI was terminated as to the provision of future services. However, all of the outstanding and unfunded obligations of the Partnership to HCMSI as of December 31, 2004, as well as any additional obligations that may arise in relation to these amounts, will continue to be due and payable to HCMSI until satisfied in accordance with the provisions of the agreements in place.

**Accounts Held with Related Party**
During the year the Partnership and its subsidiaries maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2010, balances in the accounts were approximately $19.8 million, a portion of which exceeds Federal deposit insurance limits.

31

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Controlling Positions**

Various members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. Any director's fees received by the Partnership for these services as directors are paid to and retained by the Partnership. As of December 31, 2010, the Partnership and its subsidiaries held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| American Banknote Corporation | Common Equity | $ 14,821 |
| American Home Patient | Common Equity | 5,653 |
| Blackwell BMC, LLC | Term Loan | 3,547 |
| Blackwell BMC, LLC | Common Equity | 28,769 |
| Consolidated Restaurant Companies, Inc. | Term Loan | 13,626 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 57,171 |
| Cornerstone Healthcare Group Holding, Inc. | Term Loan | 18,513 |
| Cornerstone Healthcare Group Holding, Inc. | Loan - Second Lien | 5,250 |
| Epocal, Inc. | Preferred Equity | 80,419 |
| Ginn LA Resorts Holdings, LLC | Term Loan | 1,194 |
| Ginn LA Conduit Lender, Inc. | Loan - Second Lien | 33 |
| Highland Long/Short Equity Fund | Mutual Fund | 231 |
| Highland Healthcare Fund | Mutual Fund | 7,371 |
| Highland Credit Strategies Fund | Closed-End Mutual Fund | 4,819 |
| Home Interiors & Gifts, Inc. | Proof of Claims | 2 |
| Marcal Paper Mills, LLC | Common Equity | - |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 1,206 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 618 |
| Safety-Kleen Inc. | Common Equity | 178,486 |
| Solstice Neurosciences, Inc. | Preferred Equity | 263 |
| Terrestar | Preferred Equity | 1,022 |
| Trussway Industries, Inc. | Common Equity | 11,001 |

During the year ended December 31, 2010, the Partnership did not earn material income from those entities where members of management serve as members of the Board of Directors.

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $6.5 million. At December 31, 2010, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $264.4 million and $63.9 million, respectively.

32

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

**Affiliated Transactions**

On August 20, 2008, the Partnership issued a promissory note in the amount of $330,000 to an employee of the Partnership. The note accrues interest at a rate of LIBOR plus 1.75%. The note is payable in one lump sum on the earlier of August 20, 2015 or an event of acceleration. The note has specific forgiveness provisions of principal and interest prior to maturity if certain milestone dates are obtained. As of December 31, 2010, the principal amount on the promissory note was $212,000 with interest accrued of approximately $3,000.

In accordance with the terms of a Master Indenture Agreement (the "Indenture") dated November 2, 2006, the Credit Opportunities Master acquired 250,000 Preferred Shares of Highland Credit Opportunities CDO, Ltd (the "CDO"). The Indenture requires Credit Opportunities Master to hold, directly or indirectly, more than 99% of the CDO's outstanding Preferred Shares at all times. As of December 31, 2010, the Credit Opportunities Master held 350,000 Preferred Shares and was the sole beneficial preferred shareholder.

The CDO invests primarily in floating rate syndicated bank loans, fixed income securities, and equity investments. These investments were purchased with funds the CDO received from the issuance of rated floating rate notes and Credit Opportunities Master's purchase of the Preferred Shares. Credit Opportunities Master is the sole beneficiary of all residual income from the CDO's portfolio. Although the Preferred Shares do not have a voting interest in the CDO, they carry certain rights. Specifically, they are entitled to receive quarterly preferential dividends, without requiring any declaration by the Directors, from the date they were issued until they are redeemed.

The Investment Manager serves as the Collateral Manager for the CDO but does not receive any fees for its services to the CDO.

During the fourth quarter of 2008, the CDO failed to meet certain over-collateralization tests set forth in the First Supplement to the Indenture dated November 2, 2006. This breach would have given the CDO's Majority of Controlling Debt Class the option to accelerate repayment of the CDO's outstanding debt or initiate a liquidation of its assets. To protect the value of its investment in the CDO, Credit Opportunities Master entered into a forbearance agreement whereby the Majority Controlling Class of the CDO's note holders waived the breach and agreed not to exercise the rights discussed above. The Majority Controlling Class also agreed to waive any future events of default resulting from the CDO's failure to meet the overcollateralization tests through December 31, 2011. In return, the CDO agreed not make any preferred dividend payments to Credit Opportunities Master until the over-collateralization tests exceed certain thresholds.

Credit Opportunities Master paid certain expenses related to the forbearance agreement, which have been recorded as an increase to the cost basis of its investment in the CDO's Preferred Shares.

The Consolidated Investment Funds periodically enter into transactions to buy or sell securities with affiliated entities. During the year ended December 31, 2010, the Consolidated Investment Funds did not purchase or sell a material amount of securities to affiliated entities.

**Services Performed by an Affiliate**

In March 2007, Highland Capital of New York, L.P., a New York limited partnership ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools

33

HIGHLY CONFIDENTIAL

D-CNL000339

**Appx. 01038**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2010, total marketing fee expense charged to the Partnership by Highland New York was approximately $3.7 million and as of December 31, 2010, amounts owed to Highland New York for services rendered was approximately $1.4 million.

**11. Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, consolidated statement of income, or its liquidity. See Note 16.

**Operating Leases**
Future minimum lease payments under operating lease commitments of the Partnership and its consolidated entities with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| **Years Ending December 31,** | | |
|---|---|---|
| 2011 | $ | 1,757 |
| Thereafter | | - |
| | $ | 1,757 |

Total rental expense of the Partnership and its consolidated entities for operating leases was approximately $2.5 million for the year ended December 31, 2010.

**Loan Commitments**
At December 31, 2010, the Consolidated Investment Funds had unfunded loan commitments of approximately $1.1 million. Unfunded loan commitments are marked to market on the relevant day of valuation in accordance with the Partnership's valuation policies. Any applicable unrealized gain (loss) and unrealized appreciation (depreciation) on unfunded loan commitments are recorded on the Consolidated Balance Sheet and Consolidated Income Statement, respectively. The net change in unrealized appreciation on unfunded transactions is not material to the Income Statement.

34

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

12.   **Postretirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. Therefore, no new participants shall enter the plan after 2008 and no new benefits shall accrue under the plan after 2008. The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2010 are reconciled in the tables below.

*(in thousands)*

| Change in projected benefit obligation | | 2010 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 3,416 |
| Service cost | | - |
| Interest cost | | 195 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 184 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (437) |
| Benefit obligation at end of year | $ | 3,358 |

| Change in plan assets | | 2010 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 3,614 |
| Actual return on plan assets | | 391 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (437) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,568 |

| Reconciliation of Funded Status | | 2010 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 3,358 |
| Projected benefit obligation at end of year | | 3,358 |
| Fair value of assets at end of year | | 3,568 |
| Funded status at end of year | $ | 210 |

35

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

The Partnership does not expect to contribute to the plan during 2011.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2010:

| | |
|---|---|
| Discount rate | 5.70% |
| Rate of compensation increase | N/A |

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2010:

| | |
|---|---|
| Discount rate | 6.10% |
| Expected long-term return on plan assets | 6.10% |
| Rate of compensation increase | N/A |

As of December 31, 2010, approximately $0.7 million of the plan assets were categorized as Level 3.

13. **Goodwill and Other Intangible Assets**

Below is a summary of the Partnership's goodwill and other intangible assets as of December 31, 2010:

| *(in thousands)* | Carrying Value |
|---|---|
| Highland Floating Rate Fund | $ 12,672 |
| Highland Floating Rate Advantage Fund | 11,328 |
| Goodwill for Highland Europe | 8,020 |
| | $ 32,020 |

On April 9, 2004, the Partnership purchased the management agreements of Highland Floating Rate Fund (the "Floating Rate Fund") and Highland Floating Rate Advantage Fund (the "Advantage Fund"), collectively the "Purchased Funds." The combined purchase price for the above agreements was $24.0 million. The purchase price was allocated among the Purchased Funds pro-rata based on the approximate combined total managed assets of the funds as of the date of purchase. As a result, $12.7 million of the purchase price was allocated to the Floating Rate Fund and $11.3 million was allocated to the Advantage Fund.

The Partnership performs an impairment test as required by U.S. GAAP on a yearly basis. The Partnership's management analyzes market multiples on retail asset managers within the industry as of December 31, 2010 to determine fair value of these assets. The Partnership has determined that no impairment charge is necessary for the current year.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

14. **Reverse Repurchase Agreements**

Credit Strategies Master is party to collateralized financing transactions consisting of securities sold under agreements to repurchase. As of December 31, 2010, Credit Strategies Master held high yield corporate bonds and equities with a fair value of $39.9 million under reverse repurchase agreements. The gross amount payable to the counterparty (including accrued interest) was approximately $20.6 million and is recorded as a component of due to brokers in the Consolidated Balance Sheet.

15. **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2010, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2007 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2010.

**Crusader Master**
Crusader Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Crusader Master. Crusader Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Crusader Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Crusader Master's net taxable income.

Since Crusader Master trades investments for its own account, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The General Partner intends to conduct Crusader Master's business in such a way that it does not constitute a U.S. trade or business or create a taxable presence in any of the jurisdictions in which the Investment Manager has offices, including the United Kingdom.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2010**

Dividends as well as certain interest and other income received by Crusader Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Crusader Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2010, a withholding tax liability of $0.3 million is included in the accrued expenses in the Consolidated Balance Sheet.

It is management's responsibility to determine whether a tax position of Crusader Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As a result of adopting this guidance, management has established a reserve of approximately $12.5 million for uncertain tax positions, which includes approximately $1.2 million of interest and $4.0 million of penalties. Of this amount, approximately $2.7 million related to the current year and was recorded as a tax expense in Statement of Income. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2010.

Crusader Master files tax returns as prescribed the tax laws of the jurisdictions in which it operates. In the normal course of business, Crusader Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2010, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2007 forward.

A wholly owned corporation of Crusader Master has incurred capital losses on the sale of investments that exceed the amount of capital gains it has earned. Management has concluded that the subsidiary is not likely to generate additional gains in future periods and has established a valuation allowance to reserve for the entire amount of the deferred tax asset associated with the unused capital losses.

**Credit Opportunities Master**

The Credit Opportunities Master has adopted authoritative guidance which requires management to determine whether a tax position of Credit Opportunities Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Credit Opportunities Master has determined that there was no effect on the financial statements from the application of this guidance. As of December 31, 2010, a liability to account for uncertain tax positions of $0.2 million is classified within other liabilities within the Consolidated Balance Sheet. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2010.

Credit Opportunities Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Opportunities Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2010, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2007 forward (with limited exceptions).

38

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

Dividends as well as certain interest and other income received by Credit Opportunities Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Opportunities Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

**Credit Strategies Master**

Credit Strategies Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Credit Strategies Master. Credit Strategies Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Credit Strategies Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Credit Strategies Master's net taxable income.

The Credit Strategies Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Strategies Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2010, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2007 forward (with limited exceptions).

It is management's responsibility to determine whether a tax position of Credit Strategies Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2010.

Dividends as well as certain interest and other income received by Credit Strategies Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Strategies Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

A wholly-owned corporation of the Credit Strategies Master incurred approximately $0.9 million of tax expense on income earned by the entity. No portion of this amount was unpaid as of December 31, 2010.

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

---

**16.    Legal Proceedings**

In April 2007, CDO Master Fund entered into a risk sharing agreement structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Special Opportunities Holding Company ("SOHC"). The warehouse was financed by a reputable financial institution and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, the counterparty agreed to extend it for one year on March 15, 2008. Due to liquidity constraints, CDO Master Fund was unable to meet a November call, and the counterparty elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by the counterparty and sold on the open market through bids-wanted-in competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, the counterparty notified CDO Master Fund that its pro-rata share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount. On February 24, 2009, the counterparty (the "Plaintiffs") filed a lawsuit against CDO Master Fund, SOHC and the Partnership in the New York State Supreme Court of Manhattan alleging that they suffered losses in excess of $745 million due to the depreciation in value of the warehouse collateral. On February 19, 2010 a New York Appeals Court sided with the Partnership and dismissed UBS' claims against the Partnership. Thereafter on June 22, 2010, Plaintiffs filed an amended complaint with the Court against the Partnership and certain affiliated registered and unregistered investment vehicles alleging $687 million in damages. On March 15, 2011, the First Appellate Division heard the Partnership's appeal of the ruling regarding dismissal of the amended complaint. The First Appellate Division has not yet issued a ruling on this matter.

In April 2009, HYMF, Inc. filed a lawsuit in the New York State Court against the Partnership and certain consolidated investment funds (collectively "the Defendants"). The lawsuit alleges that the Defendants breached their contractual and fiduciary duties by failing to return HYMF's original investment in the consolidated investment funds. The Defendants intend to vigorously defend against the lawsuit. At this time, management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

On July 15, 2008, Crusader Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida. The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. Based on the ruling, Crusader Master recorded a reserve of approximately $5.3 million as of December 31, 2010, which represents its ratable share of the judgment. However, the Defendants believe they acted in good faith pursuant to the terms of the relevant agreements and intend to appeal the decision. The reserve is included as a component of accrued expenses on the Consolidated Balance Sheet and a component of net realized losses from investment transactions on the Consolidated Statement of Income.

During the first quarter of 2009, certain investors in Highland Credit Strategies Fund, Ltd. filed lawsuits in response to the decision to wind-down Credit Strategies Master's investment portfolio. They have made various claims, including breach of fiduciary duties, negligence, tortuous

40

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

interference with the payment of redemption amounts, and/or fraud. Both the Partnership and Highland Credit Strategies Fund, Ltd. have been named as parties to the lawsuits. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty. As of December 31, 2010, approximately $1.3 million of required cash payments made by Credit Strategies Master to retain legal firms to defend these matters are included in Other Assets in the Consolidated Balance Sheet.

### 17. Fund Wind Down

On February 4, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent and that it was in the best interest of the fund to liquidate the fund's remaining assets. The proceeds from the asset liquidations will be distributed to the remaining financing counterparties and other senior and trade creditors as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

During 2008, Crusader Master and Credit Strategies Master were negatively affected by deteriorating conditions in the overall economy and credit markets. These conditions became more severe during the third and fourth quarters of 2008 and generated significant losses on various derivative transactions and repurchase agreements to which Crusader Master and Credit Strategies Master were parties. In addition, certain assets that Crusader Master and Credit Strategies Master purchased on margin through prime brokerage agreements experienced a significant decline in value. In certain cases, Crusader Master and Credit Strategies Master were unable to post the collateral required to secure these losses, and the counterparties provided notice of their intent to terminate the agreements. As a result, access to the credit that Crusader Master and Credit Strategies Master used to manage its investing and financing activities became highly constrained, and in some cases unavailable. In light of these circumstances, the General Partners (the general partner of Highland Crusader Fund, L.P. and the general partner of Highland Credit Strategies Fund, L.P.) and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. concluded, in consultation with the Investment Manager, that it would be in the best interests of their investors to wind down the investment portfolios of Credit Strategies Master and Crusader Master. On October 15, 2008, the Investment Manager notified investors that it would begin the wind-down process. The Investment Manager also restricted subscriptions and the payment of withdrawals to the Feeder Funds effective the same date.

In connection with the wind down, the limited partner interests of the Feeder Funds were compulsorily withdrawn/redeemed on November 15, 2008 in accordance with the terms of the governing documents. The General Partner has suspended payment of distributions, and any outstanding balances with respect to withdrawal and/or redemption amounts. A formal plan of liquidation has not been finalized by management, and there are no assurances that investors will realize the remaining equity balance over the course of the wind down. Distributions will ultimately be made on a pro-rata basis based on the respective redemption amounts as of November 15, 2008 unless a plan of distribution dictates otherwise. Future distributions will be made as the value of Crusader Master and Credit Strategies Master's investments are realized and all obligations due to counterparties and service providers of Crusader Master, Credit Strategies Master, and the Feeder Funds have been satisfied.

Subsequent to December 31, 2010 a Plan of Distribution was agreed to for Credit Strategies Master. See Note 18 for additional discussion.

HIGHLY CONFIDENTIAL

D-CNL000347

**Appx. 01046**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2010**

As of December 31, 2010, the estimated value of the partners' capital available for distribution from Crusader Master to its Feeder funds was approximately $1,488.7 million. The actual amounts that will be distributed upon completion of the wind down process are inherently uncertain. The Investment Manager estimates that the wind down could take up to four years to complete. Capital will be distributed as it becomes available in accordance with a plan of distribution, once approved and implemented.

On October 14th 2010, certain investors in Highland Crusader Fund II,, Ltd. presented a Petition to Wind-Up the Fund to the Supreme Court of Bermuda Companies (Winding Up) Commercial Court ("the Court") for the purpose of appointing a liquidator. If a Winding-Up Order is issued, a liquidator will be appointed and the liquidator will take steps to collect in and realize the company's assets and will deal with creditors' claims. If a Winding-Up order is not issued by the Court, the Investment Manager will continue to work on finalizing a formal plan of distribution with all interested parties. Crusader Master and consequently the other Feeder Funds are not parties to this petition, but could be subject to subsequent actions taken by the creditors, shareholders, or the Court. The Investment Manager believes it is currently not possible to evaluate the likelihood of any particular outcome from the matter at this point. The matter is currently scheduled to be decided by the Court at a hearing commencing on May 30, 2011.

18. **Subsequent Events**

On January 4, 2011 and February 4, 2011 Credit Opportunities Master elected to prepay $10.0 million and $17.0 million of the outstanding principal balance of the notes, respectively, including interest and prepayment premium.

Crusader Master had previously recorded a reserve of approximately $5.3 million relating to an unfavorable decision in a legal case that involved Crusader Master. In February 2011, the District Court of Florida quashed the judgment against the Defendants and overturned the ruling that resulted in Crusader Master recording the reserve. Crusader Master does not believe an appeal of this decision will be successful and relieved the reserve, which will be reflected in the Consolidated Statement of Income for the year ending December 31, 2011.

On March 31, 2011, the Partnership amended the Revolving Credit Agreement a third time to extend a number of provisions from the December 29, 2010 waiver. A discussion of the amendment can be found in Note 8.

On March 31, 2011, the Partnership obtained loans from its co-founders totaling $6.7 million. A discussion of the loans can be found in Note 8.

In April 2011, the Bermuda Commercial Court approved a plan to distribute the assets of Credit Strategies Master. The Scheme of Arrangement for the offshore fund and Plan of Distribution for the onshore fund were implemented on May 1, 2011. As part of the arrangement, the Partnership paid $3.0 million to Credit Strategies Master.

In April 2011, the Partnership entered into a 10-year lease agreement with Crescent TC Investors, L.P.

HIGHLY CONFIDENTIAL

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000349

**Appx. 01048**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2010**

*(in thousands)*

The above information was derived from the audited December 31, 2010 consolidated financial Statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

**Assets**

Current assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 1,991 |
| Restricted cash | | 1,656 |
| Investments at fair value (cost $72,055) | | 65,749 |
| Equity method investees | | 17,926 |
| Management and incentive fees receivable | | 15,282 |
| Due from brokers | | 137 |
| Other current assets | | 13,317 |
| Deferred incentive fees receivable | | 35,883 |
| Purchased investment management contracts | | 24,000 |
| Goodwill and other intangible assets, net | | 388 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $10,237 | | 4,830 |
| | $ | 181,159 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 2,187 |
| Accrued and other liabilities | | 59,488 |
| Debt and notes payable | | 86,296 |
| Long-term incentive plan | | 1,081 |
| Total liabilities | | 149,052 |
| Partners' capital | | 32,107 |
| **Total liabilities and partners' capital** | $ | 181,159 |

44

HIGHLY CONFIDENTIAL

D-CNL000350

**Appx. 01049**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**December 31, 2010**

*(in thousands)*

The above information was derived from the audited December 31, 2010 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 78,353 |
| Incentive fees/allocations | | 8,066 |
| Interest and investment income | | 2,286 |
| Other income | | 11,193 |
| Total revenue | | 99,898 |
| | | |
| **Operating expenses:** | | |
| Compensation and benefits | | 48,802 |
| Professional fees | | 10,294 |
| Investment and research consulting | | 785 |
| Amortization and depreciation | | 1,820 |
| Interest expense | | 8,353 |
| Other operating expenses | | 19,275 |
| Total operating expenses | | 89,329 |
| | | |
| Income/(loss) before investment activities | | 10,569 |
| | | |
| **Realized and unrealized gain/(loss) from investments transactions:** | | |
| Net realized loss on sale of investment transactions | | (7,866) |
| Net change in unrealized gain on investments | | 14,628 |
| Total realized and unrealized loss from investments transactions | | 6,762 |
| | | |
| **Realized and unrealized earnings from equity method investee:** | | |
| Net unrealized losses from equity method investees | | (990) |
| Total realized and unrealized losses from equity method investees | | (990) |
| | | |
| Net realized gain on extinguishment of debt | | 10,000 |
| | | |
| **Net income** | $ | 26,341 |

45

HIGHLY CONFIDENTIAL

D-CNL000351

**Appx. 01050**

# EXHIBIT 66

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2011**

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2011**

Page(s)

**Report of Independent Auditors** ................................................................................................................ 1

**Audited Consolidated Financial Statements**

Balance Sheet ............................................................................................................................................ 2

Statement of Income .................................................................................................................................. 3

Statement of Changes in Partners' Capital ................................................................................................ 4

Statement of Cash Flows ........................................................................................................................... 5

Notes to Financial Statements ............................................................................................................. 6–44

Supplemental Information………………………………………………………………………….…45-47

HIGHLY CONFIDENTIAL



**Report of Independent Auditors**

To the General and Limited Partners of
   Highland Capital Management, L.P:

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of income, of changes in partners' capital and of cash flows (hereinafter referred to as the "financial statements") present fairly, in all material respects, the consolidated financial position of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership") at December 31, 2011, and the results of their operations, the changes in their partners' capital, and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.  These financial statements are the responsibility of the Partnership's management.  Our responsibility is to express an opinion on these financial statements based on our audit.  We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole.   The supplemental unconsolidated balance sheet and statement of income are presented for purposes of additional information, and are not a required part of the basic consolidated financial statements.  Such information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 21, 2012

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, TX 75201-2997*
*T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us*

HIGHLY CONFIDENTIAL

D-CNL000354

**Appx. 01054**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2011**

*(in thousands)*

**Assets**

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 74,668 |
| Restricted cash | | 14,691 |
| Investments at fair value (cost $2,901,075) | | 1,926,277 |
| Unrealized gains on derivative contracts | | 162 |
| Management and incentive fees receivable | | 29,402 |
| Due from brokers | | 20,708 |
| Other assets | | 26,800 |
| Deferred incentive fees receivable | | 29,428 |
| Goodwill and other intangible assets | | 8,020 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,562 | | 6,869 |
| **Total assets** | $ | 2,137,025 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---|
| Accounts payable | $ | 2,048 |
| Securities sold, not yet purchased (proceeds $6,134) | | 8,390 |
| Withdrawals payable | | 15,516 |
| Obligations to return collateral | | 6,792 |
| Interest payable | | 11,326 |
| Due to brokers | | 370,711 |
| Due to brokers for securities purchased not yet settled | | 66,882 |
| Accrued and other liabilities | | 70,256 |
| Secured borrowing | | 3,812 |
| Debt and notes payable | | 114,813 |
| Total liabilities | | 670,546 |
| Non-controlling interest | | 1,427,281 |
| Commitments (Note 11) | | |
| **Partners' capital** | | 39,198 |
| **Total liabilities and partners' capital** | $ | 2,137,025 |

The accompanying notes are an integral part of these consolidated statements.

2

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**December 31, 2011**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 154,218 |
| Incentive fees/allocations | | 1,381 |
| Interest and investment income | | 136,483 |
| Other income | | 13,772 |
| Total revenue | | 305,854 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 56,455 |
| Professional fees | | 30,717 |
| Investment and research consulting | | 708 |
| Amortization and depreciation | | 1,346 |
| Interest expense | | 26,416 |
| Tax expense | | 4,999 |
| Other expenses | | 21,155 |
| Total expenses | | 141,796 |
| | | |
| Income before investment and derivative activities | | 164,058 |
| | | |
| Realized and unrealized gain/(loss) from investment and derivative transactions: | | |
| Net realized loss on investment and derivative transactions | | (373,502) |
| Net change in unrealized gain on investment and derivative transactions | | 335,343 |
| Total realized and unrealized loss from investment and derivative transactions | | (38,159) |
| | | |
| **Extraordinary Items** | | |
| Net realized gain on extinguishment of debt | | 2,823 |
| Novation of purchased investment management contracts | | (24,000) |
| Fund wind down costs (Note 17) | | (23,292) |
| | | |
| Net income | | 81,430 |
| | | |
| Net income attributable to the non-controlling interest | | (55,183) |
| | | |
| Net income attributable to Highland Capital Management, L.P. | $ | 26,247 |

The accompanying notes are an integral part of these consolidated statements.

3

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2011**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2010 | $ 495 | $ 31,612 | $ 32,107 |
| Net income attributable to Highland Capital Management, L.P. | - | 26,247 | 26,247 |
| Partner distributions | (105) | (19,051) | (19,156) |
| Partners' capital, December 31, 2011 | $ 390 | $ 38,808 | $ 39,198 |

The accompanying notes are an integral part of these consolidated statements.

4

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2011**

*(in thousands)*

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 81,430 |
| Adjustment to reconcile net income to cash and cash equivalents provided by operating activities: | | |
| Net realized loss on investments and derivative transactions | | 373,502 |
| Net realized gain on extinguishment of debt | | (2,823) |
| Net change in unrealized gain on investments and derivative transactions | | (335,343) |
| Net change in unrealized gain from securities sold, not yet purchased | | (4,783) |
| Deferred tax expense on unrealized gains | | 1,068 |
| Amortization and depreciation | | 1,346 |
| **Changes in assets and liabilities:** | | |
| Restricted cash | | 14,410 |
| Management and incentive fee receivable | | (11,791) |
| Deferred incentive fees | | 6,455 |
| Investment management contracts | | 24,000 |
| Other assets | | 11,005 |
| Due from brokers | | 12,392 |
| Accounts payable | | (150) |
| Accrued and other liabilties | | (19,948) |
| Due to brokers for unsettled trades | | (666) |
| Interest payable | | 4,265 |
| Withdrawals payable | | (220) |
| Long-term incentive plan | | (1,081) |
| Obligations to retun collateral | | 6,792 |
| Net cash provided by operating activities | | 159,860 |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (3,381) |
| Purchases of investments | | (169,981) |
| Proceeds from dispositions of investments | | 562,705 |
| Purchases of investments to cover securities sold, not yet purchased | | (15,650) |
| Net cash provided by investing activities | | 373,693 |
| **Cash flows from financing activities:** | | |
| Payments on long-term debt | | (25,756) |
| Payments on revolving debt and promissory notes | | (26,991) |
| Payments on affiliate loans, net | | (6,614) |
| Due to brokers | | (50,349) |
| Capital contributions from minority interest investors of consolidated entities | | 107,394 |
| Capital withdrawals by minority interest investors of consolidated entities | | (533,528) |
| Partner distributions | | (19,156) |
| Net cash used in financing activities | | (555,000) |
| Net decrease in cash and cash equivalents | | (21,447) |
| | | |
| **Cash and cash equivalents** | | |
| Beginning of year | | 96,115 |
| End of year | $ | 74,668 |
| | | |
| **Supplemental disclosure of cash flow informaton:** | | |
| Interest paid during the year | $ | 26,768 |

The accompanying notes are an integral part of these consolidated statements.

HIGHLY CONFIDENTIAL

D-CNL000358

**Appx. 01058**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**1. Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment advisor under the Investment Advisors Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is 100% owned by senior management of the Partnership.

As of December 31, 2011, the Partnership provided investment advisory services for twenty-eight CLOs, five separate accounts, one registered investment company, one master limited partnership, and fourteen hedge fund structures, with total fee-earning assets under management of approximately $19.8 billion.

**2. Liquidity Considerations**

As further discussed in Note 8, the Partnership has a Revolving Credit Facility (the "Credit Agreement") originally scheduled to mature on July 21, 2011. Forbearance from the exercising of remedies for events of default was extended from July 21, 2011 through April 30, 2012 and subsequent to year-end, was further extended from April 30, 2012 to May 2, 2013. See further discussion in Note 8. The Credit Agreement is collateralized by assets of the Partnerships with an estimated fair value of approximately $115 million at December 31, 2011.

**3. Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected

6

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

**Consolidation of Non-Variable Interest Entities**
The Partnership consolidates the following non-VIE's (collectively referred to as the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005

- Highland Credit Opportunities CDO, L.P. ("Credit Opportunities Master"), a Delaware limited partnership that commenced operations on December 29, 2005;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore") a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore") a Delaware limited partnership that commenced operations on September 2, 2008; and

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Management Europe, Ltd. ("Highland Europe"), a company organized in the United Kingdom and purchased by the Partnership on April 6, 2005;

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

7

D-CNL000360

**Appx. 01060**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 59% interest in HCREA Nolen Drive, L.P., a Texas limited partnership that commenced operations on July 17, 2006;

- 100% interest in Highland Special Situations Fund, a Delaware statutory trust that is registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, as a non-diversified, closed-end management investment company, and commenced operations on May 18, 2005.

- 100% interest in Highland Energy and Materials Fund, a Delaware statutory trust that is registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, as a non-diversified, closed-end management investment company, and commenced operations on December 1, 2011.

All significant interpartnership and intercompany accounts and transactions have been eliminated in consolidation of all of the aforementioned consolidated entities. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

**Reclassifications**
Previously reported amounts for the prior year have in some instances been reclassified to conform to the current year presentation.

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2011, the Partnership and its consolidated entities recognized management and incentive fees of approximately $154.0 million, and $1.4 million, respectively. The Partnership recognized approximately $1.8 million of appreciation on incentive fees earned prior to 2008, previously deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the Consolidated Statement of Income.

8

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Derivative Contracts**

Credit Default Swaps are marked-to-market based upon values from third party vendors or broker quotations and the change in value is recorded as unrealized appreciation/depreciation. Swap contracts with cumulative unrealized gains as of a reporting date are recorded as assets on the Consolidated Balance Sheet, while swap contracts with cumulative unrealized losses as of the reporting date are recorded as liabilities. Upfront payments made/received by the Consolidated Funds are amortized or accreted for financial reporting purposes, with the unamortized or unaccreted portion included in the Consolidated Balance Sheet. A termination payment by the counterparty or the Consolidated Funds is recorded as a realized gain or loss, as well as the net periodic payments received or paid by the Consolidated Fund.

**Dividends, Interest and Expense Recognition**

Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**

The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. Of the entities consolidated, only Highland Europe is subject to these provisions. See further discussion in Note 15..

**Extraordinary Items**

Extraordinary items consist of events or transactions of a material nature that are both unusual in nature and infrequent in occurrence. An event or transaction is unusual in nature if it is abnormal and clearly unrelated to typical activities of the business. It is infrequent in occurrence if it is not reasonably expected to recur in the foreseeable future.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Foreign cash of $1.4 million is included in the cash and cash equivalents on the consolidated balance sheet. A portion of cash and cash equivalents exceeds Federal deposit insurance limits.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Restricted Cash**
The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash on the Consolidated Balance Sheet.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

**Debt Securities**
The Consolidated Funds invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Consolidated Funds first seek to obtain reliable market quotes from other parties dealing in the specific asset. Absent both a reliable market quote and third-party pricing service date, the Consolidated Funds may use various models to establish an estimated exit price. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Private Equity Investments**
The Consolidated Funds hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Consolidated Funds will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

**Asset Backed Securities**
The Consolidated Funds invest in a variety of asset backed securities. Asset backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Funds generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Funds evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Funds may apply other techniques based on a specific asset's characteristics.

10

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Credit Default Swaps**
As discussed in Note 7, under a credit default swap agreement two parties agree to transfer the credit exposure of an asset between one another. The seller of the swap guarantees the credit worthiness of a specific instrument by agreeing to pay the buying party a specific amount (generally par value) in the event that the instrument defaults.

At December 31, 2011, the Partnership's Consolidated Investment Funds were party to credit default swaps in which they act as the guaranteeing party. In the event that any of the underlying instruments default prior to the expiration of the agreements, the Consolidated Investment Funds are obligated to pay the swap counterparty the par value of the specific instrument. The Consolidated Investment Funds collect a fee based on the size of the underlying positions which are treated as realized gains once received. The difference between the current market value of the swaps and the original price of the swap is reported as an unrealized gain or loss.

**Securities Sold, Not Yet Purchased**
The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand. Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash or securities. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Investment Manager's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Securities Loaned**
The Partnership's Consolidated Investment Funds may lend securities to their financing counterparties for margin. The lending entity receives the interest associated with the securities loaned. The loans are secured by the fair value of the securities. Gains or losses in the fair value of the securities loaned that occur during the term of the loan will be for the account of the lender. The lender has the right under the lending agreement to recover the securities from the prime brokers on demand. The lender pays a fee to the broker for the cash collateral received. This is accounted for as interest expense. A credit risk exists to the lender under this type of transaction to the extent that the counterparty defaults on its obligation to return the securities loaned.

**Revolving Credit Agreements**
The funded portion of revolving credit agreements is recorded at fair value on the Consolidated Balance Sheet as a component of investments, net of the fair value of unfunded commitments for which the Consolidated Funds may be liable in the future (Note 11).

**Margin Transactions**
In order to obtain more investable cash, the Consolidated Investment Funds may use various forms of leverage including purchasing securities on margin. A margin transaction consists of

11

D-CNL000364

**Appx. 01064**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing. Such leverage may allow the Partnership and its subsidiaries to increase net assets at a greater rate during increasing markets, but also may lead to a more rapid decrease in net assets in a declining market.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2011. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. Withdrawals payable may be treated as capital for purposes of allocations of gains/losses pursuant to the partnerships' governing documents. At December 31, 2011, the Consolidated Investment Funds had withdrawals payable of $15.5 million.

**Foreign Currency Transactions**
The Partnership's subsidiary Highland Europe uses British Pounds as its functional currency and enters into transactions in multiple foreign currencies. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2011. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the consolidated statement of income.

The Consolidated Investment Funds do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments.*

**Financial Instruments**
The Partnership and its consolidated entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

**Life Settlement Contracts**
One of the Partnership's Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. The contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of "Purchase of investments" and "Proceeds from the disposition of investments" on the Consolidated Statement of Cash Flows.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

12

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Goodwill and Other Intangible Assets**
The Partnership purchased Highland Europe on April 6, 2005. Goodwill represents the amount paid in excess of the fair value of the assets of Highland Europe at the date of acquisition. No goodwill impairments existed as of December 31, 2011.

**Recently Issued Accounting Standards and Interpretations**
In May 2011, the Financial Accounting Standards Board issued Accounting Standards Update 2011-04 "Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS" ("ASU 2011-04"). ASU 2011-04 includes common requirements for measurement of and disclosure about fair value between U.S. GAAP and International Financial Reporting Standards ("IFRS"). ASU 2011-04 will require reporting entities to disclose quantitative information about the unobservable inputs used in the fair value measurements categorized within Level 3 of the fair value hierarchy. The new and revised disclosures are effective for interim and annual reporting periods beginning after December 15, 2011. At this time, management is evaluating the implications of ASU 2011-04 and its impact on the financial statements has not been determined.

In June 2011, the FASB amended existing standards to comprehensive income to require all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. Under Accounting Standards Update 2011-05, "Presentation of Comprehensive Income", the option to present the components of other comprehensive income as part of the statement of changes in stockholders' equity has been eliminated. In addition, it requires an entity to present reclassification adjustments on the face of the financial statements from other comprehensive income to net income. The guidance is effective for non-public filers during interim and annual periods beginning after December 15, 2012, and as such, the Partnership has not adopted this guidance for the year ending December 31, 2011.

In December 2011, the FASB amended existing standards to require an entity to disclose information about offsetting and related arrangements to enable users of its financial statements to evaluate the effect or potential effect of netting arrangements on an entity's financial position, including the effect or potential effect of rights of setoff associated with certain financial instruments and derivative instruments. The guidance, Accounting Standards Update No. 2011-11 "Balance Sheet – Disclosures about Offsetting Assets and Liabilities", is effective for annual reporting periods beginning on or after January 1, 2013, and interim periods within those annual periods, with retrospective disclosures required for all comparative periods presented. The Partnership is currently evaluating the impact of this accounting update on our financial disclosures but do not expect the update to have a material impact on financial position or results of operations.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

4.  **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2011:

*(in thousands)*

| | | |
|---|---|---:|
| Buildings | $ | 2,595 |
| Leasehold improvements | | 4,242 |
| Computer and equipment | | 3,758 |
| Furniture and fixtures | | 2,474 |
| Computer software | | 2,349 |
| Construction-in-Progress | | 3,013 |
| Accumulated depreciation | | (11,562) |
| | $ | 6,869 |

The Partnership and its consolidated entities are depreciating fixed assets as follows:

| | **Period** |
|---|---|
| Buildings | 29 - 40 years |
| Leasehold improvements | Lease term |
| Computer and equipment | 5 years |
| Furniture and fixtures | 7 years |
| Computer software | 3 years |

Depreciation expense in 2011 totaled approximately $1.3 million for the Partnership and its subsidiaries.

HIGHLY CONFIDENTIAL

D-CNL000367

**Appx. 01067**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

5.    **Investments**

Detailed below is a summary of the Partnership's investments at December 31, 2011:

| (in thousands) | Amortized Cost/Cost | | Fair Value | |
|---|---|---|---|---|
| Syndicated bank loans | $ | 358,557 | $ | 161,418 |
| Fixed income securites | | 489,703 | | 273,832 |
| Equity securities | | 1,400,491 | | 1,079,044 |
| Life settlement contracts | | 307,677 | | 175,700 |
| CLOs (mezz tranches) | | 38,246 | | 22,083 |
| CLOs (residual CLO equity tranches) | | 31,077 | | 8,163 |
| Closed-end mutual funds | | 10,997 | | 12,928 |
| Private placement real estate | | 84,951 | | 358 |
| Limited partnerships | | 179,376 | | 180,399 |
| Rights and Warrants | | - | | 12,352 |
| Total investments | $ | 2,901,075 | $ | 1,926,277 |
| Credit default swaps | $ | - | $ | 162 |

| | Proceeds | | Fair Value | |
|---|---|---|---|---|
| Securities sold, not yet purchased | $ | 6,134 | $ | 8,390 |

**Affiliated Investments**
***Investments in Residual CLO Equity and Mezzanine Tranches***
Investments in affiliated residual CLO equity tranches primarily represent tranches of CLOs for which the Partnership and Highland Europe provide investment advisory services. The Consolidated Investment Funds receive quarterly distributions based on the excess interest after paying the stated interest distributions to the senior and mezzanine note holders, and paying the investment manager, trustee and other related fees. A portion of these distributions are amortized against the cost basis of the investment based on the actual cash distributions received during the year versus the total expected remaining cash distributions to the residual CLO equity tranche. The remainder of the distribution is recorded as interest income.

Investments in residual equity and mezzanine tranches of CLOs are not actively traded. The estimated fair value of the CLOs is derived from broker quotes and valuation models. The estimated fair value of these investments as presented in the consolidated balance sheet does not necessarily represent the amount that could be obtained from the sale of these investments. Changes in the credit quality or the performance of the underlying collateral, the availability and price of assets available for reinvestment, interest rates and/or the interest rate curve, or other market conditions could have a material impact on the estimated fair value of the investments.

***Investment in Pyxis Long/Short Equity Fund***
The Partnership invests in Pyxis Long/Short Equity Fund ("HEOF"), a diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in HEOF was approximately $0.2 million.

15

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

*Investment in Pyxis Healthcare Fund*
The Partnership invests in Pyxis Healthcare Fund ("HHF"), a non-diversified, open-end RIC for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in HHF was approximately $7.0 million.

*Investment in Pyxis Credit Strategies Fund*
The Partnership invests in Pyxis Credit Strategies Fund ("HCF"), a diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in HCF was approximately $3.9 million. During the year ended December 31, 2011, the Partnership received approximately $0.3 million in dividends from HCF.

*Investment in Pyxis Energy and Materials Fund*
The Partnership invests in Pyxis Energy and Materials Fund ("HEF"), a non-diversified, closed-end RIC for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in HEF was approximately $3.0 million.

*Investment in Highland Diversified Credit Fund*
The Partnership invests in Highland Diversified Credit Fund ("DCF"), a hedge fund for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in DCF was approximately $2.2 million.

*Investment in Cummings Bay Healthcare Fund*
The Partnership invests in Cummings Bay Healthcare Fund, L.P. ("Cummings Bay"), a hedge fund for which the Partnership provides investment advisory services. As of December 31, 2011, the market value of the Partnership's investment in Cummings Bay was approximately $3.0 million.

*Prepaid Forward Contract*
On July 28, 2006, Highland Multi-Strategy Onshore Master Subfund I, LLC ("Subfund") and Barclays Bank PLC ("Barclays") entered into a prepaid forward contract. The Partnership and affiliates redeemed approximately $312.7 million of a reference portfolio, which was comprised of the following basket of funds advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund and Select Equity Fund. Barclays simultaneously contributed approximately $312.7 million as a hedge to its obligation under the prepaid forward contract.

Barclays was prepaid approximately $156.3 million, or one-half of the reference portfolio value at initiation of the transaction. A notional amount, (the initial reference portfolio value less the amount prepaid), accretes interest to Barclays at monthly LIBOR plus 0.90% per annum.

A collateral account in the amount of approximately $53.2 million was established to further secure the transaction. Due to extreme market volatility, all of the underlying holdings in the collateral account were sold during 2008.

The term of the prepaid forward contract was three years and allowed for net settlement upon termination. The contract expired on July 31, 2009 whereby Barclays was to remit in cash the greater of the difference between the reference portfolio value and the notional amount, as valued on the scheduled termination date, or zero. Upon expiration, Barclays was not obligated to make a cash payment to the Subfund.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

On October 7, 2008, Barclays submitted a notice of early termination for the prepaid forward contract.

***Accreting Strike Option***
On February 28, 2007, Highland Multi-Strategy Onshore Master Subfund II, LLC entered into an Accreting Strike Option ("ASO") with Barclays. The ASO's value is based on the following basket of funds ("the reference portfolio") advised by the Partnership: Highland Crusader Offshore Fund II, Ltd., Credit Strategies Domestic Feeder, Highland CDO Opportunity Fund, Ltd., Real Estate Fund, Equity Focus Fund, Select Equity Fund and Credit Opportunities Domestic Feeder. The value of the reference portfolio at inception was approximately $250.2 million.

Barclays was paid a $71.4 million premium on the option. The strike price, (the initial reference portfolio value less the premium paid), accretes interest to Barclays at monthly LIBOR plus 1.4% per annum. As of December 31, 2011, the strike price was approximately $185.6 million.

The term of the accreting strike option is five years and allows for net settlement upon termination. At contract expiration, Barclays will remit in cash the greater of the difference between the reference portfolio value and the strike price, as valued on the scheduled termination date, or zero. As of December 31, 2011, the ASO did not have a positive net fair value. As such, no amount was recorded in the Partnership's financial statements.

Detailed below is a summary of the transaction as of December 31, 2011:

*(in thousands)*

| Reference Portfolio | | Value |
|---|---|---|
| Select Equity Fund | $ | 117,395 |
| Crusader Domestic Feeder | | 16,295 |
| Equity Focus Fund | | 5,436 |
| Credit Opportunities Domestic Feeder | | 3,915 |
| Real Estate Fund | | - |
| Highland CDO Opportunity Fund, Ltd. | | - |
| Credit Strategies Domestic Feeder | | - |
| Reference Portfolio Total | $ | 143,041 |
| Notional Amount | $ | (185,577) |
| Deficit of Reference Portfolio Total to Notional Amount | $ | (42,536) |

On October 13, 2008, Barclays served notice of early termination for the accreting strike option.

6. **Fair Value of Financial Instruments**

**Fair Value Measurement**
In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Consolidated Investment Funds disclose the fair value of their investments in a

17

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

hierarchy that prioritizes the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to valuation based upon unobservable inputs that are significant to the valuation (level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

- Level 1 – Valuation based on quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Investment Funds have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Investment Funds use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

Whenever possible, the Partnership and its Consolidated Investment Funds use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Investment Funds develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

As of December 31, 2011, the Partnership and its consolidated entities' investments consisted of floating rate syndicated bank loans, high yield corporate bonds, CLO securities, private placements, private placement real estate debt and equity, life settlement contracts and common and preferred equity securities. In addition, the consolidated entities engage in short sale transactions and are parties to various credit default swaps. The majority of these financial instruments are not listed on national securities exchanges, and management is required to use significant judgment to estimate their values.

The fair value of the loans, corporate bonds and CLO securities are generally based on quotes received from brokers or independent pricing services, which may or may not reflect actual trade

18

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

activity. The policy of the Partnership and its consolidated subsidiaries is to classify loans and bonds that are prices in this manner as Level 3 assets because the markets in which they trade are not active and the inputs used by the brokers and pricing services are not readily observable. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

The consolidated entities' private placement real estate investments include equity interests in limited liability companies and debt issued by entities that invest in commercial real estate. The fair value of these investments is based on internal models developed by the Partnership. The significant inputs to the models include cash flow projections for the underlying properties and appraisals performed by independent valuation firms. These inputs are not readily observable, and the investments are classified as Level 3 assets.

Common and preferred equity securities traded on national exchanges are valued at their closing prices as of December 31, 2011. These securities are classified as Level 1 assets. The consolidated entities also hold certain equity securities for which no active market exists. The value of these securities, which are classified as Level 3 assets, is based on a combination of broker quotes and internal valuation models.

Life settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Since these inputs are not readily observable, they are classified as Level 3 assets.

The fair value of credit default swaps is based on quotes received from an independent pricing service. The inputs used to derive the quotes are not readily observable and are therefore classified as Level 3 liabilities.

HIGHLY CONFIDENTIAL

D-CNL000372

**Appx. 01072**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Investment Fund's investments and derivatives at December 31, 2011 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2011:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/11 |
|---|---|---|---|---|
| Loans | $ - | $ 21,912 | $ 139,506 | $ 161,418 |
| Bonds & Asset Backed Securities | - | 177,207 | 96,625 | 273,832 |
| Collateralized loan obligations | - | - | 30,246 | 30,246 |
| Rights & Warrants | 463 | 253 | 11,636 | 12,352 |
| Private placement real estate | - | - | 358 | 358 |
| Limited partnership interest | - | - | 180,399 | 180,399 |
| Common equity securities | 204,344 | 56,832 | 365,293 | 626,469 |
| Mutual Funds | 12,928 | - | - | 12,928 |
| Privately held equity | - | - | 271,137 | 271,137 |
| Life Settlement Contracts | - | - | 175,700 | 175,700 |
| Preferred stock | - | - | 181,438 | 181,438 |
| **Total** | **$217,735** | **$256,204** | **$ 1,452,338** | **$ 1,926,277** |

**Liabilities**

| | | | | |
|---|---|---|---|---|
| Securities sold, not yet purchased | $ 8,390 | - | - | $ 8,390 |

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2011:

*(in thousands)*

| | Total Fair Value at December 31, 2010 | Purchases | Sales and Maturities | Transfers Into Level 3 | Transfers Out of Level 3 | Net Realized Losses | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2011 |
|---|---|---|---|---|---|---|---|---|
| Loans | $ 226,453 | $ 57,806 | $ (150,996) | $ - | $ (356) | $(251,924) | $ 258,523 | $ 139,506 |
| Bonds & Asset Backed Securities | 302,177 | 36,335 | (253,458) | - | - | (46,110) | 57,681 | 96,625 |
| Collateralized loan obligations | 28,614 | 73 | (7,449) | - | - | 1,875 | 7,133 | 30,246 |
| Rights & Warrants | 1,244 | - | - | - | (309) | (6,097) | 16,798 | 11,636 |
| Private placement real estate | 524 | - | 1,170 | - | - | (32,410) | 31,074 | 358 |
| Limited partnership interest | 150,775 | 2,974 | 22,000 | - | - | (8,113) | 12,763 | 180,399 |
| Common equity securities | 316,209 | 23 | 39,069 | - | - | (26,160) | 36,152 | 365,293 |
| Mutual Funds | - | - | - | - | - | - | - | - |
| Privately held equity | 289,864 | 16,362 | (18,000) | - | - | - | (17,089) | 271,137 |
| Life Settlement Contracts | 171,698 | 36,573 | (20,000) | - | - | 12,621 | (25,192) | 175,700 |
| Preferred stock | 138,824 | 1,573 | 49,477 | - | - | 2,239 | (10,675) | 181,438 |
| | $1,626,382 | $ 151,719 | $ (338,187) | $ - | $ (665) | $(354,079) | $ 367,168 | $1,452,338 |

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to a decline or an increase in market activity (e.g. frequency of trades), which resulted in a lack of or increase in available market inputs to determine price. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2011.

20

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $104.2 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2011.

The following table provides a summary of the derivative contracts recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2011:

*(in thousands)*

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Derivative contracts, asset | $ - | $ - | $ 162 | $ 162 |

The following table provides a roll forward of the derivative contracts classified within Level 3 for the year ended December 31, 2011:

*(in thousands)*

| | |
|---|---|
| **Estimated Fair Value as of December 31, 2010** | $ 953 |
| Settlement of open contracts, net | (1,313) |
| Net transfers into Level 3 | - |
| Net transfers out of Level 3 | - |
| Net realized losses | 1,314 |
| Net change in unrealized gain | (792) |
| **Estimated Fair Value as of December 31, 2011** | $ 162 |

7.  **Derivative Financial Instruments**

    **Credit Default Swaps**
    Credit default swap ("CDS") contracts are financial instruments that involve the payment of a fixed rate premium for protection against the loss in value of an underlying debt instrument, referenced entity or index, or the occurrence of a defined credit event. Under the terms of the swap, one party acts as a "guarantor" (the Seller), receiving the periodic stream of payments (from the Buyer) over the term of the contract and agreeing to the remedies that are specified within the credit default agreement. A credit event for corporate reference obligations includes bankruptcy, failure to pay, obligation acceleration, repudiation/moratorium or restructuring. If a credit event occurs, the seller must pay the contingent payment to the buyer, which is typically the par value (full notional amount) of the reference obligation, though the actual payment may be mitigated by terms of the International Swaps and Derivative Agreement ("ISDA"), allowing for netting arrangements and collateral. In addition, the payment may be reduced by anticipated recovery rates, segregated collateral and netting arrangements that may incorporate multiple transactions with a given counterparty.

21

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

The following table summarizes the CDS contracts the Consolidated Investment Funds held as of December 31, 2011:

*(in thousands)*

| Industry | Purchased / Sold | Maturity Date | Fixed Rate of Payment | Notional Amount / Exposure Purchased | Upfront Payment | Market Value |
|---|---|---|---|---|---|---|
| Beverage, Food and Tobacco | Sold | 9/20/2012 | 4.65% | $ 7,500 | $ - | $ 143 |
| Electronics | Sold | 9/20/2012 | 2.65% | 7,500 | - | 51 |
| Diversified/Conglomerate Service | Sold | 9/20/2012 | 3.55% | 3,750 | - | (66) |
| Broadcasting and Entertainment | Sold | 9/20/2012 | 3.00% | 6,000 | - | 48 |
| Buildings and Real Estate | Sold | 9/20/2012 | 4.05% | 3,750 | - | (37) |
| Electronics | Sold | 9/20/2012 | 3.20% | 7,500 | - | (1) |
| Media/Telecom | Sold | 9/20/2012 | 3.00% | 3,000 | - | 24 |
| **Total** | | | | $ 39,000 | $ - | $ 162 |

The following table provides a summary of the Consolidated Investment Fund's maximum exposure by maturity credit rating under the swaps for which it sold protection. All of the contracts mature within the next five years.

*(in thousands)*

Current issuer credit rating*

| | |
|---|---|
| B+ | $ 7,500 |
| B | 24,000 |
| B- | 3,750 |
| CCC | 3,750 |
| | $ 39,000 |

\* The credit rating on the underlying bond provides an indicator of the risk that the Consolidated Investment Funds will have to perform under the swap arrangement. Lower credit ratings with a shorter contract term indicate a higher likelihood of performance by the Consolidated Investment Funds.

**Total Return Swaps**
A total return swap is a two-party contract under which the parties agree to exchange returns from a predetermined portfolio of investments. The gross returns to be exchanged or swapped between the parties are calculated based on a notional amount, which is valued monthly to determine each party's obligation under the contract.

During the year ended December 31, 2011, the Consolidated Investment Funds' were invested in a total return swap program with a major international financial institution, consisting primarily of corporate bank debt. The Consolidated Investment Funds realized approximately $0.1 million of net gains, which are included as a component of net realized loss from investments and derivative contracts in the Consolidated Statement of Income, and were netted against collateral previously posted with the counterparty upon termination of the program.

22

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2011

8.    **Debt and Notes Payable**

Consolidated debt and notes payable as of December 31, 2011 consists of:

| (in thousands) | | December 31, 2011 |
| --- | --- | --- |
| Partnership revolving credit facility | $ | 58,210 |
| Credit Opportunities Master note payable | | 56,603 |
| | $ | 114,813 |

**Revolving Credit Facility**

On July 21, 2009, the Partnership amended and restated the Credit Agreement with Bank of America as syndication agent and The Bank of Nova Scotia as administrative agent in the amount of $147.3 million.  The Credit Agreement provides for loans, which were scheduled to mature on July 21, 2011.

Interest is payable on the last day of each month.  The applicable spread for LIBOR loans under the Credit Agreement is LIBOR plus 5% per annum.  For base rate loans, the spread is 4% per annum over the prevailing prime rate.

Under the terms of the Credit Agreement, the availability of credit was subject to financial covenants requiring the Partnership to maintain a minimum amount of fee earning assets under management, a minimum amount of management fees earned, a minimum collateral ratio and a maximum on compensation paid.

On September 15, 2009 and February 22, 2010, the Credit Agreement was amended and restated to clarify some documentation items and reporting requirements.

On December 28, 2010, a waiver to the Credit Agreement was executed which allowed the Partnership to reduce its debt from $141.3 million to $86.3 million as of December 31, 2010. In addition to debt retired on December 30, 2010, the waiver also called for a cash payment of $12.8 million on or before March 31, 2011 which would result in the retirement of an additional $15.6 million in face value of debt.

On March 31, 2011, the Partnership amended the Revolving Credit Agreement to extend a number of provisions from the December 28, 2010 waiver, including forbearance from the exercising of remedies for events of default from July 21, 2011 to November 17, 2011. As referred to above, cash of $12.8 million was paid, retiring $15.6 million in face value.

On November 17, 2011, the Partnership amended the Revolving Credit Agreement to extend a number of provisions from the March 31, 2011 amendment, including forbearance from the exercising of remedies for events of default from November 17, 2011 to April 30, 2012. The amendment also called for two separate principal payments of $7.5 million on November 17, 2011 and on or before March 1, 2012.

On December 9, 2011, the Partnership amended the Revolving Credit Agreement for the resignation, consent and appointment of a new administrative agent. As amended, Bank of America, N.A. replaced The Bank of Nova Scotia as administrative agent.

23

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2011

On March 14, 2012, the Partnership amended the Revolving Credit Agreement to extend a number of provisions from the November 17, 2011 amendment, including forbearance from the exercising of remedies for events of default from April 30, 2012 to May 2, 2013. The amendment also called for five quarterly principal payments, commencing May 2, 2012. The first four such payments are for $6.0 million each and the final payment is for the remaining balance outstanding. The first payment for $6.0 million has been made as of the date of this report. Any mandatory prepayments made reduce future scheduled payments pro rata. Financial covenants were also modified during the forbearance period.

The balance as of the date of this report is $24.0 million.

The fair value of the facility as of December 31, 2011 was approximately $58.2 million.

**Credit Opportunities Master Note Payable**
On December 19, 2008, Highland Credit Opportunities CDO Financing, LLC ("CDO Financing"), a wholly-owned subsidiary of Credit Opportunities Master, executed a Note Purchase Agreement (the "Purchase Agreement") with certain investors that provided for the issuance of up to $218 million of senior secured convertible notes guaranteed by Credit Opportunities Master. Pursuant to the terms of the Purchase Agreement and concurrent with the execution of the Purchase Agreement, CDO Financing issued $116.6 million of senior secured convertible notes for $115.6 million of cash and securities with a fair value of $0.9 million. The proceeds from the notes were used primarily to fund an additional equity investment in Highland Credit Opportunities, Ltd. (the "CDO"). This investment was required under the terms of a forbearance agreement that the Credit Opportunities Master executed with the majority controlling class of the CDO's note holders.

The notes have a stated maturity date of December 31, 2012 and accrue interest on a quarterly basis at a rate of 25% per year. The terms of the Purchase Agreement allow for up to 75% of the accrued interest due at any payment date to be capitalized as additional principal owed to the holders of the notes. For the year ended December 31, 2011, no interest payable was capitalized and $27.0 million of senior secured convertible notes were repaid. As of December 31, 2011, there are $56.6 million of senior secured convertible notes outstanding.

Subject to certain conditions, the Purchase Agreement allows for CDO Financing to issue up to $101.4 million of additional notes to the existing note holders. The Purchase Agreement requires payment of a fee of 2.5% per annum on the unfunded portion of the note commitment. For the year ended December 31, 2011, approximately $2.5 million of unfunded commitment fees is recorded in interest expense in the Consolidated Statement of Income. As of December 31, 2011, a liability of approximately $7.9 million is included in interest payable in the Consolidated Balance Sheet. The fees will be paid on the stated maturity date, or on the full repayment of the notes.

Under the terms of the Purchase Agreement, the Credit Opportunities Master was not able to make any prepayments until July 1, 2010. From July 1, 2010 through December 31, 2010, the Credit Opportunities Master could elect to prepay 50% of the outstanding principal balance. After that period, Credit Opportunities Master may prepay all or a portion of the outstanding principal, provided that each partial payment made to the note holders is in an aggregate principal amount of at least $0.5 million.

The Purchase Agreement stipulates a premium due to the note holders upon full or partial payment of the outstanding principal of the notes. The premium due is determined by the date the principal is repaid and is calculated as a percentage of that principal balance, with a minimum of

24

D-CNL000377

**Appx. 01077**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

5% due on the stated maturity date of the notes.  The following table presents the premium rates by payment period:

| Prepayment Period | Fees |
|---|---|
| July 1, 2011 - Dec. 31, 2011 | 10.0% |
| July 1, 2012 - Dec. 31, 2012 | 6.0% |
| Dec. 31 2012 | 5.0% |

Credit Opportunities Master is accruing the minimum premium due, 5% of the outstanding balance, over the contractual life of the notes using the effective-yield method.  For the year ended December 31, 2011, approximately $0.3 million of this premium due is recorded as a component of interest expense in Credit Opportunities Master's consolidated statement of operations.  As of December 31, 2011 a liability of approximately $2.0 million for the total premium recognized over the life of the notes is included in interest payable in the Consolidated Balance Sheet.  Premium of $2.7 million was paid upon the prepayment during the year and is recorded in interest expenses in the Consolidated Statement of Income.

At the note holders' option, up to 50% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master between January 1, 2010 and June 30, 2010.  From July 1, 2010 through December 31, 2012, up to 100% of the unpaid principal and accrued interest on the notes may be converted, in whole or in part, to limited partnership interests in the Feeder Fund or Credit Opportunities Master.  As of December 31, 2011, no unpaid principal or accrued interest on the notes was converted into limited partnership interests in the Feeder Fund or Credit Opportunities Master.

The Purchase Agreement grants the note holders a lien on certain assets held by Credit Opportunities Master.  In addition, it requires Credit Opportunities Master and the CDO to comply with various financial covenants.  Failure to meet these covenants may result in an event of default and give the note holders the right to accelerate repayment of the debt or initiate a liquidation of certain assets.  Credit Opportunities Master was in compliance with the covenants as of December 31, 2011 and for the year then ended.

As of December 31, 2011, the estimated fair value of the notes was approximately $74.5 million, which is based on value of the risk-adjusted yield from the expected future cash flows of the notes relative to comparable investments.  Actual values may vary significantly from the estimates, particularly since the terms of the Company's debt are complex, and the market for the instruments is illiquid.

9.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Investment Funds' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans.  The consolidated entities may also invest in derivative instruments, including total return and credit default swaps.  Investments in these derivative instruments throughout the year subject the consolidated entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

25

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Market Risk**

Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Investment Funds due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Investment Fund's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Investment Funds investments. Volatility or illiquidity could impair the Partnership and its Consolidated Investment Funds performance or result in losses. The Partnership and its Consolidated Investment Funds may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**

Credit risk is the potential loss the Partnership and its consolidated entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the consolidated entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the consolidated entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**

The Consolidated Investment Fund's limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Investment Funds nor their manager expects such a market to develop.

**Business Risk**

The Partnership provides advisory services to the consolidated investment funds. The Consolidated Investment Funds could be materially affected by the liquidity, credit and other events of the Partnership.

**High Yield Bonds and Loans**

The Partnership and its Consolidated Investment Funds' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Investment Funds' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

HIGHLY CONFIDENTIAL

D-CNL000379

**Appx. 01079**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

When the Partnership and its Consolidated Investment Funds' purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Investment Funds have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Investment Funds may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**CLO Equity Investments**
The Partnership and its Consolidated Investment Funds may invest in CLO equity that are not rated by various credit rating agencies and are generally considered to be speculative with respect to the issuer's ability to repay principal and interest. The yields and prices of these non-rated CLO equity tranches are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed. In addition, certain of the Consolidated Investment Funds' investments have resale or transfer restrictions that further limit their liquidity. The Partnership and its consolidated investment funds are exposed to the potential non-payment of principal and interest from their CLO equity investments. As of December 31, 2011, 1 of the 29 CLO's managed by the Partnership paid interest to the equity holders on their last payment date.

**Distressed Investments**
A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Investment Funds invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

**Credit Default Swaps**
Credit default swaps involve greater risks than if the Partnership or its Consolidated Investment Funds had written the reference obligations directly. In addition to the market risk discussed above, credit default swaps are subject to liquidity risk and credit risk. If a credit event occurs, the value of the reference obligation received by the Partnership or its Consolidated Investment Funds, coupled with the periodic payments previously received, may be less than the full notional amount it pays to the buyer, resulting in loss of value.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Investment Funds' investments. However, the Consolidated Investment Funds' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of

HIGHLY CONFIDENTIAL

D-CNL000380

**Appx. 01080**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

credit risk may increase the losses suffered by the Consolidated Investment Funds. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Investment Funds to losses that are disproportionate to market movements as a whole.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Investment Funds are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Investment Funds' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Investment Funds may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Investment Funds' might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**
The Consolidated Investment Funds may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Investment Funds' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Investment Funds. If the value of the Consolidated Investment Funds' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Investment Funds are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Investment Funds' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Investment Funds to incur significant losses. In addition, to the extent the Consolidated Investment Funds have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Investment Funds' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Investment Funds. In addition, because the use of leverage allows the Consolidated Investment Funds to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Investment Funds may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Investment Funds' assets, the Consolidated Investment Funds may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Investment Funds may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Investment Funds have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2011, the Consolidated Investment Funds' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that the Consolidated Investment Funds' are able to realize on the sale of its investments will directly affect the amounts that the investors in the feeder funds are able to redeem in connection with the wind down process. These amounts may differ materially from the partners' capital balances as of December 31, 2011.

**Litigation Risk**
The Partnership and its Consolidated Investment Funds are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Investment Funds. Refer to Note 16 for a discussion of open litigation.

10.    **Related Party Transactions**

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2011, approximately $7.2 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in Other Assets in the accompanying Consolidated Balance Sheet.

**Long Term Incentive Plan and Intercompany Loan Payable to Highland Capital Management Services, Inc. ("HCMSI")**
Effective January 1, 2001, all of the Partnership's employees were transferred to HCMSI, which provides personnel management and consulting services to the Partnership. The Partnership and HCMSI entered into a management agreement whereby the Partnership compensated HCMSI for its employee expenses plus a consulting services fee. As of January 1, 2005, there were no further transactions with HCMSI as all employees were transferred to the Partnership.

Effective January 1, 2001, HCMSI approved a long-term incentive plan ("the LTIP") for select employees who are eligible to receive Long-Term Incentive Units ("the Units") under the LTIP. The number of Units authorized under the LTIP is 30,000,000 and a majority of the Units granted vest 40% during the grant year and 30% for each of the two years thereafter, expiring 10 years after such grant date, unless different terms are agreed upon between the Plan Administrator and the employee. The fair value of the Units are based upon the fair value of the Partnership, as determined in good faith, by James Dondero, the Plan Administrator and the sole shareholder of the general partner and a limited partner of the Partnership. The LTIP was transferred to the Partnership from HCMSI on January 1, 2005.

HIGHLY CONFIDENTIAL

D-CNL000382

**Appx. 01082**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

The Units are exercisable at the discretion of the Plan Administrator, or upon a triggering event defined as the earlier of the following events:

- Change in control

- Initial public offering

- Participant's voluntary or involuntary termination due to death, disability, retirement, or hardship

- Participant's voluntary or involuntary termination other than due to death, disability, retirement, hardship, or cause is exercisable to the extent the Participant is entitled to only 80% of the vested shares.

A total of 562,299 Units are outstanding as of December 31, 2011 under the LTIP. During the year ended December 31, 2011, the liability under the LTIP decreased by approximately $0.4 million, which is included in *Compensation and benefits* in the Consolidated Statement of Income.

The total balance payable to HCMSI was approximately $0.5 million as of December 31, 2011, which is related to the LTIP accrual.

Effective December 31, 2004, all of the employees at HCMSI were transferred to the Partnership, and the management agreement between the Partnership and HCMSI was terminated as to the provision of future services. However, all of the outstanding and unfunded obligations of the Partnership to HCMSI as of December 31, 2004, as well as any additional obligations that may arise in relation to these amounts, will continue to be due and payable to HCMSI until satisfied in accordance with the provisions of the agreements in place.

**Accounts Held with Related Party**
During the year the Partnership and its subsidiaries maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2011, balances in the accounts were approximately $1.4 million, a portion of which exceeds Federal deposit insurance limits.

HIGHLY CONFIDENTIAL

D-CNL000383

**Appx. 01083**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Controlling Positions**

Various members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. Any director's fees received by the Partnership for these services as directors are paid to and retained by the Partnership. During the year ended December 31, 2011, the Partnership did not earn material income from those entities where members of management serve as members of the Board of Directors. As of December 31, 2011, the Partnership and its subsidiaries held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| American Banknote Corporation | Common Equity | $ 10,587 |
| American Home Patient | Common Equity | 7,340 |
| American Home Patient | Term Loan | 7,998 |
| American Home Patient | Term Loan - Second Lien | 3,376 |
| Blackwell BMC, LLC | Common Equity | 34,828 |
| Broadstripe Holdings, LLC | Revolver | 1,065 |
| Broadstripe Holdings, LLC | Term Loan | 4,467 |
| Carey International, Inc | Term Loan | 15,987 |
| Carey Holdings, Inc. | Class A Common Stock | 99 |
| CCS Medical, Inc. | Term Loan | 5,853 |
| CCS Medical, Inc. | Term Loan - Second Lien | 4,813 |
| Consolidated Restaurant Companies, Inc. | Common Equity | 6,364 |
| Consolidated Restaurant Companies, Inc. | Term Loan | 7,398 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 81,490 |
| Cornerstone Healthcare Group Holding, Inc. | Term Loan | 18,345 |
| Cornerstone Healthcare Group Holding, Inc. | Loan - Second Lien | 4,298 |
| Epocal, Inc. | Preferred Equity | 60,944 |
| Euramax International Holdings B.V. | Common | 1,684 |
| Ginn LA Resorts Holdings, LLC | Term Loan | 1,506 |
| Highland Long/Short Equity Fund | Mutual Fund | 222 |
| Highland Long/Short Healthcare Fund | Mutual Fund | 7,050 |
| Highland Credit Strategies Fund | Closed-End Mutual Fund | 3,929 |
| Home Interiors & Gifts, Inc. | Proof of Claims | 2 |
| Marcal Paper Mills, LLC | Common Equity | - |
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 56,833 |
| Molecular Insight Pharmaceuticals, Inc. | Preferred Stock | 17,257 |
| Molecular Insight Pharmaceuticals, Inc. | Warrants | 9,742 |
| Molecular Insight Pharmaceuticals, Inc. | Term Loan | 19,198 |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 141 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 774 |
| Safety-Kleen Inc. | Common Equity | 226,920 |
| Solstice Neurosciences, Inc. | Preferred Equity | 246 |
| Terrestar | Preferred Equity | 1,006 |
| Trussway Industries, Inc. | Common Equity | 3,256 |

HIGHLY CONFIDENTIAL

D-CNL000384

**Appx. 01084**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

**Investment in Affiliated Loans**
During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $7.1 million. At December 31, 2011, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $300.4 million and $77.0 million, respectively.

**Affiliated Transactions**
In accordance with the terms of a Master Indenture Agreement (the "Indenture") dated November 2, 2006, the Credit Opportunities Master acquired 250,000 Preferred Shares of Highland Credit Opportunities CDO, Ltd (the "CDO"). The Indenture requires Credit Opportunities Master to hold, directly or indirectly, more than 99% of the CDO's outstanding Preferred Shares at all times. As of December 31, 2011, the Credit Opportunities Master held 350,000 Preferred Shares and was the sole beneficial preferred shareholder.

The CDO invests primarily in floating rate syndicated bank loans, fixed income securities, and equity investments. These investments were purchased with funds the CDO received from the issuance of rated floating rate notes and Credit Opportunities Master's purchase of the Preferred Shares. Credit Opportunities Master is the sole beneficiary of all residual income from the CDO's portfolio. Although the Preferred Shares do not have a voting interest in the CDO, they carry certain rights. Specifically, they are entitled to receive quarterly preferential dividends, without requiring any declaration by the Directors, from the date they were issued until they are redeemed. The Investment Manager serves as the Collateral Manager for the CDO but does not receive any fees for its services to the CDO.

During the fourth quarter of 2008, the CDO failed to meet certain over-collateralization tests set forth in the First Supplement to the Indenture dated November 2, 2006. This breach would have given the CDO's Majority of Controlling Debt Class the option to accelerate repayment of the CDO's outstanding debt or initiate a liquidation of its assets. To protect the value of its investment in the CDO, Credit Opportunities Master entered into a forbearance agreement whereby the Majority Controlling Class of the CDO's note holders waived the breach and agreed not to exercise the rights discussed above. The Majority Controlling Class also agreed to waive any future events of default resulting from the CDO's failure to meet the overcollateralization tests through December 31, 2011. In return, the CDO agreed not make any preferred dividend payments to Credit Opportunities Master until the over-collateralization tests exceed certain thresholds.

Credit Opportunities Master paid certain expenses related to the forbearance agreement, which have been recorded as an increase to the cost basis of its investment in the CDO's preferred shares. The CDO was in compliance with all over-collateralization tests at expiration of the forbearance agreement on December 31, 2011.

**Services Performed by an Affiliate**
In March 2007, Highland Capital of New York, L.P., a New York limited partnership ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2011, total marketing fee expense charged to the Partnership by Highland New York was approximately $3.7 million and as of December 31, 2011, amounts owed to Highland New York for services rendered was approximately $0.9 million.

32

D-CNL000385
**Appx. 01085**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

11. **Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, consolidated statement of income, or its liquidity. See Note 16.

**Operating Leases**
Future minimum lease payments under operating lease commitments of the Partnership and its consolidated entities with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | | |
|---|---|---:|
| 2012 | $ | - |
| 2013 | | 290 |
| 2014 | | 1,377 |
| 2015 | | 1,343 |
| 2016 | | 1,333 |
| Thereafter | | 6,639 |
| Total | $ | 10,982 |

Total rental expense of the Partnership and its consolidated entities for operating leases was approximately $2.2 million for the year ended December 31, 2011.

**Unfunded Loan Commitments**
At December 31, 2011, the Consolidated Investment Funds had unfunded loan commitments of approximately $2.1 million. Unfunded loan commitments are marked to market on the relevant day of valuation in accordance with the Partnership's valuation policies. Any applicable unrealized gain/(loss) and unrealized appreciation/(depreciation) on unfunded loan commitments are recorded on the Consolidated Balance Sheet and Consolidated Income Statement, respectively. The net change in unrealized appreciation on unfunded transactions of approximately $0.2 million is recorded in the Consolidated Income Statement.

12. **Postretirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

33

D-CNL000386

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2011 expense reflects a service cost charge for the value of the new participant's benefit earned during 2011. The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2011 are reconciled in the tables below

*(in thousands)*

| Change in projected benefit obligation | | 2011 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 3,358 |
| Service cost | | 4 |
| Interest cost | | 174 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | (101) |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (597) |
| Benefit obligation at end of year | $ | 2,838 |

| Change in plan assets | | 2011 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 3,568 |
| Actual return on plan assets | | 161 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (597) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,132 |

| Reconciliation of Funded Status | | 2011 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,838 |
| Projected benefit obligation at end of year | | 2,838 |
| Fair value of assets at end of year | | 3,132 |
| Funded status at end of year | $ | 294 |

The Partnership does not expect to contribute to the plan during 2012.

**Assumptions**
Weighted-average assumptions used to determine benefit obligations at December 31, 2011:

HIGHLY CONFIDENTIAL

D-CNL000387

**Appx. 01087**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

| | |
|---|---|
| Discount rate | 4.40% |
| Rate of compensation increase | N/A |

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2011:

| | |
|---|---|
| Discount rate | 5.70% |
| Expected long-term return on plan assets | 5.70% |
| Rate of compensation increase | N/A |

As of December 31, 2011, approximately $0.5 million of the plan assets were categorized as Level 3.

**13.  Goodwill and Other Intangible Assets**

Below is a summary of the Partnership's goodwill and other intangible assets as of December 31, 2011:

| (in thousands) | Carrying Value |
|---|---|
| Goodwill for Highland Europe | $        8,020 |
| | $        8,020 |

On April 9, 2004, the Partnership purchased the management agreements of Highland Floating Rate Fund (the "Floating Rate Fund") and Highland Floating Rate Advantage Fund (the "Advantage Fund"), collectively the "Purchased Funds." The combined purchase price for the above agreements was $24.0 million, which was included on the Partnership's Consolidated Balance Sheet. The Partnership performed yearly impairment tests subsequent to the purchase and recorded no impairments through the year ended December 31, 2010.

On December 15, 2011, the management agreements of the Floating Rate Fund, the Advantage Fund and three other registered investment companies were novated so that a replacement investment advisor would be substituted for the Partnership. Because the Partnership released its rights and obligations under the agreements, the Partnership fully amortized any intangible value related to these agreements. An expense of $24.0 million is recorded in the Partnership's Consolidated Income Statement.

The Partnership performs an impairment test on the Goodwill of Highland Europe as required by U.S. GAAP on a yearly basis. Due to the pending sale of the management agreements of the entity, goodwill was assessed for impairment based on the sale price. The Partnership has determined that no impairment charge is necessary for the current year. Please refer to Note 18 for further discussion of the sale of the Highland Europe management agreements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

14.     **Reverse Repurchase Agreements**

Credit Strategies Master is party to collateralized financing transactions consisting of securities sold under agreements to repurchase.  For the year ended December 31, 2011, approximately $22.7 million was paid to the counterparty to repurchase the securities sold under the repurchase agreements. Additionally $0.5 million of financing interest was paid to the counterparty. As of December 31, 2011, Credit Strategies Master was not a party to any reverse repurchase agreements.

15.     **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates.  In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2011, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2011.

**Crusader Master**
Crusader Master is an exempted limited partnership organized in Bermuda.  Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Crusader Master. Crusader Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Crusader Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Crusader Master's net taxable income.

Since Crusader Master trades investments for its own account, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below).  The General Partner intends to conduct Crusader Master's business in such a way that it does not constitute a U.S. trade or business or create a taxable presence in any of the jurisdictions in which the Investment Manager has offices, including the United Kingdom.

Dividends as well as certain interest and other income received by Crusader Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Crusader Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2011, a withholding tax liability of $0.9 million is included in the accrued expenses in the Consolidated Balance Sheet.

It is management's responsibility to determine whether a tax position of Crusader Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As a result of adopting this guidance, management has established an immaterial reserve for uncertain tax positions, The full amount relates to the current year and was recorded with net realized loss from investments and derivative contracts in the Consolidated Income Statement. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2011.

Crusader Master files tax returns as prescribed the tax laws of the jurisdictions in which it operates. In the normal course of business, Crusader Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2011, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

**Credit Opportunities Master**
For U.S. income tax purposes, Credit Opportunities Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Credit Opportunities Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Credit Opportunities Master's business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices, including the United Kingdom.

Dividends as well as certain interest and other income received by Credit Opportunities Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Opportunites Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. Deferred tax liability is a result of a temporary difference related to the unrealized appreciation on Credit Opportunities Master's investments that will become taxable income in future years. The deferred tax liability will become payable upon realization of the gain when the investment is sold and it is measured using the applicable enacted tax rate and the provisions of the enacted tax law. As of December 31, 2011, a liability to account for such withholdings and other taxes of approximately $2.1 million is classified within accrued expenses and withholding tax payable on the Consolidated Balance Sheet.

The Credit Opportunities Master applies authoritative guidance which requires management to determine whether a tax position of Credit Opportunities Master is more likely than not to be

37

D-CNL000390

**Appx. 01090**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As of December 31, 2011, a liability to account for uncertain tax positions of $0.1 million is classified within accrued expenses within the Consolidated Balance Sheet. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2011.

Credit Opportunities Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Opportunities Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2011, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

**Credit Strategies Master**

Credit Strategies Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Credit Strategies Master. Credit Strategies Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Credit Strategies Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Credit Strategies Master's net taxable income.

The Credit Strategies Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Strategies Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2011, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

It is management's responsibility to determine whether a tax position of Credit Strategies Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2011.

Dividends as well as certain interest and other income received by Credit Strategies Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Strategies Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. Deferred tax liabilities may result from temporary differences related to the unrealized appreciation on Credit Strategies Master's investments that will become taxable income in future years. Deferred tax liabilities will become payable upon

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

realization of the gains when the investments are sold, and are measured using the applicable enacted tax rate and provisions of the enacted tax law.

**Restoration Onshore**

Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by the Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2011. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2011, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

**Restoration Offshore**

Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. In accordance with this authoritative guidance, the General Partner has established a reserve of approximately $0.1 million for uncertain tax positions. The full amount relates to the current year and was recorded as a tax expense in the Consolidated Statement of Operations. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31,

HIGHLY CONFIDENTIAL

D-CNL000392

**Appx. 01092**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

2011. As of December 31, 2011, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

16. **Legal Proceedings**

In April 2007, CDO Master Fund entered into a risk sharing agreement structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Special Opportunities Holding Company ("SOHC"). The warehouse was financed by a recognized financial institution and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, the counterparty agreed to extend it for one year on March 15, 2008. Due to liquidity constraints, CDO Master Fund was unable to meet a November call, and the counterparty elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by the counterparty and sold on the open market through bids-wanted-in competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, the counterparty notified CDO Master Fund that its pro-rata share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount. On February 24, 2009, the counterparty (the "Plaintiffs") filed a lawsuit against CDO Master Fund, SOHC and the Partnership in the New York State Supreme Court of Manhattan alleging that they suffered losses in excess of $745 million due to the depreciation in value of the warehouse collateral. On February 19, 2010 a New York Appeals Court sided with the Partnership and dismissed UBS' claims against the Partnership. Thereafter on June 22, 2010, Plaintiffs filed an amended complaint with the Court against the Partnership and certain affiliated registered and unregistered investment vehicles alleging $687 million in damages. On March 13, 2012, the First Appellate Division dismissed two of the four claims against the Partnership, and severely limited the scope of the two remaining claims.

In April 2009, HYMF, Inc. filed a lawsuit in the New York State Court against the Partnership and certain consolidated investment funds (collectively "the Defendants"). The lawsuit alleges that the Defendants breached their contractual and fiduciary duties by failing to return HYMF's original investment in the consolidated investment funds. The Defendants believe they acted in accordance with the provisions of the partnership agreements and intend to vigorously defend against the lawsuit. Management believes it is currently not possible to evaluate the likelihood of any particular outcome or estimate the amount or range of potential loss with any reasonable degree of certainty.

On July 15, 2008, Crusader Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida. The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%.

40

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

Based on the ruling, Crusader Master recorded a reserve of approximately $5.3 million as of December 31, 2009, which represented its ratable share of the judgment. The reserve was included as a component of accrued expenses on the Consolidated Balance Sheet.

The Defendants believe they acted in good faith pursuant to the terms of the relevant agreements and appealed the decision. In February 2011, the Disctrict Court of Florida reversed the judgment against the Defendants and overturned the ruling that resulted in Crusader Master recording the reserve. Crusader Master does not believe an appeal of this decision will be successful and relieved the reserve. This was included as a component of the net realized loss from investments and derivative contracts on the Consolidated Income Statement.

17.    **Fund Wind Down**

On February 4, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent and that it was in the best interest of the fund to liquidate the fund's remaining assets. The proceeds from the asset liquidations will be distributed to the remaining financing counterparties and other senior and trade creditors as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

During 2008, Crusader Master and Credit Strategies Master were negatively affected by deteriorating conditions in the overall economy and credit markets. These conditions became more severe during the third and fourth quarters of 2008 and generated significant losses on various derivative transactions and repurchase agreements to which Crusader Master and Credit Strategies Master were parties. In addition, certain assets that Crusader Master and Credit Strategies Master purchased on margin through prime brokerage agreements experienced a significant decline in value. In certain cases, Crusader Master and Credit Strategies Master were unable to post the collateral required to secure these losses, and the counterparties provided notice of their intent to terminate the agreements. As a result, access to the credit that Crusader Master and Credit Strategies Master used to manage its investing and financing activities became highly constrained, and in some cases unavailable. In light of these circumstances, the General Partners (the general partner of Highland Crusader Fund, L.P. and the general partner of Highland Credit Strategies Fund, L.P.) and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. concluded, in consultation with the Investment Manager, that it would be in the best interests of their investors to wind down the investment portfolios of Credit Strategies Master and Crusader Master. On October 15, 2008, the Investment Manager notified investors that it would begin the wind-down process. The Investment Manager also restricted subscriptions and the payment of withdrawals to its feeder funds effective the same date.

In connection with the wind down, the limited partner interests of the Feeder Funds were compulsorily withdrawn/redeemed on November 15, 2008 in accordance with the terms of the governing documents.

**Crusader Master**
On July 15, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement (the "Scheme") that facilitates the winding-down of the investments of Crusader Master and the distribution of its assets. A substantial majority of the investors in its feeder funds consented to the plan of distribution as outlined in the Scheme. The Scheme became effective as of August 1, 2011.

41

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

The Scheme establishes two classes of claims; those feeder fund investors who had timely submitted withdrawal/redemption requests for withdrawal/redemption dates that fell on or before June 30, 2008 and who had not received full payment ("Prior Redeemers"), and those feeder fund investors that had not timely submitted such withdrawal/redemption requests for redemption/withdrawal dates that fell on or before June 30, 2008 ("Compulsory Redeemers") (together "Redeemers"). The basis for ratable distribution amongst both classes of Redeemers was the November 15, 2008 balances of said Redeemers ("Redemption Amount"), adjusted to add back any redemption penalties assessed against Prior Redeemers during 2008. A realization schedule for distributions is set forth in Appendix A of the Scheme (the "Realization Schedule"). The terms of the Scheme are outlined as follows:

1.  Prior Redeemers shall be entitled to 60% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Prior Redeemers' Distribution"). Each Prior Redeemer shall be entitled to their pro rata share of the Crusader Fund Prior Redeemers' Distribution based on the Prior Redeemer's Redemption Amount relative to the total of all Prior Redeemers' Redemption Amounts (inclusive of all feeders).

2.  Compulsory Redeemers shall be entitled to 40% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Compulsory Redeemers' Distribution"). With the exception of the non-consenting Compulsory Redeemers discussed below, each Compulsory Redeemer shall be entitled to their pro rata share of the Crusader Fund Compulsory Redeemers' Distribution based on the Compulsory Redeemer's Redemption Amount relative to the total of all Compulsory Redeemers' Redemption Amounts (inclusive of all feeders). This method of distribution resulted in a shift of capital from the Prior Redeemers to the Compulsory Redeemers. Since the redistribution is indifferent with respect to the Feeder Funds, total capital within each of the Feeder Funds changed as a result. This capital transfer is reflected in the Consolidated Statement of Changes in Partners' Capital as a restructure. In the event the Investment Manager fails to make distributions in accordance with the Realization Schedule for two consecutive quarters without receiving a waiver from the committee of Redeemers appointed to help oversee the Scheme (the "Redeemer Committee"), the Investment Manager can be removed for cause as the Investment Manager of the Master Partnership by the Redeemer Committee.

In connection with the implementation of the Scheme, the Partnership made a settlement payment to be allocated to Crusader investors in the amount of $6.0 million. Additionally, the Partnership reserved $8.2 million of its interest in deferred incentive fees. Both of these amounts can be found within the *Fund wind down costs* line of the Consolidated Income Statement.

**Credit Strategies Master**
A Plan of Distribution (the "Plan") was also adopted by Credit Strategies Master and its feeder funds and was consented to by a substantial majority of the investors in its feeder funds. On April 14, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement (the "Scheme") that incorporates the terms of the Plan so as to be binding upon Highland Credit Strategies Fund, Ltd. and its investors. The Scheme became effective on May 1, 2011. The Plan established two classes of claims; those investors of the Feeder Funds whose withdrawals/redemptions became effective on or before September 30, 2008 and who have not received full payment of their redemption amount ("Prior Redeemers") and those investors of the feeder funds who were compulsorily withdrawn/redeemed on October 15, 2008 ("Compulsory Redeemers").

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2011**

As investments in Credit Strategies Master are realized, distributions will be made in the following order, which summarizes the terms outlined in the Plan.

1. Payments for fund expenses
2. The first $30 million available for distribution ratably to Prior Redeemers
3. The next approximately $5.3 million available for distribution ratably to consenting Compulsory Redeemers and a trust account established for the benefit of non-consenting Compulsory Redeemers ("Redeemer Trust Account")
4. All remaining funds will be distributed as follows:
   a. 85% ratably to Prior Redeemers
   b. 15% to consenting Compulsory Redeemers and the Redeemer Trust Account

This method of distribution results in a shift of capital from the Prior Redeemers to the consenting Compulsory Redeemers and the Redeemer Trust Account. It also created a shift of capital from its offshore feeder to its onshore feeder, since there was a greater proportion of Compulsory Redeemers to Prior Redeemers in the onshore feeder than in the offshore feeder.

In connection with the implementation of the Scheme, the Partnership made a settlement payment to be allocated to Credit Strategies investors in the amount of $3.0 million. Additionally, the Partnership will make a second payment of $6.0 million on or before May 1, 2014. Both of these amounts can be found within the *Fund wind down costs* line of the Consolidated Income Statement.

**18. Subsequent Events**

In accordance with the Scheme of Arrangement, Crusader Master made distributions of approximately $102.8 million and $102.6 million effective January 31, 2012 and April 30, 2012, respectively.

In accordance with the Plan of Distribution, the $6.8 million distribution payable was distributed to the feeder funds by Credit Strategies Master.

In accordance with the Plan of Distribution, Credit Strategies Master made a distribution of approximately $5.0 million effective February 29, 2012.

On February 29, 2012, Credit Opportunities CDO, Ltd. paid $16.5 million, collectively, of preferred dividends to Credit Opportunities Master, which is restricted by the Purchase Agreement to pay interest, principal and any applicable premium.

On April 3, 2012, Credit Opportunities CDO, Ltd. paid $17.0 million, collectively, of preferred dividends to Credit Opportunities Master, which is restricted by the Purchase Agreement to pay interest, principal and any applicable premium.

On March 14, 2012, Credit Opportunities Master elected to prepay $12.3 million of the outstanding principal balance of the notes and approximately $1.4 million in interest and prepayment premium.

On April 2, 2012, Credit Opportunities Master elected to prepay $14.1 million of the outstanding principal balance of the notes and approximately $1.0 million in interest and prepayment premium.

On February 28, 2012, the Partnership completed the sale of the management contracts of four European CLOs. Gross consideration of €33.5 million was received upon completion of the sale. Beyond the closing date, the Partnership is further entitled to 65% of all future incentive fees paid

43

D-CNL000396

Appx. 01096

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2011**

under any of the four European CLOs as well as 80% of the subordinated fees accrued and unpaid as of December 31, 2011 with respect to Highlander Euro CDO B.V. After-tax net proceeds from the sale were used to reduce the Partnership's bank debt outstanding as well as to pay accrued interest and principal on affiliated notes payable.

On March 14, 2012, the Partnership amended the Revolving Credit Agreement. Further discussion of the amendment can be found in Note 8.

The Partnership has performed an evaluation of subsequent events through May 21, 2012, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000397

**Appx. 01097**

**Supplemental Information**

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2011**

*(in thousands)*

The above information was derived from the audited December 31, 2011 consolidated financial Statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

**Assets**

| | | |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ | 6,443 |
| Restricted cash | | 3,508 |
| Investments at fair value (cost $24,599) | | 60,662 |
| Equity method investees | | 24,118 |
| Management and incentive fees receivable | | 28,962 |
| Due from brokers | | 127 |
| Other assets | | 12,935 |
| Deferred incentive fees receivable | | 29,428 |
| Goodwill and other intangible assets, net | | 388 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,053 | | 6,869 |
| **Total Assets** | $ | 173,440 |

**Liabilities and Partners' Capital**

**Liabilities**

| | | |
|---|---|---|
| Accounts payable | $ | 2,061 |
| Accrued and other liabilities | | 73,971 |
| Debt and notes payable | | 58,210 |
| Total liabilities | | 134,242 |
| Partners' capital | | 39,198 |
| **Total liabilities and partners' capital** | $ | 173,440 |

46

HIGHLY CONFIDENTIAL

D-CNL000399
**Appx. 01099**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**December 31, 2011**

*(in thousands)*

The above information was derived from the audited December 31, 2011 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements and should not be used for tax purposes.

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 141,146 |
| Incentive fees/allocations | | 1,381 |
| Interest and investment income | | 341 |
| Other income | | 7,286 |
| Total revenue | | 150,154 |
| | | |
| **Operating expenses:** | | |
| Compensation and benefits | | 46,815 |
| Professional fees | | 12,986 |
| Investment and research consulting | | 707 |
| Amortization and depreciation | | 1,342 |
| Interest expense | | 5,587 |
| Other operating expenses | | 16,999 |
| Total operating expenses | | 84,436 |
| | | |
| Income before investment activities | | 65,718 |
| | | |
| **Realized and unrealized gain/(loss) from investments transactions:** | | |
| Net realized loss on sale of investment transactions | | (2,939) |
| Net change in unrealized gain on investments | | 1,779 |
| Total realized and unrealized loss from investments transactions | | (1,160) |
| | | |
| **Realized and unrealized earnings from equity method investee:** | | |
| Net unrealized gains from equity method investees | | 6,158 |
| Total realized and unrealized gains from equity method investees | | 6,158 |
| | | |
| **Extraordinary Items** | | |
| Net realized gain on extinguishment of debt | | 2,823 |
| Novation of purchased investment contracts | | (24,000) |
| Fund wind down costs (Note 17) | | (23,292) |
| | | |
| **Net income** | $ | 26,247 |

HIGHLY CONFIDENTIAL

# EXHIBIT 67

| Copy B - For Employee's Federal Income Tax Return | **2019** | OMB No. 1545-0008 |
|---|---|---|

| a Employee's social security number | 1 Wages, tips, other comp. 1944956.01 | 2 Federal income tax withheld 569633.72 |
|---|---|---|
| b Employer ID number 47-1881359 | 3 Social security wages 132900.00 | 4 Social security tax withheld 8239.80 |
| | 5 Medicare wages and tips 1944956.01 | 6 Medicare tax withheld 43906.46 |

c Employer's name, address, and ZIP code
Nexpoint Residential Trust Inc
300 Crescent Ct
Suite 700
Dallas, TX 75201

d Control number
12437 11

e Employee's name, address, and ZIP code
James Dondero

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | |
| 12a | | 13 Statutory employee  Retirement plan  3rd-party sick pay |
| 12b | | 14 Other |
| 12c | | |
| 12d | | |
| | N/A | N/A | N/A |
| 15 State Employer's State ID#  N/A | 16 State wages, tips, etc.  N/A | 17 State income tax  N/A |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

**Form W-2 Wage and Tax Statement**
This information is being furnished to the Internal Revenue Service.

Dept. of the Treasury - IRS

---

| Copy 2 - For Employee's State Income Tax Return | [TX] **2019** | OMB No. 1545-0008 |
|---|---|---|

| a Employee's social security number | 1 Wages, tips, other comp. 1944956.01 | 2 Federal income tax withheld 569633.72 |
|---|---|---|
| b Employer ID number 47-1881359 | 3 Social security wages 132900.00 | 4 Social security tax withheld 8239.80 |
| | 5 Medicare wages and tips 1944956.01 | 6 Medicare tax withheld 43906.46 |

c Employer's name, address, and ZIP code
Nexpoint Residential Trust Inc
300 Crescent Ct
Suite 700
Dallas, TX 75201

d Control number
12437 11

e Employee's name, address, and ZIP code
James Dondero

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | |
| 12a | | 13 Statutory employee  Retirement plan  3rd-party sick pay |
| 12b | | 14 Other |
| 12c | | |
| 12d | | |
| TX | NOT NEEDED | 1944956.01 | |
| 15 State Employer's State ID# | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc.  N/A | 19 Local income tax  N/A | 20 Locality name  N/A |

**Form W-2 Wage and Tax Statement**

Dept. of the Treasury - IRS

---

This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty/other sanction may be imposed on you if this income is taxable and you fail to report it.

Confidential

| Copy C - FOR EMPLOYEE'S RECORDS ONLY | **2019** | OMB No. 1545-0008 |
|---|---|---|

| a Employee's social security number | 1 Wages, tips, other comp. 1944956.01 | 2 Federal income tax withheld 569633.72 |
|---|---|---|
| ▮▮▮ | 3 Social security wages 132900.00 | 4 Social security tax withheld 8239.80 |
| b Employer ID number 47-1881359 | 5 Medicare wages and tips 1944956.01 | 6 Medicare tax withheld 43906.46 |

c Employer's name, address, and ZIP code

Nexpoint Residential Trust Inc
300 Crescent Ct
Suite 700
Dallas, TX 75201

d Control number
12437 11

e Employee's name, address, and ZIP code

James Dondero
▮▮▮▮▮▮▮

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | |

| 12a | | 13 Statutory employee   Retirement plan   3rd-party sick pay |
|---|---|---|
| 12b | | 14 Other |
| 12c | | |
| 12d | | |

| TX | NOT NEEDED | 1944956.01 | |
|---|---|---|---|
| 15 State Employer's State ID# | | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. N/A | | 19 Local income tax N/A | 20 Locality name N/A |

**Form W-2 Wage and Tax Statement**                    Dept. of the Treasury - IRS

This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty/other sanction may be imposed on you if this income is taxable and you fail to report it.

Printed by Paylocity Payroll
Page 2 of 2

Confidential

# EXHIBIT 67-2

| 44444 | For Official Use Only ▶ OMB No. 1545-0008 | | Safe, accurate, FAST! Use | IRS e-file | Visit the IRS website at www.irs.gov. |
|---|---|---|---|---|---|

**a** Employer's name, address, and ZIP code

Nexpoint Residential Trust Inc
300 Crescent Ct
Suite 700
Dallas, TX 75201

**c** Tax year/Form corrected

2017 / **W-2**

**d** Employee's correct SSN
[redacted]

**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.)

Complete boxes f and/or g only if incorrect on form **previously filed** ▶

**f** Employee's **previously reported** SSN
[redacted]

**b** Employer's Federal EIN

47-1881359

**g** Employee's **previously reported** name

**h** Employee's first name and initial: James  Last name: Dondero  Suff.

**i** Employee's address and ZIP code
[redacted]

**Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for Forms W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6).

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **1** Wages, tips, other compensation 603,363.72 | **1** Wages, tips, other compensation 625,466.64 | **2** Federal income tax withheld 150,840.93 | **2** Federal income tax withheld 156,366.66 |
| **3** Social security wages | **3** Social security wages | **4** Social security tax withheld | **4** Social security tax withheld |
| **5** Medicare wages and tips 603,363.72 | **5** Medicare wages and tips 625,466.64 | **6** Medicare tax withheld 12,379.04 | **6** Medicare tax withheld 12,898.46 |
| **7** Social security tips | **7** Social security tips | **8** Allocated tips | **8** Allocated tips |
| **9** | **9** | **10** Dependent care benefits | **10** Dependent care benefits |
| **11** Nonqualified plans | **11** Nonqualified plans | **12a** See instructions for box 12 | **12a** See instructions for box 12 |
| **13** Statutory employee / Retirement plan / Third-party sick pay | **13** Statutory employee / Retirement plan / Third-party sick pay | **12b** | **12b** |
| **14** Other (see instructions) | **14** Other (see instructions) | **12c** | **12c** |
| | | **12d** | **12d** |

**State Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **15** State TX | **15** State TX | **15** State | **15** State |
| Employer's state ID number NOT NEEDED | Employer's state ID number NOT NEEDED | Employer's state ID number | Employer's state ID number |
| **16** State wages, tips, etc. 603,363.72 | **16** State wages, tips, etc. 625,466.64 | **16** State wages, tips, etc. | **16** State wages, tips, etc. |
| **17** State income tax 0.00 | **17** State income tax 0.00 | **17** State income tax | **17** State income tax |

**Locality Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. |
| **19** Local income tax | **19** Local income tax | **19** Local income tax | **19** Local income tax |
| **20** Locality name | **20** Locality name | **20** Locality name | **20** Locality name |

**Copy B—To Be Filed with Employee's FEDERAL Tax Return**

Form **W-2c** (Rev. 8-2014)  **Corrected Wage and Tax Statement**  Department of the Treasury Internal Revenue Service

EXPERT 0000937
**Appx. 01105**

| 44444 | **For Official Use Only ▶** OMB No. 1545-0008 | | **Safe, accurate, FAST! Use** IRS e~file | Visit the IRS website at **www.irs.gov.** |
|---|---|---|---|---|

**a** Employer's name, address, and ZIP code

Nexpoint Residential Trust Inc
300 Crescent Ct
Suite 700
Dallas, TX 75201

**c** Tax year/Form corrected

2017 / **W-2**

**d** Employee's correct SSN ▮▮▮▮▮▮▮

**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.) ☑

Complete boxes f and/or g only if incorrect on form **previously filed** ▶

**f** Employee's **previously reported** SSN ▮▮▮▮▮▮▮

**b** Employer's Federal EIN

47-1881359

**g** Employee's **previously reported** name

**h** Employee's first name and initial: James    Last name: Dondero    Suff.

**Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for Forms W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6).

**i** Employee's address and ZIP code

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 1 Wages, tips, other compensation 603,363.72 | 1 Wages, tips, other compensation 625,466.64 | 2 Federal income tax withheld 150,840.93 | 2 Federal income tax withheld 156,366.66 |
| 3 Social security wages | 3 Social security wages | 4 Social security tax withheld | 4 Social security tax withheld |
| 5 Medicare wages and tips 603,363.72 | 5 Medicare wages and tips 625,466.64 | 6 Medicare tax withheld 12,379.04 | 6 Medicare tax withheld 12,898.46 |
| 7 Social security tips | 7 Social security tips | 8 Allocated tips | 8 Allocated tips |
| 9 | 9 | 10 Dependent care benefits | 10 Dependent care benefits |
| 11 Nonqualified plans | 11 Nonqualified plans | 12a See instructions for box 12 | 12a See instructions for box 12 |
| 13 Statutory employee / Retirement plan / Third-party sick pay | 13 Statutory employee / Retirement plan / Third-party sick pay | 12b | 12b |
| 14 Other (see instructions) | 14 Other (see instructions) | 12c | 12c |
| | | 12d | 12d |

## State Correction Information

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 15 State TX | 15 State TX | 15 State | 15 State |
| Employer's state ID number NOT NEEDED | Employer's state ID number NOT NEEDED | Employer's state ID number | Employer's state ID number |
| 16 State wages, tips, etc. 603,363.72 | 16 State wages, tips, etc. 625,466.64 | 16 State wages, tips, etc. | 16 State wages, tips, etc. |
| 17 State income tax 0.00 | 17 State income tax 0.00 | 17 State income tax | 17 State income tax |

## Locality Correction Information

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 18 Local wages, tips, etc. | 18 Local wages, tips, etc. | 18 Local wages, tips, etc. | 18 Local wages, tips, etc. |
| 19 Local income tax | 19 Local income tax | 19 Local income tax | 19 Local income tax |
| 20 Locality name | 20 Locality name | 20 Locality name | 20 Locality name |

**Copy C—For EMPLOYEE's RECORDS**

Form **W-2c** (Rev. 8-2014)     **Corrected Wage and Tax Statement**     Department of the Treasury Internal Revenue Service

Confidential

| 44444 | **For Official Use Only ▶** OMB No. 1545-0008 | | |
|---|---|---|---|

| **a** Employer's name, address, and ZIP code | **c** Tax year/Form corrected | **d** Employee's correct SSN |
|---|---|---|
| Nexpoint Residential Trust Inc<br>300 Crescent Ct<br>Suite 700<br>Dallas, TX 75201 | 2017 / **W-2** | ▮▮▮▮▮▮▮▮ |

**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.) ☑

Complete boxes f and/or g only if incorrect on form **previously filed** ▶

**f** Employee's **previously reported** SSN

▮▮▮▮▮▮▮▮

| **b** Employer's Federal EIN | **g** Employee's **previously reported** name |
|---|---|
| 47-1881359 | |

**h** Employee's first name and initial: James — Last name: Dondero — Suff.

**Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6).

**i** Employee's address and ZIP code

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **1** Wages, tips, other compensation<br>603,363.72 | **1** Wages, tips, other compensation<br>625,466.64 | **2** Federal income tax withheld<br>150,840.93 | **2** Federal income tax withheld<br>156,366.66 |
| **3** Social security wages | **3** Social security wages | **4** Social security tax withheld | **4** Social security tax withheld |
| **5** Medicare wages and tips<br>603,363.72 | **5** Medicare wages and tips<br>625,466.64 | **6** Medicare tax withheld<br>12,379.04 | **6** Medicare tax withheld<br>12,898.46 |
| **7** Social security tips | **7** Social security tips | **8** Allocated tips | **8** Allocated tips |
| **9** | **9** | **10** Dependent care benefits | **10** Dependent care benefits |
| **11** Nonqualified plans | **11** Nonqualified plans | **12a** See instructions for box 12 | **12a** See instructions for box 12 |
| **13** Statutory employee / Retirement plan / Third-party sick pay | **13** Statutory employee / Retirement plan / Third-party sick pay | **12b** | **12b** |
| **14** Other (see instructions) | **14** Other (see instructions) | **12c** | **12c** |
| | | **12d** | **12d** |

**State Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **15** State<br>TX | **15** State<br>TX | **15** State | **15** State |
| Employer's state ID number<br>NOT NEEDED | Employer's state ID number<br>NOT NEEDED | Employer's state ID number | Employer's state ID number |
| **16** State wages, tips, etc.<br>603,363.72 | **16** State wages, tips, etc.<br>625,466.64 | **16** State wages, tips, etc. | **16** State wages, tips, etc. |
| **17** State income tax<br>0.00 | **17** State income tax<br>0.00 | **17** State income tax | **17** State income tax |

**Locality Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. |
| **19** Local income tax | **19** Local income tax | **19** Local income tax | **19** Local income tax |
| **20** Locality name | **20** Locality name | **20** Locality name | **20** Locality name |

**Copy 2—To Be Filed with Employee's State, City, or Local Income Tax Return**

Form **W-2c** (Rev. 8-2014)    **Corrected Wage and Tax Statement**    Department of the Treasury<br>Internal Revenue Service

Confidential

# EXHIBIT 67-3

Form 1040 (2013)   JAMES D. DONDERO                                                                Page 2

| Tax and Credits | | | | | |
|---|---|---|---|---|---|
| Standard Deduction for - | 38 | Amount from line 37 (adjusted gross income) | | 38 | 48,945,921. |
| ● People who check any box on line 39a or 39b OR who can be claimed as a dependent, see instructions. | 39a Check if: | ☐ You were born before January 2, 1949, ☐ Blind. ☐ Spouse was born before January 2, 1949, ☐ Blind. | Total boxes checked ▶ 39a | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☒ | | | |
| | 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 40 | 2,342,092. |
| ● All others: | 41 | Subtract line 40 from line 38 | | 41 | 46,603,829. |
| Single or Married filing separately, $6,100 | 42 | Exemptions. If line 38 is $150,000 or less, multiply $3,900 by the number on line 6d. Otherwise, see inst. | | 42 | 0. |
| | 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | | 43 | 46,603,829. |
| Married filing jointly or Qualifying widow(er), $12,200 | 44 | Tax. Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | | 44 | 13,035,847. |
| Head of household, $8,950 | 45 | Alternative minimum tax. Attach Form 6251 | | 45 | 0. |
| | 46 | Add lines 44 and 45 ▶ | | 46 | 13,035,847. |
| | 47 | Foreign tax credit. Attach Form 1116 if required | 47 | 177. | |
| | 48 | Credit for child and dependent care expenses. Attach Form 2441 | 48 | | |
| | 49 | Education credits from Form 8863, line 19 | 49 | | |
| | 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | | |
| | 51 | Child tax credit. Attach Schedule 8812, if required | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 | 52 | | |
| | 53 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 53 | | |
| | 54 | Add lines 47 through 53. These are your total credits | | 54 | 177. |
| | 55 | Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- ▶ | | 55 | 13,035,670. |
| Other Taxes | 56 | Self-employment tax. Attach Schedule SE | | 56 | 5,374. |
| | 57 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | | 57 | |
| | 58 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | | 58 | |
| | 59a | Household employment taxes from Schedule H | | 59a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | | 59b | |
| | 60 | Taxes from: a ☒ Form 8959 b ☒ Form 8960 c ☒ inst.; enter code(s) STMT 15 | | 60 | 2,070,082. |
| | 61 | Add lines 55 through 60. This is your total tax ▶ | | 61 | 15,111,126. STATEMENT 14 |
| Payments | 62 | Federal income tax withheld from Forms W-2 and 1099 | 62 | 393,106. | STATEMENT 14 |
| If you have a qualifying child, attach Schedule EIC. | 63 | 2013 estimated tax payments and amount applied from 2012 return | 63 | 41,508. | |
| | 64a | Earned income credit (EIC) | 64a | | |
| | b | Nontaxable combat pay election ☐ 64b | | | |
| | 65 | Additional child tax credit. Attach Schedule 8812 | 65 | | |
| | 66 | American opportunity credit from Form 8863, line 8 | 66 | | |
| | 67 | Reserved | 67 | | |
| | 68 | Amount paid with request for extension to file | 68 | 16,500,000. | |
| | 69 | Excess social security and tier 1 RRTA tax withheld | 69 | | |
| | 70 | Credit for federal tax on fuels. Attach Form 4136 | 70 | | |
| | 71 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ 8885 d ☐ | 71 | | |
| | 72 | Add lines 62, 63, 64a, and 65 through 71. These are your total payments ▶ | | 72 | 16,934,614. |
| Refund | 73 | If line 72 is more than line 61, subtract line 61 from line 72. This is the amount you overpaid | | 73 | 1,823,488. |
| Direct deposit? See instructions. | 74a | Amount of line 73 you want refunded to you. If Form 8888 is attached, check here ▶ ☐ | | 74a | 1,561,228. |
| | ▶ b Routing number | ▶ c Type: ☒ Checking ☐ Savings | ▶ d Account number | | |
| | 75 | Amount of line 73 you want applied to your 2014 estimated tax ▶ | 75 | | |
| Amount You Owe | 76 | Amount you owe. Subtract line 72 from line 61. For details on how to pay, see instructions ▶ | | 76 | |
| | 77 | Estimated tax penalty (see instructions) | 77 | 262,260. | |

**Third Party Designee**
Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ Yes. Complete below.  ☐ No
Designee's name ▶ TODD CRAWFORD   Phone no. ▶ 713-982-2000   Personal identification number (PIN) ▶ 28788

**Sign Here**
Joint return? See instructions. Keep a copy for your records.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.
Your signature   Date 10/15/14   Your occupation Executive   Daytime phone number 9??-???-4100
Spouse's signature. If a joint return, both must sign.   Date   Spouse's occupation

**Paid Preparer Use Only**
| Print/Type preparer's name | Preparer's signature | Date | | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | TODD CRAWFORD | 10/14/14 | Check ☐ if self-employed | P00848788 |
| Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86 1065772 | |
| Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

310002 04-02-14

JAMES D. DONDERO

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT 12 |
|---|---|---|

| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|---|
| T | HIGHLAND CAPITAL MANAGEMENT LP | 1,911,538. | 377,643. | | | 7,049. | 43,250. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 76,085. | | | | | |
| | TOTALS | 1,987,623. | 377,643. | | | 7,049. | 43,250. |

| FORM 1040 | QUALIFIED DIVIDENDS | STATEMENT 13 |
|---|---|---|

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| NEXPOINT | 1,209,750. | 63,077. |
| NEXPOINT - GET GOOD #2 | 67,084. | 3,498. |
| NEXPOINT ADVISORS LP | 19,065. | 280. |
| FROM K-1 - HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. | 175,652. | 9,217. |
| FROM K-1 - PCMG TRADING PARTNERS XXIII, ( | 10,567. | 724. |
| FROM K-1 - STRAND ADVISORS III, INC. | 143. | 10. |
| FROM K-1 - STRAND ADVISORS, INC. | 11,447. | 1,240. |
| FROM K-1 - SERENGETI PARTNERS, LP - GET GOOD #2 | 57,678. | 30,335. |
| FROM K-1 - HAYMAN CAPITAL PARTNERS LP - GET GOOD #2 | 22,591. | 11,341. |
| FROM K-1 - HIGHLAND CAPITAL MGMT, LP | 1,360,353. | 165,565. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS LP - DUGABOY LLC | 3,498. | 1,841. |
| FROM K-1 - GRANITE BAY ADVISORS, LP | 336. | 2. |
| FROM K-1 - ACIS CAPITAL MANAGEMENT, LP - ACIS GP LLC | 20. | 11. |
| FROM K-1 - ACIS CAPITAL MANAGEMENT, LP - DUGABOY | 12,199. | 6,759. |
| FROM K-1 - NEXPOINT ADVISORS, GP LLC | 58. | 19. |
| FROM K-1 - NEXPOINT ADVISORS, L.P. - DUGABOY | 57,549. | 19,149. |
| TOTAL INCLUDED IN FORM 1040, LINE 9B | | 313,068. |

Confidential

EXPERT 0000308
**Appx. 01110**

# EXHIBIT 67-4

Appx. 01111

Form 1040 (2014)    JAMES D. DONDERO          Page **2**

| Tax and Credits | 38 | Amount from line 37 (adjusted gross income) | | 38 | 59,549,723. |
|---|---|---|---|---|---|
| | 39a Check if: | You were born before January 2, 1950, ☐ Blind, Total boxes | | | |
| Standard Deduction for - | | Spouse was born before January 2, 1950, ☐ Blind, checked ▶ 39a | | | |
| ● People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☒ | | | |
| | 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 40 | 3,242,658. |
| | 41 | Subtract line 40 from line 38 | | 41 | 56,307,065. |
| | 42 | Exemptions. If line 38 is $152,525 or less, multiply $3,950 by the number on line 6d. Otherwise, see inst. | | 42 | 0. |
| | 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | | 43 | 56,307,065. |
| ● All others: | 44 | Tax. Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | | 44 | 13,190,542. |
| Single or Married filing separately, $6,200 | 45 | Alternative minimum tax. Attach Form 6251 | | 45 | 0. |
| | 46 | Excess advance premium tax credit repayment. Attach Form 8962 | | 46 | |
| Married filing jointly or Qualifying widow(er), $12,400 | 47 | Add lines 44, 45, and 46 ▶ | | 47 | 13,190,542. |
| | 48 | Foreign tax credit. Attach Form 1116 if required | 48 | 98,016. | |
| | 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | |
| Head of household, $9,100 | 50 | Education credits from Form 8863, line 19 | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | | |
| | 52 | Child tax credit. Attach Schedule 8812, if required | 52 | | |
| | 53 | Residential energy credits. Attach Form 5695 | 53 | | |
| | 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | | |
| | 55 | Add lines 48 through 54. These are your total credits | | 55 | 98,016. |
| | 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ▶ | | 56 | 13,092,526. |
| Other Taxes | 57 | Self-employment tax. Attach Schedule SE | | 57 | 15,692. |
| | 58 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | | 59 | 60,882. |
| | 60a | Household employment taxes from Schedule H | | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | | 60b | |
| | 61 | Health care: individual responsibility (see instructions) Full-year coverage ☒ | | 61 | |
| | 62 | Taxes from: a ☒ Form 8959 b ☒ Form 8960 c ☐ Inst; enter code(s) STATEMENT 23 | | 62 | 2,080,425. |
| | 63 | Add lines 56 through 62. This is your total tax ▶ | | 63 | 15,249,525.<br>STATEMENT 22 |
| Payments | 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 388,958. | |
| If you have a qualifying child, attach Schedule EIC. | 65 | 2014 estimated tax payments and amount applied from 2013 return | 65 | | |
| | 66a | Earned income credit (EIC) | 66a | | |
| | b | Nontaxable combat pay election | 66b | | |
| | 67 | Additional child tax credit. Attach Schedule 8812 | 67 | | |
| | 68 | American opportunity credit from Form 8863, line 8 | 68 | | |
| | 69 | Net premium tax credit. Attach Form 8962 | 69 | | |
| | 70 | Amount paid with request for extension to file | 70 | | |
| | 71 | Excess social security and tier 1 RRTA tax withheld | 71 | | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | | |
| | 73 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ Reserved d ☐ | 73 | | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments ▶ | | 74 | 388,958. |
| Refund | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | | 75 | |
| Direct deposit? See instructions. | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here ▶ ☐ | | 76a | |
| | b | Routing number ▶ ☐ c Type: ☐ Checking ☐ Savings ▶ d Account number | | | |
| | 77 | Amount of line 75 you want applied to your 2015 estimated tax ▶ | 77 | | |
| Amount You Owe | 78 | Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | | 78 | 15,126,613. |
| | 79 | Estimated tax penalty (see instructions) | 79 | 266,046. | |

**Third Party Designee**    Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes.** Complete below.    ☐ No

Designee's name ▶ TODD CRAWFORD    Phone no. ▶ 713-982-2000    Personal identification number (PIN) ▶ 28788

**Sign Here**
Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature    Date 11/2/2015    Your occupation Executive    Daytime phone number 972-628-4100

Spouse's signature. If a joint return, both must sign.    Date    Spouse's occupation    If the IRS sent you an Identity Protection PIN, enter it here

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | TODD CRAWFORD | 11/02/15 | | P00848788 |

Firm's name ▶ DELOITTE TAX LLP    Firm's EIN ▶ 86-1065772

Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591    Phone no. 713-982-2000

410002 12-31-14

EXPERT 0000390
Appx. 01112

JAMES D. DONDERO

| FORM 1040 | | WAGES RECEIVED AND TAXES WITHHELD | | | | STATEMENT | 20 |

| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|---|
| T | HIGHLAND CAPITAL MANAGEMENT LP | 3,282,693. | 361,201. | | | 7,254. | 75,343. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 73,227. | | | | | |
| | TOTALS | 3,355,920. | 361,201. | | | 7,254. | 75,343. |

| FORM 1040 | QUALIFIED DIVIDENDS | | STATEMENT | 21 |

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| NEXPOINT | 2,292,312. | 207,477. |
| NEXPOINT - GET GOOD #2 | 91,123. | 8,247. |
| FROM K-1 - HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. | 170,404. | 17,154. |
| FROM K-1 - PCMG TRADING PARTNERS XXIII, LP | 18,241. | 4,500. |
| FROM K-1 - STRAND ADVISORS III, INC. | 247. | 61. |
| FROM K-1 - STRAND ADVISORS, INC. | 30,676. | 22,761. |
| FROM K-1 - SERENGETI PARTNERS, LP - GET GOOD #2 | 80,697. | 53,802. |
| FROM K-1 - HAYMAN CAPITAL PARTNERS LP - GET GOOD #2 | 265,627. | 242,852. |
| FROM K-1 - HIGHLAND CAPITAL MGMT, LP | 4,097,501. | 3,040,190. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS LP - DUGABOY LLC | 4,945. | 3,297. |
| FROM K-1 - GRANITE BAY ADVISORS, LP | 1,778. | 33. |
| FROM K-1 - ICONIQ STRATEGIC PARTNERS, L.P. | 1. | 1. |
| FROM K-1 - NEXPOINT ADVISORS, GP LLC | 81. | 4. |
| FROM K-1 - NEXPOINT ADVISORS, L.P. - DUGABOY | 80,929. | 3,738. |
| TOTAL INCLUDED IN FORM 1040, LINE 9B | | 3,604,117. |

Confidential                                        EXPERT 0000623
                                                    Appx. 01113

# EXHIBIT 67-5

Form 1040 (2015)   JAMES D. DONDERO

Page 2

| | | | |
|---|---|---|---|
| **Tax and Credits** | 38 Amount from line 37 (adjusted gross income) | 38 | 106,251,803. |
| Standard Deduction for— | 39a Check { You were born before January 2, 1951, ☐ Blind. } Total boxes if: { Spouse was born before January 2, 1951, ☐ Blind. } checked ▶ 39a | | |
| ● People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. | b If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☐ | | |
| | 40 Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 40 | 40,448,879. |
| | 41 Subtract line 40 from line 38 | 41 | 65,802,924. |
| | 42 Exemptions. If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see inst. | 42 | 0. |
| | 43 Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 65,802,924. |
| | 44 Tax. Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | 44 | 24,485,784. |
| ● All others: Single or Married filing separately, $6,300 | 45 Alternative minimum tax. Attach Form 6251 | 45 | 0. |
| | 46 Excess advance premium tax credit repayment. Attach Form 8962 | 46 | |
| Married filing jointly or Qualifying widow(er), $12,600 | 47 Add lines 44, 45, and 46 ▶ | 47 | 24,485,784. |
| | 48 Foreign tax credit. Attach Form 1116 if required | 48 | 41,902. |
| Head of household, $9,250 | 49 Credit for child and dependent care expenses. Attach Form 2441 | 49 | |
| | 50 Education credits from Form 8863, line 19 | 50 | |
| | 51 Retirement savings contributions credit. Attach Form 8880 | 51 | |
| | 52 Child tax credit. Attach Schedule 8812, if required | 52 | |
| | 53 Residential energy credits. Attach Form 5695 | 53 | |
| | 54 Other credits from Form: a ☒ 3800 b ☐ 8801 c ☐ | 54 | |
| | 55 Add lines 48 through 54. These are your total credits | 55 | 41,902. |
| | 56 Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ▶ | 56 | 24,443,882. |
| **Other Taxes** | 57 Self-employment tax. Attach Schedule SE | 57 | 27,478. |
| | 58 Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | 58 | |
| | 59 Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a Household employment taxes from Schedule H | 60a | |
| | b First-time homebuyer credit repayment. Attach Form 5405 if required | 60b | |
| | 61 Health care: individual responsibility (see instructions) Full-year coverage ☒ | 61 | |
| | 62 Taxes from: a ☒ Form 8959 b ☒ Form 8960 c ☐ Inst.; enter code(s) STATEMENT 26 | 62 | 1,176,409. |
| | 63 Add lines 56 through 62. This is your total tax ▶ | 63 | 25,647,769. STATEMENT 25 |
| **Payments** | 64 Federal income tax withheld from Forms W-2 and 1099 | 64 | 384,653. |
| | 65 2015 estimated tax payments and amount applied from 2014 return | 65 | |
| If you have a qualifying child, attach Schedule EIC. | 66a Earned income credit (EIC) | 66a | |
| | b Nontaxable combat pay election 66b | | |
| | 67 Additional child tax credit. Attach Schedule 8812 | 67 | |
| | 68 American opportunity credit from Form 8863, line 8 | 68 | |
| | 69 Net premium tax credit. Attach Form 8962 | 69 | |
| | 70 Amount paid with request for extension to file | 70 | |
| | 71 Excess social security and tier 1 RRTA tax withheld | 71 | |
| | 72 Credit for federal tax on fuels. Attach Form 4136 | 72 | |
| | 73 Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ 8885 d ☐ | 73 | |
| | 74 Add lines 64, 65, 66a, and 67 through 73. These are your total payments ▶ | 74 | 384,653. |
| **Refund** | 75 If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | 75 | |
| Direct deposit? See instructions. | 76a Amount of line 75 you want refunded to you. If Form 8888 is attached, check here ▶ ☐ | 76a | |
| | b Routing number ☐ ▶ c Type: ☐ Checking ☐ Savings ▶ d Account number ☐ | | |
| | 77 Amount of line 75 you want applied to your 2016 estimated tax 77 | | |
| **Amount You Owe** | 78 Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | 78 | 25,263,116. |
| | 79 Estimated tax penalty (see instructions) 79 | 0. | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ Yes. Complete below. ☐ No |
|---|---|
| | Designee's name ▶ TODD CRAWFORD   Phone no. ▶ 713-982-2000   Personal identification number (PIN) ▶ 28788 |

**Sign Here**
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature | Date 10/17/2016 | Your occupation Executive | Daytime phone number 972-628-4100
Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here

| **Paid Preparer Use Only** | Print/Type preparer's name TODD CRAWFORD | Preparer's signature TODD CRAWFORD | Date 10/17/16 | Check ☐ if self-employed | PTIN P00848788 |
|---|---|---|---|---|---|
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

510002 12-30-15

EXPERT 0001325
**Appx. 01115**

JAMES D. DONDERO

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT 23 |
|---|---|---|

| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|---|
| T | HIGHLAND CAPITAL MANAGEMENT LP | 2,875,058. | 360,577. | | | 7,347. | 65,764. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 61,880. | | | | | |
| | TOTALS | 2,936,938. | 360,577. | | | 7,347. | 65,764. |

| FORM 1040 | QUALIFIED DIVIDENDS | STATEMENT 24 |
|---|---|---|

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| NEXPOINT CREDIT #1061004 - GET GOOD NE2 | 424,450. | 7,055. |
| NEXPOINT CREDIT #10671 - DUGABOY INVST, | 5,075,869. | 84,367. |
| NEXPOINT CREDIT #1061005 - OTHER | 668. | 11. |
| FROM K-1 - HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. | 1,121,758. | 17,419. |
| FROM K-1 - PCMG TRADING PARTNERS XXIII, LP | 81,701. | 2,742. |
| FROM K-1 - STRAND ADVISORS III, INC. | 1,104. | 37. |
| FROM K-1 - STRAND ADVISORS, INC. | 107,555. | 10,350. |
| FROM K-1 - SERENGETI PARTNERS, LP - GET GOOD #2 | 122,685. | 36,501. |
| FROM K-1 - HAYMAN CAPITAL PARTNERS LP - GET GOOD #2 | 5,733. | 2,373. |
| FROM K-1 - HIGHLAND CAPITAL MGMT, LP | 14,222,996. | 1,368,700. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS LP - DUGABOY LLC | 7,513. | 2,235. |
| FROM K-1 - GRANITE BAY ADVISORS, LP | 586. | 12. |
| FROM K-1 - NEXBANK CAPITAL, INC. - DUGABOY | 2,126. | 1,429. |
| FROM K-1 - ICONIQ STRATEGIC PARTNERS, L.P. | 89. | 89. |
| FROM K-1 - NEXPOINT ADVISORS, GP LLC | 1,231. | 3. |
| FROM K-1 - NEXPOINT ADVISORS, L.P. - DUGABOY | 1,229,938. | 3,483. |
| TOTAL INCLUDED IN FORM 1040, LINE 9B | | 1,536,806. |

Confidential

EXPERT 0001523
Appx. 01116

**EXHIBIT 67-6**

Form 1040 (2016)    JAMES D. DONDERO                Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits** | 38 Amount from line 37 (adjusted gross income) | 38 | 67,070,747. |
| | 39a Check { ☐ You were born before January 2, 1952, ☐ Blind. } Total boxes | | |
| Standard Deduction for – | if: { ☐ Spouse was born before January 2, 1952, ☐ Blind. } checked ► 39a | | |
| ● People who check any box on line 39a or 39b Or who can be claimed as a dependent, see instructions. | b If your spouse itemizes on a separate return or you were a dual-status alien, check here ► 39b ☐ | | |
| | 40 **Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) | 40 | 35,026,261. |
| | 41 Subtract line 40 from line 38 | 41 | 32,044,486. |
| | 42 **Exemptions.** If line 38 is $155,650 or less, multiply $4,050 by the number on line 6d. Otherwise, see inst. | 42 | 0. |
| | 43 **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 32,044,486. |
| ● All others: | 44 **Tax.** Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | 44 | 10,668,862. |
| Single or Married filing separately, $6,300 | 45 **Alternative minimum tax.** Attach Form 6251 | 45 | 0. |
| Married filing jointly or Qualifying widow(er), $12,600 | 46 Excess advance premium tax credit repayment. Attach Form 8962 | 46 | |
| | 47 Add lines 44, 45, and 46 ► | 47 | 10,668,862. |
| | 48 Foreign tax credit. Attach Form 1116 if required   48   23,346. | | |
| Head of household, $9,300 | 49 Credit for child and dependent care expenses. Attach Form 2441   49 | | |
| | 50 Education credits from Form 8863, line 19   50 | | |
| | 51 Retirement savings contributions credit. Attach Form 8880   51 | | |
| | 52 Child tax credit. Attach Schedule 8812, if required   52 | | |
| | 53 Residential energy credits. Attach Form 5695   53 | | |
| | 54 Other credits from Form: a ☒ 3800 b ☐ 8801 c ☐   54 | | |
| | 55 Add lines 48 through 54. These are your **total credits** | 55 | 23,346. |
| | 56 Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ► | 56 | 10,645,516. |
| **Other Taxes** | 57 Self-employment tax. Attach Schedule SE | 57 | 33,600. |
| | 58 Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | 58 | |
| | 59 Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a Household employment taxes from Schedule H | 60a | |
| | b First-time homebuyer credit repayment. Attach Form 5405 if required | 60b | |
| | 61 Health care: individual responsibility (see instructions)   Full-year coverage ☒ | 61 | |
| | 62 Taxes from: a ☒ Form 8959 b ☒ Form 8960 c ☒ inst; enter code(s) STATEMENT 17 | 62 | 1,128,115. |
| | 63 Add lines 56 through 62. This is your **total tax** ► | 63 | 11,807,231. STATEMENT 16 |
| **Payments** | 64 Federal income tax withheld from Forms W-2 and 1099   64   361,603. | | |
| | 65 2016 estimated tax payments and amount applied from 2015 return   65 *   7,900,000. | | |
| If you have a qualifying child, attach Schedule EIC. | 66a **Earned income credit (EIC)**   66a | | |
| | b Nontaxable combat pay election   66b | | |
| | 67 Additional child tax credit. Attach Schedule 8812   67 | | |
| | 68 American opportunity credit from Form 8863, line 8   68 | | |
| | 69 Net premium tax credit. Attach Form 8962   69 | | |
| | 70 Amount paid with request for extension to file   70 | | |
| | 71 Excess social security and tier 1 RRTA tax withheld   STMT 15   71   7,347. | | |
| | 72 Credit for federal tax on fuels. Attach Form 4136   72 | | |
| | 73 Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ 8885 d ☐   73 | | |
| | 74 Add lines 64, 65, 66a, and 67 through 73. These are your **total payments** ► | 74 | 8,268,950. |
| **Refund** | 75 If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** | 75 | |
| Direct deposit? See instructions. | 76a Amount of line 75 you want **refunded to you.** If Form 8888 is attached, check here ► ☐ | 76a | |
| | ► b Routing number   ► c Type: ☐ Checking ☐ Savings ► d Account number | | |
| | 77 Amount of line 75 you want **applied to your 2017 estimated tax** ► 77 | | |
| **Amount You Owe** | 78 **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions ► | 78 | 3,810,722. |
| | 79 Estimated tax penalty (see instructions)   79   272,441. | | |

**Third Party Designee**   Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ Yes. Complete below.    ☐ No

Designee's name ► TODD CRAWFORD    Phone no. ► 713-982-2000    Personal identification number (PIN) ► 28788

**Sign Here**   Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature [signature]   Date 1/25/18   Your occupation Executive   Daytime phone number

Spouse's signature. If a joint return, **both** must sign.   Date   Spouse's occupation   If the IRS sent you an Identity Protection PIN, enter it here

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | TODD CRAWFORD | 01/18/18 | Check ☐ if self-employed | P00848788 |

Firm's name ► DELOITTE TAX LLP    Firm's EIN ► 86-1065772

Firm's address ► 1111 BAGBY STREET, SUITE 4500   HOUSTON, TX 77002-2591    Phone no. 713-982-2000

810002 11-30-16

* $7,900,000 PAYMENT MADE ON 1/18/2018. SEE CONFIRMATION ATTACHED.

EXPERT 0001999
Appx. 01118

JAMES D. DONDERO

---

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT 13 |
|---|---|---|

| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|---|
| T | HIGHLAND CAPITAL MANAGEMENT LP | 772,904. | 260,529. | | | 7,347. | 16,363. |
| T | NEXPOINT ADVISORS LP | 1,628,736. | 83,026. | | | 7,347. | 36,475. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 67,166. | | | | | |
| | TOTALS | 2,468,806. | 343,555. | | | 14,694. | 52,838. |

---

| FORM 1040 | QUALIFIED DIVIDENDS | STATEMENT 14 |
|---|---|---|

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| NEXPOINT CREDIT #1061004 - GET GOOD NE2 | 114,812. | 9,964. |
| NEXPOINT CREDIT #1061005 - OTHER | 1,447. | 126. |
| NEXPOINT CREDIT #10671 - DUGABOY INVST, | 1,741,293. | 151,116. |
| FROM K-1 - HIGHLAND CRUSADER FUND, LP - JIM | 1. | 1. |
| FROM K-1 - HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. | 301,224. | 25,062. |
| FROM K-1 - PCMG TRADING PARTNERS XXIII, LP | 23,745. | 1,635. |
| FROM K-1 - STRAND ADVISORS III, INC. | 321. | 22. |
| FROM K-1 - STRAND ADVISORS, INC. | 21,524. | 1,432. |
| FROM K-1 - SERENGETI PARTNERS, LP - GET GOOD #2 | 140,229. | 29,857. |
| FROM K-1 - HIGHLAND CAPITAL MGMT, LP | 16,011. | 1,065. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS LP - DUGABOY LLC | 8,818. | 1,835. |
| FROM K-1 - GRANITE BAY ADVISORS, LP | 837. | 316. |
| FROM K-1 - HCM - MULTI-STRATEGY INSURANCE DEDICATED FUND, L.P. | 153. | 153. |
| FROM K-1 - NEXBANK CAPITAL, INC. - DUGABOY | 60,393. | 59,222. |
| FROM K-1 - ICONIQ STRATEGIC PARTNERS, L.P. | 368. | 368. |
| FROM K-1 - NEXPOINT ADVISORS, GP LLC | 1,403. | 57. |
| FROM K-1 - NEXPOINT ADVISORS, L.P. - DUGABOY | 1,401,150. | 56,892. |
| FROM K-1 - HCRE PARTNERS, LLC | 17,215. | 14,820. |
| FROM K-1 - NEXBANK CAPITAL, INC. | 2,371. | 2,325. |
| FROM K-1 - RAND PE FUND I LP | 67,914. | 4,633. |
| FROM K-1 - NEXBANK CAPITAL-GRANT SCOTT SLHC TRUST | 836. | 819. |
| | | 361,720. |

Confidential

EXPERT 0002179
**Appx. 01119**

# EXHIBIT 67-7

Form 1040 (2017)    JAMES D. DONDERO              Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits**<br>Standard Deduction for -<br>● People who check any box on line 39a or 39b **or** who can be claimed as a dependent, see instructions.<br>● All others:<br>Single or Married filing separately, $6,350<br>Married filing jointly or Qualifying widow(er), $12,700<br>Head of household, $9,350 | **38** Amount from line 37 (adjusted gross income) .......................................... | **38** | 46,135,397. |
| | **39a** Check { ☐ **You** were born before January 2, 1953, ☐ Blind. **Total boxes** ☐ if: ☐ **Spouse** was born before January 2, 1953, ☐ Blind. } **checked** ▶ **39a** | | |
| | **b** If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ **39b** ☐ | | |
| | **40 Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) ........ | **40** | 25,717,217. |
| | **41** Subtract line 40 from line 38 ........................................................... | **41** | 20,418,180. |
| | **42 Exemptions.** If line 38 is $156,900 or less, multiply $4,050 by the number on line 6d. Otherwise, see inst. | **42** | 0. |
| | **43 Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- ..... | **43** | 20,418,180. |
| | **44 Tax.** Check if any from: **a** ☐ Form(s) 8814 **b** ☐ Form 4972 **c** ☐ _____ | **44** | 7,995,763. |
| | **45 Alternative minimum tax.** Attach Form 6251 .......................................... | **45** | 0. |
| | **46** Excess advance premium tax credit repayment. Attach Form 8962 ............................ | **46** | |
| | **47** Add lines 44, 45, and 46 ........................................................ ▶ | **47** | 7,995,763. |
| | **48** Foreign tax credit. Attach Form 1116 if required ................ **48** | | |
| | **49** Credit for child and dependent care expenses. Attach Form 2441 ... **49** | | |
| | **50** Education credits from Form 8863, line 19 ................... **50** | | |
| | **51** Retirement savings contributions credit. Attach Form 8880 ....... **51** | | |
| | **52** Child tax credit. Attach Schedule 8812, if required ............. **52** | | |
| | **53** Residential energy credits. Attach Form 5695 ................ **53** | | |
| | **54** Other credits from Form: **a** ☒ 3800 **b** ☐ 8801 **c** ☐ **54** | | |
| | **55** Add lines 48 through 54. These are your **total credits** ................................... | **55** | |
| | **56** Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ...................... ▶ | **56** | 7,995,763. |
| | **57** Self-employment tax. Attach Schedule SE ............................................... | **57** | 116,052. |
| **Other Taxes** | **58** Unreported social security and Medicare tax from Form: **a** ☐ 4137 **b** ☐ 8919 ........... | **58** | |
| | **59** Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required ......... | **59** | |
| | **60a** Household employment taxes from Schedule H .......................................... | **60a** | |
| | **b** First-time homebuyer credit repayment. Attach Form 5405 if required ....................... | **60b** | |
| | **61** Health care: Individual responsibility (see instructions)     Full-year coverage ☒ ........ | **61** | |
| | **62** Taxes from: **a** ☒ Form 8959 **b** ☒ Form 8960 **c** ☒ Inst.; enter code(s) **STATEMENT 12** | **62** | 496,784. |
| | **63** Add lines 56 through 62. This is your **total tax** ..................................... ▶ | **63** | 8,608,599. STATEMENT 11 |
| **Payments**<br>If you have a qualifying child, attach Schedule EIC. | **64** Federal income tax withheld from Forms W-2 and 1099 ...... **64** 994,763. | | |
| | **65** 2017 estimated tax payments and amount applied from 2016 return ...... **65** | | |
| | **66a Earned income credit (EIC)** ............................ **66a** | | |
| | **b** Nontaxable combat pay election ........ **66b** | | |
| | **67** Additional child tax credit. Attach Schedule 8812 ............. **67** | | |
| | **68** American opportunity credit from Form 8863, line 8 ........... **68** | | |
| | **69** Net premium tax credit. Attach Form 8962 .................. **69** | | |
| | **70** Amount paid with request for extension to file ............... **70** | | |
| | **71** Excess social security and tier 1 RRTA tax withheld ...... **STMT 10** **71** 15,772. | | |
| | **72** Credit for federal tax on fuels. Attach Form 4136 ............. **72** | | |
| | **73** Credits from Form: **a** ☐ 2439 **b** ☐ Reserved **c** ☐ 8885 **d** ☐ **73** | | |
| | **74** Add lines 64, 65, 66a, and 67 through 73. These are your **total payments** ............... ▶ | **74** | 1,010,535. |
| **Refund**<br>Direct deposit? See instructions. | **75** If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** ..... | **75** | |
| | **76a** Amount of line 75 you want **refunded to you.** If Form 8888 is attached, check here .......... ▶ ☐ | **76a** | |
| | **b** Routing number _____ ▶ **c** Type: ☐ Checking ☐ Savings ▶ **d** Account number _____ | | |
| | **77** Amount of line 75 you want **applied to your 2018 estimated tax** ...... ▶ **77** | | |
| **Amount You Owe** | **78 Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions ....... ▶ | **78** | 7,777,274. |
| | **79** Estimated tax penalty (see instructions) .................. **79** 179,210. | | |
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes.** Complete below.   ☐ **No**<br>Designee's name ▶ TODD CRAWFORD    Phone no. ▶ 713-982-2000    Personal identification number (PIN) ▶ 77002 | | |
| **Sign Here**<br>Joint return?<br>See instructions.<br>Keep a copy for your records. | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.<br>Your signature    Date    Your occupation    Daytime phone number<br>Spouse's signature. If a joint return, **both** must sign.    Date    Spouse's occupation    If the IRS sent you an identity Protection PIN, enter it here | | |
| **Paid Preparer Use Only** | Print/Type preparer's name   Preparer's signature   Date   Check ☐ if self-employed   PTIN<br>TODD CRAWFORD    TODD CRAWFORD    10/15/18    P00848788<br>Firm's name ▶ DELOITTE TAX LLP    Firm's EIN ▶ 86-1065772<br>Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591    Phone no. 713-982-2000 | | |

710002 02-22-18

SEE STMT FOR INT AND PEN NOT INCLUDED. TOTAL DUE $8198081

JAMES D. DONDERO

| FORM 1040 | TAX-EXEMPT INTEREST | STATEMENT 7 |
|---|---|---|

| NAME OF PAYER | AMOUNT |
|---|---|
| JP MORGAN #05641 - T/E | 67. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS LP - DUGABOY LLC | 1. |
| FROM K-1 - ICONIQ STRATEGIC PARTNERS, L.P. | 7. |
| FROM K-1 - NEXBANK CAPITAL, INC. & SUBS | 216,400. |
| FROM K-1 - NEXBANK CAPITAL-GRANT SCOTT SLHC TRUST | 4,208,755. |
| TOTAL TO FORM 1040, LINE 8B | 4,425,230. |

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT 8 |
|---|---|---|

| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|---|
| T | HIGHLAND CAPITAL MANAGEMENT LP | 566,370. | 177,722. | | | 7,886. | 11,510. |
| T | NEXPOINT ADVISORS LP | 3,118,250. | 627,283. | | | 7,886. | 71,479. |
| T | NEXPOINT RESIDENTIAL TRUST INC | 625,467. | 156,367. | | | 7,886. | 12,898. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 96,000. | | | | | |
| | TOTALS | 4,406,087. | 961,372. | | | 23,658. | 95,887. |

Confidential

EXPERT 0000872
Appx. 01122

# EXHIBIT 67-8

# Form 1040

Department of the Treasury - Internal Revenue Service

**U.S. Individual Income Tax Return** (99) **2018** OMB No. 1545-0074

EXTENSION GRANTED TO 10/15/19

IRS Use Only - Do not write or staple in this space.

Filing status: ☐ Single ☐ Married filing jointly ☐ Married filing separately ☒ Head of household ☐ Qualifying widow(er)

Your first name and initial: JAMES D. | Last name: DONDERO

Your standard deduction: ☐ Someone can claim you as a dependent ☐ You were born before January 2, 1954 ☐ You are blind

If joint return, spouse's first name and initial | Last name

Spouse's social security number

Spouse standard deduction: ☐ Someone can claim your spouse as a dependent ☐ Spouse was born before January 2, 1954 ☒ Full-year health care coverage or exempt (see inst.)
☐ Spouse is blind ☐ Spouse itemizes on a separate return or you were dual-status alien

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.

**Presidential Election Campaign.** (see inst.) ☐ You ☐ Spouse

City, town or post office, state, and ZIP code. If you have a foreign address, attach Schedule 6.

If more than four dependents, see inst. and √ here ►

**Dependents** (see instructions):

| (1) First name Last name | (2) Social security number | (3) Relationship to you | (4) √ if qualifies for (see inst.): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | ☒ | |

## Sign Here

Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature | Date: 10/12/19 | Your occupation: Executive | If the IRS sent you an Identity Protection PIN, enter it here

Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here

## Paid Preparer Use Only

Preparer's name: TODD CRAWFORD | Preparer's signature | PTIN: P00848788 | Firm's EIN: 86-1065772

Check if: ☒ 3rd Party Designee ☐ Self-employed

Firm's name ► DELOITTE TAX LLP
1111 BAGBY STREET, SUITE 4500

Phone no. 713-982-2000

Firm's address ► HOUSTON, TX 77002-2591

LHA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

Form **1040** (2018)

813921 12-13-18

EXPERT 0001581
**Appx. 01124**

JAMES D. DONDERO

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | | | | | STATEMENT 9 |
|---|---|---|---|---|---|---|
| T S EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
| T HIGHLAND CAPITAL MANAGEMENT LP | 566,370. | 172,663. | | | 7,961. | 11,510. |
| T NEXPOINT ADVISORS LP | 2,870,278. | 682,902. | | | 7,961. | 65,651. |
| T NEXPOINT RESIDENTIAL TRUST INC | 893,262. | 196,518. | | | 7,961. | 19,192. |
| T HIGHLAND CAPITAL MGMT PTE LTD. | 68,840. | | | | | |
| TOTALS | 4,398,750. | 1,052,083. | | | 23,883. | 96,353. |

| FORM 1040 | TAX-EXEMPT INTEREST | STATEMENT 10 |
|---|---|---|
| NAME OF PAYER | | AMOUNT |
| JP MORGAN #05641 | | 174. |
| FROM K-1 - SERENGETI OPPORTUNITIES PARTNERS - DUGABOY LLC | | 1. |
| TOTAL TO FORM 1040, LINE 2A | | 175. |

STATEMENT(S) 9, 10

# EXHIBIT 67-9

Appx. 01126

Form 1040 (2019)  JAMES D. DONDERO  Page 2

| | | | | | |
|---|---|---|---|---|---|
| 12a | Tax (see inst.) Check if any from Form(s): 1 ☐ 8814 2 ☐ 4972 3 ☐ _____ | 12a | 448,223. | | |
| b | Add Schedule 2, line 3, and line 12a and enter the total | | ▶ | 12b | 497,662. |
| 13a | Child tax credit or credit for other dependents | 13a | | | |
| b | Add Schedule 3, line 7, and line 13a and enter the total | | ▶ | 13b | |
| 14 | Subtract line 13b from line 12b. If zero or less, enter -0- | | | 14 | 497,662. |
| 15 | Other taxes, including self-employment tax, from Schedule 2, line 10 | | | 15 | 682,137. |
| 16 | Add lines 14 and 15. This is your **total tax** | | ▶ | 16 | 1,179,799. |
| 17 | Federal income tax withheld from Forms W-2 and 1099 SEE STATEMENT 4 | | | 17 | 1,461,134. |
| 18 | Other payments and refundable credits: | | | | |
| a | Earned income credit (EIC) | 18a | | | |
| b | Additional child tax credit. Attach Schedule 8812 | 18b | | | |
| c | American opportunity credit from Form 8863, line 8 | 18c | | | |
| d | Schedule 3, line 14 | 18d | 16,480. | | |
| e | Add lines 18a through 18d. These are your **total other payments and refundable credits** | | ▶ | 18e | 16,480. |
| 19 | Add lines 17 and 18e. These are your **total payments** | | ▶ | 19 | 1,477,614. |

**Refund**

| | | | | | |
|---|---|---|---|---|---|
| 20 | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** | | | 20 | 297,815. |
| 21a | Amount of line 20 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | | | 21a | 297,815. |

Direct deposit? See instructions.
▶ b Routing number _____  ▶ c Type: ☐ Checking ☐ Savings
▶ d Account number _____

| | | | | | |
|---|---|---|---|---|---|
| 22 | Amount of line 20 you want applied to your **2020 estimated tax** ▶ | 22 | | | |

**Amount You Owe**

| | | | | | |
|---|---|---|---|---|---|
| 23 | **Amount you owe.** Subtract line 19 from line 16. For details on how to pay, see instructions ▶ | | | 23 | |
| 24 | Estimated tax penalty (see instructions) ▶ | 24 | | | |

**Third Party Designee**
(Other than paid preparer)

Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions  ☐ **Yes. Complete below.**  ☒ **No**

Designee's name _____  Phone no. _____  Personal identification number (PIN) _____

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature _____ [signature]  Date 10/15/20  Your occupation President  If the IRS sent you an Identity Protection PIN, enter it here (see inst.) _____

Joint return? See instructions. Keep a copy for your records.

Spouse's signature. If a joint return, **both** must sign.  Date _____  Spouse's occupation _____  If the IRS sent you your spouse an Identity Protection PIN, enter it here (see inst.) _____

Phone no. _____  Email address _____

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: |
|---|---|---|---|---|
| TODD CRAWFORD | [signature] Todd Crawford | 10/13/20 | P00848788 | ☒ 3rd Party Designee ☐ Self-employed |

Firm's name ▶ DELOITTE TAX LLP  Phone no. 713-982-2000  Firm's EIN 86-1065772

Firm's address ▶ 1111 BAGBY STREET, SUITE 4500
HOUSTON, TX 77002-2591

Go to *www.irs.gov/Form1040* for instructions and the latest information.  Form **1040** (2019)

913022 12-02-19

EXPERT 0001023
**Appx. 01127**

JAMES D. DONDERO

| FORM 1040 | | WAGES RECEIVED AND TAXES WITHHELD | | | | STATEMENT 1 | |
|---|---|---|---|---|---|---|---|
| T S | EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
| T | HIGHLAND CAPITAL MANAGEMENT LP | 568,542. | 171,707. | | | 8,240. | 11,561. |
| T | NEXPOINT ADVISORS LP | 1,953,455. | 684,952. | | | 8,240. | 44,106. |
| T | NEXPOINT RESIDENTIAL TRUST INC | 1,944,956. | 569,634. | | | 8,240. | 43,906. |
| T | HIGHLAND CAPITAL MGMT PTE LTD. | 29,352. | | | | | |
| | TOTALS | 4,496,305. | 1,426,293. | | | 24,720. | 99,573. |

| FORM 1040 | TAX-EXEMPT INTEREST | STATEMENT 2 |
|---|---|---|

| NAME OF PAYER | AMOUNT |
|---|---|
| JP MORGAN #05641 | 169. |
| TOTAL TO FORM 1040, LINE 2A | 169. |

STATEMENT(S) 1, 2

EXPERT 0001264
**Appx. 01128**

# EXHIBIT 68

## James Dondero
## Compensation and Benefit Statement

Job Title: Partner
Department: Executive

**EARNINGS AND AWARDS**

| | |
|---|---|
| 2016 Base Salary (as of 12/31/16) | $1,062,500 |

**Effective March 1, 2017, your new base salary will be: $2,500,000**

2016 Other Awards
| | |
|---|---|
| 401(k) Match | $ 4,800 |
| Estimated 2016 Profit Sharing (will be contributed in 2017) | $ 19,875 |
| *Final profit sharing award subject to passing IRS mandated testing | |
| 2016 Deferred Compensation Award | $1,200,000 |

- It is expected that you will receive approximately 50,000 restricted stock units of NXRT relating to the 2016 performance year, which have a current market value of approximately $1,200,000

| | |
|---|---|
| ***2016 Total Earnings and Awards*** | **$2,287,175** |

**HIGHLAND PAID BENEFITS**

| | |
|---|---|
| Medical & Dental Insurance | $ 13,056 |
| Life, AD&D and Disability Insurance | $   968 |
| Executive Long Term Disability | $ 1,260 |
| Daily Catered Lunches | $ 3,000 |
| Parking | $ 2,160 |

| | |
|---|---|
| ***2016 Estimated Total Value of Highland Paid Benefits*** | **$ 20,444** |

| | |
|---|---|
| **TOTAL COMPENSATION PACKAGE** | **$2,307,619** |

HIGHLY CONFIDENTIAL

# EXHIBIT 69

Appx. 01131

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2014**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2014**

Page(s)

**Independent Auditor's Report** ............................................................................................................1

**Audited Consolidated Financial Statements**

Consolidated Balance Sheet.................................................................................................................2

Consolidated Statement of Income......................................................................................................3

Consolidated Statement of Changes in Partners' Capital....................................................................4

Consolidated Statement of Cash Flows...............................................................................................5

Consolidated Notes to Financial Statements ..................................................................................6–42

Supplemental Information…………………………………………………………………………..43-47

HIGHLY CONFIDENTIAL



<div align="center">

**Independent Auditor's Report**

</div>

To the General Partner of Highland Capital Management, L.P.:

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2014, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

***Management's Responsibility for the Consolidated Financial Statements***

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

***Auditor's Responsibility***

Our responsibility is to express an opinion on the consolidated financial statements based on our audit.  We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error.  In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.  We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

***Opinion***

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries at December 31, 2014, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

***Other Matter***

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements.  The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements.  The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 21, 2015

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201*
*T: (214) 999-1400, F: (214) 754-7991, www.pwc.com/us*

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Balance Sheet**
**December 31, 2014**

*(in thousands)*

**Assets**

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 66,033 |
| Restricted cash | | 137,855 |
| Investments at fair value (cost $2,266,538) | | 1,877,339 |
| Management and incentive fees receivable | | 8,570 |
| Due from broker for securities sold, not yet settled | | 32,536 |
| Other assets | | 64,443 |
| Deferred incentive fees receivable | | 32,592 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $5,768 | | 8,067 |
| **Total assets** | $ | 2,227,435 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---|
| Accounts payable | $ | 5,167 |
| Securities sold, not yet purchased (proceeds $43,015) | | 41,815 |
| Withdrawals payable | | 82,833 |
| Due to brokers | | 739,483 |
| Due to brokers for securities purchased, not yet settled | | 67,541 |
| Accrued and other liabilities | | 100,538 |
| Debt and notes payable | | 41,639 |
| **Total liabilities** | | 1,079,016 |
| Non-controlling interest | | 621,306 |
| Commitments (Note 10) | | |
| **Partners' capital** | | 527,113 |
| **Total liabilities and partners' capital** | $ | 2,227,435 |

The accompanying notes are an integral part of these consolidated statements.

HIGHLY CONFIDENTIAL

D-CNL000112

**Appx. 01135**

# Highland Capital Management, L.P.
## Consolidated Statement of Income
### Year Ended December 31, 2014

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 67,570 |
| Interest and investment income | | 57,451 |
| Other income | | 10,490 |
| Total revenue | | 135,511 |
| **Expenses:** | | |
| Compensation and benefits | | 37,693 |
| Professional fees | | 23,935 |
| Marketing and advertising expense | | 6,140 |
| Investment and research consulting | | 507 |
| Depreciation and amortization | | 1,358 |
| Tax expense | | 1,892 |
| Other operating expenses | | 17,265 |
| Total expenses | | 88,790 |
| Other income | | 1,655 |
| Income before investment and derivative activities | | 48,376 |
| **Realized and unrealized gain/loss from investment and derivative transactions:** | | |
| Net realized loss on investment and derivative transactions | | (172,002) |
| Net change in unrealized gain on investment and derivative transactions | | 260,351 |
| Total realized and unrealized gain from investment and derivative transactions | | 88,349 |
| Net income | | 136,725 |
| Net loss attributable to the non-controlling interest | | 8,604 |
| Net income attributable to Highland Capital Management, L.P. | $ | 145,329 |

The accompanying notes are an integral part of these consolidated statements.

3

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2014**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2013 | $ 131 | $ 407,431 | $ 407,562 |
| Net income attributable to Highland Capital Management, L.P. | - | 145,329 | 145,329 |
| Partner distributions | (131) | (25,647) | (25,778) |
| Partners' capital, December 31, 2014 | $ - | $ 527,113 | $ 527,113 |

The accompanying notes are an integral part of these consolidated statements.

4

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2014**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 136,725 |
| Adjustment to reconcile net income to cash and cash equivalents | | |
| provided by operating activities: | | |
| Cash provided by operating activities: | | |
| Net realized loss on investments and derivative transactions | | 172,002 |
| Net change in unrealized gain on investments and derivative transactions | | (260,351) |
| Amortization and depreciation | | 1,358 |
| **Changes in assets and liabilities:** | | |
| Restricted cash | | (135,154) |
| Management and incentive fee receivable | | 6,064 |
| Deferred incentive fees | | 224 |
| Other assets | | 1,053 |
| Accounts payable | | 79 |
| Accrued and other liabilties | | 22,000 |
| Due from brokers | | (1,294) |
| Due to brokers for securities purchased, not yet settled | | 11,193 |
| Tax Payable | | (8,232) |
| Due to Brokers | | 237,280 |
| Net cash provided by operating activities | | 182,947 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (356) |
| Purchases of investments | | (805,656) |
| Proceeds from dispositions of investments | | 597,251 |
| Proceeds from securities sold, not yet purchased | | 59,267 |
| Issuance of notes receivable | | (37,351) |
| Purchases of investments to cover securities sold, not yet purchased | | (17,228) |
| Net cash used in investing activities | | (204,073) |
| **Cash flows from financing activities:** | | |
| Capital contributions from minority interest investors of consolidated entities | | 4,914 |
| Capital withdrawals by minority interest investors of consolidated entities | | (118,973) |
| Capital withdrawals by investors | | 58,145 |
| Partner distributions | | (25,778) |
| Net cash used in financing activities | | (81,692) |
| Net decrease in cash and cash equivalents | | (102,818) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 162,510 |
| Additional cash from new consolidated funds | | 6,341 |
| End of year | $ | 66,033 |
| **Supplemental disclosure of cash flow informaton:** | | |
| Interest paid during the year | $ | (734) |
| Taxes paid during the year | | (7,377) |
| **Non-cash investing activities** | | |
| Investments purchased in-kind | | 41,639 |

The accompanying notes are an integral part of these consolidated statements.

HIGHLY CONFIDENTIAL

D-CNL000115

**Appx. 01138**

**Highland Capital Management, L.P.**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

1. **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is 100% owned by senior management of the Partnership.

As of December 31, 2014, the Partnership provided investment advisory services for twenty-seven CLOs, six separate accounts, one registered investment company, one master limited partnership, and sixteen hedge fund or private equity structures, with total fee-earning assets under management of approximately $11.4 billion.

2. **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

6

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Consolidation of Non-Variable Interest Entities**

The Partnership consolidates the following non-VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., Highland Select Equity Fund, L.P., Highland Equity Partners, L.P., Highland Merger Arbitrage Fund, L.P., and Highland Equity Focus Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005;

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 29, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore") a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore") a Delaware limited partnership that commenced operations on September 2, 2008

- BB Votorantim, Highland Infrastructure LLC ("BB Votorantim"), a Delaware limited liability company which began operations on May 29, 2014; and

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in HCM Europe, Ltd. ("HCM Europe") a company organized in the United Kingdom and formed by the Partnership on December 7, 2012;

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

7

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in HE Capital, LLC., a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd. a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd. a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd. a Cayman company that was formed on December 1, 2012;

- 99.9% interest in Penant Management, LP. a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Semence, LLC a Delaware limited liability company that was formed on December 16, 2013;

- 100% interest in SK Shareholder Services, LLC a Delaware limited liability company that was formed on October 24, 2013;

- 100% interest in Pollack, Ltd. a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd. a Cayman company that was formed on December 1, 2012;

- 100% interest in HCREF-I Holding Corp. a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-X Holding Corp. a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp. a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp. a Delaware company that was formed on December 13, 2012;

- 80% interest in Highland Employee Retention Assets, LLC a Delaware limited liability company that was formed on October 26th, 2009;

8

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

- 100% interest in Highland Diversified Credit Fund, LP, a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P;

- 99.6% interest in Highland Select Equity Fund, LP, a Delaware limited partnership which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value

- 100% interest in Highland Equity Partners, LP, a Delaware limited partnership which began operations on August 1, 2013 and was organized for the purpose of investing with long-term perspective in a concentrated portfolio of stocks;

- 99.6% interest in Highland Equity Focus Fund, LP, a Delaware limited partnership which began operations on September 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Merger Arbitrage Fund, LP, a Delaware limited partnership which began operations on October 16, 2014; and

All inter-partnership and intercompany accounts and transactions have been eliminated in consolidation of all of the aforementioned consolidated entities. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

Due to the deconsolidation of certain investment funds, some prior year balances referenced within the following notes to the consolidated financial statements may not tie to prior year issued financial statements.

The following table includes a rollforward of noncontrolling interests from December 31, 2013, to December 31, 2014.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2013 | $748,463 |
| Net loss attributable to noncontrolling interest | (8,604) |
| Noncontrolling partner contributions | 4,914 |
| Noncontrolling partner distributions | (118,973) |
| Noncontrolling interest of deconsolidated entities | (4,494) |
| Noncontrolling interest, December 31, 2014 | $621,306 |

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2014, the Partnership and its consolidated entities recognized management fees of approximately $67.5 million. The Partnership recognized approximately $0.2 million of depreciation on incentive fees earned prior to 2008, previously deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the Consolidated Statement of Income.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2014, the Partnership and its consolidated entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Other Income* in the Consolidated Statement of Income. See further discussion in Note 8.

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences

HIGHLY CONFIDENTIAL

D-CNL000120

**Appx. 01143**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 12.

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2014, the Partnership and Consolidated Funds held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Funds regularly monitor the credit quality of these institutions.

### Restricted Cash

The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash on the Consolidated Balance Sheet.

### Fixed Assets and Leasehold Improvements

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

### Due to/from Brokers

Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Investment Manager's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

### Securities Sold, Not Yet Purchased

The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

### Options Contracts

The Partnership and the Consolidated Investment Funds may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Investment Funds purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Investment Funds enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Investment Funds purchasing a security at a price different from the current market value.

The Partnership and the Consolidated Investment Funds are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Investment Funds is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Investment Funds consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

**Margin Transactions**

To obtain more investable cash, the Consolidated Investment Funds may use various forms of leverage including purchasing securities on margin. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**

Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2014. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2014, the Consolidated Investment Funds had withdrawals payable of $82.8 million.

**Foreign Currency Transactions**

The Partnership's subsidiaries HCM Europe and HCM Singapore use British Pounds and Singapore dollars as their functional currency, respectively. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2014. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the consolidated statement of income.

The Consolidated Investment Funds do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments.*

### Life Settlement Contracts

One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows.

### Financial Instruments

The Partnership and its consolidated entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

### Partners' Capital

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

### Recently Issued Accounting Standards and Interpretations

In August, 2014, the FASB issued Accounting Standards Update 2014-15 – "Presentation of Financial Statement – Going Concern" (Subtopic 205-40). The amendments in this Update apply to all reporting entities. The main provisions of this Update are in connection with preparing annual and interim financial statements. Management should evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statement are issued. The amendments are effective for the annual period ending after December 15, 2016. This statement is not expected to have a material impact on the Partnership's financial statements.

In February 2015, the FASB issued ASU 2015-02 "ASC Topic 810, Consolidation." ASU 2015-02 modifies the evaluation of whether limited partnerships and similar legal entities are variable interest entities or voting interest entities, eliminates the presumption that a general partner should consolidate a limited partnership, affects the consolidation analysis of reporting entities that are involved with VIEs, and provides other updates on guidance regarding consolidation. ASU 2015-02 is effective for fiscal years beginning after December 15, 2016. Management is evaluating the impact of ASU 2015-02 on the Partnership's financial statements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

3.    **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2014:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 6,441 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,596 |
| Computer and equipment | | 1,932 |
| Computer software | | 271 |
| Accumulated depreciation | | (5,768) |
| | $ | 8,067 |

The Partnership and its consolidated entities are depreciating fixed assets as follows:

| | **Period** |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 5 years |
| Computer software | 3 years |

Depreciation expense in 2014 totaled approximately $1.4 million for the Partnership and its subsidiaries.

14

D-CNL000124

Appx. 01147

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

4.    **Investments**

Detailed below is a summary of the Partnership and its consolidated entities investments at December 31, 2014:

| *(in thousands)* | Amortized Cost/Cost | Fair Value |
|---|---:|---:|
| Common equity securities | $ 875,293 | $ 1,027,376 |
| Limited partnership interests | 134,080 | 205,900 |
| Asset-backed securities | 249,269 | 182,054 |
| Preferred equity | 59,994 | 121,500 |
| Floating rate syndicated bank loans | 201,845 | 116,952 |
| Life settlement contracts | 418,467 | 114,640 |
| Closed-end mutual funds | 58,443 | 68,433 |
| LLC interests | 72,985 | 31,378 |
| Rights & warrants | 50,732 | 6,477 |
| Corporate bonds | 144,712 | 2,546 |
| Options contracts | 718 | 83 |
| Total investments | $ 2,266,538 | $ 1,877,339 |

| | Proceeds | Fair Value |
|---|---:|---:|
| Securities sold, not yet purchased | $ (43,015) | $ (41,815) |

5.    **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Investment Funds have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

15

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Investment Funds use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Investment Funds use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Investment Funds develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2014, the Partnership and its consolidated entities' investments consisted primarily of common equity securities, asset-backed securities, limited partnership interests, life settlement contracts, floating rate syndicated bank loans, preferred equity, LLC interests, right and warrants, closed-end mutual funds, options contracts, and corporate bonds. In addition, the consolidated entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges, and management is required to use significant judgment to estimate their values.

**Equity Investments**
Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. The Consolidated Investment Funds also holds a number of private equity investments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Consolidated Investment Funds will fair value the assets using

16

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Consolidated Investment Funds determine comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publicly available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Consolidated Investment Funds to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

**Debt Securities**

The Consolidated Funds invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Consolidated Funds first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Consolidated Funds may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Asset-Backed Securities**

The Consolidated Funds invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Funds generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Funds evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Funds may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

HIGHLY CONFIDENTIAL

D-CNL000127

**Appx. 01150**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Private Equity Investments**

The Consolidated Funds hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Consolidated Funds will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Consolidated Investment Funds also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Life Settlement Contracts**

Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

HIGHLY CONFIDENTIAL

D-CNL000128

**Appx. 01151**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

At December 31, 2014, the Consolidated Investment Funds' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | 1 | $ 5,000 | $ 2,956 |
| 2-3 | 3 | 13,250 | 4,426 |
| 3-4 | 11 | 68,500 | 14,452 |
| 4-5 | 9 | 51,250 | 15,024 |
| Thereafter | 96 | 971,998 | 77,782 |
| Total | 120 | $ 1,109,998 | $ 114,640 |

**Limited Partnership Interests**

The Partnership and its Consolidated Funds hold limited partnership interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Investment Fund's investments and derivatives at December 31, 2014 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2014:

(in thousands)

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/14 |
|---|---|---|---|---|
| Common equity securities | $ 516,162 | $ 290,748 | $ 220,466 | $ 1,027,376 |
| Limited partnership interests | - | - | 205,900 | 205,900 |
| Asset-backed securities | - | 172,757 | 9,297 | 182,054 |
| Preferred equity | 95,170 | 19,370 | 6,960 | 121,500 |
| Floating rate syndicated bank loans | - | 5,102 | 111,850 | 116,952 |
| Life settlement contracts | - | - | 114,640 | 114,640 |
| Closed-end mutual funds | 68,433 | - | - | 68,433 |
| LLC interests | - | 8,827 | 22,551 | 31,378 |
| Rights & warrants | 515 | - | 5,962 | 6,477 |
| Corporate bonds | - | 2,469 | 77 | 2,546 |
| Options | 83 | - | - | 83 |
| **Total** | $ 680,363 | $ 499,273 | $ 697,703 | $ 1,877,339 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 41,815 | $ - | - | $ 41,815 |

19

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2014:

(in thousands)

| | Total Fair Value at December 31, 2013 | Purchases | Sales and Maturities | Transfers Into Level 3 | Transfers Out of Level 3 | Net Realized Losses | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2014 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 190,391 | $ 7,883 | $ (3,457) | $ 1,869 | $ (82) | $ (3,378) | $ 27,240 | $ 220,466 |
| Limited partnership interests | 169,797 | 1,609 | (779) | - | - | (116) | 35,389 | 205,900 |
| Life settlement contracts | 100,521 | 39,671 | (10,000) | - | - | 4,715 | (20,267) | 114,640 |
| Floating rate syndicated bank loans | 128,357 | 12,435 | (10,800) | - | - | (143,080) | 124,938 | 111,850 |
| LLC interests | 32,597 | 599 | (1,487) | 3,249 | - | 2,136 | (14,543) | 22,551 |
| Asset-backed securities | 19,903 | 6,462 | (14,815) | - | (1) | (1,839) | (413) | 9,297 |
| Preferred equity | 19,392 | - | (14,837) | - | (100) | 9,768 | (7,263) | 6,960 |
| Rights & warrants | 9,763 | - | (1,476) | - | - | 23 | (2,348) | 5,962 |
| Corporate bonds | 5,838 | 400 | - | 255 | (5,837) | - | (579) | 77 |
| | $ 676,559 | $ 69,059 | $ (57,651) | $ 5,373 | $ (6,020) | $ (131,771) | $ 142,154 | $ 697,703 |

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to changes in observable pricing inputs as compared to the prior year. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2014.

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $26.5 million of the net unrealized gains presented in the table above relate to investments held as of December 31, 2014.

Transfers out of Level 3 are recognized at the beginning of the period. The transfers out of Level 3 at December 31, 2014 were due to increases in market activity (e.g. frequency of trades) or the availability of a market clearing broker quote.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

HIGHLY CONFIDENTIAL

D-CNL000130

**Appx. 01153**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

(Ending balance in thousands)

| Category | Ending Balance at 12/31/2014 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Asset-backed securities | $ 9,297 | Third-party pricing vendor | N/A | N/A |
| | | Net Asset Value of Underlying Assets and Liabilities | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| | | Debt-yield | Credit Specific Risk | 5% |
| | | | Liquidity | 1% |
| Common equity securities | 220,466 | Multiples analysis | Multiple of EBITDA | 2.5x - 11.5x |
| | | | Multiple of Revenue | .45x - .55x |
| | | | Liquidity discount | 15% - 30% |
| | | | Credit Specific Discount | 30% |
| | | Third-party pricing vendor | N/A | N/A |
| | | DCF | Discount Rate | 11.5% - 19% |
| | | | Terminal Multiple | 3.0x - 9.0x |
| | | Black-Scholes Option Model | Holding Period | .58 Yrs |
| | | | Volatility | 30% |
| | | Liquidation | N/A | N/A |
| | | Previous Transaction | N/A | N/A |
| Floating rate syndicated bank loans | 111,850 | DCF | Discount rate | 11.5% - 19.0% |
| | | | Terminal Multiple | 3.0x - 9.0x |
| | | Liquidation | Settlement discount | 30% |
| | | Multiples analysis | Multiple of EBITDA | 2.5x - 11.5x |
| | | | Multiple of Revenue | .45x - .55x |
| | | Previous Transaction | N/A | N/A |
| | | Third-party pricing vendor | N/A | N/A |
| | | Appraisal | N/A | N/A |
| Limited partnership investments | 205,900 | Third-party appraisal | N/A | N/A |
| | | Net Asset Value of Underlying Assets and Liabilities | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Preferred equity | 6,960 | Recent Transaction | N/A | N/A |
| | | Black Scholes | Holding Period | .58 Yrs |
| | | | Volatility | 30% |
| | | Probability Weighted Scenarios | Scenario Probabilities | Equal Weights |
| Life Settlement Contracts | 114,640 | Net Asset Value of Underlying Assets | Discount rate | 18.0% -27.5% |
| LLC interests | 22,551 | DCF | Discount rate | 50% |
| | | | PW Profile of Reserve Categories | PW-8 - PW-30 |
| | | Net Asset Value of Underlying Assets and Liabilities | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| | | Appraisal | N/A | N/A |
| | | Third-party pricing vendor | N/A | N/A |
| Corporate bonds | 77 | Liquidation | Discount Rate | 50% |
| | | Adjusted Appraisal | Liquidity discount | 30% |
| Rights & Warrants | 5,962 | DCF | Discount Rate | 14% |
| | | Liquidation | Discount Rate | 14% |
| **Total** | $ 697,703 | | | |

HIGHLY CONFIDENTIAL

D-CNL000131

**Appx. 01154**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

6.   **Derivative Financial Instruments**

**Total Return Swaps**

A total return swap is a two-party contract under which the parties agree to exchange returns from a predetermined portfolio of investments.  The gross returns to be exchanged or swapped between the parties are calculated based on a notional amount, which is reviewed periodically to determine each party's obligation under the contract.

The Partnership entered into an agreement during 2012 in which it sold its rights to five quarters of variable net senior and subordinated fee receipts from certain collateralized loan obligations managed by the Partnership for fixed monthly payments from a counter-party. In doing so, the Partnership monetized rights to potential future payments for the certainty and predictability of a fixed schedule of receipts. On December 20, 2013 the counter-party exercised its option to purchase an additional four quarters of variable net senior and subordinated fee receipts. For the year ended December 31, 2014, the Partnership recorded a realized loss of $3.2 million.

7.   **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**

The Partnership and its Consolidated Investment Funds' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans.  The consolidated entities may also invest in derivative instruments, including total return and credit default swaps.  Investments in these derivative instruments throughout the year subject the consolidated entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**

Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Investment Funds due to a change in the market value of its investments or the value of the investments underlying swap agreements.  The Partnership and its Consolidated Investment Fund's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Investment Funds investments. Volatility or illiquidity could impair the Partnership and its Consolidated Investment Funds performance or result in losses. The Partnership and its Consolidated Investment Funds may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**

Credit risk is the potential loss the Partnership and its consolidated entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the consolidated entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties.  To limit the credit risk associated with such transactions, the consolidated entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Liquidity Risk**

The Consolidated Investment Fund's limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Investment Funds nor their manager expects such a market to develop.

**Business Risk**

The Partnership provides advisory services to the consolidated investment funds. The Consolidated Investment Funds could be materially affected by the liquidity, credit and other events of the Partnership.

**High Yield Bonds and Loans**

The Partnership and its Consolidated Investment Funds' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Investment Funds' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Investment Funds' purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Investment Funds have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Investment Funds may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Investment Funds invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

23

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Limited Diversification**

The Investment Manager attempts to diversify the Consolidated Investment Funds' investments. However, the Consolidated Investment Funds' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Investment Funds. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Investment Funds to losses that are disproportionate to market movements as a whole.

At December 31, 2014, the Consolidated Investment Funds' investments were predominantly concentrated in the United States.

**Custody Risk**

The clearing operations for the Partnership and its Consolidated Investment Funds are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Investment Funds' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Investment Funds may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Investment Funds' might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**

The Consolidated Investment Funds may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Investment Funds' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Investment Funds. If the value of the Consolidated Investment Funds' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Investment Funds are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Investment Funds' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Investment Funds to incur significant losses. In addition, to the extent the Consolidated Investment Funds have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Investment Funds' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Investment Funds. In addition, because the use of leverage allows the Consolidated Investment Funds to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Investment Funds may lose in the event of adverse price movements is high in relation to the amount of their investment.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

In the event of a sudden drop in the value of the Consolidated Investment Funds' assets, the Consolidated Investment Funds may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Investment Funds may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Investment Funds have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Investment Funds may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2014, the Consolidated Investment Funds' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that certain Consolidated Investment Funds' are able to realize on the sale of its investments will directly affect the amounts that the investors in the feeder funds are able to redeem in connection with the wind down process. These amounts may differ materially from the partners' capital balances as of December 31, 2014.

**Litigation Risk**
The Partnership and its Consolidated Investment Funds are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Investment Funds. Refer to Note 12 for a discussion of open litigation.

8.    **Related Party Transactions**

In the normal course of business, the Partnership and the Consolidated Investment Funds may conduct trades with affiliates. Such trades are transacted at fair value as determined, in good faith, using third party information where available. During the period ended December 31, 2014, the Partnership and the Consolidated Investment Funds purchased various securities for approximately $11.2 million from various affiliated entities and a non-discretionary, advised account.

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2014, approximately $3.2 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in Other Assets in the accompanying Consolidated Balance Sheet.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Accounts Held with Related Party**
During the year the Partnership and its subsidiaries maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2014, balances in the accounts were approximately $60.8 million, a portion of which exceeds Federal deposit insurance limits.

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2014, the Partnership and its subsidiaries held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| American Banknote Corporation | Common Equity | $ 9,856 |
| American Home Patient | Common Equity | 1,856 |
| American Home Patient | Term Loan | 13,172 |
| Blackwell BMC, LLC | Common Equity | 12,737 |
| Canopy Timberlands, L.P. | Limited Partnership Interest | 80,164 |
| Canopy Timberlands Spout Springs, L.P. | Limited Partnership Interest | 26,003 |
| Carey International, Inc | Term Loan | 26,169 |
| Carey Holdings, Inc. | Class A Common Stock | 235 |
| CCS Medical, Inc. | Loan | 5,055 |
| CCS Medical, Inc. | Common Equity | 18 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 97,407 |
| Euramax International Holdings B.V. | Common | 9,643 |
| Euramax International Holdings B.V. | Term Loan | 27,361 |
| Ginn LA Resorts Holdings, LLC | Term Loan | 410 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche A Credit-Linked Deposit | 142 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche B Term Loan | 354 |
| Highland Capital Healthcare Partners, L.P. | Limited Partnership Interest | 3,973 |
| Highland Long/Short Equity Fund | Mutual Fund | 268 |
| Highland Long/Short Healthcare Fund | Mutual Fund | 10,740 |
| Highland Park CDO 2006-1A | Asset backed debt | 1,394 |
| JHT Holdings Inc. | Term Loan | 19,879 |
| JHT Holdings Inc. | Revolving Term Loan | 3,174 |
| JHT Holdings Inc. | Common Stock | 6,372 |
| Las Vegas Land Holding | LLC Units | 48 |
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 302,784 |
| NexPoint Credit Strategies Fund | Closed-End Mutual Fund | 37,899 |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 2,183 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 200 |
| Terrestar | Common Equity | 59,585 |
| Trussway Industries, Inc. | Common Equity | 22,671 |
| Turtle Bay Holdings, LLC | Equity Units | 5,029 |

26

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2014, the Partnership and the Consolidated Investment Funds held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| ACIS 2013-2A | Asset backed debt | $ 30,150 |
| ACIS 2013-2A | Asset backed equity | 51,800 |
| ACIS 2014-5A | Asset backed debt | 57,805 |
| BB Highland Floating Rate Fund I | Floating rate equity | 4,914 |
| BB Votorantim Highland Infrastructure LLC | Common equity | 1,539 |
| Gleneagles CLO, Ltd. | Asset backed equity | 4,800 |
| Greenbriar CLO, Ltd. | Asset backed equity | 18,238 |
| Highland Capital Healthcare Fund | Limited Partnership interest | 2,974 |
| Highland Energy MLP Fund | Mutual fund shares | 2,796 |
| Highland Floating Rate Opportunities Fund | Mutual fund shares | 708 |
| Highland Global Allocation Fund | Closed-end mutual fund shares | 2,165 |
| Highland Opportunistic Credit Fund | Mutual fund shares | 5,187 |
| Highland Park CDO, Ltd. | Asset backed debt tranche | 33 |
| Highland Multi Strategy Fund | Limited Partnership interest | 23,715 |
| Highland Long/Short Equity Fund | Mutual fund shares | 268 |
| Highland Long/Short Healthcare Fund | Mutual fund shares | 10,740 |
| NexPoint Credit Strategies Fund | Closed-end mutual fund shares | 15,269 |
| Rockwall CDO, Ltd. | Asset backed debt | 2,340 |
| Southfork CLO, Ltd. | Asset backed equity | 4,455 |
| Valhalla CLO, Ltd. | Asset backed debt | 1,760 |

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.8 million. At December 31, 2014, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $105.0 million and $85.9 million, respectively.

**Affiliated Transactions**

Effective February 26, 2014, the Partnership issued a promissory note to HCMFA in the amount of $4.0 million. The note accrues interest at a rate of 1.97%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2014 total interest and principal due on the promissory note was approximately $4.1 million.

Effective August 27, 2014, the Partnership issued a promissory note to HCMFA in the amount of $2.1 million. The note accrues interest at a rate of 3.09%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2014 total interest and principal due on the promissory note was approximately $2.1 million.

27

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

During the year ended December 31, 2014, the Partnership issued promissory notes to NexPoint in the aggregate amount of $12.7 million. The notes accrue interest at a rate of 6.0%. As of December 31, 2014 total interest and principal due on the promissory notes was approximately $13.0 million.

During the year ended December 31, 2014, the Partnership issued promissory notes to HCRE Partners, LLC, ("HCRE") in the aggregate amount of $10.0 million. The notes accrue interest at a rate of 9.0%. As of December 31, 2014 total interest and principal due on the promissory notes was approximately $9.8 million.

During the year ended December 31, 2014, The Partnership issued promissory notes to Highland Capital Management Services, Inc. ("HCMSI") in the aggregate amount of $8.5 million. The notes accrue interest at an average rate of 3.12%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2014 total interest and principal due on the promissory notes was approximately $8.6 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York, corporation, ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2014, total marketing fee expense charged to the Partnership by Highland New York was approximately $4.0 million and as of December 31, 2014, amounts owed to Highland New York for services rendered was approximately $2.5 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of Highland Capital Management Fund Advisors, L.P. ("HCMFA"), a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to HCMFA was approximately $2.0 million and as of December 31, 2014, amounts owed to the Partnership by HCMFA for services rendered were approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to Falcon was approximately $0.6 million and as of December 31, 2014, amounts owed to the Partnership by Falcon for services rendered were approximately $0.4 million.

Effective January 1, 2011, the Partnership commenced performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to Acis was approximately $3.8 million and as of December 31, 2014, no amounts were owed to the Partnership by Acis for services rendered.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

Effective January 1, 2013, the Partnership commenced performing services on behalf of NexPoint Advisors, L.P. ("NexPoint"), a Delaware limited partnership. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to NexPoint was approximately $1.4 million and as of December 31, 2014, amounts owed to the Partnership by NexPoint for services rendered were approximately $0.8 million.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to NexBank Capital was approximately $0.4 million and as of December 31, 2014, amounts owed to the Partnership by NexBank Capital for services rendered were approximately $0.1 million.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2014, the total fee charged by the Partnership to NexBank was approximately $0.7 million and as of December 31, 2014, no amounts were owed to the Partnership by NexBank for services rendered.

9.    **Debt and Notes Payable**

**Promissory Note**
On December 31, 2014, the Partnership entered in to a promissory note (the "Promissory Note") with an investor in the amount of $18.6 million, in exchange for 100% of its LP interest in Highland Multi Strategy Credit Fund, L.P. The Partnership must pay one-third of the initial note amount, plus accumulated interest on each of the first three anniversaries of the note. The Promissory Note will mature on December 31, 2017. The Promissory Note accrues interest at a rate of 3% per annum.

**Select Master Securities Loan Agreement**
On October 14, 2014, Highland Select Equity Master Fund, L.P. received a master securities loan agreement (the "Securities Agreement") from The Dugaboy Investment Trust ("Dugaboy") in the amount of $23.0 million for securities borrowed. The Securities Agreement accrues a Loan Fee at a rate of 0.38%, the short term Applicable Federal Rate. The fair value of the loan will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreement.

10.    **Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

29

D-CNL000139

**Appx. 01162**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Legal Proceedings**

The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, consolidated statement of income, or its liquidity. See Note 13.

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

**Years Ending December 31,**

| | |
|---|---:|
| 2015 | 1,477 |
| 2016 | 1,506 |
| 2017 | 1,521 |
| 2018 | 1,521 |
| 2019 | 1,550 |
| Thereafter | 3,655 |
| Total | $ 11,230 |

Total rental expense of the Partnership and its consolidated entities for operating leases was approximately $1.4 million for the year ended December 31, 2014.

**11. Postretirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2011 expense reflects a service cost charge for the value of the new participant's benefit earned during 2011.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2014 are reconciled in the tables below.

*(in thousands)*

| Change in projected benefit obligation | | 2014 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,339 |
| Service cost | | 5 |
| Interest cost | | 108 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 59 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (261) |
| Benefit obligation at end of year | $ | 2,250 |

| Change in plan assets | | 2014 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,635 |
| Actual return on plan assets | | 72 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (261) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 2,446 |

| Reconciliation of Funded Status | | 2014 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,250 |
| Projected benefit obligation at end of year | | 2,250 |
| Fair value of assets at end of year | | 2,446 |
| Funded status at end of year | $ | 196 |

The Partnership does not expect to contribute to the plan during 2014.

HIGHLY CONFIDENTIAL

D-CNL000141

Appx. 01164

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2014:

| | |
|---|---|
| Discount rate | 3.70% |
| Rate of compensation increase | N/A |

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2014:

| | |
|---|---|
| Discount rate | 4.90% |
| Expected long-term return on plan assets | 4.90% |
| Rate of compensation increase | N/A |

As of December 31, 2014, there were no plan assets categorized as Level 3.

**12.    Income Taxes**

**The Partnership**

For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2014, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2014.

**Crusader Master**

Crusader Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Crusader Master. Crusader Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Crusader Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Crusader Master's net taxable income.

HIGHLY CONFIDENTIAL

D-CNL000142

**Appx. 01165**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

Since Crusader Master trades investments for its own account, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The General Partner intends to conduct Crusader Master's business in such a way that it does not constitute a U.S. trade or business or create a taxable presence in any of the jurisdictions in which the Investment Manager has offices, including the United Kingdom.

Dividends as well as certain interest and other income received by Crusader Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Crusader Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2014, a withholding tax liability of $0.2 million is included in the accrued expenses in the Consolidated Balance Sheet.

It is management's responsibility to determine whether a tax position of Crusader Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. In accordance with this authoritative guidance, management has established a reserve for federal income tax of approximately $7.8 million for uncertain tax positions. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2014.

Crusader Master files tax returns as prescribed the tax laws of the jurisdictions in which it operates. In the normal course of business, Crusader Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2014, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

**Multi Strategy Credit Master**
For U.S. income tax purposes, Multi Strategy Credit Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Credit Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Credit Master's business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices, including the United Kingdom.

Dividends as well as certain interest and other income received by Multi Strategy Credit Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Credit Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2014, a withholding tax liability of $1.0 million is classified within accrued expenses and withholding tax payable on the Consolidated Balance Sheet.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

Multi Strategy Credit Master applies authoritative guidance which requires management to determine whether a tax position of Multi Strategy Credit Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As of December 31, 2014, a liability to account for uncertain tax positions of $0.1 million is classified within accrued expenses within the Consolidated Balance Sheet. Management does not expect a significant change in uncertain positions during the twelve months subsequent to December 31, 2014.

Multi Strategy Credit Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Credit Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2014, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

**Credit Strategies Master**

Credit Strategies Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Credit Strategies Master. Credit Strategies Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 28, 2016.

For U.S. income tax purposes, Credit Strategies Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Credit Strategies Master's net taxable income.

It is management's responsibility to determine whether a tax position of Credit Strategies Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2014.

Dividends as well as certain interest and other income received by Credit Strategies Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Credit Strategies Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2014, a withholding tax liability of $0.7 million is included in tax payable in the Consolidated Balance Sheet. Deferred tax liabilities may result from temporary differences related to the unrealized appreciation on Credit Strategies Master's investments that will become taxable income in future years. Deferred tax liabilities will become payable upon realization of the gains when the investments are sold, and are measured using the applicable enacted tax rate and provisions of the enacted tax law.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

The Credit Strategies Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Strategies Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2014, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

A wholly owned corporation at Credit Strategies Master may be subject to Federal U.S. Income Tax based on the nature of income, expense, and capital gains/losses. As of December 31, 2014, the wholly owned corporation has a tax refund receivable of $1.7 million included in other assets in the Consolidated Balance Sheet.

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2014. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2014, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

35

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2014. As of December 31, 2014, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2011 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

13. **Legal Proceedings**

On July 15, 2008, Crusader Master, Highland Offshore Partners, CDO Master Fund, Multi Strategy Credit Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida ('the Tousa action"). The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. The US Supreme Court case was heard on January 14, 2015, and the Parties are waiting the decision. Based on the ruling, Crusader Master and Highland Offshore Partners recorded a combined reserve of approximately $12.3 million as of December 31, 2014, which represents its ratable share of the judgment.

On July 8, 2009, one investor filed suit against Highland Credit Strategies Fund, LP, the Partnership, and other affiliated entities (collectively, the "Defendants"). The lawsuit alleges that the Defendants misrepresented the amount of redemptions in Credit Strategies Master. The Defendants intend to vigorously defend against the lawsuit. Accordingly, Highland Credit Strategies Fund, LP has recorded a reserve of approximately $11.3 million, which is recorded in the Consolidated Balance Sheet.

HIGHLY CONFIDENTIAL

D-CNL000146

**Appx. 01169**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

On January 31, 2011, one investor filed suit against Highland Credit Strategies Fund, LP, the Partnership, and other affiliated entities (collectively, the "Defendants"). The lawsuit alleges that the Defendants made misrepresentations and omissions relating to the level of the amount of redemptions in Credit Strategies Master. Effective March 28, 2014, Credit Strategies settled the on-going litigation for $1.5 million. Cash was paid on April 11, 2014 and an Agreed Order of Dismissal was filed seven days later dismissing all claims asserted or that could have been asserted in the lawsuit against the Fund. The settlement resulted in a gain of $1.0 million for the year ended December 31, 2014, and is recognized as a reduction to legal expense on the Consolidated financial statements.

In April 2007, CDO Master Fund entered into a risk sharing agreement with UBS Securities LLC and UBS AG, London Branch (collectively, "UBS" or "UBS Plaintiffs") structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Special Opportunities Holding Company ("SOHC"). The warehouse was financed by UBS and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, UBS agreed to extend it for one year on March 15, 2008. Due to liquidity constraints, CDO Master Fund was unable to meet a November margin call, and UBS elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by UBS and sold on the open market through bids-wanted-in competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, UBS notified CDO Master Fund that its pro-rata share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount.

On February 24, 2009, the UBS Plaintiffs filed a lawsuit against CDO Master Fund, SOHC and the Partnership in the New York State Supreme Court of Manhattan alleging that they suffered losses in excess of $745 million due to the depreciation in value of the warehouse collateral. On February 19, 2010, the First Appellate Division sided with the Partnership and dismissed UBS' claims against the Partnership. Thereafter on June 22, 2010, the UBS Plaintiffs filed an amended complaint with the Court against the Partnership alleging $687 million in damages. On March 13, 2012, the First Appellate Division dismissed two of the four claims against the Partnership, and severely limited the scope of the two remaining claims.

In the June 22, 2010 amended complaint, the UBS Plaintiffs also asserted claims against Highland Credit Strategies Fund, LP, Highland Multi Strategy Credit Fund, LP, Crusader Master, and certain of their affiliates (collectively, the "Additional Fund Defendants"). The UBS Plaintiffs seek to unwind alleged fraudulent transfers involving the Additional Fund Defendants. Although the UBS Plaintiffs have not pled a specific damages amount against the Additional Fund Defendants, any eventual damages award would be subject to pre-judgment interest of 9% (accrued as of December 3, 2008) as well as post-judgment interest of 9% (accrued as of the date a judgment, if any, is entered against the Additional Fund Defendants). Each of the Additional Fund Defendants filed a separate motion to dismiss, each of which was denied. In addition, the Additional Fund Defendants filed a motion for summary judgment, which was heard by the Court on February 14, 2014. On March 11, 2014, the First Appellate Division heard each of the Additional Fund Defendants' respective appeals of the Court's denials of their respective motions to dismiss.

Discovery is completed, but the matter is stayed pending the outcome of the interlocutory appeals. A trial date has not yet been set. Though the Defendants continue to vigorously defend against the UBS Plaintiffs' claims, at this time, the General Partners are unable to provide a reasonably probable estimate of the expected outcome.

HIGHLY CONFIDENTIAL

D-CNL000147

**Appx. 01170**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

On July 16, 2013, Credit Suisse Securities (USA), LLC ("Credit Suisse") filed suit against the Highland Credit Strategies Fund, LP, Highland Multi Strategy Credit Fund, LP, and other affiliates (the "Credit Suisse Defendants"). Credit Suisse's claims relate to several outstanding trades of debt tranches of Goldfield Ranch Reality Holdings, LLC and Westgate Investments, LLC. On May 5, 2014, Credit Suisse moved for summary judgment on both the principal amount and statutory pre-judgment interest. The Court granted the motion on August 6, 2014, and issued judgment on September 11, 2014 in the amount of $25.5 million in principal, plus $13.5 million in interest, for a total of $39.0 million. The Funds have previously reserved for the principal amount, and now has reserved for the interest amount. Interest continues to accrue based on the New York statutory rate. As of December 31, 2014, an additional $1.2 million in interest has been accrued, for a total of $14.7 million. The full amount of interest and principal is recognized on the consolidated financial statements. The Funds will appeal the application of a statutory pre-judgment interest rate as opposed to the contract rate of interest.

In April 2012, the Partnership filed suit against a former employee for breach of contract, defamation and theft of trade secrets. The former employee filed a counterclaim with numerous, unrelated allegations. The partnership refuted each allegation in detail. The former employee seeks unspecified damages against the Partnership and certain affiliates. On February 6, 2014, the jury found the former employee breached his fiduciary duty to the Partnership. The jury found that neither the Partnership nor any of its employees had breached any duty, and awarded $2.8 million to the Partnership. The jury also found that the Partnership's consolidated entity Highland Employee Retention Assets, LLC ("HERA") owed $2.6 million related to an employee retention plan. The court entered judgment on the verdict on July 11, 2014. The former employee has filed his appeal against the Partnership and HERA has filed its appeal against the judgment amount.

14. **Fund Wind Down**

On February 4, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent and that it was in the best interest of the fund to liquidate the fund's remaining assets. The proceeds from the asset liquidations will be distributed to the remaining financing counterparties and other senior and trade creditors as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

During 2008, Crusader Master and Credit Strategies Master were negatively affected by deteriorating conditions in the overall economy and credit markets. These conditions became more severe during the third and fourth quarters of 2008 and generated significant losses on various derivative transactions and repurchase agreements to which Crusader Master and Credit Strategies Master were parties. In addition, certain assets that Crusader Master and Credit Strategies Master purchased on margin through prime brokerage agreements experienced a significant decline in value. In certain cases, Crusader Master and Credit Strategies Master were unable to post the collateral required to secure these losses, and the counterparties provided notice of their intent to terminate the agreements. As a result, access to the credit that Crusader Master and Credit Strategies Master used to manage its investing and financing activities became highly constrained, and in some cases unavailable. In light of these circumstances, the General Partners (the general partner of Highland Crusader Fund, L.P. and the general partner of Highland Credit Strategies Fund, L.P.) and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. concluded, in consultation with the Investment Manager, that it would be in the best interests of their investors to wind down the investment portfolios of Credit Strategies Master and Crusader Master. On October 15, 2008, the Investment Manager notified investors that it would begin the wind-down process. The Investment Manager also restricted subscriptions and the payment of withdrawals to its feeder funds effective the same date.

In connection with the wind down, the limited partner interests of the Feeder Funds of Credit Strategies and Crusader were compulsorily withdrawn/redeemed on October 15, 2008 and November 15, 2008, respectively, in accordance with the terms of the governing documents.

**Crusader Master**

On July 15, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement (the "Scheme") that facilitates the winding-down of the investments of Crusader Master and the distribution of its assets. A substantial majority of the investors in its feeder funds consented to the plan of distribution as outlined in the Scheme. The Scheme became effective as of August 1, 2011 (the "Effective Date").

The Scheme establishes two classes of claims; those feeder fund investors who had timely submitted withdrawal/redemption requests for withdrawal/redemption dates that fell on or before June 30, 2008 and who had not received full payment ("Prior Redeemers"), and those feeder fund investors that had not timely submitted such withdrawal/redemption requests for redemption/withdrawal dates that fell on or before June 30, 2008 ("Compulsory Redeemers") (together "Redeemers"). The basis for ratable distribution amongst both classes of Redeemers was the November 15, 2008 balances of said Redeemers ("Redemption Amount"), adjusted to add back any redemption penalties assessed against Prior Redeemers during 2008. A realization schedule for distributions is set forth in Appendix A of the Scheme (the "Realization Schedule"). The terms of the Scheme are outlined as follows:

1.  Prior Redeemers shall be entitled to 60% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Prior Redeemers' Distribution"). Each Prior Redeemer shall be entitled to their pro rata share of the Crusader Fund Prior Redeemers' Distribution based on the Prior Redeemer's Redemption Amount relative to the total of all Prior Redeemers' Redemption Amounts (inclusive of all feeders).

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

2. Compulsory Redeemers shall be entitled to 40% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Compulsory Redeemers' Distribution"). With the exception of the non-consenting Compulsory Redeemers discussed below, each Compulsory Redeemer shall be entitled to their pro rata share of the Crusader Fund Compulsory Redeemers' Distribution based on the Compulsory Redeemer's Redemption Amount relative to the total of all Compulsory Redeemers' Redemption Amounts (inclusive of all feeders).

In the event the Investment Manager fails to make distributions in accordance with the Realization Schedule for two consecutive quarters without receiving a waiver from the committee of Redeemers appointed to help oversee the Scheme (the "Redeemer Committee"), the Investment Manager can be removed for cause as the Investment Manager of the Master Partnership by the Redeemer Committee.

**Crusader Redeemer Trust Account**
Effective July 15, 2011, a trust account was set-up and funded for the benefit of Compulsory Redeemers who had consented to the Scheme and Prior Redeemers (the "Redeemer Trust Account"). The portion of amounts in excess of the Redemption Amounts otherwise attributable to non-consenting Compulsory Redeemers was contributed to the Redeemer Trust Account and not distributed to non-consenting Compulsory Redeemers. Amounts in the Redeemer Trust Account are reserved and used to pay all costs of Crusader Master to defend, respond to, settle and satisfy any claims by Redeemers other than for their Scheme claim.

The non-consenting Compulsory Redeemers do not receive any allocation of profit and loss; the portion of profit and loss that would otherwise be allocated to their accounts is instead allocated to the Redeemer Trust Account. The Redeemer Trust Account is accounted for as a component of equity in the Crusader Onshore Feeder Fund. Within the earlier of 30 days after all redeemer claims have been resolved or dismissed with prejudice or the sixth anniversary of the effective date, any amounts remaining in the Redeemer Trust Account shall be distributed 100% to consenting Compulsory Redeemers pro rata based on their relative Redemption Amounts.

**Crusader Deferred Fee Account**
In accordance with the Scheme, the "Deferred Fee Account" was established on the Effective Date by allocating the right for owners of existing deferred fees to potentially receive payment in respect of deferred fees equal to $10 million.

In the event that Crusader Master makes aggregate distributions of at least $1.7 billion prior to the forty-third month following the effective date, the Partnership shall be entitled to receive payment in respect of the Deferred Fee Account.

In the event that the Master Partnership does not make aggregate distributions of at least $1.7 billion prior to the forty-third month following the effective date, then the Partnership will cause the Feeder Funds to distribute the right to receive payment 100% to consenting Compulsory Redeemers (pro rata based on their relative Redemption Amounts). The Deferred Fee Account will continue to be allocated its pro rata portion of profit and loss.

**Crusader Wind Down Progress**
Crusader Master distributed approximately $205.3 million to the Feeder Funds in accordance with the Scheme for the year ended December 31, 2014. Since the Scheme's effective date, approximately $1,351.2 million has either been distributed to the Feeder Funds for purposes of disbursement, or withheld and specially allocated for tax payments.

40

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

As of December 31, 2014, the estimated value of the partners' capital of Crusader Master was approximately $457.3 million. The actual amounts that will be distributed upon completion of the wind down process are inherently uncertain and may differ materially from the partners' capital as of December 31, 2014. Capital will be distributed as it becomes available in accordance with the Scheme.

**Credit Strategies Master**

To facilitate the winding-down of the investments in Credit Strategies Master, a Plan of Distribution (the "Plan") was also adopted by Credit Strategies Master and its feeder funds and was consented to by a substantial majority of the investors in its feeder funds. On April 14, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement (the "Scheme") that incorporates the terms of the Plan so as to be binding upon Highland Credit Strategies Fund, Ltd. and its investors. The Scheme became effective on May 1, 2011. The Plan established two classes of claims; those investors of the Feeder Funds whose withdrawals/redemptions became effective on or before September 30, 2008 and who have not received full payment of their redemption amount ("Prior Redeemers") and those investors of the feeder funds who were compulsorily withdrawn/redeemed on October 15, 2008 ("Compulsory Redeemers").

As investments in Credit Strategies Master are realized, distributions will be made in the following order, which summarizes the terms outlined in the Plan:

1. Payments for fund expenses
2. The first $30 million available for distribution ratably to Prior Redeemers
3. The next approximately $5.3 million available for distribution ratably to consenting Compulsory Redeemers and a trust account established for the benefit of non-consenting Compulsory Redeemers ("Redeemer Trust Account")
4. All remaining funds will be distributed as follows:
   a. 85% ratably to Prior Redeemers
   b. 15% to consenting Compulsory Redeemers and the Redeemer Trust Account

This method of distribution results in a shift of capital from the Prior Redeemers to the consenting Compulsory Redeemers and the Redeemer Trust Account. It also created a shift of capital from its offshore feeder to its onshore feeder, since there was a greater proportion of Compulsory Redeemers to Prior Redeemers in the onshore feeder than in the offshore feeder.

**Credit Strategies Redeemer Trust Account**

The Redeemer Trust Account is used to pay for litigation costs involving the non-consenting Compulsory Redeemers. The Plan outlines which expenses related to litigation ("Covered Claims") will be paid using funds from the Redeemer Trust Account, and any litigation will continue to be assessed under an ASC 450 (Contingencies) model. Any remaining funds in the Redeemer Trust Account that are not used for expenses related to Covered Claims by the "Trust Account Final Distribution Date" (defined as 30 days after all Covered Claims have been resolved, or the sixth anniversary of the effective date, whichever is earlier) will be distributed to consenting Compulsory Redeemers.

The Redeemer Trust Account is treated as a component of equity. It is allocated its share of profit and loss and existing capital as outlined above, and any expenses related to Covered Claims will decrease the account in the period in which the expenses are incurred.

41

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2014**

**Credit Strategies Contribution Trust Account**

In accordance with the Plan and in exchange for certain releases, a trust account (the "Contribution Trust Account") was established and initially funded on the effective date with $3.0 million contributed by the Partnership. The Partnership also paid an additional $6.0 million on April 25, 2014, approximately the third anniversary of the effective date of the Plan. This $6.0 million was recognized as a subscription into Credit Strategies Master during the year ended December 31, 2014.

The Contribution Trust Account will be used to pay for expenses related to Covered Claims to the extent that the Redeemer Trust Account is insufficient to pay such expenses. Within 30 days after all Covered Claims have been resolved or dismissed with prejudice, or the sixth anniversary of the effective date, provided that no suits asserting Covered Claims are then pending, whichever is earlier, any remaining balance in the Contribution Trust Account will be distributed 85% to consenting Compulsory Redeemers and 15% to consenting Prior Redeemers.

Similar to the Redeemer Trust Account, the Contribution Trust Account is treated as a separate component of equity. Additionally, the initial payment of the $3.0 million was treated as a contribution to the Master Partnership. However, the Contribution Trust Account does not receive an allocation of profit and loss. The only changes to the account will occur when contributions are made or expenses related to Covered Claims are paid.

15. **Subsequent Events.**

On January 26, 2015, the Partnership issued a promissory note to HCRE in the amount of $1.5 million. The note accrues interest at a rate of 9.0%.

On January 29, 2015, the Partnership issued a promissory note to NexPoint in the amount of $3.1 million. The note accrues interest at a rate of 6.0%.

The Partnership has performed an evaluation of subsequent events through May 21, 2015, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

**Supplemental Information**

HIGHLY CONFIDENTIAL    D-CNL000153

**Appx. 01176**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2014**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 1,813 | $ 64,220 | $ - | $ 66,033 |
| Restricted cash | 2,621 | 135,234 | - | 137,855 |
| Investments at fair value | 185,260 | 1,692,079 | - | 1,877,339 |
| Equity method investees | 338,778 | - | (338,778) | - |
| Management and incentive fees receivable | 8,662 | - | (92) | 8,570 |
| Due from brokers | - | 32,536 | - | 32,536 |
| Other assets | 55,435 | 10,459 | (1,451) | 64,443 |
| Deferred incentive fees receivable | 32,592 | - | - | 32,592 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $5,768 | 8,067 | - | - | 8,067 |
| **Total assets** | $ 633,228 | $ 1,934,528 | $ (340,321) | $ 2,227,435 |
| **Liabilities and partners' capital** | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 5,144 | $ 23 | $ - | $ 5,167 |
| Securities sold, not yet purchased (proceeds $43,015) | - | 41,815 | - | 41,815 |
| Withdrawals payable | - | 82,833 | - | 82,833 |
| Due to brokers | 47,215 | 692,925 | (657) | 739,483 |
| Due to brokers for securities purchased, not yet settled | - | 67,541 | - | 67,541 |
| Accrued and other liabilities | 35,108 | 66,316 | (886) | 100,538 |
| Debt and notes payable | 18,648 | 22,991 | - | 41,639 |
| **Total liabilities** | 106,115 | 974,444 | (1,543) | 1,079,016 |
| Non-controlling interest | - | 621,306 | - | 621,306 |
| Commitments (Note 10) | | | | |
| **Partners' capital** | 527,113 | 338,778 | (338,778) | 527,113 |
| **Total liabilities and partners' capital** | $ 633,228 | $ 1,934,528 | $ (340,321) | $ 2,227,435 |

44

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Statement of Income**
**Year Ended December 31, 2014**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---:|---:|---:|---:|
| **Revenue:** | | | | |
| Management fees | $ 67,570 | $ - | $ - | $ 67,570 |
| Interest and investment income | 1,847 | 55,604 | - | 57,451 |
| Other income | 9,180 | 1,310 | | 10,490 |
| Total revenue | 78,597 | 56,914 | - | 135,511 |
| **Expenses:** | | | | |
| Compensation and benefits | 37,027 | 666 | - | 37,693 |
| Professional fees | 7,192 | 16,743 | - | 23,935 |
| Marketing and advertising expense | 6,140 | - | - | 6,140 |
| Investment and research consulting | 507 | - | - | 507 |
| Depreciation and amortization | 1,358 | - | - | 1,358 |
| Tax expense | - | 1,892 | - | 1,892 |
| Bad debt expense | 3,303 | - | (3,303) | - |
| Other operating expenses | 7,229 | 6,733 | 3,303 | 17,265 |
| Total expenses | 62,756 | 26,034 | - | 88,790 |
| Other expense | 1,655 | - | - | 1,655 |
| Income before investment and derivative activities | 17,496 | 30,880 | - | 48,376 |
| **Realized and unrealized gain from investment and derivative transactions:** | | | | |
| Net realized loss on investment and derivative transactions | (2,441) | (169,561) | - | (172,002) |
| Net change in unrealized gain on investment and derivative transactions | 41,961 | 218,390 | - | 260,351 |
| Total realized and unrealized gain from investment and derivative transactions | 39,520 | 48,829 | - | 88,349 |
| Net unrealized earnings from equity method investees | 88,313 | - | (88,313) | - |
| Net income | 145,329 | 79,709 | (88,313) | 136,725 |
| Net loss attributable to the non-controlling interest | - | 8,604 | - | 8,604 |
| Net income attributable to Highland Capital Management, L.P. | $ 145,329 | $ 88,313 | $ (88,313) | $ 145,329 |

45

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
(A Delaware Limited Partnership)
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2014**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 1,813 |
| Restricted cash | | 2,621 |
| Investments at fair value (cost $173,856)* | | 286,010 |
| Equity method investees | | 238,028 |
| Management and incentive fees receivable | | 8,662 |
| Other assets | | 55,435 |
| Deferred incentive fees receivable | | 32,592 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $5,768 | | 8,067 |
| **Total assets** | $ | 633,228 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 5,144 |
| Due to brokers | | 47,215 |
| Accrued and other liabilities | | 35,108 |
| Notes payable | | 18,648 |
| Total liabilities | | 106,115 |
| Partners' capital | | 527,113 |
| **Total liabilities and partners' capital** | $ | 633,228 |

*Investments, at fair value includes $100.8 million of limited partnership interest ownership of Consolidated Non-Variable Interest Entities, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2014 consolidated financial Statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

HIGHLY CONFIDENTIAL

D-CNL000156

**Appx. 01179**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2014**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 67,570 |
| Interest and investment income | | 1,847 |
| Shared services fees and miscellaneous income | | 9,180 |
| Total revenue | | 78,597 |
| **Operating expenses:** | | |
| Compensation and benefits | | 37,027 |
| Professional fees | | 7,192 |
| Marketing and advertising expense | | 6,140 |
| Investment and research consulting | | 507 |
| Depreciation and amortization | | 1,358 |
| Bad debt expense | | 3,303 |
| Other operating expenses | | 7,229 |
| Total operating expenses | | 62,756 |
| Other income | | 1,655 |
| Income before investment activities | | 17,496 |
| **Realized and unrealized gains/losses from investments:** | | |
| Net realized loss on sale of investments | | (2,441) |
| Net change in unrealized gain on investments* | | 46,709 |
| Total realized and unrealized gain from investments | | 44,268 |
| Earnings from equity method investees: | | 83,565 |
| **Net income** | $ | 145,329 |

*Net change in unrealized gain on investments includes $4.8 million of unrealized gains from holdings of limited partnership interests of Consolidated Non-Variable Interest entities, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2014 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited financial statements.

47

HIGHLY CONFIDENTIAL

**EXHIBIT 70**

Appx. 01181

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2015**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2015**

Page(s)

**Independent Auditor's Report** ...........................................................................................................1

**Audited Consolidated Financial Statements**

Consolidated Balance Sheet....................................................................................................................2

Consolidated Statement of Income.........................................................................................................3

Consolidated Statement of Changes in Partners' Capital........................................................................4

Consolidated Statement of Cash Flows...................................................................................................5

Consolidated Notes to Financial Statements .....................................................................................6-47

Supplemental Information…………………………………………………………………………...48-52



**Independent Auditor's Report**

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2015, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

***Management's Responsibility for the Consolidated Financial Statements***

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

***Auditor's Responsibility***

Our responsibility is to express an opinion on the consolidated financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error.  In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.  We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

***Opinion***

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31, 2015, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

***Other Matter***

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements.  The information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 19, 2016

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201*
*T: (214) 999-1400, F: (214) 754-7991, www.pwc.com/us*

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Balance Sheet**
**December 31, 2015**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 45,580 |
| Restricted cash | | 74,935 |
| Investments at fair value (cost $2,166,029) | | 1,562,553 |
| Management and incentive fees receivable | | 7,542 |
| Due from broker for securities sold, not yet settled | | 8,607 |
| Other assets | | 16,363 |
| Deferred incentive fees receivable | | 31,214 |
| Due from affiliates | | 63,031 |
| Note receivable | | 63,000 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $7,683 | | 47,710 |
| **Total assets** | $ | 1,920,535 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,667 |
| Securities sold, not yet purchased (proceeds $195,298) | | 198,605 |
| Withdrawals payable | | 78,733 |
| Due to brokers | | 485,246 |
| Due to brokers for securities purchased, not yet settled | | 55,934 |
| Accrued and other liabilities | | 89,681 |
| Debt and notes payable | | 104,659 |
| **Total liabilities** | | 1,017,525 |
| Non-controlling interest | | 517,353 |
| Commitments | | |
| **Partners' capital** | | 385,657 |
| **Total liabilities and partners' capital** | $ | 1,920,535 |

The accompanying notes are an integral part of these consolidated statements.

2

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**Consolidated Statement of Income**
**Year Ended December 31, 2015**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 54,644 |
| Interest and investment income | | 56,113 |
| Other income | | 17,626 |
| Total revenue | | 128,383 |
| | | |
| **Expenses:** | | |
| Legal settlement | | 55,000 |
| Compensation and benefits | | 36,936 |
| Professional fees | | 35,779 |
| Marketing and advertising expense | | 7,452 |
| Investment and research consulting | | 967 |
| Depreciation and amortization | | 2,744 |
| Tax expense | | 875 |
| Other operating expenses | | 23,254 |
| Total expenses | | 163,007 |
| | | |
| Other income | | 4,869 |
| | | |
| Loss before investment and derivative activities | | (29,755) |
| | | |
| **Realized and unrealized loss from investment and derivative transactions:** | | |
| Net realized loss on investment and derivative transactions | | (52,005) |
| Net change in unrealized loss on investment and derivative transactions | | (199,485) |
| Total realized and unrealized loss from investment and derivative transactions | | (251,490) |
| | | |
| Net loss | | (281,245) |
| | | |
| Net loss attributable to the non-controlling interest | | 104,780 |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (176,465) |

The accompanying notes are an integral part of these consolidated statements.

3

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2015**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2014 | $ - | $ 527,113 | $ 527,113 |
| Net loss attributable to Highland Capital Management, L.P. | - | (176,465) | (176,465) |
| Partner contributions | - | 70,000 | 70,000 |
| Partner distributions | - | (34,991) | (34,991) |
| Partners' capital, December 31, 2015 | $ - | $ 385,657 | $ 385,657 |

The accompanying notes are an integral part of these consolidated statements.

HIGHLY CONFIDENTIAL

D-CNL000163

**Appx. 01187**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2015**

*(in thousands)*

| | | |
|---|---|--:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (281,245) |
| Adjustment to reconcile net loss to net cash | | |
| used in operating activities: | | |
| Net realized loss on investments and derivative transactions | | 52,005 |
| Net change in unrealized loss on investments and derivative transactions | | 199,485 |
| Amortization and depreciation | | 2,744 |
| **Changes in assets and liabilities:** | | |
| Restricted cash | | 62,920 |
| Management and incentive fee receivable | | 1,028 |
| Deferred incentive fees | | 1,378 |
| Other assets | | 3,515 |
| Accounts payable | | (499) |
| Accrued and other liabilties | | (10,975) |
| Due from brokers | | 33,145 |
| Due from affiliate | | 7,037 |
| Due to brokers for securities purchased, not yet settled | | (13,057) |
| Due to brokers | | (254,237) |
| Net cash used in operating activities | | (196,756) |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (42,387) |
| Purchases of investments | | (281,350) |
| Proceeds from dispositions of investments | | 353,688 |
| Proceeds from securities sold, not yet purchased | | 260,033 |
| Issuance of notes receivable to affiliates | | (25,500) |
| Purchases of investments to cover securities sold, not yet purchased | | (99,737) |
| Net cash provided by investing activities | | 164,747 |
| **Cash flows from financing activities:** | | |
| Payments on long-term debt | | (7,347) |
| Proceeds from long-term debt | | 58,419 |
| Capital contributions from minority interest investors of consolidated entities | | 500 |
| Capital withdrawals by minority interest investors of consolidated entities | | (7,798) |
| Partner contributions | | 7,000 |
| Capital withdrawals by investors | | (4,227) |
| Partner distributions | | (34,991) |
| Net cash provided by financing activities | | 11,556 |
| Net decrease in cash and cash equivalents | | (20,453) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 66,033 |
| End of year | $ | 45,580 |
| **Supplemental disclosure of cash flow informaton:** | | |
| Interest paid during the year | $ | (4,330) |
| Taxes paid during the year | | (492) |
| Investments received in-kind | | 33,833 |
| Investments distributed in-kind | | (9,690) |

The accompanying notes are an integral part of these consolidated statements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

1. **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is owned by an unaffiliated trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2015, the Partnership provided investment advisory services for twenty-nine CLOs, seven separate accounts, one registered investment company, one master limited partnership, and sixteen hedge fund or private equity structures, with total fee-earning assets under management of approximately $9.5 billion.

2. **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Consolidation of Non-Variable Interest Entities**

The Partnership consolidates the following non-VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., Highland Capital Healthcare Partners Master, LP, Highland Select Equity Fund, L.P., Highland Equity Partners, L.P., Highland Merger Arbitrage Fund, L.P., and Highland Equity Focus Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Crusader Offshore Partners, L.P. ("Crusader Master"), a Bermuda exempted limited partnership that commenced operations on July 10, 2000;

- Highland CDO Opportunity Master Fund, L.P. ("CDO Master Fund"), a Bermuda limited partnership that commenced operations on November 9, 2005;

- Highland Credit Strategies Master Fund, L.P. ("Credit Strategies Master"), a Bermuda exempted limited partnership that commenced operations on August 24, 2005;

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 29, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Canopy Timberlands, L.P., a Delaware limited partnership that commenced operations on April 29, 2008;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008

- BB Votorantim, Highland Infrastructure LLC ("BB Votorantim"), a Delaware limited liability company which began operations on May 29, 2014; and

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in HFP GP, LLC, a Delaware limited liability company that commenced operations on January 20, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

7

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd, a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd., a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in HE Capital, LLC., a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 99.9% interest in Penant Management, LP., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Semence, LLC, a Delaware limited liability company that was formed on December 16, 2013;

- 100% interest in SK Shareholder Services, LLC, a Delaware limited liability company that was formed on October 24, 2013;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-X Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 80% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26th, 2009;

- 100% interest in Highland Diversified Credit Fund, LP ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P;

8

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

- 99.6% interest in Highland Select Equity Fund, LP, a Delaware limited partnership which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value

- 100% interest in Highland Equity Partners, LP, a Delaware limited partnership which began operations on August 1, 2013 and was organized for the purpose of investing with long-term perspective in a concentrated portfolio of stocks;

- 99.6% interest in Highland Equity Focus Fund, LP, a Delaware limited partnership which began operations on September 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 50.87% interest in Highland Capital Healthcare Partners Master, LP ("Healthcare Master"), a Cayman limited partnership which began operations on February 1, 2011 and was organized for the purpose of achieving appreciation of its assets through the investment and trading of securities, primarily by investing with a long-term perspective in a concentrated portfolio of stocks primarily in the healthcare industry;

- 100% interest in HCM Holdco, LLC, a Delaware limited liability company formed on October 27th, 2015;

- 100% interest in Heimskringla, LLC, a Nevada limited liability company formed on November 9th, 2015;

- 100% interest in Highland Merger Arbitrage Fund, LP, a Delaware limited partnership which began operations on October 16, 2014; and

- 95% interest in Estates on Maryland Holdco, LLC ("Estates on Maryland"), a Delaware limited liability company which began operations on July 24, 2015 and was organized for the purpose of owning, operating and managing real estate

All inter-partnership and intercompany accounts and transactions involving the above listed consolidated entities ("Consolidated Entities") have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

Due to the deconsolidation of certain investment funds, some prior year balances referenced within the following notes to the consolidated financial statements may not tie to prior year issued financial statements.

HIGHLY CONFIDENTIAL

D-CNL000168

**Appx. 01192**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

The following table includes a rollforward of noncontrolling interests from December 31, 2014, to December 31, 2015.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2014 | $ 621,306 |
| Net loss attributable to noncontrolling interest | (104,780) |
| Noncontrolling partner contributions | 500 |
| Noncontrolling partner distributions | (7,798) |
| Noncontrolling interest of newly consolidated entities | 8,125 |
| Noncontrolling interest, December 31, 2015 | $ 517,353 |

**Investment Transactions**

Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**

The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2015, the Partnership and its Consolidated Entities recognized management fees of approximately $54.6 million. The Partnership recognized approximately $0.1 million of depreciation on incentive fees earned prior to 2008, previously deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the Consolidated Statement of Income.

**Shared Services Revenue**

The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2015, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $12.4 million, which has been presented in *Other Income* in the Consolidated Statement of Income. See further discussion in Note 8.

HIGHLY CONFIDENTIAL

D-CNL000169

**Appx. 01193**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

### Income and Expense Recognition

Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

### Income Taxes

The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 14.

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2015, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

### Restricted Cash

The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash on the Consolidated Balance Sheet.

### Notes Receivable

Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

### Fixed Assets and Leasehold Improvements

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

11

D-CNL000170

**Appx. 01194**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Securities Sold, Not Yet Purchased**
The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

12

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Margin Transactions**
To obtain more investable cash, the Consolidated Entities may use various forms of leverage including purchasing securities on margin. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2015. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2015, the Consolidated Investment Funds had withdrawals payable of $78.7 million.

**Foreign Currency Transactions**
The Partnership's subsidiary HCM Singapore uses Singapore dollars as their functional currency. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2015. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

**Life Settlement Contracts**
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows.

**Financing**
The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**
The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable and accrued liabilities approximate their fair values because of their short maturities.

HIGHLY CONFIDENTIAL

D-CNL000172

**Appx. 01196**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Partners' Capital**

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

**Recently Issued Accounting Standards and Interpretations**

In February 2015, the FASB issued ASU 2015-02 "ASC Topic 810, Consolidation." ASU 2015-02 modifies the evaluation of whether limited partnerships and similar legal entities are variable interest entities or voting interest entities, eliminates the presumption that a general partner should consolidate a limited partnership, affects the consolidation analysis of reporting entities that are involved with VIEs, and provides other updates on guidance regarding consolidation. ASU 2015-02 is effective for fiscal years beginning after December 15, 2016. Management is evaluating the impact of ASU 2015-02 on the Partnership's financial statements.

3.  **Fixed Assets and Leasehold Improvements**

    Fixed assets and leasehold improvements are comprised of the following as of December 31, 2015:

    *(in thousands)*

    | | | |
    |---|---|---:|
    | Land | $ | 5,080 |
    | Leasehold improvements | | 7,192 |
    | Buildings | | 36,890 |
    | Building improvements | | 580 |
    | Furniture and fixtures | | 3,035 |
    | Computer and equipment | | 2,338 |
    | Computer software | | 278 |
    | Accumulated depreciation | | (7,683) |
    | | $ | 47,710 |

    The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

    | | Period |
    |---|---:|
    | Land | Not depreciated |
    | Leasehold improvements | Lease term |
    | Buildings | 29 - 40 years |
    | Building improvements | 15 years |
    | Furniture and fixtures | 7 years |
    | Computer and equipment | 3 - 5 years |
    | Computer software | 3 years |

    Depreciation expense in 2015 totaled approximately $1.9 million for the Partnership and its subsidiaries.

14

D-CNL000173

**Appx. 01197**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

4.  **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2015:

| *(in thousands)* | Amortized Cost/Cost | Fair Value |
|---|---|---|
| Common equity securities | $ 708,716 | $ 762,119 |
| Limited partnership interests | 149,460 | 197,154 |
| Asset-backed securities | 231,177 | 151,777 |
| Life settlement contracts | 437,942 | 147,973 |
| Floating rate syndicated bank loans | 216,938 | 113,785 |
| Preferred equity | 17,278 | 84,843 |
| LLC interests | 132,257 | 33,739 |
| Closed-end mutual funds | 2,329 | 49,500 |
| Options contracts | 15,034 | 9,058 |
| Rights & warrants | 50,740 | 8,642 |
| Corporate bonds | 203,932 | 3,737 |
| American depositary receipts | 226 | 226 |
| Total investments | $ 2,166,029 | $ 1,562,553 |

| | Proceeds | Fair Value |
|---|---|---|
| Securities sold, not yet purchased | $ (195,298) | $ (198,605) |

5.  **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

15

D-CNL000174
**Appx. 01198**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Entities develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2015, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, limited partnership interests, asset-backed securities, life settlement contracts, floating rate syndicated bank loans, preferred equity, LLC interests, closed-end mutual funds, option contracts, rights and warrants, corporate bonds, and American depositary receipts. In addition, the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

16

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Equity Investments**
Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. The Consolidated Entities also holds a number of private equity investments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Consolidated Entities determine comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publicly available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Consolidated Entities to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

**Debt Securities**
The Partnership and Consolidated Entities invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Asset-Backed Securities**
The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Entities generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Entities evaluate the results based on visible

17

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Life Settlement Contracts**
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

HIGHLY CONFIDENTIAL

D-CNL000177

**Appx. 01201**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

At December 31, 2015, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 2-3 | 6 | $ 30,000 | $ 12,617 |
| 3-4 | 4 | 25,750 | 10,790 |
| 4-5 | 10 | 62,000 | 16,854 |
| Thereafter | 94 | 963,918 | 107,712 |
| Total | 114 | $ 1,081,668 | $ 147,973 |

**Limited Partnership Interests**
The Partnership and its Consolidated Entities hold limited partnership interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

**Options Contracts**
The Partnership and its Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership and its Consolidated Entities purchase (writes) an option, an amount equal to the premium paid (received) by the purchaser is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the purchaser enters into a closing transaction), the purchaser realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership and its Consolidated Entities purchasing a security at a price different from the current market value.

19

D-CNL000178

**Appx. 01202**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Entities investments and derivatives at December 31, 2015 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2015:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/15 |
|---|---|---|---|---|
| Common equity securities | $ 273,431 | $ 292,688 | $ 196,002 | $ 762,121 |
| Limited partnership interests | - | - | 197,154 | 197,154 |
| Asset-backed securities | - | 144,167 | 7,610 | 151,777 |
| Life settlement contracts | - | - | 147,973 | 147,973 |
| Floating rate syndicated bank loans | - | 10,646 | 103,138 | 113,784 |
| Preferred equity | 60,433 | 20,004 | 4,405 | 84,842 |
| LLC interests | - | 5,794 | 27,945 | 33,739 |
| Closed-end mutual funds | 49,500 | - | - | 49,500 |
| Options | 9,058 | - | - | 9,058 |
| Rights & warrants | 198 | 579 | 7,865 | 8,642 |
| Corporate bonds | 363 | 3,374 | - | 3,737 |
| American depository receipts | 226 | - | - | 226 |
| **Total** | $ 393,209 | $ 477,252 | $ 692,092 | $ 1,562,553 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 198,605 | $ - | - | $ 198,605 |

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2015:

*(in thousands)*

| | Total Fair Value at December 31, 2014 | Purchases | Sales and Maturities | Transfers Into Level 3 | Transfers Out of Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2015 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 220,466 | $ 2 | $ (17,125) | $ 14,605 | $ (13,041) | $ 7,161 | $ (16,066) | $ 196,002 |
| Limited partnership interests | 205,900 | 1,043 | (3,896) | - | - | 129 | (2,048) | 197,154 |
| Life settlement contracts | 114,640 | 41,422 | (32,149) | - | - | 10,203 | 13,857 | 147,973 |
| Floating rate syndicated bank loans | 111,850 | 4,205 | (7,381) | 1,043 | (7,256) | 159 | 518 | 103,138 |
| LLC interests | 22,551 | 1,685 | (80) | 1,918 | - | - | 1,871 | 27,945 |
| Rights & warrants | 5,962 | - | - | - | - | - | 1,903 | 7,865 |
| Asset-backed securities | 9,227 | - | (502) | 16 | - | - | (1,131) | 7,610 |
| Preferred equity | 7,030 | - | - | - | - | - | (2,625) | 4,405 |
| Corporate bonds | 77 | - | - | - | - | - | (77) | - |
| | $ 697,703 | $ 48,357 | $ (61,133) | $ 17,582 | $ (24,271) | $ 17,652 | $ (3,798) | $ 692,092 |

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to changes in observable pricing inputs as compared to the prior year. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2015.

20

D-CNL000179
**Appx. 01203**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $8.9 million of the net unrealized gains presented in the table above relate to investments held as of December 31, 2015.

Transfers out of Level 3 are recognized at the beginning of the period. The transfers out of Level 3 at December 31, 2015 were due to increases in market activity (e.g. frequency of trades) or the availability of a market clearing broker quote.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

(Ending balance in thousands)

| Category | Ending Balance at 12/31/2015 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 196,002 | Multiples analysis | Multiple of EBITDA | 2.75x - 10.0x |
| | | | Price/MHz-PoP | $0.13 - $0.50 |
| | | | Liquidity Discount | 25 - 30% |
| | | | Discount for Lack of Marketability | 15 - 25% |
| | | | Credit Specific Discount | 20% |
| | | Discounted Cash Flow | Discount Rate | 8 - 16% |
| | | | Terminal Multiple | 3.3x - 7.5x |
| | | Black-Scholes Option Model | Holding Period | .75 - 2.67 Yrs |
| | | | Volatility | 15 - 20% |
| | | Transaction recovery analysis | N/A | N/A |
| Limited partnership investments | 197,154 | Appraisal | N/A | N/A |
| | | Net Asset Value of Underlying Assets and Liabilities | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Life Settlement Contracts | 147,973 | Net Asset Value of Underlying Assets | Discount rate | 17 - 24% |
| Bank loans | 103,138 | Multiples analysis | Multiple of EBITDA | 3.5x - 7.25x |
| | | | Multiple of Revenue | .4x - .5x |
| | | Discounted Cash Flow | Discount rate | 15 - 15.5% |
| | | | Terminal Multiple | 3.75x - 6.5x |
| | | | Spread Adjustment | 1.7 - 2.3% |
| | | Transaction recovery analysis | Discount rate | 11% |
| | | Adjusted appraisal | Minority Discount | 25% |
| | | Third-party pricing vendor | N/A | N/A |
| LLC interests | 27,945 | Discounted Cash Flow | PW Profile of Reserve Categories | PV-8 - PV-20 |
| | | Adjusted appraisal | Minority Discount | 25% |
| | | Third-party pricing vendor | N/A | N/A |
| | | Appraisal | N/A | N/A |
| Rights & Warrants | 7,865 | Multiples analysis | Multiple of EBITDA | 8.0x - 10.0x |
| | | Discounted Cash Flow | Discount Rate | 12 - 14% |
| | | | Terminal Multiple | 7.5x |
| Asset-backed securities | 7,610 | Third-party pricing vendor | N/A | N/A |
| | | Look-through analysis of underlying assets | Various models including liquidation analysis | N/A |
| | | Debt-yield | Credit Specific Risk | 5% |
| | | | Liquidity | 1% |
| Preferred equity | 4,405 | Recovery analysis | Scenario Probabilities | Various |
| **Total** | **$ 692,092** | | | |

21

D-CNL000180

**Appx. 01204**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

6.     **Securities Sold under Agreements to Repurchase**

Transactions involving securities sold under agreements to repurchase are treated as collateralized financial transactions, and are recorded at their fair market values.  In addition, interest earned on the securities is included in interest receivable, and interest accrued on amounts borrowed is included in interest payable.  For the year ended December 31, 3015, Multi Strategy Master expensed approximately $0.7 million for interest charged on the amounts borrowed for repurchase agreements.

In connection with transactions in agreements to repurchase, it is Multi Strategy Master's policy that its counterparty take possession of the underlying collateral securities, the fair value of which exceeds the principal amount of the agreements to repurchase, including accrued interest, at all times. If the counterparty defaults under agreements to resell, and the fair value of the collateral declines, the realization of the collateral by Multi Strategy Master may be delayed or limited.

To reduce counterparty credit risk with respect to repurchase agreements, Multi Strategy Master has entered into a master repurchase agreement, which allows Multi Strategy Master to make (or to have an entitlement to receive) a single net payment in the event of default (close-out netting) for outstanding payables and receivables with respect to repurchase agreements with the counterparty.

The master repurchase agreement includes credit related contingent features which allow the counterparty to terminate the agreement prior to maturity in the event Multi Strategy Master's net assets decline by a stated percentage or Multi Strategy Master fails to meet the terms of the agreement, which would cause the Master Partnership to accelerate payment of any net liability owed to the counterparty.

For financial reporting purposes, Multi Strategy Master does not offset repurchase agreement assets and liabilities that are subject to netting arrangements in the Consolidated Balance Sheet. Bankruptcy or insolvency laws of a particular jurisdiction may impose restrictions on or prohibitions against the right of offset in bankruptcy, insolvency or other events.

Collateral terms are contract specific for repurchase agreements. For repurchase agreements traded under master repurchase agreements, the collateral requirements are typically calculated by netting the mark to market amount for each transaction under such agreement and comparing that to the value of any collateral currently pledged by Multi Strategy Master or the counterparty.

For financial reporting purposes, cash collateral that has been pledged to cover obligations of Multi Strategy Master, if any, is reported in due to/from brokers on the Consolidated Balance Sheet.  Generally, the amount of collateral due from or to a party must exceed a minimum transfer amount threshold before a transfer has to be made.  To the extent amounts due to Multi Strategy Master from its counterparties are not fully collateralized, contractually or otherwise, Multi Strategy Master bears the risk of loss from counterparty non-performance.

At December 31, 2015, securities with a fair value of approximately $61.2 million, which are included in investments in securities on the Consolidated Balance Sheet, were pledged to collateralize securities sold under agreements to repurchase.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

The following table presents, by counterparty, Multi Strategy Master's liabilities net of the related collateral pledged by Multi Strategy Master at December 31, 2015:

*(U.S. dollars in thousands)*

| Counterparty | Description | Class of Related Collateral | Gross Value of Liability | Net Amount Due to Counterparty | Financial Instruments | Cash Collateral Pledged | Net Exposure After Collateral | Interest Rate | Maturity |
|---|---|---|---|---|---|---|---|---|---|
| Mizuho | Repurchase agreement | Asset-backed securities | $ 10,147 | $ 10,147 | $ (10,147) | $ - | $ - | 2.10% | 10/14/2022 |
| Mizuho | Repurchase agreement | Asset-backed securities | 30,215 | 30,215 | (30,215) | $ - | $ - | 1.10% | 11/1/2026 |
| Mizuho | Repurchase agreement | Asset-backed securities | 2,735 | 2,735 | (2,735) | $ - | $ - | 2.10% | 5/1/2027 |
| Mizuho | Repurchase agreement | Asset-backed securities | 2,508 | 2,508 | (2,508) | $ - | $ - | 2.10% | 11/1/2026 |
| Jefferies LLC | Repurchase agreement | Asset-backed securities | 2,148 | 2,148 | (2,148) | $ - | $ - | 2.74% | 11/1/2026 |
| | | | $ 47,753 | $ 47,753 | $ (47,753) | | | | |

7. **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

HIGHLY CONFIDENTIAL

D-CNL000182

**Appx. 01206**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Liquidity Risk**

The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**

The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2015, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**
The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

**Leverage Risk**
The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Entities. If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses. In addition, to the extent the Consolidated Entities have posted excess collateral for margin

HIGHLY CONFIDENTIAL

D-CNL000184
**Appx. 01208**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities. In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2015, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Wind-Down Risk**
The ultimate proceeds that certain Consolidated Entities are able to realize on the sale of its investments will directly affect the amounts that the investors in the feeder funds are able to redeem in connection with the wind down process. These amounts may differ materially from the partners' capital balances as of December 31, 2015.

**Litigation Risk**
The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities. Refer to Note 15 for a discussion of open litigation.

26

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

8.    **Related Party Transactions**

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2015, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| American Banknote Corporation | Common Equity | $        6,928 |
| American Home Patient | Common Equity | 1,012 |
| American Home Patient | Term Loan | 13,463 |
| Blackwell BMC, LLC | Common Equity | 8,623 |
| Canopy Timberlands, L.P. | Limited Partnership Interest | 78,528 |
| Canopy Timberlands Spout Springs, L.P. | Limited Partnership Interest | 28,702 |
| Carey International, Inc | Term Loan | 10,160 |
| Carey Holdings, Inc. | Common Stock | 52 |
| CCS Medical, Inc. | Loan | 22,451 |
| CCS Medical, Inc. | Common Equity | 6 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 73,724 |
| Euramax International Holdings B.V. | Warrants | 887 |
| Euramax International Holdings B.V. | Term Loan | 31,768 |
| Euramax International Holdings B.V. | Common Stock | 2,803 |
| Ginn LA Resorts Holdings, LLC | Term Loan | 512 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche A Credit-Linked Deposit | 178 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche B Term Loan | 443 |
| Highland Capital Healthcare Partners, L.P. | Limited Partnership Interest | 3,680 |
| Highland Long/Short Equity Fund | Mutual Fund | 263 |
| Highland Long/Short Healthcare Fund | Mutual Fund | 2,843 |
| Highland Park CDO 2006-1A | Asset Backed Debt | 756 |
| JHT Holdings Inc. | Term Loan | 19,780 |
| JHT Holdings Inc. | Revolving Term Loan | (25) |
| JHT Holdings Inc. | Common Stock | 660 |
| Las Vegas Land Holding | LLC Units | 16 |
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 312,691 |
| NexPoint Credit Strategies Fund | Closed-End Mutual Fund | 7,356 |
| NexPoint Residential Trust, Inc. | Publicly-traded REIT | 16,700 |
| Nex-Tech Aerospace Holdings, Inc. | Common Equity | 1,936 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 174 |
| Terrestar | Common Equity | 57,598 |
| Trussway Industries, Inc. | Common Equity | 16,425 |
| Turtle Bay Holdings, LLC | Equity Units | 8,655 |

27

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2015, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership: *(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| ACIS 2013-2A | Asset backed debt | $ 28,100 |
| ACIS 2013-2A | Asset backed equity | 23,800 |
| ACIS 2014-5A | Asset backed debt | 41,342 |
| ACIS 2015-6A | Asset backed equity | 10,830 |
| ACIS 2015-6A | Asset backed debt | 4,180 |
| BB Highland Floating Rate Fund I | Floating rate equity | 4,596 |
| BB Votorantim Highland Infrastructure LLC | Common equity | 1,328 |
| Greenbriar CLO, Ltd. | Asset backed equity | 15,327 |
| Highland Capital Healthcare Fund | Limited Partnership interest | 3,680 |
| Highland Energy MLP Fund | Mutual fund shares | 1,871 |
| Highland Floating Rate Opportunities Fund | Mutual fund shares | 654 |
| Highland Global Allocation Fund | Closed-end mutual fund shares | 1,603 |
| Highland Opportunistic Credit Fund | Mutual fund shares | 3,802 |
| Highland Park CDO, Ltd. - 1A | Asset backed debt tranche | 33 |
| Highland Park CDO, Ltd. - 1X | Asset backed equity | 2,100 |
| Highland Multi Strategy Fund | Limited Partnership interest | 22,314 |
| Highland Long/Short Equity Fund | Mutual fund shares | 263 |
| Highland Long/Short Healthcare Fund | Mutual fund shares | 2,843 |
| NexPoint Credit Strategies Fund | Closed-end mutual fund shares | 7,356 |
| PAMCO 1997 - 1A | Asset backed debt tranche | 692 |
| Rockwall Investors Corp. | Asset backed equity | 1,880 |
| Southfork CLO, Ltd. | Asset backed equity | 7,496 |
| Valhalla CLO, Ltd. | Asset backed debt | 1,480 |
| Westchester CLO, Ltd | Asset backed equity | 4,125 |

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages.  A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds.  As of December 31, 2015, approximately $8.6 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**
During the year the Partnership and its Consolidated Entities maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control.  As of December 31, 2015, balances in the accounts were approximately $53.0 million, a portion of which exceeds Federal deposit insurance limits.

HIGHLY CONFIDENTIAL

D-CNL000187

**Appx. 01211**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.9 million. At December 31, 2015, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $105.0 million and $82.1 million, respectively.

**Affiliated Transactions**

During the years ended December 31, 2014, and December 31, 2015, Highland Capital Management Fund Advisors, L.P. ("HCMFA") issued promissory notes to the Partnership in the amount of $6.0 million. The notes accrue interest at rates ranging from 1.97% - 2.82%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2015 total interest and principal due on the promissory notes was approximately $6.1 million and is payable on demand. The Partnership will not demand payment on amounts owed prior to May 31, 2017. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the years ended December 31, 2014, and December 31, 2015, NexPoint Advisors, L.P. ("NexPoint") issued promissory notes to the Partnership in the aggregate amount of $15.8 million. A revolving note was established with NexPoint on July 22, 2015. This allowed for an initial advance on principal of $1.3 million. As of December 31, 2015, the total principal outstanding on the revolving note was approximately $4.0 million. Both the notes and revolving line of credit accrue interest at a rate of 6.0%. As of December 31, 2015 total interest and principal due on the promissory notes was approximately $21.1 million and is payable on demand. The Partnership will not demand payment on amounts owed prior to May 31, 2017. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the years ended December 31, 2014, and December 31, 2015, HCRE Partners, LLC ("HCRE") issued promissory notes to the Partnership in the aggregate amount of $13.0 million. The notes accrue interest at a rate of 8.0%. As of December 31, 2015 total interest and principal due on the promissory notes was approximately $13.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the years ended December 31, 2014, and December 31, 2015, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $23.0 million. The notes accrue interest at rates ranging from 2.60% - 3.12%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. During the years ended December 31, 2014, and December 31, 2015, HCMSI repaid $8.1 million of principal. As of December 31, 2015 total interest and principal due on the promissory notes was approximately $14.9 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

**Services Performed by or on Behalf of an Affiliate**

In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

year ended December 31, 2015, total marketing fee expense charged to the Partnership by Highland New York was approximately $5.8 million and as of December 31, 2015, amounts owed to Highland New York for services rendered was approximately $3.1 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to HCMFA was approximately $2.2 million and as of December 31, 2015, amounts owed to the Partnership by HCMFA for services rendered were approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to Falcon was approximately $0.4 million and as of December 31, 2015, no amounts were owed to the Partnership by Falcon for services rendered.

Effective January 1, 2011, the Partnership commenced performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to Acis was approximately $6.1 million and as of December 31, 2015, no amounts were owed to the Partnership by Acis for services rendered.

Effective January 1, 2013, the Partnership commenced performing services on behalf of NexPoint. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to NexPoint was approximately $1.0 million and as of December 31, 2015, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to NexBank Capital was approximately $0.1 million and as of December 31, 2015, no amounts were owed to the Partnership by NexBank Capital for services rendered.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2015, the total fee charged by the Partnership to NexBank was approximately $0.8 million and as of December 31, 2015, amounts owed to the Partnership by NexBank for services rendered were approximately $0.2 million.

30

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2015, the total fee charged to NREA by the Partnership was approximately $0.4 million and as of December 31, 2015, amounts owed by NREA to the Partnership for services rendered were approximately $0.4 million.

On April 20, 2016, to be effective as of January 1, 2008 the Partnership commenced performing services on behalf of Markham Fine Jewelers, L.P. ("Markham"). Services include, but are not limited to management oversight and planning services, and operational support, in each case, on an ad hoc/as needed basis. Markham is charged a fee for the services provided. For the year ended December 31, 2015, the total fee charged to Markham by the Partnership was approximately $1.9 million and as of December 31, 2015, amounts owed by Markham to the Partnership for services rendered were approximately $1.9 million.

Effective January 1, 2015, the Partnership commenced receiving services from Acis. Services include providing certain subadvisory services to the Partnership, to assist the Partnership with its services provided under the Investment Management Agreements with Bandera Strategic Credit Partners I, L.P. and Multi Strategy Master. For the year ended December 31, 2015, the total fee charged by Acis to the Partnership was $0.4 million and as of December 31, 2015, amounts owed by the Partnership to Acis for services received were approximately $0.1 million.

**9.    Note Receivable**

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an unaffiliated trust. Pursuant to the Contribution Agreement a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019.

**10.    Debt and Notes Payable**

**Promissory Note**
On December 31, 2014, the Partnership entered in to a promissory note with an investor in the amount of $18.6 million, in exchange for 100% of its LP interest in Highland Multi Strategy Credit Fund, L.P. The Partnership must pay one-third of the initial note amount, plus accumulated interest on each of the first three anniversaries of the note. The promissory note will mature on December 31, 2017. The promissory note accrues interest at a rate of 3.00% per annum. The promissory note is collateralized by limited partnership interest in Multi Strategy Master. As of December 31, 2015 the remaining principal payable on the promissory note was $12.4 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 5, 2015, the Partnership entered in to a bridge credit agreement with KeyBank, National Association ("KeyBank") in the amount of $10.0 million. The term loan will mature on February 4, 2016. The term loan accrues interest at the Daily Libor plus 3.00%. Accrued interest shall be paid monthly. The term loan is collateralized by the real property owned by Estates on Maryland. Subsequent to year end, the maturity date was extended to April 7, 2017, as discussed in Note 17. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

31

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank in the amount of $9.5 million. The promissory note will mature on August 17, 2018. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc. As of December 31, 2015 the remaining principal payable on the promissory note was 9.4 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 28, 2015, Highland Select Equity Partnership, L.P. ("Select") entered in to a promissory note with Eagle Sky Foundation, Inc. in the amount of $12.0 million. The promissory note accrues interest at 12.00% for the first twelve months, 10.00% for the following twelve months, and 8.00% for the last twelve months. Select must pay one-twelfth of the initial note amount, plus accumulated interest on a quarterly basis. The promissory note will mature on August 28, 2018. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc. As of December 31, 2015 the remaining principal payable on the promissory note was $11.0 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

On September 23, 2015, the Partnership received a master securities loan agreement (the "Securities Agreement") from The Get Good Non-Exempt Trust #2 ("Get Good") in the amount of $6.7 million for securities borrowed. The Securities Agreement accrues interest at a rate of 0.54%, the short term Applicable Federal Rate. The fair value of the loan will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreement. As of December 31, 2015 the fair value of the loan was $6.9 million. The fair value of the Partnership's securities loan approximates the carrying value of the securities loan.

On August 5, 2015, Estates on Maryland entered in to a loan and security agreement with KeyBank in the amount of $26.9 million. The loan will mature on September 1, 2020. The loan accrues interest at a rate of 4.00% above the 1 month LIBOR rate in effect from time to time, not to exceed the maximum interest rate allowed by applicable law. Accrued interest shall be paid monthly. The loan is collateralized by the mortgaged property. The fair value of Estates on Maryland's outstanding notes payable approximates the carrying value of the notes payable.

11. **Due to Broker**

As of December 31, 2015 the due to broker balance of approximately $485.2 million represents approximately $240.4 million payable to financing counterparties for margin transactions.

12. **Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Unfunded Loan Commitments**

As of December 31, 2015, Multi Strategy Master had unfunded loan commitments of approximately $4.9 million, which could be funded at the option of the borrower. The loan commitments carried no funded balance at December 31, 2015, but Multi Strategy Master will be contractually obligated to provide financial support up to the amount of the unfunded loan commitment upon the request of the borrower. Unfunded loan commitments are marked to market on the relevant day of valuation in accordance with Multi Strategy Master's valuation policies. Any applicable unrealized gain/(loss) and change in unrealized gain/(loss) on unfunded loan commitments are recorded on the Consolidated Balance Sheet and the Consolidated Statement of Income, respectively.

**Legal Proceedings**

The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity. See Note 15.

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| **Years Ending December 31,** | |
|---|---|
| 2016 | 1,506 |
| 2017 | 1,521 |
| 2018 | 1,521 |
| 2019 | 1,550 |
| 2020 | 1,566 |
| Thereafter | 2,089 |
| Total | $ 9,752 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.4 million for the year ended December 31, 2015.

**13. Postretirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2011 expense reflects a service cost charge for the value of the new participant's benefit earned during 2011.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2015 are reconciled in the tables below.

33

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

*(in thousands)*

| **Change in projected benefit obligation** | | **2015** |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,250 |
| Service cost | | 5 |
| Interest cost | | 77 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | (310) |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (300) |
| Benefit obligation at end of year | $ | 1,722 |

| **Change in plan assets** | | **2015** |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,446 |
| Actual return on plan assets | | (310) |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (300) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 1,836 |

| **Reconciliation of Funded Status** | | **2015** |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 1,722 |
| Projected benefit obligation at end of year | | 1,722 |
| Fair value of assets at end of year | | 1,836 |
| Funded status at end of year | $ | 114 |

The Partnership does not expect to contribute to the plan during 2015.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2015:

| Discount rate | 4.00% |
|---|---|
| Rate of compensation increase | N/A |

34

D-CNL000193
**Appx. 01217**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2015:

| | |
|---|---|
| Discount rate | 3.70% |
| Expected long-term return on plan assets | 3.70% |
| Rate of compensation increase | N/A |

As of December 31, 2015, there were no plan assets categorized as Level 3.

14. **Income Taxes**

**The Partnership**

For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2008 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015.

**Crusader Master**

Crusader Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Crusader Master. Crusader Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 31, 2035.

For U.S. income tax purposes, Crusader Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Crusader Master's net taxable income.

Since Crusader Master trades investments for its own account, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The General Partner intends to conduct Crusader Master's business in such a way that it does not create a taxable presence in any of the jurisdictions in which the Investment Manager has offices.

Dividends as well as certain interest and other income received by Crusader Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the

35

D-CNL000194
Appx. 01218

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Crusader Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2015, a withholding tax liability of $0.2 million is included in the accrued expenses in the Consolidated Balance Sheet.

It is management's responsibility to determine whether a tax position of Crusader Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. In accordance with this authoritative guidance, management has established a reserve for federal income tax of approximately $10.6 million for uncertain tax positions. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015.

Crusader Master files tax returns as prescribed the tax laws of the jurisdictions in which it operates. In the normal course of business, Crusader Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2012 forward (with limited exceptions).

A wholly-owned corporation of Crusader Master is subject to federal income tax. For the year ended December 31, 2015, approximately $0.9 million of tax expense was included in the Consolidated Balance Sheet. Additionally, this wholly-owned corporation has incurred capital losses on the sale of investments that exceed the amount of capital gains it has earned. A deferred tax asset related to these excess capital losses of approximately $1.4 million is included in *Other Assets* on the Consolidated Balance Sheet.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2015, a minimal withholding tax liability of $1.0 million is classified within accrued expenses and withholding tax payable on the Consolidated Balance Sheet.

36

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. As of December 31, 2015, a liability to account for uncertain tax positions of $0.1 million is classified within accrued expenses within the Consolidated Balance Sheet. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2012 forward (with limited exceptions).

**Credit Strategies Master**

Credit Strategies Master is an exempted limited partnership organized in Bermuda. Under the current laws of Bermuda, there is no income, estate, transfer, sale or other taxes payable by Credit Strategies Master. Credit Strategies Master has received an undertaking from the government of Bermuda exempting it from all such taxes until March 31, 2035.

For U.S. income tax purposes, Credit Strategies Master is treated as a pass-through entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of Credit Strategies Master's net taxable income.

It is management's responsibility to determine whether a tax position of Credit Strategies Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015.

Dividends as well as certain interest and other income received by Credit Strategies Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the Credit Strategies Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. Deferred tax liabilities may result from temporary differences related to the unrealized appreciation on the Credit Strategies Master's investments that will become taxable income in future years. Deferred tax liabilities will become payable upon realization of the gains when the investments are sold, and are measured using the applicable enacted tax rate and provisions of the enacted tax law. Credit Strategies Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Credit Strategies Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2012 forward (with limited exceptions).

HIGHLY CONFIDENTIAL

D-CNL000196

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

A wholly owned corporation at Credit Strategies Master may be subject to Federal U.S. Income Tax based on the nature of income, expense, and capital gains/losses. As of December 31, 2015 the wholly owned corporation has a minimal tax expense accrual included in the consolidated financial statements.

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2012 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution

HIGHLY CONFIDENTIAL

D-CNL000197

**Appx. 01221**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015. As of December 31, 2015, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2012 forward (with limited exceptions).

**Healthcare Master**

Healthcare Master is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of Healthcare Master's net taxable income. Interest, dividends and other income realized by Healthcare Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at the rate of 30% for nonU.S. Investment Vehicles. Interest, dividends and other income realized by Healthcare Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. Healthcare Master applies the authoritative guidance which requires Management to determine whether a tax position of Healthcare Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. Management has determined that there was no effect on the financial statements from the application of this guidance. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2015. Healthcare Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Healthcare Master is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2015, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2012 forward.

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

15.  **Legal Proceedings**

On July 15, 2008, Crusader Master, Highland Offshore Partners, CDO Master Fund, Multi Strategy Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida ('the Tousa action"). The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. The Defendants believed they acted in good faith pursuant to the terms of the relevant agreements and appealed the decision. In February 2011, the District Court of Florida quashed the judgment against the Defendants and overturned the ruling that resulted in the Defendants recording the reserve. The plaintiffs appealed the ruling of the District Court, and the issue was sent to the Eleventh Circuit of Florida. On May 15, 2012, the Eleventh Circuit unexpectedly reversed the District Court's ruling, and

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

remanded the case back to the District Court for review. The last such case was heard by the US Supreme Court case on January 14, 2015. On June 23, 2015, the District Court remanded the case back to the Bankruptcy Court for a report and recommendations regarding the effects of certain settlements on the Plaintiff's available damages. The Bankruptcy Court heard oral arguments on November 19, 2015, but has not yet issued a ruling. The additional liability and damages issues remain stayed at the District Court until the Bankruptcy Court issues its report. Based on the ruling, the Consolidated Entities recorded a combined reserve of approximately $12.3 million as of December 31, 2015. This reserve is included in *Accrued and other liabilities* on the Consolidated Balance Sheet.

On July 8, 2009, one investor filed suit against Credit Strategies Master, the Partnership, and other affiliated entities (collectively, the "Defendants"). The lawsuit alleges that the Defendants misrepresented the amount of redemptions in Credit Strategies Master. On August 28, 2015, the Dallas Court of Appeals affirmed a summary judgement against the Plaintiffs' claims. As such, the reserve of $11.3 million has been reversed and is included as a component of Professional fees on the Consolidated Income Statement.

In April 2007, CDO Master Fund entered into a risk sharing agreement with UBS Securities LLC and UBS AG, London Branch (collectively, "UBS" or "UBS Plaintiffs") structured as a derivative whereby it absorbed 51% of the gains and losses generated from a loan warehouse agreement. The remaining 49% of the warehouse gains and losses were absorbed by Highland Special Opportunities Holding Company ("SOHC"). The warehouse was financed by UBS and held collateral consisting of investments in collateralized loan obligations and credit default swaps. Although the agreement expired on August 15, 2007, UBS agreed to extend it for one year on March 15, 2008. Due to liquidity constraints, CDO Master Fund was unable to meet a November margin call, and UBS elected to terminate the agreement as of December 5, 2008. The collateral held in the warehouse was subsequently seized by UBS and sold on the open market through bids-wanted-in competition. After offsetting the proceeds received from the sale and the income earned on the collateral prior to the sale, UBS notified CDO Master Fund that its pro-rata share of the losses incurred under the agreement was $350.2 million. CDO Master Fund has accrued a liability in its financial statements for this amount.

On February 24, 2009, the UBS Plaintiffs filed a lawsuit against CDO Master Fund, SOHC and the Partnership in the New York State Supreme Court of Manhattan alleging that they suffered losses in excess of $745 million due to the depreciation in value of the warehouse collateral. On February 19, 2010, the First Appellate Division sided with the Partnership and dismissed UBS' claims against the Partnership. Thereafter on June 22, 2010, the UBS Plaintiffs filed an amended complaint with the Court against the Partnership alleging $687 million in damages. On March 13, 2012, the First Appellate Division dismissed two of the four claims against the Partnership, and severely limited the scope of the two remaining claims. The Court has yet to rule on motions for summary judgment pending for over two years, and has not set the matter for trial.

In the June 22, 2010 amended complaint, the UBS Plaintiffs also asserted claims against Credit Strategies Master, Multi Strategy Master, Crusader Master, and certain of their affiliates (collectively, the "Additional Fund Defendants"). The UBS Plaintiffs seek to unwind alleged fraudulent transfers involving the Additional Fund Defendants. Although the UBS Plaintiffs have not pled a specific damages amount against the Additional Fund Defendants, any eventual damages award would be subject to pre-judgment interest of 9% (accrued as of December 3, 2008) as well as post-judgment interest of 9% (accrued as of the date a judgment, if any, is entered against the Additional Fund Defendants). Each of the Additional Fund Defendants filed a separate motion to dismiss, each of which was denied. In addition, the Additional Fund Defendants filed a motion for summary judgment,

40

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

which was heard by the Court on February 14, 2014. On March 11, 2014, the First Appellate Division heard each of the Additional Fund Defendants' respective appeals of the Court's denials of their respective motions to dismiss. On August 19, 2013, the Court restrained the Defendants from transferring or otherwise disposing of property received (or if property had already been transferred or disposed of, the cash equivalent) in March 2009 from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement dated March 20, 2009. Shortly thereafter, the UBS Plaintiffs and the UBS Additional Fund Defendants' mutually agreed that, notwithstanding the restraining order, the Additional Fund Defendants' could market and sell any restrained property provided that the proceeds of such sales were not transferred. On November 27, 2013, the Court removed the restraining order, but the UBS Plaintiffs immediately appealed On January 30, 2014, the Appellate Court reinstated the restraining order pending resolution of the UBS Plaintiffs' appeal on the original terms set forth by the Court on August 19, 2013, and without the modification agreed to with the UBS Plaintiffs. On June 12, 2015, the UBS Plaintiffs settled their claims against the Additional Fund Defendants' for scheduled cash payment totaling $72.5 million. That restraining order remained in place until January 21, 2016 when the Appellate Court dismissed the appeal as moot following the Defendant's settlement with the UBS Plaintiffs.

On July 17, 2013, Credit Suisse Securities (USA), LLC ("Credit Suisse") filed suit against Credit Strategies Master, Multi Strategy Master, and other affiliates (the "Credit Suisse Defendants"). Credit Suisse's claims relate to several outstanding trades of debt tranches of Goldfield Ranch Reality Holdings, LLC and Westgate Investments, LLC. On May 5, 2014, Credit Suisse moved for summary judgment on both the principal amount and statutory pre-judgment interest. The Court granted the motion on August 6, 2014, and issued judgment on September 11, 2014 in the amount of $25.5 million in principal, plus $13.5 million in interest, for a total of $39.0 million. On January 14, 2016, the Credit Suisse Defendants reached settlement with Credit Suisse for payment of approximately $77.4 million in satisfaction and release of Credit Suisse's claims. The difference between the settlement amount and total exposure accrued at November 30, 2015, was recognized as of December 31, 2015, bringing the total accrued liability down to the settlement amount. The December 31, 2015 accrual of $77.4 million is included in *Accrued and other liabilities* on the Consolidated Balance Sheet.

On or about April 10, 2012, CDO Master Fund filed suit against Citibank, N.A. ("CBNA"), Citigroup Global Markets Inc. ("CGMI"), Citigroup Global Markets Limited ("CGML"), and Citigroup Financial Products Inc. ("CFPI") (collectively "Citi" or "Defendants") seeking damages for breach of contract related to Defendants' improper valuation of collateral, improper margin calls, improper declaration of default and improper seizure of collateral. More specifically, Defendants' breaches have proximately caused CDO Master Fund to suffer damages resulting from Defendants' misappropriation of assets that rightfully belong to CDO Master Fund. CDO Master Fund seeks recovery in the form of a return of the assets improperly seized by Defendants. To the extent that a return of the improperly-seized assets to CDO Master Fund is not possible or feasible, CDO Master Fund seeks damages in an amount sufficient to put it in the same economic position it would have been in had Defendants properly performed under the contracts.

Over one year after CDO Master Fund filed its suit, and having failed in its efforts to dismiss the lawsuit, Citi filed two breach of contract counterclaims against CDO Master Fund and two other counter-defendants, Highland CDO Opportunity Fund GP, L.P. and the Partnership. CDO Master Fund believes this post-hoc claim is baseless and merely brought to try to create a bargaining position. On or about March 30, 2016, the Court granted certain of the parties' motions for summary judgment. As a result of this ruling, both CDO Master Fund and Citi's claims have been pared down. The Court also ordered additional limited discovery be conducted, and that the parties submit a final round of motions for summary judgment following the conclusion of that discovery. CDO Master

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Fund has accrued a liability in its financial statements for this claim in the amount of $10.8 million and is included in *Due to brokers* on the Consolidated Balance Sheet. No trial has been set in this matter.

In April 2012, the Partnership filed suit against a former employee for breach of contract, defamation and theft of trade secrets. The former employee filed a counterclaim with numerous, unrelated allegations. The Partnership refuted each allegation in detail. The former employee seeks unspecified damages against the Partnership and certain affiliates. On February 6, 2014, the jury found the former employee breached his fiduciary duty to the Partnership. The jury found that neither the Partnership nor any of its employees had breached any duty, and awarded $2.8 million to the Partnership. The jury also found that HERA owed $2.6 million related to an employee retention plan. The court entered judgment on the verdict on July 11, 2014. The former employee has filed his appeal against the Partnership and HERA has filed its appeal against the judgment amount. The appellate court has yet to rule on the pending appeals.

In addition to the legal actions that are discussed above, the Partnership is subject to other legal actions arising from the ordinary course of its business. The ultimate outcome of these other cases is inherently uncertain and could result in additional losses to the Partnership.

16. **Fund Wind Down**

On February 2, 2009, the Partnership informed investors of CDO Master that the fund was effectively insolvent as the liabilities in the fund exceed the assets to such a degree that proceeds from the asset sales will not be able to satisfy any unpaid redemptions or to distribute amounts to any current investors.

During 2008, Crusader Master and Credit Strategies Master were negatively affected by deteriorating conditions in the overall economy and credit markets. These conditions became more severe during the third and fourth quarters of 2008 and generated significant losses on various derivative transactions and repurchase agreements to which Crusader Master and Credit Strategies Master were parties. In addition, certain assets that Crusader Master and Credit Strategies Master purchased on margin through prime brokerage agreements experienced a significant decline in value. In certain cases, Crusader Master and Credit Strategies Master were unable to post the collateral required to secure these losses, and the counterparties provided notice of their intent to terminate the agreements. As a result, access to the credit that Crusader Master and Credit Strategies Master used to manage its investing and financing activities became highly constrained, and in some cases unavailable. In light of these circumstances, the General Partners (the general partner of Crusader Master and the general partner of Credit Strategies Master) and the Board of Directors of Highland Credit Strategies Fund, Ltd. and Highland Crusader Fund, Ltd. concluded, in consultation with the Investment Manager, that it would be in the best interests of their investors to wind down the investment portfolios of Credit Strategies Master and Crusader Master. On October 15, 2008, the Investment Manager notified investors that it would begin the wind-down process. The Investment Manager also restricted subscriptions and the payment of withdrawals to its feeder funds effective the same date.

In connection with the wind down, the limited partner interests of the Feeder Funds of Credit Strategies and Crusader were compulsorily withdrawn/redeemed on October 15, 2008 and November 15, 2008, respectively, in accordance with the terms of the governing documents.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Crusader Master**

On July 15, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement (the "Scheme") that facilitates the winding-down of the investments of Crusader Master and the distribution of its assets. A substantial majority of the investors in its feeder funds consented to The Plan of Distribution ("The Plan") as outlined in the Scheme. The Scheme became effective as of August 1, 2011 (the "Effective Date").

The Scheme establishes two classes of claims; those feeder fund investors who had timely submitted withdrawal/redemption requests for withdrawal/redemption dates that fell on or before June 30, 2008 and who had not received full payment ("Prior Redeemers"), and those feeder fund investors that had not timely submitted such withdrawal/redemption requests for redemption/withdrawal dates that fell on or before June 30, 2008 ("Compulsory Redeemers") (together "Redeemers"). The basis for ratable distribution amongst both classes of Redeemers was the November 15, 2008 balances of said Redeemers ("Redemption Amount"), adjusted to add back any redemption penalties assessed against Prior Redeemers during 2008. A realization schedule for distributions is set forth in Appendix A of the Scheme (the "Realization Schedule"). The terms of the Scheme are outlined as follows:

1. Prior Redeemers shall be entitled to 60% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Prior Redeemers' Distribution"). Each Prior Redeemer shall be entitled to their pro rata share of the Crusader Fund Prior Redeemers' Distribution based on the Prior Redeemer's Redemption Amount relative to the total of all Prior Redeemers' Redemption Amounts (inclusive of all feeders).

2. Compulsory Redeemers shall be entitled to 40% in aggregate of the total distributions made by the Master Partnership constituting excess cash (the "Crusader Fund Compulsory Redeemers' Distribution"). With the exception of the non-consenting Compulsory Redeemers discussed below, each Compulsory Redeemer shall be entitled to their pro rata share of the Crusader Fund Compulsory Redeemers' Distribution based on the Compulsory Redeemer's Redemption Amount relative to the total of all Compulsory Redeemers' Redemption Amounts (inclusive of all feeders).

   In the event the Investment Manager fails to make distributions in accordance with the Realization Schedule for two consecutive quarters without receiving a waiver from the committee of Redeemers appointed to help oversee the Scheme (the "Redeemer Committee"), the Investment Manager can be removed for cause as the Investment Manager of the Master Partnership by the Redeemer Committee.

**Crusader Redeemer Trust Account**

Effective July 15, 2011, a trust account was set-up and funded for the benefit of Compulsory Redeemers who had consented to the Scheme and Prior Redeemers (the "Redeemer Trust Account"). The portion of amounts in excess of the Redemption Amounts otherwise attributable to non-consenting Compulsory Redeemers was contributed to the Redeemer Trust Account and not distributed to non-consenting Compulsory Redeemers. Amounts in the Redeemer Trust Account are reserved and used to pay all costs of Crusader Master to defend, respond to, settle and satisfy any claims by Redeemers other than for their Scheme claim.

The non-consenting Compulsory Redeemers do not receive any allocation of profit and loss; the portion of profit and loss that would otherwise be allocated to their accounts is instead allocated to the Redeemer Trust Account. The Redeemer Trust Account is accounted for as a component of equity in the Crusader Onshore Feeder Fund. Within the earlier of 30 days after all redeemer claims have been resolved or dismissed with prejudice or the sixth anniversary of the effective date, any

43

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

amounts remaining in the Redeemer Trust Account shall be distributed 100% to consenting Compulsory Redeemers pro rata based on their relative Redemption Amounts.

**Crusader Deferred Fee Account**
In accordance with the Scheme and Plan, the "Deferred Fee Account" was established on the effective date by allocating the right for the Partnership to potentially receive payment in respect of deferred fees ("Deferred Fees") equal to $10.0 million.

The Plan and Scheme provide that in the event that the Crusader Master makes aggregate distributions of at least $1.7 billion prior to the forty-third month following the effective date ("Aggregate Distribution Date"), the Partnership shall be entitled to receive payment in respect of the Deferred Fee Account.

The Plan and Scheme further provide that in the event that the Crusader Master does not make aggregate distributions of at least $1.7 billion prior to the Aggregate Distribution Date, then the Partnership will cause the Feeder Funds to distribute the right to receive payment 100% to consenting Compulsory Redeemers (pro rata based on their relative Redemption Amounts). The Deferred Fee Account will continue to be allocated it's pro rata portion of profit and loss.

The Partnership believes that the restraining order imposed against the Crusader Master in connection with the UBS Litigation (as defined in Note 15) rendered performance of the stated Realization Schedule impossible as a matter of law. Accordingly, the Partnership believes that any non-performance attributable to such restraining order is excused as a matter of law and thus all periods of the Realization Schedule have been extended for the period of non-performance attributable to such restraining order as a matter of law ("Realization Schedule Extension").

**Crusader Deferred Fee Distributions**
The Partnership shall continue to be entitled to receive payment in respect of the Deferred Fees from the applicable Feeder Fund. However, the Partnership similarly believes that the restraining order prevented the full liquidation of the Crusader Master's portfolio prior to the forty-third month after the effective date. In this situation, the Partnership would have received the Deferred Fees prior to, or on, the forty-third month after the effective date, but-for the impact of the restraining order still was in place. Therefore, the Partnership believes it has the right to receive the ratable and nonforfeitable portion of such fees crystalized as of the date the restraining order was lifted.

Until the all of the Deferred Fees have been paid, the Crusader Master shall distribute to each applicable Feeder Fund amounts, and such Feeder Fund shall fully reserve for such distributions in cash. The cash held in reserve for such Deferred Fees shall be maintained in an interest bearing account, with all interest being retained by the applicable Feeder Fund for the benefit of its Redeemers.

**Crusader Distribution Fee**
Under the Plan and Scheme, provided that assets equal to or in excess of the amount scheduled in the Realization Schedule have been distributed to Redeemers during such applicable distribution period, the Partnership will receive fees in cash in the amount of 125 basis points calculated based on all amounts actually distributed to Redeemers during such period following the effective date. This fee will also be paid and expensed out of Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., and Highland Crusader Fund, L.P. ("Feeder Funds") and will be charged to each capital account in the Feeder Funds, regardless of affiliation.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

The Partnership believes the Realization Schedule Extension has extended the applicable distribution periods.

**Crusader Wind Down Progress**

As a result of the litigation discussed in Note 15, Crusader Master did not make distributions as part of the wind down in accordance with the Scheme for the year ended December 31, 2015. Since the Scheme's effective date, approximately $1,351.2 million has either been distributed to the Feeder Funds for purposes of disbursement, or withheld and specially allocated for tax payments.

As of December 31, 2015, the estimated value of the partners' capital of Crusader Master was approximately $381.2 million. The actual amounts that will be distributed upon completion of the wind down process are inherently uncertain and may differ materially from the partners' capital as of December 31, 2015. Capital will be distributed as it becomes available in accordance with the Scheme.

**Credit Strategies Master**

To facilitate the winding-down of the investments in Credit Strategies Master, a Plan of Distribution (the "Credit Strategies Plan") was also adopted by Credit Strategies Master and its feeder funds and was consented to by a substantial majority of the investors in its feeder funds. On April 14, 2011, the Supreme Court of Bermuda Commercial Court sanctioned a Scheme of Arrangement the ("Credit Strategies Scheme") that incorporates the terms of the Credit Strategies Plan so as to be binding upon Highland Credit Strategies Fund, Ltd. and its investors. The Credit Strategies Scheme became effective on May 1, 2011. The Credit Strategies Plan established two classes of claims; those investors of the Feeder Funds whose withdrawals/redemptions became effective on or before September 30, 2008 and who have not received full payment of their redemption amount ("Prior Redeemers") and those investors of the feeder funds who were compulsorily withdrawn/redeemed on October 15, 2008 ("Compulsory Redeemers").

As investments in Credit Strategies Master are realized, distributions will be made in the following order, which summarizes the terms outlined in the Credit Strategies Plan:

1. Payments for fund expenses
2. The first $30 million available for distribution ratably to Prior Redeemers
3. The next approximately $5.3 million available for distribution ratably to consenting Compulsory Redeemers and a trust account established for the benefit of non-consenting Compulsory Redeemers ("Redeemer Trust Account")
4. All remaining funds will be distributed as follows:
   a. 85% ratably to Prior Redeemers
   b. 15% to consenting Compulsory Redeemers and the Redeemer Trust Account

This method of distribution results in a shift of capital from the Prior Redeemers to the consenting Compulsory Redeemers and the Redeemer Trust Account. It also created a shift of capital from its offshore feeder to its onshore feeder, since there was a greater proportion of Compulsory Redeemers to Prior Redeemers in the onshore feeder than in the offshore feeder.

**Credit Strategies Redeemer Trust Account**

The Redeemer Trust Account is used to pay for litigation costs involving the non-consenting Compulsory Redeemers. The Credit Strategies Plan outlines which expenses related to litigation ("Covered Claims") will be paid using funds from the Redeemer Trust Account, and any litigation will continue to be assessed under an ASC 450 (Contingencies) model.

45

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

**Credit Strategies Contribution Trust Account**

In accordance with the Credit Strategies Plan and in exchange for certain releases, a trust account (the "Contribution Trust Account") was established and initially funded on the effective date with $3.0 million contributed by the Partnership. The Partnership also paid an additional $6.0 million on May 1, 2014, approximately the third anniversary of the effective date of the Credit Strategies Plan. This $6.0 million was recognized as a subscription into Credit Strategies Master during the year ended December 31, 2013, and was received in cash during the year ended December 31, 2014.

The Contribution Trust Account will be used to pay for expenses related to Covered Claims to the extent that the Redeemer Trust Account is insufficient to pay such expenses. Within 30 days after all Covered Claims have been resolved or dismissed with prejudice, or the sixth anniversary of the effective date, provided that no suits asserting Covered Claims are then pending, whichever is earlier, any remaining balance in the Contribution Trust Account will be distributed 85% to consenting Compulsory Redeemers and 15% to consenting Prior Redeemers.

Similar to the Redeemer Trust Account, the Contribution Trust Account is treated as a separate component of equity. Additionally, the initial payment of the $3.0 million was treated as a contribution to the Master Partnership. However, the Contribution Trust Account does not receive an allocation of profit and loss. The only changes to the account will occur when contributions are made or expenses related to Covered Claims are paid.

As discussed in Note 15, a legal reserve of $11.3 million was reversed and included as a component of Legal Expense on the Consolidated Income Statement. This was partially allocated to the Contribution Trust and resulted in the $3.5 million equity balance at December 31, 2015.

**17. Subsequent Events**

Over the course of 2016 through the report date, HCMSI issued promissory notes to the Partnership in the amounts of $12.5 million. The notes accrue interest at a rate ranging from 2.24% - 2.65%.

On February 26, 2016, HCMFA issued a promissory note to the Partnership in the amount of $2.3 million. The note accrues interest at a rate of 2.62%.

Over the course of 2016 through the report date, NexPoint issued additional borrowings on its revolving line of credit to the Partnership in the amount of $2.2 million. The borrowings accrue interest at a rate of 6.0%.

As discussed in Note 10, on April 7, 2016 the Partnership extended the maturity date on the term loan with Key Bank to April 7, 2017. The amount of the Term Loan increased to $15.0 million.

On April 26, 2016, Highland Acquisition Corporation issued a promissory note to the Partnership in the amount of $0.2 million. No interest shall accrue on the note.

On January 14, 2016, the various Consolidated Entities settled the Credit Suisse lawsuit resulting in the payment of the $77.4 million. The amount paid had previously been accrued as a component of *Accrued and other liabilities* and *Due to broker for securities purchased not yet settled* on the Consolidated Balance Sheet. Additionally, the settlement resulted in a reduction of previously accrued expenses of approximately $1.5 million.

46

D-CNL000205

**Appx. 01229**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2015**

Upon the lifting of the UBS restraining order, the Credit Strategies Master then was permitted to pay the amounts payable under the Credit Strategies Plan and Scheme from the Contribution Trust. As of December 31, 2015, the Contribution Trust had remaining net assets of approximately $3.5 million, a portion of which was held in cash and a portion of which is held in an unliquidated limited partnership capital balance. The cash portion of the Contribution Trust's net assets of approximately $2.1 million was distributed in accordance with the terms of the Credit Strategies Plan and Scheme on April 22, 2016.

On April 11, 2016, the Redeemer Committee for Credit Strategies Master filed a Petition to Confirm Arbitration Award against the Partnership in relation to the 2013 sale of an asset in Credit Strategies Master. The award includes $7.0 million in damages, pre- and post-judgment interest of $4.1 million as of May 19, 2016, plus legal fees. If confirmed, the award would require the Partnership to distribute to the investors of the Credit Strategies feeder funds the net proceeds received by Credit Strategies Master from the sale of the asset as well as the damages awarded, the pre- and post-judgment interest, and fees. The award has not yet been judicially confirmed and remains subject to dispute.

On April 4, 2016, a distribution was made to Crusader Master investors related to the sale of the life settlements portfolio. In total, approximately $196.7 million was either distributed to the Feeder Funds for purposes of disbursement, or withheld and specially allocated for tax payments. Since the Scheme and Plan effective date, and including this distribution, approximately $1.5 billion has been either distributed to the Crusader Master Feeder Funds for purposes of disbursement, or withheld and specially allocated for tax payments.

In accordance with the Partnership's position as set forth in Note 16, Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd. paid Deferred Fees to the Partnership of approximately $28.3 million on January 21, 2016 and $4.1 million on April 5, 2016. These amounts represent the Partnership's ratable and unforfeitable portion of such fees based upon distributions to Redeemers made through and including those respective dates. Cash for such fees had been reserved in conjunction with aggregate previous distributions to Redeemers from the remaining portion of the Deferred Fees (not including the Deferred Fee Account).

In accordance with the Partnership's position as set forth in Note 16, Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., and Highland Crusader Fund, L.P. paid approximately $1.5 million and $2.4 million of distribution fees to the Partnership related to the November 27, 2013 and April 4, 2016 distributions, respectively.

The Partnership has performed an evaluation of subsequent events through May 19, 2016, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000207

**Appx. 01231**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2015**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 4,756 | $ 40,824 | $ - | $ 45,580 |
| Restricted cash | 2,621 | 72,314 | - | 74,935 |
| Investments at fair value | 143,245 | 1,419,308 | - | 1,562,553 |
| Equity method investees | 193,276 | - | (193,276) | - |
| Management and incentive fees receivable | 9,004 | - | (1,462) | 7,542 |
| Due from brokers | - | 8,607 | - | 8,607 |
| Other assets | 7,513 | 11,435 | (2,585) | 16,363 |
| Deferred incentive fees receivable | 31,214 | - | - | 31,214 |
| Due from affiliates | 63,031 | - | - | 63,031 |
| Note receivable | 63,000 | 11,000 | (11,000) | 63,000 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $7,683 | 7,864 | 39,846 | - | 47,710 |
| **Total assets** | $ 525,524 | $ 1,603,334 | $ (208,323) | $ 1,920,535 |
| **Liabilities and partners' capital** | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,544 | $ 123 | $ - | $ 4,667 |
| Securities sold, not yet purchased | - | 198,605 | - | 198,605 |
| Withdrawals payable | - | 78,733 | - | 78,733 |
| Due to brokers | 51,292 | 434,740 | (786) | 485,246 |
| Due to brokers for securities purchased, not yet settled | - | 55,934 | - | 55,934 |
| Accrued and other liabilities | 34,285 | 58,657 | (3,261) | 89,681 |
| Debt and notes payable | 49,746 | 65,913 | (11,000) | 104,659 |
| **Total liabilities** | 139,867 | 892,705 | (15,047) | 1,017,525 |
| Non-controlling interest | - | 517,353 | - | 517,353 |
| Commitments | | | | |
| **Partners' capital** | 385,657 | 193,276 | (193,276) | 385,657 |
| **Total liabilities and partners' capital** | $ 525,524 | $ 1,603,334 | $ (208,323) | $ 1,920,535 |

49

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Statement of Income**
**Year Ended December 31, 2015**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---:|---:|---:|---:|
| **Revenue:** | | | | |
| Management fees | $ 54,644 | $ - | $ - | $ 54,644 |
| Interest and investment income | 2,649 | 53,464 | - | 56,113 |
| Other income | 14,121 | 3,505 | | 17,626 |
| Total revenue | 71,414 | 56,969 | - | 128,383 |
| **Expenses:** | | | | |
| Legal settlement | - | 55,000 | - | 55,000 |
| Compensation and benefits | 36,202 | 734 | - | 36,936 |
| Professional fees | 6,857 | 28,922 | - | 35,779 |
| Marketing and advertising expense | 7,452 | - | - | 7,452 |
| Investment and research consulting | 967 | - | - | 967 |
| Depreciation and amortization | 1,402 | 1,342 | - | 2,744 |
| Tax expense | - | 875 | - | 875 |
| Bad debt expense | 801 | - | (801) | - |
| Other operating expenses | 9,236 | 13,217 | 801 | 23,254 |
| Total expenses | 62,917 | 100,090 | - | 163,007 |
| Other expense | 4,869 | - | - | 4,869 |
| Income/(loss) before investment and derivative activities | 13,366 | (43,121) | - | (29,755) |
| **Realized and unrealized gain/(loss) from investment and derivative transactions:** | | | | |
| Net realized loss on investment and derivative transactions | 3,969 | (55,974) | - | (52,005) |
| Net change in unrealized loss on investment and derivative transactions | (38,859) | (160,626) | - | (199,485) |
| Total realized and unrealized loss from investment and derivative transactions | (34,890) | (216,600) | - | (251,490) |
| Net unrealized earnings from equity method investees | (154,941) | - | 154,941 | - |
| Net loss | (176,465) | (259,721) | 154,941 | (281,245) |
| Net loss attributable to the non-controlling interest | - | 104,780 | - | 104,780 |
| Net loss attributable to Highland Capital Management, L.P. | $ (176,465) | $ (154,941) | $ 154,941 | $ (176,465) |

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2015**

*(in thousands)*

**Assets**

Current assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 4,756 |
| Restricted cash | | 2,621 |
| Investments at fair value (cost $198,659)* | | 268,299 |
| Equity method investees | | 68,222 |
| Management and incentive fees receivable | | 9,004 |
| Other assets | | 7,513 |
| Deferred incentive fees receivable | | 31,214 |
| Due from affiliates | | 63,031 |
| Note receivable | | 63,000 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $7,170 | | 7,864 |
| **Total assets** | $ | 525,524 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,544 |
| Due to brokers | | 51,292 |
| Accrued and other liabilities | | 34,285 |
| Notes payable | | 49,746 |
| Total liabilities | | 139,867 |
| Partners' capital | | 385,657 |
| **Total liabilities and partners' capital** | $ | 525,524 |

*Investments, at fair value includes $112.0 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2015 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

HIGHLY CONFIDENTIAL

D-CNL000210

**Appx. 01234**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2015**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 54,644 |
| Interest and investment income | | 2,649 |
| Shared services fees and miscellaneous income | | 14,121 |
| Total revenue | | 71,414 |
| | | |
| **Operating expenses:** | | |
| Compensation and benefits | | 36,202 |
| Professional fees | | 6,857 |
| Marketing and advertising expense | | 7,452 |
| Investment and research consulting | | 967 |
| Depreciation and amortization | | 1,402 |
| Bad debt expense | | 801 |
| Other operating expenses | | 9,236 |
| Total operating expenses | | 62,917 |
| | | |
| Other income | | 4,869 |
| | | |
| Income before investment activities | | 13,366 |
| | | |
| **Realized and unrealized gains/losses from investments:** | | |
| Net realized gain on sale of investments | | 3,969 |
| Net change in unrealized loss on investments* | | (56,866) |
| Total realized and unrealized loss from investments | | (52,897) |
| | | |
| Losses from equity method investees: | | (136,934) |
| | | |
| **Net loss** | $ | (176,465) |

*Net change in unrealized gain on investments includes $ 17.3 million of unrealized losses from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2015 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited financial statements.

HIGHLY CONFIDENTIAL

D-CNL000211

**Appx. 01235**

# EXHIBIT 71

Appx. 01236

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2016**

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2016**

Page

**Report of Independent Auditors** ........................................................................................................... 1

**Consolidated Financial Statements**

Consolidated Balance Sheet .................................................................................................................. 2

Consolidated Statement of Income ........................................................................................................ 3

Consolidated Statement of Changes in Partners' Capital ..................................................................... 4

Consolidated Statement of Cash Flows ................................................................................................. 5

Notes to Consolidated Financial Statements ..................................................................................... 6-43

Supplemental Information ................................................................................................................. 44-48

D-CNL000453
**Appx. 01238**



### Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2016, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

#### *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

#### *Auditors' Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

#### *Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31. 2016, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

#### *Other Matter*

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 19, 2017

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201*
*T: (214) 999-1400, F: (214) 754-7991, www.pwc.com/us*

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Balance Sheet**
**December 31, 2016**

*(in thousands)*

**Assets**

| | | |
|---|---:|---:|
| Cash and cash equivalents | $ | 30,129 |
| Investments at fair value (cost $1,203,426) | | 1,097,910 |
| Management and incentive fees receivable | | 12,583 |
| Due from broker for securities sold, not yet settled | | 892 |
| Other assets | | 12,909 |
| Notes and other amounts due from affiliates | | 172,671 |
| Notes receivable | | 6,421 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $8,533 | | 6,747 |
| **Total assets** | $ | 1,340,262 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---:|---:|
| Accounts payable | $ | 4,443 |
| Securities sold, not yet purchased (proceeds $138,589) | | 146,792 |
| Withdrawals payable | | 68,199 |
| Due to brokers | | 171,647 |
| Due to brokers for securities purchased, not yet settled | | 1,614 |
| Accrued and other liabilities | | 42,838 |
| Debt and notes payable | | 45,953 |
| Investment liabilities | | 27,318 |
| **Total liabilities** | | 508,804 |
| Non-controlling interest | | 412,847 |
| Commitments | | |
| **Partners' capital** | | 418,611 |
| **Total liabilities and partners' capital** | $ | 1,340,262 |

The accompanying notes are an integral part of these consolidated financial statements.

2

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2016**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 52,599 |
| Interest and investment income | | 34,207 |
| Shared services fees | | 9,563 |
| Incentive fees | | 8,151 |
| Other income | | 4,142 |
| Total revenue | | 108,662 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 37,127 |
| Professional fees | | 11,032 |
| Interest expense | | 5,761 |
| Marketing and advertising expenses | | 5,170 |
| Bad debt expense | | 2,094 |
| Depreciation and amortization | | 1,367 |
| Investment and research consulting | | 829 |
| Other operating expenses | | 11,160 |
| Total expenses | | 74,540 |
| | | |
| Other income | | 10,779 |
| | | |
| Income before investment and derivative activities | | 44,901 |
| | | |
| **Realized and unrealized gain from investments and derivatives:** | | |
| Net realized appreciation on investments and derivatives | | 125,732 |
| Net change in unrealized loss on investments and derivatives | | (77,649) |
| Total realized and unrealized gain from investments and derivatives | | 48,083 |
| | | |
| Net income | | 92,984 |
| | | |
| Net income attributable to the non-controlling interest | | (53,628) |
| | | |
| Net income attributable to Highland Capital Management, L.P. | $ | 39,356 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2016**

*(in thousands)*

| | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2015 | $ - | $ 385,657 | $ 385,657 |
| Net income attributable to Highland Capital Management, L.P. | 99 | 39,257 | 39,356 |
| Partner distributions | (16) | (6,386) | (6,402) |
| Partners' capital, December 31, 2016 | $ 83 | $ 418,528 | $ 418,611 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2016**

*(in thousands)*

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 92,984 |
| Adjustment to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Net realized gain on investments and derivative transactions | | (125,732) |
| Net change in unrealized loss on investments and derivative transactions | | 77,649 |
| Amortization and depreciation | | 1,367 |
| **Changes in assets and liabilities:** | | |
| Restricted cash | | 2,621 |
| Management and incentive fee receivable | | (5,041) |
| Deferred incentive fees | | 31,214 |
| Due from brokers | | 320 |
| Due from affiliate | | (3,846) |
| Other assets | | (2,347) |
| Accounts payable | | (140) |
| Accrued and other liabilities | | (878) |
| Due to brokers for securities purchased, not yet settled | | (5,441) |
| Due to brokers | | 47,931 |
| Net cash provided by operating activities | | 110,661 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (250) |
| Purchases of investments | | (495,849) |
| Proceeds from dispositions of investments | | 606,617 |
| Proceeds from securities sold, not yet purchased | | 118,744 |
| Issuance of notes receivable to affiliates | | (42,235) |
| Proceeds from repayments of notes receivable from affiliates | | 16,286 |
| Purchases of investments to cover securities sold, not yet purchased | | (223,490) |
| Net cash used in investing activities | | (20,177) |
| **Cash flows from financing activities:** | | |
| Payments on long-term debt | | (19,705) |
| Capital withdrawals by minority interest investors of consolidated entities | | (49,860) |
| Partner distributions | | (6,402) |
| Net cash used in financing activities | | (72,167) |
| Net increase in cash and cash equivalents | | 18,317 |
| **Cash and cash equivalents** | | |
| Beginning of year | | 45,580 |
| Additional cash from new consolidated funds | | (33,768) |
| End of year | $ | 30,129 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (4,947) |
| Taxes paid during the year | | (1,541) |
| Investments acquired for non-cash consideration | | 13,333 |
| Investments disposed for non-cash consideration | | (23,368) |

The accompanying notes are an integral part of these consolidated financial statements.

5

D-CNL000458

**Appx. 01243**

## Highland Capital Management, L.P.
### Notes to Consolidated Financial Statements
### December 31, 2016

**1.     Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is owned by an unaffiliated trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2016, the Partnership provided investment advisory services for twenty-nine CLOs, seven separate accounts, one master limited partnership, and eleven hedge fund or private equity structures, with total fee-earning assets under management of approximately $6.7 billion.

**2.     Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries, which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions of the entity, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions of the entity, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties.  If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

HIGHLY CONFIDENTIAL

D-CNL000459

**Appx. 01244**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016. Early adoption of ASU 2015-02 resulted in deconsolidation of Highland Crusader Offshore Partners, L.P. ("Crusader"), Highland Credit Strategies Master Fund, L.P. (Credit Strategies), and Highland CDO Opportunity Master Fund, L.P.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest ($0.9M) in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2016, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

|  | Unconsolidated VIE Net Assets | Carrying Value and Maximum Risk of Loss |
|---|---|---|
| Sponsored investment funds | $ 560,665,698 | $ 10,118,175 |

**Consolidation of Non-Variable Interest Entities**

The Partnership consolidates the following non-VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

7

D-CNL000460

**Appx. 01245**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

- BB Votorantim, Highland Infrastructure LLC ("BB Votorantim"), a Delaware limited liability company which began operations on May 29, 2014.

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management Partners Charitable Trust #1, a trust that commenced operations on September 19, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd., a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd., a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 100% interest in Neutra, Ltd., a Cayman company that was formed on December 1, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in NexPoint Opportunistic Credit Fund *(fka NexPoint Distressed Strategies Fund)*, a closed-end management investment company that was formed on March 2, 2016;

- 80% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Bandera Strategic Credit Partners I SLP, L.P., a Delaware limited liability company formed on April 3, 2014;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in HCM Holdco, LLC, a Delaware limited liability company formed on October 27, 2015 and;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016.

- 98.9% interest in Highland Acquisition Corporation, a Delaware Corporation formed on April 25, 2016.

All inter-partnership and intercompany accounts and transactions involving the above listed consolidated entities ("Consolidated Entities") have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

Due to the deconsolidation of certain investment funds, some prior year balances referenced within the following notes to the consolidated financial statements may not tie to prior year issued financial statements.

The following table includes a rollforward of noncontrolling interests from December 31, 2015, to December 31, 2016.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2015 | $ 517,353 |
| Net income attributable to noncontrolling interest | 53,628 |
| Noncontrolling partner distributions | (39,397) |
| Noncontrolling interest of deconsolidated entities | (118,737) |
| Noncontrolling interest, December 31, 2016 | $ 412,847 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2016, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $52.6 million and $8.1 million, respectively. The Partnership recognized approximately $0.9 million of appreciation on incentive fees earned prior to 2008, previously deferred under Sec. 409(A) of the Internal Revenue Code, which has been presented in *Other Income* in the Consolidated Statement of Income.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2016, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.6 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

HIGHLY CONFIDENTIAL

D-CNL000463
**Appx. 01248**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

### Income and Expense Recognition

Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

### Income Taxes

The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 14.

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2016, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

### Restricted Cash

The Partnership and its subsidiaries are required to maintain cash balances as collateral for various financing and derivative transactions. These amounts are reported as restricted cash on the Consolidated Balance Sheet.

### Notes Receivable

Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | **Period** |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Due to/from Brokers**

Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Securities Sold, Not Yet Purchased**

The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

12

D-CNL000465

**Appx. 01250**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments.  A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period.  When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability).  The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold.  When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid).  Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

**Margin Transactions**
To obtain more investable cash, the Consolidated Entities may use various forms of leverage including purchasing securities on margin.  A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable.  This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2016.  Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2016, the Consolidated Investment Funds had withdrawals payable of $68.2 million.

**Foreign Currency Transactions**
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency.  All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2016.  Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period.  Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

13

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

**Life Settlement Contracts**
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2016, the Consolidated Investment Fund was invested in 14 policies, which had a total face value of approximately $155.1 million and a fair value of $23.8 million.

**Financing**
The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**
The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

**Recently Issued Accounting Standards and Interpretations**
In August 2016, the FASB issued Accounting Standards Update 2016-15, Statement of cash flows – Classification of certain cash receipts and cash payments (Topic 230). The amendments in this Update apply to all reporting entities. This Accounting Standards Update addresses the following eight specific cash flow issues: Debt prepayment or debt extinguishment costs; settlement of zero-coupon debt instruments or other debt instruments with coupon interest rates that are insignificant in relation to the effective interest rate of the borrowing; contingent consideration payments made after a business combination; proceeds from the settlement of insurance claims; proceeds from the settlement of corporate-owned life insurance policies (COLIs) (including bank-owned life insurance policies (BOLIs)); distributions received from equity method investees; beneficial interests in securitization transactions; and separately identifiable cash flows and application of the predominance principle. ASU 2016-15 is effective for annual reporting periods in fiscal years that begin after December 15, 2016. This statement is not expected to have a material impact on the Parternship's consolidated financial statements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

In October 2016, the FASB issued Accounting Standards Update 2016-17 – Consolidation (Topic 810).  The Board is issuing this Accounting Standards Update to amend the consolidation guidance on how a reporting entity that is the single decision maker of a variable interest entity (VIE) should treat indirect interests in the entity held through related parties that are under common control with the reporting entity when determining whether it is the primary beneficiary of that VIE. Under the amendments, a single decision maker is not required to consider indirect interests held through related parties that are under common control with the single decision maker to be the equivalent of direct interests in their entirety. Instead, a single decision maker is required to include those interests on a proportionate basis consistent with indirect interests held through other related parties. The amendments are effective for the annual period ending after December 15, 2016. This statement is not expected to have a material impact on the Partnership's consolidated financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18, Statement of cash flows – Restricted cash (Topic 230).  The amendments in this Update apply to all reporting entities that have restricted cash or restricted cash equivalents and are required to present a statement of cash flows under Topic 203. The amendments in this Update require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. Therefore, amounts generally described as restricted cash and restricted cash equivalents should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. ASU 2016-18 is effective for annual reporting periods in fiscal years that begin after December 15, 2016. This statement is not expected to have a material impact on the Partnership's consolidated financial statements.

3.      **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2016:

*(in thousands)*

| | |
|---|---:|
| Leasehold improvements | $      7,192 |
| Buildings | 2,595 |
| Furniture and fixtures | 2,793 |
| Computer and equipment | 2,403 |
| Computer software | 297 |
| Accumulated depreciation | (8,533) |
| | $      6,747 |

Depreciation expense in 2016 totaled approximately $1.4 million for the Partnership and its subsidiaries.

15

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

4.    **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2016:

| *(in thousands)* | Amortized Cost/Cost | Fair Value |
|---|---|---|
| Common equity securities | $     552,694 | $     730,194 |
| Asset-backed securities | 178,094 | 120,678 |
| Floating rate syndicated bank loans | 142,041 | 54,745 |
| Closed-end mutual funds | 85,845 | 74,731 |
| Participation interests | 28,500 | 27,348 |
| Limited partnership interests | 18,806 | 24,630 |
| Life settlement contracts | 57,638 | 23,826 |
| LLC interests | 21,496 | 18,904 |
| Rights & warrants | 21,931 | 8,768 |
| Options contracts | 3,500 | 6,463 |
| Real Estate Investment Trusts | 4,793 | 5,080 |
| Corporate bonds | 88,007 | 1,943 |
| Preferred equity | 81 | 600 |
| Total investments | $    1,203,426 | $    1,097,910 |

| | Proceeds | Fair Value |
|---|---|---|
| Securities sold, not yet purchased | $     (138,589) | $     (146,792) |

5.    **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

HIGHLY CONFIDENTIAL

D-CNL000469

**Appx. 01254**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Entities develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2016, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, asset-backed securities, floating rate syndicated bank loans, closed-end mutual funds, preferred equity, participation interests, limited partnership interests, life settlement contracts, LLC interests, rights and warrants, option contracts, and corporate bonds. In addition, the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Equity Investments**

Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**

The Partnership and Consolidated Entities hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

18

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Asset-Backed Securities**

The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Entities generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Debt Securities**

The Partnership and Consolidated Entities invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Life Settlement Contracts**

Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

19

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

At December 31, 2016, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 2-3 | - | $ - | $ - |
| 3-4 | 1 | 10,000 | 3,154 |
| 4-5 | 1 | 5,000 | 1,514 |
| Thereafter | 12 | 140,079 | 19,158 |
| Total | 14 | $ 155,079 | $ 23,826 |

**Options Contracts**
The Partnership and its Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership and its Consolidated Entities purchase (writes) an option, an amount equal to the premium paid (received) by the purchaser is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the purchaser enters into a closing transaction), the purchaser realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership and its Consolidated Entities purchasing a security at a price different from the current market value.

**Limited Partnership and LLC Interests**
The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

20

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Entities investments and derivatives at December 31, 2016 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2016:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/16 |
|---|---|---|---|---|
| Common equity securities | $ 286,369 | $ 326,665 | $ 117,160 | $ 730,194 |
| Asset-backed securities | - | 112,455 | 8,223 | 120,678 |
| Floating rate syndicated bank loans | - | 42 | 54,703 | 54,745 |
| Closed-end mutual funds | 74,731 | - | - | 74,731 |
| Participation interests | 15,368 | - | 11,980 | 27,348 |
| Limited partnership interests | - | - | 24,630 | 24,630 |
| Life settlement contracts | - | - | 23,826 | 23,826 |
| LLC interests | - | 676 | 18,228 | 18,904 |
| Rights & warrants | 702 | 652 | 7,414 | 8,768 |
| Options | 6,463 | - | - | 6,463 |
| Real Estate Investment Trusts | 1,039 | 4,041 | - | 5,080 |
| Corporate bonds | - | 1,943 | - | 1,943 |
| Preferred equity | 600 | - | - | 600 |
| **Total** | $ 385,272 | $ 446,474 | $ 266,164 | $ 1,097,910 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 146,792 | $ - | - | $ 146,792 |

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2016:

*(in thousands)*

| | Total Fair Value at December 31, 2015 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Total Fair Value at December 31, 2016 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 94,654 | $ 364 | $ (50,925) | $ 49,361 | $ - | $ 4,397 | $ 19,309 | $ 117,160 |
| Floating rate syndicated bank loans | 81,512 | 7,267 | (21,984) | - | - | 9,370 | (21,462) | 54,703 |
| Limited partnership interests | 5,731 | 6,921 | (20,839) | - | 31,563 | 1,714 | (461) | 24,630 |
| Life settlement contracts | 22,528 | 6,862 | (5,000) | - | - | 940 | (1,504) | 23,826 |
| LLC interests | 19,322 | 234 | (84) | - | - | (95) | (1,149) | 18,228 |
| Participation interests | - | 13,333 | (1,353) | - | - | - | - | 11,980 |
| Asset-backed securities | 3,885 | 5,250 | (2,726) | - | 693 | 313 | 808 | 8,223 |
| Rights & warrants | 6,513 | - | - | - | - | - | 901 | 7,414 |
| Preferred equity | 18 | - | - | - | - | - | (18) | - |
| Corporate bonds | - | - | - | - | 1,094 | (19,837) | 18,743 | - |
| | $ 234,163 | $ 40,231 | $ (102,910) | $ 49,361 | $ 33,350 | $ (3,198) | $ 15,167 | $ 266,164 |

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to changes in observable pricing inputs as compared to the prior year. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2016.

21

D-CNL000474
**Appx. 01259**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $17.3 million of the net unrealized gains presented in the table above relate to investments held as of December 31, 2016.

Transfers out of Level 3 are recognized at the beginning of the period. The transfers out of Level 3 at December 31, 2016 were due to changes in observable pricing inputs as compared to the prior year.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

HIGHLY CONFIDENTIAL

D-CNL000475

**Appx. 01260**

# Highland Capital Management, L.P.
## (A Delaware Limited Partnership)
## Notes to Consolidated Financial Statements
## December 31, 2016

(Ending balance in thousands)

| Category | Ending Balance at 12/31/2016 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $    117,160 | Multiples Analysis | Multiple of EBITDA | 2.5x - 8.25x |
| | | | Discount for Lack of Marketability | 15 - 25% |
| | | | Multiple of Revenue | 0.4x - 0.5x |
| | | Discounted Cash Flow | Discount Rate | 7.5 - 27.5% |
| | | | Terminal Multiple | 2.2x - 7.5x |
| | | | Minority Discount | 20% |
| | | Bid Indications | N/A | N/A |
| | | Appraisal | N/A | N/A |
| Bank loans | 54,703 | Multiples Analysis | Multiple of EBITDA | 3.0x - 4.0x |
| | | | Multiple of Revenue | 0.4x - 0.5x |
| | | Escrow Recovery Analysis | Discount Rate | 11% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Bid Indications | N/A | N/A |
| | | Discounted Cash Flow | Discount Rate | 22% |
| | | | Terminal Multiple | 2.5x |
| | | | Spread Adjustment | 0.5 - 7.4% |
| Limited partnership interests | 24,630 | Net Asset Value of Underlying Assets and Liabilities | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Life settlement contracts | 23,826 | Net Asset Value of Underlying Assets, based on third-party pricing vendor | Discount Rate | 16 - 18% |
| LLC interests | 18,228 | Third-Party Pricing Vendor | N/A | N/A |
| | | Transaction Price | N/A | N/A |
| | | Appraisal | N/A | N/A |
| Participation interests | 11,980 | Net Asset Value of Underlying Assets | N/A | N/A |
| Asset-backed securities | 8,223 | Third-Party Pricing Vendor | N/A | N/A |
| | | Net Asset Value of Underlying Assets and Liabilities | N/A | N/A |
| | | Discounted Cash Flow | Discount Rate | 21% |
| Rights & warrants | 7,414 | Discounted Cash Flow | Discount Rate | 12 - 15% |
| | | | Terminal Multiple | 7.5x |
| | | | Minority Discount | 20% |
| | | Multiples Analysis | Multiple of EBITDA | 7.25x - 8.25x |
| | | | Discount for Lack of Marketability | 25% |
| **Total** | $    266,164 | | | |

23

D-CNL000476

**Appx. 01261**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

6. **Securities Sold under Agreements to Repurchase**

Transactions involving securities sold under agreements to repurchase are treated as collateralized financial transactions, and are recorded at their fair market values. In addition, interest earned on the securities is included in interest receivable, and interest accrued on amounts borrowed is included in interest payable. For the year ended December 31, 2016, Multi Strategy Master expensed approximately $0.8 million for interest charged on the amounts borrowed for repurchase agreements.

In connection with transactions in agreements to repurchase, it is Multi Strategy Master's policy that its counterparty take possession of the underlying collateral securities, the fair value of which exceeds the principal amount of the agreements to repurchase, including accrued interest, at all times. If the counterparty defaults under agreements to resell, and the fair value of the collateral declines, the realization of the collateral by Multi Strategy Master may be delayed or limited.

To reduce counterparty credit risk with respect to repurchase agreements, Multi Strategy Master has entered into a master repurchase agreement, which allows Multi Strategy Master to make (or to have an entitlement to receive) a single net payment in the event of default (close-out netting) for outstanding payables and receivables with respect to repurchase agreements with the counterparty.

The master repurchase agreement includes credit related contingent features which allow the counterparty to terminate the agreement prior to maturity in the event Multi Strategy Master's net assets decline by a stated percentage or Multi Strategy Master fails to meet the terms of the agreement, which would cause the Master Partnership to accelerate payment of any net liability owed to the counterparty.

For financial reporting purposes, Multi Strategy Master does not offset repurchase agreement assets and liabilities that are subject to netting arrangements in the Consolidated Balance Sheet. Bankruptcy or insolvency laws of a particular jurisdiction may impose restrictions on or prohibitions against the right of offset in bankruptcy, insolvency or other events.

Collateral terms are contract specific for repurchase agreements. For repurchase agreements traded under master repurchase agreements, the collateral requirements are typically calculated by netting the mark to market amount for each transaction under such agreement and comparing that to the value of any collateral currently pledged by Multi Strategy Master or the counterparty.

For financial reporting purposes, cash collateral that has been pledged to cover obligations of Multi Strategy Master, if any, is reported in due to/from brokers on the Consolidated Balance Sheet. Generally, the amount of collateral due from or to a party must exceed a minimum transfer amount threshold before a transfer has to be made. To the extent amounts due to Multi Strategy Master from its counterparties are not fully collateralized, contractually or otherwise, Multi Strategy Master bears the risk of loss from counterparty non-performance.

At December 31, 2016, securities with a fair value of approximately $64.9 million, which are included in investments in securities on the Consolidated Balance Sheet, were pledged to collateralize securities sold under agreements to repurchase.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The following table presents, by counterparty, Multi Strategy Master's liabilities net of the related collateral pledged by Multi Strategy Master at December 31, 2016:

*(U.S. dollars in thousands)*

| Counterparty | Decription | Class of Related Collateral | Gross Value of Liability | Net Amount Due to Counterparty | Financial Instruments | Cash Collateral Pledged | Net Exposure After Collateral | Interest Rate | Maturity |
|---|---|---|---|---|---|---|---|---|---|
| Mizuho Securities USA Inc. | Repurchase Agreement | Asset-backed securities | $ 30,785 | $ 30,785 | $ (30,785) | $ - | $ - | 1.45% | 11/1/2026 |
| Mizuho Securities USA Inc. | Repurchase Agreement | Asset-backed securities | 11,329 | 11,329 | (11,329) | - | - | 2.45% | 10/14/2022 |
| Mizuho Securities USA Inc. | Repurchase Agreement | Asset-backed securities | 3,039 | 3,039 | (3,039) | - | - | 2.45% | 5/1/2027 |
| Mizuho Securities USA Inc. | Repurchase Agreement | Asset-backed securities | 2,901 | 2,901 | (2,901) | - | - | 2.45% | 11/1/2026 |
| Mizuho Securities USA Inc. | Repurchase Agreement | Asset-backed securities | 2,660 | 2,660 | (2,660) | - | - | 2.00% | 11/1/2026 |
| | | | $ 50,714 | $ 50,714 | $ (50,714) | | | | |

7. **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Liquidity Risk**

The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**

The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

26

HIGHLY CONFIDENTIAL

D-CNL000479

**Appx. 01264**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

**Limited Diversification**

The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2016, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**

The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**

The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Leverage Risk**

The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Entities. If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses. In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities. In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**

The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**

At December 31, 2016, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**

The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities. Refer to Note 15 for a discussion of open litigation.

28

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2016

8.    **Related Party Transactions**

**Investments Under Common Control**

Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2016, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| American Banknote Corporation | Common Equity | $      582 |
| Carey Holdings, Inc. | Common Stock | 5,368 |
| CCS Medical, Inc. | Loan | 5,836 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 43,142 |
| Euramax International Holdings B.V. | Warrants | 1,108 |
| Euramax International Holdings B.V. | Term Loan | 39,124 |
| Euramax International Holdings B.V. | Common Stock | 13,454 |
| Highland Energy MLP Fund | Mutual Fund | 2,290 |
| Highland Floating Rate Opportunities Fund | Mutual Fund | 733 |
| Highland Global Allocation Fund | Mutual Fund | 2,150 |
| Highland Long/Short Equity Fund | Mutual Fund | 263 |
| Highland Long/Short Healthcare Fund | Mutual Fund | 2,423 |
| Highland Merger Arbitrage Fund | Mutual Fund | 1,177 |
| Highland Opportunistic Credit Fund | Mutual Fund | 4,857 |
| JHT Holdings Inc. | Revolving Term Loan | 1,923 |
| JHT Holdings Inc. | Common Stock | 3,349 |
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 311,225 |
| NexPoint Credit Strategies Fund | Mutual Fund | 15,029 |
| NexPoint Multifamily Capital Trust, Inc. | REIT | 4,041 |
| NexPoint Opportunistic Credit Fund | Mutual Fund | 101 |
| NexPoint Real Estate Strategies Fund | Mutual Fund | 1,039 |
| NexPoint Residential Trust, Inc. | REIT | 54,029 |
| Romacorp Restaurant Holdings, Inc. | Common Equity | 336 |
| Trussway Industries, Inc. | LLC Units | 51,482 |
| Turtle Bay Holdings, LLC | LLC Units | 13,500 |

HIGHLY CONFIDENTIAL

D-CNL000482

Appx. 01267

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2016, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| ACIS 2013-2A | Asset backed debt | $ 31,162 |
| ACIS 2013-5A | Asset backed equity | 23,975 |
| ACIS 2014-5A | Asset backed debt | 42,792 |
| ACIS 2015-6A | Asset backed equity | 4,771 |
| BB Votorantim Highland Infrastructure LLC | Common equity | 1,534 |
| Highland Energy MLP Fund | Mutual fund shares | 2,290 |
| Highland Floating Rate Opportunities Fund | Mutual fund shares | 733 |
| Highland Global Allocation Fund | Mutual fund shares | 2,150 |
| Highland Merger Arbitrage Fund | Mutual fund shares | 1,177 |
| Highland Opportunistic Credit Fund | Mutual fund shares | 4,857 |
| Highland Park CDO, Ltd. - 1A | Asset backed debt tranche | 1,572 |
| Highland Park CDO, Ltd. - 1X | Asset backed equity | 1,048 |
| Highland Prometheus Fund | Partnership Interest | 912 |
| Highland Long/Short Equity Fund | Mutual fund shares | 263 |
| Highland Long/Short Healthcare Fund | Mutual fund shares | 2,423 |
| NexPoint Credit Strategies Fund | Mutual fund shares | 15,029 |
| NexPoint Multi Family Capital Trust | REIT | 4,041 |
| NexPoint Opportunistic Credit Fund | Closed-end mutual fund shares | 101 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,039 |
| Highland Acquisition Corp | Private shares | 25 |
| PAMCO 1997 - 1A | Asset backed debt tranche | 230 |
| Rockwall Investors Corp. | Asset backed equity | 2,123 |
| Westchester CLO, Ltd | Asset backed equity | 4,127 |

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages.  A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds.  As of December 31, 2016, approximately $7.8 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**
During the year the Partnership and its Consolidated Entities maintained accounts at NexBank, SSB ("NexBank"), a related party by way of common control.  As of December 31, 2016, balances in the accounts were approximately $15.3 million, a portion of which exceeds Federal deposit insurance limits.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Investment in Affiliated Loans**
During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank.  Interest earned on the loans during the year was approximately $8.2 million.  At December 31, 2016, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $66.3 million and $45.2 million, respectively.

**Notes and Other Amounts Due from Affiliates**
During the year ended December 31, 2016, Highland Capital Management Fund Advisors, L.P. ("HCMFA") issued a promissory note to the Partnership in the amount of $2.3 million. The note accrues interest at a rate of 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2016 total interest and principal due on outstanding promissory notes was approximately $6.1 million and is payable on demand. The Partnership will not demand payment on amounts owed prior to May 31, 2018. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2016, NexPoint Advisors, L.P. ("NexPoint") received $3.9 million of principal advances on their outstanding revolving note with the Partnership. The revolving note accrues interest at a rate of 6.0%. As of December 31, 2016 total interest and principal due on outstanding promissory and revolving notes was approximately $25.9 million and is payable on demand. The Partnership will not demand payment on amounts owed prior to May 31, 2018. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2016, HCRE Partners, LLC ("HCRE") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 8.0%. As of December 31, 2016 total interest and principal due on outstanding promissory notes was approximately $6.1 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2016, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $21.6 million. The notes accrue interest at rates ranging from 2.18% - 2.65%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2016 total interest and principal due on outstanding promissory notes was approximately $22.8 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2016, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.8 million. The notes accrue interest at rates ranging from 1.95% - 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2016 total interest and principal due on the promissory notes was approximately $14.9 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2016, Mark Okada ("Okada") issued a promissory note to the Partnership in the aggregate amount of $1.3 million. The note accrues interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2016 total interest and principal due on the promissory note was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

During the year ended December 31, 2016, the Partnership purchased a promissory note due from The Dugaboy Investment Trust ("Dugaboy") in the aggregate amount of $23.4 million. The note accrues interest at a rate of 2.75% per annum. As of December 31, 2016 total interest and principal due on the promissory note was approximately $23.4 million and is payable in full on October 30, 2036. The fair value of the Partnership's outstanding notes receivable approximates its carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust. Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. As of December 31, 2016 total interest and principal due on the Note Receivable was approximately $64.6 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. For the year ended December 31, 2016, total marketing fee expense charged to the Partnership by Highland New York was approximately $4.3 million and as of December 31, 2016, amounts owed to Highland New York for services rendered was approximately $0.4 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fee charged by the Partnership to HCMFA was approximately $2.5 million and as of December 31, 2016, there were no amounts owed to the Partnership by HCMFA for services rendered.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2016, no amounts were owed to the Partnership by Falcon for services rendered.

Effective January 1, 2016, pursuant to the Second Amended and Restated Sub-Advisory Agreement and the Third Amended and Restated Shared Services Agreement dated July 29, 2016, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $5.1 million and $6.8 million, respectively. As of December 31, 2016, amount owed to the Partnership by Acis was approximately $0.5 million.

32

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

Effective January 1, 2013, the Partnership commenced performing services on behalf of NexPoint. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fee charged by the Partnership to NexPoint was approximately $0.6 million and as of December 31, 2016, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2016, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 24, 2013, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2016, the total fee charged by the Partnership to NexBank was approximately $1.5 million and as of December 31, 2016, $0.5 million was owed to the Partnership by NexBank for services rendered.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2016, the total fee charged to NREA by the Partnership was approximately $0.6 million and as of December 31, 2016, amounts owed by NREA to the Partnership for services rendered were approximately $0.9 million.

**Investment liability**
On January 28, 2016, the Partnership entered into a participation agreement with Cornerstone Healthcare Group Holding, Inc. ("Cornerstone") for securities purchased and held on their behalf which had a value of $8.0 million as of the transaction date. The fair value of the Agreement will fluctuate with the fair value of the held securities, throughout the term of the Agreement. As of December 31, 2016 the fair value of the securities were $8.6 million.

On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2016 the fair value of the participated investments was $18.7 million.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

9.    **Notes Receivable**

On October 12, 2016, the Partnership entered into a Purchase and Sale agreement (the "Agreement") with an unaffiliated registered fund. Pursuant to the Agreement, the Partnership sold, transferred and assigned to the fund, and the fund purchased and accepted from the Partnership, all of the Partnership's principal and accrued interest in various outstanding promissory notes (the "Notes") in the aggregate amount of $6.4 million. The Notes accrue interest at a rate of 7.85% per annum. As of December 31, 2016 total interest and principal due on the Notes was approximately $6.5 million.

10.    **Debt and Notes Payable**

**Promissory Note**
On December 31, 2014, the Partnership entered in to a promissory note with an investor in the amount of $18.6 million, in exchange for 100% of its LP interest in Highland Multi Strategy Credit Fund, L.P. The Partnership must pay one-third of the initial note amount, plus accumulated interest on each of the first three anniversaries of the note. The promissory note will mature on December 31, 2017. The promissory note accrues interest at a rate of 3.00% per annum. The promissory note is collateralized by limited partnership interest in Multi Strategy Master. As of December 31, 2016 the remaining principal payable on the promissory note was $6.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank in the amount of $9.5 million. The promissory note will mature on August 17, 2018. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc. As of December 31, 2016 the remaining principal payable on the promissory note was $6.9 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership must make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note will mature on May 31, 2019. The promissory note accrues interest at a rate of 3.00% per annum. As of December 31, 2016 the remaining principal payable on the promissory note was $12.7 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2016 the remaining principal payable on the promissory note was $1.0 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

34

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million, plus in the event of a sale of Trussway on or prior to June 1, 2017, 50% of the excess of the price per share over the closing date price per share. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2016 the remaining principal payable on the promissory notes was $15.4 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on September 10, 2041. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2016 the remaining principal payable on the promissory note was $3.8 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

**11.    Due to Broker**

As of December 31, 2016 the due to broker balance of approximately $171.6 million is payable to financing counterparties for margin transactions.

**12.    Commitments**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 15.

HIGHLY CONFIDENTIAL

D-CNL000488

**Appx. 01273**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or noncancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31 | | |
|---|---|---:|
| 2017 | | 1,521 |
| 2018 | | 1,521 |
| 2019 | | 1,550 |
| 2020 | | 1,566 |
| 2021 | | 1,567 |
| Thereafter | | 522 |
| Total | $ | 8,246 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2016.

**13. Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2011 expense reflects a service cost charge for the value of the new participant's benefit earned during 2011.

HIGHLY CONFIDENTIAL

D-CNL000489

**Appx. 01274**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2016 are reconciled in the tables below.

*(in thousands)*

| Change in projected benefit obligation | | 2016 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 1,722 |
| Service cost | | 5 |
| Interest cost | | 67 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 657 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (150) |
| Benefit obligation at end of year | $ | 2,301 |

| Change in plan assets | | 2016 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 1,836 |
| Actual return on plan assets | | 884 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (150) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 2,570 |

| Reconciliation of Funded Status | | 2016 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,301 |
| Projected benefit obligation at end of year | | 2,301 |
| Fair value of plan assets at end of year | | 2,570 |
| Funded status at end of year | $ | 269 |

HIGHLY CONFIDENTIAL

D-CNL000490

**Appx. 01275**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The Partnership does not expect to contribute to the plan during 2016.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2016:

| | |
|---|---|
| Discount rate | 3.69% |
| Rate of compensation increase | N/A |

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2016:

| | |
|---|---|
| Discount rate | 4.00% |
| Expected long-term return on plan assets | 4.00% |
| Rate of compensation increase | N/A |

As of December 31, 2016, there were no plan assets categorized as Level 3.

14. **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2016, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2009 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2016.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

HIGHLY CONFIDENTIAL

D-CNL000491

Appx. 01276

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2016, a minimal withholding tax liability of $1.3 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  As of December 31, 2016, a liability to account for uncertain tax positions of $0.1 million is classified within accrued expenses within the Consolidated Balance Sheet. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2016.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates.  In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2016, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2013 forward (with limited exceptions).

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income.  Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

HIGHLY CONFIDENTIAL

D-CNL000492

**Appx. 01277**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2016. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2016, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2013 forward (with limited exceptions).

**Restoration Offshore**

Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2016. As of December 31, 2016, the tax years that remain subject to examination by major jurisdictions under the statute of limitations is from the year 2013 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

15.    **Legal Proceedings**

On July 15, 2008, Crusader Master, Highland Offshore Partners, CDO Master Fund, Multi Strategy Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida ('the Tousa action"). The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. The Defendants believed they acted in good faith pursuant to the terms of the relevant agreements and appealed the decision. In February 2011, the District Court of Florida quashed the judgment against the Defendants and overturned the ruling that resulted in the Defendants recording the reserve. The plaintiffs appealed the ruling of the District Court, and the issue was sent to the Eleventh Circuit of Florida. On May 15, 2012, the Eleventh Circuit unexpectedly reversed the District Court's ruling, and remanded the case back to the District Court for review. The last such case was heard by the US Supreme Court case on January 14, 2015. On June 23, 2015, the District Court remanded the case back to the Bankruptcy Court for a report and recommendations regarding the effects of certain settlements on the Plaintiff's available damages. On April 1, 2016, the Bankruptcy Court issued its Report and Recommendations to the District Court. Briefing on the Report and Recommendations was completed in June 2016. On March 8, 2017, the District Court substantially adopted the Bankruptcy Court Report and Recommendations, which affirmed the Defendants' liability. The case has now been retuned to the Eleventh Circuit for additional appeals. Based on the ruling, the Consolidated Entities recorded a combined reserve of approximately $5.8 million as of December 31, 2016. This reserve is included in *Accrued and other liabilities* on the Consolidated Balance Sheet.

Multi Strategy Master and certain of its affiliates (collectively, the "UBS Defendants") have respectively been named as defendants in two separate lawsuits filed by UBS Securities LLC and UBS AG, London Branch (collectively, "UBS Plaintiffs") in the Supreme Court of the State of New York, New York County (the "Court"). In the lawsuits, the UBS Plaintiffs seek damages from the UBS Defendants and other entities relating to a warehouse facility formed for a proposed collateralized loan obligation, or CLO, transaction that was not completed. The UBS Plaintiffs seek monetary damages of approximately $0.7 million, plus certain costs, fees and expenses. The UBS Plaintiffs also seek to unwind alleged fraudulent transfers involving the UBS Defendants. Although the UBS Plaintiffs have not pled a specific damages amount against the UBS Defendants, any eventual damages award would be subject to pre-judgment interest of 9% (accrued as of December 3, 2008) as well as post-judgment interest of 9% (accrued as of the date a judgment, if any, is entered against the UBS Defendants). Each of the UBS Defendants filed a separate motion to dismiss, both of which were denied. In addition, Multi Strategy Master filed a motion for summary judgment, which was heard by the Court on February 14, 2014. On March 11, 2014, the Appellate Division of the Supreme Court of the State of New York (First Department) (the "Appellate Court") heard each of the UBS Defendants' respective appeals of the Court's denials of their respective motions to dismiss. The Court has not yet set a trial date. Though Multi Strategy Master continues to vigorously defend against the UBS Plaintiffs' claims, at this time, the General Partner is unable to provide a reasonably probable estimate of the expected outcome.

41

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2016**

On July 16, 2013, Credit Suisse Securities (USA), LLC ("Credit Suisse") filed suit against Multi Strategy Master and other affiliates (the "Credit Suisse Defendants"). Credit Suisse's claims relate to several outstanding trades of debt tranches of Westgate Investments, On May 5, 2014, Credit Suisse moved for summary judgment on both the principal amount and statutory pre-judgment interest. The Court granted the motion on August 6, 2014, and issued judgment on September 11, 2014 in the amount of $6.4 million in principal, plus $3.4 million in interest, for a total of $9.8 million. Multi Strategy Master continued to accrue interest based on the New York statutory rate through November 30, 2015. As of November 30, 2015, an additional $0.7 million in interest had been accrued, for a total of $4.1 million in interest. At November 30, 2015 total interest and principal liability of $10.5 million had been accrued. On January 14, 2016, the Multi Strategy Master had reached settlement with Credit Suisse for payment of $9.9 million in satisfaction and release of Credit Suisse's claims. The difference between the settlement amount and what was accrued at November 30, 2015, approximately $0.5 million, was recognized as of December 31, 2015, bringing the total accrued liability down to the settlement amount. The Master Partnership made payments of approximately $1.5 million on January 20, 2016, $2.5 million on May 6, 2016, and $5.9 million on August 8, 2016, in full settlement of the outstanding liability. As of December 31, 2016, Partnership had no liability recorded on the Consolidated Balance Sheet related to Credit Suisse.

In April 2012, the Partnership filed suit against a former employee for breach of contract, defamation and theft of trade secrets. The former employee filed a counterclaim with numerous, unrelated allegations. The Partnership refuted each allegation in detail. The former employee sought unspecified damages against the Partnership and certain affiliates. On February 6, 2014, the jury found the former employee breached his fiduciary duty to the Partnership. The jury found that neither the Partnership nor any of its employees had breached any duty, and awarded $2.8 million to the Partnership. The jury also found that HERA owed $2.6 million related to an employee retention plan. The court entered judgment on the verdict on July 11, 2014. On August 22, 2016, the Court of Appeals for the Fifth District of Texas (Dallas) affirmed the judgment against the former employee in favor of the Partnership in the amount of $2.8 million plus post-judgment interest. The Partnership then sought to enforce the judgment. The former employee paid the Partnership $3.1 million on December 14, 2016 in complete satisfaction of the outstanding judgment.

From time to time the Partnership is party to disputes with disgruntled former employees. One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions. The former employee has asserted counterclaims related to his time employed by the Partnership. The matter has been referred to arbitration and at this time, the General Partner is unable to provide a reasonably probable estimate of the expected outcome.

The Partnership is engaged in litigation with two groups of investors relating to the wind down and distribution of the remaining assets in Crusader and Credit Strategies funds. With respect to the Crusader fund, at this time, the General Partner is unable to provide a reasonably probable estimate of the expected outcome. With respect to the Credit Strategies fund, subsequent to year end a settlement was reached. Refer to Note 16 for additional discussion of settlement terms.

In addition to the legal actions that are discussed above, the Partnership is subject to other legal actions arising from the ordinary course of its business. The ultimate outcome of these other cases is inherently uncertain and could result in additional losses to the Partnership.

42

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2016**

16.   **Subsequent Events**

Over the course of 2017 through the report date, the Partnership has distributed equity to its partners in the aggregate amount of $18.3 million.

On January 5, 2017 the Partnership received a $5.5 million pay down on the outstanding Contribution Agreement.

On May 12, 2017, the Partnership entered into an agreement, approved by the independent Redeemer Committee of the Credit Strategies Fund, whereby the Partnership and Highland New York paid the Credit Strategies Fund $23.0 million in exchange for the remaining assets of the Credit Strategies Fund and releases from the on-going litigation between the Partnership and the Redeemer Committee.  Related to this transaction and release of on-going litigation claims of the Partnership, Cornerstone Health Care Group, Inc., with the approval of a special committee of its independent directors, paid indemnification to the Partnership in the amount of $17.4 million.

The Partnership has performed an evaluation of subsequent events through May 19, 2017, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000497

**Appx. 01282**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2016**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 16,716 | $ 13,413 | $ - | $ 30,129 |
| Investments at fair value | 148,034 | 949,876 | - | 1,097,910 |
| Equity method investees | 171,319 | - | (171,319) | - |
| Management and incentive fees receivable | 12,583 | - | - | 12,583 |
| Due from brokers | - | 892 | - | 892 |
| Other assets | 8,083 | 9,915 | (5,089) | 12,909 |
| Notes and other amounts due from affiliates | 172,671 | - | - | 172,671 |
| Notes receivable | 6,421 | - | - | 6,421 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $8,533 | 6,747 | - | - | 6,747 |
| **Total assets** | $ 542,574 | $ 974,096 | $ (176,408) | $ 1,340,262 |
| **Liabilities and partners' capital** | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,417 | $ 26 | $ - | $ 4,443 |
| Securities sold, not yet purchased | - | 146,792 | - | 146,792 |
| Withdrawals payable | - | 68,199 | - | 68,199 |
| Due to brokers | 29,505 | 143,136 | (994) | 171,647 |
| Due to brokers for securities purchased, not yet settled | - | 1,614 | - | 1,614 |
| Accrued and other liabilities | 36,960 | 9,973 | (4,095) | 42,838 |
| Debt and notes payable | 25,763 | 20,190 | - | 45,953 |
| Investment liabilities | 27,318 | - | - | 27,318 |
| **Total liabilities** | 123,963 | 389,930 | (5,089) | 508,804 |
| Non-controlling interest | - | 412,847 | - | 412,847 |
| Commitments | | | | |
| **Partners' capital** | 418,611 | 171,319 | (171,319) | 418,611 |
| **Total liabilities and partners' capital** | $ 542,574 | $ 974,096 | $ (176,408) | $ 1,340,262 |

HIGHLY CONFIDENTIAL

D-CNL000498

**Appx. 01283**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Statement of Income**
**Year Ended December 31, 2016**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---:|---:|---:|---:|
| **Revenue:** | | | | |
| Management fees | $ 52,599 | $ - | $ - | $ 52,599 |
| Interest and investment income | 2,750 | 33,449 | (1,992) | 34,207 |
| Shared services fees | 9,563 | - | - | 9,563 |
| Incentive fees | 8,151 | - | - | 8,151 |
| Other income | 2,392 | 1,750 | - | 4,142 |
| Total revenue | 75,455 | 35,199 | (1,992) | 108,662 |
| **Expenses:** | | | | |
| Compensation and benefits | 36,160 | 967 | - | 37,127 |
| Professional fees | 8,758 | 2,274 | - | 11,032 |
| Interest expense | 2,478 | 3,283 | - | 5,761 |
| Marketing and advertising expense | 5,170 | - | - | 5,170 |
| Bad debt expense | 2,094 | - | - | 2,094 |
| Depreciation and amortization | 1,367 | - | - | 1,367 |
| Investment and research consulting | 829 | - | - | 829 |
| Other operating expenses | 7,334 | 6,935 | (3,109) | 11,160 |
| Total expenses | 64,190 | 13,459 | (3,109) | 74,540 |
| Other income | 10,779 | - | - | 10,779 |
| Income before investment and derivative activities | 22,044 | 21,740 | 1,117 | 44,901 |
| **Realized and unrealized gain from investments and derivatives:** | | | | |
| Net realized gain on investments and derivatives | 63,605 | 185,347 | (123,220) | 125,732 |
| Net change in unrealized loss on investments and derivatives | 122,444 | (200,093) | - | (77,649) |
| Total realized and unrealized gain from investments and derivatives | 186,049 | (14,746) | (123,220) | 48,083 |
| Net unrealized earnings from equity method investees | (168,737) | - | 168,737 | - |
| Net income | 39,356 | 6,994 | 46,634 | 92,984 |
| Net income attributable to the non-controlling interest | - | (53,628) | - | (53,628) |
| Net income attributable to Highland Capital Management, L.P. | $ 39,356 | $ (46,634) | $ 46,634 | $ 39,356 |

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
### (A Delaware Limited Partnership)
### Supplemental Unconsolidated Balance Sheet
### December 31, 2016

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 16,716 |
| Investments at fair value (cost $258,209)* | | 282,863 |
| Equity method investees | | 36,490 |
| Management and incentive fees receivable | | 12,583 |
| Other assets | | 8,083 |
| Notes and other amounts due from affiliates | | 172,671 |
| Notes receivable | | 6,421 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $8,533 | | 6,747 |
| **Total assets** | $ | 542,574 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,417 |
| Due to brokers | | 29,505 |
| Accrued and other liabilities | | 36,960 |
| Notes payable | | 25,763 |
| Investment liabilities | | 27,318 |
| Total liabilities | | 123,963 |
| Partners' capital | | 418,611 |
| **Total liabilities and partners' capital** | $ | 542,574 |

*Investments, at fair value includes $123.0 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2016 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

47

D-CNL000500
Appx. 01285

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2016**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 52,599 |
| Shared services fees | | 9,563 |
| Incentive fees | | 8,151 |
| Interest and investment income | | 2,750 |
| Miscellaneous income | | 2,392 |
| Total revenue | | 75,455 |
| | | |
| **Operating expenses:** | | |
| Compensation and benefits | | 36,160 |
| Professional fees | | 8,758 |
| Marketing and advertising expense | | 5,170 |
| Interest expense | | 2,478 |
| Bad debt expense | | 2,094 |
| Depreciation and amortization | | 1,367 |
| Investment and research consulting | | 829 |
| Other operating expenses | | 7,334 |
| Total operating expenses | | 64,190 |
| | | |
| Other income | | 10,779 |
| | | |
| Income before investment activities | | 22,044 |
| | | |
| **Realized and unrealized gains/losses from investments:** | | |
| Net realized gain on sale of investments | | 63,605 |
| Net change in unrealized loss on investments* | | (29,562) |
| Total realized and unrealized gain from investments | | 34,043 |
| | | |
| Losses from equity method investees: | | (16,731) |
| | | |
| **Net income** | $ | 39,356 |

*Net change in unrealized gain on investments includes $ 0.9 million of unrealized gains from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2016 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited consolidated financial statements.

48

# EXHIBIT 72

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2017**

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2017**

|  | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** |  |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Income | 3 |
| Consolidated Statement of Changes in Partners' Capital | 4 |
| Consolidated Statement of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-41 |
| Supplemental Information | 42-46 |

HIGHLY CONFIDENTIAL



**Report of Independent Auditors**

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2017, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31, 2017, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### Other Matter

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

May 18, 2018

1

*PricewaterhouseCoopers LLP, 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201*
*T: (214) 999-1400, F: (214) 754-7991, www.pwc.com/us*

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2017**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 103,479 |
| Investments at fair value (cost $1,027,878) | | 1,056,380 |
| Management and incentive fees receivable | | 11,861 |
| Due from broker for securities sold, not yet settled | | 2,287 |
| Other assets | | 14,674 |
| Notes and other amounts due from affiliates | | 163,403 |
| Other intangible assets | | 6,330 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $9,880 | | 5,832 |
| **Total assets** | $ | **1,364,246** |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,436 |
| Securities sold, not yet purchased (proceeds $63,187) | | 95,403 |
| Withdrawals payable | | 140,955 |
| Due to brokers | | 104,896 |
| Accrued and other liabilities | | 39,181 |
| Notes payable | | 19,995 |
| Investment liabilities | | 84,359 |
| **Total liabilities** | | **489,225** |
| | | |
| Non-controlling interest | | 424,844 |
| | | |
| Commitments and contingencies | | |
| | | |
| **Partners' capital** | | **450,177** |
| | | |
| **Total liabilities and partners' capital** | $ | **1,364,246** |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000505

**Appx. 01291**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Statement of Income**
**Year Ended December 31, 2017**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 37,875 |
| Interest and investment income | | 21,122 |
| Incentive fees | | 11,795 |
| Shared services fees | | 9,445 |
| Other income | | 9,790 |
| Total revenue | | 90,027 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 37,254 |
| Professional fees | | 14,757 |
| Interest expense | | 5,508 |
| Marketing and advertising expense | | 2,374 |
| Depreciation and amortization | | 1,340 |
| Investment and research consulting | | 1,101 |
| Bad debt expense | | 2,279 |
| Other operating expenses | | 7,915 |
| Total expenses | | 72,528 |
| | | |
| Other income | | 11,967 |
| | | |
| Income before investment and derivative activities | | 29,466 |
| | | |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | |
| Net realized loss on investments and derivatives | | (9,682) |
| Net change in unrealized gain on investments and derivatives | | 114,883 |
| Net realized and unrealized gain on investments and derivatives | | 105,201 |
| | | |
| Net income | | 134,667 |
| | | |
| Net income attributable to non-controlling interest | | 82,060 |
| | | |
| Net income attributable to Highland Capital Management, L.P. | $ | 52,607 |

The accompanying notes are an integral part of these consolidated financial statements.

3

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2017**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2016 | $ 83 | $ 418,528 | $ 418,611 |
| Net income attributable to Highland Capital Management, L.P. | 133 | 52,474 | 52,607 |
| Partner distributions | (53) | (20,988) | (21,041) |
| Partners' capital, December 31, 2017 | $ 163 | $ 450,014 | $ 450,177 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000507
**Appx. 01293**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2017**

*(in thousands)*

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 134,667 |
| Adjustment to reconcile net income to net cash | | |
| used in operating activities: | | |
| Net realized loss on investments and derivative transactions | | 9,682 |
| Net change in unrealized gain on investments and derivative transactions | | (114,883) |
| Amortization and depreciation | | 1,340 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 722 |
| Due from brokers | | (1,395) |
| Due from affiliate | | (2,246) |
| Other assets | | (1,764) |
| Intangible assets | | (6,330) |
| Accounts payable | | (6) |
| Accrued and other liabilities | | (3,658) |
| Due to brokers for securities purchased, not yet settled | | (1,614) |
| Due to brokers | | (66,753) |
| Net cash used in operating activities | | (52,238) |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (425) |
| Purchases of investments | | (237,987) |
| Proceeds from dispositions of investments | | 418,686 |
| Proceeds from securities sold, not yet purchased | | 16,456 |
| Issuance of notes receivable to affiliates | | (10,050) |
| Proceeds from repayments of notes receivable from affiliates | | 27,985 |
| Purchases of investments to cover securities sold, not yet purchased | | (61,160) |
| Net cash provided by investing activities | | 153,505 |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (9,569) |
| Capital contributions from minority interest investors of consolidated entities | | 1,705 |
| Capital withdrawals by minority interest investors of consolidated entities | | 1,242 |
| Partner distributions | | (21,295) |
| Net cash used in financing activities | | (27,917) |
| Net increase in cash and cash equivalents | | 73,350 |
| **Cash and cash equivalents** | | |
| Beginning of year | | 30,129 |
| End of year | $ | 103,479 |
| | | |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (4,900) |
| Interest receivable reclassified to promissory notes | | 4,390 |
| Taxes paid during the year | | (1,676) |
| Investments acquired for non-cash consideration | | 7,713 |
| Investments disposed for non-cash consideration | | 3,452 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000508
**Appx. 01294**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2017

1.    **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is owned by an unaffiliated trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2017, the Partnership provided investment advisory services for twenty-eight CLOs, six separate accounts, one master limited partnership, and eleven hedge fund or private equity structures, with total fee-earning assets under management of approximately $4.9 billion.

2.    **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest ($1.0M) in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2017, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

| | Unconsolidated VIE Net Assets | Carrying Value and Maximum Risk of Loss |
|---|---|---|
| Sponsored investment funds | $ 625,692,621 | $ 13,979,151 |

**Consolidation of Variable Interest Entities**
The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strat Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

- BB Votorantim, Highland Infrastructure LLC ("BB Votorantim"), a Delaware limited liability company which began operations on May 29, 2014.

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management Partners Charitable Trust #1, a trust that commenced operations on September 19, 2006;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd., a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

8

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Bandera Strategic Credit Partners I SLP, L.P., a Delaware limited liability company formed on April 3, 2014;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in HCM Holdco, LLC, a Delaware limited liability company formed on October 27, 2015 and;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016.

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide -

9

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

The following table includes a rollforward of non-controlling interests from December 31, 2016, to December 31, 2017.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2016 | $ 412,847 |
| Net income attributable to noncontrolling interest | 82,060 |
| Noncontrolling partner distributions | (70,063) |
| Noncontrolling interest, December 31, 2017 | $ 424,844 |

**Investment Transactions**

Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**

The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2017, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $37.9 million and $11.8 million, respectively.

**Shared Services Revenue**

The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2017, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.4 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 9.

HIGHLY CONFIDENTIAL

D-CNL000513

**Appx. 01299**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 14.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2017, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

**Notes Receivable**
Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

**Other Intangible Assets**
Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis. Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

HIGHLY CONFIDENTIAL

D-CNL000514

**Appx. 01300**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**

The Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**

Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

.

HIGHLY CONFIDENTIAL

D-CNL000515

**Appx. 01301**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Options Contracts**

The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments.  A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period.  When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability).  The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold.  When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid).  Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

**Margin Transactions**

To obtain more investable cash, the Consolidated Entities may use various forms of leverage including purchasing securities on margin.  A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**

Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable.  This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2017.  Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2017, the Consolidated Investment Funds had withdrawals payable of $141.0 million.

13

D-CNL000516
**Appx. 01302**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Foreign Currency Transactions**

The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2017. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

**Life Settlement Contracts**

One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2017, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $29.0 million.

**Financing**

The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**

The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**

Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Recently Issued Accounting Standards and Interpretations**

In January 2016, the FASB issued ASU 2016-01, Fair Value: Recognition and Measurement of Financial Assets and Liabilities. Under the new standard, all equity investments in unconsolidated entities (other than those accounted for using the equity method of accounting) will generally be measured at fair value through earnings. The standard is effective for fiscal periods beginning after December 15, 2018. The Partnership does not expect the adoption of this standard to have a significant impact on its Consolidated Financial Statements.

In February 2016, the FASB issued ASU 2016-02, Leases, which requires lessees to recognize assets and liabilities arising from most operating leases on the statement of financial position. The standard is effective for fiscal periods beginning after December 15, 2019. The Partnership is evaluating the impact of this standard on its Consolidated Financial Statements.

In August 2016, the FASB issued ASU 2016-15, Statement of Cash Flows - Classification of Certain Cash Receipts and Cash Payments, which clarifies how cash receipts and cash payments are classified in the statement of cash flows. The standard is effective for fiscal periods beginning after December 15, 2018. The Partnership does not expect the adoption of this standard to have a significant impact on its Consolidated Financial Statements.

In May, 2014, the FASB issued ASU 2014-09, Revenue from contracts with customers, and subsequently issued several related amendments. ASC 606 provides a comprehensive model for revenue recognition and is effective in fiscal periods beginning after December 15, 2018. ASC 606 supersedes Accounting Standards Codification ("ASC") 605 and all prior FASB guidance related to revenue recognition. ASC 606 provides accounting guidance for all revenue arising from contracts with customers and also specifies the accounting for costs incurred to obtain or fulfill a revenue generating contract. The Partnership does not expect the adoption of this standard to have a significant impact on its Consolidated Financial Statements.

3.   **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2017:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 7,192 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,795 |
| Computer and equipment | | 2,799 |
| Computer software | | 331 |
| Accumulated depreciation | | (9,880) |
| | $ | 5,832 |

Depreciation expense in 2017 totaled approximately $1.3 million for the Partnership and its subsidiaries.

15

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

4.   **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2017:

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---|---|---|---|
| Common equity securities | $ | 480,073 | $ | 758,007 |
| Closed-end mutual funds | | 100,328 | | 99,620 |
| Floating rate syndicated bank loans | | 138,781 | | 68,030 |
| Real Estate Investment Trusts | | 28,950 | | 39,406 |
| Life settlement contracts | | 57,922 | | 28,959 |
| Limited partnership interests | | 24,103 | | 27,863 |
| Participation interests | | 19,449 | | 14,199 |
| Rights & warrants | | 21,899 | | 9,691 |
| Asset-backed securities | | 57,365 | | 6,477 |
| LLC interests | | 12,803 | | 3,352 |
| Corporate bonds | | 85,946 | | 527 |
| Preferred equity | | 258 | | 249 |
| Total investments | $ | 1,027,878 | $ | 1,056,380 |

| | Proceeds | | Fair Value | |
|---|---|---|---|---|
| Securities sold, not yet purchased | $ | (63,187) | $ | (95,403) |

16

D-CNL000519

**Appx. 01305**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

5.    **Fair Value of Financial Instruments**

**Fair Value Measurement**

U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction.  When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs.  For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above.  In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates.  The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities.  In cases where observable inputs are not available, the Partnership and Consolidated Entities  develop methodologies that provide appropriate fair value estimates.  These methodologies are reviewed on a continuous basis to account for changing market conditions.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2017, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, participation interests, rights and warrants, option contracts, asset-backed securities, LLC interests, corporate bonds, and preferred equity. In addition, the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Equity Investments**

Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**

The Partnership and Consolidated Entities hold private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

18

D-CNL000521

**Appx. 01307**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Debt Securities**
The Partnership and Consolidated Entities invest in various types of debt, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Life Settlement Contracts**
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2017, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 2-3 | 1 | $ 5,000 | $ 2,566 |
| 4-5 | 2 | 28,785 | 8,882 |
| Thereafter | 10 | 111,500 | 17,511 |
| Total | 13 | $ 145,285 | $ 28,959 |

19

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Options Contracts**
The Partnership and its Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership and its Consolidated Entities purchase (writes) an option, an amount equal to the premium paid (received) by the purchaser is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the purchaser enters into a closing transaction), the purchaser realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership and its Consolidated Entities purchasing a security at a price different from the current market value.

**Asset-Backed Securities**
The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Entities generally utilize an independent third party firm to perform these calculations and provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**
The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. A majority of the Consolidated Entities investments and derivatives at December 31, 2017 are classified as Level 3 positions due to the absence of active markets with quoted prices for identical or similar investments. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2017:

HIGHLY CONFIDENTIAL

D-CNL000523

**Appx. 01309**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/17 |
|---|---|---|---|---|
| Common equity securities | $ 239,176 | $ 377,630 | $ 141,201 | $ 758,007 |
| Closed-end mutual funds | 99,620 | - | - | 99,620 |
| Floating rate syndicated bank loans | - | 3,723 | 64,307 | 68,030 |
| Real Estate Investment Trusts | 35,153 | 4,253 | - | 39,406 |
| Life settlement contracts | - | - | 28,959 | 28,959 |
| Limited partnership interests | - | - | 27,863 | 27,863 |
| Participation interests | 14,199 | - | - | 14,199 |
| Rights & warrants | 1,545 | 133 | 8,013 | 9,691 |
| Asset-backed securities | - | - | 6,477 | 6,477 |
| LLC interests | - | - | 3,352 | 3,352 |
| Corporate bonds | - | 527 | - | 527 |
| Preferred equity | 249 | - | - | 249 |
| Total | $ 389,942 | $ 386,266 | $ 280,172 | $ 1,056,380 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 95,403 | $ - | - | $ 95,403 |

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2017:

*(in thousands)*

| | Fair Value at December 31, 2016 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2017 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 117,160 | $ 1,257 | $ - | $ - | $ - | $ - | $ 22,784 | $ 141,201 |
| Floating rate syndicated bank loans | 54,703 | 11,171 | (14) | - | - | (8,254) | 6,701 | 64,307 |
| Life settlement contracts | 23,826 | 6,962 | (10,000) | - | - | 3,322 | 4,849 | 28,959 |
| Limited partnership interests | 24,630 | 10,663 | (8,594) | - | - | 3,157 | (1,993) | 27,863 |
| Rights & warrants | 7,414 | 36 | - | - | - | - | 563 | 8,013 |
| Participation interests | 11,980 | - | (5,389) | - | - | - | (6,591) | - |
| Asset-backed securities | 8,223 | 2,648 | (35,715) | - | 23,976 | 2,970 | 4,375 | 6,477 |
| LLC interests | 18,228 | 143 | (16,015) | - | 676 | 5,310 | (4,990) | 3,352 |
| Corporate bonds | - | - | - | - | - | (400) | 400 | - |
| | $ 266,164 | $ 32,880 | $ (75,727) | $ - | $ 24,652 | $ 6,105 | $ 26,098 | $ 280,172 |

Transfers from Level 2 to Level 3 or from Level 3 to Level 2 are due to changes in observable pricing inputs as compared to the prior year. No significant transfers between Level 1 or Level 2 fair value measurements occurred during the year ended December 31, 2017.

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $17.3 million of the net unrealized gains presented in the table above relate to investments held as of December 31, 2017.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

21

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

(Fair value in thousands)

| Category | Ending Balance at 12/31/2017 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 141,201 | Multiples Analysis | Multiple of EBITDA | 3.0x - 8.25x |
| | | | Cap Rate | 7.5 - 8.5% |
| | | | Minority Discount | 20% |
| | | | Liquidity Discount | 25% |
| | | Discounted Cash Flow | Discount Rate | 12 - 31.5% |
| | | | Terminal Multiple | 2.0x - 7.0x |
| | | | Minority Discount | 20% |
| | | | Discount for Lack of Marketability | 15% |
| | | Equity Valuation | Discount for Lack of Marketability | 15% |
| | | Bid Indications | N/A | N/A |
| | | Enterprise Valuation | Weightings | 0-60% |
| | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | 64,307 | Multiples Analysis | Multiple of EBITDA | 3.0x - 5.0x |
| | | | Multiple of Revenue | 0.4x - 0.5x |
| | | Escrow Recovery Analysis | Discount Rate | 11% |
| | | Enterprise Valuation | Weightings | 0-60% |
| | | Appraisal | N/A | N/A |
| | | Bid Indications | N/A | N/A |
| | | Discounted Cash Flow | Discount Rate | 12.3% - 31.5% |
| | | | Terminal Multiple | 2.0x |
| | | | Spread Adjustment | 0.2% - 6.3% |
| Life settlement contracts | 28,959 | Net Asset Value of Underlying Assets, based on third-party pricing vendor | Discount Rate | 16 - 17% |
| Limited partnership interests | 27,863 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & warrants | 8,013 | Discounted Cash Flow | Discount Rate | 12 - 17% |
| | | | Terminal Multiple | 7.0x |
| | | | Minority Discount | 20% |
| | | | Discount for Lack of Marketability | 15% |
| | | Multiples Analysis | Multiple of EBITDA | 7.75x - 8.25x |
| Asset-backed securities | 6,477 | Third-Party Pricing Vendor | N/A | N/A |
| | | Net Asset Value | N/A | N/A |
| | | Adjusted NAV | N/A | N/A |
| | | Blended Approach | Weightings | 20-80% |
| LLC interests | 3,352 | Discounted Cash Flow | Discount Rate | 6% |
| | | | Scenario Probabilities | 15 - 70% |
| | | | Illiquidity Discount | 10% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Appraisal | N/A | N/A |
| **Total** | **$ 280,172** | | | |

22

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

6.    **Securities Sold under Agreements to Repurchase**

Transactions involving securities sold under agreements to repurchase are treated as collateralized financial transactions, and are recorded at their fair market values.  In addition, interest earned on the securities is included in interest receivable, and interest accrued on amounts borrowed is included in interest payable.  For the year ended December 31, 2017, Multi Strategy Master expensed approximately $1.1 million for interest charged on the amounts borrowed for repurchase agreements.

In connection with transactions in agreements to repurchase, it is Multi Strategy Master's policy that its counterparty take possession of the underlying collateral securities, the fair value of which exceeds the principal amount of the agreements to repurchase, including accrued interest, at all times. If the counterparty defaults under agreements to resell, and the fair value of the collateral declines, the realization of the collateral by Multi Strategy Master may be delayed or limited.

To reduce counterparty credit risk with respect to repurchase agreements, Multi Strategy Master has entered into a master repurchase agreement, which allows Multi Strategy Master to make (or to have an entitlement to receive) a single net payment in the event of default (close-out netting) for outstanding payables and receivables with respect to repurchase agreements with the counterparty.

The master repurchase agreement includes credit related contingent features which allow the counterparty to terminate the agreement prior to maturity in the event Multi Strategy Master's net assets decline by a stated percentage or Multi Strategy Master fails to meet the terms of the agreement, which would cause the Master Partnership to accelerate payment of any net liability owed to the counterparty.

For financial reporting purposes, Multi Strategy Master does not offset repurchase agreement assets and liabilities that are subject to netting arrangements in the Consolidated Balance Sheet. Bankruptcy or insolvency laws of a particular jurisdiction may impose restrictions on or prohibitions against the right of offset in bankruptcy, insolvency or other events.

Collateral terms are contract specific for repurchase agreements. For repurchase agreements traded under master repurchase agreements, the collateral requirements are typically calculated by netting the mark to market amount for each transaction under such agreement and comparing that to the value of any collateral currently pledged by Multi Strategy Master or the counterparty.

For financial reporting purposes, cash collateral that has been pledged to cover obligations of Multi Strategy Master, if any, is reported in due to/from brokers on the Consolidated Balance Sheet.  Generally, the amount of collateral due from or to a party must exceed a minimum transfer amount threshold before a transfer has to be made.  To the extent amounts due to Multi Strategy Master from its counterparties are not fully collateralized, contractually or otherwise, Multi Strategy Master bears the risk of loss from counterparty non-performance.

At December 31, 2017, there were no repurchase or reverse repurchase agreements.

23

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

7.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange.  These investments trade in a limited market and it may not be possible to immediately liquidate them if needed.  In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity.  Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower.  Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities  have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies.  Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest.  They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions.  Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings.  These investments have substantial inherent risks.  Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates.  The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

HIGHLY CONFIDENTIAL

D-CNL000528

**Appx. 01314**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Corporate Bonds, Preferred Securities, and Loans**
The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities). Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal. They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions. Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities. The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2017, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**
The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

26

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Leverage Risk**

The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Entities. If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses. In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities. In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**

The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**

At December 31, 2017, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**

The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities. Refer to Note 15 for a discussion of open litigation.

HIGHLY CONFIDENTIAL

D-CNL000530

**Appx. 01316**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2017

**8. Other Intangible Assets**

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations of a certain fund. The current carrying value of these rights and obligations is $3.5 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.5 million.

On December 19, 2017, the Partnership obtained value for subadvisory and shared servicing rights from an affiliate. The current carrying value of this intangible asset is approximately $2.8 million.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis. The Partnership has determined that no impairment charge is necessary for the current year.

**9. Related Party Transactions**

**Investments Under Common Control**

Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2017, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| American Banknote Corporation | Common Equity | $ 747 |
| American Home Patient | Common Equity | 1,793 |
| Carey International, Inc | Term Loan | 5,392 |
| CCS Medical, Inc. | Loan | 6,246 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 62,931 |
| JHT Holdings Inc. | Term Loan | 3,127 |
| JHT Holdings Inc. | Common Stock | 9,654 |
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 375,106 |
| OmniMax International, Inc. (fka Euramax Holdings, Inc.) | Warrants | 1,086 |
| OmniMax International, Inc. (fka Euramax Holdings, Inc.) | Term Loan | 45,445 |
| OmniMax International, Inc. (fka Euramax Holdings, Inc.) | Common Stock | 15,367 |
| Trussway Industries, Inc. | LLC Units | 51,707 |
| Turtle Bay Holdings, LLC | LLC Units | 628 |

28

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2017

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2017, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| ACIS 2013-2A | Asset backed debt | $ 1,428 |
| Bandera Strategic Credit Partners | Limited Partnership interest | 3,628 |
| Harko, LLC | LLC Units | 2,466 |
| Highland CLO Funding | Partnership Interest | 928 |
| Highland Energy MLP Fund | Mutual fund shares | 1,893 |
| Highland Floating Rate Opportunities Fund | Mutual fund shares | 1,007 |
| Highland Global Allocation Fund | Mutual fund shares | 2,144 |
| Highland Long/Short Equity Fund | Mutual fund shares | 297 |
| Highland Long/Short Healthcare Fund | Mutual fund shares | 2,632 |
| Highland Master Loan Fund | Limited Partnership interest | 105 |
| Highland Merger Arbitrage Fund | Mutual fund shares | 1,241 |
| Highland Opportunistic Credit Fund | Mutual fund shares | 5,259 |
| Highland Premier Growth Equity Fund | Mutual fund shares | 72 |
| Highland Prometheus Master Fund | Partnership Interest | 930 |
| Highland Small Cap Equity Fund | Mutual fund shares | 498 |
| NexPoint Credit Strategies Fund | Mutual fund shares | 55,161 |
| NexPoint Multi Family Capital Trust | REIT | 4,253 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,135 |
| NexPoint Residential Trust | REIT | 59,703 |

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2017, approximately $8.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**
During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2017, balances in these accounts were approximately $1.1 million, a portion of which exceeds Federal deposit insurance limits.

**Investment in Affiliated Loans**
During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $9.2 million and is included in Interest and investment income in the Consolidated Statement of Income. At December 31, 2017, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $74.4 million and $49.4 million, respectively.

29

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2017, Highland Capital Management Fund Advisors, L.P. ("HCMFA") issued a promissory note to the Partnership in the amount of $0.2 million. The note accrues interest at a rate of 1.52%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2017 total interest and principal due on outstanding promissory notes was approximately $4.9 million and is payable on demand. The Partnership will not demand payment on amounts owed prior to May 31, 2019. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On May 31, 2017, the Partnership combined its outstanding promissory and revolving notes from NexPoint Advisors, L.P. ("NexPoint") into a single promissory note with principal outstanding of $30.7 million and accruing interest at a rate of 6.0% with straight-line amortization over 30 annual payments commencing in the year ended December 31, 2017. As of December 31, 2017, $29.7 million of principal was outstanding on this note. No interest is outstanding as of December 31, 2017. Total interest expense for the year ended December 31, 2017, was approximately $1,7 million. The fair value of the Partnership's outstanding note receivable approximates the carrying value of the note receivable.

During the year ended December 31, 2017, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $2.5 million. The note accrues interest at a rate of 8.0%. As of December 31, 2017 total interest and principal due on outstanding promissory notes was approximately $8.5 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2017, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $2.0 million. All outstanding promissory notes accrue interest at a rate ranging from 2.58 - 2.78%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2017 total interest and principal due on outstanding promissory notes was approximately $14.1 million and is payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2017, James Dondero ("Dondero") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 2.03%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2017 total interest and principal due on outstanding promissory note was approximately $14.5 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2017, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2017 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

During the year ended December 31, 2017, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.75%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2017 total interest and principal due on outstanding promissory notes was approximately $22.8 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust. Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $5.7 million. As of December 31, 2017 total interest and principal due on the Note Receivable was approximately $60.7 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2017, total marketing fee expense charged to the Partnership by Highland New York was approximately $1.6 million. As of December 31, 2017, net amounts owed to the Partnership by Highland New York was approximately $4.5 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2017, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2017, no amounts were owed to the Partnership by Falcon for services rendered.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $4.8 million and $6.5 million, respectively. As of December 31, 2017, amount owed to the Partnership by Acis was approximately $1.9 million, against which the Partnership has recorded a $1.6 million reserve based on estimated collectability.

Effective January 1, 2013, the Partnership commenced performing services on behalf of NexPoint. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fee charged by the Partnership to NexPoint was approximately $0.6 million and as of December 31, 2017, $0.1 million was owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2017, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2017, the total fee charged by the Partnership to NexBank was approximately $3.1 million and as of December 31, 2017, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2017, the total fee charged to NREA by the Partnership was approximately $0.6 million and as of December 31, 2017, amounts owed by NREA to the Partnership for services rendered were approximately $0.6 million.

**Investment liability**
On January 28, 2016, the Partnership entered into a participation agreement with Cornerstone Healthcare Group Holding, Inc. ("Cornerstone") for securities purchased and held on their behalf which had a value of $8.0 million as of the transaction date. The fair value of the Agreement will fluctuate with the fair value of the held securities, throughout the term of the Agreement. As of December 31, 2017 the fair value of the securities were $14.2 million.

32

D-CNL000535
**Appx. 01321**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. During the course of the year, certain of the participated investments were monetized and proceeds were delivered to the holder of the participated interest. As of December 31, 2017, the fair value of the participated investments was $10.9 million.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2017 the remaining principal payable on the promissory note was $1.0 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million, plus in the event of a sale of Trussway on or prior to June 1, 2017, 50% of the excess of the price per share over the closing date price per share. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2017 the remaining principal payable on the promissory notes was $15.4 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2017, the fair value of the loans was $42.5 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

10.    **Notes Payable**

**Promissory Note**
On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank in the amount of $9.5 million. The promissory note will mature on August 17, 2018. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc. As of December 31, 2017 the remaining principal payable on the promissory note was $6.9 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

HIGHLY CONFIDENTIAL

D-CNL000536

**Appx. 01322**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2019. The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2017 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on September 10, 2041. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2017 the remaining principal payable on the promissory note was $3.6 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

**11.   Due to Broker**

As of December 31, 2017 the due to broker balance of approximately $104.9 million is payable to financing counterparties for margin transactions.

**12.   Commitments and Contingencies**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 9 for commitments of certain subsidiaries in affiliated loans.

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 15.

**Operating Leases**
The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

HIGHLY CONFIDENTIAL

D-CNL000537

**Appx. 01323**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

*(in thousands)*

| **Years Ending December 31,** | |
|---|---:|
| 2018 | 1,521 |
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $ 6,725 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2017.

**13.  Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2017 expense reflects a service cost charge for the value of the new participant's benefit earned during 2017.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2017 are reconciled in the tables below.

HIGHLY CONFIDENTIAL

D-CNL000538

**Appx. 01324**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

*(in thousands)*

| Change in projected benefit obligation | | 2017 |
|---|---|---:|
| Benefit obligation at beginning of year | $ | 2,301 |
| Service cost | | 6 |
| Interest cost | | 79 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 478 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (286) |
| Benefit obligation at end of year | $ | 2,578 |

| Change in plan assets | | 2017 |
|---|---|---:|
| Fair value of plan assets at beginning of year | $ | 2,570 |
| Actual return on plan assets | | 640 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (286) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 2,924 |

| Reconciliation of Funded Status | | 2017 |
|---|---|---:|
| Accumulated benefit obligation at end of year | $ | 2,578 |
| Projected benefit obligation at end of year | | 2,578 |
| Fair value of assets at end of year | | 2,924 |
| Funded status at end of year | $ | 346 |

The Partnership did not contribute to the plan during 2017.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2017:

| | |
|---|---:|
| Discount rate | 3.19% |
| Rate of compensation increase | N/A |

36

D-CNL000539

**Appx. 01325**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2017:

| | |
|---|---|
| Discount rate | 3.69% |
| Expected long-term return on plan assets | 3.69% |
| Rate of compensation increase | N/A |

As of December 31, 2017, there were no plan assets categorized as Level 3.

14. **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2017, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2014 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2017.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2017, a minimal withholding tax liability of $0.1 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

37

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2017.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2017, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2014 forward (with limited exceptions).

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2017. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2017, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2014 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

38

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2017. As of December 31, 2017, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2014 forward (with limited exceptions). During the year, Restoration Offshore received approximately $0.7 million related to a tax refund. This amount is reflected in the Statement of Cash Flows as a component of changes in other assets.

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

HIGHLY CONFIDENTIAL

D-CNL000542

**Appx. 01328**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2017**

15.    **Legal Proceedings**

On July 15, 2008, Highland Offshore Partners, Multi Strategy Master, certain affiliates, and numerous external parties (collectively, the "Defendants") were named as parties to an action filed with the Bankruptcy Court of the Southern District of Florida ('the Tousa action"). The action related to a secured lending transaction and subsequent refinancing arrangement in which the Defendants participated. On October 13, 2009, the Bankruptcy Court ruled in favor of the plaintiffs and ordered the Defendants to disgorge the principal, interest, and fees they received in connection with the refinancing arrangement. In addition, the Court ordered the defendants to pay simple interest on the disgorged amount at an annual rate of 9%. The Defendants believed they acted in good faith pursuant to the terms of the relevant agreements and appealed the decision. In February 2011, the District Court of Florida quashed the judgment against the Defendants and overturned the ruling that resulted in the Defendants recording the reserve. The plaintiffs appealed the ruling of the District Court, and the issue was sent to the Eleventh Circuit of Florida. On May 15, 2012, the Eleventh Circuit unexpectedly reversed the District Court's ruling, and remanded the case back to the District Court for review. The last such case was heard by the US Supreme Court case on January 14, 2015. On June 23, 2015, the District Court remanded the case back to the Bankruptcy Court for a report and recommendations regarding the effects of certain settlements on the Plaintiff's available damages. On April 1, 2016, the Bankruptcy Court issued its Report and Recommendations to the District Court. Briefing on the Report and Recommendations was completed in June 2016. On March 8, 2017, the District Court substantially adopted the Bankruptcy Court Report and Recommendations, which affirmed the Defendants' liability. The case has now been retuned to the Eleventh Circuit for additional appeals. Based on the ruling, the Consolidated Entities recorded a combined reserve of approximately $5.8 million as of December 31, 2016. During 2017, the Consolidated Entities settled the Tousa action for approximately $7.7 million. Final settlement and dismissal was approved by the court on January 12, 2018. The difference (approximately $2.0 million) between the amount accrued at December 31, 2016 and the amount paid was included in the Consolidate Income Statement as a realized loss.

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents. On February 19, 2010, the court dismissed all claims against the Partnership. UBS since has filed additional claims against the Partnership and certain additional investment vehicles. On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims. Additional claims were dismissed in a further appellate ruling issued on October 31, 2017. The trial court has not indicated when UBS's remaining claims against the Partnership will go to trial.

From time to time the Partnership is party to disputes with disgruntled former employees. One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions. The former employee has asserted counterclaims related to his time employed by the Partnership. Arbitration on the matter has resolved and the matter is proceeding in Texas state and federal court.

40

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2017**

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information. Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested. The dispute over the amount of his vested interest is on-going. Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership was engaged in litigation with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Credit Strategies Fund. On May 12, 2017, the Partnership entered into an agreement, approved by the independent Redeemer Committee of the Credit Strategies Fund, whereby the Partnership and Highland New York paid the Credit Strategies Fund $23.0 million in exchange for the remaining assets of the Credit Strategies Fund and releases from the on-going litigation between the Partnership and the Redeemer Committee. Related to this transaction and release of on-going litigation claims of the Partnership, Cornerstone Health Care Group, Inc., with the approval of a special committee of its independent directors, paid indemnification to the Partnership in the amount of $17.4 million, which is recorded in Other income on the Consolidated Statement of Income. Of the $23.0 million paid, $14.3 million is recorded as a settlement expense which is a reduction to Other income on the Consolidated Statement of Income.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

16.  **Subsequent Events**

Over the course of 2018, through the report date, James Dondero issued promissory notes to the Partnership in the amount of $11.7 million. The notes accrue interest at a rate ranging from 2.59%-2.66%.

The Partnership has performed an evaluation of subsequent events through May 18, 2018, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000544

**Appx. 01330**

**Highland Capital Management, L.P.**

**(A Delaware Limited Partnership)**

**As of And Year Ended December 31, 2017**

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000545

**Appx. 01331**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2017**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 10,237 | $ 93,242 | $ - | $ 103,479 |
| Investments at fair value | 181,987 | 874,393 | - | 1,056,380 |
| Equity method investees | 180,938 | - | (180,938) | - |
| Management and incentive fees receivable | 10,916 | 945 | - | 11,861 |
| Due from brokers | - | 2,287 | - | 2,287 |
| Other assets | 12,368 | 7,113 | (4,807) | 14,674 |
| Notes and other amounts due from affiliates | 165,724 | - | (2,321) | 163,403 |
| Other intangible assets | 2,830 | 3,500 | - | 6,330 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $9,880 | 5,775 | 57 | - | 5,832 |
| **Total assets** | $ 570,775 | $ 981,537 | $ (188,066) | $ 1,364,246 |
| **Liabilities and partners' capital** | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,296 | $ 140 | $ - | $ 4,436 |
| Securities sold, not yet purchased | - | 95,403 | - | 95,403 |
| Withdrawals payable | - | 140,955 | - | 140,955 |
| Due to affiliates | 4,509 | - | (4,509) | - |
| Due to brokers | 35,833 | 69,772 | (709) | 104,896 |
| Accrued and other liabilities | 34,468 | 4,313 | 400 | 39,181 |
| Notes payable | 16,420 | 5,885 | (2,310) | 19,995 |
| Investment liabilities | 25,072 | 59,287 | - | 84,359 |
| **Total liabilities** | 120,598 | 375,755 | (7,128) | 489,225 |
| Non-controlling interest | - | 424,844 | - | 424,844 |
| Commitments and contingencies | | | | |
| **Partners' capital** | 450,177 | 180,938 | (180,938) | 450,177 |
| **Total liabilities and partners' capital** | $ 570,775 | $ 981,537 | $ (188,066) | $ 1,364,246 |

43

D-CNL000546

**Appx. 01332**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Statement of Income**
**Year Ended December 31, 2017**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---:|---:|---:|---:|
| **Revenue:** | | | | |
| Management fees | $ 37,098 | $ 777 | $ - | $ 37,875 |
| Interest and investment income | 4,479 | 16,643 | - | 21,122 |
| Incentive fees | 10,042 | 1,753 | - | 11,795 |
| Shared services fees | 9,445 | - | - | 9,445 |
| Other income | 6,846 | 2,944 | - | 9,790 |
| Total revenue | 67,910 | 22,117 | - | 90,027 |
| **Expenses:** | | | | |
| Compensation and benefits | 36,312 | 942 | - | 37,254 |
| Professional fees | 12,166 | 2,591 | - | 14,757 |
| Interest expense | 1,669 | 3,839 | - | 5,508 |
| Marketing and advertising expense | 2,374 | - | - | 2,374 |
| Depreciation and amortization | 1,333 | 7 | - | 1,340 |
| Investment and research consulting | 1,101 | - | - | 1,101 |
| Bad debt expense | 2,279 | - | - | 2,279 |
| Other operating expenses | 6,965 | 950 | - | 7,915 |
| Total expenses | 64,199 | 8,329 | - | 72,528 |
| Other income | 11,967 | - | - | 11,967 |
| Income before investment and derivative activities | 15,678 | 13,788 | - | 29,466 |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | | | |
| Net realized loss on investments and derivatives | 6,495 | (16,177) | - | (9,682) |
| Net change in unrealized gain on investments and derivatives | 8,853 | 106,030 | - | 114,883 |
| Net realized and unrealized gain on investments and derivatives | 15,348 | 89,853 | - | 105,201 |
| Net unrealized earnings from equity method investees | 21,581 | - | (21,581) | - |
| Net income | 52,607 | 103,641 | (21,581) | 134,667 |
| Net income attributable to non-controlling interest | - | 82,060 | - | 82,060 |
| Net income attributable to Highland Capital Management, L.P. | $ 52,607 | $ 21,581 | $ (21,581) | $ 52,607 |

44

D-CNL000547

Appx. 01333

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2017**

*(in thousands)*

**Assets**

Current assets:

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 10,237 |
| Investments at fair value (cost $267,265)* | | 321,211 |
| Equity method investees | | 41,714 |
| Management and incentive fees receivable | | 10,916 |
| Other assets | | 12,368 |
| Notes and other amounts due from affiliates | | 165,724 |
| Other intangible assets | | 2,830 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $9,873 | | 5,775 |
| **Total assets** | $ | 570,775 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---|
| Accounts payable | $ | 4,296 |
| Due to affiliate | | 4,509 |
| Due to brokers | | 35,833 |
| Accrued and other liabilities | | 34,468 |
| Notes payable | | 16,420 |
| Investment liabilities | | 25,072 |
| Total liabilities | | 120,598 |
| Partners' capital | | 450,177 |
| **Total liabilities and partners' capital** | $ | 570,775 |

*Investments, at fair value includes $144.9 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2017 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

45

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2017**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 37,098 |
| Incentive fees | | 10,042 |
| Shared services fees | | 9,445 |
| Interest and investment income | | 4,479 |
| Miscellaneous income | | 6,846 |
| Total revenue | | 67,910 |
| **Expenses:** | | |
| Compensation and benefits | | 36,312 |
| Professional fees | | 12,166 |
| Marketing and advertising expense | | 2,374 |
| Interest expense | | 1,669 |
| Depreciation and amortization | | 1,333 |
| Investment and research consulting | | 1,101 |
| Bad debt expense | | 2,279 |
| Other operating expenses | | 6,965 |
| Total expenses | | 64,199 |
| Other income | | 11,967 |
| Income before investment activities | | 15,678 |
| **Realized and unrealized gains/losses on investments:** | | |
| Net realized gain on sale of investments | | 6,495 |
| Net change in unrealized gain on investments* | | 27,323 |
| Total realized and unrealized gain on investments | | 33,818 |
| Income from equity method investees: | | 3,111 |
| **Net income** | $ | 52,607 |

*Net change in unrealized gain on investments includes $ 18.5 million of unrealized gains from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2017 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000549

**Appx. 01335**

# EXHIBIT 73

**Payment history - Retired Dondero notes**

| Date | Total Dondero payment amount | "Restructure note" | | January 18, 2018 Note | | Total Received in respect of retired notes |
|---|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest | |
| 12/8/2017 | $ 677,501 | $ 499,242 | $ 178,258 | $ - | $ - | $ 677,501 |
| 5/31/2018 | - | (120,949) | 120,949 | | | - |
| 12/18/2018 | 2,000,000 | - | - | 1,812,768 | 187,232 | 2,000,000 |
| 12/19/2018 | 782,623 | 499,242 | 283,381 | - | - | 782,623 |
| 1/18/2019 | - | - | - | (13,390) | 13,390 | - |
| 2/14/2019 | 3,000,000 | 2,955,463 | 44,537 | - | - | 3,000,000 |
| 3/13/2019 | 5,000,000 | 4,983,447 | 16,553 | - | - | 5,000,000 |
| 5/2/2019 | 2,400,000 | 2,383,204 | 16,796 | - | - | 2,400,000 |
| 5/3/2019 | 4,400,000 | 3,777,624 | (118,479) | 740,855 | - | 4,400,000 |
| 5/7/2019 | 600,000 | - | - | 600,000 | - | 600,000 |
| 5/23/2019 | 1,500,000 | - | - | 1,500,000 | - | 1,500,000 |
| 6/7/2019 | 3,000,000 | - | - | 3,000,000 | - | 3,000,000 |
| 12/23/2019 | 783,012 | - | - | 259,767 | 59,517 | 319,284 * |
| **Total** | **$ 24,143,136** | **$ 14,977,274** | **$ 541,995** | **$ 7,900,000** | **$ 260,139** | **$ 23,679,408** |

* Difference between total payment of $783k and amount applied to January 18, 2018 note of $319k was applied to the still outstanding notes as follows:
2/2/18 Note: $239,475.29 principal, $166,840.32 interest or $406,315.61 total
8/1/18 Note: $29,954.22 interest
8/13/18 Note: $27,458.03 interest
Total of $463,727.86 applied

Appx. 01337

# EXHIBIT 74

Appx. 01338

# PROMISSORY NOTE

$3,825,000                                                    February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Tax Loan.  This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

**Exhibit 1**

Appx. 01339

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

# EXHIBIT 75



## OPERATING RESULTS

**February 2018**

Exhibit 2

**Appx. 01342**

**Highland Capital Management, L.P.**
**Significant Items Impacting HCMLP's Balance Sheet**
**February 2018**

CLOs

███████████████████

Operating Activities

███████████████████
██████████████████
███████████████████
██████████████████
██████████████████

Investments

█████████████
███████████████
███████████████
████████████████████
██████████████
██████████████
██████████████████████
█████████████████████
███████████████
███████████████

Other
 - ($3.8M) partner loan

**Highland Capital Management, L.P.**
**Financial/Operational Highlights**
**February 2018 Close Package**
*(in millions)*

|  | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|
| **Cash** | $ 6.4 | $ 10.2 | $ 2.2 | $ 9.6 |
| **Operating Revenue** | $ 4.3 | $ 13.9 | $ 4.2 | $ 4.4 |
| **Operating Expenses** [1] | (4.2) | (19.7) | (3.7) | (4.5) |
| **Operating Income** | $ 0.1 | $ (5.8) | $ 0.5 | $ (0.1) |
| **Add back: Non-Recurring Items** | $ - | $ - | $ - | $ - |
| **Adjusted Operating Income** | $ 0.1 | $ (5.8) | $ 0.5 | $ (0.1) |
| **Net Income/(Loss)** | $ 20.4 | $ 17.0 | $ 7.2 | $ (26.1) |

|  | MTD | YTD | LTM |
|---|---|---|---|
| **Operating Cash Flow** [2] | $ (6.0) | $ (4.2) | $ (7.6) |
| Interest Expense | (0.1) | (0.2) | (1.6) |
| **Adjusted Operating Cash Flow** | $ (6.1) | $ (4.4) | $ (9.2) |

| Assets Under Management (billions) | 11/30/2017 | 12/31/2017 | 1/31/2018 |
|---|---|---|---|
| CLO 1.0 | $ 2.1 | $ 1.9 | $ 1.8 |
| Sep. Accounts | 1.9 | 2.0 | 2.0 |
| Hedge/PE | 1.1 | 1.1 | 1.1 |
| **Total** | $ 5.0 | $ 5.0 | $ 4.9 |

| Headcount - including affiliates | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|
| Front Office | 47 | 45 | 45 | 42 |
| Institutional Marketing and Client Service | 7 | 7 | 9 | 8 |
| Legal | 14 | 15 | 15 | 16 |
| Admin | 13 | 14 | 13 | 13 |
| Retail Operations (HCMLP) | 4 | 4 | 4 | 4 |
| Back Office | 41 | 38 | 39 | 39 |
| HCFD/NSI | 21 | 21 | 17 | 16 |
| HCMF Strategy/Marketing | 5 | 5 | 5 | 5 |
| Total | 152 | 149 | 147 | 143 |

**Notes:**

(1) Excludes deferred compensation MTM

(2) Operating Cash Flow = Operating Income + Dep. + Deferred Comp + Non-Cash Bonus Expense

**HCMLP Rolling Fee Earning AUM Schedule**
*(in millions)*

| | 2/28/2017 | 3/31/2017 | 4/30/2017 | 5/31/2017 | 6/30/2017 | 7/31/2017 | 8/31/2017 | 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 1 0 | $ 3,396 | $ 3,405 | $ 3,402 | $ 2,250 | $ 2,250 | $ 2,249 | $ 2,063 | $ 2,060 | $ 2,072 | $ 1,859 | $ 1,827 | $ 1,831 |
| Sep Accounts | 2,251 | 2,282 | 1,538 | 1,741 | 1,732 | 1,787 | 1,823 | 1,855 | 1,905 | 1,951 | 1,987 | 2,003 |
| Hedge/PE | 1,189 | 1,195 | 1,213 | 1,076 | 1,065 | 1,049 | 1,058 | 1,067 | 1,072 | 1,112 | 1,073 | 1,084 |
| Total | $ 6,742 | $ 6,882 | $ 6,153 | $ 5,067 | $ 5,047 | $ 5,085 | $ 4,945 | $ 4,981 | $ 5,049 | $ 4,922 | $ 4,887 | $ 4,917 |



Highland Capital Management, LP

Appx. 01345

**HCMLP Monthly Management Fees**
*(in thousands)*

| | 3/31/2017 | 4/30/2017 | 5/31/2017 | 6/30/2017 | 7/31/2017 | 8/31/2017 | 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 1 0 | $ 1,433 | $ 1,081 | $ 961 | $ 961 | $ 1,644 | $ 793 | $ 802 | $ 1,082 | $ 768 | $ 765 | $ 817 | $ 713 |
| Sep Accounts | 577 | 762 | 586 | 327 | 792 | 635 | 563 | 516 | 678 | 584 | 622 | 626 |
| Subadvised Account | 566 | 526 | 505 | 588 | 538 | 520 | 529 | 447 | 620 | 621 | 491 | 497 |
| Hedge/PE Funds | 414 | 446 | 409 | 2,617 | 797 | 837 | 831 | 814 | 818 | 817 | 1,177 | 1,138 |
| Total | $ 2,990 | $ 2,815 | $ 2,462 | $ 4,494 | $ 3,771 | $ 2,785 | $ 2,725 | $ 2,860 | $ 2,885 | $ 2,786 | $ 3,107 | $ 2,974 |



Highland Capital Management, LP



**HIGHLAND CAPITAL**
**M A N A G E M E N T, L P**

**Statement of Income**
**Twelve Months Ended February 2018**
*(in thousands)*

| | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | LTM | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | |
| Management fees | $ 2,990 $ | 2,815 $ | 2,462 $ | 4,494 $ | 3,771 $ | 2,785 $ | 2,725 $ | 2,860 $ | 2,885 $ | 3,265 $ | 3,129 $ | 2,974 $ | 37,154 $ | 6,103 |
| Shared services fees | 817 | 871 | 794 | 620 | 779 | 803 | 757 | 732 | 871 | 873 | 930 | 866 | 9,713 | 1,796 |
| Incentive fees | - | - | - | - | - | - | - | - | - | - | - | - | 10,057 | - |
| Other income | 431 | 217 | 560 | 477 | 274 | 614 | 562 | 234 | 586 | 912 | 215 | 596 | 5,679 | 811 |
| **Total operating revenue** | 4,237 | 3,904 | 3,816 | 5,591 | 4,824 | 4,202 | 4,043 | 3,827 | 4,342 | 15,107 | 4,274 | 4,436 | 62,603 | 8,710 |
| **Operating expenses:** | | | | | | | | | | | | | | |
| Compensation and benefits | 2,769 | 2,539 | 2,495 | 2,702 | 2,885 | 2,800 | 2,368 | 2,308 | 2,795 | 2,692 | 2,755 | 2,769 | 31,876 | 5,524 |
| Deferred compensation | 222 | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | 101 | 3,201 | 260 |
| Professional services | 629 | 307 | 1,168 | 511 | 616 | 1,531 | 472 | 1,031 | 649 | 16,650 | 181 | 314 | 24,060 | 495 |
| Investment research and consulting | 226 | 175 | 8 | 208 | 14 | 15 | 160 | 22 | 8 | 242 | 13 | 20 | 1,111 | 33 |
| Depreciation | 110 | 110 | 110 | 114 | 112 | 112 | 113 | 112 | 112 | 108 | 109 | 108 | 1,328 | 217 |
| Other operating expenses | 875 | 684 | 702 | 1,021 | 645 | 988 | 805 | 723 | 497 | 662 | 580 | 683 | 8,866 | 1,263 |
| **Total operating expenses** | 4,831 | 4,057 | 4,640 | 4,770 | 4,697 | 5,495 | 4,216 | 4,482 | 4,816 | 20,646 | 3,798 | 3,995 | 70,442 | 7,793 |
| **Operating income** | (594) | (153) | (824) | 821 | 127 | (1,292) | (172) | (655) | (474) | (5,539) | 476 | 441 | (7,839) | 917 |
| **Other income/expense:** | | | | | | | | | | | | | | |
| Interest and investment income, net | 478 | 454 | 493 | 661 | 606 | 558 | 532 | 574 | 937 | 839 | 612 | 473 | 7,219 | 1,086 |
| Interest expense | (143) | (141) | (149) | (146) | (142) | (148) | (136) | (141) | (134) | (147) | (141) | (65) | (1,632) | (206) |
| Other income/expense | 59 | 170 | 4,060 | 947 | 39 | 13 | 63 | 77 | 64 | 19,147 | 81 | 64 | 24,784 | 145 |
| **Total other income/expense** | 394 | 484 | 4,405 | 1,462 | 503 | 424 | 459 | 510 | 867 | 19,839 | 552 | 472 | 30,370 | 1,024 |
| **Realized and unrealized gain/(loss) from investments** | | | | | | | | | | | | | | |
| Net realized gain/(loss) on sale of investment transactions | 1,547 | (20) | 2,560 | 272 | 496 | 2,811 | - | 22 | - | (1,155) | - | - | 6,533 | - |
| Net change in unrealized gain/(loss) of investments | (189) | (460) | 4,729 | 4,338 | 3,144 | (9,361) | 9,180 | (1,004) | 6,375 | 2,170 | 10,678 | (10,201) | 19,398 | 477 |
| **Total realized and unrealized gain/(loss) from investments** | 1,358 | (480) | 7,290 | 4,610 | 3,640 | (6,550) | 9,180 | (982) | 6,375 | 1,015 | 10,678 | (10,201) | 25,931 | 477 |
| **Earnings and losses from equity method investees** | | | | | | | | | | | | | | |
| | 225 | 235 | (16) | 258 | 44 | (201) | 333 | 12 | 200 | 329 | 926 | (210) | 2,135 | 716 |
| | (2,857) | (558) | (624) | 818 | (1,908) | 1,709 | (1,136) | (203) | 4,333 | 529 | (1,674) | (5,137) | (6,708) | (6,811) |
| | (5,870) | (1,935) | (1,352) | 1,692 | (3,860) | 3,454 | (2,300) | (419) | 8,353 | 1,019 | (3,731) | (11,446) | (16,395) | (15,177) |
| | - | (184) | - | (6) | (15) | - | 9 | 0 | 15 | 18 | - | - | 42 | - |
| | - | - | - | - | - | - | (14) | (18) | 11 | 102 | - | - | (125) | - |
| | - | - | - | - | - | - | - | - | 768 | - | - | - | 768 | - |
| | - | - | (1,534) | - | - | - | - | - | - | - | - | - | (1,534) | - |
| **Total earnings/(loss) from equity method investees** | (8,502) | (2,441) | (3,525) | 2,762 | (5,740) | 4,971 | (3,118) | (613) | 13,664 | 1,996 | (4,479) | (16,794) | (21,817) | (21,273) |
| **Net income** | (7,345) | (2,591) | 7,345 | 9,655 | (1,470) | (2,447) | 6,348 | (1,739) | 20,432 | 17,311 | 7,227 | (26,081) $ | 26,645 $ | (18,854) |
| **Profit margin** | -173% | -66% | 192% | 173% | -30% | -58% | 157% | -45% | 471% | 115% | 169% | -588% | 43% | -216% |
| **Operating Cash Flow Calculation:** | | | | | | | | | | | | | | |
| Operating income | (594) | (153) | (824) | 821 | 127 | (1,292) | (172) | (655) | (474) | (5,539) | 476 | 441 | (7,839) | 917 |
| Add Depreciation expense | 110 | 110 | 110 | 114 | 112 | 112 | 113 | 112 | 112 | 108 | 109 | 108 | 1,328 | 217 |
| Adjustment Deferred compensation | (2,767) | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | (489) | (378) | (330) |
| Bonus awards | 1,000 | 956 | 1,000 | 1,000 | 1,000 | (5,190) | 986 | 1,000 | 1,300 | 1,300 | 1,000 | (6,049) | (696) | (5,049) |
| **Operating Cash Flow** | (2,251) | 1,155 | 442 | 2,149 | 1,664 | (6,320) | 1,224 | 743 | 1,693 | (3,840) | 1,744 | (5,989) $ | (7,585) $ | (4,245) |
| Less Interest expense | (143) | (141) | (149) | (146) | (142) | (148) | (136) | (141) | (134) | (147) | (141) | (65) | (1,632) | (206) |
| **Adjusted Operating Cash Flow** | (2,395) | 1,015 | 293 | 2,003 | 1,523 | (6,468) | 1,087 | 603 | 1,559 | (3,987) | 1,603 | (6,054) $ | (9,217) $ | (4,451) |
| Add cash bonus expense | 1,063 | 1,001 | 1,000 | 1,100 | 1,032 | 1,025 | 1,000 | 1,008 | 1,304 | 1,300 | 1,000 | 1,000 | 12,832 | 2,000 |
| Less cash bonuses paid | (63) | (45) | - | (100) | (32) | (6,215) | (14) | (8) | (4) | - | - | (7,049) | (13,528) | (7,049) |
| **Non-cash bonus add-back** | 1,000 | 956 | 1,000 | 1,000 | 1,000 | (5,190) | 986 | 1,000 | 1,300 | 1,300 | 1,000 | (6,049) | (696) | (5,049) |
| Add deferred compensation MTM | 222 | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | 101 | 3,201 | 260 |
| Less cash deferred awards paid | (2,989) | - | - | - | - | - | - | - | - | - | - | (590) | (3,579) | (590) |
| **Non-cash deferred award add-back** | (2,767) | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | (489) | (378) | (330) |



**Balance Sheet**
**February 2018 vs. January 2018**
**(in thousands)**

| | February 28, 2018 | January 31, 2018 | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 9,607 | $ 2,161 | $ 7,446 | 344.6% |
| Investments, at fair value | 266,615 | 277,888 | (11,273) | -4.1% |
| Equity method investees | 59,692 | 82,690 | (22,997) | -27.8% |
| Management and incentive fee receivable | 1,918 | 4,988 | (3,070) | -61.5% |
| Deferred incentive fees | - | 6,944 | (6,944) | 0.0% |
| Fixed assets, net | 5,557 | 5,665 | (109) | -1.9% |
| Due from affiliates | 181,222 | 175,605 | 5,617 | 3.2% |
| Other assets | 9,408 | 10,353 | (945) | -9.1% |
| **Total assets** | $ 534,020 | $ 566,295 | $ (32,275) | (5.7%) |
| | | | | |
| **Liabilities and Partners' Capital** | | | | |
| Accounts payable | $ 2,036 | $ 2,667 | $ (631) | -23.7% |
| Due to brokers | 35,777 | 35,842 | (64) | -0.2% |
| Accrued expenses and other liabilities | 54,361 | 59,860 | (5,498) | -9.2% |
| | | | | |
| Partners' capital | 441,846 | 467,927 | (26,081) | -5.6% |
| **Total liabilities and partners' capital** | $ 534,020 | $ 566,295 | $ (32,275) | (5.7%) |

**Partners' Capital Walk**

| | |
|---|---|
| Partners' capital at 1/31 | $ 467,927 |
| Net subscriptions/(redemptions) | - |
| Net income/(loss) | (26,081) |
| Partners' capital at 2/28 | $ 441,846 |

**Appx. 01348**



**HIGHLAND CAPITAL**
**M A N A G E M E N T, LP**

Income Statement
February 2018 YTD vs. January 2017 YTD
(in thousands)

| | 2018 YTD | 2017 YTD | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 6,103 | $ 6,106 | $ (3) | 0.0% |
| Shared services fees | 1,796 | 1,574 | 221 | 14.1% |
| Other income | 811 | 808 | 3 | 0.4% |
| **Total operating revenue** | **8,710** | **8,488** | **222** | **2.6%** |
| **Operating expenses:** | | | | |
| Salaries and overtime | 2,331 | 2,274 | 57 | 2.5% |
| Bonus | 2,000 | 1,995 | 5 | 0.2% |
| Other compensation and benefits | 1,193 | 1,125 | 68 | 6.1% |
| Deferred compensation | 260 | 666 | (406) | -61.0% |
| Professional services | 495 | 740 | (245) | -33.1% |
| Investment research and consulting | 33 | 23 | 10 | 45.5% |
| Marketing and advertising expense | 341 | 460 | (119) | -25.8% |
| Depreciation expense | 217 | 221 | (4) | -2.0% |
| Other operating expenses | 922 | 747 | 175 | 23.4% |
| **Total operating expenses** | **7,793** | **8,252** | **(460)** | **-5.6%** |
| **Operating income/(loss)** | **917** | **236** | **681** | **288.5%** |
| **Other income/expense:** | | | | |
| Interest income | 1,086 | 916 | 170 | 18.6% |
| Interest expense | (206) | (244) | 39 | -15.8% |
| Other income/expense | 145 | 251 | (106) | -42.3% |
| **Total other income/expense** | **1,024** | **922** | **103** | **11.1%** |
| **Realized and unrealized gains from investments:** | | | | |
| Net realized losses on sales of investment transactions | - | - | - | 0.0% |
| Net change in unrealized gains/(losses) of investments | 477 | 10,093 | (9,616) | 95.3% |
| **Total realized and unrealized gains from investments** | **477** | **10,093** | **(9,616)** | **-95.3%** |
| **Net earnings/(losses) from equity method investees** | (21,273) | 6,393 | (27,666) | 432.8% |
| **Net income/(loss)** | **$ (18,854)** | **$ 17,644** | **$ (36,498)** | **206.9%** |
| **Profit margin** | **-216%** | **208%** | | |

| Other operating expenses detail | | | | |
|---|---|---|---|---|
| Rent expense | 258 | 196 | 61 | 31 2% |
| Fees and dues | 44 | 55 | (11) | -19 6% |
| Travel and entertainment | 137 | 201 | (63) | -31 6% |
| Insurance expense | 128 | 50 | 78 | 155 8% |
| Bad debt expense | - | - | - | 0 0% |
| Miscellaneous expenses | 354 | 245 | 110 | 44 9% |
| **Total other operating expenses** | **922** | **747** | **175** | **23.4%** |

7

**HCMLP Analytics**
*(in thousands)*

**Accounts Payable Aging Analysis**

| Vendor Type | Current | 30 Days | 45 Days | 90 Days | 120 Days | Greater Than 120 Days | Grand Total | % |
|---|---|---|---|---|---|---|---|---|
| Overhead | $ 678 | $ 45 | $ 433 | $ 86 | $ - | $ - | 1,242 | 61% |
| Legal | - | - | - | - | - | 794 | 794 | 39% |
| Grand Total | $ 678 | $ 45 | $ 433 | $ 86 | $ - | $ 794 | 2,036 | 100% |
| **% Outstanding** | 33% | 2% | 21% | 4% | 0% | 39% | | |



| Top 5 Legal Greater than 120 Days | February 2018 | Top 5 Overhead Greater than 120 Days* | February 2018 |
|---|---|---|---|
| | $ 292 | N/A | - |
| | 200 | | |
| | 180 | | |
| | 112 | | |
| | 10 | | |
| Total | $ 794 | Total | $ - |
| % Total of AP Outstanding | 39% | % Total of AP Outstanding | 0% |

**Fund Reimbursements**

| Funds | 2/28/2018 | 1/31/2018 | 2/28/2017 | Year-Over-Year $ Change | % Change |
|---|---|---|---|---|---|
| US CLOs | $ 851 | $ 1,893 | $ 633 | $ 217 | 34% |
| Hedge/Private Equity | 611 | 622 | 497 | 114 | 23% |
| Separate Accounts | 30 | 30 | 17 | 13 | 77% |
| Retail | 194 | 194 | 557 | (363) | -65% |
| International/Portfolio Co | 3,413 | 3,668 | 3,954 | (541) | -14% |
| Research Unallocated | 759 | 311 | 888 | (129) | -15% |
| Unallocated | 1,345 | 1,297 | 1,350 | - | 0% |
| Total | $ 7,202 | $ 8,015 | $ 7,896 | $ (688) | -9% |

| | 1/31/2018 | Net Additions | Receipts | 2/28/2018 |
|---|---|---|---|---|
| Month to Month Change | $ 8,015 | $ 330 | (1,143) | $ 7,202 |

| | 2/28/2017 | 2/28/2018 | 2017 YTD | 2018 YTD |
|---|---|---|---|---|
| Fund Reimbursement Receipts | $ 1,620 | $ 1,143 | $ 2,225 | $ 2,256 |

**HCMLP Invoice Metrics**

| | February 2018 | January 2018 |
|---|---|---|
| Invoices Processed: | 162 | 120 |
| $ Amount Processed: | $ 8,077 | $ 11,918 |
| # of Payments | 166 | 152 |
| $ Amount of Payments: | $ 8,558 | $ 13,302 |

**Self-Insurance Summary**

| Entity | Premium Balance |
|---|---|
| | 693 |
| | 370 |
| | 89 |
| | 9 |
| | (156) |
| | (154) |
| | (197) |
| | (392) |
| | (258) |
| Total over/(under) funded | $ 4 |

**Shared Services Receivables Summary**

| Entity | Balance |
|---|---|
| | 3,730 |
| | 367 |
| | 200 |
| | 40 |
| | 54 |
| | - |
| | - |
| Total | $ 4,391 |

**Highland Capital Management, LP**
**Schedule of Investments**
**As of February 2018**



**Historical Legal Summary through February 28, 2018**
**Includes only matters allocated to HCMLP**
**in thousands**

**HCMLP Legal by Matter**                                          **HCMLP Legal by Vendor**



| Sub-Total Top 25 Matters | 3,469 | 3,513 | 8,039 | 512 |
|---|---|---|---|---|
| Sub-Total Other Matters | 31 | 1 | - | - |
| Total Matters | 3,500 | 3,514 | 8,039 | 512 |

| Sub-Total Top 25 Vendors | 2,865 | 3,045 | 7,450 | 450 |
|---|---|---|---|---|
| Sub-Total Other Vendors | 635 | 469 | 589 | 61 |
| Total Vendors | 3,500 | 3,514 | 8,039 | 512 |

Sorted largest to smallest Matter by 2018 dollars invoiced

Sorted largest to smallest Vendor by cumulative dollars invoiced ('12 - YTD '18)

**Appx. 01352**

**Employee Expenses through February 28, 2018**
**Excludes all Dondero Reimbursements**
**HCMLP & Certain Affiliated Advisors**
**in thousands**

**Employee Expenses - Including Reimbursable**

| Company | 2015 | 2016 | 2017 | 2018 | 2018 Annualized |
|---|---|---|---|---|---|
| ▮▮▮ | $ 838 | $ 707 | $ 818 | $ 93 | $ 557 |
| ▮▮▮ | 2,447 | 1,860 | 1,041 | 85 | 509 |
| ▮▮▮ | 742 | 511 | 292 | 23 | 139 |
| ▮▮ | - | 57 | 141 | 18 | 108 |
| Total | $ 4,027 | $ 3,135 | $ 2,293 | $ 219 | $ 1,312 |

**Employee Expenses - Non-Reimbursable Only**

| Company | 2015 | 2016 | 2017 | 2018 | 2018 Annualized |
|---|---|---|---|---|---|
| HCMLP | $ 387 | $ 174 | $ 396 | $ 61 | $ 363 |
| HCFD | 2,219 | 933 | 543 | 39 | 231 |
| HCMFA | 450 | 380 | 256 | 18 | 110 |
| NPA | - | 16 | 61 | 9 | 55 |
| Total | $ 3,056 | $ 1,503 | $ 1,257 | $ 127 | $ 759 |

11

# EXHIBIT 76

Appx. 01354

# PROMISSORY NOTE

$2,500,000                                                                August 1, 2018

    FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 3**

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

**Appx. 01356**

# EXHIBIT 77

# PROMISSORY NOTE

$2,500,000                                                                                    August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Exhibit 4

Appx. 01358

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
JAMES DONDERO

**Appx. 01359**

# EXHIBIT 78

Appx. 01360



# OPERATING RESULTS

**August 2018**

**Exhibit 5**

**Highland Capital Management, L.P.**
**Significant Items Impacting HCMLP's Balance Sheet**
**August 2018**

<u>Operating Activities</u>



<u>Investments</u>

<u>Other</u>
 - ($5.0M) partner loan

**Highland Capital Management, L.P.**
**Financial/Operational Highlights**
**August 2018 Close Package**
*(in millions)*

|  | 5/31/2018 | 6/30/2018 | 7/31/2018 | 8/31/2018 |
|---|---|---|---|---|
| **Cash** | $ 6.9 | $ 7.8 | $ 7.7 | $ 3.4 |
| **Operating Revenue** | $ 5.0 | $ 4.4 | $ 4.8 | $ 3.2 |
| **Operating Expenses [1]** | (4.8) | (4.9) | (4.4) | (3.9) |
| **Operating Income** | $ 0.2 | $ (0.5) | $ 0.4 | $ (0.7) |
| **Add back: Non-Recurring Items [3]** | $ 0.9 | $ 0.9 | $ 0.7 | $ - |
| **Adjusted Operating Income** | $ 1.1 | $ 0.4 | $ 1.1 | $ (0.7) |
| **Net Income/(Loss)** | $ (1.3) | $ (2.2) | $ 12.1 | $ 11.9 |

|  | MTD | YTD | LTM |
|---|---|---|---|
| **Operating Cash Flow [2]** | $ (5.9) | $ 3.5 | $ (8.2) |
| Interest Expense | (0.2) | (1.1) | (1.6) |
| **Adjusted Operating Cash Flow** | $ (6.1) | $ 2.4 | $ (9.8) |

| **Assets Under Management (billions)** | 5/31/2018 | 6/30/2018 | 7/31/2018 |
|---|---|---|---|
| CLO 1.0 | $ 1.4 | $ 1.4 | $ 1.4 |
| Sep. Accounts | 2.5 | 2.5 | 2.5 |
| Hedge/PE | 0.6 | 0.2 | 0.2 |
| **Sub-total** | $ 4.5 | $ 4.1 | $ 4.1 |

| **Headcount - including affiliates** | 5/31/2018 | 6/30/2018 | 7/31/2018 | 8/31/2018 |
|---|---|---|---|---|
| Front Office | 38 | 38 | 38 | 38 |
| Institutional Marketing and Client Service | 4 | 4 | 3 | 2 |
| Legal | 15 | 15 | 15 | 15 |
| Admin | 15 | 15 | 15 | 15 |
| Retail Operations (HCMLP) | 6 | 6 | 6 | 6 |
| Back Office | 34 | 35 | 35 | 35 |
| HCFD/NSI | 16 | 17 | 17 | 17 |
| HCMF Strategy/Marketing | 8 | 8 | 8 | 8 |
| Total | 136 | 138 | 137 | 136 |

**Notes:**

(1) Excludes deferred compensation MTM

(2) Operating Cash Flow = Operating Income + Dep. + Deferred Comp + Non-Cash Bonus Expense

(3) Receivables reserve

**HCMLP Rolling Fee Earning AUM Schedule**
*(in millions)*

|  | 8/31/2017 | 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 | 3/31/2018 | 4/30/2018 | 5/31/2018 | 6/30/2018 | 7/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 1 0 | $ 2,063 | $ 2,060 | $ 2,072 | $ 1,859 | $ 1,827 | $ 1,831 | $ 1,579 | $ 1,572 | $ 1,575 | $ 1,402 | $ 1,390 | $ 1,393 |
| Sep Accounts | 1,823 | 1,855 | 1,905 | 1,951 | 1,987 | 2,003 | 2,013 | 2,039 | 2,493 | 2,514 | 2,515 | 2,458 |
| Hedge/PE | 1,058 | 1,067 | 1,072 | 1,112 | 1,073 | 1,084 | 757 | 751 | 598 | 596 | 204 | 199 |
| Sub-total | $ 4,945 | $ 4,981 | $ 5,049 | $ 4,922 | $ 4,887 | $ 4,917 | $ 4,349 | $ 4,362 | $ 4,665 | $ 4,512 | $ 4,108 | $ 4,050 |
| CLO 2 0 |  |  |  |  |  |  |  |  | 2,250 | 2,174 | 2,164 | 2,161 |
| Grand Total | $ 4,945 | $ 4,981 | $ 5,049 | $ 4,922 | $ 4,887 | $ 4,917 | $ 4,349 | $ 4,362 | $ 6,915 | $ 6,686 | $ 6,272 | $ 6,211 |



Highland Capital Management, LP

**HCMLP Monthly Management Fees**
*(in thousands)*

| | 8/31/2017 | 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 | 3/31/2018 | 4/30/2018 | 5/31/2018 | 6/30/2018 | 7/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Intercompany Retail Advisors | $ - | $ - | $ - | - | $ - | 252 | 252 | 252 | 252 | 1,500 | 668 | 1,500 | 668 |
| Sep Accounts | 1,036 | 938 | 1,100 | 1,361 | 1,107 | 1,068 | 963 | 987 | 967 | 961 | 894 | 893 |
| CLO 1 0 | 802 | 1,082 | 768 | 871 | 818 | 713 | 713 | 837 | 589 | 585 | 643 | 473 |
| Hedge/PE Funds | 358 | 393 | 396 | 404 | 440 | 443 | 448 | 408 | 206 | 77 | 95 | 90 |
| Other | - | - | - | 9 | - | - | - | 87 | - | 43 | 22 | 65 |
| Sub-total | 2,196 | 2,413 | 2,265 | 2,644 | 2,617 | 2,476 | 2,375 | 2,571 | 3,262 | 2,334 | 3,154 | 2,189 |
| CLO 2 0* | 529 | 447 | 620 | 561 | 491 | 497 | 497 | 500 | 497 | 497 | 407 | - |
| Grand Total | 2,725 | 2,860 | 2,885 | 3,205 | 3,108 | 2,974 | 2,873 | 3,071 | 3,760 | 2,832 | 3,561 | 2,189 |



*CLO 2 0 fees are reserved against



**HIGHLAND CAPITAL**
**M A N A G E M E N T, LP**

**Statement of Income**
**Twelve Months Ended August 2018**
**(in thousands)**

| | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | LTM | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | |
| Management fees | $ 2,725 | $ 2,860 | $ 2,885 | $ 3,205 | $ 3,108 | $ 2,974 | $ 2,873 | $ 3,071 | $ 3,760 | $ 2,832 | $ 3,561 | $ 2,189 | $ 36,041 | $ 24,366 |
| Shared services fees | 757 | 732 | 871 | 826 | 915 | 866 | 866 | 890 | 1,038 | 937 | 827 | 657 | 10,182 | 6,995 |
| Incentive fees | - | - | - | 10,043 | - | - | - | - | - | - | 18 | - | 10,061 | 18 |
| Other income | 562 | 234 | 586 | 912 | 215 | 596 | 339 | 482 | 304 | 653 | 458 | 348 | 5,689 | 3,395 |
| **Total operating revenue** | 4,043 | 3,827 | 4,342 | 14,987 | 4,237 | 4,436 | 4,079 | 4,442 | 5,102 | 4,440 | 4,846 | 3,193 | 61,973 | 34,774 |
| **Operating expenses:** | | | | | | | | | | | | | | |
| Compensation and benefits | 2,368 | 2,308 | 2,795 | 3,651 | 2,755 | 2,769 | 2,711 | 3,283 | 2,277 | 2,529 | 2,515 | 2,676 | 32,636 | 21,514 |
| Deferred compensation | 297 | 286 | 755 | 291 | 159 | 101 | 9 | 479 | 87 | 179 | 700 | 204 | 3,547 | 1,918 |
| Professional services | 472 | 1,031 | 649 | 18,821 | (15,051) | 314 | 606 | 344 | 814 | 608 | 408 | 342 | 9,358 | 1,819 |
| Investment research and consulting | 160 | 22 | 8 | 242 | 13 | 20 | 226 | 26 | 20 | 170 | 43 | 18 | 966 | 535 |
| Depreciation | 113 | 112 | 112 | 108 | 109 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 1,310 | 865 |
| Bad debt | - | - | - | 2,279 | - | - | 5 | 3,497 | 866 | 870 | 713 | - | 8,229 | 5,951 |
| Other operating expenses | 805 | 723 | 497 | 1,180 | 580 | 683 | 951 | 871 | 684 | 665 | 606 | 803 | 9,049 | 5,844 |
| **Total operating expenses** | 4,216 | 4,482 | 4,816 | 26,571 | (11,435) | 3,995 | 4,616 | 8,608 | 4,857 | 5,130 | 5,092 | 4,151 | 65,097 | 38,446 |
| **Operating income** | (172) | (655) | (474) | (11,585) | 15,672 | 441 | (537) | (4,166) | 245 | (690) | (246) | (957) | (3,124) | (3,672) |
| **Other income/expense:** | | | | | | | | | | | | | | |
| Interest and investment income, net | 532 | 574 | 937 | 839 | 612 | 473 | 524 | 886 | 554 | 462 | 978 | 529 | 7,899 | 5,018 |
| Interest expense | (136) | (141) | (134) | (145) | (143) | (65) | (131) | (140) | (151) | (141) | (152) | (156) | (1,634) | (1,078) |
| Other income/expense | 63 | 77 | 64 | 19,134 | (13,353) | 64 | 96 | 124 | 96 | 584 | 127 | 108 | 7,184 | 1,280 |
| **Total other income/expense** | 459 | 510 | 867 | 19,828 | (12,883) | 472 | 489 | 870 | 500 | 904 | 953 | 481 | 13,449 | 5,219 |
| **Realized and unrealized gain/(loss) from investments:** | | | | | | | | | | | | | | |
| Net realized gain/(loss) on sale of investment transactions | - | 22 | - | (1,196) | - | - | 3,961 | - | - | 351 | 89 | 48 | 3,276 | 4,450 |
| Net change in unrealized gain/(loss) of investments | 9,180 | (1,004) | 6,375 | (2,125) | 10,678 | (10,201) | (16,002) | 3,030 | (1,476) | (1,170) | 6,011 | 7,563 | 10,859 | (1,567) |
| **Total realized and unrealized gain/(loss) from investments** | 9,180 | (982) | 6,375 | (3,320) | 10,678 | (10,201) | (12,041) | 3,030 | (1,476) | (819) | 6,100 | 7,611 | 14,135 | 2,882 |
| **Earnings and losses from equity method investees** | | | | | | | | | | | | | | |
| ▮▮▮▮ | 333 | 12 | 200 | 329 | 926 | (210) | (821) | 726 | (617) | (91) | 223 | 122 | 1,130 | 257 |
| ▮▮▮▮ | (1,136) | (203) | 4,333 | 529 | (1,674) | (5,137) | (726) | (2,108) | 57 | (554) | 1,482 | 1,362 | (3,776) | (7,299) |
| ▮▮▮▮ | (2,300) | (419) | 8,353 | 1,019 | (3,731) | (11,446) | (199) | (5,483) | 138 | (1,348) | 3,601 | 3,311 | (8,505) | (15,157) |
| ▮▮▮▮ | 0 | 15 | - | 22 | - | - | - | - | - | - | - | - | 38 | - |
| ▮▮▮▮ | (14) | (18) | 11 | (18) | - | - | (126) | - | - | 88 | - | - | (77) | (38) |
| ▮▮▮▮ | - | - | 768 | (89) | - | - | - | - | (37) | - | - | - | 641 | (37) |
| ▮▮▮▮ | - | - | - | 75 | - | - | - | - | - | - | - | - | 75 | - |
| **Total earnings/(loss) from equity method investees** | (3,118) | (613) | 13,664 | 1,866 | (4,479) | (16,794) | (1,872) | (6,865) | (459) | (1,905) | 5,305 | 4,795 | (10,474) | (22,274) |
| **Net income** | 6,348 | (1,739) | 20,432 | 6,790 | 8,988 | (26,081) | (13,962) | (7,130) | (1,190) | (2,510) | 12,112 | 11,929 | $ 13,986 | $ (17,844) |
| **Profit margin** | 157% | -45% | 471% | 45% | 212% | -588% | -342% | -161% | -23% | -57% | 250% | 374% | 23% | -51% |
| **Operating Cash Flow Calculation:** | | | | | | | | | | | | | | |
| Operating income | (172) | (655) | (474) | (11,585) | 15,672 | 441 | (537) | (4,166) | 245 | (690) | (246) | (957) | | 9,762 |
| Add  Depreciation expense | 113 | 112 | 112 | 108 | 109 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 1,310 | 865 |
| Adjustment  Deferred compensation | 297 | 286 | 755 | 291 | 159 | 101 | 9 | 479 | 87 | 125 | 700 | 204 | | (1,586) |
| Bonus awards | (5,215) | 994 | 1,296 | 1,984 | 1,000 | 1,000 | (6,001) | 964 | 889 | 900 | 945 | (5,210) | (6,455) | (5,514) |
| **Operating Cash Flow** | (4,977) | 737 | 1,690 | (9,201) | 16,939 | 1,650 | (7,012) | (5,475) | 1,329 | 443 | 1,507 | (5,855) | $ (8,225) | 3,527 |
| Less  Interest expense | (136) | (141) | (134) | (145) | (143) | (65) | (131) | (140) | (151) | (141) | (152) | (156) | (1,634) | (1,078) |
| **Adjusted Operating Cash Flow** | (5,114) | 596 | 1,556 | (9,346) | 16,797 | 1,585 | (7,143) | (5,614) | 1,178 | 302 | 1,355 | (6,011) | $ (9,859) | 2,449 |
| Add cash bonus expense | 1,000 | 1,008 | 1,304 | 1,988 | 1,000 | 1,000 | 1,048 | 1,011 | 900 | 900 | 945 | 900 | 13,003 | 7,703 |
| Less cash bonuses paid | (6,215) | (14) | (8) | (4) | - | - | (7,049) | (48) | (11) | - | - | (6,110) | (19,458) | (13,217) |
| Non-cash bonus add-back | (5,215) | 994 | 1,296 | 1,984 | 1,000 | 1,000 | (6,001) | 964 | 889 | 900 | 945 | (5,210) | (6,455) | (5,514) |
| Add deferred compensation MTM | 297 | 286 | 755 | 291 | 159 | 101 | 9 | 479 | 87 | 179 | 700 | 204 | 3,547 | 1,918 |
| Less cash deferred awards paid | - | - | - | - | - | - | (590) | (2,860) | - | (54) | - | - | (3,504) | (3,504) |
| Non-cash deferred award add-back | 297 | 286 | 755 | 291 | 159 | 101 | (581) | (2,381) | 87 | 125 | 700 | 204 | 43 | (1,586) |



**Balance Sheet**
**August 2018 vs. July 2018**
**(in thousands)**

| | August 31, 2018 | July 31, 2018 | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 3,396 | $ 7,741 | $ (4,344) | -56.1% |
| Investments, at fair value | 265,622 | 257,648 | 7,974 | 3.1% |
| Equity method investees | 60,752 | 60,958 | (205) | -0.3% |
| Management and incentive fee receivable | 1,626 | 3,577 | (1,951) | -54.5% |
| Fixed assets, net | 4,927 | 5,035 | (108) | -2.2% |
| Due from affiliates | 179,404 | 173,894 | 5,510 | 3.2% |
| Other assets | 10,921 | 11,310 | (389) | -3.4% |
| **Total assets** | **$ 526,648** | **$ 520,162** | **$ 6,487** | **1.25%** |
| | | | | |
| **Liabilities and Partners' Capital** | | | | |
| Accounts payable | $ 1,355 | $ 2,688 | $ (1,333) | -49.6% |
| Due to brokers | 31,464 | 31,724 | (260) | -0.8% |
| Accrued expenses and other liabilities | 61,580 | 65,430 | (3,850) | -5.9% |
| | | | | |
| Partners' capital | 432,249 | 420,320 | 11,929 | 2.8% |
| **Total liabilities and partners' capital** | **$ 526,648** | **$ 520,162** | **$ 6,487** | **1.25%** |

### Partners' Capital Walk

| | |
|---|---|
| Partners' capital at 7/31 | $ 420,320 |
| Net subscriptions/(redemptions) | - |
| Net income/(loss) | 11,929 |
| Partners' capital at 8/31 | $ 432,249 |



### Income Statement
August 2018 YTD vs. August 2017 YTD
(in thousands)

| | 2018 YTD | 2017 YTD | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 24,366 | $ 25,288 | $ (922) | -3.6% |
| Shared services fees | 6,995 | 6,258 | 737 | 11.8% |
| Incentive fees | 18 | - | 18 | N/A |
| Other income | 3,395 | 3,381 | 14 | 0.4% |
| **Total operating revenue** | **34,774** | **34,927** | **(153)** | **-0.4%** |
| **Operating expenses:** | | | | |
| Salaries and overtime | 9,189 | 9,427 | (238) | -2.5% |
| Bonus | 7,703 | 8,216 | (513) | -6.2% |
| Other compensation and benefits | 4,623 | 4,547 | 76 | 1.7% |
| Deferred compensation | 1,918 | 1,372 | 546 | 39.8% |
| Professional services | 1,819 | 5,502 | (3,683) | -66.9% |
| Investment research and consulting | 535 | 669 | (134) | -20.1% |
| Marketing and advertising expense | 1,478 | 1,774 | (296) | -16.7% |
| Depreciation expense | 865 | 887 | (22) | -2.5% |
| Bad debt | 5,951 | - | 5,951 | 100.0% |
| Other operating expenses | 4,366 | 4,359 | 7 | 0.2% |
| **Total operating expenses** | **38,446** | **36,753** | **1,693** | **4.6%** |
| **Operating income/(loss)** | **(3,672)** | **(1,826)** | **(1,846)** | **101.1%** |
| **Other income/expense:** | | | | |
| Interest income | 5,018 | 4,167 | 851 | 20.4% |
| Interest expense | (1,078) | (1,113) | 35 | -3.1% |
| Other income/expense | 1,280 | 5,539 | (4,259) | -76.9% |
| **Total other income/expense** | **5,219** | **8,593** | **(3,374)** | **-39.3%** |
| **Realized and unrealized gains from investments:** | | | | |
| Net realized gains on sales of investment transactions | 4,450 | 7,666 | (3,216) | -42.0% |
| Net change in unrealized gains/(losses) of investments | (1,567) | 12,293 | (13,860) | 112.8% |
| **Total realized and unrealized gains from investments** | **2,882** | **19,959** | **(17,077)** | **-85.6%** |
| **Net earnings/(losses) from equity method investees** | (22,274) | (6,081) | (16,193) | -266.3% |
| **Net income/(loss)** | **$ (17,844)** | **$ 20,645** | **$ (38,489)** | **186.4%** |
| **Profit margin** | **-51%** | **59%** | | |

| Other operating expenses detail | | | | |
|---|---|---|---|---|
| Rent expense | 1,041 | 979 | 61 | 6 3% |
| Fees and dues | 166 | 211 | (45) | -21 2% |
| Travel and entertainment | 840 | 1,036 | (196) | -18 9% |
| Insurance expense | 496 | 431 | 64 | 15 0% |
| Miscellaneous expenses | 1,823 | 1,701 | 122 | 7 1% |
| **Total other operating expenses** | **4,366** | **4,359** | **7** | **0.2%** |

**Highland Capital Management, LP**
**Schedule of Investments**
**As of August 2018**



# EXHIBIT 79

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

     Re: Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "<u>Notes</u>") in favor of Highland Capital Management, L.P. ("<u>Payee</u>"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer


Exhibit 6
Appx. 01371

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

Appx. 01372

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 80

Docket #0006  Date Filed: 3/16/2021

D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| **v.** | § | |
| | § | **Adversary No.: 21-03003** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S ORIGINAL ANSWER

Defendant James Dondero ("<u>Dondero</u>" or "<u>Defendant</u>"), the defendant in the above-styled

and numbered adversary proceeding (the "<u>Adversary Proceeding</u>") filed by Highland Capital

Management, L.P. (the "<u>Plaintiff</u>"), hereby files this Original Answer (the "<u>Answer</u>") responding

to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*

[Adv. Dkt. 1] (the "<u>Complaint</u>"). Where an allegation in the Complaint is not expressly admitted

in this Answer, it is denied.



Exhibit 7

DEFENDANT JAMES DONDERO'S ORIGINAL ANSWER

1934054210316000000000014

Appx. 01375

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Complaint sets forth the Plaintiff's objective in bringing the Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 5 not expressly admitted are denied.

6.      The Defendant admits paragraph 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits paragraph 7 of the Complaint.

8.      The Defendant admits paragraph 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits paragraph 9 of the Complaint.

10.     The Defendant admits paragraph 10 of the Complaint.

11.     The Defendant admits paragraph 11 of the Complaint.

12.     The Defendant admits paragraph 12 of the Complaint.

## STATEMENT OF FACTS

13.     The Defendant admits that he has executed promissory notes under which the Debtor is the payee. Any allegations in paragraph 13 not expressly admitted are denied.

14.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 14 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

15.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 15 of the Complaint. The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of paragraph 15 of the Complaint and therefore denies same.

16.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 16 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

17.     The Defendant admits that section 2 of each note attached to the Complaint contains the provision quoted in paragraph 17 of the Complaint.

18.     The Defendant denies the allegations in paragraph 18 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

19.     The Defendant denies the allegations in paragraph 19 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

20.     In response to paragraph 20 of the Complaint, the Defendant admits that Exhibit 4 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 20 of the Complaint is denied.

21.     To the extent paragraph 21 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied. The Defendant otherwise admits paragraph 21 of the Complaint.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 of the Complaint and therefore denies same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of the Complaint and therefore denies same.

24.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 of the Complaint and therefore denies same.

25.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of the Complaint and therefore denies same.

26.     The Defendant denies the allegations in paragraph 26 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

27.    Paragraph 27 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

28.    Paragraph 28 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of the Complaint and therefore denies same.

29.    Paragraph 29 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the Complaint and therefore denies same.

30.    Paragraph 30 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Complaint and therefore denies same.

31.    The Defendant denies paragraph 31 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by Mr. Dondero Pursuant to 11 U.S.C. § 542(b))

32.    Paragraph 32 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

33.    Paragraph 33 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Complaint and therefore denies same.

34.    Paragraph 34 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Complaint and therefore denies the same.

35.    The Defendant denies paragraph 35 of the Complaint.

36.    Paragraph 36 of the Complaint states a legal conclusion that does not require a response. The Defendant admits that the Plaintiff transmitted the Demand Letter, and that document speaks for itself.  To the extent paragraph 36 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 of the Complaint and therefore denies the same.

37.    The Defendant denies paragraph 37 of the Complaint.

38.    Paragraph 38 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 of the Complaint and therefore denies the same.

39.    The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), and (iii).

## **AFFIRMATIVE DEFENSES**

40.    Defendant asserts that Plaintiff's claims should be barred because it was previously agreed by Plaintiff that Plaintiff would not collect on the Notes.

41.    Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due to waiver.

42.    Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due

to estoppel.

43.    Defendant further asserts that Plaintiff's claims may be barred, in whole or in part,

due to failure of consideration.

## JURY DEMAND

44.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38

of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy

Procedure.

45.    The Defendant does not consent to the Bankruptcy Court conducting a jury trial

and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that,

following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the

Complaint and provide the Defendant such other relief to which he is entitled.

Dated: March 16, 2021

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
michael.lynn@bondsellis.com
john@bondsellis.com
john.wilson@bondsellis.com
bryan.assink@bondsellis.com

**ATTORNEYS FOR DEFENDANT
JAMES DONDERO**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 16, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 81

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| **v.** | § | **Adversary No. 21-03003-sgj** |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES
### TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
### FIRST REQUEST FOR ADMISSIONS

TO:   Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant James Dondero ("Defendant" or "Dondero") serves his Objections and Responses to Debtor Highland Capital Management, L.P.'s ("Debtor" or "Highland") First Request for Admissions ("Requests"), as follows:

**Exhibit 8**

Dated: April 28, 2021    Respectfully submitted,

*/s/ Bryan C. Assink*
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**FIRST REQUEST FOR ADMISSIONS**    **PAGE 2 OF 6**
CORE/3522697.0002/166031884.1

**Appx. 01385**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on April 28, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

*/s/ Bryan C. Assink*
Bryan C. Assink

DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
FIRST REQUEST FOR ADMISSIONS                                                          PAGE 3 OF 6
CORE/3522697.0002/166031884.1

Appx. 01386

## OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 1:**  Admit that attached as Exhibit A is a true and correct copy of a Promissory Note (a) executed by James Dondero, as maker, in favor of the Debtor, as payee, (b) dated February 2, 2018, (c) in the original face amount of $3,825,000 (the "February 2 Note").

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 2:**   Admit that on or about February 2, 2018, the Debtor paid $3,825,000 to James Dondero (or for his benefit) in exchange for the February 2 Note (the "February 2 Consideration").

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 3:**  Admit that on or about February 2, 2018, the Debtor transferred $3,825,000 to an account for James Dondero's benefit.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 4:**  Admit that neither James Dondero nor any entity he owns and/or controls paid any federal or state income taxes on account of the February 2 Consideration.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 5:**  Admit that attached as Exhibit B is a true and correct copy of a Promissory Note (a) executed by James Dondero, as maker, in favor of the Debtor, as payee, (b) dated August 1, 2018, (c) in the original face amount of $2,500,000 (the "August 1 Note").

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 6:**  Admit that on or about August 1, 2018, the Debtor paid $2,500,000 to James Dondero (or for his benefit) in exchange for the August 1 Note (the "August 1 Consideration").

DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
FIRST REQUEST FOR ADMISSIONS                                                          PAGE 4 OF 6
CORE/3522697.0002/166031884.1

Appx. 01387

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 7:** Admit that on or about August 1, 2018, the Debtor transferred $2,500,000 to an account for James Dondero's benefit.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 8:** Admit that neither James Dondero nor any entity he owns and/or controls paid any federal state income taxes on account of the August 1 Consideration.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 9:** Admit that attached as Exhibit C is a true and correct copy of a Promissory Note (a) executed by James Dondero, as maker, in favor of the Debtor, as payee, (b) dated August 13, 2018, (c) in the original face amount of $2,500,000 (the "August 13 Note").

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 10:** Admit that on or about August 13, 2018, the Debtor paid $2,500,000 to James Dondero (or for his benefit) in exchange for the August 13 Note (the "August 13 Consideration").

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 11:** Admit that on or about August 13, 2018, the Debtor transferred $2,500,000 to an account for James Dondero's benefit.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 12:** Admit that neither James Dondero nor any entity he owns and/or controls paid any federal or state income taxes on account of the August 13 Consideration.

**RESPONSE:**

DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
FIRST REQUEST FOR ADMISSIONS                                    PAGE 5 OF 6
CORE/3522697.0002/166031884.1

Appx. 01388

ADMIT.

**REQUEST FOR ADMISSION NO. 13:**   Admit that attached as Exhibit D is the Debtor's December 3, 2020 demand letter (the "Demand Letter") to James Dondero demanding payment of the accrued interest and principal due and payable on the Promissory Notes in the aggregate amount of $9,004,013.07 (the "Outstanding Amount").

**RESPONSE:**

Admit only that the letter attached as Exhibit D is a letter sent from the Debtor to Dondero making demand on the notes.  The remainder of the request is denied.

**REQUEST FOR ADMISSION NO. 14:**   Admit that, as of January 22, 2021, James Dondero has not paid the Debtor the Outstanding Amount.

**RESPONSE:**

Admit only that Dondero has not paid the Debtor the amount the Debtor asserts is due on the notes in the amount of $9,004,013.07. The remainder of the request is denied.

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**FIRST REQUEST FOR ADMISSIONS**                                                                    **PAGE 6 OF 6**
CORE/3522697.0002/166031884.1

Appx. 01389

# EXHIBIT 82

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Case No. 19-34054 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § § | Chapter 11 |
| Debtor. | § § | |
| | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | |
| v. | § § | Adversary No. 21-03003-sgj |
| JAMES D. DONDERO, | § § | |
| Defendant. | § § | |

### DEFENDANT JAMES DONDERO'S OBJECTIONS AND ANSWERS
### TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
### FIRST SET OF INTERROGATORIES

TO:  Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z.
Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant James Dondero ("Defendant" or "Dondero") serves his Objections and
Answers to Debtor Highland Capital Management, L.P.'s ("Debtor" or "Highland") First Set of
Interrogatories ("Requests"), as follows:

**Exhibit 9**

Dated: 4/26/2021

Respectfully submitted,

*/s/ Bryan C. Assink*
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john@bondsellis.com
Email: joshua@bondsellis.com
Email: bryan.assink@bondsellis.com

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

DEFENDANT JAMES DONDERO'S OBJECTIONS AND ANSWERS TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES
CORE/3522697.0002/166033837.2
**PAGE 2 OF 6**

Appx. 01392

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on 4/26/2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

/s/ Bryan C. Assink
Bryan C. Assink

## OBJECTIONS AND ANSWERS

**INTERROGATORY NO. 1:** With respect to each Note, identify:

    (a)    the person who entered into each Purported Agreement on behalf of the Debtor;

    (b)    the date each Purported Agreement was entered into; and

    (c)    all documents that reflect or memorialize each Purported Agreement.

**ANSWER:**

The Agreements were entered into on behalf of the Debtor by James Dondero, subsequent to the time each Note was executed. Documents reflecting or memorializing the Agreements, if any, will be produced at a mutually agreeable time and location.

**INTERROGATORY NO. 2:** Identify every person who James Dondero believes has actual knowledge of each Purported Agreement.

**ANSWER:**

Dondero objects to this interrogatory (1) to the extent it seeks privileged information, (2) because it requires Dondero to speculate as to what other people know and believe, and (3) because the phrase "actual knowledge" is not defined. Subject to these objections, Dondero believes the following individuals may have actual knowledge of each Purported Agreement:

James Dondero

Frank Waterhouse

Mark Okada

John Honis

Scott Ellington

**INTERROGATORY NO. 3:** Identify (a) anything of value that was received by James Dondero (or for his benefit) in exchange for each Note, and (b) the date anything of value that was received by James Dondero (or for his benefit) in exchange for each Note.

**ANSWER:**

Dondero received the funds evidenced in each Note on or about the date that each Note was entered into by the parties to the Notes.

**INTERROGATORY NO. 4:** Identify each witness James Dondero intends to call at trial in this Adversary Proceeding.

**ANSWER:**

Dondero will identify witnesses in accordance with the scheduling order governing this proceeding.

DEFENDANT JAMES DONDERO'S OBJECTIONS AND ANSWERS TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES
CORE/3522697.0002/166033837.2                                                    PAGE 5 OF 6

Appx. 01395

## VERIFICATION

STATE OF TEXAS       )
                               )

COUNTY OF DALLAS   )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read Defendant's Objections and Answers to Highland Capital Management, L.P.'s First Set of Interrogatories and that the facts stated therein are within his personal knowledge and are true and correct.



_____
JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 26th day of April, 2021.

LINDA LAUCHNER
Notary Public, State of Texas
Comm. Expires 06-19-2021
Notary ID 1049001

Notary Public in and for the State of Texas

Appx. 01396

# EXHIBIT 83

Appx. 01397

Docket #0016  Date Filed: 4/6/2021

D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03003** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S AMENDED ANSWER

Defendant James Dondero ("Dondero" or "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Amended Answer (the "Answer") responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Adv. Dkt. 1] (the "Complaint"). Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

**Exhibit 10**

1934054210406000000000032

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Complaint sets forth the Plaintiff's objective in bringing the Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 5 not expressly admitted are denied.

6.      The Defendant admits paragraph 6 of the Complaint.

## THE PARTIES

7.     The Defendant admits paragraph 7 of the Complaint.

8.     The Defendant admits paragraph 8 of the Complaint.

## CASE BACKGROUND

9.     The Defendant admits paragraph 9 of the Complaint.

10.     The Defendant admits paragraph 10 of the Complaint.

11.     The Defendant admits paragraph 11 of the Complaint.

12.     The Defendant admits paragraph 12 of the Complaint.

## STATEMENT OF FACTS

13.     The Defendant admits that he has executed promissory notes under which the Debtor is the payee. Any allegations in paragraph 13 not expressly admitted are denied.

14.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 14 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

15.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 15 of the Complaint. The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of paragraph 15 of the Complaint and therefore denies same.

16.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 16 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

17.     The Defendant admits that section 2 of each note attached to the Complaint contains the provision quoted in paragraph 17 of the Complaint.

18.     The Defendant denies the allegations in paragraph 18 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

19.     The Defendant denies the allegations in paragraph 19 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

20.     In response to paragraph 20 of the Complaint, the Defendant admits that Exhibit 4 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 20 of the Complaint is denied.

21.     To the extent paragraph 21 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied. The Defendant otherwise admits paragraph 21 of the Complaint.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 of the Complaint and therefore denies same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of the Complaint and therefore denies same.

24.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 of the Complaint and therefore denies same.

25.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of the Complaint and therefore denies same.

26.     The Defendant denies the allegations in paragraph 26 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

27.     Paragraph 27 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of the Complaint and therefore denies same.

29.     Paragraph 29 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the Complaint and therefore denies same.

30.     Paragraph 30 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Complaint and therefore denies same.

31.     The Defendant denies paragraph 31 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by Mr. Dondero Pursuant to 11 U.S.C. § 542(b))

32.     Paragraph 32 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

33.     Paragraph 33 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Complaint and therefore denies same.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Complaint and therefore denies the same.

35.     The Defendant denies paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response. The Defendant admits that the Plaintiff transmitted the Demand Letter, and that document speaks for itself.  To the extent paragraph 36 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 of the Complaint and therefore denies the same.

37.     The Defendant denies paragraph 37 of the Complaint.

38.     Paragraph 38 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 of the Complaint and therefore denies the same.

39.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

40.     Defendant asserts that Plaintiff's claims should be barred because prior to the demands for payment Plaintiff agreed that it would not collect on the Notes upon fulfillment of conditions subsequent.

41.     Defendant further asserts that Plaintiff's claim should be barred, or reduced, in whole or in part, pursuant to Defendant's right to set off a mutual obligation owed to Defendant

by Plaintiff under state and/or federal law, including pursuant to 11 U.S.C. § 553. Plaintiff owes Defendant a debt that should set off or reduce any amounts that Defendant is found to owe Plaintiff on the Notes.

42.    Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due to waiver.

43.    Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due to estoppel.

44.    Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due to failure of consideration.

45.    Defendant further asserts that each Note is ambiguous.

## JURY DEMAND

46.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

47.    The Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Complaint and provide the Defendant such other relief to which he is entitled.

Dated: April 6, 2021

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
michael.lynn@bondsellis.com
john@bondsellis.com
john.wilson@bondsellis.com
bryan.assink@bondsellis.com

**ATTORNEYS FOR DEFENDANT
JAMES DONDERO**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 6, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 84

Appx. 01406

John Y. Bonds, III
State Bar No. 02589100
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES
## TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## SECOND REQUEST FOR ADMISSIONS

TO:    Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant James Dondero ("Defendant" or "Dondero") serves his Objections and

Responses to Debtor Highland Capital Management, L.P.'s ("Debtor" or "Highland") Second

Request for Admissions ("Requests"), as follows:

Exhibit 11

---

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**SECOND REQUEST FOR ADMISSIONS** PAGE 1 OF 5
CORE/3522697.0002/166180258

Appx. 01407

Dated: May 7, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**SECOND REQUEST FOR ADMISSIONS** **PAGE 2 OF 5**
CORE/3522697.0002/166180258

Appx. 01408

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on May 7, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

*/s/ Michael P. Aigen*
Michael P. Aigen

---

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S SECOND REQUEST FOR ADMISSIONS**
CORE/3522697.0002/166180258
**PAGE 3 OF 5**

**Appx. 01409**

<div align="center">

**OBJECTIONS AND RESPONSES**[1]

</div>

**REQUEST FOR ADMISSION NO. 1:**  Admit that in December 2019, James Dondero made a payment to the Debtor, a portion of which was applied to reduce principal and/or interest due under one or more of the Notes.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 2:**  Admit that James Dondero did not file a proof of claim in the Bankruptcy Case concerning or relating to the "mutual obligation" referred to in paragraph 41 of the Amended Answer.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 3:**  Admit that James Dondero did not file a proof of claim in the Bankruptcy Case concerning or relating to the "debt" referred to in paragraph 41 of the Amended Answer.

**RESPONSE:**

ADMIT.

**REQUEST FOR ADMISSION NO. 4:**  Admit that prior to serving his Amended Answer, James Dondero never informed the Debtor of his belief that any provision of any of the Notes was ambiguous, as alleged in paragraph 45 of the Amended Answer.

**RESPONSE:**

DENY.

**REQUEST FOR ADMISSION NO. 5:**  Admit that as of the date of the service of these Requests for Admission, James Dondero has not (a) identified any particular provision or clause of any Note that he contends is ambiguous (any such provision or clause, the "Identified Provision"), and (b) informed the Debtor of the Identified Provision.

---

[1] Defendant makes these responses subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and the Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. For the reasons stated in the motions, Defendant believes that the reference should be withdrawn and this proceeding stayed while the motion to withdraw the reference is considered. Defendant does not waive, but instead hereby preserves, his right to a jury trial and all rights and requests for relief asserted in the motions. Defendant does not consent to the Bankruptcy Court determining this proceeding or entering final orders or judgments in this proceeding. Defendant requests that the reference be withdrawn and that the District Court adjudicate this proceeding.

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S SECOND REQUEST FOR ADMISSIONS** **PAGE 4 OF 5**
CORE/3522697.0002/166180258

Appx. 01410

**RESPONSE:**

DENY.

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**SECOND REQUEST FOR ADMISSIONS**                                                                                       **PAGE 5 OF 5**
CORE/3522697.0002/166180258

**Appx. 01411**

# EXHIBIT 85

Appx. 01412

# EXHIBIT 20

Exhibit 12

John Y. Bonds, III
State Bar No. 02589100
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | **Adversary No. 21-03003-sgj** |
| v. | § | |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S OBJECTIONS AND ANSWERS
### TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
### SECOND SET OF INTERROGATORIES

TO:  Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant James Dondero ("Defendant" or "Dondero") serves his Objections and Answers

to Debtor Highland Capital Management, L.P.'s ("Debtor" or "Highland") Second Set of

Interrogatories ("Requests"), as follows:

---

Appx. 01414

Dated: May 7, 2021

Respectfully submitted,

*/Deborah Deitsch-Perez*
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

Appx. 01415

## CERTIFICATE OF SERVICE

  I, the undersigned, hereby certify that, on May 7, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.


             */s/ Michael P. Aigen*
             Michael P. Aigen

Appx. 01416

## OBJECTIONS AND ANSWERS[1]

**INTERROGATORY NO. 1:** Identify the "conditions subsequent" referred to in paragraph 40 of the Amended Answer.

**ANSWER:**

The conditions subsequent referred to in paragraph 40 of the Amended Answer refer to the disposition of the portfolio company interests managed and/or owned, directly or indirectly, by Highland and/or its affiliates or managed funds on a favorable basis or on a basis wholly outside Dondero's control.

**INTERROGATORY NO. 2:** With respect to each Note, identify:

(a) the person who provided legal advice to James Dondero in connection with the

negotiation, drafting, and execution of each Note, if any;

(b) the person who provided legal advice to the Debtor in connection with the negotiation,

drafting, and execution of each Note, if any; and

(c) the person who drafted each Note.

**ANSWER:**

Dondero objects to this interrogatory to the extent that it seeks privileged information. Subject to this objection, Dondero responds as follows:

Dondero does not know who specifically drafted the Notes, however, he believes they were drafted by an individual in either the Highland legal or finance department.

**INTERROGATORY NO. 3:** Identify the "mutual obligation" referred to in paragraph 41 of the Amended Answer, including (a) the date the mutual obligation was incurred, (b) any documents referring to or reflecting the mutual obligation, (c) the amount of the mutual obligation, (d) any demands made by James Dondero to the Debtor for payment on the mutual obligation.

---

[1] Defendant makes these responses subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and the Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. For the reasons stated in the motions, Defendant believes that the reference should be withdrawn and this proceeding stayed while the motion to withdraw the reference is considered. Defendant does not waive, but instead hereby preserves, his right to a jury trial and all rights and requests for relief asserted in the motions. Defendant does not consent to the Bankruptcy Court determining this proceeding or entering final orders or judgments in this proceeding. Defendant requests that the reference be withdrawn and that the District Court adjudicate this proceeding.

**DEFENDANT JAMES DONDERO'S OBJECTIONS AND ANSWERS TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S SECOND SET OF INTERROGATORIES** PAGE 4 OF 6
CORE/3522697.0002/166180645.4

**ANSWER:**

Defendant is not pursuing in this action the mutual obligation referred to in paragraph 41 of the Amended Answer, which refers to potential contribution and/or indemnity claims that are largely unliquidated and contingent, and which Dondero cannot identify until all potential claims are resolved.

**INTERROGATORY NO. 4:**  Identify every person James Dondero believes has personal knowledge of the alleged mutual obligation referred to in paragraph 41 of the Amended Answer.

**ANSWER:**

James Dondero

Frank Waterhouse

Mark Okada

John Honis

Scott Ellington

**INTERROGATORY NO. 5:**  Identify the "debt" referred to in paragraph 41 of the Amended Answer, including (a) the date the debt was incurred, (b) any documents referring to or reflecting the debt, (c) the amount of the mutual obligation, (d) any demands made by James Dondero to the Debtor for payment on the debt.

**ANSWER:**

See Response to Interrogatory No. 3.

**INTERROGATORY NO. 6:**  Identify every person James Dondero believes has personal knowledge of the alleged debt referred to in paragraph 41 of the Amended Answer.

**ANSWER:**

See Response to Interrogatory No. 3.

**INTERROGATORY NO. 7:**  Identify each provision of each Note that James Dondero contends is ambiguous.

**ANSWER:**

Dondero contends that each Note as a whole is ambiguous because it refers to additional agreements without specifying them.

---

Appx. 01418

## **VERIFICATION**

STATE OF TEXAS )

COUNTY OF DALLAS )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read Defendant's Objections and Answers to Highland Capital Management, L.P.'s Second Set of Interrogatories and that the facts stated therein are within his personal knowledge and are true and correct.

_____

JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 7th day of May, 2021.

_____

Notary Public in and for the State of Texas

Appx. 01419

# EXHIBIT 86



May 18, 2018

PricewaterhouseCoopers LLP
2001 Ross Avenue, Suite 1800
Dallas, TX 75201

We are providing this letter in connection with your audit of the consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (Appendix 1), (hereinafter collectively referred to as the "Partnership") as of December 31, 2017 (hereinafter referred to as the "balance sheet date") and the related consolidated statements of income, of changes in partners' capital, and of cash flows for the year then ended (hereinafter referred to as the "period"), (hereinafter collectively referred to as the "consolidated financial statements"), for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, changes in partners' capital and of cash flows of the Partnership in conformity with accounting principles generally accepted in the United States of America. We acknowledge and confirm that we have fulfilled our responsibility, as set out in our engagement letter of February 2, 2018, for the preparation and fair presentation in the consolidated financial statements of financial position, results of operations, changes in partners' capital and of cash flows in conformity with accounting principles generally accepted in the United States of America, including the appropriate selection of accounting policies.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement. Materiality used for purposes of these representations is $2,000,000.

We confirm, to the best of our knowledge and belief, as of May 18, 2018, the date of your report, the following representations made to you during your audit:

**General**

1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America (US GAAP), and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Partnership is subject. We have prepared the Partnership's consolidated financial statements on the basis that the Partnership is able to continue as a going concern. There are no conditions or events, considered in the aggregate, that raise substantial doubt about the Partnership's ability to continue as a going concern within one year after the date these consolidated financial statements are issued.

2. We have made available to you:

   a. All financial records and related data.

   b. Unconditional access to persons within the entity from whom you have requested audit evidence.

CONFIDENTIAL

**Exhibit 14**

    c. All minutes of the meetings of committees or other governing bodies applicable to the Partnership, including but not limited to, investors, Partners and committees of Partners, including summaries of actions of recent meetings for which minutes have not yet been prepared. The most recent meetings held were Pricing Committee, May 11, 2018.

    d. Partnership agreements, Memoranda and Articles of Association, Confidential Offering Memoranda and amendments thereto (individually or collectively referred to hereinafter as the "Governing Documents"), and all other agreements to which the Partnership is subject.

    e. Contracts or other agreements with the Partnership's service providers.

    f. All official written reports, findings, recommendations and communications from specialists or professional advisors engaged to review investments, systems, processes, operations, or compliance programs of the Partnership that are material to the Partnership, individually or in aggregate.

    g. All side letter arrangements, whether written or oral, with any investors entered into or cancelled during the period for which noncompliance would have a material effect on the Partnership's consolidated financial statements. These side letters are allowed under the terms of the Governing Documents.

    h. Withdrawal requests submitted or communicated by investors through the date of this letter.

3. We are responsible for all significant estimates and judgments affecting the consolidated financial statements. Significant estimates and judgments and their underlying assumptions, methods, procedures and the source and reliability of supporting data are reasonable and based on applicable guidance, are completely and appropriately disclosed in the consolidated financial statements, and appropriately reflect management's intent and ability to carry out specific courses of action, where relevant. The procedures and methods utilized in developing assumptions, estimates and judgments are appropriate and have been consistently applied in the periods presented. There have been no subsequent events which would require the adjustment of any significant estimate and related disclosures.

**Legal and Regulatory Compliance**

4. There have been no communications from regulatory agencies concerning the Partnership's noncompliance with or deficiencies in financial reporting practices.

5. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

6. The Partnership has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

**Fraud**

7. We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

2

8. We have disclosed to you the results of our assessment of the risk that the consolidated financial statements may be materially misstated as a result of fraud and we have no knowledge of any fraud or suspected fraud affecting the Partnership involving:

   a. Partnership management or its affiliates,

   b. Employees who have significant roles in the Partnership's internal control over financial reporting, or

   c. Others where the fraud could have a material effect on the consolidated financial statements.

9. Except for previously disclosed, we have no knowledge of any allegations of fraud or suspected fraud affecting the Partnership received in communications from employees, former employees, regulators, service providers, counterparties, current or former investors, or others.

(As to items 7, 8, and 9, we understand the term "fraud" to mean those matters described in AICPA AU-C 240.)

**Assets, Liabilities and Capital**

*Assets:*

10. The Partnership has satisfactory title to all owned assets, including investments, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, including, but not limited to, assets pledged or assigned as security for liabilities and performance of contracts, except as disclosed in the consolidated financial statements. All deposit and brokerage accounts and all investments and other assets of the Partnership of which we are aware are included in the consolidated financial statements.

11. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for transactions arising on or before the balance sheet date. All receivables have been appropriately reduced to their estimated net realizable value. Receivables, if any, from shareholders/partners or their affiliates, have been collected before the date of this letter.

12. We have evaluated all transfers of financial assets during the period, including, but not limited to, transfers between the Partnership and other affiliates, to determine that control over the transferred assets has been surrendered and that all of the conditions in accordance with Accounting Standards Codification (ASC) 860, *Transfers and Servicing*, ASC 860-10-40-5 have been met.

*<u>Investments:</u>*

With respect to Partnership's investments:

13. Portfolio investments included in the Partnership's consolidated financial statements have been stated at fair values as determined by management in accordance with the valuation methods set forth in the Governing Documents and related policies and procedures. Such policies are in accordance with US GAAP (e.g., fair value of an investment is that price which would be received to sell or paid to transfer, respectively, those assets or liabilities in orderly transactions between market participants).

3

D-JDNL-033402

**Appx. 01423**

14. The valuation policies used for securities or investments whose fair values have been estimated by management are appropriate and have been consistently applied and documented. The policies for fair value measurement are appropriately disclosed in the Partnership's consolidated financial statements. The methods, assumptions, and inputs used are appropriate and result in a fair value appropriate for consolidated financial statement measurement and disclosure purposes. As of the balance sheet date, the investments for which fair value were determined by estimates made by Partnership are appropriately disclosed in the Partnership's consolidated financial statements.

15. We have informed you of any investments as of the balance sheet date that have restrictions on their sale or transferability. We have appropriately considered restrictions that are an attribute of the investment in our fair value determination.

16. The cost of portfolio securities was determined on the basis of FIFO method.

17. All Partnership investments made during the period were in accordance with the investment policies stated in the Governing Documents. All investments made during the period were authorized by appropriate personnel.

18. We have made available to you all information received from third party specialists engaged with respect to the valuation of investments. We believe that the data used in the work of the third-party specialists is accurate, complete, and relevant, and that our fair value determinations have been properly determined using such data and assumptions. We assume responsibility for, and are responsible for the evaluation of, the findings of third-party specialists in order to determine the fair value of the investments. We have adequately considered the qualifications of the third-party specialists in determining the amounts and disclosures used in the consolidated financial statements and underlying accounting records. We did not give nor cause any instructions to be given to third-party specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the objectivity of the third-party specialists.

19. We evaluated all contracts and financial instruments to determine whether they meet the definition of a derivative under ASC 815, Derivatives and Hedging (ASC 815).

***Liabilities:***

20. All liabilities of the Partnership of which we are aware are included in the consolidated financial statements at the balance sheet date. There are no other liabilities or gain or loss contingencies that are required to be recognized or disclosed by ASC 450, *Contingencies*, and no unasserted claims or assessments that our legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Topic.

21. The Partnership is not an "SEC registrant" as that term is used in ASC 480, *Distinguishing Liabilities from Equity*, 480-10-65-1. The Partnership has properly classified and disclosed as liabilities its mandatorily redeemable securities and other financial instruments (e.g., payable) that are within the scope of ASC 480-10-65, *Effective Date, Disclosures, and Transition for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests,* in the consolidated financial statements.

22. The actuarial valuation of pension benefit obligations was determined using an acceptable methodology applied on a consistent basis and taking into account the individual characteristics of

4

D-JDNL-033403

**Appx. 01424**

the plan and reasonable assumptions, including those for the discount rate, rate of return on plan assets, mortality rate and other demographic assumptions.

23. We accurately described the processes used by management to make investment decisions, including the target allocation percentages or range of percentages for each major category of plan assets, and to determine the overall expected long-term rate of return on assets.

24. The amounts of expected employer contributions to the benefit plan during the next fiscal year represent our best estimate.

25. We do not intend to compensate for the reduction of postretirement benefits by granting an increase in pension or other benefits.

26. We applied the recognition, disclosure and measurement date provisions of ASC 715, Compensation-Retirement Benefits (ASC 715). The resulting benefit asset represents the overfunded status of the plan, and accumulated other comprehensive income includes all previously unrecognized prior service costs and credits, net gains/losses and transition assets and obligations, net of taxes.

27. We measured and recognized all plan assets as of the plan's measurement date at fair value in accordance with ASC 715, Compensation- Retirement Benefits (ASC 715).

*Capital:*

28. Partner capital balances, including the allocation of income, gains and losses, and the calculation of management fees and incentive fees/allocation have been properly calculated throughout the period in accordance with the Governing Documents, after giving consideration to the terms identified in each investor's subscription document. The methodology was consistently applied throughout the period and was correctly applied in the computation of contribution and withdrawal transactions during the period.

**Statement of Income**

29. All material expenses charged to the Partnership are permissible under the terms of the Governing Documents. All directed brokerage and other expense reimbursement agreements, if any, have been properly disclosed in the consolidated financial statements.

**Tax Matters**

30. There are no material tax liabilities incurred by the Partnership under the provisions of ASC 740, *Income Taxes*. We have made the necessary provisions and disclosures in the consolidated financial statements as required by ASC 740, *Income Taxes*. The resulting liabilities are supported by specifically identified income tax exposures.

31. We have provided you with all information and our assessment related to all significant uncertain income tax positions that we have taken, or expect to take, of which we are aware. We have also provided you with access to all opinions, rulings, memoranda and analyses that relate to positions we have taken in regard to significant income tax matters. We are responsible for the accuracy and completeness of information provided to external counsel and we believe that the facts are consistent with any stated assumptions made by external counsel for purposes of forming such tax opinions. We have made you aware of and have disclosed all significant tax positions for which it is reasonably

5

CONFIDENTIAL

possible the amount of unrecognized tax benefit will either increase or decrease in the next 12 months.

**Disclosure and Presentation of Consolidated Financial Statements**

32. The effects of the uncorrected consolidated financial statement misstatements are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

33. We have appropriately reconciled the Partnership books and records (including, but not limited to, general ledger accounts, financial accounts maintained outside the general ledger and trial balances) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger, or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements, as necessary. There were no material un-reconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to a statement of operations account and vice versa. All consolidating entries have been properly recorded. All intra-entity accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

34. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

35. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

   a. Agreements to repurchase assets previously sold.

   b. All pertinent rights and privileges of both general partner and limited partner interests in the Partnership.

   c. Fee income and expenses associated with stock lending and borrowing arrangements.

   d. Relationships and transactions with related parties, as described in ASC 850, *Related Party Disclosures*, including revenue, purchases and sales of securities, transfers, guarantees, other fees and expenses charged to the Partnership, and amounts receivable from or payable to related parties.

   e. Significant estimates and material concentrations known to us that are required to be disclosed in accordance with ASC 275, *Risks and Uncertainties*. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to matters such as volume of investment activity, available sources of financing, markets or geographic areas for which events could occur that would significantly disrupt investment performance within the next year.)

   f. All cash and deposit accounts and all other properties and assets of the Partnership are included in the consolidated financial statements.

   g. All financial instruments, including those with off-balance-sheet risk (including, but not limited to, swaps, forwards and futures), as required under US GAAP. This includes the following information with respect to the off-balance-sheet risks and the concentrations of credit risk:

6

CONFIDENTIAL

    i. The extent, nature, and terms of financial instruments with off-balance-sheet risk.

    ii. The amount of credit risk of financial instruments with off-balance-sheet risk and information about the collateral supporting such financial instruments.

h. Each significant concentration of credit risk arising from all financial instruments, and information about the collateral supporting such financial instruments, whether from an individual counterparty/prime broker or group of counterparties/prime brokers in accordance with ASC 825, *Financial Instruments,* and ASC 815, *Derivatives and Hedging* (ASC 815), 815-10-50.

i. Commitments to purchase or sell financial instruments, commitments on certain debt instruments such as revolving credit facilities and obligations to fund capital calls.

j. Guarantees, whether written or oral, under which the Partnership is contingently liable.

k. Transactions made in foreign currencies.

l. Transactions made on margin or selling short.

36. We have disclosed to you the identity of the Partnership's related parties and all the related party relationships and transactions of which we are aware.

37. The Partnership has classified and disclosed financial assets and liabilities in the consolidated financial statements as Level 1, Level 2 and Level 3 in accordance with ASC 820, *Fair Value Measurement*, including a description of inputs and information used to develop valuation techniques as well as facts that required a change to such techniques, where applicable. We have made appropriate disclosures in accordance with Accounting Standards Update (ASU) 2011-11, *Disclosures about Offsetting Assets and Liabilities,* when the Partnership has the right of setoff in accordance with a master netting or similar agreement. The netting of assets and liabilities has been performed in accordance with the specific requirements of ASC 210, *Balance Sheet,* 210-20-45-1 and ASC 815-10-45-5.

38. The Partnership has properly recorded, classified and disclosed the prime broker margin collateral requirements in the consolidated financial statements in accordance with ASC 860, *Transfers and Servicing,* as to the recognition and reclassification of collateral and disclosures relating to securitization transactions and collateral.

39. We consistently applied our policy regarding classification of cash and cash equivalents, which are short-term, highly liquid investments that are readily convertible to known amounts of cash and are so near their maturity that there is insignificant risk of changes in value due to interest rate or other credit risk changes.

40. All borrowings and financial obligations of the Partnership have been disclosed to you and are properly recorded in the consolidated financial statements.

41. The Partnership has not made any commitments during the year as underwriter, nor did it engage in joint trading or a joint investment account.

**Other**

7

D-JDNL-033406

**Appx. 01427**

      i.   The extent, nature, and terms of financial instruments with off-balance-sheet risk.

      ii.  The amount of credit risk of financial instruments with off-balance-sheet risk and information about the collateral supporting such financial instruments.

  h.  Each significant concentration of credit risk arising from all financial instruments, and information about the collateral supporting such financial instruments, whether from an individual counterparty/prime broker or group of counterparties/prime brokers in accordance with ASC 825, *Financial Instruments,* and ASC 815, *Derivatives and Hedging* (ASC 815), 815-10-50.

  i.  Commitments to purchase or sell financial instruments, commitments on certain debt instruments such as revolving credit facilities and obligations to fund capital calls.

  j.  Guarantees, whether written or oral, under which the Partnership is contingently liable.

  k.  Transactions made in foreign currencies.

  l.  Transactions made on margin or selling short.

36. We have disclosed to you the identity of the Partnership's related parties and all the related party relationships and transactions of which we are aware.

37. The Partnership has classified and disclosed financial assets and liabilities in the consolidated financial statements as Level 1, Level 2 and Level 3 in accordance with ASC 820, *Fair Value Measurement*, including a description of inputs and information used to develop valuation techniques as well as facts that required a change to such techniques, where applicable. We have made appropriate disclosures in accordance with Accounting Standards Update (ASU) 2011-11, *Disclosures about Offsetting Assets and Liabilities,* when the Partnership has the right of setoff in accordance with a master netting or similar agreement. The netting of assets and liabilities has been performed in accordance with the specific requirements of ASC 210, *Balance Sheet,* 210-20-45-1 and ASC 815-10-45-5.

38. The Partnership has properly recorded, classified and disclosed the prime broker margin collateral requirements in the consolidated financial statements in accordance with ASC 860, *Transfers and Servicing*, as to the recognition and reclassification of collateral and disclosures relating to securitization transactions and collateral.

39. We consistently applied our policy regarding classification of cash and cash equivalents, which are short-term, highly liquid investments that are readily convertible to known amounts of cash and are so near their maturity that there is insignificant risk of changes in value due to interest rate or other credit risk changes.

40. All borrowings and financial obligations of the Partnership have been disclosed to you and are properly recorded in the consolidated financial statements.

41. The Partnership has not made any commitments during the year as underwriter, nor did it engage in joint trading or a joint investment account.

**Other**

7

CONFIDENTIAL

D-JDNL-033407

**Appx. 01428**

50. We acknowledge responsibility for the presentation of the Supplemental Consolidating Balance Sheet, Supplemental Consolidating Statement of Income, Supplemental Unconsolidated Balance Sheet and Supplemental Unconsolidated Statement of Income in accordance with US GAAP and we believe such information, including its form and content, is fairly presented in accordance with US GAAP. We have communicated to you all changes in measurement or presentation from those used in the prior period. We have informed you about any significant assumptions or interpretations underlying the measurement or presentation of the information.

To the best of our knowledge and belief, no events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustments to, or disclosure in, the aforementioned consolidated financial statements.

_____

James Dondero, President
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

_____

Frank Waterhouse, Treasurer
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

9

CONFIDENTIAL

**Appendix 1**

Highland Multi Strategy Credit Fund, L.P.

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Fund, L.P.

Highland Restoration Capital Partners Offshore, L.P.

Highland Restoration Capital Partners, L.P.

BB Votorantim, Highland Infrastructure LLC

Highland Capital Special Allocation, LLC

Highland Receivables Finance 1, LLC

Highland Brasil, LLC

Highland Capital Management Partners Charitable Trust #1

Highland Capital Management (Singapore) Pte, Ltd.Highland Capital Management Korea, Ltd.

Highland Capital Management Latin America, L.P.

HE Capital, LLC

De Kooning, Ltd.

Hirst, Ltd.

Hockney, Ltd.

Oldenburg, Ltd.

Eames, Ltd.

Penant Management, L.P.

Pollack, Ltd.

Warhol, Ltd.

HCREF- I Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

Highland ERA Management, LLC

The Dondero Insurance Rabbi Trust

CONFIDENTIAL

**Appendix 1 (continued)**

The Okada Insurance Rabbi Trust

Highland Employee Retention Assets, LLC

Highland Diversified Credit Fund, L.P.

Highland Select Equity Master Fund, L.P.

Highland Select Equity Fund, L.P.

Bandera Strategic Credit Partners I SLP, L.P.

Highland Fund Holdings, LLC

HCM Holdco, LLC

Maple Avenue Holdings, LLC

Highland HCF Advisor, Ltd.

11

CONFIDENTIAL

# EXHIBIT 87

Appx. 01432

Docket #0248  Date Filed: 12/13/2019

**Fill in this information to identify the case:**

Debtor name    **Highland Capital Management, L.P.**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF TEXAS

Case number (if known)    **19-34054-SGJ**

☐ Check if this is an
amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages,
write the debtor's name and case number (if known).

| Part 1: | Income |
|---|---|

1. **Gross revenue from business**

☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|
| **From the beginning of the fiscal year to filing date:**<br>From  **1/01/2019** to **Filing Date** | ☑ Operating a business<br>☑ Other  **Exhibit A** | **$28,431,156.97** |
| **From the beginning of the fiscal year to filing date:**<br>From  **1/01/2019** to **Filing Date** | ☐ Operating a business<br>**Exhibit A - Other**<br>☑ Other  **Gain/(Loss)** | **$125,310,540.63** |
| **For prior year:**<br>From  **1/01/2018** to **12/31/2018** | ☑ Operating a business<br>☑ Other  **Exhibit A** | **$50,365,069.40** |
| **For prior year:**<br>From  **1/01/2018** to **12/31/2018** | ☐ Operating a business<br>**Exhibit A - Other**<br>☑ Other  **Gain/(Loss)** | **$-52,929,268.33** |
| **For year before that:**<br>From  **1/01/2017** to **12/31/2017** | ☑ Operating a business<br>☑ Other  **Exhibit A** | **$67,911,079.00** |
| **For year before that:**<br>From  **1/01/2017** to **12/31/2017** | ☐ Operating a business<br>**Exhibit A - Other**<br>☑ Other  **Gain/(Loss)** | **$47,701,590.21** |



Exhibit 19

| Debtor | **Highland Capital Management, L.P.** | Case number *(if known)* **19-34054-SGJ** |
|---|---|---|

**2. Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None.

| | Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
|---|---|---|

---

**Part 2:** List Certain Transfers Made Before Filing for Bankruptcy

**3. Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|
| 3.1. **Exhibit B** | | **$23,255,006.86** | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

---

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. **Exhibit C** | | **$36,608,252.91** | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

---

**Part 3:** Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

---

**Appx. 01434**

Debtor  **Highland Capital Management, L.P.**                              Case number *(if known)* **19-34054-SGJ**

☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | **Exhibit D** | | | ☐ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. | **Internal dispute resolution department within the IRS** | **IRS Appeal** | **Department of the Treasury<br>4050 Alpha Road<br>Suite 517, MC: 8000NDAL<br>Dallas, TX 75201-7849** | ☐ Pending<br>☑ On appeal<br>☐ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| **Part 4:** | **Certain Gifts and Charitable Contributions** |
|---|---|

9. **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☐ None

| | Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|---|
| 9.1. | **Exhibit E** | **Debtor does not track recipient of gift or contribution.** | | **$445,725.61** |
| | Recipients relationship to debtor | | | |

| **Part 5:** | **Certain Losses** |
|---|---|

10. **All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | Dates of loss | Value of property lost |
|---|---|---|---|

| **Part 6:** | **Certain Payments or Transfers** |
|---|---|

11. **Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|

**Appx. 01435**

Debtor  **Highland Capital Management, L.P.**                                          Case number *(if known)*  **19-34054-SGJ**

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | **Development Specialists, Inc.** **10 South LaSalle** **Suite 3300** **Chicago, IL 60603** | | **10/07/2019** | **$250,000.00** |
| | Email or website address **dsiconsulting.com** | | | |
| | Who made the payment, if not debtor? | | | |
| 11.2. | **Pachulski Stang Ziehl &** **Jones LLP** **10100 Santa Monica Blvd.** **13th Floor** **Los Angeles, CA 90067** | | **10/02/2019** | **$500,000.00** |
| | Email or website address **http://www.pszjlaw.com/** | | | |
| | Who made the payment, if not debtor? | | | |
| 11.3. | **Kurtzman Carson** **Consultants LLC** **Dept CH 16639** **Palatine, IL 60055** | | **10/07/2019** | **$50,000.00** |
| | Email or website address **https://www.kccllc.com/** | | | |
| | Who made the payment, if not debtor? | | | |

12. **Self-settled trusts of which the debtor is a beneficiary**
    List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
    Do not include transfers already listed on this statement.

☑ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

13. **Transfers not already listed on this statement**
    List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

Debtor **Highland Capital Management, L.P.**     Case number *(if known)* **19-34054-SGJ**

| | Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | **Highland Select Equity Fund, L.P.** **300 Crescent Ct.** **Dallas, TX 75201** | **Transfer of 888,731 shares of public security in exchange for LP interest.** | **12/26/2018** | **$19,632,067.79** |
| | **Relationship to debtor** **Fund managed by the debtor.** | | | |
| 13.2. | **Highland Select Equity Fund, L.P.** **300 Crescent Ct.** **Dallas, TX 75201** | **Transfer of 214,000 shares of public security in exchange for LP interest.** | **3/12/2018** | **$6,385,760.00** |
| | **Relationship to debtor** **Fund managed by the debtor** | | | |
| 13.3. | **Highland Select Equity Fund, L.P.** **300 Crescent Ct.** **Suite 700** **Dallas, TX 75201** | **Transfer of 250,000 shares of public security for LP interest** | **7/23/2019** | **$10,297,500.00** |
| | **Relationship to debtor** **Fund managed by the debtor** | | | |

| Part 7: | Previous Locations |
|---|---|

14. **Previous addresses**
    List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | Dates of occupancy From-To |
|---|---|---|
| 14.1. | **Parkway Bent Tree** **17130 Dallas Parkway** **Suite 230** **Dallas, TX 75248** | **10/16/2016 – 8/30/2018** |
| 14.2. | **2200 Ross Avenue** **Suite 4700E** **Storage Site** **Dallas, TX 75201** | **10/16/2016 – 12/31/2018** |

| Part 8: | Health Care Bankruptcies |
|---|---|

15. **Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

**Appx. 01437**

Debtor  **Highland Capital Management, L.P.**                              Case number *(if known)*  **19-34054-SGJ**

---

| **Part 9:** | **Personally Identifiable Information** |

**16. Does the debtor collect and retain personally identifiable information of customers?**

☐ No.
☑ Yes. State the nature of the information collected and retained.

> **Debtor has information including SS#, tax ID, mailing address, email address, and limited KYC for fund investors.**

> Does the debtor have a privacy policy about that information?
> ☐ No
> ☑ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☐ No. Go to Part 10.
☑ Yes. Does the debtor serve as plan administrator?

> ☐ No Go to Part 10.
> ☑ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| **Highland 401(K) Plan** | EIN: **75-2716725** |

> Has the plan been terminated?
> ☑ No
> ☐ Yes

> ☐ No Go to Part 10.
> ☑ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| **Highland Capital Management, L.P. Retirement Plan and Trust (Defined Benefit Plan)** | EIN: **75-2716725** |

> Has the plan been terminated?
> ☑ No
> ☐ Yes

---

| **Part 10:** | **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units** |

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

---

| Debtor | **Highland Capital Management, L.P.** | Case number *(if known)* | **19-34054-SGJ** |
|---|---|---|---|

☐ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|
| **Iron Mountain**<br>**PO BOX 915004**<br>**Dallas, TX 75391** | **Employee has login access to request documents.** | **Firm-wide documents sent off-site to retain documents per the firm's retention policy.** | ☐ No<br>☑ Yes |
| **Natural Disasters Site**<br>**900 Venture Dr.**<br>**Allen, TX 75013** | **Highland Capital Management IT Department** | **Primary Data Center - Storage** | ☐ No<br>☑ Yes |
| **Natural Disasters Site**<br>**3010 Waterview Parkway**<br>**Richardson, TX 75080** | **Highland Capital Management IT Department** | **Natural Disasters Site - Storage** | ☐ No<br>☑ Yes |

---

**Part 11:** Property the Debtor Holds or Controls That the Debtor Does Not Own

21. **Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☐ None

| Owner's name and address | Location of the property | Describe the property | Value |
|---|---|---|---|
| James Dondero | **300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | Artwork | Unknown |

---

**Part 12:** Details About Environment Information

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

☑ No.
☐ Yes. Provide details below.

| Case title<br>Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

---

**Appx. 01439**

Debtor   **Highland Capital Management, L.P.**                                Case number *(if known)*  **19-34054-SGJ**

 

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:   Details About the Debtor's Business or Connections to Any Business**

25. **Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case.
Include this information even if already listed in the Schedules.

☐ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| 25.1.   **Exhibit F** | | **EIN:**<br><br>**From-To** |

26. **Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☐ None

| Name and address | Date of service<br>From-To |
|---|---|
| 26a.1.   **Frank Waterhouse**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **10/23/06 - Current** |
| 26a.2.   **David Klos**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **03/30/09 - Current** |
| 26a.3.   **Kristin Hendrix**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **12/16/04 - Current** |
| 26a.4.   **Sean Fox**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **06/25/13 - Current** |
| 26a.5.   **Drew Wilson**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **02/06/12 - 09/14/18** |
| 26a.6.   **Hayley Eliason**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **11/26/18 - Current** |
| 26a.7.   **Blair Roeber**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **09/01/15 - Current** |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement
within 2 years before filing this case.

Debtor    Highland Capital Management, L.P.           Case number *(if known)*   19-34054-SGJ

---

☐ None

| Name and address | Date of service From-To |
|---|---|
| 26b.1.    **PricewaterhouseCoopers LLP** <br> **2121 N Pearl St** <br> **Dallas, TX 75201** | **2003 - Current** |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.    **Boyd Gosserand** <br> **300 Crescent Ct.** <br> **St 700** <br> **Dallas, TX 75201** | |
| 26c.2.    **Deloitte - Tax** <br> **PO Box 844736** <br> **Dallas, TX 75284** | |
| 26c.3.    **Centroid -Accounting Software Consultant** <br> **6860 Dallas Pkwy Suite 560** <br> **Dallas, TX 75204** | |
| 26c.4.    **Oracle - Accounting Software** <br> **PO Box 203448** <br> **Dallas, TX 75320** | |
| 26c.5.    **Wolters Kluwer - Tax** <br> **PO Box 71882** <br> **Chicago, IL 60694** | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☐ None

| Name and address |
|---|
| 26d.1.    **AgeeFisherBarrett, LLC** <br> **750 Hammond Dr BLDG 17** <br> **Atlanta, GA 30328** |
| 26d.2.    **Bowman Law LLC** <br> **840 Tom Wheeler Lane** <br> **Mc Ewen, TN 37101** |
| 26d.3.    **CBIZ Valuation Group, Inc.** <br> **3030 LBJ Freeway, Ste 1650** <br> **Dallas, TX 75234** |
| 26d.4.    **Cole Schotz** <br> **Court Plaza North** <br> **25 Main Street, PO Box 800** <br> **Hackensack, NJ 07602** |
| 26d.5.    **Colorado FSC** <br> **188 Inverness Drive West** <br> **Ste. 100** <br> **Centennial, CO 80112** |

---

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com       Best Case Bankruptcy

**Appx. 01441**

Debtor    Highland Capital Management, L.P.         Case number *(if known)* **19-34054-SGJ**

| Name and address |
|---|

| | |
|---|---|
| 26d.6. | **Concordeis**<br>**1120 East Long Lake Road**<br>**Ste 207**<br>**Troy, MI 48085** |
| 26d.7. | **Courtland T Group**<br>**PO Box 11929**<br>**Newport Beach, CA 92658** |
| 26d.8. | **Crown Capital Securities**<br>**725 Town & Country Rd**<br>**Ste 530**<br>**Orange, CA 92868** |
| 26d.9. | **Deloitte Tax LLP**<br>**PO Box 844736**<br>**Dallas, TX 75284** |
| 26d.10. | **DFPG Investments, Inc.**<br>**9017 S. Riverside Dr.**<br>**Ste 210**<br>**Sandy, UT 84070** |
| 26d.11. | **Discipline Advisors**<br>**14135 G-100 Midway Rd.**<br>**Dallas, TX 75244** |
| 26d.12. | **Development Specialists, Inc.**<br>**10 S. LaSalle St.**<br>**Chicago, IL 60603** |
| 26d.13. | **Emerson Equity**<br>**155 Bovet Rd. #725**<br>**San Mateo, CA 94402** |
| 26d.14. | **Frontier Bank**<br>**5100 S I-35 Service Rd.**<br>**Oklahoma City, OK 73129** |
| 26d.15. | **Grant Thornton LLP**<br>**33570 Treasury Center**<br>**Chicago, IL 60694** |
| 26d.16. | **Great Southern Bank**<br>**8201 Preston Road**<br>**Suite 305**<br>**Dallas, TX 75225** |
| 26d.17. | **Key Bank**<br>**ATTN: KREC Loan Services**<br>**4910 Tiedman Road**<br>**3rd Floor**<br>**Cleveland, OH 44144** |
| 26d.18. | **KPMG**<br>**3 Chesnut Ridge Rd**<br>**Montvale, NJ 07645** |
| 26d.19. | **Maples & Calder**<br>**Ugland House PO Box 309**<br>**S. Church Street George Town**<br>**Grand Cayman, Cayman Island** |

**Appx. 01442**

Debtor **Highland Capital Management, L.P.**      Case number *(if known)* **19-34054-SGJ**

| Name and address |
|---|
| 26d.20. **Payne and Smith**<br>**5952 Royal Lane**<br>**Suite 158**<br>**Dallas, TX 75230** |
| 26d.21. **PWC**<br>**PO Box 952282**<br>**Dallas, TX 75395** |
| 26d.22. **Squire Patton Boggs**<br>**PO Box 643051**<br>**Cincinnati, OH 45264** |
| 26d.23. **WC Capital Partners** |
| 26d.24. **Western International Securities, Inc.**<br>**70 S. Lake Ave**<br>**Ste 700**<br>**Pasadena, CA 91101** |
| 26d.25. **Jean Francois Lemay**<br>**52 Harold Street**<br>**Etobicoke M8Z 3R3** |

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Strand Advisors, Inc.** | **300 Crescent Ct, Ste 700**<br>**Dallas, TX 75201** | **General Partner** | **0.2508%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **The Dugaboy Investment Trust** | **300 Crescent Ct, Ste 700**<br>**Dallas, TX 75201** | **Voting Limited Partner** | **0.1866%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Mark Okada** | **300 Crescent Ct, Ste 700**<br>**Dallas, TX 75201** | **Voting Limited Partner** | **0.0487%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Mark and Pamela Okada Family Trust** | **300 Crescent Ct, Ste 700**<br>**Dallas, TX 75201** | **Voting Limited Partner** | **0.0098%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Mark and Pamela Okada Family Trust - #2** | **300 Crescent Ct, Ste 700**<br>**Dallas, TX 75201** | **Voting Limited Partner** | **0.0042%** |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

**Appx. 01443**

Debtor **Highland Capital Management, L.P.**   Case number *(if known)* **19-34054-SGJ**

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| **Hunter Mountain Investment Trust** | **1100 N Market St Wilmington, DE 19890** | **Non-voting Limited Partner** | **99.50%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| **James Dondero** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **Sole Shareholder of General Partner** | **100%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| **James Dondero** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **President of General Partner** | **100% of the General Partner** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| **Scott Ellington** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **Secretary of General Partner** | **0.00%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| **Frank Waterhouse** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **Treasurer of General Partner** | **0.00%** |

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☐ No
☑ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|------|---------|-------------------------------------|---------------------------------------------------|
| **Mark Okada** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **Executive Vice President** | **Since inception to 9/30/2019** |

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|------|---------|-------------------------------------|---------------------------------------------------|
| **Trey Parker** | **300 Crescent Ct, Ste 700 Dallas, TX 75201** | **Assistant Secretary** | **8/21/2015 - 4/15/2019** |

**30. Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
☑ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|--|-------------------------------|------------------------------------------------------|-------|--------------------------------|
| 30.1. | **Exhibit G** | **8,722,414.86** | | |
| | **Relationship to debtor** | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com   Best Case Bankruptcy

**Appx. 01444**

Debtor **Highland Capital Management, L.P.**      Case number *(if known)* **19-34054-SGJ**

☑ No
☐ Yes. Identify below.

**Name of the parent corporation**      **Employer Identification number of the parent corporation**

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

**Name of the pension fund**      **Employer Identification number of the parent corporation**

**Part 14:**   **Signature and Declaration**

     **WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

     I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

     I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **December 13, 2019**

_____       Bradley Sharp
Signature of individual signing on behalf of the debtor      Printed name

Position or relationship to debtor      Chief Restructuring Officer

**Are additional pages to** *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* **(Official Form 207) attached?**
☐ No
☑ Yes

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit A - SOFA 1**

| Revenue Account | Year 2019 [1] | Year 2018 | Year 2017 |
|---|---|---|---|
| **Operating Revenue** | | | |
| Management fees | $ 18,776,701.38 | $ 35,264,426.88 | $ 37,098,010.50 |
| Shared services fees | 6,002,769.24 | 9,187,200.55 | 9,445,221.98 |
| Incentive fees | 150,925.36 | 18,465.92 | 10,042,499.76 |
| Interest and Investment Income | 2,625,221.26 | 4,857,157.03 | 4,478,946.34 |
| Miscellaneous Income | 875,539.73 | 1,037,819.02 | 6,846,400.42 |
| **Total Operating Revenue** | $ 28,431,156.97 | $ 50,365,069.40 | $ 67,911,079.00 |
| | | | |
| **Other Gain/(Loss)** | | | |
| Interest income | $ 5,765,215.32 | $ 7,503,164.74 | $ 7,049,038.53 |
| Other income/expense | 838,191.46 | 658,514.02 | 3,723,833.60 |
| Net realized gains on sales of investment transactions | 3,959,534.93 | 13,396,884.40 | 6,494,555.20 |
| Net change in unrealized gains/(losses) of investments | (6,692,741.56) | (56,529,224.39) | 27,322,977.50 |
| Net earnings/(losses) from equity method investees | 121,440,340.48 | (17,958,607.10) | 3,111,185.38 |
| **Total Other Gain/(Loss)** | $ 125,310,540.63 | $ (52,929,268.33) | $ 47,701,590.21 |

*[1] Date ranges from 12/31/2018 to end of business 10/15/2019.*

1 of 1

**Appx. 01446**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit B - SOFA 3 [1]**

| Trading Partner Name | Trading Partner Address | Payment Date | Payment Amount | Reason for Transfer |
|---|---|---|---|---|
| Wilmer Cutler Pickering Hale and Dorr LLP | PO Box 7247-8760  Philadelphia PA 19170-8760 | 7/18/2019 | $        20,275.50 | Professional Services |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 7/18/2019 | 1,285.16 | Suppliers/Vendors |
| Platinum Parking | 300 Crescent Court Level G1, L8#102 Dallas TX 75201 | 7/18/2019 | 990.00 | Professional Services |
| AT&T MOBILITY | PO BOX 6463  CAROL STREAM IL 60197-6463 | 7/19/2019 | 8,789.14 | Professional Services |
| Highland Capital Management Korea Limited | (Seoul Finance Center, Taepyeongro-1-ga) 21F, 136, Sejong-daero, Jung-gu, Seoul, Korea | 7/19/2019 | 630,000.00 | Intercompany Funding |
| American Airlines | 4255 Amon Carter Blvd MD 4106 Fort Worth TX 76155 | 7/22/2019 | 30,000.00 | Professional Services |
| TRICOR BUSINESS OUTSOURCING | 80 Robinson Rd, Singapore 068898 | 7/22/2019 | 28,122.16 | Intercompany Funding |
| Meister Seelig & Fein LLP | 125 Park Avenue 7th Floor New York NY 10017 | 7/22/2019 | 24,228.30 | Professional Services |
| Flagship Cruises & Events | PO Box 120751  San Diego CA 92112 | 7/22/2019 | 16,103.26 | Suppliers/Vendors |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 7/23/2019 | 146,190.02 | Employee Benefits |
| Abrams & Bayliss LLP | 20 Montchanin Road, Suite 200  Wilmington DE 19807 | 7/24/2019 | 53,237.45 | Professional Services |
| Pricewaterhouse Coopers, LLP | 8 Cross St. #17-00 PWC Singapore Building Singapore  048424 | 7/24/2019 | 14,461.66 | Professional Services |
| Siepe Software, LLC | 5440 Harvest Hill Rd Suite 100, Dallas, TX 75230 | 7/25/2019 | 36,084.06 | Professional Services |
| Consultant | 2620 White Rock Rd.  Dallas TX 75214 | 7/25/2019 | 6,754.00 | Professional Services |
| Reid Collins & Tsai LLP | 4301 Westbank Drive Building B Suite 230 Austin TX 78746 | 7/30/2019 | 82,831.45 | Professional Services |
| Paxstone Capital LLP | 483 Green Lanes, London, Greater London, N13 4BS | 7/30/2019 | 46,063.81 | Professional Services |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 7/31/2019 | 41,053.47 | Employee Benefits |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/31/2019 | 628,000.00 | Intercompany Funding |
| Arris Western Corp. | 718 N Buckner #316  Dallas TX 75218 | 7/31/2019 | 11,000.00 | Professional Services |
| Professional Speaker | Koa Kai, LLC PO Box 232307 Leucadia CA 92023 | 7/31/2019 | 15,000.00 | Suppliers/Vendors |
| Pershing LLC | One Pershing Plaza Attn: IBD - 15th Floor Jersey City NJ 07399 | 8/1/2019 | 500,000.00 | Investing |
| Consultant | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/1/2019 | 39,586.07 | Professional Services |
| Crescent TC Investors LP | 200 Crescent Ct Suite 250 Dallas TX 75201 | 8/1/2019 | 155,361.38 | Rent Payment |
| Brasilinvest Empreendimentos e Participaçï¿½es S/A | Brazil | 8/1/2019 | 10,000.00 | Intercompany Funding |
| Frontier State Bank | 5100 S I-35 Service Rd, Oklahoma City, OK 73129 | 8/1/2019 | 68,002.70 | Secured Loan Payment |
| Massand Capital, LLC | 8140 Walnut Hill Lane, Suite 310 Dallas, TX 75231 | 8/1/2019 | 54,979.21 | Professional Services |
| Pershing LLC | One Pershing Plaza Attn: IBD - 15th Floor Jersey City NJ 07399 | 8/2/2019 | 11,959.71 | Investing |
| Bloomberg Finance LP | PO Box 416604  Boston MA 02241-6604 | 8/2/2019 | 252,041.98 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 8/2/2019 | 259.05 | Professional Services |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 8/2/2019 | 86,126.71 | Employee Benefits |
| Abrams & Bayliss LLP | 20 Montchanin Road, Suite 200  Wilmington DE 19807 | 8/7/2019 | 17,133.03 | Professional Services |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/7/2019 | 441,000.00 | Intercompany Funding |
| Status Labs.com | 151 South 1st Suite 100 Austin TX 78704 | 8/7/2019 | 9,500.00 | Professional Services |
| PetroCap Partners III, L.P. | 3333 Lee Parkway Suite 750 Dallas TX 75219 | 8/7/2019 | 510,350.41 | Investing |
| HIGHLAND CAPITAL MANAGEMENT, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/8/2019 | 115,843.80 | Employee Benefits |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 8/8/2019 | 3,573.58 | Professional Services |
| Flexential Colorado Corp. | PO Box 732368  Dallas TX 75373-2368 | 8/8/2019 | 12,056.49 | Professional Services |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 8/8/2019 | 3,267.49 | Suppliers/Vendors |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 8/9/2019 | 157,850.27 | Employee Benefits |
| Liberty Life Assurance Company of Boston - Group Benefits | PO Box 2658  Carol Stream IL 60132-2658 | 8/9/2019 | 5,283.26 | Employee Benefits |
| ICBI | London | 8/13/2019 | 12,420.78 | Professional Services |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/13/2019 | 155,000.00 | Intercompany Funding |
| Connolly Gallagher LLP | 1201 North Market Street 20th Floor Wilmington DE 19801 | 8/13/2019 | 18,295.70 | Professional Services |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 8/14/2019 | 41,300.58 | Employee Benefits |
| CBIZ Valuation Group, Inc. | 3030 LBJ Freeway, Ste 1650  Dallas TX 75234 | 8/14/2019 | 15,000.00 | Professional Services |
| Consultant | 2620 White Rock Rd.  Dallas TX 75214 | 8/14/2019 | 5,357.00 | Professional Services |
| Siepe Services, LLC | 5440 Harvest Hill Road Suite 100 Dallas TX 75230 | 8/14/2019 | 174,256.34 | Professional Services |
| Intex Solutions, Inc. | Accounts Receivable 110 A St Needham MA 02494-2807 | 8/15/2019 | 35,200.00 | Professional Services |
| AT&T | PO Box 9005  Carol Stream IL 60197-9005 | 8/15/2019 | 927.16 | Professional Services |
| ABM | PO Box 419860  Boston MA 02241-9860 | 8/15/2019 | 5,884.76 | Suppliers/Vendors |
| LinkedIn Corporation | 62228 Collections Center Drive  Chicago IL 60693-0622 | 8/15/2019 | 19,719.93 | Professional Services |
| PetroCap Partners II, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/15/2019 | 1,244,586.77 | Investing |
| Houlihan Lokey | 10250 Constellation Blvd, 5th Floor Attn: Accounts Receivable Los Angeles CA 90067-6802 | 8/15/2019 | 55,601.49 | Professional Services |
| Deloitte Tax LLP | PO Box 844736  Dallas TX 75284-4736 | 8/15/2019 | 137,396.00 | Professional Services |
| MacroMavens, LLC | 180 W. 20th Street Suite 1700 New York NY 10011 | 8/15/2019 | 18,816.84 | Professional Services |
| GRUBHUB for Work | PO Box 748570  Los Angeles CA 90074-8570 | 8/15/2019 | 13,823.98 | Suppliers/Vendors |
| Arris Western Corp. | 718 N Buckner #316  Dallas TX 75218 | 8/15/2019 | 1,420.63 | Professional Services |
| TRICOR BUSINESS OUTSOURCING | 80 Robinson Rd, Singapore 068898 | 8/16/2019 | 36,135.64 | Intercompany Funding |
| ROWLETT HILL, LLP | 25 Highland Park Village, Suite 100-448  Dallas TX 75205 | 8/16/2019 | 30,187.50 | Professional Services |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 8/16/2019 | 634.00 | Suppliers/Vendors |
| Bloomberg Finance LP | PO Box 416604  Boston MA 02241-6604 | 8/16/2019 | 6,750.00 | Professional Services |
| BCA Research Inc | 1002 Sherbrooke St. W Suite 1600 Montreal Quebec H3A 3L6 | 8/16/2019 | 19,996.94 | Professional Services |
| Willis of Texas, Inc. | PO Box 731739  Dallas TX 75373-1739 | 8/16/2019 | 5,754.18 | Insurance |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 8/16/2019 | 89,965.15 | Employee Benefits |
| Thomson West | PO Box 6292  Carol Stream IL 60197-6292 | 8/22/2019 | 21,339.33 | Suppliers/Vendors |
| Duff & Phelps, LLC | DUFF & PHELPS, LLC 12595 Collection Center Drive Chicago IL 60693 | 8/23/2019 | 100,000.00 | Professional Services |
| TRICOR BUSINESS OUTSOURCING | 80 Robinson Rd, Singapore 068898 | 8/23/2019 | 50,934.56 | Intercompany Funding |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 8/23/2019 | 97.96 | Suppliers/Vendors |
| Concur Technologies, Inc. | 62157 Collections Center Drive  Chicago IL 60693 | 8/23/2019 | 4,104.85 | Professional Services |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 8/23/2019 | 91,020.22 | Employee Benefits |
| Thomson West | PO Box 6292  Carol Stream IL 60197-6292 | 8/23/2019 | 3,153.32 | Suppliers/Vendors |
| GRUBHUB for Work | PO Box 748570  Los Angeles CA 90074-8570 | 8/23/2019 | 2,150.47 | Suppliers/Vendors |
| Highland Capital Management New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/26/2019 | 150,000.00 | Intercompany Funding |
| TW Telecom Holdings, llc | PO Box 910182  Denver CO 80291-0182 | 8/26/2019 | 8,657.28 | Professional Services |

Highland Capital Management LP
Case # 19-34054-SGJ
Exhibit B - SOFA 3 [1]

| Trading Partner Name | Trading Partner Address | Payment Date | Payment Amount | Reason for Transfer |
|---|---|---|---|---|
| TW Telecom Holdings, llc | PO Box 910182  Denver CO 80291-0182 | 8/26/2019 | 9,065.13 | Professional Services |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/27/2019 | 300,000.00 | Intercompany Funding |
| Acis Capital Management | Attn: Rakhee V. Patel, Winstead PC 500 Winstead Building Dallas TX 75201 | 8/27/2019 | 12,249.65 | Professional Services |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 8/27/2019 | 2,608.49 | Suppliers/Vendors |
| Greenwood Office Outfitters | 2951 Suffolk Drive Suite 640 Fort Worth TX 76133-1149 | 8/28/2019 | 12,877.82 | Suppliers/Vendors |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 8/29/2019 | 95,443.51 | Employee Benefits |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 8/29/2019 | 118,192.57 | Employee Benefits |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/29/2019 | 75,000.00 | Intercompany Funding |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/29/2019 | 55,000.00 | Intercompany Funding |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 8/29/2019 | 697.89 | Suppliers/Vendors |
| Platinum Parking | 300 Crescent Court Level G1, LB#102 Dallas TX 75201 | 8/29/2019 | 14,857.95 | Professional Services |
| Consultant | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 111,212.19 | Professional Services |
| Arris Western Corp. | 718 N Buckner #316  Dallas TX 75218 | 8/30/2019 | 11,000.00 | Professional Services |
| Brasilinvest Empreendimentos e Participac?es S/A | Brazil | 9/3/2019 | 10,000.00 | Intercompany Funding |
| Crescent TC Investors LP | PO Box 841772  Dallas TX 75284-1772 | 9/3/2019 | 156,958.51 | Rent Payment |
| AT&T | PO Box 9005  Carol Stream IL 60197-9005 | 9/3/2019 | 5,690.12 | Professional Services |
| Frontier State Bank | 5100 S I-35 Service Rd, Oklahoma City, OK 73129 | 9/3/2019 | 404,238.30 | Secured Loan Payment |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 9/3/2019 | 259.77 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 9/3/2019 | 295.76 | Professional Services |
| Willis of Texas, Inc. | Dallas/Ft. Worth Division PO Box 730310 Dallas TX 75373-0310 | 9/3/2019 | 21,133.38 | Insurance |
| Pershing LLC | One Pershing Plaza Attn: IBD - 15th Floor Jersey City NJ 07399 | 9/4/2019 | 500,000.00 | Investing |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/4/2019 | 500,000.00 | Intercompany Funding |
| Consultant | 2620 White Rock Rd.  Dallas TX 75214 | 9/4/2019 | 6,451.50 | Professional Services |
| Siepe Software, LLC | 5440 Harvest Hill Rd Suite 100, Dallas, TX 75230 | 9/5/2019 | 18,042.03 | Professional Services |
| HIGHLAND CAPITAL MANAGEMENT, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/5/2019 | 113,788.36 | Employee Benefits |
| Pershing LLC | One Pershing Plaza Attn: IBD - 15th Floor Jersey City NJ 07399 | 9/5/2019 | 11,286.83 | Investing |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 9/5/2019 | 858,220.29 | Employee Benefits |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 9/5/2019 | 854,278.60 | Employee Benefits |
| Dow Jones & Company, Inc. | WALL ST JRNL OR BARRONS PO Box 4137 New York NY 10261-4137 | 9/5/2019 | 16,621.23 | Professional Services |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 9/5/2019 | 3,374.19 | Suppliers/Vendors |
| Intex Solutions, Inc. | Accounts Receivable 110 A St Needham MA 02494-2807 | 9/5/2019 | 35,200.00 | Professional Services |
| Las Vegas Flamingo Holdco, LLC | Collections Account  TEXAS | 9/5/2019 | 46,536.83 | Intercompany Funding |
| GRUBHUB for Work | PO Box 748570  Los Angeles CA 90074-8570 | 9/5/2019 | 15,518.67 | Suppliers/Vendors |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 9/6/2019 | 3,573.58 | Professional Services |
| TW Telecom Holdings, llc | PO Box 910182  Denver CO 80291-0182 | 9/9/2019 | 9,138.32 | Professional Services |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 9/9/2019 | 142,884.07 | Employee Benefits |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/11/2019 | 40,000.00 | Intercompany Funding |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 9/12/2019 | 37,839.05 | Employee Benefits |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 9/12/2019 | 59,111.49 | Employee Benefits |
| Loews Coronado Bay Resort | 4000 Coronado Bay Road  Coronado CA 92118 | 9/12/2019 | 77,340.18 | Suppliers/Vendors |
| Harbor Yacht Clubs, LLC | 1880 Harbor Island Drive  San Diego CA 92101 | 9/12/2019 | 6,440.00 | Suppliers/Vendors |
| NYSE MARKET, INC | Box #223695  Pittsburgh PA 15251-2695 | 9/13/2019 | 8,857.74 | Professional Services |
| TRICOR BUSINESS OUTSOURCING | 80 Robinson Rd, Singapore 068898 | 9/13/2019 | 35,221.80 | Intercompany Funding |
| Markit North America Inc. | 620 8th Ave 35th floor New York NY 10018 | 9/13/2019 | 91,676.00 | Professional Services |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 9/13/2019 | 7,387.23 | Suppliers/Vendors |
| BDO USA, LLP | 700 North Pearl Suite 2000 Dallas TX 75201 | 9/13/2019 | 8,700.00 | Professional Services |
| ABM | PO Box 419860  Boston MA 02241-9860 | 9/13/2019 | 5,884.76 | Suppliers/Vendors |
| Concur Technologies, Inc. | 62157 Collections Center Drive  Chicago IL 60693 | 9/13/2019 | 8,187.05 | Professional Services |
| Willis of Texas, Inc. | PO Box 731739  Dallas TX 75373-1739 | 9/13/2019 | 5,754.18 | Insurance |
| Reorg Research, Inc. | 1140 Broadway Ste 201 New York NY 10001 | 9/13/2019 | 93,123.35 | Professional Services |
| Sage Search Partners | 3811 Turtle Creek Blvd Suite 850 Dallas TX 75219 | 9/13/2019 | 20,000.00 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 9/16/2019 | 927.16 | Professional Services |
| DLA Piper LLP US | 6225 Smith Avenue  Baltimore MD 21209 | 9/16/2019 | 200,000.00 | Professional Services |
| Lynn Pinker Cox & Hurst, L.L.P. | 2100 Ross Ave Suite 2700 Dallas TX 75201 | 9/17/2019 | 185,576.00 | Professional Services |
| Flexential Colorado Corp. | PO Box 732368  Dallas TX 75373-2368 | 9/17/2019 | 12,056.49 | Professional Services |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 9/17/2019 | 327.61 | Suppliers/Vendors |
| Platinum Parking | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/17/2019 | 15,210.80 | Professional Services |
| AT&T MOBILITY | PO BOX 6463  CAROL STREAM IL 60197-6463 | 9/19/2019 | 1,769.17 | Professional Services |
| ROWLETT HILL, LLC | 25 HIGHLAND PARK VILLAGE STE 100-448 DALLAS TX 75205 | 9/19/2019 | 23,718.75 | Professional Services |
| Affiliate Loan | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/19/2019 | 500,000.00 | Affiliate Loan |
| Siepe Services, LLC | 5440 Harvest Hill Road Suite 100 Dallas TX 75230 | 9/19/2019 | 185,063.83 | Professional Services |
| Greyline Partners, LLC | P.O. Box 733976  Dallas TX 75373-3976 | 9/19/2019 | 11,250.00 | Professional Services |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 9/20/2019 | 77,274.56 | Employee Benefits |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 9/20/2019 | 67,658.40 | Employee Benefits |
| Affiliate Loan | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/23/2019 | 1,000,000.00 | Affiliate Loan |
| Attia Medical, PC | 5820 Oberlin Dr. Suite 205  San Diego CA 92121 | 9/23/2019 | 12,500.00 | Professional Services |
| DLA Piper LLP US | 6225 Smith Avenue  Baltimore MD 21209 | 9/23/2019 | 200,000.00 | Professional Services |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 9/24/2019 | 3,059.50 | Suppliers/Vendors |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/25/2019 | 300,000.00 | Intercompany Funding |
| Consultant | 2620 White Rock Rd.  Dallas TX 75214 | 9/25/2019 | 8,109.75 | Professional Services |
| Cole Schotz | Court Plaza North 25 Main Street Hackensack NJ 07602-0800 | 9/25/2019 | 100,000.00 | Professional Services |
| Affiliate Loan | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/25/2019 | 900,000.00 | Affiliate Loan |
| S&P Global Market Intelligence | 33356 Collection Center Drive  Chicago IL 60693-0333 | 9/25/2019 | 368,894.61 | Professional Services |

Appx. 01448

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit B - SOFA 3 [1]**

| Trading Partner Name | Trading Partner Address | Payment Date | Payment Amount | Reason for Transfer |
|---|---|---|---|---|
| Arris Western Corp. | 718 N Buckner #316  Dallas TX 75218 | 9/25/2019 | 1,325.29 | Professional Services |
| Harbor Yacht Clubs, LLC | 1880 Harbor Island Drive  San Diego CA 92101 | 9/25/2019 | 538.75 | Suppliers/Vendors |
| ICE Data Pricing & Reference Data, LLC | PO Box 98616  Chicago IL 60693 | 9/25/2019 | 8,819.61 | Professional Services |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 9/26/2019 | 35,354.55 | Employee Benefits |
| Duff & Phelps, LLC | 2397 Paysphere Circle  Chicago IL 60674 | 9/30/2019 | 100,000.00 | Professional Services |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 200,000.00 | Intercompany Funding |
| Frontier State Bank | 5100 S I-35 Service Rd, Oklahoma City, OK 73129 | 9/30/2019 | 98,707.96 | Secured Loan Payment |
| Arris Western Corp. | 718 N Buckner #316  Dallas TX 75218 | 9/30/2019 | 11,000.00 | Professional Services |
| Professional Speaker | Koa Kai, LLC PO Box 232307 Leucadia CA 92023 | 9/30/2019 | 15,000.00 | Suppliers/Vendors |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 105,000.00 | Intercompany Funding |
| Attia Medical, PC | 5820 Oberlin Dr. Suite 205  San Diego CA 92121 | 9/30/2019 | 12,500.00 | Professional Services |
| DLA Piper LLP US | 6225 Smith Avenue  Baltimore MD 21209 | 9/30/2019 | 200,000.00 | Professional Services |
| AT&T MOBILITY | PO BOX 6463  CAROL STREAM IL 60197-6463 | 10/1/2019 | - | Professional Services |
| Employee | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/1/2019 | 13,059.43 | Bonus |
| Crescent TC Investors LP | 200 Crescent Ct Suite 250 Dallas TX 75201 | 10/1/2019 | 192,588.09 | Rent Payment |
| Frontier State Bank | 5100 S I-35 Service Rd, Oklahoma City, OK 73129 | 10/1/2019 | 128,793.00 | Secured Loan Payment |
| Bloomberg Finance LP | PO Box 416604  Boston MA 02241-6604 | 10/2/2019 | 113,095.54 | Professional Services |
| Consultant | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/2/2019 | 28,821.81 | Professional Services |
| Pachulski Stang Ziehl & Jones LLP | 10100 Santa Monica Blvd. 13th Floor Los Angeles CA 90067 | 10/2/2019 | 500,000.00 | Professional Services |
| HIGHLAND CAPITAL MANAGEMENT, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/3/2019 | 114,381.18 | Employee Benefits |
| OKADA INSURANCE RABBI TRUST | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/3/2019 | 14,875.00 | Insurance |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 10/3/2019 | 309.51 | Professional Services |
| Employee | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/4/2019 | 113,104.52 | Employee Reimbursement |
| Siepe Software, LLC | 5440 Harvest Hill Rd Suite 100, Dallas, TX 75230 | 10/4/2019 | 18,042.03 | Professional Services |
| Siepe Software, LLC | 5440 Harvest Hill Rd Suite 100, Dallas, TX 75230 | 10/4/2019 | 18,042.03 | Professional Services |
| TW Telecom Holdings, llc | PO Box 910182  Denver CO 80291-0182 | 10/4/2019 | 7,710.33 | Professional Services |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 10/4/2019 | 23,277.86 | Suppliers/Vendors |
| CDW Direct | PO BOX 75723  CHICAGO IL 60675-5723 | 10/4/2019 | 23,788.47 | Suppliers/Vendors |
| HIGHLAND CREDIT OPPORTUNITIES FUND | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/4/2019 | 500,000.00 | Intercompany Funding |
| AT&T | PO BOX 9005  Carol Stream IL 60197-9005 | 10/4/2019 | 2,845.06 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 10/4/2019 | 3,573.58 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 10/4/2019 | 146.78 | Professional Services |
| Willis of Texas, Inc. | Dallas/Ft. Worth Division PO Box 730310 Dallas TX 75373-0310 | 10/4/2019 | 5,754.18 | Insurance |
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 10/4/2019 | 109,241.27 | Employee Benefits |
| Houlihan Lokey | 10250 Constellation Blvd, 5th Floor Attn: Accounts Receivable Los Angeles CA 90067-6802 | 10/4/2019 | 55,667.91 | Professional Services |
| Ipreo Data Inc. | 421 Fayetteville Street Suite 900 Raleigh NC 27601 | 10/4/2019 | 9,500.00 | Suppliers/Vendors |
| Siepe Services, LLC | 5440 Harvest Hill Road Suite 100 Dallas TX 75230 | 10/4/2019 | 182,790.68 | Professional Services |
| Hedgeye Risk Mgmt, LLC | 1 High Ridge Park 3rd Floor Stamford CT 06905 | 10/4/2019 | 25,265.10 | Professional Services |
| Spin-Off Advisors, LLC | 1327 W. Washington Blvd Ste 4-G Chicago IL 60607 | 10/4/2019 | 15,000.00 | Professional Services |
| GRUBHUB for Work | PO Box 748570  Los Angeles CA 90074-8570 | 10/4/2019 | 14,343.81 | Suppliers/Vendors |
| Flexential Colorado Corp. | PO Box 732368  Dallas TX 75373-2368 | 10/4/2019 | 24,031.79 | Professional Services |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/4/2019 | 75,000.00 | Intercompany Funding |
| DLA Piper LLP US | 6225 Smith Avenue  Baltimore MD 21209 | 10/4/2019 | 200,000.00 | Professional Services |
| Siepe Software, LLC | 5440 Harvest Hill Rd Suite 100, Dallas, TX 75230 | 10/7/2019 | 18,042.03 | Professional Services |
| Pricewaterhouse Coopers, LLP | PO BOX 952282  DALLAS TX 75395-2282 | 10/7/2019 | 24,000.00 | Professional Services |
| LAFFER ASSOCIATES | 103 Murphy Court  NASHVILLE TN 37203 | 10/7/2019 | 28,188.37 | Professional Services |
| MARKIT WSO CORPORATION | Three Lincoln Centre 5430 LBJ Frwy; STe 800 DALLAS TX 75240 | 10/7/2019 | 27,213.92 | Professional Services |
| Strategas Securities LLC | 52 Vanderbilt Ave 8th Fl New York NY 10017 | 10/7/2019 | 27,195.87 | Professional Services |
| Bloomberg Finance LP | PO Box 416604  Boston MA 02241-6604 | 10/7/2019 | 100,000.00 | Professional Services |
| Intex Solutions, Inc. | Accounts Receivable 110 A St Needham MA 02494-2807 | 10/7/2019 | 35,200.00 | Professional Services |
| BCA Research Inc | 1002 Sherbrooke St. W Suite 1600 Montreal Quebec H3A 3L6 | 10/7/2019 | 18,294.21 | Professional Services |
| Consultant | 2620 White Rock Rd.  Dallas TX 75214 | 10/7/2019 | 5,274.50 | Professional Services |
| Employee | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/7/2019 | 43,910.97 | Employee Reimbursement |
| Verity Group | PO Box 940361  Plano TX 75094-0361 | 10/7/2019 | 8,940.84 | Suppliers/Vendors |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 10/7/2019 | 30,017.35 | Suppliers/Vendors |
| ABM | PO Box 419860  Boston MA 02241-9860 | 10/7/2019 | 5,884.76 | Suppliers/Vendors |
| Greenwood Office Outfitters | 2951 Suffolk Drive Suite 640 Fort Worth TX 76133-1149 | 10/7/2019 | 4,628.62 | Suppliers/Vendors |
| Houlihan Lokey | 10250 Constellation Blvd, 5th Floor Attn: Accounts Receivable Los Angeles CA 90067-6802 | 10/7/2019 | 113,092.79 | Professional Services |
| Houlihan Lokey | 10250 Constellation Blvd, 5th Floor Attn: Accounts Receivable Los Angeles CA 90067-6802 | 10/7/2019 | 112,000.00 | Professional Services |
| Deloitte Tax LLP | PO Box 844736  Dallas TX 75284-4736 | 10/7/2019 | 142,205.00 | Professional Services |
| Deloitte Tax LLP | PO Box 844736  Dallas TX 75284-4736 | 10/7/2019 | 104,905.00 | Professional Services |
| Siepe Services, LLC | 5440 Harvest Hill Road Suite 100 Dallas TX 75230 | 10/7/2019 | 185,000.00 | Professional Services |
| GRUBHUB for Work | PO Box 748570  Los Angeles CA 90074-8570 | 10/7/2019 | 5,556.50 | Suppliers/Vendors |
| ValueScope, Inc. | 1400 Thetford Ct.  Southlake TX 76092 | 10/7/2019 | 25,000.00 | Professional Services |
| Development Specialists, Inc. | 333 South Grand Avenue Suite 4070 Los Angeles CA 90071-1544 | 10/7/2019 | 250,000.00 | Professional Services |
| Bragalone Conroy PC | Chase Tower 2200 Ross Avenue Dallas TX 75201-7924 | 10/7/2019 | 10,000.00 | Professional Services |
| Kurtzman Carson Consultants LLC | Dept CH 16639  Palatine IL 60055-6639 | 10/7/2019 | 50,000.00 | Professional Services |
| Hunton Andrews Kurth, LLP | 1445 Ross Avenue Suite 3700 Dallas TX 75202-2799 | 10/7/2019 | 156,996.86 | Professional Services |
| Liberty Life Assurance Company of Boston - Group Benefits | PO Box 2658  Carol Stream IL 60132-2658 | 10/7/2019 | 15,928.25 | Employee Benefits |
| ICE Data Pricing & Reference Data, LLC | PO Box 98616  Chicago IL 60693 | 10/7/2019 | 5,879.74 | Professional Services |
| Refinitiv US LLC | 3 Times Square  New York NY 10036 | 10/7/2019 | 12,823.98 | Professional Services |
| Deloitte Tax LLP | PO Box 844736  Dallas TX 75284-4736 | 10/8/2019 | 128,557.00 | Professional Services |
| AT&T | PO BOX 5019  CAROL STREAM IL 60197 | 10/10/2019 | 3,573.58 | Professional Services |

**Appx. 01449**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit B - SOFA 3 [1]**

| Trading Partner Name | Trading Partner Address | Payment Date | Payment Amount | Reason for Transfer |
|---|---|---|---|---|
| Blue Cross Blue Shield of Texas | PO Box 731428  Dallas TX 75373-1428 | 10/10/2019 | 161,497.04 | Employee Benefits |
| Cole Schotz | Court Plaza North 25 Main Street Hackensack NJ 07602-0800 | 10/10/2019 | 34,894.42 | Professional Services |
| Houlihan Lokey | 10250 Constellation Blvd, 5th Floor Attn: Accounts Receivable Los Angeles CA 90067-6802 | 10/10/2019 | 1,092.79 | Professional Services |
| Snell & Wilmer LLP | One Arizona Center 400 E. Van Buren, Suite 1900 Phoenix AZ 85004-2202 | 10/10/2019 | 19,119.65 | Professional Services |
| DLA Piper LLP US | 6225 Smith Avenue  Baltimore MD 21209 | 10/10/2019 | 1,115,000.00 | Professional Services |
| ASW Law Limited | Crawford House 50 Cedar Avenue Hamilton  HM11 | 10/10/2019 | 10,845.00 | Professional Services |
| Carey Olsen | PO Box 10008 Willow House Grand Cayman  KY1-1001 | 10/10/2019 | 48,595.00 | Professional Services |
| Canteen Vending Services | PO Box 417632  Boston MA 02241-7632 | 10/10/2019 | 8,656.51 | Suppliers/Vendors |
| Platinum Parking | 300 Crescent Court Level G1, L8#102 Dallas TX 75201 | 10/10/2019 | 33,007.19 | Professional Services |
| Charles Schwab | PO Box 1270 Tulsa, OK 74101-1270 | 10/11/2019 | 34,454.43 | Employee Benefits |
| Cole Schotz | Court Plaza North 25 Main Street, PO Box 800 Hackensack NJ 07602-0800 | 10/11/2019 | 25,000.00 | Professional Services |
| Pershing LLC | One Pershing Plaza Attn: IBD - 15th Floor Jersey City NJ 07399 | 10/15/2019 | 17,745.66 | Investing |
| CBIZ Valuation Group, Inc. | 3030 LBJ Freeway, Ste 1650  Dallas TX 75234 | 10/15/2019 | 12,400.00 | Professional Services |
| Status Labs.com | 151 South 1st Suite 100 Austin TX 78704 | 10/15/2019 | 18,000.00 | Professional Services |
| Discovery Benefits [2] | 4321 20th Ave. S. Fargo, ND 58103 | Various | 36,473.83 | FSA Transfers |
| Expense Reimbursements [3] | 300 Crescent Court, Suite 700 Dallas, TX 75201 | Various | 557,471.14 | Expense reimbursements |
| **Total** | | | $   23,255,006.86 | |

[1] Does not include activity in Jefferies Prime Broker account.
[2] Discovery benefits are the daily FSA amounts paid for healthcare related charges.
[3] Expense reimbursements are not tracked in The Debtor's accounting software at detail requested

4 of 4

**Appx. 01450**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit C - SOFA #4**

| Trading Partner | Trading Partner Address | Payment Date | Payment Amount |
|---|---|---|---|
| Acis Capital Management | Attn: Rakhee V. Patel, Winstead PC 500 Winstead Building Dallas TX 75201 | 8/27/2019 | 12,249.65 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/26/2018 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/1/2018 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/3/2018 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/2/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/25/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/1/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/1/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/3/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/1/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/3/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/1/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/1/2019 | 10,000.00 |
| Brasilinvest Empreendimentos e Participaces S/A | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/3/2019 | 10,000.00 |
| Dondero Insurance Rabbi Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/2/2019 | 36,580.00 |
| Dugaboy Investment Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/19/2018 | 9,246.96 |
| Dugaboy Investment Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/28/2019 | 6,960.38 |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/13/2019 | 155,000.00 |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/29/2019 | 75,000.00 |
| Eagle Equity Advisors, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/11/2019 | 40,000.00 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/31/2018 | 41.76 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/15/2018 | 70.73 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/30/2018 | 13.96 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/14/2018 | 50.74 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/31/2018 | 26.84 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/15/2019 | 56.68 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/31/2019 | 58.06 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/15/2019 | 183.46 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/28/2019 | 18.89 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/15/2019 | 28.88 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 105.11 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/15/2019 | 23.70 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/30/2019 | 34.79 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 110.76 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/31/2019 | 31.76 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/14/2019 | 43.23 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 20.56 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 87.13 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/31/2019 | 38.96 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/15/2019 | 19.48 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 45.08 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/13/2019 | 66.22 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 10.82 |
| Frank Waterhouse - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 115.75 |
| Governance Re Ltd | Wellesley House; 2nd Floor 90 Pitts Bay Road Pembroke HM 08 | 6/14/2019 | 300,000.00 |
| HCRE Partners, LLC | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/25/2019 | 900,000.00 |
| Highland Capital Management Fund Advisors | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/2/2019 | 2,400,000.00 |
| Highland Capital Management Fund Advisors | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/3/2019 | 5,000,000.00 |
| Highland Capital Management Korea | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/6/2018 | 1,200,000.00 |
| Highland Capital Management Korea | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/17/2019 | 1,100,000.00 |
| Highland Capital Management Korea | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/8/2019 | 630,000.00 |
| Highland Capital Management Korea | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/19/2019 | 630,000.00 |
| Highland Capital Management Latin America | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/3/2019 | 1,350,000.00 |
| Highland Capital Management Latin America | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 10,000.00 |

**Appx. 01451**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit C - SOFA #4**

| Trading Partner | Trading Partner Address | Payment Date | Payment Amount |
|---|---|---|---|
| Highland Capital Management Services | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/29/2019 | 400,000.00 |
| Highland Capital Management Services | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/26/2019 | 150,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/26/2018 | 65,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/30/2018 | 5,864.10 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/13/2018 | 3,942.72 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/28/2018 | 3,848.70 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/12/2018 | 3,744.31 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/27/2018 | 4,176.47 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/11/2019 | 3,954.93 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/29/2019 | 4,703.71 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/5/2019 | 50,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/5/2019 | 150,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/26/2019 | 50,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/11/2019 | 55,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/1/2019 | 25,000.00 |
| Highland Capital Of New York | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/26/2019 | 150,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/27/2019 | 100,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 25,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/3/2019 | 15,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/15/2019 | 50,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 90,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/29/2019 | 55,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 105,000.00 |
| Highland Latin America Consulting, LTD | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/4/2019 | 75,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/5/2018 | 171,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/18/2019 | 3,000,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/2/2019 | 100,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/14/2019 | 255,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/22/2019 | 1,500,000.00 |
| Highland Select Equity Fund | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/30/2019 | 350,000.00 |
| Hunter Mountain Investment Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/19/2018 | 4,930,722.50 |
| Hunter Mountain Investment Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/28/2019 | 3,711,456.47 |
| James Dondero | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/28/2019 | 3,750,000.00 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/31/2018 | 8,986.25 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/15/2018 | 65,078.25 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/14/2018 | 115,481.36 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/31/2018 | 548.19 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/15/2019 | 96,786.37 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/31/2019 | 38,628.04 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/15/2019 | 42,434.77 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/28/2019 | 19,062.59 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/15/2019 | 50,771.13 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 21,934.60 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/15/2019 | 60,190.72 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/30/2019 | 7,164.24 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 89,256.54 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/31/2019 | 38,804.42 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/14/2019 | 82,710.42 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 7,604.98 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 47,005.97 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/31/2019 | 748.07 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/15/2019 | 85,058.51 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 12,713.97 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/13/2019 | 56,762.57 |

**Appx. 01452**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit C - SOFA #4**

| Trading Partner | Trading Partner Address | Payment Date | Payment Amount |
|---|---|---|---|
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 24,497.96 |
| James Dondero - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 32,977.48 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/31/2018 | 1,341.26 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/15/2018 | 164.01 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/30/2018 | 61.54 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/31/2018 | 2,378.81 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/31/2019 | 285.54 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/28/2019 | 876.87 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/15/2019 | 267.99 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 112.22 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/30/2019 | 160.50 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 144.02 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/14/2019 | 688.48 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 48.54 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 74.95 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/31/2019 | 153.81 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 217.72 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 3,615.11 |
| Lee Parker - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 5,644.08 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 12/7/2018 | 6,780.65 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 12/12/2018 | 17,215.19 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 1/4/2019 | 95,798.38 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 1/10/2019 | 2,600.00 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 3/7/2019 | 2,453.66 |
| Maples & Calder | Ugland House Po Box 309Gt; S Church St George Town Grand Cayman | 9/16/2019 | 5,218.40 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,600.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,600.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,600.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/11 | 3,500.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman  KY1-1102 | 2018/12 | 8,876.22 |

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit C - SOFA #4**

| Trading Partner | Trading Partner Address | Payment Date | Payment Amount |
|---|---|---|---|
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2018/12 | 8,876.22 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2018/12 | 2,453.66 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/01 | 1,300.00 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/04 | 3,450.68 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/04 | 3,450.68 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/05 | 1,777.77 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/05 | 1,777.77 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/05 | 1,777.77 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/05 | 1,777.77 |
| MaplesFS Service Company Limited | PO Box 1093 Boundary Hall Grand Cayman KY1-1102 | 2019/05 | 1,777.77 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/31/2018 | 68.12 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/31/2018 | 2,793.66 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/15/2019 | 28,862.62 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/15/2019 | 1,174.32 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/15/2019 | 740.40 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 10,809.37 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/15/2019 | 4,485.01 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 3,584.31 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/14/2019 | 6,121.00 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 2,008.15 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/15/2019 | 139.27 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 675.80 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/13/2019 | 10,961.53 |
| Mark Okada - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 7,312.69 |
| NexPoint Advisors, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/19/2019 | 500,000.00 |
| NexPoint Advisors, LP | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/23/2019 | 1,000,000.00 |
| Okada Insurance Rabbi Trust | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/3/2019 | 14,875.00 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 11/15/2018 | 1,295.64 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/31/2018 | 5,149.90 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/15/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 2/15/2019 | 102.32 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/29/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/30/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 364.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 8/30/2019 | 205,787.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 59.95 |
| Scott Ellington - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 113,104.52 |
| Strand Advisors | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/19/2018 | 12,423.44 |
| Strand Advisors | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 3/28/2019 | 9,351.38 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/31/2018 | 419.21 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 12/14/2018 | 5,024.00 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 1/31/2019 | 355.30 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/15/2019 | 529.77 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 4/30/2019 | 4,185.33 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/15/2019 | 589.52 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 5/31/2019 | 480.00 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 6/28/2019 | 1,591.54 |

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit C - SOFA #4**

| Trading Partner | Trading Partner Address | Payment Date | Payment Amount |
|---|---|---|---|
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 7/15/2019 | 125.00 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 9/30/2019 | 28.00 |
| Thomas Surgent - Expense Reimbursement | 300 Crescent Court, Suite 700 Dallas, TX 75201 | 10/15/2019 | 2,232.89 |
| **Total** | | | **36,608,252.91** |

Refer to SOFA 30 and Exhibit G for other transfers.

Highland Capital Management LP
Case # 19-34054-SGJ
Exhibit D - SOFA 7

| Case Title | Case Number | Nature of Case | Court Name | Court Address | Status of case |
|---|---|---|---|---|---|
| Duff & Phelps, LLC v. Highland Capital Management, L.P. Index No. 655813/2019 | | Claim for breach of contract and unjust enrichment for failure to pay pursuant to a Letter of Engagement and accompanying Terms and Conditions. | Supreme Court of the State of New York, County of New York | 60 Centre St, New York, NY 10007 | Concluded |
| Hamilton Partners, L.P. v. Highland Capital Management, L.P. and Joseph Furlong | Cause No. 6547 | Allegedly improper restructuring of American Home Patient | Court of Chancery of the State of Delaware | 34 The Circle Georgetown, DE 19947 | Concluded |
| In re: Acis Capital Management, L.P. (Case No. 18-30264-SGJ-11), Acis Capital Management GP, LLC (Case No. 18-30265-SGJ-11) as Debtors. Robin Phelan, Chapter 11 Trustee v. Highland Capital Management, L.P., Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd., CLO Holdco, Ltd., Neutra, Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., Acis CLO 2015-6 Ltd., Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC | Case No. 18-03212-SGJ | Chapter 11 Trustee, on behalf of Debtors, claimed violation of TRO, preliminary injunction, and fraudulent conveyance. | United State Bankruptcy Court for the Northern District of Texas, Dallas Division | George Mahon Federal Building 1205 Texas Ave., Rm 306 Lubbock, TX 79401-4002 | Pending |
| McKool Smith P.C. vs. Highland Capital Management, L.P. JAMS No.: 1310024517 | | Claim for breach of contract pursuant to Crusader Retention Agreement, Terry Retention Agreement, UBS Retention Agreement, and payment plan. | N/A | N/A | Pending |
| NWCC, LLC v. Highland CLO Management, LLC; Highland Capital Management, L.P.; Acis CLO 2014-3 Ltd.; Highland CLO 2014-3R Ltd.; Highland CLO 2014-3R LLC; Highland HCF Advisor, Ltd., as Trustee for Highland CLO Trust; Highland CLO Management Holdings, L.P.; Highland CLO Management GP, LLC; and Highland HCF Advisor, Ltd. | Case No. 654195/2018 | Claim for breach of contract for failure to pay pursuant to Master Repurchase Agreement. | Supreme Court of the State of New York, County of New York | 60 Centre St, New York, NY 10007 | Pending |
| Patrick Daugherty v. Highland Capital Management, L.P., Highland Employee Retention Assets, LLC, Highland ERA Management, LLC, and James Dondero | No. 2017-0488-SG | Claim for collection of judgment against Highland Employee Retention Assets, LLC ("HERA") and allegation of improper transfer of assets from HERA to other Defendants | Court of Chancery of the State of Delaware | 34 The Circle Georgetown, DE 19947 | Pending |
| Redeemer Committee of the Highland Crusader Fund (acting through its members, (1) Grosvenor Capital Management, L.P., (2) FRM Investment Management Limited, (3) Concord Management, LLC, (4) Baylor University, (5) FIX Asset Management, (6) The United States Army Air Force Exchange Services) vs. Highland Capital Management, L.P. | Cause 2019 No. 332 | Motion to enforce Crusader Arbitration Award | Supreme Court of Bermuda | 2nd floor, Government Administration Building 30 Parliament Street Hamilton HM12 Bermuda | Pending |
| Redeemer Committee of the Highland Crusader Fund (acting through its members, (1) Grosvenor Capital Management, L.P., (2) FRM Investment Management Limited, (3) Concord Management, LLC, (4) Baylor University, (5) FIX Asset Management, (6) The United States Army Air Force Exchange Services) vs. Highland Capital Management, L.P. | Cause 153 of 2019 | Motion to enforce Crusader Arbitration Award | Grant Court of the Cayman Islands Financial Services Division | P.O. Box 495 Grand Cayman KY1-1106 Cayman Islands | Pending |
| Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P. | No. 01-16-002-6927 | Injunctive relief and damages sought related to wind down of legacy hedge fund from the 2008 financial crisis. | N/A | N/A | Concluded |
| Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P. | No. 12533-VCG | Injunctive relief and declaratory judgment related to wind down of legacy hedge fund from the 2008 financial crisis. | Court of Chancery of the State of Delaware | 34 The Circle Georgetown, DE 19947 | Pending |
| UBS Securities LLC and UBS AG, London Branch v. Highland Capital Management, L.P., Highland Special Opportunities Holding Company, Highland CDO Opportunity Master Fund, L.P. Highland Financial Partners, L.P., Highland Credit Strategies Fund, Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P. and Strand Advisors, Inc. | Case No. 650097/2009 | Plaintiff alleges that HCMLP engaged in fraudulent transfers and breached its duty of good faith in fair dealing in managing the obligations of its funds. | Supreme Court of the State of New York, County of New York | 60 Centre St, New York, NY 10007 | Pending |
| Highland Capital Management, L.P. v. Joshua Terry | Case No. DC-16-11396 | Employee Terry was terminated for cause. Highland filed suit for return of Highland's confidential information and other counterclaims. Terry has filed counterclaims for conversion and defamation. | 162nd District Court of Dallas County, Texas | 00 Commerce Street, 7th Floor New Tower, Dallas, TX 75202 | Pending |

1 of 1

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit E - SOFA #9**

| Vendor | Amount | Expense Type | Date |
|---|---|---|---|
| B&H Photo | $        7,000.00 | Business Gifts | Feb 22, 2019 |
| Competitive Cyclist | 5,000.00 | Business Gifts | Feb 22, 2019 |
| REI | 3,009.95 | Business Gifts | Feb 22, 2019 |
| The Family Place | 4,500.00 | Business Gifts | Jan 11, 2019 |
| Neiman Marcus | 10,000.00 | Business Gifts | Jan 29, 2019 |
| Nordstrom | 9,000.00 | Business Gifts | Jan 29, 2019 |
| Neiman Marcus | 2,800.00 | Business Gifts | Aug 10, 2018 |
| Barney's New York | 3,015.00 | Business Gifts | Dec 27, 2017 |
| Etro Store | 1,710.35 | Business Gifts | Dec 27, 2017 |
| Sutterfly | 1,627.64 | Business Gifts | Jun 26, 2019 |
| B&H Video | 5,015.00 | Business Gifts | Oct 25, 2017 |
| Competitive Cyclist | 5,000.00 | Business Gifts | Oct 25, 2017 |
| Nordstrom | 5,000.00 | Business Gifts | Oct 25, 2017 |
| REI | 5,000.00 | Business Gifts | Oct 25, 2017 |
| JD | 5,000.00 | Business Gifts | Jan 29, 2019 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 7,508.95 | Business Gifts | Dec 12, 2018 |
| Dallas Childrens Advocacy | 17,500.00 | Charitable Contributions | Jan 11, 2019 |
| Political Contribution | 20,000.00 | Charitable Contributions | May 13, 2019 |
| Political Contribution | 30,000.00 | Charitable Contributions | May 29, 2019 |
| NORTHPARK CENTER | 1,230.00 | Gift/Awards | Apr 26, 2019 |
| Kroger | 1,483.30 | Gift/Awards | Apr 26, 2018 |
| Total Wine | 1,125.76 | Gift/Awards | Feb 13, 2019 |
| Costco | 2,168.86 | Gift/Awards | Feb 13, 2019 |
| Apple | 4,000.00 | Gift/Awards | Feb 26, 2018 |
| B&H Photo | 3,000.00 | Gift/Awards | Feb 26, 2018 |
| Competetive Cyclist | 5,000.00 | Gift/Awards | Feb 26, 2018 |
| Nordstrom | 1,350.00 | Gift/Awards | Feb 26, 2018 |
| Nordstrom | 4,650.00 | Gift/Awards | Feb 26, 2018 |
| Nordstrom | 1,250.00 | Gift/Awards | Feb 26, 2018 |
| Nordstrom | 3,750.00 | Gift/Awards | Mar 13, 2019 |
| Nordstrom | 7,010.00 | Gift/Awards | Mar 13, 2019 |
| REI | 4,009.95 | Gift/Awards | Mar 13, 2019 |
| Neiman Marcus | 2,075.00 | Gift/Awards | Mar 27, 2018 |
| AMAZON.COM*MB5OG1ZC1AMZN.COM/BI 1T5SDTP0V6I MERCHA | 1,000.00 | Gift/Awards | Feb 13, 2019 |
| AMERICAN AIRLINES XXXXX-XXX-XXX XXXX0103 AA.COM | 1,000.00 | Gift/Awards | Feb 13, 2019 |
| BABY.COM EGIFT CRD XXX-XXX-1977 9XXX9375PRC GIFT C | 1,000.00 | Gift/Awards | Feb 13, 2019 |
| WALMART.COM XXX-XXX-6546 AR WMZVYLNO0YU RETAIL | 1,000.00 | Gift/Awards | Feb 13, 2019 |
| AMAZON.COM*M01N33JX2AMZN.COM/BI 43WY9S9CUK8 MERCHA | 1,000.00 | Gift/Awards | Dec 12, 2018 |
| AMAZON.COM*MX1474TL1AMZN.COM/BI 594WNOFOQ54 MERCHA | 1,000.00 | Gift/Awards | Dec 12, 2018 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 68,280.95 | Gift/Awards | Dec 12, 2018 |
| WLLMS-SONMA CSTR GFTXXX-XXX-197 9XXX3699QOK GIFT C | 1,000.00 | Gift/Awards | Dec 12, 2018 |
| AAA INNOVATIONS AAA NORWOOD NJ XXXXXXX8353 NON-DUR | 4,558.75 | Gift/Awards | Jan 11, 2019 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 3,508.95 | Gift/Awards | Jan 11, 2019 |
| HOTELS.COM GIFT CARDXXX-XXX-197 9XXX8780BOK GIFT C | 1,000.00 | Gift/Awards | Jan 11, 2019 |
| WLLMS-SONMA CSTR GFT-XXX-197 9XXX6040GOK GIFT C | 1,000.00 | Gift/Awards | Jan 11, 2019 |
| AMEX HILTON GIFT CARXXX-XXX-058 XXXX4162 BOL X0285 | 5,008.95 | Gift/Awards | Feb 13, 2018 |
| WLLMS-SONMA CSTR GFTXXX-XXX-197 4XXX2954P90 GIFT C | 1,000.00 | Gift/Awards | Nov 10, 2017 |
| CS_*BABIESRUSGIFTCARXXX-XXX-197 4XXX6083G9J GIFT C | 1,000.00 | Gift/Awards | Dec 13, 2017 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 5,014.19 | Gift/Awards | Dec 13, 2017 |
| RITZ CARLTON GIFT CAMIDVALE UT XXXXXXXXX XXX-XXX-8 | 1,001.00 | Gift/Awards | Dec 13, 2017 |
| AMAZON.COM AMZN.COM/BILL WA 4HQ4J0AKNMQ MERCHANDIS | 1,000.00 | Gift/Awards | Jan 10, 2018 |
| AMEX GIFT CARDS XXX-XXX-0582 NY OPWBXXX0386BOL XX2 | 7,008.95 | Gift/Awards | Mar 13, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 1,014.93 | Gift/Awards | Mar 13, 2018 |

**Appx. 01457**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit E - SOFA #9**

| Vendor | Amount | Expense Type | Date |
|---|---|---|---|
| AMEX GIFT CARDS XXX-XXX-0582 NY OPWBXXX3116BOL XX2 | 3,520.80 | Gift/Awards | Apr 11, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 1,014.93 | Gift/Awards | Apr 11, 2018 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 5,010.95 | Gift/Awards | May 10, 2018 |
| AMAZON.COM AMZN.COM/BILL WA 16B3JYYTOHX MERCHANDIS | 1,000.00 | Gift/Awards | Jun 12, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 1,014.93 | Gift/Awards | Jun 12, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 5,014.93 | Gift/Awards | Jun 12, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 1,000.00 | Gift/Awards | Jun 12, 2018 |
| HOTELS.COM GIFT CARDXXX-XXX-197 4XXX5955KHG GIFT C | 1,000.00 | Gift/Awards | Jun 12, 2018 |
| AMAZON.COM AMZN.COM/BILL WA 4C5DKHDW6TK MERCHANDIS | 1,000.00 | Gift/Awards | Jul 11, 2018 |
| AMAZON.COM AMZN.COM/BILL WA 5AK74J5T9LC MERCHANDIS | 1,000.00 | Gift/Awards | Jul 11, 2018 |
| HOTELS.COM GIFT CARDXXX-XXX-197 4XXX5284CIM GIFT C | 1,000.00 | Gift/Awards | Jul 11, 2018 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 1,001.00 | Gift/Awards | Jul 11, 2018 |
| WLLMS-SONMA CSTR GFTXXX-XXX-197 4XXX6255NHS GIFT C | 1,000.00 | Gift/Awards | Jul 11, 2018 |
| AMAZON.COM AMZN.COM/BILL WA 3NRIPESL5H2 MERCHANDIS | 1,000.00 | Gift/Awards | Aug 10, 2018 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 3,522.85 | Gift/Awards | Aug 10, 2018 |
| HOTELS.COM GIFT CARDXXX-XXX-197 4XXXX8611J4 GIFT C | 1,000.00 | Gift/Awards | Aug 10, 2018 |
| HOTELS.COM GIFT CARDXXX-XXX-197 8XXX5959YIW GIFT C | 1,000.00 | Gift/Awards | Aug 10, 2018 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 5,001.00 | Gift/Awards | Aug 10, 2018 |
| AMAZON.COM*MT7OW87B1AMZN.COM/BI 1XJ571A2WYA MERCHA | 1,000.00 | Gift/Awards | Nov 13, 2018 |
| WLLMS-SONMA CSTR GFTXXX-XXX-197 9XXX5657XMX GIFT C | 1,000.00 | Gift/Awards | Nov 13, 2018 |
| CS *HOTELS.COM GC XXX-XXX-1977 4XXX3604JRQ GIFT CA | 1,000.00 | Gift/Awards | Mar 13, 2019 |
| HILTON GC XXX XXX-XXXXX-XXX-XXX XX0847 GIFTCARDS F | 1,008.95 | Gift/Awards | Mar 13, 2019 |
| HOTELS.COM GIFT CARDXXX-XXX-197 4XXX1517JRH GIFT C | 1,000.00 | Gift/Awards | Mar 13, 2019 |
| AMAZON.COM*MW2NP75Y2AMZN.COM/BI 1ZRLAH1KV0Q MERCHA | 1,000.00 | Gift/Awards | May 13, 2019 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 3,515.95 | Gift/Awards | May 13, 2019 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 3,520.85 | Gift/Awards | Jun 12, 2019 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 3,515.95 | Gift/Awards | Jul 11, 2019 |
| ANSE CHASTANET - RESSOUFRIERE LC XXXXXXXXXX XXX-XX | 5,000.00 | Gift/Awards | Sep 11, 2018 |
| Four Seasons 8XX7828WILMINGTON XXXXXXXXXXX XXXXXX3 | 5,014.93 | Gift/Awards | Sep 11, 2018 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 1,010.95 | Gift/Awards | Sep 11, 2018 |
| RITZ CARLTON GIFT CAMIDVALE UT XXXXXXXXX XXX-XXX-8 | 1,010.95 | Gift/Awards | Sep 11, 2018 |
| WLLMS-SONMA CSTR GFTXXX-XXX-197 4XXXX6218KG GIFT C | 1,000.00 | Gift/Awards | Sep 11, 2018 |
| AMAZON.COM*MT5FG6LG0AMZN.COM/BI 2CWA16B0JP6 MERCHA | 2,000.00 | Gift/Awards | Oct 11, 2018 |
| AMEXGIFTCARD.COM-BOLATLANTA GA XXXXXXXX XXX-XXX-86 | 7,529.80 | Gift/Awards | Oct 11, 2018 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 5,000.00 | Gift/Awards | Oct 4, 2019 |
| Hotels.com | 1,000.00 | Gift/Awards | Jul 11, 2019 |
| Buy Buy Baby | 1,000.00 | Gift/Awards | Aug 13, 2019 |
| William Sonoma | 1,000.00 | Gift/Awards | Aug 13, 2019 |
| Amazon.com | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| AMAZON.COM*MA02T1UW2AMZN.COM/BI 59I475TIIR3 MERCHA | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| CS *BUYBUYBABY EGTFCXXX-XXX-197 4XXX9435NZ1 GIFT C | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| CS *HOTELS.COM GC XXX-XXX-1977 4XXX4055UYZ GIFT CA | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| MARRIOTT GIFT CARDS MIDVALE UT XXXXXXXXX XXX-XXX-4 | 1,000.00 | Gift/Awards | Sep 10, 2019 |
| CS *HOTELS.COM GC XXX-XXX-1977 9XXX0073VU5 GIFT CA | 2,000.00 | Gift/Awards | May 13, 2019 |
| CS *HOTELS.COM GC XXX-XXX-1977 9XXX9190AU5 GIFT CA | 1,000.00 | Gift/Awards | May 13, 2019 |
| CS *HOTELS.COM GC XXX-XXX-1977 9XXXX7723U5 GIFT CA | 2,000.00 | Gift/Awards | May 13, 2019 |
| CS *HOTELS.COM GC XXX-XXX-1977 4XXXX2756TI GIFT CA | 1,000.00 | Gift/Awards | Apr 11, 2019 |
| Beard Supply | 1,623.75 | Gift/Awards | Jan 10, 2018 |
| Patagonia | 2,685.71 | Gift/Awards | Jan 26, 2018 |
| Political Contribution | 25,000.00 | Gift/Charity | Jun 30, 2018 |
| Political Contribution | 25,000.00 | Gift/Charity | Jun 30, 2019 |
| **Total** | $   445,725.61 | | |

Highland Capital Management LP
Case # 19-34054-SGJ
Exhibit F - SOFA 25

| Name | Relationship | Address | EIN | Description of Business | Date of Creation | Date of Termination (if applicable) |
|---|---|---|---|---|---|---|
| Aberdeen Loan Funding, Ltd. | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | N/A | CLO Fund | 12/14/2006 | |
| Brentwood CLO, Ltd. | IMA | MaplesFS - PO Box 1093, Grand Cayman, KY1-1102, Cayman Islands | 98-0524481 | CLO Fund | 5/21/2006 | |
| Bristol Bay Funding Ltd. | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0418113 | CLO Fund | 11/18/2003 | |
| Eastland CLO, Ltd. | IMA | Elian Fiduciary Services (Cayman) Limted - 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0550088 | CLO Fund | 3/31/2006 | |
| Gleneagles CLO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman islands | N/A | CLO Fund | 2/25/2005 | |
| Grayson CLO, Ltd. | IMA | Elian Fiduciary Services (Cayman) Limted - 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0527566 | CLO Fund | 2/7/2006 | |
| Greenbriar CLO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 10/24/2007 | |
| Highland CDO Holding Company | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0527935 | HFP sub | 1/24/2006 | |
| Highland CDO Opportunity Fund, L.P. | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3899941 | Hedge fund | 11/3/2005 | Terminated |
| Highland CDO Opportunity Fund, Ltd. | IMA | MQ Services Ltd, Victoria House, 31 Victoria Street, Hamilton HM10, Bermuda | N/A | Hedge fund | 5/8/2002 | Terminated |
| Highland CDO Opportunity Master Fund, L.P. | IMA | MQ Services Ltd, Victoria House, 31 Victoria Street, Hamilton HM10, Bermuda | 98-0520689 | Hedge fund | 10/31/2005 | Terminated |
| Highland Credit Opportunities CDO, Ltd. | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0512429 | Hedge fund | 11/1/2005 | |
| Highland Credit Opportunities Japanese Feeder Sub-Trust | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | N/A | Hedge fund | 8/22/2007 | |
| Highland Credit Strategies Fund, L.P. | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 86-1147211 | Hedge fund | 8/2/2005 | |
| Highland Credit Strategies Fund, Ltd. | IMA | MQ Services Ltd, Victoria House, 31 Victoria Street, Hamilton HM10, Bermuda | 98-0466202 | Hedge fund | 8/8/2005 | |
| Highland Credit Strategies Master Fund, L.P. | IMA | MQ Services Ltd, Victoria House, 31 Victoria Street, Hamilton HM10, Bermuda | 98-0466203 | Hedge fund | 8/19/2005 | |
| Highland Dynamic Income Fund, L.P. (fka Highland Capital Loan Fund, L.P.) | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-2123634 | Hedge fund | 2/25/2013 | |
| Highland Dynamic Income Fund, Ltd. (fka Highland Loan Fund, Ltd.) | IMA | Maples Corporate Services Limited Grand Cayman KY1-1104, Cayman Islands | N/A | Hedge fund | 2/26/2013 | |
| Highland Dynamic Income Master Fund, L.P. (fka Highland Loan Master Fund, L.P.) | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1169838 | Hedge fund | 2/26/2013 | |
| Highland Financial Corp. | IMA - terminated | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-4392555 | HFP sub | 2/28/2006 | |
| Highland Flexible Income UCITS Fund | IMA | 23 St. Stephen's Green, Dblin 2, Ireland | N/A | Separate account | 6/7/2018 | |
| Highland Legacy Limited | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 7/6/1999 | |
| Highland Loan Funding V, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 2/5/2001 | |
| Highland Multi Strategy Credit Fund, L.P. (fka Highland Credit Opportunities Fund, L.P., fka Highland Credit Opportunities CDO, L.P.) | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3874256 | Hedge fund | 12/1/2005 | |
| Highland Multi Strategy Credit Fund, Ltd. (fka Highland Credit Opportunities Fund, Ltd.) | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-0587370 | Hedge fund | 12/29/2005 | |
| Highland Park CDO I, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | 98-0515982 | CLO Fund | 7/12/2006 | |
| Highland Prometheus Feeder Fund I, L.P. | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1334547 | Hedge fund | 11/7/2016 | |
| Highland Prometheus Feeder Fund II, L.P. | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1353013 | Hedge fund | 2/17/2017 | |
| Highland Prometheus Master Fund, L.P. | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1334763 | Hedge fund | 11/7/2016 | |
| Highland Restoration Capital Partners Master, L.P. | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1458205 | Private equity fund | 11/14/2007 | |
| Highland Restoration Capital Partners Offshore, L.P. | IMA | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-0558962 | Private equity fund | 11/13/2007 | |
| Highland Restoration Capital Partners, L.P. | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1456033 | Private equity fund | 11/14/2007 | |
| Highland Select Equity Fund, L.P. | IMA | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 75-2970177 | Hedge fund | 12/5/2001 | |
| Highland Select Equity Master Fund, L.P. | IMA | MQ Services Ltd, Victoria House, 31 Victoria Street, Hamilton HM10, Bermuda | 98-0520466 | Hedge fund | 4/12/2007 | |
| Highland Special Opportunities Holding Company | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0532735 | HFP sub | 1/24/2006 | Terminated |
| Jasper CLO, Ltd. | IMA | Elian Fiduciary Services (Cayman) Limted - 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0595492 | CLO Fund | 3/9/2005 | |
| Liberty CLO, Ltd. | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0595490 | CLO Fund | 6/30/2005 | |
| Longhorn Credit Funding, LLC | IMA | United Corporate Services, Inc., 874 Walker Rd, Ste C, Dover, DE 19904 | N/A | Separate account | 10/15/2007 | |
| ML CLO XIX Sterling (Cayman), Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 4/27/1998 | |
| Pam Capital Funding, L.P. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | 20-3010953 | CLO Fund | 5/8/1998 | |
| PamCo Cayman Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 1/18/1997 | |
| PensionDanmark Pensionsforsikringsaktieselskab | IMA | Langelinie Allé 43, DK-2100 Copenhagen Ø | N/A | Separate account | 6/24/1992 | |
| Red River CLO, Ltd. | IMA | Elian Fiduciary Services (Cayman) Limted - 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0527219 | CLO Fund | 1/24/2006 | |
| Rockwall CDO II Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 4/12/2006 | |
| Rockwall CDO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | 98-0461407 | CLO Fund | 6/7/2005 | |
| Southfork CLO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 10/21/2004 | |
| Stratford CLO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | N/A | CLO Fund | 10/17/2006 | |
| Valhalla CLO, Ltd. | IMA | Intertrust Corporate Services (Cayman) Limited , 190 Elgin Ave, George Town, Grand Cayman KY1-9005, Cayman Islands | 98-0595491 | CLO Fund | 6/9/2004 | |
| Westchester CLO, Ltd. | IMA | MaplesFS Limted, PO Box 1093, George Town, Grand Cayman KY1-1102, Cayman Islands | 98-0546784 | CLO Fund | 11/10/2006 | |
| Highland Latin America GP, Ltd. | Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1362190 | GP of the relying advisor to the Argentina fund | 3/6/2017 | |

1 of 3

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit F - SOFA 25**

| Name | Relationship | Address | EIN | Description of Business | Date of Creation | Date of Termination (if applicable) |
|---|---|---|---|---|---|---|
| Highland Capital Management Latin America, L.P. | Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1362202 | Relying advisor to the Argentina fund | 4/13/2017 | |
| Neutra, Ltd. | Highland Capital Management, L.P., as trustee of Acis CMDA Trust and nominee for and on behalf of Highland CLO Assets Holdings Limited | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090422 | | 12/12/2012 | |
| Asbury Holdings, LLC (fka HCSLR Camelback Investors (Delaware), LLC) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Holds HCMLP's Haygood interest | 2/14/2017 | |
| De Kooning, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090348 | Formed to hold Select's interest in Barclays' assignment | 12/12/2012 | |
| HCREF-I Holding Corp. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-1998057 | Holds HCMLP interest in HCREF | 12/13/2012 | |
| HCREF-XI Holding Corp. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-2030348 | Holds HCMLP's interest in HE Mezz KR, LLC | 12/13/2012 | |
| HCREF-XIII Holding Corp. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-2032401 | Holds HCMLP's interest in 2006 Milam East Partners LP | 12/13/2012 | |
| HFP GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 16-1746972 | HFP GP | 1/20/2006 | |
| Highland Brasil, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-4691319 | Managing member of BB Votorantim Highland In | 1/28/2014 | |
| Highland Capital Management (Singapore) Pte Ltd | Highland Capital Management, L.P. | Tricor, 80 Robinson Road #02-00, Singapore 068898 | 98-0580590 | HCMLP's wholly owned sub in Singapore | 4/2/2008 | |
| Highland Capital Management Korea Limited | Highland Capital Management, L.P. | (Seoul Finance Center, Taepyeongno-1-ga) 21F, 136, Sejong-daero, Jung-gu, Seoul, Korea | 98-1120007 | Relying advisor to the Korea PEF | 8/2/2012 | |
| Highland Capital Multi-Strategy Fund, LP | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-5237025 | Private fund | 7/6/2006 | |
| Highland Capital Special Allocation, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1175318 | Entity received the incentive allocation from HFP. | 12/21/2006 | |
| Highland CDO Opportunity Fund GP, L.P. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3899907 | Hedge fund | 10/20/2005 | |
| Highland CDO Opportunity GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3899870 | Hedge fund GP | 10/20/2005 | |
| Highland CLO Assets Holdings Limited | Highland Capital Management, L.P. | Maples Corporate Services (BVI) Limited Kingston Chambers, PO Box 173, Road Town Tortola, British Virgin Islands | 98-1417806 | | 12/19/2017 | |
| Highland CLO Management Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1432973 | | 10/27/2017 | |
| Highland Dynamic Income Fund GP, LLC (fka Highland Capital Loan GP, LLC) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 80-0898281 | Hedge fund GP | 2/25/2013 | |
| Highland Employee Retention Assets LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 27-1596366 | HERA | 6/23/2009 | |
| Highland ERA Management, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | HERA manager | 2/1/2013 | |
| Highland Financial Partners, L.P. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 83-0446391 | HFP | 1/20/2006 | Terminated |
| Highland Fund Holdings, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | | 5/24/2016 | |
| Highland General Partner, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 86-1147210 | Hedge fund GP | 7/26/2005 | |
| Highland GP Holdings, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 86-1147208 | Hedge fund GP | 7/26/2005 | |
| Highland HCF Advisor Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1401127 | Advisor to Highland CLO Funding, Ltd. | 10/27/2017 | |
| Highland Latin America LP, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1362186 | Argentina fund structure | 3/6/2017 | |
| Highland Multi Strategy Credit Fund GP, L.P. (fka Highland Credit Opportunities CDO GP, L.P.) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Hedge fund GP | 12/29/2005 | |
| Highland Multi Strategy Credit Fund GP, LLC (fka Highland Credit Opportunities CDO GP, LLC) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Hedge fund GP | 12/29/2005 | |
| Highland Multi-Strategy Fund GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-5236824 | Private fund GP | 7/6/2006 | |
| Highland Multi-Strategy Fund GP, LP | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-5236931 | Private fund GP | 7/6/2006 | |
| Highland Receivables Finance I, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-8123634 | Entity created in 2006 that purchased all of HCMLP's receivables 100% owned by HCMLP. | 12/28/2006 | |
| Highland Restoration Capital Partners GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1455912 | Private equity fund GP | 11/6/2007 | |
| Highland Select Equity Fund GP, L.P. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3899917 | Hedge fund GP | 10/20/2005 | |
| Highland Select Equity GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-3899886 | Hedge fund GP | 10/20/2005 | |
| Highland SunBridge GP, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Hedge fund GP | 12/15/2015 | |
| Hirst, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090361 | Formed to hold CDO Ltd's interest in Barclays assignment | 12/12/2012 | |
| Hockney, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090388 | Formed to hold Crusader's interest in Barclays assignment | 12/12/2012 | |
| Maple Avenue Holdings, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 81-3600687 | Holds Uchi loan | 8/17/2016 | |
| NexPoint Hospitality Trust | Highland Capital Management, L.P. | 333 Bay Street, Suite 3400, Toronto, Ontario M5H 2S7, Canada | 83-6637675 | Hospitality REIT | 12/12/2018 | |
| NexPoint Insurance Distributors, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 84-2921534 | Insurance broker | 7/25/2019 | |
| NexPoint Insurance Solutions GP, LLC (fka Highland Capital Insurance Solutions GP, LLC) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 84-2571487 | Insurance advisor GP | 4/4/2019 | |
| NexPoint Insurance Solutions, L.P. (fka Highland Capital Insurance Solutions, L.P.) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 84-2584142 | Insurance advisor | 4/4/2019 | |
| NexPoint Multifamily Capital Trust, Inc. | Highland Capital Management, L.P. | The Corporation Trust, 2405 York Rd, Ste 201, Lutherville Timonium, MD 21093 | 46-4106316 | NMCT REIT | 11/12/2013 | |
| NexPoint Real Estate Strategies Fund | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 81-1061590 | Retail fund | 3/10/2006 | |
| NexPoint Residential Trust Inc. | Highland Capital Management, L.P. | The Corporation Trust, 2405 York Rd, Ste 201, Lutherville Timonium, MD 21093 | 47-1881359 | NXRT REIT | 9/19/2014 | |
| NexPoint Strategic Opportunities Fund (fka NexPoint Credit Strategies Fund) | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 80-0139099 | Retail fund | 3/10/2006 | |
| NHT Holdco, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 83-3011801 | Hospitality REIT structure | 1/2/2019 | |
| Oldenburg, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090453 | Formed to hold CDO LP's interest in Barclays assignment | 12/12/2012 | |
| Penant Management LP | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-1614710 | Holds HCREF's interest in Barclays assignment | 12/12/2012 | |
| PetroCap Incentive Partners III, LP | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | ? | Petrocap fund | 11/16/2017 | |
| PetroCap Partners II, L.P. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 46-4691213 | Petrocap fund | 10/7/2013 | |
| PetroCap Partners III, L.P. | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | ? | Petrocap fund | 11/16/2017 | |
| Pollack, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090519 | | 12/12/2012 | |
| SE Multifamily Holdings LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 32-0576655 | RE investment holding | 8/23/2018 | |

Appx. 01460

Highland Capital Management LP
Case # 19-34054-SGJ
Exhibit F - SOFA 25

| Name | Relationship | Address | EIN | Description of Business | Date of Creation | Date of Termination (if applicable) |
|---|---|---|---|---|---|---|
| The Dondero Insurance Rabbi Trust | Highland Capital Management, L.P. | 300 Crescent Ct, Ste 700, Dallas, TX 75201 | 75-2716725 | Holds Dondero's life insurance policies and the proceeds to be used to fund HCM's obligation to purchase Dondero Interests from the Trust Beneficiaries per Buy-Sell Agreement | 5/27/2004 | |
| The Okada Insurance Rabbi Trust | Highland Capital Management, L.P. | 300 Crescent Ct, Ste 700, Dallas, TX 75201 | 75-2716725 | Holds Okada's life insurance policies and the proceeds to be used to fund HCM's obligation to purchase Okada Interests from the Trust Beneficiaries per Buy-Sell Agreement | 5/27/2004 | |
| US Gaming SPV, LLC | Highland Capital Management, L.P. | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 84-1769285 | SPV of eSports investment in Korea | 5/14/2019 | |
| Warhol, Ltd. | Highland Capital Management, L.P. | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | 98-1090362 | Formed to hold Ops' interest in Barclays assignment | 12/12/2012 | |
| HE Capital 232 Phase I, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1616599 | Underlying property is a 71.73 acre site consisting of 232 finished single family lots in the NW Phoenix development of Asante. | 12/20/2007 | |
| HE Capital Asante, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-0525645 | Underlying project is a 843 acre multi-phase residential development in NW Phoenix, AZ | 7/5/2007 | |
| HE Capital Fox Trails, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Underlying project is a 889.58 acre vacant parcel in NW Phoenix with PAD approval for 2,320 single family units. | 3/10/2008 | |
| HE Capital KR, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | N/A | Underlying project is a 1,829.67 acre vacant parcel in SW Phoenix proposed for 4,250 single family lots of which 1,431 have final plat approval (Phase I) and 50.94 acres of commercial land. | 7/5/2007 | |
| HE Capital, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 20-8711786 | Parent entity for joint venture between Ellman and Highland. | 3/22/2007 | |
| HE CLO Holdco, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 37-1666849 | Blockers that used to hold Ellman interest | 2/3/2011 | |
| HE Mezz Fox Trails, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-2151278 | Underlying project is a 889.58 acre vacant parcel in NW Phoenix with PAD approval for 2,320 single family units. | 3/10/2008 | |
| HE Mezz KR, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-0611280 | Underlying project is a 1,829.67 acre vacant parcel in SW Phoenix proposed for 4,250 single family lots of which 1,431 have final plat approval (Phase I) and 50.94 acres of commercial land. | 7/27/2007 | |
| HE Peoria Place Property, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1600012 | Underlying project is a 127.39 acre vacant parcel in NW Phoenix being improved with interior roadways for ultimate development or sale under the PAD approving 11 acres of office, 23 acres of retail, 50 acres of single family an d43 acres of multi family. | 12/10/2007 | |
| HE Peoria Place, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-1599959 | Underlying project is a 127.39 acre vacant parcel in NW Phoenix being improved with interior roadways for ultimate development or sale under the PAD approving 11 acres of office, 23 acres of retail, 50 acres of single family an d43 acres of multi family. | 11/14/2007 | |
| Hibiscus HoldCo, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 27-1824370 | Blocker to hold Turtle Bay assets | 2/2/2010 | |
| Highland CLO Gaming Holdings, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 27-3995018 | CLO blocker that used to hold Affinity Gaming inte | 11/18/2010 | |
| Highland TCI Holding Company, LLC | HCMLP-Manager | CT Corporation, 1999 Bryan St, Ste 900, Dallas, TX 75201 | 45-2620554 | CLO blocker to hold TCI/Park West assets | 6/21/2011 | |
| Highland's Roads Land Holding Company, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-4572095 | CLO blocker to hold LLV reorg equity | 3/30/2009 | |
| Kulima Montalban Holdings, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 27-1942638 | CLO blocker to hold Turtle Bay equity | 2/19/2010 | |
| Kulima Resort Holdco, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 26-4572180 | CLO blocker to hold Turtle Bay equity | 3/18/2009 | |
| Park West Holdco, LLC | HCMLP-Manager | CT Corporation, 1999 Bryan St, Ste 900, Dallas, TX 75201 | 37-1641409 | Holds TCI assets | 4/4/2011 | |
| Park West Portfolio Holdco, LLC | HCMLP-Manager | CT Corporation, 1999 Bryan St, Ste 900, Dallas, TX 75201 | 90-0737248 | Holds TCI assets | 4/14/2011 | |
| PDK Toys Holdco, LLC | HCMLP-Manager | The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801 | 83-3591646 | PDK blocker to hold Toys R'Us loan | 2/14/2019 | |
| Acis CMOA Trust | HCMLP - Trustee | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | N/A | | 3/30/2018 | |
| Highland Latin America Trust | HCMLP - Trustee | Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman KY1-1104, Cayman Islands | N/A | | 3/30/2018 | |

Appx. 01461

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit G - SOFA 30**

| Name | Amounts | Date | Reason |
|------|--------:|------|--------|
| Dondero, James | 161.25 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 01/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 01/31/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 02/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 02/28/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 03/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 03/29/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 04/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 04/30/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 05/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 05/31/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 06/14/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 06/28/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 07/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 07/31/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 08/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 08/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 08/30/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 09/13/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 09/30/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 10/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 10/15/2019 | Regular Base Pay |
| Dondero, James | 161.25 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 10/31/2018 | Regular Base Pay |
| Dondero, James | 161.25 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 11/15/2018 | Regular Base Pay |
| Dondero, James | 161.25 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 11/30/2018 | Regular Base Pay |
| Dondero, James | 161.25 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 12/14/2018 | Regular Base Pay |
| Dondero, James | 161.25 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Dondero, James | 23,437.51 | 12/31/2018 | Regular Base Pay |
| Ellington, Scott | 71.25 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 01/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 01/31/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 02/15/2019 | Regular Base Pay |
| Ellington, Scott | 300,000.00 | 02/28/2019 | Bonus |
| Ellington, Scott | 71.25 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 02/28/2019 | Regular Base Pay |
| Ellington, Scott | 350,000.00 | 03/15/2019 | Bonus |
| Ellington, Scott | 71.25 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 03/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 03/29/2019 | Regular Base Pay |

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit G - SOFA 30**

| Name | Amounts | Date | Reason |
|------|--------:|------|--------|
| Ellington, Scott | 71.25 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 04/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 04/30/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 05/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 05/31/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 06/14/2019 | Regular Base Pay |
| Ellington, Scott | 350,629.00 | 06/28/2019 | Bonus and/or Deferred Compensation |
| Ellington, Scott | 71.25 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 06/28/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 07/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 07/31/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 08/15/2019 | Regular Base Pay |
| Ellington, Scott | 650,000.00 | 08/30/2019 | Bonus |
| Ellington, Scott | 71.25 | 08/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 08/30/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 09/13/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 09/30/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 10/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 10/15/2019 | Regular Base Pay |
| Ellington, Scott | 71.25 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 10/31/2018 | Regular Base Pay |
| Ellington, Scott | 71.25 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 11/15/2018 | Regular Base Pay |
| Ellington, Scott | 71.25 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 11/30/2018 | Regular Base Pay |
| Ellington, Scott | 71.25 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 12/14/2018 | Regular Base Pay |
| Ellington, Scott | 604.78 | 12/31/2018 | Gross up value from Dividend Reinvestment Plan |
| Ellington, Scott | 71.25 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Ellington, Scott | 18,750.00 | 12/31/2018 | Regular Base Pay |
| Okada, Mark | 204.25 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 01/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 01/31/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 02/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 02/28/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 03/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 03/29/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 04/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 04/30/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 05/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 05/31/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 06/14/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |

Appx. 01463

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit G - SOFA 30**

| Name | Amounts | Date | Reason |
|------|--------:|------|--------|
| Okada, Mark | 32,552.09 | 06/28/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 07/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 07/31/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 08/15/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 08/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 08/30/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 09/13/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 09/30/2019 | Regular Base Pay |
| Okada, Mark | 204.25 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 10/31/2018 | Regular Base Pay |
| Okada, Mark | 204.25 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 11/15/2018 | Regular Base Pay |
| Okada, Mark | 204.25 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 11/30/2018 | Regular Base Pay |
| Okada, Mark | 204.25 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 12/14/2018 | Regular Base Pay |
| Okada, Mark | 272.64 | 12/31/2018 | Gross up value from Dividend Reinvestment Plan |
| Okada, Mark | 204.25 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Okada, Mark | 32,552.09 | 12/31/2018 | Regular Base Pay |
| Parker, Lee | 47.50 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 01/15/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 01/31/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 02/15/2019 | Regular Base Pay |
| Parker, Lee | 231,250.00 | 02/28/2019 | Bonus |
| Parker, Lee | 47.50 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 02/28/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 03/15/2019 | Regular Base Pay |
| Parker, Lee | 150,000.00 | 03/29/2019 | Bonus |
| Parker, Lee | 47.50 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 03/29/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 04/15/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 04/30/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 05/15/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 05/31/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 06/14/2019 | Regular Base Pay |
| Parker, Lee | 362,935.00 | 06/28/2019 | Bonus and/or Deferred Compensation |
| Parker, Lee | 47.50 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 06/28/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 07/15/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 07/31/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 08/15/2019 | Regular Base Pay |
| Parker, Lee | 381,250.00 | 08/30/2019 | Bonus |
| Parker, Lee | 47.50 | 08/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 08/30/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 09/13/2019 | Regular Base Pay |

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit G - SOFA 30**

| Name | Amounts | Date | Reason |
|------|---------|------|--------|
| Parker, Lee | 47.50 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 09/30/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 10/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 10/15/2019 | Regular Base Pay |
| Parker, Lee | 47.50 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 10/31/2018 | Regular Base Pay |
| Parker, Lee | 47.50 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 11/15/2018 | Regular Base Pay |
| Parker, Lee | 47.50 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 11/30/2018 | Regular Base Pay |
| Parker, Lee | 47.50 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 12/14/2018 | Regular Base Pay |
| Parker, Lee | 483.56 | 12/31/2018 | Gross up value from Dividend Reinvestment Plan |
| Parker, Lee | 47.50 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Parker, Lee | 14,583.33 | 12/31/2018 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 01/15/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 01/31/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 02/15/2019 | Regular Base Pay |
| Surgent, Thomas | 300,000.00 | 02/28/2019 | Bonus |
| Surgent, Thomas | 56.25 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 02/28/2019 | Regular Base Pay |
| Surgent, Thomas | 325,000.00 | 03/15/2019 | Bonus |
| Surgent, Thomas | 56.25 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 03/15/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 03/29/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 04/15/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 04/30/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 05/15/2019 | Regular Base Pay |
| Surgent, Thomas | 100,000.00 | 05/31/2019 | Bonus and/or Deferred Compensation |
| Surgent, Thomas | 56.25 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 05/31/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 06/14/2019 | Regular Base Pay |
| Surgent, Thomas | 482,115.00 | 06/28/2019 | Bonus and/or Deferred Compensation |
| Surgent, Thomas | 56.25 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 06/28/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 07/15/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 07/31/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 08/15/2019 | Regular Base Pay |
| Surgent, Thomas | 625,000.00 | 08/30/2019 | Bonus |
| Surgent, Thomas | 56.25 | 08/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 08/30/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 09/13/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 09/30/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 10/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 16,666.67 | 10/15/2019 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 10/31/2018 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 11/15/2018 | Regular Base Pay |

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit G - SOFA 30**

| Name | Amounts | Date | Reason |
|------|--------:|------|--------|
| Surgent, Thomas | 56.25 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 11/30/2018 | Regular Base Pay |
| Surgent, Thomas | 56.25 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 12/14/2018 | Regular Base Pay |
| Surgent, Thomas | 2,344.18 | 12/31/2018 | Gross up value from Dividend Reinvestment Plan |
| Surgent, Thomas | 56.25 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Surgent, Thomas | 15,625.00 | 12/31/2018 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 01/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 01/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 01/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 01/31/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 02/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 02/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 206,250.00 | 02/28/2019 | Bonus |
| Waterhouse, Frank | 71.25 | 02/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 02/28/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 03/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 03/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 03/29/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 03/29/2019 | Regular Base Pay |
| Waterhouse, Frank | 212,500.00 | 04/15/2019 | Bonus |
| Waterhouse, Frank | 71.25 | 04/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 04/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 04/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 04/30/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 05/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 05/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 100,000.00 | 05/31/2019 | Bonus and/or Deferred Compensation |
| Waterhouse, Frank | 71.25 | 05/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 05/31/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 06/14/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 06/14/2019 | Regular Base Pay |
| Waterhouse, Frank | 306,801.00 | 06/28/2019 | Bonus and/or Deferred Compensation |
| Waterhouse, Frank | 71.25 | 06/28/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 06/28/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 07/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 07/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 07/31/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 07/31/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 08/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 08/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 418,750.00 | 08/30/2019 | Bonus |
| Waterhouse, Frank | 14,583.33 | 08/30/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 09/13/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 09/13/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 09/30/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 09/30/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 10/15/2019 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 10/15/2019 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 10/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 10/31/2018 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 11/15/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 11/15/2018 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 11/30/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 11/30/2018 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 12/14/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 12/14/2018 | Regular Base Pay |
| Waterhouse, Frank | 71.25 | 12/31/2018 | Group Term Life Insurance (value of premium for coverage in excess of $50 K) |
| Waterhouse, Frank | 14,583.33 | 12/31/2018 | Regular Base Pay |

**Appx. 01466**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

## GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODS, AND DISCLAIMER REGARDING DEBTOR'S SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS

Highland Capital Management, L.P. (the "Debtor") submits its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "SoFA") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"). The Debtor, with the assistance of its advisors and management, prepared the Schedules and SoFA in accordance with section 521 title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

These Global Notes and Statement of Limitations, Methods, and Disclaimer Regarding the Debtor's Schedules and SoFA (collectively, the "Global Notes") pertain to, are incorporated by reference in, and comprise an integral part of the Schedules and SoFA. These Global Notes should be referred to, and reviewed in connection with any review of the Schedules and SoFA.[2]

The Schedules and SoFA have been prepared by the Debtor with the assistance and under the direction of the Debtor's proposed Chief Restructuring Officer and additional personnel at Development Specialists, Inc. (collectively, the "CRO") and are unaudited and subject to further review and potential adjustment and amendment. In preparing the Schedules and SoFA, the CRO relied on financial data derived from the Debtor's books and records that was available at the time of preparation. The CRO has made reasonable efforts to ensure the accuracy and completeness of such financial information, however, subsequent information or discovery of other relevant facts may result in material changes to the Schedules and SoFA and inadvertent errors, omissions, or inaccuracies may exist. The Debtor reserves all rights to amend or supplement its Schedules and SoFA.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] These Global Notes are in addition to any specific notes contained in the Debtor's Schedules or SoFA. The fact that the Debtor has prepared a "general note" with respect to any of the Schedules and SoFA and not to others should not be interpreted as a decision by the Debtor to exclude the applicability of such general note to any of the Debtor's remaining Schedules and SoFA, as appropriate.

1

Appx. 01467

**Reservation of Rights.**  The Debtor reserves all rights to amend the SoFA and Schedules in all respects, as may be necessary or appropriate, including, but not limited to, the right to dispute or to assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability or classification of the claim, or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated."  Furthermore, nothing contained in the SoFA and Schedules shall constitute a waiver of rights by the Debtor involving any present or future causes of action, contested matters or other issues under the provisions of the Bankruptcy Code or other applicable non-bankruptcy laws.

**Description of the Case and "As Is" Information Date.**  On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.  The Debtor is managing its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 4, 2019, the Delaware Bankruptcy Court entered an Order transferring this case to the Bankruptcy Court [Docket No. 1].

Asset information in the Schedules reflects the Debtor's best estimate of asset values as of the Petition Date, unless otherwise noted.  No independent valuation has been obtained.

**Basis of Presentation.**  The Schedules and SoFA do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

Although these Schedules and SoFA may, at times, incorporate information prepared in accordance with GAAP, the Schedules and SoFA neither purport to represent nor reconcile to financial statements prepared and/or distributed by the Debtor in accordance with GAAP or otherwise.  Moreover, given, among other things, the valuation and nature of certain liabilities, to the extent that the Debtor shows more assets than liabilities, this is not a conclusion that the Debtor was solvent at the Petition Date.  Likewise, to the extent that the Debtor shows more liabilities than assets, this is not a conclusion that the Debtor was insolvent at the Petition Date or any time prior to the Petition Date.

**Estimates.**  To timely close the books and records of the Debtor, the CRO must make certain estimates and assumptions that affect the reported amounts of assets and liabilities and reported revenue and expenses.  The Debtor reserves all rights to amend the reported amounts of assets, liabilities, revenue, and expenses to reflect changes in those estimates and assumptions.

**Confidentiality**.  There may be instances within the Schedules and SoFA where names, addresses, or amounts have been left blank.  Due to the nature of an agreement between the Debtor and the third party, concerns of confidentiality, or concerns for the privacy of an individual, the Debtor may have deemed it appropriate and necessary to avoid listing such names, addresses, and amounts.

2

DOCS_DE:226892.2 36027/002

**Intercompany Claims.**  Any receivables and payables between the Debtor and affiliated or related entities in this case (each an "Intercompany Receivable" or "Intercompany Payable" and, collectively, the "Intercompany Claims") are reported as assets on Schedule B or liabilities on Schedule E and Schedule F.  These Intercompany Claims include the following components, among others:  1) loans to affiliates or related entities, 2) accounts payable and payroll disbursements made out of an affiliate's or related entity's bank accounts on behalf of the Debtor, 3) centrally billed expenses, 4) corporate expense allocations, and 5) accounting for trade and other intercompany transactions.  These Intercompany Claims may or may not result in allowed or enforceable claims by or against the Debtor, and by listing these claims the Debtor is not indicating a conclusion that the Intercompany Claims are enforceable.  Intercompany Claims may also be subject to set off, recoupment, and netting not reflected in the Schedules.  In situations where there is not an enforceable claim, the assets and/or liabilities of the Debtor may be greater or lesser than the amounts stated herein.  All rights to amend intercompany Claims in the Schedules and SoFA are reserved.

The Debtor has listed the intercompany payables as unsecured claims on Schedule F.  The Debtor reserves its rights to later change the characterization, classification, categorization, or designation of such items.

**Insiders.**  For purposes of the Schedules and SoFA, the Debtor defines "insider" pursuant to section 101(31) of the Bankruptcy Code.  Payments to insiders are set forth on Question 3.c. of the SoFA.

Persons listed as "insiders" have been included for informational purposes only.  The Debtor did not take any position with respect to whether such individual could successfully argue that he or she is not an "insider" under applicable law, including without limitation, the federal securities laws, or with respect to any theories of liability or for any other purpose.  Inclusion of any party in the Schedules and SoFA as an insider does not constitute an admission that such party is an insider or a waiver of such party's right to dispute insider status.

**Excluded Accruals and GAAP Entries.**  The Debtor's balance sheet reflects liabilities recognized in accordance with GAAP; however, not all such liabilities would result in a claim against the Debtor.  Certain liabilities (including but not limited to certain reserves, deferred charges, and future contractual obligations) have not been included in the Debtor's Schedules.   Other immaterial assets and liabilities may also have been excluded.

**Classification and Claim Descriptions**.  Any failure to designate a claim on the Schedules as "disputed," "contingent" or "unliquidated" does not constitute an admission by the Debtor that such amount is not "disputed," "contingent" or "unliquidated." The Debtor reserves the right to dispute, or to assert offsets or defenses to, any claim reflected on its Schedules as to amount, liability or classification or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated."

Listing a claim (i) in Schedule D as "secured," (ii) in Schedule E as "priority" or (iii) in Schedule F as "unsecured nonpriority," or listing a contract in Schedule G as "executory" or "unexpired," does not constitute an admission by the Debtor of the legal rights of the claimant or a waiver of the Debtor's right to recharacterize or reclassify such claim or contract.

DOCS_DE:226892.2 36027/002

Moreover, the Debtor reserves all rights to amend the SoFA and Schedules, in all respects, as may be necessary or appropriate, including, but not limited to, the right to dispute or to assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability or classification of the claim, or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated." Furthermore, nothing contained in the SoFA and Schedules shall constitute a waiver of rights by the Debtor involving any present or future causes of action, contested matters or other issues under the provisions of the Bankruptcy Code or other relevant non-bankruptcy laws.

**Credits and Adjustments.** The claims of individual creditors for, among other things, goods, products, services or taxes are listed as the amounts entered on the Debtor's books and records and may not reflect credits, allowances or other adjustments due from such creditors to the Debtor. The Debtor reserves all of its rights respecting such credits, allowances or other adjustments.

**Setoffs.** The Debtor may incur setoffs from third parties in its business. Setoffs in the ordinary course can result from various routine transactions, including intercompany transactions, pricing discrepancies, warranty claims and other disputes between the Debtor and third parties. Certain of these constitute normal setoffs consistent with the ordinary course of business in the Debtor's industry. In such instances, such ordinary course setoffs are excluded from the Debtor's responses to Question 13 of the SoFA. The Debtor reserves all rights to enforce or challenge, as the case may be, any setoffs that have been or may be asserted.

**Specific Notes.** These general notes are in addition to the specific notes set forth below or in the related Statement and Schedules hereinafter.

### General Disclaimer

The Debtor has prepared the Schedules and the SoFA based on the information reflected in the Debtor's books and records. However, inasmuch as the Debtor's books and records have not been audited or formally closed and evaluated for proper cut-off on the Petition Date, the Debtor cannot warrant the absolute accuracy of these documents. The Debtor has made a diligent effort to complete these documents accurately and completely. To the extent additional information becomes available, the Debtor will amend and supplement the Schedules and SoFA.

### <u>Specific Schedules Disclosures</u>

a. **Schedule A/B, Part 4 - Investments; Non-Publicly Traded Stock and Interests in Incorporated and Unincorporated Businesses, including any Interest in an LLC, Partnership, or Joint Venture.** Certain ownership interests in subsidiaries have been listed in Schedule A/B, Part 4, at their book value on account of the fact that the fair market value of such ownership is dependent on numerous variables and factors. Fair value of such interests may differ significantly from their net book value. Further, for investments listed at fair value, many of the Debtor's assets are not exchange traded and are fair valued utilizing unobservable

**Appx. 01470**

inputs, historical information, and significant and/or subjective estimates. As a result the liquidity and ultimately realized value of such investments may differ materially from the fair value listed on the schedule.

b. **Schedule A/B, Part 7 - Office Furniture, Fixtures, and Equipment; and Collectibles**. Dollar amounts are presented net of accumulated depreciation and other adjustments.

c. **Schedule A/B, Part 11 - All Other Assets**. Dollar amounts are presented net of impairments and other adjustments. Debtor has reflected "unknown" for value of its interests in various other assets. While the face value of the notes receivable is included, the current value of these as well as the other assets has not been determined and may differ materially.

Additionally, the Debtor may receive refunds, income tax refunds or other sales tax refunds at various times throughout its fiscal year. As of the Petition Date, however, certain of these amounts are unknown to the Debtor, and accordingly, may not be listed in Schedule A/B.

*Other Contingent and Unliquidated Claims or Causes of Action of Every Nature, including Counterclaims of the Debtor and Rights to Setoff Claims.* In the ordinary course of its business, the Debtor may have accrued, or may subsequently accrue, certain rights to counter-claims, cross-claims, setoffs, or refunds with its customers and suppliers. Additionally, the Debtor may be party to pending litigation in which the Debtor has asserted, or may assert, claims as a plaintiff or counter-claims and/or cross-claims as a defendant. Because certain of these claims are unknown to the Debtor and not quantifiable as of the Petition Date, they may not be listed on Schedule A/B, Part 11.

d. **Schedule D - Creditors Who Have Claims Secured by Property**. The Debtor reserves its rights to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D. Moreover, although the Debtor has scheduled claims of various creditors as secured claims, the Debtor reserves all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim.

The descriptions provided in Schedule D are intended only to be a summary. Reference to the applicable agreements and other related relevant documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens.

The Debtor has not included on Schedule D parties that may believe their claims are secured through setoff rights or inchoate statutory lien rights. Although there are multiple parties that hold a portion of the debt included in the secured

5

Appx. 01471

facilities, only the administrative agents have been listed for purposes of Schedule D.

e.    **Schedule E/F - Creditors Who Have Unsecured Claims.**

*Part 1 - Creditors with Priority Unsecured Claims*.  Pursuant to the *Order (I) Authorizing the Debtor to (A) Pay and Honor Prepetition Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (11) Granting Related Relief* [Docket No. 39] (the "Wage Order"), the Debtor received authority to pay certain prepetition obligations, including to pay employee wages and other employee benefits, in the ordinary course of business. The Debtor believes that any non-insider employee claims for prepetition amounts related to ongoing payroll and benefits, whether allowable as a priority or nonpriority claim, which were due and payable at the time of the Petition Date have been or will be satisfied as permitted pursuant to the Wage Order.  The Debtor filed the *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations under Employee Bonus Plans and Granting Related Relief* [Docket No. 177] pursuant to which the Debtor seeks authority to pay and honor certain prepetition bonus programs.  Employee claims related to these programs are shown in the aggregate amounts in Schedule E/F for privacy reasons.  Additional information is available by appropriate request to the Debtor.  The listing of a claim on Schedule E/F, Part 1, does not constitute an admission by the Debtor that such claim or any portion thereof is entitled to priority status.

*Part 2 - Creditors with Nonpriority Unsecured Claims*.  The liabilities identified in Schedule E/F, Part 2, are derived from the Debtor's books and records.  The Debtor made a reasonable attempt to set forth its unsecured obligations, although the actual amount of claims against the Debtor may vary from those liabilities represented on Schedule E/F, Part 2.  The listed liabilities may not reflect the correct amount of any unsecured creditor's allowed claims or the correct amount of all unsecured claims.

Schedule E/F, Part 2 reflects liabilities based on the Debtor's books and records.

Schedule E/F, Part 2, contains information regarding threatened or pending litigation involving the Debtor.  The amounts for these potential claims are listed as "unknown" and are marked as contingent, unliquidated, and disputed in the Schedules and Statements.  Additionally, the amounts of certain litigation claims may be estimates based on the allegations asserted by the litigation counterparty, and do not constitute an admission by the Debtor with respect to either liability for, or the amount of, such claims.

Schedule E/F, Part 2, reflects certain prepetition amounts owing to counterparties to executory contracts and unexpired leases.  Such prepetition amounts, however,

6

may be paid in connection with the assumption or assumption and assignment of an executory contract or unexpired lease.  In addition, Schedule E/F, Part 2, does not include claims that may arise in connection with the rejection of any executory contracts and unexpired leases, if any, that may be or have been rejected.

As of the time of filing of the Schedules and Statements, the Debtor had not received all invoices for payables, expenses, and other liabilities that may have accrued prior to the Petition Date.  Accordingly, the information contained in Schedules D and E/F may be incomplete.  The Debtor reserves its rights to amend Schedules D and E/F if and as it receive such invoices.

    f.    **Schedule G - Executory Contracts and Unexpired Leases**.  While reasonable efforts have been made to ensure the accuracy of Schedule G, inadvertent errors or omissions may have occurred.

Listing a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease or that such contract or agreement was in effect on the Petition Date or is valid or enforceable.  The Debtor hereby reserves all of its rights to dispute the validity, status, or enforceability of any contracts, agreements, or leases set forth in Schedule G and to amend or supplement such Schedule as necessary.  Certain of the leases and contracts listed on Schedule G may contain renewal options, guarantees of payment, indemnifications, options to purchase, rights of first refusal and other miscellaneous rights.  Such rights, powers, duties and obligations are not set forth separately on Schedule G.  In addition, the Debtor may have entered into various other types of agreements in the ordinary course of its business, such as supplemental agreements, amendments, and letter agreement, which documents may not be set forth in Schedule G.

Certain of the agreements listed on Schedule G may have expired or terminated pursuant to their terms, but are listed on Schedule G in an abundance of caution.

The Debtor reserves all rights to dispute or challenge the characterization of any transaction or any document or instrument related to a creditor's claim.

In some cases, the same supplier or provider may appear multiple times in Schedule G.  Multiple listings, if any, reflect distinct agreements between the Debtor and such supplier or provider.

The listing of any contract on Schedule G does not constitute an admission by the Debtor as to the validity of any such contract.  The Debtor reserves the right to dispute the effectiveness of any such contract listed on Schedule G or to amend Schedule G at any time to remove any contract.

Omission of a contract or agreement from Schedule G does not constitute an admission that such omitted contract or agreement is not an executory contract or

DOCS_DE:226892.2 36027/002

**Appx. 01473**

unexpired lease.  The Debtor's rights under the Bankruptcy Code with respect to any such omitted contracts or agreements are not impaired by the omission.

DOCS_DE:226892.2 36027/002

Appx. 01474

# EXHIBIT 88

Appx. 01475

Docket #0405 Date Filed: 01/27/2020

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

In re:                                          Chapter 11

**HIGHLAND CAPITAL MANGEMENT, LP**              Case No. 19-12239-CSS

                        Debtors.

                                                Reporting Period:          10/31/2019

**MONTHLY OPERATING REPORT**
File with Court and submit copy to United States Trustee within 20 days after end of month.

| Required Documents | Form No. | Document Attached | Explanation Attached | Affidavit/ Supplement Attached |
|---|---|---|---|---|
| Schedule of Cash Receipts and Disbursements | MOR-1 | x | | |
| Attestation of Bank Reconciliation by the CRO | MOR-1a | x | | |
| Schedule of Professional Fees and Expenses Paid | | n/a | | |
| Cash Disbursements Journals | MOR-1b | | | |
| Statement of Operations | MOR-2 | x | | |
| Balance Sheet | MOR-3 | x | | |
| Status of Postpetition Taxes | | | | |
| Copies of IRS Form 6123 or Payment Receipt | MOR-4a | x | | |
| Copies of Tax Returns Filed During Reporting Period | | n/a | | |
| Summary of Unpaid Postpetition Debts | | | | |
| Listing of Aged Accounts Payable | MOR-4b | x | | |
| Accounts Receivable Reconciliation and Aging | MOR-5a | x | | |
| Debtor Questionnaire | MOR-5b | x | | |
| Budget | MOR-6 | | | |

I declare under penalty of perjury (28 U.S.C. Section 1746) that this report and the attached documents are true and correct to the best of my knowledge and belief.

_____          _____
Signature of Debtor                               Date


_____          _____
Signature of Joint Debtor                         Date


_____          _/2-2-/9_____
Signature of Authorized Individual                Date

Bradley Sharp                                     Chief Restructuring Officer
Printed Name of Authorized Individual             Title of Authorized Individual


/s/ Frank Waterhouse                              12-2-19
_____          _____
Signature of Authorized Individual

Frank Waterhouse                                  Chief Financial Officer
_____          _____
Printed Name of Authorized Individual             Title of Authorized Individual



Exhibit 20

1934054200127000000000007

**Appx. 01476**

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**Cash Disbursements and Receipts from 10/16/2019 - 10/31/2019**
*(in thousands)*

| Week beginning | Compass Operating x6542 | Jefferies x0932 | Nexbank CD x5891 | Nexbank Insurance x7513 | Nexbank Operating x4138 | Maxim Group x1885 | Nexbank Operating x6735 | Total |
|---|---|---|---|---|---|---|---|---|
| Beginning cash | $ 2,126 | - | $ 135 | $ 291 | $ - | $ - | $ 1 | $ 2,554 |
| **Operating Receipts** | | | | | | | | |
| Other | 4 | - | - | 3 | - | - | - | 7 |
| Management fees and other related receipts | 62 | - | - | - | - | - | - | 62 |
| **Compensation and benefits** | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb | (526) | - | - | (212) | - | - | - | (738) |
| Severance payments | - | - | - | - | - | - | - | - |
| Total compensation and benefits | (526) | - | - | (212) | - | - | - | (738) |
| **General overhead** | | | | | | | | |
| General overhead - critical vendors (pre-petition) | (2) | - | - | - | - | - | - | (2) |
| General overhead - post-petition vendors | (35) | - | - | - | - | - | - | (35) |
| Singapore service fees | (35) | - | - | - | - | - | - | (35) |
| Total general overhead | (72) | - | - | - | - | - | - | (72) |
| **Investing cash flows (principal only on notes)** | | | | | | | | |
| Third party fund actual/expected distributions | 79 | - | - | - | - | - | - | 79 |
| Divs, paydowns, misc from investment assets | - | 410 | - | - | - | - | - | 410 |
| Ending cash | 1,673 | 410 | 135 | 82 | - | - | 1 | 2,302 |

Appx. 01477

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**Attestation of Bank Reconciliation by the CRO**

| Entity | Case No. | Bank | Account Type | Account # (last 4 digits) | Ending Bank Balance |
|--------|----------|------|--------------|---------------------------|---------------------|
| Highland Capital Management, LP | 19-12239-CSS | BBVA Compass | Operating | x6342 | 1,672,176.25 |
| Highland Capital Management, LP | 19-12239-CSS | Nexbank | Operating | x4130 | 250.70 |
| Highland Capital Management, LP | 19-12239-CSS | Nexbank | Insurance | x7513 | 82,272.52 |
| Highland Capital Management, LP | 19-12239-CSS | Jefferies LLC | Brokerage | x0932 | 410,107.71 |
| Highland Capital Management, LP | 19-12239-CSS | Maxim Group | Brokerage | x1885 | 163.61 |
| Highland Capital Management, LP | 19-12239-CSS | Nexbank | CD | x5891 | 135,205.21 |
| Highland Capital Management, LP | 19-12239-CSS | Nexbank | Operating | x668 | - |
| Highland Capital Management, LP | 19-12239-CSS | Nexbank | Operating | x0735 | 1,453.59 |
| | | | | **Total:** | **2,301,630** |

No bank statements are being provided with this report. I attest that the bank statements for the above-listed accounts have been reconciled to the Debtor's books and records.

Following month end, The Debtor opened three bank accounts at East West Bank. On November 21, 2019, the Debtor closed accounts ending in x735, x668 x130 and x513.

---
Signature of Authorized Individual

Frank Waterhouse
Printed Name of Authorized Individual

Signature of Authorized Individual

Bradley Sharp
Printed Name of Authorized Individual

---
Date

Chief Financial Officer
Title of Authorized Individual

12-2-19
Date

Chief Restructuring Officer
Title of Authorized Individual

**Appx. 01478**

In re: Highland Capital Management, L.P.

Case No. 19-12339-CSS
Reporting Period: 10/16/2019 - 10/31/2019

### RECEIPTS LISTING

| Date | Amount | Sender | Bank |
|------|--------|--------|------|
| 10/16/2019 | 2,777.24 | Discovery Benefits | x6342 |
| 10/16/2019 | 592.81 | Discovery Benefits | x6342 |
| 10/21/2019 | 46.00 | Co-op | x4130 |
| 10/22/2019 | 79,266.46 | Third party fund distribution | x6342 |
| 10/22/2019 | 93.83 | Paylocity | x6342 |
| 10/24/2019 | 14,128.70 | Fund Reimbursement | x6342 |
| 10/25/2019 | 438.00 | Discovery Benefits | x6342 |
| 10/28/2019 | 15,000.00 | Shared Services | x6342 |
| 10/31/2019 | 17,763.15 | Fund Reimbursement | x6342 |
| 10/31/2019 | 14,533.49 | Fund Reimbursement | x6342 |
| 10/31/2019 | 13.88 | Interest | x4130 |
| 10/30/2019 | 592.82 | Insurance Premiums | x7513 |
| 10/31/2019 | 2,371.27 | Insurance Premiums | x7513 |
| 10/31/2019 | 0.19 | Interest | x0735 |
| 10/25/2019 | 369,973.45 | Investment receipts | x0932 |
| 10/28/2019 | 12,766.83 | Investment receipts | x0932 |
| 10/28/2019 | 27,367.43 | Investment receipts | x0932 |
| 10/31/2019 | 67.44 | Dividend | x1885 |
| | 557,792.99 | | |

### DISBURSEMENT LISTING

| Date | Amount | Vendor | Bank |
|------|--------|--------|------|
| 10/16/2019 | 2,047.22 | Zayo | x6342 |
| 10/16/2019 | 836.22 | Discovery Benefits | x6342 |
| 10/16/2019 | 52.79 | Discovery Benefits | x6342 |
| 10/16/2019 | 20.00 | Discovery Benefits | x6342 |
| 10/22/2019 | 11,813.33 | Singapore Service Fee Funding | x6342 |
| 10/22/2019 | 12,600.88 | Singapore Service Fee Funding | x6342 |
| 10/22/2019 | 40.00 | Discovery Benefits | x6342, |
| 10/22/2019 | 20.00 | Discovery Benefits | x6342 |
| 10/23/2019 | 10,335.00 | Delta Risk | x6342 |
| 10/23/2019 | 4,944.58 | Discovery Benefits | x6342 |
| 10/23/2019 | 550.60 | Discovery Benefits | x6342 |
| 10/23/2019 | 25.00 | Discovery Benefits | x6342 |
| 10/23/2019 | 15.00 | Discovery Benefits | x6342 |
| 10/24/2019 | 9.73 | Discovery Benefits | x6342 |
| 10/25/2019 | 75.00 | Discovery Benefits | x6342 |
| 10/25/2019 | 215.00 | Discovery Benefits | x6342 |
| 10/25/2019 | 305.46 | Discovery Benefits | x6342 |
| 10/25/2019 | 1,303.80 | Discovery Benefits | x6342 |
| 10/28/2019 | (26.00) | Discovery Benefits | x6342 |
| 10/28/2019 | 20.00 | Discovery Benefits | x6342 |
| 10/28/2019 | 1,350.04 | Discovery Benefits | x6342 |
| 10/28/2019 | 20.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 245.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 5.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 370.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 5.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 9,770.39 | CDW | x6342 |
| 10/29/2019 | 1,876.88 | Third Party Consultant | x6342 |
| 10/30/2019 | 518.51 | Discovery Benefits | x6342 |
| 10/31/2019 | 11,000.00 | Third Party Consultant | x6342 |
| 10/31/2019 | 100.00 | Discovery Benefits | x6342 |
| 10/29/2019 | 1,475.38 | Third Party Consultant | x6342 |
| 10/31/2019 | 1,667.78 | Third Party Consultant | x6342 |
| 10/31/2019 | 10,219.19 | Singapore Service Fee Funding | x6342 |
| 10/30/2019 | 50,233.99 | Paylocity | x6342 |
| 10/30/2019 | 311,831.36 | Paylocity | x6342 |
| 10/31/2019 | 1,974.64 | Paylocity | x6342 |
| 10/30/2019 | 110,396.48 | Paylocity | x6342 |
| 10/29/2019 | 771.24 | Standard Insurance | x6342 |
| 10/29/2019 | 4,459.96 | Standard Insurance | x6342 |
| 10/30/2019 | 33,670.47 | Charles Schwab | x6342 |
| 10/30/2019 | 1,227.80 | Paylocity | x6342 |
| 10/21/2019 | 59,268.63 | Blue Cross Blue Shield of Texas | x7513 |
| 10/25/2019 | 152,732.21 | Blue Cross Blue Shield of Texas | x7513 |
| | 810,393.55 | | |

* Payments to Discovery Benefits are for employee Flexible Spending Account (FSA) reimbursement

**Appx. 01479**

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

Income Statement [1]

(in thousands)

| | Date<br>10/16/19 - 10/31/19 |
|---|---|
| **Revenue:** | |
| Management fees | 975 |
| Shared services fees | 283 |
| Other income | 99 |
| **Total operating revenue** | **1,357** |
| **Operating expenses:** | |
| Compensation and Benefits | 997 |
| Professional services | 256 |
| Investment research and consulting | 10 |
| Depreciation expense [3] | 82 |
| Other operating expenses | 201 |
| **Total operating expenses** | **1,545** |
| **Operating income/(loss)** | **(188)** |
| **Other income/expense:** | |
| Interest income | 250 |
| Interest expense | (107) |
| Re-org related expenses [2] | - |
| Other income/expense | 32 |
| **Total other income/expense** | **175** |
| Net realized gains on investments | 339 |
| Net change in unrealized gains/(losses) of investments [4] | 2,654 |
| | **2,993** |
| **Net earnings/(losses) from equity method investees** [4] | **(20)** |
| **Net income/(loss)** | **$  2,959** |

(1) Note on accruals: expenses recorded in the Income Statement reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.

(2) Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed as of the petition date. No additional amounts were accrued between October 16, 2019 and October 31, 2019.

(3) Includes full month of depreciation as depreciation is run monthly at month end. Estimated pro-rated depreciation October 16, 2019 to October 31, 2019 is $42k.

(4) Mark to market gains/(losses) on investments include normal course pricing updates for publicly traded securities and other positions with readily available market price information. Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**Balance Sheet**
(in thousands)

| | | Date |
|---|---|---|
| | | 10/31/2019 |
| **Assets** | | |
| Cash and cash equivalents | $ | 2,286 |
| Investments, at fair value [3] | | 359,448 |
| Equity method investees [3] | | 37,508 |
| Management and incentive fee receivable | | 3,202 |
| Fixed assets, net | | 3,672 |
| Due from affiliates [1] | | 152,124 |
| Other assets | | 11,261 |
| **Total assets** | $ | 569,501 |
| | | |
| **Liabilities and Partners' Capital** | | |
| Pre-petition accounts payable [4] | $ | 1,135 |
| Post-petition accounts payable [4] | | 102 |
| Secured debt | | 35,510 |
| Accrued expenses and other liabilities [4] | | 59,184 |
| Accrued re-organization related fees [5] | | - |
| Claim accrual [2] | | 73,997 |
| Partners' capital | | 399,573 |
| **Total liabilities and partners' capital** | $ | 569,501 |

[1] Includes various notes receivable at carrying value (fv undetermined).

[2] Uncontested portion of claim less appplicable offsets. Potential for additional liability based on future events.

[3] Mark to market gains/(losses) on investments include normal course pricing updates for publicly traded securities and other positions with readily available market price information. Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.

[5] Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed prior to the petition date. No additional amounts were accrued between October 16, 2019 and October 31, 2019

Appx. 01481

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

| Form 6123<br>(Rev. 06-97) | Department of the Treasury-Internal Revenue Service<br>**Verification of Fiduciary's Federal Tax Deposit** |
|---|---|
| | **Do not attach this Notice to your Return** |
| **TO** | District Director, Internal revenue Service<br>Attn: Chief, Special Procedures Function |
| **FROM:** | Name of Taxpayer   Highland Capital Management, L.P.<br>Taxpayer Address   300 Crescent Ct. Ste. 700, Dallas, TX 75201 |

The following information is to notify you of Federal tax deposit(s)(FTD) as required by the United States Bankruptcy Court (complete sections 1 and/or 2 as appropriate):

| Section 1<br><br>Taxes Reported on Form 941,  Employer's Quarterly Federal Tax Return | **Form 941 Federal Tax Deposit (FTD) Information**<br>For the payroll period from __10/16/2019__  to __10/31/2019__<br>Payroll date __10/31/2019__<br>Gross wages paid to employees $ 557,425.72<br>Income tax withheld $ 105,313.71<br>Social Security (Employer's plus Employee's share of Social Security Tax) $ __36,603.10__<br>Tax Deposited  $ 141,916.84<br>Date Deposited   10/31/2019 |
|---|---|
| Section 2<br><br>Taxes Reported on Form 940, Employer's Annual Federal Unemployment Tax Return | **Form 940 Federal Tax Deposit (FTD) Information**<br>For the payroll period from __10/16/2019__ to __10/31/2019__<br>Gross wages paid to employees  $ 557,425.72<br>Tax Deposited  $ __574.93__<br>Date Deposited   10/31/2019 |

**Certification**

**(Certification is limited to receipt or electronic transmittal of deposit only)**

This certifies receipt or electronic transmittal of deposits described below for Federal taxes as defined in Circular E, Employer's Tax Guide (Publication 15)

| Deposit Method<br>(check box) | 9 Form 8109/8109B Federal Tax Deposit (FTD) coupon<br>X 9 Electronic Federal Tax Payment System (EFTPS) Deposit | |
|---|---|---|
| Amount (Form 941<br>141,916.84 | Date of Deposit<br>10/31/2019 | EFTPS acknowledgment number or Form 8109 FTD received by:<br>EFT_COMM01_1034607 |
| Amount (Form 940<br>574.93 | Date of Deposit<br>10/31/2019 | EFTPS acknowledgment number or Form 8109 FTD received by:<br>EFT_COMM01_1051577-1-2944938 |
| Depositor's Employer<br>Identification Number:  75-2716725 | Name and Address of Bank<br>Compass Bank | |
| Under penalties of perjury, I certify that the above federal tax deposit information is true and correct | | |
| Signed: | Date: | |
| Name and Title (print or type) | | |

<div align="center">Cat. #43099Z                    Form 6123 (rev. 06-97)</div>

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**Post-Petition Accounts Payable Aging as of 10/31/2019**

|  | 0-30 days | 31 - 60 days old | 61 - 90 days old | 91 + days old | Grand Total |
|---|---|---|---|---|---|
| Remaining Amount | $ 102,132 | $ - | $ - | $ - | $ 102,132 |

Appx. 01483

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

**Accounts Receivable Reconciliation**

| | 0 - 30 days old [1] | 31 - 60 days old | 61 - 90 days old | 91 + days old net of uncollectable balances [2] | Accounts Receivable (Net) |
|---|---|---|---|---|---|
| Management Fees | $ 3,201,548 | $ - | $ - | $ - | $ 3,201,548 |
| Shared Services Fees [3] | 516,469 | | | | 516,469 |
| Expense Reimbursements [3] | 537,514 | 84,081 | 155,514 | 3,440,751 | 4,217,859 |
| **Total Receivable** | **$ 4,255,531** | **$ 84,081** | **$ 155,514** | **$ 3,440,751** | **$ 7,935,877** |

[1] All management fees and shared services fees are considered to be 0-30 days old as all such receivables are paid current per their investment management contracts.

[2] Receivables shown above are net of certain potentially uncollectible amounts. The net balances also do not include amounts that have been reserved against in prior years relating to management fees, shared services, and fund reimbursements, including but not limited to amounts paid on other entities' behalf with respect to legal related expenses as well as receivable escrowed distributions from fund holdings.

[3] Accounts Receivable from Shared Services Fees and Expense Reimbursements is included in the Other Assets line item on the Balance Sheet (see MOR-3).

Appx. 01484

In re: Highland Capital Management, L.P.

Case No. 19-12239-CSS
Reporting Period: 10/16/2019 - 10/31/2019

### DEBTOR QUESTIONNAIRE

| Must be completed each month | | Yes | No |
|---|---|---|---|
| 1 | Have any assets been sold or transferred outside the normal course of business this reporting period?  If yes, provide an explanation below. | | x |
| 2 | Have any funds been disbursed from any account other than a debtor in possession account this reporting period?  If yes, provide an explanation below. $598,419 of funds transferred from non-debtor in possession accounts, while those accounts were in process of being opened.  These debtor in possession accounts were opened following month end and are being used for operating activities as of the date of this submission. | x | |
| 3 | Have all postpetition tax returns been timely filed?  If no, provide an explanation below. | x | |
| 4 | Are workers compensation, general liability and other necessary insurance coverages in effect?  If no, provide an explanation below. | x | |
| 5 | Has any bank account been opened during the reporting period?  If yes, provide documentation identifying the opened account(s).  If an investment account has been opened provide the required documentation pursuant to the Delaware Local Rule 4001-3. Following month end, The Debtor opened three bank accounts at East West Bank. On November 21, 2019, the Debtor closed accounts ending in x735, x668 x130 and x513. | | x |

Appx. 01485

**Next 13 Weeks Commencing October 16, 2019**
*(in thousands)*

| | Actual[1] | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week beginning** | **10/16** | **10/21** | **10/28** | **11/4** | **11/11** | **11/18** | **11/25** | **12/2** | **12/9** | **12/16** | **12/23** | **12/30** | **1/6** | **13 Weeks** |
| **Beginning unrestricted operating cash** | 2,126 | 2,126 | 2,178 | 2,775 | 4,182 | 2,815 | 2,317 | 1,030 | 2,841 | 1,069 | 1,693 | 476 | 709 | 2,126 |
| Management fees | - | - | 1,600 | 1,028 | - | 1,849 | 27 | 672 | - | - | - | - | - | 5,176 |
| Shared services receipts | - | - | 105 | 633 | - | - | - | 815 | - | - | - | - | 633 | 2,186 |
| Fund reimbursements | - | 14 | - | 306 | - | - | - | - | - | - | - | - | - | 320 |
| Interest receipts on notes receivable | - | - | - | - | - | - | - | - | - | - | - | 1,155 | - | 1,155 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Management fees and other related receipts | - | 14 | 1,705 | 1,967 | - | 1,849 | 27 | 1,487 | - | - | - | 1,155 | 633 | 8,836 |
| **Compensation and benefits** | | | | | | | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb[2] | - | (7) | (663) | - | (633) | - | (633) | - | (631) | - | - | (631) | - | (3,198) |
| **Total compensation and benefits** | - | (7) | (663) | - | (633) | - | (633) | - | (631) | - | - | (631) | - | (3,198) |
| **General overhead** | | | | | | | | | | | | | | |
| Outside legal (ordinary course) | - | - | - | (75) | - | - | (75) | - | - | - | (75) | - | - | (225) |
| General overhead - critical vendors (pre-petition) | - | - | (5) | (25) | (25) | (25) | (25) | (20) | (20) | (20) | (20) | (20) | (25) | (230) |
| General overhead - post petition vendors | - | (16) | (428) | (359) | (209) | (209) | (209) | (250) | (250) | (250) | (250) | (250) | (234) | (2,913) |
| Sygnature service fees | - | (24) | (11) | - | - | (35) | - | - | - | (35) | - | - | - | (106) |
| **Total general overhead** | - | (34) | (444) | (459) | (234) | (270) | (309) | (270) | (270) | (306) | (345) | (270) | (259) | (3,473) |
| **Net change in cash due to operating activity** | - | (27) | 597 | 1,928 | (868) | 1,579 | (916) | 1,217 | (901) | (306) | (345) | 254 | 374 | 2,165 |
| **Re-org related[3] - payments to professional fee reserve acct** | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | - | - | - | (1,615) | (269) | (269) | (269) | (269) | (269) | (269) | (269) | (3,500) |
| Debtor FA CRO | - | - | - | - | - | (300) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (650) |
| Compensation consultant | - | - | - | - | - | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (128) |
| Committee counsel | - | - | - | - | - | (73) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (200) |
| Committee FA | - | - | - | - | - | (73) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (200) |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | (250) | - | (250) |
| **Total re-org related** | - | - | - | - | - | (2,077) | (372) | (372) | (372) | (372) | (372) | (622) | (372) | (4,928) |
| **Net change in cash from ops + reorg costs** | - | (27) | 597 | 1,928 | (868) | (498) | (1,287) | 845 | (1,273) | (677) | (717) | (368) | 2 | (2,763) |
| **Investing cash flows (principal only on notes)** | | | | | | | | | | | | | | |
| Select Equity Fund equity redemptions | - | - | - | - | - | 1,250 | - | 1,067 | - | 1,301 | - | - | - | 3,618 |
| Third party fund capital call obligations | - | - | - | - | - | (1,650) | - | - | - | - | - | - | - | (1,650) |
| Third party fund actual/expected distributions | - | 79 | - | - | - | 400 | - | - | - | - | - | - | - | 479 |
| Multi Strategy Credit Fund | - | - | - | - | (500) | - | - | - | (500) | - | (500) | - | (500) | (2,000) |
| Highland Capital Management Latin America | - | - | - | (100) | - | - | - | (100) | - | - | - | (150) | - | (350) |
| Proceeds from outstanding notes | - | - | - | - | - | - | - | - | - | - | - | 701 | - | 701 |
| Proceeds from other investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to investing activities** | - | 79 | - | (100) | (499) | - | - | 967 | (500) | 1,301 | (500) | 601 | (500) | 848 |
| **Ending unrestricted operating cash** | 2,126 | 2,178 | 2,775 | 4,182 | 2,815 | 2,317 | 1,030 | 2,841 | 1,069 | 1,693 | 476 | 709 | 211 | 211 |
| **Professional fees escrow account[3]** | | | | | | | | | | | | | | |
| Re-org related professional fees escrow beginning balance | - | - | - | - | - | - | 2,077 | 2,449 | 2,820 | 3,192 | 1,528 | 1,900 | 2,271 | - |
| Inflows from operating account | - | - | - | - | - | 2,077 | 372 | 372 | 372 | 372 | 372 | 622 | 372 | 4,928 |
| Payments to professionals: | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | - | - | - | - | - | - | - | (1,508) | - | - | - | (1,508) |
| Debtor FA/CRO | - | - | - | - | - | - | - | - | - | (350) | - | - | - | (350) |
| Compensation consultant | - | - | - | - | - | - | - | - | - | (32) | - | - | - | (32) |
| Committee counsel | - | - | - | - | - | - | - | - | - | (73) | - | - | - | (73) |
| Committee FA | - | - | - | - | - | - | - | - | - | (73) | - | - | - | (73) |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | (250) | - | (250) |
| Total outflows to professionals | - | - | - | - | - | - | - | - | - | (2,035) | - | (250) | - | (2,285) |
| Re-org related professional fees escrow ending balance | - | - | - | - | - | 2,077 | 2,449 | 2,820 | 3,192 | 1,528 | 1,900 | 2,271 | 2,643 | 2,643 |

*(1) Beginning unrestricted operating cash represents the bank cash balance of the Debtor's operating account as of the Petition Date.*
*(2) Benefits activity includes monthly health insurance premiums sent from the operating account to the insurance account. Within the insurance account monthly premiums are received and are used to pay claims and administrative expenses of the self-insured plan.*
*(3) Forecast assumes that amounts are funded from the operating account to the professional fees escrow account weekly; then the professional fees escrow account is used to pay re-org related vendors 80% of escrowed fees beginning in December 2019, except for the Debtor FA/CRO, which is paid 100%.*

# EXHIBIT 89

Appx. 01487

Docket #0289  Date Filed: 12/31/2019

**Monthly Operating Report**
ACCRUAL BASIS

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |
| JUDGE: | Stacey Jernigan |

## UNITED STATES BANKRUPTCY COURT

## NORTHERN & EASTERN DISTRICTS OF TEXAS

## REGION 6

## MONTHLY OPERATING REPORT

MONTH ENDING: _____November_____ _____2019_____
                        MONTH              YEAR

IN ACCORDANCE WITH TITLE 28, SECTION 1746, OF THE UNITED STATES CODE, I DECLARE UNDER PENALTY OF PERJURY THAT I HAVE EXAMINED THE FOLLOWING MONTHLY OPERATING REPORT (ACCRUAL BASIS-1 THROUGH ACCRUAL BASIS-7) AND THE ACCOMPANYING ATTACHMENTS AND, TO THE BEST OF MY KNOWLEDGE, THESE DOCUMENTS ARE TRUE, CORRECT, AND COMPLETE. DECLARATION OF THE PREPARER (OTHER THAN RESPONSIBLE PARTY) IS BASED ON ALL INFORMATION OF WHICH PREPARER HAS ANY KNOWLEDGE.

RESPONSIBLE PARTY:

_____          Chief Restructuring Officer
ORIGINAL SIGNATURE OF RESPONSIBLE PARTY           TITLE

Bradley Sharp                                12-31-19
PRINTED NAME OF RESPONSIBLE PARTY            DATE

PREPARER:

_____          Chief Financial Officer
ORIGINAL SIGNATURE OF PREPARER                    TITLE

Frank Waterhouse                            12.31.19
PRINTED NAME OF PREPARER                     DATE



**Exhibit 21**



1934054191231000000000002

**Appx. 01488**

**Monthly Operating Report**
ACCRUAL BASIS-1

| CASE NAME: | Highland Capital Management, LP |
|---|---|
| CASE NUMBER: | 19-12239-CSS |

**Comparative Balance Sheet**
(in thousands)

| | 10/15/2019 | 10/31/2019 | 11/30/2019 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 2,529 | 2,286 | 6,343 |
| Investments, at fair value[3] | 232,620 | 235,144 | 233,776 |
| Equity method investees[3] | 161,819 | 161,813 | 175,381 |
| Management and incentive fee receivable | 2,579 | 3,202 | 1,223 |
| Fixed assets, net | 3,754 | 3,672 | 3,601 |
| Due from affiliates[1] | 151,901 | 152,124 | 152,523 |
| Other assets | 11,311 | 11,260 | 10,621 |
| **Total assets** | **$ 566,513** | **$ 569,501** | **$ 583,468** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| Pre-petition accounts payable[4] | 1,176 | 1,135 | 1,250 |
| Post-petition accounts payable[4] | - | 102 | 236 |
| Secured debt: | | | |
| Frontier | 5,195 | 5,195 | 5,195 |
| Jefferies | 30,328 | 30,315 | 30,268 |
| Accrued expenses and other liabilities[4] | 59,203 | 59,184 | 60,848 |
| Accrued re-organization related fees[5] | - | - | - |
| Claim accrual[2] | 73,997 | 73,997 | 73,997 |
| Partners' capital | 396,614 | 399,573 | 411,674 |
| **Total liabilities and partners' capita** | **$ 566,513** | **$ 569,501** | **$ 583,468** |

[1] Includes various notes receivable at carrying value (fv undetermined).

[2] Uncontested portion of claim less appplicable offsets. Potential for additional liability based on future events. No interest has been accrued beyond petition date.

[3] Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information.  Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.  For balance sheet dates other than the Petition Date, amounts include both pre-petition and post-petition liabilities.

[5] Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed prior to the petition date.  No additional amounts were accrued between October 16, 2019 and November 30, 2019

**Monthly Operating Report**
**ACCRUAL BASIS-2**

| CASE NAME: | Highland Capital Management, LP |
|---|---|
| CASE NUMBER: | 19-12239-CSS |

## Income Statement [1]

(in thousands)

| | Date | Month ended | Filing to Date |
|---|---|---|---|
| | 10/16/19 - 10/31/19 | 11/30/2019 | |
| **Revenue:** | | | |
| Management fees | 975 | 1,638 | 2,613 |
| Shared services fees | 283 | 709 | 992 |
| Other income | 99 | 418 | 517 |
| **Total operating revenue** | **1,357** | **2,765** | **4,122** |
| **Operating expenses:** | | | |
| Compensation and Benefits | 997 | 1,936 | 2,932 |
| Professional services | 256 | 90 | 346 |
| Investment research and consulting | 10 | 34 | 44 |
| Marketing and advertising expense | - | 35 | 35 |
| Depreciation expense | 82 | 82 | 164 |
| Other operating expenses | 201 | 480 | 681 |
| **Total operating expenses** | **1,545** | **2,657** | **4,202** |
| **Operating income/(loss)** | **(188)** | **108** | **(80)** |
| **Other income/expense:** | | | |
| Interest income | 250 | 484 | 735 |
| Interest expense | (107) | (103) | (211) |
| Re-org related expenses [2] | - | - | - |
| Other income/expense | 32 | - | 32 |
| **Total other income/expense** | **175** | **381** | **555** |
| Net realized gains/(losses) on investments | 339 | 279 | 618 |
| Net change in unrealized gains/(losses) of investment [3] | 2,654 | (2,004) | 650 |
| | **2,993** | **(1,725)** | **1,268** |
| **Net earnings/(losses) from equity method investees [3]** | **(20)** | **13,468** | **13,448** |
| **Net income/(loss)** | **$ 2,959** | **$ 12,232** | **$ 15,192** |

(1) Note on accruals: expenses recorded in the Income Statement reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.

(2) Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed as of the petition date.  No additional amounts were accrued between October 16, 2019 and November 30, 2019

(3) Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information.  Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

**Monthly Operating Report**
**ACCRUAL BASIS-3A**

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

| CASH RECEIPTS AND DISBURSEMENTS | | OCTOBER | NOVEMBER | DECEMBER | QUARTER |
|---|---|---|---|---|---|
| 1. | CASH - BEGINNING OF MONTH [2] | $2,554,230 | $2,286,160 | | $2,554,230 |
| **RECEIPTS FROM OPERATIONS** | | | | | |
| 2. | OTHER OPERATING RECEIPTS | $6,911.97 | $972,733 | | $979,644 |
| 3 | MANAGEMENT FEES AND OTHER RELATED RECEIPTS | $15,000.00 | $1,764,749 | | $1,779,749 |
| **COLLECTION OF ACCOUNTS RECEIVABLE** | | | | | |
| 4 | PREPETITION | $46,425 | $2,962,108 | | $3,008,534 |
| 5 | POSTPETITION [1] | - | - | | - |
| 6 | TOTAL OPERATING RECEIPTS | $68,337 | $5,699,590 | | $5,767,928 |
| **NON-OPERATING RECEIPTS** | | | | | |
| 7 | THIRD PARTY FUND ACTUAL/EXPECTED DISTRIBUTIONS | $79,266 | $320,836 | | $400,103 |
| 8 | DIVS, PAYDOWNS, MISC FROM INVESTMENT ASSETS | $410,189 | $501,983 | | $912,172 |
| 9 | OTHER (ATTACH LIST) | | | | $0 |
| 10 | TOTAL NON-OPERATING RECEIPTS | $489,456 | $822,820 | | $1,312,275 |
| 11 | TOTAL RECEIPTS | $557,793 | $6,522,410 | | $7,080,203 |
| 12 | TOTAL CASH AVAILABLE | $3,112,023 | $8,808,570 | | |
| **OPERATING DISBURSEMENTS** | | | | | |
| 13 | PAYROLL, BENEFITS, AND TAXES + EXP REIMB | $737,588 | $961,282 | | $1,698,869 |
| 14 | SINGAPORE SERVICE FEES | $34,633 | $32,555 | | $67,189 |
| 15 | HCM LATIN AMERICA | | $100,000 | | $100,000 |
| 16 | THIRD PARTY FUND CAPITAL CALL OBLIGATION | | $967,555 | | $967,555 |
| 17 | UTILITIES | | | | $0 |
| 18 | INSURANCE | | | | $0 |
| 19 | INVENTORY PURCHASES | | | | $0 |
| 20 | VEHICLE EXPENSES | | | | $0 |
| 21 | TRAVEL | | | | $0 |
| 22 | ENTERTAINMENT | | | | $0 |
| 23 | REPAIRS & MAINTENANCE | | | | $0 |
| 24 | SUPPLIES | | | | $0 |
| 25 | ADVERTISING | | | | $0 |
| 26 | OTHER (ATTACH LIST) | $53,642 | $404,581 | | $458,223 |
| 27 | TOTAL OPERATING DISBURSEMENTS | $825,863 | $2,465,973 | | $3,291,836 |
| **REORGANIZATION EXPENSES** | | | | | |
| 28 | PROFESSIONAL FEES | | | | $0 |
| 29 | U.S. TRUSTEE FEES | | | | $0 |
| 30 | OTHER (ATTACH LIST) | | | | $0 |
| 31 | TOTAL REORGANIZATION EXPENSES | $0 | $0 | | $0 |
| 32 | TOTAL DISBURSEMENTS | $825,863 | $2,465,973 | | $3,291,836 |
| 33 | NET CASH FLOW | ($268,070) | $4,056,437 | | $3,788,367 |
| 34 | CASH - END OF MONTH | $2,286,160 | $6,342,598 | | $6,342,598 |

1 All postpetition receipts are included in line 3, Management Fees and Other Related Receipts.
2 Beginning cash in October represents the bank balance as of the filing date, while the cash amount shown on the balance sheet includes any outstanding checks.

**Monthly Operating Report**
ACCRUAL BASIS-3B

| CASE NAME: | Highland Capital Management |
| --- | --- |
| CASE NUMBER: | 19-34054 |

**OPERATING DISBURSMENTS - OTHER**

| Date | Amount | Vendor |
| --- | --- | --- |
| 11/1/2019 | $  155,983 | Crescent TC Invest |
| 11/1/2019 | 26,667 | Third Party Consultant |
| 11/1/2019 | 13,636 | Third Party Consultant |
| 11/8/2019 | 33,007 | Platinum Parking |
| 11/8/2019 | 1,053 | Gold's Gym International |
| 11/12/2019 | 1,525 | MicroTel |
| 11/15/2019 | 1,951 | Compass Bank Operating |
| 11/18/2019 | 2,047 | Zayo |
| 11/20/2019 | 2,894 | Third Party Consultant |
| 11/25/2019 | 24,232 | Coleman Research Group, Inc. |
| 11/26/2019 | 3,092 | Canteen Vending |
| 11/26/2019 | 925 | UPS Small Package |
| 11/26/2019 | 671 | SolarWinds |
| 11/26/2019 | 7,995 | Intralinks Inc |
| 11/26/2019 | 56,522 | Houlihan Lokey Financial Advisors |
| 11/26/2019 | 9,259 | Willis of Texas, Inc. |
| 11/26/2019 | 8,846 | GrubHub for Work |
| 11/29/2019 | 31,894 | Third Party Consultant |
| 11/29/2019 | 11,000 | Third Party Consultant |
| 11/29/2019 | 11,382 | Verity Group |
| | $   404,581 | |

-

**Monthly Operating Report**
**ACCRUAL BASIS-4**

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

| MGMT FEE RECEIVABLE AGING [2] | SCHEDULE AMOUNT | October | November | December |
|---|---|---|---|---|
| 1.  0-30 | $  2,578,744 | $  3,201,548 | $  1,222,880 | |
| 2.  31-60 | | $0 | | |
| 3.  61-90 | | $0 | | |
| 4.  91+ | | - | | |
| 5.  TOTAL MGMT FEE RECEIVABLE | $  2,578,744 | $  3,201,548 | $  1,222,880 | $0 |
| 6.  AMOUNT CONSIDERED UNCOLLECTIBLE | | | | |
| 7.  MGMT FEE RECEIVABLE (NET) | $  2,578,744 | $  3,201,548 | $  1,222,880 | $0 |

| AGING OF POSTPETITION TAXES AND PAYABLES | | MONTH: | November 2019 | |
|---|---|---|---|---|
| TAXES PAYABLE | 0-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91+ DAYS | TOTAL |
| 1.  FEDERAL | | | | | $0 |
| 2.  STATE | | | | | $0 |
| 3.  LOCAL | | | | | $0 |
| 4.  OTHER (ATTACH LIST) | | | | | $0 |
| 5.  TOTAL TAXES PAYABLE | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| 6.  ACCOUNTS PAYABLE | $215,777 | $20,059 | | | $235,836 |

| STATUS OF POSTPETITION TAXES [1] | | MONTH: | November 2019 | |
|---|---|---|---|---|
| FEDERAL | BEGINNING TAX LIABILITY | AMOUNT WITHHELD AND/ 0R ACCRUED | AMOUNT PAID | ENDING TAX LIABILITY |
| 1.  WITHHOLDING | | | | $0 |
| 2.  FICA-EMPLOYEE | | | | $0 |
| 3.  FICA-EMPLOYER | | | | $0 |
| 4.  UNEMPLOYMENT | | | | $0 |
| 5.  INCOME | | | | $0 |
| 6.  OTHER (ATTACH LIST) | | | | $0 |
| 7.  TOTAL FEDERAL TAXES | $0 | $0 | $0 | $0 |
| STATE AND LOCAL | | | | |
| 8.  WITHHOLDING | | | | $0 |
| 9.  SALES | | | | $0 |
| 10.  EXCISE | | | | $0 |
| 11.  UNEMPLOYMENT | | | | $0 |
| 12.  REAL PROPERTY | $  16,472 | $0 | $0 | $16,472 |
| 13.  PERSONAL PROPERTY | | | | $0 |
| 14.  OTHER (ATTACH LIST) | | | | $0 |
| 15.  TOTAL STATE & LOCAL | $16,472 | $0 | $0 | $16,472 |
| 16.  TOTAL TAXES | $16,472 | $0 | $0 | $16,472 |

1   The Debtor funds all state and federal employment taxes to Paylocity, who files all required federal and state related employment reports and withholdings.
2   Aging based on when management fee is due and payable.

**Monthly Operating Report**
ACCRUAL BASIS-5

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

MONTH: November    2019

**BANK RECONCILIATIONS**

| | | Account #1 | Account #2 | Account #3 | Account #4 | Account #5 | Account #6 | |
|---|---|---|---|---|---|---|---|---|
| A. | BANK: | BBVA Compass | East West Bank | East West Bank | Maxim Group | Jefferies LLC | Nexbank | |
| B. | ACCOUNT NUMBER: | x6342 | x4686 | x4693 | x1885 | x0932 | x5891 | TOTAL |
| C. | PURPOSE (TYPE): | Operating | Operating | Insurance | Brokerage | Brokerage | CD | |
| 1. | BALANCE PER BANK STATEMENT [1] | $229,247 | $5,477,826 | $105,067 | $164 | $410,108 | $135,205 | $6,357,616 |
| 2. | ADD: TOTAL DEPOSITS NOT CREDITED | | | | | | | $0 |
| 3. | SUBTRACT: OUTSTANDING CHECKS | $15,019 | | | | | | $15,019 |
| 4. | OTHER RECONCILING ITEMS | | | | | | | $0 |
| 5. | MONTH END BALANCE PER BOOKS | $214,228 | $5,477,826 | $105,067 | $164 | $410,108 | $135,205 | $6,342,598 |
| 6. | NUMBER OF LAST CHECK WRITTEN | 18133 | 100001 | n/a | n/a | n/a | n/a | |

**INVESTMENT ACCOUNTS**

| | BANK, ACCOUNT NAME & NUMBER | DATE OF PURCHASE | TYPE OF INSTRUMENT | PURCHASE PRICE | | | | CURRENT VALUE |
|---|---|---|---|---|---|---|---|---|
| 7. | | | | | | | | |
| 8. | | | | | | | | |
| 9. | | | | | | | | |
| 10. | | | | | | | | |
| 11. | TOTAL INVESTMENTS | | | $0 | | | | $0 |

**CASH**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12. | CURRENCY ON HAND | | | | | | | $0 |

| 13. | TOTAL CASH - END OF MONTH | | | | | | | $6,342,598 |

1    For Compass account x6342, funds transferred in December such that only sufficient cash to cover outstanding checks remains

**Appx. 01494**

**Monthly Operating Report**
ACCRUAL BASIS-6

| CASE NAME: | Highland Capital Management |
| CASE NUMBER: | 19-34054 |

MONTH:    November 2019

**PAYMENTS TO INSIDERS AND PROFESSIONALS**

| | INSIDERS | | | |
| --- | --- | --- | --- | --- |
| | NAME | TYPE OF PAYMENT | AMOUNT PAID | TOTAL PAID TO DATE |
| 1 | Frank Waterhouse | Salary | $29,167 | $43,750 |
| 2 | Frank Waterhouse | Expense Reimbursement | $339 | $506 |
| 3 | Scott Ellington | Salary | $37,500 | $56,250 |
| 4 | Scott Ellington | Expense Reimbursement | $84 | $2,010 |
| 5 | James Dondero | Salary | $46,875 | $70,313 |
| 6 | James Dondero | Expense Reimbursement [1] | $11,255 | $15,269 |
| 7 | Thomas Surgent | Salary | $33,333 | $50,000 |
| 8 | Thomas Surgent | Expense Reimbursement | $224 | $248 |
| 9 | Trey Parker | Salary | $29,167 | $43,750 |
| 10 | Trey Parker | Expense Reimbursement | $207 | $425 |
| | TOTAL PAYMENTS TO INSIDERS | | $188,151 | $282,519 |

[1] The total amount of reimbursements also included $83,358 for use of the credit card by the Debtor for office related expenses such as subscriptions, employee lunches, vending supplies, IT equipment/software, employee gifts/awards, training, postage and charitable donations.

| | PROFESSIONALS [2] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | NAME | DATE OF COURT ORDER AUTHORIZING PAYMENT | AMOUNT APPROVED | AMOUNT PAID | TOTAL PAID TO DATE | TOTAL INCURRED & UNPAID |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | TOTAL PAYMENTS TO PROFESSIONALS | | | $0 | $0 | $0 |

[2] Does not include payments to ordinary course professionals.

**POSTPETITION STATUS OF SECURED NOTES, LEASES PAYABLE AND ADEQUATE PROTECTION PAYMENTS**

| | NAME OF CREDITOR | SCHEDULED MONTHLY PAYMENTS DUE | AMOUNTS PAID DURING MONTH | TOTAL UNPAID POSTPETITION |
| --- | --- | --- | --- | --- |
| 1. | Crescent TC Investors LP (rent portion only) | 130,364 | 130,364 | - |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | TOTAL | 130,364 | $130,364 | $0 |

Appx. 01495

<div style="text-align:right">

**Monthly Operating Report**

**ACCRUAL BASIS-7**

</div>

| CASE NAME: | Highland Capital Management |
|---|---|

| CASE NUMBER: | 19-34054 |
|---|---|

**MONTH:**    November 2019

### QUESTIONNAIRE

| | | YES | NO |
|---|---|---|---|
| 1. | HAVE ANY ASSETS BEEN SOLD OR TRANSFERRED OUTSIDE THE NORMAL COURSE OF BUSINESS THIS REPORTING PERIOD? | | x |
| 2. | HAVE ANY FUNDS BEEN DISBURSED FROM ANY ACCOUNT OTHER THAN A DEBTOR IN POSSESSION ACCOUNT? | x | |
| 3. | ARE ANY POSTPETITION RECEIVABLES (ACCOUNTS, NOTES, OR LOANS) DUE FROM RELATED PARTIES? | x | |
| 4. | HAVE ANY PAYMENTS BEEN MADE ON PREPETITION LIABILITIES THIS REPORTING PERIOD? | x | |
| 5. | HAVE ANY POSTPETITION LOANS BEEN RECEIVED BY THE DEBTOR FROM ANY PARTY? | | x |
| 6. | ARE ANY POSTPETITION PAYROLL TAXES PAST DUE? | | x |
| 7. | ARE ANY POSTPETITION STATE OR FEDERAL INCOME TAXES PAST DUE? | | x |
| 8. | ARE ANY POSTPETITION REAL ESTATE TAXES PAST DUE? | | x |
| 9. | ARE ANY OTHER POSTPETITION TAXES PAST DUE? | | x |
| 10. | ARE ANY AMOUNTS OWED TO POSTPETITION CREDITORS DELINQUENT? | | x |
| 11. | HAVE ANY PREPETITION TAXES BEEN PAID DURING THE REPORTING PERIOD? | | x |
| 12. | ARE ANY WAGE PAYMENTS PAST DUE? | | x |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "YES," PROVIDE A DETAILED EXPLANATION OF EACH ITEM. ATTACH ADDITIONAL SHEETS IF NECESSARY.

2    $1,206,592 of funds paid from non-debtor in possession accounts, while those accounts were in the process of being opened.

3    Debtor generates fee income and other receipts from various related parties in normal course, see cash management motion for further discussion.

4    Payments have been made on prepetition liabilities, as approved in the critical vendor motion.

### INSURANCE

| | | YES | NO |
|---|---|---|---|
| 1. | ARE WORKER'S COMPENSATION, GENERAL LIABILITY AND OTHER NECESSARY INSURANCE COVERAGES IN EFFECT? | x | |
| 2. | ARE ALL PREMIUM PAYMENTS PAID CURRENT? | x | |
| 3. | PLEASE ITEMIZE POLICIES BELOW. | | |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "NO," OR IF ANY POLICIES HAVE BEEN CANCELLED OR NOT RENEWED DURING THIS REPORTING PERIOD, PROVIDE AN EXPLANATION BELOW. ATTACH ADDITIONAL SHEETS IF NECESSARY.

| INSTALLMENT PAYMENTS | | | |
|---|---|---|---|
| TYPE OF POLICY | CARRIER | PERIOD COVERED | PAYMENT AMOUNT & FREQUENCY |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT 90

## EXHIBIT C

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

155183.2
DOCS_NY:40478.29 36027/002

**Exhibit 23**

**Appx. 01498**

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

11/13/2020
**Appx. 01499**

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is January 31 ,2021.

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021.

D. All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in the interim interest income and principal payments are collected as they become due.

E. Fixed assets used in daily business operations are sold in February 2021.

F. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:

o By September 30, 2021 - $50,000,000

o By March 31, 2022 – additional $50,000,000

o By June 30, 2022 – additional $25,000,000

o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

11/13/2020

**Appx. 01500**

**Highland Capital Management, L.P.**
**Plan Analysis Vs. Liquidation Analysis**
**(US $000's)**

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 25,076 | $ 25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 – Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

*Footnotes:*

*[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee*
  *Assumes Chapter 7 Trustee engages new professionals to help liquidate assets*
*[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable*
*[3] Estimated expenses through final distribution exclude non-cash expenses:*
  *Depreciation of $462 thousand in 2021*
*[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court*
*[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors*
*[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold*
*[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million*
*[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages*
*[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees*
*[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund*

*Notes:*
*All claim amounts are estimated as of November 20, 2020 and subject to change*

11/13/2020
**Appx. 01501**

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | 2,154 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

Footnotes:
[1] Operating expenses include an adjustment in January 2021 to account
   for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $61.2 million in January 2021 includes:
   [a] $77.7 million was expensed to record for the increase of
      allowed claims.
   [b] Income of $15.8 million for the accrued, but unpaid payroll liability related to
      the Debtor's deferred bonus programs amount written-off.

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Forecast ---> 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | $ 2,154 |
| | | | | | | |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| | | | | | | |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) | $ (1,088) | $ (3,932) | $ (16,314) |
| | | | | | | |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| | | | | | | |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| | | | | | | |
| Operating Gain/(Loss) | $ (3,823) | $ (3,013) | $ (1,613) | $ (2,193) | $ (10,641) | $ (94,780) |
| | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | $ (88,922) |
| | | | | | | |
| Net Income | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) | $ (62,415) | $ (183,702) |

**Highland Capital Management, L.P.**
*Cash Flow Indirect*
*(US $000's)*

| | | | Forecast ----> | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
| Net (Loss) Income | $ | (16,708) $ | (21,247) | $ | (71,794) $ | (28,167) $ | (8,134) $ | (13,192) | $ (3,823) $ | (3,013) $ | (1,613) $ | (53,967) |
| Cash Flow from Operating Activity | | | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | | | |
| Depreciation and amortization | | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| | | | | | | | | | | | |
| Cash Flow From Investing Activities | | | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| | | | | | | | | | | | |
| Cash Flow from Financing Activities | | | | | | | | | | | | |
| Claims payable | | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| | | | | | | | | | | | |
| Net Change in Cash | $ | (9,107) $ | 22,454 | $ | (23,408) $ | 91,979 $ | (6,484) $ | 16,374 | $ (54,481) $ | (28,681) $ | (2,297) $ | (21,344) |
| Beginning Cash | | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ | 5,887 $ | 28,342 | $ | 4,934 $ | 96,913 $ | 90,428 $ | 106,803 | $ 52,322 $ | 23,641 $ | 21,344 $ | - |

# EXHIBIT 91

Appx. 01506

***Highland Capital Management, L.P.***
***Disclaimer For Financial Projections***

 This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

 This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

 These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

 Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

 These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.



Exhibit 24

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the interim interest income and principal payments are not collected due to prepayment on note

E. Fixed assets currently used in daily operations are sold in June 2021 for $0

F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HM"); UBS claim based on voting amount of $94.8 million, but Debtor and UBS have agreed in principal regarding UBS's allowed claim

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HM, $94.8 million for UBS and $45 million HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

  o By September 30, 2021 - $50,000,000
  o By March 31, 2022 – additional $50,000,000
  o By June 30, 2022 – additional $25,000,000
  o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q. Assumptions subject to revision based on business decision and performance of the business

1/28/2021

**Appx. 01508**

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---:|---:|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| | | |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| | | |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| | | |
| Class 8 – General Unsecured Claims [8][10] | 313,588 | 326,468 |
| Subtotal | 313,588 | 326,468 |
| | | |
| % Distribution to general unsecured claims | 62.14% | 48.16% |
| | | |
| Estimated amount remaining for distribution | - | - |
| | | |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

*Footnotes:*
[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
  Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs
[3] Estimated expenses through final distribution exclude non-cash expenses:
  Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages
[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund
  UBS claim included at voting amount of $94.8 million. Debtor and UBS have agreed in principal regarding UBS's allowed claim

*Notes:*
*All claim amounts are estimated as of January 26, 2020 and subject to change*

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
|   Unclassified | - | - | - | - | - | - | - | - | - | - | - |
|   Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
|   Class 2 - Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | - |
|   Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 8 – General Unsecured Claims | - | - | - | 313,588 | 313,588 | 263,588 | 263,588 | 213,588 | 188,588 | 188,588 | 118,723 |
|   Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
|   Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
|   Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 319,115 | 313,588 | 263,588 | 263,588 | 213,588 | 188,588 | 188,588 | 118,723 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 332,007 | 323,836 | 274,091 | 263,588 | 213,588 | 188,588 | 188,588 | 118,723 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 190,005 | (24,214) | (35,868) | (45,863) | (71,004) | (77,083) | (82,045) | (84,764) | (118,722) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

1/28/2021

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 591 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| | | | | | | | | | |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| | | | | | | | | | |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| | | | | | | | | | |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,138 |
| | | | | | | | | | |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (196,410) | 326 | (93) | 29 | (196,149) |
| | | | | | | | | | |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (213,037) | $ (9,978) | $ (5,433) | $ (4,259) | $ (232,707) |
| | | | | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | (13,301) | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| | | | | | | | | | |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (214,219) | $ (11,654) | $ (9,996) | $ (25,141) | $ (261,009) |

Footnotes:
[1] Operating expenses include an adjustment in January 2021 to account
for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
  [a] $209.7 million was expensed to record for the increase of
  allowed claims.
  [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to
  the Debtor's deferred bonus programs amount written-off.

1/28/2021

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Forecast ---> | | | | | |
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| | | | | | | |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| | | | | | | |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| | | | | | | |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| | | | | | | |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (196,803) |
| | | | | | | |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (254,838) |
| | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| | | | | | | |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (308,727) |

1/28/2021

Appx. 01512

**Highland Capital Management, L.P.**
**Cash Flow Indirect**
**(US $000's)**

| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Forecast ----> | | | | | | | |
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (214,219) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | (33,958) |
| **Cash Flow from Operating Activity** | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | 908 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (258,366) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,463) |
| | | | | | | | | | | |
| **Cash Flow From Investing Activities** | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| | | | | | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 319,115 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 234,948 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | (69,368) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |

1/28/2021

# EXHIBIT 92

| Engagement: | Highland Capital Management LP - 2017 Audit |
|---|---|
| Period end date: | 12/31/2017 |
| Audit unit: | Highland Capital Management LP - 2017 Audit-HQ |
| Associated Risks: | Risk of material misstatement in Other Assets |
| FSLI: | Other Assets |
| EGA title: | Test due from and notes receivable |
| Ref. no.: | 3025-1510 |

## Rollforward - Notes receivable

| When more than one preparer was involved in the completion of this EGA, document the names of the team members involved and the procedures performed. | *[Document the initials or names of team members and procedures performed (e.g., Jane Doe performed step a) below)]*<br><br>**Prepared by Hilda Garcia, PwC** |
|---|---|

| Procedures | Results | Links |
|---|---|---|
| a)  Obtain a rollforward schedule of notes receivable balances, agree balances and test mathematical accuracy. | ☐  Obtained a rollforward schedule of notes receivable balances. Attached in tab *'Results Template'* or provided link.<br><br>**Note that the team obtained the closing balances of notes and accounts receivable by account type/entity. Attached schedule in the \<Detail> tab. Additionally, note that the due from receivables listing was target tested for accounts greater than $10M and the remaining population was non-stat tested. Refer to selections made and  testing performed in the < Results Template>**<br><br>**AND**<br><br>☐  Agreed balances to prior period workpapers and closing balances to the general ledger, and<br><br>☐  No reconciling items noted, or<br>☐  Reconciling items are not significant or unusual (when considered both individually and in the aggregate); therefore no further testing performed, or<br>*[Document reconciling items noted and rationale for determination]*<br><br>☐  Significant or unusual reconciling items noted; therefore performed further testing as follows:<br><br>*[Document reconciling items noted and testing performed or provide link]*<br><br>**AND**<br>☐  Tested mathematical accuracy of the rollforward schedule, as follows:<br>*[Document schedule name(s), details of testing performed or provide link to tickmarked schedule]*<br><br>**Refer to the \<Detail> tab for procedures performed.**<br>☐  Verified spreadsheet formula.<br>☐  Manually added or recalculated.<br>☐  Application controls over related report tested.<br>☐  Other [Specify below].<br>*[Document details of testing, if not included in the linked schedule]* | |

**Appx. 01515**

| Rollforward - Notes receivable | | |
|---|---|---|
| b) Agree activity within the rollforward to testing performed. | ☐ Not applicable.  There was no current period activity, or<br>☑ Agreed activity within the rollforward to testing performed in the following EGAs (check those that apply):<br>    ☑ Total additions to testing performed in the EGA *Test additions - Notes receivable.*<br>    ☑ Total payments to testing performed in the EGA *Test payments - Notes receivable.*<br>    **The team tested additions and payments within this EGA. Refer to the subsequent tabs for procedures performed.**<br><br>                        **AND**<br>☑ Obtained appropriate supporting documentation for any other adjustments within the rollforward, and:<br>    ☐ Tested a selection of adjustments (test(s) added from Aura Tests of Details template), or<br><br>    *[Document other items tested and the details of work performed or provide link]*<br><br>    ☐ Tested all adjustments.<br>    *[Document other items tested and the details of work performed or provide link]*<br><br>    **The audit team tested all adjustments for notes selected for testing. Refer to the <Results Template> tab for testing performed.** | Results Template |

## Rollforward - Notes receivable

| | | |
|---|---|---|
| c) | Obtain detailed listing(s) of the ending balance of notes receivable by asset, agree balances and test mathematical accuracy.<br><br>*Service Delivery Center activities:*<br><br><u>Tests of Details</u> | ☐ Not applicable. The rollforward in procedure a) was performed at the individual asset level, or<br><br>☐ Obtained detailed listing(s) of the ending balance of notes receivable.<br>*[Document details of accounts selected or provide link to detailed listing(s) obtained]*<br><br>**Refer to the <Results Template> tab for procedures performed. Additionally, note that the due from receivables listing was target tested for accounts greater than $10M and the remaining population was non-stat tested. Refer to testing performed in the < Results Template>**<br><br>**AND**<br><br>☑ Agreed the total per the detailed listing to the ending balance per the rollforward, and:<br>☐ No reconciling items noted, or<br>☐ Reconciling items are not significant or unusual (when considered both individually and in the aggregate); therefore no further testing performed, or<br>*[Document reconciling items noted and rationale for determination]*<br><br>☐ Significant or unusual reconciling items noted; therefore performed further testing as follows:<br><br>*[Document reconciling items noted and testing performed or provide link]*<br><br>**AND**<br>☑ Tested mathematical accuracy of the detailed listing, as follows:<br>*[Document schedule name(s), details of testing performed or provide link to tickmarked schedule]*<br>☑ Verified spreadsheet formula.<br>☐ Manually added or recalculated.<br>☐ Application controls over related report tested.<br>☐ Other [Specify below].<br>*[Document details of testing, if not included in the linked schedule]* | Results Template |
| d) | Define what constitutes an unexpected or unusual balance and scan the subledgers or detailed listing of ending balances of notes receivable by asset for unexpected (e.g. credit balances, large balances not confirmed, etc.) or unusual items. | ☐ Defined what constitutes an unexpected or unusual balance, as follows:<br>*[Define and document what constitutes an unexpected or unusual balance]*<br><br>**An unexpected or unusual balance is defined as anything that is not considered in Due from Affiliate, within the details. The engagement team performed a Credit Risk Analysis over the material balances within the <Detail> tab to ensure that there were no unexpected or unusual loans. Refer to the <Credit Risk Analysis> tab for the engagement team analysis over the related balances.** | |

**Appx. 01517**

| Rollforward - Notes receivable | | |
|---|---|---|
| | **AND** | |
| | ☑ Scanned the subledgers or detailed listings noting the following: | |
| | ☑ No unexpected or unusual balances, or | |
| | ☐ Unusual or unexpected balances identified: | |
| | *[Document details of unexpected or unusual balances identified and resolution]* | |

| *Additional engagement specific procedures, if necessary* | |
|---|---|
| **Procedures** | **Results** |
| [Document engagement specific additional procedures, if necessary]<br>N/A | [Document results of additional procedures]<br>N/A |

Appx. 01518

**HCMLP**
**Various Assets - Detail**
**12/31/2017**
Prepared by Hilda Garcia, PwC

**Note:** The below detail is for the Due From and Notes Receivable FSLI's. The team tested 100% of the Notes Receivable balance and performed a target test in addition non-stat sample over the Due From Affiliate balance to ensure adequate coverage. Refer below for testing references.

**LS**

**Due from affiliates**



| | | | |
|---|---|---:|---|
| 14010 | CASH INTEREST RECEIVABLE | 935,693 | |
| 14110 | DIVIDENDS RECEIVABLE | 23,760 | |
| 14030 | INVESTMENT INTEREST RECEIVABLE | 216,138 | |
| 14140 | SHARED SVCS FEE RECVBL - PYXIS | 207,501 | |
| 14142 | SHARED SVCS FEE RECVBL - HCLOH | 6,020 | |
| 14145 | SHARED SVCS FEE RECVBL - ACIS | 337,643 | |
| 14146 | SHARED SVCS FEE RECVBL - NEXPOINT | 55,187 | |
| 14148 | SHARED SVCS FEE RECVBL - RAND ADVISORS | 2 | |
| 14149 | SHARED SVCS FEE RECVBL - NREA | 592,251 | **NS** |
| 14530 | DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 14,122,352 | **TT** |
| 14531 | DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 4,895,468 | **NS** |
| 14532 | DUE FROM NEXPOINT ADVISORS | 29,721,919 | **TT** |
| 14533 | DUE FROM HCRE PARTNERS | 8,457,837 | **NS** |
| 14565 | DUE FROM OTHER - TAX LOANS | 15,728,031 | **TT** |
| 14575 | DUE FROM HIGHLAND CAPITAL OF NEW YORK | 4,519,542 | |
| 14580 | DUE FROM NEXBANK | 60,000 | |
| 14585 | DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | 60,663,612 | **TT** |
| 14595 | DUE FROM HIGHLAND CAPITAL KOREA | 2,320,798 | |
| 14750 | LONG TERM NOTES RECEIVABLE | 22,860,559 | **TT** |
| | **Total** | 165,724,312 | **Rc** |
| | | ^ | |

| SUMMARY | Rc |
|---|---:|
| **Total Due From** | **165,724,312** |
| Target Test Count | 5 |
| Total Targeted | 143,096,473 |
| Total Non Stat | 13,945,556 |
| # of selections | 3 |
| Total Tested | 157,042,029 |

TOD Form: Test Due from Affiliates

| Interest Income Tested | |
|---|---:|
| HCMSI | 501,807 |
| Dondero Tax Loan | 266,997 |
| Dugaboy | 712,821 |
| HCRE | 284,231 |
| Hunter Mountain | 1,547,673 |
| NexPoint | 1705711 |
| Total Tested | 3,313,529 |
| | ^ |

**Tickmark Legend**
^ Footed without exception.
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**LS** Amount agrees to the lead schedule linked below.
  Lead schedule - Assets
**NS** Amount was selected for Non-Statistical Sampling Testing. Refer to the Non-Stat template linked below for
  further information and to the <Results Template> tab for testing performed.
  TOD Form: Test Due from Affiliates
**TT** Due from affiliate amount was selected for Target Testing. Refer to the Target Testing template linked below
  for further information and to the <Results Template> tab for testing performed.
  TOD Form: Test Due from Affiliates
**<PM** Remaining balance is below performance materiality, waive further review.

**Tickmark Legend**
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**LS** Agrees to the lead schedule linked below without exception.
  Lead schedule - Assets
**NS** The
  TOD Form: Test notes receivables, due from, and other assets
**TT** The

**Appx. 01519**

**Highland Capital Management, L.P.,**
**Credit Risk Analysis**
**12/31/2017**
Prepared by Hilda Garcia, PwC

<Details>

**Note:** The audit team performed a credit analysis for all material (above performance materiality) notes receivable in order to determine the nature and intent of each note as well as assess the ability of the payee to pay the note. Refer to the team's analysis below.

| Account # | Counter Party | Amount | Interest Rate | Maturity Date | Nature | Recoverability |
|---|---|---|---|---|---|---|
| 14530 | Highland Capital Management Services (James Dondero majority owner) | 14,122,352 | 2.75% | 12/31/2047 | Highland Capital Management Services is an S Corp that acts as a platform investment company for one-off investments. Loans are provided to this entity primarily in order to provide seed capital for new investments. | Based on our testing performed over this loan, the engagement team notes that all the previous loans issued to HCMSI have been restructured and consolidated into one loan with a maturity date of 12/31/2047 and a yearly installment payment plan. The audit team also vouched interest payments being made by the fund, which also signifies that they have the ability to continue to make their payments. As such, the team is comfortable that the fund will be able to pay the loan when it becomes due. Further note that HCM Services has also paid back $6.1 M to HCMLP in principal payments for 2017 (vouched by engagement team) and paid off all the interest owed to the fund as of 12/31/2017. As the fund is showing an ability by continuing to make payments subsequent to year end and an installment payment plan has been implemented, the audit team is comfortable that the entity has the ability to pay down this loan when it becomes due. Furthermore, Jim Dondero owns more than 70% of this entity. |
| 14531 | Highland Capital Fund Advisors | 4,895,468 | 2.62% | On demand but not before 5/31/2019 | Loans are made to HCMF for the fund's operational purposes. | Per review of the audited HCMF financial statements, the engagement team notes that the fund is realizing profits and has a positive cash flow. Based on the team's going concern considerations for this fund, the expectation is that the fund will be in positive partners capital by the next fiscal year. Based on the profit and improving performance of the fund, the team is comfortable that they will be able to pay the loan when it becomes due. |
| 14532 | Nexpoint Advisors | 29,721,919 | 6% | 12/31/2047 | Loans are made to Nexpoint for the fund's operational purposes. | Per review of the audited Nexpoint financial statements, the engagement team notes that the fund is realizing profits and has a positive cash flow. Based on the team's going concern considerations for this fund, the expectation is that the fund will continue to recover from its negative partners' capital balance in the coming years as it continues to improve performance and does not over distribute partners' capital. The engagement team additionally notes that NPA has stopped waiving management fees in the current year to the BDC (Nexpoint Capital Strategies) which is expected to significantly increase their revenue for future period. Based on the profit and improving performance of the fund, the team is comfortable that they will be able to pay the loan installments as they become due. |
| 14533 | HCRE Partners (James Dondero) | 6,457,837 | Varies | On demand and 12/31/2047 | HCRE Partners is a real estate investment entity that invests in opportunistic real estate investments and historically has realized substantial gains. Loans are provided to this entity primarily in order to provide seed capital for new investments. Note that 31% of this balance is due on demand. The remaining 69% is made up of a restructured loan that has a maturity date of 12/31/2047. | Per discussion with Dave Klos, HCMLP, the audit team notes that these loans are made at a high interest rate in order to encourage the fund to pay off the loan quickly. Based on our testing performed over this loan, the engagement team notes that the loans issued to HCRE went through a restructure in the current year. As such, 31% of the HCRE balance is due on demand and the remaining 69% is made up of a restructured loan that has a maturity date of 12/31/2047 and implements an installment plan over 30 years. The audit team also vouched interest and principal payments being made by the fund, which also signifies that they have the ability to continue to make their payments. As such, the team is comfortable that the fund will be able to pay the loan when it becomes due. Furthermore, Jim Dondero owns more than 70% of this entity. |
| 14565 | James Dondero | 15,728,031 | 2.03%-2.25% | On demand and 12/31/2047 | Related to Loans given to Limited Partners within the fund including James Dondero and Mark Okada in order to satisfy tax liability. Both have little basis in the fund, therefore a tax loan was given instead of an equity distribution. Note that James Dondero's portion was 92% of this balance and has a maturity date of 12/31/2047. | Per review of the Nexpoint Credit Strategy Fund form 13D filed with the SEC on 5/8/18, the engagement team notes that James Dondero owns 17.9% of this fund. Per review of the audited 12/31/17 financial statements for NHF, we note a total Net Asset Value of $592,308,994, which leaves Dondero's ownership value in the fund at $105,431,000. Additionally, the team notes that per NexPoint Residential Trust, Inc. form DEF 14A filed with the SEC on 4/11/2018, James Dondero also owns 19.98% of NexPoint Residential Trust. Per review of the audited 12/31/17 financial statements for NXRT, we note a total Net Asset Value of $239,444,000 which leaves Dondero's ownership value in the fund at $47,840,911. Based solely on these two investment values ($153,271,912 value), not considering his extensive ownership of other assets, the team notes that Mr. Dondero has significant net worth in excess of the amount that is payable to HCMLP and therefore he has the ability to pay the loan. We note that because NHF is a publicly traded fund, he has the ability to sell his shares or transfer them back to HCMLP to satisfy the debt. |
| 14750 | Dugaboy (James Dondero) | 22,860,559 | 3.26% | 12/31/2047 | The audit team notes that this note was primarily made in order to donate assets held by the fund to charity. Therefore, the fund sold assets in exchange for a Note Payable ultimately from Dugaboy, of which the primary beneficiary is James Dondero. | See above. |
| 14585 | Hunter Mountain Investment Trust (James Dondero) | 60,683,612 | 2.61% | On demand | Note that Hunter Mountain purchased 99.5% of HCMLP (verified through capital testing). This loan was originally made for seller financing of the purchase of HCMLP as a part of the purchase price was paid in cash and a portion was financed as a note payable to HCMLP. | As Hunter Mountain owns 99.5% of HCMLP (verified through capital testing), the audit team notes that if Hunter Mountain did not have the ability to pay when the note became due, HCMLP could simply recover the receivable by netting off Hunter Mountain's capital balance. As such, the team is comfortable with the recoverability of this note. Additionally, the team notes that James Dondero is a significant owner of Hunter Mountain through the Crown Global Life Insurance. Therefore, the team notes that Mr. Dondero has significant net worth in excess of the amount that is payable to HCMLP and therefore he has the ability to pay the loan. |

**Tickmark Legend**
A: Agrees to the note agreements obtained within the <Results Template> tab for testing.

**Appx. 01520**

**Rollforward schedule of notes receivable**

| G/L Account | Account Description | Amount per Client | | Balance per Testing Performed | TM | Rc, imm Differences |
|---|---|---|---|---|---|---|
| **Target Tested** | | | | | | |
| 14532 | DUE FROM NEXPOINT ADVISORS | 29,721,919 | <Detail> | 29,721,919 | B | - |
| 14565 | DUE FROM OTHER - TAX LOANS | 15,728,031 | <Detail> | 15,728,031 | C | 0 |
| 14585 | DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | 60,663,612 | <Detail> | 60,663,612 | <Due from Hunter Mountain> | (0) |
| 14750 | LONG TERM NOTES RECEIVABLE | 22,860,559 | <Detail> | 22,860,559 | <Dugaboy> | 0 |
| 14530 | DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 14,122,352 | <Detail> | 14,122,352 | <Due from HCMSI> | 0 |
| | **Total Amount Targeted** | 143,096,473 | | 143,096,473 | | (0) |
| **Non-Stat** | | | | | | |
| 14149 | SHARED SVCS FEE RECVBL - NREA | 592,251 | <Detail> | 555,203 | A | 37,047.68 imm |
| 14531 | DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 4,895,468 | <Detail> | 4,895,468 | B | 0 |
| 14533 | DUE FROM HCRE PARTNERS | 8,457,837 | <Detail> | 8,457,837 | D | 0 |
| | **Total Amount Non-Stat** | 13,945,556 | | 13,908,508 Rc | | 37,047.73 |
| | **Total Amount Tested** | **157,042,029.10** | | **157,004,981.46** Rc | | **37,047.64** imm |
|  |  | ^ |  | ^ |  | ^ |

**Tickmark Legend**

**Rc** Amount recalculated. Refer to respective cell for formula detail.

**imm** Amount is immaterial, below SUM. Further testing is waived.

**^** Amount footed. Refer to respective cell for formula detail.

**PY** Agrees to the prior year Asset lead schedule tested by the audit team without exception.

**A** The engagement team obtained comfort over the Shared Svcs Fee Receivable - NREA amount by performing procedures as documented in the EGA linked below. Per review of the procedures performed, the amount deemed reasonable. Waived further procedures.

Test shared services expenses

**B** The engagement team notes that the receivables above relate to amounts due from other audited HCM entities for loans provided by Highland Capital Management, L.P. ("HCMLP") to Highland Capital Management Fund Advisors ("HCMFA") or NexPoint Advisors ("NPA"). Further note the engagement team prepared and tested the Due to HCMLP rollforwards for both HCMFA and NPA, which correspond to the receivables amount above in conjunction with testing over those entities, without exception. Note that the following procedures were performed within the EGAs linked below.

| | **Amount** | |
|---|---|---|
| Due from HCMFA | 4,895,468 | HCMFA - Understand debt agreements and test compliance |
| Due from Nexpoint | 29,721,919 | Nexpoint Advisor - Understand debt agreements and test compliance |

**C** The engagement team notes that this amount is made up of 2 separate loans issued for tax purposes to two owners, James Dondero and Mark Okada, in 2016. We note that the James Dondero loans have been restructured and consolidated in the current year. Refer to the <Dondero Tax Loan> tab for testing and support obtained. The note receivable due from Mark Okada has not had any paydowns in the current year. As such Okada's note receivable balance as of 12/31/2017 is consistent with prior year.

| Date | Lender | Interest Rate | Amount | |
|---|---|---|---|---|
| 5/31/2017 | HCM Dondero - Restructured | 2.03% | 14,478,031 | <Dondero Tax Loan> |
| 4/15/2016 | HCM Okada | 2.25% | 1,250,000 | 04152016 HCM Okada $1.25M |
| | | | 15,728,031 | Rc |
| | | | ^ | |

**D** The engagement team notes that this amount is made up of 3 separate loans issued to HCRE. We not that one of the notes was restructured in the current year and an additional note has been issued. Refer below for support reconciliation and support obtained from Drew Wilson, HCM.

| Date | Lender | Interest Rate | Amount | |
|---|---|---|---|---|
| 11/27/2013 | HCRE #9 | 2.03% | 100,000 | PY |
| 5/31/2017 | HCRE Restructured | 8.00% | 5,857,837 | <HCRE Restructure> |
| 10/12/2017 | HCRE #10 | 8.00% | 2,500,000 | 10122017 HCRE $2.5M |
| | | | 8,457,837 | Rc |
| | | | ^ | |

**Appx. 01521**

**Due from Highland Capital Management Services**
**Account Detail - Year end Balances**
**12/31/2017**
PBC, tickmarked by Hilda Garcia, PwC

Note: The engagement team notes that the individual notes issued to HCM Services in the prior years were restructured and consolidated on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

| | | |
|---|---|---|
| Closing Date | 5/31/2017 | A |
| Beginning Principle Balance $ | 20,247,628.02 | |
| Interest Rate | 2.75% | |

| | Rc | B | | Rc | Rc | B | | Rc |
|---|---|---|---|---|---|---|---|---|
| Date | Interest Income | Interest Paid | | Accrued Interest | Beg Prin Bal | Principal Paid | | Ending Prin Bal |
| 5/31/2017 | | | | - | 20,247,628 | - | | 20,247,628 |
| 6/23/2017 | 35,087 | (35,087) | | - | 20,247,628 | (950,130) | 1 | 19,297,498 |
| 6/30/2017 | 10,177 | | | 10,177 | 19,297,498 | - | | 19,297,498 |
| 7/6/2017 | 8,724 | (18,901) | | - | 19,297,498 | (888,395) | 2 | 18,409,103 |
| 7/18/2017 | 16,644 | (16,644) | | - | 18,409,103 | (1,014,820) | 3 | 17,394,283 |
| 7/31/2017 | 17,037 | | | 17,037 | 17,394,283 | - | | 17,394,283 |
| 8/25/2017 | 32,763 | (199,329) | | (149,529) | 17,394,283 | (1,771,931) | 4 | 15,622,352 |
| 8/31/2017 | 7,062 | - | | (142,467) | 15,622,352 | - | | 15,622,352 |
| 9/30/2017 | 35,311 | - | | (107,156) | 15,622,352 | - | | 15,622,352 |
| 10/31/2017 | 36,488 | - | | (70,668) | 15,622,352 | - | | 15,622,352 |
| 11/30/2017 | 35,311 | - | | (35,358) | 15,622,352 | - | | 15,622,352 |
| 12/21/2017 | 24,718 | - | | (10,640) | 15,622,352 | (1,500,000) | 5 | 14,122,352 |
| 12/31/2017 | 10,640 | - | | (0) | 14,122,352 | - | | 14,122,352 |
| **Totals** | **269,961** | **(269,961)** | | **(0)** | | **(6,125,276)** | | **14,122,352** |



**Interest Income - 2017**

| Date | Principle | Interest Rate | Interest Income |
|---|---|---|---|
| 12/31/2016 | 21,650,000 | 2.26% | |
| 1/31/2017 | 21,650,000 | 2.26% | 41,556 |
| 2/28/2017 | 21,650,000 | 2.26% | 37,535 |
| 3/31/2017 | 21,800,000 | 2.78% | 51,472 |
| 4/30/2017 | 21,800,000 | 2.78% | 49,812 |
| 5/31/2017 | 21,800,000 | 2.78% | 51,472 |
| remaining | | | 269,961 |
| Total Interest | | | 501,807 |



| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 14,122,352 | above |
| Interest Income Bal | 269,961 | <PM |

**Tickmark Legend**
^ Footed without exception. Refer to the respective cell's formula for further details.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
Imm Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from notes receivable EGA in prior years database.
<PM Amount is below performance materiality, further testing waived.
A Agreed to the restructure Loan Agreement obtained from Drew Wilson, HCM, without exception. Refer to agreement linked below.
 06212017 HCMSI Loan Restructure
B Agreed to cash deposit in the Nexbank bank statement (account #: 1614130) for each respective month noted, without exception. Further testing waived. Refer below for breakdown of payment.

| 1) June | | | 2) July | | |
|---|---|---|---|---|---|
| Cash Paid to HCM | 1,508,389.34 | B | Principle Payment | 888,395 | above |
| Amount applicable to final payment of HCMSI #45 | (523,172.90) | C | Interest Payment | 18,901 | above |
| Applicable to Restructured Loan | 985,216 | Rc | | 907,296 | B |
| | | ^ | | ^ | |
| Principle Payment | 950,130 | above | | | |
| Interest Payment | 35,087 | above | | | |

| 3) July | | | 4) August | | |
|---|---|---|---|---|---|
| Principle Payment | 1,014,820 | above | Principle Payment | 1,771,931 | above |
| Interest Payment | 16,644 | above | Interest Payment | 199,329 | above |
| | 1,031,464 | B | | 1,971,260 | B |
| | ^ | | | ^ | |

| 5) December | | |
|---|---|---|
| Principle Payment | 1,500,000 | B |

C The engagement team notes that the following note receivable due from HCMSI was not included in the restructure and was completely paid off on 6/23/2017. No exceptions noted.

D The engagement team notes that the following notes were issued to HCMI during 2017. Note that the engagement team vouched the cash withdrawal to the March, June, and August 2017 Nexbank bank statement (account #: 1614130). Additionally, not that HCMSI #44 was included in the restructure of the HCMSI loans and HCMSI #45 was completely paid on the current year. No exception noted.

| | Amount issued | Date issued | Date paid off | |
|---|---|---|---|---|
| HCMSI #44 | 150,000 | 3/31/2017 | Restructured | Refer to Exhibit A in Restructured Loan Agreement in TM A |
| HCMSI #45 | 1,300,000 | 6/7/2017 | 6/23/2017 | |
| HCMSI #46 | 500,000 | 8/31/2017 | 10/16/2017 | |

**Appx. 01522**



**Due from James Dondero - Tax Loan**
**Account Detail - Year end Balances**
**12/31/2017**
PBC, tickmarked by Hilda Garcia, PwC

Note: The engagement team notes that in prior year there were two loans given to James Dondero, HCM Owner, for tax purposes. The original loan balances were agreed to their note agreements in the prior year, without exception. Note that on 5/31/2017, the loans to James Dondero were restructured and consolidated into one note receivable balance. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

| | | |
|---|---|---|
| Restructured Closing Date | 5/31/2017 | A |
| Total Commitment Restructured | $  14,977,274 | |
| Rate | 2.03% | ↓ |

| Date | Interest Income | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
|---|---|---|---|---|---|---|
| | Rc | B | Rc | Rc | B | Rc |
| 5/31/2017 | - | - | - | 14,977,273.63  above | - | 14,977,273.63 |
| 6/23/2017 | 19,158.60 | | 19,158.60 | 14,977,273.63 | | 14,977,273.63 |
| 6/30/2017 | 5,830.88 | | 24,989.48 | 14,977,273.63 | | 14,977,273.63 |
| 7/31/2017 | 25,822.46 | - | 50,811.94 | 14,977,273.63 | | 14,977,273.63 |
| 8/31/2017 | 25,822.46 | - | 76,634.40 | 14,977,273.63 | | 14,977,273.63 |
| 9/30/2017 | 24,989.48 | - | 101,623.88 | 14,977,273.63 | | 14,977,273.63 |
| 10/31/2017 | 25,822.46 | - | 127,446.34 | 14,977,273.63 | | 14,977,273.63 |
| 11/30/2017 | 24,989.48 | - | 152,435.82 | 14,977,273.63 | | 14,977,273.63 |
| 12/31/2017 | 25,822.46 | (178,258.28) | - | 14,977,273.63 | (499,242.47) | 14,478,031.16 |
| **Totals** | **178,258.28** | **(178,258.28)** | **-** | | **(499,242.47)** | **14,478,031.16** |

### Interest Income - 2017

| Date | Principle | Interest Rate | Interest Income |
|---|---|---|---|
| 12/31/2016 | 11,000,000 | 1.95% | |
| 1/31/2017 | 11,000,000 | 1.95% | 18,218 |
| 2/28/2017 | 11,000,000 | 1.95% | 16,455 |
| 3/31/2017 | 11,000,000 | 1.95% | 18,218 |
| 4/30/2017 | 11,000,000 | 1.95% | 17,630 |
| 5/31/2017 | 11,000,000 | 1.95% | 18,218 |
| remaining | | | 178,258 |
| Total Interest | | | 266,997 |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 14,478,031 | above |
| Interest Income Bal | 178,258 | ↓ <PM |

### Tickmark Legend

^ Footed without exception.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
imm Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
<PM Amount is below performance materiality, further testing waived.
A Agreed to the restructure Loan Agreement obtained from Drew Wilson, HCM, without exception. Refer to agreement linked below.
  06212017 Dondero Loan Restructure

B Agreed to cash deposit in the December Nexbank bank statement (account #: 1614130), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $677,500.75. Refer below for breakdown of payment.

| | | |
|---|---|---|
| Principle Payment | 499,242 | above |
| Interest Payment | 178,258 | above |
| | 677,501 | B |

**Appx. 01523**

**Due from Get Good**
**Account Detail - Year end Balances**
**12/31/2017**
PBC, tickmarked by Hilda Garcia, PwC

> **Note:** The engagement team notes that this amount is a related to a Note Receivable from Get Good original sold on 12/28/2016. Per review of the original purchase agreement, linked below, the audit team notes that HCMLP exchanged assets (held as a liability) for the right to receive 97.6835% of Get Good's Note receivable. We note that the original note receivable issued to Get Good Trust from the Dugaboy Trust was for $24,268,621.69 on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

GG and HCM PSA Crusader - Loan Fund - AAL_63370369_2 (2)
06212017 Dugaboy Interest Amendment

|  |  | HCM |  |
|---|---|---|---|
| **Original Note Date** | | 12/28/2016 | 97.6835% PYWP |
| **Original Note Amount** | $ 23,817,640 | $ 23,265,904 | |
| | | | |
| **Restructured Closing Date** | | 5/31/2017 | 97.6835% A |
| **Total Restructured Amount** | $ 24,268,622 | $ 23,706,439 | |
| **Rate** | 3.260% | | |

| | Rc | B | Rc | Rc | B | Rc |
|---|---|---|---|---|---|---|
| Date | Interest Income | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
| 5/31/2017 | - | - | - | 23,706,439.07 | - | 23,706,439.07 |
| 6/23/2017 | 48,698.87 | - | 48,698.87 | 23,706,439.07 | | 23,706,439.07 |
| 6/30/2017 | 14,821.40 | - | 63,520.27 | 23,706,439.07 | | 23,706,439.07 |
| 7/31/2017 | 65,637.61 | - | 129,157.88 | 23,706,439.07 | | 23,706,439.07 |
| 8/4/2017 | 8,469.37 | (441,854.32) | (304,227.07) | 23,706,439.07 | (845,879.76) | 22,860,559.31 |
| 8/31/2017 | 55,128.40 | - | (249,098.68) | 22,860,559.31 | | 22,860,559.31 |
| 9/30/2017 | 61,253.77 | - | (187,844.90) | 22,860,559.31 | | 22,860,559.31 |
| 10/31/2017 | 63,295.57 | - | (124,549.34) | 22,860,559.31 | | 22,860,559.31 |
| 11/30/2017 | 61,253.77 | - | (63,295.57) | 22,860,559.31 | | 22,860,559.31 |
| 12/31/2017 | 63,295.57 | - | - | 22,860,559.31 | | 22,860,559.31 |
| **Totals** | 441,854.32 | (441,854.32) | - | | (845,879.76) | **22,860,559.31** |
| | ^ | ^ | | | ^ | ^ |

PYWP

| Interest Income - 2017 | | | |
|---|---|---|---|
| Date | Principle | Interest Rate | Interest Income |
| 12/31/2016 | 23,817,640 | 2.75% | |
| 1/31/2017 | 23,817,640 | 2.75% | 55,629 |
| 2/28/2017 | 23,817,640 | 2.75% | 50,245 |
| 3/31/2017 | 23,817,640 | 2.75% | 55,629 |
| 4/30/2017 | 23,817,640 | 2.75% | 53,834 |
| 5/31/2017 | 23,817,640 | 2.75% | 55,629 |
| remaining | | | 441,854 |
| Total Interest | | | 712,821 |
| | | | ^ |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 22,860,559 | above |
| Interest Income Bal | 441,854 | <PM |

**Tickmark Legend**
^ Footed without exception.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
imm Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
<PM Amount is below performance materiality, further testing waived.
A Agreed to the restructure Get Good Note Receivable Loan Agreement obtained from Drew Wilson, HCM, without exception. Refer to agreement linked below
06212017 Dugaboy Interest Amendment
B Agreed to cash deposit in the August Compass Bank statement (account #: 0025876342), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $1,287,734.08. Refer below for breakdown of payment.

| Principle Payment | 845,880 | above |
|---|---|---|
| Interest Payment | 441,854 | above |
| | 1,287,734 | B |
| | ^ | |

**Appx. 01524**

**HCRE Restructure**
**Account Detail - Year end Balances**
**12/31/2017**
PBC, tickmarked by Hilda Garcia, PwC

> **Note:** The engagement team notes that some of HCRE's previous notes receivables were restructured and consolidated on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

| | | |
|---|---|---|
| Restructured Closing Date | 5/31/2017 | A |
| Total Commitment Restructured | $ 6,059,832 | |
| Rate | 8.00% | |

| Date | Interest Income **Rc** | Interest Paid **B** | Accrued Interest **Rc** | Beg Prin Bal **Rc** | Principal Paid **B** | Ending Prin Bal **Rc** |
|---|---|---|---|---|---|---|
| 5/31/2017 | - | - | - | 6,059,831.51 above | - | 6,059,831.51 |
| 6/23/2017 | 30,548.19 | | 30,548.19 | 6,059,831.51 | | 6,059,831.51 |
| 6/30/2017 | 9,297.28 | | 39,845.47 | 6,059,831.51 | | 6,059,831.51 |
| 7/31/2017 | 41,173.65 | - | 81,019.12 | 6,059,831.51 | | 6,059,831.51 |
| 8/31/2017 | 41,173.65 | - | 122,192.77 | 6,059,831.51 | | 6,059,831.51 |
| 9/30/2017 | 39,845.47 | - | 162,038.23 | 6,059,831.51 | | 6,059,831.51 |
| 10/31/2017 | 41,173.65 | - | 203,211.88 | 6,059,831.51 | | 6,059,831.51 |
| 11/30/2017 | 39,845.47 | - | 243,057.35 | 6,059,831.51 | | 6,059,831.51 |
| 12/31/2017 | 41,173.65 | (284,231.00) | - | 6,059,831.51 | (201,994.42) | 5,857,837.09 |
| **Totals** | **284,231.00** | **(284,231.00)** | **-** | | **(201,994.42)** | **5,857,837.09** |

**PYWP**

| Interest Income - 2017 | | | |
|---|---|---|---|
| Date | Principle | Interest Rate | Interest Income |
| 12/31/2016 | 5,750,000 | 7.85% | |
| 1/31/2017 | 5,750,000 | 7.85% | 38,336 |
| 2/28/2017 | 5,750,000 | 7.85% | 34,626 |
| 3/31/2017 | 5,750,000 | 7.85% | 38,336 |
| 4/30/2017 | 5,750,000 | 7.85% | 37,099 |
| 5/31/2017 | 5,750,000 | 7.85% | 38,336 |
| remaining | | | 284,231 |
| Total Interest | | | 470,964 |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 5,857,837 | above |
| Interest Income Bal | 284,231 | <PM |

**Tickmark Legend**

^ Footed without exception.

**Rc** Recalculated amount. Refer to the respective cell's formula for further details.

imm Amount is immaterial (below SUM). Therefore, further analysis is waived.

**PYWP** Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.

**<PM** Amount is below performance materiality, further testing waived.

**A** Agreed to the restructure Loan Agreement obtained from Drew Wilson, HCM, without exception. Refer to agreement linked below.
06212017 HCRE Partners Loan Restructure

**B** Agreed to cash deposit in the December Nexbank bank statement (account #: 1614130), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $486,225.42. Refer below for breakdown of payment.

| | | |
|---|---|---|
| Principle Payment | 201,994 | above |
| Interest Payment | 284,231 | above |
| | 486,225 | B |

**Appx. 01525**

HCMLP
Notes Receivable
12/31/2017
PBC, tickmarked by Hilda Garcia, PwC

Note: The audit team notes that this Note Receivable balance is made up of a Hunter Mountain Investment Trust note. The audit team obtained the original contribution agreement in prior year, and also obtained the debt rollforward from Sean Fox, HCMLP. Refer below for the rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

Beginning Principal     63,000,000   A
Interest Rate         2.61%
Effective Date      12/21/2015

| Date | Interest Income (Rc) | Interest Paid (Rc) | Accrued Interest (Rc) | Beg Prin Bal (Rc) | | Principal Paid (D) | PIK (B) | Ending Prin Bal (Rc) | |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/16 | 46,099 | - | 46,099 | 64,644,423 | PYWP | - | - | 64,644,423 | PYWP |
| 01/05/17 | 23,113 | (69,211) D | - | 64,644,423 | | (5,461,994) | - | 59,182,430 | |
| 01/31/17 | 110,031 | - | 110,031 | 59,182,430 | | - | - | 59,182,430 | |
| 02/28/17 | 118,495 | - | 228,525 | 59,182,430 | | - | - | 59,182,430 | |
| 03/31/17 | 131,190 | - | 359,716 | 59,182,430 | | - | - | 59,182,430 | |
| 04/30/17 | 126,958 | - | 486,674 | 59,182,430 | | - | - | 59,182,430 | |
| 05/31/17 | 131,190 | - | 617,865 | 59,182,430 | | - | - | 59,182,430 | |
| 06/30/17 | 126,958 | - | 744,823 | 59,182,430 | | - | - | 59,182,430 | |
| 07/31/17 | 131,190 | - | 876,013 | 59,182,430 | | - | - | 59,182,430 | |
| 08/31/17 | 131,190 | - | 1,007,204 | 59,182,430 | | - | - | 59,182,430 | |
| 09/30/17 | 126,958 | - | 1,134,162 | 59,182,430 | | - | - | 59,182,430 | |
| 10/31/17 | 131,190 | - | 1,265,353 | 59,182,430 | | - | - | 59,182,430 | |
| 11/30/17 | 126,958 | - | 1,392,311 | 59,182,430 | | - | - | 59,182,430 | |
| 12/21/17 | 88,871 | (1,481,182) B | - | 59,182,430 | | - | 1,481,182 | 60,663,612 | |
| 12/31/17 | 43,379 | - | 43,379 | 60,663,612 | | - | - | 60,663,612 | |
| **Totals** | **1,547,673 C** | **(1,550,394)** | **43,379** | | | **(5,461,994)** | **1,481,182** | **60,663,612** | |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 60,663,612 | above |
| Interest Income Bal | 1,547,673 | above |

Tickmark Legend
^ Footed without exception.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
A Agrees to the signed Hunter Mountain contribution agreement linked below without exception. Refer to pg. 49 of the agreement for further details around these amounts.
Hunter Mountain Contribution Agreement
B Per discussion with Sean Fox, HCMLP, and review of the amortization schedule within the promissory note linked below (p. 7/7), the audit team notes that the interest accrued PIKs at it's anniversary date each year. Therefore, the team deems it reasonable that the full value of accrued interest was capitalized into the principal balance on the notes one year anniversary. Refer to the note below for further details.
HM Secured Promissory Note
C Agree to the Interest Income for Hunter Mountain Trust per the <80100> detail tab within an immaterial difference. Refer to the reconciliation within the aforementioned tab linked below for further details.
<80100>
D Agreed to cash deposit in the January Compass Bank statement (account #: 0025876342), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $5,531,205. Refer below for breakdown of payment.

Principal Payment    5,461,994   above
Interest Payment      69,211   above
           5,531,205   D

**Appx. 01526**

Page 1 of 1

## HCM Account Analysis Report

Parameters given:

| | From | To |
|---|---|---|
| Entry | 0010 | 0010 |
| Dept | 000 | 999 |
| Account | 80100 | 80100 |
| Business | 00 | 99 |
| Future | 0000 | 0000 |
| GI Date Range | 01-JAN-17 | 31-DEC-17 |

Note: Note that Interest Income makes up a portion of the Other Income balance. As a majority of interest income was calculated within this EGA, the team performed a reconciliation to the detail

| JOURNAL ENTRIES | | | | | | | | | | PAYABLES | | | | RECEIVABLES | | | | FIXED ASSETS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | Date placed in service | Asset Category |
| Receivables | Misc Receipts | Receivables A 1863459 2313167 | JAN-17 Misc Receipts USD | 31-Jan-17 | 9 | Journal Import Created | 0010.000.80100.00.0000 | - | 23,113 | | | | | | 0105017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 1899658 2344091 | JAN-17 Misc Receipts USD | 31-Jan-17 | 6 | Journal Import Created | 0010.000.80100.00.0000 | - | 1,653 | | | | | | 0126017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 1922659 2366196 | FEB-17 Misc Receipts USD | 28-Feb-17 | 3 | Journal Import Created | 0010.000.80100.00.0000 | - | 1,925 | | | | | | 0213017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 1990058 2426146 | MAR-17 Misc Receipts USD | 31-Mar-17 | 7 | Journal Import Created | 0010.000.80100.00.0000 | - | 995 | | | | | | 0327017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2026660 2461091 | APR-17 Misc Receipts USD | 30-Apr-17 | 4 | Journal Import Created | 0010.000.80100.00.0000 | - | 1,607 | | | | | | 0412017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2076655 2506411 | MAY-17 Misc Receipts USD | 31-May-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 19,333 | | | | | | 0509017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2077659 2507106 | MAY-17 Misc Receipts USD | 31-May-17 | 4 | Journal Import Created | 0010.000.80100.00.0000 | - | 519 | | | | | | 0515017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2106675 2535026 | MAY-17 Misc Receipts USD | 31-May-17 | 7 | Journal Import Created | 0010.000.80100.00.0000 | - | 9,518 | | | | | | 0531017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2151677 2568629 | JUN-17 Misc Receipts USD | 30-Jun-17 | 5 | Journal Import Created | 0010.000.80100.00.0000 | - | 882 | | | | | | 0616017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2163676 2578612 | JUN-17 Misc Receipts USD | 30-Jun-17 | 7 | Journal Import Created | 0010.000.80100.00.0000 | - | 35,362 | | | | | | 0623017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2171694 2581566 | JUN-17 Misc Receipts USD | 30-Jun-17 | 4 | Journal Import Created | 0010.000.80100.00.0000 | - | 168,255 | | | | | | 0628017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2186697 2602193 | JUL-17 Misc Receipts USD | 31-Jul-17 | 9 | Journal Import Created | 0010.000.80100.00.0000 | - | 8,724 | | | | | | 0706017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2214695 2629550 | JUL-17 Misc Receipts USD | 31-Jul-17 | 5 | Journal Import Created | 0010.000.80100.00.0000 | - | 16,644 | | | | | | 0718017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2236699 2650232 | AUG-17 Misc Receipts USD | 31-Aug-17 | 4 | Journal Import Created | 0010.000.80100.00.0000 | - | 7,124 | | | | | | 0804017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2271697 2675803 | AUG-17 Misc Receipts USD | 31-Aug-17 | 3 | Journal Import Created | 0010.000.80100.00.0000 | - | 17,037 | | | | | | 0823017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2346698 2747212 | OCT-17 Misc Receipts USD | 31-Oct-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 21 | | | | | | 1002017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2371699 2773151 | OCT-17 Misc Receipts USD | 31-Oct-17 | 5 | Journal Import Created | 0010.000.80100.00.0000 | - | 565 | | | | | | 1016017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2382699 2784571 | OCT-17 Misc Receipts USD | 31-Oct-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 101,085 | | | | | | 1020017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2385695 2785572 | OCT-17 Misc Receipts USD | 31-Oct-17 | 3 | Journal Import Created | 0010.000.80100.00.0000 | - | 14 | | | | | | 1024017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2452698 2798571 | NOV-17 Misc Receipts USD | 30-Nov-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 14 | | | | | | 1101017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2495699 2923167 | DEC-17 Misc Receipts USD | 31-Dec-17 | 3 | Journal Import Created | 0010.000.80100.00.0000 | - | 8 | | | | | | 1201017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2501697 2926035 | DEC-17 Misc Receipts USD | 31-Dec-17 | 6 | Journal Import Created | 0010.000.80100.00.0000 | 25,822 | - | | | | | | 1208017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2501697 2926035 | DEC-17 Misc Receipts USD | 31-Dec-17 | 7 | Journal Import Created | 0010.000.80100.00.0000 | - | 51,643 | | | | | | 1208017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2507097 2934193 | DEC-17 Misc Receipts USD | 31-Dec-17 | 4 | Journal Import Created | 0010.000.80100.00.0000 | - | 25,204 | | | | | | 1205017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2527697 2948397 | DEC-17 Misc Receipts USD | 31-Dec-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 27,620 | | | | | | 1220017ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2538700 2961491 | DEC-17 Misc Receipts USD | 31-Dec-17 | 2 | Journal Import Created | 0010.000.80100.00.0000 | - | 41,174 | | | | | | 1227017ADW | | | | | | | |
| Spreadsheet | Adjustment | Reverses '20170531 Interest Receivable JE - NPA 6 True-up Adj'13-JUN-17 12:28:33 - 2559066 | Reverses '20170531 Interest Receivable JE - NPA 6 True-up Adjustment/USD | 31-May-17 | 2 | 5/31/2017 Interest Receivable NPA #6 True-up | 0010.000.80100.00.0000 | 43,609 | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2354621 | 20170131 NexBank MM Interest Adjustment/USD | 31-Jan-17 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2354621 | 20170131 NexBank MM Interest Adjustment/USD | 31-Jan-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |

Appx. 01527

| | | | JOURNAL ENTRIES | | | | | | | PAYABLES | | | | RECEIVABLES | | | | FIXED ASSETS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | Date placed in service | Asset Category |
| Spreadsheet | Adjustment | Spreadsheet A 2354621 | 20150131 NexBank MM Interest Adjustment USD | 31-Jan-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 2,697 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2355499 | 20150131 Hunter Mountain Note Receivable Update Adjustment | 31-Jan-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 110,031 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2357551 | 20150131 Interest Adjustment USD | 31-Jan-17 | 2 | 12/31/2016 Interest Receivable | 0010.000.80100.00.0000 | - | 343,993 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2397428 | 20170228 NexBank MM Interest Adjustment USD | 28-Feb-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2397428 | 20170228 NexBank MM Interest Adjustment USD | 28-Feb-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2397428 | 20170228 NexBank MM Interest Adjustment USD | 28-Feb-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 5,131 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2397438 | 20170228 Hunter Mountain Note Receivable Update Adjustment | 28-Feb-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 118,495 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2407378 | 20170228 Interest Reconciliation Adjustment USD | 28-Feb-17 | 2 | 1/31/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 308,550 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2438206 | 20170331 Hunter Mountain Note Receivable Update Adjustment | 31-Mar-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 151,190 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2438837 | 20170331 NexBank MM Interest Adjustment USD | 31-Mar-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2438837 | 20170331 NexBank MM Interest Adjustment USD | 31-Mar-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | 395 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2438837 | 20170331 NexBank MM Interest Adjustment USD | 31-Mar-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 2,595 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2476400 | 20170310 Cash Transfer Operating to MM Adjustment USD | 16-Mar-17 | 2 | HCMSI 34 Loan Paydown - Jet Income | 0010.000.80100.00.0000 | - | 2,012 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2439592 | 20170331 Interest Reconciliation Adjustment USD | 31-Mar-17 | 2 | 5/31/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 359,658 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2463466 | 20170331 Jefferies Reconciliation Adjustment USD | 31-Mar-17 | 39 | Services Loan Repayment | 0010.000.80100.00.0000 | - | 2,012 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2485997 | 20170430 Hunter Mountain Note Receivable Adjustment USD | 30-Apr-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 124,958 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2509281 | 20170430 Interest Receivable JE Adjustment USD | 30-Apr-17 | 5 | Double Booked Mar JE | 0010.000.80100.00.0000 | 2,012 | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2509281 | 20170430 Interest Receivable JE Adjustment USD | 30-Apr-17 | 4 | 4/30/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 327,047 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2523355 | 20170430 NexBank MM Interest Adjustment USD | 30-Apr-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2523355 | 20170430 NexBank MM Interest Adjustment USD | 30-Apr-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2523355 | 20170430 NexBank MM Interest Adjustment USD | 30-Apr-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 744 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2534072 | 20170531 Hunter Mountain Note Receivable Update Adjustment | 31-May-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 151,190 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2536980 | 20170531 Interest Receivable JE Adjustment USD | 31-May-17 | 2 | 5/31/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 289,998 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2537119 | 20170531 NexBank MM Interest Adjustment USD | 31-May-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2537119 | 20170531 NexBank MM Interest Adjustment USD | 31-May-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2537119 | 20170531 NexBank MM Interest Adjustment USD | 31-May-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 645 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2558459 | 20170531 Interest Receivable JE NPA A True-up Adjustment USD | 31-May-17 | 2 | 5/31/2017 Interest Receivable NPA #6 True-up | 0010.000.80100.00.0000 | - | 43,660 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2559065 | 20170531 Interest Receivable JE NPA A True-up Adjustment USD | 31-May-17 | 2 | NPA #6 True-up | 0010.000.80100.00.0000 | - | 42,286 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2580825 | 20170630 Hunter Mountain Note Receivable Update Adjustment | 30-Jun-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 124,958 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2591843 | 20170630 NexBank MM Interest Adjustment USD | 30-Jun-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2591843 | 20170630 NexBank MM Interest Adjustment USD | 30-Jun-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | 405 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2591843 | 20170630 NexBank MM Interest Adjustment USD | 30-Jun-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 933 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2611838 | 20170630 Interest Receivable JE Adjustment USD | 30-Jun-17 | 2 | 6/30/2017 Interest Receivable | 0010.000.80100.00.0000 | 1,381 | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2611838 | 20170630 Interest Receivable JE Adjustment USD | 30-Jun-17 | 4 | 6/30/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 329,757 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2649966 | 20170731 NexBank MM Interest Adjustment USD | 31-Jul-17 | 4 | Interest (Account *991) | 0010.210.80100.10.0000 | - | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2649966 | 20170731 NexBank MM Interest Adjustment USD | 31-Jul-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |

Appx. 01528

**JOURNAL ENTRIES** | | | **PAYABLES** | **RECEIVABLES** | **FIXED ASSETS**

| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | Date placed in service | Asset Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spreadsheet | Adjustment | Spreadsheet A 2649966 | 20170731 NexBank MM Interest Adjustment USD | 31-Jul-17 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 1,306 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2650532 | 20170731 Hunter Mountain Note Receivable Update Adjustment | 31-Jul-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 131,190 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2650573 | 20170731 Interest Receivable JE Adjustment USD | 31-Jul-17 | 2 | 7/31/2017 Interest Receivable | 0010.000.80100.00.0000 | 24,909 | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2650573 | 20170731 Interest Receivable JE Adjustment USD | 31-Jul-17 | 5 | 7/31/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 2,762 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2650573 | 20170731 Interest Receivable JE Adjustment USD | 31-Jul-17 | 8 | 7/31/2017 Interest Receivable | 0010.000.80100.00.0000 | - | 141,095 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2671397 | 20170731 Interest Reconciliation Adjustment USD | 31-Jul-17 | 42 | Carry Interest Payment | 0010.000.80100.00.0000 | - | 49,805 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2671495 | 20170731 Interest Reconciliation JE True-up Adjustment USD | 31-Jul-17 | 2 | 7/31 Interest Receivable JE True-up | 0010.000.80100.00.0000 | - | 278,887 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2685126 | 20170831 Hunter Mountain Note Receivable Update Adjustment | 31-Aug-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 131,190 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2695370 | 20170831 NexBank MM Interest Adjustment USD | 31-Aug-17 | 2 | Interest (Account *991) | 0010.210.80100.10.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2695370 | 20170831 NexBank MM Interest Adjustment USD | 31-Aug-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2695370 | 20170831 NexBank MM Interest Adjustment USD | 31-Aug-17 | 8 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 2,045 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2696075 | 20170831 Interest Receivable JE Adjustment USD | 31-Aug-17 | 2 | 8/31 Interest Receivable JE | 0010.000.80100.00.0000 | - | 338,436 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2712153 | 20170831 Jefferies Reconciliation Adjustment USD | 31-Aug-17 | 1 | Carry Interest Payment | 0010.000.80100.00.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2712153 | 20170831 Jefferies Reconciliation Adjustment USD | 31-Aug-17 | 10 | MT Statutory Trust Interest Income | 0010.000.80100.00.0000 | - | 61,996 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2745904 | 20170930 Hunter Mountain Note Receivable Update Adjustment | 30-Sep-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 126,958 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2746843 | 20170930 Interest Receivable JE Adjustment USD | 30-Sep-17 | 2 | 9/30 Interest Receivable JE True-up | 0010.000.80100.00.0000 | - | 15,726 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2746843 | 20170930 NexBank MM Interest Adjustment USD | 30-Sep-17 | 2 | Interest (Account *735) | 0010.000.80100.10.0000 | - | 363,494 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2747543 | 20170930 NexBank MM Interest Adjustment USD | 30-Sep-17 | 5 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2747543 | 20170930 NexBank MM Interest Adjustment USD | 30-Sep-17 | | Interest (Account *991) | 0010.210.80100.10.0000 | - | 586 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2747543 | 20170930 NexBank MM Interest Adjustment USD | 30-Sep-17 | | Interest (Account *130) | 0010.210.80100.10.0000 | - | 406 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2749161 | 20170930 Jefferies Reconciliation Adjustment USD | 30-Sep-17 | 13 | Carry Interest Payment | 0010.000.80100.00.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2749161 | 20170930 Jefferies Reconciliation Adjustment USD | 30-Sep-17 | 14 | Carry PIK | 0010.000.80100.00.0000 | - | 24,821 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2797447 | 20171031 Hunter Mountain Note Receivable Update Adjustment | 31-Oct-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 131,190 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2797677 | 20171031 Interest Receivable JE Adjustment USD | 31-Oct-17 | 2 | 10/31 Interest Receivable JE | 0010.000.80100.10.0000 | - | 283,722 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2798308 | 20171031 NexBank MM Interest Adjustment USD | 31-Oct-17 | 2 | Interest (Account *991) | 0010.210.80100.10.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2798308 | 20171031 NexBank MM Interest Adjustment USD | 31-Oct-17 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2798308 | 20171031 NexBank MM Interest Adjustment USD | 31-Oct-17 | 8 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 454 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2811284 | 20171031 Jefferies Reconciliation Adjustment USD | 31-Oct-17 | 13 | Carry Interest Payment | 0010.000.80100.00.0000 | - | 55,268 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2874566 | 20171130 Hunter Mountain Note Receivable Update Adjustment | 30-Nov-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 126,958 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2923523 | 20171130 Interest Receivable JE Adjustment USD | 30-Nov-17 | 2 | 11/30 Interest Receivable JE | 0010.000.80100.10.0000 | - | 28,337 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2923523 | 20171130 Interest Receivable JE Adjustment USD | 30-Nov-17 | 5 | 11/30 Interest Receivable JE | 0010.000.80100.00.0000 | - | 387,984 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2924233 | 20171130 NexBank MM Interest Adjustment USD | 30-Nov-17 | 2 | Interest (Account *735) | 0010.210.80100.10.0000 | - | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2924233 | 20171130 NexBank MM Interest Adjustment USD | 30-Nov-17 | 5 | Interest (Account *130) | 0010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2924233 | 20171130 NexBank MM Interest Adjustment USD | 30-Nov-17 | 6 | Goldfield & Carey PIK | 0010.000.80100.00.0000 | - | 1,720 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2924986 | 20171130 Jefferies Reconciliation Adjustment USD | 30-Nov-17 | 13 | Goldfield & Carey PIK | 0010.000.80100.00.0000 | - | 391,743 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2971371 | 20171231 Hunter Mountain Note Receivable Update Adjustment | 31-Dec-17 | 2 | Hunter Mountain Interest Receivable True-up | 0010.210.80100.10.0000 | - | 132,128 | | | | | | | | | | | | | |

| | | | | | | | | JOURNAL ENTRIES | | | | | | | | PAYABLES | | | | RECEIVABLES | | | | FIXED ASSETS | | | | |

| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | Date placed in service | Asset Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spreadsheet | Adjustment | Spreadsheet A 2971390 | 20171231 NexBank MM Interest Adjustment USD | 31-Dec-17 | 4 | Interest (Account *735) | 00010.210.80100.10.0000 | - | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2971390 | 20171231 NexBank MM Interest Adjustment USD | 31-Dec-17 | 5 | Interest (Account *891) | 00010.210.80100.10.0000 | - | 403 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2971390 | 20171231 NexBank MM Interest Adjustment USD | 31-Dec-17 | 6 | Interest (Account *130) | 00010.210.80100.10.0000 | - | 1,695 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2985407 | 20171231 Interest Receivable JE Adjustment USD | 31-Dec-17 | 9 | 12/31 Interest Receivable JE - HCMSI Interest True-up | 00010.000.80100.00.0000 | - | 1,093 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2985407 | 20171231 Interest Receivable JE Adjustment USD | 31-Dec-17 | 10 | 12/31 Interest Receivable JE - Dugaboy Interest True-up | 00010.000.80100.00.0000 | - | 3,206 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2985407 | 20171231 Interest Receivable JE Adjustment USD | 31-Dec-17 | 11 | 12/31 Interest Receivable JE | 00010.000.80100.00.0000 | - | 261,921 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2985407 | 20171231 Interest Receivable JE Adjustment USD | 31-Dec-17 | 12 | 12/31 Interest Receivable JE - Dugaboy Principal True-up | 00010.000.80100.00.0000 | - | 395,013 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 2985427 | 20171231 Jefferies Reconciliation Adjustment USD | 31-Dec-17 | 20 | Goldfield PIK | 00010.000.80100.00.0000 | - | 11,742 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3040434 | 20171231 Dugaboy Interest True-up | 31-Dec-17 | 2 | 12/31 Interest Receivable JE - Dugaboy Interest True-up | 00010.000.80100.00.0000 | 304,227 | - | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 5056868 | 20171231 Carey PIK Adjustment USD | 31-Dec-17 | 2 | Carey PIK | 00010.000.80100.00.0000 | - | 216,138 | | | | | | | | | | | | | |
| | | | | | | | | 402,020 | 7,451,059 | | | | | | | | | | | | | |



| | |
|---|---|
| Amount per detail above | 7,049,039 Rc |
| Amount per TB | 7,049,039 LS |
| Difference (not in thousands) | - Rc, imm |

**Hunter Mountain Interest Income Reconciliation**

| | |
|---|---|
| Hunter Mountain Interest Income per above | 1,524,439 Rc |
| Interest Income per <Due from Hunter Mountain> tab | 1,547,673 <Due from Hunter Mountain> |
| Difference | (23,234) Rc, imm |

Tickmark Legend
\* Footed without exception.
imm Amount is immaterial. Therefore, further review is waived.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
LS Amount agrees to 12/31/17 lead schedule linked below without exception.
Lead schedule - Revenue
Total of highlighted amounts have been recalculated and agree to the interest income per the <Note Receivable> tab within an immaterial difference.

**Appx. 01530**

# EXHIBIT 93

Appx. 01531

| Engagement: | Highland Capital Management LP - 2018 Audit |
|---|---|
| Period end date: | 12/31/2018 |
| Audit unit: | Highland Capital Management LP - 2018 Audit-HQ |
| Associated Risks: | Risk of material misstatement in Other Assets |
| FSLI: | Other Assets |
| EGA title: | Test due from and notes receivable |
| Ref. no.: | 3025-1510 |

## Rollforward - Notes receivable

| When more than one preparer was involved in the completion of this EGA, document the names of the team members involved and the procedures performed. | *[Document the initials or names of team members and procedures performed (e.g., Jane Doe performed step a) below)]*<br>**Prepared by Madeline Pacocha, PwC** |
|---|---|

| Procedures | Results | Links |
|---|---|---|
| a) Obtain a rollforward schedule of notes receivable balances, agree balances and test mathematical accuracy. | ☑ Obtained a rollforward schedule of notes receivable balances. Attached in tab *'Results Template'* or provided link.<br><br>**Note that the team obtained the closing balances of notes and accounts receivable by account type/entity. Attached schedule in the <Detail> tab. Additionally, note that the due from receivables listing was target tested for accounts greater than $10M and the remaining population was non-stat tested. Refer to selections made and testing performed in the < Results Template>**<br><br>**AND**<br><br>☑ Agreed balances to prior period workpapers and closing balances to the general ledger, and<br><br>　☑ No reconciling items noted, or<br>　☐ Reconciling items are not significant or unusual (when considered both individually and in the aggregate); therefore no further testing performed, or<br>　*[Document reconciling items noted and rationale for determination]*<br><br>　☐ Significant or unusual reconciling items noted; therefore performed further testing as follows:<br><br>　*[Document reconciling items noted and testing performed or provide link]*<br><br>**AND**<br>☑ Tested mathematical accuracy of the rollforward schedule, as follows:<br>*[Document schedule name(s), details of testing performed or provide link to tickmarked schedule]*<br>**Refer to the <Detail> tab for procedures performed.**<br>　☑ Verified spreadsheet formula.<br>　☐ Manually added or recalculated.<br>　☐ Application controls over related report tested.<br>　☐ Other [Specify below].<br>　*[Document details of testing, if not included in the linked schedule]* | |
| b) Agree activity within the rollforward to testing performed. | ☐ Not applicable. There was no current period activity, or<br>☑ Agreed activity within the rollforward to testing performed in the following EGAs (check those that apply):<br>　☑ Total additions to testing performed in the EGA *Test additions - Notes receivable*.<br>　☑ Total payments to testing performed in the EGA *Test payments - Notes receivable*.<br>　**The team tested additions and payments within this EGA. Refer to the subsequent tabs for procedures performed.** | Results Template |

## Rollforward - Notes receivable

| | | |
|---|---|---|
| | **AND**<br><br>☑ Obtained appropriate supporting documentation for any other adjustments within the rollforward, and:<br><br>☐ Tested a selection of adjustments (test(s) added from Aura Tests of Details template), or<br><br>*[Document other items tested and the details of work performed or provide link]*<br><br>☐ Tested all adjustments.<br>*[Document other items tested and the details of work performed or provide link]*<br><br>**The audit team tested all adjustments for notes selected for testing. Refer to the \<Results Template\> tab for testing performed.** | |

## Rollforward - Notes receivable

| | | |
|---|---|---|
| c) Obtain detailed listing(s) of the ending balance of notes receivable by asset, agree balances and test mathematical accuracy.<br><br>_Service Delivery Center activities:_<br><br><br><br>_Tests of Details_ | ☐ Not applicable. The rollforward in procedure a) was performed at the individual asset level, or<br><br>☑ Obtained detailed listing(s) of the ending balance of notes receivable.<br>_[Document details of accounts selected or provide link to detailed listing(s) obtained]_<br><br>**Refer to the <Results Template> tab for procedures performed. Additionally, note that the due from receivables listing was target tested for accounts greater than $10M and the remaining population was non-stat tested. Refer to testing performed in the < Results Template>**<br><br>**AND**<br><br>☑ Agreed the total per the detailed listing to the ending balance per the rollforward, and:<br>    ☐ No reconciling items noted, or<br>    ☐ Reconciling items are not significant or unusual (when considered both individually and in the aggregate); therefore no further testing performed, or<br>    _[Document reconciling items noted and rationale for determination]_<br><br>    ☐ Significant or unusual reconciling items noted; therefore performed further testing as follows:<br><br>    _[Document reconciling items noted and testing performed or provide link]_<br><br>**AND**<br>☑ Tested mathematical accuracy of the detailed listing, as follows:<br>_[Document schedule name(s), details of testing performed or provide link to tickmarked schedule]_<br>    ☐ Verified spreadsheet formula.<br>    ☐ Manually added or recalculated.<br>    ☐ Application controls over related report tested.<br>    ☐ Other [Specify below].<br>    _[Document details of testing, if not included in the linked schedule]_ | Results Template |
| d) Define what constitutes an unexpected or unusual balance and scan the subledgers or detailed listing of ending balances of notes receivable by asset for unexpected (e.g. credit balances, large balances not confirmed, etc.) or unusual items. | ☑ Defined what constitutes an unexpected or unusual balance, as follows:<br>_[Define and document what constitutes an unexpected or unusual balance]_<br><br>**An unexpected or unusual balance is defined as anything that is not considered in Due from Affiliate, within the details. The engagement team performed a Credit Risk Analysis over the material balances within the <Detail> tab to ensure that there were no unexpected or unusual loans. Refer to the <Credit Risk Analysis> tab for the engagement team analysis over the related balances.**<br><br>**AND**<br>☑ Scanned the subledgers or detailed listings noting the following:<br>    ☐ No unexpected or unusual balances, or<br>    ☐ Unusual or unexpected balances identified:<br>    _[Document details of unexpected or unusual balances identified and resolution]_ | |

## Rollforward - Notes receivable

### *Additional engagement specific procedures, if necessary*

| Procedures | Results |
|---|---|
| [Document engagement specific additional procedures, if necessary]<br>N/A | [Document results of additional procedures]<br>N/A |

**HCMLP**
**Various Assets - Detail**
**12/31/2018**
Prepared by Madeline Pacocha, PwC

**Note:** The below detail is for the Due From and Notes Receivable FSLI's. The team tested 100% of the Notes Receivable balance and performed a target test in addition non-stat sample over the Due from Affiliate balance to ensure adequate coverage. Refer below for testing references.

**LS**

**Due from affiliates**

| | | | | |
|---|---|---|---:|---|
| 14010 | CASH INTEREST RECEIVABLE | | 53,104 | |
| 14140 | SHARED SVCS FEE RECVBL - PYXIS | | 235,476 | |
| 14142 | SHARED SVCS FEE RECVBL - HCLOH | | 30,036 | |
| 14148 | SHARED SVCS FEE RECVBL - RAND ADVISORS | | 2 | |
| 14530 | DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 13,884,352 | TT |
| 14531 | DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 4,895,352 | NS |
| 14532 | DUE FROM NEXPOINT ADVISORS | | 28,417,403 | TT |
| 14533 | DUE FROM HCRE PARTNERS | | 9,005,843 | NS |
| 14565 | DUE FROM OTHER - TAX LOANS | | 30,141,021 | TT |
| 14575 | DUE FROM HIGHLAND CAPITAL OF NEW YORK | | 4,951,652 | NS |
| 14580 | DUE FROM NEXBANK | | 60,000 | |
| 14585 | DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | | 60,167,335 | TT |
| 14595 | DUE FROM HIGHLAND CAPITAL KOREA | | 3,564,966 | |
| 14750 | LONG TERM NOTES RECEIVABLE | | 21,556,268 | TT |
| | **Total** | | 176,962,810 | **Rc** |

^

| SUMMARY | |
|---|---:|
| **Rc** | |
| **Total Due From** | **176,962,810** |
| Target Test Count | 5 |
| Total Targeted | 154,166,379 |
| Total Non Stat | 18,852,847 |
| # of selections | 3 |
| Total Tested | 173,019,226 |
| | 3,943,584 |

TOD Form: Test Due from Affiliates

| Interest Income Tested | |
|---|---:|
| HCMSI | 265,120 |
| Dondero Tax Loan | 293,571 |
| HCRE | 468,096 |
| Hunter Mountain | 1,582,893 |
| Total Tested | 2,609,679 |

^

**Tickmark Legend**
**^** Footed without exception.
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**LS** Amount agrees to the lead schedule linked below.
  Lead schedule - Assets
**NS** Amount was selected for Non-Statistical Sampling Testing. Refer to the Non-Stat template linked below for further information and to the
  TOD Form: Test Due from Affiliates
**TT** Due from
  TOD Form: Test Due from Affiliates
**<PM** Remaining balance is below performance materiality, waive further review.

**Highland Capital Management, L.P.**
**Credit Risk Analysis**
**12/31/2018**
Prepared by Madeline Pacocha, PwC

**Note:** The audit team performed a credit analysis for all material (above performance materiality) notes receivable in order to determine the nature and intent of each note as well as assess the ability of the payee to pay the note. Refer to the team's analysis below.

<Details>

| Account # | Counter Party | Amount | Interest Rate | Maturity Date | Nature | Recoverability |
|---|---|---|---|---|---|---|
| 14530 | Highland Capital Management Services (James Dondero majority owner) | 13,884,352 | 2.75% | 12/31/2047 | Highland Capital Management Services is an S Corp that acts as a platform investment company for one-off investments. Loans are provided to this entity primarily in order to provide seed capital for new investments. | Based on our testing performed over this loan, the engagement team notes that all the previous loans issued to HCMSI have been restructured and consolidated into one loan with a maturity date of 12/31/2047 and a yearly installment payment plan. The audit team also vouched interest payments being made by the fund, which also signifies that they have the ability to continue to make their payments. As such, the team is comfortable that the fund will be able to pay the loan when it becomes due. Further note that HCM Services has also paid back $588K to HCMLP in principal payments for 2018 (vouched by engagement team) and paid off all the interest owed to the fund as of 12/31/2018. As the fund is showing an ability by continuing to make payments subsequent to year end and an installment payment plan has been implemented , the audit team is comfortable that the entity has the ability to pay down this loan when it becomes due. Furthermore, Jim Dondero owns more than 70% of this entity. |
| 14531 | Highland Capital Fund Advisors | 4,895,352 | 2.62% | On demand but not before 5/31/2019 | Loans are made to HCMF for the fund's operational purposes. | Per review of the audited HCMF financial statements, the engagement team notes that the fund is realizing profits and has a positive cash flow. Based on the team's going concern considerations for this fund, the expectation is that the fund will be in positive partners capital by the next fiscal year. Based on the profit and improving performance of the fund, the team is comfortable that they will be able to pay the loan when it becomes due. |
| 14532 | Nexpoint Advisors | 28,417,403 | 6% | 12/31/2047 | Loans are made to Nexpoint for the fund's operational purposes. | Per review of the audited Nexpoint financial statements, the engagement team notes that the fund is realizing profits and has a positive cash flow. Based on the team's going concern considerations for this fund, the expectation is that the fund continue to recover from it's negative partners' capital balance in the coming years as it continues to improve performance and does not over distribute partners' capital. The engagement team additionally notes that NPA has stopped waiving management fees to the BDC (Nexpoint Capital Strategies) which is expected to significantly increase their revenue for future period. Based on the profit and improving performance of the fund, the team is comfortable that they will be able to pay the loan installments as they become due. |
| 14533 | HCRE Partners (James Dondero) | 9,005,843 | Varies | On demand and 12/31/2047 | HCRE Partners is a real estate investment entity that investments in opportunistic real estate investments and historically has realized substantial gains. Loans are provided to this entity primarily in order to provide seed capital for new investments. Note that 31% of this balance is due on demand. The remaining 69% is made up of a restructured loan that has a maturity date of 12/31/2047. | Per discussions with Dave Klos, HCMLP, the audit team notes that these loans are made at a high interest rate in order to encourage the fund to pay off the loan quickly. The audit team also vouched interest and principal payments being made by the fund, which also signifies that they have the ability to continue to make their payments. As such, the team is comfortable with the recoverability of this note. Additionally, Jim Dondero owns more than 70% of this entity. |
| 14565 | James Dondero | 30,141,021 | 2.03%-2.25% | On demand and 12/31/2047 | Related to Loans given to Limited Partners within the fund including James Dondero and Mark Okada in order to satisfy tax liability. Both have little basis in the fund, therefore a tax loan was given instead of an equity distribution. Note that James Dondero's portion was 92% of this balance and has a maturity date of 12/31/2047. | Per review of the Nexpoint Strategy Opportunities Fund form 13D filed with the SEC on 10/25/18, the engagement team notes that James Dondero owns 16.8% of this fund. Per review of the audited 12/31/18 financial statements for NHF, we note a total Net Asset Value of $767.7 million, which leaves Dondero's ownership value in the fund at $128.9 million. Additionally, the team notes that per NexPoint Residential Trust, Inc. form DEF 13D filed with the SEC on 11/20/2018, James Dondero also owns 19.65% of NexPoint Residential Trust. Per review of the audited 12/31/18 financial statements for NXRT, we note a total Net Asset Value of $296,028,000 which leaves Dondero's ownership value in the fund at $58,169,502. Based solely on these two investment values ($188,069,502 value), not considering his extensive ownership of other assets, the team notes that Mr. Dondero has significant net worth in excess of the amount that is payable to HCMLP and therefore he has the ability to pay the loan. We note that because NHF is a publicly traded fund, he has the ability to sell his shares or transfer them back to HCMLP to satisfy the debt. |
| 14750 | Dugaboy (James Dondero) | 21,556,268 | 3.26% | 12/31/2047 | The audit team notes that this note was primarily made in order to donate assets held by the fund to charity. Therefore, the fund sold assets in exchange for a Note Payable ultimately from Dugaboy, of which the primary beneficiary is James Dondero. | See above. |
| 14585 | Hunter Mountain Investment Trust (James Dondero) | 60,167,335 | 2.61% | On demand | Note that Hunter Mountain purchased 99.5% of HCMLP. This loan was originally made for seller financing of the purchase of HCMLP as a part of the purchase price was paid in cash and a portion was financed as a note payable to HCMLP. | As Hunter Mountain owns 99.5% of HCMLP (verified through capital testing), the audit team notes that if Hunter Mountain did not have the ability to pay what note became due, HCMLP could simply recover the receivable by netting off Hunter Mountain's capital balance. As such, the team is comfortable with the recoverability of this note. Additionally, the team notes that James Dondero is a significant owner of Hunter Mountain through the Crown Global Life Insurance. Therefore, the team notes that Mr. Dondero has significant net worth in excess of the amount that is payable to HCMLP and therefore he has the ability to pay the loan. |

**Tickmark Legend**
**A** Agrees to the note agreements obtained within the <Results Template> tab for testing.

**Appx. 01537**

**Rollforward schedule of notes receivable**

| G/L Account | Account Description | Amount per Client | | Balance per Testing Performed | TM | Rc, imm Differences | |
|---|---|---|---|---|---|---|---|
| **Target Tested** | | | | | | | |
| 14530 | DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 13,884,352 | <Detail> | 13,884,352 | <Due from HCMSI> | - | imm |
| 14532 | DUE FROM NEXPOINT ADVISORS | 28,417,403 | <Detail> | 28,417,403 | A | - | |
| 14565 | DUE FROM OTHER - TAX LOANS | 30,141,021 | <Detail> | 30,141,021 | B | 0 | |
| 14585 | DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | 60,167,335 | <Detail> | 60,167,336 | <Due from Hunter Mountain> | (1) | |
| 14750 | LONG TERM NOTES RECEIVABLE | 21,556,268 | <Detail> | 21,556,268 | <Dugaboy> | - | |
| | **Total Amount Targeted** | 154,166,379 | | 154,166,379 | | (0) | |
| **Non-Stat** | | | | | | | |
| 14531 | DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 4,895,352 | <Detail> | 4,895,468 | A | -116.00 | |
| 14533 | DUE FROM HCRE PARTNERS | 9,005,843 | <Detail> | 9,005,843 | C | 0 | |
| 14575 | DUE FROM HIGHLAND CAPITAL OF NEW YORK | 4,951,652 | <Detail> | 4,951,652 | <New York> | (0) | |
| | **Total Amount Non-Stat** | 18,852,847 | | 18,852,963 Rc | | (115.89) | |
| | **Total Amount Tested** | 173,019,226.00 | | 173,019,342.30 Rc | | -116.30 | Rc, imm |

**Tickmark Legend**

**Rc** Amount recalculated. Refer to respective cell for formula detail.

**imm** Amount is immaterial, below SUM. Further testing is waived.

**^** Amount footed. Refer to respective cell for formula detail.

**PY** Agrees to the prior year Asset lead schedule tested by the audit team without exception.

**A** The engagement team notes that the receivables above relate to amounts due from other audited HCM entities for loans provided by Highland Capital Management, L.P. ("HCMLP") to Highland Capital Management Fund Advisors ("HCMFA") or NexPoint Advisors ("NPA"). Further note the engagement team prepared and tested the Due to HCMLP rollforwards for both HCMFA and NPA, which correspond to the receivables amount above in conjunction with testing over those entities, without exception. Note that the following procedures were performed within the EGAs linked below.

| | Amount | |
|---|---|---|
| Due from HCMFA | 4,895,468 | Understand debt agreements and test compliance |
| Due from Nexpoint | 28,417,403 | Understand debt agreements and test compliance |

**B** The engagement team notes that this amount is made up of 2 separate loans issued for tax purposes to two owners, James Dondero and Mark Okada. Refer to the <Dondero Tax Loan> tab for testing and support obtained. The note receivable due from Mark Okada has not had any paydowns in the current year. As such Okada's note receivable balance as of 12/31/2018 is consistent with prior year.

| Date | Lender | Interest Rate | Amount | |
|---|---|---|---|---|
| Various | HCM Dondero | Various | 28,891,021 | <Dondero Tax Loan> |
| 4/15/2016 | HCM Okada | 2.25% | 1,250,000 | 04152016 HCM Okada $1.25M |
| | | | 30,141,021 | Rc |

**C** The engagement team notes that this amount is made up of 4 separate loans issued to HCRE. We not that one of the notes was restructured in the current year and an additional note has been issued. Refer below for support reconciliation and support obtained from Kristin Hendrix, HCM.

| Date | Lender | Interest Rate | Amount | |
|---|---|---|---|---|
| 11/27/2013 | HCRE #9 | 2.03% | 100,000 | PY |
| 5/31/2017 | HCRE Restructured | 8.00% | 5,655,843 | <HCRE Restructure> |
| 10/12/2017 | HCRE #10 | 8.00% | 2,500,000 | 10122017 HCRE $2.5M |
| 10/15/2018 | HCRE #11 | | 750,000 | <HCRE Restructure> |
| | | | 9,005,843 | Rc |

**Appx. 01538**

**Due from Highland Capital Management Services**
**Account Detail - Year end Balances**
**12/31/2018**
**PBC, tickmarked by Madeline Pacocha, PwC**

Note: The engagement team notes that the individual notes issued to HCM Services in the prior years were restructured and consolidated on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.



Closing Date    5/31/2017 **A**
Beginning Principle Balance $   20,247,828.02
Interest Rate   2.75%

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|------|------|------|------|------|------|------|
| 12/31/2017 | | | | 14,122,352 | PYWP | 14,122,352 |
| 1/31/2018 | 32,984 | 0 | 32,984 | 14,122,352 | | 14,122,352 |
| 2/28/2018 | 29,792 | - | 62,777 | 14,122,352 | | 14,122,352 |
| 3/31/2018 | 32,984 | - | 95,761 | 14,122,352 | | 14,122,352 |
| 4/30/2018 | 31,920 | - | 127,682 | 14,122,352 | | 14,122,352 |
| 5/31/2018 | 32,984 | - | 160,666 | 14,122,352 | - | 14,122,352 |
| 6/30/2018 | 31,920 | - | 192,586 | 14,122,352 | - | 14,122,352 |
| 7/31/2018 | 32,984 | - | 225,571 | 14,122,352 | - | 14,122,352 |
| 8/31/2018 | 32,984 | - | 258,555 | 14,122,352 | - | 14,122,352 |
| 9/30/2018 | 31,920 | - | 290,476 | 14,122,352 | - | 14,122,352 |
| 10/8/2018 | 8,512 | (412,000) | (113,012) | 14,122,352 | (588,000) | 13,534,352 **1** |
| 10/31/2018 | 31,611 | - | (81,401) | 13,534,352 | - | 13,534,352 |
| 11/30/2018 | 30,591 | - | (50,810) | 13,534,352 | - | 13,534,352 |
| 12/31/2018 | 31,611 | - | (19,199) | 13,534,352 | - | 13,534,352 |
| **Totals** | 265,120 | (412,000) | (19,199) | | (588,000) | **13,534,352** |

| SUMMARY | |
|---|---|
| Ending Principal Bal | 13,534,352 above |
| Accrued Interest | (19,199) ↓ +PM |

Closing Date   6/25/2018 **C**
Beginning Principal   200,000
Interest Rate   3.050%

| Date | Interest Paid | Accrued Interest | Rc Beg. Prin Balance | Principal Paid | Rc Ending Prin Bal |
|------|------|------|------|------|------|
| 6/25/2018 | | | 200,000 | | 200,000 |
| 6/30/2018 | | 83.06 | 200,000 | | 200,000 |
| 7/31/2018 | | 518.08 | 200,000 | | 200,000 |
| 8/31/2018 | | 518.08 | 200,000 | | 200,000 |
| 9/30/2018 | | 501.37 | 200,000 | | 200,000 |
| 10/31/2018 | | 518.08 | 200,000 | | 200,000 |
| 11/30/2018 | | 501.37 | 200,000 | | 200,000 |
| 12/31/2018 | | 518.08 | 200,000 | | 200,000 |

| Summary | |
|---|---|
| Ending Principal | 200,000 |
| Accrued Interest | 518.08 |

Closing Date   3/26/2018 **D**
Beginning Principal   150,000
Interest Rate   2.880%

| Date | Interest Paid | Accrued Interest | Rc Beg. Prin Balance | Principal Paid | Rc Ending Prin Bal |
|------|------|------|------|------|------|
| 3/26/2018 | | | 150,000 | | 150,000 |
| 3/31/2018 | | 62.67 | 150,000 | | 150,000 |
| 4/30/2018 | | 376.03 | 150,000 | | 150,000 |
| 5/31/2018 | | 388.56 | 150,000 | | 150,000 |
| 6/30/2018 | | 376.03 | 150,000 | | 150,000 |
| 7/31/2018 | | 388.56 | 150,000 | | 150,000 |
| 8/31/2018 | | 388.56 | 150,000 | | 150,000 |
| 9/30/2018 | | 376.03 | 150,000 | | 150,000 |
| 10/31/2018 | | 388.56 | 150,000 | | 150,000 |
| 11/30/2018 | | 376.03 | 150,000 | | 150,000 |
| 12/31/2018 | | 388.56 | 150,000 | | 150,000 |

| Summary | |
|---|---|
| Ending Principal | 150,000 |
| Accrued Interest | 388.56 |

**Tickmark Legend**
* Footed without exception.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
imm Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
+PM Amount is below performance materiality, further testing waived.
A Agreed to the restructure Loan Agreement obtained from Kristen Hendrix, HCM, without exception. Refer to Agreement linked below.
    05212017 HCMSI Loan Restructure
B Agreed to cash deposit in the Nexbank bank statement (account # 1614130) for each respective month noted, without exception. Further testing waived. Refer below for breakdown of payment.

   **1) October**

     Principle Payment    (588,000) above
     Interest Payment    (412,000) above
           (1,000,000) B

C Agreed to the Loan Agreement obtained from Kristen Hendrix, HCM, without exception. Refer to agreement linked below.
    06252018 HCMSI Loan $200k
D Agreed to the Loan Agreement obtained from Kristen Hendrix, HCM, without exception. Refer to agreement linked below.
    03262018 HCMSI $150K
E See the reconciliation below for total due from HCMSI
    Ending Principal
      5/31/2017    13,534,352 Above
      6/25/2018    200,000 ↓
      3/26/2018    150,000 ↓
          13,884,352 Rc
          13,884,352 LS
     Difference     -    Rc, imm

**Due from James Dondero - Tax Loan**
**Account Detail - Year end Balances**
**12/31/2018**
PBC, tickmarked by Madeline Pacocha, PwC

Note: The engagement team notes that in prior year there were six loans given to James Dondero, HCM Owner, for tax purposes. The original loan balances were agreed to their note agreements in the prior year, without exception. Note that there were four new note receivables during 2018. The audit team obtained the original agreement and the debt rollforward from Kristin Hendrix, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the sum of the ending balance of the notes agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

### Note 1

| | | |
|---|---|---|
| Restructured Closing Date | 5/31/2017 A | D6212017 Dondero Loan Restructure |
| Total Commitment Restructured | $ 14,977,274 | |
| Rate | 2.03% | |

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|---|---|---|---|---|---|---|
| 12/31/2017 | - | - | - | 14,478,031.16 | PYWP - | 14,478,031.16 |
| 1/31/2018 | 24,961.71 | | 24,961.71 | 14,478,031.16 | | 14,478,031.16 |
| 2/28/2018 | 22,546.06 | | 47,507.78 | 14,478,031.16 | | 14,478,031.16 |
| 3/31/2018 | 24,961.71 | | 72,469.49 | 14,478,031.16 | | 14,478,031.16 |
| 4/30/2018 | 24,156.50 | | 96,625.98 | 14,478,031.16 | | 14,478,031.16 |
| 5/31/2018 | 24,961.71 | | 121,587.70 | 14,478,031.16 | | 14,478,031.16 |
| 6/30/2018 | 24,156.50 | | 145,744.19 | 14,478,031.16 | | 14,478,031.16 |
| 7/31/2018 | 24,961.71 | | 170,705.90 | 14,478,031.16 | | 14,478,031.16 |
| 8/31/2018 | 24,961.71 | - | 195,667.62 | 14,478,031.16 | | 14,478,031.16 |
| 9/30/2018 | 24,156.50 | - | 219,824.11 | 14,478,031.16 | | 14,478,031.16 |
| 10/31/2018 | 24,961.71 | - | 244,785.82 | 14,478,031.16 | | 14,478,031.16 |
| 11/30/2018 | 24,156.50 | - | 268,942.32 | 14,478,031.16 | - | 14,478,031.16 |
| 12/19/2018 | 15,259.11 | (283,380.69) | 860.74 | 14,478,031.16 | (499,242.45) | 13,978,788.71 |
| 12/31/2018 | 9,329.41 | | 10,190.15 | 13,978,788.71 | | 13,978,788.71 |
| Totals | 293,570.84 | (283,380.69) | 10,190.15 | | (499,242.45) | 13,978,788.71 |

| SUMMARY | |
|---|---|
| Ending Principal Bal | 13,978,789 above |
| Accured Interest | 10,190 <PM |

### Note 2

| | | |
|---|---|---|
| Closing Date | 2/2/2018 A | 02022018 HCM JD $3,825M |
| Total Commitment Restructured | 3,825,000 | |
| Rate | 2.66% | |

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|---|---|---|---|---|---|---|
| 2/2/2018 | | | | 3,825,000 | | 3,825,000 |
| 2/28/2018 | 7,247.59 | | 7,247.59 | 3,825,000 | | 3,825,000 |
| 3/31/2018 | 8,641.36 | | 15,888.95 | 3,825,000 | | 3,825,000 |
| 4/30/2018 | 8,362.60 | | 24,251.55 | 3,825,000 | | 3,825,000 |
| 5/31/2018 | 8,641.36 | | 32,892.90 | 3,825,000 | | 3,825,000 |
| 6/30/2018 | 8,362.60 | | 41,255.51 | 3,825,000 | | 3,825,000 |
| 7/31/2018 | 8,641.36 | | 49,896.86 | 3,825,000 | | 3,825,000 |
| 8/31/2018 | 8,641.36 | | 58,538.22 | 3,825,000 | | 3,825,000 |
| 9/30/2018 | 8,362.60 | | 66,900.82 | 3,825,000 | | 3,825,000 |
| 10/31/2018 | 8,641.36 | | 75,542.18 | 3,825,000 | | 3,825,000 |
| 11/30/2018 | 8,362.60 | | 83,904.78 | 3,825,000 | | 3,825,000 |
| 12/31/2018 | 8,641.36 | | 92,546.14 | 3,825,000 | | 3,825,000 |
| Totals | 92,546.14 | | 92,546.14 | | | 3,825,000 |

| Summary | |
|---|---|
| Ending Principal Bal | 3,825,000 above |
| Accured Interest | 92,546 <PM |

### Note 3

| | | |
|---|---|---|
| Closing Date | 8/1/2018 A | 08012018 HCM to JD $2.5M |
| Total Commitment Restructured | 2,500,000 | |
| Rate | 2.95% | |

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|---|---|---|---|---|---|---|
| 8/1/2018 | | | | 2,500,000 | | 2,500,000 |
| 8/31/2018 | 6,061.64 | | 6,061.64 | 2,500,000 | | 2,500,000 |
| 9/30/2018 | 6,061.64 | | 12,123.29 | 2,500,000 | | 2,500,000 |
| 10/31/2018 | 6,263.70 | | 18,386.99 | 2,500,000 | | 2,500,000 |
| 11/30/2018 | 6,061.64 | | 24,448.63 | 2,500,000 | | 2,500,000 |
| 12/31/2018 | 6,263.70 | | 30,712.33 | 2,500,000 | | 2,500,000 |
| Totals | 30,712.33 | | 30,712.33 | | | 2,500,000 |

| Summary | |
|---|---|
| Ending Prinpal Bal | 2,500,000 above |
| Accured Interest | 30,712 <PM |

### Note 4

| | | |
|---|---|---|
| Closing Date | 1/18/2018 A | 01182018 HCM JD $7.9M Loan |
| Total Commitment Restructured | 7,900,000 | |
| Rate | 2.59% | |

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|---|---|---|---|---|---|---|
| 1/18/2018 | | | | 7,900,000 | | 7,900,000 |
| 1/31/2018 | 7,287.48 | | 7,287.48 | 7,900,000 | | 7,900,000 |
| 2/28/2018 | 15,696.11 | | 22,983.59 | 7,900,000 | | 7,900,000 |
| 3/31/2018 | 17,377.84 | | 40,361.42 | 7,900,000 | | 7,900,000 |
| 4/30/2018 | 16,817.26 | | 57,178.68 | 7,900,000 | | 7,900,000 |
| 5/31/2018 | 17,377.84 | | 74,556.52 | 7,900,000 | | 7,900,000 |
| 6/30/2018 | 16,817.26 | | 91,373.78 | 7,900,000 | | 7,900,000 |
| 7/31/2018 | 17,377.84 | | 108,751.62 | 7,900,000 | | 7,900,000 |
| 8/31/2018 | 17,377.84 | | 126,129.45 | 7,900,000 | | 7,900,000 |
| 9/30/2018 | 16,817.26 | | 142,946.71 | 7,900,000 | | 7,900,000 |
| 10/31/2018 | 17,377.84 | | 160,324.55 | 7,900,000 | | 7,900,000 |
| 11/30/2018 | 16,817.26 | | 177,141.81 | 7,900,000 | | 7,900,000 |
| 12/18/2018 | 10,090.36 | (187,232) | 0.00 | 7,900,000 | (1,812,768) | 6,087,232 |
| 12/31/2018 | 7,287.48 | | 7,287.48 | 6,087,232 | | 6,087,232 |
| Totals | 7,287.48 | | 7,287.48 | | | 6,087,232 |

| Summary | |
|---|---|
| Ending Principal Bal | 6,087,232 above |
| Accured Interest | 7,287 <PM |

### Note 5

| | | |
|---|---|---|
| Closing Date | 8/13/2018 A | 08132018 HCM to JD $2.5M |
| Total Commitment Restructured | 2,500,000 | |
| Rate | 2.95% | |

| Date | Rc Interest Income | B Interest Paid | Rc Accrued Interest | Rc Beg Prin Bal | B Principal Paid | Rc Ending Prin Bal |
|---|---|---|---|---|---|---|
| 8/13/2018 | | | | 2,500,000 | | 2,500,000 |
| 8/31/2018 | 3,636.99 | | 3,636.99 | 2,500,000 | | 2,500,000 |
| 9/30/2018 | 6,061.64 | | 9,698.63 | 2,500,000 | | 2,500,000 |
| 10/31/2018 | 6,263.70 | | 15,962.33 | 2,500,000 | | 2,500,000 |
| 11/30/2018 | 6,061.64 | | 22,023.97 | 2,500,000 | | 2,500,000 |
| 12/31/2018 | 6,263.70 | | 28,287.67 | 2,500,000 | | 2,500,000 |
| Totals | 28,287.67 | | 28,287.67 | | | 2,500,000 |

| Summary | |
|---|---|
| Ending Principal Bal | 2,500,000 above |
| Accured Interest | 28,288 <PM |

| Summary of Dondero Tax Loans | |
|---|---|
| Total Ending Principal Balances | 28,891,021 Above |

**Tickmark Legend**
* Footed without exception.
Rc  Recalculated amount. Refer to the respective cell's formula for further details.
imm  Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP  Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
<PM  Amount is below performance materiality, further testing waived.
A  Agreed to the restructure Loan Agreement obtained from Drew Wilson, HCM, without exception. Refer to agreement linked below.
Note 1  06212017 Dondero Loan Restructure
Note 2  02022018 HCM JD $3,825M
Note 3  08012018 HCM to JD $2.5M
Note 4  01182018 HCM JD $7.9M Loan
Note 5  08132018 HCM to JD $2.5M

B  Agreed to cash deposit in the December Compass  bank statement (account #: 0025876342), without exception. Further testing waived. Note that the interest and principle payment were made in two lump sum payment of $782,623 and $2,000,000. Refer below  for breakdown of payment.

**Note 1**

| | | |
|---|---|---|
| Principle Payment | 499,242 | above |
| Interest Payment | 283,381 | above |
| | 782,623 | B |

**Note 4**

| | | |
|---|---|---|
| Principle Payment | 1,812,768 | above |
| Interest Payment | 187,232 | above |
| | 2,000,000 | B |

Appx. 01540

**Due from Get Good**
**Account Detail - Year end Balances**
**12/31/2018**
PBC, tickmarked by Madeline Pacocha, PwC

> **Note:** The engagement team notes that this amount is a related to a Note Receivable from Get Good original sold on 12/28/2016. Per review of the original purchase agreement, linked below, the audit team notes that HCMLP exchanged assets (held as a liability) for the right to receive 97.6835% of Get Good's Note receivable. We note that the original note receivable issued to Get Good Trust from the Dugaboy Trust was for $24,268,621.69 on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Drew Wilson, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

06212017 Dugaboy Interest Amendment
GG and HCM PSA Crusader - Loan Fund - AAL_63370369_2

|  |  |  | **HCM** |  |
|---|---|---|---|---|
|  |  |  |  | **PYWP** |
| Original Note Date | 12/28/2016 |  | 97.6835% | |
| Original Note Amount $ | 23,817,640 | $ | 23,265,904 | |
| | | | | |
| Restructured Closing Date | 5/31/2017 |  | 97.6835% | **A** |
| Total Restructured Amount $ | 24,268,622 | $ | 22,860,559 | |
| Rate | 3.260% |  |  | |

| | **B** | **Rc** | **Rc** | **B** | **Rc** |
|---|---|---|---|---|---|
| Date | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
| 12/31/2017 | | | 22,860,559.00 | **PYWP** | 22,860,559.00 |
| 1/31/2018 | | 63,295.56 | 22,860,559.00 | | 22,860,559.00 |
| 2/28/2018 | | 57,170.19 | 22,860,559.00 | | 22,860,559.00 |
| 3/31/2018 | | 63,295.56 | 22,860,559.00 | | 22,860,559.00 |
| 4/30/2018 | | 61,253.77 | 22,860,559.00 | | 22,860,559.00 |
| 5/23/2018 | (2,195,709) | 46,961.23 | 22,860,559.00 | (1,304,291.00) | 21,556,268.00 |
| 5/31/2018 | - | 15,402.40 | 21,556,268.00 | | 21,556,268.00 |
| 6/30/2018 | - | 57,758.99 | 21,556,268.00 | | 21,556,268.00 |
| 7/31/2018 | - | 59,684.29 | 21,556,268.00 | | 21,556,268.00 |
| 8/4/2018 | - | 7,701.20 | 21,556,268.00 | | 21,556,268.00 |
| 8/31/2018 | - | 51,983.09 | 21,556,268.00 | | 21,556,268.00 |
| 9/30/2018 | | 57,758.99 | 21,556,268.00 | | 21,556,268.00 |
| 10/31/2018 | - | 59,684.29 | 21,556,268.00 | | 21,556,268.00 |
| 11/30/2018 | - | 57,758.99 | 21,556,268.00 | | 21,556,268.00 |
| 12/31/2018 | | 59,684.29 | 21,556,268.00 | | 21,556,268.00 |
| **Totals** | **-** | **59,684.29** | | **(1,304,291.00)** | **21,556,268.00** |
| | ^ | | | ^ | ^ |

| **SUMMARY** | | |
|---|---|---|
| Ending Principal Bal | 21,556,268 | above |
| Accrued Interest | 59,684 | ↓ <PM |

**Tickmark Legend**
^ Footed without exception.
Rc Recalculated amount. Refer to the respective cell's formula for further details.
imm Amount is immaterial (below SUM). Therefore, further analysis is waived.
PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
<PM Amount is below performance materiality, further testing waived.
A Agreed to the restructure Get Good Note Receivable Loan Agreement obtained from Kristin Hendrix, HCM, without exception. Refer to agreement linked below.
06212017 Dugaboy Interest Amendment

B Agreed to cash deposit in the May Nex Bank statement (account #: 1614130), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $3,500,000. Refer below for breakdown of payment.

| Principle Payment | (1,304,291) | above |
|---|---|---|
| Interest Payment | (2,195,709) | above |
| | (3,500,000) | **B** |
| | ^ | |

**HCRE Restructure**
**Account Detail - Year end Balances**
**12/31/2018**
PBC, tickmarked by Madeline Pacocha, PwC

> **Note:** The engagement team notes that some of HCRE's previous notes receivables were restructured and consolidated on 5/31/2017. The audit team obtained the original restructured agreement and the debt rollforward from Kristen Hendrix, HCMLP. Refer below for the new restructured receivable rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

|  |  |  |
|---|---|---|
| Restructured Closing Date | 5/31/2017 | A |
| Total Commitment Restructured $ | 6,059,832 | |
| Rate | 8.00% | |

| Date | Interest Income (Rc) | Interest Paid (B) | Accrued Interest (Rc) | Beg Prin Bal (Rc) | | Principal Paid (B) | Ending Prin Bal (Rc) |
|---|---|---|---|---|---|---|---|
| 12/31/2017 | - | - | | 5,857,837.09 | PYWP | - | 5,857,837.09 |
| 1/31/2018 | 39,801.19 | | 39,801.19 | 5,857,837.09 | | | 5,857,837.09 |
| 2/28/2018 | 35,949.47 | | 75,750.66 | 5,857,837.09 | | | 5,857,837.09 |
| 3/31/2018 | 39,801.19 | - | 115,551.85 | 5,857,837.09 | | | 5,857,837.09 |
| 4/30/2018 | 38,517.28 | | 154,069.14 | 5,857,837.09 | | | 5,857,837.09 |
| 5/31/2018 | 39,801.19 | - | 193,870.33 | 5,857,837.09 | | | 5,857,837.09 |
| 6/30/2018 | 38,517.28 | - | 232,387.62 | 5,857,837.09 | | | 5,857,837.09 |
| 7/31/2018 | 39,801.19 | - | 272,188.81 | 5,857,837.09 | | | 5,857,837.09 |
| 8/31/2018 | 39,801.19 | | 311,990.01 | 5,857,837.09 | | | 5,857,837.09 |
| 9/30/2018 | 38,517.28 | | 350,507.29 | 5,857,837.09 | | | 5,857,837.09 |
| 10/31/2018 | 39,801.19 | | 390,308.49 | 5,857,837.09 | | | 5,857,837.09 |
| 11/30/2018 | 38,517.28 | | 428,825.77 | 5,857,837.09 | | | 5,857,837.09 |
| 12/19/2018 | 24,394.28 | (453,220.06) | (0.01) | 5,857,837.09 | | (201,994.38) | 5,655,842.71 |
| 12/31/2018 | 14,875.64 | | 14,875.63 | 5,655,842.71 | | | 5,655,842.71 |
| **Totals** | **468,095.69** | **(453,220.06)** | **14,875.63** | **5,655,842.71** | | **(201,994.38)** | **5,655,842.71** |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 5,655,843 | above |
| Accrued Interest | 14,876 | <PM |

|  |  |  |
|---|---|---|
| Restructured Closing Date | 10/15/2018 | C |
| Total Commitment Restructured $ | 750,000 | |
| Rate | 8.00% | |

| Date | Interest Income (Rc) | Interest Paid (B) | Accrued Interest (Rc) | Beg Prin Bal (Rc) | Principal Paid (B) | Ending Prin Bal (Rc) |
|---|---|---|---|---|---|---|
| 10/15/2018 | - | | - | 750,000.00 | | 750,000.00 |
| 10/31/2018 | 2,630.14 | | 2,630.14 | 750,000.00 | | 750,000.00 |
| 11/30/2018 | 4,931.51 | | 7,561.64 | 750,000.00 | | 750,000.00 |
| 12/19/2018 | 3,123.29 | - | 10,684.93 | 750,000.00 | - | 750,000.00 |
| 12/31/2018 | 1,972.60 | | 12,657.53 | 750,000.00 | | 750,000.00 |
| **Totals** | **12,657.53** | **793,388.08** | **12,657.53** | **750,000.00** | **-** | **750,000.00** |

| SUMMARY | |
|---|---|
| Ending Principal Bal | 750,000 |
| Accrued Interest | 12,658 |

**Tickmark Legend**

^ Footed without exception.

Rc Recalculated amount. Refer to the respective cell's formula for further details.

imm Amount is immaterial (below SUM). Therefore, further analysis is waived.

PYWP Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.

<PM Amount is below performance materiality, further testing waived.

A Agreed to the restructure Loan Agreement obtained from Kristen Hendrix, HCM, without exception. Refer to agreement linked below.
06212017 HCRE Partners Loan Restructure

B Agreed to cash deposit in the December Compass bank statement (account #: 0025876342), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $655,214. Refer below for breakdown of payment.

| | | |
|---|---|---|
| Principle Payment | 201,994 | above |
| Interest Payment | 453,220 | above |
| | 655,214 | B |
| | ^ | |

C Agreed to the restructure Loan Agreement obtained from Kristen Hendrix, HCM, without exception. Refer to agreement linked below.
HCMLP to HCRE 750K 10.15.18

**Note:** The engagement team notes the receivable based on an agreement with Highland Capital of New York, L.P. Based on the agreement, linked below, Highland Capital of New York, L.P. performs marketing and other services to Highland Capital, for a management fee. Purchases incurred are tracked, as detailed below, and then are netted again the management fee for the period. Further details related to the agreement are described in the transfer pricing agreement linked below. The engagement team performed a reconciliation of the transactions that occured through the year to arrive at the amount described on the trial balance ending 12/31/2018.

HC of NY Mgmt Service Agreement

PBC
Page **1** of **1**

## HCM Account

Parameters given:

|  | From | To |
|---|---|---|
| Entity | 0010 | 0010 |
| Dept | 000 | 000 |
| Account | 14575 | 14575 |
| Business | 00 | 00 |
| Future | 0000 | 0000 |
| Gl Date | 01-JAN- | 31-DEC-18 |

| | | | | | | | | | | PAYABLES | | | | RECEIVABLES | | | | FIXED ASSETS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JOURNAL ENTRIES** | | | | | | | | | | | | | | | | | | | | | | |
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | Transaction Description | Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
| Payables | Purchase Invoices | Payables A 2560696 2986308 2 | JAN-18 Purchase Invoices USD | 31-Jan-18 | 9 | Journal Import Created | 0010.000.14575 .00.0000 | 1290.88 | 0 | Charles Schwab | | 01152018 CS | 1/15/2018 401k Debits | | | | | | | | | |
| Payables | Purchase Invoices | Payables A 2560696 2986308 2 | JAN-18 Purchase Invoices USD | 31-Jan-18 | 9 | Journal Import Created | 0010.000.14575 .00.0000 | 23385.69 | 0 | HIGHLAND CAPITAL OF NEW YORK | | 1/15/2018 Payroll Funding | 1/15/2018 Payroll Funding | | | | | | | | | |
| Payables | Purchase Invoices | Payables A 2586696 3013544 2 | JAN-18 Purchase Invoices USD | 31-Jan-18 | 5 | Journal Import Created | 0010.000.14575 .00.0000 | 65000 | 0 | HIGHLAND CAPITAL OF NEW YORK | | 1/16/2018 Account Funding | 1/16/2018 HCNY Account Funding | | | | | | | | | |
| Receivables | Misc Receipts | Receivable s A 3012696 3492090 | AUG-18 Misc Receipts USD | 31-Aug-18 | 5 | Journal Import Created | 0010.000.14575 .00.0000 | 0 | 370.97 | | | | | | 08132018ADW | | | | | | | |
| Receivables | Misc Receipts | Receivable s A 3121698 3678139 | NOV-18 Misc Receipts USD | 30-Nov-18 | 6 | Journal Import Created | 0010.000.14575 .00.0000 | 0 | 1000 | | | | | | KH11022018 | | | | | | | |
| Receivables | Misc Receipts | Receivable s A 3185728 3774954 | DEC-18 Misc Receipts USD | 31-Dec-18 | 7 | Journal Import Created | 0010.000.14575 .00.0000 | 0 | 1693.25 | | | | | | HE12262018 | | | | | | | |
| Spreadshee t | Adjustment | Spreadshee t A 4017472 | 20181231 Intercompany reclass Adjustment USD | 31-Dec-18 | 2 | Intercompany Reclass | 0010.000.14575 .00.0000 | 0 | 924808.57 | | | | | | | | | | | | | |

|  |  |
|---|---|
| 1,360,487 ^ | 928,377 Rc |

| | | |
|---|---|---|
| PY Ending Balance | 4,519,542 | PYWP |
| Net Change in CY | 432,110 | Above |
| Total Due From | 4,951,652 | Rc |
|  | 4,951,652 | <Detail> |
| *Difference* | 0 | Rc, imm |

**PwC Tickmark Legend**
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**^** Footed without exception
**<Detail>** Refer to the <Detail> tab.
**PYWP** Agreed to prior year workpaper without exception.

Appx. 01543

HCMLP
Notes Receivable
12/31/2018
PBC, tickmarked by Madeline Pacocha, PwC

> **Note:** The audit team notes that this Note Receivable balance is made up of a Hunter Mountain Investment Trust note. The audit team obtained the original contribution agreement in prior year, and also obtained the debt rollforward from Sean Fox, HCMLP. Refer below for the rollforward tied out by the audit team. As the ending balance of the note agrees to the Notes Receivable balance on the lead schedule without exception, further analysis is waived.

| | | |
|---|---|---|
| Beginning Principal | 63,000,000 | **A** |
| Interest Rate | 2.61% | ↓ |
| Effective Date | 12/21/2015 | |

| Date | Interest Income **Rc** | Interest Paid | Accrued Interest **Rc** | Beg Prin Bal **Rc** | | Principal Paid **D** | PIK **B** | Ending Prin Bal **Rc** | |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/17 | 46,099 | - | 46,099 | 60,663,612 | **PYWP** | - | - | 60,663,612 | **PYWP** |
| 01/31/18 | 134,474 | - | 180,573 | 60,663,612 | | - | - | 60,663,612 | |
| 02/28/18 | 121,460 | | 302,033 | 60,663,612 | | - | - | 60,663,612 | |
| 03/31/18 | 134,474 | | 436,507 | 60,663,612 | | - | - | 60,663,612 | |
| 04/30/18 | 130,136 | - | 566,643 | 60,663,612 | | - | - | 60,663,612 | |
| 05/31/18 | 134,474 | | 701,116 | 60,663,612 | | - | - | 60,663,612 | |
| 06/30/18 | 130,136 | | 831,252 | 60,663,612 | | - | - | 60,663,612 | |
| 07/31/18 | 134,474 | - | 965,726 | 60,663,612 | | - | - | 60,663,612 | |
| 08/31/18 | 134,474 | - | 1,100,200 | 60,663,612 | | - | - | 60,663,612 | |
| 09/30/18 | 130,136 | | 1,230,336 | 60,663,612 | | - | - | 60,663,612 | |
| 10/31/18 | 134,474 | - | 1,364,809 | 60,663,612 | | - | - | 60,663,612 | |
| 11/30/18 | 130,136 | | 1,494,945 | 60,663,612 | | - | - | 60,663,612 | |
| 12/19/18 | 82,419 | (1,574,526) | 2,839 | 60,663,612 | | (504,880) | - | 60,158,732 | |
| 12/21/18 | 8,604 | (8,604) **B** | 2,839 | 60,158,732 | | - | 8,604 | 60,167,336 | |
| 12/31/18 | 43,024 | - | 45,863 | 60,167,336 | | | - | 60,167,336 | |
| **Totals** | **1,582,893** **C** | **(1,583,130)** | **45,863** | | | **(504,880)** | **8,604** | **60,167,336** | |

| SUMMARY | | |
|---|---|---|
| Ending Principal Bal | 60,167,336 | **above** |
| Accured Interest | 45,863 | **above** |

**Tickmark Legend**
**^** Footed without exception.
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**PYWP** Agreed to the prior year workpaper, without exception. Refer to the Test due from and notes receivable EGA in prior years database.
**A** Agrees to the signed Hunter Mountain contribution agreement linked below without exception. Refer to pg. 49 of the agreement for further details around these amounts.
Hunter Mountain Contribution Agreement
**B** Per review of the amortization schedule within the promissory note linked below (p. 7/7), the audit team notes that the interest accrued PIKs at it's anniversary date each year. Therefore, the team deems it reasonable that the full value of accrued interest was capitalized into the principal balance on the notes one year anniversary. Refer to the note below for further details.

HM Secured Promissory Note
**C** Agree to the Interest Income for Hunter Mountain Trust per the <80100> detail tab within an immaterial difference. Refer to the reconciliation within the aforementioned tab linked below for further details.
<80100>
**D** Agreed to cash deposit in the December Compass Bank statement (account #: 0025876342), without exception. Further testing waived. Note that the Interest and principle payment were made in one lump sum payment of $2,079,406. Refer below for breakdown of payment.

| | | |
|---|---|---|
| Principal Payment | 504,880 | **above** |
| Interest Payment | 1,583,130 | **above** |
| PIK | (8,604) | |
| | 2,079,406 | **D** |

Page 1 of 1
**HCM Account Analysis Report**
Parameters given:

| | From | To |
|---|---|---|
| Entity | 0010 | 0010 |
| Dept | 000 | 999 |
| Account | 80100 | 80100 |
| Business Unit | 00 | 99 |
| Future | 0000 | 9999 |
| GI Date | 01-JAN-18 | 31-DEC-18 |

Note: Note that Interest Income receivable makes up a portion of the Other Income balance. As a majority of interest income was calculated within this EGA, the

| | | JOURNAL ENTRIES | | | | | | | | PAYABLES | | | | RECEIVABLES | | | | FIXED ASSETS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
| Receivables | Misc Receipts | Receivables A 2720699 3148337 2 | APR-18 Misc Receipts USD | 30-Apr-18 | 2 | Journal Import Created | 0010.000.80100.00.0000 | 0 | 153.05 | | | | | | 04032018ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2927697 3379091 | JUL-18 Misc Receipts USD | 31-Jul-18 | 2 | Journal Import Created | 0010.000.80100.00.0000 | 0 | 115.4 | | | | | | 07032018ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 2955693 3396569 | JUL-18 Misc Receipts USD | 31-Jul-18 | 2 | Journal Import Created | 0010.000.80100.00.0000 | 0 | 337.38 | | | | | | 07172018ADW | | | | | | | |
| Receivables | Misc Receipts | Receivables A 3177740 3762252 2 | DEC-18 Misc Receipts USD | 31-Dec-18 | 3 | Journal Import Created | 0010.000.80100.00.0000 | 0 | 10090.36 | | | | | | HE12192018 | | | | | | | |
| Spreadsheet | Adjustment | Reverses "20180630 Interest Receivable JE Adjustment USD"01-AUG-18 09:05:08 - 3458829 | Reverses "20180630 Interest Receivable JE Adjustment USD"01-AUG-18 09:05:08 | 30-Jun-18 | 2 | 6/30 Interest Receivable JE | 0010.000.80100.00.0000 | 317670.24 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Reverses "20180831 Interest Receivable JE Adjustment USD"10-SEP-18 15:36:26 - 3554954 | Reverses "20180831 Interest Receivable JE Adjustment USD"10-SEP-18 15:36:26 | 31-Aug-18 | 2 | 8/31 Interest Receivable JE | 0010.000.80100.00.0000 | 371485.53 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3030498 | 20180131 Hunter Mountain Note Receivable Update Adjustment USD | 31-Jan-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3031144 | 20180131 NexBank MM Interest Adjustment USD | 31-Jan-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3031144 | 20180131 NexBank MM Interest Adjustment USD | 31-Jan-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3031144 | 20180131 NexBank MM Interest Adjustment USD | 31-Jan-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 1097.25 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3041181 | 20180131 Interest Receivable JE Adjustment USD | 31-Jan-18 | 2 | 1/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 356027.21 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3055700 | 20180131 Jefferies Reconciliation Adjustment USD | 31-Jan-18 | 12 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 12601.94 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3055700 | 20180131 Jefferies Reconciliation Adjustment USD | 31-Jan-18 | 13 | Carey PIK | 0010.000.80100.00.0000 | 0 | 324206.82 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3056870 | 20180101 Carey PIK Adjustment USD | 1-Jan-18 | 2 | Carey PIK | 0010.000.80100.00.0000 | 216137.88 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3093661 | 20180228 Hunter Mountain Note Receivable Update Adjustment USD | 28-Feb-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 121451.71 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3093710 | 20180228 NexBank MM Interest Adjustment USD | 28-Feb-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3093710 | 20180228 NexBank MM Interest Adjustment USD | 28-Feb-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.17 | | | | | | | | | | | | | |

Appx. 01545

| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR |
|---|---|---|---|---|---|---|---|---|---|
| Spreadsheet | Adjustment | Spreadsheet A 3093710 | 20180228 NexBank MM Interest Adjustment USD | 28-Feb-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 2058.13 |
| Spreadsheet | Adjustment | Spreadsheet A 3094101 | 20180228 Interest Receivable JE Adjustment USD | 28-Feb-18 | 2 | 2/28 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 337934.42 |
| Spreadsheet | Adjustment | Spreadsheet A 3097972 | 20180228 Jefferies Reconciliation Adjustment USD | 28-Feb-18 | 10 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 |
| Spreadsheet | Adjustment | Spreadsheet A 3097972 | 20180228 Jefferies Reconciliation Adjustment USD | 28-Feb-18 | 11 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 11892 |
| Spreadsheet | Adjustment | Spreadsheet A 3147202 | 20180331 NexBank MM Interest Adjustment USD | 31-Mar-18 | 4 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.19 |
| Spreadsheet | Adjustment | Spreadsheet A 3147202 | 20180331 NexBank MM Interest Adjustment USD | 31-Mar-18 | 5 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 399.92 |
| Spreadsheet | Adjustment | Spreadsheet A 3147202 | 20180331 NexBank MM Interest Adjustment USD | 31-Mar-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 840.21 |
| Spreadsheet | Adjustment | Spreadsheet A 3147221 | 20180331 Hunter Mountain Note Receivable Update Adjustment USD | 31-Mar-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 |
| Spreadsheet | Adjustment | Spreadsheet A 3147305 | 20180331 Interest Receivable JE Adjustment USD | 31-Mar-18 | 3 | 3/31 Interest Receivable JE - Okada True-up | 0010.000.80100.00.0000 | 0 | 770.55 |
| Spreadsheet | Adjustment | Spreadsheet A 3147305 | 20180331 Interest Receivable JE Adjustment USD | 31-Mar-18 | 4 | 3/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 376399.52 |
| Spreadsheet | Adjustment | Spreadsheet A 3161933 | 20180331 Jefferies Reconciliation Adjustment USD | 31-Mar-18 | 17 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 |
| Spreadsheet | Adjustment | Spreadsheet A 3161933 | 20180331 Jefferies Reconciliation Adjustment USD | 31-Mar-18 | 18 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 11167.62 |
| Spreadsheet | Adjustment | Spreadsheet A 3236844 | 20180430 Hunter Mountain Note Receivable Update Adjustment USD | 30-Apr-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 130126.83 |
| Spreadsheet | Adjustment | Spreadsheet A 3236875 | 20180430 NexBank MM Interest Adjustment USD | 30-Apr-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 |
| Spreadsheet | Adjustment | Spreadsheet A 3236875 | 20180430 NexBank MM Interest Adjustment USD | 30-Apr-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.17 |
| Spreadsheet | Adjustment | Spreadsheet A 3236875 | 20180430 NexBank MM Interest Adjustment USD | 30-Apr-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 498.3 |
| Spreadsheet | Adjustment | Spreadsheet A 3245730 | 20180430 Interest Receivable JE Adjustment USD | 30-Apr-18 | 2 | 4/30 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 363024.99 |
| Spreadsheet | Adjustment | Spreadsheet A 3263927 | 20180430 Jefferies Reconciliation Adjustment USD | 30-Apr-18 | 8 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 12836.42 |
| Spreadsheet | Adjustment | Spreadsheet A 3263927 | 20180430 Jefferies Reconciliation Adjustment USD | 30-Apr-18 | 9 | Carey Interest Receipt | 0010.000.80100.00.0000 | 0 | 75674.11 |
| Spreadsheet | Adjustment | Spreadsheet A 3263927 | 20180430 Jefferies Reconciliation Adjustment USD | 30-Apr-18 | 10 | Carey PIK | 0010.000.80100.00.0000 | 0 | 303377.61 |

| JOURNAL ENTRIES | | | | | | | | | | PAYABLES | | | | RECEIVABLES | | AR Transaction Number | AR Transaction Description | FIXED ASSETS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | | | Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
| Spreadsheet | Adjustment | Spreadsheet A 3292395 | 20180531 Hunter Mountain Note Receivable Update Adjustment USD | 31-May-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3295979 | 20180531 NexBank MM Interest Adjustment USD | 31-May-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3295979 | 20180531 NexBank MM Interest Adjustment USD | 31-May-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.19 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3295979 | 20180531 NexBank MM Interest Adjustment USD | 31-May-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 492.44 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3296208 | 20180531 Interest Receivable JE Adjustment USD | 31-May-18 | 2 | 5/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 358791.49 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3335308 | 20180531 Jefferies Reconciliation Adjustment USD | 31-May-18 | 19 | Reimer Interest Income Reversal | 0010.000.80100.00.0000 | 4099.73 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3335308 | 20180531 Jefferies Reconciliation Adjustment USD | 31-May-18 | 20 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3335308 | 20180531 Jefferies Reconciliation Adjustment USD | 31-May-18 | 21 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 11709.5 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3335308 | 20180531 Jefferies Reconciliation Adjustment USD | 31-May-18 | 22 | JHT PIK | 0010.000.80100.00.0000 | 0 | 52717.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3335535 | 20180630 Hunter Mountain Note Receivable Update Adjustment USD | 30-Jun-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 130126.83 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3354201 | 20180630 NexBank MM Interest Adjustment USD | 30-Jun-18 | 4 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3354201 | 20180630 NexBank MM Interest Adjustment USD | 30-Jun-18 | 5 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 410.06 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3354201 | 20180630 NexBank MM Interest Adjustment USD | 30-Jun-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 910.97 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3363051 | 20180630 Interest Receivable JE Adjustment USD | 30-Jun-18 | 2 | 6/30 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 317670.24 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3378836 | 20180630 Jefferies Reconciliation Adjustment USD | 30-Jun-18 | 9 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3378836 | 20180630 Jefferies Reconciliation Adjustment USD | 30-Jun-18 | 10 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 12591.64 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3378940 | 20180630 Interest Receivable JE Adjustment USD | 30-Jun-18 | 2 | 6/30 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 317670.24 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3408762 | 20180731 Hunter Mountain Note Receivable Update Adjustment USD | 31-Jul-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3458821 | 20180731 NexBank MM Interest Adjustment USD | 31-Jul-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3458821 | 20180731 NexBank MM Interest Adjustment USD | 31-Jul-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |

Appx. 01547

| | | | | | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | PAYABLES Supplier name | AP Check # | AP Invoice # | AP Invoice Description | RECEIVABLES Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | FIXED ASSETS Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Source** | **Category** | **Journal Batch Name** | **Journal Name** | **GL Date** | | | | | | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3458821 | 20180731 NexBank MM Interest Adjustment USD | 31-Jul-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 1744.89 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3458905 | 20180731 Interest Receivable JE Adjustment USD | 31-Jul-18 | 3 | 7/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 57758.99 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3458905 | 20180731 Interest Receivable JE Adjustment USD | 31-Jul-18 | 4 | 7/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 371473.69 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3504909 | 20180731 Jefferies Reconciliation Adjustment USD | 31-Jul-18 | 16 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 12591.64 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3504909 | 20180731 Jefferies Reconciliation Adjustment USD | 31-Jul-18 | 17 | Carey Interest Receipt | 0010.000.80100.00.0000 | 0 | 106164.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3504909 | 20180731 Jefferies Reconciliation Adjustment USD | 31-Jul-18 | 18 | Carey PIK | 0010.000.80100.00.0000 | 0 | 293160.35 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3506570 | 20180831 Hunter Mountain Note Receivable Update Adjustment USD | 31-Aug-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3538289 | 20180831 NexBank MM Interest Adjustment USD | 31-Aug-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3538289 | 20180831 NexBank MM Interest Adjustment USD | 31-Aug-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.19 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3538289 | 20180831 NexBank MM Interest Adjustment USD | 31-Aug-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 603.26 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3538465 | 20180831 Interest Receivable JE Adjustment USD | 31-Aug-18 | 1 | 8/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 371485.53 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3554799 | 20180831 Interest Receivable JE Adjustment USD | 31-Aug-18 | 2 | 8/31 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 381184.16 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3558805 | 20180831 Jefferies Reconciliation Adjustment USD | 31-Aug-18 | 14 | Carey Interest Receipt | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3558805 | 20180831 Jefferies Reconciliation Adjustment USD | 31-Aug-18 | 15 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3558805 | 20180831 Jefferies Reconciliation Adjustment USD | 31-Aug-18 | 16 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 12421.39 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3583897 | 20180930 Hunter Mountain Note Receivable Update Adjustment USD | 30-Sep-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 130126.83 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3598822 | 20180930 NexBank MM Interest Adjustment USD | 30-Sep-18 | 4 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3598822 | 20180930 NexBank MM Interest Adjustment USD | 30-Sep-18 | 5 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 252.31 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3598822 | 20180930 NexBank MM Interest Adjustment USD | 30-Sep-18 | 6 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 673.41 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3598861 | 20180930 Interest Receivable JE Adjustment USD | 30-Sep-18 | 2 | 9/30 Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 368956.99 | | | | | | | | | | | | | |

Appx. 01548

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JOURNAL ENTRIES** | | | | | | | | | | **PAYABLES** | | | | **RECEIVABLES** | | | | **FIXED ASSETS** | | | | | | |
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
| Spreadsheet | Adjustment | Spreadsheet A 3611323 | 20180930 Jefferies Reconciliation Adjustment USD | 30-Sep-18 | 10 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3611323 | 20180930 Jefferies Reconciliation Adjustment USD | 30-Sep-18 | 11 | Carey Interest Receipt | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3611323 | 20180930 Jefferies Reconciliation Adjustment USD | 30-Sep-18 | 12 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 14072.91 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3677868 | 20181031 NexBank MM Interest Adjustment USD | 31-Oct-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3677868 | 20181031 NexBank MM Interest Adjustment USD | 31-Oct-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3677868 | 20181031 NexBank MM Interest Adjustment USD | 31-Oct-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 141.15 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3677870 | 20181031 Hunter Mountain Note Receivable Update Adjustment USD | 31-Oct-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 134464.4 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3678489 | 20181031 Interest Receivable JE Adjustment USD | 31-Oct-18 | 2 | Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 378976.46 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3690820 | 20181031 Jefferies Reconciliation Adjustment USD | 31-Oct-18 | 10 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 11254 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3690820 | 20181031 Jefferies Reconciliation Adjustment USD | 31-Oct-18 | 11 | Carey Interest Receipt | 0010.000.80100.00.0000 | 0 | 107050.7 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3690820 | 20181031 Jefferies Reconciliation Adjustment USD | 31-Oct-18 | 12 | Carey PIK | 0010.000.80100.00.0000 | 0 | 299032.86 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3719838 | 20181130 Hunter Mountain Note Receivable Update Adjustment USD | 30-Nov-18 | 2 | Hunter Mountain Note Receivable Update - PIK | 0010.210.80100.10.0000 | 0 | 130126.83 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3720781 | 20181130 Interest Receivable JE Adjustment USD | 30-Nov-18 | 2 | Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 392259.84 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3731221 | 20181130 NexBank MM Interest Adjustment USD | 30-Nov-18 | 4 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3731221 | 20181130 NexBank MM Interest Adjustment USD | 30-Nov-18 | 5 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3731221 | 20181130 NexBank MM Interest Adjustment USD | 30-Nov-18 | 6 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 254.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3761305 | 20181130 Jefferies Reconciliation Adjustment USD | 30-Nov-18 | 11 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3761305 | 20181130 Jefferies Reconciliation Adjustment USD | 30-Nov-18 | 12 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 26489.55 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3774850 | 20181231 Hunter Mountain Note Receivable Update Adjustment USD | 31-Dec-18 | 4 | Hunter Mountain Note Receivable - Interest | 0010.210.80100.10.0000 | 0 | 134046.7 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3786797 | 20181231 HM Note True Up Adjustment USD | 31-Dec-18 | 2 | Hunter Mountain Note Receivable - Interest True UP | 0010.210.80100.10.0000 | 0 | 4438.63 | | | | | | | | | | | | | |

| | | | | | | | | | | JOURNAL ENTRIES / PAYABLES | AP Check # | AP Invoice # | | RECEIVABLES | | AR | AR | FIXED ASSETS | | | placed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Category | Journal Batch Name | Journal Name | GL Date | Journal Line Number | Journal Line Description | Account code combination | Amount DR | Amount CR | Supplier name | AP Check # | AP Invoice # | AP Invoice Description | Customer Name | AR Receipt Number | AR Transaction Number | AR Transaction Description | Asset Number | Asset vendor | Asset Description | placed in service | Asset Category |
| Spreadsheet | Adjustment | Spreadsheet A 3801275 | 20181231 NexBank MM Interest Adjustment USD | 31-Dec-18 | 4 | Interest (Account *735) | 0010.210.80100.10.0000 | 0 | 0.18 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3801275 | 20181231 NexBank MM Interest Adjustment USD | 31-Dec-18 | 5 | Interest (Account *130) | 0010.210.80100.10.0000 | 0 | 56.27 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3801275 | 20181231 NexBank MM Interest Adjustment USD | 31-Dec-18 | 6 | Interest (Account *891) | 0010.210.80100.10.0000 | 0 | 669.49 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3801965 | 20181231Interest Receivable JE Adjustment USD | 31-Dec-18 | 2 | Interest Receivable JE | 0010.000.80100.00.0000 | 0 | 368743.85 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3827317 | 20181130 Jefferies Reconciliation Adjustment USD | 31-Dec-18 | 11 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3827317 | 20181130 Jefferies Reconciliation Adjustment USD | 31-Dec-18 | 12 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3864462 | 20191231 Interest Receivable JE True up Adjustment USD | 31-Dec-18 | 2 | Interest Receivable JE True Up | 0010.000.80100.00.0000 | 23453.36 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3878401 | 20181231 HM Note Correction Adjustment USD | 31-Dec-18 | 2 | Hunter Mountain Note Receivable - Interest True UP | 0010.210.80100.10.0000 | 4337.57 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3878742 | 20181231 Jefferies Reconciliation - Turtle Bay Adjustment USD | 31-Dec-18 | 11 | Carey PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3878742 | 20181231 Jefferies Reconciliation - Turtle Bay Adjustment USD | 31-Dec-18 | 12 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 3879365 | 20181130 Jefferies Reconciliation - Carey and American Adjustment USD | 31-Dec-18 | 12 | Goldfield PIK | 0010.000.80100.00.0000 | 0 | 0 | | | | | | | | | | | | | |
| Spreadsheet | Adjustment | Spreadsheet A 4030971 | 20181130 Jefferies Reconciliation - Pendrell Adjust Adjustment USD | 31-Dec-18 | 4 | MTM | 0010.000.80100.00.0000 | 0 | 1177.1 | | | | | | | | | | | | | |
| | | | | | | | | 937184.31 | 8440349.05 | | | | | | | | | | | | | |

Amount per detail above  7,503,165  **Rc**
Amount per TB  7,503,165  **LS**
Difference (not in thousands)  (0)  **Rc, imm**
^

| **Hunter Mountain Interest Income Reconciliation** |
|---|
| Hunter Mountain Interest Income per above  1,582,893  **Rc** |
| Interest Income per <Due from Hunter Mountain> tab  45,863  **<Due from Hunter Mountain>** |
| Difference  1,537,031  **Rc, imm** |
| ^ |

**Tickmark Legend**
**^** Footed without exception.
**imm** Amount is immaterial. Therefore, further review is waived.
**Rc** Recalculated amount. Refer to the respective cell's formula for further details.
**LS** Amount agrees to 12/31/18 lead schedule linked below without exception.
Lead schedule - Revenue
Total of highlighted amounts have been recalculated and agree to the interest income per the <Note Receivable> tab within an immaterial difference.

Appx. 01550

# EXHIBIT 94

Appx. 01551

1              BURGER

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
   ------------------------------
4   IN RE:

5                     Chapter 11
    HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                  19-34054-SGI11
7

        Debtor.
8   ------------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9

        Plaintiff,
10   vs.                    Adversary
                  Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT     21-03000-sgj
    FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
    INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
    NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15          Defendants.
    ------------------------------
16

17          REMOTE DEPOSITION OF

18            PEET BURGER

19            July 30, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 197393

Page 2

```
 1              BURGER
 2
 3
 4        July 30, 2021
 5        10:01 a.m.
 6
 7
 8
 9      Remote Deposition of PEET BURGER, held
10   before Susan S. Klinger, a Registered Merit
11   Reporter and Certified Realtime Reporter of the
12   State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              BURGER
 2   A P P E A R A N C E S :
 3   (All appearances via Zoom.)
 4   Attorneys for Debtor:
        BY: John Morris, Esq.
 5      PACHULSKI STANG ZIEHL & JONES
        780 Third Avenue
 6      New York, New York  10017
 7   Attorneys for the PwC and the Witness:
        BY: John Wander, Esq.
 8      VINSON & ELKINS
        2001 Ross Avenue
 9      Dallas, Texas  75201
10   Attorneys for John Dondero, Highland Capital
     Management Services, NexPoint:
11      BY: Michael Aigen, Esq.
        STINSON
12      3102 Oak Lawn Avenue
        Dallas, Texas 75219
13
     Attorneys for NexPoint Advisors, LP, Highland
14   Capital Fund Advisors:
        BY: Thomas Berghman, Esq.
15      MUNSCH HARDT KOPF & HARR
        500 North Akard Street
16      Dallas, Texas  75201
17   Also Present:
        Ms. La Asia Canty
18
19
20
21
22
23
24
25
```

Page 4

```
 1              BURGER
 2           I N D E X
 3
 4   WITNESS                    PAGE
 5   PEET BURGER
 6   EXAMINATION BY MR. MORRIS          5
 7   EXAMINATION BY MR. AIGEN          76
 8   EXAMINATION BY MR. MORRIS         92
 9
10        E X H I B I T S
11   No.                       Page
12   Exhibit 1  Management representation   18
13      Letter, 6/3/19
14   Exhibit 2  2017 Financial Statements   30
15   Exhibit 3  2017 Workpapers            41
16   Exhibit 4  2018 Financial Statements   47
17   Exhibit 5  2018 Workpapers            55
18
19
20
21
22
23
24
25
```

Page 5

```
 1              BURGER
 2        P R O C E E D I N G S
 3           PEET BURGER,
 4   having been first duly sworn testified as
 5   follows:
 6           EXAMINATION
 7   BY MR. MORRIS:
 8      Q.   Good morning.  Can you state your
 9   name for the record, please?
10      A.   I can.  Peet Burger.
11      Q.   Are you currently employed,
12   Mr. Burger?
13      A.   Yes.
14      Q.   By whom?
15      A.   PricewaterhouseCoopers.
16      Q.   And what is your title at
17   PricewaterhouseCoopers?
18      A.   I'm an audit partner.
19      Q.   When did you become an audit partner
20   at PricewaterhouseCoopers?
21      A.   January 1st of 2014.
22      Q.   Have you been an audit partner at
23   PricewaterhouseCoopers on a consistent basis
24   since January 1st, 2014?
25      A.   Yes, I have.
```

BURGER

2 Q. In that capacity, have you overseen
3 the audits for Highland Capital Management,
4 L.P.?
5 A. Yes, I did.
6 Q. Just briefly, were you employed by
7 PricewaterhouseCoopers prior to the time you
8 became an audit partner at the beginning of
9 2014?
10 A. Yes, I have. Do I need to give the
11 dates?
12 Q. Can you just tell me when you first
13 joined PwC?
14 A. I joined in January of 1997 in our
15 South African firm. Yes, that's correct.
16 Q. When did you join the audit group?
17 A. In January of 1997.
18 Q. So you have been with
19 PricewaterhouseCoopers' audit unit on a
20 consistent basis for more than 20 years; is
21 that fair?
22 A. Correct.
23 Q. Okay. When did you personally begin
24 working on the Highland Capital Management,
25 L.P. audits, do you recall?

BURGER

2 A. Somewhere in 2013. I would say
3 April, 2013.
4 Q. And were you the audit partner in
5 charge of the Highland engagement from 2013
6 until the time the 2018 financial statements
7 were completed?
8 A. This is specific to Highland Capital
9 Management, L.P., yes.
10 Q. I'm just going to refer to Highland
11 Capital Management, L.P. as Highland going
12 forward; is that okay?
13 A. Yes.
14 Q. Have you ever been deposed before?
15 A. No.
16 Q. Okay.
17 A. No.
18 Q. I apologize, I should have started
19 with some ground rules, but I'm trying to be
20 mindful of the time. It is important that you
21 allow me to finish my questions before you
22 begin your answers; is that okay?
23 A. Sure.
24 Q. And if I begin my next question
25 before you begin – before you finish your

BURGER

2 answer, will you let me know that?
3 A. Sure.
4 Q. Do you understand that the court
5 reporter is taking down every word that we say?
6 A. Yes.
7 Q. If you want to break at any time,
8 will you let me know?
9 A. Sure.
10 Q. If there is anything that you don't
11 understand, if there is a question that I ask
12 that you either don't understand or you think
13 is ambiguous in some way, will you let me know
14 that?
15 A. Yes.
16 Q. Okay. From PricewaterhouseCoopers'
17 perspective, what is the purpose of an audit?
18 A. To provide reasonable assurance in
19 in terms of the auditing and accounting
20 standards.
21 Q. What standards are you referring to?
22 A. In this case Generally Accepted
23 Auditing Standards.
24 Q. What are Generally Accepted Auditing
25 Standards, if you know?

BURGER

2 A. It is a set of rules basically
3 governed by the AICPA of what – considered
4 what is the sort of conglomerate of rules on
5 your professional standards of engagement to
6 sign an audit opinion.
7 Q. And do I have this correctly, that
8 the purpose of the audit is to provide
9 reasonable assurance that the financial
10 statements are in compliance with Generally
11 Accepted Auditing Standards?
12 MR. WANDER: Did you say assurance
13 or insurance?
14 Q. Assurance?
15 A. Yes, assurance, yes. The procedures
16 performed by us in terms of Generally Accepted
17 Auditing Standards and the financials itself is
18 presented in terms of Generally Accepted
19 Accounting Practice.
20 Q. Okay. And are those standards or
21 practices familiar to you in the course of your
22 duties?
23 A. Yes, it is.
24 Q. Okay. Can you describe for me
25 generally the process that PwC undertook in

BURGER

1
2  connection with its auditing of the Highland
3  financial statements? Is there, you know, a
4  process that you follow?
5      A.  Yes, there is. I mean, it is a
6  pretty long process which starts all the way
7  from the planning to completion and you know,
8  through the execution which audit approach
9  outlines all the relevant standards of the
10  procedures that we're supposed perform from the
11  planning, execution and completion stage.
12      Q.  And is that something that you share
13  with Highland so that they understand the
14  process?
15      A.  We don't share our workpapers and
16  absolutely every single part of that, but they
17  -- I mean, they know what we are looking for in
18  the sense of obviously for -- we make requests
19  for information. And if the information is not
20  clear, we need to explain to them why we are
21  asking them for it.
22      Q.  And how soon after the completion of
23  the fiscal year does PwC begin the process that
24  leads to the final audit?
25      A.  We start this engagement in its

BURGER

1
2  fieldwork stage in around about April after --
3  April after the unit.
4      Q.  And what do you mean when you use
5  the phrase fieldwork?
6      A.  Our execution phase.
7      Q.  Is that the time when you begin to
8  send informational requests to Highland?
9      A.  No, we send it through the planning
10  phase as well, which the planning phase is the
11  phase where you get engaged to go through all
12  the planning and setting up the procedures that
13  you are supposed to perform for the -- for the
14  execution phase. And you can also do some of
15  the execution transaction work during that
16  period to save yourself from having to spend
17  that time in April and May.
18      Q.  And when does the planning stage
19  begin?
20      A.  Each year can be slightly different,
21  but in this case, this was around about the
22  October -- September, October.
23      Q.  So the planning would begin in the
24  fall of each fiscal year and --
25      A.  Correct.

BURGER

1
2      Q.  Is that fair?
3      A.  That's fair.
4      Q.  And then during the planning stage,
5  PwC would make information requests to
6  Highland. Do I have that right?
7      A.  You have got that correct.
8      Q.  And then in response to that,
9  Highland would feed information to PwC for
10  PwC's review. Do I have that right?
11      A.  Correct.
12      Q.  And then the fieldwork is -- is the
13  next step the fieldwork?
14      A.  Yes.
15      Q.  Okay. Do you recall during the time
16  that you were the audit partner did you have a
17  primary contact at Highland for purposes of the
18  planning and the execution phases of the audit?
19      A.  There were more than one individual
20  we dealt with, but I recall there was a primary
21  contact which facilitated sort of -- you know,
22  the -- which facilitated all of our
23  communication.
24      Q.  And who was that?
25      A.  That was David Klos.

BURGER

1
2      Q.  And who besides Mr. Klos were the
3  primary points of contact?
4      A.  Frank Waterhouse is the CFO and
5  Kristin Hendrix who, for the lack of a better
6  word was the -- the sort of chief -- the
7  accountant.
8      Q.  The accountant?
9      A.  Yes.
10      Q.  Yes. And how many people typically
11  were on the Price Waterhouse team for purposes
12  of the Highland audits?
13      A.  It depends on the phase of the
14  audit, but at the biggest part of the audit the
15  execution phase we were, including me I would
16  say six or seven people.
17      Q.  Okay. And how would
18  PricewaterhouseCoopers obtain the information
19  that it needed to prepare the audited financial
20  statements?
21      A.  Sorry. Just to make sure, say
22  obtain the information. We -- we have a -- I
23  mean, I did this over seven years. It morphed
24  over time, but we have a -- a site, a secure
25  site called Connect. And I think towards the

1                    BURGER
2    end we used that for them to upload
3    information.
4              Previously Highland had its own
5    secure site where we would raise a request and
6    they would upload the information on the secure
7    site.
8         Q.    Okay.  Did PricewaterhouseCoopers
9    rely on management to provide the information
10   that would enable PwC to prepare the audited
11   financial statements?
12        A.    We did.
13        Q.    Did PwC ever make any site visits to
14   Highland in connection with the audits?
15        A.    We did.
16        Q.    And during those visits, was it
17   typical that PricewaterhouseCoopers might have
18   follow-up requests for information?
19             MR. AIGEN:  Objection, form.
20        A.    Yes.
21        Q.    Did PwC ever provide drafts of the
22   audit reports to Highland for their review
23   prior to the time they were finalized?
24        A.    If you mean audit reports, do you
25   mean the one- or two-page opinion that I signed

1                    BURGER
2    or do you mean the financial statements?
3         Q.    I apologize, thank you for the
4    clarification.
5              I mean, the financial statements and
6    the notes accompanying the financial
7    statements?
8         A.    They compile that and that is their
9    responsibility, so they provide us with that
10   document.
11        Q.    Okay.  So the five or six pages of
12   financial statements and all of the notes are
13   compiled by Highland, not by PwC?
14        A.    Correct, yeah, correct.
15        Q.    And did PwC have an opportunity to
16   review and comment on the drafts of the
17   financial statements on the accompanying notes?
18        A.    Yes, we do.
19        Q.    And did PwC in the course of its
20   engagement ask the questions that PwC thought
21   was relevant in order to give reasonable
22   assurance that the financial statements were in
23   accordance with Generally Accepted Auditing
24   Standards?
25             MR. AIGEN:  Objection, form.

1                    BURGER
2              MR. WANDER:  You mean, GAAP, not
3    GAAS?
4         Q.    I mean, it is auditing not
5    accounting; right?  So it is Generally Accepted
6    Accounting Standards, do I have that right?
7              MR. WANDER:  The audited – the
8    financials are in accordance with GAAP.
9    The audit is done in accordance with GAAS.
10        Q.    Thank you for the clarification, so
11   let me rephrase the question.
12             Did PwC ask the questions that it
13   believed were necessary in order to provide
14   reasonable assurance that the financial
15   statements were in conformance with GAAP?
16             MR. AIGEN:  Objection, form.
17        A.    We did.
18        Q.    Did PwC receive representation
19   letters from Highland in connection with each
20   audit?
21        A.    Yeah, we did.
22        Q.    And are you personally familiar with
23   the form of management representation letter
24   that Highland provided to PwC each year?
25        A.    Yes, I am.

1                    BURGER
2         Q.    Was it part of your personal
3    responsibilities to review the management
4    representation letters?
5         A.    It was.
6         Q.    From PwC's perspective, what was the
7    purpose of the management representation
8    letters?
9         A.    It is an opportunity for us to get
10   management to make certain representations of
11   us – in terms of scope of what is expected of
12   us in an audit.
13        Q.    And was that representation letter
14   required by PwC in order for PwC to sign-off on
15   the audit?
16        A.    It is, it was.
17        Q.    And is it fair to say that PwC
18   relied on the management representation letters
19   when it decided to sign-off on the audit?
20        A.    We did.
21        Q.    I would like to put up on the screen
22   a document that I have marked as Exhibit 1,
23   which is the June 3rd, 2019 management
24   representation letter.
25             (Exhibit 1 marked.)

BURGER

1
2  Q.   Mr. Burger, so --
3       MR. AIGEN:  Sorry was this produced?
4  I just want to make sure, is there a Bates
5  label on this for the record?
6       MR. MORRIS:  I don't know but it was
7  used in Mr. Dondero's deposition.
8       MR. AIGEN:  There is a Bates label.
9  Q.   So Mr. Burger, this is a little
10 awkward.  Usually in a deposition I would be in
11 the room with you and you would have the
12 document in front of you and it would be easy
13 for you to review the document.  Since we can't
14 do that, and I don't know that you have this
15 particular document in front of you, we've put
16 it up on the screen.
17      I'm going to ask you a few questions
18 about it, but I strongly encourage you, I
19 really request that you let me know if you
20 believe that there are other portions of the
21 document that you need to review in order to
22 either refresh your recollection or to put my
23 question into context, okay?
24      We're just going to have to make due
25 with the technology, but with that background,

BURGER

1
2  you know, let's -- let's go to the -- to the
3  page ending in 419?
4       Do you see there that there are two
5  signatures?
6  A.   Correct.
7  Q.   And do you understand that those are
8  the signatures of James Dondero and Frank
9  Waterhouse?
10 A.   Yes, correct.
11 Q.   Okay.  If we could go back to the
12 top of the document, do you understand that
13 this is the management representation letter
14 that was provided to PwC by Mr. Dondero and
15 Mr. Waterhouse on June 3rd, 2019?
16 A.   Yes.
17 Q.   Do you know why Mr. Waterhouse and
18 Mr. Dondero were the people who signed this
19 letter?
20 A.   Starting with Mr. Waterhouse, he is
21 the responsible party from management in the
22 sense of being the CFO and Mr. Dondero as the
23 general partner because the entity is a limited
24 partner and we expect the general partner to
25 sign the rep letter.

BURGER

1
2  Q.   Do you know who drafted this letter?
3  A.   We did.
4  Q.   Is this a form of management
5  representation that PwC typically prepares in
6  the ordinary course of its audits?
7  A.   Yes, it is derived from a standard
8  template.
9  Q.   And you see in the first paragraph
10 there is a reference to the balance sheet date.
11 Do I have that right?
12 A.   Correct.
13 Q.   And for this particular management
14 representation letter, the balance sheet is for
15 the fiscal year ending December 31st, 2018;
16 correct?
17 A.   Correct.
18 Q.   We can scroll down to the bottom,
19 but there is -- stop right there.
20      There is a series of representations
21 that are made in this letter.  Do you
22 understand that?
23 A.   I do.
24 Q.   And if we scroll down to, I guess,
25 the page ending in 18, you will see that there

BURGER

1
2  is 50 separate representations that are made by
3  Mr. Waterhouse and Mr. Dondero, not including
4  the subparts.  Do you see that?
5  A.   I do.
6       MR. MORRIS:  And thank you, La Asia,
7  if we can go back to the top.
8  Q.   So even though the audit letter was
9  for the fiscal year ending December 31st, 2018,
10 do you see in the sentence just before general
11 that Mr. Dondero and Mr. Waterhouse confirmed
12 based on their then current knowledge that each
13 of the 50 representations were still correct as
14 of June 3rd, 2019?
15 A.   I do.
16 Q.   Okay.  And is that a standard
17 practice of PwC to require management to
18 confirm the accuracy of the representations not
19 just as of the end of the fiscal year, but
20 carrying through to the date of the completion
21 of the audit?
22 A.   It is.
23 Q.   And why does PwC require that the
24 representations be carried forward to the date
25 of the completion of the audit?

Page 22

BURGER

2 A. Because per Generally Accepted
3 Auditing Standards we have to consider material
4 events occurring after year-end but prior to
5 our opinion date or prior to on our opinion
6 date.
7 Q. Okay. And do you see in the middle
8 of the first page there is a paragraph
9 that begins "certain representations"?
10 A. Yes.
11 Q. And you see that there is a
12 definition of items that are considered
13 material?
14 A. Yes.
15 Q. Do you know why the management
16 representation letter included a definition for
17 items considered material?
18 A. Because we cannot reasonably -- we,
19 the basis of an audit is our reasonable
20 assurance with deals with our definition --
21 which deals with materiality. So if we expect
22 management to represent to us, we give them a
23 sense of what we consider to be material.
24 Q. Okay. And did Highland ever express
25 any concerns about PwC's definition of

Page 23

BURGER

2 materiality?
3 A. Not that I can recall.
4 Q. Did PwC rely on Mr. Dondero and
5 Mr. Waterhouse to provide all information
6 concerning items considered material as defined
7 in this letter?
8 MR. AIGEN: Objection, form.
9 A. We did.
10 Q. Are you generally aware that from
11 time-to-time Highland loaned money to
12 Mr. Dondero and certain affiliated entities in
13 exchange for promissory notes?
14 A. I am.
15 Q. Can we call those promissory notes
16 the affiliated party notes?
17 A. That is fine.
18 Q. For purposes of the audits, were the
19 makers obligations under the affiliated party
20 notes considered receivables of Highland?
21 A. Yes, receivables of Highland Capital
22 Management, L.P.
23 Q. Okay. Can we go to the page that is
24 ending in 413?
25 I'm just going to ask you a few

Page 24

BURGER

2 questions about some of the representations
3 here. Do you see, Mr. Burger, representation
4 number 11?
5 A. I do.
6 Q. Does representation number 11 apply
7 to the affiliated party notes?
8 A. It does.
9 Q. Was it PwC's understanding that
10 Mr. Dondero and Mr. Waterhouse represented that
11 the affiliate party notes represented bona fide
12 claims against the makers for transactions
13 arising on or before the balance sheet date?
14 MR. WANDER: Objection, form.
15 A. Correct.
16 Q. This is one of the 50
17 representations that Mr. Dondero and
18 Mr. Waterhouse confirmed as of June 30th, 2019;
19 correct?
20 A. June 3rd, yes, correct.
21 Q. Thank you for the clarification.
22 Does the last sentence of representation number
23 11 mean that all affiliated party notes were
24 current as of June 3rd, 2019?
25 A. It does.

Page 25

BURGER

2 Q. Stated another way, none of the
3 affiliated notes were in default as of June
4 30th, 2019; correct?
5 A. That's correct.
6 Q. All right. If we can go to page
7 416, please.
8 Take a look at representation number
9 32 at the top of the page. Do you have an
10 understanding of what representation number 32
11 means?
12 A. Yeah, that is a representation where
13 if we were to find any misstatements which does
14 not meet the level of materiality, we would put
15 that on what we call a summary of uncorrected
16 misstatements. And management would --
17 management would defer to the fact that they do
18 not consider those adjustments necessary in
19 terms of neutrality.
20 Q. Did PwC understand that in
21 representation number 32 Mr. Dondero and
22 Mr. Waterhouse represented that basically if
23 they got anything wrong it was not material?
24 MR. AIGEN: Objection, form.
25 A. That is correct.

Appx. 01558

BURGER

1
2 Q. And why did PwC request this
3 particular representation?
4 A. Because if anything gets sort of
5 found out to be a potential let's call it error
6 to the financial statements, part of the
7 standards require us to assert from management
8 their view that it is not material.
9 Q. Okay. Did PwC rely on
10 representation number 32 when signing off on
11 the audit?
12 MR. AIGEN: Objection, form.
13 A. We did.
14 Q. Let's look at representation number
15 34. Can you tell me what that means from PwC's
16 perspective?
17 A. It is a assessment of completeness.
18 So in other words, management asserting or,
19 sorry, representing to us that they are not
20 aware of any material transactions or
21 agreements or -- agreements being out there
22 that wasn't recorded in the financial
23 statements.
24 Q. And why did PwC want this material
25 representation?

BURGER

1
2 A. Under as -- under standards it is
3 not our duty to go out and look for necessarily
4 fraud. And you know, it is on the completeness
5 of transactions we do rely on management to let
6 us know if they were material transactions.
7 Q. Did PwC rely on representing --
8 withdrawn.
9 Did PwC rely on representation
10 number 34 when signing off on the audit?
11 A. We did.
12 Q. Let's take a look at representation
13 35D. If you can just read that to yourself for
14 a moment?
15 A. Excuse me, did you say B or D?
16 Q. D as in dog?
17 A. D, okay, okay.
18 Q. Is it fair to say that in
19 representation number 35D, as in dog,
20 Mr. Dondero and Mr. Waterhouse represented that
21 all material transactions with related parties
22 have been properly reported and disclosed in
23 the consolidated financial statements?
24 A. That's correct.
25 Q. Did PwC request this particular

BURGER

1
2 representation?
3 A. We did.
4 Q. Why?
5 A. Again, because it is important under
6 alleged party disclosures specifically all
7 disclosures but related party specific that if
8 you have material transactions or events that
9 those be disclosed. And again, we -- we do
10 rely on management to also take ownership for
11 that.
12 Q. Okay. Can we go to the next page,
13 please, page ending in 417? Okay, right there.
14 And take a look at representation number 36,
15 please.
16 A. Okay, okay.
17 Q. Can you tell me from PwC's
18 perspective what representation 36 means?
19 A. Again, for management to let us know
20 or assert to us who the related parties are.
21 Q. Is it fair to say that in management
22 representation number 36 Mr. Dondero and
23 Mr. Waterhouse represented that they had
24 disclosed, among other things, all related
25 party transactions of which they were aware?

BURGER

1
2 A. Correct.
3 Q. And did PwC rely on that
4 representation when it signed off on the audit?
5 A. We did.
6 Q. Go to page 419, please. Okay. Just
7 before the signature line there is a sentence
8 that begins, "to the best of our knowledge."
9 Do you see that?
10 A. Correct.
11 Q. Can you just read that to yourself?
12 A. Okay.
13 Q. Can you tell me from PWC's
14 perspective what that sentence means?
15 A. It means if there were events that
16 occurred after the balance sheet date, before
17 the opinion date that required disclosure, that
18 such disclosures had been made.
19 Q. And why did -- is that
20 representation one that is required by GAAP?
21 A. It is -- it is a GAAS principle, not
22 a GAAP.
23 Q. And did PwC rely on that
24 representation in the last sentence when it
25 signed off on the audits?

BURGER

1
2 A. We did.
3 Q. Let's move to the 2017 financial
4 statements. Can we please put up the next
5 exhibit.
6 (Exhibit 2 marked.)
7 Q. Again, Mr. Burger, I will just
8 remind you that if at any time you believe you
9 need to see any other portion of the document
10 in order to capably and fully answer the
11 question that I ask, just let me know, okay?
12 MR. WANDER: John, he has a hard
13 copy of this one in front of him.
14 Q. Beautiful. Maybe it would be easier
15 for you to just take it out and the rest of us
16 will just look on the screen.
17 MR. MORRIS: Thank you, John.
18 Q. Do you have the 2017 audited
19 financial statements in front of you, sir?
20 A. I do.
21 Q. And did you personally lead PwC's
22 efforts in completing the audit for the debtors
23 for Highland's 2017 financial statements?
24 A. Would you mind repeating the
25 question?

BURGER

1
2 Q. Did you personally lead PwC's
3 efforts in auditing Highland's 2017 financial
4 statements?
5 A. I did.
6 Q. Do you recall any deviations from
7 the process that you described earlier in
8 connection with the preparation of Highland's
9 2017 financial statements?
10 A. I do not.
11 Q. Can we go to page 2, please, right
12 there. Do you see in the top half of the
13 screen there is a list of assets?
14 A. I do.
15 Q. And one of those – one of those
16 assets is identified as notes and other amounts
17 due from affiliates. Do you see that?
18 A. I do.
19 Q. And do you know what that relates
20 to?
21 A. So that is the consolidated amount
22 of Highland Capital Management, L.P. with all
23 its affiliates of notes and other amounts that
24 are due from affiliates as defined.
25 Q. Do you know why the notes and other

BURGER

1
2 amounts due from affiliates are carried as
3 assets on Highland's balance sheets?
4 A. Because it meets the definition of
5 an asset.
6 Q. And what is the definition of the
7 asset – withdrawn.
8 What is the definition of an asset
9 that causes the notes and other amounts due
10 from affiliates to appear on the asset portion
11 of the balance sheet?
12 A. This is amounts in the forms of
13 notes or receivables that the entity has title
14 to in the form of an asset, or the classic
15 definition of an asset is you are entitled to
16 the asset and there is reasonable assurance of
17 the recoverability of the asset.
18 Q. Did anybody from Highland ever
19 dispute that the notes and other amounts due
20 from affiliates should be carried on Highland's
21 balance sheet as assets?
22 MR. AIGEN: Objection, form.
23 A. Sorry?
24 MR. WANDER: If you understand, you
25 can answer.

BURGER

1
2 A. No, no, they did not.
3 Q. And that is because these are
4 Highland's balance sheets; correct?
5 A. Correct.
6 Q. Highland, in fact, prepared the
7 document that we're looking at right now;
8 correct?
9 A. Correct, we did not.
10 Q. And Highland made the decision to
11 record the notes and other amounts due from
12 other affiliates as assets on its own balance
13 sheet; right?
14 MR. AIGEN: Objection, form.
15 A. Right.
16 Q. Did PwC ever have any reason to
17 question the carrying of the notes and other
18 amounts due from affiliates as assets on
19 Highland's balance sheets?
20 A. We did not.
21 Q. Is my math right here that the
22 balance sheet shows that as of the end of 2017
23 notes and other amounts due from affiliates
24 constituted more than 10 percent of Highland's
25 assets?

BURGER

1

2   A.   That's correct.

3   Q.   Okay.  If we could just scroll down

4   to the bottom of the page.  Little further,

5   yeah, right there.

6      Do you see there is a reference that

7   says, quote, the accompanying notes are an

8   integral part of these consolidated financial

9   statements, closed quote?

10   A.   I do.

11   Q.   What does that mean?

12   A.   That is to draw the attention for

13   the reader of not reading this page in a

14   stand-alone basis, because there are further

15   explanations required to the amounts in the

16   footnotes.

17   Q.   Okay.  Let's go to page 28 of the

18   document.  Okay.  Do you see that there is a

19   Section 9 entitled related party transactions?

20   A.   I do.

21   Q.   And can you describe for me your

22   understanding of why there is a note dedicated

23   to related party transactions?

24   A.   It is a GAAP requirement for

25   financial statements to disclose material

BURGER

1

2   related-party relationships and transactions.

3   Q.   If we can go to page 30, please, and

4   just scroll straight down so Mr. Burger can see

5   what he's got front of him, if we can go to

6   page 30.

7      Page 30 has a subheading to note 9

8   called notes and other amounts due from

9   affiliates.  Do you see that?

10   A.   Correct.

11   Q.   Okay.  And do I have it --

12   withdrawn.

13      Highland prepared all of the

14   information that is set forth in this section

15   of note 9; is that correct?

16   MR. AIGEN:  Objection, form.

17   A.   I did.

18   Q.   Is it fair to say that this portion

19   of note 9 is intended to describe obligations

20   due to the debtor by affiliates?

21   MR. AIGEN:  Objection, form.

22   A.   That's correct.

23   Q.   Let me ask a different question to

24   deal with Michael's objection.

25      Can you tell me, Mr. Burger, what

BURGER

1

2   information is conveyed in the section called

3   notes and other amounts due from affiliates?

4   MR. AIGEN:  Objection, form.

5   MR. WANDER:  You can answer.

6   A.   I can answer, sorry.

7      The purpose of this footnote is to

8   strike out out -- because if you look at the

9   balance sheet you just see notes and you have

10   no idea who that is from, which amounts and

11   what the basic terms are.

12   Q.   Is it your understanding that this

13   section of note 9 sets forth the amounts due

14   and owing by each affiliate as of December

15   31st, 2017?

16   A.   That's correct.

17   Q.   And are the amounts included -- are

18   those amounts included in the line item that we

19   just looked at in the balance sheet called

20   notes and other amounts due from affiliates?

21   A.   Correct.

22   Q.   Do you know who calculated the

23   amounts due and owing by each affiliate as of

24   December 31st, 2017?

25   A.   It was management.

BURGER

1

2   Q.   Okay.  Did management ever tell PwC

3   at any time prior to June -- withdrawn.

4      Did management ever tell PwC at any

5   time prior to PwC's signing off on the audited

6   financial statements for 2017 that there was

7   anything inaccurate about this section of the

8   notes?

9   MR. AIGEN:  Objection, form.

10   A.   They did not.

11   Q.   Each of the paragraph ends with a

12   sentence that may differ only in as to whether

13   it is singular or plural, but it says quote,

14   the fair value of the partnership's outstanding

15   notes receivable approximates the carrying

16   value of the notes receivable.  Do you see

17   that?

18   A.   Correct.

19   Q.   And we can scroll down a little bit

20   just so you can -- you have got the document in

21   front of you.  I would just ask you to confirm

22   that each paragraph ends with the same sentence

23   except for the last paragraph.  And does it,

24   sir?

25   A.   Yes, it is on each paragraph for

BURGER

2 that section of the notes except the paragraph

3 starting on December 21st, 2015.

4 Q. Do you have an understanding of what

5 that sentence means?

6 A. That sentence means that these notes

7 are per GAAP, the notes are supposed to be

8 recorded at fair value and the assertion is

9 that the carrying value is considered a

10 reasonable proxy for fair value.

11 Q. I'm sorry, what is fair value in

12 this context?

13 A. Fair value of all assets would be

14 what you consider to be the reasonable value

15 for exchange of the asset.

16 Q. And then what is the carrying value?

17 How does that differ from the carrying value?

18 A. Carrying value is the -- is a

19 contractual, is the term of the contractual

20 amount. In other words, whatever their loan

21 plus accrued interest minus payments. And fair

22 value is -- is basically the concept of this

23 sentence is stating that the fair value of the

24 approximate or reasonable proxy for carrying

25 value in its (inaudible).

BURGER

2 Q. So is it fair to say that based on

3 this portion of note 9, the debtors' financial

4 statements -- withdrawn.

5 Is it fair to say that based on this

6 portion of note 9, Highland is saying that the

7 fair value of the promissory notes from the

8 affiliates was approximately equal to the

9 principal and interest then due under the

10 notes?

11 MR. AIGEN: Objection, form.

12 A. That's correct.

13 Q. Is it fair to say that when the

14 audit -- withdrawn.

15 Is it fair to say that -- no,

16 withdrawn.

17 At the time the audit was completed

18 for 2017, did PwC have any reason to discount

19 the value of any of the notes described on page

20 30 or 31?

21 A. We did not.

22 Q. Okay. Can we go to page 41, please.

23 If you scroll down a little bit you will see

24 there is a section entitled subsequent events

25 which is note 16. Do you see that?

BURGER

2 A. Correct.

3 Q. Okay. What is this section intended

4 to capture?

5 A. This is supposed to capture any

6 significant material events that occurred after

7 the balance sheet that requires disclosure.

8 Q. And is the information described

9 here information that was provided by Highland

10 Capital?

11 A. Yeah, correct, by management.

12 Q. This section notes that Mr. Dondero

13 issued promissory notes to the partnership in

14 the amount of $11.7 million in 2018. Do you

15 see that?

16 A. I do.

17 Q. Those obligations are not included

18 in the balance sheet that we looked at earlier

19 for the period ending December 31st, 2017;

20 correct?

21 A. That's correct.

22 Q. The notes issued by Mr. Dondero are

23 the only material subsequent event that PwC was

24 informed about; is that correct?

25 A. Correct.

BURGER

2 Q. Let's go to the 2017 workpapers, if

3 we can call it the next exhibit, please.

4 (Exhibit 3 marked.)

5 Q. All right. I've put up on the

6 screen what I believe are PwC's workpapers in

7 connection with the 2017 audit as it pertains

8 to notes and other amounts due from affiliates.

9 Is that an accurate way to describe this

10 particular document?

11 A. Yes, it would be a workpaper that we

12 retain in our file.

13 Q. Was it prepared in connection with

14 the 2017 audit?

15 A. Yes, this one was.

16 Q. And when I use the phrase "2017

17 audit," I'm specifically talking about the

18 audit that was prepared for the financial

19 statements for the fiscal year ending December

20 31st, 2017. Do you understand that?

21 A. Correct.

22 Q. Okay. Who prepared this particular

23 document?

24 A. Who prepared it?

25 Q. I apologize, who prepared it?

BURGER

1
2     A.    Sorry, Hilda Garcia.
3     Q.    Hilda Garcia, is she employed by
4  PwC?
5     A.    She is.
6     Q.    And what is her title?
7     A.    She is a senior associate now.  She
8  would have been a senior associate back then as
9  well.
10    Q.    Does she report to you or to
11  somebody else?
12    A.    She reports to me.
13    Q.    And are you responsible for
14  overseeing Ms. Garcia's work?
15    A.    I am.
16    Q.    And what is the purpose of this
17  document?
18    A.    The purpose of this document is to
19  layout what are the amounts that makes up the
20  line item that is on the balance sheet of
21  HCMLP.  And then the audit procedure is
22  performed to gain comfort over those -- the
23  existence of those amounts based on
24  materiality.
25    Q.    And did PwC prepare workpapers of

BURGER

1
2  this type in the ordinary course of its
3  business?
4     A.    We do.
5     Q.    And did PwC prepare this particular
6  workpaper in the ordinary course of its
7  preparation of Highland's 2017 audit?
8     A.    We did.
9     Q.    Okay.  Can we go to the tab that is
10  marked as detailed, if you look at the bottom?
11  Do you have that, sir?
12    A.    Yes, I have.
13    Q.    Is that tab intended to list all of
14  the -- of the notes and other amounts due from
15  affiliates that were outstanding at the end of
16  the fiscal year?
17    A.    Correct.
18    Q.    And is this information -- where did
19  PwC get the information that is set forth on
20  the detail tab?
21    A.    It is from management from the trial
22  balance.
23    Q.    For the record, can you just tell me
24  what a trial balance is?
25    A.    So that is a summary document

BURGER

1
2  listing out the balances of all accounts from
3  the general ledger that is used to produce the
4  set of financial statements.
5     Q.    And was the trial balance made
6  available to PwC by Highland in connection with
7  its audit work?
8     A.    It was.
9     Q.    The next tab is marked credit risk
10  analysis.  Do you see that?
11    A.    Yes.
12    Q.    What is the purpose of the credit
13  risk analysis?
14    A.    The purpose of this is that if you
15  think about a receivable or any amount due it
16  is about intent and ability.  And this is where
17  we deal with ability to ask ourself the
18  question is the counterparty reasonably able to
19  repay the amounts.
20    Q.    And did PwC conclude in 2000 -- in
21  connection with the 2017 audit that the makers
22  of the notes set forth on this particular slide
23  had the ability to pay?
24    A.    In our opinion, yes.
25    Q.    Okay.  And did PwC base that opinion

BURGER

1
2  on the information that was provided by
3  management?
4        MR. AIGEN:  Objection, form.
5     A.    Partly management and partly our own
6  due diligence.
7     Q.    Okay.  The next tab is results
8  template.  Do you see that?
9     A.    Yes.
10    Q.    Can you just explain to me what that
11  page is, if we could scroll to the top, please?
12    A.    This -- there are a number of notes
13  that are being dealt with.  This -- so if you
14  go back to the detail tab, those are the
15  individual notes that makes up the amount that
16  ties to the back of the financial statement.
17  And there are relevant tabs here that deal with
18  a number of these loans.  In preparation for
19  this, we focused on due from HCMSI as that is
20  under question.
21    Q.    Why is due from HCMSI under
22  question?
23    A.    That is my understanding of what the
24  deposition relates to.
25        MR. WANDER:  When he says in

1              BURGER
2    preparation for this, he means in
3    preparation for the deposition he reviewed
4    this piece of it, the HCMSI. Not the rest
5    of the notes, just HCMSI.
6    Q.   Okay. So, so but with respect to
7    this particular page, is there an analysis that
8    PwC is undertaking? Does this reflect an –
9    withdrawn.
10        Does this page reflect an analysis
11   that PwC did?
12        MR. AIGEN: Objection, form.
13   A.   If you add the other relevant tabs
14   to it, yes. So in other words, some of them
15   link to other tabs. Some of them have
16   individual documentation as referenced in the
17   marked legends.
18   Q.   And then there are tabs for the
19   individual maker of each set of notes. Do I
20   have that right?
21   A.   Correct.
22   Q.   All right. Let's go to the 2018
23   financial statements, please. Are you familiar
24   with Highland's audited financial statements
25   for the period ending December 31st, 2018?

1              BURGER
2    A.   I am.
3        MR. AIGEN: Sorry to interrupt. Are
4    you marking this? I'm trying to keep
5    track, is this –
6        MR. MORRIS: Yes, I apologize, this
7    will be Exhibit 4.
8        (Exhibit 4 marked.)
9        MR. AIGEN: 4, okay.
10   Q.   And did you oversee the preparation
11   of the audited financial statements on behalf
12   of PwC for the period ending December 31st,
13   2018?
14   A.   Correction, not preparation, we
15   don't prepare any of these documents.
16   Q.   Let – I apologize, let me restate
17   the question.
18        Did you oversee PwC's audit of
19   Highland's financial statements for the period
20   ending December 31st, 2018?
21   A.   Yeah, I did.
22   Q.   Okay. Do you recall any deviations
23   from the process you described earlier in
24   connection with the preparation of the 2018
25   audited financials?

1              BURGER
2    A.   No, I do not.
3    Q.   Can we go to the third page of the
4    document right there. This document is dated,
5    if you look at the bottom, June 3rd, 2019. Do
6    you see that?
7    A.   I do.
8    Q.   And that was the same date as the
9    management representation letter that we looked
10   at earlier, do you recall that? We can pull it
11   up.
12   A.   No, I do.
13   Q.   Is it a coincidence that they both
14   have the same date?
15   A.   No, it is not. We require that to
16   be the same.
17   Q.   And why do you require that the
18   management representation letter and the report
19   of independent auditors be issued on the same
20   day?
21   A.   This is – this is the date that we
22   effectively consider these financials available
23   to be issued. And under standards, we are
24   required to consider all subsequent events and
25   representations up to this date. So therefore,

1              BURGER
2    we cannot accept a date of, let's call it June
3    2nd or 1st or earlier from management's
4    representation.
5    Q.   Is – is the report that is set out
6    here required by either GAAS or GAAP?
7    A.   This is – GAAS requires the audit
8    opinion to be the document whereby we
9    report to the general partner on our – on our
10   audit.
11   Q.   And does PwC have an internal
12   process by which it determines whether or not
13   to sign-off on – on any particular client's
14   audit?
15   A.   We do.
16   Q.   Can you describe that process for me
17   generally?
18   A.   From an acceptance phase of the
19   client or do you mean the content of their
20   opinion?
21   Q.   The content of the opinion, thank
22   you.
23   A.   Yes. So there is a framework that
24   we follow on going back to whether there –
25   whether we consider two things. Whether there

BURGER

1
2  are material uncorrected misstatements to the
3  financials or material deviations from required
4  disclosures. So in other words, are the
5  financials reasonable and accurate in terms of
6  GAAP, and were we able to perform all the
7  procedures. So in other words there weren't
8  any undue scope limitations which -- which got
9  us to a point we weren't able to perform the
10  audit and fulfill our professional duty.
11        If the answer to those are that we
12  fulfill both then we would give what we call an
13  unqualified or a clean opinion.
14     Q.   And is there an opinion committee
15  that is -- that is dedicated to this process?
16     A.   No, it is -- if it is a clean
17  opinion then it is the partner and if
18  applicable the second partner on the engagement
19  is called. If there is anything which goes
20  away from an unqualified opinion, in any
21  deviation, then there is a whole consultation
22  process with our national office.
23     Q.   And did you personally approve this
24  opinion letter?
25     A.   I did, that is my signature.

BURGER

1
2     Q.   Okay. Let's go to page 2, please,
3  consolidated balance sheet.
4        Do you see, again, there is the
5  notes and other amounts due from affiliates?
6     A.   I do.
7     Q.   And does this just carry over from
8  the prior years subject to any payments or
9  additional notes subject to any changes since
10  the end of the prior fiscal year?
11     A.   It does.
12     Q.   As of the end of 2018, is it fair to
13  say that the notes and other amounts due from
14  affiliates now exceeded more than 15 percent of
15  Highland's assets?
16     A.   That is correct.
17     Q.   Now, let's go to page 26, please.
18  And you will see number -- note number 8
19  relates to related-party transactions. Do you
20  see that?
21     A.   I do.
22     Q.   So again, do I have this right that
23  this section of the notes is intended to
24  provide the detail about transactions between
25  Highland and related parties?

BURGER

1
2     A.   It is.
3     Q.   And that is required by GAAP, do I
4  have that right?
5     A.   You have got it correct.
6     Q.   Okay. Let's go to page 28, please.
7        Do you see on page 28 and continuing
8  on page 29 there is again a section of note 9
9  entitled notes and other amounts due from
10  affiliates?
11     A.   I do.
12     Q.   And this information was provided by
13  management; correct?
14     A.   Correct.
15     Q.   And this portion of note 8 is
16  intended to describe the obligations that were
17  owed to the debtor by affiliates; correct?
18     A.   Correct.
19     Q.   Does this section of note 8 set
20  forth the amounts that were due and owing by
21  each affiliate as of the end of fiscal year
22  2018?
23     A.   It does.
24     Q.   And are those amounts included in
25  the line item that we just looked at on the

BURGER

1
2  balance sheet called notes and other amounts
3  due from affiliates?
4     A.   It is.
5     Q.   And can you confirm for me that
6  management is the one who decided -- withdrawn.
7        Can you confirm for me that
8  management is the one who calculated the
9  amounts due and owing by each affiliate as of
10  December 31st, 2018?
11        MR. AIGEN: Objection, form.
12     A.   That is correct.
13     Q.   To the best of your knowledge, did
14  anybody from Highland ever tell anybody from
15  PwC that any of the amounts due and owing as
16  set forth in the notes and other amounts due
17  from affiliates was wrong or incorrect?
18     A.   Not to my knowledge.
19     Q.   And can you confirm for me that in
20  connection with the 2018 financial statements
21  Highland again stated in general that the fair
22  value of the notes and other amounts due from
23  affiliates approximates the carrying value of
24  the notes receivable?
25     A.   That's correct.

BURGER

1 BURGER
2     Q.   Is it fair to say that when PwC
3 issued its audit opinion on June 3rd, 2019 that
4 they had no reason to discount the fair value
5 of any of the notes described in this portion
6 of note 8?
7         MR. AIGEN:  Objection, form.
8     A.   Yeah, that is correct.
9     Q.   Let's go to page 38, please, note
10 15.  Do you see note 15 beginning on page 38?
11    A.   I do.
12    Q.   And is this the section of the notes
13 that are intended to describe material
14 subsequent events that would require
15 disclosure?
16    A.   It is.
17    Q.   And is the information set forth in
18 section 15 or note 15 information that was
19 provided by Highland?
20    A.   Correct.
21    Q.   To the best of PwC's knowledge, as
22 of June 3rd, 2019, did note 15 in fact include
23 a description of all material subsequent events
24 that required disclosure?
25    A.   That's correct.

BURGER

1 BURGER
2     Q.   Did anyone -- withdrawn.
3         Do you know whether anyone from
4 Highland ever informed anyone at PwC that there
5 were material subsequent events that were
6 omitted from note 15?
7     A.   I'm not.
8     Q.   Let's go to the 2018 workpapers.
9         (Exhibit 5 marked.)
10    Q.   We will mark this as Exhibit 5.
11        MR. MORRIS:  I am trying to go as
12 quickly as I can, Michael, to leave you a
13 little time.
14        MR. AIGEN:  Thanks.
15    Q.   Do you have that, Mr. Burger?
16    A.   Yeah, I do.
17        MR. AIGEN:  This is Exhibit 5, John?
18        MR. MORRIS:  Yes.
19    Q.   Is there anything that you need to
20 look at, Mr. Burger, to confirm that these are
21 PwC's workpapers for the 2018 audit as it
22 relates to notes and other amounts due from
23 affiliates?
24    A.   I can confirm.
25    Q.   Okay.  And was this also prepared in

BURGER

1 BURGER
2 the first instance by Ms. Garcia?
3     A.   No, this was prepared by Madeline
4 Pacocha.
5     Q.   How do you spell her last name?
6     A.   P-a-c-o-c-h-a.
7     Q.   And did she report directly to you?
8     A.   She did.  She was part of the team.
9     Q.   Okay.  And do you know whether the
10 same process that was followed in 2018 was
11 followed in 2000 -- withdrawn.
12        Did PwC follow the same process in
13 creating this document that it did when it
14 created the workpapers in 2017?
15    A.   We did.
16    Q.   Can you confirm that this document
17 was prepared in the ordinary course of PwC's
18 business?
19    A.   It was.
20    Q.   Can you confirm that this document
21 was prepared in the ordinary course of PwC's
22 audit of Highland's 2018 financial statements?
23    A.   That's correct.
24    Q.   Okay.  I'm going to ask a few more
25 detailed questions than we did last time.  Can

BURGER

1 BURGER
2 we go to the section called credit risk
3 analysis, the tab.
4         I think earlier you testified that
5 there was kind of two aspects that PwC looked
6 at when analyzing the notes and they were the
7 intent and the ability to pay.  Do I have that
8 right?
9         MR. AIGEN:  Objection, form.
10    A.   That's correct.
11    Q.   Okay.  And this particular tab,
12 credit risk analysis, related to the ability to
13 pay part of that analysis; correct?
14    A.   That's correct.
15    Q.   Do you see there is a column called
16 recoverability?
17    A.   I do.
18    Q.   What is that?
19    A.   That is a qualitative assessment to
20 give us reasonable assurance that these notes
21 are, A, not in default or -- and B, that the --
22 at least materially the maker has enough assets
23 that we are aware of to -- to be able to repay.
24    Q.   And did Highland provide the data
25 and information related to each maker's ability

BURGER

1
2 to pay?
3     A.   This is a combination but most of
4 this is our own due diligence.
5     Q.   And – and can you describe for me
6 what steps in the due diligence process PwC
7 undertook to ascertain whether the makers have
8 the ability to pay?
9     A.   Mostly – mostly relates to evidence
10 that there are payments on notes and that none
11 of the notes are contractually in default.  And
12 then also very much specifically to
13 Mr. Dondero's ability from known assets that
14 can be found on public filings.
15     Q.   And did PwC analyze public filings
16 and conclude that Mr. Dondero had the ability
17 to repay the notes that had – that he had
18 issued to the debtor?
19     A.   Through public filings which we
20 could obtain, we could at least assess that
21 there are assets in those, sort of let's call
22 it public filings that would be adequate to
23 repay the amounts.
24     Q.   Is it fair to say that this section
25 of the workpapers is an assessment of each

BURGER

1
2 affiliate's creditworthiness?
3     A.   Not each individual, but on a more
4 look-through basis to specifically Mr. Dondero.
5 The purpose of this is not to sign-off on an
6 absolute creditworthiness of each party, but to
7 provide enough evidence to give us reasonable
8 assurance that these notes are recoverable.
9     Q.   And based on the due diligence that
10 PwC did and the information provided by
11 Highland, did PwC conclude that the makers of
12 the notes had the ability to repay the
13 obligations set forth therein?
14     A.   We did.
15     Q.   Did PwC rely on the analysis set
16 forth on this document in deciding to issue the
17 opinion in connection – the clean opinion in
18 connection with the 2018 audit?
19     A.   Yeah, this is part of our workpapers
20 which forms the collective base of our opinion,
21 yes.
22     Q.   If PwC had any concerns that any
23 maker was unable to repay the obligations under
24 any of the notes made to Highland, is there a
25 process or what would happen under that

BURGER

1
2 circumstance?
3         MR. AIGEN:  Objection, form.
4     A.   Do I answer that?
5         MR. WANDER:  Yes.
6     A.   If we become aware of any data or
7 anything which shows us that a counterparty
8 cannot repay the note, the question stems to
9 management as to why they consider the note
10 fully recoverable.  Because the fact that there
11 is a note with a legal agreement to it doesn't
12 mean – there may be adverse data that show
13 that the counterparty is not able to pay and
14 that then results in additional work to assess
15 whether that loan can be recorded at its full
16 value.
17     Q.   But in connection with the 2018
18 audit, management represented that each of the
19 notes was fully recoverable.  Do I have that
20 right?
21         MR. AIGEN:  Objection, form.
22     A.   They did.
23     Q.   Let's go to the results template,
24 please.
25         Now, do you see that there is

BURGER

1
2 approximately 116 or 117 – withdrawn.
3         Do you see that there is
4 approximately $116 difference between the
5 amount per client and the balance per testing?
6     A.   Yes, I do.
7     Q.   Okay.  What – what does –
8 withdrawn.
9         Is the amount per client the total
10 principal and interest due as of the balance
11 sheet date for each of the makers listed under
12 the account description column?
13     A.   That is the amount that is obtained
14 from the trial balance that is used for the
15 financial statements –
16     Q.   Okay.
17     A.   – in Column D.
18     Q.   And did PwC then test those amounts
19 for accuracy or reasonableness?
20     A.   For reasonableness we went back if
21 material to the appropriate legal agreements.
22         MR. AIGEN:  I didn't want to
23 interrupt, but I was objecting to form with
24 that one.
25     Q.   And based on the testing that PwC

BURGER

1
2 did, did it reach any conclusions as to the
3 reliability of the debtors' of Highland's
4 assessment as to the amount owed by each
5 client?
6    A.   Do you mind repeating that question?
7    Q.   Yeah, that wasn't very good.
8       What is the purpose of the testing
9 that -- that was undertaken that is reflected
10 on this page?
11    A.   So the purpose is, again, the 173 is
12 the amount that goes to the line item in
13 question that we are or that part of feeds into
14 another tab called detail, which goes back into
15 the detail.
16       So from there if we have a balance
17 as recorded in the financial statements we need
18 to obtain the detail behind that, what makes up
19 those amounts.  And for each one individually
20 or collective material, we need to test the, A,
21 the existence of the amount and, B, the
22 evaluation of the amount.
23    Q.   Let's go to the next tab, due from
24 HCMSI.  Do you see that?
25    A.   I do.

BURGER

1
2    Q.   So does this show that an entity
3 known as HCMSI had principal and interest due
4 on one or more promissory notes totaling
5 approximately 13 and a half million dollars?
6    A.   It is three promissory notes, which
7 adds up to approximately 13.9 million dollars.
8    Q.   Okay.  So promissory note one is on
9 the left where it says closing date May 31,
10 2017.  Do I have that right?
11    A.   Correct.
12    Q.   And if we scroll down promissory --
13 where is the second promissory note?
14    A.   Just go over to column R and then
15 AB, I can read.
16    Q.   Okay.  So then -- so that is the
17 second promissory note is the one that was
18 issued on June 25th, 2018 in the amount of
19 $200,000, and then the third one is issued on
20 March 26th, 2018 in the amount of $150,000.  Do
21 I have that right?
22    A.   That's correct.
23    Q.   And this shows that under the first
24 note, if we could go to the left a bit, that
25 HCMSI paid Highland exactly $1 million on

BURGER

1
2 October 8th, 2018 that was allocated -- a
3 portion of which was allocated to principal and
4 a portion of which was allocated to interest?
5    A.   That's correct.
6    Q.   Okay.  Let's go to the next tab,
7 Dondero tax loans.  Do you know why the loans
8 to Mr. Dondero are described as tax loans?
9    A.   It is -- it is described as tax loan
10 to facilitate tax payments based on earnings is
11 my understanding.
12    Q.   Did PwC ever make any inquiry as to
13 whether the amounts loaned to Mr. Dondero
14 approximated the amount of tax liability that
15 he faced?
16       MR. AIGEN:  Objection, form.
17    A.   We did not.
18    Q.   Does PwC have any information as to
19 whether or not the loans made to Mr. Dondero
20 were related in any way to his actual tax
21 obligations?
22       MR. AIGEN:  Objection, form.
23    A.   We did not.  We didn't consider it
24 necessary.
25    Q.   Did PwC make any inquiry as to the

BURGER

1
2 purpose of the loans to Mr. Dondero?
3       MR. AIGEN:  Objection, form.
4    A.   In general.
5    Q.   In general you made an inquiry?
6    A.   Yeah, as to the -- the -- as to
7 whether these loans are considered reasonable
8 and arm's length.
9    Q.   What information do you recall that
10 you have whether the loans were reasonable and
11 arm's length?
12    A.   Related to the notes being at an
13 interest rate which is considered a reasonable
14 interest rate considering all the parties
15 involved.  And then more on, you know, again,
16 the testing that were done and the existence of
17 the notes.
18    Q.   Did PwC make any inquiry as to the
19 purpose of any of the loans to any of the
20 affiliates including Mr. Dondero?
21    A.   We did.
22    Q.   Okay.  With respect to Mr. Dondero,
23 do you have any information that you haven't
24 already provided as to PwC's understanding of
25 the purpose of the loans?

BURGER

1
2     MR. AIGEN: Objection.
3     A.  No.
4     Q.  No.  And who -- who told PwC, if you
5  know, that the loans were being made to
6  Mr. Dondero to pay tax payments based on
7  earnings?
8     A.  Management.  I cannot recall a
9  specific name.
10    Q.  Okay.  But it is your understanding
11 that the loans were made to Mr. Dondero in
12 order to enable him to pay the taxes due on his
13 earnings.  Do I have that right?
14    A.  That's correct.
15    Q.  And who decided the amount of the
16 loans, to the best of your knowledge?
17    MR. AIGEN: Objection, form.
18    A.  It is an agreement between
19 management and Mr. -- management.
20    Q.  Do you have anybody -- do you have
21 any knowledge as to who on behalf of Highland
22 made the agreement with Mr. Dondero about the
23 amount of the loans?
24    A.  I cannot recall the specific name.
25    Q.  If you look at loan number 1 there,

BURGER

1
2  the $14 million loan that was first made in
3  December 2017, do I have this right that
4  Mr. Dondero made a payment of over $750,000
5  that was applied to principal and interest on
6  December 19th, 2018?
7     A.  That's correct.
8     Q.  Okay.  And if we scroll down a
9  little bit more, keep going, note number 4.
10 Did Mr. Dondero make a $2 million payment to
11 Highland on December 18th, 2018, a portion
12 of which was used to pay principal and a portion
13 of which was used to pay interest on note
14 number 4?
15    A.  That's correct.
16    Q.  Did anybody ever tell you that in
17 January or February 2019 that Mr. Dondero had
18 entered into an oral agreement with his sister
19 acting on behalf of Highland whereby
20 Mr. Dondero and certain of his affiliates would
21 be relieved of the obligation to pay amounts
22 due under the promissory notes if certain
23 conditions subsequent were met?
24    MR. AIGEN: Objection, form.
25    A.  No, they did not.

BURGER

1
2     Q.  Do you know whether anybody at PwC
3  was ever informed by Mr. Dondero -- withdrawn.
4     Do you know if anybody at Highland that in
5  ever informed by anybody at Highland that in
6  January or February 2019 Mr. Dondero entered
7  into an oral agreement with his sister acting
8  on behalf of Highland whereby Mr. Dondero and
9  certain of his affiliates would be relieved of
10 all obligations to pay all amounts otherwise
11 due and owing under the promissory notes if
12 certain conditions subsequent were met?
13    MR. AIGEN: Objection, form.
14    A.  I do not.
15    Q.  Okay.  Can we go -- I apologize, but
16 can we go back to tab number -- the detail tab
17 in the -- in the workpapers?
18    MR. WANDER: In Exhibit 5 or Exhibit
19 3?
20    Q.  Exhibit 5, thank you for the
21 clarification.  Okay, so the detail tab and the
22 workpapers for 2018 lists all of the notes
23 receivable that were made by affiliates of
24 Highland; correct?
25    A.  Correct.

BURGER

1
2     Q.  Are you aware of any oral or written
3  amendment to any of the promissory notes that
4  are described on the detail page of Exhibit 5?
5     MR. AIGEN: Objection, form.
6     MR. MORRIS: What -- what is the
7  objection?  Hold on before you answer, what
8  is the objection?
9     MR. AIGEN: I think it is vague.  I
10 don't know which stuff you are talking
11 about here.  Are you asking for a legal
12 conclusion, and there is no foundation.
13    Q.  Yeah, okay.  Certainly not asking
14 for a legal conclusion and I will -- let me ask
15 the question again, sir.
16    This page lists the amounts that
17 each of the affiliates owes to Highland under
18 various promissory notes; correct?
19    A.  Correct.
20    Q.  Are you aware of any oral or written
21 amendment to any of those promissory notes?
22    A.  No, up to June 3rd, 2019.
23    Q.  And do you know whether anyone at
24 PwC was aware of any oral or written amendment
25 to any of the promissory notes as of June 3rd,

BURGER

1
2 2019?
3      MR. AIGEN: Objection, form.
4   A. No, I'm not.
5   Q. Were you ever informed of any
6 amendment, written or oral, to any promissory
7 note at any time?
8   A. I was not.
9   Q. Did anyone ever tell you that any of
10 the notes in -- referred to in the detail tab
11 of Exhibit 5 might be forgiven under certain
12 circumstances?
13   A. No.
14   Q. Do you know whether anybody at PwC
15 was ever informed by anybody at Highland that
16 any of the notes in the detail tab in Exhibit 5
17 might be forgiven?
18      MR. AIGEN: Objection, form.
19   A. I do not.
20   Q. Under your understanding of the GAAP
21 rules, did Mr. Dondero and Mr. Waterhouse have
22 a continuing obligation to inform PwC of any
23 circumstances that would call into question the
24 collectability of any of the notes due from
25 affiliates?

BURGER

1
2      MR. AIGEN: Objection, form.
3   A. Yes, they had the responsibility.
4   Q. To the best of your knowledge, did
5 Mr. Dondero ever inform anybody at PwC prior to
6 June 3rd, 2019 that any of the notes might not
7 be collectable?
8      MR. AIGEN: Objection, form.
9   A. He did not.
10   Q. To the best of your knowledge, did
11 Mr. Dondero ever inform anybody at PwC prior to
12 June 3rd, 2019 that any of the notes might be
13 forgiven under certain circumstances?
14      MR. AIGEN: Objection, form.
15   A. He did not.
16   Q. To the best of your knowledge, did
17 Mr. Dondero ever inform anyone at PwC prior to
18 June 3rd, 2019 that any of the notes were
19 amended?
20      MR. AIGEN: Objection, form.
21   A. He did not.
22   Q. To the best of your knowledge, did
23 Mr. Dondero ever inform anyone at PwC prior to
24 June 3rd, 2019 that the obligations under any
25 of the notes would be extinguished based on the

BURGER

1
2 fulfillment of certain conditions subsequent?
3      MR. AIGEN: Objection, form.
4   A. Again, he did not.
5   Q. I'm going to ask the same questions
6 now with respect to Mr. Waterhouse.
7      To the best of your knowledge, did
8 Mr. Waterhouse ever inform anyone at PwC prior
9 to June 3rd, 2019 that any of the notes might
10 not be collectable?
11      MR. AIGEN: Objection, form.
12   A. He did not.
13   Q. To the best of your knowledge, did
14 Mr. Waterhouse ever inform anyone at PwC prior
15 to June 3rd, 2019 that any of the notes might
16 be forgiven under certain circumstances?
17   A. No, he did not.
18   Q. To the best of your knowledge, did
19 Mr. Waterhouse ever inform anyone at PwC prior
20 to June 3rd, 2019 that any of the notes were
21 amended?
22   A. He did not.
23   Q. To the best of your knowledge, did
24 Mr. Waterhouse ever inform anybody at PwC prior
25 to June 3rd, 2019 that the obligations under

BURGER

1
2 any of the notes would be extinguished upon the
3 fulfillment of certain conditions subsequent?
4      MR. AIGEN: Objection, form.
5   A. He did not.
6   Q. Now, just going to finish up the
7 last set of questions to make it broader for
8 anybody at Highland.
9      To the best of your knowledge, did
10 anyone from Highland ever inform anyone at PwC
11 prior to June 3rd, 2019 that any of the notes
12 might not be collectable?
13      MR. AIGEN: Objection, form.
14   A. Not to my knowledge.
15   Q. To the best of your knowledge, did
16 anyone from Highland ever inform anyone at PwC
17 prior to June 3rd, 2019 that any of the notes
18 might be forgiven under certain circumstances?
19   A. Not to my knowledge.
20   Q. To the best of your knowledge, did
21 anyone from Highland ever inform anyone at PwC
22 prior to June 3rd, 2019 that any of the notes
23 were amended?
24      MR. AIGEN: Objection, form.
25   A. Not to my knowledge.

BURGER

2  Q. To the best of your knowledge, did
3  anyone from Highland ever inform anyone at PwC
4  prior to June 3rd, 2019 that the obligations
5  under any of the notes would be extinguished
6  upon the fulfillment of certain conditions
7  subsequent?
8  A. Not to my knowledge.
9  Q. If PwC had learned before June 3rd,
10 2019 that any of the notes might not be
11 collectable, would PwC have required that
12 information to be disclosed?
13     MR. AIGEN: Objection, form.
14 A. Disclosed or potentially based on
15 materiality financials adjusted.
16 Q. I'm going to ask that question
17 again.
18 A. Okay.
19 Q. If PwC had learned before June 3rd,
20 2019 that any of the notes that had an
21 outstanding principal amount of at least $1.7
22 million might not be collectable, would PwC
23 have required that to be disclosed?
24 A. Correct.
25     MR. AIGEN: Objection, form.

BURGER

2  Q. And why is that?
3  A. If you have a material -- if you
4  have material adverse effects of the balance
5  sheet which gives a material adjustment to the
6  financial statements, depending on the type of
7  event you require either disclosure or actual
8  adjustment to the balance sheet.
9  Q. If PwC had learned before June 3rd,
10 2019 that any of the notes that had a
11 outstanding principal amount due of at least
12 $1.7 million might be forgiven, would PwC have
13 required that to be disclosed?
14 A. Yes.
15     MR. AIGEN: Objection, form.
16 Q. Is that for the same reasons that
17 you just articulated with respect to the lack
18 of collectability?
19 A. Correct.
20 Q. Just two more questions. If PwC
21 learned before June 3rd, 2019 that any of the
22 notes that had an outstanding principal amount
23 of $1.7 million or more, if those notes had
24 been amended, would PwC have required that to
25 be disclosed?

BURGER

2     MR. AIGEN: Objection, form.
3  A. We would have.
4  Q. And finally, if PwC learned before
5  June 3rd, 2019 that any of the notes that had a
6  then outstanding principal amount due of at
7  least $1.7 million would be extinguished based
8  on the fulfillment of certain conditions
9  subsequent, would PwC have required that to be
10 disclosed?
11     MR. AIGEN: Objection, form.
12 A. We would have.
13 Q. Okay.
14     MR. MORRIS: I have no further
15 questions. Thank you very much, sir.
16     EXAMINATION
17 BY MR. AIGEN:
18 Q. All right. I guess my first
19 question is, how much of a hard stop time is
20 11:45? I don't mean that for you that can be
21 for counsel.
22 A. I can go to noon.
23 Q. I will try -- I do not think I'm
24 going to be able to be done by then. I guess
25 at that point we can stop and it is possible

BURGER

2  John and I can work out stuff on the side. But
3  just for the record, I understand this isn't
4  your problem I just want to note that we were
5  never told there would be this sort of time
6  limit today. Again, not your problem and I
7  just want to reserve all rights if we can't
8  finish today we may have to come back another
9  time. Hopefully not, I will do my best to ask
10 questions.
11     Let's start with some of the
12 questions you were asked at the end about --
13 Mr. Morris asked you if you had learned certain
14 things. And he asked you several questions
15 about it, that PwC would have required that
16 information to be disclosed. Do you remember
17 that?
18 A. Okay.
19 Q. Yes, you remember that?
20 A. Yes, I do.
21 Q. When you say or he said required to
22 be disclosed, what are you talking about,
23 disclosed where and to whom?
24 A. Typically that would be disclosed in
25 your subsequent events footnotes, but you can

Page 78

BURGER

1
2 also disclose it in note 9 or 8 in this
3 instance, the relevant note.
4      Q.   And those questions were, for
5 instance, one of the questions were do you
6 remember being asked if PwC had learned that
7 the notes might be forgiven PwC would have
8 required that to have been disclosed. Do you
9 remember answering that question?
10      A.   Yeah, I do.
11      Q.   And I want to focus on this. I know
12 these are Mr. Morris' questions, so it may not
13 have been your language, but you were asked if
14 it might be forgiven.
15          What does that mean to you? Are we
16 talking about is there a difference for you if
17 there was a 1 percent chance that something
18 would be forgiven or a 90 percent change of it
19 being forgiven?
20      A.   If we learned about something, let's
21 say, we learned might be forgiven, that would
22 have resulted in additional audit work. The
23 question I understood to be and the answer I
24 gave was if something happened where there was
25 an event that actually occurred before or on

Page 79

BURGER

1
2 June 3rd, we would have required disclosure.
3      Q.   Got it. So is it fair to say that
4 in response to all of Mr. Morris' questions
5 about what would have been required to be
6 disclosed, in your mind he was referring to
7 those events or items having actually occurred
8 and the notes being actually forgiven at that
9 point in time; is that correct?
10          MR. MORRIS: Objection to the form
11      of the question.
12      Q.   I didn't hear your answer.
13      A.   Correct.
14      Q.   So you haven't provided any
15 testimony today about what PwC might have
16 required to be disclosed or disclosed if
17 certain events took place in the future; is
18 that fair to say?
19          MR. MORRIS: Objection to the form
20      of the question.
21      A.   That is fair to say, but any events
22 that we learn of may have -- will be assessed
23 for what the impact on the valuation of the
24 loan is.
25      Q.   And is it fair to say, then, that

Page 80

BURGER

1
2 PwC would have to analyze and assess a
3 condition to determine whether it is something
4 this needs to be disclosed?
5      A.   Yeah, we will have to analyze it.
6      Q.   And how would PwC go about analyzing
7 a potential event that might forgive or
8 discharge the notes?
9      A.   It depends on what the event is. It
10 comes down to a function of materiality and
11 probability and understanding the potential
12 event through discussions with management.
13 Again, it depends on the event.
14      Q.   Okay. And without knowing the
15 specific event, would you agree that you can't
16 testify today on whether that would need to be
17 disclosed in the financials?
18          MR. MORRIS: Objection to the form
19      of the question.
20      A.   Again, the purpose of subsequent
21 event disclosure is to disclose to the reader
22 of the financial statements any events that
23 actually occurred. And if we are aware of
24 something that -- that did not occur but that
25 may have a material adverse effect on the

Page 81

BURGER

1
2 financial statements, that is something that we
3 would consider for disclosure.
4      Q.   And when you say you'd consider it,
5 is it fair that you would analyze the
6 probability that the event would occur?
7          MR. MORRIS: Objection to the form
8      of the question.
9      A.   Correct.
10      Q.   And would you also --
11      A.   Correct.
12      Q.   Would you also look at the potential
13 materiality of that event?
14      A.   Yes.
15      Q.   And with respect to the promissory
16 notes at issue in this litigation, is it fair
17 to say that no one at PwC made any sort of
18 analysis about whether those notes would be
19 potentially discharged due to events that might
20 occur in the future?
21          MR. MORRIS: Objection to the form
22      of the question.
23      A.   That is not part of our professional
24 work responsibility to consider potential
25 events that might occur.

Page 82

BURGER

1
2      Q.    And the audits that we were talking
3   about were in 2017 and 2018; is that correct?
4      A.    Yeah, conducted in '18 for '17 and
5   conducted in '19 for '18.
6      Q.    Okay.  And I just want to ask some
7   general questions about the audits that were
8   done.  And to speed things up, I'm going to ask
9   you the questions combining those two years.
10  If you need to break it down per year we can do
11  that, too, but these are pretty general
12  questions.
13        Can you tell me approximately how
14  many people worked on the audits of Highland at
15  PwC in 2017 and 2018?
16     A.    Again, earlier I said six or seven.
17     Q.    And out of those six or seven, how
18  many people had communications with anyone at
19  Highland?
20     A.    I would argue all of them, all of
21  us.
22     Q.    Okay.  And who at Highland did these
23  six or seven people have communications with
24  with respect to the work on the audits?
25     A.    It depends.  It depends on the

Page 83

BURGER

1
2   nature of the question.  So again, Kristin
3   Hendrix, and actually earlier there is another
4   name Drew Wilson would have been a person that
5   we dealt with on a day-to-day basis.  Above
6   them would be Dave Klos and above them would be
7   Frank Waterhouse, the CFO.
8        So again, if it is a routine matter,
9   our more junior people probably dealt with
10  Kristin and Drew.  And if it is not a routine
11  matter and on periodic status meetings, my
12  communication would have probably been more
13  with Dave Klos and my managers.
14     Q.    I apologize.  Other than those four,
15  Ms. Hendrix, Mr. Wilson, Mr. Klos and
16  Mr. Waterhouse, is there anyone else at
17  Highland that PwC communicated with as part of
18  the audit that you are aware of?
19     A.    Not that I'm aware of.  I mean,
20  there is a chance that they might have had
21  somebody else involved, but not that I can
22  recall.
23     Q.    Have you ever had any conversations
24  with Mr. Dondero?
25     A.    Not specifically relating to any –

Page 84

BURGER

1
2   related to the audit directly.
3      Q.    Do you know whether any of the other
4   people at PwC that worked on the audit had any
5   conversations with Mr. Dondero?
6      A.    Not that I'm aware of.
7      Q.    At the end of Mr. Morris' questions
8   if you remember you were asked several
9   questions about whether you or anyone at PwC
10  had different conversations with anyone at
11  Highland about the notes and them being
12  potentially forgivable or discharged or
13  amended.  Do you remember testifying to that?
14     A.    Yeah, I do.
15     Q.    You were asked about conversations
16  you had and you said you had no such
17  conversations; is that correct?
18     A.    Correct.
19     Q.    You also testified that you are not
20  aware of any conversations of anyone else that
21  PwC had with anyone at Highland about this
22  subject; is that correct?
23     A.    That's correct.
24     Q.    Did you – I know you said you're
25  not aware and I guess my question is how do you

Page 85

BURGER

1
2   know that?  Did you have any conversations with
3   anyone else at PwC about whether they had any
4   such conversations with anyone at Highland
5   about potential dischargeability of the notes?
6      A.    I would have had discussions with my
7   manager directly through a review of the
8   engagement as we go through all of this.  And
9   in this instance depending on the person
10  involved whether it was Hilda or Madeline, we
11  analyze, review as we try to get towards
12  sign-off.
13        And on this line item, we would have
14  gone through the work done on this note, you
15  know, and the discussion of whether there is
16  any adverse event that anybody is aware of.
17     Q.    These are all the conversations you
18  are aware of during the audit not in the last
19  couple of years; is that correct?
20     A.    Yeah, during the audit.
21        MR. MORRIS:  Objection to the form
22  of the question.
23     Q.    Are you aware of any specific
24  discussions that you had with anyone else at
25  PwC about whether they had any communications

1           BURGER
2 with anyone at Highland about whether the notes
3 were potentially dischargeable or amended?
4           MR. MORRIS: Objection.
5     A.   No, I'm not aware.
6     Q.   As part of the audit process, is one
7 of the things that PwC looks at who would be
8 reviewing or relying on the financial
9 statements that you are auditing?
10    A.   Yes, we consider that.
11    Q.   And why is that considered?
12    A.   It is important -- well, A, the --
13 the format of our report and obviously just
14 governed by who relies on it. So in other
15 words, if you have a public client with the
16 PCAOB standards where everybody in the public
17 relied on there are additional procedures and
18 additional scope than we have to perform. In a
19 certain sense you can deal with two sets of
20 rules. And the other part of that is
21 considered in who we address our opinion to.
22    Q.   And in the case of the Highland
23 audits, did PwC make an effort to determine who
24 would be reviewing and relying on the audits,
25 audited financial statements?

1           BURGER
2     A.   Yes. As this is a partnership, it
3 is generally available to the general partner
4 and the partners. And there wasn't any
5 specific need that we were aware of with
6 third-party lenders or banks or anything that
7 we are relying on financials.
8     Q.   Is who is going to end up reviewing
9 and relying on a financial statement relevant
10 to what PwC considers to be material and thus
11 need to be disclosed?
12           MR. MORRIS: Objection to the form
13 of the question, asked and answered.
14    A.   No, sorry.
15    Q.   Then what is the relevance -- sorry.
16           If it is -- if who is going to
17 review a financial statement is not relevant to
18 what is going to be disclosed, why is it
19 relevant to the work that PwC is doing?
20    A.   We perform audits either in terms of
21 GAAS as promulgated by AICPA or PCAOB, and
22 there are differences in those standards.
23           And a correction to your previous
24 question, on materiality the basis for forming
25 a point of view on what is material is not

1           BURGER
2 different, but there are certain nuances in our
3 obligation of neutrality as to whether I'm in a
4 PCAOB engagement or a AICPA engagement.
5     Q.   What do you mean by that?
6     A.   So when we decide -- you get to an
7 overall materiality. So if you for example,
8 are in a fund engagement you can use different
9 metrics as to whether you are in, let's say, a
10 hedge fund or a mutual fund, which is driven by
11 the users of the financials.
12           MR. WANDER: It is a difference
13    between public and private, Michael.
14    Q.   And this would be a private
15 transaction we're calling it; is that correct?
16    A.   Yes, governed -- sorry, not
17 governed, performed. Performed under the
18 standards of the AICPA and not the PCAOB.
19    Q.   And would those standards make a
20 difference on what is considered material as
21 part of PwC's work?
22    A.   Depending on the industry, it may.
23    Q.   And would those differences
24 potentially make a difference on what needed to
25 be disclosed in the financial statements?

1           BURGER
2     A.   Yeah. The standards from a PCAOB
3 the asset and disclosure requirements under the
4 PCAOB rules, which would not be there under
5 AICPA.
6     Q.   Changing topics a little bit here.
7 We talked about related-party transactions a
8 little earlier. Do you remember?
9     A.   Sure, I do.
10    Q.   Not we, you and Mr. Morris. Can you
11 just generally at a high level explain what a
12 related-party transaction is?
13    A.   So related-party I cannot -- I
14 cannot quote the verbatim GAAP or GAAS
15 definition right now, but in effect the
16 related-party is any party that up or down the
17 stream can have material influence or control
18 of the entity. So it would be key management,
19 anybody in an ownership structure upstream
20 which has significant interest or control as
21 well as even -- it can be in certain
22 circumstances, certain service providers.
23    Q.   Let's concentrate on notes for a
24 second. There can be --
25    A.   Okay.

BURGER

2 Q. – related-party notes and then what
3 would you call them non-related-party notes if
4 they're not related-party notes? Is there a
5 term for that?
6 MR. MORRIS: Objection to form of
7 the question.
8 A. Third party, unaffiliated.
9 Q. When analyzing the collectability of
10 notes, is there any differences in what PwC was
11 doing looking at affiliated – non-affiliated
12 transaction notes versus related-party notes?
13 MR. MORRIS: Objection to the form
14 of the question.
15 A. Not really.
16 Q. You say "not really," that can –
17 A. Yeah, not – no, there isn't,
18 because at the end of the day whether a note is
19 collectable or not is something that you have
20 to get evidence of, and the existence of the
21 note is something you have to get evidence of.
22 Q. I think I can finish up with a
23 couple more questions here. I just want to
24 sort of go back to what we talked about in the
25 beginning. PwC did not do any sort of analysis

BURGER

2 as to whether the notes in question would be
3 potentially forgiven or discharged; is that
4 correct?
5 MR. MORRIS: Objection to the form
6 of the question.
7 MR. AIGEN: What is your basis for
8 the objection?
9 MR. MORRIS: It is not their
10 responsibility to do that. There is no
11 foundation.
12 Q. That is fine, you can answer the
13 question.
14 A. No, we did not as we did not have
15 to.
16 Q. If PwC had learned that there was
17 some condition down the road that could
18 potentially discharge or forgive the notes,
19 would PwC have had to do some sort of analysis
20 to determine if that condition would need to be
21 disclosed?
22 A. Yes, if you become aware of any
23 adverse event which may impact the valuation of
24 any asset you have to consider that.
25 Q. And in order to consider that, you

BURGER

2 would look at the probability that that event
3 would occur; is that correct?
4 A. Correct, probability and potential
5 impact.
6 Q. And materiality?
7 A. Materiality.
8 Q. And that is nothing that you or
9 anyone at PwC did with respect to any potential
10 conditions that might forgive these notes; is
11 that correct?
12 A. Yeah, we did not. Yeah, we did not.
13 MR. AIGEN: That is all the
14 questions I have.
15 FURTHER EXAMINATION.
16 BY MR. MORRIS:
17 Q. I just have a few more, sir, few
18 follow-ups.
19 PwC made no assessment as to whether
20 or not any of the notes might not be forgiven
21 because they were never given any information
22 that indicated that that was even possible;
23 correct?
24 MR. AIGEN: Objection, form.
25 A. That's correct.

BURGER

2 Q. PwC was never given any information
3 about the possibility that any of the
4 affiliated promissory notes might be forgiven;
5 correct?
6 A. Correct.
7 Q. PwC was never informed that
8 Mr. Dondero had entered into an agreement that
9 could impact the collectability of any of the
10 promissory notes; correct?
11 MR. AIGEN: Objection, form.
12 A. Correct.
13 MR. MORRIS: I have no further
14 questions.
15 MR. AIGEN: I don't have anything.
16 MR. MORRIS: Mr. Burger, I greatly
17 appreciate your time and your patience.
18 Thank you very much, John, same to
19 you. Thank you for the accommodations and
20 I hope –
21 MR. WANDER: Certainly, thank you.
22 (Deposition adjourned at 11:41 a.m.)
23
24
25

Page 94

```
1        BURGER
2        _____
3        PEET BURGER
4
5    Subscribed and sworn to before me
6    this      day of       2021.
7
8    --------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 95

```
1        BURGER
2        C E R T I F I C A T E
3
4        I, SUSAN S. KLINGER, a certified
5    shorthand reporter within and for the State
6    of Texas, do hereby certify:
7        That PEET BURGER, the witness whose
8    deposition is hereinbefore set forth, was
9    duly sworn by me and that such deposition
10    is a true record of the testimony given by
11    such witness.
12        I further certify that I am not
13    related to any of the parties to this
14    action by blood or marriage; and that I am
15    in no way interested in the outcome of this
16    matter.
17        IN WITNESS WHEREOF, I have hereunto
18    set my hand this 30th of July, 2021.
19
20        _____
21        Susan S. Klinger, RMR-CRR, CSR
22        Texas CSR# 6531
23
24
25
```

Page 96

```
1        ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg. No. Now Reads   Should Read  Reason
6    ___ ___ _____   _____   _____
7    ___ ___ _____   _____   _____
8    ___ ___ _____   _____   _____
9    ___ ___ _____   _____   _____
10   ___ ___ _____   _____   _____
11   ___ ___ _____   _____   _____
12   ___ ___ _____   _____   _____
13   ___ ___ _____   _____   _____
14   ___ ___ _____   _____   _____
15   ___ ___ _____   _____   _____
16   ___ ___ _____   _____   _____
17   ___ ___ _____   _____   _____
18   ___ ___ _____   _____   _____
19   ___ ___ _____   _____   _____
20
            _____
21          Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2021.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

**Appx. 01576**

## $

**$1** 63:25

**$1.7** 74:21 75:12,23 76:7

**$11.7** 40:14

**$116** 61:4

**$14** 67:2

**$150,000** 63:20

**$2** 67:10

**$200,000** 63:19

**$750,000** 67:4

## 1

**1** 17:22,25 66:25 78:17

**10** 33:24

**11** 24:4,6,23

**116** 61:2

**117** 61:2

**11:41** 93:22

**11:45** 76:20

**13** 63:5

**13.9** 63:7

**15** 51:14 54:10,18,22 55:6

**16** 39:25

**17** 82:4

**173** 62:11

**18** 20:25 82:4,5

**18th** 67:11

**19** 82:5

**1997** 6:14,17

**19th** 67:6

**1st** 5:21,24 49:3

## 2

**2** 30:6 31:11 51:2

**20** 6:20

**2000** 44:20 56:11

**2013** 7:2,3,5

**2014** 5:21,24 6:9

**2015** 38:3

**2017** 30:3,18,23 31:3, 9 33:22 36:15,24 37:6 39:18 40:19 41:2,7,14,16,20 43:7 44:21 56:14 63:10 67:3 82:3,15

**2018** 7:6 20:15 21:9 40:14 46:22,25 47:13,20,24 51:12 52:22 53:10,20 55:8, 21 56:10,22 59:18 60:17 63:18,20 64:2 67:6,11 68:22 82:3, 15

**2019** 17:23 19:15 21:14 24:18,24 25:4 48:5 54:3,22 67:17 68:6 69:22 70:2 71:6, 12,18,24 72:9,15,20, 25 73:11,17,22 74:4, 10,20 75:10,21 76:5

**21st** 38:3

**25th** 63:18

**26** 51:17

**26th** 63:20

**28** 34:17 52:6,7

**29** 52:8

**2nd** 49:3

## 3

**3** 41:4 68:19

**30** 35:3,6,7 39:20

**30th** 24:18 25:4

**31** 39:20 63:9

**31st** 20:15 21:9 36:15,24 40:19 41:20 46:25 47:12,20 53:10 67:3

**32** 25:9,10,21 26:10

**34** 26:15 27:10

**35D** 27:13,19

**36** 28:14,18,22

**38** 54:9,10

**3rd** 17:23 19:15 21:14 24:20,24 48:5 54:3, 22 69:22,25 71:6,12, 18,24 72:9,15,20,25 73:11,17,22 74:4,9, 19 75:9,21 76:5 79:2

## 4

**4** 47:7,8,9 67:9,14

**41** 39:22

**413** 23:24

**416** 25:7

**417** 28:13

**419** 19:3 29:6

## 5

**5** 55:9,10,17 68:18,20 69:4 70:11,16

**50** 21:2,13 24:16

## 8

**8** 51:18 52:15,19 54:6 78:2

**8th** 64:2

## 9

**9** 34:19 35:7,15,19 36:13 39:3,6 52:8 78:2

**90** 78:18

## A

**a.m.** 93:22

**AB** 63:15

**ability** 44:16,17,23 57:7,12,25 58:8,13,

16 59:12

**absolute** 59:6

**absolutely** 10:16

**accept** 49:2

**acceptance** 49:18

**Accepted** 8:22,24 9:11,16,18 15:23 16:5 22:2

**accommodations** 93:19

**accompanying** 15:6,17 34:7

**accordance** 15:23 16:8,9

**account** 61:12

**accountant** 13:7,8

**accounting** 8:19 9:19 16:5,6

**accounts** 44:2

**accrued** 38:21

**accuracy** 21:18 61:19

**accurate** 41:9 50:5

**acting** 67:19 68:7

**actual** 64:20 75:7

**add** 46:13

**additional** 51:9 60:14 78:22 86:17,18

**address** 86:21

**adds** 63:7

**adequate** 58:22

**adjourned** 93:22

**adjusted** 74:15

**adjustment** 75:5,8

**adjustments** 25:18

**adverse** 60:12 75:4 80:25 85:16 91:23

**affiliate** 24:11 36:14, 23 52:21 53:9

**affiliate's** 59:2

**affiliated** 23:12,16, 19 24:7,23 25:3 90:11 93:4

**affiliates** 31:17,23,24 32:2,10,20 33:12,18, 23 35:9,20 36:3,20 39:8 41:8 43:15 51:5, 14 52:10,17 53:3,17, 23 55:23 65:20 67:20 68:9,23 69:17 70:25

**African** 6:15

**agree** 80:15

**agreement** 60:11 66:18,22 67:18 68:7 93:8

**agreements** 26:21 61:21

**AICPA** 9:3 87:21 88:4,18 89:5

**AIGEN** 14:19 15:25 16:16 18:3,8 23:8 25:24 26:12 32:22 33:14 35:16,21 36:4 37:9 39:11 45:4 46:12 47:3,9 53:11 54:7 55:14,17 57:9 60:3,21 61:22 64:16, 22 65:3 66:2,17 67:24 68:13 69:5,9 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2, 11,17 91:7 92:13,24 93:11,15

**alleged** 28:6

**allocated** 64:2,3,4

**ambiguous** 8:13

**amended** 71:19 72:21 73:23 75:24 84:13 86:3

**amendment** 69:3, 21,24 70:6

**amount** 31:21 38:20 40:14 44:15 45:15 61:5,9,13 62:4,12,21, 22 63:18,20 64:14 66:15,23 74:21 75:11,22 76:6

**amounts** 31:16,23 32:2,9,12,19 33:11, 18,23 34:15 35:8 36:3,10,13,17,18,20, 23 41:8 42:19,23 43:14 44:19 51:5,13 52:9,20,24 53:2,9,15, 16,22 55:22 58:23 61:18 62:19 64:13 67:21 68:10 69:16

**analysis** 44:10,13 46:7,10 57:3,12,13 59:15 81:18 90:25 91:19

**analyze** 58:15 80:2,5 81:5 85:11

**analyzing** 57:6 80:6 90:9

**answering** 78:9

**answers** 7:22

**apologize** 7:18 15:3 41:25 47:6,16 68:15 83:14

**applicable** 50:18

**applied** 67:5

**apply** 24:6

**approach** 10:8

**approve** 50:23

**approximate** 38:24

**approximated** 64:14

**approximately** 39:8 61:2,4 63:5,7 82:13

**approximates** 37:15 53:23

**April** 7:3 11:2,3,17

**argue** 82:20

**arising** 24:13

**arm's** 65:8,11

**articulated** 75:17

**ascertain** 58:7

**Asia** 21:6

**aspects** 57:5

**assert** 26:7 28:20

**asserting** 26:18

**assertion** 38:8

**assess** 58:20 60:14 80:2

**assessed** 79:22

**assessment** 26:17 57:19 58:25 62:4 92:19

**asset** 32:5,7,8,10,14, 15,16,17 38:15 89:3 91:24

**assets** 31:13,16 32:3,21 33:12,18,25 38:13 51:15 57:22 58:13,21

**associate** 42:7,8

**assurance** 8:18 9:9, 12,14,15 15:22 16:14 22:20 32:16 57:20 59:8

**attention** 34:12

**audit** 5:18,19,22 6:8, 16,19 7:4 8:17 9:6,8 10:8,24 12:16,18 13:14 14:22,24 16:9, 20 17:12,15,19 21:8, 21,25 22:19 26:11 27:10 29:4 30:22 39:14,17 41:7,14,17, 18 42:21 43:7 44:7, 21 47:18 49:7,10,14 50:10 54:3 55:21 56:22 59:18 60:18 78:22 83:18 84:2,4 85:18,20 86:6

**audited** 13:19 14:10 16:7 30:18 37:5 46:24 47:11,25 86:25

**auditing** 8:19,23,24 9:11,17 10:2 15:23 16:4 22:3 31:3 86:9

**auditors** 48:19

**audits** 6:3,25 13:12 14:14 20:6 23:18 29:25 82:2,7,14,24 86:23,24 87:20

**aware** 23:10 26:20 28:25 57:23 60:6

69:2,20,24 80:23 83:18,19 84:6,20,25 85:16,18,23 86:5 87:5 91:22

**awkward** 18:10

---

**B**

**back** 19:11 21:7 42:8 45:14,16 49:24 61:20 62:14 68:16 77:8 90:24

**background** 18:25

**balance** 20:10,14 24:13 29:16 32:3,11, 21 33:4,12,19,22 36:9,19 40:7,18 42:20 43:22,24 44:5 51:3 53:2 61:5,10,14 62:16 75:4,8

**balances** 44:2

**banks** 87:6

**base** 44:25 59:20

**based** 21:12 39:2,5 42:23 59:9 61:25 64:10 66:6 71:25 74:14 76:7

**basic** 36:11

**basically** 9:2 25:22 38:22

**basis** 5:23 6:20 22:19 34:14 59:4 83:5 87:24 91:7

**Bates** 18:4,8

**Beautiful** 30:14

**begin** 6:23 7:22,24, 25 10:23 11:7,19,23

**beginning** 6:8 54:10 90:25

**begins** 22:9 29:8

**behalf** 47:11 66:21 67:19 68:8

**believed** 16:13

**biggest** 13:14

**bit** 37:19 39:23 63:24

67:9 89:6

**bona** 24:11

**bottom** 20:18 34:4 43:10 48:5

**break** 8:7 82:10

**briefly** 6:6

**broader** 73:7

**Burger** 5:1,3,10,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1, 2,9 19:1 20:1 21:1 22:1 23:1 24:1,3 25:1 26:1 27:1 28:1 29:1 30:1,7 31:1 32:1 33:1 34:1 35:1,4,25 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,15,20 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,16

**business** 43:3 56:18

---

**C**

**calculated** 36:22 53:8

**call** 23:15 25:15 26:5 41:3 49:2 50:12 58:21 70:23 90:3

**called** 13:25 35:8 36:2,19 50:19 53:2 57:2,15 62:14

**calling** 88:15

**capably** 30:10

**capacity** 6:2

**Capital** 6:3,24 7:8,11 23:21 31:22 40:10

**capture** 40:4,5

**carried** 21:24 32:2, 20

**carry** 51:7

**carrying** 21:20 33:17 37:15 38:9,16,17,18, 24 53:23

**case** 8:22 11:21 86:22

**CFO** 13:4 19:22 83:7

**chance** 78:17 83:20

**change** 78:18

**Changing** 89:6

**charge** 7:5

**chief** 13:6

**circumstance** 60:2

**circumstances** 70:12,23 71:13 72:16 73:18 89:22

**claims** 24:12

**clarification** 15:4 16:10 24:21 68:21

**classic** 32:14

**clean** 50:13,16 59:17

**clear** 10:20

**client** 49:19 61:5,9 62:5 86:15

**client's** 49:13

**closed** 34:9

**closing** 63:9

**coincidence** 48:13

**collectability** 70:24 75:18 90:9 93:9

**collectable** 71:7 72:10 73:12 74:11,22 90:19

**collective** 59:20 62:20

**column** 57:15 61:12, 17 63:14

**combination** 58:3

**combining** 82:9

**comfort** 42:22

**comment** 15:16

**committee** 50:14

**communicated** 83:17

**communication** 12:23 83:12

**communications** 82:18,23 85:25

**compile** 15:8

**compiled** 15:13

**completed** 7:7 39:17

**completeness** 26:17 27:4

**completing** 30:22

**completion** 10:7,11, 22 21:20,25

**compliance** 9:10

**concentrate** 89:23

**concept** 38:22

**concerns** 22:25 59:22

**conclude** 44:20 58:16 59:11

**conclusion** 69:12,14

**conclusions** 62:2

**condition** 80:3 91:17,20

**conditions** 67:23 68:12 72:2 73:3 74:6 76:8 92:10

**conducted** 82:4,5

**confirm** 21:18 37:21 53:5,7,19 55:20,24 56:16,20

**confirmed** 21:11 24:18

**conformance** 16:16

**conglomerate** 9:4

**Connect** 13:25

**connection** 10:2 14:14 16:19 31:8 41:7,13 44:6,21 47:24 53:20 59:17,18 60:17

**considered** 9:3 22:12,17 23:6,20 38:9 65:7,13 86:11, 21 88:20

**considers** 87:10

**consistent** 5:23 6:20

**consolidated** 27:23 31:21 34:8 51:3

**constituted** 33:24

**consultation** 50:21

**contact** 12:17,21 13:3

**content** 49:19,21

**context** 18:23 38:12

**continuing** 52:7 70:22

**contractual** 38:19

**contractually** 58:11

**control** 89:17,20

**conversations** 83:23 84:5,10,15,17, 20 85:2,4,17

**conveyed** 36:2

**copy** 30:13

**correct** 6:15,22 11:25 12:7,11 15:14 19:6,10 20:12,16,17 21:13 24:15,19,20 25:4,5,25 27:24 29:2, 10 33:4,5,8,9 34:2 35:10,15,22 36:16,21 37:18 39:12 40:2,11, 20,21,24,25 41:21 43:17 46:21 51:16 52:5,13,14,17,18 53:12,25 54:8,20,25 56:23 57:10,13,14 63:11,22 64:5 66:14 67:7,15 68:24,25 69:18,19 74:24 75:19 79:9,13 81:9,11 82:3 84:17,18,22,23 85:19

88:15 91:4 92:3,4,11, 23,25 93:5,6,10,12

**correction** 47:14 87:23

**correctly** 9:7

**counsel** 76:21

**counterparty** 44:18 60:7,13

**couple** 85:19 90:23

**court** 8:4

**created** 56:14

**creating** 56:13

**credit** 44:9,12 57:2, 12

**creditworthiness** 59:2,6

**current** 21:12 24:24

**D**

**data** 57:24 60:6,12

**date** 20:10 21:20,24 22:5,6 24:13 29:16, 17 48:8,14,21,25 49:2 61:11 63:9

**dated** 48:4

**dates** 6:11

**Dave** 83:6,13

**David** 12:25

**day** 48:20 90:18

**day-to-day** 83:5

**deal** 35:24 44:17 45:17 86:19

**deals** 22:20,21

**dealt** 12:20 45:13 83:5,9

**debtor** 35:20 52:17 58:18

**debtors** 30:22

**debtors'** 39:3 62:3

**December** 20:15 21:9 36:14,24 38:3

40:19 41:19 46:25 47:12,20 53:10 67:3, 6,11

**decide** 88:6

**decided** 17:19 53:6 66:15

**deciding** 59:16

**decision** 33:10

**dedicated** 34:22 50:15

**default** 25:3 57:21 58:11

**defer** 25:17

**defined** 23:6 31:24

**definition** 22:12,16, 20,25 32:4,6,8,15 89:15

**depending** 75:6 85:9 88:22

**depends** 13:13 80:9, 13 82:25

**deposed** 7:14

**deposition** 18:7,10 45:24 46:3 93:22

**derived** 20:7

**describe** 9:24 34:21 35:19 41:9 49:16 52:16 54:13 58:5

**description** 54:23 61:12

**detail** 43:20 45:14 51:24 62:14,15,18 68:16,21 69:4 70:10, 16

**detailed** 43:10 56:25

**determine** 80:3 86:23 91:20

**determines** 49:12

**deviation** 50:21

**deviations** 31:6 47:22 50:3

**differ** 37:12 38:17

**difference** 61:4

78:16 88:12,20,24

**differences** 87:22 88:23 90:10

**diligence** 45:6 58:4, 6 59:9

**directly** 56:7 84:2 85:7

**discharge** 80:8 91:18

**dischargeability** 85:5

**dischargeable** 86:3

**discharged** 81:19 84:12 91:3

**disclose** 34:25 78:2 80:21

**disclosed** 27:22 28:9,24 74:12,14,23 75:13,25 76:10 77:16,22,23,24 78:8 79:6,16 80:4,17 87:11,18 88:25 91:21

**disclosure** 29:17 40:7 54:15,24 75:7 79:2 80:21 81:3 89:3

**disclosures** 28:6,7 29:18 50:4

**discount** 39:18 54:4

**discussion** 85:15

**discussions** 80:12 85:6,24

**dispute** 32:19

**document** 15:10 17:22 18:12,13,15,21 19:12 30:9 33:7 34:18 37:20 41:10,23 42:17,18 43:25 48:4 49:8 56:13,16,20 59:16

**documentation** 46:16

**documents** 47:15

**dog** 27:16,19

**dollars** 63:5,7

**Dondero** 19:8,14,18,

22 21:3,11 23:4,12
24:10,17 25:21 27:20
28:22 40:12,22 58:16
59:4 64:7,8,13,19
65:2,20,22 66:6,11,
22 67:4,10,17,20
68:3,6,8 70:21 71:5,
11,17,23 83:24 84:5
93:8

**Dondero's** 18:7
58:13

**drafted** 20:2

**drafts** 14:21 15:16

**draw** 34:12

**Drew** 83:4,10

**driven** 88:10

**due** 18:24 31:17,24
32:2,9,19 33:11,18,
23 35:8,20 36:3,13,
20,23 39:9 41:8
43:14 44:15 45:6,19,
21 51:5,13 52:9,20
53:3,9,15,16,22
55:22 58:4,6 59:9
61:10 62:23 63:3
66:12 67:22 68:11
70:24 75:11 76:6
81:19

**duly** 5:4

**duties** 9:22

**duty** 27:3 50:10

**E**

**earlier** 31:7 40:18
47:23 48:10 49:3
57:4 82:16 83:3 89:8

**earnings** 64:10 66:7,
13

**easier** 30:14

**easy** 18:12

**effect** 80:25 89:15

**effectively** 48:22

**effects** 75:4

**effort** 86:23

**efforts** 30:22 31:3

**employed** 5:11 6:6
42:3

**enable** 14:10 66:12

**encourage** 18:18

**end** 14:2 21:19 33:22
43:15 51:10,12 52:21
77:12 84:7 87:8
90:18

**ending** 19:3 20:15,25
21:9 23:24 28:13
40:19 41:19 46:25
47:12,20

**ends** 37:11,22

**engaged** 11:11

**engagement** 7:5 9:5
10:25 15:20 50:18
85:8 88:4,8

**entered** 67:18 68:6
93:8

**entities** 23:12

**entitled** 32:15 34:19
39:24 52:9

**entity** 19:23 32:13
63:2 89:18

**equal** 39:8

**error** 26:5

**evaluation** 62:22

**event** 40:23 75:7
78:25 80:7,9,12,13,
15,21 81:6,13 85:16
91:23 92:2

**events** 22:4 28:8
29:15 39:24 40:6
48:24 54:14,23 55:5
77:25 79:7,17,21
80:22 81:19,25

**evidence** 58:9 59:7
90:20,21

**EXAMINATION** 5:6
76:16 92:15

**exceeded** 51:14

**exchange** 23:13
38:15

**Excuse** 27:15

**execution** 10:8,11
11:6,14,15 12:18
13:15

**exhibit** 17:22,25
30:5,6 41:3,4 47:7,8
55:9,10,17 68:18,20
69:4 70:11,16

**existence** 42:23
62:21 65:16 90:20

**expect** 19:24 22:21

**expected** 17:11

**explain** 10:20 45:10
89:11

**explanations** 34:15

**express** 22:24

**extinguished** 71:25
73:2 74:5 76:7

**F**

**faced** 64:15

**facilitate** 64:10

**facilitated** 12:21,22

**fact** 25:17 33:6 54:22
60:10

**fair** 6:21 12:2,3 17:17
27:18 28:21 35:18
37:14 38:8,10,11,13,
21,23 39:2,5,7,13,15
51:12 53:21 54:2,4
58:24 79:3,18,21,25
81:5,16

**fall** 11:24

**familiar** 9:21 16:22
46:23

**February** 67:17 68:6

**feed** 12:9

**feeds** 62:13

**fide** 24:11

**fieldwork** 11:2,5
12:12,13

**file** 41:12

**filings** 58:14,15,19,
22

**final** 10:24

**finalized** 14:23

**finally** 76:4

**financial** 7:6 9:9 10:3
13:19 14:11 15:2,5,6,
12,17,22 16:14 26:6,
22 27:23 30:3,19,23
31:3,9 34:8,25 37:6
39:3 41:18 44:4
45:16 46:23,24
47:11,19 53:20 56:22
61:15 62:17 75:6
80:22 81:2 86:8,25
87:9,17 88:25

**financials** 9:17 16:8
47:25 48:22 50:3,5
74:15 80:17 87:7
88:11

**find** 25:13

**fine** 23:17 91:12

**finish** 7:21,25 73:6
77:8 90:22

**firm** 6:15

**fiscal** 10:23 11:24
20:15 21:9,19 41:19
43:16 51:10 52:21

**focus** 78:11

**focused** 45:19

**follow** 10:4 49:24
56:12

**follow-up** 14:18

**follow-ups** 92:18

**footnote** 36:7

**footnotes** 34:16
77:25

**forgivable** 84:12

**forgive** 80:7 91:18
92:10

**forgiven** 70:11,17
71:13 72:16 73:18
75:12 78:7,14,18,19,
21 79:8 91:3 92:20
93:4

**form** 14:19 15:25
16:16,23 20:4 23:8
24:14 25:24 26:12
32:14,22 33:14
35:16,21 36:4 37:9
39:11 45:4 46:12
53:11 54:7 57:9 60:3,
21 61:23 64:16,22
65:3 66:17 67:24
68:13 69:5 70:3,18
71:2,8,14,20 72:3,11
73:4,13,24 74:13,25
75:15 76:2,11 79:10,
19 80:18 81:7,21
85:21 87:12 90:6,13
91:5 92:24 93:11

**format** 86:13

**forming** 87:24

**forms** 32:12 59:20

**forward** 7:12 21:24

**found** 26:5 58:14

**foundation** 69:12
91:11

**framework** 49:23

**Frank** 13:4 19:8 83:7

**fraud** 27:4

**front** 18:12,15 30:13,
19 35:5 37:21

**fulfill** 50:10,12

**fulfillment** 72:2 73:3
74:6 76:8

**full** 60:15

**fully** 30:10 60:10,19

**function** 80:10

**fund** 88:8,10

**future** 79:17 81:20

**G**

**GAAP** 16:2,8,15
29:20,22 34:24 38:7
49:6 50:6 52:3 70:20
89:14

**GAAS** 16:3,9 29:21
49:6,7 87:21 89:14

**gain** 42:22

**Garcia** 42:2,3 56:2

**Garcia's** 42:14

**gave** 78:24

**general** 19:23,24 21:10 44:3 49:9 53:21 65:4,5 82:7,11 87:3

**generally** 8:22,24 9:10,16,18,25 15:23 16:5 22:2 23:10 49:17 87:3 89:11

**give** 6:10 15:21 22:22 50:12 57:20 59:7

**good** 5:8 62:7

**governed** 9:3 86:14 88:16,17

**greatly** 93:16

**ground** 7:19

**group** 6:16

**guess** 20:24 76:18, 24 84:25

**H**

**half** 31:12 63:5

**happen** 59:25

**happened** 78:24

**hard** 30:12 76:19

**HCMLP** 42:21

**HCMSI** 45:19,21 46:4,5 62:24 63:3,25

**hear** 79:12

**hedge** 88:10

**Hendrix** 13:5 83:3,15

**high** 89:11

**Highland** 6:3,24 7:5, 8,10,11 10:2,13 11:8 12:6,9,17 13:12 14:4, 14,22 15:13 16:19,24 22:24 23:11,20,21 31:22 32:18 33:6,10 35:13 39:6 40:9 44:6 51:25 53:14,21 54:19

55:4 57:24 59:11,24 63:25 66:21 67:11,19 68:5,8,24 69:17 70:15 73:8,10,16,21 74:3 82:14,19,22 83:17 84:11,21 85:4 86:2,22

**Highland's** 30:23 31:3,8 32:3,20 33:4, 19,24 43:7 46:24 47:19 51:15 56:22 62:3

**Hilda** 42:2,3 85:10

**Hold** 69:7

**hope** 93:20

**I**

**idea** 36:10

**identified** 31:16

**impact** 79:23 91:23 92:5 93:9

**important** 7:20 28:5 86:12

**inaccurate** 37:7

**inaudible** 38:25

**include** 54:22

**included** 22:16 36:17,18 40:17 52:24

**including** 13:15 21:3 65:20

**incorrect** 53:17

**independent** 48:19

**individual** 12:19 45:15 46:16,19 59:3

**individually** 62:19

**industry** 88:22

**influence** 89:17

**inform** 70:22 71:5, 11,17,23 72:8,14,19, 24 73:10,16,21 74:3

**information** 10:19 12:5,9 13:18,22 14:3, 6,9,18 23:5 35:14 36:2 40:8,9 43:18,19

45:2 52:12 54:17,18 57:25 59:10 64:18 65:9,23 74:12 77:16 92:21 93:2

**informational** 11:8

**informed** 40:24 55:4 68:3,5 70:5,15 93:7

**inquiry** 64:12,25 65:5,18

**instance** 56:2 78:3,5 85:9

**insurance** 9:13

**integral** 34:8

**intended** 35:19 40:3 43:13 51:23 52:16 54:13

**intent** 44:16 57:7

**interest** 38:21 39:9 61:10 63:3 64:4 65:13,14 67:5,13 89:20

**internal** 49:11

**interrupt** 47:3 61:23

**involved** 65:15 83:21 85:10

**issue** 59:16 81:16

**issued** 40:13,22 48:19,23 54:3 58:18 63:18,19

**item** 36:18 42:20 52:25 62:12 85:13

**items** 22:12,17 23:6 79:7

**J**

**James** 19:8

**January** 5:21,24 6:14,17 67:17 68:6

**John** 30:12,17 55:17 77:2 93:18

**join** 6:16

**joined** 6:13,14

**June** 17:23 19:15

21:14 24:18,20,24 25:3 37:3 48:5 49:2 54:3,22 63:18 69:22, 25 71:6,12,18,24 72:9,15,20,25 73:11, 17,22 74:4,9,19 75:9, 21 76:5 79:2

**junior** 83:9

**K**

**key** 89:18

**kind** 57:5

**Klos** 12:25 13:2 83:6, 13,15

**knowing** 80:14

**knowledge** 21:12 29:8 53:13,18 54:21 66:16,21 71:4,10,16, 22 72:7,13,18,23 73:9,14,15,19,20,25 74:2,8

**Kristin** 13:5 83:2,10

**L**

**L.P.** 6:4,25 7:9,11 23:22 31:22

**La** 21:6

**label** 18:5,8

**lack** 13:5 75:17

**language** 78:13

**layout** 42:19

**lead** 30:21 31:2

**leads** 10:24

**learn** 79:22

**learned** 74:9,19 75:9, 21 76:4 77:13 78:6, 20,21 91:16

**leave** 55:12

**ledger** 44:3

**left** 63:9,24

**legal** 60:11 61:21 69:11,14

**legends** 46:17

**lenders** 87:6

**length** 65:8,11

**letter** 16:23 17:13,24 19:13,19,25 20:2,14, 21 21:8 22:16 23:7 48:9,18 50:24

**letters** 16:19 17:4,8, 18

**level** 25:14 89:11

**liability** 64:14

**limit** 77:6

**limitations** 50:8

**limited** 19:23

**link** 46:15

**list** 31:13 43:13

**listed** 61:11

**listing** 44:2

**lists** 68:22 69:16

**litigation** 81:16

**loan** 38:20 60:15 64:9 66:25 67:2 79:24

**loaned** 23:11 64:13

**loans** 45:18 64:7,8, 19 65:2,7,10,19,25 66:5,11,16,23

**long** 10:6

**look-through** 59:4

**looked** 36:19 40:18 48:9 52:25 57:5

**M**

**made** 20:21 21:2 29:18 33:10 44:5 59:24 64:19 65:5 66:5,11,22 67:2,4 68:23 81:17 92:19

**Madeline** 56:3 85:10

**make** 10:18 12:5 13:21 14:13 17:10 18:4,24 64:12,25 65:18 67:10 73:7

86:23 88:19,24

**maker** 46:19 57:22 59:23

**maker's** 57:25

**makers** 23:19 24:12 44:21 58:7 59:11 61:11

**makes** 42:19 45:15 62:18

**management** 6:3,24 7:9,11 14:9 16:23 17:3,7,10,18,23 19:13,21 20:4,13 21:17 22:15,22 23:22 25:16,17 26:7,18 27:5 28:10,19,21 31:22 36:25 37:2,4 40:11 43:21 45:3,5 48:9,18 52:13 53:6,8 60:9,18 66:8,19 80:12 89:18

**management's** 49:3

**manager** 85:7

**managers** 83:13

**March** 63:20

**mark** 55:10

**marked** 17:22,25 30:6 41:4 43:10 44:9 46:17 47:8 55:9

**marking** 47:4

**material** 22:3,13,17, 23 23:6 25:23 26:8, 20,24 27:6,21 28:8 34:25 40:6,23 50:2,3 54:13,23 55:5 61:21 62:20 75:3,4,5 80:25 87:10,25 88:20 89:17

**materiality** 22:21 23:2 25:14 42:24 74:15 80:10 81:13 87:24 88:7 92:6,7

**materially** 57:22

**math** 33:21

**matter** 83:8,11

**means** 25:11 26:15 28:18 29:14,15 38:5, 6 46:2

**meet** 25:14

**meetings** 83:11

**meets** 32:4

**met** 67:23 68:12

**metrics** 88:9

**Michael** 55:12 88:13

**Michael's** 35:24

**middle** 22:7

**million** 40:14 63:5,7, 25 67:2,10 74:22 75:12,23 76:7

**mind** 30:24 62:6 79:6

**mindful** 7:20

**minus** 38:21

**misstatements** 25:13,16 50:2

**moment** 27:14

**money** 23:11

**morning** 5:8

**morphed** 13:23

**Morris** 5:7 18:6 21:6 30:17 47:6 55:11,18 69:6 76:14 77:13 79:10,19 80:18 81:7, 21 85:21 86:4 87:12 89:10 90:6,13 91:5,9 92:16 93:13,16

**Morris'** 78:12 79:4 84:7

**move** 30:3

**mutual** 88:10

## N

**national** 50:22

**nature** 83:2

**necessarily** 27:3

**needed** 13:19 88:24

**neutrality** 25:19 88:3

**non-affiliated** 90:11

**non-related-party** 90:3

**noon** 76:22

**note** 34:22 35:7,15, 19 36:13 39:3,6,25 51:18 52:8,15,19 54:6,9,10,18,22 55:6 60:8,9,11 63:8,13,17, 24 67:9,13 70:7 77:4 78:2,3 85:14 90:18, 21

**notes** 15:6,12,17 23:13,15,16,20 24:7, 11,23 25:3 31:16,23, 25 32:9,13,19 33:11, 17,23 34:7 35:8 36:3, 9,20 37:8,15,16 38:2, 6,7 39:7,10,19 40:12, 13,22 41:8 43:14 44:22 45:12,15 46:5, 19 51:5,9,13,23 52:9 53:2,16,22,24 54:5, 12 55:22 57:6,20 58:10,11,17 59:8,12, 24 60:19 63:4,6 65:12,17 67:22 68:11,22 69:3,18,21, 25 70:10,16,24 71:6, 12,18,25 72:9,15,20 73:2,11,17,22 74:5, 10,20 75:10,22,23 76:5 78:7 79:8 80:8 81:16,18 84:11 85:5 86:2 89:23 90:2,3,4, 10,12 91:2,18 92:10, 20 93:4,10

**nuances** 88:2

**number** 24:4,6,22 25:8,10,21 26:10,14 27:10,19 28:14,22 45:12,18 51:18 66:25 67:9,14 68:16

## O

**objecting** 61:23

**objection** 14:19 15:25 16:16 23:8 24:14 25:24 26:12 32:22 33:14 35:16, 21,24 36:4 37:9 39:11 45:4 46:12 53:11 54:7 57:9 60:3, 21 64:16,22 65:3 66:2,17 67:24 68:13

69:5,7,8 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2,11 79:10, 19 80:18 81:7,21 85:21 86:4 87:12 90:6,13 91:5,8 92:24 93:11

**obligation** 67:21 70:22 88:3

**obligations** 23:19 35:19 40:17 52:16 59:13,23 64:21 68:10 71:24 72:25 74:4

**obtain** 13:18,22 58:20 62:18

**obtained** 61:13

**occur** 80:24 81:6,20, 25 92:3

**occurred** 29:16 40:6 78:25 79:7 80:23

**occurring** 22:4

**October** 11:22 64:2

**office** 50:22

**omitted** 55:6

**one-** 14:25

**opinion** 9:6 14:25 22:5 29:17 44:24,25 49:8,20,21 50:13,14, 17,20,24 54:3 59:17, 20 86:21

**opportunity** 15:15 17:9

**oral** 67:18 68:7 69:2, 20,24 70:6

**order** 15:21 16:13 17:14 18:21 30:10 66:12 91:25

**ordinary** 20:6 43:2,6 56:17,21

**ourself** 44:17

**outlines** 10:9

**outstanding** 37:14 43:15 74:21 75:11,22 76:6

**oversee** 47:10,18

**overseeing** 42:14

**overseen** 6:2

**owed** 52:17 62:4

**owes** 69:17

**owing** 36:14,23 52:20 53:9,15 68:11

**ownership** 28:10 89:19

## P

**P-A-C-O-C-H-A** 56:6

**Pacocha** 56:4

**pages** 15:11

**paid** 63:25

**paragraph** 20:9 22:8 37:11,22,23,25 38:2

**part** 10:16 13:14 17:2 26:6 34:8 56:8 57:13 59:19 62:13 81:23 83:17 86:6,20 88:21

**parties** 27:21 28:20 51:25 65:14

**partly** 45:5

**partner** 5:18,19,22 6:8 7:4 12:16 19:23, 24 49:9 50:17,18 87:3

**partners** 87:4

**partnership** 40:13 87:2

**partnership's** 37:14

**party** 19:21 23:16,19 24:7,11,23 28:6,7,25 34:19,23 59:6 89:16 90:8

**patience** 93:17

**pay** 44:23 57:7,13 58:2,8 60:13 66:6,12 67:12,13,21 68:10

**payment** 67:4,10

**payments** 38:21 51:8 58:10 64:10

66:6

**PCAOB** 86:16 87:21 88:4,18 89:2,4

**Peet** 5:3,10

**people** 13:10,16 19:18 82:14,18,23 83:9 84:4

**percent** 33:24 51:14 78:17,18

**perform** 10:10 11:13 50:6,9 86:18 87:20

**performed** 9:16 42:22 88:17

**period** 11:16 40:19 46:25 47:12,19

**periodic** 83:11

**person** 83:4 85:9

**personal** 17:2

**personally** 6:23 16:22 30:21 31:2 50:23

**perspective** 8:17 17:6 26:16 28:18 29:14

**pertains** 41:7

**phase** 11:6,10,11,14 13:13,15 49:18

**phases** 12:18

**phrase** 11:5 41:16

**piece** 46:4

**place** 79:17

**planning** 10:7,11 11:9,10,12,18,23 12:4,18

**plural** 37:13

**point** 50:9 76:25 79:9 87:25

**points** 13:3

**portion** 30:9 32:10 35:18 39:3,6 52:15 54:5 64:3,4 67:11,12

**portions** 18:20

**possibility** 93:3

**potential** 26:5 80:7, 11 81:12,24 85:5 92:4,9

**potentially** 74:14 81:19 84:12 86:3 88:24 91:3,18

**practice** 9:19 21:17

**practices** 9:21

**preparation** 31:8 43:7 45:18 46:2,3 47:10,14,24

**prepare** 13:19 14:10 42:25 43:5 47:15

**prepared** 33:6 35:13 41:13,18,22,24,25 55:25 56:3,17,21

**prepares** 20:5

**presented** 9:18

**pretty** 10:6 82:11

**previous** 87:23

**Previously** 14:4

**Price** 13:11

**Pricewaterhousecoopers** 5:15,17,20,23 6:7 13:18 14:8,17

**Pricewaterhousecoopers'** 6:19 8:16

**primary** 12:17,20 13:3

**principal** 39:9 61:10 63:3 64:3 67:5,12 74:21 75:11,22 76:6

**principle** 29:21

**prior** 6:7 14:23 22:4,5 37:3,5 51:8,10 71:5, 11,17,23 72:8,14,19, 24 73:11,17,22 74:4

**private** 88:13,14

**probability** 80:11 81:6 92:2,4

**problem** 77:4,6

**procedure** 42:21

**procedures** 9:15 10:10 11:12 50:7 86:17

**process** 9:25 10:4,6, 14,23 31:7 47:23 49:12,16 50:15,22 56:10,12 58:6 59:25 86:6

**produce** 44:3

**produced** 18:3

**professional** 9:5 50:10 81:23

**promissory** 23:13, 15 39:7 40:13 63:4,6, 8,12,13,17 67:22 68:11 69:3,18,21,25 70:6 81:15 93:4,10

**promulgated** 87:21

**properly** 27:22

**provide** 8:18 9:8 14:9,21 15:9 16:13 23:5 51:24 57:24 59:7

**provided** 16:24 19:14 40:9 45:2 52:12 54:19 59:10 65:24 79:14

**providers** 89:22

**proxy** 38:10,24

**public** 58:14,15,19, 22 86:15,16 88:13

**pull** 48:10

**purpose** 8:17 9:8 17:7 36:7 42:16,18 44:12,14 59:5 62:8, 11 65:2,19,25 80:20

**purposes** 12:17 13:11 23:18

**put** 17:21 18:15,22 25:14 30:4 41:5

**Pwc** 6:13 9:25 10:23 12:5,9 14:10,13,21 15:13,15,19,20 16:12,18,24 17:14,17 19:14 20:5 21:17,23 23:4 25:20 26:2,9,24 27:7,9,25 29:3,23

33:16 37:2,4 39:18 40:23 42:4,25 43:5, 19 44:6,20,25 46:8, 11 47:12 49:11 53:15 54:2 55:4 56:12 57:5 58:6,15 59:10,11,15, 22 61:18,25 64:12, 18,25 65:18 66:4 68:2,4 69:24 70:14, 22 71:5,11,17,23 72:8,14,19,24 73:10, 16,21 74:3,9,11,19, 22 75:9,12,20,24 76:4,9 77:15 78:6,7 79:15 80:2,6 81:17 82:15 83:17 84:4,9, 21 85:3,25 86:7,23 87:10,19 90:10,25 91:16,19 92:9,19 93:2,7

**PWC's** 12:10 17:6 22:25 24:9 26:15 28:17 29:13 30:21 31:2 37:5 41:6 47:18 54:21 55:21 56:17,21 65:24 88:21

**Q**

**qualitative** 57:19

**question** 7:24 8:11 16:11 18:23 30:11,25 33:17 35:23 44:18 45:20,22 47:17 60:8 62:6,13 69:15 70:23 74:16 76:19 78:9,23 79:11,20 80:19 81:8, 22 83:2 84:25 85:22 87:13,24 90:7,14 91:2,6,13

**questions** 7:21 15:20 16:12 18:17 24:2 56:25 72:5 73:7 75:20 76:15 77:10, 12,14 78:4,5,12 79:4 82:7,9,12 84:7,9 90:23 92:14 93:14

**quickly** 55:12

**quote** 34:7,9 37:13 89:14

**R**

**raise** 14:5

**rate** 65:13,14

**reach** 62:2

**read** 27:13 29:11 63:15

**reader** 34:13 80:21

**reading** 34:13

**reason** 33:16 39:18 54:4

**reasonable** 8:18 9:9 15:21 16:14 22:19 32:16 38:10,14,24 50:5 57:20 59:7 65:7, 10,13

**reasonableness** 61:19,20

**reasons** 75:16

**recall** 6:25 12:15,20 23:3 31:6 47:22 48:10 65:9 66:8,24 83:22

**receivable** 37:15,16 44:15 53:24 68:23

**receivables** 23:20, 21 32:13

**receive** 16:18

**recollection** 18:22

**record** 5:9 18:5 33:11 43:23 77:3

**recorded** 26:22 38:8 60:15 62:17

**recoverability** 32:17 57:16

**recoverable** 59:8 60:10,19

**refer** 7:10

**reference** 20:10 34:6

**referenced** 46:16

**referred** 70:10

**referring** 8:21 79:6

**reflect** 46:8,10

**reflected** 62:9

**refresh** 18:22

**related** 27:21 28:7, 20,24 34:19,23 51:25 57:12,25 64:20 65:12 84:2

**related-party** 35:2 51:19 89:7,12,13,16 90:2,4,12

**relates** 31:19 45:24 51:19 55:22 58:9

**relating** 83:25

**relationships** 35:2

**relevance** 87:15

**relevant** 10:9 15:21 45:17 46:13 78:3 87:9,17,19

**reliability** 62:3

**relied** 17:18 86:17

**relies** 86:14

**relieved** 67:21 68:9

**rely** 14:9 23:4 26:9 27:5,7,9 28:10 29:3, 23 59:15

**relying** 86:8,24 87:7, 9

**remember** 77:16,19 78:6,9 84:8,13 89:8

**remind** 30:8

**rep** 19:25

**repay** 44:19 57:23 58:17,23 59:12,23 60:8

**repeating** 30:24 62:6

**rephrase** 16:11

**report** 42:10 48:18 49:5,9 56:7 86:13

**reported** 27:22

**reporter** 8:5

**reports** 14:22,24 42:12

**represent** 22:22

**representation** 16:18,23 17:4,7,13, 18,24 19:13 20:5,14 22:16 24:3,6,22 25:8, 10,12,21 26:3,10,14, 25 27:9,12,19 28:2, 14,18,22 29:4,20,24 48:9,18 49:4

**representations** 17:10 20:20 21:2,13, 18,24 22:9 24:2,17 48:25

**represented** 24:10, 11 25:22 27:20 28:23 60:18

**representing** 26:19 27:7

**request** 14:5 18:19 26:2 27:25

**requests** 10:18 11:8 12:5 14:18

**require** 21:17,23 26:7 48:15,17 54:14 75:7

**required** 17:14 29:17,20 34:15 48:24 49:6 50:3 52:3 54:24 74:11,23 75:13,24 76:9 77:15,21 78:8 79:2,5,16

**requirement** 34:24

**requirements** 89:3

**requires** 40:7 49:7

**reserve** 77:7

**respect** 46:6 65:22 72:6 75:17 81:15 82:24 92:9

**response** 12:8 79:4

**responsibilities** 17:3

**responsibility** 15:9 71:3 81:24 91:10

**responsible** 19:21 42:13

**rest** 30:15 46:4

**restate** 47:16

**resulted** 78:22

**results** 45:7 60:14,23

**retain** 41:12

**review** 12:10 14:22 15:16 17:3 18:13,21 85:7,11 87:17

**reviewed** 46:3

**reviewing** 86:8,24 87:8

**rights** 77:7

**risk** 44:9,13 57:2,12

**road** 91:17

**room** 18:11

**routine** 83:8,10

**rules** 7:19 9:2,4 70:21 86:20 89:4

---

**S**

**save** 11:16

**scope** 17:11 50:8 86:18

**screen** 17:21 18:16 30:16 31:13 41:6

**scroll** 20:18,24 34:3 35:4 37:19 39:23 45:11 63:12 67:8

**section** 34:19 35:14 36:2,13 37:7 38:2 39:24 40:3,12 51:23 52:8,19 54:12,18 57:2 58:24

**secure** 13:24 14:5,6

**send** 11:8,9

**senior** 42:7,8

**sense** 10:18 19:22 22:23 86:19

**sentence** 21:10 24:22 29:7,14,24 37:12,22 38:5,6,23

**separate** 21:2

**September** 11:22

**series** 20:20

**service** 89:22

**set** 9:2 35:14 43:19 44:4,22 46:19 49:5 52:19 53:16 54:17 59:13,15 73:7

**sets** 36:13 86:19

**setting** 11:12

**share** 10:12,15

**sheet** 20:10,14 24:13 29:16 32:11,21 33:13,22 36:9,19 40:7,18 42:20 51:3 53:2 61:11 75:5,8

**sheets** 32:3 33:4,19

**show** 60:12 63:2

**shows** 33:22 60:7 63:23

**side** 77:2

**sign** 9:6 19:25

**sign-off** 17:14,19 49:13 59:5 85:12

**signature** 29:7 50:25

**signatures** 19:5,8

**signed** 14:25 19:18 29:4,25

**significant** 40:6 89:20

**signing** 26:10 27:10 37:5

**single** 10:16

**singular** 37:13

**sir** 30:19 37:24 43:11 69:15 76:15 92:17

**sister** 67:18 68:7

**site** 13:24,25 14:5,7, 13

**slide** 44:22

**slightly** 11:20

**sort** 9:4 12:21 13:6 26:4 58:21 77:5 81:17 90:24,25 91:19

**South** 6:15

**specific** 7:8 28:7 66:9,24 80:15 85:23 87:5

**specifically** 28:6 41:17 58:12 59:4 83:25

**speed** 82:8

**spell** 56:5

**spend** 11:16

**stage** 10:11 11:2,18 12:4

**stand-alone** 34:14

**standard** 20:7 21:16

**standards** 8:20,21, 23,25 9:5,11,17,20 10:9 15:24 16:6 22:3 26:7 27:2 48:23 86:16 87:22 88:18,19 89:2

**start** 10:25 77:11

**started** 7:18

**starting** 19:20 38:3

**starts** 10:6

**state** 5:8

**stated** 25:2 53:21

**statement** 45:16 87:9,17

**statements** 7:6 9:10 10:3 13:20 14:11 15:2,5,7,12,17,22 16:15 26:6,23 27:23 30:4,19,23 31:4,9 34:9,25 37:6 39:4 41:19 44:4 46:23,24 47:11,19 53:20 56:22 61:15 62:17 75:6 80:22 81:2 86:9,25 88:25

**stating** 38:23

**status** 83:11

**stems** 60:8

**step** 12:13

**steps** 58:6

**stop** 20:19 76:19,25

**straight** 35:4

**stream** 89:17

**strike** 36:8

**strongly** 18:18

**structure** 89:19

**stuff** 69:10 77:2

**subheading** 35:7

**subject** 51:8,9 84:22

**subparts** 21:4

**subsequent** 39:24 40:23 48:24 54:14,23 55:5 67:23 68:12 72:2 73:3 74:7 76:9 77:25 80:20

**summary** 25:15 43:25

**supposed** 10:10 11:13 38:7 40:5

**sworn** 5:4

**T**

**tab** 43:9,13,20 44:9 45:7,14 57:3,11 62:14,23 64:6 68:16, 21 70:10,16

**tabs** 45:17 46:13,15, 18

**taking** 8:5

**talked** 89:7 90:24

**talking** 41:17 69:10 77:22 78:16 82:2

**tax** 64:7,8,9,10,14,20 66:6

**taxes** 66:12

**team** 13:11 56:8

**technology** 18:25

**template** 20:8 45:8 60:23

**term** 38:19 90:5

**terms** 8:19 9:16,18 17:11 25:19 36:11

50:5 87:20

**test** 61:18 62:20

**testified** 5:4 57:4 84:19

**testify** 80:16

**testifying** 84:13

**testimony** 79:15

**testing** 61:5,25 62:8 65:16

**things** 28:24 49:25 77:14 82:8 86:7

**third-party** 87:6

**thought** 15:20

**ties** 45:16

**time** 6:7 7:6,20 8:7 11:7,17 12:15 13:24 14:23 30:8 37:3,5 39:17 55:13 56:25 70:7 76:19 77:5,9 79:9 93:17

**time-to-time** 23:11

**title** 5:16 32:13 42:6

**today** 77:6,8 79:15 80:16

**told** 66:4 77:5

**top** 19:12 21:7 25:9 31:12 45:11

**topics** 89:6

**total** 61:9

**totaling** 63:4

**track** 47:5

**transaction** 11:15 88:15 89:12 90:12

**transactions** 24:12 26:20 27:5,6,21 28:8, 25 34:19,23 35:2 51:19,24 89:7

**trial** 43:21,24 44:5 61:14

**two-page** 14:25

**type** 43:2 75:6

**typical** 14:17

**typically** 13:10 20:5 77:24

**U**

**unable** 59:23

**unaffiliated** 90:8

**uncorrected** 25:15 50:2

**understand** 8:4,11, 12 10:13 19:7,12 20:22 25:20 32:24 41:20 77:3

**understanding** 24:9 25:10 34:22 36:12 38:4 45:23 64:11 65:24 66:10 70:20 80:11

**understood** 78:23

**undertaken** 62:9

**undertaking** 46:8

**undertook** 9:25 58:7

**undue** 50:8

**unit** 6:19 11:3

**unqualified** 50:13, 20

**upload** 14:2,6

**upstream** 89:19

**users** 88:11

**V**

**vague** 69:9

**valuation** 79:23 91:23

**verbatim** 89:14

**versus** 90:12

**view** 26:8 87:25

**visits** 14:13,16

**W**

**WANDER** 9:12 16:2, 7 24:14 30:12 32:24

36:5 45:25 60:5 68:18 88:12 93:21

**Waterhouse** 13:4,11 19:9,15,17,20 21:3, 11 23:5 24:10,18 25:22 27:20 28:23 70:21 72:6,8,14,19, 24 83:7,16

**Wilson** 83:4,15

**withdrawn** 27:8 32:7 35:12 37:3 39:4,14, 16 46:9 53:6 55:2 56:11 61:2,8 68:3

**word** 8:5 13:6

**words** 26:18 38:20 46:14 50:4,7 86:15

**work** 11:15 42:14 44:7 60:14 77:2 78:22 81:24 82:24 85:14 87:19 88:21

**worked** 82:14 84:4

**working** 6:24

**workpaper** 41:11 43:6

**workpapers** 10:15 41:2,6 42:25 55:8,21 56:14 58:25 59:19 68:17,22

**written** 69:2,20,24 70:6

**wrong** 25:23 53:17

**Y**

**year** 10:23 11:20,24 16:24 20:15 21:9,19 41:19 43:16 51:10 52:21 82:10

**year-end** 22:4

**years** 6:20 13:23 51:8 82:9 85:19

# EXHIBIT 95

Appx. 01586

Page 1

 1

 2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 3                DALLAS DIVISION
    IN RE:              )
 4                      ) CHAPTER 11
    HIGHLAND CAPITAL        )
 5  MANAGEMENT, L.P.,       ) CASE NO.
                        ) 19-34054-sgj11
 6        Debtor.          )
    _____ )
 7
    HIGHLAND CAPITAL        )
 8  MANAGEMENT, L.P.,       )
                        ) Adversary Proceeding
 9        Plaintiff,      ) No. 20-3190-sgj11
                        )
10  v.                  )
                        )
11  JAMES D. DONDERO,         )
                        )
12        Defendant.       )
    _____ )
13

14      REMOTE VIDEO-RECORDED DEPOSITION OF

15              JAMES D. DONDERO

16          TUESDAY, JANUARY 5, 2021

17

18

19

20

21

22

23  REPORTED BY:

24  MICHAEL E. MILLER, FAPR, RDR, CRR

25  JOB NO. 188154

Page 2

1
2
3
4
5          Tuesday, January 5, 2021
6          9:50 a.m. CST
7
8
9          REMOTE ORAL VIDEO-RECORDED DEPOSITION
10   OF JAMES D. DONDERO, held via Zoom conference
11   pursuant to the Federal Rules of Civil Procedure
12   before Michael E. Miller, Fellow of the Academy
13   of Professional Reporters, Registered Diplomate
14   Reporter, Certified Realtime Reporter and Notary
15   Public in and for the State of Texas.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2    REMOTE APPEARANCES:
3    PACHULSKI STANG ZIEHL & JONES
4    Attorneys for Debtor
5    780 Third Avenue
6    New York, NY 10017
7    BY:    JOHN MORRIS, ESQ.
8          HAYLEY WINOGRAD, ESQ.
9          JEFFREY POMERANTZ, ESQ.
10         GREGORY DEMO, ESQ.
11         IRA KHARASCH, ESQ.
12
13   LATHAM & WATKINS
14   Attorney For UBS
15   885 Third Avenue
16   New York, NY 10022
17   BY:    SHANNON MCLAUGHLIN, ESQ.
18         ZACHARY PROULX, ESQ.
19
20   JENNER & BLOCK
21   Attorney for Redeemer Committee
22   353 North Clark Street
23   Chicago, IL 60654
24   BY:    TERRI MASCHERIN, ESQ.
25

Page 4

1
2    REMOTE APPEARANCES:
3    SIDLEY AUSTIN
4    Attorneys For the Creditors Committee
5    2021 McKinney Avenue
6    Dallas, TX 75201
7    BY:    PENNY REID, ESQ.
8          PAIGE MONTGOMERY, ESQ.
9          MATTHEW CLEMENTE, ESQ.
10         ALYSSA RUSSELL, ESQ.
11
12   KING & SPALDING
13   Attorney for Highland CLO Funding, Ltd.
14   500 West 2nd Street
15   Austin, TX 78701
16   BY:    REBECCA MATSUMURA, ESQ.
17
18   BONDS ELLIS EPPICH SCHAFER JONES
19   Attorneys for James Dondero
20   420 Throckmorton Street
21   Fort Worth, TX 76102
22   BY:    JOHN BONDS, ESQ.
23         BRYAN ASSINK, ESQ.
24
25

Page 5

1
2    REMOTE APPEARANCES:
3    DEBEVOISE & PLIMPTON
4    Attorneys for HarbourVest Partners
5    919 Third Avenue
6    New York, NY 10022
7    BY:    ERICA WEISGERBER, ESQ.
8
9    CARLYON CICA CHARTERED
10   Attorneys for Integrated Financial
11   Associates Inc.
12   265 East Warm Springs Road
13   Las Vegas, NV 89119
14   BY:    CANDACE CARLYON, ESQ.
15
16   ALSO PRESENT:
17   La Asia Canty, Paralegal
18   Pachulski Stang Ziehl & Jones LLP
19
20   VIDEOGRAPHER:
21   Rick Richey, TSG Reporting Inc.
22
23
24
25

Page 6

1
2  ———
3       P R O C E E D I N G S
4  January 5, 2021, 9:50 a.m. CST
5
6       THE VIDEOGRAPHER:  Good morning,
7  ladies and gentlemen.  My name is Rick Richey.
8  I'm a legal videographer in association with
9  TSG Reporting Inc.
10       Due to the severity of the COVID-19
11  and following the practice of social distancing,
12  I will not be in the same room with the witness.
13  Instead, I will record this videotaped deposition
14  remotely.
15       The court reporter, Mike Miller, also
16  will not be in the same room and will swear the
17  witness remotely.
18       Do all parties stipulate to the
19  validity of this video recording and remote
20  swearing and that it will be admissible in the
21  courtroom as if it had been taken following Rule
22  30 of the Federal Rules of Civil Procedure and
23  the state rules where the case is pending?
24       Do all agree?
25       MR. MORRIS:  Yes.

Page 7

1
2       MR. BONDS:  Yes.
3       MR. MORRIS:  Does anyone not agree?
4       (Pause.)
5       MR. MORRIS:  Having heard nothing,
6  let's proceed.  Thank you.
7       THE VIDEOGRAPHER:  This will be the
8  start of Media No. 1 in the video-recorded
9  deposition of James Dondero.  Today's date is
10  January 5th, 2021.  It's 9:52 a.m. Central
11  Standard Time.
12       The case is In re Highland Capital
13  Management LP, Debtor, Chapter 11, Case
14  No. 19-34054-sgj11 in the United States
15  Bankruptcy Court for the Northern District of
16  Texas, Dallas Division.
17       The attorneys' appearances have
18  already been noted on the steno record, so would
19  the court reporter please swear the witness.
20       MR. BONDS:  Wait just one second.
21  There's an adversary proceeding that this case is
22  actually -- or this deposition is actually being
23  taken in.  It's 20-03190-sgj.  Thank you.
24  ///
25  ///

Page 8

1       J. DONDERO
2  ———
3       JAMES D. DONDERO,
4  having been duly sworn,
5  testified as follows:
6  ———
7       EXAMINATION
8  ———
9  BY MR. MORRIS:
10       Q.  Good morning, Mr. Dondero.  Can you
11  hear me okay?
12       A.  Yes.
13       Q.  Okay.  My name is John Morris from
14  Pachulski Stang Ziehl & Jones, counsel for the
15  debtor.
16       Where are you located this morning,
17  sir?
18       A.  Highland Capital Management's
19  conference room, same as last time.
20       Q.  Is there anybody in the room with you
21  right now?
22       A.  No.
23       Q.  Do you have a telephone with you?
24       A.  Yes.
25       Q.  Is the phone off?

Page 9

1       J. DONDERO
2       A.  Yes.
3       Q.  Are you aware that the debtor sent a
4  letter to your lawyers instructing you not to be
5  on the premises after December 31st, 2020?
6       A.  Yes.
7       Q.  Did you get the debtor's permission
8  to enter the premises this morning?
9       A.  Implicitly for this depo, I believe.
10       Q.  Okay.  Did you get any explicit
11  consent or approval for you to be in the offices
12  this morning?
13       A.  Not that I'm aware of.
14       Q.  Did you ask or did anybody on your
15  behalf ask the debtors if you could participate
16  in today's deposition at the Highland offices?
17       A.  I don't know.
18       Q.  You're not aware of that, right?
19       A.  Correct.
20       Q.  Okay.  John Bonds is defending you
21  today; is that right?
22       A.  Yes.
23       Q.  And he's at the Bonds Ellis firm,
24  right?
25       A.  Yes.

Appx. 01589

J. DONDERO

2  Q. And the Bonds Ellis firms represents
3  you in your individual capacity, correct?
4  A. Yes.
5  Q. Is there any other law firm that
6  represents you in your individual capacity in the
7  Highland bankruptcy or in the adversary
8  proceeding?
9  A. I don't believe so.
10  Q. Okay. Does the Bonds Ellis firm
11  represent any entity in which you have an
12  ownership or control interest, or do they just
13  represent you in your individual capacity?
14  A. I don't know for sure.
15  Q. Okay. But as you sit here right now,
16  do you have any reason to believe that the Bonds
17  Ellis firm represents anybody other than you in
18  your individual capacity in connection with the
19  bankruptcy case?
20  A. I don't know.
21  Q. Okay. You understand that we're here
22  today for your deposition, right?
23  A. Yes.
24  Q. And do you understand that today's
25  deposition is being taken in connection with the

J. DONDERO

2  debtor's motion for -- (audio malfunction) --
3  (Clarification requested by the
4  stenographer.)
5  MR. MORRIS: I'll ask it again.
6  BY MR. MORRIS:
7  Q. Mr. Dondero, do you understand that
8  today's deposition is being taken in connection
9  with the debtor's motion for preliminary
10  injunction against you?
11  A. Yes.
12  Q. Do you intend to participate in the
13  hearing on the debtor's motion for preliminary
14  injunction?
15  MR. BONDS: Objection, form.
16  MR. MORRIS: You can answer.
17  A. I don't know.
18  BY MR. MORRIS:
19  Q. Do you intend to make -- do you
20  intend to testify at the debtor's hearing for
21  preliminary injunction?
22  MR. BONDS: Objection, form.
23  A. I don't know.
24  BY MR. MORRIS:
25  Q. You may or you may not; is that

J. DONDERO

2  right?
3  A. Yes.
4  Q. Okay. Are you on any drugs or any
5  medication right now?
6  A. No.
7  Q. Is there anything that you're aware
8  of that might affect your memory today?
9  A. No.
10  Q. Are you aware of anything that would
11  prevent you from testifying competently today to
12  the best of your ability?
13  A. No.
14  Q. You understand that you're under oath
15  right now?
16  A. Yes.
17  Q. Are you aware that on December 10th
18  the debtor obtained a temporary restraining order
19  against you?
20  A. Roughly.
21  Q. Okay. Did you ever personally read a
22  copy of the temporary restraining order?
23  A. No.
24  Q. So you've never seen the order
25  itself; is that right?

J. DONDERO

2  MR. BONDS: Objection, form.
3  A. Correct.
4  BY MR. MORRIS:
5  Q. Do you have an understanding of what
6  the order restrains you from doing?
7  A. Just in the most general sense.
8  Q. Tell me your understanding of what
9  the temporary order restrains you from doing.
10  A. Talking to the independent board
11  directly or talking directly to Highland
12  employees.
13  Q. Is there any other aspect of the
14  temporary restraining order that you're aware of
15  that would otherwise constrain or restrain your
16  conduct?
17  A. Those are the points I remember.
18  Q. Do you recall that before the Court
19  entered the temporary restraining order, it held
20  a hearing to consider the debtor's request?
21  A. I -- I don't know.
22  Q. Did you listen to the hearing?
23  A. No.
24  Q. Did you read a transcript of the
25  hearing?

Page 14

J. DONDERO

1
2     A.  No.
3     Q.  Do you respect the Court's authority
4  in this case?
5         MR. BONDS:  Objection, form.
6     A.  Yes.
7  BY MR. MORRIS:
8     Q.  Is there any particular reason why
9  you didn't take the time to read the Court's
10  temporary restraining order that was entered
11  against you?
12     A.  No.
13     Q.  James Seery is a member of the board
14  of Strand Advisors, the debtor's general partner,
15  right?
16     A.  Yes.
17     Q.  And you've been aware of that since
18  at least last January, correct?
19     A.  Yes.
20     Q.  And you're also aware that Mr. Seery
21  is the debtor's CEO and CRO, right?
22     A.  Yes.
23     Q.  And you've been aware of that since
24  last July, correct?
25     A.  Yes.

Page 15

J. DONDERO

1
2     Q.  Did you ever review the declaration
3  that Mr. Seery submitted in connection with the
4  debtor's motion for a temporary restraining order
5  against you?
6         MR. BONDS:  Objection, form.
7     A.  No.
8  BY MR. MORRIS:
9     Q.  Do you know what Mr. Seery alleged in
10  his declaration -- withdrawn.
11         Do you know the substance of what
12  Mr. Seery alleged in his declaration in support
13  of the debtor's motion for the TRO?
14     A.  No.
15     Q.  Did you care that the debtor was
16  seeking a TRO against you?
17     A.  I didn't think about it.
18     Q.  Have you thought about it since the
19  order was entered?
20     A.  Not really.
21     Q.  Okay.  You didn't submit a
22  declaration of your own in opposition of the
23  motion for TRO, right?
24     A.  I don't know.
25     Q.  You don't recall signing anything, do

Page 16

J. DONDERO

1
2  you?
3     A.  I've signed a lot of things, but
4  I'm -- I don't recall an opposition.
5     Q.  Let's talk about some of the events
6  that led to the entry of the TRO.
7         The debtor serves -- (audio
8  malfunction) --
9         (Clarification requested by the
10  stenographer.)
11         THE WITNESS:  I didn't touch the
12  microphone at this end and it's six inches or
13  eight inches from my mouth.
14         MR. MORRIS:  Yeah, let's try again,
15  Mr. Dondero.  Thank you.
16  BY MR. MORRIS:
17     Q.  The debtor serves as the portfolio
18  manager for certain collateralized loan
19  obligation vehicles; isn't that right?
20     A.  I don't want to testify to that.
21     Q.  Does the -- does the debtor manage
22  CLOs?
23         MR. BONDS:  Objection, form.
24         MR. MORRIS:  Withdrawn.
25         ///

Page 17

J. DONDERO

1
2  BY MR. MORRIS:
3     Q.  Can we agree that CLO stands for
4  collateralized loaning obligations?
5     A.  Yes.
6     Q.  Okay.  And does the debtor -- is the
7  debtor party to certain contracts that gives it
8  the right and responsibility to manage certain
9  CLO vehicles?
10         MR. BONDS:  Objection, form.
11         MR. MORRIS:  You can answer.
12     A.  Yes.
13  BY MR. MORRIS:
14     Q.  And you're aware of that because you
15  personally signed some of those contracts and
16  agreements, right?
17     A.  I don't know.
18     Q.  Okay.  NexPoint Advisors LP, are you
19  familiar with that firm?
20     A.  Yes.
21     Q.  That's an advisory firm; is that
22  right?
23     A.  Yes.
24     Q.  And we'll just refer to that as
25  NexPoint; is that okay?

**Appx. 01591**

Page 18

J. DONDERO

1
2     A. Yes.
3     Q. You have a direct or indirect
4  economic or ownership interest in NexPoint,
5  correct?
6         MR. BONDS: Objection, form.
7         MR. MORRIS: You can answer.
8     A. Yes.
9  BY MR. MORRIS:
10     Q. You're the president of NexPoint,
11  correct?
12     A. I believe so.
13     Q. And you own NexPoint's general
14  partner; is that right?
15     A. I don't know.
16     Q. Do you know who owns NexPoint's
17  general partner?
18     A. No.
19     Q. As the president of NexPoint, is it
20  fair to say that you control that entity?
21     A. Generally.
22     Q. Highland Capital Management Fund
23  Advisors LP, are you familiar with that firm?
24     A. Yes.
25     Q. And that's also an advisory firm,

Page 19

J. DONDERO

1
2  correct?
3     A. Yes.
4     Q. And we'll refer to that firm as Fund
5  Advisors; is that fair?
6     A. Sure.
7     Q. And we'll refer to Fund Advisors and
8  NexPoint together just as "the advisors"; is that
9  fair?
10     A. I think you should be more specific
11  than that, but --
12     Q. Okay. I apologize. Are you
13  finished?
14         If at any time I ask a question and
15  you don't understand, will you let me know that?
16     A. Yes.
17     Q. Okay. You have a direct or indirect
18  economic or ownership interest in Fund Advisors,
19  correct?
20     A. Yes.
21     Q. You're the president of Fund
22  Advisors; is that true?
23     A. I believe so.
24     Q. And you own Fund Advisors' general
25  partner; is that right?

Page 20

J. DONDERO

1
2     A. I don't believe I own as much of it
3  as I own of NexPoint, but I don't know the
4  numbers.
5     Q. Okay. As one of the two beneficial
6  owners of Fund Advisors and as the president of
7  Fund Advisors, is it fair to say that you control
8  that entity?
9     A. Yes.
10     Q. Okay. And Fund Advisors and NexPoint
11  manage certain investment funds; is that right?
12     A. I'm sorry, I missed the point of that
13  question.
14     Q. Didn't hear? Okay.
15         Fund Advisors, which we've talked
16  about, and NexPoint, which we've talked about,
17  those two entities manage certain investment
18  funds; is that right?
19     A. Yes.
20     Q. And one of the investment funds that
21  the advisors manage is Highland Income Fund. Do
22  I have that right?
23     A. Yes. I'm not sure which fund that
24  is, but yes, that's -- that's one of them.
25     Q. Are you the portfolio manager of the

Page 21

J. DONDERO

1
2  Highland Income Fund?
3     A. I believe so.
4     Q. Do you hold any titles at the
5  Highland Income Fund other than portfolio
6  manager?
7         MR. BONDS: To the extent you know.
8  Don't speculate.
9     A. I don't -- I don't know. I know I'm
10  portfolio manager on virtually all of the funds.
11  BY MR. MORRIS:
12     Q. Is there any fund that you're not the
13  portfolio manager for that you're aware of?
14     A. I don't know.
15     Q. Are you the portfolio manager of
16  NexPoint Capital Inc.?
17     A. If that name refers to a fund, I
18  believe so.
19     Q. Okay. You're not sure if that refers
20  to a fund?
21     A. There's a fund with the symbol NHF.
22  If that's the name -- which I don't think you
23  have the exact name. If that's the name of it,
24  then I believe -- I believe I'm the portfolio
25  manager. The name that you just gave sounded

Appx. 01592

Page 22

J. DONDERO

2 more like a holding company name or a subsidiary
3 name for NexPoint. If it's not a fund, I'm not
4 the portfolio manager. If it is a fund, I
5 believe I am.
6    Q. Okay. Do you hold -- are you
7 familiar with an entity called NexPoint
8 Capital Inc.?
9    A. No.
10    Q. Okay. How about NexPoint Strategic
11 Opportunities Fund, is that a fund that is
12 managed by one of the advisors?
13    A. I believe that's the name for NHF.
14 That's what I thought you were referring to.
15 That's the one that's a fund, and that's the one
16 that I'm portfolio manager on.
17    Q. Okay. Do you hold any titles at
18 NexPoint Strategic Opportunity Fund other than
19 portfolio manager?
20    A. I don't know.
21    Q. The advisors caused each of the funds
22 to invest in certain CLOs that are managed by the
23 debtor, right?
24    MR. BONDS: To the extent you know.
25 Don't speculate.

Page 23

J. DONDERO

2    MR. MORRIS: John, if there's an
3 objection, I welcome it. If there's a direction
4 not to answer, I welcome it. But what I don't
5 welcome is guiding the witness. If he doesn't
6 remember, he's done this so many times, he knows
7 what he's doing.
8    You want me to ask the question
9 again, Mr. Dondero?
10    THE WITNESS: Please.
11 BY MR. MORRIS:
12    Q. The two advisors that we talked
13 about, they manage funds, right?
14    A. Yes.
15    Q. And those funds have invested in
16 certain CLOs that are managed by the debtor,
17 correct?
18    A. The problem I have with that question
19 and the part that I don't want to testify as
20 agreeing to or acknowledging is that the debtor
21 manages those CLOs, because I won't testify to
22 the debtor being in good standing, and I won't
23 testify to the debtor not being in default, and I
24 won't testify to the debtor having the capability
25 to manage those CLOs --

Page 24

J. DONDERO

2    Q. Will you -- I'm sorry to interrupt.
3 Go ahead.
4    A. No, I mean, that's -- so I won't -- I
5 won't testify affirmatively to the second half of
6 that question.
7    Q. Okay. But you will admit, won't you,
8 that the debtor has -- is party to contracts that
9 give it the right to manage CLOs in which the
10 advisors caused the funds to invest, right?
11    MR. BONDS: Objection, form.
12    MR. MORRIS: You can answer.
13    A. The beginning and end of what I want
14 to testify to is that the advisor is parties --
15 party to contracts. The contracts have --
16 provide the ability to manage assets in the CLO
17 subject to a bunch of different things, subject
18 to not being in default, subject to the ability,
19 subject to the capability and being registered
20 advisor, et cetera, et cetera.
21    I don't want to have any testimony
22 that implies that the advisor is in good standing
23 or able or capable of managing those CLOs or that
24 Jim Seery is even an investment professional.
25    ///

Page 25

J. DONDERO

2 BY MR. MORRIS:
3    Q. Okay. I think I understand.
4    When you used the word "advisor" in
5 your last answer, you were referring to the
6 debtor; is that right?
7    MR. BONDS: Objection, form.
8 BY MR. MORRIS:
9    Q. It's the debtor that has -- let me
10 try again.
11    It's the debtor that has the
12 contracts with the CLO, right?
13    A. Yes.
14    Q. But it's your contention that the
15 debtor is in default and that Mr. Seery and the
16 debtor otherwise don't have the capability to
17 manage the CLOs. That's what you're saying,
18 right?
19    A. I don't want to argue, and it's for
20 the lawyers and the Court to decide, but I don't
21 want to be affirmatively acknowledging that
22 Seery's an investment professional. I don't want
23 to be affirmatively acknowledging that he has any
24 employees and staff when he's told them all
25 they're being terminated in the next few weeks.

J. DONDERO

1
2      I don't want to acknowledge that he
3  is in compliance and can operate those contracts
4  if I believe those contracts are in default
5  because, A, the advisor's in bankruptcy, and B,
6  none of the key man provisions are being adhered
7  to by the advisor.
8      I don't want to in any form or
9  fashion acknowledge or represent or somehow be
10  twisted into testifying that he is in good
11  standing or has the ability to manage those CLOs.
12  It may be found by somebody that he is, but I
13  don't want to be in any way inferred to be
14  sanctioning it.
15      Q. Okay. Are you aware -- have any of
16  the contracts pursuant to which the CLOs and the
17  debtor are the parties, have any of those
18  contracts been terminated, to the best of your
19  knowledge, since the petition date?
20      A. I believe they're subject to stays,
21  among other things, but I'm not -- I'm not a
22  lawyer.
23      Q. Has anybody sought to lift the stay
24  in order to terminate the contracts, to the best
25  of your knowledge?

J. DONDERO

1
2      A. I don't know where -- I don't know.
3      Q. Has any of the CLOs ever contended
4  that the debtor was in breach in their agreement?
5      A. I believe the beneficial holders
6  have.
7      Q. I understand that --
8      A. But I don't know -- I don't know if
9  the CLOs have.
10      Q. Okay. I'm asking you a different
11  question, and just answer my question.
12      To the best of your knowledge, has
13  any CLO contended that the debtor is in breach of
14  any of the agreements that they have between
15  them?
16      MR. BONDS: Objection, form.
17      A. I don't know.
18  BY MR. MORRIS:
19      Q. You're not aware of any such
20  contention, right?
21      A. I don't know.
22      Q. You're not aware of any contention by
23  the CLOs that the debtor is in default under any
24  CLO contract, correct?
25      MR. BONDS: Objection, form.

J. DONDERO

1
2      A. I don't know regarding the CLOs.
3  BY MR. MORRIS:
4      Q. Did you ever ask them? Withdrawn.
5      Did you ever ask anybody on behalf of
6  the CLOs whether they were going to declare a
7  default under the CLO management agreements?
8      MR. BONDS: Objection, form.
9      A. I don't know.
10  BY MR. MORRIS:
11      Q. You don't know if you asked? I'm
12  just asking you if you ever asked the question.
13      A. Not of the CLOs. Those questions
14  were asked regarding the beneficial owners, and I
15  think the beneficial owners did that, but I
16  didn't have direct knowledge or contact with the
17  CLOs.
18      Q. Okay. And the beneficial owners are
19  not parties to the CLO management agreements
20  between the CLOs and the debtor, correct?
21      MR. BONDS: Objection, form.
22      A. I don't want to draw a legal
23  conclusion of the rights of the beneficial owners
24  and the people who have the risk and the people
25  who have the ultimate decision authority whether

J. DONDERO

1
2  or not they can be circumvented or ignored by an
3  intermediate nonfinancial -- nonfinancially
4  interested party. I don't want to -- I don't
5  want to speculate on that.
6      MR. MORRIS: Okay. I move to strike.
7      And I'm not asking for a legal
8  conclusion; I'm asking for your understanding.
9  BY MR. MORRIS:
10      Q. Is it your understanding that
11  beneficial owners are parties to the CLO
12  management agreements between the debtor and the
13  CLOs?
14      MR. BONDS: Objection to form.
15      MR. MORRIS: You can answer.
16      A. I think that asks for a legal
17  conclusion.
18  BY MR. MORRIS:
19      Q. It does not. I'm asking you as a
20  factual matter based on your understanding as the
21  portfolio manager of the funds and the president
22  of the advisors who made these investments. I'm
23  asking you --
24      MR. BONDS: Objection, form.
25      ///

Page 30

1          J. DONDERO
2 BY MR. MORRIS:
3     Q. – in that capacity.
4     In that capacity, do you have any
5 understanding that the beneficial owners are
6 parties to the CLO management agreements between
7 the debtor and the CLOs?
8      MR. BONDS: Objection, form.
9     A. My understanding is that the
10 beneficial owner should always be considered.
11      MR. MORRIS: Okay. I move to strike.
12 I'm not asking you whether they should be
13 considered.
14 BY MR. MORRIS:
15     Q. I'm asking you very specifically
16 whether you believe that they are parties to the
17 contract.
18      MR. BONDS: Objection, form, asked
19 and answered.
20     A. Yeah, I believe you're asking me for
21 a legal conclusion, and I won't give one.
22 BY MR. MORRIS:
23     Q. Okay.
24      MR. MORRIS: La Asia, can we please
25 put up Exhibit 1. Let's share the screen and put

Page 31

1          J. DONDERO
2 up Exhibit 1.
3      (Dondero Deposition Exhibit 1
4 marked.)
5 BY MR. MORRIS:
6     Q. Mr. Dondero, I appreciate that it's
7 difficult to do this remotely, and as we
8 discussed last time, the one thing that I'm
9 certainly not doing today is playing gotcha with
10 documents.
11     So I'm going to put documents up on
12 the screen from time to time, and to the extent
13 that you think you need to read more of the
14 document in order to have full context, will you
15 let me know that?
16     A. Sure.
17     Q. Okay. This is a letter dated
18 October 16th from NexPoint to Mr. Seery.
19     Do you see that?
20     A. Yep.
21     Q. Okay. Are you familiar with this
22 document? Have you ever seen it before?
23     A. Generally. I'm generally familiar
24 with it, but I haven't seen it before.
25     Q. Okay. Do you recall when you first

Page 32

1          J. DONDERO
2 learned that this document was sent? Was it at
3 or around the time the document was sent?
4     A. It was at or around the time, yes.
5     Q. Did you discuss with NexPoint any of
6 the substance that is in this letter? And again,
7 I'm happy to scroll through it if that would be
8 helpful.
9      MR. BONDS: Objection, form.
10     A. Just generally.
11 BY MR. MORRIS:
12     Q. Did you – I don't want to know about
13 any conversations, but did you speak with anybody
14 at K&L Gates about this particular letter, just
15 yes or no?
16     A. My primary conversation was with
17 internal counsel. K&L Gates might have been on
18 some phone call or two.
19     Q. Okay. Whose idea was it to send this
20 out?
21      MR. BONDS: Objection, form.
22     A. Whose idea? I – I don't think
23 anybody viewed it as an idea as much as a
24 regulatory necessity.
25     ///

Page 33

1          J. DONDERO
2 BY MR. MORRIS:
3     Q. And did you authorize the sending of
4 this particular letter?
5     A. Not specifically.
6     Q. Did you generally support the sending
7 of the letter?
8     A. Yes.
9     Q. And you knew the letter was being
10 sent; is that fair?
11     A. Yes.
12     Q. And you didn't object to the sending
13 of this letter, right?
14     A. I did not object.
15     Q. Okay. And since learning that the
16 letter was sent, have you ever directed NexPoint
17 to withdraw the letter?
18     A. No.
19     Q. You have the power to do that, don't
20 you, sir?
21     A. I – I don't believe so. When the
22 chief compliance officer believes it's a breach
23 of regulatory compliance, the chief compliance
24 officer in financial institutions has personal
25 liability, and I don't believe that other C-suite

**Appx. 01595**

Page 34

1          J. DONDERO
2   executives can overrule the chief compliance
3   officer.
4          Q. Who is the chief compliance officer?
5          A. Jason Post.
6          Q. Did Mr. Post ever say that he would
7   not withdraw the letter because of regulatory
8   compliance?
9          MR. BONDS: Objection, form.
10         A. I -- not that I know of.
11  BY MR. MORRIS:
12         Q. Did you ever discuss with Mr. Post
13  whether or not this letter should be withdrawn?
14         A. Again, I didn't believe I had the
15  authority to.
16         Q. Okay. And he never told you that he
17  couldn't; that's just the implicit conclusion
18  that you drew because he was the chief compliance
19  officer; is that fair?
20         A. Implicit conclusion? It's more the
21  understanding I have of compliance from having
22  lived it the last 20 years.
23         MR. MORRIS: Okay. Let's put up
24  Exhibit 2, please.
25         (Dondero Deposition Exhibit 2

Page 35

1          J. DONDERO
2   marked.)
3          MS. CANTY: Do you see it, John?
4          MR. MORRIS: I think we still have
5   Exhibit 1.
6          MS. CANTY: Okay. Give me a second.
7   BY MR. MORRIS:
8          Q. Okay. This is another letter that
9   was sent by NexPoint to Mr. Seery, this one dated
10  November 24, 2020.
11         Do you see that, sir?
12         A. Yes.
13         Q. And you saw this letter at or around
14  the time it was sent, right?
15         A. I didn't see the letter specifically,
16  but I'm aware of it.
17         Q. And you knew it was going to be sent;
18  is that fair?
19         A. Yes.
20         Q. And did you authorize this letter to
21  be sent on behalf of the advisors and the funds
22  that are listed there?
23         MR. BONDS: Objection, form.
24         A. Let me give the consistent testimony
25  I gave last time. It wasn't an authorization. I

Page 36

1          J. DONDERO
2   was aware of it. It was, I believe, a continued
3   regulatory breach from the standpoint of the --
4   of compliance that drove the letter.
5   BY MR. MORRIS:
6          Q. When there's a regulatory breach, is
7   there an obligation to alert anybody other than
8   the portfolio manager?
9          A. I know that's being investigated. I
10  don't know the answer regarding a breach like
11  this.
12         Q. Are you aware of any notification
13  that NexPoint made to anybody in the world, other
14  than Mr. Seery, with respect to the matters set
15  forth in Exhibit 1 and Exhibit 2?
16         MR. BONDS: Objection, form.
17         A. I don't know, and I'm not in a
18  position to comment at this point.
19  BY MR. MORRIS:
20         Q. I'm just asking you if you know
21  whether -- I'm asking for your knowledge.
22         Do you know whether NexPoint ever
23  advised anybody, other than Mr. Seery, of the
24  allegations that are set forth in Exhibit 1 and
25  Exhibit 2?

Page 37

1          J. DONDERO
2          MR. BONDS: Objection, form.
3          A. I don't know, nor would I necessarily
4   be informed if compliance self-reports this to
5   the SEC or other regulatory bodies. But I do not
6   know.
7   BY MR. MORRIS:
8          Q. And nobody told you that, right?
9          A. I don't know.
10         Q. Is there -- did you see any written
11  analysis or memorandum that was prepared by
12  your -- by the chief compliance officer with
13  respect to the matters set forth in Exhibit 1 and
14  Exhibit 2?
15         A. I know there was a multipage analysis
16  that was done, but I've never seen it.
17         Q. And was it written by the chief
18  compliance officer or was it written by legal
19  staff?
20         A. I was told he did it in conjunction
21  with external counsel.
22         Q. But you've never seen it?
23         A. I've never seen it.
24         Q. Did you support the sending of this
25  letter?

**Appx. 01596**

Page 38

1         J. DONDERO
2    A. Yes.
3    Q. Since learning that this letter was
4 sent, have you directed NexPoint to withdraw this
5 letter?
6    A. No, I have not.
7    Q. Okay. Around Thanksgiving you
8 learned that Mr. Seery was seeking to sell
9 certain securities that were owned by certain
10 CLOs managed by the debtor, right?
11    A. I believe I was informed after the
12 fact.
13    Q. You were informed that certain sales
14 of securities owned by the CLOs were being sold
15 at Mr. Seery's direction, right?
16    A. Yes.
17    MR. BONDS: Objection, form.
18 BY MR. MORRIS:
19    Q. Okay. And at around that time, once
20 you learned that, you personally intervened to
21 stop those trades, right?
22    MR. BONDS: Objection, form.
23    A. Yes.
24    MR. MORRIS: Can we put up Exhibit 3,
25 please.

Page 39

1         J. DONDERO
2    (Dondero Deposition Exhibit 3
3 marked.)
4 BY MR. MORRIS:
5    Q. This is an e-mail string. We're
6 going to start at the bottom and work up, just so
7 we can get it in order. And you'll see the
8 bottom begins with an e-mail from Hunter Covitz.
9    Do you see that?
10    A. Yes.
11    Q. Who is Mr. Covitz?
12    A. Covitz, Hunter Covitz manages our CLO
13 asset – or our CLO assets, primarily.
14    Q. Is he a High- -- is he a debtor
15 employee or is he employed by any other entity?
16    A. I believe he's a debtor employee.
17    Q. Okay. Do you see there's a reference
18 there to gatekeeper@hcmlp.com?
19    A. Yes.
20    Q. Are you – withdrawn.
21    Is that – withdrawn.
22    Is it your understanding that that's
23 kind of a basket of different e-mail addresses
24 that are held together by the Gatekeeper address?
25    A. I wouldn't describe it that way, but

Page 40

1         J. DONDERO
2 it is a bucket of e-mails.
3    Q. Okay. And is your e-mail address or
4 was your e-mail address included within
5 Gatekeeper?
6    A. Historically, it was.
7    Q. And do you know when that stopped
8 being the case?
9    A. I do not know.
10    Q. Was it after the time that you
11 resigned from your position at the debtor?
12    A. I do not know.
13    Q. Okay. Matt Pearson is below
14 Gatekeeper. Do you know who Mr. Pearson is?
15    A. He is a – generally an equity trader
16 that works for Joe Sowin.
17    Q. And are Mr. Pearson and Mr. Sowin
18 employees of the debtor?
19    A. I don't believe so. I don't believe
20 Joe is. I don't know if Matt is. I don't know.
21    Q. Okay. But is it fair to say that
22 pursuant to this e-mail, Mr. Covitz is giving
23 direction to sell certain securities held by the
24 CLOs?
25    A. Yes.

Page 41

1         J. DONDERO
2    Q. Can we scroll to the e-mail above
3 that, please. And then Mr. Pearson acknowledged
4 that e-mail a little bit later in the day, right?
5    A. Yes.
6    Q. Okay. And if we can –
7    (Interruption by the videographer.)
8    MR. MORRIS: It's okay. Let's
9 proceed and we'll do the best we can.
10 BY MR. MORRIS:
11    Q. Mr. Covitz's e-mail was the – do you
12 see the subject matter is Sky Equity?
13    A. Yes.
14    Q. And do you have an understanding of
15 what Sky Equity refers to?
16    A. It's a – it's a post-restructured
17 equity that the funds have held for years.
18    Q. Okay. So if we could scroll up to
19 your e-mail that's right there, did you receive a
20 copy of Mr. Covitz's original e-mail?
21    A. It appears so.
22    Q. Okay. And did you give the
23 instruction to the recipients of Mr. Hunter
24 Covitz's e-mail not to sell the Sky Equity as had
25 been instructed by Mr. Seery?

J. DONDERO

2  A. Yes.

3  Q. And you understood at the time that
4  you gave the instruction to the people on this
5  e-mail that they were trying to execute trades
6  that Mr. Seery had authorized, right?

7      MR. BONDS: Objection, form.

8      THE WITNESS: Can you repeat the
9  question, please.

10     MR. MORRIS: Sure.

11 BY MR. MORRIS:

12     Q. At the time that you gave the
13 instruction, no, do not, you knew that you were
14 stopping trades that had been authorized and
15 directed by Mr. Seery, correct?

16     A. Yes.

17     Q. Did you speak with Mr. Seery before
18 instructing the recipients of your e-mail not to
19 execute the SKY transactions?

20     A. No, I did not.

21     Q. Did you take any steps to seek the
22 debtor's consent before instructing the
23 recipients of this e-mail not to execute the SKY
24 transactions?

25     A. I'm sorry, please repeat that again.

J. DONDERO

2  The -- I missed the first part of the sentence.

3      Q. No problem.

4      Did you take any steps to seek the
5  debtor's consent before instructing the
6  recipients of your e-mail --

7      MR. BONDS: Objection, form.

8  BY MR. MORRIS:

9      Q. -- to stop the SKY transactions, to
10 stop executing the SKY transactions?

11     A. No.

12     Q. Thank you.

13     Can we scroll up to the response.

14 Okay. Stop there.

15     Mr. Pearson responded later that
16 afternoon. Do you see that?

17     A. Yes.

18     Q. And in response, he canceled all of
19 the SKY and AVYA sales that the debtor had
20 directed but which had not yet been executed,
21 right?

22     A. Yes.

23     Q. And if we can scroll up to the e-mail
24 above that, you responded to that as well, didn't
25 you?

J. DONDERO

2  A. Yep.

3  Q. Can you please read your response out
4  loud.

5  A. HFAM and DAF -- or HFAM and DAF has
6  instructed Highland in writing not to sell any
7  CLO underlying assets. There is potential
8  liability. Don't do it again, please.

9  Q. All right. The written instructions,
10 is that a reference to the first two exhibits
11 that we looked at? And if you want to go back
12 and check them out, we can, but I'm trying to --
13 I want to know what writings you're referring to.
14 Withdrawn.

15     Are the writings that you're
16 referring to the two exhibits that we just looked
17 at, Exhibit 1 and Exhibit 2?

18     MR. BONDS: Objection, form.

19     A. Generally, yes.

20 BY MR. MORRIS:

21     Q. Are you --

22     A. I don't know if -- I don't know if
23 there were more than those two, but generally,
24 letters of those substances -- well, generally,
25 letters of those substance -- of that substance

J. DONDERO

2  is what I'm referring to.

3      Q. I appreciate that, Mr. Dondero.

4      Do you recall any other writings that
5  you were referring to at the time you sent this
6  e-mail?

7      A. I'm just saying I don't know if there
8  were others or if there were other e-mails. I
9  don't know. But there were -- they would have
10 been similar in terms of substance as those two.

11     Q. Okay. Do you see the reference there
12 in the latter portion of your e-mail, quote,
13 there is potential liability, don't do it again?

14     A. Yes.

15     Q. Who was the intended recipient of
16 that message?

17     A. At this juncture, it's to Matt
18 Pearson, I believe.

19     Q. And why would Matt Pearson have
20 personal liability -- withdrawn.

21     Why did you decide to tell
22 Mr. Pearson that he had potential liability for
23 executing the transactions that Mr. Seery had
24 directed?

25     MR. BONDS: Objection, form.

J. DONDERO

1
2     A.   Yeah, to be clear, it doesn't say
3  personal liability.  I said potential liability.
4  I believe this is -- I believe what was done here
5  is bona fide typical class action activity that
6  we've suffered from historically, when the
7  interests of beneficial holders are ignored when
8  assets are sold for no business purpose.  No
9  business purpose.  No definable, discernible,
10  articulated business purpose.
11          There's -- I think there's potential
12  liability for the manager, the fund complex, you
13  know, and sometimes for the individuals involved.
14  But my potential liability was a general
15  statement.
16          THE WITNESS:  You know what, guys,
17  listen.  I've got a couple of calls I've got to
18  make that I'm ten minutes late for, so we're
19  going to need to take a break for a few minutes
20  here, ideally now, or after the next question,
21  please.
22          MR. MORRIS:  I'm happy to take a
23  break now.  How long are you thinking, though?
24          THE WITNESS:  Ten or 15 minutes.
25          MR. MORRIS:  Yeah, that's perfectly

J. DONDERO

1
2  fine, Mr. Dondero.  Can you just state on the
3  record that you will not talk to any Highland
4  employee, including Mr. Ellington or
5  Mr. Leventon, you will not communicate with them
6  or their counsel in any way with respect to this
7  deposition?
8          THE WITNESS:  Yeah, I promise.  I
9  haven't -- yeah.  I will not talk to them.  The
10  only Highland employee I might talk to is Jerome,
11  who's handling the systems for this call, and
12  that's it.
13          MR. MORRIS:  I'm fine with that, but
14  really, I'm requesting not only Highland
15  employees but not to talk to anybody about the
16  testimony today.  I'm going to accommodate you
17  and --
18          THE WITNESS:  I won't.  Nobody cares
19  about this deposition.  I won't talk to anybody.
20          MR. MORRIS:  Okay.
21          THE WITNESS:  I'll be back in ten or
22  15 minutes, okay?
23          MR. MORRIS:  Okay.
24          THE VIDEOGRAPHER:  10:41 a.m. Central
25  Standard Time, we're off the record.

J. DONDERO

1
2          (Recess taken, 10:41 a.m. to
3  11:16 a.m. CST)
4          THE VIDEOGRAPHER:  11:16 a.m., we're
5  back on the record.
6  BY MR. MORRIS:
7     Q.   Mr. Dondero, can you hear me?
8     A.   Yes.
9     Q.   Okay.  Are you aware that the
10  deposition taking place today is pursuant to
11  Court order?
12     A.   Yes.
13     Q.   Did you schedule meetings and
14  telephone calls during the day today,
15  notwithstanding the Court's order?
16     A.   I didn't formally schedule anything.
17     Q.   Okay.  So you have nothing scheduled
18  for the rest of the day; is that right?  You're
19  here to answer questions?
20     A.   Correct.
21          MR. MORRIS:  Okay.  Can we get the
22  last exhibit back up on the screen, please.
23  Okay.  Can we scroll --
24  BY MR. MORRIS:
25     Q.   We were last looking at your e-mail.

J. DONDERO

1
2  Can we see the response above that, please?
3  Okay.  And that's Mr. Sowin responding.
4          Do you see that?
5     A.   Yes.
6     Q.   And Mr. Sowin was following your
7  instructions; is that right?
8     A.   His response is what it is.  I'm
9  not -- what do you mean by following my
10  instructions?
11     Q.   Well, he issued an order -- it says,
12  quote:  Please block all orders from hitting the
13  trading desk for the -- I assume he meant
14  funds -- Jim mentioned.
15          Do you see that?
16     A.   Yes.
17          MR. BONDS:  Objection, form.
18  BY MR. MORRIS:
19     Q.   And that's exactly what you wanted to
20  happen, right?
21     A.   I'm sorry, could you unhighlight
22  that?  It's hard for me to read with the
23  highlight.  Okay.  Thank you.
24          Yeah, they -- I think he tried to
25  figure out a way to prevent it from inadvertently

J. DONDERO

1  happening.
2      Q. Okay. And Mr. Sowin's – the
3  substance of Mr. Sowin's e-mail is consistent
4  with your intent to prevent any further trades
5  from the CLOs, right?
6      MR. BONDS: Objection, form.
7      A. My intent was to prevent trades that
8  weren't in the best interests of investors, that
9  investors – the beneficial holders had
10  articulated they didn't want sold while these
11  funds were in transition, and that the – there
12  was no business purpose or benefit to the debtor
13  to sell these assets.
14  BY MR. MORRIS:
15      Q. That –
16      A. So that's – that was the rationale I
17  was trying to capture.
18      THE WITNESS: Hold on for me one
19  second. Jerome just stepped in. What does the
20  systems guy want Jerome to do?
21      MR. MORRIS: Figure out a way to turn
22  the lights on.
23      (Technical comments off the
24  stenographic record.)

J. DONDERO

1      MR. MORRIS: Let's go forward.
2      THE WITNESS: So we're okay with
3  Jerome? That's it for now?
4      MR. MORRIS: Yeah.
5      THE WITNESS: All right. Thank you.
6  BY MR. MORRIS:
7      Q. You didn't correct anything that
8  Mr. Sowin did – said in this e-mail, did you?
9      A. No.
10      Q. You didn't tell –
11      MR. BONDS: Can you repeat the
12  question? I didn't understand it.
13      MR. MORRIS: That's okay.
14  BY MR. MORRIS:
15      Q. Mr. Dondero, you didn't correct
16  anything that Mr. Sowin wrote in this e-mail, did
17  you?
18      A. No.
19      Q. You didn't tell Mr. Sowin that he
20  misunderstood your intent, did you?
21      A. I don't believe so.
22      Q. And you didn't give any explanation
23  to him as to why you did not want to sell any CLO
24  underlying assets except for what you wrote in

J. DONDERO

1  that e-mail below, right?
2      MR. BONDS: Objection, form.
3      A. I – I believe I – well, the e-mails
4  stand on their own. I think the reasons below
5  are sufficient. I think I had a conversation
6  with Joe besides that, and there was an
7  unawareness on the trading desk and with Hunter
8  that the interest of investors had been expressed
9  and ignored by Seery, you know, so – they
10  weren't aware of that. They thought that was
11  unusual and inappropriate.
12  BY MR. MORRIS:
13      Q. In your role as portfolio manager, is
14  it – do you believe it's your responsibility to
15  always defer to the desires of your investors?
16  Do you cede – do you cede – withdrawn.
17      Do you cede responsibility and your
18  business judgment for making transactions to your
19  investors?
20      MR. BONDS: Objection, form.
21      A. In this case, it would be
22  appropriate. In general, it would depend.
23  BY MR. MORRIS:
24      Q. Okay. A few days later, you learned

J. DONDERO

1  that Mr. Seery was trying to work-around to
2  effectuate the trades anyway, right?
3      A. Yes.
4      Q. And you wrote to Thomas Surgent to
5  let him know that you were aware that Seery was
6  trying a work-around to effectuate the trades,
7  right?
8      A. I believe there was such an e-mail.
9      Q. Okay. Can you just scroll up and see
10  that e-mail, please. All right. Stop right
11  there.
12      Who is Mr. Surgent?
13      A. He's the chief compliance officer of
14  Highland Capital.
15      Q. The debtor?
16      A. Yes.
17      Q. Okay. And how long has he held that
18  position to the best of your recollection?
19      A. A long time. More than five years.
20      Q. What does it mean to – when you
21  wrote that Mr. Seery was, quote, working on a
22  work-around to trade these securities? What does
23  that mean?
24      A. As a noninvestment professional and

Page 54

J. DONDERO

2 as a nontrader and as a nonportfolio manager, he
3 set up an account for himself, I believe,
4 directly with Jefferies to trade the securities
5 in the CLOs.
6     Q. How did you learn that?
7     A. I think we still get trade reports
8 from Jefferies, or Jefferies – the Jefferies
9 trades get reported back into the system and have
10 to be input by Joe, and so Joe sees the trades
11 come back from Jefferies at the end of the day.
12     Q. And Joe is Joe Sowin?
13     A. Yes.
14     Q. And he works for you; is that right?
15     MR. BONDS: Objection, form.
16     MR. MORRIS: Withdrawn.
17 BY MR. MORRIS:
18     Q. He works for one of the advisors; is
19 that right?
20     A. I believe he works for HFAM, but I'm
21 not a hundred percent certain.
22     Q. And the work-around was – is that
23 another way of saying that Mr. Seery tried to do
24 the trades that he thought were appropriate
25 without your interference?

Page 55

J. DONDERO

2     MR. BONDS: Objection, form.
3     A. I'm not going to agree with that
4 speculation. If you want me to speculate, I
5 think Seery had no business purpose and he was
6 doing it to tweak myself and everybody else.
7 BY MR. MORRIS:
8     Q. Did he tell you that?
9     A. No. I'm speculating.
10     Q. Okay. Do you have any idea why he
11 made the trades?
12     A. He – he had no –
13     Q. Withdrawn. I'm sorry.
14     Do you have any idea why he wanted to
15 make the trades?
16     A. I didn't speak to him directly.
17     Q. Okay.
18     A. Indirectly – I didn't speak to him.
19 I didn't speak to him directly. It was –
20     Q. Do you have any personal knowledge as
21 you sit here right now as to why Mr. Seery wanted
22 to effectuate the trades that you were blocking?
23     MR. BONDS: Objection, form.
24     A. I've thought about it at length. I
25 can't come up with a business purpose that would

Page 56

J. DONDERO

2 supersede an account that's in transition and the
3 beneficial owners have made it clear that the
4 manager's not in compliance, they're moving the
5 accounts, and knowing the individual assets that
6 were sold, I can't – I couldn't think of a
7 business purpose that Seery would be operating
8 under.
9     MR. MORRIS: Okay. I move to strike.
10 I'm not asking you for what you think. I'm
11 asking you for facts.
12 BY MR. MORRIS:
13     Q. Do you have any knowledge of any
14 facts as to the business justification or
15 rationale for why Mr. Seery wanted to make these
16 trades?
17     MR. BONDS: Objection, form.
18     A. No, I don't believe there are any.
19 BY MR. MORRIS:
20     Q. And you never asked him; is that
21 right?
22     A. Correct.
23     Q. And you never instructed anybody on
24 your behalf or on behalf of the advisors or on
25 behalf of the funds to ask Mr. Seery why he

Page 57

J. DONDERO

2 wanted to make these trades, right?
3     A. That's not correct.
4     Q. Nobody ever told you that they'd had
5 a conversation with Mr. Seery in which
6 Mr. Seery – (audio malfunction) –
7     (Clarification requested by the
8 stenographer.)
9 BY MR. MORRIS:
10     Q. Did anybody ever tell you that they
11 had spoken with Mr. Seery and Mr. Seery had
12 provided an explanation, a business rationale for
13 the transactions that he wanted to effectuate?
14     MR. BONDS: Objection, form.
15     A. Yes. Yes.
16 BY MR. MORRIS:
17     Q. Who was that?
18     A. Joe Sowin.
19     Q. When did he tell you about this
20 conversation?
21     A. It was at or about this time in...
22     Q. And what did Mr. Sowin tell you?
23     A. Seery told him it was for risk
24 minimization or risk reduction.
25     Q. Did he tell him anything else?

J. DONDERO

2     A. No. He said risk reduction was why
3 he was selling the securities.
4     Q. That's the only rationale that
5 Mr. Seery gave to Mr. Sowin; is that your
6 testimony?
7     A. Yes.
8     Q. Okay. Did Mr. Sowin tell you that he
9 asked any questions of Mr. Seery?
10     A. He asked him why he was selling them.
11     Q. And you've given me the entirety of
12 the answer as conveyed by Mr. Sowin to you; is
13 that right?
14     A. Yes.
15     Q. Is Mr. Sowin's conversation with
16 Mr. Seery about the justification for these
17 trades reflected in any document or any e-mail
18 anywhere that you can recall?
19     A. Not that I recall.
20     Q. Did K&L Gates explain their
21 understanding of the business rationale of these
22 trades in any of the letters that they sent on
23 behalf of the funds or any of the advisors?
24     A. Not that I'm aware of. I'm not
25 aware.

J. DONDERO

2     Q. Do you know Dustin Norris?
3     A. Yes.
4     Q. Do you know that he testified in
5 December in connection with this bankruptcy
6 matter?
7     A. Yes.
8     Q. Did you ever tell Dustin Norris about
9 the conversation Mr. Sowin had with Mr. Seery
10 that you've described here?
11     A. I believe he was aware of it.
12     Q. Do you know – did you talk to him in
13 advance of his testimony?
14     A. I talk to Dustin most every day.
15     Q. And did you tell Dustin that he
16 should make sure to alert the Court about this
17 conversation with Mr. Sowin and Mr. Seery?
18     A. No.
19     Q. Did you think it was important that
20 the Court know Mr. Seery's business rationale?
21     A. I thought it was a nonsensical answer
22 on Seery's part. I didn't have an opinion on
23 whether or not the Court should know.
24     Q. Now, you – at the time, you were
25 speaking to Mr. Seery directly; isn't that right?

J. DONDERO

2     A. Rarely. I didn't – since the
3 injunction or since – rarely. I can't remember
4 the last time I've spoken to him. Scott
5 Ellington has been the appropriate go-between as
6 far as I understand it.
7     Q. Okay. Was there anything that
8 prevented you in November 2020 from picking up
9 the phone to talk to Mr. Seery about his desire
10 to effectuate these transactions?
11     A. No. The last time I – yeah, I'm
12 remembering, the last time I talked to Seery was
13 the day after Thanksgiving.
14     Q. Okay. Is there anything that you're
15 aware of that prevented you from picking up the
16 phone and asking Mr. Seery for his business
17 justification for these trades prior to
18 December 10, 2020?
19     MR. BONDS: Objection, form.
20     A. No. I expressed my disapproval via
21 e-mail.
22 BY MR. MORRIS:
23     Q. Okay. Why did you decide to write to
24 Mr. Surgent on November 27th?
25     A. I wasn't sure he was aware of Seery's

J. DONDERO

2 work-around, and I know Thomas has an acute
3 awareness of his personal liability for
4 regulatory breaches or doing things that aren't
5 in the best interests of investors, and I don't
6 believe he has the extra insurance and
7 indemnities that Seery has.
8     Q. If he was acutely aware of it, why
9 did you feel the need to remind him of that in
10 your e-mail to him?
11     A. Because I don't think he was aware
12 that Seery was doing a work-around on behalf of
13 the debtor that he was compliance officer of. I
14 wasn't convinced he was aware, so I included him
15 on the e-mail.
16     Q. Did you intend to suggest that by
17 following Mr. Seery's orders to execute the
18 trades, that Mr. Surgent faced personal
19 liability?
20     A. That's the way it works.
21     Q. Okay. And you wanted him to know
22 that, right?
23     A. I wanted him to know that Seery was
24 doing inappropriate trades and doing
25 inappropriate work-around, in my opinion. I

Page 62

J. DONDERO

1
2 didn't think Thomas was aware. I thought Seery
3 was operating independently.
4        Thomas might have been aware, but I
5 didn't think so. I don't talk to -- I haven't
6 talked to Thomas in I don't know when, so I
7 thought it was important for him to know.
8    Q. Okay. You have communicated with
9 Mr. Seery from time to time via text message,
10 right?
11    A. Yes.
12        MR. MORRIS: Can we put up Exhibit 4,
13 please.
14        (Dondero Deposition Exhibit 4
15 marked.)
16        MR. MORRIS: And if we can scroll
17 down a little bit. Okay.
18 BY MR. MORRIS:
19    Q. This is a text that you sent at the
20 bottom there at 5:26 p.m. to Mr. Seery; is that
21 right?
22    A. Yes.
23    Q. Can you just read that text, that
24 5:26 out loud?
25    A. Be careful what you do, last warning.

Page 63

J. DONDERO

1
2    Q. Why did you write that?
3    A. Because all the reasons we just went
4 over. And I think he's violating the Advisers
5 Act. He's putting the funds and the debtor at
6 risk, in jeopardy of class action lawsuits, and
7 he's going against the interests of investors
8 that are in transition, and expressed a desire to
9 not have their assets sold, especially when
10 there's no business reason.
11        And for all the reasons articulated
12 below -- I mean, for all the reasons we just went
13 over, and there are a few others I probably
14 haven't remembered off the top of my head, but
15 it's -- I think it's -- I think his activities
16 regarding the CLOs is incredibly inappropriate,
17 unfounded and malicious, and he hadn't sold that
18 many securities at that point in time, somewhat
19 de minimis amounts, but it was a warning to tell
20 him to stop; otherwise, rightfully, the
21 beneficial owners would take more significant
22 actions, which I think they should and they will.
23    Q. What significant action are the
24 beneficial owners going to take?
25    A. I don't know. But there's a lot more

Page 64

J. DONDERO

1
2 things that they can push on, like you were
3 suggesting earlier, asking earlier in terms of
4 self-reporting to the SEC.
5    Q. But you haven't done that yet, to the
6 best of your knowledge; is that right?
7    A. I'm not aware.
8    Q. You wrote there that it's the last
9 warning.
10        Do you see that?
11    A. Yes.
12    Q. How many other warnings have you
13 given Mr. Seery?
14    A. All the e-mails we just went over.
15    Q. Anything else?
16    A. No.
17    Q. Okay. You got document requests in
18 this -- in connection with this matter; isn't
19 that right?
20    A. Yes.
21        MR. MORRIS: Okay. Can we put up
22 Exhibit 5, please.
23 BY MR. MORRIS:
24    Q. You know, before we look at that,
25 earlier this morning you mentioned -- you made a

Page 65

J. DONDERO

1
2 reference to internal counsel.
3        Do you recall that?
4    A. Yes.
5    Q. Okay. Who were you referring to?
6    A. D.C. Sauter.
7    Q. And D.C. Sauter is internal counsel
8 for who?
9    A. I'm sorry, was there a question
10 there?
11    Q. Yes. I apologize.
12        D.C. Sauter is internal counsel for
13 who, for which entity?
14    A. NexPoint.
15    Q. Okay. Were you referring to anybody
16 else?
17    A. No.
18    Q. Okay. You mentioned Scott Ellington
19 earlier, right?
20    A. Yes.
21    Q. And who is Mr. Ellington?
22    A. He's general counsel at Highland
23 historically. I think his role has been
24 redefined as settlement counsel, that's how it
25 was described to me, I guess, six, nine months

Page 66

1        J. DONDERO
2  ago, six months ago.
3        Q.  Mr. Ellington is employed by the
4  debtor, right?
5        A.  Yes.
6        Q.  And do you know when he first became
7  employed by the debtor?
8        A.  Over a decade ago.
9        Q.  Do you know whether Mr. Ellington has
10  any employer other than the debtor?
11        A.  I don't know.
12        Q.  He never told you that he had an
13  employer other than the debtor, did he?
14        A.  I don't know.
15        Q.  You know if he told you or not,
16  right?  Did he ever tell you that?
17        A.  He never told me he did, no.
18        Q.  And you have no facts or reason to
19  believe, as you sit here right now, that the
20  debtor is -- withdrawn.
21        You have no facts or reason to
22  believe right now that Mr. Ellington has any
23  employer other than the debtor, correct?
24        MR. BONDS:  Objection, form.
25        A.  I'd like to stick with:  I don't

Page 67

1        J. DONDERO
2  know.
3  BY MR. MORRIS:
4        Q.  You have no reason to believe that;
5  is that fair?
6        A.  Correct, I don't know.
7        Q.  Okay.  He's not -- Mr. Ellington is
8  not your personal lawyer, right?
9        A.  No.
10        Q.  He's never represented Jim Dondero
11  personally; is that right?
12        A.  No.
13        MR. MORRIS:  Let's look at the
14  document request, please, Exhibit 5.
15        (Dondero Deposition Exhibit 5
16  marked.)
17  BY MR. MORRIS:
18        Q.  If we could go -- let me just ask you
19  generally, Mr. Dondero.
20        Have you ever seen this document
21  before?
22        A.  No.
23        Q.  Are you aware that the debtor served
24  document requests on the Bonds Ellis firm for
25  documents in connection with its motion for a

Page 68

1        J. DONDERO
2  preliminary injunction?
3        A.  Yes.
4        Q.  How did you learn that?
5        A.  I heard about it from my lawyers.
6        Q.  Okay.  Did you oversee the search for
7  responsive documents?
8        A.  Response -- I know we were responsive
9  and compliant, but I delegated it to my
10  assistants and the employees at Bonds Ellis.
11        Q.  Which assistants did you delegate
12  this to?
13        A.  Tara Loiben.  I think primarily Tara
14  Loiben.
15        Q.  And who is Ms. Loiben?
16        A.  She's my assistant.
17        Q.  And who is she --
18        A.  I'm sorry?
19        Q.  Who is she employed by?
20        A.  I -- I don't know for sure.  I think
21  Highland, but I don't know.  I don't want to
22  speculate.
23        Q.  What instructions -- (audio
24  malfunction) --
25        (Clarification requested by the

Page 69

1        J. DONDERO
2  stenographer.)
3  BY MR. MORRIS:
4        Q.  What instructions did you give her in
5  order to search for documents?
6        A.  I didn't -- I didn't give her any.
7  She worked with that and she had -- she has full
8  access to my e-mail, and I gave her my phone for
9  the better part of a couple days in the office.
10        Q.  You -- until the end of 2020, you had
11  an e-mail address with an HCMLP or a Highland
12  e-mail address, right?
13        A.  Yes.
14        Q.  Have you stopped -- has that e-mail
15  address ceased to be in use?
16        A.  I've switched to an e-mail at the
17  bank as of -- whatever it was, last week or...
18        Q.  In the year 2020, did you use any
19  e-mail address other than the Highland e-mail
20  address?
21        A.  No.
22        Q.  You don't have a Gmail address or any
23  other personal e-mail address?
24        A.  I have an old Gmail address, but it's
25  dormant.  I haven't logged on to it in years.

Appx. 01604

Page 70

J. DONDERO

1
2    Q. Okay. And you understood that the
3  debtor's document request called for the
4  production of all text messages that were
5  responsive to the requests, right?
6    A. Yes.
7    Q. Can we just scroll down to the
8  requests themselves? Right there.
9       Do you see Request No. 3 is for all
10 communications between you and any person
11 employed by the debtor?
12   A. Yes.
13   Q. And did you understand that the
14 request was limited to the time period of, I
15 think, December 10th, 2020 to the end of the
16 month?
17   A. I didn't read the details of this. I
18 didn't get into it. I didn't do the document
19 production that I believe was completed and
20 responsive. I delegated that.
21   Q. Did you review the documents before
22 they were produced? Do you know what was
23 produced? Withdrawn. Two different questions.
24      Did you review the documents for
25 completeness before your lawyers delivered them

Page 71

J. DONDERO

1
2  to my firm?
3    A. Only in the most general -- when
4  she'd print out a stack of them, I'd just thumb
5  through the stack of them, and that was it. But
6  other than that, no.
7    Q. Did you do anything to satisfy
8  yourself that you had produced all responsive
9  documents?
10   A. I trust Tara's work ethic and
11 capabilities, and I trust the lawyers at Bonds
12 Ellis, so I didn't -- I didn't intervene or
13 supersede or supervise.
14   Q. So you didn't do anything to make
15 sure -- you didn't do anything personally --
16 withdrawn.
17      You didn't take any steps personally
18 to make sure that all responsive documents had
19 been produced, right?
20      MR. BONDS: Objection, form.
21   A. I wasn't involved personally, but I
22 do believe it was responsive and complete.
23 BY MR. MORRIS:
24   Q. Until early December, you had a phone
25 that was bought and paid for by the debtor,

Page 72

J. DONDERO

1
2  right?
3    A. Yes.
4    Q. What happened to that phone?
5    A. It was disposed of as part of getting
6  a replacement phone in anticipation of
7  potentially a transition.
8    Q. Who decided to dispose of it?
9    A. That's historically what we've done
10 with all of our historic phones, when we've
11 gotten new phones. I've gotten a new phone, I
12 guess, every four or five years, and the old ones
13 have always been destroyed.
14   Q. Who decided to destroy this --
15 withdrawn.
16      When you say it was disposed of, what
17 does that mean?
18   A. As far as I know, it was disposed of
19 in the garbage, but I don't know if it was
20 recycled or whatever.
21   Q. And who decided to throw it in the
22 garbage?
23   A. We've always -- we've always done
24 that when we've gotten new phones, versus trading
25 them in, for the senior executives.

Page 73

J. DONDERO

1
2    Q. I appreciate that, but I'm just
3  talking about the very specific phone that the
4  debtor bought and paid for your benefit. Who
5  made the decision to dispose and throw that phone
6  away?
7       MR. BONDS: Objection, form.
8    A. I -- like I said, I understood it to
9  be our standard process and protocol. I don't
10 know. I can't label anybody with the decision.
11 BY MR. MORRIS:
12   Q. Well, who threw it away?
13   A. I don't know.
14   Q. You don't know if you threw the phone
15 away?
16   A. No, I -- I don't know. No, I don't
17 remember throwing it away, but I don't know who
18 did.
19   Q. Did you have conversations with
20 anybody about the decision to throw away the
21 phone?
22   A. Like I said, it wasn't a decision or
23 a new decision. It's been the process, as far as
24 I understand it, every time we've upgraded phones
25 over the last 30 years.

**Appx. 01605**

Page 74

J. DONDERO

1
2      Q.  You just throw it in the garbage?
3   You don't try to get a credit for it by returning
4   it?
5      A.  No.
6      Q.  Okay.  Did you ever speak with
7   Mr. Ellington about your phone that was bought
8   and paid for by the debtor?
9      A.  I think Ellington's phone and my
10  phone and I think -- I think right around the
11  same time, in anticipation, in case there was a
12  transition or in case there was a liquidation
13  plan, it was time to move the phone ownership
14  away from the estate.  The estate wasn't going to
15  pay for it anymore anyway in another couple of
16  weeks so, I --
17     Q.  Were you aware --
18     A.  I'm sorry, what's your question?
19     Q.  Are you aware that the UCC had asked
20  for your text messages before the time that you
21  disposed of your phone?
22     A.  No.
23     Q.  Nobody ever told you that the UCC
24  wanted your phone?
25     A.  No.

Page 75

J. DONDERO

1
2      Q.  When exactly did you dispose of your
3   phone?
4      A.  On or about when I got my new phone.
5      Q.  Who at the debtor did you tell that
6   you disposed of your phone?
7      A.  I don't -- I don't remember who.  Was
8   it Jason Rothstein was involved in getting my new
9   phone and knew that I was disposing of my old
10  phone?  I don't know who else knew.  But again,
11  it was standard procedure.
12     Q.  Did it ever occur to you to get the
13  debtor's consent before doing this?
14         MR. BONDS:  Objection, form.
15     A.  No.
16  BY MR. MORRIS:
17     Q.  Did you have the phone number
18  transferred to your personal account?
19     A.  Yes.
20     Q.  Did you ever ask the debtor for its
21  permission to do that?
22     A.  No.
23     Q.  Did you ever give the debtor notice
24  that you were doing that?
25     A.  I didn't believe it was necessary or

Page 76

J. DONDERO

1
2   appropriate.
3      Q.  So you wanted it to be a secret?
4         MR. BONDS:  Objection, form.
5      A.  No.  No, I wouldn't describe it as a
6   secret.  I would say I didn't think it was
7   necessary or appropriate.
8         Every executive that's ever left
9   Highland has always kept their phone number,
10  period.  Highland's never said, no, we're keeping
11  the phone number, ever, out of the two or 300
12  people that have come through Highland.  And I
13  don't believe most businesses try and retain the
14  phone number of employees when they leave.  It's
15  ludicrous on its surface.
16  BY MR. MORRIS:
17     Q.  Okay.  So let me just make sure that
18  I understand this.
19         You threw the phone -- withdrawn.
20         Somebody threw the phone that the
21  debtor bought and paid for in the garbage without
22  the debtor's knowledge or consent; is that right?
23         MR. BONDS:  Objection, form.
24     A.  I'd just repeat my testimony, that
25  it's always been our process to destroy old

Page 77

J. DONDERO

1
2   phones when we get new phones.
3   BY MR. MORRIS:
4      Q.  You were no longer an employee of the
5   debtor at the time, correct?
6      A.  At the time?  I believe I was an
7   employee of the debtor since January.
8      Q.  Well, you stayed on as an unpaid
9   employee until mid October; isn't that right?
10     A.  Right, but I -- but I don't even
11  think my phone was paid for by the debtor.  I
12  think my phone was paid for by shared services by
13  NexPoint.  I -- I don't know what you're -- I
14  don't know what you're getting at or what
15  you're -- you're asking me.
16     Q.  It's not complicated.
17         Did you tell the debtor that you
18  threw away your phone at any time until this
19  deposition?
20     A.  Did I tell the debtor?  Like I said,
21  I didn't think it was the debtor's phone.  No, I
22  did not tell the debtor or get permission.  No, I
23  did not.
24     Q.  And did you tell the debtor that you
25  were changing the phone number?

J. DONDERO

1
2    A.  No.
3        Q.  And did Mr. Ellington help you change
4    the phone number?
5        MR. BONDS:  Objection, form.
6        A.  I didn't change the phone number.
7    BY MR. MORRIS:
8        Q.  Withdrawn.
9        Did Mr. Ellington help you have the
10   phone number transitioned to your personal
11   account?
12       MR. BONDS:  Objection, form.
13       A.  No.  No.  It was Jason -- Jason
14   Rothstein handles the technology stuff and the
15   phone stuff.
16   BY MR. MORRIS:
17       Q.  Did Mr. Ellington also change his
18   phone number to his own personal account?
19       A.  My understanding was there was
20   numerous senior executives that changed their
21   phone in anticipation of being terminated by the
22   debtor shortly.
23       Q.  Who else did it?
24       A.  I don't know.  I thought it was -- I
25   didn't think it was just Ellington and I.  I

J. DONDERO

1
2    thought it was a bunch of senior execs.  But --
3        Q.  What's the basis --
4        A.  -- who cares?  Who cares?  I didn't
5    care.  I don't know.  I mean --
6        Q.  I don't care if you care or not.  I'm
7    asking you questions.
8        What is the basis for your statement
9    that other people besides you and Mr. Ellington
10   changed the phone numbers?
11       MR. BONDS:  Objection, form.
12       A.  That was my understanding.  That was
13   my understanding.  But I don't -- I don't recall
14   specifics.  I didn't pay attention.
15   BY MR. MORRIS:
16       Q.  What is the basis for the
17   understanding?  Did somebody tell you that?
18       MR. BONDS:  Can you repeat the
19   question?
20   BY MR. MORRIS:
21       Q.  What is the basis for your
22   understanding?  Did somebody tell you that
23   employees of Highland other than Mr. Ellington
24   had changed the phone numbers?
25       A.  Yes.  My understanding was everybody

J. DONDERO

1
2    had to move their phones in the next 30 days or
3    next 25 days, based on Seery's termination
4    notice.
5        Q.  Did Jim Seery -- withdrawn.  I'm
6    perfectly fine.
7        MR. MORRIS:  Can we put up Exhibit 6,
8    please.
9        (Dondero Deposition Exhibit 6
10   marked.)
11   BY MR. MORRIS:
12       Q.  That's Jason Rothstein.
13       Do you see that?
14       A.  Yes.
15       Q.  He didn't throw the phone in the
16   garbage, did he?
17       A.  I don't know.
18       Q.  Well, according to the text that he
19   sent you on December 10th, he left your own --
20   old phone in the drawer of Tara's desk.
21       Do you see that?
22       A.  Yes.
23       Q.  So he didn't think that it was his
24   responsibility as of December 10th to throw it in
25   the garbage, did he?

J. DONDERO

1
2    A.  I don't know.
3        Q.  He left it in Tara's desk, didn't he?
4        A.  On December 10th.  But I don't know
5    what he did on December 11th.
6        Q.  Did you tell him to do anything?
7        A.  I don't -- all I know is the phone's
8    been disposed of.  That's all I know.
9        Q.  Okay.  Did you tell Mr. Rothstein to
10   take the phone out of Tara's desk and throw it in
11   the garbage?
12       A.  I did not.
13       Q.  Did you tell Tara to take the phone
14   out of her desk and throw it in the garbage?
15       A.  I did not.
16       MR. MORRIS:  Okay.  Can we put up
17   Exhibit 7, please.
18       (Dondero Deposition Exhibit 7
19   marked.)
20       MR. MORRIS:  Can we just scroll down
21   a little bit.
22   BY MR. MORRIS:
23       Q.  Is this a text message from you to
24   Tara?
25       A.  Yep.

J. DONDERO

2  Q. If we could scroll up just a little
3  bit so we can see the date.
4      Well, it doesn't have a date, but do
5  you recall when you asked Tara to come in to
6  work -- (audio malfunction) --
7      (Clarification requested by the
8  stenographer.)
9  BY MR. MORRIS:
10     Q. -- to come in to work on discovery.
11  Do you recall when you sent this text message,
12  Mr. Dondero?
13     A. No.
14     Q. Do you know how Tara -- withdrawn.
15      Did Tara come in to work on discovery
16  at any time?
17     A. Yes.
18     Q. And did you give her any instructions
19  on what to do?
20     A. Again, just generally.
21     Q. What were the general instructions
22  that you gave her?
23     A. Work with the Bonds Ellis guys.
24  Here's the access to my computer and my phone.
25  Be complete and be responsive.

J. DONDERO

2  Q. Did you ever speak with Mr. Ellington
3  about your document production?
4      A. No.
5      Q. Did Mr. Ellington play any role in
6  searching for, reviewing or producing responsive
7  documents?
8      A. Nope.
9      Q. Did you ever speak with Mr. Leventon
10  about your document production?
11     A. Nope.
12     Q. Did Mr. Leventon play any role in
13  searching for, reviewing or producing responsive
14  documents?
15     A. Nope.
16     Q. Did you ever speak with anybody
17  employed by the debtor, other than Tara, about
18  your document production?
19     A. Tara's got an assistant, or my other
20  assistant that works with Tara, Kelly, would have
21  been the only other person.
22      She might have been -- Tara had to go
23  back and see her girls during lunch, so I think
24  she used Kelly to do some of the legwork.
25     Q. Let's talk about the TRO for a

J. DONDERO

2  second.
3      MR. MORRIS: Can we put up Exhibit 9,
4  please.
5      (Dondero Deposition Exhibit 9
6  marked.)
7  BY MR. MORRIS:
8      Q. This is the temporary restraining
9  order that was signed on December 10th.
10      Do you see that?
11      If we could scroll down just a little
12  bit. Yeah.
13     A. Okay.
14     Q. You've never seen this document
15  before, right?
16     A. Yes, I haven't read it.
17     Q. And I know I asked you earlier today
18  what your understanding was of how this order
19  restrained you.
20      Do you remember those questions?
21     A. Yes.
22     Q. Okay. Is there anything, upon
23  reflection, that you need to add in order to make
24  the record complete as to your understanding of
25  the scope of the injunction?

J. DONDERO

2      A. Not at this moment.
3      MR. MORRIS: Can you put up
4  Exhibit 10, please.
5      (Dondero Deposition Exhibit 10
6  marked.)
7  BY MR. MORRIS:
8      Q. All right. Have you seen this letter
9  before, sir?
10     A. No. I mean, not specifically. I
11  probably received it, but I haven't read it.
12     Q. All right. I just want to go back to
13  the phone for a second to see if I can nail this
14  down.
15      Did you dispose of the phone
16  somewhere around December 10th, 2020?
17     A. I -- I don't know. Probably.
18     Q. Well, we just looked at that e-mail,
19  right, that was from Mr. Rothstein.
20      MR. MORRIS: Can we get that back?
21     A. Yes.
22      MR. MORRIS: I just want to see what
23  the date of that was. Yes. Okay.
24  BY MR. MORRIS:
25     Q. So that's December 10th at 6:25 p.m.,

J. DONDERO

1
2 right?
3     A. Yes.
4     Q. Okay. So according to Mr. Rothstein,
5 as of that date at that time, your phone was in
6 Tara's desk, right?
7     A. Yes.
8     Q. You have no reason to disbelieve
9 that, do you?
10         MR. BONDS: Can you repeat the
11 question? I'm sorry.
12         MR. MORRIS: Withdrawn.
13 BY MR. MORRIS:
14     Q. So is it fair to say, then, that the
15 phone was disposed of and thrown in the garbage
16 sometime after December 10th?
17     A. I don't know.
18     Q. Well, as of December 10th,
19 Mr. Rothstein told you that it was in Tara's
20 desk, right?
21     A. Yes.
22     Q. Okay. So if he -- Jason's not a
23 liar, is he?
24     A. No.
25     Q. Do you have any reason to believe

J. DONDERO

1
2 that the phone was anywhere other than Tara's
3 desk at 6:25 p.m. on December 10th?
4     A. I don't know.
5     Q. You have no reason to believe that
6 that statement by Mr. Rothstein is untrue,
7 correct?
8     A. Correct.
9     Q. Do you know how it came to be that
10 the phone was disposed of in the manner that
11 you've described?
12     A. Nope.
13     Q. You can't tell me who did it; is that
14 right?
15     A. Correct.
16     Q. And you can't tell me when, after
17 December 10th, that happened, right?
18     A. Correct.
19     Q. Okay. Thank you. Let's go back to,
20 I guess, Exhibit 10. If we can just scroll down
21 a little bit.
22         I understand that you haven't seen
23 this document before. Go to the next page,
24 please -- no. Yeah, next page.
25         Do you see the first full paragraph

J. DONDERO

1
2 there beginning "On December 22nd"?
3     A. I'm going to have to get up and read
4 that. Just hold on a sec.
5     Q. Okay. Take your time.
6     A. Yes, I see that.
7     Q. Okay. Having read that paragraph, do
8 you have any basis to dispute any of the
9 statements in that paragraph?
10         MR. BONDS: I'm sorry. Can you read
11 it again or can you ask your question again?
12         MR. MORRIS: Sure. I'd like to know
13 if Mr. Dondero has any basis to dispute any
14 assertion made in that paragraph.
15     A. I disagree with every sentence in
16 that paragraph based on my 30 years of experience
17 and understanding how to operate a registered
18 investment advisor and how to do it in the
19 interest of performance, investors and a
20 registered investment advisor.
21 BY MR. MORRIS:
22     Q. All right. Let's try this
23 differently. I shouldn't have done that.
24         The first sentence, do you have any
25 basis to disagree with any aspect of the first

J. DONDERO

1
2 sentence of that paragraph? And let me just read
3 it aloud, if I may.
4     A. That -- all right. What's your
5 question?
6     Q. Is there anything inaccurate about
7 the first sentence?
8     A. I believe my instructions in the
9 e-mails we went over were to not do the trades.
10 You know, that sentence implies not settle the
11 trade, which means to not do the trades once they
12 were already bona fide. I -- I don't recall that
13 ever being my contention.
14         I would have preferred they be
15 reversed, but my instructions, I believe, in
16 everything we went over were to not do the
17 trades, stop doing trades that are adverse to the
18 interests of investors, but it wasn't regarding
19 settling outstanding trades. So I think that
20 sentence on its face is in error.
21     Q. Okay. So but it's true, then, that
22 you instructed employees of NPA and HCMFA on or
23 around December 22nd to stop doing the trades of
24 Avaya and Sky, correct?
25     A. Yes.

Page 90

1          J. DONDERO
2      Q. Near the closing bell on – we're
3  going to go back in time just a couple of days –
4  on Friday the 18th, Mr. Sowin informed you that
5  Seery wanted to sell these securities, right?
6      A. I don't recall that specifically.
7      MR. MORRIS: Okay. Can we put up
8  Exhibit 11, please.
9      (Dondero Deposition Exhibit 11
10 marked.)
11     MR. MORRIS: Okay. And if we can
12 just go down to the bottom of it. Yeah.
13 BY MR. MORRIS:
14     Q. So that e-mail at the bottom, that's
15 Mr. Seery's direction to sell Avaya securities
16 from the CLOs, right?
17     A. I don't know what's happening here.
18 I don't know if this is fuzzy or my eyes are
19 getting worse, but can we enlarge these a little
20 bit, or I'm going to have to get up each time.
21     Yeah. This is nutty and vindictive.
22 I think everybody realizes that there's no
23 liquidity in the markets the three days before
24 Thanksgiving and Christmas. There's no urgency
25 or reason to sell any of these securities that

Page 91

1          J. DONDERO
2  couldn't have waited until January or February.
3      There's no business purpose in
4  selling any of those securities, yet he's pushing
5  them through for self-serving or vindictive
6  reasons. I – or maybe trying to get more issues
7  in front of the judge. I have no idea, but
8  this – this stuff makes absolutely no sense and
9  no business purpose.
10     But I'm sorry, what's your question?
11     MR. MORRIS: Okay. I move to strike
12 and I'd ask you to listen to my question.
13 BY MR. MORRIS:
14     Q. It's simply that you learned, just
15 before the closing bell on Friday, December 18th,
16 that Mr. Seery wanted to sell Avaya securities
17 out of the CLOs?
18     MR. BONDS: Objection, form.
19     THE WITNESS: Yeah, hold on. I need
20 to interrupt for a second. When you strike
21 something, does that mean it doesn't end up in
22 the record?
23     MR. MORRIS: The judge will decide
24 whether or not it does. It's my request that the
25 judge strike it from the record. She'll make the

Page 92

1          J. DONDERO
2  ruling.
3      THE WITNESS: Okay. But then my
4  lawyer can ask to put it in as my understanding
5  of something at the end or something of the
6  deposition or...
7      MR. MORRIS: I don't want to give you
8  legal advice, Mr. Dondero, but yes, that's
9  generally how it works.
10     THE WITNESS: Okay. Thank you.
11 BY MR. MORRIS:
12     Q. So again, the question is simply
13 whether you learned near the closing bell on
14 Friday, December 18th, that Mr. Seery wanted to
15 sell Avaya shares out of the CLOs?
16     MR. BONDS: Objection, form.
17     A. It appears so.
18 BY MR. MORRIS:
19     Q. Okay. And can you just scroll up
20 above that, please. And – okay.
21     Do you see that Mr. Sowin, in fact,
22 forwards this right to you?
23     A. Yes.
24     Q. And it was on the basis of this that
25 you instructed the NPA and HCMFA employees not to

Page 93

1          J. DONDERO
2  execute these sales?
3      A. Yes.
4      Q. After the TRO was issued, did you
5  ever instruct any employees of NPA or HCMFA not
6  to interfere or impede with the debtor's
7  management of the CLOs?
8      A. No.
9      Q. To the best of your knowledge, did
10 anyone ever instruct the employees of NPA and
11 HCMFA not to interfere or impede with the
12 debtor's management of the CLOs?
13     A. No.
14     Q. Did you ever provide a copy of the
15 TRO to any employees of NPA and HCMFA?
16     A. I did not.
17     Q. Do you know if anybody ever provided
18 a copy of the TRO to any of the employees of NPA
19 and HCMFA?
20     A. I do not know.
21     MR. MORRIS: Okay. Can we put up
22 Exhibit 12, please.
23     (Dondero Deposition Exhibit 12
24 marked.)
25     ///

**Appx. 01610**

Page 94

```
1              J. DONDERO
2   BY MR. MORRIS:
3       Q.  Okay.  This is a letter that was sent
4   to K&L Gates.
5           Do you know who K&L Gates represents
6   in connection with this matter?
7       A.  Some of the retail funds.
8       Q.  And do they also represent the two
9   advisors?
10      A.  Yes.  I believe they're one of --
11  yes.
12      Q.  Attached to this letter, there's an
13  Exhibit A, if we can go down, and we'll find a
14  letter from K&L Gates there.  Okay.
15          This is another letter from K&L Gates
16  dated December 22nd, 2020.  Are you able to see
17  that, sir?  Can we scroll down a little bit?
18      A.  Yes.  Yes, I can see the letter.
19      Q.  Okay.  Were you aware that this
20  letter was sent at the time that it was?
21      A.  I was aware, yes.
22      Q.  And these are the same entities,
23  except for CLO Holdco, that had filed the prior
24  motion that was denied by the Court, right?
25      A.  I'm sorry, ask that question again.
```

Page 95

```
1              J. DONDERO
2   These were --
3       Q.  Yeah, let me just do a little
4   background.
5           A couple of -- about a week before
6   this letter was sent, the entities represented by
7   K&L Gates, except for CLO Holdco, had made a
8   motion in the bankruptcy court, right?
9       A.  Yes.
10      Q.  They had asked the Court to pause, to
11  impose a pause on the debtor from selling any CLO
12  assets; is that right?
13      A.  I don't -- I don't know what
14  exactly -- I don't know the details of what they
15  requested.
16      Q.  Okay.  Did you authorize the filing
17  of that motion?
18      A.  Authorize the filing?  I
19  championed -- I pushed and encouraged the chief
20  compliance officer and the general counsel to do
21  what they believed was right as rigorously as
22  possible, and it manifested itself in the letters
23  that you're speaking of.
24      Q.  And you -- and you approved of these
25  letters, right?
```

Page 96

```
1              J. DONDERO
2       A.  I -- not directly and not
3   specifically, but I encouraged them to do what
4   they thought was right.
5       Q.  Okay.  And you were aware that
6   letters with the substance contained in them were
7   going to be sent -- (audio malfunction) --
8           (Clarification requested by the
9   stenographer.)
10  BY MR. MORRIS:
11      Q.  -- to the debtor?
12          THE STENOGRAPHER:  And the answer
13  again, please?
14          MR. BONDS:  And I objected as to
15  form.
16          THE STENOGRAPHER:  And the answer
17  again, please?
18      A.  I was aware that letters were being
19  sent, and I was aware that motions -- or a motion
20  was being filed.
21  BY MR. MORRIS:
22      Q.  This letter was also sent on behalf
23  of CLO Holdco, Ltd.
24          Do you see that?
25      A.  Yes.
```

Page 97

```
1              J. DONDERO
2       Q.  Are you the direct or indirect
3   economic or beneficial owner of CLO Holdco, Ltd.?
4       A.  No.
5       Q.  Who is?
6       A.  I believe the DAF and HarbourVest.
7       Q.  And who controls the DAF?
8       A.  Grant Scott.
9       Q.  Who is the beneficial owner of the
10  DAF?
11      A.  Three char- -- three or four
12  charitable organizations.
13      Q.  And who controls CLO Holdco?
14      A.  I don't know exactly.
15      Q.  Do you?
16      A.  No.
17      Q.  And who are the possibilities?
18      A.  CLO Holdco, my understanding is it
19  was a -- it was an investment amalgamation
20  between HarbourVest and the DAF, so with the DAF
21  having the primary -- or the largest ownership
22  interest.
23      Q.  And with that largest ownership
24  interest, is the DAF able to control CLO Holdco?
25      A.  I don't know.  Maybe.
```

Page 98

J. DONDERO

1
2    Q. You've never asked that question?
3    A. Nope.
4    Q. Did you ever instruct any of the
5    advisors or funds to withdraw this letter?
6         MR. BONDS: Objection, form.
7    A. No.
8    BY MR. MORRIS:
9    Q. To the best of your knowledge, has
10   anyone on behalf of the advisors, the funds or
11   CLO Holdco ever instructed K&L Gates to withdraw
12   this letter?
13   A. Not that I'm aware of.
14   Q. Okay. I want to just see if I can
15   refresh your recollection a bit.
16        When you talked about the DAF and
17   HarbourVest, is it possible that you're confusing
18   that with HCLOF?
19   A. You know, you're right. It could be.
20   Maybe it is CLO Holdco -- you know what, let me
21   just -- let me not speculate. But the CLO Holdco
22   might just be the DAF, and the combined entity
23   might be the level above that. I -- I don't know
24   exactly. Let me leave it at that.
25   Q. Okay. That's fair.

Page 99

J. DONDERO

1
2         This is the -- I think you've
3    testified -- I'm trying to speed this up a little
4    bit, believe it or not -- that you supported the
5    sending of this particular letter, right? And if
6    you need to read more of it, let me know.
7    A. No, I -- again, the thrust of it, the
8    theme of it, the -- when you think bad or illegal
9    or regulatorily inappropriate stuff has happened,
10   what did you do, when you knew it, et cetera.
11   And I think the responsibilities of that
12   transcend a lot of things, you know.
13   Q. But you are aware that these very
14   same entities, except for CLO Holdco, had
15   advanced the very same arguments to the
16   bankruptcy court just six days earlier and their
17   motion is denied, right?
18        MR. BONDS: Objection, form.
19   A. Yes. And with all due respect to the
20   Court, it doesn't mean that it was wrong or
21   inappropriate to advance the argument.
22   BY MR. MORRIS:
23   Q. Okay. But having advanced the
24   argument on December 16th and having had it
25   rejected, you support these entities pressing the

Page 100

J. DONDERO

1
2    same arguments again against the debtor, right?
3    A. We try and do what's right.
4         MR. MORRIS: Okay. Can we put up
5    Exhibit 13, please.
6         (Dondero Deposition Exhibit 13
7    marked.)
8         MR. MORRIS: And if we can go to
9    Exhibit A on the back. Thanks.
10   BY MR. MORRIS:
11   Q. This is another letter sent the next
12   day, right, on December 23rd, from K&L Gates?
13   And we can scroll down further, again.
14        Do you recall that there was yet
15   another letter sent on the 23rd?
16   A. Yeah, I don't recall specifically,
17   but...
18   Q. Can we scroll down a little bit
19   further in this document.
20        Do you recall that there came a time
21   when K&L Gates, on behalf of the advisors and the
22   funds, told the debtor and its counsel that it
23   was considering initiating the process for
24   removing the debtor as portfolio manager of the
25   CLOs?

Page 101

J. DONDERO

1
2         MR. BONDS: Objection, form.
3    A. I believe they -- I don't know if
4    you're asking me a reservation of rights or
5    whatever, but I think they should do everything
6    as rigorously as possible to try and protect the
7    investors.
8    BY MR. MORRIS:
9    Q. Are you aware of any prohibition of
10   doing what you're -- withdrawn.
11        Are you aware that the debtor made an
12   offer to assign the CLO management agreements to
13   NexPoint back in the beginning of December?
14   A. I -- I do remember that, and I did
15   get a summary of that, and it was untenable in
16   terms of what it was wrapped in.
17   Q. What was untenable about it?
18   A. Off the top of my head, it would give
19   Seery releases for bad acts or inappropriate
20   trades. It required a reimbursement for, I
21   think, a million dollars of Pachulski fees
22   relative to this subject, and I think it also
23   wanted an up-front payment for the present value
24   of the future management fees to be paid to the
25   estate.

J. DONDERO

2 Q. And who made the decision to reject
3 the debtor's offer?
4 A. Made a decision to reject the --
5 reject the -- it wasn't a rejection of the offer
6 as much as a disagreement that that is the way
7 CLO contracts transfer, that the manager doesn't
8 have the right to extort from the next manager
9 when the investors want to transfer.
10 So there's a facilitation that
11 Highland could provide, but Highland is not in a
12 position, based on our understanding of the
13 market, to demand consideration.
14 Q. Okay. Who made the decision to
15 reject the offer?
16 A. I was involved in that. It wasn't a
17 formal rejection, but it was a view that it was
18 an inappropriate offer.
19 Q. Did anybody decide or suggest that
20 maybe we should make an appropriate offer?
21 A. Not yet.
22 Q. Was there any reason why, for the
23 past month, when the debtor has provided an
24 opportunity to transfer these CLO management
25 contracts, that none of the advisors or anybody

J. DONDERO

2 representing them has sought fit to make an
3 appropriate counteroffer?
4 A. We can get an appropriate
5 counteroffer out tomorrow.
6 Q. Okay. Is there anything that's
7 prevented that over the last month instead of
8 writing letters and engaging in this litigation?
9 A. The fundamental prerequisites were so
10 inappropriate that it dissuaded us from putting a
11 normal, commercial, reasonable thing forward.
12 But we'll put something commercial, reasonable
13 and appropriate through tomorrow, and we'll see
14 how far it goes.
15 Q. Did you support the sending of this
16 particular letter at the time it was sent?
17 A. I -- generally, yes.
18 Q. Okay. Have you authorized any of the
19 entities on this letter to initiate the process
20 to remove the debtor as the fund manager of any
21 CLO?
22 MR. BONDS: Objection, form.
23 A. That's not my position, and it's not
24 without legal considerations regarding what's
25 subject to a stay and what's appropriate at this

J. DONDERO

2 juncture.
3 But -- but I believe, subject to
4 whatever is legally appropriate, they should and
5 they will be moving to replace the manager as
6 quickly as possible and holding the manager
7 responsible for bad acts prior to transfer.
8 BY MR. MORRIS:
9 Q. Have you authorized any of the
10 parties that are signatory to this letter to
11 initiate the process to remove the debtor as the
12 fund manager for the CLOs?
13 A. I am not that involved. I haven't
14 authorized it per se. Again, I'm encouraging the
15 executives in charge to do the right thing, given
16 the circumstances and what's best for investors,
17 especially their retail investors and their
18 obligations under the '40 Act.
19 Q. You're the president of the two
20 advisors, right?
21 A. Yes.
22 Q. And you're the portfolio manager of
23 the funds, right?
24 A. Yes.
25 Q. Couldn't you give the direction to

J. DONDERO

2 take steps to initiate the process to remove the
3 debtor?
4 MR. BONDS: I'm sorry, can you repeat
5 the question?
6 BY MR. MORRIS:
7 Q. Don't you have the power to do that?
8 MR. BONDS: I'm sorry. I couldn't
9 hear your question.
10 MR. MORRIS: Withdrawn.
11 BY MR. MORRIS:
12 Q. Did you ever discuss with any -- with
13 anybody about whether to initiate the process to
14 remove the debtor as the portfolio manager of the
15 CLOs?
16 A. I think it's a logical remedy, and I
17 believe the executives, and particularly like the
18 executives -- the chief compliance officer always
19 has personal liability, and I think Jason Post
20 knows that, and I think he's pushing as hard as
21 he can for the benefit of investors in a
22 situation where people are moving against the
23 best interests of investors.
24 And I encourage him to move as
25 aggressively as possible subject to whatever the

J. DONDERO

1 limits of bankruptcy court is, but I can't be --
2 I've got too many other things to do to be
3 directly involved in the details, so I'm not
4 involved in the details.
5     Q. I see.
6     Did you ever instruct the parties
7 that are signatory -- withdrawn.
8     Did you ever instruct K&L Gates to
9 withdraw this letter?
10    A. No.
11    Q. To the best of your knowledge, has
12 anybody on behalf of the advisors, the funds or
13 CLO Holdco ever instructed K&L Gates to withdraw
14 this letter?
15    A. No.
16    Q. Will you commit that each of the
17 entities on whose behalf this letter was sent
18 will cease and desist from taking any steps to
19 initiate the process to remove the debtor as the
20 CLO manager?
21    MR. BONDS: Objection, form.
22    A. Say that again.
23 BY MR. MORRIS:
24    Q. Will you commit on behalf of each of
25

J. DONDERO

1 the funds and the advisors to cease and desist
2 from taking any steps to replace the debtor as
3 the portfolio manager of the CLOs?
4     A. That would be inappropriate. I'm not
5 sure it would be illegal, but I think it would be
6 a regulatory breach, and I think it would not be
7 in the best interest of investors if we were to
8 agree to anything like that. I think that's nuts
9 and it's nutty to ask that.
10    Q. People say that about me all the
11 time.
12    Did you ever exchange any e-mails or
13 texts with any employee of the parties on this
14 document, on the issue of whether or how to
15 remove the debtor as the CLO's fund manager?
16    A. Not that I recall.
17    Q. Did you ever discuss with any
18 employee of the debtor the topic of removing the
19 debtor as the portfolio manager of the CLOs?
20    A. Not that I recall.
21    MR. MORRIS: Okay. It's 1:35. Can
22 we just take a ten-minute break and resume -- is
23 it 12:35 where you are, Mr. Dondero? We'll
24 resume at 1:45 Eastern, 12:45 Central.
25

J. DONDERO

1     THE WITNESS: I'm sorry, I can't hear
2 you. We return at what time?
3     MR. MORRIS: In ten minutes, at
4 12:45.
5     MR. BONDS: And I want to say too,
6 John, that your notice showed that there was a
7 1:30 deposition Central Time of somebody else,
8 and we intend -- I mean, we planned on that, so
9 we're going to need to be through at 1:30.
10    MR. MORRIS: Yeah, you can do that if
11 you want. You can do that if you want, but the
12 record will also reflect that we started at least
13 20 minutes late and we took at least a 35-minute
14 break for Mr. Dondero. So you leave whenever you
15 want, but be guided by that.
16    Let's take a break.
17    MR. BONDS: Well, I'm telling you
18 that if you want to go forward, you can.
19    MR. MORRIS: I will. Thank you. I
20 appreciate that.
21    THE WITNESS: All right. See you
22 guys in 10 minutes.
23    THE VIDEOGRAPHER: 12:36 p.m.,
24 Central Standard Time. We're off the record.
25

J. DONDERO

1     (Recess taken, 12:36 p.m. to
2 12:49 p.m. CST)
3     THE VIDEOGRAPHER: 12:49 p.m.,
4 Central Standard Time. We're back on the record.
5 BY MR. MORRIS:
6     Q. All right. Can you hear me,
7 Mr. Dondero?
8     A. Yes.
9     Q. Is it fair -- do you think it's fair
10 to say that your personal interests are adverse
11 to the debtor's?
12    A. No.
13    Q. They asked for your resignation back
14 in October, right?
15    A. Yes.
16    Q. And you opposed the debtor's plan on
17 file, right?
18    A. Yes.
19    Q. And you objected to the debtor's
20 settlement with ACIS; is that right?
21    A. Yes.
22    Q. And you're going to object to the
23 debtor's settlement with HarbourVest; is that
24 right?
25

Page 110

```
1              J. DONDERO
2         MR. BONDS: Objection, form.
3         A. I don't know for sure. I believe so.
4   I don't know.
5   BY MR. MORRIS:
6         Q. And the debtor commenced an adversary
7   proceeding against you; is that right?
8         MR. BONDS: Objection, form.
9         A. I'm not aware of that in particular.
10  BY MR. MORRIS:
11        Q. The debtor sought and obtained a TRO
12  against you; isn't that right?
13        A. Oh. Okay, yes.
14        Q. And they also started a lawsuit?
15  They filed a complaint against you -- is that
16  right -- for preliminary and permanent injunctive
17  relief?
18        A. I'm aware of it, yes.
19        Q. And the debtor has removed you from
20  its offices, right?
21        A. Yes.
22        Q. And based on all of that, would you
23  agree that your personal interests are adverse to
24  the debtor?
25        A. No.
```

Page 111

```
1              J. DONDERO
2         Q. Okay. Since the TRO was entered,
3   have you ever discussed your litigation strategy
4   with Mr. Ellington?
5         A. Not -- no. Not that I'm aware of.
6   That's not the subject of our conversations.
7   He's more of a go-between, and he's more of an
8   overall strategist.
9         Q. And he's a strategist for your -- you
10  know, for the defense and prosecution of your
11  personal interests, right?
12        A. No.
13        Q. No?
14        Do you remember that there were
15  actually two motions on the calendar on
16  December 16th? There was the motion that you
17  brought that was called, I guess, the active
18  ordinary course transactions motion, and then
19  there was the motion brought by the K&L Gates
20  firm on behalf of -- (audio malfunction) --
21        (Clarification requested by the
22  stenographer.)
23  BY MR. MORRIS:
24        Q. -- the advisors and the funds, where
25  they sought the pause of the sale of CLO assets.
```

Page 112

```
1              J. DONDERO
2         Do you remember that those two
3   motions were on the calendar a couple of weeks
4   ago?
5         A. I remember that K&L Gates one. The
6   first one, I don't remember.
7         Q. Do you remember discussing with
8   Mr. Ellington the need for a witness for one of
9   those motions?
10        A. No. I don't remember the motion.
11        Q. Do you remember that Mr. Ellington
12  suggested that J.P. Sevilla serve as a witness
13  for one of those motions?
14        A. I don't remember that.
15        MR. MORRIS: Put up Exhibit 15,
16  please.
17        (Dondero Deposition Exhibit 15
18  marked.)
19  BY MR. MORRIS:
20        Q. If we can go down here, do you see
21  that on Saturday, December 12th, Mr. Lynn wrote
22  to you and said: It looks like a trial?
23        A. Yes.
24        Q. Can you scroll up above that, please.
25  Keep going. And then Mr. Lynn -- I'm sorry, not
```

Page 113

```
1              J. DONDERO
2   so much.
3         And then Mr. Lynn wrote: That said,
4   we must have a witness now.
5         Do you see that?
6         A. Yes.
7         Q. Now, go up to the top, and
8   Mr. Ellington writes to you and to others: It
9   will be J.P. Sevilla. I will tell him that he
10  needs to contact you first thing in the morning.
11        Have I read that correctly?
12        A. Yes.
13        Q. Now, this is after the TRO is
14  entered, right?
15        A. Like I said, I'm not -- I see my name
16  on the cc list. I don't have an awareness of
17  what this is about, so...
18        Q. Okay. Do you know what trial
19  Mr. Sevilla was going to testify at?
20        A. No.
21        Q. You didn't produce --
22        A. You can refresh my memory, but I
23  don't have a recollection from this.
24        Q. To be fair, Mr. Dondero, I don't
25  know. This is discovery, and I'm just asking a
```

**Appx. 01615**

J. DONDERO

1    J. DONDERO
2  question, if you know.
3       A. Okay.
4       Q. Do you recall if you produced this
5  e-mail in discovery?
6       A. I have no idea.
7       Q. Do you recall looking to
8  Mr. Ellington for leadership in helping to
9  coordinate all the lawyers acting on your behalf
10  and on behalf of the entities owned and
11  controlled by you?
12       A. I know I needed some coordination,
13  but I think I went in a different direction, and
14  that's why I brought on Douglas Draper, and he's
15  been functioning in that role of joint defense
16  and coordination.
17       Q. But you did tell Mr. Ellington, after
18  the TRO was entered, that you needed him to
19  provide leadership with respect to the
20  coordination of your litigation interests, right?
21       A. I -- I don't -- I don't remember.
22  Like I said, I ended up going in a different
23  direction, but I -- I don't -- I don't know as
24  far as your question is concerned.
25       MR. MORRIS: Okay. Can we put up

J. DONDERO

1    J. DONDERO
2  Exhibit 16, please.
3       (Dondero Deposition Exhibit 16
4  marked.)
5       MR. MORRIS: Scroll down to the
6  bottom. Not that far. Right there.
7  BY MR. MORRIS:
8       Q. So this is an e-mail from Mr. Draper
9  to you on December 16th.
10       Do you see that?
11       A. Yes.
12       MR. BONDS: I'm going to object.
13  Mr. Draper is a lawyer.
14       MR. MORRIS: He is. I understand
15  that.
16       MR. BONDS: Anything that was
17  produced that relates to Douglas Draper and Mike
18  Lynn and Jim Dondero is attorney-client
19  privileged.
20       MR. MORRIS: You're entitled to make
21  that assertion, but if we just look at the top so
22  we can clear this up. All the way to the top.
23  Mr. Dondero forwards this to Mr. Ellington.
24  Mr. Ellington is not Mr. Dondero's personal
25  lawyer. He is the lawyer for the debtor, and

J. DONDERO

1    J. DONDERO
2  your firm doesn't represent any business
3  interest, so there's no claim that this is
4  somehow provided pursuant to a shared services
5  agreement. Unless you can tell me that there's a
6  common -- (audio malfunction) --
7       (Clarification requested by the
8  stenographer.)
9       MR. MORRIS: -- a common interest
10  between Mr. Ellington and Mr. Dondero,
11  Mr. Dondero has waived the privilege. State your
12  position, and I'm happy to state mine, but I need
13  to ask questions.
14       Can we go back down to the bottom,
15  please. All right.
16  BY MR. MORRIS:
17       Q. So on December 16th, Mr. Draper is
18  looking to get a joint meeting together, right?
19       Do you remember that?
20       A. I'm sorry, what's the question?
21       Q. Do you recall that on or around
22  December 16th, Mr. Draper was looking to get a
23  joint meeting among all the lawyers representing
24  you and your business interests as well as the
25  employees for Highland?

J. DONDERO

1    J. DONDERO
2       A. What I do know is Douglas Draper has
3  put together a mutual defense agreement, and I
4  think the 16th is right about when he came on
5  board. He had to reach out and get people's
6  e-mails and contact information and be able to
7  coordinate it.
8       But he's now fully engaged and fully
9  functional in that role. Ellington is not
10  involved in that role at all. Can you -- but I
11  don't know exact time frames or exactly who said
12  what to who when, but go ahead, ask me whatever
13  you want.
14       Q. You mentioned a mutual defense
15  agreement. Do I have that right?
16       MR. BONDS: Objection --
17       A. I don't know what -- I don't know
18  what the legal term is.
19  BY MR. MORRIS:
20       Q. Okay. But there's a joint --
21       MR. BONDS: Don't talk about that,
22  Jim.
23       MR. MORRIS: Okay.
24  BY MR. MORRIS:
25       Q. Let me ask you this: Did Scott

1          J. DONDERO
2    Ellington participate in the drafting of the
3    joint interest or mutual defense agreement?
4          A. No.
5          Q. Did Isaac Leventon participate in the
6    drafting of a joint defense or mutual defense
7    agreement?
8          A. No.
9          Q. Did you ever discuss with either of
10   them the topic of a joint defense or a mutual
11   defense agreement?
12         A. That was entirely with Draper.
13         Q. Okay. Let's scroll up the page a
14   little bit. There's a response from Mr. Lynn.
15         Do you see that?
16         A. Yes.
17         Q. And then if we scroll up a little
18   further, you forward it to Mr. Ellington, right?
19   If we can go to the --
20         A. Yes.
21         Q. And you said: I'm going to need you
22   to provide leadership here.
23         Have I read that correctly?
24         A. Yes.
25         Q. Why did you send this e-mail string

1          J. DONDERO
2    to Mr. Ellington on December 16th?
3          A. I don't remember.
4          Q. What leadership were you looking for?
5          A. I can't piece it together from here.
6    I don't remember. I can't piece it together from
7    the e-mail, and I don't remember.
8          Q. Why did you need Mr. Ellington to
9    provide leadership?
10         A. I don't know.
11         Q. Does --
12         A. I don't remember.
13         Q. Okay. Does looking at the topic, a
14   list for a joint meeting, refresh your
15   recollection that you wanted Mr. Ellington to
16   coordinate all of the lawyers working on your
17   behalf and on behalf of the entities in which you
18   own an interest?
19         A. No. I mean, because that was the
20   beginning of the string, but the middle of the
21   string starts going in different directions. I
22   can't say -- I can't say what I wanted him to
23   have leadership with.
24         Q. Can you think of any -- any issue at
25   all, looking at this e-mail string, as to what he

1          J. DONDERO
2    would be providing leadership for if it's not to
3    coordinate your defense counsel?
4          A. I don't want to speculate, but
5    again -- I don't want to speculate, but again,
6    the middle of the string looks like it goes in
7    different directions than just forming the mutual
8    defense thing.
9          Q. Okay. So you have no recollection
10   why you forwarded this e-mail to Mr. Ellington on
11   December 16th and why you told him that you need
12   him to provide leadership here; is that your
13   testimony?
14         A. Correct.
15         Q. Is Mr. Ellington a party to any joint
16   defense or mutual defense agreement that you're a
17   party to?
18         A. I believe the employees' counsel is
19   part of the working group, although I've been on
20   calls when the employees' counsel has been on and
21   when it hasn't. But I don't even -- I think the
22   employee group is divided into a couple different
23   groups, and I don't know if Ellington is part of
24   both groups.
25         But I -- Ellington individually is

1          J. DONDERO
2    not part of the working group, and I'm not sure
3    which, if one or both, of the employee groups
4    he's in.
5          Q. So there's two employee groups; is
6    that right?
7          A. I'm beyond my involvement and
8    expertise, but I thought there were two employee
9    groups, but I don't even know that for sure.
10         Q. And has your counsel conferred with
11   counsel for either or both of the employee
12   groups?
13         MR. BONDS: I'm sorry, can you repeat
14   the question?
15         MR. MORRIS: Yes.
16   BY MR. MORRIS:
17         Q. Has your counsel at Bonds Ellis
18   conferred with counsel for either or both of the
19   employee groups?
20         A. I don't know.
21         MR. MORRIS: John, I would call for
22   the immediate production of any --
23         MR. BONDS: I don't think we have it,
24   but I can check on that.
25         MR. MORRIS: I would call for the

J. DONDERO

2 immediate production of any joint defense or
3 mutual defense agreement to which any debtor
4 employee is a party –
5        MR. BONDS: I don't think that there
6 are any.
7        MR. MORRIS: And I would call for any
8 drafts, okay?
9        MR. BONDS: Again, I don't think
10 there are any.
11        MR. MORRIS: Okay. You can give me
12 that representation.
13 BY MR. MORRIS:
14        Q. Let's look at the top, at
15 Mr. Ellington's response. And what did he tell
16 you in response to your statement that you need
17 him to provide leadership?
18        A. You mean the two words there?
19        Q. Yep.
20        A. It looks like he typed back: On it.
21        Q. Yeah.
22        Did Mr. Ellington subsequently
23 provide leadership, as you had asked?
24        A. I don't remember. Nothing I can
25 recall.

J. DONDERO

2        Q. Did Mr. Ellington ever participate in
3 any conference calls with your counsel at Bonds
4 Ellis?
5        A. Not that – not that I recall.
6 Ellington's time has been spent primarily, the
7 vast majority, representing and working with the
8 employee group. I know that. It's been
9 difficult to get his attention on anything else
10 so –
11        Q. Listen carefully to my question. I'm
12 not asking you to tell me what Mr. Ellington
13 does. I'm simply asking whether you know that
14 Mr. Ellington has participated in conference
15 calls with your counsel at Bonds Ellis at any
16 time after December 10th.
17        A. I don't know.
18        Q. Did you ever participate in any calls
19 with Mr. Ellington and any lawyer at Bonds Ellis?
20        A. Over the year, for sure. There have
21 been – earlier in the year there were several
22 times, but I can't recall one recently.
23        Q. So you have no recollection of ever
24 participating in a phone call with Mr. Ellington
25 and any lawyer at Bonds Ellis at any time since

J. DONDERO

2 December 10th; is that your testimony?
3        A. I – I can't recall. I'm willing to
4 be refreshed. I can't recall. There were –
5 there were – some of the calls that stick out in
6 my mind I believe occurred prior to that date, so
7 I can't – I can't recall any post that date.
8        Q. Okay. You didn't produce this e-mail
9 in response to the Court's order, did you?
10        A. I don't know.
11        Q. And that's because you didn't take
12 the time to look at the production before it was
13 delivered to my firm, right?
14        A. I – I believe the – yeah, I mean,
15 it's a process I don't – I don't get directly
16 involved in. Counsel has to decide what's
17 responsive, what's privileged, what's complete,
18 what's appropriate. That's not my job.
19        Q. Are you aware that any documents for
20 which a privilege was asserted were supposed to
21 be delivered to the Court last December 31st?
22        A. I'm not saying that's what – I have
23 no idea whether we produced this or didn't
24 produce it. And if we didn't, I don't know why.
25        Q. Do you know that the UCC has asked

J. DONDERO

2 for the financial statements for Dugaboy and Get
3 Good?
4        MR. BONDS: Objection, you're going
5 far afield from where we're – this TRO.
6        MR. MORRIS: You can take that
7 position if you want, but I assure you, when I'm
8 done, you'll understand.
9        MR. BONDS: I'm going to instruct the
10 witness not to answer the question.
11        MR. MORRIS: You're not going to let
12 him answer as to whether or not the UCC wanted
13 the Dugaboy and Get Good financial statements?
14        MR. BONDS: I can't hear you.
15        MR. MORRIS: Yeah, I apologize.
16 It's – it's not me, John. Let me just ask
17 again. Are you – you're going to instruct your
18 witness not to answer the question of whether he
19 knew that the UCC wanted the Dugaboy and Get Good
20 financial statements?
21        MR. BONDS: I'll let you go one –
22 you can ask that one question. But anything
23 further into Dugaboy is not something that is for
24 the Court to determine at this point in this
25 case.

J. DONDERO

1
2     MR. MORRIS: Okay.
3         So you can answer that question, sir.
4     A. I think there have been several times
5 over the last year that Dugaboy financials have
6 been requested by a variety of entities. I don't
7 know when or recently or if the UCC requested it
8 recently.
9 BY MR. MORRIS:
10    Q. You know a number of different
11 parties have asked for the Dugaboy and Get Good
12 financial statements; is that right?
13        MR. BONDS: I'm going to object to
14 any answer that you may give following up on
15 Dugaboy. Dugaboy is not subject to the TRO and
16 you're stuck with your adversary proceeding.
17        MR. MORRIS: John, there is a text
18 message that we're going to get to in a moment,
19 so I'll end the suspense. Mr. Dondero
20 specifically says: Don't produce the Dugaboy
21 financial statements without a subpoena. Those
22 documents were in the debtor's possession. I
23 will tell you that I personally made at least a
24 half a dozen requests of Mr. Ellington and
25 Mr. Leventon for those documents.

J. DONDERO

1
2         I will tell you that Jim Seery
3 instructed them to provide those documents
4 because they're in the debtor's possession,
5 custody and control.
6         I will tell you that there's no
7 shared services agreement between Dugaboy or Get
8 Good and the debtor, and there is no basis for
9 those – for Mr. Ellington and Mr. Leventon to
10 have obstructed the debtor's obligation to
11 provide those documents except in Mr. Dondero's
12 hands.
13        MR. BONDS: I'm going to instruct the
14 witness not to answer the question.
15        MR. MORRIS: I think that might be a
16 good idea. On what basis?
17        MR. BONDS: I don't need to give a
18 basis. I think that you've gone far, far from
19 what we're here on today, which is --
20        MR. MORRIS: I believe that it's --
21        MR. BONDS: -- specifically --
22        MR. MORRIS: I'm sorry to interrupt.
23 Go ahead, John.
24        MR. BONDS: Specifically, it's the
25 TRO and the injunction.

J. DONDERO

1
2     MR. MORRIS: Correct. And the TRO
3 specifically -- I know Mr. Dondero doesn't know
4 this because he hasn't read the document, but in
5 addition to the things that he mentioned, it also
6 prevents him from interfering with the debtor's
7 business.
8         The debtor is a litigant here. The
9 debtor has an obligation to provide these
10 documents. And he interfered with that
11 obligation.
12        Let me ask my questions and you can
13 direct him not to answer every single time if you
14 want, okay?
15        MR. BONDS: Okay.
16 BY MR. MORRIS:
17    Q. Do you know a woman named Melissa,
18 Mr. Dondero?
19    A. Yes.
20    Q. And who is that?
21    A. She's my personal accountant.
22    Q. Does she work at the Highland
23 offices?
24    A. Yes.
25    Q. Is she employed by the debtor?

J. DONDERO

1
2     A. I believe so.
3     Q. Do you know what her title is?
4     A. No.
5     Q. Do you directly or indirectly
6 control – withdrawn.
7         Do you directly or indirectly own
8 Dugaboy?
9     A. No.
10    Q. Who owns Dugaboy?
11        MR. BONDS: I'm going to instruct the
12 witness not to answer that question.
13        MR. MORRIS: Are you going to follow
14 your counselor's advice?
15        THE WITNESS: Yes.
16 BY MR. MORRIS:
17    Q. Who controls Dugaboy?
18        MR. BONDS: I'm going to instruct the
19 witness not to answer that question, for the
20 second time.
21        MR. MORRIS: Are you going to
22 follow -- yeah, we'll do this every time, John,
23 just for the record.
24        MR. BONDS: That's fine.
25        MR. MORRIS: So I apologize. I

Page 130

J. DONDERO

1
2 appreciate, you know, you do your job, I'll do
3 mine.
4     Mr. Dondero, are you going to follow
5 your counsel's advice?
6     THE WITNESS: Yes.
7 BY MR. MORRIS:
8     Q. To the best of your knowledge,
9 Dugaboy does not have a shared services agreement
10 with the debtor, correct?
11     You can answer, sir.
12     THE WITNESS: I'm not answering,
13 right? I'm not answering any questions on this
14 subject.
15     MR. MORRIS: Only if your lawyer
16 instructs you to do that, and he hasn't done that
17 for this question.
18     MR. BONDS: I'm going to instruct the
19 witness not to answer the question.
20     MR. MORRIS: You're not going to let
21 him answer whether Dugaboy has a shared services
22 agreement with the debtor?
23     MR. BONDS: I think that you're
24 entitled to that, so Jim, you can answer that
25 question.

Page 131

J. DONDERO

1
2     A. I -- I don't know.
3 BY MR. MORRIS:
4     Q. Okay. Are you familiar with an
5 entity called Get Good?
6     A. Yes.
7     Q. Do you directly or indirectly own Get
8 Good?
9     A. No.
10     Q. Do you control, directly or
11 indirectly, Get Good?
12     A. I don't believe so.
13     Q. Who owns Get Good?
14     MR. BONDS: I'm going to instruct the
15 witness not to answer the question.
16     MR. MORRIS: Are you going to follow
17 your counselor's advice?
18     THE WITNESS: Yes.
19 BY MR. MORRIS:
20     Q. Who controls Get Good?
21     MR. BONDS: Instruct the witness not
22 to answer the question.
23     MR. MORRIS: Are you going to follow
24 your counselor's advice, Mr. Dondero?
25     THE WITNESS: I'm going to follow his

Page 132

J. DONDERO

1
2 advice, yes.
3 BY MR. MORRIS:
4     Q. To the best of your knowledge, Get
5 Good does not have a shared services agreement
6 with the debtor, does it?
7     THE WITNESS: Can I answer that or
8 not answer that one?
9     MR. BONDS: Yes, you can.
10     A. I don't know.
11 BY MR. MORRIS:
12     Q. Did you ever discuss the request by
13 any party to produce the financial statements of
14 Get Good and Dugaboy with Scott Ellington?
15     MR. BONDS: I'm going to tell you --
16 advise you not to answer the question.
17     MR. MORRIS: Are you going to follow
18 your counselor's advice?
19     THE WITNESS: Yes.
20 BY MR. MORRIS:
21     Q. Did you ever communicate with
22 Mr. Leventon on the subject matter of whether or
23 not the financial statements for Get Good and
24 Dugaboy needed to be produced by the debtor?
25     MR. BONDS: I'm going to advise the

Page 133

J. DONDERO

1
2 witness not to answer the question.
3     MR. MORRIS: Are you going to follow
4 your counselor's advice?
5     THE WITNESS: Yes.
6 BY MR. MORRIS:
7     Q. Did you ever communicate with anybody
8 at any time who was employed by the debtor
9 regarding the production of the Dugaboy and Get
10 Good financial statements?
11     MR. BONDS: I'm going to instruct the
12 witness not to answer the question.
13     MR. MORRIS: Are you going to follow
14 your counselor's advice?
15     THE WITNESS: Yes.
16 BY MR. MORRIS:
17     Q. Melissa is Melissa Schroth, right?
18     A. Yes.
19     Q. She's an executive accountant
20 employed by the debtor, right?
21     A. Yes.
22     Q. And after December 10th, 2020
23 Ms. Schroth told you that a request had been made
24 for the production of the Dugaboy financial
25 statements, correct?

Page 134

J. DONDERO

1
2      MR. BONDS: You can answer the
3  question.
4      A. I don't remember.
5      MR. MORRIS: Okay. Can we put up
6  Exhibit 17, please.
7      (Dondero Deposition Exhibit 17
8  marked.)
9      MR. MORRIS: Can you scroll down a
10  little bit? I'm sorry. Scroll up so we can see
11  who this text was sent to.
12  BY MR. MORRIS:
13      Q. Is that Melissa Schroth?
14      A. Yes.
15      Q. And if we scroll back down, do you
16  see that you tell Ms. Schroth on December 16th:
17  No Dugaboy details without a subpoena?
18      A. Yes.
19      Q. That's a text that you sent to her on
20  December 16th, correct?
21      A. I believe so.
22      Q. What prompted you to send this text?
23      A. I don't know.
24      Q. You don't have any recollection as to
25  why you would tell Melissa, quote, no Dugaboy

Page 135

J. DONDERO

1
2  details without a subpoena?
3      A. No, but that would -- I mean, I stand
4  behind that response, but I don't remember why.
5      Q. Do you remember who was asking for
6  the documents?
7      A. Nope.
8      Q. Do you remember any discussion with
9  any person at any time concerning the production
10  of the Dugaboy or Get Good financial statements?
11      A. Nope.
12      Q. Do you have any objection to the
13  debtor producing the Dugaboy and Get Good
14  financial statements?
15      A. I'm sorry, say that again?
16      Q. Would you consent to the debtor's
17  production of the Get Good and Dugaboy financial
18  statements?
19      A. With a subpoena. I stand by that
20  statement, yeah.
21      Q. Okay. Do you know of any reason why
22  Mr. Ellington and Mr. Leventon would have failed
23  to respond to Mr. Seery's instruction to produce
24  the Dugaboy and Get Good financial statements
25  that were requested by the -- (audio

Page 136

J. DONDERO

1
2  malfunction) --
3      (Clarification requested by the
4  stenographer.)
5  BY MR. MORRIS:
6      Q. -- UCC?
7      A. I don't want to speculate.
8      Q. Have you heard of the law firm
9  Baker & McKenzie?
10      A. Yes.
11      Q. Does that firm or any lawyer at that
12  firm represent you in your individual capacity?
13      A. No.
14      Q. Does that firm or any lawyer at that
15  firm represent any entity in which you have a
16  direct or indirect ownership interest?
17      A. No. Not that I'm aware of, no.
18      Q. I'm sorry, one second.
19      Does that firm or any lawyer at that
20  firm represent any entity that you directly or
21  indirectly control?
22      A. Not that I'm aware of.
23      Q. Do you recall asking Isaac Leventon
24  for the contact information for the -- for the
25  lawyers at Baker & McKenzie?

Page 137

J. DONDERO

1
2      A. I -- I don't -- I don't -- it might
3  have been for part of the shared defense, mutual
4  defense, whatever, agreement, but that's --
5  that's the only reason why I would have asked for
6  it.
7      Q. Okay. What's your understanding as
8  to -- (audio malfunction) --
9      (Clarification requested by the
10  stenographer.)
11  BY MR. MORRIS:
12      Q. -- the parties to that mutual defense
13  agreement that you just referred to, or shared
14  defense?
15      A. I -- it's what I've testified
16  already, Douglas Draper is coordinating it.
17  I'm -- I'm not sure whether the employees are on
18  it or not, and I'm not sure if there's one
19  employee group or two employee groups, and I'm
20  not sure if one or both of them are part of that
21  agreement or not.
22      But the -- in recent history, my only
23  awareness of Baker McKenzie is with regard to
24  representing the employees. That's my only
25  awareness of that firm.

1            J. DONDERO
2      Q. Have you ever spoken with an attorney
3   at Baker McKenzie?
4      A. No, I have not.
5         MR. MORRIS: Okay. Can you put up
6   Exhibit 18, please.
7         (Dondero Deposition Exhibit 18
8   marked.)
9   BY MR. MORRIS:
10     Q. That's Mr. Leventon. Do I have that
11  right?
12     A. Yes.
13     Q. And you're communicating with him on
14  or around -- after December 10th, right?
15     A. Yes.
16     Q. Okay. And if you could scroll down a
17  little bit, right there, on December 22nd, you
18  asked Mr. Leventon to send you the Baker &
19  McKenzie contact person, right?
20     A. Yes.
21     Q. And if you scroll down a little bit.
22  Did he ever send that to you?
23     A. I'm sorry?
24     Q. Did he ever send that to you?
25     A. I don't know. I don't remember.

1            J. DONDERO
2      Q. Why did you want the Baker & McKenzie
3   contact information?
4      A. I was trying to help Draper
5   coordinate the mutual shared defense agreement.
6      Q. And it was your intent and desire to
7   have the Baker McKenzie firm participate in that
8   agreement, right?
9      A. No. I'm not a lawyer. The
10  appropriateness of who's in that group under what
11  circumstances representing who was a legal
12  decision made by Draper.
13     Q. So why didn't you just have Draper
14  deal with this? Why did you deal with it?
15     A. He was scurrying around, moving
16  quickly, trying to get contact information for
17  potential various different parties. I was just
18  helping him get the contact information.
19     Q. And you --
20        MR. BONDS: I'm going to instruct you
21  not to say anything relating to this as far as
22  what he and Draper discussed.
23  BY MR. MORRIS:
24     Q. You were aware at the time that you
25  asked for the Baker & McKenzie contact

1            J. DONDERO
2   information that Baker & McKenzie was a law firm
3   that -- that employees were considering retaining
4   for their personal interests, right?
5      A. I knew they were involved with the
6   employees. Whether -- whether or when they were
7   engaged and by which employee group and -- I
8   don't have details like that. I never did.
9      Q. But the one thing that you did know,
10  when you asked for the Baker & McKenzie contact
11  information, is that Baker & McKenzie would be
12  representing some group of Highland employees,
13  correct?
14     A. Or they might be. Or they were being
15  interviewed at the time. I think they weren't
16  formally engaged until later. I don't know these
17  details and never did.
18        MR. BONDS: I'm going to instruct the
19  witness --
20        THE WITNESS: I'm sorry, what?
21        MR. BONDS: You need to stop.
22        THE WITNESS: Okay.
23        MR. MORRIS: Why is that? Please
24  don't interrupt the witness. Assert the
25  privilege if you want, direct him not to answer,

1            J. DONDERO
2   but don't interrupt his answers.
3   BY MR. MORRIS:
4      Q. Baker McKenzie was ultimately
5   retained by some group of the debtor's employees,
6   correct?
7      A. I believe so.
8      Q. Do you know how Baker McKenzie got
9   their retainer, their retainer money?
10     A. No idea.
11     Q. Do you know -- are you familiar with
12  an entity called Gov Re?
13     A. Yes.
14     Q. What's Gov Re?
15     A. It's a Bermuda-based reinsurance
16  company.
17     Q. Do you have an ownership interest in
18  Gov Re?
19     A. I don't know.
20     Q. Do any -- do any entities in which
21  you have an interest have an ownership interest
22  in Gov Re?
23     A. I don't know.
24     Q. Do you know who controls Gov Re?
25     A. I don't know.

Page 142

J. DONDERO

1          J. DONDERO
2    Q. Do you make any decisions on behalf
3 of Gov Re?
4    A. Not recently. Not in the last year.
5 In prior years, I think I've helped them with
6 investments and some strategy, but not recently.
7    Q. Do you know whether Gov Re has made
8 any payment to Baker & McKenzie in the last
9 30 days?
10    A. I have no idea.
11    Q. Did you ever have a communication
12 with anybody at any time in the last 30 days as
13 to -- (audio malfunction) --
14    (Clarification requested by the
15 stenographer.)
16 BY MR. MORRIS:
17    Q. -- as to whether Gov Re would pay
18 money to Baker & McKenzie on behalf of some of
19 the debtor's employees.
20    A. Nope. No, I have no idea. I've
21 never heard the daisy chain you're connecting.
22 I've never heard it before.
23    MR. MORRIS: Let's take a break. I
24 might be finished. The time now is 2:32, or 1:32
25 Central. Let's just come back sharply at 1:45,

Page 143

J. DONDERO

1          J. DONDERO
2 or 2:45.
3    THE VIDEOGRAPHER: 1:32 p.m. Central
4 Standard Time. We're off the record.
5    (Recess taken, 1:32 p.m. to
6 1:50 p.m. CST)
7    THE VIDEOGRAPHER: 1:50 p.m. Central
8 Standard Time. We're back on the record.
9 BY MR. MORRIS:
10    Q. I just have a few more minutes here.
11    Going back to Gov Re, Mr. Dondero,
12 are you on the board of that entity?
13    A. I don't know.
14    Q. Can you identify any person who sits
15 on that board?
16    A. No.
17    Q. Do you know how many people sit on
18 that board?
19    A. No.
20    Q. Do you have an understanding as to
21 who makes decisions as to whether or not Gov Re
22 should make -- (audio malfunction) --
23    (Clarification requested by the
24 stenographer.)
25    MR. MORRIS: Withdrawn.

Page 144

J. DONDERO

1          J. DONDERO
2 BY MR. MORRIS:
3    Q. Mr. Dondero, do you know who makes
4 decisions on behalf of Gov Re as to whether or
5 not to make payments on claims?
6    A. No.
7    Q. Did you ever participate in any
8 decisions concerning the payment of claims made
9 under a Gov Re policy?
10    A. Not in five years. I think I was
11 more involved five years ago, but I don't
12 remember.
13    Q. So you don't know if you sit on the
14 board of directors, you don't know who makes
15 decisions to pay claims, and you can't identify
16 any members of the board; is that right?
17    A. Correct.
18    Q. Okay. And you don't know if you have
19 an indirect or direct ownership interest in
20 Gov Re; is that right?
21    A. Correct.
22    Q. Okay. You've spent some time over
23 the last months trying to put together a
24 so-called pot plan; is that right?
25    A. Yes.

Page 145

J. DONDERO

1          J. DONDERO
2    Q. Since December 10th, 2020, have you
3 had any communications with any employee of the
4 debtor concerning the pot plan?
5    A. It's been a struggle to put together
6 a pot plan. There's been an intentional block of
7 any information, even assets, at Highland, so any
8 pot plan is a stab in the dark for me when I put
9 it forward, relative to current assets and likely
10 outcome.
11    But developing the pot plan has been
12 something I think that's been applauded by the
13 judge; at different times it's been encouraged by
14 creditors, you know. But the only people -- Dave
15 Klos has helped with creating the model so that
16 the model makes sense and adds up and is
17 distributable. Dave Klos has been the person
18 that I've accessed throughout the year regarding
19 the pot plan.
20    Q. And is it fair to say that you've
21 communicated with Mr. Klos about the pot plan
22 since December 10th, 2020?
23    A. Probably. You know, to the extent
24 that the pot plan has come up, been considered or
25 distributed, yes.

Page 146

J. DONDERO

2    Q.  Okay.  Can you identify any other
3  employees of the debtor with whom you've
4  discussed the pot plan with since December 10th,
5  2020?
6    A.  No.
7    Q.  Did you discuss it with
8  Mr. Waterhouse?
9    A.  Mr. Waterhouse is Klos' direct
10  supervisor.  He probably had an awareness of it
11  from those conversations.  I don't recall.  I
12  mean, I don't – maybe – I mean, there have
13  been, maybe, peripherally, not significant, I
14  don't think, since the 16th, but I don't recall.
15    Q.  Did you ever get any balance sheets
16  or financial information about MultiStrat from
17  Scott Ellington?
18    A.  No.
19    Q.  Did you ever get any financial
20  information, including balance sheets, concerning
21  MultiStrat, from Isaac Leventon?
22    A.  No.  They – I wouldn't believe that
23  those guys would have it.  I wouldn't even think
24  to ask them for it.  It wouldn't be – I don't
25  think it's natural for them to have it.  But no,

Page 147

J. DONDERO

1  I never did, no.
2    MR. MORRIS:  Okay.  I have no further
3  questions, just two points that I'd like to make.
4    John, will you agree on behalf of
5  Mr. Dondero to have him appear at Friday's
6  hearing when the preliminary injunction takes
7  place or do I need to serve a subpoena?
8    MR. BONDS:  No, we haven't made that
9  decision yet.
10    MR. MORRIS:  Okay.  Will you accept a
11  subpoena on behalf of Mr. Dondero?
12    MR. BONDS:  Sure.
13    MR. MORRIS:  Okay.  We'll get that
14  over to you tomorrow.
15    And then lastly, the deposition of
16  Andrew Clubok has been adjourned to a date to be
17  determined.
18    MR. BONDS:  Okay.
19    MR. MORRIS:  Thank you very much,
20  all.
21    MR. BONDS:  Thanks.
22    THE VIDEOGRAPHER:  1:56 p.m. –
23  1:57 p.m. Central Standard Time.  We're off the
24  record.  This concludes the deposition.
25

Page 148

1          J. DONDERO
2      (Time noted: 1:57 p.m. CST)
3
4
5
6
7
8      _____
9      JAMES D. DONDERO
10
11  Subscribed and sworn to before me this _____
12  day of _____, 20____.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

1
2        C E R T I F I C A T E
3
4    I, MICHAEL E. MILLER, FAPR, RDR, CRR,
5  Notary Public in and for the State of Texas, do
6  hereby certify:
7    That JAMES D. DONDERO, the witness
8  whose deposition is hereinbefore set forth, was
9  duly sworn by me and that such deposition is a
10  true record of the testimony given by such
11  witness;
12    That pursuant to FRCP Rule 30,
13  signature of the witness was not requested by the
14  witness or other party before the conclusion of
15  the deposition;
16    I further certify that I am not
17  related to any of the parties to this action by
18  blood or marriage; and that I am in no way
19  interested in the outcome of this matter.
20    IN WITNESS WHEREOF, I have hereunto
21  set my hand on January 5, 2021.
22
23    _____
24  MICHAEL E. MILLER, FAPR, RDR, CRR
25  NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

Page 150

```
 1
 2      ----------------- I N D E X -----------------
 3
 4   WITNESS:  JAMES D. DONDERO
 5   EXAMINATION:                        PAGE
 6   BY MR. MORRIS                       8
 7
 8
 9     ---- LITIGATION SUPPORT INDEX ----   PAGE
10   Instruction Not To Answer          125
11   Instruction Not To Answer          125
12   Instruction Not To Answer          129
13   Instruction Not To Answer          130
14   Instruction Not To Answer          131
15   Instruction Not To Answer          131
16   Instruction Not To Answer          133
17   Instruction Not To Answer          133
18   Instruction Not To Answer          139
19   Instruction Not To Answer          140
20
21
22
23
24
25
```

Page 151

```
 1
 2            ---- E X H I B I T S ----
 3   EXHIBIT                          PAGE
 4   Exhibit 1   10/16/20 NexPoint Letter to    31
 5       Seery
 6   Exhibit 2   11/24/20 NexPoint Letter to    35
 7       Seery
 8   Exhibit 3   E-mail(s)                   39
 9   Exhibit 4   Dondero Text Messages       62
10   Exhibit 5   Request for Production of   67
11       Documents
12   Exhibit 6   Dondero Text Messages with  80
13       Jason Rothstein
14       Dondero_000022
15   Exhibit 7   Dondero Text Messages with Tara  81
16       Loiben
17       Dondero_000013
18   Exhibit 8   Skipped in Series
19   Exhibit 9   Temporary Restraining Order  84
20   Exhibit 10  12/23/20 Pachulski Letter to  85
21       Lynn
22   Exhibit 11  E-mail(s)                   90
23   Exhibit 12  12/24/20 Pachulski Letter to  93
24       Wright
25
```

Page 152

```
 1
 2   Exhibit 13   12/24/20 Pachulski Letter to    100
 3       Wright
 4   Exhibit 14   Skipped in Series
 5   Exhibit 15   E-mail(s)                   112
 6   Exhibit 16   E-mail(s)                   115
 7   Exhibit 17   Dondero Text Messages with  134
 8       Melissa Schroth
 9       Dondero_000014
10   Exhibit 18   Dondero Text Messages with  138
11       Isaac Leventon
12       Dondero_000043
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 153

```
 1
 2   ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name:     IN RE HIGHLAND/HIGHLAND v. DONDERO
 4   Dep. Date:     January 5, 2021
 5   Deponent:      JAMES D. DONDERO
 6   Pg. Ln.   Now Reads    Should Read    Reason
 7   ___ ___  _____  _____  _____
 8   ___ ___  _____  _____  _____
 9   ___ ___  _____  _____  _____
10   ___ ___  _____  _____  _____
11   ___ ___  _____  _____  _____
12   ___ ___  _____  _____  _____
13   ___ ___  _____  _____  _____
14   ___ ___  _____  _____  _____
15   ___ ___  _____  _____  _____
16   ___ ___  _____  _____  _____
17
18
19       _____
20            Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS _____ DAY OF _____, 20____.
23
24   _____
25   (Notary Public) MY COMMISSION EXPIRES: _____
```

Appx. 01625

**1**

**1** 7:8 30:25 31:2,3 35:5 36:15,24 37:13 44:17

**10** 60:18 85:4,5 87:20 108:23

**10:41** 47:24 48:2

**10th** 12:17 70:15 80:19,24 81:4 84:9 85:16,25 86:16,18 87:3,17 123:16 124:2 133:22 138:14 145:2, 22 146:4

**11** 7:13 90:8,9

**11:16** 48:3,4

**11th** 81:5

**12** 93:22,23

**12:35** 107:24

**12:36** 108:24 109:2

**12:45** 107:25 108:5

**12:49** 109:3,4

**12th** 112:21

**13** 100:5,6

**15** 46:24 47:22 112:15,17

**16** 115:2,3

**16th** 31:18 99:24 111:16 115:9 116:17, 22 117:4 119:2 120:11 134:16,20 146:14

**17** 134:6,7

**18** 138:6,7

**18th** 90:4 91:15 92:14

**19-34054-sgj11** 7:14

**1:30** 108:8,10

**1:32** 142:24 143:3,5

**1:35** 107:22

**1:45** 107:25 142:25

**1:50** 143:6,7

**1:56** 147:23

**1:57** 147:24

**2**

**2** 34:24,25 36:15,25 37:14 44:17

**20** 34:22 108:14

**20-03190-sgj** 7:23

**2020** 9:5 35:10 60:8, 18 69:10,18 70:15 85:16 94:16 133:22 145:2,22 146:5

**2021** 6:4 7:10

**22nd** 88:2 89:23 94:16 138:17

**23rd** 100:12,15

**24** 35:10

**25** 80:3

**27th** 60:24

**2:32** 142:24

**2:45** 143:2

**3**

**3** 38:24 39:2 70:9

**30** 6:22 73:25 80:2 88:16 142:9,12

**300** 76:11

**31st** 9:5 124:21

**35-minute** 108:14

**4**

**4** 62:12,14

**40** 104:18

**5**

**5** 6:4 64:22 67:14,15

**5:26** 62:20,24

**5th** 7:10

**6**

**6** 80:7,9

**6:25** 85:25 87:3

**7**

**7** 81:17,18

**9**

**9** 84:3,5

**9:50** 6:4

**9:52** 7:10

**A**

**a.m.** 6:4 7:10 47:24 48:2,3,4

**ability** 12:12 24:16, 18 26:11

**absolutely** 91:8

**accept** 147:11

**access** 69:8 82:24

**accessed** 145:18

**accommodate** 47:16

**account** 54:3 56:2 75:18 78:11,18

**accountant** 128:21 133:19

**accounts** 56:5

**ACIS** 109:21

**acknowledge** 26:2,9

**acknowledged** 41:3

**acknowledging** 23:20 25:21,23

**Act** 63:5 104:18

**acting** 114:9

**action** 46:5 63:6,23

**actions** 63:22

**active** 111:17

**activities** 63:15

**activity** 46:5

**acts** 101:19 104:7

**acute** 61:2

**acutely** 61:8

**add** 84:23

**addition** 128:5

**address** 39:24 40:3, 4 69:11,12,15,19,20, 22,23,24

**addresses** 39:23

**adds** 145:16

**adhered** 26:6

**adjourned** 147:17

**admissible** 6:20

**admit** 24:7

**advance** 59:13 99:21

**advanced** 99:15,23

**adversary** 7:21 10:7 110:6 126:16

**adverse** 89:17 109:11 110:23

**advice** 92:8 129:14 130:5 131:17,24 132:2,18 133:4,14

**advise** 132:16,25

**advised** 36:23

**Advisers** 63:4

**advisor** 24:14,20,22 25:4 26:7 88:18,20

**advisor's** 26:5

**advisors** 14:14 17:18 18:23 19:5,7,8, 18,22 20:6,7,10,15, 21 22:12,21 23:12 24:10 29:22 35:21 54:18 56:24 58:23 94:9 98:5,10 100:21 102:25 104:20 106:13 107:2 111:24

**Advisors'** 19:24

**advisory** 17:21 18:25

**affect** 12:8

**affirmatively** 24:5 25:21,23

**afield** 125:5

**afternoon** 43:16

**aggressively** 105:25

**agree** 6:24 7:3 17:3 55:3 107:9 110:23 147:5

**agreeing** 23:20

**agreement** 27:4 116:5 117:3,15 118:3,7,11 120:16 122:3 127:7 130:9,22 132:5 137:4,13,21 139:5,8

**agreements** 17:16 27:14 28:7,19 29:12 30:6 101:12

**ahead** 24:3 117:12 127:23

**alert** 36:7 59:16

**allegations** 36:24

**alleged** 15:9,12

**aloud** 89:3

**amalgamation** 97:19

**amounts** 63:19

**analysis** 37:11,15

**Andrew** 147:17

**answering** 130:12, 13

**answers** 141:2

**anticipation** 72:6 74:11 78:21

**anymore** 74:15

**apologize** 19:12 65:11 125:15 129:25

**appearances** 7:17

**appears** 41:21 92:17

**applauded** 145:12

**appropriateness** 139:10

**approval** 9:11

**approved** 95:24

**argue** 25:19

**argument** 99:21,24

**arguments** 99:15 100:2

**articulated** 46:10 50:11 63:11

**Asia** 30:24

**asks** 29:16

**aspect** 13:13 88:25

**Assert** 140:24

**asserted** 124:20

**assertion** 88:14 115:21

**asset** 39:13

**assets** 24:16 39:13 44:7 46:8 50:14 51:25 56:5 63:9 95:12 111:25 145:7,9

**assign** 101:12

**assistant** 68:16 83:19,20

**assistants** 68:10,11

**association** 6:8

**assume** 49:13

**assure** 125:7

**Attached** 94:12

**attention** 79:14 123:9

**attorney** 138:2

**attorney-client** 115:18

**attorneys'** 7:17

**audio** 11:2 16:7 57:6 68:23 82:6 96:7 111:20 116:6 135:25

137:8 142:13 143:22

**authority** 14:3 28:25 34:15

**authorization** 35:25

**authorize** 33:3 35:20 95:16,18

**authorized** 42:6,14 103:18 104:9,14

**Avaya** 89:24 90:15 91:16 92:15

**AVYA** 43:19

**aware** 9:3,13,18 12:7,10,17 13:14 14:17,20,23 17:14 21:13 26:15 27:19,22 35:16 36:2,12 48:9 52:11 53:6 58:24,25 59:11 60:15,25 61:8, 11,14 62:2,4 64:7 67:23 74:17,19 94:19,21 96:5,18,19 98:13 99:13 101:9,11 110:9,18 111:5 124:19 136:17,22 139:24

**awareness** 61:3 113:16 137:23,25 146:10

_____

**B**

**back** 44:11 47:21 48:5,22 54:9,11 83:23 85:12,20 87:19 90:3 100:9 101:13 109:5,14 116:14 122:20 134:15 142:25 143:8,11

**background** 95:4

**bad** 99:8 101:19 104:7

**Baker** 136:9,25 137:23 138:3,18 139:2,7,25 140:2,10, 11 141:4,8 142:8,18

**balance** 146:15,20

**bank** 69:17

**bankruptcy** 7:15 10:7,19 26:5 59:5 95:8 99:16 106:2

**based** 29:20 80:3 88:16 102:12 110:22

**basis** 79:3,8,16,21 88:8,13,25 92:24 127:8,16,18

**basket** 39:23

**beginning** 24:13 88:2 101:13 119:20

**begins** 39:8

**behalf** 9:15 28:5 35:21 56:24,25 58:23 61:12 96:22 98:10 100:21 106:13,18,25 111:20 114:9,10 119:17 142:2,18 144:4 147:5,12

**believed** 95:21

**believes** 33:22

**bell** 90:2 91:15 92:13

**beneficial** 20:5 27:5 28:14,15,18,23 29:11 30:5,10 46:7 50:10 56:3 63:21,24 97:3,9

**benefit** 50:13 73:4 105:21

**Bermuda-based** 141:15

**bit** 41:4 62:17 81:21 82:3 84:12 87:21 90:20 94:17 98:15 99:4 100:18 118:14 134:10 138:17,21

**block** 49:12 145:6

**blocking** 55:22

**board** 13:10 14:13 117:5 143:12,15,18 144:14,16

**bodies** 37:5

**bona** 46:5 89:12

**Bonds** 7:2,20 9:20, 23 10:2,10,16 11:15, 22 13:2 14:5 15:6 16:23 17:10 18:6

21:7 22:24 24:11 25:7 27:16,25 28:8, 21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,21 42:7 43:7 44:18 45:25 49:17 50:7 51:12 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 67:24 68:10 71:11,20 73:7 75:14 76:4,23 78:5, 12 79:11,18 82:23 86:10 88:10 91:18 92:16 96:14 98:6 99:18 101:2 103:22 105:4,8 106:22 108:6,18 110:2,8 115:12,16 117:16,21 121:13,17,23 122:5,9 123:3,15,19,25 125:4,9,14,21 126:13 127:13,17,21,24 128:15 129:11,18,24 130:18,23 131:14,21 132:9,15,25 133:11 134:2 139:20 140:18, 21 147:9,13,19,22

**bottom** 39:6,8 62:20 90:12,14 115:6 116:14

**bought** 71:25 73:4 74:7 76:21

**breach** 27:4,13 33:22 36:3,6,10 107:7

**breaches** 61:4

**break** 46:19,23 107:23 108:15,17 142:23

**brought** 111:17,19 114:14

**bucket** 40:2

**bunch** 24:17 79:2

**business** 46:8,9,10 50:13 52:19 55:5,25 56:7,14 57:12 58:21 59:20 60:16 63:10 91:3,9 116:2,24 128:7

**businesses** 76:13

_____

**C**

**C-SUITE** 33:25

**calendar** 111:15 112:3

**call** 32:18 47:11 121:21,25 122:7 123:24

**called** 22:7 70:3 111:17 131:5 141:12

**calls** 46:17 48:14 120:20 123:3,15,18 124:5

**canceled** 43:18

**CANTY** 35:3,6

**capabilities** 71:11

**capability** 23:24 24:19 25:16

**capable** 24:23

**capacity** 10:3,6,13, 18 30:3,4 136:12

**Capital** 7:12 8:18 18:22 21:16 22:8 53:15

**capture** 50:18

**care** 15:15 79:5,6

**careful** 62:25

**carefully** 123:11

**cares** 47:18 79:4

**case** 6:23 7:12,13,21 10:19 14:4 40:8 52:22 74:11,12 125:25

**caused** 22:21 24:10

**cease** 106:19 107:2

**ceased** 69:15

**cede** 52:17,18

**Central** 7:10 47:24 107:25 108:8,25 109:5 142:25 143:3,7 147:24

**CEO** 14:21

**cetera** 24:20 99:10

**chain** 142:21

**championed** 95:19

**change** 78:3,6,17

**changed** 78:20 79:10,24

**changing** 77:25

**Chapter** 7:13

**char-** 97:11

**charge** 104:15

**charitable** 97:12

**check** 44:12 121:24

**chief** 33:22,23 34:2, 4,18 37:12,17 53:14 95:19 105:18

**Christmas** 90:24

**circumstances** 104:16 139:11

**circumvented** 29:2

**Civil** 6:22

**claim** 116:3

**claims** 144:5,8,15

**clarification** 11:3 16:9 57:7 68:25 82:7 96:8 111:21 116:7 136:3 137:9 142:14 143:23

**class** 46:5 63:6

**clear** 46:2 56:3 115:22

**CLO** 17:3,9 24:16 25:12 27:13,24 28:7, 19 29:11 30:6 39:12, 13 44:7 51:24 94:23 95:7,11 96:23 97:3, 13,18,24 98:11,20,21 99:14 101:12 102:7, 24 103:21 106:14,21 111:25

**CLO's** 107:16

**CLOS** 16:22 22:22 23:16,21,25 24:9,23 25:17 26:11,16 27:3, 9,23 28:2,6,13,17,20

**compliance** 26:3 33:22,23 34:2,4,8,18, 21 36:4 37:4,12,18 53:14 56:4 61:13 95:20 105:18

**compliant** 68:9

**complicated** 77:16

**computer** 82:24

**concerned** 114:24

**concludes** 147:25

**conclusion** 28:23 29:8,17 30:21 34:17, 20

**conduct** 13:16

**conference** 8:19 123:3,14

**conferred** 121:10,18

**confusing** 98:17

**conjunction** 37:20

**connecting** 142:21

**connection** 10:18, 25 11:8 15:3 59:5 64:18 67:25 94:6

**consent** 9:11 42:22 43:5 75:13 76:22 135:16

**consideration** 102:13

**considerations** 103:24

**considered** 30:10, 13 145:24

**consistent** 35:24 50:4

**constrain** 13:15

**contact** 28:16 113:10 117:6 136:24 138:19 139:3,16,18,25 140:10

**contained** 96:6

**contended** 27:3,13

**contention** 25:14 27:20,22 89:13

**context** 31:14

**continued** 36:2

**contract** 27:24 30:17

**contracts** 17:7,15

24:8,15 25:12 26:3,4, 16,18,24 102:7,25

**control** 10:12 18:20 20:7 97:24 127:5 129:6 131:10 136:21

**controlled** 114:11

**controls** 97:7,13 129:17 131:20 141:24

**conversation** 32:16 52:6 57:5,20 58:15 59:9,17

**conversations** 32:13 73:19 111:6 146:11

**conveyed** 58:12

**convinced** 61:14

**coordinate** 114:9 117:7 119:16 120:3 139:5

**coordinating** 137:16

**coordination** 114:12,16,20

**copy** 12:22 41:20 93:14,18

**correct** 9:19 10:3 13:3 14:18,24 18:5, 11 19:2,19 23:17 27:24 28:20 42:15 48:20 51:8,16 56:22 57:3 66:23 67:6 77:5 87:7,8,15,18 89:24 120:14 128:2 130:10 133:25 134:20 140:13 141:6 144:17, 21

**correctly** 113:11 118:23

**counsel** 8:14 32:17 37:21 47:6 65:2,7,12, 22,24 95:20 100:22 120:3,18,20 121:10, 11,17,18 123:3,15 124:16

**counsel's** 130:5

**counselor's** 129:14 131:17,24 132:18 133:4,14

**counteroffer** 103:3, 5

**couple** 46:17 69:9 74:15 90:3 95:5 112:3 120:22

**court** 6:15 7:15,19 13:18 25:20 48:11 59:16,20,23 94:24 95:8,10 99:16,20 106:2 124:21 125:24

**Court's** 14:3,9 48:15 124:9

**courtroom** 6:21

**COVID-19** 6:10

**Covitz** 39:8,11,12 40:22

**Covitz's** 41:11,20,24

**creating** 145:15

**credit** 74:3

**creditors** 145:14

**CRO** 14:21

**CST** 6:4 48:3 109:3 143:6

**current** 145:9

**custody** 127:5

**D**

**D.C.** 65:6,7,12

**DAF** 44:5 97:6,7,10, 20,24 98:16,22

**daisy** 142:21

**Dallas** 7:16

**dark** 145:8

**date** 7:9 26:19 82:3,4 85:23 86:5 124:6,7 147:17

**dated** 31:17 35:9 94:16

**Dave** 145:14,17

**day** 41:4 48:14,18 54:11 59:14 60:13 100:12

**Second column additional entries:**

29:13 30:7 38:10,14 40:24 50:6 54:5 63:16 90:16 91:17 92:15 93:7,12 100:25 104:12 105:15 107:4, 20

**closing** 90:2 91:15 92:13

**Clubok** 147:17

**collateralized** 16:18 17:4

**combined** 98:22

**commenced** 110:6

**comment** 36:18

**comments** 50:24

**commercial** 103:11, 12

**commit** 106:17,25

**common** 116:6,9

**communicate** 47:5 132:21 133:7

**communicated** 62:8 145:21

**communicating** 138:13

**communication** 142:11

**communications** 70:10 145:3

**company** 22:2 141:16

**competently** 12:11

**complaint** 110:15

**complete** 71:22 82:25 84:24 124:17

**completed** 70:19

**completeness** 70:25

**complex** 46:12

**days** 52:25 69:9 80:2, 3 90:3,23 99:16 142:9,12

**de** 63:19

**deal** 139:14

**debtor** 7:13 8:15 9:3 12:18 15:15 16:7,17, 21 17:6,7 22:23 23:16,20,22,23,24 24:8 25:6,9,11,15,16 26:17 27:4,13,23 28:20 29:12 30:7 38:10 39:14,16 40:11,18 43:19 50:13 53:16 61:13 63:5 66:4,7,10,13,20,23 67:23 70:11 71:25 73:4 74:8 75:5,20,23 76:21 77:5,7,11,17, 20,22,24 78:22 83:17 95:11 96:11 100:2, 22,24 101:11 102:23 103:20 104:11 105:3, 14 106:20 107:3,16, 19,20 110:6,11,19,24 115:25 122:3 127:8 128:8,9,25 130:10,22 132:6,24 133:8,20 135:13 145:4 146:3

**debtor's** 9:7 11:2,9, 13,20 13:20 14:14,21 15:4,13 42:22 43:5 70:3 75:13 76:22 77:21 93:6,12 102:3 109:12,17,20,24 126:22 127:4,10 128:6 135:16 141:5 142:19

**debtors** 9:15

**decade** 66:8

**December** 9:5 12:17 59:5 60:18 70:15 71:24 80:19,24 81:4, 5 84:9 85:16,25 86:16,18 87:3,17 88:2 89:23 91:15 92:14 94:16 99:24 100:12 101:13 111:16 112:21 115:9 116:17,22 119:2 120:11 123:16 124:2, 21 133:22 134:16,20

138:14,17 145:2,22 146:4

**decide** 25:20 45:21 60:23 91:23 102:19 124:16

**decided** 72:8,14,21

**decision** 28:25 73:5, 10,20,22,23 102:2,4, 14 139:12 147:10

**decisions** 142:2 143:21 144:4,8,15

**declaration** 15:2,10, 12,22

**declare** 28:6

**default** 23:23 24:18 25:15 26:4 27:23 28:7

**defending** 9:20

**defense** 111:10 114:15 117:3,14 118:3,6,10,11 120:3, 8,16 122:2,3 137:3,4, 12,14 139:5

**defer** 52:16

**definable** 46:9

**delegate** 68:11

**delegated** 68:9 70:20

**delivered** 70:25 124:13,21

**demand** 102:13

**denied** 94:24 99:17

**depend** 52:23

**depo** 9:9

**deposition** 6:13 7:9, 22 9:16 10:22,25 11:8 31:3 34:25 39:2 47:7,19 48:10 62:14 67:15 77:19 80:9 81:18 84:5 85:5 90:9 92:6 93:23 100:6 108:8 112:17 115:3 134:7 138:7 147:16, 25

**describe** 39:25 76:5

**desire** 60:9 63:8 139:6

**desires** 52:16

**desist** 106:19 107:2

**desk** 49:13 52:8 80:20 81:3,10,14 86:6,20 87:3

**destroy** 72:14 76:25

**destroyed** 72:13

**details** 70:17 95:14 106:4,5 134:17 135:2 140:8,17

**determine** 125:24

**determined** 147:18

**developing** 145:11

**differently** 88:23

**difficult** 31:7 123:9

**direct** 18:3 19:17 28:16 97:2 128:13 136:16 140:25 144:19 146:9

**directed** 33:16 38:4 42:15 43:20 45:24

**direction** 23:3 38:15 40:23 90:15 104:25 114:13,23

**directions** 119:21 120:7

**directly** 13:11 54:4 55:16,19 59:25 96:2 106:4 124:15 129:5,7 131:7,10 136:20

**directors** 144:14

**disagree** 88:15,25

**disagreement** 102:6

**disapproval** 60:20

**disbelieve** 86:8

**discernible** 46:9

**discovery** 82:10,15 113:25 114:5

**discuss** 32:5 34:12 105:12 107:18 118:9 132:12 146:7

**discussed** 31:8 111:3 139:22 146:4

**discussing** 112:7

**discussion** 135:8

**dispose** 72:8 73:5 75:2 85:15

**disposed** 72:5,16,18 74:21 75:6 81:8 86:15 87:10

**disposing** 75:9

**dispute** 88:8,13

**dissuaded** 103:10

**distancing** 6:11

**distributable** 145:17

**distributed** 145:25

**District** 7:15

**divided** 120:22

**Division** 7:16

**document** 31:14,22 32:2,3 58:17 64:17 67:14,20,24 70:3,18 83:3,10,18 84:14 87:23 100:19 107:15 128:4

**documents** 31:10, 11 67:25 68:7 69:5 70:21,24 71:9,18 83:7,14 124:19 126:22,25 127:3,11 128:10 135:6

**dollars** 101:21

**dondero** 7:9 8:1,3,10 9:1 10:1 11:1,7 12:1 13:1 14:1 15:1 16:1, 15 17:1 18:1 19:1 20:1 21:1 22:1 23:1,9 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1, 3,6 32:1 33:1 34:1,25 35:1 36:1 37:1 38:1 39:1,2 40:1 41:1 42:1 43:1 44:1 45:1,3 46:1 47:1,2 48:1,7 49:1 50:1 51:1,16 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,14 63:1

64:1 65:1 66:1 67:1, 10,15,19 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1,18 82:1,12 83:1 84:1,5 85:1,5 86:1 87:1 88:1,13 89:1 90:1,9 91:1 92:1,8 93:1,23 94:1 95:1 96:1 97:1 98:1 99:1 100:1,6 101:1 102:1 103:1 104:1 105:1 106:1 107:1,24 108:1,15 109:1,8 110:1 111:1 112:1,17 113:1,24 114:1 115:1,3,18,23 116:1, 10,11 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,19 127:1 128:1,3,18 129:1 130:1,4 131:1,24 132:1 133:1 134:1,7 135:1 136:1 137:1 138:1,7 139:1 140:1 141:1 142:1 143:1,11 144:1,3 145:1 146:1 147:1,6,12

**Dondero's** 115:24 127:11

**dormant** 69:25

**Douglas** 114:14 115:17 117:2 137:16

**dozen** 126:24

**drafting** 118:2,6

**drafts** 122:8

**Draper** 114:14 115:8, 13,17 116:17,22 117:2 118:12 137:16 139:4,12,13,22

**draw** 28:22

**drawer** 80:20

**drew** 34:18

**drove** 36:4

**drugs** 12:4

**due** 6:10 99:19

**Dugaboy** 125:2,13, 19,23 126:5,11,15,20 127:7 129:8,10,17 130:9,21 132:14,24 133:9,24 134:17,25 135:10,13,17,24

**duly** 8:4

**Dustin** 59:2,8,14,15

**E**

**e-mail** 39:5,8,23 40:3,4,22 41:2,4,11, 19,20,24 42:5,18,23 43:6,23 45:6,12 48:25 50:4 51:9,17 52:2 53:9,11 58:17 60:21 61:10,15 69:8, 11,12,14,16,19,23 85:18 90:14 114:5 115:8 118:25 119:7, 25 120:10 124:8

**e-mails** 40:2 45:8 52:4 64:14 89:9 107:13 117:6

**earlier** 64:3,25 65:19 84:17 99:16 123:21

**early** 71:24

**Eastern** 107:25

**economic** 18:4 19:18 97:3

**effectuate** 53:3,7 55:22 57:13 60:10

**Ellington** 47:4 60:5 65:18,21 66:3,9,22 67:7 74:7 78:3,9,17, 25 79:9,23 83:2,5 111:4 112:8,11 113:8 114:8,17 115:23,24 116:10 117:9 118:2, 18 119:2,8,15 120:10,15,23,25 122:22 123:2,12,14, 19,24 126:24 127:9 132:14 135:22 146:17

**Ellington's** 74:9 122:15 123:6

**Ellis** 9:23 10:2,10,17 67:24 68:10 71:12

82:23 121:17 123:4, 15,19,25

**employed** 39:15 66:3,7 68:19 70:11 83:17 128:25 133:8, 20

**employee** 39:15,16 47:4,10 77:4,7,9 107:14,19 120:22 121:3,5,8,11,19 122:4 123:8 137:19 140:7 145:3

**employees** 13:12 25:24 40:18 47:15 68:10 76:14 79:23 89:22 92:25 93:5,10, 15,18 116:25 137:17, 24 140:3,6,12 141:5 142:19 146:3

**employees'** 120:18, 20

**employer** 66:10,13, 23

**encourage** 105:24

**encouraged** 95:19 96:3 145:13

**encouraging** 104:14

**end** 16:12 24:13 54:11 69:10 70:15 91:21 92:5 126:19

**ended** 114:22

**engaged** 117:8 140:7,16

**engaging** 103:8

**enlarge** 90:19

**enter** 9:8

**entered** 13:19 14:10 15:19 111:2 113:14 114:18

**entirety** 58:11

**entities** 20:17 94:22 95:6 99:14,25 103:19 106:18 114:10 119:17 126:6 141:20

**entitled** 115:20 130:24

**entity** 10:11 18:20 20:8 22:7 39:15 65:13 98:22 131:5 136:15,20 141:12 143:12

**entry** 16:6

**equity** 40:15 41:12, 15,17,24

**error** 89:20

**estate** 74:14 101:25

**ethic** 71:10

**events** 16:5

**exact** 21:23 117:11

**EXAMINATION** 8:7

**exchange** 107:13

**execs** 79:2

**execute** 42:5,19,23 61:17 93:2

**executed** 43:20

**executing** 43:10 45:23

**executive** 76:8 133:19

**executives** 34:2 72:25 78:20 104:15 105:17,18

**exhibit** 30:25 31:2,3 34:24,25 35:5 36:15, 24,25 37:13,14 38:24 39:2 44:17 48:22 62:12,14 64:22 67:14,15 80:7,9 81:17,18 84:3,5 85:4, 5 87:20 90:8,9 93:22, 23 94:13 100:5,6,9 112:15,17 115:2,3 134:6,7 138:6,7

**exhibits** 44:10,16

**experience** 88:16

**expertise** 121:8

**explain** 58:20

**explanation** 51:23 57:12

**explicit** 9:10

**entity** ...

**expressed** 52:9 60:20 63:8

**extent** 21:7 22:24 31:12 145:23

**external** 37:21

**extort** 102:8

**extra** 61:6

**eyes** 90:18

**F**

**face** 89:20

**faced** 61:18

**facilitation** 102:10

**fact** 38:12 92:21

**facts** 56:11,14 66:18, 21

**factual** 29:20

**failed** 135:22

**fair** 18:20 19:5,9 20:7 33:10 34:19 35:18 40:21 67:5 86:14 98:25 109:10 113:24 145:20

**familiar** 17:19 18:23 22:7 31:21,23 131:4 141:11

**fashion** 26:9

**February** 91:2

**Federal** 6:22

**feel** 61:9

**fees** 101:21,24

**fide** 46:5 89:12

**figure** 49:25 50:22

**file** 109:18

**filed** 94:23 96:20 110:15

**filing** 95:16,18

**financial** 33:24 125:2,13,20 126:12, 21 132:13,23 133:10, 24 135:10,14,17,24 146:16,19

**financials** 126:5

**find** 94:13

**fine** 47:2,13 80:6 129:24

**finished** 19:13 142:24

**firm** 9:23 10:5,10,17 17:19,21 18:23,25 19:4 67:24 71:2 111:20 116:2 124:13 136:8,11,12,14,15, 19,20 137:25 139:7 140:2

**firms** 10:2

**fit** 103:2

**follow** 129:13,22 130:4 131:16,23,25 132:17 133:3,13

**form** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 24:11 25:7 26:8 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 96:15 98:6 99:18 101:2 103:22 106:22 110:2,8

**formal** 102:17

**formally** 48:16 140:16

**forming** 120:7

**forward** 51:2 103:11 108:19 118:18 145:9

**forwarded** 120:10

**forwards** 92:22 115:23

**found** 26:12

**frames** 117:11

**Friday** 90:4 91:15

92:14

**Friday's** 147:6

**front** 91:7

**full** 31:14 69:7 87:25

**fully** 117:8

**functional** 117:9

**functioning** 114:15

**fund** 18:22 19:4,7,18, 21,24 20:6,7,10,15, 21,23 21:2,5,12,17, 20,21 22:3,4,11,15, 18 46:12 103:20 104:12 107:16

**fundamental** 103:9

**funds** 20:11,18,20 21:10 22:21 23:13,15 24:10 29:21 35:21 41:17 49:14 50:12 56:25 58:23 63:5 94:7 98:5,10 100:22 104:23 106:13 107:2 111:24

**future** 101:24

**fuzzy** 90:18

**G**

**garbage** 72:19,22 74:2 76:21 80:16,25 81:11,14 86:15

**Gatekeeper** 39:24 40:5,14

**gatekeeper@ hcmlp.com** 39:18

**Gates** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**gave** 21:25 35:25 42:4,12 58:5 69:8 82:22

**general** 13:7 14:14 18:13,17 19:24 46:14 52:23 65:22 71:3 82:21 95:20

**generally** 18:21 31:23 32:10 33:6 40:15 44:19,23,24 67:19 82:20 92:9 103:17

**gentlemen** 6:7

**girls** 83:23

**give** 24:9 30:21 35:6, 24 41:22 51:23 69:4, 6 75:23 82:18 92:7 101:18 104:25 122:11 126:14 127:17

**giving** 40:22

**Gmail** 69:22,24

**go-between** 60:5 111:7

**good** 6:6 8:10 23:22 24:22 26:10 125:3, 13,19 126:11 127:8, 16 131:5,8,11,13,20 132:5,14,23 133:10 135:10,13,17,24

**gotcha** 31:9

**Gov** 141:12,14,18,22, 24 142:3,7,17 143:11,21 144:4,9,20

**Grant** 97:8

**group** 120:19,22 121:2 123:8 137:19 139:10 140:7,12 141:5

**groups** 120:23,24 121:3,5,9,12,19 137:19

**guess** 65:25 72:12 87:20 111:17

**guided** 108:16

**guiding** 23:5

**guy** 50:21

**guys** 46:16 82:23 108:23 146:23

**H**

**half** 24:5 126:24

**handles** 78:14

**handling** 47:11

**hands** 127:12

**happen** 49:20

**happened** 72:4 87:17 99:9

**happening** 50:2 90:17

**happy** 32:7 46:22 116:12

**Harbourvest** 97:6, 20 98:17 109:24

**hard** 49:22 105:20

**HCLOF** 98:18

**HCMFA** 89:22 92:25 93:5,11,15,19

**HCMLP** 69:11

**head** 63:14 101:18

**hear** 8:11 20:14 48:7 105:9 108:2 109:7 125:14

**heard** 7:5 68:5 136:8 142:21,22

**hearing** 11:13,20 13:20,22,25 144:7,7

**held** 13:19 39:24 40:23 41:17 53:18

**helped** 142:5 145:15

**helpful** 32:8

**helping** 114:8 139:18

**HFAM** 44:5 54:20

**High-** 39:14

**Highland** 7:12 8:18 9:16 10:7 13:11 18:22 20:21 21:2,5 44:6 47:3,10,14 53:15 65:22 68:21 69:11,19 76:9,12 79:23 102:11 116:25 128:22 140:12 145:7

**Highland's** 76:10

**highlight** 49:23

**historic** 72:10

**historically** 40:6 46:6 65:23 72:9

**history** 137:22

**hitting** 49:12

**hold** 21:4 22:6,17 50:19 88:4 91:19

**Holdco** 94:23 95:7 96:23 97:3,13,18,24 98:11,20,21 99:14 106:14

**holders** 27:5 46:7 50:10

**holding** 22:2 104:6

**hundred** 54:21

**Hunter** 39:8,12 41:23 52:8

**I**

**idea** 32:19,22,23 55:10,14 91:7 114:6 124:23 127:16 141:10 142:10,20

**ideally** 46:20

**identify** 143:14 144:15 146:2

**illegal** 99:8 107:6

**impede** 93:6,11

**implicit** 34:17,20

**Implicitly** 9:9

**implies** 24:22 89:10

**important** 59:19 62:7

**impose** 95:11

**inaccurate** 89:6

**inadvertently** 49:25

**inappropriate** 52:12 61:24,25 63:16 99:9, 21 101:19 102:18 103:10 107:5

**inches** 16:12,13

**included** 40:4 61:14

**including** 47:4 146:20

**Income** 20:21 21:2,5

**incredibly** 63:16

**indemnities** 61:7

**independent** 13:10

**independently** 62:3

**indirect** 18:3 19:17 97:2 136:16 144:19

**indirectly** 55:18 129:5,7 131:7,11 136:21

**individual** 10:3,6,13, 18 56:5 136:12

**individually** 120:25

**individuals** 46:13

**inferred** 26:13

**information** 117:6 136:24 139:3,16,18 140:2,11 145:7 146:16,20

**informed** 37:4 38:11, 13 90:4

**initiate** 103:19 104:11 105:2,13 106:20

**initiating** 100:23

**injunction** 11:10,14, 21 60:3 68:2 84:25 127:25 147:7

**injunctive** 110:16

**input** 54:10

**institutions** 33:24

**instruct** 93:5,10 98:4 106:7,9 125:9,17 127:13 129:11,18 130:18 131:14,21 133:11 139:20 140:18

**instructed** 41:25 44:6 56:23 89:22 92:25 98:11 106:14 127:3

**instructing** 9:4

42:18,22 43:5

**instruction** 41:23 42:4,13 135:23

**instructions** 44:9 49:7,10 68:23 69:4 82:18,21 89:8,15

**instructs** 130:16

**insurance** 61:6

**intend** 11:12,19,20 61:16 108:9

**intended** 45:15

**intent** 50:5,8 51:21 139:6

**intentional** 145:6

**interest** 10:12 18:4 19:18 52:9 88:19 97:22,24 107:8 116:3,9 118:3 119:18 136:16 141:17,21 144:19

**interested** 29:4

**interests** 46:7 50:9 61:5 63:7 89:18 105:23 109:11 110:23 111:11 114:20 116:24 140:4

**interfere** 93:6,11

**interfered** 128:10

**interference** 54:25

**interfering** 128:6

**intermediate** 29:3

**internal** 32:17 65:2, 7,12

**interrupt** 24:2 91:20 127:22 140:24 141:2

**interruption** 41:7

**intervene** 71:12

**intervened** 38:20

**interviewed** 140:15

**invest** 22:22 24:10

**invested** 23:15

**investigated** 36:9

**investment** 20:11, 17,20 24:24 25:22 88:18,20 97:19

**investments** 29:22 142:6

**investors** 50:9,10 52:9,16,20 61:5 63:7 88:19 89:18 101:7 102:9 104:16,17 105:21,23 107:8

**involved** 46:13 71:21 75:8 102:16 104:13 106:4,5 117:10 124:16 140:5 144:11

**involvement** 121:7

**Isaac** 118:5 136:23 146:21

**issue** 107:15 119:24

**issued** 49:11 93:4

**issues** 91:6

---

**J**

**J.P.** 112:12 113:9

**James** 7:9 8:3 14:13

**January** 6:4 7:10 14:18 77:7 91:2

**Jason** 34:5 75:8 78:13 80:12 105:19

**Jason's** 86:22

**Jefferies** 54:4,8,11

**jeopardy** 63:6

**Jerome** 47:10 50:20, 21 51:4

**Jim** 24:24 49:14 67:10 80:5 115:18 117:22 127:2 130:24

**job** 124:18 130:2

**Joe** 40:16,20 52:7 54:10,12 57:18

**John** 8:13 9:20 23:2 35:3 108:7 121:21 125:16 126:17 127:23 129:22 147:5

**joint** 114:15 116:18, 23 117:20 118:3,6,10 119:14 120:15 122:2

**Jones** 8:14

**judge** 91:7,23,25 145:13

**judgment** 52:19

**July** 14:24

**juncture** 45:17 104:2

**justification** 56:14 58:16 60:17

---

**K**

**K&I** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**keeping** 76:10

**Kelly** 83:20,24

**key** 26:6

**kind** 39:23

**Klos** 145:15,17,21

**Klos'** 146:9

**knew** 33:9 35:17 42:13 75:9,10 99:10 125:19 140:5

**knowing** 56:5

**knowledge** 26:19,25 27:12 28:16 36:21 55:20 56:13 64:6 76:22 93:9 98:9 106:12 130:8 132:4

---

**L**

**La** 30:24

**label** 73:10

**ladies** 6:7

**largest** 97:21,23

**lastly** 147:16

**late** 46:18 108:14

**law** 10:5 136:8 140:2

**lawsuit** 110:14

**lawsuits** 63:6

**lawyer** 26:22 67:8 92:4 115:13,25 123:19,25 130:15 136:11,14,19 139:9

**lawyers** 9:4 25:20 68:5 70:25 71:11 114:9 116:23 119:16 136:25

**leadership** 114:8,19 118:22 119:4,9,23 120:2,12 122:17,23

**learn** 54:6 68:4

**learned** 32:2 38:8,20 52:25 91:14 92:13

**learning** 33:15 38:3

**leave** 76:14 98:24 108:15

**led** 16:6

**left** 76:8 80:19 81:3

**legal** 6:8 28:22 29:7, 16 30:21 37:18 92:8 103:24 117:18 139:11

**legally** 104:4

**legwork** 83:24

**length** 55:24

**letter** 9:4 31:17 32:6, 14 33:4,7,9,13,16,17 34:7,13 35:8,13,15, 20 36:4 37:25 38:3,5 85:8 94:3,12,14,15, 18,20 95:6 96:22 98:5,12 99:5 100:11, 15 103:16,19 104:10 106:10,15,18

**letters** 44:24,25 58:22 95:22,25 96:6, 18 103:8

**level** 98:23

**Leventon** 47:5 83:9, 12 118:5 126:25 127:9 132:22 135:22 136:23 138:10,18

146:21

**liability** 33:25 44:8 45:13,20,22 46:3,12, 14 61:3,19 105:19

**liar** 86:23

**lift** 26:23

**lights** 50:23

**limited** 70:14

**limits** 106:2

**liquidation** 74:12

**liquidity** 90:23

**list** 113:16 119:14

**listed** 35:22

**listen** 13:22 46:17 91:12 123:11

**litigant** 128:8

**litigation** 103:8 111:3 114:20

**lived** 34:22

**loan** 16:18

**loaning** 17:4

**located** 8:16

**logged** 69:25

**logical** 105:16

**Loiben** 68:13,14,15

**long** 46:23 53:18,20

**longer** 77:4

**looked** 44:11,16 85:18

**lot** 16:3 63:25 99:12

**loud** 44:4 62:24

**LP** 7:13 17:18 18:23

**ludicrous** 76:15

**lunch** 83:23

**Lynn** 112:21,25 113:3 115:18 118:14

---

**M**

**made** 29:22 36:13

55:11 56:3 64:25
73:5 88:14 95:7
101:11 102:2,4,14
126:23 133:23
139:12 142:7 144:8
147:9

**majority** 123:7

**make** 11:19 46:18
55:15 56:15 57:2
59:16 71:14,18 76:17
84:23 91:25 102:20
103:2 115:20 142:2
143:22 144:5 147:4

**makes** 91:8 143:21
144:3,14 145:16

**making** 52:19

**malfunction** 11:2
16:8 57:6 68:24 82:6
96:7 111:20 116:6
136:2 137:8 142:18
143:22

**malicious** 63:17

**man** 26:6

**manage** 16:21 17:8
20:11,17,21 23:13,25
24:9,16 25:17 26:11

**managed** 22:12,22
23:16 38:10

**management** 7:13
18:22 28:7,19 29:12
30:6 93:7,12 101:12,
24 102:24

**Management's** 8:18

**manager** 16:18
20:25 21:6,10,13,15,
25 22:4,16,19 29:21
36:8 46:12 52:14
54:2 100:24 102:7,8
103:20 104:5,6,12,22
105:14 106:21 107:4,
16,20

**manager's** 56:4

**manages** 23:21
39:12

**managing** 24:23

**manifested** 95:22

**manner** 87:10

**marked** 31:4 35:2
39:3 62:15 67:16
80:10 81:19 84:6
85:6 90:10 93:24
100:7 112:18 115:4
134:8 138:8

**market** 102:13

**markets** 90:23

**Matt** 40:13,20 45:17,
19

**matter** 29:20 41:12
59:6 64:18 94:6
132:22

**matters** 36:14 37:13

**Mckenzie** 136:9,25
137:23 138:3,19
139:2,7,25 140:2,10,
11 141:4,8 142:8,18

**means** 89:11

**meant** 49:13

**Media** 7:8

**medication** 12:5

**meeting** 116:18,23
119:14

**meetings** 48:13

**Melissa** 128:17
133:17 134:13,25

**member** 14:13

**members** 144:16

**memorandum**
37:11

**memory** 12:8 113:22

**mentioned** 49:14
64:25 65:18 117:14
128:5

**message** 45:16 62:9
81:23 82:11 126:18

**messages** 70:4
74:20

**microphone** 16:12

**mid** 77:9

**middle** 119:20 120:6

**Mike** 6:15 115:17

**Miller** 6:15

**million** 101:21

**mind** 124:6

**mine** 116:12 130:3

**minimis** 63:19

**minimization** 57:24

**minutes** 46:18,19,24
47:22 108:4,14,23
143:10

**missed** 20:12 43:2

**misunderstood**
51:21

**model** 145:15,16

**moment** 85:2 126:18

**money** 141:9 142:18

**month** 70:16 102:23
103:7

**months** 65:25 66:2
144:23

**morning** 6:6 8:10,16
9:8,12 64:25 113:10

**Morris** 6:25 7:3,5 8:9,
13 11:5,6,16,18,24
13:4 14:7 15:8 16:14,
16,24 17:2,11,13
18:7,9 21:11 23:2,11
24:12 25:2,8 27:18
28:3,10 29:6,9,15,18
30:2,11,14,22,24
31:5 32:11 33:2
34:11,23 35:4,7 36:5,
19 37:7 38:18,24
39:4 41:8,10 42:10,
11 43:8 44:20 46:22,
25 47:13,20,23 48:6,
21,24 49:18 50:15,22
51:2,5,7,14,15 52:13,
24 54:16,17 55:7
56:9,12,19 57:9,16
60:22 62:12,16,18
64:21,23 67:3,13,17
69:3 71:23 73:11
75:16 76:16 77:3
78:7,16 79:15,20
80:7,11 81:16,20,22
82:9 84:3,7 85:3,7,
20,22,24 86:12,13
88:12,21 90:7,11,13

91:11,13,23 92:7,11,
18 93:21 94:2 96:10,
21 98:8 99:22 100:4,
8,10 101:8 104:8
105:6,10,11 106:24
107:22 108:4,11,20
109:6 110:5,10
111:23 112:15,19
114:25 115:5,7,14,20
116:9,16 117:19,23,
24 121:15,16,21,25
122:7,11,13 125:6,
11,15 126:2,9,17
127:15,20,22 128:2,
16 129:13,16,21,25
130:7,15,20 131:3,
16,19,23 132:3,11,
17,20 133:3,6,13,16
134:5,9,12 136:5
137:11 138:5,9
139:23 140:23 141:3
142:16,23 143:9,25
144:2 147:3,11,14,20

**motion** 11:2,9,13
15:4,13,23 67:25
94:24 95:8,17 96:19
99:17 111:16,18,19
112:10

**motions** 96:19
111:15 112:3,9,13

**mouth** 16:13

**move** 29:6 30:11
56:9 74:13 80:2
91:11 105:24

**moving** 56:4 104:5
105:22 139:15

**multipage** 37:15

**Multistrat** 146:16,21

**mutual** 117:3,14
118:3,6,10 120:7,16
122:3 137:3,12 139:5

**N**

**nail** 85:13

**named** 128:17

**natural** 146:25

**necessarily** 37:3

**necessity** 32:24

**needed** 114:12,18
132:24

**Nexpoint** 17:18,25
18:4,10,19 19:8 20:3,
10,16 21:16 22:3,7,
10,18 31:18 32:5
33:16 35:9 36:13,22
38:4 65:14 77:13
101:13

**Nexpoint's** 18:13,16

**NHF** 21:21 22:13

**nonfinancial** 29:3

**nonfinancially** 29:3

**noninvestment**
53:25

**nonportfolio** 54:2

**nonsensical** 59:21

**nontrader** 54:2

**normal** 103:11

**Norris** 59:2,8

**Northern** 7:15

**noted** 7:18

**notice** 75:23 80:4
108:7

**notification** 36:12

**notwithstanding**
48:15

**November** 35:10
60:8,24

**NPA** 89:22 92:25
93:5,10,15,18

**number** 75:17 76:9,
11,14 77:25 78:4,6,
10,18 126:10

**numbers** 20:4 79:10,
24

**numerous** 78:20

**nuts** 107:9

**nutty** 90:21 107:10

## O

oath 12:14

object 33:12,14 109:23 115:12 126:13

objected 96:14 109:20

objection 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 23:3 24:11 25:7 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 98:6 99:18 101:2 103:22 106:22 110:2,8 117:16 125:4 135:12

obligation 16:19 36:7 127:10 128:9,11

obligations 17:4 104:18

obstructed 127:10

obtained 12:18 110:11

occur 75:12

occurred 124:6

October 31:18 77:9 109:15

offer 101:12 102:3,5, 15,18,20

office 69:9

officer 33:22,24 34:3, 4,19 37:12,18 53:14 61:13 95:20 105:18

offices 9:11,16 110:20 128:23

operate 26:3 88:17

operating 56:7 62:3

opinion 59:22 61:25

Opportunities 22:11

opportunity 22:18 102:24

opposed 109:17

opposition 15:22 16:4

order 12:18,22,24 13:6,9,14,19 14:10 15:4,19 26:24 31:14 39:7 48:11,15 49:11 69:5 84:9,18,23 124:9

orders 49:12 61:17

ordinary 111:18

organizations 97:12

original 41:20

outcome 145:10

outstanding 89:19

overrule 34:2

oversee 68:6

owned 38:9,14 114:10

owner 30:10 97:3,9

owners 20:6 28:14, 15,18,23 29:11 30:5 56:3 63:21,24

ownership 10:12 18:4 19:18 74:13 97:21,23 136:16 141:17,21 144:19

owns 18:16 129:10 131:13

## P

p.m. 62:20 85:25 87:3 108:24 109:2,3,4 143:3,5,6,7 147:23, 24

Pachulski 8:14 101:21

paid 71:25 73:4 74:8

76:21 77:11,12 101:24

paragraph 87:25 88:7,9,14,16 89:2

part 23:19 43:2 59:22 69:9 72:5 120:19,23 121:2 137:3,20

participate 9:15 11:12 118:2,5 123:2, 18 139:7 144:7

participated 123:14

participating 123:24

parties 6:18 24:14 26:17 28:19 29:11 30:6,16 104:10 106:7 107:14 126:11 137:12 139:17

partner 14:14 18:14, 17 19:25

party 17:7 24:8,15 29:4 120:15,17 122:4 132:13

past 102:23

pause 7:4 95:10,11 111:25

pay 74:15 79:14 142:17 144:15

payment 101:23 142:8 144:8

payments 144:5

Pearson 40:13,14,17 41:3 43:15 45:18,19, 22

pending 6:23

people 28:24 42:4 76:12 79:9 105:22 107:11 143:17 145:14

people's 117:5

percent 54:21

perfectly 46:25 80:6

performance 88:19

period 70:14 76:10

peripherally 146:13

permanent 110:16

permission 9:7 75:21 77:22

person 70:10 83:21 135:9 138:19 143:14 145:17

personal 33:24 45:20 46:3 55:20 61:3,18 67:8 69:23 75:18 78:10,18 105:19 109:11 110:23 111:11 115:24 128:21 140:4

personally 12:21 17:15 38:20 67:11 71:15,17,21 126:23

petition 26:19

phone 8:25 32:18 60:9,16 69:8 71:24 72:4,6,11 73:3,5,14, 21 74:7,9,10,13,21, 24 75:3,4,6,9,10,17 76:9,11,14,19,20 77:11,12,18,21,25 78:4,6,10,15,18,21 79:10,24 80:15,20 81:10,13 82:24 85:13,15 86:5,15 87:2,10 123:24

phone's 81:7

phones 72:10,11,24 73:24 77:2 80:2

picking 60:8,15

piece 119:5,6

place 48:10 147:8

plan 74:13 109:17 144:24 145:4,6,8,11, 19,21,24 146:4

planned 108:9

play 83:5,12

playing 31:9

point 20:12 36:18 63:18 125:24

points 13:17 147:4

policy 144:9

portfolio 16:17 20:25

21:5,10,13,15,24 22:4,16,19 29:21 36:8 52:14 100:24 104:22 105:14 107:4, 20

portion 45:12

position 36:18 40:11 53:19 102:12 103:23 116:12 125:7

possession 126:22 127:4

possibilities 97:17

post 34:5,6,12 105:19 124:7

post-restructured 41:16

pot 144:24 145:4,6,8, 11,19,21,24 146:4

potential 44:7 45:13, 22 46:3,11,14 139:17

potentially 72:7

power 33:19 105:7

practice 6:11

preferred 89:14

preliminary 11:9,13, 21 68:2 110:16 147:7

premises 9:5,8

prepared 37:11

prerequisites 103:9

present 101:23

president 18:10,19 19:21 20:6 29:21 104:19

pressing 99:25

prevent 12:11 49:25 50:5,8

prevented 60:8,15 103:7

prevents 128:6

primarily 39:13 68:13 123:6

primary 32:16 97:21

print 71:4

prior 60:17 94:23
104:7 124:6 142:5

privilege 116:11
124:20 140:25

privileged 115:19
124:17

problem 23:18 43:3

procedure 6:22
75:11

proceed 7:6 41:9

proceeding 7:21
10:8 110:7 126:16

process 73:9,23
76:25 100:23 103:19
104:11 105:2,13
106:20 124:15

produce 113:21
124:8,24 126:20
132:13 135:23

produced 70:22,23
71:8,19 114:4 115:17
124:23 132:24

producing 83:6,13
135:13

production 70:4,19
83:3,10,18 121:22
122:2 124:12 133:9,
24 135:9,17

professional 24:24
25:22 53:25

prohibition 101:9

promise 47:8

prompted 134:22

prosecution 111:10

protect 101:6

protocol 73:9

provide 24:16 93:14
102:11 114:19
118:22 119:9 120:12
122:17,23 127:3,11
128:9

provided 57:12
93:17 102:23 116:4

providing 120:2

provisions 26:6

purpose 46:8,9,10
50:13 55:5,25 56:7
91:3,9

pursuant 26:16
40:22 48:10 116:4

push 64:2

pushed 95:19

pushing 91:4 105:20

put 30:25 31:11 34:23
38:24 62:12 64:21
80:7 81:16 84:3 85:3
90:7 92:4 93:21
100:4 103:12 112:15
114:25 117:3 134:5
138:5 144:23 145:5,8

putting 63:5 103:10

Q

question 19:14
20:13 23:8,18 24:6
27:11 28:12 42:9
46:20 51:13 65:9
74:18 79:19 86:11
88:11 89:5 91:10,12
92:12 94:25 98:2
105:5,9 114:2,24
116:20 121:14
123:11 125:10,18,22
126:3 127:14 129:12,
19 130:17,19,25
131:15,22 132:16
133:2,12 134:3

questions 28:13
48:19 58:9 70:23
79:7 84:20 116:13
128:12 130:13 147:4

quickly 104:6 139:16

quote 45:12 49:12
53:22 134:25

R

rarely 60:2,3

rationale 50:17
56:15 57:12 58:4,21

59:20

reach 117:5

read 12:21 13:24
14:9 31:13 44:3
49:22 62:23 70:17
84:16 85:11 88:3,7,
10 89:2 99:6 113:11
118:23 128:4

realizes 90:22

reason 10:16 14:8
63:10 66:18,21 67:4
86:8,25 87:5 90:25
102:22 135:21 137:5

reasonable 103:11,
12

reasons 52:5 63:3,
11,12 91:6

recall 13:18 15:25
16:4 31:25 45:4
58:18,19 65:3 79:13
82:5,11 89:12 90:6
100:14,16,20 107:17,
21 114:4,7 116:21
122:25 123:5,22
124:3,4,7 136:23
146:11,14

receive 41:19

received 85:11

recent 137:22

recently 123:22
126:7,8 142:4,6

recess 48:2 109:2
143:5

recipient 45:15

recipients 41:23
42:18,23 43:6

recollection 53:19
98:15 113:23 119:15
120:9 123:23 134:24

record 6:13 7:18
47:3,25 48:5 50:25
84:24 91:22,25
108:13,25 109:5
129:23 143:4,8
147:25

recording 6:19

recycled 72:20

redefined 65:24

reduction 57:24 58:2

refer 17:24 19:4,7

reference 39:17
44:10 45:11 65:2

referred 137:13

referring 22:14 25:5
44:13,16 45:2,5 65:5,
15

refers 21:17,19 41:15

reflect 108:13

reflected 58:17

reflection 84:23

refresh 98:15 113:22
119:14

refreshed 124:4

regard 137:23

registered 24:19
88:17,20

regulatorily 99:9

regulatory 32:24
33:23 34:7 36:3,6
37:5 61:4 107:7

reimbursement
101:20

reinsurance 141:15

reject 102:2,4,5,15

rejected 99:25

rejection 102:5,17

relates 115:17

relating 139:21

relative 101:22 145:9

releases 101:19

relief 110:17

remedy 105:16

remember 13:17
23:6 60:3 73:17 75:7
84:20 101:14 111:14
112:2,5,6,7,10,11,14
114:21 116:19 119:3,

6,7,12 122:24 134:4
135:4,5,8 138:25
144:12

remembered 63:14

remembering 60:12

remind 61:9

remote 6:19

remotely 6:14,17
31:7

remove 103:20
104:11 105:2,14
106:20 107:16

removed 110:19

removing 100:24
107:19

repeat 42:8,25 51:12
76:24 79:18 86:10
105:4 121:13

replace 104:5 107:3

replacement 72:6

reported 54:9

reporter 6:15 7:19

Reporting 6:9

reports 54:7

represent 10:11,13
26:9 94:8 116:2
136:12,15,20

representation
122:12

represented 67:10
95:6

representing 103:2
116:23 123:7 137:24
139:11 140:12

represents 10:2,6,
17 94:5

request 13:20 67:14
70:3,9,14 91:24
132:12 133:23

requested 11:3 16:9
57:7 68:25 82:7
95:15 96:8 111:21
116:7 126:6,7 135:25
136:3 137:9 142:14

143:23

requesting 47:14

requests 64:17 67:24 70:5,8 126:24

required 101:20

reservation 101:4

resignation 109:14

resigned 40:11

respect 14:3 36:14 37:13 47:6 99:19 114:19

respond 135:23

responded 43:15,24

responding 49:3

response 43:13,18 44:3 49:2,8 68:8 118:14 122:15,16 124:9 135:4

responsibilities 99:11

responsibility 17:8 52:15,18 80:24

responsible 104:7

responsive 68:7,8 70:5,20 71:8,18,22 82:25 83:6,13 124:17

rest 48:18

restrain 13:15

restrained 84:19

restraining 12:18,22 13:14,19 14:10 15:4 84:8

restrains 13:6,9

resume 107:23,25

retail 94:7 104:17

retain 76:13

retained 141:5

retainer 141:9

retaining 140:3

return 108:3

returning 74:3

reversed 89:15

review 15:2 70:21,24

reviewing 83:6,13

Richey 6:7

Rick 6:7

rightfully 63:20

rights 28:23 101:4

rigorously 95:21 101:6

risk 28:24 57:23,24 58:2 63:6

role 52:14 65:23 83:5,12 114:15 117:9,10

room 6:12,16 8:19,20

Rothstein 75:8 78:14 80:12 81:9 85:19 86:4,19 87:6

Roughly 12:20

Rule 6:21

rules 6:22,23

ruling 92:2

**S**

sale 111:25

sales 38:13 43:19 93:2

sanctioning 26:14

satisfy 71:7

Saturday 112:21

Sauter 65:6,7,12

schedule 48:13,16

scheduled 48:17

Schroth 133:17,23 134:13,16

scope 84:25

Scott 60:4 65:18 97:8 117:25 132:14 146:17

screen 30:25 31:12 48:22

scroll 32:7 41:2,18 43:13,23 48:23 53:10 62:16 70:7 81:20 82:2 84:11 87:20 92:19 94:17 100:13, 18 112:24 115:5 118:13,17 134:9,10, 15 138:16,21

scurrying 139:15

search 68:6 69:5

searching 83:6,13

sec 37:5 64:4 88:4

secret 76:3,6

securities 38:9,14 40:23 53:23 54:4 58:3 63:18 90:5,15, 25 91:4,16

seek 42:21 43:4

seeking 15:16 38:8

Seery 14:13,20 15:3, 9,12 24:24 25:15 31:18 35:9 36:14,23 38:8 41:25 42:6,15, 17 45:23 52:10 53:2, 6,22 54:23 55:5,21 56:7,15,25 57:5,6,11, 23 58:5,9,16 59:9,17, 25 60:9,12,16 61:7, 12,23 62:2,9,20 64:13 80:5 90:5 91:16 92:14 101:19 127:2

Seery's 25:22 38:15 59:20,22 60:25 61:17 80:3 90:15 135:23

sees 54:10

self-reporting 64:4

self-reports 37:4

self-serving 91:5

sell 38:8 40:23 41:24 44:6 50:14 51:24 90:5,15,25 91:16 92:15

selling 58:3,10 91:4 95:11

send 32:19 118:25 134:22 138:18,22,24

sending 33:3,6,12 37:24 99:5 103:15

senior 72:25 78:20 79:2

sense 13:7 91:8 145:16

sentence 43:2 88:15,24 89:2,7,10, 20

serve 112:12 147:8

served 67:23

serves 16:7,17

services 77:12 116:4 127:7 130:9,21 132:5

set 36:14,24 37:13 54:3

settle 89:10

settlement 65:24 109:21,24

settling 89:19

severity 6:10

Sevilla 112:12 113:9, 19

share 30:25

shared 77:12 116:4 127:7 130:9,21 132:5 137:3,13 139:5

shares 92:15

sharply 142:25

she'd 71:4

She'll 91:25

sheets 146:15,20

shortly 78:22

showed 108:7

signatory 104:10 106:8

signed 16:3 17:15 84:9

significant 63:21,23 146:13

signing 15:25

similar 45:10

simply 91:14 92:12 123:13

single 128:13

sir 8:17 33:20 35:11 85:9 94:17 126:3 130:11

sit 10:15 55:21 66:19 143:17 144:13

sits 143:14

situation 105:22

Sky 41:12,15,24 42:19,23 43:9,10,19 89:24

so-called 144:24

social 6:11

sold 38:14 46:8 50:11 56:6 63:9,17

sought 26:23 103:2 110:11 111:25

sounded 21:25

Sowin 40:16,17 49:3, 6 51:9,17,20 54:12 57:18,22 58:5,8,12 59:9,17 90:4 92:21

Sowin's 50:3,4 58:15

speak 32:13 42:17 55:16,18,19 74:6 83:2,9,16

speaking 59:25 95:23

specific 19:10 73:3

specifically 30:15 33:5 35:15 85:10 90:6 96:3 100:16 126:20 127:21,24 128:3

specifics 79:14

speculate 21:8 22:25 29:5 55:4 68:22 98:21 120:4,5 136:7

speculating 55:9

speculation 55:4

**speed** 99:3

**spent** 123:6 144:22

**spoken** 57:11 60:4 138:2

**stab** 145:8

**stack** 71:4,5

**staff** 25:24 37:19

**stand** 52:5 135:3,19

**standard** 7:11 47:25 73:9 75:11 108:25 109:5 143:4,8 147:24

**standing** 23:22 24:22 26:11

**standpoint** 36:3

**stands** 17:3

**Stang** 8:14

**start** 7:8 39:6

**started** 108:13 110:14

**starts** 119:21

**state** 6:23 47:2 116:11,12

**statement** 46:15 79:8 87:6 122:16 135:20

**statements** 88:9 125:2,13,20 126:12, 21 132:13,23 133:10, 25 135:10,14,18,24

**States** 7:14

**stay** 26:23 103:25

**stayed** 77:8

**stays** 26:20

**steno** 7:18

**stenographer** 11:4 16:10 57:8 69:2 82:8 96:9,12,16 111:22 116:8 136:4 137:10 142:15 143:24

**stenographic** 50:25

**stepped** 50:20

**steps** 42:21 43:4

**stick** 66:25 124:5

**stipulate** 6:18

**stop** 38:21 43:9,10, 14 53:11 63:20 89:17,23 140:21

**stopped** 40:7 69:14

**stopping** 42:14

**Strand** 14:14

**Strategic** 22:10,18

**strategist** 111:8,9

**strategy** 111:3 142:6

**strike** 29:6 30:11 56:9 91:11,20,25

**string** 39:5 118:25 119:20,21,25 120:6

**struggle** 145:5

**stuck** 126:16

**stuff** 78:14,15 91:8 99:9

**subject** 24:17,18,19 26:20 41:12 101:22 103:25 104:3 105:25 111:6 126:15 130:14 132:22

**submit** 15:21

**submitted** 15:3

**subpoena** 126:21 134:17 135:2,19 147:8,12

**subsequently** 122:22

**subsidiary** 22:2

**substance** 15:11 32:6 44:25 45:10 50:4 96:6

**substances** 44:24

**suffered** 46:6

**sufficient** 52:6

**suggest** 61:16 102:19

**suggested** 112:12

**suggesting** 64:3

**summary** 101:15

**supersede** 56:2 71:13

**supervise** 71:13

**supervisor** 146:10

**support** 15:12 33:6 37:24 99:25 103:15

**supported** 99:4

**supposed** 124:20

**surface** 76:15

**Surgent** 53:5,13 60:24 61:18

**suspense** 126:19

**swear** 6:16 7:19

**swearing** 6:20

**switched** 69:16

**sworn** 8:4

**symbol** 21:21

**system** 54:9

**systems** 47:11 50:21

**T**

**takes** 147:7

**taking** 48:10 106:19 107:3

**talk** 16:5 47:3,9,10, 15,19 59:12,14 60:9 62:5 83:25 117:21

**talked** 20:15,16 23:12 60:12 62:6 98:16

**talking** 13:10,11 73:3

**Tara** 68:13 81:13,24 82:5,14,15 83:17,20, 22

**Tara's** 71:10 80:20 81:3,10 83:19 86:6, 19 87:2

**technical** 50:24

**technology** 78:14

**telephone** 8:23 48:14

**telling** 108:18

**temporary** 12:18,22 13:9,14,19 14:10 15:4 84:8

**ten** 46:18,24 47:21 108:4

**ten-minute** 107:23

**term** 117:18

**terminate** 26:24

**terminated** 25:25 26:18 78:21

**termination** 80:3

**terms** 45:10 64:3 101:16

**testified** 8:5 59:4 99:3 137:15

**testify** 11:20 16:20 23:19,21,23,24 24:5, 14 113:19

**testifying** 12:11 26:10

**testimony** 24:21 35:24 47:16 58:6 59:13 76:24 120:13 124:2

**Texas** 7:16

**text** 62:9,19,23 70:4 74:20 80:18 81:23 82:11 126:17 134:11, 19,22

**texts** 107:14

**Thanksgiving** 38:7 60:13 90:24

**theme** 99:8

**thing** 31:8 103:11 104:15 113:10 120:8 140:9

**things** 16:3 24:17 26:21 61:4 64:2 99:12 106:3 128:5

**thinking** 46:23

**Thomas** 53:5 61:2 62:2,4,6

**thought** 15:18 22:14 52:11 54:24 55:24 59:21 62:2,7 78:24 79:2 96:4 121:8

**threw** 73:12,14 76:19,20 77:18

**throw** 72:21 73:5,20 74:2 80:15,24 81:10, 14

**throwing** 73:17

**thrown** 86:15

**thrust** 99:7

**thumb** 71:4

**time** 7:11 8:19 14:9 19:14 31:8,12 32:3,4 35:14,25 38:19 40:10 42:3,12 45:5 47:25 53:20 57:21 59:24 60:4,11,12 62:9 63:18 70:14 73:24 74:11,13,20 77:5,6, 18 82:16 86:5 88:5 90:3,20 94:20 100:20 103:16 107:12 108:3, 8,25 109:5 117:11 123:6,16,25 124:12 128:13 129:20,22 133:8 135:9 139:24 140:15 142:12,24 143:4,8 144:22 147:24

**times** 23:6 123:22 126:4 145:13

**title** 129:3

**titles** 21:4 22:17

**today** 9:21 10:22 12:8,11 31:9 47:16 48:10,14 84:17 127:19

**today's** 7:9 9:16 10:24 11:8

**told** 25:24 34:16 37:8,20 57:4,23 66:12,15,17 74:23 86:19 100:22 120:11 133:23

**tomorrow** 103:5,13 147:15

**top** 63:14 101:18 113:7 115:21,22 122:14

**topic** 107:19 118:10 119:13

**touch** 16:11

**trade** 53:23 54:4,7 89:11

**trader** 40:15

**trades** 38:21 42:5,14 50:5,8 53:3,7 54:9, 10,24 55:11,15,22 56:16 57:2 58:17,22 60:17 61:18,24 89:9, 11,17,19,23 101:20

**trading** 49:13 52:8 72:24

**transactions** 42:19, 24 43:9,10 45:23 52:19 57:13 60:10 111:18

**transcend** 99:12

**transcript** 13:24

**transfer** 102:7,9,24 104:7

**transferred** 75:18

**transition** 50:12 56:2 63:8 72:7 74:12

**transitioned** 78:10

**trial** 112:22 113:18

**TRO** 15:13,16,23 16:6 83:25 93:4,15, 18 110:11 111:2 113:13 114:18 125:5 126:15 127:25 128:2

**true** 19:22 89:21

**trust** 71:10,11

**TSG** 6:9

**turn** 50:22

**tweak** 55:6

**twisted** 26:10

**typed** 122:20

**typical** 46:5

---

**U**

**UCC** 74:19,23 124:25 125:12,19 126:7 136:6

**ultimate** 28:25

**ultimately** 141:4

**unawareness** 52:8

**underlying** 44:7 51:25

**understand** 10:21, 24 11:7 12:14 19:15 25:3 27:7 51:13 60:6 70:13 73:24 76:18 87:22 115:14 125:8

**understanding** 13:5,8 29:8,10,20 30:5,9 34:21 39:22 41:14 58:21 78:19 79:12,13,17,22,25 84:18,24 88:17 92:4 97:18 102:12 137:7 143:20

**understood** 42:3 70:2 73:8

**unfounded** 63:17

**unhighlight** 49:21

**United** 7:14

**unpaid** 77:8

**untenable** 101:15,17

**untrue** 87:6

**unusual** 52:12

**up-front** 101:23

**upgraded** 73:24

**urgency** 90:24

---

**V**

**validity** 6:19

**variety** 126:6

**vast** 123:7

**vehicles** 16:19 17:9

**versus** 72:24

**video** 6:19

**video-recorded** 7:8

**view** 102:17

**viewed** 32:23

**vindictive** 90:21 91:5

**violating** 63:4

**virtually** 21:10

---

**W**

**Wait** 7:20

**waited** 91:2

**waived** 116:11

**wanted** 49:19 55:14, 21 56:15 57:2,13 61:21,23 74:24 76:3 90:5 91:16 92:14 101:23 119:15,22 125:12,19

**warning** 62:25 63:19 64:9

**warnings** 64:12

**Waterhouse** 146:8,9

**week** 69:17 95:5

**weeks** 25:25 74:16 112:3

**withdraw** 33:17 34:7 38:4 98:5,11 106:10, 14

**withdrawn** 15:10 16:24 28:4 34:13 39:20,21 44:14 45:20 52:17 54:16 55:13 66:20 70:23 71:16 72:15 76:19 78:8 80:5 82:14 86:12 101:10 105:10 106:8 129:6 143:25

**woman** 128:17

**word** 25:4

**words** 122:18

**work** 39:6 71:10 82:6,10,15,23 128:22

**work-around** 53:2,7, 23 54:22 61:2,12,25

**worked** 69:7

**working** 53:22 119:16 120:19 121:2 123:7

**works** 40:16 54:14, 18,20 61:20 83:20 92:9

**world** 36:13

**worse** 90:19

**wrapped** 101:16

**write** 60:23 63:2

**writes** 113:8

**writing** 44:6 103:8

**writings** 44:13,15 45:4

**written** 37:10,17,18 44:9

**wrong** 99:20

**wrote** 51:17,25 53:5, 22 64:8 112:21 113:3

---

**Y**

**year** 69:18 123:20,21 126:5 142:4 145:18

**years** 34:22 41:17 53:20 69:25 72:12 73:25 88:16 142:5 144:10,11

---

**Z**

**Ziehl** 8:14

# EXHIBIT 96

Appx. 01639

Page 103

1          Dondero - 5-28-2021

2     IN THE UNITED STATES BANKRUPTCY COURT

3       FOR THE NORTHERN DISTRICT OF TEXAS

4            DALLAS DIVISION

5   In re:                    )
                              )
6   HIGHLAND CAPITAL          )   Case No.
    MANAGEMENT, LP,           ) 19-34054 L.P.
7                             ) Chapter 11
          Debtor,            )
8   ------------------------------)
    HIGHLAND CAPITAL MANAGEMENT,  )
9   LP,                       )
                              )
10        Plaintiff,         ) Adversary No.
                             ) 21-03003-sgi
11      vs.                   )
                              )
12  JAMES D. DONDERO,              )
                              )
13        Defendant.         )

14

15          REMOTE DEPOSITION OF

16            JAMES DONDERO

17

18          Pages 103 - 282

19            Dallas, Texas

20      Friday, 28th day of May, 2021

21

22

23  Job No. 194690

24  Reported by:

25  Daniel J. Skur, Notary Public and CSR

Appx. 01640

Page 104

1    Dondero - 5-28-2021

2

3

4

5

6

7

8    28th day of May, 2021

9    9:33 a.m. - 1:59 p.m.

10

11

12    Remote Deposition of JAMES DONDERO,

13   located in Dallas, Texas, before Daniel J.

14   Skur, Notary Public and Certified Shorthand

15   Reporter in and for the State of Texas

16   located in Waxahachie, Texas.

17

18

19

20

21

22

23

24

25

Page 105

1    Dondero - 5-28-2021

2    A P P E A R A N C E S:

3    Pachulski Stang Ziehl & Jones

     Attorney(s) for Debtor

4    780 Third Avenue

     New York, New York 10017

5

6    BY:   John Morris, Esq.

7        Gregory Demo, Esq.

8

     Stinson

9    Attorney(s) for The Witness

     3102 Oak Lawn Avenue

10

     Dallas, Texas 75219

11

12    BY:   Deborah Deitsch-Perez

13        Michael Aigen, Esq.

         Paul Lackey, Esq.

14

15

     Sidley Austin

16   Attorney(s) for The Committee

     2021 McKinney Avenue

17

     Dallas, Texas 75201

18

     BY:   Paige Montgomery, Esq.

19

20

21   ALSO PRESENT:

22       Davor Rukavina, NexPoint

23       La Asia Canty

24

25

Page 106

1    Dondero - 5-28-2021

2

3    IT IS HEREBY STIPULATED AND AGREED

4    by and between the attorneys for the respective

5    parties herein, that filing and sealing be and

6    the same are hereby waived.

7    IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form  of

9    the question, shall be reserved to the

10   time of the trial.

11   IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn to and

13   signed before any officer authorized to

14   administer an oath, with the same force and

15   effect as if signed and sworn to before the

16   Court.

17        - oOo -

18

19

20

21

22

23

24

25

Page 107

1    Dondero - 5-28-2021

2    PROCEEDINGS

3    REMOTE ORAL DEPOSITION OF

4    JAMES DONDERO

5    (REPORTER NOTE:  This deposition is

6    being conducted remotely in accordance with

7    the Current Emergency Order regarding the

8    COVID-19 State of Disaster.

9        Today's date is the 28th day of

10   May, 2021.  The time is 9:33 a.m. Daylight

11   Savings Time.  The witness is located in

12   Dallas, Texas.)

13        JAMES DONDERO,

14   having been duly cautioned and sworn to tell

15   the truth, the whole truth and nothing but the

16   truth, testified as follows:

17        (9:33 A.M.)

18        EXAMINATION

19   BY MR. MORRIS:

20   Q.   Good morning, Mr. Dondero.

21   A.   Morning.

22   Q.   It's John Morris, again, from

23   Pachulski on behalf of the debtor.  We're here

24   for your deposition today.

25        Do you understand that?

Page 108

Dondero - 5-28-2021

1  A.  Yes.
2
3  Q.  Okay.  We've done this a few times,
4  so I'm going to kind of cut to the chase; but I
5  do want to remind you that we're going to be
6  looking at a number of documents today.
7      And because of the difficulty
8  sometimes of doing this on a Zoom or by video,
9  if, at any time, you believe you need to see
10  other portions of the document, please let me
11  know that.  Okay?
12  A.  Sure.
13  Q.  Okay.
14      MR. MORRIS:  Can we put up the first
15  exhibit, please?
16      (Exhibit 1 introduced.)
17  BY MR. MORRIS:
18  Q.  Okay.  This is a document that's got
19  a title, "Promissory Note."  It's dated
20  February 2, 2018, and the amount of the note is
21  $3,825,000.
22      Do you see that?
23  A.  Yes.
24      MR. MORRIS:  Can we just go to the
25  signature line, please?

Page 109

Dondero - 5-28-2021

1  BY MR. MORRIS:
2
3  Q.  Is that your signature, sir?
4  A.  I believe that's my assistant on my
5  behalf.
6  Q.  Did you authorize --
7      (Audio distortion.)
8  A.  I'm sorry?
9  BY MR. MORRIS:
10  Q.  I don't want to step on your words.
11  Were you finished with your answer?
12  MS. DEITSCH-PEREZ:  Yeah.  Can
13  you – yeah, can you ask it again?
14  MR. MORRIS:  Sure.
15  BY MR. MORRIS:
16  Q.  Is that your signature, sir?
17  A.  Yes, for – yes.
18  MR. MORRIS:  Can we go back to the
19  top of the document?
20  BY MR. MORRIS:
21  Q.  And was this document signed on or
22  around February 2, 2018?
23  A.  Yes.
24  Q.  Did you receive $3,825,000 from the
25  debtor on or around February 2nd, 2018?

Page 110

Dondero - 5-28-2021

1  A.  I – I believe so.  I don't have
2  direct awareness, but I believe so.
3  Q.  Okay.  And did you sign this
4  promissory note in exchange for that cash that
5  you believe you received?
6  A.  Yes.
7  Q.  Okay.  Are you familiar with the
8  term "demand note"?
9  A.  Yes.
10  Q.  Can you describe for me your
11  understanding of what a demand note is?
12  A.  It's a note that's -- maturity is
13  defined by the term "demand" versus a – a
14  stipulated date.
15  Q.  And if we look down to paragraph 2,
16  at the time that you signed this document on
17  February 2, 2018, did you understand, based on
18  paragraph 2, that you were signing a demand
19  note, as you've characterized it?
20  A.  Yes.
21  Q.  Okay.
22  MR. MORRIS:  Can we go back to the
23  top of the document?
24  BY MR. MORRIS:
25

Page 111

Dondero - 5-28-2021

1  Q.  Is it fair to say that under this
2  demand note, you promised to pay Highland
3  Capital Management, L.P., the sum of
4  $3,825,000?
5  A.  Yes.
6  Q.  Okay.  And at the time that you
7  signed this document on February 2nd, 2018, did
8  you intend to repay to Highland Capital
9  Management, L.P., $3,825,000 plus interest?
10  A.  Yes.
11  Q.  And at the time you signed this
12  document, did you intend to repay the principal
13  amount plus interest upon demand by HCMLP?
14  A.  Whatever was appropriate to pay,
15  what hadn't been paid if it – if it had –
16  yeah, if it had -- whatever the terms are, the
17  terms are.
18  Q.  Okay.  Did you read the promissory
19  note before you signed it?
20  A.  No.
21  Q.  Is there anything about the
22  promissory note today that you don't
23  understand?
24  A.  I haven't looked at it closely.  I'm

Dondero - 5-28-2021

1    Dondero - 5-28-2021
2   aware of it but -- you know, but I'm not aware.
3   I haven't looked at it closely.
4       Q.   Well, but you do know that the
5   debtor has sued you to collect on this note,
6   right?
7       A.   Yes.
8       Q.   Okay. And can you identify anything
9   in this note today that you don't understand?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      A.   Again, I don't want to make any
13  legal interpretation or analysis of the
14  contract.
15  BY MR. MORRIS:
16      Q.   And I appreciate that.
17      And to be clear, I'm not asking you
18  for any legal opinion or any legal analysis.
19  I'm asking for facts.
20      As a factual matter, as a layperson,
21  is there anything about this note today that
22  you do not understand?
23      MS. DEITSCH-PEREZ:  Object, no
24  foundation.
25      A.   And I can't say.

1    Dondero - 5-28-2021
2   BY MR. MORRIS:
3       Q.   Okay. You're not aware of anything;
4   is that fair?
5       MS. DEITSCH-PEREZ:  Object, no
6   foundation.
7       A.   No. I'm saying I can't give an
8   opinion.
9   BY MR. MORRIS:
10      Q.   All right. I'll try one more time a
11  slightly different way.
12      Can you identify any language in
13  this promissory note that you, as the maker of
14  the note and as a layperson, as a matter of
15  fact, do not understand?
16      MS. DEITSCH-PEREZ:  Objection, no
17  foundation.
18      A.   I -- I don't have -- I haven't
19  reviewed it. I don't have a comment.
20  BY MR. MORRIS:
21      Q.   At the time that you signed this,
22  did you believe that this note reflected all of
23  the terms and conditions with respect to the
24  subject matter of the note?
25      MS. DEITSCH-PEREZ:  Object, no

1    Dondero - 5-28-2021
2   foundation.
3       A.   Yeah, I believe largely at the time,
4   yes.
5   BY MR. MORRIS:
6       Q.   In fact, if we go to paragraph 8,
7   there's -- the last sentence is what's commonly
8   referred to as an integration clause.
9       Do you see that last sentence of
10  paragraph 8?
11      A.   Yes.
12      Q.   And did you agree with the debtor
13  that the terms and provisions of the paragraph
14  control and supersede every other provision of
15  all other agreements between the payee and the
16  maker in conflict herewith?
17      A.   I see it. I mean, I read it. But
18  what's -- what's the question?
19      Q.   Withdrawn. It's okay. It speaks
20  for itself.
21      You were the CEO of Highland at the
22  time that you signed the note, correct?
23      A.   Yes.
24      Q.   And you controlled Highland at that
25  time; is that fair?

1    Dondero - 5-28-2021
2       A.   Yes.
3       Q.   And at the time that you signed the
4   note, the Redeemer Committee had not yet
5   obtained a judgment against Highland Capital
6   Management or anybody else; is that -- any
7   other Highland entity; is that right?
8       A.   I -- and I don't recall the -- the
9   timing --
10      Q.   Okay.
11      A.   -- of their arbitration award or...
12      Q.   Let me ask you to just go back in
13  time, February of 2018. Do you recall having
14  any concern in February 2018 that you might
15  lose control of Highland?
16      A.   No, I don't recall.
17      Q.   While you were the CEO, did
18  Highland -- withdrawn.
19      I'm going to refer to Highland
20  Capital Management, L.P., variously today as
21  either the debtor, Highland, or HCMLP; is that
22  fair?
23      MS. DEITSCH-PEREZ:  John, I think
24  it's a little confusing if you do that. I
25  mean, if you could refer to the

1        Dondero - 5-28-2021
2    post-bankruptcy entity as "the debtor" and,
3    when you're talking about prebankruptcy,
4    call it "Highland" or "HCM"?
5        MR. MORRIS: Okay.
6        MS. DEITSCH-PEREZ: I – I think
7    that would probably be clearer.
8        MR. MORRIS: That's fair. I'll try
9    and do just that. Thank you very much.
10   BY MR. MORRIS:
11       Q. While you were the CEO of HCMLP, did
12   HCMLP, prepare, in the ordinary course of
13   business, a document called a "Monthly
14   Reporting Package"?
15       A. I don't know – I don't know the
16   name – I don't know that name in particular,
17   but we did do monthly financials, I believe.
18       Q. Okay. And did you personally review
19   the monthly financials each month that they
20   were prepared?
21       A. No.
22       Q. Do you know who was responsible for
23   preparing the monthly financials?
24       A. It would have been in accounting. I
25   don't know who in accounting.

1        Dondero - 5-28-2021
2        Q. Was Frank Waterhouse responsible for
3    preparing the Monthly Operating Reports?
4        A. He was our CFO. So everything,
5    ultimately, in accounting reported up through
6    him, but I don't know his involvement in that
7    report.
8        Q. Can you identify any person who was
9    responsible for preparing the Monthly Operating
10   Reports for HCMLP, while you were the CEO?
11       A. No.
12       Q. Do you know what the Monthly
13   Operating Reports were used for?
14       Withdrawn.
15       What was the purpose of preparing
16   Monthly Operating Reports, if you know?
17       A. I don't know.
18       Q. Were they delivered to you each
19   month, even if you didn't read them?
20       A. I don't believe so. Not physically,
21   that I can remember. If there was an email, I
22   don't remember.
23       Q. Did you ever discuss any of the
24   Monthly Operating Reports with Mr. Waterhouse?
25       A. I can't – I can't recall.

1        Dondero - 5-28-2021
2        MS. DEITSCH-PEREZ: I mean, do you
3    mean the report specifically or Highland's
4    financials generally?
5        MR. MORRIS: The Monthly Operating
6    Reports that we're talking about.
7        And I would appreciate it, Deborah,
8    if you have an objection, just say "Object
9    to the form of the question"; and I'll do
10   the best I can to – to try to understand
11   what you're saying, but I'd prefer no
12   speaking objections.
13   BY MR. MORRIS:
14       Q. Do you recall ever speaking with
15   anybody in accounting with respect to any
16   Monthly Operating Report that they prepared?
17       A. I don't recall.
18       Q. Okay.
19       MR. MORRIS: Can we put up Exhibit
20   Number 2, please?
21       (Exhibit 2 introduced.)
22   BY MR. MORRIS:
23       Q. Looking at the first page, sir, does
24   this appear to be what we've been describing as
25   a Monthly Operating Report for Highland Capital

1        Dondero - 5-28-2021
2    Management?
3        A. It says "Operating Results." I – I
4    have no recollection of seeing this cover sheet
5    before.
6        Q. Okay.
7        MR. MORRIS: Can we go to the second
8    page, please?
9        Stop right there.
10   BY MR. MORRIS:
11       Q. This is the second page of the
12   Operating Results for February 2018, and it's
13   headed "Significant Items Impacting HCMLP's
14   Balance Sheet."
15       Do you see that?
16       A. Yes.
17       Q. Do you know whether the accounting
18   department was charged with the responsibility
19   of identifying on a monthly basis significant
20   items that would impact Highland's balance
21   sheet?
22       A. I have no particular awareness.
23       Q. Okay. Do you see at the bottom
24   under the title "Other," it's $3.8 million and
25   it's referred to as "Partner Loan"?

Dondero - 5-28-2021

2 A. Yes.

3 Q. Do you have an understanding that

4 that 3.8 million-dollar partner loan refers to

5 what we just looked at as Exhibit 1, the

6 promissory note?

7 MS. DEITSCH-PEREZ: Object, no

8 foundation.

9 A. I have -- I have no particular

10 awareness other than the amounts are similar.

11 BY MR. MORRIS:

12 Q. And -- and do you know whether

13 Highland recorded the promissory note as an

14 asset on its balance sheet as of February 2018?

15 A. I -- I don't know.

16 Q. So, you signed a promissory note for

17 $3.8 million in February 2018; and as the CEO,

18 you don't know if Highland carried that

19 promissory note on its balance sheet. Do I

20 have that right?

21 A. I'm saying I don't have particular

22 knowledge. I -- I am a CPA and GAAP accounting

23 would suggest that it was, but I don't have --

24 I don't have particular knowledge on how it was

25 accounted for.

Dondero - 5-28-2021

2 Q. Okay. Later in the year, you signed

3 two more promissory notes in favor of Highland;

4 is that right?

5 A. I -- I believe so. Yeah.

6 MR. MORRIS: Can you put up

7 Exhibit 3, please?

8 (Exhibit 3 introduced.)

9 BY MR. MORRIS:

10 Q. And can we go to the signature line?

11 (Scrolling.)

12 BY MR. MORRIS:

13 Q. Is that your signature, sir?

14 A. Yes.

15 MR. MORRIS: Go to the top of the

16 page.

17 BY MR. MORRIS:

18 Q. Did you sign a promissory note on or

19 about August 1st, 2018, in the amount of

20 $2.5 million in favor of Highland?

21 A. Yes.

22 Q. Did you receive from Highland

23 Capital Management, L.P., $2.5 million on or

24 about August 1st, 2018?

25 A. I believe so.

Dondero - 5-28-2021

2 Q. And did you, in fact, sign this

3 promissory note in exchange for that

4 $2.5 million?

5 A. Yes.

6 MR. MORRIS: Can we go down to

7 paragraph 2, please?

8 (Scrolling.)

9 BY MR. MORRIS:

10 Q. Looking at paragraph 2, would you

11 characterize this as a demand note, using the

12 understanding that you described earlier today?

13 A. Yes.

14 Q. And -- and this note, like the

15 other, because they're demand notes, there's no

16 conditions for -- for the demand, is that

17 right, at least as drafted.

18 Withdrawn. That wasn't a great

19 question.

20 Were these unconditional demand

21 notes, these two documents that we've

22 looked at?

23 A. I -- I don't want to make a legal

24 interpretation.

25 Q. I'm just asking for your

Dondero - 5-28-2021

2 understanding as the person who signed the

3 note. At the time you signed it, at that time,

4 did you understand that there were any

5 conditions placed on Highland's ability to make

6 a demand?

7 A. I don't know.

8 Q. Okay. Did you understand that under

9 these demand notes, that if you defaulted, all

10 amounts that were due and payable would

11 accelerate?

12 MS. DEITSCH-PEREZ: Object to the

13 form.

14 A. I don't know.

15 BY MR. MORRIS:

16 Q. Did you read this -- did you read

17 this promissory note before you signed it?

18 A. No.

19 Q. Do you know whose idea it was to

20 give you the principal amount of these notes

21 and for you to execute the promissory notes in

22 exchange?

23 A. I -- again, I think it's proper

24 accounting consistent with what we've done

25 with -- we've done historically -- or Highland

Dondero - 5-28-2021

1    Dondero - 5-28-2021
2  did historically and what Highland did
3  historically for other employees.
4      Q.   Okay. I'm not asking about that.
5  I'm asking just about you and the two notes
6  that we've looked at so far: Who made the
7  decision at the respective moments in time to
8  transfer to you the principal amount of the
9  notes and for you to execute the notes?
10     A.   I believe it would have come from
11 accounting.
12     Q.   Who decided -- who decided the
13 principal amount of the note?
14     A.   I don't know. It would -- I don't
15 know.
16     Q.   Did you ask to borrow money?
17         Did you ask the folks in accounting
18 for a loan from Highland in the principal
19 amount of the notes and request that they
20 document it accordingly?
21     A.   No.
22     Q.   Who was your assistant at this time?
23     A.   My accounting assistant at this time
24 was Melissa Schroth.
25     Q.   And was she authorized to sign these

1    Dondero - 5-28-2021
2  notes on your behalf?
3      A.   I -- that -- sometimes she signs
4  stuff. I don't know on this. I'm -- I'm not
5  denying that it's a bona fide -- signed by me.
6  Or if it wasn't signed by me, it was --
7  somebody who was authorized signed it on my
8  behalf.
9      Q.   Okay. I appreciate that. Thank
10 you.
11         Is there anything about --
12 withdrawn.
13         Was there anything about this
14 promissory note that you didn't understand at
15 the time that either you signed it or it was
16 signed on your behalf?
17         MS. DEITSCH-PEREZ: Object, no
18 foundation.
19     A.   Again, I didn't evaluate it
20 carefully, and I didn't actually even read it.
21 BY MR. MORRIS:
22     Q.   Okay. As you sit here today, can
23 you identify anything in this document that you
24 do not understand?
25         MS. DEITSCH-PEREZ: Object, no

1    Dondero - 5-28-2021
2  foundation.
3      A.   I -- I don't want to make a legal
4  interpretation on a legal document.
5  BY MR. MORRIS:
6      Q.   I appreciate that, but I have no
7  ability to ask any follow-up questions. So let
8  me ask it just a different way: Is there
9  anything about this document that you don't
10 understand today?
11         MS. DEITSCH-PEREZ: Object, no
12 foundation.
13 BY MR. MORRIS:
14     Q.   You can answer.
15     A.   I don't know.
16     Q.   Okay. Do you understand that if
17 there was something that -- that you did not
18 understand, you have an obligation to tell me
19 that right now?
20         MS. DEITSCH-PEREZ: Object, no
21 foundation.
22     A.   I -- I -- the answer is the same. I
23 don't know.
24         MR. MORRIS: Can we go to Exhibit
25 Number 4, please?

1    Dondero - 5-28-2021
2         (Exhibit 4 introduced.)
3         MR. MORRIS: Can we go to the
4  signature line when you get there?
5  BY MR. MORRIS:
6      Q.   Is that your signature, sir?
7      A.   Yes.
8      Q.   And did you sign this document or --
9  or -- let me ask two questions first. Did you
10 personally sign this document?
11     A.   And again, it was either me or
12 someone with my approval, but that doesn't look
13 like my typical signature, but it's close.
14     Q.   Okay. And whoever signed it had the
15 authority from you to sign on your behalf; is
16 that fair?
17     A.   Yes.
18     Q.   Okay.
19         MR. MORRIS: Can we go to the top of
20 the page, please?
21 BY MR. MORRIS:
22     Q.   And did you or somebody acting on
23 your behalf sign this promissory note on
24 August 13, 2018, in the amount of $2.5 million?
25     A.   Yes.

Dondero - 5-28-2021

2 MR. MORRIS: Can we go to
3 paragraph 2, please?
4 BY MR. MORRIS:
5 Q. Looking at paragraph 2 and the term
6 contained therein, would you agree that this is
7 a demand note, using the definition that you
8 supplied earlier today?
9 A. Yes.
10 Q. At the time that this note was
11 signed on your behalf, did you intend to comply
12 with the terms of this note?
13 A. Yes.
14 Q. At the time that this note was
15 signed on your behalf, did you intend to pay
16 all unpaid principal and accrued, but unpaid,
17 interest upon demand of the payee?
18 A. Let me say I – I expected to honor
19 the agreement. I don't know if I can answer
20 that with regard to that one term.
21 Q. Well, I do just want to make sure
22 that – withdrawn.
23 You understood at the time you
24 signed this document, or it was signed on your
25 behalf, that it was a demand note, correct?

Dondero - 5-28-2021

2 A. That it was structured – no. I
3 think what I've testified or tried to testify
4 to is that they are demand notes or they're
5 written as demand notes. I didn't read them or
6 pay attention at the time to the structure of
7 the note.
8 Q. Okay. And as demand notes, you
9 understood that any unpaid principal and
10 interest would be due upon demand, correct?
11 A. Again, I don't want to make – I
12 don't want to make – I don't want to affirm
13 that statement. I would say I don't know
14 because I don't want to – I don't know the
15 rest of the context of the rest of the note and
16 how it all interplays.
17 Q. All right. Well, I'm happy to –
18 to – it's a very short document, so we can
19 look at it for as long as you want, but I
20 really need to know what – what you, as the
21 maker, understood when you signed the note. So
22 I'm going to ask a very simple question, and I
23 encourage you to – to ask to see whatever
24 portions of the document you want, okay?
25 When these three notes were signed

Dondero - 5-28-2021

2 by you or signed by someone you authorized to
3 sign, what did you understand the payment terms
4 to be?
5 A. I – I didn't. I didn't have an
6 understanding at the time.
7 Q. So – but – but you would agree
8 that your intention was to comply with the
9 terms of the note; is that fair?
10 A. In aggregate, yes.
11 Q. Okay.
12 MR. MORRIS: Go to Exhibit 5,
13 please.
14 (Exhibit 5 introduced.)
15 BY MR. MORRIS:
16 Q. Is it your practice to sign
17 documents or to have people sign documents on
18 your behalf that you haven't read?
19 A. Yes.
20 Q. This is a document that's entitled
21 "Operating Results" for August 2018. Do you
22 see that?
23 A. Yes.
24 MR. MORRIS: And if we could just go
25 to the second page.

Dondero - 5-28-2021

2 BY MR. MORRIS:
3 Q. Do you see under Significant Items
4 Impacting Highland's bank – balance sheet for
5 August 2018 at the bottom, there's a reference
6 to $5 million in "partner loan." Do you see
7 that?
8 A. Yes.
9 Q. Do you have an understanding as to
10 whether or not that refers to the two
11 2.5 million-dollar notes that we just looked at
12 that were signed in August 2018?
13 A. I don't know.
14 Q. Do you have any recollection at
15 all or – withdrawn.
16 Were you personally referred to as a
17 partner of Highland in August 2018?
18 A. I believe so.
19 Q. Are you aware of any partner loans
20 that were made by Highland in August 2018 other
21 than the two loans that we just looked at?
22 A. I don't know.
23 Q. You're not aware of any; is that
24 fair?
25 MS. DEITSCH-PEREZ: Object, no

Dondero - 5-28-2021

1   foundation.
2
3   A.   I don't know.
4   BY MR. MORRIS:
5       Q.   There came a time when the debtor
6   made demand on these three notes, right?
7       A.   I don't know.  I believe -- I don't
8   know specifically, but I believe so.
9           MR. MORRIS:  Can we put up
10  Exhibit 6, please?
11          (Exhibit 6 introduced.)
12  BY MR. MORRIS:
13      Q.   Do you see this is a -- it's a
14  letter dated December 3rd, and it's addressed
15  to you.
16          And if we scroll down a little bit,
17  it's signed by Mr. Seery as the CEO and CRO of
18  Highland Capital Management.
19          Do you see that?
20      A.   Yes.
21      Q.   Do you recall on or around
22  December 3rd, 2020, the debtor made a demand
23  for all outstanding principal and interest due
24  under the three notes that we just looked at?
25      A.   I -- I see the letter.  I don't have

Dondero - 5-28-2021

1   a recollection.
2
3       Q.   All right.  Do you understand that
4   in December 2020, the debtor made a demand for
5   payment of all unpaid principal and interest
6   under the three notes that we just looked at,
7   even if you don't remember this particular
8   letter?
9       A.   I'm sorry.  What was -- yeah, I
10  accept the letter, and I'll accept that it was
11  delivered.
12          What -- what's your question,
13  please?
14      Q.   I'm trying to just get -- get your
15  understanding.
16          And I think you testified that you
17  don't recall seeing this letter.  Do I have
18  that right?
19      A.   That's correct.
20      Q.   Okay.  So, putting the letter to the
21  side, did you become aware in December 2020
22  that the debtor had demanded that you pay all
23  unpaid principal and interest due under the
24  three promissory notes that we just looked at?
25      A.   Again, just generally.

Dondero - 5-28-2021

1       Q.   Did you make any payment to the
2   debtor in response to that demand?
3
4       A.   No.
5       Q.   Did you or anybody acting on your
6   behalf respond to the debtor's demand in any
7   way?
8           MS. DEITSCH-PEREZ:  Object to the
9   form.
10  BY MR. MORRIS:
11      Q.   Withdrawn.  That's fair.
12          Let me ask a different question.
13          Did you or anybody acting on your
14  behalf respond to the debtor's demand at any
15  time prior to the commencement of this
16  adversary proceeding?
17          MS. DEITSCH-PEREZ:  Object to the
18  form.
19      A.   Can you repeat it one more time?
20  BY MR. MORRIS:
21      Q.   Sure.  Did you or anybody acting on
22  your behalf respond to the debtor's demand for
23  payment of all unpaid principal and interest at
24  any time prior to the commencement of this
25  lawsuit?

Dondero - 5-28-2021

1           MS. DEITSCH-PEREZ:  Object to the
2   form.
3
4       A.   I want -- I want to answer that
5   question as -- as follows:  I'm not saying on
6   my behalf, but I know there was a lot of
7   conversations with lawyers and business people
8   around the notes and their shared services and
9   the split and the overpayments to Highland and
10  -- trying to reach some amicable resolution of
11  shared services -- in fact, the entire
12  estate -- but I don't -- I don't -- I don't
13  recall specifically or -- what lawyers or what
14  business people were saying what to the debtor,
15  but I -- I know there were a lot of
16  conversations that were going on.
17  BY MR. MORRIS:
18      Q.   Can you identify any aspect of any
19  of the conversations you just described that
20  pertained to the debtor's demand for payment of
21  all unpaid principal and interest on the three
22  notes?
23      A.   Not -- not specifically.
24      Q.   Okay.  There came a time when an
25  answer to the debtor's complaint was filed on

Dondero - 5-28-2021

2 your behalf.
3      Do you remember that?
4   A.  No, but I'm willing to be refreshed.
5   Q.  Okay.
6      MR. MORRIS:  Can we please put up
7 Exhibit 7?
8      (Exhibit 7 introduced.)
9      MR. MORRIS:  And if we could just
10 scroll down to the title.
11 BY MR. MORRIS:
12   Q.  Do you see that this document is
13 called "Defendant James Dondero's Original
14 Answer"?
15   A.  Yes.
16   Q.  And if we scroll back to the top of
17 the document, do you see that it was filed on
18 the docket on March 16, 2021?
19   A.  Yes.
20   Q.  Did you personally read this
21 document before it was filed?
22   A.  No.
23   Q.  Did you have an understanding as to
24 the contents of the document before it was
25 filed?

Dondero - 5-28-2021

2   A.  No.
3   Q.  Did you authorize Bonds Ellis to
4 file this document on your behalf?
5   A.  Not specifically that I remember.
6   Q.  Did you know on or around March 16,
7 2021, that Bonds Ellis had filed "Defendant
8 James Dondero's Original Answer" in this
9 adversary proceeding?
10   A.  Not specifically.  There's a lot
11 going on.
12   Q.  As you sit here right now--and,
13 again, happy to page through the document--can
14 you tell me whether you have ever read
15 Defendant James Dondero's Original Answer?
16   A.  Not that I recall.
17   Q.  So, as of -- and that's true as of
18 today; is that fair?
19   A.  Can we scroll through this, please?
20   Q.  Yes.  Just let us know if you want
21 us to slow down or speed up.
22      MS. DEITSCH-PEREZ:  Yeah, just go
23 slow enough so he could sort of eyeball
24 each page.
25      MR. MORRIS:  You bet.

Dondero - 5-28-2021

2      THE WITNESS:  Yep, keep going.
3      (Scrolling.)
4      THE WITNESS:  Hold on.  Could you go
5 back a little bit, please?  It just goes --
6 stop right there.
7   A.  I do remember paragraph 5.  I think
8 that was recently tried last week or so, but I
9 think that was always the -- always the way it
10 was described to me by lawyers, was that these
11 notes shouldn't be in her Court.
12      MS. DEITSCH-PEREZ:  Okay.  And I'll
13 just -- I'll just caution the witness to
14 not disclose communications with counsel,
15 but it's okay if something catches your eye
16 and you, at least, remember that part, say,
17 "Oh, yeah, I remember that one," but
18 without going into details as to any
19 communications with your lawyers.
20      MR. MORRIS:  And -- and that's fine.
21 That's fine.  I'm certainly not looking for
22 that.
23 BY MR. MORRIS:
24   Q.  The question is really simple:  Have
25 you ever seen this document before and --

Dondero - 5-28-2021

2      MS. DEITSCH-PEREZ:  John, I think he
3 said he needs to scroll through it to see
4 if anything --
5      MR. MORRIS:  I understand.
6      MS. DEITSCH-PEREZ:  -- triggers a
7 recollection.  He just said he's looking at
8 5, yeah, that looks familiar.  If you want
9 to keep going, we could find out if there
10 are any others that -- that look familiar
11 to him.
12      THE WITNESS:  Let's keep going.
13      (Scrolling.)
14      MS. DEITSCH-PEREZ:  You'll agree
15 that most answers are not particularly
16 memorable when they say things like --
17      (Simultaneous conversation.)
18      MR. MORRIS:  Please stop.  Please
19 stop.  Please stop talking.  Please stop
20 talking.  It's inappropriate.
21      MS. DEITSCH-PEREZ:  I -- I know.
22 It's your deposition, and you could do all
23 this stuff, but --
24      (Simultaneous conversation.)
25      MR. MORRIS:  Please stop talking.

Dondero - 5-28-2021

1   Please stop talking.
2   MS. DEITSCH-PEREZ: I hear you.
3   THE WITNESS: Keep -- keep going.
4   (Scrolling.)
5   THE WITNESS: Okay. Keep going.
6   (Scrolling.)
7   THE WITNESS: It looks to me like --
8   MS. DEITSCH-PEREZ: Keep -- let --
9   let him go through the whole thing.
10  THE WITNESS: Sure. Keep going.
11  (Scrolling.)
12  THE WITNESS: Okay. Is that it?
13  MR. MORRIS: Yes.
14  THE WITNESS: Okay.
15  BY MR. MORRIS:
16  Q.  Do you recall ever seeing this
17  document before, sir?
18  A.  The -- the substance of it, again,
19  some of it I -- I remember, and the -- there --
20  it strikes me as a legal argument and defenses
21  regarding the payment of the notes, and I do
22  remember a lot of conversation regarding it
23  being -- it should be outside -- it should be
24  in a different court, and it should be a jury

Dondero - 5-28-2021

1   trial. And those are two main points in here,
2   but it seems like there are a bunch of other
3   defenses listed.
4   Q.  Okay.
5   A.  And I have -- and I have an
6   awareness of it, but I'm not a lawyer.
7   Q.  I appreciate that you're not a
8   lawyer; but looking at the document, does that
9   refresh your recollection that you read and
10  reviewed this document before it was filed on
11  your behalf?
12  A.  I have -- I have an awareness of it,
13  but I wouldn't -- I wouldn't have been deeply
14  involved in its drafting or detailed approval.
15  MR. MORRIS: Can we go to page 6 of
16  8, please?
17  BY MR. MORRIS:
18  Q.  And directing your attention to
19  paragraph 40, do you see it says, as the first
20  affirmative defense, quote, "Defendant asserts
21  that plaintiff's claims should be barred
22  because it was previously agreed by plaintiff
23  that plaintiff would not collect on the notes."
24  Do you see that?

Dondero - 5-28-2021

1   A.  Yes.
2   Q.  Okay. Have I read that accurately?
3   A.  Yes.
4   Q.  Did the plaintiff ever agree that
5   plaintiff would not collect on the notes?
6   A.  Yes.
7   Q.  You subsequently amended this
8   defense; isn't that right?
9   A.  I believe so.
10  Q.  And do you understand that you
11  amended it to add a few words relating to
12  conditions subsequent?
13  A.  I -- I -- other than for
14  clarification and completeness, the -- it was
15  amended. I don't have specific knowledge of
16  what was amended.
17  Q.  Okay. When did the plaintiff agree
18  that the plaintiff would not collect on the
19  notes?
20  A.  Boy, that was early on in the case.
21  Every proposal, every POT plan, every
22  settlement discussion never included value for
23  notes.
24  Q.  All right. I'm going to ask the

Dondero - 5-28-2021

1   question again: When did the plaintiff agree
2   that it would not collect on the notes?
3   MS. DEITSCH-PEREZ: Are you talking
4   about the subsequent agreements in the next
5   pleading?
6   MR. MORRIS: I'm asking for an
7   answer as to when the agreement referred to
8   in paragraph 40 was entered into.
9   A.  First quarter of -- first quarter of
10  2020.
11  BY MR. MORRIS:
12  Q.  So it was after the petition date?
13  MS. DEITSCH-PEREZ: Are you asking
14  about the 2018 notes?
15  MR. MORRIS: Yes, those are defined
16  to be "the notes."
17  BY MR. MORRIS:
18  Q.  So -- so did -- this is your
19  defense.
20  Is it your position, Mr. Dondero,
21  that in the first quarter of 2020, the
22  plaintiff agreed that it would not collect on
23  the notes?
24  A.  I -- I -- I don't -- I want to leave

Dondero - 5-28-2021

1 my testimony as what I just said a minute ago.
2 The notes were never part of any POT plan or
3 suggested POT plan or suggested grand bargain
4 or suggested as having any value starting in
5 the first quarter of '20 -- or most of the
6 year, I believe, until the -- towards the end
7 of the year.
8    Q.   All right.  Was there ever an
9 agreement between you and the plaintiff that
10 the plaintiff would not collect on the notes if
11 there was no grand bargain or no POT plan?
12    A.   Yeah, the -- I'm sorry.  Repeat
13 again.
14    Q.   Who entered the agreement on behalf
15 of the debtor that the plaintiff would not
16 collect on the notes?
17    A.   (Indiscernible speech.)
18       Agreement on -- you know, the --
19 the -- you know the -- I think I'm looking at
20 this question from a perspective of the
21 negotiation, you know, at that time and not
22 including the subsequent conditions that were
23 overlaid on the notes, I guess.  So I guess
24 it's a combination of both.

Dondero - 5-28-2021

1    Q.   I'm asking you to identify the
2 person who acted on behalf of the debtor in
3 reaching the agreement with you that the
4 plaintiff would not collect on the notes.  Who
5 did that?
6       MS. DEITSCH-PEREZ:  John, I think
7 the problem is you're referring to the
8 debtor, so he's looking at post-bankruptcy.
9 You might ask it two questions, one --
10       MR. MORRIS:  No.  Please stop.
11 Please stop.  Please stop.
12       (Simultaneous conversation.)
13       MS. DEITSCH-PEREZ:  You agreed to
14 that condition.  You agreed to distinguish
15 between the debtor --
16       (Simultaneous conversation.)
17       MR. MORRIS:  Deborah --
18       MS. DEITSCH-PEREZ.  -- bankruptcy --
19       MR. MORRIS:  Deborah --
20       (Simultaneous conversation.)
21       THE REPORTER:  I can't -- I can't
22 write two people at the same time.
23       MR. MORRIS:  This is so improper.
24 He has --

Dondero - 5-28-2021

1       MS. DEITSCH-PEREZ:  It is not.  You
2 agreed --
3       MR. MORRIS:  Please let me finish.
4 Please let me finish.
5       He has described the conversations
6 as taking place in 2020.  I should be
7 referring to the debtor.  He is
8 describing --
9       MS. DEITSCH-PEREZ:  Right.
10       MR. MORRIS:  -- the context --
11       MS. DEITSCH-PEREZ:  But if you want
12 to know about something that happened
13 before bankruptcy, ask about Highland.
14       MR. MORRIS:  But I'm not.  I
15 don't -- please stop interrupting.
16       MS. DEITSCH-PEREZ:  It's your
17 deposition.  If you want a muddy record, be
18 my guest.
19       MR. MORRIS:  I would really
20 appreciate it.  I think I know what I'm
21 doing.
22 BY MR. MORRIS:
23    Q.   Mr. Dondero, who, on behalf of the
24 debtor, during these conversations about a

Dondero - 5-28-2021

1 grand bargain and a POT plan told you or
2 entered into the agreement that the plaintiff
3 would not collect on the notes?
4    A.   I -- I -- during the bankruptcy,
5 we're talking about, right?
6    Q.   I'm just following up on your
7 statement that the conversation -- that the
8 agreement was entered into in the first quarter
9 of 2020.
10       Do I have that right, or is that
11 wrong?
12    A.   Well --
13    Q.   Let's start again.  Let's start
14 again.
15       This affirmative defense refers to
16 an agreement.  Do you see that?
17    A.   Yes.
18    Q.   This is your affirmative defense;
19 isn't that correct?
20    A.   Yes.
21    Q.   And according to this affirmative
22 defense, the agreement was that the plaintiff
23 would not collect on the notes.  Do I have that
24 right?

Page 148

Dondero - 5-28-2021

1
2  A.  Yes.
3  Q.  Let's start with:  When was that
4  agreement entered into?
5  A.  Okay.  I'm going to have to parse,
6  and I'm going to have to answer your question
7  as accurately as I can.
8       The subsequent conditions for
9  forgiveness of the notes were established
10  during a comp period in early 2019 for these
11  notes that were drafted in '18.
12       And the agreement was reached
13  with -- I believe it's a majority of, whatever,
14  the Class A holders in the fourth amended
15  Highland Capital partnership -- partnership
16  agreement.  And that's what set up the
17  subsequent conditions and the ability for the
18  loans to be forgiven.
19       When you get into bankruptcy,
20  whether it was Seery, the independent board, or
21  whoever, no one ever put any value nor was it
22  ever included in any -- were the notes included
23  in any settlement discussions, period.
24  Q.  All right.  So, it's your testimony
25  that the debtor in settlement negotiations

Page 149

Dondero - 5-28-2021

1  never, ever, ever asked for or demanded the
2  repayment of any unpaid principal or interest
3  under these three notes?
4
5       That's your sworn testimony?
6  A.  No.
7  Q.  So how did I get that wrong, then?
8  A.  Well, a few minutes ago we went over
9  a letter from the debtor making a demand, but
10  that was, I believe, this year or -- yeah, I
11  believe that was this year or the end of '20.
12       What I'm saying is through '20, the
13  full year of '20 when we were trying to work on
14  a POT plan or global settlement before Seery
15  betrayed the estate, we were -- we never --
16  there was never value assigned to the notes.
17  Q.  And you never offered to make any
18  payment of any kind, principal or interest, on
19  any of the notes in connection with any
20  proposal you ever made as part of the grand
21  bargain or POT plan; is that right?
22  A.  I think -- I believe on the -- not
23  through 2020.  I'll say that.
24       By the time 2021 came along, on the
25  eve of trial when I sent over a capitulation

Page 150

Dondero - 5-28-2021

1
2  offer -- I think it was even titled that -- I
3  think I threw more money than everybody
4  deserved or was entitled to, to try and resolve
5  it.  And implicitly, there was -- because it
6  was more than everybody was entitled to, I
7  think implicitly it included value for the
8  notes.
9  Q.  And is it your testimony that at no
10  time prior to the delivery of the demand letter
11  did the debtor ever make an offer to you or --
12  of any kind that included any repayment of any
13  principal or interest due under the three
14  notes?
15  A.  I'm willing to be refreshed, but not
16  that I recall.
17  Q.  Okay.  And is it your testimony that
18  anybody acting on behalf of the debtor ever
19  agreed not to collect on the notes?
20  A.  I'm sorry.  Repeat that one more
21  time, just --
22  Q.  Is it your testimony -- withdrawn.
23       Did anybody acting on behalf of the
24  debtor ever agree with you that it would not
25  collect on the notes, irrespective of whether

Page 151

Dondero - 5-28-2021

1
2  there was a settlement?
3       MS. DEITSCH-PEREZ:  Object to form.
4  A.  Yeah.  Again, that was my
5  understanding through 2020.
6  BY MR. MORRIS:
7  Q.  Do you have --
8       THE WITNESS:  Let's -- let's --
9  before the next question, let's take a
10  ten-minute break, ten-minute bathroom
11  break, please.
12       MR. MORRIS:  No problem.
13       MS. DEITSCH-PEREZ:  Okay.  We've
14  been going an hour, so we'll come back
15  at -- 10:30, come back at 10:40?
16       MR. MORRIS:  That's fine.  Thank
17  you.
18       (Recess held.)
19  BY MR. MORRIS:
20  Q.  Is the agreement that you're
21  referring to and that's referred to in
22  paragraph 40, is that reflected in any document
23  that you're aware of?
24  A.  Not that I'm aware of.
25  Q.  And I believe you mentioned -- and

**Appx. 01652**

Dondero - 5-28-2021

1
2 we'll talk about this more later, but the part
3 about the subsequent conditions or the
4 conditions subsequent, that was the agreement
5 that was entered into, did you say the -- in
6 part -- as part of a compensation committee
7 meeting?
8    A.   As part of our compensation process
9 in -- early in 2019.
10    Q.   Okay.  And when you say "early
11 2019," can you -- do you recall what month?
12    A.   In January/February.
13    Q.   So, it's your testimony that in
14 January or February 2019, you and the debtor
15 reached the agreement that's referred to in
16 paragraph 40 as subsequently amended by your
17 amended answer; is that right?
18    MS. DEITSCH-PEREZ:  Object to the
19 form.
20    John, I thought you were going to
21 agree to call Highland Highland --
22    MR. MORRIS:  That's fine.  That's
23 fine.
24    (Simultaneous conversation.)
25    MS. DEITSCH-PEREZ:  -- thereafter.

Dondero - 5-28-2021

1
2    MR. MORRIS:  That's fine.  So, let
3 me rephrase the question.
4 BY MR. MORRIS:
5    Q.   I just want to make sure that I have
6 this right, Mr. Dondero.  It's your
7 recollection that in January or February of
8 2019, you reached an agreement with Highland
9 that's reflected in paragraph 40 as
10 subsequently amended to include the phrase
11 "conditions subsequent."  Do I have that right?
12    A.   I gave my testimony.  I don't know
13 if -- I don't want to opine on the legal
14 document and whether the legal document
15 captures it there or somewhere else, but my --
16 my recollection regarding pre-bankruptcy and
17 post-bankruptcy is as I -- as I stated already.
18    Q.   Let me -- let me try this a
19 different way.
20    We looked at the three promissory
21 notes.  Were those promissory notes ever
22 amended, to the best of your knowledge?
23    A.   No, not that -- I mean, not -- not
24 in writing.
25    Q.   Okay.

Dondero - 5-28-2021

1
2    A.   They were amended -- they were
3 amended -- they were amended verbally.
4    Q.   Okay.  And did that verbal agreement
5 take place in January or February 2019?
6    A.   Yes.
7    Q.   Was there any verbal agreement
8 related to the notes that occurred other than
9 the one you're referring to in January or
10 February 2019?
11    A.   Well, I gave my testimony during
12 bankruptcy in 2020, the substance of all
13 negotiations never assigned value to the -- the
14 notes.
15    Q.   But you never reached an agreement
16 with the debtor on -- on any settlement that
17 would include either payment for or forgiveness
18 of the notes; is that fair?
19    You never reached an agreement?
20    A.   Not in writing, but I believe we
21 were operating with an understanding that
22 the -- weren't likely to have value to the
23 estate.
24    MR. MORRIS:  Okay.  I move to
25 strike, and I'll ask the question again.

Dondero - 5-28-2021

1
2 BY MR. MORRIS:
3    Q.   Do you have any agreement with the
4 debtor -- agreement with the debtor with
5 respect to any of the three notes?
6    MS. DEITSCH-PEREZ:  Object to the
7 form.
8    A.   I believe the debtor in bankruptcy
9 inherits that subsequent condition agreements
10 from the first quarter of 2019; and I believe
11 in 2020, the debtor operated and participated
12 and acted in a way all negotiations
13 suggested the notes had -- were unlikely to
14 have any value to the estate.
15    MR. MORRIS:  Okay.  I move to
16 strike.
17 BY MR. MORRIS:
18    Q.   And I'd ask you to please listen
19 carefully to my question and only answer the
20 question that's asked.
21    Is there any agreement that pertains
22 to the notes other than --
23    MS. DEITSCH-PEREZ:  Objection,
24 asked --
25 BY MR. MORRIS:

Page 156

Dondero - 5-28-2021

2  Q.  – with –

3  A.  Yeah, I'm going to stick with my
4  same answer that I've given twice.

5  Q.  I'm actually – I'm actually asking
6  a different question; and if you would let me
7  finish, this would go a lot more smoothly.

8      Is there any agreement, written or
9  verbal, between you and the debtor concerning
10  the notes other than the verbal agreement that
11  you contend was entered into in January and
12  February 2019?

13      I don't want to know about
14  operations or offers or settlement discussions.
15  I want to know about agreements:  Is there any
16  agreement pertaining to the notes other than
17  the verbal agreement entered into in January or
18  February 2019?

19      MS. DEITSCH-PEREZ:  Object to the
20  form.

21  A.  Yes.

22  BY MR. MORRIS:

23  Q.  What other agreement exists?

24  A.  The agreement between, I guess, me
25  and to the extent other related parties that

Page 157

Dondero - 5-28-2021

2  had notes with the debtor, beginning in the
3  first quarter after the bankruptcy, that the
4  notes were unlikely to have any value to the
5  estate or have any value in settlement.

6  Q.  Okay.  I don't want to know about
7  value.  I want to know if there is an agreement
8  not to collect.

9      So let me try and answer – ask the
10  question differently.

11      Other than the agreement that you
12  assert was entered into in January or
13  February 2019, did anybody acting on behalf of
14  Highland or the debtor enter into any other
15  agreement pursuant to which the debtor agreed
16  not to collect on the notes?

17  A.  I'm – I'm going – same answer:
18  Implicitly, yes.

19  Q.  Okay.  Is that – is that implicit
20  agreement written down anywhere?

21      You know what?  I'm going to move
22  on, Mr. Dondero, and I look forward to the jury
23  trial.

24      MR. MORRIS:  Can we put up the next
25  exhibit, Number 8?

Page 158

Dondero - 5-28-2021

2      (Exhibit 8 introduced.)

3  BY MR. MORRIS:

4  Q.  Did you –

5      MR. MORRIS:  If we could scroll down
6  a little bit.

7  BY MR. MORRIS:

8  Q.  Are you aware that the debtor served
9  discovery in connection with this action?

10  A.  Not specifically.

11  Q.  Do you see that these are your
12  objections and responses to the debtor's
13  requests for admission?

14  A.  Yes.

15  Q.  Have you ever seen this document
16  before?

17      And we can scroll down, if you'd
18  like.

19      MS. DEITSCH-PEREZ:  Scroll through
20  it, please.

21      THE WITNESS:  Yeah, let's scroll
22  through it.

23      (Scrolling.)

24      THE WITNESS:  Can you keep going,
25  please?

Page 159

Dondero - 5-28-2021

2      MR. MORRIS:  That's the end.

3      THE WITNESS:  Okay.

4  BY MR. MORRIS:

5  Q.  Have you ever seen this document
6  before, sir?

7  A.  I'm aware of it – I mean, yes, but
8  I don't remember – ask whatever questions you
9  want about it, and we'll go from there.

10  Q.  Did you see this document before –
11  before it was sent to my firm on April 28th,
12  2021?

13  A.  I mean, I'm sure I did and – or I'm
14  sure I did if I was supposed to approve it, but
15  I don't specifically remember.

16  Q.  And did you, in fact, authorize your
17  attorneys to serve this particular document?

18  A.  I – I believe so.

19      MR. MORRIS:  Can we just go to the
20  very last request for admission, number 14?

21      (Scrolling.)

22  BY MR. MORRIS:

23  Q.  You'll see that Request For
24  Admission Number 14 asks you to admit that as
25  of January 22nd, 2021, you hadn't paid the

Dondero - 5-28-2021

1
2 debtor the outstanding amount.
3      Do you see that?
4   A.   Yes.
5   Q.   And the definition of an
6 "outstanding amount" is the number that's just
7 above that.
8      And in response, you admitted only
9 that you hadn't paid the debtor the amount the
10 debtor asserts is due on the notes in the
11 amount of approximately $9 million. Do you see
12 that?
13  A.   Yes.
14  Q.   Okay. I just want to ask a slightly
15 different question: Have you paid any amounts
16 to the debtor on account of the notes since
17 December 1st, 2020?
18  A.   I -- I don't -- I don't know for
19 sure, but I don't believe so.
20  Q.   Okay.
21      MR. MORRIS: Can we go to the next
22 exhibit, please, Number 9?
23      (Exhibit 9 introduced.)
24      MR. MORRIS: Okay. And if we can
25 scroll down just a little bit.

Dondero - 5-28-2021

1
2 BY MR. MORRIS:
3   Q.   You'll see that these are the
4 "Objections and Answers" that were tendered on
5 your behalf in response to the debtor's first
6 set of interrogatories.
7      Do you see that?
8   A.   Yes.
9      MR. MORRIS: And if we can go to the
10 last page.
11      MS. DEITSCH-PEREZ: Could you also
12 scroll through it so he could --
13      MR. MORRIS: Well, I'm happy to do
14 it. I'd like to do it my way, please.
15 Thank you.
16      Can we go to the last page, please?
17      (Scrolling.)
18 BY MR. MORRIS:
19  Q.   Is that your signature there, sir?
20  A.   Yes.
21  Q.   And did you sign this document in
22 front of a notary public?
23  A.   Yes.
24  Q.   And did you certify that you had
25 read the document and the objections to the

Dondero - 5-28-2021

1
2 interrogatories?
3   A.   Yes.
4   Q.   And did you swear that the answers
5 were true and correct?
6   A.   Yes.
7   Q.   Okay.
8      MR. MORRIS: Now let's go back to
9 the top of the document.
10 BY MR. MORRIS:
11  Q.   Did you, in fact, read this document
12 before you signed the Verification in front of
13 a notary?
14  A.   Yes.
15  Q.   Okay.
16      MR. MORRIS: Go to page 4 of 6,
17 please.
18 BY MR. MORRIS:
19  Q.   Just to help you out, do you see
20 there's a reference to "Purported Agreement" in
21 the first interrogatory, 1(a)?
22  A.   Uh-huh.
23  Q.   That's a "yes," sir; is that right?
24  A.   Yes.
25  Q.   Okay. The Purported Agreement

Dondero - 5-28-2021

1
2 refers back to the agreement that we were
3 looking at in paragraph 40 of the answer -- and
4 I can just read it again -- that says -- the
5 agreement says, quote, "Plaintiff would not
6 collect on the Notes."
7      And I asked you three questions in
8 the interrogatory. Did this interrogatory
9 accurately state, to the best of your
10 knowledge, that you, personally, entered into
11 the Purported Agreement on behalf of the
12 debtor?
13  A.   Which -- which one are you -- which
14 agreement are you talking about?
15  Q.   Just the one that we were talking
16 about earlier -- and I'll just read it again
17 for you. We can call it back on the screen, if
18 it's helpful -- but the agreement that you
19 referred to in your answer that, quote,
20 "plaintiff would not collect on the notes."
21 That's the Purported Agreement.
22      And so, I just want you to confirm
23 that in your answer to Interrogatory No. 1, you
24 stated that it was true and accurate that you
25 entered into that agreement on behalf of the

Dondero - 5-28-2021

2 debtor.

3       Do I have that right?

4       A.   I'm -- I'm going to say no because I

5  think you're using the wrong description of the

6  debtor versus Highland prebankruptcy.

7       Q.   I appreciate that.  I apologize.

8  Let me rephrase the question.  That's a fair

9  point.

10       Did you enter into the agreement

11  referred to in your answer on behalf of

12  Highland?

13       A.   The -- the agreement on behalf of

14  Highland prebankruptcy was agreed to by

15  majority of the Class A members, which I

16  believe at the time was Dugaboy.

17       Q.   All right.  That doesn't say that in

18  your answer here, does it?

19       A.   Again, there was an original, I

20  think, answers; and then there were amended

21  answers.  I think the lawyers did the best they

22  could to capture -- but, evidently, the parsing

23  between pre-bankruptcy agreements and

24  post-bankruptcy agreements was done the best it

25  could be by the lawyers but I -- I -- I don't

Dondero - 5-28-2021

2  want to comment on the legal.

3       Q.   I don't want to comment on legal

4  stuff, either; but you signed this document,

5  you verified this document, and you verified

6  that it was true and accurate.  Correct?

7       A.   Yes.

8       Q.   Okay.  And in the first sentence to

9  your answer in Interrogatory 1, you wrote, or

10  somebody wrote on your behalf, quote:  "The

11  agreements were entered into on behalf of the

12  debtor by James Dondero, subsequent to the time

13  each note was executed."

14       Is that an accurate statement, or is

15  it an inaccurate statement?

16       A.   Again, it was between me and the

17  Class A, the majority of the Class A members.

18  It was a Class A -- the Class A members were

19  representing Highland, never the debtor,

20  because the debtor didn't exist yet.

21       But then, again, I don't know if

22  this paragraph refers to, again, how we

23  operated in bankruptcy, which was the

24  assumption that the notes had -- were likely --

25  were not likely to have any value for the

Dondero - 5-28-2021

2  estate.  I don't -- I don't know which this is

3  referring to.

4       Q.   You understand that the definition

5  of the "debtor" includes Highland Capital

6  Management, L.P.?

7       A.   I think we started off the depo by

8  saying that there was a Highland prior to

9  bankruptcy and then there was a Highland in

10  bankruptcy and the debtor is Highland in

11  bankruptcy.

12       Q.   Let me just ask you this question,

13  sir:  Is that first sentence accurate, or is it

14  wrong?

15       A.   I didn't write it, so -- and you

16  swore to it.  You're the one who said it was

17  true and accurate.  So now I'm asking you:  Is

18  it actually true and accurate?

19       A.   I'm going to stick with my testimony

20  so far.  I don't want to opine on that.  I

21  think it depends -- it's not -- maybe it's not

22  perfectly written, but...

23       Q.   Sir, with all due respect, please

24  answer my question:  Is the first sentence true

25  and correct, as you verified?

Dondero - 5-28-2021

2       MS. DEITSCH-PEREZ:  He already

3  answered your question, John.

4       MR. MORRIS:  That's fine.  You can

5  have the objection, asked and answered.

6  I'm asking him to answer again.

7  BY MR. MORRIS:

8       Q.   Is that first sentence true and

9  correct as you verified it?

10       A.   "Behalf" probably isn't, like I

11  said, the right word.  It should be "between"

12  the debtor and James Dondero.  So that's how I

13  would wordsmith that.

14       Q.   Okay.  So this -- this first

15  sentence is not true and correct, to the best

16  of your knowledge; is that fair?

17       A.   I -- I don't want to say that other

18  than I think it could be stated better.

19       Q.   Okay.  But as stated right now, it

20  says that the agreement was entered into on

21  behalf of the debtor by James Dondero.  Have I

22  read that correctly?

23       A.   Yeah.  I mean, that is what it says.

24  Again, I feel like I'm interpreting legal

25  phraseology here, like "on behalf of the

Page 168

Dondero - 5-28-2021

1 debtor." If it was an agreement between the
2 debtor and the Class A entered into --
3 MS. DEITSCH-PEREZ: Mr. Morris knows
4 very well there's another -- that there's
5 an amendment to this. I don't know why
6 he's doing this.
7 Mr. Morris --
8 (Simultaneous conversation.)
9 MR. MORRIS: Please stop. Please
10 stop.
11 I'm allowed to go through his sworn
12 statements. Give me a break. Please stop.
13 Don't coach --
14 MS. DEITSCH-PEREZ: You've been
15 asking the same question over and over and
16 over.
17 MR. MORRIS: You know, I'm going to
18 shut this down if you do it one more time.
19 I will, and I'm happy to make the motion to
20 the Judge. I'm begging you, please stop
21 interfering.
22 My apologies, Mr. Dondero. Never
23 directed at you personally.
24 BY MR. MORRIS:

Page 169

Dondero - 5-28-2021

1 Q. The second sentence of the answer,
2 have you been able to identify any documents
3 that reflect or memorialize the agreements?
4 A. I mean, I -- I -- I don't -- I don't
5 know, but I don't think so.
6 Q. Thank you very much.
7 MR. MORRIS: Go to the next
8 document, please.
9 (Exhibit 10 introduced.)
10 BY MR. MORRIS:
11 Q. Do you see that this is the "Amended
12 Answer" that was filed on your behalf?
13 MS. DEITSCH-PEREZ: Let's please --
14 THE WITNESS: Yes.
15 MS. DEITSCH-PEREZ: -- scroll
16 through.
17 THE WITNESS: Yeah, please scroll
18 through.
19 (Scrolling.)
20 BY MR. MORRIS:
21 Q. All right. Have you seen this
22 document before, sir?
23 A. Yes, generally.
24 Q. Did you -- do you recall if you saw

Page 170

Dondero - 5-28-2021

1 it prior to the time it was served and filed on
2 your behalf?
3 A. Probably.
4 Q. Did you authorize it to be filed on
5 your behalf?
6 A. Yes.
7 MR. MORRIS: Can we please go to
8 page 6 of 8?
9 (Scrolling.)
10 MR. MORRIS: And if we can scroll
11 just down to the "Affirmative Defenses."
12 BY MR. MORRIS:
13 Q. All right. Do you see
14 paragraph 40 --
15 A. Yeah.
16 Q. -- as compared to the prior version
17 of your answer, has added the words, quote,
18 "upon fulfillment of conditions subsequent."
19 Do you see that?
20 A. Yes.
21 Q. Why were those words added?
22 MS. DEITSCH-PEREZ: Object to the
23 form.
24 A. I think to make this document more

Page 171

Dondero - 5-28-2021

1 complete and more clarified as things were
2 learned and investigated.
3 BY MR. MORRIS:
4 Q. And were things "learned and
5 investigated" after the time that you submitted
6 the -- withdrawn.
7 Were things "learned and
8 investigated" after the time the original
9 answer was served and filed on your behalf?
10 MS. DEITSCH-PEREZ: Object to the
11 form.
12 And I would also just caution the
13 witness before he speaks to think -- to
14 make sure he doesn't disclose
15 attorney-client communications.
16 A. I'm sorry, could you please repeat
17 the question?
18 BY MR. MORRIS:
19 Q. Sure. Did you, personally, learn or
20 discover anything related to this amended
21 paragraph 40 after the time that the original
22 answer was filed on your behalf?
23 MS. DEITSCH-PEREZ: Same objection.
24 A. We went through the -- the --

Dondero - 5-28-2021

1
2    MS. DEITSCH-PEREZ: When you say
3    "we," are you talking about you and
4    lawyers?
5        THE WITNESS: Yes.
6    MS. DEITSCH-PEREZ: Don't disclose
7    your communications with lawyers.
8  BY MR. MORRIS:
9    Q.  All right. I don't want to know
10  anything about your communications with
11  lawyers, but I'm going to ask you for facts.
12        What facts, if any, did you learn
13  after the original answer was filed that relate
14  to the words, quote, "upon fulfillment of
15  conditions subsequent."
16    A.  The "conditions subsequent" involved
17  in the first quarter of 2019 were always an
18  event, but it wasn't captured properly or
19  needed to be clarified in the amendment.
20    Q.  Well, you mentioned that "things
21  were learned and investigated" after the answer
22  was filed, and I'm just trying to pin down what
23  that was?
24    A.  I – I took it more seriously with
25  the lawyers as it – as the notes became more

Dondero - 5-28-2021

1
2  of an issue, and it's – I'm very busy over
3  here and then spent more time going through the
4  details, and this needed to be clarified or
5  stated differently.
6    Q.  Okay. With respect to the agreement
7  referred to in paragraph 40, whose idea was it
8  to enter into that agreement?
9    A.  It was – it was mine.
10    Q.  Okay. And who were – who were the
11  majority of Class A holders that you referred
12  to earlier?
13    A.  That was the counterparty
14  decision-maker for Highland prior to
15  bankruptcy, and like I said, I believe it was
16  Dugaboy.
17    Q.  Can you think of any other member of
18  Class A who entered into this agreement on
19  behalf of the debtor in the early part of 2019
20  other than Dugaboy?
21        MS. DEITSCH-PEREZ: Object to the
22  form.
23    A.  I do believe it was necessary.
24  Dugaboy alone was the requisite majority. I
25  didn't – I don't remember or remember even

Dondero - 5-28-2021

1
2  thinking about including anybody else.
3  BY MR. MORRIS:
4    Q.  Okay. And to be clear, Mr. Dondero,
5  I'm not – I don't have a view one way or the
6  other as to whether you should or shouldn't –
7  who you should have contacted.
8        I just want to know who – if you
9  can identify for me the Class A members who
10  acted to approve the agreement that's referred
11  to in paragraph 40.
12        Is there anybody other than Dugaboy?
13    A.  Not – not – not – not
14  specifically regarding that comp cycle.
15    Q.  Okay. And who acted on behalf of
16  Dugaboy to enter into the agreement that's
17  referred to in paragraph 40?
18    A.  The trustee.
19    Q.  The trustee of Dugaboy?
20    A.  Yes.
21    Q.  And who was the trustee of Dugaboy
22  in the January/February 2019 time period that
23  entered into this agreement on behalf of the
24  debtor?
25    A.  My sister Nancy.

Dondero - 5-28-2021

1
2    Q.  Did you and Nancy discuss this
3  agreement at all?
4    A.  This agreement? No.
5    Q.  Can you describe –
6        MS. DEITSCH-PEREZ: What do you mean
7  by "this agreement"?
8        (Simultaneous conversation.)
9    A.  Not the one that's on the screen.
10  BY MR. MORRIS:
11    Q.  Yes. That's the only one that I'm
12  talking about, so –
13        MS. DEITSCH-PEREZ: So you mean –
14        MR. MORRIS: Please, please, Deb –
15        MS. DEITSCH-PEREZ: John, can you
16  please clarify: Are you asking if he
17  discussed the answer with Nancy or the –
18        MR. MORRIS: I didn't use the word
19  "answer." I used the word "agreement," so
20  let me –
21        MS. DEITSCH-PEREZ: I know, but he
22  pointed to the screen.
23        (Simultaneous conversation.)
24        MR. MORRIS: Are you done?
25        MS. DEITSCH-PEREZ: Yes.

1           Dondero - 5-28-2021
2    BY MR. MORRIS:
3        Q.   Mr. Dondero, can you describe for
4    me -- withdrawn.
5            Did you discuss with your sister
6    Nancy, the agreement that's referred to in
7    paragraph 40?
8        A.   The agreement to subsequent
9    conditions, yes, absolutely.  But this
10   agreement that's on the screen, I've never --
11   I've never -- I've never shown her this
12   document or talked to her about it.
13       Q.   I'm not asking about the document.
14   I'm not asking about the document.  I'm asking
15   about the agreement that's referred to in
16   paragraph 40.
17           Do you understand that?
18       A.   Yes.  And, yes, we had several
19   conversations about it.
20       Q.   Okay.  Can you describe for me
21   everything you remember about your discussions
22   with Nancy concerning the agreement that's
23   referred to in paragraph 40?
24       A.   That the loans that were in place
25   would be forgiven upon a monetization -- the

1           Dondero - 5-28-2021
2    favorable monetization of certain large or
3    liquid assets on the Highland balance sheet;
4    and the three that were focused on was MGM,
5    Trussway, and Cornerstone.
6        Q.   Did you say anything in response?
7        A.   Just, "How much are we talking
8    about?"  And I told her it was about 9 million
9    in aggregate, and -- and I told her that it
10   was -- that the forgiveness or the compensation
11   was compliant regarding any credit covenants or
12   Hunter Mountain covenants --
13       Q.   Do you recall any --
14       A.   -- that -- that if it were to be
15   forgiven, that additional compensation would be
16   compliant or permitted and really not material
17   relative to any outstanding credit agreements
18   that Highland had or agreements with Hunter
19   Mountain.
20       Q.   Is this something that you discussed
21   with her, or is this just information that
22   you're giving me?
23       A.   This is what I discussed -- that's
24   almost the entirety of the conversation.  It
25   happened over a couple different conversations,

1           Dondero - 5-28-2021
2    but...
3        Q.   Did anybody participate in any of
4    the conversations you're describing other than
5    you and your sister?
6        A.   I don't believe it was necessary, it
7    didn't include anybody else.
8        Q.   Okay.  Again, I'm not here to
9    question.  I'm just looking for facts,
10   Mr. Dondero.
11           So nobody participated in any of
12   these conversations that you can recall other
13   than you and Nancy; is that correct?
14       A.   Correct, that I -- yes, there was
15   never a third party involved in our
16   conversations.  I don't know -- I don't think
17   she discussed it with anybody else, but I don't
18   know.
19       Q.   Did -- was the agreement subject to
20   any negotiation?  Did she make any
21   counterproposal of any kind?
22       A.   No.  No, I -- again, I believe both
23   of our views at the time was that it was
24   immaterial to Highland overall or any other
25   agreements.

1           Dondero - 5-28-2021
2        Q.   Do you know if she sought any
3    independent advice before entering into the
4    agreement that you've described?
5        A.   I don't know.
6        Q.   Do you recall whether you provided
7    her with any documents of any kind in
8    connection with the discussions that led to the
9    agreement that's referred to in paragraph 40?
10       A.   I -- I have no -- I don't -- I don't
11   believe -- no, I don't believe I gave her
12   copies of the relevant Hunter Mountain
13   limitations, or whatever.  I just spoke to her
14   about it.
15       Q.   Okay.  I'm just asking -- I'm asking
16   a broader question:  Do you recall giving her
17   any documents of any kind in connection with
18   the discussions that led to the agreement in
19   paragraph 40?
20       A.   Not -- not that I recall.  She --
21   she may -- she may have some, but I don't
22   remember.
23       Q.   Do you know if there were any
24   resolutions that were adopted by Highland to
25   reflect the agreement that's referred to in

Page 180

1          Dondero - 5-28-2021
2   paragraph 40?
3      A.   Resolutions that -- no, not that I'm
4   aware of.
5      Q.   Did you give -- did you give Nancy a
6   copy of the three promissory notes that were
7   the subject of the agreement referred to in
8   paragraph 40?
9      A.   No.
10     Q.   Did she ask to see any documents
11  before entering into the agreement that's
12  referred to in paragraph 40?
13     A.   I -- I don't remember.
14     Q.   Did you suggest that she speak with
15  anybody prior to the time that she entered into
16  the agreement that's referred to in
17  paragraph 40?
18         MS. DEITSCH-PEREZ:  Asked and
19     answered.
20     A.   Yeah.  No.
21  BY MR. MORRIS:
22     Q.   Do you know whether she actually
23  spoke with anybody concerning the subject
24  matter of the agreement that's referred to in
25  paragraph 40 prior to the time it was entered

Page 181

1          Dondero - 5-28-2021
2   into?
3      A.   I don't know.
4      Q.   Is there any time period by which
5   the subsequent -- the conditions subsequent
6   have to be fulfilled, or are they open-ended?
7      A.   I believe it was open-ended.
8      Q.   Under the agreement that's referred
9   to in paragraph 40, did the debtor surrender
10  its right to make a demand under the promissory
11  notes?
12         MS. DEITSCH-PEREZ:  And, again, are
13     you talking about the debtor as in
14     post-bankruptcy or --
15         MR. MORRIS:  I apologize.  Thank
16     you.  Thank you.  Thank you.  Thank you.
17         Withdrawn.
18  BY MR. MORRIS:
19     Q.   Under the agreement that you reached
20  with Nancy that's referred to in paragraph 40,
21  was it your understanding that Highland
22  surrendered its right to make a demand for
23  payment of unpaid principal and interest under
24  the notes?
25     A.   I think essentially, yes.

Page 182

1          Dondero - 5-28-2021
2      Q.   Okay.  What did Highland receive in
3   return for its agreement to surrender its right
4   to make a demand for unpaid principal and
5   interest, if anything?
6      A.   I think with all forgiveness of
7   notes, what it gets is it gets focus in terms
8   of the monetization and it reduces additional
9   compensation that I could have/would have taken
10  otherwise, or could have/would have been
11  entitled to otherwise.
12         So, it's -- yeah, I mean, I think
13  it's, again, heightened focused for something
14  that would be great for the debtor or great for
15  Highland at the time and reduces -- that form
16  of forgiveness becomes compensation when and if
17  it occurs, and then it -- it theoretically
18  reduces other compensation.
19     Q.   So why not just forgive it at that
20  moment?
21         Why tie it to "conditions
22  subsequent"?
23     A.   I thought it was more appropriate.
24     Q.   Did you and Nancy discuss at all
25  what the benefit would be to Highland from this

Page 183

1          Dondero - 5-28-2021
2   arrangement?
3      A.   The focus -- the focus parts for
4   sure.
5      Q.   And without -- without the agreement
6   that's referred to in paragraph 40, you
7   wouldn't have been focused on maximizing the
8   enterprises; is that right?
9      A.   No.
10     Q.   So -- I'm sorry, maybe I missed it.
11         When you used the word "focus" --
12  let me -- when you use the word "focus," what
13  do you mean?
14         What is the benefit to the debtor?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         He said "heightened focus."
18     A.   Yeah, heightened focused was my
19  words, which --
20  BY MR. MORRIS:
21     Q.   Okay.
22     A.   -- you know, means beyond normal
23  focus.  It means additional effort just like in
24  any company or what we do here with other
25  employees, for things you really want to get

Appx. 01660

Page 184

Dondero - 5-28-2021

1 done or focus on, you provide that extra
2 incentive.
3 Q. Okay. So -- so that's the benefit
4 to Highland, was that you were going to have a
5 heightened focus on maximizing value; is that
6 fair?
7 MS. DEITSCH-PEREZ: Object to the
8 form.
9 A. And then also the part 2 of my
10 answer, right, which, you know, that
11 forgiveness would be compensation which
12 would -- in any given year, additional
13 compensation coming from forgiveness reduces
14 other compensation.
15 BY MR. MORRIS:
16 Q. Was that part of the agreement that
17 you reached with Nancy? Was that -- was that
18 when these notes were forgiven, you would forgo
19 an amount equivalent to the outstanding
20 principal and unpaid interest?
21 MS. DEITSCH-PEREZ: Object to the
22 form, misstates his prior testimony.
23 A. Yeah. I remember discussing the
24 focus part with her. The -- I was giving that

Page 185

Dondero - 5-28-2021

1 answer when you were asking me what would be
2 the benefit or consideration to Highland and
3 then ultimately to debtor. I was giving you
4 compensation answer.
5 BY MR. MORRIS:
6 Q. Okay. So I just -- but I do want to
7 try to understand from your perspective the
8 benefit to the debtor.
9 And, one, you told me about the
10 heightened focus, and the second --
11 A. Right.
12 Q. -- I think you said, and correct me
13 if I'm wrong, that it would relieve the debtor
14 of paying some compensation in the future.
15 Am I mistaken about that?
16 A. Yeah, I mean -- I'm sorry. Repeat
17 that one more time, please.
18 Q. I believe you said that the second
19 benefit to Highland from entering into the
20 agreement referred to in paragraph 40 is that
21 it would relieve them of a future obligation to
22 pay compensation in the same amount.
23 Do I have that right?
24 MS. DEITSCH-PEREZ: Object to the

Page 186

Dondero - 5-28-2021

1 form.
2 A. Maybe not exactly "the same amount,"
3 but it would -- it would -- it would reduce
4 comp -- yes, it would -- it would, like, in the
5 next cycle, reduce -- or when it was realized,
6 would likely reduce comp then.
7 BY MR. MORRIS:
8 Q. Okay. And by what amount would it
9 likely reduce comp, then?
10 A. I don't know. By significant --
11 by -- by a significant amount, by something
12 similar to the 9 million bucks.
13 Q. Okay. So, is there any -- I'm just
14 trying to understand your perspective.
15 One of the benefits from entering
16 into the agreement referred to in paragraph 40
17 is that upon the realization of the forgiveness
18 of the debt, Highland or the debtor, whatever
19 the case may be, in the future would be
20 relieved from paying you an amount similar to
21 the principal amount of the notes?
22 Do I have that right?
23 A. Yeah, or -- or -- yeah. I guess the
24 reason why I keep going back and forth on the

Page 187

Dondero - 5-28-2021

1 exactness of the answer is that if --
2 there's -- depending on what the compensation
3 target is and whether or not you wanted to grow
4 something up or you're looking for a net
5 amount, but forgiveness of debt becomes a
6 taxable event with no -- no additional ability
7 to pay taxes. So it's usually not an exact
8 offset to future compensation, the way we've
9 done it here historically.
10 Q. In the agreement that you reached
11 with Nancy that's referred to in paragraph 40,
12 were there any other -- withdrawn.
13 In the agreement that you reached
14 with Nancy that's referred to in paragraph 40,
15 were there any circumstances under which you
16 would have been obligated to pay all unpaid
17 principal and interest under the notes?
18 A. If the illiquid assets weren't -- or
19 if -- if none of the illiquid assets were
20 monetized.
21 Q. But you were -- you were, at the
22 time you entered into this oral agreement, in
23 control of whether or not to monetize those
24 illiquid assets, right?

Page 188

Dondero - 5-28-2021

2 A. And I expected they would be over
3 time, yes.
4 Q. Okay. So, based on your control of
5 the enterprise at the time that you entered
6 into the agreement, is there any -- did you
7 have any -- any scenario under which you
8 believed you might actually have to pay back
9 the unpaid principal and interest due under the
10 notes?
11 A. If they weren't monetized.
12 Q. Okay. Anything else?
13 A. Assets weren't monetized, yeah.
14 Q. Anything else?
15 A. That's -- that's my recollection.
16 Q. If -- if you -- have the "conditions
17 subsequent" been met yet?
18 A. I believe the announcement of the
19 MGM sale will meet the conditions precedent
20 when it closes four or five months from now.
21 Q. Okay. But none of them have been
22 met -- have the conditions subsequent been met
23 as of today?
24 A. Have the conditions subsequent been
25 met today. I don't have awareness of --

Page 189

Dondero - 5-28-2021

2 despite objecting vehemently, we don't have
3 awareness of what the debtor is doing with
4 Trussway or Cornerstone. So there's a
5 potential that those could have triggered, but
6 I don't -- I don't have -- I don't have
7 awareness.
8 Q. Okay. Do you know -- and forgive
9 the question, sir, honestly. But do you
10 know --
11 A. Sure.
12 Q. -- whether your estate would be
13 liable to pay all of the undue principal --
14 unpaid principal and interest if you passed
15 before the conditions subsequent were
16 satisfied?
17 MS. DEITSCH-PEREZ: Object to the
18 form.
19 A. I -- I don't know that answer.
20 BY MR. MORRIS:
21 Q. That wasn't something that you and
22 your sister discussed in January or February of
23 2019; is that fair?
24 A. I wasn't contemplating that event at
25 that point in time.

Page 190

Dondero - 5-28-2021

2 Q. That's why I say "forgive the
3 question," sir.
4 Did you ever ask anybody to write
5 the agreement in paragraph 40 down on paper so
6 that it was memorialized somewhere?
7 A. No.
8 Q. Did you and Nancy --
9 (Simultaneous conversation.)
10 A. I'm sorry, go ahead.
11 BY MR. MORRIS:
12 Q. Do you and Nancy communicate by
13 email from time to time?
14 A. Almost entirely phone. I -- from
15 time to time, but it's almost entirely phone.
16 Q. All right. Let's -- let's move on.
17 A. Can I clarify something from before?
18 Q. Of course.
19 A. If the assets were never monetized
20 or the -- the notes would stay in place and not
21 be forgiven.
22 If the assets were all monetized
23 below cost or what was considered a less
24 favorable scenario, then it would be -- to
25 forgive it, something would have to be

Page 191

Dondero - 5-28-2021

2 monetized above cost, you know; but if they
3 were all monetized below cost, that would make
4 the note payable.
5 Q. I appreciate that.
6 MR. MORRIS: Let's go to the next
7 document, document Number 11.
8 (Exhibit 11 introduced.)
9 MR. MORRIS: If we could just scroll
10 down, please.
11 (Scrolling.)
12 BY MR. MORRIS:
13 Q. All right. Now, these are your
14 objections and responses to the debtor's second
15 request for admissions. Do you see that?
16 A. Yes.
17 MR. MORRIS: And let's scroll down
18 to page 4, please.
19 (Scrolling.)
20 BY MR. MORRIS:
21 Q. Okay. Do you recall whether you saw
22 this document before it was served and filed on
23 your behalf?
24 A. Yes. Can we go all the way through,
25 just go all the way down?

Page 192

1        Dondero - 5-28-2021
2        Was this notarized, also?
3    Q.   No, because these are responses to
4  requests to admit. You only --
5    A.   Okay.
6    Q.   You only notarize responses to
7  interrogatories, for whatever reason. So these
8  were not. Yeah.
9        But I'm just asking you if you have
10 a memory of reviewing the requests for
11 admission before they were served and filed on
12 your behalf?
13   A.   Yes.
14   Q.   Okay. And did you authorize your
15 lawyers to serve and file this document on your
16 behalf?
17   A.   Yes.
18   Q.   Okay. Looking at Request For
19 Admission Number 1, it asks you to admit that
20 in December 2019, you made a payment to the
21 debtor, a portion of which was applied to
22 reduce principal and/or interest due under one
23 or more of the notes.
24       Have I read that correctly?
25   A.   Yes.

Page 193

1        Dondero - 5-28-2021
2    Q.   And you've admitted that that
3  statement is true and accurate as written,
4  right?
5    A.   Yeah, I believe so. The -- yeah, I
6  believe so. Let me let you ask the questions.
7    Q.   Okay. Do you have any reason to
8  believe, as you sit here right now -- let me
9  ask you a different question.
10       Do you want to amend your response
11 in any way right now?
12   A.   I -- I'm not aware of small amounts
13 in terms of, like, interest or principal; and
14 then sometimes the tax guys will say periodic
15 interest payments are important to -- for the
16 character of the notes, so sometimes periodic
17 interest payments are made. Sometimes I think
18 they peck on some of the notes.
19       I don't -- I don't know or remember,
20 but I hope that something like this is correct.
21 Sometimes, if there was a need for cash into
22 Highland, the easiest way to -- for me or a
23 different entity to put cash into Highland was
24 to reduce a principal amount of a note with the
25 thought that we could create new notes or

Page 194

1        Dondero - 5-28-2021
2  increase another note later.
3        So how many times or how often
4  interest payments were made or if there was
5  some small principal payment made at some
6  point, I don't know the details; but I'm hoping
7  that's accurate.
8    Q.   Okay. We looked at three notes that
9  were signed by you in 2018, correct?
10   A.   Yes.
11   Q.   You signed other notes in favor of
12 Highland prior to that time, correct?
13   A.   I believe -- yeah. I mean, I
14 believe there were numerous notes beyond these.
15   Q.   Were -- were -- did you ever sign a
16 note in favor of Highland that was forgiven?
17   A.   I don't -- I don't know.
18   Q.   Do you have any recollection of ever
19 paying taxes in connection with a note that was
20 subsequently forgiven by Highland?
21   A.   If there was -- if there was a
22 forgiveness and it was taxable, I would have
23 paid the taxes. We were compliant in that
24 regard. I'm a hundred percent comfortable
25 we're compliant, but I don't know.

Page 195

1        Dondero - 5-28-2021
2    Q.   Okay. And I appreciate -- I didn't
3  mean to suggest that you weren't compliant,
4  sir. I'm just asking you if you can identify
5  any note that you made in favor of Highland
6  that was ever forgiven.
7        MS. DEITSCH-PEREZ: And I'm just
8    going to object because, while he's not
9    30(b)(6) witness, this is a deposition
10   taken in a particular case and he may have
11   not looked at the records going back to
12   2000, or whatever, that's -- since when
13   Highland was started.
14       MR. MORRIS: I just can't tell you
15   how inappropriate that is.
16 BY MR. MORRIS:
17   Q.   Go ahead, Mr. Dondero.
18   A.   The same answer, I don't know.
19   Q.   Okay. You did, in fact, pay in full
20 all principal and interest due on notes that
21 you made in favor of Highland other than the
22 three notes at issue in this case, correct?
23       MS. DEITSCH-PEREZ: Object to the
24   form.
25   A.   I -- I don't know. I would repeat

Dondero - 5-28-2021

1 Dondero - 5-28-2021
2 the answer I gave a few minutes ago when I kind
3 of rambled about cash management.
4 BY MR. MORRIS:
5     Q.   Do you know how many notes you made
6 in favor of Highland beyond the three that are
7 the subject of this litigation?
8         MS. DEITSCH-PEREZ:  Object to the
9 form.
10     A.   I -- I do not, regarding myself
11 personally.
12         I am aware that the aggregate amount
13 of affiliated notes is approximately 70 or
14 $80 million, including my notes; but that's it.
15 I mean, that's all I know.
16 BY MR. MORRIS:
17     Q.   All right.  I'm just asking you
18 about you, in your individual capacity.
19     A.   I don't know.
20     Q.   You don't know --
21         (Audio distortion.)
22         THE REPORTER:  You broke up, sir.
23 BY MR. MORRIS:
24     Q.   You don't know the number of
25 notes -- (audio distortion) -- Highland beyond

1 Dondero - 5-28-2021
2 these three, correct?
3     A.   Correct.
4     Q.   And you can't recall whether any --
5 any notes that you made in favor of Highland
6 were ever forgiven, correct?
7     A.   I -- I don't know.
8     Q.   Okay.  So, did you ever object to
9 the application of the payment referred to in
10 Request For Admission Number 1 to principal
11 and/or interest due under one or more of the
12 notes?
13         Did you ever object to the
14 application of the payment in that way?
15         MS. DEITSCH-PEREZ:  Object to the
16 form.
17     A.   I think the decision on how to
18 handle cash needed at Highland was entirely
19 made and the application to note principal or
20 interest was -- was entirely decided by the
21 accounting group.
22 BY MR. MORRIS:
23     Q.   But did you know that decision was
24 made in or around December 2019?
25     A.   Not really, no.  Not specifically.

1 Dondero - 5-28-2021
2     Q.   Well, you've admitted to the fact.
3 So, when did you learn that in December 2019 a
4 payment made on your behalf, at least a portion
5 of which was applied to reduce principal and/or
6 interest due under one or more of the notes?
7 When did you learn that?
8     A.   I don't know.  It would have been as
9 part of the process in preparing this document.
10     Q.   So it's your testimony that somebody
11 used your money in December 2019 to reduce
12 principal and/or interest due under one or more
13 of the notes without your knowledge?
14     A.   Yeah, without my specific knowledge.
15 There was a reason to put money in at that
16 point in time, and then how they applied it was
17 not my decision --
18     Q.   Making --
19     A.   -- not --
20     Q.   Making a payment -- you would agree
21 that making a payment of principle or interest
22 under one or more of the notes conflicts with
23 the agreement that you reached with Nancy,
24 right?
25         MS. DEITSCH-PEREZ:  Object to the

1 Dondero - 5-28-2021
2 form.
3     A.   No, that's not true.
4 BY MR. MORRIS:
5     Q.   Well, the conditions subsequent
6 hadn't arisen yet; is that fair?
7     A.   The notes were in '18, correct?
8     Q.   Yes, sir.
9     A.   And then, yeah, the subsequent
10 condition was in the first quarter of '19.
11     Q.   Right.  And then, in December of
12 '19, a payment of principal and/or interest was
13 made against one or more of the notes, right?
14     A.   Yes.
15     Q.   And I'm just asking you, sir, if
16 that's inconsistent with the agreement that you
17 reached with Nancy.
18         MS. DEITSCH-PEREZ:  Object to the
19 form.
20     A.   And I'm saying -- I'm saying no.  I
21 mean, it's --
22 BY MR. MORRIS:
23     Q.   Okay.  Since learning of the
24 payment, have you tried to identify the person
25 who was responsible for applying your money in

Page 200

Dondero - 5-28-2021

1  the way that's described in Request For
2  Admission Number 1?
3      A.   No.
4          MR. MORRIS:  Can we go down to
5      number 4, please?
6  BY MR. MORRIS:
7      Q.   In your amended answer, I think you
8  asserted that the -- "each note is ambiguous."
9  Do I have that right?
10         We can go back, if you would like to
11  look?
12     A.   Is this admission number 4?  Is that
13  where you're pointing to?
14     Q.   It is, and I'll just read it.  It
15  refers to paragraph 45 of the amended answer,
16  and I'll read it.  But I'm happy to go back and
17  put it on the screen, if you'd would like.
18         But it says simply:  "Defendant
19  further asserts that each note is ambiguous."
20         So request for number 4 asks you to
21  admit that before you served that amended
22  answer, you had never informed the debtor of
23  your belief that any provision of the notes was
24  ambiguous.

Page 201

Dondero - 5-28-2021

1      Do you see that?
2      A.   Yes.
3      Q.   And you've denied that request for
4  admission.
5      Do you see that?
6      A.   Yes.
7      Q.   So, who did you inform at the debtor
8  of your belief that a provision of the notes
9  was ambiguous?
10         Who did you --
11         MS. DEITSCH-PEREZ:  Object.
12 BY MR. MORRIS:
13     Q.   Who did you communicate that to?
14         MS. DEITSCH-PEREZ:  Object to the
15     form, no foundation.
16     A.   I -- I -- I don't -- "I don't know"
17 is my answer to pretty much any question you
18 could ask there.
19 BY MR. MORRIS:
20     Q.   This is -- you're denying the
21 request for admission, and that's your right.
22         Did you ever inform the debtor of
23 your belief that a provision of the notes was
24 ambiguous?

Page 202

Dondero - 5-28-2021

1          MS. DEITSCH-PEREZ:  Object, no
2      foundation.
3      A.   As -- ask the question again,
4      please.
5  BY MR. MORRIS:
6      Q.   Did you ever inform the debtor of
7  your belief that any provision of the notes was
8  ambiguous?
9          MS. DEITSCH-PEREZ:  Object, no
10     foundation.
11     A.   You know, I don't know what
12 conversations were had between lawyers.  I -- I
13 don't know.
14 BY MR. MORRIS:
15     Q.   Okay.  So I'm going to ask a
16 slightly different question because of your
17 answer:  Can you tell me whether you or anybody
18 acting on your behalf ever informed the debtor
19 of your belief that any provision of any of the
20 notes was ambiguous?
21         MS. DEITSCH-PEREZ:  Object, no
22     foundation.
23     A.   I'm going to have to say, yes, I
24 believe that statement is true; but I don't

Page 203

Dondero - 5-28-2021

1  have specific knowledge.
2  BY MR. MORRIS:
3      Q.   Do you have any knowledge, can you
4  identify any person who informed the debtor of
5  your belief?
6      A.   I don't have specific knowledge.  I
7  don't -- I don't -- I don't know.
8      Q.   Can you tell me when the debtor was
9  informed of your belief that any provision of
10 the notes was ambiguous?
11         MS. DEITSCH-PEREZ:  Object, no
12     foundation.
13     A.   I don't know.
14 BY MR. MORRIS:
15     Q.   Can you identify the person who was
16 acting on behalf of the debtor who was informed
17 by you or anyone acting on your behalf of your
18 belief that any provision of the notes was
19 ambiguous?
20         MS. DEITSCH-PEREZ:  Object, no
21     foundation.
22     A.   I don't know.
23 BY MR. MORRIS:
24     Q.   Okay.

Appx. 01665

Dondero - 5-28-2021

1
2    MR. MORRIS: Let's go to the next
3  exhibit, please.
4    THE WITNESS: Is this a good time
5  for a lunch break?
6    MR. MORRIS: Yeah. I'm happy to do
7  it. I'm trying to move as quickly as I
8  can, Mr. Dondero. This is a little bit
9  longer than you and I usually sit for, and
10  I apologize for that, but I'm happy to take
11  as long a break as you -- as you need.
12    MS. DEITSCH-PEREZ: How long do you
13  think you have for the rest of the
14  deposition? What's your guess?
15    MR. MORRIS: I would say more than
16  an hour, less than two.
17    MS. DEITSCH-PEREZ: Do you want to
18  take a really short --
19    THE WITNESS: Can we take a half
20  hour, like 12:30 our time, 1:30 East Coast
21  time?
22    MR. MORRIS: Of course.
23    THE WITNESS: Yeah. So, we'll take
24  35 minutes, and then we'll get back to it.
25  You know --

1    THE REPORTER: Are we still on the
2  record, please?
3    MR. MORRIS: Yes.
4    COURT REPORTER: Okay.
5    MS. DEITSCH-PEREZ: We'll --
6    MR. MORRIS: If you have time
7  constraints -- if you have time
8  constraints, Mr. Dondero, I'm prepared to
9  keep going. I'll take a shorter break. I
10  don't want -- you know, I apologize for the
11  burden, but these are relevant questions.
12    THE WITNESS: Yeah, let's -- let's
13  do 35 minutes, and we will try and wrap it
14  up in -- like you're saying, like an hour
15  or less than two.
16    MR. MORRIS: Yeah.
17    THE WITNESS: Yeah. I do need to be
18  someplace in the early afternoon.
19    MR. MORRIS: I assure you, I'll do
20  my best to keep to that time frame.
21    THE WITNESS: Okay. Thank you.
22    THE REPORTER: And we're off the
23  record.
24    (Lunch recess held.)
25

Dondero - 5-28-2021

1
2    MR. MORRIS: Can we put up the next
3  exhibit, which I believe is Number 12?
4    (Exhibit 12 introduced.)
5  BY MR. MORRIS:
6    Q.  Okay. So, Mr. Dondero, these are
7  interrogatories, and so I direct you first to
8  the last page of the document, the Verification
9  page.
10    And is that your signature, sir?
11    A.  Yes.
12    Q.  Now, this wasn't notarized. Is
13  there a reason why you didn't get this
14  notarized?
15    A.  No.
16    Q.  Okay.
17    MR. MORRIS: If we could just scroll
18  back up.
19  BY MR. MORRIS:
20    Q.  But is the Verification true --
21    MR. MORRIS: If we just go back to
22  it.
23  BY MR. MORRIS:
24    Q.  At the time you signed this
25  document, had you read the Defendant's

Dondero - 5-28-2021

1
2  Objections and Answers to Highland Capital
3  Management, L.P.'s Second Set of
4  Interrogatories?
5    A.  Yes.
6    Q.  And did you believe that the facts
7  stated therein were both within your personal
8  knowledge and were true and correct?
9    A.  Yes.
10    Q.  Okay.
11    MR. MORRIS: Can we go to the
12  substance of the document on page 4 of 6?
13  BY MR. MORRIS:
14    Q.  Okay. So, in the answer to
15  Interrogatory No. 1, you identify the
16  conditions subsequent that were the subject of
17  the agreement that we've been talking about
18  that you and Nancy entered into.
19    Do I have that right?
20    A.  Yes.
21    Q.  And to the best of your knowledge,
22  does the answer that's set forth in response to
23  Interrogatory No. 1 fully and accurately set
24  forth the conditions subsequent that were the
25  subject of the agreement?

1           Dondero - 5-28-2021
2           MS. DEITSCH-PEREZ: Object to the
3   form.
4       A.   Repeat the question, please.
5   BY MR. MORRIS:
6       Q.   Does this answer to Interrogatory
7   No. 1 set forth, to the best of your knowledge
8   and understanding, the conditions subsequent
9   that were part of the agreement that you and
10  Nancy entered into in January or February 2019?
11          MS. DEITSCH-PEREZ: Object to the
12  form.
13      A.   Yes, large -- yes, largely --
14  BY MR. MORRIS:
15      Q.   Okay.
16      A.   -- or yes.
17      Q.   Is there any aspect of this that you
18  believe right now is incorrect?
19      A.   No.
20      Q.   Is there any aspect of your
21  agreement with Nancy on the conditions
22  subsequent that's not described in this answer?
23          MS. DEITSCH-PEREZ: Object to the
24  form.
25      A.   My recollection is that that largely

1           Dondero - 5-28-2021
2   captures it.
3   BY MR. MORRIS:
4       Q.   Okay. There's a reference there to,
5   quote, "the disposition of the portfolio
6   company interests managed and/or owned directly
7   or indirectly by Highland and/or its affiliates
8   or managed funds."
9           Do you see that?
10      A.   Yes.
11      Q.   What does that refer to?
12      A.   Just, you know, MGM is owned in a
13  variety of places, Cornerstone is owned in a
14  variety of places, and then Trussway is owned
15  in a subsidiary of Highland.
16          So there -- I believe it's to
17  capture the fact of the different ownerships or
18  controls of those three different investments.
19      Q.   Are those the only portfolio company
20  interests managed and/or directly or indirectly
21  by Highland or its affiliates -- withdrawn.
22  That was bad.
23          This answer doesn't refer
24  specifically to any particular assets, correct?
25      A.   It does not.

1           Dondero - 5-28-2021
2       Q.   Okay.
3       A.   Well, yeah. I think what the intent
4   was -- those three companies I just mentioned
5   were always considered portfolio companies.
6   There have been a few others over the years,
7   but those are -- those -- I think they're
8   trying to capture them that way, but I only
9   remember talking to her about those three.
10      Q.   Are there any other portfolio
11  company interests that are managed and/or owned
12  directly or indirectly by Highland and/or its
13  affiliates or managed funds? Are there any
14  other assets?
15          MS. DEITSCH-PEREZ: Object to the
16  form.
17      A.   There were some lesser private
18  equity investments or companies, yes.
19  BY MR. MORRIS:
20      Q.   Can you identify them?
21      A.   CCS Medical. I think OmniMax was
22  one. Kerri International. Yeah, those --
23  those are ones that come to mind.
24      Q.   Okay. But notwithstanding the
25  answer here, to the best of your recollection,

1           Dondero - 5-28-2021
2   the agreement that you had with Nancy pertained
3   only to MGM, Cornerstone, and Trussway. Do I
4   have that right?
5           MS. DEITSCH-PEREZ: 0bject to the
6   form.
7       A.   The monetization of those three were
8   the -- were the conditions subsequent, yes.
9   BY MR. MORRIS:
10      Q.   Okay. And there's a reference there
11  to being disposed of, quote, on a favorable
12  basis.
13          Do you see that?
14      A.   Yes.
15      Q.   What does that mean?
16      A.   Above cost or book value.
17      Q.   How much above cost or book value
18  would you have to dispose of MGM, Cornerstone,
19  and Trussway in order to trigger the conditions
20  subsequent?
21      A.   There wasn't -- there was just
22  monetization on a favorable basis. There
23  wasn't a specific amount on each individual
24  one. It only took one to trigger it.
25      Q.   Oh. So the sale of any of those

Dondero - 5-28-2021

1 three assets would trigger the conditions
2
3 subsequent?
4     A.   Correct.
5     Q.   Okay.  And who decided whether the
6 asset was sold on a favorable basis?
7        Who made that decision, under your
8 agreement with Nancy?
9     A.   It was just defined relative to
10 cost, so it was just -- it was just a
11 factual -- there's nothing to decide.  It would
12 just be a factual answer.
13    Q.   So, I just want to make sure I
14 understand.
15       Your agreement with Nancy was that
16 --
17    A.   Yes.
18    Q.   -- that -- all right.  Withdrawn.
19       Your agreement with Nancy in January
20 or February 2019, was that if any of MGM,
21 Cornerstone, or Trussway was sold at cost, the
22 debtor would forgive your obligations under the
23 three notes.
24       Do I have that right?
25       MS. DEITSCH-PEREZ:  Object to the

Dondero - 5-28-2021

1
2 form.
3     A.   If any of them were sold above cost,
4 it would -- monetization would trigger the --
5 the three notes -- forgiveness of the three
6 notes, yes.
7 BY MR. MORRIS:
8     Q.   Okay.  And I just want to see if I
9 can understand:  Did you and Nancy discuss in
10 January or February 2019 how much above cost
11 the sale would have to be in order for the
12 debtor to forgive your obligations under the
13 three notes?
14       MS. DEITSCH-PEREZ:  Object to the
15 form.
16    A.   No.  It just had to be above cost,
17 not a amount above cost.
18 BY MR. MORRIS:
19    Q.   Okay.
20    A.   Because just monetizing it -- just
21 monetizing it and getting liquidity for an
22 illiquid investment, even if it was at cost, is
23 good.  So something above cost is great.  And
24 those are all big assets, and the notes were
25 small.

Dondero - 5-28-2021

1
2     Q.   Okay.  So, again, I just want to
3 really understand your agreement with Nancy.
4        Did you and her specifically agree
5 in January or February 2019 that if you sold
6 either MGM or Cornerstone or Trussway for at
7 least $1 more than cost, then your obligations
8 under the three notes would be forgiven?
9        MS. DEITSCH-PEREZ:  Object to the
10 form.
11    A.   Before I answer that, I just -- can
12 you repeat so I can get all the subjects and
13 participants straight in my head from the
14 beginning of that question?
15 BY MR. MORRIS:
16    Q.   Sure.  Did you and Nancy agree in
17 January or February 2019 that if Highland sold
18 either MGM or Cornerstone or Trussway for an
19 amount that was equal to at least $1 more than
20 cost, that -- that Highland would forgive your
21 obligations under the three notes?
22       MS. DEITSCH-PEREZ:  Object to the
23 form.
24    A.   I believe that is correct.
25 BY MR. MORRIS:

Dondero - 5-28-2021

1
2     Q.   Thank you very much.
3        Was Grant Scott the trustee of the
4 Dugaboy trust in January or February 2019?
5     A.   He was at one point.  I don't know
6 if he was -- I don't know when he was the
7 trustee, but he got replaced at a -- some point
8 in time.
9     Q.   Do you know if it was before or
10 after the petition date?
11    A.   Before or after the petition date.
12       It was before the petition date.
13       MR. MORRIS:  Okay.  I'd ask for the
14 production of any documents that show that
15 Nancy Dondero was the trustee of the
16 Dugaboy trust in January or February 2019.
17       MS. DEITSCH-PEREZ:  I'll take your
18 request under advisement.
19 BY MR. MORRIS:
20    Q.   Now, the last portion of
21 Interrogatory No. 1, the answer to it, refers
22 to a, quote, "basis wholly outside Dondero's
23 control."
24       Do you see that?
25    A.   Uh-huh.

Dondero - 5-28-2021

1
2    Q.   Was that part of the agreement that
3  you entered into with Nancy in January or
4  February 2019?
5    A.   Yeah.  It was probably unnecessary
6  complexity, but yes.
7    Q.   Was there anything that you
8  envisioned in January or February 2019 that
9  would have caused you to lose control of
10  Highland?
11         MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   No, and I wasn't -- that wasn't the
14  thought process.
15  BY MR. MORRIS:
16    Q.   So what was the thought process?
17  Why was that phrase part of -- why --
18  withdrawn.
19         Did you include that -- that aspect
20  of the conditions subsequent -- withdrawn.
21         Who decided that one of the
22  conditions subsequent was the disposition
23  of the assets that you've described, quote,
24  "wholly outside of Dondero's control."
25         Whose idea was it to put that into

Dondero - 5-28-2021

1
2  the agreement?
3    A.   It was -- it was mine.  And, again,
4  it was probably unnecessary complexity, but...
5    Q.   And why did you want that piece of
6  it into the agreement?
7    A.   MGM ended up being a success story,
8  but the value of MGM and the prospects of MGM
9  have bounced around considerably over the last
10  decade.  And we never owned more than 17 or
11  18 percent and there was a 32 percent holder,
12  and Carl Icahn was involved at different points
13  in time.  There was definitely a chance that,
14  over our objections, it could have been sold at
15  a lower price without our support.
16         And as far as Cornerstone was
17  concerned, there was a half or a majority that
18  was in the Restoration Fund that had a whole
19  bunch of outside investors in it; and,
20  theoretically, that could have been sold
21  without our -- or against our recommendations.
22         So it was really meant to capture
23  those two possibilities.
24    Q.   Did you tell Frank Waterhouse at any
25  time about your agreement with Nancy that's

Dondero - 5-28-2021

1
2  subject to the conditions subsequent referred
3  to here in Interrogatory No. 1?
4    A.   I don't know if Frank knew the
5  specifics.  I think Frank really was aware that
6  the loans could and would likely be forgiven
7  and -- yes.  That's all to that answer.
8    Q.   Did you tell him that?
9    A.   Yes, and -- I mean, partly he knew
10  it from the history of Highland, and the
11  structure of the notes are structured in a way
12  that facilitates forgiveness.
13         MR. MORRIS:  I move to strike.
14  BY MR. MORRIS:
15    Q.   Did you ever tell Frank Waterhouse
16  about the agreement that you reached with
17  Nancy?
18         MS. DEITSCH-PEREZ:  Object to the
19    form.
20    A.   Not -- not the specifics.
21  BY MR. MORRIS:
22    Q.   Did you ever mention anything about
23  any aspect of your agreement to Nancy -- with
24  Nancy to Frank Waterhouse?
25         MS. DEITSCH-PEREZ:  Object to the

Dondero - 5-28-2021

1
2  form.
3    A.   I -- listen, I don't -- I don't
4  remember talking to him about the specifics,
5  but, in general, I -- he -- he -- he was deeply
6  involved in the thought process and the
7  conclusion that the notes were forgiven or
8  going to be for--
9         MR. MORRIS:  I'm going to move to
10    strike.
11  BY MR. MORRIS:
12    Q.   And I'm not asking you to get into
13  his head to tell me what you think he knew.
14  I'm asking you about what you told him.
15         Did you ever tell Mr. Waterhouse
16  that you reached an agreement with Nancy
17  pursuant to which the debtor had agreed not to
18  collect on the notes subject to the conditions
19  subsequent set forth in your answer to
20  Interrogatory No. 1?
21         MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.   I don't remember.  I -- I don't
24  remember enough to say conclusively one way or
25  the other.

Dondero - 5-28-2021

2 BY MR. MORRIS:
3 Q. Do you have any recollection of
4 telling any employee at Highland at any time of
5 your agreement with Nancy?
6 MS. DEITSCH-PEREZ: Object to the
7 form.
8 A. I -- I don't know.
9 BY MR. MORRIS:
10 Q. Okay. Did you tell anybody employed
11 or representing the debtor at any time of your
12 agreement with Nancy?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. Not that I -- not that I recall.
16 Again, I didn't think there was a reason to,
17 initially.
18 MR. MORRIS: Can we go to
19 Exhibit 13, please?
20 (Exhibit 13 introduced.)
21 BY MR. MORRIS:
22 Q. All right. When you were the CEO,
23 did PricewaterhouseCoopers serve as Highland's
24 auditors?
25 MS. DEITSCH-PEREZ: Object to the

Dondero - 5-28-2021

2 form.
3 A. At different times they were, and
4 then KPMG was. I don't remember who it was in
5 '17.
6 BY MR. MORRIS:
7 Q. Okay. And it's a fact, is it not,
8 that until at least year-end 2018, Highland had
9 audited the financial statements prepared for
10 itself, right?
11 A. I don't know. I wasn't aware they
12 stopped.
13 Q. Okay. Okay.
14 So, I'm putting up on the screen the
15 "Consolidated Financial Statements and
16 Supplemental Information" for the period
17 December 31st, 2017.
18 Do you see that?
19 A. Uh-huh.
20 MR. MORRIS: And if we can go first
21 to the page marked 33470, which is, I
22 think, the --
23 And is this -- does this refresh
24 your recollection that PWC served as
25 Highland's independent auditors for the

Dondero - 5-28-2021

2 financial statements prepared for the year
3 ending December 31st, 2017?
4 MR. MORRIS: If you could scroll
5 down to the bottom of the page so
6 Mr. Dondero can see the date.
7 A. Okay.
8 BY MR. MORRIS:
9 Q. Do you see that?
10 A. If you're asking me to agree that it
11 was Pricewaterhouse, yes, I agree.
12 Q. And do you see that they signed
13 their letter on May 18th, 2018? Do you see
14 that?
15 A. Yeah.
16 Q. And do you see, towards the top of
17 the page, there's a statement about
18 "Management's Responsibility for the
19 Consolidated Financial Statements"?
20 A. Yes.
21 Q. And that's a pretty standard clause
22 that auditors include in audited financial
23 statements, in your experience; isn't that
24 right?
25 A. Yes.

Dondero - 5-28-2021

2 MR. MORRIS: Can we go to the
3 page -- the next page, 3471?
4 BY MR. MORRIS:
5 Q. This is the Consolidated Balance
6 Sheet for the period December 31, 2017, and
7 it's been redacted except to show "Notes and
8 other amounts due from affiliates." Do you see
9 that?
10 A. Uh-huh.
11 Q. When you were the CEO, did Highland
12 carry the Notes and Other Amounts Due from
13 Affiliates as assets on its balance sheet?
14 A. Yes.
15 Q. Okay. And that's what's reflected
16 on this page; is that correct?
17 A. I mean, that's what the heading
18 says, yes.
19 Q. Okay.
20 MR. MORRIS: Can we go to Bates
21 number 33499.
22 (Scrolling.)
23 BY MR. MORRIS:
24 Q. And you're aware, are you not, that
25 in the Notes to the financial statements, PWC

Page 224

Dondero - 5-28-2021

2 described all of the notes and other amounts
3 that were due to affiliates -- due from
4 affiliates?
5       MS. DEITSCH-PEREZ:  Object to the
6 form.
7   A.   Yes.
8 BY MR. MORRIS:
9   Q.   And were you aware that in the
10 financial statements prepared for Highland for
11 the period ending December 31st, 2017, that PWC
12 included in its notes amounts due from Highland
13 Capital Management Fund Advisors, L.P.?
14   A.   The 0.2 million in the first
15 sentence, is that your question?
16   Q.   Yes.  You know, the whole -- who at
17 Highland was responsible for providing
18 information to PWC relating to Notes and Other
19 Amounts Due from Affiliates?
20   A.   The accounting department.
21   Q.   And who was the head of the
22 accounting department as of the end of 2017?
23   A.   Frank Waterhouse.
24   Q.   And did Frank Waterhouse remain the
25 head of the accounting department until at

Page 225

Dondero - 5-28-2021

2 least the end of 2020, to the best of your
3 knowledge?
4   A.   Yes.
5   Q.   And when did Frank Waterhouse become
6 the head of the accounting department?
7   A.   A few years earlier.
8   Q.   So, to the best of your
9 recollection, Frank Waterhouse has been the
10 head of the accounting department on a
11 continuous basis from the period approximately
12 2015 until the end of 2020; is that right?
13   A.   If not earlier, but yes.  But I
14 don't know the dates.
15   Q.   Okay.
16       MR. MORRIS:  Can we scroll down to
17 the next to the last paragraph there, the
18 one that refers to Mr. Dondero?  There you
19 go.
20 BY MR. MORRIS:
21   Q.   Do you see that, according to this
22 financial report, you "did not issue any new
23 promissory notes to the Partnership" during the
24 year 2017?
25   A.   Yeah.

Page 226

Dondero - 5-28-2021

2   Q.   And to the best of your
3 recollection, was that accurate?
4   A.   Yes.
5   Q.   Okay.  And to the best of your
6 recollection, was it also accurate that as of
7 the end of 2017, the total interest and
8 principal due on an -- on outstanding
9 promissory notes was approximately 14 and a
10 half million dollars and was payable in annual
11 installments throughout the term of the note?
12   A.   Yes.
13   Q.   And prior to your execution of the
14 demand notes, do you recall that you had made,
15 in favor of Highland, certain term notes?
16   A.   I don't -- I don't recall.
17   Q.   Do you remember having to make
18 payments to Highland to satisfy the terms of
19 any notes prior to 2018?
20   A.   I can't recall.  I didn't refresh --
21 I didn't refresh myself on anything else, on
22 any other notes for this deposition.
23   Q.   Okay.  But looking at this
24 paragraph, is there anything about it that you
25 currently believe is inaccurate or incorrect?

Page 227

Dondero - 5-28-2021

2       MS. DEITSCH-PEREZ:  Object to the
3 form.
4   A.   I -- I don't know.  I don't know.
5 BY MR. MORRIS:
6   Q.   Okay.  We can scroll through the
7 entire page, if you would like, but I just --
8 I'll ask the question first, and then you tell
9 me what you need to read.
10       Do you recall whether
11 PricewaterhouseCoopers' audited financial
12 statements ever disclosed the forgiveness of
13 any loan ever made by Highland to you or any of
14 its employees?
15       MS. DEITSCH-PEREZ:  Object to the
16 form.
17   A.   I don't -- I don't know.
18 BY MR. MORRIS:
19   Q.   Do you have a recollection of any?
20   A.   I don't have a recollection --
21 recollection of any.  As a CPA, I'm not sure
22 it's required until it's forgiven, but I'm not
23 the expert.  I can't remember seeing it or not
24 seeing it.
25   Q.   Did the debtor make --

Dondero - 5-28-2021

1
2    MR. MORRIS: You know what? Let's
3    look -- let's look at each of these. We
4    can start with the bottom of the page.
5  BY MR. MORRIS:
6    Q.   Can you identify any of the makers
7  of the notes that are referred to in this
8  section that are not directly or indirectly
9  owned or controlled by you, other than
10  Mr. Okada?
11    So, if we start at the top, is
12  Highland Capital Management Fund Advisors,
13  L.P., an entity that is either directly or
14  indirectly owned or controlled by you?
15    A.   Yes.
16    Q.   NexPoint Advisors, L.P., the next
17  paragraph, is that an entity that is directly
18  or indirectly owned or controlled by you?
19    A.   Yes.
20    Q.   HCRE Partners, LLC, is that an
21  entity that is directly or indirectly owned or
22  controlled by you?
23    A.   Yes.
24    Q.   Highland Capital Management
25  Services, Inc., is that an entity that is

Dondero - 5-28-2021

1  directly or indirectly owned or controlled by
2  you?
3    A.   Yes.
4    Q.   All right. And you're the subject
5  of the next paragraph, right?
6    The next paragraph relates to Mark
7  Okada. Are you aware of any loan that was ever
8  made by Highland to Mr. Okada that was
9  forgiven?
10    A.   I don't know.
11    Q.   Okay.
12    MR. MORRIS: Can we go to the next
13  paragraph, please?
14  BY MR. MORRIS:
15    Q.   There's a reference to The Dugaboy
16  Investment Trust. Do you see that?
17    A.   Yes.
18    Q.   Either your sister or Mr. Scott have
19  served as the sole trustee of Dugaboy since the
20  time it was created; is that correct?
21    MS. DEITSCH-PEREZ: Object to the
22    form.
23    A.   I -- I don't know.
24  BY MR. MORRIS:
25

Dondero - 5-28-2021

1
2    Q.   Do you recall anybody at any time
3  serving as the trustee of The Dugaboy
4  Investment Trust other than Nancy or Mr. Scott?
5    MS. DEITSCH-PEREZ: Object to the
6    form.
7    A.   I -- I don't remember.
8  BY MR. MORRIS:
9    Q.   Are you the lifetime beneficiary of
10  The Dugaboy Investment Trust?
11    A.   Yes.
12    Q.   And have you been -- withdrawn.
13    Are you the sole lifetime
14  beneficiary of The Dugaboy Investment Trust?
15    MS. DEITSCH-PEREZ: Object to the
16    form.
17    A.   I believe so.
18  BY MR. MORRIS:
19    Q.   Okay. And has that been true since
20  the time The Dugaboy Investment Trust was
21  created?
22    MS. DEITSCH-PEREZ: Object to the
23    form.
24    A.   I don't know for sure.
25  BY MR. MORRIS:

Dondero - 5-28-2021

1
2    Q.   Okay. The next paragraph refers to
3  a Contribution Agreement. Do you see that?
4    A.   Yes.
5    Q.   Are you familiar who the affiliated
6  trust is that entered into the Contribution
7  Agreement?
8    A.   No. I'm willing to be refreshed,
9  but I don't remember.
10    Q.   Is it the Hunter Mountain Investment
11  Trust?
12    A.   It could be.
13    Q.   Can you think of any other
14  affiliated trust other than Hunter Mountain who
15  carried a note receivable in the amount of
16  $63 million due to the partnership?
17    A.   No.
18    Q.   Do you directly or indirectly own or
19  control the Hunter Mountain Trust?
20    A.   No.
21    Q.   Let's go -- do you have any interest
22  in the Hunter Mountain Trust?
23    A.   No.
24    Q.   Directly or indirectly?
25    A.   No.

Page 232

Dondero - 5-28-2021

1
2     MR. MORRIS: Can we go to 33510,
3  please?
4     (Scrolling.)
5  BY MR. MORRIS:
6     Q.    Just to refresh your recollection,
7  PricewaterhouseCoopers's letter is dated
8  May 18th, 2018.
9     And you see there, note 16 refers to
10  "Subsequent Events." Do you see that?
11     A.    Yep.
12     Q.    So, sometime between January 1st and
13  May 18, 2018, which is the report date,
14  PricewaterhouseCoopers is disclosing that you
15  issued promissory notes in the amount of
16  $11.7 million. Do you see that?
17     A.    Yes.
18     Q.    Do you believe that was true and
19  accurate at the time? Is that your
20  recollection?
21     A.    Yes.
22     Q.    Now, of the three notes that we
23  looked at, only one of them was issued before
24  May 18, 2018. That was the 2 and a half
25  million-dollar note.

Page 233

Dondero - 5-28-2021

1
2     Do you remember that?
3     I apologize. Withdrawn.
4     That was the 3.825 million-dollar
5  note.
6     Do you remember that?
7     A.    Okay. Yes.
8     Q.    Okay. So, if that note was 3. –
9  let's just call it roughly $3.9 million, does
10  that mean that there were $7.8 million of other
11  notes that you made in favor of Highland during
12  the first five months of 2018?
13     MS. DEITSCH-PEREZ: Object to the
14  form.
15     A.    Yeah, I think you got the wrong –
16  well, you're – I'm not the accounting
17  department. I'm not the auditor. My comment
18  would be our financial statements have always
19  been – our audited financial statements have
20  always been extremely accurate and
21  Pricewaterhouse and KPMG literally do a hundred
22  percent sampling of all transactions.
23  Everything is reflected accurately in the
24  financials, and there's no missing note or
25  misstated note or unequal amount, or whatever.

Page 234

Dondero - 5-28-2021

1
2  And I refuse to go in that direction just
3  because I don't know the details.
4  BY MR. MORRIS:
5     Q.    I appreciate that, sir, and I didn't
6  mean to take you into that direction. I'm just
7  asking you if you know what accounts for the
8  difference between the $11.7 million stated and
9  the 3.825 million-dollar note that we looked at
10  as Exhibit Number 1 that was tendered by you on
11  February 2nd, 2018. That's all.
12     A.    I – I don't know. I have no – I
13  have no idea.
14     Q.    Okay. In the course of the audit,
15  you personally sign management representation
16  letters, right?
17     A.    Usually at the end.
18     Q.    Yeah.
19     MR. MORRIS: So can we call the next
20  exhibit up, please?
21     (Exhibit 14 introduced.)
22  BY MR. MORRIS:
23     Q.    And happy to take a look at it. I'm
24  going to point you to a couple of things.
25     MR. MORRIS: But if we could go to

Page 235

Dondero - 5-28-2021

1
2  the document, it's page 9 of the document,
3  Bates number 33408. All right.
4     And scroll up to the prior page,
5  please. Just looking for the signatures.
6  BY MR. MORRIS:
7     Q.    All right. Is that your signature
8  there, sir?
9     A.    Yeah.
10     Q.    And did you sign this management
11  representation letter on behalf of Highland in
12  your capacity as the Strand Advisors, Inc.,
13  general partner on or about May 18th, 2018?
14     A.    Yeah.
15     Q.    And Frank Waterhouse, is that -- do
16  you know that to be his signature below?
17     A.    It resembles it, yes.
18     Q.    Okay. Do you have an understanding
19  of why you signed this document?
20     A.    Despite all their auditing and
21  double-checking of all source information,
22  they – they want a validation from management,
23  also.
24     Q.    And is that standard and customary,
25  to the best of your experience?

Dondero - 5-28-2021

1
2 A. Yes.
3 Q. Okay.
4 MR. MORRIS: Can we go back to the
5 first page, please?
6 (Scrolling.)
7 BY MR. MORRIS:
8 Q. Do you see in the second paragraph,
9 the last sentence, there's a reference to
10 "materiality"?
11 MR. MORRIS: If you can just scroll
12 down a bit.
13 BY MR. MORRIS:
14 Q. And it says, quote, "Materiality
15 used for purposes of these representations is
16 $2,000,000."
17 Am I reading that correctly?
18 A. Yes.
19 Q. And did you understand that Highland
20 was to provide to PWC, so that it could prepare
21 the audited financial statements with
22 information relating to issues and transactions
23 that were material, using that definition?
24 A. Yes.
25 MR. MORRIS: Let's go to the next

Dondero - 5-28-2021

1
2 document.
3 (Exhibit 15 introduced.)
4 BY MR. MORRIS:
5 Q. These are the audited financials for
6 the period ending December 31st, 2018.
7 MR. MORRIS: And if you could go to
8 the third page, the one ending in 33424.
9 No, above. Yeah, right there.
10 Do you see PricewaterhouseCoopers
11 signed the audit letter on June 3rd, 2019?
12 A. Yep.
13 MR. MORRIS: And if we can scroll up
14 to the top of the page, it has the same
15 statement concerning "Management's
16 Responsibility for the Consolidated
17 Financial Statements" that we looked at
18 earlier in the 2017 audit, correct?
19 A. Yes.
20 BY MR. MORRIS:
21 Q. Okay. And that's -- looking at it,
22 that's customary language that auditors include
23 in audited financial statements, correct?
24 A. Yep.
25 MR. MORRIS: Can we go to the next

Dondero - 5-28-2021

1
2 page, please?
3 BY MR. MORRIS:
4 Q. Again, you'll see that this is the
5 Consolidated Balance Sheet for the period
6 ending December 31st, 2018. Do you see that?
7 A. Yes.
8 Q. And is it accurate that Highland
9 continued to carry on its balance sheet as an
10 asset all "Notes and Other Amounts Due from
11 Affiliates"?
12 A. Yes.
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 BY MR. MORRIS:
16 Q. And you knew -- you knew at the time
17 that the audited financials were finalized that
18 Highland was carrying on its balance sheet
19 "Notes and Other Amounts Due from Affiliates,"
20 correct?
21 A. Yup.
22 Q. Did you personally tell anybody at
23 PWC in connection with the preparation of the
24 audited financial statements for 2018 that you
25 had entered into the agreement with your sister

Dondero - 5-28-2021

1
2 Nancy in January or February of 2019?
3 MS. DEITSCH-PEREZ: Object to the
4 form.
5 A. Not that I recall.
6 BY MR. MORRIS:
7 Q. Do you know if anybody told PWC,
8 prior to the completion of the audited
9 financial statements for the period ending
10 December 31st, 2018, of your agreement with
11 Nancy?
12 MS. DEITSCH-PEREZ: Object to the
13 form.
14 A. Not that I know of.
15 BY MR. MORRIS:
16 Q. Did you ever instruct anybody to
17 inform PWC about the agreement you reached with
18 Nancy in --
19 MS. DEITSCH-PEREZ: Object to the
20 form.
21 BY MR. MORRIS:
22 Q. -- January --
23 MR. MORRIS: Please let me finish
24 the question.
25 MS. DEITSCH-PEREZ: You took a

Page 240

1  Dondero - 5-28-2021
2  breath. Sorry.
3  MR. MORRIS: Are you finished?
4  MS. DEITSCH-PEREZ: Yes. As I
5  explained, you took a breath, and I thought
6  you were done. Sorry.
7  BY MR. MORRIS:
8  Q. Did you ever instruct anybody to
9  inform PWC of your agreement that you reached
10  with Nancy in January or February 2019?
11  MS. DEITSCH-PEREZ: Object to the
12  form.
13  A. No.
14  MR. MORRIS: Can you please go to
15  page 33451?
16  (Scrolling.)
17  BY MR. MORRIS:
18  Q. And we've got the "Notes and Other
19  Amounts Due from Affiliates." We had gone
20  through all of this before and I'm not going to
21  do it again, but I do want to ask you, sir:
22  Did you personally approve and authorize each
23  of the notes that are reflected in the PWC
24  disclosure concerning Notes and Other Amounts
25  Due from Affiliates?

Page 241

1  Dondero - 5-28-2021
2  MS. DEITSCH-PEREZ: Object to the
3  form.
4  A. Repeat the question.
5  Did I personally approve? Was that
6  the question or --
7  BY MR. MORRIS:
8  Q. Yes. Withdrawn.
9  I'll ask a different question.
10  And I'm happy to give you the time
11  needed to look at the full disclosure, but are
12  you aware of any note or other amount due from
13  affiliate that you didn't approve and
14  authorize?
15  A. I'm not aware.
16  MR. MORRIS: Okay. If we could just
17  focus in on that bottom paragraph relating
18  to Mr. Dondero.
19  BY MR. MORRIS:
20  Q. So there's a reference there to your
21  having "issued promissory notes to the
22  Partnership in the aggregate amount of
23  $14.9 million" during 2018.
24  Do you see that?
25  A. Yes.

Page 242

1  Dondero - 5-28-2021
2  Q. That would include the three notes
3  at issue in this lawsuit; is that right?
4  MS. DEITSCH-PEREZ: Object to the
5  form.
6  A. (No response.)
7  BY MR. MORRIS:
8  Q. Let me ask a different question.
9  The three -- the three notes at
10  issue in this lawsuit were all issued in 2018,
11  correct?
12  A. Yes.
13  Q. Okay. Do you have a recollection as
14  to what notes account for the difference
15  between the $8.8 million or so that's at issue
16  in this lawsuit and the $14.9 million
17  referenced in this disclosure?
18  A. I don't, other than that -- I
19  believe the audit is accurate and, you know,
20  there could have been principle or interest
21  paydowns. I don't know the reason for the
22  difference.
23  Q. This disclosure, as it pertains to
24  you, doesn't mention any oral agreement, does
25  it?

Page 243

1  Dondero - 5-28-2021
2  A. No.
3  Q. And it doesn't mention any amendment
4  to any of the notes, correct?
5  A. No.
6  Q. It doesn't describe any conditions
7  that have been placed on the collectability of
8  the notes from you, correct?
9  A. No.
10  Q. It doesn't state that the notes
11  might be forgiven upon some conditions
12  subsequent, correct?
13  A. No, it does not.
14  MR. MORRIS: Can we turn to
15  page 33461, please?
16  (Scrolling.)
17  BY MR. MORRIS:
18  Q. And these are "Subsequent Events,"
19  and I just want to look through them --
20  withdrawn.
21  You understand that these financial
22  statements are for the period ending
23  December 31st, 2018, correct?
24  A. Yes.
25  Q. And the agreement that you reached

Page 244

Dondero - 5-28-2021

1    with Nancy, to the best of your recollection,
2    occurred in January or February 2019, correct?
3        (Simultaneous conversation.)
4    A.   Yes --
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7        THE REPORTER:  I didn't hear an
8    answer.
9    A.   Repeat the question again, just in
10   case.
11   BY MR. MORRIS:
12   Q.   Sure.  The agreement that you -- the
13   agreement that you reached with Nancy on behalf
14   of Highland was an agreement that was reached
15   in January or February 2019, correct?
16   A.   Was in -- the last was in January or
17   February of '19, yes.  Yes.
18   Q.   Okay.  So I just want to show you
19   the entirety of the "Subsequent Events" because
20   they cover the period from December 31st, 2018,
21   until the report date of June 3, 2019.
22       MR. MORRIS:  If we could just look
23   at that.
24   BY MR. MORRIS:

Page 245

Dondero - 5-28-2021

1    Q.   Is there any reference made to the
2    agreement that you reached with Nancy in
3    January or February 2019?
4    A.   No.
5        MS. DEITSCH-PEREZ:  And I just want
6    to object for the record that we asked the
7    debtor for all of the Highland financial --
8    audited financial statements.  We got
9    highly redacted ones where the debtor has
10   clearly left unredacted only those things
11   it wanted to use while denying Mr. Dondero
12   the unredacted copies.  So we do not have
13   here, for him to look at, the unredacted
14   Highland audited financial statements.
15       MR. MORRIS:  But this is the only
16   portion of the document -- well, I'm not
17   going to argue.
18       MS. DEITSCH-PEREZ:  Yes.  You showed
19   us what you wanted to show him in an
20   unredacted (audio distortion) gave him
21   fully redacted copies.  I understand that.
22       MR. MORRIS:  Yeah, and I'll be happy
23   to submit a unredacted copy to the Judge
24   under seal so that she can see whether or

Page 246

Dondero - 5-28-2021

1    not there's any other aspect of the
2    financial statements that --
3        MS. DEITSCH-PEREZ:  That's fine.
4        MR. MORRIS:  -- pertain to the
5    notes.
6        Give me a break.  Stop.
7        MS. DEITSCH-PEREZ:  I know.
8    Litigation isn't a one-way -- one-way
9    disco.
10       MR. MORRIS:  Okay.  All right.
11       The next document, please.
12       THE WITNESS:  How are we doing on
13   time?
14       MR. MORRIS:  We're doing pretty
15   well.  I think we're going to fit within --
16   we're not quite an hour back on, but I'm
17   confident that we'll fit within the one- to
18   two-hour -- we'll be done within an hour.
19   That's my point.
20       THE WITNESS:  Okay.  I'm going to
21   give a hard stop at 2:00.  Okay?
22       MR. MORRIS:  You can do whatever you
23   want.  If we're not finished, we'll just
24   have to figure out a time to come back.  So

Page 247

Dondero - 5-28-2021

1    let's get through as much as we can, and
2    we'll see where we are.
3    BY MR. MORRIS:
4    Q.   The next document is the management
5    representation letter.
6        (Exhibit 16 introduced.)
7    BY MR. MORRIS:
8    Q.   And I would just ask you to look at,
9    I guess, page 33419 and just confirm for me
10   that that's your signature.
11   A.   Yes.
12   Q.   Okay.  And this contains the same
13   representations that you made to PWC that we
14   looked at in the earlier management rep letter,
15   right?
16   A.   Yes.
17   Q.   Okay.  Let's look at the next
18   document, please.
19       (Exhibit 17 introduced.)
20   BY MR. MORRIS:
21   Q.   So PWC issues the audited financials
22   in June of 2019, and then Highland files for
23   bankruptcy in October.
24       Do I have that right?

Page 248

Dondero - 5-28-2021

1
2  A.  Yes.
3  Q.  And at the time Highland filed for
4  bankruptcy, you were the president and CEO of
5  Highland, correct?
6  A.  Yes.
7  Q.  And you personally authorized
8  Highland's bankruptcy filing, correct?
9  A.  On Pachulski's recommendation.
10  Q.  But you're the only person who
11  authorized the filing; is that correct?
12  A.  Yes.
13  Q.  And did you understand -- you have
14  familiarity with bankruptcy proceedings, right?
15  MS. DEITSCH-PEREZ:  Object to the
16  form.
17  A.  Not this kind of bankruptcy, but,
18  yes, we have experience in bankruptcies.
19  BY MR. MORRIS:
20  Q.  And you had experience in the Acis
21  bankruptcy, for example, correct?
22  A.  Yes.
23  MS. DEITSCH-PEREZ:  Object to the
24  form.
25  BY MR. MORRIS:

Page 249

Dondero - 5-28-2021

1
2  Q.  And you understand that debtors in
3  bankruptcy have to make certain disclosures; is
4  that right?
5  MS. DEITSCH-PEREZ:  Object to the
6  form.
7  BY MR. MORRIS:
8  Q.  You can answer.
9  A.  Yes.
10  Q.  And you understand that the purpose
11  of the disclosures is to give interested
12  parties an opportunity to review the financial
13  information relating to the debtors, right?
14  MS. DEITSCH-PEREZ:  Object to the
15  form.
16  A.  Generally.
17  BY MR. MORRIS:
18  Q.  The debtor is supposed to be
19  transparent.  Is that a statement you would
20  agree with?
21  A.  I'd agree the debtor is supposed to
22  be.
23  Q.  So, are you aware that the debtor
24  filed certain schedules in connection with the
25  bankruptcy case?

Page 250

Dondero - 5-28-2021

1
2  A.  I'm sure they filed many schedules.
3  Q.  And did you -- did you review the
4  debtor's schedules before they were filed?
5  A.  No.
6  Q.  All right.  So, here is a summary of
7  the debtor's assets and liabilities that was
8  filed in December -- on December 12th, 2019.
9  Do you see the timeline at the top?
10  A.  Yes.
11  Q.  And you were still in control of the
12  debtor at that time, correct?
13  A.  Yep.
14  Q.  And was Mr. Waterhouse responsible
15  for preparing the debtor's Summary of Assets
16  and Liabilities on behalf of Highland at that
17  time?
18  A.  I -- I don't know whether DSI was in
19  control at that point.  I don't know.
20  Q.  Did DSI rely on Mr. Waterhouse and
21  the accounting team for the information that
22  was used to create the debtor's disclosures?
23  MS. DEITSCH-PEREZ:  Object to the
24  form.
25  BY MR. MORRIS:

Page 251

Dondero - 5-28-2021

1
2  Q.  Withdrawn.
3  To the best of your knowledge, did
4  DSI rely on Mr. Waterhouse and the accounting
5  team at Highland in order to prepare the
6  debtor's schedules and financial disclosures?
7  MS. DEITSCH-PEREZ:  Object to the
8  form.
9  A.  I don't know.
10  BY MR. MORRIS:
11  Q.  Did you ever discuss with
12  Mr. Waterhouse the debtor's financial
13  disclosures during the bankruptcy case?
14  A.  Nope.
15  Q.  Did you ever look at the Summary of
16  Assets and Liabilities that was filed with the
17  Court in December 2019?
18  A.  Nope.
19  MR. MORRIS:  Turn to the second
20  page, please.  Let's just go down right --
21  right there.
22  BY MR. MORRIS:
23  Q.  Do you see in part 11 -- part 11
24  pertains to all other assets and in Item
25  Number 71, there's a reference to "Notes

**Appx. 01677**

1           Dondero - 5-28-2021
2    Receivable."
3       A.   Yep.
4       Q.   And do you see that the Notes
5    Receivable are for an aggregate amount of
6    approximately $150 million?
7       A.   Yep.
8       Q.   And it refers to Exhibit D.  Do you
9    see that?
10       A.   Yes.
11       Q.   All right.
12           MR. MORRIS:  Can we turn -- go to
13       the next page?
14    BY MR. MORRIS:
15       Q.   And exhibit -- this page is Exhibit
16    D.
17           Do you see that?
18       A.   Yes.
19       Q.   And this shows an aggregate amount
20    of -- the face amount of notes to be the same
21    $150.3 million that we just saw, correct?
22           MS. DEITSCH-PEREZ:  Object to the
23       form.
24    BY MR. MORRIS:
25       Q.   We can go back and look, if you

1           Dondero - 5-28-2021
2    want.
3       A.   It seems to tie.
4       Q.   Okay.  And it was disclosed on the
5    docket in the bankruptcy case that you
6    personally had made Notes Receivable
7    outstanding in the approximate amount of
8    $9.3 million.  Do you see that?
9       A.   Yes.
10       Q.   Okay.
11           MR. MORRIS:  Can we just go to the
12       top?  I want to just show the date.
13    BY MR. MORRIS:
14       Q.   It's December 13.  That's the date
15    that this disclosure is made.  Do you see that?
16       A.   Yes.
17       Q.   And there's a footnote there, number
18    [1], that says "Doubtful or Uncollectible
19    accounts are evaluated at year end."  Do you
20    see that?
21       A.   Yes.
22       Q.   Now, nothing on this document shows
23    any of the notes as being doubtful or
24    uncollectible, correct?
25       A.   Correct.

1           Dondero - 5-28-2021
2       Q.   Do you know if the debtor's
3    schedules were ever amended after
4    December 13th, 2019, to reflect "Doubtful or
5    Uncollectible" Notes Receivable?
6           MS. DEITSCH-PEREZ:  Object to the
7       form.
8       A.   Yeah.  I believe the Hunter Mountain
9    56 was written off.
10    BY MR. MORRIS:
11       Q.   Okay.  Anything else?
12           MS. DEITSCH-PEREZ:  Object to the
13       form.
14       A.   I -- I don't know.
15    BY MR. MORRIS:
16       Q.   Okay.  Did you ever ask anyone to
17    amend the debtor's schedules to reflect any
18    Doubtful or Uncollectible receivable that's set
19    forth on this page?
20       A.   I did not.
21       Q.   Okay.
22           MR. MORRIS:  La Asia, I'm actually
23       going to just skip the next exhibit.  And
24       if we could go to the one that you and I
25       had marked as 19.  We'll just mark it as 18

1           Dondero - 5-28-2021
2    for purposes of the deposition.
3           MS. DEITSCH-PEREZ:  I think that's
4       confusing.  I don't mind if you just mark
5       18 as "omitted."  I would want a sheet with
6       "18 omitted."  That way, your numbering can
7       stay the same.
8           MR. MORRIS:  Okay.  That's fine.
9       Thank you.  So we'll mark 18 as "omitted",
10       and this will be 19.
11           (Exhibit 19 introduced.)
12    BY MR. MORRIS:
13       Q.   Are you aware of -- that the debtor
14    filed disclosures called Statements of
15    Financial Affairs, often referred to as SoFAs?
16       A.   I've heard of the form before, yes.
17       Q.   Did you ever review the debtor's
18    SoFAs?
19       A.   No.
20       Q.   So, do you know who was responsible
21    at Highland for preparing the debtor's SoFAs?
22       A.   No.
23       Q.   Would it have been -- would --
24    whoever it was, would that person have either
25    been or reported to Frank Waterhouse, as the

Dondero - 5-28-2021

1
2 CFO?
3 A. I'm sorry. Can you repeat that one
4 more time?
5 Q. I appreciate the fact that you
6 don't – you can't identify the person who
7 prepared the SoFAs; but within the
8 organizational structure of Highland during the
9 time that you were the CEO, would the person
10 have been either Frank Waterhouse or somebody
11 who reported to Frank Waterhouse?
12 A. Or DSI.
13 Q. Okay.
14 MR. MORRIS: Can we go to page 2,
15 please.
16 (Scrolling.)
17 BY MR. MORRIS:
18 Q. Do you see at number 4 here, there's
19 a reference to payments made to insiders within
20 a year of the bankruptcy case?
21 A. Yup.
22 Q. Are you aware – withdrawn.
23 Were you aware in December 2019 that
24 Highland was going to disclose all payments
25 made to insiders within a year of the

Dondero - 5-28-2021

1
2 bankruptcy case?
3 A. No.
4 MR. MORRIS: Let's go to page 19 of
5 34, please.
6 (Scrolling.)
7 MR. MORRIS: If we could, scroll
8 down near the bottom.
9 BY MR. MORRIS:
10 Q. You'll see that there's two entries
11 for Highland Capital Management Fund Advisors.
12 Do you see that?
13 A. Yup.
14 Q. And in May 2019, the debtor paid
15 Highland Capital Management Fund Advisors the
16 aggregate amount of $7.4 million. Am I reading
17 that correctly?
18 A. Yes.
19 Q. Okay. And those payments were – in
20 exchange for those payments, Highland received
21 two promissory notes, correct?
22 MS. DEITSCH-PEREZ: John, I'm going
23 to object. You're straying from the
24 subject of this adversary and going into
25 another, and I'm really not comfortable

Dondero - 5-28-2021

1
2 with that since he's only prepared for
3 his – his – for this proceeding and has
4 not refreshed himself on anything else.
5 So, this is outside of what the scope of
6 this deposition ought to be.
7 MR. MORRIS: Okay. So you have two
8 choices, Deborah: You can either state
9 your objection, "beyond the scope," or you
10 can direct the witness not to answer.
11 Which would you like to do?
12 MS. DEITSCH-PEREZ: I am going to
13 state my objection that it's beyond the
14 scope, but I'm asking you because – as a
15 matter of fairness, that you restrain
16 yourself and limit your deposition to this
17 adversary proceeding –
18 MR. MORRIS: Okay. I appreciate –
19 MS. DEITSCH-PEREZ: – and not –
20 (Simultaneous conversation.)
21 MS. DEITSCH-PEREZ: And if the
22 witness isn't prepared to answer these
23 questions, it's not fair that you proceed
24 on them.
25 MR. MORRIS: Okay. So I'll just say

Dondero - 5-28-2021

1
2 that for a couple of questions to ask the
3 former CEO about a 7.4 million-dollar
4 payment made to an affiliate that he owns
5 or controls, I'm going to ask you to give
6 me a little latitude.
7 BY MR. MORRIS:
8 Q. Mr. Dondero, were those two payments
9 backed up by promissory notes in favor of the
10 debtor, to the best of your knowledge?
11 A. I don't know.
12 Q. Okay.
13 MR. MORRIS: Let's go to the next
14 page, please.
15 Can we go towards the middle of the
16 page. Right there. That's fine.
17 BY MR. MORRIS:
18 Q. Do you see your name, James Dondero,
19 there?
20 A. Yes.
21 Q. And you were paid $3.75 million
22 within a year of the bankruptcy, correct?
23 A. Yes.
24 Q. Who determined that you should –
25 who made the decision for Highland to pay you

Dondero - 5-28-2021

2 that amount?

3    A.  Me?  I don't know.

4    Q.  Is there anybody else who had the

5 authority to determine your compensation prior

6 to the petition date, other than yourself?

7    A.  Especially -- besides myself --

8 okay.  Let me answer that question first.

9    The Class A -- majority Class A

10 holders can, and then I can.

11    Q.  Anybody else?

12    A.  Not that -- not that I know.

13    Q.  In practice, did anybody other than

14 you set your compensation?

15    A.  In practice, yes, sometimes majority

16 Class A did.

17    Q.  And at any time prior to the

18 petition date, can you think of an instance

19 where the majority of the Class A refused to

20 compensate you in the manner in which you

21 wanted?

22    A.  There was -- no, because there was

23 no reason to because there was plenty of head

24 room in all the agreements and compared to

25 market levels.

Dondero - 5-28-2021

2    MR. MORRIS:  Let's go to the next

3 document, please.

4    (Exhibit 20 introduced.)

5 BY MR. MORRIS:

6    Q.  Are you aware that, during the

7 course of the bankruptcy proceeding, the

8 debtor, in addition to the schedules and SoFAs,

9 also filed every month a document called the

10 "Monthly Operating Report"?

11    A.  I'm not aware, specifically.

12    Q.  Did you ever review any of the

13 debtor's Monthly Operating Reports?

14    A.  Not that I can recall.

15    Q.  Okay.

16    MR. MORRIS:  We can scroll down a

17 bit.

18 BY MR. MORRIS:

19    Q.  You see there's -- there's two

20 signatures here:  One electronic, one

21 handwritten, both dated December 2nd.  Do you

22 see that Brad Sharp has signed as an authorized

23 individual as the Chief Restructuring Officer?

24    A.  Yup.

25    Q.  Okay.  And then below that, there's

Dondero - 5-28-2021

2 the electronic signature of Mr. Waterhouse.  Do

3 you see?

4    A.  Yes.

5    Q.  Okay.  Were -- to the best of your

6 knowledge as the CEO at the time, were

7 Mr. Sharp and Mr. Waterhouse authorized to sign

8 and file Monthly Operating Reports with the

9 Court?

10    A.  Again, it's not my sphere of

11 knowledge.  It looks like -- individually or

12 jointly, I -- I don't have a comment.

13    Q.  I'm just asking you, as the CEO, did

14 you expect Mr. Waterhouse and Mr. Sharp to take

15 care of all financial disclosures required

16 under the bankruptcy code?

17    A.  Yes.

18    Q.  And did you expect them to do that

19 completely, transparently and accurately?

20    A.  Yes.

21    Q.  Do you have any reason to believe

22 that they failed to do so?

23    A.  Not that I'm aware.

24    MR. MORRIS:  Can we go to page 6 of

25    11?

Dondero - 5-28-2021

2    (Scrolling.)

3 BY MR. MORRIS:

4    Q.  You haven't seen this document

5 before; is that right?

6    A.  I do not believe so.

7    Q.  Okay.  But you see that it was filed

8 in late January 2020, but it was signed in

9 December, right?

10    A.  Yeah.

11    Q.  Okay.  And do you see that among the

12 assets listed are amounts "Due from

13 affiliates"?

14    A.  Yep.

15    Q.  And do you have any reason to

16 believe that the amounts due from affiliates

17 are anything other than the same notes and

18 amounts due that we saw in the audited

19 financial statements?

20    MS. DEITSCH-PEREZ:  Object to the

21 form.

22    A.  I don't know.

23 BY MR. MORRIS:

24    Q.  Okay.

25    THE WITNESS:  I do look at this and

Dondero - 5-28-2021

1        Dondero - 5-28-2021
2 get wistful. You guys should be ashamed of
3 yourselves, what you've done to this
4 company.
5      MR. MORRIS: I move to strike.
6      Can we take a look at footnote (1),
7 please?
8 BY MR. MORRIS:
9   Q. Do you see that it "Includes various
10 notes receivable at carrying value"?
11    Do you have any understanding of
12 what that --
13    MS. DEITSCH-PEREZ: You didn't state
14 the whole sentence, John. Please, if
15 you're going to point him to things, read
16 him the whole sentence.
17 BY MR. MORRIS:
18   Q. Sir, do you have any understanding
19 as to what footnote (1) refers to or means?
20   A. It says what it says.
21   Q. Okay.
22    MR. MORRIS: Let's look at the next
23 document, please.
24    (Exhibit 21 introduced.)
25    MR. MORRIS: All right. So if you

1        Dondero - 5-28-2021
2 could just stop right there.
3 BY MR. MORRIS:
4   Q. This is the Monthly Operating Report
5 for the period ending November 2019. Do you
6 see that?
7   A. Yes.
8    MR. MORRIS: Can we scroll down a
9 bit?
10 BY MR. MORRIS:
11   Q. And that's Mr. Sharp's and
12 Mr. Waterhouse's signatures, correct?
13   A. Yes.
14   Q. Do you see on this version,
15 Mr. Sharp is identified as the "Responsible
16 Party," but Mr. Waterhouse is identified as the
17 "Preparer"?
18   A. Yes.
19   Q. Do you recall ever telling Mr.
20 Waterhouse, in his capacity as the preparer of
21 Monthly Operating Reports, that there was
22 anything inaccurate in any Monthly Operating
23 Report filed by the debtor?
24   A. No.
25   Q. Do you recall ever telling

1        Dondero - 5-28-2021
2 Mr. Sharp, as the responsible party, that there
3 was anything inaccurate in any monthly --
4 Monthly Operating Report filed by the debtor?
5   A. No.
6    MR. MORRIS: Can we go to the next
7 page, please?
8    (Scrolling.)
9    THE WITNESS: I'm going to give the
10 12-minute warning here. I can be back at
11 4:00, but I'm going to need a couple hours.
12    MR. MORRIS: I'm trying to finish
13 up, okay?
14    THE WITNESS: Okay.
15    MR. MORRIS: I'd rather not come
16 back, to be honest with you.
17    Can we go to the next page, please?
18 BY MR. MORRIS:
19   Q. Again, the debtor reported that the
20 amounts due from affiliates were assets of the
21 debtor's estate, correct?
22   A. Yep.
23   Q. Do you -- do you have any issue with
24 the fact that the debtor reported the notes,
25 including your own notes, as assets of the

1        Dondero - 5-28-2021
2 estate?
3    MS. DEITSCH-PEREZ: Object to the
4 form.
5   A. Until they're forgiven, they're bona
6 fide notes.
7 BY MR. MORRIS:
8   Q. And you don't think the "conditions
9 subsequent" agreement that you entered into
10 with Nancy calls into question whether the
11 debtor would ever recover on their notes that
12 you issued to them?
13    MS. DEITSCH-PEREZ: Object to the
14 form.
15   A. Again, I don't believe it's material
16 or GAAP, is my understanding.
17 BY MR. MORRIS:
18   Q. Well, almost a third of the debtor's
19 assets are notes "Due from affiliates," right?
20   A. You have to back out Hunter
21 Mountain, and you have to back out -- you have
22 to back out about 80 million to get to the 70
23 million of affiliated notes; and then, from
24 there, you have to back out 60 of them to get
25 to the 9 million.

Dondero - 5-28-2021

1
2     MS. DEITSCH-PEREZ: Mr. Morris,
3     please don't make faces at Mr. Dondero.
4  BY MR. MORRIS:
5     Q.   Why -- why are we backing out Hunter
6  Mountain?
7     A.   I think the Hunter Mountain -- there
8  were notes going both ways, but I think the
9  Hunter Mountain is out of the estate, I
10  believe.
11     Q.   But Hunter Mountain -- the debtor
12  held notes that were made by Hunter Mountain in
13  the approximate amount of $60 million, right?
14     A.   But subsequent to these dates, I
15  think -- I think they realized it was just a
16  cross-transaction. There were dues and
17  payables that were essentially equal from
18  Hunter Mountain, so I think Hunter Mountain
19  came out of that.
20     Q.   Isn't it -- isn't it a fact that
21  they wrote them off because they didn't believe
22  they were collectible?
23     A.   Yeah, because the payment on those
24  notes depended upon Highland honoring its
25  agreements to Hunter Mountain, which Highland

Dondero - 5-28-2021

1  had no intention of doing. So, there's no
2  ability for Hunter Mountain to pay Highland.
3     Q.   Does Highland -- does Hunter
4  Mountain today have the ability to pay back any
5  of the $60 million that it -- that was
6  reflected in the notes?
7     MS. DEITSCH-PEREZ: Object.
8     A.   No, not that I know of but --
9  BY MR. MORRIS:
10     Q.   Okay.
11     MS. DEITSCH-PEREZ: And, Mr. Morris,
12  once again, I think we're straying from
13  this adversary.
14     MR. MORRIS: Can we go to page 5 of
15  9, please?
16     (Scrolling.)
17     MR. MORRIS: Above that, I think.
18  Next page, 5 of 9. We must be looking at
19  the wrong exhibit.
20     Is the one that was marked 22? No,
21  it's the next -- I believe it's the next
22  document.
23     Let's pull up the next document,
24  please.
25

Dondero - 5-28-2021

1
2     (Exhibit 22 introduced.)
3     MR. MORRIS: Yeah, that's it.
4     Go to page 5, please. Thank you.
5  BY MR. MORRIS:
6     Q.   Do you see that box there? It says
7  "Non-Operating Receipts - Other."
8     A.   Yes.
9     Q.   Okay. And do you understand that
10  that shows that, in December 2019, while you
11  were still personally in control of the debtor,
12  that certain payments of "principle or
13  interest" were made with respect to notes made
14  in favor of the debtor?
15     A.   Yes.
16     Q.   Okay. And do you understand that
17  the one dated December 23rd in the approximate
18  amount of $783,000, that was a payment that was
19  made by you?
20     MS. DEITSCH-PEREZ: Object to the
21  form.
22     A.   If you say so. I don't have a basis
23  for denying it or confirming it.
24  BY MR. MORRIS:
25     Q.   Okay. But it's true, you do recall

Dondero - 5-28-2021

1  that in December 2019, after the petition date,
2  while you were still in control of the debtor,
3  that certain payments of principal and interest
4  were made on notes that were made in favor of
5  the debtor, correct?
6     MS. DEITSCH-PEREZ: Asked -- asked
7     and answered about an hour ago.
8  BY MR. MORRIS:
9     Q.   You can answer, sir.
10     A.   I believe -- I believe so.
11     Q.   Thank you. Do you recall that in
12  connection with its Plan and Disclosure
13  Statement, that the debtor prepared a
14  Liquidation Analysis?
15     A.   Yes.
16     MR. MORRIS: Can we call the next
17  document up on the screen, please?
18     (Exhibit 23 introduced.)
19     MR. MORRIS: And if we can go to the
20  next page.
21  BY MR. MORRIS:
22     Q.   Your lawyers and lawyers acting on
23  behalf of entities you own and control or
24  otherwise have an interest spent considerable

Dondero - 5-28-2021

1          Dondero - 5-28-2021
2  time on the debtor's Liquidation Analysis and
3  confirmation.
4          Do you remember that?
5     A.   I can't -- I can't agree or disagree
6  with that.
7  BY MR. MORRIS:
8     Q.   Okay.  Did you personally review the
9  debtor's Liquidation Analysis?
10    A.   Briefly.
11    Q.   Okay.
12         MR. MORRIS:  Can we go to the next
13  page, please?
14  BY MR. MORRIS:
15    Q.   Do you see that this page contains a
16  list of "Assumptions"?
17    A.   Yes.
18         MR. MORRIS:  And can we scroll up a
19  little further so we can see the date?
20  BY MR. MORRIS:
21    Q.   You'll see that on November 24th,
22  2020, the debtor filed a Liquidation Analysis
23  that contained, as among the Assumptions,
24  quote, "All demand notes are collected in the
25  year 2021."  Do you see that?

1          Dondero - 5-28-2021
2     A.   Yes.
3     Q.   Did you or anybody acting on your
4  behalf ever inform the Court that you believed
5  that assumption was unreasonable?
6     A.   I -- I don't know, but I know we've
7  been fighting the notes consistently through
8  various mechanisms.
9     Q.   Okay.  Did you or anybody acting on
10  your behalf ever inform the Court of your
11  agreement with Nancy?
12         MS. DEITSCH-PEREZ:  Object to the
13  form.
14    A.   Not -- not that I know of.
15  BY MR. MORRIS:
16    Q.   Did you ever instruct anybody to
17  inform the Court that you had an agreement with
18  Nancy that rendered Assumption C unreasonable?
19         MS. DEITSCH-PEREZ:  Object to the
20  form.
21    A.   I did not.
22         MR. MORRIS:  Let's look at the last
23  document, please.
24         (Exhibit 24 introduced.)
25  BY MR. MORRIS:

1          Dondero - 5-28-2021
2     Q.   Do you recall that there came a time
3  just prior to the confirmation hearing that the
4  debtor amended its Liquidation Analysis?
5     A.   No.  Okay.  Yes.
6         MR. MORRIS:  Okay.  And if we could
7  go to the next page.
8  BY MR. MORRIS:
9     Q.   You'll see at the bottom right-hand
10  corner it's dated January 28th, 2021.
11         MR. MORRIS:  We wanted page up but
12  just -- yeah, page up, the assumptions.
13  Yeah, right there.
14  BY MR. MORRIS:
15    Q.   You see it's dated January 28, 2021?
16    A.   Yes.
17    Q.   Okay.  And let's look at Assumption
18  C.  It's been amended somewhat.
19         And it now says, quote, "All demand
20  notes are collected in the year 2021; 3 term
21  notes defaulted and have been demanded based on
22  default provisions; payment estimated in 2021."
23         Do you see that?
24    A.   Yes.
25    Q.   Did you or anybody on your behalf

1          Dondero - 5-28-2021
2  ever inform the Court that this assumption was
3  unreasonable?
4         MS. DEITSCH-PEREZ:  Object to the
5  form.
6     A.   Yes.  Well, Lynn wrote a letter to
7  all the counsels, which I think ended up being
8  put in the Court record, that the notes were
9  all subject to defenses and could not be
10  considered unencumbered, I think, if they're
11  sold, or whatever.  He was -- he was -- he --
12  he realized the attitude towards the notes had
13  shifted, and he penned something to everybody
14  and to make the notes so that they couldn't be
15  sold without notifying people that there were
16  good defenses to them.
17  BY MR. MORRIS:
18    Q.   Did you or anybody acting on your
19  behalf ever challenge this assumption in
20  connection with the debtor's confirmation
21  hearing?
22         MS. DEITSCH-PEREZ:  Object to the
23  form, asked and answered.
24    A.   Yeah.  I think Lynn's letter
25  objected to that vehemently.  It was just

Page 276

Dondero - 5-28-2021

1
2 ignored.
3 BY MR. MORRIS:
4    Q.   Do you know anything else –
5 anything else you're aware of?
6    A.   I think that's powerful enough.
7    Q.   That's not my question, sir.  My
8 question is:  Are you aware of any other facts
9 that you're relying upon to answer my question
10 as to whether or not you or anybody acting on
11 your behalf informed the Court that Assumption
12 C is unreasonable?
13    MS. DEITSCH-PEREZ:  Object to the
14 form.
15    A.   Just the Lynn letter.  I have no
16 other specific awareness.
17    MR. MORRIS:  Thank you very much.  I
18 have no further questions.  Thank you so
19 much, folks.  Been a pleasure.
20    MS. DEITSCH-PEREZ:  Reserve until
21 trial.
22    (Time Noted:  1:59 p.m.)
23
24
25

Page 277

Dondero - 5-28-2021

1
2       C E R T I F I C A T E
STATE OF TEXAS    )
3                 )
COUNTY OF ELLIS   )
4
5       I, Daniel J. Skur, a Notary Public
within and for the State of Texas, do
hereby certify:
6       That JAMES DONDERO, the witness whose
deposition is hereinbefore set forth, was
7       duly sworn by me and that such deposition
is a true record of the testimony given by
8       such witness.
       That pursuant to Rule 30 of the Federal
9       Rules of Civil Procedure, signature of the
witness was not reserved by the witness or
10      other party before the conclusion of the
deposition;
11      I further certify that I am not
related to any of the parties to this
12      action by blood or marriage; and that I am
in no way interested in the outcome of this
13      matter.
       IN WITNESS WHEREOF, I have hereunto
14      set my hand this 28th day of May, 2021.
15
16
17
       _____
18      Daniel J. Skur
       Notary Public, State of Texas.
19      My Commission Expires 7/7/2022
       TSG Reporting, Inc.
20      228 East 45th Street, Suite 810
       New York, New York
21      (877) 702-9580
22
23
24
25

Page 278

Dondero - 5-28-2021

1
2 ERRATA SHEET FOR THE TRANSCRIPT OF:
3 Case Name:
       IN THE UNITED STATES BANKRUPTCY COURT
4       FOR THE NORTHERN DISTRICT OF TEXAS
              DALLAS DIVISION
5  In re:                          )
   HIGHLAND CAPITAL              )  Case No.
6  MANAGEMENT, LP,               )  19-34054 L.P.
   Debtor,                       )  Chapter 11
7  _____      )
   HIGHLAND CAPITAL MANAGEMENT,  )
8  LP,                           )
                                 )
9       Plaintiff,               )  Adversary No.
   vs.                           )  21-03003-sgi
10  JAMES D. DONDERO,            )
   Defendant.                    )
11 Dep. Date: 05/28/2021
   Deponent:  JAMES DONDERO
12
   Reason codes:
13 1. To clarify the record.
   2. To conform to the facts.
14 3. To correct transcription errors.
15           CORRECTIONS:
16 Pg. LN. Now Reads   Should Read    Reason
17 ___ ___ _____ _____ _____
18 ___ ___ _____ _____ _____
19 ___ ___ _____ _____ _____
20 ___ ___ _____ _____ _____
21 ___ ___ _____ _____ _____
22 ___ ___ _____ _____ _____
23 ___ ___ _____ _____ _____
24 ___ ___ _____ _____ _____
25 ___ ___ _____ _____ _____

Page 279

Dondero - 5-28-2021

1
2 ___ ___ _____ _____ ____
3 ___ ___ _____ _____ ____
4 ___ ___ _____ _____ ____
5 ___ ___ _____ _____ ____
6 ___ ___ _____ _____ ____
7
8
9       _____
        JAMES DONDERO
10
11 SUBSCRIBED AND SWORN BEFORE ME
   THIS _____ DAY OF _____, 2021.
12
13
        _____
14 (Notary Public) MY COMMISSION EXPIRES:_____
15
16
17
18
19
20
21
22
23
24
25

Page 280

```
 1            Dondero - 5-28-2021
 2          ——————I N D E X——————
 3   WITNESS:    EXAMINATION BY       PAGE:
 4   JAMES DONDERO
 5       Mr. Morris         107
 6
 7          ————————EXHIBITS————————
 8   Defendant's              PAGE/LINE
 9   Exhibit 1   2/2/2020 Promissory Note    108/16
               2 pages
10
     Exhibit 2   February 2020 Highland     118/21
11         Capital Management, L.P.
           Operating Results
12            12 pages
13   Exhibit 3   8/1/2020 Promissory Note    121/8
               2 pages
14
     Exhibit 4   8/13/2018 Promissory Note   127/2
15            2 pages
16   Exhibit 5   August 2018 Highland        130/14
           Capital Management, L.P.
17         Operating Results
               9 pages
18
     Exhibit 6   12/3/2020 Demand Letter     132/11
19            3 pages
20   Exhibit 7   Defendant James Dondero's   136/8
           Original Answer
21            8 pages
22   Exhibit 8   Defendant James Dondero's   158/2
           Objections and Responses
23            to Highland Capital
           Management, L.P.'s First
24         Request For Admissions
               6 pages
25
```

Page 281

```
 1            Dondero - 5-28-2021
 2          ——————EXHIBITS——————
 3   Defendant's              PAGE/LINE
 4   Exhibit 9   Defendant James Dondero's   160/23
           Objections and Answers to
 5         Highland Capital
           Management, L.P.'s First
 6         Set of Interrogatories
               6 pages
 7
     Exhibit 10  Defendant James Dondero's   169/10
 8         Amended Answer
               8 pages
 9
     Exhibit 11  Defendant James Dondero's   191/8
10         Objections and Responses
           to Highland Capital
11         Management, L.P.'s Second
           Request For Admissions
12            5 pages
13   Exhibit 12  Exhibit 20, Defendant       206/4
           James Dondero's Objections
14         and Answers to Highland
           Capital Management, L.P.'s
15         Second Set of Interrogatories
               7 pages
16
     Exhibit 13  Highland Capital            220/20
17         Management, L.P.'s
           Consolidated Financial
18         Statements and
           Supplemental Information
19         12/31/2020
               48 pages
20
     Exhibit 14  5/18/2020 Management        234/21
21         Representation Letter
               11 pages
22
     Exhibit 15  Highland Capital            237/3
23         Management, L.P.'s Consolidated
           Financial Statements and
24         Supplemental Information
           12/31/2018
25            46 pages
```

Page 282

```
 1            Dondero - 5-28-2021
 2          ——————EXHIBITS——————
 3   Defendant's              PAGE/LINE
 4   Exhibit 16  6/3/2019 Management         247/7
           Representation Letter
 5            11 pages
 6   Exhibit 17  12/13/2019 Summary of       247/20
           Assets and Liabilities For
 7         Nonindividuals
               3 pages
 8
     Exhibit 18   (Skipped by Agreement)
 9
     Exhibit 19  12/13/2019 Statement of     255/11
10         Financial Affairs For
           Nonindividuals Filing
11         Bankruptcy
               42 pages
12
     Exhibit 20  10/31/2019 Monthly          261/4
13         Operating Report
               11 pages
14
     Exhibit 21  10/31/2019 Monthly          264/24
15         Operating Report
               11 pages
16
     Exhibit 22  December 2019 Monthly       270/2
17         Operating Report
               9 pages
18
     Exhibit 23  Exhibit C, Liquidation      271/19
19         Analysis/Financial
           Projections
20            8 pages
21   Exhibit 24  1/28/2021 Highland Capital  273/24
           Management LP Disclaimer
22         For Financial Projections
               7 pages
23
24
25
```

Appx. 01685

Index: $1..34

**$**

**$1** 214:7,19

**$11.7** 232:16 234:8

**$14.9** 241:23 242:16

**$150** 252:6

**$150.3** 252:21

**$2,000,000** 236:16

**$2.5** 121:20,23 122:4 127:24

**$3,825,000** 108:21 109:24 111:5,10

**$3.75** 259:21

**$3.8** 119:24 120:17

**$3.9** 233:9

**$5** 131:6

**$60** 268:13 269:6

**$63** 231:16

**$7.4** 257:16

**$7.8** 233:10

**$783,000** 270:18

**$8.8** 242:15

**$80** 196:14

**$9** 160:11

**$9.3** 253:8

**(**

**(1)** 264:6,19

**-**

**---------------------**

**EXHIBITS--------------**

**-----** 280:7 281:2 282:2

**-------l** 280:2

**0**

**0.2** 224:14

**05/28/2021** 278:11

**0bject** 211:5

**1**

**1** 108:16 120:5 163:23 165:9 192:19 197:10 200:3 207:15,23 208:7 215:21 218:3 219:20 234:10 253:18 278:13 280:9

**1(a)** 162:21

**1/28/2021** 282:21

**10** 169:10 281:7

**10/31/2019** 282:12, 14

**107** 280:5

**108/16** 280:9

**10:30** 151:15

**10:40** 151:15

**11** 191:7,8 251:23 262:25 278:6 281:9 282:5

**118/21** 280:10

**12** 206:3,4 280:12 281:13

**12-minute** 266:10

**12/13/2019** 282:6,9

**12/3/2020** 280:18

**12/31/2020** 281:19

**121/8** 280:13

**127/2** 280:14

**12:30** 204:20

**12th** 250:8

**13** 127:24 220:19,20 253:14 281:16

**130/14** 280:16

**132/11** 280:18

**136/8** 280:20

**13th** 254:4

**14** 159:20,24 226:9 234:21 281:20

**15** 237:3 281:22

**158/2** 280:22

**16** 136:18 137:6 232:9 247:7 282:4

**160/23** 281:4

**169/10** 281:7

**17** 217:10 221:5 247:20 282:6

**18** 148:11 199:7 217:11 232:13,24 254:25 255:5,6,9 282:8

**18th** 222:13 232:8 235:13

**19** 199:10,12 244:18 254:25 255:10,11 257:4 282:9

**19-34054** 278:6

**191/8** 281:9

**1:30** 204:20

**1:59** 276:22

**1st** 121:19,24 160:17 232:12

**2**

**2** 108:20 109:22 110:16,18,19 118:20, 21 122:7,10 128:3,5 184:10 232:24 256:14 280:10,15

**2.5** 131:11

**2/2/2020** 280:9

**20** 144:6 149:11,12, 13 261:4 281:13 282:12

**2000** 195:12

**2015** 225:12

**2017** 221:17 222:3 223:6 224:11,22 225:24 226:7 237:18

**2018** 108:20 109:22, 25 110:18 111:8 115:13,14 119:12 120:14,17 121:19,24 127:24 130:21 131:5, 12,17,20 143:15 194:9 221:8 222:13 226:19 232:8,13,24 233:12 234:11 235:13 237:6 238:6, 24 239:10 241:23 242:10 243:23 244:21 280:16

**2019** 148:10 152:9, 11,14 153:8 154:5,10 155:10 156:12,18 157:13 172:17 173:19 174:22 189:23 192:20 197:24 198:3,11 208:10 212:20 213:10 214:5,17 215:4,16 216:4,8 237:11 239:2 240:10 244:3,16,22 245:4 247:23 250:8 251:17 254:4 256:23 257:14 265:5 270:10 271:2 282:16

**2020** 132:22 133:4,21 143:11,22 146:7 147:10 149:23 151:5 154:12 155:11 160:17 225:2,12 263:8 272:22 280:10

**2021** 107:10 136:18 137:7 149:24 159:12, 25 272:25 274:10,15, 20,22 277:14 279:11

**206/4** 281:13

**21** 264:24 282:14

**21-03003-sgi** 278:9

**22** 269:21 270:2 282:16

**220/20** 281:16

**228** 277:20

**22nd** 159:25

**23** 271:19 282:18

**234/21** 281:20

**237/3** 281:22

**23rd** 270:17

**24** 273:24 282:21

**247/20** 282:6

**247/7** 282:4

**24th** 272:21

**255/11** 282:9

**261/4** 282:12

**264/24** 282:14

**270/2** 282:16

**271/19** 282:18

**273/24** 282:21

**28** 274:15

**28th** 107:9 159:11 274:10 277:14

**2:00** 246:22

**2nd** 109:25 111:8 234:11 261:21

**3**

**3** 121:7,8 233:8 244:22 274:20 278:14 280:13,19

**3.8** 120:4

**3.825** 233:4 234:9

**30** 277:8

**30(b)(6)** 195:9

**31** 223:6

**31st** 221:17 222:3 224:11 237:6 238:6 239:10 243:23 244:21

**32** 217:11

**33408** 235:3

**33419** 247:10

**33424** 237:8

**33451** 240:15

**33461** 243:15

**33470** 221:21

**33499** 223:21

**33510** 232:2

**34** 257:5

**3471** 223:3

**35** 204:24 205:14

**3rd** 132:14,22 237:11

---

**4**

**4** 126:25 127:2 162:16
191:18 200:6,13,21
207:12 256:18
280:14

**40** 141:20 143:9
151:22 152:16 153:9
163:3 170:15 171:22
173:7 174:11,17
176:7,16,23 179:9,19
180:2,8,12,17,25
181:9,20 183:6
185:21 186:17
187:12,15 190:5

**45** 200:16

**45th** 277:20

**46** 281:25

**4:00** 266:11

---

**5**

**5** 130:12,14 138:7
139:8 269:15,19
270:4 280:16 281:12

**5-28-2021** 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1

168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1

**5/18/2020** 281:20

**56** 254:9

---

**6**

**6** 132:10,11 141:16
162:16 170:9 207:12
262:24 280:18

**6/3/2019** 282:4

**60** 267:24

---

**7**

**7** 136:7,8 280:20

**7.4** 259:3

**7/7/2022** 277:19

**70** 196:13 267:22

**71** 251:25

---

**8**

**8** 114:6,10 141:17
157:25 158:2 170:9
280:21,22 282:20

**8/1/2020** 280:13

**8/13/2018** 280:14

**80** 267:22

**810** 277:20

**877 702-9580**
277:21

---

**9**

**9** 160:22,23 177:8
186:13 235:2 267:25
269:16,19 281:4

**9:33** 107:10,17

---

**A**

**a.m.** 107:10,17

**ability** 123:5 126:7
148:17 187:7 269:3,5

**absolutely** 176:9

**accelerate** 123:11

**accept** 133:10

**accordance** 107:6

**account** 160:16
242:14

**accounted** 120:25

**accounting** 116:24,
25 117:5 118:15
119:17 120:22
123:24 124:11,17,23

**197**:21 224:20,22,25
225:6,10 233:16
250:21 251:4

**accounts** 234:7
253:19

**accrued** 128:16

**accurate** 163:24
165:6,14 166:13,17,
18 193:3 194:7
226:3,6 232:19
233:20 238:8 242:19

**accurately** 142:3
148:7 163:9 207:23
233:23 262:19

**Acis** 248:20

**acted** 145:3 155:12
174:10,15

**acting** 127:22 134:5,
13,21 150:18,23
157:13 202:19
203:17,18 271:23
273:3,9 275:18
276:10

**action** 158:9 277:12

**add** 142:12

**added** 170:18,22

**addition** 261:8

**additional** 177:15
182:8 183:23 184:13
187:7

**addressed** 132:14

**admission** 158:13
159:20,24 192:11,19
197:10 200:3,13
201:5,22

**admissions** 191:15
280:24 281:11

**admit** 159:24 192:4,
19 200:22

**admitted** 160:8
193:2 198:2

**adopted** 179:24

**adversary** 134:16
137:9 257:24 258:17
269:14 278:9

**advice** 179:3

**advisement** 215:18

**Advisors** 224:13
228:12,16 235:12
257:11,15

**Affairs** 255:15
282:10

**affiliate** 241:13 259:4

**affiliated** 196:13
231:5,14 267:23

**affiliates** 209:7,21
210:13 223:8,13
224:3,4,19 238:11,19
240:19,25 263:13,16
266:20 267:19

**affirm** 129:12

**affirmative** 141:21
147:16,19,22 170:12

**afternoon** 205:19

**aggregate** 130:10
177:9 196:12 241:22
252:5,19 257:16

**agree** 114:12 128:6
130:7 139:14 142:5,
18 143:2 150:24
152:21 198:20 214:4,
16 222:10,11 249:20,
21 272:5

**agreed** 141:23
143:23 145:14,15
146:3 150:19 157:15
164:14 219:17

**agreement** 128:19
143:8 144:10,15,19
145:4 147:3,9,17,23
148:4,12,16 151:20
152:4,15 153:8
154:4,7,15,19 155:3,
4,21 156:8,10,16,17,
23,24 157:7,11,15,20
162:20,25 163:2,5,
11,14,18,21,25
164:10,13 167:20
168:2 173:6,8,18
174:10,16,23 175:3,
4,7,19 176:6,8,10,15,
22 178:19 179:4,9,
18,25 180:7,11,16,24
181:8,19 182:3 183:5

184:17 185:21
186:17 187:11,14,23
188:6 190:5 198:23
199:16 207:17,25
208:9,21 211:2
212:8,15,19 214:3
216:2 217:2,6,25
218:16,23 219:16
220:5,12 231:3,7
238:25 239:10,17
240:9 242:24 243:25
244:13,14,15 245:3
267:9 273:11,17
282:8

**agreements** 114:15
143:5 155:9 156:15
164:23,24 165:11
169:4 177:17,18
178:25 260:24
268:25

**ahead** 190:10 195:17

**allowed** 168:12

**ambiguous** 200:9,
20,25 201:10,25
202:9,21 203:11,20

**amend** 193:10
254:17

**amended** 142:8,12,
16,17 148:14 152:16,
17 153:10,22 154:2,3
164:20 169:12
171:21 200:8,16,22
254:3 274:4,18 281:8

**amendment** 168:6
172:19 243:3

**amicable** 135:10

**amount** 108:20
111:14 121:19
123:20 124:8,13,19
127:24 160:2,6,9,11
184:20 185:23 186:3,
9,12,21,22 187:6
193:24 196:12
211:23 213:17
214:19 231:15
232:15 233:25
241:12,22 252:5,19,
20 253:7 257:16
260:2 268:13 270:18

**amounts** 120:10
123:10 160:15

193:12 223:8,12
224:2,12,19 238:10,
19 240:19,24 263:12,
16,18 266:20

**analysis** 112:13,18
271:15 272:2,9,22
274:4

**Analysis/financial**
282:19

**and/or** 192:22 197:11
198:5,12 199:12
209:6,7,20 210:11,12

**announcement**
188:18

**annual** 226:10

**answers** 139:15
161:4 162:4 164:20,
21 207:2 281:4,14

**apologies** 168:23

**apologize** 164:7
181:15 204:10
205:11 233:3

**application** 197:9,
14,19

**applied** 192:21
198:5,16

**applying** 199:25

**approval** 127:12
141:15

**approve** 159:14
174:10 240:22 241:5,
13

**approximate** 253:7
268:13 270:17

**approximately**
160:11 196:13
225:11 226:9 252:6

**April** 159:11

**arbitration** 115:11

**argue** 245:18

**argument** 140:21

**arisen** 199:6

**arrangement** 183:2

**ashamed** 264:2

**Asia** 254:22

**asks** 159:24 192:19
200:21

**aspect** 135:18
208:17,20 216:19
218:23 246:2

**assert** 157:12

**asserted** 200:9

**asserts** 141:21
160:10 200:20

**asset** 120:14 212:6

**asset all** 238:10

**assets** 177:3 187:19,
20,25 188:13 190:19,
22 209:24 210:14
212:2 213:24 216:23
223:13 250:7,15
251:16,24 263:12
266:20,25 267:19
282:6

**assigned** 149:16
154:13

**assistant** 109:4
124:22,23

**assumption** 165:24
273:5,18 274:17
275:2,19 276:11

**assumptions**
272:16,23 274:12

**assure** 205:20

**attention** 129:6
141:19

**attitude** 275:12

**attorney-client**
171:16

**attorneys** 159:17

**audio** 109:7 196:21,
25 245:21

**audit** 234:14 237:11,
18 242:19

**audited** 221:9 222:22
227:11 233:19
236:21 237:5,23
238:17,24 239:8
245:9,15 247:22
263:18

**auditing** 235:20

**auditor** 233:17

**auditors** 220:24
221:25 222:22
237:22

**August** 121:19,24
127:24 130:21 131:5,
12,17,20 280:16

**authority** 127:15
260:5

**authorize** 109:6
137:3 159:16 170:5
192:14 240:22
241:14

**authorized** 124:25
125:7 130:2 248:7,11
261:22 262:7

**award** 115:11

**aware** 112:2 113:3
131:19,23 133:21
151:23,24 158:8
159:7 180:4 193:12
196:12 218:5 221:11
223:24 224:9 229:8
241:12,15 249:23
255:13 256:22,23
261:6,11 262:23
276:5,8

**awareness** 110:3
119:22 120:10 141:7,
13 188:25 189:3,7
276:16

_____

**B**

**back** 109:18 110:23
115:12 136:16 138:5
151:14,15 162:8
163:2,17 186:25
188:8 195:11 200:11,
17 204:24 206:18,21
236:4 246:17,25
252:25 266:10,16
267:20,21,22,24
269:5

**backed** 259:9

**backing** 268:5

**bad** 209:22

**balance** 119:14,20
120:14,19 131:4
177:3 223:5,13
238:5,9,18

**bank** 131:4

**bankruptcies**
248:18

**bankruptcy** 145:19
146:14 147:5 148:19
154:12 155:8 157:3
165:23 166:9,10,11
173:15 247:24 248:4,
8,14,17,21 249:3,25
251:13 253:5 256:20
257:2 259:22 261:7
262:16 278:3 282:11

**bargain** 144:4,12
147:2 149:21

**barred** 141:22

**based** 110:18 188:4
274:21

**basis** 119:19 211:12,
22 212:6 215:22
225:11 270:22

**Bates** 223:20 235:3

**bathroom** 151:10

**begging** 168:21

**beginning** 157:2
214:14

**behalf** 107:23 109:5
125:2,8,16 127:15,23
128:11,15,25 130:18
134:6,14,22 135:6
136:2 137:4 141:12
144:15 145:3 146:24
150:18,23 157:13
161:5 163:11,25
164:11,13 165:10,11
167:10,21,25 169:13
170:3,6 171:10,23
173:19 174:15,23
191:23 192:12,16
198:4 202:19 203:17,
18 235:11 244:14
250:16 271:24 273:4,
10 274:25 275:19
276:11

**belief** 200:24 201:9,
24 202:8,20 203:6,

10,19

**believed** 188:8 273:4

**beneficiary** 230:9,14

**benefit** 182:25 183:14 184:4 185:3, 9,20

**benefits** 186:16

**bet** 137:25

**betrayed** 149:15

**big** 213:24

**bit** 132:16 138:5 158:6 160:25 204:8 236:12 261:17 265:9

**blood** 277:12

**board** 148:20

**bona** 125:5 267:5

**Bonds** 137:3,7

**book** 211:16,17

**borrow** 124:16

**bottom** 119:23 131:5 222:5 228:4 241:17 257:8 274:9

**bounced** 217:9

**box** 270:6

**Boy** 142:21

**Brad** 261:22

**break** 151:10,11 168:13 204:5,11 205:10 246:7

**breath** 240:2,5

**Briefly** 272:10

**broader** 179:16

**broke** 196:22

**bucks** 186:13

**bunch** 141:3 217:19

**burden** 205:12

**business** 116:13 135:7,14

**busy** 173:2

**C**

**call** 116:4 152:21 163:17 233:9 234:19 271:17

**called** 116:13 136:13 255:14 261:9

**calls** 267:10

**capacity** 196:18 235:12 265:20

**Capital** 111:4,9 115:5,20 118:25 121:23 132:18 148:15 166:5 207:2 224:13 228:12,24 257:11,15 278:5,7 280:11,16,23 281:5, 10,14,16,22 282:21

**capitulation** 149:25

**capture** 164:22 209:17 210:8 217:22

**captured** 172:18

**captures** 153:15 209:2

**care** 262:15

**carefully** 125:20 155:19

**Carl** 217:12

**carried** 120:18 231:15

**carry** 223:12 238:9

**carrying** 238:18 264:10

**case** 142:21 186:20 195:10,22 244:11 249:25 251:13 253:5 256:20 257:2 278:3,5

**cash** 110:5 193:21,23 196:3 197:18

**catches** 138:15

**caused** 216:9

**caution** 138:13 171:13

**cautioned** 107:14

**CCS** 210:21

**CEO** 114:21 115:17 116:11 117:10 120:17 132:17 220:22 223:11 248:4 256:9 259:3 262:6,13

**certify** 161:24 277:5, 11

**CFO** 117:4 256:2

**challenge** 275:19

**chance** 217:13

**Chapter** 278:6

**character** 193:16

**characterize** 122:11

**characterized** 110:20

**charged** 119:18

**chase** 108:4

**Chief** 261:23

**choices** 258:8

**circumstances** 187:16

**Civil** 277:9

**claims** 141:22

**clarification** 142:15

**clarified** 171:2 172:19 173:4

**clarify** 175:16 190:17 278:13

**Class** 148:14 164:15 165:17,18 168:3 173:11,18 174:9 260:9,16,19

**clause** 114:8 222:21

**clear** 112:17 174:4

**clearer** 116:7

**close** 127:13

**closely** 111:25 112:3

**closes** 188:20

**coach** 168:14

**Coast** 204:20

**code** 262:16

**codes** 278:12

**collect** 112:5 141:24 142:6,19 143:3,23 144:11,17 145:5 147:4,24 150:19,25 157:8,16 163:6,20 219:18

**collectability** 243:7

**collected** 272:24 274:20

**collectible** 268:22

**combination** 144:25

**comfortable** 194:24 257:25

**commencement** 134:15,24

**comment** 113:19 165:2,3 233:17 262:12

**Commission** 277:19 279:14

**committee** 115:4 152:6

**commonly** 114:7

**communicate** 190:12 201:14

**communications** 138:14,19 171:16 172:7,10

**comp** 148:10 174:14 186:5,7,10

**companies** 210:4,5, 18

**company** 183:24 209:6,19 210:11 264:4

**compared** 170:17 260:24

**compensate** 260:20

**compensation** 152:6,8 177:10,15 182:9,16,18 184:12, 14,15 185:5,15,23 187:3,9 260:5,14

**complaint** 135:25

**complete** 171:2

**completely** 262:19

**completeness** 142:15

**completion** 239:8

**complexity** 216:6 217:4

**compliant** 177:11,16 194:23,25 195:3

**comply** 128:11 130:8

**concern** 115:14

**concerned** 217:17

**conclusion** 219:7 277:10

**conclusively** 219:24

**condition** 145:15 155:9 199:10

**conditions** 113:23 122:16 123:5 142:13 144:23 148:8,17 152:3,4 153:11 170:19 172:15,16 176:9 181:5 182:21 188:16,19,22,24 189:15 199:5 207:16, 24 208:8,21 211:8,19 212:2 216:20,22 218:2 219:18 243:6, 11 267:8

**conducted** 107:6

**confident** 246:18

**confirm** 163:22 247:10

**confirmation** 272:3 274:3 275:20

**confirming** 270:23

**conflict** 114:16

**conflicts** 198:22

**conform** 278:13

**confusing** 115:24 255:4

**connection** 149:19 158:9 179:8,17

194:19 238:23 249:24 271:13 275:20

**considerable** 271:25

**considerably** 217:9

**consideration** 185:3

**considered** 190:23 210:5 275:10

**consistent** 123:24

**consistently** 273:7

**Consolidated** 221:15 222:19 223:5 237:16 238:5 281:17, 23

**constraints** 205:8,9

**contacted** 174:7

**contained** 128:6 272:23

**contemplating** 189:24

**contend** 156:11

**contents** 136:24

**context** 129:15 146:11

**continued** 238:9

**continuous** 225:11

**contract** 112:14

**Contribution** 231:3, 6

**control** 114:14 115:15 187:24 188:4 215:23 216:9,24 231:19 250:11,19 270:11 271:3,24

**controlled** 114:24 228:9,14,18,22 229:2

**controls** 209:18 259:5

**conversation** 139:17,24 140:23 145:13,17,21 147:8 152:24 168:9 175:8, 23 177:24 190:9

244:4 258:20

**conversations** 135:7,16,19 146:6,25 176:19 177:25 178:4, 12,16 202:13

**copies** 179:12 245:13,22

**copy** 180:6 245:24

**corner** 274:10

**Cornerstone** 177:5 189:4 209:13 211:3, 18 212:21 214:6,18 217:16

**correct** 114:22 128:25 129:10 133:19 147:20 162:5 165:6 166:25 167:9, 15 178:13,14 185:13 193:20 194:9,12 195:22 197:2,3,6 199:7 207:8 209:24 212:4 214:24 223:16 229:21 237:18,23 238:20 242:11 243:4, 8,12,23 244:3,16 248:5,8,11,21 250:12 252:21 253:24,25 257:21 259:22 265:12 266:21 271:6 278:14

**CORRECTIONS** 278:15

**correctly** 167:22 192:24 236:17 257:17

**cost** 190:23 191:2,3 211:16,17 212:10,21 213:3,10,16,17,22,23 214:7,20

**counsel** 138:14

**counsels** 275:7

**counterparty** 173:13

**counterproposal** 178:21

**COUNTY** 277:3

**couple** 177:25 234:24 259:2 266:11

**court** 138:11 140:25 205:5 251:17 262:9 273:4,10,17 275:2,8 276:11 278:3

**covenants** 177:11, 12

**cover** 119:4 244:21

**COVID-19** 107:8

**CPA** 120:22 227:21

**create** 193:25 250:22

**created** 229:21 230:21

**credit** 177:11,17

**CRO** 132:17

**cross-transaction** 268:16

**Current** 107:7

**customary** 235:24 237:22

**cut** 108:4

**cycle** 174:14 186:6

---

### D

**Dallas** 107:12 278:4

**Daniel** 277:4,18

**date** 107:9 110:15 143:13 215:10,11,12 222:6 232:13 244:22 253:12,14 260:6,18 271:2 272:19 278:11

**dated** 108:19 132:14 232:7 261:21 270:17 274:10,15

**dates** 225:14 268:14

**day** 107:9 277:14 279:11

**Daylight** 107:10

**Deb** 175:14

**Deborah** 118:7 145:18,20 258:8

**debt** 186:19 187:6

**debtor** 107:23

109:25 112:5 114:12 115:21 116:2 132:5, 22 133:4,22 134:3 135:14 144:16 145:3, 9,16 146:8,25 148:25 149:9 150:11,18,24 152:14 154:16 155:4, 8,11 156:9 157:2,14, 15 158:8 160:2,9,10, 16 163:12 164:2,6 165:12,19,20 166:5, 10 167:12,21 168:2,3 173:19 174:24 181:9, 13 182:14 183:14 185:4,9,14 186:19 189:3 192:21 200:23 201:8,23 202:7,19 203:5,9,17 212:22 213:12 219:17 220:11 227:25 245:8, 10 249:18,21,23 250:12 255:13 257:14 259:10 261:8 265:23 266:4,19,24 267:11 268:11 270:11,14 271:3,6,14 272:22 274:4 278:6

**debtor's** 134:6,14,22 135:20,25 158:12 161:5 191:14 250:4, 7,15,22 251:6,12 254:2,17 255:17,21 261:13 266:21 267:18 272:2,9 275:20

**debtors** 249:2,13

**decade** 217:10

**December** 132:14, 22 133:4,21 160:17 192:20 197:24 198:3, 11 199:11 221:17 222:3 223:6 224:11 237:6 238:6 239:10 243:23 244:21 250:8 251:17 253:14 254:4 256:23 261:21 263:9 270:10,17 271:2 282:16

**decide** 212:11

**decided** 124:12 197:20 212:5 216:21

**decision** 124:7

197:17,23 198:17 212:7 259:25

**decision-maker** 173:14

**deeply** 141:14 219:5

**default** 274:22

**defaulted** 123:9 274:21

**Defendant** 136:13 137:7,15 141:21 200:19 278:10 280:20,22 281:4,7,9, 13

**Defendant's** 206:25 280:8 281:3 282:3

**defense** 141:21 142:9 143:20 147:16, 19,23

**defenses** 140:21 141:4 170:12 275:9, 16

**defined** 110:14 143:16 212:9

**definition** 128:7 160:5 166:4 236:23

**DEITSCH-PEREZ** 109:12 112:10,23 113:5,16,25 115:23 116:6 118:2 120:7 123:12 125:17,25 126:11,20 131:25 134:8,17 135:2 137:22 138:12 139:2, 6,14,21 140:3,9 143:4,14 145:7,14,19 146:2,10,12,17 151:3,13 152:18,25 155:6,23 156:19 158:19 161:11 167:2 168:4,15 169:14,16 170:23 171:11,24 172:2,6 173:21 175:6,13,15,21,25 180:18 181:12 183:15 184:8,22 185:25 189:17 195:7, 23 196:8 197:15 198:25 199:18 201:12,15 202:2,10, 22 203:12,21 204:12,

17 205:6 208:2,11,23 210:15 211:5 212:25 213:14 214:9,22 215:17 216:11 218:18,25 219:21 220:6,13,25 224:5 227:2,15 229:22 230:5,15,22 233:13 238:13 239:3,12,19, 25 240:4,11 241:2 242:4 244:6 245:6,19 246:4,8 248:15,23 249:5,14 250:23 251:7 252:22 254:6, 12 255:3 257:22 258:12,19,21 263:20 264:13 267:3,13 268:2 269:8,12 270:20 271:7 273:12, 19 275:4,22 276:13, 20

**delivered** 117:18 133:11

**delivery** 150:10

**demand** 110:9,12, 14,19 111:3,14 122:11,15,16,20 123:6,9 128:7,17,25 129:4,5,8,10 132:6, 22 133:4 134:3,6,14, 22 135:20 149:9 150:10 181:10,22 182:4 226:14 272:24 274:19 280:18

**demanded** 133:22 149:2 274:21

**denied** 201:4

**denying** 125:5 201:21 245:12 270:23

**Dep** 278:11

**department** 119:18 224:20,22,25 225:6, 10 233:17

**depended** 268:24

**depending** 187:3

**depends** 166:21

**depo** 166:7

**Deponent** 278:11

**deposition** 107:3,5, 24 139:22 146:18 195:9 204:14 226:22 255:2 258:6,16 277:6,7,10

**describe** 110:11 175:5 176:3,20 243:6

**describing** 118:24 146:9 178:4

**description** 164:5

**deserved** 150:4

**detailed** 141:15

**details** 138:18 173:4 194:6 234:3

**determine** 260:5

**determined** 259:24

**difference** 234:8 242:14,22

**differently** 157:10 173:5

**difficulty** 108:7

**direct** 110:3 206:7 258:10

**directed** 168:24

**directing** 141:19

**direction** 234:2,6

**directly** 209:6,20 210:12 228:8,13,17, 21 229:2 231:18,24

**disagree** 272:5

**Disaster** 107:8

**Disclaimer** 282:21

**disclose** 138:14 171:15 172:6 256:24

**disclosed** 227:12 253:4

**disclosing** 232:14

**disclosure** 240:24 241:11 242:17,23 253:15 271:13

**disclosures** 249:3, 11 250:22 251:6,13 255:14 262:15

**disco** 246:10

**discover** 171:21

**discovery** 158:9

**discuss** 117:23 175:2 176:5 182:24 213:9 251:11

**discussed** 175:17 177:20,23 178:17 189:22

**discussing** 184:24

**discussion** 142:23

**discussions** 148:23 156:14 176:21 179:8, 18

**dispose** 211:18

**disposed** 211:11

**disposition** 209:5 216:22

**distinguish** 145:15

**distortion** 109:7 196:21,25 245:21

**DISTRICT** 278:4

**DIVISION** 278:4

**docket** 136:18 253:5

**document** 108:10,18 109:19,21 110:17,24 111:8,13 116:13 124:20 125:23 126:4, 9 127:8,10 128:24 129:18,24 130:20 136:12,17,21,24 137:4 138:25 140:18 141:9,11 151:22 153:14 158:15 159:5, 10,17 161:21,25 162:9,11 165:4,5 169:9,23 170:25 176:12,13,14 191:7, 22 192:15 198:9 206:8,25 207:12 235:2,19 237:2 245:17 246:12 247:5, 19 253:22 261:3,9 263:4 264:23 269:23, 24 271:18 273:23

**document--can** 137:13

**documents** 108:6 122:21 130:17 169:3 179:7,17 180:10 215:14

**dollars** 226:10

**Dondero** 107:1,4,13, 20 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1,21 144:1 145:1 146:1,24 147:1 148:1 149:1 150:1 151:1 152:1 153:1,6 154:1 155:1 156:1 157:1,22 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1,12 166:1 167:1,12,21 168:1,23 169:1 170:1 171:1 172:1 173:1 174:1,4 175:1 176:1,3 177:1 178:1,10 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1,17 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1,8 205:1,9 206:1,6 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1,15 216:1 217:1 218:1 219:1 220:1 221:1 222:1,6 223:1 224:1 225:1,18 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1,18 242:1 243:1 244:1 245:1,12 246:1 247:1 248:1 249:1 250:1 251:1

**Dondero's** 136:13 137:8,15 215:22 216:24 280:20,22 281:4,7,9,13

**double-checking** 235:21

**doubtful** 253:18,23 254:4,18

**drafted** 122:17 148:11

**drafting** 141:15

**DSI** 250:18,20 251:4 256:12

**due** 123:10 129:10 132:23 133:23 150:13 160:10 166:23 188:9 192:22 195:20 197:11 198:6, 12 223:8,12 224:3, 12,19 226:8 231:16 238:10,19 240:19,25 241:12 263:12,16,18 266:20 267:19

**dues** 268:16

**Dugaboy** 164:16 173:16,20,24 174:12, 16,19,21 215:4,16 229:16,20 230:3,10, 14,20

**duly** 107:14 277:7

---

**E**

**earlier** 122:12 128:8 163:16 173:12 225:7, 13 237:18 247:15

**early** 142:21 148:10 152:9,10 173:19 205:19

252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1,8,18 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1,3 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1,6 278:1,10,11 279:1,9 280:1,4 281:1 282:1

**easiest** 193:22

**East** 204:20 277:20

**effort** 183:23

**electronic** 261:20 262:2

**Ellis** 137:3,7 277:3

**email** 117:21 190:13

**Emergency** 107:7

**employed** 220:10

**employee** 220:4

**employees** 124:3 183:25 227:14

**encourage** 129:23

**end** 144:7 149:11 159:2 224:22 225:2, 12 226:7 234:17 253:19

**ended** 217:7 275:7

**ending** 222:3 224:11 237:6,8 238:6 239:9 243:22 265:5

**enter** 157:14 164:10 173:8 174:16

**entered** 143:9 144:15 147:3,9 148:4 152:5 156:11,17 157:12 163:10,25 165:11 167:20 168:3 173:18 174:23 180:15,25 187:23 188:5 207:18 208:10 216:3 231:6 238:25 267:9

**entering** 179:3 180:11 185:20 186:16

**enterprise** 188:5

**enterprises** 183:8

**entire** 135:11 227:7

**entirety** 177:24 244:20

**entities** 271:24

**entitled** 130:20 150:4,6 182:11

**entity** 115:7 116:2 193:23 228:13,17,21, 25

**entries** 257:10

**envisioned** 216:8

**equal** 214:19 268:17

**equity** 210:18

**equivalent** 184:20

**ERRATA** 278:2

**errors** 278:14

**essentially** 181:25 268:17

**established** 148:9

**estate** 135:12 149:15 154:23 155:14 157:5 166:2 189:12 266:21 267:2 268:9

**estimated** 274:22

**evaluate** 125:19

**evaluated** 253:19

**eve** 149:25

**event** 172:18 187:7 189:24

**Events** 232:10 243:18 244:20

**evidently** 164:22

**exact** 187:8

**exactness** 187:2

**EXAMINATION** 107:18 280:3

**exchange** 110:5 122:3 123:22 257:20

**execute** 123:21 124:9

**executed** 165:13

**execution** 226:13

**exhibit** 108:15,16 118:19,21 120:5 121:7,8 126:24 127:2 130:12,14 132:10,11 136:7,8 157:25 158:2 160:22,23 169:10 191:8 204:3 206:3,4

220:19,20 234:10,20, 21 237:3 247:7,20 252:8,15 254:23 255:11 261:4 264:24 269:20 270:2 271:19 273:24 280:9,10,13, 14,16,18,20,22 281:4,7,9,13,16,20, 22 282:4,6,8,9,12,14, 16,18,21

**exist** 165:20

**exists** 156:23

**expect** 262:14,18

**expected** 128:18 188:2

**experience** 222:23 235:25 248:18,20

**expert** 227:23

**Expires** 277:19 279:14

**explained** 240:5

**extent** 156:25

**extra** 184:2

**extremely** 233:20

**eye** 138:15

**eyeball** 137:23

---

**F**

**face** 252:20

**faces** 268:3

**facilitates** 218:12

**fact** 113:15 114:6 122:2 135:11 159:16 162:11 195:19 198:2 209:17 221:7 256:5 266:24 268:20

**facts** 112:19 172:11, 12 178:9 207:6 276:8 278:13

**factual** 112:20 212:11,12

**failed** 262:22

**fair** 111:2 113:4 114:25 115:22 116:8

**127**:16 130:9 131:24 134:11 137:18 154:18 164:8 167:16 184:7 189:23 199:6 258:23

**fairness** 258:15

**familiar** 110:8 139:8, 10 231:5

**familiarity** 248:14

**favor** 121:3,20 194:11,16 195:5,21 196:6 197:5 226:15 233:11 259:9 270:14 271:5

**favorable** 177:2 190:24 211:11,22 212:6

**February** 108:20 109:22,25 110:18 111:8 115:13,14 119:12 120:14,17 152:14 153:7 154:5, 10 156:12,18 157:13 189:22 208:10 212:20 213:10 214:5, 17 215:4,16 216:4,8 234:11 239:2 240:10 244:3,16,18 245:4 280:10

**Federal** 277:8

**feel** 167:24

**fide** 125:5 267:6

**fighting** 273:7

**figure** 246:25

**file** 137:4 192:15 262:8

**filed** 135:25 136:17, 21,25 137:7 141:11 169:13 170:2,5 171:10,23 172:13,22 191:22 192:11 248:3 249:24 250:2,4,8 251:16 255:14 261:9 263:7 265:23 266:4 272:22

**files** 247:23

**filing** 248:8,11 282:10

**finalized** 238:17

**financial** 221:9,15 222:2,19,22 223:25 224:10 225:22 227:11 233:18,19 236:21 237:17,23 238:24 239:9 243:21 245:8,9,15 246:3 249:12 251:6,12 255:15 262:15 263:19 281:17,23 282:10,22

**financials** 116:17, 19,23 118:4 233:24 237:5 238:17 247:22

**find** 139:9

**fine** 138:20,21 151:16 152:22,23 153:2 167:4 246:4 255:8 259:16

**finish** 146:4,5 156:7 239:23 266:12

**finished** 109:11 240:3 246:24

**firm** 159:11

**fit** 246:16,18

**focus** 182:7 183:3, 11,12,17,23 184:2,6, 25 185:11 241:17

**focused** 177:4 182:13 183:7,18

**folks** 124:17 276:19

**follow-up** 126:7

**footnote** 253:17 264:6,19

**for-** 219:8

**forgive** 182:19 189:8 190:2,25 212:22 213:12 214:20

**forgiven** 148:18 176:25 177:15 184:19 190:21 194:16,20 195:6 197:6 214:8 218:6 219:7 227:22 229:10 243:11 267:5

**forgiveness** 148:9

154:17 177:10 182:6,
16 184:12,14 186:18
187:6 194:22 213:5
218:12 227:12

**forgo** 184:19

**form** 112:11 118:9
123:13 134:9,18
135:3 151:3 152:19
155:7 156:20 170:24
171:12 173:22
182:15 183:16 184:9,
23 186:2 189:18
195:24 196:9 197:16
199:2,19 201:16
208:3,12,24 210:16
211:6 213:2,15
214:10,23 216:12
218:19 219:2,22
220:7,14 221:2 224:6
227:3,16 229:23
230:6,16,23 233:14
238:14 239:4,13,20
240:12 241:3 242:5
244:7 248:16,24
249:6,15 250:24
251:8 252:23 254:7,
13 255:16 263:21
267:4,14 270:21
273:13,20 275:5,23
276:14

**forward** 157:22

**foundation** 112:24
113:6,17 114:2 120:8
125:18 126:2,12,21
132:2 201:16 202:3,
11,23 203:13,22

**fourth** 148:14

**frame** 205:21

**Frank** 117:2 217:24
218:4,5,15,24
224:23,24 225:5,9
235:15 255:25
256:10,11

**front** 161:22 162:12

**fulfilled** 181:6

**fulfillment** 170:19
172:14

**full** 149:13 195:19
241:11

**fully** 207:23 245:22

**Fund** 217:18 224:13
228:12 257:11,15

**funds** 209:8 210:13

**future** 185:15,22
186:20 187:9

---

**G**

**GAAP** 120:22 267:16

**gave** 153:12 154:11
179:11 196:2 245:21

**general** 219:5 235:13

**generally** 118:4
133:25 169:24
249:16

**get all** 214:12

**give** 113:7 123:20
168:13 180:5 241:10
246:7,22 249:11
259:5 266:9

**giving** 177:22 179:16
184:25 185:4

**global** 149:14

**good** 107:20 204:4
213:23 275:16

**grand** 144:4,12 147:2
149:20

**Grant** 215:3

**great** 122:18 182:14
213:23

**group** 197:21

**grow** 187:4

**guess** 144:24 156:24
186:24 204:14
247:10

**guest** 146:19

**guys** 193:14 264:2

---

**H**

**half** 204:19 217:17
226:10 232:24

**hand** 277:14

**handle** 197:18

**handwritten** 261:21

**happened** 146:13
177:25

**happy** 129:17 137:13
161:13 168:20
200:17 204:6,10
234:23 241:10
245:23

**hard** 246:22

**have/would** 182:9,
10

**HCM** 116:4

**HCMLP** 111:14
115:21 116:11,12
117:10

**HCMLP's** 119:13

**HCRE** 228:20

**head** 214:13 219:13
224:21,25 225:6,10
260:23

**headed** 119:13

**heading** 223:17

**hear** 140:3 244:8

**heard** 255:16

**hearing** 274:3
275:21

**heightened** 182:13
183:17,18 184:6
185:11

**held** 151:18 205:25
268:12

**helpful** 163:18

**hereinbefore** 277:6

**hereunto** 277:13

**herewith** 114:16

**Highland** 111:3,9
114:21,24 115:5,7,
15,18,19,21 116:4
118:25 120:13,18
121:3,20,22 123:25
124:2,18 131:17,20
132:18 135:9 146:14
148:15 152:21 153:8

**157:14 164:6,12,14
165:19 166:5,8,9,10
173:14 177:3,18
178:24 179:24
181:21 182:2,15,25
184:5 185:3,20
186:19 193:22,23
194:12,16,20 195:5,
13,21 196:6,25
197:5,18 207:2
209:7,15,21 210:12
214:17,20 216:10
218:10 220:4 221:8
223:11 224:10,12,17
226:15,18 227:13
228:12,24 229:9
233:11 235:11
236:19 238:8,18
244:15 245:8,15
247:23 248:3,5
250:16 251:5 255:21
256:8,24 257:11,15,
20 259:25 268:24,25
269:3,4 278:5,7
280:10,16,23 281:5,
10,14,16,22 282:21**

**Highland's** 118:3
119:20 123:5 131:4
220:23 221:25 248:8

**highly** 245:10

**historically** 123:25
124:2,3 187:10

**history** 218:10

**Hold** 138:4

**holder** 217:11

**holders** 148:14
173:11 260:10

**honest** 266:16

**honestly** 189:9

**honor** 128:18

**honoring** 268:24

**hope** 193:20

**hoping** 194:6

**hour** 151:14 204:16,
20 205:15 246:17,19
271:8

**hours** 266:11

**hundred** 194:24
233:21

**Hunter** 177:12,18
179:12 231:10,14,19,
22 254:8 267:20
268:5,7,9,11,12,18,
25 269:3,4

---

**I**

**Icahn** 217:12

**idea** 123:19 173:7
216:25 234:13

**identified** 265:15,16

**identify** 112:8 113:12
117:8 125:23 135:18
145:2 169:3 174:9
195:4 199:24 203:5,
16 207:15 210:20
228:6 256:6

**identifying** 119:19

**illiquid** 187:19,20,25
213:22

**immaterial** 178:24

**impact** 119:20

**Impacting** 119:13
131:4

**implicit** 157:19

**implicitly** 150:5,7
157:18

**important** 193:15

**improper** 145:24

**inaccurate** 165:15
226:25 265:22 266:3

**inappropriate**
139:20 195:15

**incentive** 184:3

**include** 153:10
154:17 178:7 216:19
222:22 237:22 242:2

**included** 142:23
148:22 150:7,12
224:12

**includes** 166:5 264:9

**including** 144:23 174:2 196:14 266:25

**inconsistent** 199:16

**incorrect** 208:18 226:25

**increase** 194:2

**independent** 148:20 179:3 221:25

**indirectly** 209:7,20 210:12 228:8,14,18, 21 229:2 231:18,24

**indiscernible** 144:18

**individual** 196:18 211:23 261:23

**individually** 262:11

**inform** 201:8,23 202:7 239:17 240:9 273:4,10,17 275:2

**information** 177:21 221:16 224:18 235:21 236:22 249:13 250:21 281:18,24

**informed** 200:23 202:19 203:5,10,17 276:11

**inherits** 155:9

**initially** 220:17

**insiders** 256:19,25

**installments** 226:11

**instance** 260:18

**instruct** 239:16 240:8 273:16

**integration** 114:8

**intend** 111:9,13 128:11,15

**intent** 210:3

**intention** 130:8 269:2

**interest** 111:10,14 128:17 129:10 132:23 133:5,23 134:23 135:21 149:3,

18 150:13 181:23 182:5 184:21 187:18 188:9 189:14 192:22 193:13,15,17 194:4 195:20 197:11,20 198:6,12,21 199:12 226:7 231:21 242:20 270:13 271:4,25

**interested** 249:11 277:12

**interests** 209:6,20 210:11

**interfering** 168:22

**International** 210:22

**interplays** 129:16

**interpretation** 112:13 122:24 126:4

**interpreting** 167:24

**interrogatories** 161:6 162:2 192:7 206:7 207:4 281:6,15

**interrogatory** 162:21 163:8,23 165:9 207:15,23 208:6 215:21 218:3 219:20

**interrupting** 146:16

**introduced** 108:16 118:21 121:8 127:2 130:14 132:11 136:8 158:2 160:23 169:10 191:8 206:4 220:20 234:21 237:3 247:7, 20 255:11 261:4 264:24 270:2 271:19 273:24

**investigated** 171:3, 6,9 172:21

**investment** 213:22 229:17 230:4,10,14, 20 231:10

**investments** 209:18 210:18

**investors** 217:19

**involved** 141:15 172:16 178:15 217:12 219:6

**involvement** 117:6

**irrespective** 150:25

**issue** 173:2 195:22 225:22 242:3,10,15 266:23

**issued** 232:15,23 241:21 242:10 267:12

**issues** 236:22 247:22

**Item** 251:24

**items** 119:13,20 131:3

---

**J**

**James** 107:4,13 136:13 137:8,15 165:12 167:12,21 259:18 277:6 278:10, 11 279:9 280:4,20,22 281:4,7,9,13

**January** 152:14 153:7 154:5,9 156:11,17 157:12 159:25 189:22 208:10 212:19 213:10 214:5,17 215:4,16 216:3,8 232:12 239:2,22 240:10 244:3,16,17 245:4 263:8 274:10, 15

**January/february** 152:12 174:22

**John** 107:22 115:23 139:2 145:7 152:20 167:3 175:15 257:22 264:14

**jointly** 262:12

**Judge** 168:21 245:24

**judgment** 115:5

**June** 237:11 244:22 247:23

**jury** 140:25 157:22

---

**K**

**Kerri** 210:22

**kind** 108:4 149:18 150:12 178:21 179:7, 17 196:2 248:17

**knew** 218:4,9 219:13 238:16

**knowledge** 120:22, 24 142:16 153:22 163:10 167:16 198:13,14 203:2,4,7 207:8,21 208:7 225:3 251:3 259:10 262:6, 11

**KPMG** 221:4 233:21

---

**L**

**L.P.** 111:4,10 115:20 121:23 166:6 224:13 228:13,16 278:6 280:11,16

**L.p.'s** 207:3 280:23 281:5,11,14,17,23

**La** 254:22

**language** 113:12 237:22

**large** 177:2 208:13

**largely** 114:3 208:13, 25

**late** 263:8

**latitude** 259:6

**lawsuit** 134:25 242:3,10,16

**lawyer** 141:7,9

**lawyers** 135:7,13 138:10,19 164:21,25 172:4,7,11,25 192:15 202:13 271:23

**layperson** 112:20 113:14

**learn** 171:20 172:12 198:3,7

**learned** 171:3,5,8

172:21

**learning** 199:23

**leave** 143:25

**led** 179:8,18

**left** 245:11

**legal** 112:13,18 122:23 126:3,4 140:21 153:13,14 165:2,3 167:24

**lesser** 210:17

**letter** 132:14,25 133:8,10,17,20 149:9 150:10 222:13 232:7 235:11 237:11 247:6, 15 275:6,24 276:15 280:18 281:21 282:4

**letters** 234:16

**levels** 260:25

**liabilities** 250:7,16 251:16 282:6

**liable** 189:13

**lifetime** 230:9,13

**limit** 258:16

**limitations** 179:13

**liquid** 177:3

**Liquidation** 271:15 272:2,9,22 274:4 282:18

**liquidity** 213:21

**list** 272:16

**listed** 141:4 263:12

**listen** 155:18 219:3

**literally** 233:21

**litigation** 196:7 246:9

**LLC** 228:20

**LN** 278:16

**loan** 119:25 120:4 124:18 131:6 227:13 229:8

**loans** 131:19,21 148:18 176:24 218:6

Index: located..motion

**located** 107:11

**long** 129:19 204:11, 12

**longer** 204:9

**looked** 111:25 112:3 120:5 122:22 124:6 131:11,21 132:24 133:6,24 153:20 194:8 195:11 232:23 234:9 237:17 247:15

**lose** 115:15 216:9

**lot** 135:6,15 137:10 140:23 156:7

**lower** 217:15

**LP** 278:6,8 282:21

**lunch** 204:5 205:25

**Lynn** 275:6 276:15

**Lynn's** 275:24

**M**

**made** 124:6 131:20 132:6,22 133:4 149:20 192:20 193:17 194:4,5 195:5,21 196:5 197:5,19,24 198:4 199:13 212:7 226:14 227:13 229:9 233:11 245:2 247:14 253:6, 15 256:19,25 259:4, 25 268:12 270:13,19 271:5

**main** 141:2

**majority** 148:13 164:15 165:17 173:11,24 217:17 260:9,15,19

**make** 112:12 122:23 123:5 126:3 128:21 129:11,12 134:2 149:17 150:11 153:5 168:20 170:25 171:15 178:20 181:10,22 182:4 191:3 212:13 226:17 227:25 249:3 268:3 275:14

**maker** 113:13 114:16 129:21

**makers** 228:6

**making** 149:9 198:18,20,21

**managed** 209:6,8,20 210:11,13

**management** 111:4, 10 115:6,20 119:2 121:23 132:18 166:6 196:3 207:3 224:13 228:12,24 234:15 235:10,22 247:5,15 257:11,15 278:6,7 280:11,16,23 281:5, 11,14,17,20,23 282:4,21

**Management's** 222:18 237:15

**manner** 260:20

**March** 136:18 137:6

**mark** 229:7 254:25 255:4,9

**marked** 221:21 254:25 269:21

**market** 260:25

**marriage** 277:12

**material** 177:16 236:23 267:15

**materiality** 236:10, 14

**matter** 112:20 113:14,24 180:24 258:15 277:13

**maturity** 110:13

**maximizing** 183:7 184:6

**means** 183:22,23 264:19

**meant** 217:22

**mechanisms** 273:8

**Medical** 210:21

**meet** 188:19

**meeting** 152:7

**Melissa** 124:24

**member** 173:17

**members** 164:15 165:17,18 174:9

**memorable** 139:16

**memorialize** 169:4

**memorialized** 190:6

**memory** 192:10

**mention** 218:22 242:24 243:3

**mentioned** 151:25 172:20 210:4

**met** 188:17,22,25

**MGM** 177:4 188:19 209:12 211:3,18 212:20 214:6,18 217:7,8

**middle** 259:15

**million** 119:24 120:17 121:20,23 122:4 127:24 131:6 160:11 177:8 186:13 196:14 224:14 226:10 231:16 232:16 233:9,10 234:8 241:23 242:15, 16 252:6,21 253:8 257:16 259:21 267:22,23,25 268:13 269:6

**million-dollar** 120:4 131:11 232:25 233:4 234:9 259:3

**mind** 210:23 255:4

**mine** 173:9 217:3

**minute** 144:2

**minutes** 149:8 196:2 204:24 205:14

**missed** 183:10

**missing** 233:24

**misstated** 233:25

**misstates** 184:23

**mistaken** 185:16

**moment** 182:20

**moments** 124:7

**monetization** 176:25 177:2 182:8 211:7,22 213:4

**monetize** 187:24

**monetized** 187:21 188:11,13 190:19,22 191:2,3

**monetizing** 213:20, 21

**money** 124:16 150:3 198:11,15 199:25

**month** 116:19 117:19 152:11 261:9

**monthly** 116:13,17, 19,23 117:3,9,12,16, 24 118:5,16,25 119:19 261:10,13 262:8 265:4,21,22 266:3,4 282:12,14,16

**months** 188:20 233:12

**morning** 107:20,21

**Morris** 107:19,22 108:14,17,24 109:2, 9,14,15,18,20 110:23,25 112:15 113:2,9,20 114:5 116:5,8,10 118:5,13, 19,22 119:7,10 120:11 121:6,9,12, 15,17 122:6,9 123:15 125:21 126:5,13,24 127:3,5,19,21 128:2, 4 130:12,15,24 131:2 132:4,9,12 134:10,20 135:17 136:6,9,11 137:25 138:20,23 139:5,18,25 140:14, 16 141:16,18 143:7, 12,16,18 145:11,18, 20,24 146:4,11,15, 20,23 151:6,12,16,19 152:22 153:2,4 154:24 155:2,15,17, 25 156:22 157:24 158:3,5,7 159:2,4,19, 22 160:21,24 161:2, 9,13,18 162:8,10,16, 18 167:4,7 168:4,8, 10,18,25 169:8,11,21 170:8,11,13 171:4,19 172:8 174:3 175:10, 14,18,24 176:2 180:21 181:15,18 183:20 184:16 185:6 186:8 189:20 190:11 191:6,9,12,17,20 195:14,16 196:4,16, 23 197:22 199:4,22 200:5,7 201:13,20 202:6,15 203:3,15,24 204:2,6,15,22 205:4, 7,17,20 206:2,5,17, 19,21,23 207:11,13 208:5,14 209:3 210:19 211:9 213:7, 18 214:15,25 215:13, 19 216:15 218:13,14, 21 219:9,11 220:2,9, 18,21 221:6,20 222:4,8 223:2,4,20, 23 224:8 225:16,20 227:5,18 228:2,5 229:13,15,25 230:8, 18,25 232:2,5 234:4, 19,22,25 235:6 236:4,7,11,13,25 237:4,7,13,20,25 238:3,15 239:6,15, 21,23 240:3,7,14,17 241:7,16,19 242:7 243:14,17 244:12,23, 25 245:16,23 246:5, 11,15,23 247:4,8,21 248:19,25 249:7,17 250:25 251:10,19,22 252:12,14,24 253:11, 13 254:10,15,22 255:8,12 256:14,17 257:4,7,9 258:7,18, 25 259:7,13,17 261:2,5,16,18 262:24 263:3,23 264:5,8,17, 22,25 265:3,8,10 266:6,12,15,18 267:7,17 268:2,4 269:10,12,15,18 270:3,5,24 271:9,17, 20,22 272:7,12,14, 18,20 273:15,22,25 274:6,8,11,14 275:17 276:3,17 280:5

**motion** 168:20

**Mountain** 177:12,19 179:12 231:10,14,19, 22 254:8 267:21 268:6,7,9,11,12,18, 25 269:3,5

**move** 154:24 155:15 157:21 190:16 204:7 218:13 219:9 264:5

**muddy** 146:18

**N**

**Nancy** 174:25 175:2, 17 176:6,22 178:13 180:5 181:20 182:24 184:18 187:12,15 190:8,12 198:23 199:17 207:18 208:10,21 211:2 212:8,15,19 213:9 214:3,16 215:15 216:3 217:25 218:17, 23,24 219:16 220:5, 12 230:4 239:2,11,18 240:10 244:2,14 245:3 267:10 273:11, 18

**needed** 172:19 173:4 197:18 241:11

**negotiation** 144:22 178:20

**negotiations** 148:25 154:13 155:12

**net** 187:5

**Nexpoint** 228:16

**Non-operating** 270:7

**Nonindividuals** 282:7,10

**normal** 183:22

**NORTHERN** 278:4

**notarize** 192:6

**notarized** 192:2 206:12,14

**notary** 161:22 162:13 277:4,18 279:14

**note** 107:5 108:19,20

110:5,9,12,13,20 111:3,20,23 112:5,9, 21 113:13,14,22,24 114:22 115:4 120:6, 13,16,19 121:18 122:3,11,14 123:3,17 124:13 125:14 127:23 128:7,10,12, 14,25 129:7,15,21 130:9 165:13 191:4 193:24 194:2,16,19 195:5 197:19 200:9, 20 226:11 231:15 232:9,25 233:5,8,24, 25 234:9 241:12 280:9,13,14

**Noted** 276:22

**notes** 121:3 122:15, 21 123:9,20,21 124:5,9,19 125:2 129:4,5,8,25 131:11 132:6,24 133:6,24 135:8,22 138:11 140:22 141:24 142:6, 20,24 143:3,15,17,24 144:3,11,17,24 145:5 147:4,24 148:9,11,22 149:4,16,19 150:8, 14,19,25 153:21 154:8,14,18 155:5, 13,22 156:10,16 157:2,4,16 160:10,16 163:6,20 165:24 172:25 180:6 181:11, 24 182:7 184:19 186:22 187:18 188:10 190:20 192:23 193:16,18,25 194:8,11,14 195:20, 22 196:5,13,14,25 197:5,12 198:6,13,22 199:7,13 200:24 201:9,24 202:8,21 203:11,19 212:23 213:5,6,13,24 214:8, 21 218:11 219:7,18 223:7,12,25 224:2, 12,18 225:23 226:9, 14,15,19,22 228:7 232:15,22 233:11 238:10,19 240:18,23, 24 241:21 242:2,9,14 243:4,8,10 246:6 251:25 252:4,20 253:6,23 254:5

257:21 259:9 263:17 264:10 266:24,25 267:6,11,19,23 268:8,12,24 269:7 270:13 271:5 272:24 273:7 274:20,21 275:8,12,14

**notifying** 275:15

**notwithstanding** 210:24

**November** 265:5 272:21

**now--and** 137:12

**number** 108:6 118:20 126:25 157:25 159:20,24 160:6,22 191:7 192:19 196:24 197:10 200:3,6,13,21 206:3 223:21 234:10 235:3 251:25 253:17 256:18

**numbering** 255:6

**numerous** 194:14

**O**

**object** 112:10,23 113:5,25 118:8 120:7 123:12 125:17,25 126:11,20 131:25 134:8,17 135:2 151:3 152:18 155:6 156:19 170:23 171:11 173:21 183:15 184:8, 22 185:25 189:17 195:8,23 196:8 197:8,13,15 198:25 199:18 201:12,15 202:2,10,22 203:12, 21 208:2,11,23 210:15 212:25 213:14 214:9,22 216:11 218:18,25 219:21 220:6,13,25 224:5 227:2,15 229:22 230:5,15,22 233:13 238:13 239:3, 12,19 240:11 241:2 242:4 244:6 245:7 248:15,23 249:5,14 250:23 251:7 252:22

254:6,12 257:23 263:20 267:3,13 269:8 270:20 273:12, 19 275:4,22 276:13

**objected** 275:25

**objecting** 189:2

**objection** 113:16 118:8 155:23 167:5 171:24 258:9,13

**objections** 118:12 158:12 161:4,25 191:14 207:2 217:14 280:22 281:4,10,13

**obligated** 187:17

**obligation** 126:18 185:22

**obligations** 212:22 213:12 214:7,21

**obtained** 115:5

**occurred** 154:8 244:3

**occurs** 182:17

**October** 247:24

**offer** 150:2,11

**offered** 149:17

**offers** 156:14

**Officer** 261:23

**offset** 187:9

**Okada** 228:10 229:8, 9

**omitted** 255:5,6,9

**Omnimax** 210:21

**one-** 246:18

**one-way** 246:9

**open-ended** 181:6,7

**operated** 155:11 165:23

**operating** 117:3,9, 13,16,24 118:5,16,25 119:3,12 130:21 154:21 261:10,13 262:8 265:4,21,22 266:4 280:11,17

282:13,15,17

**operations** 156:14

**opine** 153:13 166:20

**opinion** 112:18 113:8

**opportunity** 249:12

**oral** 107:3 187:23 242:24

**order** 107:7 211:19 213:11 251:5

**ordinary** 116:12

**organizational** 256:8

**original** 136:13 137:8,15 164:19 171:9,22 172:13 280:20

**outcome** 277:12

**outstanding** 132:23 160:2,6 177:17 184:20 226:8 253:7

**overlaid** 144:24

**overpayments** 135:9

**owned** 209:6,12,13, 14 210:11 217:10 228:9,14,18,21 229:2

**ownerships** 209:17

**owns** 259:4

**P**

**p.m.** 276:22

**Pachulski** 107:23

**Pachulski's** 248:9

**Package** 116:14

**PAGE/LINE** 280:8 281:3 282:3

**pages** 280:9,12,13, 15,17,19,21,24 281:6,8,12,15,19,21, 25 282:5,7,11,13,15, 17,20,22

**paid** 111:16 159:25 160:9,15 194:23 257:14 259:21

**paper** 190:5

**paragraph** 110:16, 19 114:6,10,13 122:7,10 128:3,5 138:7 141:20 143:9 151:22 152:16 153:9 163:3 165:22 170:15 171:22 173:7 174:11, 17 176:7,16,23 179:9,19 180:2,8,12, 17,25 181:9,20 183:6 185:21 186:17 187:12,15 190:5 200:16 225:17 226:24 228:17 229:6, 7,14 231:2 236:8 241:17

**parse** 148:5

**parsing** 164:22

**part** 138:16 144:3 149:20 152:2,6,8 173:19 184:10,17,25 198:9 208:9 216:2,17 251:23

**participants** 214:13

**participate** 178:3

**participated** 155:11 178:11

**parties** 156:25 249:12 277:11

**partly** 218:9

**partner** 119:25 120:4 131:6,17,19 235:13

**Partners** 228:20

**partnership** 148:15 225:23 231:16 241:22

**parts** 183:3

**party** 178:15 265:16 266:2 277:10

**passed** 189:14

**pay** 111:3,15 128:15 129:6 133:22 185:23 187:8,17 188:8

**payable** 123:10 191:4 226:10

**payables** 268:17

**paydowns** 242:21

**payee** 114:15 128:17

**paying** 185:15 186:21 194:19

**payment** 130:3 133:5 134:2,23 135:20 140:22 149:18 154:17 181:23 192:20 194:5 197:9,14 198:4,20,21 199:12,24 259:4 268:23 270:18 274:22

**payments** 193:15,17 194:4 226:18 256:19, 24 257:19,20 259:8 270:12 271:4

**peck** 193:18

**penned** 275:13

**people** 130:17 135:7, 14 145:23 275:15

**percent** 194:24 217:11 233:22

**perfectly** 166:22

**period** 148:10,23 174:22 181:4 221:16 223:6 224:11 225:11 237:6 238:5 239:9 243:22 244:21 265:5

**periodic** 193:14,16

**permitted** 177:16

**person** 117:8 123:2 145:3 199:24 203:5, 16 248:10 255:24 256:6,9

**personal** 207:7

**personally** 116:18 127:10 131:16 136:20 163:10 168:24 171:20 196:11 234:15 238:22 240:22 241:5

**perspective** 144:21 185:8 186:15

**pertain** 246:5

**pertained** 135:20 211:2

**pertaining** 156:16

**pertains** 155:21 242:23 251:24

**petition** 143:13 215:10,11,12 260:6, 18 271:2

**Pg** 278:16

**phone** 190:14,15

**phrase** 153:10 216:17

**phraseology** 167:25

**physically** 117:20

**piece** 217:5

**pin** 172:22

**place** 146:7 154:5 176:24 190:20

**places** 209:13,14

**plaintiff** 141:23,24 142:5,6,18,19 143:2, 23 144:10,11,16 145:5 147:3,23 163:5,20 278:9

**plaintiff's** 141:22

**plan** 142:22 144:3,4, 12 147:2 149:14,21 271:13

**pleading** 143:6

**pleasure** 276:19

**plenty** 260:23

**point** 164:9 189:25 194:6 198:16 215:5,7 234:24 246:20 250:19 264:15

**pointed** 175:22

**pointing** 200:14

**points** 141:2 217:12

**portfolio** 209:5,19 210:5,10

**portion** 192:21 198:4 215:20 245:17

**portions** 108:10 129:24

**position** 143:21

**possibilities** 217:23

**post-bankruptcy** 116:2 145:9 153:17 164:24 181:14

**POT** 142:22 144:3,4, 12 147:2 149:14,21

**potential** 189:5

**powerful** 276:6

**practice** 130:16 260:13,15

**pre-bankruptcy** 153:16 164:23

**prebankruptcy** 116:3 164:6,14

**precedent** 188:19

**prefer** 118:11

**preparation** 238:23

**prepare** 116:12 236:20 251:5

**prepared** 116:20 118:16 205:9 221:9 222:2 224:10 256:7 258:2,22 271:14

**preparer** 265:17,20

**preparing** 116:23 117:3,9,15 198:9 250:15 255:21

**president** 248:4

**pretty** 201:18 222:21 246:15

**previously** 141:23

**price** 217:15

**Pricewaterhouse** 222:11 233:21

**Pricewaterhouseco opers** 220:23 232:14 237:10

**Pricewaterhouseco opers'** 227:11

**Pricewaterhouseco opers's** 232:7

**principal** 111:13 123:20 124:8,13,18 128:16 129:9 132:23 133:5,23 134:23 135:21 149:3,18 150:13 181:23 182:4 184:21 186:22 187:18 188:9 189:13, 14 192:22 193:13,24 194:5 195:20 197:10, 19 198:5,12 199:12 226:8 271:4

**principle** 198:21 242:20 270:12

**prior** 134:15,24 150:10 166:8 170:2, 17 173:14 180:15,25 184:23 194:12 226:13,19 235:4 239:8 260:5,17 274:3

**private** 210:17

**problem** 145:8 151:12

**Procedure** 277:9

**proceed** 258:23

**proceeding** 134:16 137:9 258:3,17 261:7

**proceedings** 248:14

**process** 152:8 198:9 216:14,16 219:6

**production** 215:14

**Projections** 282:19, 22

**promised** 111:3

**promissory** 108:19 110:5 111:19,23 113:13 120:6,13,16, 19 121:3,18 122:3 123:17,21 125:14 127:23 133:24

153:20,21 180:6
181:10 225:23 226:9
232:15 241:21
257:21 259:9 280:9,
13,14

**proper** 123:23

**properly** 172:18

**proposal** 142:22
149:20

**prospects** 217:8

**provide** 184:2
236:20

**provided** 179:6

**providing** 224:17

**provision** 114:14
200:24 201:9,24
202:8,20 203:10,19

**provisions** 114:13
274:22

**public** 161:22 277:4,
18 279:14

**pull** 269:24

**Purported** 162:20,25
163:11,21

**purpose** 117:15
249:10

**purposes** 236:15
255:2

**pursuant** 157:15
219:17 277:8

**put** 108:14 118:19
121:6 132:9 136:6
148:21 157:24
193:23 198:15
200:18 206:2 216:25
275:8

**putting** 133:20
221:14

**PWC** 221:24 223:25
224:11,18 236:20
238:23 239:7,17
240:9,23 247:14,22

**Q**

**quarter** 143:10,22

144:6 147:9 155:10
157:3 172:17 199:10

**question** 114:18
118:9 122:19 129:22
133:12 134:12 135:5
138:24 143:2 144:21
148:6 151:9 153:3
154:25 155:19,20
156:6 157:10 160:15
164:8 166:12,24
167:3 168:16 171:18
178:9 179:16 189:9
190:3 193:9 201:18
202:4,17 208:4
214:14 224:15 227:8
239:24 241:4,6,9
242:8 244:10 260:8
267:10 276:7,8,9

**questions** 126:7
127:9 145:10 159:8
163:7 193:6 205:12
258:23 259:2 276:18

**quickly** 204:7

**quote** 141:21 163:5,
19 165:10 170:18
172:14 209:5 211:11
215:22 216:23
236:14 272:24
274:19

**R**

**rambled** 196:3

**reach** 135:10

**reached** 148:12
152:15 153:8 154:15,
19 181:19 184:18
187:11,14 198:23
199:17 218:16
219:16 239:17 240:9
243:25 244:14,15
245:3

**reaching** 145:4

**read** 111:19 114:17
117:19 123:16
125:20 129:5 130:18
136:20 137:14
141:10 142:3 161:25
162:11 163:4,16
167:22 192:24
200:15,17 206:25

227:9 264:15 278:16

**reading** 236:17
257:16

**Reads** 278:16

**realization** 186:18

**realized** 186:6
268:15 275:12

**reason** 186:25 192:7
193:7 198:15 206:13
220:16 242:21
260:23 262:21
263:15 278:12,16

**recall** 115:8,13,16
117:25 118:14,17
132:21 133:17
135:13 137:16
140:17 150:16
152:11 169:25
177:13 178:12 179:6,
16,20 191:21 197:4
220:15 226:14,16,20
227:10 230:2 239:5
261:14 265:19,25
270:25 271:12 274:2

**Receipts** 270:7

**receivable** 231:15
252:2,5 253:6 254:5,
18 264:10

**receive** 109:24
121:22 182:2

**received** 110:6
257:20

**recently** 138:8

**recess** 151:18
205:25

**recollection** 119:4
131:14 133:2 139:7
141:10 153:7,16
188:15 194:18
208:25 210:25 220:3
221:24 225:9 226:3,6
227:19,20,21 232:6,
20 242:13 244:2

**recommendation**
248:9

**recommendations**
217:21

**record** 146:18 205:3,
24 245:7 275:8 277:7
278:13

**recorded** 120:13

**records** 195:11

**recover** 267:11

**redacted** 223:7
245:10,22

**Redeemer** 115:4

**reduce** 186:4,6,7,10
192:22 193:24 198:5,
11

**reduces** 182:8,15,18
184:14

**refer** 115:19,25
209:11,23

**reference** 131:5
162:20 209:4 211:10
229:16 236:9 241:20
245:2 251:25 256:19

**referenced** 242:17

**referred** 114:8
119:25 131:16 143:8
151:21 152:15
163:19 164:11 173:7,
11 174:10,17 176:6,
15,23 179:9,25
180:7,12,16,24
181:8,20 183:6
185:21 186:17
187:12,15 197:9
218:2 228:7 255:15

**referring** 145:8
146:8 151:21 154:9
166:3

**refers** 120:4 131:10
147:16 163:2 165:22
200:16 215:21
225:18 231:2 232:9
252:8 264:19

**reflect** 169:4 179:25
254:4,17

**reflected** 113:22
151:22 153:9 223:15
233:23 240:23 269:7

**refresh** 141:10
221:23 226:20,21
232:6

**refreshed** 136:4
150:15 231:8 258:4

**refuse** 234:2

**refused** 260:19

**regard** 128:20
194:24

**relate** 172:13

**related** 154:8 156:25
171:21 277:11

**relates** 229:7

**relating** 142:12
224:18 236:22
241:17 249:13

**relative** 177:17 212:9

**relevant** 179:12
205:12

**relieve** 185:14,22

**relieved** 186:21

**rely** 250:20 251:4

**relying** 276:9

**remain** 224:24

**remember** 117:21,
22 133:7 136:3 137:5
138:7,16,17 140:20,
23 159:8,15 173:25
176:21 179:22
180:13 184:24
193:19 210:9 219:4,
23,24 221:4 226:17
227:23 230:7 231:9
233:2,6 272:4

**remind** 108:5

**REMOTE** 107:3

**remotely** 107:6

**rendered** 273:18

**rep** 247:15

**repay** 111:9,13

**repayment** 149:3
150:12

**repeat** 134:19 144:13
150:20 171:17
185:17 195:25 208:4
214:12 241:4 244:10
256:3

**rephrase** 153:3
164:8

**replaced** 215:7

**report** 117:7 118:3,
16,25 225:22 232:13
244:22 261:10 265:4,
23 266:4 282:13,15,
17

**reported** 117:5
255:25 256:11
266:19,24

**REPORTER** 107:5
145:22 196:22 205:2,
5,23 244:8

**Reporting** 116:14
277:19

**Reports** 117:3,10,13,
16,24 118:6 261:13
262:8 265:21

**representation**
234:15 235:11 247:6
281:21 282:4

**representations**
236:15 247:14

**representing** 165:19
220:11

**request** 124:19
159:20,23 191:15
192:18 197:10 200:2,
21 201:4,22 215:18
280:24 281:11

**requests** 158:13
192:4,10

**required** 227:22
262:15

**requisite** 173:24

**resembles** 235:17

**Reserve** 276:20

**reserved** 277:9

**resolution** 135:10

**resolutions** 179:24
180:3

**resolve** 150:4

**respect** 113:23
118:15 155:5 166:23
173:6 270:13

**respective** 124:7

**respond** 134:6,14,22

**response** 134:3
160:8 161:5 177:6
193:10 207:22 242:6

**responses** 158:12
191:14 192:3,6
280:22 281:10

**responsibility**
119:18 222:18
237:16

**responsible** 116:22
117:2,9 199:25
224:17 250:14
255:20 265:15 266:2

**rest** 129:15 204:13

**Restoration** 217:18

**restrain** 258:15

**Restructuring**
261:23

**Results** 119:3,12
130:21 280:11,17

**return** 182:3

**review** 116:18
249:12 250:3 255:17
261:12 272:8

**reviewed** 113:19
141:11

**reviewing** 192:10

**right-hand** 274:9

**room** 260:24

**roughly** 233:9

**Rule** 277:8

**Rules** 277:9

---

**S**

**sale** 188:19 211:25
213:11

**sampling** 233:22

**satisfied** 189:16

**satisfy** 226:18

**Savings** 107:11

**scenario** 188:7
190:24

**schedules** 249:24
250:2,4 251:6 254:3,
17 261:8

**Schroth** 124:24

**scope** 258:5,9,14

**Scott** 215:3 229:19
230:4

**screen** 163:17 175:9,
22 176:10 200:18
221:14 271:18

**scroll** 132:16 136:10,
16 137:19 139:3
158:5,17,19,21
160:25 161:12
169:16,18 170:11
191:9,17 206:17
222:4 225:16 227:6
235:4 236:11 237:13
257:7 261:16 265:8
272:18

**Scrolling** 121:11
122:8 138:3 139:13
140:5,7,12 158:23
159:21 161:17
169:20 170:10
191:11,19 223:22
232:4 236:6 240:16
243:16 256:16 257:6
263:2 266:8 269:17

**seal** 245:25

**section** 228:8

**Seery** 132:17 148:20
149:14

**sentence** 114:7,9
165:8 166:13,24
167:8,15 169:2
224:15 236:9 264:14,
16

**serve** 159:17 192:15
220:23

**served** 158:8 170:2
171:10 191:22
192:11 200:22
221:24 229:20

**services** 135:8,11
228:25

**serving** 230:3

**set** 148:16 161:6
207:3,22,23 208:7
219:19 254:18
260:14 277:6,14
281:6,15

**settlement** 142:23
148:23,25 149:14
151:2 154:16 156:14
157:5

**shared** 135:8,11

**Sharp** 261:22 262:7,
14 265:15 266:2

**Sharp's** 265:11

**sheet** 119:4,14,21
120:14,19 131:4
177:3 223:6,13
238:5,9,18 255:5
278:2

**shifted** 275:13

**short** 129:18 204:18

**shorter** 205:10

**show** 215:14 223:7
244:19 245:20
253:12

**showed** 245:19

**shown** 176:11

**shows** 252:19
253:22 270:10

**shut** 168:19

**side** 133:21

**sign** 110:4 121:18
122:2 124:25 127:8,
10,15,23 130:3,16,17
161:21 194:15
234:15 235:10 262:7

**signature** 108:25
109:3,16 121:10,13
127:4,6,13 161:19
206:10 235:7,16
247:11 262:2 277:9

**signatures** 235:5
261:20 265:12

**signed** 109:21
110:17 111:8,12,20
113:21 114:22 115:3

**120:16 121:2 123:2,**
3,17 125:5,6,7,15,16
127:14 128:11,15,24
129:21,25 130:2
131:12 132:17
162:12 165:4 194:9,
11 206:24 222:12
235:19 237:11
261:22 263:8

**significant** 119:13,
19 131:3 186:11,12

**signing** 110:19

**signs** 125:3

**similar** 120:10
186:13,21

**simple** 129:22
138:24

**simply** 200:19

**simultaneous**
139:17,24 145:13,17,
21 152:24 168:9
175:8,23 190:9 244:4
258:20

**sir** 109:3,16 118:23
121:13 127:6 140:18
159:6 161:19 162:23
166:13,23 169:23
189:9 190:3 195:4
196:22 199:8,15
206:10 234:5 235:8
240:21 264:18
271:10 276:7

**sister** 174:25 176:5
178:5 189:22 229:19
238:25

**sit** 125:22 137:12
193:8 204:9

**skip** 254:23

**skipped** 282:8

**Skur** 277:4,18

**slightly** 113:11
160:14 202:17

**slow** 137:21,23

**small** 193:12 194:5
213:25

**smoothly** 156:7

**Sofas** 255:15,18,21 256:7 261:8

**sold** 212:6,21 213:3 214:5,17 217:14,20 275:11,15

**sole** 229:20 230:13

**someplace** 205:19

**sort** 137:23

**sought** 179:2

**source** 235:21

**speak** 180:14

**speaking** 118:12,14

**speaks** 114:19 171:14

**specific** 142:16 198:14 203:2,7 211:23 276:16

**specifically** 118:3 132:8 135:13,23 137:5,10 158:10 159:15 174:14 197:25 209:24 214:4 261:11

**specifics** 218:5,20 219:4

**speech** 144:18

**speed** 137:21

**spent** 173:3 271:25

**sphere** 262:10

**split** 135:9

**spoke** 179:13 180:23

**standard** 222:21 235:24

**start** 147:14 148:3 228:4,11

**started** 166:7 195:13

**starting** 144:5

**state** 107:8 163:9 243:10 258:8,13 264:13 277:2,5,18

**stated** 153:17 163:24 167:18,19 173:5 207:7 234:8

**statement** 129:13 147:8 165:14,15 193:3 202:25 222:17 237:15 249:19 271:14 282:9

**statements** 168:13 221:9,15 222:2,19,23 223:25 224:10 227:12 233:18,19 236:21 237:17,23 238:24 239:9 243:22 245:9,15 246:3 255:14 263:19 281:18,23

**STATES** 278:3

**stay** 190:20 255:7

**step** 109:10

**stick** 156:3 166:19

**stipulated** 110:15

**stop** 119:9 138:6 139:18,19,25 140:2 145:11,12 146:16 168:10,11,13,21 246:7,22 265:2

**stopped** 221:12

**story** 217:7

**straight** 214:13

**Strand** 235:12

**straying** 257:23 269:13

**Street** 277:20

**strike** 154:25 155:16 218:13 219:10 264:5

**strikes** 140:21

**structure** 129:6 218:11 256:8

**structured** 129:2 218:11

**stuff** 125:4 139:23 165:4

**subject** 113:24 178:19 180:7,23 196:7 207:16,25 218:2 219:18 229:5 257:24 275:9

**subjects** 214:12

**submit** 245:24

**submitted** 171:6

**SUBSCRIBED** 279:11

**subsequent** 142:13 143:5 144:23 148:8, 17 152:3,4 153:11 155:9 165:12 170:19 172:15,16 176:8 181:5 182:22 188:17, 22,24 189:15 199:5,9 207:16,24 208:8,22 211:8,20 212:3 216:20,22 218:2 219:19 232:10 243:12,18 244:20 267:9 268:14

**subsequently** 142:8 152:16 153:10 194:20

**subsidiary** 209:15

**substance** 140:19 154:12 207:12

**success** 217:7

**sued** 112:5

**suggest** 120:23 180:14 195:3

**suggested** 144:4,5 155:13

**Suite** 277:20

**sum** 111:4

**summary** 250:6,15 251:15 282:6

**supersede** 114:14

**Supplemental** 221:16 281:18,24

**supplied** 128:8

**support** 217:15

**supposed** 159:14 249:18,21

**surrender** 181:9 182:3

**surrendered** 181:22

**swear** 162:4

**swore** 166:16

**sworn** 107:14 149:5 168:12 277:7 279:11

---

**T**

**taking** 146:7

**talk** 152:2

**talked** 176:12

**talking** 116:3 118:6 139:19,20,25 140:2 143:4 147:6 163:14, 15 172:3 175:12 177:7 181:13 207:17 210:9 219:4

**target** 187:4

**tax** 193:14

**taxable** 187:7 194:22

**taxes** 187:8 194:19, 23

**team** 250:21 251:5

**telling** 220:4 265:19, 25

**ten-minute** 151:10

**tendered** 161:4 234:10

**term** 110:9,14 128:5, 20 226:11,15 274:20

**terms** 111:17,18 113:23 114:13 128:12 130:3,9 182:7 193:13 226:18

**testified** 107:16 129:3 133:16

**testify** 129:3

**testimony** 144:2 148:24 149:5 150:9, 17,22 152:13 153:12 154:11 166:19 184:23 198:10 277:7

**Texas** 107:12 277:2, 5,18 278:4

**theoretically** 182:17 217:20

**thing** 140:10

**things** 139:16 171:2, 5,8 172:20 183:25 234:24 245:11 264:15

**thinking** 174:2

**thought** 152:20 182:23 193:25 216:14,16 219:6 240:5

**threw** 150:3

**tie** 182:21 253:3

**time** 107:10,11 108:9 110:17 111:7,12 113:10,21 114:3,22, 25 115:3,13 123:3 124:7,22,23 125:15 128:10,14,23 129:6 130:6 132:5 134:15, 19,24 135:24 144:22 145:23 149:24 150:10,21 164:16 165:12 168:19 170:2 171:6,9,22 173:3 174:22 178:23 180:15,25 181:4 182:15 185:18 187:23 188:3,5 189:25 190:13,15 194:12 198:16 204:4, 20,21 205:7,8,21 206:24 215:8 217:13, 25 220:4,11 229:21 230:2,20 232:19 238:16 241:10 246:14,25 248:3 250:12,17 256:4,9 260:17 262:6 272:2 274:2 276:22

**timeline** 250:9

**times** 108:3 194:3 221:3

**timing** 115:9

**title** 108:19 119:24 136:10

**titled** 150:2

**today** 107:24 108:6 111:23 112:9,21 115:20 122:12 125:22 126:10 128:8

137:18 188:23,25
269:5

**Today's** 107:9

**told** 147:2 177:8,9
185:10 219:14 239:7

**top** 109:19 110:24
121:15 127:19
136:16 162:9 222:16
228:11 237:14 250:9
253:12

**total** 226:7

**transactions** 233:22
236:22

**TRANSCRIPT** 278:2

**transcription**
278:14

**transfer** 124:8

**transparent** 249:19

**transparently**
262:19

**trial** 141:2 149:25
157:23 276:21

**trigger** 211:19,24
212:2 213:4

**triggered** 189:5

**triggers** 139:6

**true** 137:17 162:5
163:24 165:6 166:17,
18,24 167:8,15 193:3
199:3 202:25 206:20
207:8 230:19 232:18
270:25 277:7

**Trussway** 177:5
189:4 209:14 211:3,
19 212:21 214:6,18

**trust** 215:4,16 229:17
230:4,10,14,20
231:6,11,14,19,22

**trustee** 174:18,19,21
215:3,7,15 229:20
230:3

**truth** 107:15,16

**TSG** 277:19

**turn** 243:14 251:19
252:12

**two-hour** 246:19

**typical** 127:13

---

**U**

**Uh-huh** 162:22
215:25 221:19
223:10

**ultimately** 117:5
185:4

**uncollectible**
253:18,24 254:5,18

**unconditional**
122:20

**understand** 107:25
110:18 111:24 112:9,
22 113:15 118:10
123:4,8 125:14,24
126:10,16,18 130:3
133:3 139:5 142:11
166:4 176:17 185:8
186:15 212:14 213:9
214:3 236:19 243:21
245:22 248:13 249:2,
10 270:9,16

**understanding**
110:12 120:3 122:12
123:2 130:6 131:9
133:15 136:23 151:5
154:21 181:21 208:8
235:18 264:11,18
267:16

**understood** 128:23
129:9,21

**undue** 189:13

**unencumbered**
275:10

**unequal** 233:25

**UNITED** 278:3

**unnecessary** 216:5
217:4

**unpaid** 128:16 129:9
133:5,23 134:23
135:21 149:3 181:23
182:4 184:21 187:17
188:9 189:14

**unreasonable**
273:5,18 275:3

276:12

---

**V**

**unredacted** 245:11,
13,14,21,24

**validation** 235:22

**variety** 209:13,14

**variously** 115:20

**vehemently** 189:2
275:25

**verbal** 154:4,7 156:9,
10,17

**verbally** 154:3

**Verification** 162:12
206:8,20

**verified** 165:5 166:25
167:9

**version** 170:17
265:14

**versus** 110:14 164:6

**video** 108:8

**view** 174:5

**views** 178:23

---

**W**

**wanted** 187:4
245:12,20 260:21
274:11

**warning** 266:10

**Waterhouse** 117:2,
24 217:24 218:15,24
219:15 224:23,24
225:5,9 235:15
250:14,20 251:4,12
255:25 256:10,11
262:2,7,14 265:16,20

**Waterhouse's**
265:12

**ways** 268:8

**week** 138:8

**WHEREOF** 277:13

**wholly** 215:22

216:24

**wistful** 264:2

**withdrawn** 114:19
115:18 117:14
122:18 125:12
128:22 131:15
134:11 150:22 171:7
176:4 181:17 187:13
209:21 212:18
216:18,20 230:12
233:3 241:8 243:20
251:2 256:22

**word** 167:11 175:18,
19 183:11,12

**words** 109:10 142:12
170:18,22 172:14
183:19

**wordsmith** 167:13

**work** 149:13

**wrap** 205:14

**write** 145:23 166:15
190:4

**writing** 153:24
154:20

**written** 129:5 156:8
157:20 166:22 193:3
254:9

**wrong** 147:12 149:7
164:5 166:14 185:14
233:15 269:20

**wrote** 165:9,10
268:21 275:6

---

**X**

**X-------** 280:2

---

**Y**

**year** 121:2 144:7,8
149:10,11,13 184:13
222:2 225:24 253:19
256:20,25 259:22
272:25 274:20

**year-end** 221:8

**years** 210:6 225:7

**York** 277:20

**Yup** 238:21 256:21
257:13 261:24

---

**Z**

**Zoom** 108:8

# EXHIBIT 97

Appx. 01702

Page 283

1             Dondero - 6-1-2021

2     IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION

4   In Re:            )
                     )
5   HIGHLAND CAPITAL      )   Case No.
   MANAGEMENT, LP,       ) 19-34054 L.P.
6                 ) Chapter 11
       Debtor,        )
7  -------------------------------)
   HIGHLAND CAPITAL MANAGEMENT,   )
8   LP,                 )
                     )
9       Plaintiff,     ) Adversary No.
                 ) 21-03003-sgi
10     vs.            )
                     )
11   JAMES D. DONDERO,       )
                     )
12       Defendant.      )

13

14         REMOTE DEPOSITION OF

15          JAMES DONDERO

16            Volume 3

17         Pages 283 - 385

18          Dallas, Texas

19     Tuesday, 1st day of June, 2021

20

21

22

23   Reported by:

24   Daniel J. Skur, Notary Public and CSR

25   Job No. 194691

Page 284

```
1            Dondero - 6-1-2021
2
3
4
5
6
7        1st day of June, 2021
8      9:34 a.m. - 12:01 p.m.
9
10
11        Remote Deposition of JAMES DONDERO,
12   located in Dallas, Texas before Daniel J.
13   Skur, Notary Public and Certified Shorthand
14   Reporter in and for the State of Texas
15   located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 285

```
1            Dondero - 6-1-2021
2    R E M O T E  A P P E A R A N C E S:
3    Pachulski Stang Ziehl & Jones
        Attorney(s) for Debtor
4    780 Third Avenue
5    New York, New York 10017
6    BY:   John Morris, Esq.
7          Gregory Demo, Esq.
8
9    Sidley Austin
        Attorney(s) for The Committee
10   2021 McKinney Avenue
11   Dallas, Texas 75201
12   BY:   Paige Montgomery, Esq.
13        Juliana Hoffman, Esq.
14        Matthew Clemente, Esq.
15        Alyssa Russell, Esq.
16
17   Kelly Hart & Pitre
        Attorney(s) for Mark Patrick
18   400 Poydras Street
19   New Orleans, Louisiana 70130
20   BY:   Amelia Hurt, Esq.
21
22   Bonds Ellis Eppich Schafer Jones
        Attorney(s) for The Witness
23   420 Throckmorton Street
24   Fort Worth, Texas 76102
25   BY:   Clay Taylor, Esq.
```

Page 286

```
1            Dondero - 6-1-2021
2
3    R E M O T E  A P P E A R A N C E S  (continued)
4    Sbaiti & Company
        Attorney(s) for Charitable DAF, CLO HoldCo
5      and Sbaiti & Company
        2200 Ross Avenue
6
      Dallas, Texas 75201
7
      BY:   Mazin Sbaiti, Esq.
8
9
10
11   ALSO PRESENT:
12        La Asia Canty, Paralegal
13        Debra Dandeneau, Baker & McKenzie
14        J. Pomerantz
15        Lauren Drawhorn, Wick Phillips
16        Mark Patrick
17
18
19
20
21
22
23
24
25
```

Page 287

```
1            Dondero - 6-1-2021
2        IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the respective
4    parties herein, that filing and sealing be and
5    the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form  of
8    the question, shall be reserved to the
9    time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to and
12   signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16            - oOo -
17
18
19
20
21
22
23
24
25
```

Appx. 01704

1        Dondero - 6-1-2021
2        P R O C E E D I N G S
3        REMOTE ORAL DEPOSITION OF
4              JAMES DONDERO
5        (REPORTER NOTE:  This deposition is
6    being conducted remotely in accordance with
7    the Current Emergency Order regarding the
8    COVID-19 State of Disaster.
9        Today's date is the 1st day of
10   June, 2021.  The time is 9:34 a.m. Daylight
11   Savings Time.  The witness is located in
12   Dallas, Texas.)
13           JAMES DONDERO,
14   having been duly cautioned and sworn to tell
15   the truth, the whole truth and nothing but the
16       truth, testified as follows:
17           (9:33 A.M.)
18           EXAMINATION
19   BY MR. MORRIS:
20       Q.   Good morning, Mr. Dondero.  Can you
21   hear me?
22       A.   Yes.
23       Q.   Your microphone is a little soft as
24   well.
25           Can you tell me where you're located

1        Dondero - 6-1-2021
2    right now?
3        A.   4940 Chase Tower.
4        (Interruption by reporter.)
5        (Pause.)
6    BY MR. MORRIS:
7        Q.   Good morning, Mr. Dondero.
8        (Audio distortion.)
9        (Interruption by reporter.)          00:-01
10   BY MR. MORRIS:                             00:-01
11       Q.   Good morning, Mr. Dondero.
12           Can you hear me now?
13       A.   Yes.
14       Q.   You understand we're here today for
15   your deposition in connection with next week's
16   contempt proceeding; is that right?
17       A.   Yes.
18       Q.   Okay.  We have a few documents to
19   put up on the screen today; and as usual, if
20   there's anything that you need to see, will you
21   let me know that?
22       A.   Yes.
23       Q.   All right.  I want to start with
24   some background.
25           MR. MORRIS:  Can we please put up

1        Dondero - 6-1-2021
2    the first exhibit, the organizational
3    chart?
4        MR. TAYLOR:  John, before we start,
5    I just wanted to note that this is going to
6    be limited to two hours.
7        MR. MORRIS:  I'm not sure where you
8    get that from, but let's just proceed.
9        MR. TAYLOR:  You specifically asked
10   for two hours of time, and I told you we'd
11   give two hours of time, and so we're
12   limiting it to two hours.
13       MR. MORRIS:  You do whatever you
14   need to do, Clay.
15       (Exhibit 1 introduced.)
16   BY MR. MORRIS:
17       Q.   Mr. Dondero, have you seen this
18   document before, sir?
19       A.   Yes.
20       Q.   Do you know what it is?
21       A.   It's the org chart of the DAF and
22   CLO HoldCo.
23       Q.   Do you know why this structure was
24   set up the way it was?
25       MR. TAYLOR:  Objection, form.

1        Dondero - 6-1-2021
2        A.   Only generally.
3    BY MR. MORRIS:
4        Q.   Can you tell me your general
5    understanding of why this structure was set up
6    the way it was?
7        A.   To be compliant for tax purposes.
8        Q.   Was this structure set up at your
9    request?
10       MR. TAYLOR:  Objection, form.
11       A.   Set up at my request.  No.
12   BY MR. MORRIS:
13       Q.   Who decided to set up this
14   structure; do you know?
15       A.   Mark Patrick.
16       Q.   And do you know if anybody asked
17   Mark Patrick to set up this structure?
18       A.   The -- he was tasked with setting up
19   a charitable entity for Highland at that time,
20   for Highland and my -- for Highland and the
21   partners to -- to foster charitable giving and
22   provide the appropriate tax deductions for
23   such.
24       Q.   And who gave him that task, if you
25   know?

Dondero - 6-1-2021

1  
2    A.  I believe I did.
3    Q.   Okay.  So, you tasked Mr. Patrick
4  with setting up an organizational structure to
5  carry out the charitable giving on behalf of
6  Highland Capital Management, L.P., and its
7  partners?
8       Do I have that right?
9    A.  Yes.
10    Q.   Okay.  Looking at the top line, do
11  you see that there's four foundations that are
12  identified as third parties?
13    A.  Yes.
14    Q.   Are you familiar with those
15  foundations?
16    A.  Yes.
17    Q.   And do you serve as an officer or
18  director of any of those foundations?
19    A.  I -- I believe I have or I could be
20  with regard to Dallas Foundation, but I'm not
21  certain.
22    Q.   Okay.  Do you know if you have any
23  role with any of the other three foundations
24  that are on there?
25    A.  I do not believe so.

Dondero - 6-1-2021

1  
2    Q.   Okay.  Looking at the next row,
3  there's four incorporated or there's four
4  entities that are identified as supporting
5  organizations.
6       Do you see that?
7    A.  Yes.
8    Q.   Do you have an understanding of what
9  a "supporting organization" is?
10    A.   No, and I don't know the difference
11  between that first line and the second line,
12  and I don't know if my involvement with Dallas
13  Foundation was at the first line or the second
14  line.
15    Q.   Do you know when Mr. Patrick set up
16  this structure?
17    A.   Many years ago at the beginning of
18  the -- I don't think it's changed over the
19  years.  As far as I know, the general -- or
20  this -- this structure was put in place at the
21  beginning, I believe, sometime in the late
22  2000s.
23    Q.   Do you know what the Donor Advised
24  Funds are, the DAF funds?
25       MR. SBAITI:  I'm going to object to

Dondero - 6-1-2021

1  
2  the form of the question.
3       John, if you could be clear as to
4  which line -- are you talking about
5  charitable DAF HoldCo, or are you talking
6  about charitable DAF Fund, L.P.?
7       MR. TAYLOR:  If you could be as
8  specific as possible, and he'll try to
9  answer as specifically as possible.  I'm
10  not sure which box you're talking about.
11       MR. MORRIS:  All right, Clay.  Thank
12  you.
13  BY MR. MORRIS:
14    Q.   Mr. Dondero, are you familiar with
15  the phrase "DAF"?
16    A.  Yes.
17    Q.   Have you used that phrase before?
18    A.  Yes.
19    Q.   When you refer to -- when you use
20  the phrase "DAF," what are you referring to?
21    A.  It would depend.
22    Q.   On what?
23    A.  What the question is.
24    Q.   What's -- do you have an
25  understanding of what the Charitable DAF GP,

Dondero - 6-1-2021

1  
2  LLC, is?
3    A.   The exact structural differences,
4  I -- I -- I don't know.
5    Q.   So when you use the phrase "DAF,"
6  what are you referring to?
7    A.   In general, when I use the
8  expression, it's the -- the overall entity, the
9  overall pool of capital and/or overall
10  entity that makes the donations from the pool
11  of capital.
12    Q.   And which entity -- withdrawn.
13       Do you have an understanding as to
14  which entity holds the pool of capital?
15    A.   No.  It's -- no, I don't know for
16  sure.
17    Q.   Do you know if it's CLO HoldCo,
18  Ltd.?
19       MR. SBAITI:  Objection, asked and
20  answered.
21    A.  I don't know.
22  BY MR. MORRIS:
23    Q.   Do you know if Charitable DAF Fund,
24  L.P., holds any assets?
25       MR. SBAITI:  Objection, relevance,

1          Dondero - 6-1-2021
2     no foundation.
3     A.   I – I don't know which entities
4  hold which of the assets.
5  BY MR. MORRIS:
6     Q.   Did you – did you approve of the
7  organizational structure that Mr. Patrick
8  created at your request?
9     A.   Yes.
10         MR. TAYLOR:  Objection, vague.
11 BY MR. MORRIS:
12    Q.   I'm sorry.  Did – did you answer,
13 sir?
14    A.   Yes.
15    Q.   Okay.  Who is Grant Scott?
16    A.   I understand he was the trustee of
17 the DAF for a number of years.
18    Q.   When you say "he was the trustee of
19 the DAF," what are you referring to?
20    A.   I always refer to him as "trustee,"
21 but I see it's labeled here as "managing
22 member."
23    Q.   Do you know how he came to be
24 appointed the trustee of the DAF?
25    A.   I believe it was on my

1          Dondero - 6-1-2021
2  recommendation.
3     Q.   Who did you make the recommendation
4  to?
5     A.   It would have been Mark Patrick.
6     Q.   Did Mark Patrick have the authority
7  to appoint Mr. Scott as the trustee of the DAF?
8         MR. SBAITI:  Objection, vague.
9     Object to the extent it calls for a legal
10    conclusion.
11    A.   Yeah, I don't know.
12 BY MR. MORRIS:
13    Q.   Well, you've known Mr. Scott since
14 high school; isn't that right?
15    A.   Yes.
16    Q.   You went to UVA together; isn't that
17 right?
18    A.   Yes.
19    Q.   You were housemates together in
20 college; isn't that right?
21    A.   Yes.
22    Q.   He was the best man at your wedding;
23 isn't that right?
24    A.   Yes.
25    Q.   You picked Mr. Scott to serve as the

1          Dondero - 6-1-2021
2  trustee of the DAF; isn't that right?
3         MR. TAYLOR:  Objection.  That's not
4     what he stated.
5     A.   I – on the original formation, I
6  recommended Grant Scott.
7  BY MR. MORRIS:
8     Q.   And you recommended Mr. Scott to
9  Mr. Patrick?
10    A.   That's my recollection, I believe,
11 but I don't remember specifically.
12    Q.   Do you remember if Mr. Patrick held
13 any role in any entity on the chart that stands
14 before you?
15         Withdrawn.
16         Do you know if Mr. Patrick held any
17 role with any entity prior to January 1st,
18 2021?
19         MR. SBAITI:  Objection, vague.
20    A.   I don't know.
21 BY MR. MORRIS:
22    Q.   Why did you make the recommendation
23 to Mr. Patrick?
24    A.   Initially?  You're saying the
25 initial recommendation when it was set up?

1          Dondero - 6-1-2021
2     Q.   Correct.
3     A.   13, 14, 15 years ago.
4     The – it – we thought – I thought
5  at the time he would be suitable.
6     Q.   But why did you select Mr. Patrick
7  as the person to whom to make your
8  recommendation?
9     A.   Because he was responsible for
10 setting up the overall structure.
11    Q.   Did he – were you seeking his
12 approval when you made the recommendation to
13 him?
14    A.   I – I don't know the roles he was
15 playing at the – at that moment, so I – I
16 don't know.
17    Q.   At the time that you recommended
18 Mr. Scott to serve as the trustee of the DAF,
19 did you have any understanding as to who had
20 the authority to actually appoint Mr. Scott?
21    A.   I did not specifically.
22    Q.   Did you ever learn who had the power
23 to appoint the trustee of the DAF?
24    A.   I did not.
25    Q.   As you sit here today, do you have

Dondero - 6-1-2021

1    Dondero - 6-1-2021
2    any understanding as to who has the power to
3    appoint the trustee of the DAF?
4        MR. TAYLOR: I'll instruct the
5        witness not to answer to the extent it
6        would require him to reveal privileged
7        communications with counsel.
8        MR. MORRIS: I'm not asking him for
9        any communications, to be clear.
10       MR. TAYLOR: Or anything he heard
11       from counsel.
12       (Audio distortion.)
13       MR. MORRIS: Please don't -- Clay,
14       you're a very good lawyer, please don't
15       coach the witness. He's a very
16       sophisticated witness.
17   BY MR. MORRIS:
18       Q.   Do you have any understanding, as
19   you sit here today, sir, as to who has the
20   authority to appoint the trustee of the DAF?
21       A.   I know it's complicated. I know it
22   has to do with shares. I know it's -- I know
23   it's multiple levels, but I don't have specific
24   knowledge.
25       Q.   Do you know if Mr. Patrick ever

1    Dondero - 6-1-2021
2    considered appointing -- withdrawn.
3        MR. MORRIS: Could we please put up
4        the next exhibit, Patrick File 6,
5        Document 1?
6        (Exhibit 2 introduced.)
7        MR. SBAITI: John, is that document
8        you put up a labeled exhibit for the, like
9        Exhibit 1 or something, the one you have up
10       right here.
11       MR. MORRIS: Yeah, that will be
12       marked as Exhibit 1, thank you.
13       So, now we're going to put up
14       Exhibit 2.
15   BY MR. MORRIS:
16       Q.   Do you see that that's the Amended
17   and Restated Limited Liability Company
18   Agreement of the Charitable DAF GP, LLC?
19       A.   Yes.
20       Q.   And do you see that it's dated
21   effective as of January 1st, 2012?
22       A.   Yes.
23       Q.   So, that's approximately nine plus
24   years ago.
25       Do I have that right?

1    Dondero - 6-1-2021
2        A.   Yes.
3        Q.   Okay.
4        MR. MORRIS: Can we go to the last
5        page, please?
6    BY MR. MORRIS:
7        Q.   Is that your signature on that page,
8    sir?
9        A.   Yes.
10       Q.   And do you understand that, pursuant
11   to this agreement, Mr. Scott replaced you as
12   the managing member of the DAF GP, LLC?
13       A.   I -- I don't have a recollection of
14   that.
15       Q.   Do you remember that you served as
16   the managing member of the DAF GP, LLC?
17       A.   I don't -- I don't recall that.
18       Q.   Now, Mr. Scott is a lawyer, correct?
19       A.   Yes.
20       Q.   He's a patent lawyer. Do I have
21   that right?
22       A.   Yes.
23       Q.   He has no experience or expertise in
24   finance, does he, to the best of your
25   knowledge?

1    Dondero - 6-1-2021
2        A.   I would not say he has expertise. I
3    wouldn't say he's an expert in it, but I -- I'd
4    say he's more sophisticated than the average
5    layperson.
6        Q.   Well, at the time that you
7    recommended him to Mr. Patrick, did you do so
8    because you thought he had valuable experience
9    and expertise in finance or investment?
10       MR. SBAITI: Objection, assumes
11       facts not in evidence before the witness.
12   BY MR. MORRIS:
13       Q.   That wasn't one of the reasons you
14   recommended Mr. Scott, is it?
15       A.   He wasn't going to be the investment
16   advisor. DAF had a separate investment
17   advisor.
18       Q.   And who was going to be the
19   investment advisor?
20       A.   Highland.
21       Q.   And you owned and controlled
22   Highland at the time, correct?
23       MR. TAYLOR: Objection.
24   BY MR. MORRIS:
25       Q.   Withdrawn.

1        Dondero - 6-1-2021
2        You controlled Highland at the time,
3    correct?
4        A.   Yes.
5        Q.   Did Mr. Scott have any experience or
6    expertise running charitable organizations, to
7    the best of your knowledge?
8        A.   No.
9        Q.   Had he ever, to the best of your
10   knowledge, made any decisions concerning
11   collateralized loan obligations?
12       A.   No.
13       Q.   Can you tell me why you recommended
14   to Mr. Patrick that Mr. Scott serve as the
15   trustee of DAF?
16       MR. TAYLOR:  Objection, asked and
17   answered.
18       A.   I – I thought he would be a good
19   fit for the position.
20   BY MR. MORRIS:
21       Q.   Why?
22       A.   It required – I don't – in my
23   mind – or I believed it would require a lawyer
24   and someone with legal skills, and I thought he
25   would be good at the position.

1        Dondero - 6-1-2021
2        Q.   And you trusted him; is that right?
3        A.   I – yes.
4        Q.   And you had a life-long relationship
5    with him; isn't that right?  Isn't that one of
6    the reasons why you recommended him for this
7    position?
8        A.   Yes.
9        Q.   Do you know whether Mr. Patrick –
10   withdrawn.
11       Is Mr. – do you believe that
12   Mr. Patrick is the person who appointed
13   Mr. Scott as your successor as managing member
14   in 2012?
15       MR. SBAITI:  Objection, asked and
16   answered, calls for speculation; and object
17   to the extent it calls for a legal
18   conclusion.
19       A.   I could – I could repeat the answer
20   again.
21       I don't know the formal process, but
22   I do remember recommending to Mark Patrick that
23   Grant would be a good candidate.  Now, how –
24   what mechanism and how the process works and
25   who actually approved that, I – I don't know.

1        Dondero - 6-1-2021
2    BY MR. MORRIS:
3        Q.   Did you recommend anybody else, or
4    was Mr. Scott the only person that you
5    recommended?
6        A.   I don't – I don't remember.  I
7    don't remember.  I don't remember recommending
8    anybody else or if the process required it.  I
9    don't remember the process.
10       Q.   Was anybody involved in the process
11   other than you and Mr. Patrick?
12       MR. TAYLOR:  Objection to the extent
13   it calls for speculation.
14   BY MR. MORRIS:
15       Q.   Withdrawn.
16       Do you know – do you know if
17   anybody was in the process – involved in the
18   process other than you and Mr. Patrick?
19       A.   Again, I don't know the process and
20   the mechanism, if there were offshore boards
21   involved or if the four underlying charities
22   were involved.  It was – it was complicated,
23   and I delegated the process to Mark Patrick.
24       Q.   Okay.  I'm not asking you to
25   speculate.  I'm just asking for your knowledge.

1        Dondero - 6-1-2021
2        Can you identify any person or
3    entity who was involved in the appointment of
4    Mr. Scott as your successor as managing member
5    of the DAF GP, LLC, other than yourself and
6    Mr. Patrick?
7        MR. SBAITI:  Objection, assumes
8    facts.
9        A.   Yeah, I don't – I don't have
10   specific knowledge.
11   BY MR. MORRIS:
12       Q.   Okay.  Do you understand that in
13   addition to becoming the managing member of the
14   Charitable DAF GP, LLC, that Mr. Scott also
15   became the sole director of the Charitable DAF
16   HoldCo, Ltd., Charitable DAF Fund, L.P., and
17   CLO HoldCo, Ltd.?
18       MR. TAYLOR:  Objection, assumes
19   facts not before the witness.
20       A.   No.
21   BY MR. MORRIS:
22       Q.   Do you know if he ever held the
23   directorship of any of those entities?
24       MR. SBAITI:  Objection, vague.
25       A.   I – I don't know what his exact

1          Dondero - 6-1-2021
2    role is now, but I – I thought I was informed
3    that that's – his role now has something to do
4    with directorship.
5    BY MR. MORRIS:
6        Q.   Can we put the chart back up,
7    Exhibit 1, please?
8          (Exhibit 1 on screen.)
9    BY MR. MORRIS:
10       Q.   Do you know whether Mr. Scott held
11   any position at all with Charitable DAF HoldCo,
12   Ltd., at any time?
13       A.   I don't know.
14       Q.   Can you identify any person who's
15   ever – who you believe had the authority to
16   act on behalf of the Charitable DAF HoldCo,
17   Ltd., prior to March 1st, 2021?
18         MR. SBAITI:  Objection, assumes
19   facts not in evidence.
20       A.   I don't know.
21   BY MR. MORRIS:
22       Q.   You can't name anybody in the world
23   who was authorized on behalf of – who was
24   authorized to act on behalf of the Charitable
25   DAF HoldCo, Ltd., prior to March 1st, 2021?

1          Dondero - 6-1-2021
2          MR. TAYLOR:  Objection, asked and
3    answered.
4          MR. SBAITI:  Objection, calls for a
5    legal opinion.
6        A.   I don't know.
7    BY MR. MORRIS:
8        Q.   How about the Charitable DAF Fund,
9    L.P.; can you identify anybody in the world who
10   was authorized to act on behalf of that entity
11   prior to March 1st, 2021?
12         MR. SBAITI:  Objection, calls for a
13   legal opinion.
14       A.   I mean, other than Grant Scott, the
15   org chart seems to roll up back up to him.
16   BY MR. MORRIS:
17       Q.   Okay.  So, you're willing to say
18   that Grant Scott acted on behalf of that
19   entity?
20         Do I have that right?
21         MR. TAYLOR:  That's not –
22   mischaracterizes his statements.  He's
23   giving you his general –
24         MR. MORRIS:  Just object to the form
25   of the question.  Please, no speaking

1          Dondero - 6-1-2021
2    objections.  It's very simple.
3          MR. TAYLOR:  So, John, I'm going to
4    make my record.  If you don't like it, then
5    bring it up with the Judge.
6    BY MR. MORRIS:
7        Q.   Mr. Dondero, do you understand that
8    Mr. Scott was authorized to act on behalf of
9    the Charitable DAF Fund, L.P., prior to
10   March 1st, 2021?
11         MR. TAYLOR:  Objection, calls for a
12   legal conclusion.
13       A.   I – I don't know.
14   BY MR. MORRIS:
15       Q.   Okay.  Do you know if anybody was
16   authorized to act on behalf of CLO HoldCo,
17   Ltd., prior to March 1st, 2021?
18         MR. TAYLOR:  Objection, calls for a
19   legal conclusion.
20       A.   I – I don't know the specifics on
21   how this operated.
22   BY MR. MORRIS:
23       Q.   But you can't identify any person,
24   do I have that right, you don't know the
25   identity of any person who was ever authorized

1          Dondero - 6-1-2021
2    to act on behalf of CLO HoldCo, Ltd., prior to
3    March 1st, 2021; is that right?
4          MR. TAYLOR:  Objection, calls for a
5    legal conclusion.
6          MR. MORRIS:  I'm not asking for a
7    legal conclusion.  I'm asking for
8    Mr. Dondero's knowledge of the facts or his
9    understanding of the facts.
10         MR. TAYLOR:  With all due respect,
11   it calls for a legal conclusion.
12         MR. MORRIS:  I cannot wait – I
13   cannot wait until next Tuesday.  This is
14   going to be brilliant.
15   BY MR. MORRIS:
16       Q.   Mr. Dondero, let me try one last
17   time.
18         Can you identify any person who you
19   believed was authorized to act on behalf of CLO
20   HoldCo, Ltd., prior to March 1st, 2021?
21       A.   I need to answer the question this
22   way:  My knowledge begins and ends with Grant
23   as the trustee, or on this org chart, managing
24   member; and his control, it looks like it flows
25   down through all those entities.  Now – or –

Dondero - 6-1-2021

1  or ownership, at least, or maybe control or
2  agreement.
3
4      Now, what other people or boards or
5  trustees or -- or entity he had to go through,
6  whether US Cayman Guernsey, et cetera, to get
7  things done and where the assets were held, I
8  do not have specific knowledge and I don't know
9  the names of the people or the entities that
10  were on those boards or -- supervisory or
11  holders of shares, or whatever.  I wasn't
12  specifically involved in the operation of this
13  structure.
14     Q.   Did the Charitable DAF Fund, L.P.,
15  and Highland Capital Management, L.P., enter
16  into an Amended and Restated Investment
17  Advisory Agreement, to the best of your
18  knowledge?
19     A.   There was an Investment Advisory
20  Agreement, as far as I knew.
21     Q.   And what is your understanding of
22  the purpose of the Investment Advisory
23  Agreement?
24     A.   Excuse me.
25          To provide portfolio management to

Dondero - 6-1-2021

1  achieve adequate returns on the portfolio to
2  support the charitable giving of the DAF.
3
4      Q.   Did Mr. Scott lack the capability to
5  provide portfolio management services to the
6  Charitable DAF Fund, L.P., to the best of your
7  knowledge?
8      A.   I would not say that.
9      Q.   So why -- why did -- withdrawn.
10         Was the -- did you participate in
11  the negotiation -- withdrawn.
12         Can we please put up the next
13  exhibit?  We'll call it Exhibit 3.
14         (Exhibit 3 introduced.)
15  BY MR. MORRIS:
16     Q.   Do you see this is an Amended and
17  Restated Investment Advisory Agreement between
18  the Charitable DAF Fund, L.P.; the Charitable
19  DAF, GP, LLC; and Highland Capital Management,
20  L.P.?
21     A.   Yes.
22     Q.   Is this the agreement you were just
23  referring to?
24     A.   Unless there was another amended
25  one.  I believe there was always one -- best

Dondero - 6-1-2021

1  practice is to have an investment advisory
2  group.
3
4      Q.   And do you know who prepared this
5  document?
6      A.   No.
7      Q.   Do you know if it was the subject of
8  any negotiation?
9      A.   I don't know.
10     Q.   Do you know if the Charitable DAF
11  Fund, L.P., or the Charitable DAF GP, LLC, had
12  independent counsel in connection with the
13  negotiation and execution of this Amended and
14  Restated Investment Advisory Agreement?
15     A.   I don't know.
16     Q.   Do you know if the Charitable DAF
17  Fund, L.P., or the Charitable DAF GP, LLC, ever
18  hired independent counsel prior to the
19  commencement of Highland's bankruptcy in
20  October 2019?
21     A.   I don't know.
22     Q.   Did those entities also enter into a
23  Shared Services Agreement with Highland Capital
24  Management?
25     A.   I believe there was a Shared

Dondero - 6-1-2021

1  Services Agreement.  I don't know which DAF
2  entities entered it.
3      Q.   Before we get to that, pursuant to
4  the Investment and Advisory Agreement, did
5  Highland Capital Management, L.P., manage the
6  assets of the DAF and CLO HoldCo?
7          MR. TAYLOR:  Objection, vague.
8      A.   Can you repeat the question again?
9  BY MR. MORRIS:
10     Q.   Sure.  Is it your understanding that
11  pursuant to this agreement, HCMLP managed the
12  assets of the DAF and CLO HoldCo?
13     A.   This agreement discusses the DAF,
14  right?
15         This disagreement doesn't discuss
16  CLO HoldCo, right?
17     Q.   Do you know whether HCMLP ever had
18  any agreement of any kind with CLO HoldCo
19  pursuant to which it managed CLO HoldCo's
20  assets?
21     A.   I don't know for certain.
22     Q.   Do you have any understanding at all
23  as to whether such an agreement existed?
24     A.   I -- I don't know for certain.  I'm

Page 316

1    Dondero - 6-1-2021
2  willing to be refreshed.
3    Q.  Do you know who provides --
4  withdrawn.
5        Do you know whether anybody provides
6  independent -- withdrawn.
7        Do you know whether anybody has an
8  agreement with the Charitable DAF Fund, L.P.,
9  or the Charitable DAF GP, LLC, today similar to
10  the type that had been previously entered into
11  with HCMLP?
12        MR. TAYLOR:  Objection, vague.
13    A.  I believe Skygate has a similar --
14  similar agreements in place.
15  BY MR. MORRIS:
16    Q.  Is it your understanding that
17  Skygate effectively replaced HCMLP as the
18  investment advisor to the DAF?
19    A.  Let me clarify that for a second.
20        I believe Skygate has the Shared
21  Services Agreement.  I don't know whether it's
22  Skygate or NexPoint has the Investment Advisory
23  Agreement or if it was another entity.  I
24  don't -- I don't know.  I -- I don't know the
25  specifics.

Page 317

1    Dondero - 6-1-2021
2    Q.  Okay.  While Mr. Scott served -- I
3  think you said as the trustee of the DAF, can
4  you identify any investment decision that HCMLP
5  had recommended that Mr. Scott rejected?
6    A.  No.
7    Q.  Can you think of any investment that
8  Mr. Scott made on behalf of the DAF that didn't
9  originate with HCMLP?
10    A.  He wasn't the investment advisor,
11  but, no, I don't -- I don't recall.
12    Q.  Let's just speed this up a bit.
13        Do you recall that in October 2019,
14  the debtor filed for bankruptcy?
15    A.  Yes.
16    Q.  And do you recall that after the
17  debtor filed for bankruptcy, CLO HoldCo, Ltd.,
18  retained John Kane to act as counsel on its
19  behalf?
20    A.  I -- I know he was retained.  I
21  don't know which entities in particular.
22    Q.  Do you have any understanding as to
23  who Mr. Kane represented?
24    A.  My understanding was that he
25  represented the DAF.  Now, whether it included

Page 318

1    Dondero - 6-1-2021
2  all entities, CLO HoldCo, the offshore
3  entities, which entities, I -- I don't know.
4    Q.  Do you know if -- do you know how
5  Mr. Kane came to be retained by the DAF?
6        MR. SBAITI:  Objection to the extent
7    it calls for the DAF's confidential
8    privileged information (inaudible.)
9    A.  I -- I don't remember.  I know the
10  lawyers -- I let the legal department or
11  lawyers find and identify good -- I let them go
12  through the process of identifying and vetting
13  law firms.
14  BY MR. MORRIS:
15    Q.  And are the lawyers that you're
16  referring to in-house counsel at HCMLP?
17    A.  I -- I don't know which lawyers were
18  involved.
19    Q.  Well, you just said that you let the
20  lawyers do the vetting.  Which lawyers were you
21  referring to?
22    A.  It could have been the HCMLP
23  lawyers, it could have been NexPoint lawyers.
24  I don't know.
25    Q.  Could it have been any other lawyers

Page 319

1    Dondero - 6-1-2021
2  besides the HCMLP lawyers and the NexPoint
3  lawyers?
4    A.  I mean -- yes.  I mean, sometimes we
5  get recommendations from outside counsel
6  regarding other outside counsel.  The
7  recommendation could have come from one of the
8  other bankruptcy attorneys involved in the
9  case.  I don't know.
10    Q.  Do you recall that in October 2020,
11  Mr. Scott caused CLO HoldCo to amend its proof
12  of claim?
13        MR. TAYLOR:  Objection, assumes
14    facts not before the witness.
15    A.  Yeah, I don't -- I don't know.
16  BY MR. MORRIS:
17    Q.  Let me take it out of the --
18        (Simultaneous conversation.)
19  BY MR. MORRIS:
20    Q.  Okay.  Let me take it out of the
21  time frame.
22        Do you recall that there came a
23  moment in time when Mr. Scott caused CLO HoldCo
24  to amend its proof of claim by reducing the
25  value of the claim to zero dollars?

Dondero - 6-1-2021

1    A.   I – I know there was ultimately a
2  settlement agreement.  I don't know how that
3  manifested itself.
4    Q.   Okay.  So, just to be clear, you
5  don't have any memory of CLO HoldCo --
6  withdrawn.
7    Do you have a memory of CLO HoldCo
8  filing its original proof of claim in the
9  amount of approximately $11 million?
10    A.   I – I don't recall the amount.  I
11  do remember that the DAF was overbilled by
12  Highland and there was a claim.  Whether it was
13  a POC or an administrative claim or -- I don't
14  know how that manifested itself in the
15  bankruptcy.  It's -- yeah.
16    Q.   Okay.  And regardless of the form of
17  the claim, do you remember that there came a
18  point in time when Mr. Scott amended the claim
19  to reduce the value to zero?
20    A.   I – I heard a hundred thousand
21  dollars, but it's essentially zero, I guess.
22    Q.   And did you know that Mr. Scott was
23  going to amend the proof of claim in that
24  manner prior to the time that he actually did

Dondero - 6-1-2021

1  so?
2    MR. TAYLOR:  Objection to the extent
3  it calls for him to invade the
4  attorney-client privilege.
5    A.   I don't – I don't have knowledge of
6  what you just said.  I – my recollection is
7  there was a legitimate overbilling that
8  Highland did to multiple parties who have
9  pursued multiple – those multiple claims
10  against the estate, but I don't have – I don't
11  have specific knowledge of why the 11 was
12  reduced to zero, but --
13  BY MR. MORRIS:
14    Q.   Did you ever discuss with Mr. Scott
15  his decision to reduce the claim to zero?
16    A.   Not – not before he did it.
17    Q.   At any time, did you ever discuss
18  with Mr. Scott his decision to reduce the claim
19  to zero?
20    A.   I believe afterwards.
21    Q.   And what do you recall about your
22  discussions with Mr. Scott afterwards?
23    A.   That he had given up bona fide
24  claims against the debtor, and I didn't

Dondero - 6-1-2021

1  understand why.
2    Q.   Did he explain to you why he thought
3  he was not giving up bona fide claims --
4  withdrawn.
5    What did he say in response?
6    MR. SBAITI:  Objection, calls
7  for legal --
8    (Audio distortion.)
9  BY MR. MORRIS:
10    Q.   If anything?
11    A.   I don't remember him having an
12  explanation.
13    Q.   Was anybody else -- did anybody else
14  participate in this discussion?
15    A.   No.
16    Q.   Did this discussion occur in a
17  singular phone call, or was it in multiple --
18  during multiple conversations?
19    A.   A couple, one or two.
20    Q.   Do you remember anything about your
21  discussions with Mr. Scott concerning his
22  decision to amend CLO HoldCo's proof of claim
23  by reducing it to zero, other than what you've
24  testified to so far?

Dondero - 6-1-2021

1    MR. TAYLOR:  Objection, vague.
2    A.   No, but I'm willing – I'm willing
3  to be refreshed or answer more questions, but
4  those are the only things that come to mind.
5  BY MR. MORRIS:
6    Q.   Okay.  So, I think what you've told
7  me--and I just want to make sure that I have
8  this right--that after the amendment was filed,
9  you had several conversations with Mr. Scott in
10  which you told him that you believed he had
11  given up bona fide claims against the debtor,
12  but that you don't recall what, if anything, he
13  said in response.
14    Have I missed anything?
15    A.   You used "several."  It's -- I said
16  "a couple."
17    Q.   Okay.
18    A.   But otherwise, that's -- that's my
19  testimony.
20    Q.   Do you recall that sometime after
21  that, CLO HoldCo had filed an objection to the
22  proposed HarbourVest Settlement?
23    A.   Yes.
24    Q.   And did you subsequently learn that

Dondero - 6-1-2021

1 CLO HoldCo withdrew its objection to the
2 HarbourVest Settlement?
3 A. Yes.
4 Q. Do you recall if you learned that
5 before or after CLO HoldCo withdrew its
6 objection -- withdrawn.
7 That wasn't a good question.
8 Did you know, prior to the time that
9 CLO HoldCo announced that it was withdrawing
10 its objection, that it intended to do so; or
11 did you learn about that after -- you know, as
12 the announcement was being made?
13 MR. SBAITI: Objection, compound.
14 MR. TAYLOR: Objection, compound.
15 BY MR. MORRIS:
16 Q. You can answer.
17 A. I learned about it at the hearing.
18 BY MR. MORRIS:
19 Q. Were you surprised?
20 A. Yes.
21 Q. And why were you surprised?
22 A. It was inappropriate.
23 Q. Why did you believe it was
24 inappropriate?

Dondero - 6-1-2021

1 A. The night before, Counsel had
2 confirmed with other counsel.
3 MR. TAYLOR: Instruct the witness
4 not to reveal any privileged information.
5 THE WITNESS: Okay.
6 BY MR. MORRIS:
7 Q. Mr. Dondero, you and I have done
8 this many, many times. I hope that you
9 understand that I'm never, ever asking or
10 hoping that you'll mistakenly divulge
11 attorney-client communications.
12 A. Yeah. Let me rephrase.
13 Q. Yeah. So, having said that, you
14 said that you believed it was inappropriate;
15 and the question is really simple: Why did you
16 believe it was inappropriate?
17 A. There was legal basis or legal
18 interpretation, I believed, in the governing
19 partnership agreement justifying the objection;
20 and I also believed there were duties under the
21 Advisors Act to -- for the DAF to continue with
22 its -- or to argue its objections.
23 Q. And after you learned that Mr. Scott
24 instructed his attorneys to withdraw CLO

Dondero - 6-1-2021

1 HoldCo's objection to the HarbourVest
2 Settlement, did you have a conversation with
3 Mr. Scott about his decision?
4 MR. TAYLOR: Objection, assumes
5 facts not in evidence.
6 A. Yeah, I don't agree with the first
7 part of that question, so I need you to
8 rephrase it, please.
9 BY MR. MORRIS:
10 Q. After you -- after you learned that
11 CLO HoldCo withdrew the objection, did you
12 speak with Mr. Scott about that?
13 A. Yes.
14 Q. Okay. Did you have one conversation
15 or more than one conversation with Mr. Scott
16 concerning CLO HoldCo's withdrawal of its
17 objection to the HarbourVest Settlement?
18 A. I -- I only recall one.
19 Q. Did anybody participate in that
20 conversation besides the two of you?
21 A. No.
22 Q. Did that conversation take place on
23 the telephone or in some other form?
24 A. I -- I don't know.

Dondero - 6-1-2021

1 Q. Do you know how long after the
2 conclusion of the hearing the conversation took
3 place? Was it the same day? Was it
4 afterwards?
5 A. I believe it was the same day or
6 shortly thereafter.
7 Q. And what do you recall -- please
8 tell me everything you recall about the
9 conversation, everything that you said and
10 everything that he said.
11 A. The only two points I remember was
12 that it was inappropriate for the DAF to change
13 direction an hour before the hearing without
14 informing anybody else when it was -- yeah,
15 when it was a reversal of the direction he had
16 been going in for weeks and that it was also
17 inappropriate to -- well, no, that's -- that
18 was -- that was really -- that was really it, I
19 guess.
20 Q. Do you recall what, if anything,
21 Mr. Scott said in response?
22 MR. SBAITI: Objection calls --
23 (inaudible.)
24 MR. MORRIS: What's the basis for

1            Dondero - 6-1-2021
2    the objection?
3        MR. TAYLOR:  Objection, calls for
4    hearsay.
5        MR. SBAITI:  Calls for hearsay.
6    BY MR. MORRIS:
7    Q.    You can answer.
8    A.    That he had done it based on advice
9    of counsel.
10   Q.    Did you have any reason to doubt
11   that?
12   A.    It -- it didn't -- it didn't make
13   sense that counsel would change their opinion
14   between the night before and the morning of the
15   hearing, but I guess that -- that is a reason
16   to doubt it.
17   Q.    Do you think -- do you think
18   Mr. Scott acted in good faith when he made the
19   decision to withdraw CLO HoldCo's objection to
20   the HarbourVest Settlement?
21   A.    Can you ask that question -- ask
22   that question again, please?
23   Q.    Sure.  Do you believe that Mr. Scott
24   acted in good faith when he made the decision
25   to withdraw the CLO HoldCo objection to the

1            Dondero - 6-1-2021
2    HarbourVest Settlement?
3    A.    I don't believe he operated in the
4    best interest of the DAF or CLO HoldCo by
5    withdrawing the claims or withdrawing the
6    objectives -- objections.
7    Q.    Did you -- did the subject of the
8    Advisors Act come up during this conversation?
9    A.    I don't -- I don't remember if it
10   specifically came up.
11   Q.    Do you recall if the subject of
12   "fiduciary duties" came up in this
13   conversation?
14   A.    Not using those words, but reminding
15   him he needed to do what was in the best
16   interest of the DAF was definitely part of the
17   conversation.
18   Q.    Earlier you said -- and I -- if I
19   miss -- if I don't get this right, please feel
20   free to correct me; but I believe you said that
21   it was inappropriate for the DAF to change
22   direction without informing anybody else.
23        Do I have that right?
24   A.    Yes.
25   Q.    And who do you believe Mr. Scott

1            Dondero - 6-1-2021
2    needed to inform of his decision?
3    A.    There was some coordination and
4    cooperation among lawyers representing
5    different parties and I believe there was some
6    obligation -- some professional obligation as
7    part of that to inform and keep people abreast
8    of it.
9    Q.    And would the lawyers at Bonds
10   Ellis, your personal counsel, be among those
11   lawyers that you believed he had the
12   professional obligation to inform?
13       MR. SBAITI:  Objection --
14   A.    I don't know.
15       MR. SBAITI:  -- lacks foundation.
16   A.    I don't know who was in the
17   coordination group.
18   BY MR. MORRIS:
19   Q.    Do you believe that he had an
20   obligation to inform you in advance?
21       MR. SBAITI:  Objection, vague.
22   A.    I don't know if I would use the word
23   "obligation," but, again, as the founder and
24   primary donor and continued donor to the DAF
25   and as the investment advisor fighting for

1            Dondero - 6-1-2021
2    above-average returns on a daily basis for the
3    fund, significant decisions that affect the
4    finances of the fund would be something I would
5    expect typically a trustee to discuss with a
6    primary donor.
7    BY MR. MORRIS:
8    Q.    And which primary donor are you
9    referring to?
10   A.    Highland, prior to bankruptcy, and
11   myself or NexPoint post-bankruptcy.
12   Q.    Is Dugaboy -- The Dugaboy Investment
13   Trust a donor to the DAF?
14       MR. SBAITI:  Objection, relevance.
15   A.    I -- I believe it's been a donor
16   over the years.  It wasn't the initial donor, I
17   don't believe.
18   BY MR. MORRIS:
19   Q.    How about the Get Good Trust?  Is
20   the Get Good Trust a donor to the DAF?
21       MR. SBAITI:  Objection, relevance.
22   A.    I don't know.
23   BY MR. MORRIS:
24   Q.    Do you know if either the Get Good
25   Trust or the Dugaboy Trust has any beneficial

Dondero - 6-1-2021

1     interest in any of the DAF entities?
2
3     A.   It does not -- or they do not.
4     Q.   Do you know if either of the Get
5     Good or Dugaboy trusts have an interest in the
6     CLO HoldCo, Ltd., entity?
7     A.   They -- they do not. They do not.
8     Q.   Do you recall that a short while
9     later or -- or maybe even within the same
10    month, the debtor commenced a lawsuit against
11    the entities that we've referred to previously
12    as the Advisors, the Funds, and CLO HoldCo,
13    Ltd.?
14    A.   Which litigation is that?
15    Q.   That was the one where the debtor is
16    seeking injunctive relief; and there was a
17    hearing in late January on the debtor's motion
18    for preliminary injunction against the Funds,
19    the Advisors, and CLO HoldCo?
20    A.   There's -- there's -- which
21    specifically?
22    Q.   Do you remember that there came a
23    point in time when -- when Mr. Scott, on behalf
24    of CLO HoldCo, reached a settlement with the
25    debtor that resolved the debtor's claim against

Dondero - 6-1-2021

1     CLO HoldCo, Ltd.?
2
3     A.   I'm aware there was a settlement
4     that resolved most of his -- the -- most of the
5     issues with the debtor.
6     Q.   Okay. And do you recall how you
7     learned about that settlement?
8         MR. TAYLOR: Objection to the extent
9     it invades any attorney-client privilege.
10    A.   I learned about it after it was
11    done.
12    BY MR. MORRIS:
13    Q.   Okay. And do you have an
14    understanding of the basic terms of the
15    settlement?
16    A.   I think that was the hundred
17    thousand I spoke of earlier that the -- as the
18    11 or $12 million of overbilling that every
19    other entity has pursued, you know, for -- the
20    overbilling was traded for a hundred thousand
21    dollars, and the -- I think Grant agreed to not
22    pursue some historic actions and not pursue
23    replacement of HCMLP as manager, regardless of
24    whether it was in the best interest of the DAF
25    or not.

Dondero - 6-1-2021

1     Q.   And did you ever have a conversation
2     with Mr. Scott about his decision to enter into
3     that settlement on behalf of CLO HoldCo, Ltd.?
4
5     A.   Yes.
6     Q.   And did that -- did the
7     communications take place in one conversation,
8     more than one conversation, or in some other
9     form?
10    A.   It was a couple times.
11    Q.   Do you recall if anybody --
12        (Simultaneous conversation.)
13    BY MR. MORRIS:
14    Q.   I'm sorry, were you finished?
15    A.   It might have been just once, but
16    either one or two times.
17    Q.   Okay. And did anybody participate
18    in that conversation other than the two of you?
19    A.   No.
20    Q.   Can you recall everything that was
21    discussed during that conversation, everything
22    that you recall saying in sum or substance and
23    everything that you can recall Mr. Scott
24    saying?
25    A.   My message was what I just

Dondero - 6-1-2021

1     articulated, that -- that the compromise or the
2     settlement wasn't in the best interest of the
3     DAF, it wasn't in the best interest of the
4     investments in the DAF.
5     Q.   Do you recall how long the
6     conversation lasted?
7
8     A.   No. It wasn't that long.
9     Q.   Do you recall that shortly after
10    Mr. Scott reached the settlement on behalf of
11    CLO HoldCo, that he gave notice of his intent
12    to resign from his positions with the DAF
13    entities and CLO HoldCo, Ltd.?
14    A.   Yes.
15    Q.   And do you recall that there was a
16    telephone conversation between and among you
17    and Mr. Scott and certain lawyers at around the
18    same time?
19    A.   I don't -- I don't remember that
20    specifically with the lawyers.
21        MR. MORRIS: Can we please put up
22    the next exhibit, which I think we're
23    marking as Exhibit 4, which is Scott Bates
24    No. 11?
25        (Exhibit 4 introduced.)

1          Dondero - 6-1-2021
2    BY MR. MORRIS:
3    Q.   So, I'll represent to you,
4    Mr. Dondero, that the hearing at which the CLO
5    HoldCo, Ltd., settlement was presented took
6    place on January 26th. And so, this is the
7    following Sunday.
8          And do you see there's a list of
9    people who were going to participate in a
10   conference call on Sunday, January 31st?
11   A.   Yes.
12   Q.   And you and Mr. Scott are among
13   those people?
14   A.   Yes.
15   Q.   Do you recall if this phone call
16   took place?
17   A.   Yes.
18   Q.   Do you recall the purpose of the
19   phone call?
20   A.   Yes. It didn't have anything to do
21   with his resignation, this phone call.
22   Q.   So, what was the purpose of this
23   call?
24   A.   Earlier, I stated that to make -- to
25   pivot the plans or what he was -- or to

1          Dondero - 6-1-2021
2    withdraw without telling anybody, to reach
3    settlements without telling anybody that had a
4    material negative impact on the DAF was
5    inappropriate. And I believe the purpose of
6    this call was his representation that John Kane
7    had, in fact, told everybody, so -- but when I
8    spoke with everybody else, everybody said he
9    hadn't talked to them, and so to figure out --
10   to try and figure out what the truth was, we
11   had a conference call with everybody.
12   Q.   Did you figure out what the truth
13   was during that conference call?
14        MR. TAYLOR: Objection. I'm going
15   to have to instruct the client not to
16   answer. This was a conversation with
17   attorneys that were acting in concert under
18   joint-defense agreement, or at least had a
19   common interest in litigation at that point
20   in time.
21        MR. MORRIS: I think it's a little
22   late for that.
23   BY MR. MORRIS:
24   Q.   And there's no lawyer for you on
25   this call, at least that's identified on this

1          Dondero - 6-1-2021
2    email string, correct?
3        MR. TAYLOR: That's incorrect.
4    You'll see -- note that Judge Lynn's -- why
5    it was his email, I don't know, but Judge
6    Lynn's email address is on there.
7        MR. MORRIS: Okay. I think having
8    told me the purpose of the call, I think he
9    ought to be able to disclose what the
10   result of the call was. So I'm going to
11   ask my question again.
12   BY MR. MORRIS:
13   Q.   And that is, did you learn the truth
14   as to whether or not Mr. Kane had given advance
15   notice to any of the lawyers on this email
16   string about any of the decisions you're
17   referring to?
18        MR. TAYLOR: I'm going to renew my
19   objection. You can answer the question,
20   but I do want to state for the record we
21   believe it's inappropriate and if brought
22   up in later proceedings, we'll move to
23   strike.
24   A.   None of the lawyers on this email or
25   that participated in the call acknowledged any

1          Dondero - 6-1-2021
2    advanced conversations with Kane.
3    BY MR. MORRIS:
4    Q.   Do you remember anything else about
5    the phone call that's referred to on this
6    exhibit?
7        MR. TAYLOR: I'm just going to renew
8    my objection.
9    A.   No.
10   BY MR. MORRIS:
11   Q.   And do you recall that Mr. Scott
12   gave notice of his intent to resign on the same
13   day?
14   A.   I -- I didn't know it was exactly
15   the same day, but I knew it was on or around
16   that time.
17   Q.   Okay.
18        MR. MORRIS: Can we pull up the next
19   exhibit, please, Exhibit Number 5, which is
20   Bates stamped Scott 18 and start at the
21   bottom.
22        (Exhibit 5 introduced.)
23   BY MR. MORRIS:
24   Q.   Do you recall receiving this email
25   from Mr. Scott on January 31st, in the

Page 340

Dondero - 6-1-2021

1  afternoon?
2  A.  Yes.
3  Q.  Do you know why Mr. Scott gave
4  notice of his resignation at that time?
5  MR. TAYLOR:  Objection, calls for
6  speculation.
7  A.  No.  It -- you would have to
8  answer -- I have my own speculation, but you
9  would have to ask him.
10 BY MR. MORRIS:
11 Q.  Did you ever have a conversation
12 with Mr. Scott where he informed you of the
13 reasons for his decision to give notice of his
14 resignation?
15 MR. TAYLOR:  Objection, calls for
16 hearsay.
17 A.  I knew he was suffering from anxiety
18 and health issues regarding the challenges and
19 the confrontation.
20 MR. MORRIS:  I move to strike.
21 I just want you to listen carefully
22 to my question, sir.
23 BY MR. MORRIS:
24 Q.  Did Mr. Scott tell you why he had
25

Page 341

Dondero - 6-1-2021

1  decided to give notice of his intent to resign?
2  MR. TAYLOR:  Objection, calls for
3  hearsay.
4  A.  He told me he was suffering from
5  health and anxiety issues regarding the
6  confrontation and the challenges of
7  administering the DAF, given the bankruptcy.
8  BY MR. MORRIS:
9  Q.  I'm sorry, did you use the word
10 "confrontation"?
11 A.  Yes.
12 Q.  Do you have an understanding as to
13 what confrontation he was referring to?
14 MR. TAYLOR:  Objection, calls for
15 speculation.
16 A.  I believe it was the interaction,
17 challenges of dealing with your firm.
18 BY MR. MORRIS:
19 Q.  Did you have any advanced notice
20 that Mr. Scott would be sending this email to
21 you?
22 A.  Not exactly.  But a couple days
23 beforehand, he did propose it, that he was
24 considering resigning.
25

Page 342

Dondero - 6-1-2021

1  Q.  Did you ever ask him to reconsider?
2  A.  No.
3  Q.  You'll see in the third paragraph,
4  he states, quote:  My resignation will not be
5  effective until I approve of the
6  indemnification provisions and obtain any and
7  all necessary releases.
8  Do you see that?
9  A.  Yes.
10 Q.  Did he ever explain to you why his
11 release wouldn't become -- his resignation
12 wouldn't become effective until those things
13 happened?
14 MR. TAYLOR:  Objection, calls for
15 hearsay.
16 A.  No.
17 BY MR. MORRIS:
18 Q.  Did he ever tell you who he wanted a
19 release from?
20 MR. TAYLOR:  Objection, calls for
21 hearsay.
22 A.  No.
23 BY MR. MORRIS:
24 Q.  Do you know if there is any
25

Page 343

Dondero - 6-1-2021

1  agreement today that relates to the
2  indemnification and release provisions cited in
3  Mr. Scott's email?
4  MR. SBAITI:  Objection, calls for a
5  legal conclusion, lacks foundation, lacks
6  relevance.
7  A.  There's no new agreement that I'm
8  aware of.  There's an existing agreement from
9  when he was originally put in place.
10 BY MR. MORRIS:
11 Q.  Did you ask for Mr. Scott's
12 resignation?
13 A.  No.
14 Q.  Did Mr. Scott or anybody acting on
15 his behalf ever explain to you or anybody
16 acting on your behalf why he wanted the
17 indemnification and release provisions?
18 MR. TAYLOR:  Objection, hearsay.
19 A.  No.
20 BY MR. MORRIS:
21 Q.  Did you ever say or suggest to
22 Mr. Scott that he had breached his fiduciary
23 duties to anybody at any time?
24 A.  I -- I don't -- I don't remember if
25

Dondero - 6-1-2021

1 I spoke to anybody else about it.
2
3     Q.    I'm just asking if you ever -- if
4 you or anybody on your behalf ever told that to
5 Mr. Scott or anybody acting on Mr. Scott's
6 behalf, like Mr. Kane.
7         MR. SBAITI: Objection, compound.
8     A.    I -- I believe I testified already
9 that I told him he didn't do what was in the
10 best interest of the fund.
11 BY MR. MORRIS:
12    Q.    And did you ever tell him, in sum or
13 substance, that you believed he had breached
14 his fiduciary duties to anybody in the world by
15 not acting in the best interest of the fund?
16        MR. SBAITI: Objection, vague.
17    A.    I don't recall if I had those
18 discussions with somebody else. I mean -- no,
19 that's -- I don't -- I don't recall if I've had
20 those conversations with anybody else.
21 BY MR. MORRIS:
22    Q.    Did you ever threaten to sue
23 Mr. Scott?
24    A.    Did I -- no.
25    Q.    Did you ever tell Mr. Scott that you

Dondero - 6-1-2021

1 were considering suing him?
2    A.    I remember telling him he needed to
3 do what was in the best interest of the funds.
4 That's -- that's as far as I remember.
5    Q.    Did you ever tell Mr. Scott that you
6 believed that the fund had claims against him?
7    A.    I believe anytime you're a trustee
8 and you don't do what's in the best interest of
9 the funds, you leave yourself open for that,
10 potentially.
11    Q.    I appreciate that that's your
12 perspective, but I'm asking you whether you
13 ever told Mr. Scott that you believed that the
14 fund could assert claims against him.
15    A.    I don't recall that.
16    Q.    Do you recall if you ever told
17 Mr. Scott that you believed the fund should
18 assert claims against him?
19    A.    No, I don't recall that.
20    Q.    Okay. Did you ever tell Mr. Scott
21 that you believed anybody in the world had
22 potential causes of action against him for
23 actions or inactions taken on behalf of the DAF
24 or CLO HoldCo?

Dondero - 6-1-2021

1
2        MR. SBAITI: Objection, vague.
3    A.    I don't recall that.
4 BY MR. MORRIS:
5    Q.    What did you do after you received
6 this email?
7        Withdrawn.
8        Did you do anything in response to
9 receiving this email?
10        MR. TAYLOR: For the record, we're
11 talking about Exhibit 5?
12        MR. MORRIS: Yes, I believe so.
13        Is that right, La Asia?
14        MR. TAYLOR: For that -- sorry, 4.
15        MS. CANTY: I'm sorry, John. Repeat
16 that.
17        MR. MORRIS: Is this document on the
18 screen Exhibit 5?
19        MS. CANTY: It's going to be
20 Exhibit 5, but what we had -- we had
21 premarked them. So, we skipped one in
22 sequence. So, when I upload it, it will be
23 5.
24        MR. MORRIS: Okay. Thank you.
25        MS. CANTY: You're welcome.

Dondero - 6-1-2021

1
2        MR. MORRIS: Yes, Clay, we're going
3 to -- ultimately, this will be marked as
4 Exhibit 5.
5        MR. TAYLOR: Thank you.
6        MR. MORRIS: Yeah.
7 BY MR. MORRIS:
8    Q.    So, the question, Mr. Dondero, is:
9 Do you recall doing anything after receiving
10 this email?
11        MR. TAYLOR: Objection, vague.
12    A.    I don't remember doing anything with
13 it. I -- I didn't know what to do with it. I
14 didn't know how the DAF structure worked when
15 there was a resignation.
16 BY MR. MORRIS:
17    Q.    Did you ask Mr. Scott why he chose
18 to send it to you?
19    A.    No.
20    Q.    Did you forward it to anybody?
21    A.    I don't recall.
22    Q.    Did you notify anybody that you had
23 received this?
24    A.    I -- I don't remember.
25        MR. MORRIS: Can we scroll up to

1           Dondero - 6-1-2021
2      Mr. Dondero's response?
3         (Scrolling.)
4   BY MR. MORRIS:
5      Q.   You can see --
6         MR. MORRIS:  That's perfect right
7   there.
8   BY MR. MORRIS:
9      Q.   You can see in the first sentence of
10  Mr. Scott's email there's a reference to
11  resigning and divesting.  Do you see that?  I'm
12  summarizing.
13     A.   Yes.
14     Q.   And you responded, and you requested
15  clarification that -- the next morning; is that
16  fair?
17        That's the first question.
18     A.   Yes.
19     Q.   And then you tried to explain to
20  Mr. Scott what your view was of the phrase
21  "divestment" or "divest."
22        Do I have that right?
23     A.   Yes.  Divest has a different meaning
24  in investments than it does, I guess, in legal
25  structuring; and I just wanted to make sure

1   you -- you didn't mean liquidation of the
2   assets.
3      Q.   Okay.  That's what I'm getting to.
4         MR. MORRIS:  So can we scroll up to
5   Mr. Scott's response?
6         (Scrolling.)
7   BY MR. MORRIS:
8      Q.   And Mr. Scott tried to clarify why
9   he -- he used the word "divest."  Do you see
10  that?
11     A.   Yes.
12     Q.   Okay.
13        MR. MORRIS:  And then if we can
14  scroll up to your response.
15        (Scrolling.)
16  BY MR. MORRIS:
17     Q.   Do you see your response says:  What
18  does that mean?  Quote, you need to tell me
19  ASAP that you have no intent to divest assets.
20        Do you see that?
21     A.   Yes.
22     Q.   Why did you write that?
23     A.   It was unpredictable -- some of his
24  behavior was unpredictable at this point.  I

1           Dondero - 6-1-2021
2   just wanted to make sure he wasn't liquidating
3   or intending to liquidate the portfolio.
4      Q.   What interest did you have in making
5   sure that Mr. Scott didn't liquidate the
6   portfolio?
7      A.   It could materially damage the value
8   of the DAF and its ability to continue its
9   mission as a charitable entity.
10     Q.   Had Mr. Scott ever divested assets
11  before?
12        MR. TAYLOR:  Objection, vague.
13     A.   Well, by giving up the
14  11 million-dollar disclaim against the debtor,
15  he divested an 11 million-dollar asset.
16  BY MR. MORRIS:
17     Q.   Anything else?
18     A.   Not that I can recall.
19     Q.   When was the last time you
20  communicated with Mr. Scott?
21     A.   I sent him a Happy Birthday text a
22  couple days ago.
23     Q.   And when was the last time you spoke
24  with him?
25     A.   It's been a couple months.

1           Dondero - 6-1-2021
2      Q.   Is the last time you spoke to him at
3   around the time that he gave notice of his
4   intent to resign?
5      A.   No.  It was about a month after
6   that.
7      Q.   Mr. Patrick replaced Mr. Scott as
8   the managing member of the DAF GP and as the
9   director of the affiliated DAF entities and CLO
10  HoldCo, correct?
11        MR. SBAITI:  Objection --
12        (Audio distortion.)
13     A.   Ultimately, yes.
14  BY MR. MORRIS:
15     Q.   Do you know how Mr. Patrick came to
16  replace Mr. Scott?
17        MR. TAYLOR:  Objection to the extent
18  it calls for a legal conclusion.
19     A.   I -- I found out about it after it
20  happened, you know, only from things that Mark
21  Patrick told me.
22  BY MR. MORRIS:
23     Q.   Did you know that it was going to
24  happen before the event occurred, before the
25  actual replacement occurred?

1          Dondero - 6-1-2021
2          MR. TAYLOR:  Objection, relevance.
3     A.   No.
4  BY MR. MORRIS:
5     Q.   Do you know who -- who gave
6  Mr. Patrick -- withdrawn.
7          Do you know anything about the
8  circumstances by which Mr. Patrick replaced
9  Mr. Scott?
10    A.   I -- only from conversations with
11  Mark Patrick after the fact.
12    Q.   What did Mr. Patrick tell you?
13         MR. TAYLOR:  Objection, hearsay.
14    A.   He had struggled to -- he had
15  struggled to find other candidates or entities.
16  He had struggled with D&O insurance around some
17  of the alternative candidates.
18         And one day, when he was talking to
19  Grant Scott, they came to some -- I don't know
20  who said what to who, but that -- why doesn't
21  Mark Patrick do it and he has knowledge of the
22  structure, he enjoys the charitable giving
23  part.
24         And unbeknownst to me, they agreed,
25  and he sent over the appropriate documentation

1          Dondero - 6-1-2021
2  or transfer of shares of voting--again, I don't
3  know how it works specifically--and Grant
4  signed it, and Mark Patrick became the trustee.
5  BY MR. MORRIS:
6     Q.   So, it's your testimony that, prior
7  to the time they signed the documentation
8  pursuant to which Patrick replaced Scott, you
9  had no knowledge that there were discussions
10  underway pursuant to which that would occur?
11    A.   Correct.
12    Q.   You mentioned that Mr. Patrick told
13  you that they had trouble getting D&O
14  insurance.
15         Do I have that right?
16    A.   That was -- yeah, that was one of
17  the factors with a couple of the candidates.
18    Q.   And did he tell you who those
19  candidates were?
20         MR. TAYLOR:  Objection, hearsay.
21    A.   He did at the time.  I can't
22  remember who they were.  One was -- one was a
23  former Dean Foods executive, I believe; and the
24  other was an offshore sole practitioner.
25  BY MR. MORRIS:

1          Dondero - 6-1-2021
2     Q.   Did he tell you what the
3  difficulties were in obtaining D&O insurance?
4     A.   No.
5     Q.   Did you ask?
6     A.   No.
7     Q.   Do you know where Mr. Patrick got
8  the authority to -- withdrawn.
9          Do you know who determined to
10  replace Mr. Scott with Mr. Patrick?
11         MR. TAYLOR:  Objection to the extent
12  it calls for a legal conclusion.
13    A.   As I testified, I believe it was the
14  two of them together.
15  BY MR. MORRIS:
16    Q.   And do you have any understanding as
17  to what authority they had to designate
18  Mr. Scott's successor?
19         MR. TAYLOR:  Objection, calls for a
20  legal conclusion.
21    A.   I -- I believed, between the two of
22  them, they knew how the structure worked, and I
23  believed between the two of them, they had
24  authority -- believed they had authority, and
25  that's why they effectuated it.

1          Dondero - 6-1-2021
2  BY MR. MORRIS:
3     Q.   Okay.  Was Mr. Patrick ever employed
4  by HCMLP?
5     A.   Yes.
6     Q.   Do you know what period of time he
7  was employed by HCMLP?
8     A.   He's been there for quite a while.
9  I mean, he was there for quite a while.  I
10  believe over a decade.
11    Q.   And what positions did he hold, if
12  you recall?
13    A.   He headed up our tax department.  I
14  don't remember him having any position other
15  than that or before that.
16    Q.   Is he a lawyer, to the best of your
17  knowledge?
18    A.   He's -- he's a tax lawyer, yeah.
19    Q.   And do you know if he's employed
20  today?
21    A.   I -- yes.
22    Q.   Do you know where he's employed?
23    A.   Yes.
24    Q.   Where do you understand Mr. Patrick
25  is employed?

Page 356

1        Dondero - 6-1-2021
2    A.    At SkyBridge.
3    Q.    Do you know where SkyBridge's
4    offices are located?
5    A.    Yes.
6    Q.    Where are they located?
7    A.    On McKinney Avenue. I believe it's
8    2515.
9    Q.    Is that the same suite of offices
10   where your office is located?
11       MR. SBAITI: Objection, vague.
12   A.    It's not the same floor. We -- we
13   left, as you know, the Highland offices
14   suddenly, and so until we establish permanent
15   office locations, they're located there, but I
16   expect they will be relocating in the
17   not-too-distant future.
18   BY MR. MORRIS:
19   Q.    Did you have any discussions with
20   Mr. Patrick concerning the positions he was
21   inheriting from Mr. Scott before he agreed to
22   accept them?
23   A.    No.
24   Q.    Do you have any written or oral
25   agreements with Mr. Patrick of any kind?

Page 357

1        Dondero - 6-1-2021
2       MR. SBAITI: Objection --
3       MR. TAYLOR: Objection, vague.
4    A.    Yeah, not that I know of, but I'm
5    not sure what you're asking.
6    BY MR. MORRIS:
7    Q.    All right. Do you have any written
8    oral agreements of any kind with Mr. Patrick
9    pertaining to his role as an authorized
10   representative of any of the DAF entities or
11   CLO HoldCo, Ltd.?
12       MR. TAYLOR: Objection, vague.
13   A.    I do not, no.
14   BY MR. MORRIS:
15   Q.    Do you know if Mr. Patrick has any
16   agreement with any of the DAF entities or CLO
17   HoldCo, Ltd., other than those set forth in the
18   limited partnership agreement and the Amended
19   and Restated Limited Liability Company
20   Agreement for the general partnership?
21   A.    I don't know of any.
22   Q.    Okay. So, there was almost a
23   two-year period between the date that Mr. Scott
24   sent his notice to you of his intent to resign
25   and Mr. Patrick's replacement of Mr. Scott at

Page 358

1    the end of March. Do I have that right?
2       MR. TAYLOR: Objection. I think you
3    said two-year period.
4       MR. MORRIS: If I did, let me
5    restate it.
6    BY MR. MORRIS:
7    Q.    There was approximately a two-month
8    period between the time that Mr. Scott sent his
9    notice to you of his intention to resign and
10   Mr. Patrick's replacement at the end of
11   March 2021. Do I have that right?
12   A.    Yes.
13   Q.    Okay. Are you aware that during
14   that interim period, Mr. Patrick gave certain
15   instructions to Mr. Scott?
16       MR. TAYLOR: Objection, calls for
17   hearsay.
18       MR. SBAITI: Lacks foundation.
19   A.    I -- I don't know specifically.
20   BY MR. MORRIS:
21   Q.    Do you know generally? Are you
22   aware of any instructions that Mr. --
23   withdrawn.
24       Can I call that period between

Page 359

1        Dondero - 6-1-2021
2    January 31st and the time that Mr. Patrick
3    formally replaced Mr. Scott as "the interim
4    period"? Is that okay?
5    A.    Sure.
6    Q.    Okay. Did you ever learn at any
7    time during the interim period that Mr. Patrick
8    was giving Mr. Scott instructions with respect
9    to the duties and responsibilities concerning
10   the DAF and CLO HoldCo?
11       MR. SBAITI: Objection, assumes
12   facts not in evidence.
13   A.    Not that I recall.
14   BY MR. MORRIS:
15   Q.    Okay. Did you communicate with
16   Mr. Scott at all during the interim period
17   other than the birthday text that you
18   mentioned?
19       MR. SBAITI: Objection, misstates
20   testimony.
21   A.    I don't -- I don't recall. I mean,
22   I know I've had some conversations with him,
23   yeah, about that -- I have a house in Aspen
24   but -- and we had some conversations about
25   Aspen and skiing and stuff like that, but I

**Appx. 01722**

Page 360

1          Dondero - 6-1-2021
2    don't remember -- I don't remember
3    specifically --
4    BY MR. MORRIS:
5        Q.    Did -- did --
6        A.    -- anything else.
7        Q.    -- Mr. Patrick --
8            I apologize, Mr. Dondero. Were you
9    finished?
10       A.    Yeah, I'm done.
11       Q.    Okay. Did Mr. Patrick inform you of
12   any issues that were being raised that needed
13   to be addressed with Mr. Scott during the
14   interim period?
15       A.    Not that I recall.
16       Q.    Did you ever instruct Mr. Patrick on
17   what to tell Mr. Scott with respect to any
18   matter concerning any of the DAF entities or
19   CLO HoldCo during the interim period?
20       A.    Not that I recall.
21       Q.    Are you familiar with the phrase
22   "adherence agreement"?
23       A.    No.
24           MR. MORRIS: Can we please put up
25       the next exhibit, which we'll mark as

Page 361

1          Dondero - 6-1-2021
2    Exhibit 6, Grant Scott, beginning at Bates
3    No. 85.
4            (Exhibit 6 introduced.)
5            MR. MORRIS: And if we could --
6    BY MR. MORRIS:
7        Q.    Did you ever learn that there was a
8    point in time when the debtor was requesting
9    that CLO HoldCo, Ltd., enter into an adherence
10   agreement?
11       A.    No.
12           MR. MORRIS: Can we scroll up a
13       little bit, please?
14           (Scrolling.)
15           MR. MORRIS: And just a little
16       further.
17           (Scrolling.)
18   BY MR. MORRIS:
19       Q.    And do you see that Grant Scott
20   forwards it to Mark Patrick and says, "This
21   relates to the second issue from the debtor"?
22       A.    Yes.
23           MR. MORRIS: And can you scroll up a
24       little more?
25           (Scrolling.)

Page 362

1          Dondero - 6-1-2021
2    BY MR. MORRIS:
3        Q.    And you see Mr. Patrick's
4    instruction, "Do not sign the adherence
5    agreement from the debtor. The successor will
6    address this"?
7        A.    Yes.
8        Q.    Do you have any knowledge that
9    Mr. Patrick instructed Mr. Scott on March 2nd,
10   2001, not to sign an adherence agreement from
11   the debtor?
12       A.    I have no knowledge prior to this.
13       Q.    Okay.
14           MR. MORRIS: Can you scroll to the
15       top?
16           (Scrolling.)
17   BY MR. MORRIS:
18       Q.    Do you see Mr. Patrick further
19   instructed Mr. Scott on March 2nd to, quote,
20   "Stand down on any communication," close quote?
21       A.    Yes.
22       Q.    Were you aware that Mr. Patrick had
23   instructed Mr. Scott to stand down?
24       A.    No.
25       Q.    Did you ever tell Mr. Patrick to

Page 363

1          Dondero - 6-1-2021
2    instruct Mr. Scott to stand down?
3        A.    No.
4        Q.    Do you have any understanding as to
5    where Mr. Patrick obtained the authority to
6    instruct Mr. Scott to stand down?
7            MR. SBAITI: Objection, vague,
8        assumes facts not in evidence.
9        A.    I -- I wouldn't view it as an
10   authority issue. I think they had a long-term
11   relationship, friendship, working relationship
12   with regard to the DAF; and I think Mark was
13   giving him advice.
14           MR. MORRIS: Okay. It's 12:20 New
15       York time. I'd like to just take a short
16       break until 12:30, and I shouldn't have too
17       much more left.
18           MR. TAYLOR: Okay.
19           (Recess held 11:19a-11:31a.)
20           MR. MORRIS: Okay. Hopefully just
21       15 or 20 minutes more. A half hour at
22       most, I promise.
23   BY MR. MORRIS:
24       Q.    Are you ready to proceed,
25   Mr. Dondero?

**Appx. 01723**

Dondero - 6-1-2021

1
2    A.   Yes.
3    Q.   You've told me that you expressed to
4  Mr. Scott--and I'm, you know,
5  paraphrasing--that you expressed to Mr. Scott
6  your concerns with respect to his – certain of
7  the decisions that he made during the course of
8  the bankruptcy.
9         Do I have that right?  Is that fair?
10   A.   Yes.
11   Q.   Do you know whether anybody else
12  besides yourself expressed any concerns to
13  Mr. Scott concerning any of the decisions that
14  he made during the post-petition period?
15        MR. SBAITI:  Objection, vague.
16   A.   I – I don't recall.
17  BY MR. MORRIS:
18   Q.   Are you aware of anybody other than
19  yourself telling Mr. Scott, in sum or
20  substance, that any of the decisions he made
21  post-petition were inappropriate or not in the
22  best interests of the DAF or CLO HoldCo, Ltd.?
23   A.   I don't know.
24   Q.   Okay.  You're not aware of anybody;
25  is that fair?

Dondero - 6-1-2021

1
2    A.   Not as I sit here today.
3    Q.   Okay.  We talked earlier about the
4  suggestion – and again, if I get this wrong,
5  just correct me.
6         But I think you testified that
7  implicit in your conversations with Mr. Scott
8  was your belief that he wasn't acting in the
9  best interests of the DAF and CLO HoldCo, Ltd.,
10  and had breached his fiduciary duties; is that
11  fair?
12   A.   I think I testified that I didn't
13  use the word "fiduciary duties" but – I don't
14  recall using those words, but I do recall
15  stating that he was making decisions that
16  weren't in the best interest of the fund.
17   Q.   Okay.  And I appreciate the
18  clarification and – I appreciate the
19  clarification.
20        Do you have your own personal belief
21  as to whom Mr. Scott owed fiduciary duties to?
22        MR. SBAITI:  Objection, vague.
23        MR. MORRIS:  Withdrawn.
24        I'm going to try and do this a
25  different way.

Dondero - 6-1-2021

1
2         Ms. Canty, can we please put back up
3  on the screen Exhibit 1?
4         (Exhibit 1 on the screen.)
5  BY MR. MORRIS:
6    Q.   Can you see that, sir?
7    A.   Yes.
8    Q.   Is there any entity on this
9  Exhibit 1 that you do not believe Mr. Scott
10  owed a fiduciary duty to prior to the time of
11  his resignation in late March 2021?
12        MR. SBAITI:  Object to the extent it
13    calls for a legal conclusion.
14   A.   Yeah.  I – I can't answer that
15  question.
16  BY MR. MORRIS:
17   Q.   Well, do you believe that Mr. Scott
18  owed a fiduciary duty to the three entities
19  that have in their name "Charitable DAF"?
20        MR. SBAITI:  Same objection.
21   A.   Again, regardless of where the
22  assets are held, he has a responsibility, in my
23  mind, as the trustee or the managing member, to
24  optimize those assets and protect those assets
25  and to efficiently, effectively administer

Dondero - 6-1-2021

1
2  expenses.
3  BY MR. MORRIS:
4    Q.   I appreciate that.  I'm just asking
5  you to whom he owes the duty to do those
6  things, if you have an understanding.  I'm
7  just – I'm not asking for a legal conclusion.
8  I'm asking you if you have an understanding as
9  to whom he owes those duties.
10   A.   Not specifically.
11   Q.   Okay.  Did you ever discuss at any
12  time with Mr. Patrick your views concerning
13  Mr. Scott's decision to withdraw the objection
14  to the HarbourVest Settlement?
15        MR. SBAITI:  Objection, vague, lacks
16    foundation.
17   A.   I don't – I don't specifically
18  recall.  It's – I'm willing to be refreshed,
19  but I – I don't specifically recall, but
20  that's – yeah, I don't specifically recall.
21  It's not – I don't want to speculate.
22  BY MR. MORRIS:
23   Q.   I don't want you to speculate,
24  either.
25        Do you have any recollection of –

Page 368

Dondero - 6-1-2021

1          Dondero - 6-1-2021
2  at all of ever discussing with Mr. Patrick your
3  views as to Mr. Scott's decision to withdraw
4  the objection to the HarbourVest Settlement?
5          MR. TAYLOR:  Objection, asked and
6      answered.
7      A.  Yeah, I don't recall.
8  BY MR. MORRIS:
9      Q.  Did you -- do you have any
10  recollection at all of ever discussing with
11  Mr. Patrick your views concerning Mr. Scott's
12  decision to enter into the settlement agreement
13  on behalf of CLO HoldCo?
14      A.  I don't recall.
15      Q.  I'm sorry.  Are you -- yeah, are you
16  aware that CLO HoldCo and the DAF, Ltd.,
17  commenced the lawsuit against the debtor and
18  others in the United States District Court for
19  the Northern District of Texas?
20      A.  Yes.
21      Q.  Okay.
22          MR. MORRIS:  Can we put that
23      complaint up on the screen and mark it as
24      Exhibit 7, I believe?
25          (Exhibit 7 introduced.)

Page 369

1          Dondero - 6-1-2021
2  BY MR. MORRIS:
3      Q.  I'll just represent to you that this
4  is the first page of the complaint.  If you
5  need to refer to it for any purpose, just let
6  me know.
7          But I'm going to start with the
8  question of, have you ever seen a copy of the
9  complaint that was filed by the Charitable DAF
10  Fund, L.P., and CLO HoldCo, Ltd., against the
11  debtor and certain other entities?
12      A.  Yes.
13      Q.  When did you see the complaint for
14  the first time, that you recall?
15          MR. TAYLOR:  Objection, vague.
16      A.  Near final versions before it was
17  filed.
18  BY MR. MORRIS:
19      Q.  So you saw -- you saw versions of
20  the complaint before it was filed.  Do I have
21  that right?
22      A.  Yes.
23      Q.  Okay.  Did you participate in any
24  discussions concerning the substance of the
25  complaint before it was filed?

Page 370

1          Dondero - 6-1-2021
2          MR. TAYLOR:  I'm just going to
3      caution the witness:  You can tell him if
4      you participated in any conversations; but
5      to the extent that you had conversations
6      with any attorneys who were acting as
7      lawyers, please do not go into the
8      substance of those conversations.
9      A.  Yeah.  I mean, yes, I had
10  conversations with attorneys.
11  BY MR. MORRIS:
12      Q.  Which attorneys did you speak with
13  about this complaint before it was filed?
14      A.  Mazin.  I can't remember -- I can't
15  remember -- I talked to a lot of attorneys.  I
16  can't remember -- I can't remember besides
17  Mazin.
18      Q.  Okay.  Now, Mazin doesn't represent
19  you personally, does he?
20      A.  No.
21      Q.  Can you please tell me everything
22  you discussed with Mazin concerning this
23  complaint?
24          MR. TAYLOR:  Objection,
25      attorney-client privilege.

Page 371

1          Dondero - 6-1-2021
2          MR. SBAITI:  Well, I'm also -- DAF
3  is asserting work-product privilege and
4  joint-interest privilege regarding
5  communication through DAF with us.
6          MR. MORRIS:  I'm sorry.  I'm sorry.
7  I'm having a little trouble hearing you.  I
8  think I heard attorney work product.  What
9  over privileges are being asserted here?
10          MR. SBAITI:  Joint interest.  As
11  advisor to the DAF, he provided us some
12  information that we used and helped us
13  identify information that we were using.
14  So, helping his advisee's counsel perform
15  their duties falls under the work-product
16  privilege.  We're claiming work-product
17  privilege over the content of his
18  conversation.
19          MR. MORRIS:  Okay.  Did I hear
20  somebody say attorney-client privilege,
21  too?
22          MR. TAYLOR:  I had said that, but I
23  was just making sure that Mazin jumped in
24  with his objections --
25          (Whereupon, the court reporter's

Page 372

1        Dondero - 6-1-2021
2    computer crashed, calls were made, and an
3    iPad was engaged to finish the deposition.)
4        MR. MORRIS:  All right.
5    Mr. Dondero, can you hear me?
6        THE WITNESS:  Yes.
7        MR. MORRIS:  Mr. Court Reporter, can
8    you hear me?
9        THE REPORTER:  Yes, sir.
10   BY MR. MORRIS:
11   Q.   Mr. Dondero, did you provide any
12   comments to the Sbaiti firm on any draft of the
13   complaint before it was filed?
14       MR. SBAITI:  You can answer that
15   question yes or no.  I'll just instruct the
16   witness not to answer with any content of
17   any kind on the basis -- and we're
18   instructing him not to answer on the basis
19   of work-product privilege and
20   joint-interest privilege.
21   A.   Some.
22   BY MR. MORRIS:
23   Q.   Can you disclose for me all of the
24   information and comments you provided that --
25   to the draft complaints?

Page 373

1        Dondero - 6-1-2021
2        MR. SBAITI:  Instruct the witness
3    not to answer on the basis of work-product
4    privilege and joint-interest privilege.
5    BY MR. MORRIS:
6    Q.   Are you going to follow Counsel's
7    advice, Mr. Dondero?
8    A.   Yes.
9    Q.   Did you provide any conceptual or
10   strategic ideas about what claims to pursue to
11   the Sbaiti firm prior to the time the complaint
12   was filed?
13       MR. SBAITI:  Can you repeat the
14   question?
15   BY MR. MORRIS:
16   Q.   Did you provide any thoughts or
17   ideas as to what claims should be pursued in
18   this complaint prior to the time it was filed?
19       MR. TAYLOR:  I'm going to first
20   lodge an objection as to vague, and I
21   believe Mazin has some other objection.
22       MR. SBAITI:  Yeah.  I would -- I
23   will say the same objection, and we will
24   object to any content of the -- within the
25   attorney-client work-product and

Page 374

1        Dondero - 6-1-2021
2    joint-interest privilege.
3    A.   Not that I recall.
4    BY MR. MORRIS:
5    Q.   Did you provide any facts that are
6    set forth in the complaint?
7        Withdrawn.
8        Did you -- did you provide to the
9    Sbaiti firm any facts that are reflected in the
10   final version of the complaint?
11       MR. SBAITI:  Mr. Dondero, you can
12   answer that question yes or no; otherwise,
13   we instruct you not to answer on the basis
14   of -- the content on the basis of
15   attorney-client, work-product and
16   joint-interest privilege.
17   A.   Not that I recall.
18   BY MR. MORRIS:
19   Q.   You don't recall providing any facts
20   at all?
21   A.   Not specifically.
22   Q.   Did you provide any general facts or
23   ideas to the Sbaiti firm in connection with
24   your review of the drafts of the complaint?
25       MR. SBAITI:  Same instruction, same

Page 375

1        Dondero - 6-1-2021
2    objections.
3    A.   Maybe some.
4    BY MR. MORRIS:
5    Q.   Okay.  Can you describe those for
6    me, please?
7        MR. SBAITI:  I'll instruct you not
8    to answer that on the basis of
9    attorney-client work-product privilege and
10   joint-interest privilege.
11   BY MR. MORRIS:
12   Q.   Are you going to follow Counsel's
13   advice, Mr. Dondero?
14   A.   Yes.
15   Q.   Did you have any discussions with
16   the Sbaiti firm concerning whether or not to
17   name James Seery as a defendant in the original
18   complaint?
19       MR. SBAITI:  I'll instruct the
20   witness not to answer on the basis of
21   attorney-client, work-product and
22   joint-interest privilege as doing so would
23   reveal the contents of such communication.
24   BY MR. MORRIS:
25   Q.   Can you just answer yes or no?

Appx. 01726

Dondero - 6-1-2021

1
2    A.   No.
3    Q.   You didn't have -- that wasn't part
4  of any of the discussions you had prior to the
5  time the complaint was filed?
6         MR. SBAITI:  Same instruction.  Just
7    don't answer.
8         THE WITNESS:  So please don't
9    answer, right, or don't answer --
10        MR. SBAITI:  Don't answer.
11        THE WITNESS:  Okay.
12 BY MR. MORRIS:
13   Q.   Are you going to follow Counsel's
14 advice?
15   A.   Yes.
16   Q.   Did you -- did you suggest that
17 Mr. Seery should be named as a defendant in
18 this lawsuit to the Sbaiti firm prior to the
19 time it was filed?
20        MR. SBAITI:  Instruct the witness
21    not to answer on the basis of
22    attorney-client work product and
23    joint-interest privilege, as doing so would
24    reveal the contents of those
25    communications.

Dondero - 6-1-2021

1
2  BY MR. MORRIS:
3    Q.   Are you going to follow Counsel's
4  advice?
5    A.   Yes.
6    Q.   Did you know, prior to the time the
7  complaint was filed, that the Sbaiti firm
8  intended to file a motion for leave to amend
9  their complaint to add Mr. Seery as a
10 defendant?
11        MR. SBAITI:  You can answer that
12    question yes or no, but, otherwise, it will
13    reveal the content of any underlying
14    communication on the basis of
15    attorney-client work product, or
16    joint-interest privilege.
17   A.   No.
18 BY MR. MORRIS:
19   Q.   When did you learn that the Sbaiti
20 firm filed a motion for leave to amend their
21 complaint to add Mr. Seery as a defendant?
22   A.   I don't -- I don't recall.
23   Q.   Do you recall whether you had any
24 conversations with anybody in the world at any
25 time prior to the time that motion was filed

Dondero - 6-1-2021

1
2  regarding the possibility of filing a motion
3  for leave to amend the pleading to add
4  Mr. Seery as a defendant?
5         MR. SBAITI:  Objection, vague, lacks
6    foundation; and instruct the witness not to
7    reveal the content of any communications on
8    the basis protected under the
9    attorney-client, work-product,
10    common-interest privilege.
11   A.   I don't recall.
12 BY MR. MORRIS:
13   Q.   Okay.  Did you ever discuss with
14 Mr. Patrick the topic of whether or not
15 Mr. Seery should be sued?
16   A.   No.
17   Q.   Did you ever discuss with the Sbaiti
18 firm the topic of whether Mr. Seery should be
19 sued?
20        MR. SBAITI:  Instruct the witness
21    not to answer on the basis of attorney work
22    product -- attorney-client, and
23    common-interest privilege as answering
24    would reveal the contents of such
25    communications, if they occurred.

Dondero - 6-1-2021

1
2  BY MR. MORRIS:
3    Q.   Are you going to follow Counsel's
4  advise?
5    A.   Yes.
6         MR. MORRIS:  I think I may be done.
7    Can we just take a three-minute
8    break and let me just check my notes?
9         MR. SBAITI:  Sure.
10        (Recess held.)
11        MR. MORRIS:  All right.  I have no
12    further questions.  I would request the
13    production of a privilege log reflecting
14    the communications, if any, between
15    Mr. Dondero and the Sbaiti firm; but,
16    otherwise, I have nothing further at this
17    time.
18        MR. SBAITI:  Okay.
19        MR. MORRIS:  Again, I appreciate
20    your time, Mr. Dondero.
21        MR. SBAITI:  We'll reserve our
22    questions.
23        MR. MORRIS:  Okay.  Thank you,
24    everybody.
25        MR. SBAITI:  Thank you.  Take care.

Page 380

Dondero - 6-1-2021

1
2    THE REPORTER: Mr. Sbaiti, do you
3  guys need a copy of this deposition?
4    MR. SBAITI: Yeah, we would just
5  need a PTX of the deposition transcript and
6  soft copies of the exhibits. Are you going
7  to send something to the witness to read
8  and sign? I think you could send it to him
9  either directly or to Mr. Taylor on his
10  behalf.
11    (Time Noted: 12:01 p.m.)
12
13
14

JAMES DONDERO

15
16  Subscribed and sworn to before me
  this _____ day of _____, 2021.
17
18
19
20
21
22
23
24
25

Page 381

Dondero - 6-1-2021

1
2    C E R T I F I C A T E
  STATE OF TEXAS  )
3          )
  COUNTY OF ELLIS  )
4
    I, Daniel J. Skur, a Notary Public
5  within and for the State of Texas, do
  hereby certify:
6    That JAMES DONDERO, the witness whose
  deposition is hereinbefore set forth, was
7  duly sworn by me and that such deposition
  is a true record of the testimony given by
8  such witness.
    That pursuant to Rule 30 of the Federal
9  Rules of Civil Procedure, signature of the
  witness was reserved by the witness or
10  other party before the conclusion of the
  deposition;
11    I further certify that I am not
  related to any of the parties to this
12  action by blood or marriage; and that I am
  in no way interested in the outcome of this
13  matter.
    IN WITNESS WHEREOF, I have hereunto
14  set my hand this 1st day of June, 2021.
15
16
17    _____
18    Daniel J. Skur
    Notary Public, State of Texas.
19  My Commission Expires 7/7/2022
  TSG Reporting, Inc.
20  228 East 45th Street, Suite 810
  New York, New York
21  (877) 702-9580
22
23
24
25

Page 382

1    Dondero - 6-1-2021
2  ERRATA SHEET FOR THE TRANSCRIPT OF:
3  Case Name:
    IN THE UNITED STATES BANKRUPTCY COURT
4    FOR THE NORTHERN DISTRICT OF TEXAS
      DALLAS DIVISION
5  In re:
  HIGHLAND CAPITAL  )  Case No.
6  MANAGEMENT, LP,  )  19-34054 L.P.
  Debtor,  )  Chapter 11
7  --------------------------------)
  HIGHLAND CAPITAL MANAGEMENT, )
8  LP,  )
    )
9    Plaintiff,  )  Adversary No.
  vs.  )  21-03003-sgi
10  JAMES D. DONDERO,  )
  Defendant.  )
11  Dep. Date: 06/01/2021
  Deponent: JAMES DONDERO
12
  Reason codes:
13  1. To clarify the record.
  2. To conform to the facts.
14  3. To correct transcription errors.
15    CORRECTIONS:
16  Pg. LN. Now Reads  Should Read  Reason
17  ___ ___ _____ _____ _____
18  ___ ___ _____ _____ _____
19  ___ ___ _____ _____ _____
20  ___ ___ _____ _____ _____
21  ___ ___ _____ _____ _____
22  ___ ___ _____ _____ _____
23  ___ ___ _____ _____ _____
24  ___ ___ _____ _____ _____
25  ___ ___ _____ _____ _____

Page 383

1    Dondero - 6-1-2021
2  ___ ___ _____ _____ _____ _____
3  ___ ___ _____ _____ _____ _____
4  ___ ___ _____ _____ _____ _____
5  ___ ___ _____ _____ _____ _____
6  ___ ___ _____ _____ _____ _____
7  ___ ___ _____ _____ _____ _____
8  ___ ___ _____ _____ _____ _____
9  ___ ___ _____ _____ _____ _____
10  ___ ___ _____ _____ _____ _____
11  ___ ___ _____ _____ _____ _____
12  ___ ___ _____ _____ _____ _____
13  ___ ___ _____ _____ _____ _____
14  ___ ___ _____ _____ _____ _____
15  ___ ___ _____ _____ _____ _____
16  ___ ___ _____ _____ _____ _____
17
18    _____
    JAMES DONDERO
19
20
21  SUBSCRIBED AND SWORN BEFORE ME
  THIS _____ DAY OF _____, 2021.
22
23
    _____
24  (Notary Public) MY COMMISSION EXPIRES:_____
25

Appx. 01728

Page 384

```
 1           Dondero - 6-1-2021
 2          -------I N D E X-------
 3  WITNESS:     EXAMINATION BY      PAGE:
 4  JAMES DONDERO
 5      Mr. Morris          288
 6
 7              *****
 8  --------------------EXHIBITS--------------------
 9  Deposition Exhibits          PAGE/LINE
10  Exhibit 1   DAF/CLO Holder Structure   290/15
              Chart
11      Bates No. GScott000007
12  Exhibit 2   Amended and Restated       301/6
              Limited Liability Company
13      Agreement of Charitable
              DAF GP, LLC
14      Bates No. PATRICK_000031
              through 000035
15
    Exhibit 3   Amended and Restated       313/14
16      Investment Advisory
              Agreement
17      Bates No. GScott000325
              through 000340
18
    Exhibit 4   Phone Conference           335/25
19      Invitation For 1/31/2021
              Bates No. GScott000011
20
    Exhibit 5   January/February 2021      339/22
21      Email String Regarding
              Notice of Intent to Resign
22      and Divest From CLO
              HoldCo, Ltd., and Related
23      Entities
              Bates No. GScott000018
24      through 000019
25
```

Page 385

```
 1           Dondero - 6-1-2021
 2          --------------------EXHIBITS--------------------
 3  Deposition Exhibits          PAGE/LINE
 4  Exhibit 6   March 2021 Email String     361/4
              Regarding Highland
 5      Adherence Agreement
              (Highland CLO Funding) in
 6      Connection With Transfer
              of HarbourVest Shares
 7      Bates No. GScott000085
              through 000088
 8
    Exhibit 7   Original Complaint in Re:   368/25
 9      Charitable DAF Fund, L.P.
              and CLO HoldCo, Ltd., V
10      Highland Capital
              Management, L.P. and
11      Others
              Bates No. GScott000389
12      through 000414
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Appx. 01729**

**$**

**$11** 320:10

**$12** 333:18

**0**

**00:-01** 289:9,10

**1**

**1** 290:15 301:5,9,12
308:7,8 366:3,4,9

**11** 321:12 333:18
335:24 350:14,15

**11:19a-11:31a**
363:19

**12:01** 380:11

**12:20** 363:14

**12:30** 363:16

**13** 299:3

**14** 299:3

**15** 299:3 363:21

**18** 339:20

**1st** 288:9 298:17
301:21 308:17,25
309:11 310:10,17
311:3,20 381:14

**2**

**2** 301:6,14

**20** 363:21

**2000s** 293:22

**2001** 362:10

**2012** 301:21 305:14

**2019** 314:20 317:13

**2020** 319:10

**2021** 288:10 298:18
308:17,25 309:11
310:10,17 311:3,20
358:12 366:11
380:16 381:14

**228** 381:20

**2515** 356:8

**26th** 336:6

**2nd** 362:9,19

**3**

**3** 313:13,14

**30** 381:8

**31st** 336:10 339:25
359:2

**4**

**4** 335:23,25 346:14

**45th** 381:20

**4940** 289:3

**5**

**5** 339:19,22 346:11,
18,20,23 347:4

**6**

**6** 301:4 361:2,4

**6-1-2021** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1

356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1

**7**

**7** 368:24,25

**7/7/2022** 381:19

**8**

**810** 381:20

**85** 361:3

**877 702-9580**
381:21

**9**

**9:33** 288:17

**9:34** 288:10

**A**

**a.m.** 288:10,17

**ability** 350:8

**above-average**
331:2

**abreast** 330:7

**accept** 356:22

**accordance** 288:6

**achieve** 313:2

**acknowledged**
338:25

**act** 308:16,24 309:10
310:8,16 311:2,19
317:18 325:22 329:8

**acted** 309:18 328:18,
24

**acting** 337:17
343:15,17 344:5,15

**365:8** 370:6

**action** 345:23 381:12

**actions** 333:22
345:24

**actual** 351:25

**add** 377:9,21 378:3

**addition** 307:13

**address** 338:6 362:6

**addressed** 360:13

**adequate** 313:2

**adherence** 360:22
361:9 362:4,10

**administer** 366:25

**administering** 341:8

**administrative**
320:14

**advance** 330:20
338:14

**advanced** 339:2
341:20

**advice** 328:8 363:13
373:7 375:13 376:14
377:4

**advise** 379:4

**Advised** 293:23

**advisee's** 371:14

**advisor** 303:16,17,19
316:18 317:10
330:25 371:11

**Advisors** 325:22
329:8 332:12,19

**advisory** 312:17,19,
22 313:17 314:2,14
315:5 316:22

**affect** 331:3

**affiliated** 351:9

**afternoon** 340:2

**agree** 326:7

**agreed** 333:21
352:24 356:21

**agreement** 301:18
302:11 312:3,17,20,

23 313:17,22 314:14,
23 315:2,5,12,14,19,
24 316:8,21,23 320:3
325:20 337:18 343:2,
8,9 357:16,18,20
360:22 361:10 362:5,
10 368:12

**agreements** 316:14
356:25 357:8

**alternative** 352:17

**amend** 319:11,24
320:24 322:23 377:8,
20 378:3

**amended** 301:16
312:16 313:16,24
314:13 320:19
357:18

**amendment** 323:9

**amount** 320:10,11

**and/or** 295:9

**announced** 324:10

**announcement**
324:13

**answering** 378:23

**anxiety** 340:18 341:6

**anytime** 345:8

**apologize** 360:8

**appoint** 297:7
299:20,23 300:3,20

**appointed** 296:24
305:12

**appointing** 301:2

**appointment** 307:3

**approval** 299:12

**approve** 296:6 342:6

**approved** 305:25

**approximately**
301:23 320:10 358:8

**argue** 325:23

**articulated** 335:2

**ASAP** 349:20

**Asia** 346:13

**Aspen** 359:23,25

**assert** 345:15,19

**asserted** 371:9

**asserting** 371:3

**asset** 350:15

**assets** 295:24 296:4 312:7 315:7,13,21 349:3,20 350:10 366:22,24

**assumes** 303:10 307:7,18 308:18 319:13 326:5 359:11 363:8

**attorney** 371:8 378:21

**attorney-client** 321:5 325:12 333:9 370:25 371:20 373:25 374:15 375:9, 21 376:22 377:15 378:9,22

**attorneys** 319:8 325:25 337:17 370:6, 10,12,15

**audio** 289:8 300:12 322:9 351:12

**authority** 297:6 299:20 300:20 308:15 354:8,17,24 363:5,10

**authorized** 308:23, 24 309:10 310:8,16, 25 311:19 357:9

**Avenue** 356:7

**average** 303:4

**aware** 333:3 343:9 358:14,23 362:22 364:18,24 368:16

**B**

**back** 308:6 309:15 366:2

**background** 289:24

**bankruptcy** 314:19 317:14,17 319:8

320:16 331:10 341:8 364:8

**based** 328:8

**basic** 333:14

**basis** 325:18 327:25 331:2 372:17,18 373:3 374:13,14 375:8,20 376:21 377:14 378:8,21

**Bates** 335:23 339:20 361:2

**beginning** 293:17,21 361:2

**begins** 311:22

**behalf** 292:5 308:16, 23,24 309:10,18 310:8,16 311:2,19 317:8,19 332:23 334:4 335:10 343:16, 17 344:4,6 345:24 368:13 380:10

**behavior** 349:25

**belief** 365:8,20

**believed** 304:23 311:19 323:11 325:15,19,21 330:11 344:13 345:7,14,18, 22 354:21,23,24

**beneficial** 331:25

**birthday** 350:21 359:17

**bit** 317:12 361:13

**blood** 381:12

**boards** 306:20 312:4,10

**bona** 321:24 322:4 323:12

**Bonds** 330:9

**bottom** 339:21

**box** 294:10

**breached** 343:23 344:13 365:10

**break** 363:16 379:8

**brilliant** 311:14

**bring** 310:5

**brought** 338:21

**C**

**call** 313:13 322:18 336:10,15,19,21,23 337:6,11,13,25 338:8,10,25 339:5 358:25

**calls** 297:9 305:16,17 306:13 309:4,12 310:11,18 311:4,11 318:7 321:4 322:7 327:23 328:3,5 340:6,16 341:3,15 342:15,21 343:5 351:18 354:12,19 358:17 366:13 372:2

**candidate** 305:23

**candidates** 352:15, 17 353:17,19

**Canty** 346:15,19,25 366:2

**capability** 313:4

**capital** 292:6 295:9, 11,14 312:15 313:19 314:23 315:6

**care** 379:25

**carefully** 340:22

**carry** 292:5

**case** 319:9

**caused** 319:11,23

**caution** 370:3

**cautioned** 288:14

**Cayman** 312:6

**certify** 381:5,11

**cetera** 312:6

**challenges** 340:19 341:7,18

**change** 327:13 328:13 329:21

**changed** 293:18

**charitable** 291:19,21

292:5 294:5,6,25 295:23 301:18 304:6 307:14,15,16 308:11, 16,24 309:8 310:9 312:14 313:3,6,18 314:10,11,16,17 316:8,9 350:9 352:22 366:19 369:9

**charities** 306:21

**chart** 290:3,21 298:13 308:6 309:15 311:23

**Chase** 289:3

**check** 379:8

**chose** 347:17

**circumstances** 352:8

**cited** 343:3

**Civil** 381:9

**claim** 319:12,24,25 320:9,13,14,18,19,24 321:16,19 322:23 332:25

**claiming** 371:16

**claims** 321:10,25 322:4 323:12 329:5 345:7,15,19 373:10, 17

**clarification** 348:15 365:18,19

**clarify** 316:19 349:9

**Clay** 290:14 294:11 300:13 347:2

**clear** 294:3 300:9 320:5

**client** 337:15

**CLO** 290:22 295:17 307:17 310:16 311:2, 19 315:7,13,17,19,20 317:17 318:2 319:11, 23 320:6,8 322:23 323:22 324:2,6,10 325:25 326:12,17 328:19,25 329:4 332:6,12,19,24 333:2 334:4 335:11,13 336:4 345:25 351:9

357:11,16 359:10 360:19 361:9 364:22 365:9 368:13,16 369:10

**close** 362:20

**coach** 300:15

**collateralized** 304:11

**college** 297:20

**commenced** 332:10 368:17

**commencement** 314:19

**comments** 372:12, 24

**Commission** 381:19

**common** 337:19

**common-interest** 378:10,23

**communicate** 359:15

**communicated** 350:20

**communication** 362:20 371:5 375:23 377:14

**communications** 300:7,9 325:12 334:7 376:25 378:7,25 379:14

**Company** 301:17 357:19

**complaint** 368:23 369:4,9,13,20,25 370:13,23 372:13 373:11,18 374:6,10, 24 375:18 376:5 377:7,9,21

**complaints** 372:25

**compliant** 291:7

**complicated** 300:21 306:22

**compound** 324:14, 15 344:7

**compromise** 335:2

**computer** 372:2

**conceptual** 373:9

**concerns** 364:6,12

**concert** 337:17

**conclusion** 297:10 305:18 310:12,19 311:5,7,11 327:3 343:6 351:18 354:12, 20 366:13 367:7 381:10

**conducted** 288:6

**conference** 336:10 337:11,13

**confidential** 318:7

**confirmed** 325:3

**confrontation** 340:20 341:7,11,14

**connection** 289:15 314:12 374:23

**considered** 301:2

**contempt** 289:16

**content** 371:17 372:16 373:24 374:14 377:13 378:7

**contents** 375:23 376:24 378:24

**continue** 325:22 350:8

**continued** 330:24

**control** 311:24 312:2

**controlled** 303:21 304:2

**conversation** 319:18 326:3,15,16, 21,23 327:3,10 329:8,13,17 334:2,7, 8,12,18,21 335:7,16 337:16 340:12 371:18

**conversations** 322:19 323:10 339:2 344:20 352:10 359:22,24 365:7 370:4,5,8,10 377:24

**cooperation** 330:4

**coordination** 330:3, 17

**copies** 380:6

**copy** 369:8 380:3

**correct** 299:2 302:18 303:22 304:3 329:20 338:2 351:10 353:11 365:5

**counsel** 300:7,11 314:12,18 317:18 318:16 319:5,6 325:2,3 328:9,13 330:10 371:14

**Counsel's** 373:6 375:12 376:13 377:3 379:3

**COUNTY** 381:3

**couple** 322:20 323:17 334:10 341:23 350:22,25 353:17

**court** 368:18 371:25 372:7

**COVID-19** 288:8

**crashed** 372:2

**created** 296:8

**Current** 288:7

---

**D**

**D&o** 352:16 353:13 354:3

**DAF** 290:21 293:24 294:5,6,15,20,25 295:5,23 296:17,19, 24 297:7 298:2 299:18,23 300:3,20 301:18 302:12,16 303:16 304:15 307:5, 14,15,16 308:11,16, 25 309:8 310:9 312:14 313:3,6,18,19 314:10,11,16,17 315:2,7,13,14 316:8, 9,18 317:3,8,25 318:5 320:12 325:22 327:13 329:4,16,21 330:24 331:13,20

**DAF's** 318:7

**daily** 331:2

**Dallas** 288:12 292:20 293:12

**damage** 350:7

**Daniel** 381:4,18

**date** 288:9 357:23

**dated** 301:20

**day** 288:9 327:4,6 339:13,15 352:18 380:16 381:14

**Daylight** 288:10

**days** 341:23 350:22

**dealing** 341:18

**Dean** 353:23

**debtor** 317:14,17 321:25 323:12 332:10,15,25 333:5 350:14 361:8,21 362:5,11 368:17 369:11

**debtor's** 332:17,25

**decade** 355:10

**decided** 291:13 341:2

**decision** 317:4 321:16,19 322:23 326:4 328:19,24 330:2 334:3 340:14 367:13 368:3,12

**decisions** 304:10 331:3 338:16 364:7, 13,20 365:15

**deductions** 291:22

**defendant** 375:17 376:17 377:10,21 378:4

**delegated** 306:23

**department** 318:10 355:13

**depend** 294:21

**deposition** 288:3,5 289:15 372:3 380:3,5 381:6,7,10

**describe** 375:5

**designate** 354:17

**determined** 354:9

**difference** 293:10

**differences** 295:3

**difficulties** 354:3

**direction** 327:14,16 329:22

**directly** 380:9

**director** 292:18 307:15 351:9

**directorship** 307:23 308:4

**disagreement** 315:16

**Disaster** 288:8

**disclaim** 350:14

**disclose** 338:9 372:23

**discuss** 315:16 321:15,18 331:5 367:11 378:13,17

**discussed** 334:21 370:22

**discusses** 315:14

**discussing** 368:2,10

**discussion** 322:15, 17

**discussions** 321:23 322:22 344:18 353:9 356:19 369:24 375:15 376:4

**distortion** 289:8 300:12 322:9 351:12

**District** 368:18,19

**divest** 348:21,23 349:10,20

**divested** 350:10,15

**divesting** 348:11

**divestment** 348:21

**divestment** 348:11

**divulge** 325:11

**document** 290:18 301:5,7 314:5 346:17

**documentation** 352:25 353:7

**documents** 289:18

**dollars** 319:25 320:22 333:21

**donations** 295:10

**Dondero** 288:1,4,13, 20 289:1,7,11 290:1, 17 291:1 292:1 293:1 294:1,14 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1,7 311:1, 16 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1,8 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1,4 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1,8 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1,8 361:1 362:1 363:1,25 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,5,11 373:1,7 374:1,11 375:1,13 376:1 377:1 378:1 379:1,15,20 380:1,14 381:1,6

**Dondero's** 311:8 348:2

**donor** 293:23 330:24 331:6,8,13,15,16,20

**doubt** 328:10,16

**draft** 372:12,25

**drafts** 374:24

**due** 311:10

**Dugaboy** 331:12,25 332:5

**duly** 288:14 381:7

**duties** 325:21 329:12 343:24 344:14 359:9 365:10,13,21 367:9 371:15

**duty** 366:10,18 367:5

---

**E**

**earlier** 329:18 333:17 336:24 365:3

**East** 381:20

**effective** 301:21 342:6,13

**effectively** 316:17 366:25

**effectuated** 354:25

**efficiently** 366:25

**Ellis** 330:10 381:3

**email** 338:2,5,6,15,24 339:24 341:21 343:4 346:6,9 347:10 348:10

**Emergency** 288:7

**employed** 355:3,7, 19,22,25

**end** 358:2,11

**ends** 311:22

**engaged** 372:3

**enjoys** 352:22

**enter** 312:15 314:22 334:3 361:9 368:12

**entered** 315:3 316:10

**entities** 293:4 296:3 307:23 311:25 312:9 314:22 315:3 317:21 318:2,3 332:2,11 335:13 351:9 352:15 357:10,16 360:18 366:18 369:11

**entity** 291:19 295:8, 10,12,14 298:13,17 307:3 309:10,19 312:5 316:23 332:6 333:19 350:9 366:8

**essentially** 320:22

**establish** 356:14

**estate** 321:11

**event** 351:24

**evidence** 303:11 308:19 326:6 359:12 363:8

**exact** 295:3 307:25

**EXAMINATION** 288:18

**Excuse** 312:24

**execution** 314:13

**executive** 353:23

**exhibit** 290:2,15 301:4,6,8,9,12,14 308:7,8 313:13,14 335:22,23,25 339:6, 19,22 346:11,18,20 347:4 360:25 361:2,4 366:3,4,9 368:24,25

**exhibits** 380:6

**existed** 315:24

**existing** 343:9

**expect** 331:5 356:16

**expenses** 367:2

**experience** 302:23 303:8 304:5

**expert** 303:3

**expertise** 302:23 303:2,9 304:6

**Expires** 381:19

**explain** 322:3 342:11

343:16 348:19

**explanation** 322:13

**expressed** 364:3,5, 12

**expression** 295:8

**extent** 297:9 300:5 305:17 306:12 318:6 321:3 333:8 351:17 354:11 366:12 370:5

---

**F**

**fact** 337:7 352:11

**factors** 353:17

**facts** 303:11 307:8, 19 308:19 311:8,9 319:14 326:6 359:12 363:8 374:5,9,19,22

**fair** 348:16 364:9,25 365:11

**faith** 328:18,24

**falls** 371:15

**familiar** 292:14 294:14 360:21

**Federal** 381:8

**feel** 329:19

**fide** 321:24 322:4 323:12

**fiduciary** 329:12 343:23 344:14 365:10,13,21 366:10, 18

**fighting** 330:25

**figure** 337:9,10,12

**file** 301:4 377:8

**filed** 317:14,17 323:9, 22 369:9,17,20,25 370:13 372:13 373:12,18 376:5,19 377:7,20,25

**filing** 320:9 378:2

**final** 369:16 374:10

**finance** 302:24 303:9

**finances** 331:4

**find** 318:11 352:15

**finish** 372:3

**finished** 334:14 360:9

**firm** 341:18 372:12 373:11 374:9,23 375:16 376:18 377:7, 20 378:18 379:15

**firms** 318:13

**fit** 304:19

**floor** 356:12

**flows** 311:24

**follow** 373:6 375:12 376:13 377:3 379:3

**Foods** 353:23

**form** 290:25 291:10 294:2 309:24 320:17 326:24 334:9

**formal** 305:21

**formally** 359:3

**formation** 298:5

**forward** 347:20

**forwards** 361:20

**foster** 291:21

**found** 351:19

**foundation** 292:20 293:13 296:2 330:15 343:6 358:19 367:16 378:6

**foundations** 292:11, 15,18,23

**founder** 330:23

**frame** 319:21

**free** 329:20

**friendship** 363:11

**fund** 294:6 295:23 307:16 309:8 310:9 312:14 313:6,18 314:11,17 316:8 331:3,4 344:10,15 345:7,15,18 365:16 369:10

**funds** 293:24 332:12, 18 345:4,10

**future** 356:17

---

**G**

**gave** 291:24 335:11 339:12 340:4 351:3 352:5 358:15

**general** 291:4 293:19 295:7 309:23 357:20 374:22

**generally** 291:2 358:22

**give** 290:11 340:14 341:2

**giving** 291:21 292:5 309:23 313:3 322:4 350:13 352:22 359:8 363:13

**good** 288:20 289:7, 11 300:14 304:18,25 305:23 318:11 324:8 328:18,24 331:19,20, 24 332:5

**governing** 325:19

**GP** 294:25 301:18 302:12,16 307:5,14 313:19 314:11,17 316:9 351:8

**Grant** 296:15 298:6 305:23 309:14,18 311:22 333:21 352:19 353:3 361:2, 19

**group** 314:3 330:17

**Guernsey** 312:6

**guess** 320:22 327:20 328:15 348:24

**guys** 380:3

---

**H**

**half** 363:21

**hand** 381:14

**happen** 351:24

**happened** 342:14 351:20

**Happy** 350:21

**Harbourvest** 323:23 324:3 326:2,18 328:20 329:2 367:14 368:4

**HCMLP** 315:12,18 316:11,17 317:4,9 318:16,22 319:2 333:23 355:4,7

**he'll** 294:8

**headed** 355:13

**health** 340:19 341:6

**hear** 288:21 289:12 371:19 372:5,8

**heard** 300:10 320:21 371:8

**hearing** 324:18 327:3,14 328:15 332:17 336:4 371:7

**hearsay** 328:4,5 340:17 341:4 342:16, 22 343:19 352:13 353:20 358:18

**held** 298:12,16 307:22 308:10 312:7 363:19 366:22 379:10

**helped** 371:12

**helping** 371:14

**hereinbefore** 381:6

**hereunto** 381:13

**high** 297:14

**Highland** 291:19,20 292:6 303:20,22 304:2 312:15 313:19 314:23 315:6 320:13 321:9 331:10 356:13

**Highland's** 314:19

**hired** 314:18

**historic** 333:22

**hold** 296:4 355:11

**Holdco** 290:22 294:5

295:17 307:16,17 308:11,16,25 310:16 311:2,20 315:7,13, 17,19 317:17 318:2 319:11,23 320:6,8 323:22 324:2,6,10 326:12 328:25 329:4 332:6,12,19,24 333:2 334:4 335:11,13 336:5 345:25 351:10 357:11,17 359:10 360:19 361:9 364:22 365:9 368:13,16 369:10

**Holdco's** 315:20 322:23 326:2,17 328:19

**holders** 312:11

**holds** 295:14,24

**hope** 325:9

**hoping** 325:11

**hour** 327:14 363:21

**hours** 290:6,10,11,12

**house** 359:23

**housemates** 297:19

**hundred** 320:21 333:16,20

─────────

**I**

**ideas** 373:10,17 374:23

**identified** 292:12 293:4 337:25

**identify** 307:2 308:14 309:9 310:23 311:18 317:4 318:11 371:13

**identifying** 318:12

**identity** 310:25

**impact** 337:4

**implicit** 365:7

**in-house** 318:16

**inactions** 345:24

**inappropriate** 324:23,25 325:15,17

327:13,18 329:21 337:5 338:21 364:21

**inaudible** 318:8 327:24

**included** 317:25

**incorporated** 293:3

**incorrect** 338:3

**indemnification** 342:7 343:3,18

**independent** 314:12,18 316:6

**inform** 330:2,7,12,20 360:11

**information** 318:8 325:5 371:12,13 372:24

**informed** 308:2 340:13

**informing** 327:15 329:22

**inheriting** 356:21

**initial** 298:25 331:16

**Initially** 298:24

**injunction** 332:18

**injunctive** 332:16

**instruct** 300:4 325:4 337:15 360:16 363:2, 6 372:15 373:2 374:13 375:7,19 376:20 378:6,20

**instructed** 325:25 362:9,19,23

**instructing** 372:18

**instruction** 362:4 374:25 376:6

**instructions** 358:16, 23 359:8

**insurance** 352:16 353:14 354:3

**intended** 324:11 377:8

**intending** 350:3

**intent** 335:11 339:12

341:2 349:20 351:4 357:24

**intention** 358:10

**interaction** 341:17

**interest** 329:4,16 332:2,5 333:24 335:3,4 337:19 344:10,15 345:4,9 350:4 365:16 371:10

**interested** 381:12

**interests** 364:22 365:9

**interim** 358:15 359:3,7,16 360:14,19

**interpretation** 325:19

**interruption** 289:4,9

**introduced** 290:15 301:6 313:14 335:25 339:22 361:4 368:25

**invade** 321:4

**invades** 333:9

**investment** 303:9, 15,16,19 312:16,19, 22 313:17 314:2,14 315:5 316:18,22 317:4,7,10 330:25 331:12

**investments** 335:5 348:24

**involved** 306:10,17, 21,22 307:3 312:12 318:18 319:8

**involvement** 293:12

**ipad** 372:3

**issue** 361:21 363:10

**issues** 333:5 340:19 341:6 360:12

─────────

**J**

**James** 288:4,13 375:17 380:14 381:6

**January** 298:17 301:21 332:17 336:6,

10 339:25 359:2

**John** 290:4 294:3 301:7 310:3 317:18 337:6 346:15

**Joint** 371:10

**joint-defense** 337:18

**joint-interest** 371:4 372:20 373:4 374:2, 16 375:10,22 376:23 377:16

**Judge** 310:5 338:4,5

**jumped** 371:23

**June** 288:10 381:14

**justifying** 325:20

─────────

**K**

**Kane** 317:18,23 318:5 337:6 338:14 339:2 344:6

**kind** 315:19 356:25 357:8 372:17

**knew** 312:20 339:15 340:18 354:22

**knowledge** 300:24 302:25 304:7,10 306:25 307:10 311:8, 22 312:8,18 313:7 321:6,12 352:21 353:9 355:17 362:8, 12

─────────

**L**

**L.P.** 292:6 294:6 295:24 307:16 309:9 310:9 312:14,15 313:6,18,20 314:11, 17 315:6 316:8 369:10

**La** 346:13

**labeled** 296:21 301:8

**lack** 313:4

**lacks** 330:15 343:6 358:19 367:15 378:5

**lasted** 335:7

**late** 293:21 332:17
337:22 366:11

**law** 318:13

**lawsuit** 332:10
368:17 376:18

**lawyer** 300:14
302:18,20 304:23
337:24 355:16,18

**lawyers** 318:10,11,
15,17,20,23,25
319:2,3 330:4,9,11
335:17,20 338:15,24
370:7

**layperson** 303:5

**learn** 299:22 323:25
324:12 338:13 359:6
361:7 377:19

**learned** 324:5,18
325:24 326:11 333:7,
10

**leave** 345:10 377:8,
20 378:3

**left** 356:13 363:17

**legal** 297:9 304:24
305:17 309:5,13
310:12,19 311:5,7,11
318:10 322:8 325:18
343:6 348:24 351:18
354:12,20 366:13
367:7

**legitimate** 321:8

**levels** 300:23

**Liability** 301:17
357:19

**life-long** 305:4

**limited** 290:6 301:17
357:18,19

**limiting** 290:12

**liquidate** 350:3,5

**liquidating** 350:2

**liquidation** 349:2

**list** 336:8

**listen** 340:22

**litigation** 332:14
337:19

**LLC** 295:2 301:18
302:12,16 307:5,14
313:19 314:11,17
316:9

**loan** 304:11

**located** 288:11,25
356:4,6,10,15

**locations** 356:15

**lodge** 373:20

**log** 379:13

**long** 327:2 335:6,8

**long-term** 363:10

**lot** 370:15

**Lynn's** 338:4,6

---

**M**

**made** 299:12 304:10
317:8 324:13 328:18,
24 364:7,14,20 372:2

**make** 297:3 298:22
299:7 310:4 323:8
328:12 336:24
348:25 350:2

**makes** 295:10

**making** 350:4 365:15
371:23

**man** 297:22

**manage** 315:6

**managed** 315:12,20

**management** 292:6
312:15,25 313:5,19
314:24 315:6

**manager** 333:23

**managing** 296:21
302:12,16 305:13
307:4,13 311:23
351:8 366:23

**manifested** 320:4,15

**manner** 320:25

**March** 308:17,25
309:11 310:10,17

**litigation** 311:3,20 358:2,12
362:9,19 366:11

**mark** 291:15,17
297:5,6 305:22
306:23 351:20
352:11,21 353:4
360:25 361:20
363:12 368:23

**marked** 301:12 347:3

**marking** 335:23

**marriage** 381:12

**material** 337:4

**materially** 350:7

**matter** 360:18 381:13

**Mazin** 370:14,17,18,
22 371:23 373:21

**Mckinney** 356:7

**me--and** 323:8

**meaning** 348:23

**mechanism** 305:24
306:20

**member** 296:22
302:12,16 305:13
307:4,13 311:24
351:8 366:23

**memory** 320:6,8

**mentioned** 353:12
359:18

**message** 334:25

**microphone** 288:23

**million** 320:10
333:18

**million-dollar**
350:14,15

**mind** 304:23 323:5
366:23

**minutes** 363:21

**mischaracterizes**
309:22

**missed** 323:15

**mission** 350:9

**misstates** 359:19

**mistakenly** 325:11

**moment** 299:15
319:23

**month** 332:10 351:5

**months** 350:25

**morning** 288:20
289:7,11 328:14
348:15

**MORRIS** 288:19
289:6,10,25 290:7,
13,16 291:3,12
294:11,13 295:22
296:5,11 297:12
298:7,21 300:8,13,17
301:3,11,15 302:4,6
303:12,24 304:20
306:2,14 307:11,21
308:5,9,21 309:7,16,
24 310:6,14,22
311:6,12,15 313:15
315:10 316:15
318:14 319:16,19
321:14 322:10 323:6
324:16,19 325:7
326:10 327:25 328:6
330:18 331:7,18,23
333:12 334:13
335:21 336:2 337:21,
23 338:7,12 339:3,
10,18,23 340:11,21,
24 341:9,19 342:18,
24 343:11,21 344:11,
21 346:4,12,17,24
347:2,6,7,16,25
348:4,6,8 349:5,8,14,
17 350:16 351:14,22
352:4 353:5,25
354:15 355:2 356:18
357:6,14 358:5,7,21
359:14 360:4,24
361:5,6,12,15,18,23
362:2,14,17 363:14,
20,23 364:17 365:23
366:5,16 367:3,22
368:8,22 369:2,18
370:11 371:6,19
372:4,7,10,22 373:5,
15 374:4,18 375:4,
11,24 376:12 377:2,
18 378:12 379:2,6,
11,19,23

**motion** 332:17
377:8,20,25 378:2

**move** 338:22 340:21

**multiple** 300:23
321:9,10 322:18,19

---

**N**

**named** 376:17

**names** 312:9

**needed** 329:15 330:2
345:3 360:12

**negative** 337:4

**negotiation** 313:11
314:8,13

**Nexpoint** 316:22
318:23 319:2 331:11

**night** 325:2 328:14

**Northern** 368:19

**not-too-distant**
356:17

**Notary** 381:4,18

**note** 288:5 290:5
338:4

**Noted** 380:11

**notes** 379:8

**notice** 335:11 338:15
339:12 340:5,14
341:2,20 351:3
357:24 358:10

**notify** 347:22

**number** 296:17
339:19

---

**O**

**object** 293:25 297:9
305:16 309:24
366:12 373:24

**objection** 290:25
291:10 295:19,25
296:10 297:8 298:3,
19 303:10,23 304:16
305:15 306:12 307:7,
18,24 308:18 309:2,
4,12 310:11,18 311:4
315:8 316:12 318:6
319:13 321:3 322:7

323:2,22 324:2,7,11, 14,15 325:20 326:2, 5,12,18 327:23 328:2,3,19,25 330:13,21 331:14,21 333:8 337:14 338:19 339:8 340:6,16 341:3,15 342:15,21 343:5,19 344:7,16 346:2 347:11 350:12 351:11,17 352:2,13 353:20 354:11,19 356:11 357:2,3,12 358:3,17 359:11,19 363:7 364:15 365:22 366:20 367:13,15 368:4,5 369:15 370:24 373:20,21,23 378:5

**objections** 310:2 325:23 329:6 371:24 375:2

**objectives** 329:6

**obligation** 330:6,12, 20,23

**obligations** 304:11

**obtain** 342:7

**obtained** 363:5

**obtaining** 354:3

**occur** 322:17 353:10

**occurred** 351:24,25 378:25

**October** 314:20 317:13 319:10

**office** 356:10,15

**officer** 292:17

**offices** 356:4,9,13

**offshore** 306:20 318:2 353:24

**open** 345:10

**operated** 310:21 329:3

**operation** 312:12

**opinion** 309:5,13 328:13

**optimize** 366:24

**oral** 288:3 356:24 357:8

**Order** 288:7

**org** 290:21 309:15 311:23

**organization** 293:9

**organizational** 290:2 292:4 296:7

**organizations** 293:5 304:6

**original** 298:5 320:9 375:17

**originally** 343:10

**originate** 317:9

**outcome** 381:12

**overbilled** 320:12

**overbilling** 321:8 333:18,20

**owed** 365:21 366:10, 18

**owes** 367:5,9

**owned** 303:21

**ownership** 312:2

———————

**P**

**p.m.** 380:11

**paragraph** 342:4

**paraphrasing--that** 364:5

**part** 326:8 329:16 330:7 352:23 376:3

**participate** 313:10 322:15 326:20 334:17 336:9 369:23

**participated** 338:25 370:4

**parties** 292:12 321:9 330:5 381:11

**partners** 291:21 292:7

**partnership** 325:20 357:18,20

**party** 381:10

**patent** 302:20

**Patrick** 291:15,17 292:3 293:15 296:7 297:5,6 298:9,12,16, 23 299:6 300:25 301:4 303:7 304:14 305:9,12,22 306:11, 18,23 307:6 351:7, 15,21 352:6,8,11,12, 21 353:4,8,12 354:7, 10 355:3,24 356:20, 25 357:8,15 358:15 359:2,7 360:7,11,16 361:20 362:9,18,22, 25 363:5 367:12 368:2,11 378:14

**Patrick's** 357:25 358:11 362:3

**Pause** 289:5

**people** 312:4,9 330:7 336:9,13

**perfect** 348:6

**perform** 371:14

**period** 355:6 357:23 358:4,9,15,25 359:4, 7,16 360:14,19 364:14

**permanent** 356:14

**person** 299:7 305:12 306:4 307:2 308:14 310:23,25 311:18

**personal** 330:10 365:20

**personally** 370:19

**perspective** 345:13

**pertaining** 357:9

**phone** 322:18 336:15,19,21 339:5

**phrase** 294:15,17,20 295:5 348:20 360:21

**picked** 297:25

**pivot** 336:25

**place** 293:20 316:14 326:23 327:4 334:7 336:6,16 343:10

**plans** 336:25

**playing** 299:15

**pleading** 378:3

**POC** 320:14

**point** 320:19 332:23 337:19 349:25 361:8

**points** 327:12

**pool** 295:9,10,14

**portfolio** 312:25 313:2,5 350:3,6

**position** 304:19,25 305:7 308:11 355:14

**positions** 335:12 355:11 356:20

**possibility** 378:2

**post-bankruptcy** 331:11

**post-petition** 364:14,21

**potential** 345:23

**potentially** 345:11

**power** 299:22 300:2

**practice** 314:2

**practitioner** 353:24

**preliminary** 332:18

**premarked** 346:21

**prepared** 314:4

**presented** 336:5

**previously** 316:10 332:11

**primary** 330:24 331:6,8

**prior** 298:17 308:17, 25 309:11 310:9,17 311:2,20 314:18 320:25 324:9 331:10 353:6 362:12 366:10 373:11,18 376:4,18 377:6,25

**privilege** 321:5 333:9 370:25 371:3, 4,16,17,20 372:19,20 373:4 374:2,16

**privileged** 300:6 318:8 325:5

**privileges** 371:9

**Procedure** 381:9

**proceed** 290:8 363:24

**proceeding** 289:16

**proceedings** 338:22

**process** 305:21,24 306:8,9,10,17,18,19, 23 318:12

**product** 371:8 376:22 377:15 378:22

**production** 379:13

**professional** 330:6, 12

**promise** 363:22

**proof** 319:11,24 320:9,24 322:23

**propose** 341:24

**proposed** 323:23

**protect** 366:24

**protected** 378:8

**provide** 291:22 312:25 313:5 372:11 373:9,16 374:5,8,22

**provided** 371:11 372:24

**providing** 374:19

**provisions** 342:7 343:3,18

**PTX** 380:5

**Public** 381:4,18

**pull** 339:18

**purpose** 312:22 336:18,22 337:5 338:8 369:5

**purposes** 291:7

375:9,10,22 376:23 377:16 378:10,23 379:13

**pursuant** 302:10 315:4,12,20 353:8,10 381:8

**pursue** 333:22 373:10

**pursued** 321:10 333:19 373:17

**put** 289:19,25 293:20 301:3,8,13 308:6 313:12 335:21 343:10 360:24 366:2 368:22

**Q**

**question** 294:2,23 309:25 311:21 315:9 324:8 325:16 326:8 328:21,22 338:11,19 340:23 347:8 348:17 366:15 369:8 372:15 373:14 374:12 377:12

**questions** 323:4 379:12,22

**quote** 342:5 349:19 362:19,20

**R**

**raised** 360:12

**reach** 337:2

**reached** 332:24 335:10

**read** 380:7

**ready** 363:24

**reason** 328:10,15

**reasons** 303:13 305:6 340:14

**recall** 302:17 317:11, 13,16 319:10,22 320:11 321:22 323:13,21 324:5 326:19 327:8,9,21 329:11 332:8 333:6 334:11,20,22,23 335:6,9,15 336:15,18 339:11,24 344:17,19

345:16,17,20 346:3 347:9,21 350:18 355:12 359:13,21 360:15,20 364:16 365:14 367:18,19,20 368:7,14 369:14 374:3,17,19 377:22, 23 378:11

**received** 346:5 347:23

**receiving** 339:24 346:9 347:9

**recess** 363:19 379:10

**recollection** 298:10 302:13 321:7 367:25 368:10

**recommend** 306:3

**recommendation** 297:2,3 298:22,25 299:8,12 319:7

**recommendations** 319:5

**recommended** 298:6,8 299:17 303:7,14 304:13 305:6 306:5 317:5

**recommending** 305:22 306:7

**reconsider** 342:2

**record** 310:4 338:20 346:10 381:7

**reduce** 320:20 321:16,19

**reduced** 321:13

**reducing** 319:24 322:24

**refer** 294:19 296:20 369:5

**reference** 348:10

**referred** 332:11 339:5

**referring** 294:20 295:6 296:19 313:23 318:16,21 331:9 338:17 341:14

**reflected** 374:9

**reflecting** 379:13

**refreshed** 316:2 323:4 367:18

**regard** 292:20 363:12

**rejected** 317:5

**related** 381:11

**relates** 343:2 361:21

**relationship** 305:4 363:11

**release** 342:12,20 343:3,18

**releases** 342:8

**relevance** 295:25 331:14,21 343:7 352:2

**relief** 332:16

**relocating** 356:16

**remember** 298:11, 12 302:15 305:22 306:6,7,9 318:9 320:12,18 322:12,21 327:12 329:9 332:22 335:19 339:4 343:25 345:3,5 347:12,24 353:22 355:14 360:2 370:14,15,16

**reminding** 329:14

**REMOTE** 288:3

**remotely** 288:6

**renew** 338:18 339:7

**repeat** 305:19 315:9 346:15 373:13

**rephrase** 325:13 326:9

**replace** 351:16 354:10

**replaced** 302:11 316:17 351:7 352:8 353:8 359:3

**replacement** 333:23 351:25 357:25 358:11

**reporter** 288:5 289:4,9 372:7,9 380:2

**reporter's** 371:25

**Reporting** 381:19

**represent** 336:3 369:3 370:18

**representation** 337:6

**representative** 357:10

**represented** 317:23, 25

**representing** 330:4

**request** 291:9,11 296:8 379:12

**requested** 348:14

**requesting** 361:8

**require** 300:6 304:23

**required** 304:22 306:8

**reserve** 379:21

**reserved** 381:9

**resign** 335:12 339:12 341:2 351:4 357:24 358:10

**resignation** 336:21 340:5,15 342:5,12 343:13 347:15 366:11

**resigning** 341:25 348:11

**resolved** 332:25 333:4

**respect** 311:10 359:8 360:17 364:6

**responded** 348:14

**response** 322:6 323:14 327:22 346:8 348:2 349:6,15,18

**responsibilities** 359:9

**responsibility** 366:22

**responsible** 299:9

**restate** 358:6

**Restated** 301:17 312:16 313:17 314:14 357:19

**result** 338:10

**retained** 317:18,20 318:5

**returns** 313:2 331:2

**reveal** 300:6 325:5 375:23 376:24 377:13 378:7,24

**reversal** 327:16

**review** 374:24

**right--that** 323:9

**role** 292:23 298:13, 17 308:2,3 357:9

**roles** 299:14

**roll** 309:15

**row** 293:2

**Rule** 381:8

**Rules** 381:9

**running** 304:6

**S**

**Savings** 288:11

**Sbaiti** 293:25 295:19, 25 297:8 298:19 301:7 303:10 305:15 307:7,24 308:18 309:4,12 318:6 322:7 324:14 327:23 328:5 330:13,15,21 331:14, 21 343:5 344:7,16 346:2 351:11 356:11 357:2 358:19 359:11, 19 363:7 364:15 365:22 366:12,20 367:15 371:2,10 372:12,14 373:2,11, 13,22 374:9,11,23,25 375:7,16,19 376:6, 10,18,20 377:7,11,19 378:5,17,20 379:9, 15,18,21,25 380:2,4

school 297:14

Scott 296:15 297:7, 13,25 298:6,8 299:18,20 302:11,18 303:14 304:5,14 305:13 306:4 307:4, 14 308:10 309:14,18 310:8 313:4 317:2,5, 8 319:11,23 320:19, 23 321:15,19,23 322:22 323:10 325:24 326:4,13,16 327:22 328:18,23 329:25 332:23 334:3, 23 335:10,17,23 336:12 339:11,20,25 340:4,13,25 341:21 343:15,23 344:5,23, 25 345:6,14,18,21 347:17 348:20 349:9 350:5,10,20 351:7,16 352:9,19 353:8 354:10 356:21 357:23,25 358:9,16 359:3,8,16 360:13,17 361:2,19 362:9,19,23 363:2,6 364:5,13,19 365:7,21 366:9,17

Scott's 343:4,12 344:5 348:10 349:6 354:18 367:13 368:3, 11

Scott--and 364:4

screen 289:19 308:8 346:18 366:3,4 368:23

scroll 347:25 349:5, 15 361:12,23 362:14

Scrolling 348:3 349:7,16 361:14,17, 25 362:16

seeking 299:11 332:16

Seery 375:17 376:17 377:9,21 378:4,15,18

select 299:6

send 347:18 380:7,8

sending 341:21

sense 328:13

sentence 348:9

separate 303:16

sequence 346:22

serve 292:17 297:25 299:18 304:14

served 302:15 317:2

services 313:5 314:23 315:2 316:21

set 290:24 291:5,8, 11,13,17 293:15 298:25 357:17 374:6 381:6,14

setting 291:18 292:4 299:10

settlement 320:3 323:23 324:3 326:3, 18 328:20 329:2 332:24 333:3,7,15 334:4 335:3,10 336:5 367:14 368:4,12

settlements 337:3

Shared 314:23,25 316:20

shares 300:22 312:11 353:2

short 332:8 363:15

shortly 327:7 335:9

sign 362:4,10 380:8

signature 302:7 381:9

signed 353:4,7

significant 331:3

similar 316:9,13,14

simple 310:2 325:16

simultaneous 319:18 334:12

singular 322:18

sir 290:18 296:13 300:19 302:8 340:23 366:6 372:9

sit 299:25 300:19 365:2

skiing 359:25

skills 304:24

skipped 346:21

Skur 381:4,18

Skybridge 356:2

Skybridge's 356:3

Skygate 316:13,17, 20,22

soft 288:23 380:6

sole 307:15 353:24

sophisticated 300:16 303:4

speak 326:13 370:12

speaking 309:25

specific 294:8 300:23 307:10 312:8 321:12

specifically 290:9 294:9 298:11 299:21 312:12 329:10 332:21 335:20 358:20 360:3 367:10, 17,19,20 374:21

specifically--and 353:3

specifics 310:20 316:25

speculate 306:25 367:21,23

speculation 305:16 306:13 340:7,9 341:16

speed 317:12

spoke 333:17 337:8 344:2 350:23 351:2

stamped 339:20

stand 362:20,23 363:2,6

stands 298:13

start 289:23 290:4 339:20 369:7

state 288:8 338:20 381:2,5,18

stated 298:4 336:24

statements 309:22

states 342:5 368:18

stating 365:15

strategic 373:10

Street 381:20

strike 338:23 340:21

string 338:2,16

structural 295:3

structure 290:23 291:5,8,14,17 292:4 293:16,20 296:7 299:10 312:13 347:14 352:22 354:22

structuring 348:25

struggled 352:14,15, 16

stuff 359:25

subject 314:7 329:7, 11

Subscribed 380:16

subsequently 323:25

substance 334:22 344:13 364:20 369:24 370:8

successor 305:13 307:4 354:18 362:5

suddenly 356:14

sue 344:22

sued 378:15,19

suffering 340:18 341:5

suggest 343:22 376:16

suggestion 365:4

suing 345:2

suitable 299:5

suite 356:9 381:20

sum 334:22 344:12 364:19

summarizing 348:12

Sunday 336:7,10

supervisory 312:10

support 313:3

supporting 293:4,9

surprised 324:20,22

sworn 288:14 380:16 381:7

---

T

talked 337:9 365:3 370:15

talking 294:4,5,10 346:11 352:18

task 291:24

tasked 291:18 292:3

tax 291:7,22 355:13, 18

Taylor 290:4,9,25 291:10 294:7 296:10 298:3 300:4,10 303:23 304:16 306:12 307:18 309:2, 21 310:3,11,18 311:4,10 315:8 316:12 319:13 321:3 323:2 324:15 325:4 326:5 328:3 333:8 337:14 338:3,18 339:7 340:6,16 341:3,15 342:15,21 343:19 346:10,14 347:5,11 350:12 351:17 352:2,13 353:20 354:11,19 357:3,12 358:3,17 363:18 368:5 369:15 370:2,24 371:22 373:19 380:9

telephone 326:24 335:16

telling 337:2,3 345:3 364:19

terms 333:14

testified 288:16

322:25 344:8 354:13
365:6,12

**testimony** 323:20
353:6 359:20 381:7

**Texas** 288:12 368:19
381:2,5,18

**text** 350:21 359:17

**things** 312:7 323:5
342:13 351:20 367:6

**thought** 299:4 303:8
304:18,24 308:2
322:3

**thoughts** 373:16

**thousand** 320:21
333:17,20

**threaten** 344:22

**three-minute** 379:7

**time** 288:10,11
290:10,11 291:19
299:5,17 303:6,22
304:2 308:12 311:17
319:21,23 320:19,25
321:18 324:9 332:23
335:18 337:20
339:16 340:5 343:24
350:19,23 351:2,3
353:7,21 355:6 358:9
359:2,7 361:8 363:15
366:10 367:12
369:14 373:11,18
376:5,19 377:6,25
379:17,20 380:11

**times** 325:9 334:10,
16

**today** 289:14,19
299:25 300:19 316:9
343:2 355:20 365:2

**Today's** 288:9

**told** 290:10 323:7,11
337:7 338:8 341:5
344:4,9 345:14,17
351:21 353:12 364:3

**top** 292:10 362:15

**topic** 378:14,18

**Tower** 289:3

**traded** 333:20

**transcript** 380:5

**transfer** 353:2

**trouble** 353:13 371:7

**true** 381:7

**Trust** 331:13,19,20,
25

**trusted** 305:2

**trustee** 296:16,18,
20,24 297:7 298:2
299:18,23 300:3,20
304:15 311:23 317:3
331:5 345:8 353:4
366:23

**trustees** 312:5

**trusts** 332:5

**truth** 288:15,16
337:10,12 338:13

**TSG** 381:19

**Tuesday** 311:13

**two-month** 358:8

**two-year** 357:23
358:4

**type** 316:10

**typically** 331:5

---

**U**

**ultimately** 320:2
347:3 351:13

**unbeknownst**
352:24

**underlying** 306:21
377:13

**understand** 289:14
296:16 302:10
307:12 310:7 322:2
325:10 355:24

**understanding**
291:5 293:8 294:25
295:13 299:19 300:2,
18 311:9 312:21
315:11,23 316:16
317:22,24 333:14
341:13 354:16 363:4
367:6,8

**underway** 353:10

**United** 368:18

**unpredictable**
349:24,25

**upload** 346:22

**usual** 289:19

**UVA** 297:16

---

**V**

**vague** 296:10 297:8
298:19 307:24 315:8
316:12 323:2 330:21
344:16 346:2 347:11
350:12 356:11 357:3,
12 363:7 364:15
365:22 367:15
369:15 373:20 378:5

**valuable** 303:8

**version** 374:10

**versions** 369:16,19

**vetting** 318:12,20

**view** 348:20 363:9

**views** 367:12 368:3,
11

**voting--again** 353:2

---

**W**

**wait** 311:12,13

**wanted** 290:5 342:19
343:17 348:25 350:2

**wedding** 297:22

**week's** 289:15

**weeks** 327:17

**WHEREOF** 381:13

**withdraw** 325:25
328:19,25 337:2
367:13 368:3

**withdrawal** 326:17

**withdrawing** 324:10
329:5

**withdrawn** 295:12
298:15 301:2 303:25

305:10 306:15 313:9,
11 316:4,6 320:7
322:5 324:7 346:7
352:6 354:8 358:24
365:23 374:7

**withdrew** 324:2,6
326:12

**word** 330:22 341:10
349:10 365:13

**words** 329:14 365:14

**work** 371:8 376:22
377:15 378:21

**work-product**
371:3,15,16 372:19
373:3,25 374:15
375:9,21 378:9

**worked** 347:14
354:22

**working** 363:11

**works** 305:24 353:3

**world** 308:22 309:9
344:14 345:22
377:24

**write** 349:23

**written** 356:24 357:7

**wrong** 365:4

---

**Y**

**years** 293:17,19
296:17 299:3 301:24
331:16

**York** 363:15 381:20

# EXHIBIT 98

1          DONDERO - 10/29/21

2    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION
   -------------------------------
4   IN RE:

5                     Chapter 11
    HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,        CASE NO.
                      19-34054-SGI11
7
          Debtor.
8   -------------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10  vs.                    Adversary
                     Proceeding No.
11   JAMES D. DONDERO,           21-03003-sgi

12          Defendant.
   -------------------------------
13

14       REMOTE VIDEOTAPED DEPOSITION OF

15         JAMES DONDERO - VOLUME 2

16             October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874

Page 284

1  DONDERO - 10/29/21

2

3

4        October 29, 2021

5        10:21 a.m.

6

7

8

9    Remote Deposition of JAMES DONDERO, held

10  before Susan S. Klinger, a Registered Merit

11  Reporter and Certified Realtime Reporter of the

12  State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 285

1  DONDERO - 10/29/21

2  A P P E A R A N C E S:

3  (All appearances via Zoom.)

4  Attorneys for the Reorganized Highland Capital

5  Management:

6      John Morris, Esq.

7      Hayley Winograd, Esq.

8      Gregory Demo, Esq.

9    PACHULSKI STANG ZIEHL & JONES

10    780 Third Avenue

11    New York, New York 10017

12

13  Attorneys for NexPoint Advisors, LP and

14  Highland Capital Management Fund Advisors,

15  L.P.:

16      Davor Rukavina, Esq.

17      Thomas Berghman, Esq.

18    MUNSCH HARDT KOPF & HARR

19    500 North Akard Street

20    Dallas, Texas 75201

21

22

23

24

25

Page 286

1  DONDERO - 10/29/21

2  Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3  and HCMS:

4      Deborah Deitsch-Perez, Esq.

5      Michael Aigen, Esq.

6    STINSON

7    3102 Oak Lawn Avenue

8    Dallas, Texas 75219

9

10  Attorneys for Dugaboy Investment Trust:

11      Douglas Draper, Esq.

12      Michael Landis, Esq.

13    HELLER, DRAPER & HORN

14    650 Poydras Street

15    New Orleans, Louisiana 70130

16  Attorneys for Marc Kirschner as the trustee for

17  the litigation SunTrust:

18      Deborah Newman, Esq.

19    QUINN EMANUEL URQUHART & SULLIVAN

20    51 Madison Avenue

21    New York, New York 10010

22  Also Present:

23      Dan Elms

24      Aaron Lawrence

25      Patricia Jeffries, Pachulski Stang

Page 287

1  DONDERO - 10/29/21

2      I N D E X

3  WITNESS                    PAGE

4  JAMES DONDERO

5  EXAMINATION BY MR. MORRIS          289

6      E X H I B I T S

7  No.                    Page

8  Exhibit 1  Original Complaint    466

9  Exhibit 2  NexPoint Complaint    408

10  Exhibit 3  HCMS Complaint    433

11  Exhibit 4  Letter, 12/3/20    464

12  Exhibit 6  Term note    446

13  Exhibit 15 NexPoint Advisors Answer    380

14  Exhibit 16 HCMS's Answer    362

15  Exhibit 17 HCRE's Answer    377

16  Exhibit 31 Answer to Complaint    354

17  Exhibit 35 Incumbency Certificate    309

18  Exhibit 37 Incumbency Certificate    323

19  Exhibit 47 NexPoint 30(b)(6) notice    345

20  Exhibit 48 HCMS 30(b)(6) notice    353

21  Exhibit 49 HCRE 30(b)(6) notice    354

22

23

24

25

Page 288

DONDERO - 10/29/21

1      PROCEEDINGS
2      VIDEOGRAPHER: This marks the
3  beginning of Video 1 in Volume 2 of the
4  deposition of James Dondero in the matter
5  In Re: Highland Capital Management, L.P.
6  Today's date is October 29, 2021. The time
7  on the video monitor is 10:21 a.m.
8      Will the court reporter please swear
9  in the witness.
10      JAMES DONDERO,
11  having been first duly sworn, testified as
12  follows:
13      MR. MORRIS: Deborah, would you like
14  to make a statement?
15      MS. DEITSCH-PEREZ: I didn't know if
16  you wanted appearances first. Sure. This
17  is Deborah Deitsch-Perez from Stinson. I'm
18  counsel for Mr. Dondero, Nancy Dondero,
19  HCRE and HCMS in this deposition.
20      I want to apologize for everybody
21  that we're starting late. Mr. Dondero was
22  under the weather. It is -- he has taken
23  something, so he should not have to leave
24  the deposition, but if at any point he

Page 289

DONDERO - 10/29/21

1  looks green to me, I will ask that we stop
2  and reconvene when he is not feeling
3  nauseous.
4      MR. MORRIS: All right. I would
5  like to just begin here. We have counsel
6  on the line for all of the defendants, we
7  have counsel for the plaintiff, and we have
8  counsel for the Highland Litigation Trust,
9  and I think that that is everybody who
10  is -- is supposed to be here, so I would
11  like to just begin.
12      EXAMINATION
13  BY MR. MORRIS:
14      Q. Mr. Dondero, can you hear me okay?
15      A. Yes.
16      Q. Okay. And are you feeling well
17  enough to begin today's deposition?
18      A. Yes.
19      Q. Okay. I understand that you are not
20  feeling well. And I want you to know that I do
21  not want to proceed with this deposition unless
22  you believe that you are physically and
23  mentally able to participate to the best of
24  your ability. Okay? Do you understand that?

Page 290

DONDERO - 10/29/21

1      A. Yes.
2      Q. So if at any time you don't feel
3  like you can continue, I would rather adjourn
4  to one day next week to complete the deposition
5  rather than forcing you to do something that
6  you don't believe you're capable of doing.
7  Okay?
8      A. Yes. Yes. I did throw up twice
9  last night.
10      Q. Okay.
11      A. I imagine we could go for -- let's
12  shoot for four hours today, you know, maybe --
13  maybe five, I don't know, but if we don't
14  finish --
15      Q. I don't want to --
16      A. -- we will do the rest next week.
17      Q. Okay. I don't want to put an
18  arbitrary time on it. You tell me if you are
19  unable to continue. Okay? Is that fair?
20      A. Yes. That is my estimate at this
21  point.
22      Q. Okay. You founded Highland Capital
23  Management, L.P.; correct?
24      A. Yes.

Page 291

DONDERO - 10/29/21

1      Q. And we are going to refer to that
2  entity and that entity only today as Highland;
3  is that okay?
4      A. Yes.
5      Q. When did you found -- when did you
6  create Highland?
7      A. '94.
8      Q. And did you serve as Highland's
9  president from 1994 until on or around January
10  9th, 2020?
11      A. Yes.
12      Q. Did -- can you describe in your own
13  words what the business of Highland was while
14  you were president?
15      A. We were largely below investment
16  grade, credit strap, and we diversified over
17  the years to become more of an alternative
18  asset manager in a variety of formats.
19      Q. And --
20      MS. DEITSCH-PEREZ: I'm sorry, John,
21  one sec. This was set up by someone a lot
22  shorter than Mr. Dondero. Let me just take
23  one minute to adjust it.
24      MR. MORRIS: May I proceed, Deborah?

Appx. 01743

1          DONDERO - 10/29/21
2          MS. DEITSCH-PEREZ:  (Nods head.)
3      Q.    Okay.  Mr. Dondero, at its peak,
4   what is the -- the largest value of assets that
5   Highland had under management while you were
6   president?
7      A.    35 billion.
8      Q.    And do you recall what year that
9   was?
10      A.    Not exactly.
11      Q.    Was it before the 2008 financial
12   crisis?
13      A.    Yes.
14      Q.    Okay.  So you were the president of
15   Highland for about 25 years; is that right?
16      A.    Yes, 25, 26, whatever.
17      Q.    And do you consider yourself to be
18   expert in the area of money management?
19      A.    Yeah, on the things that we focus
20   on.
21      Q.    You are a sophisticated investor;
22   right?
23      A.    Yes.  I would believe I'm
24   categorized as such.
25      Q.    And you are a sophisticated money

1          DONDERO - 10/29/21
2   manager; is that fair?
3      A.    Yes.
4      Q.    And you manage money on behalf of
5   thousands of people; isn't that right?
6      A.    Yes.
7      Q.    And as a general matter, you know
8   how to read and understand balance sheets,
9   don't you?
10      A.    Yes.
11      Q.    You have signed promissory --
12   promissory notes before, haven't you?
13      A.    Yes.
14      Q.    Is it fair to say you have signed
15   hundreds of promissory notes during the 25-year
16   period that you were the president of Highland?
17      A.    No.
18      Q.    Is it fair to say that you signed
19   dozens of promissory notes during the time that
20   you were president of Highland?
21      A.    Yeah, dozens is probably fair.
22      Q.    Okay.  And is it fair to say that
23   the aggregate principal amount of the
24   promissory notes that you signed while you were
25   president of Highland likely exceeded

1          DONDERO - 10/29/21
2   $200 million?
3          MS. DEITSCH-PEREZ:  Objection to the
4      form.
5      A.    I don't have a basis for knowing
6   that.
7      Q.    You do know that it is more than
8   $100 million, don't you?
9      A.    No.
10      Q.    Do you owe today Highland Capital
11   Management Services more than $75 million?
12      A.    I don't know what the amount is.  I
13   don't believe it is that much.
14      Q.    Are the obligations to Highland
15   Capital --
16          MS. DEITSCH-PEREZ:  Hold on.  Hold
17      on.  My connection just disappeared.
18          MR. MORRIS:  Okay.
19          MS. DEITSCH-PEREZ:  Okay, I'm back.
20      Q.    Okay.  Did the -- did the
21   obligations that you have to Highland Capital
22   Management Services, are they reflected in
23   promissory notes?
24          MS. DEITSCH-PEREZ:  Could you repeat
25      that question?

1          DONDERO - 10/29/21
2          MR. MORRIS:  Sure.
3      Q.    Mr. Dondero, you borrowed money from
4   Highland Capital Management Services; correct?
5      A.    I'm sorry, it sounds like at first
6   you were asking me, did Highland Capital
7   Services borrow money from Highland.  Now
8   you're asking me if I borrowed money from
9   Services?
10      Q.    Yeah, let me -- let me rephrase the
11   question, sir, because if it is not clear, that
12   is my fault, and I apologize.
13          Did you -- have you borrowed money
14   from Highland Capital Management Services?
15      A.    I believe so.
16      Q.    Okay.  Do you know the aggregate
17   principal amount that is outstanding today,
18   ballpark?
19      A.    No.
20      Q.    Are the obligations that you have to
21   Highland Capital Management Services reflected
22   in promissory notes where you're the maker and
23   Highland Capital Management Services is the
24   payee?
25      A.    Please repeat that question.

DONDERO - 10/29/21

1
2     Q.   Are you the maker on promissory
3  notes in favor of Highland Capital Management
4  Services, Inc.?
5     A.   I don't know.  I believe -- I
6  believe so, or I believe I have in the past,
7  but I don't know.
8     Q.   Do you have any -- any estimate as
9  to how much money you owe Highland Capital
10 Management Services, Inc. today?
11       MS. DEITSCH-PEREZ:  Asked and
12    answered.
13    A.   No.
14    Q.   Can you say if it is more or less
15 than $50 million?
16    A.   I don't know.
17    Q.   Can you say if it is more or less
18 than $25 million?
19    A.   I don't know.
20    Q.   As a general matter, is it fair to
21 say that you know how to read and understand
22 promissory notes?
23       MS. DEITSCH-PEREZ:  Object to the
24    form.
25    A.   In general, yes.

DONDERO - 10/29/21

1
2     Q.   Okay.  When you were in control of
3  Highland, you personally decided who was hired
4  at that company; is that fair?
5     A.   Sometimes, in senior positions.
6     Q.   Okay.  Did your duties as president
7  of Highland include being familiar with the
8  debts and obligations that were owed to
9  Highland?
10       MS. DEITSCH-PEREZ:  Object to the
11    form.
12    A.   I mean, generally.
13    Q.   Okay.  Did you ever do anything to
14 familiarize yourself with the debts and
15 obligations that were owed to Highland?
16    A.   Are you referring to the affiliated
17 notes or --
18    Q.   Sure.
19    A.   -- or what -- what are --
20    Q.   I was -- I was asking -- I
21 apologize.  I don't mean to step on your words.
22    A.   No, you just -- because I don't
23 think Highland had a lot of other obligations
24 due from other parties, and the affiliated
25 notes in aggregate were always de minimis to

DONDERO - 10/29/21

1
2  Highland than now, at any time.
3     Q.   It is your -- it is your position
4  that the affiliate notes to Highland were de
5  minimis in amount?
6     A.   Yes.
7     Q.   And how do you define de minimus for
8  that purpose?
9     A.   I believe the balance sheet of
10 Highland today for the last three years, four
11 years, five years has been between 5 and
12 $600 million.  I believe the notes have never
13 been more than 8 or 10 or 12 percent of that
14 number.
15    Q.   And you believe that 8 or 10 or
16 12 percent of Highland's asset base you
17 would -- you would define as de minimis?
18    A.   Yes.
19    Q.   Okay.  As -- as president of
20 Highland, did you ever do anything to
21 familiarize yourself with the number and amount
22 of affiliate loans that Highland carried on its
23 books and records?
24    A.   Not that I can recall.
25    Q.   Was there anybody at Highland who

DONDERO - 10/29/21

1
2  was charged with the responsibility of knowing
3  the number and amount of affiliate loans that
4  Highland carried on its balance sheet?
5     A.   Sure.
6     Q.   Can you identify the people who were
7  responsible for that?
8     A.   The people in accounting responsible
9  for tracking assets and liabilities in
10 preparing all the audited financial statements
11 every year and the quarterly unaudited
12 financial statements that were prepared and the
13 monthly operating reports.
14    Q.   Can you -- can you name any names of
15 the people who had the responsibilities that
16 you just described?
17    A.   I think it changed regularly, but it
18 would have been people in Frank's group in
19 accounting.
20    Q.   Did Frank have any responsibility
21 for knowing and understanding the affiliate
22 loans that Highland carried on its balance
23 sheet?
24    A.   Sure.  I -- as CFO he had to sign
25 off on the audited financials and rep letters

DONDERO - 10/29/21

1  and – yes.
2  Q.   And can you -- can you identify the
3  name of any person in the accounting group in,
4  let's say, the three years prior to the
5  bankruptcy who had responsibility for knowing
6  and understanding the scope of affiliate loans
7  that Highland carried on its balance sheet?
8  A.   No, I would just be speculating but
9  it would be -- the senior people in Frank's
10  group would be responsible for the financial
11  statements.
12  Q.   Are you able to name the people, the
13  senior people in Frank's group in the couple of
14  years prior to the bankruptcy?
15  A.   Yes, but I don't know -- like
16  David Klos was a senior person, Cliff Stoops
17  was a senior person. There were a couple
18  up-and-comers below them, but who did the
19  financials -- how Frank assigned the work in
20  his group, I have no idea.
21  Q.   Did you ever ask?
22  A.   No.
23  Q.   Do you have any knowledge as you sit
24  here today who within Frank's group had

DONDERO - 10/29/21

1  responsibility for knowing and understanding
2  the affiliate loans that Highland carried on
3  its balance sheets?
4  A.   No.
5  Q.   And to the best of your knowledge as
6  you sit here today, you never personally did
7  anything to know and understand the extent and
8  scope of the affiliate loans that Highland
9  carried on its balance sheet; is that right?
10  A.   Correct.
11  Q.   Okay. You appointed Mr. Waterhouse
12  as Highland's CFO; is that right?
13  A.   I think it was appointed and
14  recommended by Patrick Boyce, but I agreed with
15  the selection.
16  Q.   And you --
17  A.   That -- (speaking simultaneously.)
18  Q.   I apologize, are you done?
19  A.   I'm just saying that was a long time
20  ago, but I don't remember the details exactly.
21  Q.   But you had the authority and you
22  used that authority to appoint Frank as CFO;
23  correct?
24  MS. DEITSCH-PEREZ: There's a lag in

DONDERO - 10/29/21

1  the video. I don't know if it matters, but
2  for a while Jim was frozen. And I know
3  because -- since there was voice and no --
4  his mouth wasn't moving. So let's just --
5  if the videographer sees there is a
6  problem, please let us know.
7  Q.   I --
8  A.   Yes. I'm sorry, could you just
9  repeat the question regarding Frank, please?
10  Q.   Sure.
11  As the president of Highland, did
12  you have the authority and did you exercise
13  that authority to appoint him as Highland's
14  CFO?
15  A.   Yes.
16  Q.   Okay. Do you recall when you
17  appointed Mr. Waterhouse CFO of Highland?
18  A.   No.
19  Q.   Was it more than five years prior to
20  the bankruptcy?
21  A.   Yes.
22  Q.   As the president -- during the time
23  that you served as president of Highland, did
24  you believe that Mr. Waterhouse fulfilled his

DONDERO - 10/29/21

1  duties as chief financial officer?
2  A.   Yes.
3  Q.   Can you recall anything that
4  Mr. Waterhouse did in his capacity as
5  Highland's CFO that did not comport with your
6  expectations?
7  A.   I think we will talk about some of
8  those today.
9  Q.   Okay. Do you have any reason to
10  believe that Mr. Waterhouse ever breached his
11  duties to Highland during the time that you
12  served as president?
13  COURT REPORTER: We can't hear you
14  speaking.
15  Q.   We haven't heard any portion of your
16  answer, Mr. Dondero.
17  MR. MORRIS: I don't know if people
18  can -- can hear it, but I cannot hear
19  Mr. Dondero.
20  COURT REPORTER: I can't either.
21  MR. MORRIS: Yeah, Deborah, can you
22  speak, please.
23  COURT REPORTER: They're on the same
24  speaker.

1    DONDERO - 10/29/21
2    VIDEOGRAPHER: Do we want to go off
3  the record?
4    MR. MORRIS: Yes, please.
5    VIDEOGRAPHER: Off the record,
6  10:41.
7  (Recess taken 10:41 a.m. to 10:47 a.m.)
8    VIDEOGRAPHER: Back on the record,
9  10:47.
10    Q.    Okay. Let me just ask the question
11  again so the record is clean, Mr. Dondero.
12    Do you have any reason to believe as
13  you sit here right now that Mr. Waterhouse ever
14  breached his duties to Highland during the time
15  that you served as president?
16    MS. DEITSCH-PEREZ: Asked and
17    answered.
18    A.    Yeah, I think I did ask and answer
19  that. Again, not intentionally, not
20  maliciously. I am -- I guess things we're
21  going to talk about today are for periods of
22  time after I was president, so...
23    Q.    Right. That is going to be the next
24  question that I ask. But to be clear -- I just
25  want to have a clear record -- during the time

1  that you were president, do you have any reason
2  to believe that Mr. Waterhouse breached his
3  duties to Highland?
4    MS. DEITSCH-PEREZ: Asked and
5    answered. This is the third time.
6    A.    No.
7    MR. MORRIS: It is actually not.
8    Q.    But thank you, Mr. Dondero. I
9  appreciate that.
10    After you ceased to be president of
11  Highland, do you have any reason to believe
12  that Mr. Waterhouse breached his duties to
13  Highland?
14    A.    Breached his duties to -- I don't --
15  I don't know if it is -- I don't want to -- I
16  don't want to make a judgment overall. When we
17  talk about the notes we can make conclusions
18  then.
19    Q.    All right. But you're not able to
20  tell me in response to my question whether you
21  believe today that Mr. Waterhouse breached his
22  duties to Highland after the time that you
23  served as president?
24    MS. DEITSCH-PEREZ: Object to the

1    DONDERO - 10/29/21
2  form of the question.
3    A.    I don't want to comment off the top
4  of my head, but I've highlighted that we will
5  discuss it around the note issue.
6    Q.    Okay. You are familiar with an
7  entity called Highland Capital Management Fund
8  Advisors, L.P.; is that correct?
9    A.    Yes.
10    Q.    And we're going to refer to that
11  entity as HCMFA. Is that okay?
12    A.    Yes.
13    Q.    Do you know who owns HCMFA?
14    A.    I believe it is myself and
15  Mark Okada.
16    Q.    Okay. And do you have an
17  understanding as to -- as to the percentage of
18  each of your interests, ownership interests in
19  HCMFA?
20    A.    No, and I don't know the entities.
21  I don't know if I own it directly or through
22  Dugaboy. And I do believe Okada tends to use
23  his trusts, but I don't know the percentages
24  either.
25    Q.    Do you own a -- do you own a

1    DONDERO - 10/29/21
2  major- -- withdrawn.
3    Do you directly or indirectly own a
4  majority of the ownership interests in HCMFA?
5    A.    I believe so.
6    Q.    Okay. And do you control HCMFA?
7    A.    Yes.
8    Q.    And do you know when HCMFA was
9  created?
10    A.    No, I do not.
11    Q.    Do you know if it was before or
12  after 2010?
13    A.    I don't know.
14    Q.    Have you controlled HCMFA since the
15  time it was created?
16    A.    I believe so, but I don't know for
17  sure.
18    Q.    Can you think of any period of time
19  when you didn't control HCMFA?
20    A.    I don't know. I don't remember the
21  ownership structure prior and I don't remember
22  when it started, so I don't know.
23    Q.    Okay. I'm asking about control and
24  not ownership.
25    Can you think of any period of time

DONDERO - 10/29/21

1
2 when you did not control HCMFA?
3    A.   I don't know.
4    Q.   Okay. Can you tell me what the
5 nature of HCMFA's business is?
6    A.   It largely housed our mutual funds.
7    Q.   What does it mean to house mutual
8 funds?
9    A.   It managed -- it managed the mutual
10 funds from a portfolio asset side and captured
11 the management fees as the advisor or sub
12 advisor -- I can't remember the structure. I
13 can't remember if it was the advisor and
14 Highland was the sub advisor or vice versa, but
15 in general, a good portion, or most of the
16 portfolio team that managed the mutual funds
17 was employed at HCMFA.
18    Q.   Do you have a title with HCMFA
19 today?
20    A.   I don't know.
21    Q.   Do you know who the president of
22 HCMFA is?
23    A.   I would believe -- I would -- I
24 would think I am, but I don't know.
25    Q.   Do you know of any title that you

DONDERO - 10/29/21

1
2 have at HCMFA today?
3    A.   I know I'm the portfolio manager on
4 a bunch of the funds, one of usually two or
5 three portfolio managers, and I believe I'm the
6 president, but I don't know beyond that.
7    Q.   Okay. Did Frank Waterhouse serve as
8 treasurer of HCMFA at any point in time?
9    A.   I don't know. I don't know. I
10 just -- I don't know. I don't remember.
11    MR. MORRIS:  Can I ask my -- my
12 colleague to please put up a document that
13 was premarked as Exhibit 35 to see if I can
14 refresh your recollection.
15    MS. DEITSCH-PEREZ:  Is that in the
16 book that you sent over?
17    MR. MORRIS:  No. She will post it
18 and she will put it in the chat room.
19    Q.   Are you able to see that,
20 Mr. Dondero?
21    A.   Yes.
22    Q.   Can you see that this is an
23 incumbency certificate?
24    A.   Yes.
25    Q.   Do you know what an incumbency

DONDERO - 10/29/21

1
2 certificate is?
3    A.   I'm reading it here for a second. I
4 guess it is an officer statement or signature
5 authority, or some combination thereof.
6    Q.   Is that your signature at the bottom
7 of this document?
8    A.   Yes.
9    Q.   And do you see that this is an
10 incumbency certificate for HCMFA that you
11 signed effective as of April 11th, 2019?
12    A.   Yes.
13    Q.   Do you see that Frank Waterhouse is
14 identified as the treasurer of HCMFA as of that
15 date?
16    A.   Yes.
17    Q.   Does that refresh your recollection
18 that Mr. Waterhouse served as the treasurer of
19 HCMFA?
20    A.   It seems to be an authoritative
21 document, but I didn't have a recollection.
22    Q.   Do you know of anybody else who has
23 ever served as the treasurer of HCMFA other
24 than Mr. Waterhouse?
25    A.   I don't recall.

DONDERO - 10/29/21

1
2    Q.   Did you, in your capacity as the
3 person who was in control of HCMFA, appoint
4 Mr. Waterhouse as the treasurer of that entity?
5    MS. DEITSCH-PEREZ:  Object to the
6 form.
7    A.   It appears to me that that's what
8 this incumbency certificate does, but...
9    Q.   Is it fair to say that you knew for
10 at least a few years prior to the petition date
11 that Mr. Waterhouse was simultaneously serving
12 as Highland's CFO and HCMFA's treasurer?
13    A.   No. I mean, like I said, I don't
14 remember, and a lot of the officers had
15 multiple roles and multiple entities. I mean,
16 it is not surprising, but I didn't have any
17 recollection.
18    Q.   Are you aware that Mr. Waterhouse
19 served in any capacity in the Highland universe
20 of companies other than as CFO of Highland
21 Capital Management, L.P.?
22    A.   I would -- I would assume he would
23 have a position like this in multiple other
24 entities, but I don't know which ones or what
25 titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

1
2  Q.  Is it fair to say, though, that he
3  wouldn't have obtained any of those titles
4  without your knowledge and approval?
5  A.  It is -- it is fair to say he was --
6  he had -- the lawyers or whoever worked on
7  general corporate structuring, Frank was a
8  senior officer in good standing, so they would
9  have used him as appropriate in different
10  things.
11  So to that extent, I guess I approve
12  it, but I sign hundreds of things like this.
13  Would -- you know, would I have been
14  specifically aware or remember -- remember it
15  is a very low likelihood.
16  Q.  Is there any position that
17  Mr. Waterhouse has ever held that you learned
18  about and you objected to on the grounds that
19  you hadn't approved it?
20  A.  No, not that I recall.
21  Q.  Okay.  Do you know if Mr. Waterhouse
22  held any positions with any of the retail
23  funds?
24  A.  I don't know.
25  Q.  He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

1
2  is that right?
3  A.  That is correct.
4  Q.  And you can't identify any title
5  that Mr. Waterhouse held during the time that
6  you served as Highland's president other than
7  CFO of Highland.  Do I have that right?
8  A.  No, I don't think that is fair.
9  Q.  Okay.
10  A.  I mean -- I mean, he was CFO, but he
11  was other things before he was CFO.  And as we
12  were just saying, he's -- he's treasurer on
13  this incumbency certificate, but I think he
14  might have been on other incumbency
15  certificates, so I think your -- your summary
16  was too narrow.
17  Q.  Okay.  Can you identify any position
18  that Mr. Waterhouse held at the same time that
19  he is CFO of Highland other than treasurer of
20  HCMFA as reflected on this document?
21  A.  I can't recall, but I imagine there
22  to be others.
23  Q.  And to the extent there are others,
24  is it fair to say that you knew at the time
25  that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

1
2  one role?
3  A.  Yes.
4  Q.  Okay.  And in his capacity as CFO of
5  Highland, did he report directly to you?
6  A.  Yes.
7  Q.  In his capacity as treasurer of
8  HCMFA, did he report directly to you?
9  A.  Yeah, it appears that, yes, that is
10  how it was structured.
11  Q.  Can you think of any position that
12  Mr. Waterhouse ever held in the Highland family
13  of companies where he didn't report directly to
14  you?
15  A.  I can't -- I can't think of any.
16  Q.  Is Mr. Waterhouse the treasurer of
17  HCMFA today?
18  A.  I don't know.  I'm not aware of any
19  changes, nor did I orchestrate any changes, but
20  I don't know for sure.
21  Q.  Can you identify any position that
22  Mr. Waterhouse holds with any former affiliated
23  company of Highland today?
24  A.  Again, I'm not aware of any changes,
25  nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

1
2  changes.  With the formation of Skyview, I
3  don't know if there was changes.  I'm not
4  aware.
5  Q.  Have you considered firing
6  Mr. Waterhouse from any of the positions that
7  he holds with any of the companies that were
8  formerly affiliated with Highland?
9  A.  No.
10  Q.  As the president of HCMFA --
11  withdrawn.
12  As the person who was in control of
13  HCMFA, did you have any responsibility for
14  being familiar with HCMFA's debts and
15  obligations?
16  MS. DEITSCH-PEREZ:  Object to the
17  form.
18  A.  I don't know.
19  Q.  Did you ever do anything in your
20  capacity as the person in control of HCMFA to
21  familiarize yourself with HCMFA's debts and
22  obligations?
23  A.  Not during -- I mean, not prior to
24  bankruptcy.
25  Q.  So before the bankruptcy, you didn't

DONDERO - 10/29/21

1
2 take any steps to familiarize yourself with
3 HCMFA's debts and obligations. Do I have that
4 right?
5    A.   Correct, not specifically.
6    Q.   Okay. Who was responsible for
7 knowing and understanding the scope and extent
8 of HCMFA's debts and obligations?
9    A.   That would have fallen on Frank and
10 his group.
11   Q.   Okay. Do you have an understanding
12 as to who was authorized to incur obligations
13 on behalf of HCMFA?
14   A.   I mean, beyond – beyond due course,
15 I struggle to see why it would be anybody other
16 than me, but I don't know.
17   Q.   Do you know if Mr. Waterhouse was
18 authorized as the treasurer of HCMFA to incur
19 obligations on its behalf?
20   A.   He wasn't the senior operating or
21 executive positions there. So the answer is
22 no, beyond, you know – beyond the normal
23 course of operating expenses or whatever, but
24 it would – he would never be the person on
25 anything of significance.

DONDERO - 10/29/21

1
2    Q.   How do you define "significance"?
3    A.   Like waiving fees on a mutual fund,
4 purchasing another mutual fund, yeah, things
5 like that.
6    Q.   Was there any document or policy
7 that you are aware of that specifically
8 identifies the scope of Mr. Waterhouse's
9 authority as the treasurer of HCMFA?
10   A.   No.
11   Q.   Is there anything that you are aware
12 of that specifically limits Mr. Waterhouse's
13 authority other than what might be in your
14 head?
15   A.   No, I would – I would say what is
16 in my head is – would be typical industry
17 practice. You wouldn't – you wouldn't have
18 executive vice presidents or ownership defined
19 if you were going to delegate everything to an
20 employee three levels down, you know.
21        MS. DEITSCH-PEREZ:  Okay. John,
22 I've had a request from Davor to take a
23 quick restroom break, so –
24        MR. MORRIS:  You know, I really –
25 Davor, I'm happy to accommodate, but at

DONDERO - 10/29/21

1
2 some point we have got to be able to get
3 more than 10 minutes of testimony in a row.
4 So let's take a short break.
5        MS. DEITSCH-PEREZ:  Thank you.
6        VIDEOGRAPHER:  Going off the record.
7 The time is 11:08.
8 (Recess taken 11:08 a.m. to 11:16 a.m.)
9        VIDEOGRAPHER:  Back on the record,
10 11:16.
11   Q.   Mr. Dondero, did you communicate
12 with anybody on the break about the substance
13 of your testimony?
14   A.   No.
15   Q.   As treasurer of HCMFA, did
16 Mr. Waterhouse's responsibilities include being
17 familiar with HCMFA's debts and obligations?
18   A.   Yes.
19   Q.   Do you have any reason to believe as
20 you sit here today that Mr. Waterhouse failed
21 to fulfill his responsibilities as treasurer of
22 HCMFA and familiarize himself with their debts
23 and responsibilities?
24        MS. DEITSCH-PEREZ:  Object to the
25 form.

DONDERO - 10/29/21

1
2    A.   I don't know.
3    Q.   I appreciate that you don't know,
4 but do you have any reason as you sit here
5 today to believe that he failed to fulfill that
6 particular responsibility?
7    A.   I don't know.
8    Q.   Okay. Are you an authorized
9 signatory on HCMFA's bank accounts?
10   A.   I don't know.
11   Q.   Do you know who the authorized
12 signatories are on HCMFA's bank accounts?
13   A.   No.
14   Q.   Do you know whether anybody now
15 employed or previously employed by Highland was
16 an authorized signatory with respect to any of
17 HCMFA's bank accounts?
18   A.   I don't know.
19   Q.   Do you know whether Mr. Waterhouse
20 was an authorized signatory on any of HCMFA's
21 bank accounts?
22   A.   I don't know how he had – had it
23 set up. There would have been, I imagine,
24 checks and balances. We run, as far as I know,
25 a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1 the right audit controls, et cetera. So I
2 would imagine there would have been somebody
3 preparing it and multiple signatures or
4 multiple sign-offs on wires, but I have no
5 awareness of this. I mean, I would believe
6 that it was done compliantly and correctly, but
7 I don't have any specific awareness.
8     Q.   Okay. Do you know Lauren Thedford?
9     A.   Yes.
10    Q.   And was Ms. Thedford an employee of
11 Highland at one time?
12    A.   Yes.
13    Q.   Do you recall what position she held
14 at any particular point in time?
15    A.   I believe she held several different
16 positions over the years, but I remember most
17 as a corporate attorney working on document --
18 documents when we -- we do new funds or amend
19 old funds.
20    Q.   Okay. Do you recall whether she
21 served as an officer of HCMFA?
22    A.   Wasn't her name on the incumbency
23 certificate we had up earlier?
24    Q.   It was. We can put it back up if

Page 321

DONDERO - 10/29/21

1 you want to look at that.
2     A.   No, but I think that is -- that is
3 the answer, but that is my only awareness.
4     Q.   Okay. Do you have -- do you have --
5 do you know whether she was ever appointed to
6 any position within the Highland corporate
7 family other than as an attorney with Highland
8 and as the secretary of HCMFA?
9     A.   I don't know.
10    Q.   Other than Ms. Waterhouse --
11 withdrawn.
12         Other than Mr. Waterhouse and
13 Ms. Thedford, can you identify any current or
14 former employee of Highland that ever served as
15 an officer of HCMFA?
16    A.   I don't know.
17    Q.   Okay. Can you identify any current
18 or former employee of Highland who was
19 simultaneously also an employee of HCMFA?
20    MS. DEITSCH-PEREZ: Object to the
21 form.
22    A.   You mean somebody who was a dual
23 employee?
24    Q.   Yeah, who was actually -- yeah, to

Page 322

DONDERO - 10/29/21

1 be clear, who was actually employed by both,
2 who received, you know, income from both.
3     A.   I don't know regarding income, but
4 some of that historic portfolio managers like
5 Michael Gregory or Jonathan Lamensdorf, they
6 did work for HCMFA primarily, but they also did
7 other things for Highland. I don't know how
8 their compensation or their bonuses were split.
9 I just -- I wouldn't have awareness of that.
10    Q.   Let's move on to NexPoint. You're
11 familiar with an entity called NexPoint
12 Advisors, L.P.; correct?
13    A.   Yes.
14    Q.   We will refer to that as NexPoint,
15 okay?
16    A.   Sure.
17    Q.   Do you know who owns NexPoint?
18    A.   Directly or indirectly, I believe I
19 do.
20    Q.   Okay. And do you control NexPoint?
21    A.   Yes.
22    Q.   And do you know when NexPoint was
23 created?
24    A.   More than five years ago, but I

Page 323

DONDERO - 10/29/21

1 don't remember when.
2     Q.   Can you tell me generally the nature
3 of NexPoint's business?
4     A.   It is generally real estate related.
5     Q.   Have you controlled NexPoint
6 throughout its corporate existence, to the best
7 of your knowledge?
8     Q.   Do you have a title with NexPoint
9 today?
10    A.   I believe I'm president, but I don't
11 know for sure.
12    Q.   Did you appoint Mr. Waterhouse to
13 serve as treasurer of NexPoint?
14    A.   I don't know.
15    MR. MORRIS: Please put up Exhibit
16 37.
17    Q.   This is another incumbency
18 certificate, sir?
19    A.   Yes.
20    Q.   And do you see, is that your
21 signature at the bottom?
22    A.   Looks like it, yes.
23    Q.   And does that refresh your

Page 324

DONDERO - 10/29/21

1    recollection that you personally identified
2    Mr. Waterhouse as the treasurer of NexPoint
3    Advisors, L.P. effective as of April 11th,
4    2019?
5         A.   No, I mean, not – no.
6         Q.   Do you have any reason to doubt that
7    Mr. Waterhouse served as the treasurer of
8    NexPoint Advisors prior to the petition date?
9         A.   No, I don't have a reason to
10   disagree with it.  I just didn't have an
11   awareness.  And when you asked me earlier, the
12   thing that was running through my mind is that
13   it could have been, you know, Brian Mitts who
14   has a strong accounting background at NexPoint.
15   I just wasn't – I didn't know, based on
16   recollection, who was treasurer.
17        Q.   Okay.  Were you aware that -- but
18   you were aware, were you not, that
19   Mr. Waterhouse wore multiple hats?
20            MS. DEITSCH-PEREZ:  Objection to
21        form.
22        Q.   Withdrawn.
23            You were aware, were you not, sir,
24   that during the time that you served as

Page 325

DONDERO - 10/29/21

1    president of Highland, that Mr. Waterhouse
2    served in capacities with respect to affiliated
3    companies?
4         A.   I was aware that multiple senior
5    executives had multiple titles at multiple
6    different entities, but I didn't have specific
7    awareness whatsoever on entities that Frank was
8    or was not involved in.
9         Q.   Okay.  But to the extent that he
10   held a title with one of the affiliated
11   companies, those affiliated companies would
12   have been managed or controlled by you;
13   correct?
14        A.   Generally.
15        Q.   You can't think of any title that he
16   held with an affiliated company that wasn't
17   managed by you, can you?
18        A.   No, not off the top of my head.
19        Q.   And you knew and intended prior to
20   the petition date to have Mr. Waterhouse serve
21   in multiple roles; is that fair?
22        A.   Yes.
23        Q.   Have you ever considered firing
24   Mr. Waterhouse from his position as treasurer

Page 326

DONDERO - 10/29/21

1    of NexPoint Advisors?
2         A.   No.
3         Q.   Okay.  As the president of NexPoint
4    Advisors, do you believe that you had a
5    responsibility to familiarize yourself with
6    NexPoint's debts and obligations?
7             MS. DEITSCH-PEREZ:  Object to the
8         form.
9         A.   Just generally.
10        Q.   Okay.  Did you do anything to
11   generally inform yourself of NexPoint's debts
12   and obligations?
13        A.   Not – not specifically that I can
14   recall.
15        Q.   Can you recall doing anything to
16   familiarize yourself with NexPoint's debts and
17   obligations at any time?
18            MS. DEITSCH-PEREZ:  Object to the
19        form.
20        A.   Not that I recall.
21        Q.   Did you ever look at NexPoint's
22   balance sheet?
23        A.   Not – not that I – not that I
24   recall.

Page 327

DONDERO - 10/29/21

1         Q.   Do you know whether NexPoint's
2    balance sheet reflected obligations that it
3    carried as liabilities that were due and owing
4    to Highland?
5         A.   I was aware generally of the notes,
6    but I didn't study the NexPoint balance sheet.
7         Q.   Do you believe that Mr. Waterhouse
8    had any responsibility as NexPoint's treasurer
9    to familiarize himself with NexPoint's debts
10   and obligations?
11        A.   Yeah.  I mean, the role is different
12   and the burden is different, and Frank and his
13   team orchestrated all the audits and compliance
14   statements and regulatory stuff for all of the
15   funds managed by NexPoint.
16        Q.   Well, you personally were
17   responsible for Highland's audited financial
18   statements, weren't you?
19            MS. DEITSCH-PEREZ:  Objection, form.
20        A.   No.  I mean, "responsible" is not
21   the right word.  I mean, we – I have to – as
22   the senior most executive, I have to -- to
23   sign -- sign statements regarding completeness
24   and no known frauds and those kinds of things,

DONDERO - 10/29/21

1
2 but I am in no way involved in the preparation.
3    Q.    We will talk about that in a bit.
4        Do you have any reason to believe
5 today that Mr. Waterhouse failed to fulfill his
6 responsibilities as treasurer of NexPoint to
7 familiarize himself with NexPoint's debts and
8 obligations?
9    A.    I don't know.
10    Q.    You can't identify any particular
11 reason that you might have for concluding that
12 Mr. Waterhouse failed to fulfill his duties as
13 treasurer of NexPoint to familiarize himself
14 with NexPoint's duties and respons -- duties
15 and obligations; correct?
16    A.    Yes, I don't know.
17    Q.    Okay.  Do you know who the
18 authorized signatories are on NexPoint's bank
19 accounts?
20    A.    No.
21    Q.    Do you know if you're an authorized
22 signatory on NexPoint's bank accounts?
23    A.    I don't know.
24    Q.    Do you know if Mr. Waterhouse is an
25 authorized signatory on NexPoint's bank

DONDERO - 10/29/21

1
2 accounts?
3    A.    I don't know.
4    Q.    Do you know whether there is any
5 current or former employee of Highland who did
6 not hold an officer position at NexPoint who
7 would have been an authorized signatory on
8 NexPoint's bank accounts?
9        MS. DEITSCH-PEREZ:  Object to the
10 form.
11    A.    I don't know.
12    Q.    Can you identify any current or
13 former employee of Highland who served as an
14 officer of NexPoint at any time other than
15 Ms. Thedford and Mr. Waterhouse?
16    A.    I don't know.
17    Q.    Okay.  Let's go to HCMS.  Are you
18 familiar with an entity called Highland Capital
19 Management Services, Inc.?
20    A.    Generally, yes.
21    Q.    And can we refer to that as HCMS?
22    A.    Yes.
23    Q.    Do you have a direct or indirect
24 ownership interest in HCMS?
25    A.    I believe so.

DONDERO - 10/29/21

1
2    Q.    And do you own a majority of the
3 interest directly or indirectly in HCMS?
4    A.    I believe so.
5    Q.    Do you control HCMS?
6    A.    I believe so.
7    Q.    Have you -- has there ever been a
8 period of time in HCMS's corporate existence
9 where you did not control that entity?
10    A.    Not that I'm aware of.
11    Q.    Do you recall when HCMS was created?
12    A.    More than five years ago, but I
13 don't remember when.
14    Q.    Do you have an understanding of the
15 nature of HCMS's business?
16    A.    It manages some assets, and it was
17 trying to create track records that then could
18 be marketed.
19    Q.    What does it mean to create a track
20 record that could be marketed?
21    A.    You execute investments and
22 investment strategy that you can refine and
23 articulate and show good results to potential
24 third-party investors as -- as evidence that
25 you can do it.  And then that track record is

DONDERO - 10/29/21

1
2 something the investors are willing to take a
3 chance on and then give you separate account
4 money along those lines.
5    Q.    Do you have a title with HCMS today?
6    A.    I don't know.
7    Q.    But you do control the entity; is
8 that fair?
9        MS. DEITSCH-PEREZ:  Object to the
10 form, asked and answered.
11    A.    I believe so.
12    Q.    Okay.  Do you know whether
13 Mr. Waterhouse has ever served as an officer of
14 HCMS?
15    A.    I have no idea.
16    Q.    Can you identify any person in the
17 world who has ever served as an officer of
18 HCMS?
19    A.    I don't know what the incumbency
20 certificate would look like for services, but
21 I'm willing to be refreshed.
22    Q.    Do you know if anybody ever served
23 as the chief -- withdrawn.
24        Did HCMF ever have anybody serve in
25 the capacity of chief financial officer?

1          DONDERO - 10/29/21
2     A.   The subject of that question was
3   HCMF.  Is that what you meant to say, or did
4   you mean Services?
5     Q.   No, I apologize.  Thank you for the
6   clarification.  I did mean HCMS, so let me try
7   again.
8          Has anybody ever served in the
9   capacity of chief financial officer of HCMS?
10    A.   HCMF.
11         MS. DEITSCH-PEREZ:  S.
12    A.   Not --
13    Q.   S.
14    A.   Not of Services -- not that --
15   again, I don't know.  I'm willing to be
16   refreshed, but I -- I have no awareness.
17    Q.   Okay.  As president -- as the person
18   in control of HCMS, do you believe you had any
19   responsibility to familiarize yourself with
20   that entity's debts and obligations?
21    A.   Again, just generally, to the extent
22   that they were material or an issue or
23   whatever, but no more than generally.
24    Q.   Can you describe anything you ever
25   did to generally familiarize yourself with

1          DONDERO - 10/29/21
2   HCMS's debts and obligations?
3     A.   I guess my answer, which would apply
4   to all of these entities, is awareness to know
5   that the amounts were de minimis relative to
6   the value of the entity, and the debt service
7   costs or issues were very de minimis relative
8   to the entities, but beyond that, I didn't
9   study them.
10    Q.   Well, did -- did HCMFA have
11   obligations to HCMLP that you would
12   characterize as di minimis from HCMFA's
13   perspective?
14    A.   Yeah, or just -- it never had
15   obligations that were more than de minimis.
16    Q.   As -- as the person in control of
17   HCMFA, did you ever have any concern that HCMFA
18   would not be able to satisfy its obligations to
19   HCMLP if -- if a demand was made?
20    A.   No.
21    Q.   Okay.  Was anybody charged with the
22   responsibility of familiarizing themselves with
23   HCMS's debts and obligations?
24    A.   Again, to differentiate or separate
25   myself from the treasury function or from what

1          DONDERO - 10/29/21
2   Frank and his group were doing.
3          From my perspective, I had to be
4   aware about it -- aware of any obligations or
5   notes or debt service costs, et cetera, but to
6   the extent that I was aware and knew that it
7   was de minimis, I didn't spend any time
8   focusing on it, studying it, calculating it
9   exactly, or anything like that.
10         Having said that, we are highly
11   compliant.  We do -- we did audits every year
12   with reputable accounting firms that were
13   complete and in depth.  And any obligations
14   and/or assets, de minimis or not, in my view,
15   would nonetheless have to be reflected or
16   captured accurately and prepared for the
17   auditors in supplying, you know, detail or
18   source documents or whatever, whatever they do
19   in accounting as part of the audit function.
20         And all that would have done -- been
21   done exactly and expertly, as far as I know,
22   and it would have been done by Frank and his
23   group.
24    Q.   Okay.
25    A.   That is -- I'm trying to give a

1          DONDERO - 10/29/21
2   complete answer regarding a myriad of ways
3   you've asked me kind of the same structural
4   questions.
5     Q.   I am, and just to be clear, I'm
6   asking kind of the same structural questions
7   with respect to each of the entities at issue.
8   I think you picked up on that.  I hope you
9   don't think I'm being repetitive.
10         You mentioned Frank and his group in
11   the context of HCMS.  Did I hear that
12   correctly?
13    A.   Yes.
14    Q.   Okay.  HCMS did not have a shared
15   services agreement with Highland; correct?
16         MS. DEITSCH-PEREZ:  You mean a
17   written shared services agreement, John?
18    Q.   Do you understand the question, sir?
19    A.   Yeah.  My answer would be the
20   advisors like NexPoint and HFAM that had to
21   have by law and regulatory statute have to have
22   formal sub advisors and shared services
23   agreements had formal shared services
24   agreement.
25         Entities that didn't need to have

DONDERO - 10/29/21

1 formal written shared services agreements were
2 often serviced similarly or -- or exactly the
3 same as those entities, but without a written
4 agreement, but with a verbal shared services
5 agreement providing, again, all the same
6 similar services.
7 And the entities that didn't have a
8 written shared services agreement weren't
9 getting shared services or support from any
10 other entities other than Highland doing the
11 same thing for them that it did for the mutual
12 funds.
13 Q. Okay. Can you tell me who entered
14 into an oral shared services agreement between
15 Highland and HCMS?
16 A. Boy, I can imagine way back in the
17 day it would have been myself and Frank, but he
18 and his group understood and knew that they
19 were doing it for all the new entities that
20 came along, and I can't imagine it was even
21 talked about much over the years.
22 Q. Did -- did HCMFA and NexPoint pay
23 money to Highland under the shared services
24 agreement until let's just say late 2020?

DONDERO - 10/29/21

1 A. Yeah, yes, and early into '21, I
2 believe also.
3 Q. Okay. As -- as part of the oral
4 agreement that you referenced, was there -- was
5 there ever an agreement that HCMS would pay any
6 money to Highland in exchange for the services
7 that Highland provided to it?
8 A. I do not believe there was a
9 financial remuneration aspect of it.
10 Q. Okay. And do you recall during your
11 time as president of Highland whether Highland
12 ever received payment from HCMS for services
13 rendered?
14 MS. DEITSCH-PEREZ: And we just
15 talking about money?
16 MR. MORRIS: Correct.
17 A. Yeah, I don't -- I don't recall
18 moneys being -- well, you know what, let me --
19 let me clarify that a little bit.
20 If there were any direct costs that
21 Highland would have incurred like getting the
22 audits done, you know, like if Price Waterhouse
23 said, okay, give us the details on, you know,
24 all the different entities that roll up into

DONDERO - 10/29/21

1 the Highland entity.
2 And then -- and they prepared
3 statements or did work for services, Frank and
4 his group would have passed through those costs
5 and expected services and/or Dugaboy or any of
6 the other entities to pay for direct
7 out-of-pocket costs. But it wouldn't have paid
8 a supplemental fee or profit or anything to
9 Highland.
10 Q. Okay. To the best of your
11 recollection, during the time that you were
12 president of Highland, did Highland ever
13 receive anything of value from HCMS on account
14 of services other than the reimbursement of
15 out-of-pocket expenses?
16 A. Yeah, I'm going to go back to my
17 comment in terms of building track record. And
18 I would use -- yeah, we had done it several
19 times in the past and it had worked
20 effectively. And that is -- you know, yeah, I
21 mean, the -- the track record in CLO paper was
22 what was used to track -- (inaudible) -- as an
23 investor.
24 And so, you know, to the extent that

DONDERO - 10/29/21

1 the DAF wasn't paying a fee, along the way, to
2 Highland for shared services, Highland got the
3 benefit of the track record that was being
4 built at the DAF to then market to third
5 parties, which then created a revenue stream
6 for Highland down the road.
7 And I would say that was the same
8 intent on Services.
9 Q. Is there anything -- anything else
10 of value that you believe HCMS provided to
11 Highland in exchange for the services that
12 Highland rendered?
13 A. That would be primarily it. I would
14 say there is probably times where Services
15 provided liquidity for Highland or helped on
16 investments that Highland was involved in, but
17 I would have to refresh myself on exactly what.
18 Q. Is it fair to say that HCMF -- HCMS
19 never provided a revenue stream to Highland
20 similar to the revenue stream that was provided
21 by HCMFA and NexPoint under the shared services
22 agreements?
23 A. That is correct.
24 Q. Okay. Did anybody at HCMF --

Page 340

1    DONDERO - 10/29/21
2  withdrawn.
3          Did anybody at HCMS ever have the
4  responsibility for familiarizing themselves
5  with HCMS' debts and obligations?
6          MS. DEITSCH-PEREZ: Object to the
7     form.
8     A.  Frank and his team, as part of
9  preparing the audited financials for all the
10 entities, would have definitively been aware of
11 all of them.  Who else on the services
12 incumbency certificate or -- would be aware or
13 have knowledge, I don't know.
14    Q.  Okay.  And when you refer to "Frank
15 and his team," are any of them acting as an
16 officer or employee of HCMS in what you are
17 thinking about?
18    A.  I -- I don't know.  I don't know.
19 Did -- we haven't -- have we looked at the
20 incumbency certificate for services?
21    Q.  No.
22    A.  I don't know.  I don't know off the
23 top of my head.
24    Q.  Okay.  Let's just finish this up.
25          Can you identify any current or

Page 341

1    DONDERO - 10/29/21
2  former Highland employee who served as an
3  officer of HCMS at any time?
4     A.  No, I would need to be refreshed.
5     Q.  Okay.  Can you identify --
6  withdrawn.  Let's go to the last one, HCRE.
7          Are you familiar with an entity
8  called HCRE Partners, LLC?
9     A.  Yes.
10    Q.  And is that entity now known as
11 NexPoint Real Estate Partners, LLC?
12    A.  You know what, I do believe it had a
13 name change.  I don't know if that is the name
14 change, but that would make sense.
15    Q.  Okay.  Can we just refer to that
16 entity as HCRE?
17    A.  That is fine.
18    Q.  Okay.  Do you have any direct or
19 indirect ownership interest in HCRE?
20    A.  Yes.
21    Q.  And is it a majority interest to the
22 best of your knowledge?
23    A.  Yes.
24    Q.  Do you control HCRE?
25    A.  Yes.

Page 342

1    DONDERO - 10/29/21
2     Q.  Have you controlled HCRE throughout
3  its corporate existence?
4     A.  Yes.
5     Q.  Can you tell me what the nature of
6  HCRE's business is?
7     A.  It makes real estate investments.
8     Q.  Do you have a title with that
9  entity?
10    A.  I don't know, but I'm willing to be
11 refreshed.  And I assume its incumbency
12 certificate looks similar to the ones that you
13 have put up.
14    Q.  Can you identify for me today
15 anybody who has ever served as an officer of
16 HCRE at any time?
17    A.  I would rather be refreshed.  I
18 would imagine myself and Matt McGraner are two
19 of those people, but I don't know for sure.
20    Q.  Okay.  Without the incumbency
21 certificates or other documentation, you are
22 not able to give me any names other than Mr. --
23 other than you and Mr. McGraner; is that fair?
24    A.  That's correct.
25    Q.  Okay.  Do you know whether anybody

Page 343

1    DONDERO - 10/29/21
2  has ever been given the responsibility --
3  withdrawn.
4          Do you know whether anybody has ever
5  had the responsibility for familiarizing
6  themselves with the debts and obligations of
7  HCRE?
8     A.  It would be the same answer as given
9  on the other entities.  It would be the
10 treasurer, which is probably Frank.  And if not
11 the treasurer it would be Frank in his role and
12 his team of putting together the complete and
13 accurate financials of HCRE.
14    Q.  Other than putting together the
15 complete and accurate financials of HCRE, did
16 Frank and his team have any other
17 responsibility with respect to understanding
18 the debts and obligations of HCRE?
19          MS. DEITSCH-PEREZ: Objection, form.
20    A.  Again, just the general overlay
21 being that they were de minimis and -- de
22 minimus, and the service obligations were de
23 minimus relative to the value or operating
24 income of the enterprise.
25          In other words, had they been more

Appx. 01756

Page 344

DONDERO - 10/29/21

1
2  material or material, they would have had more
3  focus. But they didn't deserve more focus.
4      Q.   And so is it fair to say that you
5  didn't do anything to familiarize yourself with
6  HCRE's debts and obligations?
7      MS. DEITSCH-PEREZ: Object to the
8  form.
9      A.   Not on a regular detailed basis, you
10 know, just a general awareness.
11     Q.   Did you ever take any steps to
12 review the affiliate loans and obligations that
13 were due between and among Highland and its
14 affiliated companies?
15     A.   Again, just generally.
16     Q.   What did you do?
17     A.   Like I said, I had a general
18 awareness of them.
19     Q.   And did you receive from time to
20 time lists or information that specifically
21 described the amounts that were due and owing
22 from the affiliates to Highland?
23     A.   Yeah, from time to time the amounts,
24 yes.
25     Q.   Let's just quickly go to the

Page 345

DONDERO - 10/29/21

1
2  30(b)(6) notices if we can.
3      MR. MORRIS: Can we put up a
4  document that has been marked as
5  Exhibit 47.
6      (Exhibit 47 marked.)
7      Q.   Do you understand, Mr. Dondero, that
8  you are here today in your individual capacity
9  and in your capacity as what is called a
10 30(b)(6) witness for certain entities?
11     A.   Yes, a little bit to my chagrin.
12 And I don't think you will see me again as a
13 30(b)(6) witness, but yes.
14     Q.   All right. Well, it wasn't my
15 choice, so let's just go through it quickly.
16     Have you seen this document before,
17 sir?
18     A.   Yes.
19     Q.   And do you understand that you are
20 here today in your capacity as NexPoint's
21 corporate representative?
22     A.   Yes.
23     Q.   And do you understand that your
24 answers today in your capacity as NexPoint's
25 corporate representative will be binding on

Page 346

DONDERO - 10/29/21

1
2  NexPoint?
3      MS. DEITSCH-PEREZ: As qualified by
4  the objections that we made.
5      MR. MORRIS: Sure.
6      A.   I will do the best I can.
7      Q.   Thank you so much.
8      MR. MORRIS: Can we go to the next
9  page, please. The last page. The topics.
10     Q.   Okay. Have you seen these topics
11 before, sir?
12     A.   Yes.
13     Q.   Okay. Do you see that we asked for
14 somebody to testify as to NexPoint's answer?
15     A.   Yes.
16     Q.   Okay. Are you aware that
17 NexPoint -- are you aware that NexPoint filed
18 an answer to Highland's amended complaint?
19     A.   Yes.
20     Q.   And did you review NexPoint's answer
21 at any time before today's deposition?
22     A.   It was in the binder, I believe,
23 that you guys sent over.
24     Q.   I think that's right. Are you
25 prepared to answer questions today about

Page 347

DONDERO - 10/29/21

1
2  NexPoint's answer?
3      MS. DEITSCH-PEREZ: Again, subject
4  to our objection, but...
5      A.   Yeah, to the best I can.
6      Q.   Okay. The next topic concerns
7  affirmative defenses.
8      Do you see that?
9      A.   Yes.
10     Q.   Do you have an understanding of what
11 an affirmative defense is?
12     A.   Yes.
13     Q.   What is your understanding of an
14 affirmative defense?
15     A.   I think it is those -- phrase that
16 you see in most of our answers, the
17 justification, estoppel, waiver, and then --
18 and then there is some specific answers beyond
19 that, I guess.
20     Q.   Okay. Are you prepared --
21     MS. DEITSCH-PEREZ: John, I take it
22 you will show him. He doesn't have to have
23 them memorized.
24     MR. MORRIS: No, of course not.
25     MS. DEITSCH-PEREZ: So if you are

DONDERO - 10/29/21

1 going to ask him, you will put it in front
2 of him?
3     MR. MORRIS:  Of course.
4     MS. DEITSCH-PEREZ:  Thank you.
5     Q.   Are you prepared to testify today to
6 the circumstances, communications, documents,
7 and facts concerning NexPoint's affirmative
8 defenses?
9     A.   Yeah, to the best that I can.
10     Q.   Okay.  Do you see Topic 3 concerns
11 the demand notes?
12     A.   Yes.
13     Q.   Okay.  Are you prepared to testify
14 about the demand notes, including with respect
15 to the specific issues identified in that
16 topic?
17     MS. DEITSCH-PEREZ:  Again, subject
18 to the objections, particularly I think
19 with respect to use of the proceeds.
20     Q.   We will get to that.
21     Are you prepared to testify?
22     A.   I hope so.
23     Q.   And -- and I know that there is an
24 objection there, but just a simple yes or no,

DONDERO - 10/29/21

1 are you -- do you have knowledge of the -- of
2 NexPoint's use of the proceeds of the note?
3     A.   Not specifically.
4     Q.   All right.  Maybe I will refresh
5 your recollection later.
6     And then the last topic is discovery
7 requests.
8     Do you see that?
9     A.   Yes.
10     Q.   Are you prepared to testify today on
11 NexPoint's behalf concerning Highland's
12 discovery requests?
13     A.   To the best of my knowledge.
14     Q.   Okay.  Did you do anything to
15 prepare for today's deposition?
16     A.   I met with Deborah.
17     Q.   When did you do that?
18     A.   A couple of days ago for a couple of
19 hours, and a few days before that for a couple
20 of hours.
21     Q.   How many times --
22     MS. DEITSCH-PEREZ:  Are you also
23 asking about calls?
24     MR. MORRIS:  I appreciate that.

DONDERO - 10/29/21

1     A.   Yeah.  There were a couple of phone
2 calls too.
3     Q.   How many times did you communicate
4 with Deborah in preparation for today's
5 deposition?
6     A.   A half dozen, maybe, you know.
7     Q.   How many times --
8     A.   You know, in-person and phone calls,
9 but...
10     Q.   How many times did you meet with her
11 in-person?
12     A.   Two, maybe three.
13     Q.   And can you just tell me an estimate
14 of the total time spent preparing for this
15 deposition, inclusive of both the meetings and
16 the phone calls?
17     A.   I don't know.  Does it matter?  I
18 mean, I don't know.  I don't know, four hours,
19 four hours.
20     Q.   Okay.  Did anybody participate in
21 these meetings or phone calls other than your
22 lawyers?
23     A.   No.
24     Q.   Did any lawyers participate in any

DONDERO - 10/29/21

1 of these meetings or phone calls who didn't
2 represent you in your individual capacity?
3     A.   No.  It was just -- it was just
4 Deborah and I.
5     Q.   Okay.  Have you had a chance to
6 review the transcript of Mr. Waterhouse's
7 deposition?
8     A.   No.  I haven't seen it yet.
9     Q.   You haven't seen any portion of that
10 deposition?
11     A.   No.
12     Q.   Are you aware of anything that
13 Mr. Waterhouse testified to in his deposition?
14     A.   No.
15     Q.   You have no knowledge of anything
16 that Mr. Waterhouse said last week in his
17 deposition; do I have that right?
18     A.   That's correct.
19     Q.   Okay.  Do you have any knowledge as
20 to anything your sister said in her deposition?
21     A.   No, other than she is glad it is
22 over.
23     Q.   I hope -- I hope -- I hope she
24 thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1
2 Did -- did you ever see her
3 transcript -- the transcript from her
4 deposition?
5 A. No.
6 Q. How about Mr. Seery, did you see the
7 transcript from Mr. Seery's deposition?
8 A. I didn't even know that Seery was
9 deposed, so the answer is no.
10 Q. Okay. Are you aware that Dave Klos
11 was deposed?
12 A. You know what, I think I had
13 awareness of that, but I haven't seen that
14 deposition.
15 Q. Do you know anything about anything
16 that he testified to the other day?
17 A. Nope.
18 Q. How about Kristin -- Kristin
19 Hendrix, are you aware that she was deposed?
20 A. I think I heard that she was also.
21 Q. Do you know anything about anything
22 that she testified to?
23 A. No.
24 Q. Did you look at any documents to
25 refresh your recollection in advance of this

Page 353

DONDERO - 10/29/21

1
2 deposition other than the stack that I provided
3 and the deposition notices?
4 A. I mean just -- no, just a listing of
5 the notes, but that is it.
6 Q. Did you see any emails at all in
7 connection with your preparation for today's
8 deposition?
9 A. No, not a single email.
10 MR. MORRIS: Okay. Let's put up
11 Exhibit 48, please.
12 (Exhibit 48 marked.)
13 Q. And I think you will see that this
14 is the 30(b)(6) notice for HCMS. If we can go
15 to the next page. And it is really the same --
16 I will represent to you that the topics for
17 HCMS are the same as the topics for NexPoint.
18 Have you seen HCMS's 30(b)(6) notice
19 that is up on the screen right now?
20 A. Yes.
21 Q. And if we took the time -- if I took
22 the time to ask you the same questions about
23 your ability to answer on behalf of HCMS --
24 HCMS with respect to the topics identified
25 there and subject to your counsel's objections,

Page 354

DONDERO - 10/29/21

1
2 would you be able to do so?
3 A. Yes.
4 MR. MORRIS: Let's put up Exhibit
5 49, please.
6 (Exhibit 49 marked.)
7 Q. And this is the 30(b)(6) notice for
8 HCRE. You're here today to testify on behalf
9 of HCRE as its corporate representative. Do
10 you understand that?
11 A. Yes.
12 Q. And did you review the list of
13 topics that we included in our 30(b)(6) notice
14 for HCRE?
15 A. Yes.
16 Q. And subject to your counsel's
17 objections, are you prepared to testify to the
18 topics that are listed on the page that is up
19 on the screen?
20 A. Yes.
21 MR. MORRIS: Okay. Can we please
22 put up Exhibit 31.
23 (Exhibit 31 marked.)
24 Q. Mr. Dondero, we're putting up on the
25 screen now your answer to the -- to Highland's

Page 355

DONDERO - 10/29/21

1
2 amended complaint.
3 MS. DEITSCH-PEREZ: Is that in the
4 notebook?
5 MR. MORRIS: No, no. This is one
6 that we had -- we had --
7 MS. DEITSCH-PEREZ: All right. Hang
8 on.
9 MR. MORRIS: That's okay. That is
10 why we're putting it up on the screen, and
11 we will put it in the chat room. It is
12 already in there, actually.
13 MS. DEITSCH-PEREZ: Yeah, I think we
14 have it here. Hold on. I think Nancy
15 walked off with the duplicate of this, so
16 if you need it, I will hand it to you.
17 Q. Mr. Dondero, while we wait to see if
18 your counsel has a hard copy, do you recall
19 reviewing your answer to the plaintiff's
20 amended complaint before it was filed?
21 A. I don't know if I was involved at
22 that juncture.
23 Q. All right. So just to refresh your
24 recollection, this is a document that was filed
25 with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1   DONDERO - 10/29/21
2   If you recall, Highland filed an original
3   complaint, and after you amended your answer
4   late in August pursuant to an agreement,
5   Highland filed amended complaints against
6   certain of the obligors in the notes
7   litigation.
8       Does that refresh your recollection
9   that this document was prepared in early
10  September?
11  A.   Okay.
12  Q.   Okay.
13  A.   I don't have specific memory.
14  Q.   Okay.  So as always, Mr. Dondero, we
15  have done this many times before, if there is
16  anything in the document that you think that
17  you need to see because it is a little bit of a
18  lengthy document, will you let me know that?
19  A.   Sure.
20      MS. DEITSCH-PEREZ:  Yeah.  And we
21  have a copy if you need to stop and take a
22  look.  We did get a hard copy.  We have a
23  hard copy here.
24  Q.   Okay.
25  A.   All right.

Page 357

1   DONDERO - 10/29/21
2   Q.   So – so let me ask the question
3   again then:  Do you recall, with that
4   background, having reviewed and approved the
5   filing of this document at the beginning of
6   September 2021?
7   A.   Generally.
8   Q.   Okay.  As you sit here today, are
9   you aware of anything in this document that is
10  inaccurate?
11  A.   Not that I'm aware of.
12  Q.   Okay.  Are you aware of anything in
13  the document that you believe should be
14  modified or amended to make it more complete or
15  more accurate?
16  A.   Not as of this moment.
17  Q.   Okay.  Can we please go to Paragraph
18  83.  Okay.  Right there.
19      So do you see that on – on page 13
20  of the exhibit, we have in Paragraphs 82
21  through 91 what are called your affirmative
22  defenses?
23  A.   Yes.
24  Q.   All right.  I'm going to skip the
25  one in 82 for the moment, but focusing on 83.

Page 358

1   DONDERO - 10/29/21
2   Can you just read that to yourself and tell me
3   when you have done that?
4   A.   Yes.
5   Q.   Are you aware of any facts that
6   concern this particular affirmative defense?
7   A.   Which notes are these again?
8   Q.   These would be your personal notes.
9   A.   The – personal notes.  I'm trying
10  to remember.  No, I – well, if you read the
11  question one more time.
12  Q.   Sure.  Just so – so to make sure
13  that you understand, because I'm not here to
14  trick you, this is your answer to Highland's
15  complaint against you where Highland is trying
16  to recover on the notes that you signed.
17      Do you understand that?
18  A.   Right.
19  Q.   Okay.  So in Paragraph 83 you have
20  asserted an affirmative defense that the
21  plaintiff's claims are barred in whole or in
22  part due to waiver.
23      Do you see that?
24  A.   Yes.
25  Q.   Do you have any facts that you can

Page 359

1   DONDERO - 10/29/21
2   share with me that concern that particular
3   affirmative defense?
4       MS. DEITSCH-PEREZ:  And, again, just
5   in this particular answer.
6       MR. MORRIS:  That is all I'm asking
7   about.
8   Q.   We're going to go through the answer
9   for each one of them.  So just one at a time.
10  We're only talking about your – your notes.
11  A.   No, not the moment.
12  Q.   Let's go to Paragraph 84.
13      Do you see Paragraph 84 states,
14  among other things, that plaintiff's claims are
15  barred, in whole or in part, due to estoppel?
16  A.   Yes.
17  Q.   Can you share with me any facts that
18  you are aware of that concern that particular
19  affirmative defense?
20  A.   No.
21  Q.   Okay.  I'm going to skip over 85
22  because I've gotten that answer elsewhere.  If
23  we can go to 86, do you see that Paragraph 86
24  asserts as an affirmative defense, among other
25  things, that, quote:  Plaintiff's claims may be

Page 360

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  barred, in whole or in part, due to failure of
3  consideration, closed quote?
4      A.   Right, I see that.
5      Q.   Do you -- do you -- do you
6  acknowledge that Highland transferred to you an
7  amount of money equal to the principal amount
8  on each of the notes that are at issue?
9      A.   I believe -- yes.
10     Q.   Okay.  I appreciate that.
11         Do you have any facts that would
12  support the affirmative defense that is set
13  forth in Paragraph 86?
14     A.   No.
15     Q.   Okay.  And then, finally,
16  Paragraph 88 asserts, among other things, that
17  the fraudulent transfer claim should be barred,
18  in whole or in part, because the alleged
19  fraudulent transfer -- and I'm summarizing
20  here -- was taken in good faith and for
21  reasonably equivalent value.
22         Do you see that?
23     A.   Yes.
24     Q.   Okay.  Do you have any facts that
25  concern that particular affirmative defense?

Page 361

1  DONDERO - 10/29/21
2      A.   Let me read that one more time.
3      Q.   Take your time.
4      A.   I think that one is -- I'm trying --
5  I'm trying to remember if that one -- if the
6  partner defense is on alternative comp that
7  could have been taken or forgiveness that was
8  in lieu of other comp -- I'm trying to remember
9  if that falls under this category.  I think it
10  does.
11     Q.   Okay.  Is there anything else that
12  you can -- any other facts that you can think
13  of that concern the affirmative defense in
14  Paragraph 88?
15     A.   I mean, the -- yes.  Okay.  To the
16  extent that the -- in lieu of additional comp
17  falls under there, so does the incentives to --
18  the incentive to me to help monetize illiquid
19  investments better faster.
20     Q.   And does that relate to the three
21  portfolio companies that are the subject of the
22  oral agreement between you and your sister or
23  to something else?
24     A.   It is --
25         MS. DEITSCH-PEREZ:  Objection, form.

Page 362

1  DONDERO - 10/29/21
2      A.   -- regarding that, yeah.
3      Q.   It is the same thing.  Do I have
4  that right?
5      A.   Yes.
6      Q.   Okay.  Thank you very much.
7         Is there anything else you can share
8  with me about the facts that concern the
9  affirmative defense in Paragraph 88?
10     A.   I think that is -- that is -- that
11  is it.
12     Q.   Okay.  Can we change now to
13  Exhibit 16, which you should have in your pile,
14  which is the answer that was filed by the HCMS
15  to Highland's amended complaint.
16         (Exhibit 16 marked.)
17     A.   Which number is this?
18     Q.   It is number 16.
19     A.   16 in the binder?
20     Q.   It should be, yeah.
21     A.   Yes.  Okay.  I got it.
22     Q.   Okay.  And is the first page titled
23  Defendant, Highland Capital Management
24  Services, Inc.'s Answer to Amended Complaint?
25     A.   Yes.

Page 363

1  DONDERO - 10/29/21
2      Q.   Okay.  So these questions I'm asking
3  in your capacity as HCMS' 30(b)(6) witness.
4  Okay?
5      A.   Okay.
6      Q.   And you recall that one of the
7  topics under the deposition notice was HCMS'
8  answer; right?
9         Are you prepared to answer questions
10  about this document?
11     A.   Yep, to the best I can.
12     Q.   Okay.  Have you seen it before?
13     A.   Yes.
14     Q.   And do you know whether HCMS
15  authorized this Stinson firm to file this
16  document on its behalf at the beginning of
17  2021?
18     A.   Yes.
19     Q.   Did you personally have any role in
20  reviewing and preparing this document?
21     A.   I mean, just generally that the
22  transition of former Judge Lynn passing and
23  Bonds Ellis not being able to handle
24  complexity -- maybe I shouldn't say it like
25  that -- or handle this aspect of the case

**Appx. 01761**

DONDERO - 10/29/21

1   DONDERO - 10/29/21
2   and/or -- I think it was -- yeah, just
3   whatever. He moved to Stinson from -- I think
4   maybe it started at Bonds Ellis and then maybe
5   it went to Wick Phillips and then it went to
6   Stinson but, you know, there was a migration
7   of these notes in general.
8       Q.   Was there a particular person who
9   was charged with the responsibility of
10  approving and authorizing the filing of this
11  document on behalf of HCMS?
12      A.   Like I said, I think generally that
13  was myself.
14      Q.   Okay. Are you aware of anything in
15  this document today that is inaccurate in any
16  way?
17      A.   Not specifically.
18      Q.   Are you aware of anything generally
19  in this document that is inaccurate in any way?
20      A.   Not at the moment.
21      Q.   Are you aware of anything in this
22  document that you believe should be modified or
23  amended to make it more complete or more
24  accurate?
25      A.   Not yet.

1   DONDERO - 10/29/21
2       Q.   Let's go to Paragraph 40 -- 94,
3   please.
4           MS. DEITSCH-PEREZ: We may be
5   imperfect creatures as lawyers.
6       A.   Yes.
7       Q.   Okay.
8       A.   Yes.
9       Q.   Okay. I was just going to say, do
10  you see from Paragraphs 94 through 102 HCMS has
11  set forth its affirmative defenses?
12      A.   Yes.
13      Q.   Okay. Let's -- let's start with the
14  first one.
15          Do you see in Paragraph 94 HCMS
16  asserts that, quote: Plaintiff's claims are
17  barred, in whole or in part, by the doctrine of
18  justification and/or repudiation?
19      A.   Yes.
20      Q.   Are you aware of any facts that
21  concern that particular defense?
22      A.   I believe this -- there were material
23  prepayments of the loan. I believe that is --
24  those are the -- they were material and
25  numerous prepayments of the loan, which I think

1   DONDERO - 10/29/21
2   was -- that is incorporated into that defense.
3       Q.   Okay. We will talk about the -- the
4   details of that in a moment, but are there any
5   other kind of broad statements that you can
6   give me that identify facts related to this
7   particular affirmative defense?
8           MS. DEITSCH-PEREZ: Object to the
9   form.
10      A.   That is all I have at the moment.
11      Q.   Okay. Do you know whether any
12  document that HCMS ever filed with the
13  bankruptcy court ever asserted, as in a
14  defense, that they didn't have to pay because
15  they had prepaid any obligations that were due
16  and owing?
17          MS. DEITSCH-PEREZ: Object to the
18  form.
19      A.   I don't have awareness.
20      Q.   And this document doesn't -- doesn't
21  use the word "prepayment" anywhere, does it?
22          MS. DEITSCH-PEREZ: Object to the
23  form.
24      A.   I don't know.
25      Q.   Do you know of anything that HCMS

1   DONDERO - 10/29/21
2   ever did before this week to put Highland on
3   notice that it contended that it didn't have to
4   pay its obligations under the notes because of
5   a prepayment defense?
6           MS. DEITSCH-PEREZ: Object to the
7   form.
8       A.   We have no records. I'm not sure we
9   would have ever been in a position to -- to do
10  that. The -- you know, we were relying on
11  shared services from Highland, and Highland had
12  all the records regarding the amounts and
13  prepayments, et cetera.
14      Q.   When did you learn that HCMS had
15  made a prepayment to Highland?
16      A.   I don't know, but I -- I imagine --
17  I imagine it was -- if you are asking why it
18  wasn't mentioned earlier but then mentioned
19  later, it is because somewhere in that time
20  period we became aware.
21      Q.   So you didn't -- you didn't have
22  knowledge of the prepayment until the debtor
23  produced documents. Do I have that right?
24          Withdrawn.
25          How did you learn that HCMS made a

DONDERO - 10/29/21

1
2 prepayment?
3    A.   I don't know.  I just know that we
4 became aware of that being a material fact
5 somewhere along the line.
6    Q.   Do you remember when you learned
7 that material fact?
8    A.   No.
9    Q.   Do you have any facts that you can
10 share with me concerning the prepayment?
11    A.   Eventually there was a spreadsheet
12 that summarized it, but I don't -- I don't
13 know -- I don't know when that occurred.
14    Q.   Does -- does this defense of
15 prepayment apply to demand notes or a term
16 note?
17    A.   I would -- I would -- I would say,
18 you know, primarily a term note, but -- yeah, I
19 think primarily the term note because I think
20 that was the one that was declared to be in
21 default of share, you know, whatever, so I
22 think it was regarding the term note.
23    Q.   Do you recall -- do you have any
24 knowledge as to when the prepayment was made?
25    A.   I believe there were numerous and

DONDERO - 10/29/21

1
2 material prepayments, but I don't know exactly
3 when they were made.
4    Q.   Do you know what year they were
5 made?
6    A.   No, but -- no, but -- no, I don't.
7        MS. DEITSCH-PEREZ:  If you want,
8    John, if you would like for him to give you
9    dates, he could probably dig up the
10    spreadsheet and give you dates, but you
11    have it also.
12        MR. MORRIS:  Thank you.  Okay.  I
13    think we're doing just fine here.
14    Q.   Do you know if there were any
15 prepayments made by HCMS in 2018?
16    A.   I don't know the specifics off the
17 top of my head.
18    Q.   Do you know if HCMS made any
19 prepayments in 2019?
20    A.   I don't know the specifics off the
21 top of my head.
22    Q.   Are you aware that under the term
23 note, HCMS was required to pay annual
24 installment payments at the end of each year?
25        MS. DEITSCH-PEREZ:  Object to the

DONDERO - 10/29/21

1
2 form.
3    A.   I wouldn't say it like that.
4    Q.   We will look -- we will look at the
5 documents in a few minutes.
6        Are you aware of any facts that
7 support the justification or repudiation
8 defense in Paragraph 94 other than what you
9 have testified to so far?
10    A.   I think it is largely the prepayment
11 aspect of it that is captured there.
12    Q.   Okay.  And -- and -- all right.  I
13 will leave it at that.
14        Let's go to Paragraph 95.  Do you
15 see the affirmative defense in 95 is that,
16 quote, plaintiff's claims are barred in whole
17 or in part by the doctrine of estoppel.
18        Do you see that?
19    A.   Yes.
20    Q.   Do you have any facts as the
21 30(b)(6) witness of HCMS that concern that
22 particular affirmative defense?
23    A.   You know, I think for both 95 and
24 96, the way I understand it is that was
25 reliance on Highland's and Highland's screw-up,

DONDERO - 10/29/21

1
2 to the extent that there was a screw-up, on the
3 term loans.
4    Q.   What screw-up are you referring to?
5    A.   Well, we didn't have accountants or
6 employees at Services, you know, and Services
7 was relying on Highland and shared services to
8 stay in compliance or to -- on the various
9 loans.
10    Q.   Did you ever personally instruct
11 anybody in December of 2020 to make a payment
12 on behalf of HCMS under the term note?
13    A.   To make -- I'm sorry, is this --
14 what was the timeframe again?
15    Q.   December 2020 -- let's just say
16 anytime in 2020.  Did you, in your capacity as
17 the person in control of HCMS, ever direct or
18 authorize any person in the world to make a
19 payment from HCMS to Highland in satisfaction
20 of the obligation that was due under the term
21 note at the end of the year?
22    A.   Not that -- not that I recall.
23    Q.   Okay.  Do you know whether anybody
24 acting on behalf of HCMS ever instructed or
25 authorized Highland to make a payment on

1          DONDERO - 10/29/21
2  account of HCMS's term note to Highland?
3      A.   Well, again, and maybe I didn't say
4  it clearly enough. I think there was a
5  reliance in the due course aspect, especially
6  on small amounts, and it would have been done
7  by Highland personnel on behalf of Services.
8          MR. MORRIS:  Okay. Move to strike.
9      Q.   And I'm going to ask you,
10 Mr. Dondero, to be patient with me and to
11 listen carefully to my question.
12         Are you aware of anybody acting on
13 behalf of HCMS, whoever instructed Highland to
14 make a payment in satisfaction of any payment
15 that was due at the year-end of 2020 under the
16 term note?
17     A.   Not specifically, but I'm saying I
18 don't think it needed to be made specifically.
19     Q.   Okay. So you are not aware of any
20 instruction that was ever given to Highland by
21 HCMS to make the payment; is that fair? You
22 relied on the course of dealing?
23     A.   Right. I relied on ordinary course.
24 I don't believe there was a specific -- I'm not
25 aware of a specific request.

1          DONDERO - 10/29/21
2      Q.   Okay. And you were aware that the
3  payment was due at the end of the year; isn't
4  that right?
5          MS. DEITSCH-PEREZ:  Object to the
6      form.
7      A.   Not -- not specifically. There
8  is -- to be bona fide notes, there is -- I know
9  there is -- there is tax structuring and things
10 that the auditors want to see in terms of -- of
11 regular payment that everything just doesn't
12 accrue indefinitely, but what those roles are
13 and when and if it needs to be paid and whether
14 it was by the end of the year or not.
15         I'm generally not specifically
16 knowledgeable of or involved in, and nor do I
17 have an awareness that was it or could it have
18 been satisfied by other payments throughout the
19 year. I'm not -- I'm not the person for that
20 knowledge.
21     Q.   Now, do you recall in December of
22 2020 there was some tension between you and
23 Mr. Seery?
24     A.   Tension between me and Mr. Seery. I
25 would say there was tension between Mr. Seery

1          DONDERO - 10/29/21
2  and everybody. He was trying to steal the
3  estate, you know, so yes.
4          MR. MORRIS:  I move to strike.
5      Q.   You were asked to resign from
6  Highland in late September of 2020; correct?
7      A.   Yes.
8      Q.   And you did resign as of October
9  9th, 2020; correct?
10     A.   Yes.
11     Q.   And do you recall that in early
12 December, Highland sought a temporary
13 restraining order against you?
14     A.   Yes.
15     Q.   And do you recall that Highland
16 obtained a temporary restraining order against
17 you in early December?
18     A.   Yes.
19     Q.   Okay. Do you recall that the
20 advisors that you controlled filed a motion
21 against the debtor in mid December 2020?
22     A.   Yes.
23     Q.   Okay. And do you recall that that
24 motion was curved by the Court in the middle of
25 December?

1          DONDERO - 10/29/21
2      A.   Yes, roughly.
3      Q.   And do you recall that at the end of
4  November, Highland had given notice of
5  termination of the shared services agreements
6  with the advisors?
7      A.   I believe they did that multiple
8  times or extended it multiple times. I can't
9  remember if that was -- if it was done then or
10 not.
11     Q.   Okay. And it is your testimony that
12 notwithstanding those facts and circumstances,
13 you relied on Highland to make the payment that
14 HCMS owed at the end of the year?
15     A.   Yes, absolutely. We were still
16 deluded in terms of thinking that Seery was
17 working to resolve the estate, not to steal the
18 estate.
19         MR. MORRIS:  I move to strike.
20     Q.   Do you have any other facts and
21 circumstances that relate to the affirmative
22 defenses in Paragraphs 95 and 96?
23     A.   I mean, not at the moment, not that
24 I want to volunteer. When you ask more
25 questions about the specifics, I guess we will

DONDERO - 10/29/21

1    get to some of it.
2    Q.   Well, I'm asking you questions now.
4    You are the 30(b)(6) witness.  This is one of
5    the topics that you were supposed to be
6    prepared to answer questions about, and I would
7    just like to know everything that you have in
8    your head as to facts that relate to these two
9    affirmative defenses.
10       MS. DEITSCH-PEREZ:  Object to the
11   form.
12       Q.   Because if I don't ask the right
13   question later, you know, we can't do that;
14   right?
15       So do you have any other facts that
16   you are aware of that relate to these two
17   particular affirmative defenses?
18       MS. DEITSCH-PEREZ:  John, the fact
19   that it's a 30(b)(6) deposition doesn't
20   absolve you of the necessity to ask
21   questions.
22       MR. MORRIS:  I asked the question.
23   Q.   Can I please have an answer?
24   A.   Again, the notes in general are de
25   minimis relative to asset values of Highland or

DONDERO - 10/29/21

1    the counterparties.  So the annual obligations
2    are even more de minimis or a million bucks or
4    less than a million bucks.
5        There was never an intent, nor would
6    there be a logical intent to -- from my
7    perspective or any of the entities that had
8    notice to Highland to be in default.  And it is
9    not logical that they would do that for any
10   purpose.
11       And the facts around the curing
12   quickly of the notes and getting the curing
13   amounts from Highland and making the payments
14   and Highland accepting them as they're defining
15   what it took to cure it, I think, are all, you
16   know, the key facts that make any, you know,
17   acceleration argument, you know, ridiculous.
18       Q.   Okay.  Anything else?
19       A.   That's it at this point.
20       MR. MORRIS:  Okay.  Let's go to
21   Exhibit 17, please.
22       (Exhibit 17 marked.)
23       Q.   This is HCRE's answer.  Do you see
24   that, sir?
25       A.   Yes.

DONDERO - 10/29/21

1    Q.   And I'm going to ask these questions
3    in your capacity as the 30(b)(6) representative
4    of HCRE.  Do you understand that?
5    A.   Yes.
6    Q.   Have you seen this document before?
7    A.   Yes.
8    Q.   Are you aware of anything in this
9    document that is inaccurate today?
10   A.   I mean, I think 96 we put in there
11   similar to the other affirmative defenses in
12   case there was a prepayment.  But, again, we
13   have been so blocked from getting information
14   and detail we didn't know it at the time
15   regarding, you know, prepayments.
16       So I don't think the prepayment
17   defense works for 96.  So that would be my
18   clarification of an inaccuracy.
19   Q.   Why do you believe that the
20   prepayment defense doesn't work in Paragraph 96
21   for HCRE?
22   A.   Because I don't think there were any
23   prepayments.
24   Q.   All right.  I appreciate that.
25   A.   We didn't -- we didn't know it at

DONDERO - 10/29/21

1    the time --
2    Q.   Okay.
4    A.   -- we put this together.
5    Q.   Is there any other aspect of this
6    document that you believe is inaccurate today?
7    A.   Not as far as I know.
8    Q.   Is there anything in this document
9    that you believe should be modified or amended
10   to make it more accurate or more complete?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   Not yet.
14   Q.   Okay.  Looking at Paragraph 96, I
15   believe you just testified that,
16   notwithstanding the assertion of the defense
17   therein, you are not aware of any facts
18   concerning the prepayment defense that you
19   described earlier for HCMS.
20       Do I have that right?
21   A.   Yes.
22   Q.   Okay.  Do you have facts at all
23   that relate to the affirmative defense in
24   Paragraph 96?
25   A.   I don't believe so at this moment.

DONDERO - 10/29/21

1
2      Q.   Okay.  How about Paragraphs 97 and
3  98?  Do you have any facts that relate to those
4  affirmative defenses?
5      A.   It would be the same answer as on
6  the last one.
7      Q.   Okay.  I appreciate that.  And so –
8  but we don't have to go over it again.  I will
9  just leave it at that.
10         Let's go to Exhibit 15, please.
11         (Exhibit 15 marked.)
12         MR. MORRIS:  This is the next –
13         MS. DEITSCH-PEREZ:  Hey, John.
14  John, can we take a – like a very quick
15  restroom break?
16         MR. MORRIS:  You know, if we could
17  just get through this document, which
18  shouldn't take long, then perhaps we can
19  take a short half-hour lunch break.
20         MS. DEITSCH-PEREZ:  Well, we can
21  take a short half-hour lunch break after we
22  get through this, but I just need to run to
23  the restroom.
24         MR. MORRIS:  Okay.
25         MS. DEITSCH-PEREZ:  So you can leave

DONDERO - 10/29/21

1
2  the screen on if you want so that we can
3  get back fast.
4         MR. MORRIS:  My pleasure, Deborah.
5  No problem.
6         MS. DEITSCH-PEREZ:  Thank you.
7         VIDEOGRAPHER:  Off the record,
8  12:40.
9  (Recess taken 12:40 p.m. to 12:51 p.m.)
10         Q.   Before we go on to this document,
11  sir, did HCRE have a shared services agreement
12  with Highland?
13         VIDEOGRAPHER:  We're back on the
14  record.
15         MR. MORRIS:  Oh, do I need to read
16  the question again?
17         COURT REPORTER:  No, I've got it.
18         A.   I – I don't believe it is a formal
19  written one.  I think it is just a verbal one.
20         Q.   And who is the verbal agreement
21  between?
22         A.   It was between Highland and HCRE.
23  Now it is between NexPoint and HCRE.
24         Q.   And who entered into the agreement
25  between Highland and HCRE?

DONDERO - 10/29/21

1
2      A.   I would give the same answer I gave
3  before where it was just – it was just
4  understood that we supported all the related
5  entities or entrepreneurial efforts and it was,
6  you know, modest amounts of work.
7         There wasn't specific financial
8  remuneration, but – and NexPoint is a good
9  example, too.  There was a significant track
10  record gulf that was able to be used to raise
11  other money.
12      Q.   I'm just asking you who entered into
13  the agreement between Highland and – and HCRE
14  for the provision of services by Highland?
15         MS. DEITSCH-PEREZ:  Asked and
16  answered.
17      A.   Yeah, again, same answer as before.
18  I don't think anybody specifically, formally
19  did it.
20      Q.   Okay.  Is it – are the terms of the
21  agreement written down anywhere?
22      A.   No, like I said, it is just
23  understood the accounting department and tax
24  department would handle the accounting and tax
25  for all entities.

DONDERO - 10/29/21

1
2      Q.   Did the legal department also
3  provide services to HCRE?
4      A.   It would depend on the specific
5  entity.  In the case of HCRE I think they used
6  the – the two lawyers that worked at NexPoint.
7         I don't think they used the legal
8  staff per se.  I think they – the shared
9  services that they relied on were accounting
10  and tax primarily.
11      Q.   Did Mark Patrick do work for HCRE
12  while he was employed by Highland?
13      A.   Boy, I don't know.  I imagine
14  probably tax-related stuff.
15      Q.   Did HCRE ever pay Highland anything
16  for the services that it received?
17         MS. DEITSCH-PEREZ:  Are you talking
18  about cash or –
19         MR. MORRIS:  Please, please, please.
20  – I'm trying to be really patient,
21  Deborah, but please no speaking objections.
22  Mr. Dondero is a very sophisticated man.
23         We have done this many times
24  together.  He will ask me if he doesn't
25  understand the question.  And if you would

DONDERO - 10/29/21

1    like to object, by all means. I don't have
2    a problem with that. I don't.
3        MS. DEITSCH-PEREZ: But I asked –
4    (speaking simultaneously.)
5    Q.   Mr. Dondero – Mr. Dondero –
6    Mr. Dondero, did HCRE ever pay anything to
7    Highland for services rendered?
8        MS. DEITSCH-PEREZ: Asked and
9    answered.
10   A.   Yeah, that is what I was going to
11   say. Same answer. You know, not – not a
12   formal cash remuneration, but, you know, a –
13   which wouldn't have been much anyway. But –
14   but more in terms of track record and presence
15   in the market that then Highland or NexPoint
16   could use to further its business.
17   Q.   Are you saying that – that all of
18   the entities were working kind of as a unified
19   unit and got synergistic benefits from the work
20   that it did?
21       MS. DEITSCH-PEREZ: Object to the
22   form.
23   A.   I don't want to over generalize and
24   say yes to that, but – but there were

DONDERO - 10/29/21

1    definitely – you know, when I use the DAF
2    example, you know, we would have never got the
3    Harvard vest as an investor if it wasn't for
4    the track record that the DAF had in CLO
5    equity.
6        I think there is business that
7    NexPoint got in the real estate space
8    benefiting from the HCRE performance. So I do
9    believe there was specific definable benefit
10   gained for the modest amount of cost of
11   services provided.
12   Q.   And you –
13   A.   There wasn't specific remuneration.
14   Q.   And you controlled all of these
15   entities; right?
16       MS. DEITSCH-PEREZ: Object to the
17   form.
18   A.   Well, the DAF is independent and
19   separate, but the – the HCRE-type entity, yes.
20   Q.   And did you decide that HCRE and
21   HCMS and the DAF wouldn't be required to pay
22   for services rendered to Highland?
23       MS. DEITSCH-PEREZ: Object to the
24   form.

DONDERO - 10/29/21

1    A.   My recollection on the services and
2    the HCRE is that the dollar value of the
3    services provided was – was small and nominal.
4        With regard to the DAF, it was more
5    complicated. There is rules – there is
6    charging rules in terms of fees and then there
7    is also – I wasn't the one that decided that.
8    And there are other issues there other than
9    just the value for services argument.
10       And so I don't – the short answer
11   is, I don't know and I'm not involved in that,
12   and I don't understand why sometimes there is
13   one and sometimes there isn't one. Even to
14   this day I don't know the answer to that.
15   Q.   Did – did – did you decide on
16   behalf of Highland that Highland would provide
17   services to DAF without receiving a stream of
18   income in return?
19       MS. DEITSCH-PEREZ: John, I think
20   we're really far outside of either any of
21   the 30(b)(6)s or the permissible topics for
22   Mr. Dondero's personal deposition.
23       So could you move on?
24       MR. MORRIS: Okay. I will after I

DONDERO - 10/29/21

1    get an answer to this question.
2    A.   Can you repeat the question?
3    Q.   Sure.
4        Did you make the decision on behalf
5    of Highland to provide services to the DAF
6    without receiving a stream of income in return?
7        MS. DEITSCH-PEREZ: Same objection.
8    A.   Yeah, I think I answered it with my
9    rambling a few minutes ago, but the short
10   answer is no.
11   Q.   Who made that decision? Who made
12   that decision?
13       MS. DEITSCH-PEREZ: Was that Mike's
14   dog or yours?
15       MR. MORRIS: That was my dog. I
16   apologize.
17       MS. DEITSCH-PEREZ: Okay.
18   Q.   Who made that decision, sir?
19   A.   I wasn't sure –
20       MS. DEITSCH-PEREZ: Again – again,
21   John, this is well beyond the scope of the
22   30(b)(6)s or even anything permissible for
23   Mr. Dondero's personal. And, in fact, you
24   said last time that is it, that was my last

DONDERO - 10/29/21

1 question. So...
2 MR. MORRIS: That is -- that is
3 because I thought that he would say as the
4 control person at the enterprise that he
5 made the decision, but he said that he
6 didn't.
7 So I'm just asking one follow-up
8 question. I just want to know -- Deborah,
9 please.
10 Q. I just want to know who made the
11 decision on behalf of Highland to render
12 services to the DAF without receiving a stream
13 of income in return.
14 MS. DEITSCH-PEREZ: Object to the
15 form of the question for all of the reasons
16 I stated before.
17 A. And I don't know the answer.
18 Q. Okay. So looking back at the
19 document on the screen, we're going to ask --
20 I'm going to ask these questions in your
21 capacity as NexPoint's 30(b)(6) representative,
22 okay?
23 A. Sure.
24 Q. And do you understand that the
25

DONDERO - 10/29/21

1 document on the screen is NexPoint's answer to
2 Highland's amended complaint?
3 A. Yes.
4 Q. Did you review this document before?
5 A. Just generally.
6 Q. And did you authorize the filing of
7 this document on behalf of NexPoint?
8 A. Yes, yes.
9 Q. Are you aware of anything in this
10 document today that you believe to be
11 inaccurate?
12 A. I think the -- on the affirmative
13 defenses on the -- do you remember on the prior
14 one we had the -- I think it was called
15 justification as the first one, but there
16 wasn't a prepay in that one?
17 Q. Correct.
18 A. I think this one there were prepays,
19 but the justification defense is missing from
20 the front here. And I think that is -- I think
21 if that were to continue -- I think that is
22 partly due to different law firms and what was
23 known at the time, et cetera, but I would say
24 that is -- that is the -- that is the one thing
25

DONDERO - 10/29/21

1 that jumps out at me between the two.
2 MR. MORRIS: Okay. Can we go to
3 Paragraph 80, and let's see if we can see
4 what Mr. Dondero is talking about.
5 Q. Okay. So I'm just going to focus on
6 the first three paragraphs, 80, 81, and 82, and
7 ask you whether -- whether you are aware of any
8 facts that concern the affirmative defenses set
9 forth in those paragraphs. And I think they're
10 related, and that is why I'm asking you to do
11 it all together, but we can do it one at a
12 time, whatever you are comfortable with.
13 MS. DEITSCH-PEREZ: Object to the
14 form. I mean, other than the facts in
15 those paragraphs?
16 MR. MORRIS: You are doing it again,
17 Deborah.
18 MS. DEITSCH-PEREZ: It --
19 MR. MORRIS: Please, please.
20 MS. DEITSCH-PEREZ: John, when you
21 ask questions -- I understand Mr. Dondero
22 is sophisticated, but he's also not a
23 lawyer, and when you ask questions that are
24 misleading, I'm going to interject
25

DONDERO - 10/29/21

1 something.
2 MR. MORRIS: It is completely
3 improper. He doesn't need to be a lawyer.
4 He's a 30(b)(6) witness, and I'm asking
5 such a simple question, what facts do you
6 have that support the affirmative defense.
7 A. Okay. Is it okay if I repeat some
8 of them from the prior one?
9 Q. Sure. Whatever you are comfortable
10 with.
11 A. The -- to the extent that -- to the
12 extent that the notes were prepaid -- prepaid
13 significantly, it is a real question on whether
14 or not there could have been a breach at the
15 end of the year, even if there wasn't a payment
16 at the end of the year.
17 There is no logical reason, nor
18 would I have ever authorized or suggested no
19 payment to put us on -- in default due to a de
20 minimis amount of money, like a few hundred
21 thousand dollars, even if I was highly annoyed
22 with Seery, even if we knew that Seery and
23 Highland had overcharged NexPoint by whatever
24 it was, 14, 16 million bucks, I would not have
25

DONDERO - 10/29/21

1 let a small amount cause a – cause a breach.
2 You know, the – how would I – how
3 would I add to that now. The overpayment on
4 the $14 million, holding back additional shared
5 services amount, made an inordinate amount of
6 sense.
7 There was supposed to be at that
8 time – there was another netting from Seery in
9 terms of wanting to be fair and reasonable, you
10 know, with employees and with the transition of
11 the estate, et cetera, and everything was going
12 to get trued up.
13 So I do believe there was an
14 expectation of a netting, et cetera, but
15 overall, Highland should have paid it. It
16 shouldn't have let it breach the cause, but at
17 least when I found out about it and they knew I
18 was annoyed. And I told them I didn't want it
19 to be in default, they gave me the numbers and
20 the amounts to cure it in their mind, and they
21 accepted it.
22 Now, I think they should have gone
23 back and incorporated prepays and said that no
24 amounts were due because of the prepays, et

DONDERO - 10/29/21

1 cetera, but the calculation that they came up
2 to get it in compliance in good standing was a
3 million 4. And just like we relied on them to
4 pay it and keep us out of default, we relied on
5 them to set the amount to cure.
6 But I guess I would make the
7 argument that it shouldn't have been, but
8 again, I didn't want to mince – I didn't want
9 to on small dollars make an argument that could
10 get us in bigger trouble – bigger trouble. So
11 it was easier to – to pay the million bucks
12 than it was to argue that it wasn't due.
13 Q. Did you at any time in your capacity
14 as the person in control of NexPoint instruct
15 anybody at Highland to make the payment that
16 was due at the end of 2020?
17 A. Not specifically to pay it or not
18 specifically not to pay it. It was normal,
19 again, small and de minimis that I expected to
20 be done in due course.
21 MR. MORRIS: I move to strike.
22 Q. It's a very simple question.
23 Did you personally take any steps to
24 ensure that NexPoint made the payment that was

DONDERO - 10/29/21

1 due at the end of 2020?
2 MS. DEITSCH-PEREZ: Asked and
3 answered.
4 A. Yes, I would like to repeat my same
5 answer.
6 Q. Did you tell anybody to make the
7 payment on behalf of NexPoint at the end of
8 2020?
9 MS. DEITSCH-PEREZ: Asked and
10 answered.
11 A. I would like to give the same answer
12 that you – you – you struck.
13 Q. Can you just say yes or no, sir, did
14 you tell anybody to make the payment at the end
15 of 2020 on behalf of NexPoint?
16 MS. DEITSCH-PEREZ: Asked and
17 answered.
18 A. I don't want to give anything beyond
19 the answer that I gave.
20 Q. Okay.
21 A. I get myself in trouble because I
22 paraphrase. I don't want to answer yes – I
23 don't think yes or no would be an appropriate
24 answer. I want to stay with the answer that I

DONDERO - 10/29/21

1 gave.
2 Q. Okay. I'm going to say the word
3 "Yankees," and every time I say the word
4 "Yankees" today, everybody should know that
5 that is the question that I'm going to bring to
6 the Court on a motion to compel, okay?
7 It's a very simple question. It's a
8 very simple question. I will ask one more
9 time, and if you don't want to answer, that is
10 fine.
11 MS. DEITSCH-PEREZ: What –
12 Q. Mr. Dondero – Mr. Dondero, in
13 December of 2020, did you give anybody any
14 instructions at Highland to make sure that
15 NexPoint made the payment that was due at the
16 end of the year?
17 MS. DEITSCH-PEREZ: Asked and
18 answered.
19 A. I think that means I'm supposed to
20 stick with the answer that I gave.
21 MS. DEITSCH-PEREZ: You're on mute,
22 John. John, you're on mute. John, you're
23 on mute. John, we can't hear you.
24 THE WITNESS: I do like it better

DONDERO - 10/29/21

1
2 when he yells at me on mute.
3     MS. DEITSCH-PEREZ: John, we can't
4 hear you.
5     COURT REPORTER: We can't hear you,
6 John.
7     MR. MORRIS: You can't hear me?
8     COURT REPORTER: Now we can.
9     MS. DEITSCH-PEREZ: Now we can hear
10 you, but we couldn't hear you. It looks
11 like you were yelling, but we couldn't hear
12 you.
13     A.   I do like it better when you yell at
14 me on mute.
15     Q.   I try not to yell at you, and I hope
16 that you haven't perceived this -- we do have a
17 videotape this time. So to the extent that
18 anybody perceives your comment as suggesting
19 that I have yelled at you, I would invite them
20 to look at the video.
21     MS. DEITSCH-PEREZ: Well, we said we
22 couldn't hear you, but your animation
23 looked like that.
24     Q.   Sir, can you identify any person in
25 the world acting on behalf of NexPoint who

DONDERO - 10/29/21

1
2 instructed Highland to make the payment that
3 was due on the NexPoint term note in December
4 of 2020?
5     MS. DEITSCH-PEREZ: John, that is
6 the fifth or sixth time.
7     MR. MORRIS: It is a completely
8 different question. Please.
9     MS. DEITSCH-PEREZ: Could you read
10 it back, if I was mistaken. So read it
11 back.
12     (Record read.)
13     A.   NexPoint did not have the accounting
14 staff or the systems or the records or the
15 knowledge to have any person in the world at
16 NexPoint to give that instruction.
17     So the long answer -- the short
18 answer is no, but the long answer is we had
19 been kept away from our books and records. I
20 think we largely still don't have them, and
21 there would -- I am not aware of anybody who --
22 anybody in the world at NexPoint who made that
23 request.
24     Q.   Frank Waterhouse was the treasurer
25 of NexPoint in December of 2020; is that

DONDERO - 10/29/21

1
2 correct?
3     A.   I think he was very much viewing his
4 responsibilities as Highland related and as an
5 employee of Highland. But yes, based on that
6 incumbency certificate, but that is your --
7 your question to ask Frank if he was taking
8 that seriously, but NexPoint was relying on
9 Highland.
10     Q.   Do you have any other facts that you
11 are aware of that relate to the affirmative
12 defenses set forth in Paragraphs 81 through 82?
13     A.   I think I -- I think I've said them
14 all.
15     MR. MORRIS: Okay. It is 2:13
16 Eastern time. Let's just take a short
17 half-hour lunch break, and let's return at
18 2:45, or 1:45 Central.
19     VIDEOGRAPHER: Off the record, 1:13.
20 (Recess taken 1:13 p.m. to 1:48 p.m.)
21     VIDEOGRAPHER: Back on the record,
22 1:48.
23     Q.   Mr. Dondero, are you comfortable?
24     A.   Yes.
25     Q.   And are you able to proceed?

DONDERO - 10/29/21

1
2     A.   Yes.
3     Q.   Okay. Did you speak with anybody
4 during the break about the substance of this
5 deposition?
6     A.   No.
7     Q.   You entered into certain oral
8 agreements with your sister concerning some of
9 the notes at issue in these lawsuits.
10     Do I have that right?
11     MS. DEITSCH-PEREZ: Object to the
12 form.
13     A.   Can you rephrase or repeat, please?
14     Q.   Sure.
15     You entered into certain oral
16 agreements with your sister concerning certain
17 of the notes at issue in these lawsuits.
18     Do I have that right?
19     MS. DEITSCH-PEREZ: Object --
20     A.   Yes.
21     MS. DEITSCH-PEREZ: Object to the
22 form. And I'm going to object -- object
23 every time because it just -- just so it is
24 on the record because you are saying "your
25 sister" without giving her -- her capacity.

DONDERO - 10/29/21

1
2    A.   Okay.
3         MS. DEITSCH-PEREZ:   But I don't want
4    to disrupt the deposition, so I'm just
5    telling you why I'm doing it and he can
6    continue to answer thereafter.   That is why
7    I'm doing it.
8    Q.   Okay.   Can we – can we agree,
9    Mr. Dondero, when I refer to your sister in the
10   context of oral agreements that she was
11   entering into those agreements with you as a
12   representative of Dugaboy – as Dugaboy
13   trustee, as representative for a majority of
14   the class A interest holders of Highland?
15   A.   Yeah.   How about just to make it
16   simple let's just call it the Dugaboy trustee,
17   and everybody will know that it is my sister
18   and everybody will know that it is the majority
19   of the class A unit holders.
20   Q.   Okay.   Okay.   I appreciate that and
21   I will do just that.
22        You entered into certain oral
23   agreements with the Dugaboy trustee concerning
24   certain of the notes at issue in these
25   lawsuits; is that right?

DONDERO - 10/29/21

1
2    A.   Yes.
3    Q.   Okay.   Let's discuss the purpose of
4    those oral agreements.
5         MR. MORRIS:   Can we put back up on
6    the screen Mr. Dondero's answer.
7    Q.   And while we're doing that,
8    Mr. Dondero, can you confirm that your sister
9    is the only trustee of the Dugaboy Investment
10   Trust?
11        MS. DEITSCH-PEREZ:   Object to the
12   form.
13   A.   For what period of time are we
14   talking about?
15   Q.   During the period of time at which
16   you entered into the oral agreements with the
17   Dugaboy trustee.
18        MS. DEITSCH-PEREZ:   Object to the
19   form.
20   A.   Yeah, I believe she has been the
21   trustee since 2015 and remains so today.   I
22   don't have an awareness of – I don't have an
23   awareness of another functional trustee.
24        So some of these – sometimes
25   complex trusts have other layers that are

DONDERO - 10/29/21

1
2    called trustees but they're not trustees per
3    se.   But I think I'm over thinking it.   But I'm
4    not aware of anybody I've interacted with,
5    other than her, as trustee with regard to the
6    notes.
7    Q.   Okay.   So up on the screen we
8    have – no, that is the wrong document.
9         MR. MORRIS:   We need Exhibit 31,
10   please.
11        Yeah, there you go.   That one.
12   Perfect.   Okay.
13        MS. DEITSCH-PEREZ:   31 is not – oh,
14   is that the '03 answer?
15        MR. MORRIS:   Correct, that is
16   Mr. Dondero's answer.
17   Q.   Do you see that, sir, on the screen?
18        MS. DEITSCH-PEREZ:   Hang on.   I'm
19   going to get it again.
20        Okay.   If you want a hard copy, I
21   have one here but he's got it up.
22   Q.   Do you see on the screen,
23   Mr. Dondero, marked as Exhibit 31 is your
24   answer to Highland's amended complaint?
25   A.   Yes.

DONDERO - 10/29/21

1
2    Q.   Okay.
3         MR. MORRIS:   Can we go to
4    Paragraph 82, please.
5    Q.   Is it your understanding that
6    Paragraph 82 describes, among other things, in
7    general terms your oral agreements with –
8    between you and the Dugaboy trustee?
9    A.   Yes.
10   Q.   Is it your position that the oral
11   agreements that you entered into with your
12   sister – withdrawn.
13        Is it your contention that the oral
14   agreements you entered into with the Dugaboy
15   trustee applied to each of the notes that were
16   executed by NexPoint and that are the subject
17   of Highland's lawsuit against NexPoint?
18   A.   Yes.
19   Q.   Is it your contention that the oral
20   agreements that were entered into with the
21   Dugaboy trustee apply to the notes executed by
22   HCMS that are the subject of Highland's lawsuit
23   against HCMS?
24   A.   Yes.
25   Q.   Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1
2 agreements between you and the Dugaboy trustee
3 apply to the notes that were executed by HCRE
4 that are the subject of the lawsuit that
5 Highland has commenced against HCRE?
6     A.   Yes.
7     Q.   Okay.  Do I understand correctly
8 that your oral agreements with your sister do
9 not apply to the notes that were executed on
10 behalf of HCMFA that are the subject of the
11 lawsuit that Highland commenced against HCMFA?
12    A.   Correct.
13    Q.   Okay.  I appreciate that.
14         Do you see in this paragraph towards
15 the middle it says, quote:  The purpose of this
16 agreement was to provide compensation to
17 defendant, James Dondero, who was otherwise
18 underpaid, compared to reasonable compensation
19 levels in the industry through the use of
20 forgivable loans, a practice that was standard
21 at HCMLP in the industry.
22         Have I read that correctly?
23    A.   Yes.
24    Q.   Is that the purpose of the agreement
25 that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1
2 withdrawn.
3         Is that the purpose of the agreement
4 that you entered into with the Dugaboy trustee
5 concerning the notes at issue in the lawsuits
6 that were commenced against you personally?
7         Withdrawn.  That was a bad question.
8         Does that purpose apply only to the
9 notes that you executed or does it apply to the
10 corporate notes as well?
11         MS. DEITSCH-PEREZ:  Object to the
12    form.
13         Other than HCMFA?
14         MR. MORRIS:  Correct.  I think we've
15    established the scope of the agreements.
16    A.   To give a complete answer, from my
17 perspective it is about 50 million of notes
18 between -- current balance between NexPoint,
19 Services, myself, and HCRE.
20    Q.   And HCMS; right?
21    A.   Yes, Services, Highland Capital
22 Management, yes.
23    Q.   Okay.  So I just want to know, that
24 sentence there concerning the purpose was
25 omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1
2 HCRE.
3         And I'm happy to walk you through to
4 show you.  And I just want to know in your
5 capacity as a 30(b)(6) witness for those
6 entities, if you know why that statement of
7 purpose was omitted.
8    A.   Well, we talked about it earlier.  I
9 think there is some cleanup.  There has been
10 multiple lawyers involved.  We didn't know
11 which loans were prepaid, which loans weren't.
12 But, you know, I don't know why it was omitted
13 but it applies to all of them.
14         MS. DEITSCH-PEREZ:  I think that is
15    the first time that I've noticed that.  So,
16    John, I'm going to take a mea culpa.  I
17    think that is a cut-and-paste error.
18         MR. MORRIS:  All right.  Well, I
19    will -- I will just point out that the
20    affirmative defense concerning the oral
21    agreements is the exact same in all four
22    answers, except for the omission of the
23    statement of purpose for the three
24    corporate entities.
25    Q.   And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1
2 say that you don't know why that statement of
3 purpose was omitted from the corporate
4 entities' answers?
5    A.   Yeah, I don't know why it is omitted
6 or why the complaints aren't consistent with
7 that regard.
8    Q.   Okay.  But it is your -- it is your
9 position as the purpose -- as one of the people
10 who entered into this oral agreement that the
11 purpose for the -- for the condition subsequent
12 agreement is the same as for the corporate
13 entities as it is for you, as stated in this
14 paragraph; is that right?
15    A.   Yes.
16    Q.   Okay.  We talked a little bit about
17 the NexPoint term note.
18         Do you remember that?
19    A.   Yes.
20    Q.   And do you recall that in its
21 original form the NexPoint term note was for a
22 principal amount of approximately $30 million?
23    A.   Yes.
24    Q.   And do you recall that the NexPoint
25 term note was a rollup of the outstanding

DONDERO - 10/29/21

1 principal and interest then due on certain
2 promissory notes that had previously been given
3 by NexPoint to Highland?
4     A.   Yes.
5     Q.   Okay.
6         MR. MORRIS:  Can we put up, please,
7     Exhibit Number 2, which I believe is the
8     complaint against NexPoint.
9         (Exhibit 2 marked.)
10        MR. MORRIS:  And if we can go to
11    Exhibit Number 1 of Deposition Exhibit
12    Number 2.
13    Q.   Okay.  And do you see -- I'm sorry,
14 sir, do you see that Exhibit Number 1 to the
15 complaint is a promissory note dated May 31st,
16 2017 in the approximate amount of
17 $30.75 million?
18    A.   Yes.
19    Q.   Okay.  And is that your signature on
20 page 2?
21    A.   Looks like it.
22    Q.   Okay.  And did you sign this note on
23 behalf of NexPoint on or around May 31st, 2017?
24    A.   I assume so.

DONDERO - 10/29/21

1     Q.   Do you know if you read the note
2 before you signed it?
3     A.   Not likely.
4     Q.   Do you recall whether there was
5 anything about the note that you didn't
6 understand before you signed it on behalf of
7 NexPoint?
8         MS. DEITSCH-PEREZ:  Object to the
9     form.
10    A.   Yeah, I'm not -- I doubt I read it,
11 so I don't remember objecting to anything.
12    Q.   Okay.  Looking at Paragraph 2.1, am
13 I characterizing that section fairly when I say
14 that the borrower was required to make an
15 annual installment payment at the end of each
16 calendar year?
17        MS. DEITSCH-PEREZ:  Object to the
18    form.
19    A.   I see that paragraph, yes.
20    Q.   Okay.  And did you understand when
21 you signed it that an annual installment
22 payment would be due at the end of each year by
23 NexPoint?
24        MS. DEITSCH-PEREZ:  Object to the

DONDERO - 10/29/21

1     form.
2     A.   I never read it that closely.
3     Q.   So as the control person of
4 NexPoint, is it fair to say then that you don't
5 recall having an understanding when you signed
6 this note that NexPoint would be required to
7 make annual payments at the end of each year?
8         MS. DEITSCH-PEREZ:  Object to the
9     form.
10    A.   I didn't have knowledge of the
11 specifics, and again, I would describe those
12 specifics as de minimis.
13    Q.   Okay.  Do you see -- do you have any
14 idea who drafted this note?
15    A.   It would have come from accounting.
16 I think they have boilerplate -- I don't know
17 if they work with legal at all.  I have no
18 idea, but it would have come through
19 accounting.
20    Q.   Do you recall that all three of the
21 term notes at issue were signed on the same
22 day, May 31st, 2017?
23    A.   That doesn't surprise me.  I think
24 there was an accounting reason, if I remember

DONDERO - 10/29/21

1 correctly.  I think it had something to do with
2 either the audit or the financials or if we had
3 a credit facility at the time.  I think that is
4 probably why, but I don't remember exactly.
5     Q.   Do you have any other recollection
6 as to why all three notes were executed at the
7 end of May 2017?
8     A.   Again, I believe they're -- the --
9 aggregating or solidifying them into one
10 defined note I think was required by the
11 auditors or the accounting department as
12 best practices.  I don't think -- it wasn't a
13 regulatory reason and it wasn't a compliance
14 reason.  I believe it was just an accounting or
15 an audit reason.
16    Q.   Did you ever make sure on behalf of
17 NexPoint that the terms of the promissory note
18 were fair and reasonable?
19        MS. DEITSCH-PEREZ:  Object to the
20    form.
21    A.   Yeah, I don't remember ever
22 negotiating or reading it that closely.  And
23 again, I think the view from all concerned is
24 that it was relatively de minimis from the

1          DONDERO - 10/29/21
2    balance sheet at Highland then or now and/or de
3    minimis relevant to NexPoint's value.
4       Q.    It is a $30 million note.  Do I have
5    that right?
6       A.    Yes.
7       Q.    Okay.  And it was material enough to
8    be included in Highland's financial statements;
9    is that correct?
10      A.    Anything material or not as part of
11   doing proper audited financials needs to be
12   properly included.
13      Q.    Okay.  And you know, because you
14   signed the management representation letter,
15   that this note was specifically disclosed to
16   PwC and included in both Highland's and
17   NexPoint's audited financial statements;
18   correct?
19      A.    I would -- I would have been shocked
20   if it wasn't, if it is an asset and a liability
21   respectively of the companies.
22      Q.    Okay.  Do you see the section on
23   acceleration upon default, Paragraph 4?
24      A.    Yes.
25      Q.    Have you ever seen that section

1          DONDERO - 10/29/21
2    before?
3       A.    No.
4       Q.    Do you think a prudent executive
5    signing a $30 million note should take the time
6    to read the terms and conditions of the note?
7       A.    Not necessarily.
8       Q.    Under what circumstances do you
9    think that an executive shouldn't take the time
10   to read the terms and conditions of a
11   $30 million promissory note?
12      A.    When it is between affiliates,
13   between friendly affiliates with no even
14   inkling that bankruptcy or the parties could be
15   at odds create a note, when it is a soft note
16   with limited collateral and limited other
17   protections.  And then the servicing or value
18   of the note is de minimis relative to the
19   balance sheets of each entity I think is a good
20   reason or logical reason for the executives on
21   both sides not to spend much time focusing on
22   it.
23      Q.    All right.  So you thought it was
24   reasonable not to read this particular note for
25   the reasons you just gave.

1          DONDERO - 10/29/21
2       Do I have that right?
3       A.    Right.
4          MR. MORRIS:  Okay.  Can we go to the
5    next page, please.
6       Q.    Do you see Paragraph 5?  There is a
7    paragraph entitled Waiver.
8       A.    Yes.
9       Q.    And I will read it out loud:  Maker
10   hereby waives grace, demand, presentment for
11   payment, notice of non-payment, protest, notice
12   of protest, notice of intent to accelerate,
13   notice of acceleration, and all other notices
14   of any kind hereunder.
15         Have I read that correctly?
16      A.    Yes.
17      Q.    Do you know that that paragraph is
18   included in every single note that you signed
19   that is part of the litigation that we're here
20   to talk about today?
21      A.    You have to -- you have to define
22   when.  You know, like today I know that it
23   is -- it is in those notes.
24         At the end of '20, Seery and DSI
25   were withholding all notes, all information,

1          DONDERO - 10/29/21
2    anything regarding the company from any of the
3    other subsidiaries, and Frank was administering
4    the notes on behalf of both the related parties
5    and Highland.
6          So at the time -- at the time I
7    would have -- I would have never known that at
8    the end of 2020.  And it is crazy to think I
9    would have remembered a clause in a soft note
10   from three years earlier.
11      Q.    Okay.  Is it fair to say that -- do
12   you understand today that that provision is
13   included in every note that you signed?
14         MS. DEITSCH-PEREZ:  Object to the
15   form.
16      A.    You're saying it, so I believe you.
17   I'm not asking you to go show me all the other
18   notes, but --
19      Q.    Thank you.
20      A.    -- I'm assuming it is in all the
21   other notes.  I will take your word for it.
22      Q.    And is it fair to say that at the
23   time you signed these notes you didn't take the
24   time to read that particular provision?
25         MS. DEITSCH-PEREZ:  Object to the

DONDERO - 10/29/21

1
2  form.
3      A.   That is correct.  A lot of it is
4  boilerplate.  And, again, treasury or
5  accounting would have put in what was necessary
6  for regulatory, tax, audit purposes.  Maybe the
7  auditors put that in.  I have no idea.
8          But the content and the bullet
9  points here, the nine paragraphs on a soft note
10 would have been put in by other people and
11 administered by other people other than me.
12     Q.   What is a soft note?
13     A.   You know, like a secured – I mean,
14 a note that isn't a hard note, like a note that
15 isn't secured, deed in lieu, UCC filed,
16 guaranteed, you know, performance and bad boy
17 clauses and all of that other stuff.
18         A soft note is an unsecured loan
19 that has basic terms to it, but it is likely
20 subject to renegotiation over time.
21     Q.   Were any of the notes that you
22 signed subject to negotiation?
23     A.   Well, I'm saying by definition that
24 is what a soft note is.
25     Q.   One that – that is not subject to

DONDERO - 10/29/21

1
2  the negotiation – to negotiations?
3      A.   No, one that is over time subject to
4  negotiation or modification.
5      Q.   Okay.
6      A.   Because there is – there is
7  limited – there is limited, team collateral,
8  guarantee, bad boy features in – in a soft
9  note.
10     Q.   Okay.  Perhaps my question wasn't
11 clear.
12         Did the notes that you signed – did
13 you negotiate them with anybody, the terms of
14 each note?
15     A.   No.
16     Q.   Okay.  Did you personally decide on
17 the terms of each note?
18     A.   No.  Again, they were two highly
19 solvent, highly well-capitalized subsidiaries,
20 and the amount of the notes was de minimis and
21 friendly, and they were soft notes administered
22 by a centralized treasury shared services
23 department.
24
25         They were the ones deciding what it

DONDERO - 10/29/21

1
2  took to be compliant from an accounting
3  regulatory-wise standpoint, but wasn't – they
4  were trying to come up with a balance note,
5  which I think this is, such that it wouldn't
6  have to be negotiated or haggled by any of the
7  parties.
8          And there is no evidence of any of
9  the notes ever being haggled or ever being
10 negotiated.
11     Q.   Okay.  I appreciate that.
12         At the time you signed each of the
13 notes on behalf of the obligors, did the
14 obligors have an intention at the time you put
15 your signature on the page of repaying the
16 notes in accordance with their terms?
17     A.   Yes.  They're all – soft note
18 doesn't mean it's not a bona fide note.  They
19 were all intended to be bona fide notes, and
20 they all are bona fide notes that were intended
21 to be paid and for the – virtually most part,
22 were always paid or prepaid and, you know, paid
23 in accordance.
24     Q.   Do you see to the right there is a
25 list of prior notes?

DONDERO - 10/29/21

1
2      A.   Yes.
3      Q.   And is it your understanding that
4  this note substituted and superseded the
5  promissory notes that are listed on Exhibit A
6  on the page there?
7      A.   Yeah.  I mean, effectively pay those
8  off and reestablish an aggregate note.
9      Q.   Right.  And Exhibit A actually set
10 forth the outstanding principal and interest
11 that NexPoint owed Highland under the prior
12 notes as defined there as of May 31st, 2017;
13 right?
14     A.   Yeah, that is what it looks like.
15     Q.   Okay.  And – and so the total
16 principal amount of the prior notes was what is
17 stated there, approximately $27.675 million?
18     A.   Right.
19     Q.   Okay.  You wouldn't have signed this
20 note on behalf of NexPoint if you didn't
21 believe at the time you signed it that NexPoint
22 owed Highland that amount of money; correct?
23     A.   Yeah, it is a bona fide note,
24 consistent with my testimony.
25     Q.   Okay.  Do you know why NexPoint

DONDERO - 10/29/21

1
2 borrowed the money from Highland at the times
3 and in the amounts listed on Exhibit A?
4      A.   No.
5      Q.   Did you authorize NexPoint to borrow
6 the money that is reflected in the prior note
7 set forth on Exhibit A?
8      A.   I don't know.  Probably some of
9 them, yes.
10      Q.   Okay.  And you have no recollection
11 at all as to why NexPoint borrowed over
12 $27 million from Highland in the 12-month
13 period from August 2014 to July 2015?
14      A.   Not without being refreshed.
15      Q.   Okay.  Do you have any knowledge as
16 to what NexPoint did with the proceeds from
17 these loans?
18      A.   Not without being refreshed.
19      Q.   Okay.  And you contend that this
20 note is subject to -- subject to one of your
21 oral agreements with the Dugaboy trustee;
22 correct?
23      A.   Yes.
24      Q.   Who decided to include this
25 particular note in your agreement with the

DONDERO - 10/29/21

1
2 Dugaboy trustee?
3      A.   Me, myself.
4      Q.   Okay.  What was the purpose of
5 including this note in your agreement with the
6 Dugaboy trustee?
7          Was it to provide you with a
8 compensation?
9      A.   Yeah.  I mean, in fact, I think it
10 was articulated in that big paragraph
11 reasonably well that my cash compensation, I
12 believe through any lens, people would look at
13 it as de minimis from the standpoint of
14 Highland as asset manager.
15          I don't think it was more than a
16 couple million bucks in a year and it went
17 down, I think, in the '15 through '20 period.
18          So I think it is common in private
19 companies to loan money that is bona fide debt
20 and then forgive it at different times to
21 manage compensation and incentives to managers
22 of private companies.
23          This is a -- we're in -- we each
24 have experts talking about it, but I think this
25 is, you know, typical.

DONDERO - 10/29/21

1
2      Q.   Can you identify any moment in the
3 25 or 26 year history that you were president
4 of Highland where Highland forgave an
5 intercompany loan for the purpose of providing
6 compensation to you or any other employee
7 except for the agreements that are described in
8 Paragraph 82 of your answer?
9      A.   Boy, I know we have masked it.  I
10 don't know if we -- it sounds like we may not
11 have sent it to you, but we have done it for a
12 dozen employees over the years in -- in fairly
13 significant amount --
14      Q.   I'm going to interrupt you, sir,
15 because it's not responsive to my question.  I
16 apologize for that.  I'm just focusing on
17 intercompany loans.
18          Can you identify any loan in the 25
19 or 26 years that you were president, an
20 intercompany loan where -- where Highland was
21 the payee that was forgiven for purposes of
22 giving you or any employee compensation, other
23 than -- other than the agreements that you
24 struck with the Dugaboy trustee?
25      A.   It is an odd question because I'm

DONDERO - 10/29/21

1
2 the only one at the compensation level with the
3 interrelated entities who could possibly get
4 intercompany loans forgiven as part of the
5 comp, but it --
6      Q.   Okay.  So let me ask a cleaner --
7 let me ask a cleaner question.  I appreciate
8 that clarification.
9          Other than the agreements described
10 in Paragraph 82, can you think of any other
11 intercompany loan that was ever forgiven while
12 you were president of Highland for the purpose
13 of giving you compensation?
14      A.   I don't -- I don't know.
15      Q.   This is an important issue; right?
16 The notion of a prior practice.  It is your
17 contention that there was a prior practice at
18 Highland -- hold on one second.  I apologize.
19          Sorry about that.  Somebody almost
20 dropped an air conditioner out the window.
21          MS. DEITSCH-PEREZ:  That would not
22 be good.
23          MR. MORRIS:  No.
24      Q.   All right.  Apologies.
25          MR. MORRIS:  May I have the last

DONDERO - 10/29/21

1     question read back?
2
3     (Record read.)
4     Q.   I'm going to start all over here.
5          Mr. Dondero, do you contend that
6     there was a practice at Highland of forgiving
7     loans; is that correct?
8     A.   Yes.
9     Q.   And do you recall that we talked
10    about that issue back in May?
11    A.   Yes.
12    Q.   Okay.  And since – since that time
13    have you made any effort to gather any
14    information that would demonstrate that there
15    was a prior practice at Highland of forgiving
16    loans?
17    A.   Yes.
18    Q.   And what efforts have you made?
19    A.   Like I said, we amassed a list, and
20    not insignificant list and not insignificant
21    amounts, proportionate to the people's
22    compensation where it was a practice.
23         You know, for some people for
24    relocation, for some people for bonuses, for
25    house purposes, for senior executives, senior

DONDERO - 10/29/21

1
2     executives at the bank and board members at the
3     bank in the seven-figure kind of numbers that
4     were then subsequently forgiven.
5          It is – I know we amassed more than
6     a dozen examples that were significant and
7     material.
8          MR. MORRIS:  Deborah, I apologize.
9     It is certainly possible I missed it, but I
10    don't recall seeing any list or any
11    documents of any kind that Mr. Dondero has
12    described.
13         Have they been produced?
14         MS. DEITSCH-PEREZ:  I think so.  I
15    will double-check, but I believe that
16    they're listed –
17         MR. MORRIS:  I know there is a list
18    of – I apologize.  I know there is a list
19    of names in one of the discovery responses.
20    But other than the list of names in the
21    discovery response, I don't recall
22    receiving any documents at all.
23         MS. DEITSCH-PEREZ:  No.  And I think
24    we asked you for the documents because we
25    don't have access to the documents on

DONDERO - 10/29/21

1
2     Highland's server.  The only thing I can
3     think of that we might owe you is there
4     might be a few additional names to list in
5     the interrogatory, and I will check whether
6     that has been done.
7          MR. MORRIS:  Okay.
8     Q.   Mr. Dondero, you sign management
9     representation letters in connection with
10    Highland's audit each year; is that right?
11    A.   Yes.
12    Q.   Do you understand that you have an
13    obligation when you sign the management
14    representation to disclose to the auditor all
15    agreements with affiliated entities and people
16    that are deemed to be material?
17         MS. DEITSCH-PEREZ:  Object to the
18    form.
19    A.   Generally, yes.
20    Q.   Okay.  And is it your understanding
21    that at least since 2008 Highland has disclosed
22    to its auditors all agreements with affiliates
23    that are material, as defined in the management
24    representation letter?
25    A.   Yes.

DONDERO - 10/29/21

1
2     Q.   And would that include any
3     agreements to forgive loans that were deemed to
4     be material amounts?
5     A.   No, because it is contingent in long
6     term and speculative.
7     Q.   But at some point if it is forgiven
8     would that be – would that be an event that
9     would be disclosed to the auditor?
10    A.   Sure.
11    Q.   Okay.  So is it fair to say that all
12    loans that were deemed to be material to the
13    extent they were forgiven were disclosed to the
14    auditors?
15    A.   Yes.
16    Q.   Okay.
17    A.   But, yeah, the only caveat I would
18    put on it is we have such limited information
19    regarding Cornerstone and Trust Life, which is
20    part of my agreement with the Dugaboy trustee
21    or with the majority of class A holders.
22         They could have been sold in
23    secrecy, without disclosure to us, such that
24    the notes are all forgiven at this point, but
25    we – we – we may never know.

Page 428

DONDERO - 10/29/21

1
2    Q.   So you can't rely on anything that
3  you don't know; is that fair?
4    A.   Yeah.
5        MS. DEITSCH-PEREZ:  Objection to
6  form.
7    A.   Yeah, we can't rely on things we
8  don't know and we can't rely on the debtor to
9  be honorable.
10    Q.   Well, the debtor has produced to
11  you, sir, every single audited financial
12  statement without redaction since 2008.  Are
13  you aware of that?
14    A.   That is actually news to me because
15  we were asking for them a couple of months ago.
16  That must be -- that must be a new production.
17    Q.   No.  Actually, it was produced to
18  you way back in July.  You are not aware of
19  that?
20    A.   No, I'm looking --
21        MS. DEITSCH-PEREZ:  Hang on.
22    A.   I'm looking at Deborah.  She'll --
23        MS. DEITSCH-PEREZ:  I will get the
24  date.
25    A.   Yeah.  I would love to see them.

Page 429

DONDERO - 10/29/21

1
2    Q.   So then -- so then it -- so is it
3  fair to say, sir, that when you are describing
4  this practice of forgiveness of loans, you are
5  doing so without having reviewed any of the
6  audited financial statements that Highland
7  provided to your attorneys going back to 2008?
8        MS. DEITSCH-PEREZ:  Object to the
9  form.
10    A.   What I'm saying, I guess, is that we
11  haven't treated the loans as forgiven yet
12  because if the condition precedent has been
13  satisfied, we're not aware of it yet.
14        Now, if there is something in those
15  financial statements that will show that the
16  condition precedent is satisfied, then we have
17  a decision to make about the -- or figure out
18  what the mechanism is for forgiving the loans.
19    Q.   Are you saying that there are loans
20  out there subject to forgiveness where the
21  maker is somebody other than you or an entity
22  that you control?
23    A.   No, I'm just -- I'm talking about
24  the 50 million of loans that we've been talking
25  about.

Page 430

DONDERO - 10/29/21

1
2    Q.   Okay.  So -- so I just want to go
3  back and focus on your assertion that there was
4  this practice of loan forgiveness.  I think you
5  have agreed with me that any loan that was
6  forgiven in a material amount would be
7  contained within the Highland audited financial
8  statements; right?
9    A.   I believe they -- material or not,
10  they were all included in the Highland
11  financials.  Now, they might not have been
12  specifically footnoted, you know.
13        Like in other words, if we gave
14  somebody half a million bucks to relocate and
15  then forgave the loan, it might just be mixed
16  with all other compensation in the line item.
17  It might not have been listed separately
18  because it would have been small relative to
19  the overall financial statement.
20    Q.   But you're just speculating right
21  now because, in fact, you haven't read the
22  audited financial statements for the purpose of
23  seeing whether or not there were loan -- loans
24  that were forgiven and disclosed; right?
25        MS. DEITSCH-PEREZ:  Object to the

Page 431

DONDERO - 10/29/21

1
2  form.
3    A.   Well, what I'm saying, just to be
4  clear, is I haven't looked at the presentation
5  of forgiven loans in the historic financials
6  because I was unaware that we had gotten
7  historic financials, but I am testifying that
8  we had amassed at least a dozen, 15 material
9  examples of material loan forgiveness amounts
10  to different executives.
11    Q.   All right.  Do you have any
12  documentation to support your assertion of the
13  practice of forgiving loans at Highland?
14    A.   Again, we have very, very little
15  access to anything, and we didn't take anything
16  with us that we weren't supposed to take, so we
17  don't have any of that documentation.
18        At NexBank, one of the sister
19  companies that we still have full control over
20  our records, we could show seven-figure-plus
21  loans to senior management and the entire board
22  of directors and forgiveness thereof as an
23  example, but that -- that is the only
24  documentation that we would be able to present
25  without having access to the records that you

DONDERO - 10/29/21

1
2 guys are keeping from us.
3        MR. MORRIS: I move to strike the
4    last comment, and I take offense to it,
5    sir. We're not withholding anything, okay.
6    Q.    Would the NexBank audited financial
7 statements include a disclosure of the loans
8 that you are describing?
9    A.    Yes.
10   Q.    Okay. So is it fair to say that if
11 Highland forgave loans, it would be disclosed
12 in its audited financial statements?
13        MS. DEITSCH-PEREZ: Object, asked
14    and answered.
15    A.    Well, just to be clear, these loans
16 like the one up on the sheet, those were
17 included in Highland's financials, those loans,
18 just like the NexBank loans, when they were
19 made to senior executives were included. But
20 there wasn't a – at NexBank there wasn't any
21 kind of disclosure that said, these might be
22 forgiven, or these are the terms that they
23 would be forgiven under, just like there was no
24 disclosure in the Highland financials that
25 these are the terms that it might be forgiven

DONDERO - 10/29/21

1
2 under, et cetera, et cetera.
3    Q.    It's certainly disclosed in the
4 financials when it was forgiven. Will you --
5 will you concede that point?
6    A.    Yes, sure.
7    Q.    Okay. Let's move on.
8        Let's go to HCMS. Are you familiar
9 with the notes at issue in the lawsuit that was
10 commenced by Highland against HCMS?
11        MS. DEITSCH-PEREZ: S or –
12    A    S as in Services. Yes.
13        MR. MORRIS: Okay. Can we please
14    put up Exhibit 3.
15        (Exhibit 3 marked.)
16        MS. DEITSCH-PEREZ: Is that in the
17    binder that you sent?
18        MR. MORRIS: Yes, as Exhibit 3.
19        MS. DEITSCH-PEREZ: Okay.
20        MR. MORRIS: And if we could go to
21    the Exhibits 1 through 4, okay.
22    Q.    Sir, we've put up on the screen
23 Exhibit 1 to Exhibit 3, which is the complaint
24 against HCMS. Do you see Exhibit 1 up on your
25 screen?

DONDERO - 10/29/21

1
2    A.    Yeah. This is the $150,000
3 promissory note; is that what that is?
4    Q.    Yes, sir.
5    A.    Okay. As long as I can see it on
6 the screen, I don't need to find it in hard
7 copy, do I?
8        MS. DEITSCH-PEREZ: Yeah.
9        MR. MORRIS: Can you scroll to the
10    second page, PJ.
11    Q.    Is that your signature, sir?
12    A.    Close.
13    Q.    Are you aware that your signature is
14 affixed to a $150,000 promissory note that was
15 made by HCMS to Highland Capital Management?
16    A.    Like I said –
17        MS. DEITSCH-PEREZ: Objection, form.
18    A.    Like I said, it's close. I don't
19 know if that is mine, but it's close.
20    Q.    Do you have any reason to believe
21 that either you or somebody you authorized
22 didn't sign this particular promissory note?
23    A.    Not specifically.
24        MR. MORRIS: Okay. Can we go to the
25    first page, please.

DONDERO - 10/29/21

1
2    Q.    Did HCMS receive a loan from
3 Highland in the amount of $150,000 on March
4 28th, 2018?
5    A.    I assume so.
6    Q.    Okay. You wouldn't have either
7 signed or allowed your signature to be affixed
8 to this document if you didn't understand that
9 HCMS had received from Highland $150,000;
10 correct?
11    A.    This is one of the many things I
12 would have signed on a given day.
13    Q.    Okay. And -- are you aware that
14 this note was given to Highland's auditors?
15    A.    It could. I'm not aware
16 specifically, but it should be.
17    Q.    Okay. Do you have any recollection
18 as to why HCMS obtained this loan from
19 Highland?
20    A.    Unless it says it on these two
21 pages, I have no idea.
22    Q.    Okay. Do you have any recollection
23 as to what HCMS did with the proceeds of this
24 loan?
25    A.    No.

DONDERO - 10/29/21

1
2 Q. Okay. Let's just flip through the
3 Exhibits 2, 3, and 4, if we could.
4 Looking at Exhibit 2, is that your
5 signature on Exhibit 2, sir?
6 A. Again, it is close.
7 Q. Okay. And do you have any reason to
8 believe that that is either not your signature
9 or that you did not authorize somebody to sign
10 this on behalf of HCMS in June of 2018?
11 A. No.
12 Q. Okay.
13 MR. MORRIS: Can we go to Exhibit 3,
14 please, and if we can go to the signature
15 line.
16 Q. Do you see that that is Frank
17 Waterhouse?
18 A. Yes.
19 MR. MORRIS: Okay. And can we go to
20 the page before that, the first page.
21 Q. Frank Waterhouse was the treasurer
22 of HCMS in May 2019; correct?
23 A. That is what it said right on that
24 thing we saw earlier; right?
25 Q. Incumbency certificate.

DONDERO - 10/29/21

1
2 A. Yes.
3 Q. Do you recall that HCMS borrowed
4 $400,000 from Highland in or around May 2019?
5 A. Not specifically.
6 Q. Do you have any reason to believe
7 that it didn't?
8 A. I have no knowledge -- I have no
9 knowledge of what it was used for and whether
10 it did or didn't.
11 MR. MORRIS: Okay. Let's go to the
12 next exhibit, please.
13 Q. Do you see Frank Waterhouse signed
14 here on behalf of the maker, HCMS Services?
15 A. Yes.
16 Q. Okay. Are you aware that HCMS
17 borrowed $150,000 from Highland in June 2019?
18 A. No.
19 Q. Okay. Do you have --
20 A. I'm not aware and --
21 Q. Do you have --
22 A. I didn't -- I'm sorry, go ahead. I
23 was just saying, looking at Frank's signature,
24 you know, we're switching from me signing to
25 Frank signing. And I guess we're saying Frank

DONDERO - 10/29/21

1
2 is an authorized signatory, although if you
3 look at Frank's, it looks like an automated
4 signature versus, you know, an actual
5 signature, but I assume you went over this with
6 him, but I don't have specific knowledge of
7 these at all.
8 Q. And do you know that Mr. Waterhouse
9 from time to time used an electronic signature?
10 MS. DEITSCH-PEREZ: Object to the
11 form.
12 A. I believe he did.
13 Q. And you saw -- you have seen his
14 electronic signature on other documents; is
15 that right?
16 A. Yes.
17 Q. So it doesn't surprise you to see
18 his electronic signature on a note; correct?
19 A. Yeah. Yeah, okay. Yeah, I don't
20 know. But whether or not he did it or somebody
21 else did it or -- we're just getting a little
22 far afoot from me signing it; right? That is
23 all.
24 Q. Right.
25 A. To -- Frank -- Frank may have signed

DONDERO - 10/29/21

1
2 it. He may have done it electronically or
3 somebody may have done it electronically for
4 him. Those are just different answers than me
5 signing it; right?
6 Q. Okay. And -- and that is fair.
7 Are you aware that on December 3rd,
8 2020, Highland made a demand upon HCMS for
9 payment under these four notes that we have
10 just looked at?
11 A. I knew there was a demand on the
12 NexPoint one. Can you refresh me on this one?
13 Q. Sure.
14 MR. MORRIS: Can we go to the next
15 exhibit in Exhibit 3. Exhibit 5.
16 Q. You will see that there is a letter
17 dated December 3rd, 2020, from Mr. Seery to
18 HCMS?
19 A. Yep.
20 Q. And do you see that it was sent to
21 the attention of Mr. Waterhouse?
22 Do you see that, sir?
23 A. Yes, yep.
24 Q. And, again, Mr. Waterhouse at that
25 time was the treasurer of HCMS to the best of

DONDERO - 10/29/21

1  
2  your recollection; correct?
3      A.   He primarily was the CFO of
4  Highland.  But, yes, I mean, I do see that.
5      Q.   Okay.  And did you learn on or
6  around December 3rd that Highland had made
7  demand upon HCMS for payment of all outstanding
8  principal and interest due under the four
9  demand notes that are listed on the page there?
10     A.   Yes, yep.
11     Q.   So you knew that at the time; right?
12     A.   Well, more importantly I knew they
13  were all subject to the same forgiveness
14  provisions as the other note.
15     Q.   Okay.  So I move to strike.
16          You knew in December 3rd, 2020, that
17  Highland made demand; correct?
18     A.   Yes.
19     Q.   Okay.  And do you see that Highland
20  gave HCMS an eight-day grace period or until
21  December 11th, 2020, to make payment?
22     A.   Yes.
23     Q.   Under the demand note do you have
24  any understanding that Highland was required to
25  give any grace period at all?

DONDERO - 10/29/21

1  
2      A.   I don't know.
3          MS. DEITSCH-PEREZ:  Object to the
4      form.
5      Q.   Do you know whether HCMS ever
6  responded to this demand letter prior to the
7  commencement of litigation?
8      A.   I don't know.
9      Q.   Prior to the commencement of
10  litigation, did you discuss with anyone whether
11  HCMS should respond to Highland's demand
12  letter?
13     A.   Did I discuss with anyone?  No, I
14  don't remember -- I don't remember talking
15  about this with Frank at all where --
16          MS. DEITSCH-PEREZ:  And I'm just
17      going to stop you to make sure you don't
18      blurt out any privileged communications, if
19      there are any.
20          We object to the disclosure.  But
21      with that caveat, go ahead.
22     A.   I'm sorry, repeat the question
23  again.  Let me try and keep it simple here.
24     Q.   Sure.  It may be my fault.
25          Mr. Dondero, you testified that you

DONDERO - 10/29/21

1  
2  were aware that Highland made a demand for
3  payment on these four notes; correct?
4      A.   Yes.
5      Q.   Okay.  Did you have any
6  non-privileged communications at any time after
7  Highland sent this letter about whether and how
8  HCMS should respond?
9      A.   You know, let me just -- let me
10  adjust the prior answer for a second.
11          I'm aware that this letter was sent.
12  I'm not sure I knew contemporaneously or when I
13  knew the letter was sent.  I can't -- I have no
14  recollection of receiving it at the time.
15          And to answer your question, I can't
16  recollect talking to Frank or anybody else
17  about it at the time.  I'm not sure I knew
18  about it at the time.  But I have -- I don't
19  have any recollection of discussing it with
20  anybody at or around the time.
21     Q.   Did you ever instruct anybody at any
22  time to respond to this letter, whenever it is
23  you learned about it?
24     A.   No.
25     Q.   Do you know if anyone acting on

DONDERO - 10/29/21

1  
2  behalf of HCMS ever informed Highland of HCMS'
3  defenses to the -- to the demand letter prior
4  to the commencement of litigation?
5      A.   Yeah, Frank would be the person to
6  ask there.  I don't know.
7      Q.   I'm just asking you.  Prior to the
8  commencement of litigation, did you ever
9  instruct anyone to inform Highland that the
10  HCMS notes were subject to oral agreements with
11  the Dugaboy trustee?
12     A.   I believe former Judge Lynn sent a
13  letter in that regard.  But other than that, I
14  don't remember talking to anybody -- I don't
15  remember talking to the debtor about it per se.
16     Q.   It is your recollection that
17  Judge Lynn sent a letter to Highland before the
18  commencement of litigation, putting Highland on
19  notice that the HCMS notes were the subject of
20  oral agreements between you and the Dugaboy
21  trust.
22          Do I have that right?
23     A.   Yeah, that they were part of
24  forgiveness or compensation or something.  He
25  sent a letter in that regard.

Page 444

```
1            DONDERO - 10/29/21
2     Q.   And was this part of a settlement
3  discussion or was this in response to this
4  demand letter?
5     A.   I don't know.
6     Q.   Have you produced that letter in
7  discovery?
8          MS. DEITSCH-PEREZ:  I'm aware that
9     you have the letter.  I don't know if it
10    was attached to something, but I know you
11    have it.
12         MR. MORRIS:  Because you produced it
13    in discovery or because Mr. Dondero is
14    testifying that his recollection was that
15    Mr. Dondero sent this letter to the debtor?
16         MS. DEITSCH-PEREZ:  The -- the
17    letter has either been produced or was
18    attached to something or was used in a
19    deposition, but I am aware that you have
20    it.  If you need it to be Bates stamped, we
21    could do that.
22         MR. MORRIS:  I definitely need it to
23    be Bates stamped, I do, because I'm not
24    aware of this particular letter.  But I
25    appreciate that.
```

Page 445

```
1            DONDERO - 10/29/21
2          MR. RUKAVINA:  This is Davor.
3     Couple things, John -- and I apologize for
4     interjecting.  I have not made an
5     appearance yet today.  Deborah has been
6     objecting for everyone.
7          Thomas Berghman will take over
8     around 3:00 o'clock.  Is that okay with
9     you, John?
10         He is probably just going to sit
11    here and not object.
12         MR. MORRIS:  I will miss you and I
13    hope you have safe travels.
14         MR. RUKAVINA:  Okay.  Thank you very
15    much.
16         And, second, I think that the letter
17    that is being referred to is the email
18    letter, so I have produced it to you.
19         With that, thank you everyone.
20         MR. MORRIS:  Okay.  Take care.
21    Q.   Did anyone -- did you ever instruct
22 anyone in December 2020 to make the payments
23 that Highland demanded under the HCMS notes?
24         MS. DEITSCH-PEREZ:  The demand notes
25    that are listed here on the Exhibit 5?
```

Page 446

```
1            DONDERO - 10/29/21
2          MR. MORRIS:  Yes.
3     A.   Yes, not that I recall.
4     Q.   Did you ever instruct anyone in
5  December 2020 not to make the payments that
6  Highland demanded that are listed in this
7  exhibit?
8     A.   No.
9     Q.   Do you know why HCMS did not make
10 the payments that Highland demanded under the
11 notes?
12    A.   Again, beyond compensation
13 forgiveness argument, no.
14         MR. MORRIS:  Okay.  Let's go to the
15    next exhibit, 6.
16         (Exhibit 6 marked.)
17    Q.   And this is another one of the term
18 notes; right?
19    A.   Yes.
20         MR. MORRIS:  And can we just go to
21    the signature line, please.
22    Q.   Is that your signature, sir?
23    A.   That looks more like it.
24    Q.   And do you -- are you willing to
25 agree that you signed this promissory note in
```

Page 447

```
1            DONDERO - 10/29/21
2  favor of Highland on May 31st, 2017?
3     A.   Yes.
4     Q.   And is it fair to say you didn't
5  read this note before you signed it?
6     A.   Correct.  No reason to, really.
7     Q.   Okay.  So it is fair to say that
8  there is not a provision of this note that you
9  didn't understand before you signed it;
10 correct?
11         MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   That I didn't review it, so
14 therefore I didn't have an opinion one way or
15 the other.
16    Q.   Okay.  This note substituted and
17 superseded for the promissory notes that are
18 set forth on Exhibit A to this document;
19 correct?
20    A.   Yes.
21    Q.   So just like NexPoint and HCMS, HCRE
22 also consolidated their outstanding demand
23 notes into one term notes at the end of
24 May 2017; right?
25    A.   Yep.
```

Appx. 01782

DONDERO - 10/29/21

1
2    Q.   Okay.  Let's go to HCRE, if we can
3 take this down and put up Exhibit 4.
4         Actually, before we go to that, do
5 you have any recollection as to why HCRE
6 borrowed money from Highland in the amounts
7 equal to the prior notes as set forth to the
8 exhibit to the term note?
9    A.   Nope.
10   Q.   Do you have any recollection at all
11 as to what HCRE did with the proceeds of the
12 loans that it obtained from Highland?
13   A.   No.
14   Q.   This is Exhibit 4, so this is the
15 complaint -- this is actually the complaint
16 against HCRE.
17        MR. MORRIS:  Can we go to Exhibit 6,
18   please.
19        MS. DEITSCH-PEREZ:  Exhibit 6 of
20   Exhibit 4?
21        MR. MORRIS:  No, I apologize.  That
22   was my mistake.  Yes, Exhibit 6 to Exhibit
23   4.
24        MS. DEITSCH-PEREZ:  Okay.  If you
25   want the hard copy, it is in a booklet.

DONDERO - 10/29/21

1
2    Otherwise, she is pulling it up.
3    Q.   So this is the last of the three
4 term notes.  Do you see that?
5    A.   Yes.
6    Q.   Also signed on May 31st, 2017;
7 correct?
8    A.   Yes.
9    Q.   And if we could look at the
10 signature line, is that your signature, sir?
11   A.   Yes.
12   Q.   And did you sign this note on behalf
13 of HCRE on or about May 31st, 2017?
14   A.   Yes.
15   Q.   Did you read this note before you
16 signed it?
17   A.   No.
18   Q.   And since you didn't read it, is it
19 fair to say that there wasn't a provision of
20 this agreement that you didn't understand at
21 the time that you signed it?
22        MS. DEITSCH-PEREZ:  Object to the
23   form.
24   A.   There is -- there wasn't a
25   provisions I did or didn't understand because I

DONDERO - 10/29/21

1
2 didn't review it.
3    Q.   Okay.  This note substituted and
4 superseded for the promissory notes that are
5 listed on Exhibit A on the right side of the
6 page; correct?
7    A.   Yes.
8    Q.   And Exhibit A set forth the
9 outstanding principal and interest that HCRE
10 owed to Highland under the prior notes as of
11 May 31st, 2017; correct?
12   A.   Uh-huh.
13   Q.   That is a yes, sir; correct?
14   A.   Yes.
15   Q.   Okay.  Do you know why HCRE borrowed
16 the money from Highland at the times and -- and
17 in the amounts set forth on Exhibit A to the
18 promissory note?
19   A.   No.
20   Q.   Do you have any recollection as to
21 what HCRE did with the proceeds of the loans
22 that they had obtained from Highland between
23 January 2014 and April 2015?
24   A.   No.
25   Q.   Can we call the three term notes

DONDERO - 10/29/21

1
2 that were signed by NexPoint, HCRE, and HCMS on
3 May 31st, 2017 collectively as the term notes?
4    A.   Yes.
5    Q.   Okay.  You had the authority to sign
6 each of the term notes on behalf of each of the
7 respective makers; correct?
8    A.   Yes.
9    Q.   Each of the term notes was for a
10 30-year term; correct?
11   A.   I believe so.
12   Q.   Okay.  Who decided to give each note
13 a 30-year term, if you know?
14   A.   The auditors, the accountants, not
15 me.
16   Q.   But you knew that each of the notes
17 was for a 30-year term; is that fair?
18   A.   Yes, I guess, yes.
19   Q.   Notes were unsecured; right?
20   A.   Yes.
21   Q.   And the notes were not the product
22 of any negotiations; correct?
23   A.   Correct.
24   Q.   Is it fair to say that none of the
25 makers of the term notes ever sought financing

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  from a third party as an alternative to the
3  Highland notes?
4      A.  That's correct.
5      Q.  Okay.  You don't have any reason to
6  believe that an unrelated third party would
7  have loaned money to NexPoint, HCRE, and HCMS
8  on the terms set forth in each of the term
9  notes, do you?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      A.  I -- it is not fair to draw that
13  conclusion.  You know, particularly NexPoint
14  has borrowed a lot of money at much lower rates
15  at or around 2017 and later, and to this day.
16      Q.  So then why --
17      A.  The same thing with HCRE.
18      Q.  So then why would HCRE and NexPoint
19  enter into these loans rather than obtaining
20  loans at lower interest rates if they were
21  available?
22      A.  These are soft loans, again, so
23  they're -- especially affiliate soft loans to
24  other creditors are viewed almost as equity or
25  subordinated to senior secured mortgages or

1  DONDERO - 10/29/21
2  other financings that NexPoint and HCRE did.
3  So I would say that is -- that is the reason.
4      Q.  Are you saying that Highland today
5  really has equity interests in NexPoint, HCRE,
6  and HCMS?
7      MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.  Yeah, no, I didn't say that.  I'm
10  saying it has subordinated debt interest, but
11  they are soft notes, so they're viewed as
12  deeply subordinated equity-ish, so to speak, as
13  far as the senior secured debtholders are
14  concerned.
15      Q.  Well, that would be true of any
16  senior secured debt relative to unsecured debt;
17  isn't that right?
18      A.  Yes, but again, these are
19  particularly soft notes, you know.
20      Q.  Okay.  At the time you signed these
21  notes, were you aware that each of the term
22  notes required payment of an annual installment
23  on December 31st of each year?
24      MS. DEITSCH-PEREZ:  Object to the
25  form.

1  DONDERO - 10/29/21
2      A.  I knew there was more required
3  periodic payments than historically, and that
4  was part of -- partly driven by the -- the
5  auditors, I believe.
6      THE WITNESS:  You know what, can
7  we -- can we take a break for like five or
8  10 minutes, and then, you know, at most --
9  at most I've got another hour in me today,
10  and then so we could just work on when it
11  fits on everybody else's calendar if we
12  can't wrap up in an hour; okay?
13      MR. MORRIS:  No problem,
14  Mr. Dondero.  So the time now is what --
15  what time do we have?
16      VIDEOGRAPHER:  Off the record, 2:56.
17  (Recess taken 2:56 p.m. to 3:19 p.m.)
18      VIDEOGRAPHER:  Back on the record,
19  3:19.
20      Q.  Are you ready to proceed, sir?
21      A.  Yes.
22      Q.  Okay.  Did you speak with anybody
23  during the break about the substance of this
24  deposition?
25      A.  No.

1  DONDERO - 10/29/21
2      Q.  So we were just looking at the third
3  in the series of term notes, and if we can go
4  to the -- I apologize, the first page of this
5  one, just to refresh your recollection after
6  the break that this is the term note that was
7  executed by you on behalf of HCRE Partners on
8  May 31st, 2017.
9      Do you see that?
10      A.  Yes.
11      Q.  Okay.  And I looked at Paragraph 5
12  before, but I just want to make sure, you're
13  telling me that you didn't read this before you
14  signed it, do I have that right, Paragraph 5?
15      A.  Yes.
16      Q.  And so you are unaware -- when did
17  you first -- when did you first become aware of
18  the provision that is set forth in Paragraph 5?
19      MS. DEITSCH-PEREZ:  Object to the
20  form.
21      A.  I don't know.
22      Q.  Okay.  Was it before or after the
23  commencement of the litigation?
24      A.  I don't know.
25      Q.  Okay.  NexPoint didn't make the

DONDERO - 10/29/21

1 DONDERO - 10/29/21
2 installment payment that was due at the end of
3 2020; correct?
4     MS. DEITSCH-PEREZ: Object to -- are
5 you still talking -- have you left HCRE?
6     MR. MORRIS: No. I said what I
7 meant to. So we can take down the exhibit
8 if that's the part that is confusing you.
9 I appreciate that.
10     MS. DEITSCH-PEREZ: Okay.
11     Q. Okay. NexPoint didn't make the
12 installment payment that was due at the end of
13 2020; correct?
14     MS. DEITSCH-PEREZ: Object to the
15 form.
16     A. Yeah. I mean, I think maybe the
17 right way to describe it is Highland or --
18 yeah, Highland or Frank Waterhouse on behalf of
19 NexPoint didn't make the payment.
20     Q. Okay. And HCRE didn't make the
21 installment payment that was due at the end of
22 2020; correct?
23     A. I don't -- I guess -- okay, if they
24 missed it too, I -- I did not have specific
25 awareness to that, I guess, but if you are

1 DONDERO - 10/29/21
2 suing under it, I guess they did.
3     Q. Right. And HCMS didn't make the
4 payment that was due at the end of the year, to
5 the best of your knowledge; correct?
6     MS. DEITSCH-PEREZ: Object to the
7 form.
8     A. Yeah. I mean, what I'd just
9 separate in my notes here is the HCMFA was just
10 not -- it wasn't a bona fide note, I guess,
11 is -- that is -- which I guess is a
12 different -- a different conversation.
13     Q. Yeah. Do you understand that the
14 question was about HCMS? Let me restate the
15 question.
16     MS. DEITSCH-PEREZ: Yes.
17     Q. HCMS --
18     A. Oh, I'm sorry.
19     MS. DEITSCH-PEREZ: John, I'm sorry,
20 it is really hard on the video to
21 distinguish between HCMF and HCMS, so if
22 you could just --
23     A. How about just say Services for
24 Highland Capital Management Services, just
25 say -- instead of S, just say Services.

1 DONDERO - 10/29/21
2     Q. Sure. All right. So from now on, I
3 will try and use the word "Services" and you
4 will know that means Highland Management
5 Services, Inc.; is that fair?
6     A. Yes, okay.
7     Q. Okay. So Services didn't make the
8 installment payment that was due at year-end;
9 correct?
10     A. Yes.
11     Q. Okay. And I just want to make sure
12 that I have this right. Is it -- is it the
13 corporate obligors' -- those three corporate
14 obligors' contention that one of the reasons
15 they didn't make the payments at the end of the
16 year is that they were relying on Highland to
17 make the payment for them?
18     A. Absolutely.
19     Q. Okay.
20     A. It was due course de minimis, and
21 those entities didn't have a single employee or
22 capable financial person other than the people
23 at Highland that were doing the shared services
24 for them.
25     Q. NexPoint didn't have any employees

1 DONDERO - 10/29/21
2 in December 2020. Is that your testimony?
3     A. I was thinking about HCRE and
4 Services had zero employees. NexPoint had
5 employees but none that were involved in basic
6 accounting functions.
7     Q. Okay. And -- and there are people,
8 including yourself, who were officers or
9 employees of NexPoint in December 2020;
10 correct?
11     A. Yes.
12     Q. And HCRE had officers in December
13 2020, including you; correct?
14     A. Yes. Officers, yes.
15     Q. And Services had officers in
16 December 2020, including you; correct?
17     A. Yes.
18     Q. Okay. I think in summary form, to
19 be fair, I think we have identified one of the
20 defenses for these three corporate obligors.
21     Two of them have the defense of
22 prepayment; right?
23     A. Yes.
24     Q. And one of them is NexPoint,
25 NexPoint has the defense of prepayment.

Page 460

DONDERO - 10/29/21

1
2    Do you have that -- do I have that
3  right?
4    A.  Yes.
5    Q.  Which of the other two, remind me?
6    A.  Services.
7    Q.  Okay.  So NexPoint and Services have
8  the defense of prepayment.  Are there any other
9  reasons that you know of that these three
10  corporate obligors didn't make the annual
11  installment payment that was due at the end of
12  the year?
13    MS. DEITSCH-PEREZ:  Object to the
14    form.
15    A.  Again, they -- they should have been
16  in regular course.  Those payments -- using the
17  word "payment" is almost like an overstatement
18  of the significance or the amount.  If the
19  amounts were small in all cases, they should
20  have been made or they should have been paid,
21  even in the context of contention and even in
22  the context of the larger amounts of money that
23  Highland owed us.
24    Q.  I'm just -- I'm just asking a pretty
25  simple question, sir.  I don't mean to be

Page 461

DONDERO - 10/29/21

1
2  contentious with you.  We have identified one
3  defense that these corporate obligors contends
4  exists; and that is, Highland was supposed to
5  make the payment.  Fair?
6    A.  Yes.
7    Q.  And then we have identified a second
8  defense for NexPoint and HCMS, and that is
9  their defense that they prepaid.
10    Do I have that generally right?
11    A.  Yes.
12    Q.  Can you describe for me any other
13  defenses that these three corporate obligors
14  have for not making the payment that was due at
15  the end of the year?
16    MS. DEITSCH-PEREZ:  Object to the
17    form.
18    A.  I'm thinking.  Not at the moment.
19    Q.  Okay.  Did you instruct anyone in
20  December of 2020 to make the installment
21  payments that were due on December 31st under
22  these three term notes?
23    MS. DEITSCH-PEREZ:  Object to the
24    form, asked and answered.
25    A.  No.

Page 462

DONDERO - 10/29/21

1
2    Q.  Okay.  Did you take any steps to
3  confirm that Highland would make the payments
4  that were due under these three term notes at
5  the end of the year?
6    MS. DEITSCH-PEREZ:  Object to the
7    form.
8    A.  No.  I testified already the first I
9  heard about it was a week or two later.  And I
10  called up Frank and confirmed with him to make
11  sure they got paid and make sure they were back
12  in compliance.
13    Q.  Okay.
14    MR. MORRIS:  I move to strike
15    everything after the word "no."
16    Q.  Do you know whether anybody on
17  behalf of any of the three corporate obligors
18  under the term notes ever directed Highland to
19  make the payments under them at the end of the
20  year?
21    MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.  Not before the end of the year, no.
24    Q.  Okay.  And do you know whether
25  anybody acting on behalf of any of the three

Page 463

DONDERO - 10/29/21

1
2  corporate obligors under the term notes ever
3  took any steps in December 2020 to make sure
4  that Highland would, in fact, make the payments
5  that were due at year-end?
6    MS. DEITSCH-PEREZ:  Object to the
7    form.
8    A.  No, there was a reliance on
9  Highland.
10    Q.  Okay.  Is it your testimony that
11  Highland was authorized to make the payments
12  under the notes at year-end without being
13  directed by a representative of the three
14  corporate obligors?
15    A.  Yes.  It is my contention that that
16  is how it worked in prior years also.
17    Q.  And so you believe that nobody on
18  behalf of any of the corporate obligors ever
19  authorized or directed Highland to make the
20  payments but that Highland did it without --
21  without direction?
22    MS. DEITSCH-PEREZ:  Object to the
23    form.
24    A.  Yes, typically.  And in 2017 or
25  2018, 2019, for sure.

Appx. 01786

Page 464

DONDERO - 10/29/21

1
2   Q.   Okay.  We have looked at one -- at
3   one December 3rd letter.  I mean, do you
4   remember that you also received a number of
5   letters on December 3rd demanding payment on
6   certain promissory notes?
7   A.   No.
8   Q.   All right.
9        MR. MORRIS:  Can we call up
10  Exhibit 2, please.  No, I apologize.  Not
11  Exhibit 2, Exhibit 4.
12       (Exhibit 4 marked.)
13       MS. DEITSCH-PEREZ:  Exhibit 4 in the
14  notebook?
15       MR. MORRIS:  Yes, ma'am.
16       Okay.  And now let's -- let's go to
17  the exhibits.  Exhibit 2, Exhibit 3,
18  Exhibit 4, Exhibit 5.
19  Q.   Do you see, sir, that this is a
20  letter addressed to you on behalf of HCRE
21  Partners that is also dated December 3rd, 2020?
22  A.   Yes.
23  Q.   Does that refresh your recollection
24  that you also received notices, demand notices
25  on or around December 3rd, 2020, with respect

Page 465

DONDERO - 10/29/21

1
2   to notes that were held by Highland?
3   A.   No.
4   Q.   Do you recall this letter at all?
5   A.   No, if I -- if I had, I would have
6   made the forgiveness argument or I would have
7   told someone to make the forgiveness argument,
8   but I don't remember this at all.
9   Q.   Okay.  Is it fair to say that
10  neither you nor anyone acting on behalf of
11  yourself, HCMS, or HCRE ever responded to any
12  of the demand letters at the beginning of
13  December 2020?
14       MS. DEITSCH-PEREZ:  Object to the
15  form.
16  A.   Yes, I don't -- I don't know.
17  Q.   You don't have any knowledge of
18  that; is that fair?
19       MS. DEITSCH-PEREZ:  Object to the
20  form.
21  A.   I don't know.
22  Q.   And you don't have any knowledge of
23  anybody responding to any demand letter that
24  was sent to HCMFA; correct?
25       MS. DEITSCH-PEREZ:  Object to the

Page 466

DONDERO - 10/29/21

1
2   form.
3   A.   HCMFA or Services?
4   Q.   HCMFA?
5   A.   I -- I don't know.  I don't have any
6   knowledge.
7        MR. MORRIS:  Can we put up
8   Exhibit 1, please.
9        (Exhibit 1 marked.)
10       MR. MORRIS:  We probably want to go
11  to Exhibit 3 of that document.
12  Q.   This one was sent to Mr. Waterhouse.
13       Do you see that?
14  A.   Yes.
15  Q.   Okay.  And did you become aware on
16  or around December 3rd, 2020, that Highland
17  made demand under the two notes listed in this
18  letter?
19  A.   Yes.  Why would this one go to
20  Frank Waterhouse?
21  Q.   Was he the treasurer -- was he the
22  treasurer of Highland Capital Management Fund
23  Advisors at the time?
24  A.   Right.
25  Q.   So does it make sense that the payee

Page 467

DONDERO - 10/29/21

1
2   on a note might send a demand letter to the
3   treasurer of the maker of the note?
4        MS. DEITSCH-PEREZ:  Object to form.
5   A.   I'm just saying they could have sent
6   the NexPoint letter or the Services letter to
7   him also; right?
8   Q.   I don't -- I think the NexPoint is
9   only a term note; right?  So there is no demand
10  letter.
11  A.   No, I know that.  But whatever --
12  whatever the other one we were just looking at,
13  the Services one could have gone to him, too.
14       Anyway, whatever.  It doesn't
15  matter.  But, no, I don't have a specific
16  recollection of this, if that was your
17  question.
18  Q.   You don't have -- you don't have any
19  recollection of Highland making demand under
20  promissory notes that were issued by you and
21  certain of your affiliates in early December
22  2020.  You don't remember that at all?
23  A.   There was a lot going on then.  And,
24  again, it wasn't something that we either
25  thought was legitimate based on forgiveness or

1          DONDERO - 10/29/21
2   other issues or it wasn't things that we
3   thought were legitimate as part of the overall
4   settlement.
5          You've got to remember we didn't
6   realize Seery betrayed the estate at this
7   point. We thought we were moving towards, you
8   know, resolution or a pot plan.
9      Q.   Okay.
10         MR. MORRIS: I move to strike.
11     Q.   And please listen carefully to my
12  question.
13         Did you have any knowledge in early
14  December 2020 that Highland made demand for
15  payment under demand notes that were issued by
16  you and certain of your affiliates?
17     A.   Same answer.
18     Q.   Were you aware or you were not
19  aware?
20     A.   Well, no specific knowledge for the
21  reasons articulated in the answer that you --
22  you moved to strike.
23     Q.   Okay. So -- so you had -- you had
24  no particularized knowledge of the demands in
25  December 2020; correct?

1          DONDERO - 10/29/21
2      A.   Right.
3      Q.   Okay. And so it is fair to say that
4   you never directed anybody to respond to these
5   demands because you didn't have knowledge of
6   them; correct?
7      A.   Right.
8      Q.   Okay. Do you know whether anybody
9   responded on behalf -- on your behalf or any of
10  the corporate obligors' behalf to any of the
11  demand letters that were -- that you now know
12  were sent in early December 2020?
13     A.   Well, yes. I mean, I know
14  eventually. I don't know when, but I don't
15  think anybody believes these -- these HVIN
16  notes are legitimate notes.
17         I know the response was more around
18  it being payments for the TerreStar regulatory
19  obligations for all the things that Highland
20  had mucked up in the TerreStar situation.
21     Q.   While you were president of that
22  entity; right?
23     A.   Yes.
24     Q.   Okay. And -- and
25  PricewaterhouseCoopers certainly doesn't think

1   these are frivolous obligations, does it?
2          MS. DEITSCH-PEREZ: Object to the
3   form.
4      A.   PricewaterhouseCoopers doesn't --
5      Q.   PricewaterhouseCoopers specifically
6   included a disclosure of all of these
7   promissory notes in the audited financial
8   statements; correct?
9          MS. DEITSCH-PEREZ: Object to the
10  form.
11     A.   I mean, as they should have with the
12  information they had at the time, but I think
13  what has come out since then is that they -- it
14  was moneys that moved from Highland to HFAM for
15  things that were caused by Highland and people,
16  not me, not even Frank, I think, but other
17  people assumed it was a note and made notes out
18  of it. And that is what PricewaterhouseCoopers
19  put into the financials, but I think what
20  everybody acknowledges is that they were
21  never -- they were never notes.
22     Q.   Is there a document that you have
23  ever seen in your life that supports what you
24  just said?

1          DONDERO - 10/29/21
2          MS. DEITSCH-PEREZ: Object to the
3   form.
4      A.   Yes.
5      Q.   Can you identify that document for
6   me?
7      A.   Yeah. It is a -- it is a settlement
8   with the SEC in terms of what they said the
9   breaches were, and why they were finding HFAM,
10  the rationale that they had in the regulatory
11  breaches and in the settlement, and all of the
12  breaches in the settlement were things that
13  Highland did, not that HFAM did.
14         It was all valuation, it was all --
15  it was all services that HFAM had contracted
16  with Highland that were performed deficiently
17  in the eyes of the SEC.
18     Q.   Okay. We will -- we will get to
19  that in more detail, but I just would like to
20  know if you believe that any correspondence to
21  the SEC specifically stated that Highland
22  Capital Management, L.P. and not Highland
23  Capital Management Fund Advisors, L.P. was
24  responsible for the TerreStar valuation error.
25     A.   The SEC would not have parsed

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  between the different players in the entities.
3  They would have said what they thought the
4  breaches were overall in their letter, and what
5  would govern the split is the shared services
6  agreement and where were the employees that
7  performed the activities that they cited.
8      Q.  Okay.  We will get to that at a
9  later time.
10     All right.  Let's go back to the
11 oral agreements that you entered into with the
12 Dugaboy trustee.
13     MR. MORRIS:  And let's start by
14 putting back up Exhibit 31, Paragraph 82.
15     MS. JEFFRIES:  I'm sorry, can you
16 repeat that?
17     MR. MORRIS:  Yes.  Exhibit 31,
18 Paragraph 82, yes.
19     Q.  And, again, Mr. Dondero, I think you
20 have testified already that you believe
21 Paragraph 82 generally describes the oral
22 agreement that you entered into with the
23 Dugaboy trustee with respect to the promissory
24 notes that we've described; right?
25     A.  Yes.

1  DONDERO - 10/29/21
2      Q.  And -- and it is -- and that
3  includes the promissory notes that you signed
4  that Highland is suing on as well as the
5  promissory notes that HCRE, HCMS, and NexPoint
6  signed that Highland is suing on; correct?
7      A.  Yes.
8      Q.  Okay.  Do you contend that the oral
9  agreements that you entered into with the
10 Dugaboy trustee modified the parties' rights
11 under the original promissory notes?
12     MS. DEITSCH-PEREZ:  Object to the
13 form.
14     A.  Modify, boy, sounds like a legal
15 term.  It said conditions by which they could
16 be forgiven.
17     Q.  And there were no such conditions in
18 the original notes; right?
19     A.  That is correct.
20     Q.  Okay.  So I'm just asking you from
21 your perspective whether the oral agreements
22 that you entered into with the Dugaboy trustee
23 were intended to modify the parties' rights and
24 obligations under the original promissory
25 notes.

1  DONDERO - 10/29/21
2      MS. DEITSCH-PEREZ:  Object to the
3  form.
4      A.  It was meant to condition the
5  forgiveness.
6      Q.  Did it change --
7      A.  I would like to use those words
8  versus modified the agreement.
9      Q.  Did it -- did it alter the parties'
10 rights and obligations?
11     MS. DEITSCH-PEREZ:  Object to the
12 form.
13     Q.  I'm not trying to play a game with
14 you.  I just --
15     MS. DEITSCH-PEREZ:  That is exactly
16 what you are doing.  Why don't you just ask
17 him --
18     MR. MORRIS:  Please stop talking.
19 Please stop talking.
20     Q.  Mr. Dondero, is it fair to say that
21 the promissory notes that are the subject of
22 your oral agreements with the Dugaboy --
23 Dugaboy trustee set forth the parties' rights
24 and obligations thereunder, both the maker and
25 the payee?

1  DONDERO - 10/29/21
2      MS. DEITSCH-PEREZ:  Can you read
3  that back again.
4      Q.  Is it fair to say that the original
5  promissory notes that are the subject of the
6  oral agreements between you and the Dugaboy --
7  withdrawn.
8      Is it fair to say that the original
9  promissory notes that Highland is suing under
10 set forth the maker and the payees' rights and
11 obligations under those notes?
12     MS. DEITSCH-PEREZ:  Object to the
13 form.  Object to the form.
14     A.  Yeah, I -- again, I want to -- I
15 want to avoid using the term "modification" or
16 implying modification because, again, the notes
17 are soft, and they really just talk about a
18 rate and/or payment or amortizations, but
19 they're soft notes.  Something in the agreement
20 that lays out the conditions for forgiveness
21 aren't necessarily a modification of the note,
22 and I'd like that to be --
23     Q.  Let me --
24     A.  -- my testimony.
25     Q.  Let me ask it this way:  Under each

1    DONDERO - 10/29/21
2  of the demand notes, Highland as the payee had
3  the unfettered right to demand payment at any
4  time; correct? Did you understand that?
5        MS. DEITSCH-PEREZ: At the time that
6  the notes were first signed?
7        MR. MORRIS: Yes, ma'am.
8    A.   Yeah. I mean, at the -- at the time
9  that they were first put in place, but by the
10  time the demand was made, they had already been
11  subject to the conditions present or the
12  conditions for forgiveness.
13   Q.   Okay. So this is exactly what I'm
14  trying to get at. At the time the notes were
15  signed, Highland had the right to make demand
16  for payment at any time; correct?
17   A.   Yes.
18   Q.   And when you entered into the oral
19  agreements with the Dugaboy trustee, Highland's
20  right to make a demand -- pick your word,
21  modified, altered, amended, changed -- it
22  was -- your oral agreement had an impact on
23  Highland's rights under the promissory notes;
24  correct?
25        MS. DEITSCH-PEREZ: Object to form

1    DONDERO - 10/29/21
2  of the question.
3    Q.   You can answer.
4    A.   The conditions subsequent -- the
5  condition precedent -- precedence for
6  forgiveness changed the ability for the demand
7  notes to be demanded.
8    Q.   Okay. And -- and each of the oral
9  agreements that you entered into with the
10  Dugaboy trustee was related to the loans that
11  were reflected in the promissory notes;
12  correct?
13   A.   Well, it was related to the
14  promissory notes themselves.
15   Q.   Correct. And the promissory notes
16  reflect notes that were made from the payee to
17  the maker; correct?
18   A.   Yeah. Most of them were roll-ups
19  from prior.
20   Q.   No. Those are the term notes. I'm
21  only talking about the demand notes.
22   A.   Okay.
23   Q.   Okay. So with respect to the demand
24  notes, the oral agreements that you entered
25  into with the Dugaboy trustee related to the

1    DONDERO - 10/29/21
2  loans that were the subject of the promissory
3  notes; correct?
4    A.   Yeah, I -- I -- I am just not
5  understanding the nuance enough to answer that
6  question.
7    Q.   Did the oral agreements relate to
8  the loans that were the subject of the
9  promissory notes?
10   A.   The oral agreements affected the
11  term loans and the demand notes.
12   Q.   Okay.
13   A.   Does that answer your question?
14   Q.   And so -- and so is it fair to say
15  that the oral agreements related to -- to
16  the -- to the -- to the loans that were the
17  subject of the notes?
18   A.   I don't know.
19   Q.   Okay.
20   A.   I'm not -- I'm not sure what you are
21  asking, but I don't know the answer.
22   Q.   Okay. It is your --
23        MS. DEITSCH-PEREZ: John, just
24  how -- I just think the witness is lagging
25  a little. So how much longer do you think

1    DONDERO - 10/29/21
2  you have?
3        MR. MORRIS: Oh, I've got probably
4  four hours, so I don't expect to finish
5  today. If Mr. Dondero -- if Mr. Dondero
6  wants to stop --
7    Q.   Are you unable to continue right
8  now, Mr. Dondero?
9    A.   Well, if we have four more hours, I
10  would rather do it a day next -- next week, one
11  afternoon.
12       MR. MORRIS: Okay. Can we check our
13  calendars before we go off the record?
14       We have a deposition on Tuesday.
15  I'm not available on Monday. I can make
16  myself free on Wednesday, Thursday, or
17  Friday. And I think that we should expect,
18  you know, a substantial period of time,
19  perhaps as long as a full day.
20       I mean, with all due respect --
21       MS. DEITSCH-PEREZ: How do you have
22  a full day? You have already gone -- you
23  have already gone more than half a day.
24       MR. MORRIS: Yeah. And just -- just
25  to be clear -- and I'm happy, you know,

Page 480

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2    to – to discuss this with you offline, but
3    I didn't decide that Mr. Dondero would
4    appear in his personal capacity and on
5    behalf of three separate 30(b)(6)
6    witnesses.
7        If you had given me a different
8    witness for each, I would have a total of
9    28 hours. I don't expect to use anything
10   remotely close to that time, but I am
11   examining four witnesses here and I
12   would -- I would appreciate --
13       MS. DEITSCH-PEREZ: But we also –
14       MR. MORRIS: I would appreciate it.
15   And, look, you can stop me at any time. If
16   I haven't finished asking the questions
17   that I believe I'm entitled to, I will, you
18   know, take it to the judge. I'm just
19   putting you on notice. I have – I'm on
20   page 27 of a 57-page outline, so...
21       MS. DEITSCH-PEREZ: Oh, geez.
22       MR. MORRIS: Yeah, so I do have a
23   fair amount more to cover. Okay?
24       MS. DEITSCH-PEREZ: All right.
25       MR. MORRIS: So Wednesday, Thursday,

Page 481

1    or Friday, Mr. Dondero, I will make myself
2    available at your convenience.
3        THE WITNESS: I have all day board
4    meetings on Wednesday.
5        MR. MORRIS: Okay.
6        THE WITNESS: I could do Thursday
7    afternoon or I can do Friday afternoon.
8    Hold on.
9        MS. DEITSCH-PEREZ: Let me put this
10   on mute and we will look at our calendars.
11       MR. MORRIS: Thank you.
12       VIDEOGRAPHER: Do you want to stay
13   on the record?
14       MR. MORRIS: Yes, please.
15       THE WITNESS: Hello. All right. I
16   can do Thursday afternoon for four hours.
17   And if we need more time than that we can
18   either do Friday afternoon or sometime
19   the – the week after that, but I have – I
20   have got –
21       MR. MORRIS: Thank you very much.
22   What time on Thursday works for you,
23   sir?
24       THE WITNESS: How about 1:00 o'clock

Page 482

1    DONDERO - 10/29/21
2    my time?
3        MR. MORRIS: Okay. I appreciate it.
4    Thank you very much. 1:00 o'clock Central,
5    it is, next Thursday for the continuation
6    of this.
7        And hopefully I will finish that
8    day, you know, if we can go without a lot
9    of breaks and the rest of it. Hopefully I
10   can finish that day. My intention is to do
11   that. Okay?
12       THE WITNESS: Perfect. Thank you.
13       MS. DEITSCH-PEREZ: Can – can I get
14   the rough?
15       COURT REPORTER: Yes. Yes.
16       MR. MORRIS: All right. We can go
17   off the record.
18       MS. DEITSCH-PEREZ: Thank you.
19       COURT REPORTER: Thank you.
20       VIDEOGRAPHER: Off the record, 3:53.
21   (Deposition adjourned at 3:53 p.m.)
22
23
24
25

Page 483

1    DONDERO - 10/29/21
2    _____
3    JAMES DONDERO
4
5    Subscribed and sworn to before me
6    this      day of        2021.
7
8    ------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Appx. 01791

Page 484

1          DONDERO - 10/29/21
2          C E R T I F I C A T E
3
4      I, SUSAN S. KLINGER, a certified shorthand
5   reporter within and for the State of Texas, do
6   hereby certify:
7      That JAMES DONDERO, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11     I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15     IN WITNESS WHEREOF, I have hereunto set my
16  hand this 29th of October, 2021.
17
18  _____
19      Susan S. Klinger, RMR-CRR, CSR
20      Texas CSR# 6531
21
22
23
24
25

Page 485

1          DONDERO - 10/29/21
2   NAME OF CASE:  In re: Highland Capital
3   DATE OF DEPOSITION:  October 29, 2021
4   NAME OF WITNESS:  James Dondero
5   Reason Codes:
6      1.  To clarify the record.
7      2.  To conform to the facts.
8      3.  To correct transcription errors.
9   Page____Line_____Reason_____
10  From_____to_____
11  Page____Line_____Reason_____
12  From_____to_____
13  Page____Line_____Reason_____
14  From_____to_____
15  Page____Line_____Reason_____
16  From_____to_____
17  Page____Line_____Reason_____
18  From_____to_____
19  Page____Line_____Reason_____
20  From_____to_____
21  Page____Line_____Reason_____
22  From_____to_____
23  Page____Line_____Reason_____
24  From_____to_____
25

**$**

**$100** 294:8

**$14** 392:5

**$150,000** 434:2,14
435:3,9 437:17

**$200** 294:2

**$25** 296:18

**$27** 420:12

**$27.675** 419:17

**$30** 407:22 412:4
413:5,11

**$30.75** 408:18

**$400,000** 437:4

**$50** 296:15

**$600** 298:12

**$75** 294:11

**0**

**03** 402:14

**1**

**1** 288:4 408:12,15
433:21,23,24 466:8,9

**10** 298:13,15 318:3
454:8

**10/29/21** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1

341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
452:1 453:1 454:1
455:1 456:1 457:1
458:1 459:1 460:1
461:1 462:1 463:1
464:1 465:1 466:1
467:1 468:1 469:1
470:1 471:1 472:1
473:1 474:1 475:1
476:1 477:1 478:1
479:1 480:1 481:1
482:1

**102** 365:10

**10:21** 288:8

**10:41** 304:6,7

**10:47** 304:7,9

**11:08** 318:7,8

**11:16** 318:8,10

**11th** 310:11 324:4
440:21

**12** 298:13,16

**12-month** 420:12

**12:40** 381:8,9

**12:51** 381:9

**13** 357:19

**14** 391:25

**15** 380:10,11 421:17
431:8

**16** 362:13,16,18,19
391:25

**17** 377:21,22

**1994** 291:10

**1:00** 481:25 482:4

**1:13** 398:19,20

**1:45** 398:18

**1:48** 398:20,22

**2**

**2** 288:4 408:8,10,13,
21 436:3,4,5 464:10,
11,17

**2.1** 409:13

**20** 414:24 421:17

**2008** 292:11 426:21
428:12 429:7

**2010** 307:12

**2014** 420:13 450:23

**2015** 401:21 420:13
450:23

**2017** 408:17,24
410:23 411:8 419:12
447:2,24 449:6,13
450:11 451:3 452:15
455:8 463:24

**2018** 369:15 435:4
436:10 463:25

**2019** 310:11 324:5
369:19 436:22 437:4,
17 463:25

**2020** 291:11 336:25
371:11,15,16 372:15
373:22 374:6,9,21
393:17 394:2,9,16
395:14 397:4,25
415:8 439:8,17
440:16,21 445:22
446:5 456:3,13,22
459:2,9,13,16 461:20
463:3 464:21,25
465:13 466:16
467:22 468:14,25
469:12

**2021** 288:7 357:6
363:17

**21** 337:2

**25** 292:15,16 422:3,
18

**25-year** 293:15

**26** 292:16 422:3,19

**27** 480:20

**28** 480:9

**28th** 435:4

**29** 288:7

**2:13** 398:15

**2:45** 398:18

**2:56** 454:16,17

**3**

**3** 348:11 433:14,15,
18,23 436:3,13
439:15 464:17
466:11

**30(b)(6)** 345:2,10,13
353:14,18 354:7,13
363:3 370:21 376:4,
19 378:3 388:22
391:5 406:5 480:5

**30(b)(6)s** 386:22
387:23

**30-year** 451:10,13,17

**31** 354:22,23 402:9,
13,23 472:14,17

**31st** 408:16,24
410:23 419:12 447:2

449:6,13 450:11
451:3 453:23 455:8
461:21

**35** 292:7 309:13

**37** 323:18

**3:00** 445:8

**3:19** 454:17,19

**3:53** 482:20,21

**3rd** 439:7,17 440:6,16
464:3,5,21,25 466:16

**4**

**4** 393:4 412:23 433:21
436:3 448:3,14,20,23
464:11,12,13,18

**40** 365:2

**47** 345:5,6

**48** 353:11,12

**49** 354:5,6

**5**

**5** 298:11 414:6 439:15
445:25 455:11,14,18
464:18

**50** 405:17 429:24

**57-page** 480:20

**6**

**6** 446:15,16 448:17,
19,22

**8**

**8** 298:13,15

**80** 390:4,7

**81** 390:7 398:12

**82** 357:20,25 390:7
398:12 403:4,6 422:8
423:10 472:14,18,21

**83** 357:18,25 358:19

**84** 359:12,13

**85** 359:21

**86** 359:23 360:13

**88** 360:16 361:14 362:9

**9**

**91** 357:21

**94** 291:8 365:2,10,15 370:8

**95** 370:14,15,23 375:22

**96** 370:24 375:22 378:10,17,20 379:14, 24

**97** 380:2

**98** 380:3

**9th** 291:11 374:9

**A**

**a.m.** 288:8 304:7 318:8

**ability** 289:25 353:23 477:6

**absolutely** 375:15 458:18

**absolve** 376:20

**accelerate** 414:12

**acceleration** 377:17 412:23 414:13

**accepted** 392:22

**accepting** 377:14

**access** 425:25 431:15,25

**accommodate** 317:25

**accordance** 418:16, 23

**account** 331:3 338:14 372:2

**accountants** 371:5 451:14

**accounting** 299:8, 19 300:4 319:25 324:15 334:12,19 382:23,24 383:9 397:13 410:16,20,25 411:12,15 416:5 418:2 459:6

**accounts** 319:9,12, 17,21 328:19,22 329:2,8

**accrue** 373:12

**accurate** 343:13,15 357:15 364:24 379:10

**accurately** 334:16

**acknowledge** 360:6

**acknowledges** 470:21

**acting** 340:15 371:24 372:12 396:25 442:25 462:25 465:10

**activities** 472:7

**actual** 438:4

**add** 392:4

**additional** 361:16 392:5 426:4

**addressed** 464:20

**adjourn** 290:4

**adjourned** 482:21

**adjust** 291:24 442:10

**administered** 416:11 417:21

**administering** 415:3

**advance** 352:25

**advisor** 308:11,12, 13,14

**advisors** 306:8 322:13 324:4,9 326:2,5 335:20,22 374:20 375:6 466:23 471:23

**affected** 478:10

**affiliate** 298:4,22

299:3,21 300:7 301:3,9 344:12 452:23

**affiliated** 297:16,24 314:22 315:8 325:3, 11,12,17 344:14 426:15

**affiliates** 344:22 413:12,13 426:22 467:21 468:16

**affirmative** 347:7,11, 14 348:8 357:21 358:6,20 359:3,19,24 360:12,25 361:13 362:9 365:11 366:7 370:15,22 375:21 376:9,17 378:11 379:23 380:4 389:13 390:9 391:7 398:11 406:20

**affixed** 434:14 435:7

**afoot** 438:22

**afternoon** 479:11 481:8,17,19

**aggregate** 293:23 295:16 297:25 419:8

**aggregating** 411:10

**agree** 400:8 446:25

**agreed** 301:15 430:5

**agreement** 335:15, 17,24 336:5,6,9,15, 25 337:5,6 356:4 361:22 381:11,20,24 382:13,21 404:16,24 405:3 407:10,12 420:25 421:5 427:20 449:20 472:6,22 474:8 475:19 476:22

**agreements** 335:23 336:2 339:23 375:5 399:8,16 400:10,11, 23 401:4,16 403:7, 11,14,20 404:2,8 405:15 406:21 420:21 422:7,23 423:9 426:15,22 427:3 443:10,20 472:11 473:9,21 474:22 475:6 476:19 477:9,24 478:7,10,15

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18 361:6 452:2

**amassed** 424:19 425:5 431:8

**amend** 320:19

**amended** 346:18 355:2,20 356:3,5 357:14 362:15,24 364:23 379:9 389:3 402:24 476:21

**amortizations** 475:18

**amount** 293:23 294:12 295:17 298:5, 21 299:3 360:7 385:11 391:21 392:2, 6 393:6 407:22 408:17 417:20 419:16,22 422:13 430:6 435:3 460:18 480:23

**amounts** 333:5 344:21,23 367:12 372:6 377:13 382:6 392:21,25 420:3 424:21 427:4 431:9 448:6 450:17 460:19, 22

**and/or** 334:14 338:6 364:2 365:18 412:2 475:18

**animation** 396:22

**annoyed** 391:22 392:19

**annual** 369:23 377:2 409:16,22 410:8 453:22 460:10

**answers** 345:24 347:16,18 405:25 406:22 407:4 439:4

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18 361:6 452:2

**amassed** 424:19 425:5 431:8

**amend** 320:19

**ahead** 437:22 441:21

**anytime** 371:16

**Apologies** 423:24

**apologize** 288:21 295:12 297:21 301:19 332:5 387:17 422:16 423:18 425:8, 18 445:3 448:21 455:4 464:10

**appearance** 445:5

**appearances** 288:17

**appears** 311:7 314:9

**applied** 403:15

**applies** 406:13

**apply** 333:3 368:15 403:21 404:3,9 405:8,9

**appoint** 301:23 302:14 311:3 323:14

**appointed** 301:12,14 302:18 321:6

**approval** 312:4

**approve** 312:11

**approved** 312:19 357:4

**approving** 364:10

**approximate** 408:17

**approximately** 407:22 419:17

**April** 310:11 324:4 450:23

**arbitrary** 290:19

**area** 292:18

**argue** 393:13

**argument** 377:17 386:10 393:8,10 446:13 465:6,7

**articulate** 330:23

**articulated** 421:10 468:21

**aspect** 337:10 363:25 370:11 372:5 379:5

**asserted** 358:20 366:13

**assertion** 379:16 430:3 431:12

**asserts** 359:24 360:16 365:16

**asset** 291:19 298:16 308:10 376:25 412:20 421:14

**assets** 292:4 299:9 330:16 334:14

**assigned** 300:20

**assume** 311:22 342:11 408:25 435:5 438:5

**assumed** 470:18

**assuming** 415:20

**attached** 444:10,18

**attention** 439:21

**attorney** 320:18 321:8

**attorneys** 429:7

**audit** 320:2 334:19 411:3,16 416:6 426:10

**audited** 299:10,25 327:18 340:9 412:11, 17 428:11 429:6 430:7,22 432:6,12 470:8

**auditor** 426:14 427:9

**auditors** 334:17 373:10 411:12 416:7 426:22 427:14 435:14 451:14 454:5

**audits** 327:14 334:11 337:23

**August** 356:4 420:13

**authoritative** 310:20

**authority** 301:22,23 302:13,14 310:5 317:9,13 451:5

**authorize** 371:18 389:7 420:5 436:9

**authorized** 316:12, 18 319:8,11,16,20 328:18,21,25 329:7 363:15 371:25 391:19 434:21 438:2 463:11,19

**authorizing** 364:10

**automated** 438:3

**avoid** 475:15

**aware** 311:18 312:14 314:18,24 315:4 317:7,11 324:18,19, 24 325:5 327:6 330:10 334:4,6 340:10,12 346:16,17 351:13 352:10,19 357:9,11,12 358:5 359:18 364:14,18,21 365:20 367:20 368:4 369:22 370:6 372:12, 19,25 373:2 376:16 378:8 379:17 389:10 390:8 397:21 398:11 402:4 428:13,18 429:13 434:13 435:13,15 437:16,20 439:7 442:2,11 444:8,19,24 453:21 455:17 466:15 468:18,19

**awareness** 320:6,8 321:4 322:10 324:12 325:8 332:16 333:4 344:10,18 352:13 366:19 373:17 401:22,23 456:25

---

**B**

**back** 294:19 304:8 318:9 320:25 336:17 338:17 381:3,13 388:19 392:5,24 397:10,11 398:21 401:5 424:2,10 428:18 429:7 430:3 454:18 462:11 472:10,14 475:3

**background** 324:15 357:4

**bad** 405:7 416:16 417:8

**balance** 293:8 298:9 299:4,22 300:8 301:4,10 326:23 327:3,7 405:18 412:2 413:19 418:4

**balances** 319:24

**ballpark** 295:18

**bank** 319:9,12,17,21 328:18,22,25 329:8 425:2,3

**bankruptcy** 300:6, 15 302:21 315:24,25 366:13 413:14

**barred** 358:21 359:15 360:2,17 365:17 370:16

**base** 298:16

**based** 324:16 398:5 467:25

**basic** 416:19 459:5

**basis** 294:5 344:9

**Bates** 444:20,23

**begin** 289:6,12,18

**beginning** 288:4 355:25 357:5 363:16 465:12

**behalf** 293:4 316:13, 19 349:12 353:23 354:8 363:16 364:11 371:12,24 372:7,13 386:17 387:5 388:12 389:8 394:8,16 396:25 404:10 408:24 409:7 411:17 415:4 418:13 419:20 436:10 437:14 443:2 449:12 451:6 455:7 456:18 462:17,25 463:18 464:20 465:10 469:9,10 480:5

**believes** 469:15

**benefit** 339:4 385:10

**benefiting** 385:9

**benefits** 384:20

**Berghman** 445:7

**betrayed** 468:6

**big** 421:10

**bigger** 393:11

**billion** 292:7

**binder** 346:22 362:19 433:17

**binding** 345:25

**bit** 328:3 337:20 345:11 356:17 407:16

**blocked** 378:13

**blurt** 441:18

**board** 425:2 431:21 481:4

**boilerplate** 410:17 416:4

**bona** 373:8 418:18, 19,20 419:23 421:19 457:10

**Bonds** 363:23 364:4

**bonuses** 322:9 424:24

**book** 309:16

**booklet** 448:25

**books** 298:23 397:19

**borrow** 295:7 420:5

**borrowed** 295:3,8,13 420:2,11 437:3,17 448:6 450:15 452:14

**borrower** 409:15

**bottom** 310:6 323:23

**boy** 336:17 383:13 416:16 417:8 422:9 473:14

**Boyce** 301:15

**breach** 391:15 392:2, 17

**breached** 303:11 304:14 305:3,13,15, 22

**breaches** 471:9,11, 12 472:4

**break** 317:23 318:4, 12 380:15,19,21 398:17 399:4 454:7, 23 455:6

**breaks** 482:9

**Brian** 324:14

**bring** 395:6

**broad** 366:5

**bucks** 377:3,4 391:25 393:12 421:16 430:14

**building** 338:18

**built** 339:5

**bullet** 416:8

**bunch** 309:4

**burden** 327:13

**business** 291:14 308:5 323:4 330:15 342:6 384:17 385:7

---

**C**

**calculating** 334:8

**calculation** 393:2

**calendar** 409:17 454:11

**calendars** 479:13 481:11

**call** 400:16 450:25 464:9

**called** 306:7 322:12 329:18 341:8 345:9 357:21 389:15 402:2 462:10

**calls** 349:24 350:3,9, 17,22 351:2

**capable** 290:7 458:22

**capacities** 325:3

**capacity** 303:5 311:2,19 314:4,7 315:20 331:25 332:9 345:8,9,20,24 351:3 363:3 371:16 378:3 388:22 393:14

399:25 406:5 480:4

**Capital** 288:6 290:23 294:10,15,21 295:4, 6,14,21,23 296:3,9 306:7 311:21 329:18 362:23 405:21 434:15 457:24 466:22 471:22,23

**captured** 308:10 334:16 370:11

**care** 445:20

**carefully** 372:11 468:11

**carried** 298:22 299:4,22 300:8 301:3,10 327:4

**case** 363:25 378:12 383:5

**cases** 460:19

**cash** 383:18 384:13 421:11

**categorized** 292:24

**category** 361:9

**caused** 470:16

**caveat** 427:17 441:21

**ceased** 305:11

**Central** 398:18 482:4

**centralized** 417:22

**certificate** 309:23 310:2,10 311:8 313:13 320:24 323:20 331:20 340:12,20 342:12 398:6 436:25

**certificates** 313:15 342:21

**cetera** 320:2 334:5 367:13 389:24 392:12,15 393:2 433:2

**CFO** 299:24 301:13, 23 302:15,18 303:6 311:12,20 313:7,10, 11,19 314:4 440:3

**chagrin** 345:11

**chance** 331:3 351:6

**change** 341:13,14 362:12 474:6

**changed** 299:17 476:21 477:6

**characterize** 333:12

**characterizing** 409:14

**charged** 299:2 333:21 364:9

**charging** 386:7

**chat** 309:18 355:11

**check** 426:5 479:12

**checks** 319:24

**chief** 303:2 331:23, 25 332:9

**choice** 345:15

**circumstances** 348:7 375:12,21 413:8

**cited** 472:7

**claim** 360:17

**claims** 358:21 359:14,25 365:16 370:16

**clarification** 332:6 378:18 423:8

**clarify** 337:20

**class** 400:14,19 427:21

**clause** 415:9

**clauses** 416:17

**clean** 304:11

**cleaner** 423:6,7

**cleanup** 406:9

**clear** 295:11 304:24, 25 322:2 335:5 417:11 431:4 432:15 479:25

**Cliff** 300:17

**CLO** 338:22 385:5

**close** 434:12,18,19 436:6 480:10

**closed** 360:3

**closely** 410:3 411:23

**collateral** 413:16 417:7

**colleague** 309:12

**collectively** 451:3

**combination** 310:5

**comfortable** 390:13 391:10 398:23

**commenced** 404:5, 11 405:6 433:10

**commencement** 441:7,9 443:4,8,18 455:23

**comment** 306:3 338:18 396:18 432:4

**common** 421:18

**communicate** 318:11 350:4

**communications** 348:7 441:18 442:6

**comp** 361:6,8,16 423:5

**companies** 311:20 314:13 315:7 325:4, 12 344:14 361:21 412:21 421:19,22 431:19

**company** 297:4 314:23 325:17 415:2

**compared** 404:18

**compel** 395:7

**compensation** 322:9 404:16,18 421:8,11,21 422:6,22 423:2,13 424:22 430:16 443:24 446:12

**complaint** 346:18 355:2,20 356:3 358:15 362:15,24 389:3 402:24 408:9,

16 433:23 448:15

**complaints** 356:5 407:6

**complete** 290:5 334:13 335:2 343:12, 15 357:14 364:23 379:10 405:16

**completely** 391:3 397:7

**completeness** 327:24

**complex** 401:25

**complexity** 363:24

**compliance** 327:14 371:8 393:3 411:14 462:12

**compliant** 319:25 334:11 418:2

**compliantly** 320:7

**complicated** 386:6

**comport** 303:6

**concede** 433:5

**concern** 333:17 358:6 359:2,18 360:25 361:13 362:8 365:21 370:21 390:9

**concerned** 411:24 453:14

**concerns** 347:6 348:11

**concluding** 328:11

**conclusion** 452:13

**conclusions** 305:18

**condition** 407:11 429:12,16 474:4 477:5

**conditioner** 423:20

**conditions** 413:6,10 473:15,17 475:20 476:11,12 477:4

**confirm** 401:8 462:3

**confirmed** 462:10

**confusing** 456:8

**connection** 294:17 353:7 426:9

**consideration** 360:3

**considered** 315:5 325:24

**consistent** 407:6 419:24

**consolidated** 447:22

**contained** 430:7

**contemporaneously** 442:12

**contend** 420:19 424:5 473:8

**contended** 367:3

**contends** 461:3

**content** 416:8

**contention** 403:13, 19,25 423:17 458:14 460:21 463:15

**contentious** 461:2

**context** 335:11 400:10 460:21,22

**contingent** 427:5

**continuation** 482:5

**continue** 290:4,20 389:22 400:6 479:7

**contracted** 471:15

**control** 297:2 307:6, 19,23 308:2 311:3 315:12,20 322:21 330:5,9 331:7 332:18 333:16 341:24 371:17 388:5 393:15 410:4 429:22 431:19

**controlled** 307:14 323:6 325:13 342:2 374:20 385:15

**controls** 320:2

**convenience** 481:3

**conversation** 457:12

**copy** 355:18 356:21, 22,23 402:20 434:7

448:25

**Cornerstone** 427:19

**corporate** 312:7
320:18 321:7 323:7
330:8 342:3 345:21,
25 354:9 405:10
406:24 407:3,12
458:13 459:20
460:10 461:3,13
462:17 463:2,14,18
469:10

**correct** 290:24 295:4
301:11,24 306:8
313:3 316:5 322:13
325:14 328:15
335:15 337:17
339:24 342:24
351:19 374:6,9
389:18 398:2 402:15
404:12 405:14 412:9,
18 416:3 419:22
420:22 424:7 435:10
436:22 438:18 440:2,
17 442:3 447:6,10,19
449:7 450:6,11,13
451:7,10,22,23 452:4
456:3,13,22 457:5
458:9 459:10,13,16
465:24 468:25 469:6
470:9 473:6,19
476:4,16,24 477:12,
15,17 478:3

**correctly** 320:7
335:12 404:7,22
411:2 414:15

**correspondence**
471:20

**cost** 385:11

**costs** 333:7 334:5
337:21 338:5,8

**counsel** 288:19
289:6,8,9 355:18

**counsel's** 353:25
354:16

**counterparties**
377:2

**couple** 300:14,18
349:19,20 350:2
421:16 428:15 445:3

**court** 288:9 303:14,
21,24 355:25 366:13
374:24 381:17 395:7
396:5,8 482:15,19

**cover** 480:23

**crazy** 415:8

**create** 291:7 330:17,
19 413:15

**created** 307:9,15
322:24 330:11 339:6

**creatures** 365:5

**credit** 291:17 411:4

**creditors** 452:24

**crisis** 292:12

**culpa** 406:16

**cure** 377:15 392:21
393:6

**curing** 377:11,12

**current** 321:14,18
329:5,12 340:25
405:18

**curved** 374:24

**cut-and-paste**
406:17

**D**

**DAF** 339:2,5 385:2,5,
19,22 386:5,18 387:6
388:13

**date** 288:7 310:15
311:10 324:9 325:21
428:24

**dated** 408:16 439:17
464:21

**dates** 369:9,10

**Dave** 352:10

**David** 300:17

**Davor** 317:22,25
445:2

**day** 290:5 336:18
352:16 386:15
410:23 435:12
452:15 479:10,19,22,

23 481:4 482:8,10

**days** 349:19,20

**de** 297:25 298:4,7,17
333:5,7,15 334:7,14
343:21,22 376:24
377:3 391:20 393:20
410:13 411:25 412:2
413:18 417:20
421:13 458:20

**dealing** 372:22

**Deborah** 288:14,18
291:25 303:22
349:17 350:5 351:5
381:4 383:21 388:9
390:18 425:8 428:22
445:5

**debt** 333:6 334:5
421:19 453:10,16

**debtholders** 453:13

**debtor** 367:22
374:21 428:8,10
443:15 444:15

**debts** 297:8,14
315:14,21 316:3,8
318:17,22 326:7,12,
17 327:10 328:7
332:20 333:2,23
340:5 343:6,18 344:6

**December** 371:11,
15 373:21 374:12,17,
21,25 395:14 397:3,
25 439:7,17 440:6,
16,21 445:22 446:5
453:23 459:2,9,12,16
461:20,21 463:3
464:3,5,21,25 465:13
466:16 467:21
468:14,25 469:12

**decide** 385:21
386:16 417:16 480:3

**decided** 297:3 386:8
420:24 451:12

**deciding** 417:25

**decision** 387:5,12,
13,19 388:6,12
429:17

**declared** 368:20

**deed** 416:15

**deemed** 426:16
427:3,12

**deeply** 453:12

**default** 368:21 377:8
391:20 392:20 393:5
412:23

**defendant** 362:23
404:17

**defendants** 289:7

**defense** 347:11,14
358:6,20 359:3,19,24
360:12,25 361:6,13
362:9 365:21 366:2,
7,14 367:5 368:14
370:8,15,22 378:17,
20 379:16,18,23
389:20 391:7 406:20
459:21,25 460:8
461:3,8,9

**defenses** 347:7
348:9 357:22 365:11
375:22 376:9,17
378:11 380:4 389:14
390:9 398:12 443:3
459:20 461:13

**deficiently** 471:16

**definable** 385:10

**define** 298:7,17
317:2 414:21

**defined** 317:18
411:11 419:12
426:23

**defining** 377:14

**definition** 416:23

**definitively** 340:10

**Deitsch-perez**
288:16,18 291:21
292:2 294:3,16,19,24
296:11,23 297:10
301:25 304:16 305:5,
25 309:15 311:5
315:16 317:21 318:5,
24 321:21 324:21
326:8,19 327:20
329:9 331:9 332:11
335:16 337:15 340:6
343:19 344:7 346:3
347:3,21,25 348:5,18
349:23 355:3,7,13

356:20 359:4 361:25
365:4 366:8,17,22
367:6 369:7,25 373:5
376:10,18 379:11
380:13,20,25 381:6
382:15 383:17 384:4,
9,22 385:17,24
386:20 387:8,14,18,
21 388:15 390:14,19,
21 394:3,10,17
395:12,18,22 396:3,
9,21 397:5,9 399:11,
19,21 400:3 401:11,
18 402:13,18 405:11
406:14 409:9,18,25
410:9 411:20 415:14,
25 423:21 425:14,23
426:17 428:5,21,23
429:8 430:25 432:13
433:11,16,19 434:8,
17 438:10 441:3,16
444:8,16 445:24
447:11 448:19,24
449:22 452:10 453:7,
24 455:19 456:4,10,
14 457:6,16,19
460:13 461:16,23
462:6,21 463:6,22
464:13 465:14,19,25
467:4 470:3,10 471:2
473:12 474:2,11,15
475:2,12 476:5,25
478:23 479:21
480:13,21,24 481:10
482:13,18

**delegate** 317:19

**deluded** 375:16

**demand** 333:19
348:12,15 368:15
414:10 439:8,11
440:7,9,17,23 441:6,
11 442:2 443:3 444:4
445:24 447:22
464:24 465:12,23
466:17 467:2,9,19
468:14,15 469:11
476:2,3,10,15,20
477:6,21,23 478:11

**demanded** 445:23
446:6,10 477:7

**demanding** 464:5

**demands** 468:24
469:5

**demonstrate** 424:14

**department** 382:23, 24 383:2 411:12 417:23

**depend** 383:4

**deposed** 352:9,11, 19

**deposition** 288:5,20, 25 289:18,22 290:5 346:21 349:16 350:6, 16 351:8,11,14,18,21 352:4,7,14 353:2,3,8 363:7 376:19 386:23 399:5 400:4 408:12 444:19 454:24 479:14 482:21

**depth** 334:13

**describe** 291:13 332:24 410:12 456:17 461:12

**describes** 403:6 472:21

**describing** 429:3 432:8

**deserve** 344:3

**detail** 334:17 378:14 471:19

**detailed** 344:9

**details** 301:21 337:24 366:4

**di** 333:12

**differentiate** 333:24

**dig** 369:9

**direct** 329:23 337:21 338:7 341:18 371:17

**directed** 462:18 463:13,19 469:4

**direction** 463:21

**directly** 306:21 307:3 314:5,8,13 322:19 330:3

**directors** 431:22

**disagree** 324:11

**disappeared** 294:17

**disclose** 426:14

**disclosed** 412:15 426:21 427:9,13 430:24 432:11 433:3

**disclosure** 427:23 432:7,21,24 441:20 470:7

**discovery** 349:7,13 425:19,21 444:7,13

**discuss** 306:5 401:3 441:10,13 480:2

**discussing** 442:19

**discussion** 444:3

**disrupt** 400:4

**distinguish** 457:21

**diversified** 291:17

**doctrine** 365:17 370:17

**document** 309:12 310:7,21 313:20 317:6 320:18 345:4, 16 355:24 356:9,16, 18 357:5,9,13 363:10,16,20 364:11, 15,19,22 366:12,20 378:6,9 379:6,8 380:17 381:10 388:20 389:2,5,8,11 402:8 435:8 447:18 466:11 470:23 471:5

**documentation** 342:21 431:12,17,24

**documents** 320:19 334:18 348:7 352:24 367:23 370:5 425:11, 22,24,25 438:14

**dog** 387:15,16

**dollar** 386:3

**dollars** 391:22 393:10

**Dondero** 288:1,5,11, 19,22 289:1,15 290:1 291:1,23 292:1,3 293:1 294:1 295:1,3 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1,17,20

304:1,11 305:1,9 306:1 307:1 308:1 309:1,20 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,11 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1,7 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1,24 355:1,17 356:1,14 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,10 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1,22 384:1,6,7 385:1 386:1 387:1 388:1 389:1 390:1,5, 22 391:1 392:1 393:1 394:1 395:1,13 396:1 397:1 398:1,23 399:1 400:1,9 401:1,8 402:1,23 403:1 404:1,17 405:1 406:1,25 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1,5 425:1,11 426:1,8 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1,25 442:1 443:1 444:1,13,15 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1,14 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1

**Dondero's** 386:23 387:24 401:6 402:16

**double-check** 425:15

**doubt** 324:7 409:11

**dozen** 350:7 422:12 425:6 431:8

**dozens** 293:19,21

**drafted** 410:15

**draw** 452:12

**driven** 454:4

**dropped** 423:20

**DSI** 414:24

**dual** 321:23

**due** 297:24 316:14 327:4 344:13,21 358:22 359:15 360:2 366:15 371:20 372:5, 15 373:3 389:23 391:20 392:25 393:13,17,21 394:2 395:16 397:3 408:2 409:23 440:8 456:2, 12,21 457:4 458:8,20 460:11 461:14,21 462:4 463:5 479:20

**Dugaboy** 306:22 338:6 400:12,16,23 401:9,17 403:8,14,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11,20 472:12,23 473:10,22 474:22,23 475:6 476:19 477:10,25

**duly** 288:12

**duplicate** 355:15

**duties** 297:6 303:2, 12 304:14 305:4,13, 15,23 328:12,14

464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1,19 473:1 474:1,20 475:1 476:1 477:1 478:1 479:1,5,8 480:1,3 481:1,2 482:1

**E**

**earlier** 320:24 324:12 367:18 379:19 406:8 415:10 436:24

**early** 337:2 356:9 374:11,17 467:21 468:13 469:12

**easier** 393:12

**Eastern** 398:16

**effective** 310:11 324:4

**effectively** 338:21 419:7

**effort** 424:13

**efforts** 382:5 424:18

**eight-day** 440:20

**electronic** 438:9,14, 18

**electronically** 439:2,3

**Ellis** 363:23 364:4

**else's** 454:11

**email** 353:9 445:17

**emails** 353:6

**employed** 308:17 319:15 322:2 383:12

**employee** 317:20 320:11 321:15,19,20, 24 329:5,13 340:16 341:2 398:5 422:6,22 458:21

**employees** 371:6 392:11 422:12 458:25 459:4,5,9 472:6

**end** 369:24 371:21 373:3,14 375:3,14 391:16,17 393:17 394:2,8,15 395:17 409:16,23 410:8 411:8 414:24 415:8 447:23 456:2,12,21 457:4 458:15 460:11 461:15 462:5,19,23

ensure 393:25

enter 452:19

entered 336:14 381:24 382:12 399:7, 15 400:22 401:16 403:11,14,20 404:25 405:4 407:10 472:11, 22 473:9,22 476:18 477:9,24

entering 400:11

enterprise 343:24 388:5

entire 431:21

entities 306:20 311:15,24 325:7,8 333:4,8 335:7,25 336:4,8,11,20 337:25 338:7 340:10 343:9 345:10 377:7 382:5, 25 384:19 385:16 406:6,24 407:13 423:3 426:15 458:21 472:2

entities' 407:4

entitled 414:7 480:17

entity 291:3 306:7,11 311:4 322:12 329:18 330:9 331:7 333:6 338:2 341:7,10,16 342:9 383:5 385:20 413:19 429:21 469:22

entity's 332:20

entrepreneurial 382:5

equal 360:7 448:7

equity 385:6 452:24 453:5

equity-ish 453:12

equivalent 360:21

error 406:17 471:24

established 405:15

estate 323:5 341:11 342:7 374:3 375:17, 18 385:8 392:12 468:6

estimate 290:21 296:8 350:14

estoppel 347:17 359:15 370:17

event 427:8

eventually 368:11 469:14

evidence 330:24 418:8

exact 406:21

EXAMINATION 289:13

examining 480:11

examples 425:6 431:9

exceeded 293:25

exchange 337:7 339:12

execute 330:21

executed 403:16,21 404:3,9 405:9 411:7 455:7

executive 316:21 317:18 327:23 413:4, 9

executives 325:6 413:20 424:25 425:2 431:10 432:19

exercise 302:13

exhibit 309:13 323:17 345:5,6 353:11,12 354:4,6, 22,23 357:20 362:13, 16 377:21,22 380:10, 11 402:9,23 408:8, 10,12,15 419:5,9 420:3,7 433:14,15, 18,23,24 436:4,5,13 437:12 439:15 445:25 446:7,15,16 447:18 448:3,8,14, 17,19,20,22 450:5,8, 17 456:7 464:10,11, 12,13,17,18 466:8,9, 11 472:14,17

exhibits 433:21 436:3 464:17

existence 323:7 330:8 342:3

exists 461:4

expect 479:4,17 480:9

expectation 392:15

expectations 303:7

expected 338:6 393:20

expenses 316:23 338:16

expert 292:18

expertly 334:21

experts 421:24

extended 375:8

extent 301:8 312:11 313:23 316:7 325:10 332:21 334:6 338:25 361:16 371:2 391:12, 13 396:17 427:13

eyes 471:17

F

facility 411:4

fact 368:4,7 376:18 387:24 421:9 430:21 463:4

facts 348:8 358:5,25 359:17 360:11,24 361:12 362:8 365:20 366:6 368:9 370:6,20 375:12,20 376:8,15 377:11,16 379:17,22 380:3 390:9,15 391:6 398:10

failed 318:20 319:5 328:5,12

failure 360:2

fair 290:20 293:2,14, 18,21,22 296:20 297:4 311:9 312:2,5 313:8,24 325:22 331:8 339:19 342:23 344:4 372:21 392:10 406:25 410:5 411:19

415:11,22 427:11 428:3 429:3 432:10 439:6 447:4,7 449:19 451:17,24 452:12 458:5 459:19 461:5 465:9,18 469:3 474:20 475:4,8 478:14 480:23

fairly 409:14 422:12

faith 360:20

fallen 316:9

falls 361:9,17

familiar 297:7 306:6 315:14 318:17 322:12 329:18 341:7 433:8

familiarize 297:14 298:21 315:21 316:2 318:22 326:6,17 327:10 328:7,13 332:19,25 344:5

familiarizing 333:22 340:4 343:5

family 314:12 321:8

fast 381:3

faster 361:19

fault 295:12 441:24

favor 296:3 447:2

features 417:8

fee 338:9 339:2

feel 290:3

feeling 289:3,17,21

fees 308:11 317:3 386:7

fide 373:8 418:18,19, 20 419:23 421:19 457:10

figure 429:17

file 363:15

filed 346:17 355:20, 24 356:2,5 362:14 366:12 374:20 416:15

filing 357:5 364:10

389:7

finally 360:15

financial 292:11 299:10,12 300:11 303:2 327:18 331:25 332:9 337:10 382:7 412:8,17 428:11 429:6,15 430:7,19,22 432:6,12 458:22 470:8

financials 299:25 300:20 340:9 343:13, 15 411:3 412:11 430:11 431:5,7 432:17,24 433:4 470:20

financing 451:25

financings 453:2

find 434:6

finding 471:9

fine 341:17 369:13 395:11

finish 290:15 340:24 479:4 482:7,10

finished 480:16

firing 315:5 325:24

firm 363:15

firms 334:12 389:23

fits 454:11

flip 436:2

focus 292:19 344:3 390:6 430:3

focusing 334:8 357:25 413:21 422:16

follow-up 388:8

footnoted 430:12

forcing 290:6

forgave 422:4 430:15 432:11

forgivable 404:20

forgive 421:20 427:3

forgiven 422:21

423:4,11 425:4
427:7,13,24 429:11
430:6,24 431:5
432:22,23,25 433:4
473:16

**forgiveness** 361:7
429:4,20 430:4
431:9,22 440:13
443:24 446:13 465:6,
7 467:25 474:5
475:20 476:12 477:6

**forgiving** 424:6,15
429:18 431:13

**form** 294:4 296:24
297:11 306:2 311:6
315:17 318:25
321:22 324:22 326:9,
20 327:20 329:10
331:10 340:7 343:19
344:8 361:25 366:9,
18,23 367:7 370:2
373:6 376:11 379:12
384:23 385:18,25
388:16 390:15
399:12,22 401:12,19
405:12 407:21
409:10,19 410:2,10
411:21 415:15 416:2
426:18 428:6 429:9
431:2 434:17 438:11
441:4 447:12 449:23
452:11 453:8,25
455:20 456:15 457:7
459:18 460:14
461:17,24 462:7,22
463:7,23 465:15,20
466:2 467:4 470:4,11
471:3 473:13 474:3,
12 475:13 476:25

**formal** 335:22,23
336:2 381:18 384:13

**formally** 382:18

**formation** 315:2

**formats** 291:19

**found** 291:6 392:18

**founded** 290:23

**Frank** 299:20 300:20
301:23 302:10 309:7
310:13 312:7 316:9
325:8 327:13 334:2,
22 335:10 336:18

338:4 340:8,14
343:10,11,16 397:24
398:7 415:3 436:16,
21 437:13,25 438:25
441:15 442:16 443:5
456:18 462:10
466:20 470:17

**Frank's** 299:18
300:10,14,25 437:23
438:3

**frauds** 327:25

**fraudulent** 360:17,
19

**free** 479:16

**Friday** 479:17 481:2,
8,19

**friendly** 413:13
417:21

**frivolous** 470:2

**front** 348:2 389:21

**frozen** 302:3

**fulfill** 318:21 319:5
328:5,12

**fulfilled** 302:25

**full** 431:19 479:19,22

**function** 333:25
334:19

**functional** 401:23

**functions** 459:6

**fund** 306:7 317:3,4
466:22 471:23

**funds** 308:6,8,10,16
309:4 312:23 320:19,
20 327:16 336:13

───────

**G**

**gained** 385:11

**game** 474:13

**gather** 424:13

**gave** 382:2 392:20
394:20 395:2,21
413:25 430:13
440:20

**geez** 480:21

**general** 293:7
296:20,25 308:15
312:7 343:20 344:10,
17 364:7 376:24
403:7

**generalize** 384:24

**generally** 297:12
323:3,5 325:15
326:10,12 327:6
329:20 332:21,23,25
344:15 357:7 363:21
364:12,18 373:15
389:6 426:19 461:10
472:21

**give** 331:3 334:25
337:24 342:22 366:6
369:8,10 382:2
394:12,19 395:14
397:16 405:16
440:25 451:12

**giving** 399:25 422:22
423:13

**glad** 351:22

**good** 308:15 312:8
330:23 360:20 382:8
393:3 413:19 423:22

**govern** 472:5

**grace** 414:10 440:20,
25

**grade** 291:17

**green** 289:2

**Gregory** 322:6

**grounds** 312:18

**group** 299:18 300:4,
11,14,21,25 316:10
319:25 334:2,23
335:10 336:19 338:5

**guarantee** 417:8

**guaranteed** 416:16

**guess** 304:20 310:4
312:11 333:3 347:19
375:25 393:7 429:10
437:25 451:18
456:23,25 457:2,10,
11

**gulf** 382:10

**guys** 346:23 432:2

───────

**H**

**haggled** 418:6,9

**half** 350:7 430:14
479:23

**half-hour** 380:19,21
398:17

**hand** 355:16

**handle** 363:23,25
382:24

**Hang** 355:7 402:18
428:21

**happy** 317:25 406:3
479:25

**hard** 355:18 356:22,
23 402:20 416:14
434:6 448:25 457:20

**Harvard** 385:4

**hats** 324:20

**HCMF** 331:24 332:3,
10 339:19,25 457:21

**HCMFA** 306:11,13,
19 307:4,6,8,14,19
308:2,17,18,22
309:2,8 310:10,14,
19,23 311:3 313:20
314:8,17 315:10,13,
20 316:13,18 317:9
318:15,22 320:22
321:9,16,20 322:7
333:10,17 336:23
339:22 404:10,11
405:13 457:9 465:24
466:3,4

**HCMFA's** 308:5
311:12 315:14,21
316:3,8 318:17
319:9,12,17,20
333:12

**HCMLP** 333:11,19
404:21

**HCMS** 288:20
329:17,21,24 330:3,
5,11 331:5,14,18

**gulf** column continues:

**HCMS'** 340:5 363:3,7
443:2

**HCMS's** 330:8,15
333:2,23 353:18
372:2

**HCRE** 288:20 341:6,
8,16,19,24 342:1,16
343:7,13,15,18
354:8,9,14 378:4,21
381:11,22,23,25
382:13 383:3,5,11,15
384:7 385:9,21 386:3
404:3,5 405:19 406:2
447:21 448:2,5,11,16
449:13 450:9,15,21
451:2 452:7,17,18
453:2,5 455:7 456:5,
20 459:3,12 464:20
465:11 473:5

**HCRE's** 342:6 344:6
377:23

**HCRE-TYPE** 385:20

**head** 292:2 306:4
311:25 317:14,16
325:19 340:23
369:17,21 376:8

**hear** 289:15 303:14,
19 335:11 395:24
396:4,5,7,9,10,11,22

Second column (center) index entries:

**geez** through **guys** as above. And far right column starting with **gulf**:

**332:6,9,18 335:11,14**
336:16 337:6,13
338:14 339:11,19
340:3,16 341:3
353:14,17,23,24
362:14 363:14
364:11 365:10,15
366:12,25 367:14,25
369:15,18,23 370:21
371:12,17,19,24
372:13,21 375:14
379:19 385:22
403:22,23 405:20,25
433:8,10,24 434:15
435:2,9,18,23
436:10,22 437:3,14,
16 439:8,18,25
440:7,20 441:5,11
442:8 443:2,10,19
445:23 446:9 447:21
451:2 452:7 453:6
457:3,14,17,21 461:8
465:11 473:5

**heard** 303:16 352:20 462:9

**held** 312:17,22 313:5, 18 314:12 320:14,16 325:11,17 465:2

**helped** 339:16

**Hendrix** 352:19

**hereunder** 414:14

**Hey** 380:13

**HFAM** 335:20 470:15 471:9,13,15

**Highland** 288:6 289:9 290:23 291:3, 7,14 292:5,15 293:16,20,25 294:10, 14,21 295:4,6,7,14, 21,23 296:3,9 297:3, 7,9,15,23 298:2,4,10, 20,22,25 299:4,22 300:8 301:3,9 302:12,18,24 303:12 304:14 305:4,12,14, 23 306:7 308:14 311:19,20 313:7,19 314:5,12,23 315:8 319:15 320:12 321:7, 8,15,19 322:8 325:2 327:5 329:5,13,18 335:15 336:11,16,24 337:7,8,12,22 338:2, 10,13 339:3,7,12,13, 16,17,20 341:2 344:13,22 356:2,5 358:15 360:6 362:23 367:2,11,15 371:7, 19,25 372:2,7,13,20 374:6,12,15 375:4,13 376:25 377:8,13,14 381:12,22,25 382:13, 14 383:12,15 384:8, 16 385:23 386:17 387:6 388:12 391:24 392:16 393:16 395:15 397:2 398:4, 5,9 400:14 404:5,11 405:21 408:4 412:2 415:5 419:11,22 420:2,12 421:14 422:4,20 423:12,18 424:6,15 426:21 429:6 430:7,10 431:13 432:11,24

**Highland's** 291:9 298:16 301:13 302:14 303:6 311:12 313:6 327:18 346:18 349:12 354:25 358:14 362:15 370:25 389:3 402:24 403:17,22 412:8,16 426:2,10 432:17 435:14 441:11 476:19,23

**highlighted** 306:4

**highly** 334:10 391:22 417:18,19

**hired** 297:3

**historic** 322:5 431:5, 7

**historically** 454:3

**history** 422:3

**hold** 294:16 329:6 355:14 423:18 481:9

**holders** 400:14,19 427:21

**holding** 392:5

**holds** 314:22 315:7

**honorable** 428:9

**hope** 335:8 348:23 351:24 396:15 445:13

**hour** 454:9,12

**hours** 290:13 349:20,

21 350:19,20 479:4,9 480:9 481:17

**house** 308:7 424:25

**housed** 308:6

**hundred** 391:21

**hundreds** 293:15 312:12

**HVIN** 469:15

---

**I**

**idea** 300:21 331:15 410:15,19 416:7 435:21

**identified** 310:14 324:2 348:16 353:24 459:19 461:2,7

**identifies** 317:8

**identify** 299:6 300:3 313:4,17 314:21 321:14,18 328:10 329:12 331:16 340:25 341:5 342:14 366:6 396:24 422:2, 18 471:5

**illiquid** 361:18

**imagine** 290:12 313:21 319:23 320:3 336:17,21 342:18 367:16,17 383:13

**impact** 476:22

**imperfect** 365:5

**implying** 475:16

**important** 423:15

**importantly** 440:12

**improper** 391:4

**in-person** 350:9,12

**inaccuracy** 378:18

**inaccurate** 357:10 364:15,19 378:9 379:6 389:12

**inaudible** 338:23

**Inc.'s** 362:24

**incentive** 361:18

**incentives** 361:17 421:21

**include** 297:7 318:16 420:24 427:2 432:7

**included** 354:13 412:8,12,16 414:18 415:13 430:10 432:17,19 470:7

**includes** 473:3

**including** 348:15 421:5 459:8,13,16

**inclusive** 350:16

**income** 322:3,4 343:24 386:19 387:7 388:14

**incorporated** 366:2 392:24

**incumbency** 309:23,25 310:10 311:8 313:13,14 320:23 323:19 331:19 340:12,20 342:11,20 398:6 436:25

**incur** 316:12,18

**incurred** 337:22

**indefinitely** 373:12

**independent** 385:19

**indirect** 329:23 341:19

**indirectly** 307:3 322:19 330:3

**individual** 345:8 351:3

**industry** 317:16 404:19,21

**inform** 326:12 443:9

**information** 344:20 378:13 414:25 424:14 427:18 470:13

**informed** 443:2

**initial** 419:15

**inkling** 413:14

**inordinate** 392:6

**insignificant** 424:20

**installment** 369:24 409:16,22 453:22 456:2,12,21 458:8 460:11 461:20

**instruct** 371:10 393:15 442:21 443:9 445:21 446:4 461:19

**instructed** 371:24 372:13 397:2

**instruction** 372:20 397:16

**instructions** 395:15

**intended** 325:20 418:19,20 473:23

**intent** 339:9 377:5,6 414:12

**intention** 418:14 482:10

**intentionally** 304:19

**interacted** 402:4

**intercompany** 422:5,17,20 423:4,11

**interest** 329:24 330:3 341:19,21 400:14 408:2 419:10 440:8 450:9 452:20 453:10

**interests** 306:18 307:4 453:5

**interject** 390:25

**interjecting** 445:4

**interrelated** 423:3

**interrogatory** 426:5

**interrupt** 422:14

**investment** 291:16 330:22 401:9

**investments** 330:21 339:17 342:7 361:19

**investor** 292:21 338:24 385:4

**investors** 330:24 331:2

**invite** 396:19

**involved** 325:9 328:2 339:17 355:21 373:16 386:12 406:10 459:5

**issue** 306:5 332:22 335:7 360:8 399:9,17 400:24 405:5 410:22 423:15 424:10 433:9

**issued** 467:20 468:15

**issues** 333:7 348:16 386:9 468:2

**item** 430:16

---

**J**

**James** 288:5,11 404:17

**January** 291:10 450:23

**JEFFRIES** 472:15

**Jim** 302:3

**John** 291:21 317:21 335:17 347:21 369:8 376:18 380:13,14 386:20 387:22 390:21 395:23,24 396:3,6 397:5 406:16 445:3,9 457:19 478:23

**Jonathan** 322:6

**judge** 363:22 443:12, 17 480:18

**judgment** 305:17

**July** 420:13 428:18

**jumps** 390:2

**juncture** 355:22

**June** 436:10 437:17

**justification** 347:17 365:18 370:7 389:16, 20

---

**K**

**keeping** 432:2

**key** 377:16

**kind** 335:3,6 366:5 384:19 414:14 425:3, 11 432:21

**kinds** 327:25

**Klos** 300:17 352:10

**knew** 311:9 313:24 325:20 334:6 336:19 391:23 392:18 439:11 440:11,12,16 442:12,13,17 451:16 454:2

**knowing** 294:5 299:2,21 300:6 301:2 316:7

**knowledge** 300:24 301:6 312:4 323:8 340:13 341:22 349:2, 14 351:16,20 367:22 368:24 373:20 397:15 410:11 420:15 437:8,9 438:6 457:5 465:17,22 466:6 468:13,20,24 469:5

**knowledgeable** 373:16

**Kristin** 352:18

---

**L**

**L.P.** 288:6 290:24 306:8 311:21 322:13 324:4 471:22,23

**lag** 301:25

**lagging** 478:24

**Lamensdorf** 322:6

**largely** 291:16 308:6 370:10 397:20

**larger** 460:22

**largest** 292:4

**late** 288:22 336:25 356:4 374:6

---

**Lauren** 320:9

**law** 335:21 389:23

**lawsuit** 403:17,22 404:4,11 433:9

**lawsuits** 399:9,17 400:25 405:5

**lawyer** 390:24 391:4

**lawyers** 312:6 350:23,25 365:5 383:6 406:10

**layers** 401:25

**lays** 475:20

**learn** 367:14,25 440:5

**learned** 312:17 368:6 442:23

**leave** 288:24 370:13 380:9,25

**left** 456:5

**legal** 383:2,7 410:18 473:14

**legitimate** 467:25 468:3 469:16

**lengthy** 356:18

**lens** 421:12

**letter** 412:14 426:24 439:16 441:6,12 442:7,11,13,22 443:3,13,17,25 444:4,6,9,15,17,24 445:16,18 464:3,20 465:4,23 466:18 467:2,6,10 472:4

**letters** 299:25 426:9 464:5 465:12 469:11

**level** 423:2

**levels** 317:20 404:19

**liabilities** 299:9 327:4

**liability** 412:20

**lieu** 361:8,16 416:15

**life** 427:19 470:24

**likelihood** 312:15

---

**limited** 413:16 417:7 427:18

**limits** 317:12

**lines** 331:4

**liquidity** 339:16

**list** 354:12 418:25 424:19,20 425:10,17, 18,20 426:4

**listed** 354:18 419:5 420:3 425:16 430:17 440:9 445:25 446:6 450:5 466:17

**listen** 372:11 468:11

**listing** 353:4

**lists** 344:20

**litigation** 289:2 356:7 414:19 441:7, 10 443:4,8,18 455:23

**LLC** 341:8,11

**loan** 365:23,25 416:18 421:19 422:5, 18,20 423:11 430:4, 5,15,23 431:9 435:2, 18,24

**loaned** 452:7

**loans** 298:22 299:3, 22 300:7 301:3,9 344:12 371:3,9 404:20 406:11 420:17 422:17 423:4 424:7,16 427:3,12 429:4,11,18,19,24 430:23 431:5,13,21 432:7,11,15,17,18 448:12 450:21 452:19,20,22,23 477:10 478:2,8,11,16

**logical** 377:6,9 391:18 413:20

**long** 301:20 380:18 397:17,18 427:5 434:5 479:19

**longer** 478:25

**looked** 340:19 396:23 431:4 439:10 455:11 464:2

---

**lot** 291:22 297:23 311:14 416:3 452:14 467:23 482:8

**loud** 414:9

**love** 428:25

**low** 312:15

**lower** 452:14,20

**lunch** 380:19,21 398:17

**Lynn** 363:22 443:12, 17

---

**M**

**made** 333:19 346:4 367:15,25 368:24 369:3,5,15,18 372:18 387:12,19 388:6,11 392:6 393:25 395:16 397:22 424:13,18 432:19 434:15 439:8 440:6,17 442:2 445:4 460:20 465:6 466:17 468:14 470:18 476:10 477:16

**major-** 307:2

**majority** 307:4 330:2 341:21 400:13,18 427:21

**make** 288:15 305:17, 18 341:14 357:14 358:12 364:23 371:11,13,18,25 372:14,21 375:13 377:16 379:10 387:5 393:7,10,16 394:7,15 395:15 397:2 400:15 409:15 410:8 411:17 429:17 440:21 441:17 445:22 446:5, 9 455:12,25 456:11, 19,20 457:3 458:7, 11,15,17 460:10 461:5,20 462:3,10, 11,19 463:3,4,11,19 465:7 466:25 476:15, 20 479:15 481:2

**maker** 295:22 296:2 414:9 429:21 437:14 467:3 474:24 475:10

477:17

**makers** 451:7,25

**makes** 342:7

**making** 377:13
461:14 467:19

**maliciously** 304:20

**man** 383:22

**manage** 293:4
421:21

**managed** 308:9,16
325:13,18 327:16

**management** 288:6
290:24 292:5,18
294:11,22 295:4,14,
21,23 296:3,10 306:7
308:11 311:21
329:19 362:23
405:22 412:14 426:8,
13,23 431:21 434:15
457:24 458:4 466:22
471:22,23

**manager** 291:19
293:2 309:3 421:14

**managers** 309:5
322:5 421:21

**manages** 330:16

**March** 435:3

**Mark** 306:15 383:11

**marked** 345:4,6
353:12 354:6,23
362:16 377:22
380:11 402:23
408:10 433:15
446:16 464:12 466:9

**market** 339:5 384:16

**marketed** 330:18,20

**marks** 288:3

**masked** 422:9

**material** 332:22
344:2 365:22,24
368:4,7 369:2 412:7,
10 425:7 426:16,23
427:4,12 430:6,9
431:8,9

**Matt** 342:18

**matter** 288:5 293:7
296:20 350:18
467:15

**matters** 302:2

**Mcgraner** 342:18,23

**mea** 406:16

**means** 384:2 395:20
458:4

**meant** 332:3 456:7
474:4

**mechanism** 429:18

**meet** 350:11

**meetings** 350:16,22
351:2 481:5

**members** 425:2

**memorized** 347:23

**memory** 356:13

**mentally** 289:24

**mentioned** 335:10
367:18

**met** 349:17

**Michael** 322:6

**mid** 374:21

**middle** 374:24
404:15

**migration** 364:6

**Mike's** 387:14

**million** 294:2,8,11
296:15,18 298:12
377:3,4 391:25 392:5
393:4,12 405:17
407:22 408:18 412:4
413:5,11 419:17
420:12 421:16
429:24 430:14

**mince** 393:9

**mind** 324:13 392:21

**mine** 434:19

**minimis** 297:25
298:5,17 333:5,7,12,
15 334:7,14 343:21
376:25 377:3 391:21
393:20 410:13

411:25 412:3 413:18
417:20 421:13
458:20

**minimus** 298:7
343:22,23

**minute** 291:24

**minutes** 318:3 370:5
387:10 454:8

**misleading** 390:25

**missed** 425:9 456:24

**missing** 389:20

**mistake** 448:22

**mistaken** 397:10

**Mitts** 324:14

**mixed** 430:15

**modest** 382:6 385:11

**modification** 417:4
475:15,16,21

**modified** 357:14
364:22 379:9 473:10
474:8 476:21

**modify** 473:14,23

**moment** 357:16,25
359:11 364:20 366:4,
10 375:23 379:25
422:2 461:18

**Monday** 479:15

**monetize** 361:18

**money** 292:18,25
293:4 295:3,7,8,13
296:9 331:4 336:24
337:7,16 360:7
382:11 391:21
419:22 420:2,6
421:19 448:6 450:16
452:7,14 460:22

**moneys** 337:19
470:15

**monitor** 288:8

**monthly** 299:13

**months** 428:15

**MORRIS** 288:14
289:5,14 291:25
294:18 295:2 303:18,

22 304:4 305:8
309:11,17 317:24
323:17 337:17 345:3
346:5,8 347:24 348:4
349:25 353:10 354:4,
21 355:5,9 359:6
369:12 372:8 374:4
375:19 376:22
377:20 380:12,16,24
381:4,15 383:19
386:25 387:16 388:3
390:3,17,20 391:3
393:22 396:7 397:7
398:15 401:5 402:9,
15 403:3 405:14
406:18 408:7,11
414:4 423:23,25
425:8,17 426:7 432:3
433:13,18,20 434:9,
24 436:13,19 437:11
439:14 444:12,22
445:12,20 446:2,14,
20 448:17,21 454:13
456:6 462:14 464:9,
15 466:7,10 468:10
472:13,17 474:18
476:7 479:3,12,24
480:14,22,25 481:6,
12,15,22 482:3,16

**mortgages** 452:25

**motion** 374:20,24
395:7

**mouth** 302:5

**move** 322:11 372:8
374:4 375:19 386:24
393:22 432:3 433:7
440:15 462:14
468:10

**moved** 364:3 468:22
470:15

**moving** 302:5 468:7

**mucked** 469:20

**multiple** 311:15,23
320:4,5 324:20
325:5,6,22 375:7,8
406:10

**mute** 395:22,23,24
396:2,14 481:11

**mutual** 308:6,7,9,16
317:3,4 336:12

**myriad** 335:2

### N

**names** 299:14
342:22 425:19,20
426:4

**Nancy** 288:19 355:14

**narrow** 313:16

**nature** 308:5 323:3
330:15 342:5

**nauseous** 289:4

**necessarily** 413:7
475:21

**necessity** 376:20

**needed** 372:18

**negotiate** 417:13

**negotiated** 418:6,10

**negotiating** 411:23

**negotiation** 416:22
417:2,4

**negotiations** 417:2
451:22

**netting** 392:9,15

**news** 428:14

**Nexbank** 431:18
432:6,18,20

**Nexpoint** 322:11,12,
15,18,21,23 323:6,
10,15 324:3,9,15
326:2,4 327:7,16
328:6,13 329:6,14
335:20 336:23
339:22 341:11 346:2,
17 353:17 381:23
382:8 383:6 384:16
385:8 389:8 391:24
393:15,25 394:8,16
395:16 396:25 397:3,
13,16,22,25 398:8
403:16,17 405:18,25
407:17,21,24 408:4,
9,24 409:8,24 410:5,
7 411:18 419:11,20,
21,25 420:5,11,16
439:12 447:21 451:2
452:7,13,18 453:2,5

455:25 456:11,19 458:25 459:4,9,24,25 460:7 461:8 467:6,8 473:5

**Nexpoint's** 323:4 326:7,12,17,22 327:2,9,10 328:7,14, 18,22,25 329:8 345:20,24 346:14,20 347:2 348:8 349:3,12 388:22 389:2 412:3, 17

**night** 290:10

**nods** 292:2

**nominal** 386:4

**non-payment** 414:11

**non-privileged** 442:6

**nonetheless** 334:15

**normal** 316:22

**note** 306:5 349:3 368:16,18,19,22 369:23 371:12,21 372:2,16 397:3 407:17,21,25 408:16, 23 409:2,6 410:7,15 411:11,18 412:4,15 413:5,6,11,15,18,24 414:18 415:9,13 416:9,12,14,18,24 417:9,14,17 418:4, 17,18 419:4,8,20,23 420:6,20,25 421:5 434:3,14,22 435:14 438:18 440:14,23 446:25 447:5,8,16 448:8 449:12,15 450:3,18 451:12 455:6 457:10 467:2, 3,9 470:18 475:21

**notebook** 355:4 464:14

**notes** 293:12,15,19, 24 294:23 295:22 296:3,22 297:17,25 298:4,12 305:18 327:6 334:5 348:12, 15 353:5 356:6 358:7,8,9,16 359:10

360:8 364:7 367:4 368:15 373:8 376:24 377:12 391:13 399:9, 17 400:24 402:6 403:15,21 404:3,9 405:5,9,10,17 408:3 410:22 411:7 414:23, 25 415:4,18,21,23 416:21 417:12,20,21 418:9,13,16,19,20,25 419:5,12,16 427:24 433:9 439:9 440:9 442:3 443:10,19 445:23,24 446:11,18 447:17,23 448:7 449:4 450:4,10,25 451:3,6,9,16,19,21, 25 452:3,9 453:11, 19,21,22 455:3 457:9 461:22 462:4,18 463:2,12 464:6 465:2 466:17 467:20 468:15 469:16 470:8, 18,22 472:24 473:3, 5,11,18,25 474:21 475:5,9,11,16,19 476:2,6,14,23 477:7, 11,14,15,16,20,21,24 478:3,9,11,17

**notice** 353:14,18 354:7,13 363:7 367:3 375:4 377:8 414:11, 12,13 443:19 480:19

**noticed** 406:15

**notices** 345:2 353:3 414:13 464:24

**notion** 423:16

**notwithstanding** 375:12 379:16

**November** 375:4

**nuance** 478:5

**number** 298:14,21 299:3 362:17,18 408:8,12,13,15 464:4

**numbers** 392:20 425:3

**numerous** 365:25 368:25

---

**O**

**object** 296:23 297:10 305:25 311:5 315:16 318:24 321:21 326:8, 19 329:9 331:9 340:6 344:7 366:8,17,22 367:6 369:25 373:5 376:10 379:11 384:2, 22 385:17,24 388:15 390:14 399:11,19,21, 22 401:11,18 405:11 409:9,18,25 410:9 411:20 415:14,25 426:17 429:8 430:25 432:13 438:10 441:3, 20 445:11 447:11 449:22 452:10 453:7, 24 455:19 456:4,14 457:6 460:13 461:16, 23 462:6,21 463:6,22 465:14,19,25 467:4 470:3,10 471:2 473:12 474:2,11 475:12,13 476:25

**objected** 312:18

**objecting** 409:12 445:6

**objection** 294:3 324:21 327:20 343:19 347:4 348:25 361:25 387:8 428:5 434:17

**objections** 346:4 348:19 353:25 354:17 383:21

**obligation** 371:20 426:13

**obligations** 294:14, 21 295:20 297:8,15, 23 315:15,22 316:3, 8,12,19 318:17 326:7,13,18 327:3,11 328:8,15 332:20 333:2,11,15,18,23 334:4,13 340:5 343:6,18,22 344:6,12 366:15 367:4 377:2 469:19 470:2 473:24 474:10,24 475:11

**obligors** 356:6

418:13,14 459:20 460:10 461:3,13 462:17 463:2,14,18

**obligors'** 458:13,14 469:10

**obtained** 312:3 374:16 435:18 448:12 450:22

**obtaining** 452:19

**occurred** 368:13

**October** 288:7 374:8

**odd** 422:25

**odds** 413:15

**offense** 432:4

**officer** 303:2 310:4 312:8 320:22 321:16 329:6,14 331:13,17, 25 332:9 340:16 341:3 342:15

**officers** 311:14 459:8,12,14,15

**offline** 480:2

**Okada** 306:15,22

**omission** 406:22

**omitted** 405:25 406:7,12 407:3,5

**operating** 299:13 316:20,23 343:23

**opinion** 447:14

**oral** 336:15 337:4 361:22 399:7,15 400:10,22 401:4,16 403:7,10,13,19,25 404:8 406:20 407:10 420:21 443:10,20 472:11,21 473:8,21 474:22 475:6 476:18, 22 477:8,24 478:7, 10,15

**orchestrate** 314:19, 25

**orchestrated** 327:14

**order** 374:13,16

**ordinary** 372:23

**original** 356:2 407:21 473:11,18,24 475:4,8

**out-of-pocket** 338:8,16

**outline** 480:20

**outstanding** 295:17 407:25 419:10 440:7 447:22 450:9

**overcharged** 391:24

**overlay** 343:20

**overpayment** 392:4

**overstatement** 460:17

**owe** 294:10 296:9 426:3

**owed** 297:8,15 375:14 419:11,22 450:10 460:23

**owing** 327:4 344:21 366:16

**ownership** 306:18 307:4,21,24 317:18 329:24 341:19

**owns** 306:13 322:18

---

**P**

**p.m.** 381:9 398:20 454:17 482:21

**pages** 435:21

**paid** 338:8 373:13 392:16 418:21,22 460:20 462:11

**paper** 338:22

**paragraph** 357:17 358:19 359:12,13,23 360:13,16 361:14 362:9 365:2,15 370:8,14 378:20 379:14,24 390:4 403:4,6 404:14 407:14 409:13,20 412:23 414:6,7,17 421:10 422:8 423:10 455:11,14,18 472:14, 18,21

**paragraphs** 357:20 365:10 375:22 380:2 390:7,10,16 398:12 416:9

**paraphrase** 394:23

**parsed** 471:25

**part** 334:19 337:4 340:8 358:22 359:15 360:2,18 365:17 370:17 412:10 414:19 418:21 423:4 427:20 443:23 444:2 454:4 456:8 468:3

**participate** 289:24 350:21,25

**particularized** 468:24

**parties** 297:24 339:6 413:14 415:4 418:7

**parties'** 473:10,23 474:9,23

**partly** 389:23 454:4

**partner** 361:6

**Partners** 341:8,11 455:7 464:21

**party** 452:2,6

**passed** 338:5

**passing** 363:22

**past** 296:6 338:20

**patient** 372:10 383:20

**Patrick** 301:15 383:11

**pay** 336:23 337:6 338:7 366:14 367:4 369:23 383:15 384:7 385:22 393:5,12,18, 19 419:7

**payee** 295:24 422:21 466:25 474:25 476:2 477:16

**payees'** 475:10

**paying** 339:2

**payment** 337:13 371:11,19,25 372:14,

21 373:3,11 375:13 391:16,20 393:16,25 394:8,15 395:16 397:2 409:16,23 414:11 439:9 440:7, 21 442:3 453:22 456:2,12,19,21 457:4 458:8,17 460:11,17 461:5,14 464:5 468:15 475:18 476:3, 16

**payments** 369:24 373:18 377:13 410:8 445:22 446:5,10 454:3 458:15 460:16 461:21 462:3,19 463:4,11,20 469:18

**peak** 292:3

**people** 293:5 299:6, 8,15,18 300:10,13,14 303:18 342:19 407:9 416:10,11 421:12 424:23,24 426:15 458:22 459:7 470:16, 18

**people's** 424:21

**perceived** 396:16

**perceives** 396:18

**percent** 298:13,16

**percentage** 306:17

**percentages** 306:23

**Perfect** 402:12 482:12

**performance** 385:9 416:16

**performed** 471:16 472:7

**period** 293:16 307:18,25 330:8 367:20 401:13,15 420:13 421:17 440:20,25 479:18

**periodic** 454:3

**periods** 304:21

**permissible** 386:22 387:23

**person** 300:4,17,18

311:3 315:12,20 316:24 331:16 332:17 333:16 364:8 371:17,18 373:19 388:5 393:15 396:24 397:15 410:4 443:5 458:22

**personal** 358:8,9 386:23 387:24 480:4

**personally** 297:3 301:7 324:2 327:17 363:19 371:10 393:24 405:6 417:16

**personnel** 372:7

**perspective** 333:13 334:3 377:7 405:17 473:21

**petition** 311:10 324:9 325:21

**Phillips** 364:5

**phone** 350:2,9,17,22 351:2

**phrase** 347:15

**physically** 289:23

**pick** 476:20

**picked** 335:8

**pile** 362:13

**PJ** 434:10

**place** 476:9

**plaintiff** 289:8

**plaintiff's** 355:19 358:21 359:14,25 365:16 370:16

**plan** 468:8

**play** 474:13

**players** 472:2

**pleasure** 381:4

**point** 288:25 290:22 309:8 318:2 320:15 377:19 406:19 427:7, 24 433:5 468:7

**points** 416:9

**policy** 317:6

**portfolio** 308:10,16 309:3,5 322:5 361:21

**portion** 303:16 308:15 351:10

**position** 298:3 311:23 312:16 313:17 314:11,21 320:14 321:7 325:25 329:6 367:9 403:10 407:9

**positions** 297:5 312:22 315:6 316:21 320:17

**possibly** 423:3

**post** 309:17

**pot** 468:8

**potential** 330:23

**practice** 317:17 404:20 423:16,17 424:6,15,22 429:4 430:4 431:13

**practices** 411:13

**precedence** 477:5

**precedent** 429:12,16 477:5

**precipitate** 314:25

**premarked** 309:13

**prepaid** 366:15 391:13 406:11 418:22 461:9

**preparation** 328:2 350:5 353:7

**prepare** 349:16

**prepared** 299:12 334:16 338:3 346:25 347:20 348:6,14,22 349:11 354:17 356:9 363:9 376:6

**preparing** 299:10 320:4 340:9 350:15 363:20

**prepay** 389:17

**prepayment** 366:21 367:5,15,22 368:2, 10,15,24 370:10 378:12,16,20 379:18

**portfolio** 459:22,25 460:8

**prepayments** 365:23,25 367:13 369:2,15,19 378:15, 23

**prepays** 389:19 392:24,25

**presence** 384:15

**present** 431:24 476:11

**presentation** 431:4

**presentment** 414:10

**president** 291:10,15 292:6,14 293:16,20, 25 297:6 298:19 302:12,23,24 303:13 304:15,22 305:2,11, 24 308:21 309:6 313:6 315:10 323:12 325:2 326:4 332:17 337:12 338:13 422:3, 19 423:12 469:21

**presidents** 317:18

**pretty** 460:24

**previously** 319:15 408:3

**Price** 337:23

**Pricewaterhouseco opers** 469:25 470:5, 6,19

**primarily** 322:7 339:14 368:18,19 383:10 440:3

**principal** 293:23 295:17 360:7 407:22 408:2 419:10,16 440:8 450:9

**prior** 300:5,15 302:20 307:21 311:10 315:23 324:9 325:20 389:14 391:9 418:25 419:11,16 420:6 423:16,17 424:15 441:6,9 442:10 443:3,7 448:7 450:10 463:16 477:19

**private** 421:18,22

**privileged** 441:18

**problem** 302:7 381:5 384:3 454:13

**proceed** 289:22 291:25 398:25 454:20

**proceeds** 348:20 349:3 420:16 435:23 448:11 450:21

**produced** 367:23 425:13 428:10,17 444:6,12,17 445:18

**product** 451:21

**production** 428:16

**profit** 338:9

**promissory** 293:11, 12,15,19,24 294:23 295:22 296:2,22 408:3,16 411:18 413:11 419:5 434:3, 14,22 446:25 447:17 450:4,18 464:6 467:20 470:8 472:23 473:3,5,11,24 474:21 475:5,9 476:23 477:11,14,15 478:2,9

**proper** 412:11

**properly** 412:12

**proportionate** 424:21

**protections** 413:17

**protest** 414:11,12

**provide** 383:3 386:17 387:6 404:16 421:7

**provided** 337:8 339:11,16,20,21 353:2 385:12 386:4 429:7

**providing** 336:6 422:5

**provision** 382:14 415:12,24 447:8 449:19 455:18

**provisions** 440:14 449:25

**prudent** 413:4

**pulling** 449:2

**purchasing** 317:4

**purpose** 298:8 377:10 401:3 404:15, 24 405:3,8,24 406:7, 23 407:3,9,11 421:4 422:5 423:12 430:22

**purposes** 416:6 422:21 424:25

**pursuant** 356:4

**put** 290:18 309:12,18 320:25 323:17 342:13 345:3 348:2 353:10 354:4,22 355:11 367:2 378:10 379:4 391:20 401:5 408:7 416:5,7,10 418:14 427:18 433:14,22 448:3 466:7 470:20 476:9 481:10

**putting** 343:12,14 354:24 355:10 443:18 472:14 480:19

**Pwc** 412:16

## Q

**qualified** 346:3

**quarterly** 299:11

**question** 294:25 295:11,25 302:10 304:10,24 305:21 306:2 332:2 335:18 357:2 358:11 372:11 376:13,22 381:16 383:25 387:2,3 388:2,9,16 391:6,14 393:23 395:6,8,9 397:8 398:7 405:7 417:10 422:15,25 423:7 424:2 441:22 442:15 457:14,15 460:25 467:17 468:12 477:2 478:6, 13

**questions** 335:4,6

346:25 353:22 363:2, 9 375:25 376:3,6,21 378:2 388:21 390:22, 24 480:16

**quick** 317:23 380:14

**quickly** 344:25 345:15 377:12

**quote** 359:25 360:3 365:16 370:16 404:15

## R

**raise** 382:10

**rambling** 387:10

**rate** 475:18

**rates** 452:14,20

**rationale** 471:10

**read** 293:18 296:21 358:2,10 361:2 381:15 397:9,10,12 404:22 409:2,11 410:3 413:6,10,24 414:9,15 415:24 424:2,3 430:21 447:5 449:15,18 455:13 475:2

**reading** 310:3 411:23

**ready** 454:20

**real** 323:5 341:11 342:7 385:8 391:14

**realize** 468:6

**reason** 303:10 304:12 305:2,12 318:19 319:4 324:7, 10 328:4,11 391:18 410:25 411:14,15,16 413:20 434:20 436:7 437:6 447:6 452:5 453:3

**reasonable** 392:10 404:18 411:19 413:24

**reasons** 388:16 413:25 458:14 460:9 468:21

**recall** 292:8 298:24 302:17 303:4 310:25 312:20,25 313:21 320:14,21 326:15,16, 21,25 330:11 337:11, 18 355:18 356:2 357:3 363:6 368:23 371:22 373:21 374:11,15,19,23 375:3 407:20,24 409:5 410:6,21 424:9 425:10,21 437:3 446:3 465:4

**receive** 338:14 344:19 435:2

**received** 322:3 337:13 383:16 435:9 464:4,24

**receiving** 386:18 387:7 388:13 425:22 442:14

**recess** 304:7 318:8 381:9 398:20 454:17

**recollect** 442:16

**recollection** 309:14 310:17,21 311:17 324:2,17 338:12 349:6 352:25 355:24 356:8 386:2 411:6 420:10 435:17,22 440:2 442:14,19 443:16 444:14 448:5, 10 450:20 455:5 464:23 467:16,19

**recommended** 301:15

**reconvene** 289:3

**record** 304:3,5,8,11, 25 318:6,9 330:20,25 338:18,22 339:4 381:7,14 382:10 384:15 385:5 397:12 398:19,21 399:24 424:3 454:16,18 479:13 481:14 482:17,20

**records** 298:23 330:17 367:8,12 397:14,19 431:20,25

**recover** 358:16

**redaction** 428:12

**reestablish** 419:8

**refer** 291:2 306:10 322:15 329:21 340:14 341:15 400:9

**referenced** 337:5

**referred** 445:17

**referring** 297:16 371:4

**refine** 330:22

**reflect** 477:16

**reflected** 294:22 295:21 313:20 327:3 334:15 420:6 477:11

**refresh** 309:14 310:17 323:25 339:18 349:5 352:25 355:23 356:8 439:12 455:5 464:23

**refreshed** 331:21 332:16 341:4 342:11, 17 420:14,18

**regard** 386:5 402:5 407:7 443:13,25

**regular** 344:9 373:11 460:16

**regularly** 299:17

**regulatory** 327:15 335:21 411:14 416:6 469:18 471:10

**regulatory-wise** 418:3

**reimbursement** 338:15

**relate** 361:20 375:21 376:8,16 379:23 380:3 398:11 478:7

**related** 323:5 366:6 382:4 390:11 398:4 415:4 477:10,13,25 478:15

**relative** 333:5,7 343:23 376:25 413:18 430:18 453:16

**relevant** 412:3

**reliance** 370:25 372:5 463:8

**relied** 372:22,23 375:13 383:9 393:4,5

**relocate** 430:14

**relocation** 424:24

**rely** 428:2,7,8

**relying** 367:10 371:7 398:8 458:16

**remains** 401:21

**remember** 301:21 307:20,21 308:12,13 309:10 311:14 312:14 320:17 323:2 330:13 358:10 361:5, 8 368:6 375:9 389:14 407:18 409:12 410:25 411:5,22 441:14 443:14,15 464:4 465:8 467:22 468:5

**remembered** 415:9

**remind** 460:5

**remotely** 480:10

**remuneration** 337:10 382:8 384:13 385:14

**render** 388:12

**rendered** 337:14 339:13 384:8 385:23

**renegotiation** 416:20

**rep** 299:25

**repaying** 418:15

**repeat** 294:24 295:25 302:10 387:3 391:8 394:5 399:13 441:22 472:16

**repetitive** 335:9

**rephrase** 295:10 399:13

**report** 314:5,8,13

**reporter** 288:9

303:14,21,24 381:17 396:5,8 482:15,19

**reports** 299:13

**represent** 351:3 353:16

**representation** 412:14 426:9,14,24

**representative** 345:21,25 354:9 378:3 388:22 400:12, 13 463:13

**repudiation** 365:18 370:7

**reputable** 334:12

**request** 317:22 372:25 397:23

**requests** 349:8,13

**required** 369:23 385:22 409:15 410:7 411:11 440:24 453:22 454:2

**resign** 374:5,8

**resolution** 468:8

**resolve** 375:17

**respect** 319:16 325:3 335:7 343:17 348:15, 20 353:24 464:25 472:23 477:23 479:20

**respectful** 351:25

**respective** 451:7

**respond** 441:11 442:8,22 469:4

**responded** 441:6 465:11 469:9

**responding** 465:23

**respons** 328:14

**response** 305:21 425:21 444:3 469:17

**responses** 425:19

**responsibilities** 299:15 318:16,21,23 328:6 398:4

**responsibility** 299:2,20 300:6 301:2 315:13 319:6 326:6 327:9 332:19 333:22 340:4 343:2,5,17 364:9

**responsible** 299:7,8 300:11 316:6 327:18, 21 471:24

**responsive** 422:15

**rest** 290:17 482:9

**restate** 457:14

**restraining** 374:13, 16

**restroom** 317:23 380:15,23

**results** 330:23

**retail** 312:22

**return** 386:19 387:7 388:14 398:17

**revenue** 339:6,20,21

**review** 344:12 346:20 351:7 354:12 389:5 447:13 450:2

**reviewed** 357:4 429:5

**reviewing** 355:19 363:20

**ridiculous** 377:17

**rights** 473:10,23 474:10,23 475:10 476:23

**road** 339:7

**role** 314:2 327:12 343:11 363:19

**roles** 311:15 325:22 373:12

**roll** 337:25

**roll-ups** 477:18

**rollup** 407:25

**room** 309:18 355:11

**rough** 482:14

**roughly** 375:2

**row** 318:3

**RUKAVINA** 445:2,14

**rules** 386:6,7

**run** 319:24 380:22

**running** 324:13

**S**

**safe** 445:13

**satisfaction** 371:19 372:14

**satisfied** 373:18 429:13,16

**satisfy** 333:18

**scope** 300:7 301:9 316:7 317:8 387:22 405:15

**screen** 353:19 354:19,25 355:10 381:2 388:20 389:2 401:6 402:7,17,22 433:22,25 434:6

**screw-up** 370:25 371:2,4

**scroll** 434:9

**sec** 291:22 471:8,17, 21,25

**secrecy** 427:23

**secretary** 321:9

**section** 409:14 412:22,25

**secured** 416:13,15 452:25 453:13,16

**Seery** 352:6,8 373:23,24,25 375:16 391:23 392:9 414:24 439:17 468:6

**Seery's** 352:7

**sees** 302:6

**selection** 301:16

**send** 467:2

**senior** 297:5 300:10, 14,17,18 312:8 316:20 325:5 327:23

**424**:25 431:21 432:19 452:25 453:13,16

**sense** 341:14 392:7 466:25

**sentence** 405:24

**separate** 331:3 333:24 385:20 457:9 480:5

**separately** 430:17

**September** 355:25 356:10 357:6 374:6

**series** 455:3

**serve** 291:9 309:7 323:15 325:21 331:24

**served** 302:24 303:13 304:15 305:24 310:18,23 311:19 313:6 320:22 321:15 324:8,25 325:3 329:13 331:13, 17,22 332:8 341:2 342:15

**server** 426:2

**service** 333:6 334:5 343:22

**serviced** 336:3

**services** 294:11,22 295:4,7,9,14,21,23 296:4,10 329:19 331:20 332:4,14 335:15,17,22,23 336:2,5,7,9,10,15,24 337:7,13 338:4,6,15 339:3,9,12,15,22 340:11,20 362:24 367:11 371:6,7 372:7 375:5 381:11 382:14 383:3,9,16 384:8 385:12,23 386:2,4, 10,18 387:6 388:13 392:6 405:19,21 417:22 433:12 437:14 457:23,24,25 458:3,5,7,23 459:4, 15 460:6,7 466:3 467:6,13 471:15 472:5

**servicing** 413:17

**serving** 311:11
313:25

**set** 291:22 319:23
360:12 365:11 390:9
393:6 398:12 419:9
420:7 447:18 448:7
450:8,17 452:8
455:18 474:23
475:10

**settlement** 444:2
468:4 471:7,11,12

**seven-figure** 425:3

**seven-figure-plus**
431:20

**share** 359:2,17 362:7
368:10,21

**shared** 335:14,17,22,
23 336:2,5,9,10,15,
24 339:3,22 367:11
371:7 375:5 381:11
383:8 392:5 417:22
458:23 472:5

**She'll** 428:22

**sheet** 298:9 299:4,23
300:8 301:10 326:23
327:3,7 412:2 432:16

**sheets** 293:8 301:4
413:19

**shocked** 412:19

**shoot** 290:13

**short** 318:4 380:19,
21 386:11 387:10
397:17 398:16

**shorter** 291:23

**show** 330:23 347:22
406:4 415:17 429:15
431:20

**side** 308:10 450:5

**sides** 413:21

**sign** 299:24 312:12
327:24 408:23 426:8,
13 434:22 436:9
449:12 451:5

**sign-offs** 320:5

**signatories** 319:12
328:18

**signatory** 319:9,16,
20 328:22,25 329:7
438:2

**signature** 310:4,6
323:23 408:20
418:15 434:11,13
435:7 436:5,8,14
437:23 438:4,5,9,14,
18 446:21,22 449:10

**signatures** 320:4

**signed** 293:11,14,18,
24 310:11 358:16
409:3,7,22 410:6,22
412:14 414:18
415:13,23 416:22
417:12 418:12
419:19,21 435:7,12
437:13 438:25
446:25 447:5,9
449:6,16,21 451:2
453:20 455:14 473:3,
6 476:6,15

**significance** 316:25
317:2 460:18

**significant** 382:9
422:13 425:6

**significantly** 391:14

**signing** 413:5
437:24,25 438:22
439:5

**similar** 336:7 339:21
342:12 378:11

**similarly** 336:3

**simple** 348:25 391:6
393:23 395:8,9
400:16 441:23
460:25

**simultaneously**
301:18 311:11
321:20 384:5

**single** 353:9 414:18
428:11 458:21

**sir** 295:11 323:20
324:24 335:18
345:17 346:11
377:24 381:11
387:19 394:14

**396:24 402:17**
408:15 422:14
428:11 429:3 432:5
433:22 434:4,11
436:5 439:22 446:22
449:10 450:13
454:20 460:25
464:19 481:24

**sister** 351:21 361:22
399:8,16,25 400:9,17
401:8 403:12 404:8,
25 431:18

**sit** 300:24 301:7
304:13 318:20 319:4
357:8 445:10

**situation** 469:20

**sixth** 397:6

**skip** 357:24 359:21

**Skyview** 315:2

**small** 372:6 386:4
392:2 393:10,20
430:18 460:19

**soft** 413:15 415:9
416:9,12,18,24
417:8,21 418:17
452:22,23 453:11,19
475:17,19

**sold** 427:22

**solidifying** 411:10

**solvent** 417:19

**sophisticated**
292:21,25 383:22
390:23

**sought** 374:12
451:25

**sounds** 295:5 422:10
473:14

**source** 334:18

**space** 385:8

**speak** 303:23 399:3
453:12 454:22

**speaker** 303:25

**speaking** 301:18
303:15 383:21 384:5

**specific** 320:8 325:7
347:18 348:16

**356:13 372:24,25**
382:7 383:4 385:10,
14 438:6 456:24
467:15 468:20

**specifically** 312:14
316:5 317:7,12
326:14 344:20 349:4
364:17 372:17,18
373:7,15 382:18
393:18,19 412:15
430:12 434:23
435:16 437:5 470:6
471:21

**specifics** 369:16,20
375:25 410:12,13

**speculating** 300:9
430:20

**speculative** 427:6

**spend** 334:7 413:21

**spent** 350:15

**split** 322:9 472:5

**spreadsheet** 368:11
369:10

**stack** 353:2

**staff** 383:8 397:14

**stamped** 444:20,23

**standard** 404:20

**standing** 312:8
393:3

**standpoint** 418:3
421:13

**start** 365:13 424:4
472:13

**started** 307:22 364:4

**starting** 288:22

**stated** 388:17 407:13
419:17 471:21

**statement** 288:15
310:4 406:6,23 407:2
428:12 430:19

**statements** 299:10,
12 300:12 327:15,19,
24 338:4 366:5
412:8,17 429:6,15
430:8,22 432:7,12
470:9

**states** 359:13

**statute** 335:21

**stay** 371:8 394:25
481:13

**steal** 374:2 375:17

**step** 297:21

**steps** 316:2 344:11
393:24 462:2 463:3

**stick** 395:21

**Stinson** 288:18
363:15 364:3,6

**Stoops** 300:17

**stop** 289:2 356:21
441:17 474:18,19
479:6 480:15

**strap** 291:17

**strategy** 330:22

**stream** 339:6,20,21
386:18 387:7 388:13

**strike** 372:8 374:4
375:19 393:22 432:3
440:15 462:14
468:10,22

**strong** 324:15

**struck** 394:13 422:24

**structural** 335:3,6

**structure** 307:21
308:12

**structured** 314:10

**structuring** 312:7
373:9

**struggle** 316:15

**study** 327:7 333:9

**studying** 334:8

**stuff** 327:15 383:14
416:17

**subject** 332:2 347:3
348:18 353:25
354:16 361:21
403:16,22 404:4,10
416:20,22,25 417:3
420:20 429:20
440:13 443:10,19

474:21 475:5 476:11
478:2,8,17

**subordinated**
452:25 453:10,12

**subsequent** 407:11
477:4

**subsequently** 425:4

**subsidiaries** 415:3
417:19

**substance** 318:12
399:4 454:23

**substantial** 479:18

**substituted** 419:4
447:16 450:3

**suggested** 391:19

**suggesting** 396:18

**suing** 457:2 473:4,6
475:9

**summarized** 368:12

**summarizing**
360:19

**summary** 313:15
459:18

**superseded** 419:4
447:17 450:4

**supplemental** 338:9

**supplying** 334:17

**support** 336:10
360:12 370:7 391:7
431:12

**supported** 382:4

**supports** 470:24

**supposed** 289:11
376:5 392:8 395:20
431:16 461:4

**surprise** 410:24
438:17

**surprising** 311:16

**swear** 288:9

**switching** 437:24

**sworn** 288:12

**synergistic** 384:20

**systems** 397:14

_____

**T**

**taking** 398:7

**talk** 303:8 304:21
305:18 328:3 366:3
414:20 475:17

**talked** 336:22 406:8
407:16 424:9

**talking** 337:16
359:10 383:17 390:5
401:14 421:24
429:23,24 441:14
442:16 443:14,15
456:5 474:18,19
477:21

**tax** 373:9 382:23,24
383:10 416:6

**tax-related** 383:14

**team** 308:16 327:14
340:8,15 343:12,16
417:7

**telling** 400:5 455:13

**temporary** 374:12,
16

**tension** 373:22,24,25

**term** 368:15,18,19,22
369:22 371:3,12,20
372:2,16 397:3
407:17,21,25 410:22
427:6 446:17 447:23
448:8 449:4 450:25
451:3,6,9,10,13,17,
25 452:8 453:21
455:3,6 461:22
462:4,18 463:2 467:9
473:15 475:15
477:20 478:11

**termination** 375:5

**terms** 338:18 373:10
375:16 382:20
384:15 386:7 392:10
403:7 411:18 413:6,
10 416:19 417:13,17
418:16 432:22,25
452:8 471:8

**Terrestar** 469:18,20

471:24

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

**testify** 346:14 348:6,
14,22 349:11 354:8,
17

**testifying** 431:7
444:14

**testimony** 318:3,13
375:11 419:24 459:2
463:10 475:24

**Thedford** 320:9,11
321:14 329:15

**thereof** 310:5 431:22

**thereunder** 474:24

**thing** 324:13 336:12
362:3 389:25 426:2
436:24 452:17

**things** 292:19 304:20
312:10,12 313:11
317:4 322:8 327:25
359:14,25 360:16
373:9 403:6 428:7
435:11 445:3 468:2
469:19 470:16
471:12

**thinking** 340:17
375:16 402:3 459:3
461:18

**thinks** 351:25

**third-party** 330:24

**Thomas** 445:7

**thought** 388:4
413:23 467:25 468:3,
7 472:3

**thousand** 391:22

**thousands** 293:5

**throw** 290:9

**Thursday** 479:16
480:25 481:7,17,23
482:5

**time** 288:7 290:3,19
293:19 298:2 301:20
302:23 303:12

304:14,22,25 305:6,
23 307:15,18,25
309:8 313:5,18,24
318:7 320:12,15
324:25 326:18
329:14 330:8 334:7
337:12 338:12 341:3
342:16 344:19,20,23
346:21 350:15
353:21,22 358:11
359:9 361:2,3 367:19
378:14 379:2 387:25
389:24 390:13 392:9
393:14 395:4,10
396:17 397:6 398:16
399:23 401:13,15
406:15 411:4 413:5,
9,21 415:6,23,24
416:20 417:3 418:12,
14 419:21 424:12
438:9 439:25 440:11
442:6,14,17,18,20,22
449:21 453:20
454:14,15 466:23
470:13 472:9 476:4,
5,8,10,14,16 479:18
480:10,15 481:18,23
482:2

**timeframe** 371:14

**times** 338:20 339:15
349:22 350:4,8,11
356:15 375:8 383:23
420:2 421:20 450:16

**title** 308:18,25 313:4
323:10 325:11,16
331:5 342:8

**titled** 362:22

**titles** 311:25 312:3
325:6

**today** 290:13 291:3
294:10 295:17
296:10 298:10
300:25 301:7 303:9
304:21 305:22
308:19 309:2 314:17,
23 318:20 319:5
323:11 328:5 331:5
342:14 345:8,20,24
346:25 348:6 349:11
354:8 357:8 364:15
378:9 379:6 389:11
395:5 401:21 414:20,
22 415:12 445:5

453:4 454:9 479:5

**today's** 288:7 289:18
346:21 349:16 350:5
353:7

**told** 392:19 465:7

**top** 306:3 311:25
325:19 340:23
369:17,21

**topic** 347:6 348:11,
17 349:7

**topics** 346:9,10
353:16,17,24 354:13,
18 363:7 376:5
386:22

**total** 350:15 480:8

**track** 330:17,19,25
338:18,22,23 339:4
382:9 384:15 385:5

**tracking** 299:9

**transcript** 351:7
352:3,7

**transfer** 360:17,19

**transferred** 360:6

**transition** 363:22
392:11

**travels** 445:13

**treasurer** 309:8
310:14,18,23 311:4,
12 313:12,19 314:7,
16 316:18 317:9
318:15,21 323:15
324:3,8,17 325:25
327:9 328:6,13
343:10,11 397:24
436:21 439:25
466:21,22 467:3

**treasury** 333:25
416:4 417:22

**treated** 429:11

**trick** 358:14

**trouble** 393:11
394:22

**true** 453:15

**trued** 392:13

**trust** 289:9 401:10

427:19 443:21

**trustee** 400:13,16,23 401:9,17,21,23 402:5 403:8,15,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11 472:12,23 473:10,22 474:23 476:19 477:10,25

**trustees** 402:2

**trusts** 306:23 401:25

**Tuesday** 479:14

**typical** 317:16 421:25

**typically** 463:24

---

**U**

**UCC** 416:15

**Uh-huh** 450:12

**unable** 290:20 479:7

**unaudited** 299:11

**unaware** 431:6 455:16

**underpaid** 404:18

**understand** 289:20, 25 293:8 296:21 301:8 335:18 345:7, 19,23 354:10 358:13, 17 370:24 378:4 383:25 386:13 388:25 390:22 404:7 409:7,21 415:12 426:12 435:8 447:9 449:20,25 457:13 476:4

**understanding** 299:21 300:7 301:2 306:17 316:7,11 330:14 343:17 347:10,13 403:5 410:6 419:3 426:20 440:24 478:5

**understood** 336:19 382:4,23

**unfetterred** 476:3

**unified** 384:19

**unit** 384:20 400:19

**universe** 311:19

**unrelated** 452:6

**unsecured** 416:18 451:19 453:16

**up-and-comers** 300:19

---

**V**

**valuation** 471:14,24

**values** 376:25

**variety** 291:19

**verbal** 336:5 381:19, 20

**versa** 308:14

**versus** 438:4 474:8

**vest** 385:4

**vice** 308:14 317:18

**video** 288:4,8 302:2 396:20 457:20

**videotape** 396:17

**view** 334:14 411:24

**viewed** 452:24 453:11

**viewing** 398:3

**virtually** 418:21

**voice** 302:4

**Volume** 288:4

**volunteer** 375:24

---

**W**

**wait** 355:17

**waiver** 347:17 358:22 414:7

**waives** 414:10

**waiving** 317:3

**walk** 406:3

**walked** 355:15

**wanted** 288:17

**wanting** 392:10

**Waterhouse** 301:12 302:18,25 303:5,11 304:13 305:3,13,22 309:7 310:13,18,24 311:4,11,18 312:17, 21 313:5,18,25 314:12,16,22 315:6 316:17 318:20 319:19 321:11,13 323:14 324:3,8,20 325:2,21,25 327:8 328:5,12,24 329:15 331:13 337:23 335:14,17 397:24 436:17,21 437:13 438:8 439:21,24 456:18 466:12,20

**Waterhouse's** 317:8,12 318:16 351:7

**ways** 335:2

**weather** 288:23

**Wednesday** 479:16 480:25 481:5

**week** 290:5,17 351:17 367:2 462:9 479:10 481:20

**well-capitalized** 417:19

**whatsoever** 325:8

**Wick** 364:5

**window** 423:20

**wires** 320:5

**withdrawn** 307:2 315:11 321:12 324:23 331:23 340:2 341:6 343:3 367:24 403:12 405:2,7 475:7

**withholding** 414:25 432:5

**witnesses** 480:6,11

**word** 327:22 366:21 395:3,4 415:21 458:3 460:17 462:15

476:20

**words** 291:14 297:21 343:25 430:13 474:7

**wore** 324:20

**work** 300:20 322:7 338:4 378:20 382:6 383:11 384:20 410:18 454:10

**worked** 312:6 338:20 383:6 463:16

**working** 320:18 375:17 384:19

**works** 378:17 481:23

**world** 331:17 371:18 396:25 397:15,22

**wrap** 454:12

**written** 335:17 336:2, 4,9 381:19 382:21

**wrong** 402:8

---

**Y**

**Yankees** 395:4,5

**year** 292:8 299:11 334:11 369:4,24 371:21 373:3,14,19 375:14 391:16,17 395:17 409:17,23 410:8 421:16 422:3 426:10 453:23 457:4 458:16 460:12 461:15 462:5,20,23

**year-end** 372:15 458:8 463:5,12

**years** 291:18 292:15 298:10,11 300:5,15 302:20 311:10 320:17 322:25 330:12 336:22 415:10 422:12,19 463:16

**yell** 396:13,15

**yelled** 396:19

**yelling** 396:11

**yells** 396:2

# EXHIBIT 99

**Appx. 01811**

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2            DALLAS DIVISION

3

   In re:              :
4                 : Chapter 11
                : Case No.
5   HIGHLAND CAPITAL MANAGEMENT, : 19-34054-sgj11
  L.P.             :
6         Debtor.    :
   ----------------------------
7                :
  HIGHLAND CAPITAL MANAGEMENT, :
8   L.P.             :
               :
9       Plaintiff,   :
              :
10     vs.        : Adversary
           : Proceeding No.
11   NEXPOINT ADVISORS, L.P.,   : 21-03005-sgj
  JAMES DONDERO, NANCY DONDERO,:
12   AND THE DUGABOY INVESTMENT   :
  TRUST,            :
13               :
       Defendants.   :
14   -----------------------------

15

16

17

18    REMOTE VIDEO DEPOSITION OF JAMES DONDERO

19             VOLUME III

20        Thursday, November 4, 2021

21

22

23

24

25  JOB NO. 202288

Page 2

```
1
2
3
4        November 4, 2021
5        1:17 p.m. CDT
6
7
8        Remote video deposition of JAMES
9    DONDERO taken in the above-entitled matter
10   before Suzanne J. Stotz, a Certified Shorthand
11   Reporter, Certified Realtime Reporter,
12   Registered Professional Reporter, and Notary
13   Public of the State of Texas, on Thursday,
14   November 4, 2021, commencing at 1:17 p.m. CDT.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    A P P E A R A N C E S:
2
3    Attorneys for Highland Capital Management L.P.:
4        (Via videoconference)
         PACHULSKI STANG ZIEHL & JONES
5            780 Third Avenue
             New York, New York 10017
6
7    BY:  JOHN MORRIS, ESQ.
8         HAYLEY WINOGRAD, ESQ.
9
10   Attorneys for NexPoint Advisors, L.P.:
11       (Via videoconference)
         MUNSCH HARDT KOPF & HARR
12           500 North Akard Street
             Dallas, Texas 75201
13
14   BY:  THOMAS BERGHMAN, ESQ.
15
16   Attorneys for James Dondero, Nancy Dondero,
         HCRE HCMS:
17
         (Via videoconference)
18       STINSON
             3102 Oak Lawn Avenue
19           Dallas, Texas 75219
20   BY:  DEBORAH DEITSCH-PEREZ, ESQ
21   BY:  MICHAEL AIGEN, ESQ.
22
23
24
25
```

Page 4

```
1    A P P E A R A N C E S (Continued):
2
3    Attorneys for Nancy Dondero:
4        (Via videoconference)
         GREENBERG TRAURIG
5            220 Ross Avenue
             Dallas, Texas 75201
6
7    BY:  DANIEL ELMS, ESQ.
8
9    Attorneys for The Dugaboy Investment Trust:
10       (Via videoconference)
         HELLER, DRAPER, HAYDEN, PATRICK & HORN
11           650 Poydras Street
             New Orleans, Louisiana 70130
12
13
         BY:  DOUGLAS DRAPER, ESQ.
14            MICHAEL LANDIS, ESQ.
15
16   Attorneys for The Litigation Trust:
17       (Via videoconference)
         QUINN EMANUEL URQUHART & SULLIVAN
18           51 Madison Avenue
             New York, New York 10010
19
20
         BY:  ROBERT LOIGMAN, ESQ.
21            DEBORAH NEWMAN, ESQ.
22
23
24
25
```

Page 5

```
1    A P P E A R A N C E S (Continued):
2
3    ALSO PRESENT:
4        (Via Videoconference)
         JACOB ARVOLD, Videographer
5
         (Via Videoconference)
6    LA ASIA CANTY, Legal Assistant
     c/o Pachulski Stang Ziehl & Jones
7
         (Via Videoconference)
8    AARON LAWRENCE, Law Clerk
     c/o Quinn Emanuel Urquhart & Sullivan
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1              I N D E X
2
3    EXAMINATION              Page No.
4    JAMES DONDERO
5    BY MR. MORRIS                10
6
7
8              E X H I B I T S
9
10   Exhibit
     Name       Description    Page No.
11
     Exhibit   James Dondero Compensation    56
12   68        and Benefits Statement,
               Bates stamped D-CNL003585
13
     Exhibit   James Dondero Compensation    59
14   50        and Benefits Statement,
               Bates stamped D-CNL003587
15
     Exhibit   E-mail correspondence, Bates   95
16   53        stamped D-CNL003768 through
               D-CNL003770
17
     Exhibit   E-mail correspondence, Bates  107
18   54        stamped D-CNL003777 through
               D-CNL003779
19
     Exhibit   E-mail correspondence, Bates  116
20   56        stamped D-CNL003763
21   Exhibit   Promissory Note, Bates        119
     57        stamped D-CNL003764 through
22             D-CNL003765
23
24
25
```

Page 7

```
1            I N D E X (Continued)
2
3          E X H I B I T S (Continued)
4
5    Exhibit
     Name       Description    Page No.
6
     Exhibit   Highland Capital Management,  123
7    34        L.P., Consolidated Financial
               Statements and Supplemental
8              Information, dated December
               31, 2018, Bates stamped
9              D-CNL000212 through
               D-CNL000257
10
     Exhibit   Memorandum, dated             130
11   59        October 23, 2020, Bates
               stamped HCMFAS 000025
12             through HCMFAS 000031
13   Exhibit   Defendant James Dondero's     163
     24        Objections and Responses to
14             Plaintiff's Requests for
               Admission, Interrogatories,
15             and Requests for Production
16   Exhibit   Defendant NexPoint Advisors,  173
     27        L.P.'s Objections and
17             Responses to Plaintiff's
               Requests for Admission,
18             Interrogatories, and
               Requests for Production
19
20
21
22   (Exhibits attached to transcript.)
23
24
25
```

Page 8

```
1        JAMES DONDERO
2        THE VIDEOGRAPHER: Good afternoon.
3    My name is Jacob Arvold. I'm a certified
4    legal videographer in association with
5    TSG Reporting, Inc.
6        Due to the severity of COVID-19 and
7    following the practice of social
8    distancing, I will not be in the same room
9    with the witness; instead, I will record
10   this video deposition remotely.
11       The reporter, Suzanne Stotz, also
12   will not be in the same room and will swear
13   the witness remotely.
14       Do all parties stipulate to the
15   validity of video recording and remote
16   swearing and that it will be admissible in
17   the courtroom as if it had been taken
18   following Rule 30 of the Federal Rules of
19   Civil Procedures and the state's rules
20   where this case is pending?
21       MR. MORRIS: Yes.
22       If anybody objects to that, please
23   speak up.
24       Nobody has spoken up. So everybody
25   is deemed to have accepted that.
```

Page 9

```
1        JAMES DONDERO
2        THE VIDEOGRAPHER: Thank you.
3    This is the start of Media Number 1,
4    Volume II [sic] of the video-recorded
5    deposition of James Dondero in the matter
6    of In Re: Highland Capital Management,
7    L.P., in the United States Bankruptcy Court
8    for the Northern District of Texas.
9        This deposition is being held
10   remotely on November 4, 2021, at
11   approximately 1:17 p.m.
12       Counsel, please introduce
13   yourselves.
14       MR. MORRIS: Everybody is -- is on
15   here. I don't -- we can't take the time to
16   do that. I'm familiar with everybody on
17   here. Everybody's appeared in this action
18   before, and I'd like to proceed.
19       THE VIDEOGRAPHER: All right. The
20   appearances will be on the stenographic
21   record.
22       Will the court reporter please
23   reswear the witness.
24       THE COURT REPORTER: Could you raise
25   your hand.
```

Appx. 01814

Page 10

1          JAMES DONDERO
2          THE WITNESS: (Complies with
3    request.)
4       J A M E S   D O N D E R O,
5    having first been duly sworn, was examined and
6    testified as follows:
7          MS. DEITSCH-PEREZ: I only have one
8    questions. Who's Robert Loigman?
9          MR. LOIGMAN: I already stated for
10   the record. I'm with Quinn Emanuel. I'm
11   Debbie Newman's partner.
12         MS. DEITSCH-PEREZ: Okay. Thank
13   you.
14         MR. MORRIS: Can we please put up on
15   the screen the document that's been marked
16   Exhibit 31.
17         MS. CANTY: (Complies with request.)
18              EXAMINATION
19   BY MR. MORRIS:
20      Q.   Mr. Dondero, do you understand that
21   this is a continuation of your deposition from
22   Friday?
23      A.   Yes.
24      Q.   Have you spoken with anybody about
25   your testimony since we concluded the

Page 11

1          JAMES DONDERO
2    deposition on Friday?
3       A.   No.
4       Q.   Nobody in the world?
5       A.   Just my attorney.
6       Q.   And did you speak with your attorney
7    about the substance of the deposition on
8    Friday? Just --
9          MS. DEITSCH-PEREZ: I'm going to
10   direct -- I'm going to direct him not to
11   answer.
12   BY MR. MORRIS:
13      Q.   Okay. I'm just asking you a
14   yes-or-no question. I'm not asking for the
15   substance of any communications.
16         MS. DEITSCH-PEREZ: Well, you're --
17   one, I'd have to talk to him to see what he
18   thinks "substance" means.
19         And to the extent that's
20   substantive, you're actually getting at the
21   content potentially of a discussion. So
22   I'm going to direct him not to answer.
23   BY MR. MORRIS:
24      Q.   Are you going to follow your
25   counsel's advice?

Page 12

1          JAMES DONDERO
2       A.   Yes.
3       Q.   How much time did you spend speaking
4    with your attorney since the conclusion of the
5    last deposition?
6       A.   30 minutes, 40 minutes.
7       Q.   Are you aware that Alan Johnson
8    testified in this case the other day?
9       A.   I don't know who Alan Johnson is.
10   Uh, no.
11      Q.   Okay. Is it fair to say that you
12   have no knowledge of Mr. Johnson's testimony?
13      A.   I have no knowledge of Mr. Johnson's
14   testimony.
15      Q.   Are you aware that an expert was
16   examined by me earlier in the week in
17   connection with this case?
18      A.   I'm aware there's an expert. I'm
19   not -- I'm not aware that you've examined,
20   deposed, or whatever you did with him.
21      Q.   Okay. When did you speak with your
22   counsel for 30 minutes about -- following last
23   Friday's examination?
24      A.   About 40 minutes ago.
25      Q.   Okay.

Page 13

1          JAMES DONDERO
2          MR. MORRIS: Can we go to
3    paragraph 82 of this document --
4       Q.   -- Mr. Dondero, do you see that this
5    is your answer to the Plaintiff's Amended
6    Complaint.
7       A.   Yes.
8       Q.   And we looked at this the other day;
9    do you remember that?
10      A.   Yes.
11         MR. MORRIS: Can we can go to page--
12   paragraph 82, please.
13         MS. CANTY: (Complies with request.)
14   BY MR. MORRIS:
15      Q.   And I just want to table set to make
16   sure we're on the same page.
17         Paragraph 82 describes the
18   agreements that you entered into with Dugaboy
19   consuming the forgiveness of certain Promissory
20   Notes subject to conditions subsequent.
21         Is that a fair overarching overview
22   of the nature of the agreements?
23      A.   Yes.
24      Q.   Okay. And for the rest of the
25   deposition today, when I use the phrase

JAMES DONDERO

1 JAMES DONDERO
2 "agreements," I'm going to mean the agreements
3 that are referred to in paragraph 82; is that
4 fair?
5   A.  Yes, generally.  If I have any
6 questions, I'll -- I'll ask.
7   Q.  Thank you very much.
8     The agreements covered each of the
9 notes that are the subject of the lawsuits that
10 Highland commenced against you, HCRE Services,
11 and NexPoint; is that right?
12   A.  The -- yes.
13   Q.  What are you looking at?
14   A.  Just this note sheet that covers all
15 the notes.
16   Q.  Oh.
17     MR. MORRIS:  Deborah, I would demand
18   that that sheet be produced immediately.
19     MS. DEITSCH-PEREZ:  Okay.
20     MR. MORRIS:  Okay.  And I would ask
21   him to put it away.
22     MS. DEITSCH-PEREZ:  No.  He's a
23   30(b)(6) witness.  He's entitled to have a
24   list of the notes.  He sure he is.
25     MR. MORRIS:  I'm telling you now --

1 JAMES DONDERO
2     MS. DEITSCH-PEREZ:  I'm sorry to say
3   to you.
4     MR. MORRIS:  I object.  That is -- I
5   have never in my life seen a witness --
6     MS. DEITSCH-PEREZ:  I have had
7   30(b)(6) witnesses with whole notebooks of
8   information.
9     MR. MORRIS:  Okay.  So let's just
10   make sure the record is clear.
11 BY MR. MORRIS:
12   Q.  Please describe for me what's on
13 that page.
14   A.  It's a listing of the Notes payable
15 to Highland, what their original term and
16 amount was, what the term is, and what the loan
17 date was.
18   Q.  Okay.  I'm going to ask the --
19     MS. DEITSCH-PEREZ:  No.  I'm going
20   to take a picture, and I'm going to send it
21   to you, okay?
22     MR. MORRIS:  Okay.  And what we're
23   going to do right now is ask him to put it
24   away, and I'm going to ask him questions
25   solely in his capacity as an individual,

1 JAMES DONDERO
2 okay?
3     Please put it away.
4     THE WITNESS:  Isn't that what this
5 deposition is, right?  This deposition --
6     MS. DEITSCH-PEREZ:  Well, this
7 deposition is both.
8     We're going to take a break for a
9 second.  Let me think about that, but
10 I'll --
11     MR. MORRIS:  I object.  I really
12 object.  I really object.  I'm glad that
13 this is all on the record.  I object.
14     My request is that he put it away
15 and answer questions in his capacity as an
16 individual.
17     I don't know why we need to take a
18 break.
19     MS. DEITSCH-PEREZ:  Well, because
20 I'm going to go take a picture of it and
21 send it to you.
22     MR. MORRIS:  I don't want you to do
23 that, though.
24     MS. DEITSCH-PEREZ:  Why don't you
25 want -- okay.

1 JAMES DONDERO
2     MR. MORRIS:  We can do that -- we
3 can do that when I ask him questions as a
4 30(b)(6) witness.
5     By the way, it's still
6 inappropriate, but --
7     MS. DEITSCH-PEREZ:  No, it's not
8 John.
9     MR. MORRIS:  Okay.
10     MS. DEITSCH-PEREZ:  It's just not.
11 You can say it as much as you want.  It
12 doesn't make it inappropriate.
13     And I am going to -- I want to think
14 for a minute about whether or not your
15 request to have him not have it in front of
16 him in his individual capacity is
17 appropriate.  And I'm not going to make a
18 snap decision.  I'm going to talk to my
19 colleagues, and we'll be back on the record
20 in a couple of minutes.
21     MR. MORRIS:  I object, but I can't
22 stop you.
23     MS. DEITSCH-PEREZ:  Okay.
24     THE VIDEOGRAPHER:  Would you like to
25 go off the video record, Counsel?

Page 18

JAMES DONDERO

1     JAMES DONDERO
2         MR. MORRIS: No, no, not at all.
3         THE VIDEOGRAPHER: Okay.
4         MR. MORRIS: And just keep the --
5     keep the record going.
6         THE VIDEOGRAPHER: Yep, will do.
7         MR. MORRIS: And we're not off the
8     record?
9         THE VIDEOGRAPHER: Correct.
10        THE COURT REPORTER: Correct.
11        MS. DEITSCH-PEREZ: Okay. We're
12    back on the record.
13        THE VIDEOGRAPHER: We remained on
14    the record.
15        MS. DEITSCH-PEREZ: Okay. And this
16    part -- this -- at this point Mr. Morris
17    only taking Mr. Dondero's deposition in his
18    personal capacity, not as a 30(b)(6)
19    witness.
20        If you want to resume taking his
21    deposition as a 30(b)(6) witness, let me
22    know; and I will tell him to get his list
23    of notes.
24        MR. MORRIS: So he doesn't have it
25    in front of him right now?

Page 19

1     JAMES DONDERO
2         THE WITNESS: Correct.
3         MS. DEITSCH-PEREZ: Correct, he does
4     not.
5         MR. MORRIS: Okay. I'm going to
6     proceed; and I would ask, Deborah, that
7     somebody from your office send that to me
8     as soon as possible. I'm sure it's on an
9     e-mail somewhere and all they have to do is
10    hit send.
11    BY MR. MORRIS:
12    Q.    Mr. Dondero, let's continue.
13        So you don't have that document in
14    front of you right now?
15    A.    Correct.
16    Q.    Okay. How many agreements did you
17    enter into with Dugaboy?
18        MS. DEITSCH-PEREZ: You mean with
19    the Dugaboy trustee?
20        We had an agreement that you were
21    going to refer to these as the agreements
22    with the Dugaboy trustee. So let's stay
23    consistent.
24    BY MR. MORRIS:
25    Q.    Mr. Dondero, how many agreements did

Page 20

1     JAMES DONDERO
2     you enter into with Dugaboy trustee concerning
3     Promissory Notes?
4     A.    Is your question -- is your
5     questions how many Notes were entered into?
6     Q.    No. How many separate agreements
7     did you enter into?
8     A.    The 2017, '18, and '19 agreements.
9     Q.    Okay. I didn't ask you what
10    agreements. I asked how many agreements you
11    entered into with the Dugaboy trustee.
12        MS. DEITSCH-PEREZ: Asked and
13    answered.
14        THE WITNESS: Three major ones.
15    BY MR. MORRIS:
16    Q.    Are there any minor ones?
17    A.    Not that I can recall right now.
18    Q.    Okay. When did you enter into your
19    first major agreement with the Dugaboy trustee?
20    A.    At the end of '17.
21    Q.    Meaning December 2017 or early 2018?
22    A.    Yes.
23    Q.    What Promissory Notes are the
24    subject of the first major agreement that you
25    entered into with the Dugaboy trust-- with

Page 21

1     JAMES DONDERO
2     the Dugaboy trustee?
3     A.    I don't remember which ones
4     specifically. I remember the amount was more
5     substantial than subsequent years.
6     Q.    Do you know how many Promissory
7     Notes were the subject of your first major
8     agreement with the Dugaboy trustee?
9     A.    No.
10    Q.    Can you identify the maker of any
11    Note that's subject to the first major
12    agreement with the Dugaboy trustee?
13    A.    Not without my list or details.
14    Q.    Can you identify the principal
15    amount of any Promissory Note that was subject
16    to the first agreement that you entered into
17    with the Dugaboy trustee?
18    A.    I know they were -- I know the gross
19    amount. I know they were some of the term
20    loans, but I don't know the specifics.
21    Q.    Can you tell me the aggregate
22    amount -- withdrawn.
23        Can you tell me the aggregate
24    principal amount of the Notes that are the
25    subject of your first agreement with the

**Appx. 01817**

Page 22

1          JAMES DONDERO
2   Dugaboy trustee?
3       A.   I – I believe it was 30 – 30 some
4   odd million, 30 – I can't remember the
5   principal and interest, but it's only 30 – 34,
6   35, 36. It was in that range.
7       Q.   Did your first agreement with the –
8   withdrawn.
9          Can you identify the date of any of
10  the Promissory Notes that are the subject of
11  your first agreement with the Dugaboy trustee?
12      A.   No.
13      Q.   Can you tell me the year that any of
14  the Promissory Notes that are the subject of
15  the – withdrawn.
16         Can you tell me the year that any of
17  the Promissory Notes were entered into that are
18  the subject of your first agreement with the
19  Dugaboy trustee?
20         MS. DEITSCH-PEREZ: Asked and
21      answered.
22         THE WITNESS: No, not off the top of
23      my head.
24  BY MR. MORRIS:
25      Q.   When did you – did – when did you

Page 23

1   enter into the second agreement with the
2   Dugaboy trustee?
3       Q.   Was that in December of 2018 or
4   early 2019?
5       A.   Yes.
6       Q.   How many Notes are subject to your
7   second agreement with the Dugaboy trustee?
8       A.   Less than the first, but I don't
9   know how many.
10      Q.   You don't know the number of Notes
11  that are the subject of your second agreement
12  with the Dugaboy trustee; is that right?
13      A.   Correct.
14      Q.   Can you identify the maker of any
15  Notes that are the subject of your second
16  agreement with the Dugaboy trustee?
17      A.   No, I – I – no, I don't remember.
18      Q.   Okay. So as you sit here right now,
19  you can't identify the maker of any of the
20  Notes that are the subject of the second
21  agreement with the Dugaboy trustee; is that
22  right?
23      A.   Well, it would be one of the three
24  parties or four parties here, me or NexPoint or

Page 24

1          JAMES DONDERO
2   whatever; but I don't remember –
3       Q.   Okay.
4       A.   – off the top of my head.
5       Q.   Off the top of your head, can you
6   tell me the original principal amount of any
7   Note that's subject to your second agreement
8   with the Dugaboy trustee?
9       A.   No. I just – no.
10      Q.   Can you identify the date on which
11  any of the Promissory Notes were executed that
12  were the subject of your second agreement with
13  the Dugaboy trustee?
14      A.   No.
15      Q.   Can you tell me the aggregate
16  principal amount of the Notes that are the
17  subject of your second agreement with the
18  Dugaboy trustee?
19      A.   Yes. A fraction of the prior year.
20  Less than ten million.
21      Q.   Can you be anymore precise than
22  that?
23      A.   Approximately ten million, I think.
24  Just under.
25      Q.   Okay. Did you enter into your third

Page 25

1          JAMES DONDERO
2   agreement with the Dugaboy trustee in December
3   2019 or early 2020?
4       A.   Yes.
5       Q.   That's after the petition date; do I
6   have that right?
7       A.   I – yes.
8       Q.   Did you do it before or after
9   January 9, 2020?
10      A.   Before, I believe.
11      Q.   So while you were still in control
12  of Highland but after the petition date, you
13  entered into your third agreement with the
14  Dugaboy trustee concerning Promissory Notes.
15         Do I have that right?
16      A.   Yes.
17      Q.   Did you ever inform the bankruptcy
18  court of this agreement?
19      A.   No.
20      Q.   Did you ever inform the independent
21  directors of this agreement that you entered
22  into after the petition date?
23      A.   No.
24      Q.   Can you tell me which notes are the
25  subject of your third agreement with the

Page 26

1         JAMES DONDERO
2   Dugaboy trustee?
3      A.   No.
4      Q.   Can you identify the maker on any
5   Note that's the subject of your agreement that
6   you entered into after the petition date with
7   the Dugaboy trustee?
8      A.   Not off the top of my head.
9         MS. DEITSCH-PEREZ:  I mean, John, if
10   you would let him look at his list, he
11   could tell you.
12         But if you insist on making this a
13   memory test of 18 or so different things or
14   however many there are, 13, 14, then this
15   is -- it's your deposition.  But if you
16   want more specific details, he could look
17   at the list.
18         MR. MORRIS:  Okay.  That's not even
19   an objection let alone a speaking
20   objection.
21         It is my deposition --
22         MS. DEITSCH-PEREZ:  No.
23         MR. MORRIS:  It is my deposition,
24   and I would appreciate your not making
25   gratuitous comments.

Page 27

1         JAMES DONDERO
2   BY MR. MORRIS:
3      Q.   Mr. Dondero, can you tell me the
4   aggregate value of the Notes that are the
5   subject of the third agreement that you entered
6   into with the Dugaboy trustee after the
7   petition date?
8      A.   I believe it was about a million
9   bucks.
10      Q.   And who were the makers of the Notes
11   that are the subject of the agreement with the
12   Dugaboy trustee that you entered into after the
13   petition date?
14      A.   I don't know.
15      Q.   Without the sheet that you looked at
16   earlier, you have no ability to tell me which
17   notes were the subject of which agreement that
18   you entered into with the Dugaboy trustee,
19   correct?
20         MS. DEITSCH-PEREZ:  Object to the
21   form.
22         THE WITNESS:  If I'm not certain off
23   the top of my head I can remember
24   accurately, I don't want to speculate.
25

Page 28

1         JAMES DONDERO
2   BY MR. MORRIS:
3      Q.   All right.  I don't want you to
4   speculate either.  So I'm going to ask you just
5   broad follow-up questions.
6         Can you identify any Promissory Note
7   that is the subject of any specific agreement
8   that you ever entered into with the Dugaboy
9   trustee without looking at the list?
10         MS. DEITSCH-PEREZ:  Object to the
11   form.  He's already done that to some
12   degree.
13         THE WITNESS:  I believe it covered
14   virtually all of them.  So I don't remember
15   which ones specifically in each year.
16         Generally, it was, I believe, the
17   ones incurred in that year; but I don't
18   remember which entities.  But again, the
19   ultimate result being that the term loans,
20   the demand notes, the things incurred, the
21   things outstanding were part of the
22   agreement.
23   BY MR. MORRIS:
24      Q.   Sir, you never wrote down a list of
25   the notes that are the subject of the

Page 29

1         JAMES DONDERO
2   agreements, correct?
3      A.   Correct.
4      Q.   You never asked anybody to make a
5   list of the notes that were the subject of each
6   of the agreements, correct?
7      A.   Correct.
8      Q.   You're not aware of any document
9   that was created prior to the commencement of
10   these lawsuits that identifies the Notes that
11   are the subject of the agreements, correct?
12      A.   Correct.
13      Q.   Other than the Promissory Notes that
14   are the subject of this lawsuit -- withdrawn.
15         Other than the Promissory Notes that
16   are the subject of these lawsuits, are you
17   aware of any other doc- -- Promissory Notes
18   that are the subject of an agreement with the
19   Dugaboy trustee?
20      A.   I believe there are from time to
21   time, yes.  But I -- I don't know off the top
22   of my head.
23      Q.   Can you identify the maker of any
24   Promissory Note that is the subject of any
25   agreement with the Dugaboy trustee other than

Appx. 01819

Page 30

JAMES DONDERO

1
2 the Promissory Notes that are the subject of
3 the pending lawsuits?
4    A.   Not specifically, but I believe
5 there are.
6    Q.   Okay.  Can you identify the
7 principal amount of any Promissory Note that is
8 the subject of an agreement with the Dugaboy
9 trustee that is not part of the pending
10 lawsuits?
11    A.   Not specifically.
12    Q.   Can you tell me the year in which
13 any Promissory Note was ever executed that is
14 the subject of any agreement with the Dugaboy
15 trustee other than the Promissory Notes that
16 are the subject of the pending lawsuits?
17    A.   I believe there were several, and I
18 believe there were numerous ones over the
19 years.
20    Q.   Okay.  And -- and are those
21 Promissory Notes subject to one of the three
22 agreements that we've identified or subject to
23 some other agreement with the Dugaboy trustee?
24    A.   Well, they weren't to these related
25 entities.  I -- I don't know what the

Page 31

JAMES DONDERO

1
2 agreements were specifically subject to.
3    Q.   Are you the person who entered into
4 the agreement with the Dugaboy trustee
5 concerning the notes that you are describing
6 right now?
7    A.   Yes, I guess.
8    Q.   As the person who entered into the
9 agreement with the Dugaboy trustee concerning
10 Notes that are not the subject of the pending
11 litigation, can you identify anything about
12 those Notes, whether it's the maker, the date,
13 the principal amount, anything at all?
14    A.   Not off the top of my head.
15    Q.   Okay.  What would -- what would you
16 have to look at to know?  The chart or
17 something else?
18    A.   No, not this -- not this chart.
19 This only has to do with what we thought this
20 deposition was going to be about.
21         It would be the financials of
22 Dugaboy; and then from there, the detail
23 regarding any Notes that it has.
24    Q.   Did you enter into an agreement with
25 the Dugaboy trustee to forgive a Promissory

Page 32

JAMES DONDERO

1
2 Note where Dugaboy is the maker and Highland is
3 the payee?
4    A.   Dugaboy -- can you repeat that
5 question one more time?
6    Q.   Sure.  Did you enter into an
7 agreement with the Dugaboy trustee relating to
8 any Promissory Note where Dugaboy is the maker?
9    A.   No, I don't believe so.
10    Q.   Okay.  So you don't have any
11 recollection of ever entering into an agreement
12 with the Dugaboy trustee concerning the
13 potential forgiveness of any Note that was made
14 by Dugaboy, correct?
15    A.   I -- I do not believe so.
16    Q.   Okay.  And is there a -- is there a
17 document that we could look at that would
18 refresh your recollection?
19    A.   Not beyond the financials of Dugaboy
20 and any relevant Note detail.
21    Q.   And would -- is it -- is it your
22 testimony that an agreement with Dugaboy would
23 be reflected in the Dugaboy financial
24 statements?
25    A.   No, but the Notes would be.

Page 33

JAMES DONDERO

1
2    Q.   Well, the Dugaboy Notes are
3 reflected in Highland's financial statements.
4         Do you want me to get that?
5    A.   No.  I didn't think that was -- I
6 didn't think that was the question you were
7 asking me.
8    Q.   I apologize.  Maybe it was my fault.
9         What would we have to look at in
10 order to refresh your recollection as to
11 whether or not you entered into an agreement
12 with the Dugaboy trustee concerning the
13 potential forgiveness of any Note made by
14 Dugaboy?
15    A.   Other than the ones we're talking
16 about today, right?
17    Q.   We're not talking about -- there's
18 no Promissory Note where Dugaboy is the maker
19 that is the subject of any of the pending
20 lawsuits, correct?
21    A.   Correct.
22    Q.   So I'm asking you to identify if you
23 can any Promissory Note that is the subject of
24 any agreement you have ever entered into with
25 the Dugaboy trustee that is not the subject of

Appx. 01820

1          JAMES DONDERO
2  one of the pending lawsuits.
3          Do you understand that that's what
4  I'm trying to get at?
5          MS. DEITSCH-PEREZ: Asked and
6      answered.
7          THE WITNESS: Yes.
8  BY MR. MORRIS:
9      Q.   Okay. Can you identify any such
10  Promissory Note?
11     A.   No, not specifically as I sit here
12  today.
13     Q.   Okay. Other than the promissory --
14  withdrawn.
15         Are you familiar with the term
16  "majority interest" as used in the Highland
17  Limited Partnership Agreement?
18     A.   Yes.
19     Q.   Okay. Other than the Promissory
20  Notes that are the subject of the pending
21  lawsuits, are you aware of any other Promissory
22  Notes that are the subject of any agreement
23  with the majority interest?
24         MS. DEITSCH-PEREZ: Object to the
25      form. Asked and answered.

1          JAMES DONDERO
2          THE WITNESS: The majority interest
3  is controlled by the 75 percent. It's
4  controlled by Dugaboy. But the majority
5  interest isn't an entity in and of itself,
6  right?
7  BY MR. MORRIS:
8      Q.   Okay. Has Dugaboy held the majority
9  interest since the time that Highland was
10  created?
11     A.   No.
12     Q.   Okay. So -- so then I'm going to
13  ask my question again.
14         Are you aware of any agreement
15  concerning any Promissory Note that is the
16  subject -- withdrawn.
17         Are you aware of any agreement with
18  the majority interest that concerns any
19  Promissory Note where Highland is the payee
20  other than the Notes that are the subject of
21  the pending lawsuit?
22         MS. DEITSCH-PEREZ: Asked and
23      answered.
24         THE WITNESS: Not specifically as I
25      sit here today, but I do believe there have

1          JAMES DONDERO
2      been numerous notes other than to these
3      entities today where Dugaboy was the maker
4      or recipient or whatever.
5  BY MR. MORRIS:
6      Q.   So you do believe that Dugaboy was
7  the maker of a Promissory Note that's subject
8  to an agreement with the majority interest?
9          MS. DEITSCH-PEREZ: Object to the
10     form.
11         THE WITNESS: What I'm saying is I
12     believe Dugaboy had other -- made other
13     Notes and received other Notes from other
14     entities other than Highland.
15  BY MR. MORRIS:
16     Q.   Does that have anything to do with
17  Highland?
18         Maybe I wasn't clear. I'm using the
19  phrase "majority interest" as that phrase -- I
20  thought we had -- I thought we had an
21  understanding -- as that phrase is used in the
22  Highland Limited Partnership Agreement, right?
23     A.   I thought it was a definition term
24  in the Highland, L.P.
25     Q.   It is, and I just -- I'd like to

1          JAMES DONDERO
2  move on if I can, but I just want some clarity
3  here.
4          Is there any agreement between
5  Dugaboy and the majority interest concerning
6  any Promissory Note where Dugaboy is the maker?
7          MS. DEITSCH-PEREZ: Object to the
8      form.
9          THE WITNESS: I -- I don't know what
10     you're getting at. I have a tried to
11     answer it the best I can several different
12     ways.
13         But try it one more time, and I'll
14     try and answer it just specifically yes or
15     no.
16  BY MR. MORRIS:
17     Q.   Okay. Is Dugaboy the maker on any
18  Promissory Note where Highland is the payee?
19     A.   I don't believe so at this point.
20     Q.   Was Dugaboy ever the maker on a Note
21  where Highland was the payee to the best of
22  your knowledge?
23     A.   I don't -- I just don't know what
24  the actual accounting was or could have or
25  should have been. But if it prepays a Note,

JAMES DONDERO

1  JAMES DONDERO
2  instead of prepaying a Note, it could have left
3  it in an existing Note outstanding and then
4  issued a separate Note, right, instead of
5  prepaying, right?
6  So I don't know in the – in the pas
7  past or how exactly they handled prepays
8  consistently over time. But at the moment, I
9  don't believe there's a loan going from Dugaboy
10  to Highland.
11  But I do believe over the years,
12  there were numerous loans from Dugaboy to other
13  entities other than the ones we're talking
14  about today.
15  MS. DEITSCH-PEREZ: Okay. John,
16  we've gone way far afield of the topics for
17  this deposition or anything that you ought
18  to be even asking this individual witness
19  about given what these litigations are.
20  Could we move on, please?
21  MR. MORRIS: No. Other than –
22  MS. DEITSCH-PEREZ: You're spending
23  time on things other than the –
24  MR. MORRIS: Please stop talking.
25  MS. DEITSCH-PEREZ: -- action.

1  JAMES DONDERO
2  MR. MORRIS: Please stop talking.
3  BY MR. MORRIS:
4  Q. Other than the Promissory Notes that
5  are the subject of the lawsuits, are you aware
6  of any other Promissory Notes that are the
7  subject of any agreement that the Dugaboy
8  trustee ever entered into as a representative
9  of the majority of Class A shareholders?
10  MS. DEITSCH-PEREZ: Asked and
11  answered. I think we've answered after the
12  sixth time.
13  THE WITNESS: Not as I sit here
14  today.
15  BY MR. MORRIS:
16  Q. In paragraph 82 in about the fifth
17  line down, there's a statement that, quote,
18  "Nancy Dondero is representative for a majority
19  of the Class A holders of plaintiff, agree that
20  plaintiff would forgive the Notes."
21  Do you see that?
22  A. Yes.
23  Q. The word "plaintiff" as used in your
24  answer refers to Highland Capital Management,
25  L.P., correct?

1  JAMES DONDERO
2  A. I – no – or wait. Hold on a
3  second.
4  Yes. I guess, yes.
5  Q. Okay. At the time you entered into
6  the agreements, did you understand that
7  Dugaboy, as a majority – as a representative
8  of a majority of the Class A shareholders of
9  the plaintiff was the entity that entered into
10  the agreement on behalf of Highland?
11  A. Yes.
12  Q. And your sister Nancy is the trustee
13  of Dugaboy today, correct?
14  A. Yes.
15  Q. And Nancy was the trustee of Dugaboy
16  at the time you entered into each of the
17  agreements, correct?
18  A. Yes.
19  Q. And you knew that at the time you
20  entered each of the agreements, correct?
21  A. Yes.
22  Q. You knew she was acting on behalf of
23  Dugaboy, correct?
24  A. Yes.
25  Q. Your understanding at that time that

1  JAMES DONDERO
2  you entered into each of the agreements with
3  the Dugaboy trustee was that Dugaboy held the
4  majority of Highland's Class A interest,
5  correct?
6  A. Yes.
7  Q. And that's exactly why you contacted
8  Nancy to discuss the topics that ultimately led
9  to the agreements, correct?
10  A. Yes.
11  Q. You specifically called Nancy
12  because you wanted her to cause Dugaboy to
13  enter into the agreements with you on behalf of
14  Highland, correct?
15  A. Yes.
16  Q. And just as you wanted, Nancy, in
17  fact, caused Dugaboy, as a representative of a
18  majority of the Class A shareholders of
19  plaintiff, to enter into each of the
20  agreements, correct?
21  A. Yes.
22  Q. Would you agree with me that the
23  Promissory Notes that are the subject of the
24  agreements were the debtor's property?
25  A. I think I've stated numerous times

JAMES DONDERO

1
2  due to them as that they would ultimately be
3  compensation; but to be a bona fide Note and to
4  have bona fide deferral at the time that they
5  were issued, they were the debtor's property.
6  And I guess they remained such until satisfied
7  or until the condition as present -- the
8  condition subsequent is either triggered or
9  impossible to be triggered.
10     Q.  Okay.  Is it fair to say that the
11  Promissory Notes that are the subject of the
12  agreements were assets of the debtor at the
13  time you entered into the agreements?
14     A.  Yes.
15     Q.  At the time you entered into the
16  agreements, you understood that Dugaboy was
17  exercising control over the debtor's property,
18  correct?
19         MS. DEITSCH-PEREZ:  Object to the
20     form.
21         MR. MORRIS:  Withdrawn.
22  BY MR. MORRIS:
23     Q.  At the time you entered into the
24  agreements, you understood that the Dugaboy
25  trustee was going to exercise control over the

JAMES DONDERO

1
2  debtor's property, correct?
3         MS. DEITSCH-PEREZ:  Object.  Object
4     to the form.
5         THE WITNESS:  Exercise control?  I
6     understood the trustee had the ability to
7     grant the, whatever you want to call them,
8     conditions subsequent.
9  BY MR. MORRIS:
10     Q.  On that --
11     A.  Yes.
12     Q.  And that was -- by entering into the
13  agreement, would you agree with me, that the
14  Dugaboy trustee exercised control over the
15  Promissory Notes?
16         MS. DEITSCH-PEREZ:  Object to the
17     form.
18         THE WITNESS:  They -- The trustee
19     exercised the rights given to it as a
20     majority of Class A holders.
21  BY MR. MORRIS:
22     Q.  Okay.  And is it your understanding
23  that as part of the right, it altered the
24  characteristics of the Promissory Notes?
25         MS. DEITSCH-PEREZ:  Object to the

JAMES DONDERO

1
2     form.
3         THE WITNESS:  I just want to -- I
4     believe my testimony, I granted the
5     conditions subsequent is my interpretation.
6  BY MR. MORRIS:
7     Q.  Right.  And so that's fine.  But
8  that's -- that's the thing that happened, but
9  I'm just asking you what the impact of that
10  was.
11         When the Dugaboy trustee entered
12  into the agreement, the result was that the
13  terms and conditions of the Promissory Note
14  were altered, correct?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I don't want to -- I
18     want to say I don't know to that next week.
19  BY MR. MORRIS:
20     Q.  You can't -- okay.  You can't tell
21  me if your agreement with the Dugaboy trustee
22  altered the terms and conditions of the
23  Promissory Notes that were subject to the
24  agreement; you can't tell me that?
25         MS. DEITSCH-PEREZ:  Object to the

JAMES DONDERO

1
2     form.
3         THE WITNESS:  Yeah.  I -- again, it
4     sounds like you're trying to take me
5     towards legal terms of changing terms or
6     modification in a Note or whatever; and
7     I -- I'm not -- I don't have an opinion or
8     the expert to comment on that.
9         I can just say I knew she had the
10     ability to create conditions subsequent.
11  BY MR. MORRIS:
12     Q.  Okay.  So let's take, for example,
13  the Notes that you signed.
14         Those were demand notes, right?
15     A.  Yes.
16     Q.  Okay.  And after you entered into
17  the agreement with the Dugaboy trustee, instead
18  of it being a demand note, it was now a demand
19  note subject to conditions subsequent, correct?
20         MS. DEITSCH-PEREZ:  Object to the
21     form.
22         THE WITNESS:  Yeah, that ultimately
23     they couldn't be demanded until conditions
24     subsequent were met or unable to be met.
25

1          JAMES DONDERO
2    BY MR. MORRIS:
3        Q.   Okay.  So can you agree with me that
4    that -- that that was a change in the term of
5    the Note?
6          MS. DEITSCH-PEREZ:  Object to the
7    form.
8          THE WITNESS:  Yeah.  See, that's the
9       part I don't want to comment on.  I just
10      want to say I don't know.
11   BY MR. MORRIS:
12       Q.   Okay.  Wasn't that the purpose of
13   entering into the agreements was to change the
14   terms of the each of the Promissory Notes?
15       Wasn't that your intent?
16          MS. DEITSCH-PEREZ:  Object to the
17   form.
18          THE WITNESS:  I'd say the intent was
19      to find and make compensation appropriate
20      for industry standards and Highland in
21      particular.
22   BY MR. MORRIS:
23       Q.   And did you believe that the Notes
24   as originally drafted and signed by you or the
25   representatives of the makers didn't take that

1          JAMES DONDERO
2    into account?
3        A.   I went through this already last
4    time, but the Notes were intentionally loose
5    and, I think, anticipated the ability to adjust
6    the subsequent conditions or other things.
7        Q.   Now, you told me that each of the
8    agreements was entered into between December of
9    one year or -- actually, withdrawn.
10       If we look at paragraph 82, it says
11   that each of the agreements was made, quote,
12   "sometime between the December of the year in
13   which each note was made and February of the
14   following year."
15       Do I have that right?
16       A.   Yes.
17       Q.   Can you identify with any greater
18   specificity when you entered into the first
19   agreement with the Dugaboy trustee referenced
20   in paragraph 82?
21       A.   No.
22       Q.   It's sometime within that 90-day
23   period; does that sound right to you?
24       A.   I believe it was closer to the
25   holidays around the turn of the year, but I

1          JAMES DONDERO
2    don't have specific recollection.
3        Q.   Is that answer the same for all
4    three agreements or only for the first
5    agreement?
6        A.   That would be the same for all
7    three.
8        Q.   So then why -- why does paragraph 82
9    refer to sometime between December of the year
10   in which each note was made and February of the
11   following year if your best recollection is
12   that it happened around the holidays?
13       A.   I don't know.
14       Q.   All right.  But as you sit here
15   right now, is it your testimony that you
16   believe each of the agreements was signed --
17   was more likely signed in December rather than
18   January or February?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21          THE WITNESS:  I think signed is a --
22      I'm not -- I'm not testifying that signed,
23      I guess.
24   BY MR. MORRIS:
25       Q.   I apologize.  Maybe that was my

1          JAMES DONDERO
2    mistake.
3        Is it your testimony that each --
4    that you entered each of the agreements with
5    the Dugaboy trustee in December rather than
6    January or February of the years indicated?
7        A.   That's the best of my recollection,
8    but there may have been one year that was
9    towards the wider end of the interval.  I can't
10   remember with more specificity.
11       Q.   Okay.  Do you know of anything that
12   memorialized the date on which you entered into
13   any of the agreements?
14       A.   No, other than -- no, other than --
15   no, other than, you know, other than travel
16   schedule or phone logs or whatever.
17       Q.   All right.  During the discussion
18   that led to the agreements, did you ever
19   provide any information to Nancy or to Dugaboy
20   concerning your compensation?
21       A.   Just -- just verbal.  I mean, she
22   knew it was low, and she knew we had reinvested
23   most everything we made in the company
24   over the years.  And that was the -- that was,
25   I think, understanding by all involved; and it

JAMES DONDERO

1
2 should be obvious to anybody who's looked at
3 the numbers even in hindsight.
4         MR. MORRIS:  Okay.  I move to
5     strike.
6 BY MR. MORRIS:
7     Q.   And please listen carefully to my
8 question.
9         During the discussions that led to
10 each of the agreements, did you ever provide
11 any information to your sister or Dugaboy
12 concerning your compensation?
13        MS. DEITSCH-PEREZ:  Asked and
14    answered.
15        THE WITNESS:  Not specifically.
16 BY MR. MORRIS:
17    Q.   Did you provide any general
18 information to your sister or to Dugaboy prior
19 to the entry of any of the three agreements
20 that you entered into with the Dugaboy trustee?
21    A.   I would repeat the answer that was
22 struck two questions ago.
23    Q.   That's the information that you gave
24 to her?
25    A.   Yeah.  It was – again, it was

JAMES DONDERO

1
2 verbal, and it was – but an understanding but
3 a clear and obvious understanding.
4     Q.   I want to know exactly what
5 information you gave to your sister and to
6 Dugaboy before entering into any of the three
7 agreements with the Dugaboy trustee?
8     A.   Most of what I had made over the
9 years was rolled back into the business to
10 propel growth and initiatives.  And that my
11 actual compensation was very modest based on
12 industry standards and relevant
13 responsibilities at Highland.
14    Q.   Did you tell her anything else?
15 Withdrawn.
16        Did you tell your – Nancy or
17 Dugaboy anything else beyond what you've now
18 testified to?
19    A.   You know, I think some of what I
20 testified to earlier, that forgiveness of the
21 Notes would be a modest increase in that
22 compensation but still not be in the ZIP code
23 of fair and appropriate compensation and that
24 the value of the Notes in aggregate were de
25 minimus relative to Highland and de minimis

JAMES DONDERO

1
2 relative to Dugaboy.
3     Q.   Did you tell her anything else?
4     A.   Anything else would have fallen into
5 the buckets I just described, but I can't
6 remember specifically as I sit here today.
7     Q.   Did you ever tell your sister or
8 Dugaboy that your salary was less than a
9 million dollars?
10    A.   I –
11        MS. DEITSCH-PEREZ:  I mean, just
12    from Highland?
13        THE WITNESS:  Repeat the question
14    again for me, please.
15 BY MR. MORRIS:
16    Q.   Did you ever tell your sister that
17 your salary was less than a million dollars a
18 year?
19    A.   I know my sister was aware that it
20 was very low, and it kind of decreased over
21 time, and I think it was paid by different
22 entities.
23        Whether it was a million or
24 2 million, I can't remember exactly what I
25 would have told her; but it would have been in

JAMES DONDERO

1
2 that ZIP code to paint the proper picture that
3 the cash compensation for somebody in my role
4 was well below industry standards.
5     Q.   Do you recall anything else that you
6 shared with your sister concerning your
7 compensation that you haven't testified to?
8     A.   Like I said, it would generally fall
9 into those buckets as I sit here today.
10    Q.   Did your sister or Dugaboy ask you
11 any questions about your compensation before
12 entering into the three agreements that you
13 entered into with the Dugaboy trustee?
14    A.   And, again, it would fall into the
15 buckets I just described.
16    Q.   Can you – can you recall any
17 question that your sister or Dugaboy asked of
18 you concerning your compensation before
19 entering into the agreements?
20        MS. DEITSCH-PEREZ:  Asked answered.
21        THE WITNESS:  Again, I – it would
22    fall into the buckets I just described.
23 BY MR. MORRIS:
24    Q.   Did you provide any documents to
25 your sister or to Dugaboy concerning your

Page 54

JAMES DONDERO

1  JAMES DONDERO
2  compensation before entering into the
3  agreements?
4     A.  No, not that I can recall.
5     Q.  Did your sister or Dugaboy ask you
6  for any documents before entering into -- into
7  any of the agreements?
8     A.  I do not -- I do not believe so.
9     Q.  Do you recall that in the ordinary
10 course of business, Highland prepared a
11 document called a Compensation and Benefits
12 Statement for each of its employees?
13    A.  Yes.
14    Q.  And was that prepared by the Human
15 Resources Group?
16    A.  Yes.
17    Q.  And was Mark Collins the head of the
18 Human Resources Group?
19    A.  No.
20    Q.  Who was the head of the Human
21 Resources Group?
22    A.  Brian Collins.
23    Q.  I apologize to Mr. Collins.  Thank
24 you for the correction.
25       And Mr. Collins and his team were

Page 55

1  JAMES DONDERO
2  responsible for preparing the annual
3  Compensation and Benefits Statements for
4  Highland's employees, correct?
5     A.  Yes.
6     Q.  And did you instruct them to do
7  that?
8     A.  Not specifically.
9     Q.  Okay.
10    A.  They do it every year.  They do it
11 every year as a matter of course, so I guess no
12 is the answer.
13    Q.  Okay.  So in the ordinary course of
14 business, Mr. Collins and his team would
15 prepare Compensation and Benefits Statements
16 for each of Highland's employees on an annual
17 basis, right?
18    A.  Yes.
19    Q.  Okay.
20       MR. MORRIS:  Can we please put up
21 Exhibit 68.
22       MS. CANTY:  (Complies with request.)
23
24
25

Page 56

1  JAMES DONDERO
2       (Whereupon, Exhibit 68, James
3       Dondero Compensation and Benefits
4       Statement, Bates stamped D-CNL003585,
5       marked for identification, as of this
6       date.)
7  BY MR. MORRIS:
8     Q.  Do you see the document that's been
9  premarked as Exhibit 68 that's up on the
10 screen, sir?
11    A.  Yup.
12    Q.  And does this appear to be the form
13 of annual Compensation and Benefits Statement
14 that Mr. Collins and his team prepared on an
15 annual basis for Highland's employees?
16    A.  This looks like the format, yes.
17    Q.  Okay.  And the Compensation and
18 Benefits Statement was intended to set forth
19 the types and the amounts of compensation each
20 employee received each year, correct?
21    A.  Yes, generally.
22    Q.  Okay.  Did you ever disclose any
23 information on this page to Nancy or to
24 Dugaboy?
25    A.  Honestly, I don't think I've ever

Page 57

1  JAMES DONDERO
2  seen my award letters before.
3     Q.  Okay.  So you never -- so then it's
4  a fair to say you never showed this letter to
5  your sister or to Dugaboy, correct?
6     A.  Correct.
7     Q.  Okay.  Did you ever disclose to
8  Nancy or to Dugaboy the salary that's reflected
9  on this document?
10    A.  I can't remember specifically beyond
11 what I've already testified.
12    Q.  Did you ever describe for Nancy or
13 for Dugaboy the 2016 deferred compensation
14 award that's reflected on this document?
15    A.  No.  I -- by the way, I think that's
16 only 20 percent vested a year.  I think that's
17 a gross amount.  But no, I never -- I never
18 discussed that with her.
19    Q.  Okay.  Do you see in the
20 compensation award refers to 50,000 restricted
21 stock units of NXRT relating to your 2016
22 performance?
23    A.  Yes.
24    Q.  What is NXRT?
25    A.  That's the REIT that Highland used

JAMES DONDERO

1
2 to own million shares of that series hold at 20
3 that now trade at 70.
4    Q.   And is NexPoint REIT affiliated with
5 NexPoint Advisors, L.P.?
6    A.   Yes.
7    Q.   And do you have an understanding of
8 the nature of the relationship?
9    A.   Yes.
10   Q.   And what's -- what's your
11 understanding of the nature of the relationship
12 between NexPoint REIT and NexPoint Advisors,
13 L.P.?
14   A.   It's the external manager of the
15 REIT.
16   Q.   Okay.  Did you ever tell Nancy or
17 Dugaboy that you had received these restricted
18 stock units in 2016?
19   A.   No.  But again, the vested amount
20 would have probably been about $250,000 worth
21 at that moment.
22   Q.   And did it vest over a couple of
23 years?
24   A.   The first couple of years is vested
25 over five years.  I think now it vests over six

JAMES DONDERO

1
2 or seven years.  I don't remember whether the
3 2016 award was five years, six years, or seven
4 years.
5    Q.   Okay.  We talked earlier about an
6 expert that's been retained on your behalf.
7         Do you remember that?
8    A.   Yes.
9    Q.   Do you recall if you or anybody
10 acting on your behalf ever disclosed to that
11 expert the restricted stock units reflected on
12 this document?
13       MS. DEITSCH-PEREZ:  Object to the
14 form.
15       THE WITNESS:  I don't know.
16       MR. MORRIS:  Let's put up
17 Exhibit 50, please.
18       MS. CANTY:  (Complies with request.)
19       (Whereupon, Exhibit 50, James
20       Dondero Compensation and Benefits
21       Statement, Bates stamped D-CNL003587,
22       marked for identification, as of this
23       date.)
24 BY MR. MORRIS:
25   Q.   Do you see this is your benefits

JAMES DONDERO

1
2 statement for 2017?
3    A.   Yes.
4    Q.   Did you ever disclose any of the
5 information on this page to Nancy or to
6 Dugaboy?
7    A.   No.
8    Q.   Did you ever disclose to Nancy or to
9 Dugaboy that your base salary in 2017 was.
10      2,500,024?
11      MS. DEITSCH-PEREZ:  Object to the
12 form.
13      THE WITNESS:  Not specifically, no,
14      other than the buckets we talked about
15      earlier.
16      Like I said earlier, I'm not sure if
17      I have ever seen these before.  But I also
18      -- until it's verified, I don't want to --
19      everybody to assume that the base salary
20      came a hundred percent from Highland or if
21      it was also from some other entity.
22      Because for the purposes of this letter,
23      Brian Collins wouldn't have -- we have
24      numerous or several employees that are dual
25      employees.  And whether their base salary

JAMES DONDERO

1
2 came from one or multiple entities, he
3 wouldn't have differentiated in that line.
4      So I don't know whether that amount,
5      that 2.5 million came from Highland or a
6      combination of Highland/NexPoint or some
7      other entities.  I don't know.
8 BY MR. MORRIS:
9    Q.   And who made the decision as to how
10 to allocate the base salary?
11   A.   I don't know.  I -- I mean, I don't
12 know how it was split.  But my recollection of
13 my Highland base salary is that it was
14 diminishing over time.
15   Q.   And -- and as the president of
16 Highland and as the president of NexPoint, did
17 you have any say as to how your salary was
18 allocated between those two entities?
19   A.   Not that I recall.
20   Q.   Do you have any idea the basis on
21 which your salary was allocated between those
22 two entities?
23   A.   No.
24   Q.   Do you think -- do -- do you have
25 any understanding that it was allocated based

JAMES DONDERO

2 on the amount of time you spent working for
3 each of those entities?
4    A.   I have no idea.
5    Q.   If your salary was $500,000 from
6 Highland in 2017 and $2 million to NexPoint,
7 can you -- can you think of any reason why it
8 would be allocated in that way?
9         MS. DEITSCH-PEREZ:  Object to the
10   form.
11        THE WITNESS:  Cash, cash
12   availability.  I -- I don't know.
13 BY MR. MORRIS:
14   Q.   Okay.  Did you devote your full time
15 and attention to Highland Capital Management,
16 L.P.?
17   A.   I spread my time as appropriate
18 across a variety of entities.
19   Q.   Can you identify for me the entities
20 that you spread your time across?
21   A.   Highland, NexPoint, HCMFA, HCRE.
22   Q.   How about Highland Management
23 Services, Inc.?
24   A.   Yes.
25   Q.   Are there any others?

JAMES DONDERO

2    A.   Yes.
3    Q.   Can you identify any other companies
4 to which you devoted your time and attention?
5    A.   Not off the top of my head.  I'm
6 willing to be refreshed.  But over the years
7 there's been multiple initiatives at Highland
8 that have come and gone and private equity
9 companies that have come and gone and other
10 initiatives that have come and gone.
11   Q.   Do you see the reference to the
12 65,772 restricted stock units of the NexPoint
13 REIT there on this document?
14   A.   Yes.
15   Q.   And was that, to the best of your
16 recollection, the award that you were granted
17 in connection with your 2017 performance?
18   A.   It would have been for -- it would
19 have been the prior awards at -- it would have
20 been for the prior years' awards at NFLP.  And
21 it would have been -- it would have been the
22 same five- or seven-year vesting schedule.
23        MR. MORRIS:  Now I'm looking at my
24   phone, and I don't see, Deborah, any e-mail
25   from your firm.

JAMES DONDERO

2        MS. DEITSCH-PEREZ:  Yeah.  On a
3   break, I'll take a picture of it and send
4   it to you.
5        Do you want a break now?
6        MR. MORRIS:  I really -- I really
7   don't.  And I don't know why I can't get an
8   e-mail copy rather than a photograph.  It's
9   not going to be -- it's not going to be
10   easy to read, and you know that?
11        MS. DEITSCH-PEREZ:  It'll be
12   perfectly fine.  If you can't, let me know;
13   and then I'll take the time to try and find
14   it.  But the fastest way to get it to you
15   is to take a picture of it.
16 BY MR. MORRIS:
17   Q.   Mr. Dondero, did you ever tell Nancy
18 or Dugaboy that you had received the restricted
19 stock units from the NexPoint REIT as reflected
20 on this page?
21   A.   You're -- you're saying the
22 $1.55-million number that was really 200,000
23 vested or 300,000 vested?
24   Q.   No.  I'm not talking about the
25 value.  I'm just talking about the restricted

JAMES DONDERO

2 units.
3        Did you ever tell them -- let's keep
4   it -- let's keep it simple, and let's make it
5   really broad.
6        Did you ever tell Nancy or Dugaboy
7   that you received restricted stock units as
8   part of your compensation?
9    A.   I -- I don't remember.
10   Q.   Okay.  Did you ever -- because this
11 will speed it up.
12        Did you ever tell your expert that
13 you received restricted stock units as part of
14 your compensation?
15        MS. DEITSCH-PEREZ:  Object to the
16   form.
17        THE WITNESS:  I don't -- I don't
18   remember.
19 BY MR. MORRIS:
20   Q.   Did you ever direct anyone acting on
21 your behalf to share with your expert that you
22 had received restricted stock units as a form
23 of compensation?
24        MS. DEITSCH-PEREZ:  Object to the
25   form.

1       JAMES DONDERO
2       THE WITNESS: I not – I wasn't
3   involved.
4       MR. MORRIS: All right. You know,
5   what, Deborah, let's take a break; and why
6   don't you send me that document.
7       It is now 3:28. Let's come back at
8   3:40 Eastern, and let's please be on time
9   because I'd like to try to finish this
10  today. Thank you.
11      THE VIDEOGRAPHER: Off the record at
12  2:28.
13      (Whereupon, a break was taken.)
14      THE VIDEOGRAPHER: We are back on
15  the record. The time is 2:43.
16      MR. MORRIS: I received from counsel
17  a photograph in text message form of the
18  document that Mr. Dondero was referring to
19  at the beginning of the deposition.
20      I'm going to ask for that production
21  – for the production of that document with
22  a Bates number by the end of the day, and I
23  hope that could be accommodated.
24      MS. DEITSCH-PEREZ: I'm not sure –
25  John, I'm not sure it will be by the end of

1       JAMES DONDERO
2   the day because I don't know when the
3   people who do the Bates stamping leave.
4   But if it's not today, it will be tomorrow.
5       MR. MORRIS: All right. It's 2:44
6   in the afternoon your time. I hope that
7   your firm has the capability of Bates
8   stamping and producing one page before the
9   close of business.
10      MS. DEITSCH-PEREZ: Okay. But I'm
11  not going to get – John, what difference
12  does it make whether it's tonight or
13  tomorrow?
14      MR. MORRIS: You know what, I really
15  want to use it in the deposition now, but I
16  can't do that because – because you're not
17  able – because you – because apparently,
18  you can't even promise to do it by the end
19  of the day.
20  BY MR. MORRIS:
21      Q. Mr. Dondero –
22      MS. DEITSCH-PEREZ: Could you –
23  could you use it –
24      MR. MORRIS: I'd like to –
25      MS. DEITSCH-PEREZ: – if I sent it

1       JAMES DONDERO
2   to you by e-mail instead.
3       MR. MORRIS: I'd like to proceed.
4   You can e-mail it to me. I mean, I
5   asked you to do that an hour ago.
6       MS. DEITSCH-PEREZ: Well, the
7   easiest way to do it is to send a picture
8   is to text it; but if you give me a minute,
9   I'll figure out how to send it by e-mail.
10  Give me a second. Let's see.
11      It just takes a second because it
12  goes into my personal e-mail first if it's
13  from my iPhone. Okay.
14      MR. MORRIS: Can we proceed?
15      MS. DEITSCH-PEREZ: Yeah. Give me a
16  minute and you'll have it.
17      Okay. You should have it in your
18  e-mail now, John.
19      MR. MORRIS: Thank you. All right.
20  I'll let you know when it arrives.
21  BY MR. MORRIS:
22      Q. Mr. Dondero, the questions now are
23  going to be both in your individual capacity
24  and in your capacity as the 30(b)(6) witness.
25      Do you understand that?

1       JAMES DONDERO
2       A. Okay.
3       Q. Okay.
4       A. It's either – it's either/or; it's
5   not one?
6       Q. No.
7       A. Okay.
8       Q. You contend that the Notes are
9   subject to the – withdrawn.
10      You contend that the Notes that are
11  the subject of the agreements would be forgiven
12  upon the fulfillment of certain conditions
13  present, right?
14      A. Right.
15      MS. DEITSCH-PEREZ: Object to the
16  form. He said "subsequent."
17      MR. MORRIS: I apologize. Let me
18  restate the question.
19  BY MR. MORRIS:
20      Q. You contend that the Notes subject
21  to the agreement should be forgiven or would be
22  forgiven upon the fulfillment of certain
23  conditions subsequent, correct?
24      A. Yes.
25      Q. And to the best of your knowledge,

Page 70

JAMES DONDERO

1          JAMES DONDERO
2    none of those conditions have occurred as of
3    today, correct?
4       A.    To the best of my knowledge, yes.
5       Q.    Okay.  You're not aware of any facts
6    showing that any of the conditions subsequent
7    have been satisfied, fair?
8       A.    I -- yeah.  I wouldn't know.  You
9    would probably know.  I don't know.
10      Q.    I'm only asking for your knowledge.
11           One of the conditions subsequent was
12   that the Notes would be forgiven if you caused
13   Highland to sell its interest in one of three
14   portfolio companies above cost, right?
15           MS. DEITSCH-PEREZ:  Object to the
16      form.
17           THE WITNESS:  I -- yeah.  I don't
18      know if the noun is me or Highland, but
19      yeah.
20   BY MR. MORRIS:
21      Q.    Okay.  The portfolio companies at
22   issue were MGM, Cornerstone, and Trustway,
23   correct?
24      A.    Yes.
25      Q.    And prior to the petition date, you

Page 71

1          JAMES DONDERO
2    had the authority to sell any of those
3    portfolio companies at any time without having
4    to obtain approval from anyone, correct?
5           MS. DEITSCH-PEREZ:  Object to the
6      form.
7           THE WITNESS:  Yeah.  No, I can't
8      agree with that statement.
9    BY MR. MORRIS:
10      Q.    Why not?
11           Who's approval did you have to get
12   before you could sell any of those portfolio
13   companies?
14      A.    MGM, I was one board member and I
15   think an aggregate.  When I was running
16   Highland, we spoke for 18 percent of the
17   equity.  So I couldn't force the overall sale
18   of the company unilaterally.
19           There was also a shareholder's
20   agreement in place that restricted myself and
21   Anchorage and a couple of the large holders
22   from selling their shares without a disclosure
23   and approval process.  That is one example.
24           With regard to Trustway, I believe I
25   was largely unfettered.

Page 72

1          JAMES DONDERO
2           With regard to Cornerstone, a
3    majority of it -- or not a majority, but a
4    significant minority, I think, was owned by
5    both Restoration and the Old Redeemer Fund.
6       Q.    All right.  Well, let me ask you
7    this:  The conditions subsequent that are
8    embedded in the agreements, did that relate to
9    just Highland's interests in the portfolio
10   companies, or did it relate to interests held
11   by anybody else?
12      A.    It referred to a monetization in
13   creating liquidity around Highland's interests
14   that were large and illiquid portions of
15   Highland's balance sheet.
16      Q.    Okay.  So let me ask the question
17   again.
18           Prior to the petition date, did you
19   have the authority to sell Highland's interests
20   in any of the portfolio companies without
21   having to obtain the authority of anybody else?
22           MS. DEITSCH-PEREZ:  Object to the
23      form.  Asked and answered.
24           THE WITNESS:  Sub- -- subject to my
25      prior answer, I could speak for Highland

Page 73

1          JAMES DONDERO
2    prior to the bankruptcy.
3    BY MR. MORRIS:
4       Q.    Okay.  Before entering into the
5    agreements, did you or anybody acting on your
6    behalf analyze the likelihood that any of the
7    conditions subsequent would occur?
8       A.    Likelihood?  Analyze?  My
9    description of them, which was my understanding
10   of them, but my description of the assets to my
11   sister was -- to the trustee of Dugaboy was
12   that we held them for a long time.  We were
13   working towards monetization, but there wasn't
14   anything imminent regarding any of them in 2017
15   or '18.
16      Q.    Well, but the actual sale is just
17   one part of the condition subsequent, correct?
18           The other part is that it's got to
19   be sold above cost; is that correct?
20      A.    That is right.
21      Q.    Okay.  So at the time you entered
22   into each of your -- each of the three
23   agreements, had you done any analysis to
24   determine whether or not any -- whether
25   Highland's interests in any of the portfolio

**Appx. 01830**

Page 74

JAMES DONDERO

2 companies exceeded its cost?

3    A.   No, but I -- yes.  No, I did not.

4    Q.   Did you have any understanding at

5 all as to how the value of Highland's interests

6 in MGM compared to its costs at the time you

7 entered into each of these three agreements?

8    A.   No.  I mean, my understanding was I

9 knew they were substantially higher, but I

10 didn't know how much higher.

11    Q.   Okay.  So is it fair to say that the

12 time -- at the time you entered into each of

13 these agreements, you knew and understood that

14 the value of Highland's interests in MGM was

15 substantially higher than its costs?

16    A.   For MGM, yes.

17    Q.   Okay.  Did you have an understanding

18 of the relationship between value and costs

19 concerning Cornerstone at the time you entered

20 into these agreements?

21    A.   My understanding it was moderately

22 higher, and Trustway was between substantially

23 and moderately and higher, I believe.

24    Q.   Okay.  So is it fair to say that at

25 the time you entered into each of these

Page 75

JAMES DONDERO

2 agreements, you believed that the value of

3 Highland's interests in each of the portfolio

4 companies exceeded its costs in varying

5 degrees?

6    A.   Varying degrees.  As a matter of

7 fact, I would adjust.  Cornerstone and

8 Trustway, I believe, were moderately higher

9 than their embedded costs or implied costs.

10 That was my understanding.

11        MGM was somewhat substantially.  But

12 all of them with a fair amount of volatility

13 and a fair amount of illiquidity.

14    Q.   Did you ever give your sister or

15 Dugaboy any information concerning how the

16 value of Highland's interests in any of the

17 portfolio companies compared to Highland's

18 costs before entering into the agreements?

19    A.   Not that I recall.

20    Q.   Do you have any reason to believe

21 that your sister or Dugaboy had any

22 understanding as to the likelihood that the

23 conditions subsequent would be satisfied at the

24 time the Dugaboy trustee entered into the three

25 agreements with you?

Page 76

JAMES DONDERO

2        MS. DEITSCH-PEREZ:  Object to the

3    form.

4        THE WITNESS:  I -- I remember saying

5    it would take a few years at minimum; but

6    other than expressing time, I don't believe

7    I expressed value versus cost or the

8    questions you were asking me previously.

9 BY MR. MORRIS:

10    Q.   Okay.  You never showed Nancy or

11 Dugaboy any of the Promissory Notes prior to

12 entering into any of the agreements, correct?

13    A.   Not that I recall.

14    Q.   And you never sent copies of the

15 Promissory Notes to Nancy or Dugaboy before

16 entering into any of these agreements, correct?

17    A.   Not that I recall.

18        MS. DEITSCH-PEREZ:  Object to the

19    form.

20        John, you've asked these at the last

21    deposition and actually also at the first

22    day of the deposition.

23        MR. MORRIS:  Thank you.  He's here

24    now in his 30(b)(6) capacity.  So please

25    just stop.

Page 77

JAMES DONDERO

2        You can object to the form of the

3    question.  I really don't appreciate it.

4    You should follow the very professional job

5    that your colleague, Michael Aigen, did the

6    other day.

7 BY MR. MORRIS:

8    Q.   Neither Nancy or Dugaboy has ever

9 asked to see copies of any of the Promissory

10 Notes before entering into any of the

11 agreements, correct?

12        MS. DEITSCH-PEREZ:  Object to the

13    form.

14        THE WITNESS:  I don't know.

15 BY MR. MORRIS:

16    Q.   Do you have any reason to believe

17 that Nancy or Dugaboy ever saw a copy of any of

18 the Promissory Notes at issue before entering

19 into the agreements?

20    A.   I don't know.

21    Q.   During your discussions with Nancy

22 and Dugaboy, did you identify the Promissory

23 Notes that were going to be the subject of each

24 agreement?

25        MS. DEITSCH-PEREZ:  Object to the

1          JAMES DONDERO
2  form.
3      You know, we made an agreement that
4  you were going to refer to Nancy as the
5  Dugaboy trustee. Please stick to it.
6  Otherwise, I'm going to have to object each
7  time, and I'd rather not.
8      MR. MORRIS: I have no problem with
9  your objecting to the form of the question.
10  It's the speaking that I really do object
11  to. And I don't know why you can't control
12  yourself.
13      MS. DEITSCH-PEREZ: Because I
14  hope that –
15      MR. MORRIS: Please stop. Please
16  stop.
17      MS. DEITSCH-PEREZ: – by telling
18  you this, you will listen.
19      MR. MORRIS: Okay. Your discussion
20  and your inability to control yourself is
21  going to cause this deposition to go longer
22  than it needs to, okay?
23      MS. DEITSCH-PEREZ: No. It's your
24  repeating questions that's going to do
25  that.

1          JAMES DONDERO
2      MR. MORRIS: You let me know when
3  you're done.
4      MS. DEITSCH-PEREZ: I'm done.
5  BY MR. MORRIS:
6      Q.  Mr. Dondero, during your discussions
7  with the Dugaboy trustee, did you identify the
8  Promissory Notes that were going to be the
9  subject of each agreement?
10      MS. DEITSCH-PEREZ: Object to the
11  form.
12      THE WITNESS: No, not that I recall.
13  BY MR. MORRIS:
14      Q.  Do you recall – during your
15  discussions with the Dugaboy trustee, did you
16  identify the maker of any of the Notes that
17  were the subject of any of the agreements?
18      A.  You mean Highland as the maker; is
19  that what you're saying?
20      Q.  No. I'm just asking if during your
21  discussions with the Dugaboy trustee, you ever
22  disclosed the name of the maker of any of the
23  Notes that were subject to the agreements?
24      A.  She – she knew they were Notes due
25  to Highland from various entities. So I don't

1          JAMES DONDERO
2  know what your question is. Did I identify
3  specifically that they were Notes due to
4  Highland? I guess the answer to that is yes,
5  but I don't know what you're asking me.
6      Q.  I'm sorry, sir. I'll take the
7  responsibility for that.
8      I'm asking you if you identified who
9  the maker of the Notes were, not who the payee
10  was.
11      MS. DEITSCH-PEREZ: You mean the
12  borrowers, John?
13      THE WITNESS: See, I don't want to
14  get stuck in my underwear on maker/borrower
15  nomenclature.
16      She was aware that they were notes
17  due to Highland from a variety of entities.
18  BY MR. MORRIS:
19      Q.  Okay. Did you identify any of those
20  entities?
21      A.  I – yeah. She knew that some were
22  Dugaboy, some were NexPoint for sure, and some
23  were other entities.
24      Q.  So – so there were notes where
25  Dugaboy owed the money or was the obligor or

1          JAMES DONDERO
2  was the borrower or was the maker that are
3  subject to agreements that you entered into
4  with the Dugaboy trustee?
5      A.  No. Wait. The Dugaboy – the
6  Dugaboy Notes weren't subject to the
7  forgiveness. It was the other notes that were
8  subject to forgiveness.
9      Q.  So it's really kind of a simple
10  question, and I'm not trying to trick you.
11      If you think back to the
12  conversations that you had with the Dugaboy
13  trustee, did you identify the entity of – did
14  you identify who the borrowers were under the
15  Notes that were going to be subject to the
16  agreements?
17      A.  She knew they were entities – she
18  knew there were other related entities. She
19  knew NexPoint for sure. She knew Services.
20      I can't sit here as I remember – as
21  I sit here today and remember whether or not I
22  specifically identified HCRE or not, you know;
23  but she knew they were related entities.
24      Q.  All of the revisions of the
25  agreement are set forth in paragraph 82; is

Page 82

1          JAMES DONDERO
2    that right?
3          We could put it back up on the
4    screen if you'd like.
5          MR. MORRIS:  In fact, why don't we
6    do that.
7          MS. CANTY:  I'm sorry, John.  51 --
8    I mean, 50?
9          MR. MORRIS:  I think it's
10   Exhibit 31, paragraph 82.
11         MS. CANTY:  Oh, okay, 82.  I've got
12   you.
13         MR. MORRIS:  Thank you.
14   BY MR. MORRIS:
15     Q.   Does -- Mr. Dondero, other than
16   specifying who the portfolio companies were,
17   does paragraph 82 set forth all of the material
18   terms of each of the agreements?
19     A.   I think it sets forth the conditions
20   subsequent.
21     Q.   Is there any aspect of your
22   agreement -- withdrawn.
23         Is there any aspect of your
24   agreements with the Dugaboy trustees that's not
25   described in this paragraph?

Page 83

1          JAMES DONDERO
2     A.   I don't know if it's captured in
3    there, but there was definitely a conversation,
4    discussion that if something like MGM was
5    sold -- Anchorage is the largest holder almost
6    a majority in and of themselves.  And if it was
7    bought or taken out at a price that we couldn't
8    control or couldn't agree with and it was lower
9    than cost or -- you know, Cornerstone, again,
10   had multiple funds between our ownership and
11   control that if -- if things were sold
12   beyond -- without my support but sold below
13   cost -- and I'm not sure that's captured in
14   that paragraph, but I think that was part of
15   the understanding, also.
16     Q.   Is there any other part of the
17   understanding that's not set forth in
18   paragraph 82, Mr. Dondero?
19     A.   Not that I can think of at this --
20   let me read it one more time, please.
21     Q.   Take your time.
22     A.   I believe that generally covers it.
23     Q.   Was any provision of the agreements
24   the subject of negotiation?
25         MS. DEITSCH-PEREZ:  Object to the

Page 84

1          JAMES DONDERO
2    form.
3          THE WITNESS:  I don't believe it was
4    materially adjusted by any negotiation.  It
5    was just clarified based on discussion is
6    how I would describe it.
7    BY MR. MORRIS:
8      Q.   Is there any provision in the
9    agreements that was included at your sis-- at
10   the Dugaboy trustee's request?
11     A.   Like I said, there was discussion
12   and clarification.  Not specifically that I
13   recall.
14     Q.   Okay.  Did the Dugaboy trustee
15   refuse to include any provision in the
16   agreement that you had proposed?
17     A.   Not that I recall.
18     Q.   Can you identify any provision of
19   the agreements that were the subject of a
20   counterproposal that the Dugaboy trustee made?
21     A.   I remember clarification discussion
22   around, you know, three companies versus two or
23   one.  I remember clarification of monetization
24   being turned to cash versus illiquid.
25         Yeah.  I mean, I remember

Page 85

1          JAMES DONDERO
2    discussion -- I remember clarification
3    discussions like that, but I don't remember --
4    it was a long time ago.  I don't remember the
5    details of anything specific like that.
6          It wasn't -- it wasn't a
7    contentious, nor should it have been a
8    contentious negotiation.
9      Q.   How long did -- do you recall how
10   long each of the conversations lasted that led
11   to the entry of each of the three agreements?
12     A.   I remember the first one being
13   longer than the second two, and then I remember
14   it being spread out periods of time.  So I
15   can't -- I can't -- I can't put an exact
16   estimate on it.
17     Q.   Okay.  I'm going to shift gears.
18         MR. MORRIS:  We can take that down
19   now, please.
20         MS. CANTY:  (Complies with request.)
21   BY MR. MORRIS:
22     Q.   Do you know of any written agreement
23   pursuant to which HCRE provided services to
24   Highland at any time?
25         MS. DEITSCH-PEREZ:  Object to the

1           JAMES DONDERO
2    form. Asked and answered.
3        THE WITNESS: HCRE provided
4    preferred services to. Well, the
5    participants there in HCRE are, my –
6    myself and McGraner. And, you know, we
7    both provided significant other services to
8    Highland.
9    BY MR. MORRIS:
10   Q. Okay. Is that in writing? Is there
11   a written agreement?
12       That was my question.
13       Is there a written agreement
14   pursuant to which HCRE ever provided services
15   to Highland?
16   A. I don't believe so.
17   Q. Did HCRE ever provide services to
18   Highland?
19   A. I would incorporate my last two
20   answers. Not under a written agreement, but I
21   believe myself and McGraner provided a lot of
22   services.
23   Q. And what services did you and Mr.
24   McGraner provide to Highland?
25   A. I'd say anything real estate related

1           JAMES DONDERO
2    on the Highland platform McGraner would have
3    input into.
4        And then I think my – my portfolio
5    management, leadership role in Highland over
6    time is well documented.
7    Q. And how did you know if you were
8    providing services in your capacity as the
9    president of Highland or in your capacity as an
10   officer or owner of the HCRE at the time you
11   provided the services?
12   A. Never – never really thought about
13   parsing it that way.
14   Q. I appreciate that.
15       Do you know whether Highland Capital
16   Management Services ever provided services to
17   Highland?
18   A. Yeah.
19       MS. DEITSCH-PEREZ: Object to the
20   form. Asked and answered.
21       THE WITNESS: Yeah. I would – not
22   in writing. I believe the services owners
23   isn't myself and McGraner. I think it was
24   myself and Okada.
25       And I would say our portfolio and

1           JAMES DONDERO
2    leadership contributions to Highland are
3    well documented.
4    BY MR. MORRIS:
5    Q. And my question didn't have anything
6    to do with any particular person. It's just
7    simply whether Highland Capital Management
8    Services ever provided any services to Highland
9    Capital Management, L.P.
10       MS. DEITSCH-PEREZ: Object to the
11   form.
12       THE WITNESS: The entities that
13   you're describing or you're asking
14   questions about don't have employees'
15   services in HCRE. They have ownership
16   individuals that I've described.
17       So I've tried the best I can to
18   answer your question and what the ownership
19   may have done for Highland.
20       But since there's no employee base
21   at either of those two companies, those
22   companies could not have directly provided
23   service to Highland other than, the last
24   thing I would bring up is the track-record
25   concept, you know, in terms of the

1           JAMES DONDERO
2    performance of whatever assets are in some
3    of those start-up entities ends up being a
4    useful track record that then Highland can
5    market.
6    BY MR. MORRIS:
7    Q. Okay. How about NexPoint, did
8    NexPoint ever provide services to Highland
9    Capital Management, L.P.?
10   A. Yes. The real estate – yes. I
11   mean, can I just say yes or –
12   Q. You could. That would be really
13   helpful.
14   A. Okay. There we go.
15   Q. Can you describe the circumstances
16   for me?
17       MS. DEITSCH-PEREZ: Finally, some
18   accord between the witness and the
19   questioner.
20   BY MR. MORRIS:
21   Q. Can you describe the services for
22   me?
23   A. NexPoint has a couple of attorneys
24   that are real estate experts. We have a lot of
25   different attorneys, or we did at Highland.

Page 90

JAMES DONDERO

2 But prior to the bankruptcy, none of the
3 Highland attorneys were experienced in real
4 estate.
5        So anything that required
6 transaction help on the Highland platform
7 regarding real estate, the NexPoint real estate
8 attorneys would help with.
9    Q.   Okay. Anything else?
10    A.   I'm sure there are others. That's
11 all I can think of off the top of my head. I
12 just wanted to give you an example.
13    Q.   I appreciate that.
14        You're aware that Highland has sued
15 HCMFA to collect on two notes that were signed
16 by Frank Waterhouse in 2019 in the aggregate
17 amount of $7.4 million; is that right?
18    A.   Yes.
19    Q.   Okay. And we actually went through
20 this the other day, so I don't want to belabor
21 it if I don't have.
22        But do you recall that we saw the
23 incumbency certificate which identified
24 Mr. Waterhouse as the treasurer of HCMFA as of
25 April 2019?

Page 91

JAMES DONDERO

2    A.   Yes.
3    Q.   Okay. And do you recall that you
4 signed that incumbency certify in your capacity
5 as president of HCMFA?
6        MS. DEITSCH-PEREZ: Object to the
7 form.
8        THE WITNESS: Yes.
9 BY MR. MORRIS:
10    Q.   I want to talk about the first of
11 the two Notes, the $2.4 million Note.
12        Do you recall that in early May
13 2019, Highland transferred $2.4 million to
14 HCMFA?
15    A.   I don't remember a lot of specifics,
16 but I know there were two Notes as you're
17 describing.
18    Q.   Okay. And there was -- and one of
19 them -- did you authorize the $2.4-million
20 payment?
21    A.   Yes.
22    Q.   And why did you authorize Highland
23 to transfer $2.4 million to HCMFA in early May
24 2019?
25    A.   My answer's the same for both --

Page 92

JAMES DONDERO

2 both Notes. Essentially, it's regarding the
3 terrace start issue that we had with the
4 Fort Worth SEC.
5    Q.   Did you give anyone instructions
6 concerning the transfer of the $2.4 million?
7    A.   I instructed them to make the
8 transfer, or I was involved in the -- involved
9 in approving the transfer.
10    Q.   And who did you instruct to make the
11 transfer of $2.4 million?
12    A.   Yeah. It would have been Frank.
13    Q.   Do you have a recollection of
14 instructing Frank to transfer $2.4 million?
15    A.   Yeah. Generally, yes.
16    Q.   Do you have a recollection of what
17 instructions you gave him?
18    A.   It was well-known. It was a very
19 disruptive -- the whole thing was very
20 disruptive at Highland and HCMFA. Everybody
21 was aware of it. The settlement, the
22 negotiations around the settlement, the
23 give-and-take, the amounts changed over time.
24        Everybody was aware of it in senior
25 management, including myself. And putting the

Page 93

JAMES DONDERO

2 money into HCMFA to settle it was something I
3 was aware of and authorized and a critical
4 piece of putting that issue to bed.
5    Q.   Okay. I'm just asking you if you
6 recall what instructions you gave to
7 Mr. Waterhouse concerning the transfer if you
8 recall?
9    A.   No. I mean, like I said, I
10 authorized the movement of the money.
11    Q.   Okay. Were you aware at that time
12 that the transfer of the $2.4 million from
13 Highland to HCMFA was booked as a loan on both
14 Highland and HCMFA's books and records?
15    A.   I was not aware at the time.
16    Q.   Okay.
17        MR. MORRIS: Can we put up
18 Exhibit 53 please.
19        THE VIDEOGRAPHER: Counsel, I will
20 need a media break in about five minutes.
21        MR. MORRIS: Thank you very much.
22 Why don't we take that right now before I
23 begin my examination on this document. How
24 long do you need?
25        THE VIDEOGRAPHER: It will just be a

JAMES DONDERO

1      JAMES DONDERO
2  minute, but this is the end of Media Number
3  1.
4      MR. MORRIS: Okay.
5      THE VIDEOGRAPHER: We are off the
6  record at 3:21.
7      MR. MORRIS: We are off the record,
8  but don't go anywhere.
9      MS. DEITSCH-PEREZ: What?
10     MR. MORRIS: We're not taking a
11 break.
12     THE VIDEOGRAPHER: Yep. This will
13 just take a minute. Please stand by.
14     MR. MORRIS: Thank you.
15     THE VIDEOGRAPHER: All right.
16 Suzanne, are you good to go?
17     THE COURT REPORTER: I'm good.
18     THE VIDEOGRAPHER: This is the
19 beginning of Media Number 2, Volume II
20 [sic] in the deposition of James Dondero.
21     We are back on the record at 3:22.
22     MR. MORRIS: All right. Can we
23 please put up Exhibit 53.
24     MS. CANTY: Yeah. Just one second.
25 My computer went haywire. Give me one

1      JAMES DONDERO
2  minute.
3      (Whereupon, Exhibit 53, E-mail
4  correspondence, Bates stamped D-CNL003768
5  through D-CNL003770, marked for
6  identification, as of this date.)
7  BY MR. MORRIS:
8      Q.  Okay. So Mr. Dondero, do you see
9  what's on the screen here?
10     Mr. Dondero?
11     MR. MORRIS: Deborah?
12     Apparently Mr. Dondero has left the
13 seat.
14     THE VIDEOGRAPHER: Would you like to
15 go off record?
16     MR. MORRIS: No.
17     THE VIDEOGRAPHER: Okay. We'll stay
18 on the record.
19     MR. MORRIS: The video is still
20 rolling, right, sir?
21     THE VIDEOGRAPHER: Yes, it is.
22     MR. MORRIS: Thank you.
23     Hi, Michael. If you're -- if you're
24 able, can you reach out to your partner?
25     MR. AIGEN: I had texted her. I

1      JAMES DONDERO
2  will try to call her, too; but I did text
3  her a couple of minutes ago. I will try to
4  reach out again. Hold on.
5      MS. DEITSCH-PEREZ: I'm back. I'm
6  lucky in that the ladies room is directly
7  across from the conference room.
8      Mr. Dondero's down at the other end
9  of the floor, so he will be back shortly.
10     And I just saw your note, John. The
11 -- the videographer said he needed a break;
12 and you said, okay, then let's take our
13 break now. So we took a restroom break.
14     MR. MORRIS: I think everybody on
15 the phone -- and there's a transcript of it
16 -- knows that I specifically said, how long
17 do you need. He said one minute, and I
18 said don't go anywhere.
19     This is your time, not mine.
20     MS. DEITSCH-PEREZ: Prior to that,
21 you said, let's take the break now.
22     MR. MORRIS: Yeah, to allow him to
23 change the tape. I'm not going to question
24 anybody on the call, but I'm 100 percent
25 certain that they would all tell you -- and

1      JAMES DONDERO
2  the record will reflect, I specifically
3  said do not leave.
4      MS. DEITSCH-PEREZ: Okay.
5  Mr. Dondero is back.
6      You have to turn -- turn the video
7  on.
8      THE WITNESS: I'm back.
9  BY MR. MORRIS:
10     Q.  All right. Do you see on the screen
11 there's a document that's been marked as
12 Exhibit 53?
13     A.  Yup.
14     Q.  Do you see there's an e-mail string
15 dated May 2, 2019?
16     A.  Yes.
17     Q.  And do you see that Mr. Waterhouse
18 has -- if you look at the second to the top,
19 Mr. Waterhouse's e-mail is forwarding a
20 spreadsheet to David Klos and Kristin Hendrix
21 that he described as, quote, "The support for
22 the payment to GAF by HCMFA?
23     A.  Yes.
24     Q.  What's GAF?
25     A.  That's the fund itself that owned

JAMES DONDERO

1     JAMES DONDERO
2  the TerreStar investment. The SEC wanted, I
3  believe, some payment to go to them; but they
4  all, meaning the SEC, and the SEC wanted some
5  payment to go to the fund itself for the
6  benefit of the investors.
7     Q.  Okay.
8        MR. MORRIS:  Can we can to the chart
9     that's attached.
10       MS. CANTY:  (Complies with request.)
11 BY MR. MORRIS:
12    Q.  Have you ever seen this chart
13 before, sir?
14    A.  I don't believe so specifically, but
15 I understand what it is.
16    Q.  And is it your understanding, based
17 on this chart, that the loss to the fund was
18 $6,068,851?
19       MS. DEITSCH-PEREZ:  Object to the
20    form.
21       THE WITNESS:  Yes.
22 BY MR. MORRIS:
23    Q.  And there's -- there's a column
24 there that's lost to fund.
25       Do you see that?

JAMES DONDERO

1     JAMES DONDERO
2     A.  Yes.
3     Q.  And is it -- is it consistent with
4  your recollection that the estimated loss of
5  the fund or to the fund was approximately
6  $6 million?
7     A.  Yes.  There is approximately --
8  there's some other small numbers moving around,
9  but yes.
10    Q.  Okay.  And do you recall that HCMFA
11 informed the SEC that HCMFA would make the fund
12 whole by paying it an amount of money equal to
13 the loss?
14    A.  Yes.
15    Q.  And, in fact, HCMFA paid the fund
16 approximately $6 million in connection with the
17 losses sustained as a result of the NAV error,
18 correct?
19    A.  I don't know details like that.
20    Q.  So you're not -- you're not aware of
21 the fact that HCMFA paid to the fund
22 approximately $6 million in May of 2019?
23    A.  Approximately six or approximately
24 seven. I -- I don't know. Whatever the
25 agreement was with the SEC to be paid to them

JAMES DONDERO

1     JAMES DONDERO
2  or to the fund or whatever, I -- I have all
3  faith and confidence we complied with; but I
4  don't -- I don't know exact numbers. I'm
5  not aware of the exact numbers.
6     Q.  Do you understand that this analysis
7  shows how HCMFA was going to finance the
8  payment to the fund as a result of the NAV
9  error?
10       MS. DEITSCH-PEREZ:  Object to the
11    form.
12       THE WITNESS:  I'm sorry.  Could you
13    repeat that question again?
14 BY MR. MORRIS:
15    Q.  Sure.  Do you understand that
16 this -- that this chart here sets forth the
17 manner in which HCMFA is going to fund the
18 payment that it was making to GAF on account of
19 the NAV error?
20    A.  I would call it more of a
21 calculation on where the amounts are coming
22 from. It doesn't appear to me that this is a
23 funding statement.
24    Q.  Okay.  I appreciate that.
25       So -- so your interpretation of this

JAMES DONDERO

1     JAMES DONDERO
2  is that this shows the sources of money that
3  were going to be used to make the payment; is
4  that fair?
5        MS. DEITSCH-PEREZ:  Objection to the
6     form.
7        THE WITNESS:  Yeah.  I think it's a
8     reconciliation between the insurance, some
9     forgiveness of fees, and then additional
10    monies that are necessary.
11 BY MR. MORRIS:
12    Q.  Okay.  And --
13    A.  Yeah.  Go ahead.
14    Q.  Did HCMFA file an insurance claim in
15 connection with the NAV error?
16    A.  I believe they did get -- I believe
17 they did, and I believe they did get paid some
18 insurance.
19    Q.  And -- and if we look at the totals
20 column in the right, did HCMFA receive, to the
21 best of your recollection, approximately
22 $5 million from insurance?
23    A.  Yes.  I think we should work -- I
24 think we should work from that column --
25    Q.  Okay.  So let's --

JAMES DONDERO

1
2  A.  -- versus the other column, yeah.
3  Q.  I apologize, Mr. Dondero.
4      So if we look at the last column,
5  the total, does that comport with your
6  recollection that HCMFA paid GAF approximately
7  $7.44 million in May of 2019 on account of the
8  NAV error?
9  A.  I think it's more than that, and I
10  think it's also the 375 below that.
11  Q.  Okay.
12  A.  And then I -- yeah, definitely those
13  two numbers in aggregate.  I don't know if it's
14  any others.
15  Q.  Okay.  And did, to the best of your
16  recollection, HCMFA make an insurance claim on
17  which it received almost $5 million as a source
18  of funding for the payment that was due to GAF?
19  A.  Yes.
20  Q.  Are you familiar with that insurance
21  claim?
22  A.  No.
23  Q.  Do you know if the insurance claim
24  made any mention of Highland?
25  A.  I have no idea.  I have no idea.

JAMES DONDERO

1
2  Q.  Okay.  So as a -- as a matter of
3  rough math, would you agree with me that the
4  insurance procedures funded approximately
5  5 million of the $7.8 million that was the
6  total loss?
7      MS. DEITSCH-PEREZ:  Object to the
8      form.
9      THE WITNESS:  This was the amount
10      due to the investors.  I -- I -- my rough
11      recollection is there was another amount
12      that was due the SEC, but I don't remember
13      specifically.
14  BY MR. MORRIS:
15  Q.  Okay.  And do you see in the middle
16  of the page, there's a total additional payment
17  from advisor of approximately $2.4 million?
18  A.  Yes.
19  Q.  And is it your understanding that
20  that is the amount that HCMFA had to come out
21  of pocket in order to fully fund the GAF
22  payment?
23  A.  Yes, but it's clear to me also that
24  there's a forgiveness of management fees, also.
25  Q.  Okay.  But is two point -- but is

JAMES DONDERO

1
2  $2.4 million the amount of money that HCMFA
3  needed in order to fully fund the payment to
4  GAF?
5  A.  And I don't want to mince small
6  numbers; but to the extent that they gave up
7  their management fees also, like that 1939 or
8  the 39 above that -- and I don't know what that
9  47 is above that -- those are management fees
10  that would have paid salaries and expenses at
11  HCMFA also.
12      So to the extent they gave up those
13  items as part of the settlement, then HCMFA
14  would have needed more money than even the 2.4
15  that came from Highland.
16  Q.  Do you know if HCMFA ever informed
17  the SEC that Highland was responsible for the
18  NAV error?
19  A.  I -- I don't know.  We wouldn't have
20  hidden it if they would have asked.  My
21  experience with the SEC is they identify the
22  advisor; and who the advisor picks for vendors
23  the advisor's responsible for.
24      MR. MORRIS:  I move to strike
25      everything after "I don't know."

JAMES DONDERO

1
2  BY MR. MORRIS:
3  Q.  Did you ever direct anyone to inform
4  the SEC that Highland was responsible for the
5  NAV error?
6  A.  No, not that I recall.
7  Q.  Do you know if anybody acting on
8  behalf of HCMFA ever informed the SEC that
9  Highland was responsible for the NAV error?
10  A.  I don't know.
11  Q.  Do you know if HCMFA ever informed
12  GAF that Highland was responsible for the NAV
13  error?
14  A.  Yes.
15  Q.  And is that reflected in writing
16  anywhere?
17  A.  Yes.  Numerous places.
18  Q.  And what writing would that be
19  reflected in?
20  A.  The board minutes.  There were
21  conversations every board meeting for over a
22  year.  The retail board represents GAF.  They
23  were well aware of the subadvisory agreements,
24  and they were well aware that all the staff
25  regarding valuation were housed at Highland;

JAMES DONDERO

1    JAMES DONDERO
2    all the valuation activities were performed by
3    Highland. And GAF and HCMFA relied on
4    Highland, and it was a material part of board
5    conversations for over a year.
6        MR. MORRIS: Okay. I move to
7    strike.
8    BY MR. MORRIS:
9        Q.   I'm asking you just about writings,
10   sir.
11       Can you identify --
12       A.   No, no, no. I'm not -- I'm not
13   going to -- I'm not going to allow that strike,
14   or I'm not answering anymore questions.
15       Q.   Well, the judge will be the
16   determiner of that. So I'd like you to answer
17   my question.
18       Is there any -- I don't want to know
19   about board meetings.
20       Is there anything in writing that
21   HCMFA provided to GAF that specifically stated
22   that Highland and not HCMFA was responsible for
23   the NAV error?
24       MS. DEITSCH-PEREZ: Asked and
25   answered.

1    JAMES DONDERO
2        THE WITNESS: Yes. Numerous board
3    minutes.
4    BY MR. MORRIS:
5        Q.   Okay. And have those board minutes
6    been produced in this litigation?
7        A.   I don't know.
8        Q.   Okay.
9        MR. MORRIS: Let's go to the next
10   exhibit, 54.
11       MS. CANTY: (Complies with request.)
12       (Whereupon, Exhibit 54, E-mail
13   correspondence, Bates stamped D-CNL003777
14   through D-CNL003779, marked for
15   identification, as of this date.)
16   BY MR. MORRIS:
17       Q.   Do you see that on the same day, at
18   the bottom, Mr. Klos sent an e-mail to the
19   Corporate Accounting Group?
20       A.   Yes.
21       Q.   And do you see that he instructed
22   the Corporate Accounting Group to transfer
23   $2.4 million from HCMLT to HCMFA?
24       A.   Yes.
25       Q.   And do you see that he specifically

1    JAMES DONDERO
2    informed the Corporate Accounting Group that
3    this transaction was a, quote, "New inter
4    co-loan?
5        A.   Yes.
6        Q.   Do you see that he asked
7    Christian -- Kristin or Hayley to prepare a
8    Promissory Note for discussion?
9        A.   Yes.
10       Q.   Okay. Are you aware in May 2019,
11   Frank Waterhouse was included in the e-mail
12   string identified as Corporate Accounting?
13       A.   I do not have that awareness.
14       Q.   Okay. Do you see at the top
15   Ms. Hendrix -- Ms. Hendrix's response to
16   Mr. Klos's e-mail and attaches a copy of a
17   Promissory Note?
18       A.   Yes.
19       Q.   Okay.
20       MR. MORRIS: Can we just go to the
21   attachment, please.
22       MS. CANTY: (Complies with request.)
23   BY MR. MORRIS:
24       Q.   Do you see that that is a Promissory
25   Note dated May 2, 2019, in the amount of

1    JAMES DONDERO
2    $2.4 million that where the maker is Highland
3    Capital Management Fund Advisors, L.P.?
4        A.   Yeah.
5        Q.   Have you ever seen this before?
6        A.   I think in our last deposition.
7        Q.   Okay. Do you recall when you saw it
8    for the first time?
9        A.   Our last deposition.
10       Q.   Do you recall when you learned about
11   the existence of this document for the first
12   time?
13       A.   I believe somehow regarding the
14   litigation.
15       Q.   Okay. So you have no knowledge of
16   this Promissory Note until after the litigation
17   was commenced; do I have that right?
18       A.   Correct.
19       Q.   So you're not aware of Highland
20   having made a demand for payment on this
21   Promissory Note in December of 2020?
22       A.   Not that I recall.
23       Q.   Okay. Putting aside the question of
24   the Promissory Note, do you recall when you
25   first learned that the $2.4 million that you

Page 110

JAMES DONDERO

1
2 instructed to be paid to HCMFA by Highland in
3 May of 2019, do you recall when you first
4 learned that that was booked as a loan?
5     A.   I believe just generally as part of
6 this litigation, not before then.
7     Q.   Are you aware that the Corporate
8 Accounting Group created a daily list of wire
9 transfers that were being made on behalf of
10 Highland and its affiliates?
11     A.   Not -- no, not specifically.
12     Q.   Okay.  So since you did not know
13 that the $2.4 million transfer had been booked
14 as a loan, is it fair to say that you never
15 told anybody prior to the commencement of this
16 litigation that the transaction should not have
17 been booked as a loan?
18     A.   I had no conversations either way
19 prior to this litigation regarding the booking
20 of the 2.4 million.
21     Q.   Did you ever take any steps to try
22 to determine how Highland and HCMFA accounted
23 for the $2.4 million that you instructed to be
24 transferred from Highland to HCMFA in early
25 May 2019?

Page 111

JAMES DONDERO

1
2     A.   No.
3     Q.   Did you rely on Mr. Waterhouse to
4 oversee that?
5     A.   Yes.
6     Q.   Okay.  And you did so because he
7 held not only the CFO title at Highland, but he
8 also held the treasurer title at HCMFA,
9 correct?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12         THE WITNESS:  I relied on him
13     because generally the accounting function
14     across the organization reported up through
15     him.
16 BY MR. MORRIS:
17     Q.   Let's talk about the $5 million
18 Note.
19         Do you recall that in early
20 May 2019, in fact, the next day, May 3rd,
21 Highland transferred $5 million to HCMFA?
22     A.   I -- I don't recall specifically.
23     Q.   Do you recall authorizing the
24 transfer of $5 million from Highland to HCMFA
25 in early May 2019?

Page 112

JAMES DONDERO

1
2     A.   Yes, generally.
3     Q.   Okay.  Why did you authorize
4 Highland to transfer $5 million to HCMFA in
5 early 2019?
6     A.   It was part of the overall
7 resolution of the TerreStar situation.
8     Q.   Do you recall that HCMFA paid
9 something called a consent fee equal to
10 $5 million in early May 2019?
11     A.   Well, like I said, I don't recall
12 the exact amounts or the exact amounts net of
13 insurance; but my recollection it was to
14 resolve that.
15     Q.   Do you know -- do you know -- did --
16 let's real simple.
17         Did -- did HCMFA pay a consent fee
18 in May of 2019?
19     A.   I -- I don't recall.
20     Q.   Do you know what a consent fee is?
21     A.   Yes.
22     Q.   What's a consent fee?
23     A.   It's a -- a fee to encourage
24 shareholder vote on something or shareholder
25 restitution on something, typically.

Page 113

JAMES DONDERO

1
2     Q.   And did -- do you recall if HCMFA
3 ever paid a consent fee in the year 2019?
4     A.   I don't recall.
5     Q.   Would Highland be responsible at all
6 if HCMFA paid a consent fee?
7         MS. DEITSCH-PEREZ:  Object to the
8     form.
9         THE WITNESS:  It could be.  I
10     don't -- I don't know or remember the
11     circumstances.
12 BY MR. MORRIS:
13     Q.   Is the payment of a consent fee a
14 voluntary decision by -- by HCMFA?  Is that
15 something that --
16         MS. DEITSCH-PEREZ:  Object to the
17     form.
18         MR. MORRIS:  Is that -- withdrawn.
19     That's fair.
20 BY MR. MORRIS:
21     Q.   Is the payment of a consent fee
22 required, or is that something that one can
23 exercise discretion in whether or not to make?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 114

```
1              JAMES DONDERO
2        THE WITNESS:  My answer would be it
3   depends.
4   BY MR. MORRIS:
5        Q.   Do you recall whether Highland –
6   withdrawn.
7        Do you recall whether HCMFA was
8   required to make -- to make a -- to pay a
9   consent fee at any time in 2019?
10       A.   I don't recall.
11       Q.   Do you recall ever believing that
12  HCMFA paid a consent fee because of something
13  that -- because of a mistake that Highland
14  made?
15       A.   It could be.  I don't know.
16       Q.   I'm just asking if you had a
17  recollection?
18       A.   I don't have a recollection.
19       Q.   Okay.
20       MR. MORRIS:  To the videographer, I
21  think Mr. Dondero's screen has frozen.
22       MS. DEITSCH-PEREZ:  John, your
23  screen is frozen, too.
24       MR. MORRIS:  I'm –
25       MS. DEITSCH-PEREZ:  I'm also – hang
```

Page 115

```
1              JAMES DONDERO
2   on.  I've lost contact.  Give me a minute.
3        THE VIDEOGRAPHER:  Okay.  I'd like
4   us to go off record.  Do you agree?
5        MR. MORRIS:  Yeah, but please don't
6   leave.
7        MS. DEITSCH-PEREZ:  Yes, we agree.
8        THE VIDEOGRAPHER:  All right.  Off
9   the record at 3:53.
10       (Discussion held off the record.)
11       THE VIDEOGRAPHER:  We are back on
12  the record at 3:54.
13  BY MR. MORRIS:
14       Q.   Okay.  Can we put up – no.  Before
15  we do that, Mr. Dondero, can you hear me?
16       We can't hear you.  Are you on mute?
17       Are you on mute?  Can you speak?
18       You're yelling at me now.  Stop
19  yelling at me.
20       THE VIDEOGRAPHER:  I'm seeing is
21  that Mr. Dondero is on mute.
22       (Interruption.)
23       THE VIDEOGRAPHER:  We've got – do
24  you want to go off video record?
25       MR. MORRIS:  No.
```

Page 116

```
1              JAMES DONDERO
2        Can somebody help Mr. Dondero and
3   get his audio feed fixed?
4        Thank you, sir.
5        MS. DEITSCH-PEREZ:  Does this make a
6   difference?
7        MR. MORRIS:  It sure does.
8        THE WITNESS:  Hello, hello.
9        THE WITNESS:  Thank you.  All right.
10  Let's try and – let's try and finish this
11  up.
12  BY MR. MORRIS:
13       Q.   Are you ready, sir?
14       A.   Yes.
15       Q.   Were you aware in May 2019 that the
16  $5-million transfer from Highland to HCMFA was
17  booked as a loan?
18       A.   No.
19       MR. MORRIS:  Can we put up
20  Exhibit 56, please.
21       MS. CANTY:  (Complies with request.)
22       (Whereupon, Exhibit 56, E-mail
23  correspondence, Bates stamped D-CNL003763,
24  marked for identification, as of this
25  date.)
```

Page 117

```
1              JAMES DONDERO
2   BY MR. MORRIS:
3        Q.   All right.  Do you see that this is
4   an e-mail from Ms. Hendrix to the Corporate
5   Accounting Group on May 3, 2019?
6        Do you see that, sir?
7        A.   Yes.
8        Q.   And do you see that Ms. Hendrix told
9   corporate accounting to transfer $5 million as
10  a, quote, "new loan," close quote?
11       A.   And did you see Ms. Hendrix also
12       Q.   And did you see Ms. Hendrix also
13  said that she would, quote, "paper the loan,"
14  close quote?
15       A.   Yes.
16       Q.   Okay.  You're aware that from time
17  to time, members of the Corporate Accounting
18  Group used a template for a Promissory Note
19  that had been previously prepared by counsel,
20  correct?
21       MS. DEITSCH-PEREZ:  Object to the
22  form.
23       THE WITNESS:  I – yeah.  I'm aware
24  they have a loan template, yes.
25
```

Page 118

1        JAMES DONDERO
2    BY MR. MORRIS:
3        Q.    Okay.  Do you see there's a
4    parenthetical in the first sentence that says,
5    "(4.4M should be coming in from Jim soon)"?
6        A.    Yes.
7        Q.    Do you know what that refers to?
8        A.    My -- my educated -- boy.  My
9    educted speculation is that Highland didn't
10   have enough cash, so I probably put four into
11   Highland for Highland to send to HCMFA.  That's
12   my educated guess; but otherwise, I don't know
13   specifically.
14       Q.    And do you recall that you had taken
15   out a loan from Highland earlier in the year,
16   and this payment was credited against the
17   principal and interest then due on that Note?
18       A.    I don't have specific awareness.
19   That would make sense.
20       Q.    Okay.
21       A.    Versus -- versus creating a new loan
22   or something.
23       Q.    Okay.
24            MR. MORRIS:  Let's go to Exhibit 57,
25       please.

Page 119

1        JAMES DONDERO
2        MS. CANTY:  (Complies with request.)
3            (Whereupon, Exhibit 57, Promissory
4        Note, Bates stamped D-CNL003764 through
5        D-CNL003765, marked for identification, as
6        of this date.)
7    BY MR. MORRIS:
8        Q.    In fact, were you aware, sir, that
9    in May 2019, you paid Highland exactly
10   $7.5 million?
11       A.    Not specifically, but it makes sense
12   given the context we're discussing.
13       Q.    Okay.  So the context that we're
14   discussing was HCMFA needed $7.5 million.
15   Highland didn't have it.  So that seven -- you
16   paid $7.5 million to Highland, which was
17   applied against your outstanding note.  And
18   then Highland transferred that money to HCMFA.
19            Does that sound right to you?
20       A.    Generally, yes.
21       Q.    Okay.  So now if we look at this
22   note that's on the screen, do you see this is a
23   Promissory Note for $5 million dated May 3,
24   2019?
25       A.    Yes.

Page 120

1        JAMES DONDERO
2        Q.    And did you see this for the first
3    time when I showed it to you late last week?
4        A.    Yes.
5        Q.    And did you learn about the loan
6    from Highland to HCMFA for the first time after
7    the litigation was commenced?
8        A.    That's the first time I remember.
9        Q.    And did you learn that Highland and
10   HCMFA had booked the $5-million transfer in May
11   of 2019 as a loan for the first time after the
12   litigation was commenced?
13       A.    That is my recollection.
14       Q.    Okay.  We talked at your first
15   deposition in May about Highland's audited
16   financial statements.
17            I don't know if you have a
18   recollection of that.  Do you?
19       A.    Just generally, yes.
20       Q.    Okay.  I just want to focus on these
21   two notes.
22            For this portion of the deposition,
23   we are questioning you in your individual
24   capacity, and you're only focused on these two
25   notes from HCMFA to Highland, okay?

Page 121

1        JAMES DONDERO
2        A.    Okay.
3        Q.    Okay.  When did you first learn that
4    these notes were carried as assets on
5    Highland's balance sheet?
6        A.    Like I said, I -- my recollection is
7    that as part of the bankruptcy and part of the
8    litigation.
9        Q.    And so did you learn of it as part
10   of the bankruptcy before the litigation was
11   commenced, or did you learn that these notes
12   were carried as assets after -- only after the
13   litigation was commenced?
14       A.    I believe only after.  Especially,
15   the specificity with regard to the notes, only
16   after the litigation was commenced.
17       Q.    Okay.  When did you learn for the
18   first time that these notes were carried as
19   liabilities on HCMFA's balance sheet?
20   Withdrawn.  No foundation.
21            Are you aware that these notes have
22   been carried as liabilities on HCMFA's balance
23   sheet?
24       A.    I wasn't -- I wasn't -- I wasn't
25   aware prior to the litigation.

JAMES DONDERO

1
2　Q.　Okay.　Did you learn after the
3　litigation that these notes had been carried as
4　liabilities on HCMFA's balance sheets?
5　A.　Yes.
6　Q.　Okay.　Did you ever review
7　Highland's audited financial statements?
8　A.　Not with any specificity.
9　Q.　Are you aware that Highland gave
10　these Promissory Notes to PWC as part of the
11　audit process?
12　A.　I would assume they did, but I don't
13　have specific awareness.
14　Q.　Okay.　And why do you assume that
15　they did?
16　A.　As part of complete financials to
17　the extent that they were made by Kristin or
18　whoever, properly or improperly.　Once they
19　existed, they would have been part of a
20　complete audit.
21　Q.　Are you aware that these two
22　Promissory Notes were disclosed in Highland's
23　audited financial statements for the period
24　ending December 31, 2018, as subsequent events?
25　A.　No.

JAMES DONDERO

1
2　Q.　Okay.
3　　MR. MORRIS:　Can we put up
4　Exhibit 34, please.
5　　MS. CANTY:　(Complies with request.)
6　　(Whereupon, Exhibit 34, Highland
7　Capital Management, L.P., Consolidated
8　Financial Statements and Supplemental
9　Information, dated December 31, 2018, Bates
10　stamped D-CNL000212 through D-CNL000257,
11　marked for identification, as of this
12　date.)
13　BY MR. MORRIS:
14　Q.　And turn to – just if you can see,
15　sir, the first page of this is the December 31,
16　2018, financials.
17　　MR. MORRIS:　And if we could go to
18　the second or third page to see
19　PricewaterhouseCoopers' signature.
20　　MS. CANTY:　(Complies with request.)
21　BY MR. MORRIS:
22　Q.　And do you see that
23　PricewaterhouseCoopers signed off on the audit
24　on June 3, 2019?
25　A.　Yes.

JAMES DONDERO

1
2　Q.　Okay.
3　　MR. MORRIS:　Can we go to page 252
4　of the document?　It's got to be – let's
5　see the Bates.
6　　MS. CANTY:　(Complies with request.)
7　　MR. MORRIS:　Yeah.　Right there.
8　Okay.　Scroll just to the page before so we
9　can see the heading.
10　　MS. CANTY:　(Complies with request.)
11　BY MR. MORRIS:
12　Q.　Okay.　Do you see that this is the
13　section of the audited financials entitled
14　"Subsequent Events"?
15　A.　Yes.
16　Q.　And is it your understanding that
17　the auditors include in subsequent events
18　material transactions THAT occur between the
19　end of the fiscal period in which had audit has
20　been conducted and the date that the auditors
21　sign off?
22　A.　Yes.
23　Q.　Okay.　So if you look at page 39,
24　the next to the last paragraph, do you see, it
25　says, quote, "Over the course of 2019 through

JAMES DONDERO

1
2　the report date, HCMFA issued Promissory Notes
3　to the partnership in the aggregate amount of
4　$7.4 million?
5　A.　Yes.
6　Q.　Okay.　And are you surprised to see
7　that in the audit report?
8　　MS. DEITSCH-PEREZ:　Object to the
9　form.
10　　MR. MORRIS:　Withdrawn.
11　BY MR. MORRIS:
12　Q.　Have you seen – have you seen this
13　entry in the audit report before this moment?
14　A.　No.
15　Q.　Okay.　Are you aware that Highland
16　employees were responsible for drafting the
17　audit report?
18　A.　Responsible for drafting the audit
19　report?　I don't know if that's a fair
20　statement.
21　　I think they provide the detail; but
22　my understanding, the audit report is a work
23　product of the accounting firm.　That's my
24　understanding.
25　Q.　Was there a group within Highland

Page 126

JAMES DONDERO

2 that was responsible for working with the
3 auditors in the preparation of the audit
4 reports?
5     A.    Yeah, yes.
6     Q.    Do you know what group that was?
7     A.    I believe there's a financial
8 reporting group that reports to Frank that
9 handles this interaction.
10     Q.    Are you familiar -- are you aware of
11 what role Mr. Waterhouse plays, if any, in
12 connection with Highland's annual audit, at
13 least during the time that you were serving as
14 president?
15     A.    I think he -- he coordinates -- I
16 think he has to sign off on many aspects of it,
17 you know, as a C suite executive. So he's
18 responsible for, you know, completeness,
19 integrity, et cetera.
20         And there's a certain amount of
21 reliance that PWC puts on it; but my
22 understanding is audits for the last bunch of
23 years has been pretty much a hundred percent
24 sampling and verification.
25     Q.    High- --

Page 127

JAMES DONDERO

2     A.    -- PWC.
3     Q.    I apologize, sir.
4         Highland was the sole source of
5 information that's contained in its audit
6 reports, right, to the best of your knowledge?
7     A.    No.  No.  When I -- the last thing I
8 said a minute ago about I believe it was a
9 hundred percent sampling and verification, I
10 think the audit firm ties back to vendors,
11 credit agreements, source documents, et cetera.
12         Highland is not the only source of
13 this information.
14     Q.    You were also responsible for the
15 audit report; is that fair?
16     A.    Yes.
17     Q.    And that's because you signed a
18 management representation letter, correct?
19     A.    Yes.
20     Q.    And do you have an understanding of
21 what management a representation letter is?
22         MS. DEITSCH-PEREZ:  Object to the
23         form.  I think you've asked this in each
24         day of the deposition.
25         MR. MORRIS:  Okay.  Just trying to

Page 128

JAMES DONDERO

2     get some background here.
3         THE WITNESS:  Yes, I have a general
4         understanding.  They very from accounting
5         firm to accounting firm, and they very
6         depending upon the type of audit.  But I
7         have a general understanding of them, yes.
8 BY MR. MORRIS:
9     Q.    Okay.  And you're -- are you aware
10 that HCMFA had its financial statements audited
11 by PWC as well?
12     A.    Yes.
13     Q.    Are you aware that HCMFA disclosed
14 the May 2019 Notes in its own audited financial
15 statements?
16     A.    I assume so.
17     Q.    Have you ever --
18     A.    I don't have specific -- I don't
19 have specific awareness, but it's not reported
20 here but not on HCMFA; so I assume they are,
21 yes.
22     Q.    Okay.  And do you sign Management
23 Representation Letters for HCMFA's audit as you
24 do for Highland?
25     A.    I believe so.

Page 129

JAMES DONDERO

2     Q.    Have you ever told anyone that
3 HCMFA's audited financial statements for the
4 period ending December 31, 2018, inaccurately
5 described the $7.4 million transferred from
6 Highland to HCMFA as loans?
7         MS. DEITSCH-PEREZ:  Object to the
8         form.
9         THE WITNESS:  No, I have not; but I
10         haven't been involved in any of the audit
11         functions for quite some time.
12         I don't think I was involved or
13         signed Management Representation Letters
14         for any period covered by this.
15 BY MR. MORRIS:
16     Q.    Okay.  Let's switch gears.
17         The advisors have annual contracts
18 to manage certain retail funds, correct?
19     A.    Yes.
20     Q.    And the retail funds have a board
21 that decides whether to renew the contracts
22 with the advisors, correct?
23     A.    Yes.
24     Q.    And in connection with the annual
25 renewal, the advisors provide information to

1          JAMES DONDERO
2   the retail board, correct?
3       A.   Yes.
4       Q.   And you've participated in meetings
5   with the retail board concerning the renewal
6   process, correct?
7       A.   Sometimes.
8       Q.   Okay.  Do you recall that in late
9   2020, the advisors provided a written memo to
10  the retail board in connection with the annual
11  15-C review process?
12      A.   No.
13      Q.   Okay.
14          MR. MORRIS:  Can we put up
15  Exhibit 59, please.
16          MS. CANTY:  (Complies with request.)
17          (Whereupon, Exhibit 59, Memorandum,
18      dated October 23, 2020, Bates stamped
19      HCMFAS 000025 through HCMFAS 000031, marked
20      for identification, as of this date.)
21  BY MR. MORRIS:
22      Q.   Do you see that this is a memo dated
23  October 23, 2020?
24      A.   Yes.
25      Q.   Is it fair to describe this memo as

1          JAMES DONDERO
2   a memo from the advisors to the retail boards
3   concerning a supplemental 15-C information
4   request?
5       A.   Yes.
6       Q.   Okay.  As always, Mr. Dondero, you
7   can view any portion of this document.  But if
8   we could just scroll down a little bit, I just
9   want to know --
10          MS. DEITSCH-PEREZ:  Do we have a
11      copy of this document?  Is it in your book?
12          MR. MORRIS:  No.
13          MS. DEITSCH-PEREZ:  Okay.  Well,
14      then he can't actually look at it.  He's
15      looking at what's on the screen.
16          MR. MORRIS:  Please.
17  BY MR. MORRIS:
18      Q.   Mr. Dondero, do you understand what
19  I meant?
20          Will you let me know if there's any
21  portion of the document you want to see?
22      A.   Sure.  Can you -- can you just keep
23  scrolling and let me see the next page?
24      Q.   Thank you, sir.
25          MS. CANTY:  (Complies with request.)

1          JAMES DONDERO
2          THE WITNESS:  Just stop there for a
3      second.
4          MS. CANTY:  (Complies with request.)
5          THE WITNESS:  Okay.  Keep going.
6          MS. CANTY:  (Complies with request.)
7   BY MR. MORRIS:
8       Q.   Just -- I'm going to ask you
9   questions about Section 2 just so you know, but
10  you're welcome to view any portion of this
11  document as you believe necessary.
12          MS. CANTY:  I also put it in the
13      chat, John.
14          MR. MORRIS:  Thank you.
15          THE WITNESS:  I see it.
16  BY MR. MORRIS:
17      Q.   Okay.  So --
18      A.   Can you go -- let's keep going.
19  Just I'll quickly read the whole thing.
20      Q.   No problem.
21      A.   That's it.  Okay.  Got it.  All
22  right.
23      Q.   Okay.  So now that you've seen the
24  substance of the memo, do you recall if you saw
25  it before today?

1          JAMES DONDERO
2       A.   I've never seen it before today.
3       Q.   Okay.  So do you know who's
4   responsible for preparing a memo of this type
5   on behalf of the advisors?
6       A.   Let's go back to the front and see
7   who it's from.
8       Q.   Sure.
9          MS. CANTY:  (Complies with request.)
10  BY MR. MORRIS:
11      Q.   Is that --
12      A.   Yeah.  Now, I -- given what it is,
13  it's something that, I'm sure, comes out of
14  legal and compliance.
15      Q.   And does -- do the advisors have --
16  withdrawn.
17          Did the advisors have their own
18  legal and compliance officers as of October 23,
19  2020?
20      A.   No.
21      Q.   Did they have any -- did anybody
22  serve as the advisors' general counsel as of
23  October 23, 2020?
24      A.   My belief and recollection is the
25  Shared Services Agreements provided the legal

Page 134

JAMES DONDERO

2 and accounting support for all the funds listed
3 in the "to" section here.
4       As I said earlier, NexPoint has a
5 couple accountants -- I mean -- I'm sorry -- a
6 couple lawyers who do real estate transactions
7 stuff. Their -- their title -- their title
8 meaning DC's counsel, DC Sauter, who's the most
9 senior attorney there, it might be general
10 counsel; but he only does real estate
11 transactions.
12      The legal dependents of NexPoint and
13 HCMFA was on the Shared Services Agreement and
14 the Highland attorneys that performed those
15 Shared Services Agreements.
16   Q.   Okay. Did anybody acting on behalf
17 of the advisors review and approve this memo
18 before it was sent to the retail funds?
19   A.   I don't know.
20   Q.   Is it your practice as the president
21 of the advisors to have memos sent to the
22 retail board without anybody reviewing and
23 approving the memos on behalf of the advisors?
24      MS. DEITSCH-PEREZ: Object to the
25   form.

Page 135

JAMES DONDERO

2      THE WITNESS: I'm not aware of what
3 standard practice was or wasn't; but again,
4 the infrastructure for something like this
5 would have been only at Highland.
6      HCMFA only had portfolio managers
7 and analysts as employees, and NexPoint
8 pretty much only had portfolio managers and
9 analysts as employees.
10     The staff functions were at
11 Highland, and Highland serviced the funds
12 via a Shared Services Agreement that was
13 still in place as of the date of this memo.
14     MR. MORRIS: Okay. Can we go down
15 to Section 2, please.
16     MS. CANTY: (Complies with request.)
17 BY MR. MORRIS:
18   Q.   Looking at Section 2, do you see
19 that there's a question as to whether there are
20 any material amounts currently payable or due
21 in the future EG notes to --
22   A.   Yes.
23   Q.   -- the Highland by HCMFA or
24 NexPoint?
25   A.   Yes.

Page 136

JAMES DONDERO

2   Q.   Okay. In the 53 or 54 weeks since
3 this memo as was sent, do you know if it has
4 been amended or modified in any way?
5   A.   I believe there was similar memos
6 like this for this year's annual -- for the
7 2021 renewal, but I do not have -- I've not
8 seen those either; and I don't know how this
9 answer would have changed.
10   Q.   Okay. But at least as of
11 October 23, 2020, this is the response that the
12 advisors gave to the retail board in response
13 to Question Number 2, right?
14     MS. DEITSCH-PEREZ: Object to the
15   form.
16     THE WITNESS: As far -- as far as I
17   know, having seen it here for the first
18   time and not knowing whether this was the
19   final or if there were subsequent letters
20   and not knowing what the 2021 letter looks
21   like, on its surface that appears so; but I
22   have no awareness.
23 BY MR. MORRIS:
24   Q.   Okay. And just I'll represent to
25 you, Mr. Dondero, that I obtained this letter

Page 137

JAMES DONDERO

2 from counsel to the advisors in response to my
3 specific request for the October 2020, 15-C
4 response. So that's how -- that's how I got it
5 just so you know.
6   A.   Okay.
7   Q.   So -- so were you aware in October
8 of 2020 that NexPoint informed the retail board
9 that as of June 30, 2020, it owed Highland and
10 its affiliates approximately $23.7 million?
11     MS. DEITSCH-PEREZ: Object to the
12   form.
13     THE WITNESS: I was not aware.
14 BY MR. MORRIS:
15   Q.   Does that amount comport with your
16 recollection as to what was outstanding on the
17 May 31, 2017, note that NexPoint gave to
18 Highland?
19   A.   I don't have awareness.
20   Q.   Okay. Did NexPoint -- do you know
21 if NexPoint ever informed the retail board that
22 any -- any portion of that $23.7 million was
23 subject to any of the agreements that you
24 entered into with the Dugaboy trustee?
25   A.   I -- I don't know.

JAMES DONDERO

2  Q.  Did you ever instruct anybody on
3  behalf of NexPoint to advise the retail board
4  of the existence of the agreements?
5  A.  No, I do not believe so.
6  Q.  Do you know if anybody acting on
7  behalf of NexPoint has ever informed the retail
8  board that NexPoint's outstanding obligation
9  was subject to the agreements that you entered
10  into with the Dugaboy trustee?
11  A.  No.
12  Q.  Did you ever inform the retail
13  boards that any portion of this $23 million was
14  subject to offset?
15  A.  You know what, I -- let me answer
16  that and let me also adjust the last five no
17  answers I just rattled off.
18  I'm thinking in the context of the
19  time period of the date of this letter, which
20  is October of 2020.
21  Again, there would have been similar
22  letters and disclosures like this and
23  additional questions, initial requests for
24  renewal, and then subsequent questions,
25  probably multiple subsequent questions, given

JAMES DONDERO

2  everything that's going on with the Highland
3  bankruptcy in 2021.
4  And I'm not aware of what those
5  letters contain.  I haven't seen those letters
6  either, but those letters may include quite a
7  bit of disclosure regarding the questions that
8  you're asking me; but I don't know.  But I
9  didn't specifically instruct anybody to tell
10  the board.  I also didn't instruct anybody
11  specifically to not tell the board.
12  So I don't know what was told to the
13  board for the period after October 2020.
14  Q.  Okay.  I appreciate that, and I can
15  only ask you what you know, right?
16  And so what may or may not be in any
17  other report is kind of irrelevant here because
18  you haven't seen those reports, right?
19  A.  Correct.
20  Q.  Okay.  And so you have no basis of
21  knowing one way or the other whether any report
22  delivered to the retail board after October
23  2020 -- 2020 contains anything about the
24  agreements that you entered into with the
25  Dugaboy trustee, correct?

JAMES DONDERO

2  A.  Right.  I just want to be clear that
3  my answer's saying I did not specifically
4  instruct somebody to tell them.  It doesn't
5  mean they don't know or someone else didn't
6  tell them.
7  Q.  Okay.
8  A.  So that's -- that's a clarification
9  I want to make.
10  Q.  Okay.  No problem.
11  And then -- and then do you see that
12  there's a report to the retail board that HCMFA
13  had approximately $12.3 million outstanding to
14  Highland as of June 30, 2020?
15  A.  Yes.
16  Q.  Okay.  So just the same type of
17  questions.
18  Do you have any knowledge as to how
19  that number was calculated?
20  A.  No.
21  Q.  Do you know if it includes the
22  $7.4 million, which is the aggregate principal
23  amount of the two notes that HCMFA issued to
24  Highland in May of 2019?
25  A.  I don't specifically, but given

JAMES DONDERO

2  everything we have gone over in the last -- I
3  don't know.  Probably.
4  Q.  Okay.  Do you know whether anybody
5  has informed the retail board on behalf of
6  HCMFA that that $12.3 million was overstated by
7  $7.4 million?
8  A.  I -- I don't know.
9  Q.  Okay.  Do you know whether -- do you
10  know whether anybody acting behalf of HCMFA
11  ever told the retail boards that the
12  $12.3 million was subject to offset of any
13  kind?
14  A.  I don't know, but I can't imagine
15  the October 21 letter didn't address some of
16  those issues because those issues I'm not sure
17  were known at this point in time.
18  Q.  Okay.  If -- and we can look at
19  paragraph 1 if it helps.
20  But my question is whether you're
21  aware of anybody on behalf of HCMFA ever
22  informing the retail board in 2020 that HCMFA
23  had claims against Highland?
24  MS. DEITSCH-PEREZ:  Object to the
25  form.

1          JAMES DONDERO
2          THE WITNESS: I don't know.
3     BY MR. MORRIS:
4          Q.   Do you know whether anybody acting
5     on behalf of either the advisors informed the
6     retail board at any time in the year 2020 that
7     either advisor had claims against Highland?
8          MS. DEITSCH-PEREZ: Object to the
9     form.
10         THE WITNESS: I don't know.
11         MR. MORRIS: Okay. We can take that
12    down, please.
13         MS. CANTY: (Complies with request.)
14    BY MR. MORRIS:
15         Q.   Are you aware that the Court
16    confirmed the Debtor's Fifth Amended Complaint
17    of Reorganization in February of 2021?
18         A.   Generally.
19         Q.   And do you recall that objections to
20    the confirmation of the plan were filed by you
21    and each of the advisors, among others?
22         A.   Yes.
23         Q.   And do you recall that these
24    actions, these lawsuits to collect on the
25    notes, they were commenced before the

1          JAMES DONDERO
2     confirmation hearing, right?
3          A.   I -- I don't -- I don't know.
4          Q.   All right. I'll represent to you
5     that the lawsuits were commenced on or about
6     January 22, and the confirmation hearing took
7     place, I think, on February 2 and February 3,
8     2021.
9          Does that refresh your recollection
10    at all that the lawsuits were known to you at
11    the time of confirmation?
12         MS. DEITSCH-PEREZ: Object to the
13    form.
14         THE WITNESS: Not specifically. I
15    mean, given the details you just explained,
16    I guess generally.
17    BY MR. MORRIS:
18         Q.   Okay. I'd like to refer to you
19    NexPoint and HCMFA and HCRE and Services
20    collectively as the defendants for the next set
21    of questions, okay?
22         A.   Okay.
23         Q.   And these questions are in your
24    capacity as an individual and in your 30(b)(6)
25    capacity, okay?

1          JAMES DONDERO
2          Is that okay, sir?
3          A.   I'll do the best I can. If I -- if
4     I need clarity or caveats, I'll throw them out
5     there.
6          Q.   Okay. Now, I do understand you're
7     not a 30(b)(6) witness for HCMFA today. So
8     let's make that clear.
9          MS. DEITSCH-PEREZ: Thank you.
10    BY MR. MORRIS:
11         Q.   As to HCMFA, you're just here in
12    your individual capacity as the control person,
13    okay?
14         Prior to confirmation, do you know
15    whether anyone acting on behalf of any of the
16    defendants ever disclosed to the bankruptcy
17    court the terms or the existence of your
18    agreement -- agreements with the Dugaboy
19    trustee?
20         A.   I guess generally, I've testified to
21    this already. There were numerous
22    conversations with Seery, and I know Lynn had
23    conversations.
24         Q.   Sir, I apologize, but I'm going to
25    interrupt because I know you're tired; and I

1          JAMES DONDERO
2     want to get this done. But my question had to
3     do with the disclosure to the bankruptcy court,
4     okay? Let me just try again.
5          Are you aware, sir, whether any of
6     the defendants disclosed to the bankruptcy
7     court prior to confirmation the existence of
8     the agreements that you entered into with the
9     Dugaboy trustee?
10         MS. DEITSCH-PEREZ: Object to the
11    form and to interrupting the witness.
12         THE WITNESS: I'll say yes.
13    BY MR. MORRIS:
14         Q.   Okay. Did you do that?
15         A.   Yes.
16         Q.   And did you do that as part of your
17    testimony in the hearing, or did you do it
18    through the filing of a pleading?
19         MS. DEITSCH-PEREZ: Object to the
20    form.
21         THE WITNESS: I don't -- I don't
22    know about pleadings or filings. I -- I
23    don't know.
24    BY MR. MORRIS:
25         Q.   Do you recall what you told the

Page 146

JAMES DONDERO

1
2 bankruptcy court about the agreements that you
3 entered into with the Dugaboy trustee?
4    A.   No.  I'm not – yes.  No.  I'm
5 not – no, I don't.  I don't want to – I don't
6 want to start talking and have you strike it or
7 object.  So I'll just answer specifically until
8 you get to the question.
9    Q.   Yeah.  So – so again, I'm not
10 trying to trick you.
11       Can you recall when you told the
12 bankruptcy court that you had entered into will
13 the agreements with the Dugaboy trustee?
14    A.   No.
15    Q.   Can you remember the subject matter
16 of any hearing at which you informed the
17 bankruptcy court about the existence of the
18 agreements that you entered into with the
19 Dugaboy trustee?
20    A.   I don't know where or how this works
21 legally.  But every written proposal we put
22 forward as a solution and as a plot plan,
23 always had a zero on all the affiliated notes
24 as being a zero in something that was
25 ultimately likely to be compensation.

Page 147

JAMES DONDERO

1
2       All of those settlement proposals,
3 some were done formally through Seery; some
4 were done indirectly; some of it were – some
5 of them were done to the independent board;
6 some of them were done directly to Clemente.
7 But all of those documented the expectation
8 that the notes were compensation.
9    Q.   Do you believe that any of the
10 documents that you just described were ever
11 presented to the bankruptcy court?
12    A.   Yes.
13    Q.   Okay.  When and in what context were
14 those documents delivered to the bankruptcy
15 court?
16    A.   I believed that the independent
17 board and Seery were representatives of the
18 bankruptcy court in that regard.
19       So I think within a month, two
20 months of the filing, there were proposals made
21 to creditors directly and the independent
22 board; and then subsequently, once Seery became
23 president, to him.
24       And then when Seery proved
25 ineffective regarding settlements, there were

Page 148

JAMES DONDERO

1
2 reach outs – reaches out to creditors directly
3 again and – to Clemente and the committee; but
4 I think the committee already sold all their
5 stuff by that point.
6       I mean, I – listen, I – but I
7 consider those reach-outs and characterizations
8 of the notes as not part of settlement under
9 the estate and that is likely to be
10 compensation notifying the Court generally.
11    Q.   Okay.  Are you aware of any notice
12 that was ever given to Judge Jernigan about the
13 existence of any of the agreements that you
14 entered into with the Dugaboy trustee?
15    A.   I - I don't know.
16    Q.   Okay.  You're not aware of any as
17 you sit here right now; is that fair?
18    A.   Yes.  I'm not aware if any of my
19 reach-outs to the people that I described ever
20 made it to Jernigan.  I don't know.
21    Q.   Okay.
22    A.   I know she asked for updates on the
23 plot plan.  I know she asked for whatever, but
24 I don't know what specificity any of the people
25 I described presented to her.  So I don't

Page 149

JAMES DONDERO

1
2 know.
3    Q.   And I appreciate what you've said
4 about the proposals that you've made.  But my
5 next question's very specific.
6       Prior to the commencement of
7 litigation, did you or anybody acting on your
8 behalf ever tell Jim Seery or Matt Clemente of
9 your agreements with the Dugaboy trustee?
10    A.   I – I don't know specifically.
11    Q.   Thank you very much.
12       THE COURT REPORTER:  I'm sorry.
13 When you get to a good point, could we just
14 take a quick break?
15       MR. MORRIS:  Yeah.  Why don't we do
16 that, and I hope to try to wrap up.  So
17 it's 5:37.  I mean, I'm going to need
18 probably, you know, another half hour or an
19 hour; but I want to try to finish.  It's
20 5:38.
21       I'm fine with if we just come back
22 at 4:45 Central Time, seven minutes.
23       THE VIDEOGRAPHER:  All right.  We're
24 off record at 4:38.
25       (Whereupon, a break was taken.)

Appx. 01849

1           JAMES DONDERO
2       THE VIDEOGRAPHER: This is the
3   beginning of Media Number 3 in the
4   deposition of James Dondero. We are back
5   on the record. The time is 4:45.
6   BY MR. MORRIS:
7       Q.   Just to finish up on the topic we
8   were on when we took the break, Mr. Dondero.
9       Prior to confirmation, do you know
10  which of the defendants ever informed the
11  bankruptcy court that any of the Promissory
12  Notes that are the subject of the lawsuits were
13  unenforceable for any reason?
14      And when I use the phrase
15  "bankruptcy court" here -- you know what, let
16  me ask a different question.
17      Prior to confirmation, do you know
18  if anybody acting on behalf of the defendants
19  ever disclosed to Judge Jernigan that any of
20  the Promissory Notes subject to the lawsuits
21  were unenforceable for any reason?
22      MS. DEITSCH-PEREZ: Object to the
23  form.
24      THE WITNESS: I don't know.
25

1           JAMES DONDERO
2   BY MR. MORRIS:
3       Q.   Prior to confirmation, did you
4   direct anybody to inform Judge Jernigan that
5   any of the Promissory Notes were unenforceable
6   for any reason?
7       A.   I don't know.
8       Q.   Okay. I want to direct your
9   attention to December 2020.
10      Do you recall if you had a
11  conversation with Frank Waterhouse concerning
12  payments that were due to Highland by any of
13  the companies that you directly or indirectly
14  own or control?
15      A.   I'm trying to think. Generally, we
16  overpaid on shared services, so -- by a
17  significant amount, I believe 14, 15 million
18  bucks. And then there was a supposed to be an
19  overall transition settlement true-up regarding
20  the employees, the office space, you know,
21  whatever.
22      So the -- yeah, that's -- that's the
23  -- that's my general recollection.
24      Q.   But did you give Mr. Waterhouse any
25  instructions as to whether to pay or not pay

1           JAMES DONDERO
2   any amounts that were due and owing to Highland
3   under any agreement between Highland and any
4   affiliate?
5       MS. DEITSCH-PEREZ: Object to the
6   form.
7       Are you asking about the Notes or
8   the Shared Services Agreements?
9       MR. MORRIS: I'm asking about -- I'm
10  asking very broadly any payments.
11      THE WITNESS: I do remember having
12  conversations not to pay any more shared
13  services.
14      And I hope there weren't anymore
15  payments on shared services. There --
16  There was never a specific to not pay the
17  notes.
18  BY MR. MORRIS:
19      Q.   So your recollection is that you
20  instructed Mr. Waterhouse not to make any
21  further payments under the shared services, and
22  that's the instruction you gave?
23      A.   Yes.
24      Q.   Did you ever tell anybody in
25  December of 2020 about your conversation with

1           JAMES DONDERO
2   Mr. Waterhouse?
3       A.   Not that I recall.
4       Q.   Do you recall telling anybody other
5   than Mr. Waterhouse in December 2020 that no
6   payment should be made to Highland under the
7   Shared Services Agreement?
8       A.   I do believe there was a team -- I
9   can't remember -- I know Dustin Norris is on
10  that team. He was aware. He was aware. And
11  as a matter of fact, I think -- yeah. He -- I
12  know he was aware for sure.
13      Q.   Anybody else?
14      A.   There were other people on that
15  team, but I can't remember who was on that team
16  or who was in the room at any time.
17      Q.   Is there anything in writing that
18  you recall that reflects the instruction that
19  you gave to Mr. Waterhouse in December 2020
20  that we're talking about?
21      A.   I believe the back-and-forth and the
22  true-up with Seery on the multiple of things
23  that I was just discussing, you know, right to
24  transition of people, it included no more
25  shared services being paid and a credit for

JAMES DONDERO

1  JAMES DONDERO
2  overpayment on shared services. And those –
3  those spreadsheets went back and forth, and
4  Seery has copies of them also.
5     Q.   Are you aware of any payments being
6  made by the advisors to Highland after
7  November 30, 2020?
8     A.   Hopefully not on shared services. I
9  believe there were payments on principal and
10 interest on notes.
11    Q.   Were any of those payments that you
12 have in mind made before the end of calendar
13 year 2020 -- withdrawn.
14         Were any of those payments that you
15 have in mind made in December 2020?
16    A.   I don't know. I don't know which
17 ones were paid and kept current. I don't know
18 which ones were cured. I don't -- I don't
19 remember which ones were cured.
20    Q.   Are you aware of any note that was
21 tendered by one of Highland's affiliates on
22 which payment was made in December 2020?
23    A.   I don't know. I don't know when --
24 I don't know which ones were kept current. I
25 don't know which ones were cured in December.

1  JAMES DONDERO
2  I don't know which ones were cured in January
3  or February. I don't know.
4     Q.   Is it your testimony that you
5  believe that one or more of Highland affiliates
6  made a payment in December 2020 to cure -- as a
7  cure payment?
8     MS. DEITSCH-PEREZ: Object to the
9  form.
10 BY MR. MORRIS:
11    Q.   I just -- I'm sorry. I --
12    A.   I -- I -- okay.
13    Q.   Yeah. I just want to try to get
14 this as cleanly as I can. Did you --
15    A.   I believe --
16    Q.   Go ahead, sir.
17    A.   No. I'll let you go. It's better
18 if you ask me.
19    Q.   Okay. Did you direct anybody to
20 make any payment in December 2020 to Highland
21 on behalf of any affiliate that you owned or
22 controlled?
23    A.   I believe all notes are outstanding
24 and current and in good standing. I don't know
25 when they were cured.

1  JAMES DONDERO
2     Q.   Are you just talking about the term
3  notes here or the demand notes as well?
4     A.   All of the above. All of the notes
5  as far as I know.
6     Q.   Are you aware that in December 2020,
7  Highland made a demand for payment under all of
8  the demand notes?
9     A.   And I believe they're all current as
10 far as interest and principal amortization. I
11 believe they've all been cured.
12    Q.   Okay. Can you identify any payment
13 that was made in December 2020 to Highland on
14 behalf of yourself or any entity that you
15 directly or indirectly own or control?
16    A.   I wouldn't have been involved in --
17 I wouldn't have been involved in normal course
18 payments. I know there were -- I know for sure
19 there were cure payments in January. I don't
20 know if there were in December.
21    Q.   Okay. And that's -- we'll get to
22 January. I'm just trying to finish up
23 December.
24         Are you aware of any payments made
25 in December 2020 --

1  JAMES DONDERO
2     MS. DEITSCH-PEREZ: Object to the
3  form.
4  BY MR. MORRIS:
5     Q.   -- by you -- by you or any entity
6  directly or indirectly owned or control by you
7  to Highland?
8     A.   I don't have awareness.
9     Q.   Do you recall that early in 2021,
10 Highland gave notice of default on the three
11 term notes?
12    A.   I'm aware in -- that January -- yes,
13 I guess I am aware that Highland declared them
14 in default in January, yes.
15    Q.   And you're aware that in addition to
16 declaring them in default, they gave notice of
17 acceleration?
18    A.   I'm not aware of acceleration. I'm
19 aware of, I guess, default I had heard.
20    Q.   Did you ever see the
21 notice-of-default letters that Highland sent to
22 NexPoint HCRE and services?
23    A.   I don't believe I've seen all of
24 them. I think I've seen one on demand notes.
25 I don't think I've -- I don't remember seeing

           JAMES DONDERO
1
2  any on term loans.
3      Q.   All right. So as you sit here right
4  now, you don't have a recollection of having
5  seen the default notices that were sent by
6  Highland in January 2021 with respect to the
7  term notes, right?
8      MS. DEITSCH-PEREZ: Why don't you
9  show him one.
10     THE WITNESS: I don't recall. Yeah.
11 I mean, I don't -- I don't recall seeing
12 any of them.
13 BY MR. MORRIS:
14     Q.   Okay. How did you learn that
15 Highland had sent the default notices?
16     A.   I believe it was at a hearing I
17 attended in person from which I called Frank,
18 and I was surprised and annoyed that the
19 relative de minimis amounts hadn't been paid;
20 and I asked him what does it take to cure them
21 or make them current.
22         And then he told me the numbers, and
23 they were small and de minimis; and I told him
24 make sure they get paid and make sure the notes
25 are cured.

           JAMES DONDERO
1
2      Q.   Did you do anything or say anything
3  else with respect to your -- your learning
4  about the declaration of default?
5      A.   No. It -- no. I don't remember
6  anything else.
7      Q.   Did you ask your -- do you know
8  whether anyone acting on behalf of ever reached
9  out to Highland with respect to the payments
10 that were made in January of 2021 as cure
11 payments as you described them?
12     A.   Frank was Highland.
13     Q.   I'm asking --
14     A.   Frank -- Frank -- Frank was the
15 person I reached out to at Highland. Who else
16 would I reach out to at Highland?
17     Q.   Did you -- did you reach out to
18 anybody else?
19     A.   No. Just Frank.
20     Q.   Okay. Did anybody acting on your
21 behalf reach out to anybody else?
22     A.   Not that I know of or not that I
23 thought was necessary.
24     Q.   In January of 2021, did it occur to
25 you to either communicate with or through your

           JAMES DONDERO
1
2  lawyer, with Mr. Seery, about this?
3      MS. DEITSCH-PEREZ: Object to the
4  form.
5      THE WITNESS: No. I thought Frank
6  was fully empowered.
7  BY MR. MORRIS:
8      Q.   Okay. Did you ever confirm your
9  understanding about the cure with
10 Mr. Waterhouse in writing?
11     A.   In writing? No. I believe it was
12 all in that phone conversation from the Court.
13 I don't -- I don't recall anything in writing,
14 but I'll check.
15     Q.   Do you recall sending him an e-mail
16 in which you confirmed with Mr. Waterhouse your
17 understanding that the debtor had agreed that
18 the payments that were being paid would
19 constitute a cure?
20     A.   No, I didn't -- no. At the time I
21 didn't think it was necessary. It was -- the
22 cure amount was calculated by Frank. It was
23 paid immediately. It was accepted. I never --
24 I never thought to memorialize it beyond that.
25     Q.   Okay. Did you -- did you ever ask

           JAMES DONDERO
1
2  your attorneys to confirm with Pachulski Stang
3  Ziehl & Jones or anybody acting on behalf of
4  the debtor that the payments that were made
5  would be deemed to be cure payments?
6      MS. DEITSCH-PEREZ: I'm going to not
7  to disclose communications with counsel.
8  BY MR. MORRIS:
9      Q.   Okay. Do you know whether your
10 lawyers or anybody acting on your behalf ever
11 sought to confirm your understanding that the
12 payments would be deemed to have cured the
13 default under the three term notes?
14     A.   Not that I'm aware of.
15     Q.   Okay. Is there any written record
16 of your call with Mr. Waterhouse?
17     A.   If it was from my cell phone, I'm
18 sure there's a written record taking place of
19 the call taking place.
20     Q.   Right. But did you take any notes,
21 or is there anything in writing that
22 memorialized or reflected your conversation
23 with Mr. Waterhouse in January of 2021 about
24 the cure?
25     A.   Not that I'm aware of and not that I

JAMES DONDERO

2 thought was necessary.

3 Q. Okay. Did – did you ever tell

4 Judge Jernigan that you had made cure payments?

5 A. I didn't know I'm allowed to have

6 ex parte conversations with her, but there's a

7 lot of things I'd like to tell her about this

8 case; but no I did not.

9 Q. All right. I'm not talking about

10 ex parte conversations, sir. Let's take

11 confirmation, for example.

12 Did you or anybody acting on any of

13 the defendants' behalf ever inform

14 Judge Jernigan that Frank Waterhouse had told

15 you that the payments in January 2021 would be

16 deemed to be cure payments?

17 A. Not that I'm aware of.

18 Q. Thank you.

19 MR. MORRIS: Give me one more

20 moment. In fact, I'm going to ask for just

21 three minutes. I'm going to check and see

22 how much more I have here. It won't be

23 long if I have anything. So let's go off

24 the record.

25 THE VIDEOGRAPHER: Would you like to

JAMES DONDERO

2 go off the record?

3 All right. We're off record at

4 5:03.

5 (Whereupon, a break was taken.)

6 THE VIDEOGRAPHER: We are back on

7 the record. The time is 5:06.

8 MR. MORRIS: Okay. Asia, can you

9 please put on the screen Exhibit 24, which

10 are Mr. Dondero's written responses to

11 discovery?

12 MS. CANTY: (Complies with request.)

13 (Whereupon, Exhibit 24, Defendant

14 James Dondero's Objections and Responses to

15 Plaintiff's Requests for Admission,

16 Interrogatories, and Requests for

17 Production, marked for identification, as

18 of this date.)

19 BY MR. MORRIS:

20 Q. And Mr. Dondero, I don't know if you

21 have that binder in front of you, but this is

22 one of the documents that will be in there,

23 Number 24.

24 A. Number 24?

25 Q. Yes, sir.

JAMES DONDERO

2 MS. DEITSCH-PEREZ: Do you got it?

3 THE WITNESS: Yes.

4 BY MR. MORRIS:

5 Q. Have you seen this document before,

6 sir?

7 A. No.

8 Q. Let's go to page 15 and see if that

9 refreshes your recollection.

10 Is that your signature?

11 A. Yes.

12 MS. DEITSCH-PEREZ: Yeah. It's late

13 in the day, John.

14 THE WITNESS: Yes.

15 MR. MORRIS: That's why I showed him

16 the signature.

17 BY MR. MORRIS:

18 Q. Does that refresh your recollection

19 that you've seen this before?

20 A. No. It refreshes my recollection

21 that I signed it.

22 Q. Okay. And –

23 A. Not that I recall – not that I

24 looked at it in detail in any way.

25 Q. Okay. Did you review it before you

JAMES DONDERO

2 signed it?

3 A. I – as I sit here today, I don't

4 remember. So let's go through whatever

5 questions you have.

6 Q. Okay.

7 MR. MORRIS: Go to page 8, please.

8 MS. CANTY: (Complies with request.)

9 BY MR. MORRIS:

10 Q. You will see that Interrogatories 3

11 and 4 ask in substance for you to admit that

12 you never disclosed the terms or existence of

13 the agreement to Frank Waterhouse prior to the

14 commencement of the adversary proceeding.

15 Do you see that?

16 MS. DEITSCH-PEREZ: Wait. Object to

17 the form. Those are two different

18 requests.

19 MR. MORRIS: Okay. Okay. I was

20 trying to do this quickly. We'll do it –

21 we'll do it – we'll do it your way?

22 MS. DEITSCH-PEREZ: No. I think you

23 – okay.

24 BY MR. MORRIS:

25 Q. So let's look at Request for

             JAMES DONDERO
1
2  Admission Number 3.
3       Do you see that Highland asked you
4  to admit, quote, "that prior to the
5  commencement of the adversary proceeding, you
6  never disclosed the terms of the agreement to
7  Frank Waterhouse," close quote?
8       A.  That's on page 8, Number 3, right?
9       Q.  Correct.  And you denied that,
10 correct?
11      A.  Yes.
12      Q.  Okay.  Did you disclose the terms of
13 the agreement as we've defined that term to
14 Frank Waterhouse prior to the commencement of
15 the adversary proceeding?
16      A.  You know, what I've answered was a
17 long answer earlier that the notes were
18 compensation.  The notes were to be – would be
19 forgiven as part of compensation, shouldn't be
20 included in any settlement.
21          Frank and his group were deeply
22 involved in all the plot plan and settlement,
23 things that went back and forth.  He knew.
24          Now, whether he knew the specifics
25 of the agreement in terms of, whether I ever

1            JAMES DONDERO
2  discussed the MGM Cornerstone, Trustway, and
3  the specifics of the agreement with him before,
4  I don't – I don't know.  So...
5       Q.  Do you –
6       A.  I think denying is appropriate, but
7  I'm at not saying Frank knew the specifics of
8  the agreement prior to the commencement of
9  litigation.
10      Q.  Did you tell him that you had an
11 agreement with the Dugaboy trustee?
12      A.  I told him there were mechanisms for
13 forgiving the – or there were – there were
14 mechanisms for the notes being compensation and
15 not being part of any kind of cement or asset
16 to the estate.
17      Q.  Okay.  Do you recall telling him
18 anything else during these conversations?
19      A.  No, I didn't – no.  I didn't feel
20 it necessary to talk to him about the
21 specifics.
22      Q.  Okay.  And do you recall having this
23 discussion in any context other than in
24 connection with the preparation of a settlement
25 proposal?

1            JAMES DONDERO
2       A.  There wasn't another reason – there
3  – no, I don't remember any other context.
4       Q.  Okay.
5       A.  But the settlements were regular and
6  ongoing –
7       Q.  Okay.
8       A.  – in our mind, not in the
9  Stonehill's mind.
10      Q.  Okay.  Can you go – can we go to
11 page 9, Request for Admission Number 8?
12      A.  Yes.
13      Q.  Number 8 we asked you to "admit that
14 no document was created prior to the
15 commencement of the adversary proceeding
16 concerning the existence of the agreement."
17          Have I read that right –
18      A.  I'm just reading what's on page 9,
19 admit that prior to the agreement he never
20 disclosed any other creditor.
21      Q.  No, no, no.  I'm sorry.  We're on
22 Number 8.
23          Can you read Number 8 out loud?
24      A.  Number 8, I'm sorry.  Admit that no
25 document was created prior to the commencement

1            JAMES DONDERO
2  of the adversary proceeding concerning the
3  existence of the agreement.
4       Q.  All right.  So you've read that.
5  And so my question to you is:  Did you deny
6  that because there are settlement proposals
7  that you created that show zero value for the
8  Promissory Notes at issue?
9       A.  Yes, partly.
10      Q.  Okay.  What other documents were
11 created prior to the commencement of the
12 adversary proceeding that you contend concerned
13 the existence of the agreement?
14      A.  I'm trying to think if the LPA does.
15      Q.  Okay.  Anything else?
16      A.  No.  That would be – that would be
17 it.
18      Q.  Okay.  Request for Admission
19 Number 9, can you identify the creditor that
20 caused you to deny the Request for Admission
21 Number 9?
22      A.  I believe all the creditors via the
23 settlement agreements; but, you know,
24 specifically Clubock, you know, and to the
25 extent Frank is a creditor, Frank.

Page 170

JAMES DONDERO

2   Q.   But you just testified a few minutes
3   ago, I thought, that you didn't specifically
4   tell Mr. Waterhouse of the terms of the
5   agreements to him, right?  Did I miss --
6       A.   That's right.  I mean, not the
7   specific terms, correct.
8       Q.   Okay.  So is there any creditor to
9   whom you -- is there any creditor of Highland's
10  to whom you disclosed the existence of the
11  agreements that you entered into with the
12  Dugaboy trustee prior to the commencement of
13  the adversary proceeding?
14      MS. DEITSCH-PEREZ:  Asked and
15  answered.
16      THE WITNESS:  Yeah.  I mean,
17  generally, all the creditors via the
18  settlement.  And then we have lots of
19  one-off conversations with Clubock
20  representing UBS where the notes were
21  described as going to be forgiven
22  compensation, never part of the estate.
23  BY MR. MORRIS:
24      Q.   All right.  I don't -- I don't want
25  to wrestle with you.

Page 171

JAMES DONDERO

2       A.   Sure.
3       Q.   I'm going to remind you that when I
4   use the word "agreements," I'm referring
5   specifically to the agreements that were set
6   forth in paragraph 82 of your answer.
7       Do you understand that?
8       A.   Yes.  And so I guess my answer is
9   generally but not specifically.
10      Q.   Okay.  And when you say "generally,"
11  you don't mean that you disclosed the existence
12  or terms of the agreement to any creditor.
13  What you mean is that you told all of the
14  creditors that you believed that the notes
15  should be forgiven as part of compensation.
16      Do I have that right?
17      A.   Well, that they would be forgiven as
18  part of compensation.
19      Q.   Okay.  Subject to that correction,
20  are we on the same page now?
21      A.   Yes.
22      Q.   Okay.  Can we go to page 12,
23  Interrogatory Number 2?
24      A.   This is still in Section 24?
25      Q.   Yes, sir.

Page 172

JAMES DONDERO

2       MS. DEITSCH-PEREZ:  Object to the
3   form.
4       THE WITNESS:  24, I'm sorry.
5   Page 2?
6   BY MR. MORRIS:
7       Q.   Page 12.
8       A.   Page 12.  Yes.  Which one?
9       Q.   Number 2.
10      A.   All right.
11      Q.   You didn't identify any email
12  correspondence in response to Interrogatory
13  Number 2; is that correct?
14      A.   I don't have my e-mails.  So we have
15  painfully little from the Highland estate.
16      Q.   Okay.
17      A.   I think at the time we responded, we
18  thought we might get access to things; but we
19  haven't been able to come up with anything.  We
20  have -- we have no access to anything.
21      Q.   Okay.  So as you sit here today, you
22  cannot identify any e-mail correspondence that
23  discusses the existence of the agreement,
24  correct?
25      A.   Not yet, no.

Page 173

JAMES DONDERO

2       (Whereupon, Exhibit 27, Defendant
3   NexPoint Advisors, L.P.'s Objections and
4   Responses to Plaintiff's Requests for
5   Admission, Interrogatories, and Requests
6   for Production, marked for identification,
7   as of this date.)
8   BY MR. MORRIS:
9       Q.   Let's go to Exhibit Number 27.
10      A.   Yes.
11      Q.   And if we can go to page 7.
12      MR. MORRIS:  I think -- I don't know
13  who's shuffling paper.
14  BY MR. MORRIS:
15      Q.   But if we're at page 7, we're
16  looking at Interrogatory Number 3.
17      Is the reason for the denial -- and
18  I apologize.  I may be going too quickly
19  because I know we're all anxious to finish, but
20  I do want to represent to you that we're
21  looking at the discovery responses of NexPoint
22  Advisors.
23      A.   Right.
24      Q.   And if we went to page 12, we'd find
25  your signature on that one, okay?  So looking

Page 174

JAMES DONDERO

2 at –
3    A.   Yes.
4    Q.   – Request for Admission Number 3,
5 is your answer the same on behalf of NexPoint
6 Advisors as it was for yourself as to why you
7 denied Request for Admission Number 3?
8    A.   Yes.
9    Q.   Okay.  If we can go to Request for
10 Admission Number 6, that is the same Request
11 for Admission that we talked about with respect
12 to yourself in your individual capacity a
13 moment ago.
14       Is your reason for denying Request
15 for Admission Number 6 the same reason that you
16 gave for yourself?
17    A.   Yes.
18    Q.   And looking at Request for
19 Admissions Number 7 and 8, is the reason that
20 you denied those Requests for Admissions
21 because you told Seery and the committee and
22 Clubock that you wouldn't pay anything for the
23 notes because they were supposed to be forgiven
24 as part of your compensation?
25    A.   And the independent board, yes.

Page 175

JAMES DONDERO

2    Q.   Okay.  Is there any other reason
3 that you denied Request for Admissions Number 7
4 and 8?
5    A.   Not that I can think of at this
6 point in time.
7       I don't think the LPA applies much
8 here, but I may be –
9       MR. MORRIS:  All right.  I have no
10 further questions.
11       THE WITNESS:  Wonderful.  Thank you.
12 Have a good evening.
13       MR. MORRIS:  Thank you.  Take care.
14       MS. DEITSCH-PEREZ:  Thank you.
15       MR. MORRIS:  Bye now.
16       THE VIDEOGRAPHER:  All right.  If
17 there are no further questions, this
18 concludes today's deposition.  Volume II
19 [sic] consists of three media.  We are off
20 the record at 5:21 p.m.
21       THE COURT REPORTER:  Everybody is
22 leaving, and I wanted to get everybody's
23 order on the record.
24       MS. DEITSCH-PEREZ:  I'd like the
25 rough.  And then the regular can be

Page 176

JAMES DONDERO

2 whenever you get the regular done.  No
3 special rush.
4       THE COURT REPORTER:  Okay.  Thank
5 you.
6       MS. DEITSCH-PEREZ:  You're welcome.
7       THE COURT REPORTER:  Ms. Canty, I
8 think there's a standing order for a daily
9 delivery -- or an immediate delivery for
10 your firm?
11       MS. CANTY:  Yes.
12       THE COURT REPORTER:  Okay.  I just
13 wanted to confirm that.  I'll get that out
14 tonight, then.
15       MS. CANTY:  Okay, thank you.
16       (The witness is excused.)
17       (Deposition of James Dondero
18 concluded at 5:21 p.m. CDT.)
19
20
21
22
23
24
25

Page 177

1          C E R T I F I C A T E
2
3
4       I, SUZANNE J. STOTZ, a Certified
5 Shorthand Reporter, Registered Professional
6 Reporter, Certified Realtime Reporter, and
7 Notary Public in and for the State of Texas, do
8 hereby certify that the foregoing is a true and
9 accurate transcript of the stenographic
10 above-captioned matter.
11
12
13       _____
14       SUZANNE J. STOTZ, CSR, RPR, CRR
15       Texas Certification No. 11942
16
17
18 DATED:  November 4, 2021
19
20
21 NOTE:  THE CERTIFICATE APPENDED TO THIS
22 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23 OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24 DIRECT CONTROL AND/OR DIRECTION OF THE
25 CERTIFYING COURT REPORTER.

Page 178

1        E R R A T A   S H E E T

2        I have read my testimony in the foregoing

3    transcript and believe it to be true and

4    correct to the best of my knowledge and belief

5    with the following changes:

6    PAGE    LINE        CHANGE

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17

18   _____ _____

19   WITNESS SIGNATURE        DATE

20

21   Sworn and subscribed to before me this

22   _____ day of _____ , 2021.

23

24   Notary Public of the

25   State of _____.

Appx. 01857

**$**

**$1.55-million** 64:22

**$12.3** 140:13 141:6, 12

**$2** 62:6

**$2.4** 91:11,13,23 92:6,11,14 93:12 103:17 104:2 107:23 109:2,25 110:13,23

**$2.4-million** 91:19

**$23** 138:13

**$23.7** 137:10,22

**$250,000** 58:20

**$5** 101:22 102:17 111:17,21,24 112:4, 10 117:9 119:23

**$5-million** 116:16 120:10

**$500,000** 62:5

**$6** 99:6,16,22

**$6,068,851** 98:18

**$7.4** 90:17 125:4 129:5 140:22 141:7

**$7.44** 102:7

**$7.5** 119:10,14,16

**$7.8** 103:5

**0**

**000025** 130:19

**000031** 130:19

**1**

**1** 9:3 94:3 141:19

**100** 96:24

**12** 171:22 172:7,8 173:24

**13** 26:14

**14** 26:14 151:17

**15** 151:17 164:8

**15-C** 130:11 131:3 137:3

**17** 20:20

**18** 20:8 26:13 71:16 73:15

**19** 20:8

**1939** 104:7

**1:17** 9:11

**2**

**2** 52:24 94:19 97:15 108:25 132:9 135:15, 18 136:13 143:7 171:23 172:5,9,13

**2,500,024** 60:10

**2.4** 104:14 110:20

**2.5** 61:5

**20** 57:16 58:2

**200,000** 64:22

**2016** 57:13,21 58:18 59:3

**2017** 20:8,21 60:2,9 62:6 63:17 73:14 137:17

**2018** 20:21 23:4 122:24 123:9,16 129:4

**2019** 23:5 25:3 90:16, 25 91:13,24 97:15 99:22 102:7 108:10, 25 110:3,25 111:20, 25 112:5,10,18 113:3 114:9 116:15 117:5 119:9,24 120:11 123:24 124:25 128:14 140:24

**2020** 25:3,9 109:21 130:9,18,23 133:19, 23 136:11 137:3,8,9 138:20 139:13,23 140:14 141:22 142:6 151:9 152:25 153:5, 19 154:7,13,15,22 155:6,20 156:6,13,25

**2021** 9:10 136:7,20 139:3 142:17 143:8 157:9 158:6 159:10, 24 161:23 162:15

**21** 141:15

**22** 143:6

**23** 130:18,23 133:18, 23 136:11

**24** 163:9,13,23,24 171:24 172:4

**252** 124:3

**27** 173:2,9

**2:28** 66:12

**2:43** 66:15

**2:44** 67:5

**3**

**3** 117:5 119:23 123:24 143:7 150:3 165:10 166:2,8 173:16 174:4,7

**30** 8:18 12:6,22 22:3, 4,5 137:9 140:14 154:7

**30(b)(6)** 14:23 15:7 17:4 18:18,21 68:24 76:24 143:24 144:7

**300,000** 64:23

**31** 10:16 82:10 122:24 123:9,15 129:4 137:17

**34** 22:5 123:4,6

**35** 22:6

**36** 22:6

**375** 102:10

**39** 104:8 124:23

**3:21** 94:6

**3:22** 94:21

**3:28** 66:7

**3:40** 66:8

**3:53** 115:9

**3:54** 115:12

**3rd** 111:20

**4**

**4** 9:10 165:11

**4.4M** 118:5

**40** 12:6,24

**47** 104:9

**4:38** 149:24

**4:45** 149:22 150:5

**5**

**5** 103:5

**50** 59:17,19 82:8

**50,000** 57:20

**51** 82:7

**53** 93:18 94:23 95:3 97:12 136:2

**54** 107:10,12 136:2

**56** 116:20,22

**57** 118:24 119:3

**59** 130:15,17

**5:03** 163:4

**5:06** 163:7

**5:21** 175:20 176:18

**5:37** 149:17

**5:38** 149:20

**6**

**6** 174:10,15

**65,772** 63:12

**68** 55:21 56:2,9

**7**

**7** 173:11,15 174:19 175:3

**70** 58:3

**75** 35:3

**8**

**8** 165:7 166:8 168:11, 13,22,23,24 174:19 175:4

**82** 13:3,12,17 14:3 39:16 47:10,20 48:8 81:25 82:10,11,17 83:18 171:6

**9**

**9** 25:9 168:11,18 169:19,21

**90-day** 47:22

**A**

**ability** 27:16 43:6 45:10 47:5

**acceleration** 157:17,18

**accepted** 8:25 160:23

**access** 172:18,20

**accommodated** 66:23

**accord** 89:18

**account** 47:2 100:18 102:7

**accountants** 134:5

**accounted** 110:22

**accounting** 37:24 107:19,22 108:2,12 110:8 111:13 117:5, 9,17 125:23 128:4,5 134:2

**accurately** 27:24

**acting** 40:22 59:10 65:20 73:5 105:7 134:16 138:6 141:10 142:4 144:15 149:7 150:18 159:8,20 161:3,10 162:12

**action** 9:17 38:25

**actions** 142:24

**activities** 106:2

**actual** 37:24 51:11 73:16

**addition** 157:15

**additional** 101:9 103:16 138:23

**address** 141:15

**adjust** 47:5 75:7 138:16

**adjusted** 84:4

**admissible** 8:16

**Admission** 163:15 166:2 168:11 169:18, 20 173:5 174:4,7,10, 11,15

**Admissions** 174:19, 20 175:3

**admit** 165:11 166:4 168:13,19,24

**adversary** 165:14 166:5,15 168:15 169:2,12 170:13

**advice** 11:25

**advise** 138:3

**advisor** 103:17 104:22 142:7

**advisor's** 104:23

**advisors** 58:5,12 109:3 129:17,22,25 130:9 131:2 133:5, 15,17 134:17,21,23 136:12 137:2 142:5, 21 154:6 173:3,22 174:6

**advisors'** 133:22

**affiliate** 152:4 155:21

**affiliated** 58:4 146:23

**affiliates** 110:10 137:10 154:21 155:5

**afield** 38:16

**afternoon** 8:2 67:6

**aggregate** 21:21,23 24:15 27:4 51:24 71:15 90:16 102:13 125:3 140:22

**agree** 39:19 41:22 43:13 46:3 71:8 83:8 103:3 115:4,7

**agreed** 160:17

**agreement** 19:20 20:19,24 21:8,12,16, 25 22:7,11,18 23:2,8, 12,17,22 24:7,12,17 25:2,13,18,21,25 26:5 27:5,11,17 28:7, 22 29:18,25 30:8,14, 23 31:4,9,24 32:7,11, 22 33:11,24 34:17,22 35:14,17 36:8,22 37:4 39:7 40:10 43:13 44:12,21,24 45:17 47:19 48:5 69:21 71:20 77:24 78:3 79:9 81:25 82:22 84:16 85:22 86:11,13,20 99:25 134:13 135:12 144:18 152:3 153:7 165:13 166:6,13,25 167:3,8,11 168:16,19 169:3,13 171:12 172:23

**agreements** 13:18, 22 14:2,8 19:16,21, 25 20:6,8,10 29:2,6, 11 30:22 31:2 40:6, 17,20 41:2,9,13,20, 24 42:12,13,16,24 46:13 47:8,11 48:4, 16 49:4,13,18 50:10, 19 51:7 53:12,19 54:3,7 69:11 72:8 73:5,23 74:7,13,20 75:2,18,25 76:12,16 77:11,19 79:17,23 81:3,16 82:18,24 83:23 84:9,19 85:11 105:23 127:11 133:25 134:15 137:23 138:4,9 139:24 144:18 145:8 146:2,13,18 148:13 149:9 152:8 169:23

170:5,11 171:4,5

**ahead** 101:13 155:16

**Aigen** 77:5 95:25

**Alan** 12:7,9

**allocate** 61:10

**allocated** 61:18,21, 25 62:8

**allowed** 162:5

**altered** 43:23 44:14, 22

**amended** 13:5 136:4 142:16

**amortization** 156:10

**amount** 15:16 21:4, 15,19,22,24 24:6,16 30:7 31:13 57:17 58:19 61:4 62:2 75:12,13 90:17 99:12 103:9,11,20 104:2 108:25 125:3 126:20 137:15 140:23 151:17 160:22

**amounts** 56:19 92:23 100:21 112:12 135:20 152:2 158:19

**analysis** 73:23 100:6

**analysts** 135:7,9

**analyze** 73:6,8

**Anchorage** 71:21 83:5

**annoyed** 158:18

**annual** 55:2,16 56:13,15 126:12 129:17,24 130:10 136:6

**answer's** 91:25 140:3

**answering** 106:14

**answers** 86:20 138:17

**anticipated** 47:5

**anxious** 173:19

**anymore** 24:21 106:14 152:14

**apologize** 33:8 48:25 54:23 69:17 102:3 127:3 144:24 173:18

**apparently** 67:17 95:12

**appearances** 9:20

**appeared** 9:17

**appears** 136:21

**applied** 119:17

**applies** 175:7

**approval** 71:4,11,23

**approve** 134:17

**approving** 92:9 134:23

**approximately** 9:11 24:23 99:5,7,16,22, 23 101:21 102:6 103:4,17 137:10 140:13

**April** 90:25

**arrives** 68:20

**Arvold** 8:3

**Asia** 163:8

**aspect** 82:21,23

**aspects** 126:16

**asset** 167:15

**assets** 42:12 73:10 89:2 121:4,12

**association** 8:4

**assume** 60:19 122:12,14 128:16,20

**attached** 98:9

**attaches** 108:16

**attachment** 108:21

**attended** 158:17

**attention** 62:15 63:4 151:9

**attorney** 11:5,6 12:4 134:9

**attorneys** 89:23,25 90:3,8 134:14 161:2

**audio** 116:3

**audit** 122:11,20 123:23 124:19 125:7, 13,17,18,22 126:3,12 127:5,10,15 128:6,23 129:10

**audited** 120:15 122:7,23 124:13 128:10,14 129:3

**auditors** 124:17,20 126:3

**audits** 126:22

**authority** 71:2 72:19, 21

**authorize** 91:19,22 112:3

**authorized** 93:3,10

**authorizing** 111:23

**availability** 62:12

**award** 57:2,14,20 59:3 63:16

**awards** 63:19,20

**aware** 12:7,15,18,19 29:8,17 34:21 35:14, 17 39:5 52:19 70:5 80:16 90:14 92:21,24 93:3,11,15 99:20 100:5 105:23,24 108:10 109:19 110:7 116:15 117:16,23 119:8 121:21,25 122:9,21 125:15 126:10 128:9,13 135:2 137:7,13 139:4 141:21 142:15 145:5 148:11,16,18 153:10, 12 154:5,20 156:6,24 157:12,13,15,18,19 161:14,25 162:17

**awareness** 108:13 118:18 122:13 128:19 136:22 137:19 157:8

---

**B**

**back** 17:19 18:12 49:23 51:9 66:7,14

81:11 82:3 94:21 96:5,9 97:5,8 115:11 127:10 133:6 149:21 150:4 154:3 163:6 166:23

**back-and-forth** 153:21

**background** 128:2

**balance** 72:15 121:5, 19,22 122:4

**bankruptcy** 9:7 25:17 73:2 90:2 121:7,10 139:3 144:16 145:3,6 146:2,12,17 147:11, 14,18 150:11,15

**base** 60:9,19,25 61:10,13 88:20

**based** 51:11 61:25 84:5 98:16

**basis** 55:17 56:15 61:20 139:20

**Bates** 56:4 59:21 66:22 67:3,7 95:4 107:13 116:23 119:4 123:9 124:5 130:18

**bed** 93:4

**begin** 93:23

**beginning** 66:19 94:19 150:3

**behalf** 40:10,22 41:13 59:6,10 65:21 73:6 105:8 110:9 133:5 134:16,23 138:3,7 141:5,10,21 142:5 144:15 149:8 150:18 155:21 156:14 159:8,21 161:3,10 162:13 174:5

**belabor** 90:20

**belief** 133:24

**believed** 75:2 147:16 171:14

**believing** 114:11

**benefit** 98:6

**benefits** 54:11 55:3, 15 56:3,13,18 59:20, 25

**binder** 163:21

**bit** 131:8 139:7

**board** 71:14 105:20, 21,22 106:4,19 107:2,5 129:20 130:2,5,10 134:22 136:12 137:8,21 138:3,8 139:10,11, 13,22 140:12 141:5, 22 142:6 147:5,17,22 174:25

**boards** 131:2 138:13 141:11

**bona** 42:3,4

**book** 131:11

**booked** 93:13 110:4, 13,17 116:17 120:10

**booking** 110:19

**books** 93:14

**borrower** 81:2

**borrowers** 80:12 81:14

**bottom** 107:18

**bought** 83:7

**boy** 118:8

**break** 16:8,18 64:3,5 66:5,13 93:20 94:11 96:11,13,21 149:14, 25 150:8 163:5

**Brian** 54:22 60:23

**bring** 88:24

**broad** 28:5 65:5

**broadly** 152:10

**buckets** 52:5 53:9, 15,22 60:14

**bucks** 27:9 151:18

**bunch** 126:22

**business** 51:9 54:10 55:14 67:9

**Bye** 175:15

**C**

**calculated** 140:19 160:22

**calculation** 100:21

**calendar** 154:12

**call** 43:7 96:2,24 100:20 161:16,19

**called** 41:11 54:11 112:9 158:17

**Canty** 10:17 13:13 55:22 59:18 82:7,11 85:20 94:24 98:10 107:11 108:22 116:21 119:2 123:5, 20 124:6,10 130:16 131:25 132:4,6,12 133:9 135:16 142:13 163:12 165:8 176:7, 11,15

**capability** 67:7

**capacity** 15:25 16:15 17:16 18:18 68:23,24 76:24 87:8,9 91:4 120:24 143:24,25 144:12 174:12

**Capital** 9:6 39:24 62:15 87:15 88:7,9 89:9 109:3 123:7

**captured** 83:2,13

**care** 175:13

**carefully** 50:7

**carried** 121:4,12,18, 22 122:3

**case** 8:20 12:8,17 162:8

**cash** 53:3 62:11 84:24 118:10

**caused** 41:17 70:12 169:20

**caveats** 144:4

**CDT** 176:18

**cell** 161:17

**cement** 167:15

**Central** 149:22

**certificate** 90:23

**certified** 8:3

**certify** 91:4

**cetera** 126:19 127:11

**CFO** 111:7

**change** 46:4,13 96:23

**changed** 92:23 136:9

**changing** 45:5

**characteristics** 43:24

**characterizations** 148:7

**chart** 31:16,18 98:8, 12,17 100:16

**chat** 132:13

**check** 160:14 162:21

**Christian** 108:7

**circumstances** 89:15 113:11

**Civil** 8:19

**claim** 101:14 102:16, 21,23

**claims** 141:23 142:7

**clarification** 84:12, 21,23 85:2 140:8

**clarified** 84:5

**clarity** 37:2 144:4

**Class** 39:9,19 40:8 41:4,18 43:20

**cleanly** 155:14

**clear** 15:10 36:18 51:3 103:23 140:2 144:8

**Clemente** 147:6 148:3 149:8

**close** 67:9 117:10,14 166:7

**closer** 47:24

**Clubock** 169:24 170:19 174:22

**co-loan** 108:4

**code** 51:22 53:2

**colleague** 77:5

**colleagues** 17:19

**collect** 90:15 142:24

**collectively** 143:20

**Collins** 54:17,22,23, 25 55:14 56:14 60:23

**column** 98:23 101:20,24 102:2,4

**combination** 61:6

**commenced** 14:10 109:17 120:7,12 121:11,13,16 142:25 143:5

**commencement** 29:9 110:15 149:6 165:14 166:5,14 167:8 168:15,25 169:11 170:12

**comment** 45:8 46:9

**comments** 26:25

**committee** 148:3,4 174:21

**communicate** 159:25

**communications** 11:15 161:7

**companies** 63:3,9 70:14,21 71:3,13 72:10,20 74:2 75:4, 17 82:16 84:22 88:21,22 151:13

**company** 49:23 71:18

**compared** 74:6 75:17

**compensation** 42:3 46:19 49:20 50:12 51:11,22,23 53:3,7, 11,18 54:2,11 55:3, 15 56:3,13,17,19 57:13,20 59:20 65:8, 14,23 146:25 147:8

148:10 166:18,19 167:14 170:22 171:15,18 174:24

**Complaint** 13:6 142:16

**complete** 122:16,20

**completeness** 126:18

**compliance** 133:14, 18

**complied** 100:3

**complies** 10:2,17 13:13 55:22 59:18 85:20 98:10 107:11 108:22 116:21 119:2 123:5,20 124:6,10 130:16 131:25 132:4, 6 133:9 135:16 142:13 163:12 165:8

**comport** 102:5 137:15

**computer** 94:25

**concept** 88:25

**concerned** 169:12

**concerns** 35:18

**concluded** 10:25 176:18

**concludes** 175:18

**conclusion** 12:4

**condition** 42:7,8 73:17

**conditions** 13:20 43:8 44:5,13,22 45:10,19,23 47:6 69:12,23 70:2,6,11 72:7 73:7 75:23 82:19

**conducted** 124:20

**conference** 96:7

**confidence** 100:3

**confirm** 160:8 161:2, 11 176:13

**confirmation** 142:20 143:2,6,11 144:14 145:7 150:9,17 151:3

162:11

**confirmed** 142:16 160:16

**connection** 12:17 63:17 99:16 101:15 126:12 129:24 130:10 167:24

**consent** 112:9,17, 20,22 113:3,6,13,21 114:9,12

**consistent** 19:23 99:3

**consistently** 38:8

**consists** 175:19

**Consolidated** 123:7

**constitute** 160:19

**consuming** 13:19

**contact** 115:2

**contacted** 41:7

**contained** 127:5

**contend** 69:8,10,20 169:12

**content** 11:21

**contentious** 85:7,8

**context** 119:12,13 138:18 147:13 167:23 168:3

**continuation** 10:21

**continue** 19:12

**contracts** 129:17,21

**contributions** 88:2

**control** 25:11 42:17, 25 43:5,14 78:11,20 83:8,11 144:12 151:14 156:15 157:6

**controlled** 35:3,4 155:22

**conversation** 83:3 151:11 152:25 160:12 161:22

**conversations** 81:12 85:10 105:21 106:5 110:18 144:22,

23 152:12 162:6,10 167:18 170:19

**coordinates** 126:15

**copies** 76:14 77:9 154:4

**copy** 64:8 77:17 108:16 131:11

**Cornerstone** 70:22 72:2 74:19 75:7 83:9 167:2

**corporate** 107:19,22 108:2,12 110:7 117:4,9,17

**correct** 18:9,10 19:2, 3,15 23:14 27:19 29:2,3,6,7,11,12 32:14 33:20,21 39:25 40:13,17,20,23 41:5, 9,14,20 42:18 43:2 44:14 45:19 55:4 56:20 57:5,6 69:23 70:3,23 71:4 73:17, 19 76:12,16 77:11 99:18 109:18 111:9 117:20 127:18 129:18,22 130:2,6 139:19,25 166:9,10 170:7 172:13,24

**correction** 54:24 171:19

**correspondence** 95:4 107:13 116:23 172:12,22

**cost** 70:14 73:19 74:2 76:7 83:9,13

**costs** 74:6,15,18 75:4,9,18

**counsel** 9:12 12:22 17:25 66:16 93:19 117:19 133:22 134:8, 10 137:2 161:7

**counsel's** 11:25

**counterproposal** 84:20

**couple** 17:20 58:22, 24 71:21 89:23 96:3 134:5,6

**court** 9:7,22,24 18:10

25:18 94:17 142:15 144:17 145:3,7 146:2,12,17 147:11, 15,18 148:10 149:12 150:11,15 160:12 175:21 176:4,7,12

**courtroom** 8:17

**covered** 14:8 28:13 129:14

**covers** 14:14 83:22

**COVID-19** 8:6

**create** 45:10

**created** 29:9 35:10 110:8 168:14,25 169:7,11

**creating** 72:13 118:21

**credit** 127:11 153:25

**credited** 118:16

**creditor** 168:20 169:19,25 170:8,9 171:12

**creditors** 147:21 148:2 169:22 170:17 171:14

**critical** 93:3

**cure** 155:6,7 156:19 158:20 159:10 160:9, 19,22 161:5,24 162:4,16

**cured** 154:18,25 155:2,25 156:11 158:25 161:12

**current** 154:17,24 155:24 156:9 158:21

---

**D**

**D-CNL000212** 123:10

**D-CNL000257** 123:10

**D-CNL003585** 56:4

**D-CNL003587** 59:21

**D-CNL003763**

116:23

**D-CNL003764** 119:4

**D-CNL003765** 119:5

**D-CNL003768** 95:4

**D-CNL003770** 95:5

**D-CNL003777** 107:13

**D-CNL003779** 107:14

**daily** 110:8 176:8

**date** 15:17 22:9 24:10 25:5,12,22 26:6 27:7, 13 31:12 49:12 56:6 59:23 70:25 72:18 95:6 107:15 116:25 119:6 123:12 124:20 125:2 130:20 135:13 138:19 163:18 173:7

**dated** 97:15 108:25 119:23 123:9 130:18, 22

**David** 97:20

**day** 12:8 13:8 66:22 67:2,19 76:22 77:6 90:20 107:17 111:20 127:24 164:13

**DC** 134:8

**DC's** 134:8

**de** 51:24,25 158:19, 23

**Debbie** 10:11

**Deborah** 14:17 19:6 63:24 66:5 95:11

**debtor** 42:12 160:17 161:4

**debtor's** 41:24 42:5, 17 43:2 142:16

**December** 20:21 23:4 25:2 47:8,12 48:9,17 49:5 109:21 122:24 123:9,15 129:4 151:9 152:25 153:5,19 154:15,22, 25 155:6,20 156:6, 13,20,23,25

**decides** 129:21

**decision** 17:18 61:9 113:14

**declaration** 159:4

**declared** 157:13

**declaring** 157:16

**decreased** 52:20

**deemed** 8:25 161:5, 12 162:16

**deeply** 166:21

**default** 157:10,14,16, 19 158:5,15 159:4 161:13

**Defendant** 163:13 173:2

**defendants** 143:20 144:16 145:6 150:10, 18

**defendants'** 162:13

**deferral** 42:4

**deferred** 57:13

**defined** 166:13

**definition** 36:23

**degree** 28:12

**degrees** 75:5,6

**DEITSCH-PEREZ** 10:7,12 11:9,16 14:19,22 15:2,6,19 16:6,19,24 17:7,10, 23 18:11,15 19:3,18 20:12 22:20 26:9,22 27:20 28:10 34:5,24 35:22 36:9 37:7 38:15,22,25 39:10 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 50:13 52:11 53:20 59:13 60:11 62:9 64:2,11 65:15, 24 66:24 67:10,22,25 68:6,15 69:15 70:15 71:5 72:22 76:2,18 77:12,25 78:13,17,23 79:4,10 80:11 83:25 85:25 87:19 88:10 89:17 91:6 94:9 96:5, 20 97:4 98:19 100:10

101:5 103:7 106:24 111:10 113:7,16,24 114:22,25 115:7 116:5 117:21 125:8 127:22 129:7 131:10, 13 134:24 136:14 137:11 141:24 142:8 143:12 144:9 145:10, 19 150:22 152:5 155:8 157:2 158:8 160:3 161:6 164:2,12 165:16,22 170:14 172:2 175:14,24 176:6

**delivered** 139:22 147:14

**delivery** 176:9

**demand** 14:17 28:20 45:14,18 109:22 156:3,7,8 157:24

**demanded** 45:23

**denial** 173:17

**denied** 166:9 174:7, 20 175:3

**deny** 169:5,20

**denying** 167:6 174:14

**dependents** 134:12

**depending** 128:6

**depends** 114:3

**deposed** 12:20

**deposition** 8:10 9:5, 9 10:21 11:2,7 12:5 13:25 16:5,7 18:17, 21 26:15,21,23 31:20 38:17 66:19 67:15 76:21,22 78:21 94:20 109:6,9 120:15,22 127:24 150:4 175:18 176:17

**describe** 15:12 57:12 84:6 89:15,21 130:25

**describes** 13:17

**describing** 31:5 88:13 91:17

**description** 73:9,10

**detail** 31:22 32:20 125:21 164:24

**details** 21:13 26:16 85:5 99:19 143:15

**determine** 73:24 110:22

**determiner** 106:16

**devote** 62:14

**devoted** 63:4

**difference** 67:11 116:6

**differentiated** 61:3

**diminishing** 61:14

**direct** 11:10,22 65:20 105:3 151:4,8 155:19

**directly** 88:22 96:6 147:6,21 148:2 151:13 156:15 157:6

**directors** 25:21

**disclose** 56:22 57:7 60:4,8 161:7 166:12

**disclosed** 59:10 79:22 122:22 128:13 144:16 145:6 150:19 165:12 166:6 168:20 170:10 171:11

**disclosure** 71:22 139:7 145:3

**disclosures** 138:22

**discovery** 163:11 173:21

**discretion** 113:23

**discuss** 41:8

**discussed** 57:18 167:2

**discusses** 172:23

**discussing** 119:12, 14 153:23

**discussion** 11:21 49:17 78:19 83:4 84:5,11,21 85:2 108:8 115:10 167:23

**discussions** 50:9 77:21 79:6,15,21

85:3

**disruptive** 92:19,20

**distancing** 8:8

**District** 9:8

**doc-** 29:17

**document** 10:15 13:3 19:13 29:8 32:17 54:11 56:8 57:9,14 59:12 63:13 66:6,18,21 93:23 97:11 109:11 124:4 131:7,11,21 132:11 164:5 168:14,25

**documented** 87:6 88:3 147:7

**documents** 53:24 54:6 127:11 147:10, 14 163:22 169:10

**dollars** 52:9,17

**Dondero** 8:1 9:1,5 10:1,20 11:1 12:1 13:1,4 14:1 15:1 16:1 17:1 18:1 19:1,12,25 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1,3 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1, 18 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,3 57:1 58:1 59:1,20 60:1 61:1 62:1 63:1 64:1,17 65:1 66:1,18 67:1,21 68:1,22 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1 81:1 82:1,15 83:1,18 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1,8, 10,12 96:1 97:1,5 98:1 99:1 100:1 101:1 102:1,3 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1,

15,21 116:1,2 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,6,18 132:1 133:1 134:1 135:1 136:1,25 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4,8 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,20 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**Dondero's** 18:17 96:8 114:21 163:10, 14

**drafted** 46:24

**drafting** 125:16,18

**dual** 60:24

**due** 8:6 42:2 79:24 80:3,17 102:18 103:10,12 118:17 135:20 151:12 152:2

**Dugaboy** 13:18 19:17,19,22 20:2,11, 19,25 21:2,8,12,17 22:2,11,19 23:3,8,13, 17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:8 29:19,25 30:8,14,23 31:4,9,22, 25 32:2,4,7,8,12,14, 19,22,23 33:2,12,14, 18,25 35:4,8 36:3,6, 12 37:5,6,17,20 38:9, 12 39:7 40:7,13,15, 23 41:3,12,17 42:16, 24 43:14 44:11,21 45:17 47:19 49:5,19 50:11,18,20 51:6,7, 17 52:2,8 53:10,13, 17,25 54:5 56:24 57:5,8,13 58:17 60:6, 9 64:18 65:6 73:11

75:15,21,24 76:11,15
77:8,17,22 78:5 79:7,
15,21 80:22,25 81:4,
5,6,12 82:24 84:10,
14,20 137:24 138:10
139:25 144:18 145:9
146:3,13,19 148:14
149:9 167:11 170:12

**duly** 10:5

**Dustin** 153:9

**E**

**e-mail** 19:9 63:24
64:8 68:2,4,9,12,18
95:3 97:14,19
107:12,18 108:11,16
116:22 117:4 160:15
172:22

**e-mails** 172:14

**earlier** 12:16 27:16
51:20 59:5 60:15,16
118:15 134:4 166:17

**early** 20:21 23:5 25:3
91:12,23 110:24
111:19,25 112:5,10
157:9

**easiest** 68:7

**Eastern** 66:8

**easy** 64:10

**educated** 118:8,12

**educted** 118:9

**either/or** 69:4

**email** 172:11

**Emanuel** 10:10

**embedded** 72:8 75:9

**employee** 56:20
88:20

**employees** 54:12
55:4,16 56:15 60:24,
25 125:16 135:7,9
151:20

**employees'** 88:14

**empowered** 160:6

**encourage** 112:23

**end** 20:20 49:9 66:22,
25 67:18 94:2 96:8
124:19 154:12

**ending** 122:24 129:4

**ends** 89:3

**enter** 19:17 20:2,7,18
23:2 24:25 31:24
32:6 41:13,19

**entered** 13:18 20:5,
11,25 21:16 22:17
25:13,21 26:6 27:5,
12,18 28:8 31:3,8
33:11,24 39:8 40:5,9,
16,20 41:2 42:13,15,
23 44:11 45:16 47:8,
18 49:4,12 50:20
53:13 73:21 74:7,12,
19,25 75:24 81:3
137:24 138:9 139:24
145:8 146:3,12,18
148:14 170:11

**entering** 32:11 43:12
46:13 51:6 53:12,19
54:2,6 73:4 75:18
76:12,16 77:10,18

**entities** 28:18 30:25
36:3,14 38:13 52:22
61:2,7,18,22 62:3,18,
19 79:25 80:17,20,23
81:17,18,23 88:12
89:3

**entitled** 14:23 124:13

**entity** 35:5 40:9
60:21 81:13 156:14
157:5

**entry** 50:19 85:11
125:13

**equal** 99:12 112:9

**equity** 63:8 71:17

**error** 99:17 100:9,19
101:15 102:8 104:18
105:5,9,13 106:23

**Essentially** 92:2

**estate** 86:25 89:10,
24 90:4,7 134:6,10
148:9 167:16 170:22
172:15

**estimate** 85:16

**estimated** 99:4

**evening** 175:12

**events** 122:24
124:14,17

**everybody's** 9:17
175:22

**exact** 85:15 100:4,5
112:12

**examination** 10:18
12:23 93:23

**examined** 10:5
12:16,19

**exceeded** 74:2 75:4

**excused** 176:16

**executed** 24:11
30:13

**executive** 126:17

**exercise** 42:25 43:5
113:23

**exercised** 43:14,19

**exercising** 42:17

**exhibit** 10:16 55:21
56:2,9 59:17,19
82:10 93:18 94:23
95:3 97:12 107:10,12
116:20,22 118:24
119:3 123:4,6
130:15,17 163:9,13
173:2,9

**existed** 122:19

**existence** 109:11
138:4 144:17 145:7
146:17 148:13
165:12 168:16 169:3,
13 170:10 171:11
172:23

**existing** 38:3

**expectation** 147:7

**expenses** 104:10

**experience** 104:21

**experienced** 90:3

**expert** 12:15,18 45:8
59:6,11 65:12,21

**experts** 89:24

**explained** 143:15

**expressed** 76:7

**expressing** 76:6

**extent** 11:19 104:6,
12 122:17 169:25

**external** 58:14

**F**

**fact** 41:17 75:7 82:5
99:15,21 111:20
119:8 153:11 162:20

**facts** 70:5

**fair** 12:11 13:21 14:4
42:10 51:23 57:4
70:7 74:11,24 75:12,
13 101:4 110:14
113:19 125:19
127:15 130:25
148:17

**faith** 100:3

**fall** 53:8,14,22

**fallen** 52:4

**familiar** 9:16 34:15
102:20 126:10

**fastest** 64:14

**fault** 33:8

**February** 47:13
48:10,18 49:6 142:17
143:7 155:3

**Federal** 8:18

**fee** 112:9,17,20,22,23
113:3,6,13,21 114:9,
12

**feed** 116:3

**feel** 167:19

**fees** 101:9 103:24
104:7,9

**fide** 42:3,4

**figure** 68:9

**file** 101:14

**filed** 142:20

**filing** 145:18 147:20

**filings** 145:22

**final** 136:19

**Finally** 89:17

**finance** 100:7

**financial** 32:23 33:3
120:16 122:7,23
123:8 126:7 128:10,
14 129:3

**financials** 31:21
32:19 122:16 123:16
124:13

**find** 46:19 64:13
173:24

**fine** 44:7 64:12
149:21

**finish** 66:9 116:10
149:19 150:7 156:22
173:19

**firm** 63:25 67:7
125:23 127:10 128:5
176:10

**fiscal** 124:19

**five-** 63:22

**fixed** 116:3

**floor** 96:9

**focus** 120:20

**focused** 120:24

**follow** 11:24 77:4

**follow-up** 28:5

**force** 71:17

**forgive** 31:25 39:20

**forgiven** 69:11,21,22
70:12 166:19 170:21
171:15,17 174:23

**forgiveness** 13:19
32:13 33:13 51:20
81:7,8 101:9 103:24

**forgiving** 167:13

**form** 27:21 28:11
34:25 36:10 37:8
42:20 43:4,17 44:2,
16 45:2,21 46:7,17

48:20 56:12 59:14 60:12 62:10 65:16, 22,25 66:17 69:16 70:16 71:6 72:23 76:3,19 77:2,13 78:2, 9 79:11 84:2 86:2 87:20 88:11 91:7 98:20 100:11 101:6 103:8 111:11 113:8, 17,25 117:22 125:9 127:23 129:8 134:25 136:15 137:12 141:25 142:9 143:13 145:11,20 150:23 152:6 155:9 157:3 160:4 165:17 172:3

**formally** 147:3

**format** 56:16

**Fort** 92:4

**forward** 146:22

**forwarding** 97:19

**foundation** 121:20

**fraction** 24:19

**Frank** 90:16 92:12,14 108:11 126:8 151:11 158:17 159:12,14,19 160:5,22 162:14 165:13 166:7,14,21 167:7 169:25

**Friday** 10:22 11:2,8

**Friday's** 12:23

**front** 17:15 18:25 19:14 133:6 163:21

**frozen** 114:21,23

**fulfillment** 69:12,22

**full** 62:14

**fully** 103:21 104:3 160:6

**function** 111:13

**functions** 129:11 135:10

**fund** 72:5 97:25 98:5, 17,24 99:5,11,15,21 100:2,8,17 103:21 104:3 109:3

**funded** 103:4

**funding** 100:23 102:18

**funds** 83:10 129:18, 20 134:2,18 135:11

**future** 135:21

**G**

**GAF** 97:22,24 100:18 102:6,18 103:21 104:4 105:12,22 106:3,21

**gave** 50:23 51:5 92:17 93:6 104:6,12 122:9 136:12 137:17 152:22 153:19 157:10,16 174:16

**gears** 85:17 129:16

**general** 50:17 128:3, 7 133:22 134:9 151:23

**generally** 14:5 28:16 53:8 56:21 83:22 92:15 110:5 111:13 112:2 119:20 120:19 142:18 143:16 144:20 148:10 151:15 170:17 171:9, 10

**give** 68:8,10,15 75:14 90:12 92:5 94:25 115:2 151:24 162:19

**give-and-take** 92:23

**glad** 16:12

**good** 8:2 94:16,17 149:13 155:24 175:12

**grant** 43:7

**granted** 44:4 63:16

**gratuitous** 26:25

**greater** 47:17

**gross** 21:18 57:17

**group** 54:15,18,21 107:19,22 108:2 110:8 117:5,18 125:25 126:6,8 166:21

**growth** 51:10

**guess** 31:7 40:4 42:6 48:23 55:11 80:4 118:12 143:16 144:20 157:13,19 171:8

**H**

**half** 149:18

**hand** 9:25

**handled** 38:7

**handles** 126:9

**hang** 114:25

**happened** 44:8 48:12

**Hayley** 108:7

**haywire** 94:25

**HCMFA** 62:21 90:15, 24 91:5,14,23 92:20 93:2,13 97:22 99:10, 11,15,21 100:7,17 101:14,20 102:6,16 103:20 104:2,11,13, 16 105:8,11 106:3, 21,22 107:23 110:2, 22,24 111:8,21,24 112:4,8,17 113:2,6, 14 114:7,12 116:16 118:11 119:14,18 120:6,10,25 125:2 128:10,13,20 129:6 134:13 135:6,23 140:12,23 141:6,10, 21,22 143:19 144:7, 11

**HCMFA's** 93:14 121:19,22 122:4 128:23 129:3

**HCMFAS** 130:19

**HCMLT** 107:23

**HCRE** 14:10 62:21 81:22 85:23 86:3,5, 14,17 87:10 88:15 143:19 157:22

**head** 22:23 24:4,5 26:8 27:23 29:22 31:14 54:17,20 63:5

90:11

**heading** 124:9

**hear** 115:15,16

**heard** 157:19

**hearing** 143:2,6 145:17 146:16 158:16

**held** 9:9 35:8 41:3 72:10 73:12 111:7,8 115:10

**helpful** 89:13

**helps** 141:19

**Hendrix** 97:20 108:15 117:4,8,12

**Hendrix's** 108:15

**hidden** 104:20

**High-** 126:25

**higher** 74:9,10,15,22, 23 75:8

**Highland** 9:6 14:10 15:15 25:12 32:2 34:16 35:9,19 36:14, 17,22,24 37:18,21 38:10 39:24 40:10 41:14 46:20 51:13,25 52:12 54:10 57:25 60:20 61:5,13,16 62:6,15,21,22 63:7 70:13,18 71:16 72:25 79:18,25 80:4,17 85:24 86:8,15,18,24 87:2,5,9,15,17 88:2, 7,8,19,23 89:4,8,25 90:3,6,14 91:13,22 92:20 93:13,14 102:24 104:15,17 105:4,9,12,25 106:3, 4,22 109:2,19 110:2, 10,22,24 111:7,21,24 112:4 113:5 114:5,13 116:16 118:9,11,15 119:9,15,16,18 120:6,9,25 122:9 123:6 125:15,25 127:4,12 128:24 129:6 134:14 135:5, 11,23 137:9,18 139:2 140:14,24 141:23 142:7 151:12 152:2,3

153:6 154:6 155:5,20 156:7,13 157:7,10, 13,21 158:6,15 159:9,12,15,16 166:3 172:15

**Highland's** 33:3 41:4 55:4,16 56:15 72:9,13,15,19 73:25 74:5,14 75:3,16,17 120:15 121:5 122:7, 22 126:12 154:21 170:9

**Highland/nexpoint** 61:6

**hindsight** 50:3

**hit** 19:10

**hold** 40:2 58:2 96:4

**holder** 83:5

**holders** 39:19 43:20 71:21

**holidays** 47:25 48:12

**Honestly** 56:25

**hope** 66:23 67:6 78:14 149:16 152:14

**hour** 68:5 149:18,19

**housed** 105:25

**Human** 54:14,18,20

**hundred** 60:20 126:23 127:9

**I**

**idea** 61:20 62:4 102:25

**identification** 56:5 59:22 95:6 107:15 116:24 119:5 123:11 130:20 163:17 173:6

**identified** 30:22 80:8 81:22 90:23 108:12

**identifies** 29:10

**identify** 21:10,14 22:9 23:15,20 24:10 26:4 28:6 29:23 30:6 31:11 33:22 34:9 47:17 62:19 63:3

77:22 79:7,16 80:2, 19 81:13,14 84:18 104:21 106:11 156:12 169:19 172:11,22

**II** 9:4 94:19 175:18

**illiquid** 72:14 84:24

**illiquidity** 75:13

**imagine** 141:14

**immediately** 14:18 160:23

**imminent** 73:14

**impact** 44:9

**implied** 75:9

**impossible** 42:9

**improperly** 122:18

**inability** 78:20

**inaccurately** 129:4

**inappropriate** 17:6, 12

**include** 84:15 124:17 139:6

**included** 84:9 108:11 153:24 166:20

**includes** 140:21

**including** 92:25

**incorporate** 86:19

**increase** 51:21

**incumbency** 90:23 91:4

**incurred** 28:17,20

**independent** 25:20 147:5,16,21 174:25

**indirectly** 147:4 151:13 156:15 157:6

**individual** 15:25 16:16 17:16 38:18 68:23 120:23 143:24 144:12 174:12

**individuals** 88:16

**industry** 46:20 51:12

53:4

**ineffective** 147:25

**inform** 25:17,20 105:3 138:12 151:4 162:13

**information** 15:8 49:19 50:11,18,23 51:5 56:23 60:5 75:15 123:9 127:5,13 129:25 131:3

**informed** 99:11 104:16 105:8,11 108:2 137:8,21 138:7 141:5 142:5 146:16 150:10

**informing** 141:22

**infrastructure** 135:4

**initial** 138:23

**initiatives** 51:10 63:7,10

**input** 87:3

**insist** 26:12

**instruct** 55:6 92:10 138:2 139:9,10 140:4

**instructed** 92:7 107:21 110:2,23 152:20

**instructing** 92:14

**instruction** 152:22 153:18

**instructions** 92:5,17 93:6 151:25

**insurance** 101:8,14, 18,22 102:16,20,23 103:4 112:13

**integrity** 126:19

**intended** 56:18

**intent** 46:15,18

**intentionally** 47:4

**inter** 108:3

**interaction** 126:9

**interest** 22:5 34:16, 23 35:2,5,9,18 36:8, 19 37:5 41:4 70:13

118:17 154:10 156:10

**interests** 72:9,10,13, 19 73:25 74:5,14 75:3,16

**interpretation** 44:5 100:25

**Interrogatories** 163:16 165:10 173:5

**Interrogatory** 171:23 172:12 173:16

**interrupt** 144:25

**interrupting** 145:11

**Interruption** 115:22

**interval** 49:9

**introduce** 9:12

**investment** 98:2

**investors** 98:6 103:10

**involved** 49:25 66:3 92:8 129:10,12 156:16,17 166:22

**iphone** 68:13

**irrelevant** 139:17

**issue** 70:22 77:18 92:3 93:4 169:8

**issued** 38:4 42:5 125:2 140:23

**issues** 141:16

**items** 104:13

**J**

**Jacob** 8:3

**James** 8:1 9:1,5 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1

47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,2 57:1 58:1 59:1,19 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,14 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**January** 25:9 48:18 49:6 143:6 155:2 156:19,22 157:12,14 158:6 159:10,24 161:23 162:15

**Jernigan** 148:12,20 150:19 151:4 162:4, 14

**Jim** 118:5 149:8

**job** 77:4

**John** 17:8 26:9 38:15 66:25 67:11 68:18 76:20 80:12 82:7

96:10 114:22 132:13 164:13

**Johnson** 12:7,9

**Johnson's** 12:12,13

**Jones** 161:3

**judge** 106:15 148:12 150:19 151:4 162:4, 14

**June** 123:24 137:9 140:14

**K**

**kind** 52:20 81:9 139:17 141:13 167:15

**Klos** 97:20 107:18

**Klos's** 108:16

**knew** 40:19,22 45:9 49:22 74:9,13 79:24 80:21 81:17,18,19,23 166:23,24 167:7

**knowing** 136:18,20 139:21

**knowledge** 12:12,13 37:22 69:25 70:4,10 109:15 127:6 140:18

**Kristin** 97:20 108:7 122:17

**L**

**L.P.** 9:7 36:24 39:25 58:5,13 62:16 88:9 89:9 109:3 123:7

**L.p.'s** 173:3

**ladies** 96:6

**large** 71:21 72:14

**largely** 71:25

**largest** 83:5

**lasted** 85:10

**late** 120:3 130:8 164:12

**lawsuit** 29:14 35:21

**lawsuits** 14:9 29:10, 16 30:3,10,16 33:20 34:2,21 39:5 142:24 143:5,10 150:12,20

**lawyer** 160:2

**lawyers** 134:6 161:10

**leadership** 87:5 88:2

**learn** 120:5,9 121:3, 9,11,17 122:2 158:14

**learned** 109:10,25 110:4

**learning** 159:3

**leave** 67:3 97:3 115:6

**leaving** 175:22

**led** 41:8 49:18 50:9 85:10

**left** 38:2 95:12

**legal** 8:4 45:5 133:14, 18,25 134:12

**legally** 146:21

**let alone** 26:19

**letter** 57:4 60:22 127:18,21 136:20,25 138:19 141:15

**letters** 57:2 128:23 129:13 136:19 138:22 139:5,6 157:21

**liabilities** 121:19,22 122:4

**life** 15:5

**likelihood** 73:6,8 75:22

**Limited** 34:17 36:22

**liquidity** 72:13

**list** 14:24 18:22 21:13 26:10,17 28:9,24 29:5 110:8

**listed** 134:2

**listen** 50:7 78:18 148:6

**listing** 15:14

**litigation** 31:11 107:6 109:14,16 110:6,16,19 120:7,12 121:8,10,13,16,25 122:3 149:7 167:9

**litigations** 38:19

**loan** 15:16 38:9 93:13 110:4,14,17 116:17 117:10,13,24 118:15, 21 120:5,11

**loans** 21:20 28:19 38:12 129:6 158:2

**logs** 49:16

**Loigman** 10:8,9

**long** 73:12 85:4,9,10 93:24 96:16 162:23 166:17

**longer** 78:21 85:13

**looked** 13:8 27:15 50:2 164:24

**loose** 47:4

**loss** 98:17 99:4,13 103:6

**losses** 99:17

**lost** 98:24 115:2

**lot** 86:21 89:24 91:15 162:7

**lots** 170:18

**loud** 168:23

**low** 49:22 52:20

**lower** 83:8

**LPA** 169:14 175:7

**lucky** 96:6

**Lynn** 144:22

---

**M**

**made** 32:13 33:13 36:12 47:11,13 48:10 49:23 51:8 61:9 78:3 84:20 102:24 109:20 110:9 114:14 122:17 147:20 148:20 149:4 153:6 154:6,12,15,22 155:6 156:7,13,24

**made** (cont.)

**made** (cont.)

159:10 161:4 162:4

**major** 20:14,19,24 21:7,11

**majority** 34:16,23 35:2,4,8,18 36:8,19 37:5 39:9,18 40:7,8 41:4,18 43:20 72:3 83:6

**make** 13:15 15:10 17:12,17 29:4 46:19 65:4 67:12 92:7,10 99:11 101:3 102:16 113:23 114:8 116:5 118:19 140:9 144:8 152:20 155:20 158:21,24

**maker** 21:10 23:15, 20 26:4 29:23 31:12 32:2,8 33:18 36:3,7 37:6,17,20 79:16,18, 22 80:9 81:2 109:2

**maker/borrower** 80:14

**makers** 27:10 46:25

**makes** 119:11

**making** 26:12,24 100:18

**manage** 129:18

**management** 9:6 39:24 62:15,22 87:5, 16 88:7,9 89:9 92:25 103:24 104:7,9 109:3 123:7 127:18,21 128:22 129:13

**manager** 58:14

**managers** 135:6,8

**manner** 100:17

**Mark** 54:17

**marked** 10:15 56:5 59:22 95:5 97:11 107:14 116:24 119:5 123:11 130:19 163:17 173:6

**market** 89:5

**material** 82:17 106:4 124:18 135:20

**materially** 84:4

**math** 103:3

**Matt** 149:8

**matter** 9:5 55:11 75:6 103:2 146:15 153:11

**Mcgraner** 86:6,21,24 87:2,23

**meaning** 20:21 98:4 134:8

**means** 11:18

**meant** 131:19

**mechanisms** 167:12,14

**media** 9:3 93:20 94:2,19 150:3 175:19

**meeting** 105:21

**meetings** 106:19 130:4

**member** 71:14

**members** 117:17

**memo** 130:9,22,25 131:2 132:24 133:4 134:17 135:13 136:3

**Memorandum** 130:17

**memorialize** 160:24

**memorialized** 49:12 161:22

**memory** 26:13

**memos** 134:21,23 136:5

**mention** 102:24

**message** 66:17

**met** 45:24

**MGM** 70:22 71:14 74:6,14,16 75:11 83:4 167:2

**Michael** 77:5 95:23

**middle** 103:15

**million** 22:4 24:20,23 27:8 52:9,17,23,24 58:2 61:5 62:6 90:17

**mince** 104:5

**mind** 154:12,15 168:8,9

**mine** 96:19

**minimis** 51:25 158:19,23

**minimum** 76:5

**minimus** 51:25

**minor** 20:16

**minority** 72:4

**minute** 17:14 68:8,16 94:2,13 95:2 96:17 115:2 127:8

**minutes** 12:6,22,24 17:20 93:20 96:3 105:20 107:3,5 149:22 162:21 170:2

**mistake** 49:2 114:13

**moderately** 74:21, 23 75:8

**modest** 51:11,21

**modification** 45:6

**modified** 136:4

**moment** 38:8 58:21 125:13 162:20 174:13

**monetization** 72:12 73:13 84:23

**money** 80:25 93:2,10 99:12 101:2 104:2,14 119:18

**monies** 101:10

**month** 147:19

**months** 147:20

**91**:11,13,23 92:6,11, 14 93:12 99:6,16,22 101:22 102:7,17 103:5,17 104:2 107:23 109:2,25 110:13,20,23 111:17, 21,24 112:4,10 117:9 119:10,14,16,23 125:4 129:5 137:10, 22 138:13 140:13,22 141:6,7,12 151:17

**Morris** 8:21 9:14 10:14,19 11:12,23 13:2,11,14 14:17,20, 25 15:4,9,11,22 16:11,22 17:2,9,21 18:2,4,7,16,24 19:5, 11,24 20:15 22:24 26:18,23 27:2 28:2, 23 34:8 35:7 36:5,15 37:16 38:21,24 39:2, 3,15 42:21,22 43:9, 21 44:6,19 45:11 46:2,11,22 48:24 50:4,6,16 52:15 53:23 55:20 56:7 59:16,24 61:8 62:13 63:23 64:6,16 65:19 66:4,16 67:5,14,20, 24 68:3,14,19,21 69:17,19 70:20 71:9 73:3 76:9,23 77:7,15 78:8,15,19 79:2,5,13 80:18 82:5,9,13,14 84:7 85:18,21 86:9 88:4 89:6,20 91:9 93:17,21 94:4,7,10, 14,22 95:7,11,16,19, 22 96:14,22 97:9 98:8,11,22 100:14 101:11 103:14 104:24 105:2 106:6,8 107:4,9,16 108:20,23 111:16 113:12,18,20 114:4,20,24 115:5, 13,25 116:7,9,12,19 117:2 118:2,24 119:7 123:3,13,17,21 124:3,7,11 125:10,11 127:25 128:8 129:15 130:14,21 131:12,16, 17 132:7,14,16 133:10 135:14,17 136:23 137:14 142:3, 11,14 143:17 144:10 145:13,24 149:15 150:6 151:2 152:9,18 155:10 157:4 158:13 160:7 161:8 162:19 163:8,19 164:4,15,17 165:7,9,19,24 170:23 172:6 173:8,12,14 175:9,13,15

**move** 37:2 38:20 50:4 104:24 106:6

**movement** 93:10

**moving** 99:8

**multiple** 61:2 63:7 83:10 138:25 153:22

**mute** 115:16,17,21

### N

**Nancy** 39:18 40:12, 15 41:8,11,16 49:19 51:16 56:23 57:8,12 58:16 60:5,8 64:17 65:6 76:10,15 77:8, 17,21 78:4

**nature** 13:22 58:8,11

**NAV** 99:17 100:8,19 101:15 102:8 104:18 105:5,9,12 106:23

**needed** 96:11 104:3, 14 119:14

**negotiation** 83:24 84:4 85:8

**negotiations** 92:22

**net** 112:12

**Newman's** 10:11

**Nexpoint** 14:11 23:25 58:4,5,12 61:16 62:6,21 63:12 64:19 80:22 81:19 89:7,8,23 90:7 134:4, 12 135:7,24 137:8, 17,20,21 138:3,7 143:19 157:22 173:3, 21 174:5

**Nexpoint's** 138:8

**NFLP** 63:20

**nomenclature** 80:15

**normal** 156:17

**Norris** 153:9

**Northern** 9:8

**note** 14:14 21:11,15 24:7 26:5 28:6 29:24 30:7,13 32:2,8,13,20 33:13,18,23 34:10 35:15,19 36:7 37:6, 18,20,25 38:2,3,4

42:3 44:13 45:6,18, 19 46:5 47:13 48:10 91:11 96:10 108:8, 17,25 109:16,21,24 111:18 117:18 118:17 119:4,17,22, 23 137:17 154:20

**notebooks** 15:7

**notes** 13:20 14:9,15, 24 15:14 18:23 20:3, 5,23 21:7,24 22:10, 14,17 23:7,11,16,21 24:11,16 25:14,24 27:4,10,17 28:20,25 29:5,10,13,15,17 30:2,15,21 31:5,10, 12,23 32:25 33:2 34:20,22 35:20 36:2, 13 39:4,6,20 41:23 42:11 43:15,24 44:23 45:13,14 46:14,23 47:4 51:21,24 69:8, 10,20 70:12 76:11,15 77:10,18,23 79:8,16, 23,24 80:3,9,16,24 81:6,7,15 90:15 91:11,16 92:2 120:21,25 121:4,11, 15,18,21 122:3,10,22 125:2 128:14 135:21 140:23 142:25 146:23 147:8 148:8 150:12,20 151:5 152:7,17 154:10 155:23 156:3,4,8 157:11,24 158:7,24 161:13,20 166:17,18 167:14 169:8 170:20 171:14 174:23

**notice** 148:11 157:10,16

**notice-of-default** 157:21

**notices** 158:5,15

**notifying** 148:10

**noun** 70:18

**November** 9:10 154:7

**number** 9:3 23:11 64:22 66:22 94:2,19 136:13 140:19 150:3

163:23,24 166:2,8 168:11,13,22,23,24 169:19,21 171:23 172:9,13 173:9,16 174:4,7,10,15,19 175:3

**numbers** 50:3 99:8 100:4,5 102:13 104:6 158:22

**numerous** 30:18 36:2 38:12 41:25 60:24 105:17 107:2 144:21

**NXRT** 57:21,24

### O

**object** 15:4 16:11,12, 13 17:21 27:20 28:10 34:24 36:9 37:7 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 59:13 60:11 62:9 65:15,24 69:15 70:15 71:5 72:22 76:2,18 77:2,12,25 78:6,10 79:10 83:25 85:25 87:19 88:10 91:6 98:19 100:10 103:7 111:10 113:7, 16,24 117:21 125:8 127:22 129:7 134:24 136:14 137:11 141:24 142:8 143:12 145:10,19 146:7 150:22 152:5 155:8 157:2 160:3 165:16 172:2

**objecting** 78:9

**objection** 26:19,20 101:5

**objections** 142:19 163:14 173:3

**objects** 8:22

**obligation** 138:8

**obligor** 80:25

**obtain** 71:4 72:21

**obtained** 136:25

**obvious** 50:2 51:3

**occur** 73:7 124:18 159:24

**occurred** 70:2

**October** 130:18,23 133:18,23 136:11 137:3,7 138:20 139:13,22 141:15

**odd** 22:4

**office** 19:7 151:20

**officer** 87:10

**officers** 133:18

**offset** 138:14 141:12

**Okada** 87:24

**one-off** 170:19

**ongoing** 168:6

**opinion** 45:7

**order** 33:10 103:21 104:3 175:23 176:8

**ordinary** 54:9 55:13

**organization** 111:14

**original** 15:15 24:6

**originally** 46:24

**outs** 148:2

**outstanding** 28:21 38:3 119:17 137:16 138:8 140:13 155:23

**overarching** 13:21

**overpaid** 151:16

**overpayment** 154:2

**oversee** 111:4

**overstated** 141:6

**overview** 13:21

**owed** 80:25 137:9

**owing** 152:2

**owned** 72:4 97:25 155:21 157:6

**owner** 87:10

**owners** 87:22

**ownership** 83:10
88:15,18

**P**

**p.m.** 9:11 175:20
176:18

**Pachulski** 161:2

**page--** 13:11

**paid** 52:21 99:15,21,
25 101:17 102:6
104:10 110:2 112:8
113:3,6 114:12
119:9,16 153:25
154:17 158:19,24
160:18,23

**painfully** 172:15

**paint** 53:2

**paper** 117:13 173:13

**paragraph** 13:3,12,
17 14:3 39:16 47:10,
20 48:8 81:25 82:10,
17,25 83:14,18
124:24 141:19 171:6

**parenthetical** 118:4

**parsing** 87:13

**part** 18:16 28:21 30:9
43:23 46:9 65:8,13
73:17,18 83:14,16
104:13 106:4 110:5
112:6 121:7,9
122:10,16,19 145:16
148:8 166:19 167:15
170:22 171:15,18
174:24

**parte** 162:6,10

**participants** 86:5

**participated** 130:4

**parties** 8:14 23:25

**partly** 169:9

**partner** 10:11 95:24

**partnership** 34:17
36:22 125:3

**pas** 38:6

**past** 38:7

**pay** 112:17 114:8
151:25 152:12,16
174:22

**payable** 15:14
135:20

**payee** 32:3 35:19
37:18,21 80:9

**paying** 99:12

**payment** 91:20
97:22 98:3,5 100:8,
18 101:3 102:18
103:16,22 104:3
109:20 113:13,21
118:16 153:6 154:22
155:6,7,20 156:7,12

**payments** 151:12
152:10,15,21 154:5,
9,11,14 156:18,19,24
159:9,11 160:18
161:4,5,12 162:4,15,
16

**pending** 8:20 30:3,9,
16 31:10 33:19 34:2,
20 35:21

**people** 67:3 148:19,
24 153:14,24

**percent** 35:3 57:16
60:20 71:16 96:24
126:23 127:9

**perfectly** 64:12

**performance** 57:22
63:17 89:2

**performed** 106:2
134:14

**period** 47:23 122:23
124:19 129:4,14
138:19 139:13

**periods** 85:14

**person** 31:3,8 88:6
144:12 158:17
159:15

**personal** 18:18
68:12

**petition** 25:5,12,22
26:6 27:7,13 70:25
72:18

**phone** 49:16 63:24

96:15 160:12 161:17

**photograph** 64:8
66:17

**phrase** 13:25 36:19,
21 150:14

**picks** 104:22

**picture** 15:20 16:20
53:2 64:3,15 68:7

**piece** 93:4

**place** 71:20 135:13
143:7 161:18,19

**places** 105:17

**plaintiff** 39:19,20,23
40:9 41:19

**Plaintiff's** 13:5
163:15 173:4

**plan** 142:20 146:22
148:23 166:22

**platform** 87:2 90:6

**plays** 126:11

**pleading** 145:18

**pleadings** 145:22

**plot** 146:22 148:23
166:22

**pocket** 103:21

**point** 18:16 37:19
103:25 141:17 148:5
149:13 175:6

**portfolio** 70:14,21
71:3,12 72:9,20
73:25 75:3,17 82:16
87:4,25 135:6,8

**portion** 120:22
131:7,21 132:10
137:22 138:13

**portions** 72:14

**potential** 32:13
33:13

**potentially** 11:21

**practice** 8:7 134:20
135:3

**precise** 24:21

**preferred** 86:4

**premarked** 56:9

**preparation** 126:3
167:24

**prepare** 55:15 108:7

**prepared** 54:10,14
56:14 117:19

**preparing** 55:2
133:4

**prepaying** 38:2,5

**prepays** 37:25 38:7

**present** 42:7 69:13

**presented** 147:11
148:25

**president** 61:15,16
87:9 91:5 126:14
134:20 147:23

**pretty** 126:23 135:8

**previously** 76:8
117:19

**price** 83:7

**Pricewaterhouseco
opers** 123:23

**Pricewaterhouseco
opers'** 123:19

**principal** 21:14,24
22:5 24:6,16 30:7
31:13 118:17 140:22
154:9 156:10

**prior** 24:19 29:9
50:18 63:19,20 70:25
72:18,25 73:2 76:11
90:2 96:20 110:15,19
121:25 144:14 145:7
149:6 150:9,17 151:3
165:13 166:4,14
167:8 168:14,19,25
169:11 170:12

**private** 63:8

**problem** 78:8 132:20
140:10

**procedures** 8:19
103:4

**proceed** 9:18 19:6
68:3,14

**proceeding** 165:14
166:5,15 168:15
169:2,12 170:13

**process** 71:23
122:11 130:6,11

**produced** 14:18
107:6

**producing** 67:8

**product** 125:23

**production** 66:20,21
163:17 173:6

**professional** 77:4

**promise** 67:18

**promissory** 13:19
20:3,23 21:6,15
22:10,14,17 24:11
17,24 30:2,7,13,15,
21 31:25 32:8 33:18,
23 34:10,13,19,21
35:15,19 36:7 37:6,
18 39:4,6 41:23
42:11 43:15,24
44:13,23 46:14
76:11,15 77:9,18,22
79:8 108:8,17,24
109:16,21,24 117:18
119:3,23 122:10,22
125:2 150:11,20
151:5 169:8

**propel** 51:10

**proper** 53:2

**properly** 122:18

**property** 41:24 42:5,
17 43:2

**proposal** 146:21
167:25

**proposals** 147:2,20
149:4 169:6

**proposed** 84:16

**proved** 147:24

**provide** 49:19 50:10,
17 53:24 86:17,24
89:8 125:21 129:25

**provided** 85:23 86:3,
7,14,21 87:11,16
88:8,22 106:21 130:9

133:25

**providing** 87:8

**provision** 83:23
84:8,15,18

**purpose** 46:12

**purposes** 60:22

**pursuant** 85:23
86:14

**put** 10:14 14:21 15:23
16:3,14 55:20 59:16
82:3 85:15 93:17
94:23 115:14 116:19
118:10 123:3 130:14
132:12 146:21 163:9

**puts** 126:21

**putting** 92:25 93:4
109:23

**PWC** 122:10 126:21
127:2 128:11

### Q

**question** 11:14 20:4
32:5 33:6 35:13 50:8
52:13 53:17 69:18
72:16 77:3 78:9 80:2
81:10 86:12 88:5,18
96:23 100:13 106:17
109:23 135:19
136:13 141:20 145:2
146:8 150:16 169:5

**question's** 149:5

**questioner** 89:19

**questioning** 120:23

**questions** 10:8 14:6
15:24 16:15 17:3
20:5 28:5 50:22
53:11 68:22 76:8
78:24 88:14 106:14
132:9 138:23,24,25
139:7 140:17 143:21,
23 165:5 175:10,17

**quick** 149:14

**quickly** 132:19
165:20 173:18

**Quinn** 10:10

**quote** 39:17 47:11
97:21 108:3 117:10,
13,14 124:25 166:4,7

### R

**raise** 9:24

**range** 22:6

**rattled** 138:17

**reach** 95:24 96:4
148:2 159:16,17,21

**reach-outs** 148:7,19

**reached** 159:8,15

**reaches** 148:2

**read** 64:10 83:20
132:19 168:17,23
169:4

**reading** 168:18

**ready** 116:13

**real** 86:25 89:10,24
90:3,7 112:16 134:6,
10

**reason** 62:7 75:20
77:16 150:13,21
151:6 168:2 173:17
174:14,15,19 175:2

**recall** 20:17 53:5,16
54:4,9 59:9 61:19
75:19 76:13,17
79:12,14 84:13,17
85:9 90:22 91:3,12
93:6,8 99:10 105:6
109:7,10,22,24 110:3
111:19,22,23 112:8,
11,19 113:2,4 114:5,
7,10,11 118:14 130:8
132:24 142:19,23
145:25 146:11
151:10 153:3,4,18
157:9 158:10,11
160:13,15 164:23
167:17,22

**receive** 101:20

**received** 36:13 56:20
58:17 64:18 65:7,13,
22 66:16 102:17

**recipient** 36:4

**recollection** 32:11,
18 33:10 48:2,11
49:7 61:12 63:16
92:13,16 99:4 101:21
102:6,16 103:11
112:13 114:17,18
120:13,18 121:6
133:24 137:16 143:9
151:23 152:19 158:4
164:9,18,20

**reconciliation** 101:8

**record** 8:9 9:21
10:10 15:10 16:13
17:19,25 18:5,8,12,
14 66:11,15 89:4
94:6,7,21 95:15,18
97:2 115:4,9,10,12,
24 149:24 150:5
161:15,18 162:24
163:2,3,7 175:20,23

**recording** 8:15

**records** 93:14

**Redeemer** 72:5

**refer** 19:21 48:9 78:4
143:18

**reference** 63:11

**referenced** 47:19

**referred** 14:3 72:12

**referring** 66:18
171:4

**refers** 39:24 57:20
118:7

**reflect** 97:2

**reflected** 32:23 33:3
57:8,14 59:11 64:19
105:15,19 161:22

**reflects** 153:18

**refresh** 32:18 33:10
143:9 164:18

**refreshed** 63:6

**refreshes** 164:9,20

**refuse** 84:15

**regard** 71:24 72:2
121:15 147:18

**regular** 168:5 175:25
176:2

**reinvested** 49:22

**REIT** 57:25 58:4,12,
15 63:13 64:19

**relate** 72:8,10

**related** 30:24 81:18,
23 86:25

**relating** 32:7 57:21

**relationship** 58:8,11
74:18

**relative** 51:25 52:2
158:19

**relevant** 32:20 51:12

**reliance** 126:21

**relied** 106:3 111:12

**rely** 111:3

**remained** 18:13 42:6

**remember** 13:9
21:3,4 22:4 23:18
24:2 27:23 28:14,18
49:10 52:6,24 57:10
59:2,7 65:9,18 76:4
81:20,21 84:21,23,25
85:2,3,4,12,13 91:15
103:12 113:10 120:8
146:15 152:11 153:9,
15 154:19 157:25
159:5 165:4 168:3

**remind** 171:3

**remote** 8:15

**remotely** 8:10,13
9:10

**renew** 129:21

**renewal** 129:25
130:5 136:7 138:24

**Reorganization**
142:17

**repeat** 32:4 50:21
52:13 100:13

**repeating** 78:24

**report** 125:2,7,13,17,
19,22 127:15 139:17,
21 140:12

**reported** 111:14
128:19

**reporter** 8:11 9:22,
24 18:10 94:17
149:12 175:21 176:4,
7,12

**reporting** 8:5 126:8

**reports** 126:4,8
127:6 139:18

**represent** 136:24
143:4 173:20

**representation**
127:18,21 128:23
129:13

**representative**
39:8,18 40:7 41:17

**representatives**
46:25 147:17

**representing** 170:20

**represents** 105:22

**request** 10:3,17
13:13 16:14 17:15
55:22 59:18 84:10
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:4,25
132:4,6 133:9 135:16
137:3 142:13 163:12
165:8,25 168:11
169:18,20 174:4,7,9,
10,14,18 175:3

**requests** 138:23
163:15,16 165:18
173:4,5 174:20

**required** 90:5 113:22
114:8

**resolution** 112:7

**resolve** 112:14

**Resources** 54:15,
18,21

**respect** 158:6 159:3,
9 174:11

**responded** 172:17

**response** 108:15
136:11,12 137:2,4
172:12

**responses** 163:10,
14 173:4,21

**responsibilities**
51:13

**responsibility** 80:7

**responsible** 55:2
104:17,23 105:4,9,12
106:22 113:5 125:16,
18 126:2,18 127:14
133:4

**rest** 13:24

**restate** 69:18

**restitution** 112:25

**Restoration** 72:5

**restricted** 57:20
58:17 59:11 63:12
64:18,25 65:7,13,22
71:20

**restroom** 96:13

**result** 28:19 44:12
99:17 100:8

**resume** 18:20

**reswear** 9:23

**retail** 105:22 129:18,
20 130:2,5,10 131:2
134:18,22 136:12
137:8,21 138:3,7,12
139:22 140:12 141:5,
11,22 142:6

**retained** 59:6

**review** 122:6 130:11
134:17 164:25

**reviewing** 134:22

**revisions** 81:24

**rights** 43:19

**Robert** 10:8

**role** 53:3 87:5 126:11

**rolled** 51:9

**rolling** 95:20

**room** 8:8,12 96:6,7
153:16

**rough** 103:3,10
175:25

**Rule** 8:18

**rules** 8:18,19

**running** 71:15

**rush** 176:3

———————

**S**

**salaries** 104:10

**salary** 52:8,17 57:8
60:9,19,25 61:10,13,
17,21 62:5

**sale** 71:17 73:16

**sampling** 126:24
127:9

**satisfied** 42:6 70:7
75:23

**Sauter** 134:8

**schedule** 49:16
63:22

**screen** 10:15 56:10
82:4 95:9 97:10
114:21,23 119:22
131:15 163:9

**scroll** 124:8 131:8

**scrolling** 131:23

**seat** 95:13

**SEC** 92:4 98:2,4
99:11,25 103:12
104:17,21 105:4,8

**section** 124:13 132:9
134:3 135:15,18
171:24

**Seery** 144:22 147:3,
17,22,24 149:8
153:22 154:4 160:2
174:21

**sell** 70:13 71:2,12
72:19

**selling** 71:22

**send** 15:20 16:21
19:7,10 64:3 66:6
68:7,9 118:11

**sending** 160:15

**senior** 92:24 134:9

**sense** 118:19 119:11

**sentence** 118:4

**separate** 20:6 38:4

**series** 58:2

**serve** 133:22

**service** 88:23

**serviced** 135:11

**services** 14:10 62:23
81:19 85:23 86:4,7,
14,17,22,23 87:8,11,
16,22 88:8,15 89:8,
21 133:25 134:13,15
135:12 143:19
151:16 152:8,13,15,
21 153:7,25 154:2,8
157:22

**serving** 126:13

**set** 13:15 56:18 81:25
82:17 83:17 143:20
171:5

**sets** 82:19 100:16

**settle** 93:2

**settlement** 92:21,22
104:13 147:2 148:8
151:19 166:20,22
167:24 169:6,23
170:18

**settlements** 147:25
168:5

**seven-year** 63:22

**severity** 8:6

**share** 65:21

**shared** 53:6 133:25
134:13,15 135:12
151:16 152:8,12,15,
21 153:7,25 154:2,8

**shareholder** 112:24

**shareholder's** 71:19

**shareholders** 39:9
40:8 41:18

**shares** 58:2 71:22

**sheet** 14:14,18 27:15
72:15 121:5,19,23

**sheets** 122:4

**shift** 85:17

**shortly** 96:9

**show** 158:9 169:7

**showed** 57:4 76:10
120:3 164:15

**showing** 70:6

**shows** 100:7 101:2

**shuffling** 173:13

**sic** 9:4 94:20 175:19

**sign** 124:21 126:16
128:22

**signature** 123:19
164:10,16 173:25

**signed** 45:13 46:24
48:16,17,21,22 90:15
91:4 123:23 127:17
129:13 164:21 165:2

**significant** 72:4 86:7
151:17

**similar** 136:5 138:21

**simple** 65:4 81:9
112:16

**simply** 88:7

**sir** 28:24 56:10 80:6
95:20 98:13 106:10
116:4,13 117:6 119:8
123:15 127:3 131:24
144:2,24 145:5
155:16 162:10
163:25 164:6 171:25

**sis-** 84:9

**sister** 40:12 50:11,18
51:5 52:7,16,19 53:6,
10,17,25 54:5 57:5
73:11 75:14,21

**sit** 23:19 34:11 35:25
39:13 48:14 52:6
53:9 81:20,21 148:17
158:3 165:3 172:21

**situation** 112:7

**sixth** 39:12

**small** 99:8 104:5
158:23

**snap** 17:18

**social** 8:7

**sold** 73:19 83:5,11,12
148:4

**sole** 127:4

**solely** 15:25

**solution** 146:22

**sought** 161:11

**sound** 47:23 119:19

**sounds** 45:4

**source** 102:17 127:4,
11,12

**sources** 101:2

**space** 151:20

**speak** 8:23 11:6
12:21 72:25 115:17

**speaking** 12:3 26:19
78:10

**special** 176:3

**specific** 26:16 28:7
48:2 85:5 118:18
122:13 128:18,19
137:3 149:5 152:16
170:7

**specifically** 21:4
28:15 30:4,11 31:2
34:11 35:24 37:14
41:11 50:15 52:6
55:8 57:10 60:13
80:3 81:22 84:12
96:16 97:2 98:14
103:13 106:21
107:25 110:11
111:22 118:13
119:11 139:9,11
140:3,25 143:14
146:7 149:10 169:24
170:3 171:5,9

**specificity** 47:18
49:10 121:15 122:8
148:24

**specifics** 21:20
91:15 166:24 167:3,
7,21

**speculate** 27:24
28:4

**speculation** 118:9

**speed** 65:11

**spend** 12:3

**spending** 38:22

**spent** 62:2

**split** 61:12

**spoke** 71:16

**spoken** 8:24 10:24

**spread** 62:17,20 85:14

**spreadsheet** 97:20

**spreadsheets** 154:3

**staff** 105:24 135:10

**stamped** 56:4 59:21 95:4 107:13 116:23 119:4 123:10 130:18

**stamping** 67:3,8

**stand** 94:13

**standard** 135:3

**standards** 46:20 51:12 53:4

**standing** 155:24 176:8

**Stang** 161:2

**start** 9:3 92:3 146:6

**start-up** 89:3

**state's** 8:19

**stated** 10:9 41:25 106:21

**statement** 39:17 54:12 56:4,13,18 59:21 60:2 71:8 100:23 125:20

**statements** 32:24 33:3 55:3,15 120:16 122:7,23 123:8 128:10,15 129:3

**States** 9:7

**stay** 19:22 95:17

**stenographic** 9:20

**steps** 110:21

**stick** 78:5

**stipulate** 8:14

**stock** 57:21 58:18 59:11 63:12 64:19 65:7,13,22

**Stonehill's** 168:9

**stop** 17:22 38:24 39:2 76:25 78:15,16 115:18 132:2

**Stotz** 8:11

**strike** 50:5 104:24 106:7,13 146:6

**string** 97:14 108:12

**struck** 50:22

**stuck** 80:14

**stuff** 134:7 148:5

**Sub-** 72:24

**subadvisory** 105:23

**subject** 13:20 14:9 20:24 21:7,11,15,25 22:10,14,18 23:7,12, 16,21 24:7,12,17 25:25 26:5 27:5,11, 17 28:7,25 29:5,11, 14,16,18,24 30:2,8, 14,16,21,22 31:2,10 33:19,23,25 34:20,22 35:16,20 36:7 39:5,7 41:23 42:11 44:23 45:19 69:9,11,20 72:24 77:23 79:9,17, 23 81:3,6,8,15 83:24 84:19 137:23 138:9, 14 141:12 146:15 150:12,20 171:19

**subsequent** 13:20 21:5 42:8 43:8 44:5 45:10,19,24 47:6 69:16,23 70:6,11 72:7 73:7,17 75:23 82:20 122:24 124:14, 17 136:19 138:24,25

**subsequently** 147:22

**substance** 11:7,15, 18 132:24 165:11

**substantial** 21:5

**substantially** 74:9,

15,22 75:11

**substantive** 11:20

**sued** 90:14

**suite** 126:17

**supplemental** 123:8 131:3

**support** 83:12 97:21 134:2

**supposed** 151:18 174:23

**surface** 136:21

**surprised** 125:6 158:18

**sustained** 99:17

**Suzanne** 8:11 94:16

**swear** 8:12

**swearing** 8:16

**switch** 129:16

**sworn** 10:5

---

**T**

**table** 13:15

**takes** 68:11

**taking** 18:17,20 94:10 161:18,19

**talk** 11:17 17:18 91:10 111:17 167:20

**talked** 59:5 60:14 120:14 174:11

**talking** 33:15,17 38:13,24 39:2 64:24, 25 146:6 153:20 156:2 162:9

**tape** 96:23

**team** 54:25 55:14 56:14 153:8,10,15

**telling** 14:25 78:17 153:4 167:17

**template** 117:18,24

**ten** 24:20,23

**tendered** 154:21

**term** 15:15,16 21:19 28:19 34:15 36:23 46:4 156:2 157:11 158:2,7 161:13 166:13

**terms** 44:13,22 45:5 46:14 82:18 88:25 144:17 165:12 166:6, 12,25 170:4,7 171:12

**terrace** 92:3

**Terrestar** 98:2 112:7

**test** 26:13

**testified** 10:6 12:8 51:18,20 53:7 57:11 144:20 170:2

**testifying** 48:22

**testimony** 10:25 12:12,14 32:22 44:4 48:15 49:3 145:17 155:4

**Texas** 9:8

**text** 66:17 68:8 96:2

**texted** 95:25

**thing** 44:8 88:24 92:19 127:7 132:19

**things** 26:13 28:20, 21 38:23 47:6 83:11 153:22 162:7 166:23 172:18

**thinking** 138:18

**thinks** 11:18

**thought** 31:19 36:20, 23 87:12 159:23 160:5,24 162:2 170:3 172:18

**throw** 144:4

**ties** 127:10

**time** 9:15 12:3 29:20, 21 32:5 35:9 37:13 38:8,23 39:12 40:5, 16,19,25 42:4,13,15, 23 47:4 52:21 61:14 62:2,14,17,20 63:4 64:13 66:8,15 67:6 71:3 73:12,21 74:6, 12,19,25 75:24 76:6 78:7 83:20,21 85:4,

14,24 87:6,10 92:23 93:11,15 96:19 109:8,12 114:9 117:16,17 120:3,6,8, 11 121:18 126:13 129:11 136:18 138:19 141:17 142:6 143:11 149:22 150:5 153:16 160:20 163:7 172:17 175:6

**times** 41:25

**tired** 144:25

**title** 111:7,8 134:7

**today** 13:25 33:16 34:12 35:25 36:3 38:14 39:14 40:13 52:6 53:9 66:10 67:4 70:3 81:21 132:25 133:2 144:7 165:3 172:21

**today's** 175:18

**told** 47:7 52:25 110:15 117:8 129:2 139:12 141:11 145:25 146:11 158:22,23 162:14 167:12 171:13 174:21

**tomorrow** 67:4,13

**tonight** 67:12 176:14

**top** 22:22 24:4,5 26:8 27:23 29:21 31:14 63:5 90:11 97:18 108:14

**topic** 150:7

**topics** 38:16 41:8

**total** 102:5 103:6,16

**totals** 101:19

**track** 89:4

**track-record** 88:24

**trade** 58:3

**transaction** 90:6 108:3 110:16

**transactions** 124:18 134:6,11

**transcript** 96:15

**transfer** 91:23 92:6, 8,9,11,14 93:7,12 107:22 110:13 111:24 112:4 116:16 117:9 120:10

**transferred** 91:13 110:24 111:21 119:18 129:5

**transfers** 110:9

**transition** 151:19 153:24

**travel** 49:15

**treasurer** 90:24 111:8

**trick** 81:10 146:10

**triggered** 42:8,9

**true-up** 151:19 153:22

**trust-** 20:25

**trustee** 19:19,22 20:2,11,19 21:2,8,12, 17 22:2,11,19 23:3,8, 13,17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:9 29:19,25 30:9,15,23 31:4,9,25 32:7,12 33:12,25 39:8 40:12,15 41:3 42:25 43:6,14,18 44:11,21 45:17 47:19 49:5 50:20 51:7 53:13 73:11 75:24 78:5 79:7,15,21 81:4, 13 84:14,20 137:24 138:10 139:25 144:19 145:9 146:3, 13,19 148:14 149:9 167:11 170:12

**trustee's** 84:10

**trustees** 82:24

**Trustway** 70:22 71:24 74:22 75:8 167:2

**TSG** 8:5

**turn** 47:25 97:6 123:14

**turned** 84:24

**type** 128:6 133:4 140:16

**types** 56:19

**typically** 112:25

---

**U**

**UBS** 170:20

**ultimate** 28:19

**ultimately** 41:8 42:2 45:22 146:25

**unable** 45:24

**understand** 10:20 34:3 40:6 68:25 98:15 100:6,15 131:18 144:6 171:7

**understanding** 36:21 40:25 43:22 49:25 51:2,3 58:7,11 61:25 73:9 74:4,8,17, 21 75:10,22 83:15,17 98:16 103:19 124:16 125:22,24 126:22 127:20 128:4,7 160:9,17 161:11

**understood** 42:16, 24 43:6 74:13

**underwear** 80:14

**unenforceable** 150:13,21 151:5

**unfettered** 71:25

**unilaterally** 71:18

**United** 9:7

**units** 57:21 58:18 59:11 63:12 64:19 65:2,7,13,22

**updates** 148:22

---

**V**

**validity** 8:15

**valuation** 105:25 106:2

**variety** 62:18 80:17

**varying** 75:4,6

**vendors** 104:22 127:10

**verbal** 49:21 51:2

**verification** 126:24 127:9

**verified** 60:18

**versus** 76:7 84:22,24 102:2 118:21

**vest** 58:22

**vested** 57:16 58:19, 24 64:23

**vesting** 63:22

**vests** 58:25

**video** 8:10,15 17:25 95:19 97:6 115:24

**video-recorded** 9:4

**view** 131:7 132:10

**virtually** 28:14

**volatility** 75:12

**Volume** 9:4 94:19 175:18

**voluntary** 113:14

**vote** 112:24

---

**W**

**wait** 40:2 81:5 165:16

**wanted** 41:12,16 90:12 98:2,4 175:22 176:13

**Waterhouse** 90:16, 24 93:7 97:17 108:11 111:3 126:11 151:11, 24 152:20 153:2,5,19 160:10,16 161:16,23 162:14 165:13 166:7, 14 170:4

**Waterhouse's** 97:19

**ways** 37:12

**week** 12:16 44:18 120:3

**weeks** 136:2

**well-known** 92:18

**wider** 49:9

**wire** 110:8

**withdrawn** 21:22 22:8,15 29:14 34:14 35:16 42:21 47:9 51:15 69:9 82:22 113:18 114:6 121:20 125:10 133:16 154:13

**witnesses** 15:7

**Wonderful** 175:11

**word** 39:23 171:4

**work** 101:23,24 125:22

**working** 62:2 73:13 126:2

**works** 146:20

**world** 11:4

**worth** 58:20 92:4

**wrap** 149:16

**wrestle** 170:25

**writing** 86:10 87:22 105:15,18 106:20 153:17 160:10,11,13 161:21

**writings** 106:9

**written** 85:22 86:11, 13,20 130:9 146:21 161:15,18 163:10

**wrote** 28:24

---

**Y**

**year** 22:13,16 24:19 28:15,17 30:12 47:9, 12,14,25 48:9,11 49:8 52:18 55:10,11 56:20 57:16 105:22 106:5 113:3 118:15 142:6 154:13

**year's** 136:6

**years** 21:5 30:19 38:11 49:6,24 51:9 58:23,24,25 59:2,3,4 63:6 76:5 126:23

**years'** 63:20

**yelling** 115:18,19

**yes-or-no** 11:14

**Yup** 56:11 97:13

---

**Z**

**Ziehl** 161:3

**ZIP** 51:22 53:2

# EXHIBIT 100

Appx. 01873

1

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION

4
    IN RE:
5                          CHAPTER 11
    HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,        CASE NO. 19-34054-SGI11
            Debtor.
7   _____/
    HIGHLAND CAPITAL
8   MANAGEMENT, L.P.,
            Plaintiff,      ADVERSARY PROCEEDING
9      v.                   NO: 21-03000-SGI

10  HIGHLAND CAPITAL
    MANAGEMENT FUND ADVISORS,
11  L.P.; NEXPOINT ADVISORS,
    L.P.; HIGHLAND INCOME
12  FUND; NEXPOINT STRATEGIC
    OPPORTUNITIES FUND;
13  NEXPOINT CAPITAL, INC.;
    AND CLO HOLDCO, LTD.,
14          Defendants.
    _____/
15

16
        REMOTE VIDEOTAPED DEPOSITION
17
               OF
18
        NANCY DONDERO
19
       Monday, October 18, 2021
20

21

22

23

24  Reported by:
    ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25  JOB NO. 201194

Page 2

```
1
2
3
4
5        October 18, 2021
6        10:30 a.m. (Central)
7
8      Remote videotaped deposition of
9   NANCY DONDERO, pursuant to Notice Rule
10  30(b)(6) and individually, before
11  Annette Arlequin, a Certified Court
12  Reporter, a Registered Professional
13  Reporter, a Certified Realtime
14  Reporter, and a Realtime Systems
15  Administrator and a Notary Public of
16  the State of New York, New Jersey and
17  Florida.
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4   PACHULSKI STANG ZIEHL & JONES
5   Attorneys for Debtor
6       150 California Street
7       San Francisco, California 94111
8   BY: JOHN MORRIS, ESQ.
9        - and -
10  PACHULSKI STANG ZIEHL & JONES
11      780 Third Avenue
12      New York, New York 10017
13  BY: HAYLEY WINOGRAD, ESQ.
14      GREGORY DEMO, ESQ.
15
16
17  STINSON
18  Attorneys for Jim Dondero, HCMS, HCRE and NexPoint
19      3102 Oak Lawn Avenue
20      Dallas, Texas  75219
21  BY: DEBORAH DEITSCH-PEREZ, ESQ.
22      MICHAEL AIGEN, ESQ.
23
24
25
```

Page 4

```
1
2   A P P E A R A N C E S(Cont'd.):
3
4   LATHAM & WATKINS
5   Attorneys for UBS Securities LLC and UBS AG London
6       1271 Avenue of the Americas
7       New York, New York  10020
8   BY: SHANNON McLAUGHLIN, ESQ.
9
10  HELLER DRAPER & HORN
11  Attorneys for Dugaboy
12      650 Poydras Street
13      New Orleans, Louisiana  70130
14  BY: DOUGLAS DRAPER, ESQ.
15
16
17  GREENBERG TRAURIG
18  Attorneys for Nancy Dondero
19      2200 Ross Avenue
20      Dallas, Texas  75201
21  BY: DANIEL ELMS, ESQ.
22
23
24
25
```

Page 5

```
1
2   A P P E A R A N C E S(Cont'd.):
3
4
5   MUNSCH HARDT KOPF & HARR
6   Attorneys for Highland Capital Management
7   Fund Advisors, L.P. and NexPoint Advisors L.P.
8       500 N. Akard Street
9       Dallas, Texas 75201
10  BY: DAVOR RUKAVINA, ESQ.
11      THOMAS BERGHMAN, ESQ.
12
13
14  ALSO PRESENT:
15
16  AARON LAWRENCE,  Clerk, Quinn Emanuel
17  LA ASIA CANTY, Paralegal from Pachulski
18  PAIGE MONTGOMERY, Litigation Trust Attorney
19  PATRICK DAUGHERTY (as noted)
20  DEBORAH NEWMAN
21  MANUEL GARCIA, Legal Videographer
22
23
24
25
```

Page 6

1
2      IT IS HEREBY STIPULATED AND
3  AGREED by and between the attorneys for
4  the respective parties herein, that
5  filing and sealing be and the same are
6  hereby waived;
7      IT IS FURTHER STIPULATED AND
8  AGREED that all objections, except as
9  to the form of the question, shall be
10  reserved to the time of the trial;
11      IT IS FURTHER STIPULATED AND
12  AGREED that the within deposition may
13  be sworn to and signed before any
14  officer authorized to administer an
15  oath, with the same force and effect as
16  if signed and sworn to before the
17  Court.
18
19      - o0o -
20
21
22
23
24
25

Page 7

1              N. Dondero
2      THE VIDEOGRAPHER:  Good morning.
3  My name is Manuel Garcia.  I'm a
4  certified legal videographer in
5  association with TSG Reporting, Inc.
6      Due to the severity of COVID-19,
7  and following the practice of social
8  distancing, I will not be in the same
9  room with the witness, but will record
10  the deposition remotely.
11      The reporter, Annette Arlequin,
12  also will not be in the same room and
13  will swear the witness remotely.
14      Do all parties stipulate to the
15  validity of this video recording and
16  remote swearing, and that it will be
17  admissible in the courtroom as if it
18  had been taken following Rule 30 of the
19  Federal Rules of Civil Procedures and
20  the State's rules where this case is
21  pending?
22      MR. MORRIS:  Yes.
23      I would ask if anybody objects,
24  to speak up.  If you don't object, then
25  we're going to go on negative notice

Page 8

1              N. Dondero
2  here.
3      (No response.)
4      MR. MORRIS:  Thank you very much.
5      And just to be clear, as I
6  communicated with Debra last evening,
7  the court reporter is not currently in
8  the State of Texas.
9      And I understand that counsel for
10  all defendants in the notes litigation
11  have waived any objection to the fact
12  that the oath is being administered
13  outside of the state.
14      If anybody disagrees or objects
15  to that, please speak up now.
16      Thank you very much.
17      Okay.  You can swear the witness.
18      *      *      *
19  N A N C Y  D O N D E R O,  called as a
20  witness, having been duly sworn by a
21  Notary Public, was examined and
22  testified as follows:
23      THE WITNESS:  Yes.
24  EXAMINATION BY
25  MR. MORRIS:

Page 9

1              N. Dondero
2      Q.  Okay.  Can you please state your
3  name for the record?
4      A.  Nancy Dondero.
5      Q.  And where are you located right
6  now, Ms. Dondero?
7      A.  In the law office of Deborah
8  Deitsch-Perez.
9      Q.  Are you in Dallas?
10      A.  I am.
11      Q.  Is there anybody in the room with
12  you right now?
13      A.  Yes.
14      Q.  Who is in the room with you?
15      A.  Deborah Deitsch-Perez and Dan
16  Elms.
17      Q.  Is there anybody else in the room
18  with you right now?
19      A.  Electronically is Douglas Draper.
20      Q.  Okay.  Thank you very much.
21      Do you have a telephone with you
22  right now?
23      A.  My cellphone?
24      Q.  Yes.
25      A.  Yes.  It's in my purse.

Page 10

1        N. Dondero
2    Q.   Is it turned off?
3    A.   It is -- well, yes, um-hmm.  It's
4  on silent.
5    Q.   Okay.  Thank you very much.
6        My name is John Morris.  I'm an
7  attorney at Patchulski Stang Ziehl & Jones.
8  We represent the reorganized Highland
9  Capital Management LP, and we're here for
10  your deposition today.
11        Do you understand that?
12    A.   I do.
13    Q.   Okay.  Do you understand that
14  this deposition is being videotaped?
15    A.   Yes.
16    Q.   And do you understand that I may
17  seek to use that videotape in a court of
18  law?
19    A.   Yes.
20    Q.   Do you understand that you're not
21  allowed to communicate with anybody
22  concerning the substance of your testimony
23  until the deposition is completed?
24    A.   Yes.
25    Q.   Is there anything that would

Page 11

1        N. Dondero
2  prevent you from answering my questions
3  today?
4    A.   No.
5    Q.   Do you have any problems with
6  your memory?
7    A.   No.
8    Q.   Are you on any drugs or
9  medications that might impair your ability
10  to answer questions today?
11    A.   No.
12    Q.   Have you ever been deposed
13  before?
14    A.   Once, a number of years ago.
15    Q.   Do you recall the subject matter
16  of the testimony or the circumstances in
17  which you gave a deposition?
18    A.   Personal injury.
19    Q.   And were you a witness or were
20  you the plaintiff in that matter?
21    A.   Plaintiff.
22    Q.   Okay.  So let me just give you
23  the general ground rules so that there's --
24  so that this can be efficient.
25        This is a very difficult process

Page 12

1        N. Dondero
2  in normal times.  It's particularly
3  difficult because we're doing this
4  remotely.
5        So it is very important that you
6  allow me to finish my question before you
7  begin your answer.
8        Is that fair?
9    A.   Yes.
10    Q.   And it's very important that I
11  allow you to finish your answers before I
12  begin the next question.
13        And if I fail to do that, will
14  you let me know?
15    A.   I will.
16    Q.   Okay.  If there is anything that
17  I ask you that you don't understand, will
18  you let me know that?
19    A.   Yes.
20    Q.   Okay.  From time to time, we're
21  going to put some documents on the screen.
22  It's not a -- you know, it's not intended
23  to be a test.
24        If you see a document on the
25  screen and you think that you need to see a

Page 13

1        N. Dondero
2  different portion of the document to put
3  what I'm asking you about in context, will
4  you let me know that?
5    A.   Yes.
6    Q.   Okay.  I sent down to your lawyer
7  last week 29 hard copies of certain
8  documents.
9        Do you have those handy?
10    A.   The big binder?
11    Q.   Yes.
12    A.   Yes.
13    Q.   Okay.  All right.  We may refer
14  to those --
15        MR. RUKAVINA:  John, hold up for
16  a second.  This is the Davor Rukavina.
17  I'm one of the attorneys defending two
18  of the defendants.  I just -- we
19  haven't taken appearances, John.  I
20  just want to make sure that the record
21  is clear that Deborah will be
22  objecting, Ms. Deitsch-Perez will be
23  objecting for me so that I don't have
24  you to object.  In other words, when
25  she objects, consider it an objection

Page 14

1          N. Dondero
2    on behalf of my clients NexPoint and
3    HCM Financial Advisors.
4          Is that acceptable, John?
5          MR. MORRIS: Yes.
6          MR. RUKAVINA: Thank you. Then
7    there is no need for me to speak.
8          MR. MORRIS: Okay. We'll miss
9    you.
10   BY MR. MORRIS:
11        Q.   If you need a break at any time,
12   will you let me know that?
13        A.   Yes.
14        Q.   Okay. It's very important that
15   all of your responses to my questions be
16   verbal so that the court reporter can take
17   it down, okay?
18        A.   Okay.
19        Q.   And you do understand that the
20   court reporter is going to record and
21   transcribe every word that you and I say
22   today, okay?
23        A.   Yes.
24        Q.   Okay. From time to time, a
25   lawyer might object to one of my questions.

Page 15

1          N. Dondero
2    That gives me the opportunity to think
3    about whether or not the answer to the
4    question would be admissible if I didn't
5    correct it.
6          I may ask you to just answer the
7    question because I don't think the
8    objection is going to be sustained. Just
9    let the lawyers do their thing. And unless
10   your lawyer directs you not to answer a
11   question, I would ask that you answer every
12   question that I ask, okay?
13        A.   Yes.
14        Q.   Thank you.
15        That's where you need to give the
16   verbal answer.
17        Just to go through a couple of
18   definitions so that I don't have to say
19   full names on certain things throughout the
20   day.
21        If I use the word "Dugaboy," will
22   you understand that I'm referring to The
23   Dugaboy Investment Trust?
24        A.   Yes.
25        Q.   If I use the word "Highland,"

Page 16

1          N. Dondero
2    will you understand that I'm referring only
3    to the entity that was known as Highland
4    Capital Management LP, both before the
5    bankruptcy filing and after the bankruptcy
6    filing?
7          A.   Okay.
8          Q.   If I use the phrase "LP
9    agreement" -- withdrawn.
10        Are you familiar with the fourth
11   amended and restated limited partnership
12   agreement of Highland Capital Management
13   LP?
14        A.   Yes.
15        Q.   Okay. And if I refer to that
16   document as the "LP agreement," will you
17   understand what I'm referring to?
18        A.   Yes.
19        Q.   Do you understand that you're
20   here today both in your individual capacity
21   and in your capacity as the trustee or the
22   30 -- what's called the 30(b)(6)
23   representative for Dugaboy?
24        A.   Yes.
25        Q.   And have you done anything to

Page 17

1          N. Dondero
2    prepare for today's deposition?
3          A.   Yes.
4          Q.   Can you tell me what you did to
5    prepare for today's deposition?
6          A.   I met with my attorney. And I
7    reviewed your big binder.
8          Q.   When did you meet with your
9    attorneys?
10        A.   Yesterday.
11        Q.   Is that the only time that you
12   conferred with your attorneys in
13   preparation for today's deposition?
14        A.   In person, yes.
15        Q.   Okay. And how long did you meet
16   in person yesterday?
17        A.   Four hours, four and a half
18   hours.
19        Q.   And where did you meet?
20        A.   At Deborah's office.
21        Q.   And was anybody present there
22   other than your attorneys?
23        A.   No.
24        Q.   Was anybody on speakerphone or
25   otherwise communicating during the meeting

1          N. Dondero
2   that was not one of your attorneys?
3       A.  No.
4       Q.  I think you mentioned, or you may
5   have implied, that you communicated with
6   your attorneys in preparation for today's
7   deposition but it wasn't in person.
8           Do I have that right?
9       A.  Correct.
10      Q.  Okay.  Did you speak with them on
11  the phone?
12      A.  Zoom meeting.
13      Q.  And how many Zoom meetings did
14  you have in preparation for today's
15  deposition?
16      A.  Three.
17      Q.  Okay.  And can you tell me when
18  those three Zoom meetings occurred?
19      A.  Wednesday, Thursday, and Friday.
20      Q.  And can you tell me how long each
21  of those meetings took place, each of those
22  Zoom meetings took place?
23      A.  Approximately an hour.
24      Q.  Did anybody other than your
25  attorneys participate in any of those three

1          N. Dondero
2   Zoom meetings?
3       A.  No.
4       Q.  Did you review any documents in
5   preparation for today's deposition other
6   than the documents that I provided?
7       A.  No.
8           MS. DEITSCH-PEREZ:  To be fair, I
9       think we did give her the Dugaboy
10      notice.  I don't remember if it's in
11      your binder.
12          MR. MORRIS:  Deborah, are you
13      referring to the 30(b)(6) notice?
14          MS. DEITSCH-PEREZ:  Yes.
15          MR. MORRIS:  I appreciate that.
16      It was not in the binder.
17  BY MR. MORRIS:
18      Q.  Other than the 30(b)(6) notice
19  that was in the binder and the 29 documents
20  that I provided to you, did you review
21  anything else, Ms. Dondero, in preparation
22  for today's deposition?
23      A.  Not that I'm aware of.
24      Q.  Was your brother present or did
25  your brother participate in any of the four

1          N. Dondero
2   preparation meetings that you described?
3       A.  No.
4       Q.  Since the beginning of the year,
5   since January 1st, 2021, have you
6   communicated with your brother at any time
7   about the promissory notes that are the
8   subject of this litigation?
9       A.  Not that I recall.
10      Q.  You don't recall ever speaking to
11  your brother in 2021 about the promissory
12  notes that are the subject of the
13  litigation.
14          Do I have that right?
15      A.  That's correct.  I do not recall.
16      Q.  Do you recall if you had any
17  conversations with your brother at any time
18  in 2021 about any of the defenses that he
19  is asserting in the litigation?
20      A.  What do you -- can you be more
21  specific?
22      Q.  Are you aware that your brother
23  is a defendant in the lawsuits in which --
24  withdrawn.
25          Are you aware that you are a

1          N. Dondero
2   defendant in certain lawsuits?
3       A.  Yes.
4       Q.  Are you aware that your brother
5   is also a defendant in certain lawsuits?
6       A.  Yes.
7       Q.  Are you aware that your brother
8   has asserted certain defenses to the claims
9   that are being asserted against him in
10  those lawsuits?
11      A.  Yes.
12      Q.  Did you ever discuss with your
13  brother at any time in 2021 any aspect of
14  the defenses that he is asserting in the
15  lawsuits?
16      A.  No.
17      Q.  Did you discuss with your brother
18  at any time in 2021 who would represent you
19  in connection with the lawsuits?
20      A.  No, I don't believe so.
21      Q.  Did you communicate with your --
22  and when I use the word "communication," I
23  want to be clear, I mean any form of
24  communication; either a meeting in public,
25  on the telephone, by email or text.

N. Dondero

1
2     Do you understand that?
3     A.   Yes.
4     Q.   Okay.   Did you -- and did you
5  understand that when I asked the last few
6  questions about your communications with
7  your brother?
8     A.   Yes, sir.
9     Q.   Okay.   In 2021, had you
10  communicated with your brother at any time
11  about who would represent Dugaboy?
12     A.   Not that I remember.
13     Q.   You're the trustee of Dugaboy.
14     Do I have that right?
15     A.   Yes.
16     Q.   Okay.   And Mr. Draper represents
17  Dugaboy in Highland's bankruptcy case; is
18  that right?
19     A.   Yes, sir.
20     Q.   Your brother and people working
21  for him identified and selected Mr. Draper
22  to serve as Dugaboy's counsel, correct?
23     MS. DEITSCH-PEREZ:   Object to the
24     form.
25     A.   I'm sorry.   Can you ask that

N. Dondero

1
2  again?
3     Q.   Sure.
4     Your brother -- you didn't select
5  Mr. Draper to represent Dugaboy; is that
6  right?
7     MS. DEITSCH-PEREZ:   Object to the
8     form.
9     A.   I believe he was referred.
10     Q.   And who was he referred to?
11     A.   Me.
12     Q.   Who referred Mr. Draper to you?
13     A.   I do not remember.
14     Q.   It's your testimony that
15  Mr. Draper was referred to you, and you
16  decided to retain Mr. Draper?
17     A.   I don't -- I don't know.
18     Q.   Do you know who decided to retain
19  Mr. Draper?
20     A.   I do not.
21     Q.   Do you know who identified
22  Mr. Draper as a possible attorney for
23  Dugaboy?
24     A.   I do not know.
25     Q.   Do you know when Mr. Draper was

N. Dondero

1
2  retained?
3     A.   No.
4     Q.   Do you recall when you first
5  spoke to Mr. Draper -- withdrawn.
6     Do you recall when you first
7  communicated with Mr. Draper?
8     A.   A couple of months ago.
9     Q.   Would it have been before or
10  after July 1st, 2021?
11     A.   I don't know.
12     Q.   It might have been before; it
13  might have been after.
14     Do I have that right?
15     A.   Correct.
16     Q.   Can you identify any matter that
17  Mr. Draper has handled in the Highland
18  bankruptcy other than his representation of
19  Dugaboy in these notes litigations?
20     A.   I would have to look.   I don't
21  know offhand.
22     MS. DEITSCH-PEREZ:   Yeah, John, I
23     don't -- this isn't a topic on the
24     Dugaboy 30(b)(6).   If you need her to
25     go back and check the engagement -- I

N. Dondero

1
2  mean, it's not something that I believe
3  she's been prepared on.   And so I don't
4  think it's fair to have a memory test
5  on the dates of these things.
6     MR. MORRIS:   Okay.   I appreciate
7     that, Deborah.   I'm asking -- so let's
8     clarify and say this was not a 30(b)(6)
9     topic.   It's not something that she
10     should have prepared for.   But I -- she
11     is here in her individual capacity, and
12     I'll stipulate that these particular
13     questions are in her individual
14     capacity.
15     MS. DEITSCH-PEREZ:   Well, but in
16     her individual capacity, it's not the
17     subject of the notes litigation.   And
18     then I would object that it's really
19     beyond the scope.
20     MR. MORRIS:   Okay.   There is no
21     scope because she's here in her
22     individual capacity.   But the objection
23     is noted.   Thank you very much.
24     MS. DEITSCH-PEREZ:   Thank you.
25  BY MR. MORRIS:

Page 26

N. Dondero

1
2     Q.   Did you ever consider hiring an
3  attorney for Dugaboy other than Mr. Draper?
4     A.   No.
5     Q.   Did you ever spend any time
6  trying to identify an attorney who would
7  represent Dugaboy?
8     A.   No.
9     Q.   The Stinson firm represents you
10  personally in this litigation; is that
11  right?
12     A.   That's incorrect.
13     Q.   Who -- do you know the name of
14  Ms. Deitsch-Perez's law firm?
15     A.   Her law firm is Stinson.
16     Q.   And does that law firm represent
17  you in your individual capacity?
18     A.   Okay.
19     Q.   That's okay.
20     A.   She represents -- okay.  Dan is
21  here representing me personally.
22     Q.   Okay.  And Dan is with the
23  Stinson firm, correct?
24     A.   That's incorrect.
25     Q.   What firm --

Page 27

N. Dondero

1
2     A.   Dan is with Greenberg Traurig.
3     Q.   Ah.  And I appreciate that.
4     A.   Sure.
5     Q.   Is that Dan Elms?
6     A.   Correct.
7     Q.   When did you retain Mr. Elms?
8     A.   Mid to late summer.
9     Q.   How did you identify Mr. Elms as
10  your counsel?
11     A.   He was referred by Deborah.
12     Q.   And Deborah is Deborah
13  Deitsch-Perez, counsel for certain other
14  defendants in this lawsuit; is that right?
15     A.   Correct.
16     Q.   Okay.  Did you consider hiring
17  anybody to represent you in this litigation
18  other than Mr. Elms?
19     A.   No.  I trusted Deborah's
20  referral.
21     Q.   Had you worked with Deborah
22  before she referred Mr. Elms to you?
23     A.   On this matter?  Yes.
24     Q.   On any other matters?
25     A.   No.

Page 28

N. Dondero

1
2     Q.   When did you first communicate
3  with Ms. Deitsch-Perez?
4     A.   Prior to this deposition being
5  scheduled in June.
6     Q.   Was she your counsel at the time?
7     A.   Yes.
8     Q.   When did you retain her?
9     A.   To the best of my recollection,
10  it had to be late April or May of this
11  year.
12     Q.   So Ms. Deitsch-Perez was
13  representing you and your brother at the
14  same time?  Do I have that right?
15     A.   Yes.
16     Q.   Do you have any agreements of any
17  kind with your brother concerning these
18  lawsuits?
19          Withdrawn.  That wasn't a good
20  question.
21          Do you have any agreements or
22  understandings with your brother concerning
23  the defense of these lawsuits?
24     A.   I'm sorry.  I don't understand
25  the question.

Page 29

N. Dondero

1
2     Q.   Have you heard the word
3  "indemnification" before or "indemnity"?
4     A.   Yes.
5     Q.   Okay.  Do you have an
6  understanding of what that means?
7     A.   Generally.
8     Q.   What's your general understanding
9  of the term "indemnity"?
10     A.   That one forgives another
11  person's error.
12     Q.   Okay.  I'm going to try and give
13  you a little bit of a different definition
14  and see if you understand it.
15          Did your brother ever offer to
16  satisfy and pay any judgment that might be
17  entered against you in connection with
18  these litigations?
19     A.   No.
20     Q.   Do you have any agreement of any
21  kind or any understanding that he would be
22  responsible for the outcome of these
23  lawsuits?
24     A.   Only what is written in the trust
25  agreement.

**Appx. 01881**

N. Dondero

2   Q.  Do you know whether the trust
3  agreement protects you in your individual
4  capacity as opposed to your capacity as the
5  trustee of the Dugaboy trust?
6      MS. DEITSCH-PEREZ:  Object to the
7  form.
8   A.  I'm sorry.  Can you reask that
9  question, Mr. Morris?
10   Q.  Sure.
11      Do you know whether the trust
12  agreement indemnifies you in your
13  individual capacity, or is it only in your
14  capacity as the trustee of the Dugaboy
15  trust?
16      MS. DEITSCH-PEREZ:  Object to the
17  form.
18   A.  That's a legal question I don't
19  feel comfortable answering.
20   Q.  All right.  I appreciate that it
21  may have legal implications, but I just
22  want to know what is in your head as a
23  factual matter.
24      Is it your personal
25  understanding, whether it's right or wrong,

N. Dondero

2  that you are indemnified in your personal
3  capacity under the trust, under the Dugaboy
4  trust?
5      MS. DEITSCH-PEREZ:  Object to the
6  form.
7   A.  I would have to think about that.
8   Q.  Okay.  Did your brother ever
9  offer to pay any costs and expenses that
10  you incur in your personal capacity in
11  connection with this lawsuit?
12   A.  I don't understand.
13   Q.  Okay.  So you're a defendant in
14  your individual capacity in four different
15  lawsuits.
16      Do you understand that?
17   A.  Yes.
18   Q.  And Dugaboy is also a defendant
19  in the same lawsuits, right?
20   A.  Yes.
21   Q.  Okay.  So I'm asking you whether
22  your brother ever offered to pay any costs
23  or expenses that you incur in your
24  individual capacity in connection with
25  these lawsuits?

N. Dondero

2   A.  No.
3   Q.  Okay.  Greenberg Traurig only
4  represents you in your individual capacity.
5      Do I have that right?
6   A.  Yes.
7   Q.  Okay.  Do you have any agreement
8  with anybody as to who would pay the
9  invoices rendered by Greenberg Traurig?
10   A.  Yes.
11   Q.  And what agreement is that?
12   A.  That Dugaboy will pay Greenberg
13  Traurig's expenses, bills.
14   Q.  Okay.  So pursuant to that
15  agreement, you won't have to pay any legal
16  expenses associated with the defense of
17  these lawsuits in your individual capacity.
18      Do I have that right?
19   A.  Yes, sir.
20   Q.  Okay.  Let's just get some
21  background here.
22      Are you currently employed,
23  ma'am?
24   A.  I am.
25   Q.  By whom?

N. Dondero

2   A.  Crescent Research Services.
3   Q.  Do you have a direct or indirect
4  ownership in that entity?
5   A.  I do.
6   Q.  And what is the nature of your
7  interest?
8   A.  I own the company.
9   Q.  100 percent; is that fair?
10   A.  Yes.
11   Q.  Okay.  And what is the nature of
12  the business of Crescent Research?
13   A.  It's an investigative firm.
14   Q.  And do you oversee the day-to-day
15  operations of Crescent Research?
16   A.  I do.
17   Q.  And how many employees does
18  Crescent Research have?
19   A.  I have an outside contractor at
20  certain times when the workload demands it.
21  Otherwise, it is just me.
22   Q.  Okay.  And how long have you
23  owned and operated Crescent Research?
24   A.  Since 1997.
25   Q.  Have you owned and operated

N. Dondero

1
2  Crescent Research on a continuous basis
3  since 1997 until today?
4      A.  Correct.
5      Q.  Have you had any other employment
6  since 1997 other than the work that you do
7  for Crescent Research?
8      A.  No.
9      Q.  Did you obtain a college degree?
10     A.  I did.
11     Q.  Where did you attend college?
12     A.  Penn State.
13     Q.  And you graduated from Penn
14  State?
15     A.  Correct.
16     Q.  And when was that?
17     A.  1987.
18     Q.  What was your degree in?
19     A.  Hotel restaurant management.
20     Q.  Was it a BA or BS?
21     A.  I believe it's a BS.
22     Q.  Okay.  Do you have any
23  postgraduate degrees?
24     A.  No.
25     Q.  Do you hold any licenses of any

N. Dondero

1
2  kind other than your driver's license?
3      A.  I do.
4      Q.  Can you describe for me every
5  license that you hold other than your
6  driver's license?
7      A.  I'm a real estate agent.  I am
8  notary.  I have several professional
9  licenses.  Asset recovery specialist.
10  Those are off the top of my head that I
11  remember.
12     Q.  What is an asset recovery
13  specialist license?
14     A.  It's licensed through -- I don't
15  remember the organization.  You have to --
16  I'm not sure how to answer that,
17  Mr. Morris.
18     Q.  Can you tell me what asset
19  recovery is generally in the context of
20  your license?
21     A.  Certainly.
22         It's finding assets for companies
23  that have gone bankrupt.
24     Q.  So do you typically get hired by
25  an estate fiduciary, a bankruptcy estate

N. Dondero

1
2  fiduciary?
3      A.  I haven't done asset recovery in
4  a number of years.
5      Q.  Okay.  As opposed to licenses, do
6  you have any certifications of any kind?
7      A.  Not that I recall.
8      Q.  Can you tell me generally what
9  you did professionally between the time you
10  graduated from Penn State in 1987 and the
11  time you formed and began working for
12  Crescent Research?
13     A.  Immediately out of college, I
14  worked for a company called Royal Schutt.
15  Is an investigative firm.  I built up their
16  background division.  The company closed.
17  I took the background division and opened
18  up a company called Info-Back Services.  I
19  ran that for a number of years in New
20  Jersey.
21         When I moved to Florida, I
22  transferred that company and it became
23  Crescent Research Services.
24         We predominately do preemployment
25  background screening, tenant research, and

N. Dondero

1
2  I do a lot of trial prep for various
3  attorneys.
4      Q.  All right.  I think you mentioned
5  three things.  The first was preemployment
6  background.
7         Do I have that right?
8      A.  Yes.
9      Q.  And can you just describe
10  generally what preemployment background
11  pertains to?
12     A.  When people are applying for a
13  job, I do the screening on their
14  application prior to them being hired.
15     Q.  Okay.  And what was the second
16  piece?
17     A.  I do tenant screening as well,
18  which is the equivalent for people renting
19  properties.
20         And the third component would be
21  trial prep.
22     Q.  And what about trial prep?  What
23  does that mean?  Can you help me to
24  understand what investigative services you
25  provide in the area of trial prep?

Page 38

N. Dondero

2    A.   Certainly.
3         I work for private attorneys.  I
4   worked for the public defender's office.
5   I've worked to capital murder cases on
6   down.  I look for discrepancies in
7   statements.  I find witnesses, take
8   statements and so forth.  I help the lawyer
9   prepare for trial.
10   Q.   Okay.  You're familiar with a
11  company, the company that we identified
12  earlier, called Highland Capital Management
13  LP?
14        Do I have that right?
15   A.   Yes.
16   Q.   Oh, by the way, did you ever hear
17  of a person named James P. Seery, Jr.?
18   A.   In regards to this case, yes.
19   Q.   Did you ever investigate
20  Mr. Seery?
21   A.   No.
22   Q.   Did you ever investigate any of
23  the independent directors who were
24  appointed at Strand Advisors?
25   A.   Can you tell me who they are?

Page 39

N. Dondero

2    Q.   Russell Nelms or John Dubel?
3    A.   No.
4    Q.   Have you undertaken any
5   investigation of any current or former
6   employee of Highland since October 19th,
7   2019?
8    A.   No.
9    Q.   Are you aware that Highland is
10  the company that your brother founded with
11  Mark Okada in the 1990s?
12   A.   Yes.
13   Q.   And you're aware that Highland
14  filed for bankruptcy, correct?
15   A.   Yes.
16   Q.   Do you know when that occurred?
17   A.   October of '19, I believe.
18   Q.   Okay.  I'll tell you it is
19  October 19th, 2019.  And if it's okay with
20  you, I'd like to refer to October 19th,
21  2019, as the petition date.
22        Is that okay?
23   A.   Certainly.
24   Q.   Okay.  When did you find out that
25  Highland filed for bankruptcy?

Page 40

N. Dondero

2    A.   It was either the day after --
3   when it appeared in the Dallas Morning
4   News.
5    Q.   So you didn't have any advanced
6   notice that your brother was going to file
7   Highland for bankruptcy; is that right?
8    A.   I did not.
9    Q.   Did you speak to your brother
10  after learning that Highland filed for
11  bankruptcy?
12   A.   I would imagine I called him,
13  sure.
14   Q.   Do you have any recollection of
15  what was said in the phone call that you
16  imagine occurred?
17   A.   No.
18   Q.   Okay.  Do you directly or
19  indirectly own any economic interest in
20  Highland today?
21   A.   No.
22   Q.   Do you understand that if I use
23  the phrase "directly or indirectly," I'm
24  asking whether you own it in your personal
25  name or through a company that you might

Page 41

N. Dondero

2   own, such as Crescent Research?
3    A.   Okay.
4    Q.   Do you understand the phrase
5   "directly or indirectly"?
6    A.   No.
7         Can you elaborate, please?
8    Q.   Sure.
9         A direct interest would be an
10  interest that you hold in your own name, in
11  the name of Nancy Dondero.
12        Do you understand that?
13   A.   Okay.
14   Q.   And an indirect interest is an
15  interest that you own through some other
16  vehicle, through some other entity in which
17  you also have an ownership interest.
18        Do you understand that?
19   A.   Okay.
20   Q.   Okay.  So --
21   A.   Yes.  But are you referring to --
22   Q.   Go ahead.
23   A.   I'm just not clear.
24        Do you mean like Highland funds
25  or stock?

Page 42

N. Dondero

1
2    Q.   I'm only talking about Highland
3    Capital Management LP.
4        A.   No, I have no interest.
5        Q.   Have you ever directly or
6    indirectly owned any limited partnership
7    interests in Highland?
8        A.   No.
9        Q.   Have you ever directly or
10   indirectly owned any interest of any kind
11   in Highland?
12       A.   No.
13       Q.   Do you directly or indirectly
14   have any claims against Highland that you
15   know of?
16       MS. DEITSCH-PEREZ:  And, again,
17       you are still talking about Nancy
18       Dondero?
19       MR. MORRIS:  Yes, I am.  Thank
20       you.
21       A.   No, sir.
22       Q.   Did you have an understanding of
23   the nature of Highland's business as of the
24   petition date?
25       A.   Generally.

Page 43

N. Dondero

1
2        Q.   And what did you understand the
3    nature of Highland's business to be as of
4    the petition date?
5        A.   A hedge fund.
6        Q.   Do you have any understanding of
7    what a hedge fund is?
8        A.   Not really.
9        Q.   I appreciate that.
10           By the way, do you know if
11   Crescent Research has any claims against
12   Highland?
13       A.   That's a very good question.
14   There may be -- I think I am creditor for a
15   very little bit of money, but I'm not
16   positive on that, if that was settled.
17       Q.   Do you recall filing any claim
18   against Highland on behalf of Crescent
19   Research?
20       A.   I can't say definitely one way or
21   the other, but...
22       Q.   Okay.  It's a matter of record.
23   I don't mean to test your memory.  It's
24   okay.
25           So other than your understanding

Page 44

N. Dondero

1
2    that Highland was a hedge fund, do you have
3    any understanding or did you have any
4    understanding as of the petition date
5    regarding the nature of Highland's
6    business?
7        A.   Since the petition date?
8        Q.   As of the petition date.
9        A.   No.
10       Q.   Do you have any -- I apologize.
11       A.   I know obviously it's a financial
12   company, and it has funds and so forth.
13       Q.   Have you learned anything about
14   the nature of Highland's business since the
15   petition date?  Anything additional?
16       A.   No.
17       Q.   Okay.  Do you have an
18   understanding of the industry that Highland
19   operates in or that Highland operated in
20   prior to the petition date?
21       A.   Sure.  Yes.
22       Q.   What industry did you understand
23   Highland to be operating in prior to the
24   petition date?
25       A.   The financial industry.

Page 45

N. Dondero

1
2        Q.   Were you ever employed by
3    Highland at any time?
4        A.   No.
5        Q.   Did you ever serve as an officer
6    or director of Highland at any time?
7        A.   No.
8        Q.   Have you ever heard of an entity
9    called Strand Advisors Inc.?
10       A.   Yes.
11       Q.   Can we refer to that entity as
12   "Strand"?
13       A.   Yes, sir.
14       Q.   Do you know if Strand has any
15   relationship to Highland?
16       A.   General partner.
17       Q.   Do you recall when you learned
18   that Strand was Highland's general partner?
19       A.   A number of years ago, I believe.
20       Q.   Do you recall how you learned
21   that Strand was Highland's general partner?
22       A.   I do not.
23       Q.   Do you recall if you read it or
24   if somebody told that to you?
25       A.   I do not recall.

Page 46

N. Dondero

1
2  Q. Do you recall the circumstances
3  under which you learned that Strand was
4  Highland's general partner?
5  A. No, sir.
6  Q. Have you done anything to try to
7  verify whether Strand was in fact
8  Highland's general partner?
9  A. No.
10  Q. Have you ever been employed by
11  Strand?
12  MS. DEITSCH-PEREZ: Object to the
13  form.
14  BY MR. MORRIS:
15  Q. You can answer. That's one of
16  those situations your lawyer can object to
17  preserve the question. I think the
18  question is fine, so you can answer the
19  question.
20  MS. DEITSCH-PEREZ: Do you mean
21  technically like hired and worked as a
22  W-2 employee?
23  MR. MORRIS: Yes.
24  A. Okay. And that's a no, a W-2
25  employee.

Page 47

N. Dondero

1
2  Q. Okay. Have you ever served as an
3  officer or director of Strand?
4  A. No, sir.
5  Q. Have you ever been employed by
6  any entity in which you believed your
7  brother had a direct or indirect ownership
8  interest?
9  A. No, sir.
10  Q. Have you ever served as an
11  officer or director for any entity in which
12  you believed your brother had a direct or
13  indirect ownership interest?
14  A. No, sir.
15  Q. Has Crescent Research ever
16  provided services to Highland?
17  A. Yes.
18  Q. When did Crescent Research first
19  provide services to Highland?
20  A. It's been a number of years. The
21  actual beginning, I don't know.
22  Q. And did you, in your capacity as
23  the owner of Crescent Research, run
24  individualized background checks on
25  prospective employees of Highland?

Page 48

N. Dondero

1
2  A. Yes.
3  Q. Okay. Did Crescent Research
4  provide any services for Highland other
5  than that?
6  A. No, not that I'm aware of.
7  Q. Okay. Have you ever been
8  employed in the financial services
9  industry?
10  A. No, sir.
11  Q. Other than as it may relate to
12  this case, do you have any experience
13  making decisions in the area of executive
14  compensation?
15  A. No.
16  Q. Do you hold yourself out as an
17  expert in the area of executive
18  compensation?
19  A. No.
20  Q. Have you ever taken any classes
21  or courses concerning executive
22  compensation?
23  A. No.
24  Q. Have you ever been compensated
25  for services rendered by you in the area of

Page 49

N. Dondero

1
2  executive compensation?
3  A. No.
4  Q. Have you ever conferred with
5  anybody who you believed to be an expert in
6  the area of executive compensation?
7  A. No, sir.
8  Q. Have you ever prepared any
9  analysis of any kind concerning executive
10  compensation?
11  A. No, sir.
12  Q. Have you ever asked anyone to
13  prepare any analysis of any kind in the
14  area of executive compensation?
15  A. No.
16  Q. Has anyone ever prepared an
17  analysis for you in the area of executive
18  compensation?
19  A. I'm sorry, sir. Can you repeat
20  that question?
21  Q. Sure.
22  Did anybody ever prepare any
23  analysis for you that covered the topic –
24  any topic concerning executive
25  compensation?

Page 50

1          N. Dondero
2     A.  No.
3     Q.  Do you have any knowledge as to
4  how executives are compensated in the
5  financial industry?
6     A.  Just a general awareness.
7     Q.  And what is the basis, what is
8  the foundation of your general awareness?
9     A.  Obviously the better a company
10  does, probably the more the CEO is paid.
11     Q.  Do you have any understanding of
12  how executives are compensated in the
13  financial industry other than that?
14     A.  No, sir.
15     Q.  All right.  So now I'm going to
16  ask you the same questions in your capacity
17  as the trustee of Dugaboy.
18          Did Dugaboy ever prepare any
19  written analysis concerning executive
20  compensation?
21     A.  No, sir.
22     Q.  Has Dugaboy ever asked anybody to
23  prepare any analysis on any issue
24  concerning executive compensation?
25     A.  No.

Page 51

1          N. Dondero
2     Q.  Have you in your capacity as the
3  trustee of Dugaboy ever prepared any
4  analysis on the issue of executive
5  compensation?
6     A.  No.
7     Q.  Have you ever done any analysis
8  of the compensation that your brother
9  received from Highland over time?
10     A.  Not that I am aware of.
11     Q.  Do you have any information that
12  you can share with me concerning the
13  compensation that you your brother received
14  from Highland at any moment in time?
15     A.  In general terms, sure.
16     Q.  What can you share with me in
17  general terms?
18     A.  I know Jim was not highly paid.
19  I know for the last couple of years, his
20  salary has been roughly less than a
21  million, 500, 700,000, somewhere in that
22  ballpark.
23     Q.  Did you play any role in the
24  setting of his salary?
25     A.  I'm sorry?

Page 52

1          N. Dondero
2     Q.  Did you personally ever play any
3  role in the setting of Mr. Dondero's
4  salary?
5     A.  In the salary that we are talking
6  about, no, I did not.
7     Q.  Thank you.
8          Did Dugaboy play any role in the
9  setting of Mr. Dondero's salary?
10          MS. DEITSCH-PEREZ:  Do you mean
11  setting or approving, John?
12  BY MR. MORRIS:
13     Q.  Let's go with setting first.
14     A.  Okay.  No.
15     Q.  Did Dugaboy play any role in
16  approving Mr. Dondero's salary?
17     A.  It has that right, but I don't
18  believe it did in the salary that he had at
19  the time.
20     Q.  Okay.  I just want to nail this
21  down.
22          To the best of your recollection,
23  Dugaboy never played a role in approving
24  Mr. Dondero's salary.
25          Do I have that right?

Page 53

1          N. Dondero
2     A.  Can you rephrase that so I
3  understand?
4     Q.  Sure.
5          Can you think of any year in
6  which Dugaboy approved of Mr. Dondero's
7  salary from Highland?
8     A.  His actual salary?
9     Q.  Correct.
10     A.  Not -- we are not talking about
11  the notes now; you are talking about
12  salary?
13     Q.  Yes.
14     A.  No -- yes, okay, not to my
15  recollection.
16     Q.  Do you know what Mr. Dondero's
17  total compensation was in the year 2017?
18     A.  His total compensation, no.
19     Q.  Did you ever ask anybody what his
20  compensation was in the year 2017?
21     A.  Not that I recall.
22     Q.  Do you know what Mr. Dondero's
23  total compensation was in 2018?
24     A.  When you're saying "total," you
25  mean just from Highland or from any entity?

N. Dondero

1          N. Dondero
2    Q.  I'm just talking about Highland.
3    A.  Okay.  Didn't we talk about those
4  numbers?
5    Q.  We talked about salary before.
6    A.  Right.
7    Q.  And now I'm asking you about
8  total compensation.
9       Do you understand that.
10    A.  No, I don't.
11    Q.  Let me try again.  Thank you for
12  letting me know that.  And I encourage you
13  to let me know if you don't understand a
14  question.
15       Do you know what Mr. Dondero's
16  total compensation was from Highland in
17  2017?
18    A.  No, I do not.
19    Q.  Did you ever ask anybody what
20  Mr. Dondero's total compensation from
21  Highland was in 2017?
22    A.  No.  Other than the figures that
23  we are talking about.  Because I'm still
24  not understanding, John.  I'm sorry.
25    Q.  Well, do you understand that

N. Dondero

1          N. Dondero
2  salary is just one component of
3  Mr. Dondero's compensation?
4    A.  That's correct.
5    Q.  Okay.
6    A.  Um-hmm.  That, I understand.
7    Q.  Okay.  And so do you understand
8  that I'm moving from salary to total
9  compensation, and I'm asking for the value
10  of any benefits he received from Highland
11  when I use the word "compensation"?
12    A.  Okay.  And --
13    Q.  So with that understanding, I'm
14  going to start again.
15       Do you know what Mr. Dondero's
16  total compensation was in 2017?
17    A.  I do not know.
18    Q.  Did you ever ask anybody what
19  Mr. Dondero's total compensation was in
20  2017?
21    A.  No.
22    Q.  Did Dugaboy know what
23  Mr. Dondero's compensation was in 2017?
24    A.  I do not believe so.
25    Q.  To the best of your knowledge,

N. Dondero

1          N. Dondero
2  did anybody on behalf of Dugaboy ever try
3  to ascertain what Mr. Dondero's total
4  compensation was in 2017?
5    A.  To the best of my knowledge, no.
6    Q.  Do you know what Mr. Dondero's
7  total compensation from Highland was in
8  2018?
9    A.  No.
10    Q.  Did you ever ask anybody what
11  Mr. Dondero's total compensation was in
12  2018?
13    A.  I don't believe so.
14    Q.  Did Dugaboy know what
15  Mr. Dondero's total compensation was for
16  2018?
17    A.  I don't think so.
18    Q.  To the best of your knowledge,
19  did anybody ever ask on behalf of Dugaboy
20  what Mr. Dondero's total compensation from
21  Highland was in 2018?
22    A.  I don't recall.  I don't know.
23    Q.  Do you know what Mr. Dondero's
24  total compensation was in 2019?
25    A.  No.

N. Dondero

1          N. Dondero
2    Q.  Did you ever ask anybody what
3  Mr. Dondero's total compensation was in
4  2019?
5    A.  Not that I remember.
6    Q.  Did Dugaboy know what
7  Mr. Dondero's total compensation from
8  Highland was in 2019?
9    A.  I don't believe so.
10    Q.  Do you know whether Dugaboy ever
11  asked anybody what Mr. Dondero's total
12  compensation was from Highland in 2019?
13    A.  I don't think so.
14       THE WITNESS:  Would it be okay if
15  we take a break?
16       MR. MORRIS:  Just a couple more
17  questions, Deborah.
18       You know what, I apologize.  Of
19  course, of course we can take a break.
20       MR. DRAPER:  John, this is
21  Douglas.  Let me raise an issue with
22  you.
23       MR. MORRIS:  Do you want to do
24  this on the record?
25       MR. DRAPER:  Well, we can do it

N. Dondero

1      N. Dondero
2   off the record. But I just noticed on
3   the participants you have Page
4   Montgomery and Deborah Newman, who are
5   not parties to this litigation, and I
6   would request that you ask them to get
7   off the line.
8       MR. MORRIS: Okay. I'll take it
9   under advisement, Douglas, but I will
10  point out that there have always been
11  people who have -- they actually have
12  an interest in this litigation, so I'm
13  not even going to address that. They
14  have an interest in the litigation,
15  okay?
16      MR. DRAPER: John --
17      MR. MORRIS: Let's go off the
18  record, please.
19      THE VIDEOGRAPHER: The time is
20  10:30. We are going off the record.
21      (Recess is taken.)
22      THE VIDEOGRAPHER: The time is
23  10:51. Back on the record.
24  BY MR. MORRIS:
25    Q.  Ms. Dondero, can you hear me?

N. Dondero

1   A.  I can.
2     Q.  Okay. Did you communicate with
3   anybody during the break about any of the
4   questions that I asked?
5     A.  No.
6     Q.  Did you communicate with anybody
7   on the break regarding any answers you gave
8   to any of the questions that I asked?
9     A.  No.
10    Q.  Did you communicate with anybody
11  on the break about any questions that I
12  might ask in the future?
13    A.  No.
14    Q.  Did you communicate with anybody
15  on the break about any answers you might
16  give in the future?
17    A.  No.
18    Q.  I believe you testified earlier
19  that you learned that your brother received
20  less than a million dollars in salary.
21      Do I have that right?
22    A.  Yes.
23    Q.  Can you tell me when you learned
24  that?

N. Dondero

1   A.  I don't remember.
2     Q.  Do you remember how you learned
3   it?
4     A.  No.
5     Q.  Did you ever know that your
6   brother received a salary of a million
7   dollars from Highland?
8     A.  A million dollars even?
9     Q.  Yes.
10    A.  No.
11    Q.  Did you ever learn that your
12  brother had his salary increased to
13  two-and-a-half million dollars from
14  Highland?
15    A.  When?
16    Q.  I'm just asking if you ever
17  learned it.
18    A.  Oh, no.
19    Q.  Did you ever learn that somebody
20  made a decision to allocate the
21  two-and-a-half million dollars between and
22  among different entities that your brother
23  owned and controlled?
24    A.  I have no idea.

N. Dondero

1   Q.  Did you have any conversation at
2   any time with your brother about why he was
3   receiving less than a million dollars from
4   Highland?
5     A.  Why he was?
6     Q.  Yes.
7     A.  No.
8     Q.  Did you ever learn at any time
9   how your brother's salary was established?
10    A.  Not that I recall.
11    Q.  Did you ever learn at any time as
12  to who made the decision to set your
13  brother's salary?
14    A.  Set his salary? No.
15    Q.  Are you aware your brother has
16  retained experts in this case?
17    A.  I was not aware.
18    Q.  So is it fair to say that you've
19  never spoken with any expert retained by
20  your brother?
21    A.  Not that I'm aware of.
22    Q.  Let's talk about access to
23  financial information.
24      Do you have an understanding of

1            N. Dondero
2    the term "financial statements"?
3        A.   Yes.
4        Q.   And what's your understanding of
5    the term "financial statements"?
6        A.   Balance sheets, bank statements.
7        Q.   Would it include profit and loss
8    statements?
9        A.   Certainly.
10       Q.   Would it include statements of
11   operations?
12       A.   I would imagine, yes.
13       Q.   Using a definition of the term
14   financial statements that incorporates each
15   of the items that we just discussed, did
16   you ever review Highland's financial
17   statements prior to the petition date?
18       A.   No, I haven't reviewed Highland's
19   financials.
20       Q.   Is it fair to say that you never
21   reviewed Highland's balance sheet prior to
22   the petition date?
23       A.   That's fair.  Correct.
24       Q.   Did you ever see Highland's
25   audited financial statements prior to the

1            N. Dondero
2    petition date?
3        A.   Not that I remember, no.
4        Q.   Did you ever ask anybody to see
5    Highland's financial statements?
6        A.   Not that I recall.
7        Q.   Did you ever have access to
8    Highland's financial statements?
9        A.   No.
10       Q.   Did you know anything about
11   Highland's financial condition prior to the
12   petition date?
13       A.   No, I was not aware.
14       Q.   Have you ever heard of the term
15   "portfolio company" in relation to
16   Highland?
17       A.   I have.
18       Q.   Do you have an understanding of
19   the term "portfolio company" as it relates
20   to Highland?
21       A.   Yes, generally.
22       Q.   What is your general
23   understanding of the term "portfolio
24   company" as it relates to Highland?
25       A.   As I understand it, they're

1            N. Dondero
2    companies owned by Highland under their
3    umbrella.
4        Q.   And how did you form that
5    understanding?
6        A.   I don't know.
7        Q.   Do you recall when you first came
8    to the understanding that you have
9    concerning the term "portfolio company" as
10   it relates to Highland?
11       A.   No.
12       Q.   Based on your understanding of
13   the term "portfolio company," do you know
14   how many portfolio companies Highland had
15   prior to the petition date?
16       A.   Several.
17       Q.   Can you give me an approximate
18   number, to the best of your understanding?
19       A.   More than – I would imagine more
20   than three.
21       Q.   And why do you imagine it's more
22   than three?
23       A.   Because I'm aware of three.
24       Q.   Are you aware of any others,
25   other than the three that you have in your

1            N. Dondero
2    head?
3        A.   Not off the top of my head, no.
4        Q.   Can you identify any of the three
5    portfolio companies that you have in your
6    head?
7        A.   Certainly.
8        Q.   Okay.  Can you please identify
9    them?
10       A.   Trussway, Cornerstone, MGM.
11       Q.   And you believe that Highland had
12   a – withdrawn.
13            And your understanding was that
14   Highland directly or indirectly owned each
15   of those three companies?
16       A.   That was my understanding.
17       Q.   And what was the basis for that
18   understanding?
19       A.   The basis of that understanding
20   has to do with the forgiveness of the note.
21       Q.   So how did you learn that
22   Highland had a direct or indirect economic
23   interest in each of the three portfolio
24   companies that you identified?
25       A.   I believe it was from Jim.

Page 66

N. Dondero

2  Q.  Do you recall any source of
3  information other than Jim?
4  A.  Not that I recall.
5  Q.  Prior to the petition date, were
6  you aware of the price that Highland paid
7  to acquire its interest in each of the
8  three portfolio companies that you
9  identified?
10  A.  Not that I am aware of.
11  Q.  Did you ever ask for any
12  information concerning the price that
13  Highland paid to acquire its interest in
14  each of the three portfolio companies that
15  you identified?
16  A.  No.
17  Q.  Prior to the petition date, did
18  you have access to any information
19  concerning the value of any of the three
20  portfolio companies that you identified?
21  A.  Not that I am aware of.
22  Q.  Prior to the petition date --
23  well, let's talk about them individually.
24  You referred to MGM.
25  Do I have that right?

Page 67

N. Dondero

2  A.  Yes, sir.
3  Q.  And your understanding is that
4  MGM was a Highland portfolio company; is
5  that right?
6  A.  Yes.
7  Q.  Do you have any knowledge about
8  the nature of Highland's interest in MGM?
9  A.  No.
10  Q.  Do you know if Highland owns debt
11  or equity in MGM?
12  A.  I couldn't be sure.
13  Q.  Do you know when Highland
14  acquired its interest in MGM?
15  A.  A number of years ago.
16  MR. MORRIS:  I just want the
17  record to be clear and I want counsel
18  to be clear, these questions that I'm
19  asking now are going to be in
20  Ms. Dondero's capacity as a 30(b)(6)
21  witness for Dugaboy.
22  BY MR. MORRIS:
23  Q.  So I'm going to ask a couple of
24  questions.
25  Again, at any time prior to the

Page 68

N. Dondero

2  petition date, did Dugaboy have an
3  understanding of the nature of Highland's
4  interest in MGM?
5  A.  Not that I'm aware of.  Well,
6  wait, I'm sorry.  Can you -- wait.  Ask
7  that again, John.  Say that again.
8  Q.  Sure.
9  At any time prior to the petition
10  date --
11  A.  Right.
12  Q.  -- did Dugaboy have an
13  understanding as to the nature of
14  Highland's interest in MGM?
15  A.  I knew that they had an interest
16  in MGM prior to the petition date.
17  Q.  Okay.  Did you or Dugaboy know
18  the nature of that interest, in what form
19  it held?
20  A.  Not specifically, John.
21  Q.  Did you or Dugaboy make any
22  effort prior to the petition date to learn
23  about the nature and extent of Highland's
24  interest in MGM?
25  A.  Not that I recall.

Page 69

N. Dondero

2  Q.  Did you or Dugaboy know what
3  Highland's cost was to acquire its interest
4  in MGM?
5  A.  No.
6  Q.  Did you or Dugaboy ever make any
7  effort to try to determine what Highland's
8  cost was to acquire its interest in MGM?
9  A.  No.
10  Q.  Did you ever ask for any
11  information -- withdrawn.
12  Did you or Dugaboy ever ask
13  anybody for any information concerning
14  Highland's cost to acquire its interest in
15  MGM?
16  A.  No.
17  Q.  Did you or Dugaboy ever obtain
18  any information concerning the value of
19  Highland's interest in MGM?
20  A.  Not that I recall.
21  Q.  Do you recall the value of
22  Highland's interest in MGM as you sit here
23  today?
24  MS. DEITSCH-PEREZ:  Object to the
25  form.

N. Dondero

1
2     A.   I'm sorry, John, the question?
3     Q.   Sure.
4          I'm going to ask a different
5     question.  It was a fine objection.
6          Do you recall the value of
7     Highland's interest in MGM at any time
8     prior to the petition date?
9     A.   I do not recall.
10    Q.   Did you or Dugaboy ever know the
11    value of Highland's interest in MGM at any
12    time prior to the petition date?
13    A.   No.
14    Q.   Did you or Dugaboy ever ask for
15    any information concerning the value of
16    Highland's interest in MGM at any time
17    prior to the petition date?
18    A.   Not that I remember.
19    Q.   Prior to the petition date, did
20    you or Dugaboy ever make any determination
21    as to whether the value of Highland's
22    interest in MGM exceeded its cost?
23    A.   I'm sorry.  Can you repeat that,
24    John?
25    Q.   Sure.

N. Dondero

1
2          At any time prior to the petition
3     date, did you or Dugaboy ever know whether
4     the value of Highland's interest in MGM
5     exceeded the cost that it paid to acquire
6     that interest?
7     A.   We didn't know.
8     Q.   Did you or Dugaboy ever ask
9     anybody prior to the petition date whether
10    Highland's cost to acquire its interest in
11    MGM was more or less than the value?
12    A.   No, we never made that inquiry.
13    Q.   Now do you know the nature of the
14    MGM business?
15    A.   The movie theater and video
16    library, that type.
17    Q.   Do you know anything else about
18    the nature of MGM's business other than
19    that?
20    A.   No.
21    Q.   At any time prior to the petition
22    date, did you or Dugaboy do any due
23    diligence to try to ascertain the value of
24    MGM?
25    A.   Prior to the petition date?

N. Dondero

1
2     Q.   Yes.
3     A.   No.
4     Q.   All right.  I'm going to ask
5     similar questions with respect to
6     Cornerstone.
7          Cornerstone is one of the
8     portfolio companies that you identified
9     earlier, correct?
10    A.   Yes.
11    Q.   And did you learn from Jim that
12    Cornerstone was one of Highland's portfolio
13    companies prior to the petition date?
14    A.   I believe that is correct.
15    Q.   Do you have any other source of
16    information for that other than your
17    brother?
18    A.   Not that I remember.
19    Q.   At any time prior to the petition
20    date, did you or Dugaboy have an
21    understanding as to the nature of
22    Highland's interest in Cornerstone?
23    A.   No.
24    Q.   At any time prior to the petition
25    date, did you or Dugaboy ask anybody what

N. Dondero

1
2     the nature of Highland's interest was in
3     Cornerstone?
4     A.   Not that I recall.
5     Q.   Prior to the petition date, did
6     you or Dugaboy make any effort to try to
7     ascertain the nature of Highland's interest
8     in Cornerstone?
9     A.   Not that I remember.
10    Q.   Prior to the petition date, did
11    you or Dugaboy know how much Highland paid
12    to acquire its interest in Cornerstone?
13    A.   No.
14    Q.   Prior to the petition date, did
15    you or Dugaboy ever ask anybody what
16    Highland's cost was to acquire its interest
17    in Cornerstone?
18    A.   Not that I remember.
19    Q.   Prior to the petition date, did
20    you or Dugaboy ever make any effort to try
21    to ascertain how much Highland paid to
22    acquire its interest in Cornerstone?
23    A.   No.
24    Q.   Do you know what Cornerstone --
25    do you know the nature of Cornerstone's

Page 74

1         N. Dondero
2   business?
3      A.  I do not.
4      Q.  Did you ever ask anybody what the
5   nature of Cornerstone's business was?
6      A.  No.
7      Q.  Did you ever make any effort --
8   withdrawn.
9         Did you or Dugaboy ever make any
10  effort to try to determine the nature of
11  Cornerstone's business?
12     A.  Not that I recall.
13     Q.  Did you or Dugaboy know the value
14  of Highland's interest in Cornerstone prior
15  to the petition date?
16     A.  We did not.
17     Q.  Did you or Dugaboy ever ask
18  anybody prior to the petition date what the
19  value of Highland's interest in Cornerstone
20  was?
21     A.  Not that I remember.
22     Q.  Do you remember whether you or
23  Dugaboy made any effort prior to the
24  petition date to try to ascertain the value
25  of Highland's interest in Cornerstone?

Page 75

1         N. Dondero
2      A.  I don't believe so.
3      Q.  Have you heard of a company
4   called Trussway?
5      A.  Yes.
6      Q.  Do you know the nature of
7   Trussway's business?
8      A.  I do not.
9      Q.  Did you ever ask anybody what the
10  nature of Trussway's business was?
11     A.  No, sir.
12     Q.  Did you or Dugaboy make any
13  effort at any time prior to the petition
14  date to try to understand the nature of
15  Trussway's business?
16     A.  I don't believe so.
17     Q.  Did you or Dugaboy make any
18  effort prior to the petition date to
19  understand the financial condition of MGM?
20     A.  Of MGM?  I'm sorry.  I thought we
21  were talking about Trussway.  We're going
22  back to MGM?
23     Q.  We were.  I'm sorry.  It's a new
24  question.  I'm just going to tick the box.
25     A.  Oh, okay.  I'm sorry.  I was a

Page 76

1         N. Dondero
2   little slow on the switch.
3      Q.  That's okay.
4      A.  Can you repeat the question?
5      Q.  Sure.
6         Did you or Dugaboy make any
7   effort prior to the petition date to assess
8   MGM's financial condition?
9      A.  Not that I recall.
10     Q.  Did you or Dugaboy make any
11  effort prior to the petition date to try to
12  understand the financial condition of
13  Cornerstone?
14     A.  Not that I recall.
15     Q.  Did you or Dugaboy prior to the
16  petition date make any effort to try to
17  understand the financial condition of
18  Trussway?
19     A.  No, not that I recall.
20     Q.  Is it your understanding that
21  Trussway was one of the portfolio
22  companies, as you defined it earlier?
23     A.  Yes.
24     Q.  And is that understanding based
25  solely on information that you received

Page 77

1         N. Dondero
2   from your brother?
3      A.  Yes.  Yes.
4      Q.  Okay.  At any time prior to the
5   petition date, did you or Dugaboy have an
6   understanding as to the nature of
7   Highland's interest in Trussway?
8      A.  I don't know.
9      Q.  Do you recall whether you or
10  Dugaboy ever had an understanding prior to
11  the petition date concerning the nature of
12  Highland's interest in Trussway?
13     A.  I don't know.
14     Q.  Do you recall that either you or
15  Dugaboy ever asked anybody what the nature
16  of Highland's interest in Trussway was
17  prior to the petition date?
18     A.  I don't believe so.
19     Q.  Prior to the petition date, did
20  you or Dugaboy make any effort to try to
21  determine the nature of Highland's interest
22  in Trussway?
23     A.  I don't believe so.
24     Q.  Prior to the petition date, did
25  you or Dugaboy know Highland's cost to

Appx. 01893

Page 78

1    N. Dondero
2  acquire its interest in Trussway?
3      A.  We did not.
4      Q.  Prior to the petition date, did
5  you or Dugaboy ever ask anybody what
6  Highland's cost was to acquire its interest
7  in Trussway?
8      A.  Not that I recall.
9      Q.  Prior to the petition date, did
10  you or Dugaboy make any effort to try to
11  ascertain what Highland's cost was to
12  acquire its interest in Trussway?
13      A.  Not that I remember.
14      Q.  Did you or Dugaboy know the value
15  of Highland's interest in Trussway prior to
16  the petition date?
17      A.  Not that I am aware of.
18      Q.  Prior to the petition date, did
19  you or Dugaboy ever ask anybody what the
20  value of Highland's interest was in
21  Trussway?
22      A.  I don't think so.
23      Q.  Do you know whether you or
24  Dugaboy prior to the petition date made any
25  effort to try to ascertain the value of

Page 79

1    N. Dondero
2  Highland's interest in Trussway?
3      A.  I don't believe so.
4      Q.  Did you or Dugaboy know prior to
5  the petition date whether the value of
6  Highland's interest in Trussway was more or
7  less than its cost?
8      A.  I do not know.
9      Q.  Did you ever ask anybody --
10  withdrawn.
11        Did you or Dugaboy ever ask
12  anybody prior to the petition date whether
13  the value of Highland's interest in
14  Trussway was more or less than its cost?
15      A.  I don't think so.
16      Q.  Did you or Dugaboy make any
17  attempt prior to the petition date to
18  determine whether the value of Highland's
19  interest in Trussway was more or less than
20  its cost?
21      A.  I don't think so.
22      Q.  Okay.  I apologize if I asked
23  these questions already.  I think I may
24  have forgotten them, but I'm just going to
25  ask just those last couple of questions --

Page 80

1    N. Dondero
2      MS. DEITSCH-PEREZ:  All of them.
3  BY MR. MORRIS:
4      Q.  -- related to Cornerstone.
5      A.  Okay.
6      Q.  Did you or Dugaboy know prior to
7  the petition date whether the value of
8  Highland's interest in Cornerstone was more
9  or less than its cost?
10      A.  I don't know if we knew.
11      Q.  Did you or Dugaboy ask anybody
12  prior to the petition date whether the
13  value of Highland's interest in Cornerstone
14  was more or less than its cost?
15      A.  I don't recall.
16      Q.  Do you know whether you or
17  Dugaboy made any effort prior to the
18  petition date to determine whether
19  Highland's -- whether the value of
20  Highland's interest in Cornerstone was more
21  or less than its cost?
22      A.  I don't remember.
23      Q.  Okay.  I'm going to shift gears
24  now to talk about loans.
25      A.  Okay.

Page 81

1    N. Dondero
2      Q.  All right.  You're aware that
3  from time to time, Highland provided loans
4  to certain of its officers and employees,
5  right?
6      A.  I am.
7      Q.  And you're aware that in exchange
8  for the loans from Highland, the officers
9  and employees gave Highland promissory
10  notes?
11      A.  Correct.
12      Q.  Are you aware of any loan that
13  Highland ever gave to an officer or
14  employee where the officer or employee
15  failed to give a promissory note in return?
16      MS. DEITSCH-PEREZ:  Object to the
17  form.
18      A.  John, I'm sorry.  Can you repeat
19  the question, please?
20      Q.  Yeah.
21        I just want to know if you are
22  aware of any instance where Highland gave a
23  loan to an officer or an employee where the
24  officer or employee failed to give Highland
25  a promissory note in exchange?

N. Dondero

1
2      MS. DEITSCH-PEREZ: Object to the
3  form.
4  BY MR. MORRIS:
5      Q.  You can answer.
6      A.  I am not aware of any.
7      Q.  Okay.  Do you have a general
8  understanding of what a promissory note is?
9      A.  A promise to pay.
10     Q.  Okay.  Is it a promise to pay a
11  sum certain?
12     MS. DEITSCH-PEREZ: Object to the
13  form.
14     MR. MORRIS:  Withdrawn.
15  BY MR. MORRIS:
16     Q.  Do you understand that a
17  promissory note is a promise to pay a
18  specified amount at some point in the
19  future?
20     MS. DEITSCH-PEREZ: Object to the
21  form.
22  BY MR. MORRIS:
23     Q.  You can answer.
24     A.  That was my understanding, John.
25     Q.  Okay.  Prior to the petition

N. Dondero

1
2  date, did you ever see any promissory note
3  that was signed by an officer or employee
4  of Highland?
5      A.  I'm not sure.
6      Q.  Do you have any recollection --
7  do you have any recollection, as you sit
8  here right now, of having seen a promissory
9  note that was signed by an officer or
10  employee of Highland prior to the petition
11  date?
12     Withdrawn.  That is not a good
13  question?
14     Prior to the petition date, did
15  you see any promissory note that was signed
16  by any officer or employee of Highland?
17     A.  I don't remember.
18     Q.  You don't have any recollection
19  of that; is that fair?
20     A.  That's fair.
21     Q.  Do you know whether Dugaboy ever
22  saw any promissory note prior to the
23  petition date that had been signed by an
24  officer or employee of Highland?
25     A.  I don't know.

N. Dondero

1
2      Q.  Prior to the petition date, did
3  you or Dugaboy ever ask to see any
4  promissory note that was executed by an
5  officer or employee of Highland?
6      MS. DEITSCH-PEREZ: Object to the
7  form.
8      A.  I don't remember, John.
9      Q.  Okay.  Do you know if Highland
10  ever forgave any obligations under any
11  promissory note that was issued by any
12  Highland employee or officer?
13     MS. DEITSCH-PEREZ: Objection.
14  No foundation.
15     A.  I am not aware.
16     Q.  You're not aware of Highland ever
17  forgiving any loan that it made to any
18  officer or employee.
19     Do I have that right?
20     MS. DEITSCH-PEREZ: Object.  No
21  foundation.
22     A.  I'm not sure, John.  I'm not
23  sure.
24     Q.  Does Dugaboy have any knowledge
25  concerning any loan that was given by

N. Dondero

1
2  Highland to any of its officers or
3  employees that was forgiven in whole or in
4  part?
5      A.  I don't know.
6      Q.  Did you or Dugaboy ever ask
7  anybody prior to the petition date whether
8  Highland had ever forgiven any loan that it
9  made to any officer or employee?
10     A.  I don't think so.
11     Q.  Did you or Dugaboy make any
12  effort at any time prior to the petition
13  date to determine whether Highland had ever
14  forgiven in whole or in part any loan that
15  it made to any of its officers or
16  employees?
17     A.  Did I make any inquiries?  Is
18  that what you're asking?
19     Q.  Did you make any effort to try to
20  answer -- to try to figure that out?
21     A.  To determine one way or the
22  other?
23     Q.  Correct.
24     A.  Not that I recall, no.
25     Q.  Did anybody ever tell you --

Page 86

1          N. Dondero
2  withdrawn.
3          Did anybody ever give you or
4  Dugaboy any information concerning any loan
5  that Highland ever made to any of its
6  employees or officers that was forgiven in
7  whole or in part?
8      A.  I was aware that that was a
9  common practice at Highland.
10     Q.  Okay.  And how did you become
11 aware of that common practice?
12     A.  In conversations with Jim.
13     Q.  Was there any other source of
14 information concerning that common practice
15 that he described for you -- withdrawn.
16         Did you have any other source of
17 information concerning the common practice
18 that you just mentioned?
19     A.  Did I have any --
20     Q.  Any other source -- yeah.
21         Did you have any other source of
22 information other than your brother
23 concerning the common practice that you
24 just described?
25     A.  I'm not sure if I spoke to other

Page 87

1          N. Dondero
2  people in addition to Jim.  I don't know.
3      Q.  Can you identify anybody that you
4  recall speaking to concerning the practice
5  that your brother told you that Highland
6  had of forgiving loans to employees and
7  officers?
8      A.  I don't remember who it was at
9  Highland that I have spoken to about that
10 or overheard a conversation.
11     Q.  Do you recall when the
12 conversation took place?
13     A.  No, I don't.
14     Q.  Do you recall where the
15 conversation took place?
16     A.  No, no, I don't.  I believe it
17 was a phone conversation.
18     Q.  Can you identify any person who
19 participated in the phone conversation?
20     A.  Jim was one of the parties.
21     Q.  Do you recall anybody else?
22     A.  I do not.
23     Q.  Do you recall if the conversation
24 took place before or after the petition
25 date?

Page 88

1          N. Dondero
2      A.  I don't know.
3      Q.  So it might have happened before;
4  it might have happened after.
5          Is that fair?
6      A.  Correct.
7      Q.  Do you remember the substance of
8  the conversation at all?
9      A.  Not in detail.
10     Q.  Can you describe for me
11 everything you recall about the
12 conversation you have in your mind
13 concerning the practice that Highland had
14 of forgiving loans to officers and
15 employees?
16     A.  I am aware that it was common
17 practice, or at least I believed it was
18 common practice at Highland.
19     Q.  Do you have any other information
20 that you can share with me that you learned
21 concerning the practice other than the fact
22 that it existed?
23     A.  Not at this time.
24     Q.  Can you identify a single officer
25 or employee who had a loan forgiven?

Page 89

1          N. Dondero
2      A.  Not off the top of my head, no.
3      Q.  Did you or Dugaboy ever know the
4  identity of any officer or employee of
5  Highland who had a loan forgiven?
6          MS. DEITSCH-PEREZ:  Object to the
7  form.
8      A.  Again, John, not off the top of
9  my head.
10     Q.  Did you ever see anything in
11 writing that concerned or related to the
12 practice that your brother described for
13 you?
14     A.  Not that I remember, no.
15     Q.  Did you ever ask to see any
16 documents that concerned or related to the
17 practice that your brother described for
18 you?
19     A.  Again, I don't recall, John.
20     Q.  Did Dugaboy ever ask for
21 information concerning Highland's practice
22 of forgiving loans?
23     A.  No, I don't believe so.
24     Q.  Did you or Highland ever know
25 about the number of loans that Highland

1          N. Dondero
2  made to employees or officers that Highland
3  forgave?
4      A.  I'm sorry, did me or Highland
5  know?
6      Q.  I apologize.  If that's what I
7  said, I'm mistaken.  Thank you.
8          Did you or Dugaboy -- did you or
9  Dugaboy ever know how many loans were
10 forgiven?
11     A.  A specific number, no.
12     Q.  Did you or Dugaboy know -- ever
13 know the amount, the face amount of the
14 loans that were forgiven?
15     A.  No, not that I recall.
16     Q.  Did you or Dugaboy ever know the
17 year in which Highland ever forgave any
18 loan to any officer or employee?
19     A.  Not that I recall.
20     Q.  Okay.  Do you know Mark Okada?
21     A.  I do.
22     Q.  Have you ever met him?
23     A.  I have.
24     Q.  Okay.  Do you know whether
25 Highland ever gave a loan to Mr. Okada that

1          N. Dondero
2  was the subject of a promissory note?
3      A.  Specifically, no.
4      Q.  Did you ever ask anybody whether
5  Highland had ever made a loan to Mr. Okada
6  that was backed by a promissory note?
7      A.  I never asked.
8      Q.  Do you or Dugaboy know whether
9  Highland ever forgave any loan that was
10 ever made to Mr. Okada?
11     A.  I am not aware.
12     Q.  Did you or Dugaboy ever ask
13 anybody whether Highland had ever made a
14 loan to Mr. Okada that Highland forgave?
15     A.  No.
16     Q.  Did you or Dugaboy ever make any
17 effort to ascertain whether Highland had
18 ever forgiven any loan that it had made to
19 Mr. Okada?
20     A.  I'm sorry.  The beginning part of
21 that, John?  Did I --
22     Q.  Sure.
23          Did you or Dugaboy ever make any
24 effort to figure out if Highland had ever
25 forgiven any loan that it had made to

1          N. Dondero
2  Mr. Okada?
3      A.  No, sir.
4      Q.  You're aware that Highland loaned
5  money to your brother, correct?
6      A.  Correct.
7      Q.  Do you know how many loans
8  Highland made to your brother?
9      A.  Over what period of time, John?
10     Q.  From the time the company was
11 formed.
12     A.  Okay.  There's more -- I'm not
13 sure how to answer that, John.
14     Q.  Okay.  That's fair.
15     A.  Can you be more specific with the
16 time frame, please?
17     Q.  You bet.
18          Let's take it for the ten years
19 prior to the petition date.  So let's go
20 back to 2009.
21          From 2009 to 2019 --
22     A.  Okay.
23     Q.  -- do you know how many loans
24 Highland made to your brother?
25     A.  To just Jim or to Jim and his

1          N. Dondero
2  entities?
3      Q.  Just to Jim.
4      A.  I don't know a specific number,
5  no.
6      Q.  Did you or Dugaboy ever ask
7  anybody how many loans Highland made to Jim
8  in the ten-year period prior to the
9  petition date?
10     A.  No.  We never asked.
11     Q.  Did you or Dugaboy ever ask
12 anybody how many loans Highland made to Jim
13 during any time period?
14     A.  No, I don't believe so.
15     Q.  Did you or Dugaboy ever make any
16 effort to try to ascertain the number of
17 loans that Highland made to your brother
18 during any particular time period?
19     A.  Not that I recall.
20     Q.  Do you know if your brother ever
21 paid Highland back the principal amount
22 due, plus interest under any loan that he
23 had obtained from Highland?
24     A.  In its entirety?
25     Q.  Yes.

Page 94

N. Dondero

1
2 A. Or a portion?
3 What are you speaking of?
4 Q. Let's start with the entirety,
5 and I'll ask the question again.
6 Are you and Dugaboy aware of any
7 loan that your brother obtained from
8 Highland that he paid back in full, plus
9 interest?
10 A. I am not sure.
11 Q. Did you or Dugaboy ever ask
12 anybody whether your brother had ever
13 obtained a loan from Highland that he paid
14 back in full, plus interest?
15 A. I don't think so.
16 Q. Did you or Dugaboy ever make any
17 effort prior to the petition date to
18 determine whether or not Highland had --
19 withdrawn.
20 Did you and Dugaboy make any
21 effort prior to the petition date to
22 determine whether your brother had ever
23 paid back all principal and interest due on
24 any loan that he had obtained from
25 Highland?

Page 95

N. Dondero

1
2 A. Not that I recall, John.
3 Q. Prior to the petition date, did
4 you or Dugaboy ever see any promissory note
5 that your brother signed?
6 A. I'm not sure. I don't know.
7 Q. Prior to the petition date, did
8 you or Dugaboy ever ask anybody to see any
9 promissory note that your brother had
10 signed in favor of Highland?
11 A. I don't believe we asked.
12 Q. Prior to the petition date, did
13 you or Dugaboy ever make any effort to try
14 to obtain any promissory note that your
15 brother signed in favor of Highland?
16 A. No, I don't think so.
17 Q. Do you know how many promissory
18 notes your brother signed in favor of
19 Highland?
20 A. Totally? No.
21 Q. Okay. I am going to ask similar
22 questions now regarding the corporate
23 entities.
24 Do you understand that Highland
25 has what are referred to as affiliates?

Page 96

N. Dondero

1
2 A. Yes.
3 Q. Okay. And do you have an
4 understanding of the term "affiliates" as
5 it relates to Highland?
6 A. Yes.
7 Q. What's your understanding of the
8 term "affiliates" as it relates to
9 Highland?
10 A. Companies that are associated
11 with Highland.
12 Q. And what does it mean to be
13 associated with Highland?
14 MS. DEITSCH-PEREZ: Object to the
15 form.
16 MR. MORRIS: Withdrawn.
17 BY MR. MORRIS:
18 Q. What do you mean when you say
19 that affiliated companies are those that
20 are associated with Highland?
21 A. They're under the Highland
22 umbrella.
23 Q. Is it your understanding that
24 affiliated companies are controlled by your
25 brother?

Page 97

N. Dondero

1
2 MS. DEITSCH-PEREZ: Object to the
3 form.
4 A. I'm sorry, John?
5 MS. DEITSCH-PEREZ: There's some
6 noise. We can hear somebody talking.
7 Someone probably needs to mute.
8 MR. MORRIS: Give me one second.
9 It might be me. We'll see.
10 I apologize for that if it was me
11 anyway.
12 Can I have last question read
13 back please.
14 THE REPORTER: Sure.
15 (Question was read back as
16 follows:
17 "QUESTION: Is it your
18 understanding that affiliated companies
19 are controlled by your brother?")
20 A. Yes.
21 Q. Okay. And are you aware -- with
22 that understanding of the term if
23 "affiliates," are you aware that from time
24 to time, Highland provided loans to certain
25 of its affiliates?

Page 98

1           N. Dondero
2      A.   I'm not sure.  Of Highland loans?
3  Okay.  I'm not sure, John.
4      Q.   Prior to the petition date, did
5  you or Dugaboy know whether Highland ever
6  made a loan to an affiliate, as you've
7  defined it?
8      A.   Yes, there were loans made.
9      Q.   Okay.  And how did you learn that
10  there were loans made by Highland to its
11  affiliates?
12      A.   Jim and I had discussed the loans
13  that were made.
14          Are we talking about certain
15  ones, John?
16      Q.   I'm just talking generally at the
17  moment.
18          How did you learn whatever
19  information you have, and we'll get into
20  the details, but how did you learn that
21  Highland made loans to affiliates?
22      A.   From Jim.
23      Q.   Okay.  Did you have any source of
24  information other than your brother on the
25  question of whether Highland made loans to

Page 99

1           N. Dondero
2  affiliates?
3      A.   Not that I'm aware of.
4      Q.   Were you and Dugaboy generally
5  aware that when Highland made loans to its
6  affiliates, the affiliates gave Highland
7  promissory notes in return?
8      A.   Yes.
9      Q.   Okay.  And how did you learn
10  that?
11      A.   In conversation.
12      Q.   And would those be conversations
13  that you had with Jim?
14      A.   Correct.
15      Q.   Did you have conversations with
16  anybody else on the topic of whether or not
17  the affiliates gave Highland promissory
18  notes in exchange for loans?
19      A.   Not that I recall.
20      Q.   Prior to the petition date, did
21  you or Dugaboy ever see a promissory note
22  that was signed on behalf of any affiliate?
23      A.   I don't recall.
24      Q.   Prior to the petition date, did
25  you or Dugaboy ever ask anybody to see any

Page 100

1           N. Dondero
2  promissory note that was signed in favor of
3  Highland by one of its affiliates?
4      A.   Not that I recall, John.
5      Q.   Prior to the petition date, did
6  you or Dugaboy make any effort to try to
7  obtain any promissory note that was
8  executed by a Highland affiliate in favor
9  of Highland?
10      A.   I don't believe so.
11      Q.   Do you know if Highland ever
12  forgave any obligations under any
13  promissory note that was signed on behalf
14  of any affiliate?
15      A.   I have no idea.
16      Q.   Did you or Dugaboy ever ask
17  anybody whether Highland had ever forgiven
18  any loan that was given to an affiliate?
19      A.   Did we – I'm sorry, John, can
20  you repeat the question, please?
21      Q.   Yes.
22          Did you or Dugaboy ever ask
23  anybody prior to the petition date whether
24  Highland had ever forgiven in whole or in
25  part any loan that it made to an affiliate?

Page 101

1           N. Dondero
2      A.   No, because it was my assumption
3  that that was common practice.
4      Q.   Okay.  And what was that
5  assumption based on?
6      A.   Conversations that I either had
7  with Jim or overheard.
8      Q.   Okay.  Do you have anything to
9  add about the practice that you haven't
10  already testified to?
11          Withdrawn.
12          Does the practice that you're
13  referring to, is that the same practice
14  that you have identified earlier with
15  respect to loans that were made to officers
16  and employees?
17      A.   That's correct, John.
18      Q.   Okay.  So did you have any source
19  of information other than your brother that
20  you can identify right now concerning the
21  practice of forgiving loans to affiliates?
22      A.   Not at this time.
23      Q.   Can you identify any loan that
24  Highland ever made to an affiliate that was
25  forgiven?

Page 102

1           N. Dondero
2      A.   Not that I recall.
3      Q.   Did you or Dugaboy ever ask
4  anybody to identify any loan that it ever
5  made to an affiliate that was forgiven in
6  whole or in part?
7      A.   Can you restate that, John?
8      Q.   Sure.
9           Did you or Dugaboy ever ask
10 anybody to identify a loan that was made by
11 Highland to an affiliate that was forgiven
12 in whole or in part?
13     A.   Not that I remember.
14     Q.   Can you or Dugaboy identify today
15 any affiliate that obtained a loan from
16 Highland that Highland forgave?
17     A.   Not that I know of.
18     Q.   Did you or Dugaboy ever take any
19 steps to confirm what your brother told you
20 about the practice of forgiving loans?
21     A.   Did we take any steps?
22     Q.   Did you do anything?
23     A.   Not that I am aware of, no.
24     Q.   Did you ever see any document
25 that concerned or related to the practice

Page 103

1           N. Dondero
2  your brother described for you whereby
3  Highland forgave loans to affiliates?
4      A.   I do not recall, John, no.
5      Q.   Did you ever ask to see any
6  documents that reflected the practice your
7  brother described?
8      A.   I never asked.
9      Q.   Give me one second.
10          Have you ever heard of an entity
11 called Highland Capital Management Services
12 Inc.?
13     A.   Yes.
14     Q.   Can we refer to that entity as
15 HCMS?
16     A.   Okay.
17     Q.   Is HCMS an affiliate --
18 withdrawn.
19          Did you and Dugaboy understand
20 that HCMS was an affiliate of Highland's
21 prior to the petition date?
22     A.   Yes.
23     Q.   And how did you come to
24 understand that HCMS was an affiliate of
25 Highland prior to the petition date?

Page 104

1           N. Dondero
2      A.   Because it's another one of Jim's
3  companies.
4      Q.   And how did you learn that that
5  was another one of Jim's companies?
6      A.   I don't remember how I learned
7  it. It's under the Highland umbrella.
8      Q.   And when you say that it's one of
9  "Jim's companies," what do you mean by
10 that?
11     A.   The beneficial owner.
12     Q.   And how did you learn that your
13 brother was the beneficial owner of HCMS?
14          MS. DEITSCH-PEREZ:  Object to the
15     form.  That's not what she said.  She
16     said he is a beneficiary owner --
17          MR. MORRIS:  You can object to
18     the question.  I appreciate it.
19 BY MR. MORRIS:
20     Q.   And you can answer it.
21          MS. DEITSCH-PEREZ:  Don't
22     misstate what she said, please.
23          MR. MORRIS:  All you do is get to
24     object to the question, please.  Don't
25     coach the witness.

Page 105

1           N. Dondero
2          MS. DEITSCH-PEREZ:  I'm not
3     coaching the witness.
4          You want to have the court
5     reporter read it back.
6  BY MR. MORRIS:
7      Q.   Can you please answer my
8  question, please?
9      A.   How did I learn that Jim was a
10 beneficial owner --
11     Q.   Sure.
12     A.   -- of the company?
13          I would assume from Jim.
14     Q.   Okay.  Do you have any reason to
15 believe your source of information was
16 anybody other than Jim?
17     A.   I don't know, John.
18     Q.   Okay.  Do you know the nature of
19 HCMS's business?
20     A.   No.
21     Q.   Did you or Dugaboy ever ask
22 anybody what the nature of HCMS's business
23 was?
24     A.   No, not that I recall.
25     Q.   Did you or Dugaboy ever make any

Appx. 01900

Page 106

N. Dondero

1
2 effort to determine what HCMS's business
3 was?
4    A.   Not that I recall.
5    Q.   Did you or Dugaboy ever know --
6 withdrawn.
7        Did you or Dugaboy ever have any
8 information concerning HCMS's financial
9 condition?
10    A.   No, not that I'm aware of.
11    Q.   Did you or Dugaboy ever ask
12 anybody for information concerning HCMS's
13 financial condition?
14    A.   No.
15    Q.   Did you or Dugaboy ever make any
16 independent effort to try to determine what
17 HCMS's financial condition was?
18    A.   Not that I recall.
19    Q.   Do you or Dugaboy know whether
20 any agreements exist between HCMS and
21 Highland other than any promissory notes?
22    A.   I don't know.
23    Q.   Did you or Dugaboy ever ask
24 anybody whether any agreements existed
25 between Highland and HCMS other than

Page 107

N. Dondero

1
2 promissory notes?
3    A.   I don't know.  No, I don't
4 believe so.
5    Q.   I appreciate your patience.  I
6 do.
7    A.   That's okay.
8    Q.   Did you or Dugaboy ever make any
9 effort to try to learn whether any
10 agreements existed between Highland and
11 HCMS other than promissory notes?
12    A.   I don't believe so.
13    Q.   Did you or Dugaboy know prior to
14 the petition date whether Highland ever
15 provided any services to HCMS?
16    A.   I don't know.
17    Q.   Did you or Dugaboy ever ask
18 anybody prior to the petition date whether
19 Highland ever provided any services to
20 HCMS?
21    A.   I don't believe it was asked.
22    Q.   Did you or Dugaboy ever made any
23 effort prior to the petition date to learn
24 whether Highland provided any services to
25 HCMS?

Page 108

N. Dondero

1
2    A.   Not that I am aware of, John.
3    Q.   Do you know if HCMS -- withdrawn.
4        Did you or Dug -- withdrawn.
5        Did you or Dugaboy know prior to
6 the petition date whether HCMS ever
7 rendered any services to Highland?
8    A.   I wouldn't --
9        MS. DEITSCH-PEREZ:  Object to the
10 form.
11    A.   I wouldn't know.
12        MR. MORRIS:  Can I have the
13 question read back?
14        THE REPORTER:  Sure.
15        (Question was read back as
16 follows:
17        "QUESTION:  Did you or Dugaboy
18 know prior to the petition date whether
19 HCMS ever rendered any services to
20 Highland?"
21        "ANSWER:  I wouldn't know.")
22 BY MR. MORRIS:
23    Q.   Did you or Dugaboy ever ask
24 anybody prior to the petition date whether
25 HCMS ever rendered any services to

Page 109

N. Dondero

1
2 Highland?
3    A.   I don't believe so, John.
4    Q.   Did you or Dugaboy make any
5 effort prior to the petition date to
6 determine whether HCMS ever rendered any
7 services to Highland?
8    A.   I don't think so.
9    Q.   Do you know if Highland ever
10 loaned any money to HCMS?
11        MS. DEITSCH-PEREZ:  Asked and
12 answered.
13        MR. MORRIS:  You can answer.
14    A.   Oh, answer it again?
15    Q.   If I asked it, I apologize, but
16 go ahead, yeah.
17        MS. DEITSCH-PEREZ:  I thought you
18 asked about promissory notes.  If I'm
19 wrong, I apologize.
20        MR. MORRIS:  That's okay.
21    A.   Yeah, I'm sorry.  Okay.  So not
22 including any notes?
23    Q.   Yeah, let me ask a different
24 question.  I'm not asking about promissory
25 notes.

Page 110

```
1              N. Dondero
2       A.  Okay.
3       Q.  I'm asking whether prior to the
4   petition date, you or Dugaboy were aware of
5   any loans that Highland made to HCMS?
6       A.  Okay.  I'm aware of the ones that
7   are in question.
8           Are you speaking of others?
9       Q.  I am asking broadly at this time.
10          Are you generally aware that
11  Highland loaned --
12      A.  Yes.
13      Q.  -- money to HCMS prior to the
14  petition date?
15      A.  Yes, I am generally aware.
16      Q.  Okay.  Did you and Dugaboy know
17  how many loans Highland made to HCMS prior
18  to the petition date?
19      A.  Yes, I believe.
20      Q.  And how many loans did Highland
21  make to HCMS prior to the petition date, to
22  the best of your knowledge?
23      A.  At least five.
24      Q.  And are those the loans that are
25  reflected in the five promissory notes that
```

Page 111

```
1   are the subject of the lawsuit against
2   HCMS?
3       A.  Correct.
4       Q.  Okay.  Are you aware of any loans
5   that Highland ever made to HCMS that are
6   not subject to the lawsuit?
7       A.  I'm not -- I'm not aware, John.
8       Q.  Did you ever ask -- withdrawn.
9           Did you or Dugaboy ask at any
10  time where Highland had ever made any
11  loans to HCMS that weren't reflected in the
12  promissory notes that are the subject of
13  the lawsuits?
14      A.  I don't believe we ever asked.
15      Q.  Do you know who authorized
16  Highland to make the loans to HCMS that
17  you're aware of?
18      A.  Okay.  I'm sorry, once again,
19  John, the question?
20      Q.  Did you or Dugaboy know prior to
21  the petition date who authorized Highland
22  to make the loans to HCMS that are the
23  subject of the promissory notes that you
24  referred to?
25
```

Page 112

```
1              N. Dondero
2       A.  Who authorized?
3       Q.  Yes.
4       A.  I don't know.
5       Q.  Do you recall if you or Dugaboy
6   asked anybody at any time prior to the
7   petition date who authorized Highland to
8   make the loans to HCMS?
9       A.  I don't believe that was asked.
10      Q.  Okay.  Do you have any
11  information as to whether HCMS intended to
12  pay back each of the loans that are the
13  subject of the promissory notes at the time
14  the loans were given to them by Highland?
15          MS. DEITSCH-PEREZ:  Objection.
16  No foundation.
17      A.  John, can you just say the
18  question again, please?
19      Q.  Sure.
20          Did you or Dugaboy have any
21  information prior to the petition date as
22  to whether HCMS intended to repay the loans
23  that are the subject of the promissory
24  notes that you identified?
25      A.  No.
```

Page 113

```
1              N. Dondero
2       Q.  Okay.  Did you or Dugaboy ever
3   ask anybody prior to the petition date
4   whether HCMS had intended to repay the
5   loans at the time and times that it
6   obtained them from Highland?
7       A.  Okay, John, can you ask that
8   again?
9       Q.  Sure.
10          Did you or Dugaboy ever ask
11  anybody whether HCMS intended to repay the
12  loans at the time HCMS obtained them from
13  Highland?
14      A.  I don't believe we asked their
15  intent.
16      Q.  Okay.
17          MS. DEITSCH-PEREZ:  Whenever --
18  we've been going about another hour.
19  So whenever is good for you, John.
20          MR. MORRIS:  Okay.  I'm going to
21  finish up this section here.
22  BY MR. MORRIS:
23      Q.  Do you or Dugaboy have any
24  knowledge as to why Highland made the loans
25  to HCMS?
```

N. Dondero

1               N. Dondero
2     A. Only assumptions.
3     Q. Okay. I don't want assumptions.
4  I want information.
5     A. Then I don't -- then I don't
6  know.
7     Q. Okay. Do you or Dugaboy ever ask
8  anybody why Highland made the loans to HCMS
9  that are the subject of the promissory
10  notes you referred to?
11     A. No.
12     Q. Did you or Dugaboy ever make any
13  effort to try to determine why Highland
14  made the loans to HCMS?
15     A. No, not that I remember.
16     Q. Did you or Dugaboy know prior to
17  the petition date what HCMS did with the
18  proceeds of the loans that it obtained from
19  Highland?
20     A. I don't know, John.
21     Q. Did you or Dugaboy ever ask
22  anybody at any time prior to the petition
23  date what HCMS did with the proceeds of the
24  loans that it obtained from Highland?
25     A. No.

1               N. Dondero
2     Q. Did you or Dugaboy ever make any
3  effort to determine what HCMS did with the
4  proceeds of the loans that it obtained from
5  Highland?
6     A. No.
7     Q. You're aware that HCMS issued
8  promissory notes in favor of Highland in
9  exchange for the loans, correct?
10     A. Correct.
11     Q. Prior to the petition date, did
12  you ever see any promissory note that was
13  issued by HCMS in favor of Highland?
14     A. Prior to October of '19?
15     Q. Correct.
16     A. I don't recall.
17     Q. Do you recall whether you or
18  Dugaboy asked at any time prior to the
19  petition date to see promissory notes that
20  were executed on behalf of HCMS in favor of
21  Highland?
22     A. I don't know.
23     Q. Do you recall whether you or
24  Dugaboy made any effort at any time prior
25  to the petition date to obtain copies of

1               N. Dondero
2  promissory notes that were issued by HCMS
3  in favor of Highland?
4     A. I don't believe so.
5     Q. Prior to the petition date, were
6  you and Dugaboy aware of the terms of the
7  promissory notes that HCMS issued in favor
8  of Highland?
9       MS. DEITSCH-PEREZ: Object to the
10    form.
11     A. Can you be more specific? Just
12  the terms of the loan, John?
13     Q. Yes.
14       Did you and Dugaboy know the
15  terms of the loans that were reflected in
16  the promissory notes?
17     A. I believe so, yes.
18     Q. Okay. And who gave you the
19  information regarding the terms of the
20  loans that HCMS obtained from Highland?
21     A. Jim.
22     Q. Do you remember anything about
23  the terms of the loans that HCMS obtained
24  from Highland?
25     A. Regarding -- you mean the term?

1               N. Dondero
2  There's 30-year. There's demand.
3     Q. You tell me.
4       You described five promissory
5  notes, I think, that were executed by HCMS
6  in favor of Highland, right?
7     A. That's correct.
8     Q. Okay. And I believe you
9  testified that you didn't see those notes
10  prior to the petition date, correct?
11     A. Right. Well, yeah, I'm a little
12  vague on the date; but, yes, I don't
13  believe I saw them prior to -- so right,
14  prior to the petition date, correct.
15  Um-hmm.
16     Q. But did you or Dugaboy --
17  withdrawn.
18       Did you and Dugaboy have an
19  understanding of the terms of the notes
20  prior to the petition date?
21     A. Yes. From what I understand, my
22  recollection is several of them were
23  demand, and one was 30-year.
24     Q. And do you have an understanding
25  of what it means -- of what a demand notice

**Appx. 01903**

Page 118

```
1              N. Dondero
2  is?
3          MS. DEITSCH-PEREZ:  Object to the
4  form.
5      A.  Payable upon demand.
6      Q.  Okay.  So you knew prior to the
7  petition date that certain of the notes
8  issued by HCMS to Highland were demand
9  notes; is that right?
10     A.  Yes.
11     Q.  Okay.
12         MR. MORRIS:  All right.  I'm
13  happy to take a break now.  Hopefully
14  it won't be as long as the last one.
15  But we can go off the record.
16         THE VIDEOGRAPHER:  The time is
17  12:00 p.m.  We are going off the
18  record.
19      (Recess is taken.)
20      (Patrick Daugherty not in
21  attendance at this time.)
22         THE VIDEOGRAPHER:  The time is
23  12:16.  Back on the record.
24  BY MR. MORRIS:
25     Q.  Ms. Dondero, did you communicate
```

Page 119

```
1              N. Dondero
2  with anybody during your break regarding
3  any aspect of your testimony?
4      A.  No, sir.
5      Q.  Okay.  Have you ever heard of an
6  entity called HCRE Partners LLC?
7      A.  Yes, sir.
8      Q.  Do you understand that HCRE is an
9  affiliate of Highland?
10     A.  I do.
11     Q.  Okay.  And what was the -- what
12  is the basis of your understanding that
13  HCRE -- withdrawn.  I should have put a
14  time frame on this.
15      Is it your understanding that
16  HCRE was an affiliate of Highland prior to
17  the petition date?
18     A.  Yes, sir.
19     Q.  And what is the basis for your
20  understanding?
21     A.  They were under the Highland
22  umbrella prior to October of '19.
23     Q.  And to the best of your
24  knowledge, does HCRE fit the definition of
25  affiliate that you provided earlier today?
```

Page 120

```
1              N. Dondero
2          MS. DEITSCH-PEREZ:  Objection.
3      A.  Yes.
4      Q.  Do you know the nature of HCRE's
5  business?
6      A.  I believe it's real estate.
7      Q.  Do you or Dugaboy have any
8  information about the nature of HCRE's
9  business other than it's real estate?
10     A.  No.
11     Q.  Did you or Dugaboy ever ask
12  anybody what the nature of HCRE's business
13  was?
14     A.  No.
15     Q.  Did you or Dugaboy ever make any
16  effort to ascertain the nature of HCRE's
17  business?
18     A.  Not that I recall.
19     Q.  Did you or Dugaboy know whether
20  HCRE had any agreements with Highland prior
21  to the petition date?
22         MS. DEITSCH-PEREZ:  Object to the
23  form.
24         MR. MORRIS:  Withdrawn.
25  BY MR. MORRIS:
```

Page 121

```
1              N. Dondero
2      Q.  Do you or Dugaboy know whether
3  HCRE had any agreements with Highland prior
4  to the petition date other than the
5  promissory notes?
6      A.  Other than the promissory notes,
7  no.
8      Q.  Did you or Dugaboy ever ask
9  anybody at any time prior to the petition
10  date whether HCRE had any agreements with
11  Highland other than the promissory notes?
12     A.  No.
13     Q.  Did you or Dugaboy make any
14  effort prior to the petition date to
15  ascertain whether any agreements existed
16  between Highland and HCRE other than the
17  promissory notes?
18     A.  Not that I recall.
19     Q.  Do you know -- withdrawn.
20      Did you or Dugaboy know prior to
21  the petition date whether HCRE had ever
22  rendered any services to Highland?
23         MS. DEITSCH-PEREZ:  Object to the
24  form.
25     A.  I don't know.
```

Page 122

N. Dondero

1
2     Q.   Did you or Dugaboy ever ask
3 anybody prior to the petition date whether
4 HCRE ever rendered any services to
5 Highland?
6     A.   I don't believe so.
7     Q.   Did you or Dugaboy make any
8 effort to ascertain prior to the petition
9 date whether HCRE ever rendered any
10 services to Highland?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   I'm sorry, John, can you repeat
14 that, please, the question?
15    Q.   Did you or Dugaboy make any
16 effort prior to the petition date to
17 determine whether or not HCRE had ever
18 provided any services to Highland?
19        MS. DEITSCH-PEREZ:  Object to the
20    form.
21    A.   I don't believe so.
22    Q.   Are you aware -- withdrawn.
23        Did you or Dugaboy know prior to
24 the petition date whether Highland had ever
25 loaned any money to HCRE?

Page 123

N. Dondero

1
2     A.   Yes.
3     Q.   And were the loans that you're
4 aware of reflected in promissory notes?
5     A.   Correct.
6     Q.   And are those the promissory
7 notes that are the subject of one of the
8 litigations?
9     A.   Yes, sir.
10    Q.   Are you aware of any loans that
11 Highland made to HCRE that are not the
12 subject of one of the promissory notes in
13 the lawsuits?
14    A.   I'm not aware of any.
15    Q.   Did you ever ask anybody whether
16 Highland had ever made any loans to HCRE
17 that were not reflected in the promissory
18 notes that are the subject of the lawsuit?
19    A.   Not that I recall.
20    Q.   Did you or Dugaboy know prior to
21 the petition date who authorized Highland
22 to make the loans to HCRE?
23        MS. DEITSCH-PEREZ:  Object to the
24    form.
25    A.   Sorry, John, could you say the

Page 124

N. Dondero

1
2 question again, please?
3     Q.   Sure.
4         Did you or Dugaboy know prior to
5 the petition date who authorized Highland
6 to make the loans to HCRE?
7        MS. DEITSCH-PEREZ:  Object to the
8    form.
9     A.   I don't know.
10    Q.   Did you or Dugaboy ever ask
11 anybody prior to the petition date who
12 authorized Highland to make the loans to
13 HCRE that are reflected in the promissory
14 notes you referred to?
15        MS. DEITSCH-PEREZ:  Object to the
16    form.
17    A.   No.
18    Q.   Did you or Dugaboy ever make any
19 effort to ascertain who had authorized
20 Highland to make the loans to HCRE that are
21 reflected in the promissory notes you
22 referred to?
23    A.   Not that I recall.
24    Q.   Did you or Dugaboy have any
25 information prior to the petition date as

Page 125

N. Dondero

1
2 to whether HCRE intended to repay the loans
3 that are reflected in the promissory notes
4 at the time the loans were made?
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7     A.   John, I'm sorry, did I have any
8 information if they intended to pay their
9 loans?
10    Q.   At the time that they obtained
11 the loans, yes.
12    A.   I have no reason to think they
13 wouldn't pay their loans --
14    Q.   Okay.
15    A.   -- at the time they were made,
16 correct.
17    Q.   You're not aware of any facts
18 that suggest that HCRE didn't intend to
19 repay the loans at the time they obtained
20 them, right?
21    A.   Correct.
22    Q.   Prior to the petition date, did
23 you or Dugaboy have any information in
24 regard to the purpose of the loans that
25 Highland gave to HCRE that were reflected

**Appx. 01905**

Page 126

```
1            N. Dondero
2  in the promissory notes?
3       A.  No, no idea.
4       Q.  Did you or Dugaboy attempt to
5  obtain prior to the petition date any
6  information concerning the purpose of the
7  loans that were made by Highland to HCRE
8  that were reflected in the promissory
9  notes?
10      A.  I don't believe so.
11      Q.  Did you or Dugaboy make any
12 effort to ascertain the purpose of the
13 loans that Highland made to HCRE?
14      A.  I don't believe so.
15      Q.  Did you or Dugaboy know prior to
16 the petition date what HCRE did with the
17 proceeds of the loans that it obtained from
18 Highland in exchange for the promissory
19 notes?
20      A.  We don't know.
21      Q.  Did you or Dugaboy ever ask
22 anybody what HCRE did with the proceeds of
23 the loans that it obtained from Highland in
24 exchanged from the promissory notes?
25      A.  I don't believe we did.
```

Page 127

```
1            N. Dondero
2       Q.  Did you or Dugaboy ever make any
3  effort prior to the petition date to
4  ascertain what HCRE did with the proceeds
5  of the loans that it obtained from Highland
6  that are reflected in the promissory notes?
7       A.  No.
8       Q.  Did you ever see -- withdrawn.
9            Did you or Dugaboy ever see prior
10 to the petition -- withdrawn.  Not good.
11 Too many questions.
12           Did you or Dugaboy -- withdrawn.
13           Prior to the petition date, did
14 you or Dugaboy ever see any promissory note
15 that was executed by HCRE in favor of
16 Highland?
17      A.  Not that I recall.
18      Q.  Prior to the petition date, did
19 you or Dugaboy ever ask anybody to see any
20 promissory note that was issued by HCRE in
21 favor of Highland?
22      A.  Not that I recall.
23      Q.  Prior to the petition date, did
24 you or Dugaboy make any effort to try to
25 obtain any promissory note that was ever
```

Page 128

```
1            N. Dondero
2  executed on behalf of HCRE in favor of
3  Highland?
4       A.  No.
5       Q.  Prior to the petition date, did
6  you and Dugaboy know the terms of any of
7  the promissory notes that were issued by
8  HCRE to Highland?
9       A.  Yes.
10      Q.  And how did you learn of the
11 terms of the notes?
12      A.  From Jim.
13      Q.  And what did Jim tell you about
14 the terms of the notes that were issued by
15 HCRE to Highland?
16      A.  He mentioned the 30-year demand,
17 the dates, the amounts.
18      Q.  Okay.  Did you do -- withdrawn.
19           Did you or Dugaboy take any steps
20 to try to corroborate what your brother
21 told you concerning the terms of the notes
22 that were issued by HCRE to Highland?
23      A.  Not that I recall.
24      Q.  Okay.  Did you have any source of
25 information for the terms of the notes
```

Page 129

```
1            N. Dondero
2  other than what your brother gave to you?
3       A.  I don't believe so.
4       Q.  Okay.  Last one.  NexPoint.
5            Are you familiar with an entity
6  called NexPoint Advisors LP?
7       A.  Yes.
8       Q.  Can we refer to that entity as
9  NexPoint?
10      A.  Yes.
11      Q.  Is it your understanding that
12 NexPoint was an affiliate of Highland's
13 prior to the petition date, as you've used
14 the term "affiliate"?
15      A.  Um-hmm.  Yes.
16      Q.  And what's the basis for your
17 understanding that prior to the petition
18 date, NexPoint was an affiliate of
19 Highland?
20      A.  Because Jim is a beneficial
21 owner.
22      Q.  Is it your understanding that Jim
23 is a beneficial owner of all of the
24 defendants in each of the promissory note
25 lawsuits?
```

Page 130

```
1            N. Dondero
2        MS. DEITSCH-PEREZ:  Object to the
3     form.
4        THE WITNESS:  Can I answer?
5   BY MR. MORRIS:
6     Q.  Yes.
7     A.  Yes, that is my belief, John.
8     Q.  Do you have any reason to believe
9   Jim is not a beneficial owner of any
10  corporate defendant in any of the lawsuits?
11    A.  No, I have no reason to believe
12  that.
13    Q.  Prior to the petition date, did
14  you or Dugaboy know the nature of
15  NexPoint's business?
16    A.  I'm not really sure.
17    Q.  Do you know the nature of
18  NexPoint's business today?
19    A.  I'm not sure.
20    Q.  Did you or Dugaboy ever ask
21  anybody at any time what the nature of
22  NexPoint's business was?
23    A.  I don't believe we did.
24    Q.  Did you or Dugaboy make any
25  effort at any time to try to learn what the
```

Page 131

```
1            N. Dondero
2   nature of NexPoint's business was?
3     A.  Not that I recall.
4     Q.  Did you or Dugaboy know prior to
5   the petition date whether NexPoint had any
6   agreements with Highland?
7        MS. DEITSCH-PEREZ:  Object to the
8     form.
9        MR. MORRIS:  I apologize.  I'll
10    make the same qualification.
11  BY MR. MORRIS:
12    Q.  Did you and Dugaboy know prior to
13  the petition date whether NexPoint and
14  Highland had any agreements together other
15  than the promissory notes?
16    A.  I'm not aware of any.
17    Q.  Okay.  Did you or Dugaboy ask
18  anybody at any time prior to the petition
19  date whether any agreements existed between
20  NexPoint and Highland other than the
21  promissory notes?
22    A.  No, not that I'm aware of.
23    Q.  Did you or Dugaboy ever make any
24  effort prior to the petition date to
25  determine whether any agreements existed
```

Page 132

```
1            N. Dondero
2   between Highland and NexPoint other than
3   the promissory notes?
4     A.  Not that I'm aware of.
5     Q.  Did you or Dugaboy know prior to
6   the petition date whether NexPoint ever
7   rendered any services to Highland?
8        MS. DEITSCH-PEREZ:  Object to the
9     form.
10    A.  I don't know.
11    Q.  Did you or Dugaboy ever ask
12  anybody at any time prior to the petition
13  date whether NexPoint had ever rendered any
14  services to Highland?
15       MS. DEITSCH-PEREZ:  Object to the
16    form.
17    A.  I'm sorry, John.  Can you repeat
18  the question, please?
19    Q.  Sure.
20       Did you and Dugaboy ask anybody
21  at any time prior to the petition date
22  whether NexPoint had ever rendered any
23  services to Highland?
24    A.  Not that I'm aware of.
25    Q.  Did you and Dugaboy make any
```

Page 133

```
1            N. Dondero
2   effort prior to the petition date to
3   determine whether or not NexPoint had ever
4   rendered any services to Highland?
5     A.  Not that I'm aware of.
6     Q.  Are you aware that Highland made
7   loans to NexPoint from time to time?
8     A.  I don't know.
9     Q.  Did you ever see any -- do you
10  know whether -- withdrawn.
11       Prior to the petition date, were
12  you and Dugaboy aware of any promissory
13  notes that NexPoint had issued in favor of
14  Highland?
15       MS. DEITSCH-PEREZ:  You mean
16    other than what's at issue here?  Just
17    generally?
18       MR. MORRIS:  I'm starting with
19    the general, yeah.
20    A.  I'm not aware of.
21    Q.  Are you aware of any promissory
22  notes that NexPoint ever issued in favor of
23  Highland?
24    A.  I'm not aware of any.
25    Q.  Do you know whether there are any
```

N. Dondero

1
2 promissory notes that NexPoint issued that
3 are the subject of this lawsuit?
4     A.   Yeah.   John, can we back up a
5 question?
6     Q.   Absolutely.
7     A.   Are you talking about the notes
8 -- yeah, please.
9         Are you talking about the notes,
10 part of this proceeding or are you not?
11     Q.   I'm starting -- that's okay.   Let
12 me --
13     A.   Because obviously there is the
14 NexPoint promissory note that we are
15 talking about.   When I answered the way I
16 did, it was regarding others that I'm not
17 aware of.   I'm aware of the one obviously
18 in this proceeding.
19     Q.   Okay.   Thank you for the --
20     A.   Does that clarify?
21     Q.   It does.   It is helpful.   Thank
22 you very much.
23         Other than the one -- how many
24 NexPoint notes do you understand are the
25 subject of these litigations?

N. Dondero

1
2     A.   One.
3     Q.   Okay.   Other than that one note,
4 are you aware of any other promissory notes
5 that NexPoint ever issued in favor of
6 Highland?
7         MS. DEITSCH-PEREZ:   Object to the
8 form.
9     A.   No, I'm not aware of any other.
10     Q.   Did you ask anybody -- withdrawn.
11         Did you or Dugaboy ask anybody
12 prior to the petition date whether NexPoint
13 had issued any other promissory notes in
14 favor of Highland other than the one that's
15 the subject of the lawsuit?
16     A.   I don't believe so.
17     Q.   Did you or Dugaboy know prior to
18 the petition date whether Highland had made
19 any loan to NexPoint other than the loan
20 that's reflected in the promissory note?
21         MS. DEITSCH-PEREZ:   Object to the
22 form.
23     A.   I'm not aware of any.
24     Q.   Do you know how much the
25 promissory -- do you know the principal

N. Dondero

1
2 amount of -- withdrawn.
3         Do you know the -- withdrawn.
4         Did you and Dugaboy know the
5 principal amount of NexPoint's promissory
6 note prior to the petition date?
7     A.   Yes.
8     Q.   And how did you learn that?
9     A.   From Jim.
10     Q.   And what did Jim tell you that
11 you can recall?
12     A.   30 million thereabouts, in that
13 neighborhood.
14     Q.   Do you know how many principal
15 was owed as of the petition date?
16     A.   It's paid down by, oh, about a
17 third, so it's somewhere 22, 23 million, I
18 believe, in that ballpark.
19     Q.   Okay.   And how did you learn that
20 NexPoint had paid down the principal to
21 that ballpark?
22     A.   I'm not sure.
23     Q.   Do you recall when you learned
24 that NexPoint had paid down the principal
25 to that ballpark?

N. Dondero

1
2     A.   Not exactly.
3     Q.   Okay.   But you are aware that
4 NexPoint paid approximately 7 to 8 million
5 dollars in principal on the note that's the
6 subject of the lawsuit, correct?
7         MS. DEITSCH-PEREZ:   Object to the
8 form.
9     A.   Yes, it was somewhere in that
10 ballpark.   Sure.
11     Q.   Okay.   Did you and Dugaboy know
12 prior to the petition date who authorized
13 Highland to make the loan to NexPoint?
14         MS. DEITSCH-PEREZ:   Object to the
15 form.
16     A.   No, I don't know.
17     Q.   Did you or Dugaboy prior to the
18 petition date ask anybody who had
19 authorized Highland to make the $30 million
20 loan to NexPoint?
21     A.   Not that I recall.
22     Q.   Did you or Dugaboy make any
23 effort prior to the petition date to
24 determine who had authorized Highland to
25 make the $30 million loan to NexPoint?

N. Dondero

1
2    A.   Not that I recall.
3    Q.   Do you have any reason to believe
4  that NexPoint did not intend to pay all
5  principal and interest due under the
6  promissory note at the time that it
7  obtained the loan from Highland?
8    A.   I have no reason to believe they
9  weren't intending to pay.
10    Q.   Did you have any reason to
11  believe -- withdrawn.
12       Do you or Dugaboy have any reason
13  to believe that Highland wasn't not
14  expecting to get repaid all principal and
15  interest due under the loan at the time it
16  made the loan?
17       MS. DEITSCH-PEREZ:  Object to the
18    form.  Actually, can somebody --
19    Annette, could you read that
20    back?  There were a double negative or
21    two.
22       MR. MORRIS:  Okay.  Let me
23    rephrase the question.  That's fine.
24    That's fine.
25  BY MR. MORRIS:

N. Dondero

1
2    Q.   Do you have any reason to believe
3  that Highland didn't intend to get repaid
4  all principal and interest due under the
5  NexPoint note at the time it made the loan?
6    A.   I have no reason to believe that
7  I didn't think that they weren't to get
8  repaid at the time the notes were
9  initiated.
10    Q.   Okay.  Did you or Dugaboy know
11  prior to the petition date what the purpose
12  of the $30 million loan was?
13    A.   I don't know.
14    Q.   Did you or Dugaboy ever ask
15  anybody prior to the petition date what the
16  purpose of the $30 million loan was?
17    A.   I don't believe so.
18    Q.   Did you or Dugaboy make any
19  effort prior to the petition date to
20  ascertain what the purpose of the $30
21  million loan was?
22    A.   I don't believe so.
23    Q.   Do you or Dugaboy -- withdrawn.
24       Did you or Dugaboy know prior to
25  the petition date what NexPoint did with

N. Dondero

1
2  the proceeds of the loan?
3    A.   No, I don't know.
4    Q.   Did you or Dugaboy ever ask
5  anybody prior to the petition date what
6  NexPoint did with the proceeds of the loan?
7    A.   We did not.
8    Q.   Did you or Dugaboy know prior to
9  the petition date that the $30 million loan
10  was a rollup of previously existing loans
11  that Highland had made to NexPoint?
12       MS. DEITSCH-PEREZ:  Object to the
13    form.
14    A.   I was not aware of that.
15    Q.   Are you aware today that the $30
16  million loan was a roll up of previously
17  existing notes?
18    A.   I didn't, no.
19    Q.   Did you ever see the promissory
20  note that was issued by NexPoint in favor
21  of Highland that's the subject of one of
22  these notes -- litigations?
23    A.   I don't remember.  That was in
24  '17, correct, John?
25    Q.   I'm just asking if -- let me ask

N. Dondero

1
2  a different question.
3    A.   Yeah, I don't --
4    Q.   Okay.  Did you or Dugaboy see the
5  promissory note prior to the
6  commencement -- no.
7       Did you or Dugaboy prior to the
8  petition date ever see the promissory note
9  that NexPoint issued in favor of Highland
10  in the principal amount of approximately
11  $30 million?
12    A.   I don't recall.
13    Q.   Do you recall if you or Dugaboy
14  ever asked anybody prior to the petition
15  date to see the $30 million promissory note
16  that NexPoint issued in favor of Highland?
17    A.   I don't believe so.
18    Q.   Did you or Dugaboy make any
19  effort prior to the petition date to obtain
20  a copy of the $30 million promissory note
21  that NexPoint issued in favor of Highland?
22    A.   I don't recall.
23    Q.   Were you and Dugaboy aware at any
24  time prior to the petition date of the
25  terms of the promissory note that NexPoint

```
 1            N. Dondero
 2  issued in favor of Highland?
 3      A.  30-year.
 4      Q.  It was a 30-year note?
 5      A.  Um-hmm.
 6      Q.  Do you recall anything else about
 7  that note?
 8      A.  I believe it was 2017.
 9      Q.  Okay.
10      A.  And the amounts we already
11  discussed.
12      Q.  Do you know who determined that
13  the promissory note would be a 30-year
14  term?
15      A.  I do not.
16      Q.  Do you know who on behalf of
17  Highland agreed to accept a 30-year note
18  from NexPoint?
19          MS. DEITSCH-PEREZ:  Object to the
20  form.
21      A.  I don't know, John.
22      Q.  Did you or Dugaboy make an effort
23  at any time prior to the petition date to
24  determine whether or not a 30-year term was
25  appropriate?
```

```
 1            N. Dondero
 2          MS. DEITSCH-PEREZ:  Object to the
 3  form.
 4      A.  No.
 5      Q.  Did you or Dugaboy ask anybody at
 6  any time prior to the petition date whether
 7  a 30-year term was appropriate?
 8          MS. DEITSCH-PEREZ:  Object to the
 9  form.
10      A.  Not that I recall.
11      Q.  Did you or Dugaboy know prior to
12  the petition date whether the $30 million
13  note was the subject of any negotiation
14  between NexPoint and Highland?
15          MS. DEITSCH-PEREZ:  Object to the
16  form.
17      A.  I didn't know.
18      Q.  Did you or Dugaboy ask anybody at
19  any time prior to the petition date whether
20  the $30 million note was subject to
21  negotiation?
22      A.  Subject to negotiation?  Can you
23  elaborate?  What negotiation?
24      Q.  Are you aware of anybody on
25  behalf of Highland suggesting that the term
```

```
 1            N. Dondero
 2  of the note should be something other than
 3  30 years?
 4      A.  No.  Changing that term, no, I'm
 5  not familiar.
 6      Q.  Okay.  Let's switch topics and
 7  I'll cover this topic and then we can take
 8  a lunch break.
 9          I'd like to turn now to the
10  limited partnership agreement, the LP
11  agreement as I think we've defined it.  And
12  I'm going to ask my colleague to put up on
13  the screen -- I don't think it's in the
14  binder that I gave you.
15          MS. DEITSCH-PEREZ:  Yes, it is.
16          MR. MORRIS:  Oh, is it?
17          MS. DEITSCH-PEREZ:  It is?
18          MR. MORRIS:  What number is it?
19          MS. DEITSCH-PEREZ:  It is number
20  2, it looks like.
21          MR. MORRIS:  So we'll put it up
22  on the screen and then you can look at
23  the hard copy.
24          MS. DEITSCH-PEREZ:  Okay.  Is
25  there a particular page you want to
```

```
 1            N. Dondero
 2  turn to?
 3          MR. MORRIS:  Let's just start
 4  with this.
 5  BY MR. MORRIS:
 6      Q.  Do you understand --
 7          MS. DEITSCH-PEREZ:  Hang on a
 8  minute.  One second.
 9          Okay.  We're good.  We've got it.
10  BY MR. MORRIS:
11      Q.  Okay.  Are you looking at the
12  document that is Exhibit 4 that's attached
13  to the document that's been denoted as
14  number 2?
15          MS. DEITSCH-PEREZ:  Yes.
16          Turn to the page before the one
17  that says --
18          THE WITNESS:  Oh, okay.
19      A.  So page 4 of 37?
20      Q.  Yes.
21          (Document review.)
22      A.  Okay.
23      Q.  All right.
24      A.  Okay.  Go ahead.
25      Q.  At the top, do you see it says
```

1      N. Dondero
2   Document 63-4 in the middle?
3      A.  Yes, I do.
4      Q.  And you're at page 2 of 37,
5   correct?
6      A.  Correct.
7      Q.  Okay.  Do you understand that
8   this is the document we defined earlier as
9   the LP agreement?
10     A.  Yes, sir.
11     Q.  Have you seen this document
12  before now?
13     A.  Yes.
14     Q.  Do you recall when you saw this
15  document for the first time?
16     A.  Shortly after it was made, when I
17  was trustee.
18     Q.  Okay.  Do you recall the
19  circumstances under which you saw the LP
20  agreement for the first time?
21     A.  No, I don't remember the
22  circumstance.
23     Q.  Do you have a copy of the LP
24  agreement in your personal possession?
25  Like other than right now, did you have it

1      N. Dondero
2   before today or before I sent it?
3      A.  Yes.
4      Q.  Okay.  Do you recall when you
5   first obtained a copy of the LP agreement?
6      A.  The very first time?
7      Q.  Yeah.
8      A.  I don't know specifically, John.
9      Q.  Can we go to the document -- the
10  page that's marked 32 of 37?
11     MS. DEITSCH-PEREZ:  2 of 37?
12     THE WITNESS:  32 of 7 -- 32 of
13  37.
14     MS. DEITSCH-PEREZ:  Thank you.
15     (Document review.)
16  BY MR. MORRIS:
17     Q.  And is that your signature there?
18     MR. MORRIS:  If we can get page
19  32 of 37 up on the screen.
20     (Document review.)
21  BY MR. MORRIS:
22     Q.  And is that your signature there,
23  ma'am?
24     A.  Well, on the paper copy, it is.
25  Oh, there it is.  Yes.

1      N. Dondero
2      Q.  Okay.
3      MR. MORRIS:  And I apologize La
4   Asia, but can we go now to Section
5   3.10?
6      We're going to mark it.  This one
7   is Exhibit 2.  Don't worry that we are
8   going out of order.  They're premarked.
9   So this document we're going to mark as
10  Exhibit 2.
11     (N. Dondero Exhibit 2, Amended
12  Complaint for (1) Breach of Contract,
13  (II) Turnover of Property, (III)
14  Fraudulent Transfer, and (IV) Breach of
15  Fiduciary Duty, marked for
16  identification, as of this date.)
17     MS. DEITSCH-PEREZ:  Did I miss
18  Exhibit 1?
19     MR. MORRIS:  No.
20     MS. DEITSCH-PEREZ:  Okay.
21  BY MR. MORRIS:
22     Q.  Do you see Section 3.10?  Do you
23  have that in front of you?
24     A.  Yes.
25     Q.  Have you seen that provision of

1      N. Dondero
2   the LP agreement before?
3      A.  Yes.
4      Q.  Do you recall when you first read
5   or you first saw Section 3.10?
6      A.  On the day I probably signed it.
7      Q.  All right.  I don't want you to
8   speculate.  I want you to search your
9   memory.
10     A.  Okay.
11     Q.  Do you recall when you saw
12  Section 3.10 for the first time?
13     A.  The first time I saw the
14  document.
15     Q.  Okay.  Do you recall the
16  circumstances under which you reviewed
17  Section 3.10?
18     A.  Prior to signing the document.
19     Q.  Do you see there is a reference
20  in the document in Section 3.10 to majority
21  interest?
22     A.  Yes, sir.
23     Q.  Do you have an understanding of
24  what that term means?
25     A.  Class A shareholders -- limited

Page 150

N. Dondero

2 partners. I apologize.

3    Q. And what is the basis for that

4 understanding?

5    A. Because the class A limited

6 partners is the majority interest. Holds

7 -- I'm sorry, holds the majority interest.

8    Q. And did you ever discuss that

9 with anybody at any time?

10    MS. DEITSCH-PEREZ: And I'm going

11 to direct her to ask exclude any

12 discussions with lawyers. So other --

13    MR. MORRIS: Let me rephrase the

14 question. Let me rephrase the

15 question.

16 BY MR. MORRIS:

17    Q. Did you ever discuss the

18 definition of majority interest with

19 anybody at any time prior to the petition

20 date?

21    A. I don't recall.

22    Q. Do you believe that Dugaboy holds

23 a majority interest, as that term is used

24 in Section 3.10?

25    A. Yes, I do believe that.

Page 151

N. Dondero

2    Q. And did you believe that prior to

3 the petition date?

4    A. Yes.

5    Q. What was the basis for your

6 belief prior to the petition date that

7 Dugaboy held a majority interest?

8    A. I was told that Dugaboy held the

9 majority interest.

10    Q. And who told you that Dugaboy

11 held the majority interest?

12    A. Melissa Schroth.

13    Q. Do you recall when Ms. Schroth

14 told you that?

15    A. Shortly after I became trustee.

16    Q. And can you tell me who Melissa

17 Schroth is?

18    A. Melissa is a financial assistant

19 with Jim.

20    Q. And you communicated with

21 Ms. Schroth on a regular basis prior to the

22 petition date; is that fair?

23    A. Correct.

24    Q. Do you know, is Ms. Schroth a

25 lawyer?

Page 152

N. Dondero

2    A. I don't believe so.

3    Q. Do you know anything about her

4 background or expertise?

5    A. Accounting, I believe.

6    Q. Did you ever do anything to

7 corroborate what Ms. Schroth told you about

8 Dugaboy being a majority interest?

9    A. I had no reason to disbelieve

10 her.

11    Q. But you didn't do anything to

12 corroborate that; is that right?

13    A. I did not, sir.

14    Q. Did you seek any advice from

15 anybody to ascertain whether what

16 Ms. Schroth told you was accurate?

17    A. I don't recall.

18    Q. Okay. Do you see at the end of

19 Section 3.10, there is a reference to NAV

20 trigger period?

21    A. Yes.

22    Q. Do you have an understanding --

23 withdrawn.

24    Did you have an understanding

25 prior to the petition date of what a NAV

Page 153

N. Dondero

2 trigger period was?

3    A. No.

4    Q. Did you ever ask anybody prior to

5 the petition date what a NAV trigger period

6 was?

7    A. I don't believe so.

8    Q. Did you or Dugaboy make any

9 effort prior to the petition date to

10 ascertain whether a NAV trigger period had

11 occurred?

12    A. I don't believe so.

13    Q. Did you or Dugaboy ever know

14 prior to the petition date whether in fact

15 a NAV trigger period had ever occurred?

16    A. I don't think so.

17    Q. All right.

18    MR. MORRIS: I think if it's okay

19 with you guys, now might be a nice time

20 to take a lunch break.

21    I prefer that it not be too

22 extended. Would it be okay if we came

23 back at the bottom of the hour?

24    THE WITNESS: 1:30, would that be

25 okay?

Page 154

N. Dondero

1
2     MR. MORRIS:  Yeah, 1:30 Central.
3  Is that good?
4     THE WITNESS:  That would be
5  great.  Thank you.
6     MR. MORRIS:  Thanks so much.
7     THE VIDEOGRAPHER:  The time is
8  12:54.  We're going off the record.
9     (Recess is taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 155

N. Dondero

1
2     A F T E R N O O N   S E S S I O N
3     (Time noted:  1:35 p.m.)
4     THE VIDEOGRAPHER:  The time is
5  1:35.  We are back on the record.
6        *     *     *
7  N A N C Y   D O N D E R O,   resumed and
8     testified as follows:
9  EXAMINATION BY (Cont'd.)
10  MR. MORRIS:
11     Q.   Ms. Dondero, are you ready to
12  proceed?
13     A.   I am.
14     MR. MORRIS:  Are you Deborah?
15     MS. DEITSCH-PEREZ:  (Nodding.)
16     MR. MORRIS:  Okay.  Thank you.
17  BY MR. MORRIS:
18     Q.   Can you hear me okay?
19     A.   Yes, sir.
20     Q.   Okay.  I've switched from my
21  phone to my computer.  Somehow it worked.
22  Now I wanted to make sure you can hear me.
23     Ms. Dondero, did you speak to
24  anybody during the break about the
25  substance of your testimony?

Page 156

N. Dondero

1
2     A.   No, sir.
3     Q.   Did you speak to anybody during
4  the break regarding the substance of this
5  deposition in any way?
6     A.   No, sir.
7     Q.   Okay.  When we left, we had just
8  looked at Section 3.10 of the LP agreement.
9     Do you remember that?
10     A.   Yes.
11     Q.   Is there anything about the LP
12  agreement that you -- withdrawn.
13     Is there anything that you or
14  Dugaboy don't understand about Section 3.10
15  of the LP agreement?
16     MS. DEITSCH-PEREZ:  Object to the
17     form.
18  BY MR. MORRIS:
19     Q.   You can answer.
20     A.   No.
21     Q.   Is there any aspect of Section
22  3.10 that you and Dugaboy thinks is
23  ambiguous?
24     MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 157

N. Dondero

1
2     A.   No.
3     Q.   Let's switch gears now and let's
4  talk about the oral agreement that's been
5  referred to in this litigation.
6     I'd like to put up on the screen
7  a document that you don't have a hard copy
8  of, or at least I didn't give it to you,
9  and that would be the Amended Complaint
10  that was served by Highland against you and
11  your brother and Dugaboy.
12     MR. MORRIS:  And that document
13  we're marking for purposes of the
14  deposition as Exhibit No. 31.
15     (N. Dondero Exhibit 31, Defendant
16  James Donder's Answer to Amended
17  Complaint, marked for identification,
18  as of this date.)
19     MR. MORRIS:  Can we put that on
20  the screen, please, and turn to
21  paragraph 82?
22  Actually, stop right there.
23  BY MR. MORRIS:
24     Q.   Ms. Dondero, have you ever seen,
25  if we can scroll up -- and, again, this is

Page 158

```
1              N. Dondero
2  consistent with what I explained to you at
3  the beginning of the deposition.
4         I don't mean to rush you. I
5  think you should take all the time you need
6  to look at this document if you want to,
7  but my first question is simply whether you
8  have ever seen this document before. And
9  if you need to see more of it, just let me
10 know.
11        (Document review.)
12    A.  Can you scroll to the next page,
13 John, please?
14    Q.  Sure.
15        (Document review.)
16        MS. DEITSCH-PEREZ:  I have a hard
17 copy here I could give the witness.
18        Do you want me to do that?
19        MR. MORRIS:  Sure.
20 BY MR. MORRIS:
21    Q.  And just for clarity,
22 Ms. Dondero, this is the Amended Complaint
23 that Highland served to collect on the
24 notes that were issued by your brother.
25    A.  Okay.
```

Page 159

```
1              N. Dondero
2        MS. CANTY:  John, I'm sorry.  31
3  is actually the answer to the Amended
4  Complaint.
5        MR. MORRIS:  I'm sorry.  I
6  apologize that.  Let me restate that.
7        Exhibit 31 is the answer,
8  Mr. Dondero's answer to the Amended
9  Complaint.
10        MS. DEITSCH-PEREZ:  All right.
11 So what are you asking if she has seen?
12 I was going to hand her the complaint.
13        MR. MORRIS:  It's my mistake,
14 Deborah.  If we can go back to – if we
15 can go back to the top.
16        Let me start this over.
17 BY MR. MORRIS:
18    Q.  Do you see, Ms. Dondero, that
19 this is defendant James Dondero's answer to
20 Amended Complaint?
21    A.  Yes, I see that.
22    Q.  Have you ever seen your brother's
23 answer to the Amended Complaint?
24    A.  I don't remember if I've seen
25 this or not.  Deborah just gave me a hard
```

Page 160

```
1              N. Dondero
2  copy.  Can I have a quick minute to glance
3  over it?
4     Q.  Sure.  Take your time.  And let
5  me know at the top of it, what the docket
6  number is.
7     A.  Certainly.
8        Docket No. DOC 83 –
9     Q.  Okay.  Perfect.
10    A.  – filed on December 3rd.
11        Is that it?
12    Q.  Yes.  So we are looking at the
13 same thing.
14        MR. MORRIS:  And this document is
15 going to be marked as Exhibit 31.
16    A.  Okay.
17    Q.  All right.  Have you seen this
18 document before?
19    A.  I think so.
20    Q.  Okay.
21        MR. MORRIS:  I'm going to ask, La
22 Asia go to paragraph 82.
23    A.  Okay.
24    Q.  Do you seep paragraph 82 is up on
25 the screen?
```

Page 161

```
1              N. Dondero
2     A.  Yes, sir.
3     Q.  So I'm going to read a portion of
4  it to you beginning at the very top, okay?
5        I just want you to follow along
6  with me.
7        Paragraph 82 says in part,
8  "Plaintiff's claims are barred in whole or
9  in part because prior to the demands for
10 payment, plaintiff agreed that it would not
11 collect the notes upon fulfillment of
12 condition subsequent.  Specifically,
13 sometime between December of the year in
14 which each note was made and February the
15 following year, Defendant Nancy Dondero, as
16 representative for a majority of the Class
17 A shareholders of plaintiff agreed that
18 plaintiff would forgive the notes if
19 certain portfolio companies were sold for
20 greater than cost or on a basis outside of
21 defendant James Dondero's control.  The
22 purpose of this agreement was to provide
23 compensation to defendant James Dondero,
24 who was otherwise underpaid compared to
25 reasonable compensation levels in the
```

N. Dondero

1 N. Dondero
2 industry through the use of forgivable
3 loans, a practice that was standard at
4 HCMLP and in the industry."
5 Have I read that correctly?
6 A. Um-hmm, yes.
7 Q. Okay. To the best of your
8 knowledge, is the portion of paragraph 82
9 that I just read true and accurate?
10 A. Yes. Correct.
11 Q. Are you aware, as Dugaboy's
12 30(b)(6) witness, that HCRE, HCMS, and
13 NexPoint all make the same allegation in
14 defense?
15 A. Yes.
16 Q. So is it your testimony that the
17 statement that I just read from paragraph
18 82 applies to the promissory notes issued
19 by HCRE, HCMS, and NexPoint, and that are
20 the subject of the lawsuits?
21 A. Yes.
22 Q. So it's your testimony that you
23 entered into oral agreements with your
24 brother between December and the year each
25 note was made, and February of the

1 N. Dondero
2 following year, pursuant to which plaintiff
3 agreed that plaintiff would forgive the
4 notes if certain portfolio companies were
5 sold for greater than cost or on a basis
6 outside of James Dondero's control,
7 correct?
8 A. That is correct.
9 Q. Can we refer to each of the oral
10 agreements that you entered into with your
11 brother concerning the promissory notes
12 that are described in paragraph 82 as an
13 agreement and collectively as the
14 agreements?
15 A. Certainly.
16 MS. DEITSCH-PEREZ: Okay. And
17 just, John, just so I don't have to
18 object each time, when you say "you,"
19 you're talking about Dugaboy?
20 MR. MORRIS: I'm talking about
21 both unless I say otherwise. But thank
22 you for pointing that out.
23 MS. DEITSCH-PEREZ: Okay.
24 MR. DRAPER: John, just so you
25 know, to the extent that -- hold on.

1 N. Dondero
2 I'm muted.
3 To the extent Deborah raises an
4 objection for the "you," Nancy, as a
5 trustee, I'm not going to say anything,
6 but my objection is a follow-on for the
7 same thing, for the same reasons.
8 MR. MORRIS: Okay. I appreciate
9 that, Douglas.
10 So I'm going to ask the question
11 again.
12 BY MR. MORRIS:
13 Q. Is it your testimony that you, as
14 the trustee of The Dugaboy Investment
15 Trust, entered into oral agreements with
16 your brother between December and the year
17 each note was made and February of the
18 following year, pursuant to which plaintiff
19 agreed that plaintiff would forgive the
20 notes if certain portfolio companies were
21 sold for greater than cost or on a basis
22 outside of James Dondero's control?
23 A. That is correct.
24 Q. Okay. And can we refer to each
25 of the oral agreements that are the subject

1 N. Dondero
2 of paragraph 82 individually as an
3 agreement and collectively as the
4 agreements?
5 A. Um-hmm. Yes.
6 Q. Is that a yes?
7 A. Yes. That is a yes. Sorry.
8 Q. And do you and Dugaboy understand
9 that the phrase "plaintiff" in paragraph 82
10 refers to Highland?
11 A. Yes.
12 Q. And do you and Dugaboy understand
13 that Dugaboy, as the representative of a
14 majority of the Class A shareholders of
15 Highland is the actual entity that entered
16 into the agreements on behalf of Highland?
17 A. Yes.
18 Q. And you are the trustee of
19 Dugaboy today, correct?
20 A. Correct.
21 Q. And you were the trustee of
22 Dugaboy at the time each of the agreements
23 referred to in paragraph 82 was entered
24 into, correct?
25 A. Correct.

Page 166

N. Dondero

1
2    Q.  And you personally caused Dugaboy
3   to enter into each agreement that is
4   referred to in paragraph 82, correct?
5        MS. DEITSCH-PEREZ:  Object to the
6       form.
7   BY MR. MORRIS:
8    Q.  You can answer.
9        MS. DEITSCH-PEREZ:  I'm sorry,
10      John, can you repeat the question,
11      please?
12  BY MR. MORRIS:
13   Q.  You personally caused Dugaboy to
14  enter into each of the agreements that's
15  referred to in paragraph 82, correct?
16       MS. DEITSCH-PEREZ:  Object to the
17      form.
18   A.  Correct.
19   Q.  What is Dugaboy?
20   A.  The trust, the living
21  maintenance, education, and health trust.
22   Q.  Do you know when it was formed?
23   A.  2010.
24   Q.  Have you been the trustee of the
25  Dugaboy Trust since the time it was

Page 167

N. Dondero

1
2   created?
3    A.  No.
4    Q.  Who preceded you as trustee, to
5   the best of your knowledge?
6    A.  I don't know.
7    Q.  Did you ever ask anybody who
8   preceded you as trustee of The Dugaboy
9   Investment Trust?
10   A.  Did I ever ask who was the
11  trustee prior to --
12   Q.  Yes.
13   A.  I did not.
14   Q.  Okay.  Do you recall when you
15  became the trustee of the Dugaboy Trust?
16   A.  October 2015.
17   Q.  Did somebody appoint you to be
18  trustee of the Dugaboy Trust?
19   A.  By "appoint," do you mean asked
20  me to be?
21   Q.  Okay.  Let me restate the
22  question.
23   A.  Sorry.
24   Q.  Do you know how you became the
25  trustee of the Dugaboy Trust?

Page 168

N. Dondero

1
2    A.  Jim had asked me to.
3    Q.  Did Jim ask you to be the Dugaboy
4   trustee at around the same time that you
5   became the trustee?
6    A.  That's correct.
7    Q.  Prior to accepting Jim's --
8   withdrawn.
9        Did you agree to become the
10  trustee at the Dugaboy Trust in response to
11  Jim's request?
12   A.  Yes, sir.
13   Q.  Okay.  Before you accepted the
14  appointment as trustee of the Dugaboy
15  Trust, did you obtain any information about
16  the purpose of the Dugaboy Trust?
17   A.  Yes.
18   Q.  What information do you recall
19  obtaining before you agreed to serve as the
20  trustee at the Dugaboy Trust?
21   A.  The purpose of the trust is to
22  provide health, education, maintenance,
23  lifestyle for the beneficiaries, who is my
24  brother, for as long as he lives and then
25  his children and subsequent generations.

Page 169

N. Dondero

1
2    Q.  Is your brother the sole
3   beneficiary of the Dugaboy Trust during his
4   lifetime?
5    A.  Yes.
6    Q.  Did you make any independent
7   decisions with respect to the Dugaboy
8   Trust?
9    A.  Of course.
10   Q.  Do you know if the Dugaboy Trust
11  owned an interest in Highland at the time
12  Dugaboy entered into each of the agreements
13  referred to in paragraph 82?
14   A.  Okay.  I'm sorry.  Say that
15  again, John.
16   Q.  Do you know whether Dugaboy owned
17  an interest in Highland at the time each
18  agreement was entered into?
19       MS. DEITSCH-PEREZ:  Other than
20      what she's already testified to?
21   A.  Other than it being a major Class
22  A shareholder, John?  A limited partner.
23   Q.  I'm sorry, it's a little bit of a
24  different question.
25   A.  Okay.

Page 170

1              N. Dondero
2      Q.   You entered into more than one
3  agreement with your brother; is that right?
4      A.   That's correct.
5      Q.   How many agreements did you enter
6  into with him?
7      A.   Okay.  How many notes or how many
8  agreements -- you mean, per -- one per year
9  for three years covering 13 notes.
10      Q.   So there's three annual
11  agreements that you recall?  Do I have that
12  right?
13      A.   Correct.
14      Q.   And was Dugaboy's interest in
15  Highland the same at each moment that you
16  entered into each of the three agreements?
17      A.   I'm sorry?
18      Q.   Do you know whether -- do you
19  know whether Dugaboy's interest in Highland
20  changed at all between the time that you
21  entered into each of the three agreements
22  that you just referred to?
23      A.   I don't know.  I don't think so.
24      Q.   Did you ever ask anybody at any
25  time prior to the petition date if

Page 171

1              N. Dondero
2  Dugaboy's interest in Highland changed at
3  any time during the period in which you
4  were entering into these agreements on
5  behalf of Dugaboy?
6      A.   No.
7           And, John, can I back up for a
8  second?
9      Q.   Sure.
10      A.   Just in answer to one of my
11  questions when I said that I had three
12  conversations with Jim.  That pertained to
13  this procedure.  That's my answer for this
14  scope.
15      Q.   Right.
16      A.   Okay.  Just so we're on the same
17  page.  Okay.  Okay.
18      Q.   And do you recall -- we'll get to
19  it.
20           All right.  So you entered into
21  three agreements.
22           Do I have that right?
23      A.   Correct.
24      Q.   And do you recall when you
25  entered into each one of the three

Page 172

1              N. Dondero
2  agreements?
3      A.   To the best of my recollection,
4  it was around the holidays.
5      Q.   Do you remember the year you
6  entered into the first agreement?
7      A.   It would have been either been
8  the tail end of '17, beginning of '18.
9      Q.   And would the second agreement be
10  the tail of '18, the beginning of '19?
11      A.   Correct, sir.
12      Q.   And would the third one be the
13  tail of '19 and the beginning of '20?
14      A.   Either/or.  Correct.  Um-hmm.
15      Q.   Okay.  And when we say late in
16  each year, is paragraph 82 correct, to the
17  best of your knowledge, that it was either
18  December of the year or the following
19  January or February?
20      A.   Correct.
21      Q.   So it's your recollection that as
22  the trustee of The Dugaboy Investment
23  Trust, you entered into an agreement
24  pursuant to 3.10 of the LP agreement in
25  either December 2019 or January or February

Page 173

1              N. Dondero
2  of 2020?
3      A.   Yes.
4      Q.   Okay.  So you entered into that
5  third agreement after the petition date.
6           Do I have that right?
7      A.   That's correct.
8      Q.   Do you recall that there came a
9  time in January of 2020 when your brother
10  relinquished control of Highland in favor
11  of an independent board?
12      A.   January of '20, yes.  Um-hmm.
13      Q.   Do you recall if the agreement
14  that you entered into in late 2019 or early
15  2020 occurred before or after your brother
16  surrendered control of Highland?
17      A.   I believe it was before.
18      Q.   So sometime in December of 2019
19  or prior to the date in January when your
20  brother surrendered control, you and your
21  brother entered into the third in the
22  series of three oral agreements that are
23  referred to in paragraph 82, correct?
24      A.   Correct.
25      Q.   Okay.  Do you recall what the

Page 174

```
1          N. Dondero
2   terms of each of the oral agreements was?
3       A.  They were all the same, the
4   agreements.  Obviously for different notes.
5   But the terms were that the notes would be
6   forgiven if any of the three portfolio
7   companies that we discussed earlier,
8   Trussway, Cornerstone, MGM, would monetize
9   at a higher value, and then the notes would
10  be forgiven and considered deferred
11  compensation.
12      Q.  And when you say a higher value,
13  did you understand at the time you entered
14  into the agreements what higher value
15  meant?
16      A.  Yes.
17      Q.  Okay.  What does higher value
18  mean in the context of the agreements that
19  you entered into with your brother?
20      A.  Higher than the purchase price.
21      Q.  So do I have this correct that if
22  one of the three portfolio companies was
23  sold for a value that exceeded the cost by
24  at least one dollar, then all of the notes
25  that were subject to the agreements would
```

Page 175

```
1          N. Dondero
2   be forgiven?
3       A.  That's correct.
4       Q.  Okay.  Can you identify the
5   promissory notes that were the subject of
6   each of the three agreements?
7       A.  I don't understand by identified,
8   John.  In your book or --
9       Q.  Are you able to list for me the
10  promissory notes --
11      A.  Sure --
12      Q.  Let me finish the question,
13  please.
14      Are you able to list for me the
15  promissory notes that were the subject of
16  each of the three agreements?
17      A.  In 2017, there were four notes:
18  One to NexPoint, two to HCRE, I believe,
19  and one to HCMS.  I don't have specifics,
20  but I believe the four of them originally
21  totaled somewhere near 60 million, in that
22  ballpark, when they were originally set up.
23  That was 2017.
24      MS. DEITSCH-PEREZ:  John, we have
25  a list.
```

Page 176

```
1          N. Dondero
2       Do you want her to do this from
3       memory or do you want her to look --
4       MR. MORRIS:  I don't.  I'm going
5       to try it a different way, Deborah.
6       MS. DEITSCH-PEREZ:  Okay.
7   BY MR. MORRIS:
8       Q.  Is there -- did the three oral
9   agreements with your brother --
10      A.  Yes?
11      Q.  -- cover all of the promissory
12  notes that are subject of the lawsuits in
13  which are a defendant?
14      A.  Yes.
15      Q.  Do you know if any of the three
16  agreements you entered into with your
17  brother cover any promissory notes that are
18  not the subject of the lawsuits in which
19  you are a defendant?
20      MS. DEITSCH-PEREZ:  Object to the
21      form.
22      A.  I don't believe they do.
23      Q.  Okay.  So to the best of your
24  knowledge, as the person who caused Dugaboy
25  to enter into these agreements on behalf of
```

Page 177

```
1          N. Dondero
2   Highland, you do not believe that your
3   agreements covered any promissory note that
4   is the subject of the lawsuits that have
5   been commenced against you, correct?
6       MS. DEITSCH-PEREZ:  Wait.  Can
7       you -- I think you -- can you have the
8       court reporter read it back so you can
9       hear it?  Because either I heard it
10      wrong or you misspoke, I think.
11      THE REPORTER:  I can read it
12      back, if you'd like.
13      MR. MORRIS:  Sure.
14      MS. DEITSCH-PEREZ:  Yeah,
15      Annette, can you read it back?
16      THE REPORTER:  Sure.
17      (Question was read back as
18      follows:
19      "QUESTION:  Okay.  So to the best
20      of your knowledge, as the person who
21      caused Dugaboy to enter into these
22      agreements on behalf of Highland, you
23      do not believe that your agreements
24      covered any promissory note that is the
25      subject of the lawsuits that have been
```

1 　　　　N. Dondero
2 commenced against you, correct?")
3 　　　MR. MORRIS: All right. Let me
4 ask the question again. Let me ask the
5 question again.
6 　　　MS. DEITSCH-PEREZ: Okay.
7 BY MR. MORRIS:
8 　Q. Ms. Dondero, as the person who
9 caused Dugaboy to enter into the agreements
10 described in paragraph 82 on behalf of
11 Highland, do you have any reason to believe
12 that those agreements related to any
13 promissory notes that are not the subject
14 of the lawsuits that have been commenced
15 against you and Dugaboy?
16 　A. No.
17 　Q. Okay.
18 　A. I believe they include the notes
19 that we've been referring to, that we've
20 been talking to about all day, John.
21 　Q. Okay. Did you or Dugaboy ever
22 make a list of the promissory notes that
23 were the subject of each agreement --
24 withdrawn.
25 　　　Prior to the petition date, did

1 　　　　N. Dondero
2 you or Dugaboy ever make a list of the
3 promissory notes that were the subject of
4 each agreement?
5 　　　MS. DEITSCH-PEREZ: Object to the
6 form.
7 　A. I don't recall.
8 　Q. You have no recollection of you
9 or Dugaboy ever writing down the promissory
10 notes that were the subject of any of the
11 three oral agreements that Dugaboy entered
12 into with your brother, correct?
13 　A. I don't believe I did.
14 　Q. And you don't believe Dugaboy did
15 either, right?
16 　　　MS. DEITSCH-PEREZ: Object to the
17 form.
18 　A. Correct.
19 　Q. Are you or Dugaboy aware of
20 anything in writing that identifies --
21 withdrawn.
22 　　　Are you and Dugaboy aware of
23 anything that was written prior to the
24 petition date that identified the
25 promissory notes that were the subject of

1 　　　　N. Dondero
2 each agreement that was entered into?
3 　A. Am I aware of anything that was
4 written down not by me?
5 　Q. Right.
6 　A. Nothing that I can recall at this
7 time.
8 　Q. How do you know that the
9 promissory notes that are the subject of
10 the lawsuits against you were all subject
11 to the oral agreements that you entered
12 into on behalf of Dugaboy with your
13 brother?
14 　A. Of the 13 notes in total, we
15 discussed 4 and 17; 6 and 18; and 3 in 19,
16 and that's total, if I'm not mistaken, the
17 13 notes in question.
18 　Q. Okay. Now neither you nor
19 Dugaboy ever saw any of the notes prior to
20 the petition date, correct?
21 　　　MS. DEITSCH-PEREZ: Object to the
22 form.
23 　A. That's correct.
24 　Q. And neither you nor Dugaboy are
25 aware of any writing that was created prior

1 　　　　N. Dondero
2 to the petition date that identified the
3 promissory notes that were the subject of
4 the agreements between Dugaboy and your
5 brother, correct?
6 　A. That is correct.
7 　Q. So are you basing your belief
8 that the agreements covered only the
9 promissory notes that are the subject of
10 the lawsuits on your memory or on anything
11 else?
12 　　　MS. DEITSCH-PEREZ: Object to the
13 form.
14 　　　MR. MORRIS: Withdrawn.
15 BY MR. MORRIS:
16 　Q. What is the basis for your belief
17 that the agreements covered the promissory
18 notes that are the subject of each -- of
19 the lawsuits against you and Dugaboy?
20 　A. Because I remember what we
21 discussed.
22 　Q. So you have a memory. You
23 remember that three to four years ago, you
24 can remember the promissory notes that were
25 the subject of your first agreement even

Page 182

1          N. Dondero
2   though you never saw the notes?  Do I have
3   that right?
4       A.   I remember the amount.  I don't
5   remember all the specifics from that many
6   years ago, John, but I do remember the
7   amount per each year, and I knew that there
8   were 13 in total.
9       Q.   Who identified the notes that
10  would be the subject of the agreements?  Do
11  you recall?
12      A.   In what context who identified
13  them?
14      Q.   Well, the agreement was entered
15  into twin in your capacity as the trustee
16  of Dugaboy and your brother, correct?
17      A.   Correct.
18      Q.   As between you and your brother,
19  did one of you identify the notes that
20  would be the subject of the agreements?
21      A.   Yes, that would be --
22      Q.   And who identified -- okay.  And
23  who was that?
24      A.   Jim.
25      Q.   And during these three

Page 183

1          N. Dondero
2   conversations, did he describe for you the
3   notes that were going to be the subject of
4   the conversation?
5       A.   Yes.
6       Q.   I apologize.  I withdraw the
7   question.
8          Did your brother describe for you
9   the notes that were going to be the subject
10  of each agreement?
11      A.   Yes.
12      Q.   Do you have any basis for knowing
13  which agreements -- no.  Withdrawn.
14         Do you have any basis for knowing
15  which notes are the subject of the
16  agreements other than what your brother
17  told you in the three -- in the
18  conversations that led to the three
19  agreements?
20      A.   No, I don't believe so.
21      Q.   Did your brother explain to you
22  why he selected these notes that are the
23  subject of the lawsuits for inclusion in
24  the agreements?
25      A.   Not that I recall.

Page 184

1          N. Dondero
2          MR. MORRIS:  I'd like to put up
3      on the screen a document that's been
4      marked as Exhibit 43.
5          (N. Dondero Exhibit 43,
6      Promissory Note, Bates-stamped
7      D-CNL000550 through 551, marked for
8      identification, as of this date.)
9   BY MR. MORRIS:
10      Q.   And do you see, Ms. Dondero, that
11  this is a promissory note dated January 18,
12  2018, in the amount of $7,900,000?
13         MR. MORRIS:  And if we can scroll
14      to the bottom so we could see the
15      signature.
16  BY MR. MORRIS:
17      Q.   Do you see that that's been
18  signed by your brother?
19      A.   I see that.
20      Q.   Have you ever seen this
21  particular promissory note before?
22         MR. MORRIS:  And we can go back
23      to the top.
24         (Document review.)
25      A.   It doesn't look familiar, John.

Page 185

1          N. Dondero
2       Q.   This note is not a note that's
3   subject to your agreement with your
4   brother, correct?
5       A.   Correct.
6       Q.   Do you know why?
7       A.   I do not.
8       Q.   And Highland has not sued anybody
9   to collect under this note, to the best of
10  your knowledge, correct?
11         MS. DEITSCH-PEREZ:  Object to the
12      form.
13      A.   I --
14  BY MR. MORRIS:
15      Q.   Withdrawn.
16         Are you aware of any lawsuit that
17  has been commenced by Highland to collect
18  under this note?
19      A.   I am not aware of any.
20      Q.   When you entered into these
21  agreements, did you have any understanding
22  that the agreement would cover all of the
23  notes that were executed by your brother or
24  by other entities under the Highland
25  umbrella?

1        N. Dondero
2        MS. DEITSCH-PEREZ: Object to the
3    form.
4        A.   John, can you repeat the
5    question, please?
6        Q.   Sure.
7            At the time that you entered into
8    the agreements, did you have any
9    understanding that the agreements would
10   cover all notes executed by your brother,
11   NexPoint, HCRE and HCMS?
12       A.   Yes.
13       Q.   Okay.  Was it your understanding
14   that all promissory notes would be covered?
15       MS. DEITSCH-PEREZ: Do you mean
16   all of the ones at issue here or all,
17   like, including --
18       MR. MORRIS:  No.
19       MS. DEITSCH-PEREZ: Object to the
20   form.
21       MR. MORRIS:  I thought I was
22   clear, but I'll try it one more time.
23       MS. DEITSCH-PEREZ: Please.
24   BY MR. MORRIS:
25       Q.   Was it your understanding that

1        N. Dondero
2    when you entered into each of these
3    agreements, that the agreements would cover
4    every promissory note that was executed by
5    your brother, by NexPoint, by HCMS, and by
6    HCRE, irrespective of whether it wound up
7    being part of the lawsuit?
8        A.   My understanding for the
9    agreement I had with Jim is just for these
10   13 notes.
11       Q.   Okay.  So there may be other
12   notes that Jim or NexPoint or HCRE or HCMS,
13   there may be other notes that they
14   executed, but if there are, they were not
15   the subject of any of your agreements with
16   your brother, correct?
17       MS. DEITSCH-PEREZ: Object to the
18   form.
19           You mean any of the agreements
20   that she's been testifying here today?
21       MR. MORRIS:  Yes.  We've defined
22   agreements, so unless there is a
23   question, unless somebody wants to
24   revisit the definition, we've defined
25   it.

1        N. Dondero
2        MS. DEITSCH-PEREZ: Okay.  Got
3    it.  No.
4        A.   Um-hmm.
5        Q.   When you say "um-hmm," what could
6    you mean?
7        A.   I'm sorry, John.  The
8    conversation got me away from the question.
9    I'm sorry.  I'm sorry.
10       MS. DEITSCH-PEREZ: It's my
11   fault.
12       THE WITNESS:  I'm sorry.
13       A.   Go ahead, John.
14       MR. MORRIS:  Can I have the last
15   question read back, please.
16       THE REPORTER:  Sure.
17           (Question was read back as
18   follows:
19       "QUESTION:  Okay.  So there may
20   be other notes that Jim or NexPoint or
21   HCRE or HCMS, there may be other notes
22   that they executed, but if there are,
23   they were not the subject of any of
24   your agreements with your brother,
25   correct?")

1        N. Dondero
2        A.   Correct.
3        Q.   Okay.
4        I'm only speaking for these 13.
5        Q.   Okay.  Do you recall whose idea
6    it was to enter into each of the
7    agreements?
8        A.   It was Jim's suggestion.
9        Q.   Okay.  And did he call you to
10   make the suggestion?
11       A.   Yes.  At least one, if not two of
12   the agreements were verbal or at least
13   started verbally.  And one I remember was
14   in person.
15       Q.   Okay.  Did you ever have any
16   concerns that your brother might have a
17   conflict of interest since he controlled
18   both the borrower and the lender under each
19   of these transactions?
20       MS. DEITSCH-PEREZ: Object to the
21   form.
22       A.   No.
23       Q.   Did it ever occur to you that
24   your brother might have a conflict of
25   interest since he controlled both the

Page 190

1          N. Dondero
2 borrower and the lender in each of these
3 transactions?
4          MS. DEITSCH-PEREZ: Object to the
5 form.
6      A. I'm sorry, I thought I answered.
7 No.
8      Q. Yeah, the first question was
9 whether you had any concerns. And the
10 second question was did it ever occur to
11 you.
12          Did you understand that?
13      A. I did.
14          It didn't occur to me, and I
15 didn't have any concern.
16      Q. Okay. And I think you just
17 mentioned that your recollection is that
18 two of the agreements were reached on the
19 telephone, and one was reached in person;
20 is that right?
21      A. That's correct.
22      Q. Okay. The agreement that was
23 reached in person, where were you?
24      A. Florida.
25      Q. Where at?

Page 191

1          N. Dondero
2      A. My house in Vero Beach.
3      Q. Was anybody else present during
4 this discussion?
5      A. Jim's kids, underage. My father,
6 who's elderly. Family.
7      Q. Do you have any reason to believe
8 that anybody was aware of the substance of
9 the discussion that you had with your
10 brother concerning the agreement?
11      A. No.
12      Q. The two other conversations that
13 you had on the phone, do you recall whether
14 any person participated in those
15 discussions other than your brother and
16 yourself?
17      A. No one else participated.
18      Q. Out of the three agreements that
19 you entered into, do you recall whether it
20 was the first, second, or third that was
21 entered into during a face-to-face meeting?
22      A. To the best of my recollection,
23 it would have been the end of '18,
24 beginning of '19.
25      Q. Were there any conversations --

Page 192

1          N. Dondero
2 withdrawn.
3          So there were three agreements;
4 is that correct?
5      A. Through this discussion?
6      Q. Yes.
7      A. There are three agreements, yes.
8      Q. And all three agreements are oral
9 agreements, correct?
10      A. They're all oral. One in person
11 and two on the phone, yes.
12      Q. Okay. Were there any
13 communications concerning the scope or term
14 or terms of the proposed agreement that
15 took place before the day on which the
16 agreements were entered into?
17          MS. DEITSCH-PEREZ: Object to the
18 form.
19 BY MR. MORRIS:
20      Q. I just want to know if there were
21 any conversations or communications that
22 occurred prior to the entry of the three
23 agreements.
24      A. There could have been, John.
25      Q. I know there could have been.

Page 193

1          N. Dondero
2 I'm asking what you remember.
3      A. I don't -- at this time, I don't
4 know.
5      Q. Okay. Do you have any reason to
6 believe, as you sit here right now, that
7 there were any communications that occurred
8 prior to the three days in which you
9 entered into the three oral agreements?
10      A. There could have been.
11      Q. I appreciate that. I'm asking if
12 you have any recollection of any such
13 communications.
14      A. I'm not sure at this time, John.
15      Q. Were any of the oral agreements
16 ever the subject of negotiation?
17      A. I don't understand what you're
18 asking.
19      Q. Why don't you tell me what the
20 conversations were that led to each of the
21 agreements to the best that you can recall.
22      A. The conversations with my brother
23 that took place towards the end of each of
24 the years that we're discussing, they
25 started as general conversations about

1          N. Dondero
2   business, about work. And Jim would bring
3   up the loans that were done earlier in the
4   year.
5          He had stated in the conversation
6   that he thought he was undercompensated for
7   the work that he does and the time that he
8   puts in. And he wanted those loans to be
9   forgiven if any of the three portfolio
10  companies that we talked about monetized at
11  a higher value.
12      Q.  And you agreed with that?
13      A.  Well, it was -- yes, I did agree
14  with that proposal. I thought it was a
15  win-win for everybody.
16      Q.  Did you ever propose any
17  alternative to the proposal that your
18  brother made that you just described?
19      A.  I did not.
20      Q.  Can you identify any provision of
21  any of the agreements that you negotiated
22  with your brother?
23      A.  I didn't negotiate, but Jim had
24  concern, and rightfully so, that he would
25  put in the work and the time and the effort

1          N. Dondero
2   to increase the value of any of those
3   portfolio companies and that factors that
4   you mention you beyond his control might
5   cause them to be sold at a value under the
6   price that was paid for them and this deal
7   would not happen.
8          So hence, that part of the deal
9   came up, but I don't know if I'd consider
10  it a negotiation.
11      MR. MORRIS:  Okay. I'm going to
12  move to strike.
13  BY MR. MORRIS:
14      Q.  And I'm just going to ask you if
15  you can identify any provision of any of
16  the agreements that you recall being the
17  subject of negotiation?
18      A.  I don't recall any part being a
19  negotiation.
20      Q.  Who identified the portfolio
21  companies that were the subject of each
22  agreement?
23      A.  Jim.
24      Q.  Did you ask your brother why he
25  selected those companies?

1          N. Dondero
2       A.  No.
3       Q.  Do you know why your brother
4   selected those companies?
5       A.  I do not.
6       Q.  Did you ever suggest that
7   different portfolio companies should be
8   used?
9       A.  I did not.
10      Q.  Did you ask him if Highland had
11  any other portfolio companies?
12      A.  I don't know.
13      Q.  And your brother is the person
14  who proposed that all of the notes would be
15  forgiven if all of the three portfolio
16  companies was sold for greater than cost;
17  is that right?
18      A.  That's correct.
19      Q.  Do you know whether your brother
20  had a duty to maximize value at the time
21  that you entered into the agreements with
22  him?
23      A.  I don't know.
24      Q.  Did you ever ask anybody prior to
25  entering into any of the agreements whether

1          N. Dondero
2   your brother already had a duty to maximize
3   value?
4       A.  I did not.
5       Q.  Did you ever make a
6   counterproposal to the term of the
7   agreement that said all of the notes would
8   be forgiven if one of the portfolio
9   companies was sold for greater than cost?
10      A.  I'm sorry, John. Once again, the
11  question, please?
12      Q.  Sure.
13          Did you or Dugaboy ever make a
14  counterproposal to the provision in the
15  agreements that all of the notes would be
16  forgiven if one of the portfolio companies
17  was sold above cost?
18      A.  Wasn't that his proposal? Jim's
19  proposal?
20      Q.  It was his proposal. I think
21  you've testified to that. And I'm asking
22  you if you or Dugaboy ever made a
23  counterproposal with respect to that
24  particular provision?
25      A.  No.

Page 198

N. Dondero

2 Q. Did you ever consider requiring a
3 higher threshold other than having a sale
4 above cost for the triggering of the
5 condition subsequent?
6 A. No.
7 Q. Was there any part of your
8 brother's proposal that you rejected?
9 A. No.
10 Q. Was there any part of your
11 brother's proposal that Dugaboy rejected?
12 A. No.
13 Q. Is there any aspect of any of the
14 agreements that incorporates a proposal or
15 idea that you or Dugaboy made?
16 MS. DEITSCH-PEREZ: Object to the
17 form.
18 A. No.
19 Q. Now do you recall that paragraph
20 82 also provides that all of the notes
21 would be forgiven if any of the portfolio
22 companies was sold on a basis out of Jim
23 Dondero's control?
24 A. Yes.
25 Q. Whose idea was it to include that

Page 199

N. Dondero

2 provision in the agreement?
3 A. I thought I already stated that.
4 That Jim had concerns. That was Jim's
5 proposal.
6 Q. Okay. Did you or Dugaboy reject
7 that proposal?
8 A. We did not.
9 Q. Did you push back on that
10 proposal at all?
11 A. No.
12 Q. Did either you or Dugaboy make
13 any counterproposal to that aspect of the
14 agreement?
15 A. No.
16 Q. Do you understand that James
17 Seery is in control of the portfolio
18 companies subject to the agreement?
19 MS. DEITSCH-PEREZ: Object to the
20 form.
21 A. I didn't know that.
22 Q. Are you aware that your brother
23 no longer controls the portfolio companies
24 that were the subject of the agreement?
25 A. Yes.

Page 200

N. Dondero

2 Q. So you're aware that somebody
3 other than your brother may sell Highland's
4 interest in the portfolio companies; is
5 that right?
6 A. Correct.
7 Q. So under the agreements that you
8 caused Dugaboy to enter into on behalf of
9 Highland, all of the notes that were
10 subject to the agreements will be forgiven
11 at the moment somebody other than your
12 brother sells one of the portfolio
13 companies.
14 Do I have that right?
15 A. I'm sorry, John. Once again?
16 Q. Okay. I just want to understand,
17 you know, the import of the agreements that
18 you've described. So let me try again.
19 Under the agreements that you
20 caused Dugaboy to enter into on behalf of
21 Highland, all of the notes that are subject
22 to the agreements will be forgiven the
23 moment that any of those three portfolio
24 companies are sold.
25 Do I have that right?

Page 201

N. Dondero

2 A. Correct, you have that right.
3 Q. Why did you agree, as the trustee
4 of Dugaboy, that all of the notes subject
5 to the agreements would be forgiven if any
6 of the subject portfolio companies was sold
7 on a basis outside of your brother's
8 control?
9 A. I agreed to that provision of the
10 agreement because -- and I believe I stated
11 this -- Jim had concerns about doing the
12 work and the effort and putting the time in
13 to build up any one of those three
14 portfolio companies and then having
15 somebody outside of his control sell it for
16 less than a monetized value that would
17 allow the notes to be forgiven.
18 Q. But there's no component of the
19 agreement that will avoid the forgiveness
20 of the notes depending on the price at
21 which the assets were sold, correct?
22 A. John, there's no provision of the
23 agreement what?
24 Q. If somebody were to sell the
25 portfolio assets for a substantial price

1          N. Dondero
2  above cost –
3      A.  Above cost?
4      Q.  Above cost.
5      – would the notes still be
6  forgiven?
7      A.  Yes, of course.
8      Q.  And if the portfolio companies
9  are sold at a price substantially below
10  cost, will the notes still be forgiven?
11      A.  They will if they're sold by
12  somebody that's not my brother, that's not
13  Jim.
14      Q.  Okay.
15      A.  If somebody comes in or – who
16  did you say, that gentleman that now has
17  control of them, if he decides to sell them
18  below cost, the notes are still forgiven.
19      Q.  And if he decides to sell them
20  above cost, the notes are forgiven, right?
21      A.  That is correct, but Highland
22  would benefit.
23      Q.  How does Highland benefit because
24  some third party sells the assets?
25      A.  Okay.  That's not what I said.

1          N. Dondero
2      But to answer your question, they
3  wouldn't – if it got sold for less than
4  the value of them, then Highland wouldn't
5  benefit.  But that wouldn't be in Jim's
6  control.
7      Q.  Did you expect Highland to
8  benefit if the portfolio companies were
9  sold on a basis outside of Mr. Dondero's
10  control?
11      A.  I have no idea, John.
12      Q.  Did you have any idea – did you
13  or Dugaboy have any idea when you entered
14  into the agreement if Highland would
15  benefit from the sale of the portfolio
16  companies on a basis outside of
17  Mr. Dondero's control?
18      A.  I wouldn't know that.
19      Q.  Okay.  Now if Jim sold one of
20  those portfolio companies for a dollar
21  above cost, all of the notes would have
22  been forgiven, correct?
23      A.  Correct.
24      Q.  And did he have the ability to
25  sell any of the portfolio companies at the

1          N. Dondero
2  time you entered into the agreements?
3      MS. DEITSCH-PEREZ:  Object to the
4  form.
5      MR. MORRIS:  Withdrawn.
6  BY MR. MORRIS:
7      Q.  Did you and Dugaboy understand
8  that Mr. Dondero had the ability to sell
9  any of the portfolio companies at the time
10  you entered into the agreements?
11      A.  Yes.
12      Q.  Okay.  If your brother –
13      A.  That was my understanding.
14      Q.  Okay.  And if your brother sold
15  one of those portfolio companies for a
16  dollar above cost, what benefit would
17  Highland receive if the consequence of that
18  was the forgiveness of more than $60
19  million in principal amount of promissory
20  notes?
21      MS. DEITSCH-PEREZ:  Object to the
22  form.
23      A.  John?
24      Q.  Yes?
25      A.  Oh.

1          N. Dondero
2      Q.  You can answer.
3      A.  That hasn't happened in a
4  hypothetical.  I don't have an opinion on
5  that.
6      Q.  Well, you entered into the
7  agreements, did you not?
8      A.  I did.
9      Q.  And you agreed on behalf of
10  Dugaboy on behalf of the plaintiff that if
11  Jim sold one of the portfolio companies at
12  a dollar above cost, all of the notes would
13  be forgiven, correct?
14      A.  I entered into the agreement for
15  Dugaboy that if, you're right, any of the
16  portfolio companies monetized higher,
17  right, the notes would be forgiven.  But –
18  and I thought about your scenario, but I
19  also thought about it could be $100
20  million.  We don't know.  This is all
21  hypothetical.
22      Q.  It's actually not hypothetical
23  because the term of your agreement was that
24  he could have sold any of the three
25  portfolio companies at a dollar above cost

Page 206

N. Dondero

1
2 and received in return the forgiveness of
3 all of these notes, right?
4    A. Correct.
5    Q. Okay. As the trustee of Dugaboy
6 who entered into the agreement on behalf of
7 Highland, what benefit would there be to
8 Highland if the portfolio companies were
9 sold at any price less than the aggregate
10 principal amount of the notes?
11    A. Less than?
12    Q. Let's say it was sold for $50
13 million above cost, then Highland would
14 have had to forgiven more than $60 million
15 of notes, correct?
16    A. Correct.
17    Q. How would Highland benefit by
18 having an asset sold $50 million above cost
19 where the consequence was that they would
20 forgive more than $50 million of money that
21 was owed to it?
22    A. Well, I looked at it differently,
23 John. And I thought it benefitted Highland
24 at the time because money didn't come out
25 of Highland's balance sheets to increase

Page 207

N. Dondero

1
2 Jim's salary. They received interest in
3 payment on the loans. We don't know when
4 and if the trigger is going to come into
5 play that the loans would be forgiven.
6 Even as we sit here today, 20-plus million
7 has been paid on the loan.
8    Q. Can you explain why your brother
9 is making payments on demand notes after
10 entering into the agreements with you?
11    A. It's my limited understanding
12 that he's made payments when whatever
13 entity needs money.
14    Q. And what is the basis for that
15 understanding?
16    A. Common sense. I don't know,
17 John.
18       THE WITNESS: And I hate to do
19    this, but I know when you -- can you
20    come to a place of a break in the near
21    future whenever is convenient in your
22    questions please, please?
23       MR. MORRIS: Sure.
24 BY MR. MORRIS:
25    Q. What is the basis for saying that

Page 208

N. Dondero

1
2 your brother paid back loans at times that
3 Highland needed the money -- withdrawn.
4       Is it your testimony that your
5 brother made payments against the loans
6 after entering into the agreements with you
7 because Highland needed the money?
8    A. That's my belief, John.
9    Q. Okay. And what is the basis for
10 that belief?
11    A. I don't have one except I know
12 how my brother works.
13    Q. Do you know that your brother
14 caused the borrowers under the promissory
15 notes to make payments against those notes
16 after entering into the agreements with
17 you?
18    A. I do not.
19    Q. Did you ever ask anybody?
20    A. I did not.
21    Q. And I think we covered this
22 earlier, but I just want to try and cover
23 it quickly before we take the break.
24       At the time you entered into each
25 of the agreements, neither you nor Dugaboy

Page 209

N. Dondero

1
2 had any understanding of the nature of
3 Highland's interest in each of the
4 portfolio companies, correct?
5    A. That would be correct, yes.
6    Q. And at the time the three
7 agreements were entered into, neither you
8 nor Dugaboy had any understanding as to
9 Highland's cost for acquiring its interest
10 in each of the three portfolio companies,
11 correct?
12    A. Yes, that is correct.
13    Q. And at the time each of these
14 three agreements were entered into, neither
15 you nor Dugaboy had any information as to
16 the value of Highland's interest in any of
17 the portfolio companies, correct?
18       MS. DEITSCH-PEREZ: Object to the
19    form.
20       MR. MORRIS: You can answer.
21    A. I'm sorry, John, can you repeat
22 the question, please?
23    Q. At the time that you entered into
24 each of these three agreements, neither you
25 nor Dugaboy had any information concerning

Appx. 01926

Page 210

1         N. Dondero
2   the value of Highland's interest in the
3   three portfolio companies, correct?
4         MS. DEITSCH-PEREZ: Object to the
5   form.
6         A. That's correct, John.
7         Q. And at the time that you entered
8   into these three agreements, neither you
9   nor Dugaboy knew whether the value of
10  Highland's interest in the three portfolio
11  companies was more or less than the cost of
12  acquisition, correct?
13        A. That's correct.
14        MR. MORRIS: We can take that
15  break now if you'd like.
16        MR. DRAPER: John, this is
17  Douglas.
18        How much more do you think you
19  have?
20        THE VIDEOGRAPHER: The time is
21  2:41. We are going off the record.
22        (Recess is taken.)
23        THE VIDEOGRAPHER: The time is
24  2:57. We are back on the record.
25        MR. MORRIS: Can we put back up

Page 211

1         N. Dondero
2   paragraph 82 from Mr. Dondero's answer
3   to the Amended Complaint?
4         (Document review.)
5   BY MR. MORRIS:
6         Q. Ms. Dondero, can you hear me?
7         A. Yes.
8         Q. Okay. Do you see in the middle
9   of paragraph 82 it talks about the purpose
10  of the agreement?
11        A. Um-hmm.
12        Q. And do you see where it says that
13  Jim Dondero, quote, "was otherwise
14  underpaid compared to reasonable
15  compensation levels in the industry"?
16        A. I see that.
17        Q. At the time that you caused
18  Dugaboy to enter into the three agreements
19  on behalf of Highland, did you believe that
20  James Dondero was underpaid compared to
21  reasonable compensation levels in the
22  industry?
23        A. Yes, I believed what he told me.
24        Q. Okay. Did you have any basis for
25  believing that he was underpaid compared to

Page 212

1         N. Dondero
2   reasonable compensation levels in the
3   industry other than what your brother told
4   you?
5         A. No.
6         Q. Okay. Did Dugaboy have any basis
7   for believing that your brother was
8   underpaid compared to reasonable
9   compensation levels in the industry other
10  than what your brother said?
11        A. Not that I'm aware of.
12        Q. Prior to entering into each of
13  these three agreements, did you or Dugaboy
14  make any effort to ascertain whether your
15  brother was underpaid compared to
16  reasonable compensation levels in the
17  industry?
18        A. Not that I remember.
19        Q. At the time that you entered into
20  these agreements, neither you nor Dugaboy
21  knew the total compensation package that
22  Mr. Dondero received from Highland in any
23  calendar year, correct?
24        A. John, can you ask that question
25  again, please?

Page 213

1         N. Dondero
2         Q. Yes. I'd be happy to.
3         At the time that you caused
4   Dugaboy to enter into each of the three
5   agreements that you've described, neither
6   you nor Dugaboy made any effort to
7   determine your brother was underpaid
8   compared to reasonable compensation levels
9   in the industry, correct?
10        A. That's correct.
11        Q. And at the time that you caused
12  Dugaboy to enter into the agreements,
13  neither you nor Dugaboy knew how much
14  compensation your brother received from
15  Highland in any particular year, correct?
16        MS. DEITSCH-PEREZ: You mean the
17  exact number?
18        MR. MORRIS: I mean general
19  number. Any number.
20        A. Okay. I think we spoke about
21  this earlier. I had a general number on
22  salary.
23        Q. Correct.
24        And now I'm asking about total
25  compensation, including deferred

1         N. Dondero
2   compensation, including any profit sharing,
3   including any distributions, total
4   compensation, right?
5         Do you see that this is referring
6   not to salary but to compensation?
7         A.   I do.
8         Q.   Okay.
9         A.   And I would not have known that.
10        Q.   Okay.  So let me ask the question
11  again just to make sure it's clear.
12        At the time that you caused
13  Dugaboy to enter into each of these three
14  agreements, neither you nor Dugaboy knew
15  what Mr. Dondero's compensation was from
16  Highland for any particular year, correct?
17        A.   Correct.
18        Q.   And at the time that you caused
19  Dugaboy to enter into the three agreements,
20  neither you nor Dugaboy ever asked anybody
21  what Mr. Dondero's compensation was from
22  Highland for any particular year, correct?
23        A.   Correct.
24        Q.   And at the time you caused
25  Dugaboy to enter into these three

1         N. Dondero
2   agreements, neither you nor Dugaboy made
3   any effort to try to ascertain what
4   Mr. Dondero's compensation from Highland
5   was in any particular year, correct?
6         A.   That's correct.
7         Q.   Okay.  Did you or Dugaboy ever
8   conduct any analysis of what reasonable
9   compensation levels in the industry were?
10        A.   Not that I recall.
11        Q.   Did Mr. Dondero ever tell you
12  what he thought reasonable compensation
13  levels were in the industry?
14        A.   John, I vaguely remember him
15  throwing out examples of other people in
16  his position and the astronomical money
17  that they make.  I just don't remember
18  their names or the companies.
19        Q.   Okay.  Did you or Dugaboy make
20  any effort at any time prior to entering
21  into the three agreements to determine what
22  reasonable compensation levels were in the
23  industry?
24        A.   No.
25        Q.   Did you or Dugaboy reach any

1         N. Dondero
2   conclusions prior to entering into the
3   agreements as to whether Mr. Dondero was
4   underpaid compared to reasonable
5   compensation levels in the industry?
6         A.   The first part of that, John?
7   The first part of your question?
8         Q.   Did you or Dugaboy reach any
9   conclusions prior to entering into the
10  three agreements as to whether your brother
11  in fact was underpaid compared to
12  reasonable compensation levels in the
13  industry?
14        A.   Yes, I came to the conclusion
15  that he was based on what he told me.
16        Q.   Okay.  And you had no other
17  information upon which you relied to reach
18  your conclusion that he was underpaid
19  except for the information that your
20  brother provided to you, correct?
21        A.   That's correct.
22        Q.   Okay.  And other than -- okay.
23        MR. MORRIS:  We can take that
24  down.  Thank you.
25  BY MR. MORRIS:

1         N. Dondero
2         Q.   Ms. Dondero, do you know if the
3   terms of any of the agreements were ever
4   reduced to writing?
5         A.   I didn't put them in writing.
6   That's all I can speak to.
7         Q.   Have you ever seen the terms of
8   any of the agreements in writing?
9         A.   I have not.
10        Q.   Did anyone ever tell you that the
11  terms of the agreements were written down
12  anywhere?
13        A.   Not that I recall.
14        Q.   Did you or Dugaboy ever ask
15  anyone if the terms of the agreements were
16  written down anywhere?
17        A.   Not that I remember.
18        Q.   Did you believe that these
19  agreements were important at the time that
20  you caused Dugaboy to enter into them?
21        A.   Yes.
22        Q.   Why did you think that these
23  agreements were important?
24        A.   I think I thought they were
25  important because they gave Highland the

Page 218

N. Dondero

1 chance to motivate and get Jim -- or give
2 Jim an extra incentive to make the
3 portfolio companies into something really
4 magnanimous, which would have been great
5 for Highland and Jim.
6 Q. When you entered into the
7 agreements, did you intend that they would
8 be binding on Highland?
9 A. That was my belief, yes.
10 Q. Did it ever occur to you that you
11 might want to write down the terms of these
12 important agreements?
13 A. Honestly, it didn't come to mind,
14 no.
15 Q. Did you ever tell anybody in the
16 world prior to the petition date that you
17 had entered into these three agreements
18 with your brother?
19 A. Besides Melissa, who knew, I
20 don't remember anyone else offhand that I
21 would have discussed them with.
22 Q. How did Melissa know?
23 A. Pardon?
24 Q. Are you referring to Melissa
25

Page 219

N. Dondero

1 Schroth?
2 A. Correct.
3 Q. Why do you think that she knew?
4 A. I have a vague memory of
5 discussing it with her.
6 Q. What do you remember about that
7 vague memory?
8 A. It was in regards to Dugaboy.
9 She is one of my main contact people, and I
10 think it was more a recap conversation.
11 Q. And what did she say?
12 A. She just listened, made a note, I
13 assume, made a mental note.
14 Q. Do you recall, did this occur in
15 a telephone conversation?
16 A. Yes, I believe it did.
17 Q. Okay. Do you recall when that
18 conversation took place?
19 A. I do not.
20 Q. Do you recall if it was before or
21 after the petition date?
22 A. I do not.
23 Q. Did she ask any questions?
24 A. Not that I recall.
25

Page 220

N. Dondero

1 Q. Did you tell her which notes were
2 the subject of the agreements?
3 A. The conversation was not that
4 detailed.
5 Q. Well, if she didn't ask any
6 questions and she didn't say anything that
7 you recall in response, can you recall
8 everything you said to Ms. Schroth during
9 this conversation?
10 A. I don't remember, John, the
11 specifics.
12 Q. Do you remember anything about
13 the conversation at all?
14 A. I just remember them coming up in
15 conversation.
16 Q. You remember what coming up?
17 A. The forgiveness of the loan.
18 Q. Did she indicate to you that she
19 knew about it already?
20 A. I don't remember.
21 Q. Did she express any surprise at
22 what you told her?
23 A. No, but I do remember her saying
24 it was the great motivator.
25

Page 221

N. Dondero

1 Q. And you don't think your brother
2 was otherwise motivated to sell one of
3 three assets at a dollar above cost,
4 correct?
5 A. I never said --
6 MS. DEITSCH-PEREZ: Object to the
7 form.
8 I didn't say that.
9 Q. Well, but that's what the
10 agreement permitted, correct, that the
11 notes would be forgiven if he sold an asset
12 at a dollar above cost, right?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. John, at the time I entered into
16 the agreement, I believe that they would be
17 a motivator, an increased motivator.
18 You met my brother, right? You
19 know he's motivated.
20 Q. It never would have occurred to
21 me that he needed more motivation, but
22 maybe that's just my view.
23 A. It's increased motivation when
24 there's money on the line.
25

Page 222

N. Dondero

1  Q.  But how does it motivate him when
2  he can recover the benefits of the
3  agreement regardless of how much above cost
4  the asset is sold?
5      A.  Okay.  I'm sorry, John, one more
6  time, please, the question?
7      Q.  How does it motivate him when he
8  will reap the benefits of the agreement if
9  he sells -- withdrawn.
10      How does he get motivated under
11  an agreement whereby he will get the
12  benefit of the forgiveness of over $60
13  million of notes without regard to how much
14  above cost he sells one of three assets?
15      A.  Okay.  John, when I entered into
16  these, he was still at the helm of
17  Highland.
18      Q.  Correct.
19      A.  So if he would have monetized
20  them at a really high value, he would have
21  benefitted from his interest, beneficial
22  interest in Highland.
23      Q.  Under the terms of the agreement,
24  are you able to identify how Mr. Dondero
25

Page 223

N. Dondero

1  would have been motivated whether --
2  withdrawn.
3      It doesn't matter under the
4  agreements that you entered into on behalf
5  of Dugaboy how much above cost the assets
6  are sold before Mr. Dondero could reap the
7  benefits of the agreement, correct?
8      A.  Correct.
9      Q.  And you could have, but you
10  didn't, demand that the notes would be
11  forgiven only if he sold the assets at --
12  I'm just going to pick a number -- 50
13  percent more than cost, right?
14      A.  Anything is possible.
15      Q.  But you didn't -- anything is
16  possible, but the fact is that neither you
17  nor Dugaboy made any proposal that would
18  tie the benefits that Mr. Dondero wanted to
19  the amount of gain that was to be recovered
20  on behalf of Highland, correct?
21      A.  Correct.  I didn't look at it the
22  way you are, correct.
23      Q.  And so when you speak of
24  motivation under the terms of the agreement
25

Page 224

N. Dondero

1  that you entered into on behalf of
2  Highland, Mr. Dondero would be indifferent
3  whether the asset was sold at 1 percent
4  above cost, at 10 percent above cost, more
5  than the face amount of the promissory
6  note, right?  There's no relationship
7  between the gain to Highland and the
8  benefit to Mr. Dondero, correct?
9      A.  You mean now when he's not at the
10  helm of Highland, John?
11      Q.  No, I mean -- no.  Let me try
12  again.
13      At the moment you entered into
14  the agreement --
15      A.  Right.
16      Q.  -- if a subsequent event
17  occurred, you and your brother knew that he
18  would receive more than $6 million in value
19  through the forgiveness of the notes,
20  correct?
21      A.  Correct.
22      Q.  But at the time that you entered
23  into the agreements, neither you nor your
24  brother knew what the economic benefit to
25

Page 225

N. Dondero

1  Highland would be because the asset hadn't
2  been sold yet, correct?
3      A.  Correct.
4      Q.  And it wasn't in the hands of a
5  third party, correct?
6      A.  Correct.
7      Q.  Okay.  And I think you may have
8  testified to this earlier.  If you did, I
9  apologize.  But do you know the aggregate
10  amount that's due under each of the notes
11  that are subject to the agreements that you
12  entered into on behalf of Dugaboy?
13      A.  As of today's value or --
14      Q.  Let's start with today's value.
15      A.  Okay.  The amount owed I believe
16  per the lawsuit for all of them is just
17  north of 50 million.
18      Q.  And were you aware at the time
19  you entered into the agreements, the
20  aggregate principal amount that was still
21  due on the notes that were subject to the
22  agreement?
23      A.  When I entered into the three
24  agreements?
25

Page 226

N. Dondero

2 Q. Yes.
3 A. The total for '17, '18, and '19
4 combined was in the ballpark of 72 million,
5 I believe.
6 Q. And the difference between the
7 principal amount that was due at the time
8 that you entered into the agreements and
9 the principal amount that's due today is
10 the payments that were made in the
11 intervening period.
12 Do I have that right?
13 A. I'm assuming payments and
14 interest, sir, yes.
15 Q. Okay. If the assets are sold
16 now, what benefit will Highland receive
17 relative to the forgiveness of the notes?
18 MS. DEITSCH-PEREZ: Object to the
19 form.
20 BY MR. MORRIS:
21 Q. The assets are now in the hands
22 of a third party, right?
23 A. Um-hmm. Correct.
24 Q. Okay. And is it your
25 understanding that if a third party sells

Page 227

N. Dondero

2 the assets that irrespective of the price
3 at which it sold, the moment it's sold, the
4 notes will be forgiven?
5 A. That is my understanding.
6 Q. So that if a third party were to
7 sell the asset -- withdrawn.
8 So at the time that you entered
9 into the agreements on behalf of Dugaboy,
10 neither you nor Dugaboy had any
11 understanding of what Highland's economic
12 recovery would be if a third party sold any
13 of the portfolio companies, correct?
14 A. I wouldn't have known the future.
15 That is correct.
16 Q. Did you and Dugaboy -- withdrawn.
17 Did you and Dugaboy believe at
18 the time that you entered into the
19 agreements that Highland received
20 reasonably equivalent value in exchange for
21 the agreements?
22 MS. DEITSCH-PEREZ: Object to the
23 form.
24 A. John, I repeat, I thought at the
25 time I entered into the agreement, there

Page 228

N. Dondero

2 was a -- that it was a good deal for both
3 Jim and Highland, a win-win situation. I
4 think we discussed this already.
5 Q. Okay. But you didn't know the
6 price at which Mr. Dondero would sell the
7 asset that was subject to the condition
8 subsequent, correct?
9 A. John, correct, but I know my
10 brother, and he's a financial guru, and I
11 trusted in the fact that he would make them
12 into something great.
13 Q. Okay. But neither you nor
14 Dugaboy could predict whether Highland
15 would receive from the sale of the assets
16 more or less than the principal and
17 interest due under the notes, correct?
18 A. You are correct; I could not
19 predict what would happen.
20 Q. Okay. Did Mr. Dondero express
21 any reason to you why he thought the notes
22 should be forgiven if the assets were sold
23 by somebody other than himself?
24 A. Okay. I'm sorry, John. Again?
25 Q. Did Mr. Dondero give you any

Page 229

N. Dondero

2 reason as to why he believed he was
3 entitled to the forgiveness of the notes
4 simply because the assets were sold by
5 somebody other than himself?
6 A. I believe we touched on this
7 already, but I will repeat it.
8 His concern was that he put the
9 time and effort and energy into the three
10 portfolio companies and then some element
11 beyond his control come in and sell
12 them at a loss after he had done all the
13 work. And if we didn't have that provision
14 in, his notes wouldn't be forgiven.
15 Q. Did you ask him why he was
16 concerned that some element beyond his
17 control were to intervene to prevent him
18 from selling the assets?
19 A. I did not.
20 Q. Did you ask him why that was even
21 a possibility at the time that you entered
22 into these three agreements?
23 A. I did not. But knowing my
24 brother, he looks at all sides of every
25 situation.

Page 230

1              N. Dondero
2    Q.  Okay.  The notes that were issued
3 by HCMS, HCRE, and NexPoint, can we refer
4 to those for the next set of questions as
5 the corporate notes?
6    A.  Okay.
7        MS. DEITSCH-PEREZ:  Can you read
8    that back?
9        MR. MORRIS:  Sure.
10 BY MR. MORRIS:
11    Q.  Can we call the notes that were
12 executed on behalf of HCMS, HCRE, and
13 NexPoint as the corporate notes?
14        MS. DEITSCH-PEREZ:  You're
15    including HCMFA in this?
16        MR. MORRIS:  No, I never said
17    that.
18        MS. DEITSCH-PEREZ:  I thought you
19    did.  That's why I said -- I think you
20    misspoke, but can you ask the question
21    again.
22        MR. MORRIS:  I don't think so.  I
23    don't think so, but I'll say it for a
24    third time.
25 BY MR. MORRIS:

Page 231

1              N. Dondero
2    Q.  Can we call the notes executed on
3 behalf of HCMS, HCRE, and NexPoint as the
4 corporate notes?
5        MS. DEITSCH-PEREZ:  Okay.  Thank
6    you.  I think I was hearing S as F.
7    Sorry.
8 BY MR. MORRIS:
9    Q.  Is that okay, Ms. Dondero?
10    A.  Yes, that's fine.  Thank you.
11    Q.  Okay.  And under the agreements,
12 were the corporate notes to be forgiven as
13 compensation to your brother or as
14 compensation to the corporate obligors, the
15 corporate borrowers?
16    A.  Deferred compensation for Jim.
17    Q.  So let me get this right.
18        HCMS, HCRE, and NexPoint each
19 borrow money from Highland and give
20 Highland promissory notes in return.
21        Do I have that right?
22    A.  I'm sorry, John.  Just one more
23 time, the question, please?
24    Q.  Each of HCMS, HCRE, and NexPoint
25 borrowed money from Highland and gave

Page 232

1              N. Dondero
2 promissory notes in return, correct?
3    A.  Yes.  That's my understanding.
4    Q.  And under the agreement that you
5 entered into on behalf of Dugaboy, those
6 corporate notes would be forgiven as
7 compensation to your brother upon the
8 condition -- upon the fulfillment of
9 conditions subsequent, correct?
10    A.  That is correct.
11    Q.  So that the forgiveness of the
12 corporate notes was, in your mind, the same
13 thing as giving compensation to your
14 brother, correct?
15        MS. DEITSCH-PEREZ:  Object to the
16    form.
17    A.  They would be considered deferred
18 compensation.
19    Q.  And they would be considered
20 compensation to your brother, not
21 compensation to the borrowers under each of
22 the corporate notes?
23    A.  That's how I understood it, yes.
24    Q.  Okay.  So in your mind, when you
25 entered into these agreements, it didn't

Page 233

1              N. Dondero
2 matter whether the notes were executed by
3 your brother or any of these three
4 corporate obligors; the cancellation of the
5 notes would be a direct benefit for
6 compensation purposes only to your brother,
7 correct?
8        MS. DEITSCH-PEREZ:  Object to the
9    form.
10        THE WITNESS:  Do I still answer?
11 BY MR. MORRIS:
12    Q.  Yes.
13    A.  Yes, John, that's how I
14 understood it.
15    Q.  Thank you.
16    A.  Certainly.
17    Q.  Now the compensation that was the
18 subject of these agreements, that wasn't to
19 compensate him for past services, was it?
20        MS. DEITSCH-PEREZ:  Object to the
21    form.
22        MR. MORRIS:  Withdrawn.
23 BY MR. MORRIS:
24    Q.  The compensation that was subject
25 to the agreement was for services that

Page 234

```
1            N. Dondero
2   would be rendered in the future, correct?
3            MS. DEITSCH-PEREZ:  Object to the
4   form.
5   BY MR. MORRIS:
6       Q.  You can answer.
7       A.  Well, in the future from what
8   date?
9       Q.  From the date that the agreements
10  were entered into.
11      A.  Correct.  Yes.  From the date,
12  yes.
13      Q.  The agreement was that the notes
14  would be forgiven based on a condition
15  subsequent, right?
16      A.  Yes.  So a future date from when
17  we entered them, um-hmm.
18      Q.  So something had to happen in the
19  future in order for your brother to get the
20  benefit of the bargain, right?
21      A.  Correct.
22      Q.  Because if it was compensation
23  for services rendered in the past, you just
24  give him the money, right?
25      A.  So true.
```

Page 235

```
1            N. Dondero
2            MS. DEITSCH-PEREZ:  Object to the
3   form.
4   BY MR. MORRIS:
5       Q.  Let me ask another question, a
6   different question, Ms. Dondero, and just
7   try to finish this up.
8            Pursuant to the agreement that
9   you entered into on behalf of Dugaboy, the
10  notes would only be forgiven if some future
11  event occurred, correct?
12      A.  Right, the monetization of one of
13  the three portfolio companies, correct.
14  Um-hmm.
15      Q.  The forgiveness of the notes was
16  not for services rendered in the past,
17  correct?
18            MS. DEITSCH-PEREZ:  Object to the
19  form.
20      A.  That is correct.
21      Q.  Okay.  Do you know if Dugaboy
22  ever issued any promissory notes in favor
23  of Highland?
24      A.  I know there are loans between
25  Dugaboy and Highland.
```

Page 236

```
1            N. Dondero
2       Q.  And do you know who made the loan
3   and who received the loan or loans?
4       A.  I believe Dugaboy was the
5   borrower.  The loan with Highland, it was
6   in 2017.  And if my memory serves me right,
7   it was 23, 24 million.
8            Again, going by memory, John,
9   because I really wasn't prepared for this
10  line of questioning, but I believe there is
11  an earlier loan between the two of them.
12      Q.  And did you – I apologize.  I
13  didn't mean to step on your words.
14            Are you finished?
15      A.  Oh, no.  I am.  Thank you.
16      Q.  Okay.  Were you the trustee of
17  the Dugaboy Trust at the time the loans you
18  just described were obtained from Highland?
19      A.  The one that I mentioned that I
20  remembered the – I believe it's close to
21  or around 24 million, in May of '17, I was
22  obviously.  I became trustee in October of
23  '15.
24            The other one, I'm not positive
25  on, John, the date and the amount.  I just
```

Page 237

```
1            N. Dondero
2   know of another one.
3       Q.  Now the Dugaboy trust is, I think
4   as you've described it, a trust for
5   education and health and lifestyle
6   purposes, right?
7       A.  And maintenance, correct.
8       Q.  Do you know why Dugaboy needed to
9   borrow 23 to 24 million dollars from
10  Highland in 2017?
11      A.  I'd be speculating.  I don't know
12  for sure, but I believe it was for real
13  estate.
14      Q.  And did you – do you recall
15  executing any documents on behalf of
16  Dugaboy in connection with the loan that it
17  obtained from Highland?
18      A.  Not that I recall, John, right
19  now.
20      Q.  Do you know who authorized
21  Highland – withdrawn.
22            Did you ever have any
23  conversations with anybody at any time
24  concerning Dugaboy's 23 to 24 million
25  dollar loan that it obtained from Highland
```

Page 238

1        N. Dondero
2    in around 2017?
3        MS. DEITSCH-PEREZ:  I'm going to
4    object.  This is neither one of the
5    Dugaboy topics and it's beyond the --
6    it doesn't pertain to the four
7    adversary proceedings.  So it's not
8    fair to ask the witness about things
9    she's not had the occasion to refresh
10   herself on.
11       MR. MORRIS:  Okay.
12       MR. DRAPER:  John, I let this go
13   on behalf of Dugaboy a little bit just
14   for background information, but now
15   we're sort of bordering on specifics of
16   a transaction that is --
17       MR. MORRIS:  I am -- go ahead,
18   Douglas.  I'm sorry.
19       MR. DRAPER:  -- that is not in
20   dispute in this litigation.  It is not
21   within your 30(b)(6) designation.  And
22   so it's fundamentally unfair to put
23   this witness through a memory test for
24   no purpose whatsoever that servers
25   nothing to do with this litigation.

Page 239

1        N. Dondero
2        MR. MORRIS:  Okay.  Number one, I
3    agree that it's not a 30(b)(6) topic.
4        Number two, I agree that I'm not
5    asking her these questions in her
6    capacity as the Dugaboy trustee.  I'm
7    asking them in her individual capacity.
8    So I don't think you have any grounds
9    to object any longer, Mr. Draper.
10       And number three, I think all of
11   this goes to credibility.  And it goes
12   to everything we've been talking about
13   today.
14       And so I'm going to continue to
15   ask my questions.  And if at any time
16   you want to direct the witness not to
17   answer, you know, we'll deal with it.
18   Okay?
19       MR. DRAPER:  Okay.  So if I
20   understand what you just said, just so
21   the record is clear, this is not
22   30(b)(6) questions to the witness.  In
23   fact, these are questions to the
24   witness in her individual capacity and
25   will not serve as a 30(b)(6) answer on

Page 240

1        N. Dondero
2    batch of Dugaboy, correct?
3        MR. MORRIS:  I thought I was
4    quite clear, but, yes, Douglas, that is
5    correct.
6        MR. DRAPER:  Great.  Thank you.
7        MR. MORRIS:  Yep.
8    BY MR. MORRIS:
9    Q.   Okay.  So Ms. Dondero, do you
10   recall any conversations you ever had at
11   any time concerning the 23 or 24 million
12   dollars that Dugaboy borrowed from
13   Highland?
14   A.   Not at this time.
15   Q.   Okay.  You mentioned that you
16   believed that the money was used for the
17   acquisition of real estate.
18       Do I have that right?
19       MS. DEITSCH-PEREZ:  Object to the
20   form.
21   A.   Yes.
22   Q.   And was that for the acquisition
23   of Jim's house in Colorado?
24   A.   I don't know.
25   Q.   Do you know if your brother

Page 241

1        N. Dondero
2    acquired a house in Colorado in or around
3    2017?
4    A.   I know he acquired a house in
5    Colorado.  The time frame, I'm not certain
6    of.
7    Q.   Do you know that he paid more
8    than $20 million for a house in Colorado?
9    A.   No.
10   Q.   Was the loan that Dugaboy
11   obtained from Highland subject to any of
12   the three agreements that you entered into
13   as the trustee of Dugaboy?
14   A.   Any of the three agreements we've
15   been discussing?
16   Q.   Yes.
17   A.   No.
18   Q.   Did you ever ask Jim why the
19   Dugaboy note wasn't included in the
20   agreements?
21   A.   I did not.
22   Q.   But you knew Dugaboy note existed
23   at the time you entered into the
24   agreements, correct?
25       MS. DEITSCH-PEREZ:  Object to the

Page 242

N. Dondero

1           N. Dondero
2     form.
3     A.   At the time I entered into the
4   agreements, I don't know, John.
5     Q.   So at the time you entered into
6   these three agreements, you don't recall
7   whether you knew that Dugaboy had obtained
8   a 23 to 24 million dollar loan from
9   Highland.
10         Do I have that right?
11    A.   I don't know as I sit here now.
12  What I knew then, I don't remember.
13    Q.   But you do remember the specific
14  identity of each promissory note that was
15  the subject of each of these three
16  agreements, correct?
17    A.   When I refreshed my memory, sure.
18    Q.   Do you know if Dugaboy ever
19  entered into any agreement on behalf of
20  Highland other than the three oral
21  agreements that you described today?
22    A.   Dugaboy has entered into a lot of
23  agreements with Highland.
24    Q.   All right.  Let me restate the
25  question.

Page 243

N. Dondero

1           N. Dondero
2     Did Dugaboy ever, ever -- ever,
3   ever.  Let me try again.
4     Did Dugaboy ever enter into any
5   agreements pursuant to Section 3.10 of the
6   LP agreement other than the three
7   agreements that you've mentioned today?
8     A.   Oh --
9     MS. DEITSCH-PEREZ:  Were there
10    any before these, John?  Before?
11    MR. MORRIS:  I don't care if it's
12    before or after.  So let me ask again.
13  BY MR. MORRIS:
14    Q.   As the trustee of Dugaboy, are
15  you aware of any agreement Dugaboy has ever
16  entered into pursuant to Section 3.10 of
17  the LP agreement other than the three
18  agreements that you have described today?
19    A.   Not that I'm aware of,
20  compensation.
21    Q.   Can we put up your discovery
22  responses, which I think is document No. 25
23  in your pile.
24    MS. DEITSCH-PEREZ:  The notebook.
25    MR. ELMS:  25.

Page 244

N. Dondero

1           N. Dondero
2     THE WITNESS:  What is it?
3     MR. ELMS:  Tab 25.
4     THE WITNESS:  Tab 25.  Okay.
5     (Document review.)
6   BY MR. MORRIS:
7     Q.   Have you seen this document
8   before, ma'am?
9     A.   Just one second.  I'm getting
10  there.
11    Q.   Sure.  Take your time.
12    A.   Okay.
13    (Document review.)
14    A.   Yes.  Yes, I believe I have.
15    Q.   Can you turn to page 15?
16    (Witness complies.)
17    Q.   Is that your signature?
18    A.   It is.
19    Q.   And did you review this document
20  before you signed it?
21    A.   I did.
22    Q.   Did you have an opportunity to
23  consult with counsel before you signed it?
24    A.   I did.
25    Q.   Did you in fact consult with

Page 245

N. Dondero

1           N. Dondero
2   counsel before signing it?
3     A.   I did.
4     Q.   And you reviewed this document in
5   connection with your preparation for
6   today's deposition, correct?
7     A.   Correct.
8     Q.   As you sit here now, do you know
9   of anything in the objections and responses
10  that is wrong or inaccurate?
11    (Document review.)
12    A.   I don't see anything, John.  I
13  don't believe so.
14    Q.   As you sit here right now, do you
15  have any reason to amend these objections
16  and responses to make them more complete or
17  more precise?
18    A.   Not at this time.
19    Q.   Can you turn to page 9, please?
20    (Witness complies.)
21    Q.   Do you see in request for
22  admissions No. 7 and 8, you were asked to
23  admit, and I'm going to summarize, that no
24  document was created prior to the
25  commencement of the adversary proceeding

Page 246

```
1          N. Dondero
2  that reflects -- let's just take them one
3  at a time.  Let me withdraw that.
4          Looking at No. 7, do you see that
5  you denied having sufficient knowledge or
6  information to admit or deny the request?
7      A.  Yes.
8      Q.  Okay.  Would you agree that as
9  you sit here right now, you are not aware
10 of any document that was created prior to
11 the commencement of the adversary
12 proceeding that reflects or memorializes
13 the terms of the agreement?
14     A.  Yes.
15     Q.  Okay.  And turning to No. 8, do
16 you see for that one, you also responded by
17 saying you lack sufficient information to
18 admit or deny the request?
19     A.  Yes, I do.
20     Q.  Would you agree with me that it
21 would be fair to say that as you sit here
22 today, you are not aware of any document
23 that was created prior to the commencement
24 of the adversary proceeding concerning the
25 existence of the agreement?
```

Page 247

```
1          N. Dondero
2      A.  That's correct; I'm not aware of
3  any.
4      Q.  Okay.  Can we go to Interrogatory
5  No. 5?
6          MS. DEITSCH-PEREZ:  So page 12 to
7  13.  No, no, where you were.  We were
8  in Tab 25.
9          THE WITNESS:  Tab 25.  What page
10 now?
11         MR. ELMS:  Page 13.
12         MS. DEITSCH-PEREZ:  Page 13.  The
13 number is on page 12, but then --
14         MR. ELMS:  He's asking you at the
15 very top there.
16         THE WITNESS:  Oh.
17         (Document review.)
18 BY MR. MORRIS:
19     Q.  And do you see that Interrogatory
20 No. 5 asked you to identify every document
21 and communication you reviewed in
22 connection with your decision to enter into
23 the agreement?
24     A.  Yes.
25     Q.  Okay.  And you said that you
```

Page 248

```
1          N. Dondero
2  either reviewed or discussed with your
3  brother the LP agreement and the Dugaboy
4  Trust documents.
5          Do you see that?
6      A.  Yes.
7      Q.  Do you have any recollection of
8  actually reviewing the LP agreement before
9  entering into any of the agreements that
10 you've described?
11     A.  I don't recall.
12     Q.  You may or you may not, but do
13 you have a recollection of discussing it
14 with your brother?
15     A.  I don't recall, John.
16     Q.  Do you recall reviewing Section
17 3.1 before you entered into any of the
18 three agreements?
19     A.  I don't know when that review
20 took place.
21     Q.  Do you recall whether the review
22 took place in connection with your entry on
23 behalf of Dugaboy into any of the three
24 agreements?
25     A.  I don't know the time frame,
```

Page 249

```
1          N. Dondero
2  John.
3      Q.  Did you confer with anybody --
4  withdrawn.
5          Did you or Dugaboy confer with
6  anybody other than your brother before you
7  caused Dugaboy to enter into the three
8  agreements?
9      A.  No, not that I'm aware of.
10     Q.  Did you or Dugaboy seek any legal
11 advice before entering into any of the
12 three agreements?
13     A.  No.
14     Q.  Do you have any recollection of
15 actually reviewing the Dugaboy Trust
16 documents before entering into any of the
17 three agreements?
18     A.  I have reviewed the trust
19 documents, John.  I don't know what time
20 frame.
21     Q.  Okay.  I appreciate that.
22     A.  Sure.
23     Q.  I'm sorry, did I cut you off?
24     A.  Oh, no.  I'm sorry.  I was just
25 answering you.  Thank you.
```

Page 250

N. Dondero

1
2 Q. Okay. So take a look at
3 Interrogatory No. 6 below.
4 Do you see that?
5 A. Yes.
6 Q. And your response was, "Other
7 than generally approving compensation,
8 including the agreements at issue in this
9 notes proceeding, none."
10 Do you see that?
11 A. I do.
12 Q. What does "Other than generally
13 approving compensation" refer to?
14 A. Well, "Other than generally..."
15 I'm assuming it means the
16 forgiveness of the loan, "Other than
17 generally approving compensation."
18 Q. Okay. So let's look at the
19 Interrogatory. This Interrogatory
20 specifically says that "Other than the
21 agreement" --
22 A. Okay.
23 Q. -- "identify every agreement you
24 ever entered into as a representative of a
25 majority of Class A shareholders of

Page 251

N. Dondero

1
2 plaintiff."
3 Do you see that?
4 A. I do.
5 Q. Are you aware of any agreement
6 that you ever entered into as a
7 representative of a majority of Class A
8 shareholders of plaintiff other than the
9 agreements that you've identified?
10 A. No.
11 Q. Okay. And were you, in your
12 capacity as the trustee of Dugaboy --
13 withdrawn.
14 Did you, in your capacity as
15 trustee of Dugaboy, approve compensation
16 for any affiliate of Strand other than the
17 three agreements that you entered into that
18 you've described today?
19 A. Not that I'm aware of.
20 Q. Okay. So generally approving
21 compensation, does that have any meaning at
22 all other than the three agreements that
23 you entered into that you've described
24 today?
25 A. No.

Page 252

N. Dondero

1
2 MR. MORRIS: Can we put up --
3 withdrawn. Hold on.
4 BY MR. MORRIS:
5 Q. Before we take this down, did
6 Dugaboy provide -- withdrawn.
7 Did Dugaboy approve any
8 compensation for Jim Dondero other than the
9 three agreements that you've described
10 today?
11 A. I do not believe so since I've
12 been trustee.
13 MR. MORRIS: Can we put up
14 Exhibit No. 26, please, which would
15 have been Dugaboy's discovery
16 responses?
17 (N. Dondero Exhibit 26, Defendant
18 the Dugaboy Investment Trust's
19 Objections and Responses to Plaintiff's
20 Request for Admission, Interrogatories,
21 and Requests for Production, marked for
22 identification, as of this date.)
23 BY MR. MORRIS:
24 Q. And that was No. 26 in the
25 binder.

Page 253

N. Dondero

1
2 A. Okay. Um-hmm.
3 Q. Have you seen this document
4 before?
5 A. I believe so, yes.
6 Q. And can you turn to page 14?
7 A. Yes.
8 Q. Is that your signature?
9 A. It is.
10 Q. And did you review this document
11 before you signed it?
12 A. I did.
13 Q. And did you have an opportunity
14 to consult with counsel before you signed
15 it?
16 A. I did.
17 Q. And did you in fact consult with
18 counsel before you signed it?
19 A. I did.
20 Q. As you sit here right now, in
21 your capacity as the trustee of the Dugaboy
22 Trust, do you know of anything in the
23 objections and responses that is wrong or
24 inaccurate?
25 (Document review.)

N. Dondero

1
2      A.   I don't see anything that needs
3   to be changed.
4      Q.   As you sit here right now, as the
5   trustee of the Dugaboy Trust, do you have
6   any reason to amend your objections or
7   responses to make them more complete or
8   more precise?
9      A.   I have no reason at this time,
10   John.
11      Q.   Okay.  I think I have kind of the
12   same questions that I just asked you about
13   your discovery responses, but let's see.
14          Can we turn to page 8, which
15   again has responses to request for
16   admission No. 7 and 8?
17      A.   Okay.
18      Q.   And if you take a look request
19   for admission No. 7 and the response, can
20   you just read the that to yourself and tell
21   me when you're finished?
22          (Witness complies.)
23      A.   I'm done.
24      Q.   Okay.  Would your response be
25   accurate as follows:  Dugaboy is not aware

N. Dondero

1
2   of any document that was created prior to
3   the commencement of the adversary
4   proceeding that reflects or memorializes
5   the terms of the agreement?
6      A.   That is correct.
7      Q.   Okay.  Moving to request for
8   admission No. 8, the same thing, can you
9   just read the request and the response to
10   yourself and let me know when you're
11   finished?
12          (Witness complies.)
13      A.   I'm done, John.
14      Q.   Okay.  Would it be fair to
15   interpret your response as follows:
16   Dugaboy is not aware of any document that
17   was created prior to the commencement of
18   the adversary proceeding concerning the
19   existence of the agreement?
20      A.   Correct.
21      Q.   Okay.  And let's go to
22   Interrogatory No. 5.
23          Are your answers in your capacity
24   as -- and if you want me to go through it
25   again, I'm happy to do it, but I just need

N. Dondero

1
2   to know in the first instance, is there any
3   difference -- will your answers concerning
4   Interrogatory No. 5 be any different in
5   your capacity as the Dugaboy trustee than
6   they were in your individual capacity?
7      A.   Let me read it, John.
8      Q.   Take your time.
9          (Document review.)
10      A.   It's the same as the one earlier.
11      Q.   Okay.  And finally, let's just
12   look at Interrogatory No. 6.  Please take a
13   look at that and the response and let me
14   know if your answers in your capacity as
15   the trustee of the Dugaboy Trust would
16   differ in any way from the answers that you
17   gave pertaining to Interrogatory No. 6 in
18   your individual capacity.
19      A.   No, it's the same.
20      Q.   Okay.
21          MR. MORRIS:  So the time right
22   now is 4:57 Eastern, I guess 3:57 your
23   time.  I'm done with my outline, but I
24   just want to check my notes to see if I
25   have anything left.

N. Dondero

1
2          Douglas, you'll be happy to know
3   that I do expect to finish well in
4   advance of 4:30 Central time.  So why
5   don't we just take a break and we'll
6   come back at, I guess, 4:10 Central
7   time?
8          THE WITNESS:  Okay.
9          THE VIDEOGRAPHER:  The time is
10   3:57.  We are going off the record.
11          (Recess is taken.)
12          THE VIDEOGRAPHER:  The time is
13   12:15.  We are back on the record.
14          MR. MORRIS:  This is John Morris.
15   I have no further questions of this
16   witness at this time.
17          Does anybody else have any
18   questions?
19          MS. DEITSCH-PEREZ:  Reserve for
20   trial.
21          MR. MORRIS:  So are we in
22   agreement that we can close the record
23   right now?
24          MR. DRAPER:  Yes.
25          MR. MORRIS:  Thank you very much

Page 258

```
1            N. Dondero
2    everybody.  Ms. Dondero, thank you.
3            THE VIDEOGRAPHER:  The time is
4    4:16.  This concludes today's
5    deposition, Monday, October 18, 2021.
6        (Time noted:  4:16 p.m.)
7
8    _____.
9        NANCY DONDERO
10
11
12   Subscribed and sworn to before me
13   this  day of    2021.
14
15   _____
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
1
2        C E R T I F I C A T E
3
4    STATE OF FLORIDA      )
5            : ss.
6    COUNTY OF PALM BEACH  )
7
8        I, ANNETTE ARLEQUIN, a Notary
9    Public within and for the State of New
10   York, do hereby certify:
11       That NANCY DONDERO, whose
12   deposition is hereinbefore set forth,
13   was duly sworn by me, and that the
14   transcript of such depositions is a
15   true record of the testimony given by
16   such witness.
17       I further certify that I am not
18   related to any of the parties to this
19   action by blood or marriage; and that I
20   am in no way interested in the outcome
21   of this matter.
22       IN WITNESS WHEREOF, I have hereunto
23   set my hand this 18th day of October, 2021.
24   _____
25       ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA
```

Page 260

```
1
2        I N D E X
3
4    WITNESS              PAGE
5
6    NANCY DONDERO
7    BY MR. MORRIS          8
8
9
10      INDEX OF EXHIBITS
11   DESCRIPTION            PAGE
12
     N. Dondero Exhibit 2, Amended    148
13   Complaint for (1) Breach of
     Contract, (II) Turnover of
14   Property, (III) Fraudulent
     Transfer, and (IV) Breach of
15   Fiduciary Duty
16
     N. Dondero Exhibit 31, Defendant   157
17   James Donder's Answer to Amended
     Complaint
18
19   N. Dondero Exhibit 43, Promissory   184
     Note, Bates-stamped D-CNL000550
20   through 551
21
     N. Dondero Exhibit 26, Defendant    252
22   the Dugaboy Investment Trust's
     Objections and Responses to
23   Plaintiff's Request for
     Admission, Interrogatories, and
24   Requests for Production
25
```

Page 261

```
1
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    CASE NAME:  IN RE: HIGHLAND CAPITAL MANAGEMENT
4    DATE:    OCTOBER 18, 2021
5    DEPONENT:  NANCY DONDERO
6    Pg.  Ln.  Now Reads  Should Read  Reason
7    ___  ___  _____  _____  _____
8    ___  ___  _____  _____  _____
9    ___  ___  _____  _____  _____
10   ___  ___  _____  _____  _____
11   ___  ___  _____  _____  _____
12   ___  ___  _____  _____  _____
13   ___  ___  _____  _____  _____
14   ___  ___  _____  _____  _____
15   ___  ___  _____  _____  _____
16   ___  ___  _____  _____  _____
17
18       _____
19       NANCY DONDERO
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____ 2021.
22
23   _____
24   (Notary Public)
25   MY COMMISSION EXPIRES:_____
```

Appx. 01939

**$**

**$100** 205:19

**$20** 241:8

**$30** 137:19,25 139:12,16,20 140:9, 15 141:11,15,20 143:12,20

**$50** 206:12,18,20

**$6** 224:19

**$60** 204:18 206:14 222:13

**$7,900,000** 184:12

**(**

**(1)** 148:12

**1**

**1** 148:18 224:4

**10** 224:5

**100** 33:9

**10:30** 58:20

**10:51** 58:23

**12** 247:6,13

**12:00** 118:17

**12:15** 257:13

**12:16** 118:23

**12:54** 154:8

**13** 170:9 180:14,17 182:8 187:10 189:4 247:7,11,12

**14** 253:6

**15** 236:23 244:15

**17** 140:24 172:8 180:15 226:3 236:21

**18** 172:8,10 180:15 184:11 191:23 226:3 258:5

**19** 39:17 115:14 119:22 172:10,13

180:15 191:24 226:3

**1987** 34:17 36:10

**1990s** 39:11

**1997** 33:24 34:3,6

**19th** 39:6,19,20

**1:30** 153:24 154:2

**1:35** 155:3,5

**1st** 20:5 24:10

**2**

**2** 144:20 145:14 146:4 147:11 148:7,10,11

**20** 172:13 173:12

**20-plus** 207:6

**2009** 92:20,21

**2010** 166:23

**2015** 167:16

**2017** 53:17,20 54:17, 21 55:16,20,23 56:4 142:8 175:17,23 236:6 237:10 238:2 241:3

**2018** 53:23 56:8,12, 16,21 184:12

**2019** 39:7,19,21 56:24 57:4,8,12 92:21 172:25 173:14, 18

**2020** 173:2,9,15

**2021** 20:5,11,18 21:13,18 22:9 24:10 258:5,13

**22** 136:17

**23** 136:17 236:7 237:9,24 240:11 242:8

**24** 236:7,21 237:9,24 240:11 242:8

**25** 243:22,25 244:3,4 247:8,9

**26** 252:14,17,24

**29** 13:7 19:19

**2:41** 210:21

**2:57** 210:24

**3**

**3** 180:15

**3.1** 248:17

**3.10** 148:5,22 149:5, 12,17,20 150:24 152:19 156:8,14,22 172:24 243:5,16

**30** 7:18 16:22 136:12 144:3

**30(b)(6)** 16:22 19:13, 18 24:24 25:8 67:20 162:12 238:21 239:3, 22,25

**30-year** 117:2,23 128:16 142:3,4,13, 17,24 143:7

**31** 157:14,15 159:2,7 160:15

**32** 147:10,12,19

**37** 145:19 146:4 147:10,11,13,19

**3:57** 256:22 257:10

**3rd** 160:10

**4**

**4** 145:12,19 180:15

**43** 184:4,5

**4:10** 257:6

**4:16** 258:4,6

**4:30** 257:4

**4:57** 256:22

**5**

**5** 247:5,20 255:22 256:4

**50** 223:13 225:18

**500** 51:21

**551** 184:7

**6**

**6** 180:15 250:3 256:12,17

**60** 175:21

**63-4** 146:2

**7**

**7** 137:4 147:12 245:22 246:4 254:16,19

**700,000** 51:21

**72** 226:4

**8**

**8** 137:4 245:22 246:15 254:14,16 255:8

**82** 157:21 160:22,24 161:7 162:8,18 163:12 165:2,9,23 166:4,15 169:13 172:16 173:23 178:10 198:20 211:2, 9

**83** 160:8

**9**

**9** 245:19

**A**

**ability** 11:9 203:24 204:8

**Absolutely** 134:6

**accept** 142:17

**acceptable** 14:4

**accepted** 168:13

**accepting** 168:7

**access** 61:23 63:7 66:18

**Accounting** 152:5

**accurate** 152:16 162:9 254:25

**acquire** 66:7,13 69:3, 8,14 71:5,10 73:12, 16,22 78:2,6,12

**acquired** 67:14 241:2,4

**acquiring** 209:9

**acquisition** 210:12 240:17,22

**actual** 47:21 53:8 165:15

**add** 101:9

**addition** 87:2

**additional** 44:15

**address** 58:13

**administer** 6:14

**administered** 8:12

**admissible** 7:17 15:4

**admission** 252:20 254:16,19 255:8

**admissions** 245:22

**admit** 245:23 246:6, 18

**advance** 257:4

**advanced** 40:5

**adversary** 238:7 245:25 246:11,24 255:3,18

**advice** 152:14 249:11

**advisement** 58:9

**Advisors** 14:3 38:24 45:9 129:6

**affiliate** 98:6 99:22 100:8,14,18,25 101:24 102:5,11,15 103:17,20,24 119:9, 16,25 129:12,14,18 251:16

**affiliated** 96:19,24 97:18

**affiliates** 95:25 96:4, 8 97:23,25 98:11,21 99:2,6,17 100:3 101:21 103:3

**agent** 35:7

**aggregate** 206:9 225:10,21

**agree** 168:9 194:13 201:3 239:3,4 246:8, 20

**agreed** 6:3,8,12 142:17 161:10,17 163:3 164:19 168:19 194:12 201:9 205:9

**agreement** 16:9,12, 16 29:20,25 30:3,12 32:7,11,15 144:10,11 146:9,20,24 147:5 149:2 156:8,12,15 157:4 161:22 163:13 165:3 166:3 169:18 170:3 172:6,9,23,24 173:5,13 178:23 179:4 180:2 181:25 182:14 183:10 185:3, 22 187:9 190:22 191:10 192:14 195:22 197:7 199:2, 14,18,24 201:10,19, 23 203:14 205:14,23 206:6 211:10 221:11, 17 222:4,9,12,24 223:8,25 224:15 225:23 227:25 232:4 233:25 234:13 235:8 242:19 243:6,15,17 246:13,25 247:23 248:3,8 250:21,23 251:5 255:5,19 257:22

**agreements** 28:16, 21 106:20,24 107:10 120:20 121:3,10,15 131:6,14,19,25 162:23 163:10,14 164:15,25 165:4,16, 22 166:14 169:12 170:5,8,11,16,21 171:4,21 172:2 173:22 174:2,4,14, 18,25 175:6,16 176:9,16,25 177:3, 22,23 178:9,12

179:11 180:11 181:4, 8,17 182:10,20 183:13,16,19,24 185:21 186:8,9 187:3,15,19,22 188:24 189:7,12 190:18 191:18 192:3, 7,8,9,16,23 193:9,15, 21 194:21 195:16 196:21,25 197:15 198:14 200:7,10,17, 19,22 201:5 204:2,10 205:7 207:10 208:6, 16,25 209:7,14,24 210:8 211:18 212:13, 20 213:5,12 214:14, 19 215:2,21 216:3,10 217:3,8,11,15,19,23 218:8,13,18 220:3 223:5 224:24 225:12, 20,25 226:8 227:9, 19,21 229:22 231:11 232:25 233:18 234:9 241:12,14,20,24 242:4,6,16,21,23 243:5,7,18 248:9,18, 24 249:8,12,17 250:8 251:9,17,22 252:9

**ahead** 41:22 109:16 145:24 188:13 238:17

**allegation** 162:13

**allocate** 60:21

**allowed** 10:21

**alternative** 194:17

**ambiguous** 156:23

**amend** 245:15 254:6

**amended** 16:11 148:11 157:9,16 158:22 159:3,8,20,23 211:3

**amount** 82:18 90:13 93:21 136:2,5 141:10 182:4,7 184:12 204:19 206:10 223:20 224:6 225:11, 16,21 226:7,9 236:25

**amounts** 128:17 142:10

**analysis** 49:9,13,17,

23 50:19,23 51:4,7 215:8

**Annette** 7:11 138:19 177:15

**annual** 170:10

**answering** 11:2 30:19 249:25

**answers** 12:11 59:8, 16 255:23 256:3,14, 16

**apologize** 44:10 57:18 79:22 90:6 97:10 109:15,19 131:9 148:3 150:2 159:6 183:6 225:10 236:12

**appearances** 13:19

**appeared** 40:3

**application** 37:14

**applies** 162:18

**applying** 37:12

**appoint** 167:17,19

**appointed** 38:24

**appointment** 168:14

**approve** 251:15 252:7

**approved** 53:6

**approving** 52:11,16, 23 250:7,13,17 251:20

**approximate** 64:17

**approximately** 18:23 137:4 141:10

**April** 28:10

**area** 37:25 48:13,17, 25 49:6,14,17

**Arlequin** 7:11

**ascertain** 56:3 71:23 73:7,21 74:24 78:11, 25 91:17 93:16 120:16 121:15 122:8 124:19 126:12 127:4 139:20 152:15 153:10 212:14 215:3

**Asia** 148:4 160:22

**aspect** 21:13 119:3 156:21 198:13 199:13

**asserted** 21:8,9

**asserting** 20:19 21:14

**assess** 76:7

**asset** 35:9,12,18 36:3 206:18 221:12 222:5 224:4 225:2 227:7 228:7

**assets** 35:22 201:21, 25 202:24 221:4 222:15 223:6,12 226:15,21 227:2 228:15,22 229:4,18

**assistant** 151:18

**association** 7:5

**assume** 105:13 219:14

**assuming** 226:13 250:15

**assumption** 101:2,5

**assumptions** 114:2, 3

**astronomical** 215:16

**attached** 145:12

**attempt** 79:17 126:4

**attend** 34:11

**attendance** 118:21

**attorney** 10:7 17:6 23:22 26:3,6

**attorneys** 6:3 13:17 17:9,12,22 18:2,6,25 37:3 38:3

**audited** 62:25

**authorized** 6:14 111:16,22 112:2,7 123:21 124:5,12,19 137:12,19,24 237:20

**avoid** 201:19

**aware** 19:23 20:22, 25 21:4,7 39:9,13 48:6 51:10 61:16,18, 22 63:13 64:23,24 66:6,10,21 68:5 78:17 81:2,7,12,22 82:6 84:15,16 86:8, 11 88:16 91:11 92:4 94:6 97:21,23 99:3,5 102:23 106:10 108:2 110:4,6,10,15 111:5, 8,18 115:7 116:6 122:22 123:4,10,14 125:17 131:16,22 132:4,24 133:5,6,12, 20,21,24 134:17 135:4,9,23 137:3 140:14,15 141:23 143:24 162:11 179:19,22 180:3,25 185:16,19 191:8 199:22 200:2 212:11 225:19 243:15,19 246:9,22 247:2 249:9 251:5,19 254:25 255:16

**awareness** 50:6,8

---

**B**

**BA** 34:20

**back** 24:25 58:23 75:22 92:20 93:21 94:8,14,23 97:13,15 105:5 108:13,15 112:12 118:23 134:4 138:20 153:23 155:5 159:14,15 171:7 177:8,12,15,17 184:22 188:15,17 199:9 208:2 210:24, 25 230:8 257:6,13

**backed** 91:6

**background** 32:21 36:16,17,25 37:6,10 47:24 152:4 238:14

**balance** 62:6,21 206:25

**ballpark** 51:22 136:18,21,25 137:10 175:22 226:4

**bank** 62:6

**bankrupt** 35:23

**bankruptcy** 16:5 22:17 24:18 35:25 39:14,25 40:7,11

**bargain** 234:20

**barred** 161:8

**based** 64:12 76:24 101:5 216:15 234:14

**basing** 181:7

**basis** 34:2 50:7 65:17,19 119:12,19 129:16 150:3 151:5, 21 161:20 163:5 164:21 181:16 183:12,14 198:22 201:7 203:9,16 207:14,25 208:9 211:24 212:6

**batch** 240:2

**Bates-stamped** 184:6

**Beach** 191:2

**began** 36:11

**begin** 12:7,12

**beginning** 20:4 47:21 91:20 158:3 161:4 172:8,10,13 191:24

**behalf** 14:2 43:18 56:2,19 99:22 100:13 115:20 128:2 142:16 143:25 165:16 171:5 176:25 177:22 178:10 180:12 200:8, 20 205:9,10 206:6 211:19 223:5,21 224:2 225:13 227:9 230:12 231:3 232:5 235:9 237:15 238:13 242:19 248:23

**belief** 130:7 151:6 181:7,16 208:8,10 218:10

**believed** 47:6,12 49:5 88:17 211:23 229:2 240:16

**believing** 211:25 212:7

**beneficial** 104:11,13 105:10 129:20,23 130:9 222:22

**beneficiaries** 168:23

**beneficiary** 104:16 169:3

**benefit** 202:22,23 203:5,8,15 204:16 206:7,17 222:13 224:9,25 226:16 233:5 234:20

**benefits** 55:10 222:3,9 223:8,19

**benefitted** 206:23 222:22

**bet** 92:17

**big** 13:10 17:7

**bills** 32:13

**binder** 13:10 17:7 19:11,16,19 144:14 252:25

**binding** 218:9

**bit** 29:13 43:15 169:23 238:13

**board** 173:11

**book** 175:8

**bordering** 238:15

**borrow** 231:19 237:9

**borrowed** 231:25 240:12

**borrower** 189:18 190:2 236:5

**borrowers** 208:14 231:15 232:21

**bottom** 153:23 184:14

**box** 75:24

**Breach** 148:12,14

**break** 14:11 57:15,19 59:4,8,12,16 118:13 119:2 144:8 153:20

**believing** 155:24 156:4 207:20 208:23 210:15 257:5

**bring** 194:2

**broadly** 110:9

**brother** 19:24,25 20:6,11,17,22 21:4,7, 13,17 22:7,10,20 23:4 28:13,17,22 29:15 31:8,22 39:10 40:6,9 47:7,12 51:8, 13 59:20 60:7,13,23 61:3,16,21 72:17 77:2 86:22 87:5 89:12,17 92:5,8,24 93:17,20 94:7,12,22 95:5,9,15,18 96:25 97:19 98:24 101:19 102:19 103:2,7 104:13 128:20 129:2 157:11 158:24 162:24 163:11 164:16 168:24 169:2 170:3 173:9,15,20,21 174:19 176:9,17 179:12 180:13 181:5 182:16,18 183:8,16, 21 184:18 185:4,23 186:10 187:5,16 188:24 189:16,24 191:10,15 193:22 194:18,22 195:24 196:3,13,19 197:2 199:22 200:3,12 202:12 204:12,14 207:8 208:2,5,12,13 212:3,7,10,15 213:7, 14 216:10,20 218:19 221:2,19 224:18,25 228:10 229:24 231:13 232:7,14,20 233:3,6 234:19 240:25 248:3,14 249:6

**brother's** 61:10,14 159:22 198:8,11 201:7

**BS** 34:20,21

**build** 201:13

**built** 36:15

**business** 33:12 42:23 43:3 44:6,14 71:14,18 74:2,5,11

**believing** 75:7,10,15 105:19,22 106:2 120:5,9,12,17 130:15,18,22 131:2 194:2

**C**

**calendar** 212:23

**call** 40:15 189:9 230:11 231:2

**called** 8:19 16:22 36:14,18 38:12 40:12 45:9 75:4 103:11 119:6 129:6

**cancellation** 233:4

**CANTY** 159:2

**capacity** 16:20,21 25:11,14,16,22 26:17 30:4,13,14 31:3,10, 14,24 32:4,17 47:22 50:16 51:2 67:20 182:15 239:6,7,24 251:12,14 253:21 255:23 256:5,6,14,18

**capital** 10:9 16:4,12 38:5,12 42:3 103:11

**care** 243:11

**case** 7:20 22:17 38:18 48:12 61:17

**cases** 38:5

**caused** 166:2,13 176:24 177:21 178:9 200:8,20 208:14 211:17 213:3,11 214:12,18,24 217:20 249:7

**cellphone** 9:23

**Central** 154:2 257:4, 6

**CEO** 50:10

**certifications** 36:6

**certified** 7:4

**chance** 218:2

**changed** 170:20 171:2 254:3

**Changing** 144:4

**check** 24:25 256:24

**checks** 47:24

**children** 168:25

**circumstance** 146:22

**circumstances** 11:16 46:2 146:19 149:16

**Civil** 7:19

**claim** 43:17

**claims** 21:8 42:14 43:11 161:8

**clarify** 25:8 134:20

**clarity** 158:21

**class** 149:25 150:5 161:16 165:14 169:21 250:25 251:7

**classes** 48:20

**clear** 8:5 13:21 21:23 41:23 67:17,18 186:22 214:11 239:21 240:4

**clients** 14:2

**close** 236:20 257:22

**closed** 36:16

**coach** 104:25

**coaching** 105:3

**colleague** 144:12

**collect** 158:23 161:11 185:9,17

**collectively** 163:13 165:3

**college** 34:9,11 36:13

**Colorado** 240:23 241:2,5,8

**combined** 226:4

**comfortable** 30:19

**commenced** 177:5 178:2,14 185:17

**commencement** 141:6 245:25 246:11, 23 255:3,17

**common** 86:9,11,14, 17,23 88:16,18 101:3 207:16

**communicate** 10:21 21:21 28:2 59:3,7,11, 15 118:25

**communicated** 8:6 18:5 20:6 22:10 24:7 151:20

**communicating** 17:25

**communication** 21:22,24 247:21

**communications** 22:6 192:13,21 193:7,13

**companies** 35:22 64:2,14 65:5,15,24 66:8,14,20 72:8,13 76:22 96:10,19,24 97:18 104:3,5,9 161:19 163:4 164:20 174:7,22 194:10 195:3,21,25 196:4,7, 11,16 197:9,16 198:22 199:18,23 200:4,13,24 201:6,14 202:8 203:8,16,20,25 204:9,15 205:11,16, 25 206:8 209:4,10,17 210:3,11 215:18 218:4 227:13 229:10 235:13

**company** 33:8 36:14,16,18,22 38:11 39:10 40:25 44:12 50:9 63:15,19,24 64:9,13 67:4 75:3 92:10 105:12

**compared** 161:24 211:14,20,25 212:8, 15 213:8 216:4,11

**compensate** 233:19

**compensated** 48:24 50:4,12

**compensation** 48:14,18,22 49:2,6,

10,14,18,25 50:20,24 51:5,8,13 53:17,18, 20,23 54:8,16,20 55:3,9,11,16,19,23 56:4,7,11,15,20,24 57:3,7,12 161:23,25 174:11 211:15,21 212:2,9,16,21 213:8, 14,25 214:2,4,6,15, 21 215:4,9,12,22 216:5,12 231:13,14, 16 232:7,13,18,20,21 233:6,17,24 234:22 243:20 250:7,13,17 251:15,21 252:8

**complaint** 148:12 157:9,17 158:22 159:4,9,12,20,23 211:3

**complete** 245:16 254:7

**completed** 10:23

**complies** 244:16 245:20 254:22 255:12

**component** 37:20 55:2 201:18

**computer** 155:21

**concern** 190:15 194:24 229:8

**concerned** 89:11,16 102:25 229:16

**concerns** 189:16 190:9 199:4 201:11

**concludes** 258:4

**conclusion** 216:14, 18

**conclusions** 216:2, 9

**condition** 63:11 75:19 76:8,12,17 106:9,13,17 161:12 198:5 228:7 232:8 234:14

**conditions** 232:9

**conduct** 215:8

**confer** 249:3,5

**conferred** 17:12 49:4

**confirm** 102:19

**conflict** 189:17,24

**connection** 21:19 29:17 31:11,24 237:16 245:5 247:22 248:22

**consequence** 204:17 206:19

**considered** 174:10 232:17,19

**consistent** 158:2

**consult** 244:23,25 253:14,17

**Cont'd** 155:9

**contact** 219:10

**context** 13:3 35:19 174:18 182:12

**continue** 239:14

**continuous** 34:2

**Contract** 148:12

**contractor** 33:19

**control** 161:21 163:6 164:22 173:10,16,20 195:4 198:23 199:17 201:8,15 202:17 203:6,10,17 229:11, 17

**controlled** 60:24 96:24 97:19 189:17, 25

**controls** 199:23

**convenient** 207:21

**conversation** 61:2 87:10,12,15,17,19,23 88:8,12 99:11 183:4 188:8 194:5 219:11, 16,19 220:4,10,14,16

**conversations** 20:17 86:12 99:12,15 101:6 171:12 183:2, 18 191:12,25 192:21 193:20,22,25 237:23 240:10

**copies** 13:7 115:25

**copy** 141:20 144:23 146:23 147:5,24 157:7 158:17 160:2

**correctly** 162:5

**Cornerstone** 65:10 72:6,7,12,22 73:3,8, 12,17,22,24 74:14, 19,25 76:13 80:4,8, 13,20 174:8

**Cornerstone's** 73:25 74:5,11

**corporate** 95:22 130:10 230:5,13 231:4,12,14,15 232:6,12,22 233:4

**correct** 15:5 18:9 20:15 22:22 24:15 26:23 27:6,15 34:4, 15 39:14 53:9 55:4 62:23 72:9,14 81:11 85:23 88:6 92:5,6 99:14 101:17 111:4 115:9,10,15 117:7, 10,14 123:5 125:16, 21 137:6 140:24 146:5,6 151:23 162:10 163:7,8 164:23 165:19,20,24, 25 166:4,15,18 168:6 170:4,13 171:23 172:11,14,16,20 173:7,23,24 174:21 175:3 177:5 178:2 179:12,18 180:20,23 181:5,6 182:16,17 185:4,5,10 187:16 188:25 189:2 190:21 192:4,9 196:18 200:6 201:2,21 202:21 203:22,23 205:13 206:4,15,16 209:4,5, 11,12,17 210:3,6,12, 13 212:23 213:9,10, 15,23 214:16,17,22, 23 215:5,6 216:20,21 219:3 221:5,11 222:19 223:8,9,21, 22,23 224:9,21,22 225:3,4,6,7 226:23 227:13,15 228:8,9, 17,18 232:2,9,10,14, 22 233:7 234:2,11,21 235:11,13,17,20

**copies** 13:7 115:25

237:7 240:2,5 241:24 242:16 245:6,7 247:2 255:6,20

**corroborate** 128:20 152:7,12

**cost** 69:3,8,14 70:22 71:5,10 73:16 77:25 78:6,11 79:7,14,20 80:9,14,21 161:20 163:5 164:21 174:23 196:16 197:9,17 198:4 202:2,3,4,10, 18,20 203:21 204:16 205:12,25 206:13,18 209:9 210:11 221:4, 13 222:4,15 223:6,14 224:5

**costs** 31:9,22

**counsel** 8:9 22:22 27:10,13 28:6 67:17 244:23 245:2 253:14, 18

**counterproposal** 197:6,14,23 199:13

**couple** 15:17 24:8 51:19 57:16 67:23 79:25

**courses** 48:21

**court** 6:17 8:7 10:17 14:16,20 105:4 177:8

**courtroom** 7:17

**cover** 144:7 176:11, 17 185:22 186:10 187:3 208:22

**covered** 49:23 177:3,24 181:8,17 186:14 208:21

**covering** 170:9

**COVID-19** 7:6

**created** 167:2 180:25 245:24 246:10,23 255:2,17

**credibility** 239:11

**creditor** 43:14

**Crescent** 33:2,12,15, 18,23 34:2,7 36:12,

23 41:2 43:11,18 47:15,18,23 48:3

**current** 39:5

**cut** 249:23

---

**D**

**D-CNL000550** 184:7

**Dallas** 9:9 40:3

**Dan** 9:15 26:20,22 27:2,5

**date** 39:21 42:24 43:4 44:4,7,8,15,20,24 62:17,22 63:2,12 64:15 66:5,17,22 68:2,10,16,22 70:8, 12,17,19 71:3,9,22, 25 72:13,20,25 73:5, 10,14,19 74:15,18,24 75:14,18 76:7,11,16 77:5,11,17,19,24 78:4,9,16,18,24 79:5, 12,17 80:7,12,18 83:2,11,14,23 84:2 85:7,13 87:25 92:19 93:9 94:17,21 95:3,7, 12 98:4 99:20,24 100:5,23 103:21,25 107:14,18,23 108:6, 18,24 109:5 110:4, 14,18,21 111:22 112:7,21 113:3 114:17,23 115:11,19, 25 116:5 117:10,12, 14,20 118:7 119:17 120:21 121:4,10,14, 21 122:3,9,16,24 123:21 124:5,11,25 125:22 126:5,16 127:3,13,18,23 128:5 129:13,18 130:13 131:5,13,19,24 132:6,13,21 133:2,11 135:12,18 136:6,15 137:12,18,23 139:11, 15,19,25 140:5,9 141:8,15,19,24 142:23 143:6,12,19 148:16 150:20 151:3, 6,22 152:25 153:5,9, 14 157:18 170:25 173:5,19 178:25 179:24 180:20 181:2

184:8 218:17 219:22 234:8,9,11,16 236:25 252:22

**dated** 184:11

**dates** 25:5 128:17

**Daugherty** 118:20

**Davor** 13:16

**day** 15:20 40:2 149:6 178:20 192:15 258:13

**day-to-day** 33:14

**days** 193:8

**deal** 195:6,8 228:2 239:17

**Deborah** 9:7,15 13:21 19:12 25:7 27:11,12,21 57:17 58:4 155:14 159:14, 25 164:3 176:5

**Deborah's** 17:20 27:19

**Debra** 8:6

**debt** 67:10

**December** 160:10 161:13 162:24 164:16 172:18,25 173:18

**decided** 23:16,18

**decides** 202:17,19

**decision** 60:21 61:13 247:22

**decisions** 48:13 169:7

**defendant** 20:23 21:2,5 31:13,18 130:10 157:15 159:19 161:15,21,23 176:13,19 252:17

**defendants** 8:10 13:18 27:14 129:24

**defender's** 38:4

**defending** 13:17

**defense** 28:23 32:16 162:14

**defenses** 20:18 21:8,14

**deferred** 174:10 213:25 231:16 232:17

**defined** 76:22 98:7 144:11 146:8 187:21, 24

**definition** 29:13 62:13 119:24 150:18 187:24

**definitions** 15:18

**degree** 34:9,18

**degrees** 34:23

**Deitsch-perez** 9:8, 15 13:22 19:8,14 22:23 23:7 24:22 25:15,24 27:13 28:3, 12 30:6,16 31:5 42:16 46:12,20 52:10 69:24 80:2 81:16 82:2,12,20 84:6,13, 20 89:6 96:14 97:2,5 104:14,21 105:2 108:9 109:11,17 112:15 113:17 116:9 118:3 120:2,22 121:23 122:11,19 123:23 124:7,15 125:5 130:2 131:7 132:8,15 133:15 135:7,21 137:7,14 138:17 140:12 142:19 143:2,8,15 144:15,17,19,24 145:7,15 147:11,14 148:17,20 150:10 155:15 156:16,24 158:16 159:10 163:16,23 166:5,9,16 169:19 175:24 176:6, 20 177:6,14 178:6 179:5,16 180:21 181:12 185:11 186:2, 15,19,23 187:17 188:2,10 189:20 190:4 192:17 198:16 199:19 204:3,21 209:18 210:4 213:16 221:7,14 226:18 227:22 230:7,14,18 231:5 232:15 233:8,

20 234:3 235:2,18 238:3 240:19 241:25 243:9,24 247:6,12 257:19

**Deitsch-perez's** 26:14

**demand** 117:2,23,25 118:5,8 128:16 207:9 223:11

**demands** 33:20 161:9

**denied** 246:5

**denoted** 145:13

**deny** 246:6,18

**depending** 201:20

**deposed** 11:12

**deposition** 6:12 7:10 10:10,14,23 11:17 17:2,5,13 18:7,15 19:5,22 28:4 156:5 157:14 158:3 245:6 258:5

**describe** 35:4 37:9 88:10 183:2,8

**designation** 238:21

**detail** 88:9

**detailed** 220:5

**details** 98:20

**determination** 70:20

**determine** 69:7 74:10 77:21 79:18 80:18 85:13,21 94:18,22 106:2,16 109:6 114:13 115:3 122:17 131:25 133:3 137:24 142:24 213:7 215:21

**determined** 142:12

**differ** 256:16

**difference** 226:6 256:3

**differently** 206:22

**difficult** 11:25 12:3

**diligence** 71:23

**direct** 33:3 41:9 47:7, 12 65:22 150:11 233:5 239:16

**directly** 40:18,23 41:5 42:5,9,13 65:14

**director** 45:6 47:3,11

**directors** 38:23

**directs** 15:10

**disagrees** 8:14

**disbelieve** 152:9

**discovery** 243:21 252:15 254:13

**discrepancies** 38:6

**discuss** 21:12,17 150:8,17

**discussed** 62:15 98:12 142:11 174:7 180:15 181:21 218:22 228:4 248:2

**discussing** 193:24 219:6 241:15 248:13

**discussion** 191:4,9 192:5

**discussions** 150:12 191:15

**dispute** 238:20

**distancing** 7:8

**distributions** 214:3

**division** 36:16,17

**DOC** 160:8

**docket** 160:5,8

**document** 12:24 13:2 16:16 102:24 145:12,13,21 146:2, 8,11,15 147:9,15,20 148:9 149:14,18,20 157:7,12 158:6,8,11, 15 160:14,18 184:3, 24 211:4 243:22 244:5,7,13,19 245:4, 11,24 246:10,22 247:17,20 253:3,10, 25 255:2,16 256:9

**documents** 12:21 13:8 19:4,6,19 89:16 103:6 237:15 248:4 249:16,19

**dollar** 174:24 203:20 204:16 205:12,25 221:4,13 237:25 242:8

**dollars** 59:21 60:8,9, 14,22 61:4 137:5 237:9 240:12

**Donder's** 157:16

**Dondero** 7:1 8:1 9:1, 4,6 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1,21 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,11 42:1,18 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 25 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1,25 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1,11 149:1 150:1 151:1

152:1 153:1 154:1 155:1,11,23 156:1 157:1,15,24 158:1,22 159:1,18 160:1 161:1,15,23 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,8 179:1 180:1 181:1 182:1 183:1 184:1,5,10 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1,8 205:1 206:1 207:1 208:1 209:1 210:1 211:1,6,13,20 212:1,22 213:1 214:1 215:1,11 216:1,3 217:1,2 218:1 219:1 220:1 221:1 222:1,25 223:1,7,19 224:1,3,9 225:1 226:1 227:1 228:1,6,20,25 229:1 230:1 231:1,9 232:1 233:1 234:1 235:1,6 236:1 237:1 238:1 239:1 240:1,9 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1,8,17 253:1 254:1 255:1 256:1 257:1 258:1,2, 9

**Dondero's** 52:3,9, 16,24 53:6,16,22 54:15,20 55:3,15,19, 23 56:3,6,11,15,20, 23 57:3,7,11 67:20 159:8,19 161:21 163:6 164:22 198:23 203:9,17 211:2 214:15,21 215:4

**double** 138:20

**Douglas** 9:19 57:21 58:9 164:9 210:17 238:18 240:4 257:2

**Draper** 9:19 22:16,21 23:5,12,15,16,19,22, 25 24:5,7,17 26:3 57:20,25 58:16 163:24 210:16 238:12,19 239:9,19 240:6 257:24

**driver's** 35:2,6

**drugs** 11:8

**Dubel** 39:2

**due** 7:6 71:22 93:22 94:23 138:5,15 139:4 225:11,22 226:7,9 228:17

**Dug** 108:4

**Dugaboy** 15:21,23 16:23 19:9 22:11,13, 17 23:5,23 24:19,24 26:3,7 30:5,14 31:3, 18 32:12 50:17,18,22 51:3 52:8,15,23 53:6 55:22 56:2,14,19 57:6,10 67:21 68:2, 12,17,21 69:2,6,12, 17 70:10,14,20 71:3, 8,22 72:20,25 73:6, 11,15,20 74:9,13,17, 23 75:12,17 76:6,10, 15 77:5,10,15,20,25 78:5,10,14,19,24 79:4,11,16 80:6,11, 17 83:21 84:3,24 85:6,11 86:4 89:3,20 90:8,9,12,16 91:8,12, 16,23 93:6,11,15 94:6,11,16,20 95:4,8, 13 98:5 99:4,21,25 100:6,16,22 102:3,9, 14,18 103:19 105:21, 25 106:5,7,11,15,19, 23 107:8,13,17,22 108:5,17,23 109:4 110:4,16 111:10,21 112:5,20 113:2,10,23 114:7,12,16,21 115:2,18,24 116:6,14 117:16,18 120:7,11, 15,19 121:2,8,13,20 122:2,7,15,23 123:20 124:4,10,18,24 125:23 126:4,11,15, 21 127:2,9,12,14,19, 24 128:6,19 130:14,

20,24 131:4,12,17,23 132:5,11,20,25 133:12 135:11,17 136:4 137:11,17,22 138:12 139:10,14,18, 23,24 140:4,8 141:4, 7,13,18,23 142:22 143:5,11,18 150:22 151:7,8,10 152:8 153:8,13 156:14,22 157:11 163:19 164:14 165:8,12,13, 19,22 166:2,13,19,25 167:8,15,18,25 168:3,10,14,16,20 169:3,7,10,12,16 171:5 172:22 176:24 177:21 178:9,15,21 179:2,9,11,14,19,22 180:12,19,24 181:4, 19 182:16 197:13,22 198:11,15 199:6,12 200:8,20 201:4 203:13 204:7 205:10, 15 206:5 208:25 209:8,15,25 210:9 211:18 212:6,13,20 213:4,6,12,13 214:13,14,19,20,25 215:2,7,19,25 216:8 217:14,20 219:9 223:6,18 225:13 227:9,10,16,17 228:14 232:5 235:9, 21,25 236:4,17 237:3,8,16 238:5,13 239:6 240:2,12 241:10,13,19,22 242:7,18,22 243:2,4, 14,15 248:3,23 249:5,7,10,15 251:12,15 252:6,7,18 253:21 254:5,25 255:16 256:5,15

**Dugaboy's** 22:22 162:11 170:14,19 171:2 237:24 252:15

**duly** 8:20

**duty** 148:15 196:20 197:2

20,24 131:4,12,17,23

72:9 76:22 101:14 119:25 146:8 174:7 194:3 208:22 213:21 225:9 236:11 256:10

**early** 173:14

**Eastern** 256:22

**economic** 40:19 65:22 224:25 227:11

**education** 166:21 168:22 237:5

**effect** 6:15

**efficient** 11:24

**effort** 68:22 69:7 73:6,20 74:7,10,23 75:13,18 76:7,11,16 77:20 78:10,25 80:17 85:12,19 91:17,24 93:16 94:17,21 95:13 100:6 106:2,16 107:9,23 109:5 114:13 115:3,24 120:16 121:14 122:8, 16 124:19 126:12 127:3,24 130:25 131:24 133:2 137:23 139:19 141:19 142:22 153:9 194:25 201:12 212:14 213:6 215:3,20 229:9

**Either/or** 172:14

**elaborate** 41:7 143:23

**elderly** 191:6

**Electronically** 9:19

**element** 229:10,16

**Elms** 9:16 27:5,7,9, 18,22 243:25 244:3 247:11,14

**email** 21:25

**employed** 32:22 45:2 46:10 47:5 48:8

**employee** 39:6 46:22,25 81:14,23,24 83:3,10,16,24 84:5, 12,18 85:9 88:25 89:4 90:18

**employees** 33:17

**E**

**earlier** 38:12 59:19

47:25 81:4,9 85:3,16 86:6 87:6 88:15 90:2 101:16

**employment** 34:5

**encourage** 54:12

**end** 152:18 172:8 191:23 193:23

**energy** 229:9

**engagement** 24:25

**enter** 166:3,14 170:5 176:25 177:21 178:9 189:6 200:8,20 211:18 213:4,12 214:13,19,25 217:20 243:4 247:22 249:7

**entered** 29:17 162:23 163:10 164:15 165:15,23 169:12,18 170:2,16, 21 171:20,25 172:6, 23 173:4,14,21 174:13,19 176:16 179:11 180:2,11 182:14 185:20 186:7 187:2 191:19,21 192:16 193:9 196:21 203:13 204:2,10 205:6,14 206:6 208:24 209:7,14,23 210:7 212:19 218:7, 18 221:16 222:16 223:5 224:2,14,23 225:13,20,24 226:8 227:8,18,25 229:21 232:5,25 234:10,17 235:9 241:12,23 242:3,5,19,22 243:16 248:17 250:24 251:6, 17,23

**entering** 171:4 196:25 207:10 208:6, 16 212:12 215:20 216:2,9 248:9 249:11,16

**entirety** 93:24 94:4

**entities** 60:23 93:2 95:23 185:24

**entitled** 229:3

**entity** 16:3 33:4 41:16 45:8,11 47:6,

11 53:25 103:10,14 119:6 129:5,8 165:15 207:13

**entry** 192:22 248:22

**equity** 67:11

**equivalent** 37:18 227:20

**error** 29:11

**established** 61:10

**estate** 35:7,25 120:6, 9 237:13 240:17

**evening** 8:6

**event** 224:17 235:11

**exact** 213:17

**EXAMINATION** 8:24 155:9

**examined** 8:21

**examples** 215:15

**exceeded** 70:22 71:5 174:23

**exchange** 81:7,25 99:18 115:9 126:18 227:20

**exchanged** 126:24

**exclude** 150:11

**executed** 84:4 100:8 115:20 117:5 127:15 128:2 185:23 186:10 187:4,14 188:22 230:12 231:2 233:2

**executing** 237:15

**executive** 48:13,17, 21 49:2,6,9,14,17,24 50:19,24 51:4

**executives** 50:4,12

**Exhibit** 145:12 148:7,10,11,18 157:14,15 159:7 160:15 184:4,5 252:14,17

**exist** 106:20

**existed** 88:22 106:24 107:10 121:15 131:19,25 241:22

**existence** 246:25 255:19

**existing** 140:10,17

**expect** 203:7 257:3

**expecting** 138:14

**expenses** 31:9,23 32:13,16

**experience** 48:12

**expert** 48:17 49:5 61:20

**expertise** 152:4

**experts** 61:17

**explain** 183:21 207:8

**explained** 158:2

**express** 220:22 228:20

**extended** 153:22

**extent** 68:23 163:25 164:3

**extra** 218:3

---

**F**

**face** 90:13 224:6

**face-to-face** 191:21

**fact** 8:11 46:7 88:21 153:14 216:11 223:17 228:11 239:23 244:25 253:17

**factors** 195:3

**facts** 125:17

**factual** 30:23

**fail** 12:13

**failed** 81:15,24

**fair** 12:8 19:8 25:4 33:9 61:19 62:20,23 83:19,20 88:5 92:14 151:22 238:8 246:21 255:14

**familiar** 16:10 38:10 129:5 144:5 184:25

**Family** 191:6

**father** 191:5

**fault** 188:11

**favor** 95:10,15,18 100:2,8 115:8,13,20 116:3,7 117:6 127:15,21 128:2 133:13,22 135:5,14 140:20 141:9,16,21 142:2 173:10 235:22

**February** 161:14 162:25 164:17 172:19,25

**Federal** 7:19

**feel** 30:19

**fiduciary** 35:25 36:2 148:15

**figure** 85:20 91:24

**figures** 54:22

**file** 40:6

**filed** 39:14,25 40:10 160:10

**filing** 6:5 16:5,6 43:17

**finally** 256:11

**financial** 14:3 44:11, 25 48:8 50:5,13 61:24 62:2,5,14,16, 25 63:5,8,11 75:19 76:8,12,17 106:8,13, 17 151:18 228:10

**financials** 62:19

**find** 38:7 39:24

**finding** 35:22

**fine** 46:18 70:5 138:23,24 231:10

**finish** 12:6,11 113:21 175:12 235:7 257:3

**finished** 236:14 254:21 255:11

**firm** 26:9,14,15,16, 23,25 33:13 36:15

**fit** 119:24

**Florida** 36:21 190:24

**follow** 161:5

**follow-on** 164:6

**force** 6:15

**forgave** 84:10 90:3, 17 91:9,14 100:12 102:16 103:3

**forgivable** 162:2

**forgive** 161:18 163:3 164:19 206:20

**forgiven** 85:3,8,14 86:6 88:25 89:5 90:10,14 91:18,25 100:17,24 101:25 102:5,11 174:6,10 175:2 194:9 196:15 197:8,16 198:21 200:10,22 201:5,17 202:6,10,18,20 203:22 205:13,17 206:14 207:5 221:12 223:12 227:4 228:22 229:14 231:12 232:6 234:14 235:10

**forgiveness** 65:20 201:19 204:18 206:2 220:18 222:13 224:20 226:17 229:3 232:11 235:15 250:16

**forgives** 29:10

**forgiving** 84:17 87:6 88:14 89:22 101:21 102:20

**forgotten** 79:24

**form** 6:9 21:23 22:24 23:8 30:7,17 31:6 46:13 64:4 68:18 69:25 81:17 82:3,13, 21 84:7 89:7 96:15 97:3 104:15 108:10 116:10 118:4 120:23 121:24 122:12,20 123:24 124:8,16 125:6 130:3 131:8 132:9,16 135:8,22 137:8,15 138:18 140:13 142:20 143:3, 9,16 156:17,25 166:6,17 176:21

179:6,17 180:22
181:13 185:12 186:3,
20 187:18 189:21
190:5 192:18 198:17
199:20 204:4,22
209:19 210:5 221:8,
15 226:19 227:23
232:16 233:9,21
234:4 235:3,19
240:20 242:2

**formed** 36:11 92:11
166:22

**foundation** 50:8
84:14,21 112:16

**founded** 39:10

**fourth** 16:10

**frame** 92:16 119:14
241:5 248:25 249:20

**Fraudulent** 148:14

**Friday** 18:19

**front** 148:23

**fulfillment** 161:11
232:8

**full** 15:19 94:8,14

**fund** 43:5,7 44:2

**fundamentally**
238:22

**funds** 41:24 44:12

**future** 59:13,17
82:19 207:21 227:14
234:2,7,16,19 235:10

___

**G**

**gain** 223:20 224:8

**Garcia** 7:3

**gave** 11:17 59:8 81:9,
13,22 90:25 99:6,17
116:18 125:25 129:2
144:14 159:25
217:25 231:25
256:17

**gears** 80:23 157:3

**general** 11:23 29:8
45:16,18,21 46:4,8
50:6,8 51:15,17

63:22 82:7 133:19
193:25 213:18,21

**generally** 29:7 35:19
36:8 37:10 42:25
63:21 98:16 99:4
110:10,15 133:17
250:7,12,14,17
251:20

**generations** 168:25

**gentleman** 202:16

**give** 11:22 15:15 19:9
29:12 59:17 64:17
81:15,24 86:3 97:8
103:9 157:8 158:17
218:2 228:25 231:19
234:24

**giving** 232:13

**glance** 160:2

**good** 7:2 28:19 43:13
83:12 113:19 127:10
145:9 154:3 228:2

**graduated** 34:13
36:10

**great** 154:5 218:5
220:25 228:12 240:6

**greater** 161:20 163:5
164:21 196:16 197:9

**Greenberg** 27:2
32:3,9,12

**ground** 11:23

**grounds** 239:8

**guess** 256:22 257:6

**guru** 228:10

**guys** 153:19

___

**H**

**half** 17:17

**hand** 159:12

**handled** 24:17

**hands** 225:5 226:21

**handy** 13:9

**Hang** 145:7

**happen** 195:7 228:19
234:18

**happened** 88:3,4
205:3

**happy** 118:13 213:2
255:25 257:2

**hard** 13:7 144:23
157:7 158:16 159:25

**hate** 207:18

**HCM** 14:3

**HCMFA** 230:15

**HCMLP** 162:4

**HCMS** 103:15,17,20,
24 104:13 106:20,25
107:11,15,20,25
108:3,6,19,25 109:6,
10 110:5,13,17,21
111:3,6,12,17,23
112:8,11,22 113:4,
11,12,25 114:8,14,
17,23 115:3,7,13,20
116:2,7,20,23 117:5
118:8 162:12,19
175:19 186:11 187:5,
12 188:21 230:3,12
231:3,18,24

**HCMS's** 105:19,22
106:2,8,12,17

**HCRE** 119:6,8,13,16,
24 120:20 121:3,10,
16,21 122:4,9,17,25
123:11,16,22 124:6,
13,20 125:2,18,25
126:7,13,16,22
127:4,15,20 128:2,8,
15,22 162:12,19
175:18 186:11 187:6,
12 188:21 230:3,12
231:3,18,24

**HCRE's** 120:4,8,12,
16

**head** 30:22 35:10
65:2,3,6 89:2,9

**health** 166:21 168:22
237:5

**hear** 38:16 58:25
97:6 155:18,22 177:9
211:6

**heard** 29:2 45:8
63:14 75:3 103:10
119:5 177:9

**hearing** 231:6

**hedge** 43:5,7 44:2

**held** 68:19 151:7,8,11

**helm** 222:17 224:11

**helpful** 134:21

**high** 222:21

**higher** 174:9,12,14,
17,20 194:11 198:3
205:16

**Highland** 10:8 15:25
16:3,12 24:17 38:12
39:6,9,13,25 40:7,10,
20 41:24 42:2,7,11,
14 43:12,18 44:2,18,
19,23 45:3,6,15
47:16,19,25 48:4
51:9,14 53:7,25 54:2,
16,21 55:10 56:7,21
57:8,12 60:8,15 61:5
63:16,20,24 64:2,10,
14 65:11,14,22 66:6,
13 67:4,10,13 73:11,
21 81:3,8,9,13,22,24
83:4,10,16,24 84:5,9,
12,16 85:2,8,13 86:5,
9 87:5,9 88:13,18
89:5,24,25 90:2,4,17,
25 91:5,9,13,14,17,
24 92:4,8,24 93:7,12,
17,21,23 94:8,13,18,
25 95:10,15,19,24
96:5,9,11,13,20,21
97:24 98:2,5,10,21,
25 99:5,6,17 100:3,8,
9,11,17,24 101:24
102:11,16 103:3,11,
25 104:7 106:21,25
107:10,14,19,24
108:7,20 109:2,7,9
110:5,11,17,20
111:6,11,17,22
112:7,14 113:6,13,24
114:8,13,19,24
115:5,8,13,21 116:3,
8,20,24 117:6 118:8
119:9,16,21 120:20
121:3,11,16,22
122:5,10,18,24
123:11,16,21 124:5,

12,20 125:25 126:7,
13,18,23 127:5,16,21
128:3,8,15,22 129:19
131:6,14,20 132:2,7,
14,23 133:4,6,14,23
135:6,14,18 137:13,
19,24 138:7,13 139:3
140:11,21 141:9,16,
21 142:1,17 143:14,
25 157:10 158:23
165:10,15,16 169:11,
17 170:15,19 171:2
173:10,16 177:2,22
178:11 185:8,17,24
196:10 200:9,21
202:21,23 203:4,7,14
204:17 206:7,8,13,
17,23 208:3,7 211:19
212:22 213:15
214:16,22 215:4
217:25 218:6,9
222:18,23 223:21
224:3,8,11 225:2
226:16 227:19 228:3,
14 231:19,20,25
235:23,25 236:5,18
237:10,17,21,25
240:13 241:11 242:9,
20,23

**Highland's** 22:17
42:23 43:3 44:5,14
45:18,21 46:4,8
62:16,18,21,24 63:5,
8,11 67:8 68:3,14,23
69:3,7,14,19,22 70:7,
11,16,21 71:4,10
72:12,22 73:2,7,16
74:14,19,25 77:7,12,
16,21,25 78:6,11,15,
20 79:2,6,13,18 80:8,
13,19,20 89:21
103:20 129:12 200:3
206:25 209:3,9,16
210:2,10 227:11

**highly** 51:18

**hired** 35:24 37:14
46:21

**hiring** 26:2 27:16

**hold** 13:15 34:25
35:5 41:10 48:16
163:25 252:3

**holds** 150:6,7,22

**holidays** 172:4

**Honestly** 218:14

**Hotel** 34:19

**hour** 18:23 113:18 153:23

**hours** 17:17,18

**house** 191:2 240:23 241:2,4,8

**hypothetical** 205:4, 21,22

**I**

**idea** 60:25 100:15 126:3 189:5 198:15, 25 203:11,12,13

**identification** 148:16 157:17 184:8 252:22

**identified** 22:21 23:21 38:11 65:24 66:9,15,20 72:8 101:14 112:24 175:7 179:24 181:2 182:9, 12,22 195:20 251:9

**identifies** 179:20

**identify** 24:16 26:6 27:9 65:4,8 87:3,18 88:24 101:20,23 102:4,10,14 175:4 182:19 194:20 195:15 222:25 247:20 250:23

**identity** 89:4 242:14

**II** 148:13

**III** 148:13

**imagine** 40:12,16 62:12 64:19,21

**Immediately** 36:13

**impair** 11:9

**implications** 30:21

**implied** 18:5

**import** 200:17

**important** 12:5,10 14:14 217:19,23,25

218:13

**inaccurate** 245:10 253:24

**incentive** 218:3

**include** 62:7,10 178:18 198:25

**included** 241:19

**including** 109:22 186:17 213:25 214:2, 3 230:15 250:8

**inclusion** 183:23

**incorporates** 62:14 198:14

**incorrect** 26:12,24

**increase** 195:2 206:25

**increased** 60:13 221:18,24

**incur** 31:10,23

**indemnification** 29:3

**indemnified** 31:2

**indemnifies** 30:12

**indemnity** 29:3,9

**independent** 38:23 106:16 169:6 173:11

**indifferent** 224:3

**indirect** 33:3 41:14 47:7,13 65:22

**indirectly** 40:19,23 41:5 42:6,10,13 65:14

**individual** 16:20 25:11,13,16,22 26:17 30:3,13 31:14,24 32:4,17 239:7,24 256:6,18

**individualized** 47:24

**individually** 66:23 165:2

**industry** 44:18,22,25 48:9 50:5,13 162:2,4 211:15,22 212:3,9,17

213:9 215:9,13,23 216:5,13

**Info-back** 36:18

**information** 51:11 61:24 66:3,12,18 69:11,13,18 70:15 72:16 76:25 86:4,14, 17,22 88:19 89:21 98:19,24 101:19 105:15 106:8,12 112:11,21 114:4 116:19 120:8 124:25 125:8,23 126:6 128:25 168:15,18 209:15,25 216:17,19 238:14 246:6,17

**initiated** 139:9

**injury** 11:18

**inquiries** 85:17

**inquiry** 71:12

**instance** 81:22 256:2

**intend** 125:18 138:4 139:3 218:8

**intended** 12:22 112:11,22 113:4,11 125:2,8

**intending** 138:9

**intent** 113:15

**interest** 33:7 40:19 41:9,10,14,15,17 42:4,10 47:8,13 58:12,14 65:23 66:7, 13 67:8,14 68:4,14, 15,18,24 69:3,8,14, 19,22 70:7,11,16,22 71:4,6,10 72:22 73:2, 7,12,16,22 74:14,19, 25 77:7,12,16,21 78:2,6,12,15,20 79:2, 6,13,19 80:8,13,20 93:22 94:9,14,23 138:5,15 139:4 149:21 150:6,7,18,23 151:7,9,11 152:8 169:11,17 170:14,19 171:2 189:17,25 200:4 207:2 209:3,9, 16 210:2,10 222:22, 23 226:14 228:17

**interests** 42:7

**interpret** 255:15

**Interrogatories** 252:20

**Interrogatory** 247:4, 19 250:3,19 255:22 256:4,12,17

**intervene** 229:17

**intervening** 226:11

**investigate** 38:19,22

**investigation** 39:5

**investigative** 33:13 36:15 37:24

**Investment** 15:23 164:14 167:9 172:22 252:18

**invoices** 32:9

**irrespective** 187:6 227:2

**issue** 50:23 51:4 57:21 133:16 186:16 250:8

**issued** 84:11 115:7, 13 116:2,7 118:8 127:20 128:7,14,22 133:13,22 134:2 135:5,13 140:20 141:9,16,21 142:2 158:24 162:18 230:2 235:22

**items** 62:15

**IV** 148:14

**J**

**James** 38:17 157:16 159:19 161:21,23 163:6 164:22 199:16 211:20

**January** 20:5 172:19,25 173:9,12, 19 184:11

**Jersey** 36:20

**Jim** 51:18 65:25 66:3 72:11 86:12 87:2,20 92:25 93:3,7,12

98:12,22 99:13 101:7 105:9,13,16 116:21 128:12,13 129:20,22 130:9 136:9,10 151:19 168:2,3 171:12 182:24 187:9, 12 188:20 194:2,23 195:23 198:22 199:4 201:11 202:13 203:19 205:11 211:13 218:2,3,6 228:3 231:16 241:18 252:8

**Jim's** 104:2,5,9 168:7,11 189:8 191:5 197:18 199:4 203:5 207:2 240:23

**job** 37:13

**John** 10:6 13:15,19 14:4 24:22 39:2 52:11 54:24 57:20 58:16 68:7,20 70:2, 24 81:18 82:24 84:8, 22 89:8,19 91:21 92:9,13 95:2 97:4 98:3,15 100:4,19 101:17 102:7 103:4 105:17 108:2 109:3 111:8,20 112:17 113:7,19 114:20 116:12 122:13 123:25 125:7 130:7 132:17 134:4 142:4 142:21 147:8 158:13 159:2 163:17,24 166:10 169:15,22 171:7 175:8,24 178:20 182:6 184:25 186:4 188:7,13 192:24 193:14 197:10 200:15 201:22 203:11 204:23 206:23 207:17 208:8 209:21 210:6,16 212:24 215:14 216:6 220:11 221:16 222:6,16 224:11 227:24 228:9, 24 231:22 233:13 236:8,25 237:18 238:12 242:4 243:10 245:12 248:15 249:2, 19 254:10 255:13 256:7 257:14

**Jones** 10:7

**Jr** 38:17

**judgment** 29:16

**July** 24:10

**June** 28:5

### K

**kids** 191:5

**kind** 28:17 29:21 35:2 36:6 42:10 49:9,13 254:11

**knew** 68:15 80:10 118:6 182:7 210:9 212:21 213:13 214:14 218:20 219:4 220:20 224:18,25 241:22 242:7,12

**knowing** 183:12,14 229:23

**knowledge** 50:3 55:25 56:5,18 67:7 84:24 110:22 113:24 119:24 162:8 167:5 172:17 176:24 177:20 185:10 246:5

### L

**La** 148:3 160:21

**lack** 246:17

**late** 27:8 28:10 172:15 173:14

**law** 9:7 10:18 26:14, 15,16

**lawsuit** 27:14 31:11 111:2,7 123:18 134:3 135:15 137:6 185:16 187:7 225:17

**lawsuits** 20:23 21:2, 5,10,15,19 28:18,23 29:23 31:15,19,25 32:17 111:14 123:13 129:25 130:10 162:20 176:12,18 177:4,25 178:14 180:10 181:10,19 183:23

**lawyer** 13:6 14:25 15:10 38:8 46:16 151:25

**lawyers** 15:9 150:12

**learn** 60:12,20 61:9, 12 65:21 68:22 72:11 98:9,18,20 99:9 104:4,12 105:9 107:9,23 128:10 130:25 136:8,19

**learned** 44:13 45:17, 20 46:3 59:20,24 60:3,18 88:20 104:6 136:23

**learning** 40:10

**led** 183:18 193:20

**left** 156:7 256:25

**legal** 7:4 30:18,21 32:15 249:10

**lender** 189:18 190:2

**letting** 54:12

**levels** 161:25 211:15, 21 212:2,9,16 213:8 215:9,13,22 216:5,12

**library** 71:16

**license** 35:2,5,6,13, 20

**licensed** 35:14

**licenses** 34:25 35:9 36:5

**lifestyle** 168:23 237:5

**lifetime** 169:4

**limited** 16:11 42:6 144:10 149:25 150:5 169:22 207:11

**list** 175:9,14,25 178:22 179:2

**listened** 219:13

**litigation** 8:10 20:8, 13,19 25:17 26:10 27:17 58:5,12,14 157:5 238:20,25

**litigations** 24:19 29:18 123:8 134:25

140:22

**lives** 168:24

**living** 166:20

**LLC** 119:6

**loan** 81:12,23 84:17, 25 85:8,14 86:4 88:25 89:5 90:18,25 91:5,9,14,18,25 93:22 94:7,13,24 98:6 100:18,25 101:23 102:4,10,15 116:12 135:19 137:13,20,25 138:7, 15,16 139:5,12,16,21 140:2,6,9,16 207:7 220:18 236:2,3,5,11 237:16,25 241:10 242:8 250:16

**loaned** 92:4 109:10 110:11 122:25

**loans** 80:24 81:3,8 87:6 88:14 89:22,25 90:9,14 92:7,23 93:7, 12,17 97:24 98:2,8, 10,12,21,25 99:5,18 101:15,21 102:20 103:3 110:5,17,20,24 111:5,12,17,23 112:8,12,14,22 113:5,12,24 114:8, 14,18,24 115:4,9 116:15,20,23 123:3, 10,16,22 124:6,12,20 125:2,4,9,11,13,19, 24 126:7,13,17,23 127:5 133:7 140:10 162:3 194:3,8 207:3, 5 208:2,5 235:24 236:3,17

**located** 9:5

**long** 17:15 18:20 33:22 118:14 168:24

**longer** 199:23 239:9

**looked** 156:8 206:22

**loss** 62:7 229:12

**lot** 37:2 242:22

**LP** 10:9 16:4,8,13,16 38:13 42:3 129:6 144:10 146:9,19,23

147:5 149:2 156:8, 11,15 172:24 243:6, 17 248:3,8

**lunch** 144:8 153:20

### M

**made** 60:21 61:13 71:12 74:23 78:24 80:17 84:17 85:9,15 86:5 90:2 91:5,10,13, 18,25 92:8,24 93:7, 12,17 98:6,8,10,13, 21,25 99:5 100:25 101:15,24 102:5,10 107:22 110:5,17 111:6,11 113:24 114:8,14 115:24 123:11,16 125:4,15 126:7,13 133:6 135:18 138:16 139:5 140:11 146:16 161:14 162:25 164:17 194:18 197:22 198:15 207:12 208:5 213:6 215:2 219:13,14 223:18 226:10 236:2

**magnanimous** 218:5

**main** 219:10

**maintenance** 166:21 168:22 237:7

**major** 169:21

**majority** 149:20 150:6,7,18,23 151:7, 9,11 152:8 161:16 165:14 250:25 251:7

**make** 13:20 68:21 69:6 70:20 73:6,20 74:7,9 75:12,17 76:6, 10,16 77:20 78:10 79:16 85:11,17,19 91:16,23 93:15 94:16,20 95:13 100:6 105:25 106:15 107:8 109:4 110:21 111:17, 23 112:8 114:12 115:2 120:15 121:13 122:7,15 123:22 124:6,12,18,20 126:11 127:2,24

130:24 131:10,23 132:25 137:13,19,22, 25 139:18 141:18 142:22 153:8 155:22 162:13 169:6 178:22 179:2 189:10 197:5, 13 199:12 208:15 212:14 214:11 215:17,19 218:3 228:11 245:16 254:7

**making** 48:13 207:9

**management** 10:9 16:4,12 34:19 38:12 42:3 103:11

**Manuel** 7:3

**mark** 39:11 90:20 148:6,9

**marked** 147:10 148:15 157:17 160:15 184:4,7 252:21

**marking** 157:13

**matter** 11:15,20 24:16 27:23 30:23 43:22 223:4 233:2

**matters** 27:24

**maximize** 196:20 197:2

**meaning** 251:21

**means** 29:6 117:25 149:24 250:15

**meant** 174:15

**medications** 11:9

**meet** 17:8,15,19

**meeting** 17:25 18:12 21:24 191:21

**meetings** 18:13,18, 21,22 19:2 20:2

**Melissa** 151:12,16, 18 218:20,23,25

**memorialize** 246:12 255:4

**memory** 11:6 25:4 43:23 149:9 176:3 181:10,22 219:5,8 236:6,8 238:23

242:17

**mental** 219:14

**mention** 195:4

**mentioned** 18:4 37:4 86:18 128:16 190:17 236:19 240:15 243:7

**met** 17:6 90:22 221:19

**MGM** 65:10 66:24 67:4,8,11,14 68:4,14, 16,24 69:4,8,15,19, 22 70:7,11,16,22 71:4,11,14,24 75:19, 20,22 174:8

**MGM's** 71:18 76:8

**Mid** 27:8

**middle** 146:2 211:8

**million** 51:21 59:21 60:7,9,14,22 61:4 136:12,17 137:4,19, 25 139:12,16,21 140:9,16 141:11,15, 20 143:12,20 175:21 204:19 205:20 206:13,14,18,20 207:6 222:14 224:19 225:18 226:4 236:7, 21 237:9,24 240:11 241:8 242:8

**mind** 88:12 218:14 232:12,24

**minute** 145:8 160:2

**misspoke** 177:10 230:20

**misstate** 104:22

**mistake** 159:13

**mistaken** 90:7 180:16

**moment** 51:14 98:17 170:15 200:11,23 224:14 227:3

**Monday** 258:5

**monetization** 235:12

**monetize** 174:8

**monetized** 194:10 201:16 205:16 222:20

**money** 43:15 92:5 109:10 110:13 122:25 206:20,24 207:13 208:3,7 215:16 221:25 231:19,25 234:24 240:16

**Montgomery** 58:4

**months** 24:8

**morning** 7:2 40:3

**Morris** 7:22 8:4,25 10:6 14:5,8,10 19:12, 15,17 25:6,20,25 30:9 35:17 42:19 46:14,23 52:12 57:16,23 58:8,17,24 67:16,22 80:3 82:4, 14,15,22 96:16,17 97:8 104:17,19,23 105:6 108:12,22 109:13,20 113:20,22 118:12,24 120:24,25 130:5 131:9,11 133:18 138:22,25 144:16,18,21 145:3, 5,10 147:16,18,21 148:3,19,21 150:13, 16 153:18 154:2,6 155:10,14,16,17 156:18 157:12,19,23 158:19,20 159:5,13, 17 160:14,21 163:20 164:8,12 166:7,12 176:4,7 177:13 178:3,7 181:14,15 184:2,9,13,16,22 185:14 186:18,21,24 187:21 188:14 192:19 195:11,13 204:5,6 207:23,24 209:20 210:14,25 211:5 213:18 216:23, 25 226:20 230:9,10, 16,22,25 231:8 233:11,22,23 234:5 235:4 238:11,17 239:2 240:3,7,8 243:11,13 244:6 247:18 252:2,4,13,23 256:21 257:14,21,25

**motivate** 218:2 222:2,8

**motivated** 221:3,20 222:11 223:2

**motivation** 221:22, 24 223:25

**motivator** 220:25 221:18

**move** 195:12

**moved** 36:21

**movie** 71:15

**moving** 55:8 255:7

**murder** 38:5

**mute** 97:7

**muted** 164:2

**N**

**N** 148:11 157:15 184:5 252:17

**nail** 52:20

**named** 38:17

**names** 15:19 215:18

**Nancy** 9:4 41:11 42:17 161:15 164:4 258:9

**nature** 33:6,11 42:23 43:3 44:5,14 67:8 68:3,13,18,23 71:13, 18 72:21 73:2,7,25 74:5,10 75:6,10,14 77:6,11,15,21 105:18,22 120:4,8, 12,16 130:14,17,21 131:2 209:2

**NAV** 152:19,25 153:5,10,15

**needed** 208:3,7 221:22 237:8

**negative** 7:25 138:20

**negotiate** 194:23

**negotiated** 194:21

**negotiation** 143:13, 21,22,23 193:16

195:10,17,19

**neighborhood** 136:13

**Nelms** 39:2

**Newman** 58:4

**News** 40:4

**Nexpoint** 14:2 129:4, 6,9,12,18 131:5,13, 20 132:2,6,13,22 133:3,7,13,22 134:2, 14,24 135:5,12,19 136:20,24 137:4,13, 20,25 138:4 139:5,25 140:6,11,20 141:9, 16,21,25 142:18 143:14 162:13,19 175:18 186:11 187:5, 12 188:20 230:3,13 231:3,18,24

**Nexpoint's** 130:15, 18,22 131:2 136:5

**nice** 153:19

**Nodding** 155:15

**noise** 97:6

**normal** 12:2

**north** 225:18

**notary** 8:21 35:8

**note** 65:20 81:15,25 82:8,17 83:2,9,15,22 84:4,11 91:2,6 95:4, 9,14 99:21 100:2,7, 13 115:12 127:14,20, 25 129:24 134:14 135:3,20 136:6 137:5 138:6 139:5 140:20 141:5,8,15,20,25 142:4,7,13,17 143:13,20 144:2 161:14 162:25 164:17 177:3,24 184:6,11,21 185:2,9, 18 187:4 219:13,14 224:7 241:19,22 242:14

**notebook** 243:24

**noted** 25:23 155:3 258:6

**notes** 8:10 20:7,12 24:19 25:17 53:11 81:10 95:18 99:7,18 106:21 107:2,11 109:18,22,25 110:25 111:13,24 112:13,24 114:10 115:8,19 116:2,7,16 117:5,9, 19 118:7,9 121:5,6, 11,17 123:4,7,12,18 124:14,21 125:3 126:2,9,19,24 127:6 128:7,11,14,21,25 131:15,21 132:3 133:13,22 134:2,7,9, 24 135:4,13 139:8 140:17,22 158:24 161:11,18 162:18 163:4,11 164:20 170:7,9 174:4,5,9,24 175:5,10,15,17 176:12,17 178:13,18, 22 179:3,10,25 180:9,14,17,19 181:3,9,18,24 182:2, 9,19 183:3,9,15,22 185:23 186:10,14 187:10,12,13 188:20, 21 196:14 197:7,15 198:20 200:9,21 201:4,17,20 202:5, 10,18,20 203:21 204:20 205:12,17 206:3,10,15 207:9 208:15 220:2 221:12 222:14 223:11 224:20 225:11,22 226:17 227:4 228:17, 21 229:3,14 230:2,5, 11,13 231:2,4,12,20 232:2,6,12,22 233:2, 5 234:13 235:10,15, 22 250:9 256:24

**notice** 7:25 19:10,13, 18 40:6 117:25

**noticed** 58:2

**number** 11:14 36:4, 19 45:19 47:20 64:18 67:15 89:25 90:11 93:4,16 144:18,19 145:14 160:6 213:17, 19,21 223:13 239:2, 4,10 247:13

**numbers** 54:4

---

**O**

**oath** 6:15 8:12

**object** 7:24 13:24 14:25 22:23 23:7 25:18 30:6,16 31:5 46:12,16 69:24 81:16 82:2,12,20 84:6,20 89:6 96:14 97:2 104:14,17,24 108:9 116:9 118:3 120:22 121:23 122:11,19 123:23 124:7,15 125:5 130:2 131:7 132:8,15 135:7,21 137:7,14 138:17 140:12 142:19 143:2, 8,15 156:16,24 163:18 166:5,16 176:20 179:5,16 180:21 181:12 185:11 186:2,19 187:17 189:20 190:4 192:17 198:16 199:19 204:3,21 209:18 210:4 221:7, 14 226:18 227:22 232:15 233:8,20 234:3 235:2,18 238:4 239:9 240:19 241:25

**objecting** 13:22,23

**objection** 8:11 13:25 15:8 25:22 70:5 84:13 112:15 120:2 164:4,6

**objections** 6:8 245:9,15 252:19 253:23 254:6

**objects** 7:23 8:14 13:25

**obligations** 84:10 100:12

**obligors** 231:14 233:4

**obtain** 34:9 69:17 95:14 100:7 115:25 126:5 127:25 141:19 168:15

**obtained** 93:23 94:7, 13,24 102:15 113:6, 12 114:18,24 115:4 116:20,23 125:10,19 126:17,23 127:5 138:7 147:5 236:18 237:17,25 241:11 242:7

**obtaining** 168:19

**occasion** 238:9

**occur** 189:23 190:10, 14 218:11 219:15

**occurred** 18:18 39:16 40:16 153:11, 15 173:15 192:22 193:7 221:21 224:18 235:11

**October** 39:6,17,19, 20 115:14 119:22 167:16 236:22 258:5

**offer** 29:15 31:9

**offered** 31:22

**offhand** 24:21 218:21

**office** 9:7 17:20 38:4

**officer** 6:14 45:5 47:3,11 81:13,14,23, 24 83:3,9,16,24 84:5, 12,18 85:9 88:24 89:4 90:18

**officers** 81:4,8 85:2, 15 86:6 87:7 88:14 90:2 101:15

**Okada** 39:11 90:20, 25 91:5,10,14,19 92:2

**opened** 36:17

**operated** 33:23,25 44:19

**operates** 44:19

**operating** 44:23

**operations** 33:15 62:11

**opinion** 205:4

**opportunity** 15:2 244:22 253:13

**opposed** 30:4 36:5

**oral** 157:4 162:23 163:9 164:15,25 173:22 174:2 176:8 179:11 180:11 192:8, 10 193:9,15 242:20

**order** 148:8 234:19

**organization** 35:15

**originally** 175:20,22

**outcome** 29:22

**outline** 256:23

**overheard** 87:10 101:7

**oversee** 33:14

**owed** 136:15 206:21 225:16

**owned** 33:23,25 42:6,10 60:24 64:2 65:14 169:11,16

**owner** 47:23 104:11, 13,16 105:10 129:21, 23 130:9

**ownership** 33:4 41:17 47:7,13

**owns** 67:10

---

**P**

**p.m.** 118:17 155:3 258:6

**package** 212:21

**paid** 50:10 51:18 66:6,13 71:5 73:11, 21 93:21 94:8,13,23 136:16,20,24 137:4 195:6 207:7 208:2 241:7

**paper** 147:24

**paragraph** 157:21 160:22,24 161:7 162:8,17 163:12 165:2,9,23 166:4,15 169:13 172:16 173:23 178:10 198:19 211:2,9

**Pardon** 218:24

**part** 85:4,14 86:7 91:20 100:25 102:6, 12 134:10 161:7,9 187:7 195:8,18 198:7,10 216:6,7

**participants** 58:3

**participate** 18:25 19:25

**participated** 87:19 191:14,17

**parties** 6:4 7:14 58:5 87:20

**partner** 45:16,18,21 46:4,8 169:22

**partners** 119:6 150:2,6

**partnership** 16:11 42:6 144:10

**party** 202:24 225:6 226:22,25 227:6,12

**past** 233:19 234:23 235:16

**Patchulski** 10:7

**patience** 107:5

**patrick** 118:20

**pay** 29:16 31:9,22 32:8,12,15 82:9,10, 17 112:12 125:8,13 138:4,9

**Payable** 118:5

**payment** 161:10 207:3

**payments** 207:9,12 208:5,15 226:10,13

**pending** 7:21

**Penn** 34:12,13 36:10

**people** 22:20 37:12, 18 58:11 87:2 215:15 219:10

**percent** 33:9 223:14 224:4,5

**Perfect** 160:9

**Pardon** 218:24

**period** 92:9 93:8,13, 18 152:20 153:2,5, 10,15 171:3 226:11

**permitted** 221:11

**person** 17:14,16 18:7 38:17 87:18 176:24 177:20 178:8 189:14 190:19,23 191:14 192:10 196:13

**person's** 29:11

**personal** 11:18 30:24 31:2,10 40:24 146:24

**personally** 26:10,21 52:2 166:2,13

**pertain** 238:6

**pertained** 171:12

**pertaining** 256:17

**pertains** 37:11

**petition** 39:21 42:24 43:4 44:4,7,8,15,20, 24 62:17,22 63:2,12 64:15 66:5,17,22 68:2,9,16,22 70:8,12, 17,19 71:2,9,21,25 72:13,19,24 73:5,10, 14,19 74:15,18,24 75:13,18 76:7,11,16 77:5,11,17,19,24 78:4,9,16,18,24 79:5, 12,17 80:7,12,18 82:25 83:10,14,23 84:2 85:7,12 87:24 92:19 93:9 94:17,21 95:3,7,12 98:4 99:20, 24 100:5,23 103:21, 25 107:14,18,23 108:6,18,24 109:5 110:4,14,18,21 111:22 112:7,21 113:3 114:17,22 115:11,19,25 116:5 117:10,14,20 118:7 119:17 120:21 121:4, 9,14,21 122:3,8,16, 24 123:21 124:5,11, 25 125:22 126:5,16 127:3,10,13,18,23 128:5 129:13,17 130:13 131:5,13,18,

---

24 132:6,12,21 133:2,11 135:12,18 136:6,15 137:12,18, 23 139:11,15,19,25 140:5,9 141:8,14,19, 24 142:23 143:6,12, 19 150:19 151:3,6,22 152:25 153:5,9,14 170:25 173:5 178:25 179:24 180:20 181:2 218:17 219:22

phone 18:11 40:15 87:17,19 155:21 191:13 192:11

phrase 16:8 40:23 41:4 165:9

pick 223:13

piece 37:16

pile 243:23

place 18:21,22 87:12, 15,24 192:15 193:23 207:20 219:19 248:20,22

plaintiff 11:20,21 161:10,17,18 163:2,3 164:18,19 165:9 205:10 251:2,8

Plaintiff's 161:8 252:19

play 51:23 52:2,8,15 207:5

played 52:23

point 58:10 82:18

pointing 163:22

portfolio 63:15,19,23 64:9,13,14 65:5,23 66:8,14,20 67:4 72:8, 12 76:21 161:19 163:4 164:20 174:6, 22 194:9 195:3,20 196:7,11,15 197:8,16 198:21 199:17,23 200:4,12,23 201:6, 14,25 202:8 203:8, 15,20,25 204:9,15 205:11,16,25 206:8 209:4,10,17 210:3,10 218:4 227:13 229:10 235:13

portion 13:2 94:2 161:3 162:8

position 215:16

positive 43:16 236:24

possession 146:24

possibility 229:21

postgraduate 34:23

practice 7:7 86:9,11, 14,17,23 87:4 88:13, 17,18,21 89:12,17,21 101:3,9,12,13,21 102:20,25 103:6 162:3

preceded 167:4,8

precise 245:17 254:8

predict 228:14,19

predominately 36:24

preemployment 36:24 37:5,10

prefer 153:21

premarked 148:8

prep 37:2,21,22,25

preparation 17:13 18:6,14 19:5,21 20:2 245:5

prepare 17:2,5 38:9 49:13,22 50:18,23

prepared 25:3,10 49:8,16 51:3 236:9

present 17:21 19:24 191:3

preserve 46:17

prevent 11:2 229:17

previously 140:10, 16

price 66:6,12 174:20 195:6 201:20,25 202:9 206:9 227:2 228:6

principal 93:21 94:23 135:25 136:5, 14,20,24 137:5

138:5,14 139:4 141:10 204:19 206:10 225:21 226:7, 9 228:16

prior 28:4 37:14 44:20,23 62:17,21,25 63:11 64:15 66:5,17, 22 67:25 68:9,16,22 70:8,12,17,19 71:2,9, 21,25 72:13,19,24 73:5,10,14,19 74:14, 18,23 75:13,18 76:7, 11,15 77:4,10,17,19, 24 78:4,9,15,18,24 79:4,12,17 80:6,12, 17 82:25 83:10,14,22 84:2 85:7,12 92:19 93:8 94:17,21 95:3,7, 12 98:4 99:20,24 100:5,23 103:21,25 107:13,18,23 108:5, 18,24 109:5 110:3, 13,17,21 111:21 112:6,21 113:3 114:16,22 115:11,14, 18,24 116:5 117:10, 13,14,20 118:6 119:16,22 120:20 121:3,9,14,20 122:3, 8,16,23 123:20 124:4,11,25 125:22 126:5,15 127:3,9,13, 18,23 128:5 129:13, 17 130:13 131:4,12, 18,24 132:5,12,21 133:2,11 135:12,17 136:6 137:12,17,23 139:11,15,19,24 140:5,8 141:5,7,14, 19,24 142:23 143:6, 11,19 149:18 150:19 151:2,6,21 152:25 153:4,9,14 161:9 167:11 168:7 170:25 173:19 178:25 179:23 180:19,25 192:22 193:8 196:24 212:12 215:20 216:2, 9 218:17 245:24 246:10,23 255:2,17

private 38:3

problems 11:5

procedure 171:13

Procedures 7:19

proceed 155:12

proceeding 134:10, 18 245:25 246:12,24 250:9 255:4,18

proceedings 238:7

proceeds 114:18,23 115:4 126:17,22 127:4 140:2,6

process 11:25

Production 252:21

professional 35:8

professionally 36:9

profit 62:7 214:2

promise 82:9,10,17

promissory 20:7,11 81:9,15,25 82:8,17 83:2,8,15,22 84:4,11 91:2,6 95:4,9,14,17 99:7,17,21 100:2,7, 13 106:21 107:2,11 109:18,24 110:25 111:13,24 112:13,23 114:9 115:8,12,19 116:2,7,16 117:4 121:5,6,11,17 123:4, 6,12,17 124:13,21 125:3 126:2,8,18,24 127:6,14,20,25 128:7 129:24 131:15,21 132:3 133:12,21 134:2,14 135:4,13, 20,25 136:5 138:6 140:19 141:5,8,15, 20,25 142:13 162:18 163:11 175:5,10,15 176:11,17 177:3,24 178:13,22 179:3,9,25 180:9 181:3,9,17,24 184:6,11,21 186:14 187:4 204:19 208:14 224:6 231:20 232:2 235:22 242:14

properties 37:19

Property 148:13

proposal 194:14,17 197:18,19,20 198:8, 11,14 199:5,7,10 223:18

propose 194:16

proposed 192:14 196:14

prospective 47:25

protects 30:3

provide 37:25 47:19 48:4 161:22 168:22 252:6

provided 19:6,20 47:16 81:3 97:24 107:15,19,24 119:25 122:18 216:20

provision 148:25 194:20 195:15 197:14,24 199:2 201:9,22 229:13

public 8:21 21:24 38:4

purchase 174:20

purpose 125:24 126:6,12 139:11,16, 20 161:22 168:16,21 211:9 238:24

purposes 157:13 233:6 237:6

purse 9:25

pursuant 32:14 163:2 164:18 172:24 235:8 243:5,16

push 199:9

put 12:21 13:2 119:13 144:12,21 157:6,19 184:2 194:25 210:25 217:5 229:8 238:22 243:21 252:2,13

puts 194:8

putting 201:12

Q

qualification 131:10

question 6:9 12:6,12 15:4,7,11,12 28:20, 25 30:9,18 43:13 46:17,18,19 49:20 54:14 70:2,5 75:24

76:4 81:19 83:13 94:5 97:12,15,17 98:25 100:20 104:18,24 105:8 108:13,15,17 109:24 110:7 111:20 112:18 122:14 124:2 132:18 134:5 138:23 141:2 150:14,15 158:7 164:10 166:10 167:22 169:24 175:12 177:17,19 178:4,5 180:17 183:7 186:5 187:23 188:8,15,17,19 190:8,10 197:11 203:2 209:22 212:24 214:10 216:7 222:7 230:20 231:23 235:5,6 242:25

**questioning** 236:10

**questions** 11:2,10 14:15,25 22:6 25:13 50:16 57:17 59:5,9,12 67:18,24 72:5 79:23,25 95:22 127:11 171:11 207:22 219:24 220:7 230:4 239:5,15,22,23 254:12 257:15,18

**quick** 160:2

**quickly** 208:23

**quote** 211:13

---

**R**

**raise** 57:21

**raises** 164:3

**ran** 36:19

**reach** 215:25 216:8,17

**reached** 190:18,19,23

**read** 45:23 97:12,15 105:5 108:13,15 138:19 149:4 161:3 162:5,9,17 177:8,11,15,17 188:15,17 230:7 254:20 255:9 256:7

**ready** 155:11

**real** 35:7 120:6,9 237:12 240:17

**reap** 222:9 223:7

**reask** 30:8

**reason** 105:14 125:12 130:8,11 138:3,8,10,12 139:2,6 152:9 178:11 191:7 193:5 228:21 229:2 245:15 254:6,9

**reasonable** 161:25 211:14,21 212:2,8,16 213:8 215:8,12,22 216:4,12

**reasons** 164:7

**recall** 11:15 20:9,10,15,16 24:4,6 36:7 43:17 45:17,20,23,25 46:2 53:21 56:22 61:11 63:6 64:7 66:2,4 68:25 69:20,21 70:6,9 73:4 74:12 76:9,14,19 77:9,14 78:8 80:15 85:24 87:4,11,14,21,23 88:11 89:19 90:15,19 93:19 95:2 99:19,23 100:4 102:2 103:4 105:24 106:4,18 112:5 115:16,17,23 120:18 121:18 123:19 124:23 127:17,22 128:23 131:3 136:11,23 137:21 138:2 141:12,13,22 142:6 143:10 146:14,18 147:4 149:4,11,15 150:21 151:13 152:17 167:14 168:18 170:11 171:18,24 173:8,13,25 179:7 180:6 182:11 183:25 189:5 191:13,19 193:21 195:16,18 198:19 215:10 217:13 219:15,18,21,25 220:8 237:14,18 240:10 242:6 248:11,15,16,21

**recap** 219:11

**receive** 204:17 224:19 226:16 228:15

**received** 51:9,13 55:10 59:20 60:7 76:25 206:2 207:2 212:22 213:14 227:19 236:3

**receiving** 61:4

**recess** 58:21 118:19 154:9 210:22 257:11

**recollection** 28:9 40:14 52:22 53:15 83:6,7,18 117:22 172:3,21 179:8 190:17 191:22 193:12 248:7,13 249:14

**record** 7:9 9:3 13:20 14:20 43:22 57:24 58:2,18,20,23 67:17 118:15,18,23 154:8 155:5 210:21,24 239:21 257:10,13,22

**recording** 7:15

**recover** 222:3

**recovered** 223:20

**recovery** 35:9,12,19 36:3 227:12

**reduced** 217:4

**refer** 13:13 16:15 39:20 45:11 103:14 129:8 163:9 164:24 230:3 250:13

**reference** 149:19 152:19

**referral** 27:20

**referred** 23:9,10,12,15 27:11,22 66:24 95:25 111:25 114:10 124:14,22 157:5 165:23 166:4,15 169:13 170:22 173:23

**referring** 15:22 16:2,17 19:13 41:21 101:13 178:19 214:5

218:25

**refers** 165:10

**reflected** 103:6 110:25 111:12 116:15 123:4,17 124:13,21 125:3,25 126:8 127:6 135:20

**reflects** 246:2,12 255:4

**refresh** 238:9

**refreshed** 242:17

**regard** 125:24 222:14

**regular** 151:21

**reject** 199:6

**rejected** 198:8,11

**relate** 48:11

**related** 80:4 89:11,16 102:25 178:12

**relates** 63:19,24 64:10 96:5,8

**relation** 63:15

**relationship** 45:15 224:7

**relative** 226:17

**relied** 216:17

**relinquished** 173:10

**remember** 19:10 22:12 23:13 35:11,15 57:5 60:2,3 63:3 70:18 72:18 73:9,18 74:21,22 78:13 80:22 83:17 84:8 87:8 88:7 89:14 102:13 104:6 114:15 116:22 140:23 146:21 156:9 159:24 172:5 181:20,23,24 182:4,5,6 189:13 193:2 212:18 215:14,17 217:17 218:21 219:7 220:11,13,15,17,21,24 242:12,13

**remembered** 236:20

**remote** 7:16

**remotely** 7:10,13 12:4

**rendered** 32:9 48:25 108:7,19,25 109:6 121:22 122:4,9 132:7,13,22 133:4 234:2,23 235:16

**renting** 37:18

**reorganized** 10:8

**repaid** 138:14 139:3,8

**repay** 112:22 113:4,11 125:2,19

**repeat** 49:19 70:23 76:4 81:18 100:20 122:13 132:17 166:10 186:4 209:21 227:24 229:7

**rephrase** 53:2 138:23 150:13,14

**reporter** 7:11 8:7 14:16,20 97:14 105:5 108:14 177:8,11,16 188:16

**Reporting** 7:5

**represent** 10:8 21:18 22:11 23:5 26:7,16 27:17

**representation** 24:18

**representative** 16:23 161:16 165:13 250:24 251:7

**representing** 26:21 28:13

**represents** 22:16 26:9,20 32:4

**request** 58:6 168:11 245:21 246:6,18 252:20 254:15,18 255:7,9

**Requests** 252:21

**requiring** 198:2

**research** 33:2,12,15,18,23 34:2,7 36:12,23,25 41:2 43:11,19 47:15,18,23 48:3

**Reserve** 257:19

**reserved** 6:10

**respect** 72:5 101:15 169:7 197:23

**respective** 6:4

**responded** 246:16

**response** 8:3 168:10 220:8 250:6 254:19, 24 255:9,15 256:13

**responses** 14:15 243:22 245:9,16 252:16,19 253:23 254:7,13,15

**responsible** 29:22

**restate** 102:7 159:6 167:21 242:24

**restated** 16:11

**restaurant** 34:19

**resumed** 155:7

**retain** 23:16,18 27:7 28:8

**retained** 24:2 61:17, 20

**return** 81:15 99:7 206:2 231:20 232:2

**review** 19:4,20 62:16 145:21 147:15,20 158:11,15 184:24 211:4 244:5,13,19 245:11 247:17 248:19,21 253:10,25 256:9

**reviewed** 17:7 62:18, 21 149:16 245:4 247:21 248:2 249:18

**reviewing** 248:8,16 249:15

**revisit** 187:24

**rightfully** 194:24

**role** 51:23 52:3,8,15, 23

**roll** 140:16

**rollup** 140:10

**room** 7:9,12 9:11,14, 17

**roughly** 51:20

**Royal** 36:14

**Rukavina** 13:15,16 14:6

**Rule** 7:18

**rules** 7:19,20 11:23

**run** 47:23

**rush** 158:4

**Russell** 39:2

---

**S**

**salary** 51:20,24 52:4, 5,9,16,18,24 53:7,8, 12 54:5 55:2,8 59:21 60:7,13 61:10,14,15 207:2 213:22 214:6

**sale** 198:3 203:15 228:15

**satisfy** 29:16

**scenario** 205:18

**scheduled** 28:5

**Schroth** 151:12,13, 17,21,24 152:7,16 219:2 220:9

**Schutt** 36:14

**scope** 25:19,21 171:14 192:13

**screen** 12:21,25 144:13,22 147:19 157:6,20 160:25 184:3

**screening** 36:25 37:13,17

**scroll** 157:25 158:12 184:13

**sealing** 6:5

**search** 149:8

**section** 113:21 148:4,22 149:5,12, 17,20 150:24 152:19 156:8,14,21 243:5,16

**248:16**

**seek** 10:17 152:14 249:10

**seep** 160:24

**Seery** 38:17,20 199:17

**select** 23:4

**selected** 22:21 183:22 195:25 196:4

**sell** 200:3 201:15,24 202:17,19 203:25 204:8 221:3 227:7 228:6 229:11

**selling** 229:18

**sells** 200:12 202:24 222:10,15 226:25

**sense** 207:16

**series** 173:22

**serve** 22:22 45:5 168:19 239:25

**served** 47:2,10 157:10 158:23

**servers** 238:24

**serves** 236:6

**services** 33:2 36:18, 23 37:24 47:16,19 48:4,8,25 103:11 107:15,19,24 108:7, 19,25 109:7 121:22 122:4,10,18 132:7, 14,23 133:4 233:19, 25 234:23 235:16

**set** 61:13,15 175:22 230:4

**setting** 51:24 52:3,9, 11,13

**settled** 43:16

**severity** 7:6

**share** 51:12,16 88:20

**shareholder** 169:22

**shareholders** 149:25 161:17 165:14 250:25 251:8

**sharing** 214:2

**sheet** 62:21

**sheets** 62:6 206:25

**shift** 80:23

**Shortly** 146:16 151:15

**sides** 229:24

**signature** 147:17,22 184:15 244:17 253:8

**signed** 6:13,16 83:3, 9,15,23 95:5,10,15, 18 99:22 100:2,13 149:6 184:18 244:20, 23 253:11,14,18

**signing** 149:18 245:2

**silent** 10:4

**similar** 72:5 95:21

**simply** 158:7 229:4

**single** 88:24

**sir** 22:8,19 32:19 42:21 45:13 46:5 47:4,9,14 48:10 49:7, 11,19 50:14,21 67:2 75:11 92:3 119:4,7, 18 123:9 146:10 149:22 152:13 155:19 156:2,6 161:2 168:12 172:11 226:14

**sit** 69:22 83:7 193:6 207:6 242:11 245:8, 14 246:9,21 253:20 254:4

**situation** 228:3 229:25

**situations** 46:16

**slow** 76:2

**social** 7:7

**sold** 161:19 163:5 164:21 174:23 195:5 196:16 197:9,17 198:22 200:24 201:6, 21 202:9,11 203:3,9, 19 204:14 205:11,24 206:9,12,18 221:12 222:5 223:7,12 224:4

**225:3 226:15 227:3, 12 228:22 229:4**

**sole** 169:2

**solely** 76:25

**sort** 238:15

**source** 66:2 72:15 86:13,16,20,21 98:23 101:18 105:15 128:24

**speak** 7:24 8:15 14:7 18:10 40:9 155:23 156:3 217:6 223:24

**speakerphone** 17:24

**speaking** 20:10 87:4 94:3 110:8 189:4

**specialist** 35:9,13

**specific** 20:21 90:11 92:15 93:4 116:11 242:13

**specifically** 68:20 91:3 147:8 161:12 250:20

**specifics** 175:19 182:5 220:12 238:15

**speculate** 149:8

**speculating** 237:11

**spend** 26:5

**spoke** 24:5 86:25 213:20

**spoken** 61:20 87:9

**standard** 162:3

**Stang** 10:7

**start** 55:14 94:4 145:3 159:16 225:15

**started** 189:13 193:25

**starting** 133:18 134:11

**state** 8:8,13 9:2 34:12,14 36:10

**State's** 7:20

**stated** 194:5 199:3

201:10

**statement** 162:17

**statements** 38:7,8
62:2,5,6,8,10,14,17,
25 63:5,8

**step** 236:13

**steps** 102:19,21
128:19

**Stinson** 26:9,15,23

**stipulate** 7:14 25:12

**STIPULATED** 6:2,7,
11

**stock** 41:25

**stop** 157:22

**Strand** 38:24 45:9,
12,14,18,21 46:3,7,
11 47:3 251:16

**strike** 195:12

**subject** 11:15 20:8,
12 25:17 91:2 111:2,
7,13,24 112:13,23
114:9 123:7,12,18
134:3,25 135:15
137:6 140:21 143:13,
20,22 162:20 164:25
174:25 175:5,15
176:12,18 177:4,25
178:13,23 179:3,10,
25 180:9,10 181:3,9,
18,25 182:10,20
183:3,9,15,23 185:3
187:15 188:23
193:16 195:17,21
199:18,24 200:10,21
201:4,6 220:3
225:12,22 228:7
233:18,24 241:11
242:15

**Subscribed** 258:12

**subsequent** 161:12
168:25 198:5 224:17
228:8 232:9 234:15

**substance** 10:22
88:7 155:25 156:4
191:8

**substantial** 201:25

**substantially** 202:9

**sued** 185:8

**sufficient** 246:5,17

**suggest** 125:18
196:6

**suggesting** 143:25

**suggestion** 189:8,
10

**sum** 82:11

**summarize** 245:23

**summer** 27:8

**surprise** 220:22

**surrendered**
173:16,20

**sustained** 15:8

**swear** 7:13 8:17

**swearing** 7:16

**switch** 76:2 144:6
157:3

**switched** 155:20

**sworn** 6:13,16 8:20
258:12

———

**T**

**Tab** 244:3,4 247:8,9

**tail** 172:8,10,13

**talk** 54:3 61:23 66:23
80:24 157:4

**talked** 54:5 194:10

**talking** 42:2,17 52:5
53:10,11 54:2,23
75:21 97:6 98:14,16
134:7,9,15 163:19,20
178:20 239:12

**talks** 211:9

**technically** 46:21

**telephone** 9:21
21:25 190:19 219:16

**ten** 92:18

**ten-year** 93:8

**tenant** 36:25 37:17

**term** 29:9 62:2,5,13
63:14,19,23 64:9,13
96:4,8 97:22 116:25
129:14 142:14,24
143:7,25 144:4
149:24 150:23
192:13 197:6 205:23

**terms** 51:15,17
116:6,12,15,19,23
117:19 128:6,11,14,
21,25 141:25 174:2,5
192:14 217:3,7,11,15
218:12 222:24
223:25 246:13 255:5

**test** 12:23 25:4 43:23
238:23

**testified** 8:22 59:19
101:10 117:9 155:8
169:20 197:21 225:9

**testifying** 187:20

**testimony** 10:22
11:16 23:14 119:3
155:25 162:16,22
164:13 208:4

**Texas** 8:8

**text** 21:25

**theater** 71:15

**thereabouts** 136:12

**thing** 15:9 160:13
164:7 232:13 255:8

**things** 15:19 25:5
37:5 238:8

**thinks** 156:22

**thought** 75:20
109:17 186:21 190:6
194:6,14 199:3
205:18,19 206:23
215:12 217:24
227:24 228:21
230:18 240:3

**threshold** 198:3

**throwing** 215:15

**Thursday** 18:19

**tick** 75:24

**tie** 223:19

**time** 6:10 12:20

14:11,24 17:11 20:6,
17 21:13,18 22:10
26:5 28:6,14 36:9,11
45:3,6 51:9,14 52:19
58:19,22 61:3,9,12
67:25 68:9 70:7,12,
16 71:2,21 72:19,24
75:13 77:4 81:3
85:12 88:23 92:9,10,
16 93:13,18 97:23,24
101:22 110:9 111:11
112:6,13 113:5,12
114:22 115:18,24
118:16,21,22 119:14
121:9 125:4,10,15,19
130:21,25 131:18
132:12,21 133:7
138:6,15 139:5,8
141:24 142:23 143:6,
19 146:15,20 147:6
149:12,13 150:9,19
153:19 154:7 155:3,4
158:5 160:4 163:18
165:22 166:25 168:4
169:11,17 170:20,25
171:3 173:9 174:13
180:7 186:7,22
193:3,14 194:7,25
196:20 201:12 204:2,
9 206:24 208:24
209:6,13,23 210:7,
20,23 211:17 212:19
213:3,11 214:12,18,
24 215:20 217:19
221:16 222:7 224:23
225:19 226:7 227:8,
18,25 229:9,21
230:24 231:23
236:17 237:23
239:15 240:11,14
241:5,23 242:3,5
244:11 245:18 246:3
248:25 249:19 254:9
256:8,21,23 257:4,7,
9,12,16 258:3,6

**times** 12:2 33:20
113:5 208:2

**today** 10:10 11:3,10
14:22 16:20 34:3
40:20 69:23 102:14
119:25 130:18
140:15 147:2 165:19
187:20 207:6 226:9
239:13 242:21 243:7,
18 246:22 251:18,24

252:10

**today's** 17:2,5,13
18:6,14 19:5,22
225:14,15 245:6
258:4

**told** 45:24 87:5
102:19 128:21 151:8,
10,14 152:7,16
183:17 211:23 212:3
216:15 220:23

**top** 35:10 65:3 89:2,8
145:25 159:15 160:5
161:4 184:23 247:15

**topic** 24:23 25:9
49:23,24 99:16 144:7
239:3

**topics** 144:6 238:5

**total** 53:17,18,23,24
54:8,16,20 65:8,16,
19 56:3,7,11,15,20,
24 57:3,7,11 180:14,
16 182:8 212:21
213:24 214:3 226:3

**totaled** 175:21

**Totally** 95:20

**touched** 229:6

**transaction** 238:16

**transactions** 189:19
190:3

**transcribe** 14:21

**Transfer** 148:14

**transferred** 36:22

**Traurig** 27:2 32:3,9

**Traurig's** 32:13

**trial** 6:10 37:2,21,22,
25 38:9 257:20

**trigger** 152:20 153:2,
5,10,15 207:4

**triggering** 198:4

**true** 162:9 234:25

**Trussway** 65:10
75:4,21 76:18,21
77:7,12,16,22 78:2,7,
12,15,21 79:2,6,14,
19 174:8

**Trussway's** 75:7,10, 15

**trust** 15:23 29:24 30:2,5,11,15 31:3,4 164:15 166:20,21,25 167:9,15,18,25 168:10,15,16,20,21 169:3,8,10 172:23 236:17 237:3,4 248:4 249:15,18 253:22 254:5 256:15

**Trust's** 252:18

**trusted** 27:19 228:11

**trustee** 16:21 22:13 30:5,14 50:17 51:3 146:17 151:15 164:5, 14 165:18,21 166:24 167:4,8,11,15,18,25 168:4,5,10,14,20 172:22 182:15 201:3 206:5 236:16,22 239:6 241:13 243:14 251:12,15 252:12 253:21 254:5 256:5, 15

**TSG** 7:5

**turn** 144:9 145:2,16 157:20 244:15 245:19 253:6 254:14

**turned** 10:2

**turning** 246:15

**Turnover** 148:13

**twin** 182:15

**two-and-a-half** 60:14,22

**type** 71:16

**typically** 35:24

**U**

**um-hmm** 10:3 55:6 117:15 129:15 142:5 162:6 165:5 172:14 173:12 188:4,5 211:11 226:23 234:17 235:14 253:2

**umbrella** 64:3 96:22 104:7 119:22 185:25

**underage** 191:5

**undercompensated** 194:6

**underpaid** 161:24 211:14,20,25 212:8, 15 213:7 216:4,11,18

**understand** 8:9 10:11,13,16,20 12:17 14:19 15:22 16:2,17, 19 22:2,5 28:24 29:14 31:12,16 37:24 40:22 41:4,12,18 43:2 44:22 53:3 54:9, 13,25 55:6,7 63:25 75:14,19 76:12,17 82:16 95:24 103:19, 24 117:21 119:8 134:24 145:6 146:7 156:14 165:8,12 174:13 175:7 190:12 193:17 199:16 200:16 204:7 239:20

**understanding** 29:6,8,21 30:25 42:22 43:6,25 44:3,4, 18 50:11 54:24 55:13 61:25 62:4 63:18,23 64:5,8,12,18 65:13, 16,18,19 67:3 68:3, 13 72:21 76:20,24 77:6,10 82:8,24 96:4, 7,23 97:18,22 117:19,24 119:12,15, 20 129:11,17,22 149:23 150:4 152:22, 24 185:21 186:9,13, 25 187:8 204:13 207:11,15 209:2,8 226:25 227:5,11 232:3

**understandings** 28:22

**understood** 232:23 233:14

**undertaken** 39:4

**unfair** 238:22

**V**

**vague** 117:12 219:5, 8

**vaguely** 215:14

**validity** 7:15

**vehicle** 41:16

**verbal** 14:16 15:16 189:12

**verbally** 189:13

**verify** 46:7

**Vero** 191:2

**video** 7:15 71:15

**videotape** 10:17

**view** 221:23

**W**

**W-2** 46:22,24

**wait** 68:6 177:6

**waived** 6:6 8:11

**wanted** 155:22 194:8 223:19

**Wednesday** 18:19

**week** 13:7

**whatsoever** 238:24

**win-win** 194:15 228:3

**withdraw** 183:6 246:3

**withdrawn** 16:9 20:24 24:5 28:19 65:12 69:11 74:8 79:10 82:14 83:12 86:2,15 94:19 96:16 101:11 103:18 106:6 108:3,4 111:9 117:17 119:13 120:24 121:19 122:22 127:8, 10,12 128:18 133:10 135:10 136:2,3 138:11 139:23 152:23 156:12 168:8 178:24 179:21 181:14 183:13 185:15 192:2 204:5 208:3 222:10 223:3 227:7,16 233:22 237:21 249:4 251:13 252:3,6

**witnesses** 38:7

**word** 14:21 15:21,25 21:22 29:2 55:11

**words** 13:24 236:13

**work** 34:6 38:3 194:2,7,25 201:12 229:13

**worked** 27:21 36:14 38:4,5 46:21 155:21

**working** 22:20 36:11

**workload** 33:20

**works** 208:12

**world** 218:17

**worry** 148:7

**wound** 187:6

**write** 218:12

**writing** 89:11 179:9, 20 180:25 217:4,5,8

**written** 29:24 50:19 179:23 180:4 217:11, 16

**wrong** 30:25 109:19 177:10 245:10 253:23

**Y**

**year** 20:4 28:11 53:5, 17,20 90:17 161:13, 15 162:24 163:2 164:16,18 170:8 172:5,16,18 182:7 194:4 212:23 213:15 214:16,22 215:5

**years** 11:14 36:4,19 45:19 47:20 51:19 67:15 92:18 144:3 170:9 181:23 182:6 193:24

**yesterday** 17:10,16

**Z**

**Ziehl** 10:7

**Zoom** 18:12,13,18,22 19:2

# EXHIBIT 101

Page 1

1

2        IN THE UNITED STATES BANKRUPTCY COURT

3          FOR THE NORTHERN DISTRICT OF TEXAS

4                DALLAS DIVISION

5                Case No. 2021-1193

6    ---------------------------------x

7    In Re:                    Chapter 11

8    HIGHLAND CAPITAL MANAGEMENT, L.P.  Case No.

9              Debtor,        19-34054-sqj11

10   ---------------------------------x

11   HIGHLAND CAPITAL MANAGEMENT, L.P.,

12              Plaintiff,      Adversary

13      -vs-                    Proceeding No.

14   NEXPOINT ADVISORS, L.P., JAMES      21-03005-sgj11

15   DONDERO, NANCY DONDERO, and the

16   DUGABOY INVESTMENT TRUST,

17              Defendants.

18   ---------------------------------x

19    REMOTE VIDEOTAPED DEPOSITION OF ALAN JOHNSON

20        Tuesday, November 2, 2021

21

22   Reported by:

23   Amy A. Rivera, CSR, RPR, CLR

24   JOB NO. 202068

25

Appx. 01958

Page 2

1
2          November 2, 2021
3              9:02 a.m.
4
5          REMOTE videotaped deposition of ALAN
6   JOHNSON held pursuant to Notice, before Amy A.
7   Rivera, Certified Shorthand Reporter, Registered
8   Professional Reporter, Certified LiveNote Reporter,
9   and a Notary Public of the States of New York, New
10  Jersey and Delaware.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2   R E M O T E   A P P E A R A N C E S:
3   PACHULSKI STANG ZIEHL & JONES
4   Attorneys for Highland Capital Management, L.P.
5      780 Third Avenue
6      New York, NY 10017
7   BY:  JOHN MORRIS, ESQ.
8        HAYLEY WINOGRAD, ESQ.
9
10  STINSON
11  Attorneys for James Dondero, HCRE, HCMS
12      3102 Oak Lawn Avenue
13      Dallas, TX 75219
14  BY:  MICHAEL AIGEN, ESQ.
15       DEBORAH DEITSCH-PEREZ, ESQ.
16
17  GREENBERG TRAURIG
18  Attorneys for Nancy Dondero
19      2200 Ross Avenue
20      Dallas, TX 75201
21  BY:  DANIEL ELMS, ESQ.
22
23
24
25

Page 4

1
2   ALSO PRESENT:
3      Michael Landis
4      Deborah Newman
5      Michael Perniciaro
6      La Asia Canty
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          ALAN JOHNSON
2          COURT REPORTER:  Good morning,
3   Counsel.
4          My name is Amy Rivera.  I am a
5   certified court reporter in association with
6   TSG Reporting, Inc.
7          Due to the severity of the COVID-19
8   and following the practice of social
9   distancing, I will not be in the same room
10  with the witness but will record this
11  deposition remotely and will swear the
12  witness remotely.
13          Do all parties stipulate to the
14  validity of the remote recording and remote
15  swearing and that it will be admissible in
16  the courtroom as if it had been taken
17  following Rule 30 and other rules of the
18  Federal Rules of Civil Procedures and the
19  state's rules where this case is pending?
20          MR. MORRIS:  John Morris, Pachulski
21  Stang Ziehl & Jones, for Highland Capital
22  Management, L.P.
23          We stipulate.
24          MR. AIGEN:  Michael Aigen from
25  Stinson.

Appx. 01959

Page 6

ALAN JOHNSON

1
2      And I'm here with Deborah
3  Deitsch-Perez.
4      And we also stipulate.
5      MR. ELMS:  Daniel Elms, Greenberg
6  Traurig, on behalf of Nancy Dondero.
7      We stipulate.
8  A L A N   J O H N S O N, having been duly sworn
9  by the Notary Public, testified as follows:
10      MR. MORRIS:  Thank you.
11  EXAMINATION
12      Q.   Good morning, Mr. Johnson.
13      Can you hear me?
14      A.   Yes, you're very clear.
15      Q.   Okay.
16      My name is John Morris.  I'm an
17  attorney at Pachulski Stang Ziehl & Jones, and we
18  represent Highland Capital Management.
19      We're here today for your deposition.
20      Do you understand that?
21      A.   Yes.
22      Q.   And do I understand correctly that
23  you've been engaged to provide expert testimony in
24  this matter?
25      A.   Yes.

Page 7

ALAN JOHNSON

1
2      Q.   Do you have a general understanding of
3  the nature of the litigation in which your expert
4  testimony is being offered?
5      A.   At a high level, I do, yes.
6      Q.   Can you tell me what your general
7  understanding at a high level is in the pending
8  litigation?
9      A.   The litigation involves loans for
10  Mr. Dondero that were taken out during -- over a
11  period of years.
12      Late in 2018 and '19, the loans were
13  consolidated and modified to put in place
14  acceleration features, if -- if the specific
15  transactions occurred, so that at least -- there's
16  a lot of litigation, but as I understand what I'm
17  involved is these loans that accumulated over a
18  period of years, the practices of loans, and I'm
19  also opining on his market compensation over the
20  period 2013 through 2019.
21      Q.   Do you know who the obligors are under
22  the loans you just mentioned?
23      A.   Obligors?  Could you explain -- give
24  me more detail what you're looking for?
25      Q.   Sure.

Page 8

ALAN JOHNSON

1
2      Do you know who own -- who the loan
3  was made to -- withdrawn.
4      Do you know who the loan -- I think
5  you used the word, plural, "loans," so let me ask,
6  using your word, if I have that correctly, do you
7  know who Highland made the loans to that are the
8  subject of the litigation.
9      A.   I'm not clear, no.
10      Q.   Okay.
11      You don't have an understanding as you
12  sit here today as to who the loans Highland made
13  to that are the subject of the litigation.
14      Do I have that right?
15      A.   If I understand it, the loans
16  criss-crossed differently to different entities,
17  so I'm not exactly sure how all that was
18  structured.
19      Q.   Okay.
20      You've been deposed before, right?
21      A.   Yes.
22      Q.   Okay.
23      And you've served as an expert before,
24  right?
25      A.   Yes.

Page 9

ALAN JOHNSON

1
2      Q.   In fact, you've been retained by my
3  firm to provide expert services in the area of
4  executive compensation.  Is that right?
5      A.   Yes.  Yes, I have.
6      MR. MORRIS:  Mr. Kornfeld sends his
7  best regards.
8      THE WITNESS:  Thank you.
9      MR. MORRIS:  You bet.
10      Q.   So I don't know if you've given remote
11  depositions before, but just very, very
12  preliminarily, since you are an experienced
13  witness, we'll be looking at a number of documents
14  today, and if I put something up on the screen and
15  you believe that you need to see more of the
16  document, will you let me know that?
17      A.   Sure.
18      Q.   Where are you sitting right now?
19      A.   My home in New Jersey.
20      Q.   Okay.
21      Do you have any documents in front of
22  you right now?
23      A.   No.
24      Q.   Do you have a telephone?
25      A.   Yes, I do.

Page 10

1          ALAN JOHNSON
2     Q.   Is it on right now?
3     A.   Yes. It is my cell phone.
4     Q.   Could I trouble you to just turn it
5  off?
6          You know what, if you're not
7  comfortable for personal reasons, could I ask you
8  not to look at your phone unless it rings and it's
9  your child or spouse?
10     A.   Let me put it out of arm's reach and
11  put it upside down, how's that?
12     Q.   That's fair. That's fair.
13          I've taken a look at your report that
14  you prepared back in May. Based on that report,
15  do I have it correct that you've spent your entire
16  career as an executive compensation consultant?
17     A.   Yes, that is correct.
18     Q.   And you've had your own executive
19  compensation consulting firm since the early '90s.
20  Is that right?
21     A.   Yes.
22     Q.   And your firm specializes in
23  compensation consulting for the financial services
24  industry, correct?
25     A.   Yes.

Page 11

1          ALAN JOHNSON
2     Q.   You've advised major asset management
3  and investment firms on issues concerning
4  executive compensation. Is that right?
5     A.   Yes.
6     Q.   You've advised hedge funds and other
7  alternative firms on issues concerning executive
8  compensation, correct?
9     A.   Yes.
10     Q.   According to your report, did I read
11  this correctly that your firm's clients include
12  many of the world's most significant financial
13  institutions?
14     A.   Yes, they do -- it does.
15     Q.   Have you personally ever been retained
16  by a board of directors to provide advice
17  concerning executive compensation?
18     A.   Many times.
19     Q.   Can you give me a rough number? Is it
20  more than 20?
21     A.   Board of directors? More than 20.
22     Q.   More than 50?
23     A.   I don't know. It may -- it's a lot.
24     Q.   Is it fair to say it's somewhere
25  between 20 and 50 and it could even be more?

Page 12

1          ALAN JOHNSON
2     A.   Probably more than 50.
3     Q.   Have you ever been retained by a
4  compensation committee of a board of directors to
5  provide advice?
6     A.   Yes.
7     Q.   And if I separate that from boards of
8  directors generally, is that also a number that
9  measures in the dozens?
10     A.   At least.
11     Q.   Other than boards of directors and
12  compensation committees of boards of directors,
13  can you identify generally any other decision
14  makers that you've been retained by to give advice
15  on areas of executive compensation?
16     A.   We -- we get involved from time to
17  time with business owners. That might be a
18  private equity firm or hedge fund looking at their
19  portfolio companies.
20          We also do a lot of project work. So
21  that would involve working with senior leaders of
22  different financial services firms to look at
23  either their whole compensation program or the
24  programs for particular units.
25          We also from time to time get involved

Page 13

1          ALAN JOHNSON
2  with some of the major consulting firms where
3  they -- we provide advice to them as they work
4  with their clients on financial services
5  compensation.
6     Q.   Okay.
7          And what is it that you sell? Can you
8  describe for me, if you were giving a sales pitch,
9  why a board or a compensation committee should
10  hire you?
11     A.   Well, we have a lot of experience in
12  the space across financial services. So we have a
13  large home-field advantage of knowledge,
14  experiences. We know the nuances of what goes on
15  in the industry. That's part of the sales pitch.
16          We also are good consultants. We --
17  we listen. We are experts at looking at
18  information and data and all that.
19          And at the end of the sales pitch, I
20  usually say, We also have big scans, so we're used
21  to dealing with difficult people.
22          So many of the people in financial
23  services are opinionated and, at times, difficult,
24  so a lot of experience across cycles. We're
25  comfortable giving clients difficult news, and

Page 14

ALAN JOHNSON

1   ALAN JOHNSON
2   we're good at what we do.
3       Q.   And is it fair to say you have
4   expertise in the area of executive compensation?
5       A.   Absolutely.
6       Q.   And is it fair to say that part of
7   that expertise is knowing the marketplace?
8       A.   Absolutely.
9       Q.   And is part of that expertise knowing
10  or being familiar with the current trends in the
11  marketplace?
12      A.   Yes, absolutely.
13      Q.   And would you say that you have a
14  really good understanding of how to structure
15  compensation plans that are appropriate to the
16  clients that you serve?
17      A.   Yes.
18      Q.   And one of the things that we're here
19  to discuss today is the concept of forgivable
20  loans.
21           Do you understand that?
22      A.   Yes.
23      Q.   And your client is James Dondero.
24           Do I have that right?
25      A.   I was retained by Stinson, but they

Page 15

ALAN JOHNSON

1   ALAN JOHNSON
2   represent him, yes.
3       Q.   Okay.  We'll talk about that just a
4   bit more.
5           I'm going to read from your report.
6   If you want me to put it up on the screen, I'm
7   happy, but I want to focus just on one sentence of
8   your report that says that you understand from
9   Mr. Dondero that "The 2018 loans that are the
10  subject of this suit were modified by agreement in
11  late 2018 or early 2019 under which the loans
12  would be forgiven upon the sale at over cost of
13  substantially all of any three portfolio companies
14  held in the Highland platform."
15          Do you remember that?
16      A.   Yes.
17      Q.   Would you like to see it so you can
18  see the context?
19      A.   I think I understand it.
20      Q.   Okay.  So that's the sentence that I
21  want to focus on.
22          Is the agreement that you described
23  the only agreement that you're aware of pertaining
24  to Highland and Mr. Dondero and the forgiveness of
25  loans or do you understand there's more than one

Page 16

ALAN JOHNSON

1   ALAN JOHNSON
2   agreement?
3       A.   When I discussed it with Mr. Dondero,
4   I believed there was a single agreement, but that
5   I'm not sure of.  I think that's the -- what I got
6   out of him.
7       Q.   Okay.
8           You haven't been informed that more
9   than one agreement exists.
10          Do I have that right?
11      A.   I don't believe so.
12      Q.   Okay.
13          Do you know how many loans are the
14  subject of the agreement?
15      A.   There were -- they were consolidated,
16  I believe, in late '18 or '19.  Originally, there
17  were a lot more.  I think they're down to a
18  couple, if I recall.
19      Q.   Is it relevant to your analysis to
20  know the number of loans that are the subject of
21  the agreement?
22      A.   I don't think so.
23      Q.   Do you know the aggregate value of the
24  loans that are the subject of the agreement that
25  you referred to in your report?

Page 17

ALAN JOHNSON

1   ALAN JOHNSON
2       A.   I think the total of the loans is
3   somewhere in the 40 to $50 million range, if
4   that -- I think that's what I read.
5       Q.   And where did you read that?
6       A.   I think in all the documents, when I
7   tried to parse out the -- all the loans, I think
8   it totaled to something like 40 to $50 million, if
9   I recall.
10      Q.   And can you describe the document that
11  you're referring to?
12      A.   There were a bunch of loan agreements
13  in all the different materials.  I don't recall
14  where I saw them.
15      Q.   Okay.
16          Is the value of the -- is the
17  aggregate value of the loans relevant to your
18  analysis?
19      A.   No.
20      Q.   Do you know anything about the loans
21  that are the subject of the agreement other than
22  what you've written in your report?
23      A.   Subsequent to the report, I've seen
24  some of the documentation of the loans, so I've
25  seen some amounts and the period of the loans, the

ALAN JOHNSON

1
2 interest rates and so forth.
3     Q.    When did you see that documentation?
4     A.    In the last week or so, prior to this
5 deposition.
6     Q.    Have you amended your report?
7     A.    I have not.
8     Q.    So are any of the conclusions altered
9 at all by any of the documents you've seen
10 recently?
11    A.    No.
12    Q.    And now that I am aware that you've
13 seen certain loan documentation, I'll ask you
14 again if you can identify any obligor under any of
15 the loans other than Mr. Dondero?
16    A.    I'm sorry. I just didn't pay that
17 much attention. I was looking – I don't
18 remember.
19    Q.    Do you recall if the loans were demand
20 loans or term loans?
21    A.    The ones I recall were – they were
22 for a very long period of time, I think 30 years.
23 They were – they were 30-year term loan.
24    Q.    And do you recall how many 30-year
25 term loans you saw?

ALAN JOHNSON

1
2     A.    I recall at least a couple.
3     Q.    Did you see any demand loans?
4     A.    I don't recall seeing any.
5     Q.    Have you ever seen any written
6 agreement covering the forgiveness of any loans
7 that Highland extended to Mr. Dondero?
8     A.    I have not.
9     Q.    Have you ever seen any written
10 agreement covering the forgiveness of any loans
11 that Highland extended to any corporate affiliate?
12    A.    I have not.
13    Q.    Have you ever seen any written
14 agreement covering the forgiveness of any loans
15 that Highland had ever extended to any person or
16 entity in the world?
17    A.    I have not.
18    Q.    Have you seen any documents that
19 describe the existence or terms of any forgiveness
20 agreement between Highland and Mr. Dondero?
21    A.    I have not.
22    Q.    Have you seen any documents that
23 describe the existence or terms of any forgiveness
24 agreement between Highland and any corporate
25 affiliate?

ALAN JOHNSON

1
2     A.    I have not.
3     Q.    Have you seen any documents that
4 describe the existence or terms of any forgiveness
5 agreement between Highland and any person or
6 entity in the world?
7     A.    I have not.
8     Q.    So is it fair to say that you have not
9 seen any documentary evidence of any loan
10 forgiveness agreement between Highland and anybody
11 in the world?
12    A.    I have not seen any documents, that's
13 right.
14    Q.    Okay.
15         The agreement that Mr. Dondero
16 described for you, do you understand that that is
17 an oral agreement?
18    A.    I don't think he said to me it was an
19 oral agreement. He described it to me. I
20 don't – I don't think he – I don't remember if
21 he characterized it as an oral agreement, but he
22 described how – he described how – in his
23 opinion, how the agreement worked.
24         I don't – I don't recall if he
25 mentioned it was just verbal or it was written. I

ALAN JOHNSON

1
2 don't – that, I don't recall.
3     Q.    Did you ask Mr. Dondero or any of his
4 attorneys if there was a written agreement?
5     A.    I don't recall if that came up. It
6 may very well have, I don't remember whether we –
7 whether there was an agreement or not. I just
8 don't recall.
9     Q.    Did you or anybody working on your
10 behalf ever ask Mr. Dondero or anybody working on
11 his behalf if there were any documents that
12 reflect the existence or terms of any forgiveness
13 agreement that Highland ever entered into?
14    A.    When I talked to executives at
15 Highland, we asked – or former executives about
16 loans, we talked about documentation.
17         They just didn't have any
18 documentation of the loans they had had. They
19 described the fact that several of them had been
20 forgiven. The documentation had existed at one
21 time, but they don't – they didn't keep it or
22 didn't have it available.
23         So we talked about that, but...
24    Q.    You're not offering any opinion as to
25 whether an agreement actually exists pertaining to

Page 22

ALAN JOHNSON

1
2 the forgiveness of any loans that Highland
3 extended to Mr. Dondero or his affiliates, are
4 you?
5    A.   I am not.
6    Q.   You're not offering any opinion as to
7 the terms of any alleged agreement between
8 Mr. Dondero and Highland concerning the
9 forgiveness of loans, are you?
10    A.   I am not.
11    Q.   You're not offering any opinions on
12 the reasonableness of any of the terms of any
13 alleged agreement between Mr. Dondero and Highland
14 concerning the forgiveness of loans, are you?
15    A.   I am not.
16    Q.   You've been informed that this
17 modification was intended to provide Mr. Dondero
18 with additional compensation based on the
19 satisfaction of what we've been calling "certain
20 conditions subsequent." Is that fair?
21    A.   As I understood it, the loans
22 existed – I don't know.  I don't know if that's a
23 fair characterization.
24       I think the loans were modified –
25 that, I'd have to really think about, because the

Page 23

ALAN JOHNSON

1
2 loans themselves may have been already
3 compensation.
4       I guess these would have actualized
5 the compensation, so it certainly – if these
6 loans were modified with the performance
7 characteristic, it would have turned it in from
8 perhaps deferred compensation into actual
9 compensation.
10       So it would have changed the
11 characteristics of it, but I'm not sure it created
12 compensation.  There may have already been
13 compensation in these loans in the first place.
14    Q.   Is it fair to say that you're
15 speculating on that?
16    A.   There's some speculation there, yes.
17    Q.   Do you have any knowledge as to the
18 intent of the parties when they entered into the
19 modification agreement on the topic of
20 forgiveness?
21    A.   Mr. Dondero described it as to reward
22 him for actualizing – I guess there were three
23 portfolio investments, and if they were – if a
24 transaction occurred at more than the mark price,
25 that was to reward him for having one of those

Page 24

ALAN JOHNSON

1
2 transactions occur.
3    Q.   Okay.  So it was supposed to – your
4 understanding from Mr. Dondero was that the
5 agreement was intended to reward him if he
6 achieved some level of performance in the future.
7       Do I have that right?
8    A.   Yes.
9    Q.   Okay.
10       Do you know what the purpose of any of
11 the loans that are the subject of the forgiveness
12 agreement was?
13    A.   Mr. Dondero described the – the loans
14 as a way to invest in the business rather than
15 paying out compensation.  He described it, I
16 think, as delayed gratification, that these funds
17 then would be invested in the business rather than
18 being paid out to him as – as current
19 compensation.
20    Q.   Do you know what the – what the
21 obligors under the various loans did with the
22 proceeds that they received from Highland?
23    A.   Mr. Dondero described it as the
24 proceeds would be reinvested in the business.
25    Q.   Do you have any source of information

Page 25

ALAN JOHNSON

1
2 as to the intent of the forgiveness agreement
3 other than what Mr. Dondero told you?
4    A.   No.
5    Q.   Do you have any source of information
6 other than Mr. Dondero as to the purpose of each
7 of the loans that are the subject of the
8 forgiveness agreement?
9    A.   Just going back to the prior comment,
10 that he had described the general practice that
11 the loans were to give him the ability to reinvest
12 in the business, but not – not – that was in the
13 totality, not loan by loan.
14    Q.   All right.
15       But your sole source of information
16 regarding that topic is Mr. Dondero.
17       Do I have that right?
18    A.   It was – when I interviewed the other
19 Highland – former Highland executives, they also
20 described the general practice of that as well,
21 that going back a long time, they were familiar
22 with that idea of delaying it and reinvesting in
23 the business.
24       So that went back aways, but most of
25 it is Mr. Dondero.

Page 26

ALAN JOHNSON

2  Q.  Did they tell you anything concerning
3  the intent of the loans other than what you've
4  just described?
5     A.  They described their individual
6  circumstances around why the loans were made to
7  them and the circumstances, but the intent of the
8  loan itself, no.  It just -- some comments from
9  them and Mr. Dondero.
10    Q.  Okay.  I apologize, I probably wasn't
11 clear here.  I am only talking about the loans
12 that are the subject of the forgiveness agreement
13 that's -- that's part of the lawsuit.  I'm not
14 talking about any loans to any prior employees.
15        So I think -- I think we may have been
16 talking past each other, so let me try again.
17        With respect to the purpose of each of
18 the loans that are the subject of the pending
19 lawsuit, do you have any source of information
20 regarding their purpose other than Mr. Dondero?
21    A.  I do not.
22    Q.  Okay.
23        Do you have any source of information
24 other than Mr. Dondero concerning what the
25 obligors of each of the loans that's subject to

Page 27

ALAN JOHNSON

2  the lawsuit did with the proceeds?
3     A.  Just a description from Mr. Dondero
4  about the purpose of the -- what the loans would
5  be used for.
6     Q.  Okay.
7        So your understanding from Mr. Dondero
8  was that the purpose of the forgiveness agreement
9  that he entered into in late 2018 or early 2019
10 was to incentivize him to perform in the future,
11 correct?
12    A.  Yes.
13    Q.  And, in fact, your understanding is
14 that under the modification agreement, the loans
15 will only be forgiven if some future event occurs,
16 correct?
17    A.  Yes.
18    Q.  The loan was not intended to provide
19 him for compensation for services previously
20 rendered.  Is that fair?
21    A.  No.  As I -- as I mentioned earlier,
22 my speculation was that the -- the loans were,
23 using his words, delayed gratification.  He paid
24 himself and others less than the market wage and
25 used loans as a form of compensation in the past.

Page 28

ALAN JOHNSON

2  Q.  Well, if the assets subject to the
3  agreement are not sold above cost, Mr. Dondero
4  will never get any gratification.  Is that
5  correct?
6     A.  Yes.
7        MR. AIGEN:  Objection, form.
8     Q.  I think you said that you have
9  experience giving advice concerning forgivable
10 loans.
11        Do I have that right?
12    A.  Yes.
13    Q.  And have you ever given advice on how
14 to structure forgivable loans as part of executive
15 compensation?
16    A.  Yes.
17    Q.  Can you please describe your
18 experience in that area?
19    A.  From time to time, clients or we come
20 up with using loans as a vehicle to incent and
21 motivate executives and senior professionals.  So
22 we'll get involved in the magnitude of the loans,
23 the terms, interest rates, you know, if there's
24 performance attached to it, what the performance
25 would be defined as.

Page 29

ALAN JOHNSON

2  So it would be around sizing,
3  magnitudes, the terms, you know, of how the loans
4  would work.
5     Q.  When giving advice -- you know, I want
6  to, if I can use, a phrase here during the
7  deposition of "decision maker."
8        If I use the word -- the phrase
9  "decision maker," will you understand that I mean
10 the person who is acting on behalf of the employer
11 to make the decision -- to actually make the
12 decision as to whether or not to forgive a loan?
13    A.  Okay.
14    Q.  Somebody has to act on behalf of the
15 company -- you would agree, based on your
16 expertise, that somebody has to make the decision
17 on behalf of the company whether or not to forgive
18 loans.  Is that fair?
19    A.  Well, it could be a committee like a
20 board or a comp committee or others, but there
21 needs to be somebody or person that decides.
22    Q.  Okay.
23        So whether it's a board of directors
24 or a special committee or a compensation committee
25 or a CEO, if he or she is dealing with other

Page 30

ALAN JOHNSON

2 employees, I'm going to use the phrase "decision
3 maker" to refer to that person or body who is
4 making the decision on behalf of the employer to
5 forgive a loan as part of executive compensation.
6 Is that fair?
7    A.  Sure.  Okay.
8    Q.  Okay.
9        And you've given advice to decision
10 makers using the definition that I've just
11 described, correct?
12    A.  Yes.
13    Q.  Okay.
14        When you give advice to decision
15 makers who are considering whether to forgive
16 loans as part of executive compensation, do you
17 advise them to obtain any information before
18 making that decision?
19    A.  You want them to be informed.  Maybe
20 they already have adequate information about
21 circumstances, but you would certainly want them
22 to be informed before they made a -- certainly, a
23 final decision.
24    Q.  And if you were giving expert advice
25 to a decision maker, what areas would you tell

Page 31

ALAN JOHNSON

2 them that they ought to be informed on before they
3 enter into a forgiveness?
4    A.  Make sure I understand the question,
5 you're talking about before they do the agreement
6 itself, not the forgiveness of it but structuring
7 the agreement?
8    Q.  No.  I apologize.  I'm not talking
9 about the underlying loan.  I'm talking about the
10 decision to enter into an agreement pursuant to
11 which, you know, loans would be forgiven, what
12 information should they have before they're --
13 that kind of an agreement?
14    A.  Fair enough.
15        They should understand the -- the
16 magnitude of the accomplishment that would be
17 attached to the -- to the loans.
18        They should have a basic understanding
19 of the magnitude of the loans, the magnitude of
20 the events that they're incenting or rewarding, if
21 it is -- is there some proportionality between the
22 success and the amount of loan forgiveness?
23        They should have some idea of the
24 probability of these accomplishments happening.
25 Is it highly unlikely or very likely to happen?

Page 32

ALAN JOHNSON

2        So I think they should have some
3 understanding of the proportionality.  They should
4 have some understanding of difficulty.  And is it
5 a -- is it fair to forgive these loan if these
6 events occur?
7    Q.  Let's talk about some information.
8        In your opinion, should the decision
9 maker be knowledgeable about the executive's
10 compensation history before entering into an
11 agreement concerning the forgiveness of any loans?
12    A.  The decision maker should have a
13 general understanding of the pay history of the
14 individual, the context of the company, the
15 situation.  It should -- it would be one of the
16 factors that you should -- you should certainly be
17 aware of.
18    Q.  And why do you believe that a decision
19 maker should be knowledgeable about the
20 executive's pay history before she, he or it
21 agrees to forgive loans?
22    A.  I think in the real world, you want to
23 understand the context.  Has this executive been
24 very well paid or poorly paid in the past?  What
25 is that individual's perspective on his or she's

Page 33

ALAN JOHNSON

2 pay history?  I think that's relevant.
3        You know, is the forgiveness of the
4 loan significant enough to motivate the behaviors
5 that you're trying to do?  If that individual --
6 if this is a trivial amount, then it won't have
7 much of an impact.  If it's overwhelming, maybe it
8 will lead to behaviors that are not good, take too
9 much risk or whatever.
10        So, yes, you should be aware of the
11 pay history, but also, the business context, how
12 important is it for these events to happen.  Is
13 this -- is this very significant in the company's
14 future?
15        So yes, you should be aware.
16    Q.  Can you think of any circumstances
17 where it would be appropriate for a decision maker
18 to agree to forgive loans as part of an
19 executive's compensation without having an
20 understanding of the executive's compensation
21 history?
22    A.  Well, you -- sometimes, you have new
23 executives, so you wouldn't -- you wouldn't have
24 any pay history to be aware of.  And some -- many
25 of our clients, the pay history is somewhat murky

Page 34

ALAN JOHNSON

1  ALAN JOHNSON
2  or complicated, so it would not be ideal, but it
3  certainly has happened.
4      Q.   So -- so it happens, you think -- the
5  circumstances you can think of are for new
6  employees or for people with murky compensation
7  histories.
8      Do I have that right?
9      A.   I think that would usually be the
10  circumstances where you would at least have some
11  good, general understanding of somebody's pay
12  history.
13     Q.   Would you recommend that the decision
14  maker seek information concerning the executive's
15  compensation history before agreeing to forgive
16  any loans?
17     A.   I -- generally, advice, I would want
18  to know that.  So yes, I would suggest they find
19  that out, if it's feasible or -- but yes, that
20  would be one of the things I would probably
21  suggest.
22     Q.   Would you ever advise a decision maker
23  to forgive loans without having an understanding
24  of the executive's compensation history?
25     A.   I probably would not suggest that you

Page 35

1  ALAN JOHNSON
2  forgive the loans without having some knowledge of
3  that.  It's possible to get it.
4      Q.   Would you ever advise a decision maker
5  to forgive loans as part of executive compensation
6  without ever asking anybody for information
7  relating to the executive's compensation history?
8      A.   I would not recommend that usually.
9      Q.   Okay.  Let's talk about the entity's
10  financial condition.
11     In your opinion, is the entity's
12  financial condition relevant for a decision maker
13  to consider before entering into a loan
14  forgiveness program?
15     A.   I think the financial condition is
16  certainly relevant, and as I mentioned earlier,
17  the significance of the events that you're trying
18  to motivate.
19     So yes, I think you want to know both.
20  You'd want to know your financial condition and
21  you want to know the significance of the events
22  that you're trying to -- to reward.
23     Q.   And why do you believe in your expert
24  opinion that the decision maker should have an
25  understanding of the entity's financial condition

Page 36

1  ALAN JOHNSON
2  before agreeing to forgive loans?
3      A.   Well, I think you'd want to know just
4  would the forgiveness of these loans be
5  significant to the financial condition of the
6  company.  It may be significant to the individual
7  but be trivial to the overall organization, so I
8  think you'd want to know are these loans
9  significant in terms of the financial condition of
10  the company.
11     Q.   Can you think of any circumstance
12  where it would be appropriate for a decision maker
13  to agree to forgive loans as part of executive
14  compensation without having an understanding of
15  the entity's financial condition?
16     A.   No.  I don't think that would be
17  ideal.  I think you would certainly -- you would
18  want to know the condition of the business.
19     Q.   Okay.  I'm not asking you what's
20  ideal.
21     Can you ever -- can you fathom any
22  scenario where it would be appropriate for a
23  decision maker to agree to forgive loans without
24  having an understanding of the employer's
25  financial condition?

Page 37

1  ALAN JOHNSON
2      A.   Well, I think if there's a chaotic
3  financial situation, say the financial crisis or
4  others where it's very difficult or impossible to
5  get a clear understanding of the financial
6  condition of the business or it's in dispute
7  where -- what the condition is.
8      So that can exist, and I think in
9  those situations you'd need to make a decision.
10  Maybe forgiving the loans is appropriate even
11  though you may not have a clear idea of the
12  financial condition.
13     So it's not ideal, but I've had
14  clients, you know, where the financial condition
15  was uncertain and different people had different
16  opinions, but you still had to make a decision.
17     So that's why I used the word "ideal."
18  It would be ideal to have it, but sometimes you
19  just don't have that -- you don't have that
20  clarity.
21     Q.   Do you have any reason to believe that
22  during the seven-year period -- withdrawn.
23     Can you think of a circumstance where
24  it would be appropriate for a decision maker to
25  enter into a loan forgiveness program as part of

**Appx. 01967**

Page 38

ALAN JOHNSON

1
2  executive compensation without even asking for
3  information relating to a company's financial
4  condition?
5      A.  Well, I don't -- if they already had a
6  good familiarity, they perhaps often don't need to
7  ask, but if they weren't clear, then they should
8  ask.
9      Q.  Okay.
10        Is it fair to say that you would never
11 advise a decision maker to enter into a forgivable
12 loan program as part of executive compensation
13 without having an understanding of the entity's
14 financial condition?
15     A.  Well, I think -- as I said earlier, I
16 think there are situations where you just can't
17 know what the condition is.  If -- if -- I think
18 the decision maker should try to understand the
19 condition of the business to the best of their
20 ability, but if that's not possible, they still
21 may have to make a decision on loans or other --
22 other compensation elements.
23     Q.  Let's say it is possible to understand
24 the entity's financial condition.  In a
25 hypothetical world, if you could understand the

Page 39

ALAN JOHNSON

1
2  entity's financial condition and it wasn't subject
3  to dispute at that moment in time, would you be
4  able to -- would you ever advise the decision
5  maker to enter into the loan forgiveness program
6  without attempting to gain an understanding of
7  that very financial condition?
8      A.  No.  I would suggest to the client
9  that they try to understand that condition.
10     Q.  And if there was information
11 available, would you always advise your client to
12 try to obtain that information concerning the
13 entity's financial condition before entering into
14 an agreement to forgive loans as part of executive
15 compensation?
16     A.  I think you would almost always or
17 often try to do that.  I don't -- again, there are
18 practicalities of time frames and getting the data
19 and so forth might enter into it, but yes, I think
20 the -- the general thesis is, if you're going to
21 make forgivable loans, you should try to have an
22 understanding of the condition of the business.
23     Q.  Okay.  Let's drill down on that just a
24 little bit and talk specifically about financial
25 statements.

Page 40

ALAN JOHNSON

1
2        When I use the phrase "financial
3  statements," I'm thinking of your traditional
4  package in an audit report, the balance sheet,
5  statement of operations, cash flow, P&L
6  statements.
7        You're familiar with that type of
8  document, right?
9      A.  Yes.
10     Q.  Okay.
11        In your opinion, should a decision
12 maker review and understand the financial
13 statements of the -- of the employer before
14 agreeing to enter into a loan forgiveness program?
15     A.  They should -- they should have a
16 basic understanding of financial statements, yes.
17     Q.  And that's the advice that you would
18 always give to a decision maker, correct?
19     A.  Yes.
20     Q.  And why would you give that advice?
21     A.  Well, I think that you would want --
22 as part of making forgivable loans or any
23 compensation, you would want to have a basic
24 knowledge of the financial condition of the
25 business.

Page 41

ALAN JOHNSON

1
2      Q.  Can you think of any circumstance
3  where it would be appropriate for a decision maker
4  to agree to forgive loans as part of an executive
5  compensation package without having a basic
6  knowledge of the financial condition of the
7  employer?
8      A.  Well, I think, as I said earlier, if
9  it's -- if it's just not possible to do that, you
10 just can't -- it's chaotic enough or it's just
11 very difficult to figure out the condition of the
12 business, then you still have to make decisions,
13 but you should strive to have an understanding
14 before you make these decisions.
15     Q.  Can you think of any circumstance
16 where a decision maker should enter into a loan
17 forgiveness program without asking to see the
18 financial statements of the employer?
19     A.  Well, if someone already has a good
20 understanding, you may not need to supplement
21 that, but if you don't have a clear understanding,
22 you should have -- you should try to obtain that.
23     Q.  Is it fair to say you would never
24 advise a decision maker to agree to forgive loans
25 as part of executive compensation without

Page 42

ALAN JOHNSON

1  understanding the entity's financial statements,
2  including its profit and loss and its balance
3  sheet?
4      A.   As I said earlier, you would try to
5  have that understanding if it's possible,
6  absolutely.
7      Q.   Okay.
8          Under the modification agreement
9  that's described in your report, the 2018 loans
10 are to be forgiven upon the sale of certain assets
11 above cost.
12         Do I have that right?
13     A.   Yes.
14     Q.   And so is it fair to call that kind of
15 a contingency, the forgiveness is contingent upon
16 a future event?
17     A.   Yes.
18     Q.   And the future event here, or the
19 "subsequent event" as we call it sometimes, is the
20 sale of one of three assets above cost.
21         Do I have that right?
22     A.   Yes.
23     Q.   I think you said this earlier, but
24 just to make sure, before agreeing to provide

Page 43

ALAN JOHNSON

1  compensation through forgivable loans, would you
2  advise the decision maker under this scenario to
3  make an assessment of the likelihood that the
4  condition subsequent would occur?
5      A.   You would want to have that basic
6  understanding.  It's difficult to forecast, but
7  yes, you would want to look at the magnitude of
8  the forgivable -- the amount of loans being
9  forgiven and the significance of these
10 accomplishments along with the probability of it
11 actually happening.
12         So you would want at least at a high
13 level to have some either understanding or feel
14 for the magnitude of the loans, the significance
15 of the accomplishments and their likelihood of it
16 happening.
17     Q.   And if we -- if we applied those
18 thoughts to this case, would you recommend or
19 advise the decision maker that he or she obtain
20 information about the cost of each of the three
21 assets that are subject to the conditions
22 subsequent?
23     A.   Yeah, you would want to understand the
24 significance of these transactions, the proceeds,

Page 44

ALAN JOHNSON

1  the -- have an understanding of how significant
2  these amounts are to the -- to the company.
3      Q.   And would you also advise your client,
4  who's the decision maker in this hypothetical,
5  that he or she or it should obtain information
6  about the value of those assets as of the date of
7  the agreement?
8      A.   You should have a basic understanding
9  of the value of these assets, where they're marked
10 on the books, around the time you do the
11 agreement.
12     Q.   Why do you believe that the decision
13 maker should have at the time of the agreement
14 information enabling him, her or it to make an
15 assessment as to the likelihood that the condition
16 subsequent will occur?
17     A.   Well, I think if you're trying to
18 motivate someone or reward someone, you have to
19 have some idea, is it likely to happen?  Is it
20 impossible?  Is it certainty?
21         Again, I think that's part of the
22 calculus is to reward someone for achieving
23 something that may be difficult with a significant
24 payout but it's not impossible.

Page 45

ALAN JOHNSON

1      So I think as you design either loans
2  or more commonly, comp program, you've got to
3  assess the difficulty and importance of these
4  things happening.
5      Q.   Can you think of any circumstances
6  where it would be appropriate for a decision maker
7  to enter into an agreement to forgive loans based
8  on some future event without having an
9  understanding of the likelihood that that future
10 event will occur?
11     A.   Well, usually, when we do these
12 things, there's a great deal of judgment and
13 subjectivity in that.
14         So I think it is not generally
15 quantifiable, whether you use the word "gut
16 feeling" or "impression" or the difficulty of
17 these things happening.  Often, it's -- it's quite
18 a subjective assessment, how difficult these
19 things are, so you want to try to have an
20 understanding, but it can be frustrating.  It can
21 be quite subjective about whether -- the
22 likelihood or the difficulty of these things
23 happening.
24     Q.   Well, let's just say hypothetically

Page 46

ALAN JOHNSON

2 that I'm going to enter into an agreement that is
3 going to permit me to -- withdrawn.
4        So let's say hypothetically I'm an
5 employee and I've borrowed a hundred dollars from
6 my employer, and my employer says to me, I'm going
7 to forgive that hundred dollars if you sell any of
8 three assets above cost. On the date that we
9 entered into the agreement, each of the assets has
10 cost me $5 and each of the assets is worth $100,
11 so 20 times the cost on the date of the agreement.
12        Do you think that's information that
13 the decision maker should know before agreeing to
14 forgive the $100 loan?
15    A.   I think he should understand the value
16 the asset that is -- in your hypothetical, he
17 should have an understanding of that and how
18 significant in your hypothetical selling that
19 would be to the business.
20        Maybe that the proceeds of one of them
21 is really significant in terms of the -- turning
22 the business around or providing liquidity or
23 other types of things, he should have some idea of
24 if one of those three assets are sold, what does
25 that do to the firm and its future.

Page 47

ALAN JOHNSON

2    Q.   And is it fair to say that with the
3 information about value and cost, the assessment
4 as to whether or not the future event is likely to
5 occur is not purely subjective and it's not purely
6 based on a gut feeling, is that fair, if you have
7 that information?
8    A.   It's hard. It's a lot closer to a gut
9 feeling, subjective than objective. But it's hard
10 to -- your ability to actually sell something,
11 when, to who, at what price, can be quite -- is
12 often quite subjective.
13        So you may have -- depending on
14 circumstances, you may have good information of
15 likelihood, but oftentimes, you really don't.
16    Q.   Would you -- would you always advise
17 the decision maker under this hypothetical to try
18 to obtain as much information as he, she, or it
19 can on the issues of cost and value of the three
20 assets at issue?
21    A.   I would -- I would tell clients to try
22 to understand that as best they could.
23    Q.   Can you think of any circumstance
24 where it would be appropriate for a decision maker
25 to enter into a loan forgiveness agreement without

Page 48

ALAN JOHNSON

2 even asking for that information?
3    A.   Well, in circumstances where they
4 already thought they had a good understanding,
5 they didn't probably need to ask, but you should
6 try to have a good understanding.
7        Again, as I said, the significance of
8 these assets and whether -- if they're not sold, for
9 example, what that impact would be on the
10 business.
11    Q.   I think one of the things you've done
12 in your report is to provide your assessment of
13 compensation paid to comparable executives.
14        Is that fair to describe at least a
15 portion of your report?
16    A.   Yes.
17    Q.   Okay.
18        In your opinion, is the amount and
19 form of compensation paid to comparable executives
20 relevant to a decision maker's determination of
21 whether or not to enter into a forgiveness program
22 as part of executive compensation?
23    A.   As I said earlier, that would be one
24 of the things you would want to have -- you would
25 want to have a general understanding of, the pay

Page 49

ALAN JOHNSON

2 history and the context of the situation.
3    Q.   Okay.
4    A.   In fact, this is what you sell. Isn't
5 that right, one of the things you sell?
6    A.   To make sure I understand the
7 question, what am I selling here?
8    Q.   One of the things you sell is your
9 knowledge, expertise and experience about how
10 comparable executives are compensated in the
11 financial services industry, right?
12    A.   Yes.
13    Q.   And so is it fair to say that you
14 believe the decision maker should have an
15 understanding as to how comparable executives are
16 compensated before agreeing to enter into an
17 executive loan program -- loan forgiveness
18 program?
19    A.   I think more it would be about the
20 individual's pay history. I think how other
21 people in the industry is probably of less
22 importance on that narrow issue.
23        I think you'd want to know how has
24 Mary or Jim been paid in the past on that issue
25 rather -- I think that would be more important

**Appx. 01970**

Page 50

ALAN JOHNSON

2 than how other executives in the industry had been
3 paid.
4    Q.   Well, let's say hypothetically that in
5 the industry, very senior founding executives get
6 paid on the average of $6 million a year.
7    A.   Okay.
8    Q.   And the executive at issue has
9 received $6 million a year for at least, let's
10 say, 7 years, just to say hypothetically.
11       If a decision maker wanted to forgive
12 loans of $50 million, do you understand the
13 decision maker should know, is that what other
14 people doing this job are getting?  Are they
15 getting that kind of money?
16       Don't you think they should know that
17 before entering into the agreement?
18    A.   Yes, I think you would want to know
19 the magnitude, in your example of $50 million, how
20 does that stack up to the compensation of the
21 executive and how other people in the industry
22 would have been paid?
23       So yes, you would want to – in your
24 hypothetical, the $50 million, you would want to
25 have some idea of how that – the magnitude of

Page 51

ALAN JOHNSON

2 that money.
3    Q.   Right.
4       A decision maker should try to take
5 steps to avoid overpaying.  Is that fair?
6    A.   A decision maker should try to both
7 make sure you don't under or overpay.  You should
8 try to get it right and fair, whatever that means.
9    Q.   And one of the ways to get it right or
10 fair is to try to have an understanding as to how
11 comparable executives are compensated in the same
12 industry.  Is that fair?
13    A.   That's one of the factors you would
14 want to consider, absolutely.
15    Q.   And you would recommend and advise
16 your decision makers that they should attempt to
17 gain an understanding of how comparable executives
18 are paid before entering into a loan forgiveness
19 program.  Is that fair?
20    A.   They should try to be – whether they
21 have it immediately or they should try to have an
22 understanding – if they don't already, they
23 should try to have an understanding how does this
24 in your hypothetical $50 million relate to, not
25 only the executive, but how other people are paid.

Page 52

ALAN JOHNSON

2    Q.   Okay.  Let's say hypothetically the
3 decision maker has no prior knowledge as to how
4 comparable executives are paid in the industry,
5 would you recommend that such a decision maker
6 hire somebody like yourself?
7    A.   They could hire someone like us or
8 they could talk to their attorneys or they could
9 do their own research or talk to the HR
10 department.  You could get it from many sources.
11       But if someone were to ask me out of
12 the blue, I would say, yeah, you should have an
13 understanding, how does – how does the amount
14 you're going to forgive stack up to the industry
15 you're in?  Is it a small amount, large amount?
16       You should have some idea of the
17 relative magnitude of the amount in question.
18    Q.   Is it fair to say that you would never
19 advise a decision maker who has no knowledge of
20 how comparable executives are paid to enter into a
21 loan forgiveness program without at least
22 attempting to understand how the – how the
23 competition pays their employees?
24    A.   Well, the caveat of – the answer –
25 the broad answer would be, yes, but the caveat

Page 53

ALAN JOHNSON

2 would be how significant the loans were.
3       If the loans were relatively small, it
4 probably wouldn't be required.  The larger the
5 loans, generally, you would say – you would want
6 to have a better understanding of pay practices in
7 the industry.
8    Q.   Okay.
9       Let's say hypothetically the people
10 who are involved in the discussions concerning the
11 forgiveness of the loans are the CEO and an
12 outside director.  Okay?
13       Are you with me so far?
14    A.   Yes.  I'm sorry.
15    Q.   And let's – let's assume that the
16 outside director has no experience in the
17 financial services industry.  Let's assume that
18 the outside director has never worked for the
19 company.  Let's assume that the outside director
20 doesn't have access to the company's financial
21 statements.  Okay?
22       With that hypothetical, would you
23 advise the decision maker to utilize a source of
24 information other than the CEO himself before
25 entering into the agreement?

Appx. 01971

Page 54

ALAN JOHNSON

2    A.   In your hypothetical, as a director
3  with fiduciary duties, you should try to have an
4  understanding of the magnitude of what you're
5  being asked to do, and you should try to have
6  independent verification in one way or the other,
7  is what being proposed, whether it be a loan or
8  any other business decision, is this reasonable?
9  You should try to have an understanding, yes.
10    Q.   Would you ever advise the decision
11  maker in the circumstances that I've described in
12  this hypothetical to rely solely on the CEO as the
13  source of all information that would be considered
14  before entering into the forgiveness program?
15    A.   Well, that would be very unusual. I
16  think it really would depend on the circumstances.
17        If the circumstance – I can have
18  other hypotheticals where it – there could be a
19  chaotic situation. It could be the – it was an
20  extremist situation where you need to make a rapid
21  decision and so forth.
22        But in more typical situations, yes,
23  you should try to get independent advice from, you
24  know, others or your own research to found it. If
25  you have to make an immediate decision, you know,

Page 55

ALAN JOHNSON

2  you got to do what you got to do.
3    Q.   Let's take it out of the hypothetical.
4        Have you ever advised a client to
5  enter into a loan forgiveness program without
6  having obtained any information from any source
7  other than the executive or the employee who's the
8  beneficiary under the agreement?
9    A.   I have not advised a client that way,
10  no.
11    Q.   Would you ever advise a client to do
12  that?
13    A.   Again, assuming it was a significant
14  amount of money, no, I would not advise a client
15  to do that.
16    Q.   Can you think of any – I guess you've
17  already described if it's an extremist or a
18  chaotic situation.
19        Are those the only two situations that
20  you can conjure up in your head where it might be
21  appropriate for a decision maker to rely solely on
22  the beneficiary of the agreement before entering
23  into the loan forgiveness program?
24    A.   I think with the caveat I mentioned
25  earlier, if the amounts were small, you know, not

Page 56

ALAN JOHNSON

2  particularly meaningful, but if it's a meaningful
3  amount, you would try to get information.
4    Q.   What if the amount constituted –
5  withdrawn.
6        Is it your understanding that the
7  modification agreement pursuant to which certain
8  loans will be forgiven in the future upon the
9  occurrence of certain conditions subsequent, is it
10  your understanding that that agreement applies not
11  only to loans that were given to Mr. Dondero, but
12  to loans to affiliated companies that Mr. Dondero
13  either directly or indirectly owns and controls?
14    A.   My understanding from Mr. Dondero was
15  all the loans. That came from him.
16    Q.   And how do you define "from him"?
17    A.   In the conversation – the
18  conversations I had with him.
19    Q.   I just want to know, is it just the
20  loans that Highland gave to him as an individual
21  human being or does it also cover loans that
22  Highland made to entities that are directly or
23  indirectly owned or controlled by him?
24    A.   It was my understanding from him that
25  it was all of the loans.

Page 57

ALAN JOHNSON

2    Q.   So do you believe that the decision
3  maker should have a knowledge and understanding
4  about all of the loans before entering into a
5  forgiveness program?
6    A.   The decision maker should know the
7  magnitude of the loans to be forgiven.
8    Q.   Do you think the decision maker should
9  be familiar with the terms of each of the loans
10  that are subject to the forgiveness agreement?
11    A.   I think the decision maker should have
12  a general understanding of the terms of the loans,
13  yes.
14    Q.   Do you think the decision maker should
15  have an understanding as to why the loans were
16  originally obtained?
17    A.   I think that's – it would be ideal to
18  do that. I think it's probably less importance.
19    Q.   Would you advise the decision maker to
20  obtain copies of the promissory notes?
21    A.   I would want the decision maker to be
22  generally familiar with the loans. I don't – I
23  don't know if they necessarily have to read each
24  of the promissory notes, but I think they should
25  have a general familiarity, what the loans are,

Appx. 01972

Page 58

ALAN JOHNSON

1
2 the magnitudes, the broad terms, the interest
3 rates and the basic features.
4      Q.   And if the decision maker weren't a
5 sophisticated party, would you advise the decision
6 maker to obtain advice concerning the nature,
7 extent and structure of the loans that were under
8 consideration for forgiveness?
9      A.   I think the decision maker should have
10 an understanding of the loan – what they're
11 forgiving, what the terms or – you know, you
12 should have an understanding of the structure of
13 the loans you're forgiving.
14      Q.   Could you contemplate any situation
15 where a decision maker should enter into a
16 forgiveness of loans without having an
17 understanding of the scope and structure of the
18 loans themselves?
19      A.   No.  I think – I think – as I said,
20 I think the decision maker should have a general
21 understanding of the loans, the amounts, the terms
22 at least – at least at reasonably high level.
23      Q.   Would you always advise your client to
24 understand the nature and extent of each of the
25 loans that was under consideration for forgiveness

Page 59

ALAN JOHNSON

1
2 before actually agreeing to forgive those loans?
3      A.   If there are a lot of loans, I – it
4 may not be practical.
5      I think you'd want to have a general
6 idea of the term, the amount, the interest rates.
7 The exact provisions of each loan is probably less
8 important.  To have some understanding of how much
9 is being at stake, when would they in general have
10 been paid, what the interest rate would be.
11      I think the ins and outs of each loan
12 would probably be of less importance.
13      Q.   Do you think it would be important for
14 the decision maker to know, let's just say
15 hypothetically, as to whether the loans under
16 consideration were demand loans or whether they
17 were 30-year term notes?
18      A.   Yeah, I think you would want to know
19 that.  You would want to know – that would be one
20 of the things you would want to know.
21      Q.   And why would you want to know that?
22      A.   I think if you're trying to design a
23 plan, you'd want to have some idea of the urgency
24 of the – of the loans.
25      You mentioned a 30-year term, it

Page 60

ALAN JOHNSON

1
2 perhaps is less urgent than a demand note, so I
3 think if you're trying to incent someone to
4 achieve something, you want to have some idea of
5 the urgency of these loans that are outstanding.
6      Q.   Can you think of any circumstance
7 where it would be appropriate for a decision maker
8 to agree to forgive loans without having an
9 understanding as to the number, value and
10 structure of the loans that are to be forgiven?
11      A.   The number of loans is probably of
12 less importance, as I said earlier.  I think you'd
13 want to know the rough magnitude of what we're
14 forgiving, and I think you would want to know the
15 basic structure of the loans.
16      Q.   I appreciate that, but can you think
17 of any circumstance where the decision maker
18 should agree to forgive loans without knowing the
19 structure and aggregate value the loans being
20 forgiven?
21      A.   No.  I think – I think the decision
22 maker should have a general understanding of the
23 dollar amounts and the structure of the loans to
24 be forgiven.
25      Q.   And you would never advise a client to

Page 61

ALAN JOHNSON

1
2 forgive loans without knowing the dollar amount
3 and the structure of the loans themselves,
4 correct?
5      A.   That would not be my advice, no.
6      Q.   Okay.
7      Do you believe that a decision maker
8 who's considering entering into a loan forgiveness
9 program as part of executive compensation has a
10 duty to try to negotiate the best terms possible
11 for the company?
12      A.   I think the decision maker has to have
13 reasonable terms and a fair agreement.  I don't
14 think they have an obligation to necessarily
15 strike the best possible deal.  They've got to
16 balance a number of factors, but the deal should
17 clearly be fair to the company.
18      Q.   And why do you believe that a decision
19 maker should make sure that the agreement is fair
20 to the company before entering into it?
21      A.   Well, I think the – the decision
22 maker has a responsibility to be fair to the
23 shareholders and the other parties at the company,
24 and the agreement should be fair to – to the
25 company – the interest of the company.

Appx. 01973

Page 62

ALAN JOHNSON

1
2    If they're in the position of making
3    that decision and they're representing the
4    company, the decision should be fair.
5    Q.    And how – how would you advise a
6    decision maker to make sure that the agreement was
7    fair before he, she, or it entered into it?
8    A.    Well, if we're talking about loans, as
9    I said earlier, you want to know the rough
10    magnitude of the loans and the terms. You'd want
11    to know the achievement of these goals, how
12    significant are they for the success of the
13    company, and try to balance that, and the
14    probabilities and other things.
15    But you'd want to balance that in a
16    fair way where you felt that the – if it's a
17    loan, the forgiveness of these loans is – is
18    fairly rewarded by the achievement of these goals.
19    Q.    And so in order to assess the
20    fairness, you testified earlier that you would
21    always advise the decision maker to the extent
22    possible to obtain information concerning the
23    executive's compensation history, correct?
24    A.    You would want to know that if they
25    didn't know it already. You would want to have

Page 63

ALAN JOHNSON

1
2    them have some idea of the individual's pay
3    history. That would be one of the things you'd
4    want to know.
5    Q.    And in order to assess the fairness of
6    the transaction before entering into it, you would
7    always recommend to the extent possible that the
8    decision maker understand the financial condition
9    of the employer, correct?
10    A.    You would want the decision maker to
11    understand, as best they could in the
12    circumstances, the condition, you know, of the
13    company at that time.
14    Q.    And in order to assess the fairness of
15    the transaction before you enter into it, you
16    would always advise the decision maker to the
17    extent possible to obtain and understand the
18    employer's financial statements. Is that fair?
19    A.    As part of that, if they didn't
20    already have an understanding – that's really
21    part of the financial condition of the company –
22    you'd want them to have a general understanding of
23    the financial position of the company, you know,
24    when the loan agreement was made.
25    Q.    And in order to assess the fairness of

Page 64

ALAN JOHNSON

1
2    the transaction before entering into it – give me
3    one second, please. Sorry.
4    Before entering the – in order to
5    assess the transaction – withdrawn.
6    In order to assess the fairness of a
7    transaction before entering into it, you would
8    always advise the decision maker to obtain
9    information so that he, she, or it, could assess
10    the likelihood of any future, subsequent events
11    for which the forgiveness is contingent. Is that
12    fair?
13    A.    The best you can, you want to at least
14    have an impression of the difficulty or likelihood
15    of these events being achieved.
16    As I said earlier, that often is quite
17    subjective. You have an impression, but you at
18    least want to have some impression as best you can
19    of the likelihood and importance of these things
20    happening.
21    Q.    And – and in order to assess the
22    fairness of the transaction before entering into
23    it, you would always recommend that the decision
24    maker seek and obtain as much information as
25    possible about how comparable executives are paid.

Page 65

ALAN JOHNSON

1
2    Is that fair?
3    A.    As part of making this, I think you
4    would want to have some idea of the magnitude of
5    the loan being forgiven and how does that stack up
6    with the pay of other people in the industry, the
7    context of those decisions.
8    Q.    And in order to determine the fairness
9    of the loan before – withdrawn.
10    In order to determine the fairness of
11    a forgiveness agreement before entering into it,
12    you would always advise the decision maker to have
13    at least an understanding as to the aggregate
14    value and the structure of the loans that are to
15    be forgiven, correct?
16    A.    Yes, you would want to have that
17    knowledge.
18    Q.    Okay.
19    So let's go back to the hypothetical
20    where you have the CEO and an outside director
21    who's not familiar with the industry and doesn't
22    have access to financial statements or any
23    information about comparable executives.
24    In that hypothetical, if the executive
25    were to go to the outside director and make a

**Appx. 01974**

Page 66

ALAN JOHNSON

1
2 proposal regarding loan forgiveness, would you
3 advise that decision maker to try to negotiate
4 with the executive?
5      A.  Well, it depends on what the terms are
6 being proposed.  It may on its -- its face be a
7 fair deal and you don't need to negotiate.  If
8 the -- if the term -- if the director believes the
9 terms are not as being proposed fair, yes, they
10 should negotiate and try to get an agreement that
11 is at least fair from the standpoint of the
12 company.
13      Q.  Well, in my hypothetical, assume that
14 the decision maker, the director, doesn't have any
15 information concerning the executive's
16 compensation history, doesn't have an
17 understanding of the entity's financial condition,
18 hasn't obtained or reviewed the entity's financial
19 statements, hasn't spoken to anybody other than
20 the CEO himself, has no experience in the
21 industry, has no expertise in the area of
22 executive compensation, would you advise that
23 particular decision maker to enter into the
24 agreement that's first proposed by the CEO without
25 negotiation?

Page 67

ALAN JOHNSON

1
2      A.  Well, I think even before negotiation,
3 in your hypothetical, someone who knows nothing
4 should get informed before they make any decision.
5 So that probably comes first.
6           You know, once they got better
7 informed, they could decide on whether they need
8 to negotiate or the offer on its face is fair, but
9 if they know nothing, they should get informed
10 before they agree to any decision.
11      Q.  Based on your knowledge and experience
12 and expertise in the industry, can you conjure up
13 a scenario where a decision maker who knows
14 nothing but nevertheless enters into a forgiveness
15 program has fulfilled his, her, or its duties to
16 the company?
17           MR. AIGEN:  Objection, form.
18      A.  I'm sorry, could you repeat the
19 question?  I lost my train of thought.
20      Q.  Sure.
21           Let's assume the decision maker knows
22 nothing.  In your opinion, can that decision maker
23 ever fulfill his, her, or its duty by entering
24 into a loan forgiveness program with the CEO?
25           MR. AIGEN:  Objection, form.

Page 68

ALAN JOHNSON

1
2      A.  Well, I think the director could get
3 lucky where the proposal was imminently fair and
4 you -- you put it in place, but certainly, you're
5 at risk of agreeing to something that's not fair.
6 But a director or a company could get lucky in
7 that the proposal was -- was fair on its face,
8 so...
9      Q.  Would you ever advise a client to --
10 who was a decision maker who knew nothing to enter
11 into the agreement and hope that he, she, or it
12 got lucky?
13      A.  I do not advise clients to try to get
14 lucky, no.
15      Q.  Have you ever heard of a decision
16 maker -- withdrawn.
17           In your 30 years' experience, have you
18 ever heard of a decision maker entering into a
19 loan forgiveness program with no knowledge of the
20 executive's employment history, the employer's
21 financial condition, without an understanding of
22 the financial statements, with no knowledge of
23 comparable executives, have you ever heard of
24 anybody like that ever entering into a loan
25 forgiveness program?

Page 69

ALAN JOHNSON

1
2      A.  I don't recall that -- that situation,
3 no.
4      Q.  You'd agree with me it's not common in
5 the industry, is it?
6      A.  The facts that you've laid out would
7 not be common, no.
8      Q.  If you were advising a decision maker
9 who was contemplating entering into a loan
10 forgiveness program as part of executive
11 compensation, would you advise that decision maker
12 to make sure that the agreement is in writing?
13      A.  Yes.  Yes, I would.
14      Q.  And why would you do that?
15      A.  We -- you want there to be no
16 misunderstandings.  I think many of these
17 agreements are complicated and you -- people's
18 memory are fallible, so we often advise clients to
19 put many agreements in writing just so there's no
20 misunderstandings, everybody understands what the
21 terms are.
22      Q.  Can you think of any exception to the
23 advice you would give with respect to making sure
24 that forgiveness agreements are in writing?
25           Can you think of any scenario where

ALAN JOHNSON

1
2 you would advise the decision maker, don't put
3 that in writing?
4     A.   No.  No, we wouldn't advise that.
5 Although unfortunately, many of our clients don't
6 put things in writing, but that would not be our
7 advice.
8     Q.   How about a hypothetical where the
9 agreement to forgive loans encompassed more than a
10 dozen loans, would you also recommend that there
11 be a written record of the identity of the loans
12 that were the subject of the agreement?
13     A.   If there were a dozen meaningful
14 loans, we would recommend that you have a catalog
15 of what the loans are talking about, absolutely.
16     Q.   Can you think of any scenario where it
17 would be appropriate to enter into an agreement
18 for the forgiveness of a dozen or more loans
19 without having any written record of it?
20     A.   As I said earlier, we would recommend
21 that all of these agreements be put in writing.
22     Q.   As an expert on executive
23 compensation, have you ever advised the decision
24 maker to enter into an oral agreement concerning
25 forgivable loans?

ALAN JOHNSON

1
2     A.   I -- I would never -- we always -- I
3 would always want to have it in writing.
4     Q.   So let's go back to my hypothetical
5 where you have an agreement between a CEO and an
6 outside director.  If you were advising the
7 outside director, would you tell him or her that
8 your advice is to make sure that somebody in the
9 organization other than the CEO knows about the
10 terms in existence of the loan forgiveness
11 program?
12     A.   I would tell the outside director that
13 other people should be informed.
14          Other directors, the -- yes, I would
15 want other people -- I would -- if I were asked, I
16 would -- I would suggest or recommend that other
17 people be informed.
18     Q.   And why would you make -- why would
19 you give that advice?
20     A.   You would want -- at just an
21 operational level, you would want to make sure
22 your finance department was aware that certain
23 payments might stop or in preparing the financial
24 statements or -- or other just operational issues,
25 so, again, there's no misunderstanding as you put

ALAN JOHNSON

1
2 your financial statements together or just
3 operationalize these loans.
4     Q.   In your -- in your experience, do
5 companies that enter into loan forgiveness
6 programs customarily include reference to the
7 agreements in their financial statements or in
8 their books and records?
9     A.   It's a mixed practice.  Some people do
10 and some people don't, particularly private firms.
11     Q.   Have you ever heard of a situation
12 where the decision maker and the executive enter
13 into a loan forgiveness program and never tell
14 anybody about the terms or existence of the
15 program until after litigation is commenced?
16     A.   I don't know if I can -- sitting here
17 if I can recall a loan forgiveness program.
18          I can -- there's certainly other
19 facets of compensation where things weren't
20 documented and there's all kinds of disputes, but
21 I can't sitting here think of another loan
22 forgiveness program.
23     Q.   Okay.  I appreciate that.  My question
24 is just a little bit different.
25          Can you recall any instance in your

ALAN JOHNSON

1
2 career where you've heard about a decision maker
3 who entered into a loan forgiveness program with
4 an employee but never told anybody in the world
5 about that until after litigation was commenced?
6     A.   I can't recall any sitting here.
7     Q.   Okay.  And you would never recommend
8 that a decision maker keep to him or herself the
9 entry into any agreement concerning the
10 forgiveness of loans?
11     A.   I think, again, we would -- I would
12 always recommend things be in writing with the
13 caveat if it was a small or trivial amount,
14 perhaps it wasn't needed.
15     Q.   In your opinion are the loans at issue
16 in this case small or trivial?
17     A.   No.
18          MR. MORRIS:  Okay.  We've been going
19 an hour and a half.  I really appreciate
20 your patience, sir.
21          Can we take just a 10-minute break and
22 come back at 10:40 eastern?  It's actually a
23 13-minute break.
24          THE WITNESS:  Okay.
25          MR. MORRIS:  Okay.  Thank you very

Page 74

```
1              ALAN JOHNSON
2      much.
3          (Recess taken from 10:27 a.m. until
4      10:40 a.m.)
5  BY MR. MORRIS:
6      Q.   Mr. Johnson, did you speak with
7  anybody during the break about your testimony
8  today?
9      A.   No.
10     Q.   Did you communicate with anybody in
11 writing about your testimony today during the
12 break?
13     A.   No.
14     Q.   Do you recall when you were --
15 withdrawn. I apologize.
16         Are you -- were you engaged in this
17 case or was your firm engaged in this case or is
18 it one in the same?
19         I just want to make sure I get it
20 right.
21     A.   I was engaged as an expert witness as
22 part of my firm.
23     Q.   Okay.
24         Do you recall when you were engaged in
25 this case?
```

Page 75

```
1              ALAN JOHNSON
2      A.   Maybe March or April of this year.
3      Q.   Do you have an engagement letter?
4      A.   We did, yes.
5      Q.   Okay.
6          And would that engagement letter
7  reflect the date upon which you were engaged in
8  this matter?
9      A.   Yes, it would.
10     Q.   Okay.
11         Did you ever review any of the
12 pleadings in this case, any of the complaints?
13     A.   I just don't -- I don't recall.
14     Q.   Did you have any familiarity with
15 Highland Capital Management, L.P. or any of its
16 affiliates prior to your engagement in this case?
17     A.   I don't believe so.
18     Q.   Did you have any familiarity with
19 James Dondero prior to being retained in this
20 case?
21     A.   I don't believe so.
22     Q.   I think you said that you were
23 retained by the Stinson firm.
24         Do I have that right?
25     A.   Yes.
```

Page 76

```
1              ALAN JOHNSON
2      Q.   And had you done work for the Stinson
3  firm prior to this case?
4      A.   I don't believe so.
5      Q.   You have been retained by my firm
6  before. Is that right?
7      A.   Yes.
8      Q.   Is that just one occasion?
9      A.   No, several times.
10     Q.   Oh, okay. Well, it's nice to meet you
11 because we've never worked together, right, just
12 for the record?
13     A.   Yes.
14     Q.   All right. We're going to put your
15 expert report up on the screen. I forgot what
16 number we have premarked it, but let's take a look
17 at it.
18     MS. CANTY:  Sixty-two, John.
19     MR. MORRIS:  Thank you very much.
20         (Exhibit 62, expert report, was marked
21     for identification at this time.)
22 BY MR. MORRIS:
23     Q.   So your report, Mr. Johnson, is up on
24 the screen. It's been premarked as Exhibit 62 for
25 our purposes.
```

Page 77

```
1              ALAN JOHNSON
2      MR. MORRIS:  And can we go to page 16,
3  please.
4      Q.   And if we go to the bottom of the
5  page, is that your signature, sir?
6      A.   Yes.
7      Q.   And did you sign this on or about
8  May 28, 2021?
9      A.   Yes.
10     Q.   You haven't amended this report since
11 May. Is that right?
12     A.   That's right.
13     Q.   Okay.
14         And there's no modification to any of
15 your opinions that are set forth in this report,
16 correct?
17     A.   That's correct.
18     Q.   Okay.
19     MR. MORRIS:  Can we go to page 25,
20 please.
21     Q.   And do you see that there's a list
22 here of documents reviewed?
23     A.   Yes.
24     Q.   And I'm embarrassed to say, but I've
25 actually looked at all the documents.
```

Page 78

ALAN JOHNSON

1
2    Is it -- is it fair to characterize
3  the documents that you reviewed as either
4  tax-related information, financial statements from
5  NexPoint or Highland Capital Management Fund
6  Advisors or certain agreements between and among
7  the parties?
8    A.    I think it's certainly that.  There
9  may be other things, but certainly, those were
10  included in there, yes.
11    Q.    Can you identify any other type of
12  document that you recall reviewing prior to the
13  preparation of this report other than tax-related
14  information, financial statements for NexPoint and
15  HCMFA and certain agreements between and among the
16  parties?
17    A.    You had asked about the pleadings, and
18  I just don't recall, but with that -- with that
19  caveat, I think that's accurate.
20    Q.    Okay.
21    And to the best of your knowledge,
22  does this page identify every document that you
23  were provided with prior to the preparation of
24  your report?
25    A.    Yes, I believe so.

Page 79

ALAN JOHNSON

1
2    Q.    Okay.
3    You're not aware of any documents that
4  you received that aren't disclosed on this page,
5  right?
6    A.    Not that I'm aware of.
7    Q.    Okay.
8    Has anybody provided you with any
9  documents between May 28th and today that relate
10  to the subject matter of your report?
11    A.    I'm sorry, I didn't catch the last
12  bit.
13    Q.    Has anyone provided you any documents
14  between May 28th, 2021 and today that concern or
15  relate to any aspect of your report?
16    A.    I'm not sure how to answer the
17  question.  I received other documents, so I'm not
18  sure what you're trying to get at.
19    Q.    What other documents do you recall
20  receiving since May 28th, 2021 that concern your
21  report.
22    A.    I think I mentioned I reviewed some of
23  the loan documentation on the loans.  I've seen
24  the financial statements for Highland Capital
25  Management.  I've -- those two I recall.

Page 80

ALAN JOHNSON

1
2    Q.    Okay.
3    Do you remember for what years the
4  financial statements were for Highland?
5    A.    If I recall, they were 2014, I
6  believe, through -- it's either '14 or '15 through
7  '19, I believe.
8    Q.    And reviewing these documents didn't
9  cause you to amend or modify your opinions in any
10  way, correct?
11    A.    No.
12    Q.    Okay.  I'm just going to ask you a
13  series of questions to see if you're familiar with
14  any of the following categories of documents.
15    You mentioned that you saw some loan
16  documents.
17    Do I have that right?
18    A.    Yes.
19    Q.    Would the loan documents that you have
20  in mind be promissory notes?
21    A.    I'm not sure what the definition of a
22  "promissory note" is.
23    Q.    Are you familiar with promissory notes
24  generally?
25    A.    I'm familiar with notes, but I'm not

Page 81

ALAN JOHNSON

1
2  sure of the legal meaning of what a promissory
3  note is.
4    Q.    I think you mentioned that certain of
5  the loan documents that you saw referenced what
6  I'll characterize as a roll-up of existing loans.
7    Do I have that right?
8    A.    I saw that described, yes.
9    Q.    And was that -- was there a schedule
10  to the document entitled, I think, either
11  Exhibit A or Schedule A that listed various loans,
12  including the principal amount and the interest
13  that was outstanding as of the date of the
14  document?
15    A.    I've seen schedules like that, yes.
16    Q.    Okay.
17    Other than -- other than the documents
18  with the schedules that -- that you've just
19  acknowledged seeing, do you recall seeing any
20  other loan documents prior to today's deposition?
21    A.    If it's not on the list that we're
22  looking at, I don't recall anything else.
23    Q.    Do you know where you got these
24  documents -- withdrawn.
25    Who gave you these documents?

Page 82

ALAN JOHNSON

2    A.    They're from the Stinson law firm.

3    Q.    And do you recall when the Stinson law

4  firm gave you these documents?

5    A.    And "these documents" refer to prior

6  to writing the report or recently?

7    Q.    I apologize. Great question.

8         I'm only asking about the loan

9  documents and the financial statements that you

10  have testified to having received after the date

11  of this report.

12    A.    I've received it from the law firm

13  within the last week.

14    Q.    Did you -- did you ask them for

15  documents or did they give them to you of their

16  own accord?

17    A.    I had asked them from documents prior

18  to writing my report, and then I think we asked

19  for documents getting ready for this deposition.

20    Q.    And what they gave you in response to

21  your request were the loan documents with the

22  schedule listing certain principal and interest

23  due on the loans as well as, to the best of your

24  recollection, financial statements for HCM, L.P.

25  for around 2014 or '15 through around 2019. Is

Page 83

ALAN JOHNSON

2  that right?

3    A.    Yes.

4    Q.    Okay.

5         At no time since the report was signed

6  by you back in May has Mr. Dondero or anyone

7  acting on his behalf given you any documents that

8  describe the terms or existence of any loan

9  forgiveness agreement, correct?

10    A.    I had a conversation with Mr. Dondero

11  about the loan forgiveness program at Next Bank,

12  but I had that conversation with him.

13    Q.    But has anybody given you since

14  May 28, 2021 any documents that reflect the terms

15  or existence of the loan forgiveness program

16  that's referred to in your expert report?

17    A.    No.

18    Q.    Did the Stinson firm give you

19  Highland's audited financial statements for 2008,

20  '9, '10, '11, '12, or '13?

21    A.    Now -- now you're testing me, and I'm

22  just not sure. They provided them to me, and I'm

23  just not sure.

24    Q.    Okay.

25         Are you aware that

Page 84

ALAN JOHNSON

2  PricewaterhouseCoopers was Highland's outside

3  auditors?

4    A.    I remember seeing PwC, yes.

5    Q.    Are you aware that PwC gave a

6  deposition in this case after the date you had

7  authored your report?

8    A.    I was not aware of that.

9    Q.    So is it fair to say that you've never

10  seen PricewaterhouseCoopers' deposition

11  transcript?

12    A.    I have not.

13    Q.    And is it fair to say that you have no

14  knowledge about what, if anything,

15  PricewaterhouseCoopers testified to in this case?

16    A.    I do not know.

17    Q.    Have you ever heard of a Dugaboy

18  Investment Trust?

19    A.    Dugaboy? I don't believe so.

20    Q.    So is it fair to say you have no

21  knowledge as to whether or not the Dugaboy

22  Investment Trust testified in this case?

23    A.    I have no knowledge.

24    Q.    So it's fair to say that you've never

25  seen a deposition transcript relating to any

Page 85

ALAN JOHNSON

2  testimony given on behalf of the Dugaboy

3  Investment Trust, correct?

4    A.    I have not.

5    Q.    Have you ever heard of Frank

6  Waterhouse?

7    A.    I don't believe so.

8    Q.    I'll try and refresh your

9  recollection.

10         Do you know whether Mr. Waterhouse

11  served as Highland Capital Management, L.P.'s

12  chief financial officer for the five-plus years

13  prior to the petition date?

14    A.    Now I think you've refreshed my

15  memory. I think I've seen the name, yes.

16    Q.    Do you know if -- have you ever seen a

17  deposition transcript of any testimony

18  Mr. Waterhouse has given in this case?

19    A.    I have not.

20    Q.    Do you know whether Mr. Dondero has

21  testified in this case?

22    A.    I -- I've seen some deposition

23  testimony for Mr. Dondero.

24    Q.    And when did you see the deposition

25  testimony?

ALAN JOHNSON

1
2    A.    Within the last week.
3    Q.    Do you know if he testified – do you
4  know when the deposition was?
5    A.    I don't recall.
6    Q.    Do you recall – did you actually see
7  a transcript?
8    A.    I saw the transcript, yes.
9    Q.    Did you see one transcript or more
10  than one transcript?
11    A.    Just one.
12    Q.    And do you know if that deposition
13  took place in May or did that deposition take
14  place more recently?
15    A.    I – I don't know.
16    Q.    Were you given – were you provided a
17  copy of the entire transcript?
18    A.    I received an excerpt – I'm not sure.
19  I focused on an excerpt, but I'm not sure if I
20  received the whole transcript.
21    Q.    And were you directed to that
22  particular excerpt that you looked at?
23    A.    Yes.
24    Q.    And who directed you to that excerpt?
25    A.    The Stinson law firm.

ALAN JOHNSON

1
2    Q.    And did the Stinson law firm direct
3  you to any portion of the transcript other than
4  that excerpt?
5    A.    No.
6    Q.    And how – how long was the excerpt?
7  Was it a few lines or a few pages or –
8    A.    A few pages.
9    Q.    Okay.
10        And can you recall generally what the
11  excerpt was that was provided to you by the
12  Stinson law firm?
13    A.    It revolved around the loans.
14    Q.    And do you remember the substance of
15  the excerpt, like what about the loans were you
16  being directed to review?
17    A.    It was Mr. Dondero's testimony around
18  the constructing of these forgivable loans.  It
19  was – that was – that was the – those were the
20  pages.
21    Q.    Do you recall the page numbers
22  perhaps?
23    A.    Actually, I do.  One was 143.
24    Q.    Okay.  Any others?
25    A.    I read before that and after that, but

ALAN JOHNSON

1
2  I think that was – that was – for some reason, I
3  recall that number.
4    Q.    Have you received – withdrawn.
5        Other than the loan documents and
6  financial statements you've described as well as
7  the excerpt from Mr. Dondero's deposition, have
8  you received any information concerning
9  Mr. Dondero's compensation that was produced by
10  Highland after May 28, 2021?
11    A.    I recall there was a – an excel file
12  that had some additional things on compensation.
13  Yeah, I think there was an excel file that broke
14  out, you know, different elements of compensation.
15    Q.    When did you receive that?
16    A.    Sometime in October.
17    Q.    Did you receive anything in October
18  other than the Excel file that you've just
19  described and the loan documents and financial
20  statements and excerpt from Mr. Dondero's
21  transcript?
22    A.    Not that I recall.
23    Q.    Do you recall anything about the Excel
24  file?
25    A.    It had different elements of pay.  It

ALAN JOHNSON

1
2  had some of the different legal entities.
3        I think that I – I think that's all I
4  remember.
5    Q.    Did that Excel file cause you to
6  change in any way any of the opinions that are set
7  forth in your report?
8    A.    No.
9    Q.    Did Mr. Dondero's deposition
10  transcript excerpt cause to you change, modify, or
11  amend in any way any of the opinions set forth in
12  your report?
13    A.    No.
14    Q.    Other than the Excel file, did you
15  receive any other documents that Highland has
16  produced in this matter since the date you
17  executed your expert report on May 28, 2021?
18    A.    No.
19        MR. MORRIS:  If we can go to page 5 of
20  the report, we still have it up on the
21  screen here.
22    Q.    Do you see where it says, "Facts and
23  Data Considered"?
24    A.    Yes.
25    Q.    Okay.

Page 90

ALAN JOHNSON

1
2      In the first sentence, you wrote, "in
3  preparing this report, I've considered certain
4  documents provided to me, interviews with
5  Mr. Dondero, and former Highland or affiliate
6  employees."
7      Do you see that?
8   A.   Yes.
9   Q.   When did you interview Mr. Dondero?
10  A.   Probably early May, early May of this
11 year.
12  Q.   Is that the only time you've
13 communicated with him directly concerning this
14 case?
15  A.   I think I mentioned earlier I talked
16 to him about the Next Bank – in the last week
17 about the Next Bank loans, and then I talked to
18 him prior to this report.
19     I think those are the only times.
20  Q.   And did you speak with him on the
21 phone?  Did you meet with him in person or some
22 other form of communication?
23  A.   Didn't – it was not in person.  It
24 was either a phone call or Zoom.  I don't recall.
25  Q.   Do you recall how many phone calls or

Page 91

ALAN JOHNSON

1
2  Zoom calls you had with Mr. Dondero for the
3  purpose of interviewing him, as stated in the
4  first sentence of the Facts and Data Considered?
5   A.   Prior to this report, I think I talked
6  to him three times, I believe.
7   Q.   And was anybody – did anybody
8  participate in those Zoom or telephone calls
9  besides you and Mr. Dondero?
10  A.   There would have been someone from the
11 Stinson law firm and likely my colleague,
12 Mr. Perniciaro, would have been on the call as
13 well.
14  Q.   Do you know approximately what the
15 total time you spent speaking with Mr. Dondero was
16 before you prepared this report?
17     Was it an hour or three hours?
18  A.   Probably an hour and a half.
19  Q.   So about 90 minutes.
20     Do you recall – did you ask to
21 interview him or did the Stinson firm suggest that
22 you should speak with him?
23  A.   I suggested talking to him.
24  Q.   Okay.
25     Do you recall what he told you during

Page 92

ALAN JOHNSON

1
2  this interview?
3   A.   We talked about his duties,
4  responsibilities, went into what he – what he was
5  involved in going back in time to the current, his
6  duties, how he ran the firm.  So we spent a fair
7  amount of time talking about that.
8      Talked about the different – these
9  loans and the purpose of the loans, his philosophy
10 around the loans.
11     I think those were the two broad –
12 the two broad categories.
13  Q.   Did he describe for you in any way the
14 agreement that was entered into in late 2018,
15 early 2019 relating to the forgiveness of the
16 loans?
17  A.   Yes.  Yes, he did.
18  Q.   What did he tell you about that?
19  A.   He said that the – the structure to
20 reward him for a successful transaction with one
21 of these three portfolio investments, that was the
22 purpose, that loans had been used in the company
23 in the past, that the loans were – had always
24 intended to be forgiven, and this was simply
25 codifying and structured the intent of the loans

Page 93

ALAN JOHNSON

1
2  all along.
3   Q.   Did he identify who the decision maker
4  was who acted on behalf of the company?
5   A.   He – I don't believe that came up.  I
6  don't recall hearing that.
7   Q.   Did you ask him any questions that
8  you – your gut told you he wasn't able to answer
9  completely?
10  A.   No.  I thought he was candid.  I
11 thought he was straightforward.  I didn't – the
12 questioning that I had with him, I didn't find –
13 he answered the questions I had about both his
14 role and the – how these loans were intended to
15 operate.
16  Q.   Did he tell you that under the
17 agreement he entered into with the decision maker,
18 the loans would be forgiven if the assets were
19 sold not by him but by a third party?
20  A.   I don't – I don't recall that, no.
21  Q.   It doesn't say that in your report,
22 does it?
23  A.   It does not.
24  Q.   And you don't recall him specifically
25 telling you that one of the terms of the agreement

Page 94

ALAN JOHNSON

1
2  was that all of the loans subject to the agreement
3  would be forgiven if any of the three assets were
4  sold by a third party. Is that fair?
5     A.  We didn't get into that, no.
6     Q.  And he didn't tell you that, correct?
7     A.  No.
8     Q.  Do your opinions rely on anything that
9  Mr. Dondero told you?
10     A.  Certainly, the -- his role was in --
11  my opinion on what his role was, which formed the
12  compensation thing, is influenced by what he said
13  about this role. So yes, it impacted that, you
14  know, part of the report.
15     Q.  Okay.
16        So other than his role and his duties
17  and responsibilities, is there anything else that
18  Mr. Dondero told you during the interview that you
19  have relied upon in formulating your opinions?
20     A.  I don't believe so.
21     Q.  How many former Highland or affiliate
22  employees did you interview?
23     A.  I interviewed four.
24     Q.  Do you recall the names of any of
25  them?

Page 95

ALAN JOHNSON

1
2     A.  Adkins, Hurley, Lawlor, and Cote.
3     Q.  When did you interview those
4  individuals?
5     A.  Probably early May of this year.
6     Q.  Do you have any notes from those
7  interviews?
8     A.  I do not.
9     Q.  Do you know if your colleague has any
10  notes from those interviews?
11     A.  I don't think so.
12     Q.  Do you know if there's any written
13  record at all of the interviews you conducted with
14  those former Highland or affiliate employees?
15     A.  I don't believe so.
16     Q.  Did you speak to them all at one time
17  or did you speak to them individually?
18     A.  Individually over a few days.
19     Q.  Let's take them one at a time.
20        Mr. Adkins, do you recall the
21  substance of what Mr. Adkins told you?
22     A.  The substance of the four interviews
23  were very similar. They described his role. They
24  described their experiences with loans. So the --
25  the comments from the four were very similar.

Page 96

ALAN JOHNSON

1
2     Q.  So I apologize, I wasn't writing fast
3  enough.
4     A.  I'm sorry --
5     Q.  I have Adkins --
6     A.  -- I apologize.
7     Q.  I have Mr. Adkins, Mr. Lawlor, and who
8  were the other two?
9     A.  Mr. Hurley and Mr. Cote.
10        I believe those are the names.
11     Q.  Did any of them tell you -- withdrawn.
12        Did all of them tell you that they had
13  obtained loans from Highland which were
14  subsequently forgiven in whole or in part?
15     A.  I believe so.
16     Q.  Did any of them tell you how much
17  money was forgiven?
18     A.  We talked about that, yes. They
19  described the amounts.
20     Q.  Okay.
21        What amounts do you recall being
22  described as having been forgiven by Highland?
23     A.  It was in the hundreds of thousands.
24     Q.  Did any of them tell you that they had
25  ever had a loan from Highland that was forgiven in

Page 97

ALAN JOHNSON

1
2  an amount equal to or more than $500,000?
3     A.  They were a little sketchy on the
4  exact amounts, but my impression, they ranged
5  from, say, a quarter million to maybe $500,000 or
6  a little more. That -- that was their
7  recollections.
8     Q.  Did -- did you learn from these four
9  interviews when the last of these loans was
10  forgiven?
11     A.  Probably 8 or 10 years ago.
12     Q.  Did anybody -- withdrawn.
13        Did any of the four of them inform you
14  that Highland had forgiven any loans to any
15  officer or employee in the last 8 to 10 years?
16     A.  I don't recall them saying that, no.
17     Q.  Did you -- do you recall asking them
18  when was the last loan that Highland ever forgave?
19     A.  I don't believe I asked that question.
20     Q.  And as you sit here right now, you
21  have no knowledge as to when the last loan that
22  Highland gave that was forgiven in whole or in
23  part, correct?
24     A.  I don't have that knowledge, no.
25     Q.  Other than the loans that were

Appx. 01982

Page 98

ALAN JOHNSON

2 described for you by these four individuals, can
3 you identify any other loan that Highland has ever
4 forgiven?
5    A.   I don't have any other knowledge, no.
6    Q.   Did any of these four individuals give
7 you any documents relating to any aspect of your
8 report?
9    A.   No.
10    Q.   Did any of them give you any documents
11 that would substantiate the information that they
12 provided to you during the interview?
13    A.   They didn't provide any documents, no.
14    Q.   Did you ask them if they had any
15 documents to substantiate what you were told?
16    A.   Yes.  Yes, I did.
17    Q.   And they told you that they didn't
18 have any?
19       Do I have that right?
20    A.   Yes, that's right.
21    Q.   I think you testified that you do not
22 know who the decision maker was who entered into
23 the agreement with Mr. Dondero in late 2018 or
24 early 2019 with respect to the forgiveness of the
25 loans.

Page 99

ALAN JOHNSON

2       Do I have that right?
3    A.   When I interviewed Mr. Dondero, I did
4 not -- that didn't come up.
5    Q.   So I'm going to represent to you that
6 it's in the pleading that Mr. Dondero entered into
7 the agreement with his sister Nancy, who was the
8 trustee of the Dugaboy Investment Trust who
9 purportedly holds a majority of Highland's
10 interests.
11       Is that new information for you?
12    A.   Yes, it is.
13    Q.   Have you ever heard of Nancy Dondero
14 before?
15    A.   I had heard her name just because
16 there's attorneys representing her.  That's all
17 I -- that's all I know.
18    Q.   You weren't aware until I just told
19 you that she's the person who entered into the
20 agreement with Mr. Dondero concerning --
21 withdrawn.
22       You didn't know until I just told you
23 that Nancy Dondero, as the trustee for the Dugaboy
24 Investment Trust, as the holder of a majority of
25 interests of Highland, is the person who entered

Page 100

ALAN JOHNSON

2 into the agreement with Mr. Dondero?
3    A.   If your assertion is true, then I --
4 then I -- I did not know that.
5    Q.   Okay.
6       And is it fair to say then that you
7 don't know that she was deposed in this case?
8    A.   I don't believe I knew that, no.
9    Q.   And is it fair to say that you've
10 never seen her deposition transcript, if one
11 exists?
12    A.   I have not seen it.
13    Q.   Did you ever ask to speak with the
14 decision maker?
15    A.   No, I did not.
16    Q.   And is that because -- why -- why
17 didn't you ask to speak with the decision maker?
18    A.   My assignment here was to talk about
19 practice, you know, in the industry of using loans
20 and other things.  It was not to -- I was not
21 asked to assess these particular loans.
22       So if the assignment had been to -- to
23 assess the reasonableness or fairness, then I
24 certainly would have done other things, but that
25 was not the assignment here.

Page 101

ALAN JOHNSON

2    Q.   Okay.
3       And can you -- can you be as specific
4 as you can as to what the assignment was?
5    A.   Well, in addition to coming up with a
6 market compensation, in the report, I said the
7 assignment was to talk about the practice and --
8 of using loans and forgivable loans and, you know,
9 financial services firms, but it was not to assess
10 the reasonableness of -- the specific
11 reasonableness of this particular transaction.
12    Q.   Okay.
13       And you're not offering any opinion as
14 to the reasonableness of the agreement that
15 Mr. Dondero entered into with the Dugaboy
16 Investment Trust concerning the forgiveness of any
17 loans.  Is that fair?
18    A.   I'm not -- I'm not putting that forth,
19 no.
20    Q.   And you're not offering any opinions
21 as to whether or not such an agreement exists,
22 correct?
23    A.   No, I am not.
24    Q.   You're not offering any opinions as to
25 whether or not it would have been appropriate for

Page 102

ALAN JOHNSON

1 the company to enter into a loan forgiveness
2 program under the facts and circumstances that
3 existed at the time, correct?
4 A. That's right.
5 Q. And you're not offering any opinion
6 that the loan forgiveness program that Mr. Dondero
7 entered into is consistent with industry
8 standards, are you?
9 A. No, I'm not.
10 Q. Okay.
11 What you are doing is you're -- you're
12 making an assessment of what comparable executives
13 earn in the industry. Is that fair?
14 A. That's part of it, and then the
15 second, as I mentioned, just the use of such loans
16 within the industry and, you know, within
17 Highland.
18 Q. Okay.
19 But you're not offering any opinion as
20 to whether or not -- withdrawn.
21 We'll keep going.
22 You have no information about what
23 diligence, if any, the decision maker conducted
24 prior to entering into the agreement with

Page 103

ALAN JOHNSON

1 Mr. Dondero in late 2018 or early 2019, correct?
2 A. I do not.
3 Q. And you're not offering any opinion as
4 to whether or not the diligence that was done by
5 that person was sufficient, correct?
6 A. I'm not making that opinion, no.
7 Q. And you don't have any information
8 about the skill set or the experience of the
9 decision maker, fair?
10 A. I do not.
11 Q. And you're not offering any opinion as
12 to the skill set or the experience of the decision
13 maker who entered into this alleged agreement on
14 behalf of Highland, correct?
15 A. I am not.
16 MR. MORRIS: Let's go to page 3 of
17 your report, please.
18 So this is the introduction, right?
19 So this is the very first substantive page
20 of the report, is that right?
21 A. Yes.
22 Q. Okay.
23 If you take a look near the end of the
24 first paragraph, there's a sentence that reads,

Page 104

ALAN JOHNSON

1 "Throughout this period, he received loans in lieu
2 of additional current compensation."
3 Do you see that?
4 A. Yes.
5 Q. Have I read that correctly?
6 A. Yes.
7 Q. Why did you include that sentence in
8 your report?
9 A. I -- Mr. Dondero described these loans
10 as -- as a practice of, in lieu of paying
11 compensation, these loans were -- these loans were
12 made.
13 Q. What information were you given that
14 you relied upon in order to make the statement
15 that I just read into the record?
16 A. Well, I interviewed Mr. Dondero, and
17 then I talked to the four prior Highland
18 executives.
19 Q. Now, you told me that the four prior
20 Highland executives described for you certain
21 loans that they had received that had been
22 forgiven in whole or in part by Highland.
23 Do I have that right?
24 A. Yes.

Page 105

ALAN JOHNSON

1 Q. Did any of them give you any
2 information to support the statement that
3 throughout this period Mr. Dondero received loans
4 in lieu of additional current compensation or is
5 that information that came exclusively from
6 Mr. Dondero?
7 A. They described a practice at the
8 company of using these loans as a -- a form of
9 deferred pay, so they described it -- it was not
10 only them, but it applied to others, and then when
11 I interviewed Mr. Dondero, his testimony -- his
12 comments to me were consistent with that.
13 Q. Okay.
14 Did any of the four former employees
15 specifically tell you that Mr. Dondero had ever
16 received loans in lieu of additional current
17 compensation or did they just describe a general
18 practice that applied to others?
19 A. I think they were describing the
20 general practice.
21 Q. Okay.
22 So did anybody other than Mr. Dondero
23 tell you that "Throughout this period, he received
24 loans in lieu of additional current compensation"?

ALAN JOHNSON

1
2      A.   I don't believe so.
3      Q.   Do you have any information at all to
4  support the statement that throughout this period,
5  Mr. Dondero received loans in lieu of additional
6  current compensation other than what Mr. Dondero
7  specifically told you?
8      A.   For him specifically, it's relying on
9  what Mr. Dondero said.
10     Q.   Okay.
11          You haven't seen any documents that
12  support that statement, do you – did you?
13     A.   I have not – I have not seen any
14  documents, no.
15     Q.   Would your opinions change if you
16  learned that for at least the 11 years prior to
17  the bankruptcy filing, Mr. Dondero never received
18  a single loan in lieu of compensation?
19     A.   I'm – I don't understand the
20  question. I'm sorry.
21     Q.   This is the first paragraph of your
22  expert report that we're looking at, right?
23          What if I told you that the sentence
24  "Throughout this period, he received loans in lieu
25  of additional current compensation" was false at

ALAN JOHNSON

1
2  least going back as far as 2008, would you want to
3  amend your report in any way?
4      A.   Well, then the sentence wouldn't be
5  true if the loans weren't a form of deferred
6  compensation.
7          So if the facts changed, then the
8  report would need to be changed.
9      Q.   So let me state it a different way.
10          Would your opinions change if you
11  assume that in the 11 years prior to the
12  bankruptcy filing Highland never forgave any loan
13  in whole or in part that it had extended to
14  Mr. Dondero.
15          MR. AIGEN: Objection, form.
16     A.   No, I don't – I don't think that – I
17  don't think that sentence would change that, no.
18     Q.   Okay.
19          I'm not talking about the sentence
20  itself, but if I could prove to you today that
21  there's no written record of Highland ever
22  forgiving a loan to Mr. Dondero, would that have
23  an impact at all on your opinions?
24     A.   I don't think the written record would
25  change my opinion. I think he – he had stated to

ALAN JOHNSON

1
2  me that the – the – that a lot of these loans
3  were made as a form of deferred compensation with
4  the intent to be forgiven at some point in the
5  future.
6      Q.   All right. I'm going to ask you to
7  assume the following facts: For the 11 years
8  prior to the petition date, other than the three
9  loans that were outstanding as of the petition
10  date, Mr. Dondero received three loans from
11  Highland. Okay?
12          So that's assumption No. 1, that
13  between 2008 and 2019, Mr. Dondero received three
14  loans from Highland.
15          Assumption No. 2, that Mr. Dondero
16  paid Highland all principal and interest due under
17  all three loans.
18          Assumption No. 3: The last of those
19  three loans was taken out in January 2018 and was
20  paid back in full plus interest in December 2019.
21          The next assumption: Mr. Dondero has
22  testified that any loan that Highland actually
23  forgave would be described in Highland's audited
24  financial statements and that in those financial
25  statements going back to 2008, there's no

ALAN JOHNSON

1
2  description of any loan ever being given to
3  Mr. Dondero that was forgiven in whole or in part.
4          Do you remember all those assumptions?
5      A.   I believe so.
6      Q.   Okay.
7          If you assume that each of those
8  assumptions is, in fact, true, would you have any
9  basis at all to conclude that Mr. Dondero received
10  loans in lieu of additional compensation in the
11  decade before Highland filed for bankruptcy?
12          MR. AIGEN: Objection, form.
13     A.   Well, in trying to answer the
14  question, the – I think a lot of the loans here,
15  as I recall, were for different entities and
16  different, you know, amounts and situations.
17          So if – if the – either hypothetical
18  or the assumptions we're making here, that the
19  loans eventually were not forgiven, I don't know
20  if the – they were intended to be forgiven and
21  just weren't or we're talking about other loans
22  that are outside the three that you – that you
23  mentioned.
24     Q.   Is it fair to say that neither
25  Mr. Dondero nor the Stinson firm ever shared with

Page 110

ALAN JOHNSON

2 you the fact that Mr. Dondero had received three
3 loans that are not the subject of this litigation?
4    A.   I was aware that I believe there were
5 loans that were not subject to litigation that had
6 been paid off or other types of things. I was
7 aware of that.
8    Q.   How did you learn that?
9    A.   I think I've seen materials that
10 listed loans that showed principals paid off and
11 so forth, but I think I've been -- I know they
12 were loans -- I believe I recall that they were
13 loans outside of what's being disputed.
14    Q.   I'm sorry.
15    A.   No, I was done. I'm sorry.
16    Q.   Did you ever discuss that with
17 Mr. Dondero?
18    A.   I did not.
19    Q.   Do you have any knowledge as to why he
20 paid back some loans and others were supposed to
21 be treated as compensation?
22    A.   I do not know.
23    Q.   Is there any reason you didn't
24 disclose in your report that Mr. Dondero had
25 received loans that he had paid back?

Page 111

ALAN JOHNSON

2    A.   I didn't think it was relevant.
3    Q.   Did you ever ask Mr. Dondero how he
4 reconciled the payment of principal and interest
5 due on the notes prior to the petition date but
6 his treatment of the notes pursuant to the
7 agreement that's been described to you?
8    A.   I did not.
9    Q.   Are you curious at all as to why he
10 paid off some of the notes but not others?
11       MR. AIGEN:  Objection, form.
12    A.   Yeah, I'm probably curious. It's
13 convoluted enough, I'm a curious person, so yeah,
14 I'd probably be curious to understand all the ins
15 and outs.
16    Q.   Did it cause you any discomfort that
17 Mr. Dondero paid certain loans off in full but the
18 only loans that he didn't pay off in full were the
19 loans that existed as of the petition date?
20       MR. AIGEN:  Objection, form.
21    A.   Well, isn't that by definition true?
22 If they've already been paid off, they couldn't
23 exist as of the petition date, right?
24       Isn't that just -- am I missing
25 something?

Page 112

ALAN JOHNSON

2    Q.   Well, you told me that, from the
3 review of the documents, you understood that there
4 were loans that Mr. Dondero had taken out that had
5 been paid off in full. Is that right?
6    A.   Yes, I recall that I was aware that
7 there were loans that had been paid off. I was
8 aware of that.
9    Q.   And so paying back the loans is
10 certainly not -- would you agree with me that if
11 he -- that if he was paying back the loans, then
12 he didn't receive the loans in lieu of additional
13 current compensation?
14    A.   Yeah, when I wrote the report, maybe I
15 should have parsed out that, but I think I was
16 focusing on that there were loans that were
17 deferred compensation.
18       I guess what we're saying is there may
19 have been other loans that were not deferred
20 compensation. They were more run-of-the-mill
21 obligations, so if that's the point we're making,
22 but I think what I was trying to address here,
23 that there were loans made that were intended to
24 be deferred compensation.
25    Q.   And the only basis that you have for

Page 113

ALAN JOHNSON

2 that statement is what Mr. Dondero told you,
3 correct?
4    A.   For himself, that is true, and then
5 the other four executives provided a little bit of
6 history on the use of such loans within the
7 company.
8    Q.   And it didn't concern you at all that
9 certain loans were paid back and that certain
10 loans, according to Mr. Dondero, are subject to
11 this agreement that he entered into with the
12 company?
13    A.   I think that would be something that
14 if -- certainly, I would have asked him about, but
15 that certainly would be something to -- to discuss
16 with him, yes.
17    Q.   But you haven't done that as of today,
18 correct?
19    A.   I have not.
20    Q.   And nobody has explained to you why he
21 paid back certain loans but certain other loans
22 were supposed to be provided in lieu of additional
23 current compensation, right?
24    A.   That's right.
25    Q.   Okay.

ALAN JOHNSON

1
2      The next sentence in this paragraph
3  says -- and I just want to make sure that I'm
4  quoting this correctly -- "Consistent with company
5  practice, the loans were considered a form of
6  deferred compensation that could be realized over
7  time as the loans were forgiven and the income
8  recognized by the individuals."
9      Have I read that correctly?
10     A.   Yes.
11     Q.   Why did you include that sentence in
12  your report?
13     A.   Well, from talking to the four former
14  executives and himself, he described a company
15  practice of having using loans as deferred
16  compensation.  In his words, it was called
17  "delayed gratification."
18      So you had these loans that were
19  intended to provide capital to invest in the
20  business, and they would eventually be forgiven
21  and then the income would be recognized by the
22  individual.
23      So the four of them and himself had
24  described a company practice of using these loans
25  to -- you know, as a form of deferred

ALAN JOHNSON

1
2  compensation.
3      Q.   And that practice is very important to
4  your opinions, right?
5      A.   Well, it -- it -- as I said earlier,
6  my opinion is about the use of loans in private
7  financial services companies and what his market
8  value, his compensation, would be.
9      Q.   But actually, the practice that was
10  described to you by Mr. Dondero and these four
11  former employees, you relied upon to determine
12  that Highland had a practice and that the
13  forgiveness of the loans in this instance would be
14  consistent with that practice.  Is that right?
15     A.   That's right.
16      MR. MORRIS:  Let's turn to page 16 of
17  the report.
18     Q.   This is your conclusion, right?
19     A.   Yes.
20     Q.   And in the middle, it says,
21  "Additionally, it is my opinion that the loans
22  provided to Mr. Dondero should be considered
23  potential deferred compensation as they were
24  similar to loans given to other professionals at
25  the firm."

ALAN JOHNSON

1
2      Have I read that correctly?
3      A.   Yes.
4      Q.   And is the information that supports
5  your opinion in that sentence based solely on what
6  was told to you by Mr. Dondero and the four
7  individuals?
8      A.   Yes.
9      Q.   You have no documents that support
10  that sentence.  Is that correct?
11     A.   That's correct.
12     Q.   And I assume, as a dutiful expert, you
13  asked for any documentation that might concern or
14  relate to the prior practice.  Is that right?
15     A.   That's right.
16     Q.   Just looking at the sentence itself,
17  what do you mean by the loans being "similar to
18  loans given to other professionals at the firm"?
19     A.   Just that they would be forgiven.  I
20  mean that deferred compensation at some point
21  would be -- would be forgiven.
22     Q.   They're certainly not similar in
23  amount.  Is that fair?
24     A.   No.  They're much larger.
25     Q.   In fact, I think you testified that

ALAN JOHNSON

1
2  the largest loan you have been informed has ever
3  been forgiven was $500,000 or thereabouts.
4      Do I have that right?
5      A.   That's what I'm aware of, yes.
6      Q.   And Mr. Dondero has told you that
7  there's 40 to $50 million in loans that he
8  contends are the subject of an agreement?
9      A.   I don't know if he told me the 40 to
10  50 million, but I think I've seen that in various
11  spreadsheets or numbers.  That's the number I
12  believe -- at least that I recall that's in
13  dispute.
14     Q.   So is it fair to say that the
15  aggregate value of the loans that are the subject
16  to the agreement that Mr. Dondero described for
17  you concern loans that are 80 to 100 times larger
18  than the largest loan you have been told has ever
19  been forgiven by Highland?
20     A.   It is much -- it is much large than
21  any loan I'm familiar with, yes.
22     Q.   Did anybody ever tell you that
23  Highland had ever forgiven a loan made to a
24  corporate affiliate?
25     A.   That, I'm not aware of, no.

Page 118

ALAN JOHNSON

2  Q.  So there's nothing similar about the
3  loans that were given to the corporate affiliates
4  as compared to the loans that were forgiven for
5  the four individuals you spoke with.  Is that
6  correct?
7      MR. AIGEN:  Objection, form.
8      MR. MORRIS:  Withdrawn.  That's a fair
9  objection.
10     Q.  The four individuals that you spoke
11 with, they described for you loans that had been
12 given to individuals.  Is that right?
13     A.  Yes.
14     Q.  But the loan documents that you saw
15 that had those schedules of loans that were being
16 rolled up, all of those loans related to corporate
17 entities.  Isn't that right?
18     A.  No.  I think I mentioned before, I
19 didn't really focus on that.  I looked at the
20 loans themselves.  So I did not actually focus on
21 the corporate entities in my perusal of those
22 documents.
23     Q.  Would there be any difference in your
24 expert opinion as to whether or not the loan was
25 given to an individual or given to a corporate

Page 119

ALAN JOHNSON

2  entity?
3      A.  Usually it would, but in these closely
4  held corporations, often they're synonymous, so it
5  really would depend on the circumstances.
6      Q.  Let's -- let's spend some time looking
7  at the documentation that we have that's been
8  produced in this case concerning this company
9  practice.
10     MR. MORRIS:  And so I'd like to put up
11 on the screen what's been marked as --
12 premarked as Exhibit 63, which is Highland's
13 2008 audited financial statements.
14     (Exhibit 63, Highland's 2008 audited
15     financial statements, was marked for
16     identification at this time.)
17 BY MR. MORRIS:
18     Q.  And I'd like you, as we go through
19 this exercise, Mr. Johnson, to take notes of all
20 of the loans that we're going to discuss.  There
21 won't be many, but do you have a pen and a piece
22 of paper with you?
23     A.  I do.
24     Q.  Yeah, can I trouble you to just write
25 down, you know, "2008 financial statements," and

Page 120

ALAN JOHNSON

2  we're just going to do this for every year through
3  2018, so you can have a full understanding of the
4  loans that Highland included in its audited
5  financial statements.
6      I assume that you did not rely on this
7  document for your opinions because you didn't have
8  it at the time that you prepared your report;
9  correct?
10     A.  That's right.
11     Q.  Okay.
12     MR. MORRIS:  And if we could turn to
13 page 38, please.
14     I'm sorry, not PDF 38.  I'm referring
15 to the document, No. 38.  It shouldn't be
16 too far.
17     This is going to be a little painful
18 on the Zoom, Mr. Johnson.  I ask for your
19 patience.
20     All right.  Stop right there.
21     Q.  Do you see that this portion of the
22 Highland's 2008 audited financial statements has a
23 section called "Notes to Affiliates"?
24     A.  Yes.
25     Q.  Okay.

Page 121

ALAN JOHNSON

2      And in paragraph 1, it says that the
3  partnership issued a promissory note of $400,000
4  to an employee.
5      Do you see that?
6      A.  Yes.
7      Q.  And at the end of the paragraph, it
8  says that that promissory note was forgiven.
9      Do you see that?
10     A.  Yes.
11     Q.  So we can write down that in 2008,
12 Highland forgave a promissory note to an employee
13 in the amount of $400,000.
14     A.  Okay.
15     Q.  The next paragraph, there's a
16 reference to an August 1 promissory note in the
17 amount of $500,000.
18     Do you see that?
19     A.  Yes.
20     Q.  And at the end of the year, that
21 promissory note was still outstanding.
22     Do you see that?
23     A.  Okay.
24     Q.  So No. 1 is 7/31/06, $400,000
25 forgiven.

Page 122

ALAN JOHNSON

No. 2 is 8/1/08, $500,000 outstanding,
right?

No. 3, do you see there's a reference
to two loans that were made in 2 – on May 21,
2007, in the amount of a million dollars each?

A. Okay.

Q. And if you read further, it says that
during 2008, 30 percent of the outstanding
principal was owed – was forgiven, leaving
$700,000 due and paying.

So there's two loans that were
forgiven in the amount of $300,000 each.

Do I have that right?

A. Okay.

Q. Then, in the next paragraph, we've got
August 20th, 2008, and there's $330,000 loan which
is all outstanding at year end.

Do I have that right?

A. Okay.

Q. And the next paragraph, August 1
there's a $500,000 loan that was given to an
employee that was all outstanding at year end.

Do I have that right?

A. Okay.

Page 123

ALAN JOHNSON

Q. And then on October 15th, there's
another $500,000 loan made to another employee
that was outstanding at year end.

Do I have that right?

A. Okay.

Q. So would you agree with me that in
fiscal year 2008, Highland forgave one loan to an
employee in the amount of $400,000 and forgave in
part loans to two other employees in the amount of
$300,000 each?

A. Okay.

Q. Okay.

MR. MORRIS: Let's go to Exhibit
No. 64.

(Exhibit 64, Highland's audited
financial statements for December 31, 2009,
was marked for identification at this time.)

BY MR. MORRIS:

Q. And do you see that this is Highland's
audited financial statements for December 31,
2009?

A. Yes.

Q. Okay.

MR. MORRIS: Can we go to page 33 of

Page 124

ALAN JOHNSON

the document?

There you go. All right.

Q. The first one that's described is an
August 20th, 2008 loan in the amount of $300,000,
and that seems to correspond with the fourth loan
that we looked at in 2008 because it's also a loan
dated August 20, 2008 in the amount of $330,000.

Do you see that?

A. I'm sorry, I lost my train.

Where is it now?

Q. So in the very first paragraph, under
"Affiliated Transactions"?

A. Yeah, okay, I see it now. I'm sorry.

Q. Okay.

This loan, is it fair, if you take a
look at your notes, this loan corresponds with
the – with the loan that was described in the
2008 financials.

Do you have that as the fourth item on
your list, if you look at your list?

A. My list is going to be incomplete here
in terms of going through this, but I'm trying to
take notes here, but I believe what you say is
true.

Page 125

ALAN JOHNSON

Q. Okay.

And you can see that the principal
amount of the note had been reduced by year end.

Do you see that?

A. Yes.

Q. Okay.

So there's no evidence that this
particular note was forgiven in whole or in part
in 2009, correct?

A. That's right.

Q. And if we look at the next paragraph,
there's a reference to an August 1, 2008 note in
the amount of $500,000.

Do you see that?

A. Yes.

Q. And that entire amount of principal
was still outstanding at the end of the year.

Do you see that?

A. Yes.

Q. So there's no evidence that this note
was forgiven in whole or in part in 2009, correct?

A. Yes.

Q. And there's no other – we can go
through the rest of the section, but there's no

Appx. 01989

Page 126

1           ALAN JOHNSON
2    other notes of any kind that are referred to in --
3    in this section of the audited financials.
4           If we can just scroll down to the end
5    of the affiliated transaction sections, I mean, I
6    will tell you that they put the employees up top.
7           So is it fair to say based on just
8    what I've shown you that you don't see any
9    evidence that Highland forgave any notes to any
10   employees in 2009?
11       A.  I think that's right.
12       Q.  Okay.
13          MR. MORRIS:  Let's go to 2010,
14   Exhibit 65, please.
15          (Exhibit 65, Highland's audited
16       financial statements for December 31, 2010,
17       was marked for identification at this time.)
18          MR. MORRIS:  And if we can turn to
19   page 33.
20   BY MR. MORRIS:
21       Q.  So if we look at the first paragraph,
22   do you see there's still a reference to the
23   $330,000 note?
24       A.  Yep.
25       Q.  Okay.

Page 127

1           ALAN JOHNSON
2           It's interesting, in the
3    next-to-the-last sentence -- let's see if I'm
4    reading this correctly -- it says, "The note has
5    specific forgiveness provisions of principal and
6    interest prior to maturity if certain milestones'
7    dates are obtained."
8           Do you see that?
9        A.  Yes.
10       Q.  So based on that, would you conclude
11   in your experience that the note actually had
12   specific provisions concerning forgiveness?
13       A.  Yes, that's what that implies.
14       Q.  And based on your experience, would
15   you understand that this note was really a form of
16   retention note whereby it would be forgiven if the
17   person were still employed at the time of the
18   note's -- at the end of the note's term?
19       A.  It's hard to tell.  Milestones could
20   be performance or it -- it could go either way,
21   but there's certain provisions that have been
22   documented that it will be forgiven either through
23   time or performance.
24       Q.  Well, it doesn't refer to milestones.
25   Instead, it refers to milestone dates.

Page 128

1           ALAN JOHNSON
2           Do you see that?
3        A.  I -- I think you're right, just I've
4    never seen the word "milestone dates" used, so I'm
5    not quite sure what they were trying to say, but I
6    think you're probably right.
7        Q.  Okay.
8           But in any event, you would agree with
9    me that there's nothing in this paragraph that
10   suggests that Highland forgave that loan in whole
11   or in part in 2010, correct?
12       A.  That's right.
13       Q.  And if we scroll down through the rest
14   of this section, I think -- I hope you'll agree
15   with me that there's no other reference to any
16   other loans given to any employee in 2010?
17       A.  I think that's right.
18          MR. MORRIS:  Okay.  Let's go to
19   Exhibit 66 --
20       Q.  Oh, I'm going to tell you, I'm
21   skipping, actually, because there's only so much
22   pain I'm willing to endure.
23          We're going to skip 2011, '12, and
24   '13, and I'm going to represent to you that
25   there's absolutely nothing in any of those audited

Page 129

1           ALAN JOHNSON
2    financial statements that pertains or concerns any
3    loans given to any employee.
4           And you can -- you can -- not accept
5    my representation, but take that as an assumption
6    you should make, that there's no reference to any
7    loan to any employee in those years.
8           MR. MORRIS:  Can we go to Exhibit 66
9    please.
10          MS. CANTY:  It's 69, 2014.
11          MR. MORRIS:  Okay.  Yep, it's up on
12   the screen.
13          (Exhibit 69, Highland's audited
14       financial statements for December 31, 2014,
15       was marked for identification at this time.)
16   BY MR. MORRIS:
17       Q.  So do you see that this is the 2014
18   audited financial reports for Highland Capital
19   Management?
20       A.  Yes.
21       Q.  And you may or may not have seen this
22   report.  Is that right?
23       A.  I think I got it.
24       Q.  When you reviewed the audited
25   financial statements that you were given, did you

ALAN JOHNSON

1

2 review them to try to learn any more information

3 about the practice that was described to you

4 whereby Highland would forgive loans to employees

5 in whole or in part?

6    A.   I had just received these.  I didn't

7 have time to go through it.

8       MR. MORRIS:  Let's go to page 27,

9 please.

10    Q.   Okay.  Do you see that there's a

11 section called "Affiliated Transactions" again

12 that begins at the bottom of page 27?

13    A.   Okay.

14    Q.   And do you see that the first

15 paragraph describes a loan between Highland and

16 Highland Capital Management Fund Advisors?

17    A.   Yes.

18    Q.   And does it appear to you that the

19 loan that was granted in 2014 was fully

20 outstanding at year end?

21    A.   Yes.

22    Q.   And there's no reference in that

23 paragraph to any portion of the loan having been

24 forgiven, correct?

25    A.   That's right.

ALAN JOHNSON

1

2    Q.   And then the next paragraph refers to

3 another loan between the same parties.

4       Do I have that right?

5    A.   Yes.

6    Q.   And there's nothing in that paragraph

7 that suggests that that loan was forgiven in whole

8 or in part at any time in 2014, correct?

9    A.   That's right.

10       MR. MORRIS:  And let's go to the next

11 page, please.

12    Q.   Do you see that there's a reference to

13 a note in the first paragraph between Highland and

14 NexPoint that was issued in 2014?

15    A.   Yes.

16    Q.   And there's nothing in that paragraph

17 that suggests the note was forgiven in whole or in

18 part at any time in 2014, correct?

19    A.   Yes.

20    Q.   In fact, the entirety of the principal

21 amount plus interest was still due at year end,

22 correct?

23    A.   Yes.

24    Q.   The next paragraph, do you see it

25 refers to a note between Highland and an entity

ALAN JOHNSON

1

2 called "HCRE"?

3    A.   Yes.

4    Q.   And there's nothing in that paragraph

5 that suggests that the note or the loan was

6 forgiven in whole or in part at any time in 2014,

7 correct?

8    A.   That's right.

9    Q.   There was a modest payment made of

10 principal during the year.

11       Do I have that right?  Is my

12 interpretation a fair interpretation?

13    A.   That's right.

14    Q.   And then the last section of this, the

15 last paragraph of this section refers to a note

16 between Highland and an entity called "Highland

17 Capital Management Services, Inc."

18       Do you see that?

19    A.   Yes.

20    Q.   And there's nothing in that paragraph

21 that suggests that any portion of that loan was

22 forgiven in whole or in part in 2014, correct?

23    A.   That's right.

24    Q.   And, in fact, the entire principal

25 balance plus interest was due at year end.  Is

ALAN JOHNSON

1

2 that fair?

3    A.   Yes.

4       MR. MORRIS:  Okay.  Let's go to 2015,

5 please.

6       What exhibit are we on?

7       MS. CANTY:  70 is 2015.

8       MR. MORRIS:  I see what we did.  Okay.

9       (Exhibit 70, Highland's audited

10 financial statements for December 31, 2015,

11 was marked for identification at this time.)

12       MR. MORRIS:  If we can just go to the

13 first page, please.

14 BY MR. MORRIS:

15    Q.   Do you see that this is the first page

16 of the audited financial statements for the year

17 ending 2015 for Highland?

18    A.   Yes.

19    Q.   And you're not relying on this

20 document for any of your opinions, correct?

21    A.   That's right.

22       MR. MORRIS:  Can we turn to page 27,

23 please -- I messed this up, sorry.

24       Keep going down.  Keep going.  Keep

25 going.

ALAN JOHNSON

2 Okay. Stop right there.

3 Can we just scroll down so we can see

4 what page number we're on?

5 Q. All right. Do you see we're on

6 page 29, Mr. Johnson?

7 A. Yes.

8 MR. MORRIS: Can we go to the top of

9 the affiliates transaction.

10 Q. Do you see that there's a reference to

11 Highland Capital Management Fund Advisors?

12 A. Yes.

13 Q. Okay.

14 And do you see there's a reference to

15 $6.1 million principal and interest being due at

16 the year end?

17 A. Yes.

18 Q. And then there's a sentence that says,

19 "The partnership will not demand payment on

20 amounts owed prior to May 31, 2017."

21 Do you see that?

22 A. Yes.

23 Q. Were you aware that Highland had

24 agreed with its affiliate not to make a demand on

25 the payments for a period of time?

ALAN JOHNSON

2 A. I wasn't aware of that.

3 Q. Do you see the last paragraph -- the

4 last sentence of the paragraph says, "A fair value

5 of the partnership's outstanding notes receivable

6 approximates the carrying value of the notes

7 receivable"?

8 A. Yes.

9 Q. Do you understand that to mean that

10 the fair value of the notes equals to the

11 principal face amount of the notes?

12 A. The carrying value would include the

13 face amount probably and any unpaid interest, but

14 yes, it would be the book -- the book value, yes.

15 Q. And the book value in this case equals

16 the unpaid principal and interest due on the note,

17 correct?

18 A. Yes.

19 Q. And so as of this time anyway, the

20 fair value of the notes equaled the unpaid

21 principal and interest due on the note, correct?

22 MR. AIGEN: Objection, form.

23 A. Yes, I think that's right.

24 Q. There's nothing in that first

25 paragraph that says or suggests that any of the

ALAN JOHNSON

2 loans with HCMFA were forgiven in whole or in part

3 in 2015, correct?

4 A. Right.

5 Q. And the next paragraph relates to

6 loans with NexPoint Advisors.

7 Do you see that?

8 A. Yes.

9 Q. Okay.

10 Take your time, but my question is

11 whether there's anything in that paragraph that

12 states or suggests that any portion of the loans

13 between Highland and NexPoint were forgiven in

14 whole or in part in 2015?

15 A. I think that's right, yes.

16 Q. Do you see there was also a statement

17 regarding Highland's not demanding payment on the

18 notes for a couple of years?

19 A. Yes.

20 Q. In your experience and based on your

21 expertise, can you think of a reason why Highland

22 would agree not to make a demand on promissory

23 notes?

24 A. It could be the financial condition of

25 the borrower that was part of the negotiation

ALAN JOHNSON

2 putting the loans together. It would -- it

3 generally have something to do with the financial

4 condition of the borrower and the terms.

5 Q. Let's look at the next paragraph.

6 Do you see it relates to HCRE?

7 A. Yes.

8 Q. And do you see how during 2014 and

9 '15, HCRE issued promissory notes to Highland in

10 the aggregate amount of $13 million and that

11 principal amount plus interest was due at the end

12 of the year?

13 A. Sorry, it just says it's payable on

14 demand, right?

15 Q. Right.

16 And the amount is -- that was loaned

17 was $13 million, but at year end 2015, the unpaid

18 principal and interest actually equaled

19 $13.3 million.

20 Have I read that correctly?

21 A. Yes.

22 Q. Is there anything in this paragraph

23 that says or suggests that Highland forgave in

24 whole or in part any loans that were made to HCRE

25 in the year 2014 or '15?

ALAN JOHNSON

1
2  A. No.
3     MR. MORRIS: Let's go to the next
4  paragraph.
5     Q. Do you see there's a reference to
6  loans or promissory notes that were issued to
7  Highland by HCMSI?
8     A. Yes.
9     Q. Okay.
10     And do you see that the aggregate
11  amount of the notes was $23 million?
12     A. Yes.
13     Q. And do you see that during the years
14  ended 2014, Highland Capital Management Services,
15  Inc. repaid $8.1 million in principal?
16     A. Yes.
17     Q. Is it customary in the industry to
18  make principal payments or interest payments
19  against loans that are the subject to agreements
20  of forgiveness?
21     A. It really would depend on the
22  likelihood of it being forgiven. If I had a loan
23  that I thought wouldn't be forgiven, I might pay
24  it early because I just don't think the
25  probability of being forgiven is likely. If I

ALAN JOHNSON

2  think it's likely or highly likely, I would try to
3  avoid paying down the balance and wait for it to
4  be forgiven.
5     Q. And is that the advice you would give
6  to the maker of a note who owed money that was
7  subject to a forgiveness agreement?
8     A. Maker of the loan, I would tell them
9  if -- if things are looking like you're going to
10  forgive it, they probably won't want to pay down
11  the principal and the interest if they can avoid
12  it, and if the -- it's unlikely it will be
13  forgiven due to the terms, then they're more
14  likely to pay the principal and interest sooner.
15     Q. Is there anything in this paragraph
16  that says or suggests that Highland had agreed to
17  forgive in whole or in part any loan that it had
18  extended to Highland Capital Management Services?
19     A. I don't believe so, no.
20     MR. MORRIS: Okay. Let's go to the
21  2016 financials.
22     Q. Do you see that this is the audited
23  financial statements for Highland Capital
24  Management, L.P. for the period ending December
25  31, 2016?

ALAN JOHNSON

1
2     A. Yes.
3     Q. Okay. And you're not relying on this
4  report for any of your opinions, correct?
5     A. That's correct.
6     Q. Okay.
7     MR. MORRIS: Can we go to page 31,
8  please.
9     Q. Okay. Do you see notes and other
10  amounts due from affiliates?
11     A. Yes.
12     Q. The first paragraph relates to loans
13  between Highland and its affiliate HCMFA.
14     Do you see that?
15     A. Yes.
16     Q. Is there anything in this paragraph
17  that states or suggests that Highland has forgiven
18  in whole or in part any portion of any loan that
19  it made to HCMFA?
20     A. No.
21     Q. Looking at the next paragraph, do you
22  see that concerns loans between Highland and
23  NexPoint Advisors?
24     A. Yes.
25     Q. Is there anything in that paragraph

ALAN JOHNSON

2  that states or suggests that Highland forgave in
3  whole or in part any portion of any loan that it
4  gave to NexPoint?
5     A. No.
6     Q. Looking at the next paragraph, do you
7  see there's a reference to loans between Highland
8  and HCRE Partners, LLC?
9     A. Yes.
10     Q. Is there any statement or suggestions
11  in that paragraph that Highland forgave in whole
12  or in part any loan it made to HCRE Partners, LLC?
13     A. No.
14     Q. Looking at the next paragraph, do you
15  see there's a reference to loans between Highland
16  and HCMSI?
17     A. Yes.
18     Q. Is there anything in that paragraph
19  that states or suggests that Highland forgave in
20  whole or in part any loan that it made to HCMSI?
21     A. No.
22     MR. MORRIS: Okay. Can we go to the
23  next paragraph.
24     Q. Do you see there's a reference to
25  promissory notes that James Dondero issued to

ALAN JOHNSON

1
2 Highland in the aggregate amount of $14.8 million
3 in 2016?
4    A.   Yes.
5    Q.   Okay.
6        So this is the first time we're seeing
7 a loan to Mr. Dondero that's reported in the
8 financial statements that we've looked at.  Is
9 that fair?
10   A.   I think that's right, yes.
11   Q.   Okay.
12       And according to this audited
13 financial statement, Highland loaned Mr. Dondero
14 $14.8 million in 2016.
15       Do I have that right?
16   A.   Yes.
17   Q.   And at the end of the year, he
18 actually owed principal and interest in the amount
19 of $14.9 million, correct?
20   A.   Yes.
21   Q.   And there's no statement or suggestion
22 in this paragraph that Highland had forgiven in
23 whole or in part any portion of the loans that it
24 had extended to Mr. Dondero.
25       Do I have that right?

ALAN JOHNSON

1
2    A.   Yes.
3    Q.   Okay.
4        Do you see the next paragraph relates
5 to a gentleman named Mark Okada?
6    A.   Yes.
7    Q.   Do you have any understanding as to
8 who Mr. Okada is?
9    A.   He was the other major shareholder in
10 Highland.
11   Q.   And do you understand him to be one of
12 the -- to be a co-founder with Mr. Dondero of
13 Highland?
14   A.   I believe that's right, yes.
15   Q.   Did you make any inquiry as to whether
16 or not Mr. Okada had ever obtained any loans from
17 Highland?
18   A.   I don't -- I don't believe I did.
19   Q.   Do you know if Highland ever forgave
20 any loan in whole or in part that it extended to
21 Mr. Okada?
22   A.   I don't know.
23   Q.   Are you aware that Mr. Okada paid back
24 the loan referenced in this paragraph in full plus
25 interest?

ALAN JOHNSON

1
2    A.   I was not aware of that.
3        MR. MORRIS:  Let's just go to the next
4 page to see if there's anything else here.
5    Q.   There's a reference to Dugaboy.
6        Do you see that?
7    A.   Yes.
8    Q.   You don't know what Dugaboy is, do
9 you?
10   A.   I do not.
11   Q.   Nobody has ever told you about
12 Dugaboy.
13       Do I have that right?
14   A.   That's right.
15   Q.   So you weren't aware that Highland
16 loaned $23.4 million to Dugaboy in 2016?
17   A.   Well, that's not -- it says they
18 purchased a promissory note due from Dugaboy.
19   Q.   Okay.
20       So now Dugaboy owes the partnership
21 $23.4 million, correct?
22   A.   That's not -- at least my reading of
23 it is they purchased a note from Dugaboy.
24   Q.   Why don't we assume that what they
25 meant by that was that Dugaboy provided a note to

ALAN JOHNSON

1
2 Highland in the amount of $23.4 million.
3        Okay?  Can we make that assumption?
4    A.   We can assume that.  That's not what
5 it says.
6    Q.   Okay.  I'm going to ask you to
7 assume --
8    A.   Okay.
9    Q.   -- that in 2016, Dugaboy incurred an
10 obligation to Highland in the amount of
11 $23.6 million.
12       I'm going to ask you to further assume
13 that the Dugaboy Investment Trust is a trust
14 created by Jim Dondero.
15       I'm going to ask you to further assume
16 that the purpose of the trust is to provide living
17 expenses to the beneficiaries.
18       I'm going to ask you to further assume
19 that Mr. Dondero is the beneficiary of that trust
20 for his lifetime.
21       And I'm going to ask you to further
22 assume that his sister Nancy is the trustee.
23       If Highland loaned money to Dugaboy,
24 is that a fact that would have been relevant to
25 your analysis?

ALAN JOHNSON

1
2    A.  It could have been. It could have
3 been.
4    Q.  And why could it have been relevant to
5 your analysis?
6    A.  Well, if it's in effect a loan to him,
7 then I would probably consider it similar to the
8 other loans, but maybe if I had time to think
9 about it, it -- I might have considered
10 differently.
11      But if I came to the conclusion that
12 loaning to that -- the investment trust or to him
13 personally is essentially the same thing, then I
14 probably would have considered, you know, an
15 equal -- on an equal basis.
16    Q.  Now, neither Mr. Dondero nor Stinson
17 shared with you any information about any loan
18 that Highland ever extended to Dugaboy, if any.
19 Is that correct?
20    A.  It may have been in the listing of
21 loans -- the listing, but I had no separate
22 conversation about Dugaboy, no.
23    Q.  There's nothing in this paragraph that
24 suggests that any loan between Dugaboy and
25 Highland was forgiven in whole or in part in 2016,

ALAN JOHNSON

1
2 correct?
3    A.  That's right.
4    Q.  So if you look at your notes and
5 refresh your recollection as to what we've been
6 through just now, is it fair to say that there's
7 no evidence of Highland forgiving any loan to
8 anybody in the world in whole or in part at any
9 time since 2008?
10      MR. AIGEN: Objection, form.
11    A.  The ones we've looked through, I think
12 you're right. I think there was forgiveness in
13 2008. I think that's correct.
14    Q.  And given the amounts of the loans
15 that we looked at in 2008 -- and if you want to
16 refer to your cheat sheet to refresh your
17 recollection -- does it seem that the loans that
18 were described in the 2008 audited financial
19 statements might, in fact, be the very loans that
20 were described for you by the four individuals you
21 interviewed?
22    A.  They could -- they certainly could
23 have been, yes.
24    Q.  They're consistent with the amount of
25 the loans that were forgiven as was told by you,

ALAN JOHNSON

1
2 right?
3    A.  That is correct, yes.
4      MR. MORRIS: Let's go to 2017.
5      Can we go to page 30 --
6    Q.  Oh, I apologize, before we do that,
7 did you see that first page, sir?
8      Do you understand that we're looking
9 at Highland's audited financial statements for the
10 period ending December 31, 2017?
11    A.  Yes.
12    Q.  Okay.
13      And this is not a document you're
14 relying on, correct?
15    A.  That is correct.
16    Q.  Okay.
17      So now we're at page 30 of the audited
18 financial statements, and we're again in the
19 section relating to notes and other amounts due
20 from affiliates.
21      And do you see the first paragraph
22 relates to notes that Highland Capital Management
23 Fund Advisors has issued to Highland?
24    A.  Yes.
25    Q.  And this paragraph, like all of the

ALAN JOHNSON

1
2 paragraphs, continues to say, quote, at the end,
3 that fair value of the partnership's outstanding
4 notes receivable approximates the carrying value
5 of the notes receivable.
6      Do you see that?
7    A.  Yes.
8    Q.  Okay.
9      And that sentence is at the end of
10 every paragraph in this section.
11      Do I have that right, if we continue
12 to scroll there?
13    A.  Yes.
14    Q.  Okay.
15      So looking at the first paragraph
16 relating to HCMFA, there's nothing in that
17 paragraph that states or suggests that Highland
18 agreed to forgive in whole or in part any loan it
19 had extended to HCMFA, correct?
20    A.  Yes.
21    Q.  And looking at the second paragraph,
22 do you see that it states that Highland combined
23 its outstanding promissory and revolving notes
24 from NexPoint to a single note with a 30-year
25 amortization schedule?

Page 150

ALAN JOHNSON

1
2      I'm summarizing.
3      A.   Yes.
4      Q.   And is it fair to assume that that's
5   probably one of the notes that recently saw?
6           MR. AIGEN:  Objection, form.
7      A.   Yes.  Yes.
8      Q.   Yes?
9      A.   Yes, that's correct.
10     Q.   And the reason it's correct is because
11  it comports with your recollection that there was
12  a roll-up of previously outstanding notes that
13  were combined in one into a 30-year term note,
14  right?
15     A.   That is correct.
16     Q.   Okay.
17          Is there anything in this paragraph
18  that states or suggests that Highland agreed to
19  forgive in whole or in part any aspect of any loan
20  it ever gave to NexPoint?
21     A.   No, there's not.
22     Q.   Looking at the next paragraph for
23  HCRE, do you see that there's a description of the
24  promissory note that HCRE issued to Highland in
25  exchange for a loan in December -- in 2017?

Page 151

ALAN JOHNSON

1
2      A.   Yes.
3      Q.   Is there anything in that paragraph
4   that suggests or states that Highland has agreed
5   to forgive in whole or in part any portion of any
6   loan it ever extended to HCRE?
7      A.   No.
8      Q.   The next paragraph refers to loans
9   that Highland has extended to Highland Capital
10  Management Services, Inc.
11          Do you see that?
12     A.   Yes.
13     Q.   Is there anything in that paragraph
14  that states or suggests that Highland has agreed
15  to forgive in whole or in part any portion of any
16  loan it ever extended to HCMSI?
17     A.   No.
18          MR. MORRIS:  Can we go to the next
19  paragraph, please.
20     Q.   Okay.  These two paragraphs relate to
21  Mr. Dondero and Mr. Okada.
22          Did you see that?
23     A.   Yes.
24     Q.   And it wasn't up on the screen before,
25  so I just want to make it clear that each of those

Page 152

ALAN JOHNSON

1
2   paragraph ends with the same sentence concerning
3   the fair value of the notes approximating the
4   carrying value the notes receivable.
5           Do I have that right?
6      A.   Yes.
7      Q.   Okay.
8           Now, remember we saw in the 2016
9   financials that Mr. Dondero had $14.9 million
10  outstanding at year end.
11          Do you recall that?
12     A.   I don't specifically recall that,
13  but -- I don't specifically recall that, no.
14     Q.   I'll represent to you that the 2016
15  audited financial statements showed that the
16  outstanding principal and interest due by
17  Mr. Dondero under the note that he issued to
18  Highland was $14.9 million.  Okay?
19     A.   Okay.
20     Q.   With that representation, do you see
21  that the amount has been reduced by $400,000 at
22  the end of 2017?
23     A.   Yes.
24     Q.   Okay.
25          And so is it fair -- is it a fair

Page 153

ALAN JOHNSON

1
2   conclusion to reach that at some point in 2017,
3   Mr. Dondero made payments against his obligations
4   to Highland that reduced the amount owing from
5   14.9 million to 14.5 million at the end of 2017,
6   again, assuming that I'm right about 2016?
7      A.   That would be right.  That would be
8   correct, yes.
9      Q.   And there's nothing in this paragraph
10  that states or suggests that Highland has agreed
11  to forgive in whole or in part any loan it has
12  ever extended to Mr. Dondero, correct?
13     A.   That's correct.
14     Q.   Okay.  So I would like you to note
15  down, because it's hard to flip back -- this is
16  the dilemma of virtual depositions -- but can you
17  write down that Mr. Dondero owed Highland
18  principal and interest of $14-and-a-half million
19  at the end of 2017?
20     A.   Okay.
21     Q.   And the next paragraph relates to
22  Mr. Okada.
23          There's nothing in there that states
24  or suggests that Highland has agreed to forgive in
25  whole or in part any loan Highland had ever

Page 154

                    ALAN JOHNSON

2   extended to Mr. Okada, correct?
3       A.   That's correct.
4           MR. MORRIS:  Okay.  Can we continue on
5   to the next page.
6       Q.   And do you see the first paragraph
7   relates to Dugaboy again?
8       A.   Yes.
9       Q.   And it specifically says that during
10  the year ending December 31, 2017, Dugaboy did not
11  issue any new notes to the partnership.
12          Do you see that?
13      A.   Yes.
14      Q.   And then it states that all
15  outstanding notes accrue interest at the rate of
16  2.75 percent.
17          Do you see that?
18      A.   Yes.
19      Q.   And then it says that at year end, the
20  total unpaid principal and interest due was
21  approximately $22.8 million and was payable on
22  demand?
23          Have I read that correctly?
24      A.   Yes.
25      Q.   Okay.

Page 155

                    ALAN JOHNSON

2           Is there anything in this paragraph
3   that states or suggests that Highland ever agreed
4   to forgive in whole or in part any loan it ever
5   extended to Dugaboy?
6       A.   No.
7       Q.   The next paragraph refers to a
8   contribution agreement.
9           Do you see that?
10      A.   Yes.
11      Q.   Have any idea what a contribution
12  agreement is in this context?
13      A.   Not in this context, no.
14      Q.   Is that something you might – you
15  might have asked about had you been told – had
16  you been given these financial statements, let's
17  say, back in July?
18      A.   I – I might have asked about this,
19  yes.
20      Q.   I mean, in fact, this is in the
21  section of the audited financial statements that
22  is entitled –
23          MR. MORRIS:  If would can go back to
24  the top – no – I'm sorry – the top of
25  that section, page – yeah.

Page 156

                    ALAN JOHNSON

2       Q.   That section is specifically called
3   "Notes and Other Amounts Due From Affiliates,"
4   right?
5       A.   Yes.
6       Q.   If you wanted to assess whether or not
7   Mr. Dondero was reasonably compensated, wouldn't
8   you want to know about all of the notes that
9   Highland held on behalf of the affiliates that
10  were owned and controlled by Mr. Dondero?
11          MR. AIGEN:  Objection, form.
12      A.   I – I would have – if I had had the
13  financials, I would have certainly looked through
14  these things, yes.
15      Q.   And if you had been given this
16  information, wouldn't you want to know the full
17  extent – I mean – withdrawn.
18          I think we – I think at the beginning
19  of the day – I know we've been going at this for
20  a while – you specifically told me that you would
21  advise a decision maker to know and understand the
22  full scope of all loans that were given to or for
23  the benefit of the executive before entering into
24  a forgiveness agreement, right?
25      A.   Yes.

Page 157

                    ALAN JOHNSON

2       Q.   Okay.
3           And the information that's contained
4   in this section of the audited financial
5   statements specifically pertains to loans to
6   affiliates.  Isn't that right?
7       A.   Yes, among other things, but yes.
8       Q.   Okay.
9           In order to know if Mr. Dondero had
10  been compensated in a way equal to his peers
11  wouldn't you want to know the full extent of
12  amounts loaned to entities he owned and
13  controlled?
14          MR. AIGEN:  Objection to form.
15      A.   Well, a straight loan to someone is
16  not generally compensation.  If the loan is going
17  to be forgiven at some point in the future, yes,
18  that would have been a relevant – you know,
19  relevant factor, but just a straight loan wouldn't
20  generally be considered compensation.
21      Q.   If Highland – let's say
22  hypothetically Highland – withdrawn.
23          You see NexPoint Advisors on the page,
24  the second box?
25      A.   Yes.

ALAN JOHNSON

2    Q.   Highland -- let's assume that James
3    Dondero owns and controls NexPoint.  Okay?
4    A.   Yes.
5    Q.   As of May 31, 2017, according to
6    Highland's audited financial statements, it loaned
7    NexPoint $30.7 million.
8        Do you see that?
9    A.   Well, I think it's saying it combined
10   all these notes together and a new note of 30.7,
11   right?
12   Q.   I appreciate that -- that precision.
13   So let me restate the question.
14       According to the audited financial
15   statements, Highland had loaned in the aggregate
16   $30.7 million to NexPoint, correct?
17   A.   Yes.
18   Q.   Okay.
19       And what if I told you that NexPoint
20   took that money and they invested it and they
21   turned that money into $100 million, would that be
22   a benefit to Mr. Dondero if you assume that he
23   owned and controlled the entity?
24   A.   Well, it's certainly -- he made a wise
25   investment with his $30 million loan for sure.

ALAN JOHNSON

2    Q.   And would you agree that Highland
3    enabled him to make that wise investment by giving
4    him the loan?
5    A.   They facilitated it, but it depends
6    what the terms of the loan are and -- so, yes, he
7    would have benefited from his wise investment, and
8    they would have facilitated him doing that by
9    loaning the $30 million.
10   Q.   And NexPoint didn't go into the
11   marketplace to negotiate for a loan with a third
12   party, right?
13   A.   That, I don't know.
14   Q.   Well, they took the loan from
15   Highland, correct?
16   A.   It already had loans, right, from
17   Highland, yes.
18   Q.   And you understood that Mr. Dondero
19   controlled both NexPoint and Highland at the time,
20   correct?
21   A.   Yes.
22   Q.   Okay.
23       And so is it fair to say based on your
24   experience and expertise that Highland used --
25   withdrawn.

ALAN JOHNSON

2        Is it based -- is it fair based on
3    your knowledge and expertise that Mr. Dondero used
4    Highland to increase the value of its affiliated
5    companies by providing it with capital?
6        MR. AIGEN:  Objection to form.
7    A.   Yeah, I don't -- I guess I would be
8    uncomfortable -- I'm not sure I understand the
9    question.  I'm sorry.
10   Q.   Okay.
11       You did not -- your report and your
12   opinions -- withdrawn.  Let me take this simply.
13       Your conclusion in your report is that
14   Mr. Dondero had earnings from Highland of
15   approximately $3 million for the 7 years prior to
16   the petition date; correct?
17   A.   That's right, from the -- from the --
18   yes, from the various entities, yes.
19   Q.   And based on your analysis of
20   comparable executives, you believe he should have
21   been earning $6 million for each of those seven
22   years, correct?
23   A.   Yes, that is correct.
24   Q.   And the difference between the two
25   equals $3 million for seven years, or $21 million.

ALAN JOHNSON

2        Do I have that right?
3    A.   Yes.
4    Q.   And you calculated that based solely
5    on certain W-2 income, correct?
6    A.   W-2s and I think, also, with the
7    1040s, I believe, but yeah, it was the W-2s.
8    Q.   So you did not take into account, for
9    example, any benefit that Mr. Dondero received by
10   using Highland's capital to support his affiliated
11   companies, correct?
12       MR. AIGEN:  Objection, form.
13   A.   We did not take into account any
14   ownership -- using the ownership capital either
15   for him or for anybody else, that's correct.
16   Q.   And you didn't try to quantify the
17   benefit to Mr. Dondero from using Highland's
18   capital to support his affiliated companies,
19   correct?
20   A.   We made no attempt to -- to do it for
21   him or for anybody else we might have thought of
22   as comparable executives, that's correct.
23   Q.   Would you -- would you agree with me
24   that it was a benefit to Mr. Dondero to have
25   access to Highland's capital for the purpose of

Page 162

ALAN JOHNSON

1              ALAN JOHNSON
2  supporting his affiliated companies?
3       MR. AIGEN: Objection, form.
4     A.  He -- he benefited from having
5  significant capital -- he certainly benefited as
6  an owner from something significant capital,
7  absolutely.
8     Q.  Okay.
9        And how would you -- how would you
10  describe that benefit?
11    A.  Well, he would get returns on the
12  capital. Either through loans or direct
13  investments as the owner of both Highland and
14  NexPoint, he would benefit from their successes
15  and, of course, lose from their failures.
16    Q.  Are you aware of any failures?
17    A.  In getting these financials, there
18  were a couple of years that were terrible. There
19  were some outstanding years, so it varied during
20  this period.
21       So there were certainly a couple of
22  years with very disappointing results.
23    Q.  And which entity are you referring to
24  that had those disappointing results? Was that
25  Highland?

Page 163

ALAN JOHNSON

1              ALAN JOHNSON
2    A.  I believe -- I believe -- I believe it
3  was Highland as well, yes.
4    Q.  And do you think that when a company
5  fails, that that's a factor that a decision maker
6  should take into account when deciding whether or
7  not to forgive loans?
8       Is that part of the financial
9  condition that we described earlier?
10    A.  Absolutely, the condition of the
11  company, it's both income, capital, and the
12  importance of achieving those goals as part of
13  forgiving absolutely should be considered.
14       MR. MORRIS: I've forgotten if I've
15  gone through 2017 yet.
16       Does anybody recall?
17       All right. We'll do it again.
18       MS. CANTY: This is 2017 on the
19  screen.
20       MR. MORRIS: Right. But I have -- all
21  right. I'll just do it again then.
22       Michael starts objecting as asked and
23  answered, I'll get the hint.
24    Q.  Mr. Johnson, take a look at the first
25  paragraph.

Page 164

ALAN JOHNSON

1              ALAN JOHNSON
2       Do you see that that -- under the
3  section "Notes and Other Amounts Due From
4  Affiliates," describes loans between Highland and
5  HCMFA in 2017?
6    A.  Yes.
7    Q.  Is there anything in that paragraph
8  that states or suggests that Highland agreed to
9  forgive in whole or in part any loan it ever
10  extended to HCMFA?
11    A.  No.
12    Q.  Looking at the next paragraph, next
13  point, do you see that the next paragraph concerns
14  loans that Highland extended to NexPoint?
15    A.  Yes.
16    Q.  Is there anything in that paragraph
17  that states or suggests that Highland has agreed
18  to forgive in whole or in part any note that it
19  ever -- any loan it ever extended to NexPoint?
20    A.  No.
21    Q.  All right.
22       Looking at the next paragraph, do you
23  see the next paragraph describes loans between
24  Highland and HCRE Partners, LLC?
25    A.  Yes.

Page 165

ALAN JOHNSON

1              ALAN JOHNSON
2    Q.  Is there anything in that paragraph
3  that states or suggests that Highland has agreed
4  to forgive in whole or in part any loan it ever
5  extended to HCRE Partners, LLC?
6    A.  No.
7    Q.  The next paragraph relates to loans
8  between Highland and Highland Capital Management
9  Services, Inc.
10       Do you see that?
11    A.  Yes.
12    Q.  Is there anything in that paragraph
13  that states or suggests that Highland has agreed
14  to forgive in whole or in part any loan it ever
15  extended to Highland Capital Management Services,
16  Inc.?
17    A.  No.
18    Q.  The next paragraph relates to
19  Mr. Dondero.
20       Do you see that?
21    A.  Yes.
22    Q.  And do you see that it states that
23  Mr. Dondero didn't obtain any new loans from
24  Highland in 2017?
25    A.  Yes.

Page 166

```
 1                ALAN JOHNSON
 2      Q.   And do you see that --
 3           MR. MORRIS:  Michael, I'm boring you,
 4      because you should be asking as asked and
 5      answered because there's that $14.5 million
 6      number that I know Mr. Johnson wrote down,
 7      right?  So we have done this before.  Okay?
 8           Let's go to the 2018 audited
 9      financials.
10           MS. CANTY:  This is Exhibit 34.
11           MR. MORRIS:  Thank you very much.
12           (Exhibit 34, Highland's audited
13      financial statements for December 31, 2018,
14      was marked for identification at this time.)
15           MR. MORRIS:  And if we can go to the
16      first page.
17  BY MR. MORRIS:
18      Q.   Do you see that this is a -- the first
19  page of Highland's audited financial statements
20  for the period ending December 31, 2018?
21      A.   Yes.
22           MR. MORRIS:  Before we go to -- before
23      we go to the affiliate loans, can we just
24      turn to the -- I think it's the first
25      substantive page, the balance sheet.
```

Page 167

```
 1                ALAN JOHNSON
 2           Yes, stop right there.
 3      Q.   Do you see -- do you see the balance
 4  sheet, sir?
 5      A.   Yes.
 6      Q.   Do you see that near the bottom
 7  there's a line item showing notes and other
 8  amounts due from affiliates?
 9      A.   Oh, yeah -- I'm sorry -- yes.
10      Q.   And do you see that Highland has
11  carried on its balance sheet $173.4 million in
12  notes and other amounts due from affiliates?
13      A.   Yes.
14      Q.   Do you understand that the affiliates
15  are owned and controlled by Mr. Dondero?
16      A.   Owned and controlled?  I think
17  Mr. Okada owned some of -- he certainly controlled
18  them.  I don't know if he had 100 percent
19  ownership of all of them.  He certainly controlled
20  the affiliates we're talking about.
21      Q.   At the time that you prepared your
22  report, did you know that Highland's affiliates
23  owed it $174 million as of the end of 2018?
24      A.   I don't think I was aware of that, no.
25      Q.   Is that a fact that you would have
```

Page 168

```
 1                ALAN JOHNSON
 2  wanted to be aware of before you prepared your
 3  report?
 4      A.   I'm not sure.  I'm not sure.
 5      Q.   Well, I think you testified that if
 6  you were advising a decision maker, you would
 7  advise them to try to obtain as much information
 8  as they could concerning any loans that had been
 9  extended by the employer to or for the benefit of
10  the executive, correct?
11      A.   That is correct.
12      Q.   And is there any reason for you to
13  believe that this $173.4 million didn't relate to
14  loans that were made by the employer to or for the
15  benefit of the executive and Mr. Okada?
16           MR. AIGEN:  Objection, form.
17      A.   Yeah, I don't -- at least that
18  174 million would say they're notes from
19  affiliates, but the affiliates is also the
20  businesses.
21           So I'm not -- I certainly would want
22  to be aware of that.  Whether it would have
23  changed my report, I'd have to -- I'd have to
24  think about.
25      Q.   Okay.
```

Page 169

```
 1                ALAN JOHNSON
 2           But you weren't told about the
 3  totality of the loans, correct?
 4      A.   I did not know the totality, no.
 5      Q.   Did you know that more than 15 percent
 6  of Highland's assets were tied up in notes and
 7  other amounts due from affiliates?
 8           MR. AIGEN:  Objection, form.
 9      A.   I did not know that.
10      Q.   Is that a fact that you would have
11  liked to have known about before you issued your
12  report?
13      A.   As I answered before, I'm not sure.
14  I'm not sure.
15      Q.   Do you think this is a fact that the
16  decision maker should have known about before he
17  or she entered into the forgiveness agreement?
18      A.   I think -- as I testified before, I
19  think the decision makers certainly understand the
20  totality of the loans that are potentially being
21  forgiven, absolutely.
22      Q.   Do you think the decision maker could
23  have done his or her job without knowing that the
24  employer had extended over $173 million to the
25  executive before entering into the agreement?
```

**Appx. 02000**

1          ALAN JOHNSON
2          MR. AIGEN: Objection, form.
3      A.  Well, I think – at least I
4  understand, the way it's stated here in the
5  financials, those are to the businesses.
6          So I think the – a decision maker
7  should know, you know, the totality of the loans
8  being forgiven and the decision maker probably
9  should have some idea of the various – as I
10 testified earlier, about the financial condition
11 of the company, which would include these notes
12 from affiliates.
13         MR. MORRIS: Let's – can we scroll
14     down a page or two?
15         Okay. Stop right – a little
16     further – no, go to the top of this page.
17     Q.   Do you see that this page is the
18 consolidated income statement?
19     A.   Yes.
20     Q.   And you're familiar with income
21 statements. Is that right?
22     A.   Yes.
23         MR. MORRIS: Okay. Can we go to the
24     bottom, please?
25     Q.   Do you see that in the year before

1          ALAN JOHNSON
2  bankruptcy, the net loss attributable to Highland
3  was more than $73 million, at the bottom of the
4  page?
5      A.   Yes.
6      Q.   Is that a fact that you knew of at the
7  time that you prepared your report?
8      A.   I did not.
9      Q.   Is that a fact that you would have
10 liked to have known about before you prepared your
11 report?
12     A.   I would have liked to have seen all of
13 these financial statements before I prepared my
14 report, absolutely.
15     Q.   Is the fact that Highland lost
16 $73 million in 2018 relevant to your analysis at
17 all?
18     A.   I'd have to think about it, but I
19 certainly would have wanted to know about it.
20     Q.   And you were told by Mr. Dondero that
21 the forgiveness agreement was entered into in
22 either December of 2018 or January or February of
23 2019, correct?
24     A.   It's in my report. I can't remember
25 if it was late '17 or '18 or late '18 and '19.

1          ALAN JOHNSON
2  Sitting here, I don't recall which, but it was
3  told a time frame. It was either late one year or
4  early the next. I don't recall the –
5      Q.   We're not going to put it back up on
6  the screen, but I'll just try to refresh your
7  recollection that on page 6 of your report, you
8  had stated, "I understand from Mr. Dondero that
9  the 2018 loans that are the subject of this suit
10 were modified by an agreement in late 2018 or
11 early 2019."
12         Does that refresh your recollection as
13 to the timing of the purported agreement that was
14 described to you?
15     A.   Yes, I think that's right, yep.
16     Q.   And do you understand that this
17 $74 million loss relates to the period ending in
18 December 2018?
19     A.   Yes.
20     Q.   And do you think the decision maker
21 should have known about the financial condition of
22 the company when he or she entered into the
23 agreement on behalf of Highland in late 2018 or
24 early 2019?
25     A.   The decision maker should have had an

1          ALAN JOHNSON
2  idea about the condition of the company,
3  absolutely.
4      Q.   Do you have any reason to believe that
5  the decision maker had any information about the
6  financial condition of the company before agreeing
7  on behalf of Highland to enter into a forgiveness
8  of loans with the potential value of 40 to
9  $50 million?
10     A.   I have no information about that.
11         MR. MORRIS: Can we go back to the
12     balance sheet for a second?
13     Q.   Do you see how the assets exceed the
14 liabilities and there's partners' capital of about
15 $371 million?
16     A.   Yes.
17     Q.   That partners' capital assumes that
18 the value of the notes and other amounts due and
19 affiliates equals $173.4 million, correct?
20     A.   That's one of the assumptions, right,
21 yes.
22     Q.   And there's nothing on the balance
23 sheet that discloses potential litigation
24 liability, correct?
25     A.   No, there's nothing on here, on the

Page 174

```
1           ALAN JOHNSON
2   balance sheet, no.
3       Q.   Did anybody ever give you any
4   information about potential litigation risk that
5   Highland faced in 2018 and '19?
6       A.   I think in preparing my report, I was
7   aware of litigation around this company. I think
8   there had been an arbitration award that was
9   outstanding, so I was aware of any significant
10  litigation risk and litigation expenses ongoing.
11  I was aware of that.
12      Q.   Okay.
13           So is it fair to say that the
14  statement of partners' capital on this page, to
15  the best of your knowledge, assumes the recovery
16  in full -- assumes, among other things, the
17  recovery in full of the notes and other amounts
18  due from affiliates in the amount of
19  $173.4 million?
20      A.   That's one of the assumptions that
21  goes into this balance sheet, yes.
22      Q.   And is it fair to say that the
23  statement of partners' capital doesn't take into
24  account at all litigation risk?
25           MR. AIGEN: Objection, form.
```

Page 175

```
1           ALAN JOHNSON
2       A.   That, I don't know. I don't know what
3   PwC would have done with the litigation risk.
4           But if we're just looking at the line
5   items here, I don't see a reserve for litigation,
6   but that might be in the footnotes or so forth.
7   But as written here, the balance sheet seems to
8   suggest that there is no -- there's nothing on
9   here for litigation risk.
10      Q.   Okay.
11           MR. MORRIS: Can we go to page -- I
12  think it's 28.
13      Q.   Amount -- you see, "Notes and Other
14  Amounts Due From Affiliates"?
15      A.   Yes.
16      Q.   There's notes from HCMFA.
17           Do you see that?
18      A.   Yes.
19      Q.   We'll just do it the same way.
20           Can you take a look at that paragraph
21  and let me know if you see anything in there that
22  states or suggests that Highland agreed to forgive
23  in whole or in part any loan it ever extended to
24  HCMFA?
25      A.   I don't see that, no.
```

Page 176

```
1           ALAN JOHNSON
2       Q.   Okay.
3           Same question for the next paragraph,
4   can you tell me if you see anything in the second
5   paragraph that states or suggests that Highland
6   has agreed to forgive in whole or in part any loan
7   it ever extended to NexPoint?
8       A.   I don't -- I don't see that there
9   either.
10      Q.   Next paragraph, is there anything in
11  the next paragraph that states or suggests that
12  Highland has agreed to forgive in whole or in part
13  any loan it ever extended to HCRE Partners?
14      A.   No, I don't see that.
15      Q.   The next paragraph, is there anything
16  in the next paragraph that states or suggests that
17  Highland has agreed to forgive in whole or in part
18  any note it ever extended to Highland Capital
19  Management Services, Inc.?
20      A.   No, I don't see that.
21      Q.   And do you see that with respect to
22  these four paragraphs, each of them still contains
23  as its last sentence the statement that the fair
24  value of the partnership's outstanding notes
25  receivable approximates the carrying value the
```

Page 177

```
1           ALAN JOHNSON
2   notes receivable?
3       A.   Yes.
4       Q.   So this is as late as -- for the
5   financial statements that are dated as of -- I'm
6   sorry.
7           This is -- these statements refer --
8   withdrawn.
9           These statements concern Highland's
10  audited financial statements for the period ending
11  December 31, 2018, correct?
12      A.   Yes.
13      Q.   Okay. Let's continue to scroll down.
14           Do you see there's a reference to Jim
15  Dondero having issued new promissory notes for
16  $14.9 million in 2018?
17      A.   Yes.
18      Q.   Okay. So if you add the 14.9 with the
19  14.5 that was due -- if you could write this
20  down -- at the end of 2018, that would be a total
21  of $29.4 million.
22           Do I have that right?
23      A.   I believe that's right, yes.
24      Q.   Okay.
25           But at the end of the year, he
```

ALAN JOHNSON

1
2 actually owed just a hair less than that,
3 $29.2 million.
4        Do you see that?
5    A.   Yes.
6    Q.   Okay.
7        Is it fair to conclude that at some
8 point in 2018, Mr. Dondero made a modest payment
9 of principal and interest against the loans that
10 were outstanding to Highland?
11       MR. AIGEN:  Objection, form.
12   A.   That -- that appears what's going on,
13 yes.
14   Q.   And there's certainly nothing in this
15 paragraph that states or suggests that Highland
16 agreed to forgive in whole or in part any loan it
17 ever extended to Mr. Dondero, correct?
18   A.   That's right.
19   Q.   And the next paragraph again relates
20 to Mr. Okada.
21       Do you see that?
22   A.   Yes.
23   Q.   And there's nothing in that paragraph
24 that states or suggests that Mr. Okada had -- had
25 reached an agreement with Highland on the

ALAN JOHNSON

1
2 forgiveness of any loan extended to him in whole
3 or in part?
4    A.   That's correct.
5        MR. MORRIS:  Okay.  Can we go down to
6    the next page, please.
7    Q.   Okay.  And then you have the same
8 statement about Dugaboy and the contribution
9 agreement.
10       Do you see that?
11   A.   Yes, I see it.
12   Q.   Is there anything in either paragraph
13 that states or suggests that Highland has agreed
14 to forgive in whole or in part any loan it ever
15 extended to Dugaboy or pursuant to -- in
16 connection with the contribution agreement?
17   A.   No.
18   Q.   Okay.
19       Are you familiar with the concept of
20 subsequent events?
21   A.   Sure.
22   Q.   And what's your understanding of the
23 concept of subsequent events for purposes of
24 audited financial statements?
25   A.   In the footnotes, often they'll talk

ALAN JOHNSON

1
2 about events that happen shortly after the end of
3 the fiscal year and before the reports or things,
4 and usually, they'll appear in the footnotes and
5 talk about events that a shareholder should be
6 aware of that have happened following the
7 financial year end and the issues of the
8 financials.
9    Q.   It's not just the shareholders, it's
10 anybody who uses or relies on the financial
11 statements should have that information.  Is that
12 fair?
13       MR. AIGEN:  Objection.
14   A.   Anybody who -- yeah, well said, anyone
15 who relies on it, the subsequent event is
16 material -- is material enough that you should
17 be -- you she take into account and be aware of.
18   Q.   Now, if Mr. Dondero had entered into
19 the forgiveness agreement in late 2018, would you
20 have expected it to have been described in the
21 section that we just looked at?
22       MR. AIGEN:  Objection, form.
23   A.   I would hope it would show up in the
24 reported financials.  I would hope that would
25 happen, yes.

ALAN JOHNSON

1
2    Q.   Why is it your hope that it would
3 happen?
4    A.   Well, as I testified earlier, I
5 recommend to clients, and sometimes they follow,
6 to document things in writing, and if it's in
7 writing, it would usually or hopefully would show
8 up in the audited financial statements.
9    Q.   Would you always recommend your client
10 to inform its auditors of any agreement relating
11 to the forgiveness of loans made to executives?
12       MR. AIGEN:  Objection, form.
13   A.   I would certainly recommend -- if it
14 was an issue, I would certainly recommend to
15 clients that they report to the finance team,
16 which would then talk to the auditors, about how
17 to disclose material loans to executives and if
18 they were going to be forgiven.
19       MR. MORRIS:  Okay.  Can we scroll
20    down -- I apologize, I don't know the page
21    number, but there's a section of this report
22    concerning subsequent events.
23       Okay.  Right there.
24    Q.   Do you see on page 38 of Highland's
25 2018 audited financials there's Section 15

Page 182

1            ALAN JOHNSON
2  entitled, "Subsequent Events"?
3      A.  Yes.
4          MR. MORRIS:  Okay.  If we could just
5  show Mr. Johnson that portion and continue
6  on to page 39.
7      Q.  Okay.  And do you see -- now that
8  you've got the whole section on the screen, do you
9  see in the next-to-the-last paragraph there's a
10 reference to HCMFA having issued promissory notes
11 to the partnership in the aggregate amount of
12 $7.4 million during the course of 2019 through the
13 date of the report?
14     A.  Yeah, yes.  Yes, I see that.
15     Q.  Is it your understanding with 30 years
16 in the industry that the auditors would require
17 the disclosure of material transactions that occur
18 after the date of the report but prior to its
19 issuance?
20         MR. AIGEN:  Objection, form.
21     A.  I'm not familiar with the exact
22 accounting rules of what qualifies as subsequent
23 event, but my expectation would be that material
24 events that occurred after the end of the year
25 would be disclosed in a section like this before

Page 183

1            ALAN JOHNSON
2  the financials came out.
3      Q.  If Mr. Dondero had entered into his
4  forgiveness agreement in early 2019, would you
5  have expected that agreement to have been
6  disclosed in the subsequent event section of the
7  audited financial report?
8          MR. AIGEN:  Objection, form.
9      A.  As I said earlier, I would hope it
10 would be -- I would hope that it would be
11 documented and I would hope that if it was -- in
12 this case, was significant, that it would have
13 been informed and probably shown up in a section
14 like this.
15     Q.  But you don't see it show up in a
16 section like this, do you, sir?
17     A.  I don't see it here, no.
18         MR. MORRIS:  Can we go to the, I
19 think, second or third page of the document?
20         Yeah, the signature page, yeah.
21     Q.  Do you see that that's
22 PricewaterhouseCoopers' signature on the audited
23 financial report for the period ending
24 December 31, 2018?
25     A.  You mean, '19 -- nor '18 -- I'm

Page 184

1            ALAN JOHNSON
2  sorry -- yes, I see PwC.
3      Q.  Right.
4          And do you see it's dated June 3,
5  2019?
6      A.  Yes.
7      Q.  And is it your understanding that the
8  subsequent event section covers the period
9  January 1, 2019 until June 3, 2019?
10     A.  I'm not -- again, I'm not an expert on
11 exactly the timing of the subsequent events, but
12 it -- it would have -- it covers some of the
13 period -- some or all the period before they
14 issued.  I don't know when they have a cutoff, but
15 it covers certainly at period after the end of the
16 year before these are finalized.
17     Q.  Okay.  So just to shift gears -- you
18 can take this down, please.
19         Just a few more questions and we will
20 have a short break for lunch, and I hope I won't
21 have a lot more after that, just to give you a
22 sense of where we are.
23         We just saw, based on the 2018 audited
24 financials, that as of the end of that year,
25 Mr. Dondero had loans outstanding of approximately

Page 185

1            ALAN JOHNSON
2  $29.4 million, at least according to the audited
3  financial statements, right?
4      A.  I think that's true from Highland.  I
5  don't know if that included the different
6  affiliates, but I think that's an accurate figure
7  from Highland.
8      Q.  And do you understand that Mr. Dondero
9  has borrowed money from other affiliates as well?
10     A.  I believe that's true, yes.
11     Q.  Do you have any understanding of the
12 magnitude of his borrowing from those affiliates?
13     A.  I believe in this case there's I
14 believe, something like 40 to $50 million at
15 stake, but I don't know the interplay of the
16 different -- the different amounts.
17     Q.  Just maybe I'm confused, but are you
18 talking about the money loaned from Highland to
19 affiliates or are you talking about money loaned
20 from affiliates to Mr. Dondero?
21     A.  I -- Mr. Dondero owes -- that he owes,
22 if I'm phrasing it correctly.
23     Q.  All right.  Look, I don't want to
24 confuse this, so let's try and keep this simple.
25         We just saw in the 2018 audit report

Page 186

ALAN JOHNSON

1
2 that as of the end of the year, he personally had
3 obligations to Highland of $29.4 million, right?
4    A.  Yes.
5    Q.  Okay.
6        And there was nothing in the audited
7 financial statements that suggested that any
8 portion of that was subject to forgiveness,
9 correct?
10   A.  That's correct.
11   Q.  Okay.
12       And you're aware that Highland was a
13 debtor in bankruptcy.  Is that right?
14   A.  It went into bankruptcy.  I don't
15 recall the date of the filing, but it certainly
16 went into bankruptcy.
17   Q.  Did you – did you – do you know –
18 are you aware that it filed for bankruptcy in
19 October of 2019.
20   A.  That's the time frame.  That's what I
21 believed, yes.
22   Q.  Just a few months after
23 PricewaterhouseCoopers signed off on the 2018
24 audit, right?
25   A.  Yes.

Page 187

ALAN JOHNSON

1
2    Q.  Do you know if Mr. Dondero or anyone
3 acting on his behalf ever informed the bankruptcy
4 court that some or all of the loans were subject
5 to forgiveness?
6    A.  That, I don't know.
7    Q.  Did you – did you ask anybody?
8    A.  No.
9    Q.  If you were advising a client – if
10 you were advising a debtor in bankruptcy – no –
11 withdrawn.
12       If you were advising the maker of
13 certain notes that were held by a debtor in
14 bankruptcy, would you advise that client to tell
15 the Court of any agreements that existed that –
16 pursuant to which the notes might be forgiven?
17       MR. AIGEN:  Objection, form.
18   A.  I would certainly – if it wasn't
19 obvious already, I would have certainly advised
20 the client to inform whoever if there are terms
21 that would be favorable to them, absolutely.
22   Q.  And why would you do that?
23   A.  Well, if I was an executive or an
24 entity that had forgiveness provisions that might
25 benefit me and someone else who's not a banker or

Page 188

ALAN JOHNSON

1
2 bankruptcy judge wasn't aware of it, I would
3 suggest that they inform them rapidly that these
4 favorable provisions were in place.
5    Q.  Can you think of any reason why the
6 executive wouldn't disclose the favorable
7 provisions that were in place?
8        MR. AIGEN:  Objection, form.
9    A.  Having seen some bankruptcies, I think
10 people forget, people make bad decisions.  In the
11 chaotic situations that happen, people often
12 ignore things.  But I – the most logical one
13 would be the confusion or chaos.
14   Q.  Let me give you a hypothetical:
15 There's an executive who owes a bankrupt entity
16 $30 million in its individual capacity, and the
17 debtor discloses in its disclosure statement and
18 its plan of reorganization its intention to
19 collect that $30 million as part of its plan of
20 reorganization.
21       If the executive doesn't stand up and
22 say, Hold your horses, I've got an agreement
23 pursuant to which those notes might be forgiven,
24 and only makes that disclosure after litigation is
25 commenced, in your experience as an executive

Page 189

ALAN JOHNSON

1
2 compensation consultant, would you question
3 whether there was really an agreement in the first
4 place?
5        MR. AIGEN:  Objection, form.
6    A.  Of course I would question it, and I
7 often question clients about decisions that I
8 wished they hadn't made, but yeah, certainly, I
9 would question it.
10   Q.  And what if you knew in the
11 hypothetical that the individual was represented
12 by multiple law firms, would that cause you to
13 question it even further?
14       MR. AIGEN:  Objection, form.
15   A.  No, I would expect in a situation like
16 that, he would be represented by a bunch of law
17 firms, but I would certainly question that.  It
18 seems convenient.  That doesn't mean it's not
19 true, though, which I often find clients that make
20 very unfortunate decisions, so – but I would
21 certainly question it.
22   Q.  Okay.  Just a few more questions
23 before we break.
24       So we spent a lot of time, and I
25 really appreciate your patience, Mr. Johnson,

**Appx. 02005**

Page 190

ALAN JOHNSON

1 going through many of Highland's audited financial
2 statements, but I just want to know, with the
3 caveat that you're relying on only what I showed
4 you, with that caveat, would you agree with me
5 that based on our review Highland has not forgiven
6 a loan to anyone in the world since around 2009?
7    A.   Yeah, that's what it appeared from the
8 financials, I guess.
9         The only thing that makes me pause is
10 I'd want to look at the -- again, the similar
11 documents for the affiliates and see if there's
12 stuff in there as well.  But in the documents that
13 you showed, that appeared to be, you know, what is
14 recorded in these financials.
15    Q.   And Highland -- the -- Highland
16 capital Management, L.P. is the only payee on the
17 notes that you're aware of, correct?
18    A.   I believe so.  I believe that's right.
19    Q.   And Highland Capital Management, L.P.
20 was the only entity that was in bankruptcy.  Is
21 that right?
22    A.   I believe that's right.
23         MR. AIGEN:  Objection to form.
24    Q.   And you're not aware that Highland has

Page 191

ALAN JOHNSON

1 an ownership interest in any of the makers under
2 any of the notes at issue here, correct?
3    A.   That, you're getting -- I'm not sure I
4 understand -- ownership -- that, I don't know.
5    Q.   Okay.  Okay.
6         But we can agree that, based at least
7 on Highland's audited financial statements, you're
8 comfortable concluding that Highland hasn't
9 forgiven a loan to anybody or any entity since
10 2009, correct?
11    A.   That's the only thing, and the things
12 you showed me have been disclosed, that's right.
13    Q.   And based on what I showed you, you're
14 comfortable in concluding that the largest loan
15 that Highland ever forgave was $500,000.  Is that
16 fair?
17    A.   That's what it appears, that's right.
18    Q.   Okay.
19         And based on what I showed you, you're
20 comfortable excluding that Highland has never
21 forgiven a loan to Mr. Dondero, correct, or at
22 least through 2008?
23    A.   And as reported in the financials,
24 that appears to be correct, yes.

Page 192

ALAN JOHNSON

1    Q.   And based on the information that I've
2 given you and the financials that we looked at,
3 you're comfortable concluding that at no time
4 since at least 2008 has Highland ever forgiven in
5 whole or in part any loan that it ever extended to
6 any affiliate, right?
7         MR. AIGEN:  Objection to form.
8    A.   That's -- that's what's in the
9 financials, yes.
10         MR. MORRIS:  Okay.  So it's 1 o'clock.
11 Let's break until 1:30.  And I hope, you
12 know, I have another 60 or 90 minutes.
13         Thank you very much.
14         (Luncheon recess taken from 1:02 p.m.
15 until 1:32 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 193

ALAN JOHNSON

1    A F T E R N O O N   S E S S I O N
2         (Time noted:  1:32 p.m.)
3 BY MR. MORRIS:
4    Q.   Good afternoon, Mr. Johnson.
5    A.   Hello.
6    Q.   Did you speak with anybody during the
7 break about the substance of your testimony today?
8    A.   No.
9         MR. MORRIS:  Okay.  I'd like to put up
10 on the screen a document that has been
11 premarked as Exhibit 70 -- you know what, I
12 apologize, not 70, 73.
13         (Exhibit 73 Exhibit 73, Demonstrative,
14 was marked for identification at this time.)
15 BY MR. MORRIS:
16    Q.   Mr. Johnson, are you able to view the
17 document that's been premarked as Exhibit 33
18 that's up on the screen?
19    A.   Yes.  Yes, I can.
20    Q.   So I'm going to represent to you that
21 this is a -- this is what we call a "demonstrative
22 exhibit," right?
23         This isn't a document that was
24 prepared in the ordinary course of business.  It's

Page 194

ALAN JOHNSON

1      a summary of other information that we've produced
2  in this litigation, and I will represent to you
3  that we have produced in this litigation, among
4  other things, bank statements that show the
5  transfer of money on behalf of Mr. Dondero against
6  a couple of outstanding notes.
7        And, you know, Mr. Dondero's counsel
8  can, you know, take the documents that were
9  produced with this to make sure that it's
10 accurate, but I believe it to be accurate, and I
11 just want to ask you some questions about this --
12 about the information that's contained in this
13 document.
14       I assume you've never seen this
15 before, right?
16     A.   I don't -- I may have seen something
17 similar.  I don't believe I've seen this exact
18 thing, no.
19     Q.   Were you -- do you remember before we
20 looked back and there was that $14.9 million loan
21 that was reflected in the -- in the financials?
22     A.   Yes.
23     Q.   And I'll represent to you that's
24 what's the restructured note in Column C and D.

Page 195

ALAN JOHNSON

1      Do you see that?
2     A.   Yes.
3     Q.   Okay.
4        And do you recall from the financials
5  that in 2018, Mr. Dondero had borrowed an
6  additional $14 million and change?
7     A.   Yes.
8     Q.   Okay.
9        I'll represent to you that the
10 January 18, 2018 note in the principal amount of
11 $7.9 million was among the new loans that he
12 obtained in 2018.
13       Were you ever informed that in 2017,
14 '18, and '19, Mr. Dondero was making payments of
15 principal and interest due on loans that he had
16 obtained from Highland?
17     A.   I don't think I discussed that with
18 anybody.  I think I had noticed that -- these loan
19 amounts changing around, that something was going
20 on in terms of payment, but I don't think I
21 discussed that with anybody.
22     Q.   Before completing your report, would
23 you have liked to have known about Mr. Dondero's
24 payment history, if any?

Page 196

ALAN JOHNSON

1     A.   Yeah, that would have been something I
2  would have liked to have known, yes.
3     Q.   Because that would relate to the whole
4  concept of whether or not there was a prior course
5  of forgiveness.  Is that right?
6     A.   I would -- yeah, that would have
7  been -- that would have been helpful to know.
8     Q.   I mean, it's -- you wouldn't dispute
9  that if, in fact, this chart is correct and
10 Mr. Dondero was making payments in 2017, '18, and
11 '19 against those notes, that those notes were not
12 likely to be subject to any forgiveness agreement,
13 correct?
14     MR. AIGEN:  Objection, form.
15     A.   As I testified before, you could have
16 a loan forgiveness that you would make payments
17 on.  It really would depend on the circumstances
18 and what you thought the probability of the
19 forgiveness happening, but answering your
20 question, yes, I would have liked to have known
21 about this.
22     Q.   According to this chart, if you just
23 focus -- you see the Column G, "Total Received in
24 Respect of Retired Notes"?

Page 197

ALAN JOHNSON

1     A.   Yes.
2     Q.   Okay.
3        And do you see the total is
4  approximately $23.7 million?
5     A.   Yes.
6     Q.   If you exclude the first three
7  payments that were made in 2017 and '18, they
8  total about $3.3 million or $3.4 million.
9        Is my math roughly correct?
10     A.   Yes, it looks that way.
11     Q.   Okay.
12       So is it fair then to just -- if you
13 deduct that from the total, to say that
14 Mr. Dondero made principal and interest payments
15 against those two notes in 2019 in excess of
16 $20 million?
17     A.   That looks correct, yes.
18     Q.   Okay.
19       Now, do you see the last payment was
20 made, if you look at the Row 16, on December 23,
21 2019?
22     A.   Yes.
23     Q.   Okay.
24       And do you understand that that's

Page 198

ALAN JOHNSON

1
2 after the petition date?
3     A.   Yes, that would be.
4     Q.   And according to this chart anyway, in
5 Column B, the payment that was made on that date
6 was approximately $783,000?
7     A.   Yes.
8     Q.   And that money was applied to
9 outstanding principal and interest that was due
10 under the January 18, 2018 note.
11       Do you see that?
12     A.   Yes.
13     Q.   Okay.
14       And do you see how the principal
15 balance of $7.9 million was paid exactly as of
16 December 23, 2019?
17     A.   I'm sorry, I don't understand.  The
18 7.9 was --
19     Q.   Was the principal amount of the note,
20 right?
21       And I'll represent to you that the
22 January '18 note was given by Mr. Dondero to
23 Highland in exchange for 17. -- for a $7.9 million
24 loan on the same day.  Okay?
25     A.   Okay.

Page 199

ALAN JOHNSON

1
2     Q.   And do you see in Column G, it shows
3 that once the portion of the payment was applied
4 to the January 2018 note, the total that was
5 applied was about 319,000 and change?
6     A.   Yes.  Okay.
7     Q.   And then there's an asterisk in
8 Column H next to that total received on that date.
9       Do you see that?
10     A.   Yes.
11     Q.   Okay.
12       And if you look at the footnote, it
13 says the difference between the total paid on
14 December 23, 2019 and the amount applied to the
15 January 18, 2018 note was applied in three
16 different ways.
17       Do you see that?
18     A.   Yes.
19     Q.   And do you see that it was applied
20 against principal and interest due on three other
21 notes that Mr. Dondero took in 2018?
22     A.   Yes.
23     Q.   Were you aware, until I showed you
24 this, that Mr. Dondero had made payments of
25 principal and interest against the notes that he

Page 200

ALAN JOHNSON

1
2 contends are subject to the forgiveness agreement?
3     A.   I don't think I was aware of that.
4     Q.   Is that a fact that you would have
5 liked to have known before you completed your
6 report?
7     A.   I would have probably liked to have
8 known that, yes.
9     Q.   And why is that?
10     A.   The statement I made in the report
11 around the practice of the company to forgive
12 loans, I would have had to perhaps rethought that.
13 This would have been -- this would have been
14 information that I would have liked to have known,
15 yes.
16     Q.   In fact, this page shows that, you
17 know, if we exclude the payment made in late 2017,
18 from December 2018 to December 2019, Mr. Dondero
19 paid approximately $23-and-a-half million again
20 principal and interest due on 5 different notes.
21       Have I characterized that fairly based
22 on this chart?
23     A.   I think you may have double counted in
24 your arithmetic, but the point is he made
25 significant payments against principal and

Page 201

ALAN JOHNSON

1
2 interest.
3     Q.   Okay.  I don't want to double count.
4 Let me try and do it again.
5       Do you see the total Dondero payment
6 amount in Column B is $24.143 million.
7     A.   Yes.
8     Q.   If we simply deduct from that
9 $677,000, do you come out to roughly
10 $23-and-a-half million?
11     A.   Yes, that's right.  That's right.
12     Q.   And that $23-and-a-half million was
13 paid in the 370-day period between December 18,
14 2018 and December 23, 2019, correct?
15     A.   I don't want to be a stickler here,
16 but if you look to the payment amount of
17 24 million, I think you were trying to say that
18 the end of '18-'19, so you'd subtract those first
19 three payments in that Column B, I think, which
20 gets you to about $20 million.
21       So it looks like in '19 -- it's north
22 of $20 million.
23     Q.   Okay.
24       And if we add the payments that were
25 made on December 18, 2018 and December 19, 2018,

Page 202

ALAN JOHNSON

1
2 you come up with about 23 to $23-and-a-half
3 million, right?
4     A.   Something like that, that's right.
5     Q.   And that's about a one-year period
6 that straddles the petition date, to the best of
7 your knowledge, right?
8     A.   Yes.  Yes, it does.
9     Q.   And so those payments, according to
10 this chart – and, again, I'm asking you to assume
11 the accuracy of this chart – according to this
12 chart, for the approximately one-year period from
13 December 2018 to December 2019, Mr. Dondero made
14 principal and interest payments of approximately
15 23 to $23-and-a-half million against 5 different
16 promissory notes that were held by Highland,
17 correct?
18     A.   Yes, I believe that's true.
19     Q.   And is it fair to say that that
20 information conflicts with the concept of Highland
21 having a practice of forgiving loans?
22         MR. AIGEN:   Objection, form.
23     A.   Well, as I said earlier, it doesn't
24 mean that the loans weren't forgivable.  It means
25 he made payments against loans that may have been

Page 203

ALAN JOHNSON

1
2 subject to a – you know, a forgiveness agreement,
3 which, as I testified earlier, you know, could
4 happen, but it would certainly be a fact you'd
5 want to – you know, you'd want to consider.
6     Q.   And tell me the understanding – your
7 opinion as to the circumstances under which you
8 think a maker under notes would rationally make a
9 payment of principal and interest against notes
10 that were the subject of a forgiveness agreement?
11         MR. AIGEN:   Objection, form.
12     A.   Well, I think, as I testified earlier,
13 I think someone would think to themselves, what is
14 the likelihood of those notes being forgiven?
15         If they believe they're not likely to
16 be forgiven, and if they're a senior executive of
17 the company and the company perhaps needs the
18 money, they might make those payments.  A rational
19 executive or borrower could make those payments
20 believing that, perhaps, the likelihood of the
21 things being forgiven is not high and/or the
22 company needs the money.
23     Q.   Did – did anybody give you any
24 explanation as to why Mr. Dondero made
25 approximately $23-and-a-half million of payments

Page 204

ALAN JOHNSON

1
2 against premium – against principal and interest
3 due on these 5 notes?
4     A.   No, they did not.
5     Q.   To the best of your knowledge and
6 understanding was Mr. Dondero in control of
7 Highland throughout that period December 2018
8 until the end of 2019?
9     A.   I'm not – I'm not sure about what
10 happened in bankruptcy, but certainly from the
11 period up until the filing of the bankruptcy, he
12 was in control.
13     Q.   Okay.
14         Do you know – if you look at the
15 restructure note, the January 18, 2018 note, and
16 the notes that are referred to in Rows 21, 22, and
17 23, are you able to identify which of them, if
18 any, are subject to the modification agreement
19 described if your report?
20     A.   I cannot identify them, no.
21     Q.   So you don't know which, if any, were
22 the subject – were subject to the agreement.
23         Do I have that right?
24     A.   I can't identify them, no.
25         MR. MORRIS:  Okay.  Can we go back to

Page 205

ALAN JOHNSON

1
2 Mr. Johnson's report, Exhibit 62?
3         And if we can go to page 3, please.
4     Q.   This is the introduction of your
5 report, right?
6     A.   Yes.
7     Q.   And now that we've done the work we
8 have so far today, I'm going to point you to the
9 sentence towards the end of the first paragraph
10 that says, "Throughout this period, he received
11 loans in lieu of additional current compensation."
12         Do you see that?
13     A.   Yes.
14     Q.   And the "he" there refers to
15 Mr. Dondero, correct?
16     A.   Yes.
17     Q.   Knowing what you know now, do you
18 stand by that statement?
19         MR. AIGEN:  Objection, form.
20         MR. MORRIS:  Withdrawn.
21     Q.   Knowing what you know now, do you
22 believe that statement is accurate?
23     A.   I'd have to rethink about it.  I
24 haven't heard anything that would say what he told
25 me was not true.

Page 206

ALAN JOHNSON

1
2  Q.  Have you seen any evidence that
3  Mr. Dondero ever received a loan in lieu of
4  additional current compensation?
5      A.  Besides his -- his assertions to me,
6  I've seen no written documentation, no.
7      Q.  And, in fact, the audited financial
8  statements that we looked at did, in fact,
9  disclose the loans that were forgiven to the
10  individuals that you spoke with, correct?
11      MR. AIGEN:  Objection, form.
12      A.  Yes.
13      Q.  There was nothing in any of the
14  audited financial statements that we saw that
15  showed that any loan was ever given to Mr. Dondero
16  that was forgiven, correct?
17      A.  In the Highland financials we looked
18  at -- and I guess when that was asked before, I
19  had the caveat around the affiliated companies,
20  but in the Highland financials that we went
21  through, there was nothing disclosed of that.
22      Q.  Highland -- does the practice of other
23  entities in terms -- is that -- withdrawn.
24      When you described the practice, are
25  you describing the practice of firms or entities

Page 207

ALAN JOHNSON

1
2  or affiliates other than Highland?
3      A.  Well, I -- in this case, everything is
4  kind of inter -- intertwined here, so when I talk
5  about loans, the loan could have potentially come
6  from an affiliate or some other organization since
7  these all were co-owned.
8      So we went through the Highland thing,
9  so the loans to Mr. Dondero could have been made
10  by -- potentially could have been made by an
11  affiliate or some other entity.
12      Q.  Do you have knowledge of any affiliate
13  ever forgiving any loan to Mr. Dondero?
14      A.  I do not.
15      Q.  Do you have knowledge of any affiliate
16  ever forgiving in whole or in part any loan to
17  anyone in the world?
18      MR. AIGEN:  Objection, form.
19      A.  I -- I don't have any knowledge of
20  that either.
21      Q.  And your report does not depend in any
22  way, sir, on whether or not affiliates forgave
23  loans to any of its employees, correct?
24      MR. AIGEN:  Objection to form.
25      A.  That's correct.

Page 208

ALAN JOHNSON

1
2      Q.  Looking at the last sentence, there's
3  a reference to company practice.
4      Do you see that?
5      A.  Yes.
6      Q.  That company practice would not
7  include the forgiveness of any loans from the year
8  2009 until the end of 2018, correct?
9      A.  None -- none of those would have
10  been -- none of those were disclosed in the
11  financials we looked at.
12      MR. MORRIS:  Can we go to page 6,
13  please?
14      Q.  Yeah, I'm looking at the first
15  sentence of the second bullet point:  I understand
16  from Mr. Dondero that the 2018 loans that are the
17  subject of the suit were modified by an agreement
18  in late 2018 or early 2019 under which the loans
19  would be forgiven upon the sale and cost of
20  substantially of any of three portfolio companies.
21      Have I generally categorized that
22  statement correctly?
23      A.  Yes.
24      Q.  Based on everything that we've talked
25  about and looked at today, are you confident that

Page 209

ALAN JOHNSON

1
2  that sentence is accurate?
3      Withdrawn.
4      Based on everything we've talked about
5  and looked at today, are you confident that
6  Mr. Dondero accurately disclosed to you the
7  subject of this agreement?
8      MR. AIGEN:  Objection, form.
9      A.  I'm sorry, could you repeat that?
10      Q.  Sure.
11      Mr. Dondero told you that the 2018
12  loans were the subject of a modification
13  agreement, correct?
14      A.  Yes.
15      Q.  Would you stake your professional
16  reputation on the accuracy of what he told you?
17      MR. AIGEN:  Objection, form.
18      A.  I -- I heard him clearly.  I can't
19  vouch for his word, but he told me -- what is
20  written there is what -- is what he told me
21  happened.  And I asked that question.
22      Q.  I appreciate that.
23      So --
24      A.  I wasn't finished.  I'm sorry.
25      Q.  I apologize.

**Appx. 02010**

Page 210

ALAN JOHNSON

2 A. So I asked that question, you know,
3 pretty specifically, so that -- I understood that
4 that's what he said.
5 And I'm sorry to interrupt you. I'm
6 sorry. Go ahead.
7 Q. That's okay.
8 So what you've reported in this
9 sentence is what you were told. Is that fair?
10 A. Yes, I was told by Mr. Dondero about
11 the modification of the loans.
12 Q. And you don't have any information or
13 evidence to support that statement other than what
14 he told you, correct?
15 A. I've seen no other document, no.
16 Q. Does the absence of documentation
17 cause you to question the reliability of what
18 Mr. Dondero told you as described in that
19 sentence?
20 A. Well, as I testified before, I think
21 it certainly would bring it into question, but as
22 I testified before, I have other clients that
23 don't document important things as well. So it
24 would certainly -- not the lack of documentation
25 would bring it into question, but that doesn't

Page 211

ALAN JOHNSON

2 mean it's not -- it's not true.
3 Q. Would the lack of disclosure to the
4 bankruptcy also call it into question --
5 MR. AIGEN: Objection to form.
6 Q. -- in your opinion?
7 A. Certainly, as I testified before,
8 people often in chaotic situations don't do the
9 things that are even to their advantage.
10 So certainly that raised -- that
11 raises questions about, again, did he disclose
12 things that may have been even to his advantage in
13 a bankruptcy situation.
14 Q. Would the existence of the agreement
15 be called into question if you assumed that the
16 decision maker never told anybody in the world
17 that he or she had entered into the agreement on
18 behalf of the company?
19 MR. AIGEN: Objection, form.
20 A. Certainly. The lack of disclosure is
21 a reasonable question to ask, Why didn't you
22 disclose?
23 But as I've said a couple times now,
24 that I've got private clients that over time have
25 not disclosed things, and as I testified earlier,

Page 212

ALAN JOHNSON

2 I admonish them to write things down and disclose
3 them, and they often don't.
4 Q. Looking back at the document on the
5 screen, the next-to-the-last sentence of that
6 paragraph says, "Based on interviews from prior
7 employees, the use of forgivable loans was a known
8 business practice at Highland, and there was a
9 clear expectation similar loans would be
10 forgiven."
11 Do you see that?
12 A. Yes.
13 Q. Okay.
14 The prior employees are the four
15 people we talked about before, right?
16 A. Yes.
17 Q. And they told you about the four loans
18 that they had that were forgiven in whole or in
19 part, correct?
20 A. And I would answer that, yes, they
21 said it, and Mr. Dondero mentioned it as well.
22 Q. And they told that there was a use of
23 forgivable loans as a nonbusiness practice at
24 Highland, right?
25 A. Yes.

Page 213

ALAN JOHNSON

2 Q. They didn't mention any other entity,
3 correct?
4 A. That, I don't remember. I don't
5 believe so.
6 Q. You wrote Highland, right?
7 A. Yes.
8 Q. And you haven't seen any documents
9 that support the known business practice that they
10 described for you, correct?
11 A. I have seen no written documentation,
12 no.
13 Q. When you referred to a "clear
14 expectation," whose expectation are you referring
15 to?
16 A. The recipient of the loan, that's what
17 I was referring to.
18 Q. And when you used the phrase "similar
19 loans," do you mean similar to the ones that were
20 forgiven by the four employees -- the four former
21 employees that you interviewed?
22 A. I meant just that there was a loan of
23 a significant period of time and it would be
24 forgiven over time. That's what I was trying to
25 get at there.

**Appx. 02011**

Page 214

ALAN JOHNSON

1
2    Q.    Now that you have seen -- withdrawn.
3        Now that I have shown you the
4    demonstrative exhibit that reflects payments by
5    Mr. Dondero against 5 different promissory notes
6    in the 12-month period between December '18 and
7    December '19, do you believe that he had a clear
8    expectation that his loans would be forgiven?
9        MR. AIGEN:  Objection, form.
10   A.    I -- I don't -- I don't -- he hasn't
11   told me what his expectation -- I don't -- I would
12   just be speculating about what his expectations
13   were.
14   Q.    Well, paying -- paying more than
15   $23 million in a 12-month period is inconsistent
16   with any expectation that the loans would be
17   forgiven.
18       Would you give me that?
19       MR. AIGEN:  Objection, form.
20   A.    Well, I think I testified before that
21   you could forgive -- you could make payments
22   against the loan if you thought the probability of
23   achieving the goals were not highly likely and/or
24   the company needed the money.
25       So on a private situation, such as

Page 215

ALAN JOHNSON

1
2    this, Mr. Dondero rationally could have said to
3    himself, I'll repay the loans because the company
4    needs the money and/or the odds of selling one of
5    these three assets in a reasonably timely manner
6    may be unlikely, but I'm just speculating on what
7    he -- he may have thought.
8    Q.    Okay.
9        MR. MORRIS:  Can we go to page 16,
10       please?
11   Q.    Just to finish this up, in the middle,
12   it says, "It is my opinion that the loans provided
13   to Mr. Dondero should be considered potential
14   deferred compensation as they were similar to
15   loans given to other professionals at the firm."
16       Have I read that correctly?
17   A.    Yes.
18   Q.    After our questions today and looking
19   at the documents is that still your opinion?
20   A.    Well, I think it goes back to what
21   Mr. Dondero told me.  If what Mr. Dondero told me
22   is accurate, it -- his statement continues to be
23   true, that these loans were intended to be
24   forgiven, and that that would have been similar to
25   the other four executives that I interviewed.

Page 216

ALAN JOHNSON

1
2    Q.    So that sentence and your opinion is
3    dependent 100 percent on the accuracy of what
4    Mr. Dondero told you, correct?
5    A.    If Mr. Dondero, you know, was
6    inaccurate, then that sentence will be inaccurate
7    as well.
8    Q.    And is there anything that we looked
9    at today, like the financial statements or the
10   payment history for the 12-month period from
11   December 2018 to December 2019, that calls you to
12   question the accuracy of what he told you?
13   A.    I don't -- I don't -- I believe it
14   still could very well be true, so I don't -- I
15   don't -- I don't believe that -- I don't believe I
16   would have changed that sentence based on what
17   I've heard today.
18   Q.    Your report refers in several places
19   to a founder's premium.
20       Do I have that phrased right?
21   A.    Yes.  Yes, it does.
22   Q.    What's a founder's premium?
23   A.    In many or most financial services
24   companies, founders get paid more than comparable
25   executives elsewhere.  They're the face of the

Page 217

ALAN JOHNSON

1
2    firm.  They have an unusual stature in the
3    industry and so forth.
4        So when you look at large or outsized
5    pay packages, they're often delivered to founders
6    of similar financial firms.
7    Q.    Have you done any analysis to
8    determine what the founder's premium would be in
9    this case?
10   A.    I have not.
11   Q.    You're not offering any opinion as to
12   what the founder's premium should be, correct?
13   A.    I have not done that work, no.
14   Q.    You haven't attempted to quantify what
15   the founder's premium is, correct?
16   A.    Again, I haven't done that work.
17   Q.    Is there a particular reason why you
18   didn't attempt to quantify or analyze the
19   founder's premium that you referred to in your
20   report?
21   A.    Well, when I wrote the report in May,
22   I didn't have available some of the things we've
23   talked about today, I just didn't feel that that
24   was appropriate.
25       So I took what I thought was a

ALAN JOHNSON

1           ALAN JOHNSON
2 conservative view of what the market rate with him
3 would be, and then it could obviously be
4 supplemented at some future point with additional
5 information or facts.
6    Q. But as you sit here today, you haven't
7 done any analysis to try to update your report to
8 quantify a founder's premium, correct?
9    A. I have not.
10    MR. MORRIS: Can we go to page 19 of
11 Mr. Johnson's report.
12    Q. Right there at the top, you've got
13 Exhibit C. That's Mr. Dondero's actual
14 compensation for the period 2013 to 2019.
15    Do I have that right?
16    A. Yes.
17    Q. Why did you use that seven-year
18 period?
19    A. It was after the financial crisis. It
20 seemed more stability in the business. It seemed
21 like a reasonable period to look at.
22    Q. Is there any -- is the decision to use
23 the seven-year period from 2018 to 2019 a
24 subjective decision that you made on your own?
25    A. To be -- I don't remember.

ALAN JOHNSON

1           ALAN JOHNSON
2    Q. Is it fair to say that somebody else
3 might differ with you and apply either a 4-year
4 period, for example, or a 10-year period?
5    A. Reasonable people might have a
6 different point of view, yes.
7    Q. Did you rely on any particular
8 methodology or industry study in reaching your
9 decision to use a seven-year period?
10    A. No.
11    Q. Is there any article that you're aware
12 of or any presentation anybody has ever made
13 whereby they -- they suggested that when doing an
14 analysis of this type, one ought to the use a
15 seven-year look-back period?
16    A. I -- I don't -- I'm not aware of
17 any -- any study like that.
18    Q. And the reason that the timeline is
19 important, of course, is it because you're just
20 multiplying the difference between Mr. Dondero's
21 compensation as reflected in this chart --
22 withdrawn.
23    The reason why the time period is
24 important, because you're taking the average of
25 Mr. Dondero's annual compensation during the

ALAN JOHNSON

1           ALAN JOHNSON
2 seven-year period and comparing it with the
3 average for your comps and multiplying it by
4 seven, correct?
5    A. Well, I'm looking at his average pay
6 over the period. I wanted a long enough period to
7 be representative and looking at what the market
8 rate would have been over that period, so yes, you
9 arithmetically will come up with a difference over
10 that period.
11    Q. And your difference is $21 million,
12 right?
13    A. Yes.
14    Q. And your difference is $21 million
15 because you compared Mr. Dondero's average of
16 $3 million with what you determined to be the
17 industry average of $6 million, you took the
18 difference of 3 and multiplied it by the 7 years
19 and you got to $21 million, correct?
20    A. In simple fashion, that's right.
21    Q. Is there any other fashion in which my
22 description of what you did is incorrect?
23    A. No. I think that's accurate, but the
24 point was that he had been underpaid from a W-2
25 perspective during this period and, you know,

ALAN JOHNSON

1           ALAN JOHNSON
2 the -- anyway, that was the point.
3    Q. And if a reasonable mind decided that,
4 you know, the look-back period should be a bit
5 shorter, only 5 years, then the delta would only
6 be $15 million, right?
7    A. Assuming the same facts, the 3 million
8 and the 6 million, that's right.
9    Q. And if somebody thought it ought to be
10 10 years, then the delta be would be $30 million,
11 right?
12    A. It could be, but I don't know what his
13 pay was prior to 2013. Maybe that wouldn't be
14 accurate. But yes, assuming the facts are the
15 same, that would be -- that would be accurate.
16    Q. Okay. But one of the three factors --
17 so there are 3 factors in the $21 million. It's
18 Mr. Dondero's average compensation during the
19 7-year period, correct?
20    A. Yes.
21    Q. And it's the industry average as
22 you've determined for the seven-year period,
23 correct?
24    A. Well, just to be picky, it's not the
25 industry average. It's what I think the market

Page 222

ALAN JOHNSON

1 was for his particular role, which was 6 million,
2 but yes, it's 3 million and 6 million.
3 Q. Thank you. Thank you for the
4 clarification.
5 And then the third factor in reaching
6 the $21 million is multiplying the difference
7 between those first two numbers by 7, correct?
8 A. Exactly.
9 Q. And you determined to use 7, correct?
10 A. Yes.
11 Q. And you made that determination based
12 on your subjective judgment, correct?
13 A. Yes.
14 Q. Did you're not aware of any -- any
15 guideline, any analysis, any peer-reviewed
16 article, any presentation, anything in the world
17 that caused you to select 7 years. You just based
18 that on your own experience. Is that fair?
19 A. That's fair.
20 Q. Okay.
21 So if you look at the chart, you've
22 got three different line items. The first is
23 "Highland Capital Management W-2 Income," correct?
24 A. Yes.

Page 223

ALAN JOHNSON

1 Q. Okay.
2 And why did you decide that this
3 analysis should incorporate Mr. Dondero's Highland
4 Capital Management W-2 income?
5 A. That is his reported employee
6 compensation.
7 Q. The next line relates to NexPoint
8 Residential Trust W-2 income.
9 Do you see that?
10 A. Yes.
11 Q. You've only included income for 2018.
12 Do I have that right?
13 A. That's right.
14 Q. Why did you decide that it was
15 appropriate to include NexPoint Residential Trust
16 W-2 income in your analysis?
17 A. It was a W-2. I think he was paid as
18 an employee, and that should be recognized here.
19 Q. And how come you only disclosed the
20 income for 2018?
21 A. That's the only one we have W-2 for.
22 Q. Okay.
23 How about NexPoint Advisors' W-2
24 income, why did you decide to include that in this

Page 224

ALAN JOHNSON

1 analysis?
2 A. Again, it was employee income.
3 These businesses are so intertwined
4 that I included his pay for, you now, his
5 activities at NexPoint.
6 Q. Okay.
7 And did you not go back prior to 2016
8 because you didn't have any W-2 income for that
9 entity?
10 A. Didn't have a W-2 income.
11 Q. Do you know if Mr. Dondero received
12 any other W-2 income from any other
13 Highland-related affiliate?
14 A. We were not -- I was not aware that
15 there was any others.
16 Q. If you were aware of other W-2 income
17 that Mr. Dondero received from a Highland
18 affiliate, would you have included it in this
19 analysis?
20 A. I would have included it, yes.
21 MR. MORRIS: Okay. Let's go down to
22 page 21, and if we can go to the bottom of
23 the page.
24 Q. All right. So correct me if I'm wrong

Page 225

ALAN JOHNSON

1 here, but what I think you did is you went and did
2 some research and you tried to identify executives
3 who had similar responsibilities to Mr. Dondero --
4 Mr. Dondero and you reviewed what information was
5 in the public domain to try to ascertain what
6 their total compensation was for each of the years
7 2013 through 2019.
8 Is that generally correct?
9 A. Yes, that's generally correct.
10 Q. And looking at this chart, this chart
11 at the bottom of page 21 only relates to 2019.
12 Do I have that right?
13 A. Yes.
14 Q. And you have one, two, three, four,
15 five, six, seven comps.
16 Do I have that right?
17 A. Yes.
18 Q. And the first portion of the analysis
19 shows the total base salary cash bonus for the
20 total amount of total cash that was paid to each
21 executive by their employer in 2019. Is that
22 right?
23 A. That's right.
24 Q. Now, Mr. Dondero received

ALAN JOHNSON

2 substantially more cash than any of these

3 executives in 2019, correct?

4     A. I don't recall his actual cash in

5 2019. That, I don't know, sitting here.

6     Q. And then the next part of the analysis

7 relates to stock options and restricted shares.

8 Let's take them one at a time.

9     What are stock options for purposes of

10 your analysis?

11     A. It's the value of a -- of an award

12 made, and this is their disclosed value of the

13 ability to exercise a -- a -- an option to

14 purchase the company's stock at a fixed price. So

15 if on the day of grant the company is trading at

16 $25, you're granted options to purchase the stock

17 at $25.

18     You don't have to exercise. The stock

19 increases in value at some point within a 10-year

20 period, you can exercise those options and realize

21 a gain.

22     The numbers shown here reflect their

23 disclosed value in their proxy statement, so use

24 Black-Scholes or some other method to value the

25 prospective value of these options.

ALAN JOHNSON

2     Q. In your expert opinion, is it

3 appropriate to include the value of the stock

4 options when trying to assess the total

5 compensation of an executive comparable to

6 Mr. Dondero?

7     A. Yes, it would be.

8     Q. Did you ask Mr. Dondero or anybody

9 acting on his behalf whether he ever received any

10 stock options of any kind?

11     A. I did not.

12     Q. So is it fair to say that your

13 analysis does not take into account the value of

14 any stock options that Mr. Dondero may have

15 received?

16     A. I was not aware that he received any,

17 so it would not have included it, no.

18     Q. And nobody told you that he received

19 any, correct?

20     A. No.

21     Q. And you didn't ask, correct?

22     A. I don't recall whether I asked or not,

23 but I didn't see it anyway.

24     Q. The next column relates to restricted

25 shares.

ALAN JOHNSON

2     Do you see that?

3     A. Yes.

4     Q. What are restricted shares?

5     A. It's the grant of shares with time

6 vesting. So you receive $100,000 worth of stock

7 in the company, and then that vests over, say, a

8 3- or 4-year period. So it's a fixed number of

9 shares that vest on the passage of time.

10     Q. And in your professional and expert

11 opinion, do you believe that the value of

12 restricted shares should be considered when

13 assessing the total compensation received by

14 executives comparable to Mr. Dondero?

15     A. Yes.

16     Q. Did you ask Mr. Dondero or anybody

17 acting on his behalf whether he had ever received

18 restricted shares during the 7-year period you

19 were analyzing?

20     A. I don't recall asking that, no.

21     Q. Did Mr. Dondero or anybody on his

22 behalf ever disclose to you any restricted shares

23 that Mr. Dondero may have received?

24     A. I'm not aware that he received any.

25 No one told me anything about it.

ALAN JOHNSON

2     Q. So is it fair to say that your

3 analysis does not take into account any restricted

4 shares that Mr. Dondero may have received during

5 the 7-year period of your -- of your analysis?

6     A. Well, he would have if either options

7 were the restricted shares. If they had turned

8 into actual shares, they would have shown up in

9 his W-2.

10     So if there were things that didn't

11 show up in his W-2, then yes, I would have been

12 unaware of it.

13     Q. Okay.

14     And is the total long term just the

15 addition really of the stock options and the

16 restricted shares?

17     A. Yes.

18     Q. Okay.

19     All right. So let's look at a few

20 more documents. I'm almost done here.

21     MR. MORRIS: Can we go back up to the

22 page with Mr. Dondero's chart, 19.

23     Yeah, there we go.

24     Q. Okay. So you included the NexPoint

25 Residential Trust W-2 income, correct?

Page 230

```
1              ALAN JOHNSON
2       A.   Yes.
3       Q.   And the only reason that you limited
4  yourself to 2018 is because you hadn't found any
5  W-2 income related to that entity during your
6  diligence, right?
7       A.   That's right.
8            MR. MORRIS:  Can we please put up
9  what's been marked as Exhibit 67.
10           (Exhibit 67, 2019 W-2 , was marked for
11      identification at this time.)
12  BY MR. MORRIS:
13      Q.   Do you see that this is a 2019 W-2
14  made out to Mr. Dondero from NexPoint Residential
15  Trust, Inc.?
16      A.   Yes, yes.
17      Q.   Okay.  And if we go to the bottom of
18  the page, do you see it says, "Expert No. 1"?
19      A.   Yes, I see that.
20      Q.   This is, in fact, a document that was
21  provided to you before you completed your report,
22  right?
23      A.   I believe that that appears to be
24  right.
25           MR. MORRIS:  Okay.  Let's go back to
```

Page 231

```
1  the top of the document.
2       Q.   Do you see that Mr. Dondero had W-2
3  income in 2019 of approximately $1.5 million?
4       A.   Yes, I believe that's right.
5       Q.   Okay.
6            So for consistency, your report should
7  be amended -- the chart on paragraph 19 should be
8  amended to include the number that's in box 1 of
9  the W-2 under W-2 income from NexPoint Residential
10  Trust in 2019; correct?
11      A.   If I've missed it, then it should be
12  included, yes.
13           MR. MORRIS:  Can we go -- can we put
14  up Exhibit 67-2?
15           (Exhibit 67-2, 2017 W-2 , was marked
16      for identification at this time.)
17  BY MR. MORRIS:
18      Q.   Do you see that this is a 2017 W-2
19  issued by NexPoint Residential Trust, Inc. to
20  Mr. Dondero?
21      A.   Yes.
22           MR. MORRIS:  Can we go to the bottom
23  of the page?
24           Can we just see the Bates number?
25
```

Page 232

```
1              ALAN JOHNSON
2            Oh, hold on, I know what I have to do.
3            Yeah, there you go.
4       Q.   Do you see that it's Bates stamped
5  page 937?
6       A.   Yes, I see that.
7       Q.   Does that indicate that that document
8  was provided to you before you completed your
9  report?
10      A.   I don't know what the Bates number
11  means, but I see the 937.
12      Q.   Well, I'll represent to you, sir, that
13  if we went to page 25 of your report, this
14  document would be listed among those that you were
15  given before you completed your report.
16           MR. MORRIS:  Can we go back up to the
17      top of the document?
18      Q.   Do you see in Box No. 1, it discloses
19  wages of approximately $625,000?
20      A.   Yes, I see that.
21      Q.   And that's the corrected information,
22  right?
23      A.   Yes.
24      Q.   Okay.
25           So looking at this now, in order to be
```

Page 233

```
1              ALAN JOHNSON
2  consistent, that $625,000 should have been
3  included in your report in the chart on page 19,
4  correct?
5       A.   I believe that's right.
6       Q.   Okay.
7            So those two entries alone are
8  approximately $2.5 million, or more than
9  10 percent of the $21 million difference that you
10  calculated, correct?
11      A.   Yes, I believe that's right.
12      Q.   Okay.
13           MR. MORRIS:  Can we please put up
14  Exhibit No. 68?
15           (Exhibit 68, compensation and benefit
16      statement for 2016, was marked for
17      identification at this time.)
18  BY MR. MORRIS:
19      Q.   Okay.  So what's on the screen, sir,
20  is a compensation and benefit statement that I
21  will represent to you was prepared by Highland in
22  the ordinary course of its business for years for
23  every employee -- I think for every employee in
24  the organization.
25           And if we go down to the bottom, you
```

Page 234

ALAN JOHNSON

2 can see that this document was produced to
3 Mr. Dondero's lawyers previously.
4          And if we can scroll back up, do you
5 see that there's reference in the middle to a 2016
6 deferred compensation award?
7          MR. AIGEN:  Hey, John, I think you
8     tried to scroll down to show the Bates
9     label, but I don't think it went far enough.
10          I just want to write down what the
11     Bates label was so I can have it for my
12     records.
13          MR. MORRIS:  Sure.
14          MR. AIGEN:  Or if you can read it into
15     the record, that will work, too.
16          MR. MORRIS:  Sure.
17          It's D-CNL003585.
18          MR. AIGEN:  Thank you.
19     Q.    And do you see that he's got total
20 compensation listed there of $2.3 million?
21     A.    Yes, I see that.
22     Q.    Okay.
23          Do you see that there's a reference to
24 a deferred compensation award?
25     A.    Yes.

Page 235

ALAN JOHNSON

2     Q.    And that award of $1.2 million relates
3 to 50,000 restricted stock units of NXRT.
4          Do you see that?
5     A.    Yes.
6     Q.    And you testified earlier that
7 restricted stock is something that should be taken
8 into account when assessing the total compensation
9 of an executive, correct?
10     A.    Yes.
11     Q.    And NXRT, do you know what that symbol
12 represents?
13     A.    I don't think I've seen that symbol.
14     Q.    Okay.  If I represented to you that it
15 is the symbol for the NexPoint Residential Trust
16 that we were just looking at – the W-2s that we
17 were just looking at, do you think that this
18 $1.2 million should be taken into account in
19 Mr. Dondero's 2016 total compensation since it is
20 restricted stock units that were given to him in
21 that year?
22     A.    I'd certainly have to consider that,
23 yes.
24     Q.    Okay.
25          But you weren't given this

Page 236

ALAN JOHNSON

2 information, correct?
3     A.    I don't think I've seen this.
4     Q.    Okay.
5          MR. MORRIS:  Can we please go to
6     Exhibit 50, 5-0.
7          (Exhibit 50, compensation and benefit
8     statement for 2017, was marked for
9     identification at this time.)
10 BY MR. MORRIS:
11     Q.    I'll represent to you that this is
12 Mr. Dondero's compensation and benefit statement
13 for 2017.
14          Do you see there's another reference
15 to approximately $1.55 million in restricted stock
16 units that were granted to him for the 2017
17 performance year?
18     A.    Yes, I see that.
19     Q.    And nobody told you that Mr. Dondero
20 had received any stock options prior to today,
21 correct – withdrawn.
22          Nobody told you that Mr. Dondero had
23 received restricted stock units of NXRT before
24 today, correct?
25     A.    I was not aware of this when I wrote

Page 237

ALAN JOHNSON

2 my report, no.
3     Q.    You would have – this number –
4 withdrawn.
5          MR. MORRIS:  Can we go to the bottom
6     of the page, please?
7          Just for the record, this is document
8     with Bates No. D-CNL003587.
9          And if you can scroll back up.
10     Q.    If Mr. Dondero received restricted
11 stock units of NexPoint Residential Trust in 2017
12 for the performance – for his performance during
13 that year in an amount of $1.55 million that's –
14 that's compensation that you would have included
15 in your report had you known about it at the time,
16 correct?
17     A.    Probably would have, yes.
18          MR. MORRIS:  Okay.  Can we go to
19     Exhibit 51, please.
20          (Exhibit 51, compensation and benefit
21     statement for 2018, was marked for
22     identification at this time.)
23          MR. MORRIS:  Okay.  This is
24     Mr. Dondero's compensation and benefits
25     statement for 2018.

Page 238

ALAN JOHNSON

1
2      If we can go to the bottom.
3      And it has Bates No. D-CNL003588.
4      And if we can scroll back up, please.
5   BY MR. MORRIS:
6      Q.   According to this compensation and
7   benefits statement, Mr. Dondero received almost
8   $1.7 million in restricted stock units of NXRT for
9   the 2018 performance year.
10      Do you see that?
11      A.   Yes, I do.
12      Q.   Were you told that Mr. Dondero
13   received restricted stock units of NXRT for the
14   2018 performance year?
15      A.   I was not aware of that.
16      Q.   Had you known that prior to issuing
17   your report, would you have included that in your
18   assessment of Mr. Dondero's total compensation for
19   the year 2018?
20      A.   I would have looked at those awards,
21   yes.
22      MR. MORRIS:  Let's go to Exhibit 52,
23   please.
24      (Exhibit 52, compensation and benefits
25      statement for 2019, was marked for

Page 239

ALAN JOHNSON

1
2      identification at this time.)
3   BY MR. MORRIS:
4      Q.   And when you say you would have looked
5   at the awards, if you assume that they are
6   restricted stock units of NexPoint Residential
7   Trust, is there any basis on which you would not
8   have included those restricted -- the value those
9   restricted stock units in an analysis of
10   Mr. Dondero's total compensation, just as you did
11   for the other executives that are your comps?
12      A.   I want to know what the terms of the
13   awards were.  I don't know how NXRT was valued, so
14   I would want to -- more information about -- this
15   is as employee statement, so I don't know how
16   accurate it would be, but I would certainly -- if
17   I'd have been aware of this, would certainly want
18   to consider what those awards were worth, you
19   know, what a comparable like-to-like comparison
20   would be.
21      Q.   Okay.
22      The next document that we have on the
23   screen is Exhibit 52, which is Mr. Dondero's
24   compensation and benefits statement for 2019.
25      And if we go to the bottom, we will

Page 240

ALAN JOHNSON

1
2   see it has Bates No. D-CNL003589.
3      Do you see that, sir?
4      A.   Yes.
5      Q.   And if we scroll back up, you'll see
6   that Mr. Dondero received in 2019 a deferred
7   compensation award of approximately $5.6 million
8   in the form of various grants of what appear to be
9   stock?
10      A.   Yes, the number on the page is 5
11   million 6, yes.
12      Q.   And you weren't told that Mr. Dondero
13   had received any grants of stock as part of a
14   deferred compensation award in 2019, correct?
15      A.   I was not aware of that, no.
16      Q.   But had you -- had you known about the
17   deferred compensation award, you certainly would
18   have asked the questions, right?
19      A.   I would have asked questions, yes.
20      Q.   And is it fair to say as you sit here
21   right now that just as you included the restricted
22   stock and the stock options in your comps, you
23   would have included this $5.6 million in your
24   analysis of Mr. Dondero's 2019 compensation?
25      MR. AIGEN:  Objection, form.

Page 241

ALAN JOHNSON

1
2      A.   I -- I don't know what amount of the 5
3   million 6.  I think, as I said before, I'd want to
4   know more about these entities and what -- what --
5   you know, how they were valued and so forth, but
6   I'd certainly want to be aware of it in coming up
7   with an aggregated figure for its compensation.
8      Q.   As you sit here right now, based on
9   the documents we've looked at so far, your
10   $21 million is subject to some questions.  Is that
11   fair?
12      A.   It's fair.  Certainly, the cash
13   amounts that he was paid should be added back, and
14   then we have these series of deferred comp awards
15   that I'd have to consider how do we include some
16   or all of it value.
17      Q.   But you weren't told about any of
18   these awards before you prepared your report,
19   correct?
20      A.   I was not aware of them.
21      Q.   And you don't have any information as
22   you sit here today that you're aware of that
23   relates to any of these awards except what I'm
24   showing you, right?
25      A.   I'm not aware of the terms of these

Page 242

ALAN JOHNSON

1 awards, no.
2 MR. MORRIS: Okay. Let's go to
3 Exhibit 67-3, which is Mr. Dondero's 2013
4 Form 1040.
5 (Exhibit 67-3, 2013 Form 1040, was
6 marked for identification at this time.)
7 MR. MORRIS: And if we can go to PDF
8 page 279 of 335.
9 BY MR. MORRIS:
10 Q. Do you see you received Mr. Dondero's
11 Forms 1040 for the period 2013 through I think
12 either 2019 or 2020, right?
13 A. Yes, I believe so.
14 Q. Did you take the time to look at the
15 statements supporting his 1040s that relate to
16 wages received?
17 A. I went through it, yes.
18 Q. Do you see on statement 12 there's a
19 reference to Highland Capital Management PTE LTD?
20 A. I'm sorry, where are we on the page?
21 Q. We're looking at the top. It's
22 statement 12.
23 A. Okay.
24 Q. Okay.
25

Page 243

ALAN JOHNSON

1 And do you see there's a reference to
2 Highland Capital Management PTE LTD?
3 A. I see that, yes.
4 Q. Do you have any idea what that entity
5 is?
6 A. I don't -- I don't know.
7 Q. Have you ever heard of it before?
8 A. I don't believe so.
9 Q. In your review of Mr. Dondero's tax
10 returns, did you ever notice that he had received
11 W-2 income from that firm?
12 A. If I looked at it, I don't recall.
13 Q. Based on the name of the entity by
14 itself, is it fair to conclude in the absence of
15 contrary information that any W-2 income he
16 received from an entity called Highland Capital
17 Management PTE LTD should have been included in
18 your report?
19 MR. AIGEN: Objection, form.
20 A. That -- that, I don't know. That, I
21 don't know.
22 Q. All right. Mr. Johnson, I'm going to,
23 you know, save us all the pain and tell you that
24 if we looked at Mr. Dondero's Forms 1040 for the
25

Page 244

ALAN JOHNSON

1 period from 2013 to 2019, Mr. Dondero reported
2 receiving W-2 income from Highland Capital
3 Management PTE LTD in every single year.
4 And I will also represent to you that
5 the aggregate amount of those payments were
6 approximately a half a million dollars, and that
7 if we added up the value of the payment -- the W-2
8 payments from Highland Capital Management PTE LTD,
9 along with the NexPoint Residential Trust W-2
10 income that we looked at, along with the value of
11 the stock options, that we would come up with a
12 number in excess of $13 million, with that
13 representation, how comfortable are you that your
14 $21 million accurately states the difference
15 between what Mr. Dondero received in the 7-year
16 period from 2013 through 2019 and what he would
17 have received if he had received the comparable
18 market compensation for similarly situated
19 executives?
20 MR. AIGEN: Objection, form.
21 A. I think you pointed out some
22 adjustments that would need to be made. I think,
23 as I testified before, I would need to go back and
24 look at the value of those awards.
25

Page 245

ALAN JOHNSON

1 I think of the $8 million you referred
2 to, I think about 5 or 6 million was made in the
3 year of bankruptcy, which I would certainly put
4 probably, in the work we do, put a question mark
5 next to, but you certainly pointed out some
6 omissions that should be included.
7 So the $21 million analysis would
8 certainly look like it would get somewhat smaller,
9 but I would -- sitting here, the 8 million you
10 mentioned, that looks like about 4 or 5 million
11 was a deferred comp award made in the year of
12 bankruptcy, which I'd probably put a question mark
13 around.
14 But it does look like, to some degree,
15 the $21 million difference that I've calculated
16 would be reduced.
17 Q. Have you done any analysis to
18 determine whether or not Mr. Dondero passed
19 through any personal expenses through the
20 business?
21 A. That, I don't know.
22 Q. Is that something that you would
23 consider if you had the information available, you
24 know, whether or not he passed personal expenses
25

**Appx. 02019**

ALAN JOHNSON

2 on through the business?

3    A. Well, it should be -- it should be

4 disclosed in his W-2, if he's -- if he's filling

5 out a W-2 or other income, but if it wasn't

6 reported on his taxes or there's a W-2, I wouldn't

7 know about it.

8    Q. I appreciate that you wouldn't know

9 about it.

10     I'm just asking you if you were trying

11 to assess the value that Mr. Dondero received from

12 serving as Highland's CEO, would you take into

13 account, if you had the information available and

14 you could quantify it, the value of any personal

15 expenses that -- that he ran through the business?

16    A. I would be reluctant to do that just

17 because many private business owners do a similar

18 thing, so it would not be fair to Mr. Dondero or

19 any other executive in his position to only do one

20 side of that trade.

21     So if I said $6 million was the

22 appropriate level that many private business

23 owners do similar things, so if there's something

24 particularly unusual, I might want to be aware of

25 it, but if it was the normal course of what

ALAN JOHNSON

2 business owners often do, I probably wouldn't

3 include it.

4    Q. Your comparable individuals in 2019,

5 are those CEOs of public companies?

6    A. The real comparison here, the

7 $6 million figure, is primarily not CEOs of public

8 companies. The small asset management companies

9 that we list are not -- neither paid that high in

10 the roles, as we say in the report, are

11 meaningfully different.

12     I think the real reference point is

13 people who manage similar assets mostly in the

14 private domain. So I think many of those CEOs,

15 founders, owners, would -- the issue we're talking

16 about, would pass on allegedly personal expenses

17 through the business.

18    Q. How about -- we talked about this a

19 little bit earlier.

20     You're aware that Highland doesn't

21 have an ownership interest in HCRE or Highland

22 Capital Management Fund Advisors or NexPoint or

23 Highland Capital Management Service, right?

24    A. I'm sorry, are you saying Highland

25 doesn't have an ownership interest?

ALAN JOHNSON

2     Is that what you're saying? I just

3 want to make sure I heard correctly.

4    Q. Yes.

5    A. I believe that's true yes.

6    Q. And you're also aware that Mr. Dondero

7 directly or indirectly owns at least the majority

8 interest in each of these four entities, right?

9    A. I'm aware of the NexPoint and

10 Advisors. The real estate, I'm not sure I've ever

11 heard about the ownership, but certainly, at least

12 several of those, he's the controlling or sole

13 owner.

14    Q. Are you aware that -- that Highland

15 Capital Management -- withdrawn.

16     Are you aware that Highland provided

17 services to Highland Capital Fund Advisor as

18 NexPoint pursuant to certain shared services

19 agreements?

20    A. I was aware of that.

21    Q. And are you aware that until sometime

22 in late 2020, HCMFA and NexPoint made payments to

23 Highland in exchange for those services?

24    A. I think I was aware of that, yes.

25    Q. Are you aware that when Mr. Dondero

ALAN JOHNSON

2 was in control, Highland also provided services to

3 Highland Capital Management Services, Inc. as well

4 as HCRE Partners, LLC?

5    A. I think I was aware of that as well.

6    Q. And were you aware that neither of

7 those entities had any shared services agreement

8 with Highland?

9    A. That, I'm not sure I was aware of.

10    Q. Are you aware that neither of those

11 entities ever provided any cash payment to

12 Highland for services rendered?

13    A. I have no knowledge of that.

14    Q. Is it fair to say that your analysis

15 doesn't take into account the value that HCRE and

16 HCMS received by getting services from Highland

17 without paying for them?

18     MR. AIGEN: Objection, form.

19    A. I am not familiar with what services

20 they received, so I don't -- I don't know how to

21 handle that.

22    Q. Let's assume that HCMS and HCRE

23 received back-office services similar to what

24 HCMFA and NexPoint contracted and paid for. Okay?

25     Can we -- can we make that assumption?

Page 250

ALAN JOHNSON

2  A.  Okay.
3  Q.  Okay.
4      And let's assume that neither of those
5  entities, HCRE or HCMS, ever paid any money to
6  Highland in exchange for those services.  Okay?
7  A.  Okay.
8  Q.  As the person in control of those
9  entities, do you think it would be appropriate to
10 try to quantify the benefit that Mr. Dondero
11 received through his ownership of HCRE and HCMS as
12 a result of Highland's providing services to those
13 entities without compensation?
14     MR. AIGEN:  Objection, form.
15 A.  At a high level, I think if Highland
16 was providing meaningful services that had value
17 to those entities and Highland wasn't getting
18 something back in return, you would want to try to
19 understand how big that was.
20 Q.  Okay.
21     But that's not an issue that you
22 analyzed, correct?
23 A.  It is not.
24 Q.  And your $21 million delta doesn't
25 take into account that issue at all, correct?

Page 251

ALAN JOHNSON

2  A.  It does not take that into account,
3  no.
4  Q.  And you didn't do any diligence to try
5  to determine whether or not Highland had provided
6  services without receiving payment in return with
7  respect to HCMS and HCRE, correct?
8  A.  I did no such analysis.
9  Q.  Okay.
10     MR. MORRIS:  Can we take -- it's 2:45.
11 Let's take a 5-minute break, a short break.
12 I may be done.
13     (Recess taken from 2:45 p.m. until
14 2:50 p.m.)
15     MR. MORRIS:  I have no further
16 questions of this witness at this time.
17     Thank you very much, Mr. Johnson, for
18 your time and your patience.
19     THE WITNESS:  Thank you, and also say
20 hi to Laura Johnson for me.
21     MR. MORRIS:  I sure will.  I'm sure
22 I'll be speaking to her this afternoon.
23     MR. AIGEN:  Alan, you're not
24 completely done yet.  I have one or two
25 questions I wanted to ask you, just to clear

Page 252

ALAN JOHNSON

2  something up.
3      THE WITNESS:  Okay.
4  EXAMINATION
5    BY MR. AIGEN:
6  Q.  You talked about the founder's premium
7  earlier.
8      Can you just again explain what that
9  means?
10 A.  Founder's premium in a private firm
11 like this is the amount that a founder typically
12 gets paid in excess of what a non-founder or
13 ordinary executive gets paid.
14 Q.  And I know you don't have a specific
15 number but do you have an opinion on what the
16 general founder's premium would be in this
17 marketplace?
18     MR. MORRIS:  Objection to the form of
19 the question.
20 A.  A premium could be very significant.
21 It could be two or even three times what the --
22 what a typical executive might get paid.
23 Q.  And what's that based on?
24 A.  Just working with these
25 founder-dominated firms, they often get paid an

Page 253

ALAN JOHNSON

2  awful lot for -- for the role they play.
3      MR. AIGEN:  That's all I have.
4      MR. MORRIS:  Just a couple of
5  questions, Mr. Johnson.
6  EXAMINATION (CONTINUED)
7    BY MR. MORRIS:
8  Q.  You didn't make any disclosure
9  concerning a founder's premium, correct?
10 A.  No, I have not done that work.
11 Q.  You did not conduct any analysis
12 concerning a founder's premium, correct?
13 A.  I have not.
14     MR. AIGEN:  Object to form.
15 Q.  And your report contains no opinion as
16 to what you believe the founder's premium should
17 be in this case, correct?
18 A.  That is correct.
19     MR. MORRIS:  Okay.  No further
20 questions.  Thank you very much.
21     THE WITNESS:  Thank you.
22     MR. MORRIS:  Have a good day.  Take
23 care all.
24     (Whereupon the proceedings were
25 concluded at 2:53 p.m.)

Appx. 02021

Page 254

```
1
2                    oOo
3         I, ALAN JOHNSON, the witness herein,
4    do hereby certify that the foregoing
5    testimony of the pages of this deposition to
6    be a true and correct transcript, subject to
7    the corrections, if any, shown on the
8    attached page.
9         _____
10            ALAN JOHNSON
11   Subscribed and sworn to before me this
12   _____day of _____,_____.
13
14   _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 255

```
1
2                 CERTIFICATE
3         I, AMY A. RIVERA, a Certified Shorthand
4    Reporter, Registered Professional Reporter,
5    Certified LiveNote Reporter, and Notary Public of
6    the State of New York, do hereby certify that prior
7    to the commencement of the examination ALAN JOHNSON,
8    was duly sworn by me to testify the truth, the whole
9    truth and nothing but the truth.
10        I DO FURTHER CERTIFY that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14        I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20   _____
21        Notary Public of the State of New York
22        My commission expires December 6, 2021
23        License No. XI00939
24   Dated:  November 2, 2021
25
```

Page 256

```
1
2                    INDEX
3    WITNESS                        PAGE
4    ALAN JOHNSON
5    By Mr. Morris            6, 253
6    By Mr. Aigen             252
7
8
9              EXHIBITS
10   NUMBER       DESCRIPTION        PAGE
11   Exhibit 34     Highland's audited  166
12              financial statements
13              for December 31, 2018
14   Exhibit 50     Compensation and    236
15              benefit statement for
16              2017
17   Exhibit 51     Compensation and    237
18              benefit statement for
19              2018
20   Exhibit 52     Compensation and    239
21              benefits statement for
22              2019
23   Exhibit 62     Expert report       76
24
25
```

Page 257

```
1
2             EXHIBITS (Continued)
3    NUMBER       DESCRIPTION        PAGE
4    Exhibit 63     Highland's 2008 audited  119
5              financial statements
6    Exhibit 64     Highland's audited  123
7              financial statements
8              for December 31, 2009
9    Exhibit 65     Highland's audited  126
10              financial statements
11              for December 31, 2010
12   Exhibit 67     2019 W-2           230
13   Exhibit 67-2   2017 W-2           231
14   Exhibit 67-3   2013 Form 1040     242
15   Exhibit 68     Compensation and    233
16              benefit statement for
17              2016
18   Exhibit 69     Highland's audited  129
19              financial statements
20              for December 31, 2014
21   Exhibit 70     Highland's audited  133
22              financial statements
23              for December 31, 2015
24   Exhibit 73     Demonstrative      193
25
```

Page 258

1
2   ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:  In Re:  HIGHLAND CAPITAL MANAGEMENT,

4          L.P.

5   Dep. Date:  November 2, 2021

6   Deponent:  Alan Johnson

7   Reason codes:

8       1. To clarify the record.

        2. To conform to the facts.

9       3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20

21                  _____

22              ALAN JOHNSON

23      Subscribed and sworn to before me

24      this    day of          2021.

25      _____

Appx. 02023

## $

**$1.2** 235:2,18

**$1.5** 231:4

**$1.55** 236:15 237:13

**$1.7** 238:8

**$100** 46:10,14 158:21

**$100,000** 228:6

**$13** 137:10,17 244:13

**$13.3** 137:19

**$14** 195:7

**$14-and-a-half** 153:18

**$14.5** 166:5

**$14.8** 142:2,14

**$14.9** 142:19 152:9, 18 177:16 194:21

**$15** 221:6

**$173** 169:24

**$173.4** 167:11 168:13 173:19 174:19

**$174** 167:23

**$2.3** 234:20

**$2.5** 233:8

**$20** 197:17 201:20,22

**$21** 160:25 220:11, 14,19 221:17 222:7 233:9 241:10 244:15 245:8,16 250:24

**$22.8** 154:21

**$23** 138:11 214:15

**$23-and-a-half** 200:19 201:10,12 202:2,15 203:25

**$23.4** 144:16,21 145:2

**$23.6** 145:11

**$23.7** 197:5

**$24.143** 201:6

**$25** 226:16,17

**$29.2** 178:3

**$29.4** 177:21 185:2 186:3

**$3** 160:15,25 220:16

**$3.3** 197:9

**$3.4** 197:9

**$30** 158:25 159:9 188:16,19 221:10

**$30.7** 158:7,16

**$300,000** 122:13 123:11 124:5

**$330,000** 122:17 124:8 126:23

**$371** 173:15

**$400,000** 121:3,13, 24 123:9 152:21

**$5** 46:10

**$5.6** 240:7,23

**$50** 17:3,8 50:12,19, 24 51:24 117:7 173:9 185:14

**$500,000** 97:2,5 117:3 121:17 122:2, 22 123:3 125:14 191:16

**$6** 50:6,9 160:21 220:17 246:21 247:7

**$6.1** 134:15

**$625,000** 232:19 233:2

**$677,000** 201:9

**$7.4** 182:12

**$7.9** 195:12 198:15, 23

**$700,000** 122:11

**$73** 171:3,16

**$74** 172:17

**$783,000** 198:6

**$8** 245:2

**$8.1** 138:15

## 1

**1** 108:12 121:2,16,24 122:21 125:13 184:9 192:11 230:18 231:9 232:18

**10** 83:20 97:11,15 221:10 233:9

**10-minute** 73:21

**10-year** 219:4 226:19

**100** 117:17 167:18 216:3

**1040** 242:5,6,12 243:25

**1040s** 161:7 242:16

**10:27** 74:3

**10:40** 73:22 74:4

**11** 83:20 106:16 107:11 108:7

**12** 83:20 128:23 242:19,23

**12-month** 214:6,15 216:10

**13** 83:20 128:24

**13-minute** 73:23

**14** 80:6

**14.5** 153:5 177:19

**14.9** 153:5 177:18

**143** 87:23

**15** 80:6 82:25 137:9, 25 169:5 181:25

**15th** 123:2

**16** 77:2 115:16 197:21 215:9

**17** 171:25 198:23

**174** 168:18

**18** 16:16 171:25 183:25 195:11,15 196:11 197:8 198:10, 22 199:15 201:13,25 204:15 214:6

**18-'19** 201:18

**19** 7:12 16:16 80:7 171:25 174:5 183:25 195:15 196:12 201:21,25 214:7 218:10 229:22 231:8 233:3

**1:02** 192:15

**1:30** 192:12

**1:32** 192:16 193:3

## 2

**2** 108:15 122:2,5

**2.75** 154:16

**20** 11:20,21,25 46:11 124:8

**2007** 122:6

**2008** 83:19 107:2 108:13,25 119:13,14, 25 120:22 121:11 122:9,17 123:8 124:5,7,8,19 125:13 147:9,13,15,18 191:23 192:5

**2009** 123:17,22 125:10,22 126:10 190:7 191:11 208:8

**2010** 126:13,16 128:11,16

**2011** 128:23

**2013** 7:20 218:14 221:13 225:8 242:4, 6,12 244:2,17

**2014** 80:5 82:25 129:10,14,17 130:19 131:8,14,18 132:6,22 137:8,25 138:14

**2015** 133:4,7,10,17 136:3,14 137:17

**2016** 139:21,25 142:3,14 144:16 145:9 146:25 152:8, 14 153:6 224:8 233:16 234:5 235:19

**2017** 134:20 148:4,10 150:25 152:22 153:2, 5,19 154:10 158:5

163:15,18 164:5 165:24 195:14 196:11 197:8 200:17 231:16,19 236:8,13, 16 237:11

**2018** 7:12 15:9,11 27:9 42:10 92:14 98:23 103:2 108:19 120:3 166:8,13,20 167:23 171:16,22 172:9,10,18,23 174:5 177:11,16,20 178:8 180:19 181:25 183:24 184:23 185:25 186:23 195:6, 11,13 198:10 199:4, 15,21 200:18 201:14, 25 202:13 204:7,15 208:8,16,18 209:11 216:11 218:23 223:12,21 230:4 237:21,25 238:9,14, 19

**2019** 7:20 15:11 27:9 82:25 92:15 98:24 103:2 108:13,20 171:23 172:11,24 182:12 183:4 184:5,9 186:19 197:16,22 198:16 199:14 200:18 201:14 202:13 204:8 208:18 216:11 218:14,23 225:8,12,22 226:3,5 230:10,13 231:4,11 238:25 239:24 240:6, 14,24 242:13 244:2, 17 247:4

**2020** 242:13 248:22

**2021** 77:8 79:14,20 83:14 88:10 89:17

**20th** 122:17 124:5

**21** 122:5 204:16 224:23 225:12

**22** 204:16

**23** 197:21 198:16 199:14 201:14 202:2, 15 204:17

**24** 201:17

**25** 77:19 232:13

**27** 130:8,12 133:22

**279** 242:9

**28** 77:8 83:14 88:10 89:17 175:12

**28th** 79:9,14,20

**29** 134:6

**2:45** 251:10,13

**2:50** 251:14

---

**3**

**3** 103:17 108:18 122:4 184:4,9 205:3 220:18 221:7,17 222:3

**3-** 228:8

**30** 5:17 18:22 68:17 122:9 148:5,17 182:15

**30-year** 18:23,24 59:17,25 149:24 150:13

**30.7** 158:10

**31** 123:17,21 126:16 129:14 133:10 134:20 139:25 140:7 148:10 154:10 158:5 166:13,20 177:11 183:24

**319,000** 199:5

**33** 123:25 126:19 193:18

**335** 242:9

**34** 166:10,12

**370-day** 201:13

**38** 120:13,14,15 181:24

**39** 182:6

---

**4**

**4** 245:11

**4-year** 219:3 228:8

**40** 17:3,8 117:7,9 173:8 185:14

---

**5**

**5** 89:19 200:20 202:15 204:3 214:5 221:5 240:10 241:2 245:3, 11

**5-0** 236:6

**5-minute** 251:11

**50** 11:22,25 12:2 117:10 236:6,7

**50,000** 235:3

**51** 237:19,20

**52** 238:22,24 239:23

---

**6**

**6** 172:7 208:12 221:8 222:2,3 240:11 241:3 245:3

**60** 192:13

**62** 76:20,24 205:2

**63** 119:12,14

**64** 123:15,16

**65** 126:14,15

**66** 128:19 129:8

**67** 230:9,10

**67-2** 231:15,16

**67-3** 242:4,6

**68** 233:14,15

**69** 129:10,13

---

**7**

**7** 50:10 160:15 220:18 222:8,10,18

**7-year** 221:19 228:18 229:5 244:16

**7.9** 198:18

**7/31/06** 121:24

**70** 133:7,9 193:12,13

**73** 193:13,14

---

**8**

**8** 97:11,15 245:10

**8/1/08** 122:2

**80** 117:17

---

**9**

**9** 83:20

**90** 91:19 192:13

**90s** 10:19

**937** 232:5,11

---

**A**

**a.m.** 74:3,4

**ability** 25:11 38:20 47:10 226:13

**absence** 210:16 243:15

**absolutely** 14:5,8,12 42:7 51:14 70:15 128:25 162:7 163:10, 13 169:21 171:14 173:3 187:21

**acceleration** 7:14

**accept** 129:4

**access** 53:20 65:22 161:25

**accomplishment** 31:16

**accomplishments** 31:24 43:11,16

**accord** 82:16

**account** 161:8,13 163:6 174:24 180:17 227:13 229:3 235:8, 18 246:13 249:15 250:25 251:2

**accounting** 182:22

**accrue** 154:15

**accumulated** 7:17

**accuracy** 202:11

**accurate** 78:19 185:6 194:11 205:22 209:2 215:22 220:23 221:14,15 239:16

**accurately** 209:6 244:15

**achieve** 60:4

**achieved** 24:6 64:15

**achievement** 62:11, 18

**achieving** 44:23 163:12 214:23

**acknowledged** 81:19

**act** 29:14

**acted** 93:4

**acting** 29:10 83:7 187:3 227:9 228:17

**activities** 224:6

**actual** 23:8 218:13 226:4 229:8

**actualized** 23:4

**actualizing** 23:22

**add** 177:18 201:24

**added** 241:13 244:8

**addition** 101:5 229:15

**additional** 22:18 88:12 104:3 105:5, 17,25 106:5,25 109:10 112:12 113:22 195:7 205:11 206:4 218:4

**Additionally** 115:21

**address** 112:22

**adequate** 30:20

**adjustments** 244:23

**Adkins** 95:2,20,21 96:5,7

**admissible** 5:15

**admonish** 212:2

209:16 216:3,12

**advantage** 13:13 211:9,12

**advice** 11:16 12:5,14 13:3 28:9,13 29:5 30:9,14,24 34:17 40:17,20 54:23 58:6 61:5 69:23 70:7 71:8, 19 139:5

**advise** 30:17 34:22 35:4 38:11 39:4,11 41:24 43:3,20 44:4 47:16 51:15 52:19 53:23 54:10 55:11,14 57:19 58:5,23 60:25 62:5,21 63:16 64:8 65:12 66:3,22 68:9, 13 69:11,18 70:2,4 156:21 168:7 187:14

**advised** 11:2,6 55:4, 9 70:23 187:19

**advising** 69:8 71:6 168:6 187:9,10,12

**Advisor** 248:17

**Advisors** 78:6 130:16 134:11 136:6 140:23 148:23 157:23 247:22 248:10

**Advisors'** 223:24

**affiliate** 19:11,25 90:5 94:21 95:14 117:24 134:24 140:13 166:23 192:7 207:6,11,12,15 224:14,19

**affiliated** 56:12 124:13 126:5 130:11 160:4 161:10,18 162:2 206:19

**affiliates** 22:3 75:16 118:3 120:23 134:9 140:10 148:20 156:3, 9 157:6 164:4 167:8, 12,14,20,22 168:19 169:7 170:12 173:19 174:18 175:14 185:6, 9,12,19,20 190:12 207:2,22

**afternoon** 193:5 251:22

**aggregate** 16:23 17:17 60:19 65:13 117:15 137:10 138:10 142:2 158:15 182:11 244:6

**aggregated** 241:7

**agree** 29:15 33:18 36:13,23 41:4,24 60:8,18 67:10 69:4 112:10 123:7 128:8, 14 136:22 159:2 161:23 190:5 191:7

**agreed** 134:24 139:16 149:18 150:18 151:4,14 153:10,24 155:3 164:8,17 165:3,13 175:22 176:6,12,17 178:16 179:13

**agreeing** 34:15 36:2 40:14 42:25 46:13 49:16 59:2 68:5 173:6

**agreement** 15:10,22, 23 16:2,4,9,14,21,24 17:21 19:6,10,14,20, 24 20:5,10,15,17,19, 21,23 21:4,7,13,25 22:7,13 23:19 24:5, 12 25:2,8 26:12 27:8, 14 28:3 31:5,7,10,13 32:11 39:14 42:9 44:8,12,14 45:8 46:2, 9,11 47:25 50:17 53:25 55:8,22 56:7, 10 57:10 61:13,19,24 62:6 63:24 65:11 66:10,24 68:11 69:12 70:9,12,17,24 71:5 73:9 83:9 92:14 93:17,25 94:2 98:23 99:7,20 100:2 101:14,21 102:25 103:14 111:7 113:11 117:8,16 139:7 155:8,12 156:24 169:17,25 171:21 172:10,13,23 178:25 179:9,16 180:19 181:10 183:4,5 188:22 189:3 196:13 200:2 203:2,10 204:18,22 208:17

209:7,13 211:14,17 249:7

**agreements** 17:12 69:17,19,24 70:21 72:7 78:6,15 138:19 187:15 248:19

**agrees** 32:21

**ahead** 210:6

**Aigen** 5:24 28:7 67:17,25 107:15 109:12 111:11,20 118:7 135:22 147:10 150:6 156:11 157:14 160:6 161:12 162:3 168:16 169:8 170:2 174:25 178:11 180:13,22 181:12 182:20 183:8 187:17 188:8 189:5,14 190:24 192:8 196:15 202:22 203:11 205:19 206:11 207:18,24 209:8,17 211:5,19 214:9,19 234:7,14,18 240:25 243:20 244:21 249:18 250:14 251:23

**Alan** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1

104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1,23

**alleged** 22:7,13 103:14

**allegedly** 247:16

**altered** 18:8

**alternative** 11:7

**amend** 80:9 89:11 107:3

**amended** 18:6 77:10 231:8,9

**amortization** 149:25

**amount** 31:22 33:6 43:9 48:18 52:13,15, 17 55:14 56:3,4 59:6 61:2 73:13 81:12 92:7 97:2 116:23 121:13,17 122:6,13 123:9,10 124:5,8 125:4,14,17 131:21 135:11,13 137:10,11, 16 138:11 142:2,18 145:2,10 147:24 152:21 153:4 174:18 175:13 182:11 195:11 198:19 199:14 201:6,16 225:21 237:13 241:2 244:6

**amounts** 17:25 44:3 55:25 58:21 60:23 96:19,21 97:4 109:16 134:20 140:10 147:14 148:19 156:3 157:12 164:3 167:8, 12 169:7 173:18 174:17 175:14 185:16 195:20 241:13

**Amy** 5:4

**analysis** 16:19 17:18 145:25 146:5 160:19 171:16 217:7 218:7 219:14 222:16 223:4, 17 224:2,20 225:19 226:6,10 227:13 229:3,5 239:9 240:24 245:8,18 249:14 251:8

**analyze** 217:18

**analyzed** 250:22

**analyzing** 228:19

**and/or** 203:21 214:23 215:4

**annual** 219:25

**answering** 196:20

**apologize** 26:10 31:8 74:15 82:7 96:2, 6 148:6 181:20 193:13 209:25

**appeared** 190:8,14

**appears** 178:12 191:18,25 230:23

**applied** 43:18 105:11,19 198:8 199:3,5,14,15,19

**applies** 56:10

**apply** 219:3

**approximately** 91:14 154:21 160:15 184:25 197:5 198:6 200:19 202:12,14 203:25 231:4 232:19 233:8 236:15 240:7 244:7

**approximates** 135:6 149:4 176:25

**approximating** 152:3

**April** 75:2

**arbitration** 174:8

**area** 9:3 14:4 28:18 66:21

**areas** 12:15 30:25

**arithmetic** 200:24

**arithmetically** 220:9

**arm's** 10:10

**article** 219:11 222:17

**ascertain** 225:6

**aspect** 79:15 98:7 150:19

**assertion** 100:3

**assertions** 206:5

**assess** 45:4 62:19 63:5,14,25 64:5,6,9, 21 100:21,23 101:9 156:6 227:4 246:11

**assessing** 228:13 235:8

**assessment** 43:4 44:16 45:19 47:3 48:12 102:13 238:18

**asset** 11:2 46:16 247:8

**assets** 28:2 42:11,21 43:22 44:7,10 46:8,9, 10,24 47:20 48:8 93:18 94:3 169:6 173:13 215:5 247:13

**assignment** 100:18, 22,25 101:4,7

**association** 5:5

**assume** 53:15,17,19 66:13 67:21 107:11 108:7 109:7 116:12 120:6 144:24 145:4, 7,12,15,18,22 150:4 158:2,22 194:15 202:10 239:5 249:22 250:4

**assumed** 211:15

**assumes** 173:17 174:15,16

**assuming** 55:13 153:6 221:7,14

**assumption** 108:12, 15,18,21 129:5 145:3 249:25

**assumptions** 109:4, 8,18 173:20 174:20

**asterisk** 199:7

**attached** 28:24 31:17

**attempt** 51:16 161:20 217:18

**attempted** 217:14

**attempting** 39:6 52:22

**attention** 18:17

**attorney** 6:17

**attorneys** 21:4 52:8 99:16

**attributable** 171:2

**audit** 40:4 185:25 186:24

**audited** 83:19 108:23 119:13,14 120:4,22 123:16,21 126:3,15 128:25 129:13,18,24 133:9,16 139:22 142:12 147:18 148:9, 17 152:15 155:21 157:4 158:6,14 166:8,12,19 177:10 179:24 181:8,25 183:7,22 184:23 185:2 186:6 190:2 191:8 206:7,14

**auditors** 84:3 181:10,16 182:16

**August** 121:16 122:17,21 124:5,8 125:13

**authored** 84:7

**average** 50:6 219:24 220:3,5,15,17 221:18,21,25

**avoid** 51:5 139:3,11

**award** 174:8 226:11 234:6,24 235:2 240:7,14,17 245:12

**awards** 238:20 239:5,13,18 241:14, 18,23 242:2 244:25

**aware** 15:23 18:12 32:17 33:10,15,24 71:22 79:3,6 83:25 84:5,8 99:18 110:4,7 112:6,8 117:5,25 134:23 135:2 143:23 144:2,15 162:16 167:24 168:2,22 174:7,9,11 180:6,17 186:12,18 188:2 190:18,25 199:23 200:3 219:11,16 222:15 224:15,17 227:16 228:24 236:25 238:15 239:17 240:15 241:6, 20,22,25 246:24 247:20 248:6,9,14, 16,20,21,24,25 249:5,6,9,10

**aways** 25:24

---

**B**

**back** 10:14 25:9,21, 24 65:19 71:4 73:22 83:6 92:5 107:2 108:20,25 110:20,25 112:9,11 113:9,21 143:23 153:15 155:17,23 172:5 173:11 194:21 204:25 212:4 215:20 224:8 229:21 230:25 232:16 234:4 237:9 238:4 240:5 241:13 244:24 250:18

**back-office** 249:23

**bad** 188:10

**balance** 40:4 42:3 61:16 62:13,15 132:25 139:3 166:25 167:3,11 173:12,22 174:2,21 175:7 198:15

**bank** 83:11 90:16,17 194:5

**banker** 187:25

**bankrupt** 188:15

**bankruptcies** 188:9

**bankruptcy** 106:17 107:12 109:11 171:2 186:13,14,16,18 187:3,10,14 188:2 190:21 204:10,11 211:4,13 245:4,13

**base** 225:20

**based** 10:14 22:18 29:15 45:8 47:6 67:11 116:5 126:7 127:10,14 136:20 159:23 160:2,19 161:4 184:23 190:6 191:7,14,20 192:2 200:21 208:24 209:4 212:6 216:16 222:12, 18 241:8 243:14

**basic** 31:18 40:16,23 41:5 43:6 44:9 58:3 60:15

**basis** 109:9 112:25 146:15 239:7

**Bates** 231:25 232:4, 10 234:8,11 237:8 238:3 240:2

**beginning** 156:18

**begins** 130:12

**behalf** 6:6 21:10,11 29:10,14,17 30:4 83:7 85:2 93:4 103:15 156:9 172:23 173:7 187:3 194:6 211:18 227:9 228:17, 22

**behaviors** 33:4,8

**believed** 16:4 186:21

**believes** 66:8

**believing** 203:20

**beneficiaries** 145:17

**beneficiary** 55:8,22 145:19

**benefit** 156:23 158:22 161:9,17,24 162:10,14 168:9,15 187:25 233:15,20 236:7,12 237:20 250:10

**benefited** 159:7 162:4,5

**benefits** 237:24 238:7,24 239:24

**bet** 9:9

**big** 13:20 250:19

**bit** 15:4 39:24 72:24 79:12 113:5 221:4 247:19

**Black-scholes** 226:24

**blue** 52:12

**board** 11:16,21 12:4 13:9 29:20,23

**boards** 12:7,11,12

**body** 30:3

**basis** / **bonus** 225:20

**book** 135:14,15

**books** 44:11 72:8

**boring** 166:3

**borrowed** 46:5 185:9 195:6

**borrower** 136:25 137:4 203:19

**borrowing** 185:12

**bottom** 77:4 130:12 167:6 170:24 171:3 224:23 225:12 230:17 231:23 233:25 237:5 238:2 239:25

**box** 157:24 231:9 232:18

**break** 73:21,23 74:7, 12 184:20 189:23 192:12 193:8 251:11

**bring** 210:21,25

**broad** 52:25 58:2 92:11,12

**broke** 88:13

**bullet** 208:15

**bunch** 17:12 189:16

**business** 12:17 24:14,17,24 25:12,23 33:11 36:18 37:6 38:19 39:22 40:25 41:12 46:19,22 48:10 54:8 114:20 193:25 212:8 213:9 218:20 233:22 245:21 246:2, 15,17,22 247:2,17

**businesses** 168:20 170:5 224:4

---

**C**

**calculated** 161:4 233:10 245:16

**calculus** 44:23

**call** 42:15,20 90:24 91:12 193:22 211:4

**called** 114:16 120:23 130:11 132:2,16 156:2 211:15 243:17

**calling** 22:19

**calls** 90:25 91:2,8 216:11

**candid** 93:10

**CANTY** 76:18 129:10 133:7 163:18 166:10

**capacity** 188:16

**capital** 5:21 6:18 75:15 78:5 79:24 85:11 114:19 129:18 130:16 132:17 134:11 138:14 139:18,23 148:22 151:9 160:5 161:10, 14,18,25 162:5,6,12 163:11 165:8,15 173:14,17 174:14,23 176:18 190:17,20 222:24 223:5 242:20 243:3,17 244:3,9 247:22,23 248:15,17 249:3

**career** 10:16 73:2

**carried** 167:11

**carrying** 135:6,12 149:4 152:4 176:25

**case** 5:19 43:19 73:16 74:17,25 75:12,16,20 76:3 84:6,15,22 85:18,21 90:14 100:7 119:8 135:15 183:12 185:13 207:3 217:9

**cash** 40:5 225:20,21 226:2,4 241:12 249:11

**catalog** 70:14

**catch** 79:11

**categories** 80:14 92:12

**categorized** 208:21

**caused** 222:18

**caveat** 52:24,25 55:24 73:13 78:19

**called** 190:4,5 206:19

**cell** 10:3

**CEO** 29:25 53:11,24 54:12 65:20 66:20,24 67:24 71:5,9 246:12

**CEOS** 247:5,7,14

**certainty** 44:21

**certified** 5:5

**change** 89:6,10 106:15 107:10,17,25 195:7 199:5

**changed** 23:10 107:7,8 168:23 216:16

**changing** 195:20

**chaos** 188:13

**chaotic** 37:2 41:10 54:19 55:18 188:11 211:8

**characteristic** 23:7

**characteristics** 23:11

**characterization** 22:23

**characterize** 78:2 81:6

**characterized** 20:21 200:21

**chart** 196:10,23 198:4 200:22 202:10, 11,12 219:21 222:22 225:11 229:22 231:8 233:3

**cheat** 147:16

**chief** 85:12

**child** 10:9

**circumstance** 36:11 37:23 41:2,15 47:23 54:17 60:6,17

**circumstances** 26:6,7 30:21 33:16 34:5,10 45:6 47:14 48:3 54:11,16 63:12 102:3 119:5 196:18 203:7

**Civil** 5:18

**clarification** 222:5

**clarity** 37:20

**clear** 6:14 8:9 26:11 37:5,11 38:7 41:21 151:25 212:9 213:13 214:7 251:25

**client** 14:23 39:8,11 44:4 55:4,9,11,14 58:23 60:25 68:9 181:9 187:9,14,20

**clients** 11:11 13:4,25 14:16 28:19 33:25 37:14 47:21 68:13 69:18 70:5 181:5,15 189:7,19 210:22 211:24

**closely** 119:3

**closer** 47:8

**co-founder** 143:12

**co-owned** 207:7

**codifying** 92:25

**colleague** 91:11 95:9

**collect** 188:19

**column** 194:25 196:24 198:5 199:2,8 201:6,19 227:24

**combined** 149:22 150:13 158:9

**comfortable** 10:7 13:25 191:9,15,21 192:4 244:14

**commenced** 72:15 73:5 188:25

**comment** 25:9

**comments** 26:8 95:25 105:13

**committee** 12:4 13:9 29:19,20,24

**committees** 12:12

**common** 69:4,7

**commonly** 45:3

**communicate** 74:10

**communicated** 90:13

**communication** 90:22

**comp** 29:20 45:3 241:14 245:12

**companies** 12:19 15:13 56:12 72:5 115:7 160:5 161:11, 18 162:2 206:19 208:20 216:24 247:5, 8

**company** 29:15,17 32:14 36:6,10 44:3 53:19 61:11,17,20, 23,25 62:4,13 63:13, 21,23 66:12 67:16 68:6 92:22 93:4 102:2 105:9 113:7,12 114:4,14,24 119:8 163:4,11 170:11 172:22 173:2,6 174:7 200:11 203:17,22 208:3,6 211:18 214:24 215:3 226:15 228:7

**company's** 33:13 38:3 53:20 226:14

**comparable** 48:13, 19 49:10,15 51:11,17 52:4,20 64:25 65:23 68:23 102:13 160:20 161:22 216:24 227:5 228:14 239:19 244:18 247:4

**compared** 118:4 220:15

**comparing** 220:2

**comparison** 239:19 247:6

**compensated** 49:10,16 51:11 156:7 157:10

**compensation** 7:19 9:4 10:16,19,23 11:4, 8,17 12:4,12,15,23 13:5,9 14:4,15 22:18 23:3,5,8,9,12,13 24:15,19 27:19,25

**communicate** 74:10

**28:15 29:24 30:5,16 32:10 33:19,20 34:6, 15,24 35:5,7 36:14 38:2,12,22 39:15 40:23 41:5,25 43:2 48:13,19,22 50:20 61:9 62:23 66:16,22 69:11 70:23 72:19 88:9,12,14 94:12 101:6 104:3,12 105:5,18,25 106:6, 18,25 107:6 108:3 109:10 110:21 112:13,17,20,24 113:23 114:6,16 115:2,8,23 116:20 157:16,20 189:2 205:11 206:4 215:14 218:14 219:21,25 221:18 223:7 225:7 227:5 228:13 233:15, 20 234:6,20,24 235:8,19 236:7,13 237:14,20,24 238:6, 18,24 239:10,24 240:7,14,17,24 241:7 244:19 250:13

**competition** 52:23

**complaints** 75:12

**completed** 200:5 230:21 232:8,15

**completely** 93:9 251:24

**completing** 195:23

**complicated** 34:2 69:17

**comports** 150:11

**comps** 220:3 225:16 239:11 240:22

**concept** 14:19 179:19,23 196:5 202:20

**concern** 79:14,20 113:8 116:13 117:17 177:9

**concerns** 129:2 140:22 164:13

**conclude** 109:9 127:10 178:7 243:15

**concluding** 191:9, 15 192:4

**conclusion** 115:18 146:11 153:2 160:13

**conclusions** 18:8

**condition** 35:10,12, 15,20,25 36:5,9,15, 18,25 37:6,7,12,14 38:4,14,17,19,24 39:2,7,9,13,22 40:24 41:6,11 43:5 44:16 63:8,12,21 66:17 68:21 136:24 137:4 163:9,10 170:10 172:21 173:2,6

**conditions** 22:20 43:22 56:9

**conducted** 95:13 102:24

**confident** 208:25 209:5

**conflicts** 202:20

**confuse** 185:24

**confused** 185:17

**confusion** 188:13

**conjure** 55:20 67:12

**connection** 179:16

**conservative** 218:2

**consideration** 58:8, 25 59:16

**considered** 54:13 89:23 90:3 91:4 114:5 115:22 146:9, 14 157:20 163:13 215:13 228:12

**consistency** 231:7

**consistent** 102:8 105:13 114:4 115:14 147:24 233:2

**consolidated** 7:13 16:15 170:18

**constituted** 56:4

**constructing** 87:18

**consultant** 10:16 189:2

**consultants** 13:16

**consulting** 10:19,23 13:2

**contained** 157:3 194:13

**contemplate** 58:14

**contemplating** 69:9

**contends** 117:8 200:2

**context** 15:18 32:14, 23 33:11 49:2 65:7 155:12,13

**contingency** 42:16

**contingent** 42:16 64:11

**continue** 149:11 154:4 177:13 182:5

**continues** 149:2 215:22

**contracted** 249:24

**contrary** 243:16

**contribution** 155:8, 11 179:8,16

**control** 204:6,12 249:2 250:8

**controlled** 56:23 156:10 157:13 158:23 159:19 167:15,16,17,19

**controlling** 248:12

**controls** 56:13 158:3

**convenient** 189:18

**conversation** 56:17 83:10,12 146:22

**conversations** 56:18

**convoluted** 111:13

**copies** 57:20

**copy** 86:17

**corporate** 19:11,24 117:24 118:3,16,21, 25

**corporations** 119:4

**correct** 10:15,17,24 11:8 27:11,16 28:5 30:11 40:18 61:4 62:23 63:9 65:15 77:16,17 80:10 83:9 85:3 94:6 97:23 101:22 102:4 103:2, 6,15 113:3,18 116:10,11 118:6 120:9 125:10,22 128:11 130:24 131:8, 18,22 132:7,22 133:20 135:17,21 136:3 140:4,5 142:19 144:21 146:19 147:2, 13 148:3,14,15 149:19 150:9,10,15 153:8,12,13 154:2,3 158:16 159:15,20 160:16,22,23 161:5, 11,15,19,22 168:10, 11 169:3 171:23 173:19,24 177:11 178:17 179:4 186:9, 10 190:18 191:3,11, 22,25 196:10,14 197:10,18 201:14 202:17 205:15 206:10,16 207:23,25 208:8 209:13 210:14 212:19 213:3,10 216:4 217:12,15 218:8 220:4,19 221:19,23 222:8,10, 13,24 224:25 225:9, 10 226:3 227:19,21 229:25 231:11 233:4, 10 235:9 236:2,21,24 237:16 240:14 241:19 250:22,25 251:7

**corrected** 232:21

**correctly** 6:22 8:6 11:11 104:6 114:4,9 116:2 127:4 137:20 154:23 185:22 208:22 215:16 248:3

**correspond** 124:6

**corresponds** 124:17

**cost** 15:12 28:3 42:12,21 43:21 46:8, 10,11 47:3,19 208:19

**Cote** 95:2 96:9

**counsel** 5:3 194:8

**count** 201:3

**counted** 200:23

**couple** 16:18 19:2 136:18 162:18,21 194:7 211:23

**court** 5:2,5 187:4,15

**courtroom** 5:16

**cover** 56:21

**covering** 19:6,10,14

**covers** 184:8,12,15

**COVID-19** 5:7

**created** 23:11 145:14

**crisis** 37:3 218:19

**criss-crossed** 8:16

**curious** 111:9,12,13, 14

**current** 14:10 24:18 92:5 104:3 105:5,17, 25 106:6,25 112:13 113:23 205:11 206:4

**customarily** 72:6

**customary** 138:17

**cutoff** 184:14

**cycles** 13:24

**D**

**D-CNL003585** 234:17

**D-CNL003587** 237:8

**D-CNL003588** 238:3

**D-CNL003589** 240:2

**Daniel** 6:5

**data** 13:18 39:18 89:23 91:4

**date** 44:7 46:8,11 75:7 81:13 82:10 84:6 85:13 89:16 108:8,10 111:5,19,23 160:16 182:13,18

**dated** 124:8 177:5 184:4

**dates** 127:7,25 128:4

**day** 156:19 198:24 226:15

**days** 95:18

**deal** 45:13 61:15,16 66:7

**dealing** 13:21 29:25

**Deborah** 6:2

**debtor** 186:13 187:10,13 188:17

**decade** 109:11

**December** 108:20 123:17,21 126:16 129:14 133:10 139:24 148:10 150:25 154:10 166:13,20 171:22 172:18 177:11 183:24 197:21 198:16 199:14 200:18 201:13,14,25 202:13 204:7 214:6,7 216:11

**decide** 67:7 223:3, 15,25

**decided** 221:3

**decides** 29:21

**deciding** 163:6

**decision** 12:13 29:7, 9,11,12,16 30:2,4,9, 14,18,23,25 31:10 32:8,12,18 33:17 34:13,22 35:4,12,24 36:12,23 37:9,16,24 38:11,18,21 39:4 40:11,18 41:3,16,24 43:3,20 44:5,13 45:7 46:13 47:17,24 48:20 49:14 50:11,13 51:4, 6,16 52:3,5,19 53:23 54:8,10,21,25 55:21 57:2,6,8,11,14,19,21 58:4,5,9,15,20 59:14 60:7,17,21 61:7,12,

18,21 62:3,4,6,21
63:8,10,16 64:8,23
65:12 66:3,14,23
67:4,10,13,21,22
68:10,15,18 69:8,11
70:2,23 72:12 73:2,8
93:3,17 98:22
100:14,17 102:24
103:10,13 156:21
163:5 168:6 169:16,
19,22 170:6,8
172:20,25 173:5
211:16 218:22,24
219:9

**decisions** 41:12,14
65:7 188:10 189:7,20

**deduct** 197:14 201:8

**deferred** 23:8 105:10
107:5 108:3 112:17,
19,24 114:6,15,25
115:23 116:20
215:14 234:6,24
240:6,14,17 241:14
245:12

**define** 56:16

**defined** 28:25

**definition** 30:10
80:21 111:21

**degree** 245:15

**Deitsch-perez** 6:3

**delayed** 24:16 27:23
114:17

**delaying** 25:22

**delivered** 217:5

**delta** 221:5,10
250:24

**demand** 18:19 19:3
59:16 60:2 134:19,24
136:22 137:14
154:22

**demanding** 136:17

**demonstrative**
193:14,22 214:4

**department** 52:10
71:22

**depend** 54:16 119:5
138:21 196:18

207:21

**dependent** 216:3

**depending** 47:13

**depends** 66:5 159:5

**deposed** 8:20 100:7

**deposition** 5:11 6:19
18:5 29:7 81:20
82:19 84:6,10,25
85:17,22,24 86:4,12,
13 88:7 89:9 100:10

**depositions** 9:11
153:16

**describe** 13:8 17:10
19:19,23 20:4 28:17
48:14 83:8 92:13
105:18 162:10

**describes** 130:15
164:4,23

**describing** 105:20
206:25

**description** 27:3
109:2 150:23 220:22

**design** 45:2 59:22

**detail** 7:24

**determination**
48:20 222:12

**determine** 65:8,10
115:11 217:8 245:19
251:5

**determined** 220:16
221:22 222:10

**differ** 219:3

**difference** 118:23
160:24 199:13
219:20 220:9,11,14,
18 222:7 233:9
244:15 245:16

**differently** 8:16
146:10

**difficult** 13:21,23,25
37:4 41:11 43:7
44:24 45:19

**difficulty** 32:4 45:4,
17,23 64:14

**dilemma** 153:16

**diligence** 102:24
103:5 230:6 251:4

**direct** 87:2 162:12

**directed** 86:21,24
87:16

**directly** 56:13,22
90:13 248:7

**director** 53:12,16,18,
19 54:2 65:20,25
66:8,14 68:2,6 71:6,
7,12

**directors** 11:16,21
12:4,8,11,12 29:23
71:14

**disappointing**
162:22,24

**disclose** 110:24
181:17 188:6 206:9
211:11,22 212:2
228:22

**disclosed** 79:4
182:25 183:6 191:13
206:21 208:10 209:6
211:25 223:20
226:12,23 246:4

**discloses** 173:23
188:17 232:18

**disclosure** 182:17
188:17,24 211:3,20

**discomfort** 111:16

**discuss** 14:19
110:16 113:15
119:20

**discussed** 16:3
195:18,22

**discussions** 53:10

**dispute** 37:6 39:3
117:13 196:9

**disputed** 110:13

**disputes** 72:20

**distancing** 5:9

**document** 9:16
17:10 40:8 78:12,22
81:10,14 120:7,15
124:2 133:20 148:13
181:6 183:19 193:11,

18,24 194:14 210:15,
23 212:4 230:20
231:2 232:7,14,17
234:2 237:7 239:22

**documentary** 20:9

**documentation**
17:24 18:3,13 21:16,
18,20 79:23 116:13
119:7 206:6 210:16,
24 213:11

**documented** 72:20
127:22 183:11

**documents** 9:13,21
17:6 18:9 19:18,22
20:3,12 21:11 77:22,
25 78:3 79:3,9,13,17,
19 80:8,14,16,19
81:5,17,20,24,25
82:4,5,9,15,17,19,21
83:7,14 88:5,19
89:15 90:4 98:7,10,
13,15 106:11,14
112:3 116:9 118:14,
22 190:12,13 194:9
213:8 215:19 229:20
241:9

**dollar** 60:23 61:2

**dollars** 46:5,7 122:6
244:7

**domain** 225:6 247:14

**Dondero** 6:6 7:10
14:23 15:9,24 16:3
18:15 19:7,20 20:15
21:3,10 22:3,8,13,17
23:21 24:4,13,23
25:3,6,16,25 26:9,20,
24 27:3,7 28:3 56:11,
12,14 75:19 83:6,10
85:20,23 90:5,9 91:2,
9,15 94:9,18 98:23
99:3,6,13,20,23
100:2 101:15 102:7
103:2 104:10,17
105:4,7,12,16,23
106:5,6,9,17 107:14,
22 108:10,13,15,21
109:3,9,25 110:2,17,
24 111:3,17 112:4
113:2,10 115:10,22
116:6 117:6,16
141:25 142:7,13,24
143:12 145:14,19

146:16 151:21 152:9,
17 153:3,12,17
156:7,10 157:9
158:3,22 159:18
160:3,14 161:9,17,24
165:19,23 167:15
171:20 172:8 177:15
178:8,17 180:18
183:3 184:25 185:8,
20,21 187:2 191:22
194:6 195:6,15
196:11 197:15
198:22 199:21,24
200:18 201:5 202:13
203:24 204:6 205:15
206:3,15 207:9,13
208:16 209:6,11
210:10,18 212:21
214:5 215:2,13,21
216:4,5 224:12,18
225:4,5,25 227:6,8,
14 228:14,16,21,23
229:4 230:14 231:3,
21 236:19,22 237:10
238:7,12 240:6,12
244:2,16 245:19
246:11,18 248:6,25
250:10

**Dondero's** 87:17
88:7,9,20 89:9 194:8
195:24 218:13
219:20,25 220:15
221:18 223:4 229:22
234:3 235:19 236:12
237:24 238:18
239:10,23 240:24
242:4,11 243:10,25

**double** 200:23 201:3

**dozen** 70:10,13,18

**dozens** 12:9

**drill** 39:23

**due** 5:7 82:23 108:16
111:5 122:11 131:21
132:25 134:15
135:16,21 137:11
139:13 140:10
144:18 148:19
152:16 154:20 156:3
164:3 167:8,12 169:7
173:18 174:18
175:14 177:19
195:16 198:9 199:20
200:20 204:3

**Dugaboy** 84:17,19, 21 85:2 99:8,23 101:15 144:5,8,12, 16,18,20,23,25 145:9,13,23 146:18, 22,24 154:7,10 155:5 179:8,15

**duly** 6:8

**duties** 54:3 67:15 92:3,6 94:16

**dutiful** 116:12

**duty** 61:10 67:23

**E**

**earlier** 27:21 35:16 38:15 41:8 42:5,24 48:23 55:25 60:12 62:9,20 64:16 70:20 90:15 115:5 163:9 170:10 181:4 183:9 202:23 203:3,12 211:25 235:6 247:19

**early** 10:19 15:11 27:9 90:10 92:15 95:5 98:24 103:2 138:24 172:4,11,24 183:4 208:18

**earn** 102:14

**earning** 160:21

**earnings** 160:14

**eastern** 73:22

**effect** 146:6

**elements** 38:22 88:14,25

**Elms** 6:5

**embarrassed** 77:24

**employed** 127:17

**employee** 46:5 55:7 73:4 97:15 121:4,12 122:23 123:3,9 128:16 129:3,7 223:6,19 224:3 233:23 239:15

**employees** 26:14 30:2 34:6 52:23 90:6 94:22 95:14 105:15

**115:11** 123:10 126:6, 10 130:4 207:23 212:7,14 213:20,21

**employer** 29:10 30:4 40:13 41:7,18 46:6 63:9 168:9,14 169:24 225:22

**employer's** 36:24 63:18 68:20

**employment** 68:20

**enabled** 159:3

**enabling** 44:15

**encompassed** 70:9

**end** 13:19 103:24 121:7,20 122:18,23 123:4 125:4,18 126:4 127:18 130:20 131:21 132:25 134:16 137:11,17 142:17 149:2,9 152:10,22 153:5,19 154:19 167:23 177:20,25 180:2,7 182:24 184:15,24 186:2 201:18 204:8 205:9 208:8

**ended** 138:14

**ending** 133:17 139:24 148:10 154:10 166:20 172:17 177:10 183:23

**ends** 152:2

**endure** 128:22

**engaged** 6:23 74:16, 17,21,24 75:7

**engagement** 75:3,6, 16

**enter** 31:3,10 37:25 38:11 39:5,19 40:14 41:16 45:8 46:2 47:25 48:21 49:16 52:20 55:5 58:15 63:15 66:23 68:10 70:17,24 72:5,12 102:2 173:7

**entered** 21:13 23:18 27:9 46:9 62:7 73:3

**92:14** 93:17 98:22 99:6,19,25 101:15 102:8 103:14 113:11 169:17 171:21 172:22 180:18 183:3 211:17

**entering** 32:10 35:13 39:13 50:17 51:18 53:25 54:14 55:22 57:4 61:8,20 63:6 64:2,4,7,22 65:11 67:23 68:18,24 69:9 102:25 156:23 169:25

**enters** 67:14

**entire** 10:15 86:17 125:17 132:24

**entirety** 131:20

**entities** 8:16 56:22 89:2 109:15 118:17, 21 157:12 160:18 206:23,25 241:4 248:8 249:7,11 250:5,9,13,17

**entitled** 81:10 155:22 182:2

**entity** 19:16 20:6 119:2 131:25 132:16 158:23 162:23 187:24 188:15 190:21 191:10 207:11 213:2 224:10 230:5 243:5,14,17

**entity's** 35:9,11,25 36:15 38:13,24 39:2, 13 42:2 66:17,18

**entries** 233:7

**entry** 73:9

**equal** 97:2 146:15 157:10

**equaled** 135:20 137:18

**equals** 135:10,15 160:25 173:19

**equity** 12:18

**essentially** 146:13

**estate** 248:10

**event** 27:15 42:17, 19,20 45:9,11 47:4 128:8 180:15 182:23 183:6 184:8

**events** 31:20 32:6 33:12 35:17,21 64:10,15 179:20,23 180:2,5 181:22 182:2,24 184:11

**eventually** 109:19 114:20

**evidence** 20:9 125:8, 21 126:9 147:7 206:2 210:13

**exact** 59:7 97:4 182:21 194:18

**EXAMINATION** 6:11

**exceed** 173:13

**excel** 88:11,13,18,23 89:5,14

**exception** 69:22

**excerpt** 86:18,19,22, 24 87:4,6,11,15 88:7, 20 89:10

**excess** 197:16 244:13

**exchange** 150:25 198:23 248:23 250:6

**exclude** 197:7 200:17

**excluding** 191:21

**exclusively** 105:6

**executed** 89:17

**executive** 9:4 10:16, 18 11:4,7,17 12:15 14:4 28:14 30:5,16 32:23 35:5 36:13 38:2,12 39:14 41:4, 25 48:22 49:17 50:8, 21 51:25 55:7 61:9 65:24 66:4,22 69:10 70:22 72:12 156:23 168:10,15 169:25 187:23 188:6,15,21, 25 203:16,19 225:22 227:5 235:9 246:19

**executive's** 32:9,20

**33:19,20** 34:14,24 35:7 62:23 66:15 68:20

**executives** 21:14,15 25:19 28:21 33:23 48:13,19 49:10,15 50:2,5 51:11,17 52:4, 20 64:25 65:23 68:23 102:13 104:19,21 113:5 114:14 160:20 161:22 181:11,17 215:25 216:25 225:3 226:3 228:14 239:11 244:20

**exercise** 119:19 226:13,18,20

**exhibit** 76:20,24 81:11 119:12,14 123:14,16 126:14,15 128:19 129:8,13 133:6,9 166:10,12 193:12,14,18,23 205:2 214:4 218:13 230:9,10 231:15,16 233:14,15 236:6,7 237:19,20 238:22,24 239:23 242:4,6

**exist** 37:8 111:23

**existed** 21:20 22:22 102:4 111:19 187:15

**existence** 19:19,23 20:4 21:12 71:10 72:14 83:8,15 211:14

**existing** 81:6

**exists** 16:9 21:25 100:11 101:21

**expect** 189:15

**expectation** 182:23 212:9 213:14 214:8, 11,16

**expectations** 214:12

**expected** 180:20 183:5

**expenses** 145:17 174:10 245:20,25 246:15 247:16

**experience** 13:11,24 28:9,18 49:9 53:16

66:20 67:11 68:17
72:4 103:9,13
127:11,14 136:20
159:24 188:25
222:19

**experienced** 9:12

**experiences** 13:14
95:24

**expert** 6:23 7:3 8:23
9:3 30:24 35:23
70:22 74:21 76:15,20
83:16 89:17 106:22
116:12 118:24
184:10 227:2 228:10
230:18

**expertise** 14:4,7,9
29:16 49:9 66:21
67:12 136:21 159:24
160:3

**experts** 13:17

**explain** 7:23

**explained** 113:20

**explanation** 203:24

**extended** 19:7,11,15
22:3 107:13 139:18
142:24 143:20
146:18 149:19 151:6,
9,16 153:12 154:2
155:5 164:10,14,19
165:5,15 168:9
169:24 175:23 176:7,
13,18 178:17 179:2,
15 192:6

**extent** 58:7,24 62:21
63:7,17 156:17
157:11

**extremist** 54:20
55:17

---

**F**

---

**face** 66:6 67:8 68:7
135:11,13 216:25

**faced** 174:5

**facets** 72:19

**facilitated** 159:5,8

**fact** 9:2 21:19 27:13

49:4 109:8 110:2
116:25 131:20
132:24 145:24
147:19 155:20
167:25 169:10,15
171:6,9,15 196:10
200:4,16 203:4
206:7,8 230:20

**factor** 157:19 163:5
222:6

**factors** 32:16 51:13
61:16 221:16,17

**facts** 69:6 89:22 91:4
102:3 107:7 108:7
218:5 221:7,14

**fails** 163:5

**failures** 162:15,16

**fair** 10:12 11:24 14:3,
6 20:8 22:20,23
23:14 27:20 29:18
30:6 31:14 32:5
38:10 41:23 42:15
47:2,6 48:14 49:13
51:5,8,10,12,19
52:18 61:13,17,19,
22,24 62:4,7,16
63:18 64:12 65:2
66:7,9,11 67:8 68:3,
5,7 78:2 84:9,13,20,
24 92:6 94:4 100:6,9
101:17 102:14
103:10 109:24
116:23 117:14 118:8
124:16 126:7 132:12
133:2 135:4,10,20
142:9 147:6 149:3
150:4 152:3,25
159:23 160:2 174:13,
22 176:23 178:7
180:12 191:17
197:13 202:19 210:9
219:2 222:19,20
227:12 229:2 240:20
241:11,12 243:15
246:18 249:14

**fairly** 62:18 200:21

**fairness** 62:20 63:5,
14,25 64:6,22 65:8,
10 100:23

**fallible** 69:18

**false** 106:25

**familiar** 14:10 25:21
40:7 57:9,22 65:21
80:13,23,25 117:21
170:20 179:19
182:21 249:19

**familiarity** 38:6
57:25 75:14,18

**fashion** 220:20,21

**fast** 96:2

**fathom** 36:21

**favorable** 187:21
188:4,6

**feasible** 34:19

**features** 7:14 58:3

**February** 171:22

**Federal** 5:18

**feel** 43:14 217:23

**feeling** 45:17 47:6,9

**felt** 62:16

**fiduciary** 54:3

**figure** 41:11 185:6
241:7 247:7

**file** 88:11,13,18,24
89:5,14

**filed** 109:11 186:18

**filing** 106:17 107:12
186:15 204:11

**filling** 246:4

**final** 30:23

**finalized** 184:16

**finance** 71:22 181:15

**financial** 10:23 11:12
12:22 13:4,12,22
35:10,12,15,20,25
36:5,9,15,25 37:3,5,
12,14 38:3,14,24
39:2,7,13,24 40:2,12,
16,24 41:6,18 42:2
49:11 53:17,20 63:8,
18,21,23 65:22
66:17,18 68:21,22
71:23 72:2,7 78:4,14
79:24 80:4 82:9,24

83:19 85:12 88:6,19
101:9 108:24 115:7
119:13,15,25 120:5,
22 123:17,21 126:16
129:2,14,18,25
133:10,16 136:24
137:3 139:23 142:8,
13 147:18 148:9,18
152:15 155:16,21
157:4 158:6,14 163:8
166:13,19 170:10
171:13 172:21 173:6
177:5,10 179:24
180:7,10 181:8
183:7,23 185:3 186:7
190:2 191:8 206:7,14
216:9,23 217:6
218:19

**financials** 124:19
126:3 139:21 152:9
156:13 162:17 166:9
170:5 180:8,24
181:25 183:2 184:24
190:9,15 191:24
192:3,10 194:22
195:5 206:17,20
208:11

**find** 34:18 93:12
189:19

**finish** 215:11

**finished** 209:24

**firm** 9:3 10:19,22
12:18 46:25 74:17,22
75:23 76:3,5 82:2,4,
12 83:18 86:25 87:2,
12 91:11,21 92:6
109:25 115:25
116:18 215:15 217:2
243:12

**firm's** 11:11

**firms** 11:3,7 12:22
13:2 72:10 101:9
189:12,17 206:25
217:6

**fiscal** 123:8 180:3

**five-plus** 85:12

**fixed** 226:14 228:8

**flip** 153:15

**flow** 40:5

**focus** 15:7,21
118:19,20 196:24

**focused** 86:19

**focusing** 112:16

**follow** 181:5

**footnote** 199:12

**footnotes** 175:6
179:25 180:4

**forecast** 43:7

**forgave** 97:18
107:12 108:23
121:12 123:8,9 126:9
128:10 137:23 141:2,
11,19 143:19 191:16
207:22

**forget** 188:10

**forgivable** 14:19
28:9,14 38:11 39:21
40:22 43:2,9 70:25
87:18 101:8 202:24
212:7,23

**forgive** 29:12,17
30:5,15 32:5,21
33:18 34:15,23 35:2,
5 36:2,13,23 39:14
41:4,24 45:8 46:7,14
50:11 52:14 59:2
60:8,18 61:2 70:9
130:4 139:10,17
149:18 150:19 151:5,
15 153:11,24 155:4
163:7 164:9,18
165:4,14 175:22
176:6,12,17 178:16
179:14 200:11
214:21

**forgiven** 15:12 21:20
27:15 31:11 42:11
43:10 56:8 57:7
60:10,20,24 65:5,15
92:24 93:18 94:3
96:14,17,22,25
97:10,14,22 98:4
104:23 108:4 109:3,
19,20 114:7,20
116:19,21 117:3,19,
23 118:4 121:8,25
122:10,13 125:9,22
127:16,22 130:24
131:7,17 132:6,22

136:2,13 138:22,23, 25 139:4,13 140:17 142:22 146:25 147:25 157:17 169:21 170:8 181:18 187:16 188:23 190:6 191:10,22 192:5 203:14,16,21 206:9, 16 208:19 212:10,18 213:20,24 214:8,17 215:24

**forgiveness** 15:24 19:6,10,14,19,23 20:4,10 21:12 22:2,9, 14 23:20 24:11 25:2, 8 26:12 27:8 31:3,6, 22 32:11 33:3 35:14 36:4 37:25 39:5 40:14 41:17 42:16 47:25 48:21 49:17 51:18 52:21 53:11 54:14 55:5,23 57:5, 10 58:8,16,25 61:8 62:17 64:11 65:11 66:2 67:14,24 68:19, 25 69:10,24 70:18 71:10 72:5,13,17,22 73:3,10 83:9,11,15 92:15 98:24 101:16 102:2,7 115:13 127:5,12 138:20 139:7 147:12 156:24 169:17 171:21 173:7 179:2 180:19 181:11 183:4 186:8 187:5,24 196:6,13,17,20 200:2 203:2,10 208:7

**forgiving** 37:10 58:11,13 60:14 107:22 147:7 163:13 202:21 207:13,16

**forgot** 76:15

**forgotten** 163:14

**form** 27:25 28:7 48:19 67:17,25 90:22 105:9 107:5,15 108:3 109:12 111:11,20 114:5,25 118:7 127:15 135:22 147:10 150:6 156:11 157:14 160:6 161:12 162:3 168:16 169:8 170:2 174:25 178:11

180:22 181:12 182:20 183:8 187:17 188:8 189:5,14 190:24 192:8 196:15 202:22 203:11 205:19 206:11 207:18,24 209:8,17 211:5,19 214:9,19 240:8,25 242:5,6 243:20 244:21 249:18 250:14

**formed** 94:11

**Forms** 242:12 243:25

**formulating** 94:19

**found** 54:24 230:4

**founder's** 216:19,22 217:8,12,15,19 218:8

**founders** 216:24 217:5 247:15

**founding** 50:5

**fourth** 124:6,20

**frame** 172:3 186:20

**frames** 39:18

**Frank** 85:5

**front** 9:21

**frustrating** 45:21

**fulfill** 67:23

**fulfilled** 67:15

**full** 108:20 111:17,18 112:5 120:3 143:24 156:16,22 157:11 174:16,17

**fully** 130:19

**fund** 12:18 78:5 130:16 134:11 148:23 247:22 248:17

**funds** 11:6 24:16

**future** 24:6 27:10,15 33:14 42:17,19 45:9, 10 46:25 47:4 56:8 64:10 108:5 157:17 218:4

**— G —**

**gain** 39:6 51:17 226:21

**gave** 56:20 81:25 82:4,20 84:5 97:22 141:4 150:20

**gears** 184:17

**general** 7:2,6 25:10, 20 32:13 34:11 39:20 48:25 57:12,25 58:20 59:5,9 60:22 63:22 105:18,21

**generally** 12:8,13 34:17 45:15 53:5 57:22 80:24 87:10 137:3 157:6,20 208:21 225:9,10

**gentleman** 143:5

**give** 7:23 11:19 12:14 25:11 30:14 40:18,20 64:2 69:23 71:19 82:15 83:18 98:6,10 105:2 139:5 174:3 184:21 188:14 203:23 214:18

**giving** 13:8,25 28:9 29:5 30:24 159:3

**goals** 62:11,18 163:12 214:23

**good** 5:2 6:12 13:16 14:2,14 33:8 34:11 38:6 41:19 47:14 48:4,6 193:5

**grant** 226:15 228:5

**granted** 130:19 226:16 236:16

**grants** 240:8,13

**gratification** 24:16 27:23 28:4 114:17

**great** 45:13 82:7

**Greenberg** 6:5

**guess** 23:4,22 55:16 112:18 160:7 190:9 206:18

**guideline** 222:16

**gut** 45:16 47:6,8 93:8

**— H —**

**hair** 178:2

**half** 73:19 91:18 244:7

**handle** 249:21

**happen** 31:25 33:12 44:20 180:2,25 181:3 188:11 203:4

**happened** 34:3 180:6 204:10 209:21

**happening** 31:24 43:12,17 45:5,18,24 64:20 196:20

**happy** 15:7

**hard** 47:8,9 127:19 153:15

**HCM** 82:24

**HCMFA** 78:15 136:2 140:13,19 149:16,19 164:5,10 175:16,24 182:10 248:22 249:24

**HCMS** 249:16,22 250:5,11 251:7

**HCMSI** 138:7 141:16, 20 151:16

**HCRE** 132:2 137:6,9, 24 141:8,12 150:23, 24 151:6 164:24 165:5 176:13 247:21 249:4,15,22 250:5,11 251:7

**head** 55:20

**hear** 6:13

**heard** 68:15,18,23 72:11 73:2 84:17 85:5 99:13,15 205:24 209:18 216:17 243:8 248:3,11

**hearing** 93:6

**hedge** 11:6 12:18

**held** 15:14 119:4 156:9 187:13 202:16

**helpful** 196:8

**Hey** 234:7

**high** 7:5,7 43:13 58:22 203:21 247:9 250:15

**Highland** 5:21 6:18 8:7,12 15:14,24 19:7, 11,15,20,24 20:5,10 21:13,15 22:2,8,13 24:22 25:19 56:20,22 75:15 78:5 79:24 80:4 85:11 88:10 89:15 90:5 94:21 95:14 96:13,22,25 97:14,18,22 98:3 99:25 102:18 103:15 104:18,21,23 107:12, 21 108:11,14,16,22 109:11 115:12 117:19,23 120:4 121:12 123:8 126:9 128:10 129:18 130:4, 15,16 131:13,25 132:16 133:17 134:11,23 136:13,21 137:9,23 138:7,14 139:16,18,23 140:13, 17,22 141:2,7,11,15, 19 142:2,13,22 143:10,13,17,19 144:15 145:2,10,23 146:18,25 147:7 148:22,23 149:17,22 150:18,24 151:4,9,14 152:18 153:4,10,17, 24,25 155:3 156:9 157:21,22 158:2,15 159:2,15,17,19,24 160:4,14 162:13,25 163:3 164:4,8,14,17, 24 165:3,8,13,15,24 167:10 171:2,15 172:23 173:7 174:5 175:22 176:5,12,17, 18 178:10,15,25 179:13 185:4,7,18 186:3,12 190:6,16, 20,25 191:9,16,21 192:5 195:17 198:23 202:16,20 204:7 206:17,20,22 207:2,8 212:8,24 213:6

Index: Highland's..invest

222:24 223:4 224:18
233:21 242:20 243:3,
17 244:3,9 247:20,
21,23,24 248:14,16,
17,23 249:2,3,8,12,
16 250:6,15,17 251:5

**Highland's** 83:19
84:2 99:9 108:23
119:12,14 120:22
123:16,20 126:15
129:13 133:9 136:17
148:9 158:6 161:10,
17,25 166:12,19
167:22 169:6 177:9
181:24 190:2 191:8
246:12 250:12

**Highland-related**
224:14

**highly** 31:25 139:2
214:23

**hint** 163:23

**hire** 13:10 52:6,7

**histories** 34:7

**history** 32:10,13,20
33:2,11,21,24,25
34:12,15,24 35:7
49:2,20 62:23 63:3
66:16 68:20 113:6
195:25 216:10

**hold** 188:22 232:2

**holder** 99:24

**holds** 99:9

**home** 9:19

**home-field** 13:13

**hope** 68:11 128:14
180:23,24 181:2
183:9,10,11 184:20
192:12

**horses** 188:22

**hour** 73:19 91:17,18

**hours** 91:17

**how's** 10:11

**HR** 52:9

**human** 56:21

**hundred** 46:5,7

**hundreds** 96:23

**Hurley** 95:2 96:9

**hypothetical** 38:25
44:5 46:16,18 47:17
50:24 51:24 53:22
54:2,12 55:3 65:19,
24 66:13 67:3 70:8
71:4 109:17 188:14
189:11

**hypothetically**
45:25 46:4 50:4,10
52:2 53:9 59:15
157:22

**hypotheticals** 54:18

---

**I**

**idea** 25:22 31:23
37:11 44:20 46:23
50:25 52:16 59:6,23
60:4 63:2 65:4
155:11 170:9 173:2
243:5

**ideal** 34:2 36:17,20
37:13,17,18 57:17

**identification** 76:21
119:16 123:18
126:17 129:15
133:11 166:14
193:15 230:11
231:17 233:17 236:9
237:22 239:2 242:7

**identify** 12:13 18:14
78:11,22 93:3 98:3
204:17,20,24 225:3

**identity** 70:11

**ignore** 188:12

**immediately** 51:21

**imminently** 68:3

**impact** 33:7 48:9
107:23

**impacted** 94:13

**implies** 127:13

**importance** 45:4
49:22 57:18 59:12
60:12 64:19 163:12

**important** 33:12
49:25 59:8,13 115:3
210:23 219:19,24

**impossible** 37:4
44:21,25

**impression** 45:17
64:14,17,18 97:4

**inaccurate** 216:6

**incent** 28:20 60:3

**incenting** 31:20

**incentivize** 27:10

**include** 11:11 72:6
104:8 114:11 135:12
170:11 208:7 223:16,
25 227:3 231:9
241:15 247:3

**included** 78:10
120:4 185:5 223:12
224:5,19,21 227:17
229:24 231:13 233:3
237:14 238:17 239:8
240:21,23 243:18
245:7

**including** 42:3 81:12

**income** 114:7,21
161:5 163:11 170:18,
20 222:24 223:5,9,
12,17,21,25 224:3,9,
11,13,17 229:25
230:5 231:4,10
243:12,16 244:3,11
246:5

**incomplete** 124:22

**inconsistent** 214:15

**incorporate** 223:4

**incorrect** 220:22

**increase** 160:4

**increases** 226:19

**incurred** 145:9

**independent** 54:6,
23

**indirectly** 56:13,23
248:7

**individual** 26:5
32:14 33:5 36:6
56:20 114:22 118:25

**188:16 189:11**

**individual's** 32:25
49:20 63:2

**individually** 95:17,
18

**individuals** 95:4
98:2,6 114:8 116:7
118:5,10,12 147:20
206:10 247:4

**industry** 10:24 13:15
49:11,21 50:2,5,21
51:12 52:4,14 53:7,
17 65:6,21 66:21
67:12 69:5 100:19
102:8,14,17 138:17
182:16 217:3 219:8
220:17 221:21,25

**influenced** 94:12

**inform** 97:13 181:10
187:20 188:3

**information** 13:18
24:25 25:5,15 26:19,
23 30:17,20 31:12
32:7 34:14 35:6 38:3
39:10,12 43:21 44:6,
15 46:12 47:3,7,14,
18 48:2 53:24 54:13
55:6 56:3 62:22 64:9,
24 65:23 66:15 78:4,
14 88:8 98:11 99:11
102:23 103:8 104:14
105:3,6 106:3 116:4
130:2 146:17 156:16
157:3 168:7 173:5,10
174:4 180:11 192:2
194:2,13 200:14
202:20 210:12 218:5
225:5 232:21 236:2
239:14 241:21
243:16 245:24
246:13

**informed** 16:8 22:16
30:19,22 31:2 67:4,7,
9 71:13,17 117:2
183:13 187:3 195:14

**inquiry** 143:15

**ins** 59:11 111:14

**instance** 72:25
115:13

**institutions** 11:13

**intended** 22:17 24:5
27:18 92:24 93:14
109:20 112:23
114:19 215:23

**intent** 23:18 25:2
26:3,7 92:25 108:4

**intention** 188:18

**inter** 207:4

**interest** 18:2 28:23
58:2 59:6,10 61:25
81:12 82:22 108:16,
20 111:4 127:6
131:21 132:25
134:15 135:13,16,21
137:11,18 138:18
139:11,14 142:18
143:25 152:16
153:18 154:15,20
178:9 191:2 195:16
197:15 198:9 199:20,
25 200:20 201:2
202:14 203:9 204:2
247:21,25 248:8

**interesting** 127:2

**interests** 99:10,25

**interplay** 185:15

**interpretation**
132:12

**interrupt** 210:5

**intertwined** 207:4
224:4

**interview** 90:9 91:21
92:2 94:18,22 95:3
98:12

**interviewed** 25:18
94:23 99:3 104:17
105:12 147:21
213:21 215:25

**interviewing** 91:3

**interviews** 90:4
95:7,10,13,22 97:9
212:6

**introduction** 103:19
205:4

**invest** 24:14 114:19

**invested** 24:17 158:20

**investment** 11:3 84:18,22 85:3 99:8, 24 101:16 145:13 146:12 158:25 159:3, 7

**investments** 23:23 92:21 162:13

**involve** 12:21

**involved** 7:17 12:16, 25 28:22 53:10 92:5

**involves** 7:9

**issuance** 182:19

**issue** 47:20 49:22,24 50:8 73:15 154:11 181:14 191:3 247:15 250:21,25

**issued** 121:3 131:14 137:9 138:6 141:25 148:23 150:24 152:17 169:11 177:15 182:10 184:14 231:20

**issues** 11:3,7 47:19 71:24 180:7

**issuing** 238:16

**item** 124:20 167:7

**items** 175:5 222:23

J

**James** 14:23 75:19 141:25 158:2

**January** 108:19 171:22 184:9 195:11 198:10,22 199:4,15 204:15

**Jersey** 9:19

**Jim** 49:24 145:14 177:14

**job** 50:14 169:23

**John** 5:20 6:16 76:18 234:7

**Johnson** 5:1 6:1,12 7:1 8:1 9:1 10:1 11:1

12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1,6 75:1 76:1,23 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,19 120:1,18 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1,6 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,24 164:1 165:1 166:1,6 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1,5 183:1 184:1 185:1 186:1 187:1 188:1 189:1,25 190:1 191:1 192:1 193:1,5,17 194:1 195:1 196:1 197:1 198:1 199:1

200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1,23 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1,17,20

**Johnson's** 205:2 218:11

**Jones** 5:21 6:17

**judge** 188:2

**judgment** 45:13 222:13

**July** 155:17

**June** 184:4,9

K

**kind** 31:13 42:15 50:15 126:2 207:14 227:10

**kinds** 72:20

**knew** 68:10 100:8 171:6 189:10

**knowing** 14:7,9 60:18 61:2 169:23 205:17,21

**knowledge** 13:13 23:17 35:2 40:24 41:6 49:9 52:3,19 57:3 65:17 67:11 68:19,22 78:21 84:14,21,23 97:21,24 98:5 110:19 160:3 174:15 202:7 204:5 207:12,15,19 249:13

**knowledgeable** 32:9,19

**Kornfeld** 9:6

L

**L.P.** 5:22 75:15 82:24 139:24 190:17,20

**L.p.'s** 85:11

**label** 234:9,11

**lack** 210:24 211:3,20

**laid** 69:6

**large** 13:13 52:15 117:20 217:4

**larger** 53:4 116:24 117:17

**largest** 117:2,18 191:15

**late** 7:12 15:11 16:16 27:9 92:14 98:23 103:2 171:25 172:3, 10,23 177:4 180:19 200:17 208:18 248:22

**Laura** 251:20

**law** 82:2,3,12 86:25 87:2,12 91:11 189:12,16

**Lawlor** 95:2 96:7

**lawsuit** 26:13,19 27:2

**lawyers** 234:3

**lead** 33:8

**leaders** 12:21

**learn** 97:8 110:8 130:2

**learned** 106:16

**leaving** 122:10

**legal** 81:2 89:2

**letter** 75:3,6

**level** 7:5,7 24:6 43:14 58:22 71:21 246:22 250:15

**liabilities** 173:14

**liability** 173:24

**lieu** 104:2,11 105:5, 17,25 106:5,18,24 109:10 112:12 113:22 205:11 206:3

**lifetime** 145:20

**like-to-like** 239:19

**likelihood** 43:4,16 44:16 45:10,23 47:15 64:10,14,19 138:22 203:14,20

**limited** 230:3

**lines** 87:7

**liquidity** 46:22

**list** 77:21 81:21 124:21,22 247:9

**listed** 81:11 110:10 232:14 234:20

**listen** 13:17

**listing** 82:22 146:20, 21

**litigation** 7:3,8,9,16 8:8,13 72:15 73:5 110:3,5 173:23 174:4,7,10,24 175:3, 5,9 188:24 194:3,4

**living** 145:16

**LLC** 141:8,12 164:24 165:5 249:4

**loan** 8:2,4 17:12 18:13,23 20:9 25:13 26:8 27:18 29:12 30:5 31:9,22 32:5 33:4 35:13 37:25 38:12 39:5 40:14 41:16 46:14 47:25 49:17 51:18 52:21 54:7 55:5,23 58:10 59:7,11 61:8 62:17 63:24 65:5,9 66:2 67:24 68:19,24 69:9 71:10 72:5,13,17,21 73:3 79:23 80:15,19 81:5,20 82:8,21 83:8, 11,15 88:5,19 96:25 97:18,21 98:3 102:2, 7 106:18 107:12,22 108:22 109:2 117:2, 18,21,23 118:14,24 122:17,22 123:3,8

124:5,6,7,16,17,18
128:10 129:7 130:15,
19,23 131:3,7 132:5,
21 138:22 139:8,17
140:18 141:3,12,20
142:7 143:20,24
146:6,17,24 147:7
149:18 150:19,25
151:6,16 153:11,25
155:4 157:15,16,19
158:25 159:4,6,11,14
164:9,19 165:4,14
175:23 176:6,13
178:16 179:2,14
190:7 191:10,15,22
192:6 194:21 195:19
196:17 198:24 206:3,
15 207:5,13,16
213:16,22 214:22

**loaned** 137:16
142:13 144:16
145:23 157:12 158:6,
15 185:18,19

**loaning** 146:12 159:9

**loans** 7:9,12,17,18,
22 8:5,7,12,15 14:20
15:9,11,25 16:13,20,
24 17:2,7,17,20,24,
25 18:15,19,20,25
19:3,6,10,14 21:16,
18 22:2,9,14,21,24
23:2,6,13 24:11,13,
21 25:7,11 26:3,6,11,
14,18,25 27:4,14,22,
25 28:10,14,20,22
29:3,18 30:16 31:11,
17,19 32:11,21 33:18
34:16,23 35:2,5 36:2,
4,8,13,23 37:10
38:21 39:14,21 40:22
41:4,24 42:10 43:2,9,
15 45:2,8 50:12 53:2,
3,5,11 56:8,11,12,15,
20,21,25 57:4,7,9,12,
15,22,25 58:7,13,16,
18,21,25 59:2,3,15,
16,24 60:5,8,10,11,
15,18,19,23 61:2,3
62:8,10,17 65:14
70:9,10,11,14,15,18,
25 72:3 73:10,15
79:23 81:6,11 82:23
87:13,15,18 90:17
92:9,10,16,22,23,25

93:14,18 94:2 95:24
96:13 97:9,14,25
98:25 100:19,21
101:8,17 102:16
104:2,10,12,22
105:4,9,17,25 106:5,
24 107:5 108:2,9,10,
14,17,19 110:10,14,
19,21 110:3,5,10,12,
13,20,25 111:17,18,
19 112:4,7,9,11,12,
16,19,23 113:6,9,10,
21 114:5,7,15,18,24
115:6,13,21,24
116:17,18 117:7,15,
17 118:3,4,11,15,16,
20 119:20 120:4
122:5,12 123:10
128:16 129:3 130:4
136:2,6,12 137:2,24
138:6,19 140:12,22
141:7,15 142:23
143:16 146:8,21
147:14,17,19,25
151:8 156:22 157:5
159:16 162:12 163:7
164:4,14,23 165:7,23
166:23 168:8,14
169:3,20 170:7 172:9
173:8 178:9 181:11,
17 184:25 187:4
195:12,16 200:12
202:21,24,25 205:11
206:9 207:5,9,23
208:7,16,18 209:12
210:11 212:7,9,17,23
213:19 214:8,16
215:3,12,15,23

**logical** 188:12

**long** 18:22 25:21
87:6 220:6 229:14

**look-back** 219:15
221:4

**looked** 77:25 86:22
118:19 124:7 142:8
147:11,15 156:13
180:21 192:3 194:21
206:8,17 208:11,25
209:5 216:8 238:20
239:4 241:9 243:13,
25 244:11

**lose** 162:15

**loss** 42:3 171:2
172:17

**lost** 67:19 124:10
171:15

**lot** 7:16 11:23 12:20
13:11,24 16:17 47:8
59:3 108:2 109:14
184:21 189:24

**lucky** 68:3,6,12,14

**lunch** 184:20

**luncheon** 192:15

## M

**made** 8:3,7,12 26:6
30:22 56:22 63:24
104:13 108:3 112:23
117:23 122:5 123:3
132:9 137:24 140:19
141:12,20 153:3
158:24 161:20
168:14 178:8 181:11
189:8 197:8,15,21
198:5 199:24 200:10,
17,24 201:25 202:13,
25 203:24 207:9,10
218:24 219:12
222:12 226:12
230:14 244:23 245:3,
12 248:22

**magnitude** 28:22
31:16,19 43:8,15
50:19,25 52:17 54:4
57:7 60:13 62:10
65:4 185:12

**magnitudes** 29:3
58:2

**major** 11:2 13:2
143:9

**majority** 99:9,24
248:7

**make** 29:11,16 31:4
37:9,16 38:21 39:21
41:12,14 42:25 43:4
44:15 49:6 51:7
54:20,25 61:19 62:6
65:25 67:4 69:12
71:8,18,21 74:19
104:15 114:3 129:6
134:24 136:22

138:18 143:15 145:3
151:25 159:3 188:10
189:19 194:10
196:17 203:8,18,19
214:21 248:3 249:25

**maker** 29:7,9 30:3,25
32:9,12,19 33:17
34:14,22 35:4,12,24
36:12,23 37:24
38:11,18 39:5 40:12,
18 41:3,16,24 43:3,
20 44:5,14 45:7
46:13 47:17,24 49:14
50:11,13 51:4,6 52:3,
5,19 53:23 54:11
55:21 57:3,6,8,11,14,
19,21 58:4,6,9,15,20
59:14 60:7,17,22
61:7,12,19,22 62:6,
21 63:8,10,16 64:8,
24 65:12 66:3,14,23
67:13,21,22 68:10,
16,18 69:8,11 70:2,
24 72:12 73:2,8 93:3,
17 98:22 100:14,17
102:24 103:10,14
139:6,8 156:21 163:5
168:6 169:16,22
170:6,8 172:20,25
173:5 187:12 203:8
211:16

**maker's** 48:20

**makers** 12:14 30:10,
15 51:16 169:19
191:2

**makes** 188:24
190:10

**making** 30:4,18
40:22 62:2 65:3
69:23 102:13 103:7
109:18 112:21
195:15 196:11

**manage** 247:13

**management** 5:22
6:18 11:2 75:15 78:5
79:25 85:11 129:19
130:16 132:17
134:11 138:14
139:18,24 148:22
151:10 165:8,15
176:19 190:17,20
222:24 223:5 242:20

243:3,18 244:4,9
247:8,22,23 248:15
249:3

**manner** 215:5

**March** 75:2

**mark** 23:24 143:5
245:5,13

**marked** 44:10 76:20
119:11,15 123:18
126:17 129:15
133:11 166:14
193:15 230:9,10
231:16 233:16 236:8
237:21 238:25 242:7

**market** 7:19 27:24
101:6 115:7 218:2
220:7 221:25 244:19

**marketplace** 14:7,
11 159:11

**Mary** 49:24

**material** 180:16
181:17 182:17,23

**materials** 17:13
110:9

**math** 197:10

**matter** 6:24 75:8
79:10 89:16

**maturity** 127:6

**meaning** 81:2

**meaningful** 56:2
70:13 250:16

**meaningfully**
247:11

**means** 51:8 202:24
232:11

**meant** 144:25 213:22

**measures** 12:9

**meet** 76:10 90:21

**memory** 69:18 85:15

**mention** 213:2

**mentioned** 7:22
20:25 27:21 35:16
55:24 59:25 79:22
80:15 81:4 90:15

102:16 109:23
118:18 212:21
245:11

**messed** 133:23

**method** 226:24

**methodology** 219:8

**Michael** 5:24 163:22
166:3

**middle** 115:20
215:11 234:5

**milestone** 127:25
128:4

**milestones** 127:19,
24

**milestones'** 127:6

**million** 17:3,8 50:6,9,
12,19,24 51:24 97:5
117:7,10 122:6
134:15 137:10,17,19
138:11,15 142:2,14,
19 144:16,21 145:2,
11 152:9,18 153:5,18
154:21 158:7,16,21,
25 159:9 160:15,21,
25 166:5 167:11,23
168:13,18 169:24
171:3,16 172:17
173:9,15,19 174:19
177:16,21 178:3
182:12 185:2,14
186:3 188:16,19
194:21 195:7,12
197:5,9,17 198:15,23
200:19 201:6,10,12,
17,20,22 202:3,15
203:25 214:15
220:11,14,16,17,19
221:6,7,8,10,17
222:2,3,7 231:4
233:8,9 234:20
235:2,18 236:15
237:13 238:8 240:7,
11,23 241:3,10
244:7,13,15 245:2,3,
8,10,11,16 246:21
247:7 250:24

**mind** 80:20 221:3

**minutes** 91:19
192:13

**missed** 231:12

**missing** 111:24

**misunderstanding**
71:25

**misunderstandings**
69:16,20

**mixed** 72:9

**modest** 132:9 178:8

**modification** 22:17
23:19 27:14 42:9
56:7 77:14 204:18
209:12 210:11

**modified** 7:13 15:10
22:24 23:6 172:10
208:17

**modify** 80:9 89:10

**moment** 39:3

**money** 50:15 51:2
55:14 96:17 139:6
145:23 158:20,21
185:9,18,19 194:6
198:8 203:18,22
214:24 215:4 250:5

**months** 186:22

**morning** 5:2 6:12

**Morris** 5:20 6:10,16
9:6,9 73:18,25 74:5
76:19,22 77:2,19
89:19 103:17 115:16
118:8 119:10,17
120:12 123:14,19,25
126:13,18,20 128:18
129:8,11,16 130:8
131:10 133:4,8,12,
14,22 134:8 138:3
139:20 140:7 141:22
144:3 148:4 151:18
154:4 155:23 163:14,
20 166:3,11,15,17,22
170:13,23 173:11
175:11 179:5 181:19
182:4 183:18 192:11
193:4,10,16 204:25
205:20 208:12 215:9
218:10 224:22
229:21 230:8,12,25
231:14,18,23 232:16
233:13,18 234:13,16
236:5,10 237:5,18,23

**missed** 238:5,22 239:3
242:3,8,10 251:10,
15,21

**motivate** 28:21 33:4
35:18 44:19

**multiple** 189:12

**multiplied** 220:18

**multiplying** 219:20
220:3 222:7

**murky** 33:25 34:6

---

**N**

**named** 143:5

**names** 94:24 96:10

**Nancy** 6:6 99:7,13,23
145:22

**narrow** 49:22

**nature** 7:3 58:6,24

**necessarily** 57:23
61:14

**needed** 73:14 214:24

**negotiate** 61:10
66:3,7,10 67:8
159:11

**negotiation** 66:25
67:2 136:25

**net** 171:2

**news** 13:25

**Nexpoint** 78:5,14
131:14 136:6,13
140:23 141:4 149:24
150:20 157:23 158:3,
7,16,19 159:10,19
162:14 164:14,19
176:7 223:8,16,24
224:6 229:24 230:14
231:10,20 235:15
237:11 239:6 244:10
247:22 248:9,18,22
249:24

**next-to-the-last**
127:3 182:9 212:5

**nice** 76:10

**nonbusiness**

212:23

**normal** 246:25

**north** 201:21

**Notary** 6:9

**note** 60:2 80:22 81:3
121:3,8,12,16,21
125:4,9,13,21 126:23
127:4,11,15,16
131:13,17,25 132:5,
15 135:16,21 139:6
144:18,23,25 149:24
150:13,24 152:17
153:14 158:10
164:18 176:18
194:25 195:11
198:10,19,22 199:4,
15 204:15

**note's** 127:18

**noted** 193:3

**notes** 57:20,24 59:17
80:20,23,25 95:6,10
111:5,6,10 119:19
120:23 124:17,24
126:2,9 135:5,6,10,
11,20 136:18,23
137:9 138:6,11 140:9
141:25 147:4 148:19,
22 149:4,5,23 150:5,
12 152:3,4 154:11,15
156:3,8 158:10 164:3
167:7,12 168:18
169:6 170:11 173:18
174:17 175:13,16
176:24 177:2,15
182:10 187:13,16
188:23 190:18 191:3
194:7 196:12,25
197:16 199:21,25
200:20 202:16 203:8,
9,14 204:3,16 214:5

**notice** 243:11

**noticed** 195:19

**nuances** 13:14

**number** 9:13 11:19
12:8 16:20 60:9,11
61:16 76:16 88:3
117:11 134:4 166:6
181:21 228:8 231:9,
25 232:10 237:3
240:10 244:13

**numbers** 87:21
117:11 222:8 226:22

**NXRT** 235:3,11
236:23 238:8,13
239:13

---

**O**

**objecting** 163:22

**objection** 28:7
67:17,25 107:15
109:12 111:11,20
118:7,9 135:22
147:10 150:6 156:11
157:14 160:6 161:12
162:3 168:16 169:8
170:2 174:25 178:11
180:13,22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
240:25 243:20
244:21 249:18
250:14

**objective** 47:9

**obligation** 61:14
145:10

**obligations** 112:21
153:3 186:3

**obligor** 18:14

**obligors** 7:21,23
24:21 26:25

**obtain** 30:17 39:12
41:22 43:20 44:6
47:18 57:20 58:6
62:22 63:17 64:8,24
165:23 168:7

**obtained** 55:6 57:16
66:18 96:13 127:7
143:16 195:13,17

**obvious** 187:19

**occasion** 76:8

**occur** 24:2 32:6 43:5
44:17 45:11 47:5
182:17

**occurred** 7:15 23:24 182:24

**occurrence** 56:9

**occurs** 27:15

**October** 88:16,17 123:2 186:19

**odds** 215:4

**offer** 67:8

**offered** 7:4

**offering** 21:24 22:6, 11 101:13,20,24 102:6,20 103:4,12 217:11

**officer** 85:12 97:15

**oftentimes** 47:15

**Okada** 143:5,8,16,21, 23 151:21 153:22 154:2 167:17 168:15 178:20,24

**omissions** 245:7

**one-year** 202:5,12

**ongoing** 174:10

**operate** 93:15

**operational** 71:21, 24

**operationalize** 72:3

**operations** 40:5

**opining** 7:19

**opinion** 20:23 21:24 22:6 32:8 35:11,24 40:11 48:18 67:22 73:15 94:11 101:13 102:6,20 103:4,7,12 107:25 115:6,21 116:5 118:24 203:7 211:6 215:12,19 216:2 217:11 227:2 228:11

**opinionated** 13:23

**opinions** 22:11 37:16 77:15 80:9 89:6,11 94:8,19 101:20,24 106:15 107:10,23 115:4 120:7 133:20 140:4

**160**:12

**option** 226:13

**options** 226:7,9,16, 20,25 227:4,10,14 229:6,15 236:20 240:22 244:12

**oral** 20:17,19,21 70:24

**order** 62:19 63:5,14, 25 64:4,6,21 65:8,10 104:15 157:9 232:25

**ordinary** 193:25 233:22

**organization** 36:7 71:9 207:6 233:24

**originally** 16:16 57:16

**outs** 59:11 111:15

**outsized** 217:4

**outstanding** 60:5 81:13 108:9 121:21 122:2,9,18,23 123:4 125:18 130:20 135:5 149:3,23 150:12 152:10,16 154:15 162:19 174:9 176:24 178:10 184:25 194:7 198:9

**overpay** 51:7

**overpaying** 51:5

**overwhelming** 33:7

**owed** 122:10 134:20 139:6 142:18 153:17 167:23 178:2

**owes** 144:20 185:21 188:15

**owing** 153:4

**owned** 56:23 156:10 157:12 158:23 167:15,16,17

**owner** 162:6,13 248:13

**owners** 12:17 246:17,23 247:2,15

**ownership** 161:14 167:19 191:2,5

247:21,25 248:11 250:11

**owns** 56:13 158:3 248:7

───────

**P**

**P&I** 40:5

**p.m.** 192:15,16 193:3 251:13,14

**Pachulski** 5:20 6:17

**package** 40:4 41:5

**packages** 217:5

**pages** 87:7,8,20

**paid** 24:18 27:23 32:24 48:13,19 49:24 50:3,6,22 51:18,25 52:4,20 59:10 64:25 108:16,20 110:6,10, 20,25 111:10,17,22 112:5,7 113:9,21 143:23 198:15 199:13 200:19 201:13 216:24 223:18 225:21 241:13 247:9 249:24 250:5

**pain** 128:22 243:24

**painful** 120:17

**paper** 119:22

**paragraph** 103:25 106:21 114:2 121:2, 7,15 122:16,21 124:12 125:12 126:21 128:9 130:15, 23 131:2,6,13,16,24 132:4,15,20 135:3,4, 25 136:5,11 137:5,22 138:4 139:15 140:12, 16,21,25 141:6,11, 14,18,23 142:22 143:4,24 146:23 148:21,25 149:10,15, 17,21 150:17,22 151:3,8,13,19 152:2 153:9,21 154:6 155:2,7 163:25 164:7,12,13,16,22,23 165:2,7,12,18 175:20 176:3,5,10,11,15,16

178:15,19,23 179:12 182:9 205:9 212:6 231:8

**paragraphs** 149:2 151:20 176:22

**parse** 17:7

**parsed** 112:15

**part** 13:15 14:6,9 26:13 28:14 30:5,16 33:18 35:5 36:13 37:25 38:12 39:14 40:22 41:4,25 44:22 48:22 61:9 63:19,21 65:3 69:10 74:22 94:14 96:14 97:23 102:15 104:23 107:13 109:3 123:10 125:9,22 128:11 130:5 131:8,18 132:6,22 136:2,14,25 137:24 139:17 140:18 141:3,12,20 142:23 143:20 146:25 147:8 149:18 150:19 151:5,15 153:11,25 155:4 163:8,12 164:9,18 165:4,14 175:23 176:6,12,17 178:16 179:3,14 188:19 192:6 207:16 212:19 226:6 240:13

**participate** 91:8

**parties** 5:13 23:18 61:23 78:7,16 131:3

**Partners** 141:8,12 164:24 165:5 176:13 249:4

**partners'** 173:14,17 174:14,23

**partnership** 121:3 134:19 144:20 154:11 182:11

**partnership's** 135:5 149:3 176:24

**party** 58:5 93:19 94:4 159:12

**pass** 247:16

**passage** 228:9

**passed** 245:19,25

**past** 26:16 27:25 32:24 49:24 92:23

**patience** 73:20 120:19 189:25 251:18

**pause** 190:10

**pay** 18:16 32:13,20 33:2,11,24,25 34:11 48:25 49:20 53:6 63:2 65:6 88:25 105:10 111:18 138:23 139:10,14 217:5 220:5 221:13 224:5

**payable** 137:13 154:21

**payee** 190:17

**paying** 24:15 104:11 112:9,11 122:11 139:3 214:14 249:17

**payment** 111:4 132:9 134:19 136:17 178:8 195:21,25 197:20 198:5 199:3 200:17 201:5,16 203:9 216:10 244:8 249:11 251:6

**payments** 71:23 134:25 138:18 153:3 195:15 196:11,17 197:8,15 199:24 200:25 201:19,24 202:9,14,25 203:18, 19,25 214:4,21 244:6,9 248:2

**payout** 44:25

**pays** 52:23

**PDF** 120:14 242:8

**peer-reviewed** 222:16

**peers** 157:10

**pen** 119:21

**pending** 5:19 7:7 26:18

**people** 13:21,22 34:6 37:15 49:21 50:14,21

51:25 53:9 65:6 71:13,15,17 72:9,10 188:10,11 211:8 212:15 219:5 247:13

**people's** 69:17

**percent** 122:9 154:16 167:18 169:5 216:3 233:9

**perform** 27:10

**performance** 23:6 24:6 28:24 127:20,23 236:17 237:12 238:9,14

**period** 7:11,18,20 17:25 18:22 37:22 104:2 105:4,24 106:4,24 134:25 139:24 148:10 162:20 166:20 172:17 177:10 183:23 184:8,13,15 201:13 202:5,12 204:7,11 205:10 213:23 214:6,15 216:10 218:14,18,21,23 219:4,9,15,23 220:2,6,8,10,25 221:4,19,22 226:20 228:8,18 229:5 242:12 244:2,17

**permit** 46:3

**Perniciaro** 91:12

**person** 19:15 20:5 29:10,21 30:3 90:21,23 99:19,25 103:6 111:13 127:17 250:8

**personal** 10:7 245:20,25 246:14 247:16

**personally** 11:15 146:13 186:2

**perspective** 32:25 220:25

**pertaining** 15:23 21:25

**pertains** 129:2 157:5

**perusal** 118:21

**petition** 85:13 108:8,

9 111:5,19,23 160:16 198:2 202:6

**philosophy** 92:9

**phone** 10:3,8 90:21,24,25

**phrase** 29:6,8 30:2 40:2 213:18

**phrased** 216:20

**phrasing** 185:22

**picky** 221:24

**piece** 119:21

**pitch** 13:8,15,19

**place** 7:13 23:13 68:4 86:13,14 188:4,7 189:4

**places** 216:18

**plan** 59:23 188:18,19

**plans** 14:15

**platform** 15:14

**pleading** 99:6

**pleadings** 75:12 78:17

**plural** 8:5

**point** 108:4 112:21 116:20 153:2 157:17 164:13 178:8 200:24 205:8 208:15 218:4 219:6 220:24 221:2 226:19 247:12

**pointed** 244:22 245:6

**poorly** 32:24

**portfolio** 12:19 15:13 23:23 92:21 208:20

**portion** 48:15 87:3 120:21 130:23 132:21 136:12 140:18 141:3 142:23 151:5,15 182:5 186:8 199:3 225:19

**position** 62:2 63:23 246:19

**potential** 115:23 173:8,23 174:4

215:13

**potentially** 169:20 207:5,10

**practical** 59:4

**practicalities** 39:18

**practice** 5:8 25:10, 20 72:9 100:19 101:7 104:11 105:8,19,21 114:5,15,24 115:3,9, 12,14 116:14 119:9 130:3 200:11 202:21 206:22,24,25 208:3,6 212:8,23 213:9

**practices** 7:18 53:6

**precision** 158:12

**preliminarily** 9:12

**premarked** 76:16,24 119:12 193:12,18

**premium** 204:2 216:19,22 217:8,12, 15,19 218:8

**preparation** 78:13, 23

**prepared** 10:14 91:16 120:8 167:21 168:2 171:7,10,13 193:25 233:21 241:18

**preparing** 71:23 90:3 174:6

**presentation** 219:12 222:17

**pretty** 210:3

**previously** 27:19 150:12 234:3

**price** 23:24 47:11 226:14

**Pricewaterhouseco opers** 84:2,15 186:23

**Pricewaterhouseco opers'** 84:10 183:22

**primarily** 247:7

**principal** 81:12 82:22 108:16 111:4 122:10 125:3,17

127:5 131:20 132:10, 24 134:15 135:11,16, 21 137:11,18 138:15, 18 139:11,14 142:18 152:16 153:18 154:20 178:9 195:11, 16 197:15 198:9,14, 19 199:20,25 200:20, 25 202:14 203:9 204:2

**principals** 110:10

**prior** 18:4 25:9 26:14 52:3 75:16,19 76:3 78:12,23 81:20 82:5, 17 85:13 90:18 91:5 102:25 104:18,20 106:16 107:11 108:8 111:5 116:14 127:6 134:20 160:15 182:18 196:5 212:6, 14 221:13 224:8 236:20 238:16

**private** 12:18 72:10 115:6 211:24 214:25 246:17,22 247:14

**probabilities** 62:14

**probability** 31:24 43:11 138:25 196:19 214:22

**Procedures** 5:18

**proceeds** 24:22,24 27:2 43:25 46:20

**produced** 88:9 89:16 119:8 194:2,4,10 234:2

**professional** 209:15 228:10

**professionals** 28:21 115:24 116:18 215:15

**profit** 42:3

**program** 12:23 35:14 37:25 38:12 39:5 40:14 41:17 45:3 48:21 49:17,18 51:19 52:21 54:14 55:5,23 57:5 61:9 67:15,24 68:19,25 69:10 71:11 72:13,15,17,22 73:3 83:11,15 102:3,7

**programs** 12:24 72:6

**project** 12:20

**promissory** 57:20, 24 80:20,22,23 81:2 121:3,8,12,16,21 136:22 137:9 138:6 141:25 144:18 149:23 150:24 177:15 182:10 202:16 214:5

**proportionality** 31:21 32:3

**proposal** 66:2 68:3,7

**proposed** 54:7 66:6, 9,24

**prospective** 226:25

**prove** 107:20

**provide** 6:23 9:3 11:16 12:5 13:3 22:17 27:18 42:25 48:12 98:13 114:19 145:16

**provided** 78:23 79:8, 13 83:22 86:16 87:11 90:4 98:12 113:5,22 115:22 144:25 215:12 230:21 232:8 248:16 249:2,11 251:5

**providing** 46:22 160:5 250:12,16

**provisions** 59:7 127:5,12,21 187:24 188:4,7

**proxy** 226:23

**PTE** 242:20 243:3,18 244:4,9

**public** 6:9 225:6 247:5,7

**purchase** 226:14,16

**purchased** 144:18, 23

**purely** 47:5

**purported** 172:13

**purportedly** 99:9

**purpose** 24:10 25:6 26:17,20 27:4,8 91:3 92:9,22 145:16 161:25

**purposes** 76:25 179:23 226:9

**pursuant** 31:10 56:7 111:6 179:15 187:16 188:23 248:18

**put** 7:13 9:14 10:10, 11 15:6 68:4 69:19 70:2,6,21 71:25 76:14 119:10 126:6 172:5 193:10 230:8 231:14 233:13 245:4, 5,13

**putting** 101:18 137:2

**Pwc** 84:4,5 175:3 184:2

**Q**

**qualifies** 182:22

**quantifiable** 45:16

**quantify** 161:16 217:14,18 218:8 246:14 250:10

**quarter** 97:5

**question** 31:4 49:7 52:17 67:19 72:23 79:17 82:7 97:19 106:20 109:14 136:10 158:13 160:9 176:3 189:2,6,7,9,13, 17,21 196:21 209:21 210:2,17,21,25 211:4,15,21 216:12 245:5,13

**questioning** 93:12

**questions** 80:13 93:7,13 184:19 189:22 194:12 211:11 215:18 240:18,19 241:10 251:16,25

**quote** 149:2

**quoting** 114:4

**R**

**raised** 211:10

**raises** 211:11

**ran** 92:6 246:15

**range** 17:3

**ranged** 97:4

**rapid** 54:20

**rapidly** 188:3

**rate** 59:10 154:15 218:2 220:8

**rates** 18:2 28:23 58:3 59:6

**rational** 203:18

**rationally** 203:8 215:2

**reach** 10:10 153:2

**reached** 178:25

**reaching** 219:8 222:6

**read** 11:10 15:5 17:4, 5 57:23 87:25 104:6, 16 114:9 116:2 122:8 137:20 154:23 215:16 234:14

**reading** 127:4 144:22

**reads** 103:25

**ready** 82:19

**real** 32:22 247:6,12 248:10

**realize** 226:20

**realized** 114:6

**reason** 37:21 88:2 110:23 136:21 150:10 168:12 173:4 188:5 217:17 219:18, 23 230:3

**reasonable** 54:8 61:13 211:21 218:21 219:5 221:3

**reasonableness** 22:12 100:23 101:10, 11,14

**reasons** 10:7

**recall** 16:18 17:9,13 18:19,21,24 19:2,4 20:24 21:2,5,8 69:2 72:17,25 73:6 74:14, 24 75:13 78:12,18 79:19,25 80:5 81:19, 22 82:3 86:5,6 87:10, 21 88:3,11,22,23 90:24,25 91:20,25 93:6,20,24 94:24 95:20 96:21 97:16,17 109:15 110:12 112:6 117:12 152:11,12,13 163:16 172:2,4 186:15 195:5 226:4 227:22 228:20 243:13

**receivable** 135:5,7 149:4,5 152:4 176:25 177:2

**receive** 88:15,17 89:15 112:12 228:6

**received** 24:22 50:9 79:4,17 82:10,12 86:18,20 88:4,8 104:2,22 105:4,17,24 106:5,17,24 108:10, 13 109:9 110:2,25 130:6 161:9 196:24 199:8 205:10 206:3 224:12,18 225:25 227:9,15,16,18 228:13,17,23,24 229:4 236:20,23 237:10 238:7,13 240:6,13 242:11,17 243:11,17 244:16,18 246:11 249:16,20,23 250:11

**receiving** 79:20 244:3 251:6

**recently** 18:10 82:6 86:14 150:5

**recess** 74:3 192:15 251:13

**recipient** 213:16

**recognized** 114:8,21 223:19

**recollection** 82:24 85:9 147:5,17 150:11 172:7,12

**recollections** 97:7

**recommend** 34:13 35:8 43:19 51:15 52:5 63:7 64:23 70:10,14,20 71:16 73:7,12 181:5,9,13, 14

**reconciled** 111:4

**record** 5:10 70:11,19 76:12 95:13 104:16 107:21,24 234:15 237:7

**recorded** 190:15

**recording** 5:14

**records** 72:8 234:12

**recovery** 174:15,17

**reduced** 125:4 152:21 153:4 245:17

**refer** 30:3 82:5 127:24 147:16 177:7

**reference** 72:6 121:16 124:2 125:13 126:22 128:15 129:6 130:22 131:12 134:10,14 138:5 141:7,15,24 144:5 177:14 182:10 208:3 234:5,23 236:14 242:20 243:2 247:12

**referenced** 81:5 143:24

**referred** 16:25 83:16 126:2 204:16 213:13 217:19 245:2

**referring** 17:11 120:14 162:23 213:14,17

**refers** 127:25 131:2, 25 132:15 151:8 155:7 205:14 216:18

**reflect** 21:12 75:7 83:14 226:22

**reflected** 194:22 219:21

**reflects** 214:4

**refresh** 85:8 147:5, 16 172:6,12

**refreshed** 85:14

**reinvest** 25:11

**reinvested** 24:24

**reinvesting** 25:22

**relate** 51:24 79:9,15 116:14 151:20 168:13 196:4 242:16

**related** 118:16 230:5

**relates** 136:5 137:6 140:12 143:4 148:22 153:21 154:7 165:7, 18 172:17 178:19 223:8 225:12 226:7 227:24 235:2 241:23

**relating** 35:7 38:3 84:25 92:15 98:7 148:19 149:16 181:10

**relative** 52:17

**relevant** 16:19 17:17 33:2 35:12,16 48:20 111:2 145:24 146:4 157:18,19 171:16

**reliability** 210:17

**relied** 94:19 104:15 115:11

**relies** 180:10,15

**reluctant** 246:16

**rely** 54:12 55:21 94:8 120:6 219:7

**relying** 106:8 133:19 140:3 148:14 190:4

**remember** 15:15 18:18 20:20 21:6 80:3 84:4 87:14 89:4 109:4 152:8 171:24 194:20 213:4 218:25

**remote** 5:14 9:10

**remotely** 5:11,12

**rendered** 27:20 249:12

**reorganization** 188:18,20

**repaid** 138:15

**repay** 215:3

**repeat** 67:18 209:9

**report** 10:13,14 11:10 15:5,8 16:25 17:22,23 18:6 40:4 42:10 48:12,15 76:15,20,23 77:10,15 78:13,24 79:10,15,21 82:6,11,18 83:5,16 84:7 89:7,12,17,20 90:3,18 91:5,16 93:21 94:14 98:8 101:6 103:18,21 104:9 106:22 107:3,8 110:24 112:14 114:12 115:17 120:8 129:22 140:4 160:11, 13 167:22 168:3,23 169:12 171:7,11,14, 24 172:7 174:6 181:15,21 182:13,18 183:7,23 185:25 195:23 200:6,10 204:19 205:2,5 207:21 216:18 217:20,21 218:7,11 230:21 231:7 232:9, 13,15 233:3 237:2,15 238:17 241:18 243:19 247:10

**reported** 142:7 180:24 191:24 210:8 223:6 244:2 246:6

**reporter** 5:2,5

**Reporting** 5:6

**reports** 129:18 180:3

**represent** 6:18 15:2 99:5 128:24 152:14 193:21 194:3,24 195:10 198:21 232:12 233:21 236:11 244:5

**representation** 129:5 152:20 244:14

**representative** 220:7

**represented** 189:11, 16 235:14

**representing** 62:3 99:16

**represents** 235:12

**reputation** 209:16

**request** 82:21

**require** 182:16

**required** 53:4

**research** 52:9 54:24 225:3

**reserve** 175:5

**Residential** 223:9, 16 229:25 230:14 231:10,20 235:15 237:11 239:6 244:10

**respect** 26:17 69:23 98:24 176:21 196:25 251:7

**response** 82:20

**responsibilities** 92:4 94:17 225:4

**responsibility** 61:22

**rest** 125:25 128:13

**restate** 158:13

**restricted** 226:7 227:24 228:4,12,18, 22 229:3,7,16 235:3, 7,20 236:15,23 237:10 238:8,13 239:6,8,9 240:21

**restructure** 204:15

**restructured** 194:25

**result** 250:12

**results** 162:22,24

**retained** 9:2 11:15 12:3,14 14:25 75:19, 23 76:5

**retention** 127:16

**rethink** 205:23

**rethought** 200:12

**Retired** 196:25

**return** 250:18 251:6

**returns** 162:11 243:11

**review** 40:12 75:11 87:16 112:3 130:2 190:6 243:10

**reviewed** 66:18 77:22 78:3 79:22 129:24 225:5

**reviewing** 78:12 80:8

**revolved** 87:13

**revolving** 149:23

**reward** 23:21,25 24:5 35:22 44:19,23 92:20

**rewarded** 62:18

**rewarding** 31:20

**rings** 10:8

**risk** 33:9 68:5 174:4, 10,24 175:3,9

**Rivera** 5:4

**role** 93:14 94:10,11, 13,16 95:23 222:2

**roles** 247:10

**roll-up** 81:6 150:12

**rolled** 118:16

**room** 5:9

**rough** 11:19 60:13 62:9

**roughly** 197:10 201:9

**Row** 197:21

**Rows** 204:16

**Rule** 5:17

**rules** 5:17,18,19 182:22

**run-of-the-mill** 112:20

—————

**S**

**salary** 225:20

**sale** 15:12 42:11,21 208:19

**sales** 13:8,15,19

**satisfaction** 22:19

**save** 243:24

**scans** 13:20

**scenario** 36:22 43:3 67:13 69:25 70:16

**schedule** 81:9,11 82:22 149:25

**schedules** 81:15,18 118:15

**scope** 58:17 156:22

**screen** 9:14 15:6 76:15,24 89:21 119:11 129:12 151:24 163:19 172:6 182:8 193:11,19 212:5 233:19 239:23

**scroll** 126:4 128:13 134:3 149:12 170:13 177:13 181:19 234:4, 8 237:9 238:4 240:5

**section** 120:23 125:25 126:3 128:14 130:11 132:14,15 148:19 149:10 155:21,25 156:2 157:4 164:3 180:21 181:21,25 182:8,25 183:6,13,16 184:8

**sections** 126:5

**seek** 34:14 64:24

**select** 222:18

**sell** 13:7 46:7 47:10 49:4,5,8

**selling** 46:18 49:7 215:4

**sends** 9:6

**senior** 12:21 28:21 50:5 203:16

**sense** 184:22

**sentence** 15:7,20 90:2 91:4 103:25 104:8 106:23 107:4, 17,19 114:2,11

**116:**5,10,16 127:3 134:18 135:4 149:9 152:2 176:23 205:9 208:2,15 209:2 210:9,19 212:5 216:2,6,16

**separate** 12:7 146:21

**series** 80:13 241:14

**serve** 14:16

**served** 8:23 85:11

**Service** 247:23

**services** 9:3 10:23 12:22 13:4,12,23 27:19 49:11 53:17 101:9 115:7 132:17 138:14 139:18 151:10 165:9,15 176:19 216:23 248:17,18,23 249:2, 3,7,12,16,19,23 250:6,12,16 251:6

**serving** 246:12

**set** 77:15 89:6,11 103:9,13

**seven-year** 37:22 218:17,23 219:9,15 220:2 221:22

**severity** 5:7

**shared** 109:25 146:17 248:18 249:7

**shareholder** 143:9 180:5

**shareholders** 61:23 180:9

**shares** 226:7 227:25 228:4,5,9,12,18,22 229:4,7,8,16

**sheet** 40:4 42:4 147:16 166:25 167:4, 11 173:12,23 174:2, 21 175:7

**shift** 184:17

**short** 184:20 251:11

**shorter** 221:5

**shortly** 180:2

Index: show..success

**show** 180:23 181:7 182:5 183:15 194:5 229:11 234:8

**showed** 110:10 152:15 190:4,14 191:13,14,20 199:23 206:15

**showing** 167:7 241:24

**shown** 126:8 183:13 214:3 226:22 229:8

**shows** 199:2 200:16 225:20

**side** 246:20

**sign** 77:7

**signature** 77:5 183:20,22

**signed** 83:5 186:23

**significance** 35:17, 21 43:10,15,25 48:7

**significant** 11:12 33:4,13 36:5,6,9 44:2,24 46:18,21 53:2 55:13 62:12 162:5,6 174:9 183:12 200:25 213:23

**similar** 95:23,25 115:24 116:17,22 118:2 146:7 190:11 194:18 212:9 213:18, 19 215:14,24 217:6 225:4 246:17,23 247:13 249:23

**similarly** 244:19

**simple** 185:24 220:20

**simply** 92:24 160:12 201:8

**single** 16:4 106:18 149:24 244:4

**sir** 73:20 77:5 148:7 167:4 183:16 207:22 232:12 233:19 240:3

**sister** 99:7 145:22

**sit** 8:12 97:20 218:6 240:20 241:8,22

**sitting** 9:18 72:16,21 73:6 172:2 226:5 245:10

**situated** 244:19

**situation** 32:15 37:3 49:2 54:19,20 55:18 58:14 69:2 72:11 189:15 211:13 214:25

**situations** 37:9 38:16 54:22 55:19 109:16 188:11 211:8

**Sixty-two** 76:18

**sizing** 29:2

**sketchy** 97:3

**skill** 103:9,13

**skip** 128:23

**skipping** 128:21

**small** 52:15 53:3 55:25 73:13,16 247:8

**smaller** 245:9

**social** 5:8

**sold** 28:3 46:24 48:8 93:19 94:4

**sole** 25:15 248:12

**solely** 54:12 55:21 116:5 161:4

**somebody's** 34:11

**sooner** 139:14

**sophisticated** 58:5

**source** 24:25 25:5,15 26:19,23 53:23 54:13 55:6

**sources** 52:10

**space** 13:12

**speak** 74:6 90:20 91:22 95:16,17 100:13,17 193:7

**speaking** 91:15 251:22

**special** 29:24

**specializes** 10:22

**specific** 7:14 101:3, 10 127:5,12

**specifically** 39:24 93:24 105:16 106:7,8 152:12,13 154:9 156:2,20 157:5 210:3

**speculating** 23:15 214:12 215:6

**speculation** 23:16 27:22

**spend** 119:6

**spent** 10:15 91:15 92:6 189:24

**spoke** 118:5,10 206:10

**spoken** 66:19

**spouse** 10:9

**spreadsheets** 117:11

**stability** 218:20

**stack** 50:20 52:14 65:5

**stake** 59:9 185:15 209:15

**stamped** 232:4

**stand** 188:21 205:18

**standards** 102:9

**standpoint** 66:11

**Stang** 5:21 6:17

**starts** 163:22

**state** 107:9

**state's** 5:19

**stated** 91:3 107:25 170:4 172:8

**statement** 40:5 104:15 105:3 106:4, 12 113:2 136:16 141:10 142:13,21 170:18 174:14,23 176:23 179:8 188:17 200:10 205:18,22 208:22 210:13 215:22 226:23 233:16,20 236:8,12

237:21,25 238:7,25 239:15,24 242:19,23

**statements** 39:25 40:3,6,13,16 41:18 42:2 53:21 63:18 65:22 66:19 68:22 71:24 72:2,7 78:4,14 79:24 80:4 82:9,24 83:19 88:6,20 108:24,25 119:13,15, 25 120:5,22 123:17, 21 126:16 129:2,14, 25 133:10,16 139:23 142:8 147:19 148:9, 18 152:15 155:16,21 157:5 158:6,15 166:13,19 170:21 171:13 177:5,7,9,10 179:24 180:11 181:8 185:3 186:7 190:3 191:8 194:5 206:8,14 216:9 242:16

**states** 136:12 140:17 141:2,19 149:17,22 150:18 151:4,14 153:10,23 154:14 155:3 164:8,17 165:3,13,22 175:22 176:5,11,16 178:15, 24 179:13 244:15

**stature** 217:2

**steps** 51:5

**stickler** 201:15

**Stinson** 5:25 14:25 75:23 76:2 82:2,3 83:18 86:25 87:2,12 91:11,21 109:25 146:16

**stipulate** 5:13,23 6:4,7

**stock** 226:7,9,14,16, 18 227:3,10,14 228:6 229:15 235:3,7,20 236:15,20,23 237:11 238:8,13 239:6,9 240:9,13,22 244:12

**stop** 71:23 120:20 134:2 167:2 170:15

**straddles** 202:6

**straight** 157:15,19

**straightforward** 93:11

**strike** 61:15

**strive** 41:13

**structure** 14:14 28:14 58:7,12,17 60:10,15,19,23 61:3 65:14 92:19

**structured** 8:18 92:25

**structuring** 31:6

**study** 219:8,17

**stuff** 190:13

**subject** 8:8,13 15:10 16:14,20,24 17:21 24:11 25:7 26:12,18, 25 28:2 39:2 43:22 57:10 70:12 79:10 94:2 110:3,5 113:10 117:8,15 138:19 139:7 172:9 186:8 187:4 196:13 200:2 203:2,10 204:18,22 208:17 209:7,12 241:10

**subjective** 45:19,22 47:5,9,12 64:17 218:24 222:13

**subjectivity** 45:14

**subsequent** 17:23 22:20 42:20 43:5,23 44:17 56:9 64:10 179:20,23 180:15 181:22 182:2,22 183:6 184:8,11

**subsequently** 96:14

**substance** 87:14 95:21,22 193:8

**substantially** 15:13 208:20 226:2

**substantiate** 98:11, 15

**substantive** 103:20 166:25

**subtract** 201:18

**success** 31:22 62:12

**successes** 162:14

**successful** 92:20

**sufficient** 103:6

**suggest** 34:18,21,25 39:8 71:16 91:21 175:8 188:3

**suggested** 91:23 186:7 219:13

**suggestion** 142:21

**suggestions** 141:10

**suggests** 128:10 131:7,17 132:5,21 135:25 136:12 137:23 139:16 140:17 141:2,19 146:24 149:17 150:18 151:4,14 153:10,24 155:3 164:8,17 165:3,13 175:22 176:5,11,16 178:15,24 179:13

**suit** 15:10 172:9 208:17

**summarizing** 150:2

**summary** 194:2

**supplement** 41:20

**supplemented** 218:4

**support** 105:3 106:4, 12 116:9 161:10,18 210:13 213:9

**supporting** 162:2 242:16

**supports** 116:4

**supposed** 24:3 110:20 113:22

**swear** 5:11

**swearing** 5:15

**sworn** 6:8

**symbol** 235:11,13,15

**synonymous** 119:4

**T**

**taking** 219:24

**talk** 15:3 32:7 35:9 39:24 52:8,9 100:18 101:7 179:25 180:5 181:16 207:4

**talked** 21:14,16,23 90:15,17 91:5 92:3,8 96:18 104:18 208:24 209:4 212:15 217:23 247:18

**talking** 26:11,14,16 31:5,8,9 62:8 70:15 91:23 92:7 107:19 109:21 114:13 167:20 185:18,19 247:15

**tax** 243:10

**tax-related** 78:4,13

**taxes** 246:6

**team** 181:15

**telephone** 9:24 91:8

**telling** 93:25

**term** 18:20,23,25 59:6,17,25 66:8 127:18 150:13 229:14

**terms** 19:19,23 20:4 21:12 22:7,12 28:23 29:3 36:9 46:21 57:9, 12 58:2,11,21 61:10, 13 62:10 66:5,9 69:21 71:10 72:14 83:8,14 93:25 124:23 137:4 139:13 159:6 187:20 195:21 206:23 239:12 241:25

**terrible** 162:18

**testified** 6:9 62:20 82:10 84:15,22 85:21 86:3 98:21 108:22 116:25 168:5 169:18 170:10 181:4 196:16 203:3,12 210:20,22 211:7,25 214:20 235:6 244:24

**testimony** 6:23 7:4 74:7,11 85:2,17,23, 25 87:17 105:12 193:8

**testing** 83:21

**thereabouts** 117:3

**thesis** 39:20

**thing** 94:12 146:13 190:10 191:12 194:19 207:8 246:18

**things** 14:18 34:20 45:5,13,18,20,23 46:23 48:11,24 49:5, 8 59:20 62:14 63:3 64:19 70:6 72:19 73:12 78:9 88:12 100:20,24 110:6 139:9 156:14 157:7 174:16 180:3 181:6 188:12 191:12 194:5 203:21 210:23 211:9, 12,25 212:2 217:22 229:10 246:23

**thinking** 40:3

**thought** 48:4 67:19 93:10,11 138:23 161:21 196:19 214:22 215:7 217:25 221:9

**thoughts** 43:19

**thousands** 96:23

**tied** 169:6

**time** 12:16,17,25 18:22 21:21 25:21 28:19 39:3,18 44:11, 14 63:13 76:21 83:5 90:12 91:15 92:5,7 95:16,19 102:4 114:7 119:6,16 120:8 123:18 126:17 127:17,23 129:15 130:7 131:8,18 132:6 133:11 134:25 135:19 136:10 142:6 146:8 147:9 159:19 166:14 167:21 171:7 172:3 186:20 189:24 192:4 193:3,15 211:24 213:23,24 219:23 226:8 228:5,9

**testimony** 230:11 231:17 233:17 236:9 237:15, 22 239:2 242:7,15 251:16,18

**timeline** 219:18

**timely** 215:5

**times** 11:18 13:23 46:11 76:9 90:19 91:6 117:17 211:23

**timing** 172:13 184:11

**today** 6:19 8:12 9:14 14:19 74:8,11 79:9, 14 107:20 113:17 193:8 205:8 208:25 209:5 215:18 216:9, 17 217:23 218:6 236:20,24 241:22

**today's** 81:20

**told** 25:3 73:4 91:25 93:8 94:9,18 95:21 98:15,17 99:18,22 104:20 106:7,23 112:2 113:2 116:6 117:6,9,18 144:11 147:25 155:15 156:20 158:19 169:2 171:20 172:3 205:24 209:11,16,19,20 210:9,10,14,18 211:16 212:17,22 214:11 215:21 216:4, 12 227:18 228:25 236:19,22 238:12 240:12 241:17

**top** 126:6 134:8 155:24 170:16 218:12 231:2 232:17 242:22

**topic** 23:19 25:16

**total** 17:2 91:15 154:20 177:20 196:24 197:4,9,14 199:4,8,13 201:5 225:7,20,21 227:4 228:13 229:14 234:19 235:8,19 238:18 239:10

**totaled** 17:8

**totality** 25:13 169:3, 4,20 170:7

**trade** 246:20

**trading** 226:15

**traditional** 40:3

**train** 67:19 124:10

**transaction** 23:24 63:6,15 64:2,5,7,22 92:20 101:11 126:5 134:9

**transactions** 7:15 24:2 43:25 124:13 130:11 182:17

**transcript** 84:11,25 85:17 86:7,8,9,10,17, 20 87:3 88:21 89:10 100:10

**transfer** 194:6

**Traurig** 6:6

**treated** 110:21

**treatment** 111:6

**trends** 14:10

**trivial** 33:6 36:7 73:13,16

**trouble** 10:4 119:24

**true** 100:3 107:5 109:8 111:21 113:4 124:25 185:4,10 189:19 202:18 205:25 211:2 215:23 216:14 248:5

**trust** 84:18,22 85:3 99:8,24 101:16 145:13,16,19 146:12 223:9,16 229:25 230:15 231:11,20 235:15 237:11 239:7 244:10

**trustee** 99:8,23 145:22

**TSG** 5:6

**turn** 10:4 115:16 120:12 126:18 133:22 166:24

**turned** 23:7 158:21 229:7

**turning** 46:21

**type** 40:7 78:11
219:14

**types** 46:23 110:6

**typical** 54:22

---

**U**

**unaware** 229:12

**uncertain** 37:15

**uncomfortable**
160:8

**underlying** 31:9

**underpaid** 220:24

**understand** 6:20,22
7:16 8:15 14:21 15:8,
19,25 20:16 29:9
31:4,15 32:23 38:18,
23,25 39:9 40:12
43:24 46:15 47:22
49:6 50:12 52:22
58:24 63:8,11,17
106:19 111:14
127:15 135:9 143:11
148:8 156:21 160:8
167:14 169:19 170:4
172:8,16 185:8 191:5
197:25 198:17
208:15 250:19

**understanding** 7:2,
7 8:11 14:14 24:4
27:7,13 31:18 32:3,4,
13 33:20 34:11,23
35:25 36:14,24 37:5
38:13 39:6,22 40:16
41:13,20,21 42:2,6
43:7,14 44:2,9 45:10,
21 46:17 48:4,6,25
49:15 51:10,17,22,23
52:13 53:6 54:4,9
56:6,10,14,24 57:3,
12,15 58:10,12,17,21
59:8 60:9,22 63:20,
22 65:13 66:17 68:21
120:3 143:7 179:22
182:15 184:7 185:11
203:6 204:6

**understands** 69:20

**understood** 22:21
112:3 159:18 210:3

**unfortunate** 189:20

**units** 12:24 235:3,20
236:16,23 237:11
238:8,13 239:6,9

**unpaid** 135:13,16,20
137:17 154:20

**unusual** 54:15 217:2
246:24

**update** 218:7

**upside** 10:11

**urgency** 59:23 60:5

**urgent** 60:2

**utilize** 53:23

---

**V**

**validity** 5:14

**valued** 239:13 241:5

**varied** 162:19

**vehicle** 28:20

**verbal** 20:25

**verification** 54:6

**vest** 228:9

**vesting** 228:6

**vests** 228:7

**view** 193:17 218:2
219:6

**virtual** 153:16

**vouch** 209:19

---

**W**

**W-2** 161:5 220:24
222:24 223:5,9,17,
18,22,24 224:9,11,
13,17 229:9,11,25
230:5,10,13 231:3,
10,16,19 243:12,16
244:3,8,10 246:4,5,6

**W-2S** 161:6,7 235:16

**wage** 27:24

**wages** 232:19 242:17

**wait** 139:3

**wanted** 50:11 156:6
168:2 171:19 220:6
251:25

**Waterhouse** 85:6,
10,18

**ways** 51:9 199:16

**week** 18:4 82:13 86:2
90:16

**wise** 158:24 159:3,7

**wished** 189:8

**withdrawn** 8:3 37:22
46:3 56:5 64:5 65:9
68:16 74:15 81:24
88:4 96:11 97:12
99:21 102:21 118:8
156:17 157:22
159:25 160:12 177:8
187:11 205:20
206:23 209:3 214:2
219:22 236:21 237:4
248:15

**word** 8:5,6 29:8
37:17 45:16 128:4
209:19

**words** 27:23 114:16

**work** 12:20 13:3 29:4
76:2 205:7 217:13,16
234:15 245:5

**worked** 20:23 53:18
76:11

**working** 12:21 21:9,
10

**world** 19:16 20:6,11
32:22 38:25 73:4
147:8 190:7 207:17
211:16 222:17

**world's** 11:12

**worth** 46:10 228:6
239:18

**write** 119:24 121:11
153:17 177:19 212:2
234:10

**writing** 69:12,19,24
70:3,6,21 71:3 73:12
74:11 82:6,18 96:2
181:6,7

**written** 17:22 19:5,9,
13 20:25 21:4 70:11,
19 95:12 107:21,24
175:7 206:6 209:20
213:11

**wrong** 224:25

**wrote** 90:2 112:14
166:6 213:6 217:21
236:25

---

**Y**

**year** 50:6,9 75:2
90:11 95:5 120:2
121:20 122:18,23
123:4,8 125:4,18
130:20 131:21
132:10,25 133:16
134:16 137:12,17,25
142:17 152:10
154:10,19 170:25
172:3 177:25 180:3,7
182:24 184:16,24
186:2 208:7 235:21
236:17 237:13 238:9,
14,19 244:4 245:4,12

**years** 7:11,18 18:22
50:10 80:3 85:12
97:11,15 106:16
107:11 108:7 129:7
136:18 138:13
160:15,22,25 162:18,
19,22 182:15 220:18
221:5,10 222:18
225:7 233:22

**years'** 68:17

---

**Z**

**Ziehl** 5:21 6:17

**Zoom** 90:24 91:2,8
120:18

# EXHIBIT 102

# INTENTIONALLY

# OMITTED

Appx. 02045

# EXHIBIT 103

# INTENTIONALLY

# OMITTED

# EXHIBIT 104

# INTENTIONALLY

# OMITTED

# EXHIBIT 105

Appx. 02048

1           WATERHOUSE - 10-19-21

2    IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3         DALLAS DIVISION
    ------------------------------
4  IN RE:

5              Chapter 11
  HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,     CASE NO.
            19-34054-SGI11
7

      Debtor.
8  ------------------------------
  HIGHLAND CAPITAL MANAGEMENT, L.P.,
9

      Plaintiff,
10  vs.              Adversary
              Proceeding No.
11  HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
  FUND ADVISORS, L.P.; NEXPOINT
12  ADVISORS, L.P.; HIGHLAND
  INCOME FUND; NEXPOINT
13  STRATEGIC OPPORTUNITIES FUND;
  NEXPOINT CAPITAL, INC.; and
14  CLO HOLDCO, LTD.,

15      Defendants.
  ------------------------------
16

17      REMOTE VIDEOTAPED DEPOSITION OF

18        FRANK WATERHOUSE

19         October 19, 2021

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No: 201195

Page 2

1    WATERHOUSE - 10-19-21

2

3

4     October 19, 2021

5     9:30 a.m.

6

7

8

9   Remote Deposition of FRANK WATERHOUSE,

10 held before Susan S. Klinger, a Registered

11 Merit Reporter and Certified Realtime Reporter

12 of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    WATERHOUSE - 10-19-21

2 A P P E A R A N C E S :

3 (All appearances via Zoom.)

4 Attorneys for the Reorganized Highland Capital

5 Management:

6  John Morris, Esq.

7  Hayley Winograd, Esq.

8  PACHULSKI STANG ZIEHL & JONES

9  780 Third Avenue

10  New York, New York  10017

11 Attorneys for the Witness:

12  Debra Dandeneau, Esq.

13  Michelle Hartmann, Esq.

14  BAKER McKENZIE

15  1900 North Pearl Street

16  Dallas, Texas 75201

17 Attorneys for NexPoint Advisors, LP and

18 Highland Capital Management Fund Advisors,

19 L.P.:

20  Davor Rukavina, Esq.

21  An Nguyen, Esq.

22  MUNSCH HARDT KOPF & HARDD

23  500 North Akard Street

24  Dallas, Texas  75201-6659

25

Page 4

1    WATERHOUSE - 10-19-21

2 Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3 and HCMS:

4  Deborah Deitsch-Perez, Esq.

5  Michael Aigen, Esq.

6  STINSON

7  3102 Oak Lawn Avenue

8  Dallas, Texas 75219

9

10 Attorneys for Dugaboy Investment Trust:

11  Warren Horn, Esq.

12  HELLER, DRAPER & HORN

13  650 Poydras Street

14  New Orleans, Louisiana 70130

15

16 Attorneys for Marc Kirschner as the trustee for

17 the litigation SunTrust:

18  Deborah Newman, Esq.

19  QUINN EMANUEL URQUHART & SULLIVAN

20  51 Madison Avenue

21  New York, New York  10010

22

23 Also Present:

24  Ms. La Asia Canty

25

Page 5

1    WATERHOUSE - 10-19-21

2     I N D E X

3

4 WITNESS       PAGE

5 FRANK WATERHOUSE

6 EXAMINATION BY MR. MORRIS  10

7 EXAMINATION BY MR. RUKAVINA  256

8 EXAMINATION BY MS. DEITSCH-PEREZ  352

9 EXAMINATION BY MR. MORRIS  377

10 EXAMINATION BY MR. RUKAVINA  387

11 EXAMINATION BY MS. DEITSCH-PEREZ  393

12

13    E X H I B I T S

14 No.      Page

15 Exhibit 2  NPA et al Amended Complaint 142

16 Exhibit 33 6/3/19 Management  91

17  Representation

18 Exhibit 34 HCMLP Consolidated Financial 94

19  Statements

20 Exhibit 35 HCMFA Incumbency Certificate 151

21 Exhibit 36 Email string re 15(c) 170

22 Exhibit 39 HCMLP Operating Results 2/18 226

23 Exhibit 40 Summary of Assets and 236

24  Liabilities

25 Exhibit 41 12/19 Monthly Operating Report  258

1  WATERHOUSE - 10-19-21
2  Exhibit 45 HCMFA Consolidated Financial     135
3       Statements
4  Exhibit 46 NexPoint 2019 Audited        218
5       Financials
6
7  Exhibit A1 Emails 11/25            328
8  Exhibit A2 Emails 12/31            338
9  Exhibit A6 Emails 1/12             341
10 Exhibit A7 Promissory Notes          297
11 Exhibit A9 Email, 8/31             307
12 Exhibit A10 Acknowledgment from HCMLP        302
13 Exhibit A11 HCMLP Schedule 71A           309
14
15
16
17
18
19
20
21
22
23
24
25

1       WATERHOUSE - 10-19-21
2       P R O C E E D I N G S
3       VIDEOGRAPHER: Good morning,
4  Counselors. My name is Scott Hatch. I'm a
5  certified legal videographer in association
6  with TSG Reporting, Inc.
7       Due to the severity of COVID-19 and
8  following the practice of social
9  distancing, I will not be in the same room
10 with the witness. Instead, I will record
11 this videotaped deposition remotely. The
12 reporter, Susan Klinger, also will not be
13 in the same room and will swear the witness
14 remotely.
15      Do all parties stipulate to the
16 validity of this video recording and remote
17 swearing, and that it will be admissible in
18 the courtroom as if it had been taken
19 following Rule 30 of the Federal Rules of
20 Civil Procedures and the state's rules
21 where this case is pending?
22      MR. HORN: Yes.
23      MS. DANDENEAU: Yes.
24      MR. MORRIS: Yes. John Morris. I
25 would just try to do a negative notice

1       WATERHOUSE - 10-19-21
2  here, as we did yesterday. If anybody has
3  a problem with what was just stated, can
4  you state your objection now?
5       Okay. No response, so everybody
6  accepts the stipulation and the instruction
7  that was just given.
8       VIDEOGRAPHER: Thank you. This is
9  the start of media labeled Number 1 of the
10 video recorded deposition of Frank
11 Waterhouse In Re: Highland Capital
12 Management, L.P., in the United States
13 Bankruptcy Court for the Northern District
14 of Texas, Dallas Division, Case Number
15 21-03000-SGI.
16      This deposition is being held via
17 video conference with participants
18 appearing remotely due to COVID-19
19 restrictions on Tuesday, October 19th, 2021
20 at approximately 9:32 a.m. My name is
21 Scott Hatch, legal video specialist with
22 TSG Reporting, Inc. headquartered at 228
23 East 45th Street, New York, New York. The
24 court reporter is Susan Klinger in
25 association with TSG Reporting.

1       WATERHOUSE - 10-19-21
2       Counsel, please introduce
3  yourselves.
4       MR. MORRIS: John Morris, Pachulski
5  Stang Ziehl & Jones for the reorganized
6  Highland Capital Management, L.P., the
7  plaintiff in these actions.
8       MS. DANDENEAU: Deborah Dandeneau
9  from Baker McKenzie. My partner, Michelle
10 Hartmann, is also in the room with me,
11 representing Frank Waterhouse individually.
12      MS. DEITSCH-PEREZ: Deborah
13 Deitsch-Perez from Stinson, LLP,
14 representing Jim Dondero, Nancy Dondero,
15 HCRA, and HCMS.
16      MR. HORN: Warren Horn with Heller,
17 Draper & Horn in New Orleans representing
18 Dugaboy Investment Trust.
19      MR. RUKAVINA: Davor Rukavina with
20 Munsch Hardt Kopf & Harr in Dallas
21 representing NexPoint Advisors, LP and
22 Highland Capital Management Fund Advisors,
23 L.P.
24      MR. AIGEN: Michael Aigen from
25 Stinson, and I represent the same parties

Page 10

1           WATERHOUSE - 10-19-21
2   as Deborah Deitsch-Perez.
3           MS. NEWMAN:  This is Deborah Newman
4   from Quinn Emanuel.  We represent the
5   litigation – Marc Kirschner as the trustee
6   for the litigation SunTrust.
7           MR. MORRIS:  I think that is
8   everybody.
9           VIDEOGRAPHER:  Thank you.  Will the
10  court reporter please swear in the witness.
11          FRANK WATERHOUSE,
12  having been first duly sworn, testified as
13  follows:
14          EXAMINATION
15  BY MR. MORRIS:
16      Q.   Please state your name for the
17  record.
18      A.   My name is Frank Waterhouse.
19      Q.   Good morning, Mr. Waterhouse.  I'm
20  John Morris, as you know, from Pachulski Stang
21  Ziehl & Jones.  You understand that my firm and
22  I represent Highland Capital Management, L.P.;
23  is that right?
24      A.   Yes.
25      Q.   Okay.  And do you understand that

Page 11

1           WATERHOUSE - 10-19-21
2   we're here today for your deposition in your
3   individual capacity?
4       A.   Yes.
5       Q.   Did you review and – did you
6   receive and review a subpoena that Highland
7   Capital Management, L.P., served upon you?
8       A.   Yes.
9       Q.   You have been deposed before; right?
10      A.   Yes.
11      Q.   How many times have you been
12  deposed?
13      A.   About three or four times.
14      Q.   Okay.  And I defended you in one
15  deposition; isn't that right?
16      A.   That is correct.
17      Q.   So the general ground rules for this
18  deposition are largely the same as the
19  depositions you have given before.  And that is
20  I will ask you a series of questions, and it is
21  important that you allow me to finish my
22  question before you begin your answer; is that
23  fair?
24      A.   Yes.
25      Q.   And it is important that I allow you

Page 12

1           WATERHOUSE - 10-19-21
2   to finish your answers before I begin a
3   question, but if I fail to do that, will you
4   let me know?
5       A.   I can certainly do that.
6       Q.   Okay.  Do you understand that this
7   deposition is being videotaped?
8       A.   Yes.
9       Q.   You understand that I may seek to
10  use portions of the videotape in a court of
11  law?
12      A.   I did not know that, until you just
13  said that.
14      Q.   Okay.  And you are aware of that now
15  before the deposition begins substantively; is
16  that right?
17      A.   Yes.
18      Q.   So unlike I think the other
19  depositions that you have given, this one is
20  being given remotely.  So that presents some
21  unique challenges, at least as compared to a
22  deposition that is taken in-person.
23          From time to time we're going to put
24  documents up on the screen, Mr. Waterhouse.
25  And it is important that I give you the

Page 13

1           WATERHOUSE - 10-19-21
2   opportunity to review any portion of the
3   document that you think you need in order to
4   fully and completely answer the question.
5           So I would ask you to let me know if
6   there is a portion of a document that you need
7   to see in order to fully and completely answer
8   the question.  Can you do that for me?
9       A.   Yes.
10          MS. DANDENEAU:  Mr. Morris, I would
11  just note that we do have hard copies of
12  the documents that you sent, so if you can
13  just refer to the exhibit number as
14  reflected in the documents that you sent,
15  Mr. Waterhouse will be able to look at the
16  hard copies of those documents.
17          MR. MORRIS:  I appreciate that,
18  and – and I will encourage him to do so.
19  There will be other documents that we did
20  not send to you that we'll be using today
21  though.
22      Q.   Okay.  With that as background, if
23  there is anything that I ask you, sir, that you
24  don't understand, will you let me know?
25      A.   Yes.

Page 14

WATERHOUSE - 10-19-21

2 Q. Okay. Are you currently employed?
3 A. Yes.
4 Q. By whom?
5 A. The Skyview Group.
6 Q. When did you become employed by the
7 Skyview Group?
8 A. I believe March 1st of 2021.
9 Q. Do you have a title at Skyview?
10 A. Yes.
11 Q. What is your title?
12 A. My title is chief financial officer.
13 Q. Do you report to anybody in your
14 role as CFO?
15 A. I don't, no.
16 Q. No. Is there a president or a CEO
17 of Skyview?
18 A. Yes.
19 Q. Who is that?
20 A. That is Scott Ellington.
21 Q. But you don't report to
22 Mr. Ellington; is that right?
23 A. I don't think so.
24 Q. Does Skyview Group --
25 MS. DANDENEAU: Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

2 A. I -- I -- I might. I just -- I
3 don't recall.
4 Q. Okay. Does Skyview Group provide
5 any services to any entity directly or
6 indirectly owned or controlled by Jim Dondero?
7 A. Yes.
8 Q. Can you name -- is that pursuant to
9 written contracts?
10 A. Yes.
11 Q. And do you know how many contracts
12 exist?
13 A. Approximately six or so.
14 Q. And is the Skyview Group made up of
15 individuals who were formerly employees of
16 Highland Capital Management, L.P.?
17 A. No.
18 Q. Do you know how many -- how many --
19 how many employees does Skyview have?
20 A. Approximately 35.
21 Q. And can you tell me how many of
22 those 35 are former officers, directors, or
23 employees of Highland Capital Management, L.P.?
24 A. I don't know the exact number.
25 Q. Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

2 A. Yes.
3 Q. Is it more than 30?
4 A. I don't know.
5 Q. Can you tell me what portion of
6 Skyview -- Skyview's revenue is derived from
7 entities that are directly or indirectly owned
8 or controlled by Jim Dondero?
9 MS. DANDENEAU: Mr. Morris, I mean,
10 you called Mr. Waterhouse here individually
11 for purposes of his testimony in connection
12 with the noticed litigation. I have given
13 you some leeway to ask him some background
14 information about Skyview Group, but this
15 is not a substitute for a deposition in
16 connection with any other pending disputes
17 that exist. And -- and we agreed to accept
18 the subpoena on the basis of he -- this is
19 testimony that he is giving in connection
20 with the noticed litigation.
21 I really think that you are now
22 going a little bit far afield from the
23 purpose of this deposition.
24 MR. MORRIS: Okay. It is -- I'm not
25 intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

2 these questions for any purpose other than
3 this litigation. I think you understand
4 fully why I'm asking the questions, and I
5 just have a couple more, if you will bear
6 with me.
7 MS. DANDENEAU: Okay.
8 MS. DEITSCH-PEREZ: Can we have an
9 agreement that an objection by one is an
10 objection for any other party here?
11 MR. MORRIS: Sure. I would -- I
12 would encourage that, sure.
13 MS. DEITSCH-PEREZ: Thank you.
14 MR. MORRIS: It can't be sustained
15 or overruled more than one time, so...
16 Q. Mr. Waterhouse, can you answer my
17 question, please.
18 MS. DANDENEAU: Do you want to
19 repeat it, Mr. Morris, for his benefit?
20 MR. MORRIS: Sure.
21 Q. Can you -- can you tell me the
22 approximate portion of Skyview's revenue that
23 is derived from entities that are directly or
24 indirectly owned or controlled by Mr. Dondero?
25 A. I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21

1
2  Q.   Is it more than 75 percent?
3  A.   Yes.
4  Q.   Is it more than 90 percent?
5  A.   I don't know.
6  Q.   Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8  A.   Yes.
9  Q.   All right.  And you previously
10 served as Highland's CFO; correct?
11 A.   Yes.
12 Q.   When did you join Highland?
13 A.   I don't recall the exact date.
14 Q.   Can you tell me what year?
15 A.   2006.
16 Q.   When did you -- in what year did you
17 become Highland's CFO?
18 A.   I don't recall the exact date.
19 Q.   I'm not asking you for the exact
20 date.  I'm asking you if you recall the year in
21 which you were appointed CFO.
22 A.   I don't recall the exact year.
23 Q.   Can you tell me which years it is
24 possible that you were appointed to CFO of
25 Highland?

Page 19

WATERHOUSE - 10-19-21

1
2  A.   2011 or 2012.
3  Q.   Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6  A.   Yes.
7  Q.   During that entire time you reported
8  directly to Jim Dondero; correct?
9  A.   I -- I don't know.
10 Q.   Is there anybody else you reported
11 to -- withdrawn.
12      Did you report to Mr. Dondero for
13 some portion of the time that you served as
14 CFO?
15 A.   Yes.
16 Q.   Is there a portion of time that you
17 don't recall who you reported to?
18 A.   Yes.
19 Q.   What portion of time do you have in
20 your mind when you can't recall who you
21 reported to?
22 A.   From the 2011 to -- for
23 approximately a year or two.
24 Q.   Okay.  So is it fair to say that you
25 reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2  from at least 2014 until the time you left
3  Highland?
4       MS. DANDENEAU:  Objection to form.
5  A.   I don't want to speculate the exact
6  or what year that changed or -- so I would like
7  to stick with my testimony.
8  Q.   Can you recall when you began
9  reporting to Mr. Dondero?
10 A.   I don't recall.
11 Q.   Can you -- can you give me an
12 estimate of what year you think you might have
13 began reporting to Mr. Dondero?
14 A.   I will go back to my prior
15 testimony.
16 Q.   Okay.  There is no -- you have no
17 ability to tell me when you began reporting to
18 Mr. Dondero.
19      Do I have that right?
20      MS. DANDENEAU:  Objection to form.
21 A.   I don't recall.
22 Q.   Okay.  Do you recall who you might
23 have reported to before you began reporting to
24 Mr. Dondero?
25 A.   Yes.

Page 21

WATERHOUSE - 10-19-21

1
2  Q.   Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5  A.   That would have been Patrick Boyce.
6  Q.   Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8  A.   Yes.
9  Q.   And we refer to that as the petition
10 date?
11 A.   Yes.
12 Q.   Okay.  Do you hold any professional
13 licenses, sir?
14 A.   Yes.
15 Q.   Can you tell me what professional
16 licenses you hold?
17 A.   I'm a certified public accountant.
18 Q.   Okay.  Anything else?
19 A.   No.
20 Q.   Do you have any other professional
21 licenses or certificates?
22 A.   When you say "professional license,"
23 that is not education?
24 Q.   Tell me -- sure.  Anything other
25 than a driver's license.

Page 22

1          WATERHOUSE - 10-19-21
2     Do you have any other license or
3  certificate or certification?
4     A.  Are you asking, like, where I went
5  to school and the --
6     Q.  I am not.  I am not.  I didn't say
7  education.  I didn't ask about degrees.
8     Do you know what a license is?
9     A.  Well, yeah, I mean, a license is
10  something you get after you receive a certain
11  level of proficiency.
12     Q.  Do you have any licenses or
13  certifications other than your CPA?
14     MS. DANDENEAU:  Objection, form.
15     I assume you mean professional
16  licenses, Mr. Morris; correct?
17     Q.  Can you answer my question, sir?
18     A.  Mr. Morris, I'm thinking.  I
19  don't -- I don't think I have any others.
20     Q.  Are you familiar with an entity
21  called Highland Capital Management Fund
22  Advisors?
23     A.  Yes.
24     Q.  Were you ever -- can we refer to
25  that entity as HCMFA?

Page 23

1          WATERHOUSE - 10-19-21
2     A.  Yes.
3     Q.  Were you ever employed by HCMFA?
4     A.  Not that I recall.
5     Q.  Were you ever -- did you ever hold
6  the title of an officer or director of HCMFA?
7     A.  Yes.
8     Q.  What title did you hold?
9     A.  Treasurer.
10     Q.  When did you become the treasurer of
11  HCMFA?
12     A.  I don't recall.
13     Q.  Can you tell me the year?
14     A.  I don't -- I don't know the year.
15     Q.  Can you approximate the year in
16  which you became the treasurer of HCMFA?
17     A.  I don't know.
18     Q.  Can you tell me if it was before or
19  after 2016?
20     A.  I don't recall.
21     Q.  Are you still the -- do you know if
22  you're still the treasurer of HCMFA today?
23     A.  Today, I am the acting treasurer for
24  HCMFA.
25     Q.  Is there a distinction between

Page 24

1          WATERHOUSE - 10-19-21
2  treasurer and acting treasurer?
3     A.  I said "acting treasurer" as I am an
4  employee of Skyview, as you previously
5  stated -- or asked.
6     Q.  But you are the treasurer of HCMFA
7  today; correct?
8     A.  I am -- I am the acting treasurer
9  for HCMFA.
10     Q.  How did you become the treasurer of
11  HCMFA?
12     A.  Are you asking how I became the
13  treasurer of HCMFA today?
14     Q.  How did you become appointed to
15  serve as the treasurer of HCMFA?
16     A.  Well, in -- in -- in what time
17  capacity?
18     Q.  The first time that you were
19  appointed.
20     A.  First time.  I believe I was asked
21  to serve as treasurer for HCMFA the first time.
22     Q.  By who?  Who asked you to do that?
23     A.  I don't recall.
24     Q.  Is there anything that would refresh
25  your recollection as to who appointed you as

Page 25

1          WATERHOUSE - 10-19-21
2  the treasurer of CF- -- HCMFA for the first
3  time?
4     A.  I don't -- I mean, there would be
5  some documents, some legal documents.  I don't
6  know where those are.
7     Q.  How many times have you been
8  appointed the treasurer of HCMFA?
9     A.  I don't know.
10     Q.  Was it more than once?
11     A.  I don't know.
12     Q.  Can you tell me any period of time
13  since 2016 that you did not hold the title of
14  treasurer of HCMFA?
15     MS. DANDENEAU:  Objection to form.
16     A.  I don't recall.
17     Q.  What are your duties and
18  responsibilities as the treasurer of HCMFA?
19     A.  My duties are to do the best job
20  that I can as the -- as an accountant and
21  finance guy.
22     Q.  What specific duties and
23  responsibilities do you have as the treasurer
24  of HCMFA?
25     A.  My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   that I can as the accounting and finance person
3   for HCMFA.
4       Q.   As the accounting and finance person
5   for HCMFA, do you have any particular areas of
6   responsibility?
7       A.   Yeah, it is to manage the accounting
8   and finance function for HCMFA.
9       Q.   Would that include -- do you have
10  responsibility for overseeing HCMFA's annual
11  audit?
12      A.   Can I please elaborate on my prior
13  question?
14      Q.   Of course.  You -- you are giving
15  answers.  I'm asking questions.
16      A.   Okay.  Yes, so the -- it -- like I
17  said, it is to manage the accounting finance
18  aspect, but I am, as we discussed, the
19  treasurer.  That is -- being treasurer is what
20  gives me that -- that management function.
21      Q.   Does anybody report to you in your
22  capacity as treasurer of HCMFA?
23      A.   I don't believe so.
24      Q.   Does HCMFA have a chief financial
25  officer?

Page 27

1   WATERHOUSE - 10-19-21
2       A.   I don't -- I don't know.
3       Q.   You don't know?
4           You're the treasurer of HCMFA but
5   you don't know if HCMFA has a chief financial
6   officer.
7           Do I have that right?
8       A.   That's right.
9       Q.   Okay.  Have you heard of a company
10  called NexPoint Advisors?
11      A.   Yes.
12      Q.   We will refer to that as NexPoint.
13  Okay?
14      A.   Okay.
15      Q.   Were you ever employed by NexPoint?
16      A.   I don't recall.
17      Q.   Did you ever hold any title with
18  respect to the entity known as NexPoint?
19      A.   Yes.
20      Q.   What titles have you held in
21  relation to NexPoint?
22      A.   Treasurer.  I think it was only
23  treasurer.
24      Q.   Can you tell me the approximate year
25  you became the treasurer of NexPoint?

Page 28

1   WATERHOUSE - 10-19-21
2       A.   I don't know.
3       Q.   Are you still the treasurer of
4   NexPoint today?
5       A.   I am the acting treasurer for
6   NexPoint.
7       Q.   When did your title change from
8   treasurer to acting treasurer?
9       A.   I don't know.
10      Q.   Did your duties and responsibilities
11  change at all when your title was changed from
12  treasurer to acting treasurer?
13      A.   I don't -- I don't believe so.
14      Q.   Why did --
15      A.   I still manage the finance and
16  accounting function for NexPoint.
17      Q.   Why did your title change from
18  treasurer to acting treasurer?
19      A.   I don't -- I'm using the term
20  "acting treasurer" as I'm a Skyview employee.
21  I don't -- I don't know -- again, I am a -- as
22  I am the Skyview employee.
23      Q.   Okay.
24      A.   And we -- we provide officer
25  services.

Page 29

1   WATERHOUSE - 10-19-21
2       Q.   And you serve as an officer of
3   HCMFA; correct?
4       A.   I think we went over that with my
5   testimony.  Yes, I'm the acting treasurer for
6   HCMFA.
7       Q.   And you are an officer of NexPoint;
8   correct?
9       A.   I think -- I am the acting treasurer
10  for NexPoint Advisors.
11      Q.   And -- and who appointed you acting
12  treasurer of NexPoint Advisors?
13      A.   I don't recall specifically.
14      Q.   Do you have any recollection of who
15  might have appointed you the treasurer of
16  NexPoint?
17      A.   I mean, it -- it -- I don't recall
18  exactly who it was.
19      Q.   Who were the possibilities?
20      MS. DEITSCH-PEREZ:  Object to the
21  form.
22      Q.   You can answer.
23      A.   Someone in the legal group for
24  NexPoint.  The other officers as well.
25      Q.   Have you heard of a company called

Page 30

```
 1          WATERHOUSE - 10-19-21
 2  Highland Capital Management Services, Inc.?
 3     A.   Yes.
 4     Q.   We will refer to that as HCMS.
 5  Okay?
 6     A.   HCMS.  Okay.
 7     Q.   Were you ever employed by HCMS?
 8     A.   No.
 9     Q.   Have you ever held any titles in
10  relation to HCMF -- I apologize -- HCMS?
11     A.   Yes.
12     Q.   What titles have you held in
13  relation to HCMS?
14     A.   Treasurer and acting treasurer.
15     Q.   When did you first become treasurer
16  or acting treasurer of HCMS?
17     A.   I don't recall the exact dates.
18     Q.   Can you recall -- can you
19  approximate the year that you became the
20  treasurer of HCMS?
21     A.   I don't -- I don't know.
22     Q.   Are you still the treasurer of HCMS
23  today?
24     A.   I am the acting treasurer for HCMS.
25     Q.   And are your duties and
```

Page 31

```
 1          WATERHOUSE - 10-19-21
 2  responsibilities as the acting treasurer for
 3  HCMS and the acting treasurer for NexPoint the
 4  same as your duties and responsibilities in
 5  your role as the acting treasurer of HCMFA?
 6     A.   More or less.
 7     Q.   Have you ever heard of a company
 8  called HCRE Partners, LLC?
 9     A.   Yes.
10     Q.   And do you understand that that
11  entity is now known today as NexPoint Real
12  Estate Partners?
13     A.   I did not know that.
14     Q.   All right.  Can we refer to HCRE
15  Partners as HCRE?
16     MS. DANDENEAU:  Objection to form.
17        Did you mean NexPoint Real Estate
18  Partners, Mr. Morris?
19     MR. MORRIS:  No.
20     MS. DANDENEAU:  Oh.
21     MR. MORRIS:  He said he wasn't
22  familiar that it was succeeded by that
23  entity.  So --
24     MS. DANDENEAU:  Okay.
25     MR. MORRIS:  -- let's go with what
```

Page 32

```
 1          WATERHOUSE - 10-19-21
 2     the witness knows.
 3     Q.   You're familiar with an entity
 4  called HCRE Partners, LLC; correct?
 5     A.   Yes.
 6     Q.   Okay.  So that is the entity that we
 7  will refer to as HCRE.  If you're aware of any
 8  successor, that is great.  If not, let's just
 9  define it as such.
10        Have you ever been employed by HCRE
11  or any entity that you know to have succeeded
12  HCRE?
13     A.   No.
14     Q.   Did you ever serve as an officer or
15  director of HCRE or any successor?
16     A.   Not that I recall.
17     Q.   Okay.  Can we refer to NexPoint and
18  HCMFA as the advisors?
19     A.   Yes.
20     Q.   In general, the advisors provided
21  investment advisory services to certain retail
22  funds; correct?
23     A.   Yes.
24     Q.   And we will refer to the retail
25  funds that are served by the advisors
```

Page 33

```
 1          WATERHOUSE - 10-19-21
 2  collectively as the retail funds; is that okay?
 3     A.   Okay.
 4     Q.   Each of the retail funds is governed
 5  by a board; correct?
 6     A.   Yes.
 7     Q.   And do you know the people who serve
 8  on the boards of the retail funds?
 9     MS. DANDENEAU:  Objection to form.
10     A.   I don't know all of them.
11     Q.   Do you know whether the same people
12  serve on the board of each of the retail funds
13  as we've defined that term?
14     A.   Which -- so when you say "retail
15  funds" -- again, I want to be -- what retail
16  funds are you referring to, because there are
17  -- there are several distinctions?
18        What retail funds are you using when
19  you refer to them?
20     Q.   That is why -- that is why I tried
21  to define the terms.  So let me do it again.
22        Retail funds for the purposes of
23  this deposition means any retail fund to which
24  either of the advisors provides advisory
25  services.  Okay?
```

Appx. 02057

Page 34

1      WATERHOUSE - 10-19-21
2   A.   Okay.
3   Q.   Okay.  So do you know whether the
4   same people serve on the board of each of the
5   retail funds?
6   A.   I don't know.
7   Q.   Were you ever employed by any of the
8   retail funds?
9   A.   No.
10  Q.   No?
11  A.   No.
12  Q.   Okay.  Do you have any title with
13  respect to any of the retail funds?
14  A.   Yes.
15  Q.   What titles do you hold --
16  withdrawn.
17       Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20       MS. DANDENEAU:  Objection to form.
21  Q.   Withdrawn.
22       Do you have the same title with
23  respect to each of the retail funds?
24  A.   No.
25  Q.   Tell me which title you have with

Page 35

1      WATERHOUSE - 10-19-21
2   respect to each retail fund.
3        Actually, let's do it a different
4   way.  I withdraw the question.
5        Can you give me one title you have
6   in relation to any retail fund?
7   A.   Yes.
8   Q.   What title -- what title can you
9   give me?
10  A.   Principal executive officer.
11  Q.   Do you serve as principal executive
12  officer for each of the retail funds?
13  A.   No.
14  Q.   Can you identify for me the retail
15  funds in which you serve as the principal
16  executive officer?
17  A.   Yes.  Highland Funds 1, Highland
18  Funds 2, Highland Income Fund, Highland Global
19  Allocation Fund.
20  Q.   I'm sorry, you said "Global
21  Allocation Fund"?
22  A.   Yes.
23       VIDEOGRAPHER:  Excuse me,
24  Mr. Morris.  This is the videographer.  I'm
25  concerned about the lighting in the

Page 36

1      WATERHOUSE - 10-19-21
2   witness' camera.
3        Do you want to go off the record and
4   make some adjustments?
5        MR. MORRIS:  Sure, but just for this
6   purpose.  I don't want to take a break.  We
7   just started.
8        MS. DANDENEAU:  Yeah, that is fine.
9   That is fine.  We're going to put you on
10  mute.
11       MR. MORRIS:  All right.
12       MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14       VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16  (Recess taken 10:08 a.m. to 10:11 a.m.)
17       VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19  Q.   Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22  A.   I don't recall.
23  Q.   Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?

Page 37

1      WATERHOUSE - 10-19-21
2   A.   2021.
3   Q.   Did you ever hold any title with
4   respect to any of the four funds you have just
5   identified other than principal executive
6   officer?
7   A.   I don't recall.
8   Q.   Is it possible that you held a
9   position or a title with the four funds you
10  just identified prior to 2021?
11  A.   Yes.
12  Q.   But you don't recall if you did or
13  not; do I have that right?
14  A.   No.  You -- I thought you asked, did
15  I hold other titles.
16  Q.   Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20  A.   Yes.
21  Q.   What titles did you hold?
22  A.   I don't recall all the titles.
23  Q.   Do you recall any of the titles?
24  A.   Yes.
25  Q.   What titles do you recall holding at

Page 38

1        WATERHOUSE - 10-19-21
2  those four retail funds before 2021?
3      A.   Principal executive officer.
4      Q.   Were you the principal executive
5  officer of the four retail funds that you have
6  identified?
7      A.   Sorry, could you repeat the
8  question?
9      Q.   Were you the principal executive
10 officer for each of the four retail funds that
11 you have identified?
12     A.   Yes.
13     Q.   When did you become the principal
14 executive -- withdrawn.
15          Can you give me the approximate year
16 that you became the principal executive officer
17 for each of the four retail funds you've
18 identified?
19     A.   I don't recall.
20     Q.   What are your duties and
21 responsibilities as the principal executive
22 officer of these four retail funds?
23     A.   It is to manage the finance and
24 accounting positions.
25     Q.   So at the same time you serve as the

Page 39

1        WATERHOUSE - 10-19-21
2  treasurer of the advisors, you also serve as
3  the principal executive officer of these four
4  retail funds; correct?
5      A.   Yes.
6      Q.   Did you ever hold any title with
7  respect to any other retail fund?
8      A.   Not that I recall.
9      Q.   During the period that you served as
10 Highland's CFO, from time to time Highland
11 loaned money to certain of its officers and
12 employees; correct?
13     A.   Yes.
14     Q.   During the period that you served as
15 Highland's CFO, from time to time Highland
16 loaned money to certain --
17     A.   Let me -- let me retract that,
18 sorry, that -- you asked during the time I was
19 CFO, Highland loaned moneys to employees.  I
20 don't -- I don't recall that during my tenure
21 of CFO.
22     Q.   You have no recollection during the
23 time that you were the CFO of Highland of
24 Highland ever loaning any money to any officer
25 or director of Highland?

Page 40

1        WATERHOUSE - 10-19-21
2      A.   I don't recall during my tenure of
3  Highland or my -- as CFO of Highland -- yeah,
4  if there are any loans as CFO of Highland.
5      Q.   I'm just talking about officers and
6  employees right now.  You have no recollection
7  of Highland ever making a loan to any of its
8  officers or employees during the time that you
9  served as CFO.  Do I have that right?
10          MS. DANDENEAU:  Objection to form.
11     A.   So I thought you were saying
12 officers and employees as CFO, right, so there
13 were -- I mean, okay, yes.
14     Q.   I would ask you to listen carefully
15 to my question.  If I -- if I'm not clear, let
16 me know, but I'm really trying to be as clear
17 as I can.
18     A.   I'm listening as carefully as I can,
19 and you are asking very specific questions in a
20 timeline.  And I'm trying to answer your
21 questions as specifically as I can, and I
22 apologize if -- if I'm going back.  I am -- you
23 are asking very specific questions.  Thank you.
24     Q.   During the period that you served as
25 Highland's CFO, from time to time Highland

Page 41

1        WATERHOUSE - 10-19-21
2  loaned money to certain corporate affiliates;
3  correct?
4          MS. DANDENEAU:  Objection to form.
5      A.   What are corporate affiliates?
6      Q.   How about the ones that are in
7  Highland's audited financial statements under
8  the section entitled Loans to Affiliates.  Why
9  don't we start with those.  Do you have any
10 understanding of what the phrase "affiliates"
11 means?
12          MS. DANDENEAU:  Objection to form.
13     A.   I understand what affiliates are,
14 yet affiliates can have different meanings in
15 different contexts, so...
16     Q.   Why don't you -- why don't you tell
17 me what your understanding of the term
18 "affiliate" is in relation to Highland Capital
19 Management, L.P.
20     A.   Is that a -- it depends on the
21 context.
22     Q.   How about the context of making
23 loans?
24          MS. DANDENEAU:  Objection to form.
25     A.   I didn't make the determination of

Appx. 02059

Page 42

WATERHOUSE - 10-19-21

1
2 who an affiliate was or is at the time those –
3 I didn't – that wasn't my job to make a
4 determination of who an affiliate is.
5    Q.   All right.  So as the CFO of
6 Highland, do you have any ability right now to
7 tell me which companies that were directly or
8 indirectly owned and/or controlled by
9 Mr. Dondero in whole or in part received loans
10 from Highland Capital Management, L.P.?
11        MS. DANDENEAU:  Objection to form.
12        MS. DEITSCH-PEREZ:  Objection, form.
13    A.   Yes.
14    Q.   Okay.  Identify every entity that
15 you can think of that was directly or
16 indirectly owned and/or controlled by
17 Mr. Dondero in whole or in part that received a
18 loan from Highland Capital Management, L.P.
19        MR. RUKAVINA:  Objection, legal
20        conclusion.
21    A.   NexPoint Advisors, Highland Capital
22 Management Fund Advisors, HCM Services,
23 Dugaboy.  Sorry, I don't think – Dugaboy
24 doesn't fit that definition.  You said owned
25 and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1
2 definition –
3    Q.   I said owned and/or controlled.
4    A.   I don't – again, I'm not – I'm not
5 the legal expert.  I don't think it controls –
6 he controls Dugaboy, so again, I'm not the
7 legal person.
8    Q.   I'm not asking you for a legal
9 conclusion, sir.  I'm asking you for your
10 knowledge, okay, as the CFO – the former CFO
11 of Highland Capital Management, other than
12 NexPoint, HCMFA, and HCMF – HCMS, can you
13 think of any other entities that were owned
14 and/or controlled directly or indirectly in
15 whole or in part by Jim Dondero who received a
16 loan from Highland Capital Management, L.P.?
17        MS. DANDENEAU:  Objection to form.
18    A.   HCRE.
19    Q.   Any others?
20    A.   That is – that is all I can think
21 of.
22    Q.   And you're aware that from time to
23 time while you were the CFO, Highland loaned
24 money to Jim Dondero; correct?
25    A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Can we refer to the four
3 entities that you just named and Mr. Dondero as
4 the affiliates?
5    A.   So that would be Jim Dondero,
6 NexPoint Advisors, Highland Capital Management
7 Fund Advisors, and HCRE.
8    Q.   And HCMS?
9    A.   And HCMS, okay.
10    Q.   And can we refer to the loans that
11 were given to each of those affiliates as the
12 affiliate loans?
13    A.   Yes.
14    Q.   And is it fair to say that each of
15 the affiliates were the borrowers under the
16 affiliate loans as we're defining the term?
17        MR. RUKAVINA:  Objection, legal
18        conclusion.
19    A.   The borrowers are whoever were on
20 the notes.  I don't – I don't know.  I'm not
21 the legal person.
22    Q.   But you –
23    A.   I don't know.
24    Q.   You do know, as Highland's former
25 CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1
2 identified tendered notes to Highland; correct?
3        MR. RUKAVINA:  Hey, John, will you
4        just give me a running objection to legal
5        conclusion to HCM –
6        MR. MORRIS:  No.  No, if you want to
7        object –
8        MR. RUKAVINA:  I will object every
9        time.  Object to legal conclusion.
10        MR. MORRIS:  That is fine.
11    A.   Sorry, can you repeat the question?
12    Q.   Are you aware that each of the –
13 that each of the affiliates, as we have defined
14 the term, gave to Highland a promissory note in
15 exchange for the loans?
16        MR. RUKAVINA:  Objection to the
17        extent that calls for a legal conclusion.
18    A.   I don't.
19    Q.   No, you don't know that?
20    A.   No, they didn't – you said they
21 exchanged a promissory note for a loan.  I
22 don't – I don't understand that question, so I
23 said no.
24    Q.   At the time of the bankruptcy
25 filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21
1
2 promissory notes that were signed by each of
3 the affiliates?
4     A. Yes.
5     Q. To the best of your knowledge,
6 during the time that you served as Highland's
7 CFO, did Highland disclose to its outside
8 auditors all of the loans that were made to
9 affiliates?
10     MR. RUKAVINA: Objection, that calls
11 for a legal conclusion.
12     MS. DEITSCH-PEREZ: I also couldn't
13 hear you, John, because there was some
14 garbling on -- on the -- on the call.
15     MR. MORRIS: Folks, I've got to tell
16 you this is not going well, and I'm
17 reserving my right --
18     MS. DANDENEAU: John, it was just
19 the end of that question. It was just the
20 end of that question. I couldn't hear it
21 either. Sorry, if you could repeat it,
22 please.
23     MR. MORRIS: That is less than an
24 hour into this, but folks are trying to run
25 out the clock, and so I'm just going to

Page 47

WATERHOUSE - 10-19-21
1
2 state that now.
3     MS. DANDENEAU: You know, and,
4 Mr. Morris, I really object to that. I
5 mean --
6     MR. MORRIS: Okay.
7     MS. DANDENEAU: -- Mr. Waterhouse
8 just told you he's trying to listen to your
9 questions and answer them carefully, and
10 you have no basis for saying that.
11     MR. MORRIS: Okay.
12     MS. DANDENEAU: This does not --
13 this is not an experienced witness, so he's
14 trying to do the best he can.
15     Q. Mr. Waterhouse, during the time that
16 you served as Highland's CFO, did Highland
17 disclose to its outside auditors all of the
18 loans that it made to each of the affiliates
19 that you have identified?
20     MR. RUKAVINA: Objection, legal
21 conclusion.
22     A. Yes.
23     Q. To the best of your knowledge, while
24 you were Highland's CFO, were all of the
25 affiliate loans described in Highland's audited

Page 48

WATERHOUSE - 10-19-21
1
2 financial statements?
3     MR. RUKAVINA: Objection, legal
4 conclusion.
5     A. When an audit was performed, any
6 loans that were made by Highland to the
7 affiliates were disclosed to auditors.
8     Q. Are you aware of any loan that was
9 made to any affiliate that was not disclosed to
10 the auditors?
11     A. I'm not aware.
12     Q. To the best of your knowledge, did
13 each of the affiliates who were --
14 (inaudible) -- loaned from Highland execute a
15 promissory note in connection with that loan?
16     MR. RUKAVINA: Objection, legal
17 conclusion.
18     A. Sorry, you -- halfway through the
19 question it got muffled.
20     Can you repeat that again?
21     Q. To the best of your knowledge, did
22 every affiliate execute a promissory note in
23 connection with each loan that it obtained from
24 Highland?
25     MR. RUKAVINA: Objection, legal

Page 49

WATERHOUSE - 10-19-21
1
2 conclusion.
3     A. Yes.
4     Q. You are not aware of any loan that
5 any affiliate ever obtained from Highland where
6 the affiliate did not give a promissory note in
7 return; is that fair?
8     A. Yes, I'm not aware.
9     Q. And to the best of your knowledge,
10 did Highland loan to each affiliate an amount
11 of money equal to the principal amount of each
12 promissory note?
13     MR. RUKAVINA: Objection, legal
14 conclusion.
15     A. Yes.
16     Q. During the time that you served as
17 CFO, did Highland ever loan money to
18 Mark Okada?
19     A. I -- I don't recall.
20     Q. Did you ever see any promissory
21 notes executed by Mark Okada?
22     A. I don't recall.
23     Q. Do you know if Highland ever forgave
24 any loan that it ever made to Mr. Okada?
25     A. I don't recall.

Appx. 02061

Page 50

WATERHOUSE - 10-19-21
2   Q.   Do you recall if Mr. Okada paid back
3   all principal and interest due and owing under
4   any loan he obtained from Highland?
5        MS. DEITSCH-PEREZ:  Objection to
6   form.
7        MS. DANDENEAU:  Objection to form.
8   A.   I don't recall.
9   Q.   Do you recall whether -- during your
10  time as CFO, whether Highland ever loaned money
11  to Jim Dondero?
12  A.   Yes.
13  Q.   To the best of your knowledge, did
14  Mr. Dondero sign and deliver to Highland a
15  promissory note in connection with each loan
16  that he obtained from Highland?
17  A.   If you are referring to the
18  promissory notes that, you know, part of
19  Highland's records, yes.
20  Q.   Okay.  You're not aware of any loan
21  that Mr. Dondero took from Highland that wasn't
22  backed up by -- by a promissory note with a
23  face -- with a principal amount equal to the
24  amount of the loan; correct?
25  A.   Am I aware that Jim Dondero took a

Page 51

WATERHOUSE - 10-19-21
2   loan?
3   Q.   Without giving a -- let me ask a
4   better question.  I'm sorry, Mr. Waterhouse.
5        Are you aware of any loan that
6   Mr. Dondero obtained from Highland where he
7   didn't give a promissory note in return?
8   A.   I'm not aware.
9   Q.   During the time that you served as
10  Highland's CFO, did Highland ever forgive any
11  loans, in whole or in part, that it made to
12  Mr. Dondero?
13  A.   Not that I'm aware.
14  Q.   At the time that you served as
15  Highland's CFO, did Highland ever forgive any
16  loan, in whole or in part, that it made to any
17  affiliate as we've defined the term today?
18  A.   Not that I'm aware.
19  Q.   During the time that you served as
20  Highland's CFO, did Highland ever forgive, in
21  whole or in part, any loan that it ever made to
22  any officer or employee?
23  A.   Highland forgave loans to officers
24  and employees.  It may not have been at the
25  time when my title was CFO.

Page 52

WATERHOUSE - 10-19-21
2   Q.   Okay.  And so I appreciate the
3   distinction.
4        Is it fair to say that, to the best
5   of your knowledge, Highland did not forgive a
6   loan that it made to an officer or employee
7   after 2013?
8        MS. DANDENEAU:  Objection to form.
9   A.   I don't recall.
10  Q.   To the best of your knowledge, did
11  Highland disclose to its auditors every
12  instance where it forgave, in whole or in part,
13  a loan that it had made to one of its officers
14  or employees?
15  A.   No.
16  Q.   Can you think of -- can you -- can
17  you identify any loan to an officer or employee
18  that was forgiven by Highland, in whole or in
19  part, that was not disclosed to Highland's
20  outside auditors?
21  A.   Look, I don't recall all of the
22  loans and the loan forgiveness.  I just know as
23  part of the audit process there is a
24  materiality concept.
25       So if there were loans to employees

Page 53

WATERHOUSE - 10-19-21
2   that were of -- you know, that were deemed
3   immaterial, those items may not have been
4   disclosed by the team to the auditors.
5   Q.   I appreciate that.
6        Do you have an understanding as to
7   what the level of materiality was?
8   A.   I don't recall.
9   Q.   As the CFO of Highland, to the best
10  of your knowledge, did Highland disclose to its
11  outside auditors every loan that was forgiven,
12  in whole or in part, that was material as that
13  term was defined by the outside auditors?
14  A.   Yes.
15  Q.   And do you recall where -- do you
16  recall where the definition of materiality can
17  be found for -- for this particular purpose?
18       MS. DANDENEAU:  Objection to form.
19  A.   No.  You -- I don't determine
20  materiality.
21  Q.   Okay.  I'm just asking you if you
22  can help me understand where it is, but I think
23  we will find it in a few minutes.
24       You are aware that Highland has
25  commenced lawsuits against each of the

**Appx. 02062**

1          WATERHOUSE - 10-19-21
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5      A.   Yes.
6      Q.   And are you familiar with the notes
7  that are issue -- at issue in the lawsuits?
8          MS. DANDENEAU:  Objection to form.
9      A.   Generally familiar.
10     Q.   Can we refer to the lawsuits that
11  Highland has commenced against the affiliates
12  collectively as the lawsuits?
13     A.   Yes.  And, again, the affiliates are
14  NexPoint, HCMFA, HCMS, and HCRE.
15     Q.   And Mr. Dondero?
16     A.   Okay.  See, that is a new -- and now
17  Mr. Dondero is included in your affiliate
18  definition.
19     Q.   I just --
20     A.   I thought affiliates -- I thought
21  affiliates were just the four prior entities,
22  so I just want to be clear.
23     Q.   I appreciate that.  So let's --
24  let's keep them separate and let's refer to the
25  four corporate entities as the affiliates, and

1          WATERHOUSE - 10-19-21
2  Mr. Dondero we will call Mr. Dondero.  Okay?
3      A.   Okay.  Thank you.  As you can see,
4  Mr. Morris, there is a lot of entities -- a lot
5  here.  I just want to be clear.
6      Q.   Okay.  Now, the affiliates of
7  Mr. Dondero signed promissory notes that are
8  not subject to the lawsuit.
9          Do you understand that?
10         MS. DANDENEAU:  Objection to form.
11     A.   The affiliates and Mr. Dondero
12  signed --
13     Q.   You know what?  I will skip it.
14  That is okay.  Okay.
15         From time to time while you were
16  Highland's CFO, payments were applied against
17  principal and interests that were due under the
18  notes that were tendered by the affiliates and
19  Mr. Dondero; correct?
20         MR. RUKAVINA:  Objection to the
21     extent that calls for a legal conclusion.
22     A.   Yes.
23     Q.   Did Highland have a process where --
24  whereby payments would be applied against
25  principal and interest against the notes that

1          WATERHOUSE - 10-19-21
2  were given by the affiliates and Mr. Dondero?
3      A.   Yes.
4      Q.   Can you describe the process for me?
5      A.   The process, payment should be
6  applied as laid out in the -- in the promissory
7  note.
8      Q.   From time to time were payments made
9  that were not required under the promissory
10  notes?
11         MS. DANDENEAU:  Objection to form.
12     A.   Yes.
13     Q.   Who was responsible for deciding
14  when and how much the payments would be made
15  with respect to each of the notes that were
16  issued by the affiliates and Mr. Dondero?
17     A.   Who was responsible for deciding how
18  much was paid prior to the due date?
19     Q.   Yes.
20     A.   I don't know.
21     Q.   Did you approve of each payment that
22  was made against principal and interest on the
23  notes that were given by the affiliates and
24  Mr. Dondero?
25         MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21
2      A.   Did I approve the payments?  I
3  approve -- I approve -- if there was cash -- if
4  there was cash being repaid on a note payment,
5  yes, I approved in the general sense of being
6  made aware of the payment and the amount.
7      Q.   And are you the person who
8  authorized Highland's employees to effectuate
9  those payments?
10     A.   Yes.
11     Q.   When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14     A.   I mean, it -- I mean, it -- it
15  depends.
16     Q.   Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22     A.   I can't recall specifically.
23     Q.   Can you identify -- withdrawn.
24         Did Mr. Dondero ever tell you that a
25  payment that was made against principal and

Page 58

1          WATERHOUSE - 10-19-21
2 interest due under one of the notes that was
3 tendered by an affiliate or himself should not
4 have been made?
5     A.   Yes.
6     Q.   Can you identify the payment for me?
7     A.   It would be for -- for NexPoint
8 Advisors.
9     Q.   Okay.  And when did Mr. Dondero tell
10 you that a payment that you had initiated on
11 behalf of NexPoint should not have been made?
12    A.   I wasn't initiating payment.  It was
13 in the context of the -- I think you used this
14 term, "the advisors," so NexPoint Advisors and
15 Highland Capital Management Fund Advisors had
16 overpaid on certain agreements with Highland
17 Capital Management, L.P.  And as a part of that
18 process, the advisors -- what I was told at the
19 time were in talks and negotiations and
20 discussions with Highland Capital Management,
21 L.P., on offsets in relation to those
22 overpayments.
23    Q.   When did this conversation take
24 place?
25         MS. DANDENEAU:  Objection to form.

Page 59

1          WATERHOUSE - 10-19-21
2     A.   I don't recall specifically.
3     Q.   Do you recall what year it was?
4     A.   Yes.
5     Q.   What year did the conversation with
6 Mr. Dondero take place that you just described?
7     A.   2020.
8     Q.   Okay.  Do you remember if it was
9 December 2020?
10    A.   It -- it -- I don't -- I don't
11 recall what month specifically, but it would
12 have been November or December.
13    Q.   And we're talking here about a
14 payment of principal and/or interest that was
15 due -- withdrawn.
16         We're talking here about a payment
17 of principal and interest that was applied
18 against NexPoint's note; correct?
19         MS. DANDENEAU:  Objection to form.
20    A.   I don't recall what that payment
21 consisted of.
22    Q.   Is it possible that the payment you
23 have in mind related to the shared services
24 agreement?
25         MS. DANDENEAU:  Objection to form.

Page 60

1          WATERHOUSE - 10-19-21
2     A.   No.
3     Q.   Are you certain that the payment --
4 that the payment that you have in mind related
5 to the promissory note that NexPoint issued in
6 favor of Highland?
7         MS. DANDENEAU:  Objection to form.
8     A.   Yes.
9     Q.   Okay.  Other than that one payment,
10 can you identify any other instance where
11 Mr. Dondero told you that a payment should not
12 have been applied against principal and
13 interest under any promissory note tendered by
14 any affiliate or Mr. Dondero?
15        MS. DANDENEAU:  Objection to form.
16        MS. DEITSCH-PEREZ:  Objection to
17 form.
18    A.   Not that I recall.
19    Q.   Thank you very much.
20        Do you know if Mr. Dondero approved
21 in advance of each loan made to each affiliate
22 and himself during the time that you were the
23 CFO?
24        MS. DEITSCH-PEREZ:  Object to the
25 form.

Page 61

1          WATERHOUSE - 10-19-21
2     A.   Yes, generally.
3     Q.   Can you identify any loan that was
4 ever made to an affiliate or to Mr. Dondero
5 that Mr. Dondero did not approve of in advance?
6     A.   Other than the ones that are in
7 dispute, I'm not aware.
8     Q.   Do you believe that Mr. Dondero did
9 not approve of each of the loans that are in
10 dispute in advance of the time that the loan
11 was made?
12        MS. DANDENEAU:  Objection to form.
13    A.   Given what is in the dispute, you
14 know, and -- and -- and the way things might --
15 yeah, I mean...
16    Q.   I am not asking about the dispute,
17 and it was probably my mistake to follow you
18 there.
19        Were you aware of every loan made by
20 Highland to each of its affiliates and
21 Mr. Dondero while you were the CFO at the time
22 each loan was made?
23    A.   Was I aware of every loan, yes.
24    Q.   Okay.  And if you put yourself back
25 in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1
2 that were made to one of the affiliates or
3 Mr. Dondero during the time that you were the
4 CFO was made without Mr. Dondero's prior
5 knowledge and approval?
6    A.   Not that I recall.
7    Q.   Thank you.  In fact, do you -- as
8 the CFO, would you have allowed Highland to
9 loan money to an affiliate or to Mr. Dondero
10 without obtaining Mr. Dondero's prior approval?
11        MS. DANDENEAU:  Objection to form.
12    A.   I can't -- there was so many times
13 over the years, I can't speak for every single
14 one, but generally, yes, I -- I spoke to him.
15    Q.   You -- you never -- you never --
16 withdrawn.  I will just take that.
17        Can you recall any payment that was
18 ever made against principal and interest on a
19 note that was issued in favor of Highland by an
20 affiliate or Mr. Dondero that you personally
21 did not know about in advance?
22    A.   There are so many through the years,
23 I don't -- I don't -- I don't recall every
24 single one.
25    Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21

1
2 that was made against principal and interest on
3 any note tendered by any affiliate or
4 Mr. Dondero that you didn't know about in
5 advance?
6    A.   I don't recall.
7    Q.   Other than Mr. Dondero -- withdrawn.
8        Did anybody at Highland have the
9 authority to make a payment against principal
10 and interest due under a loan given to the
11 affiliates and Mr. Dondero without your
12 knowledge and approval?
13        MS. DANDENEAU:  Objection to form.
14    A.   Sorry, there was -- to make a
15 payment on an affiliate loan, what you are
16 saying would it require my knowledge and
17 approval, yes.
18    Q.   Okay.  I appreciate that.  Thank
19 you.
20        Did anybody at Highland have the
21 authority, to the best of your knowledge, to
22 effectuate a loan to an affiliate without
23 Mr. Dondero's prior knowledge and approval?
24        MS. DANDENEAU:  Objection to form.
25    A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21

1
2 generally, yes.
3    Q.   Did you personally communicate with
4 Mr. Dondero to let him know each time a payment
5 of principal or interest was being made against
6 any note that was tendered by an affiliate or
7 Mr. Dondero to Highland?
8    A.   I don't -- are you saying, did I let
9 Mr. Dondero know if a payment was made on any
10 affiliate or loan to Mr. Dondero?  I mean,
11 not -- not every -- no.
12    Q.   Let me ask it this way:  Did you
13 have a practice of informing Mr. Dondero when
14 payments were made against principal and
15 interest on any note that was tendered by an
16 affiliate or Mr. Dondero?
17        MS. DEITSCH-PEREZ:  Objection to
18 form.
19        MS. DANDENEAU:  Objection to form.
20    A.   No, I did not.
21    Q.   Did Mr. Dondero ever tell you that a
22 payment of principal or interest had been made
23 against a note that was tendered by an
24 affiliate or himself that he had been unaware
25 of?

Page 65

WATERHOUSE - 10-19-21

1
2    A.   Not that I recall.
3    Q.   Are you aware that Mr. Dondero and
4 the affiliates -- withdrawn.
5        Are you aware that Mr. Dondero
6 NexPoint, HCRE, and HCMS all contend that they
7 do not have to pay on any of the notes they
8 issued because they are subject to an oral
9 agreement between Mr. Dondero and Nancy
10 Dondero, in her capacity as the trustee of the
11 Dugaboy Investment Trust?
12        MS. DANDENEAU:  Objection to form.
13    A.   I didn't -- I didn't -- I didn't
14 know that it was all notes.
15    Q.   Okay.  Are you -- did you ever learn
16 that there was an oral agreement between Jim
17 Dondero and Nancy Dondero pertaining to any
18 notes issued by any affiliate or Mr. Dondero?
19        MS. DEITSCH-PEREZ:  Object to the
20 form.
21    A.   Yes.
22    Q.   Do you have any understanding as to
23 the terms of that agreement?
24    A.   Yes.
25    Q.   What is your understanding of the

Page 66

1    WATERHOUSE - 10-19-21
2  terms of the agreement?
3       A.   That there were certain milestones
4  that had to be reached.
5       Q.   Do you have any understanding of the
6  terms of the agreement between Mr. Dondero and
7  Nancy Dondero concerning any of the notes
8  issued by the affiliates or Mr. Dondero other
9  than that there have to be milestones reached?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      A.   There are milestones, I found out
13  yesterday, or there was some --
14      MS. DANDENEAU:  Okay.  I'm just
15  going to object to the extent that you
16  learned anything in conversations with
17  counsel, please don't reveal -- that is
18  privileged, and don't reveal any privileged
19  communications.
20      THE WITNESS:  Okay.
21      A.   So I'm not aware of anything else.
22      Q.   Do you know what the milestones
23  were?
24      MS. DANDENEAU:  Objection to form.
25      A.   I don't.

Page 67

1    WATERHOUSE - 10-19-21
2       Q.   Do you know anything about -- do you
3  know what promissory notes the agreement
4  covered?
5       A.   I don't.
6       Q.   Do you know if -- if Jim and Nancy
7  Dondero entered into one agreement or more than
8  one agreement?
9       MS. DEITSCH-PEREZ:  Object to the
10  form.
11      A.   I don't know.
12      Q.   Do you know if the agreement is in
13  writing?
14      A.   I don't know.
15      Q.   How did you learn of the existence
16  of the agreement?
17      MS. DANDENEAU:  Objection to form.
18  Again --
19      A.   I don't -- I don't recall who told
20  me.
21      Q.   You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24      MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 68

1    WATERHOUSE - 10-19-21
2       A.   I don't recall.
3       Q.   Do you recall how you learned of the
4  agreement?
5       Was it in a meeting?  Was it in a
6  phone call?  Was it in an email?
7       A.   I don't recall.
8       Q.   Do you recall when you learned of
9  the agreement?
10      A.   Not specifically.
11      Q.   Do you recall what year you learned
12  of the agreement?
13      A.   In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16      Q.   All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20      Do you understand my question now?
21  Should I ask my question again?
22      A.   Yeah, sure.  Go ahead.
23      Q.   I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into

Page 69

1    WATERHOUSE - 10-19-21
2  where you understood that certain milestones
3  had to be reached.  Okay?
4       A.   Uh-huh.
5       MS. DANDENEAU:  Objection.
6       MS. DEITSCH-PEREZ:  Object to the
7  form.
8       MR. MORRIS:  Just defining a term,
9  what is the objection?
10      MS. DEITSCH-PEREZ:  The objection --
11      MR. MORRIS:  I will move on.  I will
12  move on.
13      MS. DEITSCH-PEREZ:  John --
14      Q.   Sir, are you okay with that
15  definition of agreement?
16      A.   Okay.
17      Q.   Okay.  So you don't recall who --
18  who informed you of the existence of the
19  agreement; is that right?
20      A.   I don't recall.
21      Q.   You don't recall who told you the
22  terms of the agreement.
23      Do I have that right?
24      A.   Correct.
25      Q.   And you don't recall if you learned

**Appx. 02066**

Page 70

WATERHOUSE - 10-19-21

1
2 about the agreement in a meeting, through an
3 email, or through a phone call.
4        Do I have that right?
5    A.   I don't recall.
6    Q.   Can you tell me when you learned of
7 the agreement?
8    A.   I don't -- I don't -- I don't
9 remember specifically.
10   Q.   Can you tell me if you learned of
11 the agreement before or after the petition
12 date?
13   A.   It would have been -- it would have
14 been after.
15   Q.   Can you tell me if you learned of
16 the agreement before or after January 9th,
17 2020?
18   A.   It would have been after.
19   Q.   Can you tell me if you learned of
20 the agreement before or after you left Highland
21 Capital Management in February of 2021?
22   A.   I don't -- I don't -- I don't know.
23   Q.   It is possible that you learned of
24 it while you were a Highland employee.
25        Do I have that right?

Page 71

WATERHOUSE - 10-19-21

1
2    A.   I don't remember the -- I mean, it
3 was sometime in 2021. I don't remember when.
4    Q.   All right. So to the best of your
5 recollection, it was in 2021 but you don't
6 recall if it was before or after you ceased to
7 be a Highland employee.
8        Do I have that right?
9    A.   Yeah, I mean, it was -- it was
10 likely after I was -- after I left Highland
11 because, if I put myself back into the last
12 days of -- of 2021, it was -- you know, the
13 communications with Mr. Dondero were -- were --
14 were -- there weren't as many communications
15 because of the circumstances.
16   Q.   And so based on that you believe
17 that it is most likely that you learned of this
18 agreement sometime after you left Highland
19 employment?
20   A.   I wouldn't use the term "most
21 likely." I don't recall specifically. I don't
22 recall.
23   Q.   Do you recall ever telling Jim Seery
24 about this agreement?
25   A.   No, I don't -- I didn't tell

Page 72

WATERHOUSE - 10-19-21

1
2 Jim Seery.
3    Q.   Did you tell anybody at DSI about
4 this agreement?
5    A.   No.
6    Q.   Did you tell any of Highland's
7 independent directors about this agreement?
8    A.   No.
9    Q.   Did you tell anybody at Pachulski
10 Stang Ziehl & Jones about this agreement?
11   A.   No.
12   Q.   Did you tell any employee of
13 Highland about this agreement?
14   A.   No.
15        MS. DANDENEAU: Mr. Morris, it has
16 been an hour and a half. Is this a good
17 time for a break?
18        MR. MORRIS: Sure.
19   Q.   Mr. Waterhouse, I will just remind
20 you that during the break please don't speak
21 with anybody about the deposition, the
22 substance of your testimony or anything else
23 concerning the deposition. Okay?
24   A.   Yes.
25        MR. MORRIS: So it is 11:02. We're

Page 73

WATERHOUSE - 10-19-21

1
2 at 11:02 your time. Let's come back, I
3 guess, at 15 -- at 11:15 your time.
4        VIDEOGRAPHER: We're going off the
5 record at 11:02 a.m.
6 (Recess taken 11:02 a.m. to 11:20 a.m.)
7        VIDEOGRAPHER: We are back on the
8 record at 11:20 a.m.
9    Q.   Mr. Waterhouse, did you speak with
10 anybody during the break about this deposition?
11   A.   No.
12        MS. DANDENEAU: Other than -- other
13 than his counsel.
14   Q.   Did you speak to your counsel about
15 the substance of your deposition today?
16   A.   No, I didn't bring it up.
17   Q.   I didn't ask you if you brought it
18 up. I asked you if you had any conversation
19 with your lawyer about the substance of your
20 deposition.
21        MS. DANDENEAU: Yes, he did.
22   Q.   Can you tell me what the -- you
23 discussed?
24        MS. DANDENEAU: No, I object to
25 that. He's not going to answer. That is a

Page 74

WATERHOUSE - 10-19-21

1 privileged conversation.
2     MR. MORRIS: So I just want to make
3 sure that I understand. During the break
4 you spoke with your client about the
5 substance of this deposition; is that
6 right?
7     MS. DANDENEAU: Yes, John.
8     MR. MORRIS: And you refuse – you
9 refuse to let your client tell me what was
10 discussed; is that right?
11     MS. DANDENEAU: That's correct.
12     MR. MORRIS: You know, I had given
13 the instruction prior to the break not to
14 speak with counsel. I would have
15 appreciated –
16     MS. DANDENEAU: No, you didn't –
17 actually, that is not true, Mr. Morris.
18 You said not to speak with anyone. We
19 never have interpreted that to mean
20 conversations with counsel. That's never
21 been – I have never, ever heard that
22 instruction.
23     MR. MORRIS: Okay. We will – we
24 will – we will deal with it when and if we
25

Page 75

WATERHOUSE - 10-19-21

1 have to.
2     Q.    Mr. Waterhouse, after learning about
3 the agreement, did you ask anybody if the
4 agreement was reflected in a writing?
5     MS. DANDENEAU: Objection to form.
6     A.    No.
7     Q.    Did you ask anybody if the terms of
8 the agreement were memorialized anywhere?
9     MS. DANDENEAU: Objection to form.
10     MR. MORRIS: What is the –
11     A.    No.
12     MS. DANDENEAU: Well, because you
13 keep talking about this agreement and I –
14 I – I think, Mr. Morris, that is really
15 not clear what you mean by "the agreement."
16 And maybe you can just go back and restate
17 what that is.
18     MR. MORRIS: Okay. Your client has
19 agreed with me twice on the definition, but
20 I will try one more time.
21     Q.    Mr. Waterhouse, do you understand
22 that when I use the term "agreement," I'm
23 referring to the agreement between Jim and
24 Nancy Dondero concerning certain promissory
25

Page 76

WATERHOUSE - 10-19-21

1 notes where you learned that one of the terms
2 of the agreement was milestones reached?
3     A.    Okay.
4     Q.    And did you understand that that was
5 the – the agreement that we were referring to
6 every time we used the word "agreement" in this
7 deposition?
8     A.    I don't know anything about this
9 agreement. So, look, I do – it – I don't
10 know whether –
11     Q.    Let's – let's try this again.
12     A.    Yeah. Look, I don't know what this
13 agreement relates.
14     MS. DEITSCH-PEREZ: John, John –
15     Q.    Let me try –
16     MS. DEITSCH-PEREZ: John, please let
17 the witness finish.
18     MR. MORRIS: Please stop. Please
19 stop. Please stop talking.
20     MS. DEITSCH-PEREZ: No, you stop.
21 Let the witness –
22     MR. MORRIS: Stop talking.
23     MS. DEITSCH-PEREZ: – finish – you
24 interrupted him.
25

Page 77

WATERHOUSE - 10-19-21

1     MR. MORRIS: You know what, you
2 guys, this is really wrong. It is really,
3 really wrong. Okay?
4     I had the witness agree not once,
5 but twice to the definition of agreement.
6 Okay? I'm going to try and do it a third
7 time.
8     MS. DANDENEAU: No, but, please,
9 John, really –
10     MR. MORRIS: No, please stop
11 talking. Please. It is my deposition.
12 Object to questions.
13     MS. DANDENEAU: No, but also you
14 instructed him that – that if you were
15 going – if you were interrupting him, that
16 he should remind you that you're
17 interrupting him and – and –
18     MR. MORRIS: Let him do that. Let
19 him do that.
20     MS. DANDENEAU: Okay. Well, you –
21     MR. MORRIS: Please stop talking.
22     A.    Okay. I don't know any of the
23 details of these agreements. I don't know
24 anything about them. I heard – someone – I

1      WATERHOUSE - 10-19-21
2  don't know who, I don't know when, as you
3  asked, sometime in '21, someone told me about
4  this -- or I don't honestly know -- I don't
5  even recall exactly how I was made aware of
6  this, but I was. I don't know -- I don't know
7  any of these details, and I'm getting -- again,
8  there is, you know, I -- I -- I had a passing
9  conversation with -- with Jim at some point
10  on -- on some -- on the executive comp, and I'm
11  getting confused of what is what, because
12  again, I don't know any of these details.
13      Q.   Okay. Let me try again,
14  Mr. Waterhouse, and I apologize.
15          Are you aware of any agreement
16  between Jim Dondero and Nancy Dondero
17  concerning any promissory note that was given
18  to Highland by any affiliate or Mr. Dondero?
19      MS. DEITSCH-PEREZ:  Object to the
20      form.
21      A.   I've heard of an agreement. That
22  is -- that is -- I mean, if you are using aware
23  as heard, sure.
24      Q.   And you understand that one of the
25  terms of the agreement is that it was based on

1      WATERHOUSE - 10-19-21
2  milestones that had to be reached; is that
3  right?
4      MS. DANDENEAU:  Objection to form.
5      A.   That was one of the words that was
6  used when I heard about it, yes.
7      Q.   And when you heard about this
8  agreement that had a term in it concerning
9  milestones reached, did you ask the person who
10  was telling you about the agreement whether or
11  not it was in writing?
12      A.   I did not.
13      Q.   Did you ask any questions at all?
14      MS. DANDENEAU:  Objection to form.
15      A.   Not that I recall.
16      Q.   But do you understand that going
17  forward, we're going to refer to the agreement
18  as the agreement that you just described that
19  you were --
20      MS. DANDENEAU:  Object to the form.
21      A.   Yes.
22      Q.   Okay. You don't have any personal
23  knowledge concerning the terms of the
24  agreement; correct?
25      MS. DEITSCH-PEREZ:  Object to the

1      WATERHOUSE - 10-19-21
2  form.
3      Q.   You can answer.
4      A.   I don't -- I heard about the
5  agreement. I don't know anything -- I heard
6  there was an agreement. That is -- again, as I
7  testified before -- I said before, heard about
8  it, don't know the details. I believe it was
9  sometime this year.
10      Q.   Do you have any personal knowledge
11  about the terms of the agreement, sir?
12      MS. DANDENEAU:  Objection to form.
13      A.   Other than what I have previously
14  discussed, I don't -- I don't know.
15      Q.   Did -- did Mr. Dondero tell you
16  about the existence of the agreement?
17      A.   I don't recall.
18      Q.   Do you recall the source of your
19  information when you learned about the
20  agreement?
21      A.   No, I don't -- I don't recall. I
22  don't remember. I just -- I heard about it
23  generally. I don't remember -- I don't
24  remember who, how, if, how. I don't remember.
25      Q.   You know, Mr. Waterhouse, I just

1      WATERHOUSE - 10-19-21
2  want to be clear that I never would have asked
3  you to appear at this deposition if your name
4  hadn't been included in responses to discovery
5  as to somebody with knowledge about the -- who
6  was told about the existence of the agreement.
7          That is what prompted me do this,
8  and I really do feel compelled to tell you that
9  I otherwise would never have called you as a
10  witness. So I regret that you're being put
11  through this today. I had no intention of
12  burdening you or taking your time, but that is
13  the reason that we issued the subpoena is
14  because certain of the defendants identified
15  you as somebody --
16      MS. DEITSCH-PEREZ:  Mr. Morris, you
17  are here to ask questions, not to have --
18      MR. MORRIS:  I feel badly for the
19  guy. I really do.
20      MS. DEITSCH-PEREZ:  I'm sure you do.
21      MR. MORRIS:  I do. Stop.
22      MS. DEITSCH-PEREZ:  You stop.
23      MR. MORRIS:  I'm allowed.
24      MS. DEITSCH-PEREZ:  No, you're not
25  allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Well, I hope that you
3  appreciate what I'm saying here,
4  Mr. Waterhouse.
5      MS. DANDENEAU:  All right.  Let's go
6  ahead and ask questions, and again, you're
7  entitled to probe his -- his knowledge
8  of -- whatever knowledge he has about
9  this -- this agreement and --
10     MR. MORRIS:  That is what I'm doing.
11     MS. DANDENEAU:  -- he will answer
12  the questions to the best that he can.
13     MR. MORRIS:  That is what I'm doing.
14  Q.   Mr. Waterhouse, I take it you do not
15  know which promissory notes issued by which
16  affiliates or Mr. Dondero are the subject of
17  this agreement; do I have that right?
18  A.  Yes, I don't -- I don't know.
19  Q.   Do you know of any way to determine
20  which promissory notes issued by the affiliates
21  and Mr. Dondero are the subject of this
22  agreement other than asking Jim or Nancy
23  Dondero?
24     MS. DANDENEAU:  Objection to form.
25  A.  I don't know.

Page 83

WATERHOUSE - 10-19-21

1
2  Q.  Did you ever make --
3  A.  I don't know anything about these
4  agreements.
5  Q.  Did you ever make any effort to
6  determine which promissory notes are subject to
7  this agreement?
8  A.  No.
9  Q.  Did you ever ask anybody which
10  promissory notes are subject to this agreement?
11  A.  No.
12  Q.  Do you know if there is a list
13  anywhere of the promissory notes that are
14  subject to this agreement?
15  A.  I'm not aware.
16  Q.  Have you ever seen the terms of the
17  agreement written down anywhere?
18  A.  No.
19  Q.  Have you ever asked anybody whether
20  the terms of the agreement were written down
21  anywhere?
22  A.  I have not.
23  Q.  Did learning about the agreement
24  cause you to do anything in response?
25     MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21

1
2  A.  No.
3  Q.  Did anybody ever describe to you the
4  nature of the milestones that you referred to
5  earlier?
6  A.  No, I don't -- I don't have any
7  details of this.
8  Q.  That is fine.
9      PricewaterhouseCoopers served as
10  Highland's outside auditors prior to the
11  petition date; correct?
12  A.  Yes.
13  Q.  You refer to PricewaterhouseCoopers
14  as PwC?
15  A.  Yes.
16  Q.  PricewaterhouseCoopers audited
17  Highland's financial statements on an annual
18  basis; correct?
19  A.  During my -- during my time as -- as
20  CFO, yes, PricewaterhouseCoopers was the
21  auditor.
22  Q.  Do you know why Highland had its
23  annual financial statements audited each year?
24  A.  Generally.
25  Q.  Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1
2  as to the reason why Highland had its annual
3  financial statements audited each year.
4  A.  From -- from time to time, they were
5  used -- or asked for, as part of diligence or
6  transactions or -- or things of that nature.
7  Q.  And were they given to third parties
8  for purposes of diligence or transactions from
9  time to time?
10  A.  As far as I'm aware, yes.
11  Q.  And was it your understanding as the
12  CFO that the third parties who received the
13  financial statements in diligence or
14  transactions was going to rely on those?
15     MS. DANDENEAU:  Objection to form.
16  A.  I don't know -- I don't know gen --
17  I don't know specifically what they were going
18  to rely on.  You know, we would get requests
19  for audited financial statements.  I don't know
20  what they were relying on.
21  Q.  And --
22  A.  You would have to ask them.
23  Q.  Did you personally play a role in
24  PwC's annual audit and the conduct of the
25  audit?

1    WATERHOUSE - 10-19-21
2        MS. DANDENEAU: Objection to form.
3    A. During my tenure as CFO, I played a
4 very minimal role.
5    Q. What was the minimal role that you
6 played?
7    A. You know, again, it was -- it was to
8 check in with the team, to make sure that, you
9 know, audit -- the deadlines were being hit,
10 information was being presented to the auditors
11 in a -- in a timely fashion, but, you know,
12 other than that, it was a very capable team
13 that are still current employees of Highland
14 and, you know, they -- they conducted 99
15 percent of -- look, I don't want to give
16 percentages. I mean, this is -- but I -- I --
17 I played a minimal role towards the end.
18        Before during my earlier years as
19 CFO, I did more, and then as time went on, I
20 did less in it.
21    Q. Okay. Was there a person at
22 Highland who was responsible for overseeing
23 Highland's participation in PwC's audit during
24 the time that you were the CFO?
25    A. Yeah. I mean, there was -- there

1    WATERHOUSE - 10-19-21
2 was a -- there was a point -- it varies. It
3 varies by year, in function, in time and, you
4 know, depending on the request, but yes, I
5 mean, there is -- there is -- there is
6 generally a point person of communication.
7    Q. And who was the point person from
8 2016 until the time you left Highland?
9    A. I don't -- I don't know
10 specifically, but it would have been, you
11 know -- you know, someone on the corporate
12 accounting team.
13    Q. And was there a head of the
14 corporate accounting team?
15    A. Yes, so -- yes.
16    Q. Who was the head of corporate
17 accounting for the five years prior to the time
18 you left Highland?
19    A. I don't -- if you're asking from
20 2016 on, I don't -- it was Dave Klos, but,
21 again, there was -- there was changes to the
22 team and the reporting structure. I don't
23 remember exactly when that happened during --
24 you know, over the last -- since 2016.
25    Q. Did the folks who participated and

1    WATERHOUSE - 10-19-21
2 ran the audit all report to you, directly or
3 indirectly?
4    A. Yes.
5    Q. And did you have any responsibility
6 for making sure that the audit report was
7 accurate before it was finalized?
8    A. Yeah. I mean, you know, that --
9 that is -- my responsibility to the auditors
10 was -- again, is -- and the CFO is to -- we are
11 providing accurate financial statements; right?
12        And -- and -- and as part of any
13 audit, we disclose all relevant information as
14 part of any audit.
15    Q. Okay. And as the CFO, did you take
16 steps to make sure that the audit report was
17 accurate?
18    A. I mean, I would say in a general
19 sense, yes. But, again, I mean, I had a
20 very -- I had a very capable and competent
21 team. I wasn't managing them.
22        You know, part of what I do is I let
23 the team -- I want managers to grow. I want
24 managers to have rope. And that is -- you
25 know, I'm not a stand-behind-you type of guy.

1    WATERHOUSE - 10-19-21
2 If you -- if you talk to my team members, I'm
3 not micromanaging people. I want people to
4 learn and grow in their function so they can go
5 on and do bigger and better things with their
6 careers.
7        And so, yes, generally I was
8 responsible for it, but I wanted the team to
9 learn and grow and be responsible for the bulk
10 of the audit.
11    Q. Did you personally review each audit
12 report before it was finalized to satisfy
13 yourself that it was accurate?
14    A. I don't -- I don't recall, you know,
15 for every single -- we're talking 2016, there
16 would have been three years, 2016 to '17, '18.
17 I don't -- we're -- we're going back
18 five years-plus. I don't -- you know, I don't
19 recall.
20    Q. Did you have a practice that you
21 employed to make sure that you were satisfied
22 that Highland's audit reports were true and
23 accurate to the best of your knowledge?
24    A. I mean, our -- the practice was set
25 up with our -- the -- the practice to put

Page 90

1          WATERHOUSE - 10-19-21
2 together accurate audited or accurate financial
3 statements is to your control environment.
4          So, you know, the – so the practice
5 was to maintain a stable control environment
6 which then the output is – is accurate
7 financial statements.
8          So – so, you know, if I was
9 comfortable that the control environment was
10 operating, then, you know, that would dictate
11 how I would – you know, what I might or might
12 not do in a given year.
13     Q.    Okay.  Do you recall ever being
14 uncomfortable with the control environment
15 during the period that you served as CFO?
16     A.    Yeah.  I mean, look, yes, there are
17 times – you know, nothing is perfect.  So
18 there were – there were times when, yes, you
19 know – there are times when I learned I was
20 uncomfortable with the control environment, and
21 that is part of the management of the process
22 and having, you know – and – and working
23 through whatever obstacles present themselves.
24     Q.    Okay.  Were you ever uncomfortable
25 with the control process as it related to

Page 91

1          WATERHOUSE - 10-19-21
2 reporting and disclosures of loans to
3 affiliates and Mr. Dondero?
4          MS. DANDENEAU:  Objection to form.
5     A.    I don't – I don't recall –
6     Q.    So you don't recall –
7     A.    – the –
8          MS. DANDENEAU:  Mr. Morris –
9     A.    I don't recall being uncomfortable.
10 But, again, we're going back several years.  I
11 don't – you know, the practice in an audit is
12 to disclose all information to the auditors.
13 And I don't – I don't recall.
14     Q.    As part of the process of the audit,
15 did you sign what is sometimes referred to as a
16 management representation letter?
17     A.    Yes.
18          MR. MORRIS:  Can we put up on the
19 screen a document that we have premarked as
20 Exhibit 33.
21          (Exhibit 33 marked.)
22          MS. DANDENEAU:  Mr. Morris, that is
23 not in the binder; correct?
24          MR. MORRIS:  Correct.
25     Q.    So you will see, Mr. Waterhouse,

Page 92

1          WATERHOUSE - 10-19-21
2 this is a letter dated June 3rd.  And if we
3 could go to the signature page.
4          And do you see that you and
5 Mr. Dondero signed this document?
6     A.    Yes.
7     Q.    That is your signature; right?
8     A.    Yes.
9          MR. MORRIS:  Okay.  Can you go back
10 to the top.
11          MS. DANDENEAU:  Mr. Morris, can you
12 have somebody post this in the chat so that
13 we have can have a copy of this, please.
14          MR. MORRIS:  Yeah, sure.  Asia, can
15 you do that, please.
16     Q.    Okay.  Do you see at the bottom of
17 the second paragraph there is a reference to
18 materiality?
19     A.    Yes.
20     Q.    Okay.  It says, Materiality used for
21 purposes of these representations is
22 $1.7 million.
23          Do you see that?
24     A.    I do.
25     Q.    And did PwC set that level of

Page 93

1          WATERHOUSE - 10-19-21
2 materiality?
3     A.    Yes.
4     Q.    And for purposes of the audit, did
5 PwC set the level of materiality each year?
6     A.    Yes.
7     Q.    Did that number change over time?
8     A.    I'm not aware of what materiality is
9 every single year, so – but, you know, this
10 number would likely fluctuate.
11     Q.    Okay.  I'm going to go back to a
12 question I asked you earlier today.  And that
13 is in connection – this letter is issued in
14 connection with the audit for the period ending
15 12/31/2018; correct?
16     A.    Yes.
17     Q.    Okay.  And is it fair to say that if
18 any – actually, withdrawn.  I'm going to take
19 it outside of this.
20          If Highland ever forgave the loan to
21 any affiliate or any of its officers or
22 employees, in whole or in part, to the best of
23 your knowledge, would that forgiveness have
24 been disclosed in the audited financial
25 statements if it exceeded the level of

1          WATERHOUSE - 10-19-21
2  materiality that PwC established?
3          MS. DANDENEAU:  Objection to form.
4     A.   So, again, during my tenure as CFO,
5  and -- Highland -- it was -- it is required to
6  disclose any affiliate loans that are in excess
7  of materiality.
8          Now, the forgiveness of those loans
9  may or may not -- I mean, since materiality
10 fluctuates every year, a -- you know, if a loan
11 was forgiven, it may or may not, you know --
12 and, look, I may want to consult the guidance
13 around this.
14         It is not something we do -- you
15 know, it is not -- you know, GAAP can be and
16 disclosures can be very specialized so, again,
17 we want to consult the guidance.  But we would
18 see if and what would need to be disclosed if
19 it were deemed immaterial.
20    Q.   Did you and Mr. Dondero sign
21 management representation letters of this type
22 in each year in which you served as Highland's
23 CFO?
24    A.   I -- I -- I will speak for myself.
25 I signed them.  There may have been others that

1          WATERHOUSE - 10-19-21
2  signed as well.  I don't -- I don't recall.
3     Q.   But to the best of your knowledge,
4  you, personally, signed a management
5  representation letter in connection with
6  Highland's audit each year that you served as
7  the CFO; correct?
8     A.   I would say generally speaking,
9  Mr. Morris.  I don't recall for every single
10 year, you know, generally, but I would want to
11 refer to all the rep letters and see who signed
12 them.
13    Q.   Do you recall Highland having its
14 financial statements audited in any year during
15 the period that you were a CFO where you didn't
16 sign the management representation letter?
17    A.   I don't recall.  But, John, we're
18 going back five, six, seven, eight, nine,
19 decade.  I don't -- I don't remember.
20    Q.   I don't want to go back that many
21 decades, but I'm just asking you if you recall
22 that there was you didn't sign it?
23    A.   I -- I -- I don't, but my memory
24 is -- again, I -- I -- I can't tell you what I
25 did in 2012.  I mean, I think generally, yes,

1          WATERHOUSE - 10-19-21
2  but I don't -- I don't know for sure, and I
3  would want to rely on the document.
4     Q.   Let me ask the question a little bit
5  differently then.
6          Do you have any reason to believe
7  that Highland had its annual financial audit
8  and you did not sign a management
9  representation letter in connection with that
10 audit?
11         MS. DANDENEAU:  Objection to form.
12    A.   I don't believe it would, but,
13 again, I would want to -- I don't recall and I
14 would want to confirm it to -- to make, you
15 know, an affirmative -- to give an affirmative
16 answer.
17    Q.   Do you know whether PwC required
18 management to sign management representation
19 letters?
20         MS. DANDENEAU:  Objection to form.
21    A.   Yes.  I mean, it -- management
22 representation letters are signed by
23 management.
24    Q.   Okay.  And do you know -- do you
25 have any understanding as to why PwC requires

1          WATERHOUSE - 10-19-21
2  management to sign management representation
3  letters?
4          MS. DEITSCH-PEREZ:  Object to the
5  form.
6     A.   I don't know why PwC's -- what PwC's
7  specific practice is.  I know generally what
8  management representation letters are.
9     Q.   Okay.  Do you personally -- I'm not
10 asking about PwC.  I'm asking for you -- I'm
11 asking about you, do you have an understanding
12 as to why the auditor asks for management
13 representation letters?
14    A.   Okay.  So you're asking me in my
15 personal capacity, yes, I have a general
16 understanding of why.
17    Q.   Can you give me the general
18 understanding that you have as to why
19 management representation letters are required?
20    A.   They are -- they are required to --
21 they are -- they are one of the items required
22 in an audit to help verify completeness.
23    Q.   Do you have any -- any other
24 understanding as to why management
25 representation letters are required?

Page 98

WATERHOUSE - 10-19-21

1    A.   That is -- that is -- other than
2  what I said, it is -- it is -- it is required
3  so -- to ensure that the -- you know, there
4  is -- there is completeness in what is being
5  audited.
6    Q.   Did you -- did you have a practice
7  whereby you and Mr. Dondero conferred about the
8  management representation letters before you
9  signed them?
10    A.   No.
11    Q.   Did you have a practice --
12  withdrawn.
13    Do you see just the next sentence
14  after the materiality, there is a sentence that
15  states:  We confirm, to the best of our
16  knowledge and belief, as of June 3rd, 2019, the
17  date of your report, the following
18  representations made to you during your audit.
19    Do you see that sentence?
20    A.   Yes.
21    Q.   Okay.  Did you understand when you
22  signed this letter that you were confirming the
23  representations that followed?
24    A.   When I signed this management
25

Page 99

WATERHOUSE - 10-19-21

1  letter -- representation letter, yes.
2    Q.   Okay.  Did you discuss this letter
3  with Mr. Dondero before you signed it?
4    A.   I don't recall.
5    Q.   Do you recall if Mr. Dondero asked
6  you any questions before he signed the letter?
7    A.   I don't recall.
8    Q.   Do you recall if you asked
9  Mr. Dondero any questions before you signed
10  this letter?
11    A.   I don't recall.
12    Q.   Is it fair to say that Mr. Dondero
13  did not disclose to you the existence of the
14  agreement that we have -- as we've defined that
15  term prior to the time you signed this letter?
16    MS. DANDENEAU:  Objection to form.
17    A.   I don't think I understand the
18  question.  So, again, you are saying, did
19  Mr. Dondero not disclose to me the existence of
20  this letter?
21    Q.   No, I apologize.
22    Did Mr. Dondero disclose to you the
23  existence of the agreement prior to the time
24  you signed this letter on June 3rd, 2019?
25

Page 100

WATERHOUSE - 10-19-21

1    A.   The agreement -- the agreement that
2  we talked about earlier?
3    Q.   Correct.
4    A.   Look, as I said earlier, the first
5  time I heard of this agreement was sometime
6  this year.
7    Q.   Okay.  Can we turn -- let's just
8  look at a couple of items on the list.  If we
9  can go to page 33416.  Do you see in Number 35
10  it talks about the proper recording or
11  disclosure in the financial statements of ND
12  relationships and transactions with related
13  parties.
14    Do you see that?
15    A.   I do.
16    Q.   As the CFO, do you have any
17  understanding as to whether Dugaboy is a
18  related party?
19    A.   I don't recall.
20    Q.   Do you know whether any of the
21  affiliates are related parties?
22    A.   If -- if it was NexPoint, HCMFA,
23  HCMS, HCRE, yeah, if -- if that is the
24  affiliate definition, and there.  In ASC 850 --
25

Page 101

WATERHOUSE - 10-19-21

1  again, I mean, I haven't looked at ASC 850 in
2  quite some time, but, you know, if -- if there
3  is a control language, you know, ASC 850, would
4  that -- that section in GAAP would -- would
5  pick up and define what are related parties.
6    So, you know, like I said, if -- one
7  of the four entities I just described, if -- if
8  they are in that control definition of ASC 850,
9  they would be picked up in 35D.
10    Q.   Do you -- do you have any reason to
11  believe that they would be picked up in that
12  definition, based on your knowledge and
13  experience?
14    A.   I -- I believe that entities
15  controlled under GAAP are -- are affiliates.
16    Q.   Okay.  Would Mr. Dondero also
17  qualify as a related party for purposes of
18  Section 35D, to the best of your knowledge?
19    A.   Yeah, I don't -- I don't know.  I
20  would think -- I would have to read the code
21  section to see if someone personally -- is it
22  talking about related parties.  So, look, if
23  your own in control, yeah, I mean, I would have
24  to read the section.
25

Appx. 02074

Page 102

WATERHOUSE - 10-19-21

1
2    Q.    To the best of your knowledge, was
3    the existence of the agreement ever disclosed
4    to PwC?
5    A.    I'm not – I'm not aware.
6    Q.    Do you recall if the agreement was
7    ever disclosed in Highland's audited financial
8    statements?
9    A.    I don't – I don't remember if it
10   was in every Highland's audited financial
11   statements during my tenure. We would have to
12   read the financial statements to see what was
13   disclosed, but I'm not – I mean, as I sit here
14   today, I'm not aware.
15   Q.    That is all I'm asking for.
16   A.    I'm not aware.
17   Q.    Can we go to the next page, please,
18   and look at 36. 36 says, we have disclosed to
19   you the identity of the partnership's related
20   party relationships and all the related party
21   relationships and transactions of which we are
22   aware.
23        Do you see that?
24   A.    Yes.
25   Q.    To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

1
2    June 3rd, 2019, did Highland disclose to PwC
3    the identity of the partnership's related
4    parties and all the related party relationships
5    and transactions of which it was aware?
6    A.    I mean, I can speak for myself as
7    signer of this representation letter. I
8    disclosed what – what, you know, what –
9    what – what I knew. Sorry, look, yes, so I –
10   I disclosed what I knew.
11   Q.    Okay. Can we go to page 419. Do
12   you see at the end there is a reference to
13   events that occurred since the end of the
14   fiscal year and the date of the letter?
15   A.    Yes.
16   Q.    And were you aware of that – of
17   that provision of the management representation
18   letter before you signed the document?
19   A.    Yes.
20   Q.    Do you have an understanding as to
21   why PwC asked for that confirmation of that
22   particular part of the management
23   representation letter?
24   A.    It is – it is – it is just – it
25   is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

1
2    Q.    And do you understand – do you have
3    an understanding that PwC wanted to know that
4    as of the date of the audit whether any
5    material changes had occurred since the end of
6    the fiscal year, using the definition of
7    materiality that is in this particular
8    management representation letter?
9    A.    It – it is – it is – it is a –
10   it is as described. It is just a poorly worded
11   question, so it is hard for me to say yes.
12   Q.    If I asked you this, I apologize,
13   but did you ever learn when the agreement was
14   entered into?
15   A.    I don't – I don't – like I said
16   before, I don't know or have any details of the
17   agreement.
18   Q.    Okay. Did you ever ask anybody when
19   the agreement was entered into?
20   A.    I did not.
21   Q.    Let's look at the audited financial
22   statements. We will put up on the screen a
23   document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU: And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

1
2    Canty could please put that in the chat
3    room, that would be great.
4        MR. MORRIS: I will assure you we
5    will put every document in the chat room.
6    Q.    Now, I'm just going to ask you
7    questions that are related to the provisions of
8    this report that concern the affiliate loans,
9    but again, Mr. Waterhouse, if there is any part
10   of the document that you need to see or that
11   you think you might need to see in order to
12   refresh your recollection to answer any of my
13   questions, will you let me know that?
14   A.    Yes.
15   Q.    Because this is a pretty lengthy
16   document, but do you see that the cover page
17   here is the Highland consolidated financial
18   statements for the period ending December 31st,
19   2018?
20   A.    Yes.
21   Q.    If we can go to – I think it is the
22   next one, looking for PwC's signature line.
23        MS. CANTY: I'm sorry, John, did you
24   say something?
25        MR. MORRIS: Yes, can we turn the

Appx. 02075

Page 106

1        WATERHOUSE - 10-19-21
2    page. I think it is 215. Yes, stop right
3    there, just above -- I'm sorry, I want to
4    see just the date of the report.
5        Q.  Okay. Do you see at the bottom of
6    that page there, Mr. Waterhouse,
7    PricewaterhouseCoopers has signed this audit
8    report?
9        A.  Yes, I see their signature.
10       Q.  Okay. And it is the dated same day
11   as your management representation letter; is
12   that right?
13       A.  It is -- yes, it is the same day.
14       Q.  Was that the practice to sign the
15   management representation letter on the same
16   day that the audit report was signed?
17       A.  Yes, that is typical in every audit.
18       Q.  Can we just scroll down to the
19   balance sheet on the next page.
20           Do you see that there is a line
21   there that says, Notes and Other Amounts Due
22   from Affiliates?
23       A.  Yes.
24       Q.  Does that line, to the best of your
25   knowledge, include the amounts that were due

Page 107

1        WATERHOUSE - 10-19-21
2    under the affiliate under the notes signed by
3    the affiliates and Mr. Dondero?
4        MR. RUKAVINA:  Objection to the
5    extent that calls for a legal conclusion.
6        A.  I mean, I would want to see the
7    detail and the build to this $173,398,000, but,
8    yes, I mean, if -- if -- given what we
9    discussed before, you know, it -- it should
10   capture that.
11       Q.  And -- and while you were the CFO of
12   Highland, were all notes held by Highland that
13   were issued by an affiliate or Mr. Dondero
14   carried as assets on Highland's balance sheets?
15       MS. DANDENEAU:  Objection to form.
16       MS. DEITSCH-PEREZ:  Object to form.
17       A.  I don't -- I don't know how else
18   they would be carried.
19       Q.  Okay. Can you think of any -- are
20   you aware of any promissory note issued by an
21   affiliate or Mr. Dondero that was not carried
22   on Highland's audited financial balance sheets?
23       A.  I'm -- I'm -- I'm not aware.
24       Q.  Okay. Are you aware of any category
25   of asset on Highland's balance sheet in which

Page 108

1        WATERHOUSE - 10-19-21
2    any of the promissory notes issued by an
3    affiliate or Mr. Dondero would have been
4    included?
5        MS. DANDENEAU:  Objection to form.
6        A.  Sorry, am I aware of any asset of an
7    affiliate being included --
8        Q.  That -- let me -- let me try again.
9        Do you see there is a number of
10   different assets that are described on this
11   balance sheet?
12       A.  Yes.
13       Q.  One of the assets that is described
14   is Notes and Other Amounts Due from Affiliates;
15   right?
16       A.  Yes.
17       Q.  And it is reasonable to conclude
18   that the notes from the affiliates and
19   Mr. Dondero are included in that line item;
20   right?
21       A.  Yes, based on this description.
22   Again, I would want to see a build of this to
23   100 percent confirm, but based on the
24   description, the asset description, it is -- it
25   is likely.

Page 109

1        WATERHOUSE - 10-19-21
2        Now, does that mean absolute?  I
3    don't know.
4        Q.  Do you have any reason to believe
5    that the promissory notes would have been
6    carried on the balance sheet in a category
7    other than Notes and Other Amounts Due from
8    Affiliates?
9        A.  If they were deemed -- no. If they
10   were deemed an affiliate, you know, under GAAP,
11   they should be carried in that line.
12   Otherwise, it would go into another line.
13       Q.  Okay. And do you see the total
14   asset base as of December 31st, 2018, was
15   approximately $1.04 billion?
16       A.  Yes.
17       Q.  Is my math correct that the Notes
18   and Other Amounts Due from Affiliates
19   constituted approximately 17 percent of
20   Highland's assets as of the end of 2018?
21       A.  Well, so how are you defining
22   Highland?
23       Q.  Highland Capital Management, L.P.,
24   the entity that this audit is subject to -- or
25   the subject of.

Page 110

1          WATERHOUSE - 10-19-21
2     A.    On a consolidated or unconsolidated
3  basis?
4     Q.    I'm looking at the balance sheet.
5  It is a consolidated balance sheet. Okay?
6          Does the Notes and Other Amounts Due
7  from Affiliates constitute approximately
8  17 percent of the total assets of Highland
9  Capital Management, L.P., on a consolidated
10 basis?
11        MS. DANDENEAU: Objection to form.
12    A.    I don't have a calculator in front
13 of me but I will take your math, if you are
14 taking the 173 divided by the billion.
15    Q.    Okay.
16    A.    If that is accurate, yes. But,
17 again, on a consolidated basis.
18    Q.    And on an unconsolidated basis the
19 percentage would be higher; correct?
20    A.    I – no. I don't know.
21    Q.    Well, okay. That is fair.
22        MR. MORRIS: Can we turn to
23 page 241, please.
24    Q.    Do you see that this is a section of
25 the audit report that is entitled Notes and

Page 111

1          WATERHOUSE - 10-19-21
2  Other Amounts Due from Affiliates?
3     A.    Sorry, I can't see the – the –
4     Q.    It is at the top.
5     A.    Notes and Other Amounts Due from
6  Affiliates, yes, I see that. I don't – I
7  don't have a page number, but I'm on a page
8  that says at the top: Notes and Other Amounts
9  Due from Affiliates.
10    Q.    Okay. And that is the same title of
11 the line item on the balance sheet that we just
12 looked at; right? Notes and Other Amounts Due
13 from Affiliates?
14    A.    Yes.
15    Q.    And is it your understanding, based
16 on your experience and knowledge as the CFO,
17 that this is the section of the narrative that
18 ties into the line item that we just looked at?
19    A.    Yes.
20    Q.    And is this section of the audit
21 report intended to describe and disclose all of
22 the material facts concerning the Notes and
23 Other Amounts Due from Affiliates?
24        MS. DANDENEAU: Objection, form.
25    A.    This – these notes – these notes

Page 112

1          WATERHOUSE - 10-19-21
2  of the financial statements are – the purpose
3  is to disclose any material items in relation
4  to that balance sheet line item.
5     Q.    Okay. And all of the information,
6  to the best of your knowledge, that is set
7  forth in this section of the audit report was
8  provided by Highland; correct?
9     A.    Yes, it would have been provided by
10 the corporate accounting team.
11    Q.    Okay. And the corporate accounting
12 team, did that team report to you in the
13 organizational structure?
14    A.    Yes.
15    Q.    And did you have any concerns about
16 the controls that were in place to make sure
17 that the information provided with respect to
18 Notes and Other Amounts Due from Affiliates was
19 accurate and complete?
20        MS. DANDENEAU: Objection to form.
21    A.    Not that I recall.
22    Q.    Okay. Do you recall ever being
23 concerned that any portion of the Notes and
24 Other Amounts Due from Affiliates in any audit
25 report was inaccurate, incomplete, or not

Page 113

1          WATERHOUSE - 10-19-21
2  reliable?
3     A.    I didn't – I had concerns about,
4  you know, like I talked about before, of there
5  were – there were potentially issues in the
6  control environment. But as far as it relates
7  to the audited financial statements, any – the
8  team would work with the auditors to disclose
9  all – all notes in Highland's possession.
10        And any – any notes that were
11 deemed material by the auditor, right, these
12 were disclosed in these – in this section, you
13 know, in – in the notes to the consolidated
14 financial statements as you presented.
15    Q.    Do you recall ever having a
16 conversation with anybody at any time
17 concerning the accuracy of the section of audit
18 reports that relates to Notes and Other Amounts
19 Due from Affiliates?
20        MS. DANDENEAU: Objection to form.
21    A.    You know, as – as – I didn't have
22 direct conversations with
23 PricewaterhouseCoopers as I had, you know –
24 I – I had the team that managed this.
25        Again, I wasn't anywhere chose to

WATERHOUSE - 10-19-21

1  being the point person of this audit. And I
2  can't recall, you know, when -- you know, I
3  don't even know if I was ever the point person
4  during my tenure as CFO.
5       I don't know if PwC had any concerns
6  when they were performing those audit
7  procedures. They may have and they may have --
8  and it may not have been communicated to me. I
9  don't know.
10      MR. MORRIS: All right. I move to
11  strike.
12      Q.  And I'm going to ask you to listen
13  carefully to my question.
14      Did you -- do you recall ever having
15  a conversation with anybody at any time
16  concerning the accuracy of the reporting
17  provided in the audited financial statement on
18  the topic of Notes and Other Amounts Due?
19      MS. DANDENEAU: Objection to form.
20      A.  I don't recall for this, but that
21  doesn't mean that it didn't exist.
22      Q.  Okay. But you have no reason to
23  believe, as you sit here right now, that you
24  ever discussed with anybody concerns over the

WATERHOUSE - 10-19-21

1  accuracy of the section of the audit reports
2  called Notes and Other Amounts Due from
3  Affiliates; correct?
4       MS. DANDENEAU: Object to the form.
5       MS. DEITSCH-PEREZ: Objection to
6  form.
7       A.  I don't recall having any
8  conversations. But, again, I mean, this is --
9  this is two years ago.
10      Q.  I'm just asking for your
11  recollection, sir.
12      A.  Yes.
13      Q.  If you don't recall, this will --
14      A.  Yeah.
15      Q.  (Overspeak) -- if you don't
16  recall --
17      A.  Yeah, I don't -- I don't recall.
18      Q.  Do you know who was responsible for
19  drafting the audit report?
20      A.  Are you asking the actual Highland
21  employee responsible? I mean, it was
22  Highland's responsibility, so, I mean, that
23  is --
24      Q.  Right.

WATERHOUSE - 10-19-21

1       A.  -- Highland's responsibility.
2  Highland's responsibility.
3       Q.  Who, at Highland, was responsible
4  for drafting this section of the audit report?
5       A.  I -- I don't know the answer to
6  that. Again, there was a team who worked on
7  this. And I don't know, you know, whether it
8  was the staff or the manager.
9       Again, this is where I let the teams
10  manage. And, you know, there may be a
11  corporate accountant who worked on this. I
12  just -- you know, I wasn't part of that process
13  to give that person experience. I don't know.
14      Q.  Do you recall having any
15  communications with anybody at any time
16  concerning this section of the report?
17      A.  Yeah, I don't recall.
18      Q.  Do you recall whether you ever told
19  anybody at any time that any aspect of this
20  section of the report was inaccurate or
21  incomplete?
22      A.  I don't recall.
23      Q.  As you sit here today, do you have
24  any reason to believe that this section of the

WATERHOUSE - 10-19-21

1  audit report is incomplete or inaccurate in any
2  way?
3       And I'm happy to give you a moment
4  to -- to look at it, if you would like.
5       MS. DANDENEAU: Objection to form.
6       MS. DEITSCH-PEREZ: Same.
7       A.  I mean, I would have to look at -- I
8  would have to look at the bill to the note
9  schedule to make sure I know you presented me
10  with materiality, but again, there might be a
11  note as of 12/31/18 that somehow was -- was
12  under materiality not disclosed. I don't -- I
13  don't know. I would need more information.
14      Q.  Okay. But without more information,
15  you have no reason to believe anything this
16  section is inaccurate; correct?
17      MS. DANDENEAU: Objection to form.
18      A.  I don't. I mean, you know, this was
19  part of the audit.
20      Q.  Thank you. Now, you will see if we
21  could scroll just a little bit more that each
22  of the first five paragraphs concerns
23  specifically the four affiliates that we've
24  been discussing and Mr. Dondero.

Page 118

1    WATERHOUSE - 10-19-21
2    MR. MORRIS: If we could go the
3  other way, La Asia. We don't need Okada.
4  We're going to have to thread the needle.
5  Okay. Good, perfect.
6    Q.  Do you see those five paragraphs
7  certain the four affiliates and Mr. Dondero as
8  we've been referring to today?
9    A.  Yes.
10    Q.  Okay. And do you see at the end of
11  every paragraph it states, quote: A fair value
12  of a partnership's outstanding notes receivable
13  approximates the carrying value of the notes
14  receivable?
15    A.  Yes, I see that.
16    Q.  Do you have an understanding of what
17  that means?
18    A.  Yes.
19    Q.  What is your understanding of that
20  sentence?
21    A.  It is the – again, the – the fair
22  value, right, which is – which is what the –
23  what Highland could sell that asset for. This
24  statement is comparing the fair value of the
25  notes to the carrying value, so the carrying

Page 119

1    WATERHOUSE - 10-19-21
2  value is the line item that you showed me
3  earlier that is in Notes and Other Amounts Due
4  from Affiliates.
5    Q.  Okay. Is another way to say this is
6  that the fair market value of the notes equals
7  the principal amount and – withdrawn.
8    Is the fair way to interpret this
9  that the fair market value of the notes equals
10  all remaining unpaid principal and interest due
11  under the notes?
12    MS. DANDENEAU: Object to the form.
13    MS. DEITSCH-PEREZ: Objection, form.
14    A.  I don't know the answer to that,
15  because I don't recall where – where any –
16  where – in what line item was the interest
17  component reported.
18    Q.  All right. Well, if we look in this
19  audit report, you will see in the middle of the
20  first paragraph, for example, it states that as
21  of December 31st, 2018, total interest and
22  principal due on outstanding promissory notes
23  was approximately $5.3 million.
24    Do you see that?
25    A.  I do.

Page 120

1    WATERHOUSE - 10-19-21
2    Q.  Is that the carrying value or the
3  fair value?
4    A.  That would be the carrying value –
5    Q.  And is the last –
6    A.  – in my opinion.
7    Q.  Okay. And it is in your opinion as
8  the chief financial officer of Highland during
9  the period of time that you described; right?
10  It is an educated opinion?
11    A.  I'm reading this at face value. I'm
12  taking that as that is carrying value.
13    Q.  Okay. And does the last sentence
14  say that the carrying value is roughly
15  approximate the fair market value?
16    MS. DANDENEAU: Objection to form.
17    MS. DEITSCH-PEREZ: Objection, form.
18    A.  Again, this note to the financial
19  statement is specific to notes and other
20  amounts due from affiliates.
21    Q.  Correct.
22    A.  If the interest component is
23  reported elsewhere on the balance sheet, you
24  know, it – it – it could be off. Again, I
25  don't have the detail. I don't know, but yes,

Page 121

1    WATERHOUSE - 10-19-21
2  look, I mean, if you – I mean, if you are
3  saying the 5.3 million is in the notes and
4  other amounts due from affiliates, then the
5  last statement is saying the fair value
6  approximates 5.3 million. That is what that
7  last sentence is saying.
8    Q.  Do you see in the middle of the
9  first paragraph – not in the middle, the next
10  to last sentence there is a statement that the
11  partnership will not demand payment on amounts
12  that exceed HCMFA's excess cash availability
13  prior to May 31st, 2021.
14    Do you see that?
15    A.  I do.
16    Q.  Do you know when Highland agreed not
17  to demand payment as described in that
18  sentence?
19    A.  I don't know specifically.
20    Q.  Do you know why Highland agreed not
21  to demand payment on HCMFA's notes until May
22  2021?
23    A.  Yes.
24    Q.  Why was that decision made?
25    A.  You know, well, it – it – that

Page 122

1        WATERHOUSE - 10-19-21
2   decision was made as to not put HCMFA into a
3   position where it didn't have sufficient assets
4   to pay for the demand note.
5       Q.   And at the time the agreement was
6   entered into, pursuant to which the partnership
7   wouldn't demand payment, did HCMFA have
8   insufficient assets to satisfy the notes if a
9   demand had been made?
10      MS. DANDENEAU:  Objection to form.
11      A.   I don't have HCMFA's financial
12  statements in front of me as of 12/31/18.
13      Q.   Was there a concern that HCMFA would
14  be unable to satisfy its demands under the
15  notes if demand was made?
16      MS. DANDENEAU:  Objection to form.
17      A.   Well, there is – I don't recall –
18  I mean, there is something, right, in place to
19  basically not demand payment until May 31, 2021
20  as detailed here.
21      Q.   And who made the decision to enter
22  into – who made the decision on behalf of
23  Highland not to demand payment until May 31st,
24  2021?
25      A.   I'm trying to remember.  I don't

Page 123

1        WATERHOUSE - 10-19-21
2   remember exactly – I don't remember if it was
3   myself or – or Jim Dondero who – who – there
4   was – there was something signed, from what I
5   recall, that – that – that backed up this
6   line item in the – in the notes I'm – look,
7   I'm, I'm –
8       Q.   We will get to that.
9       A.   You –
10      Q.   I'm just –
11      A.   You have – I mean –
12      Q.   We're going to give that to you.
13  I'm going to give that to you.
14      A.   You – you – you have all the
15  documents.  I don't have the documents, and
16  that is what makes it so hard.  I don't have
17  any documents to prepare for this deposition;
18  right?  You have all – I don't – I don't – I
19  don't remember, but, you know, again, it would
20  probably be myself or Jim.
21      Q.   Do you know if Highland received
22  anything in return for its agreement not to
23  make a demand for two years?
24      A.   I don't – I don't think it referred
25  anything.

Page 124

1        WATERHOUSE - 10-19-21
2       Q.   And did you and Mr. Dondero discuss
3   HCMFA's ability to satisfy the notes if a
4   demand was made at the time this agreement was
5   entered into?
6       MS. DANDENEAU:  Objection to form.
7       A.   I don't – I don't – I don't recall
8   having a specific conversation, if I did, or –
9   or David Klos.
10      Q.   Okay.  I'm just asking if you recall
11  any conversations that you had.
12      A.   I don't recall.
13      Q.   Okay.  Do you know why Highland
14  loaned the money to HCMFA that is the subject
15  of the notes described in this paragraph?
16      A.   I don't remember specifically why
17  5.3 million was loaned.  I mean, I – it would
18  have to be put in the context.
19      Q.   Do you have any recollection at all
20  as to why Highland ever loaned any money to
21  HCMFA?
22      A.   Yes.
23      MS. DANDENEAU:  Objection to form.
24      Q.   What do you remember about that?
25      A.   There was a Highland Global

Page 125

1        WATERHOUSE - 10-19-21
2   Allocation Fund, which was a – a fund managed
3   by Highland Capital Management Fund Advisors.
4   There was a – we – I'm just telling you,
5   there was – there was – there was a – a
6   ultimately a NAV error found in this fund while
7   it was an open-ended fund and, you know, there
8   were amounts owed by the advisor in – in
9   relation to that NAV error.
10          There were also, for the same fund,
11  that same fund was ongoing an
12  open-end-to-close-end conversion, and as part
13  of that proposal, shareholders who voted for
14  the conversion received compensation from the
15  advisor.
16      Q.   All right.  Now, the events that
17  you're describing occurred in the spring of
18  2019; right?
19      A.   These started back – I think, I
20  mean –
21      Q.   I apologize.
22      A.   – that – I mean, the answer to
23  that is no.
24      Q.   I apologize, the loans that were
25  made in connection with the events that you're

Page 126

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  describing occurred in May 2019; right?
3        MR. RUKAVINA:  Objection to the
4    extent that calls for a legal conclusion.
5    A.  I don't recall specifically what
6  amounts of money were moved when, for what
7  purpose.
8    Q.  Okay.  Fair enough.  Going to the
9  next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13    A.  This is for NexPoint Advisors?
14    Q.  Yes.
15    A.  I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18    Q.  Do you know why?
19    A.  But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21    Q.  Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24    A.  Yes.
25    Q.  Why did High -- why do you recall --

Page 127

1    WATERHOUSE - 10-19-21
2  what is the reason you recall Highland lending
3  money to NexPoint?
4    A.  I mean, I was just -- I just -- I
5  just recall.  I mean, I just -- I don't
6  remember why.
7    Q.  I understand.  And I'm asking you if
8  you recall --
9    A.  Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe that the legal name is NexPoint
12  Capital, Inc.  And it -- it provided a
13  co-invest into that fund.
14        And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17    Q.  So this was an investment that
18  NexPoint was required to make; is that right?
19        MS. DANDENEAU:  Objection to form.
20    A.  I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23    Q.  Okay.  But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.

Page 128

1    WATERHOUSE - 10-19-21
2        Do I have that right?
3    A.  Yes.
4    Q.  How about HCRE?  Do you know why
5  HCRE borrowed money from Highland?
6    A.  I don't remember specifically.
7    Q.  Do you remember generally?
8    A.  Generally, yeah -- I mean, yes.
9    Q.  Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12    A.  For -- for -- for investment
13  purposes.
14    Q.  So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18        Do I have that right?
19    A.  I mean, I -- you know, generally.
20    Q.  Okay.  How about Highland Management
21  Services, Inc.?
22        Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24    A.  Generally.
25    Q.  What is your general recollection as

Page 129

1    WATERHOUSE - 10-19-21
2  to why HCMS borrowed money from Highland?
3    A.  For -- for investment purposes.
4    Q.  So it is the same thing, HCMS wanted
5  to make investments and it borrowed money from
6  Highland in order to finance those investments;
7  is that right?
8    A.  I mean, yes, generally.  I mean, I
9  can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14    Q.  Okay.  I appreciate that.
15        MR. MORRIS:  Let's go to the page
16  with Bates No. 251.  La Asia, are you
17  there?
18        MS. CANTY:  Sorry, John.  It went
19  out for a minute.  Can you say that again.
20  I don't know what is going on.
21        MR. MORRIS:  The page with Bates
22  No. 251, can we go to that.
23        MS. CANTY:  Yes, sorry.
24        MR. MORRIS:  Keep going to the
25  bottom.  Yeah, there you go.

Appx. 02081

Page 130

WATERHOUSE - 10-19-21

2  Q.  Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5  A.  I do.
6  Q.  And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10  that you disclosed subsequent events?
11  A.  I mean, it relates to it, but not in
12  its entirety.
13  Q.  Okay.
14  MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17  Q.  And what do you mean by that, sir?
18  MR. MORRIS:  Yeah, right there.
19  Perfect.
20  A.  There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25  Q.  Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6  A.  Yes, if they were deemed material or
7  disclosable.
8  Q.  Okay.  I appreciate that.
9  Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14  A.  Yes.
15  Q.  And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19  A.  I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22  Q.  Yes.
23  A.  I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4  Q.  Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9  A.  In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13  Q.  Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16  MS. DANDENEAU:  Objection to form.
17  A.  I didn't recall initially but I've
18  been reminded.
19  Q.  Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22  A.  Yes.
23  Q.  So that was just a month before the
24  audit was completed; correct?
25  A.  Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

2  date, right, if -- if my memory serves me
3  right.
4  Q.  Yes, I will represent to you that
5  your memory is accurate in that regard.
6  Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9  A.  So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14  Q.  Right.
15  A.  Not that I'm aware.
16  Q.  While you were the CFO of Highland,
17  did anybody ever tell you that that sentence
18  was wrong?
19  A.  Not that I'm aware.
20  Q.  Highland -- withdrawn.
21  HCMFA disclosed these notes in its
22  own audited financial statements; right?
23  MR. RUKAVINA:  Objection, form.
24  A.  I assume that these would be
25  material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1  statements, yes, they -- they -- they should be
2  and they were likely disclosed.
3      Q.  Now, there is no statement
4  concerning the 2019 notes about the forbearance
5  that we looked at in the affiliated note
6  section of the report; right?
7      MS. DANDENEAU:  Objection to form.
8      Q.  I'll withdraw.  That was bad.
9      Do you recall when we were looking
10 at the paragraph concerning HCMFA earlier it
11 had that disclosure about the agreement whereby
12 Highland wouldn't ask for demand on the -- on
13 the HCMFA notes?
14     A.  Yes.
15     Q.  That forbearance disclosure is not
16 made with respect to the 2019 notes; right?
17     A.  Not -- look, not that I can recall,
18 unless -- unless it was done at a subsequent
19 day.
20     Q.  Right.  And it is not in the
21 subsequent event section that we're looking at
22 right now where the 2019 notes are described;
23 right?
24     A.  Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1  June 3rd.  It could have been done on June 4th.
2  I don't -- I don't -- I don't recall.
3      Q.  Okay.
4      MR. MORRIS:  Can we put up on the
5  screen the HCMFA audit report.  And while
6  we're --
7      MS. DANDENEAU:  What exhibit is
8  this?
9      MR. MORRIS:  La Asia, what number is
10 that?
11     MS. CANTY:  45.
12     MR. MORRIS:  So this will be marked
13 as Exhibit 45.
14     (Exhibit 45 marked.)
15     MS. CANTY:  Yeah, and I will put it
16 in the chat.
17     MS. DANDENEAU:  Thank you.
18     Q.  Okay.  All right.  Do you see that
19 this is the consolidated financial statements
20 for HCMFA for the period ending 12/31/18?
21     A.  Yes.
22     Q.  As the treasurer of HCMFA at the
23 time, did you have to sign a management
24 representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1  we looked at earlier for Highland?
2      A.  I would imagine I would have been
3  asked to.  I don't recall if I did.
4      Q.  Do you recall ever being asked by an
5  auditor to sign a management representation
6  letter and then not doing it?
7      A.  No.
8      MR. MORRIS:  Can we just scroll down
9  again.  I just want to see the date of the
10 document.
11     A.  I mean, let me -- you know, there
12 are different versions to management
13 representation letters I will qualify.
14     Yes, there are certain -- from time
15 to time auditors can make representations
16 that -- in the rep letter that is being
17 proposed that are inaccurate or out of scope or
18 things like that and they've asked for
19 signature.
20     In that context, yes.  I mean, you
21 know -- I mean, if I have been asked to sign
22 and make those representations and those
23 representations are invalid, yes, I would not,
24 I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1      Q.  Okay.  PricewaterhouseCoopers served
2  as HCMFA's outside auditors as well; correct?
3      A.  Yes.
4      Q.  Do you see that this audit report is
5  signed on June 3rd, 2019, just like the
6  Highland audit report?
7      A.  That is correct.
8      Q.  And did the process of -- of
9  preparing HCMFA's audit report, was that the
10 same process that Highland followed when it did
11 its audit report at this time?
12     A.  I mean, it is a different entity.
13 There are different assets.  You know, it --
14 it -- it is -- as you saw, Highland's
15 financials are on a consolidated basis.  This
16 is different, so it is under the same control
17 environment and team.
18     Q.  Okay.  I appreciate that.  So the
19 same control environment and team participated
20 in the preparation of the audit for Highland
21 and for HCMFA at around the same time; correct?
22     A.  Yes.
23     MR. MORRIS:  Can we go to page 17 of
24 the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you see that just like
3    Highland's audited financial report, HCMFA's
4    audited financial report also has a section
5    related to subsequent events?
6    A.   Yes.
7    Q.   And am I reading this correctly that
8    just as Highland had done, HCMFA disclosed in
9    its audited financial report a subsequent event
10   that related to the issuance of promissory
11   notes to Highland in the aggregate amount of
12   $7.4 million in 2019?
13   A.   That is what I see in the report.
14   Q.   And you were the treasurer of HCMFA
15   at the time; right?
16   A.   Yes, to the best of my knowledge.
17   Q.   And did anybody ever tell you prior
18   to the time of the issuance of this audit
19   report that that sentence relating to HCMFA's
20   2019 notes was inaccurate or wrong in any way?
21   A.   Not that I recall.
22   Q.   As you sit here right now, has
23   anybody ever told you that that sentence is
24   inaccurate or wrong in any way?
25   A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1
2    Q.   I apologize if I asked you this
3    already, but has anybody ever told you at any
4    time that you are not authorized to sign the
5    promissory notes that are the subject of the
6    sentence we're looking at?
7    A.   Not that I recall.
8    Q.   Did anybody ever tell you at any
9    time that you had made a mistake when you
10   signed the promissory notes that are the
11   subject of this sentence?
12   A.   Say that again.  Did anyone ever say
13   that I made a mistake?
14   Q.   Let me ask the question again.
15        Did anybody ever tell you at any
16   time that you made a mistake when you signed
17   the two promissory notes in Highland's favor on
18   behalf of HCMFA in 2019?
19   A.   Not that I recall.
20   MR. MORRIS:  Let's just look at the
21   promissory notes quickly.  Can we please
22   put up Document Number 1, and so this is in
23   the pile that y'all have.  We'll just go
24   for a few more minutes and we can take our
25   lunch break.

Page 140

WATERHOUSE - 10-19-21

1
2    Q.   All right.  So I don't know if you
3    have seen this before, sir.  Do you see that
4    this is a complaint against HCMFA?
5    A.   Yes, I am looking at it on the
6    screen.
7    Q.   Okay.  And have you ever seen this
8    document before?
9    A.   I went through some of these
10   documents with my counsel here yesterday.
11   MR. MORRIS:  All right.  Can we go
12   to Exhibit 1 of this document.
13   Q.   Do you see Exhibit 1 is a
14   $2.4 million promissory note back in 2019?
15   A.   Yeah, I found it in the book.  Yes,
16   I have it here in front of me.
17   Q.   And this is a demand note, right, if
18   you look at Paragraph 2?
19   A.   Yes.
20   Q.   And this is a note where the maker
21   is HCMFA, and Highland is the payee; right?
22   A.   Yes.
23   MR. MORRIS:  And if we can scroll
24   down, can we just see Mr. Waterhouse's
25   signature.

Page 141

WATERHOUSE - 10-19-21

1
2    Q.   Is that your signature, sir?
3    A.   Yes, it is.
4    Q.   And did you sign this document on or
5    around May 2nd, 2019?
6    A.   I don't recall specifically signing
7    this, but this is my signature.
8    Q.   Okay.  And do you recall that
9    Highland transferred $2.4 million to HCMFA at
10   or around the time you signed this document?
11   A.   I don't recall specifically.  I
12   would want to, as I sit here today, go back and
13   confirm that, but again, presumably that --
14   that -- that did happen.
15   Q.   You wouldn't have signed this
16   document if you didn't believe that HCMFA
17   either received or was going to receive
18   $2.4 million from Highland; is that fair?
19   A.   I mean, it -- if -- if -- if there
20   wasn't a transfer of value, yeah, I mean, you
21   know, I would have no reason to -- to sign a
22   note.
23   Q.   And -- and Highland wouldn't have
24   given this note to PricewaterhouseCoopers if --
25   withdrawn.

Page 142

1    WATERHOUSE - 10-19-21
2    HCMFA wouldn't have given this note
3  to PricewaterhouseCoopers if it hadn't received
4  the principal value of – of the note in the
5  form of a loan; correct?
6       MR. RUKAVINA: Objection, legal
7    conclusion, speculation and form.
8    A.   Again, we – what we provided to PwC
9  were, as part of the audit, any promissory
10 notes executed and outstanding. You know, as a
11 part of the audit, they, you know, they – they
12 have copies of all the bank statements,
13 things – things of that sort.
14      MR. MORRIS: Okay. Can we go to
15   Exhibit 2.
16      (Exhibit 2 marked.)
17   Q.   Do you see that this is a promissory
18 note dated May 3rd, 2019 in the amount of
19 $5 million?
20   A.   Yes.
21   Q.   Do you believe this is also a demand
22 note if you look at Paragraph 2?
23   A.   Yes.
24   Q.   And do you see that HCMFA is the
25 maker, and Highland is the payee?

Page 143

1    WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   And if we go to the bottom, can we
4  just confirm that that is your signature?
5    A.   Yes.
6    Q.   And together these notes are the
7  notes that are referred to both in Highland and
8  HCMFA's audited financial reports in the
9  subsequent event sections; correct?
10      MS. DANDENEAU: Objection to form.
11   A.   They – they – they totaled
12 $7.4 million, so presumably, yes.
13   Q.   Okay. And you were authorized to
14 sign these two notes; correct?
15      MR. RUKAVINA: Objection, legal
16   conclusion.
17   A.   Yeah. I mean, I'm – I was the
18 officer of – of HCMFA. You know, I – I'm not
19 the legal expert on -- on what that – what
20 that confers to me or what it doesn't. I mean,
21 that is my signature on the notes.
22   Q.   And you believed you were authorized
23 to sign the notes; is that fair?
24   A.   I signed a lot of documents in my
25 capacity, just because it is operational in

Page 144

1    WATERHOUSE - 10-19-21
2  nature. So, you know, to me this was just
3  another document, to be perfectly honest.
4    Q.   Sir, would you have signed
5  promissory notes with the principal amount of
6  $7.4 million if you didn't believe you were
7  authorized to do so?
8       MS. DANDENEAU: Objection to form.
9    Q.   Are you frozen?
10   A.   No. I'm just – you know, it is –
11 you know, again, I typically don't sign
12 promissory notes, and I don't recall why I
13 signed these, but – you know, but I did.
14   Q.   All right. So listen carefully to
15 my question. Would you have ever signed
16 promissory notes with a face amount of
17 $7.4 million without believing that you were
18 authorized to do so?
19   A.   No. I mean, I'm – I'm putting my
20 signature on there, so no.
21   Q.   Okay. And would you have signed two
22 promissory notes obligating HCMFA to pay
23 Highland $7.4 million without Mr. Dondero's
24 prior knowledge and approval?
25      MS. DEITSCH-PEREZ: Object to the

Page 145

1    WATERHOUSE - 10-19-21
2  form.
3    A.   You know, from – from what I recall
4  around these notes, you know, I don't recall
5  specifically Mr. – Mr. Dondero saying to – to
6  make this a loan.
7       So my conversation with Mr. Dondero
8  around the culmination of the NAV error as
9  related to TerreStar which was a – a – I
10 think it was a year and a half process. I
11 don't know, it was a multi-month process, very
12 laborious, very difficult.
13      When we got to the end, I had a
14 conversation with Mr. Dondero on where to, you
15 know, basically get the funds to reimburse the
16 fund, and I recall him saying, get the money
17 from Highland.
18   Q.   And so he told you to get the money
19 from Highland; is that right?
20   A.   That is what I recall – in my
21 conversation with him, that is – that is what
22 I can recall.
23   Q.   Do you know who drafted these notes?
24   A.   I don't.
25   Q.   Did you ask somebody to draft the

Appx. 02085

1        WATERHOUSE - 10-19-21
2    notes?
3        A.   I didn't ask -- I don't specifically
4    ask people to draft notes really.  I mean,
5    again, you know, the legal group at Highland is
6    responsible and has always been responsible for
7    drafting promissory notes.
8        Q.   So based on your -- based on the
9    practice, you believe that somebody from the
10   Highland's legal department would have drafted
11   these notes.  Do I have that right?
12       MS. DEITSCH-PEREZ:  Object to the
13   form.  John, I also asked you for the Word
14   versions of these notes so we could look at
15   the properties, and you have not provided
16   them.  Are you intending to?
17       MR. MORRIS:  No.
18       Q.   Can you answer my question, sir?
19       A.   Again, I --
20       MS. DANDENEAU:  Do you want him to
21   repeat it?
22       A.   Yeah, why don't you repeat it?
23       Q.   Sure.  Mr. Waterhouse, based on the
24   practice that you have described in your
25   understanding, do you believe that these notes

1        WATERHOUSE - 10-19-21
2    would have been drafted by somebody in the
3    legal department?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6        A.   Yes.
7        Q.   Okay.  And do you know who would
8    have instructed -- do you have any knowledge as
9    to who would have instructed the legal
10   department to draft these notes?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13       A.   It was whoever was working -- I
14   mean, it was likely someone on the team.  I
15   mean, I don't remember exactly on every note or
16   every document, but, again, a lot of these
17   things of this nature -- they're operational in
18   nature -- were handled by the team.
19       The team knows to -- I mean, we
20   don't draft documents.  We're not lawyers.
21   We're not attorneys.  It is not what I do or
22   accountants do.
23       So they are always instructed to go
24   and -- and go to the legal team to get
25   documents like this drafted.  Also, when you go

1        WATERHOUSE - 10-19-21
2    to the legal team, the -- you know, we always
3    loop in compliance.  And compliance -- when you
4    go to the legal team, compliance is part of
5    legal team.  They're made aware of -- of -- of
6    these types of transactions.
7        Q.   And do you believe that you had
8    the -- withdrawn.
9        Did you ever tell Mr. Dondero --
10   (inaudible) -- did you see those?
11       A.   Sorry.
12       MS. DEITSCH-PEREZ:  I did not hear
13   the end of that question.
14       Q.   Did you ever tell Mr. Dondero that
15   you signed these two notes?
16       A.   I don't recall ever -- no, I don't
17   recall having a conversation with him.
18       Q.   Did you ever discuss these two notes
19   with him at any time?
20       A.   The conversation, I recall, was what
21   I described earlier.  And that is the only time
22   I recall ever discussing this.
23       Q.   Okay.  But the corporate accounting
24   group had a copy of this -- of these two notes.
25   And pursuant to the audit process, the

1        WATERHOUSE - 10-19-21
2    corporate accounting group gave the two notes
3    to PricewaterhouseCoopers in connection with
4    the audit; correct?
5        MS. DANDENEAU:  Objection to form.
6        A.   Yes.  I mean, that is -- yeah, I
7    mean, they -- unless the legal team can also
8    retain copies of items like this.  I mean, I
9    don't know everything that they would retain as
10   well.
11       The legal team would also, if they
12   had documents as part of audits, turn that over
13   to the auditors as well.  So it could have been
14   the corporate accounting team.  It could be
15   someone on the legal team.
16       Q.   All right.  So you didn't -- you
17   didn't draft this note; right?
18       A.   I -- I -- I did not.
19       Q.   But somebody at Highland did; is
20   that fair?
21       MS. DEITSCH-PEREZ:  Object to the
22   form.
23       A.   I don't know.  I mean, we can go to
24   the legal team.  I don't -- I'm not sitting
25   behind someone in legal.  Maybe they went to

Page 150

1       WATERHOUSE - 10-19-21
2  outside counsel. I have no idea.
3       Q.   Did you have any reason to believe
4  you weren't authorized to sign this note,
5  either of these two notes?
6       A.   I think I have already answered that
7  question.
8       Q.   Okay. You didn't give these notes
9  to PricewaterhouseCoopers; correct?
10       MS. DANDENEAU: Objection to form.
11       A.   I don't recall giving these to
12  PricewaterhouseCoopers.
13       Q.   And in the practice that you have
14  described, somebody in the corporate accounting
15  group would have given these two notes to
16  PricewaterhouseCoopers; correct?
17       MS. DANDENEAU: Objection to form.
18       A.   I think I've answered that. I said
19  either the corporate accounting team or maybe
20  the legal team.
21       MR. MORRIS: Okay. Why don't we
22  take our lunch break here.
23       VIDEOGRAPHER: We're going off the
24  record at 1:04 p.m.
25       (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

1       WATERHOUSE - 10-19-21
2       VIDEOGRAPHER: We are back on the
3  record at 1:49 p.m.
4       Q.   Mr. Waterhouse, did you speak with
5  anybody during the break about the substance of
6  this deposition?
7       A.   I spoke to -- to Deb and Michelle.
8       Q.   About the substance of the
9  deposition?
10       A.   Yes.
11       Q.   Can you tell me what you talked
12  about?
13       MS. DANDENEAU: No. We object on
14  the basis of privilege.
15       Q.   Okay. You are going to follow your
16  counsel's objection here?
17       A.   Yes.
18       Q.   Okay.
19       MR. MORRIS: Can we put up on the
20  screen Exhibit 35.
21       (Exhibit 35 marked.)
22       Q.   Are you able to see that document,
23  sir?
24       A.   Yes.
25       Q.   Have you ever seen an incumbency

Page 152

1       WATERHOUSE - 10-19-21
2  certificate before?
3       A.   I have.
4       Q.   Do you have a general understanding
5  of what an incumbency certificate is?
6       A.   I have a general understanding.
7       Q.   What is your general understanding?
8       A.   You know, those -- my general
9  understanding is that the incumbency
10  certificate basically lists folks that can --
11  are like authorized signers.
12       Q.   Okay. And do you see that this is
13  an incumbency certificate for Highland Capital
14  Management Fund Advisors, L.P.?
15       A.   Yes.
16       Q.   Okay. And if we could scroll down
17  just a little bit, do you see that it's dated
18  effective as of April 11th, 2019?
19       A.   Yes, I see that.
20       Q.   Okay. And is that your signature in
21  the middle of the signature block?
22       A.   Yes, it is.
23       Q.   And by signing it, did you accept
24  appointment as the treasurer of HCMFA effective
25  as of April 11th, 2019?

Page 153

1       WATERHOUSE - 10-19-21
2       A.   Again, I'm not the legal -- I don't
3  know if this makes me the treasurer or the
4  appointment. I don't know -- I don't know
5  that, so I don't -- I don't know if that
6  document -- again, I think -- again, I'm not
7  the legal expert. I think isn't there --
8  aren't there other legal documents that detail
9  who the officers are that could be incorporated
10  or things like that? Again, I don't want to
11  play armchair attorney here.
12       Q.   I'm not asking you for a legal
13  conclusion. I'm asking you for your knowledge
14  and understanding. When you signed this
15  document, did you understand that you were
16  accepting an appointment as the treasurer of
17  HCMFA?
18       MS. DANDENEAU: Objection to form.
19       MS. DEITSCH-PEREZ: Objection, form.
20       A.   Again, I don't think this -- that
21  wasn't my understanding. I don't think this
22  makes -- this document makes me the treasurer.
23       Q.   What do you think this document --
24  why did you sign this document?
25       MS. DEITSCH-PEREZ: Objection to

Page 154

WATERHOUSE - 10-19-21

1 form.
2    MR. MORRIS: You're objecting to the
3 form of the question when I asked him why
4 did you sign the document? What is the
5 basis for the objection?
6    MS. DEITSCH-PEREZ: Because, John, I
7 think that it does call for a legal
8 conclusion other than -- with him saying
9 because somebody told me to sign this
10 document. But if you want to go there,
11 that is fine.
12    MR. MORRIS: Okay.
13    MS. DANDENEAU: I don't think --
14 he's already said he's not a lawyer.
15    MR. MORRIS: I'll allow the witness
16 to answer this question.
17    Q. Why did you sign this document, sir?
18    A. I mean, our -- our legal group would
19 bring by these incumbency certificates from
20 time to time. I have no idea why they're being
21 updated, and I was asked to sign.
22    Q. Did you ask anybody, what is this
23 document?
24    A. No.
25

Page 155

WATERHOUSE - 10-19-21

1    Q. Did anybody tell you why they needed
2 you to sign the document?
3    A. Not that I can recall.
4    Q. You testified earlier that you
5 understood that you served as the acting
6 treasurer for HCMFA; correct?
7    A. Yes.
8    Q. How did you become the acting
9 treasurer of HCMFA?
10    MS. DANDENEAU: Objection to form.
11    A. I don't -- I don't know the legal --
12 I don't know the legal mechanic of how I became
13 the acting treasurer.
14    Q. I'm not asking for the legal
15 mechanic. I'm asking you as the person who
16 is --
17    MS. DANDENEAU: John, you said --
18    MR. MORRIS: Stop.
19    MS. DANDENEAU: -- how did you
20 become the treasurer. That is --
21    MR. MORRIS: Please stop.
22    MS. DANDENEAU: That is a legal
23 question.
24    MR. MORRIS: I am not asking any
25

Page 156

WATERHOUSE - 10-19-21

1 legal questions, to be clear. I'm asking
2 for this witness' understanding as to how
3 he became the acting treasurer of HCMFA.
4 If he doesn't know, he can say he doesn't
5 know, but this legal stuff is nonsense, and
6 I really object to it.
7    Q. Sir, I'm asking you a very simple
8 question.
9    MS. DANDENEAU: Argumentative.
10    Q. You testified -- you testified that
11 you became the acting treasurer of HCM --
12 HCMFA; correct?
13    A. Yes.
14    Q. How did that happen?
15    MS. DANDENEAU: Again, object to
16 form.
17    MR. MORRIS: I can't wait to do this
18 in a courtroom. Good God.
19    Q. Go ahead, sir.
20    A. I don't know the exact process of
21 how that happened.
22    Q. Do you have any idea whether signing
23 this document was part of the process?
24    MR. MORRIS: You know what --
25

Page 157

WATERHOUSE - 10-19-21

1    MS. DANDENEAU: Objection.
2    MR. MORRIS: -- withdrawn. You guys
3 want to do this, I can't wait. I can't
4 wait. This is the craziest stuff ever.
5    MS. DANDENEAU: John, he said he's
6 not a lawyer, and you are asking him for a
7 legal conclusion, and he says he doesn't
8 know, and you persist.
9    MR. MORRIS: Okay.
10    MS. DANDENEAU: So you can ask these
11 questions --
12    MR. MORRIS: Did anyone -- please
13 stop talking.
14    MS. DANDENEAU: -- at another
15 point -- no, no, no, I'm entitled to talk,
16 too; right? If you're going to make these
17 accusations as if we're trying to stonewall
18 you, this is not the witness to ask that
19 question.
20    MR. MORRIS: I can't -- I can't
21 wait -- I can't wait to do this in a
22 courtroom. I will just leave it at that.
23    MS. DANDENEAU: That's right, I'm
24 sure you can't.
25

Page 158

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   Did anyone ever tell you, sir, that
3    even though you were the acting treasurer of
4    HCMFA, that you were not authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.   I'm not sure I understand the
8    question.  I wasn't -- I mean, I'm -- I'm the
9    current acting treasurer.
10   Q.   Did anybody ever tell you at any
11   time that even though you were the acting
12   treasurer of HCMFA, that you were not
13   authorized to sign the two promissory notes
14   that we looked at before lunch?
15        MS. DANDENEAU:  Objection to form.
16   A.   Not that I recall.
17   Q.   Did anybody ever tell you at any
18   time that you were not authorized to sign the
19   two promissory notes that we looked at before
20   lunch?
21   A.   Not that I recall.
22   Q.   Did anybody ever tell you at any
23   time that you should not have signed the two
24   promissory notes that we looked at before
25   lunch?

Page 159

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    A.   Not that I recall.
3    Q.   Did you ever tell anybody at any
4    time that you weren't authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.   Not that I recall.
8    Q.   Did you ever tell anybody at any
9    time that you made a mistake when you signed
10   the two promissory notes that we looked at
11   before lunch?
12   A.   Not that I recall.
13   Q.   As you sit here right now, do you
14   have any reason to believe that you were not
15   authorized to sign the two documents that we
16   looked at before lunch?
17        MS. DANDENEAU:  Objection to form.
18   A.   If -- if this is the -- the valid
19   incumbency certificate, I mean, this does --
20   this does detail who the signers are.
21   Q.   Okay.  And looking at that document,
22   does that give you comfort that you were
23   authorized to sign the two promissory notes
24   that we looked at before lunch?
25        MS. DEITSCH-PEREZ:  Object to the

Page 160

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    form.
3        MS. DANDENEAU:  Objection, form.
4    A.   Yes.
5    Q.   As of October 20th -- withdrawn.
6        I'm trying to take your mind back to
7    a year ago, October 2020.  Do you recall at
8    that time that the boards of the retail funds
9    were making inquiries about obligations that
10   were owed by the advisors to Highland in
11   connection with their 15(c) review?
12        MS. DANDENEAU:  Objection to form.
13   A.   I don't -- I don't recall.
14   Q.   As of October 2020, you had no
15   reason to believe you weren't authorized to
16   sign the two promissory notes that we just
17   looked at; correct?
18        MS. DANDENEAU:  Objection, form.
19        MS. DEITSCH-PEREZ:  Objection to
20   form.
21   A.   I didn't think about it in October
22   of 2020, but I mean --
23   Q.   Did you have any reason to believe
24   at that time that you weren't authorized to
25   sign the two notes that we just looked at?

Page 161

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    A.   Not that I'm aware, no.
3    Q.   Did you have any reason to believe a
4    year ago that you made a mistake when you
5    signed those two notes?
6    A.   Not that I'm aware.
7    Q.   A year ago you believed that HCMFA
8    owed Highland the unpaid principal amounts that
9    were due under those two notes; correct?
10   A.   They're -- they're promissory notes
11   that were -- as you presented, that were --
12   that were executed.  Whether they're valid or
13   if there's other reasons, I didn't -- I don't
14   know.
15   Q.   I'm not asking you whether they're
16   valid or not.  I'm asking you for your state of
17   mind.  A year ago you believed that HCMFA
18   was -- was obligated to pay the unpaid
19   principal amount under the two notes that you
20   signed; correct?
21   A.   Yeah, I'm -- I'm -- yes.
22   Q.   Thank you.  Are you aware -- you're
23   aware that -- that in 2017, NexPoint issued a
24   note in favor of Highland in the approximate
25   amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

1
2    A.   I'm -- I'm -- I'm generally aware.
3    Q.   Okay.  And are you generally aware
4    that from time to time, after the note was
5    issued by NexPoint, that moneys were applied to
6    principal and interest that were due under the
7    NexPoint note?
8    A.   Yes, I'm generally aware.
9    Q.   Okay.  And did anybody ever tell you
10   that the payments that were made against the
11   NexPoint notes were made by mistake?
12   A.   Yes.
13   Q.   And is it the one payment that we
14   talked about earlier today?
15   A.   We talked about a lot of things
16   today.  What payment are we talking about?
17   Q.   Okay.  Who told you that any payment
18   made against the NexPoint note was made by
19   mistake?
20   A.   D.C. Sauter.
21   Q.   When did Mr. Sauter tell you that?
22   A.   I don't -- I don't remember
23   specifically.
24   Q.   Do you remember what payments --
25   A.   Sometime -- sometime this year.

Page 163

WATERHOUSE - 10-19-21

1
2    Q.   Sometime in 2021?
3    A.   Yes.
4    Q.   Do you remember what payment he was
5    referring to?
6    A.   It was the -- the payment made in
7    January of 2021 or -- yeah, January of -- of
8    this -- January of 2021.
9    Q.   Okay.  So did anybody ever tell you
10   at any time that any payment that was made
11   against principal --
12   A.   And -- and -- and -- hold on, and it
13   may have been other -- again, it may have been
14   that payment or -- or there may have been what
15   he was explaining, a misapplication of prior
16   payments as well.
17   Q.   Can you -- can you give me any
18   specificity -- withdrawn.
19   Withdrawn.  Can you tell me
20   everything that Mr. Sauter told you about --
21   about errors in relation to payments made
22   against principal and interest due under the
23   NexPoint note?
24   MS. DANDENEAU:  Can I just --
25   MR. RUKAVINA:  Hold on.  Hold on.

Page 164

WATERHOUSE - 10-19-21

1
2    I'm going to object here, and I'm going to
3    instruct the witness not to answer
4    depending on the discussion that you had --
5    Mr. Waterhouse, I'm the lawyer for
6    NexPoint, and as everyone here knows, D.C.
7    Sauter is in-house counsel.
8    So if you and Mr. Sauter were having
9    a factual discussion and him preparing his
10   affidavit, et cetera, then go ahead and
11   answer that.  But if you were having a
12   discussion as to our legal strategy in this
13   lawsuit, or anything having to do with
14   that, then do not answer that.
15   And if you need to talk to either
16   your counsel or me about that, then we need
17   to have that discussion now.
18   A.   Okay.  Yeah, I don't -- I don't
19   really know how to make that distinction, so
20   maybe I need to talk to counsel before I
21   answer, or if I can answer.
22   Q.   Let me just ask you this question:
23   Did -- did you have any conversation with
24   Mr. Sauter about any payment of principal and
25   interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

1
2    Highland's employment, or did it happen after
3    you left Highland's employment?
4    A.   I don't -- I don't recall if -- I
5    don't recall.  I mean, it was sometime in 2021.
6    I don't remember if it was before or after I
7    was let go from Highland.
8    Q.   Okay.  So -- so nobody told you
9    prior to 2021 that any error or mistake was
10   made in the application of payments against
11   principal and interest due on the NexPoint
12   note.  Do I have that right?
13   A.   Yeah, I don't -- I don't recall this
14   being in 2020.
15   Q.   Okay.  And it didn't happen in 2019;
16   correct?
17   A.   I don't recall that happened.
18   Q.   And it didn't happen in 2018;
19   correct?
20   A.   I don't -- I don't recall that
21   happening.
22   Q.   And it didn't happen in 2017;
23   correct?
24   A.   I don't recall.
25   Q.   But -- but you believe the

Page 166

WATERHOUSE - 10-19-21

1  conversation took place in 2021. You just
2  don't remember if it was before or after you
3  left Highland's employment. Do I have that
4  right?
5      A.  It was sometime this year. I
6  don't – I don't remember.
7      Q.  Okay. Did you report this
8  conversation to Mr. Seery at any point?
9      A.  I don't believe so.
10     Q.  Did you report this conversation to
11  anybody at DSI at any time?
12     A.  I don't recall.
13     Q.  Do you have – you don't have a
14  recollection of ever doing that; correct?
15     A.  Yeah, that's right. I don't recall
16  doing that.
17     Q.  Do you recall telling anybody at
18  Pachulski Stang about the conversation you
19  recall with Mr. Sauter?
20     A.  No, I don't – I don't recall.
21     Q.  Did you tell any of the independent
22  board members about your conversation with
23  Mr. Sauter?
24     A.  I don't recall.

Page 167

WATERHOUSE - 10-19-21

1      Q.  Did you tell any of the employees at
2  Highland before you left Highland's employment
3  about this call that you had with Mr. Sauter?
4      MS. DANDENEAU: Objection to form.
5      A.  No, I don't – no, I don't recall.
6      Q.  NexPoint – to the best of your
7  knowledge, did NexPoint ever file a proof of
8  claim against Highland to try to recover moneys
9  that were mistakenly paid against the principal
10  and interest due under the note?
11     A.  Okay. Hold on. You are saying did
12  NexPoint Advisors file a proof of claim to
13  Highland for errors related to payments under
14  the NexPoint note to Highland?
15     Q.  Correct.
16     A.  I'm – I'm – I'm not – I'm not
17  aware.
18     Q.  Are you aware –
19     A.  I'm not the legal person here, I
20  don't know.
21     Q.  I'm just asking for your knowledge,
22  sir.
23     A.  Yeah, I don't know. I'm not aware.
24     Q.  Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1  kind that NexPoint has ever made to try to
2  recover the amounts that it contends were – or
3  that Mr. Sauter contend were mistakenly applied
4  against principal and interest due under the
5  NexPoint note?
6      A.  I'm not aware.
7      MS. DANDENEAU: Objection to form.
8      Q.  Okay. The advisors' agreements with
9  the retail funds are subject to annual renewal;
10  correct?
11     A.  Yes.
12     Q.  And do you participate in the
13  renewal process each year?
14     A.  Yes.
15     Q.  What role do you play in the renewal
16  process?
17     A.  I'm – I'm asked by the retail board
18  to walk-through the advisors financials.
19     Q.  And do you do that in the context of
20  a board meeting?
21     A.  Yes, it is – yes, it is typically
22  done in a board meeting.
23     Q.  And do you recall the time –
24  does – does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1  the same time each year?
2      A.  Yes, it is – it is around the same
3  time every year.
4      Q.  And what – what time period of the
5  year does the renewal process occur?
6      A.  Approximately the September
7  timeframe.
8      Q.  During that process, in your
9  experience, does the board typically conduct
10  its own diligence and ask for information?
11     A.  Does the board ask for lots of – I
12  mean, just – I mean, lots of information as a
13  part of that – that – as part of that board
14  meeting and that process.
15     Q.  Okay. And do you recall that the
16  process in 2020 spilled into October?
17     A.  Yes. Yes.
18     Q.  Okay. And as part of the process in
19  2020, the retail board asked – asked what are
20  referred to as 15(c) questions; right?
21     A.  I guess I don't want to be – they
22  asked 15(c) – are you saying they asked 15(c)
23  questions and this is why it went into October
24  or –

Page 170

WATERHOUSE - 10-19-21

1
2    Q.   No, I apologize.
3         Do you have an understanding of
4    what – of what 15(c) refers to in the context
5    of the annual renewal process?
6    A.   Yes, generally.
7    Q.   All right.  What is your general
8    understanding of the term "15(c)" in the
9    context of the annual renewal process?
10   A.   I – I think 15(c) is the section
11   that – that – you know, that – that the
12   board has to evaluate every year, the retail
13   board.  They have to, you know, go through,
14   evaluate, and go through that approval process
15   on a yearly basis.
16   Q.   Okay.
17        MR. MORRIS:  Can we put up on the
18   screen Exhibit 36, please.
19        (Exhibit 36 marked.)
20        MR. MORRIS:  I guess let's just
21   start at the bottom so Mr. Waterhouse can
22   see what is here.
23   Q.   You see this begins with an email
24   from Blank Rome to a number of people.
25        MR. MORRIS:  And if we can scroll

Page 171

WATERHOUSE - 10-19-21

1
2    up – keep going just a little bit.
3    Q.   You will see that there is an email
4    from Lauren Thedford to Thomas Surgent and
5    others where she reports that she was attaching
6    and reproducing below additional 15(c)
7    follow-up questions from the board.
8         Do you see that?
9    A.   Yes.
10   Q.   And do you see Question No. 2 asks
11   whether there are any material outstanding
12   amounts currently payable or due in the future
13   (e.g., notes) to HCMLP by HCMFA or NexPoint
14   Advisors or any other affiliate that provides
15   services to the funds?
16        Do you see that?
17   A.   Yes.
18   Q.   And – and did you – do you recall
19   that in in October of 2020 the retail boards
20   were asking for that information?
21   A.   I don't recall it, but there –
22   they're obviously asking in this email.
23   Q.   Okay.
24        MR. MORRIS:  Can we scroll up a
25   little bit, please.

Page 172

WATERHOUSE - 10-19-21

1
2    Q.   And then do you see that
3    Ms. Thedford includes you on the email string
4    on Tuesday, October 6th, at 5:52?
5    A.   Yes.
6    Q.   And she asks you and Dave Klos and
7    Kristin Hendrix for advice on that particular
8    Request No. 2 that I have just read; right?
9    A.   Yes.
10   Q.   Okay.  Can you tell me who
11   Ms. Thedford is?
12   A.   She was an attorney that was in the
13   legal group.
14   Q.   At Highland Capital Management,
15   L.P.?
16   A.   I'm – I'm – I'm – I don't
17   remember if she was an employee of Highland or
18   any of the advisors.
19   Q.   Okay.  Do you know if she served as
20   the corporate secretary for both HCMFA and
21   NexPoint?
22   A.   Yes.
23   Q.   And – okay.
24        Do you know whether Ms. Thedford
25   held any positions in relation to the retail

Page 173

WATERHOUSE - 10-19-21

1
2    funds as we defined that term?
3    A.   Yes.
4    Q.   What is your understanding of the
5    positions that Ms. Thedford held at the retail
6    funds?
7    A.   I – I recall her being an officer.
8    I don't recall her title.
9    Q.   Okay.  Is still an officer at
10   any of the retail funds today?
11   A.   No.
12   Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14   A.   Approximately.
15   Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17   A.   It was in – it was in early of
18   2021.
19   Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21   A.   I don't recall.
22   Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25   A.   I believe so.

WATERHOUSE - 10-19-21

2  Q.  Okay.  Do you know what title she
3  held in her capacity as an officer, if any?
4  A.  I told you I don't remember.
5  Q.  Okay.  So she sends this email to
6  you at 5:52 p.m. on October 6th.
7  And if we can scroll up to the
8  response, you responded a minute later with a
9  one-word answer:  Yes.
10  Do you see that?
11  A.  Yes.
12  Q.  And – and yes is – yes was in
13  response to the retail board's Question No. 2,
14  right, whether there are any material
15  outstanding amounts currently payable or due in
16  the future?
17  A.  Yes.
18  MR. MORRIS:  And can we scroll up to
19  see what happened next.
20  Q.  So Ms. Thedford writes back to you a
21  few minutes later and she asks whether you
22  could provide the amounts.
23  Do you see that?
24  A.  Yes.
25  Q.  And then you respond further and you

WATERHOUSE - 10-19-21

2  refer her to the balance sheet that was
3  provided to the board as part of the 15(c)
4  materials.
5  Do you see that?
6  A.  Yes.
7  Q.  And – and did the advisors provide
8  to the board certain balance sheets in 2020 in
9  connection with the 15(c) review?
10  A.  Yes, they did.
11  Q.  Okay.  And were the amounts that
12  were outstanding or that were to be due in the
13  future by the advisors to Highland included in
14  the liability section of the balance sheet that
15  was given to the retail board?
16  A.  Yes.  Notes would be reflected as
17  liabilities.
18  Q.  Okay.  And –
19  A.  If I'm understanding your question
20  correctly.
21  Q.  You are.  And – and – and those
22  liabilities you – you were – you believed
23  were responsive to the retail board's question;
24  correct?
25  A.  Yes.

WATERHOUSE - 10-19-21

2  Q.  Okay.  And then if we can scroll up,
3  you see Ms. Thedford responds to you
4  nine minutes later with a draft response.
5  Do you see that?
6  A.  Yes.
7  Q.  And she says that she is taking from
8  the 6/30 financials certain information about
9  amounts that were due to HCMLP and affiliates
10  as of June 30th, 2020.
11  Do you see that?
12  A.  I do.
13  Q.  Okay.  And did you believe, as the
14  treasurer of NexPoint and HCMFA and as the CFO
15  of Highland, that the information that
16  Ms. Thedford obtained from the 6/30 financials
17  was accurate and responsive in relation to the
18  retail fund board's question?
19  A.  I just want to make sure I
20  understand the question.
21  Are you saying that the financial
22  information provided to the retail board as
23  part of the 15(c) process, which included
24  financial statements as of June 30th of 2021,
25  did I feel like those were responsive to their

WATERHOUSE - 10-19-21

2  questions?
3  Q.  Yes.
4  A.  Yes.
5  Q.  Thank you.
6  MS. DEITSCH-PEREZ:  John, it is not
7  in the chat yet.  Can you just make sure it
8  gets put in there.
9  MR. MORRIS:  Sure.
10  MS. CANTY:  I put it in there.  I
11  think maybe I just sent it directly, so let
12  me make sure it says to everyone.  But I
13  did put it in there.  I will try again.
14  MR. MORRIS:  Thank you, La Asia.
15  MS. DANDENEAU:  What number is it.
16  MR. MORRIS:  What, the Bates number?
17  MS. DEITSCH-PEREZ:  No, the –
18  this – yeah, 36 is not in the chat.
19  MR. MORRIS:  Okay.  We'll get it.
20  MS. DANDENEAU:  I think that
21  Ms. Canty just sent it to me originally.
22  Sorry.
23  MR. MORRIS:  Okay.  We will get it
24  there.
25  MS. CANTY:  Okay.  It is there now

1  WATERHOUSE - 10-19-21
2  for everyone.
3  MS. DEITSCH-PEREZ: Got it. Thank
4  you.
5  Q. Do you recall if the proposed
6  response that Ms. Thedford crafted was
7  delivered to the retail board with the -- with
8  the yellow dates having been completed?
9  A. I don't know.
10  MR. MORRIS: Davor, I'm going to ask
11  that the advisors and -- the advisors of
12  both HCMFA and NexPoint produce to me any
13  report that was given to the retail board
14  concerning the promissory notes at issue,
15  including the obligations under the notes.
16  Q. Do you know -- do you know if
17  ultimately NexPoint informed the retail board
18  in response to its question that NexPoint owed
19  Highland approximately 23 or $24 million?
20  MS. DANDENEAU: Objection to the
21  form.
22  A. Sorry, are you asking, did NexPoint
23  tell the retail board that it owed Highland?
24  Q. Let me ask a better question,
25  Mr. Waterhouse.

1  WATERHOUSE - 10-19-21
2  Did -- do you know if anybody ever
3  answered the retail board's question that was
4  Number 2?
5  A. I don't -- I can't say for sure.
6  Q. Okay. Do you recall -- I think you
7  testified earlier that you walked through the
8  advisors' financials with the retail board;
9  correct?
10  A. Yes.
11  Q. And as part of that process, did you
12  disclose to the retail board the obligations
13  that NexPoint and HCMFA had to Highland under
14  promissory notes?
15  A. The retail board, as I stated
16  earlier, receives financial information,
17  balance sheet, income statement information
18  from the advisors. That information is
19  provided to the retail board in connection with
20  the 15(c) process.
21  So any notes between the advisors
22  and the Highland would be -- anything would be
23  detailed in those financial statements.
24  Q. Do you recall in 2020 ever speaking
25  with the retail board about the advisors'

1  WATERHOUSE - 10-19-21
2  obligations under the notes to Highland?
3  MS. DANDENEAU: Objection to form.
4  MS. DEITSCH-PEREZ: Object to the
5  form.
6  A. I don't recall specifically.
7  Q. Do you have any general recollection
8  of discussing with the retail board the
9  advisors' obligations to Highland under the
10  notes that they issued?
11  MS. DANDENEAU: Object to the form.
12  MS. DEITSCH-PEREZ: Object to the
13  form.
14  A. I just recall generally just -- it
15  is just -- I present the financial statements,
16  and if they have questions, I answer their
17  questions and walk them through.
18  I don't recall what they asked. I
19  don't recall where the discussion went. I
20  don't recall anything of that nature.
21  Q. Okay. Do you know if anybody on
22  behalf of HCMF -- HCMFA ever told the retail
23  board that HCMFA had no obligations under the
24  two 2019 notes that you signed? Withdrawn.
25  Do you know whether anybody on

1  WATERHOUSE - 10-19-21
2  behalf of HCMFA ever told the retail boards
3  that you weren't authorized to sign either of
4  the two 2019 notes?
5  MS. DANDENEAU: Objection to form.
6  A. I'm not aware.
7  Q. Are you aware of anybody on behalf
8  of HCMFA ever telling the retail boards that
9  your execution of the two 2019 notes was a
10  mistake?
11  MS. DANDENEAU: Objection to form.
12  A. I'm not aware.
13  Q. Are you aware of anybody on behalf
14  of HCMFA ever telling the retail boards that
15  HCMFA did not have to pay the amounts reflected
16  in the two notes that you signed in 2019?
17  A. I'm not aware.
18  Q. Do you know whether anybody ever
19  told the retail boards -- withdrawn.
20  Do you know whether anybody ever
21  told the retail boards that Highland has
22  commenced a lawsuit to recover on the two notes
23  that you signed in 2019?
24  A. I'm not aware.
25  Q. Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21
1    WATERHOUSE - 10-19-21
2    the retail boards that Highland has sued to
3    recover on the NexPoint note?
4        A.   I'm not aware.
5        Q.   Do you know whether anybody ever
6    told the retail board that Highland had
7    declared a default with respect to the two
8    HCMFA notes that you signed in 2019?
9        A.   I'm not aware.
10       Q.   Are you aware of anybody ever
11   informing the retail boards that Highland had
12   declared a default under the NexPoint note?
13       A.   I'm not aware.
14       Q.   Are you aware of anybody telling the
15   retail board that Highland made a demand for
16   payment under the 2019 notes that you signed on
17   behalf of HCMFA?
18       A.   I'm not aware.
19       Q.   Let's -- let's see if there is a
20   response to Ms. Thedford's email, if we can
21   scroll up.
22            Do you see you responded to
23   Ms. Thedford five minutes after she provided
24   the draft response to you?
25       A.   Yes.

Page 183

1    WATERHOUSE - 10-19-21
2        Q.   Okay.  And do you see that Dustin
3    Norris is copied on this email?
4        A.   Yes, he is.
5        Q.   Great.  Do you know whether
6    Mr. Norris held any positions at either of the
7    advisors as of October 6, 2020?
8        A.   I will go back to -- I'm not the
9    legal expert of what appoints you or how or
10   why, but you did see Dustin's name on the
11   incumbency certificate that you produced
12   earlier.
13       Q.   Do you know what his title was in
14   October of 2020?
15       MS. DANDENEAU:  Objection to form.
16       A.   I don't -- I don't recall.
17       Q.   Was he -- did he have a title with
18   each of the advisors, to the best of your
19   recollection?
20       A.   I don't recall.
21       Q.   Do you know why he is included on
22   this email string?
23       A.   I didn't add Dustin.  It looks like
24   Lauren did.  I don't know why she added him or
25   not.  You would have to ask her.

Page 184

1    WATERHOUSE - 10-19-21
2        Q.   Does Mr. Norris play a role in
3    formulating the advisors' responses to the
4    questions asked by the retail board in
5    connection with the 15(c) annual review?
6        MS. DANDENEAU:  Objection to form.
7        A.   He -- Dustin Norris is there in the
8    board meetings.  But -- so he has a role, yes.
9        Q.   Okay.  And does Mr. Norris hold any
10   positions, to the best of your knowledge, in
11   relation to any of the retail funds?
12       A.   I don't -- I don't believe he does.
13       Q.   How about Mr. Post, do you know
14   whether Mr. Post holds any position in either
15   of the advisors?
16       A.   I mean, he -- he -- yes.
17       Q.   What is your understanding of the
18   positions that Mr. Post holds in relation to
19   the advisors?
20       MS. DANDENEAU:  Objection to form.
21       A.   He is an employee of NexPoint
22   Advisors.  He is also the chief compliance
23   officer for -- for NexPoint.
24       Q.   Who is the chief compliance officer
25   for HCMFA, if you know?

Page 185

1    WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection to form.
3        A.   That would be Jason as well.
4        Q.   Okay.  Now, looking at your
5    response, you noted initially that nothing was
6    owed under shared services.  Do I have that
7    right in substance?
8        A.   Yeah.  I think I'm being responsive
9    to Lauren's question here, whether any of the
10   shared service invoices are outstanding.
11       Q.   Right.
12       A.   Yes.
13       Q.   And that is because -- and that is
14   because the retail the retail board has asked
15   for the disclosure of all material obligations
16   that were owed to HCMLP either then or in the
17   future; isn't that right?
18       MS. DANDENEAU:  Objection to form.
19       Q.   We can go back down and look.
20       A.   Look, I don't know if that's a
21   material item, I mean, again, but sure.
22       Q.   Okay.  But there were no shared
23   services outstanding; correct?
24       MS. DANDENEAU:  Objection to form.
25       A.   That is what this email seems to

Page 186

1        WATERHOUSE - 10-19-21
2  indicate.
3     Q.   And you wouldn't have written it if
4  you didn't believe it to be true at the time;
5  correct?
6     A.   Correct.
7     Q.   And when you referred to shared
8  services outstanding, what you meant there was
9  that neither NexPoint nor HCMFA owed Highland
10  any money under the shared services agreements
11  that they had with Highland as of October 6th,
12  2020; right?
13     A.   I don't know if it is as of October
14  6, 2020 or if it was from -- like through the
15  financials -- through the date of the
16  financials as of June 30.
17     Q.   Okay.  And then you noted that
18  HCMA -- the HCMFA note is a demand note; right?
19     A.   Yes.
20     Q.   And then you referred Ms. Thedford
21  to Kristin Hendrix for the term of the NexPoint
22  note.  Do I have that right?
23     A.   Yes.
24     Q.   And then you refer to that agreement
25  that is referenced in the 2018 audited

Page 187

1        WATERHOUSE - 10-19-21
2  financials about Highland's agreement not to
3  make demand upon HCMFA until May 2021; correct?
4     A.   Correct.
5     Q.   And then -- and then the next thing
6  you write is that the attorneys think that BK
7  doesn't change that, but don't know for sure at
8  the end of the day.
9        Do you see that sentence?
10     A.   Yes.
11     Q.   Which attorneys were you referring
12  to?
13     A.   I don't remember.
14     Q.   Did you have a conversation with
15  attorneys concerning whether the bankruptcy
16  would change or alter in any way the agreement
17  not to make a demand under the HCMFA note?
18     A.   Look, yeah, I mean, I don't
19  specifically remember, but generally, I mean,
20  it is in this email.  I don't -- I don't -- I
21  don't -- I don't remember who I talked to or,
22  you know, was it inside counsel, outside
23  counsel, but obviously I talked to somebody.
24     Q.   Do you have any recollection --
25     A.   Well, I don't even know if it's --

Page 188

1        WATERHOUSE - 10-19-21
2  actually, it may not even have been me.  I say
3  the attorneys in, you know, a lot of -- like I
4  talked about the team.
5        It could have been someone on the
6  team, like, hey, we need to run this down, and
7  maybe they talked to attorneys again and
8  relayed that information to me.
9        So I really don't know if I spoke or
10  someone else did or -- or, I mean, and maybe it
11  wasn't even from corporate accounting.  Maybe
12  it was, you know, other -- I'm kind of
13  summarizing, you know, again, so I don't really
14  know -- I can't really say for sure.  I don't
15  remember how I came about of this knowledge.
16     Q.   I appreciate your efforts,
17  Mr. Waterhouse, but I will just tell you that
18  if I ask a question and you don't know the
19  answer or you don't recall, I'm happy to accept
20  that.  I don't -- I don't want you to
21  speculate, so I want to be clear about that.
22  So I appreciate it.
23        Let me just ask you simply:  Do you
24  know what attorneys -- can you identify any of
25  the attorneys who thought that the bankruptcy

Page 189

1        WATERHOUSE - 10-19-21
2  process didn't change the agreement?
3     A.   I don't recall.
4     Q.   Okay.  Perfect.
5        And then let's look at the last
6  sentence.  It says, quote:  The response should
7  include, as I covered in the board meeting,
8  that both entities have the full faith and
9  backing from Jim Dondero, and to my knowledge
10  that hasn't changed.
11        Do you see that?
12     A.   Yes.
13     Q.   Okay.  Prior to October 6th, 2020,
14  had you told the retail board that HCMFA and
15  NexPoint have the full faith and backing from
16  Jim Dondero?
17     A.   Yes.
18     Q.   Do you remember in the context in
19  which you told the retail board that?
20     A.   I mean, generally, yes.
21     Q.   Tell me what you recall.
22     A.   So we were walking through the
23  financials from the advisors; right?  So as I
24  described to you, you have got HCMFA and NPA.
25  And these -- the financials, you know, show

1          WATERHOUSE - 10-19-21
2  they have liabilities on them that exceed
3  assets.
4          So the retail board has asked, okay,
5  you know, how -- you know, if -- if these
6  liabilities come due or they're payable, you
7  know, how does that come about?
8          And, you know, the response is,
9  well, the advisors have the -- full faith
10  and backing from -- from Jim Dondero.
11      Q.  And how did you know that the
12  advisors had the full faith and backing from
13  Jim Dondero?  What was the basis for that
14  statement that you made to the retail board?
15      A.  I talked to Jim about it at some
16  point in the past.
17      Q.  And did you tell Mr. Dondero that
18  you were going to inform the retail board that
19  the advisors had his full faith and backing
20  before you actually told that to the retail
21  board?
22      A.  I don't recall having that
23  conversation.
24      Q.  Do you recall if you ever informed
25  Mr. Dondero that you had disclosed or told the

1          WATERHOUSE - 10-19-21
2  retail board that the advisors had the full
3  faith and backing of Mr. -- Mr. Dondero?
4          MS. DEITSCH-PEREZ:  Object to the
5  form.
6      A.  I don't recall discussing that with
7  him at the time.
8      Q.  When you told this to the board, was
9  Mr. Dondero participating in the discussion?
10      A.  Not that I recall.
11      Q.  Withdrawn.  Was it not -- withdrawn.
12          Do you recall whether -- when you
13  covered this issue with the board, was that in
14  a -- a Zoom call or a Webex call?  Was it a
15  telephone call?  Was it in-person?  Like where
16  were you physically in relation to the board?
17      A.  I believe I was at home.
18      Q.  Okay.  Can you identify every person
19  that you recall who was present for this
20  disclosure other than -- other than the board
21  members themselves?
22          MS. DEITSCH-PEREZ:  Object to the
23  form.
24      A.  I don't recall everyone on the call.
25      Q.  Can you identify anybody who was on

1          WATERHOUSE - 10-19-21
2  the call?
3      A.  Other than the board members?
4      Q.  Yes.
5      A.  Lauren Thedford.  I mean, there
6  are -- there are many -- my section is just one
7  of many sections that are just -- you know, as
8  you can appreciate, this is a long board
9  meeting.
10          I can't recall specifically, really
11  even generally, or who was on when this was
12  discussed.  But Lauren was typically on for the
13  entire time.
14      Q.  I apologize if I asked you this, but
15  do either of Mr. Norris or Mr. Post hold any
16  positions relative to the retail funds?
17      A.  I think you asked me this already,
18  John.
19      Q.  Okay.  I just don't recall.  Can you
20  just refresh my recollection if I did, in fact,
21  ask you the question?
22      A.  I don't believe -- if we can go
23  back.  I don't believe Mr. Norris has a title
24  at the retail funds.  Mr. -- and Mr. Post is
25  the CCO of the advisor, the advisors.

1          WATERHOUSE - 10-19-21
2      Q.  Okay.  Do you know if either of them
3  have a position with the retail board -- with
4  the retail funds?
5      A.  I don't believe Mr. Norris has a
6  position with the retail funds.
7      Q.  All right.  What about Mr. Post?
8      A.  Mr. Post is the CCO of the advisors.
9      Q.  Okay.  Does he hold any position --
10      A.  I don't believe so.
11      Q.   -- with the retail funds?
12      A.  I don't believe so.
13      Q.  Okay.
14      A.  I don't know if being the CCO for
15  the advisor conveys something for the retail
16  funds.  Again, I am not -- that is the legal
17  compliance part of it.  I don't know.
18      Q.  Why did you tell the retail board
19  that the advisors have the full faith and
20  backing from Mr. Dondero?
21          MS. DANDENEAU:  Objection to form.
22      A.  It is -- it is -- it is what has
23  been discussed with them prior.
24      Q.  And were you -- were you trying to
25  give them comfort that even though the

Page 194

WATERHOUSE - 10-19-21

1
2 liabilities exceeded the assets that the
3 advisors would still be able to meet their
4 obligations as they become due?
5      MS. DANDENEAU: Objection to form.
6      MS. DEITSCH-PEREZ: Object form.
7      A.   I – I can't – I don't remember
8 specifically the conversation, but generally –
9 you know, generally, yes. And that is why –
10 but, you know, again, in this email saying, you
11 know, I am sure I qualified it with the retail
12 board, you know, as I said I like – you know,
13 to my knowledge, that hasn't changed. But,
14 again, generally – generally that is what I
15 remember.
16      Q.   Okay. Do you recall if in the
17 advisors' response to the retail board's
18 question if the response included any statement
19 concerning Mr. Dondero and – and the full
20 faith and backing that he was giving to the
21 advisors?
22      MS. DEITSCH-PEREZ: Object to the
23 form.
24      A.   I don't – I don't remember
25 specifically what was provided.

Page 195

WATERHOUSE - 10-19-21

1
2      Q.   Okay.
3      A.   And I don't really – I don't really
4 remember generally either.
5      Q.   Okay.
6      MR. MORRIS: So – so, again, I'm
7 just going to ask Mr. Rukavina if your
8 clients can produce as soon as possible the
9 15(c) response, the written response that
10 the advisors made, if any, to the board's
11 Question No. 2.
12      I'm not looking for the whole
13 response, but I certainly want the response
14 to Question No. 2.
15      Q.   Do you have a general understanding
16 as to the amount by which – withdrawn.
17      Did – did the assets of –
18 withdrawn.
19      Did the liabilities of HCMFA exceed
20 its assets in 2020?
21      MS. DANDENEAU: Objection to form.
22      MS. DEITSCH-PEREZ: Objection, form.
23      A.   I believe I have already answered
24 that question earlier, I think. I believe I
25 said yes.

Page 196

WATERHOUSE - 10-19-21

1
2      Q.   Okay. And did the liabilities of
3 NexPoint exceed its assets in 2020?
4      MS. DEITSCH-PEREZ: Objection to
5 form.
6      A.   I don't believe so.
7      Q.   Okay. So – so it was only one of
8 the two advisors who had liabilities that
9 exceeded the value of the assets.
10      Do I have that right?
11      MS. DEITSCH-PEREZ: Objection to
12 form.
13      MS. DANDENEAU: Form.
14      A.   Yes.
15      Q.   And do you know, ballpark, the
16 amount by which the value of HCMFA's
17 liabilities exceeded their assets in 2020?
18      MS. DANDENEAU: Objection to form.
19      A.   I don't – I don't recall.
20      MR. MORRIS: I had specifically
21 requested in discovery the audited
22 financial reports for both advisors and
23 NexPoint. I think I may have gotten one
24 for NexPoint but I'm still waiting for the
25 balance. And I'm going to renew my request

Page 197

WATERHOUSE - 10-19-21

1
2 for those documents too.
3      Q.   Let's go to the next exhibit, which
4 is Number 10. So I think it is in your stack,
5 Mr. Waterhouse.
6      MR. MORRIS: And we can take the one
7 down from the screen and put up Number 10
8 for everybody.
9      (Exhibit 10 marked.)
10      Q.   And I don't know if you have ever
11 seen this before, but I'm really putting it up
12 on the screen for purposes of turning to the
13 very last page of the document.
14      So this is a document that we have
15 been – that we premarked as Exhibit 10. And
16 we're turning to the last page of the document,
17 which is a document that was filed in the
18 adversary proceeding 21-3004. And – no, I
19 apologize, I think we – right there. Perfect.
20      And it is page 31 of 31.
21      MR. MORRIS: I think there may have
22 been some something erroneously stapled to
23 the hard copy that I gave you folks, but
24 I'm looking for page 31 of 31 in the
25 document that begins with the first page of

1          WATERHOUSE - 10-19-21
2      Exhibit 10.
3      Q.   Do you have that, Mr. Waterhouse?
4      A.   I don't have it yet. I'm looking.
5      Q.   All right. If you look at the top
6  right-hand corner, you will see it says page
7  hopefully something of 31?
8      A.   Yes, I've got it now.
9      Q.   Okay. You have got 31 of 31. You
10 can take a moment to read that, if you would
11 like.
12     A.   (Reviewing document.) Okay.
13     Q.   Have you ever seen this before?
14     A.   I don't know if I have seen this
15 specific document, but, you know, I've --
16 I'm -- I'm aware of it.
17     Q.   And is this the document that you
18 had in mind when you sent that email to
19 Ms. Thedford that we just looked at where you
20 said that Highland had agreed not to make a
21 demand upon HCMFA until May 2021?
22     A.   Honestly, I don't -- it wasn't this
23 document. I mean, it's something like this,
24 yes. I mean, yes.
25     Q.   Well --

1          WATERHOUSE - 10-19-21
2      A.   It is something like this, but I
3  don't think it was this specific document.
4      Q.   Well, but this document does say in
5  the last sentence that Highland agreed not to
6  seek -- not to demand payment from HCMFA prior
7  to May 31, 2021; right?
8      A.   Yes.
9      Q.   And are you aware of any other
10 document that was ever created pursuant to
11 which Highland agreed not to demand payment on
12 amounts owed by HCMFA before May 31, 2021?
13     A.   Hold on. Are you asking, am I aware
14 of a document that by HCMFA that basically says
15 otherwise?
16     Q.   No. Let me try again.
17          Are you aware of any other document
18 pursuant to which -- pursuant to which Highland
19 agreed not to make a demand on HCMFA until May
20 31st, 2021?
21     A.   I'm -- I think there was something
22 in connection with -- with the -- with the
23 audit that basically says the same thing.
24     Q.   Okay. And do you think that the
25 audit is referring to this particular document?

1          WATERHOUSE - 10-19-21
2      A.   I don't know.
3      Q.   All right. This document is dated
4  April 15, 2019. Do you see that?
5      A.   I do.
6      Q.   And do you remember that the audit
7  was completed on June 3rd, 2019?
8      A.   Yes.
9      Q.   And do you recall that the audited
10 financials -- and I'm happy to pull them up if
11 you would like, but do you recall that the
12 audited financials included a reference to the
13 agreement pursuant to which Highland agreed not
14 to make a demand until May 31st, 2021?
15     A.   Yes, I remember.
16     Q.   And as part of the process, would
17 you have expected the corporate accounting team
18 to have provided a copy of this document to
19 PwC?
20          MS. DANDENEAU: Objection to form.
21     A.   Yes, I would have expected something
22 like this, or again, you know, some document
23 that basically states -- states the deferral
24 till May 31 of 2020.
25     Q.   Okay.

1          WATERHOUSE - 10-19-21
2      A.   May 31 of 2021, excuse me.
3      Q.   And this document states the
4  deferral that you just described; correct?
5      A.   It does.
6      Q.   And this document states the
7  deferral that was described in the audited
8  financial statements that we looked at before;
9  correct?
10     A.   It does.
11          MR. MORRIS: Okay. Can we scroll
12     down just a little bit to see who signed on
13     behalf of the acknowledgment there.
14     Q.   Okay. So Mr. Dondero signed this
15 document on behalf of both HCMFA and Highland;
16 do you see that?
17     A.   I do.
18     Q.   Okay. Did you discuss this document
19 or the -- withdrawn.
20          Did you discuss the concept of the
21 deferral with Mr. Dondero in the spring of
22 2019?
23     A.   I think I testified I don't recall.
24     Q.   Okay. Do you know whose idea it was
25 to issue the acknowledgment in this form?

Page 202

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  A. I don't recall.
3  MR. MORRIS: Can we scroll back up
4  to the document, please.
5  Q. Do you see in the beginning it says,
6  reference is made to certain outstanding
7  amounts loaned from Highland to HCMFA for
8  funding ongoing operations.
9  Do you see that?
10 A. Yes.
11 Q. And were you aware as the CFO of
12 Highland and as the treasurer of HCMFA that as
13 of April 15, 2019, Highland had made certain
14 loans to HCMFA to fund HCMFA's ongoing
15 operations?
16 A. Yes.
17 Q. And were you aware that those loans
18 were payable on demand and remained outstanding
19 as of December 31st, 2018?
20 A. Yes.
21 Q. And were you aware that those
22 amounts were payable on demand, and they
23 remained outstanding as of April 15, 2019?
24 MS. DEITSCH-PEREZ: Object to the
25 form.

Page 203

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  A. Well, this -- this document dated
3  April 15, 2019 says they have been deferred to
4  May 31, 2021.
5  Q. Right. But I'm just sticking to the
6  first paragraph where they refer to the
7  outstanding amounts. And in the end it says
8  the -- it remained outstanding on December
9  31st, 2018, and I think you told me that you
10 understood that, and then I'm just trying to
11 capture the last piece of it.
12 Did you understand that there were
13 amounts outstanding from the loan that Highland
14 made to HCMFA to fund ongoing operations as of
15 April 15th, 2019?
16 A. Yes.
17 Q. Thank you. Let's look at the next
18 sentence. HCMFA expects that it may be unable
19 to repay such amounts should they become due
20 for the period commencing today and continuing
21 through May 31st, 2021.
22 Do you see that?
23 MS. DANDENEAU: Objection to form.
24 A. I do.
25 Q. As the CFO -- withdrawn.

Page 204

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  As the treasurer of HCMFA, did you
3  believe that -- do you believe that statement
4  was true and accurate at the time it was
5  rendered?
6  A. I mean, it -- it -- the answer to
7  that is I really didn't have any -- I didn't
8  have an opinion really.
9  Q. Did you do anything to educate
10 yourself in April of 2019 on the issue of
11 whether HCMFA could repay the amounts that it
12 owed to Highland should they become due?
13 A. I don't believe so.
14 Q. Did you at any time form any
15 opinions as to HCMFA's ability to repay all
16 amounts due to Highland should they become due?
17 A. Not really. I guess I don't...
18 Q. Well, you told the retail board that
19 HCMFA's liabilities exceeded their assets in
20 2020; correct?
21 A. Yes.
22 Q. Based on the work that you did to
23 prepare for the retail board, did you form any
24 view as to whether HCMFA would be unable to
25 repay the amounts that it owed to Highland

Page 205

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  should they become due?
3  MS. DANDENEAU: Objection to form.
4  A. I mean, I -- when you look at that,
5  to answer you, completely, you know, again,
6  if -- the response I gave the retail board was,
7  you know, the -- the advice -- HCMFA advisors
8  have the -- have the full faith and backing of
9  Jim Dondero. So I didn't form an opinion of
10 whether the advisor could pay it or not.
11 Q. Did you form any view as to whether
12 the advisors could repay the amounts that it
13 owed to Highland should they become due without
14 the full faith and backing of Mr. Dondero?
15 MS. DANDENEAU: Objection to form.
16 MS. DEITSCH-PEREZ: Form.
17 A. I mean, if you -- if you -- if you
18 take that last statement out, I mean, it would
19 be difficult for HCMFA to pay back demand notes
20 at that time.
21 Q. And it was precisely for that reason
22 that you told the retail board that -- that the
23 retail -- that the advisors had the full faith
24 and backing of Mr. Dondero; correct?
25 MS. DANDENEAU: Objection to form.

Appx. 02100

1          WATERHOUSE - 10-19-21
2     A.    I mean, yes, as the mouthpiece, I
3  was relaying information.
4     Q.    Okay. And you relayed that
5  information with the knowledge and approval of
6  Mr. Dondero; correct?
7          MS. DEITSCH-PEREZ: Object to the
8  form.
9     A.    As I stated in the email, I don't
10 believe, and I think I testified I don't
11 believe I had conversations with Mr. Dondero at
12 the time of that board meeting.
13    Q.    Did you tell the retail board that
14 the advisors had the full faith and backing of
15 Mr. Dondero without Mr. Dondero's prior
16 approval?
17    A.    Yeah, I -- I -- yes, I'm -- like I
18 said, I think I testified earlier, I'm sure I
19 qualified it as well.
20    Q.    What do you mean by that?
21         MS. DANDENEAU: Objection to form.
22    A.    Again -- again, like I said in the
23 email, it has the full faith and backing of Jim
24 Dondero unless that has changed.
25    Q.    Actually that is not what you said,

1          WATERHOUSE - 10-19-21
2  so let's put the email back up.
3     A.    It is -- it is -- it is in the
4  email.
5     Q.    Let's put the email back up. You
6  didn't say unless it has changed. You said you
7  believe it hasn't changed; right?
8     A.    Okay. And to my knowledge that
9  hasn't changed, that is what it says.
10    Q.    That's right.
11    A.    But, again, I mean, that is -- I
12 don't know everything. And I'm not in every
13 conversation. I'm not -- to presume that I am,
14 is -- and you have to put myself -- as you
15 started this out, Mr. Morris, I was at home in
16 October of 2020 with COVID -- or, you know,
17 under these COVID times that we described is
18 very difficult.
19         We have all been working at home for
20 really the first time ever, undergoing
21 processes, procedures, control environments
22 that have been untested, and there is poor
23 communication.
24         So I am relaying, as I'm telling you
25 now, what is in the email. And unless

1          WATERHOUSE - 10-19-21
2  something has changed -- to my knowledge, it
3  hasn't changed, but it could have changed.
4     Q.    When you say that the advisors have
5  the full faith and backing from Mr. Dondero,
6  did you intend to convey that, to the extent
7  the advisors were unable to satisfy their
8  obligations as they become due, Mr. Dondero
9  would do it for them?
10         MS. DANDENEAU: Object to the form.
11         MS. DEITSCH-PEREZ: Object to the
12 form.
13         And, John, we have given you a lot
14 of leeway here but this does not seem
15 relevant to this case. You seem sort of
16 taking a complete sort of diversion into
17 the allegations and the complaint just
18 filed on Friday, and so I would ask you to
19 move on because --
20         MR. MORRIS: And I will tell you --
21 I will tell you that I have never read that
22 complaint cover-to-cover. I have nothing
23 to do with the prosecution of those claims.
24 And this issue that we're talking about
25 right now is related solely to the

1          WATERHOUSE - 10-19-21
2  promissory notes that your clients refuse
3  to pay.
4         So I'm going to continue to ask my
5  questions, and I would ask the court
6  reporter to read back my last question.
7         (Record read.)
8         MS. DEITSCH-PEREZ: And then I
9  believe there were objections to form.
10    Q.    You can answer the question.
11    A.    Yes.
12    Q.    Thank you very much, sir.
13         MR. MORRIS: Can we go back to the
14 other document, please?
15    Q.    Mr. Waterhouse, do you know if this
16 document was ever shared with the retail board?
17    A.    I don't recall.
18    Q.    Did you ever share it with the
19 retail board?
20    A.    I don't recall.
21    Q.    Did you ever tell the retail board
22 about the substance of this document?
23    A.    I don't recall.
24    Q.    Did you ever tell the retail board
25 that Highland had agreed not to make a demand

Page 210

1  WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3    A.  I don't recall.
4    Q.  Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9    A.  I don't recall.
10   Q.  Did you instruct Ms. Thedford or
11 anybody else responding to the retail board's
12 15(c) inquiry to disclose this document?
13   A.  Did I instruct Ms. Thedford or
14 anyone else to -- to -- to produce this, to
15 disclose this document?  Is that what you -- I
16 just want to make sure.
17   Q.  Uh-huh.
18   A.  Yeah, I don't -- I don't recall.
19   Q.  Did you instruct anybody to inform
20 the retail board, in response to their question
21 as part of the 15(c) process, to -- to tell the
22 retail board about Highland's agreement not to
23 make a demand until 2021?
24      MS. DANDENEAU:  Objection to form.
25   A.  I don't recall.

Page 211

1  WATERHOUSE - 10-19-21
2    Q.  Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4      MS. DANDENEAU:  Object to the form.
5    A.  I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8    Q.  Did -- do you know if anybody on
9  behalf of Highland ever informed
10 PricewaterhouseCoopers that HCMFA may be unable
11 to repay amounts owing to Highland, should they
12 become due?
13      MS. DANDENEAU:  Objection to form.
14   A.  Yes.  Again, I think I testified
15 earlier that -- that this was communicated to
16 the auditors.
17   Q.  Ideally --
18   A.  I don't know who exactly did that.
19 I don't recall doing it, but, yeah, it was --
20 it was communicated.  And that is why -- I
21 mean, there is a disclosure in the financial
22 statements; right?
23   Q.  There is, and that disclosure
24 relates to the last sentence of this document;
25 correct?

Page 212

1  WATERHOUSE - 10-19-21
2    A.  Yes.
3    Q.  Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6    A.  No.
7    Q.  Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10 it may be unable to repay amounts due and owing
11 to Highland should they become due?
12      MS. DEITSCH-PEREZ:  Object to the
13   form.  I think that is the third time.
14   A.  I don't recall.  Again, as I said,
15 we -- all of this was given to the auditors.
16   Q.  Do you know if Highland received
17 anything of value in exchange for its agreement
18 not to demand payment on amounts owed by HCMFA
19 prior to May 31st, 2021?
20      MS. DEITSCH-PEREZ:  Object to the
21   form.  That is the second time.
22      MS. DANDENEAU:  Object to the form.
23   A.  I have answered this question.
24      MR. RUKAVINA:  Hold on.  Object to
25   legal conclusion.  Go ahead.

Page 213

1  WATERHOUSE - 10-19-21
2    A.  I have answered this question
3  before.
4    Q.  And the answer was no?
5    A.  I'm not aware.
6    Q.  Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10 right?
11      MS. DANDENEAU:  Objection to form.
12   A.  Unless there is a drafting error.
13   Q.  Okay.  Are you aware of a drafting
14 error?
15   A.  I'm not aware.  I didn't -- I wasn't
16 part of -- I didn't sign this note or this
17 acknowledgment.  I didn't draft it.
18   Q.  But you do see it is dated April 15,
19 2019; right?
20   A.  Yes.
21   Q.  And this was a document that was
22 actually included by the advisors in a pleading
23 they filed with the Court; right?
24      MR. RUKAVINA:  Well, I don't know
25   that so I object to form.

1          WATERHOUSE - 10-19-21
2    Q.  Okay.  Let's go to the first page of
3 the document and just confirm that.
4      MR. AIGEN:  Mr. Morris, I just note
5 that you already said there was some error
6 with the document that is listed as
7 exhibit –
8      MR. MORRIS:  No.  No, no, no.
9      MS. DEITSCH-PEREZ:  Oh, okay.
10     MR. MORRIS:  What I said is that
11 there is a few pages that were mistakenly
12 stapled to the end of the document.
13     MS. DEITSCH-PEREZ:  Okay.
14     MR. MORRIS:  There is no problem
15 with this document.
16     MS. DEITSCH-PEREZ:  And just so
17 we're clear that the document – the pages
18 that start with defendant's amended answer
19 are not intended to be part of this
20 document?
21     MR. MORRIS:  That's correct.
22     MS. DEITSCH-PEREZ:  And that the –
23 but it is your representation that the rest
24 of the document is – is – is correct
25 because we don't – we don't have any way

1          WATERHOUSE - 10-19-21
2 of verifying that, we're just –
3     MR. MORRIS:  You do, actually.  You
4 could just go to Docket No. 21-3004.
5     MS. DEITSCH-PEREZ:  If you want to
6 stop this deposition so we can go and pull
7 that document up, we're happy to do it.  So
8 I am just asking you for your
9 representation.
10     MR. MORRIS:  Sure.  I gave that.
11     MS. DEITSCH-PEREZ:  Okay.
12    Q.  So do you see that this is a
13 document that was actually filed with the Court
14 by Highland Capital Management Fund Advisors?
15    A.  No.  I get with the first page in
16 the section.  Maybe I'm looking at the wrong
17 thing.  It says, Highland Capital Management.
18    Q.  Don't worry about it.  Don't worry
19 about it.
20    A.  Maybe I went back – okay.
21     MR. MORRIS:  All right.  Can we put
22 up on the screen Exhibit 2.
23     (Exhibit 2 marked.)
24     MR. MORRIS:  I think it is
25 Exhibit 1.

1          WATERHOUSE - 10-19-21
2     MS. DANDENEAU:  I'm sorry, John, did
3 you say Exhibit 2 or Exhibit 1?
4     MR. MORRIS:  It is Exhibit 2 in the
5 binders so it is premarked Exhibit 2.  And
6 now I'm asking – right there – going to
7 Exhibit 1 to the document that was marked
8 as Exhibit 2.
9     MS. DANDENEAU:  Got it.  In the
10 binder there is no –
11     MS. DEITSCH-PEREZ:  There is no
12 Exhibit 1.
13     MR. MORRIS:  All right.  So look at
14 the one on the screen.
15    Q.  Do you see, Mr. Waterhouse, that
16 this is a promissory note dated May 31st, 2017,
17 in the approximate amount of $30.7 million?
18    A.  Yes.
19    Q.  And do you see that the maker of the
20 note is NexPoint?
21    A.  Yes.
22    Q.  And that Highland is the payee; is
23 that right?
24    A.  Yes.
25    Q.  Okay.  And do you see in Paragraph 2

1          WATERHOUSE - 10-19-21
2 this is an annual installment note?
3    A.  Can you scroll down.
4    Q.  Sure.
5     MR. MORRIS:  Can we scroll down –
6 yeah, there you go.
7    A.  Right there, yeah.  Yes.
8     MR. MORRIS:  And can we scroll down
9 to the signature line.
10    Q.  And do you recognize that as
11 Mr. Dondero's signature?
12    A.  Yes.
13    Q.  And is this the promissory note that
14 we talked about earlier where NexPoint had made
15 certain payments in the aggregate amount of
16 about 6 to $7 million against principal and
17 interest?
18    A.  I don't recall discussing the
19 aggregate principal amounts of 6 to $7 million,
20 but – so I don't – I don't recall that prior
21 discussion with those amounts.
22    Q.  All right.  Let's take a look.
23 NexPoint always included this promissory note
24 as a liability on its audited financial
25 statements; right?

Page 218

1          WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   And NexPoint had its financial
4  statements audited; isn't that correct?
5     A.   Yes.
6     Q.   And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9     A.   Yes, it is similar.
10    Q.   Okay.
11         MR. MORRIS:  Can we put up
12    NexPoint's audited financials and let
13    everybody know what exhibit number it is,
14    La Asia?
15         MS. CANTY:  It is going to be
16    Exhibit 46.
17         (Exhibit 46 marked.)
18    Q.   And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22    A.   Yes.
23    Q.   Did you participate in the process
24  whereby these audited financial statements were
25  issued?

Page 219

1          WATERHOUSE - 10-19-21
2     A.   I didn't participate directly, as
3  I've described before, about the -- the team
4  performing the audit.
5     Q.   Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8     A.   Yes.
9     Q.   And when do you recall it being
10  completed?
11    A.   In January of 2021.
12    Q.   Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14    A.   Yes.
15    Q.   Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18    A.   Because we had to deal with working
19  from home from -- with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at -- at providing -- at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25         MR. MORRIS:  Can we go to the

Page 220

1          WATERHOUSE - 10-19-21
2     balance sheet on page 3?  Okay.  Stop right
3     there.
4     Q.   Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7     A.   Yes.
8     Q.   And is that the note that we just
9  looked at?
10         MS. DANDENEAU:  Objection to form.
11    Q.   Withdrawn.
12         Is that the approximately
13  $30 million note that we just looked at that
14  was dated from 2017?
15         MS. DANDENEAU:  Objection to form.
16    A.   I believe no.
17    Q.   Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21    A.   I don't recall.
22    Q.   And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25         MS. DEITSCH-PEREZ:  Object to the

Page 221

1          WATERHOUSE - 10-19-21
2     form.
3     A.   Approximately.
4     Q.   And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8     A.   Yes.  If we are just doing the math,
9  yes.
10    Q.   Okay.  Did NexPoint complete its
11  audit from 2020?
12         Sorry, you kind of broke up.  Do
13  NexPoint complete?
14    Q.   The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17    A.   No.
18    Q.   No, it's not complete?
19    A.   No, it is not complete.
20    Q.   Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22    A.   No.
23         MR. MORRIS:  Can we go to page 15,
24    please, the paragraph at the bottom.
25    Q.   Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2   included under notes payable to Highland a
3   reference to the amounts that were outstanding
4   as of the year-end 2019 under the note that we
5   looked at just a moment ago?
6      A.   Yes.  Are you talking about the
7   second paragraph?
8      Q.   I'm actually talking about first
9   paragraph.  Do you understand that the first
10  paragraph is a reference to the 2017 note, and
11  the amounts that were -- the principal amount
12  that was outstanding as of the end of 2019?
13     MS. DANDENEAU:  Objection to form.
14  John, do you mean the first paragraph of
15  that page?
16     MR. MORRIS:  No, the first paragraph
17  under notes payable to Highland.
18     A.   Yeah, I see the paragraph, and
19  again, this is what I answered earlier.  I
20  believe so, just because I don't -- again, this
21  is a number in a balance sheet, and without
22  matching it up and seeing the detail with the
23  schedule like I kind of talked about for
24  Highland's financial statements, it is a little
25  bit more difficult to tie everything in

Page 223

1      WATERHOUSE - 10-19-21
2   perfectly together.
3      Q.   Okay.  But you're not aware of any
4   note that was outstanding at the end of 2019
5   from NexPoint to Highland other than whatever
6   principal was still due and owing under the
7   $30 million note issued in 2017; correct?
8      A.   Well, it -- I don't -- there is
9   reference in the second paragraph.  I don't --
10  I don't -- I don't recall what that is
11  referring to, so I don't -- I don't know.
12     Q.   Well, if you listen carefully to my
13  question, right, I'm asking about notes that
14  were outstanding at the end of 2019, and if we
15  look at the paragraph you just referred to, it
16  says that during the year there were new notes
17  issued totaling $1.5 million, but by the end of
18  the year, no principal or interest was
19  outstanding on the notes.
20     Do you see that?
21     A.   Oh, I do, yes.
22     Q.   So does that refresh your
23  recollection that there were no notes
24  outstanding from NexPoint to Highland other
25  than the principal remaining under the original

Page 224

1      WATERHOUSE - 10-19-21
2   $30 million 2017 note that we looked at a
3   moment ago?
4      A.   Well, we're at the bottom of the
5   page.  Is there anything on page 16?
6      Q.   That is a fair question, sure.  That
7   is it.
8      A.   Okay.  So it appears that that is
9   the only note that is detailed in the notes in
10  the financial statement.
11     Q.   And you don't have any memory of any
12  other note other than the 2017 note, right,
13  being outstanding as of the end of the year?
14     A.   I deal with thousands of
15  transactions every year.  I don't really have a
16  very specific memory for what exactly was
17  outstanding.
18     MR. MORRIS:  Why don't we take a
19  break now.  We've been going for a little
20  while.  It's 3:26.  Let's come back at
21  3:40.
22     VIDEOGRAPHER:  We're going off the
23  record at 3:26 p.m.
24     (Recess taken 3:26 p.m. to 3:39 p.m.)
25     VIDEOGRAPHER:  We are going back on

Page 225

1      WATERHOUSE - 10-19-21
2   the record at 3:39 p.m.
3      Q.   All right.  Mr. Waterhouse, we -- I
4   don't think we have a lot more here.
5      To the best of your knowledge and
6   recollection, were all affiliate loans and all
7   loans made to Mr. Dondero recorded on
8   Highland's books and records as assets of
9   Highland?
10     MS. DANDENEAU:  Object to the form,
11  asked and answered.
12     A.   To my knowledge, yes.
13     Q.   Okay.  Can you recall any loan to
14  any affiliate or Mr. Dondero that was not
15  recorded on Highland's books and records as an
16  asset?
17     A.   Like during my time as CFO?  I don't
18  recall.
19     Q.   How about after the time that you
20  were CFO?  Did you recall that there was a loan
21  by Highland to an affiliate or to Mr. Dondero
22  that hadn't been previously recorded on
23  Highland's books as an asset?
24     MS. DANDENEAU:  Objection to form.
25     A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2 question. I left Highland as of -- I'm not
3 aware of -- I left Highland in February --
4 probably the last day of February of 2021.
5   Q.  Okay.
6   A.  I'm not -- I'm not aware of any --
7 I'm not aware of anything past that date.
8   Q.  Okay. While you were the CFO at
9 Highland, did Highland prepare in the ordinary
10 course of business a document that reported
11 operating results on a monthly basis?
12   A.  Yes.
13   Q.  And are you generally familiar with
14 the monthly operating reports?
15   A.  Yeah. You are referring to the
16 reports that we filed to the Court every month?
17   Q.  I apologize, I'm not. I'm taking
18 you back to the pre-petition period. There was
19 a report that I have seen that I'm going to
20 show you, but I'm just asking for your
21 knowledge.
22       MR. MORRIS: Let's put it up on the
23 screen, Exhibit 39.
24       (Exhibit 39 marked.)
25   Q.  Do you see this is a document that

Page 227

1          WATERHOUSE - 10-19-21
2 is called operating results?
3   A.  Yeah, that's the title of it.
4   Q.  Okay. And was a report of operating
5 results prepared by Highland on a monthly basis
6 during the time that you served as CFO?
7   A.  No.
8   Q.  Are you familiar with a document of
9 this type? And we can certainly look at the
10 next page or two to refresh your recollection.
11   A.  I'm just looking at the title. I
12 don't really -- again, as I discussed before, I
13 don't have any records or documents or emails
14 or appointments or anything that I was able to
15 use prior to -- prior to this deposition, so
16 I'm doing the best I can.
17   Q.  Okay. You don't need to apologize.
18 I'm just asking you if you are familiar with
19 the document called Operating Results that was
20 prepared on a monthly basis at Highland?
21       MS. DEITSCH-PEREZ: Object to the
22 form.
23   Q.  If you're not, you're not.
24   A.  I don't believe this was prepared on
25 a monthly basis.

Page 228

1          WATERHOUSE - 10-19-21
2   Q.  Okay. Do you see that this one
3 is -- is dated February 2018?
4   A.  Yes.
5   Q.  Do you have -- do you believe --
6 have you ever seen a document that was
7 purporting to report operating results for
8 Highland?
9       MS. DANDENEAU: Objection to form.
10   A.  Yes.
11   Q.  Okay. And when you say that you
12 don't believe it was produced on a monthly
13 basis, was it produced on any periodic bases to
14 the best of your recollection?
15   A.  I believe it was -- it was prepared
16 on an annual basis.
17   Q.  Okay.
18       MR. MORRIS: Can we look at the next
19 page.
20   Q.  Do you see that there is a statement
21 here called: Significant items impacting
22 HCMLP's balance sheet?
23       And it is dated February 2018.
24   A.  Yes.
25   Q.  Do you recall that there was a

Page 229

1          WATERHOUSE - 10-19-21
2 report that Highland prepared that identified
3 significant items impacting the balance sheet?
4   A.  A report that was prepared.
5   Q.  Let me ask a better question: Did
6 Highland prepare reports to the best of your
7 recollection that identified significant items
8 that impacted its balance sheet?
9   A.  Well, so Highland prepared a -- a
10 monthly close package. And maybe I'm
11 getting -- and -- and maybe change names at one
12 time or maybe I'm just -- again, just
13 misremembering -- but in that, yes, there is a
14 page that would detail just changes in -- you
15 know, just changes month over month on the
16 balance sheet.
17   Q.  Okay. And maybe it is my fault.
18 Maybe I didn't know the proper name for it.
19 But let's use the phrase "monthly close
20 package."
21       Did Highland prepare a monthly close
22 package in the ordinary course of business
23 during the time that you served as CFO?
24       MS. DANDENEAU: Objection to form.
25   A.  Yes.

Page 230

1       WATERHOUSE - 10-19-21
2       Q.   And did the monthly close package
3   that Highland prepared include information
4   concerning significant items that impacted
5   Highland's balance sheet?
6       A.   Yes, it had a page like that is –
7   that is on the screen that detailed items
8   like – of that nature.
9       Q.   And do you know who – was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13      A.   That would have been – again, it
14  varies over time during my tenure as CFO.
15  It – it varied over – over time, but – but
16  typically a – a corporate accounting manager.
17      Q.   And who were the corporate
18  accounting managers during your tenure as CFO?
19      A.   It would have been Dave Klos and
20  Kristin Hendrix.
21      Q.   And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24      A.   Sometimes.
25      Q.   Was that the practice even if there

Page 231

1   were exceptions to the practice?
2       A.   The practice meaning that they
3   sometimes lured them to me?
4       Q.   That that was the expectation even
5   if circumstances prevented that from happening
6   from time to time.
7       MS. DEITSCH-PEREZ:  Object to the
8   form.
9       A.   I – I would say it started out that
10  way but over the years it – it was not
11  enforced.
12      Q.   Okay.  So you were – you reviewed
13  and approved monthly – monthly reporting
14  packages for a certain period of time and then
15  over time you stopped doing that.
16      Do I have that right?
17      MS. DANDENEAU:  Objection to form.
18      A.   Yes, I mean, if you're talking about
19  a formal meeting where we sit down and go
20  through and approve it.  I would say that was
21  standard practice a decade – you know, early
22  on.  And as time went on that – that – that
23  practice wasn't followed.
24      Q.   Okay.

Page 232

1       WATERHOUSE - 10-19-21
2       A.   And, quite frankly, I don't even
3   know if these were – these were sent to me
4   even in any capacity.
5       Q.   What was the purpose of preparing
6   the monthly reporting package – withdrawn.
7       What was the purpose of preparing
8   the monthly close package?
9       MS. DEITSCH-PEREZ:  Object to the
10  form.
11      A.   The – the original purpose was so
12  that it would just – it would be a report that
13  was reviewed monthly with senior management.
14      Q.   Who was included in the idea of
15  senior management?
16      A.   You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19      Q.   Were monthly reporting – withdrawn.
20      Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23      A.   To my knowledge – I don't know,
24  actually.  I mean, to my knowledge, I believe
25  it was being – that was still being done.  I

Page 233

1   don't know because, again, I wasn't reviewing
2   them.  I hadn't reviewed a close package for –
3   for a long time.  But I believe the standard
4   practice that was still being carried out.
5       Q.   Did you ever have any discussions
6   with the debtor's independent board concerning
7   any promissory notes that were issued by any of
8   the affiliates or Mr. Dondero?
9       A.   I can't – I can't – I can't recall
10  specifically.
11      Q.   Did you speak with the independent
12  board from time to time?
13      A.   Yes, from – from – from time to
14  time I had discussions with the independent
15  board members, you know, either – either, you
16  know, by themselves or wholly, you know, as –
17  as a – as a combined work.
18      Q.   Okay.  Before we talk about
19  Mr. Seery, do you recall ever having a
20  conversation with Mr. Nelms or Mr. Dubel
21  concerning any promissory note that was
22  rendered by one of the affiliates or
23  Mr. Dondero to Highland?
24      A.   I don't recall any conversations

Page 234

1  WATERHOUSE - 10-19-21
2  specifically.
3  Q. Do you know if the topic was ever
4  discussed, even if you don't remember it
5  specifically?
6  MS. DANDENEAU: Objection to form.
7  A. It – it – it may have. I don't
8  know. I don't recall.
9  Q. Do you recall ever discussing any
10 promissory note issued by any of the affiliates
11 or Mr. Dondero with James Seery?
12 A. I don't – I don't recall
13 specifically.
14 Q. Do you recall generally ever
15 discussing the topic of promissory notes issued
16 by any of the affiliates or Mr. Dondero to
17 Highland with Mr. Seery?
18 A. Nothing – nothing is really jumping
19 out at me.
20 Q. Do you recall if you ever told
21 Mr. Seery that any of the affiliates or
22 Mr. Dondero didn't have an obligation to pay
23 all amounts due and owing under their notes?
24 A. I don't recall having that
25 conversation.

Page 235

1  WATERHOUSE - 10-19-21
2  Q. Did you ever tell Mr. Seery that you
3  had any reason to believe that the amounts
4  reflected in the notes issued by the affiliates
5  and Mr. Dondero were invalid for any reason?
6  A. I don't – I don't recall.
7  Q. Did you tell Mr. Dondero – did you
8  tell Mr. Seery that you thought the promissory
9  notes issued by the advisors and Mr. Dondero
10 that were outstanding as of the petition date
11 were assets of the estate?
12 A. I don't recall having a specific
13 conversation about those – you know, those
14 notes outstanding as – as of the petition date
15 being assets on the estate. I mean, we put
16 together – you know, they're in the books and
17 records of the financial statements. I don't
18 recall having a specific conversation.
19 Q. Did you ever prepare any documents
20 that were delivered to Mr. Seery that concerned
21 the promissory notes issued by any of the
22 affiliates or Mr. Dondero?
23 MS. DANDENEAU: Objection to form.
24 A. Did I produce any that concerned –
25 you mean did I just – did I give Mr. Seery

Page 236

1  WATERHOUSE - 10-19-21
2  anything that – that said I have concerns over
3  these notes?
4  Q. No. Let me try again. Maybe it was
5  my question.
6  Did you ever give Mr. Seery any
7  information concerning any of the notes that
8  were issued by any of the affiliates or
9  Mr. Dondero?
10 MS. DANDENEAU: Objection to form.
11 A. I don't recall if I did or not. I
12 don't – I don't remember. I mean, you have my
13 emails. You may have asked. Again, I don't –
14 I don't know.
15 MR. MORRIS: Can we put up the
16 document that has been premarked as Exhibit
17 39?
18 MS. DANDENEAU: John, that is this
19 document, isn't it?
20 MR. MORRIS: Oh, yeah, it might be,
21 as a matter of fact. Let's go to Number
22 40.
23 (Exhibit 40 marked.)
24 Q. During the bankruptcy,
25 Mr. Waterhouse, did you prepare documents that

Page 237

1  WATERHOUSE - 10-19-21
2  were filed with the bankruptcy court?
3  A. I didn't – I didn't prepare them
4  personally.
5  Q. Did people prepare them under your
6  direction?
7  A. Yes. There were members of the team
8  that prepared them, and they worked in – you
9  know, there were members of DSI that were
10 involved in the process as well.
11 Q. To the best of your knowledge, did
12 DSI rely on the employees of Highland for the
13 information that they used to prepare the
14 bankruptcy filings?
15 A. Yes. The books and records were
16 with the Highland personnel.
17 Q. Okay. And do you see on the screen
18 here, there is a document that we have marked
19 as Exhibit 40 that is – that is titled Summary
20 of Assets and Liabilities?
21 A. Uh-huh.
22 Q. Okay. And do you recall reviewing
23 any summary of assets and liabilities before it
24 was filed with the bankruptcy court?
25 A. Yes, I recall reviewing this at a

Appx. 02108

WATERHOUSE - 10-19-21

1 high level.

2 Q. And did you believe that it was

3 accurate at the time it was filed?

4 A. I didn't have any other reason to

5 believe otherwise.

6 Q. Okay. Do you see that the total

7 value of all properties listed in Part 1 is

8 approximately $410 million?

9 MS. DEITSCH-PEREZ: Objection to

10 form.

11 A. Yes, it is in 1c.

12 Q. Yes.

13 A. Yes, I see that.

14 Q. Okay. If we go to the second page,

15 now I think I may just have excerpts here, just

16 so everybody is clear, but if we scroll down to

17 the second page, you will see that there is

18 a – a little further. There you go. You will

19 see there is a reference to Item 71, notes

20 receivable.

21 Do you see that?

22 A. I do.

23 Q. And that was a reference to the

24 notes receivable from the affiliates and

WATERHOUSE - 10-19-21

1 Mr. Dondero, among others; is that right?

2 MS. DANDENEAU: Objection to form.

3 A. Yes. The affiliate notes and the

4 Dondero notes were in this amount, but they

5 weren't – again, like you said, and among

6 others.

7 Q. Okay. We will look at the

8 specificity because I'm not playing gaming

9 here, but do you know if the $150 million of

10 notes receivable was included within the

11 $410 million of total value of the debtor's

12 assets?

13 MS. DANDENEAU: Objection to form.

14 A. I – I – I believe so.

15 Q. Right. And so is it fair to say

16 that as of the date this document was prepared,

17 the notes receivable were more than one-third

18 of the value of the debtor's assets?

19 MS. DEITSCH-PEREZ: Object to the

20 form.

21 MS. DANDENEAU: Object to the form.

22 A. Again, if you are just taking the

23 math, 150 divided by whatever the $400 million

24 number is above, then yes, you get there.

WATERHOUSE - 10-19-21

1 Q. Okay.

2 A. You know, but as of the time of this

3 filing, that is what was put in this filing,

4 right, but, you know, I mean, numbers --

5 numbers change, facts and circumstances change.

6 Q. But as the CFO of Highland, the

7 debtor in bankruptcy, did you believe that this

8 number accurately reflected the total amount

9 due under the notes receivable?

10 A. That is what we had in our books and

11 records.

12 Q. Okay. And did you believe as the

13 CFO that the books and records accurately

14 reported the then value of the debtor's assets?

15 MS. DANDENEAU: Objection to form.

16 A. We didn't -- as part of this filing,

17 there was no fair value measurement or

18 anything. These were just accounting entries

19 for the promissory notes. There is no analysis

20 for impairment or fair market value adjustments

21 or anything of that nature. This is purely

22 taking numbers and putting them in our form.

23 Q. Did you do any impairment analysis

24 at any time while you were employed by

WATERHOUSE - 10-19-21

1 Highland?

2 A. Yes, we did do impairment analysis

3 on – on assets.

4 Q. Okay. Did you ever do an impairment

5 analysis on any of the promissory notes that

6 were given to Highland by any of the affiliates

7 or Mr. Dondero?

8 A. Not that I recall.

9 Q. Under what circumstances do you

10 prepare impairment analyses?

11 A. As – as – if you're preparing

12 financials in accordance with GAAP, generally

13 accepted accounting principles, if you're

14 preparing full GAAP financials, you should be

15 preparing – you should be undergoing on a

16 periodic basis any fair market value

17 adjustments to assets.

18 As I was instructed at the time of

19 the petition date, we weren't producing GAAP

20 financials. So this wasn't something I was

21 worried about nor concerned about.

22 Q. Okay. Were NexPoint and HCMFA and

23 Highland's audited financial statements

24 prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1
2    A.   The audited financials -- yes,
3    audited financial statements are prepared in
4    accordance with GAAP.
5        Q.   Do you recall whether any of
6    Highland or HCMFA or NexPoint ever made a fair
7    market value adjustment to any of the notes
8    issued by any of the affiliates or Mr. Dondero
9    to Highland?
10       A.   I do not recall that happening, but
11   the -- it is because under -- under GAAP,
12   the -- the treatment of liabilities is
13   different than assets.
14       Q.   Okay.  So then let's just focus on
15   Highland's audited financial statements.
16           The last audited financial
17   statements were for the period ending December
18   31st, 2018; correct?
19       A.   That is my understanding.
20       Q.   And you had -- you had an obligation
21   to disclose anything to PricewaterhouseCoopers
22   concerning any subsequent events between the
23   end of 2018 and June 3rd, 2019; correct?
24           MS. DANDENEAU:  Objection to form.
25           MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1
2    A.   Correct.
3        Q.   Okay.  To the best of your
4    knowledge, as Highland's CFO, did Highland ever
5    make any fair market value adjustments to any
6    of the promissory notes that were carried on
7    its balance sheet and that were issued by any
8    of the affiliates or Mr. Dondero?
9        A.   I think I answered that question
10   earlier.  I don't recall doing that for any of
11   those -- those notes.  So it would have
12   included the audit for the -- for the 2018
13   period.
14       Q.   Okay.
15           MR. MORRIS:  Can we go to the next
16   page.
17       Q.   Do you see this is a note a list of
18   notes receivable?  Do you see that?
19       A.   Yes, I do.
20       Q.   And do you see that this ties into
21   the page that we were just looking?
22       A.   I'm sorry, can we go back to the
23   prior page?  I mean, it was at 150,331,222.  It
24   was on the prior page.  Next page.  Yes, it
25   agrees.

Page 244

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  So now let's look at that
3    schedule.  So this was the face amount of all
4    of the promissory notes that Highland held at
5    the time this document was filed with the
6    bankruptcy court; right?
7        A.   Yes.
8        Q.   There is a footnote there that says,
9    doubtful or uncollectible accounts are
10   evaluated at year-end.
11           Do you see that?
12       A.   I do.
13       Q.   Okay.  And is it fair to say that as
14   of the year-end 2018, the year before this,
15   that to the extent any of these notes were
16   outstanding at that time, they weren't deemed
17   to be doubtful or uncollectible?
18       A.   Yeah.  For the 2018 audit, there
19   weren't any -- there weren't any adjustments to
20   fair value.
21       Q.   Okay.  And during the bankruptcy, do
22   you recall that Highland subsequently reserved
23   for the Hunter Mountain Investment Trust note?
24       A.   Yes.
25       Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1
2    involved in the decision to reserve the Hunter
3    Mountain Investment Trust note?
4        A.   I was not.
5        Q.   Do you know why Highland decided to
6    reserve for the Hunter Mountain Investment
7    Trust note?
8        A.   I don't know yet decision was made.
9    I believe it was made by someone at DSI.
10       Q.   Okay.  I'm just asking if you know
11   why.
12           Did you ever ask anyone why they
13   reserved for that particular note?
14       A.   I don't recall.
15       Q.   Do you know whether the debtor
16   reserved for any other note on this list during
17   the bankruptcy?
18       A.   Again, I don't recall.  I wasn't
19   part of any process of -- again, like any fair
20   value adjustments or anything to that degree.
21   Like I said, a lot of that was done by DSI and
22   it was kind of out of our court.
23       Q.   Okay.  Do you know if any note
24   receivable on this list was ever deemed by the
25   debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2     A.   I don't -- I don't have a
3   recollection of every filing, so I don't know.
4     Q.   Did you ever have a discussion with
5   anybody at any time about whether any of the
6   notes receivable on this list should be deemed
7   to be doubtful or uncollectible?
8     A.   No.  As I previously stated, we were
9   told we didn't have to keep GAAP financials.
10  We weren't having -- you know, there is no
11  underlying audits being performed, so I mean,
12  it wasn't something I worried about.
13        MR. MORRIS:  I move to strike.
14    Q.   Did you ever have a conversation
15  with anybody about any of the notes receivable
16  and whether they should be deemed to be
17  doubtful or uncollectible?  Did you have the
18  conversation, yes or no?
19        MS. DANDENEAU:  Objection to form.
20    A.   I don't recall.
21    Q.   Do you recall ever telling anybody
22  that you believed any of the notes receivable
23  on this list should be doubtful -- should be
24  deemed to be doubtful or uncollectible?
25        MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2     A.   I don't recall.  I mean, it may have
3   happened, you know, again, when we initially
4   getting DSI up to speed and going through
5   financials, it may have happened, but I don't
6   recall specifically.
7     Q.   While you were the CFO of Highland
8   during the time that the company was in
9   bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14        MS. DANDENEAU:  Objection to form.
15        MS. DEITSCH-PEREZ:  Form.
16    A.   I didn't know.  I didn't form an
17  opinion.  Bankruptcy was new to me.  It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21        MR. MORRIS:  I move to strike.
22    Q.   During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2         MS. DEITSCH-PEREZ:  This is like the
3   fifth time you've asked it.  Object to the
4   form.
5         MR. MORRIS:  I'm moving to strike,
6   if you haven't noticed, because he's not
7   answering the question.
8         MS. DEITSCH-PEREZ:  He was answering
9   the question, you just didn't like it, like
10  the answer.
11        MR. MORRIS:  Good Lord.
12    Q.   Go ahead, Mr. Waterhouse.
13    A.   Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.  I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.  Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22        MR. MORRIS:  I move to strike.
23    Q.   During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2   receivable on this list were doubtful or
3   uncollectible?
4         MS. DEITSCH-PEREZ:  Object to the
5   form.
6     A.   Potentially.
7     Q.   Did you ever tell anybody that?
8     A.   As I just stated like five times,
9   yes, we -- at the beginning after filing and we
10  were getting DSI and others up to speed, you
11  know, we had a myriad of discussions of a lot
12  of things and this was likely one of them.  I
13  don't -- but I don't recall specifically we
14  talked --
15    Q.   I don't want to know -- I don't want
16  to know what was --
17        MS. DEITSCH-PEREZ:  Wait, wait.
18  Excuse me.  Mr. Morris, you did not let him
19  finish his answer.
20    A.   I spoke -- we had -- we were
21  bringing Fred Karesa and Brad Sharp (phonetic)
22  up to speed on all of these items, contracts,
23  and investments and going through -- we had
24  hours and hours and hours of discussion.  And
25  then not only do I have to repeat this not

**Appx. 02111**

Page 250

WATERHOUSE - 10-19-21

1 once, twice, three, four times with – you
2 know, I mean, we – I don't – I don't remember
3 the sum culmination of all these discussions.
4 They all kind of blend together.
5 MR. MORRIS: Okay. I move to strike
6 and I will try one more time.
7 Q. Did you ever tell anybody at DSI
8 that you believed any of the notes receivable
9 on this list were doubtful or uncollectible?
10 MS. DANDENEAU: Object to form.
11 A. Potentially.
12 Q. Potentially you told them or
13 potentially they were doubtful or
14 uncollectible?
15 A. Potentially I told them that we
16 needed to look at the value of these – of
17 these assets.
18 Q. Okay. Did you – okay. It is
19 potential that you told them and it is
20 potentially that you didn't; right?
21 MS. DANDENEAU: Objection to form.
22 A. I've gone through that. I don't
23 recall specifically.
24 Q. So you should just – I don't want

Page 251

WATERHOUSE - 10-19-21

1 to tell what you to do. Do you have –
2 MS. DANDENEAU: Good.
3 Q. Other than – other than telling
4 them that they should look at the values, do
5 you have any recollection whatsoever of ever
6 having told anybody at DSI that any of the
7 notes receivable on this page were doubtful or
8 uncollectible?
9 MS. DEITSCH-PEREZ: Object to the
10 form.
11 MS. DANDENEAU: Objection.
12 A. I recall having general discussions
13 about everything on our balance sheet which
14 would have included these – these notes
15 receivable.
16 Q. Okay.
17 A. I don't recall specifically where
18 those discussions delved into.
19 Q. Do you recall any discussion at all
20 on the topic of whether any of these notes on
21 this list were doubtful or uncollectible?
22 MR. AIGEN: Mr. Morris, how on earth
23 is that question different from the
24 question that you just asked for the last

Page 252

WATERHOUSE - 10-19-21

1 five times? I mean, really I thought you
2 were – (overspeak.)
3 MR. MORRIS: Because he never
4 answered it.
5 MS. DEITSCH-PEREZ: Are you
6 listening to him?
7 MR. MORRIS: You know –
8 MS. DEITSCH-PEREZ: He basically
9 said that he had a conversation with DSI
10 that went over all of this stuff and that
11 conversation could have included the notes
12 but he doesn't recall specifically.
13 What more do you want him – to ask
14 of him?
15 MR. MORRIS: I want him – I would
16 love him to say – I would like him to
17 testify to the truth, and that is he has no
18 recollection.
19 MS. DEITSCH-PEREZ: Well, the truth
20 as you would like to see it, but – but he
21 is testifying truthfully. And I – and, by
22 the way, I move to strike that comment –
23 MR. MORRIS: Okay.
24 MS. DEITSCH-PEREZ: – because it

Page 253

WATERHOUSE - 10-19-21

1 suggests that he has not testified
2 truthfully.
3 MR. MORRIS: I will ask my question
4 again. And if at any time you want to
5 direct him not to answer, that is your
6 prerogative.
7 Q. Mr. Waterhouse, do you have any
8 recollection at all of ever telling anybody
9 from DSI that any of these notes were doubtful
10 or uncollectible?
11 MS. DANDENEAU: Object to form.
12 A. I don't remember specifically.
13 Q. Do you remember generally that
14 specific topic?
15 A. We generally talked about assets,
16 values. If – we had discussions of that and
17 collectability in nature. I mean, of Highland,
18 the funds, the CLOs, the entire complex. We
19 had discussions like that, which is, you know,
20 as you look at a billion dollar consolidated
21 balance sheet.
22 So I generally remember – this is
23 billions of dollars, including these assets –
24 having discussions of this – of this type.

Page 254

WATERHOUSE - 10-19-21

2  Q.  Do you believe that an affiliate
3  loan on this list was doubtful or
4  uncollectible? Would you have told that to
5  DSI?
6      MS. DANDENEAU: Objection to form.
7      MS. DEITSCH-PEREZ: Object to form.
8  A.  If we had, like -- again, if we --
9  if -- if we weren't preparing financial
10 statements in accordance with GAAP, and -- you
11 know, if DSI at that point -- they were --
12 again, I was new to bankruptcy.
13     The CRO is -- we are delegating
14 everything to the CRO. All the decisionmaking.
15 Remember -- remember when you and I went into
16 Delaware Court and we were saying DSI basically
17 does everything, remember this, Mr. Morris?
18     You were my counsel at the time, and
19 basically we're running everything through DSI.
20 That was what this was like in the early part.
21     Everything was communicated through
22 DSI. So DSI says this. DSI says that. That
23 is what we're doing, and we're pointing out
24 things to them.
25     Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

2  goes.
3      Q.  Did you point out that any of
4  these --
5      A.  I don't recall specifically.
6      Q.  Okay. At any time that you served
7  as Highland's CFO, did you ever point out to
8  DSI that any of these loans were doubtful or
9  uncollectible?
10     MS. DEITSCH-PEREZ: Object to the
11     form.
12     MS. DANDENEAU: Objection.
13     A.  If you're asking me if I had a
14 conversation with DSI, if any of these loans
15 were doubtful or uncollectible, I don't recall
16 specifically.
17     Q.  Do you recall that the debtor filed
18 on the docket monthly operating reports?
19     A.  Yes.
20     Q.  You prepared those personally,
21 didn't you?
22     MS. DEITSCH-PEREZ: Objection to
23     form.
24     A.  I didn't personally prepare them,
25 the team did with DSI.

Page 256

WATERHOUSE - 10-19-21

2  Q.  But you signed them; correct?
3  A.  My signature is on the MORs.
4  Q.  And you signed them as the preparer
5  of the document; correct?
6  A.  Yes, I did this pursuant to DSI's
7  instructions.
8  Q.  Okay. You wouldn't have signed the
9  document if you didn't believe it to be
10 accurate; correct?
11 A.  If I had reason to believe it
12 wasn't, presumably I wouldn't have signed it.
13 Q.  Okay. And do you have any reason to
14 believe right now that any monthly operating
15 report that has your signature on it was
16 inaccurate in any way?
17     MS. DEITSCH-PEREZ: Object to the
18     form.
19 A.  My understanding of the monthly
20 operating reports is we were filing them in
21 accordance with the standards set by the Court.
22 It wasn't -- you know, I don't -- you
23 know, it wasn't GAAP. It wasn't these other
24 standards, so I testified I didn't have
25 experience in this. The CRO was running the

Page 257

WATERHOUSE - 10-19-21

2  show. I followed their advice.
3      Q.  But you assured yourself that
4  everything in the report was accurate before
5  you signed them; correct?
6      MS. DANDENEAU: Objection to form.
7      A.  I trusted the guidance from the CRO
8  and their team and their experience and their
9  guidance for doing this for many, many, many
10 years to -- to -- to categorize and put things
11 in ways on the form.
12     You know, my team had -- had not
13 filled out these forms before and needed all of
14 this guidance. I'm not an expert in this. I
15 have oversight of it. I signed the form. DSI
16 told me to.
17     Q.  And you and your team are the source
18 of the information that DSI used to create the
19 reports; correct?
20     MS. DANDENEAU: Objection to form.
21     A.  The books and records reside with
22 the -- with -- with the corporate accounting
23 team.
24     Q.  Okay. And the corporate accounting
25 team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  under your direction; correct?
3     A.   Yes.
4     Q.   So -- so your team was responsible
5  for maintaining Highland's books and records;
6  correct?
7     A.   I'm sorry, my team was responsible?
8     Q.   Correct.
9     A.   Yes.  They -- they -- they were
10  the -- the -- the general ledger of Highland,
11  that responsibility was with the corporate
12  accounting team.
13    Q.   The corporate accounting group
14  reported to you; correct?
15    A.   Yes.
16         MR. MORRIS:  Can we put up 41,
17    please.
18         (Exhibit 41 marked.)
19    Q.   All right.  You will see that this
20  is a report that is dated January 31st, 2020,
21  but it is for the month ending December 2019.
22         Do you see that?
23    A.   I do.
24    Q.   And you signed this report in your
25  capacity as the chief financial officer of

Page 259

1    WATERHOUSE - 10-19-21
2  Highland; correct?
3     A.   Yes.
4     Q.   And you're the preparer -- you're
5  identified as the preparer of the report;
6  correct?
7     A.   That is correct.
8     Q.   Do you recall participating in the
9  preparation of monthly operating reports?
10    A.   As I testified earlier, it was put
11  together, you know, with the team.  The team
12  worked with DSI to put these monthly operating
13  reports together.  We had no experience at this
14  time of the monthly operating reports or things
15  of this nature.
16         MR. MORRIS:  Can you turn to the
17    next page, please.
18    Q.   Do you see a line item under assets
19  due from affiliates?
20    A.   Yes, I do.
21    Q.   Okay.  And to the best of your
22  knowledge and understanding, as the person who
23  is identified as the preparer of this report,
24  does that line item include the affiliate loans
25  that we've been talking about?

Page 260

1    WATERHOUSE - 10-19-21
2     A.   Again, I would have to see, just
3  like we did with the financial statements of
4  Highland and NexPoint, I would have to see a
5  detailed build, but, you know, if you look at
6  the other line items, you know, the only other
7  place it could be would be in -- in other
8  assets.
9     Q.   Okay.  And as a matter of
10  arithmetic, is it fair to say that is the value
11  of the assets due from affiliates was more than
12  25 percent of the value of Highland's total
13  assets as of 12/31/2019?
14         MS. DANDENEAU:  Objection to form.
15    I'm really not doing the mental math
16    right now, so I've been going at this depo for
17    hours, so I'm really not -- you know --
18    Q.   All right.  No problem.
19    A.   -- these are millions of dollars.
20    Q.   Let's look at the Footnote 1,
21  please.  Do you see there is a reference to the
22  Hunter Mountain note?
23    A.   Yes, I see that in Footnote 1.
24    Q.   Okay.  And that's the reserve that
25  was taken against that note?

Page 261

1    WATERHOUSE - 10-19-21
2     A.   Yes, that is what this indicates.
3     Q.   Okay.  And were you aware that the
4  reserve was being taken on that it was?
5     A.   I was -- I was aware, yeah, at some
6  point, yes.
7     Q.   Okay.  And are you aware of any
8  reserve being taken with respect to any other
9  note that was issued in favor of Highland?
10    A.   Again, as I testified, we didn't go
11  through an analysis on -- on -- on the other
12  notes.
13    Q.   Can we turn --
14    A.   I believe -- I believe it says that
15  in Footnote 1, fair value has not been
16  determined with respect to any of the notes.
17         So this footnote -- footnotes, look,
18  there has been no determination.
19    Q.   Okay.  The determination was made in
20  the audited financial statements just six
21  months earlier; right?  We saw that earlier?
22    A.   That was as of 12/31/18.  I mean,
23  things -- circumstances -- there's a bank --
24  circumstances change, things change -- things
25  change over time, you know, facts and

Page 262

1    WATERHOUSE - 10-19-21
2  circumstances change. Again, you have to do an
3  analysis.
4    Q.   Okay. And you do recall that in
5  Highland's 2018 financial statement, all of the
6  notes issued by affiliates and Mr. Dondero that
7  were due at year-end had a fair value equal to
8  the carrying value; correct? We looked at
9  that?
10   A.   Yes. That was in the -- in the
11  disclosure for the -- for the affiliate notes,
12  yes.
13   Q.   And -- and you were obligated to
14  share with PwC any subsequent events between
15  the end of 2018 and the date that you signed
16  your management representation letter on June
17  3rd, 2019; correct?
18       MS. DEITSCH-PEREZ: Object to the
19  form.
20   A.   Yes. I -- I -- I signed the
21  management, you know, my signature is in the
22  management representation letter -- I hope I'm
23  answering your question -- that is dated in
24  June with the representations made in that
25  management representation letter.

Page 263

1    WATERHOUSE - 10-19-21
2    Q.   Okay. And there was nothing that
3  caused PricewaterhouseCoopers to include in
4  subsequent events any adjustment to the
5  conclusion that the fair value of the affiliate
6  notes and the notes issued by Mr. Dondero
7  equaled the carrying value; correct?
8       MS. DANDENEAU: Objection to the
9  form.
10   A.   That is correct. That is what was
11  in the -- in the -- in the footnotes.
12   Q.   Okay. So are you aware of anything
13  that occurred between June 3rd, 2019 and
14  December 31st, 2019 that would have caused the
15  fair value of the notes to differ from the
16  carrying value?
17   A.   Yeah. Highland filed for
18  bankruptcy, things changed -- I mean, there was
19  a bankruptcy filed in October of -- of -- of
20  2019, right, the petition date that we've
21  described earlier.
22       I mean, I had a -- I guess looking
23  back naively, I thought we were going to get an
24  audit from PwC for year-ended 2019, and when we
25  had discussions with PwC, they were like, are

Page 264

1    WATERHOUSE - 10-19-21
2  you crazy, we're not auditing this. Values
3  change, all these things change, bankruptcy
4  changes the entire scenario. I mean -- and
5  they're like, we're not -- we're not touching
6  this.
7       And so, you know, I was like, okay,
8  sorry, I get it, okay, no an audit.
9       I mean, it is -- you know, and --
10  you know, and we weren't preparing GAAP
11  financial statements.
12       Again, I didn't know what we were
13  doing in relation to our financial statements,
14  but these were the discussions I was having at
15  the time. And yeah, I mean, filing bankruptcy
16  from what I got from outside auditors and
17  others involved changed things dramatically.
18   Q.   Okay. Highland wasn't the obligor
19  under any of the notes that we're talking
20  about; correct?
21   A.   No.
22   Q.   So --
23   A.   That's right.
24   Q.   So can you identify any fact that
25  would cause the fair value to deviate from the

Page 265

1    WATERHOUSE - 10-19-21
2  carrying value during the seven-month period
3  between June 3rd and the end of the year, 2019?
4       MS. DANDENEAU: Objection to form.
5    A.   No. I mean, I'm putting myself back
6  at that time, right. Hindsight is 2020, but we
7  didn't do an analysis, but we would have done a
8  fulsome analysis and looked at all of the facts
9  and circumstances at the time, but asset values
10  change. You know, there could have been a
11  market crash in hindsight in 2020, which --
12  which affected entities' abilities.
13       There could have been all of these
14  things, right, that -- that happen. It is --
15  it is easy to look back in hindsight, but when
16  you are looking at this in -- in realtime, the
17  analysis is different, and again, we didn't do
18  an analysis.
19   Q.   Okay. You didn't do an analysis.
20       Do I have that right?
21   A.   I don't -- I don't recall doing one
22  or maybe -- you know, I don't recall doing one.
23       MR. MORRIS: Okay. I'm going to
24  take a break. I may be done, so the time
25  now is -- is 4:30 your time. Let's just

Page 266

1        WATERHOUSE - 10-19-21
2    take a short break until 4:40 your time.
3        MS. DANDENEAU: Okay.
4        VIDEOGRAPHER: We're going off the
5    record, 4:31 p.m.
6    (Recess taken 4:31 p.m. to 4:43 p.m.)
7        VIDEOGRAPHER: We are back on the
8    record at 4:43 p.m.
9        MR. MORRIS: I have no further
10   questions.
11       MR. RUKAVINA: Okay.
12   Mr. Waterhouse, I will go next.
13           EXAMINATION
14   BY MR. RUKAVINA:
15   Q.   Sir, my name is Davor Rukavina. I'm
16   the lawyer for --
17       MR. MORRIS: Hey, Davor, just before
18   you begin, I just want to put on the record
19   Highland's objection to documents that were
20   produced to me 10 minutes before the
21   deposition began.
22       MR. RUKAVINA: What the basis of
23   your objection?
24       MR. MORRIS: That they were due
25   quite some time ago, and the fact that you

Page 267

1        WATERHOUSE - 10-19-21
2    had -- I just think it's appropriate to --
3    to dump documents on somebody 10 minutes
4    before the deposition. I just think
5    that's --
6        MR. RUKAVINA: Well, these are
7    documents Highland produced. I'm not aware
8    of any rule I have to give you advance
9    documents when I know for the record that
10   other than the exhibits that you sent to us
11   last week, most of the exhibits you used
12   today you did not provide to me prior to
13   this deposition.
14       MR. MORRIS: No, but the documents
15   were produced by me in -- in litigation,
16   right?
17       MR. RUKAVINA: I'm going to use
18   primarily, John, the documents that you
19   produced to me today, but you may.
20       MR. MORRIS: Primarily. I've got --
21   I've got my objection. You have got your
22   response. Proceed.
23   Q.   Mr. Waterhouse, again, I represent
24   the advisors, HCMFA and NexPoint Advisors.
25       Do you understand that?

Page 268

1        WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   You and I have never met or talked
4    before today, have we?
5    A.   No, I have -- I have heard your
6    voice on calls before.
7    Q.   Okay.
8        MR. RUKAVINA: Madam Court Reporter,
9    I will use a few exhibits today. My
10   associate, Mr. Nguyen, will find some way
11   to get them to you. I don't know how to do
12   that, but it looks like you guys do.
13       I am going to use numbers as well.
14   But to differentiate them from Mr. Morris
15   we're going to mark mine with the prefix A
16   for advisors.
17       Do you understand?
18       COURT REPORTER: Yes.
19       MR. RUKAVINA: Okay. Perfect.
20   Q.   Okay. So, Mr. Waterhouse, let's
21   start with those two HCMFA notes that you were
22   asked about, one for 5 million and one for
23   2.4 million.
24       Do you recall those notes?
25   A.   Yes.

Page 269

1        WATERHOUSE - 10-19-21
2    Q.   Were you ever the CFO of HCMFA?
3    A.   I don't recall.
4    Q.   So to the best of your recollection,
5    you were still an officer of HCMFA in 2019,
6    just that your title was treasurer?
7        MR. MORRIS: Object to the form of
8    the question. There is no leading here.
9    He works for your client.
10       MS. DANDENEAU: That is not -- that
11   is not true.
12       MR. MORRIS: He's the treasurer --
13   he is the treasurer of your client. I
14   don't -- I'm going to object every time you
15   try to lead, so...
16       MR. RUKAVINA: Totally fine to
17   object.
18       MR. MORRIS: Okay.
19   Q.   Please answer my question,
20   Mr. Waterhouse.
21   A.   I'm sorry, could you repeat? There
22   was...
23   Q.   Yes. You were -- you testified
24   earlier that in 2019 you were an officer of
25   HCMFA; correct?

**Appx. 02116**

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      A.   Yes, I testified that I was the
3   treasurer and I didn't know if that incumbency
4   certificate, you know, was one that appointed
5   me as a treasurer, but yes.
6      Q.   I'm just trying to confirm that
7   sitting here today, to the best of your
8   recollection, at that time you were -- your
9   title was treasurer.  It was not chief
10  financial officer.
11     A.   I don't recall that being my title.
12     Q.   Okay.  And in May of 2019, however,
13  I think you testified you were the chief
14  financial officer of the debtor; correct?
15         MR. MORRIS:  Objection to the form
16     of the question.
17     A.   Yes, I was -- yes.
18     Q.   Okay.  As such, in May of 2019, did
19  you have the authority, to your understanding,
20  to unilaterally loan $5 million or $2.4 million
21  to anyone on behalf of the debtor?
22         MR. MORRIS:  Objection to the form
23     of the question.
24     A.   Sorry, can you repeat that?
25     Q.   Yes.  So in your capacity as the

1      WATERHOUSE - 10-19-21
2   chief financial officer of the debtor, Highland
3   Capital Management, L.P., in May of 2019, did
4   you believe that you unilaterally, just Frank
5   Waterhouse, had the authority to loan on behalf
6   of the debtor to anyone $5 million and
7   $2.4 million?
8          MR. MORRIS:  Objection to the form
9      of the question.
10     A.   No.
11     Q.   Is it because loans of that amount
12  would have had to be approved by someone else?
13     A.   Yes.
14     Q.   Who in '20 -- in May of 2019, if
15  Highland wanted to loan 5 million or
16  $2.4 million to someone, what would have been
17  the internal approval procedure?
18         MR. MORRIS:  Objection to the form
19     of the question.
20     A.   If -- if we had loans of that nature
21  that needed to be made due to their size, we
22  would have gotten approval from the -- the
23  president of Highland.
24     Q.   And who that was individual?
25     A.   It was James Dondero.

1      WATERHOUSE - 10-19-21
2      Q.   Okay.  Now, I'm going to ask you a
3   similar question but for a different entity.
4          In May of 2019, as the treasurer of
5   HCMFA, did you believe that you unilaterally
6   had the ability to cause HCMFA to become the
7   borrower of a $5 million loan and a
8   $2.4 million loan?
9          MR. MORRIS:  Objection to the form
10     of the question.
11     A.   No.
12     Q.   What would -- what would the
13  approval have taken place -- strike that.
14         What would the approval process have
15  been like in May of 2019 at HCMFA for HCMFA to
16  take out a $7.4 million loan?
17         MR. MORRIS:  Objection to the form
18     of the question.
19     A.   The process would have been similar
20  to what we just discussed on -- for Highland to
21  make a loan to others.  So, again, you know,
22  we -- we would have -- either myself or someone
23  on the team would have discussed this with
24  the -- the president and owner of -- of HCMFA.
25     Q.   And who was that individual?

1      WATERHOUSE - 10-19-21
2      A.   That was James -- Jim Dondero.
3      Q.   So do I understand that in May of
4   2019, on behalf of both the lender, Highland,
5   and the borrower, HCMFA, Mr. Dondero would have
6   had to approve $7.4 million in loans?
7          MR. MORRIS:  Objection to the form
8      of the question.
9      A.   Yes.
10     Q.   You mentioned when Mr. Morris was
11  asking you the NAV error, N-A-V error, with
12  respect to TerreStar, without writing us a
13  novel, unless you feel like you have to, can
14  you summarize what that NAV error was?  What
15  happened?
16     A.   There was a -- in the Highland
17  Global Allocation Fund, it owned at the time an
18  equity interest in a company called TerreStar.
19  And TerreStar is -- at the time was a private
20  company, and it may still be today.  Again, I'm
21  putting myself back then as a private company.
22         We had -- sorry, I don't mean we --
23  the fund and the advisor used Houlihan Lokey
24  to -- to value that investment.  And during
25  that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    executed at market levels that were much lower
3    than the Houlihan Lokey model.
4          And based on information and
5    discussions with the portfolio managers and,
6    you know, principals that were very familiar
7    with TerreStar, it was determined that those
8    trades were non-orderly and they were not
9    considered in the valuation as consulted with
10   Houlihan Lokey and PricewaterhouseCoopers at
11   the time.
12         Subsequent to a -- I can't remember
13   the exact circumstances of why the SEC got
14   involved. I think it was due to this -- this
15   investment became a material position in the
16   fund. It triggered an SEC, kind of, inquiry.
17   And as part of that inquiry, they questioned
18   the valuation methodology. "They" meaning the
19   SEC.
20         And at the culmination of that
21   process -- this is all summarized -- the value
22   that was -- that ultimately had to be used in
23   the fund's NAV was different than -- materially
24   different than what the original valuation at
25   Houlihan Lokey provided.

Page 275

1    WATERHOUSE - 10-19-21
2          And given that there was this fund
3    was, as we discussed -- I don't know if we
4    discussed it, but it was an open-ended fund
5    that was going -- that was converting to a
6    close-end fund.
7          Due to the fact that it was an
8    open-ended fund, you had to recalculate NAV and
9    see what the impact was on people -- on
10   investors coming in and out of the fund and if
11   there is a detrimental impact and to calculate
12   what that -- what that impact was and if there
13   was any amounts owed to the fund pursuant to
14   the error.
15     Q.   Were you personally involved
16   internally at either Highland or HCMFA with
17   these investigations and discussions with the
18   SEC?
19     A.   I was.
20     Q.   Which other key people or senior
21   people at Highland were involved, to your
22   recollection?
23     A.   Myself, Thomas Surgent, David Klos,
24   Lauren Thedford, Jason Post.
25     Q.   Mr. Dondero, was he --

Page 276

1    WATERHOUSE - 10-19-21
2      A.   I believe Cliff Stoops. I'm trying
3    to think. And maybe that is -- that is -- that
4    is -- that is all kind I can recall at the
5    moment.
6      Q.   Do you recall whether it was
7    determined that the fund suffered losses as a
8    result of this error?
9      A.   The -- the fund -- the -- the --
10   because the open-ended nature of the fund,
11   there were losses that were attributable to
12   investors. Meaning they -- they would have
13   redeemed and got a less money or -- or they
14   subscribed in and maybe because they didn't get
15   enough shares and then they later sold and then
16   they were harmed in that fashion.
17         And there is -- there is -- there
18   were very -- there were very detailed
19   calculations and, you know, all these different
20   scenarios that we had to -- I'm sorry, I keep
21   saying "we" -- that the individuals involved
22   had to calculate and quantify.
23     Q.   Well, do you recall whether HCMFA
24   admitted certain fault and liability for this
25   error?

Page 277

1    WATERHOUSE - 10-19-21
2      A.   I don't recall specifically.
3      Q.   Do you recall whether HCMFA caused
4    any funds to be paid to the investors and the
5    fund the subject of the NAV error?
6      A.   Yes.
7      Q.   Do you recall the approximate amount
8    of funds, moneys paid to the investors and the
9    fund?
10     A.   It was -- it was approximately
11   $7 million.
12     Q.   If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15     A.   It was -- it was approximately 7 --
16   7 to $8 million. Again, I don't remember the
17   exact number, but it was in that ballpark.
18     Q.   So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22         MR. MORRIS: Objection to the form
23   of the question.
24     A.   And I want to make sure I'm
25   understanding your question because there is a

WATERHOUSE - 10-19-21

1 lot of different entities that are going on to
2 my head.
3     I think what you are saying is based
4 on this error, shareholders were harmed by this
5 approximately $7.8 million -- by approximately
6 $7.8 million. Is that what you are asking?
7     Q.  Yes, sir.
8     A.  Yes, that was -- again, I don't have
9 the exact numbers. If I take -- it was -- it
10 was in that ballpark, and there is a detail
11 calculation and write-up that could, that --
12 that exists someplace.
13     Q.  Now, at that time, at the time that
14 the NAV error occurred, was there a contract in
15 place between HCMFA and the debtor pursuant to
16 which the debtor was providing services to
17 HCMFA?
18     MR. MORRIS: Objection to the form
19 of the question.
20     A.  Yes.
21     Q.  Was that contract generally called a
22 shared services agreement?
23     A.  It was generally called that, but
24 there were -- there were -- I mean, it -- it --

WATERHOUSE - 10-19-21

1 it depends on who you talk to, but yes,
2 generally, there were -- there are multiple
3 agreements.
4     Q.  Pursuant to one or more of those
5 agreements, was the debtor providing certain
6 services to HCMFA?
7     MR. MORRIS: Objection to the form
8 of the question.
9     A.  Yes.
10     Q.  And can you at a very high level
11 summarize in 2018 and 2019 what those services
12 were?
13     A.  Yes, there was a -- yes.
14     Q.  Okay. Please -- please go -- go
15 through a short summary.
16     A.  There was a -- a cost reimbursement
17 agreement between Highland Capital Management
18 Fund Advisors and Highland Capital Management,
19 L.P. That agreement was for what we referred
20 to as front office services, so investment
21 management, things of that nature.
22     There was I think what most people
23 refer to as the shared services agreement that
24 was -- that agreement was between Highland

WATERHOUSE - 10-19-21

1 Capital Management Fund Advisors and Highland
2 Capital Management for back office services.
3     Q.  And can you summarize what you mean
4 by back office services?
5     A.  Those services were for accounting,
6 finance, tax, valuation, HR, IT, you know,
7 legal compliance, things of -- things of those
8 nature -- or things of that nature, excuse me.
9     Q.  So in the spring of 2019, do you
10 recall whether HCMFA took the position that it
11 was actually Highland that caused the NAV error
12 to occur pursuant to the valuation services
13 that Highland was providing?
14     MR. MORRIS: Objection to the form
15 of the question.
16     A.  I do not recall.
17     Q.  Did you ever have any discussions
18 with anyone, Jim Dondero or anyone in the first
19 half of 2019 as to whether Highland, the
20 debtor, that is, had any liability to HCMFA
21 related to the NAV error?
22     MR. MORRIS: Objection to the form
23 of the question.
24     A.  I do not recall.

WATERHOUSE - 10-19-21

1     Q.  And then you mentioned that the fund
2 was being closed and some compensation related
3 to that. Can you -- can you elaborate? What
4 were you referring to?
5     A.  Right. So the advisor, pursuant to
6 board approval, put a proposal in front of the
7 shareholders of the Highland Global Allocation
8 Fund to convert it from an open-ended fund to a
9 closed-end fund.
10     So an open-ended fund, when
11 shareholders subscribe to the fund or redeem
12 into the fund, they do it at NAV.
13     When it is -- when you have a
14 closed-end fund, closed-end funds are -- are
15 publicly-traded, like on the New York Stock
16 Exchange, exchanges like that, and -- and
17 shareholders or investors, they're not --
18 they're -- they're not subscribing and
19 redeeming with the fund. They are like shares
20 of Apple.
21     Those shares of the Highland Global
22 Allocation Fund trade on an exchange, and that
23 is how you, you know, that is how, you know,
24 you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1
2 sell your shares and you are no longer an
3 equity owner.
4       As part of that proposal, the
5 advisor told shareholders if you -- if you vote
6 for this proposal to -- to convert it from an
7 open-ended fund to a closed-end fund, we will
8 pay you some amounts of money.  I forgot -- a
9 certain number of points.  I think it was
10 like -- it was like two to three points or
11 something -- something like that.
12     Q.   Okay.  You mentioned when Mr. Morris
13 was asking you, going back to those two
14 promissory notes, you will recall the 5 million
15 and 2.4 million, you mentioned something to the
16 effect that Mr. Dondero told -- told you to pay
17 some moneys out of Highland.  Do you remember
18 that discussion with Mr. Morris?
19     A.   I do.
20     Q.   So, to the best of your
21 recollection, did you have a discussion with
22 Mr. Dondero about making some payments in May
23 of 2019 out of Highland?
24     A.   I recall, as I testified earlier,
25 that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1
2 for -- for these amounts attributable to -- it
3 was either the error -- you know, the error,
4 and in that conversation he said, go get the
5 money from Highland.  I believe that is what I
6 testified earlier, and that -- that is my
7 recollection.
8     Q.   Do you recall if that was an
9 in-person meeting or some other mode for the
10 meeting?
11     A.   I -- I -- I recall that being
12 in-person.
13     Q.   Do you recall if anyone else was
14 present, or was it just you and Mr. Dondero?
15     A.   I recall just he and I.
16     Q.   And the moneys that he told you to
17 find from -- or get from Highland, was that in
18 the amount of $5 million and $2.4 million?
19       MR. MORRIS:  Objection to the form
20 of the question.
21     A.   I believe so, but I would have to go
22 back and look and see when those moneys were
23 actually paid into the -- into the fund and,
24 you know, when those transfers were done.  If
25 they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1
2 yes, I would say it was -- it was all related
3 to that.
4     Q.   Did Mr. Dondero tell you that those
5 funds would be a loan from Highland to HCMFA?
6     A.   I don't recall.
7       MR. MORRIS:  Objection to the form
8 of the question.
9     Q.   Now, and forgive me, I'm probably
10 the only non-American born here, but I speak
11 reasonably well in English.  I don't recall,
12 does that mean you don't remember or does that
13 mean it didn't happen?
14       MR. MORRIS:  Objection to the form
15 of the question.
16     A.   It -- it means I don't -- I don't
17 remember.
18     Q.   Did Mr. Dondero tell you to have
19 those two promissory notes prepared?
20     A.   I don't recall.
21     Q.   When you -- again, when you say, I
22 don't recall today, that means that sitting
23 here today, you just don't remember one way or
24 the other.  Is that accurate?
25     A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1
2     Q.   Is it possible that you, having
3 heard what Mr. Dondero said and seeing funds
4 being transferred, assumed that that would be a
5 loan without him actually telling you that
6 would be a loan?
7       MR. MORRIS:  Objection to the form
8 of the question.
9     A.   Sorry, I want to make sure -- did I
10 ask the amounts that were transferred that I --
11 that -- that I assumed that that was a loan?
12     Q.   Well, let me -- let me take -- let
13 me try again.
14       So you have established already that
15 there were quite a number of promissory notes
16 back and forth -- I'm sorry, quite a number of
17 promissory notes with affiliated companies and
18 individuals owing Highland money; right?
19     A.   Yes.
20     Q.   And you have established that there
21 were many transactions and transfers going back
22 and forth over the years; right?
23       MS. DANDENEAU:  Objection to form.
24     A.   In -- yes, in my capacity as CFO and
25 my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

2 Q. And that's part of the reason why
3 you just can't remember some of the details
4 today because this -- this happened years ago,
5 and there were a number of transactions. Is
6 that accurate?
7 MS. DANDENEAU: Objection to the
8 form.
9 MR. MORRIS: Objection to the form
10 of the question.
11 A. I mean, I deal with thousands of --
12 of -- of -- of transactions, you know, whether
13 it has -- the processing of transactions, you
14 know, if it has got, you know, more -- more
15 zeros, you know, behind it than others.
16 When you look at thousands of
17 transactions over the years for funds and
18 advisors and -- and, you know, financial
19 statements, I mean, it is -- it is very hard
20 going back in -- in -- in my -- you know,
21 14-ish year career at -- at Highland to
22 remember a lot of those details, especially
23 when I don't have any records or books or
24 anything like that, and -- and going back many
25 years.

Page 287

WATERHOUSE - 10-19-21

2 Q. And that is fine. That -- that --
3 that is why I asked the question.
4 Is it possible in May of 2019 when
5 Mr. Dondero told you to transfer the funds from
6 Highland, you just assumed on your own that
7 those would be loans without him actually
8 telling you that those would be loans?
9 MR. MORRIS: Objection to the form
10 of the question.
11 A. I don't know.
12 Q. I'm sorry, you --
13 A. I said I don't know.
14 Q. Okay. Well, as the -- as the CFO
15 for Highland, if you saw $7.4 million going
16 out, you would feel some responsibility to
17 account for that, wouldn't you?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. Yes.
21 Q. Is it fair to say that those would
22 be in the range large enough to rise up to your
23 level?
24 MR. MORRIS: Objection to the form
25 of the question.

Page 288

WATERHOUSE - 10-19-21

2 A. If -- I don't know if I understand
3 your question. Those amounts would arise to my
4 level where I would be involved or...
5 Q. You would want to know what a
6 transfer for that amount, $7.4 million, was all
7 about, as the CFO of Highland, wouldn't you?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Yes, I make it -- I mean, I -- I
11 review all sorts of payments, I mean, even
12 smaller dollar payments on a periodic basis,
13 you know, to -- to -- to understand and to make
14 sure that we are paying things in a -- you
15 know, in -- in -- in an informed way. And, you
16 know -- and we're -- and we're paying things
17 pursuant to vendor contracts and things like
18 that.
19 Q. So as part of that, is it possible
20 that seeing $7.4 million go out you would have
21 promissory notes made in order to keep a paper
22 trail, assuming that those were loans, when
23 perhaps they were never intended to be loans by
24 Mr. Dondero?
25 MR. MORRIS: Objection to the form

Page 289

WATERHOUSE - 10-19-21

2 of the question.
3 A. I don't know. As I testified
4 earlier, I had conversations with Mr. Dondero
5 about -- about the -- the -- the moneys that
6 were needed for the NAV error. And I recall
7 him saying go get it from Highland -- or get it
8 from Highland.
9 Q. Well, why did you sign those
10 promissory notes and why didn't you have him
11 sign them?
12 MR. MORRIS: Objection to the form
13 of the question.
14 A. I don't know. I don't know.
15 Q. You mentioned earlier that you
16 typically don't sign promissory notes. Am I
17 remembering your testimony correctly?
18 I mean, promissory notes on behalf
19 of the entities. Not yourself, obviously.
20 A. Yes, that is what I said earlier.
21 Q. Do you recall any other promissory
22 notes in the million-plus range that you had
23 ever signed before on behalf of any entity?
24 A. There is -- there has been a lot of
25 transactions over the years. I don't -- I

**Appx. 02121**

Page 290

1      WATERHOUSE - 10-19-21
2  don't -- I don't recall generally. I don't --
3  I don't recall.
4      Q.   So -- but to the best of your
5  recollection, it was on your initiative,
6  following your discussion with Mr. Dondero,
7  that you had someone draft those two promissory
8  notes; is that correct?
9      MR. MORRIS:  Objection to the form
10     of the question.
11     A.   Yes, we would have -- the team, as I
12  stated earlier, we don't draft promissory
13  notes.  "The team" meaning the accounting and
14  finance team.
15       So the team would have worked with
16  the legal group at Highland to draft any notes.
17     Q.   Do you believe or do you have any
18  recollection as to whether you would have done
19  that pursuant to an email or telephone call or
20  in-person meeting?
21     MR. MORRIS:  Objection to the form
22     of the question.
23     A.   Are you asking if I would have -- if
24  those notes would have been drafted pursuant to
25  an email or phone call?

Page 291

1      WATERHOUSE - 10-19-21
2      Q.   Strike that.
3        Do you recall whether you sent an
4  email to anyone asking them to draft those two
5  promissory notes?
6      A.   I don't recall because, again,
7  once -- I would have instructed -- likely
8  instructed the team to -- to work with the
9  legal group to draft these documents.
10       I -- I -- I -- yeah, I didn't -- I
11  mean, that is more an operational-type
12  procedure.  So, you know, a manager or a
13  controller or working with legal.  You know,
14  they -- they can certainly handle that task to
15  get that -- you know, to request that from
16  legal.
17     Q.   And who on your team do you think
18  you would have asked to do that?
19     MR. MORRIS:  Objection --
20     Q.   Who would have been the logical
21  person or people, if you don't remember their
22  name today?
23     MR. MORRIS:  Objection to the form
24     of the question.
25     A.   It -- it -- there is only two

Page 292

1      WATERHOUSE - 10-19-21
2  managers of the group.  That would have been
3  Dave Klos or Kristin Hendrix.
4        Dave was the -- one of his duties
5  was managing the valuation team, and so he was
6  intimately involved with this process.  So, you
7  know...
8      Q.   Okay.
9      A.   I don't recall specifically but, I
10  mean, my general -- you know, I -- I -- I
11  likely would have talked to Dave first about it
12  versus someone like Kristin who hadn't been
13  intimately involved.
14     Q.   And -- and do you have a view as to
15  whether it is most likely that you would have
16  done that by email or in-person or how would
17  you believe you would have communicated that to
18  Mr. Klos?
19     MR. MORRIS:  Objection to the form
20     of the question.
21     A.   I likely would have done that in
22  person.  Again, if things of this nature
23  that -- again, you have to put ourselves back
24  to, we have been working on this very stressful
25  project for many, many months.  And once the

Page 293

1      WATERHOUSE - 10-19-21
2  go-ahead was to -- you know, we see the light
3  at the end of the tunnel with wrapping this up
4  and making shareholders whole -- sorry to say
5  "we" -- you know, the -- so the folks that are
6  involved in it.
7        I like to talk to people
8  face-to-face and -- and -- and go to -- and go
9  to their desk, because that shows if I'm going
10  to their desk that -- that is something that I
11  want done, you know.
12     Q.   And do you remember, Mr. Waterhouse,
13  getting those two promissory notes in paper
14  format or by email before they were executed?
15     MR. MORRIS:  Objection to the form
16     of the question.
17     A.   I don't recall.
18     Q.   For whatever was the ordinary course
19  back then in May 2019, would you expect to have
20  received them only on paper or would you have
21  expected to have received them in Word document
22  or PDF document by email?
23     MR. MORRIS:  Objection to the form
24     of the question.
25     A.   I -- I didn't sign -- I signed very

**Appx. 02122**

WATERHOUSE - 10-19-21

1 few documents via email. I can't say that it
2 never happened, but people either stopped by my
3 office and physically walked in documents for
4 signature that we discussed face-to-face.
5 Or documents were -- if -- if --
6 if -- if -- let's say I wasn't there or I
7 wasn't available, documents were dropped off.
8 I had -- I had some in- and outboxes in front
9 of my -- my office there at the Crescent.
10 Documents would be dropped off for
11 signature. There would be a cover sheet that
12 would be -- have been applied to those
13 documents detailing, you know, who dropped it
14 off, the purpose, why, what time.
15 And then, you know, as I stated, I
16 don't draft documents and I always go to the
17 legal group and the compliance group to make
18 sure that they're in the loop. And there is
19 a -- a box or section that says, Has legal
20 reviewed or approved, or something to that
21 nature.
22 Again, I don't -- I don't have
23 access to that cover sheet anymore, but it
24 was -- it was something to that effect.
25

WATERHOUSE - 10-19-21

1 And my assistant, you know, if she
2 was there, she would review that -- you know,
3 whatever was being dropped off. And if that
4 has legal, you know, reviewed or -- reviewed or
5 approved it, if that wasn't -- if that stuff
6 hadn't been done, it was like she would just
7 tell them like, go -- go -- go to the legal
8 group, because --
9 Q. Let me -- let me pause --
10 MS. DANDENEAU: Let him finish.
11 MR. MORRIS: Thank you. Go ahead.
12 A. I take -- go to the legal group
13 because that -- that was my -- you know, I
14 didn't -- I didn't review anything that -- that
15 they weren't -- you know, or there wasn't some
16 representation made to me that they had
17 reviewed, approved in some capacity.
18 Again, my -- my -- my goal, as CFO,
19 is to provide transparency and make sure that
20 groups like compliance and other things -- and
21 the other group in legal are -- are in -- you
22 know, their -- they're made aware of
23 transactions of -- you know, that are crossing
24 my desk.
25

WATERHOUSE - 10-19-21

1 Because I'm not in every
2 conversation. They're not in every
3 conversation -- meaning legal compliance -- and
4 I just want to make sure that -- that everyone
5 is in sync to, you know, to -- to the extent
6 possible.
7 Q. So if we summarize, you don't
8 specifically remember signing these two notes,
9 but most likely it would have been that they
10 would have presented -- been presented to you
11 physically on paper?
12 MR. MORRIS: Objection to the form
13 of the question.
14 A. They would -- they would have been
15 presented physically on paper most likely or
16 someone would have left it. But, I mean,
17 again, I don't -- I don't recall.
18 Q. I understand. Understand.
19 When you signed -- when you signed
20 documents, when you personally signed
21 documents, did you typically use a ink pen or
22 did you use a stamp?
23 A. No, I -- I -- I use a -- an -- an
24 ink pen.
25

WATERHOUSE - 10-19-21

1 Q. Do you know -- was there a file at
2 Highland kept anywhere with ink-signed
3 originals of a promissory notes in general or
4 these two promissory notes specifically?
5 MR. MORRIS: Objection to the form
6 of the question.
7 A. Sorry, I just want to make sure I
8 understand your question. Are you saying is
9 there a file somewhere that has ink-signed
10 originals of these two promissory notes?
11 Q. Yes.
12 A. I would -- I would assume they're
13 some place. I mean --
14 Q. Well, was there a -- was there a
15 place where Highland generally kept originals
16 of promissory notes owed to it?
17 A. I wouldn't -- no.
18 MR. RUKAVINA: Mr. Nguyen, would you
19 please pull up my A7, alpha 7.
20 Q. These are the two promissory notes,
21 Mr. Waterhouse.
22 (Exhibit A7 marked.)
23 Q. And please -- Mr. Waterhouse, please
24 command my associate to scroll down as you need
25

Page 298

WATERHOUSE - 10-19-21

1
2 to, but I want you to take a very close look at
3 your two signatures here and tell me whether
4 you believe, in fact, that you ink signed them
5 or whether you --
6      MS. DANDENEAU: Mr. Rukavina,
7 Mr. Waterhouse has the copies.
8      MR. RUKAVINA: Perfect. Then you
9 can take this down, Mr. Nguyen.
10      A.   These -- these -- these signatures
11 are identical, now that I stare at them, and I
12 mean, they are so close -- I mean, they're
13 identical that, I mean, even with my chicken
14 scratch signature, I don't know if I can -- you
15 know, I do this 100 times, could I do that
16 as -- as precisely as I see between the two
17 notes.
18      Q.   Well, that is why I ask.
19 Mr. Waterhouse, now that you have examined
20 them, does it seem like it is more likely that
21 you actually electronically signed these?
22      MR. MORRIS: Objection to the form
23 of the question.
24      A.   Is -- I don't -- I don't recall
25 specifically. As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1
2 did have a -- an electronic signature, and that
3 was used from time to time. It wasn't as
4 common practice back in 2019. It definitely
5 was more common practice when we had to work
6 from home and remotely for COVID because it
7 that made it almost impossible to, right,
8 provide wet signatures since we're all working
9 from home remotely.
10      Q.   Well, going just for these two
11 promissory notes, Mr. Waterhouse, in light of
12 your inability to remember any details, are you
13 sure you actually signed either or both of
14 those notes?
15      MS. DANDENEAU: Objection to form.
16      A.   I don't recall specifically
17 signing -- actually physically signing these
18 notes. As I said before, I don't recall doing
19 that. This -- this looks like my signature,
20 but yet these two signatures are identical.
21      Q.   So you don't recall physically
22 signing them, and I take it you don't recall
23 electronically signing them either?
24      A.   I don't recall. You know, Highland
25 has all my emails. If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1
2 you know, I don't have any of these records is
3 what I'm saying. I don't have any of those
4 records.
5      Q.   That is why I'm asking you these
6 questions in great detail because I don't have
7 those emails. I'm trying to -- I'm hoping that
8 you will give me some names or some details so
9 I can go look for more emails, but again, you
10 don't remember any -- any individual, other
11 than Mr. Dondero that we've discussed, you
12 don't remember any individual with whom you
13 discussed these promissory notes prior to their
14 execution?
15      MR. MORRIS: Objection to the form
16 of the question.
17      A.   I don't recall discussing it with
18 anybody else.
19      Q.   Okay.
20      A.   I mean, prior --
21      Q.   I understand.
22      A.   You know, there was no one else --
23 there was no one else in that meeting that I
24 recall with Mr. Dondero.
25      Q.   Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1
2 May of 2019 --
3      A.   And -- and from what I recall, and
4 the reason why I was by myself is -- is, you
5 know, I don't -- I don't want to speculate, I'm
6 sorry.
7      Q.   Okay. We have established that by
8 May of 2019, in your view, the liabilities of
9 HCMFA exceeded its assets; correct?
10      A.   Yeah. I mean, again, I don't have
11 financial statements in front of me, but I
12 think, if I recall, we'd have to go through the
13 testimony with Mr. Morris, I believe that was
14 the case.
15      Q.   In fact, you will recall that in
16 April of 2019, Mr. Dondero signed a document
17 that extended the demand feature of two prior
18 notes to May 31, 2019. Do you recall that?
19      MS. DEITSCH-PEREZ: I think you
20 might -- maybe have the court reporter read
21 that back. You might have misspoke.
22      (Record read.)
23      MR. RUKAVINA: And I did misspeak.
24      Q.   I meant to say to May 31, 2021. Do
25 you recall that, sir?

Page 302

```
1          WATERHOUSE - 10-19-21
2          MR. MORRIS: Objection to the form
3    of the question.
4      A.   Yes.
5          MR. RUKAVINA: And, Mr. Nguyen, just
6    so that the record is clear, will you please
7    pull up my Exhibit Alpha 10, A10.
8          (Exhibit A10 marked.)
9      Q.   You don't have this one in front of
10   you, Mr. Waterhouse? This is the one that
11   Mr. Morris used earlier. Do you see that
12   document, sir?
13     A.   Yes, I do.
14     Q.   And this is what you were testifying
15   about before when Mr. Morris was asking you.
16   Do you remember that?
17     A.   Yes.
18     Q.   So here is my question for you,
19   Mr. Waterhouse: As the chief financial officer
20   of Highland, was it prudent for Highland less
21   than three weeks later to be lending
22   $7.2 million to an insolvent entity that
23   couldn't even then pay its debts back to
24   Highland?
25         MS. DANDENEAU: Objection to form.
```

Page 303

```
1          WATERHOUSE - 10-19-21
2          MR. MORRIS: Objection to the form
3    of the question.
4      A.   Sorry, I just want to make sure --
5    are you asking me, did you say, was it prudent
6    for Highland to loan $7.4 million to HCMFA a
7    few weeks after this document was executed?
8      Q.   Yes, and at a time when HCMFA's
9    liabilities exceeded its assets.
10         MR. MORRIS: Objection to the form
11   of the question.
12     A.   I don't -- it is odd. I don't know.
13         MR. RUKAVINA: You can take this
14   exhibit down, Mr. Nguyen.
15     Q.   Do you recall asking anyone,
16   Mr. Dondero or -- or anyone outside as to
17   whether Highland ought to be lending
18   $7.4 million to HCMF regarding HCMF's
19   creditworthiness?
20         MR. MORRIS: Objection to the form
21   of the question.
22     A.   I don't recall.
23     Q.   Did you receive personally any of
24   that $7.4 million?
25     A.   No.
```

Page 304

```
1          WATERHOUSE - 10-19-21
2      Q.   Did you even --
3          MR. MORRIS: I didn't hear that
4    question, sir.
5          MR. RUKAVINA: The one that he
6    answered, John, or my new one?
7          MR. MORRIS: No, no, your question,
8    Davor.
9          MR. RUKAVINA: I had asked him
10   whether he received any of the
11   $7.4 million. He said no.
12         MR. MORRIS: Yeah. I thought there
13   was a question after that. Maybe I was
14   mistaken. I apologize.
15         MR. RUKAVINA: I had started a new
16   question, so here, let me start the new
17   question again.
18     Q.   Did you personally receive any
19   direct benefit from those two notes for
20   $7.4 million?
21     A.   No.
22     Q.   Did you ever personally consider
23   yourself obligated to repay either or both of
24   those notes?
25     A.   No.
```

Page 305

```
1          WATERHOUSE - 10-19-21
2          MR. RUKAVINA: Pull up those notes
3    again, Mr. Nguyen.
4      Q.   You can have them in front of you,
5    Exhibit 7, Mr. Waterhouse, whatever is easier
6    for you. If you go to your signature page, my
7    question to you is, why did you not include
8    your title as treasurer by your name, Frank
9    Waterhouse?
10         MS. DANDENEAU: Objection to form.
11     A.   I didn't -- I didn't draft this
12   document.
13     Q.   So you relied on whoever drafted it
14   to draft it correctly?
15     A.   Yes.
16     Q.   Okay. But back then when you signed
17   this, did it ever cross your mind that you were
18   the maker on these notes?
19     A.   No.
20     Q.   Back then when you signed this
21   document, did it ever cross your mind that you
22   could be a co-obligor on these notes?
23     A.   No. I didn't receive $7.4 million,
24   I mean...
25     Q.   But can you say that HCMFA received
```

1        WATERHOUSE - 10-19-21
2    $7.4 million?
3        A.   I would have to go back and look and
4    check in, you know, the – the financial
5    records and the bank statements.
6        MR. RUKAVINA:  You can take this
7    exhibit down, Mr. Nguyen.
8        Q.   Mr. Waterhouse, I'm not trying to be
9    a smart-ass, but if the law says that because
10   of the way that you signed this promissory
11   note, if that is what the law says, that that
12   made you personally – personally liable, then
13   you would agree with me that that was never
14   your intent?
15       MR. MORRIS:  Objection to the form
16   of the question.
17       A.   That was never – I wouldn't sign a
18   note and not get consideration in return.
19       Q.   So putting all other issues aside,
20   if the law – if the law says that you were
21   liable for those notes because of how you
22   signed them, then would you agree with me that
23   these notes are a mistake?
24       MR. MORRIS:  Objection to the form
25   of the question.

1        WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection to the
3    form.
4        A.   Yes.
5        Q.   So do you agree with me that it's
6    odd – I think that is the word you used –
7    that Highland would be loaning $7.4 million a
8    few weeks after that extension to an entity
9    whose liabilities exceeded its assets, and you
10   would agree with me that it was never your
11   intention to be in any way liable for these two
12   promissory notes; correct?
13       MR. MORRIS:  Objection to the form
14   of the question.
15       A.   Sorry, you – you asked a lot there.
16       MR. RUKAVINA:  I will strike it and
17   I will move on.
18       Let's go to – pull up Exhibit 9,
19   please Mr. Nguyen – Alpha 9, I'm sorry, Alpha
20   9, A9.
21       (Exhibit A9 marked.)
22       Q.   Sir, take a moment to look at this,
23   but this is an email, and you will see attached
24   July 31, 2020 affiliate notes.
25       Do you see that attachment?

1        WATERHOUSE - 10-19-21
2        A.   Yes.
3        Q.   Okay.  And do you see an entry for
4    Highland Capital Management Fund Advisors?
5        MR. MORRIS:  I'm sorry, hold on.
6    Where are you looking?
7        MR. RUKAVINA:  Last page, John.
8        MR. MORRIS:  Is it the page on the
9    screen?
10       MR. RUKAVINA:  Oh, I'm sorry.
11   Mr. Nguyen just did it.  Yes, the last page
12   there.
13       MR. MORRIS:  Thank you.
14       Q.   Do you see an entry there for HCMFA?
15       A.   Yes.
16       Q.   About $10.5 million.
17       Do you see that?
18       A.   I do.
19       Q.   And, now, do you have any
20   explanation for why if HCMFA owed $7.4 million,
21   plus the 5.3 million that had been extended,
22   why that amount was only 10.5 million?
23       A.   I don't know.  Okay.
24       MR. RUKAVINA:  Close this one and
25   pull up, Mr. Nguyen, the schedules,

1        WATERHOUSE - 10-19-21
2    schedule of assets.  What exhibit is this
3    of ours, Mr. Nguyen?
4        MR. NGUYEN:  This is A11.
5        MR. RUKAVINA:  Oh, this will be A11.
6        (Exhibit A11 marked.)
7        Q.   You don't have this in front of you,
8    Mr. Waterhouse?
9        A.   Okay.
10       Q.   This is what Mr. Morris used
11   earlier.  Do you remember looking at this with
12   Mr. Morris?
13       A.   Yes.
14       MR. RUKAVINA:  You might have to
15   zoom in a little.  Okay.
16       Q.   Now, I see Affiliate Note A, B, and
17   C.
18       Do you have any recollection as to
19   why the names of the affiliates are omitted?
20       A.   I don't.  I testified earlier that,
21   you know, the team worked with DSI in providing
22   these.  I – I don't – I don't know.
23       Q.   Can we deduce – is it logical to
24   deduce that Affiliate Note A would be NexPoint
25   given its size of $24.5 million?

Page 310

1          WATERHOUSE - 10-19-21
2          MR. MORRIS: Objection to the form
3    of the question.
4     A.   I mean, it -- it is a -- it is -- it
5    is approximate.
6     Q.   Well, can we -- can we deduce -- or,
7    I'm sorry, strike that.
8          Can you, sitting here today,
9    logically conclude that Affiliate Note B or C
10   represents HCMFA?
11         MR. MORRIS: Objection to the form
12   of the question.
13    A.   I don't know. I don't know. I
14   can't.
15    Q.   Okay. As of the petition date, we
16   have established that HCMFA, under promissory
17   notes, owed $7.4 million and $5.3 million to
18   the debtor; correct?
19         MR. MORRIS: Objection to the form
20   of the question.
21    A.   Yes.
22    Q.   Okay. And by my reckoning, that
23   would be somewhere approaching $13 million.
24         MR. MORRIS: Objection to the form
25   of the question.

Page 311

1          WATERHOUSE - 10-19-21
2     Q.   It would be $12.7 million. Is that
3    generally correct?
4     A.   Sorry, the amounts were 7.4, 5.3.
5     Q.   Yes.
6     A.   Okay. Yeah, that -- that -- I can
7    do that math, yes.
8     Q.   Do you have any explanation or any
9    understanding of why there is no similar entry
10   listed here on the schedule of assets filed
11   with the bankruptcy court?
12         MR. MORRIS: Objection to the form
13   of the question.
14    A.   I don't know. We have to look at
15   the supporting schedules, like I talked about
16   other -- presumably there is -- there is a
17   build to the schedule that would provide the
18   detail.
19    Q.   Well, that was going to be my next
20   question. You anticipated it.
21         MR. RUKAVINA: You can -- you can
22   take this down, Mr. Nguyen.
23    Q.   Do you believe that whenever you and
24   your team provided the underlying data to the
25   financial advisor that the actual names of the

Page 312

1          WATERHOUSE - 10-19-21
2    affiliates for Affiliate Note A, B, and C would
3    have been listed there?
4     A.   Are you asking we provided the names
5    to the financial advisor? I don't -- I don't
6    understand who the financial advisor is.
7     Q.   I'm sorry, DSI.
8          Let me ask the question this way,
9    Mr. Waterhouse.
10         Whenever you provided information
11   about the affiliate notes to DSI, do you
12   believe that you would have included the actual
13   names of the affiliates, you or your team, or
14   that you would have done the Affiliate Note A,
15   Note B, Note C?
16         MR. MORRIS: Objection to the form
17   of the question.
18         MS. DANDENEAU: Objection to the
19   form.
20    A.   We -- like I testified earlier, when
21   we were -- we gave everything to -- to DSI. We
22   were giving all of our records, all of our
23   files, everything to DSI. We weren't redacting
24   information or saying, hey, here is a note,
25   here is Affiliate Note A or B.

Page 313

1          WATERHOUSE - 10-19-21
2          I mean, it was -- our job and our
3    focus -- and I testified in court back in 2019;
4    right -- was -- was to be transparent and, you
5    know, get DSI up to speed on -- on the matters
6    at Highland. So I can't see us redacting at
7    that point.
8          MR. RUKAVINA: Mr. Nguyen, will you
9    please pull up Mr. Morris' Exhibit 36.
10         Just the very first page, the very top
11   email. You might zoom in a little bit.
12    Q.   Now, you recall being asked about
13   this by Mr. Morris?
14    A.   Yes, I do.
15    Q.   And you wrote: The HCMFA note is a
16   demand note.
17         You wrote that; right?
18    A.   Yes.
19    Q.   And, in fact, weren't there by that
20   point in time several notes?
21    A.   Yes, there were. Again, I don't --
22   I don't remember everything specifically. I
23   mean --
24    Q.   I understand. I understand.
25         So this is an example where -- where

WATERHOUSE - 10-19-21

1 you might have made a mistake by referring to a
2 singular instead of a plural; right?
3 A. Yes.
4 Q. Okay. And you -- you wrote -- a
5 couple of sentences later, you wrote: There
6 was an agreement between HCMLP and HCMFA the
7 earliest they could demand is May 2021.
8 You wrote that; right?
9 A. Yes.
10 Q. But I think you -- you agreed with
11 Mr. Morris that that can't possibly apply to
12 the May 2019 notes, can it?
13 MR. MORRIS: Objection to the form
14 of the question. That is not what he
15 testified to.
16 Q. Let me ask -- let me ask a different
17 question.
18 Sitting here today -- or if you can
19 answer me from your memory on October 6,
20 2020 -- did the April acknowledgment that
21 extended the maturity date apply to the
22 May 2019 notes also?
23 A. I don't recall specifically.
24 Q. Well, you recall that the notes that

WATERHOUSE - 10-19-21

1 you signed were demand notes; right?
2 A. Yes.
3 Q. Do you find it logical, based on
4 your experience, that had they intended to have
5 a different or a set maturity date, you would
6 have instructed that that set maturity date be
7 included instead of a demand feature?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Sorry, just want to make sure I
11 understand. You are saying that -- that the
12 $5 million note, the $2.4 million note, if
13 those were supposed to be a term note, that I
14 would have made sure that those were a term
15 note?
16 Q. I'm saying -- I'm saying,
17 Mr. Waterhouse, that on May the 2nd and May the
18 3rd, 2019, if you intended that those two
19 promissory notes could not be called until May
20 2021, would you have included such language in
21 those two promissory notes?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. I guess -- I'm sorry, I don't recall

WATERHOUSE - 10-19-21

1 putting language in those May notes. I don't
2 remember what language you are referring to.
3 Q. Well, let's read this again.
4 There was an agreement between HCMLP
5 and HCMFA the earliest they could demand is May
6 2021.
7 Do you recall that agreement?
8 A. Yes, that was the agreement we
9 looked at earlier; correct?
10 Q. Okay. Yes.
11 Do you -- do you understand now that
12 that agreement that we looked at earlier also
13 applied to the May 2019 notes that you signed?
14 A. I don't -- I don't know.
15 Q. But as of October 6, 2020, you're
16 writing that there is one demand note and
17 you're categorizing that demand note as not
18 being demandable on May 2021; correct?
19 A. Yes.
20 Q. And you know now that you made at
21 least one mistake in this email; correct?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. Yes.

WATERHOUSE - 10-19-21

1 MR. RUKAVINA: You can pull this
2 down, Mr. Nguyen.
3 Q. So, Mr. Waterhouse, you don't
4 remember Mr. Dondero telling you to make these
5 loans or not. HCMLP was loaning $7.4 million
6 to someone that their assets were less than
7 their liabilities.
8 We don't see on the July list of
9 notes, where there is $12.7 million of notes,
10 we don't see that on the bankruptcy schedules,
11 and we have this Exhibit 36 where you are
12 confused.
13 Are you prepared to tell me, sir,
14 today that you might have made a mistake in
15 executing those two promissory notes?
16 MR. MORRIS: Objection to the form
17 of the question.
18 A. I -- I don't know.
19 Q. And if it turns out that you're
20 personally liable for those promissory notes,
21 it would certainly be a mistake, wouldn't it?
22 MS. DANDENEAU: Objection to the
23 form.
24 MR. MORRIS: Join.

Page 318

1      WATERHOUSE - 10-19-21
2      A.   Yes.
3      Q.   If Mr. Dondero testifies that he
4  never told you to make these loans, would you
5  disagree with his testimony?
6      MR. MORRIS:  Objection to the form
7      of the question.
8      A.   Like I testified earlier with my
9  conversation with Mr. Dondero, all I recall is
10  he said, get the money from Highland.
11      Q.   And if Mr. Dondero testifies that
12  he, in consultation with other senior personnel
13  at Highland, decided that Highland needed to
14  pay HCMFA $7.4 million as compensation for the
15  NAV error and not a loan, would you have any
16  reason to disagree with Mr. Dondero?
17      MR. MORRIS:  Objection to the form
18      of the question.
19      A.   If that was -- if that was his
20  intent, yes, it would -- I would --
21      Q.   Do you have any reason to disagree
22  with him?
23      MR. MORRIS:  Objection to the form
24      of the question.
25      A.   If that was his intent, I don't

Page 319

1  know.  I don't know how I disagree with that.
2      Q.   And just to confirm, you don't
3  remember ever asking Mr. Dondero whether you
4  should have two promissory notes prepared?
5      A.   No.
6      Q.   And you don't remember discussing
7  with Mr. Dondero what the terms of those two
8  promissory notes should be?
9      A.   I don't recall -- I testified all I
10  recall is he said, get the money from Highland.
11  I don't -- the -- the terms of the note, I
12  don't recall ever having a discussion around
13  the terms of the note, but since I don't draft
14  the notes, that -- there could have been a
15  conversation with other people later.
16      Q.   Do you have any memory of whether
17  after the notes were drafted, but before you
18  signed them, that you communicated with
19  Mr. Dondero in any way to just confirm or -- or
20  get his blessing or ratification to signing
21  those notes?
22      MR. MORRIS:  Objection to the form
23      of the question.
24      A.   I don't recall.

Page 320

1      WATERHOUSE - 10-19-21
2      Q.   Again, the only thing you remember,
3  sitting here today, was Mr. Dondero said, get
4  the money from Highland, and that is it, that
5  is all you remember?
6      MR. MORRIS:  Objection to the form
7      of the question.
8      A.   I testified to that several times.
9  This was over two years ago.  A lot has
10  happened.  That is all I recall.
11      Q.   And help me here.  I'm not very
12  technologically astute.  When you -- and I -- I
13  recognize that you do it rarely, but when you
14  sign a document electronically, do you believe
15  that there is an electronic record of you
16  having authorized or signed a document
17  electronically?
18      MR. MORRIS:  Objection to the form
19      of the question.
20      A.   I -- I don't know the tech answer to
21  that, but, you know, since I don't have -- I
22  don't ever attach my signature block
23  electronically, my assistant would have done
24  that, and if that is done over email like we
25  did several times -- you know, multiple,

Page 321

1      WATERHOUSE - 10-19-21
2  multiple times over COVID, she would attach my
3  signature block and then email it out to
4  whatever party.
5      Q.   What was your assistant's name in
6  May 2019?
7      A.   It was Naomi Chisum.
8      Q.   Is she the only one?  I'm sorry, was
9  she your only assistant that would have maybe
10  facilitated logistically something like you
11  just described?
12      A.   You know, she was out on maternity
13  leave at some point.  I don't -- I don't recall
14  those dates where she was out for maternity
15  leave.  There was -- there were folks backing
16  her up.  I don't recall specifically who
17  those -- who those, you know, administrative
18  assistants were, and I don't recall
19  specifically if she was out during this time on
20  maternity leave.
21      I do know that that she was out for
22  a period of time, or who knows, or she could
23  have been on vacation that day or, you know, I
24  don't know.
25      Q.   Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 complaints that have been filed that is against
3 HCMFA and NexPoint, did you see any drafts of
4 those complaints before they were filed?
5       MR. MORRIS: Objection to the form
6    of the question, and to the extent that you
7    had any communications with counsel or you
8    were shown drafts of the complaints by
9    counsel while you were employed by
10   Highland, I direct you not to answer.
11   A.   I -- I reviewed documents yesterday
12 with counsel here. I believe that is the first
13 time I have ever seen those.
14   Q.   Okay. Did you ever discuss with
15 Mr. Seery these two lawsuits before or after
16 they were filed?
17   A.   I don't recall.
18   Q.   Were you ever interviewed by legal
19 counsel, to your knowledge, about these
20 promissory notes before the complaints were
21 filed? Without going into what was said, were
22 you ever interviewed by legal counsel?
23       MR. MORRIS: Objection to the form
24    of the question.
25   A.   I don't recall.

Page 323

1 WATERHOUSE - 10-19-21
2   Q.   Obviously with COVID, it changed,
3 but -- but before COVID, did you used to meet
4 with Mr. Seery from time to time in-person?
5   A.   Yeah, I mean, so before COVID -- so
6 we're talking kind of late March, early April,
7 right, there was about -- I don't remember the
8 specific date when the board for Highland was
9 appointed. I believe it was around February of
10 2020, so maybe there was a month-and-a-half,
11 two-month window when we were meeting
12 in-person or, you know, like we were actually
13 in the office, excuse me, we were in the
14 office.
15       And, you know, when they were first
16 appointed, the board members and Mr. Seery
17 were -- were definitely down here more
18 in-person.
19   Q.   Did you ever see Mr. Seery taking
20 written notes of -- of his meetings with you or
21 others?
22   A.   I don't recall.
23   Q.   Do you recall on any Zoom or video
24 conference with Mr. Seery, seeing him take
25 notes, written notes?

Page 324

1 WATERHOUSE - 10-19-21
2   A.   The Zoom calls we had, I don't
3 recall having seen video or, you know, or if it
4 was on Zoom, I just remember it being -- well,
5 no, you know what, there were some -- you know,
6 I take that back.
7       So there were -- there were some
8 times that I did remember seeing Mr. Seery
9 on -- on some of the Zoom calls.
10   Q.   Well, let me --
11   A.   I don't -- sorry, I'm thinking. I'm
12 thinking -- I'm going back. I'm trying to
13 process this.
14   Q.   I can make it much quicker,
15 Mr. Waterhouse. I have heard -- I have heard
16 that Mr. Seery is a copious note taker.
17       Do you have any knowledge about
18 that?
19   A.   No.
20   Q.   Okay. Switching gears yet again,
21 and this will be last theme. Do you need a
22 restroom break, or are you good to go for
23 another half an hour?
24       MS. DEITSCH-PEREZ: I need a
25    restroom break.

Page 325

1 WATERHOUSE - 10-19-21
2       MR. RUKAVINA: Can we make it five
3 minutes?
4       THE WITNESS: Five minutes would be
5    great.
6       VIDEOGRAPHER: We're going off the
7    record at 5:53 p.m.
8 (Recess taken 5:53 p.m. to 5:59 p.m.)
9       VIDEOGRAPHER: We are back on the
10   record at 5:59 p.m.
11   Q.   Mr. Waterhouse, I had asked you
12 earlier about contracts between HCMFA and the
13 debtor, and now I'm going to talk about
14 contracts between the debtor and NexPoint
15 Advisors. Okay?
16   A.   Okay.
17   Q.   Now, were there contracts similar to
18 the ones with HCMFA that NexPoint had in the
19 nature of employee reimbursement and shared
20 services?
21   A.   Yes, they -- NexPoint Advisors and
22 Highland Capital Management Fund Advisors had
23 cost reimbursement and shared services
24 agreements with Highland Capital Management,
25 L.P.

Page 326

WATERHOUSE - 10-19-21

1  
2     Q.    And was that shared services
3  agreement, to the best of your understanding,
4  in place as of December 31, 2020?
5     A.    It was -- it was terminated at some
6  point, and I remember the contracts had
7  different termination dates, but I think the --
8  the date of termination was January 31st of
9  2021, after the termination was put in.
10       So yeah, it would be in place at the
11  end of the year of December -- it would be in
12  place at December 31st, 2020.
13    Q.    And pursuant to that agreement as of
14  December 31st, 2020, was the debtor providing
15  what you would describe as back office services
16  to NexPoint?
17    A.    Yes.
18    Q.    Would those have included accounting
19  services?
20    A.    Yes.
21    Q.    And as part of those accounting
22  services, would the debtor have assisted
23  NexPoint with paying its bills?
24       MR. MORRIS:  Objection to the form
25    of the question.

Page 327

WATERHOUSE - 10-19-21

1  
2     A.    Yes.
3     Q.    So let's break that up.  You were a
4  treasurer of NexPoint as well in December of
5  2020?
6        MR. MORRIS:  Objection to the form
7     of the question.
8     A.    Yes.
9     Q.    Okay.  And in December of 2020, did
10  NexPoint have its own bank accounts?
11    A.    Yes.
12    Q.    And did it use those bank accounts
13  to pay various of its obligations?
14    A.    Yes.
15    Q.    Did employees of the debtor have the
16  ability to cause transfers to be made from
17  those bank accounts on behalf of NexPoint?
18    A.    Yes.
19    Q.    And is that one of services that the
20  debtor provided NexPoint, basically ensuring
21  that accounts payable and other obligations
22  would be paid?
23    A.    Yes.
24       MR. MORRIS:  Objection to the form
25    of the question.

Page 328

WATERHOUSE - 10-19-21

1  
2     Q.    You answered yes?
3     A.    Yes.
4     Q.    And the payments, though, whose
5  funds would they be made from?
6     A.    From the bank account of NexPoint
7  Advisors.  If they were NexPoint advisor
8  obligations, it would be made from NexPoint
9  Advisors' bank account.
10    Q.    So let's pull up Exhibit Alpha 1.
11  You should have that -- it is my Tab 1 or my
12  Exhibit 1.
13       (Exhibit A1 marked.)
14    Q.    So this is a -- this is a series of
15  emails, Mr. Waterhouse.  Let's look at the
16  first page here, November 25, 2020, between
17  Kristin Hendrix and yourself.
18       Do you see that, sir?
19    A.    I do.
20    Q.    And do you see where Ms. Hendrix
21  writes:  NPA.
22       Do you know what NPA stood for?
23    A.    Yes.
24    Q.    And what does it stand for?
25    A.    NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1  
2     Q.    And was that how you-all internally
3  at Highland refer to NexPoint Advisors, L.P.?
4     A.    I mean, yes, amongst other things.
5     Q.    And she writes at the bottom of her
6  email:  Okay to release?
7        Do you see that?
8     A.    Yes, I do.
9     Q.    So what --
10       MR. MORRIS:  Hold on one second.
11       Okay.  Go ahead.
12       MR. RUKAVINA:  Yeah.
13    Q.    So what is -- what is Ms. Hendrix
14  here on November 25 asking of you?
15    A.    She is asking me -- so she -- these
16  are -- these are payments -- typically we would
17  do an accounts payable run every week at the
18  end of every Friday.  But looking at this date,
19  it is Wednesday, November 25th, which means, to
20  me, it is likely Thanksgiving weekend.
21       So this is the day before
22  Thanksgiving, so this is the last kind of --
23  kind of day before the holidays and vacation
24  and things of that nature.  So it is
25  effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1  So she is -- she is putting in all
2  the payments for the week because we batch
3  payments weekly. And these are the payments
4  that go out that week, and she is informing me
5  of the payments and -- you know, again, at the
6  bottom of the email, she is asking for my okay
7  to -- to release these payments in the wire
8  system.
9      Q.  So these would be accounts payable
10 of NexPoint?
11     A.  I mean, it would be accounts payable
12 for all of these entities listed on this email.
13     Q.  And who was Ms. Hendrix employed by
14 in November and December of 2020?
15     A.  Highland Capital Management.
16     Q.  Okay. So -- so part of the services
17 that NexPoint had contracted with was for
18 Highland to ensure that NexPoint timely paid
19 its accounts payable; is that accurate?
20     MR. MORRIS: Objection to the form
21 of the question. You have got to be
22 kidding me.
23     Q.  Is that accurate?
24     A.  Yes.

Page 331

WATERHOUSE - 10-19-21

1      Q.  And did NexPoint rely on employees
2  of the debtor to ensure that NexPoint's
3  accounts payable were timely paid?
4      MR. MORRIS: Objection to the form
5  of the question.
6      A.  Yes.
7      MR. RUKAVINA: Let's flip to the
8  next page, Mr. Nguyen, if you will please
9  scroll to the next page.
10     Q.  So this is an email similar to the
11 prior one, November 30th.
12     Do you see where it says, NPA HCMFA,
13 USD $325,000 one-day loan?
14     Do you see that, sir?
15     A.  I do.
16     Q.  Do you have any memory of what that
17 was?
18     A.  I don't recall what that -- what
19 that payment was for.
20     Q.  Did it sometimes occur that one
21 advisor would, on very short-terms, make loans
22 to another advisor?
23     A.  Yes. This -- this -- this occurred
24 from -- from -- from time to time. It actually

Page 332

WATERHOUSE - 10-19-21

1  looking at -- I'm -- I'm looking at the date of
2  this email. It is November 30th. It is the
3  last day of the month.
4      HCMFA has obligations it needs to
5  pay to its broker-dealer, which is HCFD. And
6  it likely was short funds to make those
7  obligations under that -- under its agreement,
8  and so it provided a one-day loan because on
9  the next business day on 12/1 -- or the next
10 business day in December, it would receive
11 management fees from the underlying funds that
12 it managed and it would be able to pay back
13 that loan to NexPoint Advisors.
14     Q.  So -- so here Ms. Hendrix was
15 seeking your approval to transfer $325,000 from
16 NexPoint to HCMFA for a one-day loan; is that
17 correct?
18     A.  That is correct.
19     Q.  Let's flip to the next page, sir.
20     MR. RUKAVINA: And, Mr. Nguyen, if
21 you will please scroll down.
22     Q.  Now we have as an entry for
23 $325,000, 11/30 loan payment.
24     Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1      A.  Yes.
2      Q.  And that is probably the loan that
3  was approved on the prior page?
4      A.  Yes, most likely.
5      Q.  So is it also true, sir, that in
6  addition to accounts payable debtor employees
7  would be assisting NexPoint with respect to
8  paying back its debt?
9      MR. MORRIS: Objection to the form
10 of the question.
11     A.  I mean, yes, for loans of this
12 nature, yes.
13     Q.  Well, what about long term loans?
14 Was it reasonable for NexPoint to expect debtor
15 employees to ensure that NexPoint timely paid
16 its obligations under long-term notes?
17     MR. MORRIS: Objection to the form
18 of the question.
19     MS. DANDENEAU: Objection to form.
20     A.  I mean, that is one of the things
21 that the Highland personnel did provide to the
22 advisors. Yes, we would -- we would -- over
23 the years, yes, we -- we -- we -- we did do
24 that generally. Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  specifically but, yes, generally we -- you
3  know, we did do that.
4      Q.  So do you recall -- and we can pull
5  it up, if need be -- that under the NexPoint
6  note that Mr. Morris asked you about earlier,
7  the one for more than $30 million, that
8  NexPoint was obligated to make an annual
9  payment of principal and interest?
10     MR. MORRIS:  Objection to the form
11     of the question.
12     A.  Yes, it was -- yes, it -- it was an
13  amortizing note.  It was -- you know, from what
14  we reviewed earlier, it was payable by
15  December 31st of each year.  So -- but are --
16  are you asking me --
17     Q.  I'm just asking you, sir, if you
18  recall the note.
19     A.  Yes, the $30 million note, yes, we
20  reviewed it earlier, yes.
21     Q.  And do you recall Mr. Morris had you
22  go through the fact that NexPoint had made
23  payments in years prior to 2020 on that note?
24     A.  I do.
25     Q.  And do you believe that employees of

Page 335

1  WATERHOUSE - 10-19-21
2  the debtor would have played any role in
3  NexPoint having made those prior payments?
4      MR. MORRIS:  Objection to the form
5      of the question.
6      A.  Yes.
7      Q.  And what role in years prior to 2020
8  would employees of the debtor have had with
9  respect to NexPoint making that annual payment?
10     A.  We -- we -- we would have -- I keep
11  saying "we".  The team would have calculated
12  any amounts due under that loan and other
13  loans, as -- as standard course.
14     We would -- since we provided
15  treasury services to the advisors, we would
16  inform the -- the -- the -- we informed
17  Mr. Dondero of any cash obligations that are
18  forthcoming, whether we do cash projections.
19     If, you know, any of these payments
20  would have -- or, you know, the sum total of
21  all of these payments, including any note
22  payments, if there were any cash shortfalls, we
23  would have informed Mr. Dondero of any cash
24  shortfalls.  We could adequately plan, you
25  know, in instances like that.

Page 336

1  WATERHOUSE - 10-19-21
2      Or, sorry, we -- I say "we" -- I
3  keep saying "we" -- I keep wearing my -- again,
4  my -- my treasurer hat.
5      But, yes, it is to -- it is to
6  inform Mr. Dondero of the obligations of the
7  advisors in terms of cash and obligations that
8  are -- are upcoming and that -- and that are --
9  are scheduled to be paid.
10     Q.  And would those obligations that are
11  upcoming and scheduled to be paid prior to 2020
12  have incurred the annual payment on that
13  NexPoint $30 million note?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Davor, I think
16     you misspoke.  You might want to just
17     repeat the question.
18     Q.  Okay.  Let me repeat the question,
19  sir.
20     Prior to 2020, those services that
21  you just described, would that -- on behalf of
22  the debtor, would that have included NexPoint's
23  payments on the $30 million note?
24     A.  Yes.
25     Q.  So someone at the debtor in treasury

Page 337

1  WATERHOUSE - 10-19-21
2  or accounting would have sent some schedule or
3  a reminder that a payment would be coming due
4  in the future.  Is that generally the practice?
5      A.  Yes, we would -- you know, again, I
6  didn't -- I didn't micromanage the teams, but
7  we had a -- a corporate accounting calendar
8  that we use as kind of a tickler file to keep
9  track of payments.
10     I actually, you know, don't know how
11  actively they're using that in -- in prior to
12  2020, but it was actively used at some point.
13     We did look at NexPoint cash
14  periodically and cash for the other advisors as
15  well and payments.  You know, we -- payments
16  like this would have appeared in our cash
17  projections, in the advisor's cash projections.
18     And, again, as like I said earlier,
19  they would have appeared there, so there would
20  be time to plan for making any of these
21  payments.
22     Q.  And based on your experience, would
23  it have been reasonable for NexPoint to rely on
24  the debtors' employees to inform NexPoint of an
25  upcoming payment due on the $30 million

Appx. 02133

Page 338

1          WATERHOUSE - 10-19-21
2    promissory note?
3          MR. MORRIS:  Objection to form of
4    the question.
5          MS. DANDENEAU:  Objection to form.
6    A.   Yes.  Yes, they did.  I mean, but I
7    mean, but I don't think these -- these notes
8    were any secret to anybody.
9    Q.   I understand, and I'm not suggesting
10   otherwise.
11         MR. RUKAVINA:  Please pull up Alpha
12   2, Mr. Nguyen.
13         (Exhibit A2 marked.)
14   Q.   Now, this document is similar to the
15   ones we've seen before as of December 31, 2020,
16   and I don't see under NTA anything there for
17   paying the promissory note to Highland.
18         Do you see anything like that?
19   A.   I do not.
20         MR. RUKAVINA:  You can pull that --
21   that exhibit down, Mr. Nguyen.
22   Q.   You are aware, of course, by now
23   that, in fact, NexPoint failed to make the
24   payment due December 31, 2020, are you not?
25   A.   I am aware, and yes, I do understand

Page 339

1          WATERHOUSE - 10-19-21
2    it.
3    Q.   Were you aware that Highland
4    accelerated that $30 million promissory note?
5    A.   I am aware.
6    Q.   Were you aware of that acceleration
7    at the time that it occurred?
8    A.   I don't remember specifically.
9    Q.   Do you recall whether anyone asked
10   you -- prior to the acceleration, anyone asked
11   you at Highland, what Highland should do with
12   respect to the missed payment?
13   A.   Did anyone ask me what Highland
14   should do about the missed payment?
15   Q.   Yes, before acceleration.
16         MR. MORRIS:  Objection to the form
17   of the question.
18   A.   I mean, what -- what I recall is
19   there was the -- sorry, are you asking me --
20         MS. DANDENEAU:  Why don't you just
21   repeat the question, Mr. Rukavina.
22   Q.   Let me try again, Mr. Waterhouse,
23   let me try again.
24         I am saying you're the CFO of
25   someone, in this case, Highland, and the

Page 340

1          WATERHOUSE - 10-19-21
2    borrower failed to make the required payment.
3    Are you with me so far?
4    A.   I am.
5    Q.   Did anyone then ask you, what should
6    we do with respect to our rights against the
7    borrower that missed the payment?
8    A.   Not that I recall.
9    Q.   Did you play a role in the decision
10   to accelerate that $30 million promissory note?
11   A.   I did not.
12   Q.   Do you recall whether Mr. Seery ever
13   asked you before the acceleration as to whether
14   he should accelerate the note?
15   A.   I don't recall.
16   Q.   And you don't recall when you
17   learned of the acceleration itself?
18         MR. MORRIS:  Objection to the form
19   of that question.
20   A.   It was -- it was sometime in
21   early -- early 2021.  I don't remember
22   specifically.
23   Q.   But do you recall whether it was
24   after the acceleration had already been
25   transmitted?

Page 341

1          WATERHOUSE - 10-19-21
2          MS. DANDENEAU:  Objection to the
3    form of the question.
4    A.   I don't recall.
5    Q.   Do you recall in early to mid
6    January of 2021, after the default, discussing
7    the default with Mr. Dondero?
8    A.   I do recall discussing with
9    Mr. Dondero after December 31, 2020?
10   Q.   Yes, the fact of the default.
11   A.   I don't recall.
12         MR. RUKAVINA:  Let's pull up my
13   Exhibit 6, Alpha 6.
14         (Exhibit A6 marked.)
15         MR. RUKAVINA:  And, Mr. Nguyen, if
16   you will please scroll down.
17   Q.   This email chain begins with you
18   writing to Ms. Hendrix on January the 12th:
19   NexPoint note to HCMLP.
20         Do you see that, sir?
21   A.   I do.
22   Q.   Were you discussing this same
23   $30 million note we're talking about right now
24   with Ms. Hendrix?
25   A.   Yes.

Page 342

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you recall what prompted
3  you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5  with Jim.
6    Q.   Okay.  And what -- what did you
7  discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9  wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13    Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18    A.   No, it was -- it was that morning.
19    Q.   And do you recall how you had that
20  conversation with him?
21    MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   By telephone, by email, in-person?
24    A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1
2  December of 2020.  He called me from home.  He
3  said he was in court.  He wanted to -- he asked
4  about, you know, making payment on the note and
5  the amount, and so I didn't have those numbers
6  in front of me, so I said I would get back to
7  him.  I wanted all the details, so here is
8  this -- so I reached out to Kristin.
9    Q.   And then she gave you that
10  $1,406,000 figure?
11    MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13    A.   Yes.  Yeah, she -- the $1,406,112.
14    Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16    A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18    Q.   Are you aware of whether NexPoint,
19  in fact, then made that 1 million 406 and
20  change payment?
21    A.   Yes, they did.
22    Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25    When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2  Mr. Dondero, was -- was it also on January
3  12th?
4    A.   Sorry, when I conveyed the
5  $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10    Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15    A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21    Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making that -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

1
2    A.   No.
3    Q.   Did you tell him anything to the
4  effect that making that payment would not cure
5  the default?
6    A.   No.
7    Q.   Did you discuss that in any way with
8  him?
9    A.   No, I did not.
10    Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12    MR. MORRIS:  Objection to the form
13  of the question.
14    A.   He -- he -- he didn't go into
15  specifics.
16    Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19    MR. MORRIS:  Objection to the form
20  of the question.
21    A.   I don't recall.
22    MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24    Q.   And, again, when you say you don't
25  recall, you mean you don't remember right now

**Appx. 02135**

Page 346

1          WATERHOUSE - 10-19-21
2   either way; correct?
3       A.   Yeah, I don't remember.  I don't
4   remember us discussing that.
5       Q.   Now -- and we're almost done, I
6   promise.  I'm just going to -- I don't know how
7   to ask this question, so I'm just going to try
8   to do my best.
9          Prior to the default on December 31,
10  2020, did Mr. Seery ever tell you any words to
11  the effect that you or someone at Highland
12  should ensure that NexPoint doesn't make its
13  payment?
14      A.   No.
15      Q.   Did you have any hint or any belief
16  that anyone at NexPoint -- I'm sorry, strike
17  that.
18          Did you have any reason to believe
19  that anyone with Highland was actively trying
20  to get NexPoint to make that default by not
21  paying on December 31?
22          MR. MORRIS:  Objection to the form
23  of the question.
24      A.   Are you asking, did any Highland
25  employees actively work to make -- to

Page 347

1   somehow --
2       Q.   Yes.  Let me take a step back.  Let
3   me take a step back.
4          So you are aware now that as a
5   result of that default, what was still some
6   25-year note was accelerated and became
7   immediately due.  You are aware of that now;
8   right?
9       A.   Yes.
10      Q.   And can you see how someone at
11  Highland might actually have been pleased with
12  that development?
13          MR. MORRIS:  Objection to the form.
14      Q.   Not that they were -- not that they
15  were pleased, but you can see how someone at
16  Highland might have been pleased with that
17  development?
18          MR. MORRIS:  Objection to the form
19  of the question.
20          MS. DANDENEAU:  Object to form.
21      A.   I don't know how they would have
22  reacted to that.
23      Q.   Okay.  But you're not -- you're not
24  aware of any instructions or any actions being

Page 348

1          WATERHOUSE - 10-19-21
2   given or taken at Highland by Mr. Seery, the
3   independent board, DSI, that -- that would have
4   basically led Highland to ensure that NexPoint
5   would fail to make that payment?
6       A.   I'm not aware.
7       Q.   In other words, there wasn't a trick
8   or a settlement; right?
9          MS. DEITSCH-PEREZ:  Objection to
10  form.
11          MS. DANDENEAU:  Object to form.
12          MR. MORRIS:  Object to form.
13      A.   I'm not aware.
14          Look, I'm not aware.  I'm not in
15  every conversation.  I mean, and I'm just --
16  again, I'm sitting at home.  It is the end of
17  the year.  Again, I'm not aware.
18      Q.   That is a perfectly legitimate
19  answer.  I don't know why -- why you think
20  otherwise.
21          Okay.  Just give me one second to
22  compose my thoughts.
23          MS. DEITSCH-PEREZ:  While you're
24  taking your one second, why don't we take
25  three minutes.  I will be right back.

Page 349

1          WATERHOUSE - 10-19-21
2          VIDEOGRAPHER:  Do we want to go off
3   the record?
4          MR. RUKAVINA:  Yes.
5          VIDEOGRAPHER:  All right.  We're
6   going off the record at 6:27 p.m.
7   (Recess taken 6:27 p.m. to 6:30 p.m.)
8          VIDEOGRAPHER:  We are back on the
9   record at 6:30 p.m.
10          MR. HORN:  Is Deb back?
11          MS. DANDENEAU:  Are you asking about
12  me?  I'm here.
13          MR. HORN:  Oh, okay.  I don't see
14  you, sorry.
15      Q.   Actually, yeah, Mr. Waterhouse, so
16  when you had --
17          MS. DANDENEAU:  Are you asking about
18  Deb Dandeneau or Deborah?  I mean, there
19  are a lot -- as we talked about, a lot of
20  Debs.  I'm here.
21          MS. DEITSCH-PEREZ:  I'm here.
22          MR. HORN:  Yes, I was asking about
23  DDP.
24          MS. DEITSCH-PEREZ:  Oh, DDP is here.
25          MR. HORN:  Okay.  Here we go.  I'm

Page 350

1    WATERHOUSE - 10-19-21
2  going back on mute.
3      MS. DANDENEAU: Get the right
4  nomenclature.
5    Q.   Mr. Waterhouse, on January 12th,
6  2021, when you had those talks with Mr. Dondero
7  about the $1.4 million payment, did you have a
8  communication or a conversation with Mr. Seery
9  about that payment after January 12th, 2021?
10   A.   I don't recall.
11   Q.   Well, in response to Mr. Dondero
12 reaching out to you, do you recall on that day,
13 January 12th, talking to Mr. Seery or anyone at
14 Highland other than the email chain we just saw
15 about Mr. Dondero's call with you?
16   A.   Did I talk to -- I spoke with
17 Kristin -- I don't know if I spoke to her. I
18 likely spoke to Kristin Hendrix because we had
19 to get the wire on NexPoint's behalf to make
20 the payment to Highland.
21   Q.   So it is true, then, that -- that
22 employees of the debtor did actually cause that
23 payment to be made when it was made after
24 January 12th?
25   A.   Yes, I mean, we -- we -- as I

Page 351

1    WATERHOUSE - 10-19-21
2  testified earlier, we provided that accounting
3  finance treasury function as -- under the
4  shared services agreement. And so once I
5  got the -- I talked to Jim, got the approval to
6  make this payment, we have to then make the
7  payment, or the team does, and so the payment
8  was made.
9    Q.   Okay. But -- okay. And -- and
10 sitting here right now, after Jim called you,
11 you don't remember talking to anyone other than
12 the -- the couple of people you mentioned,
13 talking to anyone about something to the effect
14 that, hey, Jim wants to make this payment now?
15     MR. MORRIS: Objection to the form
16 of the question.
17   A.   I don't -- I don't recall.
18   Q.   And does that include legal counsel?
19     Without going into any detail, on
20 January 12th or before that payment was made,
21 did you consult with legal counsel about
22 anything having to do with the $1.4 million
23 payment?
24   A.   I don't recall.
25   Q.   Okay. Thank you, sir, for your

Page 352

1    WATERHOUSE - 10-19-21
2  time.
3      MR. RUKAVINA: Pass the witness.
4      MR. MORRIS: I just have a few
5  questions, if I may.
6      MS. DEITSCH-PEREZ: Don't you go at
7  the end?
8      MR. MORRIS: Oh, I apologize. He is
9  your witness. I'm surprised you want to
10 ask him questions, but go right ahead.
11     MS. DEITSCH-PEREZ: Just have a
12 couple of things.
13     MR. RUKAVINA: And I will just
14 object to that, that he's our witness.
15 That's not --
16     MR. MORRIS: I'm not talking to you.
17 I'm not talking to you.
18     MS. DANDENEAU: Also, Mr. Morris, it
19 is -- it is --
20     MS. DEITSCH-PEREZ: He is not my
21 witness. He's been subpoenaed by you.
22 Okay?
23     That is no offense, Mr. Waterhouse,
24 I'm -- I'm not -- okay. Anyway.
25       EXAMINATION

Page 353

1    WATERHOUSE - 10-19-21
2  BY MS. DEITSCH-PEREZ:
3    Q.   Good evening. I'm very sorry to be
4  going last and I know you have had a long and
5  taxing day, so I thank you for indulging me.
6      The kinds of services that you
7  describe that the -- that Highland provided for
8  NexPoint, did Highland also provide similar
9  services to that to HCRE and HCMS?
10   A.   Yes.
11     MR. MORRIS: Objection to the form
12 of the question.
13   Q.   What kind of services did Highland
14 provide to HCRE and HCMS?
15     MR. MORRIS: Objection to the form
16 of the question.
17     MS. DEITSCH-PEREZ: What is your
18 objection, John?
19     MR. MORRIS: It is vague and
20 ambiguous. Unlike the advisors and
21 NexPoint, they actually had shared services
22 agreements.
23     MS. DEITSCH-PEREZ: I got -- I
24 understand your objection. That is fine.
25   Q.   Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1
2 What kinds of services did Highland
3 provide to HCRE?
4 MR. MORRIS: Objection to the form
5 of the question.
6 A. HCMS, Highland employees provided
7 accounting services, treasury management
8 services, potentially legal services. I
9 don't – but I wouldn't have been directly
10 involved in that. But as far as the teams that
11 I manage, it was accounting, treasury, things
12 of that nature.
13 Q. Okay. And that was for HCM, LLP –
14 A. And – and, sorry, it would also be
15 any asset valuation if needed as well.
16 Q. Okay. We went back and forth on
17 each other and I apologize, so just to clarify.
18 You were talking about the services
19 that Highland Capital Management provided to
20 HCMS; is that right?
21 A. HCMS. So, again, yes. And
22 accounting, treasury, valuation, and also tax
23 services too.
24 Q. Okay.
25 A. Tax services. Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1
2 this, their HR services as well.
3 Q. Okay. And did that include bill
4 paying?
5 MR. MORRIS: Objection to the form
6 of the question.
7 Q. Did the services that HCM provided
8 to HCMS include bill paying?
9 MR. MORRIS: Objection to the form
10 of the question.
11 A. Yes.
12 Q. And did the services that HCMLP
13 provided to HCMS include scheduling upcoming
14 bills?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. Yes.
18 Q. And did HCMLP regularly pay – cause
19 to be paid the payments on loans HCMS had from
20 HCMLP?
21 MR. MORRIS: Objection to the form
22 of the question.
23 A. Yes.
24 Q. Typically – if there is a
25 typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1
2 HCMLP cause HCMS to pay its bills?
3 MR. MORRIS: Objection to the form
4 of the question.
5 A. I mean, it – it – it depend – it
6 depended on the nature of the payment and the
7 vendor, but, you know, if there were – if
8 there were larger scheduled payments, you know,
9 I would like to give at least 30 days notice.
10 And that is – that is kind of my
11 rule of thumb so no one is surprised.
12 Q. Okay. And was it generally HCMLP's
13 practice to timely pay HCMS' bills?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. It – it – it – that depended on
17 the nature of the payment.
18 Q. Okay. And can you explain what you
19 mean by that?
20 A. Yeah, I mean if – if it was – I
21 mean – if there was some professional fees
22 that weren't – you know, they were due but
23 they weren't urgent, those fees may not be paid
24 as timely as others that have a due date or –
25 or things like that.

Page 357

WATERHOUSE - 10-19-21

1
2 Q. Okay. Are loan payments the kinds
3 of thing that HCMLP would pay on time because
4 of potential consequences of not paying on
5 time?
6 MR. MORRIS: Objection to the form
7 of the question.
8 A. Yes. As I testified earlier, we
9 would want to give, you know, notice on – on
10 – on larger payments and – and things of that
11 nature so we didn't miss due dates.
12 Q. Okay. And over the course of time,
13 did HCMLP generally pay HCMS' loan payments in
14 a timely fashion?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. I can't remember specifically, but
18 generally, yes.
19 Q. Okay. Now, did HCMLP provide
20 similar services to HCRE that you have
21 described it provided to HCMS?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. Yes, but I don't think it – it
25 provided – I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2 services.
3    Q.   Can you describe the accounting and
4 treasury services that HCMLP provided for HCRE?
5    A.   Yeah, it -- it would provide
6 bookkeeping services on a -- on a periodic
7 basis.  It would make payments, you know, as
8 needed.
9    Q.   Okay.  So did it provide --
10    A.   And -- and I believe it -- it -- it
11 provided tax services as well.
12    Q.   Okay.  And so did it provide the
13 same kind of bill -- did HCMLP provide the same
14 kind of bill-paying services for HCRE that it
15 provided for HCMS and NexPoint?
16    MR. MORRIS:  Objection to the form
17 of the question.
18    A.   Yes.
19    Q.   And over the course of time, did
20 HCMLP generally cause to be made the loan
21 payments that HCRE owed to HCMLP?
22    MR. MORRIS:  Objection to the form
23 of the question.
24    A.   Yes.
25    Q.   Did HCMLP make loan payment -- the

Page 359

1    WATERHOUSE - 10-19-21
2 loan payment that was due from HCMS to HCMLP in
3 December of 2020?
4    MR. MORRIS:  Objection to the form
5 of the question.
6    A.   I don't believe that payment --
7 payment was made.
8    Q.   Okay.  And when HCMLP caused HCMS in
9 the past to make loan payments, whose money did
10 it use to make those payments?
11    MR. MORRIS:  Objection to the form
12 of the question.
13    A.   It was the -- the money in HCMS's
14 operating account would be made to that --
15 those moneys would be used to make payment to
16 Highland Capital Management.
17    Q.   Okay.  And Highland -- is it correct
18 that Highland Capital Management personnel had
19 the access to HCMS's accounts to be able to
20 cause such payments to be made?
21    A.   Yes, Highland personnel had access
22 to those accounts.
23    Q.   Okay.  And so now for HCRE, whose
24 money was used when HCMLP caused HCRE
25 payments -- loan payments to Highland to be

Page 360

1    WATERHOUSE - 10-19-21
2 made?
3    MR. MORRIS:  Objection to the form
4 of the question.
5    A.   It was -- it was cash in HCRE's bank
6 account that would be used to make payments to
7 Highland Capital Management.
8    Q.   Okay.  And so did Highland Capital
9 Management have access to HCRE's funds in order
10 to be able to make such payments?
11    MR. MORRIS:  Objection to the form
12 of the question.
13    A.   Personnel at Highland Capital
14 Management had access to HCRE's bank account to
15 effectuate the payments.
16    Q.   Okay.  And was the payment due from
17 HCRE to HCMLP due in December of 2020 made?
18    A.   It --
19    Q.   In December of 2020.
20    A.   It was not.
21    Q.   Okay.  And was there money in HCRE's
22 account that would have enabled the payment to
23 be made had HCM personnel attempted to make the
24 payment?
25    MR. MORRIS:  Objection to the form

Page 361

1    WATERHOUSE - 10-19-21
2 of the question.
3    A.   I -- I don't recall.
4    Q.   Do you have any reason to believe
5 that either HCRE or HCMS simply didn't have the
6 funds on hand to make the December 2020
7 payments?
8    A.   I don't know.
9    Q.   I guess I'm asking, do you have any
10 reason to believe that they didn't have the
11 funds?
12    A.   We managed cash for so many
13 different entities and funds, and I don't
14 recall, you know, where the cash position was
15 for HCRE and HCMS at 12/31/2020.
16    Q.   Okay.
17    A.   I just don't recall, and I don't --
18 and I don't remember what the loan payment
19 obligations were from HCRE to Highland, and
20 from HCMS to Highland.  I don't recall.  I
21 don't recall, I mean...
22    Q.   Let me come at it a different way.
23 Were the -- were the payments that would
24 otherwise have been due in December of 2020
25 made in January of 2021 for HCMS and HCRE?

Page 362

1          WATERHOUSE - 10-19-21
2      A.  I believe the HCRE payment was made
3  in January of 2021.  I don't recall any
4  payments being made from HCMS to Highland.
5      Q.  If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8      A.  Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10 Jim Dondero -- Jim Dondero.
11     Q.  Did he seem upset that -- that the
12 payment had not been made?
13     A.  Yeah.  On the note that was, you
14 know, that was the term note, yes, he -- he was
15 displeased that the -- that the payment had not
16 been made by year-end.
17     Q.  Okay.  And did you make the -- cause
18 the payment to be made as -- as requested?
19     A.  Yes.
20     Q.  And did anyone else from HCM
21 participate with you in causing the payment to
22 be made to -- on the HCRE loan?
23     A.  Yes.  It would have been Kristin
24 Hendrix.  I -- again, I don't -- as I testified
25 earlier, I'm not an officer of HCRE.  I don't

Page 363

1          WATERHOUSE - 10-19-21
2  believe I'm an authorized signer.  So I
3  can't -- other personnel have to make payment
4  from HCRE to -- to -- to -- to Highland.
5      Q.  Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10 the payment for, anything like that?
11     A.  No.
12     Q.  In fact, did you have the impression
13 from him that he thought that the loan would
14 be -- the default would be cured by making the
15 payment?
16        MR. MORRIS:  Objection to the form
17   of the question.
18     A.  Did I get the impression from Jim
19 Dondero that the loan would be cured if the
20 payment from HCRE --
21     Q.  Yeah, if that is what he thought.
22        MR. MORRIS:  Objection to the form
23   of the question.
24     A.  I didn't get any impression from him
25 on that at the time.

Page 364

1          WATERHOUSE - 10-19-21
2      Q.  Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5      A.  I don't recall.
6      Q.  Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10        MR. MORRIS:  Objection to the form
11   of the question.
12     A.  I don't remember.  There is -- there
13 is so many notes, and I mean, demands, and I
14 don't -- I don't remember.  It's a lot to keep
15 track in your head.
16     Q.  I understand, and -- and I hear your
17 frustration when you have explained that the
18 debtor has your documents and you don't, and so
19 I fully appreciate it, and this is no knock on
20 you.  It's a knock on somebody else on this
21 call.
22        MR. MORRIS:  I move to strike.  That
23   was pretty obnoxious, but go ahead.
24     Q.  Okay.  But so, Mr. Waterhouse, if --
25 if a payment on the HCMS loan was made in

Page 365

1          WATERHOUSE - 10-19-21
2  January of 2021, do you think it was part of
3  the same conversation where Jim Dondero said,
4  hey, why didn't that get paid, please make
5  that -- get that payment done?
6        MR. MORRIS:  I object to the form of
7   the question.
8      A.  Yes.  Likely it would have been -- I
9  mean, again, I don't recall a payment being
10 made, but, you know, again, I don't remember
11 everything.
12     Q.  Okay.  Did -- at the time you were
13 communicating with Kristin Hendrix about the
14 payment being made, whichever payments were
15 made in January, did she say anything to you
16 about the payments not curing the loan
17 defaults?
18     A.  No.
19     Q.  Okay.  All right.  So I'm going to
20 take you back to very early in the deposition
21 when Mr. Morris was asking you about the --
22 the -- the -- the agreement with respect to
23 the -- the forgiveness element of the loans, so
24 that is just to orient you.
25        Do you remember that there was a

1          WATERHOUSE - 10-19-21
2    time that you and Mr. Dondero were
3    communicating about potential means of
4    resolving the Highland bankruptcy by what was
5    colloquially referred to as a pot plan?
6        A.    Yes.
7        Q.    Okay.  And can you tell me generally
8    when that was?
9        A.    Like mid -- mid 2020, sometime in
10   2020, mid 2020.
11       Q.    Okay.  And did the process of trying
12   to figure out what the numbers should be
13   involve looking at what one should pay for the
14   Highland assets?
15          MR. MORRIS:  Objection to the form
16   of the question.
17       A.    Yes.
18       Q.    Okay.  And did there come a time
19   when you were proposing some potential numbers
20   and Mr. Dondero said something to you like,
21   well, why are you including payment for the
22   related party notes, those, you know, were
23   likely to be forgiven as part of my deferred
24   executive compensation?
25          MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21
2    of the question.
3        A.    Yes, we did have that conversation.
4        Q.    Okay.  Was that conversation in
5    connection with trying to figure out the right
6    numbers for a pot plan?
7        A.    Yeah.  I mean, it was -- it was -- I
8    mean, Jim -- Jim would ask for you, know,
9    most -- most recent asset values, you know, for
10   Highland, and -- and myself and the team
11   provided those to him, so it was in that
12   context.
13       Q.    Okay.  And does that refresh your
14   recollection that these communications were in
15   2020 rather than 2021?
16          MR. MORRIS:  Objection to the form
17   of the question.
18       A.    The -- the -- the executive
19   compensation discussions were definitely in
20   2020.
21       Q.    Okay.  Now, did you ever make
22   proposals that took into account Jim's comment
23   that the notes were likely to end up forgiven
24   as part of his compensation?
25          MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21
2    of the question.
3        A.    Yes, we -- the team and myself put
4    together, you know, asset summaries of Highland
5    at various times for all the assets of
6    Highland, and not including the notes.
7        Q.    Okay.  And were those presentations
8    communicated to -- to Mr. Seery?
9        A.    No.  Well, look, I didn't tell -- I
10   didn't tell Mr. Seery.  I don't know what
11   Mr. Dondero did with the information.
12       Q.    Okay.
13       A.    I did not have conversations with
14   Mr. Seery.
15       Q.    Okay.  Do you know who saw the
16   presentations that you put together that didn't
17   include the value of the related party notes?
18       A.    We're talking presentations -- these
19   are -- these are Excel spreadsheets?
20       Q.    Uh-huh.
21       A.    I don't know who -- these were given
22   to -- to Jim Dondero.  I don't know what was
23   done with them after that.
24       Q.    Okay.  You also mentioned earlier
25   that sometime during your tenure at Highland

1          WATERHOUSE - 10-19-21
2    you knew of the practice of giving forgivable
3    loans to executives.
4          MR. MORRIS:  Objection to the form
5    of the question.
6        Q.    Can you -- can you tell me what you
7    recall about that practice?
8          MR. MORRIS:  Objection to the form
9    of the question.
10       A.    Yes, so there were -- there were --
11   during my tenure at Highland, there were loans
12   or -- given to employees that were later
13   forgiven at a future date and time.
14       Q.    Okay.  And when the loans were
15   given, did the notes, to your recollection, say
16   anything about the potential forgiveness term?
17          MR. MORRIS:  Objection to the form
18   of the question.
19       A.    When you say "did the notes," did
20   the promissory notes detail the forgiveness?
21       Q.    Yes.
22       A.    Not that I recall.
23       Q.    And until such time as whatever was
24   to trigger the forgiveness occurred, were the
25   notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    concerned?
3         MR. MORRIS:  Objection to the form
4    of the question.
5    A.   Yes, similar to -- yes.
6    Q.   Okay.  You were going to say similar
7    to what?
8    A.   Mr. Morris earlier today showed
9    notes of the financial statements about various
10   affiliate loans.  I -- I -- I do recall these
11   notes because I -- at that time personally
12   worked on the -- the financial statements of
13   Highland.  That was, you know, in my role as a
14   corporate accountant.
15        And there were -- those loans
16   were -- to the partners were detailed in the
17   notes to the financial statements, similar to
18   what we went through earlier today in the prior
19   testimony about what we saw with Highland
20   and -- and -- and the -- and HCMFA.
21   Q.   Is it fair to say that on Highland's
22   balance sheet there were any number of assets
23   that the value of which could be affected by
24   subsequent events?
25        MR. MORRIS:  Objection to the form

Page 371

1    of the question.
2    A.   Yes.  I mean, yes, that -- there
3    are.  And that is -- yes.
4    Q.   Okay.  And is it typical accounting
5    practice that until there is some certainty
6    about those potential future events, that asset
7    value listed on -- on the books doesn't take
8    into account those potential future events?
9         MR. MORRIS:  Objection to the form
10   of the question.
11   A.   Yeah, if those -- yes.  If -- if
12   those future events, you know, at the time of
13   issuance are not known or knowable, like I
14   discussed earlier with, like, market practice,
15   asset dislocation, or, you know, I mean, things
16   like that, you -- I mean, it -- it could affect
17   its fair value --
18   Q.   Okay.
19   A.   -- in the future.
20   Q.   And am I correct you wouldn't feel
21   compelled to footnote in every possible change
22   in -- in an asset when those possibilities are
23   still remote?
24        MR. MORRIS:  Objection to the form

Page 372

1    WATERHOUSE - 10-19-21
2    of the question.
3    A.   The accounting standard is you have
4    to estimate to the best -- you know, to -- to
5    the best of your ability, the fair value of an
6    asset as of the balance sheet date under --
7    under GAAP.
8    Q.   Did -- strike that.
9         Okay.  Give me a minute.  I'm
10   close -- I'm close to done.  Let me just go off
11   and look at my notes for a second.  So take two
12   minutes.
13        VIDEOGRAPHER:  We're going off the
14   record at 7:02 p.m.
15        (Recess taken 7:02 p.m. to 7:03 p.m.)
16        VIDEOGRAPHER:  We are back on the
17   record at 7:03 p.m.
18   Q.   Mr. Waterhouse, is it generally your
19   understanding that people you work with now
20   have been asking the debtor for full and
21   unfettered access to their own former files?
22        MR. MORRIS:  Objection to the form
23   of the question.
24   A.   Yes, I am -- I am generally aware.
25   Q.   Okay.  And do you think you could

Page 373

1    WATERHOUSE - 10-19-21
2    have been better prepared for this deposition
3    if the debtor had complied with those requests?
4         MR. MORRIS:  Objection to the form
5    of the question.
6    A.   I -- I -- I most certainly -- yes.
7    I mean, again, these are multiple years,
8    multiple years ago, lots and lots of
9    transactions.
10        You know, we asked about NAV errors
11   and, you know, things like that and these
12   are -- it would make this process a lot more --
13   a lot easier and if we had -- if we had access
14   to that.
15   Q.   Okay.  And has the debtor -- is the
16   debtor suing you right now?
17   A.   Yes.
18   Q.   And is the debtor trying to renege
19   on deals that it had previously made with you?
20        MR. MORRIS:  Objection to the form
21   of the question.
22   A.   Sorry, I need to -- it is my
23   understanding that the litigation trust is
24   suing me.  And not being a lawyer, I don't
25   know -- is that the debtor?

Page 374

WATERHOUSE - 10-19-21

2 Is that -- I don't know the
3 relationship. So, again, I'm not the lawyers.
4 I've said many times. But my understanding is
5 the litigation trust is suing me. I could be
6 wrong there. I don't know.
7 Q. Okay. I understand.
8 Someone with some connection to the
9 Highland debtor has brought a claim against
10 you; is that fair?
11 MR. MORRIS: Objection to the form
12 of the question.
13 A. Yes.
14 Q. Okay. And is there also some motion
15 practice in the bankruptcy where the debtor or
16 someone associated with the debtor is
17 attempting to undo something that was
18 previously resolved with you?
19 A. Yes.
20 Q. And so in one action somebody is
21 associated with the debtors trying to --
22 threatening you with trying to take money from
23 you, and then in the other -- and trying to --
24 and in the other they are threatening not to
25 pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

2 is that correct?
3 MR. MORRIS: Objection to the form
4 of the question.
5 A. I want to be -- yes, I -- there
6 is -- I'm being sued, again, on -- on something
7 that was agreed to with Mr. Seery and myself.
8 I don't -- I don't -- I don't own that claim.
9 Q. Okay.
10 A. To be transparent, I don't own that
11 claim. So it is not my personal property.
12 Q. Okay.
13 A. And -- and being the nonlawyer, I
14 don't know how I can get sued for something
15 that I don't owe or, like, I don't own
16 anything. I'm not the lawyer. But, I mean, if
17 that is -- if I'm understanding the facts
18 correctly.
19 Q. Okay. And the lawsuit that was
20 filed that names you, that was just filed
21 this -- this past week; is that right?
22 MS. DANDENEAU: Ms. Deitsch-Perez, I
23 do want to interrupt at this point because
24 just as I told Mr. Morris, that this is a
25 deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

2 I really don't want to go -- go
3 afield --
4 MS. DEITSCH-PEREZ: Yeah.
5 MS. DANDENEAU: -- and open up a
6 whole new line of inquiry about the lawsuit
7 or the -- the motion and the bankruptcy
8 court. We will be here all night.
9 MS. DEITSCH-PEREZ: And I
10 understand.
11 Q. My -- my point is: Do you feel
12 like -- like there is some effort by these
13 parties related to the debtor to intimidate
14 you -- not that you -- I'm not saying you are
15 or you aren't.
16 But do you feel like there is some
17 effort to intimidate you and maybe an effort to
18 deter you from being as prepared as you might
19 be in this deposition?
20 MR. MORRIS: Objection to the form
21 of the question.
22 A. I was -- I was surprised by the
23 lawsuit, by me being named, because, again, I
24 don't own the asset and things like that.
25 Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

2 life at Skyview.
3 MS. DEITSCH-PEREZ: Thank you.
4 THE WITNESS: Thank you.
5 FURTHER EXAMINATION
6 BY MR. MORRIS:
7 Q. If I may, I just have a few
8 questions.
9 Mr. Waterhouse, we saw a number of
10 documents that Mr. Rukavina put up on the
11 screen where Ms. Hendrix would send you a
12 schedule of payments that were due on behalf of
13 certain Highland affiliates.
14 Do you remember that?
15 A. Yes.
16 Q. And in each instance she asked for
17 your approval to make the payments; is that
18 right?
19 A. Yes, she did.
20 Q. And was that the -- was that the
21 practice in the second half of 2020 whereby
22 Ms. Hendrix would prepare a list of payments
23 that were due on behalf of Highland associates
24 and ask for approval?
25 A. Yes.

Page 378

WATERHOUSE - 10-19-21

1
2  Q.   And I think you said that there was
3  a – a –
4  A.   It was – I think I testified to
5  this earlier when we talked about procedures
6  and policy, you know, again, I want to be
7  informed of – of – of – of – of any
8  payments that are going out. I want to be made
9  aware of these payments, and that was just a
10  general policy, not just for 2020.
11  Q.   Okay. So it went beyond 2020?
12  A.   Yes.
13  Q.   Is that right?
14  A.   Yes.
15  Q.   Okay. And the corporate accounting
16  group would prepare a calendar that would set
17  forth all of the payments that were anticipated
18  in the – in the three weeks ahead; is that
19  right?
20  A.   I – like I testified earlier, we
21  had a corporate calendar that was set up, you
22  know, to – to provide reminders or, you know,
23  of anything of any nature, whether it is
24  payments or – or financial statements or, you
25  know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2  deadlines.
3  I don't know how, as I testified
4  earlier, how much they were using that
5  calendar.
6  Q.   Okay. But – but you did get notice
7  and a request to approve the payments that were
8  coming due on behalf of Highland's affiliates.
9  Do I have that right?
10  MS. DANDENEAU: Objection to form.
11  A.   I mean, generally, yes. I mean, you
12  know, as we saw with these emails, generally, I
13  mean, did that encompass everything, no.
14  Q.   Okay. Do you know why the
15  payment – do you know why there was no payment
16  made by NexPoint at the end of 2020?
17  A.   Yes. There was – there was – we
18  talked about these agreements between the
19  advisors and Highland, the shared services and
20  the cost reimbursement agreement.
21  And in late 2020, there were
22  overpayments, large overpayments that had been
23  made over the years on these agreements, and it
24  was my understanding that the advisors were –
25  were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2  to offset any obligations that the advisors
3  owed to Highland as offset to the overpayments
4  on these agreements.
5  Q.   Okay. Did you participate in any of
6  those conversations?
7  A.   I did not.
8  Q.   Okay. Do you know – do you recall
9  that the – at the end of November, the debtor
10  did notice to the advisors of their intent to
11  terminate the shared services agreements?
12  A.   Like I testified earlier, there
13  was – the agreements weren't identical, from
14  what I recall, and there is one that had a
15  longer notice period, which I think had a
16  60-day notice period. I don't recall which one
17  that was, so not all of them were – notice
18  hadn't been given as of November 30th, for all
19  of the agreements.
20  Q.   Upon the receipt of the – the
21  termination notices that you recall, do you
22  know if the advisors decided at that point not
23  to make any further payments of any kind to
24  Highland?
25  MR. RUKAVINA: Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2  A.   No. The advisors – the advisors
3  had stopped making payments prior to that
4  notice.
5  Q.   Okay. And how do you know that the
6  advisors stopped making – making payments
7  prior to the notice?
8  A.   I had – I had a conversation
9  with – with Jim Dondero.
10  Q.   And did Mr. Dondero tell you that
11  the advisors would no longer make payments to
12  Highland?
13  MS. DEITSCH-PEREZ: Object to the
14  form.
15  A.   Yes, he – he – again, he said
16  they – they – the advisors have overpaid on
17  these agreements, to not make any future
18  payments, and that there needs to be offsets,
19  and they're working on getting offsets to these
20  overpayment.
21  Q.   Do you know if anybody ever
22  instructed Highland's employees to make the
23  payment that was due by NexPoint at the end of
24  the year?
25  A.   Did anyone instruct Highland's

WATERHOUSE - 10-19-21

2 employees to make that payment?

3    Q.    Correct.

4    A.    Anyone – not that I'm aware.

5    Q.    Were any of Highland's employees

6 authorized to make the payments on behalf of

7 its affiliates – withdrawn.

8         Was any of Highland's employees

9 authorized to effectuate the payment on behalf

10 of NexPoint that was due at the end of the year

11 without getting approval from either you or

12 Mr. Dondero?

13    A.    They had the – they had the ability

14 to make the payment, but they didn't – you

15 know, that – that payment needed to be

16 approved.

17    Q.    Okay.  And it needed to be approved

18 by you or Mr. Dondero; is that right?

19    A.    I mean, I'm not going to make the

20 unilateral decision.

21    Q.    Is that a decision that you

22 understood had to be made by Mr. Dondero?

23    A.    Yes.  Sitting back in December of

24 2020, the – that – there was this off –

25 offset negotiation that – that was happening,

WATERHOUSE - 10-19-21

2 so I mean, until those negotiations were

3 resolved, you know, there wasn't any

4 payments – there weren't any payments.

5    Q.    And – and there were no payments

6 until the negotiations were resolved because

7 that was the directive that you received from

8 Mr. Dondero; correct?

9    A.    I don't think he said – I mean, I

10 think – yeah, I mean – I'm trying to recall

11 the conversation.  It was – you know, there

12 is – there is these negotiations.  There's –

13 there needs to be these offsets.  They're

14 talking with the debtor.  So, you know, until

15 this is resolved, right, I mean, depending on

16 how, whatever that resolution was, were we to

17 take any action.

18    Q.    Okay.  How about with respect to

19 HCMS, did HCMS have a term payment due at the

20 end of the year?

21    A.    Again, I don't – I don't recall.

22    Q.    Okay.  You discussed briefly two

23 payments that were made in January of 2021, one

24 on behalf of NexPoint, and one on behalf of

25 HCMS.  Do I have that right?

WATERHOUSE - 10-19-21

2    A.    No.  The two payments I recall were

3 NexPoint and HCRE.

4    Q.    Okay.  And those two payments –

5 thank you for the correction.  And those two

6 payments were made because Mr. Dondero

7 authorized those payments to be made; correct?

8    A.    Yes.

9    Q.    And they hadn't been made before

10 that because Mr. Dondero had not authorized

11 them to be made?

12         MS. DEITSCH-PEREZ:  Object to the

13    form.

14    A.    Yes, because of these negotiations.

15    Q.    Okay.  Just a couple of more

16 questions.

17         Did anybody, to the best of your

18 knowledge, on behalf of HCMFA, ever tell the

19 SEC that HCMLP was responsible for the mistakes

20 that were made on the TerreStar valuation?

21    A.    Did anyone from Highland on HCMFA's

22 behalf tell the SEC that Highland – that

23 Highland was responsible for there – I just

24 want to make sure –

25    Q.    It was a little bit different, so

WATERHOUSE - 10-19-21

2 let me try again.

3    A.    These are very long questions, John.

4 I'm not trying to be –

5    Q.    That is good.  Do you know whether

6 anybody – do you know whether anybody on

7 behalf of HCMS – HCMFA ever told the SEC that

8 Highland was the responsible party for the

9 TerreStar valuation error?

10    A.    Not that I'm aware.

11    Q.    Okay.  Did anybody on behalf of

12 the – on behalf of HCMFA ever tell the retail

13 board that Highland was responsible for the

14 TerreStar valuation error?

15    A.    Not that I'm aware.

16    Q.    Do you know if HCMFA made an

17 insurance claim with respect to the damages

18 that were incurred in relation to the TerreStar

19 valuation error?

20    A.    Yes.

21    Q.    And do you know why they made that

22 insurance claim?

23    A.    Because there was an error.  I

24 mean –

25    Q.    Was the insured's claim made – was

Page 386

WATERHOUSE - 10-19-21

1
2 the insurance claim made under HCMFA's policy?
3 A. Yes.
4 Q. Did HCMFA at any time prior to the
5 petition date -- withdrawn.
6 You were asked a couple of questions
7 where -- where you said that Mr. Dondero told
8 you that he was ascribing zero value to the
9 notes as part of a pot plan because he believed
10 that the notes were part of executive
11 compensation.
12 Do I have that right?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. Okay. Have you ever heard that
16 Q. Okay. Have you ever heard that
17 before the time that Mr. Dondero told you that
18 in the conversation about the pot plan?
19 A. Had I heard that prior to my
20 conversation with Mr. Dondero?
21 Q. Yes.
22 A. No, I had not heard that prior.
23 Q. Okay. And that was in the context
24 of his formulation of the settlement proposal;
25 is that right?

Page 387

WATERHOUSE - 10-19-21

1
2 A. I mean, generally, yes. You know,
3 we were asked to provide asset values, right,
4 and he was having settlement discussions.
5 Again, I don't know who those went to
6 ultimately. I don't recall.
7 MR. MORRIS: I have no further
8 questions. Thank you very much for your
9 patience. I apologize for the late hour.
10 MS. DEITSCH-PEREZ: John, you stay
11 on your email when --
12 MR. RUKAVINA: Hold on, I'm not
13 done.
14 MS. DEITSCH-PEREZ: Oh, okay. Davor
15 still has questions. Sorry. I was going
16 to say both John and Davor, could you stay
17 on afterwards just to talk about the
18 requests.
19 FURTHER EXAMINATION
20 BY MR. RUKAVINA:
21 Q. Mr. Waterhouse, you were just now
22 testifying about a discussion you had with
23 Mr. Dondero where he said something like no
24 more payments.
25 Do you remember that testimony?

Page 388

WATERHOUSE - 10-19-21

1
2 A. Yes.
3 Q. Okay. And was that late November or
4 early December of 2020?
5 A. It was, I would say, first or second
6 week of November.
7 Q. Okay. Do you recall whether --
8 whenever you had that discussion, whether
9 Mr. Dondero had already been fired by the
10 debtor?
11 A. Yes, I -- I believe he was not an
12 employee of the debtor anymore at that time.
13 Q. And when you were discussing this
14 with Mr. Dondero and he said no more payments,
15 you were discussing the two shared services
16 agreements and employee reimbursement
17 agreements we testified -- you testified about
18 before; is that correct?
19 MR. MORRIS: Objection to the form
20 of the question.
21 A. That is correct.
22 Q. And had your office or you -- and we
23 will talk at a future deposition about the
24 administrative claim.
25 But had -- by that time that you

Page 389

WATERHOUSE - 10-19-21

1
2 talked to Mr. Dondero, had your office or you
3 done any estimate of what the alleged
4 overpayments were?
5 MR. MORRIS: Objection to the form
6 of the question.
7 A. Yes, we had -- there was a -- there
8 was a detailed analysis that was put together
9 by David Klos at the time.
10 Q. And do you recall just generally
11 what the total amount for both advisors of the
12 overpayments were?
13 A. It was in excess of $10 million.
14 Q. Was it in excess of $14 million?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. I -- I remember it was an
18 eight-figure number. I don't remember
19 specifically.
20 Q. Okay. And did you convey that
21 number to Mr. Dondero when you had that
22 conversation?
23 A. Yes.
24 Q. What was his reaction?
25 A. I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

2  Q.   Is it fair to say he was upset?
3  A.   Yes.
4  Q.   Did Mr. Dondero ever expressly tell
5  you to not have NexPoint make the required
6  December 31, 2020, payment?
7  A.   Yes, I recall him saying don't make
8  the payment because it was being negotiated, as
9  I discussed with Mr. Morris, this offset
10 concept.  So there were obligations due by the
11 advisors to Highland, they should be offset
12 that -- you know, those obligations should be
13 offset by this -- by this overpayment.
14 Q.   And when did he tell you that?
15 A.   I would say -- I would say around --
16 probably December -- December-ish.
17 Q.   Early December, late December?
18 A.   I don't recall with as much
19 specificity as -- as -- as -- as stopping the
20 shared services payments, because we had
21 actually made one shared services payment in
22 November.  So that is why I need to remember
23 that one more clearly.  I don't remember where
24 exactly in December that conversation occurred.
25 Q.   Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

2  word "NexPoint" when he was saying don't make
3  these payments?
4      MR. MORRIS:  Objection to the form
5  of the question, asked and answered.
6  A.   Yeah, we were -- we were discussing
7  advisor obligations.  So it was -- you know, it
8  was just obligations from the advisors.
9      And -- and he specifically talked
10 about the NexPoint payment as well.
11 Q.   Okay.  And it is your testimony that
12 he expressly told you not to make that NexPoint
13 December 31 payment?
14     MR. MORRIS:  Objection, asked and
15     answered twice.
16 A.   Yes, he -- he did, during that
17 conversation.
18 Q.   And did you ever follow up with him
19 after that about whether NexPoint should or
20 shouldn't make that payment?
21 A.   I did not.
22 Q.   Did you ever, on or about
23 December 31, 2020, remind him and say, hey,
24 this payment is due, what shall I -- what
25 should I do?

Page 392

WATERHOUSE - 10-19-21

2  A.   I did not.
3  Q.   So sitting here today, you -- you
4  remember distinctly that Dondero in December of
5  2020 expressly told you not to have NexPoint
6  make that payment?
7      MR. MORRIS:  Objection, asked and
8      answered three times.
9  A.   Yes.
10 Q.   Can you say categorically it wasn't
11 just some general discussion where he told you
12 not to make payments?
13     MR. MORRIS:  Objection, asked and
14     answer four times.
15     MR. HORN:  Four times now.  Go for
16     five.
17 A.   Yes.
18 Q.   Did you tell Mr. Seery that?
19 A.   I don't believe I did.  I don't
20 recall.
21 Q.   And was this an in-person discussion
22 or telephone or email?  Do you remember?
23 A.   This was a phone -- a phone
24 conversation.
25 Q.   Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

2  on your cell phone of when that conversation
3  might have taken place?
4      I'm sorry, strike that.
5      Was that by cell phone?
6  A.   I believe -- yes, because we -- I
7  was at home.  I mean, I don't have a landline.
8  All I have is my cell phone.
9  Q.   Do you know whether your cell phone
10 still has records of conversations from
11 December 2020 on it?
12 A.   My call log doesn't go back that
13 far.
14 Q.   Okay.  Thank you.
15     MR. RUKAVINA:  I will pass the
16     witness.
17     MS. DEITSCH-PEREZ:  Just a couple
18     quick questions.
19         FURTHER EXAMINATION
20 BY MS. DEITSCH-PEREZ:
21 Q.   With respect to HCRE and HCMS, am I
22 correct there was -- there was no direction not
23 to pay those loan payments?
24     MR. MORRIS:  Objection to the form
25     of the question.

Appx. 02147

Page 394

```
 1        WATERHOUSE - 10-19-21
 2    A.   Yes, I don't recall having
 3  conversations about, you know, those -- those
 4  entities.
 5    Q.   And, in fact, what was the tone that
 6  Mr. Dondero had when he talked to you about the
 7  fact that HCRE and HCMS payments hadn't been
 8  made when he found out that they hadn't been
 9  paid?
10        MS. DANDENEAU:  Objection to form.
11        MR. MORRIS:  Objection to form.
12    Q.   What was the tone he took with you?
13    A.   Oh, it was -- it was -- it was -- it
14  was very negative.  I mean, I think he cursed
15  at me and he doesn't usually curse.
16    Q.   Okay.  And in your mind, is that
17  consistent with the fact that he was surprised
18  that those payments hadn't been made?
19        MR. MORRIS:  Objection to the form
20  of the question.
21    A.   Yes.
22    Q.   Okay.  Thank you.
23        MR. MORRIS:  I have nothing further.
24  Thank you so much, Mr. Waterhouse.
25        MR. HORN:  I have no questions.
```

Page 395

```
 1        WATERHOUSE - 10-19-21
 2  Thank you, Mr. Waterhouse.  We appreciate
 3  your time.  I am logging off the discussion
 4  and I will talk to y'all tomorrow.
 5        MR. MORRIS:  Super.
 6        VIDEOGRAPHER:  If there are no
 7  further questions, this ends the
 8  deposition -- excuse me.  This ends the
 9  deposition, and we are going off the record
10  at 7:30 p.m.
11    (Deposition concluded at 7:30 p.m.)
12
13        _____
14        FRANK WATERHOUSE
15
16  Subscribed and sworn to before me
17  this      day of        2021.
18
19  _____
20
21
22
23
24
25
```

Page 396

```
 1        WATERHOUSE - 10-19-21
 2        C E R T I F I C A T E
 3
 4    I, SUSAN S. KLINGER, a certified shorthand
 5  reporter within and for the State of Texas, do
 6  hereby certify:
 7    That FRANK WATERHOUSE, the witness whose
 8  deposition is hereinbefore set forth, was duly
 9  sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11    I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15    IN WITNESS WHEREOF, I have hereunto set my
16  hand this 19th of October, 2021.
17
18        _____
19        Susan S. Klinger, RMR-CRR, CSR
20        Texas CSR# 6531
21
22
23
24
25
```

Page 397

```
 1        WATERHOUSE - 10-19-21
 2  NAME OF CASE:  In re:  Highland Capital
 3  DATE OF DEPOSITION:  October 19, 2021
 4  NAME OF WITNESS:  Frank Waterhouse
 5  Reason Codes:
 6    1.  To clarify the record.
 7    2.  To conform to the facts.
 8    3.  To correct transcription errors.
 9  Page____Line_____Reason_____
10  From_____to_____
11  Page____Line_____Reason_____
12  From_____to_____
13  Page____Line_____Reason_____
14  From_____to_____
15  Page____Line_____Reason_____
16  From_____to_____
17  Page____Line_____Reason_____
18  From_____to_____
19  Page____Line_____Reason_____
20  From_____to_____
21  Page____Line_____Reason_____
22  From_____to_____
23  Page____Line_____Reason_____
24  From_____to_____
25
```

Appx. 02148

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

287:15 288:6,20
303:6,18,24 304:11,
20 305:23 306:2
307:7 308:20 310:17
317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

---

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1

297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

---

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

---

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

**6:12** 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

**125:3** 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

**45:13** 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:9,16,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9, 13 326:3,13 332:8 351:4 365:22 379:20

**agreements** 58:16 77:24 83:4 168:9 186:10 279:4,6 325:24 353:22 379:18,23 380:4,11, 13,19 381:17 388:16, 17

**agrees** 243:25

**ahead** 68:22 82:6 156:20 164:10 212:25 248:12 295:12 329:11 352:10 364:23 378:18

**Aigen** 4:5 9:24 214:4 251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21 125:2 273:17 281:8, 23

**allowed** 62:8 81:23, 25

**alpha** 297:20 302:7 307:19 328:10 338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15 214:18

**amortizing** 334:13

**amount** 49:10,11 50:23,24 57:6 119:7 131:13 132:8 138:11 142:18 144:5,16 161:19,25 195:16 196:16 216:17 217:15 220:23 222:11 239:5 240:9 244:3 271:11 277:7 283:18 288:6 308:22 342:10 343:5,15,17 389:11

**amounts** 106:21,25 108:14 109:7,18 110:6 111:2,5,8,12, 23 112:18,24 113:18 114:19 115:3 119:3 120:20 121:4,11 125:8 126:6 161:8 168:3 171:12 174:15, 22 175:11 176:9 181:15 199:12 202:7, 22 203:7,13,19 204:11,16,25 205:12 211:11 212:10,18 217:19,21 222:3,11 234:23 235:3 275:13 282:8 283:2 285:10 288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24 241:3,6 261:11 262:3 265:7,8,17,18,19 389:8

**and/or** 42:8,16 43:3, 14 59:14

**annual** 26:10 84:17, 23 85:2,24 96:7 168:10 170:5,9 184:5 217:2 228:16 334:8 335:9 336:12

**answering** 248:7,8 262:23

**answers** 12:2 16:25 26:15

**anticipated** 311:20 378:17

**anymore** 294:24 388:12

**apologize** 30:10 40:22 78:14 99:22 104:12 125:21,24 139:2 170:2 192:14 197:19 226:17 227:17 304:14 352:8 354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24 56:6 59:17 60:12 162:5 168:4 294:13 316:14

**apply** 213:7 314:12, 22

**appointed** 18:21,24 24:14,19,25 25:8 29:11,15 270:4 323:9,16

**appointment** 152:24 153:4,16

**appointments** 227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5, 10 63:12,17,23 144:24 170:14 206:5, 16 271:17,22 272:13, 14 281:7 332:16 351:5 377:17,24 382:11

**approve** 56:21 57:2, 3,20 61:5,9 231:21 273:6 379:7

**approved** 57:5 60:20 231:14 271:12 294:21 295:6,18 333:4 382:16,17

**approximate** 17:22 23:15 27:24 30:19 36:23 38:15 120:15 161:24 216:17 277:7 310:5

**approximately** 8:20 15:13,20 19:23 109:15,19 110:7 119:23 126:12 169:7 173:14,15 178:19 220:12,24 221:3,7 238:9 277:10,15 278:6

**approximates** 118:13 121:6

**April** 152:18,25 200:4 202:13,23 203:3,15 204:10 210:6 213:18 301:16 314:21 323:6

**areas** 26:5

**Argumentative** 156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4, 9

**ascribing** 386:8

**Asia** 4:24 92:14 118:3 129:16 135:10 177:14 218:14

**asks** 97:12 171:10 172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6, 24 109:14 118:23 225:16,23 265:9 354:15 367:9 368:4 371:7,16,23 372:6 376:24 387:3

**assets** 5:23 107:14 108:10,13 109:20 110:8 122:3,8 137:14 190:3 194:2 195:17, 20 196:3,9,17 204:19 211:3 225:8 235:11, 15 237:20,23 239:13, 19 240:15 241:4,18 242:13 250:18 253:16,24 259:18 260:8,11,13 301:9 303:9 307:9 309:2 311:10 317:7 366:14 368:5 370:22

**assistant** 295:2 298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10 297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15 133:24 297:13

**assumed** 285:4,11 287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11 172:12

**attorneys** 3:4,11,17 4:2,10,16 147:21 187:6,11,15 188:3,7, 24,25

**attributable** 132:3 276:11 283:2

**audit** 26:11 48:5 52:23 85:24,25 86:9, 23 88:2,6,13,14,16 89:10,11,22 91:11,14 93:4,14 95:6 96:7,10 97:22 98:19 103:25 104:4 106:7,16,17 109:24 110:25 111:20 112:7,24 113:17 114:2,7 115:2,20 116:5 117:2,20 119:19 131:5 132:9,24 135:6 137:5,7,10,12,21 138:18 142:9,11 148:25 149:4 199:23, 25 200:6 218:7 219:4,5,12,15 221:11,14,20 243:12 244:18 263:24 264:8

**audited** 6:4 41:7 47:25 84:16,23 85:3, 19 90:2 93:24 95:14

98:6 102:7,10 104:21 107:22 113:7 114:18 133:22 138:3,4,9 143:8 186:25 196:21 200:9,12 201:7 211:6 217:24 218:4,12,24 241:24 242:2,3,15,16 261:20

**auditing** 264:2

**auditor** 84:21 97:12 113:11 136:6

**auditors** 46:8 47:17 48:7,10 52:11,20 53:4,11,13 84:10 86:10 88:9 91:12 113:8 136:16 137:3 149:13 211:16 212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21 270:19 271:5

**authorized** 57:8 139:4 143:13,22 144:7,18 150:4 152:11 158:4,13,18 159:4,15,23 160:15,24 181:3 320:16 363:2 382:6,9 384:7,10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6 32:7 43:22 45:12 48:8,11 49:4,8 50:20,25 51:5,8,13,18 53:24 57:6 61:7,19,23 65:3,5 66:21 78:5,15,22 83:15 85:10 93:8 102:5,14,16,22 103:5,16 107:20,23,24 108:6 133:15,19 148:5 161:2,6,22,23 162:2,3,8 167:18,19,24,25 168:7 181:6,7,12,13,17,24,25 182:4,9,10,13,14,18 198:16 199:9,13,17 202:11,17,21 213:5,13,15 220:17 223:3 226:3,6,7 261:3,5,7 263:12 267:7 295:23

338:22,25 339:3,5,6 343:18 347:5,8,25 348:6,13,14,17 372:24 378:9 382:4 385:10,15

---

**B**

**back** 20:14 36:17 40:22 50:2 61:24 71:11 73:2,7 75:17 89:17 91:10 92:9 93:11 95:18,20 125:19 140:14 141:12 151:2 160:6 174:20 183:8 185:19 192:23 202:3 205:19 207:2,5 209:6,13 215:20 224:20,25 226:18 243:22 263:23 265:5,15 266:7 273:21 280:3,5 282:13 283:22 285:16,21 286:20,24 292:23 293:19 299:4 301:21 302:23 305:16,20 306:3 313:3 324:6,12 325:9 326:15 332:13 333:9 343:6,16 344:18 347:3,4 348:25 349:8,10 350:2 354:16 365:20 372:16 382:23 393:12

**backed** 50:22 123:5

**background** 13:22 16:13

**backing** 189:9,15 190:10,12,19 191:3 193:20 194:20 205:8,14,24 206:14,23 208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19 107:14,22,25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,8,14 179:17 196:25 220:2 222:21 228:22

229:3,8,16 230:5 243:7 251:14 253:22 370:22 372:6

**ballpark** 196:15 277:17 278:11

**bank** 142:12 261:23 306:5 327:10,12,17 328:6,9 360:5,14

**bankruptcy** 8:13 21:7 45:24 187:15 188:25 219:23 236:24 237:2,14,24 240:8 244:6,21 245:17 247:9,17,23 248:14,24 254:12 263:18,19 264:3,15 311:11 317:11 366:4 374:15 376:7

**base** 109:14

**based** 71:16 78:25 101:13 108:21,23 111:15 146:8,23 204:22 274:4 278:4 315:4 337:22

**bases** 228:13

**basically** 122:19 145:15 152:10 199:14,23 200:23 252:9 254:16,19 327:20 348:4

**basis** 16:18 19:4 47:10 84:18 110:3,10,17,18 137:16 151:14 154:6 170:15 190:13 226:11 227:5,20,25 228:13,16 241:17 266:22 288:12 358:7

**batch** 330:3

**Bates** 129:16,21 137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23 266:21

**begin** 11:22 12:2 266:18

**beginning** 202:5 249:9

**begins** 12:15 170:23 197:25 341:17

**behalf** 58:11 122:22 139:18 180:22 181:2,7,13 182:17 201:13,15 210:5 211:9 212:8 213:8 270:21 271:5 273:4 289:18,23 327:17 336:21 350:19 362:9 377:12,23 379:8 382:6,9 383:24 384:18,22 385:7,11,12

**belief** 98:17 346:15

**believed** 143:22 161:7,17 175:22 246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8 358:13

**bill-paying** 358:14

**billion** 109:15 110:14 253:21

**billions** 253:24

**bills** 326:23 355:14 356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22 152:17 171:2,25 201:12 222:25 313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22 321:3

**board** 33:5,12 34:4 166:23 168:18,21,23 169:10,12,14,20 170:12,13 171:7

175:3,8,15 176:23 178:7,13,17,23 179:8,12,15,19,25 180:8,23 182:6,15 184:4,8 185:14 189:7,14,19 190:4,14,18,21 191:2,8,13, 16,20 192:3,8 193:3,18 194:12 204:18,23 205:6,22 206:12,13 209:16,19,21,24 210:6,20,22 233:7,13,16 281:7 323:8,16 348:3 385:13

**board's** 174:13 175:23 176:18 179:3 194:17 195:10 210:11

**boards** 33:8 160:8 171:19 181:2,8,14,19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23 235:16 237:15 240:11,14 257:21 258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24 128:5,23 129:2,5

**borrower** 272:7 273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5 129:25 143:3 170:21 221:24 224:4 329:5 330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20 73:10 74:4,14 139:25 150:22 151:5 224:19 265:24 266:2 324:22, 25 327:3

**briefly** 383:22

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17 248:13 374:9

**build** 107:7 108:22 260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10 229:22 332:10,11

---

**C**

**calculate** 275:11 276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7 378:16,21 379:5

**call** 46:14 55:2 68:6 70:3 154:8 167:4 191:14,15,24 192:2 290:19,25 350:15 364:21 393:12

**called** 16:10 22:21 27:10 29:25 31:8 32:4 81:9 115:3 130:3 227:2,19 228:21 273:18 278:22,24 315:20 342:8,24 343:2,16 351:10 362:8

**calling** 344:18

**calls** 45:17 46:10 55:21 107:5 126:4 268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23 129:18,23 135:12,16 177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25 21:3 24:17 26:22 65:10 97:15 143:25 174:3 232:4 258:25 270:25 285:24 295:18

**Capital** 3:4,18 8:11 9:6,22 10:22 11:7 15:16,23 18:7 22:21 30:2 41:18 42:10,18, 21 43:11,16 44:6 58:15,17,20 70:21 109:23 110:9 125:3 127:12 133:10 152:13 172:14 215:14,17 271:3 279:18,19 280:2,3 308:4 325:22,24 330:16 354:19 359:16,18 360:7,8,13

**capture** 107:10 130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18 47:9 114:14 144:14 223:12

**carried** 107:14,18,21 109:6,11 233:5 243:6

**carrying** 118:13,25 120:2,4,12,14 262:8 263:7,16 265:2

**case** 7:21 8:14 208:15 248:15 301:14 339:25

**cash** 57:3,4 121:12 335:17,18,22,23 336:7 337:13,14,16, 17 360:5 361:12,14

**categorically** 392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24 109:6

**caused** 263:3,14 277:3,19 280:12 359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3 152:2,5,10,13 159:19 183:11 270:4

**certificates** 21:21 154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17, 21,24 19:3,14,25 21:3 39:10,15,19,21, 23 40:3,4,9,12,25 42:5 43:10,23 44:25 46:7 47:16,24 49:17 50:10 51:10,15,20,25 53:9 55:16 60:23 61:21 62:4,8 84:20 85:12 86:3,19,24 88:10,15 90:15 94:4, 23 95:7,15 100:17 107:11 111:16 114:5 133:7,10,16 176:14 202:11 203:25 225:17,20 226:8 227:6 229:23 230:14, 18 240:7,14 243:4 247:7,23 248:24 255:7 269:2 285:24 287:14 288:7 295:19 339:24

**chain** 341:17 342:7 350:14

**challenges** 12:21

**change** 28:7,11,17 93:7 187:7,16 189:2

**caused** 229:11 240:6 248:17 261:24,25 262:2 264:3 265:10 343:20 371:22

**changed** 20:6 28:11 189:10 194:13 206:24 207:6,7,9 208:2,3 263:18 264:17 323:2

**characterized** 247:12

**chat** 81:25 92:12 105:2,5 135:17 177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24 27:5 120:8 184:22,24 258:25 270:9,13 271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances** 71:15 231:6 240:6 241:10 261:23,24 262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25 374:9 375:8,11 385:17,22,25 386:2 388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22 55:5 75:16 81:2 156:2 188:21 214:17 238:17 302:6

**client** 74:5,10 75:19 269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21 230:2,23 232:8,20 233:3 298:2,12

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10, 15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2 54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22 193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25 54:11 181:22

**commencing** 203:20

**comment** 252:23 367:22

**common** 299:4,5

**communicate** 64:3

**communicated** 114:9 211:15,20 254:21 292:17 319:19 368:8

**communicating** 365:13 366:3

**communication** 87:6 207:23 350:8

**communications** 66:19 71:13,14 116:16 322:7 367:14

**comp** 78:10

**companies** 42:7 285:17

**company** 27:9 29:25 31:7 247:8 273:18,

**close** 308:24 372:10

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 113:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,12 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

---

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:2
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

ensuring 327:20

enter 122:21

entered 67:7 68:25 104:14,19 122:6 124:5

entire 19:7 192:13 253:19 264:4

entirety 130:12,15

entities 16:7 17:23 43:13 44:3 54:21,25 55:4 101:8,15 189:8 278:2 289:19 330:13 361:13 394:4

entities' 265:12

entitled 41:8 82:7 110:25 157:16

entity 15:5 22:20,25 27:18 31:11,23 32:3, 6,11 42:14 109:24 137:13 272:3 289:23 302:22 307:8

entries 240:19

entry 131:10 308:3, 14 311:9 332:23

environment 90:3,5, 9,14,20 113:6 137:18,20

environments 207:21

equal 49:11 50:23 262:7

equaled 263:2

equals 119:6,9

equity 273:18 281:25 282:3

erroneously 197:22

error 125:6,9 131:17, 24 132:3 145:8 165:9 213:12,14 214:5 273:11,14 275:14 276:8,25 277:5 278:5,15 280:12,22 283:3 289:6 318:15 385:9,14,19,23

errors 163:21 167:14 373:10

Esq 3:6,7,12,13,20, 21 4:4,5,11,18

established 94:2 285:14,20 300:25 301:7 310:16

estate 31:12,17 235:11,15

estimate 20:12 372:4 389:3

et al 5:15

evaluate 170:12,14

evaluated 244:10

evening 353:3

event 131:2 134:22 138:9 143:9

events 103:13 125:16,25 130:4,10, 21 133:8 138:5 242:22 262:14 263:4 370:24 371:7,9,13

exact 15:24 17:25 18:13,18,19,22 20:5 30:17 131:20 156:21 274:13 277:17 278:10

EXAMINATION 5:6, 7,8,9,10,11 10:14 266:13 352:25 377:5 387:19 393:19

examined 298:19

exceed 121:12 190:2 195:19 196:3

exceeded 93:25 194:2 196:9,17 204:19 211:3 301:9 303:9 307:9

Excel 368:19

exceptions 231:2

excerpts 238:16

excess 94:6 121:12 389:13,14

exchange 45:15 212:17 281:17,23

exchanged 45:21

exchanges 281:17

excuse 14:25 35:23 201:2 249:18 280:9 323:13 395:8

execute 48:14,22

executed 49:21 142:10 161:12 221:6 274:2 293:14 303:7

executing 317:16

execution 181:9 300:14

executive 35:10,11, 16 36:20,24 37:5,18 38:3,4,9,14,16,21 39:3 78:10 366:24 367:18 386:10

executives 369:3

exhibit 5:15,16,18, 20,21,22,23,25 6:2,4, 7,8,9,10,11,12,13 13:13 91:20,21 104:23,24 135:8,14, 15 140:12,13 142:15, 16 151:20,21 170:18, 19 197:3,9,15 198:2 214:7 215:22,23,25 216:3,4,5,7,8,12 218:13,16,17 226:23, 24 236:16,23 237:19 258:18 297:23 302:7, 8 303:14 305:5 306:7 307:18,21 309:2,6 313:9 317:12 328:10, 12,13 338:13,21 341:13,14

exhibits 267:10,11 268:9

exist 15:12 16:17 114:22

existence 67:15 69:18 80:16 81:6 99:14,20,24 102:3

exists 278:13

expanding 354:25

expect 247:19 293:19 333:15

exchanged 45:21

exchanges 281:17

expectation 231:5

expected 200:17,21 293:21

expects 203:18 212:9

experience 101:4 111:16 116:14 169:10 256:25 257:8 259:13 315:5 337:22

experienced 47:13

expert 43:5 143:19 153:7 183:9 257:14

explain 356:18

explained 364:17

explaining 163:15

explanation 308:20 311:8

expressly 390:4,25 391:12 392:5

extended 301:17 308:21 314:22

extension 307:8

extent 45:17 55:21 66:15 107:5 126:4 208:6 244:15 296:6 322:6

extra 219:23

**F**

face 50:23 120:11 144:16 244:3

face-to-face 293:8 294:5

facilitated 321:10

fact 62:7 192:20 236:21 264:24 266:25 275:7 298:4 301:15 313:19 334:22 338:23 341:10 343:19 363:12 394:5,7,17

facts 111:22 240:6 261:25 265:8 375:17

factual 164:9

fail 12:3 348:5

failed 338:23 340:2

fair 11:23 19:24 44:14 49:7 52:4 93:17 99:13 110:21 118:11, 21,24 119:6,8,9 120:3,15 121:5 126:8,21 141:18 143:23 149:20 224:6 239:16 240:18,21 241:17 242:6 243:5 244:13,20 245:19 260:10 261:15 262:7 263:5,15 264:25 287:21 370:21 371:18 372:5 374:10 390:2

faith 189:8,15 190:9, 12,19 191:3 193:19 194:20 205:8,14,23 206:14,23 208:5

familiar 22:20 31:22 32:3 54:6,9 226:13 227:8,18 274:6

fashion 86:11 276:16 357:14

fault 229:17 276:24 277:19

favor 60:6 62:19 139:17 161:24 261:9

feature 301:17 315:8

February 70:21 226:3,4 228:3,23 323:9

Federal 7:19

feel 81:8,18 176:25 273:13 287:16 371:21 376:11,16

fees 332:12 356:21, 23

fide 369:25

figure 343:10 366:12 367:5

file 167:8,13 297:2,10 337:8

filed 21:6 197:17 208:18 213:23 215:13 219:23

226:16 237:2,24 238:4 244:5 255:17 263:17,19 311:10 322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17 246:3 249:9 256:20 264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12 230:23

**finance** 25:21 26:2,4, 8,17 28:15 38:23 127:25 128:16 129:6 280:7 290:14 351:3

**financial** 5:18 6:2 14:12 26:24 27:5 41:7 48:2 84:17,23 85:3,13,19 88:11 90:2,7 93:24 95:14 96:7 100:12 102:7, 10,12 104:21 105:17 107:22 112:2 113:7, 14 114:18 120:8,18 122:11 130:23 133:22,25 135:20 138:3,4,9 143:8 176:21,24 179:16,23 180:15 196:22 201:8 211:7,21 217:24 218:3,19,24 219:6 221:14 222:24 224:10 235:17 241:24 242:3,15,16 254:9 258:25 260:3 261:20 262:5 264:11, 13 270:10,14 271:2 286:18 301:11 302:19 306:4 311:25 312:5,6 370:9,12,17 378:24

**financials** 6:5 137:16 168:19 176:8, 16 179:8 186:15,16 187:2 189:23,25 200:10,12 218:12 241:13,15,21 242:2 246:9 247:5

**find** 53:23 268:10 283:17 315:4

**fine** 36:8,9 45:10 84:8 154:12 269:16 287:2 353:24

**finish** 11:21 12:2 76:18,24 249:19 295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6 131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25 152:10 197:23 293:5 321:15

**follow** 61:17 151:15 391:18

**follow-up** 171:7

**footnote** 244:8 260:20,23 261:15,17 371:22

**footnotes** 261:17 263:11

**forbearance** 134:5, 16

**forgave** 49:23 51:23 52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20 52:5 284:9

**forgiven** 52:18 53:11 94:11 366:23 367:23 369:13

**forgiveness** 52:22 93:23 94:8 365:23 369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14 25:15 29:21 31:16 33:9 34:20 40:10 41:4,12,24 42:11,12

43:17 50:6,7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15,17, 25 61:12 62:11 63:13,24 64:18,19 65:12,20 66:11,24 67:10,17,25 69:7 75:6,10 78:20 79:4, 14,20 80:2,12 82:24 83:25 85:15 86:2 91:4 94:3 96:11,20 97:5 99:17 107:15,16 108:5 110:11 111:24 112:20 113:20 114:20 115:5,7 117:6,18 119:12,13 120:16,17 122:10,16 124:6,23 127:19 132:16 133:23 134:8 142:5,7 143:10 144:8 145:2 146:13 147:5, 12 149:5,22 150:10, 17 153:18,19 154:2,4 155:11 156:17 158:15 159:17 160:2, 3,12,18,20 167:5 168:8 178:21 180:3, 5,11,13 181:5,11 183:15 184:6,20 185:2,18,24 191:5,23 193:21 194:5,6,23 195:21,22 196:5,12, 13,18 200:20 201:25 202:25 203:23 204:14,23 205:3,9, 11,15,16,25 206:8,21 208:10,12 209:9 210:24 211:4,13 212:13,21,22 213:11, 25 220:10,15 221:2 222:13 225:10,24 227:22 228:9 229:24 231:9,18 232:10 234:6 235:23 236:10 238:11 239:3,14,21, 22 240:16,23 242:24, 25 246:19,25 247:14, 15,16 248:4 249:5 250:11,22 251:11 253:12 254:6,7 255:11,23 256:18 257:6,11,15,20 260:14 262:19 263:9 265:4 269:7 270:15, 22 271:8,18 272:9,17

273:7 277:22 278:19 279:8 280:15,23 283:19 284:7,14 285:7,23 286:8,9 287:9,18,24 288:8,25 289:12 290:9,21 291:23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2,25 303:2,10,20 305:10 306:15,24 307:3,13 310:2,11,19,24 311:12 312:16,19 314:14 315:9,23 316:23 317:17,24 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:3 342:21 345:12,19 346:22 347:14,19,21 348:10,11,12 351:15 353:11,15 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 365:6 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 381:14 384:13 386:14 388:19 389:5,15 391:4 393:24 394:10, 11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17 376:25

**found** 53:17 66:12 125:6 140:15 394:8

**Frank** 5:5 8:10 9:11 10:11,18 271:4 305:8 395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18 329:18,25

**front** 110:12 122:12 140:16 279:21 281:7 294:9 301:11 302:9 305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9, 12,19 191:2 193:19 194:19 205:8,14,23 206:14,23 208:5 241:15 372:20

**fully** 13:4,7 17:4 364:19

**fulsome** 265:8

**function** 26:8,20 28:16 87:3 89:4 351:3

**fund** 3:18 9:22 22:21 33:23 35:2,6,18,19, 21 39:7 42:22 44:7 58:15 125:2,3,6,7,10, 11 127:10,13 145:16 152:14 176:18 202:14 203:14 215:14 273:17,23 274:16 275:2,4,6,8, 10,13 276:7,9,10 277:5,9,21 279:19 280:2 281:2,9,10,11, 12,13,15,20,23,25 282:7 283:23 308:4 325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2, 4,8,12,15,16,18,22 34:5,8,13,18,23 35:12,15,17,18 36:21,25 37:4,9,17 38:2,5,10,17,22 39:4 145:15 160:8 168:10 171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 16:7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

---

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18 210:19 211:2 335:16 336:6 337:24

**information** 16:14 80:19 86:10 88:13 91:12 112:5,17 117:14,15 169:11,13 171:20 176:8,15,22 179:16,17,18 188:8 206:3,5 218:20 230:3 236:7 237:13 257:18 274:4 312:10,24 344:19 368:11

**informed** 69:18 178:17 190:24 210:5 211:9 212:8 288:15 335:16,23 378:7

**informing** 64:13 181:25 182:11 330:5

**initially** 132:17 185:5 247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12 274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16 60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3 210:10,13,19 381:25

**instructed** 77:15 147:8,9,23 241:19 291:7,8 315:7 362:8 381:22

**instruction** 8:6 57:11 74:14,23

**instructions** 256:7 347:25

**insufficient** 122:8

**insurance** 385:17,22 386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21 214:19 288:23 315:5, 19

**intending** 16:25 146:16

**intent** 306:14 318:20, 25 380:10

**intention** 81:11 307:11

**interest** 50:3 55:25 56:22 57:18 58:2 59:14,17 60:13 62:18 63:2,10 64:5,15,22 119:10,16,21 120:22 162:6 163:22 164:25 165:11 167:11 168:5 217:17 223:18 273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16 329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16, 18

**interviewed** 322:18, 22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations** 275:17

**investment** 4:10 9:18 32:21 65:11 127:17,24,25 128:12, 14,16 129:3 244:23 245:3,6 247:11 273:24 274:15 279:21

**investments** 128:17 129:5,6 249:23

**investors** 275:10 276:12 277:4,8,21 281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10 245:2 264:17 274:14 275:15,21 276:21 288:4 292:6,13 293:6 354:10

**issuance** 131:5 138:10,18 371:14

**issue** 54:7 178:14 191:13 201:25 204:10 208:24

**issued** 56:16 60:5 62:19 65:8,18 66:8 81:13 82:15,20 93:13 107:13,20 108:2 131:11 132:6 133:12 161:23 162:5 180:10 218:25 223:7,17 233:8 234:10,15 235:4,9,21 236:8 242:8 243:7 261:9 262:6 263:6

**issues** 113:5 248:14 306:19

**item** 108:19 111:11, 18 112:4 119:2,16 123:6 185:21 220:5 238:20 259:18,24

**items** 53:3 97:21 100:9 112:3 131:21 149:8 228:21 229:3,7 230:4,7 249:22 260:6

**J**

**James** 234:11 271:25 273:2

**investment** (cont.)

**January** 70:16 163:7,8 219:11,13,17 258:20 326:8 341:6, 18 344:2 350:5,9,13, 24 351:20 361:25 362:3,7 364:8 365:2, 15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6 16:8 19:8 43:15,24 44:5 50:11,25 65:16 67:6,22 68:18 71:23 72:7 75:24 78:9,16 82:22 123:3,20 189:9,16 190:10,13, 15 205:9 206:23 232:18 273:2 280:19 342:5,7 351:5,10,14 362:8,10 363:8,18 365:3 367:8 368:22 379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3 219:20 313:2

**John** 3:6 7:24 9:4 10:20 45:3 46:13,18 69:13 74:8 76:15,17 77:10 95:17 105:23 129:18 146:13 154:7 155:18 157:6 177:6 192:18 208:13 216:2 222:14 236:18 267:18 304:6 308:7 353:18 385:3 387:10, 16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21 72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17 99:25 103:2 132:25 135:2 137:6 176:10, 24 186:16 200:7 242:23 262:16,24 263:13 265:3

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12 221:12 222:23 245:22 250:5 274:16 276:4 323:6 329:22, 23 337:8 353:13 356:10 358:13,14 380:23

**kinds** 353:6 354:2 357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9 172:6 230:19 275:23 292:3,18 389:9

**knew** 68:18 103:9,10 369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10 46:5 47:23 48:12,21 49:9 50:13 52:5,10 53:10 62:5 63:12,16, 21,23 79:23 80:10 81:5 82:7,8 89:23 93:23 95:3 98:17 101:13,19 102:2,25 106:25 111:16 112:6 138:16 144:24 147:8 153:13 167:8,22 184:10 188:15 189:9 194:13 206:5 207:8 208:2 225:5,12 226:21 232:21,23,24 237:11 243:4 259:22 322:19 324:17 384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21 230:20 292:3,12 328:17 342:11 343:8 350:17,18 362:23 365:13

**L**

**L.P.** 3:19 8:12 9:6,23 10:22 11:7 15:16,23

Index: La..made

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

**levels** 274:2

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 321:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24 271:21 288:21 295:17,23 299:7 306:12 314:2 315:15 316:21 317:15 327:16 328:5,8 334:22 335:3 343:19 345:11 350:23 351:8, 20 358:20 359:7,14, 20 360:2,17,23 361:25 362:2,4,6,12, 16,18,22 363:7 364:25 365:10,14,15 373:19 378:8 379:16, 23 382:22 383:23 384:6,7,9,11,20 385:16,21,25 386:2 390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3 57:17 63:9,14 74:3 83:2,5 86:8 88:16 89:21 96:14 112:16 117:10 123:23 127:16,18,21 129:5 136:16,23 145:6 157:17 164:19 176:19 177:7,12 187:3,17 198:20 199:19 200:14 209:25 210:7,16,23 243:5 272:21 277:24 285:9 288:10,13 294:18 295:20 296:5 297:8 303:4 315:11 317:5 318:4 324:14 325:2 331:22 332:7 334:8 338:23 340:2 342:9 344:20 346:12, 20,25 348:5 350:19 351:6,14 358:7,25 359:9,10,15 360:6, 10,23 361:6 362:6,7, 9,17 363:3 365:4 367:21 373:12 377:17 380:23 381:11,17,22 382:2, 6,14,19 384:24 390:5,7 391:2,12,20 392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3, 22 345:17

**making** 40:7 41:22 88:6 160:9 282:22 293:4 335:9 337:20 343:4 344:23 345:4 363:9,14 381:3,6

**manage** 26:7,17 28:15 38:23 116:11 354:11

**managed** 113:24 125:2 332:13 361:12

**management** 3:5,18 5:16 8:12 9:6,22 10:22 11:7 15:16,23 18:7 22:21 26:20 30:2 41:19 42:10,18, 22 43:11,16 44:6 58:15,17,20 70:21 90:21 91:16 94:21 95:4,16 96:8,18,21, 23 97:2,8,12,19,24 98:9,25 103:17,22 104:8 106:11,15 109:23 110:9 125:3 128:20 130:8 135:24 136:6,13 152:14 172:14 215:14,17 232:13,15 262:16,21, 22,25 271:3 279:18, 19,22 280:2,3 308:4 325:22,24 330:16 332:12 354:7,19 359:16,18 360:7,9,14

**manager** 116:9 230:16,22 291:12

**managers** 88:23,24 230:18 274:5 292:2

**managing** 88:21 292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21 232:18 268:15

**marked** 91:21 104:24 135:13,15 142:16 151:21 170:19 197:9 215:23 216:7 218:17 226:24 236:23

237:18 258:18 297:23 302:8 307:21 309:6 328:13 338:13 341:14

**market** 119:6,9 120:15 240:21 241:17 242:7 243:5 265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5 111:22 112:3 113:11 131:6 133:25 171:11 174:14 185:15,21 274:15

**materiality** 52:24 53:7,16,20 92:18,20 93:2,5,8 94:2,7,9 98:15 104:7 117:11, 13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14, 20

**math** 109:17 110:13 221:8 239:24 260:15 311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22 315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3 274:18 276:12 290:13 296:4

**meanings** 41:14

**means** 33:23 41:11 118:17 284:16,22 329:19 366:3

**meant** 186:8 301:24

**measurement** 240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3 378:25

**meeting** 68:5 70:2 168:21,23 169:15 189:7 192:9 206:12 231:20 283:9,10 290:20 300:23 323:11

**meetings** 184:8 323:20

**members** 89:2 166:23 191:21 192:3 233:16 237:7,9 323:16

**memorialized** 75:9

**memory** 95:23 133:2,5 224:11,16 314:20 319:17 331:17

**mental** 260:15

**mentioned** 131:17, 20 273:10 281:2 282:12,15 289:15 351:12 368:24

**met** 268:3

**methodology** 274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9 151:7

**micromanage** 337:6

**micromanaging** 89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8, 9 152:21

**milestones** 66:3,9, 12,22 69:2 76:3 79:2, 9 84:4

**million** 92:22 119:23 121:3,6 124:17 131:13 132:2,8 138:12 140:14 141:9, 18 142:19 143:12 144:6,17,23 161:25 178:19 216:17 217:16,19 220:13,20, 24 221:7 223:7,17 224:2 238:9 239:10, 12,24 268:22,23

270:20 271:6,7,15,16 272:7,8,16 273:6 277:11,12,16,20 278:6,7 282:14,15 283:18 287:15 288:6, 20 302:22 303:6,18, 24 304:11,20 305:23 306:2 307:7 308:16, 20,21,22 309:25 310:17,23 311:2 315:13 317:6,10 318:14 334:7,19 336:13,23 337:25 339:4 340:10 341:23 343:19 344:5 345:11 350:7 351:22 389:13, 14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23 60:4 160:6 161:17 198:18 305:17,21 394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8 372:9

**minutes** 53:23 139:24 174:21 176:4 182:23 266:20 267:3 325:3,4 348:25 372:12

**misapplication** 163:15

**misremembering** 229:13

**missed** 339:12,14 340:7

**misspeak** 301:23

**misspoke** 301:21 336:16

**mistake** 61:17 139:9, 13,16 159:9 161:4 162:11,19 165:9 181:10 306:23 314:2 316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4 198:10 222:5 224:3 276:5 307:22

**money** 39:11,16,24 41:2 43:24 49:11,17 50:10 62:9 124:14,20 126:6,23 127:3,15,25 128:5,10,23 129:2,5 145:16,18 186:10 276:13 282:8 283:5 285:18 318:10 319:11 320:4 359:9, 13,24 360:21 374:22

**moneys** 39:19 162:5 167:9 277:8 282:17 283:16,22 289:5 359:15

**month** 59:11 132:23 226:16 229:15 258:21 332:4

**month-and-a-half** 323:10

**monthly** 5:25 226:11,14 227:5,20, 25 228:12 229:10,19, 21 230:2,11,22 231:14 232:6,8,13, 19,20 255:18 256:14, 19 259:9,12,14

**months** 261:21 292:25

**morning** 7:3 10:19 342:16,18 344:12,14, 16

**Morris** 3:6 5:6,9 7:24 9:4 10:7,15,20 13:10, 17 16:9,24 17:11,14, 19,20 22:16,18 31:18,19,21,25 35:24 36:5,11 45:6,10 46:15,23 47:4,6,11 55:4 69:8,11 72:15, 18,25 74:3,9,13,18, 24 75:11,15,19 76:19,23 77:2,11,19, 22 81:16,18,21,23

82:10,13 91:8,18,22, 24 92:9,11,14 95:9 105:4,25 110:22 114:11 118:2 129:15, 21,24 130:14,18 135:5,10,13 136:9 137:24 139:20 140:11,23 142:14 146:17 150:21 151:19 154:3,13,16 155:19,22,25 156:18, 25 157:3,10,13,21 170:17,20,25 171:24 174:18 177:9,14,16, 19,23 178:10 195:6 196:20 197:6,21 201:11 202:3 207:15 208:20 209:13 214:4, 8,10,14,21 215:3,10, 21,24 216:4,13 217:5,8 218:11 219:25 221:23 222:16 224:18 226:22 228:18 236:15,20 243:15 246:13 247:21 248:5, 11,22 249:18 250:6 251:23 252:4,8,16,24 253:4 254:17 258:16 259:16 265:23 266:9, 17,24 267:14,20 268:14 269:7,12,18 270:15,22 271:8,18 272:9,17 273:7,10 277:22 278:19 279:8 280:15,23 282:12,18 283:19 284:7,14 285:7 286:9 287:9, 18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 295:12 296:13 297:6 298:22 300:15 301:13 302:2, 11,15 303:2,10,20 304:3,7,12 306:15,24 307:13 308:5,8,13 309:10,12 310:2,11, 19,24 311:12 312:16 313:13 314:12,14 315:9,23 316:23 317:17,25 318:6,17, 23 319:23 320:6,18 322:5,23 326:24 327:6,24 329:10 330:21 331:5 333:10,

18 334:6,10,21 335:4 338:3 339:16 340:18 342:21 345:12,19 346:22 347:14,19 348:12 351:15 352:4, 8,16,18 353:11,15,19 354:4 355:5,9,15,21 356:3,14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10,22 365:6, 21 366:15,25 367:16, 25 369:4,8,17 370:3, 8,25 371:10,25 372:22 373:4,20 374:11 375:3,24 376:20 377:6 387:7 388:19 389:5,15 390:9 391:4,14 392:7,13 393:24 394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23 245:3,6 247:11 260:22

**mouthpiece** 206:2

**move** 69:11,12 114:11 208:19 246:13 247:21 248:22 250:6 252:23 307:17 364:22 376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3 320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14 249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8 309:19 311:25 312:4, 13 375:20

**Nancy** 4:2 9:14 65:9, 17 66:7 67:6,22 68:19,25 75:25 78:16 82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6 144:2 147:17,18 180:20 230:8 240:22 253:18 259:15 271:20 276:10 279:22 280:9 292:22 294:22 325:19 329:24 333:13 354:12 356:6,17 357:11 378:23

**NAV** 125:6,9 131:17, 24 132:3 145:8 273:11,14 274:23 275:8 277:5 278:15 280:12,22 281:13 289:6 318:15 373:10

**needed** 155:2 250:17 257:13 271:21 289:6 318:13 354:15 358:8 382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19 383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4 9:21 27:10,12,15,18, 21,25 28:4,6,16 29:7, 10,12,16,24 31:3,11, 17 32:17 42:21 43:12 44:6 54:14 58:7,11, 14 60:5 65:6 100:23 126:9,13,16,23 127:3,10,11,15,18,24

161:23 162:5,7,11,18 163:23 164:6 165:11 167:7,8,13,15 168:2, 6 171:13 172:21 176:14 178:12,17,18, 22 179:13 182:3,12 184:21,23 186:9,21 189:15 196:3,23,24 216:20 217:14,23 218:3,19 219:15,22 220:18 221:6,10,13, 25 223:5,24 241:23 242:6 260:4 267:24 309:24 322:3 325:14, 18,21 326:16,23 327:4,10,17,20 328:6,7,8,25 329:3 330:11,18,19 331:2 332:14,17 333:8,15, 16 334:5,8,22 335:3, 9 336:13 337:13,23, 24 338:23 341:19 342:9 343:18 345:17 346:12,16,20 348:4 353:8,21 358:15 379:16 381:23 382:10 383:24 384:3 390:5 391:2,10,12,19 392:5

**Nexpoint's** 59:18 218:6,12 219:6 331:3 336:22 350:19

**Nguyen** 3:21 268:10 297:19 298:9 302:5 303:14 305:3 306:7 307:19 308:11,25 309:3,4 311:22 313:8 317:3 331:9 332:21 338:12,21 341:15 343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american** 284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2, 7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5 50:4,16 51:6 126:10 128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13 331:21

**occurred** 103:13 104:5 125:17 126:2 263:13 278:15 299:25 331:24 339:7 369:24 390:24

**October** 8:19 21:7 160:5,7,14,21 169:17,24 171:19 172:4 173:24 174:6 183:7,14 186:11,13 189:13 207:16 219:24 263:19 314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5 294:4,10 323:13,14 326:15 388:22 389:2

**officer** 14:12 23:6 26:25 27:6 28:24 29:2,7 32:14 35:10, 12,16 36:20,24 37:6, 18 38:3,5,10,16,22 39:3,24 51:22 52:6, 17 120:8 143:18 173:7,9,13,16,20,23 174:3 184:23,24 258:25 269:5,24 270:10,14 271:2 302:19 362:25

**officers** 15:22 29:24 39:11 40:5,8,12 51:23 52:13 93:21 153:9

**offset** 380:2,3 382:25 390:9,11,13

**offsets** 58:21 381:18, 19 383:13

**Okada** 49:18,21,24 50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14 332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11 202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-end** 125:12

**open-ended** 125:7 275:4,8 276:10 281:9,11 282:7

**operating** 5:22,25 90:10 226:11,14 227:2,4,19 228:7 255:18 256:14,20 259:9,12,14 359:14

**operational** 143:25 147:17

**operational-type** 291:11

**operations** 202:8,15 203:14

**opinion** 120:6,7,10 204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11 128:16 129:6 288:21 360:9

**ordinary** 226:9 229:22 293:18

**organizational** 112:13

**orient** 365:24

**original** 223:25 232:11 274:24 277:14

**originally** 177:21 232:16

**originals** 297:4,11, 16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12 119:22 142:10 171:11 174:15 175:12 185:10,23 186:8 202:6,18,23 203:7,8,13 220:18 222:3,12 223:4,14, 19,24 224:13,17 235:10,14 244:16

**overpaid** 58:16 381:16

**overpayment** 381:20 390:13

**overpayments** 58:22 379:22 380:3 389:4,12

**overruled** 17:15

**overseeing** 26:10 86:22 230:11

**oversight** 257:15

**overspeak** 115:16 252:3

**owe** 375:15

**owed** 125:8 160:10 161:8 178:18,23 185:6,16 186:9 199:12 204:12,25 205:13 212:18 275:13 297:17 308:20 310:17 358:21 380:3

**owing** 50:3 211:11 212:10 223:6 234:23 285:18

**owned** 15:6 16:7 17:24 42:8,16,24 43:3,13 273:17

**owner** 272:24 281:25 282:3

---

**P**

**p.m.** 150:24,25 151:3 174:6 224:23,24 225:2 266:5,6,8 325:7,8,10 349:6,7,9 372:14,15,17 395:10, 11

**Pachulski** 3:8 9:4 10:20 72:9 166:19

**package** 229:10,20, 22 230:2,12,23 232:6,8 233:3

**packages** 231:15 232:20

**pages** 214:11,17

**paid** 50:2 56:18 167:10 221:7 277:4, 8,20 283:23 327:22 330:19 331:4 333:16 336:9,11 355:19 356:23 365:4 394:9

**paper** 288:21 293:13, 20 296:12,16

**paragraph** 92:17 118:11 119:20 121:9 124:15 126:9 134:11 140:18 142:22 203:6 216:25 221:24 222:7, 9,10,14,16,18 223:9, 15

**paragraphs** 117:23 118:6

**part** 42:9,17 43:15 50:18 51:11,16,21 52:12,19,23 53:12 58:17 85:5 88:12,14, 22 90:21 91:14 93:22 103:22 105:9 116:13 117:20 125:12 142:9, 11 148:4 149:12 156:24 169:14,19 175:3 176:23 179:11 193:17 200:16 210:21 213:16 214:19 238:8 240:17 245:19 254:20 274:17 282:4 286:2 288:19 326:21 330:17 365:2 366:23

**367**:24 386:9,10

**participants** 8:17

**participate** 168:13 218:23 219:2 362:21 380:5

**participated** 87:25 137:20

**participating** 191:9 259:8

**participation** 86:23

**parties** 7:15 9:25 85:7,12 100:14,22 101:6,23 103:4 376:13

**partner** 9:9

**partners** 31:8,12,15, 18 32:4 370:16

**partnership** 121:11 122:6 131:12 132:7

**partnership's** 102:19 103:3 118:12

**party** 17:10 100:19 101:18 102:20 103:4 321:4 366:22 368:17 385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7 359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4 144:22 161:18 181:15 205:10,19 209:3 234:22 282:8, 16 302:23 318:14 327:13 332:6,13 344:19 355:18 356:2, 13 357:3,13 366:13 374:25 393:23

**payable** 171:12 174:15 190:6 202:18, 22 220:5 222:2,17 327:21 329:17 330:10,12,20 331:4

333:7 334:14

**payee** 140:21 142:25
216:22

**paying** 288:14,16
326:23 333:9 338:17
346:21 355:4,8 357:4

**payment** 56:5,21
57:4,6,12,18,25 58:6,
10,12 59:14,16,20,22
60:3,4,9,11 62:17,25
63:9,15 64:4,9,22
121:11,17,21 122:7,
19,23 162:13,16,17
163:4,6,10,14 164:24
182:16 199:6,11
212:18 331:20
332:24 334:9 335:9
336:12 337:3,25
338:24 339:12,14
340:2,7 342:9 343:4,
20 344:20,24 345:4,
11,17 346:13 348:5
350:7,9,20,23 351:6,
7,14,20,23 356:6,17
358:25 359:2,6,7,15
360:16,22,24 361:18
362:2,5,7,9,12,15,18,
21 363:3,7,10,15,20
364:3,7,25 365:5,9,
14 366:21 379:15
381:23 382:2,9,14,15
383:19 390:6,8,21
391:10,13,20,24
392:6

**payments** 55:16,24
56:8,14 57:2,9 64:14
162:10,24 163:16,21
165:10 167:14
217:15 282:22
288:11,12 328:4
329:16 330:3,4,6,8
334:23 335:3,19,21,
22 336:23 337:9,15,
21 355:19 356:8
357:2,10,13 358:7,21
359:9,10,20,25
360:6,10,15 361:7,23
362:4 365:14,16
377:12,17,22 378:8,
9,17,24 379:7 380:23
381:3,6,11,18 382:6
383:4,5,23 384:2,4,6,
7 387:24 388:14
390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4
89:3 146:4 170:24
237:5 275:9,20,21
279:23 291:21 293:7
294:3 319:16 351:12
372:19

**percent** 18:2,4 86:15
108:23 109:19 110:8
260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5
130:19 189:4 197:19
268:19 298:8

**perfectly** 144:3
223:2 348:18

**performed** 48:5
246:11

**performing** 114:7
219:4

**period** 25:12 39:9,14
40:24 90:15 93:14
95:15 105:18 120:9
135:21 169:5 203:20
218:21 219:6,16
221:15 226:18
231:15 242:17
243:13 247:22 265:2
321:22 380:15,16

**periodic** 228:13
241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7
44:21 57:7 79:9
86:21 87:6,7 114:2,4
116:14 155:16
167:20 191:18
259:22 291:21
292:22

**personal** 79:22
80:10 97:15 375:11

**personally** 62:20
64:3 85:23 89:11
95:4 97:9 101:22
237:4 255:20,24
275:15 296:21
303:23 304:18,22
306:12 317:21
370:11

**personnel** 237:16
318:12 333:22
359:18,21 360:13,23
363:3

**pertaining** 65:17

**petition** 21:9 70:11
84:11 235:10,14
241:20 263:20
310:15 386:5

**phone** 68:6 70:3
290:25 392:23 393:2,
5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16
294:4 296:12,16
299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6
112:16 122:18 166:2
260:7 272:13 278:16
297:14,16 326:4,10,
12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20
366:5 367:6 386:9,18

**play** 85:23 153:11
168:16 184:2 340:9

**played** 86:3,6,17
335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16,
17

**plural** 314:3

**point** 78:9 87:2,6,7
114:2,4 157:16 166:9
190:16 254:11 255:3,
7 261:6 313:7,20
321:13 326:6 337:12
344:9 375:23 376:11
380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10
386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5
17:22 19:13,16,19
112:23

**portions** 12:10

**position** 37:9 122:3
184:14 193:3,6,9
274:15 280:11
361:14

**positions** 38:24
172:25 173:5 183:6
184:10,18 192:16

**possession** 45:25
113:9 132:11

**possibilities** 29:19
371:23

**possibly** 213:7
314:12

**post** 92:12 184:13,
14,18 192:15,24
193:7,8 275:24

**pot** 366:5 367:6
386:9,18

**potential** 250:20
357:4 366:3,19
369:16 371:7,9

**potentially** 113:5
249:6 250:12,13,14,
16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13
89:20,24,25 90:4

91:11 97:7 98:7,12
106:14 146:9,24
150:13 230:25 231:2,
3,22,24 233:5 299:4,
5 337:4 356:13
369:2,7 371:6,15
374:15 377:21

**pre-petition** 226:18

**precisely** 205:21
298:16

**prefix** 268:15

**premarked** 91:19
104:23 197:15 216:5
236:16

**preparation** 137:21
230:11 259:9

**prepare** 123:17
204:23 226:9 229:6,
21 235:19 236:25
237:3,5,13 241:11
255:24 377:22
378:16

**prepared** 227:5,20,
24 228:15 229:2,4,9
230:3 232:20 237:8
239:17 241:25 242:3
255:20 284:19
317:14 319:5 373:2
376:18

**preparer** 256:4
259:4,5,23

**preparing** 137:10
164:9 232:5,7
241:12,15,16 254:9
264:10

**prerogative** 253:7

**present** 4:23 90:23
180:15 191:19
283:14

**presentations**
368:7,16,18

**presented** 86:10
113:14 117:10
161:11 296:11,16

**presents** 12:20

**president** 14:16
271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhouseco opers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

**Q**

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

### R

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24 33:19 44:2,10 54:10, 24 68:24 79:17 84:13 95:11 175:2 186:24 203:6 279:24 329:3

**reference** 92:17 103:12 200:12 202:6 222:3,10 223:9 238:20,24 260:21

**referenced** 132:14 186:25

**referred** 84:4 91:15 123:24 143:7 169:21 186:7,20 223:15 279:20 366:5

**referring** 33:16 50:17 75:24 76:6 118:8 163:5 187:11 199:25 223:11 226:15 281:5 314:2 316:3

**refers** 170:4

**reflected** 13:14 75:5 175:16 181:15 235:4 240:9

**refresh** 24:24 105:12 131:15 192:20 221:4 223:22 227:10 367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement** 279:17 325:19,23 379:20 388:16

**relate** 130:6

**related** 59:23 60:4 90:25 100:13,19,22 101:6,18,23 102:19, 20 103:3,4 105:7 131:17 138:5,10 145:9 167:14 208:25 280:22 281:3 284:2 366:22 368:17 376:13

**relates** 76:14 113:6, 18 130:11 211:24

**relating** 131:2 138:19

**relation** 27:21 30:10, 13 35:6 41:18 58:21 112:3 125:9 163:21 172:25 176:17 184:11,18 191:16 264:13 385:18

**relationship** 374:3

**relationships** 100:13 102:20,21 103:4

**relative** 192:16

**relayed** 188:8 206:4 342:12

**relaying** 206:3 207:24 344:18

**release** 329:6 330:8

**relevant** 88:13 208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3 237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23 203:8

**remaining** 119:10 223:25

**remember** 59:8 70:9 71:2,3 80:22,23,24 87:23 95:19 102:9 122:25 123:2,19 124:16,24 127:6,14 128:6,7 129:11 131:19 147:15 162:22,24 163:4 165:6 166:3,7 172:17 174:4 187:13,19,21 188:15 189:18 194:7, 15,24 195:4 200:6,15 234:4 236:12 250:3 253:13,14,23 254:15, 17 274:12 277:16 282:17 284:12,17,23 286:3,22 291:21

293:12 296:9 299:12 300:10,12 302:16 309:11 313:22 316:3 317:5 319:4,7 320:2, 5 323:7 324:4,8 326:6 333:25 339:8 340:21 342:14 344:15,18 345:25 346:3,4 351:11 357:17 361:18 364:9, 12,14 365:10,25 377:14 387:25 389:17,18 390:22,23 392:4,22

**remembering** 289:17

**remind** 72:19 77:17 391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14 8:18 12:20 299:6,9

**rendered** 204:5 233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14, 16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11, 15,25 205:12 211:11 212:10 304:23

**repeat** 17:19 38:7 45:11 46:21 48:20 146:21,22 249:25 269:21 270:24 336:17,18 339:21

**report** 5:25 14:13,21 19:12 26:21 88:2,6, 16 89:12 98:18 105:8 106:4,8,16 110:25 111:21 112:7,12,25 115:20 116:5,17,21

117:2 119:19 131:5, 11 133:12 134:7 135:6 137:5,7,10,12, 25 138:3,4,9,13,19 166:8,11 178:13 219:13,15 226:19 227:4 228:7 229:2,4 232:12 256:15 257:4 258:20,24 259:5,23

**reported** 19:7,10,17, 21,25 20:23 21:2 119:17 120:23 226:10 240:15 258:14

**reporter** 7:12 8:24 10:10 209:6 268:8,18 301:20

**reporting** 7:6 8:22, 25 20:9,13,17,23 21:4 87:22 91:2 114:17 230:12 231:14 232:6,19

**reports** 89:22 113:18 115:2 143:8 171:5 196:22 226:14,16 229:6 255:18 256:20 257:19 259:9,13,14

**represent** 9:25 10:4, 22 133:4 267:23

**representation** 5:17 91:16 94:21 95:5,16 96:9,18,22 97:2,8,13, 19,25 98:9 99:2 103:7,17,23 104:8 106:11,15 130:8,9 135:25 136:6,14 214:23 215:9 262:16, 22,25 295:17

**representations** 92:21 98:19,24 136:16,23,24 262:24

**representing** 9:11, 14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25 172:8 196:25 291:15 379:7

**requested** 196:21 362:18 363:7

**requests** 85:18 373:3 387:18

**require** 63:16

**required** 56:9 94:5 96:17 97:19,20,21,25 98:3 127:18,20 340:2 390:5

**requires** 96:25

**reserve** 245:2,6 260:24 261:4,8

**reserved** 244:22 245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18 383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13, 18,23 35:2 37:4 39:7 56:15 112:17 134:17 182:7 212:5 261:8,16 273:12 333:8 335:9 339:12 340:6 365:22 383:18 385:17 393:21

**respond** 174:25

**responded** 174:8 182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24 174:8,13 176:4 178:6,18 182:20,24 185:5 189:6 190:8 194:17,18 195:9,13 205:6 210:20 267:22 350:11

**responses** 81:4 184:3

**responsibilities** 25:18,23 28:10 31:2, 4 38:21 219:20

**responsibility** 26:6, 10 88:5,9 115:23 116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

**sheet** 137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

**sitting** 116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:19 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

**sheet** 192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**start** 268:21 304:16

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

---

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 10:12 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

---

U

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

**EXHIBIT 106**

 **NEXBANK™**

2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972.934.4700
www.NexBank.com


 **FDIC**

```
                                    Date 12/29/17        Page    1
                                    Primary Account
                                    Enclosures
```

```
           Highland Capital Management LP
           300 Crescent Court Suite 700
           Dallas TX 75201
```

```
    NexBank's Privacy Notice, which has not changed, is available on our website
    at www.NexBank.com/files/privacynotice.pdf.  If you would like a copy of our
    Privacy Notice mailed to you, please call us at 972-934-4700.
```

Checking Account/s

      Account Type:  Highland Capital Management LP

Analysis Checking w/ Interest
Account Number                              Statement Dates  12/01/17 thru 12/31/17



---------------------------------------------------------------------------------

Deposits and Additions

| Date | Description | Amount |
| --- | --- | --- |
| 12/08 | INCOMING WIRE<br>JAMES D DONDERO | 677,500.75 |

MEMBER FDIC          NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
each banking day will be credited as of that date.

HIGHLY CONFIDENTIAL          D-CNL003542

**Appx. 02180**



2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972 934.4700
www.NexBank.com





Date 12/29/17        Page    2
Primary Account
Enclosures

Analysis Checking w/ Interest          (Continued)



------------------------------------------------------------------------------------

Checks and Withdrawals



MEMBER FDIC                    NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
          Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
          each banking day will be credited as of that date.

HIGHLY CONFIDENTIAL



2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972 934 4700
www.NexBank.com



Date 12/29/17     Page     3
Primary Account
Enclosures

Analysis Checking w/ Interest          (Continued)

--------------------------------------------------------------------------------



--------------------------------------------------------------------------------

End of Statement

MEMBER FDIC                    NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
                Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
                each banking day will be credited as of that date.

HIGHLY CONFIDENTIAL                                          D-CNL003544

Appx. 02182

| OUTSTANDING CHECKS | | | RECONCILIATION INSTRUCTIONS | | | |
|---|---|---|---|---|---|---|
| **Reconciliation of Account** | | | Date _____ | | | |
| CHECKS WRITTEN BUT NOT PAID | | | Please examine this statement and items at once and refer any excep ions immediately. | | | |
| NUMBER | AMOUNT | | | | | |
| | | | | | | |
| | | | Sort your checks numerically or by date issued. | | | |
| | | | | | | |
| | | | Mark off in your checkbook each of your checks paid by the bank and list the numbers and amounts of those not paid in the space provided at the left. Include any checks still not paid from previous statements. | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | Subtract from your checkbook balance any SERVICE CHARGE (S.C.) or bank charge appearing on this statement. | | | |
| | | | | | | |
| | | | Reconcile your statement in the space provided below. | | | |
| | | | Enter bank balance from statement | | | |
| | | | Add deposits not credited by bank (if any) | | | |
| | | | TOTAL | | | |
| Total of Checks not paid | | | Subtract total of checks not paid | | | |
| **THIS AMOUNT SHOULD EQUAL YOUR CHECKBOOK BALANCE->** | | | | | | |

**Any Charge for Imprinted Checks Includes State Sales Tax Computed at the Current Rate, When Applicable**
**Notice: The Annual Percentage Rate and Daily Periodic Rate may vary.**

## EXPLANATION OF BALANCE ON WHICH THE INTEREST CHARGE IS COMPUTED

We figure the interest charge on your account by applying the periodic rate to the "daily balance" of your account for each day in the billing cycle. To get the "daily balance" we take the beginning balance of your account each day, add any new advances/fees, and subtract any unpaid interest or other finance charges and any payments or credits. This gives us the daily balance.

## WHAT TO DO IF YOU THINK YOU FIND A MISTAKE ON YOUR STATEMENT

If you think  here is an error on your statement, write to us at:
**NexBank**
2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
You may also contact us on the Web: www.nexbank.com
In your letter, give us the following information:
- Account Information: Your name and account number.
- Dollar Amount: The dollar amount of the suspected error.
- Description of Problem: If you think  here is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.
You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors in writing or electronically. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.
While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on  hat amount.
- The charge in question may remain on your statement, and we can inue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for  he remainder of your balance.
- We can apply any unpaid amount against your credit limit.

## IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

In Case of Errors or Questions About Your Electronic Transfers, Telephone us at 972.934.4700 or Write us at NexBank, 2515 McKinney Avenue, 11th Floor, Dallas, Texas 75201 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on  he statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
  (1) Tell us your name and account number (if any).
  (2) Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe it is
  an error or why you need more information.
  (3) Tell us  he dollar amount of the suspected error.
  We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

HIGHLY CONFIDENTIAL

# EXHIBIT 107

**BBVA** Compass

21     HIGHLAND  CAPITAL  MANAGEMENT  LP
MASTER  OPERATING  ACCOUNT
300  CRESCENT  CT  STE  700
DALLAS  TX  75201-7849

### Contacting Us

Available by phone 24/7

Phone   1-800-266-7277

Online   bbvacompass.com

Write   BBVA Compass
Customer Service
P.O. Box 10566
Birmingham, AL 35296

## Your BBVA Compass Account(s)

Please see important message regarding your
TREASURY MANAGEMENT ANALYSIS CHECKING
account

## Summary of Accounts

### Deposit Accounts/ Other Products

| Account | Account number | Ending balance last statement | Ending balance this statement |
|---|---|---|---|
| TREASURY MANAGEMENT ANALYSIS CHECKING | ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ |
| **Total Deposit Accounts** | | ▮▮▮▮▮ | ▮▮▮▮▮ |

HIGHLY CONFIDENTIAL

Page 2 of 10
Primary Account: ███
Beginning December 1, 2018 - Ending December 31, 2018          31

**BBVA** Compass

# TREASURY MANAGEMENT ANALYSIS CHECKING

Account Number: ███████████

## Account Information

Change In Terms
The following fee changes will go into effect February 1, 2019:
RDI Fax Notification - $10.00; Re-Run Deposited Items - $12.00; Outgoing Wire Transfer
with Notification - $32.00; Return Items Fax Report (per day) for ACH Origination Services
through File Transfer Services / Compass e-Transmit - $7.50; ACH EDI Information
Reporting Services per item - $1.00; Wholesale Lockbox Fax Summary - $125.00. Please
call your regional BRS team with questions regarding these changes.

## Activity Summary

## Deposits and Other Credits

| Date * | Check/Serial # | Description | Deposits/Credits |
|--------|----------------|-------------|------------------|
| ██ | | ████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | ██████████ | ████ |
| ██ | | ███████████ | ████ |
| ██ | | █████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | ████████ | ████ |
| ██ | | ██████ | ████ |
| ██ | | ██████ | ████ |
| ██ | | ████████ | ████ |

HIGHLY CONFIDENTIAL

D-CNL003547

Appx. 02186

**BBVA** Compass

| Date * | Check/<br>Serial # | Description | Deposits/<br>Credits |
|---|---|---|---|

D-CNL003548
**Appx. 02187**

**BBVA** Compass

| Date * | Check/Serial # | Description | Deposits/Credits |
|---|---|---|---|
| 12/18 | | INCOMING WIRE W/ADVICE REF 20181218F2QCZ60C00197512181255FT01 ORG JAMES D DONDERO | $2,000,000.00 |
| 12/19 | | INCOMING WIRE W/ADVICE REF 20181219F2QCZ60C00331112191531FT01 ORG JAMES D DONDERO | $782,623.14 |



## Withdrawals and Other Debits

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|

HIGHLY CONFIDENTIAL

D-CNL003549

**Appx. 02188**

**BBVA** Compass



HIGHLY CONFIDENTIAL

**BBVA** Compass



**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|--------|----------------|-------------|--------------------|

HIGHLY CONFIDENTIAL

D-CNL003552

Page 8 of 10
Primary Account: ▮▮▮▮
Beginning December 1, 2018 - Ending December 31, 2018                    31

**BBVA** Compass



HIGHLY CONFIDENTIAL

**BBVA** Compass



HIGHLY CONFIDENTIAL

**BBVA** Compass

## How to Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.

• Record all automated deductions, debit card transactions and electronic bill payments.

• Record and deduct service charges, check printing charges, or other bank fees.

• If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits your have made that do not appear on this statement (see space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Step 4 Total | | $ |

## Balancing Your Register to this Statement

**Step 5** • Enter the "current balance" shown on this statement

| | |
|---|---|
| • Add total from Step 3 | |
| • Subtotal | |
| • Subtract total from Step 4 | |
| • This balance should equal your register balance | |
| If it does not agree, see steps below | $ |

If your account does not balance, review the following:
· Check all your addition and subtraction above in your register.
· Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register.
· Amounts of deposits and withdrawals on this statement should match your register entries.
· If you have questions or need assistance, please refer to the phone number on the front of this statement.

**Change of Address**
Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Electronic Transfers** *(for consumer accounts only)*
In case of errors or questions about your Electronic Transfers, write to BBVA Compass Bank, Operations Compliance Division, P.O. Box 10566, Birmingham, AL 35296. Or simply call your local customer service number printed on the front of this statement. Call or write as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
• Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 on claims on accounts opened less than 30 calendar days) to do this, we will credit your account for the amount you think is in error, so hat you will have the use of the money during the time it takes us to complete our inves igation.

*For Non-Consumer Account customers, please refer to your current Non-Consumer Account Agreement for details regarding Electronic Fund Transfers.

**Overdraft Protection**
**Calculation of Interest Charge and Balance Subject to Interest Rate**. The interest charge is computed using your annual percentage rate divided by 365 or, in he case of a leap year, 366, which gives you the "Applicable Rate." Although we calculate the interest charge by applying the Applicable Rate to each daily balance, the interest charge can also be calculated by multiplying the Applicable Rate by the "average daily balance"(Balance Subject to Interest Rate) shown on this statement, hen multiplying that sum by the number of days in the billing cycle. To get the "Balance Subject to Interest Rate" shown on this statement we take the beginning balance of your account less any unpaid finance charges each day, add any new advances or debits, and subtract any payments or credits. This gives us the daily balance. Then we add all the daily balances for the billing cycle and divide by the number of days in the billing cycle. This give us the "average daily balance" shown on the statement as "Balance Subject to Interest Rate". Payments. Payments to your overdraft protec ion loan account made through our tellers or deposited at our automated teller machines (ATM s) Monday through Friday before he posted cut-off time will be posted to your account on the date they are accepted. Otherwise, they will be posted on the next business day. Payments made through our ATM s via a funds transfer will be posted on the date they are received or on the next business day if made after 6pm CT (6pm MT for Arizona accounts and 6pm PT for California accounts) Monday through Friday or any ime Saturday, Sunday or bank holidays. BBVA Compass Bank business days are Monday through Friday, excluding holidays.

**In Case of Errors or Questions About Your Statement** (Overdraft Protection Only)
If you think your statement is wrong, or if you need more information about a transaction on your statement, write your issue on a separate document and send it to Bankcard Center, P.O. Box 2210, Decatur, AL 35699-0001. Telephone inquires may be made by calling your local BBVA Compass branch listed on the front of this statement to speak with a Customer Service Representative. Please note: a telephone inquiry will not preserve your rights under federal law. We must hear from you no later than sixty (60) days after we sent you the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or what you need more information.
• Tell us the dollar amount of the suspected error.

You can stop the automatic deduction of the Minimum Payment from you checking account if you think your statement is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic deduction is scheduled to occur.

**Reporting Other Problems**
Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors or unauthorized transactions within the time periods specified in the deposit account agreement, we are not liable to you for any loss related to the problem, error or unauthorized transaction.

BBVA Compass is a trade name of Compass Bank, a member of the BBVA Group. Compass Bank, Member FDIC.

HIGHLY CONFIDENTIAL

# EXHIBIT 108

Appx. 02195

**BBVA** Compass

21    HIGHLAND CAPITAL MANAGEMENT LP
MASTER OPERATING ACCOUNT
300 CRESCENT CT STE 700
DALLAS TX 75201-7849

### Contacting Us

Available by phone 24/7

Phone  1-800-266-7277

Online  bbvacompass.com

Write  BBVA Compass
Customer Service
P.O. Box 10566
Birmingham, AL 35296

## Summary of Accounts

### Deposit Accounts/ Other Products

| Account | Account number | Ending balance last statement | Ending balance this statement |
|---|---|---|---|
| TREASURY MANAGEMENT ANALYSIS CHECKING | ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ |
| **Total Deposit Accounts** | | ▮▮▮▮▮ | ▮▮▮▮▮ |

HIGHLY CONFIDENTIAL

**BBVA** Compass

# TREASURY MANAGEMENT ANALYSIS CHECKING

Account Number: ▮▮▮▮ - HIGHLAND CAPITAL MANAGEMENT LP

## Activity Summary

## Deposits and Other Credits

| Date * | Check/Serial # | Description | Deposits/Credits |
|--------|----------------|-------------|------------------|
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |
| ▮ | | ▮▮▮▮▮▮ | ▮▮▮ |

HIGHLY CONFIDENTIAL

Page 3 of 11
Primary Account: ████████
Beginning February 1, 2019 - Ending February 28, 2019      28

**BBVA** Compass

| Date * | Check/<br>Serial # | Description | Deposits/<br>Credits |
|--------|--------|-------------|----------|
| ▮ | | ███████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | ████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | █████████████ | ██████ |
| ▮ | | ██████████████ | ██████ |
| ▮ | | ███████████████ | ██████ |
| ▮ | | ████████████████ | ██████ |
| ▮ | | █████████████████ | ██████ |
| ▮ | | ████████████ | ██████ |
| ▮ | | ████████████ | ██████ |
| ▮ | | ███████████ | ██████ |
| ▮ | | ████████████ | ██████ |
| ▮ | | ██████████████ | ██████ |
| ▮ | | ██████████ | ██████ |
| ▮ | | █████████████ | ██████ |
| ▮ | | ████████████████ | ██████ |

HIGHLY CONFIDENTIAL

**BBVA** Compass

| Date * | Check/ Serial # | Description | Deposits/ Credits |
|--------|-----------------|-------------|-------------------|
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ████ |
| 2/14 | | INCOMING WIRE W/ADVICE REF 20190214F2QCZ60C00347602141628FT01 ORG JAMES D DONDERO | $3,000,000.00 |
| ██ | | ████████████ | ████ |

HIGHLY CONFIDENTIAL

Page 5 of 11
Primary Account: ▇▇▇▇▇
Beginning February 1, 2019 - Ending February 28, 2019          28

**BBVA** Compass



## Withdrawals and Other Debits



HIGHLY CONFIDENTIAL

Page 6 of 11
Primary Account: ███████████
Beginning February 1, 2019 - Ending February 28, 2019          28

**BBVA** Compass

| Date * | Check/ Serial # | Description | Withdrawals/ Debits |
|--------|-----------------|-------------|---------------------|

Primary Account: ▊▊▊▊▊▊

**BBVA** Compass

Beginning February 1, 2019 - Ending February 28, 2019                    28

| Date * | Check/Serial # | Description | | Withdrawals/Debits |
|---|---|---|---|---|

HIGHLY CONFIDENTIAL

D-CNL003496

**Appx. 02202**

**BBVA** Compass

| Date * | Check/ Serial # | Description | Withdrawals/ Debits |
|--------|-----------------|-------------|---------------------|

HIGHLY CONFIDENTIAL

**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|

HIGHLY CONFIDENTIAL

Page 10 of 11
Primary Account: ████████
Beginning February 1, 2019 - Ending February 28, 2019          28



HIGHLY CONFIDENTIAL

**BBVA** Compass

## How to Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.

   • Record all automated deductions, debit card transactions and electronic bill payments.

   • Record and deduct service charges, check printing charges, or other bank fees.

   • If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits your have made that do not appear on this statement (see space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Step 4 Total |  | $ |

## Balancing Your Register to this Statement

| Step 5 | • Enter the "current balance" shown on this statement | |
|---|---|---|
|  | • Add total from Step 3 | |
|  | • Subtotal | |
|  | • Subtract total from Step 4 | |
|  | • This balance should equal your register balance | |
|  | If it does not agree, see steps below | $ |

If your account does not balance, review the following:
· Check all your addition and subtraction in your register.
· Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register.
· Amounts of deposits and withdrawals on this statement should match your register entries.
· If you have questions or need assistance, please refer to the phone number on the front of this statement.

**Change of Address**
Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Electronic Transfers** *(for consumer accounts only)*
In case of errors or questions about your Electronic Transfers, write to BBVA Compass Bank, Operations Compliance Center, P.O. Box 10566, Birmingham, AL 35296. Or simply call your local customer service number printed on the front of this statement. Call or write as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
• Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 on claims on accounts opened less than 30 calendar days) to do this, we will credit your account for the amount you think is in error, so hat you will have the use of the money during the time it takes us to complete our inves igation.

*For Non-Consumer Account customers, please refer to your current Non-Consumer Account Agreement for details regarding Electronic Fund Transfers.

**Overdraft Protection**
**Calculation of Interest Charge and Balance Subject to Interest Rate.** The interest charge is computed using your annual percentage rate divided by 365 or, in he case of a leap year, 366, which gives you the "Applicable Rate." Although we calculate the interest charge by applying the Applicable Rate to each daily balance, the interest charge can also be calculated by multiplying the Applicable Rate by the "average daily balance"(Balance Subject to Interest Rate) shown on this statement, hen multiplying that sum by the number of days in the billing cycle. To get the "Balance Subject to Interest Rate" shown on this statement we take the beginning balance of your account less any unpaid finance charges each day, add any new advances or debits, and subtract any payments or credits. This gives us the daily balance. Then we add all the daily balances for the billing cycle and divide by the number of days in the billing cycle. This give us the "average daily balance" shown on the statement as "Balance Subject to Interest Rate". Payments. Payments to your overdraft protec ion loan account made through our tellers or deposited at our automated teller machines (ATM s) Monday through Friday before he posted cut-off time will be posted to your account on the date they are accepted. Otherwise, they will be posted on the next business day. Payments made through our ATM s via a funds transfer will be posted on the date they are received or on the next business day if made after 6pm CT (6pm MT for Arizona accounts and 6pm PT for California accounts) Monday through Friday or any ime Saturday, Sunday or bank holidays. BBVA Compass Bank business days are Monday through Friday, excluding holidays.

**In Case of Errors or Questions About Your Statement** (Overdraft Protection Only)
If you think your statement is wrong, or if you need more information about a transaction on your statement, write your issue on a separate document and send it to Bankcard Center, P.O. Box 2210, Decatur, AL 35699-0001. Telephone inquires may be made by calling your local BBVA Compass branch listed on the front of this statement to speak with a Customer Service Representative. Please note: a telephone inquiry will not preserve your rights under federal law. We must hear from you no later than sixty (60) days after we sent you the first statement on which the error or problem appeared.

· Tell us your name and account number (if any).
· Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or what you need more information.
· Tell us the dollar amount of the suspected error.

You can stop the automatic deduction of the Minimum Payment from you checking account if you think your statement is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic deduction is scheduled to occur.

**Reporting Other Problems**
Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors or unauthorized transactions within the time periods specified in the deposit account agreement, we are not liable to you for any loss related to the problem, error or unauthorized transaction.

BBVA Compass is a trade name of Compass Bank, a member of the BBVA Group. Compass Bank, Member FDIC.

HIGHLY CONFIDENTIAL

**EXHIBIT 109**

**BBVA** Compass

21     HIGHLAND CAPITAL MANAGEMENT LP
       MASTER OPERATING ACCOUNT
       300 CRESCENT CT STE 700
       DALLAS TX 75201-7849

### Contacting Us

Available by phone 24/7

Phone    1-800-266-7277

Online   bbvacompass.com

Write    BBVA Compass
         Customer Service
         P.O. Box 10566
         Birmingham, AL 35296

## Summary of Accounts

### Deposit Accounts/ Other Products

| Account | Account number | Ending balance last statement | Ending balance this statement |
|---|---|---|---|
| TREASURY MANAGEMENT ANALYSIS CHECKING | ▓▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| ▓▓▓▓▓▓▓▓ | | ▓▓▓▓ | ▓▓▓▓ |

HIGHLY CONFIDENTIAL

**BBVA** Compass

# TREASURY MANAGEMENT ANALYSIS CHECKING

Account Number: ████████████████

## Activity Summary



## Deposits and Other Credits

| Date * | Check/ Serial # | Description | Deposits/ Credits |
|---|---|---|---|
| ██ | | ████████████████ | ██████ |
| ██ | | ██████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | ███████████████ | ████ |
| ██ | | ████████████████ | ████ |
| ██ | | ██████████████████ | ████ |
| ██ | | ████████████████ | ██ |
| ██ | | █████████████ | ███ |
| ██ | | ████████████████████ | ███ |
| ██ | | ████████████████████ | ███ |
| 3/13 | | INCOMING WIRE W/ADVICE REF 20190313F2QCZ60C00320903131633FT01 ORG JAMES D DONDERO | $5,000,000.00 |
| ██ | | ███████████████ | ███ |
| ██ | | ███████████████████ | ████ |
| ██ | | ███████████████████ | ████ |
| ██ | | ██████ ████████ | ███ |
| ██ | | ██████████ | ███ |

HIGHLY CONFIDENTIAL

Page 3 of 10
Primary Account: ████████
Beginning March 1, 2019 - Ending March 31, 2019          31

**BBVA** Compass

| Date * | Check/Serial # | Description | | Deposits/Credits |
|--------|----------------|-------------|--|------------------|



## Withdrawals and Other Debits

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|--------|----------------|-------------|--------------------|



HIGHLY CONFIDENTIAL

**BBVA** Compass

| Date * | Check/ Serial # | Description | Withdrawals/ Debits |
|--------|-----------------|-------------|---------------------|

HIGHLY CONFIDENTIAL

D-CNL003506

Appx. 02211

Page 5 of 10
Primary Account: ███████████
Beginning March 1, 2019 - Ending March 31, 2019                31

**BBVA** Compass

| Date * | Check/<br>Serial # | Description | Withdrawals/<br>Debits |
|---|---|---|---|

**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|--------|----------------|-------------|--------------------|

**BBVA** Compass

| Date * | Check/ Serial # | Description | Withdrawals/ Debits |
|---|---|---|---|

HIGHLY CONFIDENTIAL

**BBVA** Compass



D-CNL003510

**Appx. 02215**

Page 9 of 10
Primary Account: █████████
Beginning March 1, 2019 - Ending March 31, 2019                    31

**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|



vices and/or activity from the prior statement cycle.

**BBVA** Compass

## How to Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.

• Record all automated deductions, debit card transactions and electronic bill payments.

• Record and deduct service charges, check printing charges, or other bank fees.

• If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits your have made that do not appear on this statement (see space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Step 4 Total |  | $ |

## Balancing Your Register to this Statement

| Step 5 | | |
|---|---|---|
|  | • Enter the "current balance" shown on this statement |  |
|  | • Add total from Step 3 |  |
|  | • Subtotal |  |
|  | • Subtract total from Step 4 |  |
|  | • This balance should equal your register balance |  |
|  | If it does not agree, see steps below | $ |

If your account does not balance, review the following:
· Check all your addition and subtraction above in your register.
· Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register.
· Amounts of deposits and withdrawals on this statement should match your register entries.
· If you have questions or need assistance, please refer to the phone number on the front of this statement.

**Change of Address**
Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Electronic Transfers** *(for consumer accounts only)*
In case of errors or questions about your Electronic Transfers, write to BBVA Compass Bank, Operations Compliance Support, P.O. Box 10566, Birmingham, AL 35296. Or simply call your local customer service number printed on  he front of this statement. Call or write as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or  he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
• Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 on claims on accounts opened less than 30 calendar days) to do this, we will credit your account for the amount you think is in error, so  hat you will have the use of the money during the time it takes us to complete our inves igation.

*For Non-Consumer Account customers, please refer to your current Non-Consumer Account Agreement for details regarding Electronic Fund Transfers.

**Overdraft Protection**
**Calculation of Interest Charge and Balance Subject to Interest Rate**. The interest charge is computed using your annual percentage rate divided by 365 or, in  he case of a leap year, 366, which gives you the "Applicable Rate." Although we calculate the interest charge by applying the Applicable Rate to each daily balance, the interest charge can also be calculated by multiplying the Applicable Rate by the "average daily balance"(Balance Subject to Interest Rate) shown on this statement,  hen multiplying that sum by the number of days in the billing cycle. To get the "Balance Subject to Interest Rate" shown on this statement we take the beginning balance of your account less any unpaid finance charges each day, add any new advances or debits, and subtract any payments or credits. This gives us the daily balance. Then we add all the daily balances for the billing cycle and divide by the number of days in the billing cycle. This give us the "average daily balance" shown on the statement as "Balance Subject to Interest Rate". Payments. Payments to your overdraft protec ion loan account made through our tellers or deposited at our automated teller machines (ATM s) Monday through Friday before  he posted cut-off time will be posted to your account on the date they are accepted. Otherwise, they will be posted on the next business day. Payments made through our ATM s via a funds transfer will be posted on the date they are received or on the next business day if made after 6pm CT (6pm MT for Arizona accounts and 6pm PT for California accounts) Monday through Friday or any  ime Saturday, Sunday or bank holidays. BBVA Compass Bank business days are Monday through Friday, excluding holidays.

**In Case of Errors or Questions About Your Statement** (Overdraft Protection Only)
 If you think your statement is wrong, or if you need more information about a transaction on your statement, write your issue on a separate document and send it to Bankcard Center, P.O. Box 2210, Decatur, AL 35699-0001. Telephone inquires may be made by calling your local BBVA Compass branch listed on the front of this statement to speak with a Customer Service Representative. Please note: a telephone inquiry will not preserve your rights under federal law. We must hear from you no later than sixty (60) days after we sent you the first statement on which the error or problem appeared.

· Tell us your name and account number (if any).
· Describe the error or  he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or what you need more information.
· Tell us the dollar amount of the suspected error.

You can stop the automatic deduction of the Minimum Payment from you checking account if you think your statement is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic deduction is scheduled to occur.

**Reporting Other Problems**
Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors or unauthorized transactions within the time periods specified in the deposit account agreement, we are not liable to you for any loss related to the problem, error or unauthorized transaction.

BBVA Compass is a trade name of Compass Bank, a member of the BBVA Group. Compass Bank, Member FDIC.

HIGHLY CONFIDENTIAL

# EXHIBIT 110

Appx. 02218

Page 1 of 13
Primary Account: ███████
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

21   HIGHLAND CAPITAL MANAGEMENT LP
     MASTER OPERATING ACCOUNT
     300 CRESCENT CT STE 700
     DALLAS TX 75201-7849

### Contacting Us

Available by phone 24/7

Phone   1-800-266-7277

Online   bbvacompass.com

Write   BBVA Compass
        Customer Service
        P.O. Box 10566
        Birmingham, AL 35296

## Summary of Accounts

### Deposit Accounts/ Other Products

| Account | Account number | Ending balance last statement | Ending balance this statement |
|---|---|---|---|
| TREASURY MANAGEMENT ANALYSIS CHECKING | ████████ | ██████ | ██████ |
| **Total Deposit Accounts** | | ██████ | ██████ |

HIGHLY CONFIDENTIAL

D-CNL003515

**Appx. 02219**

**BBVA** Compass

# TREASURY MANAGEMENT ANALYSIS CHECKING

Account Number: ███████████████████

## Activity Summary

## Deposits and Other Credits

| Date * | Check/ Serial # | Description | Deposits/ Credits |
|--------|-----------------|-------------|-------------------|
| ██ | | ███████████████ | ██████ |
| ██ | | ███████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | ███████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | █████████████ | ██████ |
| ██ | | ███████████████ | |
| ██ | | ███████████████ | |
| ██ | | █████████████ | ████ |
| ██ | | ████████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | █████████████ | ████ |
| ██ | | ███████████████ | ████ |
| ██ | | ██████████████ | ████ |

HIGHLY CONFIDENTIAL

Page 3 of 13
Primary Account: █████████
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

| Date * | Check/Serial # | Description | Deposits/Credits |
|--------|----------------|-------------|------------------|
| ██ | | ████████████ ██████ | █████ |
| ██ | | ████████████ ██████ | █████ |
| ██ | | █████████████ ███████ | █████ |
| ██ | | ████████████ ████████ | █████ |
| ██ | | ████████████ ███████ | █████ |
| ██ | | ███████████ | ████ |
| ██ | | ████████████ █████ | █████ |
| ██ | | █████████████ █████████ | █████ |
| ██ | | ████████████ █████████ | █████ |
| ██ | | ██████████ ██████ | █████ |
| ██ | | ██████████ ██████ | █████ |
| ██ | | ██████████ ██████ | █████ |
| ██ | | █████████████ ████ | ████ |
| ██ | | ████████████ ████████ | █████ |
| ██ | | ██████████ █████ | █████ |
| ██ | | ███████████ █████████ | █████ |
| ██ | | ██████████ ██████ | █████ |
| ██ | | ██████████ ██████ | █████ |
| ██ | | ███████████ ██████ | █████ |
| ██ | | █████████████ ██████ | ████ |

D-CNL003517

**Appx. 02221**

Page 4 of 13
Primary Account: ███████
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

| Date * | Check/Serial # | Description | Deposits/Credits |
|---|---|---|---|
| ██ | | ████████████ | █████ |
| ██ | | ████████████ | █████ |
| ██ | | ████████████ | █████ |
| ██ | | ███████████ | █████ |
| ██ | | ████████████ | █████ |
| ██ | | ███████████ | █████ |
| ██ | | ███████████ | █████ |
| ██ | | █████████████ | █████ |
| ██ | | ██████████ | █████ |
| ██ | | ██████████████ | █████ |
| ██ | | █████████████ | █████ |
| 5/2 | | INCOMING WIRE W/ADVICE REF 20190502F2QCZ60C00351205021554FT03 ORG JAMES D DONDERO | $2,400,000.00 |
| ██ | | ███████████ | █████ |
| ██ | | █████████ | ███ |
| ██ | | █████████ | █████ |
| ██ | | ███████████ | ███ |
| ██ | | █████████ | ██ |
| ██ | | ███████████ | █████ |
| ██ | | ████████████ | █████ |
| ██ | | ██████████ | █████ |

HIGHLY CONFIDENTIAL

**BBVA** Compass

| Date * | Check/ Serial # | Description | Deposits/ Credits |
|---|---|---|---|
| ██ | | ████████████ | ████ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| 5/3 | | INCOMING WIRE W/ADVICE REF 20190503F2QCZ60C00402305031602FT03 ORG JAMES D DONDERO | $4,400,000.00 |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| 5/7 | | INCOMING WIRE W/ADVICE REF 20190507F2QCZ60C00123805071057FT03 ORG JAMES D DONDERO | $600,000.00 |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |
| ██ | | ████████████ | ██ |

HIGHLY CONFIDENTIAL

**BBVA** Compass



| Date * | Check/ Serial # | Description | Deposits/ Credits |
|---|---|---|---|
| 5/23 | | INCOMING WIRE W/ADVICE REF 20190523F2QCZ60C00127205231045FT03 ORG JAMES D DONDERO | $1,500,000.00 |

HIGHLY CONFIDENTIAL

D-CNL003520

**Appx. 02224**

Page 7 of 13
Primary Account: 
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

| Date * | Check/Serial # | Description | Deposits/Credits |
|---|---|---|---|



## Withdrawals and Other Debits

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|

HIGHLY CONFIDENTIAL

D-CNL003521

**Appx. 02225**

Page 8 of 13
Primary Account: ███████
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

| Date * | Check/ Serial # | Description | | Withdrawals/ Debits |
|--------|------|-------------|--|-----------|

HIGHLY CONFIDENTIAL

D-CNL003522

Appx. 02226

Page 9 of 13
Primary Account: ███████████
Beginning May 1, 2019 - Ending May 31, 2019          31

**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|--------|----------------|-------------|--------------------|

HIGHLY CONFIDENTIAL

D-CNL003523

**Appx. 02227**

**BBVA** Compass

| Date * | Check/Serial # | Description | | Withdrawals/Debits |
|--------|----------------|-------------|--|--------------------|

**BBVA** Compass

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|

HIGHLY CONFIDENTIAL

D-CNL003525

**Appx. 02229**

**BBVA** Compass



HIGHLY CONFIDENTIAL

**BBVA** Compass

## How to Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
  • Record all automated deductions, debit card transactions and electronic bill payments.
  • Record and deduct service charges, check printing charges, or other bank fees.
  • If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits your have made that do not appear on this statement (see space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Step 4 Total | $ |

## Balancing Your Register to this Statement

| Step 5 | |
|---|---|
| • Enter the "current balance" shown on this statement |  |
| • Add total from Step 3 |  |
| • Subtotal |  |
| • Subtract total from Step 4 |  |
| • This balance should equal your register balance |  |
| If it does not agree, see steps below | $ |

If your account does not balance, review the following:
· Check all your addition and subtraction above in your register.
· Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register.
· Amounts of deposits and withdrawals on this statement should match your register entries.
· If you have questions or need assistance, please refer to the phone number on the front of this statement.

**Change of Address**
Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Electronic Transfers** *(for consumer accounts only)*
In case of errors or questions about your Electronic Transfers, write to BBVA Compass Bank, Operations Compliance Center, P.O. Box 10566, Birmingham, AL 35296. Or simply call your local customer service number printed on the front of this statement. Call or write as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
• Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 on claims on accounts opened less than 30 calendar days) to do this, we will credit your account for the amount you think is in error, so hat you will have the use of the money during the time it takes us to complete our inves igation.

*For Non-Consumer Account customers, please refer to your current Non-Consumer Account Agreement for details regarding Electronic Fund Transfers.

**Overdraft Protection**
**Calculation of Interest Charge and Balance Subject to Interest Rate**. The interest charge is computed using your annual percentage rate divided by 365 or, in he case of a leap year, 366, which gives you the "Applicable Rate." Although we calculate the interest charge by applying the Applicable Rate to each daily balance, the interest charge can also be calculated by multiplying the Applicable Rate by the "average daily balance"(Balance Subject to Interest Rate) shown on this statement, hen multiplying that sum by the number of days in the billing cycle. To get the "Balance Subject to Interest Rate" shown on this statement we take the beginning balance of your account less any unpaid finance charges each day, add any new advances or debits, and subtract any payments or credits. This gives us the daily balance. Then we add all the daily balances for the billing cycle and divide by the number of days in the billing cycle. This give us the "average daily balance" shown on the statement as "Balance Subject to Interest Rate". Payments. Payments to your overdraft protec ion loan account made through our tellers or deposited at our automated teller machines (ATM s) Monday through Friday before he posted cut-off time will be posted to your account on the date they are accepted. Otherwise, they will be posted on the next business day. Payments made through our ATM s via a funds transfer will be posted on the date they are received or on the next business day if made after 6pm CT (6pm MT for Arizona accounts and 6pm PT for California accounts) Monday through Friday or any ime Saturday, Sunday or bank holidays. BBVA Compass Bank business days are Monday through Friday, excluding holidays.

**In Case of Errors or Questions About Your Statement** (Overdraft Protection Only)
If you think your statement is wrong, or if you need more information about a transaction on your statement, write your issue on a separate document and send it to Bankcard Center, P.O. Box 2210, Decatur, AL 35699-0001. Telephone inquires may be made by calling your local BBVA Compass branch listed on the front of this statement to speak with a Customer Service Representative. Please note: a telephone inquiry will not preserve your rights under federal law. We must hear from you no later than sixty (60) days after we sent you the first statement on which the error or problem appeared.

• Tell us your name and account number (if any).
• Describe the error or he transfer you are unsure about, and explain as clearly as you can why you believe it is an error or what you need more information.
• Tell us the dollar amount of the suspected error.

You can stop the automatic deduction of the Minimum Payment from you checking account if you think your statement is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic deduction is scheduled to occur.

**Reporting Other Problems**
Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors or unauthorized transactions within the time periods specified in the deposit account agreement, we are not liable to you for any loss related to the problem, error or unauthorized transaction.

BBVA Compass is a trade name of Compass Bank, a member of the BBVA Group. Compass Bank, Member FDIC.

HIGHLY CONFIDENTIAL