Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adversary No. 21-03082** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## APPENDIX IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Highland Capital Management Fund Advisors, L.P. files this Appendix in Support of its Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Summary Judgment, and requests the Court take judicial notice of the documents contained herein.

CORE/3522697.0002/175124837.2

| Exhibit | Document | Appendix Page(s) |
|---------|----------|------------------|
| 1 | **Declaration of James Dondero, dated January 20, 2022** | App. 1-23 |
| A | HCMS Payment Ledger | App. 24-25 |
| B | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 26-31 |
| C | Documents showing J. Dondero proof of service as Family Trustee for the Dugaboy Family Trust and subsequent resignation | App. 32-72 |
| D | Letter to J. Pomerantz from D. Lynn, dated February 1, 2021 | App. 73-74 |
| E | Termination of Amended and Restated Shared Services Agreement, among Highland Capital Management, L.P. and NexPoint Advisors, L.P., dated November 30, 2020 | App. 75-76 |
| 2 | **Declaration of Nancy M. Dondero, dated January 20, 2022** | App. 77-85 |
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 86-91 |
| 3 | **Declaration of Michael Aigen, dated January 20, 2022** | App. 92-95 |
| A | Transcript of the Video Deposition of James P. Seery, Jr. on October 21, 2021, Adv. Proc. No. 21-03005 | App. 96-185 |
| B | Transcript of the Remote Deposition of Bruce McGovern on November 9, 2021, Adv. Proc. No 21-03003 | App. 186-200 |
| C | List of Promissory Notes | App. 201-202 |
| D | Email from F. Waterhouse to K. Hendrix, dated November 25, 2020 | App. 203-208 |
| E | Email from F. Waterhouse to K. Hendrix, dated December 31, 2020 | App. 209-210 |
| F | INTENTIONALLY LEFT BLANK | App. 211-235 |
| G | Expert Report of Alan M. Johnson | App. 236-262 |
| H | Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021 | App. 263-300 |
| 4 | **Declaration of James Dondero, dated June 30, 2022** | App. 301-312 |
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 313-318 |
| B | Documents showing J. Dondero proof of service as Family Trustee for the Dugaboy Family Trust and subsequent resignation | App. 319-359 |
| C | Letter to J. Pomerantz from D. Lynn, dated February 1, 2021 | App. 360-361 |
| D | Proof of Claim No. 188, dated May 26, 2020 | App. 362-367 |
| E | HCMFA's April 2022 vs. March 2022 balance sheet | App. 368-369 |

| 5 | **Declaration of Nancy M. Dondero, dated June 30, 2022** | App. 370-374 |
|---|---|---|
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 375-380 |
| 6 | **Declaration of Michiel Hurley, dated June 29, 2022** | App. 381-383 |
| 7 | **Declaration of Michael Aigen, dated July 1, 2022** | App. 384-386 |
| A | Transcript of the Remote Deposition of James D. Dondero taken on May 5, 2022 in Adv. Proc. No. 21-03082 | App. 387-418 |
| B | Transcript of the Remote Deposition of Nancy Dondero taken on April 29, 2022 in Adv. Proc. No. 21-03082 | App. 419-436 |

CORE/3522697.0002/175124837.2

Dated: July 1, 2022

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

4

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on July 1, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# EXHIBIT 1

CORE/9990000.7726/157590134.1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03004-sgj** |
| vs. | § § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,** | § § § § | |
| **Defendant.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| vs. | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| vs. | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| vs. | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF JAMES DONDERO

I, James Dondero, hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1. My name is James Dondero. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration. I have personal knowledge of the facts stated in this Declaration.

**A. Background.**

2. I am currently a named Defendant in Adversary Proceedings No. 21-03003-sgj, 21-03005-sgj, 21-03006-sgj, and 21-03007-sgj. I have personal knowledge of the facts contained in this declaration, and if called as a witness to testify, I could and would do so competently.

3. I co-founded Highland Capital Management, L.P. ("HCM") in the year 2000, and have been working in the financial services industry for over thirty (30) years. I served as HCM's President and Chief Executive Officer until my resignation on January 9, 2020.

4. Along with having served as CEO for HCM, I have also served as a high-level executive and controlling portfolio manager for NexPoint Advisors, L.P. ("NexPoint"), HCRE Partners, LLC ("HCRE"), Highland Capital Management Services, Inc. ("HCMS"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). I have spent years of service to these companies as a chief executive, and am familiar with each company's internal management and operational structures and procedures.

**B. The Promissory Notes.**

    **1. HCM Issued Three (3) Notes to Me.**

5.     On February 2, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $3,825,000.00 (the "February 2018 Note").[1]  The February 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.66%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.   On its original terms, the February 2018 Note was a payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note, and was made, as indicated in the promissory note, to help satisfy personal tax obligations.

6.     On August 1, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 1, 2018 Note").[2]  The August 1, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.   On its original terms, the August 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.   This promissory note, unlike typical promissory notes, was a soft note, which was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

7.     On August 13, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 13, 2018 Note").[3]  The August 13, 2018

---

[1] Pl. Appx. 00678-679.
[2] *Id.* at 00681-682.
[3] *Id.* at 00684-685.

Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the August 2018 Note was payable upon demand by HCM and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

   **2.**   **HCM Issued one (1) Term Note to NexPoint.**

  8.   On May 31, 2017, NexPoint borrowed money from HCM and entered into a promissory note with HCM in the amount of $30,746,812.33 (the "NexPoint Term Note").[4] The NexPoint Term Note bore an interest rate of 6%, to be calculated at a daily rate equal to 1/365[th] per annum. The NexPoint Term Note was due in thirty (30) equal annual payments, due by the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note is paid current. The NexPoint Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due. The purpose of the NexPoint Term Note was in-part to consolidate several prior notes made between NexPoint Advisors, L.P. and HCM. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any

---

[4] *Id.* at 00042-43.

prepayment between accrued interest, future interest, and principal, and it did not contain any provision concerning what the impact of prepayments would be on future scheduled payments.

### 3. HCM Issued Five (5) Notes to HCRE.

9.  On November 27, 2013, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $100,000 (the "November 27, 2013 Note").[5] The November 27, 2013 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the November 27, 2013 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

10.  On May 31, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $6,059,831.51 (the "HCRE Term Note").[6] The HCRE Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. The HCRE Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. The HCRE Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due. The purpose of the HCRE Term Note was made in-part to consolidate several prior notes made between HCRE Partners, LLC, and HCM. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was

---

[5] *Id.* at 00202-203.
[6] *Id.* at 00218-219.

4

ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

11. On October 12, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "October 12, 2017 Note").[7] The October 12, 2017 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the October 12, 2017 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

12. On October 15, 2018, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $750,000 (the "October 15, 2018 Note").[8] The October 15, 2018 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the October 15, 2018 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[7] *Id.* at 00205-206.
[8] *Id.* at 00208-209.

**App. 8**

13.     On September 25, 2019, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $900,000 (the "September 25, 2019 Note").[9]  The September 25, 2019 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the September 25, 2019 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**4.     HCM Issued five (5) Notes to HCMS.**

14.     On March 28, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "March 28, 2018 Note").[10]  The March 28, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.88%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the March 28, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[9] *Id.* at 00211-212.
[10] *Id.* at 00118-119.

15.     On June 25, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $200,000.00 (the "June 25, 2018 Note").[11]  The June 25, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 3.05%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

16.     On May 29, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $400,000.00 (the "May 29, 2019 Note").[12]  The May 29, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.39%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[11] *Id.* at 00121-122.
[12] *Id.* at 00124-125.

**App. 10**

17. On June 26, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "June 26, 2019 Note").[13] The June 26, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.37%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the June 26, 2019 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

18. On May 31, 2017, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $20,247,628.02 (the "HCMS Term Note").[14] The HCMS Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. The HCMS Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note has been paid current. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal, and it did not contain any

---

[13] *Id.* at 00127-128.
[14] *Id.* at 00134-135.

provision concerning what the impact of prepayments would be on future scheduled payments. Attached to this Declaration as "Exhibit A" is an amortization table showing payments made on the HCMS Term Note, which was kept in the normal and ordinary course of business and made by someone with knowledge of the payments at the time it was created.

## C. Dugaboy, as the "Majority Interest" Approved Compensation.

19. HCM was formed as a limited partnership under the laws of the State of Delaware, and was governed by a Limited Partnership Agreement ("LPA").[15] The LPA was entered into on December 24, 2015, between Strand Advisors, Inc. (the General Partner), and the following Limited Partners:

(1) The Dugaboy Investment Trust ("Dugaboy"),

(2) The Mark and Pamela Okada Family Trust – Exempt Trust #1,

(3) The Mark and Pamela Okada Family Trust – Exempt Trust #2, and

(4) Mark Okada.[16]

20. Pursuant to the LPA – specifically in Section 3.10(a) –HCM's "Majority Interest[-holder]" was entitled to approve the compensation of HCM's General Partner and any "Affiliate" of the General Partner.[17] The LPA defines the Majority Interest as "the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[18] The Dugaboy Family Trust ("Dugaboy") represented the Majority Interest of the Limited Partners, owning a 74.4426% interest of the Limited Partners Class A Interest.[19]

---

[15] *Id.* at 00606-641.
[16] *Id.* at 00636-638.
[17] *Id.* at 00622.
[18] *Id.* at 00612.
[19] *Id.* at 00639.

CORE/3522697.0002/171867762.5

**App. 12**

21.     My sister Nancy Dondero has served as the Dugaboy Family Trustee since her appointment in 2015. Attached as "Exhibit B" is a copy of Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015, a record which was kept in the ordinary course of business and made by someone with knowledge of the appointment. Prior to Nancy Dondero's service, Grant Scott served as Dugaboy Family Trustee until October 12, 2015. Grant Scott's resignation letter is contained within Exhibit B. Prior to Grant Scott's service as Dugaboy Family Trustee, I personally served as Dugaboy Family Trustee until my resignation on August 26, 2015. Attached as "Exhibit C" is proof of my service as Family Trustee for the Dugaboy Family Trust and my subsequent resignation prior to Grant Scott's appointment, a record which was kept in the ordinary course of business and made by someone with knowledge of the document.. .

**D.     Dugaboy Agreed That HCM Would Not Collect on the Notes Upon Fulfillment of Conditions Subsequent, Making the Notes Potentially Deferred Compensation.**

22.     Based on my years of experience in working in Private Equity, I am familiar with the compensation structure of similarly situated Private Equity firms. Based on this experience, I am also very familiar with the compensation structure of other similarly situated executives like myself.

23.     At HCM, as at other comparable capital investment firms, it was common practice to compensate executives with forgivable loans. My compensation was no exception to this practice. In fact, I was undercompensated in my position compared to similarly-situated contemporaries in my field. I know that several other individuals may have received loans by HCM that were forgiven. These individuals include Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery and this was also a common practice and another company in which I have an interest, NexBank Capital, Inc.

10

24.     At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred. Specifically, if one of specific portfolio companies – either MGM, Cornerstone, or Trussway – were sold for above cost, or sold in a circumstance outside of my control, HCM agreed that the Notes would be forgiven.  In late 2013 or early 2014, the Dugaboy Family Trustee had made an identical agreement that applied to the November 27, 2013 Note.  The Agreement assured HCM that the monetization of these portfolio companies would have my utmost focus and attention, and served as an incentive for me to work particularly hard to make sure these assets were successful. Further, this agreement provided the additional benefit to HCM of not increasing my base salary, which I normally would have requested and obtained.  However, reaching this agreement made my compensation conditional on performance, and ensured that HCM would not immediately realize a change in its financial position through an increase in my salary, something I had the right to increase.

25.     At either the end of 2018 or the beginning of 2019, Dugaboy and I entered into another agreement that was identical to the Agreement made in the preceding year (the "2018 Agreement").  This 2018 Agreement covered all the Notes at issue in this litigation that were issued in 2018.  The 2018 Agreement provided the same benefits to the HCM as the 2017 Agreement.

26.     At either the end of 2019 or the beginning of 2020 (prior to January 9, 2020), Dugaboy and I entered into another agreement that was identical to the 2018 Agreement (the "2019 Agreement").  Again, the 2019 Agreement applied to all the Notes at issue in this litigation that were issued in 2019.  The 2019 Agreement provided the same benefits to HCM as the 2018 and 2017 Agreements.  Collectively, the 2017, 2018, and 2019 Agreements are referred to herein as

the "Agreements." I understand that Plaintiff claims in its Motion that Nancy Dondero and I do not agree about whether I identified the Notes subject to the Agreements. Despite unclear questioning at my deposition, I testified that I identified the Notes that were subject to the Agreements when entering into the Agreements (which is how Nancy Dondero was aware that they involved the different companies) and I specifically remember discussing and identifying the Notes to Nancy Dondero.

27.     In my years of experience in this industry, and experience working with financial auditors, although the Agreements were not disclosed to the financial auditors at HCM, such a disclosure was not necessary since it would not be considered material. When compared to the considerable size of HCM's assets, the Agreement on such small comparative Notes was *de minimus* when viewed in light of such large assets. Therefore, the Agreement was non-material and did not require disclosure.

28.     Prior to the commencement of any Adversary Proceedings concerning the Notes, I mentioned to Frank Waterhouse that there were mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate. This came up in the context of discussing what we called the "Pot Plan" discussion for resolving the bankruptcy. I did not discuss every detail of the Agreements, because the important point was that he was made aware that the Notes should be considered as part of my compensation in connection with a resolution of the bankruptcy. By that time there was a great likelihood that some or all of the portfolio companies would be able to be sold for far more that their acquisition price.

29.     Further, opposing counsel was alerted on February 1, 2021 that one of the defenses in this litigation was that the Notes were subject to forgiveness as potential compensation. In a letter from my one of my attorneys– to opposing counsel at Pachulski Stang Ziehl & Jones, LLP,

the late retired Bankruptcy Judge Lynn, my lead counsel, made that disclosure. A true and correct copy of this letter is attached to this Declaration as "Exhibit D."

**E.     The Agreements Were Made in Good Faith.**

30.     The Agreements made between myself and Dugaboy were all entered into in good faith. At no point in time were any of these Agreements made with the intent to hinder or defraud HCM as payee. Dugaboy had the right to approve my compensation under the LPA, and it was exercising that right when it agreed to make the Notes forgivable as compensation, provided that I performed successfully as a HCM executive and made sure that the aforementioned illiquid assets were sold for at-or-above cost.

**F.     HCM Waived Any Rights to Collect on the Notes When Dugaboy Made the Agreements.**

31.     When the Agreements were made, HCM waived any rights it had to demand repayment of the demand Notes until it became impossible for the condition subsequent to be met. However, I still intended to make periodic interest payments because I understood that until forgiveness actually occurred, the notes were still bona fide notes. Also, making periodic payments kept the Notes from becoming unreasonably large in the event the conditions for forgiveness did not come to pass. The term loans had requirements for interest payments to be made until the conditions for forgiveness were met, which, as discussed below, were met.

**G.     Under its Shared Services Agreement with NexPoint, HCM was Responsible for the NexPoint Term Note Payments Being Made.**

32.     NexPoint and HCM entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, in which HCM provided a broad array of services to NexPoint, and essentially covered all functional areas of NexPoint's business other than executive

13

**App. 16**

and investment functions.[20]  In my experience, these types of shared services agreements are common in my industry, and exist to help consolidate function and manpower between a large entity (like HCM) and smaller entities (like NexPoint) that share overlapping ownership structures.

33.     The NexPoint SSA outlined multiple areas in which HCM would provide services for NexPoint, which resulted in HCM providing virtually the entire workforce for NexPoint's business.  Among the areas of services provided under the NexPoint SSA, HCM provided services for NexPoint's back- and middle-office divisions, legal compliance and risk divisions, tax division, administrative services division, management of NexPoint's clients and accounts, and many other divisions.[21]  Again, this type of shared services agreement covering these types of services is common in the private equity market where ownership overlaps.

34.     The result of this shared services agreement was that HCM was responsible for making debt payments on behalf of NexPoint – considered a "back and middle office" task – which included making payments on the NexPoint Term Note.  In fact, HCM made the NexPoint Term Note payments – consistent with the SSA, which specifically provided that HCM would make payments to creditors – on December 31 of 2017, 2018, and 2019, without any specific authorization or permission from any of the makers.

35.     Although HCM sought to provide notice of termination of the NexPoint SSA in November of 2020, that termination date was subsequently extended and the SSA was still active and in full effect as of December 31, 2020, the date on which the 2020 annual installment payment was due.  The letters providing for the subsequent extension of the NexPoint SSA is attached to this Declaration as "Exhibit E"[22]  Because HCM was still responsible for making these types of

---

[20] *Id.* at 04163-04181.
[21] *Id.* at 04165-04167, NexPoint SSA, Section 2.02 "Provision of Services" (a-l).
[22] See attached Exhibit B, (Letters confirming Jim Dondero's resignation as Dugaboy Family Trustee, and the appointment of Nancy Dondero as Dugaboy Family Trustee)

**App. 17**

payments for NexPoint at that time under the active SSA, HCM was responsible for missing that payment. The fact that HCM did not make that payment – as it had done in previous years – was surprising to me, since I never at any point directed Frank Waterhouse to cease making term payments on any Note. In fact, I fully expected HCM's accounting staff to continue making scheduled payments on the NexPoint Note, since the SSA was still in place. The only thing I instructed Frank Waterhouse to do was to pause payment to HCM regarding the NexPoint SSA because it came to light that NexPoint was being substantially overcharged and had already substantially overpaid. I would not have instructed Frank Waterhouse to not make a $1.4 million installment payment on the NexPoint Term Note – which could result in a default – as the $1.4 million payment would be trivial compared to a note acceleration.

**H.     Under its Oral Shared Services Agreement with HCRE, HCM was also Responsible for the HCRE Term Note Payments Being Made.**

36.     HCRE had a similar shared services agreement (the "HCRE SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCRE as it did to NexPoint, and orally agreed to do so. Similar to NexPoint, HCRE simply did not have the infrastructure or manpower to run its business without the HCRE SSA. As such, HCM provided a comprehensive array of services to HCRE that included back- and middle-office tasks like making sure HCRE's bills and loans were timely paid. This HCRE SSA was long-standing, as HCM had provided these comprehensive services to HCRE for years, and HCRE relied heavily on HCM to provide these services.

37.     HCM – despite having routinely paid on bills and notes for HCRE – did not make the December 31, 2020 payment on the HCRE Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCRE SSA. Further, at no point prior to

15

that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCRE Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCRE Term Note.

**I.**     **Under its Oral Shared Services Agreement with HCMS, HCM was also Responsible for the HCMS Term Note Payments Being Made.**

38.     HCMS also had a similar shared services agreement (the "HCMS SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCMS as it did to NexPoint and HCRE, and orally agreed to do so. Similar to NexPoint and HCRE, HCMS simply did not have the infrastructure or manpower to run its business without the HCMS SSA. As such, HCM provided a comprehensive array of services to HCMS that included back- and middle-office tasks like making sure HCMS's bills and loans were timely paid. This HCMS SSA was long-standing, as HCM had provided these comprehensive services to HCMS for years, and HCMS relied heavily on HCM to provide these services.

39.     HCM – despite having routinely paid on bills and notes for HCMS – did not make the December 31, 2020 payment on the HCMS Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCMS SSA. Further, at no point prior to that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCMS Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCMS Term Note.

**J.**     **Payments Were Made on the NexPoint, HCRE, and HCMS Term Notes to Cure Any Defaults.**

40.     I did not know that the NexPoint, HCRE, and HCMS Term Notes were in default until I called Frank Waterhouse from an in-person hearing in January 2021. I was surprised,

16

angered, and annoyed to learn that such *de minimis* amounts had not been paid on the Term Notes to keep them current. After asking Frank Waterhouse what it would take to cure them and make them current, he informed me of the amounts required, and I instructed him to make sure the payments got made and that the Term Notes were cured. Much later I learned, discussed further below, that the NexPoint and HCMS loans had been substantially prepaid so that no payment was actually due in December 2021. HCM, which was responsible for keeping track of the status of the loan, did not remind me of the prepayments in December of 2020 or January of 2021. So I pressed Frank Waterhouse, who was HCM's CFO and had the ability and authority to speak on behalf of and bind HCM, to make the payments HCM should have made if it believed that end of year payments on the Term Notes were due in 2020, and he told me the amounts needed and proceeded to make the payments. I would not have caused these payments to be made if Frank Waterhouse disagreed and told me that the payments would not cure and reinstate the loans.

41.     As a result of my conversation with Frank Waterhouse, I therefore believed that the Term Notes would be cured by the payments I directed Frank Waterhouse to make. Surely if the payments would not have cured the loans, he -- the lender's CFO -- would have told me that before making the payments. I could not have been clearer that I was flabbergasted that the payments had not been made and wanted the payment to be made as soon as possible to bring the loans current. I specifically discussed with Frank Waterhouse – HCM's CFO at the time – that I wanted these payments to act as cure payments for all three Term Notes. Waterhouse did not disagree with me that the payments would cure the missed payments, and he agreed to make the cure payments. However, HCM refused to accept the payments as cure for the defaults.

### K.     Prepayments by NexPoint and HCMS.

**App. 20**

42.     The HCMS and NexPoint Term Notes called for annual payments to be made by December 31 of every calendar year.  Not only did HCM make the required term payments, but I also instructed several prepayments to be made on these Notes throughout the years whenever HCM needed liquidity.  I understood that the prepayments I caused to be made on the Term Notes, when cash flow required, would be applied to the next scheduled annual payments if payments were not otherwise able to be made, and any reconciliations would be conducted by the HCM so that the borrowers would not be in default as a result of their voluntary prepayments for HCM's benefit.  I know that both NexPoint and HCMS made substantial prepayments on their term loans.

43.     Between March and August of 2019, the following prepayments were made on the NexPoint Term Note: (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.  These payments totaled $6,380,000.00 in 2019.  Setting aside all issues of prepayment, the normal December, 2019 payment of principal and interest on the NexPoint Term Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

44.     I know that none of the payments listed above were scheduled payments, but rather, they were payments made upon request from HCM because it needed the liquid funds.  Both NexPoint and HCM intended for these payments to count as prepayments on the NexPoint Note to be applied to the December 31, 2020 annual installment payment.

45.     Similar to NexPoint, HCMS made substantial prepayments towards the HCMS Term Note between May of 2017 and December of 2020.  In fact, the prepayments were so large that the HCMS Term Note's principal was paid down by almost $14,000,000.  In that timeframe, the following prepayments were made on the HCMS Term Note: (i) $985,216.44 on June 23, 2017;

(ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.

46.     Similar to the NexPoint Term Note prepayments, none of these payments were made on December 31 of any given year, nor were any of these payments made on arrears. Instead, these payments were intended by HCMS to be applied to the annual installment payments, and were believed to be accepted as such, since HCM never declared the HCMS Term Note to be in default in either 2017, 2018, or 2019.

**L.     Sale of Shares of MGM.**

47.     I understand that Plaintiff raises the issue of a sale of Plaintiff's interest in MGM in its Motion. This sale of a small portion of Plaintiff's interest in MGM would not have implicated the Agreements because it was for a *de minimis* amount of MGM stock and was only necessitated as a result of the UCC not being willing to cooperate in a transaction as part of the bankruptcy process that was agreed to by all of the other participants.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 20, 2022

_____
JAMES DONDERO

# Exhibit A

**HCM Services**
**Exhibit A**

| | | |
|---|---|---|
| Closing Date | | 5/31/2017 |
| Total Commitment | $ | 20,247,628 |
| Rate | | 2.750% |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | 20,247,628.02 |
| 5/31/2017 | - | | - | 20,247,628.02 | | 20,247,628.02 |
| 6/23/2017 | 35,086.64 | (35,086.64) | - | 20,247,628.02 | (950,129.80) | 19,297,498.22 |
| 6/30/2017 | 10,177.45 | | 10,177.45 | 19,297,498.22 | | 19,297,498.22 |
| 7/6/2017 | 8,723.53 | (18,900.97) | - | 19,297,498.22 | (888,395.28) | 18,409,102.95 |
| 7/18/2017 | 16,643.85 | (16,643.85) | 0.00 | 18,409,102.95 | (1,014,819.85) | 17,394,283.10 |
| 7/31/2017 | 17,036.87 | | 17,036.87 | 17,394,283.10 | | 17,394,283.10 |
| 8/25/2017 | 32,763.20 | (199,329.33) | (149,529.26) | 17,394,283.10 | (1,771,930.80) | 15,622,352.30 |
| 8/31/2017 | 7,062.16 | | (142,467.10) | 15,622,352.30 | | 15,622,352.30 |
| 9/30/2017 | 35,310.80 | | (107,156.30) | 15,622,352.30 | | 15,622,352.30 |
| 10/31/2017 | 36,487.82 | | (70,668.48) | 15,622,352.30 | | 15,622,352.30 |
| 11/30/2017 | 35,310.80 | | (35,357.68) | 15,622,352.30 | | 15,622,352.30 |
| 12/21/2017 | 24,717.56 | (10,640.13) | (10,640.13) | 15,622,352.30 | (1,500,000.00) | 14,122,352.30 |
| 12/31/2017 | 10,640.13 | | 0.00 | 14,122,352.30 | | 14,122,352.30 |
| 1/31/2018 | 32,984.40 | | 32,984.40 | 14,122,352.30 | | 14,122,352.30 |
| 2/28/2018 | 29,792.36 | | 62,776.76 | 14,122,352.30 | | 14,122,352.30 |
| 3/31/2018 | 32,984.40 | | 95,761.16 | 14,122,352.30 | | 14,122,352.30 |
| 4/30/2018 | 31,920.39 | | 127,681.54 | 14,122,352.30 | | 14,122,352.30 |
| 5/31/2018 | 32,984.40 | (160,665.94) | 0.00 | 14,122,352.30 | 160,665.94 | 14,283,018.24 |
| 6/30/2018 | 32,283.53 | | 32,283.54 | 14,283,018.24 | | 14,283,018.24 |
| 7/31/2018 | 33,359.65 | | 65,643.19 | 14,283,018.24 | | 14,283,018.24 |
| 8/31/2018 | 33,359.65 | | 99,002.84 | 14,283,018.24 | | 14,283,018.24 |
| 9/30/2018 | 32,283.53 | | 131,286.37 | 14,283,018.24 | | 14,283,018.24 |
| 10/8/2018 | 8,608.94 | (412,000.00) | (272,104.68) | 14,283,018.24 | (588,000.00) | 13,695,018.24 |
| 10/31/2018 | 23,731.78 | | (248,372.91) | 13,695,018.24 | | 13,695,018.24 |
| 11/30/2018 | 30,954.49 | | (217,418.41) | 13,695,018.24 | | 13,695,018.24 |
| 12/31/2018 | 31,986.31 | | (185,432.10) | 13,695,018.24 | | 13,695,018.24 |
| 1/31/2019 | 31,986.31 | | (153,445.79) | 13,695,018.24 | | 13,695,018.24 |
| 2/28/2019 | 28,890.86 | | (124,554.93) | 13,695,018.24 | | 13,695,018.24 |
| 3/5/2019 | 5,159.08 | (37,904.91) | (157,300.76) | 13,695,018.24 | (977,095.09) | 12,717,923.15 |
| 3/31/2019 | 24,913.19 | | (132,387.57) | 12,717,923.15 | | 12,717,923.15 |
| 4/30/2019 | 28,745.99 | | (103,641.58) | 12,717,923.15 | | 12,717,923.15 |
| 5/31/2019 | 29,704.19 | | (73,937.39) | 12,717,923.15 | | 12,717,923.15 |
| 6/30/2019 | 28,745.99 | | (45,191.40) | 12,717,923.15 | | 12,717,923.15 |
| 7/31/2019 | 29,704.19 | | (15,487.21) | 12,717,923.15 | | 12,717,923.15 |
| 8/9/2019 | 8,623.80 | | (6,863.41) | 12,717,923.15 | (550,000.00) | 12,167,923.15 |
| 8/21/2019 | 11,001.14 | (4,137.73) | (0.00) | 12,167,923.15 | (5,595,862.27) | 6,572,060.88 |
| 8/31/2019 | 4,951.55 | | 4,951.55 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2019 | 14,854.66 | | 19,806.21 | 6,572,060.88 | | 6,572,060.88 |
| 10/15/2019 | 7,427.33 | | 27,233.54 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2019 | 7,922.48 | | 35,156.02 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2019 | 14,854.66 | | 50,010.68 | 6,572,060.88 | | 6,572,060.88 |
| 12/30/2019 | 14,854.66 | (65,360.49) | (495.15) | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2019 | 495.16 | | 0.00 | 6,572,060.88 | | 6,572,060.88 |
| 1/31/2020 | 15,349.81 | | 15,349.82 | 6,572,060.88 | | 6,572,060.88 |
| 2/29/2020 | 14,359.50 | | 29,709.32 | 6,572,060.88 | | 6,572,060.88 |
| 3/31/2020 | 15,349.81 | | 45,059.13 | 6,572,060.88 | | 6,572,060.88 |
| 4/30/2020 | 14,854.66 | | 59,913.79 | 6,572,060.88 | | 6,572,060.88 |
| 5/31/2020 | 15,349.81 | | 75,263.60 | 6,572,060.88 | - | 6,572,060.88 |
| 6/30/2020 | 14,854.66 | | 90,118.26 | 6,572,060.88 | | 6,572,060.88 |
| 7/31/2020 | 15,349.81 | | 105,468.08 | 6,572,060.88 | | 6,572,060.88 |
| 8/31/2020 | 15,349.81 | | 120,817.89 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2020 | 14,854.66 | | 135,672.55 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2020 | 15,349.81 | | 151,022.36 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2020 | 14,854.66 | | 165,877.02 | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2020 | 15,349.81 | | 181,226.83 | 6,572,060.88 | | 6,572,060.88 |
| 1/21/2021 | 10,398.26 | (181,226.83) | 10,398.26 | 6,572,060.88 | | 6,572,060.88 |

**App. 25**

# Exhibit B

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:     The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

DEFENDANT 000037

# THE DUGABOY INVESTMENT TRUST
## Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

      I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

      This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

**App. 28**

**DEFENDANT 000038**

### RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____        10/12/2015
Family Trustee                                          Date

STATE OF TEXAS                  §
COUNTY OF DALLAS            §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

**App. 29**

**DEFENDANT 000039**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this ___13th___ day of October, 2015.

_Nancy Marie Dondero_
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ___14th___ day of October, 2015.

_Micaela Sue Allen_
Notary Public's Signature

**MICAELA SUE ALLEN**
Notary Public, State of Texas
My Commission Expires
**January 15, 2019**

[SEAL]

Expiration: _January 15, 2019_

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

DEFENDANT 000041

# Exhibit C

TRUST AGREEMENT

Between

DANA SCOTT BREAULT,
Settlor

and

JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees

THE DUGABOY INVESTMENT TRUST

WINSTEAD PC
DALLAS, TEXAS

DEFENDANT 000001

THE DUGABOY INVESTMENT TRUST

TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS ...........................................................................................1
    1.1    Settlor...............................................................................................1
    1.2    Jim....................................................................................................1
    1.3    Trustees...........................................................................................1
    1.4    Children...........................................................................................1
    1.5    Descendants ....................................................................................1
    1.6    Code ................................................................................................1
    1.7    Per Stirpes ......................................................................................1

ARTICLE II FUNDING ................................................................................................2

ARTICLE III DISTRIBUTION OF PRINCIPAL AND INCOME .............................2
    3.1    Trust for Jim....................................................................................2
    3.2    Trust for Child.................................................................................5
    3.3    Trusts for Descendants....................................................................6
    3.4    Contingent Distribution ..................................................................9
    3.5    General Power of Appointment for Certain Beneficiaries................9
    3.6    Postponement of Distribution ........................................................10

ARTICLE IV PROVISIONS AFFECTING DISTRIBUTION ................................10
    4.1    Withdrawal Right............................................................................10
    4.2    Restriction Upon Alienation ..........................................................12
    4.3    Distributions Constitute Separate Property....................................12
    4.4    Method of Payment........................................................................12
    4.5    Evidence of Need ...........................................................................12
    4.6    Termination of Small Trust............................................................12
    4.7    Generation-Skipping Transfer Taxes and Payment .......................13

ARTICLE V THE TRUSTEE .......................................................................................13
    5.1    Resignation of Trustee ...................................................................13
    5.2    Appointment and Succession of Trustees.......................................14
    5.3    Removal of Trustee.........................................................................16
    5.4    Succession of Corporate Trustee ...................................................16
    5.5    Trustee's Fees ................................................................................16
    5.6    Bond................................................................................................16
    5.7    Liability of Trustee. .......................................................................16
    5.8    Predecessor Fiduciary ...................................................................18
    5.9    Periodic Accounting.......................................................................18
    5.10   Beneficiary under Disability ..........................................................19
    5.11   Incapacity of Individual Trustee ....................................................19

ARTICLE VI TRUST ADMINISTRATION .................................................................19

App. 34

DEFENDANT 000002

TABLE OF CONTENTS
(Continued)

PAGE

6.1 General Powers ............................................................................................19
6.2 Division of Powers........................................................................................24
6.3 Merger of Trusts ...........................................................................................25
6.4 Certain Powers and Rights Limited .............................................................25
6.5 GST Inclusion Ratio .....................................................................................25
6.6 Out-of-State Properties .................................................................................25
6.7 Management of Real Property ......................................................................26
6.8 No Court Supervision ...................................................................................26
6.9 Division of Trusts .........................................................................................26
6.10 Limitation of Powers.....................................................................................26
6.11 Dealing with Fiduciaries...............................................................................27

ARTICLE VII IRREVOCABILITY..............................................................................27

ARTICLE VIII MISCELLANEOUS PROVISIONS.....................................................28
8.1 Applicable Law.............................................................................................28
8.2 Perpetuities Provision ..................................................................................28
8.3 Gestation ......................................................................................................28
8.4 Survivorship..................................................................................................29
8.5 Release of Powers and Interests...................................................................29
8.6 Powers of Appointment.................................................................................29
8.7 Liability of Third Party .................................................................................30
8.8 Use of Words ................................................................................................30
8.9 Unenforceable Provision...............................................................................30
8.10 Titles, Headings, and Captions ....................................................................30
8.11 Counterpart Signatures.................................................................................30
8.12 Trust Name....................................................................................................30

App. 35

DEFENDANT 000003

THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this ____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

ARTICLE I

DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1     Settlor. "Settlor" means DANA SCOTT BREAULT.

1.2     Jim. "Jim" means JAMES D. DONDERO.

1.3     Trustees. The initial Trustee of each trust created hereunder is JAMES D. DONDERO. "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number. "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c). "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a). The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4     Children. "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5     Descendants. "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6     Code. "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7     Per Stirpes. "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant. The per

App. 36

DEFENDANT 000004

stirpital allocation shall commence with the most senior generation that has a living representative.

<div align="center">ARTICLE II</div>

<div align="center">FUNDING</div>

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

<div align="center">ARTICLE III</div>

<div align="center">DISTRIBUTION OF PRINCIPAL AND INCOME</div>

3.1     Trust for Jim.  The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)     Distributions to Jim.  The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health.  Undistributed income shall be accumulated and added to principal.  In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)     Jim is the primary beneficiary of the trust.

(ii)     The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)     Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)     Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)     Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)     Distributions by Independent Trustee.  The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable.  It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

App. 37

DEFENDANT 000005

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)    Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)    Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)    If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

App. 38
DEFENDANT 000006

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii)     The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e)     <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i)     <u>Pursuant to General Testamentary Power of Appointment</u>. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii)     <u>Special Testamentary Power of Appointment</u>. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii)     <u>Alternative Disposition</u>. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1)     If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

App. 39

DEFENDANT 000007

(2) If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2 <u>Trust for Child</u>. All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a) <u>Distributions to Child</u>. The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The Child's standard of living at the creation of the trust.

(ii) The Child is the primary beneficiary of the trust.

(iii) The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv) Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b) <u>Distributions to Child's Descendants</u>. The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The primary purpose of the trust.

(ii) The respective needs of each Descendant.

(iii) The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv) Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

App. 40
DEFENDANT 000008

(v) Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c) <u>Inter Vivos Special Power of Appointment</u>. The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d) <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate. The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof. If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, <u>Per Stirpes</u>. If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms. If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3 <u>Trusts for Descendants</u>. The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

-6-

DEFENDANT 000009

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

      (a)     Distributions. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)     The Beneficiary's standard of living at the creation of the trust.

          (ii)     The Beneficiary is the primary beneficiary of the trust.

          (iii)     The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

          (iv)     Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

          (v)     Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

      (b)     Distributions to Beneficiary's Descendants. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)     The primary purpose of the trust.

          (ii)     The respective needs of each Descendant.

          (iii)     The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

          (iv)     Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

          (v)     Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

App. 42

DEFENDANT 000010

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)     Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

-8-

**App. 43**

**DEFENDANT 000011**

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4     <u>Contingent Distribution</u>.  If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5     <u>General Power of Appointment for Certain Beneficiaries</u>.

(a)     Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition.  Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees shall make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable.  As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b)     If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

App. 44
DEFENDANT 000012

        (c)     The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6    <u>Postponement of Distribution</u>.   Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property. At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate. During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education. If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

## ARTICLE IV

## PROVISIONS AFFECTING DISTRIBUTION

4.1    <u>Withdrawal Right</u>.  Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer. A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust. If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes. Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

        (a)    <u>Amount That May Be Withdrawn</u>. When a contribution is made, Jim may withdraw the lesser of the following amounts:

            (i)    the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

            (ii)    the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

App. 45

DEFENDANT 000013

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

(iii)     the value of the contribution that is subject to the withdrawal right.

(b)     <u>Withdrawal Period and Notice</u>.  Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right.  Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right.  During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf.  If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse.  For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate.  The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

(c)     <u>Payment of Withdrawal Amount</u>.  If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor.  Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust.  Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose.  Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

(d)     <u>Distributions During Withdrawal Period</u>.  If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

(e)     <u>Lapse of Withdrawal Right</u>.  In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

App. 46

DEFENDANT 000014

4.2 <u>Restriction Upon Alienation</u>. No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it. Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts. The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process. The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3 <u>Distributions Constitute Separate Property</u>. Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary. Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary. Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4 <u>Method of Payment</u>. The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways: directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability. In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto. The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5 <u>Evidence of Need</u>. In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs. The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6 <u>Termination of Small Trust</u>. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration. In the event of termination, the Trustee shall distribute the trust to the income

App. 47

DEFENDANT 000015

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7     Generation-Skipping Transfer Taxes and Payment.  It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1     Resignation of Trustee.  The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

-13-

DEFENDANT 000016

5.2     Appointment and Succession of Trustees.

    (a)     Generally.

        (i)     Family Trustee. Jim is the initial Family Trustee of all trusts created hereunder. If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising. If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee. If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee. If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)     Independent Trustee. GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee. If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code. If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee. If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)     Administrative Trustee. COMMONWEALTH TRUST COMPANY is the initial Administrative Trustee. If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising. If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising. If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above. The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

App. 49

DEFENDANT 000017

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b)     Successor Trustee. If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c)     Manner of Appointment; Permissible Trustees. Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

App. 50
DEFENDANT 000018

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3     Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4     Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5     Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6     Bond. The Trustee shall not be required to furnish bond or other security.

5.7     Liability of Trustee.

(a)     Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)     Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

-16-

**App. 51**

**DEFENDANT 000019**

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

App. 52

DEFENDANT 000020

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8     Predecessor Fiduciary.  No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9     Periodic Accounting.  The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

App. 53
DEFENDANT 000021

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10    Beneficiary under Disability. A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11    Incapacity of Individual Trustee. In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

ARTICLE VI

TRUST ADMINISTRATION

6.1    General Powers. Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)    Retain Property. To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)    Invest. To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)    Sell. By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

App. 54
DEFENDANT 000022

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d)     Lease.  To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e)     Real Estate.  To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f)     Borrow.  To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g)     Loans.  To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h)     Conserve Estate.  To take any action to conserve the trust estate.

(i)     Litigation.  To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j)     Claims.  To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k)     Abandon Property.  To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l)     Documents.  To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m)     Agents.  To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

App. 55
DEFENDANT 000023

(n)    <u>Securities</u>.    To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o)    <u>Nominee</u>.    To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p)    <u>Additional Property</u>.    To receive additional property from any source and add it to the trust estate.

(q)    <u>Insurance</u>.    To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r)    <u>Business Powers</u>.

(i)    <u>In General</u>.    To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii)    <u>Closely Held Businesses</u>.    This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1)    <u>Exoneration from Liability</u>.    It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2)    <u>Management Powers</u>.    The Family Trustee shall have the exclusive duty to deal with and manage the business. In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A)    To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

App. 56

DEFENDANT 000024

(B)     To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)     To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)     To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)     To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)     To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)     To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or  a fiduciary of this Trust; and

(3)     <u>Exclusion from Powers</u>.   Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)     <u>Income and Principal</u>.  To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)     <u>Tax Elections</u>.  To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others.  The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

-22-

App. 57

DEFENDANT 000025

(u) <u>Reliance</u>. To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution. The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v) <u>Commingling</u>. To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w) <u>Division and Distribution</u>. To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x) <u>Withholding of Distribution</u>. To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y) <u>Mineral Powers</u>. To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z) <u>Environmental Hazards</u>. To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

App. 58

DEFENDANT 000026

(aa)   Miscellaneous Powers.  Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2   Division of Powers.  The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a)   Administrative Trustee.  The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i)   To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii)   To maintain storage of tangible personalty and evidence of intangible trust property.

(iii)   To maintain trust records.

(iv)   To maintain an office for Trustee meetings and other trust business.

(v)   To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi)   To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii)   To execute documents with respect to trust account transactions.

(viii)   To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b)   Independent Trustee.  The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement.  These powers may only be exercised by the Independent Trustee.

(c)   Family Trustee.  The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee.  Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate.  If there is no Family Trustee serving,

-24-

App. 59

DEFENDANT 000027

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3   <u>Merger of Trusts</u>. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4   <u>Certain Powers and Rights Limited</u>. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5   <u>GST Inclusion Ratio</u>. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6   <u>Out-of-State Properties</u>. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

App. 60

DEFENDANT 000028

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7 <u>Management of Real Property</u>. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8 <u>No Court Supervision</u>. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9 <u>Division of Trusts</u>. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

(a) <u>Division and Funding of Separate Trusts</u>. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

(b) <u>Administration of Separate Trusts</u>. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

(c) <u>Powers of Appointment</u>. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10 <u>Limitation of Powers</u>. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

App. 61

DEFENDANT 000029

(a)    <u>Support Duty</u>. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b)    <u>Adequacy of Consideration</u>. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c)    <u>Insurance</u>. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d)    <u>Borrow</u>. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e)    <u>Substitute Property</u>. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f)    <u>Vote</u>. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11   <u>Dealing with Fiduciaries</u>. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

<div align="center">ARTICLE VII</div>

<div align="center"><u>IRREVOCABILITY</u></div>

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

App. 62

DEFENDANT 000030

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1 <u>Applicable Law</u>. The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware. However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state. No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust. Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2 <u>Perpetuities Provision</u>. The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law. If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property. If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement. Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3 <u>Gestation</u>. A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

App. 63

DEFENDANT 000031

8.4 <u>Survivorship</u>. Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5 <u>Release of Powers and Interests</u>. Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law. Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6 <u>Powers of Appointment</u>.

(a) <u>Capacity in Which Exercisable</u>. Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b) <u>Manner of Appointment</u>. Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others. Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c) <u>Exercise of Inter Vivos Power</u>. An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it. If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d) <u>Determination of the Exercise of a Testamentary Power</u>. The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised. If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

-29-

App. 64

DEFENDANT 000032

(e)     Tax Consequences.  The exercise of a power of appointment may have important tax consequences.  The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7     Liability of Third Party.  No person paying money or delivering property to the Trustee need see to the application of such money or property.  No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8     Use of Words.  As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9     Unenforceable Provision.   If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10    Titles, Headings, and Captions.  All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11    Counterpart Signatures.  This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12    Trust Name.  The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals.  The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement.  The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

App. 65

DEFENDANT 000033

_Dana Scott Breault_ 23 Oct 10

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS      §
                        §
COUNTY OF DALLAS    §

BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23rd day of October, 2010.

Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

_____

JAMES D. DONDERO, Family Trustee

| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____

Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

-32-

DEFENDANT 000035

COMMONWEALTH TRUST COMPANY,
Administrative Trustee

By: _Cynthia D M Brown_
    Name:   Cynthia D. M. Brown
    Title:   President

STATE OF DELAWARE     §
                      §

COUNTY OF NEW CASTLE     §

    BEFORE ME, the undersigned authority on this day personally appeared
Cynthia D. M. Brown , President , known to me to be the person and officer
whose name is subscribed to the foregoing instrument and acknowledged to me that he/she
executed the same for the purposes and consideration therein expressed as the act of
COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

                                              November _LMB_
    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of ~~October~~, 2010.

                          _Laura M Owens_
                          Notary Public

5480300v.6 47609/1

LAURA M. OWENS
MY COMMISSION
EXPIRES
MAY 30, 2014
NOTARY PUBLIC
STATE OF DELAWARE

**App. 68**

**DEFENDANT 000036**

## THE DUGABOY INVESTMENT TRUST
### James D. Dondero, Family Trustee

August 26, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:   The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on August 26, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "Trust") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee, I appoint Grant James Scott as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

James D. Dondero

DEFENDANT 000042

## RESIGNATION OF FAMILY TRUSTEE

I, **JAMES D. DONDERO**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

I appoint **GRANT JAMES SCOTT** as the successor Family Trustee. This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein Grant James Scott accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          8.26.15
Family Trustee                          Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **JAMES D. DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.

_____
Notary Public's Signature

**MICAELA SUE ALLEN**
Notary Public, State of Texas
My Commission Expires
January 15, 2019
[SEAL]

Expiration: _1-15-2019_

**DEFENDANT 000043**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this _26 th_ day of August, 2015.

 

 

_____
GRANT JAMES SCOTT
**Family Trustee**

 

STATE OF T~~EXAS~~ *NC* §
COUNTY OF D~~ALLAS~~ §
     *WAKE*

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26 th_ day of August, 2015.



[SEAL]

_____
Notary Public's Signature

MY COMMISSION EXPIRES MAY **17, 2018**

Expiration:_____

DEFENDANT 000044

### ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee was delivered to and received by me on August 26 2015.

James D. Dondero

DEFENDANT 000045

# Exhibit D

## BONDS ELLIS EPPICH SCHAFER JONES LLP
### ATTORNEYS & COUNSELORS

D. MICHAEL LYNN | D: 817.405.6915 | MICHAEL.LYNN@BONDSELLIS.COM

February 1, 2021

***Via Email and First Class Mail:***
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

Re:    **Highland Capital Management, L.P.: notes receivable from Dondero et al.**

Dear Jeff:

The Debtor recently commenced suit to collect on certain notes payable to it executed by Mr. Dondero and certain of his affiliates. As you are aware, in addition to other defenses, Mr. Dondero views the notes in question as having been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.

Please ensure that any transferee of any of the notes is made aware of Mr. Dondero's position and that the Independent Board receives copies of this letter. I thank you in advance for your cooperation in this matter.

Sincerely,

D. Michael Lynn

Cc:    Jim Dondero
       John Bonds
       Douglas Draper
       Davor Rukavina
       Lee Hogewood
       John Kane
       Jason Rudd
       Lauren Drawhorn

Confidential                                                                    DEFENDANTS-0000435

# Exhibit E

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:** **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

**App. 76**

ACL-001587

# EXHIBIT 2

CORE/9990000.7726/157590134.1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03004-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005-sgj |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03006-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Adv. Proc. No. 21-03007-sgj |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| vs. | § | |
| | § | |
| HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF NANCY M. DONDERO

I, Nancy Marie Dondero, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.       I reside in Vero Beach, Florida and am over the age of 21. The following facts are based on my personal knowledge and are all true and correct. I am willing and able to testify about these matters if and when called upon to do so.

2.       I have successfully owned and operated my own private investigation services business for over 30 years. I also have an undergraduate college degree from Pennsylvania State University, which included the study of basic business operations and management.

3.       I am also the Family Trustee of The Dugaboy Investment Trust ("Dugaboy"), and I have held that position since October 2015. A true and correct copy of the document appointing me as Family Trustee is attached to this Declaration as Exhibit A. At the times that the notes discussed below were entered into, Dugaboy owned and represented a majority of the Class A shareholders in Highland Capital Management, L.P. ("Highland Capital"). Jim Dondero is my brother and was, at that time, the President and CEO of Highland Capital. I understood that he was one of the founders of Highland Capital and, through The Dugaboy Investment Trust, a majority interest holder.

4.       Jim Dondero told me about his current and previous annual salaries at Highland Capital and explained that he was substantially underpaid as compared to other senior executives in the financial services industry. He told me that his annual salary from Highland Capital had been around $500,000 to $700,000 during the preceding several years. I had no reason to doubt the accuracy of what he told me about his compensation from Highland Capital or how that compared unfavorably to the compensation of others in similar positions with other companies in

the industry.

5.        Jim Dondero also advised me that he and certain of his affiliated companies had, on several occasions between 2013 and 2019, borrowed money from Highland Capital and had issued demand and term promissory notes in favor of Highland Capital regarding those loans.  He proposed that Highland Capital enter into an agreement with him and the other borrowers to forgive the Notes upon the occurrence of certain conditions subsequent, as a form of additional contingent compensation to him.

6.        In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control.  I fully understood the implications and terms of this Agreement.

7.        At either the end of 2018 or the beginning of 2019, Jim Dondero and I later entered into the same Agreement to apply to subsequent notes that were issued by him or one of his affiliated companies to Highland Capital in 2018.  I also fully understood the implications and terms of this Agreement.

8.        At either the end of 2019 or the beginning of 2020, Jim Dondero and I again entered into the same agreement to cover and apply to the notes at issue in this litigation that were issued in 2019.  All the Notes referenced herein are collectively referred to as the "Notes," and the agreements between Highland Capital and Jim regarding all of the Notes are collectively referred to herein as the "Agreements**.**"  I also fully understood the implications and terms of these

Agreements.  The Notes are as follows:

i.   A demand note executed on February 2, 2018, between Highland Capital and Jim Dondero in the amount of $3,825,000.[1]

ii.   A demand note executed on August 1, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[2]

iii.   A demand note executed on August 13, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[3]

iv.   A demand note executed on March 28, 2018, between Highland Capital and Highland Capital Management Services, Inc. ("HCMS") in the amount of $150,000.[4]

v.   A demand note executed on June 25, 2018, between Highland Capital and HCMS in the amount of $200,000.[5]

vi.   A demand note executed on May 29, 2019, between Highland Capital and HCMS in the amount of $400,000.[6]

vii.   A demand note executed on June 26, 2019, between Highland Capital and HCMS in the amount of $150,000.[7]

viii.   A demand note executed on October 12, 2017, between Highland Capital and HCRE Partners, LLC ("HCRE") in the amount of $2,500,000.[8]

ix.   A demand note executed on October 15, 2018, between Highland Capital and

---

[1] Pl. Appx. 00678-679.
[2] Pl. Appx. 00681-682.
[3] Pl. Appx. 00684-685.
[4] Pl. Appx. 00118-119.
[5] Pl. Appx. 00121-122.
[6] Pl. Appx. 00124-125.
[7] Pl. Appx. 00127-128.
[8] Pl. Appx. 00205-206.

*ACTIVE 48197723v1*

HCRE in the amount of $750,000.[9]

x.    A demand note executed on September 25, 2019, between Highland Capital and HCRE in the amount of $900,000.[10]

xi.    A term note executed on May 31, 2017, between Highland Capital and NexPoint Advisors, L.P. ("NexPoint"), in the amount of $30,746,812.33.[11]

xii.    A term note executed on May 31, 2017, between Highland Capital and HCMS in the amount of $20,247,628.02.[12]

xiii.    A term note executed on May 31, 2017, between Highland Capital and HCRE in the amount of $6,059,831.51.[13]

9.    At the time I caused Highland Capital to enter into each of the Agreements, I knew that Highland Capital was a hedge fund and that its general partner was Strand Advisors, Inc. I also knew that Highland Capital owned an interest in each of Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements. I also knew that Highland Capital's business included buying and selling portfolio companies at a profit. I also knew and believed that Jim would be the person most involved in, and responsible for, the marketing and eventual sale of Cornerstone, MGM, and Trussway by Highland Capital. I also knew and believed that executives in the financial services industry tend to be paid more when the companies they work for perform better.

10.    The Agreements had two primary purposes, both of which would benefit Highland Capital's performance and reputation. First, the Agreements would provide additional incentive

---

[9] Pl. Appx. 00208-209.
[10] Pl. Appx. 00211-212.
[11] Pl. Appx. 00042-43.
[12] Pl. Appx. 00134-135.
[13] Pl. Appx. 00218-219.

*ACTIVE 48197723v1*

and motivation to Jim Dondero to attempt to maximize the value and return to Highland Capital on Trussway, Cornerstone, and MGM, and to remain in Plaintiff's employment. Second, the Agreements would allow Highland Capital to contingently increase Jim Dondero's compensation without requiring additional cash or salary to be paid to him and the consequential effect of such an increase on Highland Capital's financial position.

11.     At the time I caused Highland Capital to enter into each of the Agreements, I did not know every detail about every aspect of Highland Capital's business or the Notes. However, I did have all of the facts and information I considered necessary, appropriate, and reasonable for my decision (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into each of the Agreements. I do not believe that Highland Capital, Dugaboy, or I were deceived or mislead in any manner by Jim Dondero or anyone else regarding the Notes or any of the Agreements.

12.     At the time I caused Highland to enter into each of the Agreements, I appreciated the effect of what I was doing and I understood the nature and consequences of those acts. I was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment.

13.     At the time I caused Highland Capital to enter into each of the Agreements, I believed I had the authority, as the Dugaboy Family Trustee, to cause Dugaboy to cause Highland Capital to enter into the Agreements. I also intended, believed, and expected that each of the Agreements would be a binding and enforceable agreement between Highland Capital and Jim Dondero.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20 , 2022.

Nancy M. Dondero

# Exhibit A

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

     I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

     Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

     This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

DEFENDANT 000037

## THE DUGABOY INVESTMENT TRUST
### Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

DEFENDANT 000038

### RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____     10/12/2015
Family Trustee                      Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _14th_ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Notary Public's Signature

[SEAL]

Expiration: _January 15, 2019_

DEFENDANT 000039

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS          §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

**DEFENDANT 000040**

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October ___, 2015.

_____
James D. Dondero

DEFENDANT 000041

# EXHIBIT 3

CORE/9990000.7726/157590134.1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| --- | --- | --- |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § | |
| | § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Adv. Proc. No. 21-03007-sgj** |
| | § | |
| **Plaintiff,** | § | |
| **vs.** | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1.     I am a member of the law firm of Stinson LLP, counsel to Defendant James Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC n/k/a NexPoint Real Estate Partners, LLC, and I submit this Declaration in support of the *Defendants' Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, which

is being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and the documents listed below.

2.      Attached as **Exhibit A** is a true and correct copy of the Transcript of the Video Deposition of James P. Seery, Jr. taken on October 21, 2021 in Adv. Proc. No. 21-03005.

3.      Attached as **Exhibit** B is a true and correct copy of the Transcript of the Remote Deposition of Bruce McGovern taken on November 9, 2021 in Adv. Proc. No 21-03003.

4.      Attached as **Exhibit C** is a true and correct copy of a List of Promissory Notes, bates labeled DEFENDANTS-0000434, that was used by Mr. Dondero at his deposition and produced to Plaintiff.

5.      Attached as **Exhibit D** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated November 25, 2020.

6.      Attached as **Exhibit E** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated December 31, 2020.

7.      ███████████████████████████████████████████████
███████████████████████

8.      Attached as **Exhibit G** is a true and correct copy of the Expert Report of Alan M. Johnson, dated May 28, 2021.

9.      Attached as **Exhibit H** is a true and correct copy of Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021.

Dated:  January 20, 2022                    */s/Michael P. Aigen*
                                             Michael P. Aigen

# Exhibit A

1

2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION

4    In re:                        )
                                   ) Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT, L.P.) Case No.
                                   ) 19-34054-sqj11
6                 Debtor.          )
     ------------------------------- )
7                                  )
     HIGHLAND CAPITAL MANAGEMENT, L.P.)
8                                  )
                  Plaintiff,       )
9                                  )
         -vs-                      ) Adversary
10                                 ) Proceeding No.
     NEXPOINT ADVISORS, L.P., JAMES )  21-03005-sgj
11   DONDERO, NANCY DONDERO, AND THE )
     DUGABOY INVESTMENT TRUST,      )
12                                 )
                  Defendants.      )
13   -------------------------------

14

15

16      VIDEO DEPOSITION OF JAMES P. SEERY, JR.

17              New York, New York

18          Thursday, October 21, 2021

19

20

21

22

23

24   Reported by:
     MARIANNE WITKOWSKI-SMITH
25   JOB NO. 201192

Page 2

October 21, 2021

2:02 p.m.

Video Deposition of JAMES P. SEERY, JR., individually and on behalf of HIGHLAND CAPITAL MANAGEMENT LP, held at the offices of Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, New York, New York, before Marianne Witkowski-Smith, a Shorthand Reporter and Notary Public of the State of New York.

---

Page 3

A P P E A R A N C E S:

PACHULSKI STANG ZIEHL & JONES
Attorneys for Highland Capital Management LP and the Witness

780 Third Avenue

New York, New York 10017

BY: JOHN MORRIS, ESQ.

GREGORY DEMO, ESQ.

HAYLEY WINOGRAD, ESQ.

MUNSCH HARDT KOPF & HARR

Attorneys for NexPoint Advisors LP

500 North Akard Street

Dallas, Texas 75201

BY: DAVOR RUKAVINA, ESQ.

THOMAS BERGHMAN, ESQ.

(Continued on Next Page)

---

Page 4

A P P E A R A N C E S (Cont'd):

STINSON
Attorneys for James Dondero, Nancy Dondero, HCRE, HCMS

3102 Oak Lawn Avenue

Dallas, Texas 75219

BY: DEBORAH DEITSCH-PEREZ, ESQ.

MICHAEL AIGEN, ESQ.

HELLER, DRAPER, HAYDEN, PATRICK, & HORN

Attorneys for The Dugaboy Investment Trust

650 Poydras Street

New Orleans, Louisiana 70130

BY: WARREN HORN, ESQ.

ALSO PRESENT:
MANUEL GARCIA, Legal Video Specialist
THANHAN NGUYEN, ESQ. (Via Zoom)
AARON LAWRENCE, ESQ. (Via Zoom)
LA ASIA CANTY (Via Zoom)

---

Page 5

J. Seery

VIDEO TECHNICIAN: This is the start of Media Label No. 1 in the video-recorded deposition of James P. Seery Jr., in the matter of Highland Capital Management LP vs. NexPoint Advisors LP, et al., on October the 21st, 2021, at approximately 2:02 p.m.

My name is Manuel Garcia. I'm the certified legal videographer from TSG Reporting Inc. The court reporter is Marianne Smith, in association with TSG Reporting.

Counsel, please introduce yourselves.

MR. RUKAVINA: My name is Davor Rukavina. I represent NexPoint Advisors LP.

MR. MORRIS: My name is John Morris from Pachulski Stang Ziehl & Jones, on behalf of Capital -- Highland Capital Management LP, and I'm representing the witness, James P. Seery, Jr., today.

MS. DEITSCH-PEREZ: Hi. This is

Page 6

J. Seery

1
2    Deborah Deitsch-Perez from Stinson LLP.
3    I'm on with my partner, Michael Aigen,
4    also from Stinson.  We're representing
5    James Dondero, Nancy Dondero, HCRE and
6    HCMS.
7           MR. HORN:  Warren Horn
8    [inaudible].
9           (Reporter clarification.)
10          MR. HORN:  Warren Horn, H-O-R-N,
11   with Heller, Draper & Horn,
12   representing The Dugaboy Investment
13   Trust.
14          VIDEO TECHNICIAN:  Will the court
15   reporter please swear in the witness.
16   J A M E S   P.   S E E R Y,  J R.,
17   the witness herein, was thereupon duly
18   sworn by the Notary Public and was
19   examined and testified as follows:
20   EXAMINATION
21   BY MR. RUKAVINA:
22      Q.    Sir, good afternoon.
23            State your name, please.
24      A.    James P. Seery, Jr.
25      Q.    And just so we're clear, you have a

Page 7

J. Seery

1
2    laptop in front of you because this is being
3    done remotely as well, but you're not
4    reviewing any material or taking any
5    information or texts or emails like that, are
6    you?
7       A.    No.
8       Q.    Okay.  It's fair to say you've
9    been --
10      A.    I -- I have a phone in front of me,
11   but I don't intend to use it.
12      Q.    Okay.  Fair to say that you've been
13   deposed before?
14      A.    I have.
15      Q.    Approximately how many times?
16      A.    More -- more than twenty-five.
17      Q.    Okay.  And quite a number in this
18   case as well, correct?
19      A.    More than -- probably more than
20   fifteen.
21      Q.    Okay.  The only thing I'd ask -
22   you're -- you're a veteran - is I have an
23   accent and sometimes I talk fast, so don't --
24   don't hesitate to tell me that you didn't
25   understand or ask me to rephrase, please.

Page 8

J. Seery

1
2    Please don't hesitate to do that.
3       A.    Thank you.
4       Q.    Sir, just for the record, where do
5    you live?
6       A.    I live in New York City, Upper West
7    Side.
8       Q.    Do you have any real estate or
9    property that -- where you live periodically
10   in the State of Texas?
11      A.    No.
12      Q.    Okay.  Other than your work for
13   Highland here, do you have any business
14   calling that takes you to the State of Texas
15   on a regular basis?
16      A.    No.
17          MR. RUKAVINA:  Okay.  We'll mark
18      as Exhibit 1 the Notice of 30(b)(6).
19          (Brief off-record discussion.)
20          (Exhibit 1, Notice of
21      Deposition/Seery, marked for
22      identification, as of this date.)
23      Q.    Mr. Seery, you've been handed
24   Exhibit 1.
25            Have you seen this document?

Page 9

J. Seery

1
2       A.    I believe I have, yes.
3       Q.    Okay.  And are you familiar with
4    the topics I've designated in here?
5           MR. MORRIS:  I think this is
6       missing a page.
7           THE WITNESS:  Going to 1 to 2
8       to --
9           MR. MORRIS:  The topics aren't in
10      this version.
11          MR. RUKAVINA:  Oh, I gave you the
12      wrong one; I apologize --
13          (Simultaneous speaking.)
14          MR. RUKAVINA:  I apologize, I
15      apologize.  Sir, that -- that's the one
16      that, that -- that Notices you
17      personally here today.  Let me try
18      again, and -- and Exhibit 2 will be the
19      30(b)(6).
20          (Exhibit 2, Notice of
21      Deposition/30(b)(6), marked for
22      identification, as of this date.)
23      Q.    Sir, have you seen Exhibit 2
24   before?
25      A.    I believe I have, yes.

Page 10

J. Seery

2    Q.   Okay. And subject to your
3 counsel's objections, which he sent to me by
4 email, are you prepared to testify on the
5 topics that are designated in here today?
6    A.   Yes.
7    Q.   Okay. And have you reasonably
8 informed yourself on those topics prior to
9 sitting here today?
10    A.   Yes.
11    Q.   Okay. Now, some background, and we
12 don't need to go into excruciating detail.
13          What is your educational
14 background?
15    A.   I have a BA in history. I have a
16 law degree, JD. And I've taken lots and lots
17 of courses.
18    Q.   And what university or college is
19 your history BA from?
20    A.   Colgate University.
21    Q.   Okay. And what university is your
22 JD from?
23    A.   New York Law School.
24    Q.   And when did you graduate New York
25 Law School and get your JD?

Page 11

J. Seery

2    A.   1990.
3    Q.   Okay. And what states have you
4 been licensed in as a lawyer?
5    A.   New York and Connecticut.
6    Q.   Are you currently licensed as a
7 lawyer?
8    A.   I believe I am.
9    Q.   Okay. Have you ever faced any
10 disciplinary proceedings as a lawyer?
11    A.   No.
12    Q.   With respect to bankruptcy cases,
13 can you give us a brief recitation of -- of
14 your relevant experience in administering
15 Chapter 11 or other bankruptcy estates?
16    A.   Administering, I -- I've been
17 involved or been an active player - either as
18 a lawyer, senior lawyer, investor, and in
19 this case an independent director and CRO -
20 in really my entire career, so I would say
21 hundreds.
22    Q.   Okay. Do you consider yourself an
23 expert on bankruptcy law?
24    A.   I'm pretty good.
25    Q.   Okay. And with respect to the

Page 12

J. Seery

Highland Capital Management LP bankruptcy
2 case, obviously the plan has been confirmed
3 and it's gone effective.
4
5         Before the plan went effective,
6 what was your role with the debtor?
7    A.   I was an independent director, and
8 subsequently I was appointed as the CRO and
9 CEO of Highland.
10    Q.   And approximately when did you
11 become an independent director?
12    A.   January 9, 2020.
13    Q.   And just to be clear, what entity
14 were you an independent director of?
15    A.   I was an independent director of
16 Strand Advisors, which was the GP of Highland
17 Capital Management LP and had control of
18 Highland Capital Management LP, which became
19 the debtor - or was the debtor.
20    Q.   And there were two other
21 independent directors, correct?
22    A.   There were, yes.
23    Q.   What were their names, sir?
24    A.   Russell Nelms and John Dubel.
25    Q.   Okay. And did the three of you --

Page 13

J. Seery

were the three of you independent directors
2 since January 9, 2020, until the plan became
3 effective?
4
5    A.   That's correct.
6    Q.   Were there any other people who,
7 during that time frame, were ever independent
8 directors?
9    A.   No.
10    Q.   Okay. And, sir, when did you
11 become the CEO and/or CRO?
12    A.   In July of 2020.
13    Q.   Okay. Prior to July of 2020, was
14 your role with Highland and Strand solely
15 that of an independent director?
16    A.   It -- it was. I effectively was, I
17 guess, probably the lead independent
18 director, just spent the most time -- I
19 shouldn't say the most time.
20         I spent a significant amount of
21 time on it, as did my fellow directors, but I
22 spent a significant amount of time.
23    Q.   And -- and Mr. Nelms, he was a
24 former bankruptcy judge?
25    A.   Yes.

J. Seery

1                J. Seery
2      Q.    Okay.  And Mr. Duval [ph], what
3  was, just briefly, his background to your
4  understanding?
5      A.    Dubel --
6      Q.    I'm sorry, Dubel.
7      A.    -- and he was a -- he's a very
8  experienced practitioner in distressed
9  corporate management and bankruptcy corporate
10 management.
11     Q.    Okay.  After the bankruptcy plan
12 became effective, what happened to the
13 debtor?
14         In other words, as a corporate
15 entity, what happened to the debtor?
16     A.    The debtor was reconstituted with a
17 new GP and new limited partnership units.
18     Q.    Okay.  And do you have any role
19 with respect to authority at the debtor
20 today?
21     A.    I do.
22     Q.    What is your role, sir?
23     A.    I'm the CEO.
24     Q.    The -- I'm sorry, the CEO?
25     A.    Yes.

1                J. Seery
2      Q.    Okay.  And you're also a
3  post-confirmation trustee, are you not?
4      A.    I am, yes.
5      Q.    And what are you the trustee of?
6      A.    The Claimant trustee.
7      Q.    Okay.  And what role does the
8  Claimant trustee, if any, have with the
9  reorganized debtor?
10     A.    The Claimant trustee is the
11 claimant -- is the trustee for the Claimant
12 Trust, which holds the limited partnership
13 units for the reorganized debtor.
14     Q.    Okay.  And does it also hold any
15 general partnership units for the reorganized
16 debtor?
17     A.    It holds the ownership interest in
18 the GP.
19     Q.    Okay.  Is it fair to say that --
20 that all economic value in the reorganized
21 debtor one way or the other inures to the
22 benefit of the Claimant Trust under the plan?
23     A.    It does effectively run up to the
24 Claimant Trust, yes.
25     Q.    And is it fair to say that you are

1                J. Seery
2  in charge of the reorganized debtor?
3      A.    I'm in charge of the reorganized
4  debtor and I'm in charge of the Claimant
5  Trust, but not all of the value runs through
6  me directly.
7      Q.    Because there's also a Litigation
8  Sub-Trust?
9      A.    That's correct, and that doesn't
10 report to me.
11     Q.    As far, sir -- let's just limit it
12 now to the debtor's post effective date
13 operations.
14         Are you the person in charge of
15 those operations?
16     A.    Yes.
17     Q.    Okay.  Are you -- and you said that
18 you're the CEO of the debtor.
19         Are there any other officers,
20 either at the debtor or its new GP, in
21 addition to you?
22     A.    Yes.
23     Q.    Who -- who, sir?
24     A.    Thomas Surgent is the general
25 counsel and David Klos is the CFO.

1                J. Seery
2      Q.    Okay.  And both Mr. Surgeon -- I'm
3  sorry, Surgent and Mr. Klos were previously
4  employed with the debtor prior to the
5  effective date?
6      A.    They were.
7      Q.    Okay.  So in July 2020, you
8  mentioned you became the CEO and CRO of the
9  debtor, correct?
10     A.    That's correct.
11     Q.    Okay.  And prior to that -- well,
12 obviously, you know who Mr. James Dondero is,
13 correct?
14     A.    I do.
15     Q.    Okay.  And part of what happened on
16 January 9, 2020, in summary, was that
17 Mr. Dondero, pursuant to his agreement and
18 Court order, was removed from controlling the
19 debtor.
20         Is that a fair summary?
21     A.    Certain --
22         MR. MORRIS:  Objection to the
23 form of the question.
24     A.    Certain -- certainly with respect
25 to the -- the corporate delegation of

Page 18

J. Seery

1  authority, yes.
2  Q.  Okay.  He stayed on as an employee,
3  but whatever he did - is it fair to say -
4  after January 9, 2020 would be subject to the
5  new independent board?
6  A.  I don't think that would be fair to
7  say.  I think from a corporate rule
8  perspective it would be.  I think he -- he,
9  subsequently, we learned, did quite a few
10  things without --
11  (Reporter clarification.)
12  THE WITNESS:  Subsequently we
13  learned he did quite a few things
14  without oversight by the independent
15  board.
16  BY MR. RUKAVINA:
17  Q.  Okay.  Can you give me an example
18  of what he did without oversight by the
19  independent board?
20  A.  He traded -- traded assets; he
21  managed the Select account on his own; he
22  didn't meet margins calls at direction that
23  the -- that the board, independent board, had
24  said to -- to meet; he tried to overrule me

Page 19

J. Seery

1  subsequently and later in the year on asset
2  sales that were being conducted out of
3  certain of the CLOs --
4  (Reporter clarification.)
5  THE WITNESS:  Asset sales -- I'm
6  sorry, asset sales out of certain of
7  the CLOs.
8  So there, there -- if we take time,
9  we can go through dozens.
10  BY MR. RUKAVINA:
11  Q.  Well, I get the general gist.  And
12  is it fair to say that those things that he
13  was doing, amongst others, is why the
14  independent board made you the CEO and CRO?
15  MR. MORRIS:  Objection to the
16  form of the question.
17  Q.  Let me rephrase the question.
18  Why, in July -- first of all, who
19  made you CEO and CRO in July of 2020?
20  A.  The independent board approved it
21  and then the Court approved it.
22  Q.  And you were on that independent
23  board, so you were one of the people that
24  approved it?

Page 20

J. Seery

1  MR. MORRIS:  Objection to the
2  form of the question.
3  A.  No, I would have abstained.
4  Q.  I apologize.
5  So the other two board members
6  approved it?
7  A.  Correct.
8  Q.  Okay.  Do you have an understanding
9  as to why they approved you becoming CEO and
10  CRO?
11  A.  We felt like the organization
12  needed a specific leader and a specific
13  direction.  Mr. Dondero's activities were
14  pulling many of the people in the business
15  multiple ways, and we felt that it was both
16  dangerous for the organization and dangerous
17  for the individuals.
18  Q.  Okay.  Between January 9, 2020 and
19  July 2020, when you became the CEO and CRO, what
20  should have, pursuant to the settlement and
21  Court agreement, Mr. Dondero's role at the
22  debtor have been?
23  MR. MORRIS:  Objection to the
24  form of the question --

Page 21

J. Seery

1  A.  He was --
2  MR. MORRIS:  -- and I just -- I
3  just want to note that I, I -- I don't
4  see how this is connected in any way to
5  the issues in the lawsuits.
6  I'll allow you to ask a few more
7  questions for background purposes, but
8  I -- I just want to note my concern that
9  we're running a little far afield.
10  But you can answer the question.
11  A.  Can you read back the question --
12  (Simultaneous speaking and
13  reporter interjection.)
14  Q.  Between January 9, 2020 and July
15  2020, whenever you became the CEO and CRO,
16  pursuant to the court approved settlement,
17  what should Mr. Dondero's role at the debtor
18  have been?
19  MR. MORRIS:  Objection to the
20  form of the question.
21  A.  I think you have to understand
22  the -- the settlement.  Mr. Dondero initially
23  agreed to be removed from all roles at the
24  debtor.  At the very last second he changed

Page 22

J. Seery

2 that and wanted to be put back in. I think
3 it probably had to do with -- with press
4 reports that he didn't like reading. So he
5 maintained an unpaid role as the portfolio
6 manager. The portfolio that he really
7 managed was the Select account.
8        What he should have done is he
9 should have taken direction. He should have
10 honored the margin calls that -- that
11 Jefferies had made, he should have sold
12 assets, he should have reported to the board.
13 He did none of those things.
14        He independently, then, ran
15 roughshod over certain parts of the
16 organization. He should not have done that.
17 And it was very difficult, with the existing
18 employees, to manage them with Mr. Dondero
19 there because they'd worked for him for a
20 number of years.
21    Q.    That was going to be my next
22 question.
23        Did you feel, prior to July 2020,
24 that some employees, some key employees, were
25 basically doing his bidding instead of what

Page 23

J. Seery

2 the independent board expected them to be
3 doing?
4    A.    I think we had -- we certainly had
5 concerns about that, yes.
6    Q.    And we'll round this off pretty
7 quickly.
8        Did there come a time when you
9 asked Mr. Dondero for his resignation?
10    A.    There did, yes.
11    Q.    And -- and did he give it?
12    A.    He did, yes.
13    Q.    And do you recall the date?
14    A.    It was in October of 2020.
15        MR. RUKAVINA: I have it in here
16    somewhere. I'm not sure that it's --
17    well, let's just put it in the record,
18    see if this will refresh your memory.
19        This is going to be 3, right?
20        (Exhibit 3, Email Chain Re:
21    HCMLP Roles, marked for identification,
22    as of this date.)
23        (Brief off-record discussion.)
24 BY MR. RUKAVINA:
25    Q.    Do you recall this email chain,

Page 24

J. Seery

2 sir?
3    A.    Vague -- vaguely. I'm -- I'm
4 familiar with it, yes.
5    Q.    And does this refresh your memory
6 that Mr. Dondero resigned on October the 9th,
7 2020?
8    A.    I -- I would say it confirms my
9 memory since I said it was in October.
10    Q.    Okay. But can you now confirm that
11 it was October 9, 2020?
12    A.    Yes.
13    Q.    Okay. Thank you. Now, just to put
14 it in the record here because of Mr. Morris'
15 objection, it is -- and I apologize, we're
16 going to talk about the debtor's contentions
17 today in this lawsuit against NexPoint.
18        Is it okay if I say debtor or you
19 want me to say reorganized debtor or --
20    A.    Whatever you're more comfortable,
21 I'm okay.
22    Q.    It is -- well, the -- the debtor
23 the reorganized debtor under the plan,
24 retained interest in this lawsuit; is that
25 accurate?

Page 25

J. Seery

2    A.    That's correct.
3    Q.    Okay. So it -- it's -- is it the
4 debtor's contention that NexPoint failed to
5 make a payment due, let's say on or before
6 December 31, 2020, on this $30.7 million
7 promissory note?
8    A.    That's correct.
9    Q.    Okay. And we'll go further in
10 detail, but ultimately, on or about January
11 7, the debtor sent notice that the note was
12 immediately due and payable, correct?
13    A.    That's correct.
14    Q.    And did you make that decision to
15 say that the note is immediately due and
16 payable?
17    A.    I did, yes.
18    Q.    Okay. Thank you. Now -- and you
19 were aware, when you made that decision,
20 that -- that NexPoint was affiliated to some
21 degree with Mr. Dondero?
22        MR. MORRIS: Objection to the
23    form of the question.
24    A.    Yes, I was.
25    Q.    What was your understanding then or

J. Seery

1  what is your understanding now - you answer
2  it how ever you can - as to what
3  Mr. Dondero's role with NexPoint Advisors LP
4  was in December 2020?
5      A.   I believe it was and continues to
6  be complete ownership control and domination
7  of NexPoint Advisors.
8      Q.   Between January 9, 2020, when you
9  became an independent director, and October
10 9, 2020, when Mr. Dondero resigned, did you
11 form an opinion as to Mr. Dondero's honesty?
12     A.   Between which dates?
13     Q.   January 9 and October 9, 2020.
14     A.   January 9 and October -- yes.
15     Q.   Yes.
16          And did you form an opinion as to
17 his business acumen?
18     A.   To some degree, yes.
19     Q.   Okay.  Did you form an opinion as
20 to his management skills?
21     A.   Yes.
22     Q.   Okay.  What was your opinion
23 with -- pardon me, strike that.
24          What opinion did you form during

J. Seery

1  that time as to Mr. Dondero's honesty?
2      A.   I think he's dishonest.
3      Q.   Okay.  What opinion did you form as
4  to his business acumen?
5      A.   I think it's challenged.
6      Q.   Can you elaborate?
7      A.   I -- the Select account we've
8  talked about is a -- is a great example.
9          Shorting Zoom in the pandemic and
10 holding it, shorting Netflix for long periods
11 of time, moving money all around without any
12 thought of the corporate form, moving money
13 in and out of different entities.
14          The litigations that he was
15 involved in; Acis alone he could have settled
16 for $2 million and probably burned nearly
17 $200 million of value.
18          So those are just beginning
19 examples.
20     Q.   Given the opinions that you formed
21 as to Mr. Dondero, did you believe that
22 that's also how he was running NexPoint at
23 that time in late 2020?
24     A.   I didn't make any judgments about

J. Seery

1  NexPoint.
2      Q.   Okay.  Now, are you familiar with
3  the concepts, in bankruptcy, of solvency or
4  insolvency?
5      A.   Yes.
6      Q.   Okay.  Are you familiar with one or
7  more metrics or definitions --
8      A.   Yes.
9      Q.   -- for solvency -- okay.
10     A.   Yes.
11     Q.   Can you tell me how you understand
12 solvency to be.
13     A.   In which context?
14     Q.   Well, under the Bankruptcy Code.
15     A.   There's no --
16          MR. MORRIS:  Objection to the
17     form of the question.
18     A.   There's no definition of solvency
19 in the bankruptcy code.
20     Q.   Sir, there is.
21          MR. MORRIS:  Well --
22     A.   Failure to pay debts as they come
23 due, balance sheet insolvency --
24     Q.   That's what I'm --

J. Seery

1          (Simultaneous speaking.)
2      A.   -- depends on the context.
3          (Reporter interjection.)
4      Q.   I'm sorry.
5          So you agree with me -- you agree
6  with me, again, depending on the context,
7  that one definition of insolvency is balance
8  sheet, meaning that your liabilities exceed
9  your assets?
10     A.   That is one definition of
11 insolvency.
12     Q.   And you agree with me that another
13 definition is when you're basically unable to
14 pay your debts as they become due?
15     A.   That's another definition.
16     Q.   Okay.  And I'm going to ask you,
17 when you became -- or after you became an
18 independent director on January 9, 2020, did
19 you form an opinion as to the debtor's
20 solvency?
21     A.   On January 9?
22     Q.   Well, or after that -- after,
23 after --
24          (Simultaneous speaking.)

Page 30

J. Seery

Q.  -- January 9, 2020.

A.  It's a -- it's a long period.  So if you want to break it down --

Q.  Yeah.

A.  -- in the early part of the case I did not form an opinion as to solvency.

I had to determine what the asset values were and what the -- what the claims were.

Q.  Did you ever form an opinion -- and the reason why I'm -- I want to separate the debtor from the reorganized debtor.  That's why I'm trying to be sensitive on the dates.

So I'm going to say debtor.  Did you ever form an opinion as to the debtor's solvency?

MR. MORRIS:  Objection to the form of the question.

A.  That's -- that's what I answered.

Q.  So you did?

MR. MORRIS:  Objection to the form of the question.

A.  The -- the debtor's solvency depends on when.

Page 31

J. Seery

Q.  Okay.

A.  I think early in the case, as I said, I didn't form any opinion as to solvency.

Q.  But at some point did you form an opinion as to solvency?

A.  Yeah, I don't know exactly when it was, but at -- at some point it became clear to me that the claims exceeded the asset value.

Q.  So is it fair to say that at some point you concluded that the debtor was insolvent based on the balance sheet test?

MR. MORRIS:  Objection to the form of the question.

A.  Certainly on -- on the balance sheet test, yeah.

Q.  What about on the inability to pay debts as they become due; did you ever form an opinion on that test?

A.  Well, it was in bankruptcy, so that had already been met.

Q.  Okay.  Did you ever form an opinion or have one provided by non-lawyers to you as

Page 32

J. Seery

to whether the debtor was insolvent prior to the petition date?

A.  Did I, I -- I do now.

Q.  Okay.  What is your opinion?

A.  I think the debtor was insolvent and very much insolvent well before the filing.

Q.  Into 2018?

A.  Certainly.

Q.  2017?

A.  Certainly.

Q.  2016?

A.  Yes.

Q.  Okay.  And when you say that the debtor was well insolvent before filing, are you applying one or both of the definitions we discussed for insolvency?

MR. MORRIS:  Davor, I'm just going to express the same concern I did earlier.  For the life of me, I don't know -- I mean, I know why you're doing this, but it's certainly not related to any of the claims that are at issue in this lawsuit.  So I'm just -- I just --

Page 33

J. Seery

MR. RUKAVINA:  With due respect, John, you've saved my client for fraudulent transfer.  That requires insolvency as an element.  I'm entitled to explore insolvency.

MR. MORRIS:  Sure, for -- for 2019, go right ahead.  That's when the transfer was made, right?

MR. RUKAVINA:  The note --

MR. MORRIS:  The note is 2000 -- the, the note is -- is May 2, 2019, so --

MR. RUKAVINA:  No, sir, you're -- I'm sorry, you're confusing this with the HCMA case.  Let's put the note into evidence.

MR. MORRIS:  Okay.

MR. RUKAVINA:  It's -- I'm not trying to be --

(Simultaneous speaking.)

MR. MORRIS:  No, no, no, no, no. Let me, let me -- let me restate this.

MR. RUKAVINA:  Yeah.

MR. MORRIS:  It's for actual

Page 34

J. Seery

1    fraudulent transfer.
2        MR. RUKAVINA: Yes.
3        MR. MORRIS: Solvency is not an
4    issue. Solvency is not an issue. We
5    have no burden of proving solvency.
6    It's only -- that's exactly why we
7    didn't put constructive fraudulent
8    transfer in the complaint, so we
9    wouldn't do this.
10        MR. RUKAVINA: We can -- we can
11    debate the law on that, but I think --
12    I think you have answered it.
13 BY MR. RUKAVINA:
14    Q.    To your view, the debtor was
15    insolvent certainly as of 2016?
16    A.    Yeah.
17    Q.    Okay. And I asked you, and before
18    counsel objected, what definition or, or --
19    or both definitions were you using when you
20    told me that the debtor was insolvent in
21    2019, 2018, 2017 and 2016?
22    A.    I think --
23        MR. MORRIS: Object to the form
24    of the question.


Page 34

J. Seery

1        fraudulent transfer.
2            MR. RUKAVINA: Yes.
3            MR. MORRIS: Solvency is not an
4        issue. Solvency is not an issue. We
5        have no burden of proving solvency.
6        It's only -- that's exactly why we
7        didn't put constructive fraudulent
8        transfer in the complaint, so we
9        wouldn't do this.
10           MR. RUKAVINA: We can -- we can
11       debate the law on that, but I think --
12       I think you have answered it.
13 BY MR. RUKAVINA:
14    Q.    To your view, the debtor was
15    insolvent certainly as of 2016?
16    A.    Yeah.
17    Q.    Okay. And I asked you, and before
18 counsel objected, what definition or, or --
19 or both definitions were you using when you
20 told me that the debtor was insolvent in
21 2019, 2018, 2017 and 2016?
22    A.    I think --
23           MR. MORRIS: Object to the form
24       of the question.

Page 35

J. Seery

1    A.    I -- I think both. I think you'd
2    have to go through each, but when you
3    properly look at the balance sheet and you
4    add the contingent liabilities, it was pretty
5    clear that the debtor didn't have the -- the
6    wherewithal from the balance sheet
7    perspective to satisfy those ultimate
8    liabilities.
9        In addition, the debtor continually
10   borrowed money when it needed it. The debtor
11   was -- was always on a very tight leash with
12   respect to liquidity, as money kept getting
13   sucked out at different times.
14    Q.    Okay. After October 9, 2020, when
15   Mr. Dondero resigned, should Mr. Dondero have
16   had any ability to instruct the debtor's
17   employees as to what to do, if that question
18   makes sense?
19        MR. MORRIS: Yeah, objection to
20       the form of the question.
21    A.    The -- the answer is with
22   respect -- he was permitted, I believe, after
23   the -- the dates will get a little bit
24   confusing, but with respect to the shared

Page 36

J. Seery

1    services, he could make certain direction to
2    the employees and even after the contempt
3    finding could make certain directions with
4    respect to shared services.
5        With respect to operations of
6    HCMLP, no.
7    Q.    Okay. And that was my question.
8        So if it was an HCMLP operational
9    issue, Mr. Dondero had no ability to instruct
10   anyone else?
11    A.    Or, or -- any issue --
12    Q.    Any issue --
13    A.    -- but with respect to shared
14   services, he certainly could communicate with
15   them, and if there were shared services that
16   needed to be performed, he could request
17   those.
18    Q.    Now, as of October 9, 2020, is it
19   true that Frank Waterhouse was the chief
20   financial officer of the debtor?
21    A.    That's correct.
22    Q.    And that he was the chief financial
23   officer of the debtor through January 2021?
24    A.    I don't remember the exact date,

Page 37

J. Seery

1    but yes, right around there.
2    Q.    Okay. Was he the chief financial
3    officer of the debtor on January 12, 2021?
4    A.    I -- I believe he was. I don't
5    recall the exact dates that we did the -- the
6    cutover.
7    Q.    Okay. Well, let's -- let's try to
8    pin that down.
9        You recall that there was a shared
10   services agreement in place between the
11   debtor and NexPoint?
12    A.    Yes.
13    Q.    Okay. And you recall that the
14   debtor exercised its opt -- or right to
15   terminate that agreement?
16    A.    That's correct.
17    Q.    Okay. And do you recall the date,
18   after several extensions, on which that
19   agreement was actually terminated?
20    A.    I don't recall the initial -- I
21   think the notice was in -- in November, late
22   November or December, and it was a -- I
23   believe it was a sixty-day notice for --
24        (Reporter clarification.)

J. Seery

1
2     THE WITNESS:  Sixty-day for NPA,
3  I'm sorry, NPA.
4        And -- there was some sixty days
5     and some thirty days, so I don't recall
6     the exact date that there -- that it was
7     effectively terminated.
8  BY MR. RUKAVINA:
9     Q.   Well, by NPA, you mean NexPoint
10  Advisors?
11     A.   Correct.
12     Q.   Okay.
13     A.   Isn't that who you asked me about?
14     Q.   I know.  I'm just -- for the
15  record, the jury might not know who NPA is.
16     A.   Okay.
17     Q.   Do you recall that we -- you and I
18  had a trial in -- sometime in mid February
19  2021 about the shared services agreements?
20     A.   I know we had a hearing.  I don't
21  recall if you'd call it a trial.  It was a
22  hearing on termination.
23     Q.   Okay.  And -- and do you recall
24  that the debtor had agreed to extend
25  termination until February the 28th, 2021 of

J. Seery

1
2  the shared services agreement?
3     A.   There -- there were extensions; I
4  don't recall the specific dates.
5     Q.   Okay.  Was -- to your recollection,
6  was -- was Mr. Waterhouse the chief financial
7  officer until the termination of that shared
8  services agreement or did he cease being the
9  chief financial officer at some period prior
10  to that?
11     A.   I -- I believe it was to the end,
12  but I'm not -- I'm not absolutely certain
13  about that.
14     Q.   So in December of 2021 -- I'm
15  sorry, strike that.
16        In December of 2020, you were the
17  chief restructuring officer, you were the
18  chief executive officer of the debtor,
19  correct?
20     A.   Yes.
21     Q.   Mr. Waterhouse was the chief
22  financial officer, correct?
23     A.   Yes.
24     Q.   Who else would have been an officer
25  of the debtor in December of 2020?

J. Seery

1
2     A.   In December of 2020?
3        Scott Ellington was still the
4  general counsel.
5     Q.   Okay.
6     A.   And I don't believe that we had any
7  other corporate officers.
8     Q.   Mr. Surgent wasn't an officer, to
9  your recollection?
10     A.   He was the CCO --
11     Q.   Okay.
12     A.   -- so I don't believe that's
13  actually a corporate officer.
14     Q.   Was there a COO, do you know?
15     A.   I don't believe so at the time.
16     Q.   Okay.  Now, in the latter half of
17  2020, Mr. Dondero was trying to float some --
18  what we've all called pot plan.
19        Do you recall that?
20     MR. MORRIS:  Objection to the
21     form of the question.
22     A.   The latter half, I -- I guess
23  starting in probably around August --
24     Q.   Okay.
25     A.   -- in -- in connection with the

J. Seery

1
2  mediation.
3     Q.   You've heard the term "pot plan"
4  that Mr. Dondero has talked about before,
5  correct?
6     A.   I have, yes.
7     Q.   Okay.  And what did you understand
8  a pot plan, as he was proposing it starting
9  in August of 2020, to be?
10     A.   Yeah, it's not a novel term.
11  Certainly he didn't invent it or -- or
12  probably didn't get it in this case.  He
13  probably got it from his lawyer.
14        But the idea of a pot plan is to
15  put a bunch of money into the middle and
16  create a pot that then the creditors can
17  determine how to divide, and the reorganized
18  debtor moves on with its existence away from
19  the creditor claims.
20     Q.   There was a creditors' committee in
21  the Highland bankruptcy case, correct?
22     A.   Yes.
23     Q.   And how many committee members were
24  there?
25     A.   Four.

J. Seery

2  Q.   Okay.  And is it fair to say that
3  as part of this pot plan, Mr. Dondero was
4  trying to propose something that might be
5  palatable to that creditor's committee?
6  A.   I think it's fair to say it would
7  have to be palatable to that creditor's
8  committee.
9  Q.   And is it fair to say that -- that
10 starting in August of 2020, you were trying
11 to see if you might facilitate or bridge that
12 gap?
13 A.   I wouldn't say bridge but certainly
14 facilitate --
15 Q.   Okay.  What --
16 A.   -- or if you want to say I did as a
17 bridge between Mr. Dondero and his counsel
18 and -- and the committee and their counsel,
19 that -- that would be fair.
20 Q.   Okay.  Well, let me -- let me look
21 at your prior -- we're saying the same thing,
22 we're just having --
23      (Simultaneous speaking.)
24 A.   I don't think we're having a
25 definitional problem.  I just don't want it

J. Seery

2  to sound like I was going to bridge it with
3  any sort of finances.
4  Q.   Yeah, that's true, the word
5  "bridge" could be construed to mean that.
6  You're correct.
7       MR. RUKAVINA:  Are we on 4?
8       THE WITNESS:  Yes.
9       (Exhibit 4, Seery Declaration in
10      Support of Motion for TRO, marked for
11      identification, as of this date.)
12      (Brief off-record discussion.)
13 Q.   Do you recall this declaration,
14 sir?
15 A.   Not -- not specifically.
16 Q.   Okay.  But if I represent to you
17 that I pulled this from the docket as your
18 counsel filed it, and assuming that I'm
19 telling the truth, would it -- would this
20 have been a declaration that you caused to be
21 filed?
22 A.   Yeah, I have no -- no reason to
23 challenge it, yes.
24 Q.   Okay.  And we might come back to
25 this a little bit later.  I don't want to

J. Seery

2  waste your time right now.  But I've lost my
3  place, so we'll come back to it later, after
4  a break.
5       Going back --
6       (Simultaneous speaking.)
7  A.   -- see if there was a bridge quote
8  in here?
9  Q.   No, no, you were -- you were
10 describing that you had been trying to
11 facilitate a settlement, and I was just going
12 to try to use your words so that I wouldn't
13 misstate it.
14      But, but going back, so -- so in
15 August -- starting in August of 2020,
16 Mr. Dondero was trying to propose some pot
17 plan, and it had to have been acceptable to
18 the committee for there to be any settlement.
19 So far I'm correct, right?
20 A.   Yes.
21 Q.   And you as the COO was trying to do
22 what you could to see if you could facilitate
23 the two of them coming to an under --
24 understanding.
25      Is that generally accurate?

J. Seery

2  A.   That's correct.
3  Q.   Okay.  And did you continue doing
4  so for a period of months after that?
5  A.   Certainly into early November.
6  Q.   Okay.  Would you say that there was
7  a point in time at which you stopped
8  personally - you, Mr. Seery - personally
9  stopped trying to facilitate some settlement
10 between Mr. Dondero and the committee
11 vis-a-vis a pot plan?
12 A.   I think at some point it became
13 very clear to me that it was futile, that --
14 that Mr. Dondero was never going to come up
15 with any real value that would be anywhere
16 close to what the committee would accept.
17      And his structure of his -- his pot
18 plan was always more notes, and the basic
19 assumption was, well, if you're not paying on
20 these notes how -- how do we trust new notes?
21 Q.   And when -- when did that view
22 crystalize in your mind?
23 A.   Probably some -- it probably
24 developed - so crystallized is a fair word -
25 over a period of time.  I think in the -- the

J. Seery

1 mediation, through the negotiations in
2 September and October or the -- the multiple
3 re-trades on -- on very specific prior
4 agreements, by November it was clear to me
5 that -- that there was little hope.
6     Q.    Okay.  So we can say by December 1,
7 certainly by December 1, there was very
8 little hope?
9     A.    Yeah, I think that that's
10 probably -- at least in my mind.  I don't
11 know if others felt the same, and there was
12 certainly opportunities for settlement beyond
13 that, but it seemed pretty clear to me that
14 we were moving towards a monetization plan
15 and we started negotiating the separation,
16 not with Mr. Dondero but with the team, of --
17 of the various business and the termination
18 of the --
19         (Reporter clarification.)
20         THE WITNESS:  Businesses and the
21     termination of the shared services,
22     sorry.
23 BY MR. RUKAVINA:
24     Q.    Did you convey that to

J. Seery

1 Mr. Waterhouse at any point in time,
2 basically that you believed that
3 Mr. Dondero's pot plan was -- was not going
4 to happen?
5     A.    I -- I don't recall if I did or
6 not.
7     Q.    Did you -- strike that.
8         In -- in the course of these
9 discussions between the committee and
10 Mr. Dondero and -- and maybe your trying to
11 facilitate something, was Mr. Waterhouse even
12 involved directly, to your knowledge?
13     A.    He was certainly involved,
14 assisting Mr. Dondero --
15     Q.    Okay.
16     A.    -- and he certainly provided or his
17 team provided data to me, which ultimately
18 went to the committee.
19         So I would -- I would think he's
20 involved to some degree.  I don't recall that
21 he would ever have been involved in -- in
22 specific discussions --
23     Q.    Okay.
24     A.    -- at least not with me.

J. Seery

1         I think it was pretty clear he was
2 involved with discussions with Mr. Dondero.
3     Q.    You -- not you, pardon me.
4         The debtor had an outside financial
5 advisor, correct?
6     A.    That's correct.
7     Q.    And what was that entity's name?
8     A.    DSI.
9     Q.    Is it fair to say that you relied
10 on DSI to some degree in the course of these
11 discussions and negotiations?
12     A.    To some degree, but I don't think
13 it's a fair characterization that they were
14 sort of a hands-on financial advisor around
15 the -- these negotiations.
16     Q.    I just want to -- I just want to
17 understand that, that -- it sounds like, to
18 me, at least on the debtor's side,
19 Mr. Waterhouse was not one of the key
20 individuals trying to facilitate an agreement
21 between the debtor and the committee?
22     A.    I, I --
23         MR. MORRIS:  Objection to the
24     form of the question.

J. Seery

1     A.    I don't think that's fair.  I think
2 that I -- I and my professionals, lawyers
3 and -- and DSI, were in the middle between
4 Mr. Dondero and his counsel and the
5 committee.  The committee had their own
6 financial advisors.
7         I drew on Mr. Waterhouse and his
8 team for financial information regarding the
9 debtor's assets throughout the case,
10 certainly since I took the position as CEO.
11     Q.    Okay.
12     A.    Mr. Dondero also drew on that
13 information quite a bit.
14     Q.    At that point in time, let's say in
15 December of 2020, did you understand that
16 Mr. Waterhouse had a role with my client,
17 NexPoint Advisors?
18     A.    Did you say December of 2020?
19     Q.    Yes, sir.
20     A.    Did he have a --
21         (Simultaneous speaking.)
22     A.    -- he was -- I think he was
23 treasurer and he was an executive officer of
24 some -- one of the funds.

Page 50

J. Seery

1    Q.    Now, you mentioned the debtor's
2  monetization plan that the debtor filed.
3         I think that's the word you used,
4  right, monetization plan?
5    A.    Correct.
6    Q.    Okay.  And in, in -- in a nutshell
7  amongst other things, that plan -- well, you,
8  you tell the -- the Court.
9         What was the monetization plan
10  intended to do?
11   A.    It was aptly named.  It was
12  intended to monetize the assets of the debtor
13  over a period of time that we thought was
14  legitimate to run the businesses in a way
15  that would maximize value for the estate.
16   Q.    And some of the assets of the
17  debtor, at least in the latter half of 2020,
18  included promissory notes from Mr. Dondero
19  and other entities affiliated with
20  Mr. Dondero; is that correct?
21   A.    That's correct.
22   Q.    And some of those promissory notes
23  were demand notes; is that correct?
24   A.    That's correct.
25

Page 51

J. Seery

1    Q.    And some of those promissory notes
2  were term notes, at least as of that time; is
3  that correct?
4    A.    That's correct.
5    Q.    Okay.  And I think, actually, it's
6  in this declaration which we marked 4, did
7  we?
8    A.    Yes.
9    Q.    Yes.  So you filed -- or, I'm
10  sorry, sir, you -- this was filed on December
11  7, 2020.
12        And I think if you go to paragraph
13  26 and 27, you'll see that you're discussing
14  demand notes.
15   A.    That's correct.
16   Q.    And in paragraph 29 it says that on
17  December 30 -- I'm sorry, strike that.
18        In paragraph 29 it says (as read):
19            On December 3, 2020, at my
20        instruction, the debtor's counsel
21        sent letters to representatives of
22        Mr. Dondero and each of the
23        corporate obligors, demanding
24        payment of all unpaid principal
25

Page 52

J. Seery

1  and accrued interest due under the
2  demand notes by December 11, 2020.
3         Was that a true statement?
4    A.    Yes.
5    Q.    Why did you decide to make demand
6  of the demand notes at that time?
7    A.    Well, it was pretty -- this will be
8  a long answer, but it's pretty clear that I
9  made a mistake, that I should have demanded
10  payment from Mr. Dondero earlier in the case.
11        The demand notes were due and
12  owing, they could be called at any time, and
13  I thought that leaving them outstanding would
14  provide a way to facilitate a grand bargain,
15  or a pot plan.
16        And by the time -- the beginning of
17  December, when we knew we were moving forward
18  with the monetization plan, it was time to
19  start to collect the assets of the debtor, so
20  I made a decision that we should demand
21  payment on each of the notes.
22   Q.    At that time, on December the 3rd,
23  2020, were you aware of the $30.7 million
24  NexPoint note?
25

Page 53

J. Seery

1    A.    Yes.
2    Q.    Okay.  And did you understand that
3  at that point in time that was a term note?
4    A.    Yes.
5    Q.    Okay.  And, and did you have a -- a
6  plan at that point in time as to -- and did
7  you -- pardon me.  Strike all that.
8         Did you understand that -- that
9  that had a thirty-year term originally when
10  it was executed?
11   A.    Yeah, you should understand that --
12  and maybe you do, and that's -- so we'll make
13  sure the record is clear.
14        Each of the -- the term notes were
15  not term notes.  They were -- they became
16  term notes because they were roll-up of
17  demand notes, and they were roll-up of demand
18  notes in 27 -- 2017, when things at the
19  debtor and for Mr. Dondero became very
20  precarious.
21        Certain lawsuits had been filed,
22  the asset stripping in the Cayman Islands had
23  begun.  It was a difficult time.  So without
24  any consideration whatsoever, Mr. Dondero, on
25

J. Seery

1 both sides, extended the terms -- rolled up
2 those notes and extended the terms of those
3 notes for thirty years and generally -
4 although not all - very low interest rate and
5 very easy terms, no -- no security, no
6 covenants.
7         So those became the term notes, but
8 they were always potentially subject to other
9 litigation demands.
10    Q.    You weren't around with the debtor
11 or NexPoint in 2017, were you?
12    A.    No.
13    Q.    Okay.  So you have no personal
14 knowledge about the execution of any notes at
15 that time?
16    A.    I, I would differ and say I do -- I
17 wasn't in the room, but I have the evidence
18 by the virtue of the fact that I've seen the
19 backup to the notes, and they actually
20 contain the schedule with the roll -- the
21 notes that are being rolled up.
22    Q.    So you're -- you're making an
23 educated deduction, based on your
24 professional experience, but you aren't

J. Seery

1 either the maker or the lender in 2017, when
2 these notes -- when this note was executed,
3 were you?
4         MR. MORRIS:  Objection to the
5         form of the question.
6    A.    I haven't been the maker or the, or
7 the -- or the lender on any of these notes.
8         MR. RUKAVINA:  Well, this is
9         going to be Exhibit 5.  This is the
10        note that we're here on today.
11        (Exhibit 5, Promissory Note
12        Dated May 31, 2017, marked for
13        identification, as of this date.)
14        (Brief off-record discussion.)
15 BY MR. RUKAVINA:
16    Q.    So if we go to the last page of
17 this exhibit, this references prior notes,
18 and the body of this basically says that each
19 of the prior notes are superseded by the new
20 note, correct?
21        MR. MORRIS:  Objection to the
22        form of the question.  Can you just
23        point that to Mr. Seery so --
24    Q.    Sure.  So, Mr. Seery, if you see

J. Seery

1 Section 9, (as read):
2         The original of each of the
3         prior notes superseded hereby
4         shall be marked void.
5    A.    Yes, so --
6    Q.    And then you see the prior notes in
7 the preamble?
8    A.    Uh-huh.
9    Q.    So is this what you were just
10 talking about, that this promissory note was
11 a roll-up of these five prior demand notes?
12    A.    That's correct.
13    Q.    Okay.  Now, if -- if we look at
14 this -- I'm looking at the last page here,
15 sir.
16    A.    Uh-huh.
17    Q.    The initial note amount of the
18 original five was 27,675,000; is that
19 correct?
20    A.    That's correct.
21    Q.    And -- and as of May 31, 2017, this
22 says that principal and interest outstanding
23 was 30,746,812.33; is that correct?
24    A.    That's what it says, yes.

J. Seery

1    Q.    Okay.  Is -- is the logical
2 conclusion that -- that on those five
3 promissory notes, not even all the interest
4 had been kept current?
5    A.    I, I --
6         MR. MORRIS:  Objection to the
7         form of the question.
8    A.    Yeah, I'd have to do the math on
9 each of them.  You're talking about three
10 years, 240 -- yeah, it looks roughly but not
11 all of the -- it looks like some payments
12 were made, but -- but certainly on -- it
13 doesn't look like it completely kept current,
14 at least on some of these.
15    Q.    Well, can you think of a reason --
16 other than the failure to pay interest, can
17 you think of reason as to why the initial
18 note amount increased by at least $3 million
19 in that time frame?
20        MR. MORRIS:  Objection to the
21        form of the question.
22    A.    No, I -- I would think it would be
23 an accrual.  And it's just unclear to me on
24 each of them whether there were pay-downs,

Page 58

1          J. Seery
2  whether there were times where it didn't pay
3  down, but certainly in the -- in the
4  aggregate, they didn't pay down. And so I
5  just don't know if it was -- if there was
6  some payments or not; I don't recall.
7      Q.   Okay. And -- and we're not here on
8  the HCMFA note, but are you general --
9  generally familiar that in April of 2019,
10 Mr. Dondero executed a document that took two
11 promissory notes that HCMFA had issued that
12 were demand notes and extended them until May
13 31, 2021?
14     A.   That's not what it did, no.
15     Q.   What do you understand happened?
16     A.   It, it -- they were -- they were
17 demand notes without maturity, and the -- the
18 obligor was given the statement from the
19 holder, HCMLP, that it wouldn't collect on
20 those notes until May 31, 2021.
21          And that was done because HCMFA did
22 not have the money to pay, and because it was
23 an advisor, it had to make representations
24 that it could support itself.
25     Q.   So is it fair to say that, at least

Page 59

1          J. Seery
2  prior to the time that you became CEO/CRO,
3  the debtor was lax in its enforcement of its
4  rights as the payee under promissory notes
5  from the advisors?
6      A.   That's --
7          MR. MORRIS: Objection to form of
8      the question.
9      A.   That's completely unfair.
10         (Simultaneous speaking.)
11     A.   -- virtually no basis for you to
12 say something like that.
13         It's a demand note that hadn't been
14 demanded, and then -- then it was to a third
15 party, so they could rely on the fact that
16 HCMFA would have -- wouldn't have to have
17 outflows to payoff demands that could happen
18 at any time; that gave an agreement to extend
19 the term, which is not really a term, it's
20 just we won't demand it.
21         So how -- how you call that lax,
22 I -- that doesn't have -- has nothing to do
23 with being lax.
24     Q.   Well, I thought you testified a few
25 minutes ago that, at least in 2017, the

Page 60

1          J. Seery
2  debtor was facing serious problems and that
3  Mr. Dondero was rolling up these notes for --
4  for some ulterior purpose?
5      A.   Not ulterior purpose. The purpose
6  is really, really obvious. He wanted to
7  extend out the term so that they wouldn't
8  become due, couldn't be demanded at any time.
9      Q.   Okay. So that -- that goes back to
10 my question, which you said was not a fair
11 question --
12     A.   No, I said your characterization
13 was unfair. You can't call that being lax.
14 It's a demand note. You can either demand it
15 or not demand it, but if you don't demand it,
16 it doesn't mean you're being lax.
17     Q.   Okay. Fair enough. But if, if --
18 so we're still on Exhibit 5.
19         If the debtor had allowed for these
20 five notes' accrued interest to go unpaid for
21 a period of one or more years, wouldn't that
22 suggest to you that the debtor was, as -- as
23 a payee, not strictly enforcing its rights?
24     A.   I believe the underlying terms
25 allowed it to accrue.

Page 61

1          J. Seery
2      Q.   Okay. Okay. So is it your
3  testimony, sir, that prior to you becoming
4  CEO/CRO, the debtor did or did not enforce
5  its rights as the payee under various
6  promissory notes according to industry
7  standards, as you would understand them to
8  be?
9          MR. MORRIS: Objection to the
10     form of the question.
11     A.   I think industry standards are --
12 are a bit nebulous, particularly when you're
13 talking about the payee and the payor being
14 controlled by the same person. But I think
15 there's nothing uncommon about letting a note
16 accrue when it's permitted to accrue.
17     Q.   Do you believe that there -- strike
18 that.
19         Do you believe that the debtor,
20 prior to you becoming CEO/CRO, had acted
21 inappropriately with permitting the roll-up
22 of these five notes into Exhibit 5 or -- or
23 changing the -- the HCMFA notes from demand
24 to May 31, 2021?
25         MR. MORRIS: Objection to the

Page 62

J. Seery

1    form of the question.
2         A.    Yeah, with -- with respect to the
3    HCMFA, I don't know -- I don't think that's
4    inappropriate, based on the shared services
5    and a tangential relationship between the
6    affiliates, although clearly it was
7    aggrandizing to Mr. Dondero and his
8    interests, which it syphoned off tons of
9    value from the debtor as opposed to HCMLP.
10        With respect to the roll-up of
11   these notes for thirty years, without --
12   without real consideration, I think that that
13   was --
14        (Reporter clarification.)
15        THE WITNESS:  Inappropriate, yes.
16   BY MR. RUKAVINA:
17        Q.    So if we go back now to December of
18   2020, early December of 2020, you've made
19   demand - as we've just read in your
20   declaration - on demand notes, and you've
21   testified that you were aware of the
22   existence of this note.
23        Did you, at that point in time,
24   have any plans as to how to monetize this
25

Page 63

J. Seery

1    note, number -- Exhibit 5 --
2         A.    Yes.
3         Q.    -- on December 3, 2020?
4         A.    Yes.
5         Q.    Okay.  What was the plan back then?
6         A.    It depended on what happened to the
7    note, but ultimately we would seek to sell
8    the note because of its long tenor, but
9    likely we would end up suing Mr. -- or NPA,
10   the -- the maker of the note, for fraudulent
11   conveyance in 2017.
12        Q.    On account of the roll-up?
13        A.    Correct.
14        Q.    Okay.  Did the debtor ever actually
15   solicit any offers of -- whereby someone
16   might buy this note, No. 5, Exhibit 5?
17        A.    No.
18        Q.    Okay.  Did you form an opinion or
19   were -- were you given an opinion from a
20   non-lawyer as to what the monetization value
21   of this note, Exhibit 5, might have been in
22   early December of 2020?
23        A.    I -- we did form an opinion, and --
24   and we discounted it substantially.
25

Page 64

J. Seery

1         Q.    Can you tell the Court
2    approximately what amount?
3         A.    Off the top of my head, I don't
4    recall.
5         Q.    Okay.  But -- but substantially?
6         A.    Substantially.  The reason is
7    pretty obvious.  This is a -- if you don't
8    win the fraudulent conveyance suit, you've
9    got a long-dated note with Mr. Dondero on the
10   other side.
11        He's not generally viewed as a
12   creditworthy counter-party and he controls
13   the inflows that go into NPA.  So the chances
14   you are ever going to be paid early are
15   extremely low, and the chances that it's
16   going to default are probably pretty high.
17        Q.    And this was an unsecured note,
18   correct?
19        A.    That's correct.
20        Q.    Okay.  So you -- going into
21   December 31, 2020, were you hoping that
22   NexPoint would default on this note?
23        MR. MORRIS:  Objection to the
24   form of the question.
25

Page 65

J. Seery

1         A.    I -- I think hoping is -- is not
2    the right term.  I think I -- I assumed that
3    they wouldn't, because you'd have to not
4    understand, you know, what happens when you
5    default on a term note and it gets
6    accelerated.
7         But if it happened, if I had
8    that -- if that fortune befell the estate, I
9    thought that would be a good thing.
10        Q.    Let's look at the -- some of the
11   terms of this note, sir.  So we're on Exhibit
12   5.  And in particular, Section 2.1, sir, the
13   second sentence says (as read):
14        Borrower shall pay the
15        annual installment on the 31st day
16        of December of each calendar year.
17        Do you see that sentence, sir?
18        A.    I do.
19        Q.    Do you believe that that means that
20   the payment must be on the 31st of December
21   or is it -- should it be read as on or before
22   the 31st day of December?
23        A.    It's -- it says on, but typically
24   there's no issue about prepayment and that

Page 66

J. Seery

1 paragraph 3 says you can prepay.
2
3      Q.    Well, so you see how -- how this
4  Section 2.1 uses the word "borrower," right?
5      A.    Yes.
6      Q.    And borrower isn't defined here,
7  but logically it's maker, right?
8      A.    Correct.
9      Q.    Okay.  So that's just probably
10  sloppiness, right?
11          MR. MORRIS:  Objection to the
12      form of the question.
13      A.    Appears to be.
14      Q.    Okay.  And then you, you
15  actually -- you saw Section 3, that talks
16  about the -- the prepayment (as read):
17          Maker may prepay in whole or
18      in part the unpaid principal or
19      accrued interest of this note.
20          Do you see that, sir?
21      A.    Yes.
22      Q.    Okay.  (As read):
23          Any payments on this note
24      shall be applied first to unpaid
25      accrued interest hereon and then

Page 67

J. Seery

1
2      to unpaid principal hereof -
3  correct?
4      A.    Correct.
5      Q.    Okay.  So that, that goes -- that
6  ties back to your prior answer, that even
7  though Section 2.1 says on the 31st day of
8  December, it's logical to read it on or
9  before the 31st day of December?
10          MR. MORRIS:  Objection to the
11      form of the question.
12      A.    It, it -- it would be.  Your --
13  your interest amounts would be different but
14  yes.
15      Q.    Okay.  Well, can -- so going back
16  to Section 3, it says prepay accrued
17  interest.
18          How does one prepay accrued
19  interest?
20      A.    Interest accrues on this note.  How
21  you prepay it is you send the money before
22  the accrual date.
23      Q.    Okay.  Fair enough.  And going back
24  to Section 3, the -- the style of that
25  section - whatever the word is - it says

Page 68

J. Seery

1
2  prepayment allowed, renegotiation
3  discretionary.
4          You see where it says renegotiation
5  discretionary?
6      A.    Yes.
7      Q.    Can you -- can you see anything
8  actually in that paragraph that talks about a
9  renegotiation?
10      A.    Nope.
11      Q.    Okay.  And just to -- to be clear,
12  do you see anything in here that talks about
13  that headings are for stylistic purposes only
14  and have no meaning?
15      A.    I -- I don't see anything --
16      Q.    Okay.
17      A.    -- that says that.
18          I just think that, one, the
19  headings are probably appropriate; two,
20  renegotiation is always discretionary.
21      Q.    Okay.  Well, but nothing in here
22  suggests to you, does it, sir, that -- that
23  the debtor was prohibited from renegotiating
24  anything about this note?
25      A.    No, the -- the holder of the note,

Page 69

J. Seery

1
2  the payee, could negotiate/renegotiate or
3  not.
4          In fact, it says that.  Because it
5  says it as a waiver, that the maker hereby
6  waives any grace, demand, presentment -- it's
7  got a very clear, broad waiver of any kind of
8  implication that there might be some courtesy
9  that the payee would have to give to the
10  maker.
11          MR. RUKAVINA:  Are we on 6?
12          Okay.  Sir, I'm going to hand you
13      what's -- what's going to be marked as
14      Exhibit 6, which is your January 7, 2021
15      letter.
16          (Exhibit 6, Correspondence
17      Dated January 7, 2021, marked for
18      identification, as of this date.)
19          (Brief off-record discussion.)
20          THE WITNESS:  By the way,
21      who's -- who's Aaron Lawrence?  I
22      didn't see that person earlier.
23          MR. MORRIS:  That is, I think, a
24      paralegal with Quinn.
25          THE WITNESS:  Oh, okay.

Page 70

J. Seery

1
2       MR. MORRIS:  Or an assistant,
3    maybe an associate.
4       I apologize if you're an attorney.
5    I apologize.  In any event, but -- but,
6    Mr. Lawrence you're with Quinn, right?
7       MR. LAWRENCE:  Yes, I am.
8       MR. MORRIS:  Yeah, thank you.
9       MR. LAWRENCE:  I -- I've -- I've
10    taken the bar.
11       MR. MORRIS:  Yeah.  Oh, okay.
12    Thank you.
13       MS. DEITSCH-PEREZ:  Does that
14    imply you've just taken the bar?
15       MR. LAWRENCE:  Yes.
16       MS. DEITSCH-PEREZ:  Okay.  Thank
17    you.
18       (Simultaneous speaking.)
19  BY MR. RUKAVINA:
20    Q.    Mr. Seery, you have Exhibit 6.
21    Do you recognize this document?
22    A.    I do, yes.
23    Q.    Okay.  And -- and that's your
24  electronic signature there?
25    A.    That is.

Page 71

J. Seery

1
2    Q.    And you authorized this document to
3  be issued to NexPoint Advisors?
4    A.    I did, yes.
5    Q.    Okay.  Did you discuss this
6  document, prior to you sending it, with the
7  independent board?
8    A.    Yes.
9    Q.    Okay.  And what do you recall about
10  that discussion?  Who was there; how did it
11  happen?
12    A.    I don't recall it specifically.
13  That would be at regular meetings and we
14  talked about the case.  This came shortly
15  after -- as we were moving towards -- I don't
16  remember the exact confirmation date, but it
17  was, you know, in and around that time.  And
18  this was a material asset of the estate, so
19  talking to them about that would have been
20  normal course of action.
21    Q.    Part of what you discussed with
22  them, was it how the debtor should respond to
23  the missed December 31 payment?
24    A.    I don't -- I don't think that's a
25  fair characterization.  I would have said

Page 72

J. Seery

1
2  that they missed the payment, we're going to
3  accelerate it unless you have some objection.
4  They didn't object.  This would have been
5  standard for anyone I know who's a holder of
6  a note.
7    Q.    So there was no discussion with the
8  board about maybe giving NexPoint a chance to
9  fix that default before sending this note?
10    A.    No.
11    Q.    Okay.  Same question:  Did you
12  discuss the substance of this letter, before
13  you sent it, with the committee?
14    A.    I doubt it and I don't recall.  I
15  don't think so.  It wouldn't -- it wouldn't
16  have been -- if there had been a committee
17  call, we would have told them about it, but I
18  wouldn't have been seeking permission.
19    Q.    Okay.  Did you keep notes of your
20  meetings or discussions with the other board
21  members generally?
22    A.    Sometimes.  Not -- not always.  It
23  depends.
24    Q.    I've heard tell that you're a
25  copious note -- note-taker; is that

Page 73

J. Seery

1
2  incorrect?
3    A.    I don't -- I don't think that's
4  fair.
5    Q.    Okay.
6    A.    I take -- I take notes but not
7  always.
8    Q.    Do you have any memory, not that
9  you should, as to whether you took any notes
10  of the -- the meeting with the other board
11  members we just discussed, about where the
12  substance of this letter was discussed?
13    A.    I don't recall.  It would have been
14  unusual for me to put the substance of that
15  kind of board meeting - if it was a board
16  meeting or if it was just a call - into
17  notes, because I would have -- if it's a
18  board meeting, we would have had minutes, and
19  if it was just a call for something like
20  this, it wouldn't have risen to the level of
21  we're taking notes and writing it down.
22    Q.    Okay.
23    A.    I didn't have any reason to record
24  every single thing I said with them because
25  our collective memories are good and

Page 74

J. Seery

1   they're -- they're pretty honest folks.
2       Q.   Okay.  Did -- did either you or
3   anyone video-record or audio-record any of
4   the discussions that you had with the other
5   board members ever?
6       A.   No.
7       Q.   Okay.  Were any of those meetings
8   with the other board members by Zoom or
9   Webex?
10      A.   Very few, I mean, typically not.
11      Q.   Okay.  The very few that might have
12  taken place, do you recall if -- if anyone
13  pressed a record button on Zoom or Webex?
14      A.   Nobody would have.
15      Q.   Okay.
16      A.   I can't imagine anyone would have
17  recorded it without requesting permission
18  from the other participants.
19          We didn't do much in that group by
20  Zoom or Webex, we just -- it wasn't standard
21  operating procedure for the group.
22      Q.   Do you recall any of the other
23  board members, or anyone else on any board,
24  discussing -- seeking permission to record

Page 75

J. Seery

1   any of those meetings?
2       A.   No, never.
3       Q.   Did you keep any calendar or
4   logbook where you might be able to find the
5   dates on which you had any call or meeting
6   with the other board members?
7       A.   If it was an official board
8   meeting, certainly it would have been in
9   Outlook.
10      Q.   Okay.  And if it was an official
11  board meeting, would there have been an
12  agenda circulated prior to the meeting?
13      A.   Not always, because these were
14  always done - particularly at this time,
15  where we were in litigation - with counsel.
16      Q.   And I take it that they would have
17  been done more or less sometimes on an ad-hoc
18  basis because of developments that might
19  happen?
20      A.   They -- they could, yes.
21      Q.   Okay.  Did you -- in responding to
22  my discovery requests in this NexPoint
23  lawsuit, did you consult any of your
24  handwritten notes, as to whether there was

Page 76

J. Seery

1   anything in there responsive?
2       A.   I believe I looked -- I want to
3   make sure I don't -- I don't know if I can
4   distinguish between your requests and the
5   other requests around these notes, but I
6   certainly looked through some of my notes to
7   see if I had any specific items that might
8   have been requested.  I don't recall if there
9   was something about whether I had a
10  conversation with John --
11          (Reporter clarification.)
12          THE WITNESS:  John Dubel and Russ
13      Nelms, the other directors.
14  BY MR. RUKAVINA:
15      Q.   But you do recall, in response to
16  discovery requests, looking at your
17  handwritten notes to see if there was
18  something responsive?
19      A.   Yes, and I just don't recall the
20  specific topics, because there were some that
21  were specific topics particularly around the,
22  the -- the made-up story about a subsequent
23  event and things like that kind of nonsense.
24      Q.   Do you recall whether you provided

Page 77

J. Seery

1   to the debtor's or the reorganized debtor's
2   counsel any handwritten notes for potential
3   review and production?
4       A.   I don't believe I did, because if
5   I -- if I found something, I would have but
6   I -- but I didn't find something
7   specifically, I didn't -- wouldn't have given
8   notes that were nonresponsive.
9       Q.   Similar question:  Did you -- you
10  have a Gmail account by email, right?
11      A.   I do, yes.
12      Q.   Okay.  And -- and I'm not an
13  expert, but that wouldn't be on the debtor's
14  or reorganized debtor's server, would it?
15      A.   It would not.
16      Q.   Okay.  Did you review your personal
17  emails with respect to whether there was
18  anything responsive there to the discovery
19  requests in this NexPoint lawsuit?
20      A.   Yes.
21      Q.   Okay.  And if you found something,
22  did you send it to counsel for potential
23  review for privilege and potential production
24  to me?

Page 78

J. Seery

1                     J. Seery
2    A.   Yes.
3    Q.   Okay. Did you, on your own,
4 withhold anything believing -- well, strike
5 that.
6        Is it fair to say that anything you
7 thought might be responsive you provided to
8 counsel?
9    A.   I did, and I provided them complete
10 access to my email.
11    Q.   And you didn't intentionally
12 withhold anything that might be -- strike
13 that.
14        Other than privileged material, did
15 you intentionally withhold anything that you
16 believed was responsive to my discovery
17 requests?
18    A.   I -- I didn't withhold anything.
19 If there was -- determined to be privileged,
20 then it would have been determined by
21 counsel.
22    Q.   Understood.
23        MR. MORRIS: And if it was --
24        just to be clear, Davor, if it was
25        determined to be duplicative of other

Page 79

J. Seery

1 emails that we produced --
2        (Simultaneous speaking.)
3        MR. RUKAVINA: I'm totally fine
4 with that.
5    Q.   I just want to make sure that you,
6 Mr. Seery, did not --
7    A.   No, I didn't --
8    Q.   -- intentionally -- intentionally
9 withhold anything just because you didn't
10 want it produced?
11    A.   No, certainly not, nor -- neither
12 intentionally nor accidentally, because I
13 turned everything over.
14    Q.   Understood. Going back to
15 Exhibit 6, I've asked you about the board,
16 I've asked you about the committee.
17        And you -- you said, I believe,
18 that you don't remember having a discussion
19 about the substance of Exhibit 6 with the
20 committee, right?
21    A.   I don't think I -- certainly not in
22 advance of it, I would not -- it wouldn't
23 have been standard to -- to do that, unless
24 there had been a meeting right around then,

Page 80

J. Seery

1 and I would have mentioned that I had done
2 this.
3    Q.   Did -- similar to the -- the prior
4 answer, would you have recorded in Outlook or
5 some other means any meetings that you had
6 with the committee in the January 2021 time
7 frame?
8    A.   Yeah, it would have -- any meetings
9 with the committee would have been official.
10    Q.   Okay. You could -- you could find
11 out what days those would have been had on?
12    A.   I believe so, yes.
13    Q.   And prior to these meetings, and
14 I'm talking about January 2021 now, were
15 there -- was there an agenda shared in
16 advance either by the debtor or by the
17 committee?
18    A.   I believe oftentimes there was with
19 the committee.
20    Q.   Do you recall - and I think I know
21 your answer - whether there was any such
22 agenda related to whether the debtor should
23 declare the NexPoint note, Exhibit 5,
24 immediately due and payable?

Page 81

J. Seery

1    A.   Well, I don't recall a meeting
2 around this, so I -- I certainly wouldn't
3 recall an agenda.
4    Q.   Now I'm going to ask about
5 Mr. Waterhouse.
6        Before you authorized this letter,
7 Exhibit 6, to go out, did you discuss the
8 substance of this letter with Mr. Waterhouse?
9    A.   I don't believe so.
10    Q.   How did you find out that the
11 December 31, 2020 payment had not been made
12 by NexPoint?
13    A.   I believe I was told during the
14 cash-flow meetings that we had weekly.
15    Q.   Okay. What -- was that like a
16 certain set day of the week or --
17    A.   Yeah.
18    Q.   What day of the week was --
19    A.   -- was either Tuesday or Wednesday.
20    Q.   Okay. Do you recall who told you
21 that this payment had not been made?
22    A.   I don't recall specifically, no.
23    Q.   Okay. Would you have received a
24 report from which that would have been

J. Seery

1  
2  evident?
3      A.    I would get a cash flow,
4  thirteen-week --
5          (Reporter clarification.)
6      THE WITNESS:  Thirteen-week cash
7      flow.  I'm sorry.
8      Q.    So -- so to the best of your
9  recollection, do you recall, on the one hand,
10  whether someone told you, Mr. Seery, NexPoint
11  didn't pay or, on the other hand, whether you
12  said where is NexPoint's payment?
13      MR. MORRIS:  Objection to the
14      form of the question.
15      A.    I -- I don't recall.  It could
16  have -- it could have easily been either,
17  because it certainly would have been
18  something I would have asked about.  NexPoint
19  and others had already failed to pay their
20  shared service payments, so it was a question
21  as to whether any other payments would be
22  coming.
23      Q.    Okay.  And who would have logically
24  been, pursuant to your course of practice, on
25  these weekly cash flow meetings?

J. Seery

1  
2      A.    Typically it would be sometimes
3  Frank Waterhouse, Kristin Hendrix, Dave
4  Klos - not always but most of the time - and
5  Jack Donohue from DSI --
6      Q.    Okay.
7      A.    Fred Caruso as well, I believe --
8      Q.    So in --
9      A.    -- DSI.
10      Q.    -- in early January 2021, do you
11  have any reason to believe that any of those
12  meetings would have been recorded visually or
13  audio-recorded?
14      A.    No, I would think they would not
15  have been.
16      Q.    Would any meetings -- I'm sorry,
17  strike that -- any minutes of those
18  discussions have been kept?
19      A.    No, no minutes would have been
20  kept.
21      Q.    So you would get the, the -- the
22  thirteen-week report you mentioned.
23          Would you get any other documents
24  in the nature of an agenda or an update to
25  you as the chief executive?

J. Seery

1  
2      A.    I don't --
3      MR. MORRIS:  Objection to the
4      form of the question.
5      A.    I -- I don't believe so with
6  respect to the thirteen-week cash flow
7  discussion.
8      Q.    So what -- what do you remember
9  saying or doing right then, when you learned
10  that NexPoint did not make a December 31
11  payment?
12      A.    I don't recall the specific date,
13  but as soon as I knew that the payment was
14  late, I would have accelerated the note and
15  told counsel to draft the acceleration and
16  demand.
17      Q.    And you don't recall discussing
18  that with Mr. Waterhouse?
19      A.    I don't recall it.
20      Q.    What about with Mr. Klos?
21      A.    I don't recall it.
22      Q.    And obviously I don't want to hear
23  about your discussion with counsel.
24          Other than counsel and DS -- or
25  DSI, do you -- do you recall discussing with

J. Seery

1  
2  anyone at the debtor the fact that NexPoint
3  hadn't made the payment and that you were
4  going to do something about that payment?
5      A.    I would have only discussed it -- I
6  think I would only have discussed it with
7  counsel and with DSI, had DSI get the
8  outstanding full amount up to whatever date
9  we were going to set in the demand notice,
10  and then send out the demand notice.
11          I wasn't going to advertise to
12  anybody exactly what I was doing, because
13  HCMLP had the right to do what it could do.
14      Q.    Okay.  And I'm going to struggle to
15  ask the next question, so it's going to take
16  me several questions and counsel will object.
17          Prior to the December 31 missed
18  payment, did you issue any instructions to
19  employees of the debtor to do anything
20  differently with respect to facilitating
21  NexPoint making that payment than they had
22  done in the past?
23      MR. MORRIS:  Objection to --
24      (Simultaneous speaking.)
25      A.    -- payment or any other payment?

J. Seery

1
2    Q.    This payment.
3    A.    No.
4          (Reporter clarification.)
5          MR. MORRIS:  I'm sorry, objection
6    to form.
7          THE WITNESS:  And I said -- I
8    think my answer was no.
9    BY MR. RUKAVINA:
10   Q.    So we've -- we've learned that in
11   early December of 2020, the debtor was going
12   to be able to -- strike that.
13         You agree with me that in December
14   of 2020, it would have been to the debtor's
15   economic advantage for NexPoint to miss the
16   annual payment?
17         MR. MORRIS:  Objection to the
18   form of the question.
19   A.    I -- I don't know if that's fair,
20   because right now we're having to deal with
21   what I would say are completely nonsensical
22   defenses and spend millions of dollars to
23   collect what are obviously true and owing
24   amounts that are due to the debtor.  So I
25   don't know that it was necessarily in our

J. Seery

1    best interest to have this happen.
2          Overall, I think we will collect
3    it, and it will be in our interest rather
4    than having a thirty-year note to -- owed by
5    NPA, to have a collected amount, which I
6    expect to collect in full.
7    Q.    As opposed to selling the note at a
8    substantial discount, correct?
9    A.    That would have been one of the
10   options, yes, or suing on a fraudulent
11   conveyance.
12         (Reporter clarification.)
13         THE WITNESS:  On a fraudulent
14   conveyance.
15   BY MR. RUKAVINA:
16   Q.    So again, without ascribing any
17   mal-intent here, it turned out for the debtor
18   to be better, in December of 2020, that
19   NexPoint missed its payment, correct?
20         MR. MORRIS:  Objection to the
21   form of the question.
22   A.    Again, we'll -- we'll find out
23   after we collect.
24   Q.    Okay.  So I just want to again
25

J. Seery

1    round off --
2    A.    Quite -- quite clearly, though,
3    just so -- so it's -- there's no ambiguity,
4    it's far better to collect the full amount of
5    the note than wait to be paid on an unsecured
6    basis over the next twenty-plus years.
7    Q.    And again, just to round off this
8    topic, you did not instruct anyone at the
9    debtor to do anything or fail to do anything
10   to try to ensure that NexPoint misses that
11   payment, did you?
12   A.    No.
13   Q.    Okay.  Did you, to the best of your
14   recollection, issue any instructions to
15   employees of the debtor having anything to do
16   with NexPoint making the December 31, 2020
17   payment?
18   A.    None at all.
19   Q.    Okay.  So we go back to Exhibit 6,
20   and you'll see in the middle there it talks
21   about the amount due and payable is
22   $24,471,000 and change.
23         Do you see that, sir?
24   A.    Yes.
25

J. Seery

1    Q.    Do you recall who calculated that
2    amount?
3    A.    I believe I got that from DSI.
4    Q.    Okay.  Did you ever ask yourself or
5    ask anyone why the amount was more than
6    $6 million less than the principal amount of
7    the note?
8    A.    I knew the answer.
9    Q.    What's the answer?
10   A.    That there were payments made on
11   the note.
12         MR. RUKAVINA:  Okay.  In fact --
13   Mr. Nguyen, pull up the exhibit that I
14   don't have here.
15         You're going to have to bear with
16   me; I forgot to bring one exhibit, and I
17   apologize to everyone involved.
18         MR. MORRIS:  No apology needed.
19   BY MR. RUKAVINA:
20   Q.    Okay.  So -- so this was -- so,
21   Mr. Seery, this is a document produced by the
22   debtor.  Please scroll up and down.
23         I want to ask you first, do you
24   have any idea who created this document or
25

Page 90

```
                    J. Seery
 1              J. Seery
 2  when or why?  Because I'll represent to you
 3  that it was just produced to us like this,
 4  without any kind of context.
 5      A.    I -- I don't know specifically, no.
 6      Q.    You don't know specifically, but
 7  could it be DSI?
 8          Is this the kind of -- does it look
 9  like the kind of report that DSI would have
10  made?
11          MR. MORRIS:  Objection to the
12      form of the question.
13      A.    I don't think so.  I would think
14  this would have been produced by NPA or -- or
15  HCMLP's accounting group.
16      Q.    Well, scroll down to the next page
17  Mr. Nguyen.
18          So you see, sir, on 5/31/2020, a --
19          (Reporter clarification.)
20          MR. RUKAVINA:  I'm sorry.
21      Q.    A $575,550.56 payment made?
22      A.    Yes.
23      Q.    Okay.  And prior to that, there had
24  been advanced payments, or -- or payments on
25  more than just the principal and interest,
```

Page 91

```
 1              J. Seery
 2  right?
 3      A.    There --
 4          MR. MORRIS:  Objection to the
 5      form of the question.
 6      A.    -- there were but there's a very
 7  odd entry above that, on 12/30/19 with a --
 8  instead of having parentheses, having a
 9  negative sign.
10          I'm not sure if that's a payment or
11  what that is.
12      Q.    Well, let's scroll back to the
13  first page and see what these headings are.
14          So if we look in the far right
15  column, total paid, do you see that, sir?
16      A.    Yes, I do.
17      Q.    And principal paid.
18          So scroll back to the next page,
19  Mr. Nguyen.
20          Do you see those now, the payments?
21      A.    I do.  I just -- I'm just pointing
22  out that that's --
23      Q.    Okay.
24      A.    -- not a correct way to do it, but
25  it could have just -- maybe they did it as a
```

Page 92

```
 1              J. Seery
 2  negative number as opposed to having it
 3  negative in the -- in the Excel file --
 4      Q.    Well, sir --
 5      A.    -- automatically.
 6      Q.    -- how do you know that the note
 7  hadn't be been prepaid, that the December 31,
 8  2020 payment hadn't been prepaid?
 9      A.    Well, I know there was a payment
10  due.
11      Q.    Okay.  But you didn't ask
12  Mr. Waterhouse or anyone else whether the
13  note had been prepaid or that payment had
14  been prepaid, did you?
15      A.    In the cash-flow discussions, the
16  fact that NPA owed the money on 12/31 was a
17  common discussion.  So if it had been
18  prepaid, it wouldn't have been owed.
19      Q.    And who prepared those cash-flow
20  discussion reports?
21      A.    Waterhouse's team.
22      Q.    Okay.  When you learned that the
23  December 31, 2020 payment had not been --
24  been made, did you ask anyone as to whether
25  that payment had hypothetically been prepaid
```

Page 93

```
 1              J. Seery
 2  at some point in the -- previous to that?
 3          MR. MORRIS:  Objection to the
 4      form of the question.
 5      A.    I don't believe that I did.
 6      Q.    Okay.
 7      A.    We certainly had discussions on
 8  other notes, whether there had been
 9  prepayments.  And it would have come up
10  around this note, but I don't have a specific
11  recollection of, around December 20, asking
12  whether something had been prepaid.  There
13  was an amount due - it was listed as due and
14  owing - and I expected to get it paid.
15      Q.    And I apologize, the $24 million
16  figure in Exhibit 6, DSI supplied that?
17      A.    I believe so.
18      Q.    And do you know whether DSI
19  consulted employees of the debtor to
20  calculate that amount?
21      A.    I assume they did.  I don't -- I
22  don't know the answer.
23      Q.    Why didn't you -- strike that.
24          Before you sent this letter on --
25  that's Exhibit 6 -- well, first of all, did
```

Page 94

J. Seery

1 you understand at that point in time, on or
2 before January 7, 2021, why NexPoint didn't
3 make the December 31 payment?
4     A.    I don't recall if I knew before
5 that --
6     Q.    Okay.
7     A.    -- or right around that time --
8     Q.    Okay.
9     A.    -- but I -- I came to know --
10     (Simultaneous speaking.)
11     Q.    You came to know it?
12     A.    Uh-huh.
13     Q.    Do you recall if you asked anyone,
14 prior to sending this letter, why that
15 payment hadn't been made or did someone
16 volunteer that information to you?
17     (Simultaneous speaking and
18     reporter interjection.)
19     MR. MORRIS:  Objection to the
20     form of the question.
21     A.    I -- I think you asked me that
22 already. I'm not sure if I asked about it
23 being made or someone pointed it out to me.
24     It was certainly a -- a topic I was

Page 95

J. Seery

1 anticipating, as to -- because they had not
2 made the payment in -- on the shared
3 services, as with all the other related
4 entities, because Dondero had directed that
5 those payments not be made. So I was curious
6 as to whether they were going to make the
7 payments that were due on the term notes.
8     Q.    So let's, let's -- let's break that
9 down.
10     I had asked you before, I believe,
11 as to how you learned of the lack of payment.
12 Now I'm asking you, once you learned about
13 the lack of payment, did you ask why didn't
14 the payment get made?
15     MR. MORRIS:  Objection to the
16     form of the question.
17     A.    No, I -- I don't think I would have
18 asked why the payment didn't get made.
19 Either -- as I said, either right before
20 this, at this time or shortly thereafter, I
21 learned -- I knew that the other payments
22 hadn't been made. I believe that I knew that
23 Dondero had directed that. I just don't know
24 exactly, around these notes, about all of the

Page 96

J. Seery

1 payments; if it was before or right around
2 thereafter.
3     Q.    And when you say before or right
4 around thereafter, are you referring to
5 January 7, 2021?
6     A.    Correct.
7     Q.    Okay. And -- and so you can't tell
8 me right now the exact date, but whenever you
9 learned about why the payment -- the NexPoint
10 payment hadn't been made, what did you learn?
11     A.    I learned that the NexPoint payment
12 hadn't been made.
13     Q.    Okay. I'm sorry. What did you
14 learn about why it hadn't been made?
15     MR. MORRIS:  Objection to the
16     form of --
17     A.    I was told that Mr. Dondero
18 directed that no payments be made to the
19 debtor.
20     Q.    Who told you that?
21     A.    I believe it was Kristin Hendrix
22 who had heard it from Frank Waterhouse, was
23 directed by Frank Waterhouse.
24     Q.    So to the best of your

Page 97

J. Seery

1 recollection, Dondero told Waterhouse, who
2 told Hendrix, who told you?
3     A.    Correct.
4     Q.    Okay. So do you agree with me that
5 before you sent this Exhibit 6, this letter,
6 the debtor could have undertaken some action
7 in the nature of trying to get NexPoint to
8 cure its default?
9     MR. MORRIS:  Objection to the --
10     A.    The debtor could have, yes.
11     Q.    And you made the decision
12 ultimately to -- let's just say call the note
13 immediately due and payable?
14     A.    That's correct.
15     Q.    Why did you make that decision as
16 opposed to seeing, with NexPoint, if
17 something could be worked out?
18     A.    Number one, I'm a fiduciary. I'm a
19 fiduciary to HCMLP. It's my job to maximize
20 the value of the estate and to collect the
21 assets of the estate, including this note.
22     Number two, in furtherance of that
23 duty, the note specifically provides that
24 it's due on a specific date and that there is

Page 98

J. Seery

1     waived any notice of presentment, any demand.
2     Once the payment is missed, the entire amount
3     is due and owing.
4
5     Q.     And I believe you've called my
6     defenses nonsensical, right?
7     A.     There -- there's so many different
8     ones, but most of them, yeah.
9     Q.     Okay.  And did you take any steps,
10    prior to sending Exhibit 6, to see if
11    NexPoint had any defenses as to why that
12    payment hadn't been made?
13    A.     No.
14    Q.     Okay.  And again, you didn't ask
15    anyone whether that note had been prepaid?
16    A.     We had discussed the note and what
17    was due and owing, so it had never been
18    volunteered to me that it otherwise had been
19    prepaid in a way that would have obviated the
20    need to make this payment, so it's pretty
21    clear that this payment had to be made.
22    MR. RUKAVINA:  Okay.  I need a
23    restroom break.  Five or ten minutes?
24    (Simultaneous speaking.)
25    VIDEO TECHNICIAN:  The time is

Page 99

J. Seery

1
2     3:18.  We're going off the record.
3     (Recess taken.)
4     VIDEO TECHNICIAN:  The time is
5     3:29.  We're back on the record.
6     MR. RUKAVINA:  So, just for the
7     record, the document that my associate
8     showed to Mr. Seery during questioning
9     a few moments ago is going to be
10    emailed to Mr. Morris and the court
11    reporter, and it will be marked as
12    Exhibit 7.
13    (Exhibit 7, Loan Document
14    D-NNL-029141, marked for
15    identification, as of this date.)
16    BY MR. RUKAVINA:
17    Q.     Mr. Seery, before the break you
18    mentioned that Ms. Hendrix told you that
19    Mr. Waterhouse told her that Mr. Dondero said
20    that there'll be no payments -- whatever
21    words you used; that's not my question.
22    My question is, do you have that in
23    any email or any writing or any recording?
24    A.     I don't believe so.
25    One thing that I just wanted to add

Page 100

J. Seery

1
2     is that I was admonished by the court
3     reporter during the break that I was speaking
4     a little too quickly, and so I will try to
5     slow down quite a bit.  And I'll try to be a
6     little bit more clear.  I've been bouncing
7     between the camera and the court reporter.
8     Q.     I think you should look at this
9     one.
10    A.     Okay.
11    Q.     So, again, you said you don't think
12    that there is any email or recording of what
13    Mr. Dondero said, correct?
14    A.     Not to my recollection, no.  He
15    didn't -- he didn't say it to me.
16    Q.     Okay.  And -- and during the break,
17    did you have any more of a recollection as to
18    the time, whether it's prior to or before
19    Exhibit 6, that you learned that?
20    A.     I, I, I -- I do not have any
21    additional recollection, no.
22    Q.     Okay.  Are you aware that
23    Mr. Waterhouse was deposed a couple days ago,
24    a couple/three days ago?
25    A.     I am, yes.

Page 101

J. Seery

1
2     Q.     Okay.  Did you read all or part of
3     his deposition?
4     A.     Yes.
5     Q.     Okay.  All of it?
6     A.     It was rather lengthy so no, not
7     all of it.
8     Q.     Okay.  Did you see any of the video
9     of it?
10    A.     No.
11    Q.     Okay.  Did you read any of my
12    examination of him?
13    A.     Yes.
14    Q.     Okay.  Do you recall if you read
15    the whole of my examination of him?
16    A.     I certainly read the last part of
17    your examination of him.
18    Q.     Including where Mr. Waterhouse
19    testified about what Mr. Dondero told him
20    with respect to these payments?
21    A.     Yes.
22    Q.     Okay.  But it's your testimony that
23    you had heard that well before you read that
24    deposition transcript?
25    A.     Oh, absolutely.

J. Seery

1  
2     Q.    Okay.  And when you read
3  Mr. Waterhouse's -- parts of his transcript,
4  did it include Ms. Deborah Deitsch-Perez's
5  questions?
6     A.    There was a section at the end that
7  it was unclear to me who was asking the
8  question, because I think there was also a --
9  another attorney --
10    Q.    Okay.
11    A.    -- Debra Dandeneau.
12          (Simultaneous speaking.)
13    A.    -- so I wasn't sure who was -- who
14  was asking -- I didn't know who represented
15  whom and who was asking the questions.
16    Q.    Did you ever discuss with
17  Mr. Waterhouse the substance of what
18  Mr. Dondero told him vis-a-vis not making any
19  more payments?
20    A.    I don't believe so, no.
21    Q.    Did you ever -- other than legal
22  counsel, did you ever discuss that with
23  anyone at Highland, to your recollection?
24    A.    Yes.
25    Q.    Okay.  With whom?

J. Seery

1  
2     A.    Ms. Hendrix and Mr. Klos.
3     Q.    Why Mr. Klos?
4     A.    He's my CFO.
5     Q.    To your knowledge, did he overhear
6  Mr. Waterhouse or Mr. Dondero say something
7  to that same effect?
8     A.    I don't believe he did, no.
9     Q.    Is it fair to say that other than
10 Mr. Waterhouse's deposition from a few days
11 ago, the universe of what you heard about
12 what Mr. Dondero instructed came from
13 Ms. Hendrix?
14    A.    I don't think that's fair.  I might
15 have heard it from Mr. Klos, who heard it
16 from Mr. Hendrix -- from Ms. Hendrix, I'm
17 sorry.
18    Q.    Okay.
19    A.    So around this time it was clear
20 that the payment wasn't made, the shared
21 services payments had -- had not been made,
22 none of the payments from related entities
23 had been made, and it was clear Mr. Dondero
24 had directed that no payments be made.  And
25 even around the negotiations for any kind of

J. Seery

1  
2  transition, it was very difficult to agree on
3  any payments because Mr. Dondero had this
4  edict of no payments.
5          And I just don't recall if it was
6  before January 7, at January 7 or immediately
7  thereafter.  I just -- it -- I don't recall.
8  It may have even been as far back as
9  December.  I don't know the exact answer.
10    Q.    Did Highland, prior to the plan
11 becoming effective, have any written policies
12 or procedures in place with respect to how it
13 would operate any aspect of its business
14 practices?
15    A.    Certainly.
16    Q.    Okay.  Do you recall whether any of
17 those policies or -- or procedures related to
18 enforcing debt obligations due and payable to
19 Highland?
20    A.    I -- I don't recall seeing anything
21 like that.
22    Q.    Do you recall whether you ever
23 tried to consult any policies and procedures
24 before your letter of January the 6th?
25    A.    I, I did not nor -- nor would I

J. Seery

1  
2  have.
3     Q.    Because, again, you made the
4  determination that the payment hadn't been
5  made, the note says what it says, and it was
6  the fiduciary obligation that you felt to the
7  estate to call the note?
8     A.    That's correct.
9          MR. MORRIS:  Objection to the
10 form of the question.
11    Q.    Did any part of your motivation
12 involve trying to stick it to Mr. Dondero?
13    A.    Not at all.
14    Q.    Okay.  Did you consider any
15 alternatives to the January 6 letter before
16 you sent it?
17          MR. MORRIS:  Objection to the
18 form of the question.
19    Q.    And I think -- let's exclude
20 discussions you might have had with counsel.
21          MR. MORRIS:  Same objection.
22    A.    No, I -- I think I just considered
23 that the note was due and we would accelerate
24 it.  It wasn't paid, we'd accelerate it and
25 try to collect the whole.

J. Seery

1               J. Seery
2     Q.   After you sent your letter of
3 January 7, did you issue any instructions to
4 Mr. Waterhouse or anyone else at the debtor
5 with respect to anything having to do with
6 the NexPoint note or missed payment?
7     A.   I don't believe so, no.
8     Q.   Are you aware that on or about
9 January 12, 2021, Mr. Waterhouse and
10 Mr. Dondero had a telephone conversation, at
11 least one, regarding the missed payment?
12     A.   I am aware of that from your --
13 Mr. Waterhouse's deposition. I had no
14 knowledge of that before the --
15     Q.   Mr. Waterhouse never talked to you
16 about that prior to you seeing it in his
17 deposition?
18     A.   No.
19     Q.   Okay. You're aware that on or
20 about January the 14th, 2021, NexPoint did
21 make a $1.4 million and change payment?
22     A.   Yes, I am.
23     MR. RUKAVINA:  Okay.
24     (Brief off-record discussion.)
25     MR. RUKAVINA:  Sir, this is going

1               J. Seery
2 to be marked Exhibit 8. This is your
3 letter of January 15, 2021.
4     (Exhibit 8, Correspondence
5 Dated January 15, 2021, marked for
6 identification, as of this date.)
7     (Brief off-record discussion.).
8     THE WITNESS:  Oh, 7 is to come?
9     MR. RUKAVINA:  Yes, sir.
10     Q.   Do you recognize Exhibit 8?
11     A.   I do, yes.
12     Q.   Okay. Do you recall authorizing
13 this to be sent under your electronic
14 signature?
15     A.   Yes.
16     Q.   Okay. Do you recall what prompted
17 you to send Exhibit 8?
18     A.   Yes.
19     Q.   What was it?
20     A.   I believe the -- I think it's the
21 day before I was on the stand in a court
22 hearing, and I testified that I'd accelerated
23 this note. Mr. Dondero was there.
24     It appears to me that he
25 immediately learned or realized, oh, my gosh,

1               J. Seery
2 my edict caused the acceleration of note. I
3 don't know if he paid attention to the prior
4 demand -- acceleration and demand note.
5     So a payment was received on the
6 14th for $1.4 million. And under the terms
7 of the note, my understanding of the law, we
8 applied the payment to the balance and
9 reiterated our demand.
10     Q.   When you were just now putting
11 words in Mr. Dondero's mouth, were you
12 speculating as to his mental process or did
13 he say anything like that to you?
14     A.   He wasn't allowed to talk to me and
15 I didn't -- so I was speculating, but part of
16 it is that -- I believe the colloquy you had
17 yesterday with Frank had -- or two days ago,
18 had a reference to Mr. Dondero being in
19 court. I don't remember if that was on an
20 email or if it was in the -- the colloquy
21 that you had.
22     Q.   But at least as of January the
23 15th, 2021, your then mental impression was
24 that it was an event that occurred on January
25 the 14th, 2021 that prompted that

1               J. Seery
2 $1.4 million payment?
3     A.   I -- I think so, either the 14th or
4 the 13th. I know -- I recall testifying to
5 the acceleration and that the note -- the
6 payment had been missed and we had
7 accelerated it.
8     Q.   Do you recall what -- was that like
9 the Dondero PI -- do you recall what
10 proceeding that was?
11     A.   I don't -- I don't recall --
12     (Simultaneous speaking.)
13     A.   -- at least two that week, I
14 believe.
15     Q.   Sitting here today, you think it
16 was January 13 or January 14?
17     A.   Yes.
18     Q.   Okay. Did you ask Mr. Waterhouse
19 anything about that $1.4 million payment
20 before you sent Exhibit 8?
21     A.   No.
22     Q.   Okay. Did you ask anyone else at
23 the debtor -- again, we're excluding legal
24 counsel.
25     Did you ask anyone else at the

J. Seery

1                J. Seery
2  debtor as to anything having to do with why
3  that $1.4 million payment had come in?
4     A.    I did not. I don't -- well, I
5  don't recall doing that.
6     Q.    Why didn't you return -- I'm sorry,
7  strike that.
8         Why didn't the debtor return the
9  payment?
10    A.    Because I would apply it on account
11  and reduce the total amount owed and make the
12  demand again.
13    Q.    Why wouldn't you have applied it to
14  the amounts owing under the shared services
15  agreement and payroll reimbursement
16  agreement?
17    A.    I believe because it was on account
18  of the note, and the note had already been
19  accelerated, so any payments are on account
20  of the note.
21    Q.    What led you to believe that the
22  payment was on account of the note?
23    A.    I don't recall.
24    Q.    So until you read Mr. Waterhouse's
25  transcript, you had no knowledge of his -

J. Seery

1                J. Seery
2  let's just say January 12, whatever day it
3  was - conference with Mr. Dondero, correct?
4     A.    None.
5    Q.    And no knowledge of what they may
6  have discussed?
7     A.    No.
8    Q.    Okay. Can you think of a reason
9  why Dondero would have caused that
10  $1.4 million payment to have been made?
11        MR. MORRIS: Objection to the
12    form of the question.
13    A.    Can I speculate?
14    Q.    If you're speculating, tell me
15  you're speculating, sure.
16    A.    I -- I can speculate, yeah.
17    Q.    Speculate.
18    A.    He realized that the note had been
19  accelerated and that he was going to try to
20  decelerate it.
21        You know, one thing sort of
22  interesting that -- well, maybe there's a
23  question on it.
24        MR. RUKAVINA: Let's go off the
25    record for a second.

J. Seery

1                J. Seery
2     (Brief off-record discussion.)
3     VIDEO TECHNICIAN: The time is
4  3:40. We're going off the record.
5     (Recess taken.)
6     VIDEO TECHNICIAN: The time is
7  3:42. We're back on the record.
8     (Brief off-record discussion.)
9     MR. RUKAVINA: So during --
10  during the break, Mr. Morris was kind
11  enough to print out exhibit -- the --
12  the prior report that we had seen that
13  is now marked as Exhibit 7.
14     And I will represent to you,
15  Mr. Seery, and to the Court that Exhibit
16  7 is a true and correct copy of what was
17  previously on the Zoom, care of my
18  associate.
19     Okay. Sir, we're going to now go
20  to 9, Exhibit 9, which is going to be the
21  shared services agreement.
22     (Exhibit 9, Amended and Restated
23  Shared Services Agreement, marked for
24  identification, as of this date.)
25    Q.    Now, sir, I've handed you

J. Seery

1                J. Seery
2  Exhibit 9, and you're certainly free to read
3  it. This purports to be the amended and
4  restated shared services agreement between
5  NexPoint and the debtor.
6        I'll represent to you that it is a
7  true and correct copy, as filed by your
8  attorneys. And if I'm wrong about that, then
9  certainly you're not going to be held to your
10  answers.
11       But just sitting here today, do you
12  have any reason to suspect the authenticity
13  of Exhibit 9?
14    A.    No.
15    Q.    Okay. All right. So this is
16  called the "Amended and Restated Shared
17  Services Agreement" as of January 1, 2018.
18       To the best of your knowledge, was
19  this the latest iteration prior to its
20  termination or were there any subsequent
21  amendments?
22        MR. MORRIS: Objection to the
23    form of the question.
24    A.    I don't recall.
25    Q.    And obviously the document speaks

Page 114

J. Seery

1  for itself, but as the CRO/CEO, what was your
2  understanding of what this contract
3  effectuated as between the debtor and
4  NexPoint?
5      A.   Part of the way the debtor was set
6  up and the way it was run was that the debtor
7  would provide certain services to certain of
8  the affiliated entities.  And those would be,
9  to some degree, embodied in this agreement.
10         Oftentimes the debtor provided
11  services to affiliates without any agreement,
12  oftentimes they provided additional services
13  that may not have been in the agreement, and
14  that was because they were such closely
15  related parties.
16     Q.   As of December 2020, do you agree
17  with me -- as of December 31, 2020, do you
18  agree with me that this agreement had not yet
19  been terminated?
20     A.   As of December 20?
21     Q.   I'm sorry.
22         As of December 31, 2020, do you
23  agree with me that this agreement had not yet
24  been terminated?
25

Page 115

J. Seery

1      A.   Yeah, I think the termination
2  notice had gone out but it had not yet become
3  effective.
4      Q.   Okay.  And we see here what -- some
5  of the services that the debtor was
6  providing.  We see it on the top of page 4,
7  if you want to flip there.
8          It says, amongst other things,
9  finance and accounting, payments,
10  bookkeeping, cash management.
11         Do you see all that, sir?
12     A.   Yes.
13     Q.   Okay.  Do you have an understanding
14  of what those terms under this agreement
15  meant?
16         MR. MORRIS:  Objection to the
17     form of the question.
18     A.   Yes, I do.
19     Q.   Okay.  Give me your understanding,
20  please, sir.
21     A.   The debtor provided back office
22  support for -- under those terms, for the
23  affiliated entity and received some form of
24  remuneration in exchange for that and other
25

Page 116

J. Seery

1  services.
2      Q.   And when you said affiliated
3  entity, in this instance, are you referring
4  to NexPoint?
5      A.   Uh-huh.  Yes, I am.
6      Q.   Okay.  When you say back office
7  services, would that have included, as of
8  December 2020, helping NexPoint ensure that
9  NexPoint pays from its own funds its
10  obligations coming due?
11     A.   I -- I think as part of back office
12  services -- that's the heading of the
13  section, and so part of it is to assist in
14  preparing payments and calculating what those
15  should be.
16     Q.   So obviously the debtor wasn't
17  responsible for paying NexPoint's
18  obligations, right?
19     A.   That's correct.
20     Q.   But the debtor had some level of
21  responsibility to help NexPoint pay its
22  accounts payable on a timely basis, correct?
23     A.   Yes.
24     Q.   And that would have been from
25

Page 117

J. Seery

1  NexPoint's funds?
2      A.   Correct.
3      Q.   And is the same true for NexPoint's
4  loan obligations?
5      A.   I believe so, yes.
6      Q.   So if Mr. Waterhouse testified that
7  it was reasonable for NexPoint, in December
8  2020, to rely on the debtor to facilitate the
9  December 31 note payment, would you have
10  reason to disagree with that?
11         MR. MORRIS:  Objection to the
12     form of the question.
13     A.   I would, yes.
14     Q.   Okay.  And what's your disagreement
15  and your reason for the disagreement?
16     A.   Because the debtor does work to
17  figure out how much payments are, whether
18  they be on notes or whether they be for some
19  other service that the affiliated entity has
20  gotten.
21         The debtor's accounting team puts
22  together that schedule, and then the debtor
23  needs direction from an officer at NexPoint
24  to make the payment.  If the debtor has
25

Page 118

J. Seery

1 already been told don't make the payment, it
2 wouldn't be scheduled.
3
4 Q. So, to summarize, it's ultimately
5 up to NexPoint to specifically approve or
6 disapprove any potentially scheduled
7 payments?
8 A. Correct.
9 Q. Okay. And in this instance, what
10 you've learned is that Mr. Waterhouse was
11 told by Dondero, don't make the payment?
12 A. Correct.
13 Q. Okay. And that -- that is the sum
14 of your understanding as to why the
15 December 31 payment wasn't made?
16 A. I don't think that's the sum of it.
17 There's -- there's emails that show that
18 Ms. Hendrix prepared and requested from
19 Mr. Waterhouse payment of these amounts
20 okayed and he approves them. So they -- they
21 are the amounts that are permitted to be
22 approved, and they're all to third parties.
23 None of them are to HCMLP.
24 Q. Are you aware of any email where
25 Ms. Hendrix prepared the December 31 note

Page 119

J. Seery

1 payment by NexPoint for Mr. Waterhouse's
2 approval?
3
4 A. No, I'm not.
5 Q. If there is no such email, do you
6 have any explanation or understanding for why
7 there wouldn't be such an email?
8 A. Sure.
9 Q. Okay. What is it?
10 A. She was told not to make the
11 payment.
12 Q. So, consequently, she did not
13 include it in any upcoming payment list?
14 A. Correct.
15 Q. And that goes back to what you
16 tell -- told me before, that Waterhouse told
17 her what Dondero told him, right?
18 A. That's correct.
19 Q. Okay. And are you aware that
20 Mr. Waterhouse said -- testified that that
21 instruction had come sometime in early
22 December of 2020?
23 A. I don't recall.
24 This was in the testimony
25 yesterday?

Page 120

J. Seery

1
2 Q. From a couple days ago.
3 A. Yeah, two days ago, I'm sorry.
4 I don't recall the specific dates
5 that he said that.
6 Q. Well, whatever the -- whatever the
7 dates that he testified about were with
8 respect to the Dondero discussion, would you
9 have any reason to dispute those dates?
10 A. No.
11 Q. Okay. So, sir, is it your
12 understanding that having been given that
13 instruction by Mr. Dondero, that employees of
14 the debtor, including Mr. Waterhouse, had no
15 further obligation with respect to that
16 December 31 payment?
17 MR. MORRIS: Objection to the
18 form of the question.
19 A. I think they -- I think they took
20 the direction of Mr. Dondero to heart and
21 followed his direction.
22 Q. Is it your belief that they had no
23 obligation to subsequently ask Mr. Dondero
24 whether he meant it?
25 MR. MORRIS: Objection to the

Page 121

J. Seery

1 form of the question.
2
3 A. Absolutely.
4 Q. Did they have no such obligation?
5 A. No.
6 Q. Is it your understanding that they
7 had no obligation to communicate with
8 Mr. Dondero and inform him of the
9 consequences that would happen if that
10 payment wasn't made?
11 MR. MORRIS: Objection to the
12 form.
13 (Simultaneous speaking and
14 reporter interjection.)
15 A. I -- I don't think it would be
16 appropriate for the employees of the debtor
17 to go to the founder of the organization, who
18 owns and controls all of the entities, after
19 he's given them a direction, to go challenge
20 his direction. And that's just not the way
21 Highland ever worked, from what I could see.
22 Q. Did you believe, in December of
23 2020, that employees of Highland had a
24 conflict of interest with respect to their
25 dual role as employees of NexPoint with

J. Seery

1    respect to that promissory note?
2        A.    Not specifically with respect to
3    the promissory note, but generally it was a
4    concern of mine throughout the case.
5        Q.    Well, we can -- can we agree on
6    this; that when Mr. Dondero gave
7    Mr. Waterhouse that instruction,
8    Mr. Waterhouse should have known that that
9    instruction was not on behalf of Highland
10   because Mr. Dondero no longer had any
11   management role with Highland?
12       MR. MORRIS:  Objection to the
13       form of the question.
14       A.    I think he should have known that,
15   yes.
16       Q.    And can we therefore agree that
17   Mr. Waterhouse should have known that that
18   instruction from Dondero was coming from
19   NexPoint --
20       MR. MORRIS:  Objection --
21       (Simultaneous speaking.)
22       Q.    -- Dondero wearing his NexPoint
23   hat?
24       A.    I -- I think you're trying to parse
25

J. Seery

1    something that doesn't exist.  There's no
2    hats.  There's one hat for Mr. Dondero.  He
3    controls all of the entities other than
4    HCMLP.
5        And his edicts, whether they be
6    from prior to our taking over HCMLP as
7    independent directors or with respect to any
8    of the other entities, are final.
9        Q.    Mr. Dondero might not have had two
10   hats, but in December of 2020, would you
11   agree that Mr. Waterhouse wore two hats?
12       A.    Yes, he did.
13       Q.    The CFO of the debtor and the
14   treasurer of NexPoint?
15       A.    That's correct.
16       Q.    And both being executive officer
17   positions, correct?
18       A.    Correct.
19       Q.    Pardon me.  With, to your
20   understanding, under Delaware law, fiduciary
21   duties to his respective principals, correct?
22       A.    I believe these are both Delaware
23   but I'm not positive.
24       Q.    Certainly you would have expected
25

J. Seery

1    Mr. Waterhouse to have fiduciary duties, in
2    December of 2020, to the debtor?
3        A.    Yes.
4        Q.    Okay.  That's the role that I'm
5    asking about, sir.
6        Mr. Waterhouse simultaneously being
7    the CFO of the debtor, the payee on a large
8    promissory note, and the treasurer of
9    NexPoint, the maker on that same promissory
10   note, did you not perceive there to be any
11   conflict of interest?
12       MR. MORRIS:  Objection to the
13       form of the question.
14       A.    No, no more than -- I -- I
15   perceived a concern throughout the case, but
16   no more than there had been at any other time
17   with any of these related entities.
18       Q.    Except, sir, that at this time,
19   Mr. Waterhouse had a fiduciary duty to the
20   bankruptcy estate.
21       Would you agree with that?
22       A.    Yes.
23       Q.    Okay.  And do you agree that his
24   fiduciary duty to the bankruptcy estate, in
25

J. Seery

1    December of 2020 with respect to this
2    promissory note, might have conflicted with
3    his duties - whatever they were - to
4    NexPoint?
5        (Simultaneously speaking.)
6        (Reporter interjection.)
7        A.    I'm sorry.
8        MR. MORRIS:  Objection to the
9        form of the question.
10       A.    Potentially but not necessarily.
11   Mr. Waterhouse took direction from the man in
12   control of NexPoint.  That man directs his
13   inferiors, which would include the treasurer.
14   So following that direction doesn't cause any
15   conflict with respect to NexPoint.
16       Q.    On the debtor's side, you mentioned
17   before, for example, that -- that you
18   believed after the payment was made, that
19   your fiduciary duties necessitated the
20   calling of the note, right?
21       A.    I don't know if they necessitated
22   it.  They certainly informed it.
23       Q.    Informed it.
24       But -- so they certainly informed

Page 126

J. Seery

1 it, correct?
2    A.   Yes.
3    Q.   Okay.  And would you expect
4 Mr. Waterhouse to have had similar duties to
5 the bankruptcy estate?
6         MR. MORRIS:  Objection to the
7    form of the question.
8    A.   No, I believe that would be my
9 direction, if I had -- I would be his
10 superior at HCMLP.  If I directed that we
11 collect it, we collect it.  If I direct that
12 we don't, then we don't.
13    Q.   Is it fair to say, from your prior
14 testimony, that at no time prior to January
15 1, 2021 did Mr. Waterhouse, Mr. Klos or
16 Ms. Hendrix tell you about the Dondero
17 instruction not to make any more payments?
18         MR. MORRIS:  Objection to the
19    form of the question.
20    A.   Prior to when?
21    Q.   January 1, 2021.
22    A.   I -- I don't -- as I said, I don't
23 recall if it was right around the time of
24 the -- the payment had been failed to be made

Page 127

J. Seery

1 on the 31st, and we sent it, or if it was in
2 December.  I believe I testified to that
3 before.  And the shared service payments
4 hadn't been made, so there may have been some
5 discussion that Dondero's cut it off.
6    Q.   Well, I -- I think I asked you
7 before about the timing in reference to the
8 January 7 letter, when --
9    A.   Correct.
10    Q.   -- you said it might have been
11 right around there.
12         Am, am I understanding -- or strike
13 all that.
14         Is it your testimony that maybe you
15 learned about the Dondero instruction on or
16 before December 31, 2020?
17         MR. MORRIS:  Objection, asked and
18    answered.
19    A.   That -- that's correct.  I don't
20 recall when I learned but, factually, I know
21 that the payments on shared services hadn't
22 been made.  I could not have known that the
23 December 31 payment wouldn't have been made
24 on December 31 until after December 31.

Page 128

J. Seery

1    Q.   Well, but you could have learned
2 that Mr. Dondero had instructed that the
3 December 31 payment not be made ahead of
4 time, could you not have?
5    A.   I -- I could have, but I did not
6 learn that.
7    Q.   Okay.  That's -- that's what I'm
8 trying -- that's what I'm trying to
9 ascertain.  I'm trying to refresh your
10 memory.
11         So you can now testify that prior
12 to the payment not being made, you did not
13 know about the Dondero instruction not to
14 make the payment?
15    A.   With respect to the -- the note
16 payment, that's correct.
17    Q.   Okay.  So what -- that's what I
18 mean.
19         It would have had to have been
20 January 1 or after -- January 1, 2021 or
21 after that you learned about that?
22    A.   I would have to have learned of the
23 effect of it.  If the -- if the actual
24 statement was don't make any payments

Page 129

J. Seery

1 irrespective of when they're due, that could
2 have been made in early December.  I wouldn't
3 have known the effect of it.
4         I knew the effect with respect to
5 the shared service because it wouldn't be
6 paid.  He might have changed his mind and I
7 didn't know that.
8    Q.   Okay.  I'm going to -- I'm going to
9 try again.
10         On or about January 31, 2020 --
11    A.   December 31.
12    Q.   Thank you.
13         On or before December 31, 2020,
14 sitting here today, do you remember being
15 informed of the Dondero instruction not to
16 make payments?
17         MR. MORRIS:  Objection, asked and
18    answered.
19    A.   Again, I don't recall the exact
20 date I learned.  I believe I certainly knew
21 that the shared service payments had not been
22 made.  I believe I knew that that related to
23 a Dondero edict.
24    Q.   So you're saying shared services in

J. Seery

1  J. Seery
2  response to my answer.
3  Why, why does -- why is that
4  relevant? Because from that you deduced that
5  all payments were to cease?
6  A.  No, they were due before.
7  Q.  That's -- okay, I apologize.
8  So this shared services contract
9  required periodic payments, right?
10  A.  Correct.
11  Q.  And, and -- and are you saying that
12  before December 31, 2020, NexPoint had
13  already failed to make at least one of those
14  periodic payments?
15  A.  I believe so, yes.
16  Q.  Okay. Did you, at that point in
17  time, inquire as to why that payment hadn't
18  been made?
19  A.  I don't recall, but I loosely
20  recall - but I don't know exactly when I
21  learned it - that there had been this edict.
22  Q.  Okay. I'll use that word "edict."
23  That's the one -- we're both saying the same
24  thing, right --
25  A.  Correct.

J. Seery

1  J. Seery
2  Q.  -- where Dondero tells Waterhouse
3  no more payments, right?
4  A.  Fair enough.
5  Q.  So sitting here today, it is
6  possible that before December 31, 2020, you
7  had heard vis-a-vis Ms. Hendrix that NexPoint
8  would not be making its scheduled payment
9  because of the Dondero edict?
10  A.  Scheduled payment on the note?
11  Q.  On the note.
12  A.  No, I don't think that's fair.
13  Q.  That's all I'm -- okay. So I'm --
14  I'm asking just about the note.
15  As of December 31, 2020, sitting
16  here today, do you remember having heard that
17  NexPoint would not be making its December 31
18  payment because of the Dondero edict?
19  A.  I pretty clearly recall that the
20  payments had not been made, and I had heard
21  that there had been an edict.
22  The full implication of that edict
23  and whether it extended to the note I did not
24  know until the payment was missed.
25  Q.  Understood. I think that -- I

J. Seery

1  J. Seery
2  think -- thank you. I understand now.
3  So you knew that there had been an
4  edict not to make payments, you just didn't
5  realize definitively that that edict also
6  applied to the promissory note payment?
7  A.  Correct.
8  Q.  Okay. By December 31, 2020, had
9  the debtor laid off certain people, certain
10  employees, let's just say for cost-cutting
11  purposes as opposed to regular terminations,
12  you know -- you know what I'm trying to say?
13  Had there been just --
14  A.  Had there been a RIF?
15  Q.  A reduction --
16  (Simultaneous speaking.)
17  Q.  Yes, yes.
18  A.  No, there had not been.
19  Q.  So to your understanding, the
20  debtor personnel that would have had any
21  involvement with these treasury and payment
22  services, helping affiliated companies make
23  their payments, all those personnel were
24  still there?
25  A.  Largely the same.

J. Seery

1  J. Seery
2  Q.  Okay. When you say largely, can
3  you think of anyone right now that was no
4  longer there or changed?
5  A.  Not specifically. There were --
6  there was some attrition during 2020 and we
7  didn't specifically replace some of those,
8  but some -- some people we did replace. We
9  actually hired people in 2020.
10  Q.  But as with respect -- pardon me.
11  As it respects -- strike that.
12  With respect only to the payment
13  we're talking about, i.e. scheduling future
14  permission to pay them, all those personnel
15  that would have had a role in -- on that for
16  the debtor were still there in December 2020?
17  A.  I -- I believe that group was
18  largely the same.
19  Q.  Waterhouse, Klos and Hendrix?
20  A.  Ellison Rober -- I can't remember
21  her last name. So there -- there were a
22  couple others in that group as well, and then
23  there were some other junior people that
24  would have assisted them.
25  Q.  I'm going to ask you a hypothetical

J. Seery

2 question.  Let's say that on December the
3 10th, 2020, Hendrix tells you that Dondero
4 has instructed that the note payment by
5 NexPoint will not be made.
6         Would you have issued any
7 instructions to employees of the debtor
8 following up on that, what you just learned?
9         MR. MORRIS:  Objection to the
10    form of the question.
11    A.    I, I don't know -- know if --
12 knowing what I know now and that they hadn't
13 made the shared service payments at that time
14 and that it seemed to be going towards
15 litigation, I would not have done anything, I
16 don't think.
17    Q.    Okay.  So, again, to round off this
18 topic, you do not believe that employees of
19 the debtor had any obligation, after
20 Dondero's edict, to follow up with NexPoint
21 about its upcoming note payment?
22    A.    No.
23    Q.    Okay.  Did you consult this shared
24 services agreement, to your recollection,
25 before your January 7, 2021 letter?

J. Seery

2 A.    I certainly --
3         MR. MORRIS:  Objection to the --
4         (Simultaneous speaking and
5    reporter interjection.)
6    A.    I certainly was familiar with the
7 agreement and had consulted it numerous
8 times.
9         If your question is did I consult
10 this agreement with respect to that demand
11 letter, the answer's no.
12    Q.    Okay.  If you'll turn to Section
13 2.06 of this agreement for me, sir.
14         And certainly you can look at the
15 definitions, but the staff and services
16 provider, that's the debtor, right?
17    A.    Yes.
18    Q.    And management company, that's
19 NexPoint, right?
20    A.    Yes.
21    Q.    Okay.  So Section 2.06, the last
22 sentence, sir, that basically says that the
23 debtor will not have any duties or
24 obligations to NexPoint unless those duties
25 and obligations are specifically provided for

J. Seery

2 in this agreement.
3         Did I paraphrase that correctly?
4    A.    Roughly, yes.
5    Q.    Okay.  And if we flip to Section
6 6.01, sir, and -- and take a second, please,
7 to read that section.
8    A.    (Document review.)
9         Okay.
10    Q.    And -- and you might want to look
11 at the definition of covered person real
12 quick.  I believe you'll find it includes the
13 debtor.
14    A.    Okay.
15    Q.    So I read this and, and -- and it
16 says (as read):
17         Except as otherwise
18    expressly provided herein, each
19    covered person shall discharge its
20    duties under this agreement with
21    the care, skill, prudence and
22    diligence under the circumstances
23    then prevailing that a prudent
24    person acting in a like capacity
25    and familiar with such matters

J. Seery

2    would use in the conduct of an
3    enterprise of a like character and
4    with like aims.
5         Did I read that correctly?
6    A.    Roughly.
7    Q.    Okay.  Do you have any
8 understanding of that section, sitting here
9 today?
10    A.    I know what every one of those
11 words mean.
12    Q.    Okay.  Reading that, do you still
13 believe that Mr. Waterhouse and Mr. Klos and
14 Ms. Hendrix had no duty to go back to
15 Mr. Dondero and advise him of the
16 ramifications of his edict and try to
17 persuade him otherwise?
18         MR. MORRIS:  Objection to the
19    form of the question.
20    A.    Yes, I do.
21    Q.    Okay.
22    A.    I believe that they didn't have any
23 further duty.
24    Q.    If you had issued an edict in the
25 heat of the moment or based on bad advice,

J. Seery

1           J. Seery
2 would you expect your officers to come to you
3 and say, Mr. Seery, just so you know, there's
4 going to be consequences, please reconsider?
5         MR. MORRIS:  Objection to the --
6   A.  Me personally?
7   Q.  Yes.
8         MR. MORRIS:  -- form of the
9 question.
10       (Simultaneous speaking and
11 reporter interjection.)
12   A.  My relationship with people who
13 work with or for me is very different than I
14 understand Mr. Dondero's.  But as a
15 professional and someone who's been doing
16 this for thirty years, if I give my
17 direction, I expect it to be followed.  And I
18 know, from what I have heard and seen,
19 Mr. Dondero is that to the nth degree.
20   Q.  So, again, I understand that you
21 expect your instructions, Mr. Seery's
22 instructions, to be followed.
23   A.  Yes.
24   Q.  But from your officers, do you
25 believe that they have an obligation to come

1           J. Seery
2 to you, after you issue an instruction and if
3 they believe it's bad for the company, to
4 dissuade you of that instruction?
5   A.  I, I --
6         MR. MORRIS:  Objection to the
7 form of the question.
8   A.  I would prefer that they did, yes.
9   Q.  Okay.  NexPoint was paying the
10 debtor's employees in this -- including
11 Mr. Waterhouse, Mr. Klos and Ms. Hendrix, for
12 services under this contract, correct?
13   A.  Correct.
14   Q.  And other than amounts in
15 controversy that are not insignificant,
16 NexPoint paid millions of dollars to the
17 debtor under this contract, did it not?
18   A.  I don't believe it paid millions --
19   Q.  Okay.
20   A.  -- of dollars.
21         MR. MORRIS:  Yeah, objection.
22   Q.  Okay.  But it paid -- it paid some
23 amount under this contract?
24   A.  I would say for the services, one
25 would easily say a paltry amount.  And the

1           J. Seery
2 vehicle, NPA, was used largely to strip
3 assets and value out of Highland.
4   Q.  But the same Mr. Waterhouse that
5 has a duty to you, as the chief executive
6 officer, to tell you that one of your courses
7 of action is going to be detrimental has no
8 such duty to Mr. Dondero, because
9 Mr. Dondero's a tyrant?
10         MR. MORRIS:  Objection to the
11 form of the question.
12   A.  I said I would prefer that a
13 Mr. Waterhouse or anyone else who works for
14 or with me advise me if they think the course
15 of action I'm taking is incorrect.  If I
16 listen to their advice and make my decision,
17 then we live with my decision.  I don't want
18 to revisit it ten times.
19     So I don't know whether
20 Mr. Waterhouse told Mr. Dondero that that
21 course might have ramifications.  One would
22 think that a man who's run these businesses
23 for this long and had put this company into
24 bankruptcy and had left hundreds of millions
25 of dollars strewn across the street of

1           J. Seery
2 losses, that one would have some
3 understanding of what those ramifications
4 might be, and maybe Mr. Waterhouse didn't.  I
5 don't know; I wasn't there.
6   Q.  Do you agree, sir, that Section 601
7 also applied to you with respect to -- as a
8 covered person, with respect to how you
9 conducted business under this contract?
10     Do you --
11   A.  Could I -- no, I think it -- well,
12 I can --
13   Q.  Take a second -- take a second to
14 read the definition of covered person.
15   A.  Uh-huh.
16   Q.  And, look, we can agree that you're
17 not making any legal conclusions here.  I'm
18 just...
19   A.  (Document review.)
20     I believe it does, yes.
21   Q.  Yet before you sent your January 7
22 letter, you did not check to see whether
23 NexPoint had made any prepayments on the
24 note, correct?
25   A.  I think I testified that I didn't

Page 142

```
1                J. Seery
2  check, but our -- my understanding, based
3  upon the work of the accounting group, was
4  that the payment was due and scheduled.  It
5  had to be paid.
6         If it had not been due, it had been
7  prepaid, it would not have been scheduled.
8  So there was no need for me to go doublecheck
9  that.
10     Q.    And you did not separately inquire
11 of anyone at the debtor as to whether
12 NexPoint had a defense to your January 7
13 letter, correct?
14     MR. MORRIS:  Objection to the
15     form of the question.
16     A.    No, I did not.
17     Q.    Is that not, sir, something that
18 would have been prudent to do pursuant to
19 Section 601, check as to whether NexPoint had
20 made a prepayment or had a defense?
21     MR. MORRIS:  Objection --
22     A.    I --
23           (Simultaneous speaking.)
24     A.    -- I don't believe that's something
25 that would have been required by this or any
```

Page 143

```
1                J. Seery
2  other provision.
3     Q.    Do you believe that Section 601
4  played any role at all, now that you're
5  reading it, with respect to your decision to
6  call the note as opposed to call NexPoint and
7  say, hey, what happened?
8     A.    I don't -- I don't believe it
9  governs it at all.
10    Q.    Do you believe it governed in any
11 respect whatever Mr. Waterhouse and
12 Mr. Dondero discussed on or about January --
13 January 11, 2021?
14    A.    I don't know the substance of their
15 discussion, other than that the -- what we've
16 referred to as the edict, at least that's as
17 it's been reported.  So I don't know what
18 colloquy they had with respect to
19 ramifications of making a payment or not.
20          Clearly, there should have been
21 more ramifications for not making the shared
22 services payments, but Mr. Dondero issued a
23 similar edict or --
24          (Simultaneous speaking.)
25    Q.    Mr. Dondero didn't issue a similar
```

Page 144

```
1                J. Seery
2  edict?
3     A.    I said he did.
4     Q.    He did.
5           So why didn't you terminate the
6  services agreement immediately upon
7  NexPoint's failure to pay?
8     A.    Well, we would have, I think, if we
9  thought we could.  We also had an issue that
10 both NexPoint and HCMFA were providing
11 services to retail funds and had no ability
12 to provide any of those services without
13 Highland.  They literally had left themselves
14 completely exposed, while just stripping out
15 fees.
16    Q.    Do you believe with respect to
17 Section 601, standard of care, that the
18 parties prior course of dealing, i.e. rolling
19 up prior notes, had any role on January 7,
20 2021?
21    MR. MORRIS:  Objection to the
22    form of the question.
23    A.    No, I don't.
24    Q.    Okay.  Did you take any prior
25 course of action between the parties into
```

Page 145

```
1                J. Seery
2  account when you executed and issued your
3  January 27, 2021 letter?
4     A.    Certainly.  The payments are
5  typically made on time, and if they're not
6  paid, then it's prudent and required to
7  accelerate the note.
8     Q.    But five times before, you -- you
9  knew by then that five times before, demand
10 notes were rolled up into a term note, which
11 you said before, I believe, was for an
12 improper purpose?
13    MR. MORRIS:  Objection to the
14    form --
15    A.    At least three of them that are
16 sub -- subject to the current litigation.  I
17 don't recall if it was five, but this one
18 contained five notes, if -- three term notes
19 that were rolled notes.  But those were done
20 prior to bankruptcy and they were done with
21 Mr. Dondero on both sides of the transaction.
22    Q.    So your borrower, who owes you
23 24 million and change that you're under a
24 contract with that the borrower is paying
25 you, where you provide employees to the
```

J. Seery

borrower, and your affiliate entity misses a scheduled payment, you believe that you have no obligation to do anything before you called the note immediately due?

A. That -- that's absolutely correct.

MR. RUKAVINA: Okay. Do you mind if we take another restroom break?

MR. MORRIS: Sure.

MR. RUKAVINA: I'm getting near -- near the end. Five minutes, please.

(Brief off-record discussion.)

VIDEO TECHNICIAN: The time is 4:16. We're off the record.

(Recess taken.)

VIDEO TECHNICIAN: The time is 4:21. We're back on the record.

BY MR. RUKAVINA:

Q. Did you have a view, as of December 2020 or January 2021, as to whether the debtor owed any fiduciary duties to NexPoint?

MR. MORRIS: Objection to the form of the question.

A. I -- I believe I did.



J. Seery

Q. And what was your view?

A. I don't think -- certainly by that time, if there ever had been, I don't think by that time there were any fiduciary duties owed.

Q. Okay. Real quick, we're still on this shared services agreement, sir, page 4. This is a list of services to be provided. I'm just -- you can read it in detail, but I just have a very simple question. 4B talks about legal compliance risk analysis.

In December of 2020, was the debtor providing legal services to NexPoint?

A. I don't believe so, or at least not any -- there might have been some assistance. I'm trying to think what would have been done at that time in terms of support, but there certainly -- compliance was probably transferred pretty fully by then.

I don't think NexPoint was involved in any litigation at that point, certainly not that the debtor was supporting, so I -- I don't think very much, if anything.

Q. Okay. Do you know whether NexPoint



J. Seery

had written policies and procedures in place with respect to how it conducted its business?

A. I'm not sure.

MR. RUKAVINA: Okay. You can put that down, sir.

(Brief off-record discussion.)

MR. RUKAVINA: So this is going to be Exhibit 10.

(Exhibit 10, Email Chain D-NNL-007578 - D-NNL-007579, marked for identification, as of this date.)

BY MR. RUKAVINA:

Q. Sir, you are not on this email chain, so I don't expect to authenticate it.

But have you seen this email chain before, between Mr. Waterhouse and Ms. Hendrix on January 12, 2021?

A. I believe I have, yes.

Q. Okay. Was it in preparation for this deposition or had you seen it before?

A. Only in preparation for the deposition.

Q. Were you aware that Mr. Waterhouse



J. Seery

was asking Ms. -- asking Ms. Hendrix for the total principal on this note on January 12, 2021?

I'm sorry, were you aware of it at about that point in time?

A. No, not until I saw this email.

Q. Okay. Did you ever discuss -- so I think -- I think you've -- you've said it earlier, that you did not know until Mr. Waterhouse's deposition that Mr. Waterhouse and James Dondero had a communication on January 12, 2021, right?

A. I did not know.

Q. Did, did -- did you know from Ms. Hendrix that she had had any communications with Mr. Waterhouse on or about January 12, 2021, about how much the missed payment was?

A. No, I did not.

Q. Okay. Have you asked her about what this email was in reference to since you've seen this email?

A. No, I have not.

MR. RUKAVINA: Okay. This is

Page 150

J. Seery

1    going to be Exhibit 11, sir.
2    (Exhibit 11, Email Chain
3    D-NNL-028514 - D-NNL-028515, marked
4    for identification, as of this date.)
5    Q.    So, Mr. Seery, this -- you're not
6    on this email chain, but this email begins on
7    December 10, 2020, from Ms. Hendrix to
8    Mr. Romey -- I'm sorry, from Mr. Romey to
9    Ms. Hendrix, where he writes (as read):
10   Can you tell me the original
11   maturity date for the NPA loan
12   before it was restructured?  Sorry
13   for the hustle.  Seery is asking
14   for this ASAP for today's court
15   hearing.
16   Do you see that, sir?
17   A.    I do see it.
18   Q.    Do you recall asking Mr. Romey
19   anything about that loan or anything about
20   this on or about January -- December 10,
21   2020?
22   MR. MORRIS:  Objection to the --
23   A.    Not specifically.
24   Q.    Okay.  It says that you were --

Page 151

J. Seery

1    there was a court hearing.
2    Do you remember what that court
3    hearing might have been?
4    A.    I -- I don't.
5    Q.    Okay.  Do you have any recollection
6    as to why you would have been asking about
7    the original maturity date of the NPA loan
8    before it was restructured?
9    A.    I think it's a mistake, that there
10   were -- there were five notes --
11   Q.    Okay.
12   A.    -- that were rolled into this one.
13   I may have just been checking
14   whether they were all demand or if any of
15   them have had a maturity.  I don't -- I don't
16   know why I would have been asking for it.  I
17   don't recall what the hearing was about.
18   Q.    Fair enough.  You testified before
19   that -- and I'm not trying to put words in
20   your mouth, sir.
21   You testified before that there was
22   something maybe inappropriate or shady about
23   the roll-up of the five notes into the one
24   NexPoint note.

Page 152

J. Seery

1    Whatever -- whatever words you
2    used, was that your speculation as to why it
3    happened, was that your logical deduction, or
4    did someone tell you that that's why the
5    notes were rolled up?
6    MR. MORRIS:  Objection --
7    (Simultaneous speaking.)
8    A.    -- logical deduction.
9    (Reporter clarification.)
10   BY MR. RUKAVINA:
11   Q.    Excluding lawyers, sir, and
12   excluding now in litigation, that back
13   when -- when the debtor existed and you were
14   the CEO/CRO, did you ask anyone at the debtor
15   or did you ask Mr. Dondero why those notes
16   had been rolled up into the $30.7 million
17   note?
18   A.    I don't believe I asked
19   Mr. Dondero.
20   I know I inquired as to whether the
21   debtor got anything for the extension of the
22   maturity.
23   Q.    Who did you inquire of?
24   A.    I don't recall specifically.

Page 153

J. Seery

1    Q.    Mr. Surgent?
2    A.    I don't recall specifically.  He
3    wouldn't, he wouldn't have -- it would either
4    have been Frank Waterhouse or someone else in
5    accounting; was anything paid?  And --
6    because there were a number of notes that
7    were rolled up in a similar fashion, and it
8    all happened around the same thing; a number
9    of things were happening to the debtor at
10   that time.
11   Q.    Why did the debtor or the
12   reorganized debtor not retain Mr. Waterhouse
13   after the termination of the shared services
14   agreements?
15   A.    I didn't need him.
16   Q.    Okay.  Mr. Klos was promoted to
17   CFO?
18   A.    Correct.
19   Q.    Okay.  Did you have any personal
20   dislike of Mr. Waterhouse ever?
21   A.    No.
22   Q.    Did you have any personal views
23   that his services as CFO were not up to
24   par --

Page 154

J. Seery

2 MR. MORRIS: Objection --
3 Q. -- not up to what you expected them
4 to be?
5 A. No, I just preferred, for what we
6 were doing, Mr. Klos.
7 Q. Did you ever form the opinion that
8 Mr. Waterhouse was -- I don't know what word
9 to use -- Mr. Dondero's stooge or tentacle?
10 A. No.
11 Q. Okay. Did you have any opinion as
12 to whether he was -- again, I don't know what
13 word to use -- whether he was a responsible,
14 proper CFO when he was the CFO of Highland
15 and you were the CRO?
16 A. While he was CFO, I -- I think he
17 was adequate, but I think the challenge that
18 the employees had at Highland was the pull
19 that Dondero had, the go-betweens that he
20 had.
21 And it's hard to say at a specific
22 time, because I know a lot more now,
23 including to do with payments, including tens
24 of millions of dollars offshore, with respect
25 to Ellington.

Page 155

J. Seery

2 So I -- I know way more now, so
3 it's hard to separate those things. But with
4 respect to Mr. Waterhouse, I think he was --
5 he was adequate. I think the team was very
6 good. And I think that the -- I was always
7 concerned about loyalties.
8 Q. Did you ever, when you were the
9 CRO, discipline, censure, caution
10 Mr. Waterhouse about anything?
11 MR. MORRIS: Objection to the
12 form of the question.
13 A. I actually gave him a raise on his
14 base salary because he couldn't get bonuses
15 because of the Court order structure. I did
16 caution him and many employees about
17 loyalties and their duties to the debtor.
18 Q. And you remember cautioning him
19 specifically about that or as part of larger
20 group?
21 A. As part -- I -- I believe it was
22 part of the larger group. I certainly did it
23 with both legal and accounting, particularly
24 after Judge Jernigan's expressed --
25 expression of concern in -- in and around

Page 156

J. Seery

2 July of 2020.
3 Q. After you learned about the
4 NexPoint missed December 31, 2020 payment,
5 did you give any instructions to
6 Mr. Waterhouse or anyone else to the effect
7 of don't negotiate any settlement or cure or
8 anything on that default without talking to
9 me first?
10 A. I don't believe that I had any
11 discussion like that with anybody, but it
12 would have been clear, I think, that once the
13 demand letter went out and I had been
14 responsible for initiating it, that the full
15 amount was due, and if anybody wanted to
16 negotiate anything, they would have to do it
17 through me.
18 And certainly no one had the
19 ability to negotiate any monetary settlements
20 with respect to the debtor's assets without
21 talking to me and the board.
22 Q. Okay. Why is that?
23 A. Because we were in bankruptcy and I
24 was the CEO, and I told everybody on the team
25 that they had to come through me. Any

Page 157

J. Seery

2 material decisions had to go through me.
3 Q. And you told that to
4 Mr. Waterhouse?
5 A. The whole accounting team as well
6 as the legal team.
7 Q. Do you recall if that's in writing
8 anywhere?
9 A. I don't think so.
10 Q. Did you define materiality to them;
11 do you recall?
12 A. I don't think so.
13 Q. Okay. So you never expressly
14 prohibited Mr. Waterhouse from hypothetically
15 accepting any cure to reinstate that note,
16 but you would have expected him to know that
17 he had no authority to do so on behalf of the
18 debtor?
19 A. Oh, I --
20 MR. MORRIS: Object -- objection
21 to the form of the question.
22 A. -- I -- I think it would have been
23 beyond obvious that he had no authority to do
24 that for the debtor.
25 Q. Do you think that would have been

J. Seery

1  beyond obvious to Mr. Dondero?
2  A.  Yes, I do, well --
3  Q.  Why --
4  A.  -- beyond -- well beyond obvious.
5  Q.  Why is that?
6  A.  Because the shared services had
7  already been terminated.  We were heading
8  towards a confirmation of a monetization
9  plan.  He had already failed to pay shared
10  service amounts.  He had already been found
11  in contempt of court.
12  The idea that he could cut a deal
13  with a former employee over material asset of
14  the debtor is nonsensical.
15  Q.  Okay.  Mr. Waterhouse wasn't a
16  former employee on January 12, 2021, was he?
17  A.  No, he was not, correct.
18  Q.  And although the notice of
19  termination had gone out for the shared
20  services agreement, it had not been
21  terminated as of January 12, 2021, correct?
22  A.  That's correct.
23  Are you -- are you implying that --
24  that there was such a deal and you're going

J. Seery

1  to make up a new story?
2  Q.  Well, sir, I object to you saying
3  I'm going to make anything up.  I'll let
4  Mr. Waterhouse and Mr. Dondero testify as
5  they did.
6  But certainly you would -- you
7  would not be aware of any deal that Frank or
8  James Dondero might have made, right?
9  A.  I -- I would not be aware of any
10  such deal.
11  Q.  Certainly you would have never,
12  ahead of time or after the fact, authorized
13  any such deal?
14  A.  No, I would not.
15  Q.  Okay.  Why not?  Why not accept a
16  cure and reinstate the note?
17  A.  Because the full amount of the note
18  was due.  We're in a monetization plan.  This
19  is an opportunity to monetize an asset.
20  MR. RUKAVINA:  Just a moment,
21  please.
22  THE WITNESS:  Sure.
23  MR. RUKAVINA:  It's 4:30 local,
24  right?

J. Seery

1  Mr. Seery, allow me just five
2  minutes to consult with my co-counsel.  I
3  believe that I'm done, but before I make
4  that decision, I just want to have a few
5  minutes.
6  THE WITNESS:  Certainly.
7  VIDEO TECHNICIAN:  The time is
8  4:34.  We're going off the record.
9  (Recess taken.)
10  VIDEO TECHNICIAN:  The time is
11  4:40.  We're back on the record.
12  (Brief off-record discussion.)
13  MR. MORRIS:  Pass the witness.
14  Mr. Seery, thank you for doing this
15  in person in your beautiful city.
16  THE WITNESS:  Thank you.  It's
17  coming back, slowly.
18  MS. DEITSCH-PEREZ:  Okay.  Good
19  afternoon, Mr. Seery.
20  THE WITNESS:  Good afternoon.
21  EXAMINATION
22  BY MS. DEITSCH-PEREZ:
23  Q.  When Mr. Rukavina started
24  questioning you, and you were describing your

J. Seery

1  background, you mentioned that you had been
2  involved in hundreds of bankruptcies.
3  Could you tell us, just by listing
4  them, the -- the most substantial companies
5  that you were involved with bankruptcies for?
6  A.  United Airlines, TWA, Columbia Gas,
7  Lehman Brothers.  It, it -- it's a
8  thirty-year career, so...
9  Q.  I'm just asking for the highlights.
10  A.  Those aren't bad.
11  Q.  Okay.  Were there any other
12  financial services companies that you were
13  involved in the bankruptcy or restructuring
14  of?
15  A.  Lehman Brothers would be considered
16  a financial services company.
17  Q.  Okay.  And what kind of company
18  would you consider Highland?
19  A.  Highland is a financial advisor.
20  Q.  Okay.  Were there any other
21  financial advisors that you were involved in
22  the restructuring or bankruptcy of?
23  A.  I guess technically MF Global, in
24  some of its places, would fall into that

J. Seery

1 category. Madoff would fall into that
2
3 category.
4 Q. Any others?
5 A. There may be. Off the top of my
6 head, I don't recall.
7 Q. Okay. And in the course of those
8 engagements, were you generally aware of the
9 top-level executive compensation for the
10 top-level executives prior to the -- the
11 bankruptcies?
12 A. Not specifically. It just depends
13 on each -- each company.
14 Q. Generally, were you -- were you
15 aware? Is that the kind of thing you took
16 note of?
17 A. Not -- it -- I was more concerned
18 with the particular issue that I was dealing
19 with as opposed to whether somebody -- what
20 somebody made.
21 Q. In the bankruptcies that you were
22 involved with, with the -- with the larger
23 companies and all of the financial services
24 or financial advisory companies, can you --
25 can you tell me generally the range of

J. Seery

1 compensation for the CEOs --
2
3 A. I, I --
4 (Simultaneous speaking.)
5 A. -- no, I wouldn't be able to tell
6 you that.
7 Q. Even a ballpark you couldn't --
8 couldn't say?
9 A. They're all different kinds of
10 companies.
11 Q. I understand, but can you -- for
12 any of those companies, can you give me a
13 ballpark of what the compensation was?
14 A. It could be anywhere in any
15 particular year from zero to $25 million.
16 Q. Okay. And is there a general
17 pattern that founder CEOs have higher
18 compensation than hired-off-the-street CEOs?
19 MR. MORRIS: Objection to the
20 form of the question.
21 A. No, there's not. In fact, it could
22 sometimes go the other way.
23 Q. But -- but is it sometimes the
24 case, in your experience, that founder CEO
25 compensation is on the high end?

J. Seery

1 MR. MORRIS: Objection to the
2
3 form of the question.
4 A. I, I -- I don't have any basis to
5 say that. It really depends upon the company
6 and it depends on the performance of the
7 company. Just because you founded something
8 and you sit on a log doesn't mean you get
9 paid a lot of money.
10 Q. Do you know what the CEO
11 compensation was for the CEO of Lehman prior
12 to the bankruptcy?
13 A. In which year?
14 Q. The, the year prior -- the years
15 prior to the bankruptcy.
16 A. I -- I don't know.
17 Q. Does it -- does it refresh your
18 recollection that it was in the range of
19 $70 million?
20 A. There's no chance it was in the
21 range of $70 million. He would have gotten
22 stock awards and it would depend on what
23 those were worth.
24 (Simultaneous speaking.)
25 A. Obviously -- obviously, they ended

J. Seery

1 up being worth -- I think the number is -- I
2
3 think it's zero.
4 You're aware of that, correct?
5 Q. Prior to the bankruptcy.
6 A. Oh, prior to it being worth zero,
7 it -- it was worth a lot more.
8 Q. But as you sit here today, you
9 don't know what any of the CEOs of the
10 companies you advised made --
11 MR. MORRIS: Objection --
12 Q. -- that's what you're telling us?
13 MR. MORRIS: Objection to the
14 form of the question.
15 A. I didn't say I advised those
16 companies.
17 MR. MORRIS: Thank you.
18 Q. But you were involved in the -- in
19 the bankruptcy or reorganization --
20 A. No --
21 (Simultaneous speaking.)
22 A. -- I -- I don't have at my
23 fingertips the amount that the CEOs of
24 various companies made in various industries
25 over the last thirty years.

J. Seery

2    Q.    And -- and not even in a general
3   way, other than zero to 25 million?
4    A.    That's a pretty good range.
5    Q.    Okay.  Do you have an understanding
6   of what the typical compensation is -- for a
7   financial advisory CEO is for a company that
8   has a billion or more under management?
9    A.    It depends on the type of assets
10  that are under management, it tends -- it
11  depends on the performance of the assets and
12  it depends on the cost structure of the
13  business.
14   Q.    And taking those things into
15  account, can you describe for us what the
16  compensation for a CEO of a financial advisor
17  firm is, where there are assets under
18  management of a billion or more?
19   A.    When you [mean] a financial
20  advisor, do you mean an FA type firm or do
21  you -- financial advisor, or do you mean
22  somebody who advises investors?
23   Q.    I -- I'm talking about a company
24  similar to Highland.
25   A.    So high -- Highland is a -- is a

J. Seery

2   combination of types of businesses.  It's
3   basically, in the last five years, at best a
4   melting ice cube.  It receives certain
5   management fees and then it gives away
6   services at below cost.
7         So Highland was run at a loss.
8   Typically people who run businesses that
9   operate at an operating loss don't get paid a
10  lot of money.
11   Q.    Let me -- let me ask you, you're
12  now -- you've been the CEO of Highland for a
13  while, right?
14   A.    That's correct.
15   Q.    And you're going to remain the CEO
16  for a while longer?
17   A.    Perhaps.
18   Q.    And do you have an expectation of
19  how many years in total you'll likely be the
20  CEO of Highland?
21   A.    The less the better.
22   Q.    But aside from that, do you have an
23  expectation of how many years you will likely
24  be the CEO of Highland?
25   A.    I don't.  I hope we complete the

J. Seery

2   monetization by 2022.  Whether I'm the CEO or
3   not that will depend on the oversight board
4   and whether I want to continue to do it.
5    Q.    Okay.  And if you are as -- as
6   successful as you hope to be, whatever that
7   is, how much do you expect to make as the CEO
8   of Highland on average for each year that you
9   will have been the CEO of Highland?
10        MR. MORRIS:  Objection to the
11       form of the question.
12   A.    I -- I don't have a particular
13  expectation right now.  I have to negotiate
14  that, but I would expect to make a few
15  million dollars a year.
16   Q.    Have you not negotiated your
17  potential contingent compensation yet?
18   A.    I have not.
19   Q.    What -- what do you intend to ask
20  for?
21        MR. MORRIS:  Objection to the
22       form of the question.
23   A.    I'd like to get a significant
24  amount of money, as much as I can get and
25  treat my team fairly, but it has to be fair

J. Seery

2   based on the returns that we get for the
3   investors.
4    Q.    So based on, if you were as -- as
5   successful as you hope to be, what do you
6   think that number would be on an annual
7   basis?
8        (Simultaneous speaking and
9       reporter interjection.)
10        MR. MORRIS:  Objection to the
11       form of the question.
12   A.    I would expect it to be at least a
13  few million dollars a year.  If I was as
14  successful as I think we will be, it should
15  be significantly more than that.
16   Q.    Okay.  And so what does -- what
17  is -- because I don't know you very well,
18  Mr. Seery.
19        To you, what is significantly more
20  than a few million a year?
21   A.    Just to be clear, you don't know me
22  at all.  We've never met, so we'll -- we'll
23  make sure that that's clear so we don't --
24  there's no implication that there's some
25  prior relationship or that we've ever worked

Page 170

J. Seery

1  in any matter, in any connection whatsoever
2  other than this one.
3      Now, your question was?
4      MS. DEITSCH-PEREZ: Can you read
5  it back?
6      (As read by the reporter):
7      "QUESTION: And so what does --
8  what is -- because I don't know you
9  very well, Mr. Seery. To you, what is
10  significantly more than a few million a
11  year?"
12      A.   It will depend on -- on the cost.
13  It depends on the overall performance, and --
14  and that will dictate whether there's upside
15  to a performance bonus.
16      Q.   Is significantly -- let -- let's
17  break this down to little pieces.
18      A few million, is that two, three,
19  four, five? What is a few million?
20      A.   Typically I think of two as a
21  couple, three as a few.
22      Q.   Okay. Is four also a few?
23      A.   Four is a little more than a few,
24  but it could be in that neighborhood.
25

Page 171

J. Seery

1      Q.   Okay. So what is significantly
2  more than 3 to 4 million?
3      Is that twenty?
4      A.   That would be --
5      MR. MORRIS: Objection --
6      (Simultaneous speaking and
7  reporter interjection.)
8      A.   Twenty is significantly more than a
9  few, but it's -- it's not any -- there's no
10  prospect of $20 million of a bonus in this
11  type of arrangement. There's simply not
12  enough assets there.
13      Q.   Okay. So when you say
14  significantly more than a few, do you mean
15  something like ten, 10 million a year?
16      MR. MORRIS: Objection to the
17  form of the question.
18      A.   Again, I -- I don't have a specific
19  number in mind. I think that's -- that
20  there's no chance of that either.
21      Q.   So can you tell me what you mean by
22  significantly more than a few million?
23      A.   Five is significantly more than
24  three.
25

Page 172

J. Seery

1      Q.   Okay. Does that mean you're hoping
2  for compensation of 8 million a year or
3  5 million a year, just so I understand you?
4      MR. MORRIS: Objection to the
5  form of the question. Come on.
6      A.   There's no chance of $8 million a
7  year here. There's not enough assets.
8  There's not enough value in the estate to pay
9  anybody that amount, which is why Highland
10  would never pay anybody that amount anyway,
11  because when you have a melting ice cube and
12  you don't get any performance fees because
13  your performance is terrible, you don't pay
14  somebody that much money.
15  MO*    MS. DEITSCH-PEREZ: Move to
16      strike.
17      Q.   In your experience with the various
18  companies you've mentioned, have you seen
19  executives given loans as part of their
20  executive compensation?
21      A.   You know, I don't --
22      MR. MORRIS: Objection to the
23  form of the question.
24      A.   I don't know. I don't -- I don't
25

Page 173

J. Seery

1  recall. I've certainly seen loans be given
2  as part of compensation.
3      Typically senior executives, in my
4  experience, don't get loans because loans
5  either have to be paid back or structured in
6  an odd way.
7      If they're structured just to avoid
8  taxes, most legitimate companies don't want
9  to do that, so most companies will either pay
10  somebody a -- a base salary and deferred
11  amounts or will pay them with stock.
12      Q.   But you have seen loans given as
13  part of compensation?
14      A.   I -- I don't think I've seen it. I
15  know that it exists. I -- I don't recall any
16  senior executives in any companies that I've
17  worked around where a loan to a senior
18  executive was a -- was a material issue in a
19  case.
20      Q.   Have you also seen circumstances
21  where executives or just high-level employees
22  are given loans that are eventually forgiven
23  as part of their compensation?
24      A.   I -- I know it exists. Again, I

J. Seery

1  don't think it's been something or -- or
2  characteristic in any case either that I've
3  been involved with, invested in, worked on.
4  Q.  Given the nature of your work in
5  bankruptcies, does that simply mean that the
6  issue of loans and the forgiveness of the
7  loans has not been materially challenged in
8  the various engagements that you've
9  undertaken?
10  A.  No, I don't think -- I think it's
11  because it's not a material issue, and so you
12  don't -- you don't see very many companies
13  that I have been around where significant
14  amounts of the assets are company --
15  intercompany related loans or -- or loans to
16  the senior executives, where it's all
17  controlled by the same executive.  It's a --
18  Q.  Have you --
19  A.  -- it's a rare item.
20  Q.  Have you made any investigation, as
21  part of your role in this case, into whether
22  there are other companies that -- that have
23  similar loan programs, where executives or
24  senior officers receive loans that have the

J. Seery

1  potential to be forgiven?
2  MR. MORRIS:  Objection to the
3  form of the question.
4  A.  Yeah, again, I don't -- I don't --
5  I don't think there's a program involved in
6  this situation, and I don't think there's any
7  potential for loans to be forgiven, so I --
8  it's not something that I've seen elsewhere,
9  although forgivable loans can be used for
10  certain types of compensation to employees to
11  retain them, certainly would be -- be
12  humorous to do that with respect to a
13  founder, but I don't -- in my experience, I
14  haven't seen this as a -- as a material issue
15  like it is in this case.
16  Q.  And I was asking whether you had
17  investigated, so that you could -- currently,
18  whether or not there are other companies in
19  which there was a practice like the one you
20  just described.
21  MR. MORRIS:  Objection, asked and
22  answered.
23  A.  I haven't done any other
24  investigation, other than -- than my

J. Seery

1  experience.
2  Q.  Okay.  Did you investigate whether
3  or not any of the following people - mike
4  Hurley, Tim Lawlor, Pat Daugherty, Jack Yang,
5  Paul Adkins, Labraya Mamoud [ph], Jean Luc
6  Everland [ph] or Appou Landoseri [ph]
7  received loans that were potentially
8  forgivable and then that were, in whole or in
9  part, forgiven?
10  MR. MORRIS:  Objection to the
11  form of the question.
12  A.  I have looked at that, yes.
13  Q.  Okay.  And what did you determine?
14  A.  I determined that Highland, I don't
15  believe, has made a loan to any employee
16  other than Okada and Dondero in about twelve
17  years; that no loans were forgiven, notes --
18  so they were -- actually, I don't believe
19  they got any before 2014, maybe '13.
20  No senior executive got it except
21  with respect to Yang, but he was employed by
22  New York, not by HCMLP.  That was part --
23  effectively, was part of a severance when he
24  left.  And I don't think there's been any

J. Seery

1  that have been north of $500,000, so nothing
2  like this.
3  And I did determine that Okada's --
4  I believe he only had one loan.  I could be
5  wrong on that, but that's the only one I
6  recollect, and he paid it back.
7  Q.  And did he pay it back in
8  connection with this bankruptcy, a demand of
9  the bankruptcy?
10  A.  He did, yes.
11  Q.  Under threat of lawsuit?
12  A.  No.  I spoke to Mark and I said you
13  should go talk to your counsel, you have a
14  very good counsel, Sullivan & Cromwell.
15  He went and talked to them and he
16  said you're right, they said I have to pay it
17  back.  And he did, and we structured it.
18  Q.  So did you determine that the --
19  you mentioned Yang.
20  But the others that I listed, did
21  you determine whether they had or had not
22  received loans that had been forgiven in
23  whole or in part?
24  A.  It looks like they had, and that

Page 178

J. Seery

1 was about more than ten or twelve years ago
2 and it had not been done since. None of
3 those were obviously a founder, none of them
4 were more than $500,000.
5 Q. Okay. And did you learn that all
6 of the notes that existed in relation to
7 those loans for the people that I listed --
8 none of the notes actually contained the
9 forgiveness term?
10 MR. MORRIS: Objection to the
11 form of the question.
12 A. I -- I do not know that, no.
13 Q. Well, did you search for the notes
14 at issue?
15 A. I did not look at the notes, I just
16 looked at the dollar amounts.
17 Q. Did you talk to anyone who had been
18 involved in the -- the issuance of the notes
19 to the people that I listed that were
20 eventually forgiven?
21 A. No.
22 Q. Okay. Are -- are you aware that
23 it's generally the case, when companies use
24 potentially forgivable loans as a part of

Page 179

J. Seery

1 compensation, that the notes are bona fide
2 notes from the start that don't have a
3 forgiveness term and that the forgiveness
4 term, for tax purposes, is subsequent and
5 that taxes then are only paid when the note
6 is actually forgiven?
7 MR. MORRIS: Objection to the
8 form of the question.
9 A. My experience and understanding of
10 that is actually different. When an employee
11 receives a forgivable loan as part of either
12 their retention, and often it happens as a --
13 a way to either retain somebody or to employ
14 someone, that it's very clear that it's
15 forgivable up front. Otherwise, it would be
16 a trust-me loan.
17 Now, certainly the founder who
18 controls everything can make his own trust-me
19 loan because he can trust himself, but -- but
20 to structure it to avoid taxes, my experience
21 is that that's actually illegal.
22 Q. If you make payments on the loan
23 and it's only forgivable if certain
24 conditions occur in the future that are not

Page 180

J. Seery

1 certain --
2 MR. MORRIS: Objection to the
3 form.
4 Q. -- doesn't that -- does -- in your
5 understanding, isn't that a -- a loan that,
6 until it's forgiven, is a bona fide loan of
7 which no taxes are owed?
8 MR. MORRIS: Objection to the
9 form of the question.
10 A. I think you've described -- I
11 apologize.
12 I think you've described what I'd
13 call a scam.
14 Q. Let's step -- step back a second,
15 Mr. Seery.
16 If I use the term "tax efficient
17 transaction," what do you understand that to
18 mean?
19 MR. MORRIS: Objection to the --
20 (Simultaneous speaking.)
21 Q. -- something is tax efficient, what
22 does that mean to you, so I just make sure
23 we're -- we're talking the same language?
24 MR. MORRIS: Objection to the

Page 181

J. Seery

1 form of the question.
2 A. It -- it means a transaction
3 that's -- that's structured in a way to
4 minimize the -- the tax cost.
5 Q. Okay. And is your impression of
6 Mr. Dondero that, if he has a choice between
7 doing a transaction in a tax efficient way
8 and a non-tax efficient way, that he would
9 pick the tax efficient way?
10 A. I believe he would, yes.
11 Q. Okay. And are you condemning of
12 that --
13 A. No.
14 Q. -- is it a bad thing?
15 A. Tax -- tax avoidance is a --
16 Q. Taxi efficiency.
17 A. I said tax avoidance is a duty,
18 taxi evasion is a crime.
19 Q. Okay. So when you say "duty," what
20 do you mean?
21 Remember, a jury is listening to
22 this so I want it to be clear.
23 A. I believe --
24 MR. MORRIS: That's not entirely

Page 182

J. Seery

1 clear, just to be -- just to be
2 certain. You may never get to a jury,
3 but go ahead.
4 A. I don't recall if that was a -- a
5 quote from Learned Hand or one of the other
6 well known --
7 Q. It had that sound to you?
8 A. -- judges, but I -- I think that
9 structuring a transaction that has legitimate
10 purposes in a tax efficient way is not
11 necessarily problematic.
12 Structuring a transaction to avoid
13 taxes, and -- and mainly or solely to avoid
14 taxes, is actually a -- a violation of the
15 Internal Revenue Code.
16 Q. And looking at the various loans to
17 Mr. Dondero and the related company loans
18 that are the subject of the notes litigation
19 that you are here today to testify about, was
20 it the case that annual payments both on the
21 term loans and interest payments on the
22 demand loans were made?
23 A. Oftentimes, yes.
24 Q. Okay. And is that a characteristic

Page 183

J. Seery

1 of a bona fide loan, that --
2 MR. MORRIS: Objection to the
3 form of the question.
4 (Technical disruption.)
5 Q. -- later, but as long as that
6 hasn't happened, interest payments should be
7 made, and if it's a --
8 MR. RUKAVINA: We lost you,
9 Deborah. Deborah, we lost you.
10 MS. DEITSCH-PEREZ: Can you --
11 did you hear me?
12 MR. RUKAVINA: No.
13 MS. DEITSCH-PEREZ: Okay. I'll,
14 I'll -- I'll start over then.
15 Q. In your experience, is it a
16 characteristic of a bona fide loan, whether
17 demand or a term loan, that until it is
18 actually forgiven -- until and unless it is
19 forgiven, that annual interest payments
20 should be made on a demand loan, and whatever
21 is due pursuant to the terms of the note on
22 the term loan should also be made annually?
23 MR. MORRIS: Objection to the
24 form of the question.

Page 184

J. Seery

1 A. I -- I think that's a
2 characteristic of a bona fide loan, but I
3 think that you can have an accruing loan that
4 doesn't have those payments that is also a
5 bona fide loan. And so I -- I do think these
6 are bona fide loans. The money was given, a
7 note was signed, the amounts are owed.
8 Q. And do you have a reason to believe
9 that if it was in Mr. Dondero's power to
10 attempt to have these loans subject to a
11 condition under which there would be
12 forgiveness of the loan, is that something
13 that is -- that surprises you?
14 MR. MORRIS: Objection to the
15 form of the question.
16 A. It -- it shocks me.
17 Q. So you don't think that if
18 Mr. Dondero had the opportunity to -- to have
19 contingent compensation rather than
20 compensation in 2017, 2018 or '19, but move
21 it out into the future, it surprises you
22 that -- that he would want to do that?
23 MR. MORRIS: Objection to the
24 form of the question.

Page 185

J. Seery

1 A. Can -- can you read that question
2 back --
3 (Simultaneous speaking.)
4 A. -- I didn't understand it.
5 MS. DEITSCH-PEREZ: The court
6 reporter can read it back.
7 (As read by the reporter):
8 "QUESTION: So you don't think
9 that if Mr. Dondero had the opportunity
10 to have contingent compensation rather
11 than compensation in 2017, 2018 or '19,
12 but move it out into the future, it
13 surprises you that -- that he would
14 want to do that?"
15 MR. MORRIS: Objection to the
16 form of the question.
17 A. I -- I don't see any evidence
18 whatsoever that that's what he did. And in
19 fact, the way the business was run and the
20 monies he took out from various different
21 places connected to the business shows that
22 that wasn't the case.
23 MO* MS. DEITSCH-PEREZ: Move to strike
24 because you didn't answer --

Page 186

```
1                    J. Seery
2            MR. MORRIS:  And, and -- and I --
3      and I object, you asked him if -- I
4      just -- I, I --
5            MS. DEITSCH-PEREZ:  Well, John --
6            MR. MORRIS:  -- it's not -- the
7      judge will rule.
8            Go ahead.
9  BY MS. DEITSCH-PEREZ:
10     Q.    You've heard of -- Highland has
11  interests in Cornerstone, Trussway and MGM,
12  that's correct?
13           MR. MORRIS:  Objection to the
14      form of the question.
15     A.    You should be precise.  Highland
16  owns certain equity interests in Cornerstone,
17  approximately 4 percent.  Highland owns,
18  indirectly, all of the interests -- almost
19  all of the interests in Trussway.  Highland
20  owns a small piece of MGM.
21     Q.    Okay.  And have you made any
22  inquiry into whether employees at Highland
23  referred to these colloquially as portfolio
24  companies?
25     A.    I --
```

Page 187

```
1                    J. Seery
2            MR. MORRIS:  Object --
3      A.    I -- I know that cornerstone is
4  sometimes referred to as a portfolio company.
5  I know that Trussway is referred to as a
6  portfolio company.
7            It would be -- I've never heard
8  anyone refer to as -- MGM as a portfolio
9  company.
10     Q.    Have you ever made an inquiry as to
11  whether sometimes it was colloquially called
12  a portfolio company?
13     A.    I -- I haven't made an inquiry as
14  to it, no.  I've been around the business for
15  a year-and-a-half, nineteen months.
16     Q.    Have you ever heard Mr. Dondero
17  refer to MGM as one of the portfolio
18  companies?
19     A.    No, I haven't.  It would be very
20  odd if he would.
21     Q.    When you -- in the early days, when
22  you communicated with Mr. Dondero about the
23  prospects for the assets at Highland, did he
24  appear to have high hopes for the
25  monetization and increase in value of
```

Page 188

```
1                    J. Seery
2  Cornerstone, Trussway and MGM?
3            MR. MORRIS:  Objection to the
4      form of the question.
5      A.    I don't recall him ever talking to
6  me very much about Cornerstone and potential
7  upside or Trussway.
8            He did have high hopes, or
9  expressed high hopes, of upside value in MGM.
10  But at the same time, he sold 1.7 million
11  shares after the filing for 7250.  So that
12  sort of belied that optimism, but he
13  expressed some optimism that MGM would have
14  upside.  And of course he sat on the board,
15  so he'd have some insight into it.
16     Q.    And it looks like, hopefully, he
17  was right to -- in that optimism?
18           MR. MORRIS:  Objection to the
19      form of the question.
20     Q.    Is that right?
21     A.    We'll find out.
22     Q.    So far it appears that his optimism
23  may be justified; is that right?
24     A.    There's -- there's a transaction.
25  It's subject to approval and closure.
```

Page 189

```
1                    J. Seery
2      Q.    Okay.
3      A.    Certainly hope so.
4      Q.    If in fact all three of those
5  companies, MGM -- or Highland's interest in
6  those three companies are successfully
7  monetized, will the assets of Highland exceed
8  its liabilities?
9            MR. MORRIS:  Objection to the
10      form of the question.
11     A.    Extremely unlikely.
12     Q.    Possible though?
13           MR. MORRIS:  Objection to the
14      form of the question.
15     Q.    In your educated opinion --
16           (Simultaneous speaking.)
17     A.    Can I -- can I answer your
18  question --
19     Q.    Yes.
20     A.    -- unless "possible though" is just
21  a quip, because then I won't answer it.
22     Q.    No --
23     A.    Is that a question?
24     Q.    -- it's not a quip --
25     A.    Oh, okay.
```

J. Seery

1    Q.    -- it is a question.
2
3    A.    It's -- we know what the -- at
4    least now what the potential upside is to
5    MGM.  We don't know what the upside is for
6    Cornerstone or Trussway, but we understand
7    the performance of the companies and the
8    framework with which somebody would value
9    them.
10         So it would be extremely unlikely,
11   not impossible but extremely unlikely, for
12   those two companies - with MGM capped - to
13   have a performance that exceeded the total
14   amount of claims.
15   Q.    How close a matter is it?
16         MR. MORRIS:  Objection --
17         (Simultaneous speaking and
18   reporter interjection.)
19   Q.    How -- how close -- how close --
20   let me -- let me strike that and start again.
21         What would MGM, Trussway and
22   Cornerstone need to be monetized for in order
23   for the overall assets of Highland to exceed
24   its liabilities?
25         MR. MORRIS:  Objection to the

J. Seery

1    form of the question.
2
3    A.    I'm not in a position to answer
4    that, but all of the assets minus the
5    expenses to get there would need to exceed
6    $400 million.
7    Q.    And right now, what do you think
8    the assets are worth?
9         MR. MORRIS:  Objection to the
10   form of the question.
11   A.    Again, I don't -- I know what MGM
12   is potentially worth, but it's hard to -- I
13   can't count that until it's done.
14   Q.    I know but --
15         (Simultaneous speaking.)
16         MR. MORRIS:  Let him finish,
17   please let him finish.
18   A.    You don't -- can't count that until
19   it's done.  And then the other -- the other
20   businesses we have to put through a process,
21   to see what they're worth.  And they're,
22   they're, they're -- they've got potential
23   upside but they have challenges as well.
24   Q.    Okay.  Assuming you are as
25   successful as you hope to be, and crediting

J. Seery

1    for the moment the potential value of the MGM
2    transaction, what do you think the assets of
3    Highland are likely to be worth?
4         MR. MORRIS:  Objection to the
5    form of the question.
6    A.    I -- I don't know.  Part of it
7    depends on -- again, it's the costs.  It's
8    collection of $63 million notes in these
9    litigations, and then it's the ultimate value
10   of those assets.
11        But I would hope that we would be
12   very successful in the asset monetization,
13   where we would be able to get at lease
14   $300 million with those -- those assets and
15   others.
16   Q.    Do you think that if you're as
17   successful as you hope to be, that the assets
18   will be worth more than 400 million net of
19   the collection costs?
20   A.    I --
21        MR. MORRIS:  Objection to the
22   form of the question.
23   A.    I believe I already said I believe
24   that's unlikely, but I'm an optimistic

J. Seery

1    fellow.
2
3    Q.    So then you hope it is likely?
4    A.    I certainly hope so.
5         And, again, that -- that hope
6    counts on $63 million of note collections
7    that I do expect to collect.
8         MR. MORRIS:  Deborah?
9         MS. DEITSCH-PEREZ:  Yes.
10        MR. MORRIS:  I apologize for
11   interrupting, but sometime between now
12   and 6:00 I'm going to have to take
13   about a ten or a twelve-minute break.
14   I have no idea how much you have.
15        If you're going to finish in twenty
16   minutes, then let's do that.  If you're
17   going to take more than an hour, I
18   just -- just please stop at some point
19   by, you know, 5:30, 5:35, so I can take
20   that break.
21        I just have to attend to something
22   that -- it won't take too long, but I
23   just wanted to let you know that so you
24   weren't surprised.
25        MS. DEITSCH-PEREZ:  Okay.  If

Page 194

J. Seery

1  you're okay, let me do one more segment
2  and then I'll let you -- I'll excuse
3  you to -- to do your errands and we'll
4  come back?
5      MR. MORRIS:  Sure.
6      (Brief off-record discussion.)
7      MS. DEITSCH-PEREZ:  He needs --
8  he needs his ten or twelve minutes
9  before 6:00 --
10     THE WITNESS:  Got it, got it.
11     MS. DEITSCH-PEREZ:  -- is that
12 right?
13     MR. MORRIS:  Yep.
14 BY MS. DEITSCH-PEREZ:
15     Q.   Okay.  When Mr. Rukavina was
16 questioning you, he was questioning you about
17 the nonpayment of the NexPoint Advisors loan.
18 Remember that?
19          And you -- were you only talking
20 about NexPoint, that -- that loan not the
21 HCMS term loan and not the HCRE term loan?
22     A.   He was only asking me about the
23 NexPoint, as I understood it.
24     Q.   Okay.  So let me ask you, are you

Page 195

J. Seery

1  aware that there were what -- at issue in
2  these litigations, a term loan between
3  Highland and HCMS?
4      A.   Yes.
5      Q.   And a term loan between Highland
6  and HCRE?
7      A.   Yes.
8      Q.   Okay.  And when was the last
9  payment due on the HCMS term loan and the
10 HCRE term loan?
11     MR. MORRIS:  Objection to the
12 form of the question.
13     A.   I -- I don't recall exactly.  I
14 thought they were -- they were all in and
15 around the same time.  If they weren't the
16 31st, they were right there.
17     Q.   All right.  And were the annual
18 payments for the HCMS and HCRE term loans
19 made by December 31, 2020?
20     A.   They were not.
21     Q.   And were the annual -- and was a
22 payment made on each of those loans in
23 January of 2021?
24     A.   I believe a payment was made after

Page 196

J. Seery

1  they were accelerated for each of those
2  loans, similar to the situation with the NPA
3  loan.
4      Q.   Let me show you - hang on, let me
5  pull it up - what I have marked as -- I
6  marked it as exhibit -- premarked it as
7  Exhibit 111, just to make sure I cleared
8  Mr. Rukavina's exhibits.  But it's an
9  arbitrary number, we're not missing 100-odd
10 exhibits.
11          Okay.  Can you see the exhibit?
12          And I did email it to Mr. Morris
13 prior to the deposition.  Do you have it
14 there?
15     MR. MORRIS:  No, I didn't see
16 your email.
17     A.   I see it on the screen.
18     Q.   Okay.  You have them in your email.
19 If there are any of them that you need to
20 break for a moment and have the exhibits
21 printed so that you can look at the whole
22 thing, please let me know and we can stop,
23 okay?
24          So have you seen what I've marked

Page 197

J. Seery

1  as Exhibit 111 before?
2      A.   I believe I have.
3      Q.   Okay.  And did you cause the letter
4  to be sent out?
5      A.   I did, yes.
6      Q.   And did you write the letter?
7      A.   I don't believe I wrote it.  I
8  would have marked it up to some degree.
9      Q.   Who wrote Exhibit 111, which is the
10 letter to Mr. Dondero from you, dated
11 January 7, entitled "Demand on Promissory
12 Note"?
13     MR. MORRIS:  Objection to the
14 form of the question.
15     A.   My counsel.
16     Q.   Okay.  Do you know in particular
17 who wrote it?
18 DI*    MR. MORRIS:  I'm going to direct
19 the witness not to answer.
20     MS. DEITSCH-PEREZ:  Just he can
21 answer that, whether he knows who wrote
22 it?
23     MR. MORRIS:  Sure, he can answer
24 that question.

J. Seery

1    J. Seery
2    A.    Yes, I know.
3    Q.    Okay.  And can you tell me who
4    wrote it?
5            MR. MORRIS:  No.
6    Q.    And that's because your counsel has
7    directed you not to answer --
8            MR. MORRIS:  That's right.
9    Q.    -- or because you don't know?
10           MR. MORRIS:  It's because I'm
11       directing him not to answer.  We're not
12       going to even find out whether he knows
13       or not because it's privileged.
14    Q.    Okay.  Is this the only letter that
15   you caused to be sent to Highland Capital
16   Management Services with regard to the term
17   loan in the original principal amount of
18   20,247,628?
19    A.    I don't recall.  I would expect
20   there to have been a follow-up letter as
21   well, but I don't recall specifically.
22           Perhaps you have it.
23    Q.    I do not.  That's why I'm asking, I
24   don't see a letter like the one that we saw
25   earlier that was to NexPoint.

1    J. Seery
2    A.    I don't recall specifically; I
3    would have to look.  If we had it, we would
4    have produced it.
5    Q.    Okay.  And if you had it, would you
6    also have attached it to the complaint --
7            MR. MORRIS:  Objection to the
8       form --
9    Q.    -- the way the NexPoint letter was
10   attached to the complaint?
11           MR. MORRIS:  Objection to the
12       form of the question.
13    A.    I -- I don't know if we would have
14   or not.  I think the demand is sufficient on
15   its own.
16    Q.    Other than the possibility that
17   there was a -- let me back up.
18           Was there a payment made in January
19   on the HCMS term loan?
20    A.    I thought there was, but I don't
21   recall specifically.  I'd have to look at
22   the -- it would be in the complaint, I would
23   think.
24    Q.    Okay.  And if the complaint says
25   there was, then there -- then that would be

1    J. Seery
2    the case?
3    A.    If there was, it would have --
4    similar to the NPA, it would have been
5    applied on account.
6    Q.    Other than the letter that's been
7    marked as Exhibit 111, have you had any
8    communications with anyone at Highland
9    Capital Management Services about the note or
10   the payment or the nonpayment other than this
11   possible post-payment letter and the -- that
12   was similar to the NexPoint one that we
13   looked at earlier?
14           MR. MORRIS:  Objection to the
15       form of the question.
16    A.    I would only have communicated
17   through the demands.
18    Q.    Okay.  So just to make it very
19   clear, did you talk with Mr. Dondero about
20   the HCMS note payment, nonpayment or status
21   of the -- of the demand?
22    A.    No.
23    Q.    And did you talk with
24   Mr. Waterhouse about the note, the payment,
25   the nonpayment or the status of the demand?

1    J. Seery
2    A.    Not that I recall.
3    Q.    Okay.  What about Ms. Hendrix and
4    Mr. Klos; did you talk with either of them
5    about the note, the nonpayment, the payment
6    or the status of the -- of -- of the loan?
7    A.    Do you mean at the time this demand
8    note was sent?
9    Q.    Yes, in -- in December of 2020 or
10   January/February of 2021, that time frame.
11    A.    Not that I recall specifically, no.
12    Q.    And was it your understanding that
13   Highland provided shared services to Highland
14   Capital Management Services?
15           MR. MORRIS:  Objection to the
16       form of the question.
17    A.    It did not have a shared service
18   arrangement --
19    Q.    That wasn't -- wasn't my question.
20    A.    I'm answering your question .
21           But lots of free services were
22   given to lots of Dondero entities by lots of
23   Highland employees, who were never paid, over
24   the years.
25    Q.    Was it your understanding that

J. Seery

1                  J. Seery
2 Highland provided shared services to Highland
3 Capital Management Services?
4     A.    No.
5         MR. MORRIS: Objection to the
6    form --
7     A.    Sorry.
8         MR. MORRIS: -- of the question.
9     A.    No, shared -- shared services refer
10 to a specific agreement. There was no --
11 there was no agreement or other arrangement.
12         Highland employees did things
13 wherever Dondero asked them to do.
14     Q.    I, I -- I assume, when you say
15 there was no agreement, you're talking about
16 no formal written agreement like the one
17 we've looked at for NexPoint earlier today --
18         MR. MORRIS: Objection to --
19     Q.    -- is that what you're referring
20 to?
21         MR. MORRIS: Objection to the
22    form of the question.
23     A.    No, I'm referring to any type of
24 agreement.
25         You, you -- you refer to these

1                  J. Seery
2 companies as if they're standalone operating
3 entities that actually do things. These are
4 entries on paper that move money around.
5         So when Dondero asks an employee to
6 do work on behalf of himself, whether that's
7 closing his own house loans, whether that's
8 coming over and doing work at his house or
9 whether it's working for Highland Capital
10 Management Services, they -- they did it and
11 Highland was not compensated.
12     Q.    Have you -- have you investigated
13 whether there was effective compensation for
14 the services that Highland provided to
15 Highland Capital Management Services?
16         MR. MORRIS: Objection to the
17    form of the question.
18     A.    I -- I don't know what effective
19 compensation means, but I have investigated
20 whether Highland Capital Management received
21 anything from HCM Services.
22     Q.    And who did you ask?
23     A.    It's been part of the ongoing
24 review of the business throughout the second
25 half of this case and into the spring of this

1                  J. Seery
2 year.
3     Q.    And did you determine, in the
4 course of that investigation, that there was
5 a pattern and practice of Highland providing
6 services like the ones in the NexPoint shared
7 services agreement to Highland Capital
8 Management Services?
9     A.    I think you asked me if we got some
10 sort of -- I think you said either indirect
11 or some other form of compensation.
12         The answer was no. There were
13 things that Highland employees did at
14 different times at Mr. Dondero's directions
15 for these various entities, none of which
16 were paid for.
17     Q.    Was it generally the case that
18 Highland provided the back office services
19 for Highland Capital Management Services,
20 such as bill paying?
21     A.    Sometimes. I don't know that it
22 was generally the case. It depended. And
23 Highland Capital --
24         (Simultaneous speaking.)
25     A.    -- and Highland Capital Management

1                  J. Seery
2 Services really just owned certain things and
3 took money out of Highland.
4         The fact of the matter is, Highland
5 Capital Services' main business is that it
6 gives money to Jim Dondero. I think he owes
7 around a hundred million to services.
8 MO*     MS. DEITSCH-PEREZ: Move to
9    strike. That wasn't my question.
10     Q.    I asked you whether or not you
11 noticed, in the course of your various
12 investigations, that Highland Capital
13 Management provided back office services like
14 bill paying for cap -- for Highland Capital
15 Management Services?
16     A.    I --
17         MR. MORRIS: Objection to the
18    form of the question.
19     A.    And I -- and I answered that I
20 don't think you can think of this company --
21 this entity - or company, Highland Capital
22 Services Inc. - in that manner.
23         It didn't -- it didn't have, for
24 example, advisory services that anybody there
25 was performing for third parties like NPA.

Page 206

1            J. Seery
2   So there wasn't doing work for a fund, et
3   cetera, so I don't -- there were certain
4   things that were done.  Whether they were ad
5   hoc or specific, I didn't see any true
6   pattern that this was similar to an agreement
7   where third -- true third-party services were
8   being continually performed.
9      Q.    Did Highland Capital Management
10  Services have employees that you knew of?
11     A.    No.
12     Q.    Okay.  So if it wanted to pay a
13  bill, it was using employees at Highland
14  Capital Management to do that, correct?
15     A.    If it had a bill, yeah.
16     Q.    Okay.  And in fact, did -- did
17  Highland Capital Management charge Highland
18  Capital Management Services for shared
19  services?
20     A.    I don't believe so.
21           MS. DEITSCH-PEREZ:  Let me show
22     you another document that I'll -- has
23     been premarked as Exhibit 110.
24           MR. MORRIS:  Are we going to be
25     able to take that break shortly?

Page 207

1            J. Seery
2           MS. DEITSCH-PEREZ:  If you want
3      to take it now, that's fine.
4           MR. MORRIS:  Yeah, I would
5      appreciate it.
6           MS. DEITSCH-PEREZ:  Well,
7      actually, why don't -- if you don't
8      mind, let me just finish 110.
9           MR. MORRIS:  Okay.
10          MS. DEITSCH-PEREZ:  I think that
11     will be pretty quick and then --
12          MR. MORRIS:  Okay.
13          MS. DEITSCH-PEREZ:  -- then we
14     can break.
15          Is that all right?
16          MR. MORRIS:  Sure.
17  BY MS. DEITSCH-PEREZ:
18     Q.    Okay.  Okay.  Can you see Exhibit
19  110?
20     A.    I can, yes.
21     Q.    Okay.  And I'm going to scroll down
22  because what I'm going to ask you about is
23  the email from Fred Caruso to Brian Collins,
24  JP Sevilla, Frank Waterhouse, Dave Klos, with
25  a copy to you.

Page 208

1            J. Seery
2           Do you recall Exhibit 110?
3      A.    Not specifically, no.
4      Q.    Do you generally -- well, first,
5   who's Fred Caruso?
6      A.    He is a partner at DSI.
7      Q.    Okay.  And were Brian -- and who
8   are Brian Collins, JP Sevilla -- the other --
9   the others we've spoken about.
10          So who are Collins and Sevilla?
11     A.    Brian Collins -- at this time
12  Collins, I believe, was still head of HR at
13  HCMLP and Sevilla was a counsel at HCMLP, but
14  they were really working for the transition,
15  which I don't know if it had a name at that
16  point, whether it was Highgate or Skyview.
17          But that's what they were working
18  on, and this had to do with transition of the
19  business, the service part of the business,
20  from Highland to other entities.
21     Q.    But am I correct that this is a
22  demand from HCMLP to the companies listed in
23  Exhibit 110 for money?
24     A.    It looks to be that, yes.
25     Q.    Okay.  And the email says there are

Page 209

1            J. Seery
2   outstanding fees and cost reimbursements.
3           What kind of fees were these?
4      A.    I believe some of these were fees
5   related to shared services and others were
6   reimbursements for costs.
7      Q.    Okay.  And do you see that there is
8   a line item for HCM Services and a -- the
9   amount 116,531 is listed?
10     A.    Yes.
11     Q.    And so was that HCMLP demanding
12  money from HCM Services for services that
13  HCMLP had provided to HCM Services?
14     A.    I don't --
15          MR. MORRIS:  Objection to the
16     form of the question.
17     A.    I don't think so.
18     Q.    Why not?
19     A.    I think it's for cost
20  reimbursement.
21     Q.    What, what cost was -- was it
22  seeking to be reimbursed for?
23     A.    I -- I don't recall.  This is not
24  a -- something I recall specifically.
25     Q.    But in any event, this Exhibit 110

Page 210

J. Seery

1                  J. Seery
2 confirms that HCMLP was either providing
3 services or advancing costs for HCM Services
4 and then billing HCM Services?
5       THE WITNESS:  Objection to the
6   form of the question.
7     A.   I -- I believe it was the latter.
8     Q.   Can you exclude the possibility
9 that this was an instance of HCMLP billing
10 HCM Services for services performed by HCMLP?
11    A.   Well, there was no agreement, so I
12 don't know the basis of it, but we could look
13 for it.  I don't -- I don't think that's the
14 case.
15    Q.   Do you know whether or not there
16 was an oral agreement with respect to HCM
17 providing services to HCM Services?
18    A.   Not that I ever heard of.
19    Q.   Did you ever specifically make an
20 inquiry --
21    A.   I, I have made --
22        (Simultaneous speaking.)
23    A.   You're not finished?  I'm sorry.
24    Q.   You can -- you can answer.
25    A.   I, I have --

Page 211

J. Seery

1     Q.   I take it you got the gist.
2    A.   I have made inquiry regarding
3 whether there was any arrangement for -- to
4 provide services and pay back for those
5 services, and I was told there wasn't.
6    Q.   Who did you make --
7    A.   That's my recollection.
8    Q.   Who did you -- who did you make an
9 inquiry to?
10    A.   Our -- our accounting team.
11    Q.   And any -- which people?
12    A.   That would be Waterhouse and Klos
13 and Hendrix.
14       It's not a specific inquiry that I
15 made.  There was -- this was over the time
16 during the case.
17    Q.   You actually have a specific
18 recollection of speaking to any of the people
19 that you just listed, like to Surgent, Klos
20 and --
21    A.   I didn't mention Surgent.
22    Q.   Okay.  Klos, Hendrix and
23 Waterhouse?
24    A.   Yes.
25

Page 212

J. Seery

1     Q.   Okay.  Do you have a specific
2 recollection of asking any or -- any of them
3 whether there was an unwritten agreement
4 between HCM and HCM Services for HCM to
5 provide shared services, back office
6 services, to HCM Services?
7    A.   No, I never would have asked that
8 question.
9    Q.   Did -- do you have a specific
10 recollection of what question you did ask?
11    A.   Yes.
12    Q.   What was it?
13    A.   Do we have a shared services
14 agreement.
15    Q.   Did you make it clear that you were
16 asking for a written or unwritten agreement?
17    A.   No.  As I said, if I asked if there
18 was an agreement, I would have assumed it was
19 a formal written agreement because that's the
20 way the business was run.
21       And I didn't ask if there was some
22 unwritten, secret, hidden or not so secret
23 but not shared with anybody agreement.  I
24 don't -- it's not something I inquired about.

Page 213

J. Seery

1     Q.   Did you ask whether there was an
2 agreement caused by a pattern and practice of
3 conduct?
4    A.   No.
5     MR. MORRIS:  Hey, Deborah, I'd
6 really like to take that break now.
7 That's why I started giving a --
8     MS. DEITSCH-PEREZ:  Okay.
9     MR. MORRIS:  -- a warning quite
10 some time ago.
11   Thank you.
12     MS. DEITSCH-PEREZ:  Okay, okay.
13     MR. MORRIS:  Yep, let -- let's
14 come back --
15     VIDEO TECHNICIAN:  The time is
16 5:37.  We're going off the record.
17     (Recess taken.)
18     VIDEO TECHNICIAN:  The time is
19 5:58.  We're back on the record.
20 BY MS. DEITSCH-PEREZ:
21    Q.   Mr. Seery, I'm showing you what's
22 been premarked as Exhibit 112.  I don't know
23 if you have it there, but if not, let me
24 scroll through it.

Page 214

J. Seery

1  J. Seery
2  Have you seen it before?
3  A.  It -- it looks familiar, yes.
4  Q.  Okay.  This is a letter dated
5  January 7, from you to Mr. Dondero at HCR --
6  HCRE Partners.
7  Did you cause this letter to be
8  sent?
9  A.  Yes.
10  Q.  And like Exhibit 1 -- I think 111,
11  was this written by your counsel?
12  A.  It -- it certainly had my counsel's
13  input and my input, so how --
14  Q.  Okay.
15  A.  -- I probably got a base and marked
16  it up, and they finished it.
17  Q.  Okay.  And --
18  A.  Same as the other.
19  Q.  Okay.  And was there any
20  communication, other than Exhibit 112,
21  between you and HCRE Partners about the HCRE
22  term loan?
23  A.  No.
24  Q.  Do you know whether -- was there a
25  payment due on the HCRE term loan, in your

Page 215

1  J. Seery
2  view, by December 31, 2020?
3  A.  I believe there was, yes.
4  Q.  And was it made?
5  A.  No.
6  Q.  And was the payment made in January
7  of 2021?
8  A.  A payment was made in January of
9  2021 on account that -- the full amount that
10  was demanded.
11  Q.  Well, when high -- when HCM
12  received the payment from HCRE Partners, who
13  facilitated the -- the making of the payment,
14  as far as you know?
15  A.  I don't know.
16  Q.  Do you know if anyone from Highland
17  Capital Management was involved in the making
18  of HCRE's payment to HCM?
19  A.  I don't know.
20  Q.  Do you know whether HCRE had
21  employees?
22  A.  I don't believe it did.
23  Q.  And so was it your understanding,
24  generally, that HCM employees provided
25  services like paying bills for HCRE Partners?

Page 216

1  J. Seery
2  MR. MORRIS:  Objection to the
3  form of the question.
4  A.  It was similar to HCM Services, but
5  that doesn't mean they were the only people
6  to do anything for HCRE; I just don't know.
7  Q.  Well, when HCM received the
8  payments in January of 2021 from HCRE and HCM
9  Services, was there any communication that
10  these payments were being made to pay down
11  the term loan generally as opposed to -- to
12  making the payment otherwise to be made on
13  December 31, 2020?
14  MR. MORRIS:  Objection to the
15  form of the question.
16  A.  I -- I'm not sure I understand your
17  question, but I -- I don't recall any
18  specific communication.  Certainly if there
19  was a payment made, we would have applied it
20  on the total balance due, as you described.
21  Q.  But did anyone on behalf of the
22  HCRE or HCMS communicate that the payments
23  were to be applied to the total balance due
24  as opposed to fulfilling the payment that
25  otherwise was typically made at the end of

Page 217

1  J. Seery
2  the -- of the year?
3  MR. MORRIS:  Objection to the
4  form of the question.
5  A.  Again, I -- I don't think I
6  understand your question, but I don't know if
7  there was any communication at all.  I just
8  don't recall.
9  Q.  You don't recall one?
10  A.  No.
11  Q.  Did you look, in the course of
12  responding to the discovery, at the -- what
13  the -- the means by which HCM received the
14  payments from HCRE and HCMS?
15  MR. MORRIS:  Objection to the
16  form of the question.
17  A.  I -- I believe I did.  I certainly
18  looked at the total payments that came in
19  from various entities and how we applied
20  them, but I don't recall any specifics around
21  communication.
22  Q.  Well, did you look for the wire
23  transfer information?
24  MR. MORRIS:  Objection to the
25  form of the question.

Page 218

J. Seery

1  A.  I, I --
2  Q.  Was there -- let me rephrase.
3      Was -- did the payments come in by
4  wire?
5  A.  I don't recall.
6  Q.  Did you look for any communication
7  that would accompany the payment?
8      For example, a check can have a
9  note on the note line, a wire can have a note
10 on the re line, an ACH payment can have a
11 note on a re line.  Did you attempt, in
12 responding to the discovery in these notes
13 cases, to find any such communications?
14     MR. MORRIS:  Objection to the
15     form of the question.
16 A.  I'm relatively certain it didn't
17 come in as a check, because I would have
18 known that.  I just don't recall if it came
19 in by wire or ACH, and I didn't look for any
20 specific communication that accompanied the
21 wire or the ACH payment.
22 Q.  Okay.  And with respect to HCRE,
23 did you send a letter like the one we looked
24 at earlier for NexPoint, contending that the

Page 219

J. Seery

1  payment had been applied to the principal
2  balance as opposed to satisfying and curing
3  any default on the note?
4      MR. MORRIS:  Objection to the
5      form of the question.
6  A.  If -- if we did send it, it would
7  have been in the -- the production.  It
8  certainly would have -- there was no cure
9  provision in the notes, so we would have
10 applied it in the same way as we did the NPA
11 payment and the services payment.
12 Q.  If there are in fact no
13 post-payment letters for the HCRE term loan
14 and the HCMS term loan, was there a reason
15 for that?
16 A.  No, no reason if there are none.
17 They're not required.  The notes are very
18 clear with respect to the waiver of demand,
19 presentment.
20     So there's no requirement of it.  I
21 thought there would be, that I would have
22 sent it, but I don't -- don't recall
23 specifically.
24 Q.  Did anyone on behalf of HCRE ever

Page 220

J. Seery

1  communicate an acknowledgment or acceptance
2  that the loan was in default and that the
3  payment would be applied to the principal --
4  to the balance?
5  A.  Other than the terms of the note,
6  no.
7  Q.  And do you have an understanding of
8  why -- strike that.
9      Do you have an understanding, based
10 on personal knowledge, of why the HCRE and
11 HCMS payments were not made in December of
12 2020?
13     MR. MORRIS:  Objection to the
14     form of the question.
15 A.  I -- I believe I do.
16 Q.  And what is that knowledge based
17 on?
18 A.  The same edict that we discussed
19 with Mr. Rukavina earlier in the day.
20 Q.  So tell me the actual words that
21 you contend Ms. Hendrix said to you that
22 caused you to believe whatever it is you
23 believe about what Mr. Dondero said.
24     MR. MORRIS:  Objection to the

Page 221

J. Seery

1  form of the question, and -- asked and
2  answered.
3  A.  I -- I don't recall the specific
4  words.
5  Q.  Now, at -- in -- and -- and you
6  don't recall when the words were sent to you
7  either; you can't say whether it was December
8  or January or some other time?
9      MR. MORRIS:  Objection to the
10     form of the question --
11 A.  No, I --
12     MR. MORRIS:  -- mischaracterizes
13     the testimony.
14 A.  -- I'm pretty clear that it -- I
15 learned of the action in December.
16     I may have learned of the words in
17 December.  It could have been in January, on
18 or about the time I sent the demand note.
19 But it wouldn't have been, as you phrased it,
20 some other time.
21 Q.  Now, in -- in or around December of
22 2020, you understood there was a dispute
23 between Mr. Dondero and -- and affiliated
24 companies and the debtor about whether the

Page 222

J. Seery

1  affiliated companies had overpaid shared
2  service fees to Highland, correct?
3
4      A.    Absolutely not.
5      Q.    Are you not aware that Mr. Dondero
6  contended that NexPoint, for example, had
7  overpaid Highland by many millions of dollars
8  for shared service fees?
9      A.    I'm quite aware that Mr. Dondero
10 has fabricated a story as part of the
11 negotiations for a pot plan.  In fact, he
12 included it in one of the term sheets, to
13 fabricate a claim about additional services.
14      I'm also quite aware of other
15 evidence that shows that's not the case.
16      Q.    Let's take this in pieces.
17      How much did Mr. Dondero contend
18 shared services had been overpaid --
19      A.    I don't recall --
20      Q.    -- what amount?
21      A.    I don't recall the exact amount.
22      Q.    More than 10 million?
23      A.    I think he claimed 14, some number
24 like that, but it doesn't have any connection
25 to reality.

Page 223

J. Seery

1      Q.    Mr. Seery, what did you do to
2
3  investigate whether or not there had been
4  overpayments of shared service fees by
5  NexPoint to Highland?
6      MR. MORRIS:  I'm just going to
7  caution the -- the questioner not to go
8  too far down this path.  These are
9  topics that are related to a completely
10 separate contested matter, actually --
11      (Simultaneous speaking.)
12      MR. MORRIS:  Okay.  So I just --
13 okay, that's fine.
14      MR. RUKAVINA:  Yeah, I'm not
15 trying to litigate that, it's --
16      MR. MORRIS:  Yep.
17      MS. DEITSCH-PEREZ:  -- it's
18 relevant to this whole incident that
19 Mr. Seery is --
20      MR. MORRIS:  I don't think so,
21 but --
22      MS. DEITSCH-PEREZ:  -- is --
23      MR. MORRIS:  -- but go ahead, I'm
24 not directing him not to answer.
25      MS. DEITSCH-PEREZ:  I -- I'm not

Page 224

J. Seery

1
2      going to call him a liar like he's been
3      calling everybody else, so I'll be
4      polite about it, but it is relevant --
5      THE WITNESS:  Well, the reason
6      for that is because I don't lie, and I
7      just -- I just don't do it.  I don't
8      fabricate testimony.  So you can call
9      me whatever you like.  It doesn't
10     matter.  I -- I tell the truth.
11     I have a very good memory.  To the
12     extent I can't remember the specific
13     words of something from months ago, I --
14     I'm unable to remember those specific
15     words, but I have a pretty darn good
16     memory.
17 BY MS. DEITSCH-PEREZ:
18     Q.    Okay.  But -- but it would be in
19 your interest -- interest to -- to take
20 something that was said about a clear dispute
21 about the shared services payments and try to
22 apply it to some other payments, wouldn't it,
23 Mr. Seery?
24     A.    Not -- not in any way whatsoever.
25     Q.    Well, that's why I'm asking,

Page 225

J. Seery

1  Mr. Seery.  You were aware of the dispute,
2  whether -- regardless of your belief as to
3  the bona fides of it, you were aware of an
4  actual dispute about whether NexPoint had
5  overpaid shared services fees, correct?
6
7      A.    I --
8      MR. MORRIS:  Objection to the
9      form of the question.
10     A.    I -- I would not concede that
11 there's a dispute, because there is no
12 legitimate disagreement among what was
13 performed and what was paid.
14     I will -- I will agree that
15 Mr. Dondero came up with a story, or we can
16 say a -- an idea, that NexPoint had somehow
17 overpaid for the services that it received.
18     Q.    Ms. -- Mr. Seery, I -- I understand
19 that you're -- you are anxious to be an
20 advocate for your side.  I'm asking you for
21 strictly factual testimony.
22     Was there a dispute, meaning one
23 side said one thing and the other side said
24 the other, about whether shared services fees
25 had been overpaid?

Page 226

J. Seery

2 MR. MORRIS: Objection, asked and
3 answered.
4 A. I -- I will concede that
5 Mr. Dondero claimed that shared services by
6 NexPoint were overpaid for.
7 Q. Okay. And will you also concede
8 that you disagreed with that?
9 A. I don't need to concede that. I do
10 disagree with that.
11 Q. Okay. Hence, we have a dispute,
12 okay.
13 MR. MORRIS: Objection to the
14 form of the question.
15 Q. Mr. Seery, if you don't recall the
16 words that Ms. Hendrix said to you, how do
17 you know that whatever this edict was that
18 you have mentioned did not relate simply to
19 don't pay any more shared services because
20 they have been overpaid?
21 MR. MORRIS: Objection to the
22 form of the question, "ans" and
23 answered -- asked and answered.
24 A. Again, I believe that it was
25 Ms. Hendrix. It could have been Mr. Klos.

Page 227

J. Seery

2 Over time it could be both. We've certainly
3 had discussions about it. I believe that it
4 related to the shared services. I believe it
5 also related to the notes, because the notes
6 weren't paid.
7 Q. Okay. And am I correct that the
8 only reason you believe it also applied to
9 the notes was because the notes weren't
10 paid --
11 MR. MORRIS: Objection --
12 Q. -- not because of the words used?
13 A. The -- the words were not limiting
14 to -- that I recall in any way.
15 Q. Were the words -- did the words
16 specifically include don't pay the notes?
17 A. I believe I testified that I don't
18 recall the specific words, so I can't --
19 Q. Okay.
20 A. -- say what the specific words
21 were.
22 Q. And -- and, Mr. Seery, I recognize
23 that you're a smart guy and a cagey witness,
24 so you have said several times that the
25 reason you believe the edict applied to the

Page 228

J. Seery

2 notes was because they weren't paid.
3 And I'm just asking you to answer,
4 honestly, whether your belief that the edict
5 concerned the notes was simp -- happenstance
6 of what happened, not because of what was
7 said to you?
8 MR. MORRIS: Objection to the
9 form of the question, asked and
10 answered.
11 A. The idea that you're calling me
12 cagey is -- is insulting and rude, so you
13 should please withdraw that. No one's ever
14 called me cagey, and I always am honest.
15 I said very specifically to
16 Mr. Rukavina how I heard what I heard, how I
17 came to understand it. I don't recall the
18 specific words or the exact time. It is
19 clear what the facts are and what happened,
20 so that supports my interpretation of what I
21 heard and my recollection of it.
22 Q. You -- you can't admit, as you sit
23 here today, you're not sure whether or not
24 the edict concerned the notes?
25 A. I didn't hear the edict. All I

Page 229

J. Seery

2 know is that we didn't get the shared service
3 payments and we didn't get the -- we didn't
4 get the -- the note payments, and I read
5 Mr. Waterhouse's testimony from two days ago,
6 which seemed to confirm everything I just
7 said.
8 So it -- I think it makes sense,
9 but I don't have a specific recollection of
10 what was told to me and I do recollect that
11 the shared service payments were not made,
12 but that was before the amounts on the notes
13 were due, so there wouldn't have been a
14 discussion about the notes.
15 Q. Now, did you look at the payment
16 history on all of the term loan notes that --
17 that payments had been made prior to December
18 31, 2020 in excess of the amounts due, if
19 you -- if -- if the obligor was paying the
20 minimums for the number of years the notes
21 had been outstanding?
22 A. Which -- which notes?
23 Q. All of the note -- did you do that
24 exercise for all of the notes, all of the
25 term loan notes?

Page 230

J. Seery

2 MR. MORRIS: Objection to the
3 form of the question.
4 A. We -- we looked at the payments on
5 each of the notes, yes.
6 Q. And did you determine whether or
7 not the amounts paid in total prior to
8 December 31, 2020 exceeded the total amount
9 due of principal and interest on the minimum
10 principal and interest payments due on those
11 notes --
12 (Simultaneous speaking.)
13 A. I --
14 Q. -- outstanding?
15 A. We certainly looked at that. I
16 don't believe that's the case for each of
17 them, but I don't have a specific
18 recollection of how they each balance out.
19 Q. Did any of the loans have payments
20 that were made that, in total, exceeded the
21 total amount of minimum principal and
22 interest payments due on the loans for the
23 number of years they had been outstanding?
24 A. One of them may have; I don't
25 recall. I don't recall specifically which

Page 231

J. Seery

1 one.
2
3 Q. And were there documents that you
4 looked at in connection with that inquiry?
5 A. There would be a payment ledger.
6 Q. And have you produced that payment
7 ledger?
8 A. Yes.
9 MR. MORRIS: Yes, we have.
10 Q. Is there anyone from HCRE that you
11 contend -- and I apologize if I asked that,
12 because I'm -- I'm maybe mixing up HC -- HCMS
13 and HCRE.
14 But is there anyone from HCRE
15 that -- that acknowledged to you or said
16 something to you, admitting that the payment
17 that was made in January of 2021 was a
18 payment towards the overall principal and not
19 the payment that was due at the end of 2020?
20 A. No, I don't believe I had
21 discussion with anybody who claimed to
22 represent HCRE; which, as you said, had no
23 employees.
24 Q. Have you -- strike that.
25 Earlier I couldn't tell if it was

Page 232

J. Seery

2 Mr. Morris talking or you, and I apologize
3 for that, but somebody said something like
4 constructive fraud is not an issue in any of
5 the note cases and therefore, you know, we
6 shouldn't be looking at -- at solvency.
7 MR. MORRIS: That would have --
8 MS. DEITSCH-PEREZ: Was that you?
9 MR. MORRIS: -- that would --
10 that would have been me.
11 There is no claim for constructive
12 fraudulent transfer.
13 BY MS. DEITSCH-PEREZ:
14 Q. And so let me ask Mr. Seery, as the
15 30(b)(6) witness for HCM, is it your position
16 that constructive fraud and therefore
17 solvency has no bearing on any of the note
18 cases?
19 MR. MORRIS: Objection to the
20 form of the question.
21 A. With respect to these claims, I
22 think that the -- the allegations are pretty
23 clear that there is no agreement, there's no
24 subsequent agreement. That's nonsense. If
25 there is one --

Page 233

J. Seery

2 Q. Mr. -- Mr. Seery --
3 A. Well, I'm answering your question.
4 (Simultaneous speaking.)
5 MR. MORRIS: Please let him
6 finish.
7 A. So when -- if, in some world, that
8 story is bought, then we think it's clearly
9 an actual fraud.
10 MO* MS. DEITSCH-PEREZ: Move to
11 strike.
12 Q. I'm asking a simple question,
13 Mr. Seery. As HCM's 30(b)(6) witness, do you
14 agree with the assertion of your counsel that
15 constructive fraud is not an issue, is it
16 not something HCM is asserting in the note cases?
17 A. That's correct.
18 Q. Okay. And therefore, is it also
19 your position, as the 30(b)(6) witness for
20 HCM, that whether Highland was or was not
21 solvent at the time the notes were made or at
22 the time the forgiveness condition was agreed
23 upon, that the solvency of Highland is
24 irrelevant to those issues?
25 MR. MORRIS: Objection, it's not

Page 234

J. Seery

1  a 30(b)(6) topic, and I object to the
2  extent it calls for a legal conclusion.
3      MS. DEITSCH-PEREZ: I'm -- I'm
4  just -- can you read it back and have
5  the witness answer.
6      MR. MORRIS: Okay.
7      (As read by the reporter):
8      "QUESTION: And therefore, is it
9  also your position, as the 30(b)(6)
10  witness for HCM, that whether Highland
11  was or was not solvent at the time the
12  notes were made or at the time the
13  forgiveness condition was agreed upon,
14  that the solvency of Highland is
15  irrelevant to those issues?"
16  
17  A.   I -- I don't think it's irrelevant.
18  It's not a precondition to a case for an
19  actual fraud. But when these things are done
20  in the face of solve -- insolvency, when
21  they're -- when -- when the supposed
22  agreements are done on the eve or after
23  bankruptcy, that sure adds to the badges of
24  fraud.
25      MS. DEITSCH-PEREZ: Then, John,

Page 235

J. Seery

1  we -- we may have an issue about
2  picking up this deposition. Let me --
3  let me ask another question.
4  Q.   Do you have a solvency analysis
5  done for these note cases?
6  A.   Not for these note cases, no.
7  Q.   And are you prepared to explain
8  right now, in this deposition, how -- what
9  Highland's solvency was at any of the time
10  periods, either when the notes were made or
11  when the alleged agreement regarding
12  forgiveness -- potential forgiveness of the
13  notes was entered into?
14      Are you prepared today to tell us
15  what you think about Highland's solvency and
16  why?
17      MR. MORRIS: Objection to the
18  form of the question.
19  A.   I -- I believe I already did, but I
20  can do it again, if you'd like. Mr. Rukavina
21  asked me very specific questions about where
22  I thought solvency was, and I gave my very
23  specific answers.
24  Q.   For each -- for the dates of each

Page 236

J. Seery

1  of -- each of the notes and when the
2  forgiveness condition arose, what is your
3  answer as to whether Highland was solvent and
4  why?
5      MR. MORRIS: Objection to the
6  form of the question.
7  A.   There's -- there's about twelve
8  different dates in there, but why don't I
9  make it easy.
10      In '17, I think Highland was
11  insolvent. Highland had significant exposure
12  to litigation claims that it had not properly
13  put on its balance sheet, and I think the
14  actions of the principals show that they
15  understood the risks with respect to those
16  claims. And that's why you have a number of
17  actions, including taking money offshore,
18  including rolling out these notes thirty
19  years. That's 2017.
20      '18 is similar, because the --
21  because the actions get more and more
22  developed and the claims against Highland get
23  bigger and bigger.
24      In '19 it comes crumbling down and

Page 237

J. Seery

1  Redeemer gets a very large arbitration award
2  that it's about to win and Highland files for
3  bankruptcy.
4      I don't -- the -- the idea that
5  there are these subsequent agreements, we
6  don't even agree that that exists. We think
7  it's completely fabricated and false. But to
8  the extent it incurred -- occurred during '17
9  '18, December/January. '18, '19,
10  December/January. '19, '20 after the
11  bankruptcy, yeah, I think that -- that pretty
12  much shows that they fall into insolvency.
13      Again, with an actual fraud, we
14  don't need it. But it certainly helps with
15  the badges of fraud.
16  Q.   Is that your complete answer?
17  A.   To -- to your question, yes.
18  Q.   And do you have -- Highland has
19  made breach of fiduciary duty claims against
20  Dugaboy and then aiding and abetting claims
21  against Nancy Dondero and Jim Dondero?
22  A.   That's correct.
23  Q.   Can you tell me from whence those
24  fiduciary duties come?

Page 238

J. Seery

1
2     A.    Yes.
3     Q.    Where are -- where can we find
4  them?
5          MR. MORRIS:  Objection to the
6     form of the question.
7     A.    They're -- they're in the amended
8  complaint.
9     Q.    No, no, no, where -- where do the
10  duties come from?  What are the duties based
11  on?
12    A.    With respect to both Dugaboy and
13  Nancy Dondero, Nancy Dondero is the trustee
14  of Dugaboy.  Dugaboy was a limited partner.
15  Limited partners are not permitted to run the
16  affairs of the partnership.
17          She has testified that she made
18  agreements on behalf of Highland.  So she
19  stepped into the role of a general partner,
20  as did Dugaboy.  Her testimony was very clear
21  on these points, that she cut the agreements
22  on behalf of Highland.
23    Q.    Okay.  So it is -- are you saying
24  that it is the HCMLP partnership agreement
25  that gives rise to the fiduciary duties?

Page 239

J. Seery

1
2          MR. MORRIS:  Objection to the
3     form of the question, asked and
4     answered, mischaracterizes the
5     testimony.  It calls for a legal
6     conclusion.
7     A.    It -- it's -- in my opinion, it's
8  the law, and our position is it's the law,
9  that when a limited partner takes over the
10  operation and running of the partnership and
11  takes on those duties, they step into the
12  role of a general partner.
13          And that is the -- we don't believe
14  this agreement exists, but if it were to
15  somehow metastasize into something of an
16  agreement, then clearly we believe that it
17  breached the fiduciary duties that those
18  persons and entities who took on those duties
19  would have to the partnership.
20    Q.    Okay.  And I'm -- I'm just -- I'm
21  just trying to understand your testimony.
22          You're talking about duties under
23  the -- the HCM fourth amended limited
24  partnership agreement?
25          MR. MORRIS:  Objection to the

Page 240

J. Seery

1
2     form of the question, mischaracterizes
3     the testimony.
4     A.    The duties are under Delaware law
5  related to partnerships.
6     Q.    Yes.  And the partnership duties
7  that you're talking about are the HCMLP --
8  the fourth amended partnership agreement; is
9  that right?
10          MR. MORRIS:  Objection to the
11     form of the question, calls for a legal
12     conclusion.
13    A.    That's the partnership agreement,
14  yes.
15    Q.    Okay.  And you're not saying these
16  duties just arise out of the air?
17          MR. MORRIS:  Objection to the
18     form of the question, mischaracterizes
19     the testimony.
20    A.    I didn't say they arise out of the
21  air, no.
22    Q.    Okay.  I mean, you are the witness
23  designated to talk about these -- these
24  breach of fiduciary duty claims, correct?
25    A.    That is correct.

Page 241

J. Seery

1
2     Q.    Is there anything other than law,
3  generally, and the fourth amended limited
4  partnership agreement of Highland Capital
5  Management that gives rise to the duties that
6  you are contending Dugaboy breached and Nancy
7  Dondero and Jim Dondero allegedly aided in
8  the breaching of?
9          MR. MORRIS:  Objection, asked and
10     answered.
11    A.    There's also facts.
12    Q.    Okay.  And the, the facts -- the
13  fact that you said underlaid the claim was
14  their -- the supposed stepping into the shoes
15  of the general partner, is --
16          MR. MORRIS:  Objection to --
17    Q.    -- anything else?
18          MR. MORRIS:  Objection to the
19     form of the question, mischaracterizes
20     the testimony, asked and answered.
21    A.    Stepping into --
22    Q.    Mr. Seery, correct me if I'm wrong.
23  If there's some other fact that you are
24  pointing to, let me know.
25          MR. MORRIS:  Objection to the

1          J. Seery
2    form of the question, asked and
3    answered.
4        A.    I -- I believe I gave a pretty
5    good, concise summary, but is there more that
6    you want to know?
7            When it -- our position is that
8    when a limited partner takes over the
9    management or any of the management roles of
10   the partnership and enters into an agreement
11   on behalf of the partnership, they stepped
12   into the general partner role.
13           When they're in the general partner
14   role they have fiduciary duties to the
15   partnership and all of the partners.  When
16   they breach those duties, which we argue is
17   the case if this supposed agreement were
18   actually something, then they should be
19   liable for the damages caused by those
20   breaches.
21       Q.    You've said, a couple times now, if
22   a limited partner steps in and manages the
23   partnership.
24           Can you tell me every way in which
25   you contend Dugaboy or Nancy Dondero as the

1          J. Seery
2    trustee of Dugaboy took a management step?
3        A.    Nancy Dondero and Jim Dondero claim
4    that Nancy Dondero and Dugaboy entered into
5    an agreement on behalf of the partnership and
6    gave away 63 million -- or maybe that's the
7    total amount of the notes, but some 50
8    million-ish amount of notes for virtually
9    nothing - and in most instances could
10   actually be nothing - with no investigation,
11   no discussion, no analysis and really no
12   authority.
13           But they -- they assert that that
14   was the agreement.  And without any
15   consideration received by this entity,
16   nothing, they claim that they did this.
17           Now we don't -- we don't believe
18   this agreement exists, again, to be clear.
19   We think it's fabricated.  We think that
20   that's really beyond any kind of dispute.  We
21   think you all know that too, but we'll play
22   along.
23       Q.    Is there any other action that you
24   contend is management that you contend
25   Dugaboy or Nancy undertook with respect to

1          J. Seery
2    Highland?
3        A.    No.  Taking control of the payment
4    to an affiliate of the general partner for no
5    consideration and claiming that you are able
6    to do that, we think that is sufficient.
7    MO*      MR. DEITSCH-PEREZ:  Move to
8        strike everything after "No."
9        Q.    Let me just get it clear.  There is
10   no other action, other than entering into
11   this agreement, that you contend is
12   management by Dugaboy or Nancy Dondero; is
13   that correct?
14       A.    No, that's not correct.  It's
15   everything around the supposed agreement.
16   So, so it -- it can't be cabined to just what
17   the supposed agreement is, it's all of the
18   other -- lack of -- of -- if it were a real
19   agreement, the lack of any sort of care, the
20   lack of any sort of loyalty, it all permeates
21   from this supposed agreement --
22           (Simultaneous speaking.)
23       A.    -- these folks haven't thought
24   through --
25           MR. MORRIS:  Just let him finish.

1          J. Seery
2        A.    -- the full implications of what
3    they are arguing.
4        Q.    Okay.  Other than the things that
5    you have testified to in the last ten or
6    fifteen minutes, there are no other acts of
7    supposed management that you contend Dugaboy
8    or Nancy undertook that form the basis for
9    the breach of fiduciary duty claims, correct?
10           MR. MORRIS:  Objection to the
11   form of the question.
12       A.    I -- I think I've touched on all of
13   them.
14       Q.    Okay.  Thank you.  Okay.  I'm going
15   to show you what has been marked as --
16   premarked as Exhibit 109.
17           Is this a document that you have
18   seen before?
19       A.    I -- I believe I have, but you're
20   literally just showing me a slice of the
21   heading.
22       Q.    I know.  It's the -- it's the
23   Notice of Filing of Debtor's Amended
24   Schedules, and then annexed to it - let me
25   get to that - are the Global Notes and

Page 246

J. Seery

1             J. Seery
2 Statement of Limitations, Methods and
3 Disclaimers Regarding Debtor's Amended
4 Schedules of Assets and Liabilities.
5       Is that a document that you have
6 seen before?
7    A.   I -- I don't recall it
8 specifically.
9    Q.   Well, let me ask a different way.
10 In -- this was filed in September of 2020.
11       What was your role with respect to
12 filings of the debtor in September of 2020?
13    A.   Depending on the filing, I executed
14 many of them. So if I executed this one,
15 please let me know.
16       I certainly was around and
17 consulted with respect to all the filings. I
18 was the CEO of the company.
19       That's my signature, so I've seen
20 this.
21    Q.   Okay, okay.
22       (Simultaneous speaking.)
23    A.   I may not have seen the -- I don't
24 know if I -- I just don't recall the, the --
25 the piece at the top.

Page 247

J. Seery

1             J. Seery
2    Q.   Okay. But, generally, if you
3 signed a declaration under penalty of perjury
4 for non-individual debtors that was then
5 annexed to a filing, you would have looked
6 through the filing and assured yourself that
7 it was correct, to the best of your knowledge
8 and belief?
9    A.   I would have either looked through
10 the filing or I would have reviewed it with
11 my team, whomever prepared it.
12    Q.   And so as you sit here today, do
13 you have any reason to believe that there are
14 inaccuracies in docket 1082?
15       MR. MORRIS: Do you want to
16     give -- do you need to read the
17     document?
18    A.   I have no --
19    Q.   Yeah. And I -- and I emailed it to
20 John, so if you want to sit down and take a
21 look at it, please --
22       (Simultaneous speaking.)
23    A.   No, I -- I don't need to review it.
24       No one's brought anything to my
25 attention. I don't -- I have no reason to

Page 248

J. Seery

1             J. Seery
2 believe it wasn't accurate at the time.
3       MS. DEITSCH-PEREZ: Okay. Thank
4     you.
5       Okay. Why don't we take a few
6     minutes and I'm going to have a look at
7     my notes and -- and I'll have a better
8     idea of how much longer I have then.
9       VIDEO TECHNICIAN: The time is
10     6:36. We're going off the record.
11       (Recess taken.)
12       VIDEO TECHNICIAN: The time is
13     6:41. We're back on the record.
14       MS. DEITSCH-PEREZ: Okay. Thank
15     you.
16       Thank you very much, Mr. Seery.
17     I'm going to pass back to whomever might
18     want to ask you anything more.
19       MR. RUKAVINA: Well, I think
20     Mr. Horn is busy. I have one more
21     question for you, Mr. Seery.
22       MR. HORN: I -- I have no
23     questions, so I'll defer to Davor if he
24     has --
25       MR. RUKAVINA: Thank you, thank

Page 249

J. Seery

1             J. Seery
2     you.
3 EXAMINATION
4 BY MR. RUKAVINA:
5    Q.   My only question was as follows:
6 When you were answering counsel's questions,
7 you mentioned something about a payment
8 ledger on the notes.
9       Do you recall that?
10    A.   Not a specific -- I would have
11 looked at a payment ledger. I don't have
12 a -- I'm not thinking of one particular
13 payment ledger.
14       The one that -- that was one of the
15 exhibits --
16    Q.   That's where I'm going --
17    A.   -- is a type of payment ledger.
18       That one, it looks like it was --
19 that's actually the actual schedule of
20 payment, because it shows as if the payments
21 had made -- it doesn't show what's been made,
22 but it actually shows you the schedule of --
23 all the way to maturity, I believe, and so --
24    Q.   Well, here's -- here's where I'm
25 going with this.

J. Seery

1                J. Seery
2    A.    Okay.
3    Q.    For the $30.7 million note, to the
4  best of your knowledge, did the debtor
5  maintain a payment ledger showing any
6  historical payments on that $30.7 million
7  note?
8    A.    Yes, we would have -- we would
9  have.
10    Q.    And to the best of your knowledge,
11  would that have been produced in this
12  litigation?
13    A.    Yes.
14    Q.    Okay.  To the best of your
15  knowledge, is Exhibit 7 that or is Exhibit 7
16  something else?
17    A.    I think Exhibit 7 is something
18  else.  It's just because I hadn't seen this
19  one.  It may be that this was -- I think
20  it's -- I think it's something else.
21  RQ*      MR. RUKAVINA:  Okay.  Mr. Morris,
22    I'll just ask the debtor, I've -- I've
23    asked and we only got this in PDF,
24    there's no metadata.
25      I would just ask if the debtor

1                J. Seery
2  would be willing to please check to see
3  what the native of this Exhibit 7 is and
4  please send it to me, along with any
5  metadata.
6      MR. MORRIS:  Email that exhibit
7    to me --
8      MR. RUKAVINA:  I will.
9      MR. MORRIS:  -- and I'll be able
10    to do that, but I do know that if you
11    look -- I'm certain it was in one of
12    the supplemental productions.
13      MR. RUKAVINA:  Yes, we received
14    it recently.
15      MR. MORRIS:  Right.  So in one of
16    the supplemental productions I know
17    that we produced schedules showing all
18    payments made against all notes at
19    issue, and I think we even gave you the
20    backup with the bank statements, you
21    know, fully redacted -- yeah.
22      MR. MORRIS:  -- to show only the
23    payments --
24      MR. RUKAVINA:  Let's talk
25    offline --

1                J. Seery
2      (Simultaneous speaking.)
3      MR. MORRIS:  -- you've got all of
4    that.
5      MR. RUKAVINA:  Let's talk
6    offline, because I'm not sure that I
7    agree we have that --
8      MR. MORRIS:  Yeah.
9      MR. RUKAVINA:  -- but if the
10    debtors produced it, then we'll --
11      MR. MORRIS:  I know I instructed
12    my team to produce it, so I -- I'm --
13      MR. RUKAVINA:  Okay.
14      MR. MORRIS:  -- I'm pretty
15    confident they did what I asked.
16      MR. RUKAVINA:  That was all I
17    had.  Thank you, sir.
18      THE WITNESS:  Thank you.
19      MS. DEITSCH-PEREZ:  Okay.  Let me
20    follow up with that -- with the
21    witness.  And then if it's really a
22    conversation with counsel, we could
23    move it on to that.
24  EXAMINATION
25  BY MS. DEITSCH-PEREZ:

1                J. Seery
2    Q.    But to your knowledge, were the
3  native files such as spreadsheets and emails
4  provided to counsel to produce them, such
5  that we should be able to see the Word
6  versions of the notes, any emails about the
7  notes and the payments, so --
8      MR. MORRIS:  You -- you've got
9    that.  That's not for this witness.  We
10    can talk about that offline.  He
11    doesn't know anything about like the
12    actual --
13    Q.    Well, let -- let me just ask him.
14      Did he provide the native files to
15  counsel?
16    A.    I'm not quite sure what you mean by
17  native files, but counsel had access to -- we
18  did full -- had access to the systems, and we
19  did full data review of the systems and
20  produced everything responsive.
21      So I'm not sure exactly what you
22  mean by that, but -- but certainly counsel
23  had access to -- to those --
24      (Simultaneous speaking.)
25    Q.    -- understand that -- that native

J. Seery

1  J. Seery
2  files means a document, if it's in Excel,
3  providing it in Excel; or if it's in email,
4  providing it as a -- in a -- in email format,
5  a PST format or something that will show the
6  metadata; or if it's a Word document, in --
7  in Word, with its properties showing.
8      That's -- that's what I mean. Do
9  you know if that was done?
10     A.  Counsel certainly had access to all
11 of that. We didn't just PDF things and send
12 them to counsel. It was done electronically.
13 So anything on the system responsive was --
14 was accessible.
15     Q.  Okay. And just who is the person
16 who conducted the searches to respond to
17 discovery requests?
18     A.  It would have been through the
19 Pachulski firm, you know, working in -- with
20 outside -- either DSI or one of the outside
21 providers, to go through and -- and find
22 certain -- whatever the terms they came up
23 with to find the data.
24     Q.  And do you know who the actual
25 people were that -- that did the -- the

1  J. Seery
2  searching?
3      A.  At Pachulski? I don't -- I should
4  know, but I worked mostly through John.
5      Q.  Okay. And then what about the
6  non-lawyers; who were the non-lawyers who
7  worked on collecting materials responsive to
8  the discovery requests?
9      A.  I believe -- at third parties or
10 at --
11     (Simultaneous speaking.)
12     Q.  -- you just mentioned DSI or I
13 mean --
14     A.  DSI --
15     Q.  -- anyone other than the lawyer --
16 outside lawyers.
17     A.  Yeah, DSI. The outside firm, ISI.
18 I don't know if Robert Half was involved in
19 some of this production as well. He's been
20 on --
21     MR. MORRIS: Robert Half does
22     document review.
23     A.  -- the payroll for a long time now
24 during this case.
25     MR. MORRIS: They do -- they do

1  J. Seery
2  the document review.
3      I mean, I could just -- I could
4  just represent to you that -- that we
5  came up with search terms, my firm ran
6  the searches. There may have been
7  certain financial data that we had to get
8  from DSI, but we produced whatever came
9  up with the search terms to -- to Robert
10 Half.
11     They -- they did their review, they
12 sent the documents to us. We did a
13 little quality control and we produced
14 it.
15     Q.  Okay. And are -- are you
16 confident, Mr. Seery, that you have looked
17 for and produced whatever documents there
18 are that concern the -- the loan payments due
19 and made at the end of 2020, beginning of
20 2021?
21     A.  I -- I am. It was done in the
22 same -- same manner that -- that Mr. Morris
23 just described.
24     MR. MORRIS: Yeah. And I would
25     again encourage you guys -- I've asked

1  J. Seery
2  probably five different ways in
3  interrogatories, in emails, if you
4  actually think there's something out
5  there, instead of just fishing, you
6  should let me know if you think that
7  there's --
8      MR. RUKAVINA: Oh, oh, no, and I
9  do think --
10     MR. MORRIS: Yeah, I mean --
11     (Simultaneous speaking.)
12     MR. MORRIS: I've asked so many
13 times and -- and I --
14     MR. RUKAVINA: There's no --
15 there's no need to have this on the
16 record --
17     MS. DEITSCH-PEREZ: Yeah, and
18 Mr. Seery mentioned in -- in the course
19 of the examination that they had not
20 looked at the actual transfer
21 documents, the -- I think the -- if
22 there was a wire or an ACH, to see if
23 there were notations on them and
24 that --
25     MR. MORRIS: He said he didn't.

Page 258

J. Seery

1
2       THE WITNESS:  I said I didn't.
3       MR. MORRIS:  He said he didn't.
4       THE WITNESS:  I said I didn't.
5   BY MS. DEITSCH-PEREZ:
6       Q.    Well, do you know if anybody did?
7       A.    I don't know, but certainly that's
8   something that accounting would see rather
9   easily.
10  RQ*     MS. DEITSCH-PEREZ:  Okay.  So I
11      would like confirmation that that was
12      looked for, and -- and the same as I
13      requested previously, the Word versions
14      of -- of the notes.
15      MR. MORRIS:  Okay.
16      THE WITNESS:  I, I -- I think
17      that the materials that Mr. Morris
18      described has all that with bank
19      statements.
20      MR. MORRIS:  It's okay, thank
21      you.
22      Are we done?
23      MS. DEITSCH-PEREZ:  Thank you.
24      MR. MORRIS:  Yep.
25      MS. DEITSCH-PEREZ:  Yes.

Page 259

J. Seery

1
2       VIDEO TECHNICIAN:  The time is
3       6:49.  This concludes today's
4       deposition, Thursday, October 21, 2021.
5
6
7
8
9
10  I,           , do hereby certify under
11  penalty of perjury that I have read the foregoing
12  transcript of my deposition taken on          ;
13  that I have made such corrections as appear noted
14  herein in ink, initialed by me; that my testimony as
15  contained herein, as corrected, is true and correct.
16
17  DATED this ____ day of _____, 20  ,
18  at _____,          .
19
20
21
22
23              _____
23              JAMES P. SEERY, JR.
24
25

Page 260

1
2       C E R T I F I C A T E
3
4   STATE OF NEW YORK       )
5                           )ss.:
6   COUNTY OF NEW YORK      )
7
8       I, MARIANNE WITKOWSKI-SMITH, a Notary
9   Public within and for the State of New York,
10  do hereby certify:
11      That JAMES P. SEERY, JR., the witness
12  whose deposition is hereinbefore set forth,
13  was duly sworn by me and that such deposition
14  is a true record of the testimony given by
15  the witness.
16      I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage, and that I am in no
19  way interested in the outcome of this
20  matter.
21      IN WITNESS WHEREOF, I have hereunto
22  set my hand this 22nd day of October, 2021.
23              _____
24
25              MARIANNE WITKOWSKI-SMITH

Page 261

1
2   -----------------I N D E X-------------------
3   WITNESS        EXAMINATION BY        PAGE
4   JAMES P.       MR. RUKAVINA        6, 249
    SEERY, JR.
5                  MS. DEITSCH-PEREZ    160, 252
6
7   Directions:  197
8   Motions:  172, 185, 205, 233, 244
9
10  ------------ PRODUCTION REQUESTS -------------
11  PAGE:  250  Native Exhibit 7 and metadata.
12         258  Transfer documents notations and
                Word versions of notes.
13
14
15  -------------------EXHIBITS-------------------
16  EXHIBIT                        PAGE LINE
17  Exhibit 1
    Notice of Deposition
18  Seery                         8   20
19  Exhibit 2
    Notice of Deposition
20  30(b)(6)                      9   20
21  Exhibit 3
    Email Chain
22  Re: HCMLP Roles              23   20
23  Exhibit 4
    Seery Declaration in Support of
24  Motion for TRO               43   9
25      (Continued on Next Page)

Page 262

```
 1
 2   ---------------EXHIBITS(Cont'd)---------------
 3   EXHIBIT                       PAGE LINE
 4   Exhibit 5
     Promissory Note
 5   Dated May 31, 2017            55   12
 6   Exhibit 6
     Correspondence
 7   Dated January 7, 2021         69   16
 8   Exhibit 7
     Loan Document
 9   D-NNL-029141                  99   12
10   Exhibit 8
     Correspondence
11   Dated January 15, 2021        107   4
12   Exhibit 9
     Amended and Restated
13   Shared Services Agreement     112  22
14   Exhibit 10
     Email Chain
15   D-NNL-007578 - D-NNL-007579   148  11
16   Exhibit 11
     Email Chain
17   D-NNL-028514 - D-NNL-028515   150   3
18                   * * *
19   PREMARKED
     EXHIBITS                      PAGE LINE
20   (Not Provided to Reporter)
21   Exhibit 109                   245  16
22   Exhibit 110                   206  23
23   Exhibit 111                   196   8
24   Exhibit 112                   213  23
25
```

Page 263

```
 1                 ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads    Should Read  Reason
 6   ___  ___ _____   _____   _____
 7   ___  ___ _____   _____   _____
 8   ___  ___ _____   _____   _____
 9   ___  ___ _____   _____   _____
10   ___  ___ _____   _____   _____
11   ___  ___ _____   _____   _____
12   ___  ___ _____   _____   _____
13   ___  ___ _____   _____   _____
14   ___  ___ _____   _____   _____
15   ___  ___ _____   _____   _____
16   ___  ___ _____   _____   _____
17   ___  ___ _____   _____   _____
18   ___  ___ _____   _____   _____
19   ___  ___ _____   _____   _____
20
                             _____
21                            Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2021.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

Index: $1.4..7250

**$**

**$1.4** 106:21 108:6
109:2,19 110:3
111:10

**$2** 27:17

**$20** 171:11

**$200** 27:18

**$24** 93:15

**$24,471,000** 88:23

**$25** 163:15

**$3** 57:19

**$30.7** 25:6 52:24
152:17 250:3,6

**$300** 192:15

**$400** 191:6

**$500,000** 177:2
178:5

**$575,550.56** 90:21

**$6** 89:7

**$63** 192:9 193:6

**$70** 164:19,21

**$8** 172:7

**1**

**1** 5:3 8:18,20,24 9:7
46:7,8 113:17
126:16,22 128:21
214:10

**1.7** 188:10

**10** 148:10,11 150:8,
21 171:16 222:22

**100-odd** 196:10

**1082** 247:14

**109** 245:16

**10th** 134:3

**11** 11:15 52:3 150:2,3

**110** 206:23 207:8,19
208:2,23 209:25

**111** 196:8 197:2,10
200:7 214:10

**112** 213:23 214:20

**116,531** 209:9

**12** 37:4 106:9 111:2
143:13 148:19 149:3,
13,18 158:17,22

**12/30/19** 91:7

**12/31** 92:16

**13** 109:16 176:20

**13th** 109:4

**14** 109:16 222:23

**14th** 106:20 108:6,25
109:3

**15** 107:3,5

**15th** 108:23

**17** 236:11 237:9

**18** 236:21 237:10

**19** 184:21 185:12
236:25 237:10,11

**1990** 11:2

**2**

**2** 9:7,18,20,23 33:12

**2.06** 135:13,21

**2.1** 65:13 66:4 67:7

**20** 93:11 114:21
237:11 259:17

**20,247,628** 198:18

**2000** 33:11

**2014** 176:20

**2016** 32:13 34:16,22

**2017** 32:11 34:22
53:19 54:12 55:2,13
56:22 59:25 63:12
184:21 185:12
236:20

**2018** 32:9 34:22
113:17 184:21
185:12

**2019** 33:8,12 34:22

58:9

**2020** 12:12 13:3,12,
13 17:7,16 18:5
19:20 20:19,20
21:15,16 22:23 23:14
24:7,11 25:6 26:5,9,
11,14 27:24 29:19
30:2 35:15 36:19
39:16,25 40:2,17
41:9 42:10 44:15
49:16,19 50:18
51:12,20 52:3,24
62:19 63:4,23 64:22
81:12 86:11,14 87:19
88:17 92:8,23
114:17,18,23 116:9
117:9 119:22 121:23
123:11 124:3 125:2
127:17 129:11,14
130:12 131:6,15
132:8 133:6,9,16
134:3 146:21 147:13
150:8,22 156:2,4
195:20 201:9 215:2
216:13 220:13
221:23 229:18 230:8
231:19 246:10,12
256:19

**2021** 5:8 36:24 37:4
38:19,25 39:14
58:13,20 61:24
69:14,17 80:7,15
83:10 94:3 96:6
106:9,20 107:3,5
108:23,25 126:16,22
128:21 134:25
143:13 144:20 145:3
146:21 148:19 149:4,
13,18 158:17,22
195:24 201:10 215:7,
9 216:8 231:17
256:20 259:4

**2022** 168:2

**21** 259:4

**21st** 5:8

**24** 145:23

**240** 57:11

**25** 166:3

**26** 51:14

**27** 51:14 53:19 145:3

**27,675,000** 56:19

**28th** 38:25

**29** 51:17,19

**2:02** 5:8

**3**

**3** 23:19,20 51:20 63:4
66:2,15 67:16,24
171:3

**30** 51:18

**30(b)(6)** 8:18 9:19
232:15 233:13,19
234:2,10

**30,746,812.33** 56:24

**31** 25:6 55:13 56:22
58:13,20 61:24 64:22
71:23 81:12 84:10
85:17 88:17 92:7,23
94:4 114:18,23
117:10 118:15,25
120:16 127:17,24,25
128:4 129:11,12,14
130:12 131:6,15,17
132:8 156:4 195:20
215:2 216:13 229:18
230:8

**31st** 65:16,21,23
67:7,9 127:2 195:17

**3:18** 99:2

**3:29** 99:5

**3:40** 112:4

**3:42** 112:7

**3rd** 52:23

**4**

**4** 43:7,9 51:7 115:7
147:8 171:3 186:17

**400** 192:19

**4:16** 146:15

**4:21** 146:18

**4:30** 159:24

**4:34** 160:9

**4:40** 160:12

**4B** 147:11

**5**

**5** 55:10,12 60:18
61:22 63:2,17,22
65:13 80:24 172:4

**5/31/2020** 90:18

**50** 243:7

**5:30** 193:19

**5:35** 193:19

**5:37** 213:17

**5:58** 213:20

**6**

**6** 69:11,14,16 70:20
79:16,20 81:8 88:20
93:16,25 97:6 98:10
100:19 105:15

**6.01** 136:6

**601** 141:6 142:19
143:3 144:17

**63** 243:6

**6:00** 193:12 194:10

**6:36** 248:10

**6:41** 248:13

**6:49** 259:3

**6th** 104:24

**7**

**7** 25:11 51:12 69:14,
17 94:3 96:6 99:12,
13 104:6 106:3 107:8
112:13,16 127:9
134:25 141:21
142:12 144:19
197:12 214:5 250:15,
17 251:3

**7250** 188:11

**8**

**8** 107:2,4,10,17 109:20 172:3

**9**

**9** 12:12 13:3 17:16 18:5 20:19 21:15 24:11 26:9,11,14,15 29:19,22 30:2 35:15 36:19 56:2 112:20,22 113:2,13

**9th** 24:6

**A**

**Aaron** 69:21

**abetting** 237:21

**ability** 35:17 36:10 144:11 156:19

**absolutely** 39:12 101:25 121:3 146:6 222:4

**abstained** 20:4

**accelerate** 72:3 105:23,24 145:7

**accelerated** 65:7 84:14 107:22 109:7 110:19 111:19 196:2

**acceleration** 84:15 108:2,4 109:5

**accent** 7:23

**accept** 45:16 159:16

**acceptable** 44:17

**acceptance** 220:2

**accepting** 157:15

**access** 78:10 253:17,18,23 254:10

**accessible** 254:14

**accidentally** 79:13

**accompanied** 218:21

**accompany** 218:8

**account** 18:22 22:7 27:8 63:13 77:11 110:10,17,19,22 145:2 166:15 200:5 215:9

**accounting** 90:15 115:10 117:22 142:3 153:6 155:23 157:5 211:11 258:8

**accounts** 116:23

**accrual** 57:24 67:22

**accrue** 60:25 61:16

**accrued** 52:2 60:20 66:19,25 67:16,18

**accrues** 67:20

**accruing** 184:4

**accurate** 24:25 44:25 248:2

**ACH** 218:11,20,22 257:22

**Acis** 27:16

**acknowledged** 231:15

**acknowledgment** 220:2

**acted** 61:20

**acting** 136:24

**action** 71:20 97:7 140:7,15 144:25 221:16 243:23 244:10

**actions** 236:15,18,22

**active** 11:17

**activities** 20:14

**acts** 245:6

**actual** 33:25 128:24 220:21 225:5 233:9 234:19 237:14 249:19 253:12 254:24 257:20

**acumen** 26:18 27:5

**ad** 206:4

**ad-hoc** 75:18

**add** 35:5 99:25

**addition** 16:21 35:10

**additional** 100:21 114:13 222:13

**adds** 234:23

**adequate** 154:17 155:5

**Adkins** 176:6

**administering** 11:14,16

**admit** 228:22

**admitting** 231:16

**admonished** 100:2

**advance** 79:23 80:17

**advanced** 90:24

**advancing** 210:3

**advantage** 86:15

**advertise** 85:11

**advice** 137:25 140:16

**advise** 137:15 140:14

**advised** 165:10,15

**advises** 166:22

**advisor** 48:6,15 58:23 161:20 166:16, 20,21

**advisors** 5:7,18 12:16 26:4,8 38:10 49:7,18 59:5 71:3 161:22 194:18

**advisory** 162:24 166:7 205:24

**advocate** 225:20

**affairs** 238:16

**affiliate** 146:2 244:4

**affiliated** 25:20 50:20 114:9 115:24 116:3 117:20 132:22 221:24 222:2

**affiliates** 62:7 114:12

**afield** 21:10

**afternoon** 6:22 160:20,21

**agenda** 75:13 80:16, 23 81:4 83:24

**aggrandizing** 62:8

**aggregate** 58:4

**agree** 29:6,13 86:13 97:5 104:2 114:17, 19,24 122:6,17 123:12 124:22,24 141:6,16 225:14 233:14 237:7 252:7

**agreed** 21:24 38:24 233:22 234:14

**agreement** 17:17 20:22 37:11,16,20 39:2,8 48:21 59:18 110:15,16 112:21,23 113:4,17 114:10,12, 14,19,24 115:15 134:24 135:7,10,13 136:2,20 144:6 147:8 158:21 202:10,11,15, 16,24 204:7 206:6 210:11,16 212:4,15, 17,19,20,24 213:3 232:23,24 235:12 238:24 239:14,16,24 240:8,13 241:4 242:10,17 243:5,14, 18 244:11,15,17,19, 21

**agreements** 38:19 46:5 153:15 234:22 237:6 238:18,21

**ahead** 33:8 128:4 159:13 182:4 186:8 223:23

**aided** 241:7

**aiding** 237:21

**Aigen** 6:3

**aims** 137:4

**air** 240:16,21

**Airlines** 161:7

**allegations** 232:22

**alleged** 235:12

**allegedly** 241:7

**allowed** 60:19,25 68:2 108:14

**alternatives** 105:15

**ambiguity** 88:4

**amended** 112:22 113:3,16 238:7 239:23 240:8 241:3 245:23 246:3

**amendments** 113:21

**amount** 13:20,22 56:18 57:19 64:3 85:8 87:6 88:5,22 89:3,6,7 93:13,20 98:3 110:11 139:23, 25 156:15 159:18 165:23 168:24 172:10,11 190:14 198:17 209:9 215:9 222:20,21 230:8,21 243:7,8

**amounts** 67:13 86:24 110:14 118:19, 21 139:14 158:11 173:12 174:15 178:17 184:8 229:12, 18 230:7

**analysis** 147:12 235:5 243:11

**and/or** 13:11

**annexed** 245:24 247:5

**annual** 65:16 86:16 169:6 182:21 183:20 195:18,22

**annually** 183:23

**ans** 226:22

**answer's** 135:11

**answering** 201:20 233:3 249:6

**answers** 113:10 235:24

**anticipating** 95:2

**anxious** 225:19

**apologize** 9:12,14, 15 20:5 24:15 70:4,5 89:18 93:15 130:7 180:12 193:10 231:11 232:2

**apology** 89:19

**appears** 66:13 107:24 188:22

**applied** 66:24 108:8 110:13 132:6 141:7 200:5 216:19,23 217:19 219:2,11 220:4 227:8,25

**apply** 110:10 224:22

**applying** 32:17

**appointed** 12:8

**Appou** 176:7

**approval** 119:3 188:25

**approve** 118:5

**approved** 19:21,22, 25 20:7,10 21:17 118:22

**approves** 118:20

**approximately** 5:8 7:15 12:10 64:3 186:17

**April** 58:9

**aptly** 50:12

**arbitrary** 196:10

**arbitration** 237:2

**argue** 242:16

**arguing** 245:3

**arise** 240:16,20

**arose** 236:3

**arrangement** 171:12 201:18 202:11 211:4

**ASAP** 150:15

**ascertain** 128:10

**ascribing** 87:17

**asks** 203:5

**aspect** 104:13

**assert** 243:13

**asserting** 233:16

**assertion** 233:14

**asset** 19:2,6,7 30:8 31:10 53:23 71:18 158:14 159:20 192:13

**assets** 18:21 22:12 29:10 49:10 50:13,17 52:20 97:22 140:3 156:20 166:9,11,17 171:13 172:8 174:15 187:23 189:7 190:23 191:4,8 192:3,11,15, 18 246:4

**assist** 116:14

**assistance** 147:16

**assistant** 70:2

**assisted** 133:24

**assisting** 47:15

**associate** 70:3 99:7 112:18

**association** 5:12

**assume** 93:21 202:14

**assumed** 65:3 212:19

**assuming** 43:18 191:24

**assumption** 45:19

**assured** 247:6

**attached** 199:6,10

**attempt** 184:11 218:12

**attend** 193:21

**attention** 108:3 247:25

**attorney** 70:4 102:9

**attorneys** 113:8

**attrition** 133:6

**audio-record** 74:4

**audio-recorded** 83:13

**August** 40:23 41:9 42:10 44:15

**authenticate** 148:16

**authenticity** 113:12

**authority** 14:19 162:3 157:17,23 243:12

**authorized** 71:2 81:7 159:13

**authorizing** 107:12

**automatically** 92:5

**average** 168:8

**avoid** 173:8 179:21 182:13,14

**avoidance** 181:16, 18

**award** 237:2

**awards** 164:22

**aware** 25:19 52:24 62:22 100:22 106:8, 12,19 118:24 119:19 148:25 149:5 159:8, 10 162:8,15 165:4 178:23 195:2 222:5, 9,14 225:2,4

---

**B**

**BA** 10:15,19

**back** 21:12 22:2 43:24 44:3,5,14 60:9 62:18 63:6 67:6,15, 23 79:15 88:20 91:12,18 99:5 104:8 112:7 115:22 116:7, 12 119:15 137:14 146:18 152:13 160:12,18 170:6 173:6 177:7,8,18 180:15 185:3,7 194:5 199:17 204:18 205:13 211:5 212:6 213:15,20 234:5 248:13,17

**background** 10:11, 14 14:3 21:8 161:2

**backup** 54:20 251:20

**bad** 137:25 139:3 161:11 181:15

**badges** 234:23 237:16

**balance** 28:24 29:8 31:14,17 35:4,7 108:8 216:20,23 219:3 220:5 230:18 236:14

**ballpark** 163:7,13

**bank** 251:20 258:18

**bankruptcies** 161:3, 6 162:11,21 174:6

**bankruptcy** 11:12, 15,23 12:2 13:24 14:9,11 28:4,15,20 31:22 41:21 124:21, 25 126:6 140:24 145:20 156:23 161:14,23 164:12,15 165:5,19 177:9,10 234:23 237:4,12

**bar** 70:10,14

**bargain** 52:15

**base** 155:14 173:11 214:15

**based** 31:14 54:24 62:5 137:25 142:2 169:2,4 220:10,17 238:10

**basic** 45:18

**basically** 22:25 29:14 47:3 55:19 135:22 167:3

**basis** 8:15 59:11 75:19 88:7 116:23 164:4 169:7 210:12 245:8

**bear** 89:16

**bearing** 232:17

**beautiful** 160:16

**befell** 65:9

**beginning** 27:19 52:17 256:19

**begins** 150:7

**begun** 53:24

**behalf** 5:21 122:10 157:17 203:6 216:21 219:25 238:18,22 242:11 243:5

**belied** 188:12

**belief** 120:22 225:3 228:4 247:8

**believed** 47:3 78:16 125:19

**believing** 78:4

**benefit** 15:22

**bidding** 22:25

**bigger** 236:24

**bill** 204:20 205:14 206:13,15

**billing** 210:4,9

**billion** 166:8,18

**bills** 215:25

**bit** 35:24 43:25 49:14 61:12 100:5,6

**board** 18:6,16,20,24 19:15,21,24 20:6 22:12 23:2 71:7 72:8, 20 73:10,15,18 74:6, 9,24 75:7,8,12 79:16 156:21 168:3 188:14

**body** 55:19

**bona** 179:2 180:7 183:2,17 184:3,6,7 225:4

**bonus** 170:16 171:11

**bonuses** 155:14

**bookkeeping** 115:11

**borrowed** 35:11

**borrower** 65:15 66:4,6 145:22,24 146:2

**bought** 233:8

**bouncing** 100:6

**breach** 237:20 240:24 242:16 245:9

**breached** 239:17 241:6

**breaches** 242:20

**breaching** 241:8

**break** 30:4 44:4 95:9 98:23 99:17 100:3,16 112:10 146:8 170:18 193:13,20 196:21 206:25 207:14 213:7

**Brian** 207:23 208:7,8, 11

**bridge** 42:11,13,17 43:2,5 44:7

**briefly** 14:3

**bring** 89:17

**broad** 69:7

**Brothers** 161:8,16

**brought** 247:24

**bunch** 41:15

**burden** 34:6

**burned** 27:17

**business** 8:13 20:15 26:18 27:5 46:18 104:13 141:9 148:4 166:13 185:20,22 187:14 203:24 205:5 208:19 212:21

**businesses** 46:21 50:15 140:22 167:2,8 191:20

**busy** 248:20

**button** 74:14

**buy** 63:17

———

**C**

**cabined** 244:16

**cagey** 227:23 228:12,14

**calculate** 93:20

**calculated** 89:2

**calculating** 116:15

**calendar** 65:17 75:4

**call** 38:21 59:21 60:13 72:17 73:16,19 75:6 97:13 105:7 143:6 180:14 224:2,8

**called** 40:18 52:13 98:5 113:16 146:5 187:11 228:14

**calling** 8:14 125:21 224:3 228:11

**calls** 18:23 22:10 234:3 239:5 240:11

**camera** 100:7

**cap** 205:14

**capacity** 136:24

**Capital** 5:6,21,22 12:2,17,18 198:15 200:9 201:14 202:3 203:9,15,20 204:7, 19,23,25 205:5,12, 14,21 206:9,14,17,18 215:17 241:4

**capped** 190:12

**care** 112:17 136:21 144:17 244:19

**career** 11:20 161:9

**Caruso** 83:7 207:23 208:5

**case** 7:18 11:19 12:3 30:6 31:3 33:16 41:12,21 49:10 52:11 71:14 122:5 124:16 163:24 173:20 174:3, 22 175:16 178:24 182:21 185:23 200:2 203:25 204:17,22 210:14 211:17 222:15 230:16 234:18 242:17 255:24

**cases** 11:12 218:14 232:5,18 233:16 235:6,7

**cash** 82:3,6,25 84:6 115:11

**cash-flow** 81:15 92:15,19

**category** 162:2,3

**caused** 43:20 108:2 111:9 198:15 213:3 220:23 242:19

**caution** 155:9,16 223:7

**cautioning** 155:18

**Cayman** 53:23

**CCO** 40:10

**cease** 39:8 130:5

**censure** 155:9

**CEO** 12:9 13:11 14:23,24 16:18 17:8 19:15,20 20:10,20 21:16 49:11 156:24 163:24 164:10,11 166:7,16 167:12,15, 20,24 168:2,7,9 246:18

**CEO/CRO** 59:2 61:4, 20 152:15

**CEOS** 163:2,17,18 165:9,23

**certified** 5:10

**certify** 259:10

**cetera** 206:3

**CFO** 16:25 103:4 123:14 124:8 153:18, 24 154:14,16

**chain** 23:20,25 148:11,16,17 150:3,7

**challenge** 43:23 121:19 154:17

**challenged** 27:6 174:8

**challenges** 191:23

**chance** 72:8 164:20 171:21 172:7

**chances** 64:14,16

**change** 88:23 106:21 145:23

**changed** 21:25 129:7 133:4

**changing** 61:23

**Chapter** 11:15

**character** 137:3

**characteristic** 174:3 182:25 183:17 184:3

**characterization** 48:14 60:12 71:25

**charge** 16:2,3,4,14 206:17

**check** 141:22 142:2, 19 218:9,18 251:2

**checking** 151:14

**chief** 36:20,23 37:3 39:6,9,17,18,21 83:25 140:5

**choice** 181:7

**circulated** 75:13

**circumstances** 136:22 173:21

**city** 8:6 160:16

**claim** 222:13 232:11 241:13 243:3,16

**claimant** 15:6,8,10, 11,22,24 16:4

**claimed** 222:23 226:5 231:21

**claiming** 244:5

**claims** 30:9 31:10 32:24 41:19 190:14 232:21 236:13,17,23 237:20,21 240:24 245:9

**clarification** 6:9 18:12 19:5 37:25 46:20 62:15 76:12 82:5 86:4 87:13 90:19 152:10

**clear** 6:25 12:13 31:9 35:6 45:13 46:5,14 48:2 52:9 53:14 68:11 69:7 78:24 98:21 100:6 103:19, 23 156:12 169:21,23 179:15 181:23 182:2 200:19 212:16 219:19 221:15 224:20 228:19 232:23 238:20

**cleared** 196:8

**client** 33:3 49:17

**CLOS** 19:4,8

**close** 45:16 190:15, 19

**closely** 114:15

**closing** 203:7

**closure** 188:25

**co-counsel** 160:3

**code** 28:15,20 182:16

**Colgate** 10:20

**collect** 52:20 58:19 86:23 87:3,7,24 88:5 97:21 105:25 126:12 193:7

**collected** 87:6

**collecting** 255:7

**collection** 192:9,20

**collections** 193:6

**collective** 73:25

**college** 10:18

**Collins** 207:23 208:8,10,11,12

**colloquially** 186:23 187:11

**colloquy** 108:16,20 143:18

**Columbia** 161:7

**column** 91:15

**combination** 167:2

**comfortable** 24:20

**committee** 41:20,23 42:5,8,18 44:18 45:10,16 47:10,19 48:22 49:6 72:13,16 79:17,21 80:7,10,18, 20

**common** 92:17

**communicate** 36:15 121:7 216:22 220:2

**communicated** 187:22 200:16

**communication** 149:13 214:20 216:9, 18 217:7,21 218:7,21

**communications** 149:17 200:8 218:14

**companies** 132:22 161:5,13 162:23,24 163:10,12 165:10,16, 24 172:19 173:9,10, 17 174:13,23 175:19 178:24 186:24 187:18 189:5,6 190:7,12 203:2 208:22 221:25 222:2

**company** 135:18 139:3 140:23 161:17, 18 162:13 164:5,7 166:7,23 174:15 182:18 187:4,6,9,12 205:20,21 246:18

**compensated** 203:11

**compensation** 162:9 163:2,13,18,25 164:11 166:6,16 168:17 172:3,21 173:3,14,24 175:11 179:2 184:20,21 185:11,12 203:13,19 204:11

**complaint** 34:9 199:6,10,22,24 238:8

**complete** 26:7 78:9 167:25 237:17

**completely** 57:14 59:9 86:21 144:14 223:9 237:8

**compliance** 147:12, 19

**concede** 225:10 226:4,7,9

**concepts** 28:4

**concern** 21:9 32:20 122:5 124:16 155:25 256:18

**concerned** 155:7 162:17 228:5,24

**concerns** 23:5

**concise** 242:5

**concluded** 31:13

**concludes** 259:3

**conclusion** 57:3 234:3 239:6 240:12

**conclusions** 141:17

**condemning** 181:12

**condition** 184:12 233:22 234:14 236:3

**conditions** 179:25

**conduct** 137:2 213:4

**conducted** 19:3 141:9 148:3 254:16

**conference** 111:3

**confident** 252:15 256:16

**confirm** 24:10 229:6

**confirmation** 71:11 158:9 258:11

**confirmed** 12:3

**confirms** 24:8 210:2

**conflict** 121:24 124:12 125:16

**conflicted** 125:3

**confusing** 33:15 35:25

**connected** 21:5 185:22

**Connecticut** 11:5

**connection** 40:25 170:2 177:9 222:24 231:4

**consequences** 121:9 138:4

**consideration** 53:25 62:13 243:15 244:5

**considered** 105:22 161:16

**constructive** 34:8 232:4,11,16 233:15

**construed** 43:5

**consult** 75:24 104:23 134:23 135:9 160:3

**consulted** 93:19 135:7 246:17

**contained** 145:18 178:9 259:15

**contempt** 36:3 158:12

**contend** 220:22 222:17 231:11 242:25 243:24 244:11 245:7

**contended** 222:6

**contending** 218:25 241:6

**contention** 25:4

**contentions** 24:16

**contested** 223:10

**context** 28:14 29:3,7 90:4

**contingent** 35:5 168:17 184:20 185:11

**continually** 35:10 206:8

**continue** 45:3 168:4

**continues** 26:6

**contract** 114:3 130:8 139:12,17,23 141:9 145:24

**control** 12:17 26:7 125:13 244:3 256:13

**controlled** 61:14 174:18

**controlling** 17:18

**controls** 64:13 121:18 123:4 179:19

**controversy** 139:15

**conversation** 76:11 106:10 252:22

**convey** 46:25

**conveyance** 63:12

64:9 87:12,15

**COO** 40:14 44:21

**copious** 72:25

**copy** 112:16 113:7 207:25

**cornerstone** 186:11, 16 187:3 188:2,6 190:6,22

**corporate** 14:9,14 17:25 18:8 27:13 40:7,13 51:24

**correct** 7:18 12:21 13:5 16:9 17:9,10,13 20:8 25:2,8,12,13 36:22 37:17 38:11 39:19,22 41:5,21 43:6 44:19 45:2 48:6, 7 50:6,21,22,24,25 51:4,5,16 55:21 56:13,20,21,24 63:14 64:19,20 66:8 67:3,4 87:9,20 91:24 96:7 97:4,15 100:13 105:8 111:3 112:16 113:7 116:20,23 117:3 118:8,12 119:14,18 123:16,18,19,22 126:2 127:10,20 128:17 130:10,25 132:7 139:12,13 141:24 142:13 146:6 153:19 158:18,22,23 165:4 167:14 186:12 206:14 208:21 222:3 225:6 227:7 233:17 237:23 240:24,25 241:22 244:13,14 245:9 247:7 259:15

**corrected** 259:15

**corrections** 259:13

**correctly** 136:3 137:5

**Correspondence** 69:16 107:4

**cost** 166:12 167:6 170:13 181:5 209:2, 19,21

**cost-cutting** 132:10

**costs** 192:8,20 209:6

210:3

**counsel** 5:14 16:25 34:19 40:4 42:17,18 43:18 49:5 51:21 75:16 77:3,23 78:8, 21 84:15,23,24 85:7, 16 102:22 105:20 109:24 177:14,15 197:16 198:6 208:13 214:11 233:14 252:22 253:4,15,17, 22 254:10,12

**counsel's** 10:3 214:12 249:6

**count** 191:13,18

**counter-party** 64:13

**counts** 193:6

**couple** 100:23 120:2 133:22 170:22 242:21

**couple/three** 100:24

**courses** 10:17 140:6

**court** 5:11 6:14 17:18 19:22 20:22 21:17 50:9 64:2 99:10 100:2,7 107:21 108:19 112:15 150:15 151:2,3 155:15 158:12 185:6

**courtesy** 69:8

**covenants** 54:7

**covered** 136:11,19 141:8,14

**create** 41:16

**created** 89:25

**crediting** 191:25

**creditor** 41:19

**creditor's** 42:5,7

**creditors** 41:16

**creditors'** 41:20

**creditworthy** 64:13

**crime** 181:19

**CRO** 11:19 12:8 13:11 17:8 19:15,20

20:11,20 21:16
154:15 155:9

**CRO/CEO** 114:2

**Cromwell** 177:15

**crumbling** 236:25

**crystalize** 45:22

**crystallized** 45:24

**cube** 167:4 172:12

**cure** 97:9 156:7
157:15 159:17 219:9

**curing** 219:3

**curious** 95:6

**current** 57:5,14
145:16

**cut** 127:6 158:13
238:21

**cutover** 37:7

---

**D**

**D-NNL-007578**
148:12

**D-NNL-007579**
148:12

**D-NNL-028514**
150:4

**D-NNL-028515**
150:4

**D-NNL-029141**
99:14

**damages** 242:19

**Dandeneau** 102:11

**dangerous** 20:17

**darn** 224:15

**data** 47:18 253:19
254:23 256:7

**date** 8:22 9:22 16:12
17:5 23:13,22 32:3
36:25 37:18 38:6
43:11 55:14 67:22
69:18 71:16 84:12
85:8 96:9 97:25
99:15 107:6 112:24
129:21 148:13 150:5,

12 151:8

**dated** 55:13 69:17
107:5 197:11 214:4
259:17

**dates** 26:13 30:14
35:24 37:6 39:4 75:6
120:4,7,9 235:25
236:9

**Daugherty** 176:5

**Dave** 83:3 207:24

**David** 16:25

**Davor** 5:16 32:19
78:24 248:23

**day** 65:16,23 67:7,9
81:17,19 107:21
111:2 220:20 259:17

**days** 38:4,5 80:12
100:23,24 103:10
108:17 120:2,3
187:21 229:5

**deal** 86:20 158:13,25
159:8,11,14

**dealing** 144:18
162:18

**debate** 34:12

**Deborah** 6:2 102:4
183:10 193:8 213:6

**Debra** 102:11

**debt** 104:18

**debtor** 12:6,19
14:13,15,16,19 15:9,
13,16,21 16:2,4,18,
20 17:4,9,19 20:23
21:18,25 24:18,19,
22,23 25:11 30:13,15
31:13 32:2,6,16
34:15,21 35:6,10,11
36:21,24 37:4,12,15
38:24 39:18,25 41:18
48:5,22 50:3,13,18
52:20 53:20 54:11
59:3 60:2,19,22 61:4,
19 62:10 63:15 68:23
71:22 80:17,23 85:2,
19 86:11,24 87:18
88:10,16 89:23 93:19
96:20 97:7,11 106:4
109:23 110:2,8 113:5

114:4,6,7,11 115:6,
22 116:17,21 117:9,
17,23,25 120:14
121:16 123:14 124:3,
8 132:9,20 133:16
134:7,19 135:16,23
136:13 139:17
142:11 146:22
147:13,23 152:14,15,
22 153:10,12,13
155:17 157:18,24
158:15 221:25
246:12 250:4,22,25

**debtor's** 16:12 24:16
25:4 29:20 30:16,24
35:17 48:19 49:10
50:2 51:21 77:2,14,
15 86:14 117:22
125:17 139:10
156:20 245:23 246:3

**debtors** 247:4
252:10

**debts** 28:23 29:15
31:20

**decelerate** 111:20

**December** 25:6 26:5
37:23 39:14,16,25
40:2 46:7,8 49:16,19
51:11,18,20 52:3,18,
23 62:18,19 63:4,23
64:22 65:17,21,23
67:8,9 71:23 81:12
84:10 85:17 86:11,13
87:19 88:17 92:7,23
93:11 94:4 104:9
114:17,18,21,23
116:9 117:8,10
118:15,25 119:22
120:16 121:22
123:11 124:3 125:2
127:3,17,24,25 128:4
129:3,12,14 130:12
131:6,15,17 132:8
133:16 134:2 146:20
147:13 150:8,21
156:4 195:20 201:9
215:2 216:13 220:12
221:8,16,18,22
229:17 230:8

**December/january**
237:10,11

**decide** 52:6

**decision** 25:14,19
52:21 97:12,16
140:16,17 143:5
160:5

**decisions** 157:2

**declaration** 43:9,13,
20 51:7 62:21 247:3

**declare** 80:24

**deduced** 130:4

**deduction** 54:24
152:4,9

**default** 64:17,23 65:6
72:9 97:9 156:8
219:4 220:3

**defense** 142:12,20

**defenses** 86:22
98:6,11

**defer** 248:23

**deferred** 173:11

**define** 157:10

**defined** 66:6

**definition** 28:19
29:8,11,14,16 34:19
136:11 141:14

**definitional** 42:25

**definitions** 28:8
32:17 34:20 135:15

**definitively** 132:5

**degree** 10:16 25:21
26:19 47:21 48:11,13
114:10 138:19 197:9

**Deitsch-perez** 5:25
6:2 70:13,16 160:19,
23 170:5 172:16
183:11,14 185:6,24
186:5,9 193:9,25
194:8,12,15 197:21
205:8 206:21 207:2,
6,10,13,17 213:9,13,
21 223:17,22,25
224:17 232:8,13
233:10 234:4,25
244:7 248:3,14
252:19,25 257:17
258:5,10,23,25

**Deitsch-perez's**

102:4

**Delaware** 123:21,23
240:4

**delegation** 17:25

**demand** 50:24 51:15
52:3,6,7,12,21 53:18
56:12 58:12,17
59:13,20 60:14,15
61:23 62:20,21 69:6
84:16 85:9,10 98:2
108:4,9 110:12
135:10 145:9 151:15
156:13 177:9 182:23
183:18,21 197:12
199:14 200:21,25
201:7 208:22 219:19
221:19

**demanded** 52:10
59:14 60:8 215:10

**demanding** 51:24
209:11

**demands** 54:10
59:17 200:17

**depend** 164:22 168:3
170:13

**depended** 63:7
204:22

**depending** 29:7
246:13

**depends** 29:3 30:25
72:23 162:12 164:5,6
166:9,11,12 170:14
192:8

**deposed** 7:13
100:23

**deposition** 5:4
101:3,24 103:10
106:13,17 148:22,24
149:11 196:14 235:3,
9 259:4,12

**Deposition/30(b)(6)**
9:21

**Deposition/seery**
8:21

**describe** 166:15

**describing** 44:10
160:25

**designated** 9:4 10:5 240:23

**detail** 10:12 25:10 147:10

**determination** 105:4

**determine** 30:8 41:17 176:14 177:4, 19,22 204:3 230:6

**determined** 78:19, 20,25 176:15

**detrimental** 140:7

**developed** 45:24 236:23

**developments** 75:19

**DI** 197:19

**dictate** 170:15

**differ** 54:17

**differently** 85:20

**difficult** 22:17 53:24 104:2

**diligence** 136:22

**direct** 126:12 197:19

**directed** 95:5,24 96:19,24 103:24 126:11 198:7

**directing** 198:11 223:24

**direction** 18:23 20:14 22:9 36:2 117:24 120:20,21 121:19,20 125:12,15 126:10 138:17

**directions** 36:4 204:14

**directly** 16:6 47:13

**director** 11:19 12:7, 11,14,15 13:15,18 26:10 29:19

**directors** 12:21 13:2, 8,21 76:14 123:8

**directs** 125:13

**disagree** 117:11 226:10

**disagreed** 226:8

**disagreement** 117:15,16 225:12

**disapprove** 118:6

**discharge** 136:19

**disciplinary** 11:10

**discipline** 155:9

**Disclaimers** 246:3

**discount** 87:9

**discounted** 63:25

**discovery** 75:23 76:17 77:19 78:16 217:12 218:13 254:17 255:8

**discretionary** 68:3, 5,20

**discuss** 71:5 72:12 81:8 102:16,22 149:8

**discussed** 32:18 71:21 73:11,12 85:5, 6 98:16 111:6 143:12 220:19

**discussing** 51:14 74:25 84:17,25

**discussion** 8:19 23:23 43:12 55:15 69:19 71:10 72:7 79:19 84:7,23 92:17, 20 106:24 107:7 112:2,8 120:8 127:6 143:15 146:13 148:8 156:11 160:13 194:7 229:14 231:21 243:11

**discussions** 47:10, 23 48:3,12 72:20 74:5 83:18 92:15 93:7 105:20 227:3

**dishonest** 27:3

**dislike** 153:21

**dispute** 120:9 221:23 224:20 225:2,5,11,22 226:11 243:20

**disruption** 183:5

**dissuade** 139:4

**distinguish** 76:5

**distressed** 14:8

**divide** 41:17

**docket** 43:17 247:14

**document** 8:25 58:10 70:21 71:2,6 89:22,25 99:7,13 113:25 136:8 141:19 206:22 245:17 246:5 247:17 254:2,6 255:22 256:2

**documents** 83:23 231:3 256:12,17 257:21

**dollar** 178:17

**dollars** 86:22 139:16, 20 140:25 154:24 168:15 169:13 222:7

**domination** 26:7

**Dondero** 6:5 17:12, 17 21:23 22:18 23:9 24:6 25:21 26:11 27:22 35:16 36:10 40:17 41:4 42:3,17 44:16 45:10,14 46:17 47:11,15 48:3 49:5, 13 50:19,21 51:23 52:11 53:20,25 58:10 60:3 62:8 64:10 95:5, 24 96:18 97:2 99:19 100:13 101:19 102:18 103:6,12,23 104:3 105:12 106:10 107:23 108:18 109:9 111:3,9 118:11 119:17 120:8,13,20, 23 121:8 122:7,11, 19,23 123:3,10 126:17 127:16 128:3, 14 129:16,24 131:2, 9,18 134:3 137:15 138:19 140:8,20 143:12,22,25 145:21 149:12 152:16,20 154:19 158:2 159:5,9 176:17 181:7 182:18 184:19 185:10 187:16,22 197:11

**disruption** 200:19 201:22 202:13 203:5 205:6 214:5 220:24 221:24 222:5,9,17 225:15 226:5 237:22 238:13 241:7 242:25 243:3,4 244:12

**Dondero's** 20:14,22 21:18 26:4,12 27:2 47:4 108:11 127:6 134:20 138:14 140:9 154:9 184:10 204:14

**Donohue** 83:5

**doublecheck** 142:8

**doubt** 72:14

**dozens** 19:10

**draft** 84:15

**Draper** 6:11

**drew** 49:8,13

**DS** 84:24

**DSI** 48:9,11 49:4 83:5,9 84:25 85:7 89:4 90:7,9 93:16,18 208:6 254:20 255:12, 14,17 256:8

**dual** 121:25

**Dubel** 12:24 14:5,6 76:13

**due** 25:5,12,15 28:24 29:15 31:20 33:2 52:2,12 60:8 80:25 86:24 88:22 92:10 93:13 95:8 97:14,25 98:4,17 104:18 105:23 116:11 129:2 130:6 142:4,6 146:5 156:15 159:19 183:22 195:10 214:25 216:20,23 229:13,18 230:9,10, 22 231:19 256:18

**Dugaboy** 6:12 237:21 238:12,14,20 241:6 242:25 243:2, 4,25 244:12 245:7

**duly** 6:17

**duplicative** 78:25

**duties** 123:22 124:2 125:4,20 126:5 135:23,24 136:20 146:22 147:5 155:17 239:11,17,18,22 240:4,6,16 241:5 242:14,16

**duty** 97:24 124:20,25 137:14,23 140:5,8 181:18,20 237:20 240:24 245:9

**Duval** 14:2

### E

**earlier** 32:21 52:11 69:22 149:10 198:25 200:13 202:17 218:25 220:20 231:25

**early** 30:6 31:3 45:5 62:19 63:23 64:15 83:10 86:11 119:21 129:3 187:21

**easily** 82:16 139:25 258:9

**easy** 54:6 236:10

**economic** 15:20 86:15

**edict** 104:4 108:2 129:24 130:21,22 131:9,18,21,22 132:4,5 134:20 137:16,24 143:16,23 144:2 220:19 226:17 227:25 228:4,24,25

**edicts** 123:6

**educated** 54:24 189:15

**educational** 10:13

**effect** 103:7 128:24 129:4,5 156:6

**effective** 12:4,5 13:4 14:12 16:12 17:5 104:11 115:4 203:13, 18

**effectively** 13:16

15:23 38:7 176:24

**effectuated** 114:4

**efficiency** 181:17

**efficient** 180:17,22 181:8,9,10 182:11

**elaborate** 27:7

**electronic** 70:24 107:13

**electronically** 254:12

**element** 33:5

**Ellington** 40:3 154:25

**Ellison** 133:20

**email** 10:4 23:20,25 77:11 78:10 99:23 100:12 108:20 118:24 119:5,7 148:11,15,17 149:7, 22,23 150:3,7 196:13,17,19 207:23 208:25 251:6 254:3,4

**emailed** 99:10 247:19

**emails** 7:5 77:18 79:2 118:17 253:3,6 257:3

**embodied** 114:10

**employ** 179:14

**employed** 17:4 176:22

**employee** 18:3 158:14,17 176:16 179:11 203:5

**employees** 22:18,24 35:18 36:3 85:19 88:16 93:19 120:13 121:16,23,25 132:10 134:7,18 139:10 145:25 154:18 155:16 173:22 175:11 186:22 201:23 202:12 204:13 206:10,13 215:21,24 231:23

**encourage** 256:25

**end** 39:11 63:10 102:6 146:11 163:25 216:25 231:19 256:19

**ended** 164:25

**enforce** 61:4

**enforcement** 59:3

**enforcing** 60:23 104:18

**engagements** 162:8 174:9

**ensure** 88:11 116:9

**entered** 235:14 243:4

**entering** 244:10

**enterprise** 137:3

**enters** 242:10

**entire** 11:20 98:3

**entities** 27:14 50:20 95:5 103:22 114:9 121:18 123:4,9 124:18 201:22 203:3 204:15 208:20 217:19 239:18

**entitled** 33:5 197:12

**entity** 12:13 14:15 115:24 116:4 117:20 146:2 205:21 243:15

**entity's** 48:8

**entries** 203:4

**entry** 91:7

**equity** 186:16

**errands** 194:4

**estate** 8:8 50:16 65:9 71:18 97:21,22 105:7 124:21,25 126:6 172:9

**estates** 11:15

**et al** 5:7

**evasion** 181:19

**eve** 234:22

**event** 70:5 76:24 108:24 209:25

**eventually** 173:23 178:21

**Everland** 176:7

**evidence** 33:17 54:18 185:18 222:15

**evident** 82:2

**exact** 36:25 37:6 38:6 71:16 96:9 104:9 129:20 222:21 228:18

**examination** 6:20 101:12,15,17 160:22 249:3 252:24 257:19

**examined** 6:19

**examples** 27:20

**exceed** 29:9 189:7 190:23 191:5

**exceeded** 31:10 190:13 230:8,20

**Excel** 92:3 254:2,3

**excess** 229:18

**exchange** 115:25

**exclude** 105:19 210:8

**excluding** 109:23 152:12,13

**excruciating** 10:12

**excuse** 194:3

**executed** 53:11 55:3 58:10 145:2 246:13, 14

**execution** 54:15

**executive** 39:18 49:24 83:25 123:17 140:5 162:9 172:21 173:19 174:18 176:21

**executives** 162:10 172:20 173:4,17,22 174:17,24

**exercise** 229:24

**exercised** 37:15

**exhibit** 8:18,20,24 9:18,20,23 23:20

43:9 55:10,12,18 60:18 61:22 63:2,17, 22 65:12 69:14,16 70:20 79:16,20 80:24 81:8 88:20 89:14,17 93:16,25 97:6 98:10 99:12,13 100:19 107:2,4,10,17 109:20 112:11,13,15,20,22 113:2,13 148:10,11 150:2,3 196:7,8,12 197:2,10 200:7 206:23 207:18 208:2, 23 209:25 213:23 214:10,20 245:16 250:15,17 251:3,6

**exhibits** 196:9,11,21 249:15

**exist** 123:2

**existed** 152:14 178:7

**existence** 41:18 62:23

**existing** 22:17

**exists** 173:16,25 237:7 239:14 243:18

**expect** 87:7 126:4 138:2,17,21 148:16 168:7,14 169:12 193:7 198:19

**expectation** 167:18, 23 168:13

**expected** 23:2 93:14 123:25 154:3 157:16

**expenses** 191:5

**experience** 11:14 54:25 163:24 172:18 173:5 175:14 176:2 179:10,21 183:16

**experienced** 14:8

**expert** 11:23 77:14

**explain** 235:8

**explanation** 119:6

**explore** 33:6

**exposed** 144:14

**exposure** 236:12

**express** 32:20

**expressed** 155:24 188:9,13

**expression** 155:25

**expressly** 136:18 157:13

**extend** 38:24 59:18 60:7

**extended** 54:2,3 58:12 131:23

**extension** 152:22

**extensions** 37:19 39:3

**extent** 224:12 234:3 237:9

**extremely** 64:16 189:11 190:10,11

**F**

**FA** 166:20

**fabricate** 222:13 224:8

**fabricated** 222:10 237:8 243:19

**face** 234:20

**faced** 11:9

**facilitate** 42:11,14 44:11,22 45:9 47:12 48:21 52:15 117:9

**facilitated** 215:13

**facilitating** 85:20

**facing** 60:2

**fact** 54:19 59:15 69:4 85:2 89:13 92:16 159:13 163:21 185:20 189:4 205:4 206:16 219:13 222:11 241:13,23

**facts** 228:19 241:11, 12

**factual** 225:21

**factually** 127:21

**fail** 88:10

Index: failed..great

**failed** 25:4 82:19
126:25 130:13
158:10

**failure** 28:23 57:17
144:7

**fair** 7:8,12 15:19,25
17:20 18:4,7 19:13
31:12 42:2,6,9,19
45:24 48:10,14 49:2
58:25 60:10,17 67:23
71:25 73:4 78:6
86:19 103:9,14
126:14 131:4,12
151:19 168:25

**fairly** 168:25

**fall** 161:25 162:2
237:13

**false** 237:8

**familiar** 9:3 24:4
28:3,7 58:9 135:6
136:25 214:3

**fashion** 153:8

**fast** 7:23

**February** 38:18,25

**feel** 22:23

**fees** 144:15 167:5
172:13 209:2,3,4
222:3,8 223:4 225:6,
24

**fellow** 13:21 193:2

**felt** 20:12,16 46:12
105:6

**fide** 179:2 180:7
183:2,17 184:3,6,7

**fides** 225:4

**fiduciary** 97:19,20
105:6 123:21 124:2,
20,25 125:20 146:22
147:5 237:20,25
238:25 239:17
240:24 242:14 245:9

**fifteen** 7:20 245:6

**figure** 93:16 117:18

**file** 92:3

**filed** 43:18,21 50:3
51:10,11 53:22 113:7

246:10

**files** 237:3 253:3,14,
17 254:2

**filing** 32:8,16 188:11
245:23 246:13 247:5,
6,10

**filings** 246:12,17

**final** 123:9

**finance** 115:10

**finances** 43:3

**financial** 36:21,23
37:3 39:6,9,22 48:5,
15 49:7,9 161:13,17,
20,22 162:23,24
166:7,16,19,21 256:7

**find** 75:5 77:7 80:11
81:11 87:23 136:12
188:21 198:12
218:14 238:3 254:21,
23

**finding** 36:4

**fine** 79:4 207:3
223:13

**fingertips** 165:23

**finish** 191:16,17
193:15 207:8 233:6
244:25

**finished** 210:23
214:16

**firm** 166:17,20
254:19 255:17 256:5

**fishing** 257:5

**fix** 72:9

**flip** 115:8 136:5

**float** 40:17

**flow** 82:3,7,25 84:6

**folks** 74:2 244:23

**follow** 134:20 252:20

**follow-up** 198:20

**foregoing** 259:11

**forgivable** 175:10
176:9 178:25 179:12,
16,24

**forgiven** 173:23
175:2,8 176:10,18
177:23 178:21 179:7
180:7 183:19,20

**forgiveness** 174:7
178:10 179:4 184:13
233:22 234:14
235:13 236:3

**forgot** 89:17

**form** 17:23 19:17
20:3,25 21:21 25:23
26:12,17,20,25 27:4,
13 28:18 29:20 30:7,
11,16,19,23 31:4,6,
16,20,24 34:24 35:21
40:21 48:25 55:6,23
57:8,22 59:7 61:10
62:2 63:19,24 64:25
66:12 67:11 82:14
84:4 86:6,18 87:22
90:12 91:5 93:4
94:21 95:17 96:17
105:10,18 111:12
113:23 115:18,24
117:13 120:18 121:2,
12 122:14 124:14
125:10 126:8,20
134:10 137:19 138:8
139:7 140:11 142:15
144:22 145:14
146:24 154:7 155:12
157:21 163:20 164:3
165:14 168:11,22
169:11 171:18 172:6,
24 175:4 176:12
178:12 179:9 180:4,
10 181:2 183:4,25
184:16,25 185:17
186:14 188:4,19
189:10,14 191:2,10
192:6,23 195:13
197:15 199:8,12
200:15 201:16 202:6,
22 203:17 204:11
205:18 209:16 210:6
216:3,15 217:4,16,25
218:16 219:6 220:15
221:2,11 225:9
226:14,22 228:9
230:3 232:20 235:19
236:7 238:6 239:3
240:2,11,18 241:19
242:2 245:8,11

**formal** 202:16 212:20

**format** 254:4,5

**formed** 27:21

**fortune** 65:9

**forward** 52:18

**found** 77:6,22 158:11

**founded** 164:7

**founder** 121:17
163:17,24 175:14
178:4 179:18

**fourth** 239:23 240:8
241:3

**frame** 13:7 57:20
80:8 201:10

**framework** 190:8

**Frank** 36:20 83:3
96:23,24 108:17
153:5 159:8 207:24

**fraud** 232:4,16 233:9,
15 234:19,24 237:14,
16

**fraudulent** 33:4
34:2,8 63:11 64:9
87:11,14 232:12

**Fred** 83:7 207:23
208:5

**free** 113:2 201:21

**front** 7:2,10 179:16

**fulfilling** 216:24

**full** 85:8 87:7 88:5
131:22 156:14
159:18 215:9 245:2
253:18,19

**fully** 147:20 251:21

**fund** 206:2

**funds** 49:25 116:10
117:2 144:11

**furtherance** 97:23

**futile** 45:13

**future** 133:13 179:25
184:22 185:13

**G**

**gap** 42:12

**Garcia** 5:9

**Gas** 161:7

**gave** 9:11 59:18
122:7 155:13 235:23
242:4 243:6 251:19

**general** 15:15 16:24
19:12 40:4 58:8
163:16 166:2 238:19
239:12 241:15
242:12,13 244:4

**generally** 44:25 54:4
58:9 64:12 72:21
122:4 162:8,14,25
178:24 204:17,22
208:4 215:24 216:11
241:3 247:2

**gist** 19:12 211:2

**give** 11:13 18:18
23:11 69:9 115:20
138:16 156:5 163:12
247:16

**giving** 72:8 213:8

**Global** 161:24
245:25

**Gmail** 77:11

**go-betweens**
154:19

**good** 6:22 11:24
65:10 73:25 155:6
160:19,21 166:4
177:15 224:11,15
242:5

**gosh** 107:25

**governed** 143:10

**governs** 143:9

**GP** 12:16 14:17 15:18
16:20

**grace** 69:6

**graduate** 10:24

**grand** 52:15

**great** 27:9

**group** 74:20,22 90:15 133:17,22 142:3 155:20,22

**guess** 13:17 40:22 161:24

**guy** 227:23

**guys** 256:25

**H**

**H-O-R-N** 6:10

**half** 40:16,22 50:18 203:25 255:18,21 256:10

**hand** 69:12 82:9,11 182:6

**handed** 8:23 112:25

**hands-on** 48:15

**handwritten** 75:25 76:18 77:3

**hang** 196:5

**happen** 47:5 59:17 71:11 75:20 87:2 121:9

**happened** 14:12,15 17:15 58:15 63:7 65:8 143:7 152:4 153:9 183:7 228:6,19

**happening** 153:10

**happenstance** 228:5

**hard** 154:21 155:3 191:12

**hat** 122:24 123:3

**hats** 123:3,11,12

**HC** 231:12

**HCM** 203:21 209:8, 12,13 210:3,4,10,16, 17 212:5,7 215:11, 18,24 216:4,7,8 217:13 232:15 233:16,20 234:11 239:23

**HCM's** 233:13

**HCMA** 33:16

**HCMFA** 58:8,11,21 59:16 61:23 62:4 144:10

**HCMLP** 23:21 36:7,9 58:19 62:10 85:13 97:20 118:23 123:5,7 126:11 176:23 208:13,22 209:11,13 210:2,9,10 238:24 240:7

**HCMLP's** 90:15

**HCMS** 6:6 194:22 195:4,10,19 199:19 200:20 216:22 217:14 219:15 220:12 231:12

**HCR** 214:5

**HCRE** 6:5 194:22 195:7,11,19 214:6, 21,25 215:12,20,25 216:6,8,22 217:14 218:23 219:14,25 220:11 231:10,13,14, 22

**HCRE's** 215:18

**head** 64:4 162:6 208:12

**heading** 116:13 158:8 245:21

**headings** 68:13,19 91:13

**hear** 84:22 183:12 228:25

**heard** 41:3 72:24 96:23 101:23 103:11, 15 131:7,16,20 138:18 186:10 187:7, 16 210:18 228:16,21

**hearing** 38:20,22 107:22 150:16 151:2, 4,18

**heart** 120:20

**heat** 137:25

**held** 113:9

**Heller** 6:11

**helping** 116:9 132:22

**helps** 237:15

**Hendrix** 83:3 96:22 97:3 99:18 103:2,13, 16 118:18,25 126:17 131:7 133:19 134:3 137:14 139:11 148:19 149:2,16 150:8,10 201:3 211:14,23 220:22 226:16,25

**hereof** 67:2

**hereon** 66:25

**hesitate** 7:24 8:2

**hey** 143:7 213:6

**hidden** 212:23

**high** 64:17 163:25 166:25 187:24 188:8, 9 215:11

**high-level** 173:22

**higher** 163:17

**Highgate** 208:16

**Highland** 5:5,21 8:13 12:2,9,16,18 13:14 41:21 102:23 104:10, 19 121:21,23 122:10, 12 140:3 144:13 154:14,18 161:19,20 166:24,25 167:7,12, 20,24 168:8,9 172:10 176:15 186:10,15,17, 19,22 187:23 189:7 190:23 192:4 195:4,6 198:15 200:8 201:13, 23 202:2,12 203:9, 11,14,15,20 204:5,7, 13,18,19,23,25 205:3,4,12,14,21 206:9,13,17 208:20 215:16 222:3,7 223:5 233:20,23 234:11,15 236:4,11,12,23 237:3,19 238:18,22 241:4 244:2

**Highland's** 189:5 235:10,16

**highlights** 161:10

**hired** 133:9

**hired-off-the-street** 163:18

**historical** 250:6

**history** 10:15,19 229:16

**hoc** 206:5

**hold** 15:14

**holder** 58:19 68:25 72:5

**holding** 27:11

**holds** 15:12,17

**honest** 74:2 228:14

**honestly** 228:4

**honesty** 26:12 27:2

**honored** 22:10

**hope** 46:6,9 167:25 168:6 169:5 189:3 191:25 192:12,18 193:3,4,5

**hopes** 187:24 188:8, 9

**hoping** 64:22 65:2 172:2

**Horn** 6:7,10,11 248:20,22

**hour** 193:17

**house** 203:7,8

**HR** 208:12

**humorous** 175:13

**hundred** 205:7

**hundreds** 11:21 140:24 161:3

**Hurley** 176:5

**hustle** 150:14

**hypothetical** 133:25

**hypothetically** 92:25 157:14

**I**

**i.e.** 133:13 144:18

**ice** 167:4 172:12

**idea** 41:14 89:25 158:13 193:14 225:16 228:11 237:5 248:8

**identification** 8:22 9:22 23:21 43:11 55:14 69:18 99:15 107:6 112:24 148:13 150:5

**illegal** 179:22

**imagine** 74:17

**immediately** 25:12, 15 80:25 97:14 104:6 107:25 144:6 146:5

**implication** 69:8 131:22 169:24

**implications** 245:2

**imply** 70:14

**implying** 158:24

**impossible** 190:11

**impression** 108:23 181:6

**improper** 145:12

**inability** 31:19

**inaccuracies** 247:14

**inappropriate** 62:5, 16 151:23

**inappropriately** 61:21

**inaudible** 6:8

**incident** 223:18

**include** 102:4 119:13 125:14 227:16

**included** 50:19 116:8 222:12

**includes** 136:12

**including** 97:22 101:18 120:14 139:10 154:23 236:18,19

**incorrect** 73:2 140:15

**increase** 187:25

**increased** 57:19

**incurred** 237:9

**independent** 11:19 12:7,11,14,15,21 13:2,7,15,17 18:6,15, 20,24 19:15,21,23 23:2 26:10 29:19 71:7 123:8

**independently** 22:14

**indirect** 204:10

**indirectly** 186:18

**individuals** 20:18 48:21

**industries** 165:24

**industry** 61:6,11

**inferiors** 125:14

**inflows** 64:14

**inform** 121:8

**information** 7:5 49:9,14 94:17 217:23

**informed** 10:8 125:23,24,25 129:16

**initial** 37:21 56:18 57:18

**initialed** 259:14

**initially** 21:23

**initiating** 156:14

**ink** 259:14

**input** 214:13

**inquire** 130:17 142:10 152:24

**inquired** 152:21 212:25

**inquiry** 186:22 187:10,13 210:20 211:3,10,15 231:4

**insight** 188:15

**insignificant** 139:15

**insolvency** 28:5,24 29:8,12 32:18 33:5,6

234:20 237:13

**insolvent** 31:14 32:2,6,7,16 34:16,21 236:12

**installment** 65:16

**instance** 116:4 118:9 210:9

**instances** 243:9

**instruct** 35:17 36:10 88:9

**instructed** 103:12 128:3 134:4 252:11

**instruction** 51:21 119:21 120:13 122:8, 10,19 126:18 127:16 128:14 129:16 139:2, 4

**instructions** 85:18 88:15 106:3 134:7 138:21,22 156:5

**insulting** 228:12

**intend** 7:11 168:19

**intended** 50:11,13

**intentionally** 78:11, 15 79:9,13

**intercompany** 174:16

**interest** 15:17 24:24 52:2 54:5 56:23 57:4, 17 60:20 66:19,25 67:13,17,19,20 87:2, 4 90:25 121:24 124:12 182:22 183:7, 20 189:5 224:19 230:9,10,22

**interesting** 111:22

**interests** 62:9 186:11,16,18,19

**interjection** 21:14 29:4 94:19 121:14 125:7 135:5 138:11 169:9 171:8 190:18

**Internal** 182:16

**interpretation** 228:20

**interrogatories** 257:3

**interrupting** 193:11

**introduce** 5:14

**inures** 15:21

**invent** 41:11

**invested** 174:4

**investigate** 176:3 223:3

**investigated** 175:18 203:12,19

**investigation** 174:21 175:25 204:4 243:10

**investigations** 205:12

**Investment** 6:12

**investor** 11:18

**investors** 166:22 169:3

**involve** 105:12

**involved** 11:17 27:16 47:13,14,21,22 48:3 89:18 147:21 161:3, 6,14,22 162:22 165:18 174:4 175:6 178:19 215:17 255:18

**involvement** 132:21

**irrelevant** 233:24 234:16,17

**irrespective** 129:2

**ISI** 255:17

**Islands** 53:23

**issuance** 178:19

**issue** 32:24 34:5 36:10,12,13 65:25 85:18 88:15 106:3 139:2 143:25 144:9 162:18 173:19 174:7, 12 175:15 178:15 195:2 232:4 233:15 235:2 251:19

**issued** 58:11 71:3

134:6 137:24 143:22 145:2

**issues** 21:6 233:24 234:16

**item** 174:20 209:8

**items** 76:8

**iteration** 113:19

**J**

**Jack** 83:5 176:5

**James** 5:4,23 6:5,24 17:12 149:12 159:9 259:23

**January** 12:12 13:3 17:16 18:5 20:19 21:15 25:10 26:9,14, 15 29:19,22 30:2 36:24 37:4 69:14,17 80:7,15 83:10 94:3 96:6 104:6,24 105:15 106:3,9,20 107:3,5 108:22,24 109:16 111:2 113:17 126:15, 22 127:9 128:21 129:11 134:25 141:21 142:12 143:12,13 144:19 145:3 146:21 148:19 149:3,13,18 150:21 158:17,22 195:24 197:12 199:18 214:5 215:6,8 216:8 221:9, 18 231:17

**January/february** 201:10

**JD** 10:16,22,25

**Jean** 176:6

**Jefferies** 22:11

**Jernigan's** 155:24

**Jim** 205:6 237:22 241:7 243:3

**job** 97:20

**John** 5:19 12:24 33:3 76:11,13 186:5 234:25 247:20 255:4

**Jones** 5:21

**JP** 207:24 208:8

**Jr** 5:5,24 6:24 259:23

**judge** 13:24 155:24 186:7

**judges** 182:9

**judgments** 27:25

**July** 13:12,13 17:7 19:19,20 20:20 21:15 22:23 156:2

**junior** 133:23

**jury** 38:15 181:22 182:3

**justified** 188:23

**K**

**key** 22:24 48:20

**kind** 69:7 73:15 76:24 90:4,8,9 103:25 112:10 161:18 162:15 209:3 243:20

**kinds** 163:9

**Klos** 16:25 17:3 83:4 84:20 103:2,3,15 126:16 133:19 137:13 139:11 153:17 154:6 201:4 207:24 211:13,20,23 226:25

**knew** 52:18 84:13 89:9 94:5 95:22,23 129:5,21,23 132:3 145:9 206:10

**knowing** 134:12

**knowledge** 47:13 54:15 103:5 106:14 110:25 111:5 113:18 220:11,17 247:7 250:4,10,15 253:2

**Kristin** 83:3 96:22

**L**

**Label** 5:3

**Labraya** 176:6

**lack** 95:12,14 244:18, 19,20

**laid** 132:9

**Landoseri** 176:7

**language** 180:24

**laptop** 7:2

**large** 124:8 237:2

**largely** 132:25 133:2, 18 140:2

**larger** 155:19,22 162:22

**late** 27:24 37:22 84:14

**latest** 113:19

**law** 10:16,23,25 11:23 34:12 108:7 123:21 239:8 240:4 241:2

**Lawlor** 176:5

**Lawrence** 69:21 70:6,7,9,15

**lawsuit** 24:17,24 32:25 75:24 77:20 177:12

**lawsuits** 21:6 53:22

**lawyer** 11:4,7,10,18 41:13 255:15

**lawyers** 49:3 152:12 255:16

**lax** 59:3,21,23 60:13, 16

**lead** 13:17

**leader** 20:13

**learn** 96:11,15 128:7 178:6

**learned** 18:10,14 84:9 86:10 92:22 95:12,13,22 96:10,12 100:19 107:25 118:10 127:16,21 128:2,22,23 129:21 130:21 134:8 156:3 182:6 221:16,17

**lease** 192:14

**leash** 35:12

**leaving** 52:14

**led** 110:21

**ledger** 231:5,7 249:8, 11,13,17 250:5

**left** 140:24 144:13 176:25

**legal** 5:10 102:21 109:23 141:17 147:12,14 155:23 157:6 234:3 239:5 240:11

**legitimate** 50:15 173:9 182:10 225:12

**Lehman** 161:8,16 164:11

**lender** 55:2,8

**lengthy** 101:6

**letter** 69:15 72:12 73:12 81:7,9 93:24 94:15 97:6 104:24 105:15 106:2 107:3 127:9 134:25 135:11 141:22 142:13 145:3 156:13 197:4,7,11 198:14,20,24 199:9 200:6,11 214:4,7 218:24

**letters** 51:22 219:14

**letting** 61:15

**level** 73:20 116:21

**liabilities** 29:9 35:5,9 189:8 190:24 246:4

**liable** 242:19

**liar** 224:2

**licensed** 11:4,6

**lie** 224:6

**life** 32:21

**limit** 16:11

**Limitations** 246:2

**limited** 14:17 15:12 238:14,15 239:9,23 241:3 242:8,22

**limiting** 227:13

**liquidity** 35:13

**list** 119:13 147:9

**listed** 93:13 177:21 178:8,20 208:22 209:9 211:20

**listen** 140:16

**listening** 181:22

**listing** 161:4

**literally** 144:13 245:20

**litigate** 223:15

**litigation** 16:7 54:10 75:16 134:15 145:16 147:22 152:13 182:19 236:13 250:12

**litigations** 27:15 192:10 195:3

**live** 8:5,6,9 140:17

**LLP** 6:2

**loan** 99:13 117:5 150:12,20 151:8 173:18 174:24 176:16 177:5 179:12, 17,20,23 180:6,7 183:2,17,18,21,23 184:3,4,6,13 194:18, 21,22 195:3,6,10,11 196:4 198:17 199:19 201:6 214:22,25 216:11 219:14,15 220:3 229:16,25 256:18

**loans** 172:20 173:2, 5,13,23 174:7,8,16, 25 175:8,10 176:8,18 177:23 178:8,25 182:17,18,22,23 184:7,11 195:19,23 196:3 203:7 230:19, 22

**local** 159:24

**log** 164:8

**logbook** 75:5

**logical** 57:2 67:8 152:4,9

**logically** 66:7 82:23

**long** 27:11 30:3 52:9 63:9 140:23 183:6 193:22 255:23

**long-dated** 64:10

**longer** 122:11 133:4 167:16 248:8

**looked** 76:3,7 176:13 178:17 200:13 202:17 217:18 218:24 230:4,15 231:4 247:5,9 249:11 256:16 257:20 258:12

**loosely** 130:19

**loss** 167:7,9

**losses** 141:2

**lost** 44:2 183:9,10

**lot** 154:22 164:9 165:7 167:10

**lots** 10:16 201:21,22

**low** 54:5 64:16

**loyalties** 155:7,17

**loyalty** 244:20

**LP** 5:6,7,18,22 12:2, 17,18 26:4

**Luc** 176:6

**M**

**made** 19:15,20 22:11 25:19 33:9 52:10,21 57:13 62:19 81:12,22 85:3 89:11 90:10,21 92:24 94:16,24 95:3, 6,15,19,23 96:11,13, 15,19 97:12 98:12,21 103:20,21,23,24 105:3,5 111:10 118:15 121:10 125:19 126:25 127:5, 23,24 128:4,13 129:3,23 130:18 131:20 134:5,13 141:23 142:20 145:5 159:9 162:20 165:10, 24 174:21 176:16

**logically** 182:23 183:8,21,23 186:21 187:10,13 195:20,23,25 199:18 210:21 211:3,16 215:4,6,8 216:10,12, 19,25 220:12 229:11, 17 230:20 231:17 233:21 234:13 235:11 237:20 238:17 249:21 251:18 256:19 259:13

**made-up** 76:23

**Madoff** 162:2

**main** 205:5

**maintain** 250:5

**maintained** 22:5

**make** 25:5,14 27:25 36:2,4 52:6 53:13 58:23 76:4 79:6 84:10 94:4 95:7 97:16 98:20 106:21 110:11 117:25 118:2, 11 119:10 126:18 128:15,25 129:17 130:13 132:4,22 140:16 159:2,4 160:4 168:7,14 169:23 179:19,23 180:23 196:8 200:18 210:19 211:7,9 212:16 236:10

**maker** 55:2,7 63:11 66:7,17 69:5,10 124:10

**makes** 35:19 229:8

**making** 54:23 85:21 88:17 102:18 131:8, 17 141:17 143:19,21 215:13,17 216:12

**mal-intent** 87:18

**Mamoud** 176:6

**man** 125:12,13 140:22

**manage** 22:18

**managed** 18:22 22:7

**management** 5:6,22 12:2,17,18 14:9,10

26:21 115:11 122:12 135:18 166:8,10,18 167:5 198:16 200:9 201:14 202:3 203:10, 15,20 204:8,19,25 205:13,15 206:9,14, 17,18 215:17 241:5 242:9 243:2,24 244:12 245:7

**manager** 22:6

**manages** 242:22

**manner** 205:22 256:22

**Manuel** 5:9

**margin** 22:10

**margins** 18:23

**Marianne** 5:12

**mark** 8:17 177:13

**marked** 8:21 9:21 23:21 43:10 51:7 55:13 56:5 69:13,17 99:11,14 107:2,5 112:13,23 148:12 150:4 196:6,7,25 197:9 200:7 214:15 245:15

**material** 7:4 71:18 78:14 157:2 158:14 173:19 174:12 175:15

**materiality** 157:10

**materially** 174:8

**materials** 255:7 258:17

**math** 57:9

**matter** 5:5 170:2 190:15 205:4 223:10 224:10

**matters** 136:25

**maturity** 58:17 150:12 151:8,16 152:23 249:23

**maximize** 50:16 97:20

**meaning** 29:9 68:14 225:22

**means** 65:20 80:6 181:3 203:19 217:13 254:2

**meant** 115:16 120:24

**Media** 5:3

**mediation** 41:2 46:2

**meet** 18:23,25

**meeting** 73:10,15, 16,18 75:6,9,12,13 79:25 81:2

**meetings** 71:13 72:20 74:8 75:2 80:6, 9,14 81:15 82:25 83:12,16

**melting** 167:4 172:12

**members** 20:6 41:23 72:21 73:11 74:6,9, 24 75:7

**memories** 73:25

**memory** 23:18 24:5, 9 73:8 128:11 224:11,16

**mental** 108:12,23

**mention** 211:22

**mentioned** 17:8 50:2 80:2 83:22 99:18 125:17 161:2 172:19 177:20 226:18 249:7 255:12 257:18

**met** 31:23 169:22

**metadata** 250:24 251:5 254:6

**metastasize** 239:15

**Methods** 246:2

**metrics** 28:8

**MF** 161:24

**MGM** 186:11,20 187:8,17 188:2,9,13 189:5 190:5,12,21 191:11 192:2

**Michael** 6:3

**mid** 38:18

**middle** 41:15 49:4 88:21

**mike** 176:4

**million** 25:6 27:17,18 52:24 57:19 89:7 93:15 106:21 108:6 109:2,19 110:3 111:10 145:23 152:17 163:15 164:19,21 166:3 168:15 169:13,20 170:11,19,20 171:3, 11,16,23 172:3,4,7 188:10 191:6 192:9, 15,19 193:6 205:7 222:22 243:6 250:3,6

**million-ish** 243:8

**millions** 86:22 139:16,18 140:24 154:24 222:7

**mind** 45:22 46:11 129:7 146:7 171:20 207:8

**mine** 122:5

**minimize** 181:5

**minimum** 230:9,21

**minimums** 229:20

**minus** 191:4

**minutes** 59:25 73:18 83:17,19 98:23 146:11 160:3,6 193:16 194:9 245:6 248:6

**mischaracterizes** 221:13 239:4 240:2, 18 241:19

**missed** 71:23 72:2 85:17 87:20 98:3 106:6,11 109:6 131:24 149:19 156:4

**misses** 88:11 146:2

**missing** 9:6 196:10

**misstate** 44:13

**mistake** 52:10 151:10

**mixing** 231:12

**MO** 172:16 185:24 205:8 233:10 244:7

**moment** 137:25 159:21 192:2 196:21

**moments** 99:9

**monetary** 156:19

**monetization** 46:15 50:3,5,10 52:19 63:21 158:9 159:19 168:2 187:25 192:13

**monetize** 50:13 62:25 159:20

**monetized** 189:7 190:22

**money** 27:12,13 35:11,13 41:15 58:22 67:21 92:16 164:9 167:10 168:24 172:15 184:7 203:4 205:3,6 208:23 209:12 236:18

**monies** 185:21

**months** 45:4 187:15 224:13

**Morris** 5:19,20 9:5,9 17:22 19:16 20:2,24 21:3,20 25:22 28:17, 22 30:18,22 31:15 32:19 33:7,11,18,22, 25 34:4,24 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 69:23 70:2,8,11 78:23 82:13 84:3 85:23 86:5,17 87:21 89:19 90:11 91:4 93:3 94:20 95:16 96:16 97:10 99:10 105:9,17,21 111:11 112:10 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5,8 139:6,21 140:10 142:14,21 144:21 145:13 146:9,23 150:23 152:7 154:2 155:11 157:20 160:14 163:19 164:2

165:11,13,17 168:10, 21 169:10 171:6,17 172:5,23 175:3,22 176:11 178:11 179:8 180:3,9,20,25 181:25 183:3,24 184:15,24 185:16 186:2,6,13 187:2 188:3,18 189:9,13 190:16,25 191:9,16 192:5,22 193:8,10 194:6,14 195:12 196:13,16 197:14,19,24 198:5, 8,10 199:7,11 200:14 201:15 202:5,8,18,21 203:16 205:17 206:24 207:4,9,12,16 209:15 213:6,10,14 216:2,14 217:3,15,24 218:15 219:5 220:14, 25 221:10,13 223:6, 12,16,20,23 225:8 226:2,13,21 227:11 228:8 230:2 231:9 232:2,7,9,19 233:5, 25 234:7 235:18 236:6 238:5 239:2,25 240:10,17 241:9,16, 18,25 244:25 245:10 247:15 250:21 251:6, 9,15,22 252:3,8,11, 14 253:8 255:21,25 256:22,24 257:10,12, 25 258:3,15,17,20,24

**Morris'** 24:14

**Motion** 43:10

**motivation** 105:11

**mouth** 108:11 151:21

**move** 172:16 184:21 185:13,24 203:4 205:8 233:10 244:7 252:23

**moves** 41:18

**moving** 27:12,13 46:15 52:18 71:15

**multiple** 20:16 46:3

**N**

**named** 50:12

names 12:23

Nancy 6:5 237:22 238:13 241:6 242:25 243:3,4,25 244:12 245:8

native 251:3 253:3, 14,17,25

nature 83:24 97:8 174:5

nebulous 61:12

necessarily 86:25 125:11 182:12

necessitated 125:20,22

needed 20:13 35:11 36:17 89:19

negative 91:9 92:2,3

negotiate 156:7,16, 19 168:13

negotiate/ renegotiate 69:2

negotiated 168:16

negotiating 46:16

negotiations 46:2 48:12,16 103:25 222:11

neighborhood 170:25

Nelms 12:24 13:23 76:14

net 192:19

Netflix 27:11

Nexpoint 5:6,17 24:17 25:4,20 26:4,8 27:23 28:2 37:12 38:9 49:18 52:25 54:12 64:23 71:3 72:8 75:23 77:20 80:24 81:13 82:10,18 84:10 85:2,21 86:15 87:20 88:11,17 94:3 96:10,12 97:8,17 98:11 106:6,20 113:5 114:5 116:5,9,10,22 117:8,24 118:5 119:2 121:25 122:20,23

123:15 124:10 125:5, 13,16 130:12 131:7, 17 134:5,20 135:19, 24 139:9,16 141:23 142:12,19 143:6 144:10 146:22 147:14,21,25 151:25 156:4 194:18,21,24 198:25 199:9 200:12 202:17 204:6 218:25 222:6 223:5 225:5,16 226:6

Nexpoint's 82:12 116:18 117:2,4 144:7

Nguyen 89:14 90:17 91:19

nineteen 187:15

non-individual 247:4

non-lawyer 63:21

non-lawyers 31:25 255:6

non-tax 181:9

nonpayment 194:18 200:10,20,25 201:5

nonresponsive 77:9

nonsense 76:24 232:24

nonsensical 86:21 98:6 158:15

normal 71:20

north 177:2

Notary 6:18

notations 257:23

note 21:4,9 25:7,11, 15 33:10,11,12,16 52:25 53:4 55:3,11, 12,21 56:11,18 57:19 58:8 59:13 60:14 61:15 62:23 63:2,8,9, 11,17,22 64:10,18,23 65:6,12 66:19,23 67:20 68:24,25 72:6, 9,25 80:24 84:14 87:5,8 88:6 89:8,12 92:6,13 93:10 97:13, 22,24 98:15,16

105:5,7,23 106:6 107:23 108:2,4,7 109:5 110:18,20,22 111:18 117:10 118:25 122:2,4 124:9,11 125:3,21 128:16 131:10,11,14, 23 132:6 134:4,21 141:24 143:6 145:7, 10 146:5 149:3 151:25 152:18 157:15 159:17,18 162:16 179:6 183:22 184:8 193:6 197:13 200:9,20,24 201:5,8 218:10,12 219:4 220:6 221:19 229:4, 23 232:5,17 233:16 235:6,7 250:3,7

note-taker 72:25

noted 259:13

notes 45:18,20 50:19,23,24 51:2,3, 15 52:3,7,12,22 53:15,16,17,18,19 54:3,4,8,15,20,22 55:3,8,18,20 56:4,7, 12 57:4 58:11,12,17, 20 59:4 60:3 61:6,22, 23 62:12,21 72:19 73:6,9,17,21 75:25 76:6,7,18 77:3,9 93:8 95:8,25 117:19 144:19 145:10,18,19 151:11,24 152:6,16 153:7 176:18 178:7, 9,14,16,19 179:2,3 182:19 192:9 218:13 219:10,18 227:5,9,16 228:2,5,24 229:12, 14,16,20,22,24,25 230:5,11 233:21 234:13 235:11,14 236:2,19 243:7,8 245:25 248:7 249:8 251:18 253:6,7 258:14

notes' 60:20

notice 8:18,20 9:20 25:11 37:22,24 85:9, 10 98:2 115:3 158:19 245:23

noticed 205:11

Notices 9:16

November 37:22,23 45:5 46:5

NPA 38:2,3,9,15 63:10 64:14 87:6 90:14 92:16 140:2 150:12 151:8 196:3 200:4 205:25 219:11

nth 138:19

number 7:17 22:20 63:2 92:2 97:19,23 153:7,9 165:2 169:6 171:20 196:10 222:23 229:20 230:23 236:17

numerous 135:7

nutshell 50:7

O

object 34:24 72:4 85:16 157:20 159:3 186:3 187:2 234:2

objected 34:19

objection 17:22 19:16 20:2,24 21:20 24:15 25:22 28:17 30:18,22 31:15 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 72:3 82:13 84:3 85:23 86:5,17 87:21 90:11 91:4 93:3 94:20 95:16 96:16 97:10 105:9,17,21 111:11 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5 139:6,21 140:10 142:14,21 144:21 145:13 146:23 150:23 152:7 154:2 155:11 157:20 163:19 164:2 165:11, 13 168:10,21 169:10

171:6,17 172:5,23 175:3,22 176:11 178:11 179:8 180:3, 9,20,25 183:3,24 184:15,24 185:16 186:13 188:3,18 189:9,13 190:16,25 191:9 192:5,22 195:12 197:14 199:7, 11 200:14 201:15 202:5,18,21 203:16 205:17 209:15 210:5 216:2,14 217:3,15,24 218:15 219:5 220:14, 25 221:10 225:8 226:2,13,21 227:11 228:8 230:2 232:19 233:25 235:18 236:6 238:5 239:2,25 240:10,17 241:9,16, 18,25 245:10

objections 10:3

obligation 105:6 120:15,23 121:4,7 134:19 138:25 146:4

obligations 104:18 116:11,19 117:5 135:24,25

obligor 58:18 229:19

obligors 51:24

obviated 98:19

obvious 60:6 64:8 157:23 158:2,5

occur 179:25

occurred 108:24 237:9

October 5:7 23:14 24:6,9,11 26:10,14, 15 35:15 36:19 46:3 259:4

odd 91:7 173:7 187:20

off-record 8:19 23:23 43:12 55:15 69:19 106:24 107:7 112:2,8 146:13 148:8 160:13 194:7

offers 63:16

**office** 115:22 116:7, 12 204:18 205:13 212:6

**officer** 36:21,24 37:4 39:7,9,17,18,22,24 40:8,13 49:24 117:24 123:17 140:6

**officers** 16:19 40:7 138:2,24 174:25

**official** 75:8,11 80:10

**offline** 251:25 252:6 253:10

**offshore** 154:24 236:18

**oftentimes** 80:19 114:11,13 182:24

**Okada** 176:17

**Okada's** 177:4

**okayed** 118:20

**one's** 228:13 247:24

**ongoing** 203:23

**operate** 104:13 167:9

**operating** 74:22 167:9 203:2

**operation** 239:10

**operational** 36:9

**operations** 16:13,15 36:6

**opinion** 26:12,17,20, 23,25 27:4 29:20 30:7,11,16 31:4,7,21, 24 32:5 63:19,20,24 154:7,11 189:15 239:7

**opinions** 27:21

**opportunities** 46:13

**opportunity** 159:20 184:19 185:10

**opposed** 62:10 87:8 92:2 97:17 132:11 143:6 162:19 216:11, 24 219:3

**opt** 37:15

**optimism** 188:12,13, 17,22

**optimistic** 192:25

**options** 87:11

**oral** 210:16

**order** 17:18 155:15 190:22

**organization** 20:12, 17 22:16 121:17

**original** 56:3,19 150:11 151:8 198:17

**originally** 53:10

**outflows** 59:17

**Outlook** 75:10 80:5

**outstanding** 52:14 56:23 85:8 209:2 229:21 230:14,23

**overhear** 103:5

**overpaid** 222:2,7,18 225:6,17,25 226:6,20

**overpayments** 223:4

**overrule** 18:25

**oversight** 18:15,19 168:3

**owed** 87:5 92:16,18 110:11 146:22 147:6 180:8 184:8

**owes** 145:22 205:6

**owing** 52:13 86:23 93:14 98:4,17 110:14

**owned** 205:2

**ownership** 15:17 26:7

**owns** 121:18 186:16, 17,20

**P**

**p.m.** 5:8

**Pachulski** 5:20 254:19 255:3

**paid** 64:15 88:6

**91:15,17 93:14 105:24 108:3 129:7 139:16,18,22 142:5 145:6 153:6 164:9 167:9 173:6 177:7 179:6 201:23 204:16 225:13 227:6,10 228:2 230:7**

**palatable** 42:5,7

**paltry** 139:25

**pandemic** 27:10

**paper** 203:4

**par** 153:25

**paragraph** 51:13,17, 19 66:2 68:8

**paralegal** 69:24

**paraphrase** 136:3

**pardon** 26:24 48:4 53:8 123:20 133:10

**parentheses** 91:8

**parse** 122:25

**part** 17:15 30:6 42:3 66:18 71:21 101:2,16 105:11 108:15 114:6 116:12,14 155:19,21, 22 172:20 173:3,14, 24 174:22 176:10,23, 24 177:24 178:25 179:12 192:7 203:23 208:19 222:10

**participants** 74:19

**parties** 114:16 118:22 144:18,25 205:25 255:9

**partner** 6:3 208:6 238:14,19 239:9,12 241:15 242:8,12,13, 22 244:4

**partners** 214:6,21 215:12,25 238:15 242:15

**partnership** 14:17 15:12,15 238:16,24 239:10,19,24 240:6, 8,13 241:4 242:10, 11,15,23 243:5

**partnerships** 240:5

**parts** 22:15 102:3

**party** 59:15

**pass** 160:14 248:17

**past** 85:22

**Pat** 176:5

**path** 223:8

**pattern** 163:17 204:5 206:6 213:3

**Paul** 176:6

**pay** 28:23 29:15 31:19 57:17 58:2,4, 22 65:15 82:11,19 116:22 133:14 144:7 158:10 172:9,11,14 173:10,12 177:8,17 206:12 211:5 216:10 226:19 227:16

**pay-downs** 57:25

**payable** 25:12,16 80:25 88:22 97:14 104:18 116:23

**payee** 59:4 60:23 61:5,13 69:2,9 124:8

**paying** 45:19 116:18 139:9 145:24 204:20 205:14 215:25 229:19

**payment** 25:5 51:25 52:11,22 65:21 71:23 72:2 81:12,22 82:12 84:11,13 85:3,4,18, 21,25 86:2,16 87:20 88:12,18 90:21 91:10 92:8,9,13,23,25 94:4, 16 95:3,12,14,15,19 96:10,11,12 98:3,12, 20,21 103:20 105:4 106:6,11,21 108:5,8 109:2,6,19 110:3,9, 22 111:10 117:10,25 118:2,11,15,19 119:2,11,13 120:16 121:10 125:19 126:25 127:24 128:4, 13,15,17 130:17 131:8,10,18,24 132:6,21 133:12 134:4,21 142:4

**143:19 146:3 149:19 156:4 195:10,23,25 199:18 200:10,20,24 201:5 214:25 215:6, 8,12,13,18 216:12, 19,24 218:8,11,22 219:2,12 220:4 229:15 231:5,6,16, 18,19 244:3 249:7, 11,13,17,20 250:5**

**payments** 57:12 58:6 66:23 82:20,21 89:11 90:24 91:20 95:6,8,22 96:2,19 99:20 101:20 102:19 103:21,22,24 104:3,4 110:19 115:10 116:15 117:18 118:7 126:18 127:4,22 128:25 129:17,22 130:5,9,14 131:3,20 132:4,23 134:13 143:22 145:4 154:23 179:23 182:21,22 183:7,20 184:5 195:19 216:8,10,22 217:14,18 218:4 220:12 224:21,22 229:3,4,11,17 230:4, 10,19,22 249:20 250:6 251:18,23 253:7 256:18

**payoff** 59:17

**payor** 61:13

**payroll** 110:15 255:23

**pays** 116:10

**PDF** 250:23 254:11

**penalty** 247:3 259:11

**people** 13:6 19:24 20:15 132:9 133:8,9, 23 138:12 167:8 176:4 178:8,20 211:12,19 216:5 254:25

**perceive** 124:11

**perceived** 124:16

**percent** 186:17

**performance** 164:6 166:11 170:14,16

Index: performed..provided

performed 36:17 206:8 210:10 225:13

performing 205:25

period 30:3 39:9 45:4,25 50:14 60:21

periodic 130:9,14

periodically 8:9

periods 27:11 235:11

perjury 247:3 259:11

permeates 244:20

permission 72:18 74:18,25 133:14

permitted 35:23 61:16 118:21 238:15

permitting 61:21

person 16:14 61:14 69:22 136:11,19,24 141:8,14 160:16 254:15

personal 54:14 77:17 153:20,23 220:11

personally 9:17 45:8 138:6

personnel 132:20,23 133:14

persons 239:18

perspective 18:9 35:8

persuade 137:17

petition 32:3

ph 14:2 176:6,7

phone 7:10

phrased 221:20

PI 109:9

pick 181:10

picking 235:3

piece 186:20 246:25

pieces 170:18 222:16

pin 37:9

place 37:11 44:3 74:13 104:12 148:2

places 161:25 185:22

plan 12:3,5 13:3 14:11 15:22 24:23 40:18 41:3,8,14 42:3 44:17 45:11,18 46:15 47:4 50:3,5,8,10 52:16,19 53:7 63:6 104:10 158:10 159:19 222:11

plans 62:25

play 243:21

played 143:4

player 11:17

point 31:6,9,13 45:7, 12 47:2 49:15 53:4,7 55:24 62:24 93:2 94:2 130:16 147:22 149:6 193:18 208:16

pointed 94:24

pointing 91:21 241:24

points 238:21

policies 104:11,17, 23 148:2

polite 224:4

portfolio 22:5,6 186:23 187:4,6,8,12, 17

position 49:11 191:3 232:15 233:19 234:10 239:8 242:7

positions 123:18

positive 123:24

possibility 199:16 210:8

post 16:12

post-confirmation 15:3

post-payment 200:11 219:14

pot 40:18 41:3,8,14, 16 42:3 44:16 45:11, 17 47:4 52:16 222:11

potential 77:3,23,24 168:17 175:2,8 188:6 190:4 191:22 192:2 235:13

potentially 54:9 118:6 125:11 176:8 178:25 191:12

power 184:10

practice 82:24 175:20 204:5 213:3

practices 104:14

practitioner 14:8

preamble 56:8

precarious 53:21

precise 186:15

precondition 234:18

prefer 139:8 140:12

preferred 154:5

premarked 196:7 206:23 213:23 245:16

prepaid 92:7,8,13, 14,18,25 93:12 98:15,19 142:7

preparation 148:21, 23

prepared 10:4 92:19 118:18,25 235:8,15 247:11

preparing 116:15

prepay 66:2,17 67:16,18,21

prepayment 65:25 66:16 68:2 142:20

prepayments 93:9 141:23

presentment 69:6 98:2 219:20

press 22:3

pressed 74:14

pretty 11:24 23:6 35:5 46:14 48:2 52:8, 9 64:8,17 74:2 98:20 131:19 147:20 166:4 207:11 221:15 224:15 232:22 237:12 242:4 252:14

prevailing 136:23

previous 93:2

previously 17:3 112:17 258:13

principal 51:25 56:23 66:18 67:2 89:7 90:25 91:17 149:3 198:17 219:2 220:4 230:9,10,21 231:18

principals 123:22 236:15

print 112:11

printed 196:22

prior 10:8 13:13 17:4, 11 22:23 32:2 39:9 42:21 46:4 55:18,20 56:4,7,12 59:2 61:3, 20 67:6 71:6 75:13 80:4,14 85:17 90:23 94:15 98:10 100:18 104:10 106:16 108:3 112:12 113:19 123:7 126:14,15,21 128:12 144:18,19,24 145:20 162:10 164:11,14,15 165:5,6 169:25 196:14 229:17 230:7

privilege 77:24

privileged 78:14,19 198:13

problem 42:25

problematic 182:12

problems 60:2

procedure 74:22

procedures 104:12, 17,23 148:2

proceeding 109:10

proceedings 11:10

process 108:12 191:20

produce 252:12 253:4

produced 79:2,11 89:22 90:3,14 199:4 231:6 250:11 251:17 252:10 253:20 256:8, 13,17

production 77:4,24 219:8 255:19

productions 251:12, 16

professional 54:25 138:15

professionals 49:3

program 175:6

programs 174:24

prohibited 68:23 157:14

promissory 25:7 50:19,23 51:2 55:12 56:11 57:4 58:11 59:4 61:6 122:2,4 124:9,10 125:3 132:6 197:12

promoted 153:17

prompted 107:16 108:25

proper 154:14

properly 35:4 236:13

properties 254:7

property 8:9

propose 42:4 44:16

proposing 41:8

prospect 171:11

prospects 187:23

provide 52:15 114:8 144:12 145:25 211:5 212:6 253:14

provided 31:25 47:17,18 76:25 78:7, 9 114:11,13 115:22 135:25 136:18 147:9

201:13 202:2 203:14 204:18 205:13 209:13 215:24 253:4

**provider** 135:16

**providers** 254:21

**providing** 115:7 144:10 147:14 204:5 210:2,17 254:3,4

**proving** 34:6

**provision** 143:2 219:10

**prudence** 136:21

**prudent** 136:23 142:18 145:6

**PST** 254:5

**Public** 6:18

**pull** 89:14 154:18 196:6

**pulled** 43:17

**pulling** 20:15

**purports** 113:3

**purpose** 60:4,5 145:12

**purposes** 21:8 68:13 132:11 179:5 182:11

**pursuant** 17:17 20:21 21:17 82:24 142:18 183:22

**puts** 117:22

**putting** 108:10

**Q**

**quality** 256:13

**question** 17:23 19:17,18 20:3,25 21:11,12,21 22:22 25:23 28:18 30:19,23 31:16 34:25 35:18,21 36:8 40:21 48:25

55:6,23 57:8,22 59:8 60:10,11 61:10 62:2 64:25 66:12 67:11 72:11 77:10 82:14,20 84:4 85:15 86:18 87:22 90:12 91:5 93:4 94:21 95:17 99:21,22 102:8 105:10,18 111:12,23 113:23 115:18 117:13 120:18 121:2 122:14 124:14 125:10 126:8,20 134:2,10 135:9 137:19 138:9 139:7 140:11 142:15 144:22 146:24 147:11 155:12 157:21 163:20 164:3 165:14 168:11,22 169:11 170:4,8 171:18 172:6,24 175:4 176:12 178:12 179:9 180:10 181:2 183:4,25 184:16,25 185:2,9,17 186:14 188:4,19 189:10,14, 18,23 190:2 191:2,10 192:6,23 195:13 197:15,25 199:12 200:15 201:16,19,20 202:8,22 203:17 205:9,18 209:16 210:6 212:9,11 216:3,15,17 217:4,6, 16,25 218:16 219:6 220:15 221:2,11 225:9 226:14,22 228:9 230:3 232:20 233:3,12 234:9 235:4,19 236:7 237:18 238:6 239:3 240:2,11,18 241:19 242:2 245:11 248:21 249:5

**questioner** 223:7

**questioning** 99:8 160:25 194:17

**questions** 21:8 85:16 102:5,15 235:22 248:23 249:6

**quick** 136:12 147:7 207:11

**quickly** 23:7 100:4

**Quinn** 69:24 70:6

**quip** 189:21,24

**quote** 44:7 182:6

**R**

**raise** 155:13

**ramifications** 137:16 140:21 141:3 143:19,21

**ran** 22:14 256:5

**range** 162:25 164:18, 21 166:4

**rare** 174:20

**rate** 54:5

**re-trades** 46:4

**read** 21:12 51:19 56:2 62:20 65:14,22 66:16,22 67:8 101:2, 11,14,16,23 102:2 110:24 113:2 136:7, 15,16 137:5 141:14 147:10 150:10 170:5, 7 185:2,7,8 229:4 234:5,8 247:16 259:11

**reading** 22:4 137:12 143:5

**real** 8:8 45:15 62:13 136:11 147:7 244:18

**reality** 222:25

**realize** 132:5

**realized** 107:25 111:18

**reason** 30:12 43:22 57:16,18 64:7 73:23 83:11 111:8 113:12 117:11,16 120:9 184:9 219:15,17 224:5 227:8,25 247:13,25

**reasonable** 117:8

**recall** 23:13,25 37:6, 10,14,18,21 38:5,17, 21,23 39:4 40:19

43:13 47:6,21 58:6 64:5 71:9,12 72:14 73:13 74:13,23 76:9, 16,20,25 80:21 81:2, 4,21,23 82:9,15 84:12,17,19,21,25 89:2 94:5,14 101:14 104:5,7,16,20,22 107:12,16 109:4,8,9, 11 110:5,23 113:24 119:23 120:4 126:24 127:21 129:20 130:19,20 131:19 145:17 150:19 151:18 152:25 153:3 157:7,11 162:6 173:2,16 182:5 188:5 195:14 198:19,21 199:2,21 201:2,11 208:2 209:23,24 216:17 217:8,9,20 218:6,19 219:23 221:4,7 222:19,21 226:15 227:14,18 228:17 230:25 246:7, 24 249:9

**receive** 174:25

**received** 81:24 108:5 115:24 176:8 177:23 203:20 215:12 216:7 217:13 225:17 243:15 251:13

**receives** 167:4 179:12

**recently** 251:14

**recess** 99:3 112:5 146:16 160:10 213:18 248:11

**recitation** 11:13

**recognize** 70:21 107:10 227:22

**recollect** 177:7 229:10

**recollection** 39:5 40:9 82:9 88:15 93:11 97:2 100:14, 17,21 102:23 134:24 151:6 164:18 211:8, 19 212:3,11 228:21 229:9 230:18

**reconsider** 138:4

**reconstituted** 14:16

**record** 8:4 23:17 24:14 38:15 53:14 73:23 74:14,25 99:2, 5,7 111:25 112:4,7 146:15,18 160:9,12 213:17,20 248:10,13 257:16

**recorded** 74:18 80:5 83:12

**recording** 99:23 100:12

**redacted** 251:21

**Redeemer** 237:2

**reduce** 110:11

**reduction** 132:15

**refer** 187:8,17 202:9, 25

**reference** 108:18 127:8 149:22

**references** 55:18

**referred** 143:16 186:23 187:4,5

**referring** 96:5 116:4 202:19,23

**refresh** 23:18 24:5 128:10 164:17

**regard** 198:16

**regular** 8:15 71:13 132:11

**reimbursed** 209:22

**reimbursement** 110:15 209:20

**reimbursements** 209:2,6

**reinstate** 157:15 159:17

**reiterated** 108:9

**relate** 226:18

**related** 32:23 80:23 95:4 103:22 104:17 114:16 124:18 129:23 174:16

182:18 209:5 223:9 227:4,5 240:5

**relation** 178:7

**relationship** 62:6 138:12 169:25

**relevant** 11:14 130:4 223:18 224:4

**relied** 48:10

**rely** 59:15 117:9

**remain** 167:15

**remember** 36:25 71:16 79:19 84:8 108:19 129:15 131:16 133:20 151:3 155:18 181:22 194:19 224:12,14

**remotely** 7:3

**removed** 17:18 21:24

**remuneration** 115:25

**renegotiating** 68:23

**renegotiation** 68:2, 4,9,20

**reorganization** 165:19

**reorganized** 15:9, 13,15,20 16:2,3 24:19,23 30:13 41:17 77:2,15 153:13

**rephrase** 7:25 19:18 218:3

**replace** 133:7,8

**report** 16:10 81:25 83:22 90:9 112:12

**reported** 22:12 143:17

**reporter** 5:11 6:9,15 18:12 19:5 21:14 29:4 37:25 46:20 62:15 76:12 82:5 86:4 87:13 90:19 94:19 99:11 100:3,7 121:14 125:7 135:5 138:11 152:10 169:9 170:7 171:8 185:7,8

190:18 234:8

**Reporting** 5:11,13

**reports** 22:4 92:20

**represent** 5:17 43:16 90:2 112:14 113:6 231:22 256:4

**representations** 58:23

**representatives** 51:22

**represented** 102:14

**representing** 5:23 6:4,12

**request** 36:17

**requested** 76:9 118:18 258:13

**requesting** 74:18

**requests** 75:23 76:5, 6,17 77:20 78:17 254:17 255:8

**required** 130:9 142:25 145:6 219:18

**requirement** 219:21

**requires** 33:4

**resignation** 23:9

**resigned** 24:6 26:11 35:16

**respect** 11:12,25 14:19 17:24 33:2 35:13,23,25 36:5,6, 14 62:3,11 77:18 84:6 85:20 101:20 104:12 106:5 120:8, 15 121:24 122:2,3 123:8 125:2,16 128:16 129:5 133:10, 12 135:10 141:7,8 143:5,11,18 144:16 148:3 154:24 155:4 156:20 175:13 176:22 210:16 218:23 219:19 232:21 236:16 238:12 243:25 246:11,17

**respective** 123:22

**respects** 133:11

**respond** 71:22 254:16

**responding** 75:22 217:12 218:13

**response** 76:16 130:2

**responsibility** 116:22

**responsible** 116:18 154:13 156:14

**responsive** 76:2,19 77:19 78:7,16 253:20 254:13 255:7

**restate** 33:23

**restated** 112:22 113:4,16

**restroom** 98:23 146:8

**restructured** 150:13 151:9

**restructuring** 39:17 161:14,23

**retail** 144:11

**retain** 153:13 175:12 179:14

**retained** 24:24

**retention** 179:13

**return** 110:6,8

**returns** 169:2

**Revenue** 182:16

**review** 77:4,17,24 136:8 141:19 203:24 247:23 253:19 255:22 256:2,11

**reviewed** 247:10

**reviewing** 7:4

**revisit** 140:18

**RIF** 132:14

**rights** 59:4 60:23 61:5

**rise** 238:25 241:5

**risen** 73:20

**risk** 147:12

**risks** 236:16

**Rober** 133:20

**Robert** 255:18,21 256:9

**role** 12:6 13:14 14:18,22 15:7 20:22 21:18 22:5 26:4 49:17 121:25 122:12 124:5 133:15 143:4 144:19 174:22 238:19 239:12 242:12,14 246:11

**roles** 21:24 23:21 242:9

**roll** 54:21

**roll-up** 53:17,18 56:12 61:21 62:11 63:13 151:24

**rolled** 54:2,22 145:10,19 151:13 152:6,17 153:8

**rolling** 60:3 144:18 236:19

**Romey** 150:9,19

**room** 54:18

**roughly** 57:11 136:4 137:6

**roughshod** 22:15

**round** 23:6 88:2,8 134:17

**RQ** 250:21 258:10

**rude** 228:12

**Rukavina** 5:16,17 6:21 8:17 9:11,14 18:17 19:11 23:15,24 33:2,10,14,19,24 34:3,11,14 38:8 43:7 46:24 55:9,16 62:17 69:11 70:19 76:15 79:4 86:9 87:16 89:13,20 90:20 98:22 99:6,16 106:23,25 107:9 111:24 112:9 146:7,10,19 148:6,9, 14 149:25 152:11

159:21,24 160:24 183:9,13 194:16 220:20 223:14 228:16 235:21 248:19,25 249:4 250:21 251:8,13,24 252:5,9,13,16 257:8, 14

**Rukavina's** 196:9

**rule** 18:8 186:7

**run** 15:23 50:15 114:7 140:22 167:7,8 185:20 212:21 238:15

**running** 21:10 27:23 239:10

**runs** 16:5

**Russ** 76:13

**Russell** 12:24

---

**S**

**salary** 155:14 173:11

**sales** 19:3,6,7

**sat** 188:14

**satisfy** 35:8

**satisfying** 219:3

**scam** 180:14

**schedule** 54:21 117:23 249:19,22

**scheduled** 118:3,6 131:8,10 142:4,7 146:3

**schedules** 245:24 246:4 251:17

**scheduling** 133:13

**School** 10:23,25

**Scott** 40:3

**screen** 196:18

**scroll** 89:23 90:16 91:12,18 207:21 213:25

**search** 178:14 256:5, 9

**searches** 254:16 256:6

**searching** 255:2

**secret** 212:23

**section** 56:2 65:13 66:4,15 67:7,16,24, 25 102:6 116:14 135:12,21 136:5,7 137:8 141:6 142:19 143:3 144:17

**security** 54:6

**seek** 63:8

**seeking** 72:18 74:25 209:22

**Seery** 5:1,5,24 6:1,24 7:1 8:1,23 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,9 44:1 45:1,8 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,24,25 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,20 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,7 80:1 81:1 82:1,10 83:1 84:1 85:1 86:1 87:1 88:1 89:1,22 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,8,17 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,15 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1

137:1 138:1,3 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,6,14 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1,2,15,20 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1,18 170:1,10 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1,16 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1,22 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1,2, 19 224:1,23 225:1,2, 18 226:1,15 227:1,22 228:1 229:1 230:1 231:1 232:1,14 233:1,2,13 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1,22 242:1 243:1 244:1 245:1 246:1 247:1 248:1,16,21 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1,16 257:1,18 258:1 259:1,23

**Seery's** 138:21

**segment** 194:2

**Select** 18:22 22:7 27:8

**sell** 63:8

**selling** 87:8

**send** 67:21 77:23 85:10 107:17 218:24

219:7 251:4 254:11

**sending** 71:6 72:9 94:15 98:10

**senior** 11:18 173:4, 17,18 174:17,25 176:21

**sense** 35:19 229:8

**sensitive** 30:14

**sentence** 65:14,18 135:22

**separate** 30:12 155:3 223:10

**separately** 142:10

**separation** 46:16

**September** 46:3 246:10,12

**server** 77:15

**service** 82:20 117:20 127:4 129:6,22 134:13 158:11 201:17 208:19 222:3, 8 223:4 229:2,11

**services** 36:2,5,15, 16 37:11 38:19 39:2, 8 46:22 62:5 95:4 103:21 110:14 112:21,23 113:4,17 114:8,12,13 115:6 116:2,8,13 127:22 129:25 130:8 132:22 134:24 135:15 139:12,24 143:22 144:6,11,12 147:8,9, 14 153:14,24 158:7, 21 161:13,17 162:23 167:6 198:16 200:9 201:13,14,21 202:2, 3,9 203:10,14,15,21 204:6,7,8,18,19 205:2,7,13,15,22,24 206:7,10,18,19 209:5,8,12,13 210:3, 4,10,17 211:5,6 212:5,6,7,14 215:25 216:4,9 219:12 222:13,18 224:21 225:6,17,24 226:5,19 227:4

**Services'** 205:5

**set** 81:17 85:9 114:6

**settled** 27:16

**settlement** 20:21 21:17,23 44:11,18 45:9 46:13 156:7

**settlements** 156:19

**severance** 176:24

**Sevilla** 207:24 208:8, 10,13

**shady** 151:23

**shared** 35:25 36:5, 14,16 37:10 38:19 39:2,7 46:22 62:5 80:16 82:20 95:3 103:20 110:14 112:21,23 113:4,16 127:4,22 129:6,22,25 130:8 134:13,23 143:21 147:8 153:14 158:7,10,20 201:13, 17 202:2,9 204:6 206:18 209:5 212:6, 14,24 222:2,8,18 223:4 224:21 225:6, 24 226:5,19 227:4 229:2,11

**shares** 188:11

**sheet** 28:24 29:9 31:14,18 35:4,7 236:14

**sheets** 222:12

**shocks** 184:17

**shoes** 241:14

**shorting** 27:10,11

**shortly** 71:14 95:21 206:25

**show** 118:17 196:5 206:21 236:15 245:15 249:21 251:22 254:5

**showed** 99:8

**showing** 213:22 245:20 250:5 251:17 254:7

**shows** 185:22 222:15 237:13 249:20,22

**side** 8:7 48:19 64:11 125:17 225:20,23

**sides** 54:2 145:21

**sign** 91:9

**signature** 70:24 107:14 246:19

**signed** 184:8 247:3

**significant** 13:20,22 168:23 174:14 236:12

**significantly** 169:15,19 170:11,17 171:2,9,15,23,24

**similar** 77:10 80:4 126:5 143:23,25 153:8 166:24 174:24 196:3 200:4,12 206:6 216:4 236:21

**simp** 228:5

**simple** 147:11 233:12

**simply** 171:12 174:6 226:18

**simultaneous** 9:13 21:13 29:2,25 33:21 42:23 44:6 49:22 59:10 70:18 79:3 85:24 94:11,18 98:24 102:12 109:12 121:13 122:22 132:16 135:4 138:10 142:23 143:24 152:8 163:4 164:24 165:21 169:8 171:7 180:21 185:4 189:16 190:17 191:15 204:24 210:22 223:11 230:12 233:4 244:22 246:22 247:22 252:2 253:24 255:11 257:11

**simultaneously** 124:7 125:6

**single** 73:24

**sir** 6:22 8:4 9:15,23 12:23 13:10 14:22 16:11,23 24:2 28:21 33:14 43:14 49:20 51:11 56:16 61:3

65:12,13,18 66:20
68:22 69:12 88:24
90:18 91:15 92:4
106:25 107:9 112:19,
25 115:12,21 120:11
124:6,19 135:13,22
136:6 141:6 142:17
147:8 148:7,15
150:2,17 151:21
152:12 159:3 252:17

**sit** 164:8 165:8
228:22 247:12,20

**sitting** 10:9 109:15
113:11 129:15 131:5,
15 137:8

**situation** 175:7
196:3

**sixty** 38:4

**sixty-day** 37:24 38:2

**skill** 136:21

**skills** 26:21

**Skyview** 208:16

**slice** 245:20

**sloppiness** 66:10

**slow** 100:5

**slowly** 160:18

**small** 186:20

**smart** 227:23

**Smith** 5:12

**sold** 22:11 188:10

**solely** 13:14 182:14

**solicit** 63:16

**solve** 234:20

**solvency** 28:4,10,13,
19 29:21 30:7,17,24
31:5,7 34:4,5,6
232:6,17 233:23
234:15 235:5,10,16,
23

**solvent** 233:21
234:12 236:4

**sort** 43:3 48:15
111:21 188:12
204:10 244:19,20

**sound** 43:2 182:8

**sounds** 48:18

**speaking** 9:13 21:13
29:2,25 33:21 42:23
44:6 49:22 59:10
70:18 79:3 85:24
94:11,18 98:24 100:3
102:12 109:12
121:13 122:22 125:6
132:16 135:4 138:10
142:23 143:24 152:8
163:4 164:24 165:21
169:8 171:7 180:21
185:4 189:16 190:17
191:15 204:24
210:22 211:19
223:11 230:12 233:4
244:22 246:22
247:22 252:2 253:24
255:11 257:11

**speaks** 113:25

**specific** 20:13 39:4
46:4 47:23 76:8,21,
22 84:12 93:10 97:25
120:4 154:21 171:19
202:10 206:5 211:15,
18 212:2,10 216:18
218:21 221:4 224:12,
14 227:18,20 228:18
229:9 230:17 235:22,
24 249:10

**specifically** 43:15
71:12 77:8 81:23
90:5,6 97:24 118:5
122:3 133:5,7 135:25
150:24 152:25 153:3
155:19 162:12
198:21 199:2,21
201:11 208:3 209:24
210:19 219:24
227:16 228:15
230:25 246:8

**specifics** 217:20

**speculate** 111:13,
16,17

**speculating** 108:12,
15 111:14,15

**speculation** 152:3

**spend** 86:22

**spent** 13:18,20,22

**spoke** 177:13

**spoken** 208:9

**spreadsheets** 253:3

**spring** 203:25

**staff** 135:15

**stand** 107:21

**standalone** 203:2

**standard** 72:5 74:21
79:24 144:17

**standards** 61:7,11

**Stang** 5:20

**start** 5:3 52:20 179:3
183:15 190:20

**started** 46:16 160:24
213:8

**starting** 40:23 41:8
42:10 44:15

**State** 6:23 8:10,14

**statement** 52:4
58:18 128:25 246:2

**statements** 251:20
258:19

**states** 11:3

**status** 200:20,25
201:6

**stayed** 18:3

**step** 180:15 239:11
243:2

**stepped** 238:19
242:11

**stepping** 241:14,21

**steps** 98:9 242:22

**stick** 105:12

**Stinson** 6:2,4

**stock** 164:22 173:12

**stooge** 154:9

**stop** 193:18 196:23

**stopped** 45:7,9

**story** 76:23 159:2
222:10 225:15 233:8

**Strand** 12:16 13:14

**street** 140:25

**strewn** 140:25

**strictly** 60:23 225:21

**strike** 26:24 39:15
47:8 51:18 53:8
61:17 78:4,12 83:17
86:12 93:23 110:7
127:13 133:11
172:17 185:24
190:20 205:9 220:9
231:24 233:11 244:8

**strip** 140:2

**stripping** 53:23
144:14

**structure** 45:17
155:15 166:12
179:21

**structured** 173:6,8
177:18 181:4

**structuring** 182:10,
13

**struggle** 85:14

**style** 67:24

**stylistic** 68:13

**Sub-trust** 16:8

**subject** 10:2 18:5
54:9 145:16 182:19
184:11 188:25

**subsequent** 76:23
113:20 179:5 232:24
237:6

**subsequently** 12:8
18:10,13 19:2 120:23

**substance** 72:12
73:12,14 79:20 81:9
102:17 143:14

**substantial** 87:9
161:5

**substantially** 63:25
64:6,7

**successful** 168:6
169:5,14 191:25
192:13,18

**successfully** 189:6

**sucked** 35:14

**sued** 33:3

**sufficient** 199:14
244:6

**suggest** 60:22

**suggests** 68:22

**suing** 63:10 87:11

**suit** 64:9

**Sullivan** 177:15

**sum** 118:13,16

**summarize** 118:4

**summary** 17:16,20
242:5

**superior** 126:11

**superseded** 55:20
56:4

**supplemental**
251:12,16

**supplied** 93:16

**support** 43:10 58:24
115:23 147:18

**supporting** 147:23

**supports** 228:20

**supposed** 234:21
241:14 242:17
244:15,17,21 245:7

**Surgent** 16:24 17:3
40:8 153:2 211:20,22

**Surgeon** 17:2

**surprised** 193:24

**surprises** 184:14,22
185:14

**suspect** 113:12

**swear** 6:15

**sworn** 6:18

**syphoned** 62:9

**system** 254:13

**systems** 253:18,19

# T

**takes** 8:14 239:9,11 242:8

**taking** 7:4 73:21 123:7 140:15 166:14 236:18 244:3

**talk** 7:23 24:16 108:14 177:14 178:18 200:19,23 201:4 240:23 251:24 252:5 253:10

**talked** 27:9 41:4 71:14 106:15 177:16

**talking** 56:11 57:10 61:13 71:19 80:15 133:13 156:8,21 166:23 180:24 188:5 194:20 202:15 232:2 239:22 240:7

**talks** 66:15 68:8,12 88:21 147:11

**tangential** 62:6

**tax** 179:5 180:17,22 181:5,8,10,16,18 182:11

**taxes** 173:9 179:6,21 180:8 182:14,15

**taxi** 181:17,19

**team** 46:17 47:18 49:9 92:21 117:22 155:5 156:24 157:5,6 168:25 211:11 247:11 252:12

**technical** 183:5

**technically** 161:24

**TECHNICIAN** 5:2 6:14 98:25 99:4 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**telephone** 106:10

**telling** 43:19 165:12

**tells** 131:2 134:3

**ten** 98:23 140:18 171:16 178:2 193:13

194:9 245:5

**tenor** 63:9

**tens** 154:23

**tentacle** 154:9

**term** 41:3,10 51:3 53:4,10,15,16,17 54:8 59:19 60:7 65:3,6 95:8 145:10,18 178:10 179:4,5 180:17 182:22 183:18,23 194:22 195:3,6,10,11,19 198:16 199:19 214:22,25 216:11 219:14,15 222:12 229:16,25

**terminate** 37:16 144:5

**terminated** 37:20 38:7 114:20,25 158:8,22

**termination** 38:22, 25 39:7 46:18,22 113:20 115:2 153:14 158:20

**terminations** 132:11

**terms** 54:2,3,6 60:24 65:12 108:6 115:15, 23 147:18 183:22 220:6 254:22 256:5,9

**terrible** 172:14

**test** 31:14,18,21

**testified** 6:19 59:24 62:22 101:19 107:22 117:7 119:20 120:7 127:3 141:25 151:19, 22 227:17 238:17 245:5

**testify** 10:4 128:12 159:5 182:20

**testifying** 109:4

**testimony** 61:3 101:22 119:24 126:15 127:15 221:14 224:8 225:21 229:5 238:20 239:5, 21 240:3,19 241:20 259:14

**Texas** 8:10,14

**texts** 7:5

**there'll** 99:20

**thing** 7:21 42:21 65:10 73:24 99:25 111:21 130:24 153:9 162:15 181:15 196:23 225:23

**things** 18:11,14 19:13 22:13 50:8 53:19 76:24 115:9 153:10 155:3 166:14 202:12 203:3 204:13 205:2 206:4 234:19 245:4 254:11

**thinking** 249:12

**third-party** 206:7

**thirteen-week** 82:4, 6 83:22 84:6

**thirty** 38:5 54:4 62:12 138:16 165:25 236:19

**thirty-year** 53:10 87:5 161:9

**Thomas** 16:24

**thought** 27:13 50:14 52:14 59:24 65:10 78:7 144:9 195:15 199:20 219:22 235:23 244:23

**threat** 177:12

**Thursday** 259:4

**ties** 67:6

**tight** 35:12

**Tim** 176:5

**time** 13:7,18,19,21,22 19:9 23:8 27:2,12,24 40:15 44:2 45:7,25 47:2 49:15 50:14 51:3 52:7,13,17,19, 23 53:4,7,24 54:16 57:20 59:2,18 60:8 62:24 71:17 75:15 80:7 83:4 94:2,8 95:21 98:25 99:4 100:18 103:19 112:3, 6 124:17,19 126:15,

24 128:5 130:17 134:13 145:5 146:14, 17 147:4,5,18 149:6 153:11 154:22 159:13 160:8,11 188:10 195:16 201:7, 10 208:11 211:16 213:11,16,19 221:9, 19,21 227:2 228:18 233:21,22 234:12,13 235:10 248:2,9,12 255:23 259:2

**timely** 116:23

**times** 7:15 35:14 58:2 135:8 140:18 145:8,9 204:14 227:24 242:21 257:13

**timing** 127:8

**today** 5:24 9:17 10:5, 9 14:20 24:17 55:11 109:15 113:11 129:15 131:5,16 137:9 165:8 182:20 202:17 228:23 235:15 247:12

**today's** 150:15 259:3

**told** 34:21 72:17 81:14,21 82:10 84:15 96:18,21 97:2,3 99:18,19 101:19 102:18 118:2,11 119:10,16,17 140:20 156:24 157:3 211:6 229:10

**tons** 62:9

**top** 64:4 115:7 162:5 246:25

**top-level** 162:9,10

**topic** 88:9 94:25 134:18 234:2

**topics** 9:4,9 10:5,8 76:21,22 223:9

**total** 91:15 110:11 149:3 167:19 190:13 216:20,23 217:18 230:7,8,20,21 243:7

**totally** 79:4

**touched** 245:12

**traded** 18:21

**transaction** 145:21 180:18 181:3,8 182:10,13 188:24 192:3

**transcript** 101:24 102:3 110:25 259:12

**transfer** 33:4,9 34:2, 9 217:23 232:12 257:20

**transferred** 147:20

**transition** 104:2 208:14,18

**treasurer** 49:24 123:15 124:9 125:14

**treasury** 132:21

**treat** 168:25

**trial** 38:18,21

**TRO** 43:10

**true** 36:20 43:4 52:4 86:23 112:16 113:7 117:4 206:5,7 259:15

**Trussway** 186:11,19 187:5 188:2,7 190:6, 21

**trust** 6:13 15:12,22, 24 16:5 45:20 179:20

**trust-me** 179:17,19

**trustee** 15:3,5,6,8, 10,11 238:13 243:2

**truth** 43:19 224:10

**TSG** 5:10,12

**Tuesday** 81:20

**turn** 135:12

**turned** 79:14 87:18

**TWA** 161:7

**twelve** 176:17 178:2 194:9 236:8

**twelve-minute** 193:13

**twenty** 171:4,9 193:15

**twenty-five** 7:16

**twenty-plus** 88:7

**type** 166:9,20 171:12 202:23 249:17

**types** 167:2 175:11

**typical** 166:6

**typically** 65:24 74:11 83:2 145:5 167:8 170:21 173:4 216:25

**tyrant** 140:9

---

**U**

**Uh-huh** 56:9,17 94:13 116:6 141:15

**ulterior** 60:4,5

**ultimate** 35:8 192:10

**ultimately** 25:10 47:18 63:8 97:13 118:4

**unable** 29:14 224:14

**unclear** 57:24 102:7

**uncommon** 61:15

**underlaid** 241:13

**underlying** 60:24

**understand** 7:25 21:22 28:12 41:7 48:18 49:16 53:3,9, 12 58:15 61:7 65:5 94:2 132:2 138:14,20 163:11 172:4 180:18 185:5 190:6 216:16 217:6 225:18 228:17 239:21 253:25

**understanding** 14:4 20:9 25:25 26:2 44:24 108:7 114:3 115:14,20 118:14 119:6 120:12 121:6 123:21 127:13 132:19 137:8 141:3 142:2 166:5 179:10 180:6 201:12,25 215:23 220:8,10

**understood** 78:22 79:15 131:25 194:24

---

221:23 236:16

**undertaken** 97:7 174:10

**undertook** 243:25 245:8

**unfair** 59:9 60:13

**United** 161:7

**units** 14:17 15:13,15

**universe** 103:11

**university** 10:18,20, 21

**unpaid** 22:5 51:25 60:20 66:18,24 67:2

**unsecured** 64:18 88:6

**unusual** 73:14

**unwritten** 212:4,17, 23

**upcoming** 119:13 134:21

**update** 83:24

**Upper** 8:6

**upside** 170:15 188:7, 9,14 190:4,5 191:23

---

**V**

**Vague** 24:3

**vaguely** 24:3

**values** 30:9

**vehicle** 140:2

**version** 9:10

**versions** 253:6 258:13

**veteran** 7:22

**video** 5:2 6:14 98:25 99:4 101:8 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**video-record** 74:4

**video-recorded** 5:4

---

**view** 34:15 45:21 146:20 147:2 215:2

**viewed** 64:12

**views** 153:23

**violation** 182:15

**virtually** 59:11 243:8

**virtue** 54:19

**vis-a-vis** 45:11 102:18 131:7

**visually** 83:12

**void** 56:5

**volunteer** 94:17

**volunteered** 98:18

---

**W**

**wait** 88:6

**waived** 98:2

**waiver** 69:5,7 219:19

**waives** 69:6

**wanted** 22:2 60:6 99:25 156:15 193:23 206:12

**warning** 213:10

**Warren** 6:7,10

**waste** 44:2

**Waterhouse** 36:20 39:6,21 47:2,12 48:20 49:8,17 81:6,9 83:3 84:18 92:12 96:23,24 97:2 99:19 100:23 101:18 102:17 103:6 106:4, 9,15 109:18 117:7 118:10,19 119:16,20 120:14 122:8,9,18 123:12 124:2,7,20 125:12 126:5,16 131:2 133:19 137:13 139:11 140:4,13,20 141:4 143:11 148:18, 25 149:12,17 153:5, 13,21 154:8 155:4,10 156:6 157:4,14 158:16 159:5 200:24 207:24 211:13,24

---

**Waterhouse's** 92:21 102:3 103:10 106:13 110:24 119:2 149:11 229:5

**ways** 20:16 257:2

**wearing** 122:23

**Webex** 74:10,14,21

**Wednesday** 81:20

**week** 81:17,19 109:13

**weekly** 81:15 82:25

**West** 8:6

**whatsoever** 53:25 170:2 185:19 224:24

**wherewithal** 35:7

**whomever** 247:11 248:17

**win** 64:9 237:3

**wire** 217:22 218:5,10, 20,22 257:22

**withdraw** 228:13

**withhold** 78:4,12,15, 18 79:10

**word** 43:4 45:24 50:4 66:4 67:25 130:22 154:8,13 253:5 254:6,7 258:13

**words** 14:14 44:12 99:21 108:11 137:11 151:20 152:2 220:21 221:5,7,17 224:13,15 226:16 227:12,13,15, 18,20 228:18

**wore** 123:12

**work** 8:12 117:17 138:13 142:3 174:5 203:6,8 206:2

**worked** 22:19 97:18 121:21 169:25 173:18 174:4 255:4,7

**working** 203:9 208:14,17 254:19

**works** 140:13

**world** 233:7

---

**worth** 164:23 165:2, 6,7 191:8,12,21 192:4,19

**write** 197:7

**writes** 150:10

**writing** 73:21 99:23 157:7

**written** 104:11 148:2 202:16 212:17,20 214:11

**wrong** 9:12 113:8 177:6 241:22

**wrote** 197:8,10,18,22 198:4

---

**Y**

**Yang** 176:5,22 177:20

**year** 19:2 65:17 163:15 164:13,14 168:8,15 169:13,20 170:12 171:16 172:3, 4,8 204:2 217:2

**year-and-a-half** 187:15

**years** 22:20 54:4 57:11 60:21 62:12 88:7 138:16 164:14 165:25 167:3,19,23 176:18 178:2 201:24 229:20 230:23 236:20

**yesterday** 108:17 119:25

**York** 8:6 10:23,24 11:5 176:23

---

**Z**

**Ziehl** 5:20

**Zoom** 27:10 74:9,14, 21 112:17

# Exhibit B

```
 1                McGovern - 11-9-2021

 2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION

 4   In re:                       )
                                  )
 5   HIGHLAND CAPITAL             )    Case No.
     MANAGEMENT, LP,              )  19-34054 L.P.
 6                                )   Chapter 11
            Debtor,              )
 7   -----------------------------)
     HIGHLAND CAPITAL MANAGEMENT,  )
 8   LP,                          )
                                  )
 9          Plaintiff,            )  Adversary No.
                                  )  21-03003-sgi
10      vs.                       )
                                  )
11   JAMES D. DONDERO,            )
                                  )
12          Defendant.            )

13

14

15

16

17           REMOTE DEPOSITION OF

18               BRUCE McGOVERN

19               Houston, Texas

20      Tuesday, 9th day of November, 2021

21

22

23   Reported by:

24   Daniel J. Skur, Notary Public and CSR

25   Job No. 202067
```

Page 2

McGovern - 11-9-2021

1
2
3
4
5
6
7      9th day of November, 2021
8      10:01 a.m. - 10:34 a.m.
9
10
11      Remote Deposition of BRUCE McGOVERN,
12  located in Houston, Texas, before Daniel J.
13  Skur, Notary Public and Certified Shorthand
14  Reporter in and for the State of Texas
15  located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25

Page 3

McGovern - 11-9-2021

1
2  A P P E A R A N C E S:
3      Pachulski Stang Ziehl & Jones
4      Attorney(s) for Debtor
5      780 Third Avenue
6      New York, New York 10017
7      By: John Morris, Esq.
8
9
10
11
12      Stinson
13      Attorney(s)for James Dondero, HCMS
14      and HCRE
15      3102 Oak Lawn Avenue
16      Dallas, Texas 75219
17      By: Michael Aigen, Esq.
18
19
20
21
22  ALSO PRESENT:
23      La Asia Canty, Paralegal
24      Haley Winograd
25

Page 4

McGovern - 11-9-2021

1
2
3      IT IS HEREBY STIPULATED AND AGREED
4  by and between the attorneys for the respective
5  parties herein, that filing and sealing be and
6  the same are hereby waived.
7      IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the form of
9  the question, shall be reserved to the
10  time of the trial.
11      IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be sworn to and
13  signed before any officer authorized to
14  administer an oath, with the same force and
15  effect as if signed and sworn to before the
16  Court.
17      - oOo -
18
19
20
21
22
23
24
25

Page 5

McGovern - 11-9-2021

1
2      P R O C E E D I N G S
3      REMOTE ORAL DEPOSITION OF
4      BRUCE McGOVERN
5      (REPORTER NOTE: This deposition is
6  being conducted remotely in accordance with
7  the Current Emergency Order regarding the
8  COVID-19 State of Disaster.
9      Today's date is the 9th day of
10  November, 2021. The time is 10:01 a.m.
11  Daylight Savings Time. The witness is
12  located in Houston, Texas.)
13      BRUCE ALLEN MCGOVERN,
14  having been duly cautioned sworn to tell the
15  truth, the whole truth and nothing but the
16  truth, testified as follows:
17      (10:01 a.m.)
18      EXAMINATION
19  BY MR. MORRIS:
20      Q. Could you please state your name for
21  the record?
22      A. My name is Bruce Allen McGovern.
23      Q. Good morning, Mr. McGovern. My name
24  is John Morris. I'm an attorney at Pachulski
25  Stang Ziehl & Jones. We are counsel to

Page 6

McGovern - 11-9-2021

1 Highland Capital Management, LP, a company that
2 has been reorganized following its bankruptcy
3 in Texas.
4            Are you aware of the bankruptcy?
5     A.    Yes, I am.
6     Q.    Okay.  And we're here today for your
7 deposition; is that right?
8     A.    Yes, that's correct.
9     Q.    And you've been deposed on a number
10 of occasions in your professional capacity.
11           Do I have that right?
12    A.    I believe there have been three
13 occasions, yes.
14    Q.    Okay.  So I'm not going to ask you
15 about those occasions.  I want to try to get
16 this done as quickly as we can.
17           I'll just tell you that -- I don't
18 know if any of those occasions were remote
19 depositions, but remote depositions are
20 particularly difficult, only because we're not
21 in the same room.
22           From time to time, we'll put
23 documents on the screen.  If there's anything
24 that you need to see, will you please let me

Page 7

McGovern - 11-9-2021

1 know that?  And we'll scroll down to the
2 portions that you think you need to see.
3            Is that okay?
4     A.    Yes, I will.
5     Q.    And if there's anything that I ask
6 that you don't understand, will you let me know
7 that?
8     A.    Yes, I will.
9     Q.    Okay.  You were retained by the
10 Stinson firm to provide expert testimony on
11 behalf of James Dondero; is that correct?
12    A.    Yes, that's correct.
13    Q.    Okay.  And when were you retained?
14    A.    I was retained sometime at the
15 beginning of 2021, I believe.  I don't recall
16 the exact date, but it was in the first few
17 months of 2021.
18    Q.    How did it come -- how did your
19 retention come about?
20    A.    I received a phone call, I believe,
21 from Michael Aigen, who is here today; and he
22 discussed with me the general nature of the
23 underlying litigation and the issue on which he
24 and his firm were seeking expert testimony.

Page 8

McGovern - 11-9-2021

1 And after discussing that with him, I agreed to
2 serve as an expert witness.
3     Q.    And what exactly were you asked to
4 do?
5     A.    I was asked to prepare a report on a
6 specific legal issue that has to do with the
7 structure of some loans from Highland Capital
8 Management, LP, to Mr. Dondero and subsequently
9 to -- I understand there were similar loans to
10 entities controlled by Mr. Dondero.
11    Q.    When we use the phrase "Highland"
12 today, can we agree that we're specifically
13 referring to Highland Capital Management, LP?
14    A.    Yes, that's fine.
15    Q.    Okay.  When you were told about the
16 nature of the litigation, do you recall whether
17 you were informed that Mr. Dondero had already
18 filed an answer to the complaint?
19    A.    Yes.  I was informed of that, and I
20 was provided with copies -- at least at that
21 time, copies of the promissory notes that he
22 had signed and also the complaint by Highland
23 Capital against Mr. Dondero as well as the copy
24 of the amended answer in the litigation.

Page 9

McGovern - 11-9-2021

1     Q.    Okay.  So -- so you were given a
2 copy of the amended answer that he filed at the
3 time that you were retained?  Do I have that
4 right?
5     A.    That's correct.
6     Q.    So you couldn't have been retained
7 before the time the amended answer was filed;
8 is that fair?
9     A.    I'm just thinking through your
10 question, so... That's correct.  That's
11 correct.
12    Q.    Okay.  Have you ever been retained
13 by the Stinson firm before your engagement in
14 this case?
15    A.    No, I have not.
16    Q.    Okay.  Have you ever provided any
17 services to Highland before?
18    A.    No, I have not.
19    Q.    Have you ever met James Dondero?
20    A.    No, I have never met him.
21    Q.    Have you ever spoken with him?
22    A.    No, I have not.
23    Q.    So your report is not based in any
24 way on anything Mr. Dondero has told you; is

McGovern - 11-9-2021

1  that fair?
2      A.    That's correct.
3      Q.    Okay.  And I want to go a little bit
4  broader.  I think I used the words whether
5  you -- I'd asked whether you had spoken with
6  him.
7          So let me ask a different question:
8  Have you ever communicated with Mr. Dondero by
9  email or otherwise?
10     A.    No.  I've never had any
11  communications with him.
12     Q.    Is it fair to say that all of your
13  communications relating to the work that you've
14  done in this lawsuit have been exclusively with
15  one or more lawyers from the Stinson firm?
16     A.    Yes, that's correct.
17     Q.    Okay.  Have you ever communicated
18  with anybody else regarding any of the work
19  that you've done in connection with this
20  engagement other than lawyers from the Stinson
21  firm?
22     A.    No.  I have not.
23     Q.    Okay.  I'm going to ask you --
24     MR. AIGEN:  John.

McGovern - 11-9-2021

1      MR. MORRIS:  Yes.
2      MR. AIGEN:  I just want to point
3  something out.  The witness may not be
4  aware that one of our conversations, Dan
5  Elms was listening, I believe.
6          Actually, I apologize.  I may be
7  convincing -- confusing this with other
8  witnesses.  Dan Elms is not a lawyer at our
9  firm.  Now that I'm saying that, I actually
10  may be confusing it with conversations with
11  our other expert, so...
12     A.    I don't recall him being in any of
13  our discussions.
14     MR. AIGEN:  I apologize.  I probably
15  should just be quiet.
16 BY MR. MORRIS:
17     Q.    I'm going to ask my colleague, La
18  Asia Canty, to put on the screen a copy of your
19  report, which has been premarked as Exhibit 61.
20     (Exhibit 61 introduced.)
21 BY MR. MORRIS:
22     Q.    And can you see that, sir?
23     A.    Yes, I can.
24     Q.    Okay.

McGovern - 11-9-2021

1      MR. MORRIS:  And if we could just
2  scroll to the last page, the signature
3  line.
4 BY MR. MORRIS:
5      Q.    And that's your signature, sir?
6      A.    Yes, it is.
7      Q.    And did you sign this on or around
8  May 28th, 2021?
9      A.    Yes, I did.
10     MR. MORRIS:  You can go back to the
11  top.
12 BY MR. MORRIS:
13     Q.    As you sit here today, is there
14  anything that you believe is inaccurate about
15  your report?
16     A.    No.
17     Q.    Is there anything that you believe
18  should be modified to state more clearly the
19  opinions and the bases for them, as set forth
20  in this report?
21     A.    No.
22     Q.    Your report has not been amended or
23  supplemented in any way, correct?
24     A.    That is correct.

McGovern - 11-9-2021

1      MR. MORRIS:  If we can scroll down a
2  little bit.
3 BY MR. MORRIS:
4      Q.    You reviewed five documents for
5  purposes of preparing your report.  Do I have
6  that right?
7      A.    Yes, that's correct.
8      Q.    Okay.  And it's those five documents
9  that are listed in the first page of your
10  report, right?
11     A.    Yes, that's correct.
12     Q.    Okay.  Since signing this report on
13  May 28th, 2021, have you been provided with any
14  additional documents that relate in any way to
15  your opinions?
16     A.    I've been provided with copies of
17  the promissory notes that were executed on
18  behalf of some of the entities controlled by
19  Mr. Dondero in favor of Highland Capital, and I
20  believe I also have a copy of the complaint in
21  the adversary proceeding filed against the
22  entities.
23     Q.    When were you given those documents?
24     A.    I was provided those documents, I

McGovern - 11-9-2021

1 believe, sometime last week.

2     Q.    And to confirm, those documents

3 haven't caused you to change your opinions as

4 set forth in your report in any way, correct?

5     A.    That's correct.

6     Q.    Did you have any discussion with

7 anybody about why you weren't given those

8 documents before you completed your report on

9 May 28th?

10     A.    No. I was not provided any

11 explanation of that. What did occur is that I

12 met with attorneys from the Stinson law firm to

13 discuss the deposition today; and following

14 that conversation, I was sent by email copies

15 of the additional documents.

16     Q.    Okay. But you don't recall having

17 any discussion about why you hadn't been given

18 copies of those documents before you completed

19 your report on May 28th, 2021, correct?

20     A.    That's correct.

21     Q.    Okay. Were you ever given any

22 information concerning Highland's treatment of

23 the loans on Highland's books and records?

24     A.    No, I was not.

25

---

McGovern - 11-9-2021

1     Q.    Did you ever ask for any information

2 concerning Highland's treatment of the loans in

3 its books and records?

4     A.    No, I did not.

5     Q.    Is Highland's treatment of the loans

6 in its books and records relevant at all to

7 your opinions as set forth in Exhibit 61?

8     A.    No, I don't believe it is.

9     Q.    Were you given copies of Highland's

10 audited financial statements?

11     A.    No, I was not. I've discussed

12 already all of the documents that I was

13 provided to you, both to prepare the report and

14 that I was provided subsequent to the report.

15     Q.    Did you ask to see Highland's

16 audited financial statements?

17     A.    No, I did not.

18     Q.    Is it fair to say that the treatment

19 of the loans in Highland's audited financial

20 statements is irrelevant to your opinions as

21 set forth in Exhibit 61?

22     A.    Yes. I think that's a fair

23 assessment.

24     Q.    Did you ask for any documents that

25

---

McGovern - 11-9-2021

1 are not listed in your report?

2     A.    No, I did not.

3     Q.    So is it fair to say that you never

4 looked at any documents that were filed in

5 Highland's bankruptcy case?

6     A.    The only documents I've looked at

7 that were filed in the bankruptcy case are the

8 complaint and the amended answer.

9     Q.    And you never asked for any

10 documents that were filed in the bankruptcy

11 case other than the documents set forth in your

12 report, correct?

13     A.    That's correct.

14     Q.    As a general matter, is Highland's

15 treatment of the loans relevant at all to your

16 opinions?

17     A.    No, it's not, because I was asked to

18 make certain assumptions in connection with

19 preparing my report.

20     Q.    Okay. Can you identify any of the

21 promissory notes that you were given in the

22 last week or so?

23     A.    Off the top of my head, I can't.

24 I'd have to look in my files, but I recall, for

---

McGovern - 11-9-2021

1 example, that there were promissory notes

2 signed by a few different entities controlled

3 by Mr. Dondero that were organized in different

4 forms.

5     One, I believe, was HCE, but I can't

6 recall off the top of my head if that was a

7 limited partnership or a corporation.

8     Q.    I take it that you have never seen

9 any of Mr. Dondero's written responses to

10 Highland's discovery requests?

11     A.    That is correct.

12     Q.    Have you ever seen any transcripts

13 from any depositions that have been given in

14 these adversary proceedings?

15     A.    No, I have not.

16     Q.    Have you ever asked to see any

17 transcripts of any depositions that were given

18 in these adversary proceedings?

19     A.    No, I have not.

20     Q.    Okay. So your opinions don't take

21 into account any of the testimony that was

22 adduced in any depositions that were given in

23 these adversary proceedings, correct?

24     A.    That's correct.

Page 18

McGovern - 11-9-2021

1 Q. Okay.
2 MR. MORRIS: If we could turn to the
3 assumptions.
4 Okay. Right there is fine.
5 BY MR. MORRIS:
6 Q. So you were asked to assume the
7 facts that are set forth in the five numbered
8 paragraphs on this page, correct?
9 A. Yes, that's correct.
10 Q. Okay. And, in fact, you satisfied
11 yourself, have you not, that Assumed Fact
12 Number 1 is actually true, correct?
13 A. That is an assumption.
14 MR. AIGEN: Objection, form.
15 A. I don't have any basis for -- for
16 example, identifying that that's actually
17 Mr. Dondero's signature; but I was asked to
18 assume that for purposes of the report, that he
19 had signed these promissory notes.
20 BY MR. MORRIS:
21 Q. Did anybody tell you that
22 Mr. Dondero disputed his execution of the three
23 promissory notes that were given to you?
24 A. No.

Page 19

McGovern - 11-9-2021

1 Q. Okay. Let's look at the second
2 assumed fact.
3 It says, quote: Subsequent to
4 Mr. Dondero's execution of the notes, but
5 before Highland Capital made demand for payment
6 of the notes, Highland Capital and Mr. Dondero
7 entered into an oral agreement, which I think
8 you're defining there as "the subsequent
9 agreement."
10 Have I read that correctly?
11 A. Yes, that is correct.
12 Q. Have you been given any document --
13 withdrawn.
14 Have you been given any documentary
15 evidence concerning the subsequent agreement?
16 A. No, I have not.
17 Q. Do you know whether -- has anybody
18 ever informed you whether such documentation
19 exists?
20 A. Nobody has ever suggested that to
21 me.
22 Q. Okay. Did you ask to see any
23 documents concerning the existence of the
24 subsequent agreement?

Page 20

McGovern - 11-9-2021

1 A. No, I did not.
2 Q. And that's because you were just
3 asked to assume that the subsequent agreement
4 existed, correct?
5 A. It's because I was asked to assume
6 that there was an oral agreement, and normally
7 there would be no documentation of an oral
8 agreement.
9 Q. Okay. It's possible that after
10 somebody enters into an oral agreement,
11 somebody makes a note to -- to write down the
12 terms that were agreed to; isn't that fair?
13 A. Yes, that's possible.
14 Q. Okay. And in your expertise, would
15 you expect somebody to -- withdrawn.
16 Do you know when the subsequent --
17 withdrawn.
18 I'm going to use the phrase
19 "subsequent agreement" to refer to the
20 agreement that's described in Assumption Number
21 2. Is that okay?
22 A. Yes, that's fine.
23 Q. Okay. Do you know when the
24 subsequent agreement was entered into?

Page 21

McGovern - 11-9-2021

1 A. I don't know the exact date. I was
2 asked to assume only that it had occurred after
3 the execution of the original promissory notes.
4 Q. Were you asked to make any
5 assumptions concerning the number of subsequent
6 agreements that were entered into between
7 Mr. Dondero and Highland Capital?
8 A. I'm sorry, could you -- could you
9 restate that?
10 Q. Were you asked to assume that there
11 was one subsequent agreement between Highland
12 Capital and Mr. Dondero or more than one
13 subsequent agreement between Highland Capital
14 and Mr. Dondero?
15 A. My assumption has been that there
16 was only a single oral agreement; however,
17 given that there were multiple promissory
18 notes, it's conceivable that there could have
19 been separate oral agreements for each note.
20 But, in general, I've been assuming a single
21 oral agreement that applied to all of the
22 notes.
23 Q. And you don't have any personal
24 knowledge regarding the number of subsequent

Page 22

McGovern - 11-9-2021

1  McGovern - 11-9-2021
2  agreements that may exist, correct?
3      A.    That's correct.
4      Q.    And you weren't asked to assume that
5  more than one subsequent agreement existed,
6  correct?
7      A.    That's correct.
8      Q.    And when you prepared your report,
9  the assumption that you made was that there was
10 only one subsequent agreement, correct?
11     A.    Yes, the subsequent agreement to
12 which I refer in my report.
13     Q.    Okay.  Do you know who entered the
14 subsequent agreement on behalf of Highland
15 Capital?
16     A.    No, I do not.
17     Q.    Do you know if the subsequent
18 agreement was ever disclosed to Highland
19 Capital's outside auditors?
20     A.    No, I do not.
21     Q.    Is it fair to say that the
22 circumstances surrounding the entry into the
23 subsequent agreement are not relevant to your
24 opinions as set forth in Exhibit 61?
25     A.    Yes, that's correct, because I'm

Page 23

1  McGovern - 11-9-2021
2  assuming only that there was a subsequent
3  agreement that occurred after the execution of
4  the notes, but before demand for payment on the
5  notes had been made.
6      Q.    So you're not offering any opinion
7  that the subsequent agreement actually exists,
8  correct?
9      A.    That's correct.
10     Q.    And you're not offering any opinion
11 that the terms of the subsequent agreement were
12 reasonable, correct?
13     A.    That's correct.
14     Q.    You're not offering any opinion that
15 the subsequent agreement was fair to both
16 parties, correct?
17     A.    That's correct.
18     Q.    And you're not offering any opinion
19 that the person who entered into the subsequent
20 agreement on behalf of Highland Capital
21 fulfilled his or her or its duties, correct?
22     A.    That's correct.
23     Q.    Are you offering any opinion at all
24 about the subsequent agreement?
25           MR. AIGEN:  Objection, form.

Page 24

1  McGovern - 11-9-2021
2      A.    I'm offering an opinion only about
3  the effect of the subsequent agreement,
4  assuming that the subs- -- subsequent agreement
5  is as I described in my report.
6  BY MR. MORRIS:
7      Q.    Okay.  What if I asked you to assume
8  that there was no subsequent agreement?  Would
9  that change your opinions?
10           MR. AIGEN:  Objection, form.
11     A.    It -- it would not change my
12 ultimate opinion, which is that there is no
13 cancellation of indebtedness income for
14 Mr. Dondero.
15 BY MR. MORRIS:
16     Q.    And your opinion today is that
17 there's no taxable income to Mr. Dondero
18 because the conditions subsequent that you were
19 asked to assume have not yet been satisfied; is
20 that fair?
21     A.    That's correct.  My opinion is that
22 there was no income for him at the time of the
23 original loans because of his obligation to
24 repay, and that assuming the subsequent
25 agreement occurred, that the subsequent

Page 25

1  McGovern - 11-9-2021
2  agreement did not change the outcome for him,
3  that it -- it would not cause him to have
4  income from the -- the loans.
5      Q.    And so if there is no subs- -- if I
6  ask you to assume that there is no subsequent
7  agreement, would your opinion be that
8  Mr. Dondero therefore owes any unpaid principal
9  and interest due under each of the notes that
10 you've reviewed?
11     A.    Based on the -- my review of the
12 promissory notes, yes, that the notes are
13 demand notes in favor of Highland Capital.
14     Q.    Okay.  Let's go to Assumed Fact
15 Number 3.  It states, quote:  In the subsequent
16 agreement between Highland Capital and
17 Mr. Dondero, Highland Capital agreed that it
18 would not collect on the notes unless certain
19 conditions defined as "the conditions," could
20 not be satisfied.  In other words, Highland
21 Capital agreed that the loans will be forgiven
22 only if the conditions are satisfied.
23           Do I have that right?
24     A.    Yes, that's correct.
25     Q.    Okay.  And -- and -- and that -- all

McGovern - 11-9-2021

1 of that -- everything in Number 3 is -- is an
2 assumption that you were asked to make in
3 rendering your opinion, correct?
4     A.    Yes, that's correct.
5     Q.    Do you know what the conditions
6 were?
7     A.    I don't know the details of the
8 conditions.  I was asked to assume only that
9 the conditions related to things beyond
10 Mr. Dondero's control, such as the sale of
11 certain assets above cost.
12     Q.    Okay.  That bleeds into the fourth
13 assumption, but I just want to stick with
14 Number 3 for the moment.  Do you have any other
15 information about what the conditions were,
16 other than the sale of an asset above cost?
17     A.    No, I do not.
18     Q.    Did you ask any questions about the
19 nature, extent, and scope of the conditions?
20     A.    Only if whether the conditions were
21 things beyond his control, but other than that,
22 I did not ask for details.
23     Q.    Were you given any information
24 concerning the likelihood that the conditions
25

McGovern - 11-9-2021

1 would be satisfied?
2     A.    No, I was not.
3     Q.    Did you ask any -- did you ask for
4 any information concerning the likelihood that
5 the conditions would be satisfied?
6     A.    No, I did not.
7     Q.    Is it fair to say that the opinions
8 set forth in Exhibit 61 do not take into
9 account the likelihood that the conditions
10 would be satisfied?
11     A.    I think that's an accurate
12 statement.  The -- the only assumption is that
13 these conditions are things that will be beyond
14 Mr. Dondero's control and subject to
15 influences, such as market values.
16     Q.    So the likelihood that the
17 conditions would be satisfied was not relevant
18 to your analysis, correct?
19     A.    As far as probability, that's
20 correct.
21     Q.    Okay.  And you're not offering any
22 opinion as to the likelihood that any of the
23 conditions would be satisfied, correct?
24     A.    That's correct.
25

McGovern - 11-9-2021

1     Q.    Okay.  Let's move on to the fourth
2 assumed fact.  It states, quote:  Whether the
3 conditions are satisfied was not and is not
4 within Mr. Dondero's control because they
5 included the condition that certain portfolio
6 company assets be sold above cost or in a
7 manner outside of Mr. Dondero's control.
8         Have I read that correctly?
9     A.    Yes, you did.
10     Q.    What if the satisfaction of the
11 conditions was within Mr. Dondero's control?
12 If you make that assumption, how does your --
13 how do your opinions change, if at all?
14     A.    I'm just thinking through your
15 question.  If the conditions are within his
16 control, then that could potentially change the
17 outcome as to whether there was income from the
18 discharge of indebtedness, but in order to
19 provide an opinion on that, I would have to
20 know the details of the conditions; that is,
21 exactly what they are and how it is that he has
22 control over them.
23     Q.    Okay.  So are you aware that
24 Mr. Dondero controlled Highland prior to the
25

McGovern - 11-9-2021

1 bankruptcy?
2     A.    Yes, I am.
3     Q.    Are you aware that he had -- I'll --
4 I'll ask you to assume that he had the
5 authority to buy and sell assets on behalf of
6 Highland.  Can you -- can you accept that
7 assumption?
8     A.    Yes.
9     Q.    Okay.  If you -- if you accept that
10 assumption for purposes of my hypothetical, and
11 you also assume that the portfolio company
12 assets that are the subject of the conditions
13 were valued above cost at the time the
14 subsequent agreement was entered into, would
15 that impact your opinions if you assumed -- so
16 I'm asking you to really make just two
17 assumptions:  Number one, Mr. Dondero had the
18 ability to sell the portfolio company assets
19 any time he wanted, and number two, that at the
20 time he entered into the subsequent agreement,
21 the value of the portfolio company assets was
22 above cost.  How did those two assumptions, if
23 you -- if you accept them, how do they change
24 your analysis, if -- if at all?
25

Page 30

McGovern - 11-9-2021

1
2     A.     Assuming those two facts, they could
3  change the analysis of the issue of whether
4  Mr. Dondero had income from the cancellation of
5  indebtedness.  The key question really is
6  whether Highland Capital, at the time of the
7  subsequent agreement, was actually agreeing to
8  cancel the loans at that time, or was it
9  agreeing in the future to cancel the loans if
10 certain conditions occurred?
11     If those conditions are within the
12 control of Mr. Dondero and in effect already in
13 place, then it's quite possible that he would
14 have had income from the discharge of
15 indebtedness at that time because the loans in
16 fact had been forgiven.
17     Q.     But you weren't ass- -- you weren't
18 asked to assume that Highland placed any
19 condition on the timing of the forgiveness,
20 correct?
21     A.     That's correct.
22     Q.     And -- and you, in fact, were asked
23 to assume that if the portfolio company assets
24 were sold above cost, the loans would be
25 forgiven, correct?

Page 31

McGovern - 11-9-2021

1
2     A.     That's correct.  Although in -- in
3  fairness, as I've said, I don't know the
4  details of all the conditions, but was asked to
5  assume that they included the condition that
6  these assets be sold above cost.
7     Q.     Yeah, I just want to focus on -- on
8  the assumptions that you were asked to make, so
9  let me give you a hypothetical.  Let's say one
10 of the company assets was valued at $50 million
11 on the date the subsequent agreement was
12 entered into, but that Highland's cost for
13 acquiring its interest in that asset was only
14 $10 million, and Mr. Dondero had the ability to
15 sell that asset at -- at any time prior to the
16 bankruptcy filing.
17     Under that hypothetical, would
18 Mr. Dondero have to realize the income?
19     A.     If he actually sold the assets, then
20 -- then yes.
21     Q.     And what about if he didn't sell the
22 assets, but that it was within his control to
23 do so at any time?
24     A.     It's possible that that could change
25 the outcome, as far as whether he had income

Page 32

McGovern - 11-9-2021

1
2  from the cancellation of indebtedness, but if
3  that's true, that means that the loans actually
4  had been forgiven at that time.
5     MR. MORRIS:  I have no further
6  questions.
7     MR. AIGEN:  I have one thing to
8  clear up, I think.
9     EXAMINATION
10 BY MR. AIGEN:
11     Q.     Early on in the deposition, when
12 asked what your assignment was, you mentioned
13 that you were providing an opinion on a legal
14 issue.  I just want to make sure, you we- --
15 you're not sitting here today opining on the
16 law.  You're applying certain facts to the law;
17 is that correct?
18     A.     That's correct.  I am taking an
19 assumed set of facts, and I've been asked to
20 provide an opinion on what is the outcome on a
21 particular legal issue as app- -- applying the
22 law to those facts, that's correct.
23     MR. AIGEN:  Okay.  That's all I
24 have, John.
25     MR. MORRIS:  Okay.  Thank you,

Page 33

McGovern - 11-9-2021

1
2  professor.  I appreciate your time and --
3  and -- and your attention.
4     THE WITNESS:  All right.  Thank you
5  so much.
6     MR. MORRIS:  Okay.  Have a good day.
7     THE WITNESS:  Thank you.
8     MR. MORRIS:  Bye, now.
9     THE REPORTER:  Mr. Aigen, do you
10 need a copy of this deposition?
11     MR. AIGEN:  If we can just get a
12 rough when one's available, and then we'll
13 take the original whenever it's due.
14     (Time Noted:  10:34 a.m.)
15
16
17
          BRUCE McGOVERN
18
19 Subscribed and sworn to before me
   this _____ day of _____, 2021.
20
21
22
23
24
25

Page 34

McGovern - 11-9-2021

1
2          C E R T I F I C A T E
STATE OF TEXAS     )
3                  )
COUNTY OF ELLIS    )
4
5          I, Daniel J. Skur, a Notary Public
within and for the State of Texas, do
hereby certify:
6          That BRUCE McGOVERN, the witness
whose deposition is hereinbefore set forth,
7     was duly sworn by me and that such
deposition is a true record of the
8     testimony given by such witness.
           That pursuant to Rule 30 of the Federal
9     Rules of Civil Procedure, signature of the
witness was not reserved by the witness or
10    other party before the conclusion of the
deposition;
11         I further certify that I am not
related to any of the parties to this
12    action by blood or marriage; and that I am
in no way interested in the outcome of this
13    matter.
           IN WITNESS WHEREOF, I have hereunto
14    set my hand this 9th day of November,
2021.
15
16
17
18    _____
           Daniel J. Skur
19         Notary Public, State of Texas.
           My Commission Expires 7/7/2022
20         TSG Reporting, Inc.
           228 East 45th Street, Suite 810
21         New York, New York
           (877) 702-9580
22
23
24
25

Page 35

1                    ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads    Should Read  Reason

6   ___ ___ _____   _____  _____

7   ___ ___ _____   _____  _____

8   ___ ___ _____   _____  _____

9   ___ ___ _____   _____  _____

10  ___ ___ _____   _____  _____

11  ___ ___ _____   _____  _____

12  ___ ___ _____   _____  _____

13  ___ ___ _____   _____  _____

14  ___ ___ _____   _____  _____

15  ___ ___ _____   _____  _____

16  ___ ___ _____   _____  _____

17  ___ ___ _____   _____  _____

18  ___ ___ _____   _____  _____

19  ___ ___ _____   _____  _____

20

                      _____
21                    Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2021.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____

Page 36

McGovern - 11-9-2021

1
2          -------I N D E X-------
3   WITNESS:        EXAMINATION BY        PAGE:
4   BRUCE McGOVERN
5          Mr. Morris            5
6          Mr. Aigen            32
7
8                 *****
9   --------------------EXHIBITS-------------------
10                             PAGE/LINE
11  Exhibit 61   Expert Report of      11/21
                 Bruce McGovern
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**$**

**$10** 31:14

**$50** 31:10

**1**

**1** 18:13

**10:01** 5:10,17

**10:34** 33:14

**11-9-2021** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1

**2**

**2** 20:22

**2021** 5:10 7:16,18 12:9 13:14 14:20 33:19

**28th** 12:9 13:14 14:10,20

**3**

**3** 25:15 26:2,15

**6**

**61** 11:20,21 15:8,22 22:24 27:9

**9**

**9th** 5:9

**A**

**a.m.** 5:10,17 33:14

**ability** 29:19 31:14

**accept** 29:7,10,24

**accordance** 5:6

**account** 17:22 27:10

**accurate** 27:12

**acquiring** 31:13

**additional** 13:15 14:16

**adduced** 17:23

**adversary** 13:22 17:15,19,24

**agree** 8:13

**agreed** 8:2 20:13 25:17,21

**agreeing** 30:7,9

**agreement** 19:8,10, 16,25 20:4,7,9,11,20, 21,25 21:12,14,17,22 22:5,10,11,14,18,23 23:3,7,11,15,20,24 24:3,4,8,25 25:2,7,16 29:15,21 30:7 31:11

**agreements** 21:7,20 22:2

**Aigen** 7:22 10:25 11:3,15 18:15 23:25 24:10 32:7,10,23 33:9,11

**Allen** 5:13,22

**amended** 8:25 9:3,8 12:23 16:9

**analysis** 27:19 29:25 30:3

**apologize** 11:7,15

**app-** 32:21

**applied** 21:22

**applying** 32:16,21

**Asia** 11:19

**ass-** 30:17

**assessment** 15:24

**asset** 26:17 31:13,15

**assets** 26:12 28:7 29:6,13,19,22 30:23 31:6,10,19,22

**assignment** 32:12

**assume** 18:7,19 20:4,6 21:3,11 22:4 24:7,19 25:6 26:9 29:5,12 30:18,23 31:5

**assumed** 18:12 19:3 25:14 28:3 29:16 32:19

**assuming** 21:21 23:2 24:4,24 30:2

**assumption** 18:14 20:21 21:16 22:9 26:3,14 27:13 28:13 29:8,11

**assumptions** 16:19 18:4 21:6 29:18,23 31:8

**attention** 33:3

**attorney** 5:24

**attorneys** 14:13

**audited** 15:11,17,20

**auditors** 22:19

**authority** 29:6

**aware** 6:5 11:5 28:24 29:4

**B**

**back** 12:11

**bankruptcy** 6:3,5 16:6,8,11 29:2 31:16

**based** 9:24 25:11

**bases** 12:20

**basis** 18:16

**beginning** 7:16

**behalf** 7:12 13:19 22:14 23:20 29:6

**bit** 10:4 13:3

**bleeds** 26:13

**books** 14:24 15:4,7

**broader** 10:5

**Bruce** 5:4,13,22

**33:17

**buy** 29:6

**Bye** 33:8

**C**

**call** 7:21

**cancel** 30:8,9

**cancellation** 24:13 30:4 32:2

**Canty** 11:19

**capacity** 6:11

**Capital** 6:2 8:8,14,24 13:20 19:6,7 21:8,13, 14 22:15 23:20 25:13,16,17,21 30:6

**Capital's** 22:19

**case** 9:15 16:6,8,12

**caused** 14:4

**cautioned** 5:14

**change** 14:4 24:9,11 25:2 28:14,17 29:24 30:3 31:24

**circumstances** 22:22

**clear** 32:8

**colleague** 11:18

**collect** 25:18

**communicated** 10:9,18

**communications** 10:12,14

**company** 6:2 28:7 29:12,19,22 30:23 31:10

**complaint** 8:19,23 13:21 16:9

**completed** 14:9,19

**conceivable** 21:19

**condition** 28:6 30:19 31:5

**conditions** 24:18 25:19,22 26:6,9,10,

**16,20,21,25 27:6,10, 14,18,24 28:4,12,16, 21 29:13 30:10,11 31:4

**conducted** 5:6

**confirm** 14:3

**confusing** 11:8,11

**connection** 10:20 16:19

**control** 26:11,22 27:15 28:5,8,12,17, 23 30:12 31:22

**controlled** 8:11 13:19 17:3 28:25

**conversation** 14:15

**conversations** 11:5, 11

**convincing** 11:8

**copies** 8:21,22 13:17 14:15,19 15:10

**copy** 8:24 9:3 11:19 13:21 33:10

**corporation** 17:8

**correct** 6:9 7:12,13 9:6,11,12 10:3,17 12:24,25 13:8,12 14:5,6,20,21 16:13, 14 17:12,24,25 18:9, 10,13 19:12 20:5 22:2,3,6,7,10,25 23:8,9,12,13,16,17, 21,22 24:21 25:24 26:4,5 27:19,21,24, 25 30:20,21,25 31:2 32:17,18,22

**correctly** 19:11 28:9

**cost** 26:12,17 28:7 29:14,23 30:24 31:6, 12

**counsel** 5:25

**COVID-19** 5:8

**Current** 5:7

**D**

**Dan** 11:5,9

date 5:9 7:17 21:2
31:11

day 5:9 33:6,19

Daylight 5:11

defined 25:19

defining 19:9

demand 19:6 23:4
25:13

deposed 6:10

deposition 5:3,5 6:8
14:14 32:11 33:10

depositions 6:20
17:14,18,23

details 26:8,23 28:21
31:4

difficult 6:21

Disaster 5:8

discharge 28:19
30:14

disclosed 22:18

discovery 17:11

discuss 14:14

discussed 7:23
15:12

discussing 8:2

discussion 14:7,18

discussions 11:14

disputed 18:23

document 19:13

documentary 19:15

documentation
19:19 20:8

documents 6:24
13:5,9,15,24,25 14:3,
9,16,19 15:13,25
16:5,7,11,12 19:24

Dondero 7:12 8:9,
11,18,24 9:20,25
10:9 13:20 17:4
18:23 19:7 21:8,13,
15 24:14,17 25:8,17
28:25 29:18 30:4,12
31:14,18

Dondero's 17:10
18:18 19:5 26:11
27:15 28:5,8,12

due 25:9 33:13

duly 5:14

duties 23:21

**E**

Early 32:11

effect 24:3 30:12

Elms 11:6,9

email 10:10 14:15

Emergency 5:7

engagement 9:14
10:21

entered 19:8 20:25
21:7 22:13 23:19
29:15,21 31:12

enters 20:11

entities 8:11 13:19,
23 17:3

entry 22:22

evidence 19:16

exact 7:17 21:2

EXAMINATION 5:18
32:9

exclusively 10:15

executed 13:18

execution 18:23
19:5 21:4 23:3

exhibit 11:20,21
15:8,22 22:24 27:9

exist 22:2

existed 20:5 22:5

existence 19:24

exists 19:20 23:7

expect 20:16

expert 7:11,25 8:3
11:12

expertise 20:15

explanation 14:12

extent 26:20

**F**

fact 18:11,12 19:3
25:14 28:3 30:16,22

facts 18:8 30:2
32:16,19,22

fair 9:9 10:2,13 15:19,
23 16:4 20:13 22:21
23:15 24:20 27:8

fairness 31:3

favor 13:20 25:13

filed 8:19 9:3,8 13:22
16:5,8,11

files 16:25

filing 31:16

financial 15:11,17,20

fine 8:15 18:5 20:23

firm 7:11,25 9:14
10:16,22 11:10 14:13

focus 31:7

forgiven 25:21
30:16,25 32:4

forgiveness 30:19

form 18:15 23:25
24:10

forms 17:5

fourth 26:13 28:2

fulfilled 23:21

future 30:9

**G**

general 7:23 16:15
21:21

give 31:9

good 5:23 33:6

**H**

HCE 17:6

head 16:24 17:7

Highland 6:2 8:8,12,
14,23 9:18 13:20
19:6,7 21:8,12,14
22:14,18 23:20
25:13,16,17,20 28:25
29:7 30:6,18

Highland's 14:23,24
15:3,6,10,16,20 16:6,
15 17:11 31:12

Houston 5:12

hypothetical 29:11
31:9,17

**I**

identify 16:21

identifying 18:17

impact 29:16

inaccurate 12:15

included 28:6 31:5

income 24:13,17,22
25:4 28:18 30:4,14
31:18,25

indebtedness 24:13
28:19 30:5,15 32:2

influences 27:16

information 14:23
15:2 26:16,24 27:5

informed 8:18,20
19:19

interest 25:9 31:13

introduced 11:21

irrelevant 15:21

issue 7:24 8:7 30:3
32:14,21

**J**

James 7:12 9:20

John 5:24 10:25
32:24

Jones 5:25

**K**

key 30:5

knowledge 21:25

**L**

La 11:18

law 14:13 32:16,22

lawsuit 10:15

lawyer 11:9

lawyers 10:16,21

legal 8:7 32:13,21

likelihood 26:25
27:5,10,17,23

limited 17:8

listed 13:10 16:2

listening 11:6

litigation 7:24 8:17,
25

loans 8:8,10 14:24
15:3,6,20 16:16
24:23 25:4,21 30:8,9,
15,24 32:3

located 5:12

looked 16:5,7

LP 6:2 8:9,14

**M**

made 19:6 22:9 23:5

make 16:19 21:5 26:3
28:13 29:17 31:8
32:14

makes 20:12

Management 6:2
8:9,14

manner 28:8

market 27:16

matter 16:15

Mcgovern 5:1,4,13,
22,23 6:1 7:1 8:1 9:1

10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1, 17

**means** 32:3

**mentioned** 32:12

**met** 9:20,21 14:13

**Michael** 7:22

**million** 31:10,14

**modified** 12:19

**moment** 26:15

**months** 7:18

**morning** 5:23

**Morris** 5:19,24 11:2, 17,22 12:2,5,11,13 13:2,4 18:3,6,21 24:6,15 32:5,25 33:6, 8

**move** 28:2

**multiple** 21:18

---

**N**

**nature** 7:23 8:17 26:20

**note** 5:5 20:12 21:20

**Noted** 33:14

**notes** 8:22 13:18 16:22 17:2 18:20,24 19:5,7 21:4,19,23 23:4,5 25:9,12,13,18

**November** 5:10

**number** 6:10 18:13 20:21 21:6,25 25:15 26:2,15 29:18,20

**numbered** 18:8

---

**O**

**Objection** 18:15 23:25 24:10

**obligation** 24:23

**occasions** 6:11,14, 16,19

**occur** 14:12

**occurred** 21:3 23:3 24:25 30:10

**offering** 23:6,10,14, 18,23 24:2 27:22

**one's** 33:12

**opining** 32:15

**opinion** 23:6,10,14, 18,23 24:2,12,16,21 25:7 26:4 27:23 28:20 32:13,20

**opinions** 12:20 13:16 14:4 15:8,21 16:17 17:21 22:24 24:9 27:8 28:14 29:16

**oral** 5:3 19:8 20:7,8, 11 21:17,20,22

**order** 5:7 28:19

**organized** 17:4

**original** 21:4 24:23 33:13

**outcome** 25:2 28:18 31:25 32:20

**owes** 25:8

---

**P**

**Pachulski** 5:24

**paragraphs** 18:9

**parties** 23:16

**partnership** 17:8

**payment** 19:6 23:4

**person** 23:19

**personal** 21:24

**phone** 7:21

**phrase** 8:12 20:19

**place** 30:13

**point** 11:3

**portfolio** 28:6 29:12, 19,22 30:23

**portions** 7:3

**potentially** 28:17

**premarked** 11:20

**prepare** 8:6 15:14

**prepared** 22:8

**preparing** 13:6 16:20

**principal** 25:8

**prior** 28:25 31:15

**probability** 27:20

**proceeding** 13:22

**proceedings** 17:15, 19,24

**professional** 6:11

**professor** 33:2

**promissory** 8:22 13:18 16:22 17:2 18:20,24 21:4,18 25:12

**provide** 7:11 28:20 32:20

**provided** 8:21 9:17 13:14,17,25 14:11 15:14,15

**providing** 32:13

**purposes** 13:6 18:19 29:11

**put** 6:23 11:19

---

**Q**

**question** 9:11 10:8 28:16 30:5

**questions** 26:19 32:6

**quickly** 6:17

**quiet** 11:16

**quote** 19:4 25:15 28:3

---

**R**

**read** 19:11 28:9

**realize** 31:18

**reasonable** 23:12

**recall** 7:16 8:17 11:13 14:17 16:25 17:7

**received** 7:21

**record** 5:21

**records** 14:24 15:4,7

**refer** 20:20 22:12

**referring** 8:14

**relate** 13:15

**related** 26:10

**relating** 10:14

**relevant** 15:7 16:16 22:23 27:18

**remote** 5:3 6:19,20

**remotely** 5:6

**rendering** 26:4

**reorganized** 6:3

**repay** 24:24

**report** 8:6 9:24 11:20 12:16,21,23 13:6,11, 13 14:5,9,20 15:14, 15 16:2,13,20 18:19 22:8,12 24:5

**REPORTER** 5:5 33:9

**requests** 17:11

**responses** 17:10

**restate** 21:10

**retained** 7:10,14,15 9:4,7,13

**retention** 7:20

**review** 25:11

**reviewed** 13:5 25:10

**room** 6:22

**rough** 33:12

---

**S**

**sale** 26:11,17

**satisfaction** 28:11

**satisfied** 18:11 24:19 25:20,22 27:2,6,11, 18,24 28:4

**Savings** 5:11

**scope** 26:20

**screen** 6:24 11:19

**scroll** 7:2 12:3 13:2

**seeking** 7:25

**sell** 29:6,19 31:15,21

**separate** 21:20

**serve** 8:3

**services** 9:18

**set** 12:20 14:5 15:8, 22 16:12 18:8 22:24 27:9 32:19

**sign** 12:8

**signature** 12:3,6 18:18

**signed** 8:23 17:3 18:20

**signing** 13:13

**similar** 8:10

**single** 21:17,21

**sir** 11:23 12:6

**sit** 12:14

**sitting** 32:15

**sold** 28:7 30:24 31:6, 19

**specific** 8:7

**specifically** 8:13

**spoken** 9:22 10:6

**Stang** 5:25

**state** 5:8,20 12:19

**statement** 27:13

**statements** 15:11, 17,21

**states** 25:15 28:3

**stick** 26:14

**Stinson** 7:11 9:14 10:16,21 14:13

**structure** 8:8

**subject** 27:15 29:13

**subs-** 24:4 25:5

**Subscribed** 33:19

**subsequent** 15:15 19:4,9,16,25 20:4,17, 20,25 21:6,12,14,25 22:5,10,11,14,17,23 23:2,7,11,15,19,24 24:3,4,8,18,24,25 25:6,15 29:15,21 30:7 31:11

**subsequently** 8:9

**suggested** 19:21

**supplemented** 12:24

**surrounding** 22:22

**sworn** 5:14 33:19

———————
                    T
———————

**taking** 32:18

**taxable** 24:17

**terms** 20:13 23:11

**testified** 5:16

**testimony** 7:11,25 17:22

**Texas** 5:12 6:4

**thing** 32:7

**things** 26:10,22 27:14

**thinking** 9:10 28:15

**time** 5:10,11 6:23 8:22 9:4,8 24:22 29:14,20,21 30:6,8, 15 31:15,23 32:4 33:2,14

**timing** 30:19

**today** 6:7 7:22 8:13

12:14 14:14 24:16 32:15

**Today's** 5:9

**told** 8:16 9:25

**top** 12:12 16:24 17:7

**transcripts** 17:13,18

**treatment** 14:23 15:3,6,19 16:16

**true** 18:13 32:3

**truth** 5:15,16

**turn** 18:3

———————
                    U
———————

**ultimate** 24:12

**underlying** 7:24

**understand** 7:7 8:10

**unpaid** 25:8

———————
                    V
———————

**valued** 29:14 31:10

**values** 27:16

———————
                    W
———————

**wanted** 29:20

**we-** 32:14

**week** 14:2 16:23

**withdrawn** 19:14 20:16,18

**witnesses** 11:9

**words** 10:5 25:20

**work** 10:14,19

**write** 20:12

**written** 17:10

———————
                    Z
———————

**Ziehl** 5:25

# Exhibit C

Privileged and Confidential - Work Product

**Notes Payable to Highland**

8-Apr-21

| Maker | Term | Amount Owed Per Lawsuit | Original Loan Amount | Loan Date | Adversary Proceeding |
|---|---|---|---|---|---|
| Nexpoint Advisors | 30 yr | 23,071,195 | $30,746,812 | 5/31/2017 | 21-3005 |
| HCM Services | 30 yr | 6,757,249 | $20,247,628 | 5/31/2017 | 21-3006 |
| HCM Services | Demand | 947,519 | 150,000.00 | 3/26/2018 | 21-3006 |
| | | | 200,000.00 | 6/25/2018 | 21-3006 |
| | | | 400,000.00 | 5/29/2019 | 21-3006 |
| | | | 150,000.00 | 6/26/2019 | 21-3006 |
| JD | Demand | 9,004,013 | $3,825,000 | 2/2/2018 | 21-3003 |
| | | | $2,500,000 | 8/1/2018 | 21-3003 |
| | | | $2,500,000 | 8/13/2018 | 21-3003 |
| HCRE | 30 yr | 6,145,467 | $6,059,832 | 5/31/2017 | 21-3007 |
| HCRE | Demand | 5,012,261 | 100,000.00 | 11/27/2013 | 21-3007 |
| | | | 2,500,000.00 | 10/12/2017 | 21-3007 |
| | | | 750,000.00 | 10/15/2017 | 21-3007 |
| | | | 900,000.00 | 9/25/2019 | 21-3007 |
| | | 50,937,704 | | | |



**App. 202**

Confidential

# Exhibit D

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Wed, 25 Nov 2020 10:01:23 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

ok

**From:** Kristin Hendrix
**Sent:** Wednesday, November 25, 2020 10:01 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| AT&T | USD | 2,845.06 | |
| Grubhub | USD | 1,422.24 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 17,373.85 | Dec premiums |

**NPA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 38,453.01 | Dec premiums |
| UMB Bank | USD | 355.31 | |

**HCFD Operating**

| | | | |
|---|---|---|---|
| HCMFA | USD | 61,691.00 | Shared Services |
| HCM Insurance Acct | USD | 51,779.84 | Dec premiums |

**Eagle Equity**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 2,323.63 | Dec premiums |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**

HIGHLAND CAPITAL
MANAGEMENT

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



**Exhibit A1**

**App. 204**

ACL-019692

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Mon, 30 Nov 2020 10:45:44 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Monday, November 30, 2020 10:46 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| Arris Western | USD | 11,000.00 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM | USD | 308,374.00 | Shared Services |
| HCFD Oper | USD | 250,000.00 | Equity Contribution |

**NPA**

| | | | |
|---|---|---|---|
| HCMFA | USD | 325,000.00 | one day loan |
| HCFD Oper | USD | 120,762.09 | Transfer Pricing |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Sea Island | USD | 23,511.90 | Final Presidents Club bill |

**HCFD 12B-1**

| | | | |
|---|---|---|---|
| HCMFA | USD | 37,822.00 | 12B-1 Reimbursement |

**Falcon GP**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Shared Services |

**NREA**

| | | | |
|---|---|---|---|
| HCM | USD | 80,000.00 | Shared Services |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Tue, 1 Dec 2020 12:04:49 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Tuesday, December 1, 2020 12:00 PM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| Crescent TC | USD | 158,695.74 | |
| Seery | USD | 150,000.00 | |
| Nelms | USD | 30,000.00 | |
| Dubel | USD | 30,000.00 | |
| Simek | USD | 42,598.52 | |

**HCMNY**

| | | | |
|---|---|---|---|
| Times Sq | USD | 27,454.67 | |

**HCMFA**

| | | | |
|---|---|---|---|
| NPA | USD | 325,000.00 | 11/30/2020 Loan Repayment |
| HIGHLAND TOTAL RETURN | USD | 72,912.75 | Advisory Fees |
| HIGHLAND FIXED INCOME | USD | 55,287.79 | Advisory Fees |
| HIGHLAND/IBOXX SRLOAN ETF | USD | 25,004.95 | Advisory Fees |
| HIGHLAND SMALL CAP EQUITY | USD | 19,293.59 | Advisory Fees |

**HCFD**

| | | | |
|---|---|---|---|
| Paul DeMaio | USD | 2,000.00 | Return of IT Holdback |

Okay to send?

**Kristin Hendrix, CPA** | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: HCM - HCMFA/NPA
**Date:** Mon, 21 Dec 2020 12:30:25 -0600
**Importance:** Normal

FYI

**From:** Jack Donohue
**Sent:** Monday, December 21, 2020 12:15 PM
**To:** Kristin Hendrix
**Cc:** Fred Caruso
**Subject:** HCM - HCMFA/NPA

Kristin,

Has NPA paid the December payments $168k and 252k payments for shared service and subadvisor? The last payment I see was 11/2/2020. Has HCMFA paid the December payment of $416k? The last payment I see was on 11/2/2020.

Thanks,

Jack

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

http://DSIconsulting.com/

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Wed, 23 Dec 2020 11:05:46 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Ok

On Dec 23, 2020, at 11:00 AM, Kristin Hendrix wrote:

**HCM**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 49,213.01 | health insurance premium funding |
| EAC | USD | 36,000.00 | Retainer Invoice; approved by Seery |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 8,686.93 | health insurance premium funding |
| ACA | USD | 375.00 | |
| Principal Life | USD | 71.53 | |

**NPA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 20,079.46 | health insurance premium funding |

**HCFD Oper**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 26,339.40 | health insurance premium funding |

**EEA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 1,161.82 | health insurance premium funding |

Okay to release?

**Kristin Hendrix, CPA** | Assistant Controller

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



# Exhibit E

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Thu, 31 Dec 2020 12:13:42 -0600
**Importance:** Normal

---

Ok

On Dec 31, 2020, at 12:11 PM, Kristin Hendrix wrote:

**HCM**

| | | | |
|---|---|---|---|
| Meta-e | USD | 360,384.10 | approved by Seery |
| Houlihan Lokey | USD | 41,460.00 | approved by Seery |
| Bloomberg Finance LP | USD | 16,491.04 | approved by Seery |
| Arris Western Corp. | USD | 11,000.00 | approved by Seery |
| TW Telecom Holdings, llc | USD | 6,182.17 | approved by Seery |
| Mauro Staltari | USD | 3,299.50 | final Garden leave payment (processed outside of payroll) |
| Canteen Vending Services | USD | 2,243.84 | approved by Seery |
| Shawn Raver | USD | 1,984.95 | approved by Seery |
| Four Seasons Plantscaping | USD | 481.71 | approved by Seery |
| Action Shred of Texas | USD | 450.00 | approved by Seery |
| ProStar Services, Inc | USD | 367.38 | approved by Seery |
| UPS Supply Chain Solutions | USD | 164.31 | approved by Seery |

**HCMFA**

| | | |
|---|---|---|
| Shawn Raver | USD | 4,631.55 |
| DTCC ITP LLC | USD | 892.88 |

**NPA**

| | | |
|---|---|---|
| Bloomberg Finance LP | USD | 26,177.78 |
| DST Asset Manager Solutions | USD | 17,152.20 |
| Dallas Zoological Society | USD | 9,404.00 |
| AnchorsGordan, PA | USD | 1,605.75 |
| Dow Jones & Company, Inc. | USD | 1,599.00 |
| UPS Supply Chain Solutions | USD | 521.37 |
| CHASE COURIERS, INC | USD | 24.48 |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Highland Capital Management Fund Advisors | USD | 64,562.00 | Nov shared services |
| DST Technologies, Inc. | USD | 5,741.59 | |
| UPS Supply Chain Solutions | USD | 114.68 | |

**Falcon**
**E&P**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Dec shared services |



App. 210
ACL-026166

# Exhibit F

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

** THIS PAGE INTENTIONALLY LEFT BLANK **

**\*\* THIS PAGE INTENTIONALLY LEFT BLANK \*\***

** THIS PAGE INTENTIONALLY LEFT BLANK **

# Exhibit G

STRICTLY CONFIDENTIAL

```
------------------------------------------------------------x
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
RE: Highland Capital Management, L.P.                       :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
------------------------------------------------------------x
```

## **<u>EXPERT REPORT OF ALAN M. JOHNSON</u>**

### **MAY 28, 2021**

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

Introduction                                                                                    3

Background                                                                                     4 – 5

Summary of Opinions                                                                        6 – 7

Statement of Opinions                                                                       8 – 15

Conclusion                                                                                      16

Exhibit A:  Work History and Education                                                  17

Exhibit B:  Alan M. Johnson Prior Expert Testimony Since 2016                  18

Exhibit C:  Actual Compensation vs. Estimated Market Compensation Range    19

Exhibit D:  Select Public Peer Comparators                                            20

Exhibit E:  Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)    21 – 23

Exhibit F: Discussions of Investment Management Compensation in the Public Domain    24

Documents Reviewed                                                                          25

Bibliography                                                                                    26

**App. 238**

STRICTLY CONFIDENTIAL

## INTRODUCTION

I have been retained by Stinson LLP ("Stinson"), counsel to Mr. James Dondero, to provide expert opinions based on my knowledge and experience advising asset management and other financial service firms on compensation over the period 2013 to 2019. Specifically, I have been asked to independently analyze the competitiveness of compensation provided to Mr. Dondero compared to compensation received by executives and senior employees with similar experience and roles. In addition, I was asked to opine on and provide information on the use of loans in the marketplace as a form of compensation. Mr. Dondero is the Founder and, throughout the period, was the CEO, and head portfolio manager of Highland Capital Management LP ("HCM") and in that role, performed the same services for related companies and companies managed by HCM, including Highland Capital Management Financial Advisors ("HCMFA") and NexPoint Advisors ("NPA"). Market competitive compensation for Mr. Dondero during this period is relevant based on the apparent shortfall in annual compensation to Mr. Dondero. Throughout this period, he received loans in lieu of additional current compensation. Consistent with company practice, the loans were considered a form of deferred compensation that could be realized over time as the loans were forgiven and the income recognized by the individuals.

My opinions in this report are based on my experience consulting on executive compensation since 1980, my review of certain materials produced on Highland and its affiliates, and my perspectives on compensation programs for comparable senior executives and key employees in the industry.

**App. 239**

STRICTLY CONFIDENTIAL

# BACKGROUND

## Professional Experience

The issues I have been asked to provide opinions on are topics I have regularly encountered during many years of advising financial services firms, including asset management firms. I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm. My firm has specialized for many years in analyzing and advising the financial services industry, including major investment and asset management firms, hedge funds and other alternative investment firms, advisory firms, commercial banks, insurance companies, and brokerage firms.

I have extensive experience reviewing and assessing appropriate market levels of compensation for clients. I have worked as a compensation consultant since 1980. In 1992, I founded my own compensation consulting firm, Johnson Associates in New York City. Johnson Associates, where I am currently Managing Director, is a boutique firm specializing in compensation consulting for the financial services industry. We routinely consult on and have a strong understanding of market compensation levels for senior professionals and executives. Prior to founding my own firm, I was a consultant at several leading compensation advisory firms.

Our clients have included many of the world's most significant financial institutions, asset managers and alternative investment firms across a broad range of issues. A summary of my work history and education is attached as Exhibit A. I am regularly quoted on compensation issues in major publications, including *The Wall Street Journal*, *Business Week*, *The New York Times*, *Fortune*, *The Washington Post*, *Bloomberg* and many others.

STRICTLY CONFIDENTIAL

Over the past 20 years, I have provided expert testimony in more than 40 cases and have been qualified as an expert in the field of executive compensation 30+ times since founding my firm in 1992 (both on the employee and employer side).  A list of cases in which I have rendered expert testimony since 2016 is attached as Exhibit B.

## Compensation

I am being compensated at my normal hourly rate of $715 per hour for preparing this report.  My compensation is not contingent on the content of my opinions.  I have been assisted in this engagement by my associate, Michael Perniciaro.  Michael's normal hourly rate is $225 per hour. All opinions in this report are my own.

## Facts and Data Considered

In preparing this report, I considered certain documents provided to me, interviews with Mr. Dondero and former Highland or affiliate employees. The documents include information about Highland and its related entities, Mr. Dondero's compensation history, and financial statements over the period. Importantly, given the state of document production in this case, I did not receive all the documents typical for an assessment of compensation. The result of which could lead to a conservative bias in my assessment of market competitive compensation. I have evaluated publicly disclosed proxy statements of a select group of Highland peer firms, as well as information from news sources.  The information is consistent with the data and outcomes across our client studies.

STRICTLY CONFIDENTIAL

## SUMMARY OF OPINIONS

Based on my experience as an executive compensation consultant and my review of the compensation and other documents, it is my opinion that:

- Reasonable compensation for Mr. Dondero's role is positioned well above the market median, toward the market high end. Based on analysis and market research, it is apparent that Mr. Dondero was the key leader of the firm and deeply involved in all its operations, with contributions well beyond the traditional CEO / Chief Investment Officer role at comparators. Competitive market high-end for Mr. Dondero's role is about $6.0M per year while his actual compensation over the period was an average of about $3.0M per year. Therefore, the aggregate shortfall in compensation provided to Mr. Dondero against reasonable compensation levels in the market is at least $21M over the period I examined. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder. Founders are often paid significantly more in the market.

- I understand from Mr. Dondero that the 2018 loans that are the subject of this suit were modified by an agreement in late 2018 or early 2019 under which the loans would be forgiven upon the sale at over cost of substantially all of any of three portfolio company assets held in the Highland platform, MGM, Cornerstone and/or Trussway. Based on interviews from prior employees, the use of forgivable loans was a known business practice at Highland and there was a clear expectation similar loans would be forgiven. Loans are often used both in private firms and more broadly in the market, both as a perk without forgiveness and also with forgiveness as deferred compensation.

**App. 242**

STRICTLY CONFIDENTIAL

- While I do not have sufficient data to know the capital in the firm at year end 2018,[1] the substantial amount of capital remaining in the firm at the time of bankruptcy (i.e., ≅ $399.6M) includes undistributed earnings to its Founders and primary shareholders, Mr. Dondero and Mr. Okada. For asset management firms, it is market practice to distribute most earnings annually to the firm's equity holders. The retention of the earnings in the business, further illustrate the shortfall in payments made to Mr. Dondero over the period.

---

[1] I have been told that the Debtor has not produced much of what was requested by Mr. Dondero and that Mr. Dondero no longer has access to the Highland server.  Therefore, I understand, what information he provided was from his own accountants, recollections, and/or from companies over which he still has control.

**App. 243**

STRICTLY CONFIDENTIAL

## STATEMENT OF OPINIONS

**Factual Background**

From my review and analysis of available materials and research, I understand the consolidated Highland business ("Highland") is a multi-strategy asset management firm focused on CLOs, hedge funds, and several private investments. Prior to the financial crisis, in 2008, Highland was very successful, reaching its peak revenue and assets under management levels. Looking at the post financial crisis period from 2013 to 2019, Highland continued to operate under the leadership of Mr. Dondero. During this period, several loans were made to Mr. Dondero. Part of my mandate was to assess market compensation levels during this period relative to firms with similar size and earnings. To do so, an assessment of Highland's financial information is necessary. I did not receive all of the financial information for HCM that I would have liked to have had because, I was told, HCM refused to produce most of the documentation requested from it. However, I was able to review the actual financials of HCMFA and NPA, and to obtain information Mr. Dondero possessed and/or recollected. The revenues for HCMFA and NPA ranged from $30.5M to $65.9M over the period with assets under management of $4.7B to $7.5B. To complete my analysis, Mr. Dondero provided his best recollection of the size and structure of the consolidated three entities stating assets under management from 2013 to 2019 ranging from $10.0B to $20.0B, with a primary focus on CLOs and an average of about $1.0B being in hedge funds. Based on the incomplete nature of my data review, there is a possibility that the market figures provided in this report could be understated based on my conservative approach, relying primarily on the documented data for HCMFA and NPA but only the recollection of Mr. Dondero for HCM, not the actual documentation, such as audited financial statements.

STRICTLY CONFIDENTIAL

When examining Mr. Dondero's role at Highland relative to others in the market, it is apparent that his contributions and responsibilities exceeded the traditional duties of executive officers and lead investors who are paid significant amounts elsewhere. Mr. Dondero was the key man running daily business and operations, attracting clients, and overall investments. Given his outsized role, it would be reasonable to expect his compensation to be well above the market median. The sources utilized to ascertain specifics of his role and arrive at this conclusion include interviews with former Highland or Highland affiliate employees, as well as articles in the public domain and discussions with Mr. Dondero.

The total annual compensation for Mr. Dondero from 2013 - 2019 was $3.0M on average and the aggregate compensation over the period was $21.0M (source: W-2 filings). To assess the compensation in the market and determine the final market range, I utilized three methodologies including: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top portfolio managers. Market compensation figures provided in this report strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

To opine on the use of the loans as a form of compensation, I relied on market research, industry expertise, and interviews. My findings from this assessment are the use of forgivable loans was a normal business practice for Highland and there was a clear expectation they would be forgiven over time, based on varying performance criteria, depending on the employee.

An important additional consideration is the Founders, Mr. Dondero and Mr. Okada, did not receive the typical amount of distribution payments from their equity ownership. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital

STRICTLY CONFIDENTIAL

in the business amounting to $399.6M. This amount includes undistributed earnings to the original equity shareholders, primarily Mr. Dondero.

**Market Assessment of Executive and Investor Compensation**

During my career as a compensation expert, I have had significant experience assessing and designing annual compensation awards across the financial services industry, including comparable asset management firms. Accordingly, I am familiar with typical annual compensation levels for senior executives and senior portfolio managers at comparable asset management firms. I would expect pay levels for a key individual such as Mr. Dondero to be substantial, given his contributions, responsibilities, and the competitive market for investment management pay.

To assess reasonable compensation across the competitive market range, it is important to determine Mr. Dondero's responsibilities and contributions relative to others in the industry. It is my understanding that Mr. Dondero worked tremendously long hours, was involved in all aspects of the business including investment decisions, fundraising, business management / administration and the operation of portfolio companies. An article published in the *Dallas Morning News* states, "Mr. Dondero works 70 hours weeks… his days are filled with board and investor meetings, company strategy sessions and constant monitoring and adjusting of the firm's portfolios."[2] In my opinion, Mr. Dondero's role as CEO and head portfolio manager clearly exceeds the traditional duties of executive officers who are paid significant amounts elsewhere. Based on his significant responsibilities and key man status for the firm, it would be reasonable to expect annual compensation significantly above the market median.

---

[2] "High Intensity Pays Off For Highland," The Dallas Morning News, September 3, 2003, https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

**App. 246**

STRICTLY CONFIDENTIAL

The appropriate positioning for Mr. Dondero is further accentuated by the assessment of "replacement cost". If Mr. Dondero departed Highland in the period of 2013 to 2019, the cost of replacing him as CEO / head investor with a similar level of contribution across all functions would be multiples of his annual compensation. In assessing and providing market compensation for Mr. Dondero's role, I considered how his skillsets and contributions are valued in the market. My assessment of market compensation considers the cost of replacing Mr. Dondero with an outside hire.

The final market range provided in Exhibit C reflects my industry experience and expertise as well as three methodologies for determining competitive compensation magnitudes. These methodologies include: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms over the period, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top Portfolio Managers. Several methodologies utilized to capture Mr. Dondero's specific role as CEO and head portfolio manager. The market figures do not include any premium for being a Founder. In the market, Founders can be, and generally are, paid substantially more.

As shown below and in Exhibit E, the average annual compensation of public company asset management CEOs from 2013 to 2019 ranges from $2.1M - $4.1M. Importantly, in the market it is common for some senior investment professionals to earn more than the CEO or other corporate officers. Incorporating firm leadership functions into the investment role is a savings of sorts, as someone must still do this job.

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | $2,049 |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | $2,700 |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | $3,375 |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | $4,091 |

**App. 247**

STRICTLY CONFIDENTIAL

While we examined the disclosed compensation of a select group of public peers (Exhibit D), few of Highland's direct competitors are public and disclose the pay of their top investment professionals (see Exhibit F for some discussions about investment management compensation in the public domain). Instead, firms are either 1) private, or 2) if public, disclosed officers most often are not highly paid portfolio management professionals.

Specifics of individual portfolio management pay are closely guarded for competitive reasons. That said, there are some articles quoting portfolio manager pay in the public domain showing compensation for portfolio managers can be well above the competitive range for public asset management CEOs (see Exhibit F). For example, according to an article published by "efinancialcareers" top performing portfolio managers at the average Hedge Funds with greater than $4.0B assets under management earned $6.8M in total compensation.[3] While Highland's structure differs from a pure hedge fund, the skills and role responsibilities are comparable to Mr. Dondero. Another example is the CEO of the Harvard Endowment, Mr. Narvekar, earned $6.25M in 2019.[4] The McLagan "Highland Capital CEO Compensation Analysis" (April 2020) produced by HCM, shows 2018 total compensation for the Head of Alternative Credit Strategy / CIO of $4.1M at the 75th percentile and 2018 total compensation for CEO With/Without CIO Responsibilities making $5.4M at the market median and $9.6M at the market 75th percentile.

The final method for assessing compensation in the market is a top-down analysis of competitive percentages of revenue attributed to portfolio managers or their teams in the market. Based on competitive market research and industry knowledge, 10% to 12% of revenue would

---

[3] Dan Butcher, "Here Are the Salaries and Bonuses at Hedge Funds in the U.S.," eFinancialCareers, May 5, 2018, https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

[4] Janet Lorin, "Harvard Endowment Chief Narvekar $6.25 Million for 2019," Bloomberg.com (Bloomberg, May 14, 2021), https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

**App. 248**

be within the competitive market range for someone in Mr. Dondero's role. One public example of a dual CEO and CIO sharing directly in profitability is Mario Gabelli; he earns a fixed 10% of aggregate pre-tax profit every year per his employment agreement.[5]

The final competitive range below (Exhibit C) reflects the market competitive annual total compensation range. This competitive range was determined based on my interactions with asset management firms and over 30 years of industry experience and the insights gained from the three methodologies for determining competitive market compensation outlined above. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

| Figures in 000s | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

Based on the market research and the insights gained through my extensive experience advising on compensation in the industry, reasonable annual compensation for Mr. Dondero's extensive role as CEO and portfolio manager is positioned at the market high-end at **$6.0M per year**. This figure takes into account firm size, profitability, asset class, and both the investment functions, as well as responsibilities for running the firm. In summary, given his outsized role, his compensation should be positioned toward the market high-end. If the comparison was directly to hedge fund portfolio managers, the figures would be far higher (i.e., often $10M+

---

[5] "Schedule 14A GAMCO INVESTORS, INC.," SEC.gov, April 29, 2020, https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm

**App. 249**

STRICTLY CONFIDENTIAL

annually). Additionally, market figures do not include any premium for being a Founder. In the market, Founders are often paid substantially more than the market figures shown.

Mr. Dondero's aggregate compensation during the period of 2013 to 2019 is well below the reasonable market compensation level. Mr. Dondero's aggregate actual compensation from 2013 - 2019 was $21.0M (source: W-2 filings). Reasonable competitive compensation for Mr. Dondero based on our analysis of his role is $6.0M per year or $42.0M in aggregate over the period. The shortfall in actual compensation to Mr. Dondero versus reasonably expected competitive compensation levels over the period is about **$21.0M** (Exhibit C). Market figures provided do not include any premium as a Founder, which further broadens the shortfall to market. An important additional consideration is the relative lack of typical equity distributions to Mr. Dondero for his historic ownership of the firm.

## Use of Loans as Compensation

In my expert opinion, the use of loans from a company to its senior professionals continues to be a common practice for private businesses. At Highland, the use of loans was a common practice with the clear expectation among senior professionals that the loans would be forgiven over time based on performance, particularly of success in specified projects. I heard from former Highland or Highland affiliate employees that similar loans were used at Highland as deferred incentive compensation and intended to be forgiven over time or on the occurrence of particular achievements.

While, for public companies, Sarbanes Oxley Section 402 explicitly prohibits publicly traded companies from making loans to executive officers it is still a common practice at private

STRICTLY CONFIDENTIAL

companies.[6] The use of these loans at private companies is beneficial for retention by allowing the firm to provide annual or periodic or other forgiveness for a portion the loan and eventually forgiving the full amount. The amount of loan forgiveness is considered income to the professionals and is taxable when forgiven. This was the case at Highland as well. In a publicly available article for the *Dow Jones Private Equity Analyst – Global Compensation Study*, two Proskauer partners outline the tax regulations for similar loans to professionals.[7]

## Market Practices on Equity Distributions

It is the standard practice in the market to distribute the majority of earnings to equity owners each year for asset management businesses. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital in the business equaling $399.6M. This amount included undistributed earnings to the primary equity holders, Mr. Dondero and Mr. Okada. Highland did not distribute these earnings based on their philosophy of "delayed gratification". This policy has been in place since the inception of the firm, including the peak years prior to the financial crisis. Very recently, the "delayed gratification" approach paid off in connection with Highland's private direct investment in MGM which was announced to be acquired by Amazon with significant economics attached.[8]

---

[6] Sarbanes-Oxley Act (2002).

[7] Michael J Album and James E Gregory, "Human Capital Considerations For Maturing Private Equity Firms," Dow Jones Private Equity Analyst-Global Compensation Study, 2012, pp. 84-96, https://www.proskauer.com/insights/download-pdf/1930.

[8] Annie Palmer, "Amazon to Buy MGM Studios for $8.45 Billion," CNBC (CNBC, May 26, 2021), https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 251**

STRICTLY CONFIDENTIAL

## CONCLUSION

It is my opinion that Mr. Dondero's aggregate compensation from 2013 to 2019 is significantly below the reasonable competitive compensation level for his role relative to similarly situated firms. In aggregate, the total shortfall in Mr. Dondero's actual compensation versus reasonable competitive compensation is at least $21.0M. This shortfall does not include any premium as a Founder, which could be considerable. Additionally, it is my opinion that the loans provided to Mr. Dondero should be considered potential deferred compensation as they were similar to loans given to other professionals at the firm. Lastly, the significant amount of capital in the business at the time of bankruptcy is at least partially attributable to Mr. Dondero as un-recognized payments as a prior equity holder, and indicates the rationale for having the potential for considerable deferred compensation.

\*     \*     \*

I reserve the right to supplement this report and/or to supplement or modify my opinions in light of any additional facts or data that may come to my attention.

Dated:  May 28, 2021

Respectfully submitted,

Alan Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
Phone: (212) 221-740

**App. 252**

STRICTLY CONFIDENTIAL

## Exhibit A: Work History and Education

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

### Professional Experience

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 – 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 – 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 – 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 – 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 – 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 – Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

### Education

| | |
|---|---|
| 1973 – 1975 | U.S. Naval Academy |
| 1975 – 1977 | University of Florida, B.A. (History/Economics) |
| 1977 – 1978 | University of Virginia, Graduate Economics |
| 1978 – 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**
- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms. I consult on the design and magnitudes of compensation programs for senior executives on a regular basis. I am quoted extensively in the press on compensation issues related to major financial service firms.

**App. 253**

STRICTLY CONFIDENTIAL

## Exhibit B: Alan M. Johnson Prior Expert Testimony for Previous Five Years

| LAW FIRM: | CASE: | COURT: | |
|---|---|---|---|
| Schulte Roth & Zabel LLP | Mark Rohman and Sean Cunningham v. Capstone Advisory Group, LLC. | Arbitration | (April 2016) |
| Gibson Dunn & Crutcher LLP | United States v. Greebel | Eastern District of NY | (December 2017) |
| Cohen Tauber Spievack & Wagner P.C. | Jeffry Brown v. Neuberger Berman Group LLC, and NB Alternatives Advisers LLC | Arbitration | (January 2018) |
| Gibson Dunn & Crutcher LLP | Robert Emerson Mulholland v. UBS Financial Services Inc. | FINRA Dispute Resolution Arbitration | (December 2018) |
| Proskauer Rose LLP | Damian Dalla-Longa v. Magnetar Capital LLC | Arbitration | (September 2019) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Isaly v. OrbiMed | Arbitration | (January 2020) |
| Pachulski Stang Ziehl & Jones LLP | RTI Holding Company vs. Debtors | Delaware Bankruptcy Court | (December 2020) |

**App. 254**

STRICTLY CONFIDENTIAL

## Exhibit C: Actual Compensation vs. Estimated Market Compensation Range

### Mr. Dondero Actual Compensation (2013 - 2019)

**Notes:** Mr. Dondero's compensation reflects amounts disclosed in W-2 filings for 2013 to 2019

- Does not include equity distributions over the period; typically, not included in competitive assessments of compensation.

| James Dondero Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Average |
| Highland Capital Management W-2 Income | $1,911,538 | $3,282,693 | $2,875,058 | $772,904 | $566,370 | $566,370 | $568,542 | $10,543,475 | $1,506,211 |
| Nexpoint Residential Trust W-2 Income | -- | -- | -- | -- | -- | $893,262 | -- | $893,262 | -- |
| NextPoint Advisors W-2 Income | -- | -- | -- | $1,628,736 | $3,118,250 | $2,870,278 | $1,953,455 | $9,570,718 | $2,392,679 |
| Total W-2 Income (Source: W-2) | $1,911,538 | $3,282,693 | $2,875,058 | $2,401,639 | $3,684,620 | $4,329,910 | $2,521,996 | $21,007,455 | $3,001,065 |

### Estimated Market Compensation Range

**Notes:** Market annual total compensation range reflecting my direct interactions with asset management firms and over 30 years of industry experience

- We have factored in Mr. Dondero's out-sized role / contributions on both the investment management and firm-stewardship responsibilities where applicable.
- Greater than findings from public proxy analysis reflecting higher compensation to portfolio managers in the market / alternatives space.
- Represents finding from the 3 methodologies outlined for determining market compensation.
- Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

### Compensation Shortfall

**Notes:** In my opinion, reasonable competitive annual compensation for Mr. Dondero over the period is $6.0M, positioning him toward the market high-end to reflect his out-sized role and contribution to the firm

| | |
|---|---|
| Aggregate Reasonable Competitive Compensation | $42,000,000 |
| Less: Actual Total Compensation | $21,007,455 |
| **Shortfall in Compensation** | **$20,992,545** |

**App. 255**

STRICTLY CONFIDENTIAL

## Exhibit D: Select Public Peer Comparators

**Notes:**

- Industry consolidation continues to shrink pool of publicly available compensation data for the asset management industry, even at much larger firms than Highland
- Group intended to represent a range of firms that are relevant but not perfectly similar
- Disclosure of Portfolio Manager positions limited as typically not included in publicly filed data (no compulsion to disclose as with executive officers)
- Highland data includes good faith estimate of consolidated entities assets under management during the period. Actual financials not assessed due to the non-disclosure of Highland Capital Management ("HCM") information. Data for "HCMFA" and "NPA" reviewed.

| Peers | Assets Under Management ($B) | | | | | | | Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| **Asset Management** | | | | | | | | | | | | | | |
| Cohen & Steers | $72 | $55 | $62 | $60 | $53 | $53 | -- | $411 | $381 | $378 | $350 | $329 | $314 | $298 |
| Pzena Investment | $41 | $33 | $39 | $30 | $26 | $28 | $25 | $151 | $154 | $141 | $108 | $117 | $113 | $96 |
| Silvercrest | $25 | $19 | $21 | $19 | $18 | $18 | $16 | $102 | $99 | $91 | $80 | $75 | $69 | $60 |
| Diamond Hill | $23 | $19 | $22 | $19 | $17 | $16 | $12 | $137 | $146 | $145 | $136 | $124 | $105 | $81 |
| Manning & Napier | $19 | $20 | $25 | $32 | $35 | $48 | $51 | $136 | $161 | $202 | $249 | $328 | $405 | $376 |
| Westwood Holdings | $15 | $17 | $24 | $21 | $21 | $20 | $19 | $84 | $122 | $134 | $123 | $131 | $113 | $92 |
| Hennessy Advisors | $5 | $6 | $7 | $7 | $6 | $6 | $4 | $43 | $55 | $53 | $51 | $45 | $35 | $24 |
| Main Street Capital | $4 | $3 | $3 | -- | -- | -- | -- | $173 | $214 | $235 | -- | -- | -- | -- |
| **Consolidated Highland\*** | -- | $10.0 | $14.0 | $15.0 | $18.0 | $20.0 | $19.0 | -- | -- | -- | -- | -- | -- | -- |
| **Highland Hedge Fund\*** | | $1.9 | $1.0 | $0.9 | $1.3 | $1.0 | $0.7 | -- | -- | -- | -- | -- | -- | -- |
| **HCMFA & NP (only)** | $7.5 | $6.1 | $5.1 | $4.8 | $5.2 | $5.7 | $4.7 | $66 | $52 | $42 | $41 | $50 | $31 | $31 |

*Represents estimated for the consolidated three entities. Financial for Highland Capital Management ("HCM") not provided by the debtor

**App. 256**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

**Notes:**

- Reflects disclosed senior executive officer compensation in $ thousands
- CEO not necessarily the highest paid employee at any given firm
- Senior investment professionals' pay often not disclosed and can be greater than CEO
- GAMCO not included; Mr. Gabelli receives 10% of aggregate pre-tax profit annually
- Indicates awards granted for performance each, not outstanding or fully vested compensation
- Where applicable, partial year salaries annualized. One-time awards annualized over appropriate vesting periods. Performance share values reflects target award values; does not reflect payouts from past cycles

## Summary of Proxy Analysis

| Proxy Analysis CEO Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

## Proxy Analysis by Year and Individual

| Chief Executive Officer - 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $835 | **$1,585** | $0 | $2,915 | $0 | **$2,915** | $0 | **$4,500** |
| Manning & Napier | Mayer, M. | CEO | $500 | $2,250 | **$2,750** | $145 | $755 | $0 | **$900** | $0 | **$3,650** |
| Silvercrest | Hough, R. | Pres & CEO | $700 | $1,000 | **$1,700** | $800 | $475 | $0 | **$1,275** | $240 | **$3,215** |
| Main Street Capital | Hyzak, D. | CEO | $625 | $650 | **$1,275** | $0 | $1,395 | $0 | **$1,395** | $0 | **$2,670** |
| Pzena Investment | Pzena, R. | Chairman, CEO, & Co-CIO | $365 | $685 | **$1,055** | $0 | $1,425 | $0 | **$1,425** | $0 | **$2,480** |
| Hennessy Advisors | Hennessy, N. | Chairman & CEO | $350 | $1,455 | **$1,805** | $0 | $155 | $0 | **$155** | $0 | **$1,960** |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $0 | **$650** | $0 | $0 | $0 | **$0** | $0 | **$650** |
| 25th Percentile | | | $435 | $670 | $1,165 | $0 | $315 | $0 | $530 | $0 | $2,220 |
| 50th Percentile | | | $625 | $835 | $1,585 | $0 | $1,275 | $0 | $1,275 | $0 | $2,670 |
| 75th Percentile | | | $675 | $1,230 | $1,755 | $75 | $1,410 | $0 | $1,410 | $0 | $3,435 |
| 90th Percentile | | | $720 | $1,775 | $2,185 | $405 | $2,020 | $0 | $2,020 | $95 | $3,990 |

**App. 257**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2018

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohen & Steers | Steers, R. | CEO | $750 | $650 | $1,400 | $0 | $2,355 | $0 | $2,355 | $0 | $3,755 |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $1,065 | $1,715 | $0 | $0 | $1,995 | $1,995 | $0 | $3,710 |
| Pzena Investment | Pzena, R. | Chairman, CEO, & CIO | $365 | $995 | $1,360 | $0 | $1,925 | $0 | $1,925 | $0 | $3,285 |
| Main Street Capital | Hyzak, D. | CEO | $555 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,275 | $0 | $3,230 |
| Silvercrest | Hough, R. | CEO | $700 | $1,600 | $2,300 | $500 | $40 | $0 | $540 | $240 | $3,080 |
| Hennessy Advisors | Hennessy, N. | CEO | $350 | $2,420 | $2,770 | $0 | $220 | $0 | $220 | $0 | $2,990 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $500 | $800 | $0 | $1,000 | $0 | $1,000 | $510 | $2,310 |
| Manning & Napier | Coons, J. | Co-CEO & President | $400 | $520 | $920 | $0 | $0 | $0 | $0 | $0 | $920 |
| Manning & Napier | Goldberg, R. | Co-CEO & Director | $750 | $0 | $750 | $0 | $155 | $0 | $155 | $0 | $905 |
| **25th Percentile** | | | $365 | $520 | $920 | $0 | $40 | $0 | $220 | $0 | $2,310 |
| **50th Percentile** | | | $555 | $995 | $1,400 | $0 | $220 | $0 | $1,000 | $0 | $3,080 |
| **75th Percentile** | | | $700 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,925 | $0 | $3,285 |
| **90th Percentile** | | | $750 | $1,765 | $2,395 | $100 | $2,010 | $400 | $2,065 | $295 | $3,720 |

### Chief Executive Officer - 2017

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,540 | $2,190 | $0 | $0 | $1,995 | $1,995 | $0 | $4,185 |
| Cohen & Steers | Steers, R. | CEO | $750 | $735 | $1,485 | $0 | $2,615 | $0 | $2,615 | $0 | $4,100 |
| Main Street Capital | Foster, V. | Chairman, CEO | $610 | $1,500 | $2,110 | $0 | $1,780 | $0 | $1,780 | $0 | $3,890 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,240 | $3,590 | $0 | $245 | $0 | $245 | $0 | $3,835 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $2,560 | $2,925 | $0 | $0 | $0 | $0 | $0 | $2,925 |
| Silvercrest | Hough, R. | CEO | $700 | $1,500 | $2,200 | $0 | $40 | $0 | $40 | $240 | $2,480 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $550 | $850 | $0 | $0 | $0 | $0 | $1,180 | $2,030 |
| Manning & Napier | Stamey, C. | Co-CEO, Sales / Distribution | $300 | $1,140 | $1,440 | $0 | $135 | $0 | $135 | $0 | $1,575 |
| **25th Percentile** | | | $340 | $1,040 | $1,475 | $0 | $0 | $0 | $30 | $0 | $2,370 |
| **50th Percentile** | | | $490 | $1,500 | $2,150 | $0 | $90 | $0 | $190 | $0 | $3,380 |
| **75th Percentile** | | | $665 | $1,795 | $2,380 | $0 | $630 | $0 | $1,835 | $60 | $3,945 |
| **90th Percentile** | | | $715 | $2,765 | $3,125 | $0 | $2,030 | $600 | $2,180 | $520 | $4,125 |

### Chief Executive Officer - 2016

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,350 | $2,000 | $0 | $0 | $3,955 | $3,955 | $0 | $5,955 |
| Cohen & Steers | Steers, R. | CEO | $750 | $675 | $1,425 | $0 | $2,425 | $0 | $2,425 | $0 | $3,850 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,075 | $3,425 | $0 | $350 | $0 | $350 | $0 | $3,775 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $600 | $900 | $0 | $0 | $0 | $0 | $1,180 | $2,080 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $1,600 | $1,965 | $0 | $0 | $0 | $0 | $0 | $1,965 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $55 | $0 | $55 | $240 | $1,720 |
| Manning & Napier | Manning, W. | CEO | $1,400 | $0 | $1,400 | $0 | $0 | $0 | $0 | $0 | $1,400 |
| **25th Percentile** | | | $360 | $640 | $1,415 | $0 | $0 | $0 | $0 | $0 | $1,845 |
| **50th Percentile** | | | $650 | $725 | $1,425 | $0 | $0 | $0 | $55 | $0 | $2,080 |
| **75th Percentile** | | | $725 | $1,475 | $1,985 | $0 | $205 | $0 | $1,390 | $120 | $3,815 |
| **90th Percentile** | | | $1,010 | $2,190 | $2,570 | $0 | $1,180 | $1,580 | $3,035 | $615 | $4,690 |

**App. 258**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2015

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $2,065 | $2,665 | $0 | $0 | $2,090 | $2,090 | $0 | $4,755 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $2,515 | $2,865 | $0 | $370 | $0 | $370 | $0 | $3,230 |
| Cohen & Steers | Steers, R. | CEO | $750 | $485 | $1,235 | $0 | $1,790 | $0 | $1,790 | $0 | $3,025 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $0 | $500 | $0 | $0 | $2,000 | $2,000 | $0 | $2,500 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $380 | $605 | $980 | $0 | $1,330 | $0 | $1,330 | $0 | $2,310 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $240 | $0 | $240 | $0 | $1,665 |
| 25th Percentile | | | $370 | $545 | $990 | $0 | $0 | $0 | $850 | $0 | $2,405 |
| 50th Percentile | | | $500 | $640 | $1,235 | $0 | $0 | $1,330 | $1,600 | $0 | $2,600 |
| 75th Percentile | | | $650 | $1,395 | $2,045 | $0 | $305 | $1,800 | $1,895 | $0 | $3,130 |
| 90th Percentile | | | $720 | $2,245 | $2,745 | $0 | $940 | $2,035 | $2,035 | $0 | $3,840 |

### Chief Executive Officer - 2014

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,995 | $2,595 | $0 | $0 | $2,060 | $2,060 | $0 | $4,650 |
| Cohen & Steers | Steers, R. | CEO | $750 | $460 | $1,210 | $0 | $1,660 | $0 | $1,660 | $0 | $2,870 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,750 | $2,100 | $0 | $280 | $0 | $280 | $0 | $2,380 |
| Silvercrest | Hough, R. | CEO | $650 | $725 | $1,375 | $0 | $70 | $0 | $70 | $0 | $1,445 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $495 | $995 | $0 | $0 | $0 | $0 | $0 | $995 |
| 25th Percentile | | | $395 | $530 | $1,055 | $0 | $0 | $0 | $125 | $0 | $1,680 |
| 50th Percentile | | | $550 | $685 | $1,295 | $0 | $35 | $0 | $940 | $0 | $2,490 |
| 75th Percentile | | | $640 | $1,495 | $1,920 | $0 | $230 | $1,200 | $1,645 | $0 | $2,805 |
| 90th Percentile | | | $700 | $1,875 | $2,350 | $0 | $970 | $1,830 | $1,860 | $0 | $3,760 |

### Chief Executive Officer - 2013

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Manning & Napier | Cunningham, P. | CEO | $500 | $1,500 | $2,000 | $0 | $4,020 | $0 | $4,020 | $0 | $6,020 |
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,505 | $2,105 | $0 | $0 | $1,395 | $1,395 | $0 | $3,500 |
| Cohen & Steers | Steers, R. | CEO | $750 | $365 | $1,115 | $0 | $1,800 | $0 | $1,800 | $0 | $2,915 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,170 | $1,520 | $0 | $90 | $0 | $90 | $0 | $1,610 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $280 | $1,145 | $1,420 | $0 | $0 | $0 | $0 | $0 | $1,420 |
| Silvercrest | Hough, R. | CEO | $500 | $600 | $1,100 | $0 | $70 | $0 | $70 | $0 | $1,170 |
| 25th Percentile | | | $355 | $620 | $1,110 | $0 | $0 | $0 | $80 | $0 | $1,515 |
| 50th Percentile | | | $500 | $1,145 | $1,420 | $0 | $70 | $0 | $1,395 | $0 | $2,600 |
| 75th Percentile | | | $550 | $1,335 | $1,760 | $0 | $945 | $700 | $1,700 | $0 | $3,210 |
| 90th Percentile | | | $660 | $1,500 | $2,040 | $0 | $2,690 | $1,475 | $2,690 | $0 | $4,510 |

**App. 259**

STRICTLY CONFIDENTIAL

## Exhibit F: Discussions of Investment Management Compensation in the Public Domain

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

"Eight Hedge Fund Managers Earned More Than $1 Billion Each in 2019. Cue the Questions." *Institutional Investo*r. March 25, 2020. https://www.institutionalinvestor.com/article/b1kwjngp2rnp9y/Eight-Hedge-Fund-Managers-Earned-More-Than-1-Billion-Each-in-2019-Cue-the-Questions

Langlois, Shawn. "Think celebrities and CEOs make way too much money? Check out this chart" *MarketWatch.com*. November 29, 2019. https://www.marketwatch.com/story/hedge-fund-managers-to-taylor-swift-and-disneys-bob-iger-hold-my-beer-2019-11-26

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

Moore, Heidi. "Bill Gross reportedly earns $290m bonus even as investors withdraw billions from Pimco funds" *The Guardian.* November 14, 2014. https://www.theguardian.com/business/2014/nov/14/pimco-paid-15bn-bonus-pool-executives-according-to-disputed-report

Rosenburg, John S. "Harvard Discloses Leaders' Annual Compensation" *Harvard Magazine*. May 11, 2018 https://www.harvardmagazine.com/2018/05/harvard-endowment-manager-and-administrator-pay

STRICTLY CONFIDENTIAL

## Documents Reviewed

### Data Items Reviewed from Debtor
- Bates Label Range: D-JDNL-017439 to D-JDNL-017441

### Data Items Reviewed:
- Bates Label Range: EXPERT 0000001 to EXPERT 0002316

### Individual Documents - Starting Bates Label
- Expert 1 – EXPERT 0000001
- Expert 1 – EXPERT 0000003
- Expert 1 – EXPERT 0000004
- Expert 1 – EXPERT 0000024
- Expert 1 – EXPERT 0000026
- Expert 1 – EXPERT 0000028
- Expert 1 – EXPERT 0000030
- Expert 1 – EXPERT 0000365
- Expert 1 – EXPERT 0000367
- Expert 1 – EXPERT 0000372
- Expert 1 – EXPERT 0000383
- Expert 1 – EXPERT 0000384
- Expert 1 – EXPERT 0000385
- Expert 1 – EXPERT 0000387
- Expert 1 – EXPERT 0000389
- Expert 1 – EXPERT 0000679
- Expert 1 – EXPERT 0000703
- Expert 1 – EXPERT 0000928
- Expert 1 – EXPERT 0000929
- Expert 1 – EXPERT 0000931
- Expert 1 – EXPERT 0000933
- Expert 1 – EXPERT 0000935
- Expert 1 – EXPERT 0000937
- Expert 1 – EXPERT 0000940
- Expert 1 – EXPERT 0000942
- Expert 1 – EXPERT 0000944
- Expert 1 – EXPERT 0000968
- Expert 1 – EXPERT 0000970
- Expert 1 – EXPERT 0000972
- Expert 1 – EXPERT 0000974
- Expert 1 – EXPERT 0000979
- Expert 1 – EXPERT 0001003
- Expert 1 – EXPERT 0001021
- Expert 1 – EXPERT 0001023
- Expert 1 – EXPERT 0001324
- Expert 1 – EXPERT 0001578
- Expert 1 – EXPERT 0001579
- Expert 1 – EXPERT 0001580
- Expert 1 – EXPERT 0001581
- Expert 1 – EXPERT 0001881
- Expert 1 – EXPERT 0001897
- Expert 1 – EXPERT 0001898
- Expert 1 – EXPERT 0001900
- Expert 1 – EXPERT 0001902
- Expert 1 – EXPERT 0001903
- Expert 1 – EXPERT 0001905
- Expert 1 – EXPERT 0001928
- Expert 1 – EXPERT 0001935
- Expert 1 – EXPERT 0001957
- Expert 1 – EXPERT 0001975
- Expert 1 – EXPERT 0001998
- Expert 1 – EXPERT 0002233
- Expert 1 – EXPERT 0002234
- Expert 1 – EXPERT 0002253
- Expert 1 – EXPERT 0002260
- Expert 1 – EXPERT 0002267
- Expert 1 – EXPERT 0002285
- Expert 1 – EXPERT 0002304

STRICTLY CONFIDENTIAL

## Bibliography

"High Intensity Pays Off For Highland." *The Dallas Morning News*, September 3, 2003. https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

"Schedule 14A GAMCO INVESTORS, INC." SEC.gov, April 29, 2020. https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm.

Sarbanes-Oxley Act (2002). https://www.friedfrank.com/siteFiles/Publications/681A0950DF7BC8CF412DF4C4A4805E09.pdf.

Album, Michael J, and James E Gregory. "Human Capital Considerations For Maturing Private Equity Firms." Dow Jones Private Equity Analyst-Global Compensation Study, 2012. https://www.proskauer.com/insights/download-pdf/1930.

Palmer, Annie. "Amazon to Buy MGM Studios for $8.45 Billion." CNBC. CNBC, May 26, 2021. https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 262**

# Exhibit H

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## HIGHLAND'S RESPONSES AND OBJECTIONS TO
## DEFENDANTS' JOINT DISCOVERY REQUESTS

Highland Capital Management, L.P., the reorganized debtor[1] ("Highland" or, as may be

temporally required, the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy

Case") and plaintiff in the above-captioned adversary proceedings (the "Adversary Proceedings"),

hereby responds to *Defendants' Joint Discovery Requests To Highland Capital Management, L.P.*

(the "Requests")[2] served by defendants James Dondero ("Mr. Dondero"), Nancy Dondero, ("Ms.

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital* Management, *L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Requests.

Dondero"), The Dugaboy Investment Trust ("Dugaboy"), NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Services, Inc. ("HCMS"), and NexPoint Real Estate Partners, LLC ("NREP") (collectively, "Defendants"). Highland's responses and objections to the Requests (the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## **GENERAL OBJECTIONS**

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1.  The Responses contained herein are based upon information presently known and ascertained by the Highland and Highland reserves the right to amend, supplement, or modify these Responses during depositions or otherwise.

2.  Highland objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. All references in these objections and responses to Highland's agreement to produce documents shall be construed to mean non-privileged documents.

3.  Highland objects to the Requests to the extent they request information that is not reasonably or readily available to it, in its possession, custody or control, or is more readily available to the Defendants from another source or for which the burden of obtaining such information is not substantially greater for the Defendants than it is for Highland.

4.      Highland objects to the Requests to the extent they call for legal conclusions and/or analyses.

5.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      Highland objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      Highland's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.      Notwithstanding Highland's production of certain documents that were lodged on the main docket or in one or more of the Adversary Proceedings, Highland has not reviewed all documents lodged therein and reserves the right to use, reply upon, or offer into evidence any such documents.

9.      Unless indicated otherwise, Highland's search for responsive documents and communications covers the period December 1, 2018 to the present.

10.     These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 1, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 2**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 2, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 3**:

Produce all documents and communications supporting or related to your Declaratory Relief claims (Count 5 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 3, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 4**:

Produce all documents and communications supporting or related to your Breach of Fiduciary Duty claims (Count 6 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 4, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 5**:

Produce all documents and communications supporting or related to your Aiding and Abetting a Breach of Fiduciary Duty claims (Count 7 of the Amended Complaint) against James Dondero and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 5, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 6**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against NPA.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 6, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 7**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCMS.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 7, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 8**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCRE.

**RESPONSE:**

Subject to the General Objections and this specific objection, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 8, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information. Highland reserves its right to supplement its Response to this Request in light of ongoing discovery.

**REQUEST FOR PRODUCTION NO. 9**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 9, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 10**:

Produce all documents and communications supporting or related to any damages that you are seeking pursuant to your Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11:**

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that, "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12:**

Produce all documents and communications related to the Alleged Agreement referenced in the Amended Complaints.

**RESPONSE:**

In response to Request for Production No. 12, Highland states that it is not aware of any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the Debtor's books and records do not reflect the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement.)"

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 15**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 15, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 16**:

Produce all communications between the Debtor and Debtor's outside auditor.

**RESPONSE:**

Highland objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 16, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the Notes.

**REQUEST FOR PRODUCTION NO. 17**:

Produce all communications between the Debtor and Debtor's outside auditor related to any allegations in the Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 17, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 18**:

Produce all communications between Mr. Dondero and Debtor's CFO (as that term is used in the Amended Complaints) related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 18, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 19**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Nancy Dondero also lacked the authority to enter into the Alleged Agreement or to otherwise bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 19, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 20**:

Produce all communications between Nancy Dondero and James Dondero.

**RESPONSE:**

Highland objects to Request for Production No. 20 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it asks for "all" communications between Nancy Dondero and James Dondero. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 20, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the allegations in the Amended Complaint or the Notes or the Amended Answer.

**REQUEST FOR PRODUCTION NO. 21**:

Produce all communications between Nancy Dondero and James Dondero related to the allegations in the Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 21, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 22**:

Produce all communications between Nancy Dondero and James Dondero related to James Dondero's compensation from the Debtor.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 22, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 23**:

Produce all documents and communications supporting or related to the allegations in the Amended Complaints that each of the Defendants entered into the "Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 23, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 24**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that the "Alleged Agreement was not subject to negotiation."

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 24, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the value of the consideration received by the Debtor for the transfers was not reasonably equivalent value."

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 25, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 26**:

Produce all documents and communications evidencing the value of the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 26.

**REQUEST FOR PRODUCTION NO. 27**:

Produce all documents and communications evidencing the value of the consideration received by the Debtor related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 27, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 28**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that James Dondero and Nancy Dondero "were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 28, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 29**:

Produce all documents and communications supporting any damages you are seeking related to the Amended Complaints.

**RESPONSE:**

Highland objects to Request for Production No. 29 on the ground that it is duplicative of Request for Production No. 10. Subject to the General Objections and this specific objection, Highland incorporates by reference its Response to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 30**:

Produce all documents and communications relating to the solvency and financial condition of the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 30 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 30.

**REQUEST FOR PRODUCTION NO. 31**:

Produce all monthly balance sheets of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE**:

Highland objects to Request for Production No. 31 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 31.

**REQUEST FOR PRODUCTION NO. 32**:

Produce all of the Debtor's internal monthly reporting packages for the period from January 1, 2013 to the present.

**RESPONSE**:

Highland objects to Request for Production No. 32 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 32.

**REQUEST FOR PRODUCTION NO. 33**:

Produce all of the Debtor's financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 33 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 33.

**REQUEST FOR PRODUCTION NO. 34**:

Produce all "loan summaries" of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 34 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 34.

**REQUEST FOR PRODUCTION NO. 35**:

Produce all of the Debtor's audited financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 35 on the ground that Highland has previously produced documents responsive to this Request and does not intend to produce all such documents again.

**REQUEST FOR PRODUCTION NO. 36**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of the following entities:

Trussway Holdings, LLC, Trussway Industries, LLC, MGM Holdings, and Cornerstone Healthcare for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 36 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 36.

**REQUEST FOR PRODUCTION NO. 37**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of all entities and assets owned, directly or indirectly, by the following entities and in which the Debtor has an interest: Highland Select Equity Fund, L.P., Highland Restoration Capital Partners, L.P., Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Capital Management Korea Limited, and Cornerstone Healthcare.

**RESPONSE:**

Highland objects to Request for Production No. 37 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1). .

**REQUEST FOR PRODUCTION NO. 38**:

Produce all documents showing the financial performance of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 38 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 39**:

Produce all financial statements for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 39 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 40**:

Produce all monthly balance sheets for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 40 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 41**:

Produce all internal monthly reporting packages for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 41 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 42**:

Produce all documents reflecting the assets under management for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 42 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 43**:

Produce all documents reflecting the investment results and/or performance for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 43 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 44**:

Produce all documents reflecting marketing materials for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 44 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 45**:

Produce all documents related to any employment and/or shareholder or partnership agreement between Dondero, on the one hand, and any of the following entities on the other hand, for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE**:

Highland objects to Request for Production No. 45 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 46**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by Dondero from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE**:

Highland objects to Request for Production No. 46 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to this Request to the extent they relate to (i) the Debtor.

**REQUEST FOR PRODUCTION NO. 47**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by any Related Entity for Dondero or on Dondero's behalf, from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries,

both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 47 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 48**:

Produce all documents reflecting and/or relating to any organizational charts for any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 48 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1). Subject to the forgoing objection, Highland refers the Defendants to documents filed on this main docket in the above-referenced bankruptcy case.

**REQUEST FOR PRODUCTION NO. 49**:

Produce all documents reflecting and/or relating to Dondero's employment, investment, and/or managerial role(s) in any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 49 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 50**:

Produce the Debtor's "books and records" referred to in paragraph 66(j) of the Amended Complaint filed against Defendant James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 50.

**REQUEST FOR PRODUCTION NO. 51**:

Produce all documents and communications evidencing any action taken by any limited partner of the Debtor to (i) take part in the control (within the meaning of the Delaware Act) of the Partnership's business; (ii) transact any business in the Partnership's name; and/or (iii) sign any documents or otherwise bind the Partnership in accordance with the LPA.

**RESPONSE:**

Highland objects to Request for Production No. 51 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 52**:

Produce all documents and communications evidencing the value of the HCRE Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 52.

**REQUEST FOR PRODUCTION NO. 53**:

Produce all documents and communications evidencing the value of the HCMS Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 53.

**REQUEST FOR PRODUCTION NO. 54**:

Produce all documents and communications evidencing the value of the NPA Note.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 54.

**REQUEST FOR PRODUCTION NO. 55**:

Produce all documents and communications evidencing the value of the Dondero Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 55.

**REQUEST FOR PRODUCTION NO. 56**:

Produce the loan documentation for all loans made by Debtor to any then-current executive, consultant, or employee of Debtor or any related Person.

**RESPONSE:**

Highland objects to Request for Production No. 56 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 57**:

Produce all documents reflecting the payment status of all loans identified in response to the above (No. 56) Request for Production, and if forgiven, all documents reflecting the conditions for forgiveness.

**RESPONSE:**

Highland objects to Request for Production No. 57 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" in Request for Production No. 56 are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 58**:

Produce all documents related to any audits of the Debtor from 2013 forward, including, but not limited to, any management letters, audit notes, and audit files.

**RESPONSE:**

Highland objects to Request for Production No. 58 on the grounds that  it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the General Objections and these specific objections, Highland and PricewaterhouseCoopers previously produced documents responsive to Request for Production No. 58.

**REQUEST FOR PRODUCTION NO. 59**:

Produce all documents related to the sale or potential sale of any portfolio companies of the Debtor or interests in any portfolio companies owned by the Debtor, including, but not limited to, MGM, Trussway, and Cornerstone.

**RESPONSE:**

Highland objects to Request for Production No. 59 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrase "potential sale" is vague and

ambiguous.  Subject to the General Objections and these specific objections, Highland states that

it has no documents responsive to Request for Production No. 59.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

Admit that Highland Capital Management, L.P. entered into the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA"), on or about December 24, 2015.

**RESPONSE:**

Deny.  Highland Capital Management, L.P. did not enter into, and is not a party to, the

LPA.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the LPA provided that the Majority Interest of Highland Capital Management, L.P. could approve compensation for the General Partner and its Affiliates (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  Request for Admission No. 2 inaccurately summarizes Section 3.10 of the LPA,

which speaks for itself.

**REQUEST FOR ADMISSION NO. 3:**

Admit that James Dondero was an Affiliate of the General Partner in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that James Dondero was an Affiliate of the General Partner in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 5:**

Admit that James Dondero was an Affiliate of the General Partner in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that James Dondero was an Affiliate of the General Partner in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Admit that James Dondero was an Affiliate of the General Partner from January 1 through January 9, 2020, and otherwise deny Request for Admission No. 6 on the basis of the corporate governance settlement that Mr. Dondero entered into and that was approved by the Court. See Docket Nos. 338 and 339.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2017.

**RESPONSE:**

HCMLP objects to Request for Admission No. 11 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 11.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2017.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2018.

**RESPONSE:**

HCMLP objects to Request for Admission No. 12 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 12.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2018.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2019.

**RESPONSE:**

HCMLP objects to Request for Admission No. 13 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 13.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2019.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2020.

**RESPONSE:**

HCMLP objects to Request for Admission No. 14 on the ground that "Dugaboy Family Trust" is not defined in the LPA. HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 14. HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2020.

**REQUEST FOR ADMISSION NO. 15:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2017.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 15. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 16:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2018.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 16. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 17:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2019.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 17. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 18:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2020.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 18. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2017.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2017.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities in January 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2019.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2019.

## REQUEST FOR ADMISSION NO. 23:

Admit that within Highland each of MGM, Cornerstone and Trussway were referred to as "Portfolio Companies."

## RESPONSE:

Highland objects to Request for Admission No. 24 on the ground that the phrase "within Highland" is vague and ambiguous.

## **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

### **INTERROGATORY NO. 1:**

Identify all damages that you are seeking against each of the Defendants, including, how those damages are calculated.

### **RESPONSE:**

Against each maker of each Notes, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, (b) all accrued and unpaid interest under each Note, and (c) all actual expenses of collection, including court costs, and reasonable attorneys' fees in connection with each of the Adversary Proceedings.  HCMLP incorporates by reference its prior written responses to discovery and refers the defendants to the Notes and the invoices of Pachulski Stang Ziehl & Jones, LLP other documents being produced in this adversary proceeding.

Against Nancy Dondero and Dugaboy, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Against James Dondero for aiding and abetting Nancy Dondero's and Dugaboy's breach of fiduciary duty, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Damages will continue to increase as interest continues to accrue and Highland continues to incur additional costs of collection.

### **INTERROGATORY NO. 2:**

Provide the factual basis for your allegation in the Amended Complaints that Dugaboy owed a fiduciary duty to the Debtor.

### **RESPONSE:**

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement on behalf of HCMLP pursuant to which HCMLP agreed to forgive collection on all or any of the Notes, then Dugaboy will have owed a fiduciary duty to the Debtor because, among

other things, (a) Dugaboy would have been acting on the Debtor's behalf, (b) Dugaboy would have bound the Debtor, and (c) Dugaboy would have been required to act reasonably under the circumstances.

**INTERROGATORY NO. 3:**

Provide the factual basis for your allegation in the Amended Complaints that Nancy Dondero owed a fiduciary duty to the Debtor.

**RESPONSE:**

HCMLP incorporates by reference its response to Interrogatory No. 3 and further notes that Ms. Dondero would have caused Dugaboy to enter into the Alleged Agreement.

**INTERROGATORY NO. 4:**

Identify all acts or omissions by each of the Defendants that breached any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement pursuant to which HCMLP agreed to forgive collection on the Notes, then Dugaboy and Nancy would have breached their fiduciary duties by acting unreasonably by (a) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million for $1 in value, (b) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million at a time when they had no obligation to do so and received woefully inadequate consideration in return, and (c) otherwise acting unreasonably under the circumstances, including failing to perform reasonable diligence, failing to document and otherwise disclose the "agreement" to the Debtor's management and auditors, and by failing to disclose the "agreement" to the Bankruptcy Court at any time.

**INTERROGATORY NO. 5:**

Identify all acts or omissions by each of the Defendants that aided and abetted the breach of any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Highland incorporates by reference its response to Interrogatory No. 5 and further states - that James Dondero would have further aided and abetted in the breach of fiduciary duties by using undue influence to persuade Ms. Dondero to enter into the Alleged Agreement on behalf of Dugaboy.

**INTERROGATORY NO. 6:**

Provide the factual basis for your allegation in the Amended Complaints that "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

The evidence that Mr. Dondero controlled the Debtor is extensive and HCMLP objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the General Objections, the evidence that Mr. Dondero controlled the Debtor through at least January 9, 2020, includes his admissions, his control of Strand Advisors, Inc., his role as President of HCMLP, his authorization of the commencement of the Bankruptcy Case on behalf of HCMLP, and his agreement to the corporate governance settlement as embodied in Docket Nos. 338 and 339.

**INTERROGATORY NO. 7:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled NPA.

**RESPONSE:**

The evidence that Mr. Dondero controlled NPA is extensive and HCMLP objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the

evidence that Mr. Dondero controls NPA includes, among other things, his admissions, the admissions of DC Sauter and Jason Post at various points in this case, and prior judicial findings, holdings, rulings, and orders.

**INTERROGATORY NO. 8:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCRE.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCRE is extensive and HCMLP objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCRE includes, among other things, his own admissions, his direct or indirect ownership interest in HCRE, and the positions he holds and has with respect to HCRE..

**INTERROGATORY NO. 9:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCMS.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCMS is extensive and HCMLP objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCMS includes, among other things, his own admissions, his direct or indirect ownership interest in HCMS, and the positions he holds and has with respect to HCMS.

**INTERROGATORY NO. 10:**

Provide the factual basis for your allegation in the Amended Complaints that "the Alleged Agreement is a fiction."

**RESPONSE:**

Highland incorporates by reference and refers the Defendants to (a) the purported terms of the Alleged Agreement, (b) the purported purpose of the Alleged Agreement, (c) Mr. Dondero's prior sworn testimony in Adv. Pro. 21-03003; (d) documents identified on Docket Nos. 31 and 35, respectively, in Adv. Pro. 21-3004; (e) Mr. Dondero's Rule 26 disclosures in Adv. Pro. 21-03003; (f) the deposition testimony of PricewaterhouseCoopers and the exhibits marked during that deposition; (g) the lack of any documentation memorializing the terms of the Alleged Agreement, and (h) the lack of disclosure of the alleged "agreement" to the Bankruptcy Court .at any time prior to confirmation, including in connection with that objection to the Debtor's Plan.

**INTERROGATORY NO. 11:**

Provide the factual basis for your allegation in the Amended Complaints that "Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Highland contends that the evidence will prove that the Alleged Agreement is a fiction but if a court of competent jurisdiction finds otherwise, that the evidence will prove that Mr. Dondero entered into the Alleged Agreement when he knew that certain creditors, including the Redeemer Committee and Joshua Terry, were on the verge of obtaining substantial judgments against Highland and as he had at various times in the face of adverse litigation, sought to fraudulently transfer assets to limit (if not eliminate) judgment creditors' ability to collect.

**INTERROGATORY NO. 12:**

Identify the "value of the consideration received by the Debtor for the transfers," as that term is used in the Amended Complaint, and provide the basis for how that value was calculated.

**RESPONSE:**

Highland made the payments reflected in each Note in exchange for a promise by each maker that payment would be made on the terms set forth therein, including the payment of all principal and interest and all costs of collection, including attorneys' fees.

**INTERROGATORY NO. 13:**

Identify any portfolio companies that Debtor owns (wholly or partially).

**RESPONSE:**

Highland objects to Interrogatory No. 13 on the grounds that (a) "portfolio companies" is undefined, and (b) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case.

**INTERROGATORY NO. 14:**

Identify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies) owned (wholly or partially) by the Debtor, including, but not limited to, Trussway, MGM and Cornerstone, including the date of the sale, the buyer, and the amount paid.

**RESPONSE:**

Highland objects to Interrogatory No. 14 on the grounds that (a) "portfolio companies" is undefined, (b) the phrase "potential sale" is vague and ambiguous, (c) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case, and (d) "potential sales" are not a term of the Alleged Agreement and otherwise constitute proprietary and confidential information. Subject to the forgoing objections, Highland has not sold Trussway, MGM or Cornerstone as of this time.

Dated:  September 27, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
             ikharasch@pcszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
Email:      MHayward@HaywardFirm.com
             ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 4

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | Case No. 19-34054-sgj11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 21-03082 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |

**App. 302**

## <u>DECLARATION OF JAMES DONDERO</u>

I, James Dondero, hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      My name is James Dondero.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration.

**A.      Background.**

2.      I am currently a named Defendant in Adversary Proceedings No. 21-03003-sgj, 21-03005-sgj, 21-03006-sgj, and 21-03007-sgj, and am a fact witness in this particular Adversary Proceeding.  I have personal knowledge of the facts contained in this Declaration, and if called as a witness to testify, I could and would do so competently.

3.      I co-founded Highland Capital Management, L.P. ("HCM") in the year 1993, and have been working in the financial services industry ("Private Equity") for over thirty (30) years. I served as HCM's President and Chief Executive Officer until my resignation on January 9, 2020.

4.      Along with having served as CEO for HCM, I have also served as a high-level executive and controlling portfolio manager for NexPoint Advisors, L.P. ("NexPoint"), HCRE Partners, LLC ("HCRE"), Highland Capital Management Services, Inc. ("HCMS"), and the named Defendant in this particular Adversary Proceeding, Highland Capital Management Fund Advisors, L.P. ("HCMFA").  I have spent years of service to these companies as a chief executive, and am familiar with each company's internal management and operational structures and procedures.

CORE/3522697.0002/174810087.4

**App. 303**

**B.     The 2014 and 2016 Promissory Notes.**

**1.     HCM Issued One (1) Promissory Note to HCMFA in 2014.**

5.     On February 26, 2014, HCMFA borrowed money from HCM and entered into a promissory note with HCM in the amount of $4,000,000.00 (the "2014 Note").[1] The 2014 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 1.97%, to be calculated at a daily rate equal to 1/365th per annum.  On its original terms, the 2014 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**2.     HCM Issued One (1) Note to HCMFA in 2016.**

6.     On February 26, 2016, HCMFA borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,300,000.00 (the "2016 Note," and together with the 2014 Note, the "Notes").[2] The 2016 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.64%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the 2014 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that

---

[1] Pl. Appx. 05029-31.
[2] *Id.* at 05032-34.

2

were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**C.  Dugaboy, as the "Majority Interest" Approved Compensation.**

7.  HCM was formed as a limited partnership under the laws of the State of Delaware, and was governed by a Limited Partnership Agreement ("LPA").[3]  The LPA was entered into on December 24, 2015, between Strand Advisors, Inc. (the General Partner), and the following Class A Limited Partners:

>(1)  The Dugaboy Investment Trust ("Dugaboy"),
>
>(2)  The Mark and Pamela Okada Family Trust – Exempt Trust #1,
>
>(3)  The Mark and Pamela Okada Family Trust – Exempt Trust #2, and
>
>(4)  Mark Okada.[4]

8.  Pursuant to the LPA – specifically in Section 3.10(a) –HCM's "Majority Interest[-holder]" was entitled to approve the compensation of HCM's General Partner and any "Affiliate" of the General Partner.[5]  The LPA defines the Majority Interest as "the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[6]  The Dugaboy Family Trust ("Dugaboy") represented the Majority Interest of the Limited Partners, owning a 74.4426% interest of the Limited Partners Class A Interest.[7]

9.  My sister Nancy Dondero has served as the Dugaboy Family Trustee since her appointment in 2015.  Attached as "Exhibit A" is a copy of Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015, a record

---

[3] *Id.* at 00606-641.
[4] *Id.* at 00636-638.
[5] *Id.* at 00622.
[6] *Id.* at 00612.
[7] *Id.* at 00639.

**App. 305**

which was kept in the ordinary course of business and made by someone with knowledge of the appointment. Prior to Nancy Dondero's service, Grant Scott served as Dugaboy Family Trustee until October 12, 2015. Grant Scott's resignation letter is contained within Exhibit A. Prior to Grant Scott's service as Dugaboy Family Trustee, I personally served as Dugaboy Family Trustee until my resignation on August 26, 2015. Attached as "Exhibit B" is proof of my service as Family Trustee for the Dugaboy Family Trust and my subsequent resignation prior to Grant Scott's appointment, a record which was kept in the ordinary course of business and made by someone with knowledge of the document.

**D.** **Dugaboy Agreed That HCM Would Not Collect on the Notes Upon Fulfillment of Conditions Subsequent, Making the Notes Potentially Deferred Compensation.**

10. Based on my years of experience in working in private equity, I am familiar with the compensation structure of similarly situated private equity firms. Based on this experience, I am also very familiar with the compensation structure of similarly situated executives.

11. At HCM, as at other comparable firms, it was common practice to compensate executives with forgivable loans. My compensation was no exception to this practice. In fact, I was undercompensated in my position compared to similarly-situated contemporaries in my field. I know that several other individuals may have received loans by HCM that were forgiven. These individuals include Michiel Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery and this was also a common practice and another company in which I have an interest, NexBank Capital, Inc.

12. Regarding the loan forgiven to Michiel Hurley, Hurley founded and was an executive employee of Incline Capital, LLC ("Incline"), which was the advisor for a 1940 Act Mutual Fund (the "Fund"). In May of 2011, Incline agreed to transfer its advisory contract for the Fund to HCMFA and stay on to sub-advise the Fund for HCMFA. Incline was ultimately advanced

4

funds from HCMFA as an advance on fees that I believed would be earned by Incline in the future. In 2013, I – on behalf of HCMFA – agreed to forgive this debt that was owed by Incline to HCMFA. At that time, the debt owed to HCMFA by Incline was approximately $435,000. This debt was forgiven with the intent to benefit Hurley personally for the value of the services he provided through Incline.

13.     At either the end of 2014 or the beginning of 2015, I – acting on behalf of Dugaboy for HCM and also on behalf of HCMFA – entered into an agreement (the "2014 Agreement") that HCM would not collect on the 2014 Note if certain events occurred. Specifically, if one of three portfolio companies – either MGM, Cornerstone, or Trussway – were sold for above cost, or sold in a circumstance outside of my control, HCM agreed that the 2014 Note would be forgiven. The Agreement assured HCM that the monetization of these portfolio companies would have my utmost focus and attention, and served as an incentive for me to work particularly hard to make sure these assets were successful. Further, this agreement provided the additional benefit to HCM of not increasing my base salary, which I normally would have requested and obtained. However, reaching this agreement made my compensation conditional on performance, and ensured that HCM would not immediately realize a change in its financial position through an increase in my salary, something I had the right to increase.

14.     I understand that Plaintiff takes issue with the fact that I recently remembered that I was actually the Dugaboy Trustee when the 2014 Agreement was made, characterizing my recollection as some kind of last-second surprise revelation. I simply did not think about the exact time frame during which I was the Dugaboy Trustee until around the time of my deposition on May 5, 2022 – about seven years after the 2014 Agreement was made.

15.     At either the end of 2016 or the beginning of 2017, Nancy Dondero – on behalf of HCM because she was the Dugaboy Trustee at that time – and myself on behalf of HCMFA, entered into another agreement that was identical to the 2014 Agreement, and applied to the 2016 Note (the "2016 Agreement," and together with the 2014 Agreement, the "Agreements"). The 2016 Agreement provided the same benefits to the HCM as the 2014 Agreement. I described the 2014 Agreement to Nancy when we discussed the 2016 Agreement.

16.     In my years of experience in this industry, and experience working with financial auditors, although the Agreements were not disclosed to the financial auditors at HCM, such a disclosure was not necessary since it would not be considered material. When compared to the considerable size of HCM's assets, the Agreements regarding such small obligations would have a *de minimus* impact when viewed in light of such large assets. Therefore, the Agreements were non-material and did not require disclosure. Once HCMFA was aware that an event triggering forgiveness had occurred, in March of 2022, the HCMFA financials were modified to note the sale of MGM to Amazon, its impact, and the dispute with Plaintiff-Debtor over the forgiveness.

**E.     The Agreements Were Never Kept Secret.**

17.     Prior to the commencement of any Adversary Proceedings concerning the Notes, I mentioned to Frank Waterhouse that there were mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate. This came up in the context of discussing what we called the "Pot Plan" discussion for resolving the bankruptcy. I did not discuss every detail of the Agreements, because the important point was that he was made aware that the Notes should be considered as part of my compensation in connection with a resolution of the bankruptcy. By that time there was a great likelihood that some or all of the portfolio companies would be able to be sold for far more that their acquisition price.

18.     Further, opposing counsel was alerted on February 1, 2021 that one of the defenses in this litigation was that the Notes were subject to forgiveness as potential compensation.  In a letter from my one of my attorneys– to opposing counsel at Pachulski Stang Ziehl & Jones, LLP, the late retired Bankruptcy Judge Lynn, my lead counsel, made that disclosure.  A true and correct copy of this letter is attached to this Declaration as "Exhibit C."

19.     Finally, I filed Proof of Claim #188 on May 26, 2020 – well before this or any other Adversary Proceeding regarding promissory notes was initiated – that provided in "Schedule A" notice to the world that the Notes at issue in this and the other adversary proceedings concerning notes were potentially forgivable as compensation to me.   Schedule A is attached to this Declaration as "Exhibit D."  While POC #188 was eventually withdrawn, I understand that it and Schedule A remains to this day publicly available to the Plaintiff-Debtor, the Court, and really, to anyone.

**E.     The Agreements Were Made in Good Faith.**

20.     The Agreements made between myself and Dugaboy were all entered into in good faith.  At no point in time were any of these Agreements made with the intent to hinder or defraud HCM as payee.  Dugaboy had the right to approve my compensation under the LPA, and it was exercising that right when it agreed to make the Notes forgivable as compensation, provided that I performed successfully as a HCM executive and made sure that the illiquid portfolio company assets were sold for at-or-above cost.

**F.     HCM Waived Any Rights to Collect on the Notes When Dugaboy Made the Agreements.**

21.     When the Agreements were made, HCM waived any rights it had to demand repayment of the demand Notes until it became impossible for the condition subsequent to be met.  However, I still intended to make periodic interest payments because I understood that until

forgiveness actually occurred, the notes were still bona fide notes. Also, making periodic payments kept the Notes from becoming unreasonably large in the event the conditions for forgiveness did not come to pass. In addition, I was always watchful that HCM had the funds it needed for its operations and obligations. Therefore, even when it was not necessary for payments to be made, I would cause payments to be made on the Notes for HCM's benefit.

**G. Sale of Shares of MGM.**

22. I understand that Plaintiff raises in its Motion one or more issues concerning sales of Plaintiff's interests in MGM. Initially, a small portion of HCM's interest in MGM was sold in November or 2019. I understand that Plaintiff complains that I did not declare the Notes forgiven after this small sale was made. However, this sale of a small portion of Plaintiff's interest in MGM would not have implicated the Agreements because it was for a *de minimis* amount of MGM stock and was only necessitated as a result of the UCC not being willing to cooperate in a transaction as part of the bankruptcy process that was agreed to by all of the other participants.

23. Later, in March of 2022, the MGM was sold to Amazon, monetizing the entirety of HCM's interest in MGM. As opposed to the previous 2019 sale of HCM's interest in MGM, as noted above, I considered this sale in 2022 to trigger forgiveness of the Notes. The forgiveness of the Notes is reflected on HCMFA's April 2022 vs. March 2022 balance sheet, attached to my Declaration as "Exhibit E." In fact, the balance sheet contains a footnote relating to the alleged amount owed to HCM – the value of the Notes – reading "[a]s of 3/17/2022, the 2/26/2014 and 2/26/2016 notes were discharged due to a portfolio company sale, however, due to active litigation with HCMLP, the note(s) are still reflected on the balance sheet." I considered this to be an acknowledgment by HCMFA that a triggering event had occurred – the sale of MGM – and that the Notes should now be considered forgiven.

## H.     The LPA Did Not Prohibit the Agreements.

24.     I understand that Plaintiff also argues that the LPA prohibits deferred compensation agreements like the Agreements at issue here.  Specifically, I understand Plaintiff argues that the Agreements were not authorized under the LPA because (1) Dugaboy was not authorized to "execute" the Agreements, (2) the Agreements were not in writing, and (3) the Agreements were not objectively fair.[8]

25.     I understand that Plaintiff cites to LPA Articles 3.10(a), 6.2, and 4.1(e)(ii) for its argument.  However, I have never understood § 3.10(a) to prohibit the Majority Interest from executing any compensation agreements it makes.  Further, § 6.2 of the LPA only requires that "[a]ny notice, demand, request, or report required or permitted to be given or made to a Partner under this [LPA] shall be in writing. . ."[9]  I have never understood § 6.2 to require any compensation agreements like the Agreements at issue to be in writing, as they are not "notice[s], demand[s], request[s], or report[s]" as contemplated by the LPA.  Also, Plaintiff cites to § 4.1(e)(ii) to support its fairness argument, but the LPA only requires "[a]ny service rendered for the Partnership. . . shall be on terms that are fair and reasonable for the Partnership."[10]  However, as discussed previously in this Declaration, I understand that the Agreements were fair and reasonable to HCM, because they were given in lieu of additional cash compensation and since the three portfolio companies received my utmost attention and efforts to maximize their performance.  According to my understanding of the LPA, it in no way prohibits the Agreements.

---

[8] Amended Complaint, ¶ 89.
[9] Pl. Ex. 30, 4th LPA, § 6.2, Pl. Appx. 00633.
[10] Pl. Ex. 30, 4th LPA, § 4.1(e)(ii), Pl. Appx. 00625.

## I. Any Prepayments Were Made for HCM's Benefit.

26.     Even though neither the 2014 or the 2016 Notes required payment to be made before demand, I occasionally caused prepayments to be made on the Notes throughout the years whenever HCM needed liquidity. I made these voluntary prepayments to aid HCM so that HCM's liquidity could be maintained.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is

true and correct.

Dated: June ___, 2022

JAMES DONDERO

# Exhibit A

**THE DUGABOY INVESTMENT TRUST**
**James D. Dondero, Primary Beneficiary**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

    I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

    Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

    This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

**THE DUGABOY INVESTMENT TRUST**
**Grant James Scott, Family Trustee**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:     The Dugaboy Investment Trust

Dear Ms. Breault,

I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

### RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          10/12/2015
Family Trustee                                          Date

STATE OF TEXAS              §
COUNTY OF DALLAS           §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

_____
Notary Public's Signature

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]                                       Expiration: January 15, 2019

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

_Nancy Marie Dondero_
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS       §

COUNTY OF DALLAS       §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

_Micaela Sue Allen_
Notary Public's Signature

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Expiration: _January 15, 2019_

**App. 317**

### ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

# Exhibit B

TRUST AGREEMENT

Between

DANA SCOTT BREAULT,
Settlor

and

JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees

THE DUGABOY INVESTMENT TRUST

WINSTEAD PC
DALLAS, TEXAS

# THE DUGABOY INVESTMENT TRUST

## TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS .................................................................................................1
   1.1    Settlor..............................................................................................................1
   1.2    Jim...................................................................................................................1
   1.3    Trustees ..........................................................................................................1
   1.4    Children..........................................................................................................1
   1.5    Descendants ...................................................................................................1
   1.6    Code ...............................................................................................................1
   1.7    Per Stirpes .....................................................................................................1

ARTICLE II FUNDING .......................................................................................................2

ARTICLE III DISTRIBUTION OF PRINCIPAL AND INCOME ......................................2
   3.1    Trust for Jim...................................................................................................2
   3.2    Trust for Child................................................................................................5
   3.3    Trusts for Descendants...................................................................................6
   3.4    Contingent Distribution .................................................................................9
   3.5    General Power of Appointment for Certain Beneficiaries.............................9
   3.6    Postponement of Distribution ......................................................................10

ARTICLE IV PROVISIONS AFFECTING DISTRIBUTION ...........................................10
   4.1    Withdrawal Right..........................................................................................10
   4.2    Restriction Upon Alienation ........................................................................12
   4.3    Distributions Constitute Separate Property..................................................12
   4.4    Method of Payment......................................................................................12
   4.5    Evidence of Need.........................................................................................12
   4.6    Termination of Small Trust..........................................................................12
   4.7    Generation-Skipping Transfer Taxes and Payment .....................................13

ARTICLE V THE TRUSTEE ..............................................................................................13
   5.1    Resignation of Trustee .................................................................................13
   5.2    Appointment and Succession of Trustees.....................................................14
   5.3    Removal of Trustee......................................................................................16
   5.4    Succession of Corporate Trustee .................................................................16
   5.5    Trustee's Fees...............................................................................................16
   5.6    Bond.............................................................................................................16
   5.7    Liability of Trustee. .....................................................................................16
   5.8    Predecessor Fiduciary ..................................................................................18
   5.9    Periodic Accounting.....................................................................................18
   5.10   Beneficiary under Disability .......................................................................19
   5.11   Incapacity of Individual Trustee .................................................................19

ARTICLE VI TRUST ADMINISTRATION .......................................................................19

App. 321

TABLE OF CONTENTS
(Continued)

PAGE

6.1    General Powers .................................................................................................19
6.2    Division of Powers............................................................................................24
6.3    Merger of Trusts ..............................................................................................25
6.4    Certain Powers and Rights Limited .................................................................25
6.5    GST Inclusion Ratio .........................................................................................25
6.6    Out-of-State Properties ....................................................................................25
6.7    Management of Real Property ..........................................................................26
6.8    No Court Supervision .......................................................................................26
6.9    Division of Trusts .............................................................................................26
6.10   Limitation of Powers.........................................................................................26
6.11   Dealing with Fiduciaries...................................................................................27

ARTICLE VII  IRREVOCABILITY.............................................................................27

ARTICLE VIII  MISCELLANEOUS PROVISIONS.....................................................28
8.1    Applicable Law .................................................................................................28
8.2    Perpetuities Provision ......................................................................................28
8.3    Gestation ..........................................................................................................28
8.4    Survivorship......................................................................................................29
8.5    Release of Powers and Interests......................................................................29
8.6    Powers of Appointment. ...................................................................................29
8.7    Liability of Third Party ......................................................................................30
8.8    Use of Words ....................................................................................................30
8.9    Unenforceable Provision...................................................................................30
8.10   Titles, Headings, and Captions ........................................................................30
8.11   Counterpart Signatures.....................................................................................30
8.12   Trust Name........................................................................................................30

**App. 322**

THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this ____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

ARTICLE I

DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1    Settlor. "Settlor" means DANA SCOTT BREAULT.

1.2    Jim. "Jim" means JAMES D. DONDERO.

1.3    Trustees. The initial Trustee of each trust created hereunder is JAMES D. DONDERO. "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number. "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c). "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a). The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4    Children. "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5    Descendants. "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6    Code. "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7    Per Stirpes. "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant. The per

stirpital allocation shall commence with the most senior generation that has a living representative.

<div align="center">

ARTICLE II

FUNDING

</div>

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

<div align="center">

ARTICLE III

DISTRIBUTION OF PRINCIPAL AND INCOME

</div>

3.1    Trust for Jim. The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)    Distributions to Jim. The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health. Undistributed income shall be accumulated and added to principal. In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)    Jim is the primary beneficiary of the trust.

(ii)    The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)    Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)    Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)    Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)    Distributions by Independent Trustee. The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable. It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

<div align="center">-2-</div>

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)    Inter Vivos Special Power of Appointment.  During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate.  Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations.   Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)    Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition.   Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)    If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

**App. 325**

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii) The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e) <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i) <u>Pursuant to General Testamentary Power of Appointment</u>. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii) <u>Special Testamentary Power of Appointment</u>. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii) <u>Alternative Disposition</u>. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1) If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

-4-

(2)     If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2     Trust for Child. All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a)     Distributions to Child. The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The Child's standard of living at the creation of the trust.

(ii)     The Child is the primary beneficiary of the trust.

(iii)     The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv)     Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v)     Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b)     Distributions to Child's Descendants. The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The primary purpose of the trust.

(ii)     The respective needs of each Descendant.

(iii)     The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv)     Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

(v)     Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others.  Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     <u>Inter Vivos Special Power of Appointment</u>.  The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement.  Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d)     <u>Termination</u>.  If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it.  However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate.  The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof.  If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, <u>Per Stirpes</u>.  If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms.  If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3     <u>Trusts for Descendants</u>.  The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

-6-

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

    (a)    <u>Distributions</u>. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

        (i)    The Beneficiary's standard of living at the creation of the trust.

        (ii)    The Beneficiary is the primary beneficiary of the trust.

        (iii)    The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

        (iv)    Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

        (v)    Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

    (b)    <u>Distributions to Beneficiary's Descendants</u>. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

        (i)    The primary purpose of the trust.

        (ii)    The respective needs of each Descendant.

        (iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

        (iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

        (v)    Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)     Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

-8-

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4   Contingent Distribution. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5   General Power of Appointment for Certain Beneficiaries.

(a)   Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees shall make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b)   If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

App. 331

(c)     The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6     _Postponement of Distribution._     Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property.  At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate.  During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education.  If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

ARTICLE IV

PROVISIONS AFFECTING DISTRIBUTION

4.1     _Withdrawal Right._  Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer.  A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust.   If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes.   Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a)     _Amount That May Be Withdrawn._  When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i)     the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii)     the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

(iii)     the value of the contribution that is subject to the withdrawal right.

(b)     <u>Withdrawal Period and Notice</u>. Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right. Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right. During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf. If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse. For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate. The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

(c)     <u>Payment of Withdrawal Amount</u>. If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor. Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust. Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose. Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

(d)     <u>Distributions During Withdrawal Period</u>. If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

(e)     <u>Lapse of Withdrawal Right</u>. In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

4.2 <u>Restriction Upon Alienation</u>. No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it. Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts. The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process. The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3 <u>Distributions Constitute Separate Property</u>. Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary. Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary. Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4 <u>Method of Payment</u>. The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways: directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability. In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto. The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5 <u>Evidence of Need</u>. In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs. The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6 <u>Termination of Small Trust</u>. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration. In the event of termination, the Trustee shall distribute the trust to the income

**App. 334**

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7     Generation-Skipping Transfer Taxes and Payment. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1     Resignation of Trustee. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

5.2 <u>Appointment and Succession of Trustees.</u>

    (a)    <u>Generally</u>.

        (i)    <u>Family Trustee</u>. Jim is the initial Family Trustee of all trusts created hereunder. If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising. If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee. If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee. If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)    <u>Independent Trustee</u>. GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee. If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code. If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee. If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)    <u>Administrative Trustee</u>. COMMONWEALTH TRUST COMPANY is the initial Administrative Trustee. If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising. If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising. If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above. The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b)     Successor Trustee.  If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c)     Manner of Appointment; Permissible Trustees.  Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

-15-

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3    Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4    Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5    Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6    Bond. The Trustee shall not be required to furnish bond or other security.

5.7    Liability of Trustee.

(a)    Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)    Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8    Predecessor Fiduciary. No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9    Periodic Accounting. The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10     Beneficiary under Disability.  A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11     Incapacity of Individual Trustee.  In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

ARTICLE VI

TRUST ADMINISTRATION

6.1     General Powers.    Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)     Retain Property.  To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)     Invest.  To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)     Sell.  By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper.  To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d)    Lease.  To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e)    Real Estate.  To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f)    Borrow.  To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g)    Loans.  To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h)    Conserve Estate.  To take any action to conserve the trust estate.

(i)    Litigation.  To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j)    Claims.  To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k)    Abandon Property.  To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l)    Documents.  To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m)    Agents.  To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

**App. 342**

(n)     Securities.     To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o)     Nominee. To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p)     Additional Property. To receive additional property from any source and add it to the trust estate.

(q)     Insurance. To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r)     Business Powers.

(i)     In General. To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii)     Closely Held Businesses. This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1)     Exoneration from Liability. It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2)     Management Powers. The Family Trustee shall have the exclusive duty to deal with and manage the business. In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A)     To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

(B)    To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)    To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)    To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)    To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)    To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)    To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or a fiduciary of this Trust; and

(3)    Exclusion from Powers.    Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)    Income and Principal. To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)    Tax Elections. To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others. The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

(u) <u>Reliance</u>. To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution. The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v) <u>Commingling</u>. To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w) <u>Division and Distribution</u>. To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x) <u>Withholding of Distribution</u>. To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y) <u>Mineral Powers</u>. To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z) <u>Environmental Hazards</u>. To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

**App. 345**

(aa) <u>Miscellaneous Powers</u>. Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2 <u>Division of Powers</u>. The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a) <u>Administrative Trustee</u>. The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i) To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii) To maintain storage of tangible personalty and evidence of intangible trust property.

(iii) To maintain trust records.

(iv) To maintain an office for Trustee meetings and other trust business.

(v) To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi) To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii) To execute documents with respect to trust account transactions.

(viii) To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b) <u>Independent Trustee</u>. The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement. These powers may only be exercised by the Independent Trustee.

(c) <u>Family Trustee</u>. The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee. Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate. If there is no Family Trustee serving,

-24-

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3    Merger of Trusts. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4    Certain Powers and Rights Limited. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5    GST Inclusion Ratio. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6    Out-of-State Properties. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

-25-

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7     Management of Real Property. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8     No Court Supervision. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9     Division of Trusts. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

    (a)     Division and Funding of Separate Trusts. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

    (b)     Administration of Separate Trusts. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

    (c)     Powers of Appointment. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10     Limitation of Powers. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

-26-

(a)     Support Duty. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b)     Adequacy of Consideration. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c)     Insurance. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d)     Borrow. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e)     Substitute Property. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f)     Vote. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11   Dealing with Fiduciaries. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

## ARTICLE VII

## IRREVOCABILITY

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1    Applicable Law. The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware. However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state. No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust. Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2    Perpetuities Provision. The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law. If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property. If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement. Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3    Gestation. A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

8.4 _Survivorship._ Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5 _Release of Powers and Interests._ Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law. Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6 _Powers of Appointment._

(a) _Capacity in Which Exercisable._ Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b) _Manner of Appointment._ Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others. Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c) _Exercise of Inter Vivos Power._ An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it. If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d) _Determination of the Exercise of a Testamentary Power._ The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised. If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

(e)    Tax Consequences.  The exercise of a power of appointment may have important tax consequences.  The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7    Liability of Third Party.  No person paying money or delivering property to the Trustee need see to the application of such money or property.  No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8    Use of Words.  As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9    Unenforceable Provision.  If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10    Titles, Headings, and Captions.  All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11    Counterpart Signatures.  This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12    Trust Name.  The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals.  The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement.  The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

_Dana Scott Breault_ 23 Oct 10

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS      §
                        §
COUNTY OF DALLAS   §

     BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this _23rd_ day of October, 2010.

Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

_____

JAMES D. DONDERO, Family Trustee

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____

Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

-32-

**App. 354**

COMMONWEALTH TRUST COMPANY,
Administrative Trustee

By: _Cynthia D M Brown_

Name: Cynthia D. M. Brown

Title: President

STATE OF DELAWARE §

§

COUNTY OF NEW CASTLE §

BEFORE ME, the undersigned authority on this day personally appeared
Cynthia D. M. Brown , President , known to me to be the person and officer
whose name is subscribed to the foregoing instrument and acknowledged to me that he/she
executed the same for the purposes and consideration therein expressed as the act of
COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 15th day of ~~October~~ November LMB, 2010.

_Laura M Owens_
Notary Public

5480300v.6 47609/1

-33-

## THE DUGABOY INVESTMENT TRUST
### James D. Dondero, Family Trustee

August 26, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

   Re: The Dugaboy Investment Trust

Dear Ms. Breault,

  I, James D. Dondero, am writing to inform you that on August 26, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "Trust") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

  Pursuant to the attached Resignation of Family Trustee, I appoint Grant James Scott as the successor Family Trustee of the Trust.

  This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

  Very truly yours,

James D. Dondero

### RESIGNATION OF FAMILY TRUSTEE

I, **JAMES D. DONDERO**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

I appoint **GRANT JAMES SCOTT** as the successor Family Trustee. This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein Grant James Scott accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____
Family Trustee

_____8.26.15_____
Date

STATE OF TEXAS    §
COUNTY OF DALLAS   §

Before me, a notary public, on this day personally appeared **JAMES D. DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.

_____
Notary Public's Signature

**MICAELA SUE ALLEN**
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Expiration: _1-15-2019_

**App. 357**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this _26th_ day of August, 2015.

_____
GRANT JAMES SCOTT
**Family Trustee**

STATE OF T~~EXAS~~ _NC_ §
COUNTY OF D~~ALLAS~~ §
_WAKE_

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.

[SEAL]

_____
Notary Public's Signature

MY COMMISSION EXPIRES MAY 17, 2018
Expiration:_____

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee was delivered to and received by me on August 26 2015.

James D. Dondero

# Exhibit C

# BONDS ELLIS EPPICH SCHAFER JONES LLP
## ATTORNEYS & COUNSELORS

D. MICHAEL LYNN | D: 817.405.6915 | MICHAEL.LYNN@BONDSELLIS.COM

February 1, 2021

***Via Email and First Class Mail:***
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

**Re:** **Highland Capital Management, L.P.: notes receivable from Dondero et al.**

Dear Jeff:

The Debtor recently commenced suit to collect on certain notes payable to it executed by Mr. Dondero and certain of his affiliates. As you are aware, in addition to other defenses, Mr. Dondero views the notes in question as having been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.

Please ensure that any transferee of any of the notes is made aware of Mr. Dondero's position and that the Independent Board receives copies of this letter. I thank you in advance for your cooperation in this matter.

Sincerely,

D. Michael Lynn

Cc:  Jim Dondero
John Bonds
Douglas Draper
Davor Rukavina
Lee Hogewood
John Kane
Jason Rudd
Lauren Drawhorn

App. 361

Confidential

DEFENDANTS-0000435

# Exhibit D

Claim #188 Date Filed: 5/26/2020

Fill in this information to identify the case:

Debtor    Highland Capital Management, L.P.

United States Bankruptcy Court for the:   Northern     District of   Texas
                                                                   (State)

Case number   19-34054

## Official Form 410
# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

James D. Dondero

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| James D. Dondero<br>c/o D. Michael Lynn<br>420 Throckmorton St., Suite 1000<br>Fort Worth, TX 76102 | James D. Dondero<br>300 Crescent Court, Ste. 700<br>Dallas, TX 75201 |
| Contact phone   8174056900 | Contact phone _____ |
| Contact email   michael.lynn@bondsellis.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
                                                            MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

App. 363

1934054200526000000000017

Confidential                                                         HCMFA (21-03082)-0002881

**Part 2:**   Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No |
| | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?**   $ <u>See attached Exhibit "A"</u> . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See attached Exhibit "A"</u>

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____
Amount of the claim that is secured: $_____
Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**App. 364**



Confidential

1934054200526000000000017
HCMFA (21-03082)-0002882

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

**Part 3:** Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    05/26/2020
           MM / DD / YYYY

/s/James D. Dondero
Signature

**Print the name of the person who is completing and signing this claim:**

Name    James D. Dondero
      First name      Middle name      Last name

Title    _____

Company    _____
      Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    _____

Contact phone    _____     Email    _____

---

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| James D. Dondero | Yes, supporting documentation successfully uploaded |
| c/o D. Michael Lynn | **Related Document Statement:** |
| 420 Throckmorton St., Suite 1000 | |
| | **Has Related Claim:** |
| Fort Worth, TX, 76102 | No |
| **Phone:** | **Related Claim Filed By:** |
| 8174056900 | |
| **Phone 2:** | **Filing Party:** |
| **Fax:** | Creditor |
| **Email:** | |
| michael.lynn@bondsellis.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| James D. Dondero | |
| 300 Crescent Court, Ste. 700 | |
| Dallas, TX, 75201 | |
| **Phone:** | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:**    **Uniform Claim Identifier:** |
| See attached Exhibit "A" | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See attached Exhibit "A" | No |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | **Arrearage Amount:** |
| **Based on Lease:** | |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| | |
|---|---|
| **Submitted By:** | |
| James D. Dondero on 26-May-2020 5:17:16 p.m. Eastern Time | |
| **Title:** | |
| **Company:** | |

## Exhibit A

This claim is a contingent claim asserted by James Dondero and is subject to any effort to collect on certain notes (the "Notes") identified on Schedule "A" hereto. In the event that collection efforts are made to collect the Notes, James Dondero asserts that the Notes were issued by him for funds advanced in lieu of compensation.

### Schedule A (as of March 31, 2020)

| Entity | Amount | Note |
|---|---|---|
| NexPoint Advisors | $23,034,644.034 | 30 yr Amort (issued 2017) |
| Dugaboy | $18,286,268.159 | 30 yr Amort (issued 2017) |
| Highland Capital Management Fund Advisors | $10,458,219.887 | Demand |
| James Dondero | $8,834,769.71 | Demand |
| Highland Capital Management Services | $6,572,061 | 30 yr Amort (issued 2017) |
| HCRE | $5,671,419 | 30 yr Amort (issued 2017) |
| HCRE | $4,521,267 | Demand |
| Highland Capital Management Services | $927,177 | Demand |

**App. 367**

HCMFA (21-03082)-0002885

# Exhibit E

**Highland Capital Management Fund Advisors, LP**
**Balance Sheet**
**April 2022 vs. March 2022**
**(in thousands)**

|  | April 2022 | | March 2022 | | Increase/ (Decrease) $ | | Increase/ (Decrease) % |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash and cash equivalents | $ | 4,967 | $ | 3,996 | $ 971 | | 24% |
| Management and admin fee receivable | | 1,663 | | 1,686 | (23) | | (1%) |
| Investment in Highland Capital Funds Distributor, Inc. | | 4,991 | | 4,240 | 751 | | 18% |
| Prepaids | | 901 | | 836 | 66 | | 8% |
| Reimbursable expenses | | 2,920 | | 2,920 | - | | NM |
| Investment management contracts | | 4,275 | | 4,275 | - | | NM |
| Other assets | | 29 | | 30 | (1) | | (4%) |
| **Total assets** | $ | 19,746 | $ | 17,982 | $ 1,764 | | 10% |
| | | | | | | | |
| **Liabilities and partners' capital** | | | | | | | |
| Due to Highland Capital Management, L.P.[2] | | 10,894 | | 10,894 | - | | NM |
| Due to affiliates | | 11,353 | | 9,219 | 2,134 | | 23% |
| Accrued compensation | | 1,953 | | 1,870 | 83 | | 4% |
| Accounts payable[1] | | 1,425 | | 1,609 | (184) | | (11%) |
| Accrued expenses and other liabilities | | 521 | | 825 | (303) | | (37%) |
| Partners' capital/(deficit) | | (6,400) | | (6,434) | 34 | | (1%) |
| **Total liabilities and partners' capital** | $ | 19,746 | $ | 17,982 | $ 1,764 | | 10% |

[1] A large portion of this balance, ≈70%, is currently in legal dispute.

[2] As of 3/17/2022, the 2/26/2014 and 2/26/2016 notes were discharged due to a portfolio company sale, however, due to active litigation with HCMLP, the note(s) are still reflected on the balance sheet.

**App. 369**

HCMFA (21-03082)-0002886

# EXHIBIT 5

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Case No. 19-34054-sgj11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Adversary No. 21-03082** |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |
| | § | |

## <u>DECLARATION OF NANCY M. DONDERO</u>

I, Nancy Marie Dondero, declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the following is true and correct:

1.      I reside in Vero Beach, Florida and am over the age of 21. The following facts are

based on my personal knowledge and are all true and correct.  I am willing and able to testify about

these matters if and when called upon to do so.

2.      I have successfully owned and operated my own private investigation services business for over 30 years. I also have an undergraduate college degree from Pennsylvania State University, which included the study of basic business operations and management.

3.      I am also the Family Trustee of The Dugaboy Investment Trust ("Dugaboy"), and I have held that position since October 2015.  A true and correct copy of the document appointing me as Family Trustee is attached to this Declaration as "Exhibit A."  At the times that the notes discussed below were entered into, Dugaboy owned and represented a majority of the Class A shareholders in Highland Capital Management, L.P. ("HCM").  Jim Dondero is my brother and was, at that time, the President and CEO of HCM.  I understood that he was one of the founders of HCM and, through The Dugaboy Investment Trust, a majority interest holder.

4.      In late 2016 or early 2017, Jim Dondero told me about his current and previous annual salaries at HCM and explained that he was substantially underpaid as compared to other senior executives in the financial services industry.  He told me that his annual salary from HCM had been around $500,000 to $700,000 during the preceding several years. I had no reason to doubt the accuracy of what he told me about his compensation from HCM or how that compared unfavorably to the compensation of others in similar positions with other companies in the industry.

5.      I understand that, on February 26, 2016, Highland Capital Management Fund Advisors, L.P. ("HCMFA") borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,300,000.00 (the "2016 Note").  I also understand that the 2016 Note was payable on demand by HCM, and was made between related companies.

6.       Jim Dondero also advised me that he and certain of his affiliated companies had, on several occasions, borrowed money from HCM and had issued demand and term promissory

notes in favor of HCM regarding those loans. He proposed that HCM enter into an agreement with him to forgive the 2016 Note upon the occurrence of certain conditions subsequent, as a form of additional contingent compensation to him.

7. In either December of 2016 or January of 2017, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause HCM to enter into an agreement with HCMFA that provided that the repayment obligation on the 2016 Note would be forgiven if HCM sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control (the "2016 Agreement"). I fully understood the implications and terms of the 2016 Agreement. At the time we made the 2016 Agreement, Jim told me about the substantially the same agreement Dugaboy made with respect to the 2014 Note.

8. At the time I caused HCM to enter into the 2016 Agreement, I knew that HCM was a hedge and private equity fund and that its general partner was Strand Advisors, Inc. I also knew that HCM owned an interest in each of Cornerstone, MGM, and Trussway, the portfolio companies whose sale could trigger the forgiveness at issue in the 2016 Agreement. I also knew that HCM's business included buying and selling portfolio companies at a profit. I also knew and believed that Jim Dondero would be the person most involved in, and responsible for, the marketing and eventual sale of Cornerstone, MGM, and Trussway by HCM. I also knew and believed that executives in the financial services industry tend to be paid more when the companies they work for perform better.

9. The 2016 Agreement had two primary purposes, both of which I understood would benefit HCM's performance and reputation. First, the 2016 Agreement would provide additional incentive and motivation to Jim Dondero to attempt to maximize the value and return to HCM on

Trussway, Cornerstone, and MGM, and to remain in HCM's employment. Second, the 2016 Agreement would allow HCM to make part of Jim's compensation contingent on performance, instead of paying him additional cash in 2016 or 2017, which he could have sought.

10. At the time I caused HCM to enter into the 2016 Agreement, I did not know every detail about every aspect of HCM's business or the 2016 Note. However, I did have all of the facts and information I considered necessary, appropriate, and reasonable for my decision (solely in my capacity as Dugaboy's Family Trustee) to cause HCM to enter into the 2016 Agreement. I do not believe that HCM, Dugaboy, or I were deceived or mislead in any manner by Jim Dondero or anyone else regarding the 2016 Note or the 2016 Agreement.

11. At the time I caused HCM to enter into the 2016 Agreement, I appreciated the effect of what I was doing and I understood the nature and consequences of those acts. I was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment.

12. At the time I caused HCM to enter into the 2016 Agreement, I believed I had the authority, as the Dugaboy Family Trustee, to cause Dugaboy to cause HCM to enter into the 2016 Agreement. I also intended, believed, and expected that the 2016 Agreement would be a binding and enforceable agreement between HCM and Jim Dondero.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2022.

Nancy M. Dondero

# Exhibit A

**THE DUGABOY INVESTMENT TRUST**
**James D. Dondero, Primary Beneficiary**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

    I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

    Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

    This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

## THE DUGABOY INVESTMENT TRUST
### Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:     The Dugaboy Investment Trust

Dear Ms. Breault,

I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

## RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          10/12/2015
Family Trustee                     Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]                     Expiration: January 15, 2019

**App. 378**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this $\underline{13^{th}}$ day of October, 2015.

<div align="right">

*Nancy Marie Dondero*
**NANCY MARIE DONDERO**
**Family Trustee**

</div>

STATE OF TEXAS      §

COUNTY OF DALLAS      §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

*[signature]*

Notary Public's Signature

[SEAL]

> **MICAELA SUE ALLEN**
> Notary Public, State of Texas
> My Commission Expires
> **January 15, 2019**

Expiration: *January 15, 2019*

### ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

# EXHIBIT 6

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Case No. 19-34054-sgj11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 21-03082** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF MICHIEL HURLEY

I, Michiel Hurley, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I reside in Dallas, Texas and am over the age of 21. The following facts are based on my personal knowledge and are all true and correct. I am willing and able to testify about these matters if and when called upon to do so.

**DECLARATION OF MICHIEL HURLEY – Page 1**
CORE/3522697.0002/175382153.2

**App. 382**

2.      I am currently the Chief Market Strategist at NexPoint Advisors, L.P.

3.      I previously founded and worked at Incline Capital, LLC ("Incline"), a company that was the advisor for a 1940 Act Mutual Fund (the "Fund").

4.      In May of 2011, Incline entered into an agreement that would transfer the advisory contract for the Fund to Highland Capital Management Fund Advisors, L.P. ("HCMFA") and agreed to stay on and sub-advise the Fund.

5.      As part of this relationship, Incline and HCMFA had a fee sharing arrangement, which is usual and customary in relationships such as these. Due to a loss of assets under management ("AUM") in the Fund, the level of fee income generated was materially less than when Incline and HCMFA initially entered into the agreement.

6.      When this unexpectedly occurred, Incline was advanced funds from HCMFA as an advance on fees that we believed would be earned in the future. It was both parties' expectation that these advances would eventually be paid back by Incline once the Fund regained its AUM.

7.      In 2013, Jim Dondero, on behalf of HCMFA, agreed to forgive this debt, which was owed by Incline to HCMFA. At that time, approximately $435,000 was owed to HCMFA and forgiven. Because I was the founder and owner of Incline and because it was a pass-through entity for tax purposes, I may have been personally responsible for this debt. Therefore, the forgiveness of this debt benefitted me individually.

8.      I believe this was done in recognition of the value of my services and was a fair and generous gesture.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 29, 2022.

_____
Michiel Hurley

**DECLARATION OF MICHIEL HURLEY – Page 2**
CORE/3522697.0002/175382153.2

**App. 383**

# EXHIBIT 7

CORE/9990000.7726/157590134.1

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adversary No. 21-03082** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1.      I am a member of the law firm of Stinson LLP, counsel to Defendant Highland Capital Management Fund Advisors, L.P., and I submit this Declaration in support of the *Defendant's Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Summary*

1

**App. 385**

*Judgment*, which is being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and the documents listed below.

2.      Attached as **Exhibit A** is a true and correct copy of the Transcript of the Remote Deposition of James D. Dondero taken on May 5, 2022 in Adv. Proc. No. 21-03082.

3.      Attached as **Exhibit B** is a true and correct copy of the Transcript of the Remote Deposition of Nancy Dondero taken on April 29, 2022 in Adv. Proc. No. 21-03082.

Dated: July 1, 2022                              */s/Michael P. Aigen*
                                                 Michael P. Aigen

2

**App. 386**

# Exhibit A

Page 1

1

2             IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
3                       DALLAS DIVISION

4   IN RE:                      )
                                ) CHAPTER 11
5   HIGHLAND CAPITAL            )
    MANAGEMENT, LP,             ) CASE NO.
6                               ) 19-34054-SGJ11
            Debtor.             )
7   _____)

8   HIGHLAND CAPITAL            )
    MANAGEMENT, LP,             )
9                               ) Adversary Proceeding
            Plaintiff,          ) No. 21-03082-SGJ
10                              )
    v.                          )
11                              )
    HIGHLAND CAPITAL MANAGEMENT )
12  FUND ADVISORS, LP,          )
                                )
13          Defendant.          )
    _____)

14

15  REMOTE VIDEO-RECORDED FRCP 30(b)(6) DEPOSITION OF

16    HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP

17              BY AND THROUGH ITS DESIGNEE

18                  JAMES D. DONDERO

19               THURSDAY, MAY 5, 2022

20

21

22  REPORTED BY:

23  MICHAEL E. MILLER, FAPR, RDR, CRR, NOTARY PUBLIC

24  JOB NO. 209977

25

Page 2

```
1
2
3
4              Thursday, May 5, 2022
5                 10:15 a.m.  CDT
6
7
8    REMOTE ORAL VIDEO-RECORDED FRCP 30(b)(6)
9    DEPOSITION OF HIGHLAND CAPITAL MANAGEMENT FUND
10   ADVISORS, LP, BY AND THROUGH ITS DESIGNEE,
11   JAMES D. DONDERO, held via Zoom conference
12   pursuant to the Federal Rules of Civil Procedure
13   before Michael E. Miller, Fellow of the Academy
14   of Professional Reporters, Registered Diplomate
15   Reporter, Certified Realtime Reporter and Notary
16   Public in and for the State of Texas.
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2    REMOTE APPEARANCES:
3      Pachulski Stang Ziehl & Jones
4      Attorneys for Highland Capital Management, LP
5      780 Third Avenue
6      New York, NY 10017
7      BY:   John Morris, Esq.
8            Hayley Winograd, Esq.
9
10     Stinson
11     Attorneys for Highland Capital Management
12     Fund Advisors, LP and the Witness
13     3102 Oak Lawn Avenue
14     Dallas, TX 75219
15     BY:   Deborah Deitsch-Perez, Esq. (With Witness)
16           Michael Aigen, Esq.
17
18   ALSO PRESENT:
19     La Asia Canty, Paralegal
20     Pachulski Stang Ziehl & Jones LLP
21
22   VIDEOGRAPHER:
23     Brent Jordan, TSG Reporting Inc.
24
25
```

Page 4

```
1
2               ------------
3            P R O C E E D I N G S
4            May 5, 2022, 10:15 a.m. CDT
5               ------------
6        THE VIDEOGRAPHER:  Good morning,
7    counselors.  My name is Brent Jordan.  I'm the
8    certified legal videographer in association with
9    TSG Reporting Inc.
10            Due to the severity of the COVID-19
11   and following the practice of social distancing,
12   I will not be in the same room with the witness.
13   Instead, I will record this videotaped deposition
14   remotely.  The reporter, Mike Miller, also will
15   not be in the same room and will swear the
16   witness remotely.
17            Do all parties stipulate to the
18   validity of this video recording and remote
19   swearing and that it will be admissible in the
20   courtroom as if it had been taken following
21   Rule 30 of the Federal Rules of Civil Procedures
22   and the state's rules where this case is pending?
23        MR. MORRIS:  John Morris, Pachulski
24   Stang Ziehl & Jones, on behalf of Highland
25   Capital Management LP, consents.
```

Page 5

```
1
2        MS. DEITSCH-PEREZ:  Deborah
3    Deitsch-Perez from Stinson, on behalf of HCMFA
4    and the witness, consent.
5        THE VIDEOGRAPHER:  Thank you.  This
6    is the start of Media No. 1, the videotaped
7    deposition of Highland Capital Management Fund
8    Advisors LP 30(b)(6) witness, James Dondero,
9    taken In re Highland Capital Management LP, filed
10   in the United States Bankruptcy Court for the
11   Northern District of Texas, Dallas Division, Case
12   No. 19-34054-sgj11.
13            This deposition is taken on May 5th,
14   2022 at approximately 10:17 a.m.  My name is
15   Brent Jordan.  I'm the legal video specialist
16   from TSG Reporting Inc., headquartered at 228
17   East 45th Street, New York, New York.
18            The court reporter is Mike Miller, in
19   association with TSG Reporting.
20            Will counsel please introduce
21   yourselves for the record.
22        MR. MORRIS:  John Morris, Pachulski
23   Stang Ziehl & Jones for Highland Capital
24   Management LP.  I'm joined by my colleagues
25   Hayley Winograd and La Asia Canty.
```

Page 6

HCMFA - J. DONDERO

1    HCMFA - J. DONDERO
2        MS. DEITSCH-PEREZ:  Deborah
3    Deitsch-Perez from Stinson.  I'm here with my
4    partner, Mike Aigen, for HCMFA and the witness.
5        THE VIDEOGRAPHER:  Will the court
6    reporter please swear in the witness.
7            ------------
8        JAMES D. DONDERO,
9        having been duly sworn,
10        testified as follows:
11            ------------
12            EXAMINATION
13            ------------
14    BY MR. MORRIS:
15        Q.  Good morning, Mr. Dondero.
16        A.  Good morning.
17        Q.  Can you hear me?
18        A.  Yes.
19        Q.  Do you understand that you're here
20    today in both your individual capacity and in
21    your capacity as the 30(b)(6) witness for HCMFA?
22        A.  Yes.
23        Q.  Are you aware that your counsel and
24    my firm have reached an agreement that will allow
25    us to use the transcript from the main notes

Page 7

HCMFA - J. DONDERO

1    litigation in connection with this particular
2    litigation?
3        A.  Yes.
4        MS. DEITSCH-PEREZ:  And that means
5    that it should make the deposition shorter
6    because Mr. Morris will not need to reask you the
7    questions he asked you before and -- and we'll
8    proceed accordingly.
9        MR. MORRIS:  Are you done?
10        MS. DEITSCH-PEREZ:  Yes.
11        MR. MORRIS:  Okay.
12    BY MR. MORRIS:
13        Q.  Can we put up Exhibit 1, please.
14    Exhibit 1, Mr. Dondero, is the Rule 30(b)(6)
15    notice.
16        (HCMFA/Dondero Deposition Exhibit 1
17    marked.)
18        THE WITNESS:  Yeah, on my screen
19    there's "This meeting is being recorded."  Do I
20    have to delete this or --
21        (Technical comments off the
22    stenographic record.)
23        THE WITNESS:  Okay.
24        ///
25

Page 8

HCMFA - J. DONDERO

1    HCMFA - J. DONDERO
2    BY MR. MORRIS:
3        Q.  All right.  As always, Mr. Dondero,
4    if there's something in the document that you
5    think you need to review in order to have a full
6    understanding of what I'm asking, will you let me
7    know that?
8        A.  Sure.
9        Q.  Have you seen the Rule 30(b)(6)
10    deposition notice before?
11        A.  Not that I recall.
12        Q.  Why don't we just --
13        MS. DEITSCH-PEREZ:  Why don't you
14    scroll through to the topics, Jim.
15        MR. MORRIS:  Are you done?
16        MS. DEITSCH-PEREZ:  Yes, thank you.
17        MR. MORRIS:  Okay.  Can you scroll
18    down, La Asia, to the topics?
19    BY MR. MORRIS:
20        Q.  Looking at the tapes now,
21    Mr. Dondero, and I'm going to ask Ms. Canty to
22    just very slowly scroll down, my only question to
23    you is whether you're familiar with the topics
24    that are listed on this document.  And if you
25    need --

Page 9

HCMFA - J. DONDERO

1    HCMFA - J. DONDERO
2        A.  Yes.
3        Q.  -- us to stop at any point, just say
4    no -- just say so.
5        A.  Yes, I'm familiar with the topics.
6        Q.  Okay.  Did you do anything to prepare
7    for today's deposition?
8        A.  I met with my lawyer for about half
9    an hour yesterday.
10        Q.  Did you review any documents?
11        A.  No.
12        Q.  Have you ever reviewed any documents
13    in connection with this particular litigation?
14    And this litigation, I'm referring to the
15    litigation that HCMLP has brought against HCMFA
16    for the two notes, one of which was dated 2014
17    and the second was dated 2016.
18        Have you ever seen any documents in
19    connection with this --
20        MS. DEITSCH-PEREZ:  I'm going to
21    object on the grounds of privilege, and so
22    exclude from your answer any review you've done
23    with or at the direction of counsel.
24        A.  No.
25        ///

HCMFA - J. DONDERO

1             HCMFA - J. DONDERO
2  BY MR. MORRIS:
3      Q.  Did you ever review any documents
4  with counsel?  Just yes or no.
5      A.  I guess I don't recall -- I don't
6  recall prior.
7      Q.  Okay.  Is there a person who's
8  responsible for maintaining HCMFA's books and
9  records?
10     A.  (Audio malfunction.)
11         (Clarification requested by the
12  stenographer.)
13     A.  Highland Capital.
14  BY MR. MORRIS:
15     Q.  Okay.  I appreciate that,
16  Mr. Dondero.  Let me rephrase the question.
17         Since March 1st, 2021, has HCMFA
18  maintained books and records?
19     A.  Yes.
20     Q.  And can you tell me who at HCMFA is
21  responsible for maintaining the books and
22  records?
23     A.  I think HCMFA has its books and
24  records done by Skyview.
25     Q.  Okay.  And do you know whether those

1             HCMFA - J. DONDERO
2  books and records include financial statements?
3      A.  I believe so.
4      Q.  Okay.  And in connection with the
5  preparation of today's deposition, did you speak
6  with anybody at Skyview concerning the financial
7  statements as they relate to the notes at issue?
8      A.  No.
9      Q.  Do you recall ever discussing with
10  anybody at Skyview at any time the books and
11  records as they relate to the notes at issue in
12  this lawsuit?
13     A.  No.
14     Q.  Okay.  Other than your counsel, have
15  you spoken with anybody at any time in connection
16  with your preparation for today's deposition?
17     A.  No.
18     Q.  Have you ever spoken with Nancy
19  Dondero about the claims that HCMLP has brought
20  in this particular lawsuit?
21     A.  Just generally.
22     Q.  And what do you recall about your
23  conversations with Nancy about the claims that
24  HCMLP has made in this lawsuit?
25     A.  Again, I can't remember specifically.

1             HCMFA - J. DONDERO
2  Generally, it just would have been that they were
3  disputing the forgiveness based on performance,
4  and they were not -- not acknowledging the
5  overall compensation program.
6      Q.  And do you recall when this
7  conversation took place?
8      A.  It's more than once, more than once
9  from -- I guess the first time we thought it was
10  an issue in the bankruptcy -- we didn't think it
11  was going to be an issue in the bankruptcy
12  initially.
13     Q.  Was anybody else present for this
14  conversation?
15     A.  I don't believe so.
16     Q.  Do you recall if it took place in
17  person or on the phone or in some other medium?
18     A.  I don't recall.
19     Q.  Did you have any conversations with
20  Nancy after the time this action was commenced
21  about the claims that are being asserted by
22  HCMLP?
23     A.  Not -- not that I recall, but if you
24  have any specific requests, let me know -- or any
25  specific questions, let me know.

1             HCMFA - J. DONDERO
2      Q.  I'm just asking you if you recall.
3  If you don't, that's fine.
4          Are you aware that she's been deposed
5  in connection with this lawsuit?
6      A.  Yes.
7      Q.  And have you obtained a copy of her
8  transcript?
9      A.  No, I have not.
10     Q.  Have you -- has the substance of her
11  testimony -- withdrawn.
12         Are you aware of the substance of her
13  testimony?
14     A.  No.
15     Q.  So you don't know what it is she
16  testified to; do I have that right?
17     A.  Not -- not specifically.  I haven't
18  seen the transcripts and we didn't discuss it.
19     Q.  Okay.  Do you have any general
20  understanding as to what she testified to?
21     A.  I believe the process by which the
22  notes would be forgiven.
23     Q.  Do you have any other information as
24  to the substance of Ms. Dondero's testimony in
25  this case?

Page 14

HCMFA - J. DONDERO

1                 HCMFA - J. DONDERO
2       A.  Not specifically.
3       Q.  Do you have it generally?
4       A.  I just gave it.
5       Q.  Okay.  We did reach the stipulation
6   that we referred to earlier about the use of the
7   prior transcripts.
8           As you sit here now, are you aware of
9   anything in any of your prior testimony in
10  this -- in the notes litigation that you believe
11  was either incomplete or inaccurate?
12      A.  You know, I believe there's been some
13  changes to the deposition transcripts.  I don't
14  know if I reviewed them all or reviewed them all
15  timely, and I don't know if there will be more,
16  but there have been some.
17      Q.  I appreciate that.
18          I'm just asking you:  As you sit here
19  right now and taking into account the declaration
20  that you submitted in opposition to summary
21  judgment, is there anything in the transcripts
22  that you're aware of that is inaccurate or needs
23  to be corrected that wasn't addressed in your
24  declaration?
25      MS. DEITSCH-PEREZ:  Or the errata.

Page 15

1                 HCMFA - J. DONDERO
2       MR. MORRIS:  Or the errata.  That's
3   fair.
4       A.  Not that I can think of at this
5   moment.
6   BY MR. MORRIS:
7       Q.  Okay.  Is there -- I did receive from
8   Mr. Aigen just prior to the deposition some
9   objections, and he's reserved his rights --
10  Highland will reserve its rights to contest the
11  objections.
12          But subject to the objections that
13  your counsel has tendered, are you prepared to
14  answer questions on the topics that were
15  identified in Exhibit 1?
16      A.  I believe so.  I'll do the best I
17  can.
18      Q.  Okay.  Let's put up Exhibit 2, which
19  is the first of the two notes.
20      (HCMFA/Dondero Deposition Exhibit 2
21  marked.)
22  BY MR. MORRIS:
23      Q.  I just have a series of questions on
24  each of the two notes that are at issue.  And
25  this is the first one, and if we could just

Page 16

1                 HCMFA - J. DONDERO
2   scroll down.  It's pretty short.
3           Have you seen this document before,
4   sir?
5       A.  Yes.
6       Q.  And is that your signature?
7       A.  Yes.
8       Q.  And do you know whether you signed
9   this document?  If we can scroll back to the
10  top -- did you sign this document on or about
11  February 26th, 2014?
12      A.  Yes.
13      Q.  And do you see that the very first
14  line defines the maker as Highland Capital
15  Management Fund Advisors LP?
16      A.  Yes.
17      Q.  When we go to the signature block, if
18  we can scroll down, do you see that in the
19  signature block your name and signature appear
20  under the word "Maker"?
21      A.  Yes.
22      Q.  Did you intend to sign this note in
23  your personal individual capacity as the maker of
24  this note?
25      A.  No, that's not what it says.

Page 17

1                 HCMFA - J. DONDERO
2       Q.  And is it your -- I just want you to
3   confirm, if you can, that your intent when you
4   signed this note was to sign it on behalf of
5   HCMFA as the maker; is that correct?
6       A.  Yes.
7       Q.  Okay.  To the best of your knowledge,
8   you never intended to have any personal liability
9   for this note, even though your name and
10  signature appear under the word "Maker," correct?
11      A.  Yes.
12      Q.  Does -- does HCMFA admit and
13  acknowledge that on or about February 26th, 2014
14  Highland loaned it the principal amount of
15  $4 million in exchange for this promissory note?
16      A.  Can you repeat that question, please.
17      Q.  Sure.
18          Does HCMFA admit and acknowledge that
19  on or about February 26th, 2014 Highland loaned
20  HCMFA the principal amount of $4 million in
21  exchange for this promissory note?
22      A.  I believe so.
23      Q.  Okay.  Do you know why HCMFA borrowed
24  $4 million from Highland at this time?
25      A.  I do not specifically.

Page 18

HCMFA - J. DONDERO

1    Q.  Do you recall that the money was
2  borrowed to enable HCMFA to pay bonuses at the
3  end of the fiscal year 2014?
4    A.  It could be, but I don't recall.
5    Q.  If someone testified that the loan
6  was made to enable HCMFA to pay bonuses on
7  February 28th, 2014, would HCMFA have any reason
8  to dispute that?
9    A.  It could be, but I -- it could be,
10  again, but I don't know.
11    Q.  Okay.  Do you know who drafted this
12  note?
13    A.  Would have been accounting at
14  Highland.
15    Q.  Do you know if this note was the
16  subject of any negotiation between Highland and
17  HCMFA?
18    A.  I don't know.
19    Q.  You mentioned that you thought it
20  would have been someone in accounting.
21    What's the basis for your belief that
22  someone in accounting would have prepared this
23  note?
24    A.  There was -- I believe there was a
25

Page 19

HCMFA - J. DONDERO

1  template that accounting used on almost all the
2  notes, and this looks like that template.
3    Q.  Okay.  Do you recall whether you
4  personally -- and I mentioned at the beginning,
5  or if I didn't, I'll mention it now:  All of my
6  questions are in your capacity as the 30(b)(6)
7  representative of HCMFA, unless I specifically
8  ask you otherwise; is that fair?
9    A.  Okay.
10    Q.  Okay.  Did you personally -- so this
11  one is in your individual capacity.
12    Did you personally ask someone to
13  cause Highland to loan HCMFA $4 million in
14  February 2014?
15    A.  Not that I recall.
16    Q.  Do you know who authorized this loan?
17    A.  I don't know.
18    Q.  All right.  Is it fair to say that
19  because you signed the note on behalf of HCMFA
20  that you were aware of and approved of HCMFA's
21  borrowing as reflected in this note?
22    A.  Yes.
23    Q.  Did you read the note before you
24  signed it?
25

Page 20

HCMFA - J. DONDERO

1    A.  No.
2    Q.  Did you obtain any legal advice
3  before you signed it?
4    A.  No.
5    Q.  Did you seek any legal advice before
6  you signed it?
7    A.  No.
8    Q.  Is there anything in the note that
9  you don't understand today?  And we can scroll
10  through it, if that's helpful.
11    MR. MORRIS:  In fact, please do, and
12  make sure that Mr. Dondero can see the whole
13  note.
14    (Document review.)
15    A.  I understand that generally.
16  BY MR. MORRIS:
17    Q.  Okay.  Is there anything that
18  HCMFA -- now I'm switching back to the 30(b)(6)
19  topics.
20    Is there anything in this note that
21  HCMFA contends today is ambiguous?
22    A.  I don't know.
23    Q.  Okay.  All right.  Now, I'm just
24  going to -- sorry to burden you, but I just have

Page 21

HCMFA - J. DONDERO

1  to ask the same questions with respect to the
2  second note.
3    MR. MORRIS:  If we can put the second
4  note on the screen, please.
5    (HCMFA/Dondero Deposition Exhibit 3
6  marked.)
7  BY MR. MORRIS:
8    Q.  And you can see, Mr. Dondero, that
9  this is a second note marked as Exhibit 2 [sic].
10  It's in the original principal amount of
11  $2.3 million and it's dated February 26th, 2016.
12    Do you see that?
13    A.  Yes.
14    Q.  If we can scroll down to the bottom
15  of this document, is that your signature?
16    A.  I don't know.  It is or somebody
17  signed for me.
18    Q.  Does HCMFA contend that this note is
19  not enforceable because it doesn't bear your
20  signature or a signature that was placed on this
21  document by somebody you specifically authorized?
22    A.  I don't -- I don't know.  I don't
23  believe so.
24    Q.  Okay.  You're familiar with HCMFA's
25

HCMFA - J. DONDERO

1    affirmative defenses in this case, right?
2        A.  Generally.
3        Q.  Okay.  And you're not aware of any
4    affirmative defense that suggests that the note
5    is unenforceable because it bears a signature of
6    yours that you didn't authorize; is that fair?
7        A.  I'm not aware.
8        Q.  Okay.  So let's go back to the top of
9    the document, and you'll see that this is also --
10   the maker is again defined as HCMFA.
11       Do you see that in the first line?
12       A.  Yep.
13       Q.  Is it HCMFA's -- withdrawn.
14       Does HCMFA acknowledge that it's the
15   maker on this particular note?
16       A.  Yes.
17       Q.  And you're not personally liable
18   under this note, are you, just because your name
19   appears under the word "Maker"?
20       If we can scroll down.
21       A.  Correct.
22       Q.  You intended to sign this note in
23   your capacity as an authorized representative of
24   HCMFA -- withdrawn.

HCMFA - J. DONDERO

1        HCMFA intended that your -- that your
2    signature would bind HCMFA to the obligations
3    under this note, correct?
4        A.  Yes.
5        Q.  And if we can go back to the top,
6    HCMFA acknowledges that on or about
7    February 26th, 2016, Highland transferred
8    $2.3 million to HCMFA in exchange for this note,
9    correct?
10       A.  Yes.
11       Q.  Do you know why HCMFA borrowed
12   $2.3 million from Highland on or around
13   February 26th, 2016?
14       A.  No.
15       Q.  Do you recall that the money was
16   loaned by Highland to HCMFA to enable HCMFA to
17   pay bonuses at the end of February 2016?
18       A.  Could be.  I don't have specific
19   knowledge.  Bonuses or operating expenses,
20   something in that regard, would have been
21   logical.
22       Q.  Okay.  Do you know who drafted this
23   particular note?
24       A.  Again, accounting, I believe.

HCMFA - J. DONDERO

1        Q.  And your basis for that is your
2    understanding that accounting had a template that
3    it used on the intercompany notes, demand notes;
4    do I have that right?
5        A.  Yes.
6        Q.  Was this particular note the subject
7    of any negotiations?
8        A.  Not that I recall.
9        Q.  Did you read this particular note
10   before you signed it?
11       A.  No.
12       Q.  Did you obtain any legal advice
13   before you signed it?
14       A.  No.
15       Q.  Did you seek any legal advice before
16   you signed it?
17       A.  No.
18       Q.  Is there anything about this note
19   that you don't -- you personally, Jim Dondero,
20   don't understand today?
21       A.  Not off the top of my head.
22       Q.  As HCMFA's 30(b)(6) witness, are you
23   aware of anything in this note today that HCMFA
24   contends is ambiguous?

HCMFA - J. DONDERO

1        And again, let's please scroll down.
2        (Document review.)
3        A.  Reading this line by line, Section 7
4    is I think largely referring to usury and
5    interest limitations, but it kind of, I think,
6    hints that there could be additional agreements
7    or other agreements going forward.
8    BY MR. MORRIS:
9        Q.  Okay.  Anything else?
10       A.  Not off the top of my head.
11       Q.  Okay.  I want to shift gears to
12   communications with HCMFA's outside auditors,
13   which are Topics 4(e) and (f), and I appreciate
14   the fact that this topic was covered with respect
15   to other notes, and I'm going to try to just ask
16   a few questions into these notes.
17       The two notes that we just looked at
18   I'm going to collectively refer to as "the
19   notes"; is that fair?
20       A.  Sure.
21       Q.  And just to complete the record, from
22   at least 2014 until at least 2018,
23   PricewaterhouseCoopers served as HCMFA's outside
24   auditors, correct?

Page 26

HCMFA - J. DONDERO

1
2    A.   Yes.
3    Q.   And you're a certified public
4  accountant, correct?
5    A.   Yes.
6    Q.   And to the best of your recollection,
7  you signed management representation letters on
8  behalf of HCMFA in connection with
9  PricewaterhouseCoopers' annual audits, correct?
10   A.   Yes.
11   Q.   Okay.  And as part the audit process,
12 HCMFA provided the notes to PwC, correct?
13   A.   Yes.
14   Q.   And you were aware that the notes
15 were recorded as liabilities on HCMFA's audited
16 financial statements, correct?
17   A.   Yes.
18   Q.   Are they still carried on HCMFA's
19 financial statement -- withdrawn.
20        Are the notes carried as liabilities
21 on HCMFA's balance sheet today?
22   A.   I don't know.
23   Q.   Are you aware of the notes ever being
24 removed from the liability section of HCMFA's
25 balance sheet?

Page 27

HCMFA - J. DONDERO

1
2    A.   I don't know.
3    Q.   Do you recall ever having -- and this
4  is in your individual capacity.
5        Do you recall ever participating in
6  any discussion at any time with anybody about
7  whether the notes should be carried as
8  liabilities on HCMFA's balance sheet?
9    A.   Not that I recall.
10   Q.   Okay.  And now in your capacity as
11 HCMFA's 30(b)(6) witness, are you aware of any
12 change in the treatment of the notes as
13 liabilities on HCMFA's balance sheet?
14   A.   I'm not aware.
15   Q.   Is it fair to say that from the time
16 they were executed until at least the
17 commencement of this litigation, HCMFA carried
18 the notes as liabilities without discount of any
19 kind?
20   A.   I don't know.
21   Q.   You're not aware of any discount that
22 was ever applied to the value of the notes, at
23 least as it concerns HCMFA's balance sheet; is
24 that fair?
25   A.   I'm not aware of a discount.  I'm not

Page 28

HCMFA - J. DONDERO

1
2  aware if they've been forgiven on the financials.
3  I don't know how the accountants have handled
4  that.
5    Q.   Okay.  Does HCMFA contend that its
6  audited financial statements for any year from
7  2014 to 2018 were inaccurate in any way with
8  respect to the notes?
9    A.   Not that I'm aware of.
10   Q.   Okay.  Let's shift gears now to
11 the -- we can go to the next exhibit, which I
12 think we've marked as Exhibit 4, which is HCMFA's
13 answer.
14        (HCMFA/Dondero Deposition Exhibit 4
15 marked.)
16 BY MR. MORRIS:
17   Q.   This covers, I think, Topics 1, 2 and
18 3 on the deposition notice, subject to HCMFA's
19 objections.
20        Have you ever seen HCMFA's answer in
21 this case before, Mr. Dondero?
22   A.   Probably.  I just don't remember this
23 specifically, but refresh me, please.
24   Q.   Okay.  Well, let's scroll down
25 slowly.  It's not a terribly long document.  And

Page 29

HCMFA - J. DONDERO

1
2  stop when you get to paragraph 41.
3        (Document review.)
4        MR. MORRIS:  Okay.  Just stop there.
5 BY MR. MORRIS:
6    Q.   Having seen -- having scrolled
7  through at least the portion of the answer prior
8  to the affirmative defenses, are you aware of
9  anything that is inaccurate in any way in HCMFA's
10 answer?
11        MS. DEITSCH-PEREZ:  Object to the
12 form.
13   A.   I -- not specifically.
14 BY MR. MORRIS:
15   Q.   Okay.  Was there somebody at HCMFA
16 who was responsible for reviewing this answer
17 before it was filed by HCMFA's lawyers?
18   A.   Let me read it here for a second.
19   Q.   Yeah.  Take your time.  And again, if
20 there's some other portion of the document that
21 you want to read, just let La Asia know.
22        (Document review.)
23        THE WITNESS:  Can you scroll a little
24 bit to the next page, please.
25        (Document review.)

Page 30

HCMFA - J. DONDERO

1
2     A.   Okay.  I understand this paragraph.
3  What was the question, again?
4  BY MR. MORRIS:
5     Q.   Is there somebody at HCMFA --
6  withdrawn.
7          So you're aware that the Stinson firm
8  served and filed this answer on behalf of HCMFA,
9  correct?
10    A.   Yes.
11    Q.   Was there somebody other than counsel
12  who reviewed this document to make sure it was
13  accurate and complete before it was served and
14  filed?
15    A.   I mean, I know I did.  I don't know
16  if anybody else at HCMFA did.
17    Q.   Okay.  So you personally reviewed
18  this document to make sure it was complete and
19  accurate before the Stinson firm served and filed
20  the document; is that correct?
21    A.   Well, particularly this paragraph,
22  yes.
23    Q.   Okay.  And did you personally
24  authorize the Stinson firm to file this document
25  when they did?

Page 31

HCMFA - J. DONDERO

1
2     A.   Yes.
3     Q.   Okay.  And as you sit here right
4  now -- again, happy to let you look at the
5  document if you think you need to -- but as
6  HCMFA's 30(b)(6) witness, are you aware of
7  anything that is incomplete or inaccurate in this
8  answer?
9     A.   Can you scroll down further --
10    Q.   Sure.
11    A.   -- like to the next page?  Is that
12  the end of it?  Okay.  Can you go back up,
13  please.  Now go back up a little bit further,
14  please.  I just want to see if...
15         Okay.  Go back to paragraph 41,
16  please, and we'll just sit there.
17         The -- there was a period of time
18  when I was a trustee, there was a period of
19  time -- I think it was only a couple of months --
20  where Grant Scott was the trustee preceding when
21  my sister was the trustee, so the -- I don't know
22  if that's a clarification worth noting, but I
23  think I was the trustee around the 2014 note, and
24  I think my sister was the trustee around the 2016
25  note.

Page 32

HCMFA - J. DONDERO

1
2     Q.   All right.  Let's just -- I
3  appreciate that, and let's just take them one at
4  a time.
5          Do you believe this paragraph 41 is
6  true and accurate as it relates solely to the
7  2016 note?
8     A.   I think it's true and accurate
9  regarding all the notes, so...
10    Q.   Well, did Nancy -- is it your
11  testimony that -- withdrawn.
12         MR. MORRIS:  I'm going to move to
13  strike and just ask you, because I really want to
14  try and get this done quickly.
15  BY MR. MORRIS:
16    Q.   Is paragraph 41 true and accurate
17  with respect to the 2016 note at issue in this
18  lawsuit?
19         Did Nancy Dondero enter into the
20  agreement that's described in this paragraph with
21  respect to the 2016 note?
22    A.   Yes.
23    Q.   Did Nancy Dondero enter into the
24  agreement as a representative for a majority of
25  the Class A shareholders of plaintiff with

Page 33

HCMFA - J. DONDERO

1
2  respect to the 2014 note?
3     A.   I don't believe she was the trustee
4  then, so...
5     Q.   Okay.  So is it fair to say that
6  paragraph 41 is not accurate to the extent that
7  it states or suggests that Nancy Dondero entered
8  into the agreement with respect to the 2014 note?
9     A.   I don't want to specifically commit
10  to that.  Let Nancy's testimony, whatever it is,
11  be the recollection there.
12         I can't recall the 2014 note being
13  prior to the 2016 discussion or not or if -- this
14  2014 was a small note; so was 2016 for that
15  matter.  I can't -- I can't remember if she would
16  have been involved in the '14 or if it was just
17  me as trustee around the '14 note or the '14 note
18  was part of the 2016 conversation.  Let her --
19  let her testimony stand for that, please.
20    Q.   Okay.  Her testimony will stand for
21  whatever it is it stands for, but I'm just asking
22  you:  Do you know -- and I'm asking you now in
23  your individual capacity.
24         Do you know which individuals entered
25  into any agreement relating to the 2014 note?

Page 34

HCMFA - J. DONDERO

1  Can you identify the individuals?

2     A.  It would have been me as the trustee
3  at that point in time, and potentially Nancy as
4  trustee in 2016 could have adjusted the '14 note.
5  I just can't remember specifically the
6  conversations back then, and she may have a
7  better recollection.

8     Q.  All right.  I'm going to represent to
9  you -- and if the representation is wrong, I hope
10  I'm corrected.

11     I'm going to represent to you that
12  Nancy testified that she entered into the
13  agreement described in paragraph 41 with respect
14  to the 2016 note but not with respect to the 2014
15  note.  And assuming that that --

16     MS. DEITSCH-PEREZ:  John -- John, you
17  haven't completely reflected her testimony.  She
18  also said she talked with Jim about the 2014 note
19  when she talked to him about the 2016.

20     MR. MORRIS:  That's right.

21     MS. DEITSCH-PEREZ:  Are we agreed on
22  that?

23     MR. MORRIS:  We are.  We are.  And
24  we're also agreed that she testified that she

Page 35

HCMFA - J. DONDERO

1  didn't enter into an agreement with respect to
2  the 2014 note, but that Jim told her about it.
3  Is that fair?

4     MS. DEITSCH-PEREZ:  That's fair.
5  Mr. Morris is more or less correctly reflecting
6  Nancy's testimony.

7     THE WITNESS:  Okay.

8  BY MR. MORRIS:

9     Q.  So with that, you know, general
10  common understanding -- her testimony at the end
11  of the day will speak for itself -- my only
12  question for you, Mr. Dondero, is whether you can
13  identify the individuals or the individual who
14  entered into any agreement that concerns the 2014
15  note.

16     MS. DEITSCH-PEREZ:  Asked and
17  answered.

18     A.  Myself as trustee at that point in
19  time -- and I heard what you said about Nancy's
20  testimony, but, you know, some of the
21  conversation in 2016 may have appropriately
22  covered the '14 note also, but...

23  BY MR. MORRIS:

24     Q.  Did you enter into the agreement with

Page 36

HCMFA - J. DONDERO

1  respect to the 2014 note both in your capacity as
2  the president of Highland and simultaneously in
3  your capacity as the trustee of The Dugaboy
4  Trust?

5     A.  Yes.

6     Q.  Thank you.  I appreciate that.

7     Other than what we've talked about,
8  is there anything in paragraph 41 -- withdrawn.

9     And were the terms of the agreement
10  that you entered into in that dual capacity --
11  were they the same terms that are set forth in
12  paragraph 41, or were they different in any way?

13     MS. DEITSCH-PEREZ:  Object to the
14  form.

15     A.  I'm sorry.  I read it again.  Can you
16  repeat that question, please.

17  BY MR. MORRIS:

18     Q.  Sure.  It's just whether the terms of
19  the agreement that you entered into with respect
20  to the 2014 note were the same as the terms of
21  the agreement that you entered into with Nancy
22  once she became the Dugaboy trustee.

23     A.  Yes.  I mean, essentially yes.

24     Q.  Okay.  And I appreciate the word

Page 37

HCMFA - J. DONDERO

1  "essentially," and I'll just ask you if there's
2  any difference at all between the terms of the
3  agreement that you entered into with respect to
4  the 2014 note than the terms of the agreement
5  that you entered into with Nancy concerning the
6  2016 note.

7     A.  Not that I recall at this time.

8     Q.  Okay.  Can we go to paragraph 42,
9  please.

10     I think we addressed paragraph 42.
11  Do you have anything further to add as to HCMFA's
12  defense that the notes were ambiguous, anything
13  to what you've already testified to?

14     A.  Yes, I think I said this in my last
15  deposition, but these notes were structured not
16  to be senior secured, not to be guaranteed, not
17  to be amortizing, not to be what you would do
18  with a third party.  They were meant to be soft
19  notes that could and would and likely be
20  forgiven.

21     They were bona fide in terms of their
22  terms, but they were purposely, you know, not
23  filed, not perfected, not notarized, and subject
24  to change and prepayment, et cetera, over time.

Page 38

HCMFA - J. DONDERO

1
2     In the way that they were operated,
3 they were meant to be loose and flexible notes,
4 and that's what they are.
5     MR. MORRIS: Okay. I move to strike,
6 and I'm just going to ask you to -- and if we
7 need to go back to the notes, I'm happy to do
8 that.
9 BY MR. MORRIS:
10    Q. I'm focused on paragraph 42 and the
11 question of ambiguity. Is there anything about
12 the notes that HCMFA contends is ambiguous?
13    MS. DEITSCH-PEREZ: Asked and
14 answered.
15    A. I think I answered that. And I'd
16 like my answer to stand because it specifically
17 addressed your open-ended question, was there
18 anything else. And that is the "anything else."
19 BY MR. MORRIS:
20    Q. But it's anything else with respect
21 to ambiguity. Did you understand that?
22    A. Yes, and those are the ambiguity in
23 its construct, the ambiguity in what it has and
24 what it doesn't have compared to the more
25 industry standard arm's-length note. And my

Page 39

HCMFA - J. DONDERO

1
2 answer was fair and correct.
3     MR. MORRIS: Okay. I move to strike
4 that as well. And the judge will do what she
5 does.
6 BY MR. MORRIS:
7     Q. Mr. Dondero, was it your intent when
8 you signed the notes that they would be bona fide
9 notes?
10    A. They have to be -- they have to
11 hit -- they have to be bona fide and hit minimal
12 terms in terms of construct to be bona fide for
13 financial and for tax purposes, and they were
14 bona fide for those purposes.
15    Q. Okay. Thank you very much.
16    So let's go to paragraph 43, please,
17 and if you could just read that first sentence to
18 yourself. And let me know when you've done that.
19    (Document review.)
20    A. Yes, I've read it.
21 BY MR. MORRIS:
22    Q. Can HCMFA identify any documents or
23 information that it contends is relevant to the
24 notes that Highland has not produced in
25 discovery?

Page 40

HCMFA - J. DONDERO

1
2     A. I'm not aware of anything Highland
3 has produced. I haven't seen HCMFA financials.
4 We've never gotten 2015's. We've never been
5 allowed to have an examiner in here. We've never
6 even got Highland financials on a current basis.
7 We've never gotten asset reviews. We've never --
8 as far as I know, we've gotten nothing, so...
9     Q. So it's your testimony that you've
10 gotten nothing? That's HCMFA's testimony today?
11    A. That's my testimony.
12    Q. Okay. I'm asking you in your
13 capacity as HCMFA's 30(b)(6) witness who was
14 asked to be prepared about the affirmative
15 defenses. Is it HCMFA's testimony that Highland
16 has produced nothing in discovery?
17    A. Nothing of relevance that I've seen.
18    Q. Before signing -- before authorizing
19 the Stinson firm to file this answer on behalf of
20 HCMFA, did you review Highland's document
21 production?
22    MS. DEITSCH-PEREZ: Object to the
23 form.
24    A. Not specifically.
25    ///

Page 41

HCMFA - J. DONDERO

1
2 BY MR. MORRIS:
3     Q. Have you ever reviewed Highland's
4 document production?
5     MS. DEITSCH-PEREZ: Object to the
6 form.
7     A. Not specifically.
8 BY MR. MORRIS:
9     Q. You ever review it generally?
10    MS. DEITSCH-PEREZ: Object to the
11 form.
12    A. No, I -- I've just -- it's just been
13 relayed to me verbally.
14 BY MR. MORRIS:
15    Q. Do you have any idea how many pages
16 of documents Highland produced in this
17 litigation?
18    A. No.
19    Q. Do you have any idea the volume of
20 documents that Highland has produced in this
21 litigation?
22    A. I just -- that it's been inadequate
23 and insufficient, but I don't know the volume.
24    Q. Have you authorized your attorneys to
25 make a motion to compel of any kind for

Page 42

HCMFA - J. DONDERO

1 Highland's failure to produce responsive
2 documents?
3 A. I believe they have several times.
4 Q. What's the basis for that belief?
5 MS. DEITSCH-PEREZ: I'm -- I'm
6 actually going to direct you not to answer to the
7 extent Mr. Morris is trying to inquire into
8 privileged communications.
9 John, you know very well there was a
10 motion to compel previously.
11 MR. MORRIS: This --
12 MS. DEITSCH-PEREZ: You don't need
13 the witness to --
14 MR. MORRIS: In this lawsuit?
15 MS. DEITSCH-PEREZ: No, in the
16 overall notes lawsuit.
17 MR. MORRIS: And can you inform your
18 client that Highland has produced every single
19 unredacted audited financial statement from 2008
20 to 2018? Because that's what the subject was, I
21 believe.
22 MS. DEITSCH-PEREZ: No, that wasn't
23 the sole subject of the motion to compel. It was
24 not. And you did not produce them in response to
25

Page 43

HCMFA - J. DONDERO

1 that motion. You didn't produce them until we
2 went out and subpoenaed the accountants, the
3 auditors.
4 MR. MORRIS: Okay. But you have them
5 now, right? Can you inform your client that you
6 have all of the audited financial statements from
7 2008?
8 MS. DEITSCH-PEREZ: Are you done,
9 Mr. Morris?
10 MR. MORRIS: I'm just trying to get
11 testimony with respect to the affirmative --
12 MS. DEITSCH-PEREZ: You're not trying
13 to get testimony. You're trying to have a
14 conversation, and this is not the appropriate
15 place. Do you want to talk to me? Call me after
16 the deposition.
17 MR. MORRIS: I'm just trying to get
18 testimony as to the basis for the statement in
19 paragraph 43. So I'll try one last time.
20 BY MR. MORRIS:
21 Q. Can you identify any documents or
22 information relevant -- actually, withdrawn. I
23 think I've got enough here.
24 Let's look at the affirmative
25

Page 44

HCMFA - J. DONDERO

1 defenses at the end of paragraph 43. Do you see
2 that there's a list there, Mr. Dondero?
3 A. Yes.
4 Q. Can you identify all facts that HCMFA
5 is aware of that concern or relate to the
6 affirmative defense of waiver?
7 MS. DEITSCH-PEREZ: Why don't you let
8 him read all of 43 first --
9 MR. MORRIS: I didn't prevent him --
10 MS. DEITSCH-PEREZ: -- and then he
11 can answer.
12 MR. MORRIS: I didn't prevent him
13 from doing anything.
14 THE WITNESS: Okay. What's the
15 question?
16 BY MR. MORRIS:
17 Q. My question, Mr. Dondero, is if you
18 can identify as HCMFA's 30(b)(6) witness all
19 facts that concern or relate to the affirmative
20 defense of waiver.
21 A. Well, I don't want to do legal
22 analysis or conclusions on --
23 Q. I'm not -- I'm not -- I appreciate
24 that. And I'm not asking you for that. I'm
25

Page 45

HCMFA - J. DONDERO

1 asking for facts.
2 What facts is HCMFA aware of that
3 concern or relate to the defense of waiver?
4 A. The sale of MGM.
5 Q. Okay. Anything else?
6 A. I don't know at this moment.
7 Q. And how does HCMFA contend that the
8 sale of MGM constitute Highland's waiver of its
9 right to collect under the notes?
10 A. That would be the trigger of
11 forgiveness in the notes.
12 Q. Okay. Anything else?
13 A. No.
14 Q. Okay. The next --
15 A. Not at the moment.
16 Q. -- defense -- I'm sorry, I didn't
17 mean to step on your words.
18 A. That's okay.
19 Q. Okay. The next defense you see there
20 is estoppel.
21 Can you tell me, as HCMFA's 30(b)(6)
22 witness, all facts that concern or relate to the
23 affirmative defense of estoppel?
24 A. Forgiveness, would that apply there
25

Page 46

HCMFA - J. DONDERO

1  HCMFA - J. DONDERO
2  too?
3      Q.  That's -- that's your answer.  If
4  that's your answer, I'll take it.  I'll try and
5  restate it for you.
6          Is it HCMFA's position that Highland
7  should be estopped from collecting on the notes
8  because the condition subsequent with respect to
9  the sale of MGM has occurred?
10     A.  Yes.
11     Q.  Okay.  Are you aware of any other
12 facts that would support HCMFA's affirmative
13 defense of waiver?
14         (Clarification requested by the
15 stenographer.)
16         MS. DEITSCH-PEREZ:  Do you mean
17 estoppel?
18         MR. MORRIS:  Yes, thank you, Deborah.
19 Let me restate the question.
20 BY MR. MORRIS:
21     Q.  Are you aware of any other facts that
22 concern or relate to HCMFA's affirmative defense
23 of estoppel?
24     A.  I think the forgiveness around MGM,
25 if not the agreement itself, is until the

Page 47

1  HCMFA - J. DONDERO
2  monetization of -- including Trussway and
3  Cornerstone of the three assets, so that would
4  push off collection.
5      Q.  Okay.  Anything else?
6      A.  Not at this moment.
7      Q.  The next affirmative defense is
8  failure of consideration.
9          Do you see that?
10     A.  Yes.
11     Q.  And HCMFA has admitted that Highland
12 transferred to HCMFA the principal amount
13 reflected in each note, correct?
14     A.  Yes.
15     Q.  And that it did so specifically in
16 exchange for each note, correct?
17     A.  Yes.
18     Q.  Okay.  So are you aware of any facts
19 or circumstances that concern or relate to
20 HCMFA's affirmative defense of failure of
21 consideration?
22     A.  I don't know, and I don't know if
23 that includes other cross-claims or other netting
24 of other payments would fall into that.  I don't
25 know.

Page 48

1  HCMFA - J. DONDERO
2      Q.  Prepayment is the last one.
3          Are you aware of any facts or
4  circumstances that concern or relate to HCMFA's
5  affirmative defense of prepayment?
6      A.  So, no, I don't know.  I don't know.
7  I don't know how the MGM sale affects amounts
8  that were prepaid.  I don't know.  I don't know
9  if those should be argued to be disgorged by
10 the -- by Highland.  I don't know.
11     Q.  Okay.  Let's take this down and let's
12 move to the next exhibit.  You may be happy to
13 know that I only have a seven-page outline, and
14 I'm on page 5.
15         (Recess requested by the
16 stenographer.)
17         MR. MORRIS:  Sure.  This will
18 hopefully be our only break.  It's, I guess,
19 11:17 your time.  Let's come back at 11:25,
20 eight-minute break.
21         THE WITNESS:  Yeah, okay.
22         THE VIDEOGRAPHER:  Off video at
23 11:17 a.m.
24         (Recess taken, 11:17 a.m. to
25 11:32 a.m. CDT)

Page 49

1  HCMFA - J. DONDERO
2          THE VIDEOGRAPHER:  Back on video at
3  11:32 a.m.
4  BY MR. MORRIS:
5      Q.  Mr. Dondero, did you communicate with
6  anybody about this deposition during the break?
7      A.  No.
8          MR. MORRIS:  Can we please put up
9  Exhibit 5.
10         (HCMFA/Dondero Deposition Exhibit 5
11 marked.)
12 BY MR. MORRIS:
13     Q.  And if you could just scroll down a
14 little bit to show both signatures.  Okay.
15         Mr. Dondero, are you familiar with
16 this document?
17         We can go back to the top.
18     A.  Generally.
19     Q.  Do you know what it is?
20     A.  It was something we were required to
21 do I think for the benefit of the auditors or for
22 the benefit of the audit.
23     Q.  Okay.  And is that your signature on
24 the document?
25     A.  Yes.

HCMFA - J. DONDERO

1
2     Q.   And is it your understanding that
3     pursuant to this document, HCMLP -- and I'm
4     looking at the last sentence -- agreed not to
5     demand payment on amounts owed by HCMFA prior to
6     May 31st, 2021?
7         A.   Yes.
8         Q.   Do you know what HCMLP received in
9     return for its agreement not to demand payment on
10    amounts owed by HCMF prior to May 31st, 2021?
11        A.   I think it was an inconsiderate
12    accomodation -- I mean insignificant
13    accommodation.  I don't think there was a need or
14    a request for a consideration.  No one -- I don't
15    know; no one thought that at the time, I can tell
16    you that.
17        Q.   Okay.  So at the time, you can't
18    identify any consideration that was given to
19    Highland in exchange for its agreement not to
20    demand payment on amounts owed by HCMF prior to
21    May 31, 2021, correct?
22        A.   Correct.
23        Q.   And if we go to the top of the
24    document, it says, quote:  Reference is hereby
25    made to certain outstanding amounts loaned.

HCMFA - J. DONDERO

1
2         Do you see that part of the document?
3         A.   Yes.
4         Q.   Is it your understanding that the
5     reference to certain outstanding amounts loaned
6     is a reference to the outstanding principal that
7     was due under the notes that are at issue in this
8     lawsuit?
9             MS. DEITSCH-PEREZ:  Object to the
10    form.
11        A.   It says what it says.  I don't know
12    if it was meant to be just these notes or if
13    there were other notes.  I don't know.
14    BY MR. MORRIS:
15        Q.   Do you recall if you made any inquiry
16    at the time you signed this document as to what
17    outstanding amounts loaned referred to?
18        A.   I didn't believe it was necessary, so
19    I did not.
20        Q.   Okay.  But HCMFA does acknowledge
21    that as of April 15, 2019 at least the two notes
22    that are at issue in this -- are at issue in this
23    lawsuit were outstanding, correct?
24        A.   Again, I don't know if we got the
25    accounting.  I think at much reduced size, there

HCMFA - J. DONDERO

1
2     was still some of the notes outstanding, but I
3     don't know if there were other notes.
4         Q.   Okay.  And I just ask for your
5     patience.
6             HCMS -- withdrawn.
7             HCMFA acknowledges that as of
8     April 15th, 2019 there were still outstanding
9     amounts loaned under the two notes that are at
10    issue, putting aside what the principal amount
11    was at that particular moment in time, correct?
12        A.   Yes, I believe, yes, they were
13    outstanding at that point in time.
14        Q.   Okay.  And do you see after that
15    clause, after the identification of the parties,
16    it specifically refers to -- and I'm paraphrasing
17    here -- certain amounts -- withdrawn -- certain
18    outstanding amounts loaned from Highland to
19    HCMFA, quote:  For funding of HCMF, apostrophe S,
20    ongoing operations.
21        Do you see that?
22        A.   Yes.
23        Q.   And when you signed this document,
24    did you understand that the purpose of the
25    outstanding amounts was to fund HCMF, apostrophe

HCMFA - J. DONDERO

1
2     S, ongoing operations?
3         A.   Yeah, I think we covered this before
4     where it could have been for bonuses and it could
5     have been for ongoing operating expenses.
6         Q.   And then in the next paragraph it
7     says that HCMFA expects that it, quote: may be
8     unable to repay such amounts should they become
9     due.
10        Do you see that?
11        A.   Yes.
12        Q.   And would you agree that the term
13    "such amounts" refers to the outstanding amounts
14    loaned from Highland to HCMFA as of April 15,
15    2019?
16        A.   Yes.
17        Q.   Okay.  And then the reference at the
18    end of that sentence, where it says, quote,
19    should they become due.
20        Do you see that part?
21        A.   Yes.
22        Q.   Do you have an understanding based on
23    the notes that you signed as to how such amounts
24    might, quote, become due?
25        A.   If Highland demanded payment.

Page 54

HCMFA - J. DONDERO

1
2    Q.  Okay.  And you recall -- just a
3  question or two on background.
4       Do you recall that in January of 2020
5  you entered into the corporate governance
6  agreement, where you stepped down as president
7  and an independent board was put in place?
8    A.  Yes.
9    Q.  Okay.  From that time until the
10  present, does HCMFA contend that Highland
11  breached this agreement in any way?
12    A.  I don't think so.
13    Q.  Okay.  Are you aware as HCMFA's
14  corporate representative as to whether or not
15  HCMLP ever demanded payment on amounts that were
16  outstanding as of April 15, 2019 prior to
17  May 31st, 2021?
18    A.  I don't -- I don't know and -- I
19  don't know.  I don't think so.
20    Q.  Okay.  If we can go to -- so if we
21  can go to the next document.  I think it's
22  Exhibit 6.
23       (HCMFA/Dondero Deposition Exhibit 6
24  marked.)
25       ///

Page 55

HCMFA - J. DONDERO

1
2  BY MR. MORRIS:
3    Q.  And do you see this is a letter dated
4  June 2nd, 2021?
5    A.  Yep.
6    Q.  So does that refresh your
7  recollection that Highland didn't make a demand
8  for payment of the amounts that were outstanding
9  as of April 2019 until June of 2021?
10    A.  Okay.  Yeah, that's what this letter
11  says, so --
12    Q.  And --
13    A.  If this was the first time, then
14  that's true.
15    Q.  Right.  You're generally aware that
16  the reason we have this follow-up litigation, the
17  reason why these notes weren't part of the main
18  notes litigation, is because of the exhibit that
19  we just looked at that you signed that said HCMLP
20  wouldn't make a demand until after May 31st,
21  2021, right?
22    A.  Right.
23    Q.  Okay.  So now, just looking at this
24  demand letter, do you recall whether you saw this
25  at or around the time that it was sent in early

Page 56

HCMFA - J. DONDERO

1
2  June 2021?
3    A.  I was aware of it.
4    Q.  Okay.  Do you know, did HCMFA ever
5  attempt to determine whether HCMLP's calculation
6  of the outstanding principal amount as of
7  June 4th, 2021 was accurate?
8    A.  I think that's why we were seeking
9  discovery.
10    Q.  Okay.  I'm going to just step back.
11       Do you see that there's a column
12  there, Outstanding Principal Amount, 6/4/21, and
13  it's got two entries for each of those notes?
14    A.  Yes.
15    Q.  Do you know if HCMFA ever attempted
16  to determine if those figures were accurate?
17    A.  I -- I believe it did as part of this
18  litigation through discovery.
19    Q.  Okay.  And as you sit here today,
20  does HCMFA dispute in any way the listing of the
21  outstanding principal amount set forth on this
22  document as of June 4th, 2021?
23    A.  I don't know.
24    Q.  Okay.  The next column is marked
25  Accrued But Unpaid Interest.

Page 57

HCMFA - J. DONDERO

1
2       Do you see that?
3    A.  Yes.
4    Q.  Has HCMFA ever attempted to validate
5  the figures that are set forth in that column?
6    A.  The same answer as before:  I think
7  through discovery in this litigation, they tried.
8    Q.  Okay.  And as of today, does HCMFA
9  have any factual basis for disputing the amounts
10  that are set forth in that column?
11    A.  I don't know.
12    Q.  Looking at the last column, the Total
13  Amount Outstanding, do you see that there's set
14  forth in the letter total amounts outstanding as
15  of June 4th, 2021?
16    A.  Yes.
17    Q.  Did HCMFA ever attempt to validate
18  the numbers that are in that column?
19    A.  It would be the same answer for the
20  prior two columns.  I believe it's part of this
21  litigation.
22    Q.  Okay.  And as you sit here today as
23  HCMFA's 30(b)(6) witness, do you have any facts
24  that would call into question the accuracy of the
25  total amount outstanding as reflected in this

Page 58

HCMFA - J. DONDERO

2 letter, at least as of June 4th, 2021?

3    A.  I do not.

4    Q.  Okay.  Do you know, did HCMFA respond

5 to this letter in any way?

6    A.  I don't believe so.

7    Q.  Okay.  Do you know if HCMFA ever paid

8 any amounts in response to this letter?

9    A.  I don't believe it did.

10    Q.  Let's go to Exhibit 7, please.

11        (HCMFA/Dondero Deposition Exhibit 7

12 marked.)

13 BY MR. MORRIS:

14    Q.  Okay.  Have you ever seen this

15 document before, sir?

16    A.  I'm looking -- I'm looking at it in

17 detail now.  I don't remember seeing this before.

18    Q.  Okay.  I'm going to represent to you

19 that the top box relates to the 2014 note and the

20 bottom box relates to the 2016 note, and that

21 each of the boxes summarizes payments that were

22 made against each particular note, and it shows

23 how the payments were applied.

24        And I'll represent to you that

25 Highland has produced in discovery the bank

Page 59

HCMFA - J. DONDERO

2 statements that support each of the receipts and

3 the payments -- each of the payments and receipts

4 set forth on this document.

5        I appreciate that you haven't seen

6 this before, but let me just ask generally:  Is

7 HCMFA aware that certain payments were applied

8 against the notes prior to the petition date?

9    A.  Prior to the petition date?  Yes.

10    Q.  Okay.  And do you see -- let's start

11 with the bottom box, the 2016 box.

12        Do you see that there's three

13 receipts?  One is -- refers to a bank statement

14 from September 9, 2016, another refers to a bank

15 statement from April 12th, 2017, and then a third

16 bank statement is referred to with respect to

17 December 28th, 2021.

18        Do you see those three receipt lines?

19    A.  Sure.

20    Q.  Okay.  Do you have any knowledge as

21 the 30(b)(6) representative as to, you know, the

22 process by which payments were made on HCMFA's

23 behalf against the 2016 or the 2014 note?

24    A.  Not specifically.  It just -- it

25 looks like when there was -- yeah, no, it looks

Page 60

HCMFA - J. DONDERO

2 like -- like I can't see a pattern to it

3 specifically.

4    Q.  Okay.  And then the top box has five

5 separate receipts with respect to the 2014 note.

6        Do you see that?

7    A.  Yes.

8    Q.  Did you -- did you approve each of

9 the payments on each of the notes that are

10 reflected on this page?

11    A.  I -- I don't know.

12    Q.  Were you aware before this deposition

13 that payments had been made against the HCMFA

14 notes that are at issue?

15    A.  Yes.

16    Q.  Okay.  Does HCMFA contend that there

17 was anything improper with respect to the

18 payments that were applied against the two notes

19 that are at issue in this lawsuit?

20    A.  Not that I'm aware of.

21    Q.  Okay.  Are you aware of any

22 contention by HCMFA that the payments were

23 improperly applied to outstanding principal and

24 interest due under these two notes and the other

25 notes referred to in the footnotes?

Page 61

HCMFA - J. DONDERO

2        MS. DEITSCH-PEREZ:  Object to the

3 form.

4    A.  You know, I see the footnotes.

5 The -- I'm not aware of the application or if

6 that was proper or not, to apply it to some --

7 split some of it and apply it to other loans,

8 I -- and I don't know whether we're contesting

9 that.  But I don't know if we have enough

10 information to contest it.  I don't know the

11 answer.

12 BY MR. MORRIS:

13    Q.  Well, did you check with Skyview to

14 see what HCMFA's books and records show with

15 respect to these two loans?

16    A.  No.

17    Q.  Do you know whether the payments

18 reflected on this exhibit are also reflected in

19 HCMFA's books and records?

20    A.  I don't, but I imagine they are.

21    Q.  Okay.  And why do you imagine that

22 they are?

23    A.  We run a highly compliant GAAP

24 institution.  Always have.

25    Q.  And so how does -- why does that lead

Page 62

HCMFA - J. DONDERO

1  HCMFA - J. DONDERO
2  you to conclude that the payments reflected on
3  this document would also be reflected in HCMFA's
4  books and records?
5      A.  Generally accepted accounting
6  principles are to reflect the economics of
7  transactions and cash flow movements, and if
8  it -- it would have to be reflected on the
9  financials either directly in the notes or if
10 they had some litigation contingency reserve or
11 something, but one way or another, it would have
12 to foot in terms of the money coming in or being
13 paid out, you know, the asset or liability
14 would -- it would have to be accounted, and
15 that's what dual-entry accounting is.
16     Q.  All right.  So as the person who was
17 in control of both Highland and HCMFA prior to
18 the petition date, would it be your expectation
19 that the application of payments to principal and
20 interest reflected on this document, at least
21 prior to the petition date, would be the same on
22 HCMFA's books as it is on Highland's books?
23     A.  Prior to the petition date, yes.
24     Q.  Okay.  And so the only -- the only
25 question that you might have relates to the

Page 63

1  HCMFA - J. DONDERO
2  December 2021 payments, correct?
3      A.  Yes.
4      Q.  Okay.  Fair enough.
5          Do you know whether HCMFA has done
6  any calculation of its own to determine what it
7  contends is the outstanding principal and
8  interest due on either one of the notes?
9          MS. DEITSCH-PEREZ:  Asked and
10 answered.
11     A.  I don't know.
12 BY MR. MORRIS:
13     Q.  Okay.  Let's just go, last document,
14 Exhibit 8, please, which are the discovery
15 responses.
16         (HCMFA/Dondero Deposition Exhibit 8
17 marked.)
18 BY MR. MORRIS:
19     Q.  And I forgot what topic this was, but
20 I just have a few questions.
21         Have you seen HCMFA's written
22 responses to discovery before, Mr. Dondero?
23     A.  I believe so.
24     Q.  Okay.  Can we go first to Request for
25 Admissions 9 and 10?  I think you passed it.

Page 64

1  HCMFA - J. DONDERO
2  There you go.
3      Q.  Okay.  So these two requests for
4  admission ask HCMFA to admit that they didn't
5  disclose the terms and existence of the agreement
6  to Frank Waterhouse before February 1st, 2021.
7          Do you see that?
8      A.  Yes.
9      Q.  Okay.  And this is where it really
10 becomes beneficial to have our agreement that all
11 of the prior transcripts can be admissible in
12 this case.
13         Do you believe that you've fully
14 testified as to the factual basis for the denials
15 in response to Requests for Admission No. 9 and
16 10, or is there some other part of a conversation
17 that you had with Mr. Waterhouse with respect to
18 these specific notes?
19         MS. DEITSCH-PEREZ:  Object to the
20 form.
21     A.  I'm sorry, so what's the question
22 again?
23 BY MR. MORRIS:
24     Q.  Did you have a conversation with
25 Mr. Waterhouse that you haven't already testified

Page 65

1  HCMFA - J. DONDERO
2  to as it relates to these two notes at issue, or
3  was it all part of the same conversation that
4  you've already testified to?
5      A.  Yeah, the testimony I'd like to make
6  clear is on the record that accurately reflects
7  is there was definitely a conversation from...
8          We filed for bankruptcy in '19,
9  right?  It was October of '19, correct?
10     Q.  Yes, sir.
11     A.  In the spring of '20, it was clearly
12 discussed numerous times with Seery and Frank and
13 whatever that the notes were compensation.  We --
14 you've seen in our US trustee letters, you've
15 seen it in our other allegations or presentations
16 to the court.
17         We made 35 different proposals to
18 settle the estate when, you know, we -- it became
19 clear that, you know, Seery wasn't and he was
20 moving for his own purposes.
21         So what we ended up doing, every one
22 of those, every one of those PowerPoints, we
23 specifically excluded the notes as an asset of
24 Highland's starting in -- I would say the
25 December meeting up in Grosvenor's offices, but

Page 66

HCMFA - J. DONDERO

1  in 19- -- in 2019 and there forward, we always
2  had the notes excluded as assets.
3        So there were conversations with
4  Frank, Seery, the UCC members, numerous people
5  that the notes were loose, unsecured notes that
6  were part of compensation.  So that's got to be
7  reflected somewhere in either my testimony or
8  these admissions here.
9        MR. MORRIS:  I'm going to move to
10 strike, and I'm just going to ask you to focus
11 personally on the request for admission.
12 BY MR. MORRIS:
13     Q.  And that is whether you had any
14 further conversation other than what you've
15 already testified to with Frank Waterhouse
16 concerning the existence or the terms of the
17 alleged agreements.
18       And the alleged agreements are
19 defined as the agreements in HCMFA's answer, the
20 one with Nancy Dondero.
21       So just to be clear, Mr. Dondero, I'm
22 not asking about negotiations over the notes.
23 I'm asking if you have anything to add with
24 respect to your communications with
25

Page 67

HCMFA - J. DONDERO

1  Mr. Waterhouse concerning the existence and terms
2  of the alleged agreement.
3        MS. DEITSCH-PEREZ:  Object, asked and
4  answered.
5     A.  Yeah, I'd like what I said a minute
6  ago to not be struck.  If you want me to answer
7  it differently or more specifically, let me say
8  it as follow-up.
9        There were numerous conversations
10 with Frank and at least a half dozen other people
11 that there was a compensation agreement in place
12 or that those notes were agreed to be
13 compensation.
14       There wasn't a discussion of the
15 specific terms that I can recall with Frank or
16 Seery or the UCC members or the Grosvenor general
17 counsel or all those other people, but they were
18 well aware that there was a compensation
19 agreement in place.
20 BY MR. MORRIS:
21     Q.  Okay.  I appreciate that.
22       Did you ever tell them that Nancy
23 Dondero, acting as the Dugaboy trustee, is the
24 party who entered into the agreement on behalf of
25

Page 68

HCMFA - J. DONDERO

1  Highland Capital Management LP?
2     A.  No.
3     Q.  Did you ever tell them that the
4  agreement was that the notes would be forgiven if
5  you sold any of the three portfolio companies at
6  a price above cost?
7     A.  Again, the terms and the mechanisms
8  weren't discussed.  Nobody viewed the notes as
9  material to the value of the estate at the time
10 or today.
11       MR. MORRIS:  Okay.  I move to strike
12 the last portion, and I would ask you just this.
13 I want to finish this up.
14 BY MR. MORRIS:
15     Q.  So the question was simply whether
16 you ever told anybody any of the terms of the
17 agreement that you entered into with Nancy
18 Dondero as the trustee of The Dugaboy Trust on
19 behalf of Highland.
20       MS. DEITSCH-PEREZ:  Asked and
21 answered.
22     A.  Yeah, not the terms.  The terms
23 weren't material.  But the awareness of the
24 agreement was broadly discussed.
25

Page 69

HCMFA - J. DONDERO

1  BY MR. MORRIS:
2     Q.  Okay.  And -- that's fine.
3        Let's go to Request for Admission
4  No. 15 and 16.  This talks about disclosure of
5  the existence in terms of the alleged agreement
6  to any creditor of Highland.
7        Can you identify every creditor of
8  Highland to whom you disclosed the terms of the
9  alleged agreement prior to February 1st, 2021?
10    A.  There were no creditors prior to
11 February 1st, 2021, other than -- I'm trying to
12 think -- Grosvenor --
13       Well, the answer is no.  The answer
14 is no, but there were very few creditors.  And
15 the answer is no, didn't believe it was
16 necessary.
17    Q.  Okay.
18    A.  The amounts weren't material.
19    Q.  Okay.  How about with respect to
20 No. 16, can you identify a creditor to whom you
21 disclosed the existence of the alleged agreement
22 prior to February 1st, 2021?
23       MS. DEITSCH-PEREZ:  Object, asked and
24 answered.
25

HCMFA - J. DONDERO

1
2       A.  Wait a minute.  I need to correct.  I
3  wasn't paying attention to the dates.  Okay.
4          Prior to February 2021 is all the
5  things that I rambled on about earlier that you
6  wanted to strike.  There were written proposals
7  delivered to the independent board, the UCC, all
8  the creditors, including Grosvenor, UBS, Acis,
9  Pat Dougherty, all the smaller creditors,
10  et cetera, that showed the notes treated as
11  compensation, and the notes not considered as
12  part of the balance sheet of Highland.
13          And the balance sheet of Highland at
14  that point in time and today overwhelmingly
15  covered all liabilities such that it wasn't
16  material, and it wasn't anything that anybody
17  objected to in any of the proposals going back
18  and forth.
19          MR. MORRIS:  I move to strike.
20  BY MR. MORRIS:
21      Q.  And my question is simply:  Can you
22  identify every creditor to whom you disclosed the
23  terms of the alleged agreement prior to
24  February 1st, 2021?  I'm not asking for notes.
25  I'm not asking for negotiating position.

HCMFA - J. DONDERO

1
2          The terms of the alleged agreement,
3  can you please identify if there are any
4  creditors to whom you disclosed the terms of the
5  alleged agreement before February 1st, 2021?
6          MS. DEITSCH-PEREZ:  Asked and
7  answered.
8      A.  Well, all right.  Let me succinctly
9  say it again.
10          The agreement was discussed with all
11  the creditors, all the professionals, all the
12  management team at Highland and NexPoint.  The
13  terms were not specifically discussed.
14  BY MR. MORRIS:
15      Q.  Okay.  Were any of the terms
16  discussed with any creditor prior to
17  February 1st, 2021?
18      A.  Well, the term -- the term that it
19  would be forgiven as part of compensation was
20  discussed as part of the overall agreement, but
21  the specific mechanisms were not discussed.
22      Q.  Okay.  Did you ever tell anybody --
23  withdrawn.
24          Did you ever tell any creditor prior
25  to February 1st, 2021 that you had entered into

HCMFA - J. DONDERO

1
2  an agreement on behalf of HCMFA with your sister,
3  Nancy Dondero, acting in her capacity as the
4  trustee of The Dugaboy Trust, to forgive the
5  notes?
6      A.  There was no specific conversations
7  such as that --
8      Q.  Thank you.
9      A.  -- that I remember.
10      Q.  Let's go to Interrogatory No. 1 and
11  2, please.  Okay.
12          So in paragraph 41 of the answer --
13  and we can get it back if it's helpful to you --
14  there's a reference to testimony that HCMFA
15  believes, quote, discusses the existence of the
16  agreement that may be uncovered through
17  discovery.
18          Is that a reference to any testimony
19  other than Nancy Dondero or you?
20      A.  Yeah.  I mean, again, there's 35
21  different offers to sell, pot plans, you know,
22  good faith efforts that all describe the notes as
23  subject to a compensation agreement and
24  forgiveness that are all on the debtor's servers
25  that ideally would be discovered as part of this

HCMFA - J. DONDERO

1
2  process, ideally would be brought forward by the
3  debtor, but I don't know if we have those.
4      Q.  All right.  You understand there's a
5  difference between testimony and documents,
6  right?
7      A.  Everybody involved -- and there were
8  a lot of people involved -- would give
9  corroborating testimony to those documents.
10      Q.  Okay.  Interrogatory No. 4 -- you
11  know what, I'll skip that.
12          Let's go to Interrogatory No. 8,
13  please.
14          Do you see that it says -- it asks
15  HCMFA to identify every loan that Highland
16  extended to one or more of its current or former
17  affiliates that Highland forgave in whole or in
18  part.
19          Do you see that was the
20  interrogatory?
21      A.  Yes.
22      Q.  Okay.  And then in response there's a
23  list of human beings, right?
24      A.  Yes.
25      Q.  Are those human beings affiliates,

HCMFA - J. DONDERO

1 current or former affiliates, of Highland?
2
3          MS. DEITSCH-PEREZ:  Object to the
4 form.
5      A.  In all fairness, employees and
6 consultants are affiliates, right?
7 BY MR. MORRIS:
8      Q.  Okay.  I just wanted to get the
9 testimony.
10         And is that, to the best of your
11 knowledge, a complete and accurate list of all
12 current or former affiliates of Highland who had
13 a loan forgiven by Highland, in whole or in part?
14     A.  Within sufficient discovery, that was
15 the list we could come up with from collective
16 memory.  There may be a few more, but that's the
17 best knowledge we have at the moment.
18     Q.  Okay.  Let's just go back to the top
19 of the requests for admission, and my question
20 for you, Mr. Dondero, and it could be the last
21 question, is whether there's any -- actually, I'm
22 not even going to do it that way.
23         I'm just going to ask you here
24 because this has been a 30(b)(6) topic for a very
25 long time:  Are you aware of any of HCMFA's

HCMFA - J. DONDERO

1 discovery responses in this document that are
2 incomplete or inaccurate?
3
4      A.  Only generally from counsel.
5      Q.  Okay.  Can you identify any
6 inaccuracy or incomplete response to any request
7 for admission or interrogatory -- and we can
8 scroll through them if you'd like -- that you can
9 share with --
10         MS. DEITSCH-PEREZ:  Yeah, but
11 before -- before he answers, actually give him a
12 context that that came up in, I would need a
13 break to make sure he's not going to disclose
14 privileged information.
15         Or ask it differently, John.  There's
16 a way to get at that that would be different.
17         MR. MORRIS:  Okay.  I'll ask him.
18 BY MR. MORRIS:
19     Q.  You're here as the 30(b)(6) witness.
20 Is there anything inaccurate or incomplete about
21 any response that HCMFA gave?
22     A.  That HCMFA gave or that the debtor
23 gave as part of discovery?  I'm sorry.
24     Q.  MFA -- okay.  I appreciate that,
25 Mr. Dondero.

HCMFA - J. DONDERO

1         These are HCMFA's responses to
2 Highland's requests for discovery, and my
3 question for you as HCMFA's 30(b)(6) witness is
4 whether you're aware of anything in here that is
5 inaccurate or incomplete from HCMFA's perspective
6 as the responding party.
7
8      A.  Not besides what we've already
9 covered.
10     Q.  Okay.  I appreciate that.
11         MR. MORRIS:  Can we just take a
12 two-minute break and let me confer with
13 Ms. Winograd and see if I've got anything
14 further?
15         THE VIDEOGRAPHER:  Off video at
16 12:11 p.m.
17         (Recess taken, 12:11 p.m. to
18 12:13 p.m. CDT)
19         THE VIDEOGRAPHER:  Back on video at
20 12:13 p.m.
21         MR. MORRIS:  I have no further
22 questions, Mr. Dondero.  Thank you for your
23 patience.
24         THE WITNESS:  Thank you.
25         MR. MORRIS:  Take care.

HCMFA - J. DONDERO

1         THE VIDEOGRAPHER:  This concludes
2 today's deposition.  Off video at 12:13 p.m.
3      (Time noted: 12:13 p.m. CDT)
4
5
6
7
8
9
10         _____
11          JAMES D. DONDERO
12
13 Subscribed and sworn to before me this _____
14 day of _____, 20____.
15
16
17
18
19
20
21
22
23
24
25

Page 78

```
1
2                C E R T I F I C A T E
3
4        I, MICHAEL E. MILLER, FAPR, RDR, CRR,
5    Notary Public in and for the State of Texas, do
6    hereby certify:
7             That JAMES D. DONDERO, the witness
8    whose deposition is hereinbefore set forth, was
9    duly sworn by me and that such deposition is a
10   true record of the testimony given by such
11   witness;
12            That pursuant to FRCP Rule 30,
13   signature of the witness was not requested by the
14   witness or other party before the conclusion of
15   the deposition;
16            I further certify that I am not
17   related to any of the parties to this action by
18   blood or marriage; and that I am in no way
19   interested in the outcome of this matter.
20            IN WITNESS WHEREOF, I have hereunto
21   set my hand on May 5, 2022.
22
23
     _____
24   MICHAEL E. MILLER, FAPR, RDR, CRR
25   NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS
```

Page 79

```
1
2    ---------------- I N D E X ----------------
3
4     WITNESS:  JAMES D. DONDERO
5     EXAMINATION:                          PAGE
6    BY MR. MORRIS                           6
7
8
9        ---- LITIGATION SUPPORT INDEX ----    PAGE
10   Instruction Not To Answer                42
11
12
13            ---- E X H I B I T S ----
14   EXHIBIT                                  PAGE
15   Exhibit 1    Highland?s Third Amended Notice  7
16                of Rule 30(b)(6) Deposition to
17                Highland Capital Management
18                Fund Advisors, L.P.
19   Exhibit 2    2/26/14 Promissory Note       15
20   Exhibit 3    2/26/16 Promissory Note       21
21   Exhibit 4    Defendant?s Original Answer    28
22   Exhibit 5    4/15/19 Acknowledgment from    49
23                HCMLP
24   Exhibit 6    6/2/21 Demand Letter           54
25   Exhibit 7    2/26/14 & 2/26/16 Loan Summary 58
```

Page 80

```
1
2               ---- E X H I B I T S ----
3    Exhibit 8    Highland Capital Management   63
4                 Fund Advisors, L.P.?s
5                 Objections and Responses to
6                 Plaintiff?s Requests for
7                 Admission, Interrogatories and
8                 Requests for Production
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 81

```
1                ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No. Now Reads    Should Read   Reason
6    ___ ___ _____    _____   _____
7    ___ ___ _____    _____   _____
8    ___ ___ _____    _____   _____
9    ___ ___ _____    _____   _____
10   ___ ___ _____    _____   _____
11   ___ ___ _____    _____   _____
12   ___ ___ _____    _____   _____
13   ___ ___ _____    _____   _____
14   ___ ___ _____    _____   _____
15   ___ ___ _____    _____   _____
16   ___ ___ _____    _____   _____
17   ___ ___ _____    _____   _____
18   ___ ___ _____    _____   _____
19   ___ ___ _____    _____   _____
20                         _____
21                         Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2022.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

Page 81

# ERRATA SHEET

**CASE NAME:** HIGHLAND CAPITAL MANAGEMENT v. HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS LP (21-03082-SGJ) USBC-NDTX

**DATE:** MAY 5, 2022

**DEPONENT:** JAMES DONDERO

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 28 | 4 | | [Add at end:] I have learned that the financials reflect the sale of MGM to Amazon as of the time it occurred and the dispute between HCMFA and HCMLP over whether that effected forgiveness. | Clarification |
| 29 | 13 | | [Add at end:] Other than, as I note below, I was the Dugaboy Trustee in 2014, not Nancy, and so I spoke for Highland re the agreement regarding the 2014 note. | Clarification |
| 35 | 23 | | [Add at end:] I understood that the 2016 conversation with Nancy also approved the 2014 agreement whether or not any additional agreement was needed after mine. | Letting witness finish where questioner cut him off |
| 37 | 20 | could and would and likely | could and would likely | mistranscription |
| 40 | 4 | 2015's | Rule 2015 reports. | Clarification |
| 50 | 16 | that. | that, but in any event none was needed because of the agreements concerning forgiveness of the notes. | Clarification |
| 65 | 13 | whatever | whoever | mistranscription |
| 74 | 14 | Within sufficient | With insufficient | mistranscription |
| | | | | |

```
15   ___  ___  _____     _____     _____
16   ___  ___  _____     _____     _____
17   ___  ___  _____     _____     _____
18   ___  ___  _____     _____     _____
19   ___  ___  _____
20                                                  _____
21                                                  Signature of Deponent
```

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ___ DAY OF _____, 2022.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES: _____



Robin Morrison
My Commission Expires
12/9/2025
Notary ID
133483390

**$**

**$2.3** 21:12 23:9,13

**$4** 17:15,20,24 19:14

**(**

**(f)** 25:14

**1**

**1** 5:6 7:14,15,17 15:15 28:17 72:10

**10** 63:25 64:16

**10:15** 4:4

**10:17** 5:14

**11:17** 48:19,23,24

**11:25** 48:19

**11:32** 48:25 49:3

**12:11** 76:16,17

**12:13** 76:18,20 77:3,4

**12th** 59:15

**14** 33:16,17 34:5 35:23

**15** 51:21 53:14 54:16 69:5

**15th** 52:8

**16** 69:5,21

**19** 65:8,9

**19-** 66:2

**19-34054-sgj11** 5:12

**1st** 10:17 64:6 69:10, 12,23 70:24 71:5,17, 25

**2**

**2** 15:18,20 21:10 28:17 72:11

**20** 65:11 77:14

**2008** 42:20 43:8

**2014** 9:16 16:11 17:13,19 18:4,8 19:15 25:23 28:7 31:23 33:2,8,12,14, 25 34:15,19 35:3,15 36:2,21 37:5 58:19 59:23 60:5

**2015's** 40:4

**2016** 9:17 21:12 23:8, 14,18 31:24 32:7,17, 21 33:13,14,18 34:5, 15,20 35:22 37:7 58:20 59:11,14,23

**2017** 59:15

**2018** 25:23 28:7 42:21

**2019** 51:21 52:8 53:15 54:16 55:9 66:2

**2020** 54:4

**2021** 10:17 50:6,10, 21 54:17 55:4,9,21 56:2,7,22 57:15 58:2 59:17 63:2 64:6 69:10,12,23 70:4,24 71:5,17,25

**2022** 4:4 5:14

**228** 5:16

**26th** 16:11 17:13,19 21:12 23:8,14

**28th** 18:8 59:17

**2nd** 55:4

**3**

**3** 21:6 28:18

**30** 4:21

**30(b)(6)** 5:8 6:21 7:15 8:9 19:7 20:19 24:23 27:11 31:6 40:13 44:19 45:22 57:23 59:21 74:24 75:19 76:4

**31** 50:21

**31st** 50:6,10 54:17 55:20

**35** 65:17 72:20

**4**

**4** 28:12,14 73:10

**4(e)** 25:14

**41** 29:2 31:15 32:5,16 33:6 34:14 36:9,13 72:12

**42** 37:9,11 38:10

**43** 39:16 43:20 44:2,9

**45th** 5:17

**4th** 56:7,22 57:15 58:2

**5**

**5** 4:4 48:14 49:9,10

**5th** 5:13

**6**

**6** 54:22,23

**6/4/21** 56:12

**7**

**7** 25:4 58:10,11

**8**

**8** 63:14,16 73:12

**9**

**9** 59:14 63:25 64:15

**A**

**a.m.** 4:4 5:14 48:23, 24,25 49:3

**accepted** 62:5

**accommodation** 50:13

**accomodation** 50:12

**account** 14:19

**accountant** 26:4

**accountants** 28:3 43:3

**accounted** 62:14

**accounting** 18:14, 21,23 19:2 23:25 24:3 51:25 62:5,15

**Accrued** 56:25

**accuracy** 57:24

**accurate** 30:13,19 32:6,8,16 33:6 56:7, 16 74:11

**accurately** 65:6

**Acis** 70:8

**acknowledge** 17:13, 18 22:15 51:20

**acknowledges** 23:7 52:7

**acknowledging** 12:4

**acting** 67:24 72:3

**action** 12:20

**add** 37:12 66:24

**additional** 25:7

**addressed** 14:23 37:11 38:17

**adjusted** 34:5

**admissible** 4:19 64:11

**admission** 64:4,15 66:12 69:4 74:19 75:7

**admissions** 63:25 66:9

**admit** 17:12,18 64:4

**admitted** 47:11

**advice** 20:3,6 24:13, 16

**Advisors** 5:8 16:15

**affects** 48:7

**affiliates** 73:17,25 74:2,6,12

**affirmative** 22:2,5 29:8 40:14 43:12,25 44:7,20 45:24 46:12, 22 47:7,20 48:5

**agree** 53:12

**agreed** 34:22,25 50:4 67:13

**agreement** 6:24 32:20,24 33:8,25 34:14 35:2,15,25 36:10,20,22 37:4,5 46:25 50:9,19 54:6, 11 64:5,10 67:3,12, 20,25 68:5,18,25 69:6,10,22 70:23 71:2,5,10,20 72:2,16, 23

**agreements** 25:7,8 66:18,19,20

**Aigen** 6:4 15:8

**allegations** 65:15

**alleged** 66:18,19 67:3 69:6,10,22 70:23 71:2,5

**allowed** 40:5

**ambiguity** 38:11,21, 22,23

**ambiguous** 20:22 24:25 37:13 38:12

**amortizing** 37:18

**amount** 17:14,20 21:11 47:12 52:10 56:6,12,21 57:13,25

**amounts** 48:7 50:5, 10,20,25 51:5,17 52:9,17,18,25 53:8, 13,23 54:15 55:8 57:9,14 58:8 69:19

**analysis** 44:23

**annual** 26:9

**answers** 75:11

**apostrophe** 52:19, 25

**appears** 22:20

**application** 61:5 62:19

**applied** 27:22 58:23 59:7 60:18,23

**apply** 45:25 61:6,7

**appropriately** 35:22

**approve** 60:8

**approved** 19:21

**approximately** 5:14

**April** 51:21 52:8 53:14 54:16 55:9 59:15

**argued** 48:9

**arm's-length** 38:25

**Asia** 5:25 8:18 29:21

**asks** 73:14

**asserted** 12:21

**asset** 40:7 62:13 65:23

**assets** 47:3 66:3

**association** 4:8 5:19

**assuming** 34:16

**attempt** 56:5 57:17

**attempted** 56:15 57:4

**attention** 70:3

**attorneys** 41:24

**audio** 10:10

**audit** 26:11 49:22

**audited** 26:15 28:6 42:20 43:7

**auditors** 25:13,25 43:4 49:21

**audits** 26:9

**authorize** 22:7 30:24

**authorized** 19:17 21:22 22:24 41:24

**authorizing** 40:18

**aware** 6:23 13:4,12

14:8,22 19:21 22:4,8 24:24 26:14,23 27:11,14,21,25 28:2, 9 29:8 30:7 31:6 40:2 44:6 45:3 46:11,21 47:18 48:3 54:13 55:15 56:3 59:7 60:12,20,21 61:5 67:19 74:25 76:5

**awareness** 68:24

---

**B**

**back** 16:9 20:19 22:9 23:6 31:12,13,15 34:7 38:7 48:19 49:2, 17 56:10 70:17 72:13 74:18 76:19

**background** 54:3

**balance** 26:21,25 27:8,13,23 70:12,13

**bank** 58:25 59:13,14, 16

**bankruptcy** 5:10 12:10,11 65:8

**based** 12:3 53:22

**basis** 18:22 24:2 40:6 42:5 43:19 57:9 64:14

**bear** 21:20

**bears** 22:6

**beginning** 19:5

**behalf** 4:24 5:3 17:4 19:20 26:8 30:8 40:19 59:23 67:25 68:20 72:2

**beings** 73:23,25

**belief** 18:22 42:5

**believes** 72:15

**beneficial** 64:10

**benefit** 49:21,22

**bind** 23:3

**bit** 29:24 31:13 49:14

**block** 16:17,19

**board** 54:7 70:7

**bona** 37:22 39:8,11, 12,14

**bonuses** 18:3,7 23:18,20 53:4

**books** 10:8,18,21,23 11:2,10 61:14,19 62:4,22

**borrowed** 17:23 18:3 23:12

**borrowing** 19:22

**bottom** 21:15 58:20 59:11

**box** 58:19,20 59:11 60:4

**boxes** 58:21

**breached** 54:11

**break** 48:18,20 49:6 75:13 76:12

**Brent** 4:7 5:15

**broadly** 68:25

**brought** 9:15 11:19 73:2

**burden** 20:25

---

**C**

**calculation** 56:5 63:6

**call** 43:16 57:24

**Canty** 5:25 8:21

**capacity** 6:20,21 16:23 19:7,12 22:24 27:4,10 33:23 36:2,4, 11 40:13 72:3

**Capital** 4:25 5:7,9,23 10:13 16:14 68:2

**care** 76:25

**carried** 26:18,20 27:7,17

**case** 4:22 5:11 13:25 22:2 28:21 64:12

**cash** 62:7

**CDT** 4:4 48:25 76:18 77:4

**certified** 4:8 26:3

**cetera** 37:25 70:10

**change** 27:12 37:25

**check** 61:13

**circumstances** 47:19 48:4

**Civil** 4:21

**claims** 11:19,23 12:21

**clarification** 10:11 31:22 46:14

**Class** 32:25

**clause** 52:15

**clear** 65:6,19 66:22

**client** 42:19 43:6

**colleagues** 5:24

**collect** 45:10

**collecting** 46:7

**collection** 47:4

**collective** 74:15

**collectively** 25:19

**column** 56:11,24 57:5,10,12,18

**columns** 57:20

**commenced** 12:20

**commencement** 27:17

**comments** 7:22

**commit** 33:9

**common** 35:11

**communicate** 49:5

**communications** 25:13 42:9 66:25

**companies** 68:6

**compared** 38:24

**compel** 41:25 42:11, 24

**compensation** 12:5 65:13 66:7 67:12,14, 19 70:11 71:19 72:23

**complete** 25:22 30:13,18 74:11

**completely** 34:18

**compliant** 61:23

**concern** 44:6,20 45:4,23 46:22 47:19 48:4

**concerns** 27:23 35:15

**conclude** 62:2

**concludes** 77:2

**conclusions** 44:23

**condition** 46:8

**confer** 76:12

**confirm** 17:3

**connection** 7:2 9:13,19 11:4,15 13:5 26:8

**consent** 5:4

**consents** 4:25

**consideration** 47:8, 21 50:14,18

**considered** 70:11

**constitute** 45:9

**construct** 38:23 39:12

**consultants** 74:6

**contend** 21:19 28:5 45:8 54:10 60:16

**contends** 20:22 24:25 38:12 39:23 63:7

**contention** 60:22

**contest** 15:10 61:10

**contesting** 61:8

**context** 75:12

**contingency** 62:10

**control** 62:17

**conversation** 12:7, 14 33:18 35:22 43:15 64:16,24 65:3,7 66:15

**conversations** 11:23 12:19 34:7 66:4 67:10 72:6

**copy** 13:7

**Cornerstone** 47:3

**corporate** 54:5,14

**correct** 17:5,10 22:22 23:4,10 25:25 26:4,9,12,16 30:9,20 39:2 47:13,16 50:21, 22 51:23 52:1 63:2 65:9 70:2

**corrected** 14:23 34:11

**correctly** 35:6

**corroborating** 73:9

**cost** 68:7

**counsel** 5:20 6:23 9:23 10:4 11:14 15:13 30:11 67:18 75:4

**counselors** 4:7

**couple** 31:19

**court** 5:10,18 6:5 65:16

**courtroom** 4:20

**covered** 25:15 35:23 53:3 70:15 76:9

**covers** 28:17

**COVID-19** 4:10

**creditor** 69:7,8,21 70:22 71:16,24

**creditors** 69:11,15 70:8,9 71:4,11

**cross-claims** 47:23

**current** 40:6 73:16 74:2,12

**D**

**Dallas** 5:11

**date** 59:8,9 62:18,21, 23

**dated** 9:16,17 21:12 55:3

**dates** 70:3

**day** 35:12 77:14

**Deborah** 5:2 6:2 46:18

**debtor** 73:3 75:22

**debtor's** 72:24

**December** 59:17 63:2 65:25

**declaration** 14:19, 24

**defense** 22:5 37:13 44:7,21 45:4,17,20, 24 46:13,22 47:7,20 48:5

**defenses** 22:2 29:8 40:15 44:2

**defined** 22:11 66:20

**defines** 16:14

**Deitsch-perez** 5:2,3 6:2,3 7:5,11 8:13,16 9:20 14:25 29:11 34:17,22 35:5,17 36:14 38:13 40:2 41:5,10 42:6,13,16, 23 43:9,13 44:8,11 46:16 51:9 61:2 63:9 64:19 67:4 68:21 69:24 71:6 74:3 75:10

**delete** 7:21

**delivered** 70:7

**demand** 24:4 50:5,9, 20 55:7,20,24

**demanded** 53:25 54:15

**denials** 64:14

**deposed** 13:4

**deposition** 4:13 5:7, 13 7:6,17 8:10 9:7 11:5,16 14:13 15:8, 20 21:6 28:14,18 37:16 43:17 49:6,10 54:23 58:11 60:12 63:16 77:3

**describe** 72:22

**detail** 58:17

**determine** 56:5,16 63:6

**difference** 37:3 73:5

**differently** 67:8 75:15

**direct** 42:7

**direction** 9:23

**directly** 62:9

**disclose** 64:5 75:13

**disclosed** 69:9,22 70:22 71:4

**disclosure** 69:5

**discount** 27:18,21, 25

**discovered** 72:25

**discovery** 39:25 40:16 56:9,18 57:7 58:25 63:14,22 72:17 74:14 75:2,23 76:3

**discuss** 13:18

**discussed** 65:12 68:9,25 71:10,13,16, 20,21

**discusses** 72:15

**discussing** 11:9

**discussion** 27:6 33:13 67:15

**disgorged** 48:9

**dispute** 18:9 56:20

**disputing** 12:3 57:9

**distancing** 4:11

**District** 5:11

**Division** 5:11

**document** 8:4,24 16:3,9,10 20:15 21:16,22 22:10 25:3 28:25 29:3,20,22,25 30:12,18,20,24 31:5 39:19 40:20 41:4 49:16,24 50:3,24 51:2,16 52:23 54:21 56:22 58:15 59:4 62:3,20 63:13 75:2

**documents** 9:10,12, 18 10:3 39:22 41:16, 20 42:3 43:22 73:5,9

**Dondero** 5:8 6:1,8, 15 7:1,15 8:1,3,21 9:1 10:1,16 11:1,19 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1,13 21:1,9 22:1 23:1 24:1,20 25:1 26:1 27:1 28:1,21 29:1 30:1 31:1 32:1, 19,23 33:1,7 34:1 35:1,13 36:1 37:1 38:1 39:1,7 40:1 41:1 42:1 43:1 44:1,3,18 45:1 46:1 47:1 48:1 49:1,5,15 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1, 22 64:1 65:1 66:1,21, 22 67:1,24 68:1,19 69:1 70:1 71:1 72:1, 3,19 73:1 74:1,20 75:1,25 76:1,22 77:1, 11

**Dondero's** 13:24

**Dougherty** 70:9

**dozen** 67:11

**drafted** 18:12 23:23

**dual** 36:11

**dual-entry** 62:15

**due** 4:10 51:7 53:9, 19,24 60:24 63:8

**Dugaboy** 36:4,23 67:24 68:19 72:4

**duly** 6:9

**E**

**earlier** 14:6 70:5

**early** 55:25

**East** 5:17

**economics** 62:6

**efforts** 72:22

**eight-minute** 48:20

**employees** 74:5

**enable** 18:3,7 23:17

**end** 18:4 23:18 31:12 35:11 44:2 53:18

**ended** 65:21

**enforceable** 21:20

**enter** 32:19,23 35:2, 25

**entered** 33:7,24 34:13 35:15 36:11, 20,22 37:4,6 54:5 67:25 68:18 71:25

**entries** 56:13

**errata** 14:25 15:2

**essentially** 36:24 37:2

**estate** 65:18 68:10

**estopped** 46:7

**estoppel** 45:21,24 46:17,23

**EXAMINATION** 6:12

**examiner** 40:5

**exchange** 17:15,21 23:9 47:16 50:19

**exclude** 9:22

**excluded** 65:23 66:3

**executed** 27:16

**exhibit** 7:14,15,17 15:15,18,20 21:6,10 28:11,12,14 48:12 49:9,10 54:22,23 55:18 58:10,11 61:18 63:14,16

**existence** 64:5 66:17 67:2 69:6,22 72:15

**expectation** 62:18

**expects** 53:7

**expenses** 23:20 53:5

**extended** 73:16

**extent** 33:6 42:8

---

**F**

**fact** 20:12 25:15

**facts** 44:5,20 45:2,3, 23 46:12,21 47:18 48:3 57:23

**factual** 57:9 64:14

**failure** 42:2 47:8,20

**fair** 15:3 19:9,19 22:7 25:20 27:15,24 33:5 35:4,5 39:2 63:4

**fairness** 74:5

**faith** 72:22

**fall** 47:24

**familiar** 8:23 9:5 21:25 49:15

**February** 16:11 17:13,19 18:8 19:15 21:12 23:8,14,18 64:6 69:10,12,23 70:4,24 71:5,17,25

**Federal** 4:21

**fide** 37:22 39:8,11,12, 14

**figures** 56:16 57:5

**file** 30:24 40:19

**filed** 5:9 29:17 30:8, 14,19 37:24 65:8

**financial** 11:2,6 26:16,19 28:6 39:13 42:20 43:7

**financials** 28:2 40:3, 6 62:9

**fine** 13:3 69:3

**finish** 68:14

**firm** 6:24 30:7,19,24 40:19

**fiscal** 18:4

**flexible** 38:3

**flow** 62:7

**focus** 66:11

**focused** 38:10

**follow-up** 55:16 67:9

**foot** 62:12

**footnotes** 60:25 61:4

**forgave** 73:17

**forgive** 72:4

**forgiven** 13:22 28:2 37:21 68:5 71:19 74:13

**forgiveness** 12:3 45:12,25 46:24 72:24

**forgot** 63:19

**form** 29:12 36:15 40:23 41:6,11 51:10 61:3 64:20 74:4

**forward** 25:8 66:2 73:2

**Frank** 64:6 65:12 66:5,16 67:11,16

**full** 8:5

**fully** 64:13

**fund** 5:7 16:15 52:25

**funding** 52:19

---

**G**

**GAAP** 61:23

**gave** 14:4 75:21,22, 23

**gears** 25:12 28:10

**general** 13:19 35:10 67:17

**generally** 11:21 12:2 14:3 20:16 22:3 41:9 49:18 55:15 59:6 62:5 75:4

**give** 73:8 75:11

**good** 4:6 6:15,16 72:22

**governance** 54:5

**Grant** 31:20

**Grosvenor** 67:17 69:13 70:8

**Grosvenor's** 65:25

**grounds** 9:21

**guaranteed** 37:17

**guess** 10:5 12:9 48:18

---

**H**

**half** 9:8 67:11

**handled** 28:3

**happy** 31:4 38:7 48:12

**Hayley** 5:25

**HCMF** 50:10,20 52:19,25

**HCMFA** 5:3 6:1,4,21 7:1 8:1 9:1,15 10:1, 17,20,23 11:1 12:1 13:1 14:1 15:1 16:1 17:1,5,12,18,20,23 18:1,3,7,8,18 19:1,8, 14,20 20:1,19,22 21:1,19 22:1,11,15, 25 23:1,2,3,7,9,12,17 24:1,24 25:1 26:1,8, 12 27:1,17 28:1,5 29:1,15 30:1,5,8,16 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1, 12 39:1,22 40:1,3,20 41:1 42:1 43:1 44:1,5 45:1,3,8 46:1 47:1, 11,12 48:1 49:1 50:1, 5 51:1,20 52:1,7,19 53:1,7,14 54:1,10 55:1 56:1,4,15,20 57:1,4,8,17 58:1,4,7 59:1,7 60:1,13,16,22 61:1 62:1,17 63:1,5 64:1,4 65:1 66:1 67:1 68:1 69:1 70:1 71:1

72:1,2,14 73:1,15 74:1 75:1,21,22 76:1 77:1

**HCMFA's** 10:8 19:21 21:25 22:14 24:23 25:13,24 26:15,18, 21,24 27:8,11,13,23 28:12,18,20 29:9,17 31:6 37:12 40:10,13, 15 44:19 45:22 46:6, 12,22 47:20 48:4 54:13 57:23 59:22 61:14,19 62:3,22 63:21 66:20 74:25 76:2,4,6

**hcmfa/dondero** 7:17 15:20 21:6 28:14 49:10 54:23 58:11 63:16

**HCMLP** 9:15 11:19, 24 12:22 50:3,8 54:15 55:19

**HCMLP's** 56:5

**HCMS** 52:6

**head** 24:22 25:11

**headquartered** 5:16

**hear** 6:17

**heard** 35:20

**helpful** 20:11 72:13

**Highland** 4:24 5:7,9, 23 10:13 15:10 16:14 17:14,19,24 18:15,17 19:14 23:8,13,17 36:3 39:24 40:2,6,15 41:16,20 42:19 46:6 47:11 48:10 50:19 52:18 53:14,25 54:10 55:7 58:25 62:17 68:2,20 69:7,9 70:12, 13 71:12 73:15,17 74:2,12,13

**Highland's** 40:20 41:3 42:2 45:9 62:22 65:24 76:3

**highly** 61:23

**hints** 25:7

**hit** 39:11

**hope** 34:10

**hour** 9:9

**human** 73:23,25

---

**I**

**idea** 41:15,19

**ideally** 72:25 73:2

**identification** 52:15

**identified** 15:15

**identify** 34:2 35:14 39:22 43:22 44:5,19 50:18 69:8,21 70:22 71:3 73:15 75:5

**imagine** 61:20,21

**improper** 60:17

**improperly** 60:23

**inaccuracy** 75:6

**inaccurate** 14:11,22 28:7 29:9 31:7 75:3, 20 76:6

**inadequate** 41:22

**include** 11:2

**includes** 47:23

**including** 47:2 70:8

**incomplete** 14:11 31:7 75:3,6,20 76:6

**inconsiderate** 50:11

**independent** 54:7 70:7

**individual** 6:20 16:23 19:12 27:4 33:23 35:14

**individuals** 33:24 34:2 35:14

**industry** 38:25

**inform** 42:18 43:6

**information** 13:23 39:23 43:23 61:10 75:14

**initially** 12:12

**inquire** 42:8

**inquiry** 51:15

**insignificant** 50:12

**institution** 61:24

**insufficient** 41:23

**intend** 16:22

**intended** 17:8 22:23
23:2

**intent** 17:3 39:7

**intercompany** 24:4

**interest** 25:6 56:25
60:24 62:20 63:8

**interrogatory** 72:10
73:10,12,20 75:7

**introduce** 5:20

**involved** 33:16 73:7,
8

**issue** 11:7,11 12:10,
11 15:24 32:17 51:7,
22 52:10 60:14,19
65:2

**L**

**La** 5:25 8:18 29:21

**largely** 25:5

**lawsuit** 11:12,20,24
13:5 32:18 42:15,17
51:8,23 60:19

**lawyer** 9:8

**lawyers** 29:17

**lead** 61:25

**legal** 4:8 5:15 20:3,6
24:13,16 44:22

**letter** 55:3,10,24
57:14 58:2,5,8

**letters** 26:7 65:14

**liabilities** 26:15,20
27:8,13,18 70:15

**liability** 17:8 26:24
62:13

**liable** 22:18

**limitations** 25:6

**lines** 59:18

**list** 44:3 73:23 74:11,
15

**LP** 4:25 5:8,9,24
16:15 68:2

**M**

**made** 11:24 18:7
50:25 51:15 58:22
59:22 60:13 65:17

**main** 6:25 55:17

**maintained** 10:18

**maintaining** 10:8,21

**majority** 32:24

**make** 7:6 20:13
30:12,18 41:25 55:7,
20 65:5 75:13

**maker** 16:14,20,23
17:5,10 22:11,16,20

**malfunction** 10:10

**management** 4:25
5:7,9,24 16:15 26:7
68:2 71:12

**March** 10:17

**marked** 7:18 15:21
21:7,10 28:12,15
49:11 54:24 56:24
58:12 63:17

**material** 68:10,24
69:19 70:16

**matter** 33:15

**means** 7:5

**meant** 37:19 38:3
51:12

**MFA** 75:24

**MGM** 45:5,9 46:9,24
48:7

**Mike** 4:14 5:18 6:4

**Miller** 4:14 5:18

**million** 17:15,20,24
19:14 21:12 23:9,13

**minimal** 39:11

**minute** 67:6 70:2

**moment** 15:5 45:7,
16 47:6 52:11 74:17

**monetization** 47:2

**money** 18:2 23:16
62:12

**months** 31:19

**morning** 4:6 6:15,16

**Morris** 4:23 5:22 6:14
7:7,10,12,13 8:2,15,
17,19 10:2,14 15:2,6,
22 20:12,17 21:4,8
25:9 28:16 29:4,5,14
30:4 32:12,15 34:21,
24 35:6,9,24 36:18
38:5,9,19 39:3,6,21
41:2,8,14 42:8,12,15,
18 43:5,10,11,18,21
44:10,13,17 46:18,20
48:17 49:4,8,12
51:14 55:2 58:13
61:12 63:12,18 64:23
66:10,13 67:21
68:12,15 69:2 70:19,
20 71:14 74:7 75:17,
18 76:11,21,25

**motion** 41:25 42:11,
24 43:2

**move** 32:12 38:5
39:3 48:12 66:10
68:12 70:19

**movements** 62:7

**moving** 65:20

**N**

**Nancy** 11:18,23
12:20 32:10,19,23
33:7 34:4,13 36:22

37:6 66:21 67:23
68:18 72:3,19

**Nancy's** 33:10 35:7,
20

**negotiating** 70:25

**negotiation** 18:17

**negotiations** 24:8
66:23

**netting** 47:23

**Nexpoint** 71:12

**Northern** 5:11

**notarized** 37:24

**note** 16:22,24 17:4,9,
15,21 18:13,16,24
19:20,22,24 20:9,14,
21 21:3,5,10,19 22:5,
16,19,23 23:4,9,24
24:7,10,19,24 31:23,
25 32:7,17,21 33:2,8,
12,14,17,25 34:5,15,
16,19 35:3,16,23
36:2,21 37:5,7 38:25
47:13,16 58:19,20,22
59:23 60:5

**noted** 77:4

**notes** 6:25 9:16 11:7,
11 13:22 14:10
15:19,24 19:3 24:4
25:16,17,18,20
26:12,14,20,23 27:7,
12,18,22 28:8 32:9
37:13,16,20 38:3,7,
12 39:8,9,24 42:17
45:10,12 46:7 51:7,
12,13,21 52:2,3,9
53:23 55:17,18 56:13
59:8 60:9,14,18,24,
25 62:9 63:8 64:18
65:2,13,23 66:3,6,23
67:13 68:5,9 70:10,
11,24 72:5,22

**notice** 7:16 8:10
28:18

**noting** 31:22

**numbers** 57:18

**numerous** 65:12
66:5 67:10

**J**

**James** 5:8 6:8 77:11

**January** 54:4

**Jim** 8:14 24:20 34:19
35:3

**John** 4:23 5:22 34:17
42:10 75:15

**joined** 5:24

**Jones** 4:24 5:23

**Jordan** 4:7 5:15

**judge** 39:4

**judgment** 14:21

**June** 55:4,9 56:2,7,
22 57:15 58:2

**K**

**kind** 25:6 27:19 41:25

**knowledge** 17:7
23:20 59:20 74:11,17

**litigation** 7:2,3 9:13,
14,15 14:10 27:17
41:17,21 55:16,18
56:18 57:7,21 62:10

**loan** 18:6 19:14,17
73:15 74:13

**loaned** 17:14,19
23:17 50:25 51:5,17
52:9,18 53:14

**loans** 61:7,15

**logical** 23:22

**long** 28:25 74:25

**looked** 25:18 55:19

**loose** 38:3 66:6

**lot** 73:8

**mechanisms** 68:8
71:21

**Media** 5:6

**medium** 12:17

**meeting** 7:20 65:25

**members** 66:5 67:17

**memory** 74:16

**mention** 19:6

**mentioned** 18:20
19:5

**met** 9:8

**O**

object 9:21 29:11 36:14 40:22 41:5,10 51:9 61:2 64:19 67:4 69:24 74:3

objected 70:17

objections 15:9,11, 12 28:19

obligations 23:3

obtain 20:3 24:13

obtained 13:7

occurred 46:9

October 65:9

offers 72:21

offices 65:25

ongoing 52:20 53:2, 5

open-ended 38:17

operated 38:2

operating 23:20 53:5

operations 52:20 53:2

opposition 14:20

order 8:5

original 21:11

outline 48:13

outstanding 50:25 51:5,6,17,23 52:2,8, 13,18,25 53:13 54:16 55:8 56:6,12,21 57:13,14,25 60:23 63:7

overwhelmingly 70:14

owed 50:5,10,20

**P**

p.m. 76:16,17,18,20 77:3,4

Pachulski 4:23 5:22

pages 41:15

paid 58:7 62:13

paragraph 29:2 30:2,21 31:15 32:5, 16,20 33:6 34:14 36:9,13 37:9,11 38:10 39:16 43:20 44:2 53:6 72:12

paraphrasing 52:16

part 26:11 33:18 51:2 53:20 55:17 56:17 57:20 64:16 65:3 66:7 70:12 71:19,20 72:25 73:18 74:13 75:23

participating 27:5

parties 4:17 52:15

partner 6:4

party 37:19 67:25 76:7

passed 63:25

Pat 70:9

patience 52:5 76:23

pattern 60:2

pay 18:3,7 23:18

paying 70:3

payment 50:5,9,20 53:25 54:15 55:8

payments 47:24 58:21,23 59:3,7,22 60:9,13,18,22 61:17 62:2,19 63:2

pending 4:22

people 66:5 67:11,18 73:8

perfected 37:24

performance 12:3

period 31:17,18

person 10:7 12:17 62:16

personal 16:23 17:8

personally 19:5,11, 13 22:18 24:20

30:17,23 66:12

perspective 76:6

petition 59:8,9 62:18,21,23

phone 12:17

place 12:7,16 43:16 54:7 67:12,20

plaintiff 32:25

plans 72:21

point 9:3 34:4 35:19 52:13 70:14

portfolio 68:6

portion 29:7,20 68:13

position 46:6 70:25

pot 72:21

potentially 34:4

Powerpoints 65:22

practice 4:11

preceding 31:20

prepaid 48:8

preparation 11:5,16

prepare 9:6

prepared 15:13 18:23 40:14

prepayment 37:25 48:2,5

present 12:13 54:10

presentations 65:15

president 36:3 54:6

pretty 16:2

prevent 44:10,13

previously 42:11

price 68:7

Pricewaterhouseco opers 25:24

Pricewaterhouseco opers' 26:9

principal 17:14,20 21:11 47:12 51:6

52:10 56:6,12,21 60:23 62:19 63:7

principles 62:6

prior 10:6 14:7,9 15:8 29:7 33:13 50:5,10, 20 54:16 57:20 59:8, 9 62:17,21,23 64:11 69:10,11,23 70:4,23 71:16,24

privilege 9:21

privileged 42:9 75:14

Procedures 4:21

proceed 7:9

process 13:21 26:11 59:22 73:2

produce 42:2,25 43:2

produced 39:24 40:3,16 41:16,20 42:19 58:25

production 40:21 41:4

professionals 71:11

program 12:5

promissory 17:15, 21

proper 61:6

proposals 65:17 70:6,17

provided 26:12

public 26:3

purpose 52:24

purposely 37:23

purposes 39:13,14 65:20

pursuant 50:3

push 47:4

put 7:14 15:18 21:4 49:8 54:7

putting 52:10

Pwc 26:12

**Q**

question 8:22 10:16 17:16 30:3 35:13 36:17 38:11,17 44:16,18 46:19 54:3 57:24 62:25 64:21 68:16 70:21 74:19,21 76:4

questions 7:8 12:25 15:14,23 19:7 21:2 25:17 63:20 76:22

quickly 32:14

quote 50:24 52:19 53:7,18,24 72:15

**R**

rambled 70:5

reach 14:5

reached 6:24

read 19:24 24:10 29:18,21 36:16 39:17,20 44:9

Reading 25:4

reask 7:7

reason 18:8 55:16,17

recall 8:11 10:5,6 11:9,22 12:6,16,18, 23 13:2 18:2,5 19:4, 16 23:16 24:9 27:3,5, 9 33:12 37:8 51:15 54:2,4 55:24 67:16

receipt 59:18

receipts 59:2,3,13 60:5

receive 15:7

received 50:8

recess 48:15,24 76:17

recollection 26:6 33:11 34:8 55:7

record 4:13 5:21 7:23 25:22 65:6

Index: recorded..stipulate

**recorded** 7:20 26:15

**recording** 4:18

**records** 10:9,18,22, 24 11:2,11 61:14,19 62:4

**reduced** 51:25

**refer** 25:19

**reference** 50:24 51:5,6 53:17 72:14, 18

**referred** 14:6 51:17 59:16 60:25

**referring** 9:14 25:5

**refers** 52:16 53:13 59:13,14

**reflect** 62:6

**reflected** 19:22 34:18 47:13 57:25 60:10 61:18 62:2,3,8, 20 66:8

**reflecting** 35:6

**reflects** 65:6

**refresh** 28:23 55:6

**regard** 23:21

**relate** 11:7,11 44:6, 20 45:4,23 46:22 47:19 48:4

**relates** 32:6 58:19,20 62:25 65:2

**relating** 33:25

**relayed** 41:13

**relevance** 40:17

**relevant** 39:23 43:23

**remember** 11:25 28:22 33:15 34:6 58:17 72:9

**remote** 4:18

**remotely** 4:14,16

**removed** 26:24

**repay** 53:8

**repeat** 17:16 36:17

**rephrase** 10:16

**reporter** 4:14 5:18 6:6

**Reporting** 4:9 5:16, 19

**represent** 34:9,12 58:18,24

**representation** 26:7 34:10

**representative** 19:8 22:24 32:24 54:14 59:21

**request** 50:14 63:24 66:12 69:4 75:6

**requested** 10:11 46:14 48:15

**requests** 12:24 64:3, 15 74:19 76:3

**required** 49:20

**reserve** 15:10 62:10

**reserved** 15:9

**respect** 21:2 25:15 28:8 32:17,21 33:2,8 34:14,15 35:2 36:2, 20 37:4 38:20 43:12 46:8 59:16 60:5,17 61:15 64:17 66:25 69:20

**respond** 58:4

**responding** 76:7

**response** 42:25 58:8 64:15 73:22 75:6,21

**responses** 63:15,22 75:2 76:2

**responsible** 10:8,21 29:16

**responsive** 42:2

**restate** 46:5,19

**return** 50:9

**review** 8:5 9:10,22 10:3 20:15 25:3 29:3, 22,25 39:19 40:20 41:9

**reviewed** 9:12 14:14

30:12,17 41:3

**reviewing** 29:16

**reviews** 40:7

**rights** 15:9,10

**room** 4:12,15

**Rule** 4:21 7:15 8:9

**rules** 4:21,22

**run** 61:23

**S**

**sale** 45:5,9 46:9 48:7

**Scott** 31:20

**screen** 7:19 21:5

**scroll** 8:14,17,22 16:2,9,18 20:10 21:15 22:21 25:2 28:24 29:23 31:9 49:13 75:8

**scrolled** 29:6

**section** 25:4 26:24

**secured** 37:17

**seek** 20:6 24:16

**seeking** 56:8

**Seery** 65:12,19 66:5 67:17

**sell** 72:21

**senior** 37:17

**sentence** 39:17 50:4 53:18

**separate** 60:5

**September** 59:14

**series** 15:23

**served** 25:24 30:8, 13,19

**servers** 72:24

**set** 36:12 56:21 57:5, 10,13 59:4

**settle** 65:18

**seven-page** 48:13

**severity** 4:10

**share** 75:9

**shareholders** 32:25

**sheet** 26:21,25 27:8, 13,23 70:12,13

**shift** 25:12 28:10

**short** 16:2

**shorter** 7:6

**show** 49:14 61:14

**showed** 70:10

**shows** 58:22

**sic** 21:10

**sign** 16:10,22 17:4 22:23

**signature** 16:6,17,19 17:10 21:16,21 22:6 23:3 49:23

**signatures** 49:14

**signed** 16:8 17:4 19:20,25 20:4,7 21:18 24:11,14,17 26:7 39:8 51:16 52:23 53:23 55:19

**signing** 40:18

**simply** 68:16 70:21

**simultaneously** 36:3

**single** 42:19

**sir** 16:4 58:15 65:10

**sister** 31:21,24 72:2

**sit** 14:8,18 31:3,16 56:19 57:22

**size** 51:25

**skip** 73:11

**Skyview** 10:24 11:6, 10 61:13

**slowly** 8:22 28:25

**small** 33:14

**smaller** 70:9

**social** 4:11

**soft** 37:19

**sold** 68:6

**sole** 42:24

**solely** 32:6

**speak** 11:5 35:12

**specialist** 5:15

**specific** 12:24,25 23:19 64:18 67:16 71:21 72:6

**specifically** 11:25 13:17 14:2 17:25 19:8 21:22 28:23 29:13 33:9 34:6 38:16 40:24 41:7 47:15 52:16 59:24 60:3 65:23 67:8 71:13

**split** 61:7

**spoken** 11:15,18

**spring** 65:11

**stand** 33:19,20 38:16

**standard** 38:25

**stands** 33:21

**Stang** 4:24 5:23

**start** 5:6 59:10

**starting** 65:24

**state's** 4:22

**statement** 26:19 42:20 43:19 59:13, 15,16

**statements** 11:2,7 26:16 28:6 43:7 59:2

**states** 5:10 33:7

**stenographer** 10:12 46:15 48:16

**stenographic** 7:23

**step** 45:18 56:10

**stepped** 54:6

**Stinson** 5:3 6:3 30:7, 19,24 40:19

**stipulate** 4:17

**stipulation** 14:5

**stop** 9:3 29:2,4

**Street** 5:17

**strike** 32:13 38:5 39:3 66:11 68:12 70:6,19

**struck** 67:7

**structured** 37:16

**subject** 15:12 18:17 24:7 28:18 37:24 42:21,24 72:23

**submitted** 14:20

**subpoenaed** 43:3

**Subscribed** 77:13

**subsequent** 46:8

**substance** 13:10,12, 24

**succinctly** 71:8

**sufficient** 74:14

**suggests** 22:5 33:7

**summarizes** 58:21

**summary** 14:20

**support** 46:12 59:2

**swear** 4:15 6:6

**swearing** 4:19

**switching** 20:19

**sworn** 6:9 77:13

**T**

**taking** 14:19

**talk** 43:16

**talked** 34:19,20 36:8

**talks** 69:5

**tapes** 8:20

**tax** 39:13

**team** 71:12

**technical** 7:22

**template** 19:2,3 24:3

**tendered** 15:13

**term** 53:12 71:18

**terms** 36:10,12,19,21 37:3,5,22,23 39:12 62:12 64:5 66:17 67:2,16 68:8,17,23 69:6,9 70:23 71:2,4, 13,15

**terribly** 28:25

**testified** 6:10 13:16, 20 18:6 34:13,25 37:14 64:14,25 65:4 66:16

**testimony** 13:11,13, 24 14:9 32:11 33:10, 19,20 34:18 35:7,11, 21 40:9,10,11,15 43:12,14,19 65:5 66:8 72:14,18 73:5,9 74:9

**Texas** 5:11

**things** 70:5

**thought** 12:9 18:20 50:15

**time** 11:10,15 12:9,20 17:24 27:6,15 29:19 31:17,19 32:4 34:4 35:20 37:8,25 43:20 48:19 50:15,17 51:16 52:11,13 54:9 55:13, 25 68:10 70:14 74:25 77:4

**timely** 14:15

**times** 42:4 65:12

**today** 6:20 20:10,22 24:21,24 26:21 40:10 56:19 57:8,22 68:11 70:14

**today's** 9:7 11:5,16 77:3

**told** 35:3 68:17

**top** 16:10 22:9 23:6 24:22 25:11 49:17 50:23 58:19 60:4 74:18

**topic** 25:15 63:19 74:24

**topics** 8:14,18,23 9:5 15:14 20:20 25:14 28:17

**total** 57:12,14,25

**transactions** 62:7

**transcript** 6:25 13:8

**transcripts** 13:18 14:7,13,21 64:11

**transferred** 23:8 47:12

**treated** 70:10

**treatment** 27:12

**trigger** 45:11

**true** 32:6,8,16 55:14

**Trussway** 47:2

**Trust** 36:5 68:19 72:4

**trustee** 31:18,20,21, 23,24 33:3,17 34:3,5 35:19 36:4,23 65:14 67:24 68:19 72:4

**TSG** 4:9 5:16,19

**two-minute** 76:12

**U**

**UBS** 70:8

**UCC** 66:5 67:17 70:7

**unable** 53:8

**uncovered** 72:16

**understand** 6:19 20:10,16 24:21 30:2 38:21 52:24 73:4

**understanding** 8:6 13:20 24:3 35:11 50:2 51:4 53:22

**unenforceable** 22:6

**United** 5:10

**Unpaid** 56:25

**unredacted** 42:20

**unsecured** 66:6

**usury** 25:5

**V**

**validate** 57:4,17

**validity** 4:18

**verbally** 41:13

**video** 4:18 5:15 48:22 49:2 76:15,19 77:3

**viewed** 68:9

**volume** 41:19,23

**W**

**Wait** 70:2

**waiver** 44:7,21 45:4, 9 46:13

**wanted** 70:6 74:8

**Waterhouse** 64:6, 17,25 66:16 67:2

**Winograd** 5:25 76:13

**withdrawn** 13:11 22:14,25 26:19 30:6 32:11 36:9 43:23 52:6,17 71:23

**word** 16:20 17:10 22:20 36:25

**words** 45:18

**worth** 31:22

**written** 63:21 70:6

**wrong** 34:10

**Y**

**year** 18:4 28:6

**yesterday** 9:9

**York** 5:17

**Z**

**Ziehl** 4:24 5:23

# Exhibit B

Page 1

1                  N. Dondero - Dugaboy

2          IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                     DALLAS DIVISION

4     In re:                     )
                                 )
5     HIGHLAND CAPITAL           )    Case No.
      MANAGEMENT, LP,            )  19-34054-SGJ-11
6                                )  Chapter 11
             Debtor,             )
7     ----------------------------)
      HIGHLAND CAPITAL MANAGEMENT, )
8     LP,                        )
                                 )  Advisory
9            Plaintiff,          )  Proceeding No.
                                 )  21-03082-sgj
10       vs.                     )
                                 )
11    HIGHLAND CAPITAL MANAGEMENT )
      FUND ADVISORS, LP.         )
12                               )
                                 )
13           Defendants.         )

14

15            REMOTE DEPOSITION OF
                 NANCY DONDERO
16            Individually and as
       Corporate Representative of DUGABOY
17               Dallas, Texas
          Friday, 29th day of April, 2022
18

19

20

21

22

23    Reported by:

24    Daniel J. Skur, Notary Public and CSR

25    Job No. 209980

Page 2

```
 1            N. Dondero - Dugaboy
 2
 3
 4
 5
 6
 7        29th day of April, 2022
 8        9:33 a.m. - 10:14 a.m.
 9
10
11        Remote Deposition of NANCY DONDERO,
12   Individually and as Corporate
13   Representative of Dugaboy, located in at
14   the offices of Stinson LLP, 3102 Oak Lawn
15   Avenue, Suite 777, Dallas, Texas, before
16   Daniel J. Skur, Notary Public and Certified
17   Shorthand Reporter in and for the State of
18   Texas located in Waxahachie, Texas.
19
20
21
22
23
24
25
```

Page 3

```
 1              N. Dondero - Dugaboy
 2   A P P E A R A N C E S:
 3       Pachulski Stang Ziehl & Jones
         Attorney(s) for Debtor
 4       780 Third Avenue
         New York, New York 10017
 5       BY:   Hayley Winograd, Esq.
               John Morris, Esq.
 6
 7
 8
         Stinson
 9       Attorney(s)for The Witness and HCMFA
         3102 Oak Lawn Avenue
10       Dallas, Texas 75219
         BY:   Deborah Deitsch-Perez, Esq.
11             Michael Aigen, Esq.
12
13
14
         Greenberg Traurig
15       Attorney(s) for Nancy Dondero
         2200 Ross Avenue
16       Dallas, Texas 75201
         By:   Daniel Elms, Esq.
17
18
19
         Heller, Draper, Hayden, Patrick, & Horn
20       Attorney(s) for Dugaboy
         650 Poydras Street
21       New Orleans, Louisiana 70130
         By:   Douglas Draper, Esq.
22
23
24   ALSO PRESENT:
25             La Asia Canty, Paralegal
```

Page 4

```
 1              N. Dondero - Dugaboy
 2        IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the respective
 4   parties herein, that filing and sealing be and
 5   the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form  of
 8   the question, shall be reserved to the
 9   time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to and
12   signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16                - oOo -
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              N. Dondero - Dugaboy
 2            P R O C E E D I N G S
 3            NANCY DONDERO,
 4   having been duly cautioned and sworn to tell
 5   the truth, the whole truth and nothing but the
 6        truth, testified as follows:
 7             (9:33 a.m.)
 8             EXAMINATION
 9   BY MS. WINOGRAD:
10        Q.    Good morning, Ms. Dondero.  My name
11   is Hayley Winograd.  I'm an attorney at
12   Pachulski Stang Ziehl & Jones representing
13   Highland Capital Management, L.P., as the
14   reorganized debtor; and I'll be taking your
15   deposition today.
16             Do you understand that?
17        A.    I do.  Good morning, Hayley.
18        Q.    Do you understand that you're being
19   deposed today in both your individual capacity
20   and also in your capacity as what's called a
21   30(b)(6) witness on behalf of the Dugaboy
22   Investment Trust?
23        A.    I do.
24        Q.    Can we refer to the Dugaboy
25   Investment Trust as "Dugaboy"?
```

N. Dondero - Dugaboy

1
2  A.  Yes.
3  Q.  And can we refer to Highland Capital
4  Management, L.P., as "Highland"?
5  A.  Yes.
6  Q.  If I refer to "your brother" or
7  "Mr. Dondero," do you understand that I'm
8  referring to James Dondero?
9  A.  Yes.
10  Q.  We'll be putting up documents on the
11  screen from time to time, and if you need to
12  see any other portion of this -- of the
13  document that is not being shown at any given
14  moment, just -- you can just let us know; and
15  if you need me to repeat any questions, also,
16  please, let me know; and if you don't
17  understand a question, please let me know.
18  And, also, if you need to take a break to use
19  the restroom, you can let me know; but if we do
20  take a break, it just can't be in the middle of
21  a question.
22      MS. WINOGRAD:  I want to start with
23      a stipulation we entered into with -- with
24      Mr. Aigen.
25      Mr. Aigen, we entered into our email

N. Dondero - Dugaboy

1
2  exchange from April 26th to April 28th of
3  2022, in which we agreed that the
4  deposition transcripts for any witness that
5  was deposed in connection with the main
6  notes litigation can be used in this
7  adversary proceeding.
8      Can you please confirm this
9      agreement for the record?
10      MR. AIGEN:  Confirmed.
11  BY MS. WINOGRAD:
12  Q.  And, Ms. Dondero, just to make sure
13  you understand, as I'm sure you remember, my
14  colleague, Mr. Morris, deposed you on
15  October 18th of 2021 in connection with the
16  main notes litigation; and so I will not be
17  asking you about a number of topics that he
18  covered during that deposition relating to the
19  other notes, subject to that litigation.
20      Do you understand that?
21  A.  I do.
22  Q.  Okay.
23      MS. WINOGRAD:  I'm going to ask my
24      colleague, Ms. La Asia Canty, to please
25      show Exhibit 1.

N. Dondero - Dugaboy

1
2      (Exhibit 1 introduced.)
3      MS. WINOGRAD:  Okay.  If we could
4      just scroll down a little bit.
5  BY MS. WINOGRAD:
6  Q.  Have you seen this document before?
7  A.  I think so.
8  Q.  Okay.  This is the subpoena that was
9  served on the Dugaboy Investment Trust, right?
10  A.  Yes.
11  Q.  Okay.  And you understand that
12  you've been designated as the corporate
13  representative of Dugaboy, right?
14  A.  Correct.
15  Q.  Okay.  You understand that your
16  answers of Dugaboy's corporate representative
17  will be binding on Dugaboy?
18  A.  Yeah.
19      MS. WINOGRAD:  Okay.  La Asia, if we
20      can please scroll to the topics.
21  BY MS. WINOGRAD:
22  Q.  Can you confirm that you're prepared
23  to testify on these topics?
24      MS. DEITSCH-PEREZ:  Obviously
25      subject to the objections that we filed.

N. Dondero - Dugaboy

1
2  A.  Yes.
3  BY MS. WINOGRAD:
4  Q.  Okay.
5      MS. WINOGRAD:  Okay.  We can take
6      that down for now.
7  BY MS. WINOGRAD:
8  Q.  Did you do anything to prepare for
9  today's deposition?
10  A.  I met with my lawyers yesterday.
11  Q.  Okay.  What -- did you review any
12  documents?
13  A.  I did.
14  Q.  What documents did you review?
15  A.  The trust agreement, the partnership
16  agreement, some of the documents that went back
17  and forth regarding the subpoenas and the
18  complaint.
19  Q.  Did you speak with anybody other
20  than your lawyers?
21  A.  I did not.
22  Q.  Since November 9th of 2021, have you
23  communicated with your brother, Mr. Dondero, at
24  any time about the promissory notes that are
25  the subject of this litigation?

Page 10

N. Dondero - Dugaboy

1           N. Dondero - Dugaboy
2       A.    I have not.
3       Q.    Okay.  And since November 9th of
4   2021, have you communicated with your brother
5   at any time about the defenses HCMFA is
6   asserting in this litigation?
7       A.    I have not.
8       Q.    Okay.  And I just want to clarify
9   that when I say "HCMFA," I'm referring to
10  Highland Capital Management Fund Advisors.
11      A.    Okay.
12      Q.    Have you reviewed the transcript of
13  your earlier deposition --
14      A.    I have.
15      Q.    -- from October of 2021?
16            Are you aware of anything in that
17  transcript that should be corrected or modified
18  to make it more accurate?
19      A.    There was -- there -- I don't know
20  the exact page.  It's towards the end where
21  Mr. Morris asked me a question, and I thought I
22  made it pretty clear throughout the deposition
23  that the questions were only pertaining to
24  those 13 notes and those three agreements, and
25  I thought it was a little ambiguous.  I'm not

Page 11

1   exactly sure on the page.  I can probably find
2   it for you.  But that's the only thing that
3   comes to mind.
4       Q.    Okay.  So just to make sure I
5   understand, so you wanted to just clarify that
6   there was -- there was a portion in the
7   transcript where you wanted to make sure it was
8   clear that you were only talking about the 13
9   notes at issue in that litigation?
10      A.    Correct.  There was just one
11  question that seemed a little vague from
12  Mr. Morris, that it could have seemed that it
13  was broader than I thought it was, where I
14  thought it was just pertaining to the 13 and
15  the three agreements.
16      Q.    Okay.  So other than that, can you
17  think of anything that you forgot to testify
18  about during that deposition?
19            MS. DEITSCH-PEREZ:  Object to the
20      form.
21            THE WITNESS:  Do I still answer?
22            MS. WINOGRAD:  You can --
23      A.    No, Hayley, not -- like I said, that
24  deposition, to me, was just the 13 and the

Page 12

1           N. Dondero - Dugaboy
2   three agreements; so to answer your question,
3   no.
4   BY MS. WINOGRAD:
5       Q.    Okay.  And are you familiar with
6   Highland Capital Management Fund Advisors,
7   L.P., which I referred to as HCMFA a couple
8   minutes ago?
9       A.    (Witness nods head.)
10      Q.    Okay.
11      A.    Yes.
12      Q.    So I'm going to refer to them as
13  HCMFA moving forward.
14      A.    Okay.
15      Q.    Is it your understanding that HCMFA
16  was an affiliate of Highland?
17      A.    Yes.
18      Q.    What's the basis of that
19  understanding?
20      A.    Because it was under Highland's
21  umbrella.  Jim was the beneficiary, or owner.
22      Q.    Is it your understanding that
23  Mr. Dondero owns and controls HCMFA?
24            MS. DEITSCH-PEREZ:  Object to the
25      form.

Page 13

1           N. Dondero - Dugaboy
2           You can still answer.
3           THE WITNESS:  Oh.
4       A.    That was my understanding.
5   BY MS. WINOGRAD:
6       Q.    And what is the basis of that
7   understanding?
8       A.    I believe Jim told me.
9       Q.    Okay.  Are you aware that Highland
10  filed an action against HCMFA on November 9th
11  of 2021 to collect on two promissory notes?
12      A.    I am.
13            MS. WINOGRAD:  La Asia, can you
14      please pull up Exhibit 3?
15            (Exhibit 3 introduced.)
16  BY MS. WINOGRAD:
17      Q.    Okay.  Do you see this promissory
18  note dated February 26th of 2014?
19      A.    I do.
20      Q.    Have you seen it before?
21      A.    Yes.
22      Q.    When did you see it for the first
23  time?
24      A.    Just recently.
25      Q.    Okay.

N. Dondero - Dugaboy

1
2     MS. WINOGRAD:  Can we scroll to the
3   second page, please?
4   BY MS. WINOGRAD:
5     Q.   Do you see that this promissory note
6   is signed by your brother?
7     A.   Yes.
8     Q.   And can we refer to this as "the
9   first HCMFA note"?
10    A.   Certainly.
11        MS. WINOGRAD:  La Asia, can we now
12    pull up Exhibit 4?
13        (Exhibit 4 introduced.)
14  BY MS. WINOGRAD:
15    Q.   Okay.  And do you see -- do you see
16  this promissory note dated February 26th of
17  2016?
18    A.   I do.
19    Q.   And have you seen this before?
20    A.   I have.
21    Q.   When did you see this for the first
22  time?
23    A.   Recently.
24    Q.   Okay.  Within the last couple
25  months?

N. Dondero - Dugaboy

1     A.   I'm -- certainly, sure.
2     Q.   Okay.
3
4         MS. WINOGRAD:  Can we go to the
5     second page, please?
6   BY MS. WINOGRAD:
7     Q.   Do you see this is also signed by
8   your brother?
9     A.   Yes.
10    Q.   Okay.  Can we refer to this as "the
11  second HCMFA note"?
12    A.   Certainly.
13    Q.   And can we refer to the first HCMFA
14  note and the second HCMFA note collectively as
15  "the notes"?
16    A.   Certainly.
17    Q.   Okay.  And are you aware that these
18  notes are the subject of the action Highland
19  commenced against HCMFA in November of 2021?
20    A.   I am.
21        MS. WINOGRAD:  La Asia, can we
22    please pull up Exhibit 5 now?
23        (Exhibit 5 introduced.)
24  BY MS. WINOGRAD:
25    Q.   Okay.  Have you seen this document

N. Dondero - Dugaboy

1
2   before?
3     A.   Yes.
4     Q.   When did you first see it?
5     A.   Just recently.
6     Q.   Are you aware that this is the
7   original answer filed by HCMFA on December 10th
8   of 2021?
9         MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.   Yes.
12  BY MS. WINOGRAD:
13    Q.   Okay.
14    A.   If it's dated, correct?
15    Q.   Uh-huh.
16    A.   Okay.
17        MS. WINOGRAD:  Can we scroll to
18    paragraph 41?
19        Okay.  Perfect.
20  BY MS. WINOGRAD:
21    Q.   It says, among other things, here:
22  Prior to -- "prior to the demands for payment,
23  Plaintiff agreed that it would not collect the
24  Notes upon fulfillment of conditions
25  subsequent.  Specifically, sometime between

N. Dondero - Dugaboy

1
2   December of the year in which each Note was
3   made and February of the following year, Nancy
4   Dondero, as representative for a majority of
5   the Class A shareholders of Plaintiff agreed
6   that Plaintiff would forgive the Notes if
7   certain portfolio companies were sold for
8   greater than cost or on a basis outside of
9   Mr. Dondero's control."
10        Have I read that correctly?
11    A.   You read it correctly.  It's just
12  not stated correctly.
13    Q.   Okay.  How -- how should it be
14  correctly stated?
15    A.   Well, I wasn't the trustee in 2014,
16  so instead of "Nancy," it really should be
17  "Trustee," correct?  I'm not a lawyer, but --
18    Q.   Okay.  So it's your testimony that
19  you were not the trustee in -- at the time that
20  one of these notes...
21    A.   That's correct.  I didn't become
22  trustee until October of '15.
23    Q.   Okay.  So does the statement in
24  paragraph 41 apply to the two notes that are
25  the subject of the action that Highland

Page 18

```
1        N. Dondero - Dugaboy
2   commenced against HCMFA?
3            MS. DEITSCH-PEREZ:  Object to the
4        form.
5        A.    I'm assuming that was the intent,
6   Hayley.  I just have a problem with my name
7   being there for both of them.  I just think
8   that it should be, I guess, "slash Trustee" for
9   the trustee for '14, but I'm assuming that's
10  legally correct.  I don't know.
11  BY MS. WINOGRAD:
12       Q.    Okay.  So is it your testimony,
13  then, that you entered into -- let me phrase it
14  this way:  How would you -- how would you
15  restate the statement of paragraph 41 that I
16  just read?
17            I just want to make sure I'm clear.
18       A.    It's a little out of my scope with
19  the legal part of it, but I guess what I'd be a
20  little more comfortable with is me as the
21  trustee for the '16 note and trustee for
22  whoever was trustee for the note in '14, just
23  to separate that out, I guess, if that could be
24  possible, Hayley.
25       Q.    Okay.  So for the 2016 note, then,
```

Page 19

```
1        N. Dondero - Dugaboy
2   when you're -- when you're saying you were the
3   trustee, I'm going to refer to that -- to the
4   agreement that applies to the 2016 note as the
5   agreement moving forward in this deposition.
6        A.    Okay.
7        Q.    Let's see.
8            You -- do you remember --
9            MS. DEITSCH-PEREZ:  Can I -- Hayley,
10       can I just ask a question?  Are you asking
11       her -- and I should have done this at the
12       beginning, and I apologize.
13           Are you asking her questions
14       throughout the deposition as both Nancy
15       Dondero and as the Dugaboy representative,
16       or are we breaking it -- can she assume
17       when you say "you," you're asking -- you're
18       asking both as Nancy and as the 30(b)(6)
19       representative of Dugaboy?  That might be
20       causing a little of the confusion.
21           MS. WINOGRAD:  When I say "you," I
22       just mean Ms. Dondero in her individual
23       capacity.  When I include Dugaboy, I'm
24       going to be referring to both Nancy Dondero
25       in her individual capacity and Dugaboy.
```

Page 20

```
1        N. Dondero - Dugaboy
2            MS. DEITSCH-PEREZ:  Okay.  Thank
3        you.
4   BY MS. WINOGRAD:
5        Q.    Do you remember when you testified
6   regarding the terms of the agreements covering
7   the 13 notes subject to the main notes
8   litigations back in October of 2021?
9        A.    Do I remember the deposition?
10       Q.    Do you remember when you testified
11  regarding the terms of the agreements covering
12  those 13 notes?
13       A.    Yeah.
14       Q.    Okay.  Is there any term or
15  provision of the agreement covering the 20 --
16  the February 2016 note at issue in this lawsuit
17  that differs from the agreements covering the
18  13 notes you previously testified about?
19       A.    No.
20       Q.    Okay.  So is it fair to say, then,
21  that the terms and the provisions of the
22  agreement covering the February 2016 note is
23  the same as the terms covering the agreements
24  for the 13 notes in the main notes litigation?
25       A.    That's fair, Hayley, yes.
```

Page 21

```
1        N. Dondero - Dugaboy
2        Q.    Okay.  So, then, going back to
3   paragraph 41 of the answer.
4            MS. WINOGRAD:  La Asia, could we go
5        back to paragraph 41, please?
6   BY MS. WINOGRAD:
7        Q.    So, then, it's fair to say that you
8   and your brother, as it pertains to the
9   agreement covering the February 2016 note, you
10  didn't -- you didn't agree to anything not
11  covered in this paragraph, correct?
12       A.    I'm sorry, Hayley.  Could you repeat
13  the question?
14       Q.    Sure.  So as it pertains to the
15  February of 2016 note subject to this
16  litigation, you and your brother didn't agree
17  to anything not covered in this paragraph; is
18  that correct?
19            MS. DEITSCH-PEREZ:  Object to the
20       form.
21       A.    Yes.  I just wanted to reread it,
22  Hayley.
23            Yes.
24  BY MS. WINOGRAD:
25       Q.    Okay.  Are the -- are the portfolio
```

Page 22

N. Dondero - Dugaboy

1  N. Dondero - Dugaboy
2  companies referenced in this paragraph the same
3  portfolio companies subject to the agreement
4  covering the notes in the main notes
5  litigation?
6      A.   Yes, Trussway, Cornerstone, MGM.
7  The same -- the same three, yes.
8      Q.   Okay.  And moving forward, can we
9  refer to these three portfolio companies as
10 "the portfolio companies"?
11     A.   Certainly.
12     Q.   Was there anything substantively
13 different about the conversations you had with
14 your brother regarding the agreement covering
15 the February of 2016 note that was different
16 than the conversations you had with your
17 brother as it pertains to the other agreement?
18     A.   We're going back a long time,
19 Hayley, obviously, so the memory is a little
20 fuzzy.  The only difference that I would
21 imagine, that I think was he would have
22 referenced the note from '14 in the '16
23 conversation.
24     Q.   What do you mean by "he would have
25 referenced" that note in the conversation?

Page 23

1      A.   I -- he -- when we had a
2  conversation in '16, he would have brought up
3  the note in '14 that was also forgiven.
4      Q.   When he brought it up, was he
5  referring to the '14 note that was subject to a
6  previous agreement?
7      A.   Yes.
8      Q.   Okay.  And why did he bring that up?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   The 2016 was my first involvement as
12 trustee, so it would have come up, I'm sure,
13 and it did in conversation that Jim had
14 forgiven a note in '14.
15 BY MS. WINOGRAD:
16     Q.   That Jim had forgiven a note or that
17 Highland had forgiven the note?
18     A.   Well, I believe he was trustee at
19 the time, so he would have caused Dugaboy to
20 cause Highland to forgive the note.
21     Q.   And when you say "Jim," are we
22 referring to Mr. Dondero, your brother?
23     A.   Correct.
24     Q.   Okay -- so -- okay.  And so do you

Page 24

1      N. Dondero - Dugaboy
2  remember what he told you about that?
3      A.   Again, Hayley, it's going back a
4  while.  I don't remember details.  I'm sorry.
5      Q.   That's fine.  So the agreement
6  covering the February of 2016 note -- let me
7  rephrase that.
8          Did you push back on any terms of
9  the agreement covering the February of 2016
10 note?
11     A.   I don't remember any pushback,
12 Hayley.
13     Q.   Okay.  So the agreement covering the
14 2016 note was not subject to negotiation,
15 correct?
16         MS. DEITSCH-PEREZ:  Object to the
17     form.
18     A.   Not that I recall.
19 BY MS. WINOGRAD:
20     Q.   Can you think of anything relating
21 to the agreement covering the February of 2016
22 note that is different in any way from the
23 agreement covering the other 13 notes in the
24 main notes litigation?
25     A.   No, not at this time.

Page 25

1      N. Dondero - Dugaboy
2      Q.   Okay.
3          MS. DEITSCH-PEREZ:  La Asia, we can
4      take that down for now, thank you.
5  BY MS. WINOGRAD:
6      Q.   Okay.  Prior to January 1st of 2021,
7  did you ever disclose the existence of the
8  agreement covering the February of 2016 note to
9  anyone in the world other than your brother?
10     A.   I'm sorry, Hayley.  Can you say it
11 again, please?
12     Q.   Sure.  Prior to January 1st of 2021,
13 did you ever disclose the existence of the
14 agreement covering the note from February of
15 2016 to anyone in the world other than your
16 brother?
17     A.   No, I did not.
18     Q.   Prior to January 1st of 2021, did
19 you ever disclose the terms of the agreement
20 covering the February of 2016 note to anyone in
21 the world other than your brother?
22     A.   Not that I recall.
23     Q.   Are the terms of the agreement
24 covering the February of 2016 note memorialized
25 anywhere in writing?

1     N. Dondero - Dugaboy
2          MS. DEITSCH-PEREZ:  Object to the
3     form.
4          A.    Not that I'm aware of.
5     BY MS. WINOGRAD:
6          Q.    Is the existence of the agreement
7     memorialized anywhere in writing?
8          MS. DEITSCH-PEREZ:  Object to the
9     form.
10         A.    Not that I know of, Hayley.
11    BY MS. WINOGRAD:
12         Q.    Do you know if the terms of the
13    agreement were ever written down anywhere?
14         A.    They weren't by me.
15         Q.    Have you ever seen the terms of the
16    agreement written down anywhere?
17         A.    I'm sorry, did I ever what?
18         Q.    Have you ever seen the terms of the
19    agreement written down anywhere?
20         MS. DEITSCH-PEREZ:  Form.
21         A.    I have not.
22    BY MS. WINOGRAD:
23         Q.    Okay.  And I just want to clarify
24    that when I'm referencing "the agreement," I am
25    referring to the agreement covering the

1     N. Dondero - Dugaboy
2     February of 2016 note, unless I say otherwise.
3          A.    Okay.
4          Q.    Did anyone ever tell you that the
5     terms of the agreement was ever written done
6     anywhere?
7          A.    Not that I recall.
8          Q.    Did you ever ask anyone if the terms
9     of the agreement were ever written down
10    anywhere?
11         A.    I don't think so.
12         Q.    Did it ever occur to you to write
13    the terms of the agreement down anywhere?
14         A.    No.
15         Q.    Did you ever discuss with your
16    brother, Mr. Dondero, whether you should write
17    down the terms of the agreement anywhere?
18         A.    Not that I remember, huh-uh.
19         Q.    Was anyone present at the time you
20    entered into the agreement with your brother?
21         A.    I don't think so, Hayley.
22         Q.    Can you think of anyone in the world
23    other than you and your brother who knows about
24    the existence of the agreement?
25         MS. DEITSCH-PEREZ:  Object to the

1     N. Dondero - Dugaboy
2     form.
3          A.    I'm not aware of anyone that he
4     would have told, Hayley.
5     BY MS. WINOGRAD:
6          Q.    Before entering into the agreement,
7     did you or Dugaboy know the value of Highland's
8     interest in each portfolio company?
9          A.    No.
10         Q.    Did you or Dugaboy ever ask anyone
11    for this information before entering into the
12    agreement?
13         A.    No.
14         Q.    Before entering into the agreement,
15    did you or Dugaboy know the cost that Highland
16    paid to acquire its interest in each of the
17    portfolio companies?
18         A.    No.
19         Q.    Did you or Dugaboy ever ask anybody
20    for this information?
21         A.    No.
22         Q.    So at the time you entered into the
23    agreement -- the agreement, neither you nor
24    Dugaboy knew whether Highland's cost to acquire
25    its interest in each of the portfolio companies

1     N. Dondero - Dugaboy
2     exceeded the value of Highland's interest in
3     the portfolio companies?
4          A.    That's correct.
5          Q.    Okay.  Was Highland's benefit from
6     the agreement the same as Highland's benefit
7     from the agreement covering the 13 notes in the
8     other litigation?
9          A.    Yes.
10         Q.    So is it fair to say that there's
11    nothing different about -- let me rephrase
12    that.
13         So is it fair to say that Highland
14    didn't receive anything in exchange for its
15    agreement that it did not receive in exchange
16    for the agreement to cover the 13 notes in the
17    other litigation?
18         MS. DEITSCH-PEREZ:  Object to the
19    form.
20         You mean the same type of thing?
21    BY MS. WINOGRAD:
22         Q.    Did Highland receive anything in
23    exchange for its agreement to forgive the
24    February 2016 note that it did not receive in
25    exchange for its agreement to forgive the other

1        N. Dondero - Dugaboy
2   13 notes?
3            MS. DEITSCH-PEREZ:  Object to the
4       form.
5       A.   No, I don't believe so, Hayley.
6   BY MS. WINOGRAD:
7            MS. WINOGRAD:  Okay.  Let's take a
8       five-minute break and come back at 11:08,
9       if that works for everybody.
10           THE WITNESS:  That would be great.
11      I'd love to get a water.
12           (Recess held.)
13  BY MS. WINOGRAD:
14      Q.   So just a few more questions for
15  you.  You testified earlier that when you
16  entered into -- that when you caused Dugaboy to
17  enter into the agreement as it relates to the
18  February 2016 note, you said your brother,
19  Mr. Dondero, referenced the agreement
20  pertaining to the February of 2014 note,
21  correct?
22      A.   I believe so, yes.  It's a little
23  fuzzy, Hayley.  It was a long time ago, but
24  yes, I believe he did.
25      Q.   Okay.  Did he tell you that an

1   agreement was in place with respect to the 2014
2   note?
3       A.   Yes.
4       Q.   Okay.  Did your brother tell you who
5   entered into that agreement pertaining to the
6   2014 note?
7       A.   That he did.
8       Q.   Okay.  So he told you that he did,
9   and did he tell you who else did?
10      A.   I don't remember, Hayley.
11      Q.   Okay.  So you don't -- so you do
12  remember that he told you that he entered into
13  the agreement and was that -- was that correct?
14      A.   Yes, I believe so, uh-huh.
15      Q.   Did he say that he entered into it
16  on behalf of Dugaboy?
17      A.   (No response.)
18      Q.   I'm sorry.  Let me rephrase that.
19           Did he say that he caused Dugaboy to
20  enter into the agreement?
21      A.   He caused Dugaboy to cause Highland
22  to enter into the agreement, correct.
23      Q.   Okay.  Did your brother tell you
24  what the terms of the 2014 -- of the agreement
25

1        N. Dondero - Dugaboy
2   pertaining to the 2014 notes were?
3       A.   Of the note?
4       Q.   Of the -- of the agreement covering
5   the 2014 note.
6       A.   It was very -- it was the same as
7   the agreements from the ones we've discussed
8   already and the ones we're discussing now.
9       Q.   Okay.  Okay.  Did he tell you
10  anything about the agreement covering the
11  February 2014 note other than that one -- other
12  than that one existed?
13           MS. DEITSCH-PEREZ:  Object to the
14      form.
15      A.   Hayley, you mean the terms --
16  BY MS. WINOGRAD:
17      Q.   The terms --
18      A.   -- of the agreement?
19      Q.   Other than the fact that one
20  existed, did he tell you anything about that
21  2014 -- the agreement covering the 2014 note?
22      A.   The agreement was -- is the same as
23  the ones that we've discussed for 17, 18, 19,
24  and now the second note in '16 -- the second
25  note of the party we're talking about today.

1        N. Dondero - Dugaboy
2       Q.   But he didn't tell you anything
3   about the term -- he didn't disclose anything
4   about the terms of the agreement pertaining to
5   the 2014 --
6            MS. DEITSCH-PEREZ:  Object to the
7       form.
8   BY MS. WINOGRAD:
9       Q.   -- note, correct?
10           MS. DEITSCH-PEREZ:  Object to the
11      form.
12      A.   Well, he -- I'm sorry, Hayley, maybe
13  I'm misunderstanding.  He did.  The terms that
14  we know and have discussed on all the other
15  agreements were the same for '14.
16  BY MS. WINOGRAD:
17      Q.   Okay.  I'm just trying to --
18      A.   Does that answer --
19      Q.   -- find out if he told you that,
20  though?
21      A.   Yes.
22      Q.   Okay.
23           MS. WINOGRAD:  I might be done.
24  Just give me a second.
25           THE WITNESS:  Certainly.  Thank you,

Page 34

1    N. Dondero - Dugaboy
2   Hayley.
3        MS. WINOGRAD:  Okay.  I'm actually
4   all finished.  So thank you very much,
5   Ms. Dondero.
6        THE WITNESS:  Thank you, Hayley.
7   You have a great day.
8        MS. WINOGRAD:  You, too.  Nice
9   meeting you.
10       THE WITNESS:  Nice meeting you.
11  Bye-bye now.
12       (Time Noted:  10:14 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 35

1    N. Dondero - Dugaboy
2            C E R T I F I C A T E
    STATE OF TEXAS    )
3                     )
    COUNTY OF ELLIS   )
4
5        I, Daniel J. Skur, a Notary Public
    within and for the State of Texas, do
    hereby certify:
6        That NANCY DONDERO, Individually and
    as Corporate Representative of Dugaboy, the
7   witness whose deposition is hereinbefore
    set forth, was duly sworn by me and that
8   such deposition is a true record of the
    testimony given by such witness.
9        That pursuant to Rule 30 of the Federal
    Rules of Civil Procedure, signature of the
10  witness was not reserved by the witness or
    other party before the conclusion of the
11  deposition;
         I further certify that I am not
12  related to any of the parties to this
    action by blood or marriage; and that I am
13  in no way interested in the outcome of this
    matter.
14       IN WITNESS WHEREOF, I have hereunto
    set my hand this 29th day of April, 2022.
15
16
17
18  _____
    Daniel J. Skur
19  Notary Public, State of Texas.
    My Commission Expires 7/7/2022
20  TSG Reporting, Inc.
    228 East 45th Street, Suite 810
21  New York, New York
    (877) 702-9580
22
23
24
25

Page 36

1   NAME OF CASE:
2   DATE OF DEPOSITION:
3   NAME OF WITNESS:
4   Reason Codes:
5       1.  To clarify the record.
6       2.  To conform to the facts.
7       3.  To correct transcription errors.
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25          _____

Page 37

1            J U R A T
2
3   I, _____, do hereby certify under
4   penalty of perjury that I have read the foregoing
5   transcript of my deposition taken on _____;
6   that I have made such corrections as appear noted
7   herein in ink, initialed by me; that my testimony as
8   contained herein, as corrected, is true and correct.
9
10  DATED this ____ day of _____, 20 ,
11  at _____,      .
12
13
14
15
16
17  _____
18       SIGNATURE OF WITNESS
19
20
21
22
23
24
25

Page 38

```
1           -------I N D E X-------
2    WITNESS:        EXAMINATION BY        PAGE:
3    NANCY DONDERO, Individually and as Corporate
4    Representative of Dugaboy
5           By Ms. Winograd              5
6
7                  *****
8    --------------------EXHIBITS-------------------
9
10   Debtor Exhibits             PAGE/LINE
11   Exhibit 1   Highland Capital        8/2
                 Management, L.P.'s Notice
12               of Second Amended Subpoena
                 to the Dugaboy Investment
13               Trust
                 9 pages
14
     Exhibit 3   2/26/2014 Promissory Note  13/15
15               Bates No. D-HCMFA2-017575
                 through 0175676
16
     Exhibit 4   2/26/2016 Promissory Note  14/13
17               Bates No. D HCMFA 2017573
                 through 017574
18
     Exhibit 5   Defendant's Original      15/23
19               Answer
                 8 pages
20
21
22
23
24
25
```

**1**

**1** 7:25 8:2

**10:14** 34:12

**10th** 16:7

**11:08** 30:8

**13** 10:24 11:9,15,25 20:7,12,18,24 24:23 29:7,16 30:2

**14** 18:9,22 22:22 23:4,6,15 33:15

**15** 17:22

**16** 18:21 22:22 23:3 32:24

**17** 32:23

**18** 32:23

**18th** 7:15

**19** 32:23

**1st** 25:6,12,18

**2**

**20** 20:15

**2014** 13:18 17:15 30:20 31:2,7,25 32:2, 5,11,21 33:5

**2016** 14:17 18:25 19:4 20:16,22 21:9, 15 22:15 23:12 24:6, 9,14,21 25:8,15,20, 24 27:2 29:24 30:18

**2021** 7:15 9:22 10:4, 15 13:11 15:19 16:8 20:8 25:6,12,18

**2022** 7:3 35:14

**26th** 7:2 13:18 14:16

**28th** 7:2

**29th** 35:14

**3**

**3** 13:14,15

**30** 35:9

**30(b)(6)** 5:21 19:18

**4**

**4** 14:12,13

**41** 16:18 17:24 18:15 21:3,5

**45th** 35:20

**5**

**5** 15:22,23

**7**

**7/7/2022** 35:19

**8**

**810** 35:20

**877 702-9580** 35:21

**9**

**9:33** 5:7

**9th** 9:22 10:3 13:10

**A**

**a.m.** 5:7 34:12

**accurate** 10:18

**acquire** 28:16,24

**action** 13:10 15:18 17:25 35:12

**adversary** 7:7

**Advisors** 10:10 12:6

**affiliate** 12:16

**agree** 21:10,16

**agreed** 7:3 16:23 17:5

**agreement** 7:9 9:15, 16 19:4,5 20:15,22 21:9 22:3,14,17 23:7

24:5,9,13,21,23 25:8, 14,19,23 26:6,13,16, 19,24,25 27:5,9,13, 17,20,24 28:6,12,14, 23 29:6,7,15,16,23, 25 30:17,19 31:2,6, 14,21,23,25 32:4,10, 18,21,22 33:4

**agreements** 10:24 11:16 12:2 20:6,11, 17,23 32:7 33:15

**Aigen** 6:24,25 7:10

**ambiguous** 10:25

**answers** 8:16

**apologize** 19:12

**applies** 19:4

**apply** 17:24

**April** 7:2 35:14

**Asia** 7:24 8:19 13:13 14:11 15:21 21:4 25:3

**asserting** 10:6

**assume** 19:16

**assuming** 18:5,9

**attorney** 5:11

**aware** 10:16 13:9 15:17 16:6 26:4 28:3

**B**

**back** 9:16 20:8 21:2,5 22:18 24:3,8 30:8

**basis** 12:18 13:6 17:8

**beginning** 19:12

**behalf** 5:21 31:17

**beneficiary** 12:21

**benefit** 29:5,6

**binding** 8:17

**bit** 8:4

**blood** 35:12

**break** 6:18,20 30:8

**breaking** 19:16

**bring** 23:9

**broader** 11:14

**brother** 6:6 9:23 10:4 14:6 15:8 21:8,16 22:14,17 23:23 25:9, 16,21 27:16,20,23 30:18 31:5,24

**brought** 23:3,5

**Bye-bye** 34:11

**C**

**called** 5:20

**Canty** 7:24

**capacity** 5:19,20 19:23,25

**Capital** 5:13 6:3 10:10 12:6

**caused** 23:20 30:16 31:20,22

**causing** 19:20

**cautioned** 5:4

**certify** 35:5,11

**Civil** 35:9

**clarify** 10:8 11:6 26:23

**Class** 17:5

**clear** 10:22 11:9 18:17

**colleague** 7:14,24

**collect** 13:11 16:23

**collectively** 15:14

**comfortable** 18:20

**commenced** 15:19 18:2

**Commission** 35:19

**communicated** 9:23 10:4

**companies** 17:7 22:2,3,9,10 28:17,25 29:3

**company** 28:8

**complaint** 9:18

**conclusion** 35:10

**conditions** 16:24

**confirm** 7:8 8:22

**Confirmed** 7:10

**confusion** 19:20

**connection** 7:5,15

**control** 17:9

**controls** 12:23

**conversation** 22:23, 25 23:3,14

**conversations** 22:13,16

**Cornerstone** 22:6

**corporate** 8:12,16 35:6

**correct** 8:14 11:11 16:14 17:17,21 18:10 21:11,18 23:24 24:15 29:4 30:21 31:14,23 33:9

**corrected** 10:17

**correctly** 17:10,11, 12,14

**cost** 17:8 28:15,24

**COUNTY** 35:3

**couple** 12:7 14:24

**cover** 29:16

**covered** 7:18 21:11, 17

**covering** 20:6,11,15, 17,22,23 21:9 22:4, 14 24:6,9,13,21,23 25:8,14,20,24 26:25 29:7 32:4,10,21

**D**

**Daniel** 35:4,18

**dated** 13:18 14:16 16:14

**day** 34:7 35:14

**debtor** 5:14

**December** 16:7 17:2

**defenses** 10:5

**DEITSCH-PEREZ**
8:24 11:20 12:24
16:9 18:3 19:9 20:2
21:19 23:10 24:16
25:3 26:2,8,20 27:25
29:18 30:3 32:13
33:6,10

**demands** 16:22

**deposed** 5:19 7:5,14

**deposition** 5:15 7:4,
18 9:9 10:13,22
11:19,25 19:5,14
20:9 35:7,8,11

**designated** 8:12

**details** 24:4

**difference** 22:20

**differs** 20:17

**disclose** 25:7,13,19
33:3

**discuss** 27:15

**discussed** 32:7,23
33:14

**discussing** 32:8

**document** 6:13 8:6
15:25

**documents** 6:10
9:12,14,16

**Dondero** 5:1,3,10
6:1,7,8 7:1,12 8:1
9:1,23 10:1 11:1
12:1,23 13:1 14:1
15:1 16:1 17:1,4 18:1
19:1,15,22,24 20:1
21:1 22:1 23:1,23
24:1 25:1 26:1 27:1,
16 28:1 29:1 30:1,19
31:1 32:1 33:1 34:1,5
35:1,6

**Dondero's** 17:9

**Dugaboy** 5:1,21,24,
25 6:1 7:1 8:1,9,13,
17 9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1

17:1 18:1 19:1,15,19,
23,25 20:1 21:1 22:1
23:1,20 24:1 25:1
26:1 27:1 28:1,7,10,
15,19,24 29:1 30:1,
16 31:1,17,20,22
32:1 33:1 34:1 35:1,6

**Dugaboy's** 8:16

**duly** 5:4 35:7

**E**

**earlier** 10:13 30:15

**East** 35:20

**ELLIS** 35:3

**email** 6:25

**end** 10:20

**enter** 30:17 31:21,23

**entered** 6:23,25
18:13 27:20 28:22
30:16 31:6,13,16

**entering** 28:6,11,14

**exact** 10:20

**EXAMINATION** 5:8

**exceeded** 29:2

**exchange** 7:2 29:14,
15,23,25

**exhibit** 7:25 8:2
13:14,15 14:12,13
15:22,23

**existed** 32:12,20

**existence** 25:7,13
26:6 27:24

**Expires** 35:19

**F**

**fact** 32:19

**fair** 20:20,25 21:7
29:10,13

**familiar** 12:5

**February** 13:18
14:16 17:3 20:16,22
21:9,15 22:15 24:6,9,

21 25:8,14,20,24
27:2 29:24 30:18,20
32:11

**Federal** 35:9

**filed** 8:25 13:10 16:7

**find** 11:2 33:19

**fine** 24:5

**finished** 34:4

**five-minute** 30:8

**forgive** 17:6 23:21
29:23,25

**forgiven** 23:4,15,17,
18

**forgot** 11:18

**form** 11:21 12:25
16:10 18:4 21:20
23:11 24:17 26:3,9,
20 28:2 29:19 30:4
32:14 33:7,11

**forward** 12:13 19:5
22:8

**fulfillment** 16:24

**Fund** 10:10 12:6

**fuzzy** 22:20 30:23

**G**

**give** 33:24

**Good** 5:10,17

**great** 30:10 34:7

**greater** 17:8

**guess** 18:8,19,23

**H**

**hand** 35:14

**Hayley** 5:11,17 11:24
18:6,24 19:9 20:25
21:12,22 22:19 24:3,
12 25:10 26:10 27:21
28:4 30:5,23 31:11
32:15 33:12 34:2,6

**HCMFA** 10:5,9 12:7,
13,15,23 13:10 14:9

15:11,13,14,19 16:7
18:2

**head** 12:9

**held** 30:12

**hereinbefore** 35:7

**hereunto** 35:14

**Highland** 5:13 6:3,4
10:10 12:6,16 13:9
15:18 17:25 23:18,21
28:15 29:13,22 31:22

**Highland's** 12:20
28:7,24 29:2,5,6

**huh-uh** 27:18

**I**

**imagine** 22:21

**include** 19:23

**individual** 5:19
19:22,25

**Individually** 35:6

**information** 28:11,
20

**intent** 18:5

**interest** 28:8,16,25
29:2

**interested** 35:13

**introduced** 8:2
13:15 14:13 15:23

**Investment** 5:22,25
8:9

**involvement** 23:12

**issue** 11:10 20:16

**J**

**James** 6:8

**January** 25:6,12,18

**Jim** 12:21 13:8 23:14,
17,22

**Jones** 5:12

**K**

**knew** 28:24

**L**

**L.P.** 5:13 6:4 12:7

**La** 7:24 8:19 13:13
14:11 15:21 21:4
25:3

**lawsuit** 20:16

**lawyer** 17:17

**lawyers** 9:10,20

**legal** 18:19

**legally** 18:10

**litigation** 7:6,16,19
9:25 10:6 11:10
20:24 21:16 22:5
24:24 29:8,17

**litigations** 20:8

**long** 22:18 30:23

**love** 30:11

**M**

**made** 10:22 17:3

**main** 7:5,16 20:7,24
22:4 24:24

**majority** 17:4

**make** 7:12 10:18
11:5,8 18:17

**Management** 5:13
6:4 10:10 12:6

**marriage** 35:12

**matter** 35:13

**meeting** 34:9,10

**memorialized** 25:24
26:7

**memory** 22:19

**met** 9:10

**MGM** 22:6

**middle** 6:20

**mind** 11:4

**minutes** 12:8

**misunderstanding** 33:13

**modified** 10:17

**moment** 6:14

**months** 14:25

**morning** 5:10,17

**Morris** 7:14 10:21 11:13

**moving** 12:13 19:5 22:8

**N**

**Nancy** 5:3 17:3,16 19:14,18,24 35:6

**negotiation** 24:14

**Nice** 34:8,10

**nods** 12:9

**Notary** 35:4,19

**note** 13:18 14:5,9,16 15:11,14 17:2 18:21, 22,25 19:4 20:16,22 21:9,15 22:15,22,25 23:4,6,15,17,18,21 24:6,10,14,22 25:8, 14,20,24 27:2 29:24 30:18,20 31:3,7 32:3, 5,11,21,24,25 33:9

**Noted** 34:12

**notes** 7:6,16,19 9:24 10:24 11:10 13:11 15:15,18 16:24 17:6, 20,24 20:7,12,18,24 22:4 24:23,24 29:7, 16 30:2 32:2

**November** 9:22 10:3 13:10 15:19

**number** 7:17

**O**

**Object** 11:20 12:24

16:9 18:3 21:19 23:10 24:16 26:2,8 27:25 29:18 30:3 32:13 33:6,10

**objections** 8:25

**occur** 27:12

**October** 7:15 10:15 17:22 20:8

**original** 16:7

**outcome** 35:13

**owner** 12:21

**owns** 12:23

**P**

**Pachulski** 5:12

**paid** 28:16

**paragraph** 16:18 17:24 18:15 21:3,5, 11,17 22:2

**part** 18:19

**parties** 35:12

**partnership** 9:15

**party** 32:25 35:10

**payment** 16:22

**Perfect** 16:19

**pertaining** 10:23 11:15 30:20 31:6 32:2 33:4

**pertains** 21:8,14 22:17

**phrase** 18:13

**place** 31:2

**Plaintiff** 16:23 17:5,6

**portfolio** 17:7 21:25 22:3,9,10 28:8,17,25 29:3

**portion** 6:12 11:7

**prepare** 9:8

**prepared** 8:22

**present** 27:19

**pretty** 10:22

**previous** 23:7

**previously** 20:18

**prior** 16:22 25:6,12, 18

**problem** 18:6

**Procedure** 35:9

**proceeding** 7:7

**promissory** 9:24 13:11,17 14:5,16

**provision** 20:15

**provisions** 20:21

**Public** 35:4,19

**pull** 13:14 14:12 15:22

**pursuant** 35:9

**push** 24:8

**pushback** 24:11

**putting** 6:10

**Q**

**question** 6:17,21 10:21 11:12 12:2 19:10 21:13

**questions** 6:15 10:23 19:13 30:14

**R**

**read** 17:10,11 18:16

**recall** 24:18 25:22 27:7

**receive** 29:14,15,22, 24

**recently** 13:24 14:23 16:5

**recess** 30:12

**record** 7:9 35:8

**refer** 5:24 6:3,6 12:12 14:8 15:10,13 19:3 22:9

**referenced** 22:2,22, 25 30:19

**referencing** 26:24

**referred** 12:7

**referring** 6:8 10:9 19:24 23:6,23 26:25

**related** 35:12

**relates** 30:17

**relating** 7:18 24:20

**remember** 7:13 19:8 20:5,9,10 24:2,4,11 27:18 31:11,13

**reorganized** 5:14

**repeat** 6:15 21:12

**rephrase** 24:7 29:11 31:19

**Reporting** 35:20

**representative** 8:13,16 17:4 19:15, 19 35:6

**representing** 5:12

**reread** 21:21

**reserved** 35:10

**respect** 31:2

**response** 31:18

**restate** 18:15

**restroom** 6:19

**review** 9:11,14

**reviewed** 10:12

**Rule** 35:9

**Rules** 35:9

**S**

**scope** 18:18

**screen** 6:11

**scroll** 8:4,20 14:2 16:17

**separate** 18:23

**served** 8:9

**set** 35:7,14

**shareholders** 17:5

**show** 7:25

**shown** 6:13

**signature** 35:9

**signed** 14:6 15:7

**Skur** 35:4,18

**slash** 18:8

**sold** 17:7

**speak** 9:19

**Specifically** 16:25

**Stang** 5:12

**start** 6:22

**State** 35:2,5,19

**stated** 17:12,14

**statement** 17:23 18:15

**stipulation** 6:23

**Street** 35:20

**subject** 7:19 8:25 9:25 15:18 17:25 20:7 21:15 22:3 23:6 24:14

**subpoena** 8:8

**subpoenas** 9:17

**subsequent** 16:25

**substantively** 22:12

**Suite** 35:20

**sworn** 5:4 35:7

**T**

**taking** 5:14

**talking** 11:9 32:25

**term** 20:14 33:3

**terms** 20:6,11,21,23 24:8 25:19,23 26:12, 15,18 27:5,8,13,17 31:25 32:15,17 33:4, 13

**testified** 5:6 20:5,10, 18 30:15

**testify** 8:23 11:18

**testimony** 17:18 18:12 35:8

**Texas** 35:2,5,19

**thing** 11:3 29:20

**things** 16:21

**thought** 10:21,25 11:14,15

**time** 6:11 9:24 10:5 13:23 14:22 17:19 22:18 23:20 24:25 27:19 28:22 30:23 34:12

**today** 5:15,19 32:25

**today's** 9:9

**told** 13:8 24:2 28:4 31:9,13 33:19

**topics** 7:17 8:20,23

**transcript** 10:12,17 11:8

**transcripts** 7:4

**true** 35:8

**Trussway** 22:6

**trust** 5:22,25 8:9 9:15

**trustee** 17:15,17,19, 22 18:8,9,21,22 19:3 23:13,19

**truth** 5:5,6

**TSG** 35:20

**type** 29:20

---

**U**

**uh-huh** 16:15 31:15

**umbrella** 12:21

**understand** 5:16,18 6:7,17 7:13,20 8:11, 15 11:6

**understanding** 12:15,19,22 13:4,7

---

**V**

**vague** 11:12

---

**W**

**wanted** 11:6,8 21:21

**water** 30:11

**WHEREOF** 35:14

**Winograd** 5:9,11 6:22 7:11,23 8:3,5, 19,21 9:3,5,7 11:23 12:4 13:5,13,16 14:2, 4,11,14 15:4,6,21,24 16:12,17,20 18:11 19:21 20:4 21:4,6,24 23:16 24:19 25:5 26:5,11,22 28:5 29:21 30:6,7,13 32:16 33:8,16,23 34:3,8

**works** 30:9

**world** 25:9,15,21 27:22

**write** 27:12,16

**writing** 25:25 26:7

**written** 26:13,16,19 27:5,9

---

**Y**

**year** 17:2,3

**yesterday** 9:10

**York** 35:21

---

**Z**

**Ziehl** 5:12

| | | | |
|---|---|---|---|
| 1 | NAME OF CASE: | | Highand Capital Management LP v. Highland Capital Management Fund |
| 2 | | | Advisors LP (21-03082-sgj, USBC-NDTX) |

3   DATE OF DEPOSITION:       4/29/22

4   NAME OF WITNESS:       Nancy Dondero

5   Reason Codes:

6        1.      To clarify the record.

7        2.      To conform to the facts.

8        3.      To correct transcription errors.

9   Page **10**      Line **23**      Reason **1**

10   From **the questions were only** to **the questions and my answers were only**

11   Page **18**      Line **21**      Reason **1**

12   From _____ to **delete second "trustee for"**

13   Page **23**      Line **4**      Reason **1**

14   From **that was also forgiven.** to **that was also to be forgiven upon the condition subsequent.**

15   Page **23**      Line **14-15**      Reason **1**

16   From **Jim had forgiven a note** to **Jim had entered into an agreement potentially to forgive**

17   Page **23**      Line **21**      Reason **1**

18   From **cause Highland to forgive the note.** to **cause Highland to agree potentially to forgive the**
19   **note upon the occurrence of the condition subsequent.**

20

21   _____

22                              JURAT

23   I, **Nancy Dondero** , do hereby certify under penalty of perjury that I have read the

24    foregoing transcript of my deposition taken on **April 29, 2022**; that I have made

25   such corrections as appear noted herein in ink, initialed by me; that my testimony as contained

26   //

CORE/3522697.0002/174822268.2

**App. 435**

1   herein, as corrected, is true and correct.

2

3   DATED this ___14th___ day of ___June___, 2022,

4   At ___Chase Bank - 1010 Beachland Blvd Ste 102, Vero Beach, FL 32963___

5

6       NOELLE L SOTOMAYOR
        Notary Public - State of Florida
7       Commission # HH 226716
        My Comm. Expires Feb 9, 2026

8

9

10  _____

11          SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20