**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexandre J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>　　　　Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj<br><br>AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

---

[1]  The last four digits of the Reorganized Debtor's taxpayer identification number are (8357).  The Reorganized Debtor is a Delaware limited partnership.  The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,

Defendants.

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II.  PARTIES ......................................................................................................4

III.  JURISDICTION, VENUE & STANDING ..................................................12

IV.  FACTUAL ALLEGATIONS ...................................................................14

A.  Dondero Creates HCMLP..........................................................14

B.  HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ..........15

C.  In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ................................................................18

    1.  NexPoint ........................................................................19

    2.  HCMFA ...........................................................................22

D.  Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability ............................................25

    1.  Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry ...............................................26

    2.  Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ......................29

    3.  Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS.....................................................................30

    4.  Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty ...............................33

E.  Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy .......................................35

F.  Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP .................................................................................38

    1.  HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ...............................39

    2.  HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ...................................................................41

    3.  HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct .......................42

G.  HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ...................43

H.  At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ..........................................................................................46

1.  Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ..................................................................46

2.  Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ..........................................................................47

I.  Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ..................................................................................................55

1.  Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ..................................55

(a)  The Fraudulent CLO Holdco Transaction ....................55

(b)  Fraudulent Distributions ................................................58

(c)  Fraudulent Transfers To Massand ................................63

J.  Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ..........................................................................65

K.  Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ..................................................................................66

V.  CAUSES OF ACTION ....................................................................................67

PRAYER FOR RELIEF ................................................................................................141

Plaintiff Marc S. Kirschner (the "Litigation Trustee"), as Litigation Trustee of the Litigation Sub-Trust (the "Trust") established pursuant to the Fifth Amended Plan of Reorganization (the "Plan") of Highland Capital Management L.P. ("HCMLP" or the "Reorganized Debtor") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I.    INTRODUCTION[2]

1.    The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "Dondero Entities"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2.    HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading.  Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities.  The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3.    HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities.  Even when HCMLP's full role was hidden—

---

[2]  Capitalized terms not defined in this section are defined later in the Amended Complaint.

either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4.      In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession.  The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5.      Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized.  The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation.  The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services.  The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6.      In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment.   Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, with the goal of moving funds to yet another Dondero Entity;

- Caused the fraudulent transfer of assets worth at least $100 million out of HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7.    Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts.  As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8.    In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP.  An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection.  Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

3

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9.      In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10.      HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II.      PARTIES

11.      Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan.

12.      Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his removal on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October

4

16, 2019, when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP

through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership

of, or control over the owners of, HCMLP's limited partnership interests.  As set forth below,

Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within

the Highland web, including the dozens of Dondero Entities referenced herein.

13.     Defendant Mark A. Okada is an individual who, upon information and belief, at

all times relevant to this Amended Complaint was residing in Dallas, Texas.  Okada is the co-

founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after

which he assumed an advisory role through the end of that year.  After Dondero, Okada was the

next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited

partners.  Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14.     Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is

wholly-owned by Dondero.  Since HCMLP's formation, Strand has been its general partner and

owned limited partnership interests in HCMLP.   At all times relevant to this Amended

Complaint, Strand's principal place of business was 300 Crescent Court, Suite 700, Dallas,

Texas 75201.

15.     Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited

partnership.  NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited

partner.  NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the

remaining 0.1%.  NexPoint and NexPoint GP were both formed on March 20, 2012.  NexPoint

concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint

GP's sole member and president.  At all times relevant to this Amended Complaint, NexPoint's

principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

5

16.    Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy").  Dugaboy is a grantor trust established under the laws of the state of Delaware.  Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees.  Dondero is Dugaboy's primary beneficiary.  Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees.  Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee.  In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy.  Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9 economic interest in NexPoint.  At all times relevant to this Amended Complaint, Dugaboy's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17.    Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3]  HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest).    Dondero controls,

---

[3]   HCMFA was originally created by Dondero on February 9, 2009, as Highland Funds Asset Management, L.P. ("HFAM").  On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4]   Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

6

and is the sole stockholder and director of, Strand Advisors XVI, Inc.  Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5]  HCMFA has acknowledged that it is controlled by Dondero.  At all times relevant to this Amended Complaint, HCMFA's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

18.    Defendant Scott is an individual who currently resides in North Carolina.  At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities:  he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd.  Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding.  Scott has testified under oath that Dondero is his "closest friend."  Dondero personally selected Scott as his successor to run the Charitable DAF Fund.  Dondero also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc.  Scott is also the executor of Dondero's will.  Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date.  Scott has no training in finance or compliance and no investment experience.  Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

---

[5]    Dondero is the Director and President of Highland Capital Management Services, Inc.  Scott Ellington is its Secretary.

19.     Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.  At all times relevant to this Amended Complaint, Ellington was a Texas resident.

20.     Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests.  At all times relevant to this Amended Complaint, Leventon was a Texas resident.

21.     Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands.  Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021.  At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021.  According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

22.     Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands.  At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director.  DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

23.     Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010.  CLO Holdco is a wholly-owned subsidiary of the DAF.  CLO Holdco filed a proof of claim in HCMLP's bankruptcy case, which was subsequently amended to reduce the claim amount to zero.[6]  In January 2022, CLO Holdco attempted to further amend the proof of claim to reassert a positive claim amount.  CLO Holdco has no employees or officers.  According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract).   Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco, which would then be rubber-stamped by Scott.  At all times relevant to this Amended Complaint, CLO Holdco's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

24.     As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets.  Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected.  Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

25.     Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation.  The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick.  Dondero also acted

---

[6]   This proof of claim was signed by Grant Scott in his capacity as CLO Holdco's sole director. Grant Scott served in that capacity at all times relevant to this proceeding.

as Highland Dallas's president, and Scott served as its treasurer.  Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26.     Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware.  According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts:  Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good."  Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27.     Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware.  Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP.  Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP.  Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

10

28.     Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

29.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas.  Okada controls MAP #1, which he created for the benefit of his children.

30.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas.  Okada controls MAP #2, which he created for the benefit of his siblings.

31.     Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002.  Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon.  Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015.  Massand LLC received payments from HCMLP between February 25, 2015, and August 1, 2019.  Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

32.     Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas.  Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters.  SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic

interests in SAS, respectively.  Upon information and belief, Ellington is the Chief Executive Officer of SAS.

### III.    JURISDICTION, VENUE & STANDING

33.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code.  *See In re Highland Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

34.    Venue is proper in this Court under 28 U.S.C. § 1409(a).

35.    This Court has personal jurisdiction over the defendants because each of the Defendants:  (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

36.    The Plan created the Claimant Trust, which was vested with assets including substantially "all Causes of Action" and "any proceeds realized or received from such Assets."  The Plan also created the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan.  The Plan defines Estate Claims to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing."  Proceeds

from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]"

37.     On October 8, 2021, the Claimant Trust confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Amended Complaint.  All of the claims asserted in this Amended Complaint belong to the Litigation Sub-Trust, not the Reorganized Debtor.

38.     Under the Plan, the Claimant Trust Beneficiaries are (i) the Holders of Allowed General Unsecured Claims and (ii) the Holders of Allowed Subordinated Claims, whose Claims are junior to those distributed to Holders of Allowed General Unsecured Claims.[7]  The Claimant Trust Beneficiaries' claims against the Reorganized Debtor's estate are substantial and exceed, in aggregate, $380 million.  To date, neither the Holders of Allowed General Unsecured Claims nor the Holders of Allowed Subordinated Claims have been paid at all.

39.     The Trustee has standing to avoid all transfers described herein pursuant to 11 U.S.C. § 544(b) and applicable law.  On the date of the Debtor's bankruptcy filing, at least one or more unsecured creditors who held an allowable claim, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis (all as defined herein), could have sought under state law to avoid each of the transfers made on or after October 16, 2015.  The Internal Revenue Service filed an amended Proof of Claim in the Debtor's bankruptcy case on October 6, 2021, which asserts unsecured claims including for the tax period of June 30, 2015.  Under applicable state and federal law, the IRS was entitled to seek to avoid all transfers at issue herein

---

[7]     Holders of certain Allowed Limited Partnership Interests may become Claimant Trust Beneficiaries but only if *all* Allowed General Unsecured Claims, Allowed Subordinated Claims, and costs and expenses are indefeasibly paid in full.

as a present or future creditor, including transfers that occurred on or before October 16, 2015, because the IRS's claim arose within a reasonable time of those transfers.

## IV.    FACTUAL ALLEGATIONS

### A.    Dondero Creates HCMLP

40.    HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada.  The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

41.    By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.  As of the Petition Date, HCMLP had three primary business lines:  (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

42.    Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP.  HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management.  Dondero

14

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

43.     As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[8]  At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[9]

### B.     HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages

44.     Around 2008, HCMLP's business began to falter, as the financial crisis began to set in.  The funds that HCMLP managed faced large losses, followed by substantial redemptions.  In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

45.     At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages.  In March 2008, HCMLP and its managed funds Highland CDO

---

[8]  A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans.  A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations.  A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940.  A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security.  A separately-managed account ("SMA") is a managed investment vehicle that has only one investor.  A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries.  A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[9]  At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding

Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[10] had entered

into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of

debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The

governing agreements required the Fund Counterparties to post collateral based on the mark-

to-market value of certain collateralized debt obligations. The value of these assets dropped by

more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties

failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and

claimed that it was owed 100% of its losses—which UBS alleged was as much as $745

million—from HCMLP and the Fund Counterparties.

     46.     On February 24, 2009, UBS commenced an action against HCMLP and the Fund

Counterparties in New York state court. As amended and consolidated, UBS asserted claims

against HCMLP for actual and constructive fraudulent transfer and breach of the implied

covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009,

HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's

parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March

2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

---

[10]   The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this
proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory
agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC
is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this
proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and
its general partner and as a member of HFP's monitoring committee. HFP's general partner is a
wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of
HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this
Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

47.     Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi.  Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral.  The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi.  On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls.  On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to:  (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

48.     In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action").  The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day.  Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

17

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

49.     Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

C.     **In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

50.     In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

51.     It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge funds, private equity funds, and retail funds;

- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;

- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and

- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as a healthcare equity advisor.

### 1. NexPoint

52.      NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

53.      Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

54.      For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low

19

fee payments. NexPoint continued to reap the vast majority of the generated fees, however. NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**



55.    Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow" to set up new entities controlled by Dondero and to "fund all their negative working capital."

56.    Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-

20

market, and had few to no covenants.  NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period.  At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

57.    Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement.  According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]"  By May 2017, NexPoint owed HCMLP more than $30 million.  Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period.  Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

58.    Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity, a low coupon rate, no covenants, and no security.  HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

59.    Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated.  On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan.  *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. Jan. 22, 2021).  NexPoint has raised

a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of Dondero's compensation.  More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue.    HCMLP has moved for summary judgment on this matter.

60.    From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income.  Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million.  Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million.  By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

## 2.    HCMFA

61.    Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada.  HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

62.     On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[11] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund), Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA.  HCMLP received no consideration for the transfer.  Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed.  Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services.  Thus, the effect of the transfer was to insert a new entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

63.     HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV").  Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA.  And HCMLP received no fee with respect to the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds.  Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees.  If

---

[11]   On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint.  Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF."  The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**



64.     Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively).  Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021.  As of the Petition Date, $6.3 million was outstanding on the notes subject to the

forbearance agreement.  In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

65.     Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP.  On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the debt.  HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error.  As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014, and February 26, 2016, and interest and fees continue to accrue.  HCMLP has moved for summary judgment on this matter.

**D.     Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability**

66.     As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero, along with Scott Ellington, HCMLP's Chief Legal Officer and General Counsel, and Isaac Leventon, HCMLP's Assistant General Counsel, engaged in other actions that meaningfully harmed HCMLP.  This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, Ellington, but conferred no benefit on HCMLP.  Ellington and Leventon were also financially rewarded by Dondero for faithfully serving Dondero's interest, rather than HCMLP's, even where doing was detrimental to HCMLP.  As described below, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against

HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements for hundreds of millions of dollars.

      **1.**     **Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry**

67.     In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP"). Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions. Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis. Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs. HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees. Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors. In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities. As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

68.     By 2016, tensions between Dondero and Terry hit a boiling point. Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs. Terry was the investment manager for the CLOs, and

opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

69.     On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

70.     Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions

27

benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.

71.    Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018.  In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case.  This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").  Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

72.    Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs.  This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate.  Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's

28

advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[12]

### 2.    Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

73.    Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest").  At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[13]  In soliciting this investment, Dondero and Ellington failed to disclose material facts

---

[12]    Dondero's litigation crusade against Terry and Acis continues to date.  On May 14, 2021, NexPoint, acting under Dondero's direction, caused one of its managed retail funds, NSOF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged.  On May 20, 2021, NSOF then filed a motion in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization.  On September 9, 2021, the bankruptcy court conducted a lengthy hearing, and on September 24, 2021, declined to issue the order requested by NSOF and held that NSOF must amend its complaint to comply with the plan injunction.  On October 8, 2021, NSOF then filed a motion asking the Bankruptcy Court to reconsider its ruling, but withdrew the motion on December 1, 2021.  NSOF filed an Amended Complaint in the SDNY action on November 23, 2021.  Acis, U.S. Bank, N.A., Brigade, and HCLOF (as defendant intervenor) filed motions to dismiss, which were fully briefed in March 2022, and remain pending.

[13]    CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[14]

74.   In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including:  (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

75.   Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by NexPoint and HCMFA.  Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

**3.   Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS**

76.   In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties,

---

[14]   HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees.  Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

and its fraudulent transfer claims against HCMLP, could proceed to trial.[15]  Shortly thereafter, Dondero, Ellington, and Leventon, along with HCMLP employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[16] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[17]  In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of at least $100 million—to Sentinel.

77.     The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the Fund Counterparties' first $100 million of liability to UBS.  The real goal of the transfer, however, was to drain the Fund Counterparties' assets and render the Fund Counterparties judgment-proof, while keeping the assets within Dondero's and Ellington's control.  There is no legitimate explanation as to why the Fund Counterparties transferred assets worth at least four times the premium payment to Sentinel.  And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

---

[15]   UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

[16]   Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies.  Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

[17]   In December 2017, Ellington caused Dilip Massand and DiOrio to be appointed as directors of Sentinel.

78.     Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy.  Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it.   In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets.  Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy.

79.     As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, HCMLP inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS.  In March 2021, after the policy was uncovered through HCMLP's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy.  To date, Sentinel has refused to make any payments.

80.     On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

$1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

**4.    Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty**

81.    HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees. After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees. With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis. HCMLP contributed assets to HERA, which then distributed proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

82.    Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

83.     Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs.  In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to Highland ERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

84.     When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

85.     Daugherty then sued HCMLP, HERA, Highland ERA Management, and Dondero in the Delaware Chancery Court.  A Vice Chancellor concluded that HCMLP, Dondero, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case.  The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

86.     In total, HCMLP suffered at least $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

**E.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That
Results In An Arbitration Award Against It Of Approximately $190 Million
And Forces HCMLP Into Bankruptcy**

87.    Dondero, Ellington, and Leventon also engaged in misconduct relating to
HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P.,
Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader
Funds") that resulted in an arbitration award against HCMLP of approximately $190 million.
HCMLP had placed the Crusader Funds into wind-down in October 2008.  Investors in the
funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against
HCMLP, based on allegations that Dondero had refused to make mandated distributions and
honor redemption requests, and traded the funds' positions in a manner designed to render them
illiquid in order to deter future redemptions, which led to multiple disputes among redeeming
investors.   Certain of these lawsuits were ultimately resolved in July 2011, when the parties
entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement
for its creditors (together, the "Joint Plan and Scheme").  As part of the Joint Plan and Scheme,
a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds'
investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds
to investors.

88.    The peace would not last, however.  On July 5, 2016, the Redeemer Committee
(i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery
Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer
Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had
forfeited any right to indemnification as a result of its failure to distribute proceeds to investors
of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration")

against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor.  After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses.  On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million.  Ultimately, the panel awarded ten forms of damages:  (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

89.    The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit.  For example, the "Barclays Claim"— which gave rise to over $30 million in liability for HCMLP—arose out of Dondero, Ellington, and Leventon causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer.  In so doing, Dondero, Ellington, and Leventon caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties.  Because of Dondero, Ellington, and Leventon's wrongful conduct, HCMLP was ordered to pay:  (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement

of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

90.     In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused HCMLP to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR").  During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that HCMLP had purchased the Plan Claims.  Pursuant to the arbitration award, HCMLP was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

91.     Dondero's, Ellington's, and Leventon's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company").  Some of the Portfolio Company's stock was owned by the Crusader Funds.  Dondero, Ellington, and Leventon caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that Dondero controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in the Portfolio Company as their fiduciary duties required.  Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

92.     Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete.  Dondero, Ellington, and Leventon caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016.  The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

93.     The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award.  The hearing was subsequently continued to October 16, 2019.  HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

**F.     Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP**

94.     As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP.  As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington, Leventon, and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

95.     Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct.  HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

### 1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct

96.     On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[18]  The UBS claim sought "damages arising from HCMLP's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

97.     In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting.  In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076.  Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

98.     Subsequently, HCMLP and UBS engaged in settlement discussions and mediation.  Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing.  This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP.  But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

---

[18]   The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

99.     While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring.  Purportedly acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets.  The Independent Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

100.     When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS.  As a result, the parties reopened settlement discussions.  Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim.  In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer.  The Bankruptcy Court approved the UBS settlement on May 27, 2021.

2.      **HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct**

101.    On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things:  (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[19]  The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

---

[19]   Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award.  Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

102.    Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets.   Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account.   The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP.   Pursuant to that settlement, Acis received a $23 million allowed claim against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[20] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

103.    On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "HarbourVest Proofs of Claim") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP:  (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his

---

retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

[20]    Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

104.    HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million.  Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim.  The value of the HCLOF interests that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

### G.    HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy

105.    The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy.  But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued.  As Dondero himself has acknowledged under oath, as a result of the economic recession of 2008 HCMLP "almost went under and . . . moved to a state of insolvency" from which HCMLP was still struggling to emerge in 2012.[21]  Indeed, as shown below, a valuation of HCMLP's assets and liabilities shows that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in

---

[21]   Mar. 28, 2012 H'rg Tr. 62:06-10 (J. Dondero), *In the Matter of the Marriage of I.C. and Q.C.*, Cause No. 11-16417-Z (Tex. Dist. [256th Dist.]).

2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value. Contemporaneous valuations performed by the company itself corroborate this conclusion.

106. More specifically, these valuations show that when litigation liabilities resulting from claims by Barclays and UBS against HCMLP are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013.

| | Apr. 9, 2010 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Apr. 30, 2013 |
|---|---|---|---|---|---|
| Total Assets Less Financial Liabilities[22] | ($32M) | ($22) | $60M | $101M | $145M |
| Litigation Liabilities[23] | $365M | $365M | $365M | $145M | $145M |
| Net Value | ($397M) | ($387M) | ($305M) | ($44M) | ($1M) |

107. The creation of the lifeboats and subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. HCMLP's financial condition began to improve in late 2013, due largely to

---

[22] HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

[23] Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

successful proprietary trading and overall improving market conditions, but those gains began

to dissipate in 2015 due to Dondero's reckless trading.

108.    By December 2016, the company was again firmly insolvent, inadequately

capitalized, and/or unable to pay its debts as they came due, in large part because its CLOs were

generating diminishing returns, and the company was earning only minimal fees for servicing

other Dondero Entities rather than generating new business of its own, while continuing to bear

significant employee expenses.  HCMLP's financial condition deteriorated further between

2017 and 2019, as additional litigation claims were levied against the company, and it was

forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

109.    Specifically, as shown below, when litigation liabilities resulting from claims by

UBS, the Redeemer Committee, and Acis against HCMLP are taken into account in valuations

prepared on HCMLP's behalf, HCMLP was insolvent from no later than December 31, 2016,

until the date it filed for bankruptcy.

| | Dec. 19, 2016 | Dec. 31, 2017 | Dec. 31, 2018 | Oct. 16, 2019 |
|---|---|---|---|---|
| Total Assets Less Financial Liabilities[24] | $183M | $260M | $184M | $101M |
| Litigation Liabilities[25] | $212M | $365M | $365M | $365M |
| Net Value | ($29M) | ($105M) | ($181M) | ($264M) |

---

[24]   HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities.  HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner.  Figures are rounded to the nearest million.

[25]   Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

**H.    At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit**

110.    At all times relevant to this Amended Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes.  Dondero treated the elaborate corporate web he had created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

**1.    Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand**

111.    Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker.  Dondero made every material business, operational, management, and financial decision for HCMLP.  Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled.  Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020.  For eight years he was also its secretary and only officer.

112.    Strand did not even attempt to maintain the pretenses of observing corporate formalities.  As an initial matter, Strand did not hold regular board meetings.  Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date.  This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

113.    Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005.  The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

114.    Dondero was the only officer of Strand between 1993 and 2001.  Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero.  Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance."  Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

### 2.    Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form

115.    As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct or indirect ownership stakes for his own personal benefit.  Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[26] to carry out his will.  As high-level HCMLP employees have testified under

---

[26]  *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

47

oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

116.    Dondero managed the entities as a single integrated unit.  Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made.  Indeed, as far back as 2011, company projections provided to the valuation advisor CBIZ Valuation Group projected negative operating income for HCMLP.

117.    Dondero used his domination of his web of entities, operated as a single unit, to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created or controlled.  As described above, Dondero operated NexPoint and HCMFA for the purpose of siphoning off HCMLP's revenue and value; in addition, he used HCMLP as NexPoint's and HCMFA's direct piggy-bank, transferring not only HCMLP's business and agreements, but also its cash, which was used to seed new funds and investment vehicles, among other things.

118.    Dondero's control of the various entities within the Highland web was so pervasive that his own co-founder Okada remarked at one point in 2012, "I am not cool with you coming up with ideas, using Highland's cash flow to set them up, fund all their negative working capital and then somehow think the split shouldn't be 75 25 without some sort of negotiation and true up [(i.e., making new entities that Dondero owned entirely on his own)]."

Indeed, a 2016 draft accounting memo concluded that HCMLP, HCMFA, and NexPoint (and all of their subsidiaries) "are considered to be under common control … James Dondero controls all 3 of the entities."  This conclusion accords with statements NexPoint's and HCMFA's own funds have made in public filings,[27] as well as the Bankruptcy Court's finding that they are both "controlled by Dondero."[28]

119.   Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year.  At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests.  For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper.  Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good.  Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of NexPoint and HCMFA as described above, as well as for the benefit of his personal trusts.  For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion.  HCMLP employees were involved

---

[27]  *See*, *e.g.*, NexPoint Real Estate Strategies Fund, Prospectus (Form 497) (as filed Apr. 29, 2022) ("NexPoint Advisors, L.P. … is controlled by James Dondero by virtue of his control of its general partner, Nexpoint Advisors GP, LLC."); Highland Income Fund, Prospectus Supplement (To Prospectus dated July 1, 2019) (Form 497) (July 29, 2019) ("HCMFA is owned by Highland Capital Management Services, Inc. ("HCM Services")  and its general partner, Strand Advisors XVI, Inc., of which James Dondero is the sole stockholder.  HCM Services is controlled by Mr. Dondero and Mr. Mark Okada by virtue of their respective share ownership.").

[28]  *See* Order Dismissing as Moot Debtor's Motion for a Mandatory Injunction, *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P. (In re Highland Capital Mgmt., L.P.)*, Adv. Proc. No. 21-03010-sgj11 (Bankr. N.D. Tex. Feb. 24, 2021) (Docket No. 25).

in creating, managing, and providing accounting services to Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources.

120.    This use of HCMLP's employees for Dondero's personal benefit continued even after the commencement of HCMLP's bankruptcy. For example, after the bankruptcy commenced, Schroth instructed Nancy Dondero to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to HCM AG authorizing this theft. Likewise, Dondero frequently instructed HCMLP's employees to perform services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

121.    Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. Employees shared the same office space in HCMLP's headquarters. Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address: 300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they

sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand.  In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all.  For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[29]  Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

122.    Additionally, Dondero delegated authority to his loyalists irrespective of their titles or roles.  For example, Dondero delegated decision-making authority for Acis to Ellington, notwithstanding that he was not an officer, director, or employee of Acis.  And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

123.    Dondero would also use HCMLP as his own personal piggy-bank.  For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes.  Dondero remains obligated on three of the demand notes and maintains an outstanding principal

---

[29]    Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS.  SAS did not compensate any of these HCMLP employees for their work for SAS.  Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated:  "Thank you for calling SAS Asset Recovery.  For reception press 0.  For Scott [Ellington], press 1.  For Dilip [Massand], press 2.  For JP [Sevilla], press 3.  For Tabor [Pittman, former HCMLP Associate GC], press 4.  For Katie [Irving], press 5.  For Isaac [Leventon], press 6.  Thanks and have a good day."

balance of approximately $9 million.  HCMLP has demanded payment on all of the outstanding

demand notes, but to date, Dondero has failed to make any repayments on that debt.[30]

124.    Dondero also effectively paid himself and Okada distributions from HCMLP

through other Dondero Entities, including HCMS.  Between 2013 and 2017, HCMS issued

dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between

May 2017 through 2020, HCMS issued four additional promissory demand notes with an

aggregate face amount of $900,000.  Frequently, these notes functioned as disguised

distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by

a "loan" from HCMS to Dondero and Okada.  As with other intercompany notes between

HCMLP and other Dondero Entities, these notes had minimal covenants.  Moreover, Dondero

caused HCMLP to issue these loans to HCMS with minimal interest.

125.    To take yet another example, Dondero exploited HCMLP's employees and

capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade

HCMLP's creditors.[31]   HCRE pursued financial and real estate investments, failing to pay

---

[30]  In January 2021, HCMLP filed adversary proceedings against Dondero and four of his affiliated
entities (HCMFA, NexPoint, HCRE, and HCMS) in the Bankruptcy Court to collect on these
notes.  *See*, *e.g.*, *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj
(Bankr. N.D. Tex. Jan. 22, 2021).  Dondero and his affiliated entities have raised a series of
frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's
sister—agreed to forgive the notes as part of Dondero's compensation.  As of December 2021, the
defendants owed an aggregate of over $50 million in past-due principal and interest on the
notes.  In November 2021, HCMLP filed a second adversary proceeding against HCMFA to
collect on additional notes.  *See Highland Capital Management, L.P. v. Highland Capital
Management Fund Advisors, L.P.*, Adv. Pro. 21-03082-sgj.  In this second notes litigation,
HCMFA has raised a similarly frivolous defense.

[31]  HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate
Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned
by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by
Ellington).

HCMLP any consideration for advisory, administrative, and other services HCMLP provided.

Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that

were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million

in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP

employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses

to HCMLP's right to repayment.    As of January 8, 2021, approximately $6.1 million in

principal and interest was due and owing to HCMLP on HCRE notes.

126.    As explained above, Dondero also used HCMLP to support the growth of

lifeboats like NexPoint and HCMFA.    Additionally, in December 2010, certain preferred

tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a

portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman

Islands entity then owned and controlled by a Dondero trust.  CLO Holdco purported to pay

approximately $39 million in return, but $33 million of that amount consisted of a note that was

never repaid.  The value of these preferred securities predictably skyrocketed soon thereafter,

and generated substantial income that was used to benefit Dondero's lifeboats.  An analysis of

CLO Holdco's cash flows over time demonstrates that income generated from these assets was

used to seed a variety of NexPoint-managed funds and entities, HCMFA-managed funds and

entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than

accruing in favor of HCMLP or its subsidiaries.

127.    Dondero used HCMLP's funds to support other entities in his web as well.  In

or around 2013, HCM AG entered into a joint venture with a Brazilian entity named Brasilinvest

Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a

Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland

Capital Brasil Gestora de Recursos).  With Dondero's approval, HCM AG acquired Brasilinvest

Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016.

However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or

Dugaboy.

128.    Dondero did not bother to distinguish between himself and HCMLP.  After

Dondero was removed as HCMLP's Chief Executive Officer and President in January 2020, he

continued using his HCMLP email account and continued working out of HCMLP's

headquarters until his forced resignation in October 2020 and removal from HCMLP's premises

in December 2020.  When the Court entered an order restraining Dondero from communicating

with HCMLP employees, Dondero flouted the order, including by communicating with

Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-

related document production requests, even though those documents were always kept on

HCMLP's computer system.  Likewise, a temporary restraining order entered by this Court

prohibited Dondero from participating in, or encouraging others to participate in, any action

that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery

("Seery"), regarding the disposition of HCMLP assets.  Nevertheless, Dondero did so multiple

times, including by contacting various employees and instructing them to act in a manner that

was inconsistent with Seery's directions.

129.    Dondero evinced no respect for HCMLP as an entity separate and apart from

himself.  Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant

data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to

pursue claims benefitting HCMLP.  In addition, Dondero interfered with document productions

of HCMLP and trespassed on HCMLP's property.

I.    **Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP**

    1.    **Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities**

130.    Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves.  As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

(a)    The Fraudulent CLO Holdco Transaction

131.    On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets valued by the company at approximately $24 million through a series of related assignments (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

132.    Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach.  Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction.  Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation.  Accordingly, Dondero caused Get Good

to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did.  Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco.  The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

133.    The Transferred CLO Holdco Assets consisted of:   (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer HCMLP valued at $12,625,395.44 (the "Crusader Interests").  The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.  Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

134.    Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note.  While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets.  The interest rate on the Dugaboy Note was a paltry 2.75%.  There was no security interest provided

in respect of the Dugaboy Note or other material covenants or lender protections other than

rights to cost of collections. No payments of principal or interest were required on the note

until 2036. And because Dugaboy was a completely private and opaque counterparty, there

was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk

perspective, Dondero's control over the repayment of a note clearly does not ensure timely

repayment without litigation, as evidenced by the several entities controlled by Dondero that

are currently seeking to evade their unambiguous payment obligations on other notes owed to

HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between

Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or

otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

135.    Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at

Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas

Foundation in his capacity as trustee of Get Good. Dondero and Scott caused the Highland

Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by

unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as

the directors of Highland Dallas Foundation. Following that transfer, through an omnibus

assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco

Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP

issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco,

contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this

document as managing member of DAF GP. As purported consideration for these transfers,

the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully

bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the

requisite consent documents on behalf of each entity, in his capacities as director of DAF

Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and

belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good,

DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without

performing any independent analysis.

136.   The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**



(b)   <u>Fraudulent Distributions</u>

137.   Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars

in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between

2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the

detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was

insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and

were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

138.    Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions.  Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through certain trusts.  Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests.  As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand.  The distributions made after February 28, 2015, were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

139.    Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2.  As such, the distributions made to Okada between April 9, 2010, and February 28, 2015, (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2.  The distributions to Okada made after February 28, 2015, were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

140.    On or around April 9, 2010, HCMLP made distributions to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and

$405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").[32]

141.    On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

142.    On or around May 2, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 2, 2011 Distributions").

143.    On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

144.    On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

145.    On or around February 22, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 22, 2012 Distributions").

146.    On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

---

[32] Plaintiff's original Complaint referred to the distributions as being made on or around the dates reflected on HCMLP's general ledger. Plaintiffs have now located the bank transfer statements for each distribution, and use the bank transfer date instead. The distributions being challenged, however, have not changed.

147.   On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

148.   On or around April 9, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 9, 2013 Distributions").

149.   On or around December 19, 2016, HCMLP made distributions to Hunter Mountain,[33] Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 19, 2016 Distributions").

150.   On or around January 5, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2,[34] in the amounts of $5,401, $1,087, and $466, respectively (the "January 5, 2017 Distributions").

---

[33]   In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

[34]   At the time of the December 19, 2016 distributions and thereafter, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children and siblings held economic interests in HCMLP. HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

151.    On or around February 7, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 7, 2017 Distributions").

152.    On or around June 15, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 15, 2017 Distributions").

153.    On or around December 21, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 21, 2017 Distributions").

154.    On or around March 9, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 9, 2018 Distributions").

155.    On or around December 19, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 19, 2018 Distributions").

156.    On or around March 28, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55,

62

and $156.66, respectively (the "March 28, 2019 Distributions,"  and together with the April 9,

2010 Distributions, April 13, 2011 Distributions, May 2, 2011 Distributions, September 13,

2011 Distributions, November 25, 2011 Distributions, February 22, 2012 Distributions,

February 29, 2021 Distributions, April 10, 2012 Distributions, April 9, 2013 Distributions,

December 19, 2016 Distributions, January 5, 2017 Distributions, February 7, 2017

Distributions, June 15, 2017 Distributions, December 21, 2017 Distributions, March 9, 2018

Distributions, December 19, 2018 Distributions, March 28, 2019 Distributions, the "HCMLP

Distributions").

157.    All of these distributions were made at a time when HCMLP was insolvent and

as part of a scheme to transfer HCMLP's value to Dondero and Okada and divert value away

from HCMLP's current and potential future creditors.  The March 28, 2019 Distributions, which

were made shortly after the arbitration panel awarded the Redeemer Committee over $190

million, were the final distributions made by HCMLP.  The distributions ceased at that time—

the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-

long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c)    Fraudulent Transfers To Massand

158.    HCMLP also made payments of at least $519,000 per year to Massand Capital

from November 2014 through 2019.  On January 1, 2014, HCMLP entered into a one-year

consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand

Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell

phone expenses, and other "reasonable" expenses.  Then, on January 5, 2015, HCMLP entered

into a consulting agreement (together, the "Massand Consulting Agreements") on the same

terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per

month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses.  In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

159.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP.  Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

160.    The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman.  Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

161.    Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington.  The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[35]  As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

---

[35]    In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

162.     Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

**J.     Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

163.     HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona. Net of costs and expenses in connection with the transaction, HE Capital 232 was due $8,687,245.15. These proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

164.     On March 2, 2018, Ellington directed Wick Phillips to disburse from the escrow account $4,510,000 to HCMLP and $1,200,000 to an HCMLP managed fund to pay down mezzanine debt. This left $2,977,245.15 in the escrow account that was due and owing to HCMLP. On information and belief, Dondero and Ellington directed Wick Phillips to keep these funds in the escrow account so that they could funnel the money to themselves. For three months, Wick Phillips requested disbursement instructions for the remaining funds from Ellington, but Ellington demurred while "waiting for answers from others so can tell you where to send." Upon information and belief, during this period, Ellington and Dondero were determining how to direct the funds to themselves.

165.    On June 4, 2018, Ellington dropped HCMLP's Managing Director (Real Estate) from an email chain and directed Wick Phillips to disburse the remainder to an account in the name of MaplesFS—a fiduciary services company in the Cayman Islands acting as a payment agent—for further credit to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.  MaplesFS subsequently transferred the full amount to Grey Royale Ltd.  A Wick Phillips employee commented that the payment to Grey Royale Ltd. was "pretty suspicious."

166.    In September 2019, in connection with the preparation of HE Capital 232's tax return, HCMLP's Tax Director inquired about the missing funds owed to HCMLP as a result of the Arizona property sale.  Ellington responded that the "facts as I know them" were that the approximately $3 million in missing HCMLP funds were "additional cost[s] of sale, reducing the gain," and "used to pay various legal expenses and other closing costs."  Ellington did not disclose that he had directed that the funds be paid to a Cayman Islands shell company owned by Dondero and Ellington, which had no role in the real estate transaction and was not owed any legal expenses or closing costs.

167.    Neither Dondero, Ellington, nor Grey Royale Ltd. were parties to the escrow agreement or had any legal claim to the proceeds of the real estate sale held by the escrow agent.

### K.    Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction

168.    HCMLP employees other than Dondero also engaged in, and improperly benefited from, self-interested transactions and schemes involving HCMLP.

169.    In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank,

DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement").  The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington and Leventon, loyal to Dondero during the bankruptcy. Through the Tall Pine scheme, Ellington and Leventon ensured that they would profit off their wrongdoing, and that Dondero would compensate them no matter what happened to HCMLP.

170.    Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington and Leventon, would receive approximately $17 million through pass-through entities that they created and owned over the course of two years.  When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Leventon's pass-through entity, Clairmont Holdings, LLC ("Clairmont").  Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and other pass-through entities controlled by HCMLP employees.

171.    After the Petition Date, Dondero surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon.  These payments were made to compensate Ellington and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Ellington and Leventon did not disclose these payments to the Independent Board.

## V.    CAUSES OF ACTION

### COUNT I
**Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

172.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

173.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured

creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

174.    As set forth below, HCMLP made the following HCMLP Distributions to or for

the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | | | | $107,429,122.12 | | | |

175.    At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

176.    HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above.  Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

69

177.    Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith.  To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due.  Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities.  Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

178.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

179.    Each HCMLP Distribution is voidable as a constructively fraudulent transfer.  Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**
**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

180.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

181.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

182.    As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

71

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

183.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder.  Okada was HCMLP's Co-Chief Investment Officer and Co-Founder.  Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners.  Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

184.    To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

72

(a)     Dondero and Okada were insiders of HCMLP;

(b)     before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d)     HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e)     at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f)     The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g)     Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h)     Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming

73

contingent liabilities, and effected the transfers in order to siphon value so

that such value would not be available to satisfy HCMLP's creditors.

185.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of

distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of

such distributions to them.

186.    Each HCMLP Distribution is voidable as an intentionally fraudulent transfer.

Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered

under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable,

against all initial and subsequent transferees and/or entities for whose benefit the transfers were

made.

## COUNT III
**Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act**
*(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

187.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

188.    The Delaware Revised Uniform Limited Partnership Act ("<u>DRULPA</u>") § 17-

607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect

to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets

of the limited partnership[.]"

189.    Under 17-607(b), "[a] limited partner who receives a distribution in violation of

subsection (a) … and  who knew at the time of the distribution that the distribution violated

subsection (a) of this section, shall be liable to the limited partnership for the amount of the

distribution."

190.    As set forth below, between December 31, 2016 and the Petition Date, HCMLP

made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal

Distributions").

|  | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |
| Grand Total | | $34,583,651.57 | |

191.    Hunter Mountain, Dugaboy, and Strand knew that HCMLP made the Illegal

Distributions at a time that its liabilities exceeded the fair value of its assets.  As set forth herein

and in the counts below, each of Hunter Mountain, Dugaboy, and Strand were the alter egos of

Dondero.  Even if Hunter Mountain, Dugaboy, or Strand were not the alter egos of Dondero,

they would be imputed with Dondero's knowledge.  Dondero was the sole owner of Strand.

Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to

purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy

trust (among others).  Through Hunter Mountain, Dondero continued to receive the economic

75

benefit of HCMLP's limited partnership distributions through distributions on notes that would

be triggered by those Illegal Distributions made to Hunter Mountain.

192.    Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors

for the full amount of the Illegal Distributions, plus interest.

### COUNT IV
**Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme**
*(Against Dondero and Strand)*

193.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

194.    During all periods relevant to the allegations set forth herein, Strand owed

fiduciary duties to HCMLP in its capacity as HCMLP's general partner.  Likewise, during all

periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP

by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

195.    Neither the Litigation Trustee nor the Estate could have discovered the conduct

by Dondero or Strand set out herein with reasonable diligence prior to Dondero's removal as

Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given

Strand's and Dondero's fiduciary obligations, neither the Estate nor the Litigation Trustee  was

able to inquire or was aware of the need to inquire into the breaches set out herein prior to

Dondero's removal.   By their nature, the breaches alleged herein were inherently

undiscoverable because of the complete domination and control that Dondero exercised over

HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of

the corporate structure he created and wielded for his own benefit. Dondero and Strand

transferred HCMLP's valuable business to the lifeboat entities, including but not limited to

NexPoint and HCMFA.  Pursuant to the scheme, the lifeboats utilized HCMLP's employees to

76

perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly. As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services. The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

196.    Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

197.    Strand was dominated and controlled by its sole owner, Dondero. Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled. As such, Dondero appeared on both sides of the agreements and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

198.    The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date. Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

199.    HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared

services and other agreements.   Between the date of its formation and the Petition Date,

NexPoint earned approximately $120 million in advisory and administrative fees and

approximately $50 million in profits.   Between the date of its formation and the Petition Date,

HCMFA earned approximately $150 million in advisory and administrative fees.

200.    Strand and Dondero profited from their breaches of fiduciary duties in

connection with their lifeboat scheme in violation of Delaware law.   Strand and Dondero are

liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in

an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities To**
**Third Parties**
*(Against Dondero, Strand, Ellington, and Leventon)*

201.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

202.     During all periods relevant to the allegations set forth herein:  (1) Strand owed

fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed

fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer

of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief

Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his

capacity as HCMLP's Assistant General Counsel.

203.    Neither the Litigation Trustee nor the Estate could have discovered the conduct

by Dondero, Strand, Ellington, or Leventon set out herein with reasonable diligence prior to

Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.

Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the

Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into

78

the breaches set out herein prior to Dondero's removal.  By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

204.    Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP.  In total, these breaches resulted in more than $350 million in allowed claims against HCMLP.  But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts.  These breaches resulted in millions of dollars to Dondero, Ellington, and Leventon, either directly, through transfers from HCMLP to entities owned in whole or in part by Dondero and Ellington, or indirectly, through compensation paid to Ellington and Leventon in exchange for their loyalty to Dondero in perpetrating schemes that breached their duties to HCMLP.

205.    **Liabilities to UBS.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS.  Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion.  Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

206.    Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial,

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate the surreptitious transfer of assets worth at least $100 million to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington.  Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

207.    After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court.  Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

208.    **Liabilities to Acis.**  Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry.  As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP.  When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

209.    Dondero then embarked on a crusade to ensure Terry would not collect from Acis.  In connection therewith, Dondero acted through HCMLP to, among other things:  (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis

and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

210.    In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

211.    Beginning on October 24, 2017, four days after Terry's arbitration judgment was issued, Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award.  Ellington and Leventon implemented Dondero's directives and took the steps necessary to consummate the transactions.

212.    Leventon willfully and wantonly helped to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP,

which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award.  The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role.  Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

213.   **Liabilities to HarbourVest.**  Dondero and Ellington also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest.  Dondero and Ellington, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash.  Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP.  But for Dondero's and Ellington's conduct, HCMLP would not have incurred the foregoing liabilities.  As a result of their conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

214.   **Liabilities to Crusader Funds.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to their conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.  Among other things, Dondero, Ellington, and Leventon caused HCMLP to:  (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely.  Both Ellington and Leventon provided false narratives and misrepresentations in furtherance of Dondero's harm to the Crusader Funds.  The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated."   As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

215.   Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Ellington,

Leventon and Strand.  For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy.  As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

216.    In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

**COUNT VI**
**Declaratory Judgment That Strand Is Liable For HCMLP's Debts**
**In Its Capacity As HCMLP's General Partner**
*(Against Strand)*

217.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218.    Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners."  Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners."  *Id.*

219.    Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

220.    During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP.  Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

221.    Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

## COUNT VII
### Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego
*(Against Dondero)*

222.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

223.    Between the formation of Strand and the Petition Date, Dondero, Strand's sole equity owner, dominated and controlled Strand such that Dondero and Strand operated as a single economic entity.  Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action.  Between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

224.    Dondero was the only officer of Strand between 1993 and 2001.  Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero.  Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance."  Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

225.    Strand did not observe corporate formalities.  Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting.  Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

226.    Strand did not comply with its own bylaws, which require annual meetings of stockholders.

227.    Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero could dominate and control HCMLP.  Dondero used this abuse of the corporate form to facilitate his scheme to make HCMLP act contrary to its own interests and in favor of Dondero's interests by insulating assets from HCMLP's creditors, including those whose liabilities were the direct result of Dondero's own wrongdoing.  As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

## COUNT VIII
### Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts In Their Capacities As HCMLP's Alter Ego
*(Against Dondero and Strand)*

228.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

229.    Dondero, using his alter ego Strand, dominated and exercised total control over HCMLP through the Petition Date, such that Dondero, Strand, and HCMLP operated as a single economic entity.  Dondero had total decision-making authority and governed HCMLP by decree—using the lack of an independent Strand to render HCMLP a mere instrumentality of Dondero.  HCMLP had no independence and could not exercise any business discretion separate

and apart from Dondero, in service of his personal interests and the interests of his integrated web of entities.

230.    Strand, like innumerable entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

231.    Dondero failed to observe corporate formalities with regard to HCMLP.  Indeed, he did not distinguish between HCMLP and his personal interests and businesses.  Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP.  For example, Dondero caused HCMLP to employ individuals to carry out roles serving Dondero personally.  Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

232.    Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

233.    Dondero siphoned value from HCMLP to other entities he owned and controlled by causing HCMLP's employees and resources to be used for his lifeboat businesses.  In connection with this fraudulent scheme to move assets out of the reach of HCMLP's creditors, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates.  In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees.  The purpose and effect of this scheme was to cause HCMLP to provide the employees and

infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

234.    Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero, through benefits conferred to entities he owned other than HCMLP.

235.    Dondero used his abusive domination and control to cause HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

236.    By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own obligations rendered HCMLP insolvent, including by resulting in multiple adverse awards such as the $190 million arbitration award that caused HCMLP to file for bankruptcy.

237.    Dondero further abused the corporate form to siphon assets from HCMLP by orchestrating intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer assets valued by the company at approximately $24 million through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

238.   Because Dondero operated Strand and HCMLP as a single economic entity and used that domination to defraud HCMLP's creditors, Dondero and Strand are the alter egos of HCMLP and should be held liable for the full amount of HCMLP's obligations.

**COUNT IX**
**Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero and HCMLP In Its Capacity As Dondero's Alter Ego**
*(Against Dugaboy)*

239.   Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240.   Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and his alter ego HCMLP.  Dondero treated himself, Dugaboy, and HCMLP as a single economic entity.  Dondero dominated and controlled Dugaboy.  Under the terms of Dugaboy's trust agreement, Dondero has the power to remove trustees without cause—leverage that allowed him to control Dugaboy.  Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

241.   Dondero treated Dugaboy as a vehicle for his own interests.  For example, Dondero caused Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Dondero's sister, Nancy Dondero, allegedly caused HCMLP to enter into an agreement whereby the notes owed to HCMLP by various Dondero Entities would be forgiven as compensation to Dondero upon satisfaction of certain conditions subsequent.  Dondero also caused Dugaboy to help facilitate HCMLP's transfer of the Transferred CLO Holdco Assets to Get Good, by agreeing to provide the Dugaboy Note, purportedly but not actually equal to the value of the Transferred CLO Holdco Assets and with a paltry 2.75% interest rate and no security, covenants, lender protections provided to Dugaboy, or payments due until 2036.

89

242.    Dondero disregarded corporate formalities between Dugaboy and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP.  Dondero used HCMLP employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data.  Dugaboy shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

243.    With Dondero as the primary beneficiary of Dugaboy, there are no other innocent shareholders whose expectations could be impaired by holding Dugaboy liable for Dondero or HCMLP's debts.  There are no innocent third-party creditors of Dugaboy who would be harmed by holding Dugaboy liable for Dondero's or HCMLP's debts.

244.    Dugaboy is the alter ego of Dondero, and the Court should hold Dugaboy liable for Dondero's debts.  Because Dondero is also HCMLP's alter ego, and because Dugaboy knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, Dugaboy is also the alter ego of HCMLP and the Court should hold Dugaboy liable for the debts of HCMLP.

## COUNT X
### Declaratory Judgment That NexPoint Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Egos
#### *(Against NexPoint)*

245.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

246.    Dondero dominated and controlled NexPoint such that Dondero, NexPoint, and Dondero's alter ego HCMLP operated as a single economic entity.  NexPoint is owned and controlled by Dondero through Dugaboy and NexPoint GP.

90

247.    NexPoint knowingly participated in—and played a core role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating NexPoint as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled.  Dondero and NexPoint acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

248.    Dondero disregarded the corporate formalities and the distinctions between himself, NexPoint, and HCMLP.  Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP.  NexPoint shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.  NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.  Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

249.    For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees.  Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

250.    Dondero used NexPoint as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its

owner, Dugaboy.   Transferring funds from HCMLP to NexPoint funded distributions by NexPoint to Dondero's alter ego Dugaboy, draining HCMLP's value to Dondero with NexPoint's knowledge and participation.   Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.

251.    Dondero and NexPoint worked together to further extract value from HCMLP by causing HCMLP to lend to NexPoint on terms entirely determined by Dondero.   Dondero further caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief.   As of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero and NexPoint following a payment default that occurred January 2021.

252.    There are no other innocent shareholders whose expectations could be impaired by holding NexPoint liable for Dondero or HCMLP's debts.   Similarly, there are no innocent third-party creditors of NexPoint who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

253.    NexPoint is the alter ego of Dondero and the Court should hold NexPoint liable for the debts of its ultimate shareholder Dondero.   Because Dondero is also HCMLP's alter ego, and because NexPoint knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, NexPoint is also alter ego of HCMLP and the Court should hold NexPoint liable for the debts of HCMLP.

## COUNT XI
### Declaratory Judgment That HCMFA Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Ego
*(Against HCMFA)*

254.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

255.    Dondero dominated and controlled HCMFA such that Dondero, HCMFA, and Dondero's alter ego HCMLP operated as a single economic entity.  HCMFA is controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which owns a 1% interest in HCMFA and is wholly-owned by Dondero.  Dondero and Okada are the ultimate owners of the remaining stakes in HCMFA:  HCMS owns an 89.6667% ownership interest in HCMFA, and is itself owned 75% by Dondero and 25% by Okada; the Okada Family Revocable Trust owns the remaining 9.3333% ownership interest in HCMFA.  Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

256.    HCMFA knowingly participated in—and played a key role in accomplishing— Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating HCMFA as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero directly or indirectly through other entities he controlled.  Dondero and HCMFA acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

257.    Dondero disregarded the corporate formalities and the distinctions between HCMFA and HCMLP.  HCMFA was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.  Strand Advisors XVI, Inc., HCMFA's general partner, purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.  HCMFA shared its

93

principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

258.    HCMFA was effectively a shell entity created to replace HCMLP as the new investment manager for open-ended retail investment funds.  Agreements between HCMLP and HCMFA were structured to ensure that HCMFA retained the vast majority of profits for the work performed by HCMLP and its employees.  To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

259.    Dondero used HCMFA as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to use its resources to support HCMFA.  Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million; Dondero caused HCMLP to enter into multiple forbearances on HCMFA's debts.  In May 2019, HCMLP loaned HCMFA an additional $7.4 million, and HCMFA again failed to repay.  Dondero exerted his control and dominance of these entities to direct both sides of those agreements, with the knowing participation of HCMFA, to accomplish his own ultimate goal of siphoning value from HCMLP to insulate it from creditors.

260.    There are no other innocent shareholders whose expectations could be impaired by holding HCMFA liable for Dondero or HCMLP's debts.  Similarly, there are no innocent third-party creditors of HCMFA who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

261.    HCMFA is the alter ego of Dondero and the Court should hold HCMFA liable for Dondero's debts.  Because Dondero is also HCMLP's alter ego, and because HCMFA

knowingly participated in Dondero's scheme to abuse of the corporate form to defraud creditors, HCMFA is also the alter ego of HCMLP and the Court should hold HCMFA liable for the debts of HCMLP.

### COUNT XII
### Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law
### *(Against HCMFA and NexPoint)*

262.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

263.    On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

264.    On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds").  Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

265.    HCMLP received less than reasonably equivalent value in connection with the novation agreement.  Prior to the transfer, HCMLP received management and advisory fees in return for the services that its employees performed for the Transferred Funds.  After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

266.    At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

267.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

268.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds (the fair market value of which likely exceeded $25 million at the time of transfer) is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XIII
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

269.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

270.    On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.  On December 15, 2011, HCMLP entered into

a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

271. Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and HCMFA;

(b) before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d) at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

(f)    HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

272.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

273.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XIV
### Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes
*(Against Dondero, Strand, Ellington, and Okada)*

274.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

275.    During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP'S Chief Legal Officer and General Counsel; and (4) Okada owed fiduciary duties to HCMLP in his capacity as Chief Investment Officer.

276.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

277.    Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned. Likewise, Dondero and Ellington oversaw and approved the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

278.    Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

279.   Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

280.   As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including, but not limited to, the distributions made to Okada, MAP #1, and MAP #2—were made at  times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

281.   By willfully and wantonly not returning the distributions made to Okada, MAP #1, and MAP #2 that were made at times that Okada knew that HCMLP was insolvent, and knowingly permitting unlawful distributions to Dondero and his controlled entities, Okada breached his fiduciary duties to HCMLP.

282.   Dondero and Okada further breached their fiduciary duties by using HCMLP employees for their own personal affairs and private business interests, on HCMLP's time and payroll.

283.   Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

284.   By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

## COUNT XV
### Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco,*
*DAF Holdco, DAF, Get Good, Highland Dallas)*

285.   Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

286.   NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand.  NexPoint and HCMFA were each dominated and controlled by Dondero.  As such, each of NexPoint and HCMFA knowingly participated in their breaches of their fiduciary duties to HCMLP.  NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

287.   SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers.  SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers.  SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP.  The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

288.   Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—

knowingly participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

289.    Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

## COUNT XVI
### Civil Conspiracy to Breach Fiduciary Duties Under Texas Law
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

290.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

291.    Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF

Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary

duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's

creditors. To effectuate the conspiracy, Dondero, Ellington, and Leventon acted outside the

scope of their HCMLP employments, as agents of the non-HCMLP entities they owned and

controlled, and for their personal benefits.

292.    Neither the Litigation Trustee nor the Estate could have discovered the conduct

set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer

and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed

to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the

need to inquire into the breaches set out herein prior to Dondero's removal.  By its nature, the

conspiracy alleged herein was inherently undiscoverable because of the complete domination

and control that Dondero exercised over HCMLP and the Dondero Entities, including but not

limited to the complexity and opacity of the corporate structure he created and wielded for his

own benefit.

293.    Dondero, Ellington, and Leventon orchestrated myriad transactions to divert

funds from HCMLP to Dondero and the entities that he owned and controlled, as well as to

Ellington, Leventon, and the entities they owned and controlled.  NexPoint and HCMFA took

over valuable HCMLP management agreements and used HCMLP's employees to usurp

HCMLP's business in return for little or no consideration to HCMLP.  SAS—which is owned

and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in

SAS, respectively—received valuable services from Massand while HCMLP bore the expense.

Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the

fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

294.    Ellington and Leventon understood that their conduct was directed at enriching themselves and Dondero at the expense of HCMLP, and each of them were compensated in excess of their HCMLP salaries by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation.   NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities.   Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

295.    In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

      (a)    Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties.   NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate

HCMLP for the use of its employees and resources.  NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b)    Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled.  Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from the Massand Consulting Agreements while HCMLP incurred the costs under those agreements.  Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c)    Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO Holdco for less than reasonably equivalent value.  Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas— consciously participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.  Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a

105

fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

(d)     Ellington and Dondero conspired to disburse to a Cayman Islands shell company they owned and controlled nearly $3 million of escrowed proceeds rightfully owing to HCMLP.

(e)     In furtherance of the conspiracy and to maintain loyalty to Dondero, Ellington and Leventon accepted benefits like minority ownership in entities (like Ellington's stake in SAS) and additional compensation via complex, circuitous schemes like the Tall Pine arrangement.

296.    Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions.  The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

### COUNT XVII
**Tortious Interference with Prospective Business Relations**
*(Against Dondero, NexPoint, and HCMFA)*

297.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

298.    Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero.  The "lifeboats," which included

NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

299.     But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

300.     By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP.  In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA.  NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

301.     Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by NexPoint and HCMFA.  Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

302.     HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

## COUNT XVIII
### Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

303.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

304.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

305.    On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were valued by the company at approximately $24 million.  The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

306.    As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

307.    Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

308.    Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

309.    Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco.  Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco.  Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

310.    Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction.  Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

311.    At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

312.   None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

313.   At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

314.   The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIX**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

315.   Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

316.   On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

110

317.    On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which the company valued at approximately $24 million.  The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

318.    As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

319.    After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco.  Dondero effected each transfer through his direct or indirect control of each of these entities.

320.    Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP;

(b)    Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c)    before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d)    at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were

111

unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)     The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f)     The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

321.    None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

322.    At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

323.    The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively**
**Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

112

324. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

325. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

326. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

327. HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value). Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

328. At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

329. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

113

## COUNT XXI
### Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law
*(Against Massand Capital)*

330.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

331.     On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

332.     On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc.  On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

333.     Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     Dondero was an insider of HCMLP;

(b)     Dondero was an insider of SAS;

(c)     Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d)     before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

114

(e)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f)     at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g)     Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

334.     HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

## COUNT XXII
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

335.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336.     On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

337.    HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant

to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The

transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

338.    HCMLP did not receive any consideration in exchange for its payments to Massand Capital.  The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

339.    Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero.  As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

340.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

341.    At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

342.    The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXIII
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under
11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

343.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

117

344.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured

creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

345.    On January 5, 2015, HCMLP entered into a fraudulent consulting agreement,

pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per

month.  The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth

below:

| Date | Amount | Date | Amount |
| --- | --- | --- | --- |
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |

| Date | Amount | Date | Amount |
|---|---|---|---|
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

346. Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP and Massand Capital;

(b)    before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d)    at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

119

(f)    The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

347.    The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XXIV
### Breach of Contract Arising Out of Hunter Mountain Note
*(Against Hunter Mountain and Rand)*

348.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

349.    On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

350.    Rand is a guarantor on the Hunter Mountain Note.

351.    Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

352.    Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

353.    On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain

Note are immediately due and payable.  As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

354.    The Hunter Mountain Note is currently in default.  Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

## COUNT XXV
### Conversion
*(Against Dondero and Ellington)*

355.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

356.    In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

357.    On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account.  The Remaining HE Capital 232 Proceeds, worth approximately $2.98 million, were never disbursed to HCMLP.

358.    HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

359.    The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

121

360.    Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands.  Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to MapleFS, a fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

361.    Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

## COUNT XXVI
### Unjust Enrichment or Money Had and Received
*(Against Dondero)*

362.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

363.    As set forth above, Dondero caused HCMLP to enter into numerous intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits.  Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

364.    Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP.  Dondero orchestrated countless transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to:  (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and

controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP's money to seed business activities and investments that would inure to his own personal benefit. Dondero diverted millions or tens of millions of dollars to himself, at HCMLP's expense.

365.    Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

366.    Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

367.    Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

368.    There was no valid express contract governing the subject matter of this dispute.

369.    As a result of fraud, duress, or taking undue advantage of his own position of authority within HCMLP, Dondero holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched him and would be unconscionable to retain.

370.    Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

## COUNT XXVII
## Unjust Enrichment or Money Had and Received
### *(Against Ellington and Leventon)*

371.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

372.    Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation.  However, each of them understood and performed their duties as functionaries for Dondero.  As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP.  Portions of Ellington's and Leventon's compensation, paid for by HCMLP, was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

373.    Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

374.    Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP.  Among other things, Ellington and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

375.    There was no valid express contract governing the subject matter of this dispute.

376.    As a result of fraud, duress, or taking undue advantage of their own positions of authority within HCMLP, Ellington and Leventon hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

377.    Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXVIII
### Unjust Enrichment or Money Had and Received
*(Against NexPoint and HCMFA)*

378.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379.    The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

380.    HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of below-market note agreements.  Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

381.    NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

382.    Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

383.    There was no valid express contract governing the subject matter of this dispute.

384.    As a result of fraud, duress, or taking undue advantage of HCMLP, NexPoint and HCMFA hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

385.    Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXIX
### Unjust Enrichment or Money Had and Received
*(Against Massand Capital and SAS)*

386.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

387.    Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements.  Nevertheless, Massand Capital was aware that it would not and never intended to perform any services on behalf of HCMLP.  Rather, Massand Capital was performing services on behalf of SAS, with HCMLP footing the bill.  HCMLP received no benefit under the Massand Consulting Agreements.

388.    Further, the value of the services provided to SAS were far less than HCMLP's payments, resulting in Massand receiving unearned profits to the tune of millions of dollars.

389.    HCMLP employees performed work for SAS.  Indeed, at least four HCMLP employees even received SAS email addresses.  SAS did not compensate HCMLP for these services.

390.    SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

391.    There was no valid express contract governing the subject matter of this dispute.

126

392.    As a result of fraud, duress, or taking undue advantage of HCMLP, Massand and

SAS hold or have held money that in equity and good conscience belongs to HCMLP, which

unjustly enriched them and would be unconscionable to retain.

393.    Plaintiff seeks restitution from Massand Capital and SAS and an order from this

Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of

value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXX
### Unjust Enrichment or Money Had and Received
*(Against CLO Holdco)*

394.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

395.    Dondero, acting through HCMLP, fraudulently induced HarbourVest to

purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an

additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest.

HCMLP received no benefit from the HarbourVest investment.  Nevertheless, HarbourVest

filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment,

and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80

million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a

new entity designated by HCMLP.  As a result of Dondero's conduct, however, the HCLOF

interests were then worth significantly less than the face amount of HarbourVest's allowed

claim. HCMLP bore the consequences for Dondero and CLO Holdco in a scheme that deposited

$75 million into the coffers of CLO Holdco.

396.    CLO Holdco was aware that HarbourVest was fraudulently induced by Dondero

to make the $75 million investment. Nonetheless, CLO Holdco said nothing to HarbourVest

and received their money, all while leaving HCMLP on the hook when HarbourVest ultimately filed their proof of claim.

397.    There was no valid express contract governing the subject matter of this dispute.

398.    As a result of fraud, duress, or taking undue advantage of HCMLP, CLO Holdco holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched it and would be unconscionable to retain

399.    Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

## COUNT XXXI
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*(Against Dondero and Ellington)*

400.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

401.    Dondero and Ellington are insiders of HCMLP.

402.    As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,753,911 and payments to Ellington of $318,893 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |

| November 15, 2018 | Dondero | $65,078 |
|---|---|---|
| December 14, 2018 | Dondero | $115,481 |
| January 15, 2019 | Dondero | $96,786 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| May 15, 2019 | Dondero | $89,257 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| July 15, 2019 | Dondero | $47,006 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| October 15, 2019 | Dondero | $32,977 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,753,911 |
| Total | Ellington | $318,893 |
| Grant Total | | $5,072,804 |

403.    The One-Year Transfers were made on account of antecedent debt.

404.    HCMLP was insolvent when each One-Year Transfer was made.

405.    Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

406.    Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

129

407.    Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550

that each of the One-Year Transfers is avoided and recoverable.

## COUNT XXXII
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent
Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

408.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

409.    To the extent the Alleged Expense Transfers do not constitute reimbursement

for valid expenses, they constitute constructive fraudulent transfers that were made to or for the

benefit of Dondero and Ellington.

410.    At the time of each Alleged Expense Transfer, HCMLP was insolvent, was

engaged or was about to engage in business or a transaction for which the remaining assets of

HCMLP were unreasonably small in relation to the business or transaction, and/or believed or

reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to

pay as they became due.

411.    HCMLP received less than reasonably equivalent value in exchange for each of

the Alleged Expense Transfers.  Indeed, HCMLP received no value for the Alleged Expense

Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero

and Ellington.

412.    Each Alleged Expense Transfer is voidable as a constructively fraudulent

transfer.  Accordingly, each Alleged Expense Transfer should be set aside, avoided, and

recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

130

against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XXXIII
### Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law
*(Against Dondero and Ellington)*

413.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

414.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

415.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.   Dondero exercised complete control over HCMLP, and Ellington acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

416.    To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     Dondero and Ellington were insiders of HCMLP;

(b)     although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

131

(c)     before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f)     HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g)     at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h)     Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to

132

siphon value so that such value would not be available to satisfy HCMLP's

creditors.

417.    Each Alleged Expense Transfer is voidable as an intentionally fraudulent

transfer.  Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and

recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

against all initial and subsequent transferees and/or entities for whose benefit the transfers were

made.

### COUNT XXXIV
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing
Participation in Breach of Fiduciary Duty under Texas Law Out Of Conduct That
Resulted in HCMLP Liabilities**
*(Against Ellington and Leventon)*

418.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

419.    Ellington and Leventon aided and abetted the breaches of fiduciary duty

committed by Dondero and Strand that foreseeably resulted in liability to HCMLP.  Ellington

and Leventon knowingly participated in Dondero's schemes that foreseeably resulted in liability

to HCMLP.  In total, these breaches that were aided and abetted by Ellington and Leventon

resulted in more than $350 million in allowed claims against HCMLP.

420.    Neither the Litigation Trustee nor the Estate could have discovered the conduct

by Ellington and Leventon set out herein with reasonable diligence prior to Dondero's removal

as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the

fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to

inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's

removal.  By its nature, the conduct alleged herein was inherently undiscoverable because of

the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

421.    **Liabilities to UBS.**    Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to UBS.  In 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Ellington and Leventon aided Dondero in causing HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington, ostensibly to pay a premium on the Sentinel insurance policy that was only $25 million.  Ellington and Leventon knew or willfully blinded themselves to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the transfer to Sentinel

422.    After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court.  When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

423.    **Liabilities to Acis.**    After the Terry arbitration award issued, Ellington and Leventon aided and abetted Dondero in causing HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took necessary steps to

consummate the transactions, knowingly or willfully blinding themselves to the fact that Dondero breached his fiduciary duties to HCMLP by stripping Acis of assets.

424.    Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement, approved by Dondero in a breach of his fiduciary duty, that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award.  The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role.  Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets and a breach of Dondero's fiduciary duty, which ultimately resulted in millions of dollars of damage to HCMLP.

425.    **Liabilities to HarbourVest.**  Ellington also aided and abetted Dondero in causing harm to HCMLP by exposing it to substantial liability to HarbourVest.  Ellington aided Dondero, acting through HCMLP, in fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment.  In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that

benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to an affiliate of HCMLP. As a result of Dondero's and Ellington's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them. Ellington either knew or willfully blinded himself to the fact that Dondero breach his fiduciary duties to HCMLP by fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash.

426.  **Liabilities to Crusader Funds.**  Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.  Among other things, Dondero, Ellington, and Leventon caused HCMLP to:  (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely.  Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance

of Dondero's harm to the Crusader Funds.  The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated."  As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.  Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero breached his duties to HCMLP through the foregoing acts.

427.   Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from Ellington's and Leventon's aiding and abetting the breaches of fiduciary duty committed by Dondero and Strand.  For example, the $190 million Redeemer arbitration award—which was itself caused by the Dondero's and Strand's breaches of their fiduciary duty to HCMLP and Ellington's and Leventon's aiding and abetting of those breaches—caused HCMLP to file for bankruptcy.  As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero and Strand breached their fiduciary duties to HCMLP through their actions that led to the $190 million Redeemer arbitration award.

428.   In light of the foregoing, Ellington and Leventon are liable for aiding and abetting Dondero's breaches of fiduciary duties to HCMLP in an amount to be determined at trial.

## COUNT XXXV
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law In Connection With Fraudulent Transfers And Schemes**
*(Against Ellington and Okada)*

429.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

430.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal.  By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

431.    Ellington aided and abetted Dondero in causing HCMLP to enter into the Massand Consulting Agreements.  Likewise, Ellington aided and abetted Dondero in overseeing and approving the Massand Transfers.  The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP.  In addition, Ellington aided and abetted Dondero in causing HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.  Ellington either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP through the foregoing actions.

138

432.    Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

433.    As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors. Okada either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by approving hundreds of millions of dollars of distributions from HCMLP at a time HCMLP was insolvent.

## COUNT XXXVI
### Disallowance or Subordination of Claims Under
### Section 502 and 510 of the Bankruptcy Code
*(Against CLO Holdco)*

434.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

435.    On April 8, 2020, CLO Holdco filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim").  The basis of the CLO Holdco Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

436.    HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme.  HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

437.    Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim.   Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request.   Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.      awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B.      setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C.      setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D.      setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E.      setting aside, avoiding, and granting recovery of the Massand Transfers;

F.      setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G.      setting aside, avoiding, and granting recovery of the One-Year Transfers;

H.      disallowing or subordinating, to the extent applicable, the CLO Holdco Claim;

I.      awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J.      awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K.      awarding Plaintiff such other and further relief as the Court deems just and proper.

141

Dated: May 19, 2022
      Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
 /s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexander J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for the Litigation Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent

via electronic mail via the Court's ECF system to parties authorized to receive electronic notice in

this case on May 19, 2022.

                                     /s/ *Paige Holden Montgomery*
                                      Paige Holden Montgomery